radio.  After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees.  Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7.      What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full-blown studio, and employing over 60 people.  By 2013, FSS started selling dietary supplements to its growing listener base.

8.      Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9.      FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.     On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11.     As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of

---

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

000150

whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.  This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13.     Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS.  The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14.     Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15.     FSS purchased to sell on its website two categories of products: (a) dietary

4

supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales.  In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.  Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company.  The fulfillment company charges FSS a flat fee per order regardless of size.  Historically, fulfillment has cost an average of ten percent of sales, without considering personnel costs, the new agreement is estimated to cost sixteen percent of sales, including personnel costs.

18.     The revenues generated from the Debtor's ongoing operations will form the basis of the subchapter v plan of reorganization the Debtor will be proposing in this case.

## C.  Critical Vendors

### i.  _Vendors Necessary under Customer Contracts_

19.     The Debtor derives substantially all of its revenue from advertising and product sales generated through its media operations.  Continuity of these operations is dependent upon payment of vendors that provide and maintain access to the Debtor's programming content.  Costs associated with the production of programming content and costs associated with purchasing

000152

product and fulfillment of customer orders is also crucial to the Debtor's ability to generate revenue.

20.     The Debtor relies on specific vendors, suppliers, and consultants to provide the Debtor with goods and services necessary for the Debtor's business to function properly and in full compliance with applicable federal and state regulations. The goods and services provided by the Debtor's vendors, suppliers, and consultants are, therefore, essential to the day-to-day operations of the Debtor's business.

21.     The Debtor's failure to pay these vendors who are critical to continuing operations would be highly detrimental if not fatal to the Debtor's ability to reorganize and pay legitimate claims of creditors.  Even if some of these vendors would be willing to provide goods or services on a cash on delivery or cash in advance basis, the acceleration of payment terms would swamp the current cash flow of the Debtor and harm the Debtor's ability to restructure its finances in this chapter 11 case for the benefit of its estate and creditors.

22.     Given the importance of the Debtor's vendors, suppliers, and consultants to the Debtor's business enterprise, the Debtor determined that it was necessary and prudent to identify the vendors, suppliers, and consultants that are most critical to the Debtor's go-forward operations (collectively, the "Critical Vendors"). After a thorough review of its business operations and diligence regarding potential alternative vendors, suppliers and consultants, the Debtor determined, in the exercise of its business judgment, that the goods and services provided by the Critical Vendors are necessary at this critical juncture to the success of this chapter 11 case, so as to avoid irreparable harm to the Debtor's business and preserve the value of the Debtor's estate.

23.     In identifying Critical Vendors, the Debtor considered the following criteria: (a) whether the vendor would be prohibitively expensive, time consuming or difficult to replace, such

as where the Debtor's existing inventory, equipment, or operations are specifically tailored to that vendor's products or services; (b) whether the vendor is a sole source or limited-source supplier of goods or services of the quality and quantity required by the Debtor, without whom the Debtor could not continue to operate without disruption; and (c) whether alternative suppliers are available and willing to provide goods and services to the Debtor.

24.     Based on the forgoing criteria, the Debtor has identified the vendors in **Schedule 1** to the attached form of Order as Critical Vendors.

25.     Failure to pay the Critical Vendors would create a significant risk of disruption to the Debtor's business and ability to generate revenue, resulting in a diminution of the Debtor's bankruptcy estate.  Many of these vendors are necessary for the Debtor to continue programming and broadcasting and supplying customers with goods and products that are in demand.  Lost revenue from even a single day of lost broadcasts is detrimental to FSS's business.

### RELIEF REQUESTED

26.     The Debtor requests entry of an order, substantially in the form of the proposed order attached hereto (the "Proposed Order"), (a) authorizing the Debtor to pay prepetition obligations owed to the Critical Vendors indicated in Schedule 1 thereto, and (b) granting related relief.

27.     The Debtor believes that payment of the Critical Vendors is vital to maximizing the value of the Debtor's estate for the benefit of all parties-in-interest.  However, the Debtor proposes to condition, in the Debtor's discretion, the payment of the Obligations upon the agreement of each Critical Vendor to continue supplying services on terms and based on practices and programs in effect between the Critical Vendor and the Debtor in the year prior to the

000154

Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtor and the Critical Vendor.

28.     The Debtor reserves the right to negotiate new trade terms with the Critical Vendor as a condition to payment of a portion of the obligations owed to each Critical Vendor (the "Obligations").  Payments made on Obligations pursuant to this Motion shall be applied first to any claim of such Critical Vendors under section 503(b)(9) of the Bankruptcy Code.  Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by the Debtor of its rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

29.     If a Critical Vendor refuses to supply services to the Debtor on Customary Trade Terms following payment of any portion of the Obligations, the Debtor seeks authority, in its discretion, and without further order of the Court, to deem any payments made to the Critical Vendor on account of the Obligations to have been in payment of then-outstanding post-petition claims of the Critical Vendor and to terminate the critical vendor status of such a vendor (the "Terminated Obligor").

30.     If, however, the Debtor chooses not to terminate the critical vendor status of a Critical Vendor immediately upon a refusal by a Critical Vendor to provide services in accordance with Customary Trade Terms, the Debtor shall not be deemed to have waived the ability to terminate a Critical Vendor or waived the ability to deem any payments made to the Critical Vendor on account of the Obligations to have been in payment of then-outstanding post-petition claims of such Critical Vendor.

31.     In the event the Debtor exercises the rights set forth in the preceding paragraph, the Debtor requests that the Terminated Obligor be required to immediately return any payments made

000155

on account of its Obligations to the extent that such payments exceed the post-petition amounts then owed to the Terminated Obligor, without giving effect to any rights of setoff or reclamation. In the event that the Terminated Obligor refuses to acknowledge such recharacterization and to issue the repayment, the Debtor proposes that it be authorized to compel such recharacterization and repayment by a motion on such notice as is required by this Court.

32.     Additionally, the Debtor requests that the order waive the 14-day stay period under Bankruptcy Rule 6004(h).

## **BASIS FOR RELIEF**

### **A.  Sections 105(a), 363(b), 363(c), and 503(b)(1) of the Bankruptcy Code Support Payment of the Critical Vendors.**

33.     Section 363(c)(1) of the Bankruptcy Code provides that a debtor may use property of the estate in the ordinary course of business without notice or a hearing. The payment of the obligations to the Critical Vendors is in the ordinary course and conducted in the regular course of the Debtor's business. The Debtor's obligations to the Critical Vendors are expenses necessary to maintain operations necessary to generate required to pay creditors with allowed claims.  In the absence of continuing revenues, the Debtor will not be able to pay its non-contingent secured and unsecured creditors, much less those creditors holding contingent claims, irrespective of the allowed amount (if any) of those claims.

34.     Courts have recognized that it is appropriate to authorize the payment of pre-petition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World*

000156

*Indus., Inc. v. James A. Phillips, Inc.,* (*In re James A. Phillips, Inc.),* 29 B.R. 391, 398 (S.D.N.Y. 1983). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 362(d), 363(b), and 1107(a) of the Bankruptcy Code support the payment of pre-petition claims as provided herein.

35.     Additionally, pursuant to Bankruptcy Code § 363(b), a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."). *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor pre-petition claims where supported by an appropriate business justification). The Debtor has articulated a valid business justification to pay the prepetition claims of the Critical Vendors.

36.     Moreover, Bankruptcy Code § 105(a) states that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. Bankruptcy Code § 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including—the actual, necessary costs and expenses of preserving the estate . . . ."  An order enabling a debtor-in-possession to pay the actual and necessary costs and expenses of the estate is well within the bounds of the power granted to bankruptcy courts by Bankruptcy Code § 105(a).  *See, e.g., In re CEI Roofing, Inc.*, 315 B.R. 50,

10

59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.,* 273 B.R. at 497 (holding that the "Court has inherent authority, through section 105(a) of the Bankruptcy Code to grant this Motion, in the interest of preservation of Debtors' bankruptcy estate."); *In re CEI Roofing, Inc.,* 315 B.R. at 56; *In re Mirant Corp.,* 296 B.R. 427 (Bankr. N.D. Tex. 2003).

37.     Courts in the Fifth Circuit, including the Southern District of Texas have followed *CoServ's* three-part test to determine whether a pre-petition claim of a "critical vendor" may be paid outside of the plan process on a post-petition basis:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ, L.L.C.,* 273 B.R. at 498; *see also In re Mirant Corp.*, 296 B.R. at 429-30.

38.     Whether payment of the obligations to Critical Vendors constitutes ordinary course transactions, appropriate non-ordinary course transactions, or necessary and appropriate to facilitate the payment of expenses required to preserve the Debtor's estate or under applicable state law, the Court should enter the Proposed Order. If the Debtor fails to pay its obligations to the Critical Vendors, the Debtor's future revenue available for its estate and creditors will be jeopardized.

000158

**B.      Certain Critical Vendors Are Entitled to Administrative Expense Claims Under Section 503(b)(9) of the Bankruptcy Code.**

39.      In addition to the foregoing, certain Critical Vendors will be entitled to priority under section 503(b)(9) of the Bankruptcy Code.  Section 503(b)(9) provides for the allowance of administrative expenses for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  Any Critical Vendor that provided the Debtor with materials or services to continue ongoing operations in the 20 days prior to the Petition Date may therefore have administrative expense priority claims that have to be paid in full.  For this and the other reasons stated, the Debtor believes that it should be authorized, but not directed, to pay the Obligations of the Critical Vendors.

40.      Courts in this district have routinely authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.  *See, e.g.*, *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) [Docket No. 475] (Bankr. S.D. Tex. Feb. 24, 2020) (authorizing debtors to pay certain pre-petition claims arising under section 503(b)(9) of the Bankruptcy Code); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 3, 2019) [Docket No. 176]; *In re Westmoreland Coal Co*., No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) [Docket No. 512].

**C.      Cause Exists to Waive the 14-Day Stay under Bankruptcy Rule 6004(h).**

41.      Under Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the use of estate property pursuant to Bankruptcy Code § 363 are automatically stayed for fourteen (14) days after entry of the order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

42.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a transaction to occur immediately where there has been no objection to the procedure. *See generally* 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed. 2020). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file the appeal. *Id.*

43.     In light of the necessity of the relief sought in this Motion, the Debtor submits that ample cause exists to justify the Proposed Order to be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rule 6004(h) be waived. To the extent a party objects to the relief sought herein, but the relief is granted over the objection, the objecting party can indicate the time needed to initiate an appeal.

## **EMERGENCY CONSIDERATION**

44.     The Debtor requests emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate. The Critical Vendors are necessary for the Debtor to continue its operations and generate revenue that will be used to pay claims in this chapter 11 case and failure to timely pay the Critical Vendors places that revenue at risk. The failure to receive the requested relief during the first 21 days of the chapter 11 case could severely disrupt the Debtor's operations at this critical juncture and imperil the Debtor's restructuring. Accordingly, the Debtor requests that the Court approve the relief requested in this Motion on an emergency basis

13

## **RESERVATION OF RIGHTS**

45.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any ground, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate, (g) a waiver or limitation of the Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession from the Debtor that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

## **NO PRIOR REQUEST**

46.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

14

000161

WHEREFORE, the Debtor respectfully requests the Court grant the relief requested herein and such other and further relief as the Court deems just and proper.

Respectfully submitted this 29th day of July, 2022.

LAW OFFICES OF RAY BATTAGLIA, PLLC

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Raymond W. Battaglia*

15

000162

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

/s/ Raymond W. Battaglia

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

000164

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

000165

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) )  Case No. 22- 60043 |
| FREE SPEECH SYSTEMS, LLC, | ) )  Chapter 11 (Subchapter V) )  |
| Debtor. | ) ) |

**ORDER (A) AUTHORIZING THE DEBTOR TO PAY PREPETITION OBLIGATIONS OF CERTAIN CRITICAL VENDORS, AND (B) GRANTING RELATED RELIEF**

Upon the *Debtor's Emergency Motion for Order (A) Authorizing the  Debtor to Pay Prepetition Obligations of Certain  Critical Vendors, and (B) Granting Related Relief* (the "Motion")[1] filed on July 29, 2022; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      The Debtor is authorized, in its sole discretion, to pay in the ordinary course of its business the prepetition obligations owed to the Critical Vendors in the amounts set forth in Schedule 1 attached hereto.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Motion.

2.      The payment of the Obligations is conditioned upon the agreement of each Critical Vendor to continue supplying services on terms and based on practices and programs in effect between the Critical Vendor and the Debtor in the year prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtor and the Critical Vendor.

3.      The Debtor shall have the right to negotiate new trade terms with the Critical Vendor as a condition to payment of a portion of the Obligations owed to each Critical Vendor (the "Obligations").

4.      Any payments made on Obligations pursuant to this Motion shall be applied first to any claim of such Critical Vendors under section 503(b)(9) of the Bankruptcy Code.  Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by the Debtor of its rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

5.      If a Critical Vendor refuses to supply services to the Debtor on Customary Trade Terms following payment of any portion of the Obligations, the Debtor,  in its discretion, and without further order of the Court, may deem any payments made to the Critical Vendor on account of the Obligations to have been in payment of then-outstanding post-petition claims of the Critical Vendor and to terminate the critical vendor status of such a vendor (the "Terminated Obligor").

6.      In the event the Debtor chooses not to terminate the critical vendor status of  a Critical Vendor immediately upon a refusal by a Critical Vendor to provide services in accordance with Customary Trade Terms, the Debtor shall not be deemed to have waived the ability to terminate a Critical Vendor or waived the ability to deem any payments made to the

2

Critical Vendor on account of the Obligations to have been in payment of then-outstanding post-petition claims of such Critical Vendor.

7.       In the event the Debtor exercises the rights set forth in the preceding paragraph, the Terminated Obligor shall be required to immediately return any payments made on account of its Obligations to the extent that such payments exceed the post-petition amounts then owed to the Terminated Obligor, without giving effect to any rights of setoff or reclamation. In the event that the Terminated Obligor refuses to acknowledge such recharacterization and to issue the repayment, the Debtor is authorized to compel such recharacterization and repayment by a motion on such notice as is required by this Court.

8.       Nothing in this Order or the Motion shall limit (a) the Debtor's authority to pay obligations to creditors that were incurred by the Debtor after the Petition Date.

9.       Nothing in this Order or any actions taken pursuant to such relief is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any ground, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate, (g) a waiver or limitation of the Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession from the Debtor

3

that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

10.     Any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

11.     This Order shall be immediately effective and enforceable upon its entry and shall not be stayed by Bankruptcy Rule 6004(h), if applicable.

