provided the data to the FBI, who immediately spent an additional 6 days combing through the metadata, finding 11 additional hidden images of child pornography. Affidavit, para. 14c-d. Once the FBI and DOJ concluded their investigation, they informed plaintiffs' counsel of the results and then plaintiffs' counsel contacted counsel for Defendants. Affidavit, para. 14e.

When Defendants discovered a third-party or parties attempted to frame them for possession of child pornography they were understandably enraged. Affidavit, para. 14g-h. The manner in which they were made aware of this information was equally enraging. *Id.* Being told by a non-law enforcement entity that you are the victim of 12 distinct acts of cyber-crime involving a child pornography email scam, ostensibly to frame and extort you, is unorthodox as the FBI/DOJ have a Victim Services Division specifically dedicated to liaising with crime victims. Affidavit, para. 14g. While all this information was coalescing in his mind, Alex Jones raised these issues in an emotionally charged stream of consciousness broadcast on 14 June 2019. In this broadcast, Alex Jones expressed his opinion that the perpetrator(s) of these cyber-attacks should be brought to justice and that Attorney Mattei's involvement in this entire course of events was suspicious. Affidavit, para. 14h. The following day, on 15 June 2019, Alex Jones issued another broadcast, apologizing for his emotional response and indicating that the 14 June 2019 broadcast should not be construed as suggesting that plaintiffs' attorneys were involved in any criminal activity related to the discovery of child pornography in the metadata. Affidavit, para. 14i.

At the 18 June hearing, plaintiffs attempted to capitalize on these broadcasts, requesting the court review a transcript of the 14 June Broadcast. Affidavit, para. 15a. At that hearing the plaintiffs indicated that they intended to file a written brief requesting a hearing regarding what, if any, sanctions were appropriate. *Id.* Judge Bellis declined the plaintiffs request to (1) brief the issue and (2) have a meaningful hearing, indicating that the court would rule that day on whether sanctions should enter against Defendants because of the broadcast. Affidavit, para. 15b.

11

Plaintiffs, citing no caselaw and explicitly choosing to not discuss the actual content of the broadcast, argued sanctions were appropriate based on (1) "Pizzagate;" (2) the prior issues with discovery compliance; and (3) their assertion that the apology during the 15 June 2019 broadcast was insufficient. Affidavit, para. 15c. Judge Bellis then turned to Defendants, interrupting their defense counsel two sentences into their argument. Affidavit, para. 15d. Judge Bellis challenged Defendants' characterization of both the apology and the initial broadcasts. Affidavit, para. 15d-e. Counsel for Defendants attempted to respond to this challenge, only to be told "[w]ell, but then you need — then you would want to put on evidence in that regard, because there's no evidence. The evidence before me are the broadcasts that you submitted... this is unchartered territory, Counsel... and despite my research, *I couldn't find a case that came close*." Affidavit, para. 15f. (emphasis added). The Court was already engaged in research without notice or affording Defendants the opportunity to do the same.

Judge Bellis then began a quasi-cross examination of counsel for Defendants, creating the appearance that the court was attempting to justify a predetermined outcome. Affidavit, para. 15g. Following additional argument, but without an evidentiary hearing or a meaningful opportunity to be heard, Judge Bellis denied Defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 15j. In doing so she held the 14 June 2019 broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. Judge Bellis went on to "reject Defendants' claim that Alex Jones was enraged... find[ing] based upon a review of the broadcast clips that it was an intentional, calculated act of rage for his viewing audience." Judge Bellis made this adverse ruling despite having admonished counsel for Defendants earlier that an evidentiary hearing was required to characterize the broadcasts. Affidavit, para. 15jiii3. Although the decisions of Judge Bellis were affirmed on appeal, her actions to that point nonetheless created the appearance of bias.

000540

### III.    The Perception of Prejudice Created By Judge Bellis's Conduct Towards Defendants Following The Appeal Of The Sanction Order

Defendants appealed this sanction to the State of Connecticut Supreme Court and, then, the United States Supreme Court. Affidavit, para. 18. Ultimately the appeal was not successful and, after a second attempt at removal, Defendants returned to Judge Bellis's courtroom on 14 April 2021. Affidavit, para. 18c. Immediately upon returning from the second removal, which had been based upon Plaintiffs' strategic dismissal of the one Connecticut-resident defendant, whose sole purpose as a defendant was to thwart removal, Judge Bellis demonstrated a bias against Defendants—admonishing their counsel for not immediately apprising the Court of a United States Supreme Court order denying a stay that was received when sabbath observance was beginning. Affidavit, para. 19. Judge Bellis indicated that she viewed this as a possible violation of Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal". *Id.*

The filing at issue was filed on 6 November 2020. *Id.* In that filing, counsel for Defendants cited the fact "that there was an application for a stay filed with the U.S. Supreme Court" as one of six bases in support of an objection. *Id.* The Supreme Court docket indicates that the application for a stay referenced in that filing was denied on November 5, 2020. However, counsel for Defendants did not receive notice of the denial until 3:57 p.m. on Friday, November 6, 2020. Affidavit, para. 19c. Counsel for Defendants became aware of this notice after submitting the filing and that awareness occurred after sabbath observance, which had begun minutes after the e-mailed denial was sent to Attorney Randazza, who could not apprise the Court himself because he had been denied the ability to appear. *Id.* On the next business day, Monday November 9, 2020, the plaintiffs informed the Court of the denial. *Id.* Judge Bellis acknowledged subsequently learning that the request for a stay was no longer pending. Affidavit, para. 19d. At a hearing on the issue, Judge Bellis insinuated that counsel for Defendants violated his ethical responsibility to be candid with

13

the court:

> with respect to the app -- the application for the stay with the US Supreme Court,
> what you filed with the Court on that day represented something that, in fact, was
> not accurate and I -- I would say it would have been incumbent upon you to correct
> what you had filed. I did learn subsequently that it wasn't correct, but I just think just
> as we move forward, if it's your or -- or even an innocent -- and I'm not saying it was
> anything but an innocent mistake, but it would be incumbent upon you to just correct
> that mistake because I don't want to have continued problems moving forward.

*Id.* Once Plaintiffs beat Defendants to notifying the Court of the denial of the stay, there was nothing

for Defendants to do, yet Judge Bellis nonetheless chose to admonish counsel.

Judge Bellis's responses to putative ethical violations have been one-sided, as seen by her

subsequent reaction to counsel for Defendants bringing similar and far more disruptive conduct by

counsel for plaintiffs to the Court's attention. Affidavit, para. 20. The conduct at issue resulted in

the court losing subject matter jurisdiction over certain claims and voided all orders entered

regarding certain plaintiffs for a period of more than two years. Affidavit, para. 20b. This conduct

had a substantial impact on the above captioned matters that far exceeded the issue that the Court

previously admonished counsel for Defendants over. However, despite this, Judge Bellis did not

admonish counsel for Plaintiffs. Rather, counsel for Defendants was again admonished by the Court

for referencing the Rules of Professional Responsibility in this context. Ultimately, the Court

indicated that referencing the Rules of Professional Conduct in filings before the Court could subject

counsel to summary disciplinary orders by the Court. The Court indicated that it would rely on

Practice Book § 2-45 to bypass the grievance committee which had previously dismissed Judge

Bellis's earlier referral of counsel for Defendants regarding the affidavit issue. Affidavit, para. 20c.

This hostility to Defendants carried over into subsequent orders by the Court. At a deposition

of a plaintiff in this case, counsel for the plaintiffs attempted to invoke the protections of a stipulated

protective order (PO). Affidavit, para. 21b. That protective order permits counsel to designate all or

part of a deposition as confidential based upon "a *good faith determination by counsel* so

000542

designating to the Court *that there is good cause for the material so designated* to receive the protections of" the PO. DN. 185.00 at 2-3. (emphasis added). At the start of the deposition a plaintiffs' attorney attempted to designate the entire deposition "Highly Confidential – Attorneys Eyes Only." Affidavit, para. 21b. Plaintiffs concede that this designation occurred "at the beginning of the deposition," and therefore without any knowledge of the actual information that was ultimately elicited. *Id.* Accordingly, plaintiffs' counsel failed to satisfy the PO's good faith determination threshold requirement. Affidavit, para. 21c. Because the PO was not properly invoked, counsel for Defendants believed there was no impediment to using the information disclosed during the deposition, especially information that did not fit any of the categories of information permitted to be designated confidential. Affidavit, para. 21d. Accordingly, prior to the conclusion of the deposition, and based on the information elicited, counsel for the defendants filed a motion for a commission to take the deposition of Hillary Clinton without naming the deponent. *Id.*

Plaintiffs filed a motion requesting sanctions for a purported violation of the PO. Affidavit, para. 21b. In response, Defendants argued that no violation occurred because plaintiffs failed to meet the PO's good faith determination threshold requirement. Affidavit, para. 21. In its order responding to the request for sanctions, the Court ignored Defendants' threshold requirement argument. *Id.* Instead, Judge Bellis recast Defendants' argument as an attack on whether there was good cause to issue the stipulated PO itself, characterized this argument as "frightening," and concluded that Defendants' disclosure of the information at issue was "willful misconduct." *Id.* However, Defendants made no such argument. *Id.* Even if counsel for Defendants technically violated the confidentiality order, sanctions were never appropriate where that violation was based on a good-faith view of the effect of that order and otherwise ensuring that no real confidential information (not even the deponent's name) was being revealed.

15

Judge Bellis has since sanctioned Defendants twice more, with another sanctions motion pending and the actual sanction to be determined.  On August 6, 2021 (DN 428.10 & 428.11), the Court sanctioned Defendants for not having produced a "subsidiary ledger" for their accounts. Judge Bellis disregarded the fact that Defendants reasonably relied on their CPA, who provided a declaration in this case, that Free Speech Systems (the only defendant to whom the request was actually directed) does not use subsidiary ledgers.  Sanctions were issued against Mr. Jones and all of his companies, even though, at worst, only Free Speech Systems was in violation of the order requiring production of subsidiary ledgers.  It is one thing to compel Free Speech Systems to produce something it did not think it actually had based on a good faith interpretation of the Court's order, and it is another thing entirely to sanction four other defendants and to give no reason why an expert CPA's opinion is given no weight, finding the expert "not credible" without taking any live testimony or Plaintiffs' expert having been subjected to cross-examination.  Neither did Judge Bellis explain how Plaintiffs were prejudiced when they were given an opportunity to redepose the bookkeeper (but have made little effort to do so since).

Then, on September 30, 2021 (DN 450.20 & 450.21), Judge Bellis sanctioned Defendants following a motion by Plaintiffs seeking sanctions for alleged non-compliance with their discovery requests for Google Analytics and social media analytics.  In actuality, those requests were fulfilled in a timely manner.  Instead of sanctioning Defendants on the bases proffered by Plaintiffs, Judge Bellis, *sua sponte*, decided that Practice Book § 10-12(a) was violated because the documents were not served on co-defendants who had not sought such discovery.  Defendants are unable to find any cases in which a Connecticut court has ruled that Section 10-12(a) means that all produced documents in discovery are "papers" required to be served on all parties, not merely the requesting party.  In Federal practice, the rules "only require[] the responding party to produce the requested documents to the requesting party or its representative, not to all parties in the litigation." *Zurich*

16

*Am. Ins. Co. v. BASF Corp.*, 2011 U.S. Dist. LEXIS 162697 at *8 (S.D. Fla. Nov. 4, 2011)(emphasis

in original). Perhaps the Court is right that the Practice Book has a different requirement, but that

sanctions would issue, in the absence of a clear and intentional violation, makes Judge Bellis appear

biased.

Another sanctions motion is pending, with Plaintiffs absurdly claiming that Defendants did

not produce their real trial balances.  (DN 457.00).  First, the request was only directed to Free

Speech Systems, not all Defendants.  Second, the real trial balances were produced—Plaintiffs'

apparent complaint is that they were not given *incorrect* trial balances.  If the Court awards sanctions

on this motion, the public will have no other view of Judge Bellis than her being on the Plaintiffs'

team.  And, the fact that the plaintiffs are now trying to liquidate all of the above sanctions, to obtain

a default, shows how this whole process is being abused.

## ARGUMENT

The foregoing is just a sampling of the perception of prejudice created by Judge Bellis's

conduct in this matter. This prejudice pervades all aspects of this case creating an appearance of

impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Practice

Book §§ 1-22, 1-23 and Conn. Gen. Stat. § 51-183 provide that any party may, by motion and

affidavit, establish that a judge currently presiding over a matter is disqualified from acting because

of an appearance of judicial impropriety. A claim of an appearance of impropriety under Canon 1

Rule 1.2 of the Connecticut Code of Judicial Conduct is fundamentally different from a claim of

actual bias. *Abington Ltd. Pshp. v. Heublein*, 246 Conn. 815, 819 (1998).

> The Code of Judicial Conduct requires a judge to disqualify himself or herself in a
> proceeding in which the judge's impartiality might reasonably be questioned. The
> reasonableness standard is an objective one. Thus, the question is not only whether
> the particular judge is, in fact, impartial but *whether a reasonable person would
> question the judge's impartiality on the basis of all the circumstances. . . Even in
> the absence of actual bias, a judge must disqualify h[er]self in any proceeding in
> which h[er] impartiality might reasonably be questioned*, because the appearance

17

and the existence of impartiality are both essential elements of a fair exercise of judicial authority.

*State v. Webb*, 238 Conn. 389, 460-61, *aff'd after remand*, 252 Conn. 128, *cert. denied*, 531 U.S. 835 (2000) (citations omitted; internal quotation marks omitted; emphasis added). "The question is not whether the judge is impartial in fact." *Heublein*, at 820. "To prevail on [a] claim of a violation of this canon, the [moving party] need not show actual bias. The [moving party] has met its burden if it can prove that the conduct in question gave rise to a reasonable appearance of impropriety." *Id.* at 819-21.

## I.    A Reasonable Person Would Question the Court's Impartiality

A reasonable person would question the court's impartiality based on (1) the alleged third-party threat against the court; (2) Judge Bellis's sanctioning Defendants following the 14 June broadcast; (3) Judge Bellis's indicating the Court would use Practice Book §2-45 to bypass the grievance committee and subject Counsel for Defendants to summary disciplinary orders; and (4) the perception of prejudice created by Judge Bellis's conduct towards Defendants following the appeal of the sanction order.

In addition, a reasonable person would question Judge Bellis's impartiality based on other matters over which she has presided. Prior to these matters, Judge Bellis was the presiding jurist in *D'Avino, et al. v. Starks*, Case No. FBT-CV-15-6048108-S, which were the claims of various Sandy Hook decedents against the estate of Nancy Lanza. That matter, which was consolidated with eight other matters, included many of the same plaintiffs as in this case (nominally, though in fiduciary capacity), represented by the same firm. Similarly, Judge Bellis is the presiding jurist over *Soto, et al. v. Bushmster Firearms Int'l, LLC,* Case No. UWY-CV15-60500025-S, which is claims of various Sandy Hook decedents against the gun manufacturer and other parties. That matter, which is ongoing, also includes many of the same plaintiffs as in this case (again, nominally), represented

000546

by the same firm.  There is no reason for Judge Bellis to be the Sandy Hook judge, exposed to arguments and evidence in other cases that would tend to color any jurist's opinion of defendants accused of calling Sandy Hook a hoax.

Courts use an objective rather than a subjective standard in deciding whether there has been a violation of Canon 1 Rule 1.2. This objective standard is guided by "two well established propositions concerning the appearance of judicial impropriety." *Heublein*, at 822. "The first proposition is that the prevention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process." *Id.* "The judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved." *Id.* at 823. "The duty to avoid creating an appearance of impropriety is one of taking reasonable precautions to avoid having a negative effect on the confidence of the thinking public in the administration of justice." *Id.* (internal quotation marks omitted.) The second proposition

> requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. . . Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. . . Yet *drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety.*

*Id.* at 823-24. (citations omitted; internal quotations omitted; emphasis added).

### a.  Judge Bellis's Personal Involvement in this Matter via the Alleged Threat Against Her Created the Appearance of Impropriety

"It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted. *State v. Echols*, 170 Conn. 11, 13 (1975), quoting *Glasser v. United States*, 315 U.S. 60, 82 (1942). In Abington Ltd. Pshp. v. Heublein, the

19

Connecticut Supreme Court held that after a judge performed an *ex parte* site visit to a property that was the subject of the matter before him, "a well-informed, thoughtful and objective observer reasonably could decide that there was. . . a significant risk of a judicial impropriety." *Heublein*, at 826. In that case, the trial judge's site visit personally involved him in the subject matter of the litigation before the court, however, the judge refused to recuse himself based "entirely on his determination that his *ex parte* site visit had not in fact caused him to be prejudiced in any way." *Id.* at 821, 824. The Connecticut Supreme Court reasoned that, "the record in the case contain[ed] persuasive evidence of an appearance of impropriety," and that the trial judge abused his discretion by failing to recuse himself. *Id.* at 824. The Supreme Court reasoned further that a "judge's lack of knowledge of a disqualifying circumstance does not eliminate the risk that h[er] impartiality might reasonably be questioned by other persons." *Heublein*, at 825.