12.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

4

## SCHEDULE 1 TO ORDER

| Vendor | Description | Amount of Critical Vendor Claim | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| Addshoppers, Inc | E Commerce Store | $ 2,191.93 | 222 S. Church Street #410M | Charlotte | NC | 28202 |
| Amazon Web Services | E Commerce Store | $ 77,000.00 | | | | |
| ATXHD,Inc | Satellite uplink | $ 19,334.48 | 602 S. Cowal Drive | Spicewood | TX | 78669 |
| Austin Security & Investigation Solution | Uniformed Security | $ 28,044.34 | P.O. Box 2904 | Pflugerville | TX | 78691 |
| Balcones Recycling Inc. | Trash / Dumpster Service | $ 386.99 | P.O. Box 679912 | Dallas | TX | 75267 |
| Cloudflare, Inc | IT / E Commerce Security | $ 124,162.64 | Dept LA 24609 | Pasadena | CA | 91185-4609 |
| eCommerce CDN LLC | E Commerce Store | $ 1,070.85 | 221 E 63rd Street | Savannah | GA | 31405 |
| Edgecast, Inc. | Radio Station Link | $ 6,449.30 | Dept CH 18120 | Palatine | IL | 60055 |
| Frost Insurance Agency | Company Insurance | $ 2,694.52 | 401 Congress Ave., 14th Floor | Austin | TX | 78701 |
| Getty Images, Inc | Licenses for Pictures / Video | $ 10,121.38 | P.O. Box 953604 | St. Louis | MO | 63195-3604 |
| Haivision Network Video | Streaming Bandwidth | $ 54,851.50 | Dept CH 19848 | Palatine | IL | 60055-9848 |
| Magento | E Commerce Store | $ 7,792.40 | P.O. Box 204125 | Dallas | TX | 75320-4105 |
| mongoDB Cloud | Cloud Storage | $ 3,054.44 | 1633 Broadway 39th Floor | New York | NY | 10019 |
| Protection 1 Alarm | Alarm Service | $ 3,461.42 | | | | |
| Synergy North America Inc | e commerce software | $ 2,061.49 | 11001 W. 120th Ave. Suite 400 | Broomfield | CO | 80021 |
| The Hartford | Company Insurance | $ 2,780.35 | | | | |
| Travelers | Company Insurance | $ 673.48 | | | | |
| TrustArc | | $ 1,221.46 | | | | |
| WMQM-AM 1600 | Advertising | $ 2,291.67 | 21 Stephen Hill Rd | Atoka | TN | 38004 |
| WWCR | Advertising | $ 9,900.00 | 1300 WWCR Avenue | Nashville | TN | 37218-3800 |
| | **Total Critical Vendors** | $ 359,544.62 | | | | |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) Case No. 22-__60043__ |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

**DEBTOR'S EMERGENCY MOTION TO EXTEND TIME TO FILE SCHEDULES AND**
**STATEMENT OF FINANCIAL AFFAIRS**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the above-referenced chapter 11 case, hereby files this emergency motion (the "Motion") respectfully submits this Emergency Motion to Extend Time to File Schedules and Statements of Financial Affairs (the "Motion"). In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of Voluntary Petition and First Day Motions* (the "First

1

000171

Day Declaration"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      On July 29, 2022 (the "Petition Date"), the Debtor commenced the above captioned cases by filing voluntary petitions for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").

2.      The Debtor continues in the possession of its property and is operating and managing its businesses as debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

3.      No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 361, and 363 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

## FSS' BACKGROUND

6.      Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum from Alex's first broadcast.  In 1996 he transitioned to talk radio.  After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees.  Revenue was largely generated from advertising and the sale of books, T-shirts and videos.

2

7.     What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full-blown studio and employing over 60 people.  By 2013, FSS started selling dietary supplements to its growing listener base.

8.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

9.     On its Infowars.com[1] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

10.    As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.  This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

11.    Since inception, Alex Jones has been a "single talent business", to wit, without Alex Jones and his show, there would neither be an InfoWars nor any internet sales. Despite the rapid

---

[1] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

000173

growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.  FSS failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million enterprise.  The Debtor and its employees continued to run the business with an inverted T structure, as though it was still a family business.

12.    In 2022, Alex Jones retained professionals to evaluate the status of FSS. Since May 2022, FSS has retained W. Marc Schwartz ("Schwartz" or "CRO") as its Chief Restructuring Officer, with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. Schwartz retained his firm Schwartz Associates to perform various accounting and forensic work associated with his mandate.

13.    In addition, FSS has retained Jeffery Shulse as its Business Manager. He has been parachuted into FSS's offices in Austin to (a) implement viable accounting and financial management functions; (b) implement sorely needed internal accounting controls and, (c) establish uniform personnel policies.

14.    Throughout the review conducted by the CRO and his team, they have been given complete access to FSS employees, books and records.  Among the preliminary conclusions reached in Schwartz' analysis of FSS are:

(a)  Although the company had a controller and two bookkeepers (none of which appear to have any formal accounting background), the 2021 general ledger had not been completed and the books for that period were not closed;

(b)  Few transactions had been recorded in the 2022 general ledger;

(c)  No financial statements were produced for the company for the 18 months preceding

4

Schwartz' engagement;

(d) The bank accounts had not been reconciled in 2021 or 2022; and

(e) Internal accounting controls were completely inadequate, including lack of segregation of duties, absence of written monthly, quarterly and annual closing schedules, lack of supervisory review of key accounting functions, including vendor set up, bank reconciliations, inventory reconciliations, or intercompany billings;

(f) Payments to vendors were debited to an expense account, but not to the specific vendor account; and

(g) Credit card transactions were not recorded to specific expense accounts.

15.     Since their engagement, the CRO and his team have closed the books for 2021 and made significant progress fixing past bookkeeping omissions and oversights.  As a result of these actions, the CRO has a vastly improved understanding of FSS's financial standing and its ability to operate profitably going forward.   Equally importantly, they have renegotiated business terms with PQPR on the allocation of proceeds from product sales to be more favorable to FSS.

16.     Because of the state of FSS's books the information required to complete the Schedules and Statement of Financial Affairs is only now becoming available to the CRO. Further the attention required to evaluate and refocus the Debtor's operations and the attention required to prepare for the commencement of this chapter 11 case has captured the CRO's time and attention leaving less time available to prepare the Schedules and Statement of Financial Affairs.

**RELIEF REQUESTED**

17.     Section 1116(3) of the Bankruptcy Code provides that in a small business case, the debtor in possession shall "timely file all schedules and statements of financial affairs, unless the

5

court, after notice and a hearing, grants an extension, which shall not extend such period to a date later than 30 days after the date of the order for relief, absent extraordinary and compelling circumstances." 11 U.S.C. § 1116(3). Bankruptcy Code 521(a) and Bankruptcy Rules 1007(b) and (c) require a debtor to file its schedules of assets and liabilities and its statement of financial affairs with the Court within 14 days of the petition date.

18.     While the Debtor has endeavored to file its Schedules and Statement of Affairs within the time allotted, it will be unable to do so for the reasons stated above.  The Debtor requests that the Court extend the time to file its Schedules and Statements of Affairs for an additional fifteen (15) days for cause shown as provided in Bankruptcy Code §1116(3).

## NO PREVIOUS REQUEST

19.     No prior motion for the relief requested herein has been made by the Debtor to this or any other court.

## EMERGENCY CONSIDERATION

20.     The Debtor requests emergency consideration of this Motion on August 3, 2022 or as soon thereafter as the Court's schedule will allow. The Schedules and Statement of Financial Affairs would need to be filed on August 12, 2022, absent the relief requested in the Motion and determination of the Motion will enable the CRO and the Debtor's professionals to properly allocate resources among the various matters requiring attention in the early parts of this chapter 11 case.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE PREMISES CONSIDERED, the Debtor moves this Court enter the Order substantially in the form attached hereto extending the time to file its Schedules and Statement of Financial Affairs until August 29, 2022, and granting the Debtor such other and further relief to which it may be justly entitled.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Raymond W. Battaglia*

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

*/s/ Raymond W. Battaglia*

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

000180

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) Case No. 22-  60043 |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

**ORDER GRANTING EXTENTION OF TIME TO FILE SCHEDULES AND STATEMENT**
**OF FINANCIAL AFFAIRS**

Upon the motion (the "<u>Motion</u>") [1] of the Debtor for entry of an order (this "<u>Order</u>"): *Debtor's Emergency Motion to Extend Time to File Schedules and Statement of Financial Affair* (the "<u>Motion</u>")[2], filed by the above-captioned debtor (the "<u>Debtor</u>"). The Court finds that: (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the Motion is in the best interests of the Debtor, its estate, and its creditors; (iv) proper and adequate notice of the Motion has been given and no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon, good and sufficient cause exists for the granting of the relief as set forth herein.

IT IS HEREBY ORDERED THAT:

1.       The Motion is GRANTED

2.       The time within which the Debtor shall file its Schedules and Statements is extended pursuant to Bankruptcy Code § 1116(3) and Bankruptcy Rule 1007(c) to and including, August 29, 2022, without prejudice to the Debtor's right to seek an additional extension upon a showing of extraordinary and compelling circumstances.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

3.      The Court shall retain jurisdiction to hear and consider all disputes arising out of the

interpretation or implementation of this Order.

Dated _____, 2022.

_____

UNITED STATES BANKRUPTCY JUDGE

2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) Case No. 22-_60043_____ |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF
<u>VOLUNTARY PETITION AND FIRST DAY MOTIONS</u>**

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      My name is W. Marc Schwartz ("<u>Schwartz</u>").

2.      I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") filed by Free Speech Systems, LLC (the "<u>Debtor</u>" or "<u>FSS</u>") on the date hereof (the "<u>Petition Date</u>"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "<u>Chapter 11 Case</u>").

3.      The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

1

5.      I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.   The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.      SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services    My firm represents individuals, companies and courts in a variety of assignments,  including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.      I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.      I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.      On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

000184

10.     On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

### RELEVANT FACTS AND PROCEDURAL BACKGROUND

**A.  Background to Creation of Free Speech Systems, LLC**

11.     Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12.     In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13.     Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14.     From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

000185

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.     Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC")*.

16.     Alex Jones was a natural.

17.     The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.     Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.     When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.     The predecessor operation of FSS in 2004 was an operation with just a handful of employees.  Alex Jones had a tiny office in the far south of Austin. He had two employees at

000186

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.     As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.     By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.     While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.     After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.     The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

000187

26.     Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B.  Present Business of Free Speech Systems, LLC**

27.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28.     On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29.     The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30.     As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided.  The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

6

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

**C.  The Relationship Between Alex Jones and FSS**

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected.  Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

000189

35.     The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

**D.  The Debtor' Owners and Management**

36.     At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.     Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.      Since then, Alex Jones has been the Managing Member of FSS.

39.     Since inception, Alex Jones has been a "single talent business", *to wit*, without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.     Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.     In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

8

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies.  With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.     The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger.  As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b)  FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

### E.  The Relationship of FSS and PQPR

*Background Information About PQPR*

43.     PQPR was founded in 2013. The business began operations in September 2013.

44.     PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.     PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.     The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47.     Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR").   Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.     Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49.     As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer.  FSS pays PQPR, as its agent, funds required to purchase product, which then pays

10

the manufacturer and manages the delivery and certification of the products.  Pricing of the Supplements is done by FSS.

50.     Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.     Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.     In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53.     On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.     The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.     On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

11

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F.  FSS Needs a Credit Card Processor**

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.  Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

000194

62.     The key players in credit card processing are:

- **Customer –** the person making a purchase.
- **Merchant –** the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway –** this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor –** (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network –** (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank –** (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank –** (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63.     In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

000195

64.     After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.     Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.     FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS.  A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.     FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.     In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.     In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

000196

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G.  Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

000197

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and *(e)* *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74.     These two actions: *(a)* *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b)* *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75.     As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76.     In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

16

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "<u>Connecticut State Court Litigation</u>" together with the Texas State Court Litigation are hereinafter referred to as the "<u>Sandy Hook Lawsuits</u>").

77.    As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78.    Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79.    Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80.    InfoW, LLC f/k/a Infowars, LLC ("<u>InfoW</u>" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "<u>InfoWDebtors</u>"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "<u>Bankruptcy Court</u>"), on April 18, 2022 (the "<u>Petition Date</u>"), initiating Case No. 22-60020 in that court (the "<u>Bankruptcy Case</u>").

81.    The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

---

17

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been  cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.      The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

### H.  Current Financial Condition of Debtor

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

000200

87.     Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88.     Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**I.      Critical Motions to Commence the Chapter 11 Case**

**First Day Motions**

89.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

000201

- **Critical Vendors Motion**. *Debtor's Motion for an  Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**.  *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.     The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

20

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

## Procedural Motion

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.     I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### **Operational Motions**

97.     **Cash Collateral Motion[6]**. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.     The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.     Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

000204

100.     The use of cash collateral  required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**.  The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim  Period").

101.     The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.     PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.     Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.     **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

23

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62. In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.

105.    After an extensive review and analysis of the Debtor's vendors, the Debtor and its professionals identified the vendors that supply products and services vital to the Debtor's continued operation. The Debtor relies on products and services from its Critical Vendors to operate its business, and, depend on the timely provision of specialized services to provide top-quality content and services to its customer base.

106.    The Critical Vendors procure and provide key services to producing and transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their mission-critical goods and services, the business of FSS would grind to a halt.

107.    I understand that the Debtor's trade relationship with its Critical Vendors is not governed by long-term contracts, and the Debtor believes those trade relationships will deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption and disturbances to the Debtor's business during the Chapter 11 Case.

108.    Subject to Court's approval, I understand the Debtor intends to pay Critical Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review, assess, and make payment on account of these claims. In return for paying these claims, the Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon each claimant's agreement to continue supplying goods and services to the Debtor in accordance

000206

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.    **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.    In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.    To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.    The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

25

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.    The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### *Adequate Assurance Procedures*

115.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.    The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

000208

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

27

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118.    **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit.  Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119.    The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120.    The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

000210

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July,  2022.

W. Marc Schwartz, as Chief Restructuring
Officer of Free Speech Systems, LLC

---

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

000211

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

+-----------------------------------------------------+
| **Free Speech Systems LLC**                         |
| **Comparative Profit and Loss Statement**           |
| **For the Year Ended December 31, 2021 and the Five Months** |
| **Ended May 31, 2021**                              |
+-----------------------------------------------------+

| | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| *Total Income* | *64,970,641.85* | *14,320,983.15* |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| *Gross Profit* | *$ 13,092,308.12* | *$ 9,384,529.36* |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| *Total Expenses* | *23,387,247.86* | *6,346,192.35* |
| *Net Operating Income* | *$ (10,294,939.74)* | *$ 3,038,337.01* |
| **Other Income** | **507,168.04** | **1,019,713.81** |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| *Total Other Expenses* | *1,131,710.75* | *2,155,946.35* |
| *Net Other Income* | *(624,542.71)* | *(1,136,232.54)* |
| *Net Income* | *$ (10,919,482.45)* | *$ 1,902,104.47* |

000213

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

**Exhibit B**

<table>
<tr><td colspan="3" align="center">

**Free Speech Systems LLC**
**Comparative Balance Sheet**
**As of December 31, 2021 and May 31, 2022**

</td></tr>
<tr><th></th><th>2021</th><th>2022</th></tr>
<tr><td>**Assets**</td><td></td><td></td></tr>
<tr><td>**Current Assets**</td><td></td><td></td></tr>
<tr><td>Cash</td><td>$ 1,508,720.21</td><td>$ 1,159,247.90</td></tr>
<tr><td>Accounts Receivable</td><td>10,187,121.95</td><td>10,013,413.22</td></tr>
<tr><td>**Other Current Assets**</td><td></td><td></td></tr>
<tr><td>Invenotry</td><td>1,732,603.13</td><td>910,116.84</td></tr>
<tr><td>Prepaid Expenses</td><td>446,475.64</td><td>114,136.99</td></tr>
<tr><td>Due from PQPR</td><td>(500.00)</td><td>-</td></tr>
<tr><td>Advance To Elevated Solutions</td><td>27,870.00</td><td>-</td></tr>
<tr><td>*Total Other Current Assets*</td><td>*2,206,448.77*</td><td>*1,024,253.83*</td></tr>
<tr><td>*Total Current Assets*</td><td>*13,902,290.93*</td><td>*12,196,914.95*</td></tr>
<tr><td>**Fixed Assets**</td><td>1,679,438.66</td><td>1,580,779.46</td></tr>
<tr><td>**Other Assets**</td><td></td><td></td></tr>
<tr><td>Intangible Assets</td><td>21,270.83</td><td>15,333.33</td></tr>
<tr><td>Security Deposits</td><td>534,560.00</td><td>534,560.00</td></tr>
<tr><td>*Total Other Assets*</td><td>*555,830.83*</td><td>*549,893.33*</td></tr>
<tr><td>*Total Assets*</td><td>*$ 16,137,560.42*</td><td>*$ 14,327,587.74*</td></tr>
<tr><td>**Liabilities and Equity**</td><td></td><td></td></tr>
<tr><td>**Liabilities**</td><td></td><td></td></tr>
<tr><td>**Current Liabilities**</td><td></td><td></td></tr>
<tr><td>Accounts Payable</td><td>$ 4,732,966.89</td><td>$ 1,217,685.58</td></tr>
<tr><td>Credit Cards</td><td>152,367.42</td><td>207,984.04</td></tr>
<tr><td>**Other Current Liabilities**</td><td></td><td></td></tr>
<tr><td>David Jones Advance</td><td>150,000.00</td><td>150,000.00</td></tr>
<tr><td>Advances from PQPR</td><td>-</td><td>571,920.57</td></tr>
<tr><td>Due to PQPR</td><td>23,058,367.00</td><td>23,058,367.00</td></tr>
<tr><td>*Total Other Current Liabilities*</td><td>*23,208,367.00*</td><td>*23,780,287.57*</td></tr>
<tr><td>*Total Current Liabilities*</td><td>*28,093,701.31*</td><td>*25,205,957.19*</td></tr>
<tr><td>**Long Term Liabilities**</td><td></td><td></td></tr>
<tr><td>Note Due to PQPR</td><td>54,580,405.22</td><td>53,845,074.41</td></tr>
<tr><td>Note Payable - Winnebago</td><td>93,505.62</td><td>82,524.37</td></tr>
<tr><td>*Total Long Term Liabilities*</td><td>*54,673,910.84*</td><td>*53,927,598.78*</td></tr>
<tr><td>*Total Liabilities*</td><td>*$ 82,767,612.15*</td><td>*$ 79,133,555.97*</td></tr>
<tr><td>**Equity**</td><td></td><td></td></tr>
<tr><td>Member's Equity</td><td>(774,291.44)</td><td>-</td></tr>
<tr><td>Member Draws</td><td>(61,937,862.26)</td><td>(254,014.00)</td></tr>
<tr><td>Member Contributions</td><td>4,305,810.14</td><td>311,350.00</td></tr>
<tr><td>Opening Balance Equity</td><td>-</td><td>(66,765,408.70)</td></tr>
<tr><td>Retained Earnings</td><td>2,695,774.28</td><td></td></tr>
<tr><td>Net Income</td><td>(10,919,482.45)</td><td>1,902,104.47</td></tr>
<tr><td>*Total Equity*</td><td>*$ (66,630,051.73)*</td><td>*$ (64,805,968.23)*</td></tr>
<tr><td>*Total Liabilities and Equity*</td><td>*$ 16,137,560.42*</td><td>*$ 14,327,587.74*</td></tr>
</table>