Courts scrutinize judicial conduct from inception through a full and fair hearing on the merits to determine whether a party "received a fair trial. . . before an impartial court, and that the core danger of judicial vindictiveness has not been realized." *State v. Herbert*, 99 Conn. App. 63, 69 (2007). Here, Judge Bellis conduct is similar to the trial judge in <u>Heublein</u>, where the Connecticut Supreme Court held an objective observer could conclude there was a risk of judicial impropriety. In <u>Heublein,</u> the trial judge became personally involved with the subject matter of the litigation. In the instant matter, Defendants' speech is the subject matter of the entire litigation. The alleged third-party threat against Judge Bellis has drawn her, albeit unwillingly, into the subject matter of this litigation. If the only information before the court were the notification by the Connecticut State police of the FBI investigation, then the prejudice realized in <u>Heublein</u> might be absent here. However, that is not the case.

Plaintiffs' complaint and subsequent arguments on the record allege that when Defendants speak it is designed to activate his audience to take action against the subject of the speech. Plaintiffs

20

trot out an FBI "Field Intelligence Bulletin" of dubious reliability to claim that when Defendants speak, the subject of that speech is "very likely"—meaning an 80-95% chance—to be targeted by Defendants' audience. As proof of this plaintiffs point to "Pizzagate." Had Judge Bellis rejected this correlation implies causation argument, then again the risk of the perception of judicial impropriety found in <u>Heublein</u> might not be present.

Unfortunately, Judge Bellis did not reject this logical fallacy. Instead, she embraced it. Based on this argument, Judge Bellis found the 14 June broadcast to be a "calculated act of rage for his viewing audience," determining via a personal viewing of the broadcast that Alex Jones stated, "I'm going to kill," despite this phrase not appearing in any transcript before the court. Affidavit, para. 15jiii2. Moreover, Judge Bellis relied on this argument to characterize the broadcasts as "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. This demonstrates Judge Bellis's true unfiltered view of Defendants commenting on the proceedings in this case. It is against this backdrop that the third-party threat must be evaluated. Clearly, in that context, the arguments advanced by the plaintiffs and Judge Bellis's endorsement of them creates the appearance of impropriety. Here, Judge Bellis, without an evidentiary hearing, concludes that when Defendants speak it is "indefensible, unconscionable, despicable, and possibly criminal behavior," based largely on the plaintiffs' "Pizzagate" rational. Employing an objective standard, there is no way to conclude that a reasonable person knowing all these circumstances would not question Judge Bellis's impartiality following the alleged third-party threat. To find otherwise is tantamount to collapsing the appearance of impropriety standard into a demand for proof of actual impropriety.

### b. Judge Bellis's Rulings Over the Course of Discovery Compliance Reveal a High Degree of Antagonism, Creating the Appearance That Fair Judgment Is Impossible, Thereby Requiring Her Disqualification.

"In assessing a claim of judicial bias, [Connecticut Courts] are mindful that adverse rulings,

21

alone, provide an insufficient basis for finding bias even when those rulings may be erroneous." *Massey v. Branford*, 118 Conn. App. 491, 502, *cert. denied*, 295 Conn. 913, (2010). Adverse rulings alone "cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required." *Liteky v. United States*, 510 U.S. 540, 555 (1994). However, adverse rulings "*may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.*; *Schimenti v. Schimenti*, 181 Conn. App. 385, 395 (2018).

In <u>Berger v. United States</u>, the United States Supreme Court held that the comments of the district judge revealed the degree of antagonism necessary to make fair judgement impossible and that the judge should have recused himself based on the alleged comments. *Liteky*, at 555-56; *Berger v. United States*, 255 U.S. 22, 36 (1921). The Supreme Court reasoned that when seeking recusal "the reasons and facts for the belief the litigant entertains . . . must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Id.*; at 33-4. The Supreme Court went on to conclude that, "[t]he facts and reasons" stated by the defendants in support of recusal "are not frivolous or fanciful but substantial and formidable and they have relation to the attitude of [the] Judge's ... mind toward defendants." *Id.*

Almost a century later, Connecticut Courts still follow the holding of <u>Berger</u>. In <u>Schimenti v. Schimenti</u>, the Connecticut Appellate Court held that a trial court judge should have recused herself from hearing a marriage dissolution proceeding. *Schimenti*, at 403-04.  The appellate court reasoned that, while "a trial judge need not leave insights and common sense derived from her life's experience at the courthouse door. . . attitudes garnered from personal life experience cannot serve as a substitute for properly admitted evidence at a hearing." *Id.* at 402. By denying a request for an evidentiary hearing, "the trial judge did not follow her prescribed decision-making pathway but,

22

instead, relied exclusively on her own prejudices born of her life experiences. The court's proper

focus should have been on the well-established decisional pathway." *Id.* at 403. The appellate court

concluded by observing that, "[t]he floor established by the Due Process Clause clearly requires a

fair trial in a fair tribunal . . . In sum, the responsibility of the court in hearing a disputed matter is

to act with impartiality. This requirement entails not only being impartial but also acting in a manner

that projects impartiality." *Id.* (citation omitted; internal quotation marks omitted.)  Here, Judge

Bellis did not hold an evidentiary hearing before terminating the anti-SLAPP motion and she did

not hold any evidentiary hearings before awarding any sanctions.

Refusing to hold evidentiary hearings, the "well established decisional pathway" employed

by impartial courts, is not the only way Connecticut Courts suss out when a trial judge's adverse

rulings demonstrate a level of antagonism that makes a fair judgment impossible. Courts also look

to evidence that the court has prejudged a party's truthfulness. In <u>Cameron v. Cameron</u>, the

Connecticut Supreme Court reasoned that "[t]he trial judge may be under a duty to reprimand

counsel in order to protect the rights of litigants" and "also has a duty to see that no falsehood or

other fraud is perpetrated in court," however, "[o]nce a [trial judge] declares that [s]he believes a

party or a witness has been deceitful . . . she cannot continue to preside in h[er] role of impartial

arbiter." 187 Conn. 163, 170 (1982).. While minor criticisms to correct erroneous statements on an

affidavit may be justified, once a judge declares a belief a party has been deceitful, she must recuse

herself.

Here, Judge Bellis adverse rulings against Defendants include both denying evidentiary

hearings and taking actions indicating that she believed that either Defendants or their counsel (or

their independent expert) had been deceitful. These actions continued on after the Grievance

Committee dismissed the Court's referral regarding the affidavit issue. Before 10 April 2019 the

position Defendants found themselves in as a result of Judge Bellis's adverse rulings were entirely

23

facially neutral. These adverse rulings alone are an insufficient basis for disqualification. However, on 10 April Judge Bellis repeated so frequently that Defendants had now substantially complied with the discovery orders that even plaintiffs' counsel remarked "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e. Up to this point, Defendants' special motion to dismiss and the plaintiffs request for a sanction precluding it, hinged on substantial compliance with the court's discovery orders. However, at this time the issue regarding a signature on an affidavit developed.

Judge Bellis's reaction to the affidavit signature issue is analogous to the reaction of the trial judge in Cameron, which went beyond merely correcting the issue and demonstrated a belief that the defendant and or counsel were attempting to perpetrate a fraud on the court. By the time Judge Bellis was ready to address the affidavit issue, the matter had already been referred to the grievance counsel and a corrected affidavit submitted. However, Judge Bellis referred the matter to the grievance counsel a second time and then *sua sponte* solicited an argument from the plaintiffs for sanctions against Defendants. This was without holding an evidentiary hearing regarding the creation of the original affidavit.

Judge Bellis pressed the plaintiffs to request a sanction. When the plaintiffs refused, Judge Bellis indicated that in light of the plaintiffs refusing to argue for sanctions, the court was satisfied with not taking any further action. However, later when ultimately sanctioning Defendants Judge Bellis explicitly referenced the affidavit issue. As the United States Supreme Court reasoned in Liteky, the focus is on the impact of adverse rulings, not merely the presence of adverse comments in the record. Accordingly, in the context of judicial disqualification, actions speak louder, or at least as loud, as words.  And, the sanctions orders highlight these actions, once for a misunderstanding regarding the protective order, once for a differing understanding of what was supposed to be produced, and once for a *sua sponte* different interpretation of the rules where no

24

Connecticut case is known to have imposed a different requirement than in Federal practice.

This conclusion accords with the second proposition the Connecticut Supreme Court advanced in <u>Heublein</u>. In the context of disqualification due to the appearance of impropriety, requiring that a judge make comments on the record that explicitly demonstrate prejudice against a party would collapse the appearance of impropriety standard into a demand for proof of actual impropriety. Accordingly, evidence that Judge Bellis prejudged Defendants' truthfulness is found in her *sua sponte* incorporation of the affidavit issue as an additional basis for sanctioning Defendants and in rejecting Defendants' expert. This is especially true given that Judge Bellis did so both times without an evidentiary hearing.

The Grievance Committee's decision to dismiss the complaint arising from the affidavit issue only emphasizes the fact that Judge Bellis's reaction, at a minimum, creates the appearance of impropriety. The Grievance Committee reached their conclusion following an adversarial hearing at which both sides were afforded a meaningful opportunity to be heard. Affidavit para. 17. Like in <u>Cameron</u>, where the Supreme Court reasoned that once a trial judge indicates that she believes a party deceitful that judge cannot continue to preside over a matter, here Judge Bellis's conduct indicated a belief that Defendants were in some way deceitful.

Moreover, over a year after the Grievance Committee dismissed the complaint Judge Bellis continued to reference the affidavit issue, demonstrating a continued prejudice against Defendants. At a 6 May 2021 status conference, Judge Bellis threatened to refer Counsel for Defendants to the Grievance Committee again. Affidavit para. 19a. This time the conduct at issue was Counsel for Defendants' failure to violate his observance of the sabbath to inform the Court he received notice of a denial of a stay application. Affidavit para. 19c. When Counsel for Defendants referenced the stay in a filing, the reference to the status of the stay was correct based upon the available information. Despite this, Judge Bellis admonished Counsel for Defendants even though the Court

25

was made aware of the denial on the next business day. *Id.*

The Court's continued prejudice against Defendants was not confined to this single exchange. Given the Court's 6 May 2021 admonishment—in particular the importance it placed on counsel for Defendants not correcting a filing that contained a purported misrepresentation of the status of a request for a stay that lingered for a single weekend—counsel for Defendants raised similar conduct by Counsel for plaintiffs via a motion. That misconduct had a far more egregious impact on the litigation. Affidavit para. 20. Rather than similarly admonishing Counsel for Plaintiffs, Judge Bellis indicated that "[a]ny further such usage of the Rules of Professional Conduct by counsel in filings in this civil action shall result in immediate action by the court. See Practice Book §2-45." Affidavit para. 20c. Importantly, §2-45 permits a court to bypass the Grievance Committee and impose summary disciplinary orders without a complaint or hearing. Practice Book §2-45. Given the prior history in which Judge Bellis's referral of Counsel for Defendants to the grievance committee was dismissed, it is difficult to interpret this reference as anything other than threatening Counsel for Defendants with summary sanctions for referencing the Rules of Professional Responsibility.

Judge Bellis's reaction—both immediate and sustained— to the affidavit issue alone creates the appearance of impropriety that would cause an objective observer to question the courts impartiality. However, Judge Bellis based her decision to sanction Defendants on more than just the affidavit issue. Just prior to sanctioning Defendants in 2019, Judge Bellis referenced the child pornography issue and the 14 June broadcast as additional bases for the sanction.  On  information and belief, an evidentiary hearing into the inadvertent production of discovery containing child pornography would have shown the following: At plaintiffs' request, Judge Bellis ordered metadata for 58,000 emails be produced in 2 weeks. Affidavit, para. 14a. Plaintiffs then provided this data to a paid "electronic storage information expert" that spent 15 days reviewing the data. Affidavit, para.

26

14b. This was longer than the time allotted by Judge Bellis for Defendants to produce this material. In those 15 days, the experts were able to detect a single image of child pornography. *Id*. Next, the FBI spent an additional 6 days to find 11 additional emails containing child pornography. Affidavit, para. 14c-d. In total, it took 21 days, at unknown cost, for paid experts and the federal government to detect these images. Had Defendants attempted to complete this type of review prior to providing this material to the plaintiffs, they would have missed the court ordered discovery deadline by over 7 days. Undoubtedly, this would have been deemed another mark of "obfuscation and delay," most likely determined without a hearing to ascertain the reason why Defendants were not able to meet the 2-week production deadline.

Similarly, there was no evidentiary hearing regarding the 14 June Broadcast. At the 18 June hearing, plaintiffs announced their intention to file, at some future date, a motion regarding the hearing that would request sanctions. Judge Bellis declined this invitation to follow the "well-established decisional pathway" of an evidentiary hearing and meaningful opportunity to be heard, opting instead for counsels' best extemporaneous analysis sans evidence.  The conflicting nature of Judge Bellis's analysis of the broadcast, demonstrates why the court in Schimenti favored the "well-established decisional pathway" of an evidentiary hearing over a judge relying on insights and common sense derived from her life's experience. Judge Bellis applied her own prejudices to what she assumed were the facts of the 14 June broadcast. For example, Judge Bellis claims to have heard "I'm going to kill" in the broadcast, despite it not appearing in any transcript before the court. Yet, when counsel for Defendants attempted to characterize the broadcasts, Judge Bellis prevented this without an evidentiary hearing.

In Schimenti, the appellate court stated that when a trial judge issues adverse rulings in this way it abandons its responsibility to act in a manner that projects impartiality. Judge Bellis's decision to assume facts, multiple refusals to hold evidentiary hearings, and rely on prejudices to

27

justify a sanction impacting the substantive rights of Defendants clearly falls far below the protective floor established by the Due Process Clause. Judge Bellis's rulings over the course of this litigation culminating in the imposition of sanctions reveals a high degree of antagonism. Notably, Judge Bellis admonished counsel for Defendants for conduct that had a minimal impact on the above captioned matters and then subsequently shielded Counsel for plaintiffs for similar conduct that had a far more substantial effect. This is evidence of actual bias. However, without even considering whether the record in this case contains evidence of actual bias, it is clear that there is an appearance of impropriety that would make an objective observer conclude it is not possible for Defendants to receive fair judgment.

Fair judgment requires a willingness to hear and evaluate the arguments of each side before executing judgment. She has repeatedly failed to do so. Therefore, Judge Bellis must be disqualified from this matter.

## CONCLUSION

For all these reasons, Defendants respectfully requests that the Court disqualify Judge Bellis from this matter and substitute another judge to hear it.

## CERTIFICATION OF COUNSEL

The undersigned Counsels for Defendants hereby certify that this motion is made in good faith.

Respectfully Submitted,

By: /s/ Jay M. Wolman /s/
Jay M. Wolman – Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103 P: 702-420-2001
F: 305-437-7662
jmw@randazza.com

*Counsel for Defendants Alex E. Jones, Free*

28

*Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC*

And

BY: /s/ Norman A. Pattis /s/
Norman A. Pattis,
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017 F: 203-393-9745
npattis@pattisandsmith.com

*Counsel for Defendants Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC*

29

000557

## ORDER

The foregoing motion having been heard, it is hereby ordered: GRANTED/DENIED.