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**Exhibit C**

<table>
<tr><td colspan="3" align="center"><b>Free Speech Systems, LLC<br>Statement of Cash Flows</b></td></tr>
<tr><td colspan="3" align="center"><b>For the Year Ended December 31, 2021  and the Five Months Ended May 31, 2022</b></td></tr>
</table>

| | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| *Net Income* | **($10,919,482.45)** | **$1,902,104.47** |
| *Adjustments to reconcile Net Income to Net Cash provided by operations:* | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| *Net cash provided by operating activities* | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| *Net cash provided by investing activities* | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| *Net cash provided by financing activities* | ***22,850,016.65*** | ***(787,074.46)*** |
| *Net cash increase for period* | ***$952,374.76*** | ***($349,472.31)*** |

000217

Exhibit "D"

13-Week Cash Flow Forecast for FSS

**Exhibit D**

000219

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

Period / Week Number:

- 1 — 07/30/2022 - 08/05/2022
- 2 — 08/06/2022 - 08/12/2022
- 3 — 08/13/2022 - 08/19/2022
- 4 — 08/20/2022 - 08/26/2022
- 5 — 08/27/2022 - 09/02/2022
- 6 — 09/03/2022 - 09/09/2022
- 7 — 09/10/2022 - 09/16/2022
- 8 — 09/17/2022 - 09/23/2022
- 9 — 09/24/2022 - 09/30/2022
- 10 — 10/01/2022 - 10/07/2022
- 11 — 10/08/2022 - 10/14/2022
- 12 — 10/15/2022 - 10/21/2022
- 13 — 10/22/2022 - 10/28/2022

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | $ 7,741,357.16 |
| Advertising | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | - | - | - | 480,166.46 | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | - | (250,000.00) | - | (500,000.00) | - | - | - | - | - | - | - | - | - | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,346.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - | (27,270.00) | - | - | - | (27,270.00) | - | - | - | - | (81,810.00) |
| Texas Sales Tax | (5,337.87) | - | - | - | (5,337.87) | - | - | - | (5,337.87) | - | - | - | - | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | - | - | - | (17,541.98) | - | - | - | (17,541.98) | - | - | - | - | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | - | (11,073.89) |
| Software License Fees | (140.80) | - | - | - | (140.80) | - | - | - | (140.80) | - | - | - | - | (422.40) |
| Server Hosting Service | (28,595.13) | - | - | - | (28,595.13) | - | - | - | (28,595.13) | - | - | - | - | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | - | - | - | (55,728.00) | - | - | - | (55,728.00) | - | - | - | - | (167,184.00) |
| Satellite Service | (137,282.93) | - | - | - | (137,282.93) | - | - | - | (137,282.93) | - | - | - | - | (411,848.78) |
| Imaging License Fee | (9,201.25) | - | - | - | (9,201.25) | - | - | - | (9,201.25) | - | - | - | - | (27,603.75) |
| Software & Apps | (5,000.00) | - | - | - | (5,000.00) | - | - | - | (5,000.00) | - | - | - | - | (15,000.00) |
| Website Hosting | - | - | (266.50) | - | - | - | (266.50) | - | - | - | (266.50) | - | - | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | - | (719,717.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (2,166.50) | - | - | - | (2,166.50) | - | - | - | (2,166.50) | - | - | - | - | (6,499.50) |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.50) | - | - | - | (1,989.50) | - | - | - | (1,989.50) | - | - | - | - | (5,968.50) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | - | - | - | (45,980.00) | - | - | - | (45,980.00) | - | - | - | - | (137,940.00) |
| Consulting Services | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | - | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | (256.19) | - | - | - | (256.19) | - | - | - | (256.19) | - | - | - | - | (768.58) |
| HVAC | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | (15,322.89) |
| CAM Charges | (20,364.16) | - | - | - | (20,364.16) | - | - | - | (20,364.16) | - | - | - | - | (61,092.48) |
| Water & Sewer | (1,708.55) | - | - | - | (1,708.55) | - | - | - | (1,708.55) | - | - | - | - | (5,125.66) |
| Gas Service | (132.09) | - | - | - | (132.09) | - | - | - | (132.09) | - | - | - | - | (396.28) |
| Pest Control | (244.65) | - | - | - | (244.65) | - | - | - | (244.65) | - | - | - | - | (733.95) |
| Waste Management | (351.81) | - | - | - | (351.81) | - | - | - | (351.81) | - | - | - | - | (1,055.43) |
| **Total Utilities** | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | - | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | - | - | - | (33,408.51) | - | - | - | (33,408.51) | - | - | - | - | (100,225.53) |
| Office Security | (33,111.90) | - | - | - | (33,111.90) | - | - | - | (33,111.90) | - | - | - | - | (99,335.69) |
| Repair & Maintenance - Building | (1,771.19) | - | - | - | (1,771.19) | - | - | - | (1,771.19) | - | - | - | - | (5,313.56) |
| Janitorial | (5,983.33) | - | - | - | (5,983.33) | - | - | - | (5,983.33) | - | - | - | - | (17,950.00) |
| **Total Occupancy** | (72,280.93) | - | - | - | (72,280.93) | - | - | - | (72,280.93) | - | - | - | - | (216,842.78) |
| Supplies | (1,258.02) | - | - | - | (1,258.02) | - | - | - | (1,258.02) | - | - | - | - | (3,774.07) |

000220

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (4,411.68) |
| **Total Travel Expenses** | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | (52,992.00) | - | - | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | (57,876.00) | - | - | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | (40,000.00) | - | - | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | (24,000.00) | - | - | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | - | - | - | - | (174,868.00) | - | - | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.27 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 22-60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE REGARDING NOTICE OF EMERGENCY HEARING ON
DEBTOR'S EMERGENCY MOTION TO MODIFY AUTOMATIC STAY**

I hereby certify that on July 29, 2022, on behalf of the Debtor I (a) provided notice of the hearing on the Debtor's Emergency Motion for an Order Modifying the Automatic Stay to Allow the Heslin/Lewis State Court Suit to Continue to Judgement [ECF No. 2] (the "Stay Motion") by email to the following parties, and (b) served a copy of the Stay Motion and the Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions [ECF No. 10] by email on the following parties:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterling, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walston
Walston Bowlin Callender, PLLC
4199 San Felipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

Date: July 29, 2022

/s/ *R. J. Shannon*
R. J. Shannon
State Bar No. 24108062
SHANNON & LEE LLP
700 Milam Street, STE 1300
Houston, Texas 77002
Email: rshannon@shannonleellp.com
Tel.: (713) 714-5770

2

000222

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE**

TO ALL PARTIES, PLEASE TAKE NOTICE David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Creditors and Parties in Interest), by and through the undersigned counsel, file this Notice of Appearance and Request for Service in the above-captioned case, pursuant to Rules 2002, 3017, 9007, and 9010 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 102(1), 342, and 1109(b) and requests that copies of all notices and pleadings given or filed in this bankruptcy case be given and served upon the Creditors and Parties in Interest by serving:

> Ryan E. Chapple
> State Bar No. 24036354
> rchapple@cstrial.com
> **CAIN & SKARNULIS PLLC**
> 303 Colorado Street, Suite 2850
> Austin, Texas 78701
> 512-477-5000
> 512-477-5011—Facsimile

PLEASE TAKE FURTHER NOTICE that the foregoing request includes not only the notices and papers referred to in the Rules specified above, but also includes, without limitation, all orders, notices, hearing dates, applications, motions, petitions, requests, complaints, demands, replies, answers, schedule of assets and liabilities, statement of

affairs, operating reports, plans of reorganization, and disclosure statements, whether formal or informal, whether written or oral, and whether transmitted or conveyed by mail, courier service, delivery, telephone, facsimile, telegraph, telex, telefax or otherwise.

PLEASE TAKE FURTHER NOTICE that this Notice of Appearance and Request for Service is not intended as consent pursuant to 28 U.S.C. § 157(c)(2) or waiver of: (1) the liquidation or estimation of unliquidated claims for purposes of distribution, reserved for Article III adjudication pursuant to 28 U.S.C. § 157(b)(2)(B); (2) the right to trial by jury pursuant to 28 U.S.C. § 1411; (3) the right to contest jurisdiction or appropriate venue; and (4) any other rights, claims, actions, or defenses in law, in equity, or otherwise that may be available under applicable law, which the Creditors and Parties in Interest expressly reserve.

Respectfully submitted this 31st day of July 2022.

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
**ATTORNEYS FOR CREDITORS AND PARTIES IN INTEREST**

000224

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Appearance and Request for Service has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 31st day of July 2022.

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

### NOTICE OF APPEARANCE AND REQUEST FOR SERVICE

TO ALL PARTIES, PLEASE TAKE NOTICE David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Creditors and Parties in Interest), by and through the undersigned counsel, file this Notice of Appearance and Request for Service in the above-captioned case, pursuant to Rules 2002, 3017, 9007, and 9010 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 102(1), 342, and 1109(b) and requests that copies of all notices and pleadings given or filed in this bankruptcy case be given and served upon the Creditors and Parties in Interest by serving:

> Randy W. Williams
> State Bar No. 21566850
> Email: rww@bymanlaw.com
> **BYMAN & ASSOCIATES PLLC**
> 7924 Broadway, Suite 104
> Pearland, Texas 77581
> 281-884-9262

PLEASE TAKE FURTHER NOTICE that the foregoing request includes not only the notices and papers referred to in the Rules specified above, but also includes, without limitation, all orders, notices, hearing dates, applications, motions, petitions, requests, complaints, demands, replies, answers, schedule of assets and liabilities, statement of affairs, operating reports, plans of reorganization, and disclosure statements, whether

formal or informal, whether written or oral, and whether transmitted or conveyed by mail, courier service, delivery, telephone, facsimile, telegraph, telex, telefax or otherwise.

PLEASE TAKE FURTHER NOTICE that this Notice of Appearance and Request for Service is not intended as consent pursuant to 28 U.S.C. § 157(c)(2) or waiver of: (1) the liquidation or estimation of unliquidated claims for purposes of distribution, reserved for Article III adjudication pursuant to 28 U.S.C. § 157(b)(2)(B); (2) the right to trial by jury pursuant to 28 U.S.C. § 1411; (3) the right to contest jurisdiction or appropriate venue; and (4) any other rights, claims, actions, or defenses in law, in equity, or otherwise that may be available under applicable law, which the Creditors and Parties in Interest expressly reserve.

Respectfully submitted this 31st day of July 2022.

_____/s/ Randy W. Williams_____
Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262
**ATTORNEYS FOR CREDITORS AND
PARTIES IN INTEREST**

000227

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Appearance and Request for Service has been served on counsel for Debtors, Debtors, and all parties receiving or entitled to notice through CM/ECF on this 31st day of July 2022.

_____/s/ Randy W. Williams_____
Randy W. Williams

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  |  |
|---|---|
| In re: | ) Case No. 22-60043 |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

**WITNESS AND EXHIBIT LIST**

| Judge: | Hon. Christopher M. Lopez |
|---|---|
| Hearing Date: | Monday, August 1, 2022 |
| Hearing Time: | 8:30 a.m. (CT) |
| Party's Name: | Free Speech Systems, LLC |
| Attorney's Name: | RJ Shannon, Kyung S. Lee |
| Attorney's Phone: | (713) 714-5770 |
| Nature of Proceeding: | Hearing on:<br>• Emergency Motion for an Order Modifying the Automatic Stay to Allow the Heslin/Lewis State Court Suit to Continue to Judgement [Docket No. 2] (the "Stay Motion"). |

Shannon & Lee LLP ("**S&L**") proposed co-counsel to Free Speech Systems, LLC (the "**Debtor**"), in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), hereby submits this witness and exhibit list in connection with the hearing to be held on Monday, August 1, 2022, at 8:30 a.m. (Central Time) (the "**Hearing**") on the Stay Motion.

**WITNESSES**

The Debtor may call any of the following witnesses at the Hearing, whether in person or by proffer:

1. W. Marc Schwartz, Chief Restructuring Officer of Free Speech Systems, LLC;

2. Any witnesses necessary to establish  notice of the Hearing has been provided; and

3. Any witnesses necessary to rebut the testimony of any witnesses called or designated by any other parties.

## <u>EXHIBITS</u>

The Debtor may offer for admission into evidence any of the following exhibits at the

Hearing:

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 1 | Debtor's Emergency Motion for Order Modifying the Automatic Stay to Allow the Heslin[s]/Lewis State Court to Continue to Judgement [ECF No. 2]. | | | | |
| 2 | Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions [ECF No. 10]. | | | | |
| 3 | CV of W. Marc Schwartz, CPA/CFF, CFE. | | | | |
| 4 | Engagement Letter of Schwartz Associates, LLC. | | | | |
| 5 | Plaintiffs' Fourth Amended Petition, D-1-GN-18-001835, District Court of Travis County, Texas 261st District Court. | | | | |
| 6 | Plaintiffs' Exhibit List. | | | | |
| 7 | Plaintiffs' Witness List. | | | | |
| 8 | Defendants Exhibit List. | | | | |
| 9 | Defendants Witness List. | | | | |

2

The Debtor reserves the right to supplement, amend or delete any witness and exhibits prior to the hearing.  The Debtor also reserves the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document.  The Debtor finally reserves the right to introduce exhibits previously admitted.

Respectfully submitted the 31st day of July, 2022.

LAW OFFICES OF RAY BATTAGLIA, PLLC

Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/ *R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
|  | ) |  |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DEBTOR'S EMERGENCY MOTION FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW THE HESLINS/LEWIS STATE COURT SUIT TO CONTINUE TO JUDGEMENT

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN 8:00 A.M. ON AUGUST 1, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the

above-referenced chapter 11 case (the "Chapter 11 Case"), hereby files this emergency motion (the

"Motion") seeking an order from the Court lifting the automatic stay provision of the Bankruptcy Code

to authorize the consolidated state court action styled as *Neil Heslin and Scarlett Lewis v. Alex E. Jones*

1

EXHIBIT

1

000232

*and Free Speech Systems, LLC,* Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas (the "Heslin/Lewis Suit") to continue trial to judgment before Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court"). In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "First Day Declaration"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## REQUEST FOR EMERGENCY HEARING OR EX PARTE RELIEF

1.      The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

2.      The Debtor further submits that *ex parte* relief pursuant to Rule 4001(a)(2) is appropriate here. The First Day Declaration show the potential for harm if the automatic stay is not granted and this motion is verified by counsel to the Debtor pursuant to Bankruptcy Local Rule 9013-1(i). Notice is not necessary here because the relief sought does not affect the rights of any parties in interest other than the Debtor.