_____ , J.

000558

## <u>CERTIFICATION</u>

I hereby certify that a copy of the above was mailed or electronically delivered on this day to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
*Attorneys for Plaintiffs*

Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
mcerame@brignole.com
*Attorneys for Defendant*
*Genesis Communications Network, Inc*

31

000560

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT H

ORDER   421277

DOCKET NO: UWYCV186046436S                SUPERIOR COURT

LAFFERTY, ERICA Et Al                     JUDICIAL DISTRICT OF WATERBURY
    V.                                        AT WATERBURY
JONES, ALEX EMRIC Et Al

                                                11/4/2021

<u>ORDER</u>

ORDER REGARDING:
10/20/2021 519.00 MOTION FOR ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER:

The request for a hearing is denied. Practice Book § 1-23 does not mandate that a hearing be held on a motion to disqualify. Where there is a factual dispute involved in a claim for disqualification, however, an evidentiary hearing may be required. Szypula v. Szypula, 2 Conn. App. 650, 655-56 (1984). Here, there is no dispute as to the underlying facts that give rise to this motion, as the evidence submitted by the defendants primarily consists of transcripts and orders contained in the official court file . "Vague and unverified assertions of opinion, speculation and conjecture cannot support a motion to recuse. . . . In addition, it is clear that adverse rulings by the judge do not amount to evidence of bias sufficient to support a claim of judicial disqualification." (Internal quotation marks omitted.) Rule 1.2 of the Code of Judicial Conduct states as follows: A judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." "The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . [A] judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned . . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all of the circumstances." (Citations omitted; emphasis in original; internal quotation marks omitted.) Papa v. New Haven Federation of Teachers, 186 Conn. 725, 745-46 (1982); see also State v. Rizzo, 303 Conn. 71, 118-19, cert. denied, 133 S. Ct. 133 (2012); Bonelli v. Bonelli, 214 Conn. 14, 18-19 (1990) (totality of circumstances test). The burden of establishing judicial bias, partiality, or impropriety rests on the movants. The motion is denied as the movants have not met their burden.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

000563

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT I

000564

| Docket No. FBT-CV-18-6076475-S | : | **JUDICIAL DISTRICT** |
| : | | |
| **ERICA LAFFERTY, et al.** | : | **OF FAIRFIELD** |
| : | | |
| **v.** | : | **AT BRIDGEPORT** |
| : | | |
| **ALEX JONES, et al.** | : | **JANUARY 24, 2019** |

## RESPONSES TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO ALEX JONES

**1. Identify:**

**a. All business organizations and/or other entities in which you have ownership and/or control**
**b. The officers or members of all organizations and/or entities responsive to part (a)**
**c. The shareholders or other owners of all organizations and/or entities responsive to part (a)**
**d. The employees of all organizations and/or entities responsive to part (a)**

ANSWER:
a. I, Alex Jones, have ownership and/or control of the following business organizations and/or other  entities: Free Speech Systems LLC, InfoWars LLC, InfoWars Health LLC, and PrisonPlanet TV LLC

b. I am the sole officer and member of all the organizations and/or entities responsive to part (a).

c. I am the sole shareholder and owner of all organizations and/or entities responsive to part (a).

d. The employees of all organizations and/or entities responsive to part (a) are attached hereto as Exhibit 1. Free Speech Systems has the employees listed in Exhibit 1, and the Department heads/managers are as follows: Rob Dew, Manager of Media/Video Production; Paul Joseph Watson, Editor/Manager of Writers; Tim Fruge, Director of Business Operations.

concerning that subject matter. Identify the owner of such domain names or URLs.

ANSWER:
Infowars.com, PrisonPlanet.com, prisonplanet.tv

**5. Identify any witnesses you may call at a hearing on a special motion to dismiss.**

ANSWER:
Alex Jones and the Plaintiffs

Under the penalty of perjury, I certify the above answers to these interrogatories are true and complete to the best of my knowledge.

_____  Dated: 3-29-19

Alex Jones

Subscribed and Sworn before me:

_____  Dated: 3-29-19

Timothy Fruge

My Commission Expires:

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791388

| Docket No. FBT-CV-18-6076475-S | : | JUDICIAL DISTRICT |
| : | | |
| ERICA LAFFERTY, et al. | : | OF FAIRFIELD |
| : | | |
| v. | : | AT BRIDGEPORT |
| : | | |
| ALEX JONES, et al. | : | JANUARY 24, 2019 |

## RESPONSES TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO FREE SPEECH SYSTEMS LLC, INFOWARS, LLC, PRISON PLANET TV LLC and INFOWARS HEALTH, LLC

1. Identify:
a. Your officers
b. Your members
c. Your shareholders or other owners
d. Your employees
e. All business organizations and/or other entities in which you have ownership and/or control

ANSWER:
a. b. & c . I, Alex Jones, am the sole owner, officer and member of each of the above named LLCs.

d. Only Free Speech Systems LLC has employees those employees are attached hereto as Exhibit 1. The Department heads/managers of Free Speech Systems LLC are as follows: Rob Dew, Manager of Media/Video Production; Paul Joseph Watson, Editor/Manager of Writers; Tim Fruge, Director of Business Operations.

2. Identify employees responsible for marketing data, research, and/or analytics concerning Infowars, Infowars.com, The Alex Jones Radio Show, and Alex Jones. If such responsibilities were outsourced our contracted out, identify the individual and/or entities to whom they were contracted.

Shooting, Sandy Hook Investigation, Non-Governmental Investigation, Sandy Hook Families, or Sandy Hook Hoax Theory, or otherwise contain content concerning that subject matter. Identify the owner of such domain names or URLs.

ANSWER:

As to Free Speech Systems LLC only: Infowars.com, PrisonPlanet.com, prisonplanet.tv. There are dozens of other URLs, but those are either not active or are set up to act as pointer (redirect) site to the main Info Wars website. A list can be assembled, there are no such URLs referencing Sandy Hook or mass shootings.

The other entities have no URLs.

**5. Identify any witnesses you may call at a hearing on a special motion to dismiss.**

ANSWER:
Alex Jones and the Plaintiffs

Under the penalty of perjury, I certify the above answers to these interrogatories are true and complete to the best of my knowledge.

_____ Dated: 3-29-19

Alex Jones as member of Infowars LLC, Free Speech Systems LLC, Infowars Health LLC, Prison Planet TV LLC

Subscribed and Sworn before me:

_____ Dated: 3-29-19

Timothy Fruge

My Commission Expires:

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791369

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT J

Michael Zimmerman 30(b)(6), Confidential
June 24, 2021

```
NO. X06-UWY-CV-18-6046436S    )  SUPERIOR COURT
                             )
ERICA LAFFERTY, ET AL,        )  COMPLEX LITIGATION DOCKET
                             )
VS.                          )  AT WATERBURY
                             )
ALEX EMRIC JONES, ET AL,       )  JUNE 24, 2021
                             )
_____       )
                             )
NO. X-06- UWY-CV18-6046437-S  )  SUPERIOR COURT
                             )
WILLIAM SHERLACH,             )  COMPLEX LITIGATION DOCKET
                             )
VS.                          )  AT WATERBURY
                             )
ALEX EMRIC JONES, ET AL.       )  JUNE 24, 2021
                             )
_____       )
                             )
NO. X06-UWY-CV-18-6046438S    )  SUPERIOR COURT
                             )
WILLIAM SHERLACH, ET AL.,      )  COMPLEX LITIGATION DOCKET
                             )
VS.                          )  AT WATERBURY
                             )
ALEX EMRIC JONES, ET AL.       )  JUNE 24, 2021
```

-----------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF
FREE SPEECH SYSTEMS, LLC
BY
MICHAEL ZIMMERMANN
JUNE 24, 2021

-----------------------------------


        ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL ZIMMERMANN,

    produced as a witness at the instance of the PLAINTIFF, and

    duly sworn, was taken in the above-styled and -numbered cause

    on JUNE 24, 2021, from 9:00 a.m. to 4:10 p.m., before

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1  Rosalind Dennis, Notary in and for the State of Texas, reported

2  by machine shorthand, appearing remotely from Dallas, Texas,

3  pursuant to the Federal Rules of Civil Procedure and the

4  provisions stated on the record or attached hereto.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4          CHRISTOPHER M. MATTEI, ESQ.
            MATTHEW S. BLUMENTHAL, ESQ.
 5          KOSKOFF KOSKOFF & BIEDER, PC
            350 Fairfield Avenue, Suite 501
 6          Bridgeport, Connecticut 06604
            Cmattei@koskoff.com
 7          mblumenthal@koskoff.com
            (203) 336-4421
 8

 9    FOR THE DEFENDANTS:

10          JAY MARSHALL WOLMAN, ESQ.
            RANDAZZA LEGAL GROUP
11          100 Pearl Street
            14th Floor
12          Hartford, Connecticut 06103
            jmw@randazza.com
13          (702) 420-2001

14
      ALSO PRESENT:
15          Joel Raguso - Videographer

16

17

18

19

20

21

22

23

24

25
```

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1   10-minute break, that'd be --

2              THE WITNESS:  Yeah.  We can do 10, roll for

3   another hour or so, and then do that.

4              MR. MATTEI:  Great.  Thank you.

5              THE WITNESS:  Okay.

6              THE VIDEOGRAPHER:  We are off the record.  The

7   time to 16:13 UTC.

8          (Break taken from 11:13 a.m. to 11:25 a.m.)

9              THE INTERPRETER:  We are on the record.  The

10  time is 16:25 UTC.

11                      EXAMINATION

12  BY MR. MATTEI:

13      Q.   Mr. Zimmermann, did anybody provide you with any

14  information during the break?

15      A.   No.

16      Q.   Okay.  All right.  So, Mr. Zimmermann

17  Free Speech Systems is owned and operated by Alex Jones,

18  correct?

19      A.   That's correct.

20      Q.   And does he have authority over all Free Speech

21  Systems operations?

22      A.   That's correct.

23      Q.   Okay.  He is the CEO and owner?

24      A.   That's correct.

25      Q.   And does he have the authority to hire and fire

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1    anybody of his choosing?

2        A.    That's correct.

3        Q.    And does he have authority to overrule any decision

4    made by a subordinate?

5        A.    That's correct.

6        Q.    And he has ultimate authority over Free Speech

7    finances?

8        A.    That's correct.

9        Q.    And he is not accountable to a board of directors or

10   any governing authority, correct?

11       A.    Correct.

12       Q.    When did Free Speech Systems hire its first employee?

13       A.    The company maintains records.  I don't have

14   information on that with me today?

15       Q.    Can Free Speech Systems approximate the year that it

16   first hired an employee?

17       A.    Approximately 2007, 2008.

18       Q.    How many people are employed by Free Speech Systems

19   presently?

20       A.    Presently, approximately 80.

21       Q.    Who within Free Speech Systems reports directly to

22   Alex Jones?

23       A.    Would be Blake Roddy for e-commerce.  Melinda Flores

24   for, accounting, Michelle Fruge for customer service.  Rob Dew

25   as the news director.

Michael Zimmerman 30(b)(6), Confidential
June 24, 2021

1  NO. X06-UWY-CV-18-6046436S        )  SUPERIOR COURT
                                     )
1  ERICA LAFFERTY, ET AL,            )  COMPLEX LITIGATION DOCKET
                                     )
1  VS.                               )  AT WATERBURY
                                     )
1  ALEX EMRIC JONES, ET AL,          )  JUNE 24, 2021
                                     )
1  _____   )
                                     )
1  NO. X-06- UWY-CV18-6046437-S      )  SUPERIOR COURT
                                     )
1  WILLIAM SHERLACH,                 )  COMPLEX LITIGATION DOCKET
                                     )
1  VS.                               )  AT WATERBURY
                                     )
1  ALEX EMRIC JONES, ET AL.          )  JUNE 24, 2021
                                     )
1  _____   )
                                     )
1  NO. X06-UWY-CV-18-6046438S        )  SUPERIOR COURT
                                     )
1  WILLIAM SHERLACH, ET AL.,         )  COMPLEX LITIGATION DOCKET
                                     )
1  VS.                               )  AT WATERBURY
                                     )
1  ALEX EMRIC JONES, ET AL.          )  JUNE 24, 2021

15                REPORTER'S CERTIFICATION

16           DEPOSITION OF MICHAEL ZIMMERMANN

17                     JUNE 24, 2021

18

19      I, Rosalind Dennis, Notary in and for the State of Texas,

20  hereby certify to the following:

21      That the witness, MICHAEL ZIMMERMANN, was duly sworn by

22  the officer and that the transcript of the oral deposition is a

23  true record of the testimony given by the witness;

24      That the original deposition was delivered to Mr. Mattei.

25      That the amount of time used by each party at the

Michael Zimmerman 30(b)(6), Confidential
June 24, 2021

1   deposition is as follows:

2   MR. MATTEI      .....05 HOUR(S): 23 MINUTE(S)
    MR. WOLMAN      .....00 HOUR(S): 26 MINUTE(S)
3

4       That pursuant to information given to the deposition

5   officer at the time said testimony was taken, the following

6   includes counsel for all parties of record:

7   Mr. Mattei                    Attorney for the Plaintiff.

8   Mr. Wolman                    Attorney for the Defendant.

9       I further certify that I am neither counsel for, related

10  to, nor employed by any of the parties or attorneys in the

11  action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of

13  the action.

14      Certified to by me this 12th day of July, 2021.

15

16

17                          _____
                            ROSALIND DENNIS
18                          Notary in and for the
                            State of Texas
19                          Notary:  129704774
                            My Commission Expires:  10/8/2022
20                          US LEGAL SUPPORT
                            8144 Walnut Hill Lane
21                          Suite 120
                            Dallas, Texas 75231
22                          214-741-6001
                            214-741-6821 (FAX)
23                          Firm Registration No. 343

24

25

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

IN RE:                                     §          Case No. 22-60043
                                           §
FREE SPEECH SYSTEMS, LLC,                  §          Chapter 11 (Subchapter V)
                                           §
        Debtor.                            §

# EXHIBIT K

NO. XO6-UWY-CV-18-6046436-S

_____

ERICA LAFFERTY, ET AL.,          ) SUPERIOR COURT
                                 ) COMPLEX LITIGATION
                                 ) AT WATERBURY
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____  )
NO. X06-UWY-CV-18-6046437-S      ) SUPERIOR COURT
                                 ) COMPLEX LITIGATION
WILLIAM SHERLACH                 ) DOCKET AT WATERBURY
                                 )
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____  )
NO. X06-UWY-CV-18-6046438-S      ) SUPERIOR COURT
                                 ) COMPLEX LITIGATION
WILLIAM SHERLACH, ET AL.         ) DOCKET AT WATERBURY
                                 )
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____  )


            VIDEOTAPED DEPOSITION OF ALEX EMRIC JONES

                        (CONFIDENTIAL)

DATE:            April 5, 2022

TIME:            9:37 a.m.

HELD AT:         Koskoff Koskoff & Bieder
                 350 Fairfield Avenue
                 Bridgeport, Connecticut

    By:          Sarah J. Miner, RPR, LSR #238

```
 1   A P P E A R A N C E S:

 2   For the Plaintiffs:

 3   Christopher M. Mattei, Esq.
     Matthew S. Blumenthal, Esq.
 4   Alinor Sterling, Esq.
     Koskoff Koskoff & Bieder
 5   350 Fairfield Avenue, Suite 501
     Bridgeport, Connecticut  06604

 6

 7   For Alex Emric Jones, Infowars, LLC, Free Speech
     Systems, LLC, Infowars Health, LLC and Prison
 8   Planet TV, LLC:

 9   Norman A. Pattis, Esq.
     Pattis & Smith, LLC
10   383 Orange Street, First Floor
     New Haven, Connecticut  06511

11

12   For Genesis Communications Network, Inc.:
      (Appearing via Zoom)
13
     Mario Kenneth Cerame, Esq.
14   Brignole, Bush & Lewis
     73 Wadsworth Street
15   Hartford, Connecticut  06106

16   Also Present:

17   Pritika Seshadri

18

19

20

21

22

23

24

25
```

Alex Emric Jones  Confidential
April 05, 2022

```
 1      A    Yes.

 2      Q    You were previously married to Kelly

 3  Jones?

 4      A    Yes.

 5      Q    I understand that you arrived at our

 6  building today with somebody who was operating a

 7  digital camera device.  Is that right?

 8      A    You mean a phone?

 9      Q    Well, did you arrive at our building with

10  somebody who was filming you?

11      A    Yes, with a phone, yes.

12      Q    Who is that?

13      A    That is just one of the crew members.

14      Q    What is his name?

15      A    He is a new guy.  I forget his name.  It

16  is Reese something.  If you want, I can call him

17  and find out who.

18      Q    He traveled with you from Texas?

19      A    Yes.

20      Q    For the purpose of filming you?

21      A    Just documenting in case anything

22  happened, yeah.

23      Q    Do you ever intend to publish the footage

24  that he shoots on one of your broadcasts after this

25  deposition?
```

Alex Emric Jones   Confidential
April 05, 2022

```
 1        A    I don't know.

 2        Q    Okay.

 3        A    Probably not.

 4        Q    But you wanted to be prepared to do that?

 5        A    Yes.

 6        Q    And part of the reason you want to be

 7   prepared to do that is because you have been

 8   raising money from your audience and you advised

 9   them that you need their funds to help finance your

10   litigation.  Correct?

11        A    Yes.

12        Q    You didn't tell them that you sold the

13   house in November, did you?

14             MR. PATTIS:  Objection as to form.

15             THE WITNESS:  Them?

16   BY MR. MATTEI:

17        Q    Your audience?

18        A    I did, yes.

19        Q    You told them how much you sold it for?

20        A    I believe I told them what I was able to

21   get from it, $3 million.  I know that was the money

22   we got from it.  I don't know the exact amount

23   after all the realty stuff.