## JURISDICTION AND VENUE

3.      On July 29, 2022 (the "Petition Date"), the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").

2

000233

4.      The Debtor continues in the possession of its property and is operating and managing its businesses as a debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

5.      No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

6.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 362 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

### BACKGROUND[1]

8.      In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *(c) Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *(d) Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and *(e) Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC,  JLJR Holdings, LLC, PLJR Holdings,*

---

[1] Additional factual background and information regarding the Debtor and the litigation it has faced prior to the Petition ~~Date is~~ Date is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions.*

3

*LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Suits").

9.      Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit. Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

10.      The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

11.      The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the chapter 11 case of related party InfoW, LLC previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[2]

---

[2] Cliff Walston, attorney for the Texas Plaintiffs, indicated at the April 22, 2022, hearing in the InfoW, LLC chapter 11 case that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to Mr. Walston, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr. Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

4

000235

### RELIEF REQUESTED

12.     Pursuant to section 362(d) of the Bankruptcy Code, the Debtor seeks an order modifying the automatic stay to permit the Heslin/Lewis Suit to continue to final judgment, but that all further proceedings remain subject to the automatic stay.

### ARGUMENT

13.     Bankruptcy Code section 362(d) sets forth the general standard for obtaining relief from the automatic stay. This provision provides, "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section such as by terminating, annulling, modifying, or conditioning of such stay . . . for cause . . . ." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause" and courts must determine when relief from the automatic stay is appropriate on a case-by-case basis.

14.     Generally, relief from the automatic stay should be granted to liquidate an unsecured claim only where the "balance of hardships" favors of determining the claim in the creditor's preferred forum. *See In re UTEX Communs. Corp.*, 457 B.R. 549, 570 (Bankr. W.D. Tex. 2011) (quoting *In re U.S. Brass Corp.*, 173 B.R. 1000 (Bankr. E.D. Tex. 1994); *see also In re Kao*, No. 15-31193-H3-13, 2015 Bankr. LEXIS 4293, at *6 (Bankr. S.D. Tex. Dec. 21, 2015); *In re Young*, No. 06-80397-G3-7, 2006 Bankr. LEXIS 2934, at *6 (Bankr. S.D. Tex. Oct. 20, 2006).

15.     Modifying the automatic stay to allow the Heslin/Lewis Suit to continue to final judgment, but no further, is appropriate here. A jury has been empaneled, the trial has commenced, and the Debtor and Plaintiffs Heslin and Lewis have participated in the trial. In light of these factors, liquidating the claims of Plaintiffs Heslin and Lewis against the Debtor through the state-court trial in the Heslin/Lewis Suit will harm neither the estate, Plaintiffs Heslin and Lewis, nor other creditors.

5

## RESERVATION OF RIGHTS

16.     The Debtor reserves any and all rights in connection with the Heslin\Lewis Suit. Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights or remedies.

## NO PRIOR REQUEST

17.     No previous request for the relief sought herein has been made to this Bankruptcy Court or any other court.

## CONCLUSION

WHEREFORE, the Debtor FSS requests that the Bankruptcy Court: (a) enter an order, in substantially the form attached hereto, modifying the automatic stay to permit the Heslin\Lewis Suit to continue to final judgment, and (b) grant such other and further relief as is just and proper.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002

6

000237

Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor*
*and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Kyung S. Lee*

7

000238

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

*/s/ Raymond W. Battaglia*

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

2

000240

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| In re:                                          ) | Case No. 22- __60043__ |
|                                                  ) | |
| FREE SPEECH SYSTEMS, LLC,   ) | Chapter 11 (Subchapter V) |
|                                                  ) | |
| Debtor.                                    ) | |
|                                                  ) | |

**ORDER MODIFYING AUTOMATIC STAY TO ALLOW HESLIN/LEWIS TRIAL TO
CONTINUE TO FINAL JUDGMENT**

At Victoria, in said District, came on for consideration the Emergency Motion to Lift

Automatic Stay in Favor of Neil Heslin and Scarlett Lewis to Continue Trial to Judgment (the

"Motion") filed by Free Speech Systems, LLC (the "Debtor" or "FSS"); and it appearing to the

Court that notice of the hearing on the Motion is adequate, appropriate and sufficient under the

circumstances of this case; and it further appearing to the Court that prior to the Petition Date, Neil

Heslin and Scarlett Lewis (collectively, the "Plaintiffs") commenced state-court actions against

FSS consolidated into the action styled as *Neil Heslin v. Alex E. Jones and Free Speech Systems,*

*LLC*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas

Heslin/Lewis State Court Litigation"); and it appearing to the Court that a trial in the Heslin/Lewis

Litigation is ongoing before Judge Maya Guerra Gamble, 459th Civil District Court, Travis County

(the "Texas State Court"); and it appearing that on July 29, 2022 (the "Petition Date"), the Debtor

filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas,

Victoria Division (the "Bankruptcy Court"); and the automatic stay provision of 11 U.S.C. § 362(a)

may prevent the continuation of the Heslin/Lewis State Court Litigation; and the Debtor having

agreed to the modification of the automatic stay so as to permit the Texas State Court to proceed

000242

up to and including the entry of judgment, if any, in the Heslin/Lewis State Court Litigation and the Plaintiffs to litigate the matter to judgment;;

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      The automatic stay provision of 11 U.S.C. § 362(a) be and hereby is modified solely for the purpose of allowing the Heslin/Lewis State Court Litigation to continue to proceed to judgment by the Texas State Court.

2.      Except to assert the claim against FSS in FSS's bankruptcy case, the automatic stay shall continue to enjoin the Plaintiffs and any other party, from exercising against FSS any remedies to collect or enforce any judgment against any assets of FSS or its bankruptcy estate including all property of the estate.

3.      This Court shall retain sole and exclusive jurisdiction with respect to the automatic stay and its application to any actions other than those expressly provided for in this Order.

Dated: _____, 2022

                                            _____
                                            UNITED STATES BANKRUPTCY JUDGE

2

000243

Declaration of W. Marc Schwartz in Support of Voluntary

Petition and First Day Motions

[ECF. No. 10]

**EXHIBIT**

2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | Case No. 22-_60043_ |
| FREE SPEECH SYSTEMS, LLC, | Chapter 11 (Subchapter V) |
| Debtor. | |

**DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF**
**VOLUNTARY PETITION AND FIRST DAY MOTIONS**

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      My name is W. Marc Schwartz ("Schwartz").

2.      I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3.      The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively. I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

1

**EXHIBIT**

5.     I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.    The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.     SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services    My firm represents individuals, companies and courts in a variety of assignments,  including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.     I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.     I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.     On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

2

000246

10. On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. Background to Creation of Free Speech Systems, LLC

11. Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12. In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13. Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14. From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

000247

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.     Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC")*.

16.     Alex Jones was a natural.

17.     The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.     Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.     When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.     The predecessor operation of FSS in 2004 was an operation with just a handful of employees. Alex Jones had a tiny office in the far south of Austin. He had two employees at

4

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.     As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.     By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.     While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.     After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.     The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

000249

26.     Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B.  Present Business of Free Speech Systems, LLC**

27.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28.     On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29.     The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30.     As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided. The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

6

000250

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

### C. The Relationship Between Alex Jones and FSS

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected. Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

000251

35.     The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

### D. The Debtor' Owners and Management

36.     At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.     Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.      Since then, Alex Jones has been the Managing Member of FSS.

39.     Since inception, Alex Jones has been a "single talent business", *to wit,* without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.     Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.     In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

8

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies. With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.    The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger. As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b) FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

9

000253

**E. The Relationship of FSS and PQPR**

*Background Information About PQPR*

43.   PQPR was founded in 2013. The business began operations in September 2013.

44.   PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.   PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.   The current owners and their ownership interests in PQPR are as follows:

| | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR H oldings, LLC | 20.00% |
| Total | 100.00% |

47.   Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR"). Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.   Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49.   As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer. FSS pays PQPR, as its agent, funds required to purchase product, which then pays

10

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50.    Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.    Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.    In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53.    On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.    The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.    On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

11

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F. FSS Needs a Credit Card Processor**

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.  Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

12

000256

62.     The key players in credit card processing are:

- **Customer** – the person making a purchase.
- **Merchant** – the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway** – this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor** – (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network** – (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank** – (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank** – (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63.     In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil H eslinv. Alex E. Jones (Texas).

13

64.     After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.     Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.     FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS.  A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.     FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.     In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.     In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

14

000258

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds. In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%). This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G. Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *(c) Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *(d) Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

15

000259

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and *(e) Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74.    These two actions: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75.    As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76.    In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

16

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

77.  As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78.  Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79.  Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80.  InfoW, LLC f/k/a Infowars, LLC ("InfoW" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "InfoWDebtors"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"), on April 18, 2022 (the "Petition Date"), initiating Case No. 22-60020 in that court (the "Bankruptcy Case").

81.  The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

17

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.     The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H. Current Financial Condition of Debtor**

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

18

87.     Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May

31, 2022 and December 31, 2021.

88.     Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS

for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**I.      Critical Motions to Commence the Chapter 11 Case**

**First Day Motions**

89.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions

seeking orders granting various forms of relief intended to stabilize the Debtor's business

operations and facilitate the efficient administration of the Chapter 11 Case. The First Day

Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

19

- **Critical Vendors Motion**. *Debtor's Motion for an Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**. *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.     The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

20

000264

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

**Procedural Motion**

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

21

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.     I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

**Operational Motions**

97.     **Cash Collateral Motion**[6]. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.     The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.     Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

000266

100.    The use of cash collateral required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period").

101.    The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.    PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.    Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.    **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

23

000267

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical

Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62.

In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-

one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the

Court, to consider approval of the Critical Vendors Motion on a final basis.

105.    After an extensive review and analysis of the Debtor's vendors, the Debtor and

its professionals identified the vendors that supply products and services vital to the Debtor's

continued operation. The Debtor relies on products and services from its Critical Vendors to

operate its business, and, depend on the timely provision of specialized services to provide top-

quality content and services to its customer base.

106.    The Critical Vendors procure and provide key services to producing and

transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely

fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their

mission-critical goods and services, the business of FSS would grind to a halt.

107.    I understand that the Debtor's trade relationship with its Critical Vendors is not

governed by long-term contracts, and the Debtor believes those trade relationships will

deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical

Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption

and disturbances to the Debtor's business during the Chapter 11 Case.

108.    Subject to Court's approval, I understand the Debtor intends to pay Critical

Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review,

assess, and make payment on account of these claims. In return for paying these claims, the

Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon

each claimant's agreement to continue supplying goods and services to the Debtor in accordance

24

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.   I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.   **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.   In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.   To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.   The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

25

000269

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.    The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### *Adequate Assurance Procedures*

115.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.    The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

26

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

000271

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118.    **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit. Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119.    The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120.    The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

28

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July,  2022.

W. Marc Schwartz, as Chief Restructuring
Officer of Free Speech Systems, LLC

---

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

29

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022,
through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

**Free Speech Systems LLC**
**Comparative Profit and Loss Statement**
**For the Year Ended December 31, 2021 and the Five Months**
**Ended May 31, 2021**

| | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| *Total Income* | *64,970,641.85* | *14,320,983.15* |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| *Gross Profit* | *$ 13,092,308.12* | *$ 9,384,529.36* |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| *Total Expenses* | *23,387,247.86* | *6,346,192.35* |
| *Net Operating Income* | *$ (10,294,939.74)* | *$ 3,038,337.01* |
| **Other Income** | 507,168.04 | 1,019,713.81 |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| *Total Other Expenses* | *1,131,710.75* | *2,155,946.35* |
| *Net Other Income* | *(624,542.71)* | *(1,136,232.54)* |
| *Net Income* | *$ (10,919,482.45)* | *$ 1,902,104.47* |

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

000276

**Exhibit B**

| Free Speech Systems LLC | | |
| --- | --- | --- |
| Comparative Balance Sheet | | |
| As of December 31, 2021 and May 31, 2022 | | |

| | 2021 | 2022 |
| --- | --- | --- |
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 1,508,720.21 | $ 1,159,247.90 |
| Accounts Receivable | 10,187,121.95 | 10,013,413.22 |
| **Other Current Assets** | | |
| Inventory | 1,732,603.13 | 910,116.84 |
| Prepaid Expenses | 446,475.64 | 114,136.99 |
| Due from PQPR | (500.00) | - |
| Advance To Elevated Solutions | 27,870.00 | - |
| *Total Other Current Assets* | *2,206,448.77* | *1,024,253.83* |
| *Total Current Assets* | *13,902,290.93* | *12,196,914.95* |
| **Fixed Assets** | 1,679,438.66 | 1,580,779.46 |
| **Other Assets** | | |
| Intangible Assets | 21,270.83 | 15,333.33 |
| Security Deposits | 534,560.00 | 534,560.00 |
| *Total Other Assets* | *555,830.83* | *549,893.33* |
| *Total Assets* | *$ 16,137,560.42* | *$ 14,327,587.74* |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 4,732,966.89 | $ 1,217,685.58 |
| Credit Cards | 152,367.42 | 207,984.04 |
| **Other Current Liabilities** | | |
| David Jones Advance | 150,000.00 | 150,000.00 |
| Advances from PQPR | - | 571,920.57 |
| Due to PQPR | 23,058,367.00 | 23,058,367.00 |
| *Total Other Current Liabilities* | *23,208,367.00* | *23,780,287.57* |
| *Total Current Liabilities* | *28,093,701.31* | *25,205,957.19* |
| **Long Term Liabilities** | | |
| Note Due to PQPR | 54,580,405.22 | 53,845,074.41 |
| Note Payable - Winnebago | 93,505.62 | 82,524.37 |
| *Total Long Term Liabilities* | *54,673,910.84* | *53,927,598.78* |
| *Total Liabilities* | *$ 82,767,612.15* | *$ 79,133,555.97* |
| **Equity** | | |
| Member's Equity | (774,291.44) | - |
| Member Draws | (61,937,862.26) | (254,014.00) |
| Member Contributions | 4,305,810.14 | 311,350.00 |
| Opening Balance Equity | - | (66,765,408.70) |
| Retained Earnings | 2,695,774.28 | - |
| Net Income | (10,919,482.45) | 1,902,104.47 |
| *Total Equity* | *$ (66,630,051.73)* | *$ (64,805,968.23)* |
| *Total Liabilities and Equity* | *$ 16,137,560.42* | *$ 14,327,587.74* |

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**Exhibit C**

**Free Speech Systems, LLC**
**Statement of Cash Flows**

**For the Year Ended December 31, 2021  and the Five Months Ended May 31, 2022**

|  | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| **Net Income** | **($10,919,482.45)** | **$1,902,104.47** |
| **Adjustments to reconcile Net Income to Net Cash provided by** | | |
| **operations:** | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| *Net cash provided by operating activities* | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| *Net cash provided by investing activities* | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| *Net cash provided by financing activities* | **22,850,016.65** | **(787,074.46)** |
| *Net cash increase for period* | **$952,374.76** | **($349,472.31)** |

Exhibit "D"