24             MR. MATTEI:  Bring up Exhibit 1.

25   BY MR. MATTEI:
```

Alex Emric Jones   Confidential
April 05, 2022

```
1                  C E R T I F I C A T E

2         I hereby certify that I am a Notary Public, in

3  and for the State of Connecticut, duly commissioned

4  and qualified to administer oaths.

5         I further certify that the deponent named in

6  the  foregoing deposition was by me duly sworn and

7  thereupon testified as appears in the foregoing

8  deposition; that said deposition was taken by me

9  stenographically in the presence of counsel and

10  reduced to typewriting under my direction, and the

11  foregoing is a true and accurate transcript of the

12  testimony.

13         I further certify that I am neither of counsel

14  nor related to either of the parties to said suit,

15  nor of either counsel in said suit, nor am I

16  interested in the outcome of said cause.

17         Witness my hand and seal as Notary Public the

18  10th day of April, 2022.

19

20

21  _____

    Sarah J. Miner, RPR, LSR #238
22  Notary Public

23  My Commission Expires:

24  November 30, 2022

25
```

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT L

NO. XO6-UWY-CV-18-6046436-S

_____

ERICA LAFFERTY, ET AL.,          ) SUPERIOR COURT
                                 ) COMPLEX LITIGATION
                                 ) AT WATERBURY
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____   )
NO. X06-UWY-CV-18-6046437-S      ) SUPERIOR COURT
                                 ) COMPLEX LITIGATION
WILLIAM SHERLACH                 ) DOCKET AT WATERBURY
                                 )
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____   )
NO. X06-UWY-CV-18-6046438-S      ) SUPERIOR COURT
                                 ) COMPLEX LITIGATION
WILLIAM SHERLACH, ET AL.         ) DOCKET AT WATERBURY
                                 )
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____   )

              CONTINUED VIDEOTAPED DEPOSITION OF
                     ALEX EMRIC JONES
                        VOLUME II
                      (CONFIDENTIAL)

DATE:             April 6, 2022

TIME:             9:37 a.m.

HELD AT:          Koskoff Koskoff & Bieder
                  350 Fairfield Avenue
                  Bridgeport, Connecticut

    By:           Sarah J. Miner, RPR, LSR #238

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1    A P P E A R A N C E S:

 2    For the Plaintiffs:

 3    Christopher M. Mattei, Esq.
      Matthew S. Blumenthal, Esq.
 4    Alinor Sterling, Esq.
      Koskoff Koskoff & Bieder
 5    350 Fairfield Avenue, Suite 501
      Bridgeport, Connecticut  06604

 6

 7    For Alex Emric Jones, Infowars, LLC, Free Speech
      Systems, LLC, Infowars Health, LLC and Prison
 8    Planet TV, LLC:

 9    Norman A. Pattis, Esq.
      Pattis & Smith, LLC
10    383 Orange Street, First Floor
      New Haven, Connecticut  06511

11

12    For Genesis Communications Network, Inc.:
       (Appearing via Zoom)
13
      Mario Kenneth Cerame, Esq.
14    Brignole, Bush & Lewis
      73 Wadsworth Street
15    Hartford, Connecticut  06106

16    Also Present:

17    Pritika Seshadri

18

19

20

21

22

23

24

25
```

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1              successful.

 2   BY MR. MATTEI:

 3       Q   You are the -- well, they are the reason

 4   that you can, right, because you take their money.

 5   Right?

 6                   MR. PATTIS:  Objection.

 7                   MR. CERAME:  Objection.

 8                   THE WITNESS:  I think when you air to

 9           this audience they are more supportive

10           because they understand who you are and

11           what you are.

12   BY MR. MATTEI:

13       Q   Well, you have already been using this

14   litigation to raise as much money from them as

15   possible.  Correct?

16                   MR. PATTIS:  Objection.

17                   MR. CERAME:  Objection.

18   BY MR. MATTEI:

19       Q   And you are going to continue to do that?

20       A   I am going to continue to fight tyranny

21   for the rest of my life.

22                   MR. CERAME:  Objection.  And I find

23           this question to be a violation of 13-30.

24                   MR. MATTEI:  I look forward to your

25           motion with the Court, Mario.
```

1              MR. CERAME:  I am noting it so you

2         can perhaps take notice.

3    BY MR. MATTEI:

4         Q   Mr. Jones, let's go to --

5              MR. CERAME:  13-30 requires me to

6         give you notice.  I am giving you notice.

7              MR. MATTEI:  Thank you, Mario.

8    BY MR. MATTEI:

9         Q   Let's go to -- in 2016, you decided to --

10             MR. PATTIS:  I didn't hear the

11        predicate for the question, Chris.  I'm

12        sorry.

13   BY MR. MATTEI:

14        Q   2016.

15             MR. PATTIS:  Thank you.

16   BY MR. MATTEI:

17        Q   Mr. Jones, does all the money that you

18   raise -- well, let me ask it this way.  When you

19   raise money from your audience for your legal

20   defense, does all the money you raise from that go

21   to your lawyers?

22        A   The specific accountant we had for that,

23   100 percent of it has gone to that, yes.

24        Q   You have an account for Genesis

25   Communications Network.  Right?

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1        A    Yes.
 2        Q    You set that up so that your audience
 3   could fund Genesis defense?
 4        A    And that goes to them.
 5                  MR. CERAME:  Objection.
 6   BY MR. MATTEI:
 7        Q    And there is a specific link for that that
 8   goes directly to an account controlled by Ted
 9   Anderson.  Right?
10        A    Uh-huh.
11                  MR. CERAME:  Objection.
12   BY MR. MATTEI:
13        Q    Then you separately raised money from your
14   audience for your own -- what you claim is
15   defensive InfoWars.  Right?
16        A    Yes.
17        Q    And people can give to that -- is there a
18   specific link for that for InfoWars legal defense?
19        A    There is a website.
20        Q    There's a specific website.  And when
21   people give to that website, where does it go?
22        A    It is put in an account and accounted for
23   as an account.
24        Q    It is a Free Speech Systems account?
25        A    Yes, it is spent on legal.
```

1     Q    Who set it up?

2     A    That is how we set it up, the legal

3   accountant, again.  One goes to Ted (phonetic) and

4   the other one Witt (phonetic), and that's put in

5   the ledger as that.  And the last time I checked, I

6   think it has been spent on legal.

7     Q    When is the last time you checked?

8     A    I checked it last week.

9     Q    Your sworn testimony here is that every

10  penny that was deposited into the account you just

11  described for me went to your lawyers?

12    A    I mean, I can't -- I haven't done the

13  accounting myself, but that's my general belief.

14  That's what the money is for.

15    Q    There's also a link on your website just

16  for people to donate.  Right?

17    A    Yes.

18    Q    And that money just goes right into the

19  Free Systems General Fund?

20    A    Absolutely.  It goes into the War Fund.

21    Q    Are you at war with somebody?

22              MR. CERAME:  Objection.

23              THE WITNESS:  With the globalists and

24        all the crime syndicates.

25  BY MR. MATTEI:

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1

 2        A    Everybody knows about the new world order.

 3        Q    You are enlisting your audience in that

 4   battle as well?

 5        A    Absolutely.

 6        Q    They are foot soldiers in the war against

 7   the globalists.  Right?

 8        A    In the information war against people that

 9   have destroyed this country.

10        Q    Are my clients globalists?

11        A    Most Sandy Hook parents, the ones you

12   have, you are using them and HBO, they were

13   globalists conglomerate to try to silence the

14   populous voices.  They are just being used as pawns

15   by you.

16        Q    The Sandy Hook families that have decided

17   to sue you are just pawns in a much larger battle.

18   Is that what you are saying?

19        A    I am not going to speak for them.  In my

20   view, they are being used by you and Senator

21   Blumenthal and others.

22        Q    By me, their lawyer?

23        A    You are a well-known ambulance chaser,

24   Democrat anti-free speech, anti-gun tyrant.

25        Q    I am a tyrant and so I need to be stopped.
```

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1              C E R T I F I C A T E

 2        I hereby certify that I am a Notary Public, in

 3   and for the State of Connecticut, duly commissioned

 4   and qualified to administer oaths.

 5        I further certify that the deponent named in

 6   the  foregoing deposition was by me duly sworn and

 7   thereupon testified as appears in the foregoing

 8   deposition; that said deposition was taken by me

 9   stenographically in the presence of counsel and

10   reduced to typewriting under my direction, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13        I further certify that I am neither of counsel

14   nor related to either of the parties to said suit,

15   nor of either counsel in said suit, nor am I

16   interested in the outcome of said cause.

17        Witness my hand and seal as Notary Public the

18   12th day of April, 2022.

19

20

21   _____

22   Notary Public

23   My Commission Expires:

24   November 30, 2022

25
```

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT M

4/6/2022 1:43 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-22-001610
Ruben Tamez

D-1-GN-22-001610

CAUSE NO. _____

| | | |
|---|---|---|
| NEIL HESLIN, SCARLETT LEWIS, LEONARD POZNER, VERONIQUE DE LA ROSA, MARCEL FONTAINE | § § § § | IN THE DISTRICT COURT |
| Plaintiffs | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, PLJR HOLDINGS, LLC, CAROL JONES, DAVID JONES, PQPR HOLDINGS, LLC, JLJR HOLDINGS LIMITED, LLC, AEJ HOLDINGS, LLC, AEJ TRUST 2018 | § § § § § § § § § § § § | 200TH, DISTRICT COURT |
| Defendants. | § § | _____ DISTRICT COURT |

## PLAINTIFFS' ORIGINAL PETITION

### Introduction

1.    After Alex Jones was sued for claiming the massacre at Sandy Hook Elementary was a hoax, the infamous conspiracy theorist conspired to divert his assets to shell companies owned by insiders like his parents, his children, and himself. Since being sued, Jones transferred millions of dollars from his fortune to these insiders—whom he apparently thought were beyond reach. But the Texas Uniform Fraudulent Transfer Act prohibits defendants from playing shell games to shield assets from their creditors. And it allows creditors like the Sandy Hook Families to void fraudulent transfers that defendants like Alex Jones make to their insiders. The Sandy Hook Families and Fontaine therefore assert TUFTA claims against Jones and his insiders to foil this scheme.

000593

## Parties

**The Sandy Hook Families**

    2.     Plaintiff Neil Heslin is an individual who resides in Connecticut.

    3.     Plaintiff Scarlett Lewis is an individual who resides in Connecticut.

    4.     Plaintiff Leonard Pozner is an individual who resides in Florida.

    5.     Plaintiff Veronique De La Rosa is an individual who resides in Florida.

**Fontaine**

    6.     Plaintiff Marcel Fontaine is an individual who resides in Massachusetts.

**The Jones Debtors**

    7.     Defendant Alex E. Jones is a resident of Austin, Texas. He hosts radio and web-based news programing, including "The Alex Jones Show," and he owns Free Speech Systems, LLC, which operates the website infowars.com. Jones can be served at his place of business, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

    8.     Defendant InfoWars, LLC is a Texas limited-liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Ave., 18th Floor, Austin, TX 78701.

    9.     Defendant Free Speech Systems, LLC is a Texas limited-liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Ave., 18th Floor, Austin, TX 78701.

    10.    At all times relevant to this petition, these Jones Debtors operated as a joint venture, joint enterprise, single-business enterprise, or alter ego.

000594

**The Jones Transferees**

11.     Defendant PQPR Holdings Limited LLC is a Nevada limited-liability company. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

12.     Defendant JLJR Holdings, LLC is a Nevada limited-liability company. It directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

13.     Defendant PLJR Holdings, LLC is a Nevada limited-liability company. It directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

14.     Defendant Carol Jones is a resident of Austin, Texas. She is Alex Jones's mother and directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. She can be served personally at 3402 Clawson Road, Austin, Texas 78704 or wherever she can be found.

15.     Defendant David Jones is a resident of Austin, Texas. He is Alex Jones's father and directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. He can be served personally at 3402 Clawson Road, Austin, Texas 78704 or wherever he can be found.

16.     Defendant PQPR Holdings, LLC is an entity that has been previously identified by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

000595

17.     Defendant JLJR Holdings Limited, LLC is an entity listed as a member of PQPR Holdings Limited, LLC and PLJR Holdings, LLC. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

18.     Defendant AEJ Holdings, LLC is an entity that has been identified previously by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

19.     Defendant AEJ Trust 2018 is an entity that has been identified previously by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

20.     At all times relevant to this petition, the Jones Transferees and Defendant Alex Jones operated as a joint venture, joint enterprise, single-business enterprise, or alter ego.

## Discovery-Control Plan

21.     Discovery should be conducted under Level 3 case of the Texas Rules of Civil Procedure.[1] Plaintiffs seek monetary relief over $1,000,000.[2]

## Jurisdiction and Venue

22.     The amount in controversy exceeds the Court's minimum jurisdictional requirements.

---

[1] *See* Tex. R. Civ. P. 190.

[2] *See* Tex. R. Civ. P. 47. Plaintiffs may also seek injunctive relief, in which case they may request expedited discovery.  *See* Tex. R. Civ. P. 680.

4

23.     Venue is proper in Travis County because that's where certain Defendants resided when the cause of action accrued and because all or a substantial part of the events or omissions giving rise to the claims occurred in Travis County.[3]

## Background

24.     Alex Jones, through his media companies Free Speech Systems and InfoWars, became a national figure by peddling bizarre conspiracy theories. Followers tune in to hear him and his guests ramble about unsubstantiated claims—like how the September 11th attacks were an inside job by the U.S government. They can also hear him tout the various products available to buy on his InfoWars website. And they can then navigate to that website, where they have a host of products available for purchase.

25.     They can buy, for example, bumper stickers echoing the types of conspiracy theories they hear on Jones's programming:



---

[3] *See* Tex. Civ. Prac. & Rem. Code § 15.002.

[4] InfoWars Store, at "Stickers and Decals", https://www.infowarsstore.com/gear/stickers-and-decals (last visited April 4, 2022).

000597

26.    They can even buy various "preparedness" kits ranging from seeds to storable food to survival gear to nuclear and biological supplies:



27.    The sale of these types of products on the InfoWars website and elsewhere enabled the Jones Debtors to earn a fortune.

28.    But after the Jones Debtors aimed their conspiracy theories at Sandy Hook Elementary—claiming the tragic shooting there was staged—that all changed.

---

5 InfoWars Store, at "Preparedness", https://www.infowarsstore.com/preparedness (last visited April 4, 2022).

000598

**The Sandy Hook Families and Fontaine sue the Jones Debtors for defamation.**

29.     In April 2018, the Sandy Hook Families and Fontaine sued the Jones Debtors for defamation, among other claims, based on various lies and conspiracy theories Alex Jones espoused through his media outlet (the Defamation Cases).[6] The claims of the Sandy Hook Families—parents of children slain at Sandy Hook—stem from conspiracy theories the Jones Debtors disseminated that the mass shooting was a hoax.[7] Similarly, Fontaine's claims arose from falsehoods the Jones Debtors spread that he was the shooter responsible for murdering 17 people at a high school in Parkland, Florida.[8]

30.     Rather than accept responsibility for propagating these lies, however, the Jones Debtors continued to deflect the truth. The Jones Debtors first tried to dismiss the Defamation Cases. But the trial courts denied those attempts in part because the Jones Debtors refused to cooperate in the cases' truth-finding phase of discovery. Instead of accepting blame then, the Jones Debtors appealed the trial courts' denials of their dismissal motions. Each time, the appellate court declined the Jones Debtors' requests to dismiss the cases. The appellate court

---

[6] Cause No.: D-1-GN-18-001835; *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-001842; *Leonard Pozner and Veronique De La Rosa v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 345th Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-19-004651; *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-006623; *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 98th Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-001605; *Marcel Fontaine v Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*; In the 459th Judicial District Court of Travis County, Texas.

[7] *See e.g., Jones v. Heslin*, No. 03-20-00008-CV, 2020 WL 4742834, at *1 (Tex. App.—Austin Aug. 14, 2020, pet. denied); *Jones v. Heslin*, No. 03-19-00811-CV, 2020 WL 1452025, at *1 (Tex. App.—Austin March 25, 2020, pet. denied); *Jones v. Pozner*, No. 03-18-00603-CV, 2019 WL 5700903, at *9 (Tex. App.—Austin Nov. 5, 2019, pet. denied); *Jones v. Lewis*, No. 03-19-00423-CV, 2019 WL 5090500, at *4 (Tex. App.—Austin October 11, 2019, pet. denied).

[8] *Infowars, LLC v. Fontaine*, No. 03-18-00614-CV, 2019 WL 5444400, at *1 (Tex. App.—Austin Oct. 24, 2019, pet. denied).