13-Week Cash Flow Forecast for FSS

Case 22-60043   Document 10   Filed in TXSB on 07/29/22   Page 37 of 38

**Exhibit D**

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| | Period | 07/30/2022- 08/05/2022 | 08/06/2022- 08/12/2022 | 08/13/2022- 08/19/2022 | 08/20/2022- 08/26/2022 | 08/27/2022- 09/02/2022 | 09/03/2022- 09/09/2022 | 09/10/2022- 09/16/2022 | 09/17/2022- 09/23/2022 | 09/24/2022- 09/30/2022 | 10/01/2022- 10/07/2022 | 10/08/2022- 10/14/2022 | 10/15/2022- 10/21/2022 | 10/22/2022- 10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Income** | | | | | | | | | | | | | | | |
| Product Sales | | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | | | | | 480,166.46 | | | | 480,166.46 | | | | 480,166.46 | | 1,440,499.38 |
| Donations | | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | | |
| Inventory Purchase | | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfilment Services | | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | | (5,337.87) | | | | | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | | |
| Advertising & Promotion | | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | | (17,541.98) | - | - | - | (17,541.98) | - | - | - | (17,541.98) | - | - | - | - | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | | |
| Internet & TV services | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | | (1,608.39) | | (11,073.89) |
| Software License Fees | | (140.80) | | | | (140.60) | | | | (140.60) | | | | | (422.40) |
| Server Hosting Service | | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Web site Hosting | | | (266.50) | | | | (266.50) | | | | | | (266.50) | | (799.50) |
| **Total Computer/IT/IP Expense** | | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | - | (1,874.89) | - | (719,717.72) |
| Insurance | | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | | (1,989.90) | | | | (1,989.90) | | | | (1,989.90) | | | | | (5,969.69) |
| Office Supplies/Printing/Copy | | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.09) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | | (12,000.00) | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | | |
| Electricity | | | (5,107.63) | | | | (5,107.63) | | | | | | (5,107.63) | | (15,322.89) |
| HVAC | | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| CAM Charges | | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | - | (5,107.63) | - | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | | |
| Rent | | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Office Security | | (33,113.90) | | | | (33,113.90) | | | | (33,113.90) | | | | | (99,335.69) |
| Repair & Maintenance - Building | | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | | (72,280.93) | - | - | - | (72,280.93) | - | - | - | (72,280.93) | - | - | - | - | (216,842.78) |
| Supplies | | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

000281

Case 22-60043   Document 10   Filed in TXSB on 07/29/22   Page 38 of 38

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| | Period 07/30/2022-<br>08/05/2022 | 08/06/2022-<br>08/12/2022 | 08/13/2022-<br>08/19/2022 | 08/20/2022-<br>08/26/2022 | 08/27/2022-<br>09/02/2022 | 09/03/2022-<br>09/09/2022 | 09/10/2022-<br>09/16/2022 | 09/17/2022-<br>09/23/2022 | 09/24/2022-<br>09/30/2022 | 10/01/2022-<br>10/07/2022 | 10/08/2022-<br>10/14/2022 | 10/15/2022-<br>10/21/2022 | 10/22/2022-<br>10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (4,411.68) |
| **Total Travel Expenses** | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | (680,347.03) | (1,898.71) | (236,811.88) | (428.15) | (680,347.03) | (1,898.71) | (256,815.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (1,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (525,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | (1,034,341.69) |
| **Total Other Expenses** | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | - | - | - | - | - | - | (174,868.00) | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 501,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 320,269.75 | $ (289,606.70) | $ 793,406.77 | $ (731,356.72) | $ 113,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | 440,373.41 |



Schwartz Associates



## W. Marc Schwartz, CPA/CFF, CFE

(832) 583-7028

MSchwartz@SchwartzAssociates.us

**EXPERIENCE:** Marc's practice over the past forty-five years as a CPA has included providing business valuation, financial restructuring and expert witness services on a number of civil and criminal cases as well as serving, for the past thirty-five years, as a Chapter 11 bankruptcy trustee, an examiner with expanded powers and as a Federal and State court receiver. He has also assisted clients involved in civil litigation in matters involving construction litigation, professional malpractice, oil and gas disputes (upstream, oilfield services, downstream and midstream), intellectual property, breach of contract, trust and estate disputes, lender liability issues, personal injury, fraud and bankruptcy. The industries Marc has worked in include publishing, retail, healthcare, including medical devices, home and inpatient care, and medical practice operations, oil and gas, biofuels, manufacturing, telecommunications, transportation and refined products trading, amongst others. He is experienced in testifying in federal, state and bankruptcy courts as well as arbitration proceedings throughout the United States.

Marc was awarded his CPA certificate in 1975, was recognized with the Certified Fraud Examiner designation by the Association of Certified Fraud Examiners in 1989 and was Certified in Financial Forensics by the AICPA in 2008. In 2014 the Association of Certified Fraud Examiners presented him with its Lifetime Achievement Award for his more than twenty-five years of service to the anti-fraud profession. In 2019 he was admitted to Full Membership in the National Association of Federal Equity Receivers, an organization of 205 Full Members who have "…been appointed as federal equity receivers in matters of material size and complexity."

Marc started his career with Coopers & Lybrand (now PricewaterhouseCoopers) where he spent twenty years, the last twelve as an audit partner with the firm, working for a variety of client industries. His clients included Gulf Oil Corporation, Sterling Chemicals, Inc. and Mt. Airy Trading Company (at the time the largest refined products trader on the New York Mercantile Exchange, accounting for one third of the Exchange's volume). Marc also oversaw the Firm's Houston based Forensic and Valuation Services practice and served as the Firm's Southwest Region Coordinator of Banking Services.



**EXHIBIT**

3

**Professional History**
**(Partial Listing):**   **August 2019 to Present: Chairman, Schwartz Associates, LLC**

Professional services firm specializing in financial forensics, financial restructuring and reorganization services, and federal and state court receiverships.

**July 2018 to July 2019: Senior Vice President, Nathan Associates Inc.**

Senior Vice President responsible for building the companies litigation, restructuring and advisory practices in the Central United States.

**February 2001 to July 2018: Principal and President, HSSK, LLC**

A professional services firm specializing in business valuation, litigation consulting, and financial restructuring and reorganization services.

**July 1993 to January 2001: Shareholder and President, Schwartz Spilker & Co**

Along with its predecessor firms, provided litigation and bankruptcy, corporate acquisition, and strategic planning consulting services to clients

**1983 to 1993: Partner, Financial Advisory Services Group of Coopers & Lybrand, Houston, Texas**

Provided litigation consulting, bankruptcy consulting and valuation services as well as assisted clients in leveraged buyouts of financial institutions. Continued to serve as an audit partner with clients in the banking, oil and gas and manufacturing industries. Served as Southwest Region-- Coordinator of Banking Services.

**1976 to 1983: Audit staff and ultimately Partner, Coopers & Lybrand, Houston, Texas**

Provided litigation support services for clients, as well as serving audit clients in the banking, oil and gas and manufacturing industries

**1974 to 1976: Audit staff, Coopers & Lybrand, Chicago, Illinois**

Assisted clients in the banking and publishing (magazines and books) industries. Served as Director of Taxation for a NYSE listed company with U. S. and International operations in publishing and the hospitality industries.

**PROFESSIONAL AFFILIATIONS**

**& ACTIVITIES:**   National Association of Federal Equity Receivers, Full Member

American Institute of Certified Public Accountants

Texas Society of Certified Public Accountants (TSCPA) and Houston Chapter

National Association of Certified Fraud Examiners

National Association of Forensic Economics



**Schwartz** Associates

000284

Turnaround Management Association

State Bar of Texas, Bankruptcy Law Section, Non-Lawyer

**ACCREDITATIONS**

**& LICENSES:**

| | |
|---|---|
| Certified Public Accountant | Licensed to practice in Texas. |
| Certified Fraud Examiner | Association of Certified Fraud Examiners |
| Certified in Financial Forensics | American Institute of Certified Public Accountants |
| Licensed Private Investigator | Texas Department of Public Safety, Private Security Bureau (No. 00079856) |

**EDUCATION:**

| | |
|---|---|
| BA, Economics | Princeton University (1972) |
| MBA, Finance and Accounting | University of Chicago (1973) |
| Continuing Education | American Institute of Certified Public Accountants |
| | Texas Society of CPAs |
| | Houston Chapter of the Texas Society of CPAs |
| | Dallas Chapter of the Texas Society of CPAs |
| | University of Texas School of Law |
| | National Association of Corporate Directors |
| | Turnaround Management Association |
| | Houston Chapter of the Association of Certified Fraud Examiners |
| | State Bar of Texas |
| | Programs Sponsored by Various Law Firms |

**CIVIC**

**INVOLVEMENT:**  Marc serves on the Board of Directors of the Mission Centers of Houston, ESCAPE Family Resource Center, the Memorial Exchange Club and as Past President of the National Exchange Club Foundation. He is also a former director and officer of the Houston Chapter of the Texas Society of CPAs.



**Schwartz**Associates

000285



**Schwartz** Associates

May 19,2022

<u>**VIA EMAIL**</u>

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. CRO will work to maximize returns and to assure a fair pro rata distribution to all unsecured creditors.

I.       **Scope of Engagement**

CRO will lead FSS' management and personnel through the restructuring process. It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

1

**EXHIBIT**

4

000286



**Schwartz**Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;
10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.
11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

**II.     Indemnification**

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

2



**Schwartz** Associates

### III.    Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.    Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.    Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3



**Schwartz** Associates

### VI.   Term & Termination

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

### VII.   Compensation

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

#### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS.  SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

4



**Schwartz** Associates

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII. CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX. Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5



**Schwartz**Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

000291

7/22/2022 1:49 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Adrian Rodriguez

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS,<br>    *Plaintiffs* | §<br>§<br>§ | IN DISTRICT COURT OF |
| VS. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES and FREE SPEECH<br>SYSTEMS, LLC<br>    *Defendants* | §<br>§<br>§ | 261st DISTRICT COURT |

## PLAINTIFFS' FOURTH AMENDED PETITION

Plaintiffs NEIL HESLIN and SCARLETT LEWIS files this Fourth Amended Petition against Defendants, ALEX JONES and FREE SPEECH SYSTEMS, LLC, and alleges as follows:

### DISCOVERY CONTROL PLAN

1.    Plaintiffs sought and secured a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2.    Plaintiff Neil Heslin in an individual residing in the State of Connecticut.

3.    Plaintiff Scarlett Lewis in an individual residing in the State of Connecticut.

4.    Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he owns and operates the website InfoWars.com.

1



EXHIBIT
5

5.     [Removed].

6.     Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas.

7.     [Removed].

8.     At all times relevant to this Petition, Defendants Alex Jones and Free Speech Systems, LLC operated as a joint-venture, joint-enterprise, single business enterprise, or alter ego.

## JURISDICTION & VENUE

9.     The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

10.     Venue is proper in Travis County under Tex. Civ. Prac. & Rem. Code §15.002 because it is the county of Defendants' residence at the time the cause of action accrued.

## FACTUAL BACKGROUND

11.     Plaintiffs Neil Heslin and Scarlett Lewis are the parents of deceased minor J.L., a victim of the December 14, 2012 Sandy Hook Elementary School shooting.

12.     This case arises out of accusations by InfoWars in the summer of 2017 that Mr. Heslin was lying about whether he actually held his son's body and observed a bullet hole in his head. This heartless and vile act of defamation re-ignited the Sandy

2

Hook "false flag" conspiracy and tore open the emotional wounds that Mr. Heslin has tried so desperately to heal.

13.     This case also arises out of the intentional infliction of emotional distress committed against Plaintiffs for the past five years through InfoWars' recklessly false statements concerning the circumstances of the death of their child, as well as InfoWars' coordination and encouragement of a fringe community of dangerous fanatics who have stalked and endangered the Sandy Hook parents. Plaintiffs and their family have been specifically targeted in this campaign of harassment.

14.     This conspiracy theory, which has been pushed by InfoWars and Mr. Jones since the day of the shooting, alleges that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using actors, and that the parents of the victims are participants in a horrifying cover-up.

15.     In addition to cruel mockery of the families, InfoWars has spent years advancing a vast collection of grotesque and outrageous falsehoods about the circumstances of the shooting and the subsequent law enforcement investigation and media coverage.

16.     All of these baseless and vile allegations, which have been pushed by InfoWars and Mr. Jones on a continuous basis since the shooting, advance the idea that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using carefully placed actors, or that the families of the victims are also participants in a horrifying cover-up. InfoWars knew its assertions

000294

were false or made these statements with reckless and outrageous disregard for their truth.

**INFOWARS' FIVE YEARS OF HARASSING COVERAGE OF SANDY HOOK**

17.     Beginning in the month of the shooting, in December 2012, InfoWars published multiple videos with false information while claiming the incident was a "false flag" or otherwise staged.

18.     InfoWars continued with a video on January 27, 2013 entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones introduced a variety of completely baseless claims which he would continually repeat with malicious obsession for the next five years.

19.     On March 28, 2013, InfoWars published an article advancing its hoax claim, entitled "Cover-Up of Adam Lanza Link to Psychotropic Drugs."

20.     In an April 9, 2013 video entitled "Obama Gun Grabbing Psyop Speech of Evil," Mr. Jones warned his viewers that recent mass shootings were actually "a government operation," and that Sandy Hook was an "inside job."

21.     In an April 16, 2013 video entitled "Shadow Govt Strikes Again," Mr. Jones discussed his allegation that the government was staging various national tragedies. He told his audience: "They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."

22.     On January 27, 2014, InfoWars published an article advancing its hoax claim, entitled "Exposed: Sandy Hook Shooter's Biggest Threat Still Lives."

4

23.     On February 18, 2014, InfoWars published an article advancing its hoax claim, entitled "School Shooting Expert Threatened Over Sandy Hook Investigation."

24.     In a March 14, 2014 video entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones said, "Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

25.     On May 9, 2014, InfoWars published an article advancing its hoax claim, entitled "Revealed: Sandy Hook Truth Exposed."

26.     On May 13, 2014, InfoWars published an article advancing its hoax claim, entitled "Connecticut Tries to Hide Sandy Hook Truth."

27.     On May 13, 2014, InfoWars published a video entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert." Mr. Jones hosted a notorious crank, Wolfgang Halbig, who solicits donations to support his "investigation" into Sandy Hook. Mr. Halbig maintains that the event was staged and that the parents are actors. Mr. Jones agreed with Mr. Halbig during the video, and he asked his viewers to financially support Halbig. Over the coming years, Mr. Halbig was

000296

a frequent guest, and InfoWars continued to provide support and encouragement to

Mr. Halbig to carry out his campaign of harassment against the Sandy Hook parents.

28.    On September 24, 2014, InfoWars published an article advancing its

hoax claim, titled: "FBI Says No One Killed At Sandy Hook."

29.    InfoWars also published a video on September 25, 2014 entitled

"Connecticut PD Has FBI Falsify Crime Statistics." Mr. Jones again hosted Mr. Halbig

for a lengthy discussion in which they asserted the event was fake. Mr. Jones stated:

> This is not a game...If you've got a school of 100 kids and
> then nobody can find them, and you've got parents
> laughing going "Ha, Ha, Ha," and then they walk over to the
> camera and go (crying), and I mean, not just one, but a
> bunch of parents doing this and then photos of kids that are
> still alive they said die. I mean, they think we're so dumb
> that it's really hidden in plain view, and so the
> preponderance -- I mean, I thought they had some scripting
> early on to exacerbate and milk the crisis as Rahm
> Emmanuel said, but when you really look at it, where are
> the lawsuits? There would be incredible lawsuits and
> payouts, but there haven't been any filed, nothing. I've
> never seen this. This is incredible.

30.    On September 26, 2014, InfoWars published an article advancing its

hoax claim, entitled: "Sandy Hook Investigator: Connecticut PD Had FBI Falsify Crime

Statistics."

31.    On December 2, 2014, InfoWars published an article promoting the hoax

video entitled "We Need to Talk About Sandy Hook."

32.    On December 9, 2014 published an article advancing its hoax claim,

entitled: "Internet Censors Viral Sandy Hook Truth Documentary."

6

33.     In a December 27, 2014 broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones made numerous false claims about Sandy Hook, including his false allegations about "rotations in and out of the building," "blue-screen," "police in anti-terror outfits in the woods," and many others. Mr. Jones described the alleged "acting" by the parents as "just over the top, over the top sick." The video also featured claims that the event was undertaken as a Satanic ritual by global elites.