000599

even sanctioned the Jones Debtors for raising a frivolous appeal that misrepresented the underlying facts and the governing law.[9]

31.     Even after the appellate court allowed the Defamation Cases to proceed, the Jones Debtors continued to obstruct discovery. Their repeated discovery abuses even culminated in the trial court granting default judgments for the Sandy Hook Families and against the Jones Debtors on liability in September 2021. The first trial against the Jones Debtors on damages commences at the end of April 2022. The next will follow soon after. In other words, judgments against the Jones Debtors are imminent.

**During the Defamation Cases, the Jones Debtors doomsday prepped for these eventual judgments by diverting assets.**

32.     After the Sandy Hook Families and Fontaine filed their Defamation Cases, the Jones Debtors started diverting their assets. From 2018 to 2021, for example, Alex Jones personally drew about $18 million from his InfoWars company, Free Speech Systems. These draws were in addition to his yearly salary, which exceeded $600,000, and taken while Free Speech Systems operated at a net loss in the millions each of those years.

33.     Jones apparently drew these $18 million while his company, Free Speech Systems, was insolvent. Just three months after the last appellate-court decision allowing the Defamation Cases to proceed, a company named PQPR filed a UCC Financing Statement claiming a security interest in essentially everything Free Speech Systems owns. The claimed security interest covers an alleged $54 million debt Free Speech Systems owes to PQPR. The supposed debt began accruing years earlier as part of an arrangement where Free Speech Systems sells PQPR's products on the InfoWars website. Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while

---

[9] *Heslin*, 2020 WL 1452025, at *6.

000600

Free Speech Systems retained the other 30%. In practice, however, Free Speech Systems supposedly kept 100% of the revenue for about seven years and didn't pay for the goods PQPR provided—to the point where a $54 million debt had accumulated. All the while, PQPR not only supplied Free Speech Systems with more products to sell but also paid Free Speech Systems millions of dollars a year to advertise on the InfoWars website. PQPR still supplies the Jones Debtors with products to sell and pays for advertising on the website.

34.     So why would an independent business like PQPR continue to engage in such questionable transactions?

35.     Because PQPR is not actually an independent business. It's an insider of the Jones Debtors. It is owned and operated directly or indirectly by Jones, his parents, and his children through an alphabet soup of shell entities like JLJR Holdings Limited LLC; JLJR Holdings, LLC; PLJR Holdings, LLC; PQPR Holdings, LLC; AEJ Holdings, LLC; and AEJ Trust 2018. And the income PQPR receives—including from sources like the Jones Debtors—goes to Alex Jones and these Jones Transferees.

36.     And after the Defamation Cases began, the Jones Debtors started transferring large sums of money to the Jones Transferees. These sums include money the Jones Debtors started regularly transferring from Free Speech Systems to PQPR *the same month that the default judgments were rendered*. In fact, the month the default judgments were rendered, Free Speech Systems started transferring to PQPR between $11,000 per day and $11,000 per week plus 60–80% of Free Speech Systems' sales revenue—supposedly just to pay the interest on the alleged $54 million debt. Free Speech Systems claims these payments are part of a "financial disentanglement between the two companies[.]" In reality, they're transfers designed to siphon off the Jones Debtors' assets to make them judgment-proof.

000601

37.     This fact is only confirmed by the jaw-dropping amount in transfers the Jones Debtors made during the Defamation Cases. In 2021 alone, the Jones Debtors transferred from Free Speech Systems tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the Defamation Cases to proceed.

## Causes of Action

38.     The Sandy Hook Families and Fontaine assert fraudulent-transfer claims under the Texas Uniform Fraudulent Transfer Act to void transfers between the Jones Debtors and the Jones Transferees. Texas enacted TUFTA to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach.[10] Through TUFTA's statutory scheme, creditors may seek recourse for fraudulent transfers of assets or property.[11] The Sandy Hook Families and Fontaine are creditors entitled to recourse under TUFTA because the Jones Debtors engaged in fraudulent transfers and conspired to commit fraudulent transfers.[12]

### Count 1—Fraudulent Transfer with actual intent to hinder, delay, or defraud under § 24.0005(a)(1)

39.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

---

[10] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016).

[11] *Sargeant v. Al Saleh*, 512 S.W.3d 399, 411–12 (Tex. App.—Corpus Chrisi-Edinburg 2016, no pet.) (citing cases).

[12] *See* Tex. Bus. & Com. Code § 24.002 (defining "creditor" as a person who has a "claim" and "claim" as a right to payment including whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed); *see also Bank of Am., N.A. v. Fulcrum Enterprises, LLC*, 20 F. Supp. 3d 594, 601 (S.D. Tex. 2014) (explaining that a person my bring a TUFTA action as a creditor of the transferor by virtue of a legal action, pending and unliquidated at the time of transfer).

000602

40.     The Jones Debtors are liable for engaging in fraudulent transfers as to present and future creditors under § 24.0005(a)(1).[13] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor under this section if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any creditor of the debtor.[14] Such transfers or obligations are fraudulent whether the creditor's claim arose before or within a reasonable time after the transfers were made or obligations incurred.[15]

41.     The Jones Debtors engaged in fraudulent transfers under this standard. During the Defamation Cases—while the Sandy Hook Families and Fontaine were creditors—the Jones Debtors transferred millions of dollars from Free Speech Systems for reasons unrelated to Free Speech Systems' business operations. In 2021 alone, they transferred from Free Speech Systems tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the Defamation Cases to proceed.

42.     Transfers by the Jones Debtors while the Defamation Cases were pending also include payments to insiders, like Jones himself. From 2018 to 2021, for example, Jones apparently drew $18 million from Free Speech Systems, even though it was insolvent and operating at a net loss each of those years. These draws were in addition to (and about 30 times greater than) Jones's yearly salary.

43.     And since the Defamation Cases began, the Jones Debtors also transferred large sums to other insiders, like the Jones Transferees. These sums include money the Jones Debtors

---

[13] Tex. Bus. & Com. Code § 24.005(a)(1) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor;").

[14] *Id.*

[15] *Id.*

000603

started regularly transferring from Free Speech Systems to insider PQPR the same month that default judgments in the Defamation Cases were rendered. Specifically, PQPR started receiving as much as $11,000 per day plus 60–80% of Free Speech Systems' sales revenue. These payments are allegedly to pay just the interest on the questionable $54 million obligation to PQPR the Jones Debtors decided that Free Speech incurred just three months after the appellate court allowed the Defamation Cases to proceed. All the while the Jones Debtors retained possession and control of these money transfers and obligations, as the money PQPR receives from Free Speech Systems goes directly and indirectly to insiders like Jones, his parents, and his children through the shell entities included as Jones Transferees.

44.     These transfers and obligations that the Jones Debtors made and incurred were done with the actual intent to hinder, delay, or defraud their creditors—including the Sandy Hook Families and Fontaine. That truth becomes especially glaring considering the badges of fraud surrounding these transfers and obligations.[16] Those badges include, for example, that the transfers and obligations were made to insiders who retained possession and control over the property; the transfers and obligations were concealed and made while the Defamation Cases were pending and while the Jones Debtors were insolvent; and that past and future transfers to PQPR will eliminate substantially all of the Jones Debtors' assets—as these essential assets paid

---

[16] Tex. Bus. & Com. Code § 24.005(b) ("(b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.").

000604

to insider and supposed secured creditor PQPR will be subsequently transferred to insiders like Jones, his parents, and his children through the Jones Transferees.

45.     The Jones Debtors are thus liable under § 24.0005(a)(1) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies the Sandy Hook Families and Fontaine seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[17]

**Count 2—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0005(a)(2)**

46.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

47.     The Jones Debtors are liable for engaging in fraudulent transfers as to present and future creditors under § 24.0005(a)(2).[18] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor under this section if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and either (1)  the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to

---

[17] Tex. Bus. & Com. Code § 24.008.

[18] Tex. Bus. & Com. Code § 24.005(a)(2) "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or the transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.").

000605

the business or transaction; or (2) the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[19] Such transfers or obligations are fraudulent whether the creditor's claim arose before or within a reasonable time after the transfers were made or obligations incurred.[20]

48.     Under these standards the Jones Debtors committed fraudulent transfers as to the Sandy Hook Families and Fontaine. While the Defamation Cases were pending—that is, while the Sandy Hook Families and Fontaine were creditors—the Jones Debtors transferred millions of dollars from Free Speech Systems without receiving reasonably equivalent value in exchange, and while the Jones Debtors' assets were unreasonably small. Moreover, the Jones Debtors incurred millions of dollars in obligations they intended or reasonably should have believed they would be unable to pay as they became due.

49.     For instance, in 2021 the Jones Debtors transferred from Free Speech Systems tens of millions more than it cost to operate the company. These transfers were unrelated to operating the business and thus weren't in exchange for reasonably equivalent value. And these transfers far exceeded Free Speech Systems' assets—and any of the Jones Debtors' for that matter—which were unreasonably small compared to the millions transferred away.

50.     And from 2018 to 2021, the Jones Debtors also transferred from Free Speech Systems to Jones about $18 million on top of the already substantial salary he received. Of course these $18 million in draws weren't for reasonably equivalent value, especially given that Free Speech Systems was operating at a loss at that time and allegedly had other substantial debts to insider PQPR it hadn't been paying for years. And these $18 million in transfers

---

[19] *Id.*

[20] *Id.*

000606

virtually eliminated Free Speech Systems' remaining assets, which were already unreasonably small compared to the $18 million that had been transferred.

51.     And around the time that default judgments were rendered against the Jones Debtors in the Defamation Cases, the Jones Debtors incurred an obligation to insider PQPR to pay only the interest on the supposed $54 million debt to PQPR that Free Speech Systems hadn't been paying as it became due. Under this obligation to pay only the interest, Free Speech Systems agreed to pay as much as $11,000 per day plus 60–80% of its sales revenue. Incurring such a hefty obligation to cover only the interest on an alleged debt to an insider is not for reasonably equivalent value. And the Jones Debtors intended to incur or believed or reasonably should have believed that Free Speech Systems was incurring, debts beyond its ability to pay as they became due. After all, given that 100% of Free Speech Systems' sales revenue was already too little to cover its operating expenditures, counting on only 20–40% of sales revenue to cover operating expenditures would be quixotic. The Jones Debtors knew or should have known their new obligation to insider PQPR—which is directly and indirectly run by and benefits Jones, his parents, and his children through the Jones Transferees—is beyond their ability to pay.

52.     This of course rests against the backdrop of the dubious $54 million obligation Free Speech Systems now claims it owes PQPR. Free Speech Systems apparently did not recognize any obligation to PQPR before the Defamation Cases. Only after the appellate court allowed the cases to proceed, did any evidence of an obligation by Free Speech Systems to PQPR surface. That Free Speech Systems needlessly agreed to take on a $54 million obligation to an insider is not an obligation in exchange for reasonably equivalent value. And it's an obligation the Jones Debtors apparently intended to incur or believed or reasonably should have believed they would incur and would be beyond their ability to pay as they became due.

15

53.     The Jones Debtors are thus liable under § 24.0005(a)(2) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[21]

**Count 3—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0006(a)**

54.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

55.     The Jones Debtors are liable for engaging in fraudulent transfers as to present creditors under § 24.0006(a).[22] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[23]

56.     The Jones Debtors also committed fraudulent transfers under this standard. While the Sandy Hook Families and Fontaine were creditors and while the Jones Debtors were insolvent, the Jones Debtors transferred millions of dollars without receiving reasonably

---

[21] Tex. Bus. & Com. Code § 24.008.

[22] Tex. Bus. & Com. Code § 24.006(a) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").

[23] *Id.*

16

equivalent value. These transfers include the tens of millions transferred from Free Speech Systems in 2021 that were unrelated to its operation. They also include $18 million that Jones drew from his business, Free Speech Systems. And they include the Jones Debtors' payments on just the interest on an alleged $54 million debt Free Speech Systems owes insider PQPR—payments that include as much as $11,000 per day plus 60–80% of Free Speech Systems' sales revenue. As explained in prior sections, none of these transfers and obligations were in exchange for reasonably equivalent value. And all were apparently made and incurred while the Jones Debtors were insolvent—or they became insolvent as a result of these transfers and obligations.

57.     The Jones Debtors are thus liable under § 24.0006(a) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[24]

**Count 4—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0006(b)**

58.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

59.     The Jones Debtors are liable for engaging in fraudulent transfers as to present creditors under § 24.0006(b).[25] A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent

---

[24] Tex. Bus. & Com. Code § 24.008.

[25] Tex. Bus. & Com. Code § 24.006(b) ("(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.").

000609

debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[26]

60.     The Jones Debtors engaged in fraudulent transfers under this standard. After the Sandy Hook Families' and Fontaine's claims against the Jones Debtors arose, the Jones Debtors started repaying an alleged debt to insider PQPR, which is owned directly and indirectly by Jones, his parents, and his children through various entities—the Jones Transferees. Moreover, income that PQPR receives from Free Speech Systems, for example, is directly and indirectly paid to Jones, his parents, and his children though the Jones Transferees. The Jones Debtors made these transfers to pay off this antecedent debt to insider PQPR directly (and Jones and the Jones Transferees indirectly) while they were insolvent. And the Jones Transferees, including PQPR, had reasonable cause to believe that the Jones Debtors were insolvent at the time. After all, the Jones Debtors allegedly failed to the pay the supposed debt to PQPR for years to the point where the debt reached $54 million and exceeded the Jones Debtors' assets.

61.     And to the extent that the $18 million Jones drew from Free Speech Systems between 2018 and 2021 were payments for antecedent debts, such payments are also fraudulent transfers under this section. These transfers were made after the Sandy Hook Families' and Fontaine's claims against the Jones Debtors arose. As Free Speech Systems' sole owner, Jones was its insider. And as its sole owner, Jones had reasonable cause to believe that Free Speech Systems was insolvent—and in fact was insolvent—when these transfers to him were made.

62.     The Jones Debtors are thus liable under § 24.0006(b) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones

---

[26] *Id.*

18

Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[27]

**Count 5—Conspiracy to commit fraudulent transfers**

63.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

64.     The Jones Debtors and the Jones Transferees are liable for conspiracy to commit fraudulent transfers.[28] The elements of a civil conspiracy are: (1) two or more persons; (2) an end to be accomplished; (3) meeting of the minds on the end or course of action; (4) one or more overt unlawful acts; and (5) proximately resulting in injury.[29]

65.     Here, the Jones Debtors and the Jones Transferees conspired to commit fraudulent transfers. As the prior paragraphs establish, the Jones Debtors and the Jones Transferees conspired to siphon the Jones Debtors' assets away to avoid paying the Sandy Hook Families and Fontaine in the Defamation Cases. The Jones Debtors and the Jones Transferees then proceeded with the course of action of transferring millions of dollars in assets away from the Jones Debtors and having the Jones Debtors incur millions of dollars in obligations to its insider Jones Transferees, who weren't sued in the Defamation Cases. These overt acts are unlawful fraudulent transfers under TUFTA. And they proximately resulted in injury to the Sandy Hook Families and Fontaine. Diverting assets away from the Jones Debtors to the Jones Transferees impairs the Sandy Hook Families' and Fontaine's ability to collect on their judgments.

---

[27] Tex. Bus. & Com. Code § 24.008.

[28] *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 743 (Bankr. S.D. Tex. 2020) (citing *Ramirez v. Rodriguez (In re Ramirez),* 413 B.R. 621, 629 (Bankr. S.D. Tex. 2009) and *Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008)).

[29] *Id.* at 743–44.

000611

## Conditions Precedent

66.     All conditions precedent to the Sandy Hook Families' and Fontaine's claims for relief have been performed or have occurred or have been waived.

## Attorney's Fees and Interest

67.     The Sandy Hook Families and Fontaine seek costs and attorney's fees under § 24.013 of the Texas Uniform Fraudulent Transfer Act.[30]

68.     The Sandy Hook Families and Fontaine further seek pre- and post-judgment interest on the amount of any judgment as allowed by law.

## Request for Disclosure

69.     Defendants are requested to disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## Trial by Jury

70.     The Sandy Hook Families and Fontaine respectfully request a trial by jury.

## Notice of Intent

71.     Under Rule 193.7, Plaintiffs intend to use any documents produced in response to written discovery requests at trial and in any pretrial matters in the litigation.[31]

## Prayer

For these reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer and that judgment be awarded to Plaintiffs for the following:

1) avoidance of transfers or obligations to the extent necessary to satisfy Plaintiffs' claims;

---

[30] Tex. Bus. & Com. Code § 24.013.

[31] Tex. R. Civ. P. 193.7.