34.     In a December 29, 2014 broadcast entitled "America the False Democracy," Jones again discussed Sandy Hook, telling his audience, "The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? How do you even convince the public something is a total hoax?" Mr. Jones stated, "It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research."

35.     In the same December 2014 broadcast, Jones continued with more false assertions: "The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

36.     On January 2, 2015, InfoWars published an article advancing its hoax claim, entitled "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

7

37.    In a January 13, 2015 broadcast entitled "Why We Accept Gov't Lies," Mr.

Jones continued his allegations about Sandy Hook. During his discussion, he stated:

> You learn the school had been closed and re-opened. And
> you've got video of the kids going in circles, in and out of
> the building, and they don't call the rescue choppers for
> two hours, and then they tear the building down, and seal
> it. And they get caught using blue-screens, and an email by
> Bloomberg comes out in a lawsuit, where he's telling his
> people get ready in the next 24 hours to capitalize on a
> shooting. Yeah, so Sandy Hook is a synthetic, completely
> fake with actors, in my view, manufactured. I couldn't
> believe it at first. I knew they had actors there, clearly, but
> I thought they killed some real kids. And it just shows how
> bold they are that they clearly used actors. I mean they
> even ended up using photos of kids killed in mass shootings
> here in a fake mass shooting in Turkey, or Pakistan. The sky
> is now the limit."

38.    Mr. Jones' statement about Pakistan refers to a conspiracy theory Jones

helped spread involving a Sandy Hook victim whose photograph appeared at vigil for

children slain a school attack in Peshawar. InfoWars' story was meant to reinforce Mr.

Jones' persistent lie that the victims of the shooting, such as Plaintiff's deceased son

J.L., are not real, or that some sinister conspiracy murdered his child.

39.    In a February 12, 2015 video with an unknown title, Mr. Jones continued

to repeat his false claims. During his discussion, Mr. Jones stated, "I know they're

using blue screens...There are literally hundreds of smoking guns here that this thing

doesn't add up."

40.    In a March 4, 2015 video entitled "New Bombshell Sandy Hook

Information In-Bound," Mr. Jones continued to promote Mr. Halbig, hosting him for a

8

000299

wide-ranging discussion accusing the parents of evil acts. Mr. Jones told Mr. Halbig, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake."

41.   In June of 2015, InfoWars sent its reporter Dan Bidondi to Newtown, Connecticut to accompany Mr. Halbig. While in Newtown, Bidondi and Halbig confronted Newtown residents and civil servants. Mr. Bidondi, a former cage-fighter, aggressively berated several individuals with profanity, false claims, and outrageous threats to publicize their crimes. Their activities created a climate of fear in the community.

42.   In a July 7, 2015 broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behinds the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.

43.   In a July 7, 2015 video entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his false claims about Sandy Hook. During his discussion, Mr. Jones stated:

> No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.

9

000300

Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.

We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method…

You've got green-screen with Anderson Cooper, where I was watching the video, and the flower and plants were blowing in some of them, and then they blow again the same way. It's looped. And then his nose disappears. I mean, it's fake. The whole thing is…I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House. You know? I don't know how they do it, but it's not real. When you take your kids to see the Haunted House and ghosts are flying around, it's not real, folks. It's staged. I mean, a magician grabs a rabbit out of his hat. I know he's got a box under the table that he reaches in and gets the rabbit. I don't know what the trick is here. I've got a good suspicion. But when you've got Wolfgang Halbig…He believed it was real. People called him. He went and investigated. No paperwork, no nothing. It's bull. And now an FBI retired agent, who retired, you know, with decorations. I mean, [InfoWars reporter Rob] Dew, this unprecedented.

44.     On July 10, 2015, InfoWars published an article advancing its hoax claim,

entitled "Sandy Hook FOIA Killed by Commission."

45.     On January 5, 2016, InfoWars published an article advancing its hoax

claim, entitled "Obama's Crying Fuels Speculation It Was Faked."

10

46.     In January of 2016, InfoWars follower Lucy Richards began stalking and making death threats to Leonard Pozner, a fellow Sandy Hook parent and personal friend of Plaintiff Scarlett Lewis. The threats included messages stating: "Death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."[1] When Richards was later sentenced, Senior U.S. District Judge James Cohn stated: "I'm sure [Leonard Pozner] wishes this was false, and he could embrace [N.P.], hear [N.P.'s] heartbeat and hear [N.P.] say 'I love you, Dad'...Your words were cruel and insensitive. This is reality and there is no fiction. There are no alternative facts."[2] As part of her sentence, Ms. Richards will not be permitted to access a list of conspiracy-based websites upon her release, including InfoWars.[3] Ms. Richard's arrest and sentencing are an ominous reminder to the Plaintiffs of the danger posed by InfoWars' continuing lies about Sandy Hook.

47.     Mr. Jones and InfoWars were well-aware of the unhinged community of "Sandy Hook Investigators" they had fostered. Defendants knew that a large collection of Sandy Hook deniers were coordinating their harassment against Plaintiffs and other victims. Plaintiffs and their family have suffered harassment and threats from this community. Mr. Jones and InfoWars have frequently communicated with the hoax community and have interviewed or promoted members of this

[1] https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[2] http://www.nydailynews.com/news/crime/judge-hands-sandy-hook-truther-prison-sentence-article-1.3229754
[3] https://www.buzzfeed.com/claudiakoerner/a-conspiracy-theorist-will-serve-time-for-threatening-a

11

dangerous community on their programming. During a February 2015 video, one prominent member of the Sandy Hook denier community issued a threat to a Sandy Hook parent on the air. During the same video, Mr. Jones showed maps and addresses used by the parent. This parent was the leader of a Sandy Hook non-profit who had complained to YouTube about the emotional distress caused by Jones. Since that time, Mr. Jones' open animosity towards the Sandy Hook parents has been on full display.

48.    By November 2016, a growing tide of public outrage caused Mr. Jones to appear on InfoWars and rant about his false Sandy Hook claims for twenty minutes in what he called his "Final Statement on Sandy Hook," published on November 18, 2016.

49.    During the outrageous video, Mr. Jones directly addressed the public outcry over his statements by doubling down on his accusations. For example, Mr. Jones stated: "That shows some kind of cover-up happening. And then I saw Anderson Cooper -- I've been in TV for twenty-something years, I know a blue-screen or a green-screen -- turn and his nose disappeared. Then I saw clearly that they were using footage on the green-screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage...Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training."

50.    The gist of these statements was that Sandy Hook parents are actually participating in a sinister manipulation plan to fool the public, or that a shadowy cabal

12

000303

of elites pre-planned the murder of their children and controlled the coverage of the event through the media manipulation.

51.     During the November 2016 broadcast, Mr. Jones played video footage of Anderson Cooper interviewing Sandy Hook parent Veronique De La Rosa, at which point Jones stated: "We point out clear chromakey, also known as blue-screen or greenscreen being used, and we're demonized. We point out that they're clearly doing fake interviews...and their answer is to say that we said nobody died."

52.     Towards the end of the November 2016 broadcast, Mr. Jones stated: "Why should anybody fear an investigation? If they have nothing to hide? In fact, isn't that in Shakespeare's Hamlet? Methinks you protest too much...This particular case, they are so scared of investigation."

53.     Mr. Jones concluded the video by accusing parents seen on television of being actors. Mr. Jones stated, "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real."

54.     The November 2016 video broadcast was entitled, "Alex Jones Final Statement on Sandy Hook." It was Plaintiff's hope that the title was accurate, and that Mr. Jones would finally end his reckless attacks on the Sandy Hook parents and his assertions that they were liars and actors engaged in a fraud on the American people.

13

55.     As horrifying as the November 2016 broadcast was, its promise of being the "Final Statement" gave some hope to Plaintiffs that Mr. Jones' harassment might be coming to an end after four long years.

56.     Those hopes were soon dashed. Instead, InfoWars continued its cruel campaign in 2017.

57.     In a March 8, 2017 video, Mr. Jones praised the credibility of Steve Pieczenik, who had previously claimed on InfoWars programming that Sandy Hook was "a Homeland Security drill that they passed off as a real event." Mr. Jones admitted that despite his years of prior statements, "I can't prove it one way or the other." Nonetheless, Mr. Jones repeated his accusation that Veronique De La Rosa's interview with Anderson Cooper was faked in front of a blue screen. He also told his audience that Anderson Cooper was in the CIA, hoping to convince them that the agency was part of the plot.

58.     On April 22, 2017, InfoWars published a video entitled "Sandy Hook Vampires Exposed." This video again repeated the large collection of false accusations which Mr. Jones had been using for years to support his ceaseless attacks on the Sandy Hook families, including the false claims that Sandy Hook parent Veronique De La Rosa participated in a fake blue-screen interview with Anderson Cooper, that the school was closed until that year and was rotting and falling apart in videos, that the children were "going in circles, in and out of the building with their hands up," that port-a-potties had been delivered "an hour after it happened, for the big media event,"

14

000305

and that police were "pulling guns out of cars" and "finding people in the back woods who are dressed up in SWAT gear." Not only did this video continue to advance these hideous and reckless lies about the tragedy, but Mr. Jones and his employee Rob Dew mocked the families as actors and discussed their desire to see photographs of the children's dead bodies.

59.     On June 13, 2017, in a video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook," Mr. Jones addressed what he knew would be a highly embarrassing interview with Megyn Kelly that was scheduled to air several days later. During this video, Mr. Jones pointed his viewers to a list of questions published by Zero Hedge, a notorious anonymous website that spreads misinformation. These questions were all based on Mr. Jones' baseless lies, including his allegation that school's website received no internet traffic in the years before the attack, that there had been reports of other shooters in the woods who fled, that port-a-potties had been delivered within an hour, that FBI crime statistics show no murders in Newtown in 2012, that EMTs were not allowed in the building, and that Mrs. De La Rosa's interview was faked using a blue-screen.

60.     On June 18, 2017, NBC aired Ms. Kelly's profile of Jones. During his interview, Mr. Jones stated that there had been a "cover-up" and "manipulation." He also falsely claimed that children were filmed going in circles in and out of the school.

61.     The following exchange took place:

15

000306

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied...
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.

62.    Mr. Jones and Ms. Kelly also had the following exchange:

> JONES: But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.
>
> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in.

63.    On June 26, 2017, InfoWars' broadcast featured a segment hosted by reporter Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and see his injury.

64.    During the broadcast, Shroyer said, "The statement [Plaintiff] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."[4]

---

[4] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/

16

000307

65.     As support for these defamatory statements, Shroyer played video footage where the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person.

66.     Shroyer also stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."[5]

67.     Stroyer continued by stating that Mr. Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."[6]

68.     "The conspiracy theorists on the internet out there have a lot of questions are that are yet to be answered. You say whatever you want about the event, that's just a fact."[7]

69.     At the conclusion of his report, Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[8]

70.     The underlying point or gist of Shroyer's report is that Mr. Heslin's version "is not possible" and "cannot be accurate," and that Mr. Heslin was lying about the circumstances of his son's tragic death for a nefarious and criminal purpose.

71.     Shroyer's report was manifestly false. In addition, a minimal amount of research would have caused any competent journalist not to publish the defamatory

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

17

accusation. According to contemporary news accounts, the bodies of the victims were released from the medical examiner into the custody of the families.[9] Funerals where the children's bodies were in the custody of their parents were widely reported on by the press.[10]

72.     On July 20, InfoWars programming featured a segment hosted by Alex Jones in which Shroyer's report was re-broadcast in full. When introducing the segment, Jones demanded that Mr. Heslin "clarify" what actually happened.

73.     After showing the segment, Jones said he told Shroyer, "I could never find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this. But maybe they did. So I'm sure it's all real. But for some reason they don't want you to see [Shroyer's segment]."[11]

74.     Regarding the Sandy Hook shooting, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. But you can't blame people for asking."[12]

75.     Mr. Jones was lying. In the five years following the tragedy, he has repeatedly and unequivocally called the Sandy Hook shooting a hoax.

76.     Over the next year, Mr. Jones continued to gaslight the Plaintiffs by insisting that he admitted for years that Sandy Hook was real. He even claims to have

---

[9] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting
[10] http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101;
https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100
[11] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333
[12] *Id.*

18

000309

apologized in a video released on the day of Megyn Kelly profile, on June 18, 2017. Yet his video did not actually contain any apology, and soon thereafter, Mr. Jones continued to publish false facts about the death of Plaintiffs' son. Ultimately Jones waffled and back forth on whether Plaintiffs' son and the other children actually died, but he consistently maintained the event was "phony," and repeats his dozens of recklessly false assertions to support his conclusion.

77.     For example, in an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones continued his false claims, including stating that the CIA visited Sandy Hook shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones also told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

78.     Despite his well-documented conduct, Mr. Jones decided to cast the families as dishonest not only about Sandy Hook, but about their own torment at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Mr. Jones once again proved himself to be an emotionally manipulative liar while mocking the parents with a cruel and juvenile imitation:

> I think they almost do this to mess with us or something.
> I'm serious, man...They go, "Oh, my gosh, why are you
> doing that? You hurt me." And we're like, "No, no. We're
> sorry." "You've hurt me." And like five years later, "You hurt
> me. Stop hurting me." And we're like, "But we're not
> bringing you up."

19

000310

79.     In truth, Mr. Jones has continuously leveled his accusations against the parents, repeated a collection of false claims about the shooting, and even claimed the incident was phony a few months before the first lawsuits were filed against him.

80.     In the same video on April 20, 2018, Mr. Jones continued to accuse the parents of lying about his conduct, and he falsely claimed that he had not discussed Sandy Hook in many years. In a mocking imitation, he stated, "'Oh, my gosh. Alex has no heart. He is -- nothing is sacred. He brought it up again.' No. You did and lied about it."

81.     In the April 20, 2018 video, Mr. Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents...Who in the hell would try to go after people's parents who have dead children?"

82.     In the April 20, 2018 video, Mr. Jones also continued to make recklessly false claims about Sandy Hook. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the video, he repeated his claim that there was a police "stand down" at Sandy Hook.

83.     In the April 20, 2018 video, Mr. Jones also continued his bizarre allegations about Veronique De La Rosa's interview with Anderson Cooper, stating, "It's just a background with the flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chroma key." Mr. Jones also repeated his claim that Anderson

20

Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

84.     Finally, it must be noted that the above descriptions of InfoWars' conduct are not exhaustive. InfoWars has published an enormous amount of video and written content regarding its Sandy Hook hoax claim. Much of that material was removed from the public domain in 2018 and cannot be identified by date and title. It is impossible for the Plaintiffs to present the full scope of InfoWars' actions over the past five years without testimony and documents from the participants.

85.     Nonetheless, it is clear that InfoWars did not merely "cover" the Sandy Hook conspiracy. Instead, its malicious allegations about Sandy Hook quickly become a core element of its programming and soon turned into an outrageous five-year obsession. The publications described above were part of a continuous course of conduct in which Mr. Jones promoted false facts about the death of Plaintiffs' son with malicious motives.

## CAUSES OF ACTION

I.      **Defamation and Defamation *Per Se* by All Defendants Against Neil Heslin.**

86.     All previous allegations are incorporated by reference.

87.     Plaintiffs are private individuals and neither a public officials nor public figures.

21

88.     The June 26, 2017 and July 20, 2017 broadcasts by Defendants were false, both in their particular facts and in the main point, essence, or gist in the context in which they were made.

89.     In viewing the June 26, 2017 and July 20, 2017 broadcasts, a reasonable member of the public would be justified in inferring that the publications implicated the Plaintiff. Individuals who know the Plaintiff understood the publications to concern Plaintiff.

90.     The June 26, 2017 and July 20, 2017 broadcasts were also defamatory because they are reasonably susceptible to a defamatory meaning by innuendo. A reasonable person, reviewing the statements in question, could conclude the Plaintiff was being accused of engaging in fraudulent or illegal activity. In context, the gist of the statements could be construed as defamatory to the Plaintiff by an average member of general public. Individuals who know the Plaintiff understood the publications to implicate criminal conduct by Plaintiff.