000612

2) an attachment or any other provisional remedy against the assets transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings;

3) an injunction—including temporary and permanent injunctive relief—against further disposition by the debtors or transferees, or both, of the assets transferred or of other property;

4) an appointment of a receiver to take charge of the assets transferred or of other property of the transferees;

5) to levy execution on assets transferred or their proceeds;

6) actual damages, including direct, indirect, special, incidental, and consequential damages;

7) exemplary damages;

8) costs and reasonably attorney's fees as are equitable and just;

9) pre- and post-judgment interest;

10) any other relief the circumstances may require.

Dated: April 6, 2022

Respectfully submitted


**MCDOWELL HETHERINGTON LLP**


By: */s/ Avi Moshenberg*
    Avi Moshenberg
    Texas Bar No. 24083532
    Nick Lawson
    State Bar No. 24083367
    Matthew Caldwell
    State Bar No. 24107722
    1001 Fannin Street, Suite 2700
    Houston, TX 77002
    Phone: (713) 337-5580
    Fax: (713) 337-8850
    Email: avi.moshenberg@mhllp.com
    Email: nick.lawson@mhllp.com
    Email: matthew.caldwell@mhllp.com

000613

**KASTER LYNCH FARRAR & BALL, LLP**


By: */s/ Mark D. Bankston*
     Mark D. Bankston
     State Bar No. 24071066
     William R. Ogden
     State Bar No. 24073531
     1117 Herkimer
     Houston, Texas 77008
     (713) 221-8300 Telephone
     (713) 221-8301 Fax
     Email: mark@fbtrial.com
     Email: bill@fbtrial.com


**THE AKERS FIRM PLLC**


By: */s/ Cordt Akers*
     Cordt Akers
     State Bar No. 24080122
     3401 Allen Parkway, Suite 101
     Houston, TX 77019
     Phone: (713) 877-2500
     Fax: (713) 583-8662
     Email: cca@akersfirm.com


**ATTORNEYS FOR PLAINTIFFS**

000614

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

## ORDER GRANTING
## EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Upon the motion (Motion) of David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Sandy Hook Movants) for entry of an order (this Order): (1) granting relief from the automatic stay to allow the Sandy Hook Movants to pursue their claims to judgment in the Connecticut Action; and (2) allowing the relief from the automatic stay to take effect immediately under Bankruptcy Rule 4001(a)(3) upon the entry of this Order; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and appropriate notice having been provided under the circumstances of the Motion and the opportunity for a hearing on the Motion, and that no other or further notice is required; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

000615

1.      The Motion is GRANTED as set forth herein.

2.      The automatic stay provision of 11 U.S.C. § 362(a) be and hereby is immediately modified solely for the purpose of allowing the Connecticut Action to continue to proceed to judgment.

3.      This Court shall retain sole and exclusive jurisdiction with respect to the automatic stay and its application to any actions other than those expressly provided for in this Order.


Dated: _____, 2022


                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 01, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22-__60043____ |
| FREE SPEECH SYSTEMS, LLC, | Chapter 11 (Subchapter V) |
| Debtor. | |

## ORDER MODIFYING AUTOMATIC STAY TO ALLOW HESLIN/LEWIS TRIAL TO CONTINUE TO FINAL JUDGMENT

At Victoria, in said District, came on for consideration the Emergency Motion to Lift Automatic Stay in Favor of Neil Heslin and Scarlett Lewis to Continue Trial to Judgment (the "Motion") filed by Free Speech Systems, LLC (the "Debtor" or "FSS"); and it appearing to the Court that notice of the hearing on the Motion is adequate, appropriate and sufficient under the circumstances of this case; and it further appearing to the Court that prior to the Petition Date, Neil Heslin and Scarlett Lewis (collectively, the "Plaintiffs") commenced state-court actions against FSS consolidated into the action styled as *Neil Heslin v. Alex E. Jones and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas Heslin/Lewis State Court Litigation"); and it appearing to the Court that a trial in the Heslin/Lewis Litigation is ongoing before Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court"); and it appearing that on July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"); and the automatic stay provision of 11 U.S.C. § 362(a) may prevent the continuation of the Heslin/Lewis State Court Litigation; and the Debtor having agreed to the modification of the automatic stay so as to permit the Texas State Court to proceed

up to and including the entry of judgment, if any, in the Heslin/Lewis State Court Litigation and the Plaintiffs to litigate the matter to judgment;;

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      The automatic stay provision of 11 U.S.C. § 362(a) be and hereby is modified solely for the purpose of allowing the Heslin/Lewis State Court Litigation to continue to proceed to judgment by the Texas State Court.

2.      Except to assert the claim against FSS in FSS's bankruptcy case, the automatic stay shall continue to enjoin the Plaintiffs and any other party, from exercising against FSS any remedies to collect or enforce any judgment against any assets of FSS or its bankruptcy estate including all property of the estate.

3.      This Court shall retain sole and exclusive jurisdiction with respect to the automatic stay and its application to any actions other than those expressly provided for in this Order.

Signed: August 01, 2022

_____

Christopher Lopez

United States Bankruptcy Judge

000618

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC | § | Chapter 11 (Subchapter V) |
| Debtor. | § | |

### NOTICE OF APPEARANCE AND REQUEST FOR NOTICES

PLEASE TAKE NOTICE that, SHELBY A. JORDAN appears on behalf of an interested party ("party-in-interest"), in the above Bankruptcy and pursuant to Bankruptcy Rules 2002, 3017 and 9010, requests that all notices given, or required to be given in this case, and all papers served, or required to be served in this case, be given to and served upon the undersigned at the office, address and telephone number set forth below:

Shelby A. Jordan
State Bar # 11016700
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd, Suite 900
Corpus Christi, Texas 78401
Telephone:  (361) 884-5678
Facsimile:  (361) 888-5555
Email: sjordan@jhwclaw.com
Copy to: cmadden@jhwclaw.com

PLEASE TAKE FURTHER NOTICE that, pursuant to Bankruptcy Rule 2002 and 9007, and all applicable local rules of the Bankruptcy Court, the foregoing request includes, without limitation, all notices of orders, applications, complains, demands, objections, hearings, motions, petitions, orders, pleadings or requests and any other documents brought before the Bankruptcy Court in this case, whether formal or informal, written or oral, and whether transmitted or conveyed by mail, delivery, telephone, facsimile or otherwise.

Dated: August 1, 2022

000619

Respectfully submitted,

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
**Jordan & Ortiz, P.C.**
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
        aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR INTERESTED PARTY**

000620

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that notice of the filing of this document has been served on the below named parties by available knowledge by the Court's CM/ECF system on August 1, 2022.

/s/ Shelby A. Jordan
Shelby A. Jordan

000621

# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 8/1/2022 8:29:28 AM |
| Audio File Name : | 6bk2022-60043_20220801-082928.mp3 |
| Audio File Size : | 29674 KB |
| Audio Run Time : | [01:01:49] (hh:mm:ss) |

**Help using this file:**

> An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

> **This digital recording is a copy of a court proceeding and is provided as a convenience to the public. In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **Free Speech Systems LLC** | § | **Subchapter V** |
| | § | |
| Debtor. | § | Case No. 22-60043 (cml) |

### NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that the undersigned appears as bankruptcy co-counsel for Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine, creditors and parties in interest in the above referenced case, pursuant to Section 1109(b) of Title 11 of the United States Code ("**Bankruptcy Code**") and Rule 9010 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and hereby submits this notice of appearance and requests notice of all hearings and conferences herein and makes demand for service of all papers herein, including all papers and notices pursuant to Bankruptcy Rules 2002, 3017, and 9007. All notices given or required to be given in this case shall be served upon:

Jarrod B. Martin
Texas Bar No. 24070221
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
P: 713.356.1280 | F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

Please take further notice that the foregoing request includes notices and papers referred to in the Bankruptcy Rules and includes, without limitation, any plans of reorganization, notices of hearings, orders, pleadings, motions, applications, complaints, demands, requests, petitions, disclosure statements, memoranda, briefs and any other documents brought before this Court

with respect to these proceedings, whether formal or informal, whether written or oral, whether transmitted or conveyed by mail, hand delivery, telephone, telecopier, telegraph, or telex.

Dated: August 1, 2022

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.**

By:  /s/ Jarrod B. Martin

Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
P: 713-356-1280
F: 713-658-2553
E: Jarrod.Martin@chamberlainlaw.com

*Bankruptcy Co-Counsel for Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 1, 2022, a true and correct copy of the foregoing Notice was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

/s/ Jarrod B. Martin
Jarrod B. Martin

**SmBus, PlnDue, DsclsDue, ReqSepNtc, Subchapter_V, APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 22-60043

|  |  |
| --- | --- |
| *Date filed:* | 07/29/2022 |
| *Date of Intradistrict transfer:* | 08/04/2022 |
| *341 meeting:* | 09/07/2022 |
| *Deadline for filing claims:* | 10/07/2022 |
| *Deadline for filing claims (govt.):* | 02/07/2023 |
| *Deadline for objecting to discharge:* | 03/10/2023 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
Asset

*Debtor*
**Free Speech Systems LLC**
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741
TRAVIS-TX
SSN / ITIN: xxx-xx-0005

represented by **Raymond William Battaglia**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
2106019405
Email: rbattaglialaw@outlook.com

**Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**R. J. Shannon**
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002
713-714-5770
Email: rshannon@shannonpllc.com

**Christina Walton Stephenson**
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201
214-420-2163
Email: Crissie.Stephenson@crowedunlevy.com

*Trustee*
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

represented by **Elizabeth Carol Freeman**
The Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208-1209
832-779-3580
Email: liz@lizfreemanlaw.com

**Melissa Anne Haselden**
Haselden Farrow PLLC

Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

*U.S. Trustee*
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

*Creditor Committee*
**Official Committee of Unsecured Creditors
of Alexander E. Jones**
c/o Marty L. Brimmage, Jr.
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
214-969-2800

represented by **Marty L Brimmage**
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
214-969-2885
Fax : 214-969-4343
Email: mbrimmage@akingump.com

| Filing Date | # | Docket Text |
|---|---|---|
| 08/01/2022 | ◓20 | Courtroom Minutes. Time Hearing Held: 8:30 AM. Appearances: Ha Nguyen, Ryan Chapple, Alinor Sterling, Cordt Akers, Jarrod Martin, W. Marc Schwartz, Kyung Lee, Raymond Battaglia, R.J. Shannon, Melissa Haselden, Avi Moshenberg, Randy Williams, Chris Matty. (Related document(s): 2 Emergency Motion for An Order Modifying the Automatic Stay to Allow the Heslin/Lewis State Court Suit to Continue to Judgment ). For the reasons stated on the record, Motion Granted. Order Signed. Hybrid Hearing on First Day Motions is scheduled for 8/3/2022 at 10:00 AM. Hybrid Hearing on (Related document(s): 15 Motion for Relief from Stay to Proceed with Connecticut State Court Litigation) to be held on 8/5/2022 at 10:00 AM. (ZildeMartinez) (Entered: 08/01/2022) |

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO.  22-60043-CML |
| | § | |
| FREE SPEECH SYSTEMS LLC, | § | Chapter 11 |
| | § | |
| DEBTOR | § | |

## NOTICE OF APPEARANCE AND REQUEST FOR
## SERVICE OF NOTICE AND PLEADINGS

The Texas Comptroller of Public Accounts, Revenue Accounting Division (the "Texas Comptroller") hereby gives notice of its appearance in the case pursuant to Bankruptcy Rule 9010 by and through the undersigned counsel:

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin, Texas 78711-2548
christopher.dylla@oag.texas.gov

The Texas Comptroller respectfully requests through its counsel that it be served with copies of all notices and other documents issued by the Clerk of the Court and all other pleadings and notices to parties in interest filed by Debtor, the Creditors' Committee, or any other interested parties in this case, including disclosure statements and/or schedules, in accordance with Bankruptcy Rules 2002, 3017, and 9013 and any other Bankruptcy Rules or local rules governing notice.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

*/s/ Christopher J. Dylla*
CHRISTOPHER J. DYLLA
Texas State Bar No. 24128128
Assistant Attorney General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, TX 78711-2548
Telephone:  (512) 475-4937
Facsimile:  (512) 936-1409
christopher.dylla@oag.texas.gov

ATTORNEYS FOR THE TEXAS
COMPTROLLER OF PUBLIC ACCOUNTS

000628

## CERTIFICATE OF SERVICE

I certify that on August 2, 2022, a true copy of the foregoing was served by the method and on the following parties as indicated:

By First Class Mail:

Free Speech Systems LLC
3019 Alvin Devane Blvd. Ste. 300
Austin, TX 78741

By Electronic Mean as listed on the Court's ECF Noticing System:

- **Raymond William Battaglia** rbattaglialaw@outlook.com, rwbresolve@gmail.com
- **Ryan E Chapple** rchapple@cstrial.com, aprentice@cstrial.com
- **Shelby A Jordan** cmadden@jhwclaw.com
- **Jarrod B. Martin** jarrod.martin@chamberlainlaw.com, Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com
- **Ha Minh Nguyen** ha.nguyen@usdoj.gov
- **R. J. Shannon** rshannon@shannonpllc.com, rshannon@shannonleellp.com;7044075420@filings.docketbird.com
- **US Trustee** USTPRegion07.HU.ECF@USDOJ.GOV
- **Randy W Williams** rww@bymanlaw.com, rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com

*/s/ Christopher J. Dylla*
CHRISTOPHER J. DYLLA

000629

**UNITED STATES DEPARTMENT OF JUSTICE**
**OFFICE OF THE UNITED STATES TRUSTEE**
**KEVIN M. EPSTEIN**
**UNITED STATES TRUSTEE**
**HA M. NGUYEN**
**TRIAL ATTORNEY**
**515 RUSK, SUITE 3516**
**HOUSTON, TX 77002**
**Telephone: (202) 590-7962**
**Fax: (713) 718-4670**
**E-Mail: ha.nguyen@usdoj.gov**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
|   FREE SPEECH SYSTEMS LLC, | § | **CASE NO. 22-60043** |
| | § | |
| | § | |
| | § | **CHAPTER 11** |
| DEBTOR. | § | |

### NOTICE OF APPOINTMENT OF SUBCHAPTER V TRUSTEE

Pursuant to 11 U.S.C. § 1183(a), the United States Trustee has appointed the following qualified individual as Subchapter V trustee in the above-captioned case:

**MELISSA HASELDEN**
**700 MILAM, SUITE 1300**
**HOUSTON, TX 77002**
**Email: mhaselden@haseldenfarrow.com PH: 832-819-1149**

The trustee's verified statement of disinterestedness and anticipated rate of compensation is attached to this notice.

Dated: August 2, 2022

KEVIN M. EPSTEIN
United States Trustee Region 7
Southern and Western Districts of Texas

By:    */s/ Ha M. Nguyen*
       Ha M. Nguyen
       Trial Attorney
       CA State Bar No. 305411
       515 Rusk, Suite 3516
       Houston, Texas 77002

1

000630

Telephone: (202) 590-7962
Fax: (713) 718-4670
Ha.nguyen@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **NOTICE OF APPOINTMENT OF SUBCHAPTER V TRUSTEE,** was served upon the parties on the attached list by United States Mail, first class, postage prepaid, and/or by electronic means for all Pacer system participants on August 2, 2022.

By:     */s/ Ha M. Nguyen*
Ha M. Nguyen
Trial Attorney
CA State Bar No. 305411
515 Rusk, Suite 3516
Houston, Texas 77002
Telephone: (202) 590-7962
Fax: (713) 718-4670
Ha.nguyen@usdoj.gov

**By Mail to Debtor:**

**Free Speech Systems LLC**
3019 Alvin Devane Blvd., STE 300
Austin, TX 78741

2

000631

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **FREE SPEECH SYSTEMS LLC,** | § | **CASE NO. 22-60043** |
| | § | |
| | § | |
| | § | **CHAPTER 11** |
| **DEBTOR.** | § | |

**VERIFIED STATEMENT OF SUBCHAPTER V TRUSTEE**

In connection with the United States Trustee's Notice of Appointment of me as Subchapter V trustee in this proceeding, I hereby verify that I am a "disinterested person" as defined by 11 U.S.C. §101(14) in that I:

    (a)    am not a creditor, equity security holder or insider of the debtor;

    (b)    am not, and was not, within two years before the date of filing of the petition, a director, officer, or employee of the debtor; and

    (c)    do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason other than the following connections:

        (i)    from April 18, 2022 through June 10, 2022, I served as Subchapter V trustee in the jointly administered bankruptcy cases of InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC, which were administered under Bankruptcy Case No. 20-60020 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

        (ii)    the attorneys with HF have professional connections through the Moller/Foltz Inn of Court, Turnaround Management Association, International Women's Insolvency & Restructuring Confederation, American Bankruptcy Institute, Houston Bar Association, continuing education courses, and/or social media through which certain attorneys may have connections to the United States Trustee's office, Judge, Court staff, and other bankruptcy practitioners who may represent parties in this case.