91.     Defendants' defamatory publications were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack.

92.     Defendants acted with actual malice. Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

93.     Defendants' defamatory publications were not privileged.

22

94.    Defendants' defamatory statements constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiff in heinous criminal conduct. False implications of criminal conduct are the classic example of defamation *per se*.

95.    Defendants publicly disseminated the defamatory publications to an enormous audience causing significant damages to the Plaintiff.

96.    Defendants' defamatory publications have injured Plaintiff's reputation and image, and they have exposed Plaintiff to public and private hatred, contempt, and ridicule.

97.    In light of their prior experience with these kinds of reckless statements, Defendants knew that their publication could cause Plaintiff to suffer harassment and potential violence.

98.    Defendants' defamatory publications have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## II.    Intentional Infliction of Emotional Distress by Alex Jones and Free Speech Systems, LLC Against Neil Heslin and Scarlett Lewis.

99.    All previous allegations are incorporated by reference.

100.   Defendants knew or should have known that their videos on November 18, 2016, March 8, 2017, April 22, 2017, June 13, 2017, June 19, 2017, June 26, 2017, July 20, 2017, October 26, 2017, and April 20, 2018 would cause Plaintiffs severe

23

000314

emotional distress and cause their family to be the subject of harassment, ridicule, and threats to their safety.

101. Defendants made the statements in these videos in bad faith and with malicious motives, knowing the statements were false or in reckless disregard for the truth, and knowing they would cause severe emotional distress.

102. Defendants consistently published false assertions about the circumstances of the death of Plaintiffs' child in scores of videos and articles for years, long after they should have known their allegations were false and causing emotional distress and danger.

103. In addition, Defendants have been acting in a continuing course of conduct against Plaintiffs since at least January 27, 2013, when Mr. Jones first made his outrageous and false Sandy Hook hoax allegations. Since that time, Defendants have been engaged in a continuous campaign of cruel and dishonest harassment as detailed above, all of which has caused severe emotional distress to Plaintiffs.

104. Defendants' malicious statements were part of a continuous pattern of five years of intentional and reckless harassment accomplished through dozens of disturbing videos, a relentless stream of recklessly false articles published on InfoWars.com, harassing social media content, as well as the encouragement, aid, and financial support to third parties in furthering this harassment. The cumulative quality and quantity of the harassment has been extreme and has shocked the nation.

24

105.  Defendants recognized the distress of the Sandy Hook parents and often addressed the parents directly in their outrageous videos.

106.  In light of their prior experience with these kinds of reckless statements, Defendants knew or should have known that their conduct could cause Plaintiffs and their family to suffer harassment and violence. Defendants knew or should have known their reckless conduct was likely to prompt its audience to contact or communicate with Sandy Hook victims in a hostile or harassing manner.

107.  Severe emotional distress was the primary risk created by Defendants' reckless conduct, and Defendants knew and intended for Plaintiffs to suffer emotional distress.

108.  Defendants' conduct, as a whole, was outrageous and intolerable, going beyond all possible bounds of decency.

109.  Defendants' five-year campaign of willful lies and malicious harassment was utterly intolerable in a civilized community.

110.  No reasonable person could be expected to endure the emotional distress inflicted upon Plaintiffs.

111.  Plaintiffs are private individuals and are neither public officials nor public figures.

112.  Defendants' actions were not conducted in a public space. Rather, Defendants' actions were conducted on its own private property for the purpose of profit.

25

000316

## DAMAGES

113.   Defendants' actions have and will continue to cause harm to Plaintiffs. Due to Defendants' conduct, Plaintiffs have suffered and continue to suffer substantial damages in an amount to be proven at trial.

114.   Plaintiffs have suffered general and special damages, including a severe degree of mental stress and anguish which disrupted their daily routine and caused a high degree of psychological pain.

115.   Plaintiffs are also entitled to exemplary damages because the Defendants acted with gross negligence, ill-will, and malice.

116.   Plaintiffs are entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

117.   Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs are seeking an amount in relief which exceeds $1,000,000.

## JURY DEMAND

118.   Plaintiffs demand a jury trial and tendered the appropriate fee with their Original Petitions.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiffs ask that the Court issue citation for each Defendant to appear and answer, and that Plaintiffs be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiffs are justly entitled.

000317

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022, the forgoing pleading was served upon all counsel of record via electronic service.

MARK D. BANKSTON

27

000318

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST
Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 7/22/2022 1:49:53 PM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 7/22/2022 1:49:53 PM | SENT |
| William R.Ogden | | bill@fbtrial.com | 7/22/2022 1:49:53 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph C. Magliolo | 12821600 | jmagliolo@frlaw.us | 7/22/2022 1:49:53 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/22/2022 1:49:53 PM | SENT |
| Andrew Grant | | aj@fbtrial.com | 7/22/2022 1:49:53 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/22/2022 1:49:53 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrew Grant on behalf of Mark Bankston
Bar No. 24071066
aj@fbtrial.com
Envelope ID: 66587441
Status as of 7/25/2022 7:20 PM CST
Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Federico Reynal | 24060482 | areynal@frlaw.us | 7/22/2022 1:49:53 PM | ERROR |

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and<br>SCARLETT LEWIS | §<br>§<br>§ | IN DISTRICT COURT OF |
| | | TRAVIS COUNTY, TEXAS |
| VS. | §<br>§ | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>OWEN SHROYER | §<br>§<br>§ | |

---

### PLAINTIFFS' EXHIBIT LIST

---

| EXHIBIT NO. | BATES NO. | EXHIBIT DESCRIPTION | ADMITTED |
|---|---|---|---|
| PX 001 | | Family photograph 1 | |
| PX 002 | | Family photograph 2 | |
| PX 003 | | Family photograph 3 | |
| PX 004 | | Family photograph 4 | |
| PX 005 | | Report of the Uniform Crime Reporting Program - Connecticut - 2012 | |
| PX 006 | SANDY HOOK-00350-351 | Sandy Hook Official Report - Book 5 - 00014498 | |
| PX 007 | SANDY HOOK-000354-360 | Sandy Hook Official Report - Book 6 - 00002060 | |
| PX 008 | SANDY HOOK-000373-379 | Sandy Hook Official Report - Book 6 - 00029085 | |
| PX 009 | SANDY HOOK-000387-388 | Sandy Hook Official Report - Book 6 - 00040345 | |
| PX 010 | Ex 4 to Jones 3/14/19 deposition | Dashcam frame | |
| PX 011 | | Affidavit of Alex Jones – 2018 | |
| PX 012 | | Affidavit of Alex Jones – 2019 | |
| PX 013 | | Affidavit of Dr. Wayne Carver | |
| PX 014 | | Affidavit of Owen Shroyer | |
| PX 015 | SANDY HOOK-001692-1752 | Becca Lewis - Alternative Influence | |
| PX 016 | Sandy Hook-000627-637 | Fairleigh University Poll | |
| PX 017 | SANDY HOOK-001586-1691 | Becca Lewis - Media Manipulation and Disinformation Online | |
| PX 018 | SANDY HOOK-000643-656 | Becca Lewis Chart of Literature | |
| PX 019 | SANDY HOOK-000396-421 | CNN Transcript - McDonnel Interview | |

1



EXHIBIT<br>6

| PX 020 | SANDY HOOK-000422-425 | Article – Megyn Kelly Fails to Fact Check Sandy Hook Father's Contradictory Claim In Alex Jones Hit Piece | |
| PX 021 | Ex 8 to Jones 3/14/19 deposition | Screenshot of InfoWars episode | |
| PX 022 | Ex 9 to Jones 3/14/19 deposition | Photo of Dhahran International Hotel | |
| PX 023 | Ex 11 to Jones 3/14/19 deposition | Photo of Dhahran International Hotel | |
| PX 024 | SANDY HOOK-000599-600 | Newtown Bee Photo Archive | |
| PX 025 | SANDY HOOK-000550-558 | Pages from AllThingsAndersonCooper.com | |
| PX 026 | SANDY HOOK-000448-455 | SPJ Code of Ethics | |
| PX 027 | SANDY HOOK-000429-432 | Website of the Sandy Hook Elementary School Shooting Reports | |
| PX 028 | | E-mail - Halbig to JT Lewis – 2019.09.09 (1st) | |
| PX 029 | | E-mail – Halbig to JT Lewis – 2019.09.09 (2nd) | |
| PX 030 | | E-mail – Halbig to JT Lewis – 2019.11.09 | |
| PX 031 | | Index of Defendant's video discovery production, produced November 7, 2019 | |
| PX 032 | FSS_NET_0204-0205 | Free Speech Systems, LLC Balance Sheet | |
| PX 033 | FSSTX-086569-86583 | InfoWars Amazon Sales Summary | |
| PX 034 | FSSTX-086588 | InfoWars Order Spreadsheet | |
| PX 035 | FSSTX-086589 | InfoWars Revenue | |
| PX 036 | FSSTX-086588 | InfoWars Revenue | |
| PX 037 | FSSTX-086587 | InfoWars Revenue | |
| PX 038 | FSSTX-086265 | InfoWars Analytics Landing Pages | |
| PX 039 | FSSTX-082669-082812 | InfoWars Analytics Content Drilldown | |
| PX 040 | Ex 8 to Paz 12/14/22 deposition | Notes of Corporate Representative Brittany Paz | |
| PX 041 | Ex 5 to Jones 3/14/19 deposition | Photograph of Dan Bidondi | |
| PX 042 | FSSTX-043896 | Photograph of Scarlett Lewis | |
| PX 043 | FSSTX-042476 | Halbig Superbowl Photograph | |
| PX 044 | FSSTX-085544-85730 | Leonard Pozner – Comprehensive Report | |
| PX 045 | FSSTX-077825 | E-mail – Adan S. to Louis S. | |
| PX 046 | FSSTX-076236 | E-mail – Dew to Changeshorses | |
| PX 047 | FSSTX-013639 | E-mail – Dew to Aaron | |
| PX 048 | FSSTX-072489 | E-mail – Watson to Pozner | |
| PX 049 | FSSTX-075755 | E-mail – Changeshorses to robd | |
| PX 050 | FSSTX-075999 | E-mail – Dew to changeshorses | |
| PX 051 | FSSTX-04802-040803 | E-mail – Heath to Adan S. | |

2

| PX 052 | FSSTX-078964 | E-mail – Captor to writers@infowars | |
| PX 053 | FSSTX-012708 | E-mail - Louis S. to Matt W. | |
| PX 054 | FSSTX038928-038933 | E-mail - Halbig to Nico@infowars | |
| PX 055 | FSSTX-075327 | E-mail – Nico to Dew | |
| PX 056 | Heslin (19-4651)-000125 | Article – Internet Censors Viral Sandy Hook Truth Documentary | |
| PX 057 | FSSTXX-037204-06 | E-mail – Johnson to Dew | |
| PX 058 | FSSTX-039550 | E-mail – Halbig to kmccune & info@safeandsoundschools.org | |
| PX 059 | Heslin (19-4651)-000166 | Article – Sandy Hook Victim Dies (Again) in Pakistan | |
| PX 060 | FSSTX-075922-28 | Daily Show Log – 02-12-15 | |
| PX 061 | FSSTX-039429 | E-mail – Halbig to Nico | |
| PX 062 | FSSTX-039897 | E-mail – Nico to Dew | |
| PX 063 | FSSTX-040027 | E-mail – Halbig to Wildrosefarm1740 | |
| PX 064 | FSSTX-079546 | E-mail – Louis S. to Lee Ann | |
| PX 065 | FSSTX-037740-42 | E-mail – Dew to Knight | |
| PX 066 | FSSTX-042477 | Letter from Diocese to Halbig | |
| PX 067 | | E-mail – Dew to Bidondi | |
| PX 068 | FSSTX-0381775-76 | E-mail – Dew to Bidondi | |
| PX 069 | FSSTX-018762-63 | E-mail – Powell to Dew | |
| PX 070 | FSSTX-076105 | E-mail – Powell to Hannan | |
| PX 071 | FSSTX-076069 | E-mail – Darrin to Dew | |
| PX 072 | FSSTX-019237-38 | E-mail – Dew to Fetzer | |
| PX 073 | FSSTX-027752 | E-mail – Watson to Buckley | |
| PX 074 | FSSTX-027766 | E-mail – Watson to Buckley | |
| PX 075 | FSSTX-075936 | E-mail – caliberhiter to showtips and writers | |
| PX 076 | Heslin(19-46651) –000766 | E-mail – Adan S to Dew | |
| PX 077 | FSSTX-076588-89 | E-mail – Watson to Buckley | |
| PX 078 | | E-mail – Halbig to Nico and others | |
| PX 079 | FSSTX-042462-63 | E-mail – Murray – robd & funkyboypd | |
| PX 080 | FSSTX-043252-53 | E-mail – Halbig to others | |
| PX 081 | FSSTX-051348-49 | E-mail – Halbig to others | |
| PX 082 | FSSTX-043912-043916 | E-mail – Murray to Habig and others | |
| PX 083 | FSSTX-012675 | E-mail – Wadesvids to robd, alexj, ceo, newstip | |
| PX 084 | FSSTX-052942 | E-mail – Wadesvids to others | |
| PX 085 | | E-mail – David Knight to seekthetruth80 | |
| PX 086 | | E-mail – David Knight to David Knight | |
| PX 087 | FSSTX-052975-76 | E-mail – Wadesvids to robd & others | |
| PX 088 | FSSTX-053016-17 | E-mail – Halbig to Pozner and others | |
| PX 089 | FSSTX-053394 | E-mail – Halbig to Mead and others | |
| PX 090 | FSSTX-015270 | E-mail – Dew to Shroyer | |
| PX 091 | FSSTX-028423 | E-mail – Dew to Jon | |
| PX 092 | FSSTX-014466 | E-mail – Adan S to Darrin | |

000325

| PX 093 | Heslin (19-4651)-000661 | E-mail – Dew to Karpova | |
| PX 094 | Heslin (19-4651)-000627 | E-mail – Bidondi to Dew | |
| PX 095 | Heslin (19-4651)-000719-21 | E-mail – Nico to Darrin | |
| PX 096 | Heslin (19-4651)-000862 | E-mail Jones to Dew | |
| PX 097 | Heslin (19-4651)-000873 | E-mail – Dew to Dew | |
| PX 098 | | Rob Dew Tweet - 2017.12.22 | |
| PX 099 | | Rob Dew Tweet - 2018.01.20 | |
| PX 100 | Ex B-42 to Defs' TCPA Motion | Transcript – The Alex Jones Show – 2017.07.20 | |
| PX 101 | Ex B-43 to Defs' TCPA Motion | Transcript – The Alex Jones Show – 2017.04.22 | |
| PX 102 | Ex B-49 to Defs' TCPA Motion | Transcript – The Alex Jones Show – 2017.04.28 | |
| PX 103 | Ex B-38 to Defs' TCPA Motion | Transcript – The Alex Jones Show – 2017.06.25 | |
| PX 104 | Ex B-39 to Defs' TCPA Motion | Transcript – Sunday Night with Megyn Kelly – 2017.06.18 | |
| PX 105 | | C.V. of Rebecca Lewis | |
| PX 106 | | C.V. of Dr. Roy Lubit | |
| PX 107 | | C.V. of Bernard Pettingill | |
| PX 108 | | C.V. of Fred Zipp | |
| PX 109 | | Argument of Amicus Curiae – 2018.08.23 | |
| PX 110 | | Sandy Hook Facts Screenshot 1 | |
| PX 111 | | Sandy Hook Facts Screenshot 2 | |
| PX 112 | | Sandy Hook Facts Screenshot 3 | |
| PX 113 | | Sandy Hook Facts Screenshot 4 | |
| PX 114 | | Sandy Hook Facts Screenshot 5 | |
| PX 115 | | Sandy Hook Facts Screenshot 6 | |
| PX 116 | | Sandy Hook Facts Screenshot 7 | |
| PX 117 | | Sandy Hook Facts Screenshot 8 | |
| PX 118 | Ex 19 to Jones 12/04/21 deposition | Jones Audio Recording | |

| VIDEO EXHIBIT NO. | VIDEO DESCRIPTION | ADMITTED |
| --- | --- | --- |
| PVX 001 | Connecticut School Massacre Looks Like False Flag Says Witnesses (SH VIDEO 1) | |
| PVX 001A | Clip A of PVX 001 | |
| PVX 001B | Clip B of PVX 001 | |
| PVX 001C | Clip C of PVX 001 | |
| PVX 001D | Clip D of PVX 001 | |