1

I do not believe any of these connections creates an adverse relationship with any Debtor.

Subject to court approval pursuant to 11 U.S.C. § 330, I anticipate seeking compensation for my service in this case at an hourly rate of $450.00, in addition to seeking reimbursement for any actual and necessary expenses I incur.

I hereby accept my appointment as subchapter V trustee in this case pursuant to FRBP 2008.

Dated: August 1, 2022                    Respectfully submitted,

**HASELDEN FARROW PLLC**

By: _____
Melissa A. Haselden
State Bar No. 00794778
700 Milam, Suite 1300
Pennzoil Place
Houston, Texas 77002
Telephone: (832) 819-1149
Facsimile: (866) 405-6038
mhaselden@haseldenfarrow.com

2

000633

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22–60043** |
| | § | |
| Debtor. | § | |

## NOTICE OF APPEARANCE OF COUNSEL

PLEASE TAKE NOTICE that the undersigned appears as counsel for Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine, creditors and parties in interest in the above referenced case pursuant to § 1109(b) of Title 11 of the United States Code ("**Bankruptcy Code**") and Rule 9010(b) of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and hereby submits this *Notice of Appearance of Counsel and Demand for Service of Papers* requesting notice of all hearings and conferences herein and makes demand for service of all papers herein, including all papers and notices pursuant to Bankruptcy Rules 2002, 3017, and 9007 and §§ 342 and 1109(b) of the Bankruptcy Code.  All notices given or required to be given in this case shall be served upon:

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street
Suite 2700
Houston, TX 77002
P: 713-337-5580
F: 713-337-8850
E: avi.moshenberg@mhllp.com

000634

Dated: August 2, 2022                  Respectfully submitted,

                                       MCDOWELL HETHERINGTON LLP

                                       By:  */s/ Avi Moshenberg*
                                       Avi Moshenberg
                                       Texas Bar No. 24083532
                                       1001 Fannin Street
                                       Suite 2700
                                       Houston, TX 77002
                                       P: 713-337-5580
                                       F: 713-337-8850
                                       E: avi.moshenberg@mhllp.com

                                       ***Counsel to Neil Heslin, Scarlett
                                       Lewis, Leonard Pozner, Veronique De La Rosa,
                                       and Marcel Fontaine***


## CERTIFICATE OF SERVICE


        The undersigned certifies that on August 2, 2022, a true and correct copy of the foregoing
Notice was served electronically on all parties registered to receive electronic notice of filings in
this case via this Court's ECF notification system.


                                       */s/ Avi Moshenberg*
                                       Avi Moshenberg

UNITED STATES BANKRUPTCY COURT         SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Victoria | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems, LLC | |

This lawyer, who is admitted to the State Bar of _____ Connecticut _____:

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | Alinor C. Sterling<br>Koskoff Koskoff & Bieder PC<br>350 Fairfield Avenue, Bridgeport, CT 06604<br>(203) 336-4421<br>asterling@koskoff.com<br>CT Bar No. 411754 / Fed Bar No. ct17207 |
|---|---|

Seeks to appear as the attorney for this party:

| David Wheeler, et al. (the Connecticut State Court Plaintiffs) | |
|---|---|
| Dated: | Signed: *AC St* |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. | |
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

Order

This lawyer is admitted *pro hac vice*.

Dated: _____        _____
                                                United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 02, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Victoria | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems, LLC | |

This lawyer, who is admitted to the State Bar of _____ Connecticut _____ :

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | Alinor C. Sterling<br>Koskoff Koskoff & Bieder PC<br>350 Fairfield Avenue, Bridgeport, CT 06604<br>(203) 336-4421<br>asterling@koskoff.com<br>CT Bar No. 411754 / Fed Bar No. ct17207 |
|---|---|

Seeks to appear as the attorney for this party:

| David Wheeler, et al. (the Connecticut State Court Plaintiffs) |
|---|
| Dated:                    Signed: *A C St* |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. |
|---|
| Dated:                    Signed: _____<br>Deputy Clerk |

| Order |
|---|

This lawyer is admitted *pro hac vice*.

Signed: August 02, 2022

Christopher Lopez
United States Bankruptcy Judge

000637

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**WITNESS AND EXHIBIT LIST**
**FOR HEARING ON DEBTOR'S EMERGENCY FIRST DAY MOTIONS**
**[ECF. NOS. 6, 7, 8, & 9]**

| | |
|---|---|
| Judge: | Hon. Christopher M. Lopez |
| Hearing Date: | Wednesday, August 3, 2022 |
| Hearing Time: | 10:00 a.m. (CT) |
| Party's Name: | Free Speech Systems, LLC |
| Attorney's Name: | Ray Battaglia, RJ Shannon, Kyung S. Lee |
| Attorney's Phone: | (210) 601-9405 and (713) 714-5770 |
| Nature of Proceeding: | Hearing on:<br>• Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Section 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender Filed by Debtor Free Speech Systems LLC [Docket No. 6]<br><br>• Emergency Motion for Entry of an Order (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment for Future Utility Services; (II) Approving Adequate Assurance Procedures; (III) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services, and (IV) Granting Related Relief Filed by Debtor Free Speech Systems LLC [Docket No. 7]<br><br>• Emergency Motion for Order (A) Authorizing the Debtor to Pay Prepetition Obligations of Certain Vendors, and (B) Granting Related Relief Filed by Debtor Free Speech Systems LLC [Docket No. 8]<br><br>• Emergency Motion Emergency Motion to Extend Time to File Schedules and Statement of Financial Affairs Filed by Debtor Free Speech Systems LLC [Docket No. 9] |

000638

LawOfficesof Ray Battglia, PLLC proposed co-counsel to Free Speech Systems, LLC (the

"**Debtor**"), in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), hereby submits this

witness and exhibit list in connection with the hearings to be held on Wednesday, August 3, 2022

at 10:00 A.M.(Central Time) (the "**Hearing**") on the pleading listed below.

- Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Section 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender Filed by Debtor Free Speech Systems LLC [Docket No. 6]

- Emergency Motion for Entry of an Order (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment for Future Utility Services; (II) Approving Adequate Assurance Procedures; (III) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services, and (IV) Granting Related Relief Filed by Debtor Free Speech Systems LLC [Docket No. 7]

- Emergency Motion for Order (A) Authorizing the Debtor to Pay Prepetition Obligations of Certain Vendors, and (B) Granting Related Relief Filed by Debtor Free Speech Systems LLC [Docket No. 8]

- Emergency Motion Emergency Motion to Extend Time to File Schedules and Statement of Financial Affairs Filed by Debtor Free Speech Systems LLC [Docket No. 9]

## WITNESSES

The Debtor may call any of the following witnesses at the Hearing, whether in person or

by proffer:

1. W. Marc Schwartz, Chief Restructuring Officer of Free Speech Systems, LLC;

2. Any witnesses necessary to establish  notice of the Hearing has been provided; and

3. Any witnesses necessary to rebut the testimony of any witnesses called or designated by any other parties.

## EXHIBITS

The Debtor may offer for admission into evidence any of the following exhibits at the

hearing:

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1 | CV of W. Marc Schwartz, CPA/CFF, CFE. | | | | |
| 2 | Engagement Letter of Schwartz Associates, LLC, dated May 19, 2022, and signed on June 6, 2022. | | | | |
| 3 | Plan Support Agreement IW Health | | | | |
| 4 | PQPR August 13, 2020 $29,588,000 Note | | | | |
| 5 | PQPR Security Agreement | | | | |
| 6 | PQPR November 10, 2021 $25,300,000 Promissory Note | | | | |
| 7 | PQPR UCC-1 Financing Statement | | | | |
| 8 | PQPR Forbearance Term Sheet | | | | |
| 9 | 13 Week Budget | | | | |
| 10 | Interim Cash Collateral Budget | | | | |
| 11 | Critical Vendor List | | | | |
| 12 | Utility List | | | | |

The Debtor reserves the right to supplement, amend or delete any witness and exhibits prior to the hearing.  The Debtor also reserves the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document.  The Debtor finally reserves the right to introduce exhibits previously admitted.

Respectfully submitted the 2st day of August, 2022.

3

LAW OFFICES OF RAY BATTAGLIA, PLLC


*/S/ Ray Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/ *Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

4





## W. Marc Schwartz, CPA/CFF, CFE

(832) 583-7028

MSchwartz@SchwartzAssociates.us

**EXPERIENCE:** Marc's practice over the past forty-five years as a CPA has included providing business valuation, financial restructuring and expert witness services on a number of civil and criminal cases as well as serving, for the past thirty-five years, as a Chapter 11 bankruptcy trustee, an examiner with expanded powers and as a Federal and State court receiver. He has also assisted clients involved in civil litigation in matters involving construction litigation, professional malpractice, oil and gas disputes (upstream, oilfield services, downstream and midstream), intellectual property, breach of contract, trust and estate disputes, lender liability issues, personal injury, fraud and bankruptcy. The industries Marc has worked in include publishing, retail, healthcare, including medical devices, home and inpatient care, and medical practice operations, oil and gas, biofuels, manufacturing, telecommunications, transportation and refined products trading, amongst others. He is experienced in testifying in federal, state and bankruptcy courts as well as arbitration proceedings throughout the United States.

Marc was awarded his CPA certificate in 1975, was recognized with the Certified Fraud Examiner designation by the Association of Certified Fraud Examiners in 1989 and was Certified in Financial Forensics by the AICPA in 2008. In 2014 the Association of Certified Fraud Examiners presented him with its Lifetime Achievement Award for his more than twenty-five years of service to the anti-fraud profession. In 2019 he was admitted to Full Membership in the National Association of Federal Equity Receivers, an organization of 205 Full Members who have "...been appointed as federal equity receivers in matters of material size and complexity."

Marc started his career with Coopers & Lybrand (now PricewaterhouseCoopers) where he spent twenty years, the last twelve as an audit partner with the firm, working for a variety of client industries. His clients included Gulf Oil Corporation, Sterling Chemicals, Inc. and Mt. Airy Trading Company (at the time the largest refined products trader on the New York Mercantile Exchange, accounting for one third of the Exchange's volume). Marc also oversaw the Firm's Houston based Forensic and Valuation Services practice and served as the Firm's Southwest Region Coordinator of Banking Services.



EXHIBIT

3

1

000642

**Professional History**
**(Partial Listing):**     **August 2019 to Present: Chairman, Schwartz Associates, LLC**

Professional services firm specializing in financial forensics, financial restructuring and reorganization services, and federal and state court receiverships.

**July 2018 to July 2019: Senior Vice President, Nathan Associates Inc.**

Senior Vice President responsible for building the companies litigation, restructuring and advisory practices in the Central United States.

**February 2001 to July 2018: Principal and President, HSSK, LLC**

A professional services firm specializing in business valuation, litigation consulting, and financial restructuring and reorganization services.

**July 1993 to January 2001: Shareholder and President, Schwartz Spilker & Co**

Along with its predecessor firms, provided litigation and bankruptcy, corporate acquisition, and strategic planning consulting services to clients

**1983 to 1993: Partner, Financial Advisory Services Group of Coopers & Lybrand, Houston, Texas**

Provided litigation consulting, bankruptcy consulting and valuation services as well as assisted clients in leveraged buyouts of financial institutions. Continued to serve as an audit partner with clients in the banking, oil and gas and manufacturing industries. Served as Southwest Region-- Coordinator of Banking Services.

**1976 to 1983: Audit staff and ultimately Partner, Coopers & Lybrand, Houston, Texas**

Provided litigation support services for clients, as well as serving audit clients in the banking, oil and gas and manufacturing industries

**1974 to 1976: Audit staff, Coopers & Lybrand, Chicago, Illinois**

Assisted clients in the banking and publishing (magazines and books) industries. Served as Director of Taxation for a NYSE listed company with U. S. and International operations in publishing and the hospitality industries.

**PROFESSIONAL AFFILIATIONS**

**& ACTIVITIES:**     National Association of Federal Equity Receivers, Full Member

American Institute of Certified Public Accountants

Texas Society of Certified Public Accountants (TSCPA) and Houston Chapter

National Association of Certified Fraud Examiners

National Association of Forensic Economics


**Schwartz**Associates

00006443

Turnaround Management Association

State Bar of Texas, Bankruptcy Law Section, Non-Lawyer

**ACCREDITATIONS**

**& LICENSES:**     Certified Public Accountant     Licensed to practice in Texas.

Certified Fraud Examiner     Association of Certified Fraud Examiners

Certified in Financial Forensics     American Institute of Certified Public Accountants

Licensed Private Investigator     Texas Department of Public Safety, Private Security Bureau (No. 00079856)

**EDUCATION:**     BA, Economics     Princeton University (1972)

MBA, Finance and Accounting     University of Chicago (1973)

Continuing Education     American Institute of Certified Public Accountants

Texas Society of CPAs

Houston Chapter of the Texas Society of CPAs

Dallas Chapter of the Texas Society of CPAs

University of Texas School of Law

National Association of Corporate Directors

Turnaround Management Association

Houston Chapter of the Association of Certified Fraud Examiners

State Bar of Texas

Programs Sponsored by Various Law Firms

**CIVIC**

**INVOLVEMENT:**     Marc serves on the Board of Directors of the Mission Centers of Houston, ESCAPE Family Resource Center, the Memorial Exchange Club and as Past President of the National Exchange Club Foundation. He is also a former director and officer of the Houston Chapter of the Texas Society of CPAs.



**Schwartz**Associates



**Schwartz**Associates

May 19, 2022

**VIA EMAIL**

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

     This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

     SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. CRO will work to maximize returns and to assure a fair pro rata distribution to all unsecured creditors.

**I.**     **Scope of Engagement**

     CRO will lead FSS' management and personnel through the restructuring process. It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

1



EXHIBIT
4
2
exhibitsticker.com
0000845



**Schwartz** Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;

8. Implement cost containment measures;

9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;

10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.

11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

**II.     Indemnification**

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

2



**SchwartzAssociates**

### III. Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV. Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V. Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3

000847



**Schwartz** Associates

### VI. Term & Termination

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

### VII. Compensation

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

4



**Schwartz** Associates

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII.  CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX.  Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5



**Schwartz** Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

00008550

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, the "Agreement") is made and entered into as of April 14, 2022 by and among the following parties (each individually a "Party" and collectively referred to as the "Parties"):

(a)     Free Speech Systems, LLC, a Texas limited liability company ("FSS");

(b)     Alex E. Jones, an individual residing in Texas ("AJ");

(c)     InfoW, LLC,[1] a Texas limited liability company ("IW");

(d)     InfoHealth, LLC,[2] a Texas limited liability company ("IWH"); and

(e)     Prison Planet TV, LLC, a Texas limited liability company ("PTV").

## RECITALS

WHEREAS, IW, IWH and PTV (collectively the "Debtors" and each individually a "Debtor") intend to commence voluntary reorganization cases (the "Bankruptcy Cases") under subchapter V of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court") to affect the resolution and payment of certain claims and litigation claims through one or more chapter 11 plan(s) of reorganization;

WHEREAS, the Debtors have determined that it would be in their best interests and the interest of their creditors to implement a restructuring of their indebtedness and other obligations through the prosecution of the Bankruptcy Cases under the exclusive control of trustees to be approved by the Bankruptcy Court and funded by AJ and FSS (collectively the "Third-Party Funding Contributor[s]") as herein provided;

WHEREAS, the Parties have agreed on the terms of this Agreement and the elements of a proposed chapter 11 plan(s) for the Debtors, each as may be amended, modified, or supplemented from time to time, including any schedules and exhibits attached thereto, in each case, in accordance with the terms hereof (the "Plan");

WHEREAS, subject to the terms hereof and appropriate approvals of the Bankruptcy Court, as may be required, the following sets forth the agreement among the Parties concerning their respective obligations in connection with the Plan(s) and the Bankruptcy Cases.

---

[1]     Formerly known as InfoWars, LLC

[2]     Formerly known as InfoWars Health, LLC

EXHIBIT
3

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

## Section 1      CERTAIN DEFINITIONS

Applicable definitions contained in (i) the Bankruptcy Code; and (ii) the Litigation Settlement Trust (and associated documents) are incorporated into this Agreement except as modified in this Section 1 or except as conflicting with the defined the terms herein. The following definitions shall have the meanings as specified herein, and shall be designated, when such special definitions are applicable, with capital letters, and these definitions shall be enforceable as terms of the Agreement in conjunction with the respective matters to which they reference or define.

*"Allowed"* or *"Allowed Claim"* means a Litigation Settlement Trust Claims or Claim that is allowed: (i) in any stipulation executed by the Debtor (or the Litigation Settlement Trustees after the Confirmation Order becomes a Final Order), the Third-Party Funding Contributors and the holder of the Litigation Settlement Trust Claim; (ii) in a Final Order; or (iii) pursuant to the terms of the Plan.