4

| PVX 002 | Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School (F2mRuEhmoGA) | |
| PVX 002A | Clip A of PVX 002 | |
| PVX 003 | Callers React to Foreign Media Pushing Total Gun Confiscation (SH VIDEO 2) | |
| PVX 003A | Clip A of PVX 003 | |
| PVX 004 | Clearing Up Some Disinfo on Sandy Hook Massacre with James Tracy (SH VIDEO 3) | |
| PVX 004A | Clip A of PVX 004 | |
| PVX 004B | Clip B of PVX 004 | |
| PVX 005 | Why People Think Sandy Hook is a Hoax (tM5ZdO-IgEE) | |
| PVX 005A | Clip A of PVX 005 | |
| PVX 006 | Obama Gun Grab Psyop (SH VIDEO 4) | |
| PVX 006A | Clip A of PVX 006 | |
| PVX 007 | Shadow Govt Strikes Again (SH VIDEO 5) | |
| PVX 007A | Clip A of PVX 007 | |
| PVX 008 | Shadow Govt Strike Again (esIvAO2aIlw) | |
| PVX 008A | Clip A of PVX 008 | |
| PVX 009 | Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert (x2a1FwYEZS4) | |
| PVX 009A | Clip A of PVX 009 | |
| PVX 010 | Sandy Hook Deaths Missing From FBI Report (A2Z0zUZBn7k) | |
| PVX 010A | Clip A of PVX 010 | |
| PVX 010B | Clip B of PVX 010 | |
| PVX 010C | Clip C of PVX 010 | |
| PVX 011 | Lawsuit Could Reveal Truth About Sandy Hook Massacre (kK8CnIBA928) | |
| PVX 011A | Clip A of PVX 011 | |
| PVX 011B | Clip B of PVX 012 | |
| PVX 012 | America the False Democracy (SH VIDEO 6) | |
| PVX 012A | Clip A of PVX 012 | |
| PVX 013 | Why We Accept Govt Lies (SH VIDEO 7) | |
| PVX 013A | Clip A of PVX 013 | |
| PVX 014 | Title Unknown – Video discussing HONR Network (SH VIDEO 8) | |
| PVX 014A | Clip A of PVX 014 | |
| PVX 014B | Clip B of PVX 014 | |
| PVX 014C | Clip C of PVX 014 | |
| PVX 014D | Clip D of PVX 014 | |
| PVX 014E | Clip E of PVX 014 | |
| PVX 014F | Clip F of PVX 014 | |
| PVX 014G | Clip G of PVX 014 | |
| PVX 015 | New Bombshell Sandy Hook Information In-Bound (7ib5WkULBY) | |
| PVX 015A | Clip A of PVX 015 | |
| PVX 015B | Clip B of PVX 015 | |
| PVX 015C | Clip C of PVX 015 | |
| PVX 015D | Clip D of PVX 015 | |
| PVX 015E | Clip E of PVX 015 | |
| PVX 015F | Clip F of PVX 015 | |

000327

| PVX 015G | Clip G of PVX 015 | |
|---|---|---|
| PVX 016 | Govt is Manufacturing Crises (SH VIDEO 9) | |
| PVX 016A | Clip A of PVX 016 | |
| PVX 016B | Clip B of PVX 016 | |
| PVX 016C | Clip C of PVX 016 | |
| PVX 017 | Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP (jCOe3qIgyFA) | |
| PVX 017A | Clip A of PVX 017 | |
| PVX 017B | Clip B of PVX 017 | |
| PVX 017C | Clip C of PVX 017 | |
| PVX 018 | Alex Jones Final Statement on Sandy Hook (MwudDfz1yAk) | |
| PVX 018A | Clip A of PVX 018 | |
| PVX 018B | Clip B of PVX 018 | |
| PVX 018C | Clip C of PVX 018 | |
| PVX 020 | Sandy Hook Vampires Exposed (rUn1jKhWTXI) | |
| PVX 020A | Clip A of PVX 020 | |
| PVX 020B | Clip B of PVX 020 | |
| PVX 021 | Media Refuses To Report Alex Jones' Real Statements On Sandy Hook (kf2F7RxJ9e4) | |
| PVX 021A | Clip A of PVX 021 | |
| PVX 022 | Megyn Kelly Profile (SH VIDEO 13) (Also produced as Ex B-39 to Defs' TCPA Motion) | |
| PVX 022A | Clip A of PVX 022 | |
| PVX 023 | Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (SH VIDEO 11) | |
| PVX 023A | Clip A of PVX 023 | |
| PVX 024 | JFK Assassination Documents To DROP Tonight (SH VIDEO 12) | |
| PVX 024A | Clip A of PVX 024 | |
| PVX 024B | Clip B of PVX 024 | |
| PVX 025 | CNN Interview with De La Rosa (SH VIDEO 14) | |
| PVX 025A | Clip A of PVX 025 | |
| PVX 026 | Sandy Hook Official Report - WDMCS_School_Interior_4_of_5 (Sandy Hook 000642) | |
| PVX 026A | Clip A of PVX 026 | |
| PVX 027 | Excerpt from Dan Bidondi FOIA Livestream (Exhibit 12 to Jones 03/19 deposition) | |
| PVX 028 | Excerpt from Dan Bidondi FOIA Livestream (Exhibit 6A to Jones 11/19 deposition) | |
| PVX 029 | CNN Interview with Heslin | |
| PVX 030 | Excerpt from The Alex Jones Show, October 1, 2021 (Exhibit 2 to Jones 12/21 deposition) | |
| PVX 031 | The Fight for Freedom of Information in Sandy Hook (l0miXJ-djeA) | |
| PVX 031A | Clip A of PVX 031 | |
| PVX 031B | Clip B of PVX 031 | |
| PVX 031C | Clip C of PVX 031 | |
| PVX 032 | Video of Dr. Carver Interview | |

6

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

---

## PLAINTIFFS' WITNESS LIST

---

Pursuant to the Court's pretrial order, Plaintiffs Neil Heslin and Scarlett Lewis hereby set forth their list of trial witnesses.

**I.    Witnesses Who May be Called Live**

Neil Heslin
Plaintiff

Scarlett Lewis
Plaintiff

J.T. Lewis
Plaintiff's son

Alex Jones
Defendant

Owen Shroyer
Defendant

Rob Dew
Employee of Defendant

Daria Karpova
Employee of Defendant

Daniel Jewiss
CT State Police Lead Investigator

1



00329

Charles Frye
Online debunker who warned InfoWars

Megyn Kelly
Media personality

CNN Custodian of Records
Cable news organization

Fred Zipp
Retained journalism standards expert

Becca Lewis
Retained online media expert

Bernard Pettingill
Retained economist expert

Roy Lubit
Retained forensic psychiatrist

Michael Crouch
Treating psychotherapist

## II.   Witnesses Who May be Called Through Deposition

Brittany Paz
Corporate representative

Kit Daniels
Employee of Defendant

Adan Salazar
Employee of Defendant

Paul Watson
Employee of Defendant

Dan Bidondi
Former employee of Defendant

Rob Jacobson
Former employee of Defendant

2

000330

Joshua Owens
Former employee of Defendant

**III.   Witnesses Who May be Called Through Affidavit**

Dr. Wayne Carver (deceased)
Office of the Chief Medical Examiner of Connecticut

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2022 the forgoing document was served upon all counsel of record via electronic service.

MARK D. BANKSTON

3

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS<br>Plaintiffs; | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | 261ST JUDICIAL DISTRICT |
| OWEN SHROYER, Defendants. | § | |

### Defendants, Free Speech Systems, LLC; Infowars, LLC; Alex E. Jones; and Owen Shroyer's Exhibit List

| EXHIBIT # | DESCRIPTION OF EXHIBITS | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Google Analytics Reports (FSSTX-085731 through FSSTX-086492) | | |
| 2 | Infowars store Financial Records (FSSTX-086589) | | |
| 3 | 2012.12.17 Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School | | |
| 4 | 2012.12.19 Sandy Hook 2nd Shooter Cover-Up | | |
| 5 | 2012.12.19 Sandy Hook Father Remembers Fallen Hero | | |
| 6 | 2012.12.21 Lower Part of Gotham Renamed "Sandy Hook" in Dark Knight Film | | |
| 7 | 2012.12.22 Expert: Violence on TV and Video Games Cause of Sandy Hook Massacre | | |
| 8 | 2013.01.10 Prof. Claims Sandy Hook Massacre MSM Misinformation | | |
| 9 | 2013.01.15 Sandy Hook AR-15 Hoax? Still No School Surveillance Footage | | |

1 of 5



| EXHIBIT # | DESCRIPTION OF EXHIBITS | OFFERED | ADMITTED |
|---|---|---|---|
| 10 | 2013.01.27 Why People Think Sandy Hook is A Hoax | | |
| 11 | 2013.02.02 Children of Sandy Hook To Perform At Super Bowl | | |
| 12 | 2013.03.27 Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | | |
| 13 | 2013.04.01 Crisis Actors Used at Sandy Hook! Special Report | | |
| 14 | 2013.11.23 Sandy Hook Police Ordered to Stand Down? | | |
| 15 | 2013.12.05 Sandy Hook Mom: BACKGROUND CHECKS WOULDN'T HAVE PREVENTED TRAGEDY | | |
| 16 | 2014.02.20 Sandy Hook Investigator Stonewalled and Threatened | | |
| 17 | 2014.03.14 Sandy Hook, False Narratives Vs. The Reality | | |
| 18 | 2014.05.09 Revealed: Sandy Hook Truth Exposed | | |
| 19 | 2014.05.13 Sandy Hook "Officials" Caught In Coverup And Running Scared | | |
| 20 | 2014.05.13 Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert | | |
| 21 | 2014.05.14 Sandy Hook Red Flags Ignored By Newtown School Board | | |
| 22 | 2014.09.25 Sandy Hook Deaths Missing From FBI Report | | |
| 23 | 2014.12.12 Sandy Hook Film Censorship Efforts Backfire | | |
| 24 | 2014.12.12 The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms | | |

| EXHIBIT # | DESCRIPTION OF EXHIBITS | OFFERED | ADMITTED |
|-----------|------------------------|---------|----------|
| 25 | 2014.12.16 Will Bushmaster Lawsuit Reveal Sandy Hook Hoax? | | |
| 26 | 2014.12.27 Lawsuit Could Reveal Truth About Sandy Hook Massacre | | |
| 27 | 2015.03.04 New Bombshell Sandy Hook Information In-Bound | | |
| 28 | 2015.05.29 New Sandy Hook Questions Arise from FOIA Hearing | | |
| 29 | 2015.05.29 Sandy Hook: The Lies Keep Growing-Infowars Nightly News-05/28/2015 | | |
| 30 | 2015.05.29 School Administrator Exposes Sandy Hook Stonewall | | |
| 31 | 2015.06.04 Official Claims DHS Involved in Sandy Hook | | |
| 32 | 2015.07.07 Retired FBI agent Investigates Sandy Hook: MEGA MASSIVE COVER UP | | |
| 33 | 2015.07.08 The Fight for Freedom of Information in Sandy Hook | | |
| 34 | 2016.11.18 Alex Jones Final Statement on Sandy Hook | | |
| 35 | 2017.04.22 Sandy Hook Vampires Exposed | | |
| 36 | 2017.06.13 Media Refuses to Report Alex Jones' Real Statements on Sandy Hook | | |
| 37 | 2018.04.17 Alex Jones: Responds to Sandy Hook Anti Free Speech Lawsuit | | |
| 38 | 2018.04.17 Full Show-Alex Jones' Full Statement on Frivolous Sandy Hook Lawsuit | | |
| 39 | 2018.04.20 Democrats File Suit to Overturn 2016 Election As Megyn Kelly Re Opens Sandy Hook Wounds | | |

000334

| EXHIBIT # | DESCRIPTION OF EXHIBITS | OFFERED | ADMITTED |
|---|---|---|---|
| 40 | 2018.04.20 March as Megyn Kelly Opens Old Wounds of Sandy Hook Victims | | |
| 41 | 2018.04.20 MSM Continues to Demonize Alex Jones Over Sandy Hook Lawsuits | | |
| 42 | 2018.05.23 Alex Jones' Satatement on New Sandy Hook Lawsuit | | |
| 43 | 2018.05.23 Full SHow-SOROS LAWFARE EXPOSED: Phony Sandy Hook Lawsuits Filed by FBI agent And Families | | |
| 44 | 2018.05.25 Alex Jones Responds to Morgan Freeman, Harvey Weinstein, And Sandy Hook Controversy | | |
| 45 | 1 in 1000_ Infowars Wins Sandy Hook Appeal Request.mp4 | | |
| 46 | Alex Jones And Lawyer Respond to Sandy Hook Show Trials.mp4 | | |
| 47 | Alex Jones' Official Statement on rook Ban and Sandy Hook Show Trials.mp4 | | |
| 48 | America Shocked At Bill Maher's Declaration of War Against The Midwest.mp4 | | |
| 49 | Black Lives Matter_Inside Secrets Exposed by Top Lawyer.mp4 | | |
| 50 | Exclusive Footage from Inside the Alex Jones Sandy Hook Trial.mp4 | | |
| 51 | EXCLUSIVE_Alex Jones Responds to Sandy Hook Child Porn Set Up.mp4 | | |
| 52 | FBI Says Alex Jones Setup With Child Porn in Sandy Hook Case.mp4 | | |
| 53 | Google's Analytics Prove Infowars Has No Sandy Hook Marketing.mp4 | | |
| 54 | Howard Stern Mocks Dead Sandy Hook Children.mp4 | | |

000335

| EXHIBIT # | DESCRIPTION OF EXHIBITS | OFFERED | ADMITTED |
|-----------|-------------------------|---------|----------|
| 55 | Lawyer Breaks Down The BREak Sandy Hook Conspiracy & More.mp4 | | |
| 56 | MSM Use Sandy Hook to Cover Up Leftist Gun Control Agenda.mp4 | | |
| 57 | MSM Uses Tragic Suicide of Sandy Hook Dad To Smear Alex Jones.mp4 | | |
| 58 | New Sandy Hook Hoax synced by AP.mp4 | | |
| 59 | NY TIMES Releases Bizarre Sandy Hook 2nd Shooter Story.mp4 | | |
| 60 | Robert Barnes Makes MAJOR Announcements Concerning Sandy Hook 2nd Shooter Story.mp4 | | |
| 61 | Sandy Hook Smear of Alex Hones Failing, MSM Tales The Nuclear Option.mp4 | | |
| 62 | Sen. Blumenthal Dances On Graves of Sandy Hook Children To Attack Alex Jones.mp4 | | |
| 63 | Sandy Hook Photos | | |
| 64 | Alex Jones Net Worth (AJ_Net_001-AJ_Net_0108) | | |
| 65 | Owen Shroyer Net Worth SHROYER_NET_0001 - SHROYER_NET_0098 | | |
| 66 | Free Speech Systems Net Worth FSS_NET_0001-FSS_NET_0209 | | |

5 of 5

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS, Plaintiffs; | § § § § | IN THE DISTRICT COURT |
| | § | TRAVIS COUNTY, TEXAS |
| v. | § § | |
| ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, AND OWEN SHROYER, Defendants. | § § § | 261ST JUDICIAL DISTRICT |

### DEFENDANTS WITNESS LIST

1. Alex Jones

2. Owen Shroyer

3. Rob Dew

4. Daria Karpova

5. Bob Roe

6. Michael Zimmerman

7. Blake Roddy

8. Tim Fruge

9. Wolfgang Halbig

10. James Fetzer

11. Maria Chang

12. Brittany Paz



EXHIBIT
9

Page 1 of 1

000337