*"Approved Plan Documents"* means those agreements and documents executed and or submitted in conjunction with the Plan or as a supplement to the Plan which have been approved by the Third-Party Funding Contributors.

*"Bankruptcy Cases"* means collectively or individually the cases filed by the Debtors pursuant to 11 U.S.C. §1101, *et seq*.

*"Bankruptcy Code"* means title 11 of the United States Code.

*"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan(s) pursuant to section 1191 of the Bankruptcy Code.

"*Debtor*" or "*Debtors*" shall refer individually and collectively to InfoW,  LLC (XXXX), InfoHealth, LLC (XXXX), and Prison planet TV, LLC (XXXX), including any and all affiliated, predecessor, successors, assigns, agents, employees, partners, attorneys, representatives, administrators, investigators, consultants and other persons, acting or purporting to act on behalf of any of the above entities.

"*Definitive Documents*" means, with respect to the Plan(s), all material documents (including any related Bankruptcy Court orders, agreements, schedules, pleadings, motions, filings, or exhibits) that are contemplated by this Agreement and that are otherwise necessary or desirable to implement the Plan(s) and this Agreement, including (as applicable): (i) the Plan(s); (ii) Disclosure Statement(s) if ordered by the Bankruptcy Court; (iii) any other operative documents and/or agreements relating to the Plan(s) (including any documents necessary to implement the distributions contemplated thereunder); (iv) the Confirmation Order.

*"Effective Date"* means April 8, 2022.

*"Final Order"* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

*"Litigation"* means pending civil lawsuits, including but not limited to the following:

Marcel Fontaine vs. Alex E., Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels, Cause No. D-1-GN-18-001605 in the 459th Judicial District Court of Travis County, Texas;

Neil Heslin vs. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835 in the 261st Judicial District Court of Travis County, Texas;

Veronique de la Rosa and Leonard Pozner vs. Alex E. Jones, Inforwars, LLC, and Free Speech Systems, LLC, Cause No. D-1-GN-18-001842 in the 345th Judicial District Court of Travis County, Texas;

Scarlett Lewis vs. Alex E. Jones, Inforwars, LLC, Free Speech Systems, LLC and Owen Shroyer, Cause No. D-1-GN-18-006623 in the 98th Judicial District Court of Travis County, Texas;

Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046437-S in the Superios Court of Connecticut, Waterbury Division;

000653

William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046438-S in the Superios Court of Connecticut, Waterbury Division; and

Brennan M. Gilmore v. Alexander ("Alex") E. Jones, Infowars, LLC, Free Speech Systems, LLC, Lee Stanahan, Lee Ann McAdoo a/k/a Lee Ann Fleissner, Scott Creighton, James ("Jim") Hoft, Allen B. West, Derrick Wilburn, Michelle Hickford, and Words-n-Ideas, LLC, Cause No. 3:18-cv-00017-GEC in the United States Districrt Court for the Western District of Virginia, Charlottesville Division;

together with any other pending lawsuits against any of the Parties on the Effective Date of this Agreement (collectively, the "Litigation Claims").

***"Initial Trust Funding"*** means $725,000 in cash funded to the Litigation Settlement Trust by AJ from his Exempt property upon the Effective Date of this Agreement to pay the costs of administration of the Debtors' Bankruptcy Cases and the Litigation Settlement Trust, including retention of the Litigation Settlement Trustees and retention by the Trustees of all professionals deemed necessary to accomplish the purpose of this Trust and the commitment of the Third-Party Funding Contributors to maintain for not less than 120 days after the Petition Date a balance of $200,000 after payment of all initial administrative expense retainers to newly appointed Litigation Settlement Trustees and as the only members of the Debtors acting as independent Members, together with the Debtors' professionals from time to time, to be paid directly, or thereafter maintained in the Litigation Settlement Trust for continued payment of the costs of Administration of the Litigation Settlement Trust and the Debtors' Bankruptcy Cases.

***"Litigation Settlement Trust"*** means the 2022 Litigation Settlement Trust dated effective April 1, 2022 for the benefit of the Debtors' as provided therein, including that Third-Party Funding Contributor[s] intended to facilitate and underwrite the "Payment in Full" Plan Class of Allowed Litigation Settlement Trust Claims and the Litigation Settlement Trust Beneficiaries Litigation Settlement Trust Claims, as may exist from time to time and as may be funded by the Third-Party Funding Contributors for this purpose from time to time to achieve Payment in Full.(s).

***"Litigation Settlement Trustees"*** means two individuals approved by the Bankruptcy Court to serve as Trustees of Litigation Settlement Trust who will replace the interim trustee serving in that capacity prior to the filing of the Bankruptcy Cases.

***"Litigation Settlement Trust Claims Bar Date"*** means the bar date for filing Claims or Litigation Claims in the Bankruptcy Cases established by Order of the Bankruptcy Court;

***"Litigation Settlement Trust Claims"*** means the Claims of any party arising out of or related to the Litigation Claims and evidenced by a proof of claim timely filed in the Debtors' Chapter 11 case(s).

000654

"***Litigation Settlement Trust Claims Estimation***" means the estimation of the Litigation Settlement Trust Claims by the Bankruptcy Court in these Bankruptcy Cases pursuant to Sections 502(c) and 105 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules of Procedure.

"***Litigation Settlement Trust Beneficiary***" Means the holder of a Litigation Settlement Trust Claim.

"***Litigation Trust Expenses***" means all costs, expenses and professional fees incurred by the Litigation Settlement Trust and the Litigation Settlement Trustees during the Support Period, specifically including, but not limited to the allowed fees and expenses of the Debtors and their professionals incurred in connection with the prosecution of the Bankruptcy Cases and those incurred after the Plan Effective Date, approved by the Litigation Settlement Trustees.

"***Petition Date***" means the date upon which the earliest of the Debtors' Bankruptcy Cases was commenced as a voluntary bankruptcy case.

"***Plan(s)***" or "***Plan(s) of Reorganization***" means the chapter 11 plan(s) to be jointly proposed by the Debtors supported by the Third-Party Funding Contributors in each of the Bankruptcy Cases, that contains the same terms set forth in, and is otherwise materially consistent with this Agreement and that is an Approved Plan Document, as the same may be amended, supplemented, or otherwise modified as provided herein.

"***Plan Effective Date***" means the date on which the Plan, as confirmed, becomes effective, as defined therein.

"***Support Period***" means, with respect to any Party, the period commencing on the later of (a) the Agreement Effective Date and (b) the Petition Date and ending on the date on the earlier of (i) 180 days following the commencement date and (ii) termination of this Agreement, *provided* however that if a Confirmation Order is entered, then on and after the Effective Date the Support Period shall remain in effect for the earlier of not less than 5 years from the Plan Effective Date or until Payment in Full, or full liquidation of all available assets in the Litigation Settlement Trust, which ever first occurs.

**Section 2     The Plan(s) and the Litigation Settlement Trust Claims Estimation**

The Parties agree that as soon as practical after the Petition Date, and during the Support Period that they will

(i)     promptly file a Motion to set a Litigation Settlement Trust Claims Bar Date;

(ii)     promptly file a Motion to Estimate all Litigation Settlement Trust Claims pursuant to Section 502(c) to determine for all purposes, except, allowance of the amount of all Litigation Claims, and shall set an Estimation Protocol to initiate and conduct such estimations.

000655

(iii)    promptly initiate the protocol for settlement negotiations of the allowed amounts of all Litigation Settlement Trust Claims, the Plan treatment, and all related issues and matters toward a Plan Confirmation of a "Payment in Full" Plan; and

(iv)    promptly initiate and negotiate the Definitive Documents in good faith, and such Definitive Documents will be materially consistent in all respects with this Agreement, and otherwise in form and substance reasonably acceptable to the Parties, and that, upon execution, the terms and conditions set forth in this Agreement are not subject to further negotiation or change. Notwithstanding anything to the contrary herein, in no event shall the Plan or the Definitive Documents (x) increase or decrease directly or indirectly the settlement consideration or otherwise require any amount to be payable, directly or indirectly, by the Third-Party Funding Contributors or (y) change the conditions precedent for funding by the Third-Party Funding Contributors.  If the Plan and the Definitive Documents satisfy the criteria in this Section 2, they will be considered the "Approved Plan Documents."  This provision, however, is not intended in any way to abrogate, abridge or affect in any way the fiduciary duties and obligations of the Debtors.

**Section 3    Joint Agreements**

During the Support Period, the Parties agree to the following:

(a)    The Debtors and the Litigation Settlement Trust along with the Third-Party Funding Contributors shall jointly file and prosecute a motion to establish (x) a Litigation Settlement Trust Claims Bar Date, (y) a Litigation Settlement Trust Claims Estimation protocol, and (z) the Plan(s).

(b)    Each Party agrees to (i) support and take all reasonable actions necessary to facilitate the confirmation, implementation and consummation of, the Plan and (ii) not take any action that is inconsistent with the implementation or consummation of this Agreement or the Plan.

(c)    No Party shall:

(i)   object to, delay, or take any other action to interfere, directly or indirectly, in any respect with acceptance or implementation of the Plan(s), nor encourage any person or entity to do any of the foregoing;

(ii)  directly or indirectly seek, solicit, propose, file, support, encourage, or vote for any plan of reorganization other than the Plan;

(iii) take any other action, including but not limited to, initiating any legal proceeding, that is materially inconsistent with, or that would prevent or delay consummation of, the Plan; and

(iv) impede either in the Bankruptcy Court or any other court reasonable efforts to have the Plan confirmed by the Court as during the Support Period.

**Section 4    Third-Party Funding Contributor Agreements**

(a) During the Plan Support Period the Third-Party Funding Contributors shall:

(i) fund the Initial Trust Funding to the Litigation Settlement Trust;

(ii) subject to execution of confidentiality agreements in a form acceptable to the Third-Party Funding Contributors, (A) deliver or cause to be delivered to the Litigation Settlement Trustees any and all documents (or copies thereof) relating to the Litigation Settlement Trust Claims, held by the Debtors, their employees, agents, advisors, attorneys, accountants, or any other professionals hired by the Debtors, and (B) provide reasonable access to the Litigation Settlement Trustees and their advisors to such employees of the Debtors, their agents, advisors, attorneys, accountants, or any other professionals hired by the Debtors with knowledge of matters relevant to the Litigation Settlement Trust Claims for the purpose of enabling the Litigation Settlement Trustees to fulfill their obligations under this Plan and the Litigation Settlement Trust, including the prosecution of the Litigation Settlement Trust Claims.

(iii) subject to execution of confidentiality agreements in a form acceptable to the Third-Party Funding Contributors or the Bankruptcy Court, upon request from the Litigation Settlement Trustees, the Third-Party Funding Contributors shall deliver current financial information, operating information, assets or account information ("Information") as reasonably needed to determine that each Third-Party Funding Contributor has the financial ability to pay Allowed Litigation Settlement Trust Claims in full, in accordance with the Plan. The Information shall be produced only under this provision, and if there is any disagreement on Information production requested, the Litigation Settlement Trustees may seek orders from any Federal Court.

(b)     After the Confirmation Order becomes a Final Order and continuing until the Third-Party Funding Contributors declare that they will not Pay in Full a settlement proffered by the Litigation Settlement Trustees:

(i)     From time to time thereafter, transfer to the Litigation Settlement Trust additional funds to the extent required by the Litigation Settlement Trust and the confirmed Plan to pay Litigation Trust Expenses during the Support Period.

(ii)     The Plan shall provide that the Litigation Settlement Trustees shall hold a perfected lien and security interest in and to all of FSS's and all non-exempt AJ assets to secure their obligations hereunder, subject to this Section 4(b) hereof. The Litigation Settlement Trustees and the Third-Party Funding Contributors shall determine from time to time an appropriate budget for FSS to be operated properly during the Support Period and an appropriate personal budget for AJ consistent with the anticipated needs of individual contributions during the Support Period and consistent with his usual and ordinary needs. No agreed budget term or provision will waive any right to an exemption in property otherwise available to AJ and his

Plan Support Agreement                      Page 7

family. The Third-Party Funding Contributors covenant that they shall not divert, secret, hide or hinder assets subject to this agreement, other than those available to each under the agreed budgets during the Support Period prior to termination. In any Litigation relating to allegations of breach of this provision shall be brought exclusively in the bankruptcy court and shall entitle the Litigation Settlement Trustees to injunctive relief and costs.

(iii) Subject to execution of confidentiality agreements in a form acceptable to the Third-Party Funding Contributors, upon request from the Litigation Settlement Trustees, the Third-Party Funding Contributors shall deliver the current financial information, operating information, assets or account information ("Information") as reasonably needed to determine that each Third-Party Funding Contributor is maintaining operations and business sufficient to not only maintain the minimum balance in the Litigation Settlement Trust, but also to pay Allowed Litigation Settlement Trust Claims in full, in accordance with the Plan. The Information shall be produced only under this provision, and to the extent that there is any disagreement on Information production requested, the Litigation Settlement Trustees may seek orders from any Federal Court.

(iv) In accordance with the confirmed Plan, (i) transfer $2 million to the Litigation Settlement Trust, (ii) , contribute $250,000 per quarter for 20 consecutive quarters to the Litigation Settlement Trust, and contribute additional funds to the Litigation Settlement Trust as may be requested by the Litigation Settlement Trustees and agreed to by the Third-Party Funding Contributors in writing, or pursuant to an agreed budget, from time to time in accordance with the Plan to Pay in Full Allowed Litigation Settlement Trust Claims or Allowed Claims.

**Section 5 Duration of the Agreement.**

The Agreement shall become effective on the date it is executed by all Parties, *provided*, however, that if the Agreement is not executed by the Debtors on or before 5:00 p.m. (Central Daylight Time) on April 15, 2022, or such later date as agreed by the Debtors and the Third-Party Funding Contributors (the "Expiration Date"), this Agreement shall no longer be available for acceptance by the Debtors. The Agreement will remain in effect and be irrevocable by the Parties during the Support Period. Upon implementation under the Plan, the Agreement shall remain in effect for not less than 5 years from the Plan Effective Date.

**Section 6 Representations and Warranties.**

(a) The Third-Party Funding Contributors jointly and severally represent and warrant that the following statements are true, correct and complete as of the date hereof:

(viii) Organization and Good Standing. FSS is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.

Plan Support Agreement   Page 8

(ix)     Authorization of Agreement.  Each of the Third-Party Funding Contributors has the requisite power and authority to execute this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by the Third-Party Funding Contributors and the consummation by the Plan of the transaction contemplated hereby has been duly authorized by FSS' managers and no other corporate proceedings on the part of the Third-Party Funding Contributors are necessary to authorize this Agreement or to consummate the transaction contemplated hereby.  This Agreement has been duly executed and delivered by the Third-Party Funding Contributors and, assuming due execution and delivery by the Debtors of this Agreement, this Agreement constitutes a valid and binding obligation of the Third-Party Funding Contributors, enforceable against the Third-Party Funding Contributors in accordance with its terms.  The Third-Party Funding Contributors are prepared to consummate this Agreement immediately upon its acceptance by the Debtors.

(x)     Due Diligence.  The Third-Party Funding Contributors have completed their due diligence, and this Agreement is not subject to a due diligence condition, *provided* that the Debtors shall continue to provide information regarding the Bankruptcy Cases and the process surrounding confirmation of the Plan(s).

(xi)     No Securities; No Third-Party Financing.  No securities are being issued and the obligation of the Third-Party Funding Contributors to perform under this Agreement is not conditioned on obtaining third-party financing.

(xii)     Financial Capability.  The Third-Party Funding Contributors have and will have upon Plan Effective Date, sufficient cash and/or cash flow available to consummate the transactions contemplated by this Agreement and the Plan.

(xiii)     No Violation; Consents.  The execution and delivery by the Third-Party Funding Contributors of this Agreement and the consummation of the transactions contemplated hereby do not and will not (1) violate any provision of the organizational documents of FSS, (2) violate any Order of any governmental authority to which the Third-Party Funding Contributors are bound or subject, (3) violate any applicable law, or (4) violate any legal agreements to which a Third-Party Funding Contributor is a party.

(xiv)     No Third-Party Approvals Required.  No regulatory or other third-party approvals, consents or filings are required to be obtained or made by the Third-Party Funding Contributors in order to consummate this Agreement, except for any such requirements, the failure of which to be obtained or made would not reasonably be expected to prevent, impede or materially delay or otherwise affect in any material respect the transactions contemplated by this Agreement.

(xv)     Bankruptcy.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by or, to the knowledge of the Third-Party Funding Contributors, threatened against the Third-Party Funding Contributors.

000659