**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| Free Speech Systems, LLC, | ) | Case No. 22-60043 (CML) |
| Debtor. | ) | |

**THE SANDY HOOK PLAINTIFFS' WITNESS AND EXHIBIT LIST FOR HEARING SCHEDULED FOR AUGUST 3, 2022 AT 10:00 A.M. (PREVAILING CENTRAL TIME)**

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", and, together with the Texas Plaintiffs, the "Sandy Hook Plaintiffs", creditors and parties-in-interest in the above-captioned case ("Bankruptcy Case"), file their Witness and Exhibit List for the hearing to be held on August 3, 2022, at 10:00 a.m. (prevailing Central Time) (the "Hearing") as follows:

**WITNESSES**

The Sandy Hook Plaintiffs may call the following witnesses at the Hearing:

1. W. Marc Schwartz.
2. Any witness called or designated by any other party.
3. Any witness necessary to rebut the evidence or testimony of any witness offered or designated by any other party

**EXHIBITS**

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER TRIAL |
|---|---|---|---|---|---|---|---|
| **1.** | Debtor's Voluntary Petition for Non-Individuals Filing for Bankruptcy [Docket No. 1]. | | | | | | |
| **2.** | Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Section 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Docket No. 6]. | | | | | | |
| **3.** | Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions [Docket No. 10]. | | | | | | |
| **4.** | Debtors' Emergency Application for Interim and Final Orders (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief, *In re InfoW, LLC et al.*, Case No. 22-60020-CML (Bankr. S.D. Tex) [Docket No. 7]. | | | | | | |
| **5.** | Declaration of W. Marc Schwartz Regarding Bankruptcy Code § 1116(1) Requirements, *In re InfoW, LLC et al.*, Case No. 22-60020-CML (Bankr. S.D. Tex) [Docket No. 42-1]. | | | | | | |

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER TRIAL |
|---|---|---|---|---|---|---|---|
| **6.** | Signed Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases, *In re InfoW, LLC et al.*, Case No. 22-60020-CML (Bankr. S.D. Tex) [Docket No. 114]. | | | | | | |
| **7.** | Transcript of Hearing dated A, pr. 22, 2022, *In re InfoW, LLC et al.*, Case No. 22-60020-CML (Bankr. S.D. Tex). | | | | | | |
| **8.** | Mary Papenfuss, *Alex Jones Gloats About Bankruptcy Plot To Tie Up Sandy Hook Damages 'For Years'*, MSN (Aug. 1, 2022), https://www.msn.com/en-us/money/other/alex-jones-gloats-about-bankruptcy-plot-to-tie-up-sandy-hook-damages-for-years/ar-AA10cDan?ocid=msedgntp&cvid=d8d7f30d75c7420b82d47ad87af8f803. | | | | | | |
| **9.** | Order on Plaintiff's Motion for Default Judgment, *Heslin v. Jones*, Case No. D-1-GN-18-001835 (Tex. Dist. Ct. Sept. 27, 2021). | | | | | | |
| **10.** | Court's Ruling, *Lafferty et al. v. Jones, et al.*, XO6 UWY CVlS-6046436-S, *Sherlach et al. v. Jones, et al.*, Case Nos. XO6 UWY CVlS-6046437-S, XO6 UWY CVlS-6046438-S (Conn. Sup. Ct. Nov. 15, 2021). | | | | | | |
| **11.** | Oral and Videotaped Deposition of Brittany Paz, Corporate Representative of Free Speech Systems, LLC, *Fontaine v. InfoWars, LLC*, Cause No. D-1-GN-18-001605 (Tex. Dist. Ct. Feb. 15, 2022). | | | | | | |
| **12.** | Deposition Notes by Corporate Representative of Free Speech Systems, LLC, dated Feb. 15, 2022. | | | | | | |

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER TRIAL |
|---|---|---|---|---|---|---|---|
| **13.** | Plaintiffs' Original Petition, *Heslin v. Jones*, Cause No. D-1-GN-22-001610 (Tex. Dist. Ct. filed Apr. 4, 2022). | | | | | | |
| **14.** | Oral and Videotaped Deposition of Alex Jones, Volume III, *Lafferty et al. v. Jones, et al*., XO6 UWY CVlS-6046436-S, *Sherlach et al. v. Jones, et al*., Case Nos. XO6 UWY CVlS-6046437-S, XO6 UWY CVlS-6046438-S (Conn. Sup. Ct. June 21, 2022). | | | | | | |
| **15.** | Videotaped Deposition of Brittany Paz, Volume III, *Lafferty et al. v. Jones, et al*., XO6 UWY CVlS-6046436-S, *Sherlach et al. v. Jones, et al*., Case Nos. XO6 UWY CVlS-6046437-S, XO6 UWY CVlS-6046438-S (Conn. Sup. Ct. June 21, 2022). | | | | | | |
| **16.** | Any document or pleading filed in the above-captioned main cases | | | | | | |
| **17.** | Any exhibit necessary for impeachment and/or rebuttal purposes | | | | | | |
| **18.** | Any exhibit identified or offered by any other party | | | | | | |

**RESERVATION OF RIGHTS**

The Sandy Hook Plaintiffs reserve the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above, and further reserve the right to supplement this list prior to the Hearing.

Dated: August 3, 2022

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**

Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

***Counsel for the Texas Plaintiffs***

***CAIN & SKARNULIS PLLC***

Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Facsimile: (512) 477-5011

-and-

**BYMAN & ASSOCIATES PLLC**

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Counsel for Connecticut Plaintiffs***

**Certificate of Service**

I certify that on August 3, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jarrod B. Martin*
Jarrod B. Martin

# Exhibit 1

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern District of Texas (State)

Case number (*If known*): ______________________ Chapter 11

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

**1. Debtor's name**

Free Speech Systems LLC

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as* names

______________________

**3. Debtor's federal Employer Identification Number** (EIN)

26 – 1510005

**4. Debtor's address**

**Principal place of business**

3019 Alvin Devane Blvd., STE 300
Number Street

______________________

Austin, TX 78741
City State ZIP Code

Travis
County

**Mailing address, if different from principal place of business**

______________________
Number Street

______________________
P.O. Box

______________________
City State ZIP Code

**Location of principal assets, if different from principal place of business**

______________________
Number Street

______________________

______________________
City State ZIP Code

**5. Debtor's website** (URL) ______________________

Debtor Free Speech Systems LLC
Name
Case number (*if known*) ______

**6. Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
☐ Partnership (excluding LLP)
☐ Other. Specify: ______

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Railroad (as defined in 11 U.S.C. § 101(44))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

5151 __ __

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7
☐ Chapter 9
☒ Chapter 11. *Check **all** that apply*:

- ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
- ☒ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
- ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
- ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

Debtor Free Speech Systems LLC
Name
Case number (if known)

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No
☐ Yes. District ___ When ___ (MM / DD / YYYY) Case number ___
District ___ When ___ (MM / DD / YYYY) Case number ___

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☒ No
☐ Yes. Debtor ___ Relationship ___
District ___ When ___ (MM / DD / YYYY)
Case number, if known ___

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? ___

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ___

**Where is the property?** ___
Number Street
___
City State ZIP Code

**Is the property insured?**

☐ No
☐ Yes. Insurance agency ___

Contact name ___

Phone ___

## Statistical and administrative information

Debtor Free Speech Systems LLC
Name

Case number (*if known*)

**13. Debtor's estimation of available funds**

*Check one:*

[X] Funds will be available for distribution to unsecured creditors.

[ ] After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| [ ] 1-49 | [ ] 1,000-5,000 | [ ] 25,001-50,000 |
| [X] 50-99 | [ ] 5,001-10,000 | [ ] 50,001-100,000 |
| [ ] 100-199 | [ ] 10,001-25,000 | [ ] More than 100,000 |
| [ ] 200-999 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| [ ] $0-$50,000 | [ ] $1,000,001-$10 million | [ ] $500,000,001-$1 billion |
| [ ] $50,001-$100,000 | [X] $10,000,001-$50 million | [ ] $1,000,000,001-$10 billion |
| [ ] $100,001-$500,000 | [ ] $50,000,001-$100 million | [ ] $10,000,000,001-$50 billion |
| [ ] $500,001-$1 million | [ ] $100,000,001-$500 million | [ ] More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| [ ] $0-$50,000 | [ ] $1,000,001-$10 million | [ ] $500,000,001-$1 billion |
| [ ] $50,001-$100,000 | [ ] $10,000,001-$50 million | [ ] $1,000,000,001-$10 billion |
| [ ] $100,001-$500,000 | [X] $50,000,001-$100 million | [ ] $10,000,000,001-$50 billion |
| [ ] $500,001-$1 million | [ ] $100,000,001-$500 million | [ ] More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 07/29/2022
MM / DD / YYYY

✘ W. Marc Schwartz (signature)
Signature of authorized representative of debtor

W. Marc Schwartz
Printed name

Title Chief Restructuring Officer

Case 22-60043 Document 1 Filed in TXSB on 07/29/22 Page 5 of 27

Debtor Free Speech Systems LLC
Name

Case number (*if known*)

**18. Signature of attorney**

✘ ______________________________ Date 07/29/2022
Signature of attorney for debtor MM / DD / YYYY

Raymond W. Battaglia
Printed name

Law Offices of Ray Battaglia, PLLC
Firm name

66 Granburg Circle
Number Street

San Antonio | Texas | 78218
City | State | ZIP Code

(210) 601-9405
Contact phone

rbattaglialaw@outlook.com
Email address

01918055 | Texas
Bar number | State

| Fill in this information to identify the case: |
|---|
| Debtor name Free Speech Systems LLC |
| United States Bankruptcy Court for the: Southern District of Texas (State) |
| Case number (If known): |

❑ Check if this is an amended filing

Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Elevated Solutions Group<br>28 Maplewood Drive<br>Cos Cob, CT 06870 | | Trade claim | | | | $319,148.16 |
| 2 | Christopher Sadowski<br>c/o Copycat Legal PLLC<br>3111 N. University Drive STE 301<br>Coral Springs, FL 33065 | Daniel DeSouza<br>877-437-6228<br>dan@copycatlegal.com | Potential lawsuit for copyright infringement | Disputed<br>Unliquidated | | | $90,000.00 |
| 3 | Atomial LLC<br>1920 E. Riverside Dr.<br>Suite A-120 #124<br>Austin, TX 78741 | | Trade claim | | | | $75,600.00 |
| 4 | Cloudflare, Inc<br>Dept LA 24609<br>Pasadena, CA 91185-4609 | | Trade claim | | | | $61,273.68 |
| 5 | Jacquelyn Blott<br>200 University Blvd<br>Suite 225 #251<br>Round Rock, TX 78665 | | Legal fees | | | | $58,280.00 |
| 6 | Joel Skousen<br>PO Box 565<br>Spring City, UT 84662 | | Trade claim | | | | $35,035.00 |
| 7 | eCommerce CDN, LLC<br>221 E 63rd Street<br>Svannah, GA 31405 | | Trade claim | | | | $27,270.00 |
| 8 | Paul Watson<br>9 Riverdale Road<br>Ranmoor Sheffield<br>South Yorkshire S10 3FA<br>UK | | Trade claim | | | | $25,000.00 |

Debtor Free Speech Systems LLC
Name

Case number (if known)

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | Brennan Gilmore<br>c/o Civil rights Clinic<br>600 New Jersey Avenue, NW<br>Washington, DC 20001 | Andrew Mendrala<br>202-662-9065<br>andrew.mendrala@georgetown.edu | Litigation claim | | | | $50,000.00 |
| 10 | Greenair, Inc<br>23569 Center Ridge Rd<br>Westlake, OH 44145 | | Trade claim | | | | $12,240.00 |
| 11 | Edgecast, Inc<br>Dept CH 18120<br>Palatine, IL 60055 | | Trade claim | | | | $11,726.00 |
| 12 | Ready Alliance Group, Inc<br>PO Box 1709<br>Sandpoint, ID 83864 | | Trade claim | | | | $9,431.90 |
| 13 | Getty Images, Inc<br>PO Box 953604<br>St. Louis, MO 63195-3604 | | Trade claim | | | | $9,201.25 |
| 14 | RatsMedical.com<br>c/o Rapid Medical<br>120 N Redwood Rd<br>North Salt Lake, UT 84054 | | Trade claim | | | | $9,185.00 |
| 15 | David Icke Books Limited<br>c/o Ickonic Enterprises Limited<br>St. Helen's House King Street<br>Derby DE1 3EE<br>UK | | Trade claim | | | | $9,000.00 |
| 16 | WWCR<br>1300 WWCR Ave<br>Nashville, TN 37218-3800 | | Trade claim | | | | $9,000.00 |
| 17 | JW JIB Productions, LLC<br>2921 Carvelle Drive<br>Riviera Beach, FL 33404 | | Trade claim | | | | $7,000.00 |
| 18 | CustomTattoNow.com<br>16107 Kensington Dr. #172<br>Sugar Land, TX 77479 | | Trade claim | | | | $5,389.36 |
| 19 | AT&T<br>PO Box 5001<br>Carol Stream, IL 60197-5001 | | Utilities claim | | | | $3,973.83 |
| 20 | Justin Lair<br>1313 Lookout Ave<br>Klamath Falls, OR 97601 | | Trade claim | | | | $3,240.82 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FREE SPEECH SYSTEMS LLC | ) | Case No. 22 - _________ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**LIST OF EQUITY SECURITY HOLDERS**

| *Registered Name of Holder of Security, Last Known Address or Place of Business* | *Class of Security* | *Number Registered* | *Kind of Interest* |
|---|---|---|---|
| Alexander E. Jones<br>3019 Alvin Devane Blvd., Suite 300<br>Austin, TX 78741 | Common Equity | 100% | Membership Interests |

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the Chief Restructuring Officer of the limited liability company named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: 7/29/2022

Signature: ______________________
W. Marc Schwartz

# Free Speech Systems, LLC

## Balance Sheet

As of May 31, 2022

| | TOTAL |
|---|---:|
| ASSETS | |
| Current Assets | |
| Bank Accounts | |
| 10000 Cash | 1,157,710.72 |
| Petty Cash | 1,537.18 |
| **Total Bank Accounts** | **$1,159,247.90** |
| Accounts Receivable | |
| 11000 Accounts Receivable | 10,013,413.22 |
| **Total Accounts Receivable** | **$10,013,413.22** |
| Other Current Assets | |
| 12000 Inventory | 910,116.84 |
| 13000 Prepaid Expenses | 114,136.99 |
| **Total Other Current Assets** | **$1,024,253.83** |
| **Total Current Assets** | **$12,196,914.95** |
| Fixed Assets | |
| 15000 Property and Equipment | 1,580,700.46 |
| Art Work | 79.00 |
| **Total Fixed Assets** | **$1,580,779.46** |
| Other Assets | |
| 17100 Security Deposits | 534,560.00 |
| 17300 Intangible Assets - Net | 15,333.33 |
| **Total Other Assets** | **$549,893.33** |
| **TOTAL ASSETS** | **$14,327,587.74** |

# Free Speech Systems, LLC

## Balance Sheet

As of May 31, 2022

| | TOTAL |
|---|---|
| LIABILITIES AND EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| 20000 Accounts Payable | 1,244,885.93 |
| **Total Accounts Payable** | **$1,244,885.93** |
| Credit Cards | |
| 22000 Credit Cards | 207,984.04 |
| **Total Credit Cards** | **$207,984.04** |
| Other Current Liabilities | |
| Advances from PQPR | 571,920.57 |
| David Jones Advance | 150,000.00 |
| Due to PQPR | 23,058,367.00 |
| Interest Payable | 0.00 |
| **Total Other Current Liabilities** | **$23,780,287.57** |
| **Total Current Liabilities** | **$25,233,157.54** |
| Long-Term Liabilities | |
| 27000 Note Due to PQPR | 53,845,074.41 |
| Note Payable - Winnebago | 82,524.37 |
| **Total Long-Term Liabilities** | **$53,927,598.78** |
| **Total Liabilities** | **$79,160,756.32** |
| Equity | |
| 31000 Opening Balance Equity | -66,792,609.05 |
| 33000 Distributions to Member | 57,336.00 |
| 35000 Retained Earnings | |
| Net Income | 1,902,104.47 |
| **Total Equity** | **$ -64,833,168.58** |
| **TOTAL LIABILITIES AND EQUITY** | **$14,327,587.74** |

# Free Speech Systems, LLC
## Statement of Cash Flows
### For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2022

| | 2021 | 2022 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| ***Net Income*** | ***($10,919,482.45)*** | ***$1,744,855.66*** |
| ***Adjustments to reconcile Net Income to Net Cash provided by operations:*** | | |
| 11000 Accounts Receivable:PQPR Reimbursement Receivable | ($10,187,121.95) | $648,708.73 |
| 12000 Inventory | ($94,344.61) | $822,486.29 |
| Prepaid Expenses | ($403,821.24) | $65,286.20 |
| Accumulated Depreciation | $209,887.99 | $98,750.20 |
| Accumulated Amortization | $35,361.29 | $0.00 |
| 20000 Accounts Payable | $3,005,707.55 | ($3,410,484.85) |
| 22000 Credit Card Payable | ($236,394.79) | $207,984.04 |
| Advances from PQPR | $0.00 | $256,920.57 |
| David Jones Advance | $150,000.00 | $0.00 |
| Due to PQPR | ($2,229,789.04) | $0.00 |
| Interest Payable - PQPR | ($200,022.99) | $0.00 |
| ***Net cash provided by operating activities*** | **($20,870,020.24)** | **$434,506.84** |
| **INVESTING ACTIVITIES** | | |
| 15000 Property and Equipment | ($522,121.65) | ($91.00) |
| 17100 Security Deposits | ($500,000.00) | $0.00 |
| 17300 Intangible Assets | ($5,500.00) | $3,229.15 |
| ***Net cash provided by investing activities*** | ***($1,027,621.65)*** | ***$3,138.15*** |
| **FINANCING ACTIVITIES** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | $24,992,405.22 | ($735,330.81) |
| Note Payable - Winnebago | ($18,832.81) | ($10,981.25) |
| 31000 Opening Balance Equity | $0.00 | $0.00 |
| Member's Equity | ($23,193.36) | ($98,098.40) |
| Net Member Distributions | ($2,100,362.40) | $57,019.45 |
| ***Net cash provided by financing activities*** | ***$22,850,016.65*** | ***($787,391.01)*** |
| ***Net cash increase for period*** | ***$952,374.76*** | ***($349,746.02)*** |

**Free Speech Systems LLC**
**Comparative Profit and Loss Statement**
**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2021**

| | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| **Total Income** | **64,970,641.85** | **14,320,983.15** |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| **Gross Profit** | **$ 13,092,308.12** | **$ 9,384,529.36** |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Miscellaneous Expenses | 0.00 | - |
| Uncategorized Expense | - | 103,815.00 |
| **Total Expenses** | **23,387,247.86** | **6,346,192.35** |
| **Net Operating Income** | **$ (10,294,939.74)** | **$ 3,038,337.01** |
| **Other Income** | **507,168.04** | **1,019,713.81** |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| **Total Other Expenses** | **1,131,710.75** | **2,155,946.35** |
| **Net Other Income** | **(624,542.71)** | **(1,136,232.54)** |
| **Net Income** | **$ (10,919,482.45)** | **$ 1,902,104.47** |

**Free Speech Systems LLC**
**Comparative Balance Sheet**
**As of December 31, 2021 and May 31, 2022**

| | 2021 | 2022 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 1,481,519.86 | $ 1,159,247.90 |
| Accounts Receivable | 10,187,121.95 | 10,013,413.22 |
| **Other Current Assets** | | |
| Invenotry | 1,732,603.13 | 910,116.84 |
| Prepaid Expenses | 446,475.64 | 114,136.99 |
| Due from PQPR | (500.00) | - |
| Advance To Elevated Solutions | 27,870.00 | - |
| **Total Other Current Assets** | **2,206,448.77** | **1,024,253.83** |
| **Total Current Assets** | **13,875,090.58** | **12,196,914.95** |
| **Fixed Assets** | 1,679,438.66 | 1,580,779.46 |
| **Other Assets** | | |
| Intangible Assets | 21,270.83 | 15,333.33 |
| Security Deposits | 534,560.00 | 534,560.00 |
| **Total Other Assets** | **555,830.83** | **549,893.33** |
| **Total Assets** | **$ 16,110,360.07** | **$ 14,327,587.74** |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 4,732,966.89 | $ 1,244,885.93 |
| Credit Cards | 152,367.42 | 207,984.04 |
| **Other Current Liabilities** | | |
| David Jones Advance | 150,000.00 | 150,000.00 |
| Advances from PQPR | - | 571,920.57 |
| Due to PQPR | 23,058,367.00 | 23,058,367.00 |
| **Total Other Current Liabilities** | **23,208,367.00** | **23,780,287.57** |
| **Total Current Liabilities** | **28,093,701.31** | **25,233,157.54** |
| **Long Term Liabilities** | | |
| Note Due to PQPR | 54,580,405.22 | 53,845,074.41 |
| Note Payable - Winnebago | 93,505.62 | 82,524.37 |
| **Total Long Term Liabilities** | **54,673,910.84** | **53,927,598.78** |
| **Total Liabilities** | **$ 82,767,612.15** | **$ 79,160,756.32** |
| **Equity** | | |
| Member's Equity | (774,291.44) | - |
| Member Draws | (61,937,862.26) | (254,014.00) |
| Member Contributions | 4,305,810.14 | 311,350.00 |
| Opening Balance Equity | - | (66,792,609.05) |
| Retained Earnings | 2,668,573.93 | - |
| Net Income | (10,919,482.45) | 1,902,104.47 |
| **Total Equity** | **$ (66,657,252.08)** | **$ (64,833,168.58)** |
| **Total Liabilities and Equity** | **$ 16,110,360.07** | **$ 14,327,587.74** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FREE SPEECH SYSTEMS LLC | ) | Case No. 22 - _________ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**DECLARATION OF W. MARC SCHWARTZ REGARDING BANKRUPTCY CODE § 1116(1) REQUIREMENTS**

I, W. Marc Schwartz, hereby declare as follows:

1. My name is W. Marc Schwartz.

2. I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters. The firm is also licensed as an investigations company by the Texas Department of Public Safety.

3. SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services My firm represents individuals, companies and courts in a variety of assignments including as Chief Restructuring Officers, financial advisers, trustees and examiners in bankruptcy matters; working as testifying or consulting experts on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as court appointed receivers in state and federal courts.

4. I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am

Case 22-60043 Document 6-1 Filed in TXSB on 07/29/22 Page 2 of 7

licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

5. I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state law.

6. I was retained as the Debtor's Chief Restructuring Officer in June 2022.

7. The Debtor is a disregarded entity for tax purposes and therefore has never prepared an income tax return.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 29, 2022

By: ______________________
W. Marc Schwartz

**WRITTEN CONSENT OF SOLE MEMBER OF FREE SPEECH SYSTEMS, LLC A LIMITED LIABILITY COMPANY**

The undersigned, sole Member of FREE SPEECH SYSTEMS, LLC ("Company"), in accordance with the Company Agreement, hereby adopt the following written consent.

**WHEREAS,** the Member signing this consent is the holder of all of the member interest entitled to vote at the Company's meetings as provided in Section 8 of the Company Agreement and on the following resolutions; and

**WHEREAS,** the undersigned desires to execute a written consent in lieu of formally holding a Member's meeting and agrees that the adoption of the following resolutions shall be valid and have the same force and effect as though such resolutions had been adopted at a formal meeting;

**WHEREAS,** the Member has had the opportunity to consult with the financial and legal advisors of the Company and assess the considerations related to the commencement of a chapter 11 case under title 11 of the United States Code (the "Bankruptcy Code"), including materials provided by the financial and legal advisors, and the Member adopts these resolutions.

**WHEREAS**, in light of the Company's current financial condition, the Member has investigated, discussed and considered options for addressing the Company's financial challenges and, after consultation with the Company's advisors, have concluded that it is in the best interests of the Company, its creditors, employees and other interested parties that a petition be filed by the Company seeking relief under the provisions of the Bankruptcy Code; now therefore be it

**RESOLVED** that the Manager of the Company is hereby authorized, empowered and directed, in the name and on behalf of the Company, to execute and verify a petition under Chapter 11 of the Bankruptcy Code and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), at such time as said manager shall determine in consultation with the Company's legal and financial advisors; and it is further

**RESOLVED**, that the Company is authorized to hire the Law Offices of Ray Battaglia, PLLC and Shannon & Lee LLP as its bankruptcy counsel; and it is further

**RESOLVED**, that the Company is authorized to hire W. Marc Schwartz to serve as Chief Restructuring Officer ("CRO") and to retain any professionals and advisors to the extent necessary or useful in any chapter 11 case authorized hereby; and it is further

**RESOLVED**, that the Manager and the CRO is hereby authorized, empowered and directed to execute and file all petitions, schedules, motions, lists, applications, pleadings and other papers and, in that connection, to employ and retain all assistance by legal counsel, accountants, financial advisors, liquidators and other professionals, and to take

and perform any and all further acts and deeds deemed necessary, proper or desirable in connection with the successful prosecution of the chapter 11 case; and it is further

**RESOLVED**, that any and all past actions heretofore taken by the Manager, the CRO or any other Officer in the name and on behalf of the Company in furtherance of any or all of the proceeding resolutions be, and the same hereby are, ratified, confirmed, and approved; and it is further.

**RESOLVED**, that this written consent shall have the same force and effect as a formal Members' meeting for all purposes.

The undersigned, by signing this Unanimous Written Consent, hereby waive notice of the time and place of the meeting, consent to the meeting and approves the contents of this written consent. The undersigned directs that this written consent be filed with the minutes of the proceedings of the Company.

**DATED** to be effective on July 28, 2022

Free Speech System, LLC

______________________
Alex E. Jones, Manager and
Sole Member

# Exhibit 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 22-60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S EMERGENCY MOTION FOR AN INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(B) AND (II) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDER**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the above-referenced chapter 11 case, hereby files this emergency motion (the "Motion") seeking an order from the Court (i) authorizing the use of cash collateral pursuant to Sections 105, 361, and 363

of the Bankruptcy Code and Bankruptcy Rule 4001(b); and (ii) granting adequate protection to the Debtor's pre-petition secured lenders. In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "First Day Declaration"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. On July 29, 2022 (the "Petition Date"), the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").

2. The Debtor continues in the possession of its property and is operating and managing its businesses as debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

3. No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

4. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 361, and 363 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

## FSS' BACKGROUND[1]

6. Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum for Alex's first broadcast. In 1996 he transitioned to talk

[1] Additional factual background and information regarding the Debtor and its operations is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions*

radio. After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees. Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7. What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full blown studio, and employing over 60 people. By 2013, FSS started selling dietary supplements to its growing listener base.

8. Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9. FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10. On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11. As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12. FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13. Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS. The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14. Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15. FSS purchased to sell on its website two categories of products: (a) dietary supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to

advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16. As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17. Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales. In the past, both FSS and PQPR attempted to provide fulfillment services for product sales. Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company. The fulfillment company charges FSS a flat fee per order regardless of size. Historically, fulfillment has cost an average of ten percent of sales, without considering payroll, the new agreement is estimated to cost sixteen percent of sales.

## PQPR INDEBTEDNESS

18. As discussed above, PQPR ordered and paid for Supplements which it marked up and then sold to FSS. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

19. The indebtedness to PQPR had accrued over a period of years from the sale of PQPR products through the Debtor's internet platform, generated by the Debtor and Alex Jones' sponsorship of those products. The PQPR Note balance represents the unpaid share of the proceeds from product sales by PQPR to FSS over a four year period for which the Debtor did not fully remit the proceeds to PQPR.

20. On or about August 13, 2020, the Debtor executed that certain Promissory Note in favor of PQPR in the original principal amount of $29,588,000.00 (the "PQPR Note"). A security agreement of the same date granted PQPR a security interest in all of the Debtor's personal property assets, including but not limited to the Debtor's tangible and intangible property, accounts, and proceeds derived from those assets (the "PQPR Security Agreement"). PQPR filed a UCC-1 financing statement with the Texas Secretary of State that on November 18, 2020.

21. The PQPR Security Agreement secures the obligations under the PQPR Note and any future advances owing by the Debtor to PQPR. Specifically, "Obligations" is defined in the PQPR Security Agreement to include "any and all other obligations of Debtor to [PQPR] of any kind or character, now owed or hereafter arising."

22. Subsequent to the date of the PQPR Note, the Debtor accrued additional indebtedness to PQPR representing a portion of PQPR's share of the proceeds from product sales from the date of the PQPR Note through November 10, 2021, for which the Debtor did not fully remit the required proceeds to PQPR. The Debtor executed a second promissory note ("Second PQPR Note" and together with the PQPR Note, collectively the "PQPR Notes") in the amount of $25,300,000. The Second PQPR Note is also secured by the PQPR Security Agreement.

23. As of the Petition Date, $53,655,082.29 of principal and $11,794,19 of interest are due and owing under the PQPR Notes.

**RELIEF REQUESTED**

24. Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of

rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.” [6] 11 U.S.C. § 363(a).

25. 11 U.S.C. § 363(c)(2) states as follows:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

26. The Debtor is in possession of certain funds which are not proceeds of PQPR’s collateral. Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR. Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR’s cash collateral.

27. The Debtor requires the use of cash collateral to pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, inventory purchases, lease payments, marketing, taxes, and insurance. Those uses required in the next fourteen (14) days from the date of the emergency hearing are set forth on the budgets attached hereto as **Exhibit A** and incorporated herein by reference. The Debtor’s proposed emergency use of cash collateral is necessary to preserve the value of the Debtor’s estate for the benefit of all creditors, including the PQPR, and any other secured creditors purporting to hold an interest in the Debtor’s cash collateral during the first fourteen (14) days of the Chapter 11 Cases (the “Interim Period”). The Debtor also requests that continued use of cash collateral is equally necessary to preserve the value of the Debtor’s assets and rights of all of the constituencies with claims or interests in this Chapter 11 Case.

28. Section 363 of the Bankruptcy Code authorizes a debtor to use cash collateral if those parties having an interest in such cash collateral consent or the court authorizes the use. *See* 11 U.S.C. § 363(c)(2). The use of cash collateral, however, may be prohibited or conditioned, upon proper request, as necessary to adequately protect any interest in cash collateral. *See* 11 U.S.C. §363(e).

29. A court may authorize the use of cash collateral upon showing that those with an interest in the cash collateral are adequately protected. *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, (Bankr. S.D. Tex. 2009) ("in order for this Court to authorize the use of cash collateral, the Lender must be adequately protected); *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) (A debtor requesting court approval to use cash collateral has the burden of proof as to the issue of "adequate protection".) Adequate protection requires examination of the creditor(s)' aggregate collateral position, not simply protection of its lien on cash. Adequate protection may be provided by granting replacement or additional liens "to the extent [that the use of cash collateral] results in a decrease in the value of [an] entity's interest in property." *See* 11 U.S.C. § 361(2). Authorizing a debtor to use cash collateral on an interim basis is appropriate where, as here, continuing the business as a going concern will cause the generation of future revenues upon which the secured lender is granted replacement liens. *See, e.g., In re Neise, Inc.,* 16 B.R. 600 (Bankr. D. Fla. 1981); *In re Certified Corp.*, 51 B.R. 768 (Bankr. D. Haw. 1985); *In re Post- Tron Systems, Inc.*, 106 B.R. 345 (Bankr. D.R.I. 1989).

30. By authorizing the Debtor to use cash collateral, the Court will place the Debtor in a position to fund its operating expenses and to operate as a going concern for the immediate future. The Debtor needs to use cash collateral in order to, *inter alia*, pay its employees, suppliers, and meet other on-going business obligations. Without the authority to use cash collateral, the Debtor will be unable to fund its business operations in a manner that will allow the Debtor to continue to operate, to the detriment of *all* of the Debtor's creditors, including the lenders referred to herein and the pool

of unsecured creditors. Furthermore, without the ability to fund continuing operations, the Debtor and its estate will suffer immediate and irreparable harm. For example, employees will not continue to provide services if they are not paid the wages for which they have already worked, and vendors will not continue to provide necessary services or supplies if they are not paid. Therefore, the Debtor seeks the emergency relief requested herein.

31. Attached to this Motion is a proposed form of the Interim Cash Collateral Order (the "Interim Cash Collateral Order") that authorizes the Debtor's use of cash collateral.

32. The proposed offer of adequate protection on an interim basis is set forth in the attached proposed Interim Cash Collateral Order and incorporated by reference herein for the purpose of setting forth the proposed offer of adequate protection for lenders. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of each lender's collateral, if any, and failure of other forms of adequate protection provided by the Debtor. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, and court-approved administrative expense claims of estate professionals.

33. The Debtor believes that the terms of the proposed Interim Cash Collateral Order as set forth above are fair and reasonable under the circumstances. The Debtor asserts that the value of PQPR's cash collateral will not diminish as a result of the use of cash in this case. The value of PQPR's interest in cash may fluctuate, but such value should not diminish, other than minimally, over the next fourteen (14) days, the period of interim relief requested.

34. The Debtor believes that PQPR is entitled to the protections set forth in the proposed Interim Cash Collateral Order. The adequate protection provisions have been drafted to provide

protection without taking undue or inappropriate value from the estate or its unsecured creditors. Given that the interests of the lenders will be adequately protected, it is in the best interest of the Debtor, its estate, and all of their creditors to be able to continue operations during the Interim Period and for the Debtor to be authorized to use cash collateral as requested herein.

35. Therefore, the Debtor respectfully requests that it be authorized to use cash collateral as proposed herein for the purposes of paying necessary business expenses as allowed by Section 363 of the Bankruptcy Code, and that the Court grant PQPR a replacement lien on post-petition assets, as allowed by Sections 361, and/or 363 of the Bankruptcy Code, consistent with the terms and provisions contained in this Motion. The Debtor requests that this relief be granted on both an interim and final basis.

## RESERVATION OF RIGHTS

36. The Debtor reserves any and all rights in connection with the Heslin\Lewis Suit. Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights or remedies.

## NO PRIOR REQUEST

37. No previous request for the relief sought herein has been made to this Bankruptcy Court or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the Court (i) authorize the use of cash collateral pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b); (ii) grant adequate protection to the pre-petition secured lenders; and (iii) grant such other and further relief as the Court may deem proper.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

**CERTIFICATE OF ACCURACY**

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Raymond W. Battaglia*

## CERTIFICATE OF SERVICE

    I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

    */s/ Raymond W. Battaglia*

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION**

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August ___, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1. The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (this "Court").

2. Debtor-in-Possession. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3. Jurisdiction and Venue. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "Local Rules").

4. Committee Formation. To date, no official committee (a "Committee") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5. Notice. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("PQPR"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule

4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6. Immediate Need for Use of Cash Collateral. The Debtor asserts that an immediate and critical need exists for the Debtor to use Cash Collateral in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

7. Conditional Consent to Use of Cash Collateral. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to the Motion as Exhibit A (the "Budget") for the period (the "Interim Period") from the Petition Date through and including August 15, 2022 (the "Termination Date").

8. Good Cause/Fair and Reasonable Terms. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the

security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. Motion Granted. The Motion is hereby granted on an interim basis as set forth herein. Any objections to the entry of this Order that have not been previously resolved or withdrawn are hereby overruled on their merits.

2. Interim Order. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. DIP Account. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "DIP Account"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. Terms of Cash Collateral Use. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the

overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5. No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

6. Further Authorization. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

7. Taxes. Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

8. Adequate Protection – Replacement Liens. As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "Diminution in Value"), the Pre-Petition Lender is hereby granted, effective as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "Replacement Liens") in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding

avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "Adequate Protection Collateral"). The Replacement Liens granted pursuant to this Order shall have the same priority as each of the Pre-Petition Lender's properly perfected unavoidable pre-petition liens but shall be subject to the Carve Out.

9. Adequate Protection – Priority Administrative Claim. As additional partial adequate protection for the Debtor's use of Cash Collateral, to the extent of any Diminution in Value and a failure of the other adequate protection provided by this Order the pre-petition lenders shall have an allowed priority administrative expense claim in this Case and any successor case as provided in and to the fullest extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code and otherwise (the "Adequate Protection Priority Claim").

10. Carve Out. The Replacement Liens and Adequate Protection Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "Estate Professionals"), for incurred but unpaid fees, expenses and other costs (all such carve-out amounts referenced above, collectively, the "Carve Out").

11. Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

12. Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on August ____ 2022, at __:___.m. Central time. Objections to the entry of a final order approving the Motion shall be filed and served on counsel for the Debtor and pre- petition lenders not later than 4:00 p.m. Central time on August ____ 2022.

Dated: August ___, 2022

________________________________________
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**13-Week Budget**

Free Speech Systems LLC

# Forecasted 13 Week Cash Flow Budget

Between July 30, 2022 and October 28, 2022

| *Period* / *Week Number* | *07/30/2022-08/05/2022* *1* | *08/06/2022-08/12/2022* *2* | *08/13/2022-08/19/2022* *3* | *08/20/2022-08/26/2022* *4* | *08/27/2022-09/02/2022* *5* | *09/03/2022-09/09/2022* *6* | *09/10/2022-09/16/2022* *7* | *09/17/2022-09/23/2022* *8* | *09/24/2022-09/30/2022* *9* | *10/01/2022-10/07/2022* *10* | *10/08/2022-10/14/2022* *11* | *10/15/2022-10/21/2022* *12* | *10/22/2022-10/28/2022* *13* | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | $ 40,836.21 |
| **Total Income** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** | **598,630.26** | **9,222,692.75** |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | - | (250,000.00) | - | (500,000.00) | - | - | - | - | - | - | - | - | - | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - | (27,270.00) | - | - | - | (27,270.00) | - | - | - | - | (81,810.00) |
| Texas Sales Tax | (5,337.87) | - | - | - | (5,337.87) | - | - | - | (5,337.87) | - | - | - | - | (16,013.61) |
| **Total Cost of Goods Sold** | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** | **(729,961.80)** | **(262,569.67)** | **(229,961.80)** | **(229,961.80)** | **(229,961.80)** | **(262,569.67)** | **(229,961.80)** | **(229,961.80)** | **(229,961.80)** | **(229,961.80)** | **(3,837,326.97)** |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | **(17,541.98)** | **-** | **-** | **-** | **(17,541.98)** | **-** | **-** | **-** | **(17,541.98)** | **-** | **-** | **-** | **-** | **(52,625.93)** |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | - | (1,608.39) | - | (11,073.89) |
| Software License Fees | (140.80) | - | - | - | (140.80) | - | - | - | (140.80) | - | - | - | - | (422.40) |
| Server Hosting Service | (28,595.13) | - | - | - | (28,595.13) | - | - | - | (28,595.13) | - | - | - | - | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | - | - | - | (55,728.00) | - | - | - | (55,728.00) | - | - | - | - | (167,184.00) |
| Satellite Service | (137,282.93) | - | - | - | (137,282.93) | - | - | - | (137,282.93) | - | - | - | - | (411,848.78) |
| Imaging License Fee | (9,201.25) | - | - | - | (9,201.25) | - | - | - | (9,201.25) | - | - | - | - | (27,603.75) |
| Software & Apps | (5,000.00) | - | - | - | (5,000.00) | - | - | - | (5,000.00) | - | - | - | - | (15,000.00) |
| Website Hosting | - | - | (266.50) | - | - | - | (266.50) | - | - | - | - | (266.50) | - | (799.50) |
| **Total Computer/IT/IP Expense** | **(238,031.01)** | **-** | **(1,874.89)** | **-** | **(238,031.01)** | **-** | **(1,874.89)** | **-** | **(238,031.01)** | **-** | **-** | **(1,874.89)** | **-** | **(719,717.72)** |
| Insurance | (2,166.50) | - | - | - | (2,166.50) | - | - | - | (2,166.50) | - | - | - | - | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | - | - | - | (1,989.90) | - | - | - | (1,989.90) | - | - | - | - | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** | **(328.46)** | **(10,239.71)** |
| Outsourced Services | (45,980.00) | - | - | - | (45,980.00) | - | - | - | (45,980.00) | - | - | - | - | (137,940.00) |
| Consulting Services | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | - | (12,000.00) | - | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | - |
| Electricity | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | - | - | (5,107.63) | - | (15,322.89) |
| HVAC | (256.19) | - | - | - | (256.19) | - | - | - | (256.19) | - | - | - | - | (768.58) |
| CAM Charges | (20,364.16) | - | - | - | (20,364.16) | - | - | - | (20,364.16) | - | - | - | - | (61,092.48) |
| Water & Sewer | (1,708.55) | - | - | - | (1,708.55) | - | - | - | (1,708.55) | - | - | - | - | (5,125.66) |
| Gas Service | (132.09) | - | - | - | (132.09) | - | - | - | (132.09) | - | - | - | - | (396.28) |
| Pest Control | (244.65) | - | - | - | (244.65) | - | - | - | (244.65) | - | - | - | - | (733.95) |
| Waste Management | (351.81) | - | - | - | (351.81) | - | - | - | (351.81) | - | - | - | - | (1,055.43) |
| **Total Utilities** | **(23,057.46)** | **-** | **(5,107.63)** | **-** | **(23,057.46)** | **-** | **(5,107.63)** | **-** | **(23,057.46)** | **-** | **-** | **(5,107.63)** | **-** | **(84,495.27)** |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | - | - | - | (33,408.51) | - | - | - | (33,408.51) | - | - | - | - | (100,225.53) |
| Office Security | (31,111.90) | - | - | - | (31,111.90) | - | - | - | (31,111.90) | - | - | - | - | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | - | - | - | (1,777.19) | - | - | - | (1,777.19) | - | - | - | - | (5,331.56) |
| Janitorial | (5,983.33) | - | - | - | (5,983.33) | - | - | - | (5,983.33) | - | - | - | - | (17,950.00) |
| **Total Occupancy** | **(72,280.93)** | **-** | **-** | **-** | **(72,280.93)** | **-** | **-** | **-** | **(72,280.93)** | **-** | **-** | **-** | **-** | **(216,842.78)** |
| Supplies | (1,258.02) | - | - | - | (1,258.02) | - | - | - | (1,258.02) | - | - | - | - | (3,774.07) |

Free Speech Systems LLC

# Forecasted 13 Week Cash Flow Budget

Between July 30, 2022 and October 28, 2022

| *Period* | *07/30/2022-08/05/2022* | *08/06/2022-08/12/2022* | *08/13/2022-08/19/2022* | *08/20/2022-08/26/2022* | *08/27/2022-09/02/2022* | *09/03/2022-09/09/2022* | *09/10/2022-09/16/2022* | *09/17/2022-09/23/2022* | *09/24/2022-09/30/2022* | *10/01/2022-10/07/2022* | *10/08/2022-10/14/2022* | *10/15/2022-10/21/2022* | *10/22/2022-10/28/2022* | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **(1,656,236.39)** |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (1,470.56) | - | | (4,411.68) |
| **Total Travel Expenses** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(99.69)** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(5,707.66)** |
| **Total Operating Expenses** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** | **(428.15)** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** | **(428.15)** | **(680,347.03)** | **(428.15)** | **(238,503.91)** | **(19,410.68)** | **(237,033.35)** | **(3,053,102.68)** |
| ***Non-Operating Expenses*** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | **(184,890.28)** | **(15,500.00)** | **(199,890.28)** | **(27,500.00)** | **(199,890.28)** | **(27,500.00)** | **(227,390.28)** | **(55,000.00)** | **(227,390.28)** | **(55,000.00)** | **(227,390.28)** | **(55,000.00)** | **(55,000.00)** | **(1,557,341.69)** |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Adviosr Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | **-** | **-** | **-** | **-** | **-** | **-** | **(174,868.00)** | **-** | **(159,680.00)** | **-** | **-** | **-** | **-** | **(334,548.00)** |
| **Total Cash Flow** | **$ (529,176.72)** | **$ 101,269.75** | **$ (87,237.70)** | **$ 320,906.77** | **$ (544,176.72)** | **$ 339,269.75** | **$ (289,605.70)** | **$ 793,406.77** | **$ (731,356.72)** | **$ 313,240.31** | **$ (97,225.73)** | **$ 774,424.24** | **$ 76,635.11** | **440,373.41** |

# Exhibit 3

Case 22-60043 Document 5 Filed in TXSB on 07/29/22 Page 1 of 38

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 22-60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF VOLUNTARY PETITION AND FIRST DAY MOTIONS**

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1. My name is W. Marc Schwartz ("Schwartz").

2. I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3. The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively. I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4. Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters. The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6. SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services My firm represents individuals, companies and courts in a variety of assignments, including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7. I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8. I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9. On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

10. On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. Background to Creation of Free Speech Systems, LLC

11. Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12. In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13. Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14. From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15. Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC").*

16. Alex Jones was a natural.

17. The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18. Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19. When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20. The predecessor operation of FSS in 2004 was an operation with just a handful of employees. Alex Jones had a tiny office in the far south of Austin. He had two employees at

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21. As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22. By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23. While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24. After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25. The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

26. Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B. Present Business of Free Speech Systems, LLC**

27. FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28. On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29. The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30. As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided. The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31. FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

**C. The Relationship Between Alex Jones and FSS**

32. FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33. Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34. All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected. Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

35. The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

**D. The Debtor' Owners and Management**

36. At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37. Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38. Since then, Alex Jones has been the Managing Member of FSS.

39. Since inception, Alex Jones has been a "single talent business", *to wit,* without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40. Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41. In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies. With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42. The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger. As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b) FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

**E. The Relationship of FSS and PQPR**

*Background Information About PQPR*

43. PQPR was founded in 2013. The business began operations in September 2013.

44. PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45. PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46. The current owners and their ownership interests in PQPR are as follows:

| | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47. Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR"). Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48. Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49. As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer. FSS pays PQPR, as its agent, funds required to purchase product, which then pays

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50. Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51. Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52. In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53. On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54. The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55. On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

56. On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57. The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58. As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59. PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F. FSS Needs a Credit Card Processor**

60. An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate. Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61. Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

62. The key players in credit card processing are:

- **Customer –** the person making a purchase.
- **Merchant –** the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway –** this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor –** (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network –** (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank –** (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank –** (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63. In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

64. After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65. Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66. FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS. A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67. FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68. In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69. In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

70. The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds. In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%). This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

**G. Sandy Hook and Litigation Resulting Therefrom**

71. The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72. The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73. In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and ***(e)*** *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74. These two actions: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75. As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76. In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

77. As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78. Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79. Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80. InfoW, LLC f/k/a Infowars, LLC ("InfoW" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "InfoWDebtors"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"), on April 18, 2022 (the "Petition Date"), initiating Case No. 22-60020 in that court (the "Bankruptcy Case").

81. The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

82. Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83. Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been cannibalized in successive trials over a five-month period.

84. Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85. The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H. Current Financial Condition of Debtor**

86. Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

87. Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88. Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

## I. Critical Motions to Commence the Chapter 11 Case

### First Day Motions

89. Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*
- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

- **Critical Vendors Motion**. *Debtor's Motion for an Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*
- **Utilities Motion**. *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*
- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90. The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91. The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92. I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

**Procedural Motion**

93. **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94. Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95. Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96. I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

**Operational Motions**

97. **Cash Collateral Motion**[6]. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98. The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website, pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99. Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral. Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR. Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

100. The use of cash collateral required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period").

101. The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102. PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103. Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104. **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62. In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.

105. After an extensive review and analysis of the Debtor's vendors, the Debtor and its professionals identified the vendors that supply products and services vital to the Debtor's continued operation. The Debtor relies on products and services from its Critical Vendors to operate its business, and, depend on the timely provision of specialized services to provide top-quality content and services to its customer base.

106. The Critical Vendors procure and provide key services to producing and transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their mission-critical goods and services, the business of FSS would grind to a halt.

107. I understand that the Debtor's trade relationship with its Critical Vendors is not governed by long-term contracts, and the Debtor believes those trade relationships will deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption and disturbances to the Debtor's business during the Chapter 11 Case.

108. Subject to Court's approval, I understand the Debtor intends to pay Critical Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review, assess, and make payment on account of these claims. In return for paying these claims, the Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon each claimant's agreement to continue supplying goods and services to the Debtor in accordance

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109. I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110. **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111. In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112. To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113. The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114. The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

***Adequate Assurance Procedures***

115. Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116. The proposed Adequate Assurance Procedures are as follows:

> Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.
>
> Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.
>
> Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.
>
> The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118. **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit. Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119. The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120. The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121. The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2022.

W. Marc Schwartz, as Chief Restructuring Officer of Free Speech Systems, LLC

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

Exhibit "A"


Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

**Free Speech Systems LLC**
**Comparative Profit and Loss Statement**
**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2021**

| | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| ***Total Income*** | ***64,970,641.85*** | ***14,320,983.15*** |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| ***Gross Profit*** | ***$ 13,092,308.12*** | ***$ 9,384,529.36*** |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| ***Total Expenses*** | ***23,387,247.86*** | ***6,346,192.35*** |
| ***Net Operating Income*** | ***$ (10,294,939.74)*** | ***$ 3,038,337.01*** |
| **Other Income** | **507,168.04** | **1,019,713.81** |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| ***Total Other Expenses*** | ***1,131,710.75*** | ***2,155,946.35*** |
| ***Net Other Income*** | ***(624,542.71)*** | ***(1,136,232.54)*** |
| ***Net Income*** | ***$ (10,919,482.45)*** | ***$ 1,902,104.47*** |

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

Case 22-60043 Document 16-1 Filed in TXSB on 08/23/22 Page 83 of 566

**Exhibit B**

**Free Speech Systems LLC**
**Comparative Balance Sheet**
**As of December 31, 2021 and May 31, 2022**

| | 2021 | 2022 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 1,508,720.21 | $ 1,159,247.90 |
| Accounts Receivable | 10,187,121.95 | 10,013,413.22 |
| **Other Current Assets** | | |
| Invenotry | 1,732,603.13 | 910,116.84 |
| Prepaid Expenses | 446,475.64 | 114,136.99 |
| Due from PQPR | (500.00) | - |
| Advance To Elevated Solutions | 27,870.00 | - |
| ***Total Other Current Assets*** | ***2,206,448.77*** | ***1,024,253.83*** |
| ***Total Current Assets*** | ***13,902,290.93*** | ***12,196,914.95*** |
| **Fixed Assets** | 1,679,438.66 | 1,580,779.46 |
| **Other Assets** | | |
| Intangible Assets | 21,270.83 | 15,333.33 |
| Security Deposits | 534,560.00 | 534,560.00 |
| ***Total Other Assets*** | ***555,830.83*** | ***549,893.33*** |
| ***Total Assets*** | ***$ 16,137,560.42*** | ***$ 14,327,587.74*** |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 4,732,966.89 | $ 1,217,685.58 |
| Credit Cards | 152,367.42 | 207,984.04 |
| **Other Current Liabilities** | | |
| David Jones Advance | 150,000.00 | 150,000.00 |
| Advances from PQPR | - | 571,920.57 |
| Due to PQPR | 23,058,367.00 | 23,058,367.00 |
| ***Total Other Current Liabilities*** | ***23,208,367.00*** | ***23,780,287.57*** |
| ***Total Current Liabilities*** | ***28,093,701.31*** | ***25,205,957.19*** |
| **Long Term Liabilities** | | |
| Note Due to PQPR | 54,580,405.22 | 53,845,074.41 |
| Note Payable - Winnebago | 93,505.62 | 82,524.37 |
| ***Total Long Term Liabilities*** | ***54,673,910.84*** | ***53,927,598.78*** |
| ***Total Liabilities*** | ***$ 82,767,612.15*** | ***$ 79,133,555.97*** |
| **Equity** | | |
| Member's Equity | (774,291.44) | - |
| Member Draws | (61,937,862.26) | (254,014.00) |
| Member Contributions | 4,305,810.14 | 311,350.00 |
| Opening Balance Equity | - | (66,765,408.70) |
| Retained Earnings | 2,695,774.28 | - |
| Net Income | (10,919,482.45) | 1,902,104.47 |
| ***Total Equity*** | ***$ (66,630,051.73)*** | ***$ (64,805,968.23)*** |
| ***Total Liabilities and Equity*** | ***$ 16,137,560.42*** | ***$ 14,327,587.74*** |

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

Case 22-60043 Document 101 Filed in TXSB on 08/29/22 Page 35 of 56

**Exhibit C**

**Free Speech Systems, LLC**
**Statement of Cash Flows**

**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2022**

| | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| ***Net Income*** | ***($10,919,482.45)*** | ***$1,902,104.47*** |
| ***Adjustments to reconcile Net Income to Net Cash provided by operations:*** | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| ***Net cash provided by operating activities*** | ***($20,870,020.24)*** | ***$434,464.00*** |
| **Investing Activities** | **-** | **-** |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| ***Net cash provided by investing activities*** | ***($1,027,621.65)*** | ***$3,138.15*** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| ***Net cash provided by financing activities*** | ***22,850,016.65*** | ***(787,074.46)*** |
| ***Net cash increase for period*** | ***$952,374.76*** | ***($349,472.31)*** |

Exhibit “D”

13-Week Cash Flow Forecast for FSS

**Exhibit D**

Free Speech Systems LLC

## Forecasted 13 Week Cash Flow Budget

Between July 30, 2022 and October 28, 2022

| Period / Week Number | 07/30/2022-08/05/2022 1 | 08/06/2022-08/12/2022 2 | 08/13/2022-08/19/2022 3 | 08/20/2022-08/26/2022 4 | 08/27/2022-09/02/2022 5 | 09/03/2022-09/09/2022 6 | 09/10/2022-09/16/2022 7 | 09/17/2022-09/23/2022 8 | 09/24/2022-09/30/2022 9 | 10/01/2022-10/07/2022 10 | 10/08/2022-10/14/2022 11 | 10/15/2022-10/21/2022 12 | 10/22/2022-10/28/2022 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | $ 40,836.21 |
| **Total Income** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** | **598,630.26** | **9,222,692.75** |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | - | (250,000.00) | - | (500,000.00) | - | - | - | - | - | - | - | - | - | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - | (27,270.00) | - | - | - | (27,270.00) | - | - | - | - | (81,810.00) |
| Texas Sales Tax | (5,337.87) | - | - | - | (5,337.87) | - | - | - | (5,337.87) | - | - | - | - | (16,013.61) |
| **Total Cost of Goods Sold** | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** | **(729,961.80)** | **(262,569.67)** | **(229,961.80)** | **(229,961.80)** | **(229,961.80)** | **(262,569.67)** | **(229,961.80)** | **(229,961.80)** | **(229,961.80)** | **(229,961.80)** | **(3,837,326.97)** |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | **(17,541.98)** | - | - | - | **(17,541.98)** | - | - | - | **(17,541.98)** | - | - | - | - | **(52,625.93)** |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | - | (1,608.39) | - | (11,073.89) |
| Software License Fees | (140.80) | - | - | - | (140.80) | - | - | - | (140.80) | - | - | - | - | (422.40) |
| Server Hosting Service | (28,595.13) | - | - | - | (28,595.13) | - | - | - | (28,595.13) | - | - | - | - | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | - | - | - | (55,728.00) | - | - | - | (55,728.00) | - | - | - | - | (167,184.00) |
| Satellite Service | (137,282.93) | - | - | - | (137,282.93) | - | - | - | (137,282.93) | - | - | - | - | (411,848.78) |
| Imaging License Fee | (9,201.25) | - | - | - | (9,201.25) | - | - | - | (9,201.25) | - | - | - | - | (27,603.75) |
| Software & Apps | (5,000.00) | - | - | - | (5,000.00) | - | - | - | (5,000.00) | - | - | - | - | (15,000.00) |
| Website Hosting | - | - | (266.50) | - | - | - | (266.50) | - | - | - | - | (266.50) | - | (799.50) |
| **Total Computer/IT/IP Expense** | **(238,031.01)** | - | **(1,874.89)** | - | **(238,031.01)** | - | **(1,874.89)** | - | **(238,031.01)** | - | - | **(1,874.89)** | - | **(719,717.72)** |
| Insurance | (2,166.50) | - | - | - | (2,166.50) | - | - | - | (2,166.50) | - | - | - | - | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | - | - | - | (1,989.90) | - | - | - | (1,989.90) | - | - | - | - | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** | **(328.46)** | **(10,239.71)** |
| Outsourced Services | (45,980.00) | - | - | - | (45,980.00) | - | - | - | (45,980.00) | - | - | - | - | (137,940.00) |
| Consulting Services | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | - | (12,000.00) | - | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | - |
| Electricity | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | - | - | (5,107.63) | - | (15,322.89) |
| HVAC | (256.19) | - | - | - | (256.19) | - | - | - | (256.19) | - | - | - | - | (768.58) |
| CAM Charges | (20,364.16) | - | - | - | (20,364.16) | - | - | - | (20,364.16) | - | - | - | - | (61,092.48) |
| Water & Sewer | (1,708.55) | - | - | - | (1,708.55) | - | - | - | (1,708.55) | - | - | - | - | (5,125.66) |
| Gas Service | (132.09) | - | - | - | (132.09) | - | - | - | (132.09) | - | - | - | - | (396.28) |
| Pest Control | (244.65) | - | - | - | (244.65) | - | - | - | (244.65) | - | - | - | - | (733.95) |
| Waste Management | (351.81) | - | - | - | (351.81) | - | - | - | (351.81) | - | - | - | - | (1,055.43) |
| **Total Utilities** | **(23,057.46)** | - | **(5,107.63)** | - | **(23,057.46)** | - | **(5,107.63)** | - | **(23,057.46)** | - | - | **(5,107.63)** | - | **(84,495.27)** |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | - | - | - | (33,408.51) | - | - | - | (33,408.51) | - | - | - | - | (100,225.53) |
| Office Security | (31,111.90) | - | - | - | (31,111.90) | - | - | - | (31,111.90) | - | - | - | - | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | - | - | - | (1,777.19) | - | - | - | (1,777.19) | - | - | - | - | (5,331.56) |
| Janitorial | (5,983.33) | - | - | - | (5,983.33) | - | - | - | (5,983.33) | - | - | - | - | (17,950.00) |
| **Total Occupancy** | **(72,280.93)** | - | - | - | **(72,280.93)** | - | - | - | **(72,280.93)** | - | - | - | - | **(216,842.78)** |
| Supplies | (1,258.02) | - | - | - | (1,258.02) | - | - | - | (1,258.02) | - | - | - | - | (3,774.07) |

**Free Speech Systems LLC**

## Forecasted 13 Week Cash Flow Budget

**Between July 30, 2022 and October 28, 2022**

| *Period* | *07/30/2022-08/05/2022* | *08/06/2022-08/12/2022* | *08/13/2022-08/19/2022* | *08/20/2022-08/26/2022* | *08/27/2022-09/02/2022* | *09/03/2022-09/09/2022* | *09/10/2022-09/16/2022* | *09/17/2022-09/23/2022* | *09/24/2022-09/30/2022* | *10/01/2022-10/07/2022* | *10/08/2022-10/14/2022* | *10/15/2022-10/21/2022* | *10/22/2022-10/28/2022* | *Total* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **(1,656,236.39)** |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (1,470.56) | - | | (4,411.68) |
| **Total Travel Expenses** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(99.69)** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(5,707.66)** |
| **Total Operating Expenses** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** | **(428.15)** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** | **(428.15)** | **(680,347.03)** | **(428.15)** | **(238,503.91)** | **(19,410.68)** | **(237,033.35)** | **(3,053,102.68)** |
| ***Non-Operating Expenses*** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | **(184,890.28)** | **(15,500.00)** | **(199,890.28)** | **(27,500.00)** | **(199,890.28)** | **(27,500.00)** | **(227,390.28)** | **(55,000.00)** | **(227,390.28)** | **(55,000.00)** | **(227,390.28)** | **(55,000.00)** | **(55,000.00)** | **(1,557,341.69)** |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Adviosr Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | **-** | **-** | **-** | **-** | **-** | **-** | **(174,868.00)** | **-** | **(159,680.00)** | **-** | **-** | **-** | **-** | **(334,548.00)** |
| **Total Cash Flow** | **$ (529,176.72)** | **$ 101,269.75** | **$ (87,237.70)** | **$ 320,906.77** | **$ (544,176.72)** | **$ 339,269.75** | **$ (289,605.70)** | **$ 793,406.77** | **$ (731,356.72)** | **$ 313,240.31** | **$ (97,225.73)** | **$ 774,424.24** | **$ 76,635.11** | **440,373.41** |

# Exhibit 4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - 60020 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - 60021 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - 60022 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**DEBTORS' EMERGENCY APPLICATION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED AND IF THE COURT CONSIDERS THIS MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN TWENTY-ONE (21) DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF, OR IF YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED ON OR BEFORE **APRIL 22, 2022**.

InfoW, LLC ("InfoW"), IWHealth, LLC ("IW Health"), and Prison Planet TV, LLC ("Prison Planet TV", and together with InfoW and IW Health, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby move for entry of an order substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of W. Marc Schwartz (the "Proposed CRO") of Schwartz Associates, LLC ("SALLC") as their Chief Restructuring Officer (the "Application") pursuant to that certain engagement letter agreement by and between the Debtors and SALLC, a copy of which is attached hereto as Exhibit A (the "Engagement Agreement"). In support of the Application, the Debtors submit the Declaration of W. Marc Schwartz attached hereto as Exhibit B (the "Schwartz Declaration") and respectfully represent as follows:

## REQUEST FOR EMERGENCY HEARING

1. The Debtors seek emergency consideration of this Application on or before **April 22, 2022**, or as soon after as the Court's schedule will allow. Appointment of a chief restructuring office to perform the services set forth in the Engagement Agreement is necessary for the Debtors to adequately perform their duties as debtors-in-possession, including preparation of schedules of assets and liabilities, compliance with reporting requirements, and preparation of financial information and testimony.

## JURISDICTION

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

3. The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2016-1 of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A. Case Background

4. On April 18, 2022 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6. As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

**B. The Debtors**

7. The Debtors are holding companies for certain intellectual property assets. Debtor InfoW, owns copyrights and domain names related to "Infowars.com." Debtor IWHealth owns cash flow from royalties and/or an agreement with Youngevity. Debtor Prison Planet TV owns copyrights and domain names related to prisonplanet.tv.

8. "Infowars"—a conspiracy-oriented website and media company—is operated by Free Speech Systems, LLC ("FSS"), which does business under a registered trademark for that name. InfoW and Prison Planet TV license their intellectual property and domain names to FSS for use in its business but the Debtors do not produce or have any control over the content of Infowars. FSS maintains and operates the website https://www.infowars.com/.[1]

9. Alex E. Jones ("Jones") owns one hundred percent (100%) of the equity in FSS. Prior to the Petition Date, Jones also owned one hundred percent (100%) of the equity in InfoW, IWHealth and Prison Planet TV. He assigned these equity interests to the 2022 Litigation Settlement Trust (the "Litigation Settlement Trust") before the Petition Date.

**C. Pending Litigation Against the Debtors**

10. The Debtors' financial distress stems primarily from statements of Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Various parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

[1] The Debtors have been advised that all the assets of FSS serve as collateral to repay obligations to PQPR Holdings.

11. The relatives of the Sandy Hook victims and certain other parties (the "Sandy Hook Plaintiffs") assert, among other things, that Jones and other employees of FSS made defamatory statements and inflicted emotional distress. In 2018, the Sandy Hook Plaintiffs brought actions in Texas and Connecticut (collectively, the "Sandy Hook Lawsuits") against Jones, FSS, and certain of the Debtors. The crux of the allegations in the Sandy Hook Lawsuits is that Jones and FSS employees damaged the Sandy Hook Plaintiffs by saying or implying that the Sandy Hook shooting did not occur, and that the entire incident was a "false flag" hoax.

12. The Debtors are also defendants in other pending litigation unrelated to the events at Sandy Hook Elementary School:[2]

- *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605, pending before the 459th District Court for Travis County, Texas—This case involves an article authored by an FSS employee about the shooter at Marjory Stoneman Douglas High School in Parkland, Florida. Iterations of the article included a photograph of the plaintiff, even though the plaintiff was not involved with the shooting or even in Florida at the time.

- *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, pending before the 200th District Court for Travis County, Texas—This lawsuit was brought by the plaintiffs in the other Texas lawsuits under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). The allegations are that Jones diverted his assets to companies owned by insiders like his parents, his children, and himself. The Plaintiffs seek judgment allowing them to take possession and execute on the assets.

- *Larry Klayman v Infowars, LLC, et al.*, Case No. 20-61912, before the U.S. District Court for the Southern District of Florida, Fort Lauderdale Division—The plaintiff in this case brought claims against InfoWars, LLC, Free Speech Systems, LLC, Alex Jones, David Jones, and Owen Shroyer for defamation, Florida Deceptive and Unfair Trade Practices Act, tortious interference, and violation of the Lanham Act for publishing disparaging statements about the plaintiff. On April 14, 2022, the District Court entered a take-nothing judgment in favor of the InfoW and the other defendants. The plaintiff has appealed to the Eleventh Circuit Court of Appeals.

[2] On April 11, 2022, the U.S. District Court for the Western District of Virginia entered a Stipulation and Order [Dkt. No. 504], resolving the defamation action in Brennan M. Gilmore v Alexander E. Jones, et. al., Case No. 3:18-cv-00017-NKM-JCH, resolving that litigation in exchange for a $50,000 settlement to the plaintiff.

13. Jones, FSS, and the Debtors have spent more than $10.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits. Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones, FSS, and the Debtors failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default.[3] No court has yet to quantify the amount of the damages.

14. The pending litigation presents a classic "race to the courthouse." The Texas court is scheduled to be the first damages case to go to trial and is set to commence with jury selection on April 25, 2022. The damages trial in the Texas actions is scheduled for months before the damages will be determined in the actions pending in Connecticut.

15. Given the limited cash on hand available to the Debtors, Jones, and FSS, there is a substantial likelihood that efforts to collect on a judgment of the Texas actions would result in leaving nothing left for the Connecticut Sandy Hook Plaintiffs or other creditors. Indeed, prior to even liquidating their claims, the Texas plaintiffs sought execution by initiating the TUFTA litigation.

**D. 2022 Litigation Settlement Trust**

16. To address the Sandy Hook Lawsuits and other litigation, and preserve assets for equal distribution to all creditors, the Debtors, Jones, and FSS have created the 2022 Litigation Settlement Trust (the "Litigation Settlement Trust") to provide a mechanism for the payment in full of the litigation claims.

17. The Litigation Settlement Trust removes control of the Debtors and settlement funds from Jones and ensures that any settlement of or judgment in the Sandy Hook Lawsuits and

[3] The applicable Debtors do not intend to challenge any determination of liability entered by the respective state courts unless the claimant elects to liquidate their claims through continuation of the litigation.

other litigation will be paid according to the terms of the Declaration of Trust and any plan of reorganization in these Chapter 11 Cases. The Litigation Trust has been initially funded pursuant to the funding agreement attached to the Declaration of Trust and the Plan Support Agreement, as may be amended (the "PSA"). The "Initial Trust Funding" of $725,000 for administration of these Chapter 11 Cases has been paid to the interim trustee or the Debtors' professionals from exempt personal assets of Jones. Upon confirmation of a plan, the Litigation Trust is expected to be funded with additional funds, including $2,000,000 in cash on the effective date.

18. Contemporaneously with this Application, the Debtors have requested an order authorizing the appointment of former bankruptcy judges Russell F. Nelms and Richard S. Schmidt to serve as trustees of the Litigation Settlement Trust (the "Litigation Settlement Trustees").

**E. Proposed Employment of Schwartz as Chief Restructuring Officer**

*i. Scope of Employment*

19. The Debtors seek to engage the Proposed CRO as chief restructuring officer to advise and lead the day-to-day restructuring efforts of the Debtors, pursuant to the Engagement Agreement. The Debtors contemplate that the Proposed CRO will perform some or all the following tasks:

a. Make business and debt restructuring decisions, including as it relates to business strategy(ies) and other key elements of the business;

b. Manage due diligence requests and other items requested by various constituents as part of the restructuring process;

c. Prepare cash flow forecasts and related financial and business models;

d. Identify and implement short and long-term liquidity initiatives;

e. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the Court, as well as provide necessary testimony before the Court on matters within CRO's areas of expertise;

      f. Review inventory marketability and provide monetization alternatives;

g. Make operational decisions with advice of appropriate governance body;

h. Implement cost containment measures;

i. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest and submit proposals for payment to Third Party Funding Contributors, trustees and the Court;

j. Maximize value of the Debtors;

k. Oversee all business decisions of Debtors, as necessary or required, utilizing CRO's business judgment.

l. Be authorized, during normal business hours, to (a) review and analyze the books of account, bank accounts, accounting source documents and financial statements of FSS and Jones including, but not limited to, QuickBooks accounts, bank statements and included documents, invoices, credit card processing reports, other documents reflecting cash receipts, invoices received and issued, and other accounting source documents, (b) have read-only access to bank accounts used by FSS Jones in the conduct of their businesses, and (c) have access to the personnel, managers, and/or financial professionals of FSS and Jones to interview and request additional documents or information.

m. Execute all documents and take all other acts necessary to effectuate the restructuring of the Debtors, including in any case before the Court, subject to approval of the trustees of the Litigation Settlement Trustees.

20. The Proposed CRO will be subject to the oversight and direction of the Litigation Settlement Trustees, who will have full governance authority over the Debtors.

21. Additionally, the Debtors seek authority for other staff of SALLC to perform services required to assist the Proposed CRO within the scope of this engagement.

*ii.* *Necessity of Employment*

22. The Debtors believe that the retention and employment of the Proposed CRO is necessary and appropriate to administer these Chapter 11 Cases and ultimately prepare and obtain confirmation of a plan of reorganization. While the Litigation Settlement Trustees will have oversight of the Proposed CRO and direct the overall direction of these Chapter 11 Cases, the

Debtors need a professional with financial expertise to serve as an officer of the Debtors to perform the services indicated in the Engagement Agreement.

23. The litigation between the Sandy Hook Plaintiffs and the defendants has been acrimonious, littered with sanctions, and rages on unabated year after year. For example, when Jones filed an offer of compromise pursuant to Connecticut procedure, the Connecticut plaintiffs responded that the "so-called offer is a transparent and desperate attempt by Alex Jones to escape a public reckoning under oath with his deceitful, profit-driven campaign against the plaintiffs and the memory of their loved ones lost at Sandy Hook." There is no reasonable prospect of a resolution which allows for a fair distribution of recoveries to all affected parties.

24. Some of the defendants have faced and been hit with "death penalty" discovery sanctions. Whether these problems were the result of bad faith or merely the lack of someone with the adequate experience and ability,[4] a qualified financial professional answering to independent fiduciaries to wit, the Litigation Settlement Trustees, is necessary for any negotiations that will result in a consensual plan that provides for payment in full to creditors.

*iii.* *Reasons for Selection*

25. The Debtors believe that the Proposed CRO is well qualified to provide management services that will assist and enhance the Debtors' efforts to maximize value to their creditors.

26. Marc Schwartz is a licensed CPA with more than 40 years' experience providing expert witness and financial restructuring services. He frequently serves as a chief restructuring officer, and as a federal and state court appointed receiver, in bankruptcy and non-bankruptcy

---

[4] For the avoidance of doubt, the Debtors reserve their rights to contest the sanctions on appeal absent consensual resolution.

proceedings. Mr. Schwartz is one of approximately 200 full members of the National Association of Federal Equity Receivers. He understands how to be a fiduciary.

*iv.* *Proposed Compensation & Reimbursement*

27. The Debtor intends to file a motion to establish interim compensation procedures in this case. The CRO proposes to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including sections 330 and 331, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim compensation order entered in these Chapter 11 Cases.

28. Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, the Debtors propose to pay on an hourly basis the Proposed CRO and SALLC from funds of the Litigation Settlement Trust, as set out in the Engagement Agreement and summarized in the following chart:

| BILLER | RATE |
|---|---|
| W. Marc Schwartz (Proposed CRO) | $690.00 per hour |
| M. Christian Schwartz | $470.00 per hour |
| Managers | $350.00 per hour |
| Associates | $280.00 per hour |
| Analysts | $210.00 per hour |
| Administrative Staff | $95.00 per hour |

29. Additionally, the Engagement Agreement provides that the Debtors shall be responsible for the reasonable and necessary documented out-of-pocket costs and expenses incurred by Proposed CRO and SALLC in connection with the engagement. SALLC will submit detailed documentation of all expenses incurred in connection with requests for reimbursement.

30. The Debtors believe that the agreed terms of reimbursement, compensation, and hourly rates are reasonable. The CRO will notify the Debtors of any change in the hourly rates charged for services rendered while the Chapter 11 Cases are pending.

*v.* *Retainer*

31. The Debtors engaged the Proposed CRO prior to the Petition Date. The CRO received a retainer of $50,000 (the "Retainer"). The Proposed CRO has worked against the Retainer, and, as of the Petition Date, the amount remaining in the Retainer is approximately $20,018.00.[5]

32. Pursuant to the Engagement Agreement, the Debtors propose that SALLC will hold the Retainer to be applied to SALLC's final fees and expenses at the conclusion of the engagement. The Proposed Order modifies the Engagement Agreement such that the Proposed CRO and SALLC shall not draw on the Retainer except upon order of the Court awarding final compensation and reimbursement in the Chapter 11 Cases.

*vi.* *Connections*

33. The Schwartz Declaration sets out the connections of the Proposed CRO and SALLC with the Debtors, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtors' knowledge, neither the Proposed CRO nor SALLC hold any connections other than those disclosed in the Schwartz Declaration.

34. The Debtors believe that neither the Proposed CRO nor SALLC holds or represents any disqualifying interest that is adverse to the estate and each is a "disinterested person." If any new relevant facts or relationships are discovered, the Proposed CRO and SALLC will supplement its disclosure to the Court and the U.S. Trustee.

[5] The CRO will furnish the exact number left in the Retainer at any hearing on this Application or in a supplement.

## RELIEF REQUESTED

35. The Debtors request that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtors to retain the Proposed CRO and SALLC, effective as of the Petition Date pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order.

## BASIS FOR RELIEF

36. Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes trustees—and debtors-in-possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." Bankruptcy Code § 327(c) says that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

37. Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

a. Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

b. State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

  c. Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**A. The Proposed CRO and SALLC Meet the Requirements of Bankruptcy Code § 327(a)**

38. Based on the Schwartz Declaration, the Debtors submit that neither the Proposed CRO nor SALLC hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

39. The Bankruptcy Code defines what it means to be a "disinterested person" Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

40. The Schwartz Declaration discloses no connections with the Debtors that would disqualify the Proposed CRO or SALLC as a "disinterested person" and the Debtors are aware of no connections in addition to those disclosed in the Schwartz Declaration.

**B. This Application and the Schwartz Declaration Meet the Requirements of Bankruptcy rule 2014.**

41. This Application and the Schwartz Declaration meet the requirements as set out in Bankruptcy Rule 2014. The Application is made by the Debtors and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation. The Schwartz Declaration is a verified statement pursuant to 28 U.S.C. § 1746 that sets out all connections that the Proposed CRO and SALLC has with the Debtors, creditors, any other party in interest, their respective

attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtors are not aware of any other connections in addition to those disclosed in the Schwartz Declaration.

[*Remainder of Page Intentionally Left Blank*]

Case 22-60043 Document 7-1 Filed in TXSB on 04/18/22 Page 15 of 21

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order approving the employment of the Proposed CRO and SALLC effective as of the Petition Date, pursuant to the terms of the Engagement Agreement and grant any other appropriate relief.

Dated: April 18, 2022

**PARKINS LEE & RUBIO LLP**

*/s/R.J. Shannon*
Kyung S. Lee
TX Bar No. 12128400
R.J. Shannon
TX Bar No. 24108062
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: klee@parkinslee.com
rshannon@parkinslee.com
Phone: 713-715-1660
Fax: 713-715-1699

*Proposed Counsel to the Debtors and Debtors-in-Possession*

**CERTIFICATE OF ACCURACY**

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/R.J. Shannon*
R.J. Shannon

# CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2022, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on the parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei, Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Norman A Pattis, Cameron L. Atkinson
Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Ray Battaglia
Law Office of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX
rbattaglialaw@outlook.com

Attn: Avi Moshenberg, Nick Lawson, Matthew Caldwell
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com
nick.lawson@mhllp.com
matthew.caldwell@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Richard S. Schmidt
615 Leopard, #635
Corpus Christi, TX 78401
rss@judgerss.com

Russell F. Nelms
115 Kay Lane
Westworth Village, TX 76114
rfargar@yahoo.com

Attn: W. Marc Schwartz
Schwartz Associates
712 Main Street, Ste. 1830
Houston, TX 77002
mschwartz@schwartzassociates.us

Attn: Matthew Okin
Okin Adams LLP
1113 Vine St., Ste. 240
Houston, TX 77002
mokin@okinadams.com

*/s/ R. J. Shannon*
R. J. Shannon

Alex E. Jones
c/o Jordan & Ortiz, P.C.
Attn: Shelby Jordan
500 North Shoreline Blvd, STE 900
Corpus Christi, TX 78401


Brennan Gilmore
c/o Civil Rights Clinic
ATTN: Andrew Mendrala
600 New Jersey Avenue, NW
Washington, DC 20001


Carlee Soto-Parisi
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Carlos Soto
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive Ste. 301
Coral Springs, FL 33065


Dona Soto
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Erica Lafferty
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Francine Wheeler
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604

Free Speech Systems, LLC
c/o Law Office of Raymond W. Battaglia
66 Granburg Circle
San Antonio, TX 78218


Ian Hockley
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jacqueline Barden
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jennifer Hensel
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jeremy Richman
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jillian Soto
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Leonard Pozner
c/o Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


Marcel Fontaine
c/o Kaster, Lynch, Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


Mark Barden
c/o Koskoff Koskoff & Bieder

350 Fairfield Ave
Bridgeport, CT 06604


Neil Heslin
c/o Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


Nicole Hockley
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


PQPR Holdings Limited, LLC
c/o Eric Taub, Waller
100 Congress Ave STE 1800
Austin, TX 78701


Robert Parker
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Scarlett Lewis
c/o Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008


Veronique De La Rosa
c/o Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


William Sherlach
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


William Aldenberg
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

Randazza Legal Group
2764 Lake Sahara Dr STE 109
Las Vegas, NV 89117

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - 60020 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - 60021 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - 60022 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**INTERIM ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Application for Interim and Final Orders (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1] filed on April 18, 2022; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. Subject to a final hearing to be scheduled by the Court and any objections to the Application, the Application is granted on an interim basis, to the extent set forth herein. Any objections to the entry of a final order granting the Application must be filed with the Court and served according to Bankruptcy Local Rule 9013-1 on or before **May 9, 2022**.

2. In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain W. Marc Schwartz (the "CRO") effective as of the Petition Date, as chief restructuring officer, under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3. The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Alexander E. Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Cases.

4. The CRO is authorized to delegate appropriate tasks to Schwartz Associates, LLC ("SALLC"), pursuant to the terms of the Engagement Agreement.

5. The CRO and SALLC shall be compensated for their services and reimbursed for actual expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules, and any orders of this Court; *provided*, *however*, that the CRO and SALLC shall not seek reimbursement from

the Debtors' estates for any fees incurred in defending any fee applications in these bankruptcy cases.

6. All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned chapter 11 case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

7. Notwithstanding anything to the contrary in the Engagement Agreement, the CRO and SALLC shall hold the prepetition retainer pending a final order allowing compensation and reimbursement in these cases or order otherwise directing disposition of the retainer amounts.

8. Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the CRO and SALLC shall not be entitled to reimbursement or fees and expenses in connection with any objection to their fees, without further order of the Court.

9. The CRO and SALLC shall provide ten (10) business days' notice to the Debtors and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

10. The CRO and SALLC shall use reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

11. The CRO and SALLC will review their files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and SALLC will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a).

12. The Litigation Settlement Trustees may, at any time and in their sole discretion, terminate the employment of the CRO and SALLC without further order of the Court, *provided*, *however*, that such termination shall not affect the validity of the CRO or SALLC's employment under this Order or any Final Order prior to such termination.

13. To the extent the Application, the Schwartz Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

14. The Debtors, the CRO, and SALLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

15. This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: ______________________________ ______________________________________
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**Engagement Agreement**



712 Main Street, Suite 1830, Houston, TX 77002

April 7, 2022

**VIA EMAIL**

InfoWars, LLC
InfoWars Health, LLC
Prison Planet TV, LLC

VIA EMAIL: Shelby Jordan

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that InfoW, LLC; InfoHealth, LLC; and, Prison Planet TV, LLC ("Clients") have engaged W. Marc Schwartz ("Consultant") of Schwartz Associates, LLC ("SALLC") to act as their Chief Restructuring Officer ("CRO"), effective as of March 31, 2022, to advise and lead its restructuring efforts involving the scope described herein, including a filing of the Clients under Subchapter V of the Bankruptcy Code.

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of Clients' assets, including negotiations with creditors of Clients and affiliates of the Clients to assure that creditors of the Clients have the best chance of recoveries on their claims. Consultant will work to maximize return and to assure a fair pro rata distribution to all unsecured creditors.

**I. Scope of Engagement**

Subject to oversight by the Client's governing body, Consultant shall be in charge of Clients' restructuring process. It is agreed that Consultant's authority shall include, but not be limited to, the following:

1. Make business and debt restructuring decisions, including as it relates to business strategy and other key elements of the business;
2. Manage due diligence requests and other items requested by various constituents as part of the restructuring process;
3. Prepare cash flow forecast and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as provide necessary testimony before the Bankruptcy Court on matters within Consultant's areas of expertise;



712 Main Street, Suite 1830, Houston, TX 77002

6. Review inventory marketability and provide monetization alternatives;
7. Make operational decisions with advice of appropriate governance body;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest and submit proposal for payment to Third Party Funding Contributors, trustees and the bankruptcy court;
10. Maximize value of Clients;
11. Be in charge of all business decisions of Clients, as necessary or required, utilizing Consultant's business judgment.
12. Be authorized, during normal business hours, to (a) review and analyze the books of account, bank accounts, accounting source documents and financial statements of Free Speech Systems, LLC ("FSS") including, but not limited to, QuickBooks accounts, bank statements and included documents, invoices, credit card processing reports, other documents reflecting cash receipts, invoices received and issued, and other accounting source documents (b) have read only access to all bank accounts used by FSS in the conduct of its business (c) have access to the personnel, managers, and /or financial professionals of FSS to interview and request additional documents or information.
13. Execute all documents and take all other acts necessary to effectuate restructuring of the Debtors, including in any case before the Bankruptcy Court, subject to approval of the trustees of the 2022 FSS Litigation Settlement Trusty (the "Litigation Settlement Trustees") or Boards of Directors or managers as applicable.

## II. Indemnification

Clients agree to indemnify, defend, and hold harmless Consultant, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as, and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for the Clients under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as as financial advisor ("FA") or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

Clients will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing,



712 Main Street, Suite 1830, Houston, TX 77002

pending or threatened litigation against the party; provided, however, that the Clients shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by Clients. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at the Clients' expense. Such funds shall be made available to the Clients as part of the monies to be requested under the Plan Support Agreement during and after the bankruptcy case of the Debtors.

**III. Materials Provided**

Clients agree to provide Consultant and SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. Consultant and SALLC agree to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

**IV. Work Product**

Consultant and SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: i) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; ii) with Client's written consent; iii) when legally required to do so; or iv) if such information is available from public sources.

All records of Clients obtained by SALLC will be promptly returned to the Clients at the conclusion of this engagement.

**V. Disclosures**

Clients shall not disclose any work or analyses of SALLC or Consultant to any third party (other than any direct or indirect equity holder of the Clients) without prior written consent of Consultant, which shall not be unreasonably withheld. Neither SALLC nor Consultant shall disclose any information respecting the business, properties, books, and records of the Clients except to professionals hired by the Clients for purposes of this engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLC, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You



712 Main Street, Suite 1830, Houston, TX 77002

agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to Clients' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this engagement. You agree that party shall not have responsibility to Clients relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to Clients.

SALLC has performed an internal search for any such conflict of interest with respect to the Clients, its officers, directors, creditors, and other parties and has found no conflicts of interest.

**VI. Term & Termination**

This agreement shall remain in effect until the earlier of i) the completion of the Support Period of the Clients, ii) Execution of a comprehensive debt restructuring agreement, iii) Confirmation and completion of a plan of reorganization, iv) SALLC or Consultant's resignation, or v) Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if Clients fail to make payments when due hereunder.

**VII. Compensation**

For services provided described herein, SALLC shall be compensated for the services of Consultant on an hourly fee bases of $690.00 per hour.

If, in consultant's sole judgment, it is determined that additional services are required to assist with the scope of this engagement as outlined by this Agreement, consultant may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

Clients shall be responsible for Consultant's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connect with this



712 Main Street, Suite 1830, Houston, TX 77002

engagement. SALLC will provide to Clients detailed documentation of all expenses incurred.

SALLC acknowledges that, should Clients seek relief under Title 11 of the United States Code, and the Clients apply for authorization to retain and employ Consultant and SALLC, the Clients' payment of consultant's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

**A. Retainer**

In order to commence the engagement, SALLC requires a retainer payment in the amount of $50,000 for the representation of Clients. The retainer will be held and applied to SALLC's final fees and expenses at the conclusion of the engagement. However, SALLC reserves the right to apply the retainer, at any time, to any outstanding fees and expenses owed to SALLC by Clients. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. If this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to Clients within thirty days.

**B. Invoicing**

Prior to filing bankruptcy invoices reflecting the services of SALLC, including the services of Consultant, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter through draws on the retainer. In the event the retainer balance is exhausted Client shall pay the invoice within seven (7) business days and deposit and replenish the retainer balance to $50,000.. In case of a disputed invoice, Client agrees to pay undisputed part of any fees. Expense charges shall be submitted to Clients no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

**VIII. Authorization**

The Clients represent that this Agreement outlines the engagement and has been approved by Clients' Boards of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of the Clients has been duly authorized to do so, including express consent of the Litigation Settlement Trustees, Boards of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or liquidation cannot be guaranteed. The monthly fees and related expenses to be paid by Clients to Consultant and SALLC are not contingent upon the results of this engagement and neither consultant



712 Main Street, Suite 1830, Houston, TX 77002

nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and have your client do the same by signing and dating below. Once executed, a copy will be delivered to you via email. If you have any questions regarding this engagement letter, please call me at (832) 583-7021.

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

InfoW, LLC

By: ____________________

Date: 4/11/22

Invoices should be sent to:

Name: ____________________

Email: ____________________

InfoHealth, LLC

By: ____________________

Date: 4/11/22

Prison Planet TV, LLC

By: ____________________

Date: 4/11/22

# EXHIBIT B

## Schwartz Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - _________ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - _________ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - _________ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**DECLARATION OF W. MARC SCHWARTZ**

I, W. Marc Schwartz, declare under penalty of perjury as follows:

1. I am a CPA and a founder and chairman of Schwartz Associates, LLC ("SALLC"). On my behalf and SALLC, I am duly authorized to execute this declaration in support of the application filed by the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") seeking approval to retain me as the chief restructuring officer ("CRO") and SALLC to assist me in those duties.

2. Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of SALLC reviewed by me or SALLC staff under my supervision and direction or derived from information available to me that I believe to be true and correct.

**A. Application**

3. I have reviewed the Debtors' Emergency Application for Interim and Final Orders (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief (the "Application"). The Application accurately describes my proposed role as chief restructuring officer.

**B. Disclosure of Connections**

4. SALLC performed the following actions to determine whether it or any of its professionals has any disclosable connections to the Debtors, creditors, any other party in interest, their attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas:

a. First, SALLC staff sent emails to all email account holders within SALLC requesting the recipient respond to any representation known to be adverse or otherwise connected to the Debtors or their estates. Neither I nor my staff received any responses indicating that a conflict or connection exists.

b. Second, SALLC staff conducted a computerized search of all clients of SALLC using the list of parties in interest listed in Schedule 1 hereto.

c. No connections or potential connections were identified.

5. The search uncovered no connections other than (a) SALLC has worked with certain of the professionals on matters unrelated to the Debtors, and (b) SALLC has worked on matters before the U.S. Bankruptcy Court for the Southern District of Texas unrelated to the Debtors.

6. I personally reviewed the list of parties in interest listed in Schedule 1 hereto. I do not have any connections with searched parties other than (a) I have worked with certain of the professionals on matters unrelated to the Debtors and (b) I have worked on matters before the U.S. Bankruptcy Court for the Southern District of Texas unrelated to the Debtors.

7. The results of the foregoing connections search process confirm that neither I, SALLC, nor any of its employees or shareholders, to the best of my knowledge, have any disqualifying connections. Neither I nor SALLC (a) have any debt or equity securities in the Debtors, (b) are an insider of the Debtors, or (c) was a creditor of the Debtors on the Petition Date.

**C. Affirmative Statement of Disinterestedness**

8. Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and SALLC are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

9. I am not a creditor, an equity security holder, or an insider of the Debtors; I am not and was not within 2 years before the Petition Date a director of the Debtors; and I do not have any interest materially adverse to the interests of the Debtors' bankruptcy estate or any class of creditors or equity security holders.

10. SALLC is not a creditor, an equity security holder, or an insider of the Debtor; SALLC is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtors; and SALLC does not have any interest materially adverse to the interests of the Debtors' bankruptcy estates or any class of creditors or equity security holders.

11. Notwithstanding the foregoing, SALLC and I were retained pursuant to the Engagement Letter prior to the Petition Date to prepare for the filing. My understanding is that Bankruptcy Code § 1107(b) provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

**D. Bankruptcy Rule 2016(b) Disclosures**

12. Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, neither I nor SALLC have shared or agreed to share (a) any of its compensation from the employment by the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2022,

By: ______________________
W. Marc Schwartz

**SCHEDULE 1 TO SCHWARTZ DECLARATION**

**SEARCHED PARTIES**

Debtor & Professionals

InfoW, LLC
Prison Planet TV, LLC
IWHealth, LLC
Parkins Lee & Rubio LLP

Debtor's Equity & Trustees

Alexander E. Jones
Robert Dew, Trustee
Richard Schmidt
Russell Nelms

Creditors & Parties in Interest

Brennan Gilmore
Carlee Soto-Parisi
Carlos Soto
Christopher Sadowski
Dona Soto
Erica Lafferty
Francine Wheeler
Free Speech Systems, LLC
Ian Hockley
Jacqueline Barden
Jennifer Hensel
Jeremy Richman
Jillian Soto
Leonard Pozner
Marcel Fontaine
Mark Barden
Neil Heslin
Nicole Hockley
PQPR Holdings Limited, LLC
Robert Parker
Scarlett Lewis
Veronique De La Rosa
William Sherlach
William Aledenberg
Larry Klayman
Randazza Legal Group

Attorneys for Creditors and Parties in Interest

Kaster Lynch Farrar & Ball LLP
Koskoff Koskoff & Bieder
Fertitta & Reynal LLP
Pattis & Smith, LLC
Zeisler & Zeisler P.C.
Jordan & Ortiz, P.C.
McDowell Heterhington LLP
The Akers Law Firm PLLC
Law Office of Ray Battaglia, PLLC
Copycat Legal PLLC
Waller Lansden Dortch & Davis, LLP

U.S. Bankruptcy Judges and Staff

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro
Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

U.S. Trustee Personnel

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera
Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

# Exhibit 5

EXHIBIT
1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - _________ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**DECLARATION OF W. MARC SCHWARTZ REGARDING BANKRUPTCY CODE § 1116(1) REQUIREMENTS**

I, W. Marc Schwartz, hereby declare as follows:

1. My name is W. Marc Schwartz.

2. I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters. The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

3. SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services My firm represents individuals, companies and courts in a variety of assignments including as Chief Restructuring Officers, financial advisers, trustees and examiners in bankruptcy matters; working as testifying or consulting experts on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as court appointed receivers in state and federal courts.

4. I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

5. I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state law.

6. I was retained as of April __, 2022 by the Trustee of the Litigation Settlement Trust formed by InfoW, Inc. ("InfoW"), IWHealth, LLC ("IWH") and Prison Planet TV, LCC ("PTV", and together with the InfoW, IWH, and PTV, the "Debtors") as the Debtors' Chief Restructuring Officer.

7. Since my retention, I have met with Bob Roe, a CPA retained to delve into the books of account of various entities affiliated with the Debtors and assist those entities to prepare accurate financials statements which could be relied upon by the reader to accurately reflect the financial condition and activities of the entities. I have also met with counsel for the Debtors and Mr. Jones to obtain an understanding of the Debtors' operations. I have also reviewed lists of assets owned by the Debtors.

8. I have learned that the Debtor's have no purpose other than to hold assets which may be used by other entities. They undertake no business activities, they do not sell, rent or lease to others anything. Their assets do not generate any income for them. They have no bank accounts and do not pay money to anyone for any reason. They have no debt or other liabilities other than those related to pending or potential litigation. For

these reasons, they have no financial statements or books of account and they do not file income tax returns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 04/18/2022

By: ______________________
W. Marc Schwartz

# Exhibit 6

United States Bankruptcy Court
Southern District of Texas
ENTERED
June 10, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **INFOW, LLC *et al.*** | § | **CASE NO. 22-60020** |
| | § | |
| **DEBTORS.** | § | **CHAPTER 11 (Subchapter V)** |
| | § | **Jointly Administered** |
| | § | |

**STIPULATION AND AGREED ORDER**
**DISMISSING DEBTORS' CHAPTER 11 CASES**
**[Related to ECF. No. 50]**

This *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* is entered into by and among the above-captioned debtors (the "Debtors"), Melissa Haselden as the duly appointed Subchapter V Trustee (the "Sub V Trustee") and the United States Trustee ("UST" and together with the Debtors and the Sub V Trustee, the "Parties").

WHEREAS, on April 17, 2022 and April 18, 2022, the Debtors filed their bankruptcy cases which are jointly administered under Case No. 22-60020 (collectively, the "Chapter 11 Cases").

WHEREAS, the Connecticut Plaintiffs filed their *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Designation as Subchapter V Small Business Vendors* (sic) [ECF No. 36] on April 26, 2022 (the "Connecticut Plaintiffs MTD").

WHEREAS, the Texas Plaintiffs filed *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] on April 27, 2022 (the "Texas Plaintiffs MTD").

WHEREAS, on April 29, 2022, the UST filed its *Motion to Dismiss Debtors' Chapter 11 Cases* [ECF No. 50] (the "UST MTD").

WHEREAS, the Texas and Connecticut Plaintiffs have dismissed the Debtors with prejudice from the state court litigation and stipulated that they are no longer creditors and claim holders against the Debtors.

WHEREAS, Marc Schwartz, the Chief Restructuring Officer of the Debtors, has determined that it is in the best interest of the Debtors' estates and their creditors not to continue the Chapter 11 Cases in light of the dismissal with prejudice of the Debtors from the lawsuits against them by the Texas and Connecticut Plaintiffs.

WHEREAS, Debtors and the UST wish to stipulate to the disposition of the Chapter 11 Cases.

**Accordingly, it is hereby AGREED and, upon approval of the Court, ORDERED that:**

1. The Chapter 11 Cases are hereby dismissed pursuant to 11 U.S.C. § 1112(b) upon entry of this Order.

2. The Sub V Trustee is hereby discharged from her duties upon entry of this Order.

3. Within three (3) business days from the entry of this Order, the Debtors shall advance $25,000 to the Sub V Trustee to hold in her IOLTA trust account for application against any fees and expenses approved for payment by this Court.

4. Within ten (10) days from the entry of this Order, the Sub V Trustee shall file a final application seeking approval of her fees and expenses related to these Chapter 11 Cases. All parties shall have the right to object to and contest the allowance of all fees and expenses sought by the Sub V Trustee.

5. Upon the order approving the Sub V Trustee's fees and expenses becoming a final order, the Sub V Trustee shall take into income the allowed fees and expenses from the IOLTA trust fund account. Any amount remaining after taking the allowed amount into income by the Sub V Trustee shall be returned to the Debtors.

6. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation and Agreed Order.

Signed: June 10, 2022

Christopher Lopez
United States Bankruptcy Judge

**AGREED TO AND ENTRY REQUESTED:**

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

By: /s/Jayson B. Ruff
Jayson B. Ruff
Trial Attorney
Michigan Bar No. P69893
515 Rusk, Ste. 3516
Houston, TX 77002
Telephone: (713)718-4650 ext. 252
Facsimile: (713)718-4670

– and –

INFOW, LLC (F/K/A INFOWARS, LLC),
IWHEALTH, LLC (F/K/A INFOWARS
HEALTH, LLC), AND PRISON PLANET TV, LLC

/s/ Kyung S. Lee
KYUNG S. LEE PLLC
Kyung S. Lee
State Bar No. 12128400
klee@kslpllc.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. 713-301-4751

Proposed Counsel to the Debtors

– and –

SUBCHAPTER V TRUSTEE

By: /s/Mellissa Haselden
Melissa Haselden
700 Milam, Suite 1300
Houston, TX 77002
Tel. 832-819-1149

# Exhibit 7

Case 22-60020 Document 391 Filed in TXSB on 04/27/22 Page 1 of 75

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| | CASE NO: 22-60020-CML |
| INFOW, LLC, | Victoria, Texas |
| Debtor. | Friday, April 22, 2022 |
| | 9:00 a.m. - 10:49 a.m. |
| IWHEALTH, LLC, | CASE NO: 22-60021-CML |
| Debtor. | |

TRIAL

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors: KYUNG SHIK LEE
R.J. SHANNON
Parkins Lee & Rubio LLP
Pennzoil Place
700 Milam Street
Suite 1300
Houston, TX 77002

For the U.S. Trustee: JAYSON B. RUFF
HA MINH NGUYEN
Office of the United States Trustee
515 Rusk Street
Suite 3516
Houston, TX 77002

For Proposed Litigation Settlement Trustees: MATTHEW OKIN
DAVID CURRY
Okin Adams
1113 Vine Street
Suite 240
Houston, TX 77002

For Neil Heslin et al: JON MAXWELL BEATTY
The Beatty Law Firm PC
935 Bayou Parkway
Houston, TX 77077

CLIFFORD HUGH WALSTON
Walston Bowlin, LLP
4299 San Felipe Street
Suite 300
Houston, TX 77027

Sub Chapter V Trustee: MELISSA A. HASELDEN
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002

For David Wheeler et al: RYAN E. CHAPPLE
Cain & Skarnulis PLLC
303 Colorado Street
Suite 2850
Austin, TX 78701

RANDY W. WILLIAMS
Byman & Associates PLLC
7924 Broadway
Suite 104
Pearland, TX 77581

ALINOR STERLING
CHRISTOPHER M. MATTEI
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Suite 501
Bridgeport, CT 06604

For the Trustee: RAYMOND WILLIAM BATTAGLIA
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218

Interested Party: Shelby A Jordan
Jordan & Ortiz, PC
500 N Shoreline
Suite 900 N
Corpus Christi, TX 78401

Case 22-60043 Document 391 Filed in TXSB on 01/27/23 Page 3 of 25

Also Present: MARC SCHWARTZ, CRO
RICHARD SCHMIDT

Court Reporter/Deputy: Kimberly Picota

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

VICTORIA, TEXAS; FRIDAY, APRIL 22, 2022 9:00 AM

(Call to Order)

THE COURT: Good morning, everyone. This is Judge Lopez. Today is April 22nd. I'm going to call the nine a.m. case, which is essentially first-day hearings in InfoW LLC, IWL -- it should be IWHealth LLC, and Prison Planet TV LLC.

There are a number of folks on the line, and I'm going to try to keep the line unmuted, just see how that goes. We have a feature where I can mute the entire line, and I'm going to try to avoid that. But if I end up doing it, I will give everyone plenty of notice and you will have to hit five-star if you wish to be heard.

I'm going to just ask everyone to please put your phone on mute right now until your case is called. And I hear a lot of back noise. I'm just going to turn the feature on. So I'm asking everyone just please take a look at your phone and please keep it on mute. When it is time to speak, I will call on you and you are able to speak. Let's see how this goes.

Let me start off by taking appearances. And why don't I start in the courtroom. Who is here on behalf of the Debtors?

MR. LEE: Good morning, Your Honor. Kyung Lee, K-

y-u-n-g, L-e-e, on behalf of the three debtors. And I would like to introduce some of the players on my side that are helping me with this project, the first one being RJ Shannon.

Can you stand up, RJ?

MR. SHANNON: Good morning.

THE COURT: Good morning.

MR. LEE: That's my very bright, smart associate. Younger than I am, so he is able to work a lot harder than I am.

The second party that's also helping me is Adam Rodriguez, who is my paralegal, who has been working on this case. As you all know, he (indiscernible) get done by one person (indiscernible) who made a team that worked with me. So those two would be an integral part of the team.

And the third party I'd like to introduce today is Mr. Marc Schwartz,. He's sitting with me at counsel's table. He is chief restructuring officer of the three debtors, Your Honor.

MR. SCHWARTZ: Good morning.

THE COURT: Okay. Who wants to go next?

MR. RUFF: Good morning, Your Honor. Jason Ruff for the U.S. Trustee's office. And today with me is Ha Nguyen.

THE COURT: Good morning to both of you. And I

think it's the first time I've actually seen you in person as opposed to on the screen. Good morning.

MR. OKIN: Good morning, Your Honor. Matthew Okin, O-k-i-n, and David Curry. We are here on behalf of the proposed litigation settlement trustees, Russell Nelms and Richard Schmidt. I believe that Mr. Schmidt and Mr. Nelms are on the call.

THE COURT: I see them on video. And good morning to you, sir. Good morning to you, Mr. Schmidt and Mr. Nelms.

MR. BEATTY: Yes, Your Honor. Max Beatty and Cliff Walston. We are here on behalf of creditors, Heslin, Lewis, De La Rosa, Fontaine, and Pozner.

THE COURT: Good morning.

MR. BEATTY: Good morning.

MS. HASELDEN: Good morning, Your Honor. Melissa Haselden, Subchapter V Trustee.

THE COURT: Good morning.

MR. CHAPPLE: Good morning, Your Honor. Ryan Chapple and my colleague, Randy Williams, are here on behalf of what we'll probably refer to as the Connecticut plaintiffs, Mr. David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carly Soto-Parisi, Carlos Soto, Jillian Soto-Marino, William Aldenberg, Richard Cohn, Trustee of the

bankruptcy estate of Erica Lafferty, William Sherlock, and Robert Parker.

And, Your Honor, I also have the Connecticut Plaintiff's counsel on Zoom. I would like to introduce them as well.

THE COURT: Sure.

MR. CHAPPLE: Ms. Alinor Sterling and Chris Mattei. And they will be filing motions of pro hac. They just...

THE COURT: Okay. Good morning to both of you. And, Ms. Sterling, if you wish to speak today, if anyone wishes to speak today who has not filed a pro hac, you are free to do so (indiscernible) of today. Not a problem at all.

MS. STERLING: Thank you for that courtesy, Your Honor.

THE COURT: Okay. Does anyone else wish to make an appearance in the courtroom? Okay. I am hearing some background noise. So I am going to mute the line. I have about 70 folks on the line, and it got a little tricky. So I'm going to -- if you wish to speak, just hit five-star if you wish to make an appearance. Let me see if there's anyone who wishes to make an appearance. If you wish to make an appearance, just hit five-star.

Okay. There's an area code 207-650 number. Do

you wish to make an appearance?

UNIDENTIFIED SPEAKER: Good morning, Your Honor. Peter (indiscernible) from (indiscernible) Group. Thank you, sir.

THE COURT: Good morning. Does anyone else wish to make an appearance?

I've got one more. I've got an area code 210-601 number. Area code 210-601, do you wish to make an appearance?

MR. BATTAGLIA: Sorry, Your Honor. I had it on mute. Too many buttons to push. Ray Battaglia for Free Speech Systems.

THE COURT: Good morning, Mr. Battaglia.

Okay, I think I have an area code 512-710. Does someone wish to make an appearance from an area code 512-710 number?

MR. JORDAN: Your Honor, Shelby Jordan. I am making appearance on behalf of Alex Jones.

THE COURT: Okay. Good morning, Mr. Jordan.

MR. JORDAN: Good morning.

THE COURT: Okay. Mr. Lee -- for the folks who have made an appearance, I have left your line unmuted. I'm going to ask that you just keep your phone on mute just during this time. And if you with to make -- wish to speak, just let me know. Okay, I believe I have covered everyone

who wishes to make an appearance. So, Mr. Lee, let me turn things over to you, sir.

MR. LEE: May it please the Court, Your Honor. Kyung Lee, for the record, for the three debtors. I want to take out some administrative matters before we head to the substantive matters for the Court.

THE COURT: Okay.

MR. LEE: Number one, Docket 8 had a joint administration motion that was set for today, and I believe Your Honor has already signed that order. So that is going to be moot for today's hearing.

THE COURT: Yes, I did sign it.

MR. LEE: Thank you, Your Honor.

Number two, I believe in the Subchapter 5 cases, that it would be your desire to sign these Subchapter 5 deadlines order today. And we have a form of order which sets the status conference for an 1188 conference as well as the status report under 1188(c) and a deadline to file a Chapter 11 plan under 1188. So we have a form of order for that if you want to consider that at the end of the hearing, or whenever you think --

THE COURT: I think -- I don't know who can answer that question. But if we pick a date, I need to know whether we're going to have a case or not. But I'm not sure that you can answer that question.

 MR. LEE: That would be a question for --

(Break in audio)

THE COURT: Yeah. It's really a question for the third party contributors because they are the ones who have the right to terminate it. But one of the concerns that I have -- and maybe this is just something -- again, all I know is we're not going to write on the papers. Right? So I'm just raising some concern to something that maybe somebody can answer very quickly for me, is the third-party contributors essentially fund these Chapter 11 cases. I don't see any sources of revenue. As I read the trust agreement, the Debtors are not actually allowed to engage in any business activity, so they can't generate funds. So if the third party contributors decide to pull the plug and not fund this at any point, you know, maybe a ruling that I make or just decide they don't want to go forward with it any more, you know, the lifeblood of these Chapter 11 cases goes away. And I think I need to understand whether we have cases or not. Because, you know, sometimes the judge rules in favor of one way, sometimes the judge rules in another way. And I need to know kind of whether they are really committed to these cases. You know, any (indiscernible) Subchapter IV trustee doing her work and doing her -- fulfilling her statutory duties in a Subchapter V case.

And I'm not indicating one way or the other that I

believe that the third-party contributors are not serious about funding these cases. Obviously they took the time and did it. I'm just raising -- parties really want to go forward with a Chapter 11 case, right? There has to be some stream of guaranteed source of funds, and it can't be tied to dates that I haven't approved or decisions that I have not yet to even consider based on motions that have yet to be filed. You know, it's just not -- it's a hypothetical world. But I just need to understand that.

But maybe all that could be answered. We're not really going forward today. I'm just -- it's one of the things that makes me think about the trust. And as I think about the trustees -- if you're here, Mr. Okin.

Mr. Nelms and Mr. Schmidt, this is -- they're certainly qualified. Put that aside. The question is who is working on behalf of -- I'm just thinking at the 10,000-foot level. Right? Who works for the estate, right? If the settlement trust fees are bound by the settlement trust and must only work within the confines of the trust -- and I know that the trust is still yet to be negotiated. But whatever it lands on, then who does the work of the estate, right? If they're trustees of a trust, then by approving the trustees and then approving them to do the work according to the trust. So it's almost like an implied approval of the work done under the trust. But then who

 represents the estate? That's the question that ultimately somebody is going to have to answer. Who does the work of the estate? Who is acting on behalf of solely the interest of the estate? I get it, Mr. Schwartz is operating as a 327, but the proposed order that was -- someone was going to ask me to sign today was going to say that Mr. Schmidt and Mr. Nelms could fire them without my approval. Maybe somebody should think about that as they think about the 10,000-foot level. There has to be a 327. 327 means that they are fiduciaries of the estate, which means that the court would have some supervision or they would answer on behalf of the estate or be fiduciaries of the estate. I just want to make sure that there is someone who is going to take a position, and sometimes they're hard positions, on behalf of the estate.

And I'm not saying these questions can't be answered, I'm just -- again, (indiscernible) order on papers, and they raised questions. And I didn't want to blindside anyone with any of these questions that I had. So I don't want to start making comments on a trust agreement that you're telling me is going to get negotiated. We'll have to wait and see what's finally there.

MR. OKIN: We are certainly happy to have your comments in advance so we can address them. But we will -- these are issues we are wrestling with, including not making

sure the funding is available --

THE COURT: Because the money comes in, but the money is not -- the way the trust is set up, the third party contributors contribute to the trust, but it doesn't become property of the estate because it stays within the trust, and then the trustees fund in accordance with --

MR. LEE: The plan.

THE COURT: Right? So that becomes interesting. And so if -- yeah, let's just say a payment in full -- payment in full is defined under 10.1(c). Maybe that number is different than what other people may have expected. Is it property -- it's not property of the estate. And so I would be allowing a claim that would never be paid. It's the things that I think about.

And again, this has zero to do with Mr. Schmidt or Mr. Nelms. That's not -- I just think about on behalf of the estate and the Debtors that have to get administered here. I should probably stay quiet and just allow Mr. Schwartz to just answer. But I'm saying this for the benefit of Mr. Lee, who is going to put Mr. Schwartz on. Today is a day for information as I understand it. And so I think I want to kind of express some of the thoughts that I had as I read the papers and give everyone an opportunity to react to it. Because I'm going to ask Mr. Schwartz these questions. And so I suspect -- I don't want to surprise Mr.

Schwartz by the way I'm reading and understanding the trust agreement. Because if I've got something wrong, I want somebody to tell me.

MR. OKIN: Your Honor, I don't think you do on the current documents. And that's part of what we are working on. I did just want to leave the Court with -- both Mr. Schmidt and Mr. Nelms have raised a lot of these same issues. They think they can be a help to this process. They come at this completely neutral. They think that if people give them a chance and give this process a chance.

They've spent their whole lives, their professional careers at least, in the bankruptcy system. They believe in it. They think that more often than not, it is a fair and equitable process for dividing up scarce resources and that if given an opportunity, they can actually give some people some peace and an opportunity to resolve these issues. And they think that given enough time and the opportunity to do it, that they can help bring that about.

THE COURT: Okay. Thank you very much.

MR. RUFF: Good morning, Your Honor.

THE COURT: Good morning.

MR. RUFF: Jason Ruff for the U.S. Trustee's Office.

Your Honor raises a number of great questions.

And quite frankly, this case begs those questions as it has been set forth before the Court.

I would like to just say at the outset too, our opposition has nothing to do with the individuals that are proposed to be the trustees, Your Honor. Our position is threefold. And first of all, there's no emergency, so that's off today. I think everybody recognizes there is no emergency. But to Your Honor's questions that Your Honor was just asking and what has been proposed here today, this form with this litigation settlement trust, it's called a litigation settlement trust. It seems to operate more than that, thought. It seems to operate more like an LLC operating agreement and that the trustees, as was proposed, were to be managers of the LLC, have management authority of the LLC, and with Mr. Schwartz reporting to them essentially, that his duties would run to them. And there is an inherent conflict there.

But Your Honor, 105, which is the authority that they cite for seeking that, your Court blessed that, doesn't extend that far. The bankruptcy code is clear about when a court can enter orders appointing individuals, examiners and trustees under 1104. And were Congress is provided a power in one place but not another, Section 105 cannot be used to give the court more powers.

And one other thing, Your Honor, is that we found

very problematic and was set forth of course in our pleading. But the motion asks for the Court to bless certain liability protections that are wholly unnecessary for the Court to do. The trust stands on its own. It's an agreement that the trustees are being asked to sign that was orchestrated and put into place by Alex Jones and Free Speech Systems. And, Your Honor, it can determine what their -- if they're going to agree to that, they can agree to that. They don't need the Court to do that. The agreement was entered before it ever even -- these cases were filed, Your Honor, before they ever came to court.

So it is our position that not only does the Court not have authority to do it, but under the Code at least Your Honor -- it is not necessary, either.

THE COURT: Mr. Ruff, in terms of the timing question if we don't go forward on the CRO motion and on the trustee motion, do you have a sense of timing?

MR. RUFF: Your Honor, I think we can use at least 21 days from the date that they were originally proposed. I don't see what emergency there is. Mr. Schwartz has already exercised authority on behalf of the Debtors by signing these petitions.

THE COURT: The only question that came to my mind on -- you know, and maybe Mr. Schwartz will answer the question -- is somebody needs to work on schedules and, you

know, the bread and butter bankruptcy materials and start to answer questions, and Ms. Haselden has questions or the trustee has basic questions. I doubt that there's any bank accounts or any -- your know, or anything. I just want to make sure that there's -- but I guess Mr. Lee has given me some comfort that they're there. It's the only one that makes me think, you know, should we have someone -- but maybe Mr. Schwartz is going to tell me that he can do that work. And if he can do that work, then I'm okay with the timing on that.

MR. RUFF: Your Honor, my response to that, to your question would be simply this. Your Honor, these individuals were put into place. Take a step back. These companies were -- these entities were 100 percent wholly owned and controlled by Alex Jones prior to the trust being put into place. And they were given authority pursuant to those documents, pursuant to things that were done in advance of the bankruptcy case.

Your Honor, the court wasn't necessary for them to have authority at that point. I don't see that it's necessary for them to have authority now as a 327 professional if that's what they're going to seek for the CRO's employment under. That has more to do with their ability to be -- not only to act on behalf of the Debtors, but also to be compensated and the duties that they're going

to run under the Code.

But every professional that comes in prior to a bankruptcy case still has duties and still has an obligation to act. If it all blows up, Your Honor, if there is no case here, if Mr. Jones decides that he doesn't want to fund, then that's really on Mr. Jones. These companies don't operate, they don't have employees. This is not a situation where if, for lack of a better word, these cases crater, that we are going to see employees of these companies suffer and be without a job and without a source of income. There's not trade creditors out there or other parties who are not going to receive goods and services.

Your Honor, the only person here who might be harmed is Alex Jones. And because these cases appear to be -- at least it's questionable to why we're even here. But they appear to be orchestrated by him to limit his liability and the liability of Free Speech Systems. So I don't even know that it really even matters. It's to his benefit. He wants these cases to go, then he can decide to fund these cases. If he doesn't want them to go, to try and do whatever it is that he's trying to do, then he can pull the purse strings and back off and these cases can be dismissed, which perhaps they should.

THE COURT: Thank you.

MR. BEATTY: Your Honor, if I may. I represent a

group of creditors who I am going refer to as the Texas Claimants.

THE COURT: Okay.

MR. BEATTY: And these are the cases that ultimately -- one of which was scheduled to start on Monday. This bankruptcy halted that process and slowed down ultimately the liquidation of damages not only against the Debtors -- I think that's relatively minor. We can see within the context of what's already been filed that these Debtors don't really operate a business. The bankruptcy itself was filed to protect Alex Jones and to protect Free Speech from having to face trial on Monday.

And I think Your Honor has looked at and seen some of the issues that we identified initially. But I think there's a lot more than that. And I think that we have gateway and threshold issues that have to be answered before anyone should go forward in deciding who is a trustee of a trust that apparently has holes in the documents and will need to be changed and who is going to be appointed to run these, and so on and so forth.

So just as a preliminary issue, I have some problem with saying that we're going to hear that in 20 more days. Because I think this Court is going to need to decide the propriety of this bankruptcy well in advance of that. There are a lot of attorneys in this room right now.

There's a lot of billing that's going on that to me may be wholly unnecessary. And all it's doing is causing delay.

And, Your Honor, I think one of the things we have to decide right off the bat, is this case subject to dismissal, is it subject to conversion, should it be a Subchapter V even? Those questions have to be answered before we spend that extra money. And what we've already seen in the PSA, that plan support agreement, is if you did any of those things, that plan support agreement is dead. If this isn't a Subchapter V, dead. Dismissed, dead. Converted to a seven, dead. There is no intent on funding unless they can effectively force third-party releases into a bankruptcy plan. That's not permitted in the Fifth Circuit. This is a near (indiscernible) opportunity for them. They are trying to get a release for Alex Jones and for Free Speech. And they are attempting to do it without the transparency that's inherent to a bankruptcy process. Because when you look at those agreements, certainly the trustees have some opportunity to look at budgets for Free Speech, for Mr. Jones. But when you look at the agreement, at best, there's a weak, toothless oversight board who doesn't necessarily have any right to look at any of these confidential documents. So I think the threshold question for this Court before we move forward, before we do anything else, is whether or not this case should be dismissed.

The Fifth Circuit says that good faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose.

And let me tell you, I think we've got a sinister and unworthy purpose here. I don't think -- and even if I am wrong on that, we don't have an actual intent to reorganize here. And I say that because you can look at the Schwartz declaration which was filed with every single one of the petitions.

And I want to read a paragraph. It's Paragraph 8. "I have learned that the Debtors have no purpose other than to hold assets which may be used by other entities. They undertake no business activities. They do not sell, rent, or lease to others anything. Their assets do not generate any income for them. They have no bank accounts and cannot pay money to anyone for any reason. They have no debt other than liabilities, other than those related to pending or potential litigation. For these reasons, they have no financial statements or books of account, and they do not file income tax returns."

I don't know what we are trying to reorganize here. We're not setting up a business to contain them in the future, we're channeling settlements and forcing it down

Plaintiff's throats. They want to use a claim estimation procedure, and it's transparent why that needs to occur to them, because they want to face the state court. We can all say we have disagreements about what the value of those claims are worth. I am certain if you ask the Defense attorneys from the state court litigations, they would tell you none of the claims are worth much.

But even without ever talking to any of the plaintiffs, you see an agreement that suggests there is going to be $2 million put in and a stream of income worth another five. So at a minimum before we can even negotiate with them, they're telling this Court $7 million in liability. And the claims estimation procedure, I don't think that -- that's not a process where we have a lot of different claims that will take forever to decide.

Again, two of my clients' claims would have been decided. The dollar amount would have been done. The other claims are all set for trial in state court. But there's just a series of poison pills in the trust agreement and the PSA. If you lift a stay, that -- no more payments. No more payments from Jones. If there is a remand, no payments. On and on and on. Conversion, dismissal, anything. It's all dead.

This is a situation where the first question for this Court is is this proper. And I don't want to see all

the parties here continuing to spend money on what I think is tertiary before that actual question gest answered.

And, Your Honor, the simple issue is that you can look at it and see that it will fail just based on the question of whether or not they are a Sub V debtor. You know? To be a Sub V debtor, you have to be a person engaged in commercial or business activities. Mr. Schwartz has already told us neither of those items are true. They don't accept money, they don't get paid. They don't pay anything. They don't operate.

So if Sub V is inappropriate, the PSA is down. There is no money. These are the things we need to look at first, Your Honor. I don't think we need to make any other decisions.

MR. WILLIAMS: Thank you. Your Honor, Randy Williams for David Wheeler --

THE COURT: Good morning. Just get to a mic. I just want to make sure they can hear you on the...

MR. WILLIAMS: Sorry, Your Honor.

THE COURT: No worries. Good morning.

MR. WILLIAMS: David Wheeler and the other Connecticut plaintiffs.

I think Mr. Beatty has very eloquently and concisely laid out the similar concerns that our clients have and that the fundamental issue here is in light of Mr.

Schwartz's declaration, what are we doing here? And, Your Honor, I will for the record object to Mr. Schwartz giving any further testimony beyond what he has already declared in that declaration today. Because what have we learned so far today? That we want to get trustees approved for a trust that the trustees don't even agree to what it's going to look like or say. And we don't know when we're going to get it or when we're going to have it. And we're talking about setting hearings and how long we can go, but we don't know when they're going to get a trust agreement that they're happy with or when we're going to be able to see it.

And no clock should start ticking and no deadline should run on us until they come forward and give notice of what it is that they want to do. You've got a PSA we've talked about. It's not a PSA, Your Honor. It was negotiated between Alex Jones and himself. Who stood up on the other side for anybody? Because again, look at Mr. Schwartz's declaration to these petitions. These entities don't qualify for Subchapter V. They don't even qualify to be in the Chapter 11. This has all been done for the benefit of Alex Jones and Free Speech.

And let's talk about that for a minute. Your Honor, these cases that were being litigated in Texas and Connecticut have been going on for years. And in the course of those cases, these Debtors, Mr. Jones and Free Speech,

have all suffered death penalty sanctions because of their conduct before those courts. They removed the Connecticut cases, they removed the Texas cases back to (indiscernible) court. That's not the first time that's happened. In Connecticut I know it's happened at least twice, and twice they've been sent back. We've already filed an emergency motion in Connecticut to remand that case, and the Connecticut judge has said that the trial date as to Mr. Jones and Free Speech in September of this year that's already been set and was already pending, as soon as she gets the case back is going to stick. And again, if they wanted to estimate these claims and know what the real liability was and they've really spent $10 million in legal fees that ended up in them having their pleadings struck and death penalty sanctions, then why didn't they go to court on Monday and see what happened in that case? Because that would have laid a groundwork that would have then led to something in the way of putting together a plan.

Your Honor, being on the bench, you have a lot of experience with Chapter 11 cases I know in your practice. And you know that if there's a real desire to put together a plan and bring people together and forge a settlement between Claimants and Debtors, that there's some negotiation that goes on with someone pre-petition. And here, it's nonexistent. They came up with all of this on their own.

Actually, Mr. Jones did it. And he's put $750,000 into the trust that's already -- you ask about Mr. Schwartz. And based on what I read, Your Honor, Mr. Schwartz has already exhausted over $30,000 of his $50,000 retainer that he got. He filed these cases. And if his declaration, which I accept as true, then Your Honor, filing schedules and statements in these cases with no bank accounts, no tax returns, no income, no expenses, has got to be a pretty easy process.

But mostly I want to get back to we've got to get to the fundamental issue here. We've had somebody who, because of his behavior and the behavior of the entities that he owned and controlled and ongoing litigations in multiple courts in Texas and Connecticut face death penalty sanctions. And Connecticut, those death penalty sanctions were appealed and he lost. And they were upheld. That's how bad the conduct has been. And now we're in another court here trying to do a Subchapter V where you don't get a Committee and have a say. Only the Debtor can file a plan. Your Honor, this just isn't right.

One of the colleagues from Connecticut in our initial meeting with us said this process is illegitimate. And at the time, I was thinking that's a really strong word. And then I slept on it. And I told Mr. Chapple, I said, well, I've got to apologize to her because she's absolutely

right. This is illegitimate. And before this Court begins taking steps to move things forward or treat things as first-day hearings, the Court needs to look at whether or not this is proper and appropriate, and we need to be taking all those other steps.

Again, we don't even have a trust agreement. That's the first thing we get told today is when -- and I didn't hear Mr. Lee say it. He said he didn't want to go forward with it. But it was counsel for these proposed trustees, said, well, we don't have a trust agreement. So what are we going to have? And why are we talking about what it might be when -- why aren't we looking at the issue again of why we're here?

And another thing, Your Honor, that's troubling to my clients -- and with all due respect to the Court, why are we in Victoria? We've pulled the records on these three entities from the Secretary of State up through November of last year. Every information report that's been filed, every document that's been filed on these entities says that they're domiciled, their assets and their principal place of business was a PO box in Austin, Texas. So why do these cases get filed in Victoria? And if Mr. Schwartz's declaration is true, then how do we get to Victoria if we don't have any employees, if we don't have any business until the last umpteen years that these companies have been

in business with always saying we were in Austin -- or not in business, that they were in existence. I apologize, Your Honor.

So again, we do intend to file an emergency motion to dismiss because we want dismissal considered before we move forward with any of this first-day issues or having anyone talk about -- I don't know what information Mr. Schwartz can give us beyond his declaration. And again, I don't -- we are very concerned that to the extent the Court comments on and takes testimony in this case, it begins to legitimize the process. But again, I agree with my Connecticut counsel, I will --

THE COURT: Let me just tell you though, today was the first day and there were two motions set. And I read objections that were filed to them, and no one is going forward today on anything.

I'm giving comments based upon things that I thought about when I read the overall case, read the documents. I don't think anyone should read anything other than that. I had two m options in front of me, and I found out they're not going forward today. If someone files another motion, I'll take that up and consider it.

So if people want me to consider something, then they'll file something and I will consider it. And it sounds like you are. And when that's filed, I'll consider

it. But right now, I have two motions and I'm trying to find out -- the Debtor has filed two motions and then asked for consideration of them. I've got a duty to think about the timing of those questions, and I'm raising other questions. And if somebody files something, then we'll take that up. But somebody has to file something for me to consider it.

MR. WILLIAMS: Both of those motions are premised on a trust document that you've now been told the two trustees that you were asked to appoint, don't approve of them. So again --

THE COURT: That's why I'm asking the question. I'm telling you --

MR. WILLIAMS: But we don't have notice of what it's going to be or what we're going to do. (indiscernible) set something --

THE COURT: I agree with you.

MR. WILLIAMS: We don't know what it's going to be.

THE COURT: That's why I'm asking questions about timing and what that looks like. I don't know. But I think Mr. Lee is going to have to give me an answer to that question. And I agree with you. We can't set a hearing until there's a document that everyone can look at. Not just me, but other parties and have an opportunity to review

and observe, and Subchapter V trustee, your client. I don't know what that timing looks like.

So I don't know whether 20 days, 60 days makes sense. I think they're going to have to tell us when that document stops moving, and then we can set a date. And if there are other motions that are filed before then, then I'll consider those motions as well.

We just have to run a transparent -- and a process that's based upon -- and I'm not saying you're saying anything different. But you need to run a process where there's transparency and there's due process afforded to all parties. And I'm not going to jam anyone on an emergency motion based on a document that someone has seen 24 hours in advance. I'm not doing that. So let's just -- I think Mr. Lee is going to have to -- and maybe with the input of Mr. Okin. And maybe that's not today. But I don't think -- and maybe it's just continued to a date to be determined. But I think on the CRO motion, they need to -- someone needs to tell me when they want to come back. And on the trust document, I think we're going to have to find out. And if there's another motion or something else that gets filed, we'll take that up in due course.

And I don't think I'm -- I'm not disagreeing with anything of what you're saying. I'm just highlighting for the parties in the room and for those who may be listening

that, you know, we're going to run a process based on the federal rules of bankruptcy procedure. We're going to follow the Bankruptcy Code, and we're going to follow due process to all parties in interest.

So I don't -- you know, I'm commenting on documents that were in a motion that was before me. That's it. I don't think anybody should read one way -- I'm not legitimizing or delegitimatizing anything. I think I've probably asked more questions than Mr. Lee probably wanted me to ask.

I'm just kidding. I'm just kidding, Mr. Lee.

MR. WILLIAMS: Respectfully, Your Honor, with regard to asking Mr. Lee or Mr. Okin, it's Mr. Battaglia or Mr. Jordan, whom I'm glad announced today whom they were representing, since when they filed their notices of appearance, they chose not to identify their clients in those documents. I did see in the attachment to the trust document for the budget that they had gotten retainers to represent Mr. Jones.

It's interesting that a trust that's supposed to be for the benefit of injured parties -- and again, liability has already been established. That's not an issue here. The only issue is the dollar amount of that. And again, if you really wanted to have that decided, you could have good clues starting next Monday, but Mr. Jones chose

not to do that. He created this bizarre system that we see here, which we still don't know what it is. But it's not the Debtor or the trustees, who are not actually trustees, who can answer your questions. It's Mr. Jones and Free Speech. Because as Your Honor has pointed out, they're the ones who are using their money, and they want releases for that, as Mr. Beatty has pointed out. But they don't want to come into this Court. They don't even want to have their lawyers file notice of appearance that identify who they are appearing on behalf of. They want the benefit of bankruptcy without being in bankruptcy. We'd be having a whole other discussion at be at a whole other position today, Mr. Beatty and I, and Mr. Jones and Free Speech for part of it. But the truth is, they're not. They're staying outside of it. And that's not right. They shouldn't be -- they're getting the advantage of the stay of these debtors to keep that case from going forward on Monday, and they paid $750,000 of all these professionals, plus some folks on the screen there, to get them to make that happen. And our folks are just waiting to liquidate their claims, claims that need to be liquidated in state court that shouldn't be liquidated as part of a bankruptcy because the Court's jurisdiction, if it did have jurisdiction, would be tenuous at best.

But again, Your Honor, I don't have anything else to add at this time. I appreciate that we are not going

forward today. We had only filed an emergency motion to continue. We do intend to object -- well, we intended to object to the motions as filed. Since they're going to change, we don't know what we're going to do to those. But we will be filing an emergency motion to dismiss these cases on the grounds that Mr. Beatty has raised and I echoed today.

THE COURT: Okay. Thank you.

MR. BATTAGLIA: Your Honor, may I briefly be heard? This is Ray Battaglia.

THE COURT: Yes. You've identified yourself. There's a lot of boxes, so I appreciate you saying that.

MR. BATTAGLIA: I'm not going to address all of the things that are before the Court, but there are a couple questions that were raised, and much has been said about, I don't know, maybe some (indiscernible) responsive how my appearance was entered and how this trust agreement is not a final document.

And I think the Court should appreciate that the trust agreement was negotiated somewhat in the blind. That's not to suggest that Mr. Lee did not act on behalf of his clients in reviewing it. But at the end of the day, parties who need the most input are the trustees. And the interim trustee has literally no power under this document, as appropriate. So the appointment of the trustees is a

very important step in getting that document to final.

I don't think Mr. Okin -- and he can comment on this. I don't think we're talking about a wholesale rewrite of this document. I think there are issues that he brought up this week to us that we were expecting, a first turn of the document. And of course the third-party funders are amenable to reasonable modifications to that document. But I think that the suggestion that somehow there is something nefarious about this being less than a complete document is absurd. We negotiated as best we could a document that serves the purpose of trying to pay allowed claims in full. And the other thing I think that's missing here is that should the case have gone to trial in Austin, there's a significant likelihood that there would be no money for anybody. And that's the intent here, is to try to preserve a means to pay allowed claims. And that's what this system is set up to do. I could dispute a lot of other things, but I think those are the most important thing.

I think, Judge, your comment about April 30th, of course we're not going to hold an April 30th deadline, but we do need this to move forward with some speed so that we know that we've got people we can talk to on the other side to get these documents into final shape.

THE COURT: Okay, thank you. Anyone else wish to address the Court at this time? Is there anyone on the line

who wishes to address the Court? Hit five-star. Okay.

MR. LEE: Good morning, Your Honor. For the record, Kyung Lee. I want to apologize. My bladder is not as strong as it used to be when I was younger, and that's the reason I took a little break.

I just want to say one thing if you allow me to put Mr. Schwartz on without any objection from this audience. I just need to tell you, the parties have been working here very hard, in good faith to create a proposal to, one, pay creditors, and two, to pay them in an equal fashion. I think those are really pretty legitimate purposes of the Bankruptcy Code which I feel very good about saying to you and to this entire group here, that I feel very proud of being able to bring to this Court a process to do that.

Yes, it may have some warts on it. And yes, it's not perfect. But it's a proper purpose of this Court and to this process in my view, for the 40 years I've been doing this, to bring to this Court a structure that allows for resolution of the bickering that's been going on for the last ten years in which Mr. Schwartz and I have brought to the table on Day 1 of a bankruptcy case $10 million to be made available and for equal sharing of that money among creditors, and yet I hear nothing, nothing but complaining by those who actually want the money or who are entitled to

the money.

And so I say to you, Your Honor, there must be something else going on for people to complain about that when for ten years they've had nothing to be able to collect on any of their judgments. And I find that quite upsetting on my part to have worked this hard to bring to the table this kind of a structure and hear nothing but complaints when the effort has been done solely to bring to the table a structure that has fiduciaries watching over this process for the next five years and bringing $10 million to the table as a first offer on the table with the parties that they believe caused all this injury.

And so with that said, Your Honor, if I may, I'd like to be able to show this Court what we've done, why we're here, and what we're trying to do. And again, in a non-adversarial fashion to try to present to you --

THE COURT: I don't know if that's possible today, Mr. Lee.

MR. LEE: Again, I'm going to tone down my rhetoric in my presentation. But I didn't have a presentation for you --

THE COURT: Yeah. If it's in the form of a presentation, I have no problem with it. If we're going to -- the declaration isn't admitted into the record. So there's no evidence and there's no motion to go forward. So

I don't need to take evidence about anything. There's nothing going forward today and there's nothing that Mr. Schwartz -- I want to make sure he's clear about this -- that will be used in connection with support of any motion that may or may not go forward today. We don't have dates on anything. So if what Mr. Schwartz wants to do is provide what typically happens in a Chapter 11 case, someone provides background information about why we're here and what you intend to accomplish, I've got no problem with that. I just want to make sure that everybody is really clear, this is not going to serve as evidentiary in support for any motion because there is no motion before the Court today.

I will also tell everyone there is clearly -- and I understand it -- a lot of emotion on both sides. It's completely justifiable, and I understand it. My job is to not focus on that.

MR. LEE: Yes, Your Honor.

THE COURT: My job is to rule on matters that are before me, the legal issues that are before me. There are parties who are being referenced who are not here, but who are certainly parties in interest. They are party contributors. And I've got to consider that. There are due process issues that are being raised, there are motions that sound like they're going to get filed. And when we take

them up, I may rule on them based on the evidence that is before me.

I think some of the concerns, Mr. Lee, are legit.

MR. WILLIAMS: And I understand, Your Honor.

THE COURT: And there are legitimate concerns about how we're here based on the papers. Mr. Schwartz wants to talk today. Give him an opportunity to talk.

MR. RUFF: Your Honor, I would actually object to -- I don't know -- what is he going to inform the Court about?

THE COURT: Look, what I am anticipating -- and Mr. Lee will have to (indiscernible) -- is kind of a generic Chapter 11 presentation. I have questions about these --

MR. RUFF: Well, I have a lot of questions too, Your Honor. I think everybody in this room has a lot of questions. But Mr. Schwartz is being put up as the chief restructuring officer.

THE COURT: No, he's not being put up for that reason. If he's going to stand -- if Mr. Schwartz wants, he can stand here and tell me about background information about the case. This is not going to be used as testimony in any way. Because if that's the case, then Mr. Schwartz better be ready for a lot of folks cross-examining him today. If this --

MR. RUFF: Will there be an opportunity to ask

questions of Mr. Schwartz?

THE COURT: If Mr. Schwartz is going to speak. Mr. Schwartz can answer questions.

MR. LEE: I have no problems with that, Your Honor. Mr. Schwartz is --

THE COURT: That's what I'm saying. If Mr. Schwartz is going to -- just like every Chapter 11 case, if there are questions of the person who stands up and provides a presentation, folks get to ask questions.

MR. LEE: We intend to run a transparent process, Your Honor.

THE COURT: I'm just saying this is not going to be where Mr. Schwartz makes a statement and no one gets to ask questions. If Mr. Schwartz wants to make a statement, people get to ask questions.

MR. RUFF: I guess --

THE COURT: I have questions. And I'm going to get my questions answered is what I'm saying. And you may like the questions I ask.

MR. RUFF: I liked the questions that you asked already, Your Honor, as I said at the outset. And again, this case begs many questions. I just -- again, you are here today for a specific purpose.

THE COURT: I agree.

MR. RUFF: We don't even know what these cases are

about now. The Debtors admittedly, Mr. Oaken --

THE COURT: That's what I'm trying to find out.

MR. RUFF: Well, okay, very well. But whatever he says today might be without any merit, because it might all change is what I think we heard today.

THE COURT: I guess that's what I'm saying. Isn't that something you would want to know?

MR. WILLIAMS: No, Your Honor. Until we have a document that we know is --

THE COURT: I'm not talking about the trust agreement. I'm talking about general background information about who does IW help. That's the question I have. What do they do? Are they still conducting business activities? He says no, but I'd like to hear it from him. Are they conducting commercial activities? I'd like to know the answer to that question. Folks, I get to ask questions. I get it, you get a check, but I get to ask questions.

MR. WILLIAMS: I have no problem with you asking questions, Your Honor. But with respect to the declaration -- and I know it was offered as an exhibit -- it is part of the record in all three of these cases, at least one administered cases. I would ask that the Court take judicial notice of that declaration and make it part of any record about what he is going to talk about. Because I think all your questions are actually answered in that

declaration. And if he is going to say something different today than what's in --

THE COURT: You don't know that, because you don't know the questions I'm going to ask, Mr. Williams.

MR. WILLIAMS: Well, he talks about bank accounts and --

THE COURT: You don't know what I'm going to ask, Mr. Williams.

MR. WILLIAMS: Yes, Your Honor. I object to there being any testimony today.

THE COURT: There's no testimony. Mr. Williams, you've been part of a million Chapter 11 cases. People get to present information at the beginning, at the outset of a case. That's all -- and if Mr. Lee goes too far, I'm going to shut it down. It's really simple what's happening here. In every Chapter 11 case, someone gets to make a presentation and the Court gets to ask basic questions about the Debtor. Why are you here? How did you get here? Who are these three entities? What are they doing? Why are we in Victoria? I get to ask a bunch of questions. It sounds like you would want to know some of the answers to some of these questions. Maybe there are questions you don't want to know the answer to, but you get to ask questions.

MR. WILLIAMS: Again, Your Honor, respectfully, I have no problem with you asking any questions that you have

about anything related to this. I do have a problem with Mr. Schwartz making any presentation because this is not a typical case. These folks are victims, not creditors. The liability has been established. The only issue is how much. Mr. Lee wants to take credit for a document --

THE COURT: I'm not doing any of that.

MR. WILLIAMS: -- that's been (indiscernible) that doesn't exist.

THE COURT: Mr. Williams, I understand. But you have to -- you said you have no problem with me asking questions.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. So, Mr. Schwartz, can I ask you a few questions?

MR. SCHWARTZ: Yes, Your Honor. (indiscernible) please?

THE COURT: You can stand right there. You can take that microphone right there.

It sounds like you have a short presentation you'd like to make. What would you like to tell the Court?

MR. SCHWARTZ: Well, (indiscernible).

THE COURT: If you can just get the microphone a little bit closer to you.

MR. SCHWARTZ: What we're trying to do -- and I got involved (indiscernible) in this process that

(indiscernible) the strategic plan, which (indiscernible). But I was involved after that in a lot of the other matters. But essentially to set up in a single location, a single venue the claims -- the claims determination process, the damage determinization process in a manner independent of any influence by Mr. Jones or any of his associates and to negotiate with Mr. Jones, which is what we did, creating the fund, the initial fund is $9.8 million, to pay the claims over a period of five years under the supervision of the trust. That's my legal description of what we're trying to do. The goal was to pay off other claims.

Mr. Jones also, as everyone has heard, put up $725,000, and we'll continue dialogue with him. I would call it a negation (indiscernible) more serious money than that, we need to put up $2 million. And then I discovered a royalty that was being paid to Mr. Jones that will have documentation to support this. The (indiscernible) that was given to me was at some point in time IWHealth was the party that generated or created that royalty and that Mr. Jones for some reason at some point in time (indiscernible) paid the royalty directly to Mr. Jones. They got to have that royalty back. And he agreed to give us that. And then also we negotiated that $250,000 a quarter over five years to get our total fund up to $9.8 million.

This was a negotiated process. It was not Mr.

Jones telling us what he was going to do and us saying okay, fine, we'll take that. I had no idea who Mr. Jones was. I didn't even know until April 4th. And Mr. Lee approached me and I had to go find out who is this guy. I had never heard of him. I hadn't heard of Infowars. I was not very interested in conspiracy theories. (indiscernible) landing on the moon, and I don't pay much attention to it. So that was the -- just of how we got here.

A little bit about the structure. There are two entities in the Jones business enterprise, two legal entities that are responsible for all of the money generation. FSS, which is the marketing arm that reaches out to his audience and sells everything from t-shirts to vitamins and mineral supplements and emergency food supplies, (indiscernible) that you could use. Everything you would expect, from books and whatever else. That -- most of that inventory is supplied to FSS by a company called PQPR. And they are --

MR. LEE: Let me interject. There's an Exhibit 6, if I may approach, Your Honor, that's already in the binders. It's corporate diagram that might help the audience as well as the Court.

THE COURT: Just refer to a docket.

MR. LEE: It's Exhibit 6 in the witness's binder book, Your Honor.

THE COURT: Okay, thank you.

MR. SCHWARTZ: And if you look at the PQPR (indiscernible) supplies most of the product, not all of it. Third-party vendors also supply the product, too. But that's where the money comes from.

As you know, or they know, Jones and his companies have been severely -- the word is they were cast out (indiscernible) or they have had problems (indiscernible) banks. But any kind of service. So they are very careful, conscious, of trying to maintain their current vendors.

One of the concerns that came up, and we're looking at this, was the question of filing the bankruptcy is that that would probably push FSS over the top and it would lose all of its or most of its vendor connections and it could no longer survive. In 2018 and 2019 -- I'm working off memory here. I'm 71 years old, so it doesn't always work. But there was something like -- FSS generally did something like 76 to 79, almost $80 million of revenues in those two years. That's a significant amount of money.

MR. WILLIAMS: Your Honor, if I could respectfully -- we are hearing about entities that he is not CRO for and that aren't debtors in this case. And if we're going to have a presentation about the debtors in this case, I don't need to know what their strategy was about why Mr. Jones elected not to file another --

THE COURT: I have a question, Mr. Williams. Thank you. Please continue.

MR. SCHWARTZ: Continue? Okay, 76, 78 million dollars of revenue from those two entities. The -- if you look at the impact of the litigation in 2021, I would estimate (indiscernible) books be closed for 2021. But based on the merchant receipts from the credit card operations, the revenue 2021 is approximately $56 million. $20 million less than it had been in the past.

THE COURT: So at some point over the last -- let's just call it -- you said you (indiscernible) around April 4th. So let's say sometime early this month.

MR. SCHWARTZ: Yes.

THE COURT: (indiscernible) with respect to the three entities that are in bankruptcy today.

MR. SCHWARTZ: Yes.

THE COURT: So let's talk a little bit about that. Can you just tell me a little bit about each -- your understanding as to each entity that's in bankruptcy. So I'll start with the first one. Infowars LLC. It's InfoW LLC, which was formerly known as Infowars.

MR. SCHWARTZ: Correct.

THE COURT: When did it change its name?

MR. SCHWARTZ: It was changed in April.

THE COURT: In April? Do you remember when?

MR. SCHWARTZ: No, I don't.

THE COURT: Sometime before the filing?

MR. SCHWARTZ: Oh, before the filing. It was shortly before the filing as I recall.

THE COURT: Okay. And --

MR. LEE: And, Your Honor, if I may interject here. Part of the reason the name was changed --

THE COURT: I don't want to get into the part of the reason the name was -- I just want to understand. Because at this point -- what does InfoW LLC do?

MR. SCHWARTZ: InfoW LLC owns the trade name Infowars. Infowars is the name that FSS uses to market its products, and that is the name that Alex's podcasts go out under. So it is the trademark. It's the Coca-Cola for the (indiscernible).

THE COURT: I won't hold you to these numbers, but just help me understand. So let's just say within the 40 days before the filing, how much cash did -- or maybe on the petition date, how much cash do you think InfoW holds?

MR. SCHWARTZ: InfoW has no cash. Up until the time it was transferred to the trust, it was owned by Alex as just part of his business operation. I don't know why.

THE COURT: What sources of revenues in the last 90 days?

MR. SCHWARTZ: InfoW (indiscernible) he annualized

his revenue (indiscernible) for use of the trade name that it owns.

THE COURT: Okay. Okay. so let's turn to IWHealth LLC. Okay. Let's just -- what does IWHealth LLC do?

MR. SCHWARTZ: IWHealth holds a royalty interest. And it's referred to a royalty. And what it is, it's a commission that is paid by Youngevity to the Jones enterprise for the sale of Youngevity products on the FSS. But that royalty started in April, generally before the filing. It is now paid to IWHealth. That was the amount I said we discovered and I said has to come back here to --

THE COURT: Do you know how much that amount was?

MR. SCHWARTZ: About $38,000 a month.

THE COURT: $38,000?

MR. SCHWARTZ: A month.

THE COURT: A month?

MR. SCHWARTZ: Yes, sir.

THE COURT: Is it currently receiving?

MR. SCHWARTZ: Yes.

THE COURT: And so I think you mentioned that FSS sells in markets. It's a non-debtor. Does IWHealth sell and market anything or does it just receive that royalty?

MR. SCHWARTZ: It just receives that royalty.

THE COURT: Okay, thank you. Was it receiving any

Case 4:23-cv-00463 Document 6-11 Filed on 03/23/23 in TXSD Page 188 of 566

royalty interest before? Like let's just say with in the 90 days before the filing?

MR. SCHWARTZ: Well...

THE COURT: Go ahead. I'll tell you why I'm asking. I don't want you to be confused by my question. You mentioned that there was a direct pay at some point, and then you stopped. Or you stepped in and said no, it's got to go directly to IW health, the royalty payment. What was the pre-bankruptcy arrangement before you...

MR. SCHWARTZ: Pre-bankruptcy, the royalty was sent to Alex Jones directly, his personal bank account.

THE COURT: Okay, thank you.

MR. SCHWARTZ: And I discovered that (indiscernible) that was a Monday. Because that's when I went to Austin. So prior to that date, it was not receiving any royalty..

THE COURT: Okay. And then there's one more. Prison Planet TV LLC.

MR. SCHWARTZ: Prison Planet owns a number of videos that were produced and developed by Alex Jones' enterprise. I think eight, 10, 12 or something like that. There's a list of them.

THE COURT: Aside from own them, what does it do? It just owns them?

MR. SCHWARTZ: It's similar to...

THE COURT: InfoW?

MR. SCHWARTZ: InfoW. It just owns them.

THE COURT: How much cash do you think it held on the petition date?

MR. SCHWARTZ: It held zero.

THE COURT: It held zero. Within the 90-day period before the petition date, was it generating any income?

MR. SCHWARTZ: The 90 days before -- so just like InfoW, owned by Alex Jones a hundred percent. And half of its assets were used (indiscernible) FSS. It was not anything for that use.

THE COURT: Okay. Okay. I guess I can ask you and I can ask Mr. Lee. And I think Mr. Lee has already asked the question. What do you believe the purpose of these Chapter 11 cases is?

MR. SCHWARTZ: The purpose? The purpose is to arrange to pay all of the plaintiffs the amount of their -- let's say in a bankruptcy sense, their allowed claim in full. That's the purpose.

THE COURT: So when the pleadings talk about paying it in full, you are referring to a defined term in the trust agreement that basically says whatever the court -- whatever is allowed in the bankruptcy case, the amount of that claim.

MR. SCHWARTZ: Yes.

THE COURT: Okay. Does that contemplate payments -- does the settlement then contemplate just the Debtors or will it include a global settlement including the non-debtors that you've described earlier?

MR. SCHWARTZ: It includes the -- specially Alex Jones and FSS.

THE COURT: Okay.

MR. SCHWARTZ: Because they are the source of the funds to make the payment.

THE COURT: Okay. Mr. Schwartz, I will tell you, there was a motion set for you for today. It sounds like it's not going forward. I think those are all the questions that I have for you. I think that is what is customary on a first day I think to just ask, get a general understanding. Are you aware of anything else in connection with the bankruptcy case itself that you think I should know at this time in terms of what may be coming?

Typically -- and I'm just saying this for folks who are listening. It's very typical for a bankruptcy judge to ask at the beginning of a case what might I expect in the short-term future. I've been told by some folks they are going to file a motion, and I'll take them up. And maybe this is a question for Mr. Lee. What may I expect in the short near-term.

MR. SCHWARTZ: Well, Your Honor, I'm not a lawyer, as you know.

THE COURT: No, no, no. You're not.

MR. SCHWARTZ: Mr. Lee (indiscernible) remand. And that's coming I guess But I don't know -- I don't think I'm qualified to talk about it.

THE COURT: No, no, no. I don't want you using those words. That's completely fine. Thank you very much, Mr. Schwartz.

MR. SCHWARTZ: Thank you, Your Honor.

MR. RUFF: Your Honor, could I just ask a couple questions?

THE COURT: Yeah, go ahead. Just stand on the other side.

MR. RUFF: Yeah, I'll just (indiscernible) the microphone is -- there we go.

Mr. Schwartz, I just have a question. And it relates to why we are here in Victoria. And on the petitions, there was an address listed for the Debtors where they were located, 5606 North Navarro, Victoria, Texas. Are you familiar with that location?

MR. SCHWARTZ: Yes, I am.

MR. RUFF: Okay. And do the Debtors have a lease of that space? Is that what your understanding is?

MR. SCHWARTZ: Well, it's executive suites. We

have two offices there. I guess that's some form of a lease.

MR. RUFF: Okay. So who sits in those office?

MR. SCHWARTZ: There's one desk and one chair and one desk and one chair. So that's...

MR. RUFF: Do you know when those leases were entered into?

MR. SCHWARTZ: Early April I think.

MR. RUFF: So prior to that, prior to early April, they weren't located there?

MR. SCHWARTZ: No.

MR. RUFF: Okay. Now, the petition that was signed under penalty of perjury I believe says that for the greater part of 180 days, the debtors were located at that --

MR. LEE: Objection, Your Honor. This is asking for a legal answer. And if you want to talk about that, we can talk about that.

THE COURT: Yeah. I think that's probably -- well, it's a question. I think the trustee -- I think maybe Mr. Schwartz probably -- you know, like with the remand, maybe someone else can answer --

MR. RUFF: I won't ask for a legal conclusion, Your Honor. I just want to make sure it's clear though that it wasn't the greater part of 180 days that the Debtors were

located there.

MR. LEE: That's not an accurate question, Your Honor. (indiscernible) Dallas, Judge Hale, these Debtors had domicile in every location in the state of Texas for 180 days. So we can have an argument about that --

THE COURT: But we're not going to have it today. What we're going to have is argument (indiscernible) motion in front of the Court that the Court will then consider. Today we're just going to ask very --

MR. RUFF: Your Honor, I was just asking the question to figure out -- to get an idea of why we are here in Victoria.

THE COURT: You can ask questions and people can answer or not.

MR. RUFF: Do you have any idea -- so you had mentioned that Mr. Jones is the one who is going to be filing -- excuse me, funding this process.

MR. SCHWARTZ: Mr. Jones and FSS. Most of the money come from -- of the $9.8, most of it will come from FSS.

MR. RUFF: Okay. Ans is it your understanding that both of those entities are also liable for the same body of claims that we are here to try and deal with?

MR. SCHWARTZ: Well, I must admit, I've not looked at the petitions and complaints in the underlying cases. I

would be shocked if they were not. That's where the money is at.

MR. RUFF: Okay. Any idea -- and again, only if you actually know or whatever. But any idea or any discussions as to why Mr. Jones didn't file for bankruptcy?

MR. SCHWARTZ: Yes.

MR. RUFF: Okay. Do you know why? What was discussed as to why he didn't file for bankruptcy?

MR. SCHWARTZ: I know the discussions because I was involved in some of them. The discussions was, you know, Infowars is a prominent trademark in the conspiracy theories community, if you will. Alex Jones' name is equally as prominent. And so the concern was (indiscernible) FSS, FSS were concerned about losing lenders. In Alex Jones' case, that it would somehow ruin -- harm this trademark, his name and his ability to generate funds, sell merchandise to these people.

MR. RUFF: So that's what was expressed to you at least?

MR. SCHWARTZ: That was what we discussed.

MR. RUFF: And does that make sense to you, that that would -- I mean, he is funding this. the claims are against him. Does it make sense that somehow him being part of a bankruptcy process that is open and transparent -- how does that harm him?

MR. SCHWARTZ: Being put into bankruptcy is what we were concerned about. By putting him in bankruptcy would harm his trademark value, his value to us and generally cashflow. That was the reason as I understood it. And that was the reason I was involved in discussing it.

MR. RUFF: Well, why didn't it harm the debtors that actually filed then? They own intellectual property, don't they?

MR. SCHWARTZ: They own intellectual property, but they are not in the public eye at all. I don't think anyone knew who InfoW was or Infowars LLC was. I would assume, and I think a lot of people did, that that was a significant entity other than the ownership of the trade name, which is significant. That was all the significance to the business operation (indiscernible).

MR. RUFF: Now, you had mentioned that when you were negotiating -- for example, you had mentioned that you said that when you discovered about those royalties, hey, those have to become and be paid directly to -- I forget who it was. I think IWHealth?

MR. SCHWARTZ: Yes.

MR. RUFF: Okay. And when were those negotiations taking place approximately?

MR. SCHWARTZ: Well, they started on the first Monday I was in Austin, right after the April 4th meeting

with Mr. Lee. They probably, you know, went for four or five days (indiscernible) for transferring the (indiscernible) sending money to the trust, we've got to get bank account (indiscernible) for the trust.

MR. RUFF: Okay.

MR. SCHWARTZ: Because the trust was going to own InfoHealth. That's what -- the decision was made to put it (indiscernible).

MR. RUFF: Okay. And were you engaged as the chief restructuring officer at that point?

MR. SCHWARTZ: I don't think so. I think I was engaged on the 8th or 9th of April. I could have been. It was very close to that date.

MR. RUFF: Okay. So the agreement, the trust agreement that you said that you were negotiating, you were not really negotiating on behalf of nay party, were you?

MR. SCHWARTZ: No. Each party had a lawyer there. I guess the trust didn't. But I was the CRO. I guess I was negotiating for the Debtors, because that's who my responsibility was to.

MR. RUFF: Is it more accurate to say you were the proposed CRO at that point?

MR. SCHWARTZ: Correct. I was proposed CRO.

MR. RUFF: Okay. So do you think maybe perhaps it was more accurate to say that you were giving advice as to

how it would be better set up optically?

MR. SCHWARTZ: No. I was not giving advice on (indiscernible). They wanted me to be CRO. I've got a reputation -- I've been in this business for over 40 years. And I've done all kinds of stuff. I worked as a (indiscernible) receiver. I've been special (indiscernible). I've got a reputation. They came to me and they wanted my reputation. You want my reputation. That's one of the things (indiscernible) everything to be clear. If this money does not belong to Alex, shouldn't be going to Alex, (indiscernible) over here. So I didn't put it in those words, and I didn't have to.

MR. RUFF: Sure. So it's accurate to say that if you were going to be a part of this, this is how you wanted it to be done.

MR. SCHWARTZ: I wanted it to be clear, clean, as see-through, and I wanted it to be right. I wanted as much money getting into the pot. I'm not think that this was being negotiated. I'm thinking this is going to be hard to do with $725,000 and $40,000 a month royalty.

MR. RUFF: Right. So I guess my question then is your negotiation was more on behalf of yourself and, hey, if I'm going to be invested in this, this is how I want it to be.

MR. SCHWARTZ: No. At that point in time, my

Case 4:23-cv-00463 Document 39-1 Filed on 03/23/24 in TXSD Page 59 of 566

objective was to get as much money on the table you can get for the benefit of claimants, the claimants. That was our job. Okay? If they wanted me here, then they had let me do my job. And that would continue to be the case. You know, can we get more money on the table is the question I have.

MR. RUFF: Okay. But again, that was your job that you were looking perhaps to do. At that point you had not been engaged, correct?

MR. SCHWARTZ: Correct. I had not been engaged.

MR. RUFF: Okay. So Mr. Jones and presumably some of his professionals were looking to have you engaged in this process at this time. Is that correct?

MR. SCHWARTZ: Well, and they were definitely considering engaging me because I went to their office and they held nothing back from me that I asked f

MR. RUFF: And at that time, they were propping to you this structure. Is that acute?

MR. SCHWARTZ: Yes. They were working on the structure. But the framework was...

MR. RUFF: Did they have a draft of trust agreement, for example, for you to look at?

MR. SCHWARTZ: I don't recall when I first saw that.

MR. RUFF: was it discussed do you believe?

MR. SCHWARTZ: In general, the trust agreement.

MR. RUFF: Okay.

MR. SCHWARTZ: I knew there was on coming. I knew who the proposed trustees were.

MR. RUFF: If -- and that a big if -- if these cases are to go forward, do you think the Debtor or you as the chief restructuring officer of the Debtors would have any opposition to a committee being appointed in these cases?

MR. SCHWARTZ: I mean, whatever the Court wants. I want this thing -- my goal when I walk off this thing five years from now that nobody can question what I did. And if someone wants to have a committee, they'll have a committee. I mean, that's not for me to say. But I don't have a problem with it.

MR. RUFF: All right. Thank you, Mr. Schwartz.

THE COURT: Thank you.

Mr. Lee, let me just ask you. We're not going forward today. Thank you very much, Mr. Schwartz.

MR. LEE: That's correct.

THE COURT: So you agree with Mr. Williams that I think it's premature to set a date on a timing for the motion, call it the trustee motion, until there is some -- until the document stops moving. And then somebody can refile the --

MR. LEE: I disagree -- I apologize.

THE COURT: No, I get it. But I'm just telling you. Because you're asking for this (indiscernible) relief, right? And this is different than -- maybe you refile something and maybe the date gets set. But as of right now, I don't know what version of that document is going to look like based upon the statements that Mr. Okin made. So this isn't a DIP that's going to get tweaked or a disclosure statement where additional sentences are going to get added based upon objections and you kind of negotiate it up. This is a trust agreement that, I don't know, could materially change. Mr. Battaglia tells me it won't or he doesn't anticipate it, but I don't know. Maybe we set a status conference in a week and then we'll know more.

MR. LEE: Your Honor, I fully support that. And let me just add to this that --

THE COURT: Let me get this additional thought out.

MR. LEE: Yes, sir.

THE COURT: At that status conference, you're going to have to help me understand why at a minimum InfoW and Prison Planet are Subchapter V debtors. We haven't taken any evidence today. But based upon what I've heard -- so I'm not ruling on it. You're going to have to help me understand.

MR. LEE: Yes, Your Honor.

THE COURT: And I want to make sure that everybody understands why I'm asking these questions. And it's based entirely on the statutory provisions. Section 1182 of the Bankruptcy Code defines a Debtor as a person that engaged in commercial or business activity. Person is defined in Section 101(41) of the Bankruptcy Code and includes individuals, partnerships, or corporations. So person directly is satisfied, but commercial or business activity, I don't hear any. (indiscernible) comes to those two. And today is not the day to take it up. I just want everybody to give it some thought based on what I heard. I think IWHealth -- and again, I didn't take any evidence. But I did hear Mr. Schwartz say that at least there is a royalty of some amount coming in every month, which I think puts that entity in a different bucket than the other two that I heard. And again, this is just preliminary discussions that I've heard. And I'm putting this in the what kind of case do we have as I ask the questions about third-party funding, you know, the ability for them to cut off the lifeline of a case at any point, the role of the trustees and who they would serve, the role of a CRO, whether a true fiduciary of the estate or working for a trust that has not -- that may not have the best interest of the estate. And it may or may not, but I think at a minimum I need to understand from a foundational standpoint what chapter these cases should be

in.

It sounds like other motions are going to get filed, and I'm not here to prejudice or encourage one way or the other what people are going to file. People will file whatever they file, and we take them up in due course. But based upon what I heard, I think we've got -- I've got to answer that question pretty quickly, and I think it can be done in short order I suspect.

Mr. Lee?

MR. LEE: Yes, Your Honor.

THE COURT: Now I'm going to stay quiet.

MR. LEE: Number one, with respect to the question that you've asked about the two other entities, I can give you the answer today, but I am prepared to answer at the status conference, and we'll present whatever you want that we think satisfies the business rule that you are asking about insofar as these two Debtor entities, and we are happy to do that.

THE COURT: Okay.

MR. LEE: Number two, whatever they want to file, please file. Number three, in our way of thinking about this issue, Your Honor, there's only so much a Debtor can do pre-petition to negotiate with third parties. Like in a DIP, as you all know. We've brought what is best -- what we could do with third parties. We are asking now for the

creditors, the U.S. Trustee, and for you to help us finish those negotiations. Because we don't have the balance of the leverage of negotiations with FSS and Alex Jones. And that's why we are here. And so if the parties want to do that, they should do that. And we encourage that. We've told everybody that. But for people to just nick pick at this thing and to say it's not appropriate, et cetera, they're fine. They can do that. But I want the Court and everyone to know that there is a good faith effort being made here to try to do something constructive with the bankruptcy process. And you're right, it's not perfect. It's not the panacea of all things. But it is a construct devised to bring together the parties to a resolution of a very sad and complex situation. And just like the Boy Scouts, just like the Catholic Diocese, just like any other situation where litigation is at hand, the Bankruptcy Code and the courts are the appropriate vehicles to do this. And we've picked one because we think it's a resolution process that makes sense here. And because, unlike the Boy Scouts, unlike Catholic Diocese, there are not millions of dollars available here. There are limited funds, and we are trying to maximize it so that it goes to the Claimants. And that's part of the reason why we chose Subchapter V, because not only are we qualified to do that, but it's the right vehicle under the Bankruptcy Code to do this. And that's why we are

here.

And again, these are arguments, nothing more than arguments. And we'll come to you at the appropriate time to make these as actual fact and proof. But we'll be here on the status conference when you want us to. I'm going to push the parties to get this trust document done. And I will tell you, I disagree with Mr. Williams and I disagree with the other parties wanting to delay this thing. Because we only have 120 days to get this case done in my view. The trust document is what it is. It will get fixed to the point where I think you will get comfortable with it. The two jurists aren't going to sit on something were either they have been misled or not appropriate.

And for people to suggest that you're going to be snookered by something like this I think is inappropriate. The parties are going to act right on this side of the table, and we're going to do our very best to make sure the process is correct, that it's upright, and that it's in good faith. And I will be here to present all of that to you next Friday, and I'm going to push the parties to get the trust document done and to fix the PSA as you pointed out and the things that you've said so far. And we'll proceed as --

THE COURT: Wait a minute. I'm not approving the PSA. So (indiscernible).

MR. LEE: I'm a little overly-ambitious today, Your Honor. And I apologize for that. But we will be here Friday to take care of whatever you --

THE COURT: I want -- there's a lot of folks here I courtroom and a lot of folks on the phone saying they are going to file things. And once they're filed, we'll take a look at them and we'll take them up. I am making no ruling today on the two matters that were set, the CRO motion and the trustee motion. I very much appreciate all the comments made by the parties. I very much appreciate the statements made by Mr. Schwartz. I know more than I did before I got on. And if parties file things, then we'll take them up. Everybody knows here in Southern District, reach out to my case manager and just let me know something got filed. You know, I'll set a hearing on it.

Why don't we set a status conference? And status conference, again, I don't know if it's going to be an evidentiary hearing. It might just -- but everybody is going to get plenty of notice before any witness is filed. I can carry any witness and exhibit list that got filed. If parties want to supplement it based upon something they may or may not see, they certainly have the right to do so. But I'm not going to -- you know, if you filed something today and you feel like it's good, it will carry whenever something gets heard, probably should take comfort in that.

You know, would Friday the 29th, do you think we could hold it -- would 3:00 work for the parties?

MR. LEE: For the Debtors it does, Your Honor.

THE COURT: Okay.

MR. LEE: I'm sorry, Your Honor. Did you say the 29th?

THE COURT: Yes. That's next Friday I believe. Yeah.

MR. OKIN: Your Honor, if the goal was to have the trust document done and available to parties with time to read it, could I suggest we push it to Monday?

THE COURT: Well, the reason I am not pushing it until that following Monday is I would like to stop and just see where things are. And maybe at that point -- I don't -- there's going to be a lot of moving pieces over the next week, and I want to just stop there, even if it's just to check in. It could be a ten-minute hearing. It could be more. But I want to check in at that point and I want to put the pressure on the parties, which means that some young associate is going to be working all weekend. And all I can say is I've been there.

MR. LEE: Your Honor, if I may ask, are there any specific issues you would like for us to be in a position to address for you at that status conference next Friday?

THE COURT: The only things that are before me are

the two motions. And I've got to check in to see where that is and when the parties wish to go forward on that. And if something else gets filed, then we can talk scheduling on that. But at least it's a good place, we don't lose much time on this.

Does anyone else have anything they wish to say at this time?

MR. WALSTON: Your Honor, Cliff Walston on behalf of the Texas plaintiffs.

THE COURT: Yes, sir.

MR. WALSTON: The only other data point I would like to add is I do believe as to what is coming, the Texas plaintiffs intend to immediately file a motion to lift the stay before Your Honor and a motion to remand the trial court proceedings back to the state court. In particular, the trial that was supposed to start on Monday. And I think that it's important to --

THE COURT: But can you just -- something -- I don't know -- I heard the word remand. I have not heard the word removed.

MR. WALSTON: Yes, Your Honor.

THE COURT: I don't know what the status of that litigation is and where it is. Maybe you can help me with that.

MR. WALSTON: Sure. I'll help you. I'd love to

fill you in on the details of that.

As we all know, Mr. Lee filed this plan in the wee hours of Monday morning. At 9:30 Monday morning of this week, the plaintiffs in that lawsuit non-suited Infowars LLC.

THE COURT: Okay.

MR. WALSTON: Infowars LLC was the only debtor that was a defendant in that case. The other two debtors are not parties to that case. Then after at 3:30 p.m., even though by operation of law, Infowars LLC was no longer a party to that litigation because the notice of non-suit had been filed and under state law becomes effective upon filing, Infowars nevertheless removed that case to the Western District in Austin because that case was set to proceed in Austin. And they had a pretrial hearing on Wednesday of this week previously scheduled to handle all pretrial matters in addition. The court there had requested an especially large jury pool of extra jurors to show up on Monday.

And so ultimately after a contested hearing on Wednesday about whether that removal was proper, even though at the time of removal Infowars was not a party to that case, the court ultimately decided there in the trial court that the plaintiffs needed to go to the court of -- to the Austin bankruptcy court, Western District Bankruptcy Court,

seek remand of that trial court back to her. And she informed all of the parties that the very first possible day after that case hits back and she is able to get a hundred jurors in that courtroom, that they were going to start trial.

THE COURT: So that's the question. You kind of got to it. So it's not before me.

MR. WALSTON: It is not before you. The motion to lift --

THE COURT: (indiscernible).

MR. WALSTON: You said what is going to be filed.

THE COURT: No, I appreciate it.

MR. WALSTON: None of the cases -- so there were three cases for the Texas plaintiffs set back to back to back. The first was supposed to start on Monday. The second one was June, I believe. And the third one is set for August, I believe. So all three of those cases were removed to the Western District as a part of this filing.

What is before you though is in the second and third of those cases, Infowars LLC is still a defendant in those cases. So we will be seeking to lift the stay as to those two, to then go to the Western District to seek remand of those two cases, what I'm going to call the June and August trials.

THE COURT: Got it.

MR. WALSTON: But the reason why I raise these issues is because those trials aren't just about liquidating the damages, liquidating these claims. And I actually applaud Mr. Lee for trying to come up with a creative structure to put some money on the table for the Claimants. But those trials will actually determine the nature of those claims and likelihood. And here's why.

The Austin court had already entered a liability finding against Mr. Jones with three key issues. The first was that he was liable for defamation. The second was that he did that with actual malice, which includes an intent to harm element. And the third was a finding that all of Mr. Jones' entities, including Infowars, Free Speech Systems, and Mr. Jones himself, were all alter egos of each other.

And so had that case gone to trial and there had been the liability finding had become final and that claim had been liquidated in terms of an actual dollar amount, there is a very high likelihood that as to Alex Jones individually, that would not have been a dischargeable debt under 523 because it was a damage award against him for an intentional tort in harming these families.

THE COURT: But I guess --

MR. WALSTON: And so it's the nature of the claim as well, not just the amount.

THE COURT: No, I understand that. I guess but

procedurally what's coming our way is a motion to lift stay to --

MR. WALSTON: Two of the three.

THE COURT: Two of the three to allow you to seek remand.

MR. WALSTON: Correct.

THE COURT: In the Western District.

MR. WALSTON: We don't believe we need to seek your lifting the stay as to the one case in which (indiscernible). Correct.

THE COURT: Okay. I just want to make sure procedurally I understood why you were using the word remand.

MR. WALSTON: Yes.

THE COURT: You weren't asking me to remand anything. It's in the Western District. I just wanted to understand where they were.

MR. WALSTON: Correct.

THE COURT: Okay, thank you.

MR. WALSTON: And the other aspect of this too, Your Honor, as we learned from Mr. Schwartz as to the type of money that was generated by Alex Jones and his entities. You know, each year we heard $80 million, we heard it's down to $50 million. So the practical reality for these creditors isn't just a dollar amount. Mr. Jones, since 2012

when this tragedy happened, has apparently generated in excess of half a billion dollars of revenue with his bullhorn. That's how he makes his money. He sells these products because he has an audience of millions and millions of people and he has a very, very loud bullhorn with which to do it.

These individual families don't have that kind of platform. They do in the courtroom. And these cases are every bit as much about having a determination finally made for them, them having their day in court in which Mr. Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional. And that's why there are so many people in this courtroom and stuff.

THE COURT: Yeah.

MR. WALSTON: So those cases are very important to go forward, not just from a claims perspective and what that claim really is, and is that claim even dischargeable, but it's also about them having their day in court and the emotional aspect that comes with that and their right as a plaintiff to have their claims heard by a jury of their peers.

THE COURT: If you file the motion, we'll consider it.

MR. WALSTON: Thank you.

THE COURT: Thank you.

MR. LEE: Your Honor, just one observation to show the power of the bankruptcy system. As soon as we filed, they non-suited us. So it was (indiscernible) Infowars. I just want you to know that.

THE COURT: Is there anything else procedurally I should know about before we -- is there anyone on the line who wishes to address the court? Hit five-star. I didn't mean to neglect anyone who wishes to address the Court. Okay. All right.

I thank everyone today for their participation. I would let everyone know for those of you who are participating by video and by phone, as you can tell, my dial-in number and the GoToMeeting link is on there. It is available at any time for me. So if there is another hearing set, it sounds like Next Friday at 3:00 p.m., it's going to be the same dial-in and the same GoToMeeting link for all cases that are before me. So it's just not -- it's a feature that I'm very proud of that we have here in the Southern District of Texas. Feel free to participate, free to listen in. And I thank you very much for your time and your participation. I thank each of the parties for their time, and I will see everyone next Friday at 3:00 p.m. Thank you.

(Proceedings adjourned at 10:49 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya M. Ledanski Hyde

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: April 27, 2022

# Exhibit 8

  8/2/22, 6:44 PM Case 4:23-cv-00463 Document 6-11 Filed on 03/23/23 in TXSD Page 216 of 566
Alex Jones Gloats About Bankruptcy Plot To Tie Up Sandy Hook Damages 'For Years'

649

STRESS-FREE
PARKING IS SO SWEET
Don't let this deal melt away, take control today.
BOOK NOW
Book Online
SAVE 50
DFW Airport Prepaid Remote Parking.
Prepay. Park. Go.
DFW

AdChoices

HuffPost
Follow
View Profile

# Alex Jones Gloats About Bankruptcy Plot To Tie Up Sandy Hook Damages 'For Years'

Mary Papenfuss - Yesterday 9:14 PM

649
1k
Share
Save

Producer
Will Tooke
Editor
Justin Gaccione
Footage
Getty
Associated Press
HUFFPOST

Far-right conspiracy podcaster Alex Jones gloated on his program about how his latest bankruptcy scheme would slash defamation damages to Sandy Hook families and tie up

Feedback

000921
https://www.msn.com/en-us/money/other/alex-jones-gloats-about-bankruptcy-plot-to-tie-up-sandy-hook-damages-for-years/ar-AA10cDan?ocid=msed… 1/10

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

Jones signed a Chapter 11 bankruptcy protection petition Friday to shield the Infowars podcast parent company, Free Speech Systems LLC, his co-defendant in two defamation cases. It reportedly raked in $65 million in revenue last year.

649

Platinum engagement rings - Latest Results
Ad holidaygiftssearch.com/Platinum engagem...

Jones was found liable for defamation last year in cases in Connecticut and Texas for repeatedly insisting that the 20 first-grade children killed in a mass shooting at Sandy Hook Elementary School in 2012 in Newtown, Connecticut — and their devastated parents — were actors in a fake anti-gun stunt staged by the U.S. government. (Six adults were also killed.)

The trial in Texas, where Infowars is based, is currently being held to determine the amount of damages Jones must pay.

Jones attempted — and was forced to drop — a similar ploy earlier this year when he filed a bankruptcy case for Infowars and for trademark and web-domain rights holding companies in a bid to force a restrictive monetary settlement with the Sandy Hook families.

Jones claimed on his podcast Sunday that his current bankruptcy filing would slash the bond he'll have to post for an appeal to only half of his (declared) net worth— and then he still plans to tie whatever damages are decided within that reduced amount "for years" as his Infowars podcast continues to operate. He also claimed "we've never lied" and that "all we have is our credibility."

Ron Filipkowski
@RonFilipkowski · Follow
Alex Jones says he filed for bankruptcy so his appeal bond on the Sandy Hook judgment will now only be half his net worth, allowing him to tie it up for years and stay on the air.
Watch on Twitter

Microsoft Start
4
Search the web
Feedback

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

10:27 AM · Aug 1, 2022
8.8K
Reply
Share
Read 2.4K replies
649

Jones' money scheme was being played out during dramatic testimony over the pain and suffering of the Sandy Hook families, who not only grapple with the loss of their children in a mass shooting but also are forced to face harassment and death threats by Jones' unhinged supporters who are weaponized by his lies.

Parents of the dead children are suffering from both post-traumatic stress disorder and a constant fear that Jones' followers will kill them, a psychiatrist testified Monday in Jones' Austin, Texas, defamation trial.

"The overwhelming cause of their pain is what Jones is doing," said Roy Lubit, a forensic psychiatrist hired by the plaintiffs.

Lubit pointed to the experience of plaintiffs Neil Heslin and Scarlett Lewis, who lost their 6-year-son, Jesse Lewis, in the massacre.

Heslin has been accosted on the street, and Lewis has installed surveillance equipment and sleeps with a gun, knife and pepper spray at her bedside.

Families are not backing off the fight, despite Jones' latest bankruptcy plot, said their lawyers.

Jones "has once again fled like a coward to bankruptcy court in a transparent attempt to delay facing the families that he has spent years hurting," Connecticut lawyer Chris Matei said in a statement.

But lawyers raised concerns in court Monday at a hearing over the bankruptcy filing about the structure of Jones' latest move — and his timing.

Free Speech Systems is seeking a special kind of bankruptcy protection that allows small businesses to speed through insolvency, Bloomberg reported. It's generally aimed at companies that owe less than $7.5 million. The Infowars parent is claiming more than $50 million of debt — much of it owed to PQPR Holdings, which is owned by Alex Jones, according to yet another lawsuit against Jones.

Feedback

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

fraudulent transfer lawsuit against Jones and Infowars in Texas, said at the Chapter 11 hearing. "This is hardly a small business."

649

Alinor Sterling, an attorney representing Sandy Hook families in one of the defamation suits, expressed "serious concerns" at the hearing "based on discovery done in Connecticut that Alex Jones has been systematically siphoning large amounts of money out of Free Speech Systems."

In the bankruptcy filing, Free Speech Systems listed $14.3 million in assets, including almost $1.16 million in cash and close to $1.6 million in property and equipment as of May 31, The Associated Press reported. It also claimed $79 million in liabilities, with a $54 million debt owed to PQPR Holdings.

Besides the sizable annual Infowars revenue, Jones has been the beneficiary of a secret cryptocurrency angel, who handed over about $6 million worth of the coin in May for a total of close to $8 million worth of cryptocurrency in under a month, the Southern Poverty Law Center has reported.

Joneswill next face a Connecticut jury in September to determine damages in that case. Jury selection began this week.

Jones, who is linked to extremist groups behind the storming of the U.S. Capitol on Jan. 6, 2021, is also the focus of investigators for his role in planning events preceding the violence.
*This article originally appeared on HuffPost and has been updated.*

Feedback

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

© Provided by HuffPost

AUSTIN, TX - APRIL 18: Infowars founder Alex Jones speaks into a bullhorn at the Texas State Capital building on April 18, 2020 in Austin, Texas. The protest was organized by Infowars host Owen Shroyer who is joining other protesters across the country in taking to the streets to call for the country to be opened up despite the risk of the COVID-19. (Photo by Sergio Flores/Getty Images)

# Related...

- Psychiatrist Says Sandy Hook Parents Fear For Their Lives
- Sandy Hook Lawyers Rip Bankruptcy Bid By 'Coward' Alex Jones To Dodge Damages
- Infowars Whistleblower: Staff Laughed At Pleas To Stop Pushing Sandy Hook Lies
- Second Day Of Alex Jones Trial Focuses On Notorious Sandy Hook Conspiracist
- Opening Arguments Begin In Alex Jones' Sandy Hook Defamation Case

## Sponsored Content

Feedback

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

649

Top 10 Deals for Gold Clock!

Ad Microsoft Ads

Kay Mother Heart Charm Sterling Silver

Ad Kay Jewelers

# MORE FOR YOU

Rachel Gold Friendship Bracelet In Pink Mix

Ad Kendra Scott

Kay Diamond Necklace 1/20-Carat Round-Cut Sterling Silver

Ad Kay Jewelers

David Yurman M Shipwreck Coin

Ad David Yurman

Fort Worth Star-Telegram

Texas father killed 2 teen daughters because he couldn't control them, prosecutor says

36 12

Inside The Dodgers on FanNation

Dodgers News: LA Trades Former All-Star to Seattle Mariners for Cash

4 1

littlethings.com

Mystery Pooper School Every Da Superintendent

489 263

Feedback

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

RawStory

Fox News host taken aback when Joe Manchin asks if she fears his bill will 'help our...

821 502

Daily Mail

Footage shows the moment singer is removed from flight by armed police

338 88

649

Got an eye for s
GE SAVINGS
rs who switch and
Ad Progressive Insura

Why Are Thousands of Men Switching to This Brand of...
Ad Wolf & Shepherd

Fine Jewelry Made to Last - Timeless Pieces to Treasure
Ad jcpenney.com

KOCO Oklahoma Ci

Woman dies, 16

during road-rag Oklahoma City,

A woman died and a after shots were firec incident Monday eve

5

USA TODAY SPORTS

+ Follow View Profile

# Why Deshaun Watson's towel habit was key in his suspension ruling

Brent Schrotenboer, USA TODAY - 10h ago

React 369 Comments | 279

Support journalism

Feedback

000927

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

Judge Sue L. Robinson issued her decision against Deshaun Watson Mon[day] with a written ruling that mentions a certain piece of evidence nine times in 16 pages.

649

It's about his towel habit.

The Cleveland Browns quarterback liked to use a towel to drape himself in massage sessions instead of a larger sheet and sometimes even brought his own small or medium towel, according to court records.

***From NFL plays to college sports scores, all the top sports news you need to know every day.***

Why does this matter?

Robinson, the NFL's independent disciplinary officer, handed down a six-game suspension against Watson Monday after he was sued by 24 women who accused him of sexual misconduct in massage sessions in 2020 and early 2021. Her ruling noted the towel evidence nine times, helping her conclude that Watson had a "sexual purpose" in these encounters.

Professional massage therapists typically provide larger sheets to drape clients as a way to avoid unwanted exposure of their clients' private parts. In these cases, the women generally said Watson exposed his genitals to them in

Feedback

000928

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

made easier by his insistence on using a smaller towel instead of a sheet, according to Robinson's ruling.

649

**NFL NEWSLETTER:** Sign up now for exclusive content sent to your inbox

Continue reading

## Sponsored Content

## MORE FOR YOU

YourTango

Mom Who Lasered Son's Birthmark Defends Herself From Criticism Online

CNBC

A 45-year-old who's been 'fake retired' for 10 years shares the surprising lessons he learned...

The Drive

Steel Wheels on the Amish and I

Feedback

000929

8/2/22, 6:44 PM Case 4:23-cv-00463 Document 6-11 Filed on 03/23/23 in TXSD Page 225 of 566
Alex Jones Gloats About Bankruptcy Plot To Tie Up Sandy Hook Damages For Years

© 2022 Microsoft Privacy & Cookies Terms of use Advertise

1k 700 ...

99 76

619 340

The Washington Post

Beyoncé used 'ableist' slur in a new song. After uproar, she's deleting it.

210 279 ...

Arizona Republic

If Kari Lake's dream came true, it would make Donald Trump unable to be president again

198 141 ...

Fort Worth Star-Tele

Texas father kill daughters beca control them, p

FORT WORTH, Texas sister, Sarah, were gi prosecutor on Tuesd

36 12

Feedback

000930

https://www.msn.com/en-us/money/other/alex-jones-gloats-about-bankruptcy-plot-to-tie-up-sandy-hook-damages-for-years/ar-AA10cDan?ocid=mse… 10/10

# Exhibit 9

Filed in The District Court
of Travis County, Texas

AR SEP 27 2021

At 3:30 P M.
Velva L. Price, District Clerk

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN<br>*Plaintiff*<br><br>VS.<br><br>ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and OWEN SHROYER<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN DISTRICT COURT OF<br><br><br>TRAVIS COUNTY, TEXAS<br><br><br>459th DISTRICT COURT |

**ORDER ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

On this day, the Court considered Neil Heslin's Motion for Default Judgment. The Court finds that the Motion should be granted.

**BACKGROUND**

On October 18, 2019, this Court ordered expedited discovery in Mr. Heslin's IIED claim, including written discovery and depositions. Defendants failed to comply with the order in numerous respects. On December 20, 2019, the Court assessed sanctions and held the Defendants in contempt for intentionally disobeying the order. At that time, the Court took under advisement all additional remedies based on representations by Defendants that discovery would be promptly supplemented during the appellate stay. As the Court stated in its prior order, the amount of supplemental discovery would be a factor when revisiting sanctions upon remand. Despite their promises, Defendants failed to supplement any discovery following the

2019 hearing and prior to remand. Defendants also failed to supplement any discovery for nearly three months following remand in June 2021.

On August 26, 2021, a few days before the hearing on this matter, Defendants provided some additional documents to Mr. Heslin, but it is clear these documents do not satisfy Defendants' outstanding obligations. In addition, Defendants did not provide any supplemental discovery responses, nor did Defendants make efforts for a corporate representative deposition to cure their non-appearance. Nor have the Defendants fully and fairly responded to the discovery requests at issue.

**FINDINGS**

The Court now finds that a default judgment on liability should be granted. The Court finds that Defendants' discovery conduct in this case has shown flagrant bad faith and callous disregard for the responsibilities of discovery under the rules. The Court finds Defendants' conduct is greatly aggravated by the consistent pattern of discovery abuse throughout the other Sandy Hook cases pending before this Court. Prior to the discovery abuse in this case, Defendants also violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623) and *Heslin v. Jones, et al.* (D-1-GN-18-001835). After next violating the October 18, 2019 discovery order in this case, Defendants also failed to timely answer discovery in *Pozner v. Jones, et al.* (D-1-GN-18-001842), another Sandy Hook lawsuit, as well as *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that

Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. In sum, Defendants have been engaged in pervasive and persistent obstruction of the discovery process in general. The Court is also faced with Defendants' refusal to produce critical evidence. Defendants have shown a deliberate, contumacious, and unwarranted disregard for this Court's authority. Based on the record before it, this Court finds that Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit.

In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense and determined they would be inadequate in light of the history of Defendants' conduct in this Court. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

It is accordingly ORDERED that a default judgment be entered against Defendants with respect to liability in this lawsuit.

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiffs' Motion. Plaintiffs shall submit evidence regarding the reasonable value of the time expended by their attorneys related to their Motion for Default Judgment subsequent to the December 2019 hearing in this matter.

Dated September 27, 2021.

Hon. Maya Guerra Gamble

# Exhibit 10

XO6 UWY CV18-6046436-S : SUPERIOR COURT
ERICA LAFFERTY, ET AL : JUDICIAL DISTRICT OF WATERBURY
V : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES, ET AL : NOVEMBER 15, 2021

---

XO6 UWY CV18-6046437-S : SUPERIOR COURT
WILLIAM SHERLACH, ET AL : JUDICIAL DISTRICT OF WATERBURY
V : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES, ET AL : NOVEMBER 15, 2021

---

XO6 UWY CV18-6046438-S : SUPERIOR COURT
WILLIAM SHERLACH, ET AL : JUDICIAL DISTRICT OF WATERBURY
V : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES, ET AL : NOVEMBER 15, 2021

**COURT'S RULING**

B E F O R E:

THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

Representing the Plaintiffs:

ATTORNEY CHRISTOPHER MATTEI
ATTORNEY ALINOR STERLING
ATTORNEY MATTHEW BLUMENTHAL
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, Connecticut 06604

Representing the Defendants:

ATTORNEY JAY MARSHALL WOLMAN
Randazza Legal Group
100 Pearl Street
Hartford, Connecticut 06103

ATTORNEY CAMERON L. ATKINSON
Pattis & Smith
383 Orange Street
New Haven, Connecticut 06511

ATTORNEY MARIO CERAME
Brignole Bush & Lewis
73 Wadsworth Street
Hartford, Connecticut 06106

Recorded and Transcribed By:
Patricia Sabol
Court Monitor
400 Grand Street
Waterbury, Connecticut 06702

THE COURT: All right. So I will order a copy of the transcript of the following ruling, and I will sign it and I will place it in the court file as my decision for the purposes of any appeal.

So I'll first address the Clinton deposition issue and the conduct of July 1, 2021. In the July 19, 2021 court filing by the defendants Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet, LLC, they described how in the motion to depose Hillary Clinton, testimony designated by the plaintiffs as highly confidential was filed in the Clinton deposition motion. They explained that this was done because in their opinion, the plaintiffs did not have a good-faith basis to designate the deposition as highly confidential before the deposition had commenced, despite the fact that the Jones defendants had previously done so themselves. And it is not lost on the Court that the highly confidential information was improperly filed in the middle of the first deposition of a plaintiff.

The July 19, 2021 filing is in sharp contrast to the Jones defendants' position at the October 20, 2021 sanctions hearing where the Court addressed what, if any, sanctions should enter. At the October 20 hearing, the Jones defendants claim they could publish confidential information as long as they did not reveal the name of the witness. That is, they argued

unconvincingly that they didn't understand the very protective order that they themselves drafted and asked the Court to approve as a Court order, which the Court did.

The position of the Jones defendants at the October 20, 2021 sanctions hearing did nothing but reinforce the Court's August 5th, 2021 order and findings that the cavalier actions on July 1st, 2021 constituted willful misconduct and violated the Court's clear and unambiguous protective order.

The history of the attorneys who have appeared for the defendants, Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC is a convoluted one, even putting aside the motions to withdraw appearance, the claims of conflict of interest and the motions for stay advanced by these five defendants.

As the record reflects, on June 28, 2018, Attorney Wolman appeared for all five of the Jones defendants. Eight months later, on March 1st, 2019, Attorney Wolman is out of the case and Pattis & Smith filed an in-lieu-of appearance for all five defendants. On February 24, 2020, Attorney Latonica also appeared for all five defendants. Five months later on July 7, 2020, Attorney Latonica and Pattis & Smith is now out of the case and Attorney Wolman is back in the case for all five defendants. Then on

June 28, 2020, Pattis and Smith is back in the case, but now only appears for the four LLC defendants.

But what is perhaps more significant is the transparent attempt to cloud the issues by Pattis & Smith, for example, by listing the names of only three of the four clients they represent when filing the motion to take the deposition of Hillary Clinton and then listing all four clients in the July 19, 2021 filing relating to the issue. And by Attorney Wolman who then argued in his October 20, 2021 file that Infowars, LLC had no involvement in the motion for commission because their lawyer did not list their name on the motion. It is simply improper under our rules of practice for an attorney to do so.

Turning to the issue of the subsidiary ledgers. The five Jones defendants on November 6, 2020 filed with the Court their discovery objections relating to the deposition of Free Speech Systems' accounting manager and current employee, Melinda Flores. In response to the plaintiff's request for subsidiary ledgers, the Jones defendants objected on the basis that the production of the subsidiary ledgers was oppressive, unduly burdensome, disproportionate, harassing and that it will require digging through eight years of accounting. No objection was raised as to the term "subsidiary ledger", although parties frequently will object to a discovery request if they

consider it vague or confusing.

On April 29, 2021, the Court overruled the objection. On May 6, 2021, the Court ordered the deposition of Flores to take place on June 4, 2021 and ordered the documents to be produced by the close of business on May 14, 2021 stating that failure to comply may result in sanctions.

On May 14, 2021, the five Jones defendants responded to the document request and Court order and stating that the subsidiary ledgers were incorporated into the trial balances and had been produced.

At her June 4, 2021 deposition, Flores, the accounting manager, testified that subsidiary ledgers or detail was easily accessible and available to her. She testified that it would show the sources of advertising income and she testified repeatedly that Free Speech Systems maintained subsidiary ledger information. Flores did not believe she was obligated to produce the subsidiary ledgers, and it is unclear as to whether they have been produced.

It was impossible to reconcile the expert hired by Free Speech Systems with the November 6, 2020 objections filed with the Court and with Flores' deposition testimony. While the Jones defendants in their May 5th, 2021 motion state that Flores would be the best employee to identify and produce the requested documents and further state that Flores

would be compelled by Free Speech Systems to produce the requested documents at the deposition, the defendants hired expert, Mr. Roe, said that Flores was wrong and that Free Speech Systems doesn't use or have subsidiary ledgers.

The Court, in its August 6, 2021 order, found that the subsidiary ledger information was easily accessible by Flores by clicking on each general account, that, despite the Court orders and although the information exists and is maintained by Free Speech Systems and was required by the Court order to be produced, it had not been produced. And, again, it is still unclear as to what documents have been produced.

The Court rejected Roe's statements in his affidavit as not credible in light of the circumstances. The Court found that the plaintiffs were prejudiced in their ability to prosecute their claims and conduct further meaningful depositions and that sanctions would be addressed at a future hearing.

At the October, 2021 sanctions hearing, the Court addressed whether sanctions should enter. The Court finds that sanctions are, in fact, appropriate in light of the defendant's failure to fully and fairly comply with the plaintiff's discovery request and the Court's orders of April 29, 2021, May 6, 2021 and August 6, 2021.

Turning to the trial balances. In addition to objecting to the deposition of Flores, the Jones defendants, as I mentioned, filed discovery objections to the request for production directed to Flores. The Court ruled in favor of the defendants on one production request and ruled in favor of the plaintiffs with respect to others.

In addition to the subsidiary ledgers, the Court ordered production of the trial balances. Flores had run trial balances in the past unrelated to this action. Flores testified at her June 4, 2021 deposition that she personally accessed Quick Books and selected the option to generate trial balances for 2012 to 2019. She testified that she ran the reports and printed them out and believed that the reports were produced. Her testimony the reports that she ran were produced was left uncorrected by counsel at the deposition.

The reports were not produced by the Court-ordered deadline of May 14, 2021. They were not produced at her June 4, 2021 deposition, and they have not been produced to date, despite their obligation to do so.

While the Jones defendants, in their May 5, 2021 Court filing, emphasized that Flores would be the best employee to identify and produce the requested documents which would include the trial balances and

that Flores would be compelled by Free Speech Systems to produce the documents at her deposition, not only were the reports not produced, but the Jones defendants in their October 7, 2021 filing now claim that Flores, a mere bookkeeper, provided flawed information to the defendants that the defendants, through Roe, had to correct. And the Court rejects that position.

The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by the Jones defendants' outside accountant were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that their own accounting manager had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiff's request or to the Court's order.

Turning to the analytics. The date for the parties to exchange written discovery has passed after numerous extensions by the Court. On May 14, 2021, the Court ordered that the defendants were obligated to fully and fairly comply with the plaintiff's earlier request for disclosure and production.

On June 1, 2021, the defendants filed an emergency motion for protective order apparently seeking protection from the Court's own order where the defendants again attempted to argue the scope of appropriate discovery.

The Court, on June 2, 2021, declined to do so and extended the deadline for final compliance to June 28, 2021 ordering the defendants to begin to comply immediately on a rolling basis. In its June 2nd order, the Court warned that failure to comply would result in sanctions including default.

With respect to analytics, including Google Analytics and social media Analytics, the defendants on May 7, 2019 represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports, but did not regularly use them. As the Court previously set forth in its September 30, 2021 order, the defendants also claim that on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not the codefendants, an email the plaintiffs state they did not receive and that the Court found would not have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete final supplemental compliance was made by the defendants,

Alex Jones and Free Speech Systems, LLC and that Infowars, LLC, Infowars Health, LLC and Prison Planet, LLC, quote: Had previously produced all documents required to be produced, end quote, representing that with respect to the Google Analytics documents, Free Speech Systems, LLC could not export the dataset and that the only way they could comply was through the sandbox approach.

Then on August 8, 2021, the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for Infowars dot com and not for any of the other websites such as Prison Planet TV or Infowars Health. Importantly, the Jones defendants to date have still not produced any analytics data from any other platform such as Alexa, Comcast or Criteo.

The Jones defendants production of the social media analytics has similarly been insubstantial and similarly has fallen far short both procedurally and substantively, despite prior representations by the Jones defendants that they had produced the social media analytics and despite the May 25, 2021 deposition testimony of Louis Certucci, Free Speech Systems social media manager for nearly a decade, that there were no such documents.

At the June 28, 2021 deposition of Free Speech Systems corporate designee Zimmerman, Mr. Zimmerman

testified that, in fact, he had obtained some responsive documents from Certucci which were then loaded into a deposition chat room by counsel for the Jones defendants. It appears that these documents were minimal summaries or reports for Facebook and Twitter, but not for other platforms used by the defendants such as You Tube.

Any claim of the defendants that the failure to produce these documents was inadvertent falls flat as there was no evidence submitted to the Court that the defendants had a reasonable procedure in place to compile responsive materials within their power, possession or knowledge.

Months later, on October 8, 2021, the Jones defendants formally produced six documents for the spring of 2017 for Facebook containing similar information to the Zimmerman chat room documents, but not included in the chat room documents and screen shots of posts by Free Speech Systems to an unidentified social media account with no analytics.

The defendants represented that they had produced all the analytics when they had not done so. They represented in court filings that they did not rely on social media analytics and this, too, is false.

I'm going to need to take a thirty second water break, please.

(A short break in the proceedings occurred.)

This response was false. The plaintiffs in support of their motion for sanctions on the analytics issue attached as exhibit D, an email dated December 15, 2014 between former Free Speech Systems business manager Timothy Fruge and current Free Speech Systems employee Buckley Hamman. Fruge attaches annotated charts of detailed analytics concerning Jones' 2014 social media audience including gender demographics engagement and social media sites that refer people to Infowars dot com. As pointed out by the plaintiffs, Fruge's annotations are even more telling than the charts themselves and totally contradict the Jones defendants misrepresentations to the Court that, quote: There is no evidence to suggest that Mr. Jones or Free Speech Systems ever used these analytics to drive content, end quote.

The next image on the document shows key indicators on Twitter. Those are engagement and influence. Again, this is reading from Fruge's notes. Again, the next image shows the key indicators on Twitter. Those are engagement and influence. Notice our influence is great and our engagement is low. I bring this up -- again these are Fruge's notes -- because we should try and raise our engagement with our audience. Engagement is how well we are communicating and interacting with our audience. The higher our engagement, the more valuable our audience

will become to our business. And that is the end of Fruge's notes.

I would note that regardless of this reliance on social media analytics, the concept is simple. The defendants were ordered to produce the documents and our law requires them to produce information within their knowledge, possession or power. Discovery is not supposed to be a guessing game. What the Jones defendants have produced by way of analytics is not even remotely full and fair compliance required under our rules.

The Court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiff's ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants.

Neither the Court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to is fundamental fairness that the other side produces that information which is within their knowledge, possession and power and that the other side meet its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

Here the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

The Court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous Court orders, and they have not.

In addressing the sanctions that should enter here, the Court is not punishing the defendants. The Court also recognizes that a sanction of default is one of last resort. This Court previously sanctioned the defendants not by entering a default, but by a lesser sanction, the preclusion of the defendant's special motions to dismiss. At this point entering other lesser sanctions such as monetary sanctions, the preclusion of evidence or the establishment of facts is inadequate given the scope and extent of the discovery material that the defendants have failed to produce.

As pointed out by the plaintiffs, they are attempting to conduct discovery on what the defendants publish and the defendants' revenue. And the failure

of the defendants to produce the analytics impacts the ability of the plaintiffs to address what is published and the defendants failure to produce the financial records such as sub-ledgers and trial balances affects the ability of the plaintiffs to address the defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was caused by the Jones defendants willful noncompliance, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.

For these reasons, the Court is entering a default against the defendants Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC. The case will proceed as a hearing in damages as to the defendants. The Court notes Mr. Jones is sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all the defendants have failed to fully and fairly comply with their discovery obligations.

As I said, I will order a copy of the transcript. I will sign it and I will file it in the Court as the Court's order.

Bellis, J.

XO6 UWY CV18-6046436-S : SUPERIOR COURT.
ERICA LAFFERTY, ET AL : JUDICIAL DISTRICT OF WATERBURY
V : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES, ET AL : NOVEMBER 15, 2021

---

XO6 UWY CV18-6046437-S : SUPERIOR COURT
WILLIAM SHERLACH, ET AL : JUDICIAL DISTRICT OF WATERBURY
V : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES, ET AL : NOVEMBER 15, 2021

---

XO6 UWY CV18-6046438-S : SUPERIOR COURT
WILLIAM SHERLACH, ET AL : JUDICIAL DISTRICT OF WATERBURY
V : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES, ET AL : NOVEMBER 15, 2021

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in the Superior Court, Judicial District of Waterbury, at Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 15th day of November, 2021.

Dated this 15th day of November, 2021, in Waterbury, Connecticut.

Patricia Sabol
Court Monitor

# Exhibit 11

CAUSE NO. D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE, | ) | IN THE DISTRICT COURT |
| Plaintiff, | ) | |
| vs. | ) | TRAVIS COUNTY, TEXAS |
| INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and KIT DANIELS, | ) | |
| Defendants. | ) | 261ST JUDICIAL DISTRICT |

ORAL AND VIDEOTAPED DEPOSITION OF

BRITTANY PAZ, CORPORATE REPRESENTATIVE OF

FREE SPEECH SYSTEMS, LLC

February 15, 2022

ORAL AND VIDEOTAPED DEPOSITION OF BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on February 15, 2022, from 9:03 a.m. to 3:34 p.m., before Amy M. Clark, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Kirker Davis, LLP, 8310-I North Capital of Texas Highway, Suite 350, Austin, Texas 78731, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR PLAINTIFF:

Mr. Bill Ogden
Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, Texas 77008
Telephone: (713)221-8300
Fax: (713)221-8301
Email: bill@fbtrial.com
Email: mark@fbtrial.com

FOR DEFENDANTS:

Ms. Jacquelyn Blott
Law Office of Jacquelyn W. Blott
200 University Boulvard
Suite 225, No. 251
Round Rock, Texas 78665
Telephone: (512)639-9904
Email: jblott@jblottlaw.com

ALSO PRESENT:

Mr. Manuel Martin, Videographer

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC | |
| Examination by Mr. Odgen | 5 |
| Examination by Ms. Blott | 265 |
| Further Examination by Mr. Ogden | 268 |
| Signature Page | 280 |
| Court Reporter's Certificate | 283 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Email from Kit Daniels to Infowars Staff, 6/7/18 | 31 |
| Exhibit 2 | Web message, Use the links on the left to browse saved web pages. | 97 |
| Exhibit 3 | Web search message, Page no longer available | 97 |
| Exhibit 4 | Defendant's Amended Responses to Plaintiff's First Request for Production | 117 |
| Exhibit 5 | Defendant's Responses to Plaintiff's Second Request for Production | 125 |
| Exhibit 6 | Defendant's First Supplemental Answers to Plaintiff's First Set of Interrogatories | 137 |
| Exhibit 7 | Social media post | 140 |
| Exhibit 8 | Prison Planet dot com post | 141 |

EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Defendant's Answers to Plaintiff's Second Set of Interrogatories | 148 |
| Exhibit 10 | Photograph | 159 |
| Exhibit 11 | Post from 4chan | 162 |
| Exhibit 12 | Infowars internal system screen capture | 168 |
| Exhibit 13 | Defendant's Answer to Interrogatory Regarding Net Worth | 176 |
| Exhibit 14 | Profit & Loss, 2020 | 184 |
| Exhibit 15 | Balance Sheet, 12/31/20 | 195 |
| Exhibit 16 | Income statement | 195 |
| Exhibit 17 | UCC Financing Statement | 196 |
| Exhibit 18 | Notepad | 219 |
| Exhibit 18A | Handwritten notes about conversation with Mr. Jones | 254 |
| Exhibit 18B | Handwritten notes, 2/14/22 | 261 |
| Exhibit 18C | Handwritten notes, 2/15/22 | 262 |

THE VIDEOGRAPHER: We are on the record on February 15th, 2022 at 9:03 a.m. This is the videotaped deposition of Brittany Paz.

BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. OGDEN

Q. Could you please introduce yourself to the jury.

A. Sure. My name is Brittany Paz.

MS. BLOTT: And, just for the record, we're gonna take this subject to the protective order that's been entered in this case.

MR. OGDEN: Okay.

MR. BANKSTON: There's no protective -- is there a protective? I don't think we have one. I'm not sure we do.

MS. BLOTT: Okay.

MR. OGDEN: I don't think we do.

MS. BLOTT: My apologies. I will have to check that.

THE WITNESS: Before we get started, can I amend something that we talked about yesterday?

MR. OGDEN: It's kind of a different case.

THE WITNESS: Well, I --
MR. BANKSTON: You get to read and sign.
MS. BLOTT: No. No. No. She --
THE WITNESS: Well, I want to add something. Just -- it was on the subject of -- Attorney Bankston asked me about a Bloomberg article that was referenced by Mr. Jones. And I didn't know which article it was. But I located the article. So I just wanted to bring it to your attention and put it on the record.
MR. OGDEN: I don't --
MS. BLOTT: It's an entirely different deposition.
THE WITNESS: Yeah. Okay. Okay.
MR. OGDEN: Different case, different subject matter.
THE WITNESS: Okay. Well, I guess Attorney Blott can email you.
MR. BANKSTON: We're not terribly concerned with what your attorney's prepared you on after your obligations for that deposition.
THE WITNESS: It wasn't --
MS. BLOTT: I'm gonna object. Because --
THE WITNESS: It wasn't anything she prepared me on. But, okay.

MS. BLOTT: Go ahead.
MR. BANKSTON: Well, I mean, just because this is put on the record, and it may be used in the Sandy Hook case, and I was taking that deposition. It's our position, Ms. Paz was ordered by the Court to appear yesterday for a deposition, prepped on those topics. We do not feel she was prepared. And anything she did last night, after the obligation of the deposition, is completely irrelevant to us. That's our position on the Sandy Hook case.
Q. (By Mr. Ogden) All right. So what -- Ms. Paz, what do you do for a living?
A. I am a practicing attorney in Connecticut.
Q. Today we are obviously in Austin, Texas.
You're not gonna be practicing law today, correct?
A. No.
Q. What are you -- what were you tasked with doing today?
A. For this deposition?
Q. Yes.
A. In the Fontaine deposition, I was tasked with being the corporate representative for Free Speech in relationship to the petition that he filed.
Q. And you just used the term corporate

representative.
What does that mean to you?
A. It means that I am a fact witness on behalf of the company.
Q. Okay. And does that job require -- have responsibilities with it?
A. I think I was tasked and have the responsibility to speak -- speak coherently on what the company knows or knew at the time that the allegations were made about the allegations in his petition.
Q. And that's it?
A. In relation to this case?
Q. Yes.
A. Yes.
Q. Okay.
MR. OGDEN: Do you have a copy of the notice?
MR. BANKSTON: It ought to be in your book. I can show it to you.
MR. OGDEN: Yeah.
MR. BANKSTON: One second.
Q. (By Mr. Ogden) When were you retained to be the corporate representative in this case?
A. It was at the same time as what the previous case is. So January 31st, February 1st, around that

time. It's about two weeks ago.
Q. Who retained you?
A. The company.
Q. No. Who specifically?
A. I believe Mr. Jones retained me.
Q. He called you?
A. Did I speak directly to him at the time? No. I spoke to Attorney Blott.
Q. So Ms. Blott reached out to you to be the corporate representative?
A. And Mr. -- and Mr. Pattis.
Q. Okay.
A. So Attorney Blott and Mr. Pattis.
Q. Was it kind of like a conference call with everybody on it, or did Mr. Pattis call you and then Ms. Blott called you?
A. I think Mr. Pattis called me and then Attorney Pattis called me.
Q. Okay. And you have a relationship with Mr. Pattis, correct?
A. I have a prior professional relationship with Attorney Pattis, yes.
Q. Okay. Do you have any personal relationship with him in any way, as you sit here today?
A. No.

Q. So y'all aren't friends?
A. I wouldn't consider us friends. I consider us work colleagues.
Q. When Mr. Pattis called you to be the corporate representative for Free Speech Systems and Infowars, LLC, what was your reaction?
A. I don't know that I had a reaction. He had a need for someone to serve as the corporate representative. He asked if I would be able to do so, given the time constraints and my other work obligations. I considered it. We had some discussions about it; and, ultimately, we decided it would work.
Q. You understand that Free Speech Systems and Infowars, LLC have had a couple different corporate representatives previously, correct?
A. Yes.
Q. And so -- and when Mr. Pattis retained you, did he tell you that time constraint of you only have two weeks to prepare?
A. Yes. I was aware. I think I had already seen the deposition notice.
Q. And did -- when Mr. Pattis was telling you about the time constraints, did he also mention the amount of work and materials that would go into being prepared for these depositions?

A. Yes.
Q. Okay. And so he told you, Mr. Pattis did, that you'd have to review over a hundred thousand pages of documents?
A. He said that there were those types of volumes of documents that were a part of the case, yes.
Q. And you agreed that you were, you know, able-bodied enough to be able to be prepared and review every single one of those documents?
A. I don't think anyone is able to review every single one of those documents. I think what I was tasked to do is try to be as prepared as possible, given the time constraints, because the Court ordered a corporate representative to come in and cogently talk about these topics. And I did that to best of my ability.
Q. Okay. And did Mr. Pattis tell you that the judge in these cases on the record -- and we have the transcript -- went into pretty good amount of detail as to what she expected out of you as the corporate representative in these depositions? Did you know that?
A. I didn't read the transcript, and I don't think he read the transcript. I read the deposition notice.
Q. As we sit here today, if the judge had expectations of what a corporate representative should

be prepared to do, would that be something you'd probably find helpful as you were getting started in preparing for these depos?
A. Would I have found it helpful to have read the transcripts?
Q. Of what the judge specifically said for you, as the corporate representative, to be prepared to do in these rooms the last two -- yesterday and today?
A. Sure. It would have been helpful. But I did review the depo notice.
Q. So if the judge said, I expect every single document to be read, would you understand that to mean that the corporate representative that sits down for these depos should have reviewed every single document?
A. I don't know that that's what was said.
Q. I'm not asking you if you know that that's what was said.
I'm saying: If the judge said that, you would understand that to mean whoever's sitting in the chair that you were sitting in right now should've reviewed every single document that was produced in discovery?
A. I don't know. I don't know the answer -- how to answer that. I don't think it's possible for one person to read all those documents.

Q. I think you're right.
So would it surprise you to know that the judge, on the record -- we have the transcript, if you'd like to review it on break -- said this would likely require multiple corporate representative designees for different topics to share the brunt of what would be expected.
Did you know that?
A. I don't know. Like I said, I haven't reviewed the transcript.
Q. Right. But one thing we can agree on is that you don't have the capacity to be fully prepared to discuss the topics in detail for the depo notices from today and yesterday?
A. No.
Q. No. You don't agree with that?
A. No. I don't agree with that.
Q. Well, you said just a second ago, to the best of your ability, not I'm completely prepared.
So which is it?
A. I think that I have reviewed documents that are relevant and to be prepared to talk on the topics that the deposition has noticed me for.
Q. That didn't answer my question.
A. I think it did.

Q. Okay. What was my question?
A. Your question was whether or not I am able to testify as to the topics in this -- in this deposition that were noticed as per Mr. Fontaine, and I am able to do that.
Q. Okay. That wasn't my question. But we'll just move on from there.
How much are you being paid?
A. As I testified yesterday, this --
Q. For this case, and this case only, how much are you being paid?
A. It was the same amount as the -- as the case yesterday. So as I testified yesterday, I was paid a flat fee of $30,000, and it encompassed both cases.
Q. Okay. How much did you --
MR. OGDEN: I -- I'm not everyone. Okay.
Q. (By Mr. Ogden) How much of the $30,000 was for today?
A. It wasn't divided up or allocated. It was just a flat $30,000 for the both cases.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
Q. (By Mr. Ogden) So the $30,000 that you were paid was not allocated to the specific time that was done, rather it was just a flat fee to encompass all of

it?
A. Yes.
Q. Okay. Where did that number come from?
A. I believe I testified yesterday that we had -- that there was a starting number and that we negotiated from there.
Q. Okay. Okay. What was the starting number?
A. I believe it was 25,000, and then I negotiated back at 30.
Q. Okay. Where did you get that number?
A. Just given the amount of time that I thought it would take, how many documents I would have to review, how much -- how much time constraints there were with the case, that's -- I thought it was a fair number.
Q. Right. And I'm trying to figure out, why did -- how did you come to the idea that $30,000 was fair?
A. As I just testified, the time that I thought it would require, the documents I would have to review, and the time constraints involved in the case; that's how I came to that number.
Q. How much time did you think it would require?
A. I would think it would require as much time as I could dedicate to it. But, ultimately, it ended up requiring probably around a hundred hours of review

time.
Q. Okay. For this case specifically, how many hours did you take preparing?
A. So with the document review of the -- just specifically related to Mr. Fontaine, including the interviews that I had with Mr. Daniels and other employees in connection with this case, I would say probably in the neighborhood of 10 hours. That also includes preparation with the attorneys discussing the case.
Q. So 10 hours total?
A. Probably, yes.
Q. Okay. Do you remember how many topics were on the deposition notice?
A. I believe there were eight.
Q. All right. So you spent roughly 1.25 -- an hour and 15 minutes per topic?
A. Well, that doesn't -- you told me specifically related to Fontaine.
Q. Correct.
A. So I testified that it's taken a hundred hours of review time total to review all of the documents. So I think that per the eight topics, if we're dividing them up, that would include all hundred hours. But the Fontaine documents specifically, it was about 10 hours.

Q. Right.
A. Right.
Q. And there's eight topics for the Fontaine case --
A. Right.
Q. -- which is why we're here today, right?
A. Right. That would also include the Sandy Hook discovery. So that would include a hundred hours of dis- -- of review of that material.
Q. Are they -- tell me how they're related.
A. A lot of those questions have to do with the company and the business structure of the company and the information about the -- I might be referring to the other deposition notice.
Q. I think you are.
A. Okay.
Q. Okay. I can print this out, if you need it.
A. Sure.
Q. (Inaudible.)
A. I don't recall off the top of my head which ones those are.
Q. Yesterday you came in and you had a pretty, color-coded, tabbed-up binder with a lot of information in it.
You remember that?

A. Yes.
Q. And today you don't have anything?
A. That was marked as an exhibit for that deposition.
Q. Was there something in that binder that you would have needed for today?
A. Most of that binder were the video discoveries, the video -- I'm sorry -- not video discoveries. The summaries that I had of the videos specifically related to Sandy Hook.
Q. Okay. Right. So we don't need those.
A. I don't think we were talking about those for the Fontaine case.
Q. Correct.
A. Right.
Q. So you didn't bring anything with you today for this case?
A. Aside from the supplemental dis- -- production that we produced yesterday.
Q. Okay. And have you reviewed all of that production?
A. I believe so, yes.
Q. When did you review it?
A. Sometime last week and through the weekend.
Q. So that supplemental production was prepared

and ready to go last week --
A. No.
Q. -- and it was given to us today?
A. That's not what I said.
Q. Okay. When did you review that?
A. This particular packet (indicating)?
Q. Yes.
A. It was emailed to me this morning.
Q. Okay.
A. But the materials in here had been started to be put together -- sometime last week we started to put it together.
Q. How do you know that?
A. Because I looked at some of the Fontaine production.
Q. Okay. Which parts of the Fontaine production were you able to see last week?
A. So on our Dropbox that I believe I did mention yesterday, I did see articles. I saw blog posts. I saw -- and social media posts on Twitter, Facebook. I saw -- not just news articles, but articles posted by people on the internet. I believe I saw our article. There wasn't -- there was maybe a couple hundred pages worth of material on that.
Q. A couple hundred. Let's say 200.

A. You could round it.
Q. Okay. So you got an additional 140 pages this morning?
A. Yes.
Q. And you were able to review those fully?
A. I haven't read each and every line of these, no.
Q. Have you looked at every single page, at least?
A. I did try to look at each and every single page. But...
Q. I didn't ask if you tried, Ms. Blott -- excuse me, Ms. Paz. I asked if you have looked at every page prior to you flipping through --
A. I don't know that I looked at every page.
Q. Okay. So it's safe to say if one of the expectations today was to be able to testify to the discovery produced, there's probably some things in there you're not prepared to do, considering you haven't reviewed it all?
A. Well, it was filed this morning -- or yesterday morning. So, no.
Q. Okay. Were you surprised when you got a call from Mr. Pattis to be the corporate representative in this case?
A. I wouldn't say I was surprised. I knew he had

been working on the Mr. Jones case for a couple of years. So I wouldn't say I was surprised.
Q. When you say working on, he's been litigating it?
A. I believe he litigates the Connecticut cases.
Q. Correct. So when he said, hey, I need you to go to Texas, did that surprise you?
A. Not really.
Q. Have you ever given a deposition prior to yesterday?
A. No.
Q. Have you ever served as a corporate representative?
A. No.
Q. Ever gone to a -- you know, have you ever gone through a civil jury trial?
A. Have I gone through a jury trial? No.
Q. Okay. So your background is in criminal law, correct?
A. For the most part, yes.
Q. So when a civil lawyer calls you and says, I'd like for you to be the corporate representative in these civil matters, things you've never done before, you weren't at all surprised?
A. Well, Norm is not only a civil lawyer. But...

No. I wasn't very surprised.
Q. I didn't say Norm was only a civil lawyer.
A. You said when a civil lawyer calls you. So he's not just a civil lawyer.
Q. True or false, Norm's a civil lawyer?
A. He practices civil and criminal.
Q. There we go.
So the answer to my question would be yes, and I don't need all the extra.
You understand that, right?
A. Sure.
Q. Right. Because I sat through yesterday. And, unfortunately, Mr. Bankston is far more patient than I'm gonna be. Okay? I'm just putting it out there.
If I ask a question, answer the one that's on the table.
You're a lawyer. You know what to do, right? Or do you?
A. Is there -- is there an actual question there?
Q. Yes. Do you know what to do when someone asks you a question --
A. Yes.
Q. -- in a deposition?
Okay. Well, then, based on what just happened there, let me tell you that when I'm asking a

question in a deposition, let me finish, and then answer so that Ms. -- the court reporter right here can get down a clear record. Okay?
A. Sure.
Q. Giving you another heads up. Because when you said yes you know what you're doing, you're actually kind of violating a different rule.
When it came to your $30,000 flat rate, how much were you estimating per hour?
A. I don't know if it actually works out to be that. But, usually, my hourly rate was around $350. But given the amount of time, I doubt it's calculated out to be that much.
Q. Sure. I was asking how you came to that number, $30,000.
It's a specific number, correct?
A. Sure. It's a specific number.
Q. Okay. So if you estimated, I guess, what, 86 hours of work times 350 would get us there, correct?
A. That's probably what it breaks down to; but, ultimately, it required more.
Q. Right. Are you gonna charge more?
A. No.
Q. Okay. Who'd you -- you mentioned that you talked with Mr. Daniels in preparation for today, right?

A. Yes.
Q. How long did y'all talk?
A. A couple of hours. I think probably about two hours.
Q. Okay. That was on the phone?
A. No. I spoke to him in person.
Q. Where?
A. At the office.
Q. Whose office?
A. The company's office.
Q. In Austin?
A. Yes.
Q. Okay. When was that?
A. Saturday.
Q. Okay. Who else?
You said you spoke with Mr. Daniels and other employees earlier.
Who else did you talk to?
A. In connection with just the Fontaine case?
Q. Yes, ma'am.
A. I spoke to Mr. Jones; I spoke to Mr. Salazar; I spoke to -- I spoke to the attorneys.
Q. You said that plurally.
Who are the attorneys?
A. I spoke to Attorney Blott; I spoke to Attorney

Pattis.
Q. Okay. What was Mr. Pattis's role in all of this?
A. I just -- generally, we're talking about the depositions and the information that I needed and required.
Q. What'd y'all talk about?
A. I -- I think that's privileged.
Q. I didn't ask you if you think it's privileged. If it's privileged, Ms. Blott will object and instruct you.
But Mr. Pattis isn't an attorney of record here. He's not an employee of Infowars and you, in your capacity, weren't acting as a lawyer.
So I'm gonna ask you again: What did you and Mr. Pattis talk about?
MS. BLOTT: I'm gonna object to attorney-client privilege.
A. I think Attorney Pattis is an attorney for the company, maybe not in this particular case, but he is an attorney for the company.
Q. (By Mr. Ogden) And Mr. Pattis was in Austin?
A. No. He's not in Austin.
Q. You said you spoke to him on this case.
So he's not -- you didn't speak to him

here?
A. In person? No. I spoke to him on the phone.
Q. Okay. And was Mr. Pattis giving legal advice?
A. About this particular case?
Q. Yes.
A. I believe so, yes.
Q. Okay.
MR. OGDEN: I'm just gonna leave that there.
MR. BANKSTON: Yeah.
Q. (By Mr. Ogden) You understand that if practicing law in a state that you're not licensed is an ethical violation and, in most states, criminal.
Do you understand that?
A. I'm not here to testify as to that.
Q. I just asked you if you understood that.
A. I don't understand that.
Q. Okay. Mr. Jones, Mr. Daniels, Mr. Salazar, Ms. Blott, and Mr. Pattis.
Anybody else you spoke to on this case?
A. I don't believe so.
Q. Do you feel, sitting here right now, that you are adequately prepared to discuss the topics that were in the deposition notice?
A. Yes.

Q. Did you think walking into yesterday that you were prepared?
A. As much as I could be, yes.
Q. I didn't ask as much as you could be. I asked if you were prepared, fully prepared.
A. Like I said, as much as I could be, yes. I don't think there was anybody who could have testified any better as to those topics.
Q. Okay. Did I ask that?
A. No.
Q. Did I ask you if you thought there was anyone else that could be better prepared?
A. No.
Q. Okay. Why'd you say it?
A. Because it's true.
Q. Right. But I like hot dogs is true, but I'm not gonna blurt it out randomly in a deposition.
A. It wasn't random.
Q. It wasn't, which is why I'm asking you why you said it.
A. And I just told you.
Q. Cause it's true?
A. No. Because it's relevant to your question.
Q. Okay. I truly want to get on the road back home today. You understand that?

I'm not from Austin; did you know that?
A. No, I don't.
Q. Okay. I know you need to get back home, too, right?
A. Sir, do you have a question for me?
Q. Right.
You -- you have a flight booked this afternoon, correct?
A. Yes, I do.
Q. Okay. And it leaves at 4:00, right?
A. No, it doesn't.
Q. Okay. Then you need to leave here by 4:00?
A. Yes.
Q. Okay. And I'd like to get us both out of here. Truly, I don't want to be here any longer than I can be.
But when you start randomly injecting information into questions that aren't asked, do you understand that that's going to make this a much longer process?
A. Sir, can you pose me a question.
Q. I asked you: Do you understand that?
A. I understand what your point is.
Can you please pose me a question.
Q. Sure. How old are you?
A. I'm 35.

Q. Okay. Where'd you go to law school?
A. Quinnipiac University School of Law.
Q. You said, I believe, you're in your 10th year.
A. Yes.
Q. Where is your office?
A. I have an office in Shelton, Connecticut.
Q. Okay. How -- you -- earlier you said you had a professional relationship with Mr. Pattis.
You used to work for him, correct?
A. Yes.
Q. How long?
A. About five years.
Q. Okay. And that was right out of law school?
A. Yes.
Q. What'd you work -- what kind of cases did you work with?
A. Mostly criminal, but we did do some civil.
Q. Did you handle any defamation cases?
A. No.
Q. All right. There is a number of individuals at the company that are -- that have been with the company for much longer than two weeks, correct?
A. Yes.
Q. Okay. Why do you think that you were the only person, as you stated earlier, that could have possibly

been prepared to testify on the subject matter of these two depositions?

A. Because I think that you have previously tried to depose two other people. Those depositions, they were not adequately able to testify as to the topics that were presented. And I also think that perhaps they didn't have either the time that was required to dedicate to such an undertaking. And, third, that I think that there is no one person that is in charge with -- of this material at the company to testify as to it.

Q. What did you do to prepare to discuss the company's policies regarding the factual vetting of information that Infowars disseminates?

A. Sure. So I've spoken to -- as we testified to yesterday, I've spoken to a number of other people in connection with the policies and procedures. So I spoke to Melinda; I spoke to Daria; I spoke to Rob Dew; I spoke to Alex Jones, a bunch of other people.

And, generally speaking, as far as the vetting procedures for sourcing and articles, the company's position is that it does not engage in journalism. So it requires the vetting be done by the sources that it's citing.

Q. I believe yesterday you said there are no --

there are no policies at Infowars for fact checking, I think is how it came out.

Do you remember that?

A. Right. There are no written policies. But, generally speaking, as I said earlier and yesterday, the company relies on the sources to do their fact checking.

Q. Okay. And the sources were also -- let's back up a little bit.

Also, you said that Infowars doesn't really have journal- -- and by Infowars, you understand I mean Free Speech Systems and its --

A. I understand.

Q. You said that Infowars doesn't necessarily have journalists; it's all punditry-type things.

A. Right. Commentary, blogging, that type of thing; that's right.

MR. OGDEN: Let's mark Exhibit 1.

(Exhibit 1 marked.)

Q. (By Mr. Ogden) Let's mark this as Exhibit 1, now that you gave me that answer.

Exhibit 1, can you read for the jury who that's from?

A. It appears to be from Kit Daniels.

Q. Okay. And you spoke with Mr. Daniels preparing for today?

A. I did.

Q. So you had spoken to him prior to you just telling the jury that there are no written policies and procedures, correct? Correct?

A. May I just look at this for a second.

Q. The question doesn't require you to know what's in there.

I'm just asking you if you spoke to Kit Daniels before you just told the jury that there are no written policies and procedures?

A. I did speak to Kit Daniels.

Q. Okay.

A. And I have seen this --

Q. Okay.

A. -- in the connection with -- this is the company handbook that was produced to me by --

Q. There's no question.

A. -- Melinda.

Q. There's no question on the table. You're just talking.

A. The question was did I speak to Kit Daniels. Yes, I did.

Q. Okay. And I'll -- trust me, I will ask you about Melinda, if I need to.

The front page of Exhibit 1, can you read

who that's to?

A. It says Infowars staff.

Q. Okay. And the subject line, can you read it for me?

A. It says, new editorial policy for all reporters, journalists, and writers.

Q. I swear -- so after reporters, what was that word you said?

A. It says journalists.

Q. And you told us that you have seen this prior to today, correct?

A. This particular email (indicating)?

Q. Exhibit 1.

A. Well, Exhibit 1 is two things. So I want to know what part of it you are asking about.

Q. Did you see the first page before today?

A. No.

Q. Don't you think you probably should have?

A. Sure.

Q. Especially if you spoke to the person that wrote it who implemented the policies, correct?

A. I did speak to Kit Jones [sic]. So, yes.

Q. Daniels, correct?

A. Oh, yes. I'm sorry. I did say Jones.

Q. Mr. Daniels, he withheld this information about

sending this out, a specific policy that was implemented post the filing of these lawsuits?
A. I don't know that he withheld it.
Q. But you didn't know about it, right?
A. I didn't see this. No.
Q. All right. You wish you would have?
A. Sure.
Q. Because prior to me handing you that document, you also told the jury that Infowars doesn't have journalists, and that document appears Mr. Daniels, in a supervisorial [sic] role, that -- is instructing requirements for journalists, right?
A. As I testified earlier, it's the company's position that we're not engaged, generally, in journalism.
Q. Was not my question.
My question was, Mr. Daniels is writing that to researchers and journalists?
A. It doesn't say researchers; it says reporters.
Q. Excuse me. You're right.
Reporters and journalists.
A. That's what it says.
Q. Okay. And the keyword there is journalist, and that's what I want to focus on.
Because you would agree that prior to me

handing you that document, you were going to have this jury believe that Infowars doesn't have journalists.
A. It's the company's position that we're not engaged in journalism.
Q. Wasn't my question.
I asked if you were -- prior to that document being handed to you, your testimony would lead this jury to believe that Infowars doesn't have journalists?
A. Yes. That's the company's position.
Q. Okay. When did that change?
A. What -- what do you mean, when did that change?
Q. Well, you had Mr. Jones three times, Mr. Shroyer, Mr. Dew twice, Ms. Karpova at least once, and that document, in front of you, all stating that Infowars does journalism and has journalists.
So I'm asking you: When did the policy change to where they no longer have journalists and don't do journalism?
A. I don't think it's changed.
Q. Okay. You would agree with me that every single person I listed before you in that last question is more qualified to tell us what Infowars does, correct?
A. No.

Q. You think you're more qualified than which one, which person that I named?
A. Well, first of all, I don't want to ad- -- not just advocate, but I don't want to say that I agree with what you're saying, that these people have said these things in the past.
But I'm here to testify on the behalf of the company, not individual people and what individual people may think about themselves and what they do.
Q. Okay.
A. The company's position is that 98 percent of what we do is commentary on things that have already been in the news cycle.
Q. I heard you say that 98 percent yesterday.
A. Yes.
Q. Very specific number.
Where'd you get it?
A. That's based on my conversations with Mr. Jones and the other employees that -- vast, vast majority of what they do is, like I said yesterday, the production process of looking through the news cycle and what is -- what other sources are saying and commenting on those particular sources.
There are a small percentage of things that would probably be considered independent, such as

the few articles Mr. Salazar did, as an example. But that is not the norm or what the company is engaged in for the vast majority of it.
Q. Okay. And I know that we have to say the company --
A. Yes.
Q. -- because there's a legal vacuum of LLCs.
Who owns the company?
A. Who owns Free Speech?
Q. Who owns Free Speech and Infowars, LLC?
A. I believe Mr. Jones owns Free Speech.
Q. Right. And -- and you understood earlier when I said Mr. Jones has been in a deposition chair, raised his right hand, and swore to God to tell the whole truth three times before you sat here, correct?
A. I know he's given three depositions, yes.
Q. And Mr. Jones also started these companies, right?
A. Yes, he did.
Q. And you're sitting here today saying your testimony is the company's position, but Mr. Jones testifying on the company as the owner and inventer of these companies, we -- we should discount that?
A. I'm saying I don't recall what you're referring to in his depositions. But, like I'm saying, after my

conversations with Mr. Jones and others, as I've already testified, that is the company's position.
Q. Do political commentary, people that do political commentary, do they have a duty to tell their audiences the truth?
A. I think that what we are offering are opinions.
Q. Didn't ask what you're offering. Didn't even get close to that question.
A. Yeah. You said I'm offering political comment.
Q. If you listen carefully, I'll ask it again.
A. Sure.
Q. Do individuals that do political commentary --
A. Uh-huh.
Q. -- owe a duty to their viewers to be truthful?
A. And here's what my problem with the question is. When you're saying truthful, something is truthful if it's capable of being true or false. An opinion is an opinion and capable of being proven true or false. So that's why I'm having a problem with your question.
Q. Okay. The things that a political commentator say that can be proven true or false --
A. Uh-huh.
Q. -- does that individual have a duty to its viewers to be truthful in those positions?
A. So I think that the company's position has been

that they do strive to put forth truthful information. So...
Q. I didn't ask that.
A. And -- but as far as a duty owed to the viewership or whoever's listening to the broadcasts, I think what the company puts forth are the source materials and tells the -- tells the audience where they can go find this information and then that source has a duty to be truthful.
MS. BLOTT: Listen to the question.
Q. (By Mr. Ogden) You've watched a number of hours of Infowars, I'm sure, over the past two weeks.
A. Yes.
Q. Okay. Surely, you've heard Mr. Jones on one of his shows numerous times say his -- kind of a motto that he does when he's signing off that says, we're the truth in journalism.
Surely, you've heard that if you've watched a hundred hours.
A. I -- I do recall him saying something to that effect.
Q. What do you think he meant?
A. I don't know.
Q. Surely, if you're gonna sit here and say that 98 percent isn't journalism, you'd ask him in one of the

interviews right?
A. As I said, Mr. Jones has his own opinions, and this is something that you'd probably have to ask him.
Q. Right. We did. He doesn't think in any way your 98 percent is accurate on any planet.
A. I don't think that that's accurate, based on my conversations with him.
Q. Okay. That's why I asked did you ask when it changed.
Because you read his deposition, right?
A. I didn't read all of them. I think my testimony was I didn't read them all.
Q. Why didn't you read them all?
A. Just time constraints.
Q. Is that the only reason?
A. Yes.
Q. Okay. The depositions that you did read, who gave those to you?
A. They were provided to me on our Dropbox. So it was the materials that were produced in connection with these cases, the Texas cases.
Q. Who created that Dropbox?
A. You -- you know what, I'm not a hundred percent sure. We do have a -- at one time did have a consultant that we worked with to try to put information on the

Dropbox and organize it and try to help us find material, but I don't -- I don't know anything other than that.
Q. A third -- not an Infowars person?
A. No. He's not a --
Q. A third party?
A. A third party.
Q. Surely, he signed the protective order, right?
A. I don't know the answer to that.
Q. You didn't sign a protective order?
A. No, I didn't.
Q. And you're not an employee of Infowars?
A. No, I'm not.
Q. Or Free Speech Systems?
A. No.
Q. Okay. I want to get back to this 98 percent, because you've said it twice under oath, and it seems like you base that number on all of the research and preparation you did for the two depositions yesterday and today, correct?
A. Yes.
Q. What'd you use? Some sort of algorithm or matrix to get to that number?
A. No.
Q. Why didn't you settle for a whole number, like

95 or 99, 97? How'd you get to that 98?
A. That wasn't my number. I think that was a number that Mr. Jones had said that in his estimation that's what he thought we did as a company.
Q. Okay. So Mr. Jones is now the position -- based on the company, the company's position is that Mr. Jones believes that 98 percent of what he does on air is not journalism, correct?
A. I think the company's position is that, not Mr. Jones.
Q. Right.
A. But, yes.
Q. But the company is basing that opinion on an interview it did with Mr. Jones, right?
A. It's not just that interview, no.
Q. Okay. What else is it?
A. It was based on my interviews with the other employees, as to the purpose and types of material that are put on to the air on a daily basis, and how they do their production, and what the purpose of those productions are. So I think that it's based on confirmatory interviews that I did with other people, not just with Mr. Jones.
Q. Okay. Mr. Jones, did -- did he give you a percentage?

A. I believe that that percentage came from Mr. Jones, based on our conversation. But, like I said, it was confirmed by my other conversations with people.
Q. Okay. So other people in the company also are saying 98 percent?
A. I don't think they used that number. But their position to me was that the process is and generally what they're engaged in is commentary on what is in the news cycle and the process by which that happens on a daily basis.
Q. If I ran a business and 98 percent of it was baking cakes and 2 percent of it was doing brain surgery, you would expect that I would be extremely qualified and adhered to the standards for 2 percent of brain surgery that I do, correct?
A. I don't know how to answer that.
Q. Well, let me ask you this: Because 2 percent is journalism --
A. Uh-huh.
Q. -- would you agree that Infowars has a duty to make sure that what they report is true?
A. For the -- for the articles or whatever that are independent reporting, sure.
Q. Okay. And when Mr. Jones or any other personality goes on air and says, I've done the

research; I've seen the data, and this is my conclusion, what is that?
A. It's an opinion.
Q. What if they don't say opinion? What if they say, based on the evidence, this is a fact?
A. I don't think that's what he said. That's not -- that's not what he said.
Q. Who and when?
A. I think you're referring to Mr. Jones' statement that I've done the deep research, and I think this, et cetera.
Q. No.
A. He doesn't -- he did not say it the way you said it.
Q. I'm not saying he did. I'm not talking about that.
A. Okay.
Q. I'm saying if a personality like David Knight --
A. Okay.
Q. -- or Owen Shroyer -- Owen Shroyer, specifically, we'll focus on him -- says I've done the research, and this is a fact.
If that comes out of someone's mouth at Infowars, there's a duty that it should be truthful,

right?
A. I'm sorry. I don't know which statement you're referring to.
Are you representing that Owen did, in fact, say that?
Q. Did you --
A. Or are you saying -- is that a hypothetical question?
I want to make sure I understand.
Q. Well, I'll say it's a hypothetical right now.
A. Okay. If it's a hypothetical and someone is the original source saying this is a fact and I -- this is -- and putting something forth as a fact, then I think there's a different standard, yes.
Q. What do you mean -- what do you mean when you use the term source?
A. What I mean is, is that someone has done vetting of a particular piece of information.
Q. Okay. So when someone's talking about the vetting they've done on a piece of information, that's a source?
A. Right.
Q. So if Infowars is talking about the -- the research and the review of data that they've done, and then they come out with a conclusion at the end of that,

that they would be the source?
A. No.
Q. How is that different?
A. Because when the research that they're referring to are other articles that have cited their own source and have done their own sourcing and their own vetting, that is not -- that is not -- they are -- they are not the source.
Q. Right.
A. The person that the information came from is the source.
Q. Right. But when someone from Infowars takes an independent article and then says, I read this; I've done the research; I've seen this stuff, and this is my conclusion.
A. I don't think that's the context of the statement. I think the context is, is I've read this source, this is what I'm basing my opinion on, and here's my opinion.
Q. Oh. So they definitely used the word opinion?
A. I don't think they definitely used the word opinion, but it was presented as an opinion.
Q. How do the viewers of Infowars know when it's opinion or when it's fact?
MS. BLOTT: Objection; calls for

speculation.
A. I don't know how to answer that.
MR. OGDEN: If you want to restrict those to form and adhere to the Texas rules, I'd appreciate it.
Q. (By Mr. Ogden) Can you repeat your answer, please.
A. I said I don't really know how to answer that. I don't know what somebody else is going -- is going to think.
Q. Okay. If a source is used at Infowars, who determines whether or not they're trustworthy?
A. So I believe this is a conversation we had yesterday, too.
But -- so preproduction, there is a list of sources. Each host has their own list that they -- of preferred sources that they like to go -- that they like to go to. That source is -- it changes over time based on my conversations with -- for example, Nikko, Alex's list now is not Alex's list from when Nikko worked with him.
But, basically, these are sources that the host prefers and has found to be reliable in the past and so would then trust -- trust where the articles are coming from. Excuse me.

Q. And you saw the lists?
A. Did I see the lists for each host? No. I did talk to Daria about what Alex's current list is. But aside from that, I -- I did not do any research for other hosts.
Q. What's on Mr. Jones' current list?
A. I don't know if this is an exhaustive list, but I know that he looks at Drudge Report. He looks at what is trending on Twitter. He looks at Zero Hedge. And there may be two -- two or three others that I'm missing. But there's -- there's a list of five or six different sources.
Q. Okay. Is 4chan on there?
A. No.
Q. Why not?
A. I don't think that he does his sourcing from 4chan.
Q. Does anyone use 4chan to -- for sourcing?
A. I don't think that sourcing is the right word. But I do know that based on my conversations, that certain of the reports -- writers, probably a better word, uses that for tips. But I wouldn't say that it was used -- it's used for sourcing.
Q. Okay. When you say sourcing, are you -- is there an implication that sourcing is reliable?

A. I'm sorry. I don't understand the question. Can you rephrase it.
Q. Something you use as a source is reliable. Something you use for a tip is just kind of -- is what it is and you need to go verify it?
A. Yes. That would be a fair -- fair assessment.
Q. Okay. Now that you've seen Exhibit 1 --
A. Uh-huh.
Q. -- you understand it's from Kit Daniels?
A. I understand it looks like an email from Kit Daniels, yes.
Q. And yesterday you testified he's one of the supervisor roles at the company, correct?
A. Yes. I think he started in that capacity sometime in 2018.
Q. Why would he be sending that out to all journalists, among other people, if Infowars doesn't have any?
A. I don't know why he used these specific terms. I do know that after the litigation, there had been some efforts made to try to put forth some standards, policies, and procedures that weren't in place previously.
Q. Did Infowars -- in the Fontaine case, did Infowars do anything wrong?

A. In the Fontaine case specifically?
Q. Correct.
A. I think that in the Fontaine case, there was a breaking news story; that Mr. Daniels saw a photo circulating on social media. He had seen that photo in a couple of different locations, and he posted an article the same day -- it was late in the afternoon -- and then left for the day. Saw that it was inaccurate and immediately took it down the next day.
Q. The answer to my question is?
A. No.
Q. No, Infowars didn't do anything wrong?
A. No.
Q. Okay. In the Sandy Hook coverage, did Infowars do anything wrong?
A. Can you be more specific.
Q. No. Do you think in any way Infowars did anything wrong in the Sandy Hook case?
A. I don't know how to answer that just because I don't know what you're referring to.
Q. Okay. Their coverage, was any of it wrong or inaccurate?
A. I think that most of the Sandy Hook coverage was opinion statements that -- that the hosts are entitle- -- and writers are entitled to have opinions.

Q. Okay. Was any of it wrong?
A. Wrong factually?
Q. Correct.
A. Which part?
Q. Any of it.
A. I don't know what you're specifically referring to.
Q. Well, I'm trying to figure out why after the litigation started that one of the supervisors at Infowars decided to put a policy in place to protect the company, if the company's position is it didn't do anything wrong?
A. I didn't testify it was to protect the company.
Q. Okay. Why would he put that in place?
A. Because I think that it came to the attention of the company that it was growing, it was -- there were a lot of different people involved, different departments, and that it wasn't being managed or supervised in an appropriate way, and they wanted to make certain policies clearer going forward.
All of these things, like I testified yesterday, there were departments that nobody was talking to anybody, there was really no overall hierarchical structure. So after the lawsuits, there were efforts made to rectify that.

Q. Okay. So based on that answer, you -- we can agree on something, finally, which is the way that these different departments were being supervised was inappropriate?
A. I just think it was not organized well, for -- for a company.
Q. Well, you used the term -- you said they were not managed appropriately.
And then I inferred from that, that we can agree that they were managed inappropriately, correct?
A. I think they could have been managed better.
Q. Right. Wasn't my question.
But --
A. I wouldn't use the term inappropriate.
Q. Okay. Then I'll use it the way that you used it in your answer.
We can agree that Infowars was managed -- the way that Infowars was managed was not appropriate --
A. It --
Q. -- correct?
A. Correct. It could have been done better.
Q. Okay. Can I see that real quick.
A. This?
Q. Yeah. I only have one copy. But...
(Mr. Ogden reviewing document.)

Q. (By Mr. Ogden) That policy, would you agree, was made to protect the company?
A. Which policy? The one in this -- in -- in the email.
Q. Right. The email that has the attachment behind it.
A. Well, the attachment is not the same thing as what is being cited in the email.
Q. Okay.
A. So that's why I wanted to know which policy.
Q. I'm focused on the policy in the body of the email.
A. Okay. So this policy in the body of the emailing regarding possibility of crimes being committed, that's the one you're talking about?
Q. (Nodding.)
A. Okay. What was your question?
Q. It's made to protect the company?
A. I think it was made to give guidance on how to write articles in the -- in the future.
Q. Why was it giving guidance to write articles in the future?
A. Because there was no -- there was no guidance previously.
Q. Okay. And the reason we're giving guidance is

to protect the company, correct?
I'm not sure why we're fighting on this. It helps you.
A. I don't know why it would -- I mean, sure it helps the company. So there could be -- obviate any potential future lawsuits. So, sure, it could help the company.
Q. Okay.
A. It could be for other things. I don't know if the purpose of it was that. But...
Q. The -- it mentions in there that any story involving even the potential for criminal liability needs to be vetted by multiple, in all caps, editors, correct?
MS. BLOTT: I'm gonna object to the extent that it mischaracterized the content.
MR. OGDEN: Ms. Blott -- Ms. Blott, I'm gonna ask you one more time. If you don't follow the Texas rules -- and you can object to form or the other two permissible objections.
MS. BLOTT: Objection; form.
MR. OGDEN: Thank you. I'll ask if I need clarification to cure it.
I mean, I'm not trying to be rude at all, but I'm having a hard enough time getting your witness

to answer my questions, and if I have a bunch of speaking objections for you, that's just gonna -- I -- I don't think that we're gonna be able to do this. We may have to get the judge on the phone. Okay?
(Ms. Blott looking at Mr. Ogden.)
A. I'm sorry. What was your question?
Q. (By Mr. Ogden) My question was, that it needs -- that articles need to be checked by multiple, in all caps, editors, correct?
A. That's what it says.
Q. Why would something need to be checked by multiple editors?
A. I don't know.
Q. Prior to today, you had never seen that email?
A. No. I've never seen this email.
MR. OGDEN: Right.
Q. (By Mr. Ogden) And so whenever I asked you about Topic 1 in your deposition notice, which were the policies regarding the factual vetting of information, nobody even gave you this piece -- this document to prepare, true?
A. No. This -- this doesn't have a Bates stamp on it, so it wouldn't have been included in the -- in the material that I was provided.
Q. So the only thing that you reviewed for this

case was Bates stamped?
A. I don't think the only material I reviewed was Bates stamped. The depositions are not Bates stamped.
Q. Did you review any other documents that weren't Bates stamped preparing for yesterday or today?
A. The depositions, as I said, were not Bates stamped. I don't believe the petitions were Bates stamped.
Q. How many documents did you get through out of the 81,290- --
A. Thousands of documents.
Q. Let me finish my question, please.
Of the 81,297 documents, how many did you get through?
A. Thousands.
Q. How many thousands?
A. I don't know how many thousands.
Q. Tens of thousands? Fives of thousands?
A. Probably 10s of thousands.
Q. Okay. Did you get about half, maybe?
A. I'm sorry?
Q. Halfway?
A. Halfway through what?
Q. Did you get to 40,596 documents through?
That's half of the document production.

A. I don't know. I don't know the exact number.
Q. And probably because you don't is because -- I don't know -- 22,000 of those documents were produced by Infowars without Bates stamps.
Did you know that?
A. I know that there has been an issue with the organization of the production materials.
Q. So surely you weren't shocked when you said that you didn't review -- you've never seen this, but it doesn't have a Bates stamp, right? Because you saw a number of documents that were produced in this litigation that didn't have those, right?
A. Did I see documents without Bates stamps; is that your question?
Q. Correct.
A. I didn't see documents like this without Bates stamps.
Q. What do you mean like this?
A. This is an email.
Q. Sure.
A. I didn't see any emails without Bates stamps.
Q. So we can -- out of the production that's been given to us, all emails that aren't Bates labeled, we can take those out, because you didn't read those?
A. I didn't see any emails that didn't have Bates

stamps.
Q. Okay. Because that'll give us a better idea of what documents you did get through.
A. Okay.
Q. Because there's a number of them.
A. Okay.
Q. Wouldn't you agree that Mr. Daniels is creating a policy for vetting information?
A. For vetting this specific type of information.
Q. Right. So if I say all information, and that's a specific type of information, the answer to my question is yes, true?
A. Not all information. Just this type of information, yes.
Q. Right. Other than the one that I just was -- had the privilege of teaching you about, are there any other policies regarding the vetting of information at Infowars that began February 2018 to today?
A. I don't believe so. But I will say, just -- just a caveat to this is, in my conversations -- I don't want to make you think, like, Mr. Daniels didn't talk to me about this. I was aware of this. I just never saw this particular email.
Q. I --
A. I just -- I just wanted to make sure that

we're -- you're aware of that. It's not that I didn't know that this -- he made this policy. It's just I didn't see this particular document.
MR. OGDEN: Madam Court Reporter, I'm gonna object to all of that as nonresponsive.
Q. (By Mr. Ogden) Other than the policy that you just got put in front of you today, the -- you were also tasked with the -- actually, let's back up. Sorry.
Other than that policy there, are there any other policies Infowars has in place to vet information?
A. To vet information, no.
Q. Okay. So from the inception of Infowars to February of 2000- -- actually, I don't know what the date is on that one.
A. June 2018.
Q. June 2018.
There were no policies for whether or not anybody needed to vet the veracity of information that was disseminated by Infowars?
A. The veracity, no. I do believe, based on my conversations with people, that there was a -- I don't want to say policy, but there was an understanding that there would be multiple sources used for articles, that you wouldn't rely solely on one source. But I don't

think that that's checking the veracity of the information. So, no.
Q. Outside of articles, what about with on-air talent?
A. I think that that would apply on air, as well.
Q. Okay. So anything that went out on air, that was, quote, unquote, journalism --
A. Uh-huh.
Q. -- would have multiple sources to back it up, true?
A. Assuming it was journalism, it should have multiple sources.
Q. Okay. Who told you that?
A. So that's based on my conversation with Mr. Daniels, when I asked him about prior to him being a supervisor, if Kurt Nimmo had the same policy -- we're calling it a policy; although, it's not a written policy, but it is an understanding that it would have multiple sources.
When I spoke to Adan, his position was similar that he agreed that he was expected to cite to more than one source. And that during the writing process -- and they circulate amongst themselves articles -- they would try to check to make sure each other's articles have multiple sources.

But, again, that's not checking the veracity of the source. It's just checking to see if you have multiple sources.
Q. I just asked for names.
A. Sure.
Q. I just asked for who. I didn't ask for anything else. I'll ask you follow-ups, I promise. I've got a lot of them. I'm really good at follow-up questions. It's probably one of my best qualities.
A. I spoke to Adan and I spoke to Kit, and those are the two people I spoke to.
Q. Perfect. Thank you.
Are there any policies or procedures in place when it comes to using anonymous sources?
A. I'm sorry. Can you be more specific.
You mean about like 4chan, like that type of source?
Q. Anonymous social media content. That would be what I am referring to.
A. Okay. So if there is a policy or procedure about checking to make sure that something is -- that's seen on a social media source and it's anonymous.
So when I asked this question, I don't think there's a policy, so to speak. Information, such as 4chan or on social media, I think I said earlier,

those are used more so as tips rather than sources.
So if it's seen on social media, generally, we try to find another source or two, at least make sure where that information is coming from is, like, not a fake page or something like that.
Q. Okay. So -- and by fake page, you mean a page that was recently created with a name of -- that's not an actual person and maybe a picture that's not of a person at all?
A. You mean like the profile picture?
Q. Any of it.
A. So when I talked to -- when I talked to Nikko, his basic premise when he was trying to vet -- vet guests, that was his process by just trying to make sure that a person was who he said he was.
But as I said earlier, I think that -- sites such as 4chan were used more as tips rather than actual sources, and then they would try and go verify it in another place.
Q. Okay. Like Twitter?
A. Like Twitter. On Twitter -- Twitter has also links and cites to other news sources. So, like, if something was trending, it would link to other news articles, things like that. So Twitter could potentially be a source to link to other sources.

Q. You've used the term trending a couple of times today.
A. Yes.
Q. What's that mean?
A. On Twitter, there are -- there are -- I don't -- I'm sorry. I don't personally use Twitter.
But on Twitter, there are news stories that are trending for the day and the time. Some might be breaking news. And so there's things on Twitter with a hashtag that would be trending for that time period.
Q. So the hashtags that are attached to different categories of information, based on that hashtag, something could be trending if it was popular enough?
A. Sure.
Q. Okay. You -- we kind of went into the anonymous social media content policies. And it sounded like there were more like they're not rules; they're, like, guidelines.
A. Guidelines is a good word, guidelines.
Q. Nobody's getting fired if they disseminate something that's completely factually wrong, because they pulled it off of 4chan and threw it up on Infowars dot com, correct?
A. They could be.
Q. Okay. What would make -- was Mr. Daniels

fired?
A. No. Mr. Daniels was not fired.
Q. Okay. Has anybody, to your knowledge, ever been fired for doing that?
A. For doing that? I'm not sure if for doing that, but there are people who have been terminated from the company.
Q. I would assume so. It's been 30 years.
But for the specific topic that we were talking about, which is has anybody ever been fired for disseminating, recklessly, information that's just not true?
A. I don't know.
Q. So when you say -- when I say, oh, they're not gonna get fired, you say they could be.
Pure guess?
A. No. It's not a pure guess.
Q. Okay.
A. Because when I've spoken to Mr. Jones and Melinda, who does HR, there are -- they couldn't name for me specific instances where people had been fired, but it is a possibility and it is listed in the handbook as up to termination. So it is a possibility.
Q. What about prior to June 2018?
A. This handbook was not made in June 2018.

Q. Okay. When was it made?
A. It says effective date 10/1/2012.
Q. Okay.
A. So that was when this was last updated.
Q. I gotcha. So it's your position that that employee handbook was updated in June of 2018?
A. No. I don't believe that this policy was ever incorporated into this -- into this employee handbook.
Q. Was that employee handbook made specifically for Infowars?
A. I don't know. It says Free Speech Systems on it. When I asked Melinda about the handbook, because I did ask to see it, she said it was there -- it predated her tenure there, so she doesn't know who created it or when. It was updated on that date, but it had existed before then.
Q. You did ask Melinda, though?
A. I did talk to Melinda about the handbook, yes.
Q. And when she said she didn't know, surely you went and asked Mr. Jones.
A. Oh, I don't think Mr. Jones would have known. He -- he didn't write this. There was --
Q. Okay. He's been at the company the longest, though, correct?
A. Well, I mean, it's his company, but he wouldn't

have written this.
Q. So he would -- he would know when that was initially implemented?
A. I don't know if he knows that.
Q. Right. Because you didn't ask him?
A. I didn't ask him about the handbook, no. I asked Melinda. There was a -- I can't remember the name of the woman that was there before her. But...
Q. Okay. Let's -- let's break this down.
You asked someone about the handbook, and they said, I don't know, that was before I started here, right?
A. Regarding when it was produced?
Q. Correct.
A. Yes.
Q. And who produced it?
A. She didn't know who produced it.
Q. Why it was produced initially?
A. I don't know why it would have -- why it's produced. But...
Q. Right. So, yet, this person says I don't know, I don't know, I don't know, and that's where you stop your investigation?
A. The person who probably would have known didn't work there anymore, and I didn't know how to reach her.

Q. You used the word probably.
But you don't know, because you didn't ask anybody that was there when it was implemented?
A. I couldn't. That person -- whoever would have been there is no longer there.
Q. You don't think the owner of the company knows when he invoked an employee handbook?
A. No, I don't.
Q. Why?
A. Because I don't think he would have had anything to do with this.
Q. But you had conversations with him, right?
A. I did have a conversation with him.
Q. And you'd seen this document before that, right?
A. Sure.
Q. Okay. So you could have just asked?
A. I could have.
Q. But you chose not to?
A. I don't know that I chose not to. I just didn't ask.
Q. Okay. You either didn't care or you chose not to, correct?
A. No.
Q. Okay. What's the other alternative?

A. That I didn't think he was a good source of information on that particular topic.
Q. Do you think he's a good source of information on any topics?
A. Sure.
Q. Like what?
A. Like what type of business the company is engaged in, as he started the business; like what he is doing on a daily basis on his shows; like some of the structure of the company, that type of information.
Q. What person at the company is in charge overall of making sure all employees follow the rules?
A. There's no one such person.
Q. Okay. So if Alex Jones tries to fire someone because they violated a rule, there are other -- he -- depending on the department, he may or may not have that power?
A. I didn't say that.
Q. Okay.
A. Alex Jones is -- obviously, it's his company. So I'm sure he would have the ultimate say over whether someone got fired or not. But to a lesser extent, if there's some issue within a department, I'm sure the supervisor would take up the issue with the person, whatever the issue was. And if it escalated, I'm sure

Alex would take care of it.
Q. Okay. So when I asked who, if anyone, at Infowars is -- is overall in charge, the answer to that question is Alex Jones?
A. Whether he had the ultimate say, sure.
Q. Were there any policy -- the -- the policies in place in February of 2018 regarding the reliability of 4chan posting -- or the information in 4chan posts and any facts or knowledge informing that position, that's one of the topics you're tasked with, correct?
A. I believe so.
Q. Okay. What was the company's position?
A. On 4chan?
Q. (Nodding.)
A. On 4chan, I think, as I testified earlier, it was more so used as a tip. And then the general position -- guideline, I think is the word you used -- you should always make sure to have multiple sources, and that would include for 4chan.
Q. Okay. Multiple additional sources is what you said?
A. I think -- well, it says here multiple editors. But I think that it -- based on my conversation, it was at least two sources.
Q. Okay.

A. I don't know that there was a specific number attached to that guideline.
Q. Who told you about the two-source rule?
A. When I spoke to Mr. Daniels, he indicated that prior to that -- this time period where he's the supervisor, Kurt Nimmo was the supervisor, that was generally his policy, as well. That was confirmed by Adan when I spoke to him, as well.
Q. Can you remember if you spoke to Mr. Nimmo or not?
A. I did not speak to Mr. Nimmo.
Q. Okay. Any particular reason?
A. I don't -- I don't know that I had his information readily available, and I don't know that I had the time to talk to him. I spoke to a lot of people.
Q. Did you ask for it?
A. For Mr. Nimmo's phone number? Yes. I did ask Melinda for it, and I don't know if she was able to find it.
Q. Did she tell you?
A. Did she tell me?
Q. Actually, let's back up.
How'd you communicate with Melinda?
A. I spoke to Melinda in person.

Q. Okay. And you just asked her for Kurt Nimmo's phone number?
A. I asked her for a bunch of phone numbers, yes; Kurt Nimmo's was among them.
Q. Okay. You don't -- you can't recall whether or not you were given --
A. No. I was not given it.
Q. -- Mr. --
And what was Mr. Nimmo's position in February 2018?
A. I -- I believe at that time he was the lead writer.
Q. Okay.
A. So he would have been, like, the supervisor.
Q. Who's the lead writer currently?
A. I believe it's Mr. Daniels.
Q. Has Paul Watson ever held that title?
A. No. Paul Watson, I believe, has always been a consultant.
Q. Okay. Now, the analytics for the number of pages used for Mr. Daniels' article received by Free Speech from February 14th to February 15th, 2018, are you prepared to discuss that topic?
A. I -- I believe I did see Google analytics, yes.
Q. I asked you if you were prepared to discuss the

topics.
A. Yes.
Q. Okay. When did you see Google analytics? Was that part of this morning, or was that part of when you had it last week?
A. I believe I reviewed the Google analytics when I spoke to Mr. Zimmerman last week, Thursday or Friday, maybe.
Q. And that was for Fontaine, not for the Sandy Hook's, correct?
A. I think for both.
Q. Okay. What did Mr. Zimmerman have to say about the Fontaine case?
A. Specifically about the Fontaine case?
Q. Correct.
A. I think that what he --
Q. Let's back up real quick.
A. Sure.
Q. I don't want any answers to start it might, maybe, I think. Not here for your personal opinion; and, frankly, I just don't care about it. I want to know what you know and only what you know. If you don't know, that's fine; you can say that. We have procedures in place here where we can go and cure these deficiencies.

A. Okay. I'm not --
Q. So don't guess.
A. I'm not -- I don't specifically remember what he said.
Q. Okay. As far as discussing the analytics and the number of page views between February 14th and February 15th for Free Speech Systems, you will be relying wholly on the documents produced to plaintiffs last night, correct?
A. That is a fair statement.
Q. Okay.
(Sotto voce conversation between Mr. Bankston and Mr. Ogden.)
Q. (By Mr. Ogden) Yeah. Those are the documents that were produced.
A. This was what was handed to me by counsel. So I --
Q. Okay. And when it was handed to you, Ms. Blott represented to you that that's what was produced to us last night?
A. I think so.
Q. Okay. Where in the documents -- can you point to where in those documents you are going to pull the analytics for the page use?
A. I'd have to look through every single page,

sir. It was produced -- I've not seen this before this morning.
Q. Okay. So, yeah, so fair to say that if you you've got to flip through everything, because you've never seen some of these before, you're not prepared, right? I'm not trying to trick you. I'm just...
A. No. I mean, I can't off the top of my head tell you a specific number without looking at a document, no.
Q. Sure. Give me a cheat sheet. Look through the document.
A. I -- you want me to flip through all -- couple-hundred pages?
Q. 333.
A. Okay. So, like I said, you want me to flip through all couple-hundred pages?
Q. Sure. If you're -- if you are aware of what you're looking for, it's not hard to flip through 333 pages. We'll wait. I'm okay with some awkward silence.
A. I mean, I don't imagine where it would be.
Q. I bet it's in that stack. You told me that it was.
A. Well, I don't know if it is in this stack. I didn't put this together.
Q. Now you are guessing. And we already talked

about what happens when you guess.
A. I'm not guessing. I didn't put this -- this document together.
MR. BANKSTON: You said that it was in there.
Q. (By Mr. Ogden) Yeah. You told me it was in there, and then you said, well, I don't know if it's in here.
So which one is? Were you lying then or are you lying now?
A. I'm not lying at all.
Q. Sure.
A. I just don't know what's in here, because I didn't put this together.
Q. Okay. Where's the materials you did put together for this depo?
Yesterday you had a very extensive binder with tabs and color-coding. It looked very professional.
Where's the one for today, or are you just -- this one is not as serious as yesterday?
A. It's not that it's not as serious. There weren't a lot of documents in connection with this specific case.
Q. Sounds like there were. You said, how am I

supposed to flip through all these documents to find the analytics?
A. I don't know if the analytics are in here is what I'm telling you.
Q. Why didn't you bring them with you? If you needed them to discuss Topic 4, why didn't you bring the information you needed?
A. I don't know.
Q. Because without that information, it's safe to say, you're not prepared to talk about Topic 4, are you?
A. I can't give you a specific number without looking at it.
Q. Okay. And you don't -- as far as right now, you don't have it?
A. I don't know if it's in here, no.
Q. Okay. Well, I'm gonna represent to you that that's being unprepared. And if I'm wrong, Ms. Blott will correct me right now.
MS. BLOTT: You're wrong.
MR. OGDEN: Okay.
MS. BLOTT: Now, would you like me to tell you why?
MR. BANKSTON: Absolutely not.
MR. OGDEN: I don't, Ms. Blott. Because the witness here, she's supposed to tell me.

Q. (By Mr. Ogden) So, actually, here's my question: Tell me the page used for February 14th, 2018, for the -- for the web -- web page in question in this lawsuit?
A. I think I already answered your question.
Q. How many?
A. I can't tell you a specific number without looking at the document.
Q. Sure. Take your time.
A. I'm not gonna flip through all those pages. I don't know if it's in there.
Q. Okay. Well, what do you --
MR. BANKSTON: I think we need (inaudible).
MR. OGDEN: Actually, let's take a break. We're gonna get the Court on the phone.
MR. BANKSTON: Well, I think we should at least give the court reporter a break.
MR. OGDEN: Yeah. We're gonna -- we're off the record.
MR. BANKSTON: Let's talk about this. We may be suspending the deposition.
THE VIDEOGRAPHER: We are off the record at 10:18.
(Recess from 10:18 a.m. to 10:28 a.m.)

THE VIDEOGRAPHER: We are back on the record at 10:28.
Q. (By Mr. Ogden) Ms. Paz, we just got back from a break. I -- I observed you walk back into the room with Ms. Blott and the documents that you brought with you today.
Were -- did you -- were you able to go through those documents during the break?
A. I did not look through the entirety of the documents. I flipped through it.
Q. Before we call the Court and inform the Court that the question -- a question has been asked verbatim of Topic 4 on the deposition notice, the witness has informed us that the responsive information might be in the set of documents that she brought with her today and she is refusing to look through it to find that information, before we do that, now that we've come back from a break, would you like to change your answers?
A. I don't believe it's in there.
Q. Okay. So if it's not in there and you didn't bring anything else with you for this case, is it safe to say you're not prepared to discuss Topic 4 today?
A. I can't discuss the exact numbers, but the Google analytics are the ones that I reviewed that have been produced in this case. So it's in the production,

but I just don't have it in front of me.
Q. Right. I understand the -- I mean, there's 81,000 pages of documents.
You understand that you're designated here today -- 81,000, that's actually in the Sandy Hook case.
In the Fontaine case, it's like 450 documents, right?
A. It was a much smaller number.
Q. Right. And the -- you understand that you're here as the corporate representative to discuss those documents?
A. The 450 pages that you just mentioned?
Q. If the 450 pages contain the information that's listed in a specific topic that you were given to be prepared for?
A. I don't know if the Google analytics were prepared amongst those 450 pages. I do know that Google analytics were produced in connection with the general Sandy Hook case. So we did not make a differentiation between the -- this case and Sandy Hook case. As far as the Google analytics, we produced analytics for all of our landing pages. Amongst those, would have been this particular article.
Q. You're certain?
A. Right. So what we did was there were thousands

of landing pages for thousands of articles and thousands of videos, and what I reviewed with Mr. Zimmerman were the thousands of -- that Google analytics page that had those thousands of landing pages.
Do I believe those were produced? Is that what you're asking?
Q. No. Are you certain that the information for the Fontaine post is in those analytics?
A. Yes. It would have been in the landing page because it's all of our landing pages.
Q. Okay. Do you understand, as the corporate representative, you are tasked with being able and prepared to discuss the analytics of that post?
A. Yes.
Q. Okay. Are you prepared?
A. I can't testify as to the exact number because I just don't have it in front of me.
Q. Okay. I'll ask my question a simpler way.
Are you prepared?
A. I don't have the number in front of me, so I can't espys [sic] the number.
Q. So would that be on the yes side of prepared or the no side?
A. I don't want to agree with your words.
Q. Okay. I'm not asking you to agree one way or

another.
I'm just asking you if you're prepared to discuss Topic 4?
A. And as I've already testified, I can't testify as to the exact number. I don't have the document in front of me.
MR. OGDEN: Ms. Blott, before we have to call the Court -- I really don't want to.
MS. BLOTT: Is it yes or no?
MR. OGDEN: Thank you.
A. No. I cannot testify to the number.
Q. (By Mr. Ogden) No, you are not prepared to Discuss Topic 4?
A. No.
Q. Okay. Let's talk about Topic 5, the analytics for the number of pages used after a retraction was posted on April 2nd, 2018.
Are you prepared to Discuss Topic 5 today?
A. That would be the same answer as the previous -- previous one.
Q. Which was, no, I'm not prepared to discuss the topics that were laid out in Plaintiff's Notice of Deposition of a Corporate Representative?
A. As far as the numbers, no.
Q. I'm sorry.

As far as the numbers, no, you are not prepared or no --
A. That was your question, yes, are you prepared.
Q. Right. Okay. Just making sure. That was a bad question. I will be the first one to say I'm gonna ask bad questions; I do it all the time.
Okay. Topic No. 6, the company's knowledge of Mr. Fontaine.
A. (Nodding.)
Q. Are you prepared to discuss Mr. Fontaine?
A. Yes.
Q. Okay. What did you do to prepare for that?
A. So in addition to speaking to Mr. Daniels, I spoke to -- I think we talked about we spoke to Mr. Salazar. I spoke to Mr. Jones. I reviewed the documents that we had and are in the production. And I think that's the universe of information that I have on that.
Q. Why'd you talk to Mr. Jones about the Fontaine case?
A. I wanted to see what, if anything, he knew about the case.
Q. Did --
A. Which wasn't very much.
Q. Did he know anything?

A. No, not really.
Q. You said not really and you said very much.
So what did Mr. Jones know about Fontaine, specifically?
A. I don't think he really knew anything except that there was this issue that happened and that it was rectified in a relatively short period of time.
Q. I'm not asking you what you think. That's what you know.
A. That's what he conveyed to me is what he knew.
Q. Let's slow down. I promise, I'll let you finish your answer, if you let me finish my question.
I'm not asking you what you think. I'm asking you what you know.
So what do you know?
A. I know that he doesn't know anything aside from the article went up and it was taken down in a relatively short period of time.
Q. Okay. That's Mr. Jones' knowledge of Mr. Fontaine?
A. Right (nodding).
Q. Okay. What did Mr. Salazar have to say?
A. According to my interview with him, he thought that it -- the article went up relatively late in the afternoon, but there were some red flags relatively

shortly thereafter within a few hours. I think it was pretty late in the afternoon, and I think that what he conveyed to me was that there -- I believe people had left for the afternoon already, but that they had talked about it amongst themselves, and that they agreed that it should be taken down, and so it was taken down.
Q. Who is they?
A. According to my conversation with Adan, is he spoke to the other writers. I want to say one of them -- his name is -- you know what, I'm not really sure the other two names. There's two other names. And then had spoken with Kit, and then they all agreed that it had been -- that it should be taken down.
Q. Okay. If I wanted to know what other two writers were in the editorial discussion as to whether or not to take the post down, how would I ascertain that information?
A. I could -- I could probably get their names. I just can't remember off the top of my head right now.
Q. How would you get them?
A. I'm sorry?
Q. How would you get those names?
A. I could ask for them.
Q. From whom?
A. From either Mr. Jones or Mr. Salazar or

Mr. Daniels.
Q. Let's back up a little bit.
I thought you said Mr. Jones' knowledge was restricted to only knowing that a post went up and a post came down?
A. He knows who is in his writers -- in his writing department.
Q. Okay. Are those the only two other writers in his writing department, or are there more?
A. There's a group of three writers that are generally the three main writers.
Q. Who was working that day?
A. I'm sorry. I don't have that informations in front of me.
Q. Okay.
A. I -- I think we produced an exhibit yesterday that might -- it might have been in there. But...
Q. And again, might, may, I thinks, I don't want them.
A. Okay. I'm not sure.
Q. Not fair to jury.
A. All right.
Q. The only job -- you have a couple of jobs sitting in that chair today. One of them is don't guess.

And whether or not it's been produced is irrelevant to me. Because I want to know, as the corporate representative tasked with discussing these topics, what you know. Okay?

Other than the two unknown writers, Mr. Salazar, Mr. Daniels and Mr. Jones, did anyone else at the company have any knowledge of Mr. Fontaine?

A. No.

Q. And I'm saying that from the date of February 4th, 2018, to today.

A. No. We don't have any other information on Mr. Fontaine.

Q. Okay. You don't -- no one knows where he lives, correct?

A. I believe I read in an article he lives in Massachusetts. But other...

Q. Was it an Infowars article?

A. No.

Q. So then why do I care?

A. That's why I'm saying. You're asking me what I know, and I'm telling you what I know.

Q. On behalf of -- I'm not asking for your personal knowledge. I'm asking you your knowledge as the corporate representative. And I know it's a confusing topic for people that don't do this all the

time, and I'm trying to be patient with you.

But when I say what you know, it means what you know, based on the list of instructions on information you were supposed to go and prepare.

A. And I do know it based on that, because it was in the production.

Q. Okay.

A. I didn't do any independent research, if that's what the question is.

Q. Okay.

A. I read it in the production.

Q. When you read it, did you ask: Hey, where'd this come from?

A. Where did the piece of paper in the production come from?

Q. Correct.

A. No. I didn't ask where it came from.

Q. Did you ask who pulled it and why?

A. No.

Q. Okay. Did you ask where this was saved? Are there any others in that folder?

A. In what folder?

Q. Whatever folder this was in.

A. I don't know what folder you're talking about. It was in -- amongst the production material in the

Dropbox for this particular case.

Q. Okay. So an attorney gave you a document to review, and you saw that it contained information about the plaintiff, right?

A. Information about where he lived, yes.

Q. Information about the plaintiff. Not splitting hairs here.

A. Right.

Q. And so then when you got the deposition notice and you saw the company's knowledge of the plaintiff, and you were like, oh, that document definitely is knowledge of the plaintiff, you didn't ask any follow-ups as to, hey, where'd this come from? Why? When?

A. I didn't really think it was a relevant question just 'cause it was clearly not our article.

Q. So it's -- does this ask for the knowledge of Infowars' articles of the plaintiff?

A. No.

Q. No. It isn't.

Other than that one article, were there any other articles that you came across or that were given to you?

A. There were numerous articles in the production.

Q. About Mr. Fontaine?

A. About the issue for which he is suing, about -- I don't know if there's any more personal information about him, other than where he lives in the articles. But there were numerous articles.

Q. Okay. Is it all in that production?

A. This production (indicating)? It's not in this production.

Q. Is it in the previous production of the Fontaine case?

A. That's where I saw it on the Dropbox.

Q. Did you do any -- did you do any searching on your own to figure out if there were any other documents about Mr. Fontaine at Infowars that were not in the production?

A. Did I independently do a search?

Q. Right. Because yesterday you said that you did a pretty in-depth search in the Sandy Hook case while you were at Infowars searching for documents and different things.

And so I'm asking you: Did you do the same thing in the Fontaine case?

A. Well, yesterday what I testified to was I did a search trying to -- trying to narrow down documents that I should look at. So I did a search regarding search terms.

Is that what you're referring to? Did I do the same thing here?
Q. Let's break this down.
Did you do a search -- when you did the search in the Sandy Hook case preparation --
A. Yes.
Q. -- was that search limited to only the documents that have been produced, or was that at Infowars -- you know, their -- their email servers or going through their files or that kind of thing?
A. No. I didn't do any -- I didn't do that, no.
Q. So you relied on the documents that were given to you by an attorney?
A. Right.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
Q. (By Mr. Ogden) I just conferred with my co-counsel, and he went through the indexing of the first set of production. And last night he and I had the benefit of going through the new set of production. We don't see any of the articles that you're talking about.
A. I'm sorry.
Q. We don't see any of the articles that you're talking about referencing where Mr. Fontaine lives, what state he lives in, anything like that.

A. I disagree. I remember -- I recall specifically reading articles.
Q. Okay. Show me.
A. I don't have the entirety of the production that has been produced in this case. I have the supplemental production, but I don't have that production.
Q. You have -- so all this -- all this information was sent to you on Dropbox; is that true?
A. Right.
Q. You keep this in Dropbox.
Okay. Did you bring your computer today?
A. Sure.
MR. OGDEN: Okay. Let's take a break. Let her pull her computer out and find the documents in the production that she has in the Dropbox, and then she can point us to what she's talking about.
THE VIDEOGRAPHER: We are off the record at 10:42.
(Recess from 10:42 a.m. to 11:02 a.m.)
THE VIDEOGRAPHER: We are back on the record at 11:02.
Q. (By Mr. Ogden) We just took a break so that you could look through some materials on your computer to find the document that we were talking about.

The stack of documents that's next to you, is that the production that was made last night?
A. I believe so, yes.
Q. Okay. Can you flip to the last page.
A. (Witness complies.) Okay.
Q. Okay. Can you read Bates number on it?
A. The last one?
Q. Yes, ma'am.
A. DEFS000334.
Q. Okay. The article we were talking about that identifies personal information about Mr. Fontaine, what's the Bates number on that?
A. This one says Fontaine 001103 through 1104.
Q. Okay. That would signify that there are 1104 pages of production, correct?
A. I don't know how these Bates numbers are produced, but I think that's accurate, yep.
Q. Okay. Because when I asked you earlier how many documents were involved, we -- it appeared the global number of documents was about 425, correct?
A. I think that was the number you put on it, and I said I didn't know how many documents there were, but that it was significantly less than Sandy Hook.
Q. Okay.

A. I don't think I ascribe -- subscribed to that number.
Q. Okay. The -- how many documents, roughly, did you review in the Fontaine case?
A. A few hundred documents, probably. Definitely -- definitely more than a couple hundred documents. It probably would be in the range of five or 600 pages total.
Q. So if there are 1,104 pages, it's safe to say you didn't review it all?
A. I don't know if that's the end of production.
Q. That's fine.
A. Yeah.
Q. But if there are 1100, you didn't look at 1100?
A. I don't know that I looked at 1100 pages, no.
Q. Probably more like half?
A. I don't know how many.
Q. Do you know when that document was produced?
A. It doesn't say when it was produced.
Q. What article -- what's the source of that article?
A. You mean where did this article come from?
Q. Yes.
A. I don't know how it came to be in our possession. I know it appears to be a -- American

Statesman article dated 4/2/2018. But, otherwise, I don't know where else it came from.

Q. Okay. You don't know who -- who in Infowars found it, saved it, anything like that?

A. That's assuming anybody at Infowars did do that. I don't know if that's accurate.

Q. Okay. So this production could have come from outside of Infowars and someone slapped a Fontaine sticker on it?

A. No. Someone could have sent it to us. It could have been produced in connection with the litigation by one of our attorneys. I just -- just don't know how it came to be in the company's possession.

Q. Okay. So as far as the knowledge of the defendants, with regards to Mr. Fontaine, you aren't sure where that knowledge came from or how it was given, if at all, to Infowars?

A. Regarding his location in Massachusetts?

Q. Yes.

A. Well, I can testify as to the source of my knowledge of these articles. But as far as how these articles came to be in our possession, no, I don't know that.

Q. Okay. And you understand that you're here to

testify on how they came -- our possession? It's not your personal knowledge, but you're here to testify the company's knowledge?

A. Yes.

Q. Okay. You can't do that as far as where this document came from when, why, or how?

A. I don't know where this document came from, no.

Q. Okay. Are there any other documents --

(Mr. Bankston enters.)

Q. (By Mr. Ogden) -- that contain information that Infowars has on Mr. Fontaine similar to this one?

MR. BANKSTON: Bates number on it. Bates don't go that high in this case.

MR. OGDEN: I agree.

Q. (By Mr. Ogden) There any others, besides the one you're viewing now?

A. Yes. I do recall a report from a psychologist. I believe that might have been produced by plaintiffs. I recall reading a letter from his psychologist or therapist.

Q. Okay. So Mr. Fontaine's personal information was shared with you, and you have not signed a protective order; that's true?

A. I don't have -- I didn't sign anything, no.

Q. So true?

A. Yes, that's true.

Q. Did you come across any documents that were stamped confidential during your review?

A. That document may have been stamped confidential.

Q. Do you --

A. I'm not sure.

Q. In general, do you remember any documents?

A. I don't remember anything stamped confidential.

Q. Okay. Other than Mr. Fontaine's mental health records that were given to you by counsel and the article that is Bates labeled Fontaine 1103 and 1104, does the company have any other knowledge of Mr. Fontaine?

A. This might not be the only article that would list his location in Massachusetts. So I don't know if this is the only article. But I think that that's the entirety of what the company knows about Mr. Fontaine; that's correct.

Q. Okay. Did you look at the posts that the company had done that displayed Mr. Fontaine's image?

A. Oh, you mean the -- the specific -- the photograph, you mean?

Q. Any -- any post that the company has made --

A. I viewed --

Q. -- with Mr. Fontaine's photograph?

A. Sure. I viewed the post -- or I should call it an article regarding this -- the Parkland shooting that contained that -- the photograph of Mr. Fontaine.

Q. Did you read the comments?

A. I've read some comments. There -- there are also a bunch of comments on other sites regarding that photograph. But...

Q. Okay. When you were going through -- and I'm gonna mark these Exhibits 2 and 3.

(Exhibits 2 and 3 marked.)

Q. (By Mr. Ogden) When you were reviewing the documents that were previously produced in this case -- give you some printouts.

Do you understand that those are Bates labeled 252 and 296? Do you see that at bottom?

A. I see that, yes.

Q. Okay. Did you come across documents like this when you were reviewing?

A. I did see some photo -- see some pages that looked like this.

Q. Okay. So when you had them, you couldn't access these either, correct?

A. No.

Q. Okay. So when you got them, did you download

them immediately?
A. When I got what?
Q. Well, there's been an accusation in this case that the reason that the production looks like this is because we didn't download them when they were sent; however, we did, and you just verified that you don't have -- yours looked like this, too, correct?
A. What I have in the Dropbox.
Q. Okay. When -- did you ask anybody, hey, where are these web pages?
A. I think that what you just said was what was conveyed to me, which was, there are links that we no longer have anymore.
Q. Okay. So who told you that?
A. I don't know if I can testify as to --
MS. BLOTT: Attorney-client --
A. Right.
MS. BLOTT: Objection; attorney-client privilege.
Q. (By Mr. Ogden) Okay. When were you told that these web pages were no longer available?
A. When I was reviewing the Fontaine material this past week.
Q. Okay. So it was in the last seven days?
A. Right.

Q. Once you informed them that the pages were no longer available, was that the end of the conversation, or did it go any further?
A. When I was informed?
Q. Yes.
A. No. That was the end of the conversation.
Q. They just said skip over them, we don't have them?
A. They did not say that. But I can't testify as to what our communications were.
Q. Okay. Did you skip over them because you didn't have them?
A. I can't review something I don't have.
Q. I can't either.
A. Right. (Laughing.)
Q. Finding some more common ground, Ms. Paz.
Okay. The -- other than -- is it your understanding that the documents Fontaine 1103 to 1104 has been produced to the plaintiffs in this case?
A. I know that we've given over everything that we have. I -- I know that there have been some production issues as to what's been turned over to you. So I don't know what's been turned over to you. I know that it has a Bates label on it, so, to me, that means that it was produced.

Q. Okay. I'm gonna represent to you that I produced this.
A. Okay.
Q. Other than the production that we've provided to defendants, are there any -- is there any other knowledge of Mr. Fontaine that anyone at Infowars has?
A. Based on my review, no, nothing that I can see. If you produced this, then we didn't have this in our original -- in our material.
Q. Okay. Did you review a letter that was sent after the article went up requesting a retraction and correction?
A. Yes. I did see that.
Q. Okay. And the information in that is -- states that Mr. Fontaine is, in fact, not Mr. Cruz and the post is incorrect, correct?
A. That's what the letter says.
Q. Okay. So that would be knowledge of the plaintiff, as well, correct?
A. I don't think that's knowledge of the plaintiff.
Q. Okay. Prior to that letter, was the company aware they had posted a picture of the wrong person?
A. Yes. Because we had taken it down before we received that letter.

Q. Okay. When -- we'll get to that.
How did the company -- what information would the company become aware of to take down the post?
A. Just based on my comments -- or, I'm sorry -- my communications with Mr. Daniels and interviews, I think that this -- this photograph was originally seen on social media by Mr. Daniels. He had seen it in a number of places on social media. He had put it in -- it wasn't just unfortunate, it was on other locations on social media. And then he wrote the article. The article contained a photograph that says it's -- an alleged picture of the shooter. And then there were quickly chatter on social media that confirmed that that picture was not of the shooter. And so based on that, it was felt that that photograph was not accurate and taken down.
Q. Okay. Where -- where was this chatter?
A. Based on my conversations with Mr. Daniels, the -- it appears that it was on social media.
Q. Okay. Did Infowars take steps to save any of that?
A. To save what he reviewed?
Q. To save whatever information on social media that he found chattering about the identity of Mr. Fontaine's photo?

A. No. But I will say that in this -- in this material -- I don't know if it's production that you've produced or we've produced -- there is a lot of social media information and chatter talking about the identity of the person in the photograph. So it could very well have been something like that. But did -- did the company take any steps to preserve those particular posts, no.

Q. And just for the record, everything you said about the article that you have in front of you marked Fontaine 1103 and 04, that's just conjecture.

You have no idea when the company got that, if it ever got it, and if it's ever been reviewed by anybody other than an attorney?

A. This particular document?

Q. Yes, ma'am.

A. I know that it was produced by you because you just told me it was produced by you.

Q. Right.

A. So it's not conjecture.

Q. You don't -- you don't know -- right. But you said, oh, well, this article has all this information about social media chatter. But --

A. No. This -- this article doesn't. No.

Q. Okay. Maybe I just misunderstood your

question. And, frankly, I think I got what I need out of this.

A. Okay.

Q. The net worth of the company, are you prepared to discuss that?

A. Yes.

Q. Okay. What did you do to prepare for that topic?

A. So this also was in the binder from yesterday that we marked as Exhibit 8, I believe. But I do also have another copy of that. But, essentially, what I did was I sat with Melinda, who does the QuickBooks, and I went through the profit-loss sheet for 2020 -- that's the most recent time that that is -- that information is available -- and we discussed the profit-loss sheet. But I --

Q. Okay. What else did you do?

A. I discussed with Melinda the structure of the company so that I could understand the reasons why I was seeing what I was seeing and the numbers and the relationship between Free Speech and other companies, such as PQPR, because there are some -- some debts owed -- due and owing amongst the companies. And I may have -- I think I may have reviewed Alex's tax statements, which I believe you have. I think that's

it.

Q. Were they tax statements, or were they bank statements?

A. I think they were his tax returns.

MR. OGDEN: Ms. Blott, I don't have those.

MR. BANKSTON: Yeah, we definitely don't.

MR. OGDEN: What do we do here?

MR. BANKSTON: Because if she reviewed them...

MR. OGDEN: I gotcha.

MS. BLOTT: They were produced in the net worth discovery in the Sandy Hook case; I know that.

MR. BANKSTON: No.

MR. OGDEN: Not in Texas.

MR. BANKSTON: No, they were.

Mr. Reeves specifically (inaudible) against that.

MR. OGDEN: While you're looking for that, can I proceed a little bit with this?

MS. BLOTT: Yeah.

MR. OGDEN: Okay.

Q. (By Mr. Ogden) So you discussed with Melinda the company structure, the profit-loss, PQPR, and Mr. Jones' tax statements.

Anything else?

A. No, that's it.

Q. Are you positive?

A. (Nodding.) I believe so. That's -- I think that's it, yes.

Q. Didn't ask if you believe you were positive.

A. That's it.

Q. Okay. Because yesterday I swore I heard you say that you talked with Dustin Whittenburg.

A. Dustin is the -- is a tax attorney.

Q. What'd you talk to him about?

A. I did not talk to him about the company's profit-loss.

Q. What'd you talk to him about?

MS. BLOTT: I'm gonna object to the extent of attorney-client privilege and any conversations that she had with Mr. Whittenburg.

Q. (By Mr. Ogden) Who's Mr. -- Mr. Whittenburg's a tax attorney for who?

A. I believe he's a tax attorney for the company.

Q. Okay. I'm not gonna ask you what you talked about; I'm gonna ask why you talked to him.

A. I think that would necessitate I talked to him about what we talked about.

Q. I don't think it would necessitate that.

Why'd you talk to him?

A. Because I felt like maybe I should talk to him.
Q. Why'd you feel that way?
A. To get a better idea about the company, and that was pretty much it.
Q. A better idea about what about the company?
A. Sir, I do believe that these are privileged conversations.
Q. That's fine. I'm not asking what y'all talked about. I'm not asking about the communications. I'm asking your beliefs and feelings going forward in your preparation for today. And you said that you wanted to talk to him. And so I'm asking why did you want to talk to him.
A. I didn't specifically ask to talk to him, no. So he came, and I talked to him. But I didn't specifically request that I talk to him. I don't think I ever testified that I requested to speak to him.
MR. OGDEN: Can you read back her prior answer.
(The record was read as requested.)
Q. (By Mr. Ogden) So you said you talked to him because you wanted a better idea of the company, correct?
A. He was there; I spoke to him.
Q. Not my question. Not even close.

I said you spoke to him because you wanted a better idea of the company, correct?
A. He was there, and he was available, and I could get a better idea about the company. So I said I could -- so I figured I would talk to him.
Q. What about the company?
A. About the structure of the company, about the -- how the company runs. We also talked about some other privileged information. But that's pretty much it.
Q. Okay. You do any white collar law?
A. Not usually, no.
Q. During any of your preparation for yesterday or today, were there any instances where you drew concern as far as any ethical duties that may have -- may or may not have been violated by anyone in this case?
A. I'm sorry. Can you be more specific.
Anyone meaning who, like the attorneys?
Q. Anybody you talked to.
A. Did I have a concern about ethical violations by attorneys, by accountants?
Can we break that down a little bit.
Q. Sure.
A. Sure.
Q. We'll start with accountants.

A. Sure. No, I did not have a concern about ethical violations on the part of the accountants.
Q. Did you speak with Robert Roe?
A. I did.
Q. Okay. Are you aware of his history in litigation regarding Sandy Hook cases?
A. I'm sorry. Can you be more specific.
Q. Yeah. Did you know that -- that the defendants in that case were sanctioned because Mr. Roe had been found by the Court to have manipulated the QuickBooks entries prior to producing them? Did you know that?
A. I'm aware there was an issue to which there was a profit-loss statement or something to that effect that there were missing lines that weren't produced at the bottom that were subsequently reproduced. So I'm aware of that issue, yes.
Q. Did you read the Court's order?
A. I did not read the Court's order, no.
Q. Well, how did you find out the information you just regurgitated?
A. I was told that by Mr. Roe and in discussions with counsel.
Q. Okay. Because I encourage you to go read that order.
What about any lawyers?

A. Do I have concerns about whether lawyers in the case have breached duty to the company? Is that your question?
Q. Only with regard to anything you came across while preparing for the last two depositions.
A. Anything regarding -- you mean the financial statements or anything in the entire universe of the case?
Q. Anything that you came across in preparation for your depositions.
A. I did have concerns on behalf of the company regarding the company's prior representation, yes.
Q. What about it?
A. The company's prior lawyers.
Q. Okay. What about them?
A. I think that there are issues that there have been -- even though the company has produced material to its at- -- attorneys, has not been produced appropriately and has resulted in many, if not all, of the sanctions.
Q. Would that be in the Texas cases or the --
A. Both.
Q. -- Connecticut?
Okay. Any lawyers in specifics?
A. I think that there are specific issues

regarding Mr. Randazzao but -- although he doesn't have an appearance in this file, and Brad Reeves, and perhaps the -- I can't remember his name before him.

Q. There's six.

A. There's a bunch. And I agree with you, yes.

Q. Okay. So Brad Reeves, Mr. Randazzao -- I'll just go -- Mr. Enoch.

A. I'm not sure about Mr. Enoch. I think he's -- he's done a pretty decent job.

Q. T. Wade Jefferies?

A. I'm sorry. I don't know much about him. I don't have an opinion about him.

MR. OGDEN: Burnett?

MR. BANKSTON: Michael Burnett.

Q. (By Mr. Ogden) Michael Burnett?

A. I don't have an opinion about him either.

MR. BANKSTON: Bob Barnes.

Q. (By Mr. Ogden) Bob Barnes.

A. Barnes.

Q. You did have an issue with him?

A. Yes.

Q. Okay.

MR. OGDEN: Is that Whitehurst --

MR. BANKSTON: It's Wilhite.

Q. (By Mr. Ogden) Wilhite?

A. Oh, I'm sorry. I don't have an opinion about him either.

Q. And Ms. Blott?

A. I think Ms. Blott is fabulous.

Q. I think she is, too.

Okay. With regards to Mr. Randazzao, what were your kind of issues you took with his representation?

A. I think -- the company thinks that there have been attempts by Mr. Randazzao to gain entry into Texas pro hac vice. Those attempts were unsuccessful ultimately. But while those issues were pending, there were orders and time lines and deadlines and scheduling orders that were in place that weren't being responded to in a timely fashion.

There's also some issues regarding the organization. I think we already talked about the Bates stamp and how they're not necessarily organized appropriately so we know which -- what was produced where. I think I said that yesterday, as well, that I'm not really sure what documents were produced in which cases. And that's a problem with the organization amongst the attorneys.

Q. I want to -- and I assume that was the problem for Mr. Barnes, Mr. Reeves, and Mr. Randazzao?

A. Yes. I'm -- I'm not really sure which time periods are overlapping and who was responsible for what. But, generally, based on my discussions, those were my issues.

Q. And we'll just go in order. We'll start with Mr. Randazzao.

So while his pro hac was pending, his representation of the company caused a disorganization and inability to tell whether or not something had or had not been produced, correct?

A. Right. What -- and, also -- I don't even know whether he was communicating to us about what needed to be produced or what was still outstanding, if there was anything outstanding. So, in general, there were a lot of issues regarding production.

THE WITNESS: Here. (Handing phone to Ms. Blott.)

Q. (By Mr. Ogden) Mr. Randazzao, was he in charge of the litigation?

A. At what time?

Q. When he was involved.

A. I don't know the time period. I'm sorry. I know there's a lot -- there's some overlap. There were six or seven other attorneys at various points, so I don't know the time period.

Q. I'll just say this: At some point since the Sandy Hook and the Fontaine case have been filed, Mr. Randazzao was representing the defendants in these defamation suits?

A. Yes.

Q. Okay. As he was doing his representation in the litigation, did -- did he have an explanation as to when he would be pro hac -- filing a motion for pro hac vice or, you know, kind of anything like that?

A. You mean to the company?

Q. Or -- correct. To the client -- his clients.

A. I think those -- he was having those conversations ongoing about getting admitted. But we were not being informed as to, you know, the issues regarding the production and the time lines with the case.

Q. And at that point, he was in charge of --

A. I believe so. But I could -- like I said, I don't know what dates. There's -- there's those overlaps.

Q. Okay. Yeah. I went over this a little bit with Mr. Shroyer in his deposition, and I'll ask you the same thing.

Based on the information that you just testified to, is the company -- has the company decided

one way or another on legal malpractice as a potential asset?

A. We have not decided on -- made any final decisions on legal malpractice yet.

Q. Okay.

A. As to whether to file or who to file against, we've not made any final decisions on that.

Q. Okay. Is it being -- has it been discussed or is it going to be discussed?

A. It's being discussed.

Q. I would ask that should that discussion happen and that go forward, that the plaintiffs in this case, as a potential creditor, just be made aware, because that could be a potential asset to the company.

A. Sure.

Q. Was the company at all aware -- did Mr. Randazzao inform the company at any --

(Phone ringing.)

MS. BLOTT: I'm stupid. Can we go off the record a minute.

MR. OGDEN: Do you need to take that?

MS. BLOTT: No. I need to --

Are we off the record?

THE REPORTER: No.

MS. BLOTT: Okay. I'm older than you

guys. I don't know how to make it quit ringing. Let me just turn it off. And I sincerely apologize.

MR. OGDEN: Hold the power button.

THE WITNESS: The power button.

MS. BLOTT: My son just bought this for me.

Is this the power button?

(Siri responds: Interesting question.)

MS. BLOTT: So y'all can all laugh at me. Okay?

(Siri responds: I'm sorry.)

MS. BLOTT: Oh, fuck you.

I'm sorry. I apologize for my language.

THE WITNESS: See, as to your question, I said she's fabulous; that's why.

MS. BLOTT: Why? Because I don't know how to work an iPad?

THE WITNESS: More so your language. But...

MS. BLOTT: I apologize.

THE WITNESS: I just proved the veracity of my opinion.

But go ahead.

Q. (By Mr. Ogden) At any point during these proceedings, did Mr. Randazzao inform the company that

he was practicing law in Texas without a license and without any order on the pro hac vice?

A. I don't -- I don't know the answer to that.

Q. (By Mr. Ogden) Okay. Did Mr. Randazzao ever work on the preparation of any pleadings or motions or documents involved in this -- in these two actions in Texas?

A. I don't -- I don't know the answers if he -- if he worked on them, like, as in drafts. I know he didn't sign them because he couldn't sign them and file them. But I don't know if he worked on them, no.

Q. Okay. Did Mr. Randazzao give any legal advice?

A. To the company?

Q. Yes. Specific to the actions in Texas.

A. I mean, he represented the company. So...

Q. Okay.

A. I -- I believe that that's a yes answer.

MS. BLOTT: Don't guess.

A. I mean, I haven't had any conversations with Mr. Randazzao, so I don't --

Q. (By Mr. Ogden) Did --

A. -- know for sure.

Q. -- did you receive -- we'll go back up to the net worth. Well, because this is kind of all tied into it.

A. Sure.

Q. When you talked with Mr. Whittenburg, did he -- did you review any document that he gave you?

A. I never spoke to Mr. Whittenburg.

Q. Okay. I thought you had conversations with -- with Dustin Whittenburg.

A. Oh, I'm sorry. That's his name. I didn't know his last name. You're right. I did talk -- talk to Mr. Whittenburg.

Q. Did you review any documents when you spoke with him?

A. No.

Q. Okay. He didn't show me anything.

MR. BANKSTON: Circle back on those tax documents, too.

(Brief pause as Mr. Ogden goes through documents.)

MR. OGDEN: This is gonna be Exhibit 4.

(Exhibit 4 marked.)

Q. (By Mr. Ogden) Did you review this prior to today?

A. No.

MR. BANKSTON: Oh, that's the number --

Q. (By Mr. Ogden) You did -- you said you did not look at the discovery responses?

A. I don't think I saw this, no. (Shaking head.)
Q. Okay.
A. Aside from the pleadings -- the petition, I think -- I think the petitions were the only pleadings I reviewed. So, no, I didn't read this.
Q. I'll point you to Request for Production No. 4 on Page 3.
A. Okay.
Q. And Request for Production No. 4 on Page 3 says, all communications within Infowars relating to the plaintiff, the article in question, or efforts to ascertain the identity of the Douglas High School shooter.
A. I see that.
Q. In response, the answer is: After a diligent search, no responsive documents in Free Speech Systems' possession, custody, or control were identified.
A. I see that.
Q. Okay. Can you tell me what this search -- how -- who did the search?
A. So after speaking to Mr. Daniels, once we were informed that there was going to be a lawsuit, he searched through his personal computer. He searched through his phone, and, I believe, searched through anything that would have been on his computer at work,

and there was nothing found. So we -- we didn't have anything in our custody.
Q. Okay. So it was -- there was just Mr. Daniels doing the search?
A. Mr. Daniels searched his -- his specific phone and computer, and I believe -- I'm sorry -- let me just amend my response. I think that also we --
Q. I don't want thinking.
A. Because we did search our emails, and that was not done by Mr. -- by Mr. Daniels.
Q. Okay.
A. So we did search the emails, as well.
Q. Okay. Who searched the emails?
A. I don't know the identity of the person who searched the emails. I'm not -- I'm not sure. I think -- and, like I said, I'm not sure. So...
Q. Then we can end it there.
A. Right.
Q. I don't know is -- is an answer that --
A. I'm not sure.
Q. Okay. And how do you know that they -- that someone did an email search?
A. Because we've produced many thousands of pages of emails.
Q. In this case?

A. In the -- amongst the two cases. I don't know in this case specifically, but I know we've produced many thousands of emails.
Q. Have any emails at all been produced in this case regarding Mr. Fontaine or specifically the information requested in requests for production?
A. I don't believe that we had any responsive emails on Mr. Fontaine.
Q. I didn't ask if you believed if you did. I asked if --
A. We did not produce any emails because there were no responsive emails on Mr. Fontaine.
Q. Okay. What -- when was the search done?
A. I'm sorry. I don't know the answer to that.
Q. Okay. What were the searching and culling terms?
A. Because I don't know who did the search, I'm not sure who -- who did the search terms.
Q. Okay. Did you -- when you came and did your interviews with members of the company, were you given any sort of restrictions on your access of who you could talk to?
A. No. (Shaking head.)
Q. Okay. Did you ask who did the search?
A. I don't remember.

Q. Did you ask when the search was done?
A. Well, so here -- here's the reason why I don't know is just because I know we have been dealing -- there was a -- some third-party person, and I'm not really sure who or when that was. So I -- no, I'm not sure.
Q. So you mean third party as in the defendants hired a person from a different company to search their own system?
A. No. I don't know necessarily search. I know that was there was a mirror image done of our hard drives, and I don't know who did that. But I don't know who did the search, if it was that third party or someone in the company. It may very well have been Mr. Zimmerman, but I don't know.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
MR. OGDEN: Okay.
Q. (By Mr. Ogden) And did you ask Mr. Zimmerman if he did the search?
A. You know what, I may have, but I just -- I don't remember, as I sit here right now.
Q. Did you ask Mr. Zimmerman what searching and culling terms he used in the ESI?
A. That's assuming he did it. I don't know.

Q. Okay. Did you ask him if he was aware of who did it?
A. You know what, I don't recall.
Q. Do you know when this third party imaged the defendants' ESI system?
A. No.
Q. Okay. Do you remember how you became aware that a third-party contractor had imaged the hard drives at the defendants' place of business?
A. I know that based on my discussions with counsel that there had -- that had been done. I just didn't know how or when.
Q. (Inaudible.)
A. I'm sorry?
Q. I said excuse me. Water went down the wrong pipe.
Okay. So earlier you gave me a definitive response that there are no communications, correct?
A. I'm sorry. Communications regarding Requests for Production 4?
Q. Yes.
A. Yes.
Q. Okay. And you've given me the affirmative.
You're not saying you're not sure; you're saying there are none, correct?

A. Based on my review of the documents -- and I know we've produced the document -- everything that we have -- we do not have anything regarding Production No. 4.
Q. And the documents you reviewed were based on a search that you do -- that you have no idea what the parameters are, correct?
A. You mean my search?
Q. No.
A. My search through the documents?
Q. The documents were given to you by lawyers, correct?
A. Right.
Q. Those documents were the result of someone doing a search, correct?
A. Yes.
Q. You have no idea what was searched for, correct?
A. No, I don't know.
Q. You don't know what terms -- searching terms or culling terms were used, correct?
A. No, I don't.
Q. You don't know when it was done?
A. No.
Q. And you don't know who did it?

A. No.
Q. Okay. And based on those four points, you are sitting here today definitive -- definitively telling this jury that no communications exist, correct?
A. Whatever -- whatever we had, we produced, and we don't have anything.
MS. BLOTT: It's yes or no.
A. No.
MS. BLOTT: Sorry.
Q. (By Mr. Ogden) I'm sorry.
And that question was -- well, a little winded.
But based on that, you're telling this jury that there are no communications that exist, correct?
A. Yes.
Q. Okay. Would you -- as -- you know, I'm not even asking you as a lawyer.
Do you think that that is a reliable basis to come to that conclusion under oath swearing to God?
A. I know that we've produced everything that we have on Mr. Fontaine, so, yes.
Q. So you believe that you have reliable information to make that conclusion to the jury?
A. Based on my review and my communications with

the interviews. (Nodding) yes.
Q. Okay.
A. We produced everything.
Q. By based on your communications, you mean the conversation you had with Mr. Zimmerman that you don't even remember?
A. I don't remember the whole thing. I spoke to Mr. Zimmerman a long time.
Q. But you don't remember anything about the definitive answer you're now giving the jury, correct?
A. I don't know anything about who did the search.
Q. Or if he did? When?
A. He -- yeah. I don't know the specifics of that; that's correct.
Q. Okay. Gonna mark this Exhibit 5.
(Exhibit 5 marked.)
Q. (By Mr. Ogden) Earlier you said you hadn't reviewed any of the pleadings or responses in discovery.
Is that true for this document, as well?
A. Yes.
Q. Okay. I want to focus on Request for Production No. 1.
A. Okay.
Q. Produce any documents which show what time on February 14th, 2018 the challenged image was published

on Infowars dot com.

The response says, Defendant will produce any additional responsive documents in its possession, custody, or control, correct?

A. That's what it says.

Q. Okay. When was the document first published, at what time?

A. Based on my conversations with Mr. Daniels, it was published late in the afternoon, probably around 4:00 p.m. That's...

Q. So answer to my question is I don't know exactly, true?

A. I -- I don't know exactly what time. But based on my conversations with Mr. Daniels, it was late in the afternoon.

(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)

Q. (By Mr. Ogden) Earlier, you said once we were infer- -- informed that a lawsuit may be coming.

Do you remember that, when you said that?

A. In response to what question? I'm sorry.

Q. This lawsuit, anything that you -- do you know when the company was informed there may or may not be a lawsuit?

A. When we received your letter.

Q. Okay. Do you remember the date on that?

A. I don't remember the exact date.

Q. Okay. Would you -- is it safe to say that once that letter was received, efforts were made by the defendants to preserve evidence?

A. (Nodding) yes.

Q. Okay. What were those efforts?

A. As I had testified to earlier, Mr. Daniels was made aware of the letter, and he made efforts to search through his devices and report back whether there was anything responsive.

And as I also testified, I don't know exactly when those searches were done for emails. So I can't really respond to it for the emails end of it. But...

Q. So you can respond for Mr. Daniels, specifically, but not really for the company in any way, true?

A. Regarding the emails?

Q. Regarding the preservation of evidence.

A. Regarding the preservation of the information on Mr. Daniels' devices, I can.

Q. Right.

A. For the company.

Q. And the rest of the company?

A. You mean -- you mean other individuals besides Mr. Daniels?

Q. Well, I'll give you a very specific one.

The original post --

A. Uh-huh.

Q. -- was that preserved?

A. I thought that -- you know, I don't -- I don't want to know -- say if I read the original post. But I do remember seeing the article as it is in current form, but I don't know if I read -- saw the original post.

Q. So you don't -- sitting here today in a defamation lawsuit against the defendants, you're sitting as the corporate representative for the defendants, and you're not sure if you've even seen the defamatory post?

A. The defamatory post was taken down the very next day. And so in its current form or in its original form was not preserved because we did not receive that preservation email from you or letter until after it was already taken down.

Q. How do you know?

A. Because we received that letter many weeks later.

Q. You said you didn't know when you received the letter.

A. I don't know the exact date, but it was way after we took it down.

(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)

Q. (By Mr. Ogden) Are you aware -- I'm gonna represent to you that our letter was sent to you on February 26th.

A. Okay.

Q. I'm going to then represent to you that this -- there was no response and that a lawsuit was filed on April 1st. Okay?

A. Okay.

Q. I'm then going to represent to you that the retraction and -- in its current form, as you've referred to it as, was done on April 2nd, the next day.

A. The post was taken down on February 15th. So 10 days before your letter -- or 11 days before your letter.

Q. The post was or the...

A. The article was revised on February 15th.

Q. To -- to say what?

A. To take out the defamatory language.

Q. Okay. So you would -- one thing we can agree on, there was defamatory language?

A. I think that the photograph representing that

it was Mr. Fontaine was not accurate and represented him to be a -- potentially the shooter at Parkland. So it was removed on February 15th, along with the language saying this is the alleged -- alleged photo of the shooter was removed.

Q. When was the retraction done?

A. I don't know the date.

Q. April 2nd.

A. Okay.

Q. Did you our -- did you read the letter that plaintiffs sent on February 26th?

A. Yes. I saw the letter.

Q. Okay. Based on that, do you have -- did -- were you able to learn why defendants did not, pursuant to the statute, do a proper retraction until after the deadline that's in the statute?

A. I don't believe that that's accurate. I don't believe we -- we missed the deadline per the statute. And I do believe that we mitigated the -- the issue regarding the photograph.

Q. Do you -- do you know if Mr. Fontaine's ever even been to Florida?

A. No, I don't know.

Q. Do you know about the death threats that Mr. Fontaine has received?

A. I don't believe I reviewed anything like that in the production. So, no.

Q. Well, you read our production. We know, because you cited it, Fontaine 1103, 1104.

So you read some of my production, correct?

A. I read some of your production.

Q. In that production, you didn't see any of the horrific things that were said about him online in the comment sections?

A. I'm sure there were horrific things. Yes. I read a number of --

Q. I didn't ask you if you were sure there were. I'm asking you if you read them.

A. Yes. I did read them.

Q. Okay. So when I asked you whether or not you know about it, I don't want to hear, oh, I'm sure there were. I want to know whether or not you know.

A. Yes, I know.

Q. Okay. After reading some of those comments, what did you come away with?

A. I came away with there was a misidentification of Mr. Fontaine as the shooter and that there were negative comments about him as a result.

Q. When you say negative comments, what do you

mean?

A. Negative comments, not nice comments.

Q. Sure. Were there any threats?

A. Not that I recall. But...

Q. Okay. I encourage you after this depo to keep reading, because there's a lot of them.

Is the -- are any of the defendants apologetic for putting Mr. Fontaine through this?

A. Oh, yes. When I spoke to Mr. Daniels, he was very, very upset, and he is very apologetic. So, yes.

Q. Usually when you're apologetic, you give an apology to the person, correct?

A. I -- I would disagree with that when -- especially when there's ongoing litigation. So I would disagree with that.

Q. Right. You would tell your lawyer, and the lawyers would tell each other, right?

A. Tell each other or tell the other lawyers.

Q. The lawyers would tell -- if Mr. Daniels wanted to, at any point, he could have asked Ms. Blott or Mr. Reeves, Mr. Randazzao, Mr. Barnes, Mr. Whitehurt -- I forget -- Wilhite, Mr. Enoch, Mr. -- I mean, he could have asked any of them, hey, I would like to apologize to the plaintiff, and that could have been communicated through the lawyers, right?

A. I don't know if he was advised not to do that.

Q. (By Mr. Ogden) Oh, so the lawyers may have advised him --

A. I don't know.

Q. -- not to apologize?

A. I don't know the answer to that.

Q. Stop guessing.

A. Yeah. But you're asking me --

Q. Keep reminding you of that.

A. But you're saying that he could have, and I don't know that he could have because I don't know if he was advised not to.

Like, I -- I will traditionally advise my clients who commit offenses and criminal offenses, they may be very apologetic, but they cannot make admissions during the pendency of the case.

And so I don't know that he could have done that.

Q. Do you know what happened to Mr. Shroyer after he was -- he -- he communicated an apologetic message to the plaintiffs?

A. Do I know if anything happened to him? No, I don't know.

Q. So you don't know that -- where he currently stands in this case?

A. What do you mean? Can you be more specific.
Q. Whether or not --
A. I know he's still a defendant in the case.
Q. Yeah. Do you know whether or not he's a -- in negotiations to settle?
A. I can't answer that.
Q. Because you don't know?
A. I don't know. (Shaking head.)
Q. Okay. And does -- does -- do any of the defendants contend that they produced documents showing what time the article -- this article in question was originally published?
A. No.
Q. Okay. I want to go to Request for Production 2.
A. Are we still on No. 5?
Q. Yes.
MS. BLOTT: Would this be a good time to take a break.
MR. OGDEN: If I can get through this one, this will be the last of this document.
MS. BLOTT: Okay. Thanks.
A. Which one did you say?
Q. (By Mr. Ogden) No. 2.
A. Okay.

Q. It says a copy of every version of the article in question which was published on Infowars' website.
And the response is: Free Speech Systems has produced responsive documents in its possession, custody, or control.
A. I'm sorry. Which one are you on?
Q. No. 2.
A. This one says, web browser history for No. -- Request for Production 2.
Q. Maybe I did -- oop, you're right. I'm sorry. I'm on the right one now.
No. 2.
A. This is Exhibit 2?
Q. Yes.
A. Okay. Let me just --
Q. No. I'm sorry. This is the exhibit you were on.
A. Oh, it's the same exhibit.
Okay. So which one was it? I'm --
Q. The one you were on.
Produce a copy of any web browser history showing all pages you visited from each web browser on any electronic device you used on February 14th to -- 2018 to February 15th, 2018, concerning searches or pages related to the challenged publication, the

challenged image, the plaintiff, or your efforts to ascertain the identity of Stoneman Douglas High School shooter.
A. I see it.
Q. Okay. Response: None known to exist.
What does that mean?
A. It means that at the time this was drafted, we didn't have any knowledge that we -- that existed that had these browser histories that were being requested.
Q. Were there any attempts to -- to search for this information?
A. I -- I don't know.
MR. BANKSTON: Or preserve it.
Q. (By Mr. Ogden) Were there any -- were there any efforts to preserve this information?
A. I don't know. As I -- as I said, I think we -- we -- we asked Mr. Daniels to search his computer. So I don't know if Mr. Daniels did it. So I don't know.
Q. Did you ask anybody else?
A. No.
Q. Okay. So you didn't ask -- you didn't ask any of the individuals that you listed out to us -- Mr. Salazar or the two ghost writers that we do not know the identities of, you didn't ask them to preserve their browsing history and to search it?

A. I don't -- I don't know the answer to that.
Q. Okay. So --
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
MR. BANKSTON: There it is right there.
Q. (By Mr. Ogden) So when it comes to the company's efforts to preserve evidence for this case, Topic No. 7 in the notice of deposition, you would not be prepared to discuss any of the preservation of web browsing history, because the only thing that you did was talk to Mr. Daniels?
A. Yes.
MR. OGDEN: We can take a break.
THE VIDEOGRAPHER: We are off the record at 11:57.
(Recess from 11:57 a.m. to 12:12 p.m.)
THE VIDEOGRAPHER: We are back on the record at 12:12.
Q. (By Mr. Ogden) Give you Exhibit 6.
(Exhibit 6 marked.)
A. Oh, and I don't know if you want the names of the three writers, but I could give that to you, if you want them.
Q. (By Mr. Ogden) Over here. Go ahead.
A. So it's Adan, Kellan, and Jaimie. I did not

speak to Kellan and Jaimie, though.

Q. Jaimie a boy or a girl?

A. He's male.

Q. Exhibit 6.

We're gonna look at Interrogatory No. 6. It's on Page 3.

A. Okay.

Q. Okay. It says, list every occasion and every medium by which any employee or agent of Infowars publically posted a link, shared, or otherwise referenced the article in question.

Do you understand what that request is for?

A. Yes. I think you're -- you're asking for whether or not the company or an employee for the company posted the original article about Mr. Fontaine, correct?

Q. It's asking for a list of any time that that post was made, shared, or referenced.

A. Okay.

Q. Okay. And the answer is kind of long, so I'll go slow.

Answer: As set forth in its general response above, Infowars, LLC does not engage in any business, has no employees, and did not publicly discuss

or post a link to the article in question, and thus does not have in its possession, custody, or control information responsive to this interrogatory.

Free Speech Systems, LLC published a link to the challenged publication on the Infowars dot com website on February 14th, 2018. The challenged publication was also scraped to NewsWars dot com, but Free Speech does not believe that version of the article published on the site contained the image of Mr. Fontaine, parentheses, because the web archive does not contain a version of the article with the image, end parentheses.

Kit Daniels shared a link to the challenged publication on his work-related Twitter account and his work-related Facebook page on February 14th, 2018. Free Speech Systems, LLC does not have any records of whether or not a link to the challenged publication was -- was posted on social media accounts maintained by Free Speech Systems, LLC, parentheses, including Twitter and Facebook, end parentheses, since those platforms, without notice to or consent from Free Speech Systems, LLC removed all Free Speech Systems -- Free Speech Systems, LLC's content.

Did I read that correctly?

A. Yes.

Q. Okay. So the only place that Free Speech Systems published the article with Mr. Fontaine's picture was Mr. Daniels' article -- on Infowars dot com, correct?

A. Yes. So that's what this answer is saying, yes.

Q. Okay.

MR. OGDEN: I don't have a Tab 7.

MR. BANKSTON: What do you mean? Tab 7 is this. We took it out, remember?

MR. OGDEN: Oh, that's right.

MR. BANKSTON: So you just need to go there.

MR. OGDEN: Yeah. You're right.

Q. (By Mr. Ogden) Okay. This is gonna be Exhibit No. 7.

(Exhibit 7 marked.)

Q. (By Mr. Ogden) Gonna be two pages. Excuse me -- one page.

Here's a copy.

Okay. Have you ever seen this document?

A. I believe I saw this in the materials that I reviewed. So, yes.

Q. Okay. And can you describe for the jury what this document is?

A. This appears to be a post on social media, not sure which, it might be Facebook or Twitter. And it's replying to at the Real Donald Trump at CNN and at MSNBC. And the commentary is shooter was a communist, with a photograph of Mr. Fontaine on the right and an advertisement for Trump 2020 on the left.

Q. Okay. Gonna hand you Exhibit 8.

(Exhibit 8 marked.)

Q. (By Mr. Ogden) So when you click on the images in Exhibit 7, this is the full picture of Exhibit 8, which is a screenshot.

You would agree?

And I take that as look at the top right of the document. You can see a cell phone battery, time, all that good stuff.

A. Yes, I see that. But I guess I don't understand what you're saying.

Is if I click on a link on Exhibit 7, it will link me to Exhibit 8?

Q. No. Exhibit 7 is two photographs.

A. Right.

Q. Okay. If you click on either of them, you can see the entire photograph.

A. Okay. Yes. Yes.

Q. Okay. And so you understand Exhibit 8 would be

enlarging the -- the picture on the right of Exhibit 7?
A. I don't -- I don't know that that's true.
Q. Okay. I'm going to represent to you that that's what we did.
A. Okay.
Q. Okay. And it doesn't really matter, necessarily, what the stuff at the top is of the screenshot.
But if you look at the bottom of it, you can see that that picture was taken from a website.
Can you read what website that is?
A. Prison Planet dot com. WWW dot Prison Planet dot com.
Q. Have you ever heard of Prison Planet dot com?
A. Yes.
Q. Who owns it?
A. I believe that this -- well, actually, I'm not sure, because I know that Mr. Watson has something to do with Prison Planet dot com. So I'm not sure that he owns it or the -- personally or the company posts on that with his consent. So I'm not sure.
Q. I'm gonna represent to you that the public filings show that Prison Planet dot com is owned by Free Speech Systems, LLC.
A. Okay.

Q. And the reason we went through the last three exhibits is we saw the interrogatory response that I read earlier the said the only place we could find that it was posted was Infowars dot com.
A. Yes. I see that.
Q. But then when plaintiffs actually go do a search, not with the internal documents, but just what's out in the public, we find that it was also posted on the defendant's other website.
So I have to ask, what efforts were made to actually locate responsive information?
A. Well, I don't -- I don't know anything about Exhibit 8. I've never seen that before, and it wasn't amongst the materials that I reviewed. So I don't know where it came from.
I see what you're -- that you're representing that it was taken from Prison Planet dot com, but I don't have any independent recollection or information that that's where it came from.
Q. Well, you told the jury you'd seen Exhibit 7 before, right?
A. Yes. I've seen this, yes.
Q. And you saw it on your computer, true?
A. Yes.
Q. Okay. And was it a native?

A. You mean could I, from that article, make -- click and it would redirect me?
Q. Correct.
To CNN or MSNBC or the Real Donald Trump?
A. No. I couldn't click it. So it was -- it was just a photo.
Q. Okay. Well, in the production, these two were right next to each other, correct? Or did the attorneys who gave you documents leave that one out?
A. I don't remember ever seeing this in Exhibit 8.
Q. If you had seen it, would it have caught your eye?
A. Yes. (Nodding.)
Q. Okay. So it's fair to say that this Exhibit 7 was the document you did review, but Exhibit 8 was a document you did not review, correct?
A. Right.
Q. Okay.
A. And then -- go ahead.
Q. From this we can establish that there are at -- there are additional posts with Mr. Fontaine's photograph that the defendants published, correct?
A. I don't know.
Q. And I will -- and I'll say it like this: If Exhibit 8 is rendered to be a true and accurate copy of

a Prison Planet dot com post, that would be an additional publication Defendants made that was not disclosed in their interrogatory answers, which were sworn to be a complete and accurate truth, true?
A. If this, in fact, was published by Prison Planet dot com?
Q. Yes.
A. Yes.
Q. And I will represent to you that if you went to Prison Planet dot com and tried to find this, that it's been taken down.
A. Okay.
Q. Do you know anybody outside of the defendants that would have access to take down posts on a website owned by Free Speech Systems?
A. I don't know how -- I don't know the answer to that.
Q. Okay. Do you know whether or not any preservation or searching and culling was done on the Prison Planet dot com platform?
A. I don't know.
Q. Other than this photo in Exhibit 8 that shows Prison Planet dot com, did you come across any other Prison Planet dot com postings or information regarding that website?

A. No. I don't recall seeing anything else by Prison Planet dot com.
Q. In your conversations with the individuals you spoke to at Free Speech Systems regarding this lawsuit and evidence preservation, did any of them mention Prison Planet dot com?
A. No.
Q. When you talked with Melinda about the company structures and how they work, did she disseminate any information to you explaining how Infowars' post can end up on Prison Planet dot com?
A. No. Those conversations were mostly about the -- the structure of the company, not necessarily all the websites that we post content to.
Q. Do you -- sitting here today, do you have an understanding of -- of how Infowars dot com, Prison Planet dot com, Free Speech Systems, and all of the programming at Free Speech Systems, how they're -- all work together and cross-post and republish? Do you have an understanding of how that works?
A. No.
Q. Okay. Based on the documents that were produced by the defendants in this case that you reviewed, will you agree that this document was not in there?

A. I don't recall seeing it, so I don't -- I don't know -- I don't want to say it's not in there, but I don't recall seeing it. I recall seeing this photo (indicating) with the picture of Mr. Fontaine and this commentary underneath, R0 shooter is a commie Re, whatever that means. I recall seeing that. I've seen it reposted a number of times. But I don't recall seeing this with the Prison Planet dot com on the bottom.
Q. Okay. And the -- based on your testimony in this line of questioning, it's fair to say that you don't have any information on the viewership or any analytics for Prison Planet dot com, correct?
A. No. I don't have analytics for that website.
MR. BANKSTON: Just for the record, because the Bates number's obscured on here because of the document. You might want to put on the record --
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
MR. OGDEN: Sure. For the record Exhibit 8 is Bates labeled Fontaine 000989.
Do you know what this one is?
MR. BANKSTON: Oh, yeah. Oh, that one doesn't have -- might not -- what I think. Give me one second. Oh, it is. It's 991.

MR. OGDEN: 991.
MR. BANKSTON: Uh-huh.
MR. OGDEN: And then Exhibit 7 is a page from Fontaine 00991.
Q. (By Mr. Ogden) This is gonna be Exhibit 9.
(Exhibit 9 marked.)
Q. (By Mr. Ogden) Okay. I've handed you Exhibit 9, and we're gonna look at Interrogatory No. 3.
Interrogatory No. 3 says, if Free Speech Systems, LLC contends there were any publications of the challenged image by a nonparty on February 14th, 2018, prior to the publication of the challenged image on the Infowars website, identify the nonparty publisher, the time of publication, and the location of the publication, such as internet, URL link, newspaper, television, et cetera.
The answer is: Free Speech Systems responds that Kit Daniels visited websites on February 14th, 2018, where he saw the challenged image of Mr. Fontaine, parentheses, prior to the publication of the challenged image on Infowars dot com, end parentheses, including 4chan dot org, Twitter dot com, and other websites, the identities of which he cannot recall.
Mr. Daniels does not recall the exact

times he saw the challenged image on these websites on February 14th, 2018, but it was after the Parkland shooting was reported and before the publication of the challenged image on the Infowars dot com website.
Did I read that correctly?
A. Yes.
Q. Okay. Please tell the jury what efforts were made to preserve the sources that Mr. Daniels allegedly relied on?
A. You mean did we go back to 4chan, Twitter, and other websites, the identities of which Mr. Daniels cannot recall, to preserve what he saw? Is that what the question is?
Q. Yes.
A. We did not do that.
Q. Okay. What did you do? Just ask Mr. Daniels?
A. We asked -- asked Mr. Daniels what his basis for the post was or the article, using the photograph in his article, and he told us.
We don't traditionally maintain those types of records. So whenever -- when we source an article and we're -- you know, we don't take screenshots of the original source to save for later. We'll link it usually in the article, but we don't -- it's not a part of our records system to preserve every single source.

Q. Did you link it here?
A. He did not link it, no.
Q. Okay. So Mr. Daniels' behavior in this case was abnormal?
A. I -- I think I would agree with that. He saw a -- some pictures on social media; it had been circulating. In his opinion, he had seen it in a number of places and that was adequate sourcing.
Q. At the time of this post, who was in Mr. Daniels' position -- his current -- Mr. Daniels' current position as a supervisor role?
A. Right.
Q. Who was the supervisor at that time?
A. Kurt Nimmo.
Q. Kurt Nimmo.
So after Mr. Daniels posted this article in an abnormal way that was not standard operating procedure, we'll call it, he was promoted, correct?
A. Promoted in the sense that he currently is a supervisor?
Q. Well, before he posted it, the -- let's say this: When he woke up on February 14th, he wasn't a supervisor, correct?
A. Right.
Q. And then when he woke up this morning, he was

the supervisor, right?
A. Yes.
Q. That's a promotion, correct?
A. Yes.
Q. So he was rewarded for what he does for the company and promoted into a -- a more important role, correct?
A. I don't think he was promoted because of this, but he has been promoted, yes.
Q. Okay.
A. I can't say as to why.
Q. Other than the subject post that Mr. Daniels made on February 14th, 2018, have any other Infowars employee -- or, excuse me -- Free Speech Systems employees made defamatory posts and then been promoted?
A. I don't know.
Q. Did you ask why Mr. Daniels was promoted?
A. No.
Q. Did he get a pay raise?
A. I don't know.
Q. You would agree, typically, when you're promoted you get a pay raise?
A. Not necessarily.
Q. Okay. Okay. But typically?
A. I -- I don't know whether it happened in this

case, and I don't want to say that it happened.
Q. I'm not asking if it happened in this case.
I'm asking if your understanding is, typically, when someone's promoted to a supervisor role, there's a pay increase?
A. I don't know.
Q. Okay. If -- I'll let that answer stand for the jury.
On February 26th of 2018, you would agree Mr. Daniels' web browsing history was -- existed?
A. On what date?
Q. Excuse me.
On February 26th, 2018, you would agree with me that Mr. Daniels' web browsing history from February 14th still existed, true?
A. I don't know. I don't know how often he cleared -- clears his web browser history.
Q. So you would not be prepared to discuss the evidence perseveration on that specific topic or question?
A. No.
Q. Okay. Are you aware of any steps that the defendants took to preserve Mr. Daniels' web browsing history?
A. Aside from what I've already testified to, no.

Q. Which you've testified to nothing.
A. No.
Q. Correct?
A. That's not accurate.
I testified that we requested that Mr. Daniels review his computer and his phone to get the material, and he did so.
Q. When?
A. I don't know when. It would have been sometime after we received your letter.
Q. Okay. Could have been a month ago? Could have been a year ago? Could have been two years ago?
A. I don't know.
MR. BANKSTON: Who instructed him?
Q. (By Mr. Ogden) Okay. Who instructed him?
A. I'm not sure exactly who he spoke to.
Q. So your information on this is purely just Mr. Daniels telling you that someone told him to -- at some point that we just don't know, instructed him to preserve his web browsing history?
A. It's based on my communications with Mr. Daniels, yes.
Q. Did you ask anybody else?
A. About who preserved -- if -- or what preservation efforts were made for the -- for the

browser history specifically?
Q. Correct.
A. No. Because he was the only one that would have had access to that. He would have been -- he was the one that was asked to preserve that.
Q. Right. But you were tasked with discussing what the company did to preserve, right?
A. Right. And --
Q. So what did the company do?
A. We asked Mr. Daniels.
Q. Who is we?
A. The company -- I'm not sure who individually representing the company. But the company asked Mr. Daniels to preserve his -- to go through his materials.
Q. Do you -- do you know who -- who from -- how do you know that it was the company that asked him?
A. You mean do I think it was a lawyer who asked him?
Q. I'm asking you why you keep saying the company did this, but you have no idea who that person is.
A. I just don't know who exactly asked him.
Q. But somebody from the company?
A. (Nodding.)
Q. You're 100 percent certain on that and not

guessing?
A. I -- I don't know who talked to him. I don't -- I -- as I said, I don't know who asked him to do it.
Q. So you don't know what the company did or didn't do? You don't know if the company was the one who asked him, true?
A. I don't know who -- who -- who asked him.
Q. Right. So you don't know what the company did to -- to preserve this?
MS. BLOTT: Objection; asked and answered.
MR. OGDEN: It's been asked. I will agree with that.
A. I've answered to the best of my knowledge that I do not know who asked him.
Q. (By Mr. Ogden) Okay.
MR. BANKSTON: She keeps saying that I told him --
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
MR. OGDEN: Yeah.
Q. (By Mr. Ogden) Yeah. You mentioned that Mr. Daniels was told by someone, either with the company or not, to preserve his emails and some other items, correct?

A. I don't know that he was asked specifically what to preserve. I think he was asked to go through his phone and his computer to preserve information related to Mr. Fontaine. I don't know that it was specified what -- what to preserve.
Q. Is that concerning to you that --
A. I don't --
Q. -- somebody said, we need you to go preserve all this; we're not gonna tell you what, but you need to preserve it?
A. Like I said, I don't know if it was communicated to him what to preserve.
Q. Again, same question: Isn't that very concerning, sitting here where you are right now?
A. No. I don't know that it didn't happen. It could have happened. I just don't know whether it happened or not.
Q. Sure. And it -- it could -- just as well could have not happened, right?
A. Sure.
Q. Because you're guessing?
A. I'm not guessing. I'm just saying I don't know.
Q. Any time you say it could have happened, let's be honest with each other, we know what that means,

right?
A. I don't understand your question.
Q. It means you have no idea.
A. That's exactly what I said. I don't know what was communicated to him on what to preserve or if there was direction given to him. I don't know, because I don't know who communicated it to him.
Q. Right. And you did nothing to find out who communicated it, true?
A. I don't know who communicated it, no.
Q. I didn't say that.
I said you, as the corporate representative tasked with this topic, did nothing to find out who made this direction to Mr. Daniels or what they actually told Mr. Daniels to do, correct?
A. No, not correct. I believe I asked, but I don't think I got a reply or a response or nobody knew for sure. So...
Q. Who did you ask?
A. I asked Mr. Daniels. I don't think that he remembered.
Q. Okay. And you said you didn't get a reply.
Was that by text or email?
A. No. I spoke to Mr. Daniels in person.
Q. Okay. And then he said, I'll get back to you?

A. No. He doesn't know. I don't think he knows who communicated it to him.
Q. Well, you said you didn't get a reply.
A. I think I asked, and the response was --
Q. You did or you didn't?
Not you thought.
A. The response I got was that he didn't remember.
Q. Okay. Did you talk to Mr. Nimmo?
A. I did not talk to Mr. Nimmo, no.
Q. Did you try?
A. I think I -- we talked earlier about I asked Melinda to try to get his number, and I don't -- and she couldn't get it or she didn't have it, so I was not able to talk to him.
Q. Okay. Did you talk to Mr. Jones?
A. I've spoken to Mr. Jones, yes.
Q. Okay. About this specifically?
A. About preservation of this -- of this particular article and anything related to it, no.
Q. Okay. About -- and did you talk to anybody at Free Speech Systems as to who made the decision to instruct Mr. Daniels to preserve evidence?
A. I think what my testimony was, was that I asked Mr. Daniels and he wasn't sure. But aside from that, no.

Q. Okay. This is gonna be Exhibit 10.
(Exhibit 10 marked.)
Q. (By Mr. Ogden) We went over this photo a little bit previously.
You've seen this photo, correct?
A. Yes.
Q. And the Bates label at the bottom, DEFS, dash, 000106 would identify to you that it has been -- that was in the production the defendants gave to plaintiffs in this case, correct?
A. Yes.
Q. Okay. Where'd this photo come from?
A. I'm unable to tell just by looking at this document its origin.
Q. Okay. Where was this located in -- in Infowars' files?
A. I don't know.
Q. Who --
A. There's no way to tell.
Q. Who was tasked with searching and pulling out things like this from Infowars' system?
A. Like I said, I don't know where this came from, so I don't know whether it was in our system, whether it was online, whether we got it on the internet. I -- I don't know where it came from. So...

Q. One thing: Did you -- what'd you do to try to find that out?
A. I didn't -- I don't -- I didn't do anything to ask where this came from.
Q. Okay. Do you know when this was saved or preserved?
A. No. I don't know how it came to be in the files.
Q. One thing we can agree on that you do know is that this is the photo that was posted in the original article by Mr. Daniels, correct?
A. Yes.
Q. Were there any other photographs of Mr. Fontaine in the original article?
A. No. It was just this one.
Q. How do you know?
A. Based on my conversations with Mr. Daniels.
Q. Okay. Other than based on the conversations with the individual who made the defamatory post, how else, if at all -- do you know where this photo -- or if any other photos were in the original post Mr. Daniels made?
A. Well, I can't -- I don't have the original post, so I couldn't look at the original post. So I asked Mr. -- Mr. Daniels, and it was this was the only

photo -- or I believe it's the only photo, and there was the commentary saying that he -- this is the alleged shooter.
Q. Okay.
A. I think there was also another photo of Mr. Cruz.
Q. How do you know that?
A. Because the subsequent version of the article still contained a photo of Mr. Cruz.
Q. You say still contained, but you don't know if it was contained in the original post, because you've never seen it, correct?
A. Well, I've never seen it; that's correct.
But when I asked Mr. Daniels, his position was the only thing that he did to change the article once it had been up for however many hours it was up was to remove the photo and the -- the commentary related to the photo.
MR. BANKSTON: No. Don't worry about it. No.
Q. (By Mr. Ogden) Was there any text included that was taken out of the original post?
A. Yes. I believe -- from what my conversation with Mr. Daniels was that the comment related to this is an alleged picture of the -- of the shooter was removed.

Q. Anything else?
A. Aside from that, I don't know.
Q. Okay.
A. But --
Q. Did you ask anyone?
A. Anyone else aside from Mr. Daniels?
Q. Did you ask Mr. Daniels?
A. When I asked Mr. Daniels, he told me that he removed the photo and he removed the reference to the photo.
Q. What did you ask him specifically?
A. What he did to mitigate the post once it came to his attention that it was not accurate.
Q. Okay. This is gonna be Exhibit 11.
(Exhibit 11 marked.)
Q. (By Mr. Ogden) Have you ever seen Exhibit 11?
A. Yes.
Q. Okay. When?
A. When I was reviewing the Fontaine document sometime in the last week.
Q. All right. Since -- can you -- can you please tell the jury when this was posted?
A. You mean -- you want me to read the date?
Q. Date and time.
A. It says February 14th, 2018, 17:50:12.

Q. Okay. And at bottom right-hand corner, you see that it's marked Defendants 00006?
A. Yes.
Q. Which would mean that it was produced by the defendants, correct?
A. Yes.
Q. Okay. You would -- why would the defendants produce this to us?
A. I don't know how it came to be in our possession, so I don't know.
Q. Okay. Do you know anything about this -- the history of this document?
A. No. This isn't -- wasn't produce -- produced by us in the sense that this is a post that we made. So, no.
Q. Who made this post that we're looking at?
A. It looks like a post by somebody posting on a chat room, so to speak.
Q. Okay. How was it found?
A. I don't know.
Q. When was it found?
A. I don't know how it came to be in our possession, so I don't know.
Q. When you got this document, did it confuse you a little bit that -- as to why it was in the possession

of the defendants?
A. No.
Q. Okay. Do you -- is this document -- is this -- is Defendants 006, is that the post that was used for Mr. Daniels off of 4chan?
A. I don't know.
Q. Okay. Did you take any steps to figure out what this was?
A. I didn't talk to Mr. Daniels about this particular document.
Q. Okay. I'm gonna represent to you that this is a post from 4chan.
A. Okay.
Q. And if it is a post from 4chan and Mr. Daniels pulled the image from 4chan, wouldn't that be something you wanted to talk about with him?
A. He -- I don't think it's accurate to say he pulled the image only from 4chan. I think his response was he saw the image on 4chan as well as other social media sources. So I don't know that this was the post that he saw necessarily.
Q. Where did Mr. -- where did Mr. Daniels pull the post that he used in his article?
A. As his representation in the production was and his similar comment to me was he saw it on social media

first -- I think he said Twitter. I think that's what it says in the production -- in the responses -- and he also saw it on 4chan. I don't know whether this was the particular document he saw on 4chan. But when I spoke to him, he said he had seen it, not first on 4chan, but on a social media site, such as -- I believe Twitter.
Q. Okay. So we're not really -- you know, what I got out of all that is we're not a hundred percent sure why this exists in Infowars' files, correct?
A. That's right.
Q. Okay. And we didn't really take any steps to figure out what it is, why, when, how it came about, anything, right?
A. I didn't ask him about this, no.
Q. You didn't ask anyone?
A. No.
Q. Okay. Does any Info- -- do defendants have the ability to provide information any time a post is put up on the internet on its website?
A. I'm sorry. Can you repeat that.
Q. Is it documented in Infowars' system when a post is put up on its web page?
A. I guess I don't understand the question.
So if a -- you mean if there's a post -- like an article --

Q. Yeah. Sure.
A. -- and when that is up -- posted to the website?
Q. Yes.
A. Okay. So, yes, I think that what -- what would happen is, if you post the article, the -- the time would be posted.
Q. Okay. And if you alter the article, what's the time say at the top?
A. Oh, you know what, I don't know. I don't know if the time gets changed.
Q. Okay. Because that's kind of an important detail, correct?
A. As to the time that the original post -- article was uploaded?
Q. As to the time that's at the top of the web page that we have available to us today.
A. Well, that's not the original article.
Q. I know.
A. Right.
Q. But is that the original time?
A. I don't know the answer to that.
Q. What time was the article originally posted?
A. Based on my conversation with Kit Daniels, he says it was posted sometime in the late afternoon around

4:00 o'clock.
Q. Okay. So we don't know?
A. I can give you an about time that it was posted.
Q. That sounds like a guess.
Wouldn't you agree?
A. It's not a guess. It's based on my interview.
Q. Okay.
A. So it's definitely not 9:00 o'clock in the morning; I know that. And it's definitely not 7:30 or 8:00 o'clock at night.
Q. What about 3:00?
A. In the afternoon?
Q. Yeah. What about 5:00?
A. I don't know how late it was posted. It was in the afternoon.
Q. 7:00?
A. I don't think it was posted that late, because it was before Kit left in the afternoon.
Q. What time does the afternoon end?
A. To me, it would end before someone left in the evening time.
Q. Not to you, to the company.
A. He would have left his office at the end of business hours.

Q. Okay. What time is that?
A. He would have left around 5:00.
Q. Do employees clock in and clock out?
A. I don't know around this time whether they were clocking in or clocking out.
Q. Did you look?
A. Did I ask if people were clocking in and clocking out?
Q. Did you -- yeah. Did you try -- did you look for any information to ascertain when Mr. Daniels left?
A. I don't know that the company has such information.
Q. You didn't look either.
A. No, I didn't.
Q. My question is whether or not you looked.
A. No.
Q. Okay. This is gonna be Exhibit 12.
(Exhibit 12 marked.)
Q. (By Mr. Ogden) Have you seen Exhibit 12?
A. I -- I don't think so.
Q. Really?
A. It doesn't look familiar.
Q. Okay. Well, I'm gonna represent to you that this is a screenshot or a screen capture on Infowars internal system.

And if you look at it, the name of the post -- the ID of the post is 479629.
See where it says that?
A. Yes.
Q. Then it says the name of the post is, report, Florida shooter inspired by Isis Allahu Akbar.
You see that?
A. Yes.
Q. If you go up one line, it post status.
What's it say right next to that?
A. You mean under that?
Q. Next to it?
A. Post modified.
Q. Post modified.
Under that it says a time.
A. Yes.
Q. Okay. So this tells us exactly when the post was modified, correct?
A. That's what it says.
Q. Okay. And that's April 2nd, 2018.
So that's when I represented to you earlier when the retrac- -- the proper retraction was made the day after this lawsuit was filed.
Do you remember that?
A. I know we talked about that date, but that

doesn't represent all the times this article was modified.

Q. You're right. Thank you for that.

Please tell the jury why we don't have one of these for every other modification.

A. Because I don't know that we saved that information.

Q. Why would you save this one?

A. I don't know.

Q. Okay. So the -- the answer to my question of why we don't have one of these for every single time this article was published and then modified is because you just don't know?

A. Well, I don't know when in relationship to the time we received your notification it was modified. I know it was modified on the 15th, and then we wouldn't have necessarily saved that information because we didn't get the letter yet. And then it was modified after that on this date, as well. I don't know if it was modified again before that.

But at least as far as the 2/15 modification, I can say that we wouldn't have saved this because we weren't aware that it needed to be saved.

Q. When -- or, actually, what -- what question were you just answering?

A. You asked me why you don't have --

Q. No.

A. -- this document for every modification.

Q. That's not -- that's not what I asked.

A. Okay.

Q. Which is why I was sitting here with my arms crossed, confused as to what you were talking about for that long.

If you'll listen to my question, they're not hard. Most of them can be answered with a yes or no. I get that you want to advocate for your -- for the, you know, company you represent here today. You don't have to. If Ms. Blott wants to ask you questions when I'm done, I'm -- she's free to do so.

A. Do you want to reask your question?

Q. I'd love to.

The reason we don't have a post -- a document like document Defendants 0025 is because you don't know.

A. No. No. As in I'm not agreeing with your question.

Q. Okay. How long does Infowars save these?

A. I don't -- I don't know the answer to that.

Q. Are they --

A. I don't know that they are saved.

Q. Are they auto deleted or does somebody go in cache, if you know?

A. I don't know.

Q. Okay. What program sets this up?

A. I don't know the name of it.

Q. Okay. Does it happen -- does it happen immediately after, or is there a delay after the article goes live? Or does this -- is this generated immediately, if you know?

A. You mean is this date -- is this time --

Q. Was this document --

A. Uh-huh.

Q. -- created at this exact time that's listed on it, or do you know?

A. Oh, when was the document created?

I don't know when this document was created.

Q. Okay.

A. No.

Q. Who has access to the system that generates this information?

A. I don't know --

Q. Okay.

A. -- the name of the person.

Q. Right. And so when you say we -- we -- the

original post and modification were on 2/15, so we don't have those.

You have no idea, do you?

A. No. I don't -- I have an idea, and that was the prior answer I was giving.

Q. Okay.

A. But...

Q. Ms. Paz, you just testified you've never even seen this before.

A. No. I've never seen this.

Q. Okay. So -- but now all the sudden, you've got all this knowledge as to when docu- -- when information on this system is deleted, not deleted, whether --

A. That's not what I said, sir.

Q. Okay. Then I'll ask my questions a little more simpler.

Do -- the information from the system in Exhibit --

A. 12.

Q. -- 12, does Infowars have possession of the same information from when the post was originally posted and -- and then the first modification?

A. (Shaking head.) I don't believe so, no.

Q. Why?

A. Because I don't think that information gets

174

saved.
Q. I'm not asking you what you think; I'm asking what you know.
A. I don't know.
Q. And I've tried very hard to be patient with you Ms. Paz. You're an attorney and you know better. Answer my questions. Don't guess. Please stop. Answer the question that's on the table and stop guessing.
A. I don't know why it doesn't save that information or how it gets saved. I don't know.
Q. Is it saved?
A. I don't know.
Q. Right. So when you're sitting here, no, I don't believe so, that's a pure pull-out-of-the-air guess, true?
A. No. It's not pull-out-of-the-air guess. I'm making an educated inference based on the information that I see in this document. You asked me about the document, and you asked me what I -- about this document, and I'm getting an inference from the document.
Q. Stop inferring, because that's a guess. I want to know what you know.
A. I didn't ask about this document, so I don't know.

175

Q. I know you didn't, because you didn't know it existed until I handed it to you.
A. That's right.
Q. Now, my question is: Does -- does one of these exist for February 15th -- or excuse me -- February 14th, 2018, that says original post?
A. I don't know.
Q. You don't know.
Does -- does a document like this with this information exist for February 15th with the first post modified?
A. I don't know.
Q. Okay. Sitting here today, that information very well could be on the system, correct?
A. I don't know if it gets saved on the system, so I don't know.
Q. Right. You have no idea.
So when you sit here and say, no, I don't believe that exists, you have -- that is a guess, and that's not accurate, true?
A. I don't know what exists or what doesn't exist --
Q. Exactly.
A. -- or what gets saved or what doesn't get saved on this particular platform.

176

Q. Okay. With that answer in mind, I want you to answer this question: Why previously did you say this -- that information no longer exists?
A. Because it says the dates that are modified -- the post modified and whether it was posted. It doesn't say how many times it was modified. That's why. That's the basis for my testimony.
Q. I will let that answer stand for the jury.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
MR. BANKSTON: We're at 1:00. I didn't know if you wanted to take a break now. I don't remember when we took the last one.
MR. OGDEN: Are you okay?
THE REPORTER: Yes. Thank you.
MR. OGDEN: If you just give me the look, I'll know.
THE REPORTER: Okay.
(Exhibit 13 marked.)
Q. (By Mr. Ogden) I'm gonna hand you Exhibit 13.
Have you Ever seen Exhibit 13 before?
A. Yes.
Q. Okay. Earlier you said that you'd only seen what I assumed was the petitions. And you said that was all that I've looked at. And now we've established that

177

you have seen some interrogatory answers. So let me go back and ask you again.
What-all did you -- what documents did you review to prepare yourself for today?
A. I think this was shown to me in connection with my conversations regarding the net worth.
Q. With who?
A. With Melinda, maybe.
Q. Okay. And it's your testimony, sitting here today, that the conversation you had with Mr. Whittenburg did not go into the net worth?
That was my understanding of your answer.
A. No. I -- yeah. I didn't talk to him about the net worth.
Q. Okay. Did he have information about any of the deposition topics from yesterday or today?
A. Him?
Q. Yes.
A. I don't know what he has information about.
Q. Okay.
A. I can't say what he knows.
Q. That's very peculiar that you spoke to him.
A. I don't agree. He represents the company; I represent the company.
Q. In what capacity?

A. What capacity do I represent the company?
Q. Yeah.
A. In connection with these depositions.
MR. BANKSTON: I thought she told me she didn't.
Q. (By Mr. Ogden) Yeah. I thought you said you did not represent the company. You told Mr. Bankston --
A. Oh, you mean -- oh, I'm sorry. I'm sorry. I misspoke. I'm getting exhausted.
I don't represent the company in a legal capacity as a lawyer. I represent the company as the corporate representative. But I don't represent the company as an attorney, no.
Q. How long did you talk to Mr. Whittenburg?
A. I don't know. I didn't talk to him very long.
Q. After how yesterday went and how today has definitely gone, don't you think that time would have been more useful reviewing the information that you should have been reviewing?
A. No.
Q. Okay. And just to establish, your conversation with Mr. Whittenburg had nothing to do with any of the Infowars internal discussions about yesterday or today or any of the depo topics that were listed yesterday or today, correct?

A. You mean did I talk to him in -- today or yesterday?
Q. No. I'm asking --
A. I'm sorry. I don't --
Q. Sure.
A. I didn't understand your question.
Q. You had two deposition --
A. Yes.
Q. You had two deposition notices, correct?
A. Yes.
Q. One for yesterday and one for today.
A. Yes.
Q. And Mr. Whittenburg, did he -- did he possess knowledge on any of those topics?
A. I don't know. I don't think so.
Q. Okay. So my same question: Don't you think your very limited time preparing for these two depositions would have been well spent doing something actually productive to prepare you?
A. No.
Q. When you spoke to him, were you aware of how many documents you were tasked with reviewing?
A. Yes.
Q. And knowing that, you still think that having a conversation completely unrelated to these depos was a

good idea?
A. Yes.
Q. Okay.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
Q. (By Mr. Ogden) Yeah. I need to clear up a little thing.
A. Uh-huh.
Q. You told us that today you spent about 10 hours preparing for this deposition, true?
A. Yes.
Q. Okay. How many total hours did you spend preparing?
A. Between the two cases?
Q. Yes. Since you've been hired by the defendant, how much have you spent?
A. It's about -- it's around a hundred hours, not including the deposition time.
Q. Okay. Because yesterday I believe the breakdown was a hundred hours of -- I thought it was -- I calculated it to be like 145 hours.
Is that wrong? It's just hundred hours total?
A. How did you get 145?
I don't recall ever saying -- saying 145.

You mean --
Q. Sure.
A. -- we were adding up hours?
Q. I'll break it down. You gave Mr. Bankston yesterday -- do you remember saying that you spent about 75 hours reviewing documents? Do you remember that?
A. No. I think what I said was I spent about 35 hours or so reviewing videos.
Q. Yep. I got that one.
A. Right. And then I spent more hours -- I can't remember what I said yesterday as far as reviewing documents. And then talking to people and et cetera. I don't think I said 75 hours reviewing documents. That's not accurate.
Q. Okay. What is accurate? How many hours did you spend reviewing documents?
A. It -- are we talking about all documents, the universe of documents, deposition, Bates stamps, things like that?
Q. Yep.
A. Maybe 45 or 50 hours plus the interviews that I did.
Q. Okay. How many hours did you do spending -- spend doing interviews?
A. So I started interviewing people on Wednesday

through Saturday. So --
Q. Yesterday you testified between that Wednesday and Saturday doing interviews was about 25 hours.
A. There -- thereabouts. So eight, 16 -- 20, 25 hours. I also spent on Sunday an hour interviewing Mr. Watson via Zoom.
Q. Okay. So I got 50 --
A. My math is terrible. I'm sorry.
Q. 50 and 25 is 75 --
A. Uh-huh.
Q. -- plus 36 is 116?
A. Okay.
Q. Okay. So in 14 days, you billed 116 hours?
A. It's not billable time. But can I account for 116 hours, I can account for my time, yes.
Q. Okay. So just breaking this down. That's 58 hours -- no -- yeah -- 58 hours for week one, 58 hours week two, if we just split it in half, right?
A. I don't know. My math's terrible. So I can't do that in my head.
Q. Okay. So out of the, roughly, 116 hours -- and I know that's not an exact number -- you spent 106 on Sandy Hook and 10 Mr. Fontaine?
A. No. The review of the documents and those hours and the time pro- -- include the Fontaine review.

But if you're saying did I spend 10 hours reviewing Fontaine documents specifically, and if you're gonna break it down like that, then -- in comparison, is that what the question is?
Q. I got 116 hours total.
A. Right.
Q. Earlier you told me that in preparation for today total you spent about 10 hours on this deposition --
A. Right.
Q. -- on these -- on these topics.
A. Right.
Q. So I'll end it there. I think we're pretty clear.
Do you think you're prepared for today?
A. I'm prepared as I could be with the time that I was given. So, yes.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
Q. (By Mr. Ogden) Do you know when these depositions were ordered by the Court?
A. No, I don't. I don't know the date. All I can tell you is when I was retained to prepare.
Q. What is Ms. -- what is -- we'll start here.
What is Kit Daniels' net worth?

A. I -- I don't know if we've produced that.
Q. I'm asking you -- you were tasked with --
A. Do I recall --
Q. Hold on.
A. -- his net worth? No, I don't.
Q. Let's back up. Slow down.
You were tasked with the net worth of defendants in this case, correct?
A. I was tasked with being -- to testify against -- to the net worth of Free Speech, because I am the corporate representative.
Q. Okay. I'll back up.
What is the net worth of Free Speech Systems?
A. I believe we have a negative net worth.
Q. I'm not asking what you believe. I'm asking --
A. We have a negative net worth.
Q. Okay. What is it?
A. If I may refer to the profit-loss?
Q. Okay. I'm gonna throw a sticker on that.
A. If you want to -- sure.
Q. This will be 14.
(Exhibit 14 marked.)
Q. (By Mr. Ogden) Couple of questions while you're reviewing it.

A. Sure.
Q. Where'd that come from?
A. As I testified earlier, I met with Melinda, who printed me the QuickBooks information.
(Sotto voce conversation between Mr. Ogden and Mr. Bankston.)
A. May I continue?
Q. (By Mr. Ogden) Yeah. Sure.
A. Sure. So I asked Melinda for the profit-loss statements through 2020. The 2021 numbers are not available yet; they're not finalized.
So according to the profit-loss for the year, there is a negative net income of $6.8 million.
Q. Sitting here today, what is Infowars -- what is Free Speech Systems net worth?
A. I don't -- I'm sorry. This doesn't -- this doesn't tell me the exact number. Just give me one second.
MR. BANKSTON: (Inaudible.)
Q. (By Mr. Ogden) What's the Bates label -- what's the Bates number on Exhibit 14?
A. This doesn't have a Bates label.
Q. Okay.
A. This was produced to me -- and just -- this was at my request that I asked Melinda to produce this to

me.

Q. When'd she give it to you?

A. Friday.

Q. Okay. And did you -- did you go over it with anyone after you got it?

A. I went over it with -- I don't think I spoke to Melinda about it. I might have spoken to Bob about it, just asked him to explain it to me. But other than that, no.

MR. BANKSTON: (Inaudible.)

Q. (By Mr. Ogden) You spoke with Bob about it on Friday?

A. Friday.

Q. Okay. How long did y'all talk?

A. An hour or so.

Q. All right. That was on phone or that was in person?

A. No. I saw him in person. He was at -- he was at the office.

Q. Okay. So you were at the office during all this?

A. Yes. I was at the office, Wednesday, Thursday, Friday, and Saturday.

Q. Okay. Why did you ask for that document?

A. Because I believe it was relative and -- to the

topics that I was to testify about today.

Q. Okay. Did you -- were you under -- were you under the belief that that document had been produced in this litigation?

A. I don't know whether this has been produced. These are the numbers for 2020. I don't know if it's been produced already.

MR. OGDEN: Ms. Blott, we don't have that.

MS. BLOTT: I know we don't, because the numbers were -- this is a revised one that she and I was given Friday, and I believe the revisions took place --

MR. OGDEN: Can I ask you a question?

MS. BLOTT: Sure.

MR. OGDEN: Why didn't it come with the other 333 I got last night?

MS. BLOTT: Because I was concentrating on those for the Fontaine, and I ran out of time.

MR. OGDEN: Okay. Why want -- why didn't you hand it to me this morning or during the first break or the second break, or the third break?

THE WITNESS: This is actually in --

MR. OGDEN: I'm not asking you, Ms. Paz.

THE WITNESS: It was in the binder.

MR. OGDEN: That's fine. I understand you have comments. You can keep them to yourself for a

second.

MS. BLOTT: I didn't do it. That's my answer.

MR. OGDEN: Okay. Do you believe that the information in Exhibit 14 that I just stickered is information plaintiffs are entitled to?

MS. BLOTT: Yes, I do.

MR. OGDEN: Okay. Let's take a short break so that we can read over what's in there.

THE VIDEOGRAPHER: We are off the record at 1:14.

(Recess from 1:14 p.m. to 1:29 p.m.)

THE VIDEOGRAPHER: We are back on the record at 1:29.

MS. BLOTT: Mr. Ogden, I need to clarify my response to the question you posed with respect to the financial document that Ms. Paz has.

This document was provided on Friday, this immediately past Friday. And in my continuous review of the answers or the discovery responses by prior counsel in this case, I did not see where any profit and loss or balance sheet had been produced in response to the interrogatory that used the term financial statement.

And so I reached out and learned that no, in fact, it had not been produced by prior counsel

because they did not consider it a financial statement, which is contrary to my professional opinion. And because of that, I did get the document so that I can supplement that discovery.

MR. OGDEN: Okay. I just want to put on the record for myself and on behalf of my clients that that document has been sitting in the corporate representative's bag next to her all day without producing it to us.

MS. BLOTT: It is in the binder that you have and contains another document.

MR. OGDEN: What binder do we have?

THE WITNESS: Yesterday. I had brought with me my binder. It was in my binder.

MR. OGDEN: I don't have that.

MS. BLOTT: Well, whoever has it. The court reporter has it. Somebody has it.

MR. OGDEN: Did you give me a copy? Does it have a Bates number?

MS. BLOTT: Yes, as a matter of fact.

MR. OGDEN: What's the Bates number?

MS. BLOTT: I'd have to look on my iPad.

MR. OGDEN: (Inaudible.)

MR. BANKSTON: (Inaudible.)

MR. OGDEN: I have not produced it.

MR. BANKSTON: It hasn't been produced.
MS. BLOTT: It has not been formally produced.
MR. OGDEN: We --
MR. BANKSTON: It's being produced right now is what we're saying, like, within the past 10 minutes.
MR. OGDEN: Yes.
MR. BANKSTON: Okay.
MR. OGDEN: Let's just -- I want to make something clear.
When we started this depo, the topics were very clear that -- that net worth was one of the topics. And that document this witness testified was she -- she asked for it to be prepared to discuss that topic, and it's been sitting in her bag.
I wouldn't have a problem if I'd have gotten it this morning or during any of our breaks. But the fact that at the very end after -- I don't know -- four or five hours of questioning, I ask the witness -- we get to that topic, and then all of a sudden it comes out of the -- out of the bag, and now we're saying that it's been Bates labeled and it's on the way and -- you know, I'm -- you can obviously probably see how it looks from my seat.

I'm not accusing you one way or the other. But I'm just looking at, you know, the aggregate of what's happened in this case with all lawyers. And every lawyer has come in and told me they're not that person; they're transparent; they're gonna get on it. And every single time they are replaced, the new one comes in and says the same thing.
Who did you talk to that had a different professional opinion than you on the production of that document so that I know who to name in my motion?
MS. BLOTT: Bradley Reeves.
MR. BANKSTON: All right. I need to make a phone call.
MR. OGDEN: My other -- and I need to clear one thing up before I go on to this line of questioning.
A document was produced to me by Mr. Whittenburg when y'all came to my office, and I wanted to -- it was not clear which case he was giving that to me for.
MS. BLOTT: The profit and loss and balance sheet. So they were provided to you. Okay?
MR. OGDEN: A completely different one with completely different numbers --
MS. BLOTT: Correct.

MR. OGDEN: -- was provided to me. And it's stamped attorney's eyes only. And I don't know if it was in regards to this case, the Sandy Hook cases, or both. And I don't want to violate a protective order by bringing it out here right now.
So I'm asking on the record if you'll consent to us using that as an exhibit when we question the witness?
MS. BLOTT: Yes. I will represent to you, though, Mr. Ogden, just so that there is no confusion, the profit and loss -- oh, wait a minute -- may I see that a minute? I want to make sure --
MR. OGDEN: Sure.
MS. BLOTT: -- that's the most recent one.
MR. OGDEN: That's what Mr. Whittenburg gave us.
MS. BLOTT: Oh. Okay. So wait. Wait. Before you -- okay. You haven't marked this one.
This was -- this is not any type of balance sheet, profit and loss statement; this was merely prepared for the purposes of settlement negotiations.
MR. OGDEN: You'd agree with me, though, that it has information in it that is completely relevant to the net worth of the company? Yes?

MS. BLOTT: But it's not current.
MR. OGDEN: I didn't ask if it was current. I asked if it had information relevant to the net worth of the company.
MS. BLOTT: Yes.
MR. OGDEN: Okay.
MS. BLOTT: At one point.
MR. OGDEN: Okay. With that said, is it still okay if we --
MS. BLOTT: No.
MR. OGDEN: -- talk about it with this witness?
MS. BLOTT: No. Because it's not a financial statement, per se. I don't know whether -- so no.
MR. OGDEN: Do you know what -- the order does not say financial statement, neither does my net worth discovery request.
MS. BLOTT: Yes. It does say financial statement.
MR. OGDEN: And so how -- I'll -- I'll -- I'm gonna propose a solution, potential solution, which is: We use this. We've already established -- there is no protective order in this case, so I guess that's -- that is an issue.

MS. BLOTT: Well, we can take care of that on the record.

THE REPORTER: We are on the record.

MS. BLOTT: I know. I just realized that. (Inaudible.)

MR. OGDEN: How would you like to take care of this?

MS. BLOTT: I'm not gonna agree to it. This was work product in preparation of settlement negotiations only.

MR. OGDEN: That's fine.

MS. BLOTT: And it was provided to you only for that reason.

MR. OGDEN: That's fine.

But the Rule 408 that was cited prior to us engaging in that discussion in my office was directly to admissibility, not the use of it in discovery. And it's not work product because you gave it to me.

MS. BLOTT: So let's do this -- and I will tell you she has not seen this.

MR. OGDEN: That's fine. I know she's talked to the person that put it together.

MS. BLOTT: So I will agree that you can use this at the deposition.

MR. OGDEN: Okay.

MS. BLOTT: Provided that we agree that this document will not be produced or cir- -- will not be circulated, will remain confidential, unless and until one of us applies to the Court to release it to dissemination.

MR. OGDEN: We don't have a protective order in place. So if we use it -- what am I -- then what happens to all the testimony that we have about it?

MS. BLOTT: Well, right. Oh.

THE WITNESS: I don't even know what that is.

MR. OGDEN: I know. It's kind of putting me in a little pinch here.

MS. BLOTT: I know. And I'm sorry. Both of us.

So, yes, go ahead.

MR. OGDEN: So we can use this in the deposition.

MS. BLOTT: (Nodding.)

MR. OGDEN: Okay.

(Exhibit 15 marked.)

MR. OGDEN: I'm gonna hand the witness Exhibit 15, which is Bates labeled FSS, underscore, NET, underscore, 204.

(Exhibit 16 marked.)

MR. OGDEN: I'm also going to hand the witness Exhibit 16, which is marked confidential, attorney's eyes only. It's not Bates labeled and was provided to counsel by Ms. Blott and a Mr. Dustin Whittenburg.

Is that his name, Dustin or Justin?

MS. BLOTT: Dustin Whittenburg.

MR. OGDEN: Was provided to counsel by Dustin Whittenburg at plaintiff's counsel's office two weeks ago in a meeting where myself, Mr. Bankston Mr. Whittenburg, and Ms. Blott met.

Also gonna hand over Exhibit 17, which is also marked attorney's eyes only, but it's actually a public record. It's just the UCC filing that we discussed. That'll be Exhibit 17.

(Exhibit 17 marked.)

Q. (By Mr. Ogden) Just hold those. We're gonna work on that one first.

Now -- now that you have Exhibit 15 -- I believe is the one you pulled out of your purse, correct?

A. No. 14.

Q. 14. Okay. 14.

All right. Same question: What is the net worth of Free Speech Systems?

A. This is the profit-loss statement. So this document does not reflect a profit-loss number. The prof- -- the net worth of Free Speech Systems is negative $53 million and change.

Q. Okay. How do you know?

A. This is based on my conversations and my review of the documents. So I did -- as I previously represented, I spoke to Mr. Roe. I also -- like I said earlier, I have seen this answer regarding the net worth, and I do know that these numbers are updated because these were revised for 2020. So the numbers that we see in Exhibit 13 are off by about $160,000, but are otherwise accurate.

Q. It does not sound like Free Speech Systems operates a very good business, does it?

A. I think I testified to that earlier that I did not think that it was -- that Mr. Jones was a good businessman.

Q. Considering that he ran a company that was highly profitable into a negative $53 million debt.

That's your understanding?

A. That is my understanding, yes.

Q. Okay. Who is that debt owed to?

A. A vast majority of that debt is approximately $53 million -- $54 million so debt to PQPR on the basis

of costs of products that were not paid to PQPR.
Q. Okay. How many -- how long has that debt been accruing?
A. I think that that debt was accruing up to a few months ago, and I don't know when it started, unfortunately. I could tell you the reasons why it was accruing, but I don't -- I don't know when it was started to be accruing.
Q. All right. Let me see those real quick.
A. This one?
Q. Yeah. This stack of (inaudible) here -- yeah. Okay.
Who -- what -- how did we get to a $53 million note?
A. Sure. So PQPR is the company that purchases the products that are ultimately sold on the Infowars website. And for a number of years -- and I'm sorry I don't know for how long -- all of the money was flowing to Free Speech Systems instead of being paid to PQPR. They were kind of just giving the money here and there, but with no regularity. And so the amount of money that was owed to PQPR for those products totals that amount of money.
Q. Okay. Who at PQPR was able to front $53 million?

A. I don't know -- I can't answer anything for PQPR. I don't represent them as a corporate representative.
Q. Sure.
A. I don't know.
Q. In -- where did you learn about PQPR?
A. When I was discussing the structure of the company from Melinda and how the -- the money is paid from Free Speech to PQPR and who has ownership interests in PQPR and Free Speech. That's how I found it out.
Q. How --
A. Based on my conversations.
Q. How is the money paid?
A. Now how is it paid to PQPR? I can say now how it is. Previously, I don't know.
So within the last few months, there is this debt, and Free Speech has been attempting to pay this debt down. It pays PQPR $11,000 per week -- I believe it's per business day -- five business days. So it's not seven business days, five -- five business days -- plus a percentage of the products that are sold on the site in attempt to address the backlog.
But prior to the last few months when it was -- it wasn't being paid with any regularity.
Q. So 11,000 -- so $44,000 every 20 days?

A. Right. So five days -- so, yes. So per five business days, $11,000.
Q. The --
A. Plus the percentage.
Q. The -- when you say it started a few months ago, when?
A. I believe that -- based on my conversations with Mr. Roe, the financial disentanglement between the two companies happened within the last few months, perhaps back to September. But it's relatively recent.
Q. Do you know what triggered that?
A. I know that Mr. Jones had begun some -- some estate management that was in -- in motion in the years prior. And I also know that PQPR and an attorney associated with PQPR retained Mr. Roe as a consultant to try to disentangle this. I can't say as to when he was -- he was retained to do that. He wasn't retained by Free Speech. He was retained by -- by I believe an attorney -- I can't remember his name -- on behalf of PQPR.
Q. His name's Eric Todd.
A. I don't think that's the person that retained him, no.
Q. The only reason I say this is because Mr. Whittenburg is the attorney you're talking about

that was retained, correct?
A. No. That's not accurate.
Q. Well, then who is the attorney that was retained?
A. Like I said, I don't remember his name.
Q. So you don't remember the name of anybody that -- of the person that represents PQPR. You don't remember the attorney that was retained by that person at PQPR.
A. I don't -- I'm not the corporate representative for PQPR.
Q. I know.
A. So I don't know.
Q. Just trying to figure out what you know.
A. Yeah.
Q. So a lawyer at PQPR hired a lawyer?
A. No. The lawyer hired Mr. Roe.
Q. Gotcha.
A. Right. As a consultant.
Q. Okay. If you look at -- let's look at Exhibit 15.
A. Okay.
Q. Do you see the redactions?
A. Yes.
Q. Why are those redacted?

A. I don't know.
Q. Have you seen copies without redactions?
A. I've only seen the Exhibit -- Exhibit 14.
Q. So you -- someone showed you the profit-loss breakdown, but nobody preparing you to talk about net worth showed you the actual balance sheet?
A. Wait, I'm sorry. Just give me one second.
I don't know what the redactions are. I may have seen this. It may have been in the binder that I brought yesterday, but I don't know what the redactions are.
Q. Okay. You said that you had an electronic copy of the binder.
A. No. I have an electronic copy of my notes on -- in the -- from the binder. So I -- I don't have an electronic copy of this.
Q. It's my understanding that Ms. Blott printed out all the documents in your binder yesterday, correct?
A. I believe she put the binder together for me, yes, because I didn't have a printer.
Q. Okay. Did you send her everything that needed to go in the binder and then she printed it for you?
A. No. I sent her my notes to go into the binder.
Q. Everything else that was in there was put in there by Ms. Blott?

A. I believe so.
Q. How did Ms. Blott get a copy of the profit-loss breakdown that is Exhibit 14?
A. I don't -- I don't know where this came from.
Q. That's 15.
A. 15, right.
So 14 -- you're asking for 14?
Oh, I believe I testified to this. We received this from Melinda. Melinda printed this off of QuickBooks.
Q. Okay. And that was on Friday?
A. Yes.
Q. And that was put into your binder?
A. Yes. This is in my binder. I remember this being in my binder.
Q. And then the balance sheet, Exhibit 15, it's your testimony that that is also in your binder?
A. I think it is in the binder.
Q. Okay.
A. Because I remember that Attorney Blott told me it was in the binder, but I didn't physically print it, though. So...
Q. So Free Speech Systems has a 53 -- $54,876,000 note that it owed -- or, excuse me -- has a note that it is secured against -- sorry. Let me back up.

PQPR has a $54.876 million note that Infowars -- or that Free Speech Systems is responsible for paying?
A. Yes. Just with the caveat that that number I don't think is accurate anymore, just because, like I said, we've been paying down the debt. It's a little over -- it's probably a little over $53 million. But, principally, yes, that's correct.
Q. Where were you getting the exact number from?
A. So the numbers that are in the -- the answer regarding net worth in Exhibit 13.
Q. Uh-huh.
A. These numbers are accurate with the caveat that it's off by about $160,000, which is what the updated information was that was provided to us this week. The reason why there is a discrepancy of the $160,000 was there's some -- some writeoffs regarding the equipment that needed to be corrected.
Q. Who did that correction?
A. I -- I don't know. It -- it might have been -- it probably would have been the tax attorney, but I'm not sure, so I don't -- I don't want to say.
Q. Okay. So these numbers are from 2020, correct?
A. The ones that you're referring to?
Q. Exhibit 15 and Exhibit 14 are numbers from

2020, correct?
A. Yes.
Q. Okay. And Exhibit -- what is it -- 13, the interrogatory?
A. Yes.
Q. Exhibit 13, that was produced in December of 2021?
A. Yes.
Q. Okay. And it's now your -- it's your testimony that the number that was given -- I don't know -- 60 days ago, 70 -- 75 days ago is not accurate, and, instead, we go look at the balance sheet and profit-loss sheet that have adjustments made by someone of $160,000, and that's the accurate number for the net worth of the company at the end of 2020?
A. Yes.
Q. Okay. Why was -- why were adjustments being made in the last 75 days to a balance sheet from almost two years ago?
A. I don't know. I'm not an accountant. I don't know why -- I don't know.
Q. Okay.
A. I think there was an error that was found regarding the -- the -- I'm sorry -- I'm not a -- I'm not really a tax attorney.

Q. Why do you think that?
A. Just based on my conversations with Mr. Roe regarding why -- the accuracy of these numbers --
Q. And, again, you --
A. -- and the reason why this was updated.
Q. Again, we established that you are unaware of any findings in Connecticut on Mr. Roe's accounting practices, correct?
A. I'm aware that there was an issue in Connecticut, but I wouldn't say I'm aware of issues regarding his practices.
Q. Okay. Do -- do you know whether or not he was found to have manipulated the numbers?
A. I didn't read that decision, so I don't -- I'm not aware of the finding.
Q. What's your -- what's your understanding of what happened?
A. My understanding of what happened was there was a document that was produced, and there were lines at the bottom that were missing or cut off and that subsequently the accurate numbers with the lines that were missing were produced.
Q. Well, that doesn't sound like anything nefarious, true?
A. Not to me.

Q. Did you know that the -- do you know what the basis for the Connecticut Court's granting of the default judgment? Do you know why they did that?
A. No, I don't.
Q. Would it surprise you to know that Mr. Roe's accounting practices had a little bit to do with that?
A. Like I said, I didn't review it, so I don't know.
Q. Okay. Do you find Mr. Roe to be reliable?
A. I found him to be forthcoming in answering all of my questions and providing me the information that I requested and explaining this to me so that I could testify cogently about it.
Q. What were your questions to him?
A. I asked him to explain to me these numbers. I asked him to explain to me why it -- why the numbers were -- were slightly different. I asked him to explain to me how Free Speech has been addressing the debt. I asked him to explain to me the --
Q. Does it --
A. He -- he -- and the -- also, the -- the -- the -- what's it called? The tax -- the Schedule C. I asked him to explain that to me, too. And I -- I think that that's it. I think that I spoke to him for an hour or two. It wasn't a very long conversation.

Q. What's Schedule C?
A. The taxes. I think I said I reviewed the taxes earlier.
MR. OGDEN: Do we have any taxes?
MR. BANKSTON: No.
A. So Free Speech is reported in Mr. Jones' taxes. So I would -- I -- he showed me the Schedule C. So when I testified earlier, I reviewed the taxes, that's what I reviewed, because those are where Free Speech's income is reported.
Q. (By Mr. Ogden) Okay. Where -- where is the copy of those?
A. I'm sorry. I don't have a copy of those.
Q. You didn't ask for a copy of the document that's filed with the federal agency that reflects Free Speech Systems' income?
A. I don't have a copy of the -- of the Schedule C, no.
Q. Okay. What's in it?
A. I can't testify as to the numbers that are -- that are in there.
Q. Why?
A. Because I don't recall. I can't give you an exact number, and I don't want to tell you a wrong number.

Q. Why didn't you ask for a copy of that?
A. I saw it. I don't -- I, honestly, assumed that you had it.
Q. Okay. But if you knew you had to testify about this and there was a filed document that reflected income for Free Speech Systems, why didn't you get a copy and bring it with you?
A. Like I said, I assumed you had it.
Q. Do you have an electronic copy?
A. I don't -- no, I don't have an electronic copy.
Q. Okay. So Mr. Roe gave you a hard copy and then --
A. No. He didn't give me a hard copy. He showed me a copy. He did not give me a copy. I don't have a copy of the Schedule C.
Q. And you just purposefully didn't ask him for a copy to put with the -- I mean, you went to accounting and asked her to pull a profit-loss breakdown?
A. Well, I did that because this is -- I know this is different. This is updated information that was updated just this past week. So that's why I did that.
Q. Why were the profit-losses from 2020 updated in February of 2022?
A. As I testified earlier, there was an issue with the -- the deductions associated with some of the

equipment and that had to be adjusted.
Q. And you learned that -- and Mr. Roe was the one that made that adjustment and informed you, correct?
A. I don't know whether he made the adjustment, but he informed me of why the numbers were different.
Q. Did you ask why so late?
A. I didn't ask why so late.
Q. Do you think, sitting here today under oath, that -- that the numbers that are putting forth in these balance sheet, the profit-loss, and everything -- and the documents, Exhibit 17, do you believe those are accurate?
A. Yes. With the -- with the exception that -- of the $160,000 that I testified to, these numbers are accurate.
Q. Is it normal, based on any experience you may have, for a company to accrue a $53 million debt over an unknown amount of years, paying zero back on it, and then in the middle of litigation, post losing a default judgment dispute, all of the sudden that debt's secured up and a payment system's been made in the last four -- four months? Does that sound normal?
A. I -- well, first of all, I don't have any experience with that, so I don't think I am qualified to answer that question. But I also don't know when that

note was written, so I -- I don't -- I'm not qualified to answer that question.
Q. Does Mr. Roe work at Infowars?
A. No. He's not an employee of Infowars.
Q. Okay. Where's he an employee of?
A. He's a consultant. He's an independent consultant.
Q. He's a consultant, or he's a tax attorney, or he's a CPA? What is it?
A. I don't know. You'd have to ask him. He's not an employee.
Q. Well, you were tasked with learning the net worth of the company.
A. Yes.
Q. And some random person came in and started telling you stuff.
And you didn't vet what his credentials were?
A. No. I'm not -- I wasn't responsible for retaining him. So he was retained by the company. I didn't vet him myself, if that's the question. But --
Q. So Free Speech --
A. -- he had already been hired.
Q. So Free Speech Systems retained Mr. Roe?
A. Yes. As a consultant.

Q. And a consultant for what? These cases?
A. So I -- just -- just to make clear, he originally was retained by PQPR.
Q. How do you know?
A. Just based on my conversations with him, he worked for PQPR. And then at some point in time, that ended, and then he was subsequently retained as consultant for Free Speech. But, originally, he was retained by PQPR. That's the discussion we had earlier about the lawyer for PQPR who had retained Mr. Roe.
Q. Okay. So you got a company that has a dormant debt of about 50 -- over $50 million. You've got some sort of -- I don't even know if you can -- financial consultant, tax consultant.
What is -- what kind of consultant?
A. I don't know how to -- how to describe it.
Q. So you --
A. Just consultant.
Q. So somebody could just walk into you as a corporate representative preparing for a deposition, and say, hey, I'm a consultant, and you're just believing every word they say?
A. No. He was already retained by the company prior to me coming there. Mr. Jones indicated to me this was the person that was gonna help me understand

the financial documents. And so did I trust Mr. Jones' representation as to Mr. -- Mr. Roe, then, yes, that's accurate. But, no, a random person didn't just walk in.
Q. So Mr. Jones vouched for Mr. Roe? That's your testimony?
A. He indicated to me this was the person that would help me understand the documents.
Q. Okay. Do you understand these documents?
A. I am not an accountant, and I am not good with numbers. So I'm doing my best here.
Q. If Mr. Roe is a consultant, wouldn't he be the person that should have been designated for this topic?
A. I don't -- I think that I can answer your questions adequately.
Q. Well, you just said you're not an accountant; you're not a financial person.
A. I'm not.
Q. Okay. And you don't know what my questions are gonna be.
A. No, I don't.
Q. Yet, your testimony to the jury, under oath, is that you can answer them.
A. I think I understand enough about it to be able to answer the questions.
Q. Instead of wasting time talking with Mr. Roe

about this topic, don't you think it would have been more efficient to let you have less topics and less preparation and focus on the other stuff and then let Mr. Roe discuss all the things that he's been doing?
A. Unfortunately, that is above my pay grade. I don't make such decisions.
Q. Did -- would Mr. Roe be more qualified to talk on this subject than you?
A. I don't know because I don't know the questions you're going to ask me.
Q. Well, let's say this: In preparation -- in preparing for today, Mr. Roe gave you the information you needed, correct?
A. Not all of it. So the profit-loss statement, as I said earlier, I received this from Melinda, and this was in -- amongst the materials that I had access to; although, Mr. Roe went through it with me.
Q. Who owns PQPR?
A. PQPR is owned 20 percent by Dr. and Mrs. Jones and 80 percent by PLJR, ALC [sic].
Q. David Jones, what was his wife's name? 20 percent by David Jones and who?
A. And his wife. I'm sorry. Her name is escaping me right now. And Mrs. Jones.
Q. Carol, I think, right?

A. Oh, yes. That's sound right.
Q. Carol Jones.
Okay. And then were PLJR.
A. PLJR owns 80 percent of PQPR.
Q. Okay. And who owns PLJR?
A. PLJR is owned 10 percent by Carol Jones, so Mrs. Jones, Alex's mother, and 90 percent by the AEJ Trust 2018.
Q. Okay. When did the trust begin?
A. So I think the trust was finalized in 2018, that's why it says AEJ Trust. But as I said earlier, Mr. Jones had actively been engaged in estate planning prior to that. But I think it was officially formed -- formed in that year.
Q. Okay.
MR. BANKSTON: Who's JLJR? Who's this one?
Q. (By Mr. Ogden) Yeah. I've got a JLJR, as well.
A. You know what, I'm not sure about that one. I know PLJR is -- is the one that's -- owns PQPR.
Q. Okay. The -- so Free Speech Systems gets into litigation early 2018, and the trust is executed that same year through PLJR, ALC [sic], correct?
A. ALC or LLC?
Q. LLC.

A. Yeah. LLC. So -- so, like I said, I think that the -- the trust was executed in that year, but the estate planning for the trust had begun prior to that.
Q. That's fine.
A. Sure.
Q. My question was just PLJR.
And the -- who is the trustee for this trust?
A. The trustee? You know, I'm not sure who the trustee is. I know who the beneficiaries are.
Q. Who are the beneficiaries?
A. So the beneficiaries are -- of the corpus of the trust are his children, so they're -- in the trust are, you know, whatever money is in there. And Alex as a remainderman. And then the income going into the trust is paid to Alex.
Q. Okay. So Mr. Jones' income comes from the profits of the trust.
A. But, ultimately, that -- I don't think that income --
Q. I didn't ask a question --
A. Okay.
Q. -- Ms. Paz.
MS. BLOTT: Can I ask when we're referring to Mr. Jones, we articulate which Mr. Jones we are

referring to?
THE WITNESS: Oh, you mean whether it's Dr. Jones or Alex Jones? Okay.
MS. BLOTT: So that there's no confusion in the record.
Q. (By Mr. Ogden) The income -- so the income goes to the remainderman, Mr. -- Mr. Alex Jones, correct?
A. The income -- the income is paid to Mr. Jones, but with the caveat, which is what I was trying to say before, that there is another entity, AEJ Holdings, that owns Alex's interest in -- in PL -- in PQPR. So, total, Alex's interest is like 72 percent.
Q. Say that again AL...
A. AEJ Holdings, LLC.
Q. What's -- do you know Alex Jones' middle name?
A. I don't. I'm so sorry.
Q. I bet it starts with an E, though, huh?
A. (Nodding.)
So that ownership interest in PQPR, he owns about a -- if you divide it amongst his parents and their percentages, he owns a 72 percent interest. So he sold his interest in that to AEJ Holdings, and there's a 25.9 or 29 -- $25.9 million note on that.
Q. Okay. Where's that come from?
A. What do you mean where does it come from?

Q. Where does the $29 million note come from -- or, I guess, 29.9.
Where does the $30 million note come from?
A. So I thought I had seen the note. It's the -- it represents the value of Mr. Jones' interest in PQPR.
Q. Okay.
A. Such that it -- such as it were because it's about -- it's 72 percent. And then the money that is paid principal and interest off of that note is paid to Alex Jones.
Q. And I don't need you to, you know, kind of be shooting from the hip guessing on the numbers. If you need to refer back to your notes, that's fine.
A. No. I believe that that's accurate. It's 25.9.
Q. Okay. Did you take notes when you met with Mr. Roe?
A. (Shaking head.) I don't believe so. Aside from looking at the documents.
Q. Okay. So Mr. Roe just broke down 20 percent to David Jones; 80 percent to PLJR, LLC, who PLJR is 10 percent Carol, 90 percent AEJ Trust, which has Mr. Jones' children as beneficiaries, Mr. Jones as the remainderman, and the income due to the remainderman goes to AEJ Holdings, which is 72 percent of the

interest, which would be roughly $29.9 million; that's correct?
A. 72 percent of his interest in -- which represents his interest in PQPR, not of the interest, but his interest in that company.
Q. Okay. And you just can do all -- you -- you learned all of that from Mr. Roe with no financial background without taking any notes?
That's just what I want to make clear for the record.
A. I have a decent memory.
Q. Okay. I noticed you pulled your yellow pad out.
A. I have some notes.
Q. Let's mark that as Exhibit 18.
A. I don't think I took any notes.
(Exhibit 18 marked.)
Q. (By Mr. Ogden) Mark the whole thing.
A. The whole -- I don't know if there's any information in there about my other clients.
Q. Okay. Well, it's been pulled out, and you said that you got notes in it.
So by the Rules of Texas Procedure, I can mark it as an exhibit, and it's gonna be admitted into the deposition's record. And you'll get a copy back

after she gets some copies to scan in.
A. I haven't reviewed --
Q. I'm sorry.
MR. OGDEN: Ms. Paz.
A. -- the notebook. I'm just saying, I haven't reviewed it.
Q. (By Mr. Ogden) Can I see that?
A. Sure.
Q. Thank you.
(Witness handing notepad over.)
(Brief pause as Mr. Ogden reviews notepad.)
MS. BLOTT: These are the notes that were transcribed and provided to you.
MR. OGDEN: They were?
Because I don't remember these notes on here. These notes with the conversation with Bob, those aren't in there. I got $70 million sales. Looks like -- what is that under there?
Q. (By Mr. Ogden) 260 D.
What is that?
A. Divided by 260 days.
Q. Okay.
A. Those are business days.
Q. And then, also, in Exhibit 18, you've got this

no way to determine --
A. Which.
Q. -- which...
A. I don't -- I'm sorry. I can't read my own handwriting.
Q. Blank generated checks.
A. I don't -- wait. Generated. Generated. That is generated, yes.
Q. What is that one?
A. I'm not sure.
Q. Okay. So --
A. But I -- I think --
Q. And then it says here, no spoliation letter. Then it talks about deplatforming.
What do you mean no spoliation letter?
A. I asked when -- or if he knew or if anybody at the company knew whether we had received a spoliation letter for the Sandy Hook litigation.
Q. Okay. It says chain of title in parentheses.
Tell me about the chain of title you and Bob talked about.
A. That's what I just went over --
Q. Okay.
A. -- regarding Free Speech and the ownership per -- on the ownership and who owns what and what

percentages. But, ultimately, I did talk to Melinda about that, too.

Q. These two words right here (indicating), what does that say?

A. Bill Love files tax returns.

Q. Okay. Who is Bill Love?

A. I believe he's the company's tax attorney.

MS. BLOTT: And just let me interrupt a minute.

Are there any notes in there about conversations you and I had?

THE WITNESS: There might be. That's why I'm saying I haven't reviewed it. That's why I'm saying I think that I should review it first.

MR. OGDEN: Ms. Blott, the witness pulled this out to rely on it in answering my questions.

A. I did not look at that to answer your questions, sir.

Q. (By Mr. Ogden) Okay. Well, we can go back to video, if you'd like, and I can -- there's -- I watched you start doing this (flipping pages in notebook). So...

A. I didn't look at anything in there. I didn't pull out anything in there.

MR. OGDEN: Ms. Blott and I can handle

this.

Ms. Blott, how would you like to proceed?

MS. BLOTT: I would like to look at it such that to the extent and only to the extent that she took any notes regarding conversations she had with me, they be redacted. The entirety of -- of anything else that she has in there, fair game.

MR. BANKSTON: Well, we -- just to put this on the record -- this is Mr. Bankston. We would have to bring a motion on that. Because if the witness was using this notepad to refresh her memories, then regardless if it contained privileged information, we're entitled to see it.

MS. BLOTT: Well --

MR. BANKSTON: So we'd have to bring a motion on that. And so that's what we'd want to know is if you want to take this from us right now.

MS. BLOTT: Yes, I do.

MR. BANKSTON: Okay. Then we can bring a motion.

MS. BLOTT: Because -- just to clarify, she transcribed those notes, and they were provided to you and are in --

MR. BANKSTON: Kind of sounds like you're testifying about what that is, and that sounds weird to

me.

MS. BLOTT: Well, I don't give a shit.

Anyway, she transcribed the notes. They were in her binder.

MR. OGDEN: Ms. Blott -- let's slow down. Let's slow down, Ms. Blott. Let's slow down.

MS. BLOTT: You took her binder --

MR. OGDEN: Ms. Blott.

MS. BLOTT: -- and she pulled out the notebook because she does not have her transcribed notes.

MR. OGDEN: Okay. Ms. Blott, let me just back up.

One, I am one who admires, you know, zealous advocacy of a client. Let's watch our language on the record, just out of respect for the Court. Second --

MR. BANKSTON: If not for me.

MR. OGDEN: Second of all, if these were transcribed, there should be no problem with me reading them.

THE WITNESS: No. But...

MR. OGDEN: And your witness is the one who made the decision to bring them and then take them out.

MS. BLOTT: I disagree. I'm going to...

MR. OGDEN: Disagree with what? Her bringing them or taking it out?

MS. BLOTT: I disagree with the position that you're taking. When she transcribed those notes, she would have omitted conversations with me.

MR. OGDEN: Okay.

MS. BLOTT: Because she does not have --

MR. OGDEN: If you would like to --

MS. BLOTT: -- her transcribed notes --

MR. OGDEN: If you would like to go through -- and I'm not gonna read them. I just want to see how deep into it. Okay. So it's pretty deep.

If you would like to go into this and -- and redact -- or, I guess, just what are you gonna do? Pull them out?

MS. BLOTT: No. I'm -- to the extent that they're in the middle of the page with something else, I'm going to redact it.

MR. BANKSTON: I'd like to have photo copies made of that before you do that.

MS. BLOTT: Of what?

MR. BANKSTON: You need to make sure that there's secured photocopies of what is under those redactions.

MR. OGDEN: Yes. Before you redact -- how are you going to redact?

MR. BANKSTON: Because we're going to move to compel.

MR. OGDEN: Yeah.

Hold on, Mark. Let me do this.

How are you gonna redact this? Like how -- the actual process of covering the information, how are you gonna do it?

MS. BLOTT: Okay. Here's what I suggest: I will scan them in so that the original is preserved, and then I will use a copy and save the document and redact any information as it relates to conversations with me.

MR. OGDEN: Okay. How are we going to do that and allow me to ask questions about the notes here right now?

MS. BLOTT: Well, he's the one that just said he wants to preserve it in its original form. So what do you propose?

MR. OGDEN: I agree. I agree.

MS. BLOTT: We can go off the record, run them through a copy machine. I can take the originals.

MR. OGDEN: If we want to do that, I think we can have Sonya do a copy.

MR. BANKSTON: Let's do it right now. And then let you sit down --

MR. OGDEN: And I'll let you go through it. I'm trying to hurry. It's 2:18 --

MS. BLOTT: I understand.

MR. OGDEN: -- and I'm trying to get Ms. Paz out of here by 4:00 o'clock. So...

THE WITNESS: Do you want -- do you want me to go through it?

MR. BANKSTON: You know what might work best is if you were to -- and I see you are reviewing now.

MS. BLOTT: Yeah.

MR. BANKSTON: If you were -- if you were to determine if you even need to redact. And if you do, then I will make sure that this office scans it for you and you're able to have a copy.

MS. BLOTT: This entire page needs to be redacted. Well, yeah.

MR. BANKSTON: Okay. Well, why don't you make arrangements with the office staff here to have that scanned so you can have an electronic copy, and then you can make whatever redactions you believe you need to make and we can bring our motion. And then Mr. Ogden can --

MR. OGDEN: We can go off the record. I see -- I just realized you're pounding away.

THE VIDEOGRAPHER: We are off the record at 2:19.

(Recess from 2:19 p.m. to 2:28 p.m.)

THE VIDEOGRAPHER: We are back on the record at 2:28.

MR. OGDEN: We're back from a small break.

Ms. Blott, were you able to go through the notes that Ms. Paz took out mid deposition?

And it's plaintiff's position that those notes in their entirety should be able to be marked as an exhibit and added as an exhibit to this deposition. However, I believe Ms. Blott has taken issue with that position. I'm not sure what the basis is, but I will -- I will say -- one more point before I hand it over to Ms. Blott. That a witness pulling out notes privileged -- conversation with an attorney or not, are not privileged and would be akin to an attorney sitting there whispering into the witness' ear, which would also be completely allowed to be produced and should be produced to us.

MR. BANKSTON: Yeah. If I can just add something to the record really quick. This is Attorney Bankston.

And I'd just like to -- to make a citation to the -- to the Kerns case. And -- I mean, that's just something I pulled off the top here. But in Kerns, the Court agreed that if materials that were otherwise claimed as attorney-client privilege could be protected, but when the witness relies on such documents to provide deposition testimony, it presented, quote, a conflict between the liberal interpretation required under our own rules of discovery and the liberal construction in favor of the exercise of the attorney-client privilege.

Therefore, the Court decided that any privileges were waived once the witness relied on that document to provide testimony. The Court said it would be unconscionable to prevent the adverse party from seeing and obtaining copies of it.

We've now been told that we will be prevented from seeing and obtaining copies of them. We object and we will move to compel.

MR. OGDEN: Thank you, Mark.

Ms. Blott, the floor's yours.

MS. BLOTT: Thank you, very much.

The legal pad that Ms. Paz pulled out is the handwritten notes of the transcribed notes that she provided to counsel yesterday. When she transcribed those notes, she did not, obviously, include the

confidential communication with her -- with the counsel for Free Speech Systems, Inc. And because she did not have her transcribed notes with her today, she pulled out the legal pad -- and did not have those notes, through no fault of her own.

She pulled out the legal pad and has not -- we will have to check the videotape. I don't think that she has referred to it. However, that being said, I have offered to take those portions of the tablet that are subject to the attorney-client privilege and redact them. And my understanding is that your position is that that attorney-client privilege has been waived.

MR. OGDEN: My -- my position is, yes, it's been waived.

MS. BLOTT: Okay.

MR. OGDEN: For the sake of efficiency, how many pages do you need to redact?

MS. BLOTT: Two.

MR. OGDEN: Okay. If you'd like to pull that yellow piece of paper off and stick it over the page that those are in, we can go through them with this witness. We don't want to have to come back. It's expensive for everybody. And then we can have that given to the court reporter so that she can preserve the

original, and we can brief whether or not we're entitled to the two redacted pages.

And, just to be clear, the two pages you're referring to are attorney work product or are they attorney-client privilege?

MS. BLOTT: Attorney-client privilege.

MR. OGDEN: Okay. The bigger question is: Are they, like, bad for you guys or what?

MS. BLOTT: No, not at all.

Oh, okay.

MR. OGDEN: I get caught up, too. Sometimes I argue just to argue. I was just curious.

MS. BLOTT: Do you want me to pull these out and photocopy them and give the originals to her? Is that what you suggested?

MR. BANKSTON: Wouldn't we be fine --

MR. OGDEN: I just said, we -- we can have the court reporter withhold the exhibit -- the unredacted version and she'll have a copy of it, and then we can -- you can get that from her, send it to Court, and we can have our motion.

MS. BLOTT: Well, just to be perfectly clear, I don't have a problem with you having copies of her notes, except to the extent of the pages that contain...

MR. OGDEN: The good part about it is, when I go through that, other than those two pages you're talking about, I bet they're verbatim. I hope that they are.

THE WITNESS: Do you mean my notes?

MR. OGDEN: Uh-huh.

THE WITNESS: Pretty -- yeah. The top part of the page.

MS. BLOTT: Okay. That's what I thought. I just wanted to make sure.

THE WITNESS: This makes me wish my handwriting was better. Now everybody's gonna see my real --

MS. BLOTT: Well, at least we're off the record.

MR. OGDEN: Everybody's gonna think you're a surgeon.

(Brief pause.)

(Ms. Blott handing notepad to Mr. Ogden.)

MR. OGDEN: Thank you.

Mark, take a gander.

Q. (By Mr. Ogden) Exhibit 16, maybe 17 -- 17.

A. Okay.

Q. Okay. Have you ever seen that before?

A. I don't remember.

Q. Okay. Do you know what a UCC-1 is?

A. Kind of. Like I said, I'm not an accountant. So kind of.

Q. Okay. You understand that this goes directly to Free Speech Systems assets and/or liabilities, correct?

A. Yes.

Q. What is -- what's your understanding of what a UCC-1 does?

A. I don't -- I -- honestly, I don't think I could tell you with any -- with any specificity.

Q. That's fine. You said that you had a general understanding what it was.

I just want to know what you believe it is.

A. I think it's a financing statement for the -- for the company.

Q. What do you mean financing statement?

A. I think that it's a statement on the company's finances to the government.

Q. Okay. What about the company's finances?

A. I -- I don't know. Like I said, I don't recall. I don't know whether I've seen this.

Q. Okay. So that's fine.

A. I don't know if I've spoken to anybody about

it.
Q. Based on those two answers, I'm gonna go ahead and assume really you don't know what this document is?
A. Right.
Q. Because you said it's a financing statement, which is -- it says UCC financing statement at the top.
A. Basically.
Q. You're just kind of reading it.
So when it comes to liabilities of the company, are any of them secured?
A. Secured by -- what do you mean? Secured by a note?
Q. Do you know what a secured debt is?
A. I'm sorry. I don't -- I don't know how to answer that, and I'm not sure what the answer is.
Q. When coming to evaluate the company's net worth --
A. Uh-huh.
Q. -- you had to look at liabilities and you had to look at assets, right?
A. Right. Yes.
Q. Okay. Do you know what the difference is on a secured liability versus an unsecured liability?
A. I don't know the difference.
Q. So as you sit here today, you are in no

position to testify as to whether or not any of the company's net worth is in a secured debtor's hands or if any of it has been secured whatsoever, true?
A. I don't know. That's right.
Q. Okay. Do you -- you remember you talked to Bob?
A. Yeah, I spoke to Bob.
Q. And that's -- and that's Bob Roe?
A. Yes.
Q. Okay. And Mr. Roe, he gave you kind of a presentation, correct?
A. Yes.
Q. Okay. Do you know what company he works for?
A. Acuity.
Q. Okay. You see the name on the file at the top-left corner?
A. Yes.
Q. Do you know if Acuity -- do you know when Bob Roe became a consultant for Free Speech Systems -- Free Speech Systems and stopped his relationship with PQPR Holdings, Limited?
A. I don't know the exact date of -- when I asked Bob about it, he said it was a couple of years ago.
Q. Okay.
A. So -- but I don't know the exact date.

Q. Because right here, we've got a UCC-1 statement that was filed on November 18th, 2020, correct?
A. That's what it says.
Q. By Bob Roe's company, correct?
A. I see that.
Q. On behalf of Free Speech Systems as the debtor, correct?
A. That's correct.
Q. And on -- and as the secured party in Paragraph 3, it lists PQPR, correct?
A. That's right.
Q. Could that be a conflict of interest?
A. I can't say.
Q. Because it sounds like a conflict of interest.
A. I don't -- I don't know.
Q. Is it -- have you ever -- I think I know the answer to this.
But have you ever seen a company secure a $53 million debt nine months after a lawsuit is filed on a debt that no one has any idea how old it is or why it's so big?
A. Well, I have an idea as to why it's so big. But I can't answer your primary question, which is, in my experience, have I ever seen that, because, as I've said, I don't have that kind of experience. I don't

think I'm qualified to answer it.
Q. Why is it so big?
A. As I testified earlier, there had been a significant period of time where the -- the product that was being purchased and sold by PQPR on Infowars' website was not being paid to PQPR. And so that money represents the amount that is due and owing to PQPR for those sales.
Q. Just for the benefit of the jury, you would agree that this spider web of trusts and secured beneficiaries for different subsidiaries or holding companies is just a way for Free Speech Systems to protect its money from people that file lawsuits against them?
A. No, I don't agree.
Q. Okay. Why'd they set it up this way?
A. I don't know why it was set up this way.
Q. But you definitely don't agree that it -- it was set up to -- to protect the assets of Mr. Jones?
A. I don't know why it was set up. I don't think it was in relationship to this lawsuit.
As I testified earlier, the trusts and that -- that structure of the companies was in motion prior to the lawsuit.
Q. And you got that from Robert Roe?

A. Mr. Roe, Mr. Jones; that's correct.
Q. Okay. So the individual who worked for one company, switched over and worked for another and secured debt to one another with the sole proprietor being a 72 percent beneficiary to three parent holding companies down.
You trusted him and you trusted Mr. Jones, the sole proprietor of a company that is the subject of a number of defamation lawsuits involving parents who lost children in a school shooting, who he, for years, then went on to say that it didn't happen or it did, but -- but there was a government conspiracy and all this other stuff.
That -- those are the two people you trusted, correct?
A. Those are the people with the information, so yes.
Q. You think it's odd that they picked somebody for this topic that has zero financial background?
A. I can't answer that; I don't know.
Q. When -- were you surprised when they said you're gonna be talking about our finances and net worth?
A. I wasn't surprised. I had seen the notice of deposition.

Q. Were you surprised when people started having to make charts and breakdowns of the different subsidiaries, who owned them and how many percent?
A. No, not necessarily. I'm aware that businesses own shares through LLCs -- through other LLCs. So I don't think it's necessarily odd.
Q. No. You're -- you're completely right.
But are all of the holding LLCs typically going to be the -- a sole proprietor's parents or children or themselves?
A. Oh, like I said, I don't know. I'm not qualified to answer that.
Q. What's a spendthrift trust?
A. I don't know if that's what this type of trust is. And, honestly, I don't have a background in trust and estates either, so I can't answer that.
Q. So throughout this, no one even told you the AEJ Trust is a spendthrift? Nobody even told you that?
A. I don't know what type of trust it is, no.
Q. You didn't ask either, right?
A. I know what the trust does. But...
Q. Didn't ask you that.
A. But, no, I don't ask -- I didn't ask what type of trust it was.
Q. Okay. Why not, other than you didn't know to

ask?
A. Well, I didn't know to ask. But I think that they tried to give me the information that I needed to testify on the topic.
Q. You said that you think they tried to give you the answer -- the information you needed.
Or could it also be that they -- you accepted as true the answers that they wanted you to accept?
A. No. I think also the problem is that I don't -- I am not -- I am a corporate rep for Free Speech; I'm not a corporate rep for PQPR or PLJR. So I don't think that I need to necessarily have all the nitty-gritty informations [sic] on other companies that are not Free Speech.
Q. Okay. Based on this balance sheet, how is Mr. Jones covering his bills every month?
Excuse me. How is Free Speech Systems covering their bills every month?
A. So there are -- so there's income that the -- that Free Speech makes off of the relationship with PQPR via the sales. PQPR also pays money to Free Speech for advertising on the website, that includes the banners and such. So that's -- and so, essentially, the way that the business makes money is -- is those two primary

ways.
Q. Okay. Let's look at the balance sheet that was provided. It's Exhibit 15, I believe.
A. Okay.
Q. That one (indicating). Yeah.
So the balance sheet is for all of 2020, correct. You understand that?
A. That's what it says.
Q. Okay. And can you tell me where the income is that Infowars makes from PQPR for advertising?
A. I don't know if this is not a specific line item. I know that there are -- there are line items more -- that would give this more specificity, but there's no way to tell from looking at this.
Q. Do you know what the GAP is?
A. What do you mean, the GAP?
Q. Do you know what GAP means in this context that you're testifying about?
A. I don't know what you mean by GAP.
Q. I'm gonna represent to you it's not a store at the mall.
A. I didn't think it was.
Q. Generally accepted accounting principals.
Do you know any of them?
A. I'm not an accountant, so no.

Q. On a balance sheet, you use the term line item.
What's a line item?
A. A line item is more specific information on -- on these numbers.
Q. Okay. So if there's not a specific line item, there would still be a -- a broader category that would encompass that income.
Can you tell me which one?
And if you don't know, I understand.
A. I don't know if it's -- if it's redacted here under assets. So it may be in this redacted. But, like I said, I don't know because it's redacted.
Q. Okay. But your best guess is that, that redacted line item would be your interest made from PQPR?
A. I -- I don't know. Like I said, I -- I don't see the specific line item here for that.
Q. I have a question.
A. Sure.
Q. PQPR is owed $53 million, according to you, right?
A. About, yes.
Q. Why are they paying Infowars for advertising when they could just keep that money and have the amount -- the -- the note go down?

A. I think that the -- the answer that I got when I spoke to Mr. Roe and Mr. Jones was the efforts that have been made to make sure their -- the two companies are -- are not so financially entangled. So it's easier to have them pay out the marketing and then have us reimburse them than it is to just say, oh, just take it off what I owe you. It makes for cleaner tracking.
Q. Okay. So for the first time in the history of this case, we have something in the business from Free Speech that's cleaner tracking.
This is where they decided they wanted to be clean?
A. This only happened, like I said, within the last few months. So...
Q. Before that, what was happening?
A. As I testified earlier, there really was no set schedule to repay this debt or any set schedule to make payments to PQPR for the costs of the products. So -- so there really wasn't anything clean about it.
Q. Okay. The -- at any point since 2018 to today, has Infowars transferred any assets without an exchange of goods or services?
A. I don't -- I don't know what you mean. I'm sorry.
Q. Do you know what goods and services are?

A. Yes. Paying somebody in response -- in response to things -- good or service that you received, yes.
Q. You know what transfer means?
A. Transfer of money.
Q. Do you know what assets are?
A. Assets could be money, it could be other items --
Q. Okay.
A. -- including money.
Q. Has -- has Free Speech Systems transferred any assets without an exchange of goods and services from the time this lawsuit was filed to now?
A. That's a really broad question, and I don't know how to answer it.
Q. Well, it's a very broad question, so it should be easy to answer, based on your knowledge. If there's not very many at all, then it wouldn't be hard at all either.
A. I don't -- honestly, I didn't ask that question, so I don't know how to answer it.
Q. So the broadness of the question doesn't matter.
You just don't know one way or the other, no matter how specific I get, true?

A. True. I don't know specifically what you're referring to, but I didn't ask that specific question --
Q. Okay.
A. -- so I don't know the answer to it.
Q. Did you -- you reviewed the Interrogatory, Exhibit 13?
A. Okay. Yes.
Q. Okay. So you see B?
A. I'm sorry. What page are you on? Is this Page 4.
Q. Page 4, yeah.
A. Okay.
Q. Part B listed in it, it asks for all assets transferred in any manner.
A. Okay.
Q. Okay. So with that said, were any of these transfers done without an exchange -- a fair exchange of goods and services?
A. What transfers are you referring to?
Q. Any at all. They didn't itemize them, and that's why you are sitting in the chair to answer the specific question. That's what you were tasked for.
A. What do you mean itemized transfers?
I don't see any transfers listed here.
Q. They're -- they're not itemized. And the

reason I'm asking you for the itemized information is because you're tasked with telling us what this means.
A. I guess I don't understand the question. And I'm sorry that might just be because I don't have a background in this.
But it says a list of all assets transferred. And there is a list of what assets the company possesses, but I don't see where you're referring to that there are transfers.
Can you point me to that.
Q. No, I can't. Because this answer doesn't give them, which is why I'm asking you to give them to me now.
A. Well, the answer is -- the answer here, as I read it, it doesn't seem to be responsive to B at all. It doesn't say that there's any transfers.
Q. You are completely right --
A. Okay.
Q. -- which is why I'm asking.
A. You're assum- -- I guess my question is: You're assuming there are transfers, but you're not sure, and that is your question to me as to whether there any transfers.
Q. Are there any transfers?
A. I don't know.

Q. Did you ask?
A. I did not ask.
Q. You would agree that's a pretty bad fact?
A. A bad fact as to what?
Q. That you didn't ask.
A. I did not ask.
Q. If you're sitting here -- I can read these words. I understand all these words in this order.
A. Yes.
Q. Right?
You're sitting here to answer the questions that these answers don't provide, and you can't.
It's my -- it's my -- and correct me if I'm wrong. But the same individuals that have everything to lose in this case gave you these numbers and answers and said, this is what -- that's what it is?
A. Well, I didn't do any independent analysis of it. I don't have a background in accounting. So I don't think I'm in a position to verify the accuracy of these numbers.
Q. Right.
A. I asked for them, and I think that I -- I did what I could in the time that was available to me, and testifying as best as I can on it.

Q. So you'd say, currently, as you sit there, you are disseminating information that is unverified? Does that sound familiar with regard to the defendant you're sitting in that chair for?
A. I'm sorry. I don't understand the question.
Q. Sure. Free Speech Systems, they spit out a bunch of information that is completely unverified; some of it is just made up.
And you're sitting here today -- does -- everything that you're giving us, you didn't verify?
A. I didn't independently verify these, no.
Q. You didn't even ask why Robert Roe, a consultant that does not work for the company, had full access to the company's books to the point where a year and -- I don't know -- four months after the year was over was able to go in and change numbers? You didn't ask why, did you?
A. No. I asked why, and I gave you my answer as to why. I know you -- I don't know if you don't understand why.
But as far as verifying, I mean, like I said, I didn't check these numbers myself. But I did see the tax return forms, the Schedule Cs, these numbers are -- are the same as the numbers that are on the Schedule Cs.

MR. OGDEN: Ms. Blott --
Let's stop there.
Ms. Blott, this witness, now for the second time, has given me information that in preparation for her testimony today relied on tax records that have not been produced.
What are we gonna do about it?
It's kind of -- it's like a revolving door at this point.
MS. BLOTT: It is not a complete tax return.
MR. OGDEN: I don't care what it is. Whatever she had, I want.
MS. BLOTT: Okay. I'm sorry. Are you gonna let me finish?
MR. OGDEN: Not if it starts with that.
Go ahead.
MS. BLOTT: Just file your motion.
MR. OGDEN: I'm giving you a chance right here to try and tread water a little longer.
MS. BLOTT: The Schedule C that she reviewed, not the complete tax return, is not a finalized Schedule C and has not been filed with the Internal Revenue Service.
MR. OGDEN: But the witness relied on it

for her testimony right now. I don't understand where the miscommunication is on my end.

MS. BLOTT: I don't know why she's testifying that she relied on it. It has the same numbers as what she's looking at now.

MR. OGDEN: How do you know? Have you seen it?

MS. BLOTT: Yeah.

MR. OGDEN: Okay. Why hasn't it been produced?

MR. BANKSTON: Why are we not producing it right now at this very second?

MS. BLOTT: Do you want to continue with the deposition?

MR. BANKSTON: Wow.

MR. OGDEN: I -- if that -- I'm literally giving you, you know, a lifeline here to try and just fix it. If you have it, hand it over. If not -- we can cure it now.

But if that's -- if your response is file your motion or would you like to continue, then I will.

MS. BLOTT: Well, here is my explanation. It's an explanation; it's not an excuse.

Since the day I got on this case, I have been working round the clock to get the production --

verify the documents you have been provided with are full and complete documents.

As an example, I realized when I saw the profit and loss and the balance sheet that it had not been produced because of differences in opinions on the definition of financial statement.

MR. BANKSTON: Brad Reeves says you're not telling the truth, by the way.

I'm sorry. I didn't hear you.

MS. BLOTT: I said, oh, gee, surprise, surprise.

MR. BANKSTON: Oh, so -- okay. So -- so I just want to make sure we're clear on the record.

We're just going to go ahead and make the assertion that it's not surprising that Brad Reeves said something that you think is false, because I guess the implication is Brad Reeves is a liar or has a propensity for lying. And I certainly didn't find that Brad Reeves.

MR. OGDEN: Okay. Let's just do this. I think with where we're at now on this impasse, doesn't seem like there's very much more we can do. If I don't have the document, I'm not really hearing from you that you're going to give it to me.

MS. BLOTT: I am going to give it to you.

Do I physically have it -- have I had physical possession of it? No. It's like --

MR. OGDEN: How'd you see it?

MS. BLOTT: On a screen.

It's just like the Bates labeling -- or, excuse me -- the financial documents. I received those on Friday.

MR. OGDEN: I'm questioning Ms. Paz on net worth.

MS. BLOTT: I understand that.

MR. OGDEN: When were you gonna give it to me? After the depo?

MS. BLOTT: So what do you want to do?

MR. OGDEN: I don't know much more I can do.

MS. BLOTT: Okay.

MR. OGDEN: I mean, this is every time I turn the corner, I've got something new or something -- I mean --

MS. BLOTT: Okay.

MR. OGDEN: I think at this point, we should suspend the depo so that we can brief this to the Court, because the Court, in the hearing, was very clear, that if there are any issues, to bring them to her attention, and she will act swiftly so that the

trial date is not interrupted.

MS. BLOTT: Okay.

MR. OGDEN: Do you have a solution different to that?

MS. BLOTT: No.

MR. OGDEN: Okay. Well, then we'll suspend the deposition.

MR. BANKSTON: Actually, can I confer with you for a couple of minutes about some questions?

MR. OGDEN: We won't suspend. Let's take a five-minute break.

MS. BLOTT: You're not leaving with that notebook in your hand.

THE REPORTER: Okay. Can we go off the record?

MR. OGDEN: Yes.

THE VIDEOGRAPHER: We are off the record at 2:57.

(Recess from 2:57 p.m. to 3:04 p.m.)

THE VIDEOGRAPHER: We are back on the record at 3:04.

MR. OGDEN: We took a break. I think that at this point it is the safest decision for all parties to suspend any more testimony on net worth until we can get a complete set of documents and -- and kind of have

a understanding of what direction this is even going to go. But I do have a couple of follow-ups.
MR. BANKSTON: There's one, two, three -- they're marked.
Q. (By Mr. Ogden) And this is Exhibit --
THE WITNESS: It's already -- I think it's already marked.
THE REPORTER: You already marked it.
MR. OGDEN: I know. But I was gonna make it 18B -- 18A and D so it's clean.
I know I should have been a court reporter. I would have less gray in my hair.
(Exhibit 18A marked.)
Q. (By Mr. Ogden) I have marked a couple pages out of your notes, and I want to ask you about it.
We'll start with Page -- what's marked as 18A out of Exhibit 18.
Do you see --
A. Yes.
Q. -- see your notes there?
Okay. Where did these notes come from? Which interview, or who were you talking to?
A. Can I flip back.
Q. You can do whatever you want.
A. Oh, this was a conversation I had with

Mr. Jones.
Q. Okay. And it says here at the top, perfect place to post disinfo, hyphen, 4chan, underline.
Do you see that?
A. Yes.
Q. What did you think that means -- why did you write that?
A. So this was a conversation I had with Mr. Jones about using 4chan --
THE WITNESS: I'm sorry that's --
MR. OGDEN: It's okay.
THE WITNESS: -- my -- my father.
(Turning off phone.)
A. So this was a conversation I had with Mr. Jones about using 4chan for material from which to draw, and Mr. Jones' -- he -- he -- he -- as you can see after that, I talked a lot about Pizzagate and operatives on 4chan.
And it's Mr. Jones' opinion that 4chan is -- that people purposefully sometimes post information on there for the purpose of misleading. And he used Pizzagate as an example. But his position was he didn't realize that at the time.
Q. But after Pizzagate, Mr. Jones realized 4chan was not a reliable?

A. Well, not that it wasn't reliable, but that I think he thinks that people are -- people associated with certain entities are posting things on there to try to -- like a breadcrumb to get him to pick up on bait. So I think that that was the sum and substance of that part of our conversation.
Q. What entities?
A. The democratic party, people in the government, any other people that he -- he thinks are trying to spread misinformation.
Q. Okay. And did Mr. Jones, after Pizzagate, come out and definitively tell his staff that 4chan is not a reliable source to be using?
A. Well, I think my note here says I told them not to do it. So I think at some point he -- you know, he did convey to them that if you're -- I know you're looking at, but if you're gonna see something on there, make sure that there's other sources.
Q. Okay. And in this case, the other source was a Twitter post, correct?
A. I think that's what Mr. Daniels says in his answer. But, yes, that he had seen it on social media; that's correct.
Q. I'm not asking you about it the day after tomorrow.

A. Sure.
Q. But it is unquestionable -- you know, it's not really any doubt in this case that what Kit Daniels did was just wrong, right?
A. It was inaccurate; that's correct. I don't think there's any dispute that the photograph was not of the shooter. I don't think there's that dispute.
Q. And has anybody during your preparation told you what Mr. Fontaine's gone through?
A. Has he gone through? I mean, I read through the materials as far as what was posted on the internet and in various comments on the internet. And I said I read that letter from his therapist. So I have some idea of what he's been through, yes.
Q. Do you know that Mr. Fontaine suffers from some mental health issues?
A. Pre this post, yes, I am aware of that.
Q. And also post this post?
A. I -- I don't know about that. Like I said, I read in the document that there weren't a lot of issues post post.
Q. What do you know about his mental health pre this incident?
A. You want me to testify as his -- as to the diagnosis that I'm aware of?

Q. Nope. I want you -- I want you to tell us what you know.
A. Based on that material that I read that I just referenced, his psychological -- it's not a psych record. It would more adequately be characterized as a letter from his psychologist. It summarizes his history precontact with Mr. Fontaine, and it does diagnose him with Asperger's.
Q. Okay. Anything else that you know about Mr. Fontaine?
A. Apart from what's in that letter, no.
Q. You know anything about Asperger's?
A. I don't have any personal knowledge of what Asperger's is, no.
Q. Okay. I'll tell you it's -- it's on the spectrum of autism.
A. Okay.
Q. And people that suffer from it are generally very -- have a lot of social issues --
A. Okay.
Q. -- with their development and in their ongoing adult life.
Did you know that?
A. Like I said, I don't have any personal knowledge about Asperger's, and I'm not really qualified

to say what it is or what the symptoms are.
Q. Okay. Well, you were tasked with the knowledge of Mr. Fontaine.
And when you saw what it was, you didn't do anything and take any steps to figure out what that meant, correct?
A. Well, I was tasked with what was in the company's knowledge of Mr. Fontaine, which was what was in that letter.
Q. Let me just ask --
A. The definition of Asperger's is not contained in that material. So...
Q. I'm just asking as person.
A. As a person, I did not do any independent research as to what Asperger's is.
Q. Do you have any personal feelings about what happened in this case?
A. I don't have any personal feelings, no.
Q. What about the Sandy Hook case?
A. I think I was asked that question yesterday.
Q. Okay.
A. I don't have any personal feelings, no.
Q. Okay. Do you -- is it your position as the company today to sit here and say that Marcel Fontaine did not suffer any injuries or damages as a result of

being misidentified by Infowars as the Parkland shooter?
A. I don't know the extent to his damages. I didn't say he didn't suffer damages. I don't know the extent of his damages.
Q. So we can agree that he did suffer damages?
A. I don't -- I don't know.
Q. Okay. Has anybody at Infowars told you that people contacted Marcel privately through messaging and made threats?
A. I did not see any private communications in the material that I reviewed --
Q. It's --
A. -- directly to Mr. Fontaine.
Q. And I want you to understand that the reason I'm asking you these questions is: I think with this case, specifically with all of the documents and all of the sanctions and all of the moving parts that you had to deal with, with Bob Roe and Dustin Whittenburg and Ms. Blott and Mr. Jones and Mr. Pattis and everyone else that you had to go through to get to this point, I want you to know there's a real person on the other side.
A. Okay.
Q. Go to the next one.
One follow up.
With the 4chan when Mr. Jones said not to

do it, you didn't ask him when he said that, right?
A. Just based on my notes and just what I remember of my notes, it -- I'm not sure when. He was referencing in relation to Pizzagate, but I'm not sure.
(Exhibit 18B marked.)
Q. (By Mr. Ogden) Okay. With -- with regard to what's marked as 18B, bottom right corner, it says Infowars, LLC, and then it says Jacobson circled.
A. Uh-huh.
Q. Why?
A. Those two things are not connected.
Q. Why are they in the same box?
A. I was doodling.
Q. Okay. Why do you have arrows pointing towards it?
A. I was doodling.
Q. Do you remember testifying yesterday?
A. I did testify yesterday.
Q. Do you remember when you said you had never heard of affiliated relations?
A. Yes.
Q. Do you want to take a look a little bit higher than the first box I pointed you to.
What's that say in quotations in your notes?

A. That was when you referenced it to me on the record. These are my notes from yesterday's deposition. And so I made a note because you asked me the questions regarding that, and I didn't know the answer.
Q. Okay. So you wrote this yesterday during the depo or...
A. Yes. Those are my notes from yesterday -- well, I wouldn't call them notes, most of them doodles. But those are from yesterday.
Q. Okay.
MR. BANKSTON: I think that's the same notes.
MR. OGDEN: Yeah. This is probably the same thing.
Q. (By Mr. Ogden) Which -- do you remember which document Bradley Reeves never produced we were talking about in 18C?
(Exhibit 18C marked.)
A. That was in response -- this is today's notes. It's dated. This was in -- this is the note of your discussion with Attorney Blott about the financial document that wasn't produced and the discussion back and forth about whether it should have been produced or not.
Q. (By Mr. Ogden) Okay. With -- with how this

depo's gone, how do you think you did?
A. I think I did pretty good, depending just not how -- obviously, I can't have all of the information about everything under the sun. But given the task, I think I did okay.
Q. You had eight topics, right?
A. Yes.
Q. You realize that you were not prepared to discuss five -- three of them?
A. Okay.
Q. Okay. So you still think that's a passing score?
A. Do you want me to give myself a rate from 0 to 100?
Q. If you want to.
A. I'm sorry?
Q. I said if you would like to.
A. I'm asking what you would like for me in my answer.
Q. I was just asking if you thought you -- now -- now that we are at this point in the depo having to suspend the last topic for a number of reasons, if you thought -- if you still thought now, like you did at beginning, which is that you were prepared?
A. I think I did a decent job, given all the other

circumstances involved. And I think the depo's being suspended just because you don't have documents. I don't -- I don't think that has -- really relates to my testimony. But...
Q. Okay. Then I'll clear that up just so there's no confusion.
Tell me the information that's in the Schedule C that you reviewed in preparing for you testimony.
A. Oh, I can't cite to it, as I sit here.
Q. You have it memorized?
A. I do not have it memorized.
Q. So you're not prepared to talk about it, if you don't have the document in front of you?
A. I can't talk about it if it isn't in front of me.
Q. Okay. That's what --
MR. OGDEN: We'll go ahead and go off the record. We'll suspend there.
MS. BLOTT: Okay. I have --
THE VIDEOGRAPHER: Off the record?
MR. OGDEN: Stay on. Ms. Blott would like to make a record.

EXAMINATION
BY MS. BLOTT
Q. Ms. Paz, did -- you testified that you did not read the Court's order with respect to the motion to compel and for sanctions --
MR. OGDEN: I'll object.
Q. (By Ms. Blott) -- on the corporate --
MR. OGDEN: I'll object to leading.
A. Yes, I did.
Q. (By Ms. Blott) Did you see the order?
MR. OGDEN: Same objection.
A. The order regarding the sanctions?
I -- I don't know that I saw it. I think we talked about it.
MR. OGDEN: I'm going to object to nonresponsive.
A. I don't -- I don't remember seeing it.
Q. (By Ms. Blott) Did you have conversations with anyone about the judge's expectations?
A. I did have conversations with counsel.
Q. Was it your understanding that you were trying to determine the viewership based on the judge's ruling?
A. Yes.
Q. Did you -- was it your understanding that the judge gave instructions on specific things that could be

done to determine that?
MR. OGDEN: Object to leading.
A. Yes.
Q. (By Ms. Blott) Did you -- what was your understanding of what was suggested by the judge to be done?
A. As I said, I didn't read the order. But based on my conversation with counsel, the judge had suggested that we try to determine the number of orders that were placed on the days that those broadcasts were aired, and I believe we did that.
Q. Okay. And did you speak with someone at Infowars about doing that?
A. The number of orders? Yes. I spoke to somebody at the warehouse. She worked -- well, I don't think she works for Infowars. I think she might work for PQPR.
Q. In the over-- you've test- -- with respect to the documents that you reviewed in preparation for your testimony in the Sandy Hook cases, were those documents separated between the two cases, meaning Sandy Hook and Fontaine?
A. There was a Fontaine folder with production in that specific case; but, otherwise, most of the documents were just Sandy Hook documents.

Q. Okay. Were the documents in the Sandy Hook folder equally pertinent to Fontaine in some instances as it relates to the notice of deposition?
A. In some instances, yes.
MR. OGDEN: Well, we're gonna be here a while.
Q. (By Ms. Blott) Did you have any conversations with employees regarding editorial conversations?
A. I asked employees. Specifically, I spoke to Adan, to Mr. Jones, to -- to Mr. Daniels regarding whether or not they had editorial discussions, and that would include, I guess, personal discussions. And I confirmed that there -- they wouldn't -- they didn't have any editorial discussions. The only discussion that Mr. Salazar recalled -- I think we talked about this yesterday in connection Mr. Jacobson. That wasn't regarding the Fontaine case, though, that was regarding the Sandy Hook case. But other than that...
Q. Do you know -- do you know the distinction between how electronic data is printed and hard form versus web pages?
A. How it's printed versus how it appears on a web page?
Q. Yes.
A. You mean how -- how -- is there a difference

between how it appears?
Q. Yes.
A. I mean, I don't have any technology on that, no.
Q. Okay. And you made references several times to posts.
Were there times that you were referring to actual posts on the internet versus posts that were produced as hard copies?
Because I was confused about that.
MR. OGDEN: I'm gonna object to leading.
A. I -- I don't understand the question.
MS. BLOTT: Okay. Pass the witness.
MR. OGDEN: Got quite a bit of follow ups now that we did that.

FURTHER EXAMINATION

BY MR. OGDEN
Q. Fontaine folder, correct?
A. There was -- on the Dropbox, there was a folder labeled Fontaine on it, yes.
Q. Who labeled it?
A. I didn't label it. I don't know who labeled it.
Q. Who sent it to you?
A. It was on the Dropbox. It wasn't sent to me.

Q. Is the Dropbox protected?
A. What do you mean is it protected?
Q. Does it require a password or does it require an invite, or is it --
A. It required an invite, yes.
Q. Who invited you?
A. It was our consultant at the time. I don't think he's our consultant anymore.
Q. What's his name?
A. Chris LaTronica.
Q. LaTronica. Just laughing when I write that name because there's no way me or the court reporter can get that one right.
A. It's L-a, capital, T-r-o-n-i-c-a.
Q. Okay. And Mr. LaTronica is a criminal defense attorney in Brooklyn, New York.
A. I believe so, yes.
Q. Okay. So your electronic consultant's a criminal defense attorney in Brooklyn.
When was he brought on as your consultant?
A. I don't know. I know he's been involved in the case longer than I have.
Q. Okay.
A. So I don't know.
Q. So as far as preservation and issues with

document production and possibly altered or -- or corrupted documents, he would be a person that we would want to talk to, correct?

A. I don't think that's accurate. I think all he did was organize the folders. I don't think he had any responsibility in production of any documents.

Q. When did he organize the folders?

A. I don't know when he did it.

Q. Before you came on?

A. Before and probably during. They were actively being reorganized.

Q. Okay. The -- what -- what files were in the Fontaine folder that Chris LaTronica put together for you?

A. Those would be the -- whatever we had regarding what we produced. And, as I indicated, there were also files in there that the plaintiffs produced that had your Bates numbers on it.

Q. Did you ask if that was a complete set of all files produced by plaintiffs and defendants?

A. I don't know if it's a complete set.

Q. The judge tasked you with reading every single document produced, right?

A. Yes. But I don't know -- like I said earlier, there's been an issue with me seeing what's been

produced in each and every case and whether I had the complete production. So I -- I don't know, as I sit here, if it was complete.

Q. You said that there was a number of documents that were pertinent during the Sandy Hook doc review that were pertinent to the Fontaine case.

A. Sure.

Q. Okay. Which ones?

A. So I think the financials documents, there were [sic] overlap. I think that this issue of editorial discussions, there are overlap. I think that the issue of sourcing of materials, there's overlap.

Q. Okay. Why were the financial documents in Sandy Hook pertinent to Fontaine?

A. They're the same financial statements from the company, whether it's Fontaine or Sandy Hook. So...

Q. Yeah. But you weren't tasked and did not testify on the financial -- on the financial issues with the company in the Sandy Hook deposition yesterday.

A. No. I wasn't asked questions about it.

Q. So why did you spend time prepping?

A. I spent one amount of time prepping for the financials.

Q. Okay. Right. Because --

A. I mean, I didn't prep once for one deposition

for the financials and a second time for a second deposition, if that's your question.

Q. Financials weren't a topic yesterday, were they?

A. I wasn't asked about it, no.

Q. Yet you still prepared?

A. I prepared on the financials.

Q. Okay. Well, it sounds like you prepared for the financials for Sandy Hook and for Fontaine?

A. I prepared to speak on the financials, and I thought I would be asked them at -- at yesterday's deposition.

Q. What made you think that?

A. That's -- that was my impression, but apparently it was inaccurate.

Q. Did you read the depo notices?

A. I did.

Q. They weren't identical.

You understand that, right?

A. I understand they're not identical.

Q. Nothing in the deposition topics you were tasked with being prepared yesterday had anything to do with the financials, correct?

A. Okay.

Q. Correct?

A. I don't remember, as I sit here today.

Q. Yet. Over the last two weeks, you've been going through financial docs for -- you know, for the Sandy Hook case, it seems.

A. No. I think what I testified to was when I got here I was talking to people about the financials. I didn't have the financial materials prior, arriving here. So it hasn't been two weeks, no.

Q. Well, you prepped for the financial stuff just for Fontaine, true?

A. Sure.

Q. Otherwise, you wasted a bunch of time doing it for the Sandy Hook depos because you weren't asked -- you weren't tasked with it in the topics.

I mean, I'm completely lost.

A. Sir, there's no separate preparation that would have been required. So you -- the way you're phrasing your question is that I would have prepped it once for Sandy Hook and then I would have prepped it a second time for Fontaine.

Q. No.

A. And that's not what I'm testifying to.

I'm saying that I reviewed materials regarding financials for both -- you know, just for the depositions. And I was under the impression you were

gonna ask them [sic] about it yesterday, but you didn't, and so that was my error.

But I didn't make two separate preparations for -- for one case versus the other.

Q. I don't think you understood my question, but I think you ended up giving the answer kind of right eventually.

What other -- other than the financials, which I'm still not sure how they are pertinent in any way to the Sandy Hook documents that you were tasked.

What other documents were in the Sandy Hook folders and not in the Fontaine ones that you found pertinent to the Fontaine case?

A. Did I just -- I think I just said the sourcing -- the issues regarding the sourcing and the -- I forgot what my answer was.

Q. Uh-huh.

A. Sourcing and one other thing I said.

Q. Okay. So the documents about sourcing.

Because the -- and the -- and the sourcing had a little bit of overlap, maybe.

But the Fontaine topics were very specific; you would agree?

A. Sure.

Q. The Sandy Hook ones were more broad?

A. Sure.

Q. Okay. Well, other than that, what -- what other -- what other topics did you find pertinent to Ms. Blott's question as far as you -- stuff you looked at in the Sandy Hook folders also was pertinent to the Fontaine preparation?

A. I forgot what I said in addition to sorting -- to sourcing.

Q. I did too.

And so we can just move on.

A. Sure.

Q. You also said that there is no such thing as editorial discussions in response to Ms. Blott's questioning.

You remember that?

A. Right. I think this was a topic we spoke about yesterday, as well.

Q. Can you think of one editorial discussion that you came across in your preparation for today?

A. Well, I think -- and I said this yesterday -- my -- my problem was with the term editorial discussion, just assuming that it happens on a regular basis.

But it sound to me like -- in connection with Fontaine, when I spoke to Mr. Salazar, there may have been some discussion about Mr. Fontaine -- about

this particular case. I don't know to the extent that was conveyed to Mr. Daniels.

Q. Okay.

A. But, as I said, Mr. -- Mr. Salazar and the three individuals, they sit together, generally, and they pass around their -- their articles. So I suppose you could term that an editorial discussion; although, I don't think it's formally an editorial discussion.

Q. Well, an editorial discussion would be as if -- if Mr. Daniels and Adan and a couple other writers got together about a post, and after having the editorial discussion decided to take it down, right?

A. If that happened. Because I'm not sure that that was -- that's what happened. When I -- so when I -- when I talked to Adan, he -- he was -- he's told me that he thought that he spoke to everybody, but I don't know that that was conveyed to Kit.

Q. Did you ever -- I understand that you had some issues with the definition of editorial discussion; is that fair?

A. That's fair.

Q. Okay. Did you -- did you relay that to Ms. Blott?

A. Did -- that I had an issue with it?

Q. That you didn't know exactly what it was or

what qualified or constituted an editorial discussion.

A. That's not what my problem is with the term.

Q. What's your problem with the term?

A. The term is -- the problem is, is I don't think that what is happening here could be termed an editorial discussion, and I think I raised that issue yesterday.

Q. What's an editorial discussion?

A. So I think that --

Q. Not what you think.

What is an editorial discussion?

A. An editorial discussion would be a -- a conversation amongst people about what should or shouldn't be published, whether or not the articles are -- are grammatically correct, whether they are being -- the sources are written in there appropriately. I think that's an editorial discussion.

Q. How did you come to that understanding of that being an editorial discussion?

A. That's just based on my conversations. It's not a definition anybody provided to me.

Q. Okay. If the judge was very clear on what she expected the corporate deposition notice -- or, excuse me -- the corporate representative deposition to be -- sorry -- let me back up here.

If Judge Guerra Gamble, on the record,

clearly defined what an editorial -- what an editorial discussion was to both myself, Mr. Bankston, and Ms. Blott, would that -- would that definition what she expected you to be prepared to do, would that be important to you in preparing for today?

A. Sure. As I said, I didn't read the exact order, but I did have a conversation with Attorney Blott about it.

Q. Okay. But what the judge is -- okay. So it's -- but you didn't -- you said that -- how much of your definition of editorial discussion came from Ms. Blott?

A. I am aware that the judge wanted me to also find out whether there were any hallway conversations. I don't know if that was the exact term. But, as I said, when I asked these people those questions, there were no such discussions.

Q. What'd you ask them?

A. What did I ask or who?

Q. What? What questions were you asking these people?

A. I asked Adan and Kit and I believe I asked Daria, as well, whether they had any discussions and at any point in time with anybody about these cases, and the answer was no, with the caveat of what I've already

testified to.

Q. Okay.

MR. OGDEN: I think that will be all the redirect I have, other than to just preserve that this will be suspended as far as the last topic, which is the net worth.

THE VIDEOGRAPHER: We are off the record at 3:34.

(Proceedings concluded at 3:34 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC

DATE OF DEPOSITION: February 15, 2022

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I, BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____________________________

BRITTANY PAZ,

CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC

THE STATE OF _______________)

COUNTY OF __________________)

Before me, _____________________________, on this day personally appeared BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, known to me or proved to me (under oath or through ___________________________ ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _________________, _______.

___________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF _____________

My Commission Expires: _________

CAUSE NO. D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE, | ) | IN THE DISTRICT COURT |
| Plaintiff, | ) | |
| vs. | ) | TRAVIS COUNTY, TEXAS |
| INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and KIT DANIELS, | ) | |
| Defendants. | ) | 261ST JUDICIAL DISTRICT |

REPORTER'S CERTIFICATE

ORAL AND VIDEOTAPED DEPOSITION OF BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC

February 15, 2022

I, Amy M. Clark, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, BRITTANY PAZ, CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was duly submitted on _________________ to the witness or to the attorney for the witness for examination, signature, and return to me by _______________________.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount

of time used by each party at the time of the deposition:

Mr. Bill Ogden (5h19m)
Attorney for Plaintiff

Mr. Mark Bankston (0h0m)
Attorney for Plaintiff

Ms. Jacquelyn Blott (0h05m)
Attorney for Defendants

That a copy of this certificate was served on all parties shown herein on _____________________ and filed with the Clerk.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of the Texas Code of Civil Procedure will be complied with after they have occurred.

Certified to by me on this 21st day of February, 2022.

_____________________________
Amy M. Clark, CSR
Texas CSR 8753
Expiration: 10/31/2023
Res Ipsa Litigation Support, LLC
Firm No. 11371
501 Congress Avenue, Suite 150
Austin, Texas 78701
(512) 334-6777

FURTHER CERTIFICATION UNDER TRCP RULE 203

The original deposition was/was not returned to the deposition officer on _____________________.

If returned, the attached Changes and Signature page(s) contain(s) any changes and the reasons therefor.

If returned, the original deposition was delivered to Bill Ogden, Custodial Attorney.

$______ is the deposition officer's charges to the Plaintiff for preparing the original deposition and any copies of exhibits;

The deposition was delivered in accordance with Rule 203.3, and a copy of this certificate, served on all parties shown herein, was filed with the Clerk.

Certified to by Res Ipsa Litigation Support, LLC on this ______ day of _____________________, ________.

_____________________________
Res Ipsa Litigation Support, LLC
Firm No. 11371
501 Congress Avenue, Suite 150
Austin, Texas 78701
(512) 334-6777

**$**

**$11,000** 199:18 200:2
**$160,000** 197:12 204:14,16 205:13 210:14
**$25.9** 217:23
**$29** 218:1
**$29.9** 219:1
**$30** 218:3
**$30,000** 14:14,17,20,23 15:16 23:8,15
**$350** 23:11
**$44,000** 199:25
**$50** 212:12
**$53** 197:4,20,25 198:14,25 204:7 210:17 236:19 242:20
**$54** 197:25
**$54,876,000** 203:23
**$54.876** 204:1
**$6.8** 185:13
**$70** 220:18

**0**

**0** 263:13
**00006** 163:2
**000106** 159:8
**000989** 147:21
**001103** 92:14
**0025** 171:18
**006** 164:4
**00991** 148:4
**04** 102:11

**1**

**1** 31:17,18,19,21 32:25 33:13,14 49:7 55:18 125:22
**1,104** 93:9
**1.25** 16:16
**10** 16:8,11,25 129:17 159:1,2 180:9 182:23 183:1,8 190:6 215:6 218:22
**10/1/2012** 65:2
**100** 154:25 263:14
**106** 182:22
**10:18** 77:24,25
**10:28** 77:25 78:2
**10:42** 91:20,21
**10s** 56:19
**10th** 29:3
**11** 129:17 162:14,15,16
**11,000** 199:25
**1100** 93:14,15
**1103** 96:12 99:18 102:11 131:4
**1104** 92:14,15 96:12 99:18 131:4
**116** 182:11,13,15,21 183:5
**11:02** 91:21,23
**11:57** 137:15,16
**12** 168:17,18,19 173:19,20
**12:12** 137:16,18
**13** 176:19,20,21 197:12 204:11 205:3,6 245:6
**14** 182:13 184:22,23 185:21 188:5 196:22,23 202:3 203:3,7 204:25
**140** 20:2
**145** 180:21,24,25
**14th** 71:22 73:6 77:2 125:25 135:23 139:6,16 148:11,19 149:2 150:22 151:13 152:15 162:25 175:6
**15** 16:17 195:21,23 196:19 201:21 203:5,6,16 204:25 241:3
**15th** 5:2 71:22 73:7 129:16,20 130:3 135:24 170:16 175:5,10
**16** 182:4 195:25 196:2 232:22
**17** 196:12,15,16 210:11 232:22
**17:50:12** 162:25
**18** 219:15,17 220:25 254:17
**18A** 254:10,13,17
**18B** 254:10 261:5,7
**18C** 262:17,18
**18th** 236:2
**1:00** 176:11
**1:14** 188:11,12
**1:29** 188:12,14
**1st** 8:25 129:11

**2**

**2** 43:12,14,17 97:10,11 134:15,24 135:7,9,12,13
**2/15** 170:21 173:1
**20** 182:4 199:25 214:19,22 218:20
**200** 19:25
**2000-** 59:14
**2018** 49:15 58:18 59:16,17 64:24,25 65:6 69:7 71:10,22 77:3 81:17 86:10 125:25 135:24 139:6,16 148:11,19 149:2 151:13 152:9,13 162:25 169:20 175:6 215:8,10,22 243:20
**2020** 103:13 141:6 185:10 187:6 197:11 204:23 205:1,15 209:22 236:2 241:6
**2021** 185:10 205:7
**2022** 5:2 209:23
**204** 195:24
**22,000** 57:3
**25** 182:3,4,9
**25,000** 15:8
**25.9** 217:23 218:15

**252** 97:16

**260** 220:20,22

**26th** 129:7 130:11 152:9,13

**29** 217:23

**29.9** 218:2

**296** 97:16

**2:18** 227:4

**2:19** 228:4,5

**2:28** 228:5,7

**2:57** 253:18,19

**2nd** 81:17 129:15 130:8 169:20

**3**

**3** 97:10,11 118:7,9 138:6 148:8,9 236:10

**30** 15:9 64:8

**31st** 8:25

**333** 74:14,18 187:15

**35** 28:25 181:7

**350** 23:19

**36** 182:11

**3:00** 167:12

**3:04** 253:19,21

**3:34** 279:8,9

**4**

**4** 76:6,10 78:13,22 81:3,13 117:18,19 118:6,9 122:20 123:4 245:10,11

**4/2/2018** 94:1

**40,596** 56:24

**408** 194:15

**425** 92:21

**45** 181:21

**450** 79:6,12,13,17

**479629** 169:2

**4:00** 28:10,12 126:10 167:1 227:7

**4chan** 48:13,17,18 61:16,25 62:17 63:22 69:8,13,15,19 148:22 149:10 164:5,12,14, 15,18,19 165:3,4,5 255:3,9, 15,18,19,24 256:12 260:25

**4th** 86:10

**5**

**5** 81:15,18 125:15,16 134:16

**50** 181:21 182:7,9 212:12

**53** 203:23

**58** 182:16,17

**5:00** 167:14 168:2

**6**

**6** 82:7 137:19,20 138:4,5

**60** 205:10

**600** 93:8

**7**

**7** 137:8 140:8,9,16,17 141:10, 18,20 142:1 143:20 144:14 148:3

**70** 205:11

**72** 217:12,21 218:8,25 219:3 238:5

**75** 181:6,13 182:9 205:11,18

**7:00** 167:17

**7:30** 167:10

**8**

**8** 103:10 141:7,8,10,19,25 143:13 144:10,15,25 145:22 147:21

**80** 214:20 215:4 218:21

**81,000** 79:3,5

**81,290-** 56:10

**81,297** 56:13

**86** 23:18

**8:00** 167:11

**9**

**9** 148:5,6,8

**90** 215:7 218:22

**95** 42:1

**97** 42:1

**98** 36:11,14 39:25 40:5 41:16 42:1,7 43:5,11

**99** 42:1

**991** 147:25 148:1

**9:00** 167:9

**9:03** 5:2

**A**

**a.m.** 5:2 77:25 91:21 137:16

**ability** 11:16 13:19 165:18

**able-bodied** 11:8

**abnormal** 150:4,17

**Absolutely** 76:23

**accept** 240:9

**accepted** 240:8 241:23

**access** 97:23 120:21 145:14 154:4 172:20 214:16 248:14

**account** 139:15 182:14,15

**accountant** 205:20 213:9,15 233:2 241:25

**accountants** 107:21,25 108:2

**accounting** 206:7 207:6 209:17 241:23 247:19

**accounts** 139:19

**accrue** 210:17

**accruing** 198:3,4,7,8

**accuracy** 206:3 247:20

**accurate** 40:5,6 92:18 94:6
101:15 130:1,17 144:25 145:4
153:4 162:13 164:17 175:20
181:14,15 197:13 201:2
204:5,13 205:11,14 206:21
210:12,15 213:3 218:14 270:4

**accusation** 98:3

**accusing** 191:1

**act** 252:25

**acting** 25:14

**actions** 116:6,14

**actively** 215:12 270:10

**actual** 22:19 62:8,18 202:6
226:8 268:8

**Acuity** 235:14,18

**ad-** 36:3

**Adan** 60:20 61:10 70:8 84:8
137:25 267:10 276:10,15
278:22

**add** 6:4 228:23

**added** 228:13

**adding** 181:3

**addition** 82:13 275:7

**additional** 20:2 69:20 126:3
144:21 145:2

**address** 199:22

**addressing** 207:18

**adequate** 150:8

**adequately** 26:23 30:5
213:14 258:5

**adhere** 47:4

**adhered** 43:14

**adjusted** 210:1

**adjustment** 210:3,4

**adjustments** 205:13,17

**admires** 224:14

**admissibility** 194:17

**admissions** 133:15

**admitted** 113:13 219:24

**adult** 258:22

**adverse** 229:14

**advertisement** 141:6

**advertising** 240:23 241:10
242:23

**advice** 26:3 116:12

**advise** 133:13

**advised** 133:1,3,12

**advocacy** 224:15

**advocate** 36:4 171:11

**AEJ** 215:7,11 217:10,14,22
218:22,25 239:18

**affiliated** 261:20

**affirmative** 122:23

**afternoon** 28:8 50:7 83:25
84:2,4 126:9,15 166:25
167:13,16,19,20

**agency** 208:15

**agent** 138:9

**aggregate** 191:2

**agree** 13:11,16,17 34:25
35:21 36:4 43:20 52:2,10,17
53:1 58:7 80:24,25 95:14
110:5 129:23 141:12 146:24
150:5 151:21 152:9,13 155:12
160:9 167:6 177:23 192:23
194:8,23 195:1 226:21
237:10,15,18 247:3 260:5
274:23

**agreed** 11:7 60:21 84:5,12
229:4

**agreeing** 171:20

**ahead** 7:1 115:23 137:24
144:19 195:16 234:2 249:17
251:14 264:18

**air** 42:8,19 43:25 60:5,6

**aired** 266:10

**Akbar** 169:6

**akin** 228:19

**ALC** 214:20 215:23,24

**Alex** 30:19 68:14,20 69:1,4
216:14,16 217:3,7,15 218:10

**Alex's** 47:20 48:3 103:24
215:7 217:11,12

**algorithm** 41:22

**Allahu** 169:6

**allegations** 8:9,10

**alleged** 101:12 130:4 161:2,
25

**allegedly** 149:8

**allocated** 14:19,24

**allowed** 228:21

**alter** 166:8

**altered** 270:1

**alternative** 67:25

**amend** 5:24 119:7

**American** 93:25

**amount** 10:24 11:19 14:12
15:11 23:12 198:21,22 210:18
237:7 242:25 271:22

**analysis** 247:18

**analytics** 71:20,24 72:3,6
73:5,24 76:2,3 78:24 79:16,
18,21 80:3,8,13 81:15 147:13,
14

**and/or** 233:5

**anonymous** 61:14,18,22
63:16

**answering** 170:25 207:10
222:16

**answers** 72:19 78:18 116:8
145:3 177:1 188:20 234:2
240:8 247:12,17

**anymore** 66:25 98:13 204:5
269:8

**apologetic** 132:8,10,11
133:15,20

**apologies** 5:21

**apologize** 115:2,13,20
132:23 133:5

**apology** 132:12

**apparently** 272:15

**appearance** 110:2

**appeared** 92:20

**appears** 31:23 34:10 93:25 101:19 141:1 267:22 268:1

**applies** 195:4

**apply** 60:5

**appropriately** 52:8 109:19 111:19 277:15

**approximately** 197:24

**April** 81:17 129:11,15 130:8 169:20

**archive** 139:10

**argue** 231:12

**arms** 171:6

**arrangements** 227:21

**arriving** 273:7

**arrows** 261:14

**article** 6:6,8 19:22 46:13 50:7 71:21 79:23 83:17,24 86:15, 17 88:16,21 92:11 93:20,21, 22 94:1 96:12,15,17 97:3 100:11 101:10,11 102:10,22, 24 118:11 128:9 129:20 134:11 135:1 138:11,16 139:1,8,11 140:2,3 144:1 149:18,19,22,24 150:16 158:19 160:11,14 161:8,15 164:23 165:25 166:6,8,15,18, 23 170:1,12 172:7

**articles** 19:19,21 30:21 37:1 43:22 46:5 47:24 53:20,21 55:8 59:24 60:3,24,25 62:24 80:1 88:18,22,24 89:3,4 90:21,24 91:3 94:22,23 276:6 277:13

**articulate** 216:25

**ascertain** 84:16 118:12 136:2 168:10

**ascribe** 93:1

**asks** 22:20 245:13

**Asperger's** 258:8,12,14,25 259:11,15

**assertion** 251:15

**assessment** 49:6

**asset** 114:2,14

**assets** 233:5 234:20 237:19 242:11 243:21 244:6,7,12 245:13 246:6,7

**assum-** 246:20

**assume** 64:8 111:24 234:3

**assumed** 176:24 209:2,8

**assuming** 60:11 94:5 121:25 246:21 275:22

**at-** 109:18

**attached** 63:11 70:2

**attachment** 53:5,7

**attempt** 199:22

**attempting** 199:17

**attempts** 111:10,11 136:10

**attention** 6:9 51:15 162:13 252:25

**attorney** 6:5,18 7:13 9:8,13, 17,22 24:25 25:12,19,21 88:2 90:13 102:14 105:9,18,19 174:6 178:13 200:14,19,25 201:3,8 203:20 204:21 205:25 211:8 222:7 228:18,19,24 231:4 262:21 269:16,19 278:7

**attorney's** 6:20 192:2 196:3, 13

**attorney-client** 25:18 98:16, 18 105:15 229:5,10 230:10,12 231:5,6

**attorneys** 16:9 24:22,24 94:12 107:18,21 109:18 111:23 112:24 144:8

**audience** 39:7

**audiences** 38:5

**Austin** 7:14 24:11 25:22,23 28:1

**autism** 258:16

**auto** 172:1

**aware** 10:20 58:22 59:1 74:17 100:23 101:3 108:5,12,15 114:13,16 122:1,7 127:9 129:5 152:22 170:23 179:21 206:9,10,15 239:4 257:17,25 278:13

**awkward** 74:19

## B

**back** 15:9 27:24 28:3 31:7 41:16 59:8 60:9 70:23 72:17 78:1,3,4,17 85:2 91:22 106:18 116:23 117:14 127:10 137:17 149:10 157:25 177:2 184:6,12 188:13 200:10 203:25 210:18 218:13 219:25 222:19 224:13 228:6,8 230:23 253:20 254:23 262:22 277:24

**background** 21:18 219:8 238:19 239:15 246:5 247:19

**backlog** 199:22

**bad** 82:5,6 231:8 247:3,4

**bag** 189:8 190:16,22

**bait** 256:4

**baking** 43:12

**balance** 188:22 191:22 192:20 202:6 203:16 205:12, 18 210:10 240:16 241:2,6 242:1 251:4

**bank** 104:2

**Bankston** 5:16 6:2,6,19 7:2 8:18,21 14:22 22:13 26:10 73:13 75:4 76:23 77:13,17,21 90:16 95:9,12 104:6,8,13,15 110:14,17,24 117:14,23 121:17 126:17 129:4 136:13 137:4,5 140:9,12 147:15,19, 23 148:2 153:14 155:17,20 161:19 176:10,11 178:4,7 180:5 181:4 183:19 185:6,19 186:10 189:24 190:1,5,9 191:12 196:10 208:5 215:16 223:8,9,15,19,24 224:18 225:20,23 226:3 227:1,10,14, 20 228:23,25 231:16 250:11, 15 251:7,12 253:8 254:3 262:11 278:2

**banners** 240:23

**Barnes** 110:17,18,19 111:25 132:21

**base** 41:18

**based** 22:24 36:18 40:6 42:6, 17,21 43:2 44:5 47:19 48:20 52:1 59:21 60:14 63:12 69:23 87:3,5 100:7 101:4,14,18 112:3 113:24 122:10 123:1,5 124:2,13,25 125:4 126:8,13 130:13 146:22 147:10 153:21 160:17,18 166:24 167:7 174:17 197:6 199:12 200:7 206:2 210:16 212:5 234:2 240:16 244:17 258:3 261:2 265:22 266:7 277:19

**basic** 62:13

**basically** 47:22 234:7

**basing** 42:13 46:18

**basis** 42:19 43:10 68:9 124:19 149:17 176:7 197:25 207:2 228:15 275:22

**Bates** 55:22 56:1,3,5,6,7 57:4,10,13,16,21,23,25 92:7, 13,17 95:12 96:12 97:15 99:24 111:17 147:16,21 159:7 181:18 185:20,21,22 189:19, 21 190:23 195:23 196:3 252:5 270:18

**battery** 141:14

**began** 58:18

**begin** 215:9

**beginning** 263:24

**begun** 200:12 216:3

**behalf** 8:3 36:7 86:22 109:11 189:6 200:19 236:6

**behavior** 150:3

**belief** 187:3

**beliefs** 106:10

**believed** 120:9

**believes** 42:7

**believing** 212:21

**beneficiaries** 216:10,11,12 218:23 237:11

**beneficiary** 238:5

**benefit** 90:20 237:9

**bet** 74:21 217:17 232:3

**big** 236:21,22 237:2

**bigger** 231:7

**Bill** 222:5,6

**billable** 182:14

**billed** 182:13

**bills** 240:17,19

**binder** 17:23 18:5,7 75:17 103:9 187:23 189:10,12,14 202:9,13,15,18,19,22,23 203:13,14,15,17,18,21 224:4, 7

**bit** 31:8 85:2 104:19 107:22 113:21 159:4 163:25 207:6 261:22 268:14 274:21

**Blank** 221:6

**blog** 19:19

**blogging** 31:15

**Bloomberg** 6:6

**Blott** 5:12,19,21 6:3,12,18,23 7:1 9:8,9,13,16 20:11 24:25 25:10,17 26:19 39:10 46:25 54:15,17,21 55:5 73:18 76:17, 19,21,24 78:5 81:7,9 98:16,18 104:5,11,20 105:14 111:3,4 112:17 114:19,22,25 115:5,9, 12,16,20 116:18 124:7,9 132:20 134:18,22 155:11 171:13 187:8,9,13,16 188:2,7, 15 189:10,16,20,22 190:2 191:11,21,25 192:9,14,17 193:1,5,7,10,13,19 194:1,4,8, 12,19,23 195:1,9,14,19 196:4, 7,11 202:17,25 203:2,20 216:24 217:4 220:13 222:8, 15,25 223:2,3,14,18,21 224:2, 5,6,7,8,9,12 225:1,4,8,10,17, 22 226:10,18,22 227:5,13,18 228:9,14,17 229:20,21 230:16,19 231:6,9,13,22 232:9,14,19 249:1,3,10,14,18, 21 250:3,8,13,22 251:10,25 252:4,10,13,16,20 253:2,5,12 260:19 262:21 264:20,22 265:2,7,10,18 266:4 267:7 268:13 276:23 278:3,7,12

**Blott's** 275:4,13

**blurt** 27:17

**Bob** 110:17,18 186:7,11 220:17 221:21 235:6,7,8,18, 23 236:4 260:18

**body** 53:11,13

**book** 8:19

**booked** 28:7

**books** 248:14

**bottom** 97:16 108:15 142:9 147:9 159:7 163:1 206:20 261:7

**bought** 115:5

**box** 261:12,23

**boy** 138:2

**Brad** 110:2,6 251:7,15,17,18

**Bradley** 191:11 262:16

**brain** 43:12,15

**breached** 109:2

**breadcrumb** 256:4

**break** 13:4 66:9 77:15,18 78:4,8,18 90:3 91:15,24 107:22 134:19 137:13 176:12 181:4 183:3 187:19,20 188:9 228:8 253:11,22

**breakdown** 180:20 202:5 203:3 209:18

**breakdowns** 239:2

**breaking** 50:4 63:9 182:16

**breaks** 23:20 190:18

**bring** 6:9 18:16 76:5,6 78:21 91:13 209:7 223:10,15,19 224:24 227:24 252:24

**bringing** 192:5 225:3

**Brittany** 5:3,4,11

**broad** 244:14,16 274:25

**broadcasts** 39:5 266:10

**broader** 242:6

**broadness** 244:22

**broke** 218:20

**Brooklyn** 269:16,19

**brought** 78:5,15 189:13

202:10 269:20

**browser** 135:8,21,22 136:9 152:17 154:1

**browsing** 136:25 137:10 152:10,14,23 153:20

**brunt** 13:6

**bunch** 30:19 55:1 71:3 97:7 110:5 248:7 273:12

**Burnett** 110:13,14,15

**business** 17:12 43:11 68:7,8 122:9 138:25 167:25 197:15 199:19,20 200:2 220:24 240:25 243:9

**businesses** 239:4

**businessman** 197:18

**button** 115:3,4,7

**C**

**cache** 172:2

**cakes** 43:12

**calculated** 23:12 180:21

**call** 9:14,15 20:22 78:11 81:8 97:2 150:18 191:13 262:8

**called** 9:6,16,17,18 10:4 207:22

**calling** 60:17

**calls** 21:21 22:3 46:25

**capable** 38:17,18

**capacity** 13:12 25:14 49:14 177:25 178:1,11

**capital** 269:14

**caps** 54:13 55:9

**capture** 168:24

**care** 67:22 69:1 72:21 86:19 194:1,7 249:12

**carefully** 38:10

**Carol** 214:25 215:2,6 218:22

**case** 5:14,25 6:15 7:4,10 8:12,23,25 11:6 14:10,12 15:14,20 16:2,7,10 17:4 18:13,17 20:24 21:1 24:19 25:20,24 26:4,20 49:24 50:1, 3,18 56:1 72:13,14 75:24 78:21,25 79:5,6,19,20 82:20, 22 88:1 89:9,17,21 90:5 91:6 93:4 95:13 97:13 98:3 99:19 104:12 107:16 108:9 109:2,8 113:2,16 114:12 119:25 120:2,5 133:16,25 134:3 137:7 146:23 150:3 152:1,2 159:10 184:8 188:21 191:3,19 192:3 193:24 229:2 243:9 247:16 250:24 256:19 257:3 259:17,19 260:16 266:24 267:17,18 269:22 271:1,6 273:4 274:4,13 276:1

**cases** 11:18 14:14,20 21:5 29:15,18 40:21 108:6 109:21 111:22 120:1 180:14 192:3 212:1 266:20,21 278:24

**categories** 63:12

**category** 242:6

**caught** 144:11 231:11

**caused** 112:8

**caveat** 58:20 204:4,13 217:9 278:25

**cell** 141:14

**cetera** 44:11 148:16 181:12

**chain** 221:19,20

**chair** 12:20 37:13 85:24 245:21 248:4

**challenged** 125:25 135:25 136:1 139:5,6,14,18 148:11, 12,19,21 149:1,4

**chance** 249:19

**change** 35:11,12,18 78:18 161:15 197:4 248:16

**changed** 35:20 40:9 166:11

**characterized** 258:5

**charge** 23:22 30:9 68:11 69:3 112:18 113:17

**charts** 239:2

**chat** 163:18

**chatter** 101:13,17 102:4,23

**chattering** 101:24

**cheat** 74:10

**check** 5:22 60:24 230:7 248:22

**checked** 55:8,11

**checking** 31:1,6 60:1 61:1,2, 21

**checks** 221:6

**children** 216:13 218:23 238:10 239:10

**chose** 67:19,20,22

**Chris** 269:10 270:13

**cir-** 195:2

**Circle** 117:14

**circled** 261:8

**circulate** 60:23

**circulated** 195:3

**circulating** 50:5 150:7

**circumstances** 264:1

**citation** 229:1

**cite** 60:21 264:10

**cited** 46:5 53:8 131:4 194:15

**cites** 62:22

**citing** 30:24

**civil** 21:16,21,23,25 22:2,3,4, 5,6 29:17

**claimed** 229:5

**clarification** 54:23

**clarify** 188:15 223:21

**clean** 243:12,19 254:10

**cleaner** 243:7,10

**clear** 23:3 180:6 183:14 190:11,13 191:15,19 212:2 219:9 231:3,23 251:13 252:24 264:5 277:21

**cleared** 152:17

**clearer** 51:20

**clears** 152:17

**click** 141:9,18,22 144:2,5

**client** 113:11 224:15

**clients** 113:11 133:14 189:6 219:20

**clock** 168:3 250:25

**clocking** 168:5,7,8

**close** 38:8 106:25

**CNN** 141:3 144:4

**co-counsel** 90:18

**cogently** 11:14 207:13

**coherently** 8:8

**collar** 107:11

**colleagues** 10:3

**color-coded** 17:23

**color-coding** 75:18

**comment** 38:9 131:10 161:24 164:25

**commentary** 31:15 36:12 38:3,4,12 43:8 141:4 147:5 161:2,17

**commentator** 38:20

**commenting** 36:22

**comments** 97:5,6,7 101:4 131:20,24,25 132:2 187:25 257:12

**commie** 147:5

**commit** 133:14

**committed** 53:15

**common** 99:16

**communicate** 70:24

**communicated** 132:24 133:20 156:12 157:5,7,9,10 158:2

**communicating** 112:12

**communication** 230:1

**communications** 99:10 101:5 106:9 118:10 122:18,19 124:4,14,25 125:4 153:21 260:10

**communist** 141:4

**companies** 37:17,23 103:21, 23 200:9 237:12,23 238:6 240:14 243:3

**company** 8:4,9 9:3 17:12 25:20,21 29:21 30:10 31:6 32:16 36:8 37:2,5,8,22 39:6 42:4,6,13 43:4 49:13 51:11, 13,16 52:6 53:2,18 54:1,5,7 64:7 65:23,25 67:6 68:7,10, 11,20 86:7 96:13,18,21,24 100:22 101:2,3 102:7,12 103:4,19 104:23 105:19 106:3,5,22 107:2,4,6,7,8 109:2,11,17 111:9 112:8 113:10,25 114:14,16,17 115:25 116:13,15 120:20 121:8,14 126:23 127:17,24,25 138:15,16 142:20 146:8,13 151:6 154:7,9,12,13,17,20,23 155:5,6,9,23 167:23 168:11 171:12 177:23,24 178:1,7,10, 11,13 192:25 193:4 197:19 198:15 199:8 205:15 210:17 211:13,20 212:11,23 219:5 221:17 233:17 234:10 235:13 236:4,18 238:3,8 246:8 248:13 259:24 271:16,19

**company's** 24:10 30:13,22 34:13 35:3,10 36:11 37:21 38:2,25 42:6,9 51:11 69:12 82:7 88:10 94:13 95:3 105:11 109:12,14 137:7 222:7 233:19,21 234:16 235:2 248:14 259:8

**comparison** 183:3

**compel** 226:4 229:18 265:5

**complete** 145:4 249:10,22 251:2 253:25 270:19,21 271:2,3

**completely** 7:9 13:19 63:21 179:25 191:23,24 192:24 228:21 239:7 246:17 248:7 273:15

**complies** 92:6

**computer** 91:13,16,25 118:23,25 119:6 136:17 143:23 153:6 156:3

**concentrating** 187:16

**concern** 107:14,20 108:1

**concerned** 6:20

**concerns** 109:1,11

**concluded** 279:9

**conclusion** 44:1 45:25 46:15 124:20,24

**confer** 253:8

**conference** 9:14

**conferred** 90:17

**confidential** 96:3,5,9 195:3 196:2 230:1

**confirmatory** 42:22

**confirmed** 43:3 70:7 101:13 267:13

**conflict** 229:7 236:12,14

**confuse** 163:24

**confused** 171:7 268:10

**confusing** 86:25

**confusion** 192:10 217:4 264:6

**conjecture** 102:11,20

**connected** 261:11

**Connecticut** 7:13 21:5 29:6 109:23 206:7,10 207:2

**connection** 16:7 24:19 30:17 32:15 40:20 75:23 79:18 94:11 177:5 178:3 267:16 275:23

**consent** 139:22 142:21 192:7

**considered** 10:11 36:25

**conspiracy** 238:12

**constituted** 277:1

**constraint** 10:18

**constraints** 10:10,23 11:13 15:13,20 40:14

**construction** 229:9

**consultant** 40:24 71:19 200:15 201:19 211:6,7,8,25 212:1,8,14,15,18,21 213:11 235:19 248:13 269:7,8,20

**consultant's** 269:18

**contacted** 260:8

**contained** 88:3 97:4 101:11 139:9 161:9,10,11 223:12 259:11

**contend** 134:10

**contends** 148:10

**content** 54:16 61:18 63:16 139:23 146:14

**context** 46:16,17 241:17

**continue** 185:7 250:13,21

**continuous** 188:19

**contractor** 122:8

**contrary** 189:2

**control** 118:17 126:4 135:5 139:2

**conversation** 14:21 43:2 47:13 60:14 67:13 69:23 73:12 84:8 90:15 99:2,6 121:16 125:5 126:16 129:3 137:3 147:18 155:19 161:23 166:24 176:9 177:10 178:21 179:25 180:4 183:18 185:5 207:25 220:17 228:18 254:25 255:8,14 256:6 266:8 277:12 278:7

**conversations** 36:18 38:1 40:7 43:3 47:19 48:20 58:20 59:22 67:12 101:18 105:15 106:7 113:13 116:19 117:5 126:8,14 146:3,12 160:17,18 177:6 197:6 199:12 200:7 206:2 212:5 222:11 223:5 225:6 226:13 265:18,20 267:7,8 277:19 278:14

**convey** 256:16

**conveyed** 83:10 84:3 98:12 276:2,17

**copies** 202:2 220:1 225:21 229:15,17 231:23 268:9

**copy** 8:16 52:24 103:11 135:1,21 140:20 144:25 189:18 202:12,14,16 203:2 208:12,13,14,17 209:1,7,9,10, 11,13,14,15,17 219:25 226:12,23,25 227:17,22 231:19

**corner** 163:1 235:16 252:18 261:7

**corporate** 5:4 7:23,25 8:23 9:10 10:4,8,14 11:14,20,25 12:7,13 13:5 20:23 21:12,22 79:10 80:11 81:23 86:3,24 128:13 157:12 178:12 184:11 189:7 199:2 201:10 212:20 240:11,12 265:7 277:22,23

**corpus** 216:12

**correct** 7:16 9:20 10:15 16:20 18:14 21:6,19 23:16,19 28:8 29:9,22 32:4 33:11,21,23 35:24 37:15 41:20 42:8 43:15 49:13 50:2 51:3 52:10,20,21 54:1,14 55:9 57:15 63:23 65:24 66:14 67:23 69:10 72:10,15 73:9 76:18 86:14 87:16 92:16,21 96:19 97:23 98:7 100:16,19 106:23 107:2 112:10 113:11 122:18,25 123:7,12,15,18,21 124:4,15 125:10,14 126:4 131:6 132:12 138:17 140:4 144:3,8,16,22 147:13 150:18,23 151:3,7 153:3 154:2 155:25 157:15,16 159:5,10 160:11 161:12,13 163:5 165:9 166:13 169:18 175:14 178:25 179:9 184:8 191:25 196:21 201:1 202:18 204:8,23 205:1 206:8 210:3 214:13 215:23 217:7 219:2 233:6 235:11 236:2,4,7,8,10 238:1,15 241:7 247:14 256:20,23 257:5 259:6 268:18 270:3 272:23,25 277:14

**corrected** 204:18

**correction** 100:12 204:19

**correctly** 139:24 149:5

**corrupted** 270:2

**costs** 198:1 243:18

**counsel** 73:16 96:11 108:22 122:11 188:20,25 196:4,8 229:24 230:1 265:20 266:8

**counsel's** 196:9

**couple** 10:14 19:23,25 21:1 24:3 50:6 63:1 85:23 93:6 184:24 235:23 253:9 254:2,14 276:10

**couple-hundred** 74:13,16

**court** 7:5 11:13 23:2 59:4 77:16,18 78:11 81:8 108:10 183:21 189:17 195:4 224:16 229:4,11,13 230:25 231:18,21 252:23 254:11 269:12

**Court's** 108:17,18 207:2 265:4

**coverage** 50:14,21,23

**covering** 226:8 240:17,19

**CPA** 211:9

**created** 40:22 62:7 65:14 172:13,15,17

**creating** 58:7

**credentials** 211:17

**creditor** 114:13

**crimes** 53:14

**criminal** 21:18 22:6 26:13 29:17 54:12 133:14 269:15,19

**cross-post** 146:19

**crossed** 171:7

**Cruz** 100:15 161:6,9

**Cs** 248:23,25

**culling** 120:15 121:24 123:21 145:19

**cure** 54:23 72:24 250:19

**curious** 231:12

**current** 48:3,6 128:9,17 129:14 150:10,11 193:1,3

**custody** 118:17 119:2 126:4 135:5 139:2

**cut** 206:20

**cycle** 36:13,21 43:9

D

**daily** 42:19 43:10 68:9

**damages** 259:25 260:2,3,4,5

**Daniels** 16:6 23:25 24:16 26:18 31:23,24 32:9,11,21 33:23,25 34:10,17 49:9,11

50:4 58:7,21 60:15 63:25 64:2 70:4 71:16 82:13 85:1 86:6 101:5,7,18 118:21 119:3,5,10 126:8,14 127:8,16 128:2 132:9,19 136:17,18 137:11 139:13 148:18,25 149:8,11, 16,17 150:16 151:12,17 153:6,18,22 154:10,14 155:23 157:14,15,20,24 158:22,24 160:11,17,21,25 161:14,24 162:6,7,8 164:5,9,14,22 166:24 168:10 256:21 257:3 267:10 276:2,10

**Daniels'** 71:21 127:22 140:3 150:3,10 152:10,14,23 183:25

**Daria** 30:18 48:3 278:23

**dash** 159:7

**data** 44:1 45:24 267:20

**date** 59:15 65:2,15 86:9 127:1,2 129:1 130:7 152:11 162:23,24 169:25 170:19 172:10 183:22 235:22,25 253:1

**dated** 94:1 262:20

**dates** 113:19 176:4

**David** 44:18 214:21,22 218:21

**day** 50:7,8,9 63:8 85:12 128:17 129:15 169:23 189:8 199:19 250:24 256:24

**days** 98:24 129:17 182:13 199:19,20,21,25 200:1,2 205:11,18 220:22,24 266:10

**deadline** 130:16,18

**deadlines** 111:13

**deal** 260:18

**dealing** 121:3

**death** 130:24

**debt** 197:20,23,24,25 198:2,4 199:17,18 204:6 207:18 210:17 212:12 234:13 236:19, 20 238:4 243:17

**debt's** 210:20

**debtor** 236:6

**debtor's** 235:2

**debts** 103:22

**December** 205:6

**decent** 110:9 219:11 263:25

**decided** 10:12 51:10 113:25 114:3 229:11 243:11 276:12

**decision** 158:21 206:14 224:24 253:23

**decisions** 114:4,7 214:6

**dedicate** 15:24 30:8

**deductions** 209:25

**deep** 44:10 225:13

**defamation** 29:18 113:4 128:12 238:9

**defamatory** 128:15,16 129:22,24 151:15 160:19

**default** 207:3 210:19

**defendant** 126:2 134:3 180:15 248:3

**defendant's** 143:9

**defendants** 94:16 100:5 108:8 113:3 121:7 127:5 128:12,14 130:14 132:7 134:10 144:22 145:2,13 146:23 152:23 159:9 163:2,5, 7 164:1,4 165:17 171:18 184:8 270:20

**defendants'** 122:5,9

**defense** 269:15,19

**deficiencies** 72:25

**defined** 278:1

**definition** 251:6 259:11 276:19 277:20 278:3,11

**definitive** 122:17 124:3 125:10

**definitively** 124:3 256:12

**DEFS** 159:7

**DEFS000334** 92:10

**delay** 172:7

**deleted** 172:1 173:13

**democratic** 256:8

**department** 68:16,23 85:7,9

**departments** 51:18,22 52:3

**depending** 68:16 263:2

**deplatforming** 221:14

**depo** 12:10 13:13 75:16 132:5 178:24 190:12 252:12,22 262:6 263:21 272:16

**depo's** 263:1 264:1

**depos** 12:3,14 179:25 273:13

**depose** 30:4

**deposition** 5:3 6:13,21 7:4,6, 8,20,22 10:21 11:23 13:23 14:3 16:14 17:14 18:4 21:9 22:23 23:1 26:24 27:17 37:13 40:10 55:18 77:22 78:13 81:23 88:9 113:22 137:8 177:16 179:7,9 180:10,18 181:18 183:9 194:24 195:18 212:20 228:10,13 229:7 238:25 250:14 253:7 262:2 267:3 271:19,25 272:2,12,21 277:22,23

**deposition's** 219:25

**depositions** 10:25 11:21 25:5 30:2,4 37:16,25 40:17 41:19 56:3,6 109:5,10 178:3 179:18 183:21 273:25

**describe** 140:24 212:16

**designated** 79:4 213:12

**designees** 13:5

**detail** 11:19 13:13 166:13

**determine** 221:1 227:15 265:22 266:1,9

**determines** 47:12

**development** 258:21

**device** 135:23

**devices** 127:10,22

**Dew** 30:18 35:14

**diagnose** 258:7

**diagnosis** 257:25

**difference** 234:22,24 267:25

**differences** 251:5

**differentiation** 79:19

**diligent** 118:15

**direction** 157:6,14 254:1

**directly** 9:7 194:16 233:4 260:13

**dis-** 17:9 18:18

**disagree** 91:2 132:13,15 225:1,2,4

**disclosed** 145:3

**discount** 37:23

**discoveries** 18:7,8

**discovery** 12:22 17:8 20:17 104:12 117:25 125:18 188:20 189:4 193:18 194:17 229:9

**discrepancy** 204:16

**discuss** 13:13 26:23 30:12 71:23,25 76:6 78:22,23 79:10 80:13 81:3,13,18,21 82:10 103:5 137:9 138:25 152:18 190:15 214:4 263:9

**discussed** 103:15,18 104:22 114:8,9,10 196:15

**discussing** 16:9 73:5 86:3 154:6 199:7

**discussion** 84:15 114:11 194:16 212:9 262:21,22 267:14 275:18,21,25 276:7,8, 9,12,19 277:1,6,7,10,11,16,18 278:2,11

**discussions** 10:11 108:21 112:3 122:10 178:23 267:11, 12,14 271:11 275:13 278:17, 23

**disentangle** 200:16

**disentanglement** 200:8

**disinfo** 255:3

**disorganization** 112:8

**displayed** 96:21

**dispute** 210:20 257:6,7

**disseminate** 63:20 146:9

**disseminated** 59:20

**disseminates** 30:14

**disseminating** 64:11 248:2

**dissemination** 195:5

**distinction** 267:19

**divide** 217:20

**divided** 14:19 220:22

**dividing** 16:23

**doc** 271:5

**docs** 273:3

**docu-** 173:12

**document** 12:12,14,21 16:4 34:8,10 35:1,7,15 52:25 55:20 56:25 59:3 67:14 74:9,11 75:3 77:8 81:5 88:2,11 92:1 93:18 95:6,7 96:4 102:15 117:3 123:2 125:19 126:6 134:21 140:21,25 141:14 144:15,16 146:24 147:17 159:14 162:19 163:12,24 164:3,10 165:4 171:3,18 172:11,15,16 174:18,19,20,21,24 175:9 186:24 187:3 188:17,18 189:3,7,11 190:14 191:10,17 195:2 197:2 206:19 208:14 209:5 226:12 229:13 234:3 251:23 257:20 262:16,22 264:14 270:1,23

**documented** 165:21

**documents** 11:4,6,9,11 12:25 13:21 15:12,19 16:22, 25 56:4,9,11,13,24 57:3,11, 13,16 58:3 73:8,14,22,23 75:23 76:1 78:5,8,10,15 79:3, 7,11 82:16 89:12,18,23 90:8, 12 91:16 92:2,20,21,23 93:3, 5,7 95:8 96:2,8 97:13,18 99:18 111:21 116:6 117:10, 15,17 118:16 123:1,5,10,11, 14 125:24 126:3 134:10 135:4 143:7 144:9 146:22 177:3 179:22 181:6,12,13,16,17,18 182:24 183:2 197:7 202:18 210:11 213:1,7,8 218:19 229:6 251:1,2 252:6 253:25 260:16 264:2 266:19,20,25 267:1 270:2,6 271:4,9,13 274:10,11,19

**dogs** 27:16

**Donald** 141:3 144:4

**doodles** 262:8

**doodling** 261:13,16

**door** 249:8

**dormant** 212:11

**dot** 63:23 126:1 139:5,7 140:3 142:12,13,14,19,23 143:4,17 145:1,6,10,20,23,24 146:2,6, 11,16,17 147:8,13 148:21,22 149:4

**doubt** 23:12 257:3

**Douglas** 118:12 136:2

**download** 97:25 98:5

**drafted** 136:7

**drafts** 116:9

**draw** 255:15

**drew** 107:14

**drives** 121:12 122:8

**Dropbox** 19:18 40:19,22 41:1 88:1 89:10 91:10,12,17 98:8 268:19,25 269:1

**Drudge** 48:8

**due** 103:23 218:24 237:7

**duly** 5:6

**Dustin** 105:8,9 117:6 196:4,6, 7,9 260:18

**duties** 107:15

**duty** 38:4,14,23 39:4,9 43:20 44:25 109:2

**E**

**ear** 228:20

**earlier** 24:17 29:7,25 31:5 34:13 37:12 61:25 62:16 69:15 92:19 122:17 125:17 126:18 127:8 143:3 158:11 169:22 176:23 183:7 185:3 197:9,16 208:3,8 209:24 212:9 214:15 215:11 237:3,22 243:16 270:24

**early** 215:22

**easier** 243:4

**easy** 244:17

**editorial** 33:5 84:15 267:8,11, 14 271:10 275:13,18,21 276:7,8,9,11,19 277:1,5,7,10, 11,16,18 278:1,11

**editors** 54:13 55:9,12 69:22

**educated** 174:17

**effect** 39:21 108:13

**effective** 65:2

**efficiency** 230:17

**efficient** 214:2

**efforts** 49:21 51:25 118:11 127:4,7,9 136:1,15 137:7 143:10 149:7 153:25 243:2

**electronic** 135:23 202:12,14, 16 209:9,10 227:22 267:20 269:18

**email** 6:18 33:12 49:10 53:4, 5,8,12 55:14,15 57:19 58:23 90:9 119:22 128:19 157:23

**emailed** 19:8

**emailing** 53:14

**emails** 57:21,23,25 119:9,12, 13,15,24 120:3,4,8,11,12 127:13,14,19 155:24

**employee** 25:13 41:12 65:6, 8,9 67:7 138:9,15 151:14 211:4,5,11

**employees** 16:7 24:17 36:19 42:18 68:12 138:25 151:15 168:3 267:8,9

**encompass** 14:25 242:7

**encompassed** 14:14

**encourage** 108:23 132:5

**end** 45:25 93:11 99:2,6 119:17 127:14 139:11,20 146:10 148:21 167:20,21,24 183:13 190:19 205:15 250:2

**ended** 15:24 212:7 274:6

**engage** 30:22 138:24

**engaged** 34:14 35:4 37:2 43:8 68:8 215:12

**engaging** 194:16

**enlarging** 142:1

**Enoch** 110:7,8 132:22

**entangled** 243:4

**entered** 5:14

**enters** 95:9

**entire** 109:7 141:23 227:18

**entirety** 78:9 91:5 96:18 223:6 228:12

**entities** 256:3,7

**entitle-** 50:25

**entitled** 50:25 188:6 223:13 231:1

**entity** 217:10

**entries** 108:11

**entry** 111:10

**equally** 267:2

**equipment** 204:17 210:1

**Eric** 200:21

**error** 205:23 274:2

**escalated** 68:25

**escaping** 214:23

**ESI** 121:24 122:5

**espys** 80:21

**essentially** 103:11 240:24

**establish** 144:20 178:21

**established** 176:25 193:23 206:6

**estate** 200:13 215:12 216:3

**estates** 239:16

**estimated** 23:18

**estimating** 23:9

**estimation** 42:3

**ethical** 26:13 107:15,20 108:2

**evaluate** 234:16

**evening** 167:22

**eventually** 274:7

**everybody's** 232:12,16

**evidence** 44:5 127:5,20 137:7 146:5 152:19 158:22

**exact** 57:1 78:23 80:16 81:5 127:2 129:1 148:25 172:13 182:22 185:17 204:9 208:24 235:22,25 278:6,15

**EXAMINATION** 5:7 265:1 268:16

**exception** 210:13

**exchange** 243:21 244:12 245:17

**excuse** 20:11 34:20 47:25 122:15 140:18 151:14 152:12 175:5 203:24 240:18 250:23 252:6 277:22

**executed** 215:22 216:2

**exercise** 229:10

**exhausted** 178:9

**exhaustive** 48:7

**exhibit** 18:3 31:17,18,19,21 32:25 33:13,14 49:7 85:16 103:10 117:18,19 125:15,16 135:13,16,18 137:19,20 138:4 140:15,17 141:7,8,10,18,19, 20,25 142:1 143:13,20 144:10,14,15,25 145:22 147:21 148:3,5,6,8 159:1,2 162:14,15,16 168:17,18,19 173:18 176:19,20,21 184:23 185:21 188:5 192:7 195:21, 23,25 196:2,12,15,16,19 197:12 201:21 202:3 203:3,16 204:11,25 205:3,6 210:11 219:15,17,24 220:25 228:13 231:18 232:22 241:3 245:6 254:5,13,17 261:5 262:18

**exhibits** 97:10,11 143:2

**exist** 124:4,14 136:5 175:5, 10,22

**existed** 65:15 136:8 152:10, 15 175:2

**exists** 165:9 175:19,21 176:3

**expect** 12:11 43:13

**expectations** 11:25 20:16 265:19

**expected** 11:20 13:7 60:21 277:22 278:4

**expensive** 230:24

**experience** 210:16,24 236:24,25

**explain** 186:8 207:15,16,17, 19,23

**explaining** 146:10 207:12

**explanation** 113:7 250:22,23

**extensive** 75:17

**extent** 54:15 68:22 105:14 223:4 225:17 231:24 260:2,4 276:1

**extra** 22:9

**extremely** 43:13

**eye** 144:12

**eyes** 192:2 196:3,13

**F**

**fabulous** 111:4 115:15

**Facebook** 19:20 139:15,20 141:2

**fact** 8:3 31:1,6 44:5,23 45:5, 12,13 46:24 100:15 145:5 188:25 189:20 190:19 247:3,4

**facts** 69:9

**factual** 30:13 55:19

**factually** 51:2 63:21

**fair** 15:14,17 49:6 73:10 74:3 85:21 144:14 147:11 223:7 245:17 276:20,21

**fake** 62:5,6

**false** 22:5 38:17,18,21 251:16

**familiar** 168:22 248:3

**fashion** 111:15

**father** 255:12

**fault** 230:5

**favor** 229:10

**February** 5:2 8:25 58:18 59:14 69:7 71:10,22 73:6,7 77:2 86:10 125:25 129:7,16, 20 130:3,11 135:23,24 139:6, 16 148:11,19 149:2 150:22 151:13 152:9,13,15 162:25 175:5,6,10 209:23

**federal** 208:15

**fee** 14:14,25

**feel** 7:7 26:22 106:2

**feelings** 106:10 259:16,18,22

**felt** 101:15 106:1

**fighting** 54:2

**figure** 15:15 51:8 89:12 164:7 165:12 201:14 259:5

**figured** 107:5

**file** 110:2 114:6 116:10 235:15 237:13 249:18 250:20

**filed** 7:24 20:20 113:2 129:10 169:23 208:15 209:5 236:2,19 244:13 249:23

**files** 90:10 159:16 160:8 165:9 222:5 270:12,17,20

**filing** 34:2 113:8 196:14

**filings** 142:23

**final** 114:3,7

**finalized** 185:11 215:10 249:23

**finally** 52:2

**finances** 233:20,21 238:22

**financial** 109:6 188:17,23 189:1 193:14,17,19 200:8 212:13 213:1,16 219:7 238:19 251:6 252:6 262:21 271:13, 15,18 273:3,7,9

**financially** 243:4

**financials** 271:9,23 272:1,3, 7,9,10,23 273:6,24 274:8

**financing** 233:16,18 234:5,6

**find** 12:2 39:8 41:1 62:3 70:19 76:1 78:16 91:16 92:1 108:19 143:3,8 145:10 157:8,14 160:2 207:9 251:18 275:3 278:14

**finding** 99:16 206:15

**findings** 206:7

**fine** 72:23 93:12 106:8 187:24 194:11,14,21 216:4 218:13 231:16 233:12,24

**finish** 23:1 56:12 83:12 249:15

**fire** 68:14

**fired** 63:20 64:1,2,4,10,15,21 68:22

**five-minute** 253:11

**Fives** 56:18

**fix** 250:18

**flags** 83:25

**flat** 14:14,20,25 23:8

**flight** 28:7

**flip** 74:4,12,15,18 76:1 77:10 92:5 254:23

**flipped** 78:10

**flipping** 20:13 222:21

**floor's** 229:20

**Florida** 130:22 169:6

**flowing** 198:18

**focus** 34:24 44:22 125:21 214:3

**focused** 53:11

**folder** 87:21,22,23,24 266:23 267:2 268:18,19 270:13

**folders** 270:5,7 274:12 275:5

**follow** 54:18 68:12 260:24 268:14

**follow-up** 61:8

**follow-ups** 61:7 88:13 254:2

**Fontaine** 7:22 14:4 16:5,19, 25 17:3 18:13 19:14,16 24:19 49:24 50:1,3 72:9,13,14 79:6 80:8 82:8,10,19 83:3,20 86:7,

12 88:25 89:9,13,21 90:25 92:12,14 93:4 94:8,16 95:11 96:12,14,18 97:4 98:22 99:18 100:6,15 102:11 113:2 120:5, 8,12 124:22 130:1,25 131:4, 23 132:8 138:16 139:10 141:5 147:4,21 148:4,20 156:4 160:14 162:19 182:23,25 183:2 187:17 257:15 258:7,10 259:3,8,24 260:13 266:22,23 267:2,17 268:18,20 270:13 271:6,14,16 272:9 273:10,20 274:12,13,22 275:6,24,25

**Fontaine's** 95:21 96:10,21 97:1 101:25 130:21 140:2 144:21 257:9

**forget** 132:22

**forgot** 274:16 275:7

**form** 47:4 54:19,21 128:9,17, 18 129:14 226:19 267:20

**formally** 190:2 276:8

**formed** 215:13,14

**forms** 248:23

**forthcoming** 207:10

**forward** 51:20 106:10 114:12

**found** 12:4 47:23 94:4 101:24 108:10 119:1 163:19,21 199:10 205:23 206:13 207:10 274:12

**frankly** 72:21 103:1

**free** 5:4 7:23 10:5,13 31:11 37:9,10,11 41:14 65:11 71:21 73:7 103:21 118:16 135:3 139:4,8,16,19,22,23 140:1 142:23 145:15 146:4,17,18 148:9,17 151:14 158:21 171:14 184:10,13 185:15 196:25 197:3,14 198:19 199:9,10,17 200:18 203:23 204:2 207:18 208:6,9,15 209:6 211:22,24 212:8 215:21 221:24 230:2 233:5 235:19 236:6 237:12 240:11,15,18, 21,22 243:9 244:11 248:6

**Friday** 72:7 186:3,12,13,23 187:11 188:18,19 203:11 252:7

**friends** 10:1,2

**front** 32:25 35:15 59:7 79:1 80:17,20 81:6 85:14 102:10 198:24 264:14,15

**FSS** 195:23

**fuck** 115:12

**full** 141:10 248:13 251:2

**fully** 13:12 20:5 27:5

**future** 53:20,22 54:6

### G

**gain** 111:10

**Gamble** 277:25

**game** 223:7

**gander** 232:21

**GAP** 241:15,16,17,19

**gave** 31:20 40:18 55:20 88:2 117:3 122:17 144:9 159:9 181:4 192:16 194:18 209:11 214:12 235:10 247:16 248:18 265:25

**gee** 251:10

**general** 69:16 79:18 96:8 112:14 138:23 233:12

**generally** 25:4 30:20 31:5 34:14 43:7 62:3 70:7 85:11 112:3 241:23 258:18 276:5

**generated** 172:8 221:6,7,8

**generates** 172:20

**ghost** 136:23

**girl** 138:2

**give** 42:24 53:19 58:2 74:10 76:11 77:18 97:14 116:12 128:3 132:11 137:19,22 147:24 167:3 176:16 185:17 186:2 189:18 202:7 208:23 209:13,14 224:2 231:14 240:3,5 241:13 246:11,12 251:24,25 252:11 263:13

**giving** 23:5 26:3 53:21,25 125:10 173:5 191:19 198:20 248:10 249:19 250:17 274:6

**global** 92:21

**God** 37:14 124:20

**good** 11:19 61:8 63:19 68:1,3 134:18 141:15 180:1 197:15, 17 213:9 232:1 244:2 263:2

**goods** 243:22,25 244:12 245:18

**Google** 71:24 72:3,6 78:24 79:16,17,21 80:3

**gotcha** 65:5 104:10 201:18

**government** 233:20 238:12 256:8

**grade** 214:5

**grammatically** 277:14

**granting** 207:2

**gray** 254:12

**ground** 99:16

**group** 85:10

**growing** 51:16

**Guerra** 277:25

**guess** 6:17 23:18 64:16,17 73:2 75:1 85:25 116:18 141:16 165:23 167:5,7 174:7, 15,16,22 175:19 193:24 218:2 225:15 242:13 246:3,20 251:16 267:12

**guessing** 74:25 75:2 133:7 155:1 156:21,22 174:8 218:12

**guests** 62:14

**guidance** 53:19,21,23,25

**guideline** 69:17 70:2

**guidelines** 63:18,19

**guys** 115:1 231:8

### H

**hac** 111:11 112:7 113:8 116:2

**hair** 254:12

**hairs** 88:7

**half** 56:20,25 93:16 182:18

**Halfway** 56:22,23

**hallway** 278:14

**hand** 37:14 141:7 176:20 187:19 195:22 196:1,12 228:16 250:18 253:13

**handbook** 32:16 64:22,25 65:6,8,9,12,18 66:6,10 67:7

**handed** 35:7 73:16,18 148:7 175:2

**handing** 34:8 35:1 112:16 220:10 232:19

**handle** 29:18 222:25

**hands** 235:2

**handwriting** 221:5 232:12

**handwritten** 229:23

**happen** 114:11 156:15 166:6 172:6 238:11

**happened** 22:25 83:6 133:19,22 151:25 152:1,2 156:16,17,19,24 191:3 200:9 206:17,18 243:13 259:17 276:13,14

**happening** 243:15 277:5

**hard** 54:25 74:18 121:11 122:8 171:10 174:5 209:11,13 244:18 267:20 268:9

**hashtag** 63:10,12

**hashtags** 63:11

**head** 17:20 74:7 84:19 118:1 120:23 134:8 173:23 182:20 218:18

**heads** 23:5

**health** 96:10 257:16,22

**hear** 131:17 251:9

**heard** 36:14 39:14,18 105:7 142:14 261:20

**hearing** 251:23 252:23

**Hedge** 48:9

**held** 71:17

**helpful** 12:2,4,9

**helps** 54:3,5

**hey** 21:6 87:12 88:13 98:9 132:23 212:21

**hierarchical** 51:24

**high** 95:13 118:12 136:2

**higher** 261:22

**highly** 197:20

**hip** 218:12

**hired** 121:8 180:15 201:16,17 211:23

**histories** 136:9

**history** 108:5 135:8,21 136:25 137:10 152:10,14,17, 24 153:20 154:1 163:12 243:8 258:6

**hold** 115:3 184:4 196:17 226:6

**holding** 237:11 238:5 239:8

**Holdings** 217:10,14,22 218:25 235:21

**home** 27:25 28:3

**honest** 156:25

**honestly** 209:2 233:10 239:15 244:20

**Hook** 7:4,10 17:7 18:10 50:14,18,23 79:5,19,20 89:17 90:5 92:24 104:12 108:6 113:2 182:23 192:3 221:18 259:19 266:20,21,25 267:1,18 271:5,14,16,19 272:9 273:4, 13,19 274:10,12,25 275:5

**Hook's** 72:10

**hope** 232:3

**horrific** 131:9,11

**host** 47:16,23 48:2

**hosts** 48:5 50:24

**hot** 27:16

**hour** 16:17 23:9 182:5 186:15 207:24

**hourly** 23:11

**hours** 15:25 16:3,8,11,21,24, 25 17:8 23:19 24:3,4 39:11,19 84:1 161:16 167:25 180:9,12, 17,20,21,22 181:3,6,8,10,13, 15,21,23 182:3,5,13,15,17,21, 25 183:1,5,8 190:20

**How'd** 42:1 70:24 252:3

**HR** 64:20

**hundred** 11:3 15:25 16:21,24 17:8 19:23,25 39:19 40:23 93:5,6 165:8 180:17,20,22

**hurry** 227:4

**hyphen** 255:3

**hypothetical** 45:7,10,11

**I**

**ID** 169:2

**idea** 15:16 58:2 102:12 106:3, 5,22 107:2,4 123:6,17 154:21 157:3 173:3,4 175:17 180:1 236:20,22 257:14

**identical** 272:18,20

**identified** 118:17

**identifies** 92:12

**identify** 148:13 159:8

**identities** 136:24 148:23 149:11

**identity** 101:24 102:4 118:12 119:14 136:2

**image** 96:21 121:11 125:25 136:1 139:9,11 148:11,12,19, 21 149:1,4 164:15,18,19

**imaged** 122:4,8

**images** 141:9

**imagine** 74:20

**immediately** 50:9 98:1 172:7,9 188:19

**impasse** 251:21

**implemented** 33:21 34:1 66:3 67:3

**implication** 48:25 251:17

**important** 151:6 166:12 278:5

**impression** 272:14 273:25

**in-depth** 89:17

**inability** 112:9

**inaccurate** 50:8,22 257:5 272:15

**inappropriate** 52:4,14

**inappropriately** 52:10

**inaudible** 17:19 77:14 104:16 122:13 185:19 186:10 189:23, 24 194:5 198:11

**inception** 59:13

**incident** 257:23

**include** 16:24 17:7,8 69:19 182:25 229:25 267:12

**included** 55:23 161:21

**includes** 16:9 240:23

**including** 16:5 139:20 148:22 180:18 244:10

**income** 185:13 208:9,16 209:6 216:15,17,20 217:6,8 218:24 240:20 241:9 242:7

**incorporated** 65:8

**incorrect** 100:16

**increase** 152:5

**independent** 36:25 43:23 46:13 87:8 143:18 211:6 247:18 259:14

**independently** 89:15 248:11

**indexing** 90:18

**indicating** 19:6 33:12 89:6 147:4 222:3 241:5

**individual** 36:8 38:23 160:19 238:2

**individually** 154:12

**individuals** 29:20 38:12 128:1 136:22 146:3 247:15 276:5

**infer-** 126:19

**inference** 174:17,20

**inferred** 52:9

**inferring** 174:22

**Info-** 165:17

**inform** 78:11 114:17 115:25

**information** 17:13,23 25:5 28:17 30:14 33:25 39:1,8 40:25 45:18,20 46:10 55:19 58:8,9,10,11,13,14,17 59:11, 12,19 60:2 61:24 62:4 63:12 64:11 68:2,3,10 69:8 70:14 76:7,9 78:14,17 79:13 80:7 82:17 84:17 86:11 87:4 88:3, 5,6 89:2 91:9 92:12 95:10,21 100:14 101:2,23 102:4,22 103:14 107:9 108:19 113:24 120:6 124:24 127:21 136:11, 15 139:3 143:11,19 145:24 146:10 147:12 153:17 156:3 165:18 168:10,12 170:7,17 172:21 173:12,17,21,25 174:10,17 175:10,13 176:3 177:15,19 178:18 185:4 188:5,6 192:24 193:3 204:15 207:11 209:20 214:12 219:20 223:12 226:8,13 238:16 240:3,6 242:3 246:1 248:2,7 249:4 255:21 263:3 264:7

**informations** 85:13 240:14

**informed** 78:14 99:1,4 113:14 118:22 126:19,23 210:3,5

**informing** 69:9

**Infowars** 10:5,14 25:13 30:14 31:1,9,10,13 33:2 34:9 35:2,8, 16,23 37:10 39:12 41:4,12 43:20 44:25 45:23 46:12,23 47:11 49:17,24,25 50:12,14, 17 51:10 52:17,18 57:4 58:18 59:10,13,20 63:22 65:10 69:3 86:17 89:13,18 90:9 94:3,5,8, 18 95:11 100:6 101:20 118:10 126:1 138:9,24 139:5 140:3 143:4 146:16 148:13,21 149:4 151:13 168:24 171:22 173:20 178:23 185:14 198:16 204:2 211:3,4 241:10 242:23 243:21 260:1,7 261:8 266:13,16

**Infowars'** 88:18 135:2 146:10 159:16,21 165:9,21 237:5

**initially** 66:3,18

**injecting** 28:16

**injuries** 259:25

**inspired** 169:6

**instances** 64:21 107:14 267:2,4

**instruct** 25:10 158:22

**instructed** 153:14,15,19

**instructing** 34:11

**instructions** 87:3 265:25

**interest** 217:11,12,19,21,22 218:5,9 219:1,3,4,5 236:12,14 242:14

**Interesting** 115:8

**interests** 199:9

**internal** 143:7 168:25 178:23 249:24

**internet** 19:22 148:15 159:24 165:19 257:11,12 268:8

**interpretation** 229:8

**interrogatory** 138:5 139:3 143:2 145:3 148:8,9 177:1 188:23 205:4 245:5

**interrupt** 222:8

**interrupted** 253:1

**interview** 42:14,15 83:23 167:7 254:22

**interviewing** 181:25 182:5

**interviews** 16:6 40:1 42:17, 22 101:5 120:20 125:1 181:21,24 182:3

**introduce** 5:9

**inventer** 37:22

**investigation** 66:23

**invite** 269:4,5

**invited** 269:6

**invoked** 67:7

**involved** 15:20 51:17 92:20 112:21 116:6 264:1 269:21

**involving** 54:12 238:9

**ipad** 115:17 189:22

**irrelevant** 7:9 86:2

**Isis** 169:6

**issue** 57:6 68:23,24,25 83:6 89:1 108:12,16 110:20 130:19 193:25 206:9 209:24 228:14 270:25 271:10,11 276:24 277:6

**issues** 99:22 109:16,25 111:7,12,16 112:4,15 113:14 206:10 252:24 257:16,20 258:19 269:25 271:18 274:15 276:19

**item** 241:12 242:1,2,3,5,14,17

**itemize** 245:20

**itemized** 245:23,25 246:1

**items** 155:24 241:12 244:8

**J**

**Jacobson** 261:8 267:16

**Jaimie** 137:25 138:1,2

**January** 8:25

**Jefferies** 110:10

**JLJR** 215:16,18

**job** 8:5 85:23 110:9 263:25

**jobs** 85:23

**Jones** 6:7 9:5 21:1 24:21 26:18 30:19 33:22,24 35:13 36:18 37:11,13,17,21 38:1 39:14 40:2 42:3,5,7,10,14,23, 24 43:2,24 64:19 65:20,21 68:14,20 69:4 82:15,19 83:3 84:25 86:6 158:15,16 197:17 200:12 212:24 213:4 214:19, 21,22,24 215:2,6,7,12 216:25 217:3,7,8 218:10,21,23 237:19 238:1,7 240:17 243:2 255:1,8,14,24 256:11 260:19, 25 267:10

**Jones'** 44:9 48:6 83:19 85:3 104:24 208:6 213:1 216:17 217:15 218:5,23 255:16,19

**journal-** 31:10

**journalism** 30:23 34:15 35:4, 16,19 39:17,25 42:8 43:18 60:7,11

**journalist** 34:23

**journalists** 31:14 33:6,9 34:10,12,18,21 35:2,9,16,18 49:17

**judge** 11:18,24 12:6,11,18 13:3 55:4 265:25 266:5,8 270:22 277:21,25 278:9,13

**judge's** 265:19,22

**judgment** 207:3 210:20

**June** 59:16,17 64:24,25 65:6

**jury** 5:10 21:16,17 31:21 32:3, 9 34:9 35:2,8 85:21 124:4,14, 24 125:10 140:24 143:20 149:7 152:8 162:22 170:4 176:8 213:21 237:9

**Justin** 196:6

**K**

**Karpova** 35:14

**Kellan** 137:25 138:1

**Kerns** 229:2,3

**keyword** 34:23

**kind** 5:25 9:14 23:7 29:15 39:15 49:4 63:15 90:10 111:7 113:9 116:24 138:21 166:12 195:12 198:20 212:15 218:11 223:24 233:2,3 234:8 235:10 236:25 249:8 253:25 274:6

**Kit** 31:23 32:8,11,21 33:22 49:9,10 61:10 84:12 139:13 148:18 166:24 167:19 183:25 257:3 276:17 278:22

**knew** 8:9 20:25 82:21 83:5,10 157:17 209:4 221:16,17

**Knight** 44:19

**knowing** 85:4 179:24

**knowledge** 64:3 69:9 82:8 83:19 85:3 86:7,23 88:10,12, 17 94:15,17,22 95:2,3 96:13 100:6,18,20 136:8 155:14 173:12 179:14 244:17 258:13, 25 259:2,8

**Kurt** 60:16 70:6 71:1,4 150:14,15

**L**

**L-A** 269:14

**label** 99:24 159:7 185:20,22 268:22

**labeled** 57:23 96:12 97:16 147:21 190:23 195:23 196:3 268:20,21,22

**labeling** 252:5

**laid** 81:22

**landing** 79:22 80:1,4,9,10

**language** 115:13,18 129:22, 24 130:3 224:15

**late** 50:7 83:24 84:2 126:9,14 166:25 167:15,18 210:6,7

**Latronica** 269:10,11,15 270:13

**laugh** 115:9

**laughing** 99:15 269:11

**law** 7:15 21:18 26:12 29:1,2, 13 107:11 116:1

**lawsuit** 77:4 118:22 126:19, 22,24 128:12 129:10 146:4 169:23 236:19 237:21,24 244:13

**lawsuits** 34:2 51:24 54:6 237:13 238:9

**lawyer** 21:21,25 22:2,3,4,5,17 25:14 124:18 132:16 154:18 178:11 191:4 201:16,17 212:10

**lawyers** 108:25 109:1,14,24 123:11 132:17,18,19,25 133:2 191:3

**lead** 35:7 71:11,15

**leading** 265:8 266:2 268:11

**learn** 130:14 199:6

**learned** 188:24 210:2 219:7

**learning** 211:12

**leave** 26:8 28:12 144:9

**leaves** 28:10

**leaving** 253:12

**left** 50:8 84:4 141:6 167:19, 21,24 168:2,10

**legal** 26:3 37:7 114:1,4 116:12 178:10 229:22 230:4,6

**lesser** 68:22

**letter** 95:19 100:10,17,22,25 126:25 127:4,9 128:19,22,25 129:6,17,18 130:10,12 153:10 170:18 221:13,15,18 257:13 258:6,11 259:9

**liabilities** 233:5 234:9,19

**liability** 54:12 234:23

**liar** 251:17

**liberal** 229:8,9

**license** 116:1

**licensed** 26:12

**life** 258:22

**lifeline** 250:17

**limited** 90:7 179:17 235:21

**lines** 108:14 111:13 113:15 206:19,21

**link** 62:23,25 138:10 139:1,4, 13,17 141:18,19 148:15 149:23 150:1,2

**links** 62:22 98:12

**list** 47:15,16,20 48:3,6,7,11 87:3 96:16 138:8,18 246:6,7

**listed** 35:22 64:22 79:14 136:22 172:13 178:24 245:13, 24

**listen** 38:10 39:10 171:9

**listening** 39:5

**lists** 48:1,2 236:10

**literally** 250:16

**litigates** 21:5

**litigating** 21:3

**litigation** 49:20 51:9 57:12 94:12 108:6 112:19 113:7 132:14 187:4 210:19 215:22 221:18

**live** 172:8

**lived** 88:5

**lives** 86:14,15 89:3 90:25 91:1

**living** 7:12

**LLC** 5:5 10:6,14 37:10 138:24 139:4,16,19,22 142:24 148:10 215:24,25 216:1 217:14 218:21 261:8

**LLC's** 139:23

**LLCS** 37:7 239:5,8

**locate** 143:11

**located** 6:8 159:15

**location** 94:19 96:16 148:14

**locations** 50:6 101:9

**long** 24:2 29:11 125:8 138:21 171:8,22 178:14,15 186:14 198:2,18 207:25

**longer** 28:15,18 29:22 35:18 67:5 98:13,21 99:2 176:3 249:20 269:22

**longest** 65:23

**looked** 19:14 20:8,12,14 75:18 93:15 97:21 98:7 168:15 176:25 275:4

**lose** 247:16

**losing** 210:19

**loss** 188:21 191:21 192:11,20 251:4

**lost** 238:10 273:15

**lot** 17:11,23 51:17 61:8 70:15 75:23 102:3 112:14,23 132:6 255:17 257:20 258:19

**love** 171:16 222:5,6

**lying** 75:9,10,11 251:18

**M**

**machine** 226:23

**Madam** 59:4

**made** 8:10 49:21 51:25 53:2, 18,19 59:2 64:25 65:1,9 92:3 96:24 114:3,7,13 127:4,9 138:19 143:10 145:2 149:8 151:13,15 153:25 157:14 158:21 160:19,22 163:14,16 169:23 205:13,18 210:3,4,21 224:24 225:21 242:14 243:3 248:8 260:9 262:3 268:5 272:13

**main** 85:11

**maintain** 149:20

**maintained** 139:19

**majority** 36:19 37:3 197:24

**make** 28:18 43:21 45:9 51:20 58:21,25 60:24 61:21 62:4,14 63:25 69:18 79:19 115:1 124:24 133:15 144:1 190:10 191:12 192:12 212:2 214:6 219:9 225:23 227:16,21,23,24 229:1 232:10 239:2 243:3,17 251:13,14 254:9 256:18 264:23 274:3

**makes** 232:11 240:21,25 241:10 243:7

**making** 68:12 82:4 174:17

**male** 138:3

**mall** 241:21

**malpractice** 114:1,4

**managed** 51:18 52:8,10,11, 17,18

**management** 200:13

**manipulated** 108:10 206:13

**manner** 245:14

**Marcel** 259:24 260:8

**mark** 31:17,19 97:10 125:15 219:15,18,24 226:6 229:19 232:21

**marked** 18:3 31:18 97:11 102:10 103:10 117:19 125:16 137:20 140:17 141:8 148:6 159:2 162:15 163:2 168:18 176:19 184:23 192:18 195:21, 25 196:2,13,16 219:17 228:12

254:4,7,8,13,14,16 261:5,7 262:18

**marketing** 243:5

**Massachusetts** 86:16 94:19 96:16

**material** 17:9 19:24 30:10 41:2 42:18 55:24 56:2 87:25 98:22 100:9 102:2 109:17 153:7 255:15 258:3 259:12 260:11

**materials** 10:24 19:10 39:7 40:20 57:7 75:15 91:25 140:22 143:14 154:15 214:16 229:4 257:11 271:12 273:7,23

**math** 182:8

**math's** 182:19

**matrix** 41:23

**matter** 6:16 30:1 142:6 189:20 244:23,25

**matters** 21:23

**meaning** 107:18 266:21

**means** 8:3 87:2 99:24 136:7 147:6 156:25 157:3 241:17 244:4 246:2 255:6

**meant** 39:22 259:6

**media** 19:20 50:5 61:18,22,25 62:2 63:16 101:7,8,10,13,19, 23 102:4,23 139:18 141:1 150:6 164:20,25 165:6 256:22

**medium** 138:9

**meeting** 196:10

**Melinda** 30:18 32:18,24 64:20 65:12,17,18 66:7 70:19, 24,25 103:12,18 104:22 146:8 158:12 177:8 185:3,9,25 186:7 199:8 203:9 214:15 222:1

**members** 120:20

**memories** 223:11

**memorized** 264:11,12

**memory** 219:11

**mental** 96:10 257:16,22

**mention** 10:23 19:18 146:5

**mentioned** 23:24 79:12 155:22

**mentions** 54:11

**message** 133:20

**messaging** 260:8

**met** 185:3 196:11 218:16

**Michael** 110:14,15

**mid** 228:10

**middle** 210:19 217:15 225:18

**million** 185:13 197:4,20,25 198:14,25 204:1,7 210:17 212:12 217:23 218:1,3 219:1 220:18 236:19 242:20

**mind** 176:1

**minute** 114:20 192:11,12 222:9

**minutes** 16:17 190:7 253:9

**mirror** 121:11

**mischaracterized** 54:16

**miscommunication** 250:2

**misidentification** 131:22

**misidentified** 260:1

**misinformation** 256:10

**misleading** 255:21

**missed** 130:18

**missing** 48:11 108:14 206:20,22

**misspoke** 178:9

**misunderstood** 102:25

**mitigate** 162:12

**mitigated** 130:19

**modification** 170:5,22 171:3 173:1,22

**modified** 169:13,14,18 170:2, 12,15,16,18,20 175:11 176:4, 5,6

**money** 198:18,20,21,23 199:8,13 216:14 218:8 237:6, 13 240:22,25 242:24 244:5,7, 10

**month** 153:11 240:17,19

**months** 198:5 199:16,23 200:5,9 210:22 236:19 243:14 248:15

**morning** 19:8 20:3,20,21 72:4 74:2 150:25 167:10 187:19 190:18

**mother** 215:7

**motion** 113:8 191:10 200:13 223:10,16,20 227:24 231:21 237:23 249:18 250:21 265:4

**motions** 116:5

**motto** 39:15

**mouth** 44:24

**move** 14:7 226:3 229:18 275:10

**moving** 260:17

**MSNBC** 141:4 144:4

**multiple** 13:5 54:13 55:8,12 59:24 60:9,12,19,25 61:3 69:18,20,22

**N**

**name's** 200:21

**named** 36:2

**names** 61:4 84:11,18,22 137:21

**narrow** 89:23

**native** 143:25

**necessarily** 31:13 111:18 121:10 142:7 146:13 151:23 164:21 170:17 239:4,6 240:13

**necessitate** 105:22,24

**needed** 18:6 25:5 59:19 76:6, 7 112:12 170:23 202:21 204:18 214:13 240:3,6

**nefarious** 206:24

**negative** 131:24,25 132:2 184:15,17 185:13 197:4,20

**negotiated** 15:5,8

**negotiations** 134:5 192:22

194:10

**neighborhood** 16:8

**net** 103:4 104:11 116:24 177:6,11,14 183:25 184:5,7, 10,13,15,17 185:13,15 190:13 192:25 193:4,17 195:23 196:25 197:3,9 202:5 204:11 205:14 211:12 234:16 235:2 238:22 252:8 253:24 279:6

**news** 19:21 36:13,21 43:9 50:4 62:22,23 63:7,9

**newspaper** 148:15

**Newswars** 139:7

**nice** 132:2

**night** 7:8 73:9,20 90:19 92:3 167:11 187:15

**Nikko** 47:19,20 62:12

**Nimmo** 60:16 70:6,9,11 150:14,15 158:8,9

**Nimmo's** 70:18 71:1,4,9

**nitty-gritty** 240:14

**Nobody's** 63:20

**nodding** 53:16 69:14 82:9 83:21 105:3 125:1 127:6 144:13 154:24 195:19 217:18

**nonparty** 148:11,13

**nonresponsive** 59:5 265:16

**norm** 21:25 22:2 37:2

**Norm's** 22:5

**normal** 210:16,22

**note** 198:14 203:24 204:1 211:1 217:23 218:1,3,4,9 234:12 242:25 256:14 262:3, 20

**notebook** 220:5 222:21 224:10 253:13

**notepad** 220:10,12 223:11 232:19

**notes** 202:14,23 218:13,16 219:8,14,16,22 220:13,16,17 222:10 223:5,22 224:3,11 225:5,10 226:16 228:10,12,17 229:23,25 230:3,4 231:24 232:5 254:15,20,21 261:2,3, 25 262:2,7,8,12,19

**notice** 8:17 10:21 11:23 12:10 16:14 17:14 26:24 55:18 78:13 81:22 88:9 137:8 139:21 238:24 267:3 277:22

**noticed** 13:23 14:4 219:12

**notices** 13:13 179:9 272:16

**notification** 170:15

**November** 236:2

**number** 15:3,5,7,10,14,21 23:15,16,17 29:20 30:16 36:16 39:11 41:18,23,25 42:2, 3 43:6 57:1,11 58:5 70:1,18 71:2,20 73:6 74:8 76:11 77:7 79:8 80:16,20,21 81:5,11,16 92:7,13,21,22 93:2 95:12 101:8 117:23 131:12 147:7 150:7 158:12 182:22 185:17, 21 189:19,21 197:2 198:17 204:4,9 205:10,14 208:24,25 238:9 263:22 266:9,14 271:4

**number's** 147:16

**numbers** 71:3 78:23 81:24 82:1 92:17 103:20 185:10 187:6,10 191:24 197:10,11 204:10,13,23,25 206:3,13,21 207:15,16 208:20 210:5,9,14 213:10 218:12 242:4 247:16, 21 248:16,22,23,24 250:5 270:18

**numerous** 39:15 88:24 89:4

## O

**oath** 41:17 124:20 210:8 213:21

**object** 6:23 25:10,17 54:15, 19 59:5 105:14 229:18 265:6, 8,15 266:2 268:11

**objection** 46:25 54:21 98:18 155:11 265:11

**objections** 54:20 55:2

**obligation** 7:8

**obligations** 6:21 10:11

**obscured** 147:16

**observed** 78:4

**obtaining** 229:15,17

**obviate** 54:5

**occasion** 138:8

**odd** 238:18 239:6

**offenses** 133:14

**offered** 230:9

**offering** 38:6,7,9

**office** 24:8,9,10 29:5,6 167:24 186:19,20,22 191:18 194:16 196:9 227:16,21

**officially** 215:13

**Ogden** 5:8,15,20,25 6:11,15 7:11 8:16,20,22 14:16,17,21, 23 25:22 26:8,11 31:17,19 39:11 47:3,6 52:25 53:1 54:17,22 55:5,7,16,17 59:4,6 73:13,14 75:6 76:20,24 77:1, 15,19 78:3 81:7,10,12 90:15, 17 91:15,24 95:10,14,15 97:12 98:20 104:5,7,10,14,18, 21,22 105:17 106:18,21 110:13,15,18,23,25 112:18 114:21 115:3,24 116:4,21 117:16,18,20,24 121:16,18,19 124:10 125:17 126:16,18 129:3,5 133:2 134:20,24 136:14 137:3,6,13,19,24 140:8,11,14,15,18 141:9 147:18,20 148:1,3,5,7 153:15 155:12,16,19,21,22 159:3 161:21 162:16 168:19 176:9, 14,16,20 178:6 180:4,6 183:18,20 184:24 185:5,8,20 186:11 187:8,12,14,18,22,24 188:4,8,15 189:5,12,15,18,21, 23,25 190:4,8,10 191:14,23 192:1,10,13,15,23 193:2,6,8, 11,16,21 194:6,11,14,21,25 195:6,12,17,20,22 196:1,8,17 208:4,11 215:18 217:6 219:18 220:4,7,11,15,20 222:15,19, 25 224:5,8,12,19,23 225:2,7, 9,11 226:1,5,15,21,24 227:3, 6,25 228:1,8 229:19 230:14, 17,20 231:7,11,17 232:1,6,16, 19,20,22 249:1,12,16,19,25 250:6,9,16 251:20 252:3,8,11, 14,17,21 253:3,6,10,16,22

254:5,9,14 255:11 261:6 262:13,15,25 264:18,22 265:6,8,11,15 266:2 267:5 268:11,14,17 279:3

**older** 114:25

**omitted** 225:6

**on-air** 60:3

**ongoing** 113:13 132:14 258:21

**online** 131:9 159:24

**oop** 135:10

**operates** 197:15

**operating** 150:17

**operatives** 255:17

**opinion** 38:17,18 42:13 44:3,4 46:18,19,20,22,24 50:24 72:20 110:12,16 111:1 115:22 150:7 189:2 191:9 255:19

**opinions** 38:6 40:2 50:25 251:5

**order** 5:13 41:8,10 95:23 108:17,18,24 112:5 116:2 192:4 193:16,24 195:7 247:8 265:4,10,12 266:7 278:7

**ordered** 7:5 11:13 183:21

**orders** 111:13,14 266:9,14

**org** 148:22

**organization** 57:7 111:17,22

**organize** 41:1 270:5,7

**organized** 52:5 111:18

**origin** 159:14

**original** 45:12 100:9 128:4,8,10,17 138:16 149:23 160:10,14,21,23,24 161:11,22 166:14,18,21 173:1 175:6 226:11,19 231:1

**originally** 101:6 134:12 166:23 173:21 212:3,8

**originals** 226:23 231:14

**other's** 60:25

**outstanding** 112:13,14

**over--** 266:18

**overlap** 112:23 271:10,11,12 274:21

**overlapping** 112:2

**overlaps** 113:20

**owe** 38:14 243:7

**owed** 39:4 103:23 197:23 198:22 203:24 242:20

**Owen** 44:21 45:4

**owing** 103:23 237:7

**owned** 142:23 145:15 214:19 215:6 239:3

**owner** 37:22 67:6

**ownership** 199:9 217:19 221:24,25

**owns** 37:8,9,10,11 142:16,20 214:18 215:4,5,20 217:11,20,21 221:25

**P**

**p.m.** 126:10 137:16 188:12 228:5 253:19 279:9

**packet** 19:6

**pad** 219:12 229:22 230:4,6

**pages** 11:3 19:23 20:2 71:21 74:13,16,19 77:10 79:3,12,13,17,22 80:1,4,10 81:16 92:16 93:8,9,15 97:20 98:10,21 99:1 119:23 135:22,25 140:18 222:21 230:18 231:2,3,24 232:2 254:14 267:21

**paid** 14:8,11,13,24 198:1,19 199:8,13,14,24 216:16 217:8 218:9 237:6

**paper** 87:14 230:21

**Paragraph** 236:9

**parameters** 123:7

**parent** 238:5

**parentheses** 139:10,12,20,21 148:20,22 221:19

**parents** 217:20 238:9 239:9

**Parkland** 97:3 130:2 149:2 260:1

**part** 11:6 21:20 33:15 51:4 72:4 108:2 149:24 232:1,8 245:13 256:6

**parties** 253:23

**parts** 19:16 260:17

**party** 41:6,7 121:7,13 122:4 229:14 236:9 256:8

**pass** 268:13 276:6

**passing** 263:11

**password** 269:3

**past** 36:6 39:12 47:23 98:23 188:19 190:6 209:21

**patient** 22:13 87:1 174:5

**Pattis** 9:11,13,15,17,18,20,22 10:4,17,22 11:2,17 20:23 25:1,12,16,19,22 26:3,19 29:8 260:19

**Pattis's** 25:2

**Paul** 71:17,18

**pause** 117:16 220:11 232:18

**pay** 151:19,22 152:5 199:17 214:5 243:5

**paying** 204:3,6 210:18 242:23 244:1

**payment** 210:21

**payments** 243:18

**pays** 199:18 240:22

**Paz** 5:3,4,11 7:5,11 20:12 78:3 99:16 173:8 174:6 187:22 188:17 216:23 220:4 227:7 228:10 229:22 252:8 265:3

**peculiar** 177:22

**pendency** 133:16

**pending** 111:12 112:7

**people** 19:22 30:4,16,19 36:5,8,9 38:3 42:22 43:3,4 49:17 51:17 59:22 61:11 64:6,21 70:16 84:3 86:25 168:7 181:12,25 237:13 238:14,16 239:1 255:20 256:2,8,9

258:18 260:8 273:6 277:12 278:16,21

**percent** 36:11,14 39:25 40:5, 23 41:16 42:7 43:5,11,12,14, 17 154:25 165:8 214:19,20,22 215:4,6,7 217:12,21 218:8,20, 21,22,25 219:3 238:5 239:3

**percentage** 36:24 42:25 43:1 199:21 200:4

**percentages** 217:21 222:1

**perfect** 61:12 255:2

**perfectly** 231:22

**period** 63:10 70:5 83:7,18 112:22,25 237:4

**periods** 112:2

**permissible** 54:20

**perseveration** 152:19

**person** 12:25 24:6 26:2 29:25 30:9 33:20 35:22 36:2 41:4 46:10 62:8,9,15 66:21,24 67:4 68:11,13,24 70:25 100:23 102:5 119:14 121:4,8 132:12 154:21 157:24 172:24 186:17, 18 191:5 194:22 200:22 201:7,8 211:15 212:25 213:3, 6,12,16 259:13,14 260:21 270:2

**personal** 9:23 72:20 86:23 89:2 92:12 95:2,21 118:23 258:13,24 259:16,18,22 267:12

**personality** 43:25 44:18

**personally** 63:6 142:20

**pertinent** 267:2 271:5,6,14 274:9,13 275:3,5

**petition** 7:24 8:10 118:3

**petitions** 56:7 118:4 176:24

**phone** 24:5 26:2 55:4 70:18 71:2,3 77:16 112:16 114:18 118:24 119:5 141:14 153:6 156:3 186:16 191:13 255:13

**photo** 50:4,5 97:20 101:25 130:4 144:6 145:22 147:3 159:3,5,12 160:10,20 161:1,5, 9,17,18 162:9,10 225:20

**photocopies** 225:24

**photocopy** 231:14

**photograph** 96:23 97:1,4,8 101:6,11,15 102:5 129:25 130:20 141:5,23 144:22 149:18 257:6

**photographs** 141:20 160:13

**photos** 160:21

**phrasing** 273:17

**physical** 252:1

**physically** 203:21 252:1

**pick** 256:4

**picked** 238:18

**picture** 62:8,10 100:23 101:12,14 140:3 141:10 142:1,10 147:4 161:25

**pictures** 150:6

**piece** 45:18,20 55:20 87:14 230:21

**pinch** 195:13

**pipe** 122:16

**Pizzagate** 255:17,22,24 256:11 261:4

**PL** 217:11

**place** 49:22 51:10,14 59:10 61:14 62:19 69:7 72:24 111:14 122:9 140:1 143:3 187:11 195:7 255:3

**places** 101:8 150:8

**plaintiff** 88:4,6,10,12,18 100:19,21 118:11 132:24 136:1

**plaintiff's** 81:22 196:9 228:11

**plaintiffs** 73:8 95:18 99:19 114:12 130:11 133:21 143:6 159:9 188:6 270:17,20

**planet** 40:5 142:12,14,19,23 143:17 145:1,6,10,20,23,24 146:2,6,11,17 147:8,13

**planning** 215:12 216:3

**platform** 145:20 175:25

**platforms** 139:21

**pleadings** 116:5 118:3,4 125:18

**PLJR** 214:20 215:3,4,5,6,20, 23 216:6 218:21 240:12

**plurally** 24:23

**point** 28:22 73:22 91:18 113:1,17 115:24 118:6 132:20 153:19 193:7 212:6 228:16 243:20 246:10 248:14 249:9 252:21 253:23 256:15 260:20 263:21 278:24

**pointed** 261:23

**pointing** 261:14

**points** 112:24 124:2

**policies** 30:13,17 31:1,4 32:3,10 33:21 49:22 51:20 55:19 58:17 59:10,18 61:13 63:16 69:6

**policy** 33:5 34:1 35:17 51:10 53:1,3,10,11,13 58:8 59:2,6,9, 23 60:16,17,18 61:20,24 65:7 69:6 70:7

**political** 38:3,4,9,12,20

**popular** 63:13

**portions** 230:9

**pose** 28:20,23

**posed** 188:16

**position** 7:5,9 30:22 34:14 35:3,10 36:11 37:21 38:2,25 42:5,6,9 43:7 51:11 60:20 65:5 69:9,12,17 71:9 150:10, 11 161:14 225:4 228:11,15 230:12,14 235:1 247:20 255:22 259:23

**positions** 38:24

**positive** 105:2,5

**possess** 179:13

**possesses** 246:8

**possession** 93:25 94:14,23 95:1 118:17 126:3 135:4 139:2 163:10,23,25 173:20 252:2

**possibility** 53:14 64:22,23

**possibly** 29:25 270:1

**post** 34:2 80:8,13 84:16 85:4, 5 96:24 97:2 100:15 101:3 128:4,8,10,15,16 129:16,19 138:19 139:1 141:1 145:1 146:10,14 149:18 150:9 151:12 160:19,21,24 161:11, 22 162:12 163:14,16,17 164:4,12,14,20,23 165:18,22, 24 166:6,14 169:2,5,9,13,14, 17 171:17 173:1,21 175:6,11 176:5 210:19 255:3,20 256:20 257:17,18,21 276:11

**posted** 19:21 50:6 81:17 100:23 138:10,16 139:18 143:4,8 150:16,21 160:10 162:22 166:2,7,23,25 167:4, 15,18 173:22 176:5 257:11

**posting** 69:8 163:17 256:3

**postings** 145:24

**posts** 19:19,20 69:8 96:20 102:8 142:20 144:21 145:14 151:15 268:6,8

**potential** 54:6,12 114:1,13,14 193:22

**potentially** 62:25 130:2

**pounding** 228:2

**power** 68:17 115:3,4,7

**PQPR** 103:22 104:23 197:25 198:1,15,19,22,24 199:2,6,9, 10,14,18 200:14,15,20 201:7, 9,11,16 204:1 212:3,6,9,10 214:18,19 215:4,20 217:11,19 218:5 219:4 235:20 236:10 237:5,6,7 240:12,21,22 241:10 242:15,20 243:18 266:17

**practices** 22:6 206:8,11 207:6

**practicing** 7:13,15 26:12 116:1

**pre** 257:17,22

**precontact** 258:7

**predated** 65:13

**preferred** 47:17

**prefers** 47:23

**premise** 62:13

**prep** 271:25

**preparation** 16:9 23:25 41:19 90:5 106:11 107:13 109:9 116:5 183:7 194:9 214:3,11 249:5 257:8 266:19 273:16 275:6,19

**preparations** 274:4

**prepare** 10:19 30:12 55:21 82:12 87:4 103:7 177:4 179:19 183:23

**prepared** 6:20,25 7:7 10:25 11:8,12 12:1,7 13:12,19,22 18:25 20:18 26:23 27:2,5,12 30:1 71:23,25 74:5 76:10 78:22 79:15,17 80:13,15,19, 22 81:2,12,18,21 82:2,3,10 103:4 137:9 152:18 183:15,16 190:15 192:21 263:8,24 264:13 272:6,7,8,10,22 278:4

**preparing** 12:3 16:3 31:24 56:5 109:5 179:17 180:10,13 202:5 212:20 214:12 264:8 278:5

**prepped** 7:6 273:9,18,19

**prepping** 271:21,22

**preproduction** 47:15

**presentation** 235:11

**presented** 30:6 46:22 229:7

**preservation** 127:20,21 128:19 137:9 145:19 146:5 153:25 158:18 269:25

**preserve** 102:7 127:5 136:13, 15,24 137:7 149:8,12,25 152:23 153:20 154:5,7,14 155:10,24 156:2,3,5,8,10,12 157:5 158:22 226:19 230:25 279:4

**preserved** 128:6,18 153:24 160:6 226:11

**pretty** 11:19 17:22 84:2 89:17 106:4 107:9 110:9 183:13 225:13 232:7 247:3 263:2

**prevent** 229:14

**prevented** 229:17

**previous** 8:24 81:20 89:8

**previously** 10:15 30:3 49:23 53:24 97:13 159:4 176:2 197:7 199:15

**primary** 236:23 240:25

**principal** 218:9

**principally** 204:8

**principals** 241:23

**print** 17:17 203:21

**printed** 185:4 202:17,22 203:9 267:20,22

**printer** 202:20

**printouts** 97:14

**prior** 9:21 20:13 21:9 32:2 33:10 34:8,25 35:6 55:14 60:15 64:24 70:5 100:22 106:18 108:11 109:12,14 117:20 148:12,20 173:5 188:20,25 194:15 199:23 200:14 212:24 215:13 216:3 237:24 273:7

**Prison** 142:12,14,19,23 143:17 145:1,5,10,20,23,24 146:2,6,11,16 147:8,13

**private** 260:10

**privately** 260:8

**privilege** 25:18 58:16 98:19 105:15 229:5,10 230:10,12 231:5,6

**privileged** 25:8,9,10 106:6 107:9 223:12 228:18,19

**privileges** 229:12

**pro** 111:11 112:7 113:8 116:2

**pro-** 182:25

**problem** 38:15,19 111:22,24 190:17 224:20 231:23 240:10 275:21 277:2,3,4

**procedure** 61:20 150:18 219:23

**procedures** 30:17,21 32:4, 10 49:22 61:13 72:23

**proceed** 104:19 223:2

**proceedings** 115:25 279:9

**process** 28:19 36:21 43:7,9 60:23 62:14 226:8

**produce** 120:11 125:24 126:2 135:21 163:8,13 185:25

**produced** 12:21 18:19 20:17 32:16 40:20 57:3,11 66:13,16, 17,18,20 73:8,15,19 74:1 78:25 79:18,21 80:5 85:16 86:1 90:8 91:6 92:18 93:18,19 94:11 95:18 97:13 99:19,25 100:2,8 102:3,17,18 104:11 108:14 109:17,18 111:19,21 112:10,13 119:23 120:2,4 123:2 124:5,21 125:3 134:10 135:4 146:23 163:4,13 184:1 185:24 187:3,5,7 188:22,25 189:25 190:1,3,5 191:17 195:2 205:6 206:19,22 228:21,22 249:6 250:10 251:5 262:16,22,23 268:9 270:16, 17,20,23 271:1

**producing** 108:11 189:9 250:11

**product** 194:9,18 231:4 237:4

**production** 18:18,21,25 19:15,16 36:20 42:20 56:25 57:7,22 78:25 82:16 87:6,11, 14,25 88:24 89:5,6,7,8,14 90:19,20 91:5,7,8,17 92:3,16 93:11 94:7 98:4 99:21 100:4 102:2 112:15 113:15 118:6,9 120:6 122:20 123:3 125:22 131:2,3,5,7,8 134:15 135:9 144:7 159:9 164:24 165:2 191:9 250:25 266:23 270:1,6 271:2

**productions** 42:21

**productive** 179:19

**products** 198:1,16,22 199:21 243:18

**prof-** 197:3

**professional** 9:21 29:8 75:19 189:2 191:9

**profile** 62:10

**profit** 188:21 191:21 192:11, 20 251:4

**profit-loss** 103:13,15 104:23 105:12 108:13 184:19 185:9, 12 197:1,2 202:4 203:2 205:12 209:18 210:10 214:14

**profit-losses** 209:22

**profitable** 197:20

**profits** 216:18

**program** 172:4

**programming** 146:18

**promise** 61:7 83:11

**promoted** 150:18,19 151:6,8, 9,15,17,22 152:4

**promotion** 151:3

**propensity** 251:17

**proper** 130:15 169:22

**propose** 193:22 226:20

**proprietor** 238:4,8

**proprietor's** 239:9

**protect** 51:10,13 53:2,18 54:1 237:13,19

**protected** 229:5 269:1,2

**protective** 5:13,16,17 41:8, 10 95:23 192:4 193:24 195:6

**proved** 115:21

**proven** 38:18,21

**provide** 165:18 229:6,13 247:12

**provided** 40:19 55:24 100:4 188:18 191:22 192:1 194:12 195:1 196:4,8 204:15 220:14 223:22 229:24 241:3 251:1 277:20

**providing** 207:11

**psych** 258:4

**psychological** 258:4

**psychologist** 95:17,19 258:6

**public** 142:22 143:8 196:14

**publically** 138:10

**publication** 135:25 139:5,7, 14,18 145:2 148:12,14,15,20 149:3

**publications** 148:10

**publicly** 138:25

**published** 125:25 126:6,9 134:12 135:2 139:4,9 140:2 144:22 145:5 170:12 277:13

**publisher** 148:13

**pull** 73:23 91:16 164:22 209:18 222:24 225:16 230:20 231:13

**pull-out-of-the-air** 174:14, 16

**pulled** 63:22 87:18 164:15,18 196:20 219:12,21 222:15 224:9 229:3,22 230:3,6

**pulling** 159:20 228:17

**punditry-type** 31:14

**purchased** 237:5

**purchases** 198:15

**pure** 64:16,17 174:14

**purely** 153:17

**purpose** 42:18,20 54:10 255:21

**purposefully** 209:16 255:20

**purposes** 192:21

**purse** 196:20

**pursuant** 130:14

**put** 6:9 7:3 19:11 39:1 40:25 42:19 49:21 51:10,14 59:7 74:24 75:2,14,15 92:22 101:8 147:17 165:18,22 189:5 194:22 202:19,24 203:13 209:17 223:8 270:13

**puts** 39:6

**putting** 22:14 45:13 132:8 195:12 210:9

Q

**qualified** 35:23 36:1 43:14 210:24 211:1 214:7 237:1

239:12 258:25 277:1

**qualities** 61:9

**question** 13:24 14:1,2,6 22:8, 15,19,21 23:1 27:23 28:5,20, 23 32:6,17,19,21 34:16,17 35:5,22 38:8,15,19 39:10 45:8 49:1 50:10 52:12 53:17 55:6,7 56:12 57:14 58:12 61:23 69:4 77:2,3,5 78:12 80:18 82:3,5 83:12 87:9 88:16 103:1 106:25 109:3 115:8,14 118:11 124:11 126:11,21 134:11 135:2 138:11 139:1 149:13 152:20 156:13 157:2 165:23 168:15 170:10,24 171:9,15,21 174:8 175:4 176:2 179:6,16 183:4 187:12 188:16 192:7 196:24 210:25 211:2,21 216:6,21 231:7 236:23 242:18 244:14,16,21,22 245:2,22 246:3,20,22 248:5 259:20 268:12 272:2 273:18 274:5 275:4

**questioning** 147:11 190:20 191:16 252:8 275:14

**questions** 17:11 28:17 55:1 61:9 82:6 171:13 173:15 174:7 184:24 207:11,14 213:14,18,24 214:9 222:16,18 226:16 247:12 253:9 260:15 262:3 271:20 278:16,20

**quick** 52:22 72:17 198:9 228:24

**Quickbooks** 103:12 108:10 185:4 203:10

**quickly** 101:13

**Quinnipiac** 29:2

**quit** 115:1

**quotations** 261:24

**quote** 60:7 229:7

**R**

**R0** 147:5

**raise** 151:19,22

**raised** 37:13 277:6

**ran** 43:11 187:17 197:19

**Randazzao** 110:1,6 111:6, 10,25 112:6,18 113:3 114:17 115:25 116:4,12,20 132:21

**random** 27:18 211:15 213:3

**randomly** 27:17 28:16

**range** 93:7

**rate** 23:8,11 263:13

**reach** 66:25

**reached** 9:9 188:24

**reaction** 10:6,7

**read** 6:2 11:22,23 12:4,12,25 20:6 31:21 32:25 33:3 40:10, 11,12,13,17 46:13,17 57:24 86:15 87:11,12 92:7 97:5,6 106:18,20 108:17,18,23 118:5 128:8,10 130:10 131:3,5,7,12, 14,15 139:24 142:11 143:3 149:5 162:23 188:9 206:14 221:4 225:12 246:15 247:7 257:10,13,20 258:3 265:4 266:7 272:16 278:6

**readily** 70:14

**reading** 91:3 95:19 131:20 132:6 224:20 234:8 270:22

**ready** 19:1

**real** 52:22 72:17 141:3 144:4 198:9 232:13 260:21

**realize** 255:23 263:8

**realized** 194:4 228:2 251:3 255:24

**reask** 171:15

**reason** 40:15 53:25 70:12 98:4 121:2 143:1 171:17 194:13 200:24 204:16 206:5 246:1 260:14

**reasons** 103:19 198:6 263:22

**recall** 17:20 37:24 39:20 71:5 91:2 95:17,19 122:3 132:4 146:1 147:1,3,6,7 148:24,25 149:12 180:25 184:3 208:23 233:23

**recalled** 267:15

**receive** 116:23 128:18

**received** 71:21 100:25 126:25 127:4 128:22,24 130:25 153:10 170:15 203:9 214:15 221:17 244:2 252:6

**recent** 103:14 192:14 200:10

**recently** 62:7

**recess** 77:25 91:21 137:16 188:12 228:5 253:19

**recklessly** 64:11

**recollection** 143:18

**record** 5:1,12 6:10 7:3 11:18 13:3 23:3 25:12 77:20,23 78:2 91:19,23 102:9 106:20 114:20,23 137:14,18 147:15, 17,20 188:10,14 189:6 192:6 194:2,3 196:14 217:5 219:10, 25 223:9 224:16 226:22 228:1,3,7,24 232:15 251:13 253:15,17,21 258:5 262:2 264:19,21,23 277:25 279:7

**records** 96:11 139:17 149:21, 25 249:6

**rectified** 83:7

**rectify** 51:25

**red** 83:25

**redact** 225:15,19 226:1,2,7, 13 227:15 230:11,18

**redacted** 201:25 223:6 227:19 231:2 242:10,11,12,14

**redactions** 201:23 202:2,8, 11 225:25 227:23

**redirect** 144:2 279:4

**Reeves** 104:16 110:2,6 111:25 132:21 191:11 251:7, 15,17,19 262:16

**refer** 184:19 218:13

**reference** 162:9

**referenced** 6:7 138:11,19 258:4 262:1

**references** 268:5

**referencing** 90:25 261:4

**referred** 129:15 230:8

**referring** 17:13 37:24 44:9 45:3 46:5 50:20 51:6 61:19 90:1 204:24 216:24 217:1 231:4 245:2,19 246:9 268:7

**reflect** 197:2

**reflected** 209:5

**reflects** 208:15

**refresh** 223:11

**refusing** 78:16

**regard** 109:4 248:3 261:6

**regular** 275:22

**regularity** 198:21 199:24

**regurgitated** 108:20

**reimburse** 243:6

**related** 16:5,19 17:10 18:9 135:25 156:4 158:19 161:17, 24

**relates** 226:13 264:3 267:3

**relating** 118:10

**relation** 8:12 261:4

**relations** 261:20

**relationship** 7:24 9:19,21,23 29:8 103:21 170:14 235:20 237:21 240:21

**relative** 186:25

**relay** 276:22

**release** 195:4

**relevant** 13:22 27:23 88:15 192:25 193:3

**reliability** 69:7

**reliable** 47:23 48:25 49:3 124:19,23 207:9 255:25 256:1,13

**relied** 90:12 149:9 229:12 249:5,25 250:4

**relies** 31:6 229:6

**rely** 59:25 222:16

**relying** 73:8

**remain** 195:3

**remainderman** 216:15 217:7 218:24

**remember** 16:13 17:25 31:3 66:7 70:9 73:3 84:19 91:2 96:8,9 110:3 120:25 121:22 122:7 125:6,7,9 126:20 127:1, 2 128:9 140:10 144:10 158:7 169:24 176:13 181:5,6,11 200:19 201:5,6,8 203:14,20 220:16 232:25 235:5 261:2, 17,19 262:15 265:17 273:1 275:15

**remembered** 157:21

**reminding** 133:9

**remove** 161:17

**removed** 130:3,5 139:22 161:25 162:9

**rendered** 144:25

**reorganized** 270:11

**rep** 240:11,12

**repay** 243:17

**repeat** 47:6 165:20

**rephrase** 49:2

**replaced** 191:6

**reply** 157:17,22 158:3

**replying** 141:3

**report** 43:21 48:8 95:17 127:10 169:5

**reported** 149:3 208:6,10

**reporter** 23:2 59:4 77:18 114:24 176:15,18 189:17 194:3 230:25 231:18 253:14 254:8,12 269:12

**reporters** 33:6,7 34:19,21

**reporting** 43:23

**reports** 48:21

**reposted** 147:7

**represent** 76:16 100:1 129:6, 9,13 142:3,22 145:9 164:11 168:23 170:1 171:12 177:24 178:1,7,10,11,12 192:9 199:2 241:20

**representation** 109:12 111:8 112:8 113:6 164:24 213:2

**representative** 5:4 7:23 8:1, 23 9:10 10:5,9 11:14,21,25 12:7,13 13:5 20:23 21:13,22 79:10 80:12 81:23 86:3,24 128:13 157:13 178:12 184:11 199:3 201:10 212:20 277:23

**representative's** 189:8

**representatives** 10:15

**represented** 73:19 116:15 130:1 169:21 197:8

**representing** 45:4 113:3 129:25 143:17 154:13

**represents** 177:23 201:7 218:5 219:4 237:7

**reproduced** 108:15

**republish** 146:19

**request** 106:16 118:6,9 125:21 134:14 135:9 138:12 185:25 193:18

**requested** 106:17,20 120:6 136:9 153:5 207:12

**requesting** 100:11

**requests** 120:6 122:19

**require** 8:5 13:5 15:19,22,23 32:6 269:3

**required** 23:21 25:6 30:7 229:8 269:5 273:17

**requirements** 34:12

**requires** 30:23

**requiring** 15:25

**research** 41:18 44:1,10,23 45:24 46:4,14 48:4 87:8 259:15

**researchers** 34:18,19

**respect** 188:16 224:16 265:4 266:18

**respond** 127:14,16

**responded** 111:14

**responds** 115:8,11 148:18

**response** 118:15 119:7 122:18 126:2,21 129:10 135:3

136:5 138:24 143:2 157:17 158:4,7 164:18 188:16,22 244:1,2 250:20 262:19 275:13

**responses** 117:25 125:18 165:2 188:20

**responsibilities** 8:6

**responsibility** 8:8 270:6

**responsible** 112:2 204:2 211:19

**responsive** 78:14 118:16 120:7,12 126:3 127:11 135:4 139:3 143:11 246:15

**rest** 127:25

**restrict** 47:3

**restricted** 85:4

**restrictions** 120:21

**result** 123:14 131:24 259:25

**resulted** 109:19

**retained** 8:22 9:2,5 10:17 183:23 200:15,17,18,22 201:1,4,8 211:20,24 212:3,7, 9,10,23

**retaining** 211:20

**retrac-** 169:22

**retraction** 81:16 100:11 129:14 130:6,15 169:22

**return** 248:23 249:11,22

**returns** 104:4 222:5

**Revenue** 249:24

**review** 11:3,8,10 12:10 13:4 15:12,19,25 16:4,22 17:9 18:23 19:5 20:5 45:24 56:4 57:9 88:3 93:4,10 96:3 99:13 100:7,10 117:3,10,20 123:1 124:25 144:15,16 153:6 177:4 182:24,25 188:19 197:6 207:7 222:14 271:5

**reviewed** 12:14,21 13:9,21 18:20 20:19 55:25 56:2 72:6 78:24 80:2 82:15 101:22 102:13 103:24 104:8 118:5 123:5 125:18 131:1 140:23 143:14 146:24 208:2,8,9 220:2,6 222:13 245:5 249:22

260:11 264:8 266:19 273:23

**reviewing** 52:25 97:12,19 98:22 162:19 178:18,19 179:22 181:6,8,11,13,16 183:1 184:25 227:11

**reviews** 220:11

**revised** 129:20 187:10 197:11

**revisions** 187:11

**revolving** 249:8

**rewarded** 151:5

**right-hand** 163:1

**ringing** 114:18 115:1

**road** 27:24

**Rob** 30:18

**Robert** 108:3 237:25 248:12

**Roe** 108:3,9,21 197:8 200:8, 15 201:17 206:2 207:9 209:11 210:2 211:3,24 212:10 213:2, 4,11,25 214:4,7,12,17 218:17, 20 219:7 235:8,10,19 237:25 238:1 243:2 248:12 260:18

**Roe's** 206:7 207:5 236:4

**role** 25:2 34:11 150:11 151:6 152:4

**roles** 49:13

**room** 78:4 163:18

**rooms** 12:8

**roughly** 16:16 93:3 182:21 219:1

**round** 20:1 250:25

**rude** 54:24

**rule** 23:7 68:15 70:3 194:15

**rules** 47:4 54:19 63:17 68:12 219:23 229:9

**ruling** 265:22

**run** 226:22

**runs** 107:8

**S**

**safe** 20:15 76:9 78:21 93:9 127:3

**safest** 253:23

**sake** 230:17

**Salazar** 24:21 26:18 37:1 82:15 83:22 84:25 86:6 136:23 267:15 275:24 276:4

**sales** 220:18 237:8 240:22

**sanctioned** 108:9

**sanctions** 109:20 260:17 265:5,12

**Sandy** 7:4,10 17:7 18:10 50:14,18,23 72:9 79:5,19,20 89:17 90:5 92:24 104:12 108:6 113:2 182:23 192:3 221:18 259:19 266:20,21,25 267:1,18 271:5,14,16,19 272:9 273:4,13,19 274:10,11, 25 275:5

**sat** 22:12 37:15 103:12

**Saturday** 24:14 182:1,3 186:23

**save** 101:20,22,23 149:23 170:8 171:22 174:9 226:12

**saved** 87:20 94:4 160:5 170:6,17,22,23 171:25 174:1, 10,11 175:15,24

**scan** 220:1 226:11

**scanned** 227:22

**scans** 227:16

**schedule** 207:22 208:1,7,17 209:15 243:17 248:23,25 249:21,23 264:8

**scheduling** 111:13

**school** 29:1,2,13 118:12 136:2 238:10

**score** 263:12

**scraped** 139:7

**screen** 168:24 252:4

**screenshot** 141:11 142:8

168:24

**screenshots** 149:22

**search** 89:15,17,23,24 90:4, 5,7 118:16,19,20 119:4,9,12, 22 120:13,17,18,24 121:1,8, 10,13,20 123:6,8,10,15 125:11 127:9 136:10,17,25 143:7

**searched** 118:23,24 119:5, 13,15 123:17

**searches** 127:13 135:24

**searching** 89:11,18 120:15 121:23 123:20 145:19 159:20

**seat** 190:25

**sections** 131:10

**secure** 236:18

**secured** 203:25 210:20 225:24 234:10,11,13,23 235:2,3 236:9 237:10 238:4

**send** 202:21 231:20

**sending** 34:1 49:16

**sense** 150:19 163:14

**separate** 273:16 274:3

**separated** 266:21

**September** 200:10

**serve** 10:8

**served** 21:12

**servers** 90:9

**service** 244:2 249:24

**services** 243:22,25 244:12 245:18

**set** 78:15 90:19,20 138:23 237:16,17,19,20 243:16,17 253:25 270:19,21

**sets** 172:4

**settle** 41:25 134:5

**settlement** 192:21 194:9

**shaking** 118:1 120:23 134:8 173:23 218:18

**share** 13:6

**shared** 95:22 138:10,19 139:13

**shares** 239:5

**she'll** 231:19

**sheet** 74:10 103:13,15 188:22 191:22 192:20 202:6 203:16 205:12,13,18 210:10 240:16 241:2,6 242:1 251:4

**Shelton** 29:6

**shit** 224:2

**shocked** 57:8

**shooter** 101:12,14 118:13 130:2,5 131:23 136:3 141:4 147:5 161:3,25 169:6 257:7 260:1

**shooting** 97:3 149:3 218:12 238:10

**short** 83:7,18 188:8

**shortly** 84:1

**should've** 12:20

**show** 8:19 91:4 117:13 125:24 142:23

**showed** 202:4,6 208:7 209:13

**showing** 134:10 135:22

**shown** 177:5

**shows** 39:15 68:9 145:22

**Shroyer** 35:14 44:21 113:22 133:19

**sic** 33:22 34:11 80:21 214:20 215:23 240:14 271:10 274:1

**side** 80:22,23 260:21

**sign** 6:2 41:10 95:24 116:10

**signed** 41:8 95:22

**significant** 237:4

**significantly** 92:24

**signify** 92:15

**signing** 39:16

**silence** 74:19

**similar** 60:21 95:11 164:25

**simpler** 80:18 173:16

**sincerely** 115:2

**single** 11:9,11 12:11,14,21 20:8,9 35:22 73:25 149:25 170:11 191:6 270:22

**sir** 28:5,20 74:1 106:6 173:14 222:18 273:16

**siri** 115:8,11

**sit** 9:24 11:24 39:24 121:22 175:18 227:2 234:25 248:1 259:24 264:10 271:2 273:1 276:5

**site** 139:9 165:6 199:22

**sites** 62:17 97:7

**sits** 12:13

**sitting** 12:19,20 26:22 37:20 85:24 124:3 128:11,13 146:15 156:14 171:6 174:13 175:13 177:9 185:14 189:7 190:16 210:8 228:19 245:21 247:7,11 248:4,9

**skip** 99:7,11

**slapped** 94:8

**slightly** 207:17

**slow** 83:11 138:22 184:6 224:5,6

**small** 36:24 228:8

**smaller** 79:8

**social** 19:20 50:5 61:18,22,25 62:2 63:16 101:7,8,10,13,19, 23 102:3,23 139:18 141:1 150:6 164:19,25 165:6 256:22 258:19

**sold** 198:16 199:21 217:22 237:5

**sole** 238:4,8 239:9

**solely** 59:25

**solution** 193:22 253:3

**someone's** 44:24 45:19 152:4

**son** 115:5

**Sonya** 226:25

**sort** 41:22 120:21 212:13

**sorting** 275:7

**sotto** 14:21 73:12 90:15 121:16 126:16 129:3 137:3 147:18 155:19 176:9 180:4 183:18 185:5

**sound** 197:14 206:23 210:22 215:1 248:3 275:23

**sounded** 63:16

**sounds** 75:25 167:5 223:24, 25 236:14 272:8

**source** 39:6,8 45:12,16,21 46:1,6,8,11,18 47:11,18 49:3 59:25 60:22 61:2,17,22 62:3, 25 68:1,3 93:20 94:21 149:21, 23,25 256:13,19

**sources** 30:24 31:6,7 36:22, 23 47:16,17,22 48:12 59:24 60:9,12,19,25 61:3,14 62:1, 18,22,25 69:18,20,24 149:8 164:20 256:18 277:15

**sourcing** 30:21 46:6 48:16, 18,19,23,24,25 150:8 271:12 274:15,18,19,20 275:8

**speak** 8:8 9:7 25:25 32:11,21 33:22 61:24 70:11 106:17 108:3 138:1 163:18 266:12 272:10

**speaking** 30:20 31:5 55:2 82:13 118:21

**specific** 14:24 23:16,17 34:1 36:16 49:19 50:16 58:9,11 61:15 64:9,21 70:1 74:8 75:24 76:11 77:7 79:14 96:22 107:17 108:7 109:25 116:14 119:5 128:3 134:1 152:19 241:11 242:3,5,17 244:25 245:2,22 265:25 266:24 274:23

**specifically** 9:4 12:6 16:2,5, 18,25 18:9 44:22 50:1 51:6 65:9 72:14 73:3 83:4 91:3 104:16 106:14,16 120:2,5 127:17 154:1 156:1 158:17 162:11 183:2 245:1 260:16 267:9

**specificity** 233:11 241:13

**specifics** 109:24 125:13

**spectrum** 258:16

**speculation** 47:1

**Speech** 5:4 7:23 10:5,13 31:11 37:9,10,11 41:14 65:11 71:22 73:7 103:21 118:16 135:3 139:4,8,16,19,22,23 140:1 142:24 145:15 146:4, 17,18 148:9,17 151:14 158:21 184:10,13 185:15 196:25 197:3,14 198:19 199:9,10,17 200:18 203:23 204:2 207:18 208:6,16 209:6 211:22,24 212:8 215:21 221:24 230:2 233:5 235:19,20 236:6 237:12 240:12,15,18,21,22 243:10 244:11 248:6

**Speech's** 208:9

**spend** 180:12 181:16,24 183:1 271:21

**spending** 181:23

**spendthrift** 239:13,18

**spent** 16:16 179:18 180:9,16 181:5,7,10 182:5,22 183:8 271:22

**spider** 237:10

**spit** 248:6

**split** 182:18

**splitting** 88:6

**spoke** 9:8 24:6,16,21,22,25 25:24 26:2,20 30:17,18,19 31:24 32:8 33:20 60:20 61:10, 11 70:4,8,9,15,25 72:7 82:14, 15 84:9 106:24 107:1 117:4, 10 125:7 132:9 146:4 153:16 157:24 165:4 177:22 179:21 186:6,11 197:8 207:24 235:7 243:2 266:14 267:9 275:16,24 276:16

**spoken** 30:15,16 32:2 64:19 84:12 158:16 186:7 233:25

**spoliation** 221:13,15,17

**spread** 256:10

**stack** 74:21,23 92:2 198:11

**staff** 33:2 227:21 256:12

**stamp** 55:22 57:10 111:18

**stamped** 56:1,3,5,7,8 96:3,4, 9 192:2

**stamps** 57:4,13,17,21 58:1 181:18

**stand** 152:7 176:8

**standard** 45:14 150:17

**standards** 43:14 49:21

**stands** 133:25

**start** 28:16 72:19 107:25 112:5 183:24 222:21 254:16

**started** 5:23 12:2 19:10,11 37:17 49:14 51:9 66:11 68:8 181:25 190:12 198:5,8 200:5 211:15 239:1

**starting** 15:5,7

**starts** 217:17 249:16

**state** 26:12 91:1

**stated** 29:25

**statement** 44:10 45:2 46:17 73:10 108:13 188:23 189:1 192:20 193:14,17,20 197:1 214:14 233:16,18,19 234:5,6 236:1 251:6

**statements** 50:24 103:25 104:2,3,24 109:7 185:10 271:15

**states** 26:13 100:14

**Statesman** 94:1

**stating** 35:15

**status** 169:9

**statute** 130:15,16,18

**Stay** 264:22

**steps** 101:20 102:7 152:22 164:7 165:11 259:5

**stick** 230:21

**sticker** 94:9 184:20

**stickered** 188:5

**Stoneman** 136:2

**stop** 66:22 133:7 174:7,8,22 249:2

**stopped** 235:20

**store** 241:20

**stories** 63:7

**story** 50:4 54:11

**strive** 39:1

**structure** 17:12 51:24 68:10 103:18 104:23 107:7 146:13 199:7 237:23

**structures** 146:9

**stuff** 46:14 141:15 142:7 211:16 214:3 238:13 273:9 275:4

**stupid** 114:19

**subject** 5:13 6:5,16 30:1 33:3 151:12 214:8 230:10 238:8

**subscribed** 93:1

**subsequent** 161:8

**subsequently** 108:15 206:21 212:7

**subsidiaries** 237:11 239:3

**substance** 256:5

**sudden** 173:11 190:21 210:20

**suffer** 258:18 259:25 260:3,5

**suffers** 257:15

**suggest** 226:10

**suggested** 231:15 266:5,8

**suing** 89:1

**suits** 113:4

**sum** 256:5

**summaries** 18:9

**summarizes** 258:6

**sun** 263:4

**Sunday** 182:5

**supervised** 51:19 52:3

**supervisor** 49:13 60:16 68:24 70:6 71:14 150:11,13, 20,23 151:1 152:4

**supervisorial** 34:11

**supervisors** 51:9

**supplement** 189:4

**supplemental** 18:18,25 91:7

**suppose** 276:6

**supposed** 76:1,25 87:4

**surely** 39:14,18,24 41:8 57:8 65:19

**surgeon** 232:17

**surgery** 43:13,15

**surprise** 13:2 21:7 207:5 251:10,11

**surprised** 20:22,25 21:2,24 22:1 238:21,24 239:1

**surprising** 251:15

**suspend** 252:22 253:7,10,24 263:22 264:19

**suspended** 264:2 279:5

**suspending** 77:22

**swear** 33:7

**swearing** 124:20

**swiftly** 252:25

**switched** 238:3

**swore** 37:14 105:7

**sworn** 5:6 145:4

**symptoms** 259:1

**system** 121:9 122:5 149:25 159:21,23 165:21 168:25 172:20 173:13,17 175:14,15

**system's** 210:21

**Systems** 5:5 10:5,13 31:11 41:14 65:11 73:7 135:3 139:4, 16,19,22,23 140:2 142:24 145:15 146:4,17,18 148:10,17 151:14 158:21 184:14 185:15 196:25 197:3,14 198:19 203:23 204:2 209:6 211:24 215:21 230:2 233:5 235:19,20 236:6 237:12 240:18 244:11 248:6

**Systems'** 118:16 208:16

**T**

**T-R-O-N-I-C-A** 269:14

**Tab** 140:8,9

**tabbed-up** 17:23

**table** 22:16 32:19 174:8

**tablet** 230:10

**tabs** 75:18

**takes** 46:12

**taking** 7:4 219:8 225:3,5

**talent** 60:4

**talk** 11:14 13:22 24:2,18 25:7, 16 48:3 58:21 65:18 70:15 76:10 77:21 81:15 82:19 105:10,11,13,25 106:1,12,14, 16 107:5 117:8 120:22 137:11 158:8,9,14,15,20 164:9,16 177:13 178:14,15 179:1 186:14 191:8 193:11 202:5 214:7 222:1 264:13,15 270:3

**talked** 5:24 23:25 62:12 74:25 82:14 84:4 105:8,20,21,22,23 106:8,15,21 107:8,19 111:17 117:2 146:8 155:2 158:11 169:25 194:22 221:21 235:5 255:17 265:14 267:15 276:15

**talking** 18:12 25:4 32:20 44:15 45:19,23 51:23 53:15 64:10 87:24 90:21,25 91:18 92:1,11 102:4 171:7 181:12, 17 200:25 213:25 232:3 238:22 254:22 262:16 273:6

**talks** 221:14

**task** 263:4

**tasked** 7:18,22 8:7 11:12 59:8 69:10 80:12 86:3 154:6 157:13 159:20 179:22 184:2, 7,9 211:12 245:22 246:2 259:2,7 270:22 271:17 272:22 273:14 274:10

**tax** 103:24 104:2,4,24 105:9, 18,19 117:14 204:21 205:25 207:22 211:8 212:14 222:5,7 248:23 249:5,10,22

**taxes** 208:2,4,6,8

**teaching** 58:16

**technology** 268:3

**television** 148:16

**telling** 10:22 32:3 76:4 86:21 124:3,13 153:18 211:16 246:2 251:8

**tells** 39:7 169:17

**Tens** 56:18

**tenure** 65:14

**term** 7:25 45:16 52:7,14 63:1 188:23 242:1 275:21 276:7 277:2,3,4 278:15

**termed** 277:5

**terminated** 64:6

**termination** 64:23

**terms** 49:19 89:25 120:16,18 121:24 123:20,21

**terrible** 182:8,19

**terribly** 6:19

**test-** 266:18

**testified** 5:6 14:9,13 15:4,18 16:21 27:7 30:15 34:13 38:2 49:12 51:21 69:15 81:4 89:22 106:17 113:25 127:8,12 152:25 153:1,5 173:8 182:2 185:3 190:14 197:16 203:8 208:8 209:24 210:14 237:3,22 243:16 265:3 273:5 279:1

**testify** 14:3 20:16 26:15 30:1,5,10 36:7 51:13 80:16 81:4,11 94:21 95:1,2 98:15 99:9 184:9 187:1 207:13 208:20 209:4 235:1 240:4 257:24 261:18 271:18

**testifying** 37:22 223:25 241:18 247:25 250:4 261:17 273:22

**testimony** 35:7 37:21 40:12 147:10 158:23 176:7 177:9 195:8 203:17 205:9 213:5,21 229:7,13 249:5 250:1 253:24 264:4,9 266:20

**Texas** 7:14 21:7 40:21 47:4 54:19 104:14 109:21 111:10 116:1,7,14 219:23

**text** 157:23 161:21

**that'll** 58:2 196:15

**therapist** 95:20 257:13

**thereabouts** 182:4

**thing** 13:11 31:16 53:7 55:25 89:21 90:2,10 113:23 125:7 129:23 137:10 160:1,9 161:15 180:7 191:7,15 219:18 262:14 274:18 275:12

**things** 20:17 21:23 31:14 33:14 36:6,12,24 38:20 51:21 54:9 62:24 63:9 89:19 131:9,11 159:21 181:18 214:4 244:2 256:3 261:11 265:25

**thinking** 119:8

**thinks** 85:18 111:9 256:2,9

**third-party** 121:4 122:8

**thought** 15:11,14,18 27:11 42:4 83:23 85:3 117:5 128:7 158:6 178:4,6 180:20 218:4 232:9 263:20,23 272:11 276:16

**thousand** 11:3

**thousands** 56:11,15,16,17,18,19 79:25 80:1,3,4 119:23 120:3

**threats** 130:24 132:3 260:9

**threw** 63:22

**throw** 184:20

**Thursday** 72:7 186:22

**tied** 116:24

**time** 8:9,24 9:1,7 10:10,18,23 11:13 14:24 15:11,13,18,20,22,23 16:1,22 23:12 30:7 40:14,24 47:18 54:18,25 63:8,10 70:5,15 71:11 77:9 82:6 83:7,18 87:1 103:14 111:13 112:1,20,22,25 113:15 125:8,24 126:7,13 134:11,18 136:7 138:18 141:15 148:14 150:9,13 156:24 162:24 165:18 166:6,9,11,14,16,21,23 167:3,20,22 168:1,4 169:15 170:11,15 172:10,13 178:17 179:17 180:18 182:14,15,25 183:16 187:17 191:6 212:6 213:25 237:4 243:8 244:13 247:24 249:4 252:17 255:23 269:7 271:21,22 272:1 273:12,20 278:24

**timely** 111:15

**times** 23:19 35:13 37:15 39:15 63:1 147:7 149:1 170:1 176:6 268:5,7

**tip** 49:4 69:16

**tips** 48:22 62:1,17

**title** 71:17 221:19,20

**today** 7:14,15,19 9:24 11:24 12:8 13:14 14:18 17:6 18:2,6,16 19:3 20:16 23:25 27:25 31:25 33:11,16 37:20 41:20 55:14 56:5 58:18 59:7 63:2 75:20 78:6,15,22 79:5 81:18 85:24 86:10 91:13 106:11 107:14 117:21 124:3 128:11 146:15 166:17 171:12 175:13 177:4,10,16 178:16,23,25 179:1,11 180:9 183:8,15 185:14 187:1 210:8 214:12 230:3 234:25 243:20 248:9 249:5 259:24 273:1 275:19 278:5

**today's** 262:19

**Todd** 200:21

**told** 11:2 16:18 27:21 32:9 33:10 34:9 60:13 70:3 74:21 75:6 98:14,20 102:18 108:21 143:20 149:19 153:18 155:18,23 157:15 162:8 178:4,7 180:9 183:7 191:4 203:20 229:16 239:17,18 256:14 257:8 260:7 276:15

**tomorrow** 256:25

**top** 17:20 74:7 84:19 141:13 142:7 166:9,16 229:3 232:8 234:6 255:2

**top-left** 235:16

**topic** 16:17 55:18 64:9 68:2 71:23 76:6,10 78:13,22 79:14 81:3,13,15,18 82:7 86:25 103:8 137:8 152:19 157:13 190:15,21 213:12 214:1 238:19 240:4 263:22 272:3 275:16 279:5

**topics** 7:6 11:15 13:6,13,22 14:3 16:13,23 17:3 26:23 27:8 30:5 68:4 69:10 72:1 81:22 86:4 177:16 178:24 179:14 183:11 187:1 190:12,13 214:2 263:6 272:21 273:14 274:22 275:3

**total** 16:11,22 93:8 180:12,23 183:5,8 217:11

**totals** 198:22

**tracking** 243:7,10

**traditionally** 133:13 149:20

**transcribed** 220:14 223:22 224:3,10,20 225:5,10 229:23, 24 230:3

**transcript** 11:19,22,23 13:3, 10

**transcripts** 12:5

**transfer** 244:4,5

**transferred** 243:21 244:11 245:14 246:7

**transfers** 245:17,19,23,24 246:9,16,21,23,24

**transparent** 191:5

**tread** 249:20

**trending** 48:9 62:23 63:1,8, 10,13

**trial** 21:16,17 253:1

**trick** 74:6

**triggered** 200:11

**true** 22:5 27:15,16,22 38:17, 18,21 43:21 55:21 58:12 60:10 64:12 91:10 95:23,25 96:1 125:19 126:12 127:18 142:2 143:23 144:25 145:4 152:15 155:7 157:9 174:15 175:20 180:10 206:24 235:3 240:8 244:25 245:1 273:10

**Trump** 141:3,6 144:4

**trust** 32:23 47:24 213:1 215:8,9,10,11,22 216:2,3,8, 13,16,18 218:22 239:13,14, 15,18,19,21,24

**trusted** 238:7,15

**trustee** 216:7,9,10

**trusts** 237:10,22

**trustworthy** 47:12

**truth** 37:14 38:5 39:16 145:4 251:8

**truthful** 38:14,16,24 39:1,9 44:25

**turn** 115:2 252:18

**turned** 99:22,23

**turning** 255:13

**Twitter** 19:20 48:9 62:20,21, 24 63:5,6,7,9 139:14,20 141:2 148:22 149:10 165:1,6 256:20

**two-source** 70:3

**type** 31:15 58:9,11,13 61:16 68:7,10 192:19 239:14,19,23

**types** 11:5 42:18 149:21

**typically** 151:21,24 152:4 239:8

## U

**UCC** 196:14 234:6

**UCC-1** 233:1,9 236:1

**Uh-huh** 38:13,22 43:19 49:8 60:8 128:5 148:2 172:12 180:8 182:10 204:12 232:6 234:18 261:9 274:17

**ultimate** 68:21 69:5

**ultimately** 10:12 15:24 23:21 111:12 198:16 216:19 222:1

**unable** 159:13

**unaware** 206:6

**unconscionable** 229:14

**underline** 255:3

**underneath** 147:5

**underscore** 195:23,24

**understand** 10:13 12:12,19 22:10 26:11,14,17 27:25 28:18,21,22 31:10,12 45:9 49:1,9,10 79:2,4,9 80:11 94:25 97:15 103:19 138:12 141:17,25 157:2 165:23 179:6 187:24 212:25 213:7,8,23 227:5 233:4 241:7 242:9 246:3 247:8 248:5,20 250:1 252:10 260:14 268:12 272:19, 20 276:18

**understanding** 59:23 60:18 99:18 146:16,20 152:3 177:12 197:21,22 202:17 206:16,18 230:11 233:8,13 254:1 265:21,24 266:5 277:17

**understood** 26:16 37:12 274:5

**undertaking** 30:8

**unfortunate** 101:9

**universe** 82:17 109:7 181:18

**University** 29:2

**unknown** 86:5 210:18

**unprepared** 76:17

**unquestionable** 257:2

**unquote** 60:7

**unredacted** 231:19

**unrelated** 179:25

**unsecured** 234:23

**unsuccessful** 111:11

**unverified** 248:2,7

**updated** 65:4,6,15 197:10 204:14 206:5 209:20,21,22

**uploaded** 166:15

**ups** 268:14

**upset** 132:10

**URL** 148:15

## V

**vacuum** 37:7

**vast** 36:19 37:3 197:24

**veracity** 59:19,21 60:1 61:2 115:21

**verbatim** 78:12 232:3

**verified** 98:6

**verify** 49:5 62:18 247:20 248:10,11 251:1

**verifying** 248:21

**version** 135:1 139:8,11 161:8 231:19

**versus** 234:23 267:21,22 268:8 274:4

**vet** 59:10,12,19 62:13 211:17, 21

**vetted** 54:13

**vetting** 30:13,21,23 45:18,20 46:7 55:19 58:8,9,17

**vice** 111:11 113:9 116:2

**video** 18:7,8 222:20

**videos** 18:9 80:2 181:8

**videotape** 230:7

**viewed** 96:25 97:2

**viewers** 38:14,24 46:23

**viewership** 39:5 147:12 265:22

**viewing** 95:16

**views** 73:6

**violate** 192:4

**violated** 68:15 107:16

**violating** 23:7

**violation** 26:13

**violations** 107:20 108:2

**visited** 135:22 148:18

**voce** 14:21 73:12 90:15 121:16 126:16 129:3 137:3 147:18 155:19 176:9 180:4 183:18 185:5

**volumes** 11:5

**vouched** 213:4

**W**

**Wade** 110:10

**wait** 74:19 192:11,17 202:7 221:7

**waived** 229:12 230:13,15

**walk** 78:4 212:19 213:3

**walking** 27:1

**wanted** 6:9 51:19 53:10 58:25 82:21 84:14 106:11,22 107:1 132:19 164:16 176:12 191:19 232:10 240:8 243:11 278:13

**warehouse** 266:15

**wasted** 273:12

**wasting** 213:25

**watch** 224:15

**watched** 39:11,19 222:20

**water** 122:15 249:20

**Watson** 71:17,18 142:18 182:6

**ways** 241:1

**web** 77:3 98:10,21 135:8,21, 22 137:9 139:10 152:10,14, 17,23 153:20 165:22 166:16 237:10 267:21,22

**website** 135:2 139:6 142:10, 11 143:9 145:14,25 147:14 148:13 149:4 165:19 166:3 198:17 237:6 240:23

**websites** 146:14 148:18,23 149:1,11

**Wednesday** 181:25 182:2 186:22

**week** 18:24 19:1,11,17 72:5,7 98:23 162:20 182:17,18 199:18 204:15 209:21

**weekend** 18:24

**weeks** 9:1 10:19 29:22 39:12 128:22 196:10 273:2,8

**weird** 223:25

**what'd** 25:7 29:15 41:22 105:10,13 160:1 278:18

**What-all** 177:3

**whatsoever** 235:3

**When'd** 186:2

**where'd** 29:1 36:17 87:12 88:13 159:12 185:2

**whispering** 228:20

**white** 107:11

**Whitehurst** 110:23

**Whitehurt** 132:21

**Whittenburg** 105:8,16 117:2, 4,6,9 177:11 178:14,22 179:13 191:18 192:15 196:5, 7,9,11 200:25 260:18

**Whittenburg's** 105:17

**Who'd** 23:24

**whoever's** 12:19 39:5

**wholly** 73:8

**Why'd** 27:14 82:19 105:25 106:2 237:16

**wife** 214:23

**wife's** 214:21

**Wilhite** 110:24,25 132:22

**winded** 124:12

**withheld** 33:25 34:3

**withhold** 231:18

**witness'** 228:20

**woke** 150:22,25

**woman** 66:8

**word** 33:8 46:20,21 48:19,22 63:19 67:1 69:17 212:22

**words** 80:24 222:3 247:8

**work** 10:3,10,12,24 23:19 29:9,15,16 66:25 115:17 116:5 118:25 146:9,19 194:9, 18 196:18 211:3 227:10 231:4 248:13 266:16

**work-related** 139:14,15

**worked** 40:25 47:21 116:9,11 212:6 238:2,3 266:15

**working** 21:1,3 85:12 250:25

**works** 23:10 146:20 235:13 266:16

**worry** 161:19

**worth** 19:24 103:4 104:12

116:24 177:6,11,14 183:25 184:5,7,10,13,15,17 185:15 190:13 192:25 193:4,18 196:25 197:3,10 202:6 204:11 205:14 211:13 234:17 235:2 238:23 252:9 253:24 279:6

**Wow** 250:15

**write** 53:20,21 65:22 255:7 269:11

**writeoffs** 204:17

**writer** 71:12,15

**writers** 33:6 48:21 50:25 84:9,15 85:6,8,10,11 86:5 136:23 137:22 276:10

**writing** 34:17 60:22 85:7,9

**written** 31:4 32:3,10 60:17 66:1 211:1 277:15

**wrong** 49:25 50:12,15,18,21 51:1,2,12 63:21 76:17,19 100:23 122:15 180:22 208:24 247:15 257:4

**wrote** 33:21 101:10 262:5

**WWW** 142:12

### Y

**y'all** 10:1 24:2 25:7 106:8 115:9 186:14 191:18

**year** 29:3 153:12 185:13 215:14,23 216:2 248:14,15

**years** 21:2 29:12 64:8 153:12 198:17 200:13 205:19 210:18 235:23 238:10

**yellow** 219:12 230:21

**yesterday** 5:24 7:6 12:8 13:14 14:9,13 15:4 17:22 18:19 19:19 20:20 21:10 22:12 27:1 30:16,25 31:5 36:14,20 41:19 47:14 49:12 51:22 56:5 75:17,21 85:16 89:16,22 103:9 105:7 107:13 111:20 177:16 178:16,23,24 179:2,11 180:19 181:5,11 182:2 189:13 202:10,18 229:24 259:20 261:17,18 262:5,7,9 267:16 271:19 272:3,22 274:1 275:17,20 277:6

**yesterday's** 262:2 272:11

**York** 269:16

### Z

**zealous** 224:15

**Zimmerman** 72:7,12 80:2 121:15,19,23 125:5,8

**Zoom** 182:6

# Exhibit 12

2 years ago.

Business Model-

Free Speech LLC 100% owned by AJ. Reported in his personal tax return.

PQPR Holdings- buys product. They own the product. Sales commission on the product.  Sales tax issues in other states. 70% of the sale gets retained by PQPR and 30% to free speech.

From 2015- August 2021, this wasn't happening in actual practice.

Free speech got 100% of the money and gave PQPR whatever it wanted.  PQPR sent invoices but they weren't paid. $53m debt.

$18m in costs associated with litigation.

$10m developing facilities.

AJ paid a salary $625000/year. Periodically he would withdraw additional funds.

2018-2021- draws totaling $18m.

PQPR- 80% owned by PLJR, LLC and 20% by Dr. and Mrs. Jones. PLJR owned 10% by Carol Jones, and 90% by Trust. Effectively the trust owns 72% of PQPR.

Trust was created as a result of estate planning in motion prior to lawsuits.

Promissory note to AEJ Holdings, LLC bears interest at .032% no principal until it matures in 2048. 30 year loan interest only. $25.9 million total value of principal. $780,000 per year.  It's never been paid regularly. Was supposed to be paid annually.

Trust- beneficiaries. David Jones settlor of trust. AJ grantor. Kids have first interest in the corpus of the trust. Original corpus was $10,000 but then added the corpus of PLJR holdings. Alex is remainderman. If children got the money, it is subject to the loan in the note. Alex is paid the income.

PQPR holdings buys and sells dietary supplements acquired from various suppliers. At one point was being collected by Free speech systems. More often than not fulfilling its responsibilities. AEJ 2018 trust—AJ is income beneficiary. His children are corpus beneficiares and AJ the man is the remainderman. 72% of PQPR holdings is owned by AEJ trust. (90% divided by 80 percent is 72%), that is worth the $25.9m.

Interest accrued and principal paid to as a result of the note goes to AEJ holdings, and it gets reported on AJ's individual tax returns.

Interest from original $10,000 it gets paid to AJ.

Interest earned on note to AEJ holdings. If AEJ holding earns interest by the bank, it gets paid directly to AJ.

Bank statements:

Frost bank kicked him out a year ago. Since 2020, Security Bank of Crawford TX. Not a member of the fed.

    4 primary accounts:

Lydia used to be the accountant and had experience and left 3-4 years ago and Melinda took over. Started as a payroll clerk 9/2016, but now does Quickbooks for both FSS and PQPR.

Entering invoices, accounts payable. Also does HR. Background checks by Department. Onboarding process—welcome packet. ADP for payroll, employee handbook w/ offer letter, rate, position and supervisor, ADP policies, NDA, I9, direct deposit.

Head of production used to be Rob Dew, but he left and is now a contractor. Each department would have its own rules and policies. For example, Kelly has warehouse policies. Doesn't know about verbal policies.

Disciplinary procedure in handbook. Verbal/written warning up to termination. This has happened 2-3 times that it has escalated to that point, but most discipline is handled within the individual departments.

Roe was brought in by Baker Hofsteter on behalf of PQPR in order to review the financial entanglement between FSS and PQPR. At some point, Mark Balon had to withdraw because of his wife's employment and then Mr. Roe's consulting terminated. Financial issues were resolved before contract terminated—all of the notes. August 2021 retained by FSS as a consultant to address.

New process- Auriam- 3rd party process in the middle to run credit cards. $500,000 per year to guarantee the credit card transactions. No one wants to deal with Alex Jones. Received all the money from the credit card processor. Auriam gets paid 10% plus 4.9% to the cc processor.

FSS has its own products. To catch up on the debt to PQPR, FSS pays $11,000 per business day plus 80% of their products (has since been amended to 60%). Mostly paying interest. Still owe $53m.

Employee Handbook- effective date 10/2012 and hasn't been updated since.

Monthly break even is $5m including a budget for litigation. Only took in a little over $1m in January.

**Kurt Nimmo Deposition-**
Was fired.
For 2 years was a contract employee.
Needed someone to update the website and also write new content and be a writer.
Had a blog- Another Day in the Empire. Considered himself as engaged in journalism.
No training.
Within 2 years, they had a professional company design the website so he was strictly writing and editing.
He hired Adan and Kit Daniels
The writers had authority to post on the website independently.
No independent review of articles.
Want to give his writers autonomy.
Paul Watson operated prison planet p. 58

# Exhibit 13

4/6/2022 1:43 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-22-001610
Ruben Tamez

D-1-GN-22-001610
**CAUSE NO. ______________**

| | | |
|---|---|---|
| **NEIL HESLIN, SCARLETT LEWIS, LEONARD POZNER, VERONIQUE DE LA ROSA, MARCEL FONTAINE** | § | **IN THE DISTRICT COURT** |
| **Plaintiffs** | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| **ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, PLJR HOLDINGS, LLC, CAROL JONES, DAVID JONES, PQPR HOLDINGS, LLC, JLJR HOLDINGS LIMITED, LLC, AEJ HOLDINGS, LLC, AEJ TRUST 2018** | § | 200TH, DISTRICT COURT |
| **Defendants.** | § | **_________ DISTRICT COURT** |

## PLAINTIFFS' ORIGINAL PETITION

### Introduction

1. After Alex Jones was sued for claiming the massacre at Sandy Hook Elementary was a hoax, the infamous conspiracy theorist conspired to divert his assets to shell companies owned by insiders like his parents, his children, and himself. Since being sued, Jones transferred millions of dollars from his fortune to these insiders—whom he apparently thought were beyond reach. But the Texas Uniform Fraudulent Transfer Act prohibits defendants from playing shell games to shield assets from their creditors. And it allows creditors like the Sandy Hook Families to void fraudulent transfers that defendants like Alex Jones make to their insiders. The Sandy Hook Families and Fontaine therefore assert TUFTA claims against Jones and his insiders to foil this scheme.

## Parties

**The Sandy Hook Families**

2.      Plaintiff Neil Heslin is an individual who resides in Connecticut.

3.      Plaintiff Scarlett Lewis is an individual who resides in Connecticut.

4.      Plaintiff Leonard Pozner is an individual who resides in Florida.

5.      Plaintiff Veronique De La Rosa is an individual who resides in Florida.

**Fontaine**

6.      Plaintiff Marcel Fontaine is an individual who resides in Massachusetts.

**The Jones Debtors**

7.      Defendant Alex E. Jones is a resident of Austin, Texas. He hosts radio and web-based news programing, including "The Alex Jones Show," and he owns Free Speech Systems, LLC, which operates the website infowars.com. Jones can be served at his place of business, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

8.      Defendant InfoWars, LLC is a Texas limited-liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Ave., 18th Floor, Austin, TX 78701.

9.      Defendant Free Speech Systems, LLC is a Texas limited-liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Ave., 18th Floor, Austin, TX 78701.

10.      At all times relevant to this petition, these Jones Debtors operated as a joint venture, joint enterprise, single-business enterprise, or alter ego.

**The Jones Transferees**

11.     Defendant PQPR Holdings Limited LLC is a Nevada limited-liability company. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

12.     Defendant JLJR Holdings, LLC is a Nevada limited-liability company. It directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

13.     Defendant PLJR Holdings, LLC is a Nevada limited-liability company. It directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

14.     Defendant Carol Jones is a resident of Austin, Texas. She is Alex Jones's mother and directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. She can be served personally at 3402 Clawson Road, Austin, Texas 78704 or wherever she can be found.

15.     Defendant David Jones is a resident of Austin, Texas. He is Alex Jones's father and directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. He can be served personally at 3402 Clawson Road, Austin, Texas 78704 or wherever he can be found.

16.     Defendant PQPR Holdings, LLC is an entity that has been previously identified by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

17. Defendant JLJR Holdings Limited, LLC is an entity listed as a member of PQPR Holdings Limited, LLC and PLJR Holdings, LLC. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

18. Defendant AEJ Holdings, LLC is an entity that has been identified previously by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

19. Defendant AEJ Trust 2018 is an entity that has been identified previously by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

20. At all times relevant to this petition, the Jones Transferees and Defendant Alex Jones operated as a joint venture, joint enterprise, single-business enterprise, or alter ego.

## Discovery-Control Plan

21. Discovery should be conducted under Level 3 case of the Texas Rules of Civil Procedure.[1] Plaintiffs seek monetary relief over $1,000,000.[2]

## Jurisdiction and Venue

22. The amount in controversy exceeds the Court's minimum jurisdictional requirements.

[1] *See* Tex. R. Civ. P. 190.

[2] *See* Tex. R. Civ. P. 47. Plaintiffs may also seek injunctive relief, in which case they may request expedited discovery. *See* Tex. R. Civ. P. 680.

23. Venue is proper in Travis County because that's where certain Defendants resided when the cause of action accrued and because all or a substantial part of the events or omissions giving rise to the claims occurred in Travis County.[3]

**Background**

24. Alex Jones, through his media companies Free Speech Systems and InfoWars, became a national figure by peddling bizarre conspiracy theories. Followers tune in to hear him and his guests ramble about unsubstantiated claims—like how the September 11th attacks were an inside job by the U.S government. They can also hear him tout the various products available to buy on his InfoWars website. And they can then navigate to that website, where they have a host of products available for purchase.

25. They can buy, for example, bumper stickers echoing the types of conspiracy theories they hear on Jones's programming:

[4]

[3] *See* Tex. Civ. Prac. & Rem. Code § 15.002.

[4] InfoWars Store, at "Stickers and Decals", https://www.infowarsstore.com/gear/stickers-and-decals (last visited April 4, 2022).

26. They can even buy various "preparedness" kits ranging from seeds to storable food to survival gear to nuclear and biological supplies:

[5]

27. The sale of these types of products on the InfoWars website and elsewhere enabled the Jones Debtors to earn a fortune.

28. But after the Jones Debtors aimed their conspiracy theories at Sandy Hook Elementary—claiming the tragic shooting there was staged—that all changed.

---

[5] InfoWars Store, at "Preparedness", https://www.infowarsstore.com/preparedness (last visited April 4, 2022).

**The Sandy Hook Families and Fontaine sue the Jones Debtors for defamation.**

29. In April 2018, the Sandy Hook Families and Fontaine sued the Jones Debtors for defamation, among other claims, based on various lies and conspiracy theories Alex Jones espoused through his media outlet (the Defamation Cases).[6] The claims of the Sandy Hook Families—parents of children slain at Sandy Hook—stem from conspiracy theories the Jones Debtors disseminated that the mass shooting was a hoax.[7] Similarly, Fontaine's claims arose from falsehoods the Jones Debtors spread that he was the shooter responsible for murdering 17 people at a high school in Parkland, Florida.[8]

30. Rather than accept responsibility for propagating these lies, however, the Jones Debtors continued to deflect the truth. The Jones Debtors first tried to dismiss the Defamation Cases. But the trial courts denied those attempts in part because the Jones Debtors refused to cooperate in the cases' truth-finding phase of discovery. Instead of accepting blame then, the Jones Debtors appealed the trial courts' denials of their dismissal motions. Each time, the appellate court declined the Jones Debtors' requests to dismiss the cases. The appellate court

---

[6] Cause No.: D-1-GN-18-001835; *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-001842; *Leonard Pozner and Veronique De La Rosa v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 345th Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-19-004651; *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-006623; *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 98th Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-001605; *Marcel Fontaine v Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*; In the 459th Judicial District Court of Travis County, Texas.

[7] *See e.g., Jones v. Heslin,* No. 03-20-00008-CV, 2020 WL 4742834, at *1 (Tex. App.—Austin Aug. 14, 2020, pet. denied); *Jones v. Heslin*, No. 03-19-00811-CV, 2020 WL 1452025, at *1 (Tex. App.—Austin March 25, 2020, pet. denied); *Jones v. Pozner*, No. 03-18-00603-CV, 2019 WL 5700903, at *9 (Tex. App.—Austin Nov. 5, 2019, pet. denied); *Jones v. Lewis*, No. 03-19-00423-CV, 2019 WL 5090500, at *4 (Tex. App.—Austin October 11, 2019, pet. denied).

[8] *Infowars, LLC v. Fontaine*, No. 03-18-00614-CV, 2019 WL 5444400, at *1 (Tex. App.—Austin Oct. 24, 2019, pet. denied).

even sanctioned the Jones Debtors for raising a frivolous appeal that misrepresented the underlying facts and the governing law.[9]

31. Even after the appellate court allowed the Defamation Cases to proceed, the Jones Debtors continued to obstruct discovery. Their repeated discovery abuses even culminated in the trial court granting default judgments for the Sandy Hook Families and against the Jones Debtors on liability in September 2021. The first trial against the Jones Debtors on damages commences at the end of April 2022. The next will follow soon after. In other words, judgments against the Jones Debtors are imminent.

**During the Defamation Cases, the Jones Debtors doomsday prepped for these eventual judgments by diverting assets.**

32. After the Sandy Hook Families and Fontaine filed their Defamation Cases, the Jones Debtors started diverting their assets. From 2018 to 2021, for example, Alex Jones personally drew about $18 million from his InfoWars company, Free Speech Systems. These draws were in addition to his yearly salary, which exceeded $600,000, and taken while Free Speech Systems operated at a net loss in the millions each of those years.

33. Jones apparently drew these $18 million while his company, Free Speech Systems, was insolvent. Just three months after the last appellate-court decision allowing the Defamation Cases to proceed, a company named PQPR filed a UCC Financing Statement claiming a security interest in essentially everything Free Speech Systems owns. The claimed security interest covers an alleged $54 million debt Free Speech Systems owes to PQPR. The supposed debt began accruing years earlier as part of an arrangement where Free Speech Systems sells PQPR's products on the InfoWars website. Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while

[9] *Heslin*, 2020 WL 1452025, at *6.

Free Speech Systems retained the other 30%. In practice, however, Free Speech Systems supposedly kept 100% of the revenue for about seven years and didn't pay for the goods PQPR provided—to the point where a $54 million debt had accumulated. All the while, PQPR not only supplied Free Speech Systems with more products to sell but also paid Free Speech Systems millions of dollars a year to advertise on the InfoWars website. PQPR still supplies the Jones Debtors with products to sell and pays for advertising on the website.

34. So why would an independent business like PQPR continue to engage in such questionable transactions?

35. Because PQPR is not actually an independent business. It's an insider of the Jones Debtors. It is owned and operated directly or indirectly by Jones, his parents, and his children through an alphabet soup of shell entities like JLJR Holdings Limited LLC; JLJR Holdings, LLC; PLJR Holdings, LLC; PQPR Holdings, LLC; AEJ Holdings, LLC; and AEJ Trust 2018. And the income PQPR receives—including from sources like the Jones Debtors—goes to Alex Jones and these Jones Transferees.

36. And after the Defamation Cases began, the Jones Debtors started transferring large sums of money to the Jones Transferees. These sums include money the Jones Debtors started regularly transferring from Free Speech Systems to PQPR *the same month that the default judgments were rendered*. In fact, the month the default judgments were rendered, Free Speech Systems started transferring to PQPR between $11,000 per day and $11,000 per week plus 60–80% of Free Speech Systems' sales revenue—supposedly just to pay the interest on the alleged $54 million debt. Free Speech Systems claims these payments are part of a "financial disentanglement between the two companies[.]" In reality, they're transfers designed to siphon off the Jones Debtors' assets to make them judgment-proof.

37. This fact is only confirmed by the jaw-dropping amount in transfers the Jones Debtors made during the Defamation Cases. In 2021 alone, the Jones Debtors transferred from Free Speech Systems tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the Defamation Cases to proceed.

## Causes of Action

38. The Sandy Hook Families and Fontaine assert fraudulent-transfer claims under the Texas Uniform Fraudulent Transfer Act to void transfers between the Jones Debtors and the Jones Transferees. Texas enacted TUFTA to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach.[10] Through TUFTA's statutory scheme, creditors may seek recourse for fraudulent transfers of assets or property.[11] The Sandy Hook Families and Fontaine are creditors entitled to recourse under TUFTA because the Jones Debtors engaged in fraudulent transfers and conspired to commit fraudulent transfers.[12]

**Count 1—Fraudulent Transfer with actual intent to hinder, delay, or defraud under § 24.0005(a)(1)**

39. The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

[10] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016).

[11] *Sargeant v. Al Saleh*, 512 S.W.3d 399, 411–12 (Tex. App.—Corpus Chrisi-Edinburg 2016, no pet.) (citing cases).

[12] *See* Tex. Bus. & Com. Code § 24.002 (defining "creditor" as a person who has a "claim" and "claim" as a right to payment including whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed); *see also Bank of Am., N.A. v. Fulcrum Enterprises, LLC*, 20 F. Supp. 3d 594, 601 (S.D. Tex. 2014) (explaining that a person my bring a TUFTA action as a creditor of the transferor by virtue of a legal action, pending and unliquidated at the time of transfer).

40. The Jones Debtors are liable for engaging in fraudulent transfers as to present and future creditors under § 24.0005(a)(1).[13] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor under this section if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any creditor of the debtor.[14] Such transfers or obligations are fraudulent whether the creditor's claim arose before or within a reasonable time after the transfers were made or obligations incurred.[15]

41. The Jones Debtors engaged in fraudulent transfers under this standard. During the Defamation Cases—while the Sandy Hook Families and Fontaine were creditors—the Jones Debtors transferred millions of dollars from Free Speech Systems for reasons unrelated to Free Speech Systems' business operations. In 2021 alone, they transferred from Free Speech Systems tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the Defamation Cases to proceed.

42. Transfers by the Jones Debtors while the Defamation Cases were pending also include payments to insiders, like Jones himself. From 2018 to 2021, for example, Jones apparently drew $18 million from Free Speech Systems, even though it was insolvent and operating at a net loss each of those years. These draws were in addition to (and about 30 times greater than) Jones's yearly salary.

43. And since the Defamation Cases began, the Jones Debtors also transferred large sums to other insiders, like the Jones Transferees. These sums include money the Jones Debtors

---

[13] Tex. Bus. & Com. Code § 24.005(a)(1) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor;").

[14] *Id.*

[15] *Id.*

started regularly transferring from Free Speech Systems to insider PQPR the same month that default judgments in the Defamation Cases were rendered. Specifically, PQPR started receiving as much as $11,000 per day plus 60–80% of Free Speech Systems' sales revenue. These payments are allegedly to pay just the interest on the questionable $54 million obligation to PQPR the Jones Debtors decided that Free Speech incurred just three months after the appellate court allowed the Defamation Cases to proceed. All the while the Jones Debtors retained possession and control of these money transfers and obligations, as the money PQPR receives from Free Speech Systems goes directly and indirectly to insiders like Jones, his parents, and his children through the shell entities included as Jones Transferees.

44. These transfers and obligations that the Jones Debtors made and incurred were done with the actual intent to hinder, delay, or defraud their creditors—including the Sandy Hook Families and Fontaine. That truth becomes especially glaring considering the badges of fraud surrounding these transfers and obligations.[16] Those badges include, for example, that the transfers and obligations were made to insiders who retained possession and control over the property; the transfers and obligations were concealed and made while the Defamation Cases were pending and while the Jones Debtors were insolvent; and that past and future transfers to PQPR will eliminate substantially all of the Jones Debtors' assets—as these essential assets paid

[16] Tex. Bus. & Com. Code § 24.005(b) ("(b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.").

to insider and supposed secured creditor PQPR will be subsequently transferred to insiders like Jones, his parents, and his children through the Jones Transferees.

45. The Jones Debtors are thus liable under § 24.0005(a)(1) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies the Sandy Hook Families and Fontaine seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[17]

**Count 2—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0005(a)(2)**

46. The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

47. The Jones Debtors are liable for engaging in fraudulent transfers as to present and future creditors under § 24.0005(a)(2).[18] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor under this section if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and either (1) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to

[17] Tex. Bus. & Com. Code § 24.008.

[18] Tex. Bus. & Com. Code § 24.005(a)(2) "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or the transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.").

the business or transaction; or (2) the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[19] Such transfers or obligations are fraudulent whether the creditor's claim arose before or within a reasonable time after the transfers were made or obligations incurred.[20]

48. Under these standards the Jones Debtors committed fraudulent transfers as to the Sandy Hook Families and Fontaine. While the Defamation Cases were pending—that is, while the Sandy Hook Families and Fontaine were creditors—the Jones Debtors transferred millions of dollars from Free Speech Systems without receiving reasonably equivalent value in exchange, and while the Jones Debtors' assets were unreasonably small. Moreover, the Jones Debtors incurred millions of dollars in obligations they intended or reasonably should have believed they would be unable to pay as they became due.

49. For instance, in 2021 the Jones Debtors transferred from Free Speech Systems tens of millions more than it cost to operate the company. These transfers were unrelated to operating the business and thus weren't in exchange for reasonably equivalent value. And these transfers far exceeded Free Speech Systems' assets—and any of the Jones Debtors' for that matter—which were unreasonably small compared to the millions transferred away.

50. And from 2018 to 2021, the Jones Debtors also transferred from Free Speech Systems to Jones about $18 million on top of the already substantial salary he received. Of course these $18 million in draws weren't for reasonably equivalent value, especially given that Free Speech Systems was operating at a loss at that time and allegedly had other substantial debts to insider PQPR it hadn't been paying for years. And these $18 million in transfers

[19] *Id.*

[20] *Id.*

virtually eliminated Free Speech Systems' remaining assets, which were already unreasonably small compared to the $18 million that had been transferred.

51. And around the time that default judgments were rendered against the Jones Debtors in the Defamation Cases, the Jones Debtors incurred an obligation to insider PQPR to pay only the interest on the supposed $54 million debt to PQPR that Free Speech Systems hadn't been paying as it became due. Under this obligation to pay only the interest, Free Speech Systems agreed to pay as much as $11,000 per day plus 60–80% of its sales revenue. Incurring such a hefty obligation to cover only the interest on an alleged debt to an insider is not for reasonably equivalent value. And the Jones Debtors intended to incur or believed or reasonably should have believed that Free Speech Systems was incurring, debts beyond its ability to pay as they became due. After all, given that 100% of Free Speech Systems' sales revenue was already too little to cover its operating expenditures, counting on only 20–40% of sales revenue to cover operating expenditures would be quixotic. The Jones Debtors knew or should have known their new obligation to insider PQPR—which is directly and indirectly run by and benefits Jones, his parents, and his children through the Jones Transferees—is beyond their ability to pay.

52. This of course rests against the backdrop of the dubious $54 million obligation Free Speech Systems now claims it owes PQPR. Free Speech Systems apparently did not recognize any obligation to PQPR before the Defamation Cases. Only after the appellate court allowed the cases to proceed, did any evidence of an obligation by Free Speech Systems to PQPR surface. That Free Speech Systems needlessly agreed to take on a $54 million obligation to an insider is not an obligation in exchange for reasonably equivalent value. And it's an obligation the Jones Debtors apparently intended to incur or believed or reasonably should have believed they would incur and would be beyond their ability to pay as they became due.

53. The Jones Debtors are thus liable under § 24.0005(a)(2) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[21]

**Count 3—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0006(a)**

54. The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

55. The Jones Debtors are liable for engaging in fraudulent transfers as to present creditors under § 24.0006(a).[22] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[23]

56. The Jones Debtors also committed fraudulent transfers under this standard. While the Sandy Hook Families and Fontaine were creditors and while the Jones Debtors were insolvent, the Jones Debtors transferred millions of dollars without receiving reasonably

---

[21] Tex. Bus. & Com. Code § 24.008.

[22] Tex. Bus. & Com. Code § 24.006(a) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").

[23] *Id.*

equivalent value. These transfers include the tens of millions transferred from Free Speech Systems in 2021 that were unrelated to its operation. They also include $18 million that Jones drew from his business, Free Speech Systems. And they include the Jones Debtors' payments on just the interest on an alleged $54 million debt Free Speech Systems owes insider PQPR—payments that include as much as $11,000 per day plus 60–80% of Free Speech Systems' sales revenue. As explained in prior sections, none of these transfers and obligations were in exchange for reasonably equivalent value. And all were apparently made and incurred while the Jones Debtors were insolvent—or they became insolvent as a result of these transfers and obligations.

57. The Jones Debtors are thus liable under § 24.0006(a) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[24]

**Count 4—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0006(b)**

58. The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

59. The Jones Debtors are liable for engaging in fraudulent transfers as to present creditors under § 24.0006(b).[25] A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent

[24] Tex. Bus. & Com. Code § 24.008.

[25] Tex. Bus. & Com. Code § 24.006(b) ("(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.").

debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[26]

60. The Jones Debtors engaged in fraudulent transfers under this standard. After the Sandy Hook Families' and Fontaine's claims against the Jones Debtors arose, the Jones Debtors started repaying an alleged debt to insider PQPR, which is owned directly and indirectly by Jones, his parents, and his children through various entities—the Jones Transferees. Moreover, income that PQPR receives from Free Speech Systems, for example, is directly and indirectly paid to Jones, his parents, and his children though the Jones Transferees. The Jones Debtors made these transfers to pay off this antecedent debt to insider PQPR directly (and Jones and the Jones Transferees indirectly) while they were insolvent. And the Jones Transferees, including PQPR, had reasonable cause to believe that the Jones Debtors were insolvent at the time. After all, the Jones Debtors allegedly failed to the pay the supposed debt to PQPR for years to the point where the debt reached $54 million and exceeded the Jones Debtors' assets.

61. And to the extent that the $18 million Jones drew from Free Speech Systems between 2018 and 2021 were payments for antecedent debts, such payments are also fraudulent transfers under this section. These transfers were made after the Sandy Hook Families' and Fontaine's claims against the Jones Debtors arose. As Free Speech Systems' sole owner, Jones was its insider. And as its sole owner, Jones had reasonable cause to believe that Free Speech Systems was insolvent—and in fact was insolvent—when these transfers to him were made.

62. The Jones Debtors are thus liable under § 24.0006(b) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones

[26] *Id.*

Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[27]

**Count 5—Conspiracy to commit fraudulent transfers**

63. The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

64. The Jones Debtors and the Jones Transferees are liable for conspiracy to commit fraudulent transfers.[28] The elements of a civil conspiracy are: (1) two or more persons; (2) an end to be accomplished; (3) meeting of the minds on the end or course of action; (4) one or more overt unlawful acts; and (5) proximately resulting in injury.[29]

65. Here, the Jones Debtors and the Jones Transferees conspired to commit fraudulent transfers. As the prior paragraphs establish, the Jones Debtors and the Jones Transferees conspired to siphon the Jones Debtors' assets away to avoid paying the Sandy Hook Families and Fontaine in the Defamation Cases. The Jones Debtors and the Jones Transferees then proceeded with the course of action of transferring millions of dollars in assets away from the Jones Debtors and having the Jones Debtors incur millions of dollars in obligations to its insider Jones Transferees, who weren't sued in the Defamation Cases. These overt acts are unlawful fraudulent transfers under TUFTA. And they proximately resulted in injury to the Sandy Hook Families and Fontaine. Diverting assets away from the Jones Debtors to the Jones Transferees impairs the Sandy Hook Families' and Fontaine's ability to collect on their judgments.

[27] Tex. Bus. & Com. Code § 24.008.

[28] *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 743 (Bankr. S.D. Tex. 2020) (citing *Ramirez v. Rodriguez (In re Ramirez),* 413 B.R. 621, 629 (Bankr. S.D. Tex. 2009) and *Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008)).

[29] *Id.* at 743–44.

## Conditions Precedent

66. All conditions precedent to the Sandy Hook Families' and Fontaine's claims for relief have been performed or have occurred or have been waived.

## Attorney's Fees and Interest

67. The Sandy Hook Families and Fontaine seek costs and attorney's fees under § 24.013 of the Texas Uniform Fraudulent Transfer Act.[30]

68. The Sandy Hook Families and Fontaine further seek pre- and post-judgment interest on the amount of any judgment as allowed by law.

## Request for Disclosure

69. Defendants are requested to disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## Trial by Jury

70. The Sandy Hook Families and Fontaine respectfully request a trial by jury.

## Notice of Intent

71. Under Rule 193.7, Plaintiffs intend to use any documents produced in response to written discovery requests at trial and in any pretrial matters in the litigation.[31]

## Prayer

For these reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer and that judgment be awarded to Plaintiffs for the following:

1) avoidance of transfers or obligations to the extent necessary to satisfy Plaintiffs' claims;

---

[30] Tex. Bus. & Com. Code § 24.013.

[31] Tex. R. Civ. P. 193.7.

2) an attachment or any other provisional remedy against the assets transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings;

3) an injunction—including temporary and permanent injunctive relief—against further disposition by the debtors or transferees, or both, of the assets transferred or of other property;

4) an appointment of a receiver to take charge of the assets transferred or of other property of the transferees;

5) to levy execution on assets transferred or their proceeds;

6) actual damages, including direct, indirect, special, incidental, and consequential damages;

7) exemplary damages;

8) costs and reasonably attorney's fees as are equitable and just;

9) pre- and post-judgment interest;

10) any other relief the circumstances may require.

Dated: April 6, 2022

Respectfully submitted

**MCDOWELL HETHERINGTON LLP**

By: */s/ Avi Moshenberg*

Avi Moshenberg
Texas Bar No. 24083532
Nick Lawson
State Bar No. 24083367
Matthew Caldwell
State Bar No. 24107722
1001 Fannin Street, Suite 2700
Houston, TX 77002
Phone: (713) 337-5580
Fax: (713) 337-8850
Email: avi.moshenberg@mhllp.com
Email: nick.lawson@mhllp.com
Email: matthew.caldwell@mhllp.com

**KASTER LYNCH FARRAR & BALL, LLP**


By: */s/ Mark D. Bankston*
    Mark D. Bankston
    State Bar No. 24071066
    William R. Ogden
    State Bar No. 24073531
    1117 Herkimer
    Houston, Texas 77008
    (713) 221-8300 Telephone
    (713) 221-8301 Fax
    Email: mark@fbtrial.com
    Email: bill@fbtrial.com


**THE AKERS FIRM PLLC**


By: */s/ Cordt Akers*
    Cordt Akers
    State Bar No. 24080122
    3401 Allen Parkway, Suite 101
    Houston, TX 77019
    Phone: (713) 877-2500
    Fax: (713) 583-8662
    Email: cca@akersfirm.com


**ATTORNEYS FOR PLAINTIFFS**

# Exhibit 14

NO. X-06-UWY-CV-18-6046436-S : SUPERIOR COURT

ERICA LAFFERTY, ET AL. : COMPLEX LITIGATION DOCKET
:

V. : AT WATERBURY

ALEX EMRIC JONES, ET AL. : OCTOBER 21, 2021

---

NO. X-06-UWY-CV-18-6046437-S : SUPERIOR COURT

WILLIAM SHERLACH : COMPLEX LITIGATION DOCKET
:

V. : AT WATERBURY

ALEX EMRIC JONES, ET AL. : OCTOBER 21, 2021

---

NO. X-06-UWY-CV-18-6046438-S : SUPERIOR COURT

WILLIAM SHERLACH, ET AL, : COMPLEX LITIGATION
: DOCKET
:

V. : AT WATERBURY

ALEX EMRIC JONES, ET AL. : OCTOBER 21, 2021

**************************************

ORAL AND VIDEOTAPED DEPOSITION

APPEARING REMOTELY FROM

AUSTIN, TEXAS

ALEX JONES

JUNE 21, 2022

**************************************

V O L U M E III

ANSWERS AND ORAL DEPOSITION OF ALEX JONES, a witness produced at the instance of the Plaintiff, was taken in the above-styled and numbered cause on the 21ST day of JUNE 2022, from 9:11 a.m. to 3:13 p.m., before VANESSA S. ROBERTSON, CSR in and for the State of Texas, reported by machine shorthand, appearing remotely from Parker County, Texas, pursuant to the Texas Federal Rules of Civil Procedure.

REMOTE APPEARANCES:

FOR THE PLAINTIFF:

MR. CHRISTOPHER M. MATTEI
MS. ALINOR STERLING
MS. JESSICA HARTMAN
KOSKOFF KOSKOFF & BIEDER, PC
350 FAIRFIELD AVENUE
BRIDGEPORT, CONNECTICUT 06604
(203) 336-4421
cmattei@koskoff.com

FOR THE DEFENDANT:

MR. CAMERON ATKINSON
PATTIS & SMITH LLC
383 ORANGE STREET
FIRST FLOOR
NEW HAVEN, CONNECTICUT 06511
(203) 393-3017
catkinson@pattisandsmith.com

FOR THE DEFENDANT:

MR. MARIO KENNETH CERAME
BRIGNOLE & BUSH, LLC
73 WADSWORTH STREET
HARTFORD, CONNECTICUT 06106
(860) 527-9973
mario@brignole.com

ALSO PRESENT:

MR. MARK HENDRIX, VIDEOGRAPHER

T A B L E O F C O N T E N T S

| | PAGE |
|---|---|
| APPEARANCES . . . . . . . . . . . . . . | 760 |
| ALEX JONES | |
| EXAMINATION BY MR. CERAME . . . . . | 763 |
| EXAMINATION BY MR. MATTEI . . . . . | 773 |
| SIGNATURE AND CHANGES . . . . . . . . . | 890 |
| REPORTER'S CERTIFICATE . . . . . . . . . | 892 |

* * *

E X H I B I T S

| | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 179 | Deposition Notice | 881 |

(Provided electronically to the reporter.)

REPORTED REMOTELY FROM PARKER COUNTY, TEXAS

P R O C E E D I N G S

THE VIDEOGRAPHER: Today's date is June 21st, 2022. We are on the record at approximately 9:11 a.m. Central Time, in the deposition of Alex Jones. The witness is located at Fibercove, 1700 South Lamar Boulevard, Austin, Texas. And this proceeding is being held remotely via Zoom.

Will all counsel please introduce yourselves for the record, after which, the court reporter will swear in the witness.

MR. MATTEI: Good morning. This is Chris Mattei on behalf of the plaintiffs.

MR. ATKINSON: Good morning. This is Cameron Atkinson on behalf of Alex Jones and Free Speech Systems.

MR. CERAME: Good morning. This is Mario Cerame for Genesis Communication Network, Incorporated.

MS. STERLING: Good morning. This is Alinor Sterling, also for the plaintiffs.

THE COURT REPORTER: My name is Vanessa Robertson, Texas CSR No. 4930. I am reporting the deposition remotely by stenographic means from Weatherford, Texas. The witness is located in Austin,

Texas.

ALEX JONES,

having being first duly sworn, testified as follows:

MR. CERAME: Okay. Are we all set? Anybody else need to do any other affirmations or anything?

THE COURT REPORTER: No.

MR. CERAME: Speak now or forever hold your peace.

* * * E X A M I N A T I O N * * *

BY MR. CERAME:

Q Hello, Mr. Jones. Good morning.

A Good morning.

Q My name is Mario Cerame. You and I have met before. And I have some questions, mostly about Ted Anderson and Genesis Communication Network. And when I say -- sometimes I'm going to refer to Ted, and that means Ted Anderson. Sometimes I'm going to refer to Genesis and that means Genesis Communication Network, Incorporated.

And you're familiar with both of these entities and person, right?

A Yes.

Q All right. And I don't have a ton of questions, but I do have some. And first, I want to

talk about how you came to know Ted, just generally, in terms of history. If that is an extremely long answer, then I'll interrupt you and redirect you. But just, generally speaking, how did you come to meet Ted?

A In about 1997, he was a sponsor or a gold sponsor of a small radio network called Public Broadcasting out of Michigan. And he was based in Minnesota. He had a gold company, a gold and silver, precious metals company and he was a sponsor on that network and he became a sponsor of mine.

Q Okay. And how long did that sponsorship relationship last about?

A Until about -- until about eight years ago, nine years ago.

Q All right. So we're talking about 2016-ish is when your -- your radio station -- your radio -- or I should say -- strike that.

Until about 2016, sometime thereabouts, give or take a year, your businesses relationship with Ted Anderson's businesses ended?

A Again, there's no general dates. The gold market collapsed, whenever that was, 2013, '14 or so, and so he stopped advertising. And then a few years later, he shut his business down. And so that had always been the main funding of the relationship. And

so I began to try to, in a friendly way, end the relationship really by about 2013, trying to disentangle, but Ted wanted to be still -- still be associated with him some. And so it was a disentanglement that happened but it took several years, but by 2016, we were basically unentangled.

Q So I should mention another business of Ted's, Midas Resources. You're familiar with that business as well?

A That's the gold and silver company, that's where I originally had the relationship.

Q Okay. Okay. And then when did your relationship, if you recall, relative to Genesis start? And when I say you, I mean you or one of the companies that you are responsible for.

A I don't have the exact dates, but I think it was around -- it wasn't around. It was -- I think he started GCN in '99, and he wanted me to do a show with him in -- maybe it was '98 or '99, whenever he started GCN, I started do a separate show, not just my show out of Austin, but I started doing a show syndicated out of his offices in St. Paul, I believe, St. Paul. And so '98, '99 --

Q Okay.

A -- ish is when he got into radio

syndication.

Q Right. Right. And by way of Genesis. And I appreciate you saying you don't remember the exact date. I don't expect you to remember exact dates for any of my questions, but to the extent you can remember, generally speaking, the date, just say I don't remember exactly when, but it was about, that's perfectly fine in terms of answering our questions.

A Yeah, absolutely.

Q I just want to make sure you understand --

A Ted -- Ted will have all of the records of that. I've not reviewed them.

Q That's fine. That's fine. And let's talk about where your -- where the business relationship lay about 2009 between Midas and Ted and Genesis and your businesses and you. So did you have Ted Anderson come onto your radio show around that time?

A Yes.

Q Okay. And what -- for what purpose did you have -- why did Ted come onto your radio station?

A He came on the show to promote and sell precious metals and also books and films.

Q Do you remember when he -- do you remember when about he stopped coming onto your radio show?

A I mean, we were still friendly. He still came

on a few times a year just to talk about stuff in the financial markets, even though he wasn't a sponsor, up until -- I mean, he's been on the last few years, so it never stopped. But the gold sponsorship stopped 2013, '14, something like that, because he was -- he was becoming insolvent in the gold and silver company and was not paying me.

I think by the end he had like a $700,000 bill that was racked up over a year. I forget the exact year, 2013. It was 2013. And then he was still paying me some for the radio show, I was still employed there, but that was not substantial enough for me to keep my show over there. And so that's when I -- when we started disentanglement.

Q I got it. I follow. I appreciate your clarification. Did you ever have him come on your show to comment about any news or topics besides the gold and silver markets --
A No.
Q -- or precious metals generally?
A No.
Q Okay.
A He would come on and sell like -- or had free booklets and sell books. He would like to preach about the Federal Reserve Monetary Policy. He would come on

and sell films, DVDs, books, and then that was -- he'd put a pamphlet in it that was a promotional pamphlet. We also did mailers for Ted where he would pay us to put a sales brochure in all of our orders. And again, that happened -- that stopped happening by about 2013, '14.
Q Okay. And to the extent you can recall, the pamphlets, the books, the materials that the media that you're talking about, that was -- concerned financials and gold and silver?
A Yes.
Q And precious metals generally?
A Yes, sir.
Q Okay. To what extent, if at all, do you have a shared ownership interest or did you have a shared ownership interest in Midas, if at all?
A I never had any ownership, management or anything or employment in Midas Resources.
Q Okay. To what extent -- to the extent that you know, what financial interest did Ted have in Free Speech Systems?
A Zero.
Q Okay. To what extent that you know, did Ted Anderson have a financial interest in any of the LLCs that were formerly defendants in this case?

A Zero.
Q Okay. To what extent, if ever, did Ted Anderson or Genesis exercise editorial control over your radio shows, to the extent you can remember?
A In 2001, the syndication manager, Michael Trudeau {phonetic}, who worked there, attempted to exercise editorial control, something Ted wasn't doing over any of the shows, because Ted acted as a syndicator platform, just like you can call up yourself and rent time on any satellite you wish they don't have control.

And then Ted explained to him that he was over advertising and working with the networks or platforms that were paying inside the -- and that they were a syndication platform not -- not, you know, a publishing or a managerial control. And then that was being done because I was questioning 9/11. And so we lost most of our affiliates.

And so Trudeau tried to come in and talk some, quote, sense into me to get me to stop saying it. And Ted said we don't exercise editorial control. If he wants to lose most of the radio stations, he can. That's -- that's up to him. And so that was the extent to any editorial control that was ever attempted to be exercised, was in 2001.

Q Aside from that instance in 2000 -- in the early 2000's that you described relative to 9/11 issues, when -- is it my -- is it correct to say that Genesis Communication Network and Ted Anderson have never exercised editorial control over any of your -- any of your broadcasts or any of the broadcasts by one of your companies?
A Zero editorial control.
Q Okay. To what extent was there discussions -- aside from the 9/11 issues, to what extent was there ever discussions about content that should be broadcast, and aside from anything about precious metals, right, when you had him come on, to what extent was there ever a discussion about the content of news coverage on any of your -- any of your broadcasts or broadcasts of any of your companies?
A No, zero. It was all complete, direct infomercial or for a segment on the show, we would come in and say, here's our sponsor, here's their products. We didn't do product placement. There was no connection to the news that we were reporting into that of a sponsor. It was just direct, clear-cut sponsorship.
Q Okay. You never cord -- your people, you and your companies, never coordinated with Genesis

Communication Network vis-a-vis the content, aside from the Midas Resources content relative to gold and silver. There was never any collaborations as to what would be broadcast?
A No, the extent would be --
MR. ATKINSON: Objection to form. You can answer, Mr. Jones. You can -- you can answer, Mr. Jones.
A Okay. I mean, the extent would be hey, gold's going up right now, we think -- we think it's -- or hey, we got a bunch of coins at a great deal. We ought to pitch these silver dollars. Can we come on? Or hey, I just bought 20,000 of this book, it's a hot book, can we come and pitch it. That's it.
Q (By Mr. Cerame) Okay. And you have no recollection of any collaboration vis-a-vis the coverage of Sandy Hook between your companies and you or Ted Anderson and his companies?
A Zero.
MR. ATKINSON: Objection to form. You can answer, Mr. Jones.
A Zero. Absolutely never discussed Sandy Hook.
Q (By Mr. Cerame) Okay. So we talked about -- just briefly, we talked about some of the potential

business interests Ted Anderson had -- you said that he had no interest in any of the co-defendants in this case, the co-defendant companies in this case, right?
A No, no -- no interest that I know of.
Q And to your -- to the best of your knowledge, he has no interest in the LLC known as PQPR, correct?
A No.
Q Same with JLJR, right, he had no interest in that company?
A No.
Q Or PLJR, he had no interest in that company, to the best of your knowledge?
A No.
Q Or AEG Holdings [sic], either that or the trust, Ted Anderson or his companies have no interest in those, to the best of your knowledge?
A No interest.
Q Okay. Very good.
MR. CERAME: Mr. Jones, I appreciate you being direct and candid with my questions. In light of some of the discussions I've had with your team and with you, I really -- I have no further questions for you.
THE WITNESS: Thank you.
* * * E X A M I N A T I O N * * *

BY MR. MATTEI:
Q Mr. Jones, I have some questions for you. First of all, I understand that you were recently traveling; is that correct?
A Yes.
Q Are you aware that your deposition was originally scheduled for last week, but it was postponed until this week in order to accommodate your travel plans?
A Yes.
Q Where were you traveling, sir?
A I was traveling to Hawaii.
Q Okay. When did you leave for Hawaii?
A The 7th.
Q And this was for personal vacation?
A That, and some work.
Q Okay. Who accompanied you?
A My wife and child.
Q Anybody else?
A My assistant.
Q Okay.
A Assistant.
Q Who is your assistant?
A It was Dustin Wright.
Q Mr. Wright, an employee of Free Speech

Systems?
A No, he works for a security company.
Q Did Dustin Wright accompany you to your deposition in Connecticut?
A I don't remember.
Q When did you return from Hawaii?
A Yesterday.
Q Did you fly commercial or private?
A I flew commercial.
Q Where did you stay in Hawaii?
A In Kauai.
Q Was it a resort or a rental?
A I stayed at the Marriott.
Q And so the only people who accompanied you on that trip were your wife, your child, and that I assume to be, your youngest daughter?
A Yes.
Q And Mr. Wright, nobody else, correct?
A I guess a nanny went, that's right, a nanny went.
Q Anybody else?
A No.
Q You paid for that trip personally?
A I'm paying for it personally.
Q Okay. In other words, you didn't use Free

Page 775

Speech Systems' resources to pay for that trip, it was your own personal money?

A I don't know how we booked it.

Q Okay. Well then, how do you know that you paid for it personally?

A Well, because -- I mean, I don't have it in front of me, but I would imagine I'm paying for it personally.

Q Okay. Who is responsible for making those arrangements?

A I really -- I really don't know. My wife wanted to go, she said that a long time ago.

Q Your wife set up the trip?

A I believe she --

MR. ATKINSON: Objection to form. You can answer.

A I mean, look, you can ask me what I had for breakfast, whether I could probably remember for ya, but I mean, like...

Q (By Mr. Mattei) My question, though, Mr. Jones is just, did your wife set up the trip?

A I think she was involved in it.

Q Okay. And your testimony is that you don't know whether Free Speech Systems' money or your own personal money was used to fund the trip?

Page 776

A Yes.

Q Who would know that?

A I'd have to check.

Q Okay. You said that the trip also had some work purposes. What work purposes did the trip have?

A Just research on the economy and just observe what's going on in the -- in the rest of the country.

Q Did you go anywhere else besides Hawaii?

A No.

Q Okay.

A Well, I mean, technically we landed in Los Angeles and landed in Phoenix, so I guess I went there, too.

Q Okay. You had layovers there, correct?

A Yes, Los Angeles LAX on the way there and Phoenix, Arizona on the way back.

Q And the research you did on the economy and what's going on, was research you did in Hawaii?

A Yes, and I recorded some shows there and -- and reports off of what I observed.

Q Did you have any travel difficulties?

A There was some, some delays and stuff that's been in the news, not -- not much of it.

Q Your flight was delayed?

A There was -- yeah, there was some things like that also, like making people, you know, wait on the tarmac while other planes were moving around, things like that.

Page 777

Q Okay. I guess what I'm asking you, was your return delayed in any way as a result of travel difficulties or did you return on the day that you planned to return?

A I did return on the day I planned to return.

Q Since your deposition, sir, you arranged for three of your companies to seek bankruptcy protection, correct?

A Yes.

Q Those were Infowars, LLC; Infowars Health, LLC; and Prison Planet TV, LLC, correct?

A Yes.

Q And at the time that you sought bankruptcy protection for those companies, you had 100 ownership interest in each of them, correct?

A I believe so.

Q And each of those companies had, at the time you filed, had -- well, let's take one at a time.

At the time you filed, did Infowars, LLC have any assets of any kind?

A Yes, Infowars.

Q Infowars, LLC had assets, what assets did it have?

Page 778

A Infowars, the website.

Q Okay. Infowars.com?

A Yes.

Q Your testimony is that at the time you filed for bankruptcy, Infowars.com was owned by Infowars, LLC, correct?

A I'm not a business person and -- that's my understanding, yes.

Q Well, you are a business person. You own several businesses, correct?

A Well, I mean, I don't have all of the technicals, but that is my understanding --

Q Okay.

A -- of the -- that -- uh-huh.

Q Your understanding is that at the time you filed for bankruptcy, Infowars, LLC owned Infowars.com, correct?

A My understanding, the way it has been explained to me, is it controlled it.

Q Okay. Who or what owns the website Infowars.com?

A I believe that -- that corporation.

Q Okay. So I want to show -- you know who Michael Zimmerman is, correct?

Page 779

A Yes.
Q Michael Zimmerman was a former employee of Free Speech Systems, correct?
A Yes.
Q And he still does contract work for Free Speech Systems, correct?
A Yes.
Q And you authorized him to testify on behalf of Free Speech Systems; Infowars, LLC; Infowars Health, LLC; and Prison Planet TV, LLC in this case, correct?
A I believe so, yes.
Q All right. I'm going to show you what's been marked as Exhibit No. 188. And can you see what I've brought up for you, Mr. Jones?
A Yes.
Q It is a transcript of a deposition given on June 24th, 2021 of Free Speech Systems, LLC provided by Michael Zimmerman. Do you see that?
A Yes.
Q Okay. I'm going to go to Page 92 of that deposition. Do you see here at Line 14, Mr. Zimmerman is asked on behalf of Free Speech Systems, I would like to review the websites that are owned by Free Speech Systems. Am I correct that Free Speech Systems owns Infowars.com? He testified, That's correct. Do you

Page 780

see that?
A I do.
Q Okay. And so you see that in June of 2021, your company, Free Speech Systems, provided sworn testimony that it owned Infowars.com, correct?
A I mean, I haven't read this before. You guys interview everybody and just try to confuse everybody. I told you what I believe. I -- I don't really keep track of it all.
But I'm told that -- I mean, I think when people say Infowars, they mean, in general, or they say in, you know, like Free Speech Systems. But I mean, that's -- that's -- I mean, you can -- I mean, I'm sure you guys have those documents and things. So as far as I know, that's -- I mean, it's like -- you know, it's like PrisonPlant.TV has its own corporation, which is the PrisonPlanet.com, LLC, so you can -- so I'm just confused.
Q Well, the only question I asked you was, whether having looked at that transcript, that you understand that your company, Free Speech Systems, through Michael Zimmerman, testified in June of 2021 that Free Speech Systems owned Infowars.com, you saw that, correct?
A Yes.

Page 781

MR. ATKINSON: Objection to form. You can answer.
A I mean, I did see that.
Q (By Mr. Mattei) Thank you. And as of June 2021, you have no reason to think that that testimony was inaccurate, correct?
MR. ATKINSON: Objection to form. You can answer.
A I don't know. I mean, I don't think he would purposefully be wrong on purpose about something, but it -- I'm confused by it, so...
Q (By Mr. Mattei) Okay. Well, what confuses you, Mr. Jones?
A I mean, I think I was pretty clear that -- that to my understanding, but again, I'm wrong about a lot of this stuff, because quite frankly, I don't keep track of a lot of it, that -- I mean, I think you guys know that and that's why you sued it.
Q Mr. Jones, I just asked you what you're confused about?
A I'm confused -- whether Zimmerman was mistaken or whether I'm right or whether I was mistaken, because I told you what -- to the best of my knowledge what I know.
Q And it's possible that may both be right,

Page 782

right? I mean, Mr. Zimmerman testified in June 2021 that Free Speech Systems owned the website Infowars.com. You've testified here today that as of the filing of your bankruptcy, you believed Infowars.com was owned by Infowars, LLC.
And so I'm asking you now, whether you have any knowledge of Infowars, LLC acquiring the website Infowars.com from Free Speech Systems?
MR. ATKINSON: Objection to form. You can answer.
A I don't understand -- I mean, I can't speculate.
Q (By Mr. Mattei) Well, Mr. Jones, you're the 100 percent owner of Free Speech Systems, correct?
A Yes.
Q Okay. And prior to the bankruptcy, you were the 100 percent owner of Infowars, LLC, correct?
A I think so.
Q And so I'm asking you, whether one company that you had 100 ownership interest of, Infowars, LLC, acquired from Free Speech Systems, the website Infowars.com after June of 2021?
MR. ATKINSON: Objection to form. You can answer.
A I -- I'm confused. I can't answer your

question accurately.
Q (By Mr. Mattei) So you don't know which of your companies owns the website Infowars.com, is that what you're saying?
A I'm saying I'm confused by what you're saying.
Q Okay. Let me ask you this question again. Do you know which of your companies, if any, owns the website Infowars.com?
MR. ATKINSON: Objection to form.
A I believe --
MR. ATKINSON: You can answer.
A I believe Infowars, LLC, since it got set up, like, 12 or 13 years ago, whatever it was. But I'm just confused.
Q (By Mr. Mattei) Let me ask this, since June of 2021, have you authorized the sale or acquisition of the website Infowars.com?
A I don't have any knowledge of that, no. Again, I'm confused.
Q Mr. Jones, you keep saying that you're confused, but I just asked you a very simple question, which is, whether or not you have any knowledge of whether you authorized the sale or acquisition of the website Infowars.com since June of 2021?

MR. ATKINSON: Objection --
A No, I don't have knowledge --
MR. ATKINSON: Mr. Jones, objection. Chris, he's answered I don't know how many times that he doesn't know. I think he's given you a fair answer at this point.
MR. MATTEI: What I'm trying to get at is the source of his confusion, because he seems to be qualifying his answers by saying I'm confused.
Q (By Mr. Mattei) So I just want to make sure that on this particular issue, if there's anything confusing to you, Mr. Jones, I want to clear it up, okay, on the question of, whether or not you authorized the sale or acquisition of the website Infowars.com since June of 2021. Do you know whether you did or you did not?
A I do not believe that I've done anything like that. My confusion stems from Michael Zimmerman's answer versus what I believe to be true. That is the source of the confusion. Michael is a smart guy, but he's not really huge in the whole business end of things, more like IT stuff. And so I -- I'm confused. When I'm done with this deposition today, I'm going to try to find out exactly what you're talking about.
Q If Mr. Zimmerman really wasn't into the

business stuff, why did you designate him to testify on behalf of Free Speech Systems?
MR. ATKINSON: Objection to form. You can answer.
A Look, I'm just -- again, I'm confused by that question as well.
Q (By Mr. Mattei) Okay.
A I mean, you act like I'm IBM executive or something. I'm a guy that has a radio TV show that start my own grass roots thing.
Q Mr. Jones, I'm asking you as the owner of several companies, including companies that have been sued here, you have been -- you have authorized individuals to testify on behalf of your companies, including Mr. Zimmerman, correct?
A Yes.
Q Okay. So the question I'm asking you is, based on your earlier answer that Mr. Zimmerman is more of an IT guy and not really into the business, why did you designate him to testify on behalf of Free Speech Systems?
MR. ATKINSON: Objection to form. You can answer.
A Basically because the lawyers thought he -- by talking to him, knew the most general knowledge because

they asked all sorts of different -- all sorts of different questions, and not really one person has all of those answers.
Q (By Mr. Mattei) And so you -- so in retrospect, you're saying perhaps he wasn't the best person to testify about the business operations of Free Speech Systems?
MR. ATKINSON: Objection to form. You can answer.
A You know, quite frankly, I just -- this whole thing is just a big mess. I can't even keep track of it.
Q (By Mr. Mattei) Okay. Just give me a moment, please. Mr. Jones, I'm going to show you -- well, before I do this.
So in April of 2022 is when you caused three of your companies that are defendants in this case to seek bankruptcy protection, correct?
A I believe so.
Q Okay. And you were contemplating doing that at the time of your deposition, correct?
A Which deposition?
Q The deposition I took when you were in Connecticut?
A I think we were.

Page 787

Q Okay. Now, I want to show you Exhibit 179. And let me ask you, Mr. Jones, is it -- is it easier for you to see this document if I scroll one page or if I scroll two pages?
A Just do one page at a time.
Q Okay. Do you see a document I've put up for you called Voluntary Petition for Non-Individuals Filing for Bankruptcy?
A Yes.
Q Okay. And it lists your company, InfoW, LLC as the debtor, correct?
A Yes.
Q And it indicates that its prior name had been Infowars, LLC, correct?
A Yes.
Q So you essentially changed the name of Infowars, LLC for purposes of filing for bankruptcy, correct?
MR. ATKINSON: Objection to form. You can answer.
A This was done on the legal advice by lawyers. I don't understand this stuff.
Q (By Mr. Mattei) Okay. I'm just asking you, were you aware that the name of the entity Infowars, LLC was changed for purposes of filing for bankruptcy,

Page 788

is that something that you were aware of?
A I am.
Q Okay. And that's obviously not something that could have happened without your authorization, you own the company, correct?
A Yes.
Q All right. And I want to go down to the part of the document titled Declaration of W. Marc Schwartz Regarding Bankruptcy Code. Do you see that?
A Yes.
Q Marc Schwartz is the gentleman you hired to be the chief restructuring officer of these three entities, correct?
A Yes.
Q You met with him in connection with preparing that bankruptcy, yes?
A I don't think at this time I had met with him.
Q Okay. Well, if you look at Paragraph 7, he says in his declaration, I have also met with counsel for the debtors and Mr. Jones to obtain an understanding of debtor's operation. I've also reviewed lists of assets owned by the debtors.
A Yes.
Q At some point you met with Mr. Schwartz,

Page 789

correct?
A I guess you mean over the phone as a meeting? I think I talked to him on the phone some, but since then, I've met with him in person.
Q Okay. And according to Mr. Schwartz, if you look at Paragraph 8, he said, I have learned that the debtors have no purpose other than to hold assets which may be used by other entities. Do you see that?
A Yes.
Q They undertake no business activities. They do not sell, rent or lease to others anything. Do you see that?
A Yes.
Q He says, Their assets do not generate any income for them. Do you see that?
A Yes.
Q They have no bank accounts and do not pay money to anyone for any reason. Do you see that?
A Yes.
Q They have no debt or other liabilities other than those related to pending or potential litigation. Do you see that?
A Yes.
Q Okay. And I take it your testimony is that, as far as you're concerned as the owners of those

Page 790

entities, that information is accurate, correct?
MR. ATKINSON: Objection to form. You can answer.
A Can I -- can I see the -- what companies are they again?
Q (By Mr. Mattei) Sure. If you go up to Paragraph 6, you'll see that the debtors are defined as the three entities we discussed earlier, Info -- which names were changed for purposes of the bankruptcy, but the three entities that you filed for bankruptcy protection were Infowars, LLC; Infowars Health, LLC and Prison Planet TV, LLC, correct?
A Yes.
Q Okay. Those are the debtors listed here under the new names that were given to them for the purposes of the bankruptcy, correct?
A Yes.
Q All right. So those are the debtors that were described by Mr. Schwartz in Paragraph 8 as having no business activities, income, bank accounts or debts or liabilities. Do you see that?
A Yes, and I'm confused by that, because -- but this is -- this is all complex stuff. I -- I don't understand this, so I can't speak to it.
Q Okay. Well, are -- is it your testimony that

you don't know whether those companies that you own 100 percent of had any business activities?

A Well, I mean, Infowars Health brings in like $40,000 a month, so it does have business activities. I'm -- I'm -- I don't know how -- I'm going to have to speak to the lawyers and these CPAs, because I believe whatever they're doing is good faith here, but I'm under oath here, I'm telling you that that Infowars Health brings in money --

Q Okay.

A -- so...

Q And that's through your interest in Youngevity products, correct?

A Yes.

Q You promote Youngevity products and you get a cut of any of those sales, correct?

A Yes.

Q All right. And that money goes directly from Infowars -- or at least it did, it goes directly form Infowars Health, LLC to you personally, correct?

A Yes.

MR. ATKINSON: Objection.

Q (By Mr. Mattei) And -- but whatever the assets of these companies may have been at the time, you would agree with me that compared -- or as a

percentage of Free Speech Systems' overall assets, the three companies that you put into bankruptcy protection had a -- contained few, if any, of the overall assets, correct?

MR. ATKINSON: Objection to form. You can answer.

A No, I don't see Infowars as -- as being a small asset, the website.

Q (By Mr. Mattei) Okay. And so what would you say is the value of the Infowars.com website?

MR. ATKINSON: Objection to form. You can answer.

A I can't quantify that. Just, it has value in my mind and so does Infowars Health --

Q (By Mr. Mattei) Well, can you --

A So does Infowars Health, I mean, it's value right there.

Q Can you give me an estimate of percentage of your company -- of your overall holding valuation the website represents?

MR. ATKINSON: Objection to form. You can answer.

A I -- I can't speculate.

Q (By Mr. Mattei) Okay. That would be speculation for you to do something like that?

A Sitting here in this room, yeah.

Q Okay. Mr. Jones, I'm going to show you a video or I'm going to attempt to show you a video. On your video now, do you have a paused -- I'm sorry, on your screen right now, do you have a paused video that shows you in the middle of the screen?

A Yes.

Q All right. And this is Exhibit No. 183. Do you recall preparing a video that was titled Alex Jones Responds to Stories about Justice Department Denying Infowars Bankruptcy?

A I didn't write that headline, somebody clipped that out, but this is from a live show that I did.

Q Okay. So this is -- this is from a live show that you did, correct?

A I would have to see it. It appears -- once you play it, I'll know.

Q Okay. We'll play and if you have any trouble hearing it, just let me know.

(Playing video.)

Q (By Mr. Mattei) Did you see enough there to know that that was you, in fact, speaking and this was a segment that you broadcast?

A Yes.

Q And you're talking about the bankruptcy that

you filed, correct?

A Yes.

Q And you indicated that somebody had called a judge and said that you don't get access to the bankruptcy courts, correct?

A This is a shorter clip out of context, but yes, in fact, we're even getting the affidavit, and that wasn't brought up here, but it's going to be brought up. The U.S. Trustee's office doing unprecedented things, calling former judges that were trustees and their lawyer. And they were also in the news making similar bizarre statements, without even looking at the documents, and saying this is a policy from the top that -- that, you know, we're going to oppose this and, you know, you shouldn't do this.

Q All right. I just want to make sure I understand, you just indicated that you are preparing an affidavit or you're having an affidavit prepared?

A In fact, I believe that's already been -- being done, yeah, for the witnesses.

Q And who -- who are -- when you say the witnesses, you presumably mean the people who were contacted by the United States Bankruptcy Trustee?

A Uh-huh.

Q Is that a "yes"?

Page 795

A Yes.
Q And who is that?
A I don't remember all of the names. And I can't -- you know, I just know it was like a shocking thing, you know, I mean, unprecedented.
Q And I just want to make sure I understand what this shocking thing was is -- is your claim that the United States Bankruptcy Trustee in Texas contacted the judge, Judge Lopez, is that what you're saying?
A No, that's not what I said.
MR. ATKINSON: Objection to form. You can answer.
Q (By Mr. Mattei) Go ahead.
MR. ATKINSON: Go ahead.
A That's -- again, I don't have it all in front of me like I did that day when I was giving a gestalt of what I had been told, but I'm talking about former judges that were trust -- going to be trustees and their lawyer and people like that getting these phone calls and -- and just the disbelief at the unprecedented nature of it, before they'd ever even seen anything. And then there are public statements.
I mean, you saw the trustee's office public statements. And this is a bankruptcy attempting to pay debtors. And then there's people saying that

Page 796

no, this is a bankruptcy to hide assets when there aren't hidden assets. It's just par for the course of the political witch hunt.
Q Who described that conversation to you?
A Excuse me?
Q Who described that conversation to you?
A It's attorney/client privileged stuff, but I'm sure it'll -- it'll come out for you.
Q No, no, Mr. Jones, you have to answer the question unless your attorney asserts a privilege, but obviously, sir, if you're talking about it to an audience of millions about this conversation that was relayed to you --
MR. MATTEI: I guess I'll leave it to your attorney to make the argument about whether --
MR. ATKINSON: So, Chris, if I can help facilitate this, Mr. Jones, you can answer, but what I would suggest that you do, first of all, is identify the person who reported the conversation to you. Mr. Mattei will ask his next question to you. And then if that question gets into something that may be attorney/client privileged, I will evaluate and assess that when he asks the question. But right now, I -- I am advising you to answer the question of who reported the conversation to you.

Page 797

A Sure. I need -- I'm not prepared to answer these questions at this time. I'd need to go back. I don't remember the names of the specifics of all of that. I don't want to get that wrong or say that wrong, so I specifically can't answer the question at this time, because I don't -- I don't remember it all.
Q (By Mr. Mattei) Mr. Jones, what would you need to do in order to remember who conveyed this shocking information to you?
A I mean, I would just need to go talk to some people and collect my memory of it and get the specifics.
Q I'm going to go ahead and keep playing this now.
THE WITNESS: Can you close that door a little better?
(Playing video.)
Q (By Mr. Mattei) So there, Mr. Jones, you say that the United States Bankruptcy Trustee told the lawyers for the plaintiffs to drop the cases against the three companies you put into bankruptcy. What was your source for that statement?
A That's -- that's my speculation, but I also saw the lawyers on your side and also the U.S. Trustee's office saying the exact same things, which of

Page 798

course weren't true as usual.
Q I see. So you were just making that up, yeah?
A No, I wasn't making it up.
MR. ATKINSON: Objection to form. You can answer.
A I was speculating -- I mean, I was -- at the time, I had read probably 20 news articles about it with statements and quotes about people, so I was putting that together there for news. I don't have it in front of me. You can see I have it there in front of me on the show.
Q (By Mr. Mattei) Not one of those articles reported that the United States Bankruptcy Trustee had instructed the plaintiffs' lawyers to do anything, correct?
MR. ATKINSON: Objection; form. You can answer.
A I don't remember.
(Playing video.)
Q (By Mr. Mattei) Okay. Mr. Jones, did you hear you claim to your audience that you don't have $2 million yourself?
A Yes.
Q Okay. That's not true, is it?

MR. ATKINSON: Objection to form. You can answer.
A At -- at the time, I didn't have $2 million.
Q (By Mr. Mattei) Mr. Jones, this is two weeks ago, did you know that?
A I think this was longer than two weeks ago.
Q Well, would it help to go to Banned.video to see when it was posted?
A Well, when something is posted isn't necessarily when it's live, but I'd have to look at the date.
Q Well, let me just -- let me just make it easy for you. If this was posted -- if you recorded this in June of this year and told your audience that you don't have $2 million yourself, that is not correct?
MR. ATKINSON: Objection to form.
Q (By Mr. Mattei) Fair?
MR. ATKINSON: You can answer.
THE WITNESS: Man, it's loud in this place. Sorry, there's like a tour going on inside here.
MR. ATKINSON: Chris, I suggest that you re -- or have that question --
MR. MATTEI: No, no, no, I'll ask the question --

MR. ATKINSON: -- read back.
MR. MATTEI: -- again. I'll ask the question again.
Q (By Mr. Mattei) Mr. Jones, since the beginning of June of this year, am I correct, that you do have personal assets in excess of $2 million?
A Say that again?
Q As of the beginning of June of this year --
THE WITNESS: And I'm sorry. You're not here. There's like 10 women up and down the hall, just -- there's like glass doors here. This place is insane. There is not even doorknobs on the doors here. So I'm going to have to -- we might have to take a break here until this -- I mean, the guy has even left the room.
MR. ATKINSON: So can -- Mr. Jones, I recognize it's distracting there, but before we can take a break, I think you need to answer the question that --
THE WITNESS: Sure. Sure. I'm glad. The guy is back in the room now. He can tell you it's been loud. They're gone now.
MR. ATKINSON: So answer -- answer the question that's pending.
A Okay. Go ahead.

Q (By Mr. Mattei) Mr. Jones, if this video was recorded in June of this year and you told your audience in the video that you don't have $2 million personally, that was false, correct?
A No, that's not false.
MR. ATKINSON: Objection.
Q (By Mr. Mattei) Okay. So it's your testimony that as of the last three weeks, since the beginning of June, you don't have personal assets in excess of $2 million?
MR. ATKINSON: Objection to form. You can answer.
A I know that at the -- I'm speaking of $2 million cash. I don't have $2 million cash.
Q (By Mr. Mattei) You don't?
A At that -- at that time.
Q Which was -- which was two weeks ago?
A No, you can say when this video was posted somewhere. I'm telling you this is from longer back than two weeks.
Q Okay. Well, when was it then?
A I don't -- you got some video on the screen. I just know that -- I've been completely transparent with the audience about where you're going with the Bitcoin donations. I told them when we got a million

dollars. I told them when we got $2 million. I told them when we got the large donation after that. I told them when the Bitcoin value went down unfortunately.
I mean, the show is completely transparent. That's why you're watching and getting clips and trying to confuse me here. But I mean, I had already told -- I mean, a day or two after we got those big donations, I told the audience about it. I mean, I think I broke those donations in the news, so...
Q Mr. Jones, I didn't ask you about Bitcoin.
A But I know you're -- that's where you're going and so --
Q No, you don't know where I'm going, so just answer the question I ask you, okay?
The question I asked you was, whether -- how you know that at the time you made this video, you didn't have $2 million in personal assets?
A Not assets.
MR. ATKINSON: Objection as to form. You can answer.
A I've already answered your questions, $2 million cash.
Q (By Mr. Mattei) Okay. How did you know you didn't have $2 million cash?
A Because I had just --

MR. ATKINSON: Objection to form.
You can answer.
A Because I had just been paying bills out of what money I had left and I knew how much I had roughly.
Q (By Mr. Mattei) Mr. Jones, you just told me you don't even know when this video was made?
A I remember some of what I was talking -- you're just trying to confuse me, so I can't -- I can't answer questions when I don't know the date of the video and you keep saying assets and I said dollars in the bank. I've been very clear.
Q Okay. Well, let's just focus on assets then. You definitely have, over the course of the entire year of 2022, have had assets in excess of $2 million, correct?
MR. ATKINSON: Objection to form.
You can answer.
A Again, if you -- if you try to ask me to guesstimate how many assets I have, I can give you an uneducated guess, because I haven't -- I don't have a perfect handle on it. But if you say over the course of a year, I have -- I don't know what you're talking about.
Q (By Mr. Mattei) Mr. Jones, when you filed for

bankruptcy, you committed to fund a litigation trust with $2 million, correct?
MR. ATKINSON: Objection to form.
You can answer.
A Yes.
Q (By Mr. Mattei) Okay.
A And that money was no longer mine, I mean, once it's put in the trust for the purposes of that.
Q Mr. Jones, and so you -- it's your testimony that you funded a litigation trust with $2 million of your own money, correct?
A Yes.
MR. ATKINSON: Objection to form.
You can answer.
Q (By Mr. Mattei) That was a yes, right?
A Yes.
Q Okay. And you did that in April of 2022, correct?
A Yes.
Q And where was that money drawn from?
A From the --
MR. ATKINSON: Objection to form.
You can answer.
A From the sale of my house.
Q (By Mr. Mattei) Okay. And when did you sell

that house?
A I don't remember, sometime this year.
Q Sometime in 2022?
A Yeah, I don't have the exact date.
Q Okay. Sometime this year, though. What was the address of that property?
A You've got it, 30 -- I forget, 0 --
Q Okay. I'm going to play a little more of this video, Mr. Jones.
(Playing video.)
Q (By Mr. Mattei) Okay. Did you hear where you said there to your audience that the defendants who were dropped from these cases represents 70 percent of Infowars?
A Yes.
Q Okay. And there you are referring to Infowars, LLC; Infowars Health, LLC and Prison Planet TV, LLC, correct?
A Yes.
Q Okay. How did you come up with that 70 percent number?
A I mean, I think -- hell, you can say 100 -- you can say 100 percent. I mean, Infowars, the website, is very important, and that's -- that's most of value of what I call Infowars.

Q Okay. And so you were referring to the Infowars.com website as comprising 70 percent of all of Infowars' value, correct?
A Yeah, it's a guesstimation. It's just -- I mean, to me, that's -- that has a lot of value. So it may not to you guys, but whatever -- believe whatever you want.
Q In fact, it's -- would you say it's your most valuable asset?
A No.
Q Okay. What's more valuable than the website to you?
A Me.
Q You, personally?
A Yeah, I'm the most valuable asset of the company, yeah.
Q Besides you personally, would you say --
A I'm the key man.
Q -- the website?
A I'm a key man. I'm a key man. And then I would say our crew is the second most valuable asset.
Q All right.
A And then, of course, the audience is the third most valuable.
Q Right. And you are employed by Free Speech

Systems, correct?

A And then the pendulum swinging against tyranny is the next most valuable, so...

Q Mr. Jones -- Mr. Jones, you are employed by Free Speech Systems, correct?

A Employed by it? I don't technically know what that means. I mean, I don't -- I mean, I -- I guess I am employed by it now. I can't remember. I don't really worry about all of that stuff.

Q And your crew is employed by Free Speech Systems, right?

A Yes.

Q Okay. And so I'm just trying to figure out when you told your audience that the companies that filed for bankruptcy represented 70 percent of Infowars, what you were referring to?

A To things that are Infowars. I mean, I would say the website is like 70 percent of what I would call Infowars. And then I'd say like merchandise and stuff, you know, another 30 percent or so. I mean, I'm talking about Infowars, how I see Infowars itself. Free Speech Systems is just a management company to pay employees and -- and -- and do that stuff, but to me Infowars is what's really valuable.

Q Infowars, the brand?

A Yeah, I mean, absolutely. Infowars the site and -- and yeah.

Q Okay. But you make all of your money through the site Infowarsstore.com, right?

MR. ATKINSON: Objection to form. You can answer.

A Again, you're projecting onto this whatever it is you believe. I don't even really understand your questions. I mean, what does that mean I make my money? My show --

Q (By Mr. Mattei) Well, Mr. Jones --

A Yeah.

Q Mr. Jones, you froze for a second. Can you hear me?

A Yeah.

Q Okay. You make money by selling supplements, right?

A That'd be a yes.

Q Okay. And the supplements and the merchandize you sell are sold on the websites Infowarsstore.com and Infowarsshop.com, right?

A Yes.

Q Okay. They're not sold on Infowars.com, correct?

A No.

Q So as you sit here today, really I just want to get back to this question. The asset that you were claiming represented 70 percent of Infowars was the website, correct?

A Yes.

Q Infowars. Okay. Anything else?

A I mean, I think the archive of our shows on Prison Planet TV is valuable. I think Infowars Health is valuable. I mean, they were -- there was real stuff put in to try to, you know, just -- to try to end this, you know, and that's what it was. It was a really good faith thing to try to -- try to have a court look at how much money was actually there and stop all of the rumors and -- and stuff and actually try to just move forward.

Q So as the owner of those -- of those companies, it was your view that they were engaged in meaningful business activities, correct?

A Yeah, I'm not trying to contradict the people that worked there. I don't understand all of that, so -- I mean, being honest, looking at that, those things have value to me. And I mean, I think it was pledged in there, some of the documents I read, to use the money coming into Infowars Health to help future fund any settlements. So I -- and I'm not impugning

Mr. Schwartz. I'm just saying it's a he said/she said stuff and stuff.

Q Right. Well, you're the owner, so I'm asking you. I'm asking you, it's your testimony as the owner of these companies that they were engaged in meaningful business activities, correct?

MR. ATKINSON: Objection to form. You can answer.

A I mean, I think so, yeah.

Q (By Mr. Mattei) Okay. In addition to the 2 million that -- oh, I'm not sure I got an answer to this.

Where did that 2 million come from that you used to fund the settlement trust?

MR. ATKINSON: Objection to form. You can answer.

A From the sale of my house.

Q (By Mr. Mattei) Thank you. You did answer that. Thank you.

A And then I had like a million bucks left there, that's what I'm talking about. So I'm running out of cash, that's a fact, believe me.

Q And I'm going to show you now Page 47 of Exhibit 184. It's an exhibit that we previously looked at, Mr. Jones. Do you see here a table indicating that

Page 811

$715,000 was wired to an account on April 6th, 2022 representing exempt proceeds from homestead sale?

A Yes, I see that.

Q Okay. So that's $715,000 in addition to the 2 million?

MR. ATKINSON: Objection to form. You can answer.

A I don't -- I don't -- I've never seen these documents before, so I really can't speak to it.

Q (By Mr. Mattei) Okay. So let me just then -- I take it that it's your understanding that you transferred $2 million into the Litigation Settlement Trust, which were proceeds from the sale of your home, correct?

A I mean, I'm going from memory, but I think that's -- yeah.

Q Okay. All right. So, the -- and those three entities, Infowars, LLC; Infowars Health, LLC and Prison Planet TV, LLC, they were also transferred into the Litigation Settlement Trust, correct?

MR. ATKINSON: Objection to form. You can answer.

A I don't know.

THE WITNESS: Is there a water fountain out there?

Page 812

THE VIDEOGRAPHER: There's some water right there. Do you want me to get you some?

THE WITNESS: Hey, can we take a break, guys? And also, ask how long -- because I was told I'd be here an hour and a half or so. How much time do we got going on here after we take a break?

MR. MATTEI: Well, we can take a break. I'm not sure how much longer we have.

THE WITNESS: Because under Connecticut rules, is it going to be, like, 1,000 years or how long?

MR. ATKINSON: All right. Let's take a break, Alex, and we'll talk about it during the break, all right?

THE WITNESS: Yep.

THE VIDEOGRAPHER: We are off the record at 10:16. End of Media 1.

(A recess was taken from 10:16 to 10:22.)

THE VIDEOGRAPHER: We're on the record at 10:22. Start Media 2.

Q (By Mr. Mattei) Mr. Jones, before we went off for the break, I was just asking you to confirm that it was your understanding that those -- the three entities that you sought bankruptcy protection for, that you assigned all of your ownership in those entities to the

Page 813

Litigation Settlement Trust, correct?

A Your -- your audio is unintelligible.

Q Okay. Let me repeat that.

A It's clearer now.

Q Are you hearing me clearly --

A Yes.

Q Are you hearing me clearly right now?

A Yes.

Q Yes. Okay. Before we broke, I was just -- I believe you confirmed, but I'll ask you again, that it's your understanding that your ownership interest in those three entities that filed for bankruptcy, that you transferred your ownership interest to the Litigation Settlement Trust, correct?

A I can't competently speak to that. I don't understand it all.

Q Mr. Jones, who owns the company formerly known as Infowars, LLC today?

A I -- I'm confused by all of this.

Q Is your answer you don't know who owns Infowars, the company formerly known as Infowars, LLC?

A No, I'm confused.

Q Okay. What is confusing about the question, who owns Infowars, LLC?

Page 814

A Earlier you had someone saying that Free Speech does and I believe it's a separate company.

Q I'm not asking about the website anymore. I'm just asking about the company Infowars, LLC, that was a defendant in this case, correct?

A Yes.

Q You sought bankruptcy protection for that company, correct?

A Yes.

Q Okay. You had 100 ownership interest in that company, correct?

A I believe so, yes.

Q Okay. Then you sought bankruptcy protection for that company and you assigned all of your ownership interest to the Litigation Settlement Trust, correct?

A I believe so, but I'm confused, so I can't answer that 100 percent.

Q Okay. Well, let me show you, this is, again, Exhibit 184. All right. I'm going to bring your attention to Paragraph No. 9. Do you have Paragraph No. 9 in front of you?

A Yes.

Q Okay. Paragraph 9 describes the fact that you have 100 percent ownership interest in Free Speech Systems and the three companies you put into

Page 815

bankruptcy, correct?
A Yes.
Q And then it says, He, that is you, assigned those equity interests to the 2022 Litigation Settlement Trust before the petition date. Do you see that?
A Yes.
Q All right. And do you recall doing that?
A Now, that you've shown me this, yes, thank you.
Q Okay. And if you go down to the declaration of the 2022 Litigation Settlement Trust, you'll see that you are a signatory, correct? That's your signature on Page 86?
A It's all over -- it's jumping around here.
Q Yeah. Do you have the signature page in front of you now?
A No, I don't.
Q Okay. Hold one second.
A You might as well have had this in a shopping mall. I see it now.
Q Do you have the signature page in front of you?
A Yes.
Q Okay.

Page 816

A Yeah, that's my signature.
Q Right. And then that's Rob Dew's signature right above, signed on April 15th of this year, correct?
A Yes.
THE WITNESS: Can you close that door fully? It's -- sorry.
THE VIDEOGRAPHER: It's closed as far as it can go.
THE WITNESS: Okay. Thanks.
Q (By Mr. Mattei) Now, the bankruptcy has now been dismissed, correct?
A I believe so, yes.
Q What happened to the $2 million that you used to fund the Litigation Settlement Trust?
MR. ATKINSON: Objection to form. You can answer.
A I don't have the accounting in front of me, but I think part of it was spent on lawyers and I believe the rest is sitting there.
Q (By Mr. Mattei) Okay. You think that some portion of that $2 million is still sitting in an account for the Litigation Settlement Trust?
A Yes.
Q And you believe the rest was used to pay

Page 817

lawyers?
A I believe so.
Q And what about the ownership of Infowars, LLC; Infowars Health, LLC and Prison Planet TV, LLC; have you now retained ownership of those entities as you had before?
MR. ATKINSON: Objection to form. You can answer.
A That's an important question. I don't -- I need to -- I need to look into that.
Q (By Mr. Mattei) So the answer is you don't know?
A The answer is I don't know.
Q As of today, June 21st, 2022, who or what owns Infowars.com, the website?
MR. ATKINSON: Objection to form. You can answer.
A As I said, I'm -- this is all complex. I really don't have the answer to that, but I think I do.
Q (By Mr. Mattei) Okay. Other than Infowars.com -- well, hang on one second.
You testified earlier that you are not aware of authorizing the sale of the website, Infowars -- strike that.

Page 818

You testified earlier that you were not aware of having authorized the transfer of the Infowars.com website from Free Speech Systems to Infowars, LLC prior to the bankruptcy.
I'm asking you about any other transfers between Free Speech Systems and Infowars prior to the bankruptcy, are you aware of any?
MR. ATKINSON: Objection to form. You can answer.
A Can you -- I think since you showed me that document, that may have refreshed my memory. I should have asked that. I forget that I'm supposed to do that. Because, again, my head is not this. It gives me a headache. I'm trying to understand what you're saying. I think you refreshed my memory that the Infowars website was transferred into this trust, correct?
Q (By Mr. Mattei) That's not what that said. The document I just showed you said that you had transferred all of your ownership interest in Infowars, LLC to the trust?
A Okay. See, I can't -- I'm just totally confused. What was the next question?
Q Fair enough. Yeah, so the question I was asking you is, are you aware of any transfers of

property owned by Free Speech Systems to Infowars, LLC in the year prior to the bankruptcy?

MR. ATKINSON: Objection to form. You can answer.

A I think these documents speak for themselves. I -- I -- this is just a tornado of --

Q (By Mr. Mattei) I'm not talking about the documents now. Forget about the documents. I'm talking about you as the owner of these companies, okay?

Do you have any personal knowledge of Free Speech Systems transferring any property to Infowars, LLC in the year prior to the bankruptcy?

A No, I -- I don't remember.

Q Okay. And do you have any knowledge of Infowars, LLC transferring any property to Free Speech Systems in the year prior to the bankruptcy?

MR. ATKINSON: Objection to form. You can answer.

A No, I don't remember.

Q (By Mr. Mattei) Since the termination of the bankruptcy proceeding, are you aware of any transfers of property between Free Speech Systems and Infowars, LLC?

MR. ATKINSON: Objection to form.

You can answer.

A Since the -- since the -- since the --

Q (By Mr. Mattei) Termination of the -- I'll ask it again.

Since the termination of the bankruptcy proceeding, are you aware of any transfers of property between Free Speech Systems and Infowars, LLC?

A No.

MR. ATKINSON: The same objection.

Q (By Mr. Mattei) Let me -- let me clear that up a little bit. Since the termination of the bankruptcy proceeding, are you aware of any transfers of property between Free Speech Systems and the company formerly known as Infowars, LLC?

MR. ATKINSON: The same objection.

A I don't -- I don't believe so, but I'm completely confused.

Q (By Mr. Mattei) Okay. Do you believe that you have personal access to whatever cash remains in the Litigation Settlement Trust?

MR. ATKINSON: Objection to form. You can answer.

A I believe I do.

Q (By Mr. Mattei) In other words, you could

take that money out and use it for whatever purpose if you wanted to at this point, correct?

MR. ATKINSON: Objection to form. You can answer.

A I would have to speculate, but I mean -- I -- I don't know.

Q (By Mr. Mattei) What's WWW.Freeworldoutlet.com?

A That is a separate website with another separate media marketing group that's been set up to --

Q Who owns it?

A -- resell our products.

Q Who owns the website?

A I don't know. I don't know who specifically owns it.

Q Do you have an ownership interest in the website?

A No.

Q Does a company that you control have an ownership from in the website?

MR. ATKINSON: Objection to form. You can answer.

A No.

Q (By Mr. Mattei) Do you -- do you or any companies in which you have an interest generate

revenue from products sold on that website?

MR. ATKINSON: Objection to form. You can answer.

A Yes, it -- it -- it buys product from us.

Q (By Mr. Mattei) The owner of the website buys products from you and then sells your product on the website?

A Yes.

Q And your testimony is, you don't know who owns the website?

A I don't know who register -- I'm not sure who registered it.

Q Okay. Well, you're doing business with somebody who owns that website, right?

A Yes.

Q Okay. Who do you know that's affiliated with that website?

A Tim Fruge.

Q Tim Fruge is the former business operations manager for Free Speech Systems, right?

A Yes.

Q All right. He left Free Speech Systems and then came back sometime last year, correct?

A Yes.

Q And is -- is he still employed by Free Speech

Page 823

Systems?

A No, he has set up his own marketing company.

Q He set up his own marketing company. What's the marketing company called?

A That's why the specific of he said -- he said I want to start setting up websites and selling products and I would like to, you know, be a sponsor. So he -- that's the plan is for him to be a sponsor and to be able to buy products as well, and it's just a, you know, test marketing thing he's doing.

Q Your testimony is that it was Mr. Fruge's idea to set up that website for the purpose of reselling your products?

A I mean, we collaborate -- we collaboratively talked about it.

Q Okay. Who came up with the idea?

MR. ATKINSON: Objection to form. You can answer.

A I think Tim did.

Q (By Mr. Mattei) And was the idea to set up Freeworldoutlet.com prompted by the fact that you are looking for ways to continue to generate revenue that are not subject to recovery in this lawsuit?

MR. ATKINSON: Objection; it calls for a legal conclusion.

Page 824

A No, it's to -- it's to get around deplatforming and be able to sell our products in more markets.

Q Okay. Well, deplatform from where?

A Infowars is barred from advertising or operating in most places on the internet. And so it's a vehicle for third parties to be able to go up and sell the products and advertise.

Q When was Freeworldoutlet.com set up?

A I don't remember.

Q And I take it from your testimony that it's your understanding that Tim Fruge started a company that now owns that website, correct?

A I don't know the specifics of who registered or how that's being done. There may be thousands of URLs. It's a -- it's a -- it's a shopping cart platform.

Q Right. And I'm just trying to confirm that to the best of your understanding, Tim Fruge owns whatever entity controls the website Freeworldoutlet.com, correct?

A I don't know the specifics of that.

Q Okay. What is your understanding of Tim Fruge's association with Freeworldoutlet.com?

MR. ATKINSON: Objection to form.

Page 825

You can answer.

A He -- he is. He's running that site and he's also working on developing other -- other sites and also sponsors. He -- it's basically like he's creating like an ad agency.

Q (By Mr. Mattei) And when did he separate from employment at Free Speech Systems?

A I don't remember.

Q Do you or any companies you control provide him with funding in connection with the venture you just described?

MR. ATKINSON: Objection to form. You can answer.

A I don't remember, but I mean, it's -- it's -- I know he's designed it to be self-funding, so... You know, he -- he sells the product and then it's fulfilled, and then he pays us for the product that's sold. It's like an affiliate program.

Q (By Mr. Mattei) So your testimony is that the website that he controls will offer your products for sale, correct?

A Yes.

Q A sale is transacted and the proceeds of that sale are sent onto your company to pay for the product that he then provides to the buyer, correct?

Page 826

MR. ATKINSON: Objection to form. You can answer.

A I don't have the specifics. There are several different things that go on.

Q (By Mr. Mattei) Is there a -- do any companies in which you have an interest have an agreement with Mr. Fruge or any of his companies in relation to the operation of that website?

MR. ATKINSON: Objection to form. You can answer.

A Yeah, there's a -- there's an affiliate -- I mean, agreement on what percentage he gets and what percentage he's paid back from the sale of that, just like any affiliate. You can go start a website and sell electric bikes and then they dropship it from the place that has the electric bikes, whether they're the manufacturer or resell themselves. It's just a standard internet affiliate agreement.

Q Who are the parties to that affiliate agreement?

MR. ATKINSON: Objection to form. You can answer.

A I'm just being speculative, in general, because I haven't seen the agreements. I haven't dealt with it. It's just -- it's a standard internet

Page 827

affiliate stuff. Like you -- like you --

Q (By Mr. Mattei) Fair enough. Who signed it?

A Like, you can create just a URL that you own, which is not the case here, and then you point that URL at a place and then the percentage of sales they get off of that, you get a percentage. It's just -- it's just a, you know, pop-up basic shopping cart website deal.

Q And who paid for the -- well, let me, before I get there. So you indicated there's an affiliate agreement. There is an agreement between you and Mr. Fruge as to what percentage he retains versus what percentage he sends onto you. I want to know who are the parties to that agreement?

MR. ATKINSON: Objection to form. You can answer.

A I -- I wasn't involved in that. It's -- it's purely speculative stuff he's done that I've agreed to work with him on. It's not been very successful, quite frankly. So I haven't even been focused on it at all until now.

Q (By Mr. Mattei) Is your testimony that you don't know who the parties are to the -- what you've described as an affiliate agreement?

Page 828

A No, I've known Tim for 16 years. And he -- he went to work in Illinois, didn't like that. Then he went to work in Utah, didn't like that. He said, can I come back and at least see how things work out? Yeah. And then he came back for a while and he said, listen, I want to go out and do a whole bunch of companies. I know he's done a bunch of separate stuff for me. And I just said to him, I said, I hope those things become successful, because there's been a lack of sponsors, none of them have really been that successful yet, where they're just straight sponsors, which I'd like him to be successful at that.

And then he also, you know, had an idea of -- for several websites that he thought he could then market out there and, again, you know, get around deplatforming so that we could, you know, sell product and would be beneficial to all of us. And so that's where that is, but I know Tim. He's my friend. I haven't -- I haven't been involved in basically any of it.

Q (By Mr. Mattei) Mr. Jones, I'm just asking you whether you know who the parties are to the affiliate agreement governing the relationship between Freeworldoutlet.com and any companies that you control?

Page 829

A I haven't seen --

MR. ATKINSON: Objection to form. You can answer.

A I haven't seen the specifics, but I would imagine that agreement is there.

Q (By Mr. Mattei) Okay. So your testimony is that you believe that there is a written agreement, but that you haven't seen it, is that your testimony?

A I've not been involved almost at all.

Q Okay.

A Other than plugging it on air to see if it got any traction and to see if it got good customer reviews, which it's gotten -- gotten -- we've gotten good feedback.

Q But I need -- I need an answer to my question.

A Yeah.

Q My question is, is it your testimony that you believe there's a written agreement, but that you, yourself, haven't seen it?

A Yes, that's my testimony.

Q And so I take it that you believe Mr. Fruge is a signatory to that agreement, but you don't know who may have signed on the Infowars side; is that correct?

A Yes --

Page 830

MR. ATKINSON: Objection to form. You can answer.

A -- I mean, I don't know, that's what I just told you.

Q (By Mr. Mattei) Okay. You didn't sign anything?

A Not that I remember, no.

Q All right. What about the website PreparewithAlex.com?

A That is a URL that points at a third-party website that then fulfills and sells food and then pays us an agreed percentage back.

Q Okay. The third party -- the website that it points to is Preparetoday.com, right?

A Yes.

Q So anybody on the internet can either go to PreparewithAlex.com or Preparetoday.com and there, storable food is sold, correct?

A Yes.

Q Okay. Who owns the URL PreparewithAlex.com?

A I think I do. I'm not sure actually.

Q Okay. Is it fair to say that you believe either you own it personally or a company you control owns it?

MR. ATKINSON: Objection to form.

You can answer.

A I don't know who owns it.

Q (By Mr. Mattei) Who owns Preparetoday.com?

MR. ATKINSON: Objection to form.

You can answer.

A I don't know.

Q (By Mr. Mattei) Okay. You know that you are -- you personally have some affiliation with those websites, correct?

MR. ATKINSON: Objection to form.

You can answer.

A It's an affiliate agreement.

Q (By Mr. Mattei) Okay.

A Yes.

Q And do you know anybody associated with PreparewithAlex.com?

A Yes.

Q Who?

A Tim Fruge.

Q And what about Preparetoday.com, Tim Fruge is also associated with that website?

A Yes, PreparewithAlex.com is a redirect URL to Preparetoday.com.

Q And when were those websites created?

MR. ATKINSON: Objection to form.

You can answer.

A I don't -- two years ago, PreparewithAlex.com. I mean, three years ago. I don't remember. And the other one, I don't know.

Q (By Mr. Mattei) Okay. So PreparewithAlex.com was started two to three years ago, correct?

A Yes.

MR. ATKINSON: Objection to form.

You can answer.

Q (By Mr. Mattei) That was a "yes"?

A Yes.

Q And Preparetoday.com, you're not sure when that started?

A It's just another -- it's a -- it's a -- called a click funnel to measure where the customers came from.

Q Okay. But you don't know when it was started?

A No.

Q Okay. Other than Mr. Fruge, do you know anybody else who is associated with PreparewithAlex.com?

A Well, there's the suppliers that are on there. Yeah, they -- they -- they dropship the -- the product.

Q Right. But those -- those are your suppliers, correct?

MR. ATKINSON: Objection to form.

You can answer.

A No, those are -- those are -- those are Tim's suppliers.

Q (By Mr. Mattei) Okay. It's your testimony that Mr. Fruge, upon starting these websites, went out and independently got suppliers to sell food on those websites?

A Yeah, that's where he went to work --

MR. ATKINSON: Objection to form.

A -- and that's where he quit his job and went to work, yeah.

Q (By Mr. Mattei) They're also your -- you sell storable food on Infowarsstore.com, correct?

A Not anymore.

Q All of the storable food that you previously sold is now being sold on those websites?

A Yes.

MR. ATKINSON: Objection to form.

You can answer.

Q (By Mr. Mattei) And when did you make that decision?

A Several years ago we decided to try to just

completely do it through a third party, so there would be better customer service and things. And then we recently went back to not selling storable food on Infowars.

Q Yeah. So when did you recently decide not to sell storable food on Infowars?

A A few months ago.

Q And why did you do that?

A Because we lost our credit with the company, because we don't have the money to buy the food anymore ourselves.

Q So who's -- who's purchasing the food now?

MR. ATKINSON: Objection to form.

You can answer.

A It's a pure affiliate agreement now.

Q (By Mr. Mattei) What percentage of sales occurring on PreparewithAlex.com do you get?

A It varies from product to product. I don't have it in front of me, but it could be as low as 20 percent, as high as 50 percent.

Q And that's all part of the affiliate agreement?

A And it's paid to Infowars, yes -- or Free Speech.

Q So your testimony is that any proceeds from

Page 835

sales occurring over Freeworldoutlet.com, PreparewithAlex.com and Preparetoday.com are routed to Free Speech Systems?

MR. ATKINSON: Objection to form. You can answer.

A Can you say that again?

Q (By Mr. Mattei) Sure. I understand that Free Speech Systems gets a percentage of all sales occurring over those three websites I just mentioned --

A Yes.

Q -- am I correct about that?

A Yes.

Q Okay. And so whatever percentage of those sales, Free Speech Systems gets, those proceeds are routed into Free Speech Systems' accounts, correct?

A Yes.

Q Has Free Speech Systems ever invested any money in those three websites I've mentioned or any of the companies that control them?

MR. ATKINSON: Objection to form. You can answer.

A Say that again?

Q (By Mr. Mattei) Has Free Speech Systems ever invested any money in those three websites I just mentioned or any of the companies that control them?

Page 836

MR. ATKINSON: Same objection.

A I don't believe so.

Q (By Mr. Mattei) Have you personally invested any money in any of those three websites I just mentioned --

MR. ATKINSON: The same.

Q (By Mr. Mattei) -- or any of the companies that control them?

MR. ATKINSON: Same objection.

A I mean, not technically. I mean, you could -- you could say, like -- like, we fulfill most of the stuff off of Freeworldoutlet, but it's not -- the sales aren't very -- it's very small. And so you could say by agreeing to do that it's an investment to take that customer on, but there's not any investment of money by me into that.

Q (By Mr. Mattei) Okay. So what you were just referring to there is, if you have a product in your inventory that is purchased over one of these three websites, you will fulfill that order, correct?

A Yeah, they will pay us the money and then we'll fulfill the order and they get -- and they get their percent and then we get our percent. That's -- that's us -- like an affiliate agreement where it's going through us and then there's the other affiliate

Page 837

agreement where it's food, where somebody else is running that, and then they -- that -- that -- those separate companies fulfill it and then pay the money into Tim. Tim gets a percentage. And then we get a percentage.

Q Okay. So is it -- is it your understanding that the products that are sold on those three websites, some of those transactions are fulfilled by you, correct?

A Freeworldoutlet is, yeah.

Q Okay. So let's just stick with Freeworldoutlet for a minute. Every product sold over the Freeworldoutlet platform is fulfilled by you, correct?

MR. ATKINSON: Objection to form. You can answer.

A I'm not sure about that. No, because Tim has his own stuff he's selling, so no, I'm not -- I'm not -- I can't answer that.

Q (By Mr. Mattei) Okay. You believe --

A He -- he runs that. See, we don't deal with that.

Q Well, but you just testified that for Freeworldoutlet.com --

A They sell some of our products and then we

Page 838

fulfill them, yes.

Q Okay. They sell some of your products and fulfill them. And when you say you fulfill them, you're referring to PQPR Holding, LLC, correct?

MR. ATKINSON: Objection to form.

A I'd have to look at -- I would have to look at --

MR. ATKINSON: Hang on a second, Alex. I'm going to advise you not to answer any questions involving PQPR. And I'm going to put on the record that it is our understanding that the plaintiffs have joined a fraudulent transfer action in Texas last week. Having Mr. Jones answer questions pertaining to the companies in that action, which includes PQPR, without the Texas counsel defending that action being present, would be prejudicial to Mr. Jones. And as such, we're not going to -- we're -- I'm advising you not to answer questions as they pertain to PQPR.

Q (By Mr. Mattei) Mr. Jones, let me just confirm, your counsel has advised you not to answer any questions relating to PQPR Holdings, LLC. Do you intend to decline to answer any questions I ask you on that subject?

A Yes.

MR. MATTEI: And, Attorney Atkinson,

the basis for that instruction to Mr. Jones is that you believe it would be prejudicial to PQPR Holdings not to have its attorney present?

MR. ATKINSON: No, to Mr. Jones, that the lawyer defending him in the Texas action, he would be in the best position to advise him as to his interest in defending that action, is not present. We've had no notice in terms of Mr. Jones' notice of deposition that this would be on -- this would be part of his deposition.

Additionally, I've allowed plenty of leeway today for you to go outside the scope of Attorney Cerame's direct. My understanding is that you rested -- that you rested your deposition of Mr. Jones the last time we convened. I would also object that this is outside the scope of Mr. Cerame's direct and I stand on that.

MR. MATTEI: Okay. Well, a couple of things, you may want to talk to Attorney Pattis, because I've had multiple conversations with Attorney Pattis that have gone on up to today, in which I advised him that PQPR was going to be a subject of inquiry. No arrangements apparently have been made to have Mr. Jones' Texas counsel present for this deposition, despite that notice.

I will say that Attorney Cerame, although limited in his cross, did inquire about PQPR Holdings. And so questions about PQPR are within the scope.

I would also indicate that there are other defendants in the TUFTA action that I have asked about today that have not been objected to by you. So this appears to be a selective objection solely with respect to PQPR, not, for example, with respect to the other defendants in the TUFTA action.

So I think what we have to do, because this is going to be a significant issue, is either get Judge Bellis on the phone right now, because this, I think, is an improper instruction to your client under the Connecticut Rules, and -- and see if we can get a ruling.

MR. ATKINSON: I'm -- I'm happy to get her on the phone.

MR. MATTEI: Okay. I'll ask my -- my staff to contact Attorney Ferraro, copying all attorneys.

MR. ATKINSON: Thank you.

MR. MATTEI: And in the meantime, I will move on from PQPR.

Q (By Mr. Mattei) All right.

THE WITNESS: Can we take a break? How long is this going to go? Because I believe it was two hours maximum and I have been here an hour and 50 minutes.

MR. ATKINSON: Do you need a break, Mr. Jones?

THE WITNESS: No, I don't really need a break. I've just got something -- I mean, I've already sat two days in Connecticut and I'm sitting here again. I mean, I've heard this is not heard of everywhere else, you know, like, in two years. It's like a prison sentence or --

MR. ATKINSON: Well, hold on, we can -- we can discuss that off the record, if you wish. I'd advise you not to get into that on the record.

THE WITNESS: Okay.

Q (By Mr. Mattei) All right.

THE WITNESS: Well, let me just do this, let me give you a call and I'm going to ask you about this, because -- let's take a break, if we can, while they talk to the Judge or whatever. Does that work for you, Mattei?

MR. MATTEI: Five minutes. We can take five minutes, yeah.

MR. ATKINSON: Sounds good.

THE VIDEOGRAPHER: We are off the record at 11:00 o'clock. End of Media 2.

(A recess was taken from 11:00 to 11:08.)

THE VIDEOGRAPHER: We are on the record at 11:08. Start of Media 3.

Q (By Mr. Mattei) Mr. Jones, does -- everybody ready, we're good?

MR. ATKINSON: Yes.

Q (By Mr. Mattei) Mr. Jones, does Free Speech Systems pay for the use of the Infowars.com website?
A I don't know. I don't think so.
Q Okay. Does Free Speech Systems license in any way the Infowars.com website?
A I don't know.
Q What?
A I don't know.
Q Does Free Speech Systems license any Infowars branding property?
A I don't know.
Q Prior to -- when did you first set up cryptocurrency donation pages linked to Infowars.com?
A I don't remember the exact time.
Q Does about April of 2021 sound right?
A It sounds right.
Q Prior to accepting cryptocurrency donations on

Page 843

Infowars.com, did you have any personal cryptocurrency holdings?
A No.
Q Okay. Who set up the cryptocurrency donation pages?
MR. ATKINSON: Objection to form. You can answer.
A I instructed IT to create a -- a donation page.
Q (By Mr. Mattei) Why did you do that?
A To get donations.
Q You previously expressed public skepticism of cryptocurrency as an asset, correct?
A I mean, we've -- we've looked at all sides of it. I've been supportive of some of it, not supportive of some of them. I think some of them are legitimate and I think some aren't. And I've been learning about it over the last 12 years since it developed as a phenomenon.
Q Okay. Do you pay --
A That's technology.
Q Do you pay any employees in cryptocurrency?
A No.
Q What -- do you know what exchange you use to exchange cryptocurrency for actual currency?

Page 844

A I'm not -- I really don't understand a lot of it, but I think we use a -- Coinbase.
Q How many cryptocurrency wallets are currently linked to the Infowars.com donation page?
A I don't -- I don't know the specifics. They're all linked right there. It's all public.
Q Okay. Who manages that for you?
A The IT department.
Q Okay. Which is who?
A I mean, right now, it's -- it's basically myself and Zimmerman. He's a consultant. I don't really understand it. But I'm the person that manages it because I'm -- I mean, I've told them to set it up and -- that --
Q Okay. So you have access to those crypto wallets, correct, personal access?
A Yes.
Q And so does Zimmerman, correct?
A Yes.
Q Anybody else?
A I don't know the specifics of the technicals, but it's like three people -- or you have to put like three codes in. I've only messed with it a few times. It's -- all of the transactions are public, that's what the blockchain does, I know that. So it's all right

Page 845

there.
Q The transactions are public, but who is authorized to execute the transactions are limited to people who have access to the wallets, correct?
A Yeah, so I have to -- I mean, I go in and I do it.
Q Okay. So you personally execute the transactions within each of those wallets linked to the Infowars.com page, correct?
A I mean, I -- I mean, I go in there and then they explain it to me and I do it, yeah.
Q Okay. And you're in charge as to when to withdraw any cryptocurrency from those wallets, correct?
A Yes.
Q Okay. Nobody else has authority to dispose of the cryptocurrency assets in any of those wallets, correct?
A No.
Q Beginning of -- on April 23rd of this year, one of the wallets linked -- one of the cryptocurrency wallets linked to Infowars.com started receiving large donations of cryptocurrency from a single source, correct?
A Yes -- well, there were other donations,

Page 846

too.
Q I'm sorry?
A Can you ask your question again?
Q Sure. Well, I think you've answered it. I was asking what you said.
MR. ATKINSON: Would it be helpful for the court reporter to read it back, Chris?
MR. MATTEI: No, no, I think I have the answer. I'm just -- oh, yeah, I'd be happy to have her read back his answer. Yes. Thank you.
THE WITNESS: I don't need them to do that. The point is he said a single source. We got -- there was quite a few of Bitcoin donations.
THE COURT REPORTER: Do you want me to read it back?
MR. MATTEI: Yeah, thank you.
(Requested portion was read back.)
Q (By Mr. Mattei) So you know that I'm referring to the single donor who donated over a million dollars in Bitcoin on April 23rd, correct?
A Yes.
Q Okay. And then there was another donation of just over a million dollars on April 30th from the same donor, correct?
A Yes.

Q And there was another donation on May 19th of about $5.9 million worth of Bitcoin from that same donor, correct?
A We believe it's the same donor. We don't know.
Q Okay. Well, according to the identifying data on the donor's wallet, it's the same wallet, correct?
A I believe so. I don't have it in front of me.
Q And your testimony is that you don't know the identity of the individual responsible for those donations?
A I do not.
Q Okay. Do you know anybody who does?
A No.
Q Have you had any communication with anybody representing themselves to be the donor?
A No.
Q And you cashed out about half of the Bitcoin donated by that individual, correct?
A Yes.
Q And you did that personally, correct?
A Yes.
Q And where did those --
A I don't have it in front of me, but it's more than half.

Q And what did you do with those proceeds once you converted it to actual currency?
A I put it into a personal bank account of mine and then I've transferred most of it to -- and am still transferring it to Free Speech Systems as a capital injection.
Q And so you -- you said you have transferred and you are continuing to transfer those proceeds into Free Speech Systems as a capital investment in Free Speech Systems?
A I don't know the technical term for it, but I am -- I intend to -- to -- to spend it -- to continue Free Speech's mission of promoting freedom and populism, because that's what I have seen the donations give as. I don't know that -- I don't know why it was given, but we were -- we've been asking for donations to keep the company going. So it's my intent to use the lion share of it to continue the operation.
Q And you have not yet done that, correct?
A No, I -- I've begun to do it. I -- it -- it's -- most of it is being transferred -- has been transferred already into there.
Q Okay. Well, let's just be clear, okay? Of the money that you cashed out and directed to your personal bank account, how much have you transferred into Free Speech Systems?

A I don't have the exact accounting in front of me, but an example is, some has gone directly into Free Speech Systems, other has gone directly into legal bills, but the things, generally, you know, dealing with the operation of the company.
Q Well, you testified that you took a little bit more than half, right? So you would say over --
A I think it's a lot -- I don't have the numbers in front of me, but it's -- in fact, I was going to go today after this and try to do the accounting on that specifics, because I want to know that. Unfortunately, we didn't transfer all of it out of Bitcoin. And Bitcoin has crashed, so that's not good.
Q All right. So you transferred about $4 million out from the crypto wallet to your personal account after these donations were received, correct?
A I don't have the numbers in front of me, but I think it's more than that.
Q Okay. Is it -- is it more than 5 million?
A It had already gone down so --
MR. ATKINSON: Objection to form. You can answer.
A I don't have the specifics.

Q (By Mr. Mattei) Okay. You're -- and I'm not holding you to a precise amount here, Mr. Jones, but your testimony is that you believe that following the May 19th donation from what appears to be a single crypto donor, you executed a transaction withdrawing between 4 and $5 million from that wallet to your personal bank account, correct?
A Yes.
Q Okay. And now I'm asking you, how much of that 4 to $5 million, roughly, have you transferred into Free Speech Systems?
A I don't have the numbers in front of me.
Q So the answer is you don't know?
A Well, do I have your permission to go speculate here, like it won't be 100 percent. I don't have the exact numbers here in front of me.
Q I'm just trying to get a sense of, to the extent that you have a reasonable basis to estimate, that's fine. I don't want you to just pull a number out of thin air and you have no idea. If you have a reasonable basis to estimate how much you have reinvested in Free Speech Systems, please give that answer.
A Well, I don't know about the term reinvested. It's just a capital, you know, injection to the

company. It's -- it's -- some company bills have been directly out of my bank account, my private bank account, just for expediency. Instead of just transferring it into Free Speech Systems and having that, but more than 2 million has been transferred into Free Speech Systems and paid out for back bills. And then others has gone to legal bills. And then other has gone to buy product so that we have product to sell.

And it's my intent to do that with basically all of the funds. I may keep some to reimburse myself for past -- because I'm paid privately, but my intent is to currently spend about 90 percent of it in -- into keeping Free Speech afloat and -- and --

Q As it stands right now, I understand your testimony to be that as of today you estimate that about 2 million of the cryptocurrency proceeds that you cashed out, you have injected into Free Speech Systems, correct?

A No. If memory serves, over 2 million directly into Free Speech Systems. And then I've been paying other substantive bills for Free Speech Systems directly out of my private account.

Q I'm -- I'm leaving out the bills for a minute.

I'm just talking about direct transfer of money from your personal account to Free Speech Systems comprised of the cryptocurrency proceeds, that your testimony is that that amounts to approximately $2 million, correct?

A I think it's approaching 3 million.

Q Okay. Fair enough. And then you claim that you also used cash within your personal account, since May of this year, to pay Free Speech Systems' bills; is that right?

A Yeah, we paid a $344,000 bill for the bankruptcy yesterday out of it, out of my personal account, that's an example.

Q Okay. A $344,000 bill for the bankruptcy associated with what?

A I mean, I just do my show and you guys -- just a big, long war you got going on, so...

Q Okay. Well, you just -- you just testified that you paid $344,000 yesterday. What did you think you were paying for?

A Paying for things associated with the bankruptcy.

Q Who was the payee?

A It was a -- it was a long list. It was a long bill.

Q Okay.

A I'm sure they'll give it to you, they give you everything else, you can put it on TV and say anything. I'm surprised you guys haven't gotten stool samples. It's ridiculous.

Q Other than the $344,000 payment you claim to have made yesterday associated with the bankruptcy, have you made any other payments from your personal account since May of this year on behalf of Free Speech Systems?

A I believe so. Like I told you, I don't have it in front of me.

Q Prior to -- are you familiar with a company called Swan Bitcoin?

A Yes.

Q What is Swan Bitcoin?

A It's like a Bitcoin processing wallet or -- I don't know how to describe it. It's one of the more reputable Bitcoin exchange systems.

Q Okay. And you have promoted, on your show, Swan Bitcoin to your audience, correct?

A Yes.

Q And you get a percentage of the revenue to Swan Bitcoin of any new sign-ups, correct?

A It's an affiliate program. Of any new

sign-ups that we -- that we sent -- that we sent.

Q Right. So you -- you promote Swan Bitcoin on your show, if people sign up with Swan Bitcoin who are audience members of yours, you get a cut of that sign-up fee, correct?

A Yeah, I think it's like a percent, one percent or less or something, I forget.

Q And do you disclose to your audience that you profit from them signing up when you've promoted Swan Bitcoin?

A Yeah, that's the whole point of it. It's like Swanbitcoin.com/Alex.

Q So you disclose to your audience that you receive a cut of when they sign up?

A Yeah, we tell them go do it there because it supports us as a sponsor.

Q And who is your contact at Swan Bitcoin?

MR. ATKINSON: Objection to form. You can answer.

A I don't remember. We went and signed up with them. And I actually sat there with them on the phone. It was relatively easy and they created the link.

Q Is that Max Keiser?

A No, Max Keiser is a talk show host that promotes Bitcoin and he -- he got me -- he got me in

touch with the Bitcoin people at Swan.

Q Okay. So Mr. Keiser put you in touch with the people at Swan Bitcoin, correct?

A Yes.

Q And does he also have an affiliate agreement with Swan Bitcoin, do you know?

A I don't know.

Q In 2021, did you withdraw cryptocurrency from the wallets you control?

A I don't remember.

MR. ATKINSON: Objection to form. You can answer.

A I don't remember.

Q (By Mr. Mattei) During the course of this litigation, you sent -- you set up a GiveSendGo website called SaveInfowars.com, correct?

A Yes.

Q How much money has been generated from that website?

MR. ATKINSON: Objection to form. You can answer.

A I don't remember the exact number. It's -- it's on the website. You can see it.

Q (By Mr. Mattei) Is -- SaveInfowars.com is the same website as Infowars2022.com?

A It's not a website. I told you it's a link click funnel that goes to GiveSendGo. It's a redirect link.

Q It's the Save Infowars Legal Defense Fund, correct?

A Yes.

Q And proceeds from those donations are routed to where?

A I've directed the accountant -- it's -- it's directed and put into a ledger spent on legal bills.

Q Is that Robert Roe who you directed to do that?

A Yes.

Q So it's your understanding that a specific ledger within Free Speech Systems' books and records was set up to receive the proceeds of any donations over the GiveSendGo website to be used exclusively for legal bills?

A Yeah.

Q But you don't know how much has been taken in, correct?

A On all of the different Crowdfunding Sites, it shows the amounts. I don't know. It's 380,000, 340. I haven't looked. I don't remember. It was like 340,000 something the last time I looked at it. You

can go look at it right now.

Q Well, I was trying. And what you're describing isn't coming up for me, so that's why I'm asking you these questions, but -- well, I'll represent to you, Mr. Jones, if I go to SaveInfowars.com, it brings me to a SaveInfowarsmoneybomb, the official Save Infowars Money Bomb site, which is separate from the Save Infowars Legal Defense Fund on GiveSendGo.

And so I'm just wondering if you know why that might be?

A I would have to speculate to one of the fundraisers. Somebody in my office decided to redirect that URL at that site, because we weren't promoting the other site anymore.

Q All right.

MR. MATTEI: Counsel, it's my understanding that my office has contacted the Court to get the Judge's intervention on this PQPR issue. We've not yet heard back. So -- but I understand that Attorney Ferraro, the Judge's clerk, is working on setting something up. So I think that, you know, at this point, we will take a break and we will wait to hear from the Court.

Mr. Jones, you're going to have to stay put until we hear back from when the Court is

going to address this today.

MR. ATKINSON: Okay. Did Ron say whether it was going to be telephonic or were we going to have a full-fledged Teams hearing, Chris?

MR. MATTEI: He did not. I don't know the answer to that.

MR. ATKINSON: Okay.

THE WITNESS: I mean, I --

MR. ATKINSON: Alex, let's talk off the record. And, I guess, Chris, you have the floor, do you have any more questions for Mr. Jones at this point?

MR. MATTEI: If I do, they're very few, so normally what I would do right now is just take five minutes to review my notes and come back and finish up.

MR. ATKINSON: Well, let's do that then. And, I guess, if Attorney Cerame has any more questions, he -- we can get them in too and then I would suggest we break for lunch, if possible.

THE WITNESS: I mean, are we talking about me waiting until 5:00 at night to see what the Judge says? Just living here.

MR. MATTEI: We'll take five minutes.

MR. ATKINSON: Let's take five minutes off.

THE VIDEOGRAPHER: We are off the record at 11:33. End of Media 3.

(A recess was taken from 11:33 to 11:39.)

THE VIDEOGRAPHER: We are back on the record at 11:39. Start of Media 4.

MR. MATTEI: Okay. Other than the questions that I've reserved as to PQPR, I don't have any further questions in my redirect. At this time, I've been informed, my office has been informed, that Judge Bellis will conduct a Teams hearing on Mr. Jones' objection at 3:00 o'clock today.

MR. ATKINSON: Okay. I guess, Attorney Cerame, do you have any further questions?

MR. MATTEI: Mario, are you there? You're muted.

MR. ATKINSON: All right. I guess, he's the smarter of us, Chris, he took an early lunch.

THE WITNESS: Does that mean I need to come back here at 2:00 o'clock Central?

MR. ATKINSON: We'll let -- we'll you know, Alex. It depends on what the Judge rules. I'm less -- I'm reluctant to have the discussion without Attorney Cerame here, but it seems to me that

3:00 -- depending on whatever time Judge Bellis takes to resolve the issue, it may be better to come back at another date, but I'm not sure what your thoughts are as to that, Chris, and obviously Mario needs to weigh in on that.

MR. MATTEI: Yeah, I texted Mario to see if he's not too far, but, you know, I -- I would rather wrap up here today. I'm sure everybody would. So I can't -- you know, if you're saying to me that you want to let Mr. Jones go, agree to produce him for the purpose of addressing any questions that the Court permits, you know, it's your call.

MR. ATKINSON: Well, let me ask you this, without holding you to it, assuming that Judge Bellis allows you to go into the PQPR issue, how long would you anticipate being on that?

MR. MATTEI: No more than an hour.

MR. ATKINSON: Okay. Let me confer with Mr. Jones and see what works better for him.

MR. MATTEI: Okay.

THE VIDEOGRAPHER: We are off the record at 11:42.

(A recess was taken from 11:42 to 2:37.)

THE VIDEOGRAPHER: We are on the record at 2:37.

Q (By Mr. Mattei) All right. Mr. Jones, we presented the issue raised by your attorney to the Court. The Court has overruled his objection and instructed that you answer questions concerning PQPR Holdings Limited, LLC, that is the remaining area of question that I'm going to continue on now. Do you understand that?

A Yes.

MR. ATKINSON: I'll confirm that as well, for the record. Mr. Jones, you are to answer, all right?

Q (By Mr. Mattei) The first question that I had asked you about with respect to PQPR was the extent to which it was selling products on Freeworldoutlet.com. And I believe that your -- your testimony is that PQPR does offer products for sale on Freeworldoutlet.com, correct?

A It's a very small test company. I don't really know the specifics. I just trusted Tim with whatever he did. I haven't had a chance to talk to him about it.

Q Okay. My question was whether or not PQPR products are offered for sale on Freeworldoutlet.com?

A Yes.

Q And you have been promoting Freeworldoutlet on

your Infowars.com website program, correct?

A Yes.

Q In fact, over the past number of weeks, Freeworldoutlet advertisement has been the landing page for Infowars.com at various times, correct?

A I -- I don't understand that statement.

Q Okay. You're aware that visitors to Infowars.com will occasionally be greeted with a pop-up ad before being allowed entry to the site?

A Oh, yes.

Q Okay. And you're aware that over the past number of weeks Freeworldoutlet.com has been promoted on that -- at that particular landing page?

A Yeah, I don't call a pop-up a landing page, but now I understand what you're talking about. A landing page is the front page of a website, not a pop-up.

Q Okay. So you would agree with me then that at least over the past number of weeks, the first thing somebody will see when they visit Infowars.com is a pop-up ad for Freeworldoutlet.com?

A No, I do not agree.

Q Okay. If --

A It's sometimes. It's a rotating ad.

Q That's part of the rotating pop-up ads that

Infowars.com has run --
A Yes.
Q -- over the past number of weeks, correct?
A Yes.
Q Are any PQPR products offered for sale on PreparewithAlex or Preparetoday.com?
A No.
Q Who owns the storable food that are offered for sale on those websites?
MR. ATKINSON: Objection to form. You can answer.
A Who owns the food?
Q (By Mr. Mattei) Right.
A Do you mean -- do you mean who is the manufacturer, who is distributor?
Q No. Who is the retailer?
A Tim Fruge.
Q Okay. And you get a cut of any sale proceeds from those sales?
A Yes.
Q When was PQPR Holdings Limited, LLC formed?
A I don't remember.
Q Why was it formed?
MR. ATKINSON: Objection to form. You can answer.

A It was set up because we talked to a supplement -- former FDA lawyers, about the best way to structure a system. And I was bringing my dad in and wanted to set him up a supplement business, because he had been involved in some of that before. I think it's like 10 years ago, I'm guessing the date, 10 or 9 years. I don't remember the exact date.
And -- and so it's -- just like each new venture you generally -- when you're working with people and have a new company. And so for liability protection issues, you know, it's good to have a -- a separate company that then does all of the compliance, buys the products, does all of that. So that's what was set up for.
Q (By Mr. Mattei) Had you been involved in the business of direct sales of supplements prior to forming PQPR?
MR. ATKINSON: Objection to form. You can answer.
A Yes.
Q (By Mr. Mattei) Through what entity?
A We -- we bought in bulk some other people's products and sold them through Free Speech Systems.
Q Free Speech Systems did that?
A Uh-huh.

Q And then eventually you set up PQPR to fill that role, correct?
MR. ATKINSON: Objection to form. You can answer.
A My dad set up PQPR to do that and then worked with me at Free Speech Systems, yes.
Q (By Mr. Mattei) Okay. When you say your dad set it up, you through your ownership interest in PLJR Holdings, LLC, have a -- had at the time it was formed, a majority ownership in PQPR Holdings, correct?
MR. ATKINSON: Objection to form. You can answer.
A I don't remember the specifics.
Q (By Mr. Mattei) Is there any doubt in your mind that throughout the entire existence of PQPR, you, Alex Jones, have had a majority ownership interest, either directly or indirectly?
MR. ATKINSON: Objection to form. You can answer.
A I know that in some structure of the company, I'm -- I've -- I've got a controlling interest, but I'm not -- I mean, to answer your question, I guess so, yes.
Q (By Mr. Mattei) I'm not sure you answered that the way you intended to, Mr. Jones. So let me ask

it again.
You'd agree with me that since PQPR's formation, you, either directly or indirectly, have had a controlling majority ownership stake, correct?
MR. ATKINSON: Objection to form. You can answer.
A Yes.
Q (By Mr. Mattei) Do you recall, Mr. Jones, in connection with your divorce from Kelly Jones that you had a valuation conducted of Free Speech Systems and PQPR?
MR. ATKINSON: Objection to form. You can answer.
A I do.
Q (By Mr. Mattei) And that valuation was conducted for use in connection with your divorce, correct?
A Yes.
Q Do you know if that valuation was presented to the court presiding over your divorce?
A I think it was.
Q Okay. Mr. Jones, I'm going to show you what we've marked as Exhibit 185. And showing you Page 1. Do you have before you the valuation that was conducted

by UHY Advisors in connection with your divorce?
A Yes.
Q Going to Page 13 of that document. It indicates that PQPR Holdings Limited, LLC was founded by you in 2013, correct?
A Yes.
Q And you provided the initial funding for PQPR using your own assets and those of Free Speech Systems, correct?
A I need to read the whole thing here. I don't see that.
Q Do you see in the second sentence, The business began operations in September 2013 with significant operational and financial support from Mr. Alex Jones and Free Speech Systems. Do you see that?
A Uh-huh.
Q Is that accurate?
A Yes.
Q And do you see, according to this valuation, PLJR Holdings, LLC had an 80 percent membership interest in PQPR, correct?
A Yes.
Q And that you are the 90 percent membership interest owner in PLJR, correct?

A Uh-huh. Yes.
Q Yes? At some point did that ownership structure of PQPR change?
A I don't remember. I didn't keep track of it. Can you show me a document?
Q As you sit here right now, you have no recollection of whether PLJR Holdings, LLC, which you're a 90 percent owner, continues to own the majority of PQPR?
MR. ATKINSON: Objection to form. You can answer.
A No, I haven't looked at the documents.
Q (By Mr. Mattei) No, I know you haven't looked at the documents. I'm just asking you whether you know based on your own personal knowledge of what you own?
A No, the company just buys the products. It's not -- it's not a big profit center. I don't pay attention to it.
Q What's not a big profit center now?
A I mean, the majority of the money gets spent running the operations at Free Speech Systems and advertising and stuff. I'm saying I've not looked at it. I've not looked at that document. I don't think I even looked at that document back during the divorce you just showed me.

Q Did you just say that PQPR is not a big profit center for you?
A No, what's left in it isn't. I don't -- I don't -- put it to you this way. That's probably the first time I ever looked at that document you showed me. When I walk out of here today, I'm going to be happy as a little blue bird flying around, not thinking about any of this.
Q So what did you mean when you said that PQPR is not a big profit center for you?
MR. ATKINSON: Objection to form. You can answer.
A Honestly, the supplements are the majority of the money we make, but as for what's going on over there and you guys' theories on all of this stuff that there's all this extra money, that's just not true.
Q (By Mr. Mattei) Okay. And how do -- how do you know that?
A You guys have been all over the news saying that, that you've joined the lawsuit in Texas.
Q How do you know -- how do you know that -- I think you just testified that the majority of the money you make comes through the sales of supplements, right?
A Yeah.

Q Okay. But you also said that it's not a very big profit center, so I'm just asking you what your basis is for that testimony?
MR. ATKINSON: Objection to form. You can answer.
A Because the majority of the money gets paid back to Infowars for advertising and all of the rest of that -- of the profit.
Q (By Mr. Mattei) Okay. So your testimony is that the majority of money that PQPR makes from the sale of supplements, it then reverts back to Free Speech Systems to pay for advertising, correct?
A Yeah --
MR. ATKINSON: Objection to form. You can answer.
Q (By Mr. Mattei) Is that correct?
A Well, here's the thing. I shouldn't even speculate or try to be helpful. It doesn't matter. Just make up whatever you want. Just keep going.
Q (By Mr. Mattei) Mr. Jones, you're the owner of Free Speech Systems, correct?
A Yes.
Q Okay. You just testified that the profits made by PQPR are sent back to Free Speech Systems to pay for advertising; did you not?

Page 871

A A large portion of it. I don't have it in front of me, so I can't speak to it.
Q Okay. So a large portion is sent back in the form of advertising?
A Uh-huh.
Q Okay. Are you familiar with an entity called AEJ Holdings?
MR. ATKINSON: Objection to form. You can answer.
A I mean, I -- I don't pay attention to all of that, the business details. I've heard of it. I don't know what it does.
Q (By Mr. Mattei) You don't know whether you own it?
A I'm sure you've got -- can you show me the documents?
Q No, I'm asking you a question --
A I don't remember.
Q -- do you know?
A Show me the documents.
Q I want to know what you know, Mr. Jones, okay?
A I don't -- I don't know -- I don't know what it does.
Q I didn't ask you what it does. I asked you

Page 872

whether you are aware if you're an owner or not. Are you?
A I don't know.
Q Okay. Are you familiar with an entity called AEJ Trust 2018?
A I've heard of it, and I'm not sure what it does.
Q Are you aware of whether your children have any interest in the AEJ Trust 2018?
A I don't.
Q Okay. Do you derive -- since 2018. Let me ask it this way.
Since 2018, have you derived any personal income as a result of any ownership interest you have, either directly or indirectly in PQPR?
A I think I have -- I think I've been paid money. I don't remember. I don't have it in front of me.
Q Who would be in the best position to answer questions about your interest in PQPR?
A Today, sitting here, I'm not sure who would be the best.
Q Okay. Well, you must have some idea of who would be more knowledge about it than you, correct?
A Yeah, maybe one of the lawyers that set it

Page 873

up.
Q Well, it was set back -- it was set up in 2013, right?
A I don't remember all of this, that's what I'm telling you, so...
Q Yeah. So I mean, you obviously, Mr. Jones, are aware of people in your life who you have gotten involved in your business to assist you, correct?
A Sure.
Q Okay. So who, among those people, do you believe would be most knowledgeable of your interest in PQPR?
A I think it would be the lawyers that set up the stuff, because I haven't paid attention to it since then.
Q Are you aware of whether PQPR is owed any money?
MR. ATKINSON: Objection to form. You can answer.
A Yeah, it is -- it is my dad's position that it's owed money, uh-huh.
Q (By Mr. Mattei) How do you know that it's your father's position that PQPR is owed money?
A Because that's what he argues.
Q So he's told you that?

Page 874

A Yep.
Q Who does he say owes PQPR money?
A Free Speech Systems.
Q Do you agree with that?
MR. ATKINSON: Objection to form. You can answer.
A I mean, yes, according to the agreement, he was supposed to get a bigger percent, but Infowars and Free Speech Systems has needed the vast majority of it to keep operating it, so I've -- I've tried to renegotiate it and he hasn't renegotiated with me, so -- but -- so that's -- that's currently the agreement we have that he's owed money. And so...
Q (By Mr. Mattei) Is there a written agreement that you're aware of setting up the relationship between Free Speech Systems and PQPR?
A I believe there is.
Q And you expect that that's an agreement you would have signed at least on behalf of Free Speech Systems, correct?
A I would imagine so.
MR. ATKINSON: Objection to form. You can answer.
Q (By Mr. Mattei) I think your answer was you would imagine so?

A Yeah.
Q Where would that agreement be located?
A I don't know. I would have to ask my dad or somebody -- my lawyers.
Q Has your father ever informed you that there were efforts to subpoena him in connection with this case?
MR. ATKINSON: Objection to form. You can answer.
A I think he did, because he travels quite a bit and he actually lives in east Texas most of the time on our ranch. He -- he did tell me about that a few months ago.
Q (By Mr. Mattei) Okay. And did he tell you that he's attempting to evade service of the subpoena?
MR. ATKINSON: Objection to form. You can answer.
A No, he didn't tell me that.
Q (By Mr. Mattei) Where -- where in east Texas is that ranch?
A It -- I'd say it's closest to like Buffalo, Texas. I don't have the address, but it's -- it's in east Texas.
Q Do you own any part of that ranch?

A No, I don't.
Q That's your father's?
A Yeah, it's a couple hundred years old, so it might -- it'll predate your lawsuit.
Q And you said that's out near Buffalo?
A Uh-huh.
Q How much money does your father claim Free Speech Systems owes PQPR?
MR. ATKINSON: Objection to form. You can answer.
A I -- it's $20-plus million the last time I saw it.
Q (By Mr. Mattei) And do you know what he believes comprises that debt?
MR. ATKINSON: Objection to form. You can answer.
A I don't know what comprises the debt means.
Q (By Mr. Mattei) What does Free Speech Systems owe PQPR money for, according to him?
A I -- I think the percentage is close together. I mean, all I know is there's not enough money to pay for it. Certainly hadn't been lately, the last four years or so.
Q Okay. Is it -- is it Free Speech Systems' position that it doesn't owe money to PQPR currently?

MR. ATKINSON: Objection to form. You can answer.
A No, I mean, I don't -- I mean, I agree that that's the deal. I'm not happy about it, but we had an agreement.
Q (By Mr. Mattei) And I guess what I'm trying to understand is, what is -- what is your understanding of that agreement, that is, what is it that Free Speech Systems was obliged to pay PQPR for under that agreement?
A The percentages of what -- the percentage of -- the percentage of profit tacked onto what the product cost is -- is the main thing. I mean, because the last four years of litigation, we've been, like, at a stalemate. And basically, all of the money that comes in that's extra is spent on this. Then -- then that's basically -- there's not, you know, extra money to -- to fulfill the contract.
Q I see. So -- so that debt started accruing around 2018 when --
A You know what, I think there was some there before, but it was accelerating, yeah, which I understand the point of this lawsuit is to shut down Free Speech and bankrupt us, but the point is, there's no pot of gold at end of the rainbow here with you

guys, I guess until the Judge makes the orders or whatever.
Q I just want to make sure I understand it. Your testimony is that while Free Speech Systems might have owed some money to PQPR prior to 2018, the large majority of what Mr. David Jones claims it is owed accrued after the filing of this lawsuit?
A That's my best understanding. I don't have the numbers in front of me. I just know we've had more trouble in the last four years, you know, under the burden of -- of this. So that was really what my statement is.
Q And I understand from your testimony that you believe what Free Speech Systems -- strike that.
I understand from your testimony that you believe that David Jones is claiming that under PQPR's agreement with Free Speech Systems, Free Speech Systems was supposed to send a percentage of sale proceeds to PQPR?
A Yeah, I forget the exact agreement. You'd have to -- I forget the exact agreement. The point is is it's not being paid under what the agreement is.
Q Right. And I'm just trying to figure out what's not being paid. I take it that you -- it's a percentage of the sale proceeds that PQPR claims it was

owed --

A I don't know. It's something -- I don't remember. In fact, I shouldn't even -- I'm just trying to be helpful, but I just don't remember.

Q Has Free Speech Systems always charged PQPR to advertise on its platforms?

MR. ATKINSON: Objection to form. You can answer.

A Yes, as far as I can remember.

Q (By Mr. Mattei) And has Free Speech Systems always required PQPR to pay for other services that Free Speech Systems provides, including personnel?

MR. ATKINSON: Objection to form. You can answer.

A I don't remember.

Q (By Mr. Mattei) Does Free Speech Systems require and has it -- strike that.

Has Free Speech Systems always required PQPR to pay for fulfillment services?

MR. ATKINSON: Objection to form. You can answer.

A I -- I don't -- I don't know the particulars what you're talking about.

Q (By Mr. Mattei) It sounds like David Jones, as far as you're concerned, would be the person most

knowledgeable to testify about the relationship between PQPR and Financial -- Free Speech Systems?

MR. ATKINSON: Objection to form. You can answer.

A No, I think it would be the lawyers that set up the agreement, because they could explain how it works for you better.

Q (By Mr. Mattei) Well, you signed the agreement, didn't you?

MR. ATKINSON: Objection to form. You can answer.

A Can you show me a copy of it? I -- I'm just --

Q (By Mr. Mattei) You know what, Mr. Jones, we asked for it. And it hasn't been provided.

MR. ATKINSON: Hang on. Hang on a second, Chris, that's abusiveness to the witness. It's argumentative. Ask the question, please.

Q (By Mr. Mattei) Mr. Jones, you -- I asked you during the first deposition we had here in Connecticut about a notice of deposition requiring you to produce certain records in connection with your deposition. And I will ask you about that here in a minute.

MR. ATKINSON: While you're pulling that up, Chris, can we take a quick break?

MR. MATTEI: Actually, I just have a couple more minutes, Cameron, if we can just --

MR. ATKINSON: Go ahead.

MR. MATTEI: You got -- what's that?

MR. ATKINSON: I said go ahead, did we freeze?

MR. MATTEI: Okay.

(Exhibit No. 179 was marked.)

Q (By Mr. Mattei) We renoticed -- this is going to be whatever the next exhibit in sequence is. Okay. You have a notice of continued deposition directing your appearance for today, correct?

A Yes.

Q All right. And I will represent to you that this includes a Schedule A, Request for Documents that was included in the original notice of deposition as well. And I'm going to direct your attention to Request No. 6, Any and all contracts, memoranda of understanding, agreements, certificates of debt and/or notes concerning the relationship between any of the following: Free Speech Systems, LLC and PQPR Holdings Limited, LLC. Do you see that?

A Yes.

Q And I'll represent to you that your lawyers objected to producing any documents in response to that

request, which the Court overruled.

Did you produce any documents described in that request relating to the relationship between Free Speech Systems and PQPR?

A Didn't the Court just overrule it like 30 minutes ago?

Q No, the Court overruled it like months ago.

A Well -- yeah, I wasn't really told anything about any of this, so -- I mean, you guys already got a default on a claim that we never gave you any documents, so we could give you every ounce of blood in my body and you'd say you weren't given anything.

Q Do you have any reason to believe that we were given a copy of the agreement you've been describing?

MR. ATKINSON: Objection to form. You can answer.

A You know, like I said, that was over 10 years ago. I mean, you're sitting here asking me about all of this stuff, so -- I mean, I just don't know what to say. I thought I was here about Genesis Communications today. And -- and you say you were done like a few months ago in your office. There was one hour left for Mario. I wanted to finish it that day, but I guess that isn't what this was. I'm not a lawyer, so you -- you got me, man. I'm not as slick as folks up there in

Connecticut.

Q (By Mr. Mattei) Mr. Jones, I asked you whether you have any reason to believe that a copy of the agreement you've been describing between Free Speech Systems and PQPR was produced in this case?

MR. ATKINSON: Objection to form.

A I don't know.

MR. ATKINSON: You can answer.

A I don't know.

Q (By Mr. Mattei) I think in responding to that question you said that it was 10 years old. Is it your testimony that the agreement goes back to about 10 years?

A Man, I don't even know -- listen, I don't know what you're talking about. And it just gets weirder and weirder. So, I mean, I've answered your questions the best I can. You're sitting there asking me about a bunch of stuff I didn't know I was going to be asked about. I learned yesterday you were going to ask me about PQPR and stuff. I've been straight up about what that is. You guys are going to be very upset when you find out there's almost no money in there.

Q Mr. Jones, the question --

A I was in accounting meetings today trying to buy future supplements and the money's not even there

to do it, so...

MR. ATKINSON: Attorney Mattei, if I can, to assist you, Mr. Jones, please answer the question as it's directed.

A This is it. I don't know all of this stuff. All of these documents and all of this stuff. So the answer is I don't know. And I try to help him out --

Q (By Mr. Mattei) Mr. Jones, what is actually happening is you offer some sort of throw-away comment which I then ask you about, and then you claim to be confused.

MR. ATKINSON: And, Chris -- Chris, stop. Chris, stop. That is not out of line. Now you're arguing with the witness.

MR. MATTEI: No, I'm trying to --

MR. ATKINSON: Ask him a question directly and I will instruct him to answer it.

Q (By Mr. Mattei) Mr. Jones, you offered in one of your prior responses that the agreement between Free Speech Systems and PQPR goes back 10 years as a way of explaining why you lack knowledge about it.

And so now, all I'm trying to get you to do is confirm that what you were saying there is that the agreement governing the relationship between Free Speech Systems and PQPR, which you've testified

about, goes back 10 years?

A I believe it does, yeah.

Q Other than you, who within Free Speech Systems, is most knowledgeable about its relationship with PQPR?

MR. ATKINSON: Objection to form. You can answer.

A I mean, Free Speech Systems is -- buys the product from them. We got the percentages and stuff we pay, and that's what goes on and it pays advertising. So I would have to say the agreements or the lawyers that set it up would be the best people to talk to about that, because, again, like I said, you showed me that divorce document, I never even read that -- I mean, I read it today.

Q (By Mr. Mattei) But I'm asking about current employees of Free Speech Systems, who, other than you, would be knowledgeable about the relationship between Free Speech Systems and PQPR?

A I mean, you've got the books of Free Speech Systems. You know what's paid in and you know what's paid back. You know all of that. So, I don't -- I mean, there is nobody else.

Q Okay. So your testimony is that of all of the current employees at -- Free Speech Systems current

employees, you are the most knowledgeable concerning the relationship between Free Speech Systems and PQPR?

A Well, Bob Roe is a consultant and I think he's tried to testify. He could answer questions a lot better than me. He actually knows all of this stuff.

Q Okay. But I just -- I'm going to get to Roe.

Of Free Speech Systems' current employees, your testimony is that you are the most knowledgeable person to testify concerning the relationship between Free Speech Systems and PQPR, correct?

A Yeah, because none of them even know anything. They just run the radio and TV show. And then accounting just, under the agreement, pays -- pays PQPR.

Q And in terms of outside consultants, and let me include in this group the following, okay, David Jones, Tim Fruge, Robert Dew, Lydia Hernandez, who of those four would be most knowledgeable about the relationship between PQPR and Free Speech Systems?

MR. ATKINSON: Objection to form. You can answer.

A I would say David Jones and Lydia Hernandez, just because they can just confirm that the money was

transferred. But the real guy would be Bob --
Q (By Mr. Mattei) You also --
A Huh?
Q You also mentioned this guy Bob Roe?
A Uh-huh.
Q Okay. He's an outside CPA that you've used?
A Yeah.
Q What's his current role for either Free Speech Systems or PQPR?
A I mean, he's a consultant, just -- just coming in trying to, you know, respond to all of the stuff. We also had him in there just overlooking kind of what the other CPA's advice was and things like that.
Q Okay. Does he have any current responsibilities that he's consulting on?
A Yeah, he's a consultant, as I said.
Q All right. What's he working on?
A He's working on the books and trying to, you know, put more high-tech practices in.
Q Okay. How often do you interact with him?
A Once a week.
Q And you said you believe he's been trying to testify?
MR. ATKINSON: Objection to form. You can answer.

A Well, that would just be in my opinion, he told me, I remember -- I remember like a year or go or something he wanted to come testify in Connecticut, because some of the things that were being said about him weren't true. And then the last time I heard, they didn't want him to come up there and testify. I mean, he is the most knowledgeable. He is the guy you should talk to. He's told me he would be happy to be talk to ya.
Q (By Mr. Mattei) Just give me one second.
A You might as well end this damn deposition in the middle of a football game it's so loud out there. Feel like I'm in high school or something with the doors opening up.
MR. MATTEI: All right. Mr. Jones, I think I'm done. Attorney Cerame may wish to ask you some additional questions if he's still there.
MR. CERAME: Sorry, I lost my window for a moment. I have no further questions for Mr. Jones.
MR. ATKINSON: And I think we can declare Mr. Jones' deposition closed.
THE VIDEOGRAPHER: We are off the record at 3:13. This concludes today's deposition and Media 4.

(Deposition was concluded at 3:13 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: ALEX JONES
DATE OF DEPOSITION: JUNE 21, 2022

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |

I, ALEX JONES, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above:

______________________________
ALEX JONES

THE STATE OF __________ )
COUNTY OF _____________ )

Before me, ________________________________, on this day personally appeared ALEX JONES, known to me (or proved to me under oath or through ____________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _______ day of ________________, 20__.

_____________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ________________

NO. X-06-UWY-CV-18-6046436-S : SUPERIOR COURT
ERICA LAFFERTY, ET AL. : COMPLEX LITIGATION DOCKET
:
V. : AT WATERBURY
ALEX EMRIC JONES, ET AL. : OCTOBER 21, 2021

NO. X-06-UWY-CV-18-6046437-S : SUPERIOR COURT
WILLIAM SHERLACH : COMPLEX LITIGATION DOCKET
:
V. : AT WATERBURY
ALEX EMRIC JONES, ET AL. : OCTOBER 21, 2021

NO. X-06-UWY-CV-18-6046438-S : SUPERIOR COURT
WILLIAM SHERLACH, ET AL. : COMPLEX LITIGATION DOCKET
:
V. : AT WATERBURY
ALEX EMRIC JONES, ET AL. : OCTOBER 21, 2021

REPORTER'S CERTIFICATION
DEPOSITION OF ALEX JONES
JUNE 21, 2022

I, VANESSA S. ROBERTSON, Certified Shorthand

Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ALEX JONES, was duly sworn by the officer remotely and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________, 2022 to MR. CAMERON ATKINSON, for examination, signature and return to me by ________________, 2022.

That the amount of time used by each party at the deposition is as follows:

MR. CHRISTOPHER MATTEI - 2 hours, 32 minutes
MR. MARIO CERAME - 15 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

MR. CHRISTOPHER M. MATTEI, Attorney for Plaintiff.
MR. CAMERON ATKINSON, Attorney for Defendant.
MR. MARIO CERAME, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was

taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this ______ day of ___________, A.D., 2022.

Vanessa S. Robertson
_______________________________
VANESSA S. ROBERTSON
TEXAS CSR 4930
EXPIRATION Date: 04/30/2022
FIRM REGISTRATION No. 343

U.S. LEGAL SUPPORT
8144 WALNUT HILL LANE
SUITE 350
DALLAS, TEXAS 75231
(214) 741-6001

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on ________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to MR. CHRISTOPHER M. MATTEI, Custodial Attorney;

That $____________ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits.

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this _____ day of _________, 2022.

________________________________
VANESSA S. ROBERTSON
TEXAS CSR 4930
EXPIRATION DATE: 04/30/2022
FIRM REGISTRATION No. 343
U.S. LEGAL SUPPORT
8144 WALNUT HILL LANE
SUITE 350
DALLAS, TEXAS 75231
(214) 741-6001

**Exhibits**

**EX 0179 Alex Jones, Vol III 0621 22**
761:12 787:1 881:8

**$**

**$2**
798:22 799:3,15 800:6 801:3, 9,14 802:1, 17,21,24 803:15 804:2,10 811:12 816:14,22 852:4
**$20-plus**
876:11
**$344,000**
852:11,14,19 853:6
**$4**
849:16
**$40,000**
791:4
**$5**
850:6,10
**$5.9**
847:2
**$700,000**
767:9
**$715,000**
811:1,4

**0**

**0**
805:7

**1**

**1**
812:17 866:24
**1,000**
812:10
**10**
800:10 864:6 882:17 883:11,12 884:20 885:1
**100**
777:17 782:14,17,20 791:1 805:22,23 814:10,17,24 850:15
**10:16**
812:17,18
**10:22**
812:18,20
**11:00**
842:2,3
**11:08**
842:3,5
**11:33**
859:4,5
**11:39**
859:5,7
**11:42**
860:22,23
**12**
783:14 843:18
**13**
783:14 867:3
**14**
764:22 767:5 768:6 779:21
**15th**
816:3
**16**
828:1
**1700**
762:6
**179**
787:1 881:8
**183**
793:8
**184**
810:24 814:19
**185**
866:24
**188**
779:13
**1997**
764:5
**19th**
847:1 850:4

**2**

**2**
810:10,13 811:5 812:20 842:2 851:5, 18,21
**20**
798:8 834:19
**20,000**
771:13
**2000**
770:1
**2000's**
770:2
**2001**
769:5,25
**2009**
766:15
**2013**
764:22 765:2 767:4,10 768:5 867:5, 13 873:3
**2016**
764:18 765:6
**2016-ish**
764:15
**2018**
872:5,9,11, 13 877:20 878:5
**2021**
779:17 780:3,22 781:5 782:1, 22 783:17,25 784:15 842:23 855:8
**2022**
762:4 786:16 803:15 804:17 805:3 811:1 815:4, 12 817:14 890:3
**21**
890:3
**21st**
762:4 817:14
**23rd**
845:20 846:20
**24th**
779:17
**2:00**
859:21
**2:37**
860:23,25

**3**

**3**
842:5 852:6 859:4
**30**
805:7 807:20 882:5
**30th**
846:23
**340**
856:23
**340,000**
856:25

**380,000** 856:23
**3:00** 859:13 860:1
**3:13** 888:24 889:1

**4**

**4** 850:6,10 859:7 888:25
**47** 810:23
**4930** 762:23

**5**

**5** 849:21
**50** 834:20 841:3
**5:00** 858:22

**6**

**6** 790:7 881:18
**6th** 811:1

**7**

**7** 788:19
**70** 805:13,20 806:2 807:15,18 809:3
**7th** 773:14

**8**

**8** 789:6 790:19
**80** 867:21
**86** 815:14

**9**

**9** 814:20,21,23 864:6
**9/11** 769:17 770:2,10
**90** 851:13 867:24 868:8
**92** 779:20
**98** 765:19,23
**99** 765:18,19,23
**9:11** 762:5

**A**

**a.m.** 762:5
**able** 823:9 824:2,7
**above** 816:3 890:22
**absolutely** 766:9 771:22 808:1
**abusiveness** 880:17
**accelerating** 877:22
**accepting** 842:25
**access** 794:4 820:20 844:15,16 845:4
**accommodate** 773:8
**accompanied** 773:17 774:14
**accompany** 774:3
**account** 811:1 816:23 848:4 849:1,18 850:7 851:2,3,24 852:2,8,13 853:9
**accountant** 856:9
**accounting** 816:18 849:3,12 883:24 886:15
**accounts** 789:17 790:20 835:15
**accrued** 878:7
**accruing** 877:19
**accurate** 790:1 867:18
**accurately** 783:1
**acquired** 782:21
**acquiring** 782:7
**acquisition** 783:17,24 784:14
**act** 785:8
**acted** 769:8
**action** 838:12,14,15 839:5,7 840:6,10
**activities** 789:10 790:20 791:2,4 809:18 810:6
**actual** 843:25 848:3
**ad** 825:5 862:9,21,24
**addition** 810:10 811:4
**additional** 888:17
**Additionally** 839:11
**address** 805:6 858:1 875:23
**addressing** 860:11
**ads** 862:25
**advertise** 824:8 879:6
**advertisement** 862:4
**advertising** 764:23 769:13 824:5 868:22 870:7,12,25 871:4 885:10
**advice** 787:21 887:13
**advise** 838:9 839:6 841:15

**advised**
838:20
839:22
**advising**
796:24
838:17
**Advisors**
867:1
**AEG**
772:14
**AEJ**
871:7 872:5, 9
**affidavit**
794:7,18
**affiliate**
825:18
826:11,14, 18,19 827:1, 11,25 828:23
831:12
834:15,21
836:24,25
853:25 855:5
**affiliated**
822:16
**affiliates**
769:18
**affiliation**
831:8
**affirmations**
763:5
**affix**
890:21
**afloat**
851:14
**agency**
825:5
**ago**
764:13,14
775:12
783:14
799:5,6
801:17
832:2,3,6
833:25 834:7
864:6 875:13
882:6,7,18, 22
**agree**
791:25
860:10
862:18,22
866:2 874:4
877:3
**agreed**
827:19
830:12
**agreeing**
836:14
**agreement**
826:7,12,18, 20 827:12, 15,25 828:23
829:5,7,18, 22 831:12
834:15,22
836:24 837:1
855:5 874:7, 13,14,18
875:2 877:5, 8,10 878:17, 20,21,22
880:6,9
882:14
883:4,12
884:19,24
886:15
**agreements**
826:24
881:19
885:11
**ahead**
795:13,14
797:13
800:25
881:3,5
**air**
829:11
850:20
**Alex**
762:5,15
763:2 793:9
812:13 838:9
858:9 859:23
865:16
867:15
890:2,21,24
**Alinor**
762:21
**allowed**
839:11 862:9
**allows**
860:15
**amount**
850:2
**amounts**
852:4 856:23
**and/or**
881:19
**Anderson**
763:16,18
766:16
768:24 769:3
770:4 771:18
772:1,15
**Anderson's**
764:20
**Angeles**
776:12,15
**answer**
764:2 771:7, 21 775:16
781:2,8
782:10,24,25
783:12
784:5,19
785:4,18,23
786:9 787:20
790:3 792:6, 12,22 795:12
796:9,17,24
797:1,5
798:6,18
799:2,18
800:18,23
801:12
802:14,20
803:2,10,18
804:4,14,23
808:6 810:8, 11,16,18
811:7,22
813:20
814:17
816:17
817:8,11,13, 17,19 818:9
819:4,19
820:1,23
821:4,22
822:3 823:18
825:1,13
826:2,10,22
827:17
829:3,15
830:2 831:1, 5,11 832:1,9
833:4,22
834:14
835:5,21
837:16,19
838:9,13,18, 20,22 843:7
846:9,10
849:24
850:13,23
854:19
855:12,21
858:6 861:4, 10 863:11,25
864:19
865:4,12,19, 22 866:7,14
868:11
869:12
870:5,15
871:9 872:19
873:19
874:6,23,24
875:9,18
876:10,16
877:2 879:8, 14,21 880:4, 11 882:16
883:8 884:3, 7,17 885:7
886:5,23
887:25
**answered**
784:4 802:21
846:4 865:24

883:16
**answering**
766:8
**answers**
784:9 786:3
**anticipate**
860:16
**anybody**
763:5 773:19 774:21 830:16 831:15 832:21 844:20 847:14,16
**anymore**
814:3 833:17 834:10 857:14
**anyone**
789:18
**apparently**
839:23
**appearance**
881:12
**appears**
793:16 840:8 850:4
**appreciate**
766:3 767:15 772:19
**approaching**
852:6
**approximately**
762:4 852:4
**April**
786:16 804:17 811:1 816:3 842:23 845:20 846:20,23
**archive**
809:7
**area**
861:5
**argues**
873:24
**arguing**
884:14
**argument**
796:15
**argumentative**
880:18
**Arizona**
776:16
**around**
765:17 766:17 777:2 815:15 824:1 828:16 869:7 877:20
**arranged**
777:9
**arrangements**
775:10 839:23
**articles**
798:8,13
**asked**
779:22 780:19 781:19 783:22 786:1 802:15 818:12 840:6 861:13 871:25 880:15,19 883:2,18
**asking**
777:4 782:6, 19 785:11,17 787:23 810:3,4 812:22 814:3,4 818:5,25 828:21 846:5 848:17 850:9 857:4 868:14 870:2 871:17 882:18 883:17 885:16
**asks**
796:23
**asserts**
796:10
**assess**
796:23
**asset**
792:8 806:9, 15,21 809:2 843:13
**assets**
777:23,25 788:23 789:7,14 791:24 792:1,3 796:1,2 800:6 801:9 802:17,18 803:11,13, 15,20 845:17 867:8
**assigned**
812:25 814:14 815:3
**assist**
873:8 884:3
**assistant**
773:20,22,23
**associated**
765:4 831:15,21 832:21 852:15,21 853:7
**association**
824:24
**assume**
774:15
**assuming**
860:14
**Atkinson**
762:14,15 771:6,20 775:15 781:1,7 782:9,23 783:10,12 784:1,3 785:3,22 786:8 787:19 790:2 791:22 792:5,11,21 795:11,14 796:16 798:5,17 799:1,16,18, 22 800:1,16, 23 801:6,11 802:19 803:1,17 804:3,13,22 808:5 810:7, 15 811:6,21 812:12 816:16 817:7,16 818:8 819:3, 18,25 820:10,16,22 821:3,21 822:2 823:17,24 824:25 825:12 826:1,9,21 827:16 829:2 830:1,25 831:4,10,25 832:8 833:3, 12,21 834:13 835:4,20 836:1,6,9 837:15 838:5,8,25 839:4 840:17,22 841:5,13,25 842:8 843:6 846:6 849:23 854:18 855:11,20 858:2,7,9,17 859:1,14,18, 22 860:13,18 861:9

863:10,24 864:18 865:3,11,18 866:6,13 868:10 869:11 870:4,14 871:8 873:18 874:5,22 875:8,17 876:9,15 877:1 879:7, 13,20 880:3, 10,16,24 881:3,5 882:15 883:6,8 884:2,12,16 885:6 886:22 887:24 888:21

**attempt** 793:3

**attempted** 769:6,25

**attempting** 795:24 875:15

**attention** 814:20 868:18 871:10 873:14 881:17

**attorney** 796:10,15 838:25 839:3,13,19, 20 840:1,20 857:20 858:18 859:15,25 861:2 884:2 888:16

**attorney/ client** 796:7,22

**attorneys** 840:21

**audience** 796:12 798:22 799:14 801:3,24 802:8 805:12 806:23 807:14 853:21 854:4,8,13

**audio** 813:2

**Austin** 762:7,25 765:21

**authority** 845:16

**authorization** 788:4

**authorized** 779:8 783:17,24 784:13 785:13 818:2 845:3

**authorizing** 817:24

**aware** 773:6 787:24 788:1 817:24 818:2,7,25 819:22 820:6,13 862:7,11 872:1,8 873:7,16 874:15

B

**back** 776:16 797:2 800:1,21 801:19 809:2 822:23 826:13 828:4,5 830:12 834:3 846:7,10,15, 17 851:6 857:19,25 858:15 859:6,21 860:2 868:24 870:7,11,24 871:3 873:2 883:12 884:20 885:1,22

**bank** 789:17 790:20 803:12 848:4 849:1 850:7 851:2

**bankrupt** 877:24

**bankruptcy** 777:10,16 778:6,17 782:4,16 786:18 787:8,17,25 788:9,16 790:9,10,16 792:2 793:11,25 794:5,23 795:8,24 796:1 797:19,21 798:14 804:1 807:15 812:24 813:12 814:7,13 815:1 816:11 818:4,7 819:2,13,17, 22 820:6,13 852:12,14,22 853:7

**Banned.video** 799:7

**barred** 824:5

**based** 764:7 785:18 868:15

**basic** 827:8

**basically** 765:6 785:24 825:4 828:19 844:10 851:11 877:15,17

**basis** 839:1 850:18,21 870:3

**began** 765:1 867:13

**beginning** 800:5,8 801:8 845:20

**begun** 848:21

**behalf** 762:13,15 779:8,22 785:2,14,20 853:9 874:19

**believe** 765:22 775:14 777:19 778:23 779:11 780:8 783:11,13 784:17,19 786:19 791:6 794:19 806:6 808:8 810:22 813:10 814:2,12,16 816:13,20,25 817:2 820:17,19,24 829:7,18,21

830:22 836:2 837:20 839:2 841:2 847:4, 8 850:3 853:11 861:15 873:11 874:17 878:14,16 882:13 883:3 885:2 887:22
**believed** 782:4
**believes** 876:14
**Bellis** 840:13 859:12 860:1,15
**beneficial** 828:17
**besides** 767:17 776:8 806:17
**best** 772:5,12,16 781:23 786:5 824:19 839:6 864:2 872:19,22 878:8 883:17 885:12
**better** 797:16 834:2 860:2,19 880:7 886:6
**big** 786:11 802:8 852:17 868:17,19 869:1,10 870:2
**bigger** 874:8
**bikes** 826:15,16
**bill** 767:9 852:11,14,25
**bills** 803:3 849:6 851:1,6,7, 23,25 852:9 856:10,18
**bird** 869:7
**bit** 820:12 849:8 875:10
**Bitcoin** 801:25 802:3,10 846:13,20 847:2,19 849:14,15 853:14,16, 17,19,21,24 854:2,3,10, 17,25 855:1, 3,6
**bizarre** 794:12
**blockchain** 844:25
**blood** 882:11
**blue** 869:7
**Bob** 886:4 887:1, 4
**body** 882:12
**Bomb** 857:7
**book** 771:13,14
**booked** 775:3
**booklets** 767:24
**books** 766:22 767:24 768:1,8 856:15 885:20 887:18
**bought** 771:13 864:22
**Boulevard** 762:7
**brand** 807:25
**branding** 842:18
**break** 800:14,18 812:4,6,8, 13,14,22 841:1,5,8,20 857:22 858:20 880:25
**breakfast** 775:18
**briefly** 771:25
**bring** 814:19
**bringing** 864:3
**brings** 791:3,9 857:6
**broadcast** 770:12 771:4 793:23
**Broadcasting** 764:7
**broadcasts** 770:6,15,16
**brochure** 768:4
**broke** 802:9 813:9
**brought** 779:14 794:8,9
**bucks** 810:20
**Buffalo** 875:22 876:5
**bulk** 864:22
**bunch** 771:11 828:6,7 883:18
**burden** 878:11
**business** 764:24 765:7,8 766:14 772:1 778:8,10 784:21 785:1,19 786:6 789:10 790:20 791:2,4 809:18 810:6 822:13,19 864:4,16 867:13 871:11 873:8
**businesses** 764:19,20 766:16 778:11
**buy** 823:9 834:10 851:8 883:25
**buyer** 825:25
**buys** 822:4,5 864:13 868:16 885:8

C

**call** 769:9 805:25 807:18 841:19

860:12 862:14
**called** 764:6 787:7 794:3 823:4 832:15 853:14 855:16 871:6 872:4
**calling** 794:10
**calls** 795:20 823:24
**Cameron** 762:15 881:2
**candid** 772:20
**capital** 848:6,10 850:25
**cart** 824:16 827:8
**case** 768:25 772:3 779:10 786:18 814:5 827:5 875:7 883:5
**cases** 797:20 805:13
**cash** 801:14 802:22,24 810:22 820:20 852:8
**cashed** 847:19 848:25 851:19
**caused** 786:17
**center** 868:17,19 869:2,10 870:2
**Central** 762:5 859:21
**Cerame** 762:17,18 763:4,8,11, 14 771:15,24 772:19 840:1 858:18 859:15,25 888:16,18
**Cerame's** 839:13,16
**certain** 880:22
**Certainly** 876:22
**certificates** 881:19
**chance** 861:20
**change** 868:3 890:4
**changed** 787:16,25 790:9
**CHANGES** 890:1
**charge** 845:12
**charged** 879:5
**check** 776:3
**chief** 788:12
**child** 773:18 774:15
**children** 872:8
**Chris** 762:13 784:4 796:16 799:22 846:7 858:4,10 859:19 860:4 880:17,25
884:12,13
**claim** 795:7 798:22 852:7 853:6 876:7 882:10 884:10
**claiming** 809:3 878:16
**claims** 878:6,25
**clarification** 767:16
**clear** 781:14 784:12 803:12 820:11 848:24
**clear-cut** 770:22
**clearer** 813:4
**clearly** 813:5,7
**clerk** 857:20
**click** 832:15 856:2
**client** 840:15
**clip** 794:6
**clipped** 793:12
**clips** 802:6
**close** 797:15 816:6 876:20
**closed** 816:8 888:22
**closest** 875:22
**co-defendant** 772:3
**co-defendants** 772:2
**Code** 788:9
**codes** 844:23
**Coinbase** 844:2
**coins** 771:11
**collaborate** 823:14
**collaboration** 771:16
**collaborations** 771:3
**collaboratively** 823:14
**collapsed** 764:22
**collect** 797:11
**come** 764:4 766:16,20 767:16,23,25 769:19 770:13,18 771:12,14 796:8 805:20 810:13 828:4 858:15 859:21 860:2 888:3,6
**comes** 869:23 877:16
**comment** 767:17 884:9
**commercial** 774:8,9
**committed** 804:1
**communication** 762:18 763:16,19 770:4 771:1

847:16
**Communications**
882:20
**companies**
765:14 770:7,16,25 771:17,18 772:3,15 777:10,17,20 783:3,8 785:12,14 786:17 790:4 791:1,24 792:2 797:21 807:14 809:17 810:5 814:25 819:9 821:25 825:9 826:6,7 828:6,24 835:19,25 836:7 837:3 838:14
**company**
764:8,9 765:10 767:6 772:9,11 774:2 780:4,21 782:19 787:10 788:5 792:19 806:16 807:22 813:17,21 814:2,4,8,11,14 820:14 821:19 823:2,3,4 824:12 825:24 830:23 834:9 848:18 849:7 851:1 853:13 861:18 864:10,12 865:20 868:16
**compared**
791:25
**competently**
813:15
**complete**
770:17
**completely**
801:23 802:4 820:18 834:1
**complex**
790:23 817:18
**compliance**
864:12
**comprised**
852:2
**comprises**
876:14,17
**comprising**
806:2
**concerned**
768:9 789:25 879:25
**concluded**
889:1
**concludes**
888:24
**conclusion**
823:25
**conduct**
859:12
**conducted**
866:11,17,25
**confer**
860:18
**confirm**
812:22 824:18 838:20 861:9 884:23 886:25
**confirmed**
813:10
**confuse**
780:7 802:6 803:9
**confused**
780:18 781:11,20,21 782:25 783:5,15,20,22 784:9,22 785:5 790:22 813:19,23 814:16 818:23 820:18 884:11
**confuses**
781:12
**confusing**
784:12 813:24
**confusion**
784:8,18,20
**Connecticut**
774:4 786:24 812:10 840:15 841:9 880:20 883:1 888:3
**connection**
770:21 788:15 825:10 866:10,17 867:1 875:6 880:22
**consultant**
844:11 886:4 887:10,16
**consultants**
886:17
**consulting**
887:15
**contact**
840:20 854:17
**contacted**
794:23 795:8 857:17
**contained**
792:3
**contemplating**
786:20
**content**
770:11,14 771:1,2
**context**
794:6
**continue**
823:22 848:13,19 861:6
**continued**
881:11
**continues**
868:8
**continuing**
848:9
**contract**
779:5 877:18
**contracts**
881:18
**contradict**
809:19
**control**
769:3,7,11,16,22,24 770:5,8 821:19 825:9 828:25 830:23 835:19,25 836:8 855:9
**controlled**
778:20
**controlling**
865:21 866:4
**controls**
824:20 825:20
**convened**
839:15
**conversation**
796:4,6,12,19,25
**conversations**
839:20

**converted** 848:3
**conveyed** 797:8
**coordinated** 770:25
**copy** 880:12 882:14 883:3
**copying** 840:20
**cord** 770:24
**corporation** 778:23 780:16
**correct** 770:3 772:6 773:4 774:18 776:14 777:11,14,18 778:7,11,18, 25 779:3,6, 10,24,25 780:5,24 781:6 782:14,17 785:15 786:18,21 787:11,14,18 788:5,13 789:1 790:1, 12,16 791:13,16,20 792:4 793:15 794:1,5 798:16 799:15 800:5 801:4 803:16 804:2,11,18 805:18 806:3 807:1,5 808:24 809:4,18 810:6 811:14,20 813:1,14 814:5,8,11, 15 815:1,13 816:4,12 818:17 821:2 822:23 824:13,21 825:21,25 829:24 830:18 831:9 832:6 833:2, 16 835:11,15 836:20 837:9,14 838:4 843:13 844:16,18 845:4,9,14, 18,24 846:20,24 847:3,7,20, 22 848:20 849:18 850:7 851:20 852:5 853:21,24 854:5 855:3, 16 856:5,21 861:17 862:1,5 863:3 865:2, 10 866:5,18 867:5,9,22, 25 870:12, 16,21 872:24 873:8 874:20 881:12 886:12 890:22
**cost** 877:13
**counsel** 762:9 788:20 838:15,20 839:24 857:16
**country** 776:7
**COUNTY** 762:1
**couple** 839:18 876:3 881:2
**course** 796:2 798:1 803:14,22 806:23 855:14
**court** 762:10,22 763:7 809:12 846:7,14 857:17,23,25 860:11 861:3 866:21 882:1,5,7
**courts** 794:5
**coverage** 770:15 771:17
**CPA** 887:6
**CPA's** 887:13
**CPAS** 791:6
**crashed** 849:15
**create** 827:4 843:8
**created** 831:24 854:22
**creating** 825:4
**credit** 834:9
**crew** 806:21 807:10
**cross** 840:2
**Crowdfunding** 856:22
**crypto** 844:15 849:17 850:5
**cryptocurrency** 842:21,25 843:1,4,13, 22,25 844:3 845:13,17, 21,23 851:18 852:3 855:8
**CSR** 762:23
**currency** 843:25 848:3
**current** 885:16,25 886:8 887:8, 14
**customer** 829:12 834:2 836:15
**customers** 832:15
**cut** 791:16 854:4,14 863:18

D

**dad** 864:3 865:5, 7 875:3
**dad's** 873:20
**damn** 888:11
**data** 847:6
**date** 762:3 766:4, 6 799:11 803:10 805:4 815:5 860:3 864:6,7 890:3
**dates** 764:21 765:16 766:4

**daughter** 774:16
**David** 878:6,16 879:24 886:18,24
**day** 777:6,8 795:16 802:7 882:23
**days** 841:9
**deal** 771:11 827:9 837:21 877:4
**dealing** 849:6
**dealt** 826:24
**debt** 789:20 876:14,17 877:19 881:19
**debtor** 787:11
**debtor's** 788:22
**debtors** 788:21,23 789:7 790:7, 14,18 795:25
**debts** 790:20
**decide** 834:5
**decided** 833:25 857:12
**decision** 833:24
**declaration** 788:8,20 815:11
**declare** 888:22
**decline** 838:22
**default** 882:10
**defendant** 814:5
**defendants** 768:25 786:17 805:12 840:6,10
**defending** 838:15 839:5,7
**Defense** 856:4 857:8
**defined** 790:7
**definitely** 803:14
**delayed** 776:24 777:5
**delays** 776:22
**Denying** 793:10
**department** 793:10 844:8
**depending** 860:1
**depends** 859:23
**deplatform** 824:4
**deplatforming** 824:2 828:16
**deposition** 762:5,24 773:6 774:4 777:9 779:16,21 784:23 786:21,22,23 839:9,10,14, 25 880:20, 21,22 881:11,16 888:11,22,24 889:1 890:3, 21
**derive** 872:11
**derived** 872:13
**describe** 853:18
**described** 770:2 790:19 796:4,6 825:11 827:25 882:3
**describes** 814:23
**describing** 857:3 882:14 883:4
**designate** 785:1,20
**designed** 825:15
**details** 871:11
**developed** 843:18
**developing** 825:3
**Dew** 886:19
**Dew's** 816:2
**different** 786:1,2 826:4 856:22
**difficulties** 776:21 777:6
**direct** 770:17,22 772:20 839:13,16 852:1 864:16 881:17
**directed** 848:25 856:9,10,11 884:4
**directing** 881:11
**directly** 791:18,19 849:4,5 851:2,21,24 865:17 866:3 872:15 884:17
**disbelief** 795:20
**disclose** 854:8,13
**discuss** 841:14
**discussed** 771:22 790:8
**discussion** 770:14 859:24
**discussions** 770:9,11 772:21
**disentangle** 765:3
**disentangleme nt** 765:5 767:14
**dismissed** 816:12
**dispose** 845:16
**distracting** 800:17
**distributor** 863:15
**divorce** 866:10,17,21 867:1 868:24 885:14
**document** 787:3,6 788:8 818:11,19 867:3 868:5, 23,24 869:5

885:14
**documents** 780:14 794:13 809:23 811:9 819:5,8 868:12,14 871:16,20 881:15,25 882:2,11 884:6
**doing** 765:21 769:7 786:20 791:7 794:9 815:8 822:13 823:10
**dollars** 771:12 802:1 803:11 846:20,23
**donated** 846:19 847:20
**donation** 802:2 842:21 843:4,8 844:4 846:22 847:1 850:4
**donations** 801:25 802:8,9 842:25 843:11 845:23,25 846:13 847:12 848:15,17 849:18 856:7,16
**donor** 846:19,24 847:3,4,17 850:5
**donor's** 847:7
**door** 797:16 816:7
**doorknobs** 800:12
**doors** 800:11,12 888:14
**doubt** 865:14
**drawn** 804:20
**drop** 797:20
**dropped** 805:13
**dropship** 826:15 832:24
**duly** 763:3
**Dustin** 773:24 774:3
**DVDS** 768:1

**E**

**earlier** 785:18 790:8 814:1 817:23 818:1
**early** 770:2 859:19
**easier** 787:2
**east** 875:11,20,24
**easy** 799:12 854:22
**economy** 776:6,17
**editorial** 769:3,7,21, 24 770:5,8
**efforts** 875:6
**eight** 764:13
**either** 772:14 830:16,23 840:13 865:17 866:3 872:15 887:8
**electric** 826:15,16
**employed** 767:12 806:25 807:4,6,8,10 822:25
**employee** 773:25 779:2
**employees** 807:23 843:22 885:17,25 886:1,9
**employment** 768:18 825:7
**end** 765:1 767:8 784:21 809:10 812:17 842:2 859:4 877:25 888:11
**ended** 764:20
**engaged** 809:17 810:5
**entire** 803:14 865:15
**entities** 763:22 788:13 789:8 790:1,8,10 811:18 812:23,25 813:12 817:5
**entity** 787:24 824:20 864:21 871:6 872:4
**entry** 862:9
**equity** 815:4
**essentially** 787:16
**estimate** 792:18 850:18,21 851:17
**evade** 875:15
**evaluate** 796:22
**eventually** 865:1
**everybody** 780:7 842:6 860:8
**exact** 765:16 766:3,4 767:10 797:25 805:4 842:22 849:3 850:16 855:22 864:7 878:20,21
**exactly** 766:7 784:24
**excess** 800:6 801:9 803:15
**exchange** 843:24,25 853:19
**exclusively** 856:17
**Excuse** 796:5
**execute** 845:3,7
**executed** 850:5

**executive** 785:8
**exempt** 811:2
**exercise** 769:3,7,21
**exercised** 769:25 770:5
**exhibit** 779:13 787:1 793:8 810:24 814:19 866:24 881:8,10
**existence** 865:15
**expect** 766:4 874:18
**expediency** 851:3
**explain** 845:11 880:6
**explained** 769:12 778:20
**explaining** 884:21
**expressed** 843:12
**extent** 766:5 768:7, 14,19,23 769:2,4,24 770:9,10,13 771:5,9 850:18 861:13
**extra** 869:16 877:16,17
**extremely** 764:2

**F**

**facilitate** 796:17
**fact** 793:22 794:7,19 806:8 810:22 814:23 823:21 849:11 862:3 879:3
**fair** 784:5 799:17 818:24 827:2 830:22 852:7
**faith** 791:7 809:12
**false** 801:4,5
**familiar** 763:21 765:8 853:13 871:6 872:4
**far** 780:15 789:25 816:9 860:7 879:9, 25
**father** 875:5 876:7
**father's** 873:23 876:2
**FDA** 864:2
**Federal** 767:25
**fee** 854:5
**feedback** 829:14
**Feel** 888:13
**Ferraro** 840:20 857:20
**Fibercove** 762:6
**figure** 807:13 878:23
**filed** 777:21,22 778:5,17 790:10 794:1 803:25 807:15 813:12
**filing** 782:4 787:8, 17,25 878:7
**fill** 865:1
**films** 766:22 768:1
**financial** 767:2 768:20,24 867:14 880:2
**financials** 768:9
**find** 784:24 883:22
**fine** 766:8,13 850:19
**finish** 858:16 882:23
**first** 763:3,25 773:3 796:18 842:20 861:12 862:19 869:5 880:20
**five** 841:23,24 858:15,24 859:1
**flew** 774:9
**flight** 776:24
**floor** 858:10
**fly** 774:8
**flying** 869:7
**focus** 803:13
**focused** 827:21
**folks** 882:25
**follow** 767:15
**following** 850:3 881:21 886:18
**follows** 763:3
**food** 830:11,18 833:9,16,18 834:3,6,10, 12 837:1 863:8,12
**football** 888:12
**foregoing** 890:21
**forever** 763:8
**forget** 767:9 805:7 818:12 819:8 854:7 878:20,21
**form** 771:6,20 775:15 781:1,7 782:9,23 783:10 785:3,22 786:8 787:19 790:2 791:19 792:5,11,21 795:11 798:5,17 799:1,16

801:11 802:19 803:1,17 804:3,13,22 808:5 810:7, 15 811:6,21 816:16 817:7,16 818:8 819:3, 18,25 820:22 821:3,21 822:2 823:17 824:25 825:12 826:1,9,21 827:16 829:2 830:1,25 831:4,10,25 832:8 833:3, 12,21 834:13 835:4,20 837:15 838:5 843:6 849:23 854:18 855:11,20 863:10,24 864:18 865:3,11,18 866:6,13 868:10 869:11 870:4,14 871:4,8 873:18 874:5,22 875:8,17 876:9,15 877:1 879:7, 13,20 880:3, 10 882:15 883:6 885:6 886:22 887:24

**formation** 866:3

**formed** 863:21,23 865:9

**forming** 864:17

**forward** 809:15

**founded** 867:4

**fountain** 811:25

**four** 876:22 877:14 878:10 886:20

**frankly** 781:16 786:10 827:21

**fraudulent** 838:12

**free** 762:15 767:23 768:20 773:25 774:25 775:24 779:3,5,9, 17,22,23,24 780:4,12,21, 23 782:2,8, 14,21 785:2, 20 786:6 792:1 806:25 807:5,10,22 814:1,24 818:3,6 819:1,12,16, 23 820:7,14 822:20,22,25 825:7 834:23 835:3,7,14, 15,17,23 842:9,12,17 848:6,10,14 849:2,4 850:11,22 851:4,6,14, 19,22,23 852:2,9 853:9 856:15 864:23,24 865:6 866:11 867:8,15 868:21 870:11,21,24 874:3,9,16, 19 876:7,18, 24 877:8,24 878:4,14,17 879:5,10,12, 16,18 880:2 881:21 882:4 883:4 884:19,25 885:3,8,17, 19,20,25 886:2,8,11, 21 887:8

**freedom** 848:14

**Freeworldoutl et** 836:12 837:10,12,13 861:25 862:4

**Freeworldoutl et.com** 823:21 824:9,20,24 828:24 835:1 837:24 861:16,23 862:12,21

**Freeworldoutl et.com.** 861:14

**freeze** 881:6

**friend** 828:18

**friendly** 765:1 766:25

**front** 775:7 795:15 798:11 814:21 815:16,22 816:18 834:19 847:8,25 849:3,11,19 850:12,16 853:12 862:16 871:2 872:17 878:9

**froze** 808:13

**Fruge** 822:18,19 824:12,19 826:7 827:13 829:21 831:19,20 832:20 833:8 863:17 886:19

**Fruge's** 823:11 824:24

**fulfill** 836:11,20,22 837:3 838:1, 3 877:18

**fulfilled** 825:17 837:8,13

**fulfillment** 879:19

**fulfills** 830:11

**full-fledged** 858:4

**fully** 816:7

**fund** 775:25 804:1 809:25 810:14 816:15 856:4 857:8

**funded** 804:10

**funding**
764:25
825:10 867:7
**fundraisers**
857:12
**funds**
851:11
**funnel**
832:15 856:2
**future**
809:24
883:25

**G**

**game**
888:12
**gave**
882:10
**GCN**
765:18,20
**general**
764:21
780:11
785:25
826:23
**generally**
764:1,4
766:6 767:20
768:12 849:6
864:9
**generate**
789:14
821:25
823:22
**generated**
855:18
**Genesis**
762:18
763:16,19
765:13
766:2,15
769:3 770:4,
25 882:20
**gentleman**
788:11

**gestalt**
795:16
**getting**
794:7 795:19
802:5
**give**
764:19
786:13
792:18
803:20
841:19
848:16
850:22 853:2
882:11
888:10
**given**
779:16 784:5
790:15
848:17
882:12,14
**Givesendgo**
855:15
856:2,17
857:8
**giving**
795:16
**glad**
800:21
**glass**
800:11
**goes**
791:18,19
856:2 883:12
884:20
885:1,10
**going**
763:17,18
771:10
776:7,18
779:12,20
784:23
786:14 791:5
793:2,3
794:8,14
795:18
797:13
799:20
800:13

801:24
802:11,13
805:8 810:23
811:15
812:6,10
814:19
836:25
838:9,10,17
839:22
840:12
841:2,19
848:18
849:11
852:17
857:24
858:1,3
861:6 866:23
867:3 869:6,
14 870:19
881:9,17
883:18,19,21
886:7
**gold**
764:5,8,21
765:10
767:4,6,17
768:10 771:2
877:25
**gold's**
771:9
**good**
762:12,14,
17,20
763:12,13
772:18 791:7
809:11
829:12,14
841:25 842:7
849:15
864:11
**governing**
828:23
884:24
**grass**
785:10
**great**
771:11

**greeted**
862:8
**group**
821:10
886:18
**guess**
774:19
776:12 777:4
789:2 796:14
803:21 807:7
858:10,18
859:14,18
865:22 877:6
878:1 882:23
**guessing**
864:6
**guesstimate**
803:20
**guesstimation**
806:4
**guy**
784:20
785:9,19
800:14,21
887:1,4
888:7
**guys**
780:6,14
781:17 806:6
812:4 852:16
853:4 869:19
878:1 882:9
883:21
**guys'**
869:15

**H**

**half**
812:5 847:19
848:1 849:9
**hall**
800:10
**handle**
803:22
**hang**
817:22 838:8

880:16
**happened** 765:5 768:5 788:4 816:14
**happening** 768:5 884:9
**happy** 840:17 846:9 869:7 877:4 888:8
**Hawaii** 773:12,13 774:6,10 776:8,18
**head** 818:13
**headache** 818:14
**headline** 793:12
**Health** 777:13 779:9 790:11 791:3,9,20 792:14,16 805:17 809:8,24 811:18 817:4
**hear** 798:22 805:11 808:14 857:23,25
**heard** 841:10 857:19 871:11 872:6 888:5
**hearing** 793:19 813:5,7 858:4 859:12
**held** 762:8
**hell** 805:22
**Hello** 763:12
**help** 796:17 799:7 809:24 884:7
**helpful** 846:6 870:18 879:4
**Hernandez** 886:19,24
**hey** 771:9,11,13 812:3
**hidden** 796:2
**hide** 796:1
**high** 834:20 888:13
**high-tech** 887:19
**hired** 788:11
**history** 764:2
**hold** 763:9 789:7 815:19 841:13
**holding** 792:19 838:4 850:2 860:14
**holdings** 772:14 838:21 839:2 840:3 843:2 861:5 863:21 865:9,10 867:4,21 868:7 871:7 881:21
**home** 811:13
**homestead** 811:2
**honest** 809:21
**Honestly** 869:13
**Hook** 771:17,23
**hope** 828:8
**host** 854:24
**hot** 771:13
**hour** 812:5 841:3 860:17 882:22
**hours** 841:3
**house** 804:24 805:1 810:17
**huge** 784:21
**hundred** 876:3
**hunt** 796:3

**I**

**IBM** 785:8
**idea** 823:11,16,20 828:14 850:20 872:23
**identify** 796:19
**identifying** 847:6
**identity** 847:11
**Illinois** 828:2
**imagine** 775:7 829:5 874:21,25
**important** 805:24 817:9
**improper** 840:14
**impugning** 809:25
**inaccurate** 781:6
**include** 886:18
**included** 881:16
**includes** 838:14 881:15
**including** 785:12,15 879:12
**income** 789:15 790:20 872:14
**Incorporated** 762:19 763:20
**independently** 833:9
**indicate** 840:5
**indicated** 794:3,17 827:11
**indicates** 787:13 867:4
**indicating** 810:25
**indirectly** 865:17 866:3 872:15
**individual** 847:11,20
**individuals** 785:14
**Info** 790:8

**infomercial** 770:18
**information** 790:1 797:9
**informed** 859:11 875:5
**Infow** 787:10
**Infowars** 777:13,22, 24,25 778:2, 6,17 779:9 780:11 782:5,7,17, 20 783:13 787:14,17,24 790:11 791:3,8,19, 20 792:7,14, 16 793:11 805:14,17, 23,25 807:16,17, 19,21,24,25 808:1 809:3, 6,8,24 811:18 813:18,21,25 814:4 817:3, 4,25 818:4, 6,16,20 819:1,13,16, 23 820:7,15 824:5 829:23 834:4,6,23 842:17 856:4 857:7,8 870:7 874:8
**Infowars'** 806:3
**Infowars.com** 778:3,6,17, 22 779:25 780:5,23 782:5,8,22 783:3,9,18, 25 784:14 792:10 806:2 808:23 817:15,22 818:3 842:10,13,21 843:1 844:4 845:9,22 862:1,5,8,20 863:1
**Infowars.com.** 782:3
**Infowars2022.com** 855:25
**Infowarsshop.com** 808:21
**Infowarsstore.com** 808:4,20 833:16
**initial** 867:7
**injected** 851:19
**injection** 848:7 850:25
**inquire** 840:2
**inquiry** 839:23
**insane** 800:12
**inside** 769:14 799:20
**insolvent** 767:6
**instance** 770:1
**instruct** 884:17
**instructed** 798:15 843:8 861:4
**instruction** 839:1 840:14
**intend** 838:22 848:13
**intended** 865:25
**intent** 848:18 851:10,13
**interact** 887:20
**interest** 768:15,16, 20,24 772:2, 4,6,8,11,15, 17 777:18 782:20 791:12 813:11,13 814:10,15,24 818:20 821:16,25 826:6 839:7 865:8,16,21 867:22,25 872:9,14,20 873:11
**interests** 772:1 815:4
**internet** 824:6 826:18,25 830:16
**interrupt** 764:3
**intervention** 857:18
**interview** 780:7
**introduce** 762:9
**inventory** 836:19
**invested** 835:17,24 836:3
**investment** 836:14,15 848:10
**involved** 775:22 827:18 828:19 829:9 864:5,15 873:8
**involving** 838:10
**ish** 765:25
**issue** 784:11 840:12 857:18 860:2,15 861:2
**issues** 770:3,10 864:11

J

**JLJR** 772:8
**job** 833:13
**joined** 838:12 869:20
**Jones** 762:6,15 763:2,12 771:7,8,21 772:19 773:2 775:21 779:14 781:13,19 782:13 783:21 784:3,12 785:11 786:14 787:2 788:21 793:2,9 796:9,17 797:7,18

798:21 799:4 800:4,16 801:1 802:10 803:6,25 804:9 805:9 807:4 808:11,13 810:25 812:21 813:17 828:21 838:13,16,19 839:1,4,14 841:6 842:6, 9 850:2 857:5,24 858:11 860:10,19 861:1,10 865:16,25 866:9,10,23 867:15 870:20 871:21 873:6 878:6,16 879:24 880:14,19 883:2,23 884:3,8,18 886:19,24 888:15,20 890:2,21,24

**Jones'**
839:8,24 859:12 888:22

**judge**
794:4 795:9 840:13 841:21 858:23 859:12,23 860:1,14 878:1

**Judge's**
857:18,20

**judges**
794:10 795:18

**jumping**
815:15

**June**
762:4 779:17 780:3,22 781:4 782:1, 22 783:16,25 784:15 799:14 800:5,8 801:2,9 817:14 890:3

**Justice**
793:10

**K**

**Kauai**
774:11

**keep**
767:13 780:8 781:16 783:21 786:11 797:13 803:11 848:18 851:11 868:4 870:19 874:10

**keeping**
851:14

**Keiser**
854:23,24 855:2

**Kelly**
866:10

**key**
806:18,20

**kind**
777:23 887:12

**knew**
785:25 803:4

**know**
764:1 768:20,23 769:15 772:4 775:3,4,11, 24 776:2 777:1 778:24 780:12,15,16 781:9,18,24 783:2,8 784:4,5,15 786:10 791:1,5 793:17,19,22 794:14,15 795:4,5 799:5 801:13,23 802:11,13, 16,23 803:7, 10,23 807:6, 20 809:10,11 811:23 813:20 817:12,13 821:6,14 822:9,11,16 823:7,10 824:14,22 825:15,16 827:8,14,24 828:7,13,15, 16,18,22 829:22 830:3 831:2,6,7,15 832:4,17,20 841:11 842:11,14, 16,19 843:24 844:5,21,25 846:18 847:5,10,14 848:12,16 849:6,13 850:13,24,25 853:18 855:6,7 856:20,23 857:10,21 858:6 859:23 860:7,9,12 861:19 864:11 865:20 866:20 868:13,14 869:18,21 871:12,13, 19,21,23 872:3 873:22 875:3 876:13,17,21 877:17,21 878:9,10 879:2,22 880:14 882:17,19 883:7,9,14, 18 884:5,7 885:21,22 886:13 887:11,19

**knowledge**
772:5,12,16 781:23 782:7 783:19,23 784:2 785:25 819:11,15 868:15 872:24 884:21

**knowledgeable**
873:11 880:1 885:4,18 886:1,10,20 888:7

**known**
772:6 813:17,21 820:15 828:1

**L**

**lack**
828:9 884:21

**Lamar**
762:7

**landed**
776:11,12

**landing** 862:4,13,14, 16
**large** 802:2 845:22 871:1,3 878:5
**lawsuit** 823:23 869:20 876:4 877:23 878:7
**lawyer** 794:11 795:19 839:5 882:24
**lawyers** 785:24 787:21 791:6 797:20,24 798:15 816:19 817:1 864:2 872:25 873:13 875:4 880:5 881:24 885:11
**LAX** 776:15
**lay** 766:14
**layovers** 776:14
**learned** 789:6 883:19
**learning** 843:17
**lease** 789:11
**leave** 773:13 796:14
**leaving** 851:25
**ledger** 856:10,15
**leeway** 839:12
**left** 800:14 803:4 810:20 822:22 869:3 882:22
**legal** 787:21 823:25 849:5 851:7 856:4, 10,18 857:8
**legitimate** 843:16
**liabilities** 789:20 790:21
**liability** 864:10
**license** 842:12,17
**life** 873:7
**light** 772:21
**limited** 840:2 845:3 861:5 863:21 867:4 881:22
**line** 779:21 884:13 890:4
**link** 854:22 856:1,3
**linked** 842:21 844:4,6 845:8,21,22
**lion** 848:19
**list** 852:24
**listed** 790:14
**listen** 828:5 883:14
**lists** 787:10 788:23
**litigation** 789:21 804:1,10 811:12,20 813:1,14 814:15 815:4,12 816:15,23 820:21 855:15 877:14
**little** 797:16 805:8 820:12 849:8 869:7
**live** 793:13,14 799:10
**lives** 875:11
**living** 858:23
**LLC** 772:6 777:13,14, 23,25 778:7, 17 779:9,10, 17 780:17 782:5,7,17, 20 783:13 787:10,14, 17,25 790:11,12 791:20 805:17,18 811:18,19 813:18,22,25 814:4 817:3, 4 818:4,21 819:1,13,16, 24 820:8,15 838:4,21 861:5 863:21 865:9 867:4, 21 868:7 881:21,22
**LLCS** 768:24
**located** 762:6,25 875:2
**long** 764:2,11 775:12 812:4,11 841:2 852:17,24 860:15
**longer** 799:6 801:19 804:7 812:8
**look** 775:17 785:5 788:19 789:6 799:10 809:12 817:10 838:6 857:1
**looked** 780:20 810:24 843:14 856:24,25 868:12,13, 22,23,24 869:5
**looking** 794:13 809:21 823:22
**Lopez** 795:9
**Los** 776:11,15
**lose** 769:22
**lost** 769:18 834:9 888:18
**lot** 781:16,17 806:5 844:1 849:10 886:5

**loud**
799:19
800:22
888:12
**low**
834:19
**lunch**
858:20
859:19
**Lydia**
886:19,24

**M**

**made**
802:16 803:7
839:23
853:7,8
870:24
**mailers**
768:3
**main**
764:25
877:13
**majority**
865:10,16
866:4 868:9,
20 869:13,22
870:6,10
874:9 878:6
**make**
766:10
784:10
794:16 795:6
796:15
799:12
808:3,9,16
833:23
869:14,23
870:19 878:3
**makes**
870:10 878:1
**making**
775:9 777:1
794:12
798:2,4
**mall**
815:21
**man**
799:19
806:18,20
882:25
883:14
**management**
768:17
807:22
**manager**
769:5 822:20
**managerial**
769:16
**manages**
844:7,12
**manufacturer**
826:17
863:15
**Marc**
788:8,11
**Mario**
762:18
763:14
859:16
860:4,6
882:23
**marked**
779:13
866:24 881:8
**market**
764:22
828:15
**marketing**
821:10
823:2,3,4,10
**markets**
767:2,18
824:3
**Marriott**
774:13
**materials**
768:8
**Mattei**
762:12,13
773:1 775:20
781:4,12
782:13
783:2,16
784:7,10
785:7 786:4,
13 787:23
790:6 791:23
792:9,15,24
793:21
795:13
796:14,20
797:7,18
798:13,21
799:4,17,24
800:2,4
801:1,7,15
802:23
803:6,25
804:6,15,25
805:11
808:11
810:10,18
811:10
812:7,21
816:11,21
817:11,21
818:18
819:7,21
820:3,11,19,
25 821:7,24
822:5 823:20
825:6,19
826:5 827:2,
23 828:21
829:6 830:5
831:3,7,13
832:5,10
833:7,15,23
834:16
835:7,23
836:3,7,17
837:20
838:19,25
839:18
840:19,23,25
841:17,22,23
842:6,9
843:10
846:8,16,18
850:1
855:14,24
857:16
858:5,13,24
859:8,16
860:6,17,20
861:1,12
863:13
864:15,21
865:7,14,24
866:9,16
868:13
869:17
870:9,16,20
871:13
873:22
874:14,24
875:14,20
876:13,18
877:6
879:10,16,24
880:8,14,19
881:1,4,7,9
883:2,10
884:2,8,15,
18 885:16
887:2
888:10,15
**matter**
870:18
**Max**
854:23,24
**maximum**
841:3
**mean**
765:14
766:25 767:3
771:9 775:6,
17,19 776:11
778:12
780:6,10,11,
13,15 781:3,
9,14,17
782:1,11
785:8 789:2
791:3 792:16
794:22
795:5,23
797:10 798:7

800:14 802:4,6,7,8 804:7 805:22,23 806:5 807:7, 17,20 808:1, 9 809:7,9, 21,22 810:9 811:15 821:5 823:14 825:14 826:12 830:3 832:3 836:10 841:8,10 843:14 844:10,13 845:5,10 852:16 858:8,21 859:20 863:14 865:22 868:20 869:9 871:10 873:6 874:7 876:21 877:3,13 882:9,18,19 883:16 885:8,15,20, 23 887:10 888:6

**meaningful** 809:18 810:5

**means** 762:24 763:18,19 807:7 876:17

**meantime** 840:23

**measure** 832:15

**media** 768:8 812:17,20 821:10 842:2,5 859:4,7 888:25

**meet** 764:4

**meeting** 789:2

**meetings** 883:24

**members** 854:4

**membership** 867:21,24

**memoranda** 881:18

**memory** 797:11 811:15 818:11,15 851:21

**mention** 765:7

**mentioned** 835:9,18,25 836:5 887:4

**merchandise** 807:19

**merchandize** 808:19

**mess** 786:11

**messed** 844:23

**met** 763:14 788:15,17, 20,25 789:4

**metals** 764:9 766:22 767:20 768:12 770:13

**Michael** 769:5 778:25 779:2,18 780:22 784:18,20

**Michigan** 764:7

**Midas** 765:8 766:15 768:16,18 771:2

**middle** 793:6 888:12

**million** 798:23 799:3,15 800:6 801:3, 10,14,25 802:1,17,22, 24 803:15 804:2,10 810:11,13,20 811:5,12 816:14,22 846:20,23 847:2 849:17,21 850:6,10 851:5,18,21 852:4,6 876:11

**millions** 796:12

**mind** 792:14 865:15

**mine** 764:10 804:7 848:4

**Minnesota** 764:8

**minute** 837:12 851:25 880:23

**minutes** 841:4,23,24 858:15,25 859:2 881:2 882:6

**mission** 848:14

**mistaken** 781:21,22

**moment** 786:13 888:19

**Monetary** 767:25

**money** 775:2,24,25 789:18 791:9,18 803:4 804:7, 11,20 808:3, 10,16 809:13,24 821:1 834:10 835:18,24 836:4,15,21 837:3 848:25 852:1 855:18 857:7 868:20 869:14,16,22 870:6,10 872:17 873:17,21,23 874:2,13 876:7,19,21, 25 877:15,17 878:5 883:22 886:25

**money's** 883:25

**month** 791:4

**months** 834:7 875:13 882:7,22

**morning** 762:12,14, 17,20 763:12,13

**move** 809:14 840:24

**moving** 777:2

**multiple** 839:20

**muted** 859:17

**N**

**name** 762:22 763:14 787:13,16,24 890:2
**names** 790:9,15 795:3 797:3
**nanny** 774:19
**nature** 795:21
**necessarily** 799:10
**need** 763:5 797:1, 2,8,10 800:18 817:10 829:15 841:5,8 846:11 859:20 867:10
**needed** 874:9
**needs** 860:4
**network** 762:18 763:16,19 764:6,10 770:4 771:1
**networks** 769:13
**never** 767:4 768:17 770:5,24,25 771:3,22 811:8 882:10 885:14
**news** 767:17 770:14,21 776:23 794:12 798:8,10 802:9 869:19
**night** 858:22
**nine** 764:14
**Non-individuals** 787:7
**noted** 890:22
**notes** 858:15 881:20
**notice** 839:8,25 880:21 881:11,16
**number** 805:21 850:19 855:22 862:3,12,19 863:3
**numbers** 849:10,19 850:12,16 878:9

**O**

**oath** 791:8
**object** 839:15
**objected** 840:7 881:25
**objection** 771:6,20 775:15 781:1,7 782:9,23 783:10 784:1,3 785:3,22 786:8 787:19 790:2 791:22 792:5,11,21 795:11 798:5,17 799:1,16 801:6,11 802:19 803:1,17 804:3,13,22 808:5 810:7, 15 811:6,21 816:16 817:7,16 818:8 819:3, 18,25 820:10,16,22 821:3,21 822:2 823:17,24 824:25 825:12 826:1,9,21 827:16 829:2 830:1,25 831:4,10,25 832:8 833:3, 12,21 834:13 835:4,20 836:1,9 837:15 838:5 840:8 843:6 849:23 854:18 855:11,20 859:13 861:3 863:10,24 864:18 865:3,11,18 866:6,13 868:10 869:11 870:4,14 871:8 873:18 874:5,22 875:8,17 876:9,15 877:1 879:7, 13,20 880:3, 10 882:15 883:6 885:6 886:22 887:24
**obliged** 877:9
**observe** 776:6
**observed** 776:20
**obtain** 788:21
**obviously** 788:3 796:11 860:4 873:6
**occasionally** 862:8
**occurring** 834:17 835:1,8
**offer** 825:20 861:16 884:9
**offered** 861:23 863:5,8 884:18
**office** 794:9 795:23 797:25 857:12,17 859:11 882:22
**officer** 788:12
**offices** 765:22
**official** 857:6
**okay** 763:4 764:11 765:12,24 766:19 767:22 768:7,14,19, 23 769:2 770:9,24

771:9,15,24
772:18
773:13,17,21
774:25
775:4,9,23
776:4,10,14
777:4 778:3, 14,21,24
779:20 780:3
781:12
782:16 783:7
784:13
785:7,17
786:13,20
787:1,6,10, 23 788:3,19
789:5,24
790:14,25
791:10
792:9,24
793:2,14,18
798:21,25
800:25
801:7,21
802:14,23
803:13
804:6,17,25
805:5,8,11, 16,20 806:1, 11 807:13
808:3,16,19, 23 809:6
810:10
811:4,10,17
813:3,9,24
814:10,13, 18,23
815:11,19,25
816:10,21
817:21
818:22
819:10,15
820:19
822:13,16
823:16
824:4,23
829:6,10
830:5,13,20, 22 831:7,13
832:5,17,20
833:7 835:13
836:17
837:6,11,20
838:2 839:18
840:19
841:16
842:12
843:4,20
844:7,9,15
845:7,12,16
846:22
847:6,14
848:24
849:21
850:1,9
852:7,14,18
853:1,20
855:2 858:2, 7 859:8,14
860:18,20
861:22
862:7,11,18, 23 863:18
865:7 866:23
869:17
870:1,9,23
871:3,6,22
872:4,11,23
873:10
875:14
876:24
881:7,10
885:24
886:7,18
887:6,14,20

**once**
793:16 804:8 848:2 887:21

**one**
765:14 770:6 777:21 782:19 786:2 787:3,5 798:13 815:19 817:22 832:4 836:19
845:21 853:18 854:6 857:11 872:25 882:22 884:18 888:10

**opening**
888:14

**operating**
824:6 874:10

**operation**
788:22 826:8 848:19 849:7

**operational**
867:14

**operations**
786:6 822:19 867:13 868:21

**opinion**
888:1

**oppose**
794:15

**order**
773:8 797:8 836:20,22

**orders**
768:4 878:1

**original**
881:16

**originally**
765:11 773:7

**ounce**
882:11

**outside**
839:12,16 886:17 887:6

**overlooking**
887:12

**overrule**
882:5

**overruled**
861:3 882:1, 7

**owe**
876:19,25

**owed**
873:16,21,23 874:13 878:5,6 879:1

**owes**
874:2 876:8

**owned**
778:6,17 779:23 780:5,23 782:2,5 788:23 819:1

**owner**
782:14,17 785:11 809:16 810:3,4 819:9 822:5 867:25 868:8 870:20 872:1

**owners**
789:25

**ownership**
768:15,16,17 777:17 782:20 812:25 813:11,13 814:10,14,24 817:3,5 818:20 821:16,20 865:8,10,16 866:4 868:2 872:14

**owns**
778:21 779:24 783:3,8 813:17,20,25 817:14 821:11,13,15 822:9,14 824:13,19 830:20,24 831:2,3 863:8,12

P

**p.m.** 889:1
**page** 779:20 787:3,5 810:23 815:14,16,22 843:9 844:4 845:9 862:4,13,14,16 866:24 867:3 890:4
**pages** 787:4 842:21 843:5
**paid** 774:23 775:5 826:13 827:10 834:23 851:6,12 852:11,19 870:6 872:16 873:14 878:22,24 885:21,22
**pamphlet** 768:2
**pamphlets** 768:8
**par** 796:2
**Paragraph** 788:19 789:6 790:7,19 814:20,23
**PARKER** 762:1
**part** 788:7 816:19 834:21 839:9 862:25 875:25
**particular** 784:11 862:13
**particulars** 879:22
**parties** 824:7 826:19 827:15,24 828:22
**party** 830:13 834:1
**past** 851:12 862:3,11,19 863:3
**Pattis** 839:19,21
**Paul** 765:22
**paused** 793:4,5
**pay** 768:3 775:1 789:17 795:25 807:22 816:25 825:24 836:21 837:3 842:10 843:20,22 852:9 868:17 870:12,25 871:10 876:21 877:9 879:11,19 885:10
**payee** 852:23
**paying** 767:7,11 769:14 774:24 775:7 803:3 851:22 852:20,21
**payment** 853:6
**payments** 853:8
**pays** 825:17 830:11 885:10 886:15
**peace** 763:9
**pending** 789:21 800:24
**pendulum** 807:2
**people** 770:24 774:14 777:1 780:11 794:22 795:19,25 797:11 798:9 809:19 844:22 845:4 854:3 855:1,3 864:10 873:7,10 885:12
**people's** 864:22
**percent** 782:14,17 791:2 805:13,21,23 806:2 807:15,18,20 809:3 814:17,24 834:20 836:23 850:15 851:14 854:6 867:21,24 868:8 874:8
**percentage** 792:1,18 826:12,13 827:6,7,13,14 830:12 834:16 835:8,13 837:4,5 853:23 876:20 877:11,12 878:18,25
**percentages** 877:11 885:9
**perfect** 803:22
**perfectly** 766:8
**permission** 850:14
**permits** 860:12
**person** 763:22 778:8,10 786:2,6 789:4 796:19 844:12 879:25 886:10
**personal** 773:15 775:2,25 800:6 801:9 802:17 819:11 820:20 843:1 844:16 848:4 849:1,17 850:7 852:2,8,12 853:8 868:15 872:14
**personally** 774:23,24 775:5,8 791:20 801:4 806:14,17 830:23 831:8 836:3 845:7 847:22
**personnel** 879:12

**pertain** 838:18
**pertaining** 838:13
**petition** 787:7 815:5
**phenomenon** 843:19
**Phoenix** 776:12,16
**phone** 789:2,3 795:19 840:13,18 854:21
**phonetic** 769:6
**pitch** 771:12,14
**place** 799:20 800:11 826:16 827:6
**placement** 770:20
**places** 824:6
**plaintiffs** 762:13,21 797:20 838:11
**plaintiffs'** 798:15
**plan** 823:8
**planes** 777:2
**Planet** 777:14 779:10 790:12 805:17 809:8 811:19 817:4
**planned** 777:7,8
**plans** 773:9
**platform** 769:9,15 824:17 837:13
**platforms** 769:14 879:6
**play** 793:17,18 805:8
**playing** 793:20 797:13,17 798:20 805:10
**please** 762:9 786:14 850:22 880:18 884:3
**pledged** 809:23
**plenty** 839:11
**PLJR** 772:11 865:8 867:21,25 868:7
**plugging** 829:11
**point** 784:6 788:25 821:2 827:5 846:12 854:11 857:22 858:12 868:2 877:23,24 878:21
**points** 830:10,14
**policy** 767:25 794:13
**political** 796:3
**pop-up** 827:8 862:8, 14,17,21,25
**populism** 848:15
**portion** 816:22 846:17 871:1,3
**position** 839:6 872:19 873:20,23 876:25
**possible** 781:25 858:20
**posted** 799:8,9,13 801:18
**postponed** 773:8
**pot** 877:25
**potential** 771:25 789:21
**PQPR** 772:6 838:4, 10,14,18,21 839:2,22 840:2,3,9,24 857:18 859:9 860:15 861:4,13,15, 22 863:5,21 864:17 865:1,5,10, 15 866:12 867:4,7,22 868:3,9 869:1,9 870:10,24 872:15,20 873:12,16,23 874:2,16 876:8,19,25 877:9 878:5, 19,25 879:5, 11,19 880:2 881:21 882:4 883:5,20 884:20,25 885:5,19 886:3,11,16, 21 887:9
**PQPR's** 866:3 878:17
**practices** 887:19
**preach** 767:24
**precious** 764:9 766:22 767:20 768:12 770:12
**precise** 850:2
**predate** 876:4
**prejudicial** 838:16 839:2
**prepared** 794:18 797:1
**Preparetoday. com** 830:14,17 831:3,20 832:12 835:2 863:6
**Preparetoday. com.** 831:23
**Preparewithal ex** 863:6
**Preparewithal ex.com** 830:9,17,20 831:16,22 832:5,22 834:17 835:2
**Preparewithal ex.com.** 832:2
**preparing** 788:15 793:9 794:17

**present** 838:16 839:3,7,24
**presented** 861:2 866:20
**presiding** 866:21
**presumably** 794:22
**pretty** 781:14
**previously** 810:24 833:18 843:12
**prior** 782:16 787:13 818:4,7 819:2,13,17 842:20,25 853:13 864:16 878:5 884:19
**prison** 777:14 779:10 790:12 805:17 809:8 811:19 817:4 841:12
**Prisonplanet.com** 780:17
**Prisonplant.tv** 780:16
**private** 774:8 851:2,24
**privately** 851:13
**privilege** 796:10
**privileged** 796:7,22
**probably** 775:18 798:8 869:4
**proceeding** 762:7 819:22 820:6,13
**proceeds** 811:2,13 825:23 834:25 835:14 848:2,9 851:18 852:3 856:7,16 863:18 878:19,25
**processing** 853:17
**produce** 860:10 880:21 882:2
**produced** 883:5
**producing** 881:25
**product** 770:20 822:4,6 825:16,17,24 828:17 832:25 834:18 836:18 837:12 851:8 877:13 885:9
**products** 770:19 791:13,15 821:12 822:1,6 823:7,9,13 824:2,8 825:20 837:7,25 838:2 861:14,16,23 863:5 864:13,23 868:16
**profit** 854:9 868:17,19 869:1,10 870:2,8 877:12
**profits** 870:23
**program** 825:18 853:25 862:1
**projecting** 808:7
**promote** 766:21 791:15 854:2
**promoted** 853:20 854:9 862:12
**promotes** 854:25
**promoting** 848:14 857:13 861:25
**promotional** 768:2
**prompted** 823:21
**property** 805:6 819:1,12,16,23 820:7,14 842:18
**protection** 777:10,17 786:18 790:11 792:2 812:24 814:7,13 864:11
**provide** 825:9
**provided** 779:17 780:4 867:7 880:15
**provides** 825:25 879:12
**public** 764:6 795:22,24 843:12 844:6,24 845:2
**publishing** 769:16
**pull** 850:19
**pulling** 880:24
**purchased** 836:19
**purchasing** 834:12
**pure** 834:15
**purely** 827:19
**purpose** 766:19 781:10 789:7 821:1 823:12 860:11
**purposefully** 781:10
**purposes** 776:5 787:17,25 790:9,15 804:8
**put** 768:2,4 787:6 792:2 797:21 804:8 809:10 814:25 838:10 844:22 848:4 853:3 855:2 856:10 857:25 869:4 887:19

**putting** 798:10

Q

**qualifying** 784:9
**quantify** 792:13
**question** 775:20 780:19 783:1,7,22 784:13 785:6,17 796:10,20, 21,23,24 797:5 799:23,25 800:3,18,24 802:14,15 809:2 813:24 817:9 818:23,24 829:15,17 846:3 861:6, 12,22 865:22 871:17 880:18 883:11,23 884:4,16
**questioning** 769:17
**questions** 763:15,25 766:5,8 772:20,23 773:2 786:2 797:2 802:21 803:10 808:9 838:10,13, 18,21,22 840:3 857:4 858:11,19 859:9,10,15 860:11 861:4 872:20 883:16 886:5 888:17,19
**quick** 880:25
**quit** 833:13
**quite** 781:16 786:10 827:20 846:13 875:10
**quote** 769:20
**quotes** 798:9

R

**racked** 767:9
**radio** 764:6,16 765:25 766:17,20,24 767:11 769:4,22 785:9 886:14
**rainbow** 877:25
**raised** 861:2
**ranch** 875:12,21,25
**read** 780:6 798:8 800:1 809:23 846:7,10,15, 17 867:10 885:14,15 890:21
**ready** 842:7
**real** 809:9 887:1
**reason** 781:5 789:18 882:13 883:3 890:4
**reasonable** 850:18,21
**recall** 765:13 768:7 793:9 815:8 866:9
**receive** 854:14 856:16
**received** 849:18
**receiving** 845:22
**recently** 773:3 834:3, 5
**recess** 812:18 842:3 859:5 860:23
**recognize** 800:17
**recollection** 771:16 868:7
**record** 762:4,10 812:17,20 838:11 841:14,15 842:2,5 858:10 859:4,7 860:22,25 861:10 888:24
**recorded** 776:19 799:13 801:2
**records** 766:11 856:15 880:22
**recovery** 823:23
**redirect** 764:3 831:22 856:2 857:12 859:10
**refer** 763:17,18
**referring** 805:16 806:1 807:16 836:18 838:4 846:19
**refreshed** 818:11,15
**Regarding** 788:9
**register** 822:11
**registered** 822:12 824:14
**reimburse** 851:12
**reinvested** 850:22,24
**related** 789:21
**relating** 838:21 882:3
**relation** 826:8
**relationship** 764:12,20,25 765:2,11,13 766:14 828:23 874:15 880:1 881:20 882:3 884:24 885:4,18 886:2,11,21
**relative** 765:13 770:2 771:2
**relayed** 796:13
**reluctant** 859:24
**remaining** 861:5

**remains**
820:20
**remember**
766:3,4,6,7, 23 769:4 774:5 775:18 795:3 797:3, 6,8 798:19 803:8 805:2 807:8 819:14,20 824:10 825:8,14 830:7 832:3 842:22 854:20 855:10,13,22 856:24 863:22 864:7 865:13 868:4 871:18 872:17 873:4 879:3,4,9,15 888:2
**remotely**
762:1,8,24
**renegotiate**
874:11
**renegotiated**
874:11
**renoticed**
881:9
**rent**
769:10 789:11
**rental**
774:12
**repeat**
813:3
**reported**
762:1 796:19,25 798:14
**reporter**
762:11,22 763:7 846:7, 14
**reporting**
762:23 770:21
**reports**
776:20
**represent**
857:4 881:14,24
**represented**
807:15 809:3
**representing**
811:2 847:17
**represents**
792:20 805:13
**reputable**
853:19
**request**
881:15,18 882:1,3
**requested**
846:17
**require**
879:17
**required**
879:11,19
**requiring**
880:21
**research**
776:6,17,18
**resell**
821:12 826:17
**reselling**
823:12
**Reserve**
767:25
**reserved**
859:9
**resolve**
860:2
**resort**
774:12
**resources**
765:8 768:18 771:2 775:1
**respect**
840:9 861:13
**respond**
887:11
**responding**
883:10
**Responds**
793:10
**response**
881:25
**responses**
884:19
**responsibilities**
887:15
**responsible**
765:15 775:9 847:11
**rest**
776:7 816:20,25 870:7
**rested**
839:14
**restructuring**
788:12
**result**
777:5 872:14
**retailer**
863:16
**retained**
817:5
**retains**
827:13
**retrospect**
786:5
**return**
774:6 777:5, 6,7,8
**revenue**
822:1 823:22 853:23
**reverts**
870:11
**review**
779:23 858:15
**reviewed**
766:12 788:23
**reviews**
829:13
**ridiculous**
853:5
**right**
763:22,24 764:15 766:2 770:13 771:10 772:3,8 774:19 779:12 781:22,25 782:1 788:7 790:18 791:18 792:17 793:5,8 794:16 796:23 804:15 806:22,25 807:11 808:4,17,21 810:3 811:17 812:2,12,14 813:7 814:19 815:8 816:2, 3 822:14,20, 22 824:18 830:8,14 833:1 840:13,25 841:17 842:23,24 844:6,10,25 849:9,16 851:16 852:10 854:2 857:1,15 858:14 859:18 861:1,11 863:13 868:6 869:24 873:3

878:23 881:14 887:17 888:15
**Rob** 816:2
**Robert** 856:11 886:19
**Robertson** 762:23
**Roe** 856:11 886:4,7 887:4
**role** 865:2 887:8
**Ron** 858:2
**room** 793:1 800:15,21
**roots** 785:10
**rotating** 862:24,25
**roughly** 803:5 850:10
**routed** 835:2,15 856:7
**rules** 812:10 840:15 859:23
**ruling** 840:16
**rumors** 809:14
**run** 863:1 886:14
**running** 810:21 825:2 837:2 868:21
**runs** 837:21

**S**

**said/she** 810:1
**sale** 783:17,24 784:14 804:24 810:17 811:2,13 817:24 825:21,23,24 826:13 861:16,23 863:5,9,18 870:11 878:19,25
**sales** 768:4 791:16 827:6 834:16 835:1,8,14 836:12 863:19 864:16 869:23
**samples** 853:4
**Sandy** 771:17,22
**sat** 841:9 854:21
**satellite** 769:10
**Save** 856:4 857:6, 8
**Saveinfowars.com** 855:16,24 857:5
**Saveinfowarsmoneybomb** 857:6
**saying** 766:3 769:21 783:4,5,6,21 784:9 786:5 794:13 795:9,25 797:25 803:11 810:1 814:1 818:15 860:9 868:22 869:19 884:23
**says** 788:20 789:14 815:3 858:23
**Schedule** 881:15
**scheduled** 773:7
**school** 888:13
**Schwartz** 788:8,11,25 789:5 790:19 810:1
**scope** 839:12,16 840:4
**screen** 793:5,6 801:22
**scroll** 787:3,4
**second** 806:21 808:13 815:19 817:22 838:8 867:12 880:17 888:10
**security** 774:2
**see** 779:13,18,21 780:1,3 781:3 787:3, 6 788:9 789:8,12,15, 18,22 790:4, 7,21 792:7 793:16,21 798:2,11 799:8 807:21 810:25 811:3 815:5,12,21 818:22 828:4 829:11,12 837:21 840:15 855:23 858:22 860:7,19 862:20 867:11,12, 15,20 877:19 881:22
**seek** 777:10 786:18
**segment** 770:18 793:23
**selective** 840:8
**self-funding** 825:15
**sell** 766:21 767:23,24 768:1 789:11 804:25 808:20 824:2,8 826:15 828:16 833:9,15 834:6 837:25 838:2 851:9
**selling** 808:16 823:6 834:3 837:18 861:14
**sells** 822:6 825:16 830:11

**send**
878:18
**sends**
827:14
**sense**
769:20
850:17
**sentence**
841:12
867:12
**separate**
765:20 814:2
821:9,10
825:6 828:7
837:3 857:7
864:12
**September**
867:13
**sequence**
881:10
**serves**
851:21
**service**
834:2 875:15
**services**
879:11,19
**set**
763:4
775:13,21
783:13
821:10
823:2,3,12,
20 824:9
842:20 843:4
844:13
855:15
856:16
864:1,4,14
865:1,5,8
872:25
873:2,13
880:5 885:12
**setting**
823:6 857:21
874:15
**settlement**
810:14
811:12,20
813:1,14
814:15
815:5,12
816:15,23
820:21
**settlements**
809:25
**several**
765:5 778:11
785:12 826:3
828:14
833:25
**share**
848:19
**shared**
768:15
**shocking**
795:4,7
797:9
**shopping**
815:20
824:16 827:8
**shorter**
794:6
**show**
765:18,20,21
766:17,21,24
767:11,13,16
770:18
778:24
779:12 785:9
786:14 787:1
793:2,3,13,
14 798:12
802:4 808:10
810:23
814:18
852:16
853:20
854:3,24
866:23 868:5
871:15,20
880:12
886:14
**showed**
818:10,19
868:25 869:5
885:13
**showing**
866:24
**shown**
815:9
**shows**
769:4,8
776:19 793:6
809:7 856:23
**shut**
764:24
877:23
**sic**
772:14
**side**
797:24
829:23
**sides**
843:14
**sign**
830:5 854:3,
14
**sign-up**
854:5
**sign-ups**
853:24 854:1
**signatory**
815:13
829:22
**signature**
815:14,16,22
816:1,2
890:1,21
**signed**
816:3 827:2
829:23
854:20
874:19 880:8
**significant**
840:12
867:14
**signing**
854:9
**silver**
764:8 765:10
767:6,18
768:10
771:3,12
**similar**
794:12
**simple**
783:22
**single**
845:23
846:12,19
850:4
**sir**
768:13
773:11 777:9
796:11
**sit**
809:1 868:6
**site**
808:1,4
825:2 857:7,
13,14 862:9
**sites**
825:3 856:22
**sitting**
793:1
816:20,22
841:9 872:21
882:18
883:17
**skepticism**
843:12
**slick**
882:25
**small**
764:6 792:8
836:13
861:18
**smart**
784:20
**smarter**
859:19
**sold**
808:20,23
822:1 825:18
830:18
833:19
837:7,12
864:23

**solely**
840:8
**sort**
884:9
**sorts**
786:1
**sought**
777:16
812:24
814:7,13
**sound**
842:23
**sounds**
841:25
842:24
879:24
**source**
784:8,20
797:22
845:23
846:12
**South**
762:6
**speak**
763:8 790:24
791:6 811:9
813:15 819:5
871:2
**speaking**
764:4 766:6
793:22
801:13
**specific**
823:5 856:14
**specifically**
797:5 821:14
**specifics**
797:3,12
824:14,22
826:3 829:4
844:5,21
849:13,25
861:19
865:13
**speculate**
782:12
792:23 821:5
850:15
857:11
870:18
**speculating**
798:7
**speculation**
792:25
797:23
**speculative**
826:23
827:19
**Speech**
762:16
768:21
773:25
775:1,24
779:3,6,9,
17,22,23,24
780:4,12,21,
23 782:2,8,
14,21 785:2,
20 786:7
792:1 806:25
807:5,10,22
814:2,24
818:3,6
819:1,12,16,
23 820:7,14
822:20,22,25
825:7 834:24
835:3,8,14,
15,17,23
842:9,12,17
848:6,10,11
849:2,5
850:11,22
851:4,6,14,
19,22,23
852:2,9
853:9 856:15
864:23,24
865:6 866:11
867:8,15
868:21
870:12,21,24
874:3,9,16,
19 876:8,18,
24 877:8,24
878:4,14,17,
18 879:5,10,
12,16,18
880:2 881:21
882:4 883:5
884:20,25
885:3,8,17,
19,20,25
886:2,8,11,
21 887:8
**Speech's**
848:14
**spend**
848:13
851:13
**spent**
816:19
856:10
868:20
877:16
**sponsor**
764:5,6,9,10
767:2
770:19,22
823:7,8
854:16
**sponsors**
825:4 828:9,
11
**sponsorship**
764:11 767:4
770:23
**St**
765:22
**staff**
840:20
**stake**
866:4
**stalemate**
877:15
**stand**
839:17
**standard**
826:18,25
**stands**
851:16
**start**
765:13
785:10
812:20 823:6
826:14 842:5
859:7
**started**
765:18,19,
20,21 767:14
824:12
832:6,13,18
845:22
877:19
**starting**
833:8
**statement**
797:22 862:6
878:12
**statements**
794:12
795:22,24
798:9
**States**
794:23 795:8
797:19
798:14
**station**
764:16
766:20
**stations**
769:23
**stay**
774:10
857:25
**stayed**
774:13
**stems**
784:18
**stenographic**
762:24
**Sterling**
762:20,21
**stick**
837:11
**stool**
853:4

**stop**
769:20
809:13
884:13
**stopped**
764:23
766:24 767:4
768:5
**storable**
830:18
833:16,18
834:3,6
863:8
**Stories**
793:10
**straight**
828:11
883:20
**strike**
764:17
817:25
878:14
879:17
**structure**
864:3 865:20
868:3
**stuff**
767:1 776:22
781:16
784:22 785:1
787:22
790:23 796:7
807:9,19,23
809:9,14
810:2 827:1,
19 828:7
836:12
837:18
868:22
869:15
873:14
882:19
883:18,20
884:5,6
885:9 886:6
887:11
**subject**
823:23
838:23
839:22
**subpoena**
875:6,16
**substantial**
767:12
**substantive**
851:23
**successful**
827:20
828:9,10,12
**sued**
781:18
785:13
**suggest**
796:18
799:22
858:20
**supplement**
864:2,4
**supplements**
808:16,19
864:16
869:13,23
870:11
883:25
**suppliers**
832:23
833:1,6,9
**support**
867:14
**supportive**
843:15
**supports**
854:16
**supposed**
818:12 874:8
878:18
**sure**
766:10
780:14
784:10 790:6
794:16 795:6
796:8 797:1
800:20
810:11 812:8
822:11
830:21
832:12 835:7
837:17 846:4
853:2 860:3,
8 865:24
871:15
872:6,21
873:9 878:3
**surprised**
853:4
**Swan**
853:14,16,
21,24 854:2,
3,9,17
855:1,3,6
**Swanbitcoin.com/alex.**
854:12
**swear**
762:11
**swinging**
807:2
**sworn**
763:3 780:4
**syndicated**
765:21
**syndication**
766:1 769:5,
15
**syndicator**
769:9
**system**
864:3
**systems**
762:16
768:21 774:1
779:3,6,9,
17,22,24
780:4,12,21,
23 782:2,8,
14,21 785:2,
21 786:7
807:1,5,11,
22 814:25
818:3,6
819:1,12,17,
23 820:7,14
822:20,22
823:1 825:7
835:3,8,14,
17,23
842:10,12,17
848:6,10,11
849:2,5
850:11,22
851:4,6,19,
22,23 852:2
853:10,19
864:23,24
865:6 866:11
867:8,15
868:21
870:12,21,24
874:3,9,16,
20 876:8,18
877:9 878:4,
14,17,18
879:5,10,12,
16,18 880:2
881:21 882:4
883:5
884:20,25
885:4,8,17,
19,21,25
886:2,11,21
887:9
**Systems'**
775:1,24
792:1 835:15
852:9 856:15
876:24 886:8

### T

**table**
810:25
**tacked**
877:12
**take**
764:19
777:21
789:24
800:13,18
811:11
812:3,6,7,13

821:1 824:11 829:21 836:14 841:1,20,24 857:22 858:14,24 859:1 878:24 880:25
**taken** 812:18 842:3 856:20 859:5 860:23
**takes** 860:1
**talk** 764:1 766:13 767:1 769:20 797:10 812:13 839:19 841:21 854:24 858:9 861:20 885:12 888:8
**talked** 771:24,25 789:3 823:15 864:1
**talking** 764:15 768:9 784:24 785:25 793:25 795:17 796:11 803:8,23 807:21 810:21 819:7,9 852:1 858:21 862:15 879:23 883:15
**tarmac** 777:2
**team** 772:22
**Teams** 858:4 859:12
**technical** 848:12
**technically** 776:11 807:6 836:10
**technicals** 778:13 844:21
**technology** 843:21
**Ted** 763:15,17,18 764:1,4,20 765:3 766:11,15, 16,20 768:3, 20,23 769:2, 7,8,12,21 770:4 771:18 772:1,15
**Ted's** 765:7
**telephonic** 858:3
**tell** 800:21 854:15 875:12,14,19
**telling** 791:8 801:19 873:5
**term** 848:12 850:24
**termination** 819:21 820:3,5,12
**terms** 764:2 766:8 839:8 886:17
**test** 823:10 861:18
**testified** 763:3 779:25 780:22 782:1,3 817:23 818:1 837:23 849:8 852:18 869:22 870:23 884:25
**testify** 779:8 785:1, 14,20 786:6 880:1 886:5, 10 887:23 888:3,6
**testimony** 775:23 778:5 780:5 781:5 789:24 790:25 801:7 804:9 810:4 822:9 823:11 824:11 825:19 827:23 829:6,8,17, 20 833:7 834:25 847:10 850:3 851:17 852:3 861:15 870:3,9 878:4,13,15 883:12 885:24 886:9
**Texas** 762:1,7,23, 25 763:1 795:8 838:12,15 839:5,24 869:20 875:11,20, 23,24
**texted** 860:6
**thank** 772:24 781:4 810:18,19 815:9 840:22 846:10,16
**Thanks** 816:10
**That'd** 808:18
**theories** 869:15
**thereabouts** 764:19
**thin** 850:20
**thing** 785:10 786:11 795:5,7 809:12 823:10 862:19 867:10 870:17 877:13
**things** 776:25 777:2 780:14 784:22 794:10 797:25 807:17 809:22 826:4 828:4,8 834:2 839:19 849:6 852:21 887:13 888:4
**think** 765:16,17 767:8 771:10 775:22 780:10 781:5,9,14, 17 782:18 784:5 786:25 788:17 789:3 799:6 800:18 802:9 805:22 809:7,8,22 810:9 811:15 816:19,21

817:19
818:10,15
819:5 823:19
830:21
840:11,14
842:11
843:16,17
844:2 846:4,
8 849:10,20
852:6,19
854:6 857:21
864:5 866:22
868:23
869:22
872:16
873:13
874:24
875:10
876:20
877:21 880:5
883:10 886:4
888:16,21
**thinking**
869:7
**third**
806:23 824:7
830:13 834:1
**third-party**
830:10
**thought**
785:24
828:14
882:20
**thoughts**
860:3
**thousands**
824:15
**three**
777:10
786:17
788:12
790:8,10
792:2 797:21
801:8 811:17
812:23
813:12
814:25
832:3,6

835:9,18,24
836:4,19
837:7
844:22,23
**throw-away**
884:9
**Tim**
822:18,19
823:19
824:12,19,23
828:1,18
831:19,20
837:4,17
861:19
863:17
886:19
**Tim's**
833:5
**time**
762:5 766:17
769:10
775:12
777:16,20,
21,22 778:5,
16 786:21
787:5 788:17
791:24
797:2,6
798:8 799:3
801:16
802:16 812:6
839:15
842:22
856:25
859:10 860:1
865:9 869:5
875:11
876:11 888:5
**times**
767:1 784:4
844:23 862:5
**titled**
788:8 793:9
**today**
782:3 784:23
809:1 813:18
817:14
839:12,21

840:7 849:12
851:17 858:1
859:13 860:8
869:6 872:21
881:12
882:21
883:24
885:15
**today's**
762:3 888:24
**told**
780:8,10
781:23
795:17
797:19
799:14
801:2,25
802:1,2,7,8
803:6 807:14
812:5 830:4
844:13
853:11 856:1
873:25 882:8
888:2,8
**ton**
763:24
**top**
794:14
**topics**
767:17
**tornado**
819:6
**totally**
818:22
**touch**
855:1,2
**tour**
799:20
**track**
780:9 781:17
786:11 868:4
**traction**
829:12
**transacted**
825:23
**transaction**
850:5

**transactions**
837:8 844:24
845:2,3,8
**transcript**
779:16
780:20
**transfer**
818:2 838:12
848:9 849:14
852:1
**transferred**
811:12,19
813:13
818:16,20
848:5,8,22,
23 849:1,16
850:10 851:5
887:1
**transferring**
819:12,16
848:6 851:4
**transfers**
818:6,25
819:22
820:6,13
**transparent**
801:23 802:5
**travel**
773:9 776:21
777:5
**traveling**
773:4,11,12
**travels**
875:10
**trip**
774:15,23
775:1,13,21,
25 776:4,5
**trouble**
793:18
878:10
**Trudeau**
769:6,19
**true**
784:19
798:1,25
869:16 888:5

890:21
**trust**
772:15 795:18 804:1,8,10 810:14 811:13,20 813:1,14 814:15 815:5,12 816:15,23 818:16,21 820:21 872:5,9
**trusted**
861:19
**Trustee**
794:23 795:8 797:19 798:14
**trustee's**
794:9 795:23 797:25
**trustees**
794:11 795:18
**try**
765:1 780:7 784:24 803:19 809:10,12,14 833:25 849:12 870:18 884:7
**trying**
765:2 784:7 802:6 803:9 807:13 809:19 818:14 824:18 850:17 857:2 877:6 878:23 879:3 883:24 884:15,22 887:11,18,22
**TUFTA**
840:6,10
**TV**
777:14 779:10 785:9 790:12 805:18 809:8 811:19 817:4 853:3 886:14
**two**
787:4 799:4,6 801:17,20 802:7 832:2,6 841:3,9,11
**tyranny**
807:2

**U**

**U.S.**
794:9 797:24
**uh-huh**
778:15 794:24 864:25 867:17 868:1 871:5 873:21 876:6 887:5
**UHY**
867:1
**understand**
766:10 773:3 780:21 782:11 787:22 790:24 794:17 795:6 808:8 809:20 813:16 818:14 835:7 844:1,12 851:16 857:19 861:7 862:6,15 877:7,23 878:3,13,15
**understanding**
778:9,13,16,19 781:15 788:22 811:11 812:23 813:11 824:12,19,23 837:6 838:11 839:13 856:14 857:17 877:7 878:8 881:19
**undertake**
789:10
**uneducated**
803:21
**unentangled**
765:6
**unintelligible**
813:2
**United**
794:23 795:8 797:19 798:14
**unprecedented**
794:10 795:5,21
**upset**
883:21
**URL**
827:4,5 830:10,20 831:22 857:13
**URLS**
824:16
**usual**
798:1
**Utah**
828:3

**V**

**vacation**
773:15
**valuable**
806:9,11,15,21,24 807:3,24 809:8,9
**valuation**
792:19 866:11,16,20,25 867:20
**value**
792:10,13,16 802:3 805:25 806:3,5 809:22
**Vanessa**
762:23
**varies**
834:18
**various**
862:5
**vast**
874:9
**vehicle**
824:7
**venture**
825:10 864:9
**versus**
784:19 827:13
**video**
793:3,4,5,9,20 797:17 798:20 801:1,3,18,22 802:17 803:7,11 805:9,10
**VIDEOGRAPHER**
762:3 812:1,16,19 816:8 842:1,4 859:3,6 860:21,24 888:23
**view**
809:17
**vis-a-vis**
771:1,16
**visit**
862:20
**visitors**
862:7

**Voluntary** 787:7

W

**wait** 777:1 857:22
**waiting** 858:22
**walk** 869:6
**wallet** 847:7 849:17 850:6 853:17
**wallets** 844:3,16 845:4,8,13, 17,21,22 855:9
**want** 763:25 766:10 778:24 784:10,12 787:1 788:7 794:16 795:6 797:4 806:7 809:1 812:2 823:6 827:14 828:6 839:19 846:14 849:13 850:19 860:10 870:19 871:21 878:3 888:6
**wanted** 765:3,18 775:12 821:2 864:4 882:23 888:3
**war** 852:17
**watching** 802:5
**water** 811:24 812:2
**way** 765:1 766:2 776:15,16 777:5 778:19 842:13 864:2 865:25 869:4 872:12 884:20
**ways** 823:22
**Weatherford** 762:25
**website** 778:2,21 782:2,8,21 783:3,9,18, 25 784:14 792:8,10,20 805:24 806:2,11,19 807:18 809:4 814:3 817:15,24 818:3,16 821:9,13,17, 20 822:1,5, 7,10,14,17 823:12 824:13,20 825:20 826:8,14 827:8 830:8, 11,13 831:21 842:10,13 855:15,19, 23,25 856:1, 17 862:1,16
**websites** 779:23 808:20 823:6 828:14 831:9,24 833:8,10,19 835:9,18,24 836:4,20 837:8 863:9
**week** 773:7,8 838:13 887:21
**weeks** 799:4,6 801:8,17,20 862:3,12,19 863:3
**weigh** 860:4
**weirder** 883:15,16
**went** 774:19,20 776:12 802:3 812:21 828:2,3 833:8,11,13 834:3 854:20
**wife** 773:18 774:15 775:11,13,21
**window** 888:18
**wired** 811:1
**witch** 796:3
**withdraw** 845:13 855:8
**withdrawing** 850:5
**witness** 762:6,11,25 772:24 797:15 799:19 800:9,20 811:24 812:3,9,15 816:6,10 841:1,7,16, 18 846:11 858:8,21 859:20
880:17 884:14 890:2
**witnesses** 794:20,22
**women** 800:10
**wondering** 857:9
**words** 774:25 820:25
**work** 773:16 776:5 779:5 827:20 828:2,3,4 833:11,14 841:22
**worked** 769:6 809:20 865:5
**working** 769:13 825:3 857:20 864:9 887:17,18
**works** 774:2 860:19 880:7
**worry** 807:9
**worth** 847:2
**wrap** 860:8
**Wright** 773:24,25 774:3,18
**write** 793:12
**written** 829:7,18 874:14
**wrong** 781:10,15 797:4,5

**WWW.FREEWORLDOUTLET.COM**
821:8

**Y**

**ya**
775:18 888:9

**yeah**
766:9 776:25 793:1 794:20 798:3 805:4 806:4,15,16 808:1,2,12, 15 809:19 810:9 811:16 815:16 816:1 818:24 826:11 828:4 829:16 832:24 833:11,14 834:5 836:21 837:10 841:24 845:5,11 846:9,16 852:11 854:6,11,15 856:19 860:6 862:14 869:25 870:13 872:25 873:6,20 875:1 876:3 877:22 878:20 882:8 885:2 886:13 887:7,16

**year**
764:19 767:1,9,10 799:14 800:5,8 801:2 803:14,23 805:2,5 816:3 819:2, 13,17 822:23 845:20 852:9 853:9 888:2

**years**
764:13,14,23 765:6 767:3 783:14 812:10 828:1 832:2,3,6 833:25 841:11 843:18 864:6,7 876:3,23 877:14 878:10 882:17 883:11,13 884:20 885:1

**yesterday**
774:7 852:12,19 853:7 883:19

**youngest**
774:16

**Youngevity**
791:12,15

**Z**

**zero**
768:22 769:1 770:8,17 771:19,22

**Zimmerman**
778:25 779:2,18,21 780:22 781:21 782:1 784:25 785:15,18 844:11,18

**Zimmerman's**
784:18

**Zoom**
762:8

# Exhibit 15

STATE OF CONNECTICUT
SUPERIOR COURT
COMPLEX LITIGATION DOCKET
HELD AT WATERBURY
VOLUME III

- - - - - - - - - - - - - - - - - - -X

ERICA LAFFERTY, et al.,
PLAINTIFFS,

vs. X06-UWY-CV18-6046436-S

ALEX EMRIC JONES, et al.,
DEFENDANTS.

- - - - - - - - - - - - - - - - - - -X

WILLIAM SHERLACH,
PLAINTIFF,

vs. X06-UWY-CV18-6046437-S

ALEX EMRIC JONES, et al.,
DEFENDANTS.

- - - - - - - - - - - - - - - - - - -X

WILLIAM SHERLACH, et al.,
PLAINTIFFS,

vs. X06-UWY-CV18-6046438-S

ALEX EMRIC JONES, et al.,
DEFENDANTS.

- - - - - - - - - - - - - - - - - - -X

V I D E O T A P E D D E P O S I T I O N

The videotaped deposition of BRITTANY PAZ was taken pursuant to notice at the offices of Koskoff Koskoff & Bieder, PC, 350 Fairfield Avenue, Bridgeport, Connecticut, before Viktoria V. Stockmal, RMR, CRR, license #00251, a Notary Public in and for the State of Connecticut, on Monday, June 27, 2022, at 10:11 a.m.

A P P E A R A N C E S:

ATTORNEYS FOR THE PLAINTIFFS:
KOSKOFF KOSKOFF & BIEDER, PC
350 Fairfield Avenue
Bridgeport, CT 06604
Tel: 203-336-4421
E-mail: asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
CHRISTOPHER M. MATTEI, ESQ.
ALINOR STERLING, ESQ. (Appearing remotely)
PRITIKA SESHADRI

ATTORNEYS FOR THE DEFENDANTS:

FOR ALEX EMRIC JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, INFOWARS HEALTH, LLC and PRISON PLANET TV, LLC:

PATTIS & SMITH, LLC
383 Orange Street, First Floor
New Haven, CT 06511
Tel: 203-393-3017
E-mail: npattis@pattisandsmith.com

ZACHARY REILAND, ESQ.

FOR GENESIS COMMUNICATIONS NETWORK, INC.:
BRIGNOLE,BUSH, & LEWIS, LLC
73 Wadsworth Street
Hartford, CT 06106
Tel: 860-527-9973
E-mail: mcerame@brignole.com
MARIO KENNETH CERAME, ESQ. (Appearing remotely)

ALSO PRESENT:
Joseph Raguso, Videographer

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that all technicalities as to the proof of the official character of the authority before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that any objections to the sufficiency of the notice are waived.

IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that all objections, except as to form and privilege, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that the reading and the signing of the deposition by the deponent are NOT waived.

THE COURT REPORTER: Are you going to want me to re-swear the witness?

MR. CERAME: I think we should.

THE COURT REPORTER: Let me make sure I have everybody who is present. If everybody could identify yourselves.

MR. MATTEI: Chris Mattei on behalf of the plaintiffs. On the Zoom, I am joined by my colleague, Alinor Sterling, also on behalf of the plaintiffs. She will be observing today. And then the other individual you see on the Zoom, Pritika Seshadri, is my assistant.

MR. CERAME: This is Mario Cerame. I represent Genesis Communication Network Incorporated, a co-defendant to Alex Jones and the other co-defendants.

MR. REILAND: In the room, Attorney Zachary Reiland for the Jones defendants with Ms. Paz.

THE COURT REPORTER: Thank you.

Transcript orders?

MR. MATTEI: We just do an e-Tran.

MR. CERAME: We didn't order one at this time.

MR. REILAND: E-Tran is fine.

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there's a request and agreement to go off the record. This is the video recorded deposition of Brittany Paz being taken by counsel.

Today's Monday June 27th, 2022, the time now is 10:11 a.m. in the eastern time zone. We are here in the matter of Erica Lafferty versus Alex Jones.

My name is Joe Raguso, videographer with U.S. Legal, located at 90 Broad Street, New York, New York. I am not related to any parties in this action nor am I financially interested in the outcome.

At this time, will the reporter, Viktoria Stockmal on behalf of Legal Support, please swear in the witness.

THE COURT REPORTER: Will counsel stipulate that I can swear the witness remotely?

MR. MATTEI: Yes, counsel for the plaintiff agrees to the remote administration

of the oath and that this deposition will be conducted pursuant to that.

MR. CERAME: Zach, you go.

MR. REILAND: Attorney Zachary Reiland, present in the deposition room for the Jones defendants, agrees to the same, the witness may be sworn in.

MR. CERAME: Attorney Mario Cerame. We stipulate to the same thing that both other counsel have.

B R I T T A N Y P A Z

Business address: 4 Research Drive, Suite 402, Shelton Connecticut, 06484,

Called as a witness, having been first duly sworn and/or affirmed by Viktoria V. Stockmal, a Notary Public in and for the State of Connecticut, was examined and testified as follows:

THE COURT REPORTER: I failed to ask. Usual stipulations?

MR. MATTEI: Yes. Yes, the usual stipulations apply. In this case that is meant that the witness has reserved her right to read and sign the deposition and that the parties

are reserving all objections except those as to form until the time of trail.

MR. REILAND: And yes for the Jones defendants in the room.

MR. CERAME: Yes, for Attorney Cerame.

EXAMINATION BY MR. MATTEI:

Q Good morning, Ms. Paz.

A Good morning.

Q Welcome back. We were last here for your deposition on, I believe --

A Back in March.

Q -- March 16th. And so, before we start today, I observed that you had a set of typewritten notes before you. You've handed me a copy of those and these will be marked as the next exhibit in sequence. I don't know if we know what that will be right now or if we can just do that at the break.

MS. SESHADRI: 126.

(Plaintiff's Exhibit 126 was marked for identification: Typewritten notes.)

BY MR. MATTEI:

Q This will be Exhibit 126.

Ms. Paz, why don't you just explain to me what these notes are?

A Sure. After the last day of deposition, I went through the deposition notice that was going to be for today, but I think the day got moved because Mr. Jones took a date; and then I thought that I needed to speak to some more people on the rest of the questions; so, I spoke to Blake Roddy, who is in charge of the marketing and advertising for Free Speech and I also had a couple conversations with Bob Roe and Mark Schwartz, I think. They are the accountants that work with Free Speech about the financial aspects of it, and I took some notes about my conversations with them.

Q So, in the first section here it looks like you've headed it Advertising and then you indicate -- there's a notation, Blake Roddy interview, March 4, 2022. Am I to understand that for those first two paragraphs there before you get to Marketing Services, that that information was obtained from Mr. Roddy during an interview of him?

A Right. I spoke to him on the phone and I think these are the notes that I took during that phone conversation.

Q Did you take those -- did you type those notes at the time or were those handwritten notes that you transcribed?

A Honestly, I don't remember if I typed them

directly. I might have typed them directly because I was in front of my computer at the time, so I don't know if I hand wrote anything.

Q The Marketing Services since 2017, was that also information you obtained from Mr. Roddy during that interview?

A Post -- I think post-2018, because he wasn't in that position prior to that. So, I don't know -- I don't think he could really give me any information pre-2018 when he was in that position, which is what my notes indicate is that other people were doing that.

Q I just want to confirm for now that the itemized list, one, two, three here, that's all information you obtained from Mr. Roddy; right?

A Yes.

Q What you are saying is that information pertains to post-2017 business activity; correct?

A Right. That's what it says there.

Q And then, you have here a header that says Blake Roddy Deposition; what does that indicate?

A That after I had spoken to Blake, I reviewed his deposition.

Q That was the deposition that he gave in this case; correct?

A Yes, I believe it was in this case, Connecticut

cases.
Q So, everything down until the part that says Notes dash, that was all information that you obtained either by virtue of your interview with Mr. Roddy or your review of his deposition; correct?
A Yes.
Q Then you get to notes at the bottom which starts with "to notes" and I'm assuming this refers to the documents that were produced last week purporting to be some sort of debt instrument between Free Speech Systems and PQPR; correct?
A That is correct, yes.
Q Where did you obtain the information reflected here at the very bottom?
A These are based on a couple conversations I had. I had a video conversation with Mark Schwartz and counsel. I also had, I believe, one video conference with Bob Roe and maybe two phone calls basically explaining the spreadsheets that I believe were produced as well as the notes.
Q When did your conversation with Mr. Schwartz and counsel take place?
A Within the last couple weeks after we scheduled this date. So, within the last couple weeks.
Q Was it last week?

A It might have been the week before.
Q Okay.
Is that your best recollection that it was probably a week before?
A Yeah, I don't remember the exact date of when the conversation happened, but it was after this date was scheduled and we knew that this date was happening.
Q Well, this date's been scheduled for quite a while, so I just want to make sure I understand what your best recollection is of when your conversation with Mr. Schwartz and counsel may have taken place.
A Well, I wasn't --
Q Let me just finish.
A Oh, sure.
Q So, you indicated earlier that you thought it was within the last couple of weeks. So, today is June 27th. Do you believe it was during the week beginning June -- Sunday, June 12th?
A May I look at my calendar?
Q Yeah, please. Would that be a calendar entry?
A I might have put it in my calendar because it was a Zoom call, so it might be in my calendar.
Q That would be great.
A Just give me one second.
So, I have it on my calendar as Friday, June

17th?
Q Okay.
And that's a Zoom call involving you, a gentleman named Mark Schwartz and Attorney Pattis?
A It was Attorney Reiland.
Q Thank you.
Anybody else participate in that?
A No, it was just the three of us.
Q What's your understanding of who Mr. Schwartz is?
A I believe he's an accountant working for Free Speech.
Q Okay.
Where did you get that information?
A Attorney Pattis indicated he was the best person to speak to regarding the financial questions that were going to be in this deposition; so, that is who I contacted.
Q Okay.
The financial questions, you're referring specifically to the relationship between PQPR and Free Speech Systems?
A The questions that were noticed in the deposition, those questions.
Q What specific financial issues did you believe

he was going to be able to provide you information --
A He was going to be able to explain to me, for example, one of the noticed questions was about advertising. Who advertises, paid advertising to Free Speech who -- and how we get paid for advertising. So, he was able to pull information from our general ledger and create some spreadsheets and then he explained those to me. For example, one of the questions was questions about Mr. Jones' compensation, he created a spreadsheet, we had a conversation about the information that was in there so I can cogently testify to it today. That kind of thing.
Q You're referring to Mark Schwartz as having been the individual who --
A I had --
Q Just let me finish my question.
A Okay, sure.
Q You collected that information and was in the best position to talk about those issues on behalf of Free Speech Systems?
A I had also spoken to Mr. Roe about that previously.
Q I'm just specifically though talking about Mr. Schwartz and the meeting you had with him on June 17th and what you were informed about his status with the

company, why he was in the position to give you information concerning those issues. I just want to make clear that you're speaking specifically about Mr. Schwartz there being the one who collected spreadsheets concerning Mr. Jones's compensation and spreadsheets and information concerning advertising activity of Free Speech Systems; is that correct?
A I don't know how to answer that question. I don't know if he created those spreadsheets. All I know is he was able to explain the spreadsheets to me.
Q Those spreadsheets being the ones related to Free Speech Systems' advertising and to Mr. Jones's compensation?
A If you would like to pull up the deposition notice, I could indicate exactly which numbers I spoke to him about.
Q No, no, I'm asking you about the spreadsheets you were just voluntarily testifying about. So, I don't want to present you -- I'm asking --
A Well, you asked me a question.
Q Just let me finish, Ms. Paz.
A Sure.
Q We have to do question and answer. It's going to go a lot quicker if you just let me finish my question and then you answer; okay?

Specifically, the spreadsheets that you were referring to that Mr. Schwartz described for you and was able to explain, you referred to them as being spreadsheets relating to Mr. Jones's compensation and advertising; is that correct?
A Yes. Among others.
Q Okay, great.
What other issues did he explain to you?
A If you would pull up the deposition notice, I could tell you exactly which ones.
Q Why don't we pull up the re-notice for today.
Do you have that in front of you, Ms. Paz?
A Yes.
Q So, you would like us just to advance to the topic section?
A Yes, that would be great.
If you could scroll down just a little bit more. Wait, wait, wait. Too far, too far.
So, if you scroll up to No. 4. So, one of those spreadsheets was the identities of any third parties who provide with you marketing service. So, they were able to -- when I say "they," I mean, Mark Schwartz and Mr. Roe. I'm not sure --
Q I'm asking you specifically about Mr. Schwartz?
A I don't know who created those spreadsheets,

I'm not sure, so he was able to explain them to me.
Q Mr. Schwartz was?
A Yes.
Q And one of the spreadsheets Mr. Schwartz was able to explain to you pertained to the information described in item 4, third-party advertising services; correct?
A Yes.
Q Okay. Continue.
A Then for No. 5, any third parties who had paid Free Speech for advertising and our marketing service.
Q Mr. Schwartz described and explained those -- the information contained in those spreadsheets?
A Yes.
Then for No. 8, the compensation to Mr. Jones, David Jones and Kelly Jones?
Q Mr. Schwartz explained that data to you?
A Yes. We discussed that one.
We also discussed No. 9 which is the closed caption transcription services.
Q Mr. Schwartz -- Mr. Schwartz was able to provide you with information concerning Free Speech System's closed captioning services?
A Yes. So, I asked him -- that wasn't originally included in the information, but he was able to go

through the general ledger and search for the information and then provide that. So, he may have created that spreadsheet because I asked him directly for it.
Q You asked Mr. Schwartz directly for what now? A spreadsheet describing expenses made for closed captioning transcription services?
A Right.
Q He was able to provide that for you?
A Right. Well, it was -- it's not difficult. You go through the general ledger and just search for that account. So, it has a specific account associated with it and then he just printed off all of the transactions for that time period.
Q Okay.
A We did discuss item 10, the transactions between the two companies, Free Speech and PQPR. And if you could scroll down -- I just want to make sure I have everything. I think that's it.
Q And so, Mr. Schwartz was described to you as an accountant working for Free Speech Systems?
A Yes, I don't know exactly what his relationship is to Free Speech. It may be a consulting relationship, I'm not sure. But I was given his information and told to contact him.
Q But I just want to make sure that what you

Page 565

understand is that he is an accountant who is -- has some relationship with Free Speech Systems, it sounds like you believe in a consulting capacity?

A I don't know what capacity he's employed by Free Speech, but that was the name of the person I was told to contact, so I did.

Q And so, let me then just confirm that what you were informed was that he was an accountant?

A I believe he's an accountant, yes.

Q Based on information that Attorney Pattis provided to you?

A Yes.

Q Do you have any understanding of Mr. Schwartz's involvement in Mr. Jones's recent bankruptcy petition on behalf of three companies that he controls?

A No, I don't.

Q Were you aware that he was involved in that at all?

A No, I'm not.

Q Did he -- okay.

How long was that meeting with Mr. Schwartz?

A I would say it was about an hour.

Q Let's pull up the two notes that were produced to us last week.

These are -- what are these numbered?

Page 566

MS. SESHADRI: 117 and 118.

BY MR. MATTEI:

Q Ms. Paz, do you have before you a document captioned Promissory Note, dated August 13, 2020?

A Yes.

Q Have you seen this document before?

A Yes.

Q Did you discuss this document with Mr. Schwartz?

A Yes. We did discuss the two notes and their relationship to the payments that Free Speech makes to PQPR.

Q Let's look at 18, too, if you can just identify that, Ms. Paz. This is another document captioned as a Promissory Note, dated November 10, 2021. Have you seen this document before?

A Yes.

Q Did you discuss this with Mr. Schwartz?

A Yes.

Q Did you discuss both these document with Mr. Roe as well?

A Yes. I had had communications with Mr. Roe about the promissory -- the debt from Free Speech to PQPR. I hadn't seen these, though, when I had those conversations with him, so I didn't discuss the actual

Page 567

documents with him. But I did discuss the debt with him.

Q Understood.

How did you first receive these two documents?

A I asked for them and they were e-mailed to me.

Q When were they e-mailed to you?

A In the last week.

Q Who e-mailed them to you?

A I think Mr. Roe e-mailed them to me.

MR. MATTEI: I don't believe that we have that e-mail, Zach. I don't think it was included in what you provided last week.

MR. REILAND: That was probably sent after that disclosure was gathered together, so we'll start a new one.

BY MR. MATTEI:

Q So, you asked to see them and you asked --

A I asked for them, yes.

Q You believe Mr. Roe sent them to you last week?

A Yes.

Q Mr. Roe sent them to you last week --

A Well, within the last week. I'm not sure. Within the last week.

Q So, when did you discuss them with Mr. Schwartz?

Page 568

A I had a phone call with Mr. Schwartz after the Zoom meeting.

Q Okay.

So, in addition to your Zoom meeting, you had a phone call with him and that was last week?

A Well, yes. It had to be last week because today is Monday; so, yes.

Q The purpose of that phone call specifically was to discuss these two documents?

A Yes, discuss the notes and any other questions I had that were lingering, which weren't many. It was a short phone call.

Q But you were aware during your initial conversation with Mr. Schwartz on the 17th of the existence of these notes which is what prompted you to then ask him for them?

A Right.

Q We'll go over these in substance a little bit later.

So, your notes at the very bottom, I take it those notes are taken from your conversation with Mr. Schwartz concerning the actual documents; correct?

A Right. So, these notes I didn't have the actual document yet, we were talking about it in our Zoom call. So, these were the notes from the Zoom call.

Q I see.
And then do you have any notes that you took from your telephonic conversation with him last week?
A No, I didn't write anything down. It was a very short conversation. It wasn't that long. Maybe, ten minutes.
Q Okay.
And your testimony is that you believe that you took these notes as kind of a running Word document. You had the notes from Mr. Roddy and then you continued to fill in the document --
A Right.
Q -- with your notes from Mr. Schwartz; correct?
A That's correct, yes.
Q The only notes you took during your Zoom call with Mr. Schwartz are those at the bottom; correct?
A I believe so, yes. I don't have any -- I don't think I have any handwritten notes.
Q Okay.
Other than speaking with Mr. Roddy, reviewing Mr. Roddy's deposition and having a series of Zoom or telephone calls with both Mr. Roe and Mr. Schwartz, did you do anything else to prepare for your deposition today?
A I don't believe so. I might have tried to

refresh my recollection from some of the previous depositions, but aside from that, no.
Q Okay.
Well, do you believe that you reviewed deposition transcripts, other than Mr. Roddy's, in advance of your deposition today?
A I know I went -- over the weekend, I wanted to refresh my recollection from Mr. Daniel's deposition. Other than that, I don't think I read anything else other than these notes.
Q You reviewed Mr. Daniel's deposition this weekend?
A Yes, yes.
Q Do you know he had basically two segments of his deposition? Do you know if you read his first, his second, both?
A It wasn't -- so, I know that he was also deposed in Texas. I don't have a copy of that. So, I think I only have a copy of his Connecticut deposition. So, I re-read that.
Q That's what I'm referring to. He sat twice in Connecticut?
A Oh, I see. No, no. I only have one portion of it. I don't think I have a second portion.
Q You didn't review Alex Jones's deposition

testimony?
A No.
Q And you haven't reviewed Rob Dew's deposition testimony?
A No.
Q Has anybody summarized or described Mr. Jones's testimony to you in any way?
A His most recent deposition?
Q He --
A The one he was here in March for?
Q He was here in March, he sat for two days in March and then he appeared virtually two weeks ago.
A Okay.
I don't have copies of those, no.
Q But my question was whether anybody had summarized his testimony to you?
A No.
Q Okay.
So, as far as -- you have no basis of information for understanding what he testified about in the Connecticut case; correct?
A No, I haven't read them.
Q I know you haven't read them, but I just want to --
A No, no. No one talked to me about them either,

so, no.
Q Thank you.
When we were last here, you testified that you had been paid $30,000 for all of your work as Free Speech Systems' corporate representative both in Texas and in Connecticut. Have you received any compensation since we last met for your deposition?
A Have I received anything, no, but I do anticipate receiving an additional flat rate.
Q Okay.
And how did that -- and how much do you anticipate receiving in addition to the $30,000 you've already been paid?
A The agreement was, because we needed to have these additional days of deposition, I don't think that was contemplated that I would receive a flat $7,500 fee.
Q And that's specifically for your testimony today?
A Right.
Q You don't anticipate giving any other deposition testimony either here or in Texas; correct?
A Unless you need another day, but I don't think so.
Q I think we will be finished today.
A Okay.

Q Although I can't speak for Attorney Cerame, I think we will be finished today?
A Yes, for however long this takes.
Q May I ask, do you anticipate being available to testify at trial in any of the Texas cases?
A If it's required, then yes.
Q That's something you would be willing to do?
A If it's required, yes. I think I have to.
Q Okay.
The same would be true if called to testify in Connecticut in the trial here; right?
A Sure.
Q You expect you would probably negotiate additional compensation for that work?
A I don't know. We hadn't talked about it, in all honesty.
Q You have not yet been paid the $7,500 you are anticipating being paid for today.
A Right. I don't have it yet. But I did invoice it.
Q You invoiced it by e-mail?
A Yes, I did.
Q And am I correct that you still don't have any sort of written agreement or retainer with Attorney Pattis or Free Speech Systems?

A No, I don't think I signed a retainer agreement.
Q Let's bring up the PQPR Free Speech Systems' transaction spreadsheet, please.
I'm going to bring it up just so we have it; but let me ask you first: You're obviously familiar with the company PQPR Holdings Limited LLC; correct?
A Yes, I'm aware of it.
Q What's your understanding of that company's purpose?
A That company exists to purchase product which is then sold on the Free Speech website. It also houses the product. So, it basically -- it is -- it sells product is its purpose.
Q And the products it sells are nutritional supplements; correct?
A Yes, amongst others.
Q Storable food?
A I'm not sure about the storable food. I don't know, is the answer.
Q Merchandise?
A Yes.
Q Did you ask anybody whether or not storable food is among the products sold by PQPR?
A No.

Q You're aware that storable food is sold on websites owned by Free Speech Systems?
A I don't know.
Q You testified a moment ago that PQPR sells products on Free Speech Systems' websites. Which websites?
A I believe that they're sold on InfoWars.com. There are ads that link to -- link back to the PQPR website from InfoWars. It may also link from Prison Planet. So we have ads that link back to the PQPR website so that people can purchase from that site.
Q When you say "we have ads," what ads are you talking about? You're talking about Free Speech Systems runs ads on InfoWars.com?
A No, PQPR has these ads, but we, as in our website, InfoWars, hosts these ads that link back to PQPR's website to purchase the products.
Q Okay.
So, Free Speech Systems' testimony is that PQPR places advertisements on InfoWars.com; correct?
A I believe so, yes.
Q Free Speech Systems owns InfoWars.com; correct?
A Free Speech owns InfoWars.com, yes.
Q And the advertisements, I think you were just describing, link back to a different website other than

InfoWars.com; correct?
A It links to the PQPR's website so that the purchases can be made through PQPR.
Q Which website is that?
A I'm sorry, I don't know the name of the website. I'm not sure.
Q Okay.
Is it Free Speech Systems' testimony that PQPR owns the websites on which PQPR products are sold?
A I don't know who owns the websites.
Q Okay.
So, I'll represent to you that infowarsshop.com is a website. Do you know whether Free Speech Systems owns it?
A I'm not sure, to be honest.
So, PQPR --
Q Wait a second. There's no question pending.
Infowarsshop.com is a website. Do you know if Free Speech Systems owns it?
A I'm not sure.
Q Are you aware the website freeworldoutlet.com?
A No.
Q So, Free Speech Systems isn't prepared to testify today concerning any relationship it may have with the website freeworldoutlet.com; right?

A Right.
Q And Free Speech Systems isn't prepared to testify today concerning any relationship it has with the website preparetoday.com; correct?
A Correct. I don't know that website.
Q And Free Speech Systems is not prepared to testify today concerning any relationship it has with the website preparewithalex.com; correct?
A Right. I don't know that website.
Q Is Free Speech Systems -- well, although Free Speech Systems cannot testify as to whether it owns infowarsstore.com, infowarsshop.com, Free Speech Systems is aware that sales of PQPR products are transacted over those websites; correct?
A Yes.
Q And the -- during the time period 2012 through 2020, proceeds from sales transacted over those websites were processed by Free Speech Systems not PQPR; correct?
A No, I don't know that.
Q Okay.
So, Free Speech Systems' testimony is it does not know whether it was responsible for transacting the sales conducted on those websites; correct?
A No, I don't think, I don't know, I think that PQPR transacts -- handles those transactions.

Q Okay.
A So, no, that's not correct.
Q So, Free Speech Systems' testimony is that PQPR conducts the transactions -- the sales transactions over InfoWars.com -- I'm sorry. Strike that. Let me begin again.
Your testimony is that PQPR conducts the transactions occurring over infowarsstore.com and infowarsshop.com for the period 2012 through 2020?
MR. REILAND: I'll object to the form. I think she said she didn't make the --
BY THE WITNESS:
A I don't understand -- yeah, I don't understand the question.
Q Okay.
A I'm sorry, can you just repeat it.
Q Sure.
You testified that there are sales transactions that occur on in for infowarsstore.com and infowarsshop.com; right?
A Right.
Q When those sales occur during 2012 to 2020, where were the sales proceeds routed?
A So, PQPR handles all of the product sales. If you look at the spreadsheets, all of the product sales

are handled through PQPR and Free Speech is given credits for certain things, such as advertising and stuff on Free Speech websites; but ultimately, PQPR is handling those transactions.
Q That's not what I asked.
And I'm going to ask you what you mean by handling transactions, but what I asked what was for the period 2012 to 2020, on the websites infowarsstore.com and infowarsshop.com, where did the proceeds for those sales go?
A So, the proceeds from the sales are handled through PQPR. So, PQPR would have -- I'm sorry, I guess I'm getting confused by the question. So, all of the product sales and the products are sold --
Q Well --
A Through PQPR.
Q You're confused by the question?
A I'm confused by the question.
Q Okay.
So, when a sale happens on any of those websites; right?
A Right.
Q A customer pays money; right?
A Yes.
Q They authorize, for example, their credit card

to send money to a payee correct?
A Mm-hm.
Q That money presumably gets routed into an account; correct?
A Sure.
Q So, my question is: Who controlled the accounts to which those sale proceeds were routed for the websites infowarsshop.com and infowarsstore.com during the period of time 2012 to 2002?
A I just want to make sure that I'm answering this correctly.
Q Are you looking at something on your screen?
A Well, you have the summary of the intercompany transactions up here.
Q Okay.
A And it's helpful to understanding the answer to your question.
So, these are inter -- this is Exhibit 106 that's up here if you have to up there. So, these are how all of the payments get applied. So, these -- in this second column, these credits, when I was talking about advertising fulfillment, administration and net credits, these are credits that Free Speech doesn't have to pay to PQPR. These product sales are debits. So, these are the sales that PQPR -- so, the end balance is

the money that Free Speech owes to PQPR because PQPR is handling the fulfillment; and then we have to pay PQPR for the cost of the products.

Q Ms. Paz --

A But if the question is where is the money going initially when the customer pays it, I don't know by looking at this spreadsheet. We would to have look at another spreadsheet.

Q Let's take the spreadsheet down. I'm going to ask you questions about that spreadsheet. Okay. Right now I'm just asking about sale proceeds on infowarsstore.com and infowarsshop.com.

All I'm asking is during the period 2012 to 2002 where were those proceeds routed? Were they routed to any account controlled by Free Speech Systems or were they routed directly to accounts controlled by PQPR or were they routed somewhere else or does Free Speech Systems not know?

A I don't know by looking at that spreadsheet and I don't have any independent recollection of it.

Q Okay.

So, I just want to be clear here. Free Speech Systems' testimony is that it does not know where the sale proceeds from transactions conducted over infowarsstore.com and infowarsshop.com went once those

sales were executed for the period 2012 to 2020; correct?

A I think my answer is I don't recall. I would to have look at another spreadsheet.

Q Here's the problem, we dealt with this last time with Judge Bellis and Judge Bellis said quite clearly that I don't recall is not an acceptable answer. The answer is either Free Speech Systems, as it sits here today, either knows a fact or it does not know a fact. That's it.

So, as you sit here today, Free Speech Systems, can you testify under oath as to whether or not sale transaction conducted over infowarsstore.com and infowarsshop.com between the period 2012 and 2020 were routed to accounts controlled by Free Speech Systems?

A I don't know.

Q Thank you.

I think your testimony is Free Speech Systems doesn't even know who owned those websites during that period of time; correct?

A I don't know. I'm not sure who owns them.

Q All right. "You" being Free Speech Systems?

A Yes.

Q Thank you.

With respect to transactions over those two

websites, infowarsstore.com and infowarsshop.com, during the period 2012 to 2019 [Verbatim], were any Free Speech Systems' employees involved in processing those transactions?

A No, PQPR processes the transactions, so they are PQPR employees.

Q How many people does PQPR employ?

A I don't know.

Q Are any Free Speech Systems' employees, during the time period 2012 through 2020, involved in any activities on behalf of PQPR?

A I'm sorry, can you repeat the question.

Q Yeah.

For the time period 2012 through 2020, were any Free Speech Systems' employees engaged in any activities on behalf of PQPR?

A I don't know. I don't know how to answer that question. I don't know.

Q Okay.

Well, let me ask it this way then: You testified earlier that PQPR handles all transactions of its products, sales; correct?

A Right, it does all the fulfillment of the order, it houses all of the products and it, you know, generally just fulfills all of the orders.

Q Okay. All right.

So, let's break that down. So, you say that PQPR handles all the fulfillment of its -- did you say products?

A Right, all the products that it sells and are linked back from the website, from the Free Speech's website via ads to the store. It has a staff, it has a warehouse. They package everything. They house it. They fulfill the orders. I did tour the warehouse, so they have a whole process about how that happens. And PQPR handles that.

Q Okay. So --

A It's --

Q Free Speech Systems' testimony is that when it comes to the sale of PQPR products, PQPR owns the warehouse where those products are stored; correct?

A I don't know if it owns it or rents it or leases it. I don't know.

Q Okay.

PQPR staff, by which I assume mean employees, handle the fulfillment of all those orders; correct?

A That's correct.

Q And PQPR employees handle all the accounting for PQPR's books and records; is that right?

A I mean, I don't know how they do their internal

things. I don't represent PQPR. So, however they do that her internal business, I don't know.

Q Okay.

But Free Speech Systems' employees don't fulfill that function for PQPR, that is the accounting function?

A Right. They have -- It's separate. They are two separate entities.

Q And so, on the fulfillment piece, I take it that your testimony is that that involves receiving notice of any sale of a PQPR product, pulling that product for shipment, shipping it; anything else?

A I mean, like I said, I don't know how their internal operations work there. I mean, I did tour the warehouse. They showed me how they stock everything. They showed me how they pulled an item, how it was labeled then for packaging. And then where it was ultimately shipped out. Aside from that, their internal processes, I don't know. I know they have some software that helps them with that. I don't know the name of it. I don't know how it works.

Q Basically, anything that goes into fulfilling an order once it has been made by a customer, PQPR employees handle; correct?

A Right.

Q Free Speech Systems' employees do not?

A Correct.

Q Who gave you a tour of the warehouse?

A I went with Attorney Blott when he was down in Austin.

Q Okay.

And she's outside counsel retained by Free Speech Systems to represent them in Texas; correct?

A Right. Although I don't know if she's involved any longer, but she was when I was there and so she and I went.

Q Who were the PQPR employees who showed you kind of the fulfillment process that you were just describing?

A You know what, I'm so sorry, I don't remember their name. I don't remember.

Q Okay. Okay.

And it's your understanding that PQPR, whether it owns or leases the warehouse, pays for that facility in order to use that facility; correct?

A I would assume so.

Q Free Speech Systems does not?

A I don't know. I don't represent PQPR, so I don't know what they do to handle their warehouse.

Q Okay.

Free Speech Systems, though, has no involvement

in --

A That's correct.

Q -- sorry, just let me finish.

Free Speech Systems has no involvement in paying for or managing that warehouse operation; correct?

A Right.

Q And the information that you had just been testifying to about PQPR -- PQPR's activities as distinct from Free Speech Systems was who?

A I'm sorry, who told me that they were distinct?

Q Not just distinct, but who informed you that PQPR employees and resources are responsible for the fulfillment and administrative activities of PQPR as opposed to Free Speech Systems' employees?

A I think that would be based on my conversations with Mr. Jones, with Mr. Roe while I was down there, my conversations with counsel which I'm not going to go into. I think that would form the basis of that.

Q What, specifically, did Mr. Jones tell you about PQPR?

A That Free Speech and PQPR are separate and that they are -- they handle essentially the product sales and he is engaged in the function of being on air. So, in his mind, his business is being on the air.

Q So, he described them to you as being distinct entities and that PQPR was involved in product sales. Did he say anything about the extent to which Free Speech Systems' employees are involved in any of PQPR's business activities?

A We didn't talk about that like that.

Q The warehouse that you toured, it was in Austin?

A I think it was in Austin. It was very close by. It wasn't that far. It was maybe a ten minute ride from where Free Speech is housed. It wasn't that far.

Q When you say Free Speech is housed, do you mean the studio operation?

A Right. We drove there and it was a very quick ride.

Q You and Attorney Blott drove there?

A Right.

Q What time of day did you go?

A It was during business hours. It might have been right before lunch because I remember we were talking about where to eat after that, so it probably would have been right before lunch.

Q Can you ballpark for me how many employees you observed while you were there?

A So, there was a person who showed us around who

Page 589

I'm not really sure what their function was; but may have been a manager. And then there were probably about maybe 4 to 6 people packaging mail for, you know, all the product for delivery. So, taking, pulling up the order, printing all the labels, pulling them from the shelves and then putting them in for packaging. So, maybe a half dozen people when I was there. It was a week day, around lunch time.

Q Okay. All right.

And it's Free Speech Systems' testimony that those are all PQPR employees?

A Right.

Q Even though you can't remember who they were?

A The man who showed us around introduced himself, but I do not remember his name for the life of me. But I did not meet the people who were packaging the materials. I didn't introduce myself, they didn't introduce themselves. I don't know their names.

Q If I said the name, do you think you would remember it?

A You could try and --

Q Chris Ellison?

A No.

Q It wasn't Tim Fruge?

A No, it wasn't Tim.

Page 590

Q It wasn't Blake Roddy?

A No, I met Blake. It wasn't Blake.

Q Okay.

Who told that you the warehouse -- I know you testified that you don't know whether PQPR owns the warehouse or rents that space. Who told you that Free Speech Systems doesn't have any interest in that warehouse?

A What do you mean doesn't have an interest in the warehouse? You mean we don't pay for it?

Q Doesn't pay for it or doesn't have any ownership of that facility?

A I don't know that anybody told me that. I mean, I see -- have seen all of the transactions between the two companies and what they're for. I don't recall seeing any transactions for rent or rental space. PQPR bills us for product and, as you see, sometimes Free Speech pays, sometimes they don't. But I don't see anything in those documents to indicate that there is some type of ownership interest in the warehouse.

Q Okay.

So, I take it from your testimony that what you're saying is if, in fact, Free Speech Systems was either paying rent or had some ownership interest in that warehouse, you would have expected to see it in the

Page 591

financial records you reviewed?

A Right. But also, when I spoke to Mr. Roe and Mr. Schwartz, everybody was very clear about the relationship. The relationship is they fulfill the product, we pay them for the product. Nowhere in those conversations was we rent the space for them or we purchase the space for them or -- and I haven't seen anything in our transactions to indicate that. So from where I sit, I don't see anything that would indicate that we have any interest in the warehouse, itself. And I don't know how they get the space. That's PQPR's realm on how they get the space.

Q Okay.

So -- who told you that PQPR has its own employees that manage the fulfillment and administrative activities you were describing earlier?

A I think I had a specific conversation with Mr. Roe about that, about the fulfillment aspect and how all of those employees are employed directly by PQPR.

Q Okay.

And is it your understanding that PQPR has -- had its own employee work force since it was formed in order to maintain that distinction between Free Speech Systems and PQPR?

A I would assume. So, I -- like I said, I don't

Page 592

represent PQPR, so I really can't say how they manage their employees or when or when people get hired. I mean, I would assume so. They're separate entities.

Q Well, you were required to be prepared to testify about the relationship between Free Speech Systems and PQPR?

A Right, but I can't testify to the inner workings of PQPR.

Q I'm just asking about -- I'm asking about their employee work force and I'm asking you whether you've been informed that since PQPR was formed and started doing business with Free Speech Systems, PQPR has had its own employee work force to manage the PQPR business?

A I don't know. I think so, but I'm not -- I don't know.

Q Okay.

A I'm not sure.

Q You think somebody told you that?

A I don't -- I don't think I had a specific conversation with anybody about when and how long they've been employing people and in what capacity; because, like I said, that wasn't in my purview. So -- but the intention has always been to have them be separate. As you could see from the finances, that wasn't always what actually happened. So, I don't want to say definitively

that there wasn't any crossover between employees; because I'm not sure. And I didn't ask that specific question about whether in 2012, ten years ago, maybe, free Speech employees were at PQPR. I just don't know, so I don't want to mislead you and say I know when I don't.

Is that clear?

Q It is except now I want to want to go back to your earlier testimony. I take it your testimony concerning the fact that PQPR employees now run all PQPR business activities has to do with how -- the current situation at PQPR?

A Well, no. I mean, I don't think it's just the current situation. I mean, obviously the financial situations currently there have been efforts made to make sure that they're more separate, there's more delineated payments between the two, everything is a little bit more, you know, accounting-wise, up to speed. But as far as the process goes, you know, the relationship between the employees there, I'm just not sure. And I don't think it's something that's recent that's happened; so I don't think that's correct. But I just don't want to say that going back ten years whether any Free Speech employees have never been employed at PQPR. I just don't know the answer to that.

Q So, at least -- I mean, is Free Speech Systems prepared to say that, at least as of the initiation of this lawsuit, the fulfillment that PQPR's maintained it's own employee work force for the purpose of fulfilling all of PQPR business activities?

A Right. They have their own employees. I think they always -- they've had their own employees. I just don't want to say whether or not there's been people working at PQPR who've also worked for Free Speech. I just don't know the answer to that. But they do maintain their own work force. Yes.

Q Okay. So -- and I totally understand that. There might be somebody who, at one point, worked for Free Speech Systems and then works fork PQPR. But fair to say that if somebody is working for PQPR they are employed there; correct?

A Right.

Q And that has been the case as far as you know going back until --

A As far as I'm aware, yes.

Q I would like to talk about PQPR ownership; okay?

A If I can help you with that --

Q There's an alphabet soup.

A Yes. If I can help you there, I will do my

best to do so.

Q You've testified about this in Texas; correct?

A I did, yes.

Q And when was PQPR formed, approximately? You don't need to give me a specific date?

A You know what, I don't recall.

Q Okay.

One of the reasons obviously that you're required to testify about this is because you're here to testify in part about Mr. Jones's compensation; correct?

A Yes.

Q And when -- just give me one second.

When PQPR was first formed, Mr. Jones exercised a controlling interest in it through another corporate entity; correct?

A Yes.

Q And what was that corporate entity called?

A I think it's called PLJR. Like you said, alphabet soup. So, I believe PLJR has a 80 percent interest in PQPR. PLJR is then owned by the AEJ Trust --

Q Hold on a second.

A You want --

Q The AEJ Trust came on later; right?

A Yes.

Q So, let's just start when it was formed; okay? And I think that you're on the right track.

A There is a flowchart which I think you have which makes that easier to understand.

Q I don't know if we have that. I have seen it. I believe that it was produced in Texas. It's possible we have it. But I'm not going to -- maybe Zach can find it at the break and --

THE WITNESS: If you don't have it, I have it, I'm pretty sure.

MR. MATTEI: Can you bring up the UHY Valuation, please.

BY MR. MATTEI:

Q I don't remember if I showed you this last time, Ms. Paz, but there's a valuation that was done, I believe in -- I don't want it guess. 2014?

A I don't think I saw it last time.

Q Are you familiar with this document, a UHY Valuation of Free Speech Systems and PLJR? No? Okay?

A Oh, is this it?

Q Why don't we go ahead and advance to -- you'll see a little table listing some -- no. Keep going.

So, you see there the valuation in 2014 indicates that PQPR holdings began in September of 2013; do you see that?

A I see that, yes.
Q And at the time, PLJR holdings LLC held an 80 percent ownership interest in PQPR; correct?
A That's what it says, yes.
Q And that's --
A That's still the case today. Yes.
Q And at the time PLJR holdings was owned 90 percent by Alex Jones; correct?
A At the time of this?
Q Yes.
A That's what it says. I've never seen this document before, but --
Q Putting aside the document, I was doing this to kind of help you --
A Orient me to the time? I appreciate it, yes.
Q So, you know that when PQPR was formed, Alex -- 80 percent of it was owned by PLJR holdings and Alex Jones held a 90 percent interest in PLJR correct?
A Yes.
Q Thank you.
And that continued with that structure for how long?
A I believe it was until some time in 2018, which I think that there were some restructuring and some estate planning on Mr. Jones's part. And so, he did some

estate planning in 2018. So, probably about five years after or four years after that.
Q So, in 2018, the ownership structure of PQPR changed; correct?
A I think that's when the trust was formulated; so yes.
Q Which trust are you referring to?
A I think it's AEJ 2018 Trust.
Q AEJ 2018 Trust?
A I believe that's what it's called, yes.
Q What was the purpose of that trust?
A Estate planning on Mr. Jones's part.
Q But what do you mean estate planning? What do you mean by that?
A I mean, he created a trust for the benefit of his children as remaindermen and so, you put -- when you formulate any trust -- I mean, I'm not an estate planning attorney, but I took trusts and estates in law school. You put --
Q Hold on a second, I'm not -- I don't want you to get into --
A Okay, go ahead.
Q -- your law school training.
A Go ahead.
Q I want to know what you understand as a result

of conversations or documents you've reviewed as corporate designee; okay. So, I know that you spoke about this with Mr. Jones; right?
A Yes.
Q What did Alex Jones tell about the purpose of the AEJ Trust that was formed in 2018?
A That the purpose of it was estate planning for the purpose of his children going forward. So he put, as I said, some body -- some principal into the trust so that it is for the benefit of your beneficiaries. So, that was the purpose of it.
Q How was the AEJ 2018 Trust funded?
A So, the AEJ Trust is funded, I believe the note is in the trust, so --
Q Hang on a second --
A Or one of the notes or maybe both of notes are in the trust.
Q Just a second. To be clear, you are referring to Exhibits 117 and 118 we looked at earlier; correct?
A Right.
Q Both of those post date 2018; correct? There's an August 2020 note and a November 2021 note; right?
A Right, but those are the dates of the actual transactions. Given my notes --
Q Hang on just a second.

A Sure.
Q Those notes were not in existence in 2018 when the trust was formed; correct?
A Those documents were not; but if you look at the spreadsheets, the first note goes through the end of 2018; so the -- for example, the first note is for 29.5 million dollars. That note is calculated through the end of 2018 and so, that note is, I believe, in the body of the trust.
Q Hang on one second?
A Sure.
Q So, what you're describing right now is a spreadsheet that has been produced to us?
A Yes.
Q That purports to show the accrual of some debt owed by Free Speech Systems to PQPR; correct?
A Right.
Q And what you just described is that those spreadsheets showed debt running from some time in late 2018; correct?
A Running from or running to?
There are two notes --
Q I'm asking you.
A There are two notes --
Q I'm not asking about the notes.

Page 601

A Okay.
Q I'm asking about the spreadsheets you were referencing.
A Yeah, the --
Q Because we can agree that the notes, the documents, did not exist in 2018; correct?
A Per the dates on there, no. Right.
Q Right.
And so, what I'm trying understand is when the trust was formed, it has to be funded with some asset; correct?
A Right.
Q And I think that what you were just beginning to try to tell me was that the debt owned by PQPR was one of the assets held by the trust; is that right?
A Yes.
Q Okay.
And how was that documented at the time so as to place that debt asset into the trust?
A I don't know. All I have is the note.
Q Okay.
Who told you that the AEJ 2018 Trust was owned, the debt, purportedly held by PQPR?
A I don't know that it owns the debt. I think that it's in the trust as a part of the body of the

Page 602

trust; but I think that conversation was one I had with Mr. Roe back when I was in Texas.
Q So, you don't know if the AEJ Trust owns the debt?
A I don't know -- PQPR owns the debt, right. So, but the body of it is in the trust.
Q What does that mean?
A I'm not an estate attorney. I don't know. I can't break it down any further than that. When I spoke to Mr. Roe about this, I asked what was in the trust, in the body of the trust, and it was the note.
Q The note?
A Right. The note. The debt.
Q The debt?
A Right.
Q So, Mr. Roe told you that debt owned by PQPR is one of the trust's assets?
A Right.
Q As of 2018, when it was formed?
A I don't know when it was put in there, but that's one of the assets that's in there.
Q Okay.
And you --
A I think there are other ones in there, but I'm not sure.

Page 603

Q And you have no idea what instrument affected that transfer of debt to the trust; correct?
A No, I have not seen a document like that.
Q Have you seen the trust formation document?
A No.
Q What other assets were used to fund that trust?
A To be honest, I'm not sure which -- what assets are in there. I know the note is not the only asset; but I'm not sure what other assets are in there?
Q Okay.
So, the reason that we first started talking about this trust is because you were responding to my question about a change in ownership structure of PQPR; right?
A Right. Because when the trust was created, that changed.
Q So, tell me how that changed?
A So, instead of -- I'm not sure if -- so, PQPR is owned, in part, PLJR 80 percent, 10 percent of which is owned by Carol Jones, who's Mr. Jones's mother; and then 80 percent of that was, according to that other document, owned by Mr. Jones directly, but now it is owned by the trust.
Q All right.
So, let's go through that a little bit.

Page 604

A Sure.
Q PLJR was owned 90 percent by Mr. Jones personally and 10 percent by Carol Jones; correct?
A Prior to 2018?
Q Yes.
A I think so. I think that's what that document says, yes.
Q And then, as a result -- and then PLJR had an 80 percent stake in PQPR; correct?
A Right.
Q And so, by virtue of his 90 percent stake in PLJR and PLJR's ensuing 80 percent interest in PQPR, Mr. Jones personally had, indirectly, 80 percent ownership of PQPR; correct?
A Of PQPR?
Q Yes.
A I believe the total effective number would have been in the 70s. It's, like, 72 percent effective; because PQPR is owned 20 percent by Dr. and Mrs. Jones; and then 80 percent by PLJR who also has a 10 percent interest to Carol Jones. So, when you average out those numbers, it's something like 72 percent.
Q Who did that math for you?
A Mr. Roe did that math for me. I am very bad at math.

Q That's okay. I wouldn't expect you to have done it.
A Yes.
Q So then, in 2018, I take it that your testimony is that Mr. Jones transferred his personal ownership of PLJR to the AEJ Trust; correct?
A To the trust, right.
Q And so, whereas Mr. Jones, prior to 2018, had a 72 some-odd percent indirect ownership interest in PQPR, now the AEJ 2018 Trust does; correct?
A Right.
Q What instrument was -- have you seen any documents reflecting that transfer of ownership?
A I don't think so, no.
Q Did you ask?
A I don't remember if I asked or not to be honest.
Q So -- and Mr. Jones told you specifically that that was done in order to benefit his children?
A Right. Because his children are remaindermen in the trust. So, yes.
Q And what that means is that those children do not receive any benefit from the AEJ Trust's ownership of PQPR until Mr. Jones passes; correct?
A Right. They don't currently receive any income

from the trust.
Q The trust does generate income; correct?
A It is generating income, yes.
Q How is it generating income?
A It is generating income on the basis of the notes that Free Speech pays to PQPR.
Q Which started when?
A So, those payments, I believe, started at the end of last year, some time toward the end of last year, maybe November.
Q That is November of 2021?
A Right.
So those payments are approximately $11,000 per business day from Free Speech to PQPR.
Q And the initiation of those payments of $11,000 from Free Speech Systems to PQPR was initiated why?
A To pay down the debt between the two companies.
Q Who authorized Free Speech Systems to begin paying that purported debt?
A I would assume Alex did.
Q Are you --
A I didn't ask, but there is a debt and it needed to be paid. There were efforts made to make sure that there was, you know, all of this financial entanglement between the two companies to separate everything and make

sure that everything was accounted for and paid. So, prior to that, I don't think that there was any clear delineation. And so, there have been efforts made over the last year to do that. And so, I would assume Alex authorized it.
Q Okay.
You're not aware -- Free Speech Systems isn't aware of anybody else who could authorize Free Speech Systems to make $11,000 daily payment to another corporate entity; correct?
A No, I think Alex would have to authorize it. He owns Free Speech.
Q And Free Speech's testimony here today is that those payments, beginning in November of 2021, were motivated solely to pay down a debt Free Speech Systems purportedly owed to PQPR; is that your testimony?
A That's my understanding of the purpose of the notes, yes.
Q And how did Free Speech Systems arrive at the $11,000 number?
A I think it's based on the terms of the note.
Q Which note?
A So, the first note is a 30-year note with a balloon at the end. But the second note is principal -- it delineates principal and interest.

Q Why don't we pull them up. Let's pull up Exhibit 117, because I just saw you were referring to your notes of your conversation with Mr. Schwartz; correct?
A Yes. That's when he was explaining to me the notes and the agreement between the two notes.
Q All right.
So, we pulled up the first one. This is dated August 13th, 2020, and tell me what Free Speech Systems' understanding is of the purpose of this document and what, if any, obligations Free Speech Systems' undertakes pursuant to it?
A So, this looks like the first note for approximately $29.5 million and it outlines the principal balance, if you scroll down.
Q Let's do that. Yep.
A It also --
Q Hang on.
Can you just identify what that is when you say principal balance; what is it you're referring to?
A So, in Subsection B, it talks about the principal balance, which is the 29.5 million and then there's a percentage rate for interest on those days and how they're calculated.
Q Let me stop you right there.

A Sure.
Q In -- I'm sorry. Go up to the stop, please, I'm sorry.
On August 13th of 2020, Free Speech Systems entered this note claiming to owe $29.5 million to PQPR; correct?
A Yes.
Q And it agreed to pay an interest rate, can you scroll back down, of 1.75 -- an annual interest rate of 1.75 percent on that principal; correct?
A Right.
Q All right.
And it agreed to do -- make monthly payments on that principal and interest pursuant to this note?
A I'm not sure if the monthly -- I'm sorry, daily payments are outlined here.
Q I said monthly -- I meant daily.
A Yeah, it's daily.
So, I don't know if the daily payments of the $11,000 per number is in here.
Q Is it your understanding that the daily $11,000 payment equates to a principal and interest payment on this balance and interest rate set forth in this note?
A You mean when you divide it up, will it come up to $11,000 a business day?

Q Yeah. Really, what I'm asking is how did Mr. Jones arrive at the $11,000 per day number and is it based on this note executed in August 2020?
A I don't know how the $11,000 was arrived at. I don't know if you divide it up and it comes out to $11,000 per day over the period of time. Because --
Q What's the term of this note?
A Because the term of the note is 30 years.
Q Okay.
A Because it expires in 2050.
Q Is Free Speech Systems' testimony that when it entered this purported promissory note, that it was agreeing to pay back the some $29.5 million with the 1.75 interest rate over 30 years?
A Right.
Q But you don't know whether the $11,000 daily payment is toward the arrangement set out in this note?
A No, it is.
Q It is.
A Those two notes total -- the $11,000 per business day is for both notes. Right.
Q I see.
Well, then --
A I just don't know how they arrived at that figure. If you are asking how they arrived at it, I'm

not sure if you divide it up over 30 years at 1.5 percent it comes out $11,000 per business day. I just -- I'm not sure. So --
Q Did Free Speech Systems start making payments on this note in August of 2020, immediately?
A I don't know.
Q Okay.
A I'm not sure.
Q When did the $11,000 payments start?
A I believe, based on my conversations with Mr. Roe and Mr. Schwartz, those were happening towards the end of last year. So, in 2021.
Q So, Free Speech Systems today is not prepared to testify about any payments on this purported debt prior to approximately November of 2021; correct?
A Right. I don't know if the payments had been made prior to that. I know they were definitely at the end of last year. But I don't know if they had been made prior to that.
Q All right.
So, you don't know then whether the AEJ Trust 2018 had any income prior to the initiation of $11,000 payments in November of 2021; correct?
A Oh, you mean the income that's being -- that would be thrown off by the $11,000 per day?

Q Right.
A So, I mean, there were payments being made between PQPR and Free Speech. So, PQPR was billing Free Speech during this entire time period and they were making payments, they just were not regular payments.
Q We're talking about payments from Free Speech Systems to PQPR?
A Right.
Q And we're talking about PQPR payments then to the AEJ Trust?
A Right.
Q So, I'm focused right now just on paid income generated by the trust as a result of it's new ownership in PQPR debt.
A Right.
Q And what I hear you saying is that that income, as far as Free Speech Systems is prepared to testify today, commenced in about November of 2021; correct?
A No. Because Free Speech was still making payments to PQPR. They were just not the entire payments; you understand?
Q I do, but what --
A So, those payments that Free Speech was making to PQPR, they would still be going into the balance of the trust; but you still have a debt on the note because

they're not paying the entire balance. So, those payments that Free Speech was making, although not the entire payments, would still be going into the body of the trust. It was just not the $11,000.

Q But the trust, as I understand it, doesn't own any part of PQPR other than the debt; right?

A I don't think that's accurate because PLJR is owned 80 percent by AEJ Trust.

Q But you understand if Free Speech Systems is making payments to PQPR, just in the regular course of business?

A Mm-hm.

Q That money -- is it your testimony that that money, that is, money paid to PQPR in the regular course of business, flows as income to the trust?

A Well, if you just do it -- if you look at -- I know you don't have the spreadsheet --

Q I would tell you that the AEJ Trust -- I don't have a spreadsheet, I don't think, that shows AEJ income.

A A flowchart.

The flowchart -- I mean, we can try to pull it up at a break --

Q Why don't we do that. But what I'm focused specifically on right now is cash income flowing to the trust. And I understand one source of it to be the

$11,000 debt payments beginning in November of 2021?

A That is one source, yes.

Q Thank you.

What I am trying to understand is whether there are -- there is any other income flowing to the trust; and what you started to tell me was that regular payments to PQPR, in the course of business, are also flowing to the trust. But I'm not aware of -- and that seemed odd to me. That's what I'm trying to question you on.

A Maybe we can look at the flowchart at a break and maybe that will answer the question. Because it's hard to do it without looking at it. So, I -- you know, if we could look at it. I don't want to misstate anything. If we can look at the flowchart and just make sure. But my impression was -- and I could be wrong -- was that 80 percent of PLJR is owned by the trust. So, 80 percent then or not 80 percent, but in the 70s --

Q I don't want to you do, like -- I don't want to you kind of sketch out here what you think might be --

A Right, that's why I want to pull out -- I want to pull up the --

MR. REILAND: Chris, can we take five and --

MR. MATTEI: Yeah, we can take a break. It's about time to take a break anyway. But

let me just wrap this up, though.

BY MR. MATTEI:

Q Whatever income the trust is generating, whether it be the $11,000 daily payments beginning in November 2021 or some additional income beyond that, none of that income is being paid to any of Mr. Jones's children; correct?

A That's right. Yes.

Q It's being paid to Mr. Jones; correct?

A Mr. Jones is an income beneficiary of the trust, yes.

Q Are there any other income beneficiaries?

A I don't believe so, no.

Q So, any income paid to the AEJ 2018 Trust as a result of debt purportedly owed by Free Speech Systems or any other income is directly for the benefit of Mr. Jones; correct?

A Mr. Jones is an income beneficiary of AEJ Trust.

Q So he is the sole beneficiary of any income that flows to AEJ Trust as a result of its ownership of PQPR's debt; correct?

A Through the trust, yes.

MR. MATTEI: Why don't we take a break.

THE VIDEOGRAPHER: We are off the record.

The time is 11:35.

(Recess from 11:35 a.m. to 11:50 a.m.)

THE VIDEOGRAPHER: We are now on the record. The time is 11:50.

BY MR. MATTEI:

Q Right before the break, Ms. Paz, you testified that Mr. Jones is the sole beneficiary of any income flowing to the AEJ 2018 Trust; correct?

A Yes.

Q And as you sit here today, you are not aware of any other income to that trust other than the $11,000 payments beginning in November 2021; correct?

A Well, as I was saying earlier and, you know, I don't know how -- I'm not a trust attorney, but I believe there's other income flowing into the trust. As I said, if Free Speech is making payments to PQPR not on the notes and PQPR is owned 80 percent by PLJR, the income flowing from PQPR to PLJR is 80 percent of that, would also then -- that would flow into the trust; but I'm basing that on what I see in these charts. I'm not sure. So.

Q Which charts are you referring to?

A I think they were just e-mailed.

MR. REILAND: They were just disclosed.

Page 617

If you could pull those up. I'm sure it would help.

MR. MATTEI: Okay, so just for the record, during the break, Attorney Reiland sent our office two charts which I believe but we'll confirm have not previously been produced to us. And those will be marked as what?

MS. SESHADRI: 127 and 128.

MR. MATTEI: Okay.

(Plaintiff's Exhibit 127 was marked for identification: Chart.)

(Plaintiff's Exhibit 128 was marked for identification: Chart.)

BY MR. MATTEI:

Q So, let's bring up 127 and 128.

MR. CERAME: Sorry to interrupt. But briefly, if they were e-mailed to our office, we didn't receive them. So, if somebody at Norm's office or your office make sure we receive them, I would appreciate it. That's all I wanted to --

MR. REILAND: We can e-mail them to you.

MR. MATTEI: Are we showing these?

MS. SESHADRI: I'll show them.

MR. MATTEI: All right.

Page 618

BY MR. MATTEI:

Q So, we have a document on Zoom right now IW Org Chart No. 1, this is 127. Is this the document you were referring to earlier, Ms. Paz, as suggesting to you that the AEJ 2018 Trust might have income in addition to the $11,000 daily payments?

A Well, this is one of two charts that I saw. But -- as I said, I'm not a trust attorney, just --

Q I don't want to you speculate. I want you --

A But as I --

Q Hang on a second.

A Go ahead.

Q Because I just want to -- Before you give your answer, I want to make sure you are mindful of the fact that you're testifying to facts as Free Speech Systems. So, I'm not asking you to infer or intuit anything. I'm just asking you whether -- what the factual basis is for Free Speech Systems' testimony that there may be additional income to the trust. Go ahead.

A Well, the factual basis would be looking at this chart, Free Speech Systems is owned by Mr. Jones; but PQPR is -- Free Speech is paying PQPR aside from the notes, right. So, it has this debt from this previous time period; but it is still paying PQPR going forward.

Those payments would flow to PQPR and then 80

Page 619

percent of that income then would flow to PLJR, which, in turn, 90 percent is owned by the trust.

So it would appear to me, at least by looking at the charts, that those prior debts, yes, they are being paid $11,000 per day per the notes; but moving forward for -- the businesses are still in operation and PQPR is still billing Free Speech and Free Speech is still paying on those invoices, that that income would also flow into the trust.

Q I take it as would any other income to PQPR from any source other than Free Speech Systems; correct?

A Sure. If there are other sources of income.

Q So, I take it that Free Speech Systems' testimony is that in addition to the $11,000 daily payment being made on this purported debt, all income received in the ordinary course of business by PQPR flows in accordance with its ownership structure, 72 percent to the AEJ Trust; correct?

A That would be my understanding, yes.

Q Of which Mr. Jones is the sole income beneficiary?

A That's correct.

Q Okay.

And so, since -- have you seen any of those numbers in terms of money beyond the $11,000 daily

Page 620

payment flowing to the trust?

A You mean other payments that were made from Free Speech to PQPR?

Q No, I mean income to the trust. Because you've established that $11,000 a day is flowing to the trust; right?

A Ultimately, yes, through the other companies, yes.

Q Other than your general testimony regarding other PQPR income, have you seen any other documentation of income going to the trust?

A I haven't seen any documents related to what is in the trust. So, no.

Q Okay.

A And it wouldn't be the whole $11,000 per day, just so we're aware, because Alex -- 20 percent of that is owned by David and Carol Jones, right, and then 10 percent of that then would be -- go to Carol Jones. So, it's not the entire $11,000 per business day. But ultimately yes, it would flow to the AEJ Trust of which Alex is an income beneficiary. But I haven't seen any of those bank statements or anything related to the trust.

Q And given that the PLJR retains an 80 percent interest, as it has throughout, of PQPR, is Alex Jones, through his income interest in the AEJ Trust, still in

operational control of PQPR?
A I don't know if -- you mean, does he -- I just want to clarify. Do you mean does he have a say in the day-to-day operations of PQPR?
Q Yeah.
A I don't know.
Q That's one question. And thank you for asking it of yourself.
I take it Free Speech Systems' testimony is that it does not know whether Alex Jones has any day-to-day involvement in the operations of PQPR; correct?
A No, because I can't testify as to the PQPR operations because I don't represent them --
Q I'm asking about --
A But I don't know. Right.
Q But let's just make sure we have a clear record. Free Speech Systems is not aware of any involvement that Alex Jones has in PQPR's day-to-day operations; correct?
A Right.
Q Does Free Speech Systems know whether Alex Jones has access to PQPR bank accounts?
A I don't know that, no.
Q Who is the trustee of the AEJ 2018 Trust?

A You know, I feel like I asked this question and I was told the answer, but I don't recall as I'm sitting here. I'm sorry.
Q When did the debt, purportedly owed to PQPR by Free Speech Systems, first start to accrue?
A So, if we could pull up the spreadsheets, that would probably give us a more accurate answer. But I think the spreadsheets start in 2012 or 2014.
Q Which spreadsheet are you referring to?
A That is the spreadsheet that analyzes the transaction by year of -- between Free Speech and PQPR through the end of 2018, resulting in that $29.5 million figure for the first note.
Q Thank you.
So, you're referring to what would have been referred to in this litigation as Free Speech Systems's subsidiary ledgers; correct?
A I don't know if it's in the subsidiary ledger. I'm not sure.
Q Why don't we pull up the 2012 subsidiary ledger, I think you referred to it as a transaction report. Let's pull it up.
A I was specifically referring to the spreadsheet that I think was produced for this deposition that Mr. Roe and/or Mr. Schwartz created. That's what I was

referring to.
Q Okay.
A Because that's what I reviewed in connection with the deposition.
Q I see.
So, are you referring to the summary of intercompany transactions that we were looking at earlier?
A Yes, I think that's what it's titled, yes.
Q Why don't we pull that back up. Do you have that in front of you?
A Yes.
MR. MATTEI: What's the exhibit number on this?
MS. SESHADRI: 106.
BY MR. MATTEI:
Q Is this the spreadsheet you were referring to earlier, Ms. Paz?
A Yes, it is.
Q Am I to understand from your testimony that Free Speech Systems is claiming that the debt it now purports to owe to PQPR started accruing in December of 2014?
A Yes. That's what the spreadsheet indicates.
Q And what you have been told is that that is

when the debt started accruing; correct?
A I don't know if I asked that specific question, but these are the documents that were produced to me that I reviewed. It indicates that. So, yes.
Q And they were produced to us as well?
A Yes.
MR. MATTEI: Can you take that down.
BY MR. MATTEI:
Q Who authorized Free Speech Systems to begin to go into debt to PQPR at that time?
A What do you mean who authorized it? I don't know that it was ever a conscious decision. PQPR was sending us bills or sending Free Speech bills and we were not paying the entire of the bills -- the entirety of the bills. I'm not sure the reason why. I'm not sure if it was -- I don't think it was a conscious decision on anyone's part; but -- I don't know if -- I don't think I would use the word "authorized," but --
Q Okay.
So, this is helpful. So, in 2014, PQPR is sending -- in December 2014 PQPR is sending Free Speech Systems bills; right?
A Yes.
Q As it had been prior to that?
A Sure.

Q But in December of 2014, Free Speech Systems stops paying those bills in their entirety; correct?

A I don't know if they stopped, but most of the bills were not being paid in their entirety.

Q What were those -- how was Free Speech Systems billed? Was it by paper invoice, by electronic submission?

A They were being invoiced, yes. They were being invoiced.

Q PQPR was causing invoices to be sent to Free Speech Systems?

A Right.

Q Who was responsible for receiving and processing those invoices at Free Speech Systems beginning in December of 2014?

A I don't know and I don't want to guess.

Q And what were those -- at that time in December 2014 when this debt started accruing, what was Free Speech Systems being invoiced for from PQPR?

A For costs associated with the products, for purchasing the products. So, PQPR purchases the products, costs associated with housing the products. There also may have been some advertising costs in there. I know a couple of years there were advertising costs.

Q Hang on one second. Hang on one second.

A Sure.

Q Let's start with the cost of the products.

A Sure.

Q Why would Free Speech Systems owe PQPR for the cost of products that PQPR was responsible for buying and selling?

A So, PQPR purchases the products and sells the products but they're billing for the product sales, right; so all of the product sales would then be billed to Free Speech, ultimately.

Q So -- but if PQPR's invoicing Free Speech Systems, what you testified to is one of the invoice has to do the cost of their products. So, PQPR is saying you owe us because we bought this product?

A Mm-hm.

Q Right? Is that what you're saying?

A I believe so.

Q So, why would Free Speech Systems have to pay PQPR for PQPR's purchase of its own product?

A Well, those products are being sold on the Free Speech Systems website, ultimately.

Q Yeah?

A Right.

Q I thought you said that they were sold on --

A Well --

Q Hang on a second. Hang on a second.

I thought you said they were sold on infowarsstore.com and infowarsshop.com and you didn't know who own those websites?

A I don't know who owns those websites, but ultimately, all of those products are being sold via the ads that link back to those websites. I'm not sure who owns them. But -- so, when you visit a website on the InfoWars.com website, you visit any article and there are banners on those articles and it clicks and you can click on that link to send you to the PQPR website to purchase the products.

Q Okay.

But that would be the advertising is money that PQPR has to pay Free Speech Systems; right?

A Right. And if you watch -- if you read the spreadsheets, they are being given credit. So, Free Speech is being given credits for those advertising.

Q I'm just asking you right now what PQPR was invoicing Free Speech Systems for?

A For products.

Q Hang on a second.

So, but is Free Speech Systems buying the product from PQPR? Because that I could understand, right. Hey, you're buying this product from us, we're

selling it to you, Free Speech Systems, pay us. But that's not what I understood you to be staying. What I understood you to be saying is PQPR buys the products and sells the products; right?

A PQPR, I believe, buys the products and then stores the products and handles the sale end of the products and packaging the products. But ultimately, Free Speech pays PQPR for the product. So, it is billing Free Speech for the products.

Q So, do you understand why this is a little bit confusing -- might be a little confusing? Because if PQPR is being its product and then selling its product, what is Free Speech Systems getting when it pays for the product? Isn't the product going to the third-party customer?

A Right, but the cost of the product is not the same thing as what it is actually being sold for.

Q So, why is Free Speech Systems paying for the cost of the product, why wouldn't PQPR pay for that?

A I don't know the answer to that. I'm just here to testify as to how it is.

Q So, Free Speech Systems' testimony is that beginning -- is that one of the things it was invoicing PQ -- I'm sorry. Let me start over.

Free Speech Systems' testimony is that one of

Page 629

the things PQPR was billing it for was the cost of PQPR's products; correct?
A Right.
Q And those bills were coming in on a monthly basis to Free Speech Systems?
A Yes.
Q What else was PQPR invoicing Free Speech Systems for in December 2014?
A I don't remember off the top of my head. It may have been billing them for --
Q I don't want you to guess.
A Right. I don't remember looking at it. I would -- there are documents there that could refresh my recollection, more specifically the spreadsheets.
Q You mean the spreadsheet we were just looking at?
A Mm-hm.
Q Okay.
Bring that up. Do you have it? Okay.
A So, if you could see the debits, the product sales. So, that's what I was saying that the -- that PQPR is billing Free Speech for. And then there are some credits. So --
Q Hang on.
If we're just sitting on the debits column,

Page 630

right, this would be, presumably, money that PQPR claims it is owed by Free Speech Systems; right?
A Yes.
Q And the one source of that debt are product sales. At least listed here; correct?
A Right. At least listed here.
Q And so, what I'm asking you is, beyond the spreadsheet, is -- can Free Speech Systems testify as to any other items for which PQPR was billing it or invoicing it beginning in December of 2014?
A PQPR billing Free Speech; right?
Q Correct.
A I can't tell by looking at this.
Q Right. Okay.
But beyond the spreadsheet, though?
A Yeah, I don't know.
Q Well, that's kind of important because one of the issues you're here to discuss are the relationship between the two entities and -- so, if we close the deposition today, Free Speech Systems' testimony will be, beginning in December of 2014, a debt started to accrue to PQPR as a result of unpaid invoices for the cost of products purchased by PQPR; correct?
A Right. Minus other things. So, but yes. Ultimately, yes.

Page 631

Q Amongst other things, but I'm just focused now on the invoice piece.
A Right.
Q Beyond the debt associated with Free Speech Systems not paying for the cost of products, Free Speech Systems is not aware of any other source of any debt owed by Free Speech Systems to PQPR; correct?
A Right.
Q Okay.
So, thank you.
Getting back to the question that started this round then, I asked you who authorized Free Speech Systems to start to accrue this debt and I want to go back to that question.
Now, we know that PQPR is invoicing Free Speech Systems for the cost of its products and Free Speech Systems is not paying, or at least not paying in full; right?
A Right.
Q So, who made the decision at Free Speech Systems to stop paying?
A I don't know if it was ever a conscious decision. So, I don't know if it -- I just -- I don't subscribe to the word "authorized" or -- you know, I don't know that it was ever a conscious decision on

Page 632

anyone's part.
Q Well, Free Speech Systems receives a bill as you testified?
A Right.
Q That bill either gets paid or it doesn't get paid; right?
A Mm-hm.
Q Who decides that?
A I don't know. I mean, Alex owns the company, so -- but I don't know if he was paying attention to it that closely. I didn't ask him. So, I don't know.
Q Was there any discussion between -- so, you said Alex Jones owns Free Speech Systems; right?
A Yes.
Q And the company to which the money was owed, PQPR was, up until 2018, owned by Alex Jones through his interest in PLJR; correct?
A In part.
Q Well, in part owned by Alex Jones, but Alex Jones controlled the majority and controlling interest; correct?
A He controlled the majority percentage, yes.
Q And so this is a situation where, beginning in 2014, one company owned by Alex Jones was deciding not to pay another company in which Alex Jones was a majority

owner; correct?
A I just don't know how to came about, you know, I don't know whether it was a conscious decision. I don't know how it came about. But ultimately, the answer is right, yes. It wasn't one company was not paying another company the entirety of what was owed.
Q Right.
A Right.
Q Both owned by Alex Jones?
A In part. PQPR.
Q Mr. Jones 100 percent owner of Free Speech Systems; correct?
A Yes.
Q He is, as of this time, through his interest in PLJR, 72-some percent owner of PQPR?
A PQPR, yes.
Q And Free Speech Systems is not paying PQPR; correct?
A In its entirety, right.
Q And so, did Alex Jones -- okay.
But Free Speech Systems is not prepared to say who made the decision at Free Speech Systems to withhold money for which it is being invoiced?
A Right. Like I said, I don't know if it was ever a conscious decision. I mean, as I'm sure you've

noticed throughout the entirety of the proceedings, there was a lot of financial entanglement between the two companies. There's no real hierarchical structure, at least, at Free Speech. People come and go a lot. So, like I said, I don't know whether there was a conscious decision. I don't know how it happened or why.
Q Let me ask the next question: Why did Free Speech Systems begin to accrue this debt to PQPR?
A The why is because it wasn't being paid. But the why as it wasn't being paid, the answer is I don't know.
Q So, is it Free Speech Systems' testimony that from 2014 to 2018 it racked up a, what, $29.5 million debt?
A Yes.
Q And may have just done so unconsciously?
A I don't know why. So, it may have been unconscious, it may have been conscious. I just can't answer why.
Q Is Free Speech Systems aware of anything that PQPR attempted to do to compel Free Speech Systems to pay it the money it was owed?
A Aside from the notes? No.
Q The notes meaning --
A Meaning --

Q The documents that were --
A Yes, exactly, the notes that put into writing the debts and the payments and the structure of the repayment.
Q Prior to August of 2020, when that first note was executed, is Free Speech Systems aware of any efforts made by PQPR to compel Free Speech Systems to pay it the amount it claimed to be owed?
A Aside from the notes, I'm not aware of anything else.
Q You've never spoken to David Jones?
A No, I've not spoken to Dr. Jones.
Q You mentioned several times that during the time period 2014 -- December 2014, when this purported debt started to accrue and 2020, when the first note was executed, there was a lot of what you described as financial entanglement between the two companies; correct?
A Right. I mean, in my conversations with Mr. Roe, it kind of seemed like that was the case and that they've made efforts to make sure that everything is more separate and documented and runs more smoothly.
Q Those efforts, according to Mr. Roe, commenced in 2020?
A I'm not sure when they commenced. I don't know

honestly know.
Q What were the nature of the financial entanglement -- of Free Speech Systems's financial entanglements with PQPR?
A Well, I mean, this is one example of the invoicing and not being paid completely from one side versus another. So, efforts were being made to make sure that the debts were documented and re-paid. So, that's one example.
Q What other examples of entanglement were you describing?
A I don't think -- I don't know of -- off the top of my head of any other ones. This is obviously the biggest one.
Q Just unpaid invoices?
A Well, it's $54 million worth of unpaid invoices.
Q Yeah, actually, can you tell me how you get to 54 million. Because we were just talking about, on this spreadsheet as of December 2018, 29.5 million in debt. Is the balance having accrued from 2018 to 2020?
A Right, so that would be on the second note. The second note is for 25.3 million.
Q Ah. Hang on a second.
Let's do this, then. Just to clear up then,

because I want to talk to you about the notes.

A Mm-hm.

Q 2014 through August of 2020, Free Speech Systems is not aware of any efforts by PQPR to compel payment nor of any efforts by Free Speech Systems to make full payment on the debt that's purportedly owed; correct?

A Aside from the notes?

Q The notes weren't until August of 2020. I'm talking about the whole time before August of 2018; right?

A Well, that's when the notes were signed. But I think it the debts were calculated -- so, the first note is calculated through the end of 2018.

Q Yeah.

A And then the second note is for after 2018. So, 2018 through 2020.

Q Yes.

A So, I mean, it, at least, appears to me that even though the note was executed in 2020, they were making these efforts at the end of 2018.

Q I just want to -- I want you to be able to testify here. I'm not asking to you draw any inferences from the dates on which the notes were executed or the time period that they purport to cover; okay?

A Well, I think you are making an inference that it says because the date is 2020, that no effort was made prior to that. But I don't think that's accurate.

Q No. I'm asking whether you're aware of any. I'm asking you whether -- Because I want to you tell me. If, in fact, anybody associated with Free Speech Systems or PQPR attempted to negotiate in some way around this accruing debt prior to August 2020, I want to know about it.

So, as you sit here today as Free Speech Systems's representative, can you testify in any way about any discussions between representatives of Free Speech Systems or PQPR concerning the accrual of that debt prior to August of 2020?

A Yes.

What I'm saying is that the first note is calculated through the end of 2018 and the first note, even though I understand what you're saying that the date is August 2020, when I spoke to Mr. Roe and Mr. Schwartz, you know, they're calculating this at the end of 2020 and that's when the first note was going to be for $29.5 million. So, it seems to me these conversations were happening in 2018.

Q So, did Mr. Roe or anybody tell you that, in 2018, there was any discussion between PQPR and Free

Speech Systems about this debt?

A I don't know if there were specific conversations between the two companies. All I could say is that they're calculating these debts and the first note -- like, so, for example, if they weren't talking about it prior to 2020, they would have just calculated the end of this first note in 2020.

Q Ms. Paz, are you just kind of speculating about that?

A I'm just saying, based on my conversations, if you read my note, it says there was one at the end of 2018 for $29.5 million. That's based on my conversation with Mr. Schwartz.

Q So, in 2020, they're looking back at all this money that they claim Free Speech Systems owes PQPR and they calculate whatever it is going back to 2018; right?

A I don't know. I understand what you're saying, but I don't know.

Q I just want a clear answer to my question. And I don't want any kind of inferences or speculation.

As Free Speech Systems designee, is Free Speech Systems aware of any negotiations of any kind regarding this purported debt prior to August of 2020?

A I don't know. Like I said. I can only tell you what my conversations were with Mr. Schwartz and

that's what he indicated to me.

Q So, Free Speech Systems' response to that question is no, it not aware of any; correct?

A I don't want to say I'm not aware of any just because, like I said, in my conversations with Mr. Schwartz, the conversation was that the first note was for the end of 2018, so I --

Q I get it.

A So, I don't know if that means they were happening in 2018. So, it could be --

Q So, the answer is you don't know?

A Right. It could be 2018; but I'm not sure. So --

Q Right. So, Free Speech Systems is not aware of whether there were any negotiations or discussions concerning this debt as between Free Speech Systems and PQPR prior to August of 2020; correct?

A I don't know, right.

Q Thank you.

Now I want to talk about the notes. So, let go to this first note here. If you can bring it up.

So, August 13, 2020; right? Do you have it in front of you, Ms. Paz?

A Uh-huh.

Q I'm going to read the first paragraph: This

Page 641

promissory note is made as of the date first written above by and between Free Speech Systems, LLC, a Texas limited liability company, 3005 South Lamar Boulevard, Suite D109-317, Austin Texas and PQPR Holdings Limited, LLC, a Nevada limited liability company, 100 Congress Avenue, 18th Floor, Austin, Texas; right?
A I see that, yes.
Q And the signers of this note -- Can you scroll down to the execution page -- are Alex Jones on behalf of Free Speech Systems; correct?
A Yes.
Q And David Jones signs as the secured party on behalf of PQPR Holdings Limited, LLC; right?
A Yes.
Q So, who represented Free Speech Systems in connection with this transaction?
A Alex.
Q Okay.
How do you know that?
A He signed as the managing member of Free Speech.
Q Okay.
So, you're basing that solely on the fact that his signature appears?
A Right.

Page 642

Q So, is it Free Speech Systems' testimony that Alex Jones handled the negotiations around this transaction, personally?
A I don't know the answer to that. I don't know. He would have had to sign it, he's the 100 percent owner of Free Speech. Nobody else could sign it.
Q Nobody else could sign it, but obviously you understand in a transaction involving $25 million, oftentimes parties are represented by counsel?
A Counsel, exactly.
Q Correct?
And you're not -- Free Speech Systems is not aware of whether Mr. Jones and Free Speech Systems were represented in these negotiations by counsel; correct?
A I don't know.
Q Is Free Speech Systems aware of any negotiations that occurred around this transaction?
A You mean how the terms ultimately came to be? I don't know.
Q Yeah.
Is Free Speech Systems aware of whether there was any negotiation around this transaction?
A I don't know.
Q Is Free Speech Systems aware of how this document was generated?

Page 643

A What do you mean how it was generated? Like, who drafted it?
Q Correct.
A Oh, I don't know.
Q Okay.
Now, you see that David Jones signed on behalf of PQPR; correct?
A Yes.
Q And he purports to sign as a manager; correct?
A That's what it says.
Q Do you know what the basis for his authority is to act as a manager on behalf of PQPR?
A Well, he has an ownership interest in it.
Q Okay.
Is that what Free Speech Systems is contending was the basis for him to sign on behalf of PQPR here?
A He can sign on behalf of PQPR. He's -- has an ownership I want in it. I haven't seen the organizational paperwork for PQPR, so I don't know what his official title is within that LLC. So, I can't really answer that question.
Q Okay.
As of this time, that is the time that this document was executed, Alex Jones, through -- as of this time, that is August of 2020, Alex Jones, through his

Page 644

interest in the AEJ 2018 Trust, owned an approximately 72 percent share of PQPR; correct?
A Right. When you do the math out, that's what it works out to.
Q Now, this particular note -- can we go back up to the top, please.
This particular note pertained to a purported debt of $29.588 million; correct?
A Yes.
Q And that is the same amount reflected on that spreadsheet we were looking at earlier, purporting to document monies owed by Free Speech Systems to PQPR from December of 2014 through December of 2018; correct?
A Yes, I believe those two numbers are the same.
Q But it's Free Speech Systems' testimony that it was not aware whether Free Speech Systems started making payments on this note beginning in August of 2020; correct?
A Right. I'm not sure. I don't know the answer to that. I know they were definitely at the end of last year, but I don't know if they were before that.
Q Let's go to the second note. Okay. This is the November 10, 2021 note. And can you tell me what the -- why Free Speech Systems entered this particular note in November of 2021?

A So, after the 2018 -- so there was -- there continues to be a balance from 2019 and 2020. So, there --

Q Let me just interrupt you.

Meaning that from January of 2019 through even the date of this note, November 2021, Free Speech Systems was continuing to not pay PQPR in full for the cost of PQPR's products as PQPR was billing it for; correct?

A Right. So, this wouldn't be through 2021 because 2021's books aren't closed yet. So, there is no analysis of 2021 for the year. So, this would have been for 2019 and 2020, so these were efforts that are being made by the accountants to close out the books, right. So, come to zero balances and have everything balance out.

So, they did that with the first note at the end of 2018, and then for 2019 and 2020 they're continuing to try to balance everything out to get to that zero for the next year. They see that there's this now $25.3 million debt. So, instead of carrying that debt over into the next year, they have the note.

But this wouldn't account for 2021.

Q So, is it Free Speech Systems' testimony that from January of 2019 through December of 2020, it accrued another 25.3 million in debt to PQPR?

A Yes.

Q And the basis for that debt was the same as it had been prior to January 2019, that is, failure to pay PQPR for the cost of PQPR's goods?

A Right.

Q Any other component of the debt that Free Speech Systems is aware of?

A No. I think that's pretty much it.

Q And the -- please scroll down.

Here in November of 2021, the interest rate applying to this piece of debt is 1.8 percent; correct?

A Yes. In paragraph B, yes. That's what it is.

Q And is this another 30-year term?

A No. This appears to be coming due on November 10, 2036. So, it's a shorter term. This would be a 15-year payment.

Q Yet, Mr. Jones signs this on behalf of Free -- Mr. Alex Jones signs this on behalf of Free Speech Systems; correct?

A Can we scroll down?

Q Yes.

MR. MATTEI: Scroll down to the signature page, please.

BY THE WITNESS:

A Yes.

Q And David Jones signs on behalf of PQPR; correct?

A Yes.

Q And similar to the August 2020 note, I take it that, your testimony is that you are not aware of whether Free Speech -- whether Alex Jones personally negotiated the terms of this instrument; correct?

A Right. I don't know.

Q And you're not aware of whether there was any negotiation around this particular instrument; correct?

A I don't know either way, no.

Q And you're not aware of the basis for David Jones' authority to sign on behalf of PQPR here; correct?

A Well, I don't represent PQPR, so I don't know what their organizational structure is; so I don't know.

Q You said earlier when describing PQPR's online sales activity, you referred to a PQPR website. What website is that?

A I think you asked this question earlier and I said I wasn't sure what the name of the site is that it links back to. So, all of the ads that are on the Free Speech website link back to another website, but I'm not sure which site that is.

Q When you say linked back -- if I'm on InfoWars.com; right?

A Yep.

Q Free Speech Systems owns that; right?

A Right.

Q And I click on a link to an ad; right?

A Right.

So, if you have, like, say, a banner at the top -- even the home page, there's banners on the home page. So, if you click on that, mm-hm.

Q So, there's a banner ad on the home page at InfoWars.com for bone broth, let's say, just by way of example?

A Okay, sure.

Q I click on that. I get redirected to a different website; right?

A Yes.

Q Where I can execute a purchase for that bone broth; right?

A Yes.

Q Is that second website owned by PQPR?

A I'm not sure who owns it.

Q And you don't know what it is? That is, you don't know the domain name?

A Right, right.

Q But is that what you were referring to as the PQPR website?

A Yes.
Q Okay.
THE WITNESS: Is this a good point for a break?
MR. MATTEI: It may be. I'm just trying to see if there are a couple things I can wrap up quick because we are going to have to take a lunch.
Just give me one second, Ms. Paz.
THE WITNESS: Sure.
BY MR. MATTEI:
Q All right.
Did you review Dan Bidondi's deposition?
A For today? No.
Q But at any point?
A I don't remember. I may have, but I don't remember.
Q Let me see if I can refresh your recollection.
Do you recall reviewing Mr. Bidondi's testimony that he has exchanged text communications with Rob Dew concerning this litigation?
A I don't recall. Do you remember what the texts were, maybe give me some context?
Q They haven't been produced to us.
A Oh, I don't know, I don't know.

Q What is Rob Dew's current status with Free Speech Systems?
A I did speak to Rob about this. I think he may be a contractor now, but I'm not a hundred percent sure.
Q This would have been a conversation you had with Rob Dew going back to your first preparation.
A From my original, right. Because I did have a conversation with him for, like, two hours or so and I know his employment status has changed so he might be, like, an independent contractor now. But I'm not sure. But I can verify it for you.
Q What's Tim Fruge's current status with Free Speech Systems?
A As with a lot of the people, they kind of come and go out of good graces, as they say. So, I believe Tim is currently actively employed with Free Speech. He stopped for a while, but I think he came back on.
Q Yeah, you reviewed his deposition; right?
A I believe I did. I haven't reviewed it for today. I think I read it back during my original preparation. But I didn't review it for today.
Q Does Free Speech Systems currently have any affiliate relationships?
A What do you mean? Like, through the broadcasts?

Q I mean -- I'm -- I'll just tell you Alex Jones testified two weeks ago that Free Speech Systems is engaged in a number of affiliate relationships with third-party vendors, let's say. So, I'm just asking you, as Free Speech Systems's representative, whether you're prepared to testify about the nature of those relationships?
A You mean, like, affiliate relationships through advertising? Because we do have some advertising relationships.
Q What can you tell me about that?
A That's another topic. I don't know if you want to wait until after lunch, but there are some spreadsheets that I believe were produced about the third parties that pay us for advertising on our various platforms, so there are affiliate relationships regarding the advertising and the marketing.
Q Right. Okay. What other types of affiliate relationships do you have?
A I mean, I'm not sure. It's a very open-ended question.
You know, I can testify as to advertising third-party aspect of it. We do have payments made to us, like, we have an Amazon shopping, right, so that would be a third-party affiliate, I would consider it, so

we sell some of our products there. And they pay us for those products.
Q Does Free Speech Systems -- Does Free Speech Systems currently have any affiliate relationship with any entities in which Tim Fruge is involved?
A I don't know. I'm not sure.
Q All right.
MR. MATTEI: Let's take our lunch break. Is half an hour okay? Would people like more?
MR. REILAND: I would like 45 minutes.
THE WITNESS: Yeah, can we do a little more than that.
MR. REILAND: Until 2.
THE VIDEOGRAPHER: We are off the record, the time is 12:42.
(Recess from 12:42 p.m. to 1:38 p.m.)
THE VIDEOGRAPHER: We are now on the record. The time is 1:38.
BY MR. MATTEI:
Q Ms. Paz, at some point, did Free Speech Systems set up a website for the purpose of soliciting donations to assist in its legal defense?
A I believe it did, yes. I'm not sure of the dates.

Q And do you know what that website was?
A Not off the top of my head, no.
Q Does website SaveInfoWars ring a bell?
A I don't know, I'm not aware.
Q Do you know whether it was set up through GiveSendGo?
A I don't know how it was set up.
Q Do you know who authorized that it be set up?
A No.
Q You're aware obviously that Free Speech Systems solicited donations through The Alex Jones Show to that fund; correct?
A Yes.
Q How much money has Free Speech Systems taken in as a result of -- Strike that.
How much money has Free Speech Systems taken in through the Save InfoWars legal defense fund?
A I don't know. I don't think that was on the depo notice, so, I didn't look into it.
Q The reason I'm asking is because -- well, of course, Mr. Jones's compensation is on the depo notice; correct?
A Yes, his compensation is.
Q And you're aware of approximately $8 million in cryptocurrency donations that were made to Free Speech

Systems during the spring of this year?
A Donations to the fund? Is that what you're asking?
Q Let me backup.
Are you aware of any cryptocurrency donations to Free Speech Systems during the spring of 2022?
A No. I don't know either way.
Q So, let me see if I can just narrow this down. Free Speech Systems acknowledges that it set up a legal defense fund for the purposes of soliciting donations to assist in its legal defense in connection with this litigation; correct?
A Yes, I'm aware that that exists.
Q You're aware that Alex Jones has promoted that website and solicited donations to Save InfoWars; correct?
A Yes.
Q Free Speech Systems is not aware of whether it received $8 million -- approximately $8 million in cryptocurrency dough neighs earlier this year?
A Right. I don't know. I didn't prepare that question.
Q And Free Speech Systems is not prepared to testify today as to whether Alex Jones was compensated in any way as a result of cashing out of those

cryptocurrency donations?
A I can testify as to his compensation as listed in the spreadsheet that I reviewed which does not contain any of that. So, outside of the spreadsheet, no.
Q Okay.
So, Free Speech Systems is not prepared to testify to any fact concerning his compensation beyond that which is set forth in the spreadsheet that was produced in this case?
A Well, it's Free Speech Systems's position that represents all of Mr. Jones's compensation during those time periods.
Q Okay. And which time periods does that cover?
A I believe that's through 2020 because, like I said earlier, our books for 2021 are not closed yet. So, we don't have the numbers through 2020 -- through 2021, I'm sorry. So, the numbers would end in 2020.
Q Well, Free Speech Systems is obviously aware what it paid Mr. Jones in 2021; correct?
A I mean, I'm sure they're in the general ledger, but as I said, the books are not closed for that year.
Q But --
A I can't testify to any numbers in 2021. I have not reviewed any numbers for 2021. They are not available to me yet.

Q When you say they're not available to you yet, you're speaking as Free Speech Systems.
Is it Free Speech Systems' testimony today that it is not capable of testifying as to any compensation it paid Mr. Jones in 2021?
A As I sit here today, that's correct. I cannot testify to anything --
Q I'm not talking about you, personally--
But is that because that information is not available to Free Speech Systems or is that simply because you, Brittany Paz, haven't been presented with that information?
A I don't think I could testify to anything for numbers for a year that haven't been closed yet. So, I don't think they are available to anyone not --
Q Let's just put it this way: You haven't filed your taxes -- your personal taxes for 2022; correct?
A Right.
Q But you know that you've been paid by Free Speech Systems in 2022; correct?
A Sure.
Q And the same is true for Mr. Jones. Mr. Jones has not filed or has he filed his 2021 tax return?
A I don't know. You would to have ask him.
Q Okay.

Has Free Speech Systems filed it's 2021 tax return?
A I don't believe so, no.
Q But, regardless have whether its books have been closed or the tax return has been filed, the reality is, and you can testify to this, that, in 2021, free Speech Systems paid Mr. Jones compensation; correct?
A Yes. I just don't know how much.
Q The question I'm asking you is whether you don't know how much because that information is not reasonably available to Free Speech Systems? Can you testify under oath that is why you don't know?
A That is correct.
Q That it's just not reasonably available to you?
A I can't testify to any file numbers regarding 2021 until our books are closed for that year.
Q Says who?
A Says the accountants, says the attorneys, says -- I can't testify to anything in 2021.
Q Okay, so let me just understand that.
Have you been instructed not to testify concerning Mr. Jones' compensation that was paid to him in 2021?
A I don't know how I can be instructed not do something when that information is not available to me.

I can't testify to something that is not even available to me.
Q You haven't even looked; right?
A I asked what the most recent numbers we have available are and --
Q Let me stop you right there.
Who did you ask what the most recent compensation information for Mr. Jones is available for?
A I asked -- when I was speaking to Mr. Roe about it and Mr. Schwartz when we were going over the spreadsheets and --
Q Let's start with Mr. Roe?
A Sure.
Q You asked Mr. Roe what's the most recent compensation information we have available for Mr. Jones?
A Yes. And I was provided the spreadsheet.
Q You were provided the spreadsheet?
A Yes.
Q Did Mr. Roe tell you anything about -- did he answer your question directly about what have the most recent time peer for which compensation information was available?
A Yes. Because I asked him if we had 2021 numbers and the information for 2021 and he said those books -- the books aren't closed for 2021 yet, so it's

not available.
Q He said -- Mr. Roe told they're not available?
A Right.
Q Did Mr. Schwartz tell you they're not available?
A I did speak with Mr. Schwartz about that, too, yes.
Q Did Mr. Schwartz tell that you information concerning Mr. Jones's compensation in 2021 was not available?
A Right, because the books weren't closed yet.
Q He said that as well?
A Yes, I asked Mr. Schwartz. He said the same thing.
Q Did you ask them -- I assume you asked them about 2022 as well and they told you the same thing?
A If 2021 wasn't available, I didn't even get that far. But --
Q You didn't get that far?
A I didn't even get that far.
Q If the Notice of Deposition requires to you testify as to any compensation paid to Alex Jones from the period 2012 through the date of deposition; correct?
A That's what it says.
Q And you are not prepared to testify as to any

compensation for 2021 and 2020; correct?
A Right. I'm not able to do that.
Q An that's because you've been instructed both by Mr. Schwartz and Mr. Roe that that information simply isn't available?
A Right.
Q The explanation they gave you for why it wasn't available is because Free Speech Systems hasn't closed its books for either of those years?
A Right.
Q What do you understand "close its books" to mean?
A What I understand, obviously, I'm not an accountant, but I understand that the numbers for that year are not finalized yet. So, they need to go through and make sure everything adds up and everything balances out and then the final numbers will come out.
Q Come out to whom?
A Be available. I'm not sure what they do with it. I'm not an accountant, but that's what I understood it to mean.
Q Okay.
Let's go to Exhibit 108.
This is the spreadsheet you were referring to earlier regarding Mr. Jones's compensation?

Page 661

A Yes.
Q Who prepared this spreadsheet?
A I believe Mr. Roe prepared it.
Q He provided it to you?
A Yes.
Q Did he explain it to you?
A Yes, we discussed it.
Q The total draws listed in column G, what do you understand the figures in that column to represent?
A So, that would be his total draws -- so, there's two asterisks next to total draws and it's defined as amounts disbursed to or on behalf of Alex Jones, including amounts paid to or on behalf of Kelly Jones; so, it would be all of the amounts that Alex earned for those years including his W-2 salary, also including payments to Kelly Jones.
Q So, backup now.
There's a separate column for his W-2; correct?
A Right. So, those are his wages.
Q Hang on a second.
So, is it your testimony that the W-2 salary listed in column E is also included in the total draw figures in column G?
A I'm not sure.

Page 662

Q Okay.
A That's how I read that but, honestly, I'm not sure.
Q Okay.
For example, if you take 2016, where Mr. Jones was paid, according to this spreadsheet, apparently a salary of $181,925, you can't testify whether that amount is included in the 5.98 million he received as part of a draw or in addition to that number; correct?
A Right. I'm not sure.
Q And you're not sure on that issue with respect to any of those years; correct?
A Right.
Q With respect to the -- assume with me for a moment that the W-2 salary is in addition to the draw amount listed in column G; okay?
A Okay.
Q It's your understanding that -- what is your testimony as to what comprises that draw, excluding any potential W-2 salary?
A So, the draws would be any amounts paid directly to Alex through Free Speech. It is also including any monies paid to Kelly, because Alex reported it on his income taxes as income to him.
Q And would that amount, that is the amount paid

Page 663

to Kelly be represented by the 2.06 million total listed in column L?
A Right. So, 2.064 million, that would be included in column G, the 50.515 million.
Q So, of the 50.5 million that Mr. Alex Jones drew down during the years 2012 through 2020, 2.06 million of that represented payments to Kelly Jones; correct?
A Right.
Q Are you prepared to testify today about Mr. Jones' tax liability as set forth in column J?
A I mean, aside from the federal taxes that he paid, which are outlined in that column, are you asking for anything outside of what we see here in the spreadsheet?
Q As I understand column J, what it purports to indicate is that Mr. Jones's federal tax payments were included in the draw that he received each year; correct?
A That the payments that he made to pay for tax liability?
Q Right.
A Right, that's how I read that, too.
Q Is that true, though? Look, I'm just reading it. I have no association with Free Speech Systems. Is that, in fact, the case?

Page 664

A Federal tax included and draw -- yeah, so that means to me that's the tax that he paid on the draw.
Q Again, I want to be clear, I'm not asking to you interpret this document. I'm asking to you testify as to what is, in fact, the case. The document just is up to help you; but you didn't prepare this document. Your only knowledge on this is based on what Mr. Roe told you; correct?
A That is fair.
Q So, let's take, for example, the year 2017. All right? Mr. Jones is listed, according to this document, as having drew $6.79 million during that year; correct?
A Right.
Q There is a column titled Federal Tax Included In Draw, and the number for that particular is 6.6 million; right?
A Right.
Q So, what is the relationship between the 6.9 million listed in 2017 under column G and 6.6 million listed in column J?
A I'm not sure, just because it doesn't make sense for him to pay 6.6 million in federal tax on 6.9. So, it doesn't -- so, I don't think that's the tax that he paid. It might be the total compensation he paid tax

Page 665

on, minus deductions. But I'm not 100 percent sure about that. I'm not a tax attorney, so --
Q You don't know; right?
A I'm not sure.
Q And so, for example -- well, it sounds like you're not prepared to testify today about what the total compensation was that Free Speech Systems paid to Mr. Jones in each of these years; correct?
A No, I can testify as to what he earned on his W-2 and the total draws.
Q But you just testified earlier you don't know whether the W-2 information listed here is in addition to the draw or included in the draw; correct?
A I don't think it would be including in the draw, just because --
Q Ms. Paz, you need to testify under oath to a fact here.
A Right, I'm not sure the difference, but --
Q In other words, can you tell me today with certainty, because you're under oath testifying as Free Speech Systems; right? Can you tell me today how much total compensation Mr. Jones received from Free Speech Systems in any of the years 2012 through 2020?
A I'm just not sure whether or not the W-2 numbers are included in the total draw numbers. So, I

Page 666

mean, I can fine that out for you. That's not a big deal. But I'm not sure is the answer.
Q So, the answer is you're not prepared today to testify as to what Mr. Jones's total compensation was from Free Speech Systems between the years 2012 and 2020; correct?
A As to that particular question, the answer is no.
Q No, you're not prepared to testify to that?
A I mean, I'm prepared to testify that he has drawn $50.5 million in the eight-year period.
Q You're prepared to testify that that's what that column says; right?
A Those are his total draws as per the general ledgers of how much he drew those years.
Q You are prepared to say he was compensated at least $50.5 million; correct?
A Right.
Q But you can't testify what his total compensation was for any of those years; correct?
A I just don't know if the W-2 numbers are included in that. But I don't think so. I think it might be it's in addition to, but I'm not sure. So, no.
Q Is that the only -- well, let me -- so, you know that there was a number drawn from for Mr. Jones

Page 667

listed in the general ledger; correct?
A For column G? You mean how was this prepared?
Q Yes.
A Right, yeah, so he added the reference, so that's where he got the references for those numbers. So, right, in our ledger, that's what the number of draws is for him for that year.
Q So, according to this spreadsheet, there's only two potential sources of compensation for Mr. Jones from Free Speech Systems during these years: One is his W-2 salary and the other is his draw; right?
A Right.
Q Are there any other sources of compensation from Free Speech Systems for Mr. Jones during this time period?
A I'm unaware of anything except for these two sources of income.
Q Is that a no? Or is it an I don't know?
A When I asked what his income was, what Free Speech Systems paid to him total, this is what I was provided. So, this is what he was paid from Free Speech Systems. Anything else was gained from -- if anything else, was gained from other sources other than from Free Speech. This is what Free Speech paid to Mr. Jones.
Q This and only this?

Page 668

A Right.
Q And that's based solely on what Mr. Roe told you?
A Well, this is based on what Mr. Roe has gleaned from our general ledgers, from Free Speech's general ledgers. So, he reviewed the ledgers and prepared this spreadsheet on the basis of that.
Q Okay.
But you didn't conduct your own independent analysis of the general ledgers; correct?
A No, no, I did not, no.
Q So, what Mr. Roe represented to you was he had reviewed the general ledgers, he identified only two sources of compensation to Mr. Jones from Free Speech Systems, those being his B-2 salary and his total draw; correct?
A Right.
Q He then listed them out here; correct?
A Right.
Q But Free Speech Systems cannot testify whether or not the draw includes the W-2 salary?
A Right. I'm just not sure of that aspect of it.
Q Free Speech Systems' testimony is that, at most, Mr. Jones was compensated by Free Speech Systems approximately 53-plus-million dollars?

A Right. If you add the two columns.
Q From 2012 to 2020?
A Correct.
Q And you're not prepared to testify to any other sources of compensation Mr. Jones may have had other than these two; correct?
A Well, as far as Free Speech is concerned, these are the only sources of compensation.
Q So, let's just assume for a moment that the information Mr. Roe gave you is accurate and therefore your testimony is accurate?
A Right.
Q Separate from these two sources of information, you are not prepared to testify as to any other forms of income Mr. Jones may have had; correct?
A From sources other than Free Speech?
Q Correct?
A Right. I don't know if he has other sources of income other than Free Speech; that's correct.
Q And you asked as Free Speech Systems' corporate representative for all information concerning Mr. Jones's compensation from Free Speech Systems; correct?
A Right.
Q And this is the spreadsheet that you were provided; correct?

A Yes.
Q And this spreadsheet comprises the entirety of the information that you are relying in testifying concerning his compensation; correct?
A Right.
Q Do you know who prepares Mr. Jones's personal tax return?
A I do not. I know that Free -- well, actually, strike that.
I don't know who prepares it.
Q You're aware that Free Speech Systems does pay for certain tax services provided to Mr. Jones; correct?
A That Free Speech pays for his accountant services?
Q His personal accounting services.
A Oh, yes.
Q Have you reviewed any of Mr. Jones's tax returns in connection with your work in this case?
A I believe I was shown, when I was down in Texas, although I do not have copies of it, one or maybe two years. And because I believe Free Speech's income is filed with Mr. Jones's personal return. So, I was shown those portions of the return in connection with that. But I don't remember for which years. I wasn't shown all ten years or whatever it is, eight years.

Q Who showed you Mr. Jones's tax returns or at least a portion of it dealing with Free Speech Systems' income?
A I think that was when I met with Mr. Roe down in Texas, he had shown me some of the taxes -- tax returns. It was just the portion dealing with Free Speech's income.
Q And you believe that was for two years?
A I don't know how many years, I don't remember which years. I don't have copies of them. I wasn't provided with copies.
Q Was anybody else present during that meeting?
A Attorney Blott.
Q Was it your -- did you discuss with Mr. Roe why he was not designated to serve as corporate representative on the financial subjects listed in the notice of deposition?
A I think that's beyond my pay grade. Those are internal discussions --
Q I'm just asking whether you discussed that with him?
A I didn't discuss it with him.
Q During your testimony earlier in describing the accrual of debt owed by Free Speech Systems to PQPR, you testified that there were certain indications in the

transaction reports, which I believe you've also referred to as general ledger, suggesting that money was owed by Free Speech Systems to PQPR. Am I -- am I reorienting you to that testimony?
A Yeah, yeah. You mean the questions about how they arrived at those numbers for the notes?
Q I think I remember you indicating that the general ledgers included a general ledger account number specifically for money owed to PQPR. Was I making that up or did you testify to that?
A I think I testified to a specific account number regarding the closed captioning.
Q Ah.
A That was what I specifically remember us talking about with a number. So, when he asked Mr. Schwartz about close captioning, he was able to pretty quickly pull up all the payments that were made foreclosed captioning because that has a specific account number in the ledger and he just pulled up all the transactions for that account number.
Q When did Free Speech Systems first start recording in it's general ledger that it owed -- that it had a liability due to PQPR?
A You mean, when it was recording or when they noticed it or both, I guess?

Page 673

Q When did they first start accounting for it in their general ledger?
A I don't know the answer to that. And only because, like I said, there was a lot of financial entanglement between the two companies previously and there has been recent efforts to disentangle it. So, I'm not sure when they would have first started trying to figure it out and disentangle everything.
Q When you say disentangle, the only things that they've done to disentangle that you're aware of is having executed those two promissory notes; correct?
A Well, to try to figure out where money is going and who owes what to who and for what. So it's been a significant effort based on my conversations with Mr. Roe and Mr. Schwartz.
Q Tell me then beyond just Alex Jones and his dad executing those two promissory notes, what other work has been done to disentangle the financial relationship between Free Speech Systems and PQPR?
A You mean aside from the payments on the notes and going forward making sure that all of the amounts are being invoiced and paid properly?
Q Hold on a second.
A I don't know of anything else.
Q Okay.

Page 674

Well, let's just take those few things.
One is you mentioned paying on the note. Right? So, one thing they have done, according to Free Speech Systems is they have executed these promissory notes which require regular payments on the debt; right?
A Right, right, right.
Q That's one thing they've done.
A Right.
Q And according to Free Speech Systems, those payments, as least as of November of 2021, are being made?
A Right, right.
Q What else have they done?
A And then just, as I said, moving forward, making sure that the payments for future purchases are being invoiced and then paid properly so we're not progressively accruing more debt.
Q Moving forward from what date has that been put in place, wherein Free Speech Systems timely paid any invoices and bills sent by PQPR?
A So, that would be at the end of the second promissory note period. So, that would be at the end of 2020. So, end of 2020 is when the second note -- So, 2021 was when the second note was signed but it would have been for the end of 2020, right, because 2021 is not

Page 675

closed yet. So, they closed out 2020. So, it would have been moving forward from 2021 on.
Does that make sense?
Q Beginning in January of 2021, is when I guess PQPR first started requiring that Free Speech Systems make timely payment on any invoices it received?
A Well, I mean, I don't know if I would say requiring, but based on the invoice and we make sure we pay it just so going forward there's not an accrual of more debt.
Q Who's in charge now of making sure those payments are made timely?
A You mean, who is processing those bills for payment now?
Q Mm-hm?
A I believe it's Melinda.
Q Melinda Flores?
A Right.
Q So, as I understand it, when you were using the word entanglement, what you are describing is simply the fact that Free Speech Systems was not paying money it owes to PQPR on a timely basis, is that what you're saying?
A Right.
Q And because Free Speech Systems was not paying

Page 676

PQPR the money that PQPR was owed during that time, Free Speech Systems was retaining, within its own account, money that PQPR was entitled to?
A Right. So, the ledgers for those years would have indicated a loss, right, so it's still --
Q A loss for whom?
A A loss for Free Speech.
So, our books -- the books were still reflecting this money as being owed because we were receiving the invoices, we were putting the invoices into our account -- you know, into the books; and so, from year to year, it's carrying over the debt. So, instead of carrying that debt over from year to year, my understanding is that's why they wanted to zero out the books and make it into a note so that they were starting from the following year at zero instead of at a negative. So, that's why the first note was executed.
Q I believe that your testimony is that Free Speech Systems is not aware of any debt-related payments it was making prior to November 2021; right?
A Oh, you mean payments on the notes? On that debt? On that --
Q Yes, yeah.
A -- on that $54 million. I'm not sure when those payments are. I know for a fact they started in

Page 677

November, but I don't know if there were any other payments on that debt being made before that. So, I don't know.

Q I want to ask you some questions -- moving on to a different topic, Ms. Paz.

So Ms. Paz, I want to change topics now to discuss the radio audience of Free Speech Systems. And I want to show you Exhibit No. 121.

Why don't we pull that up until we have it in front of you, Ms. Paz.

A I see an e-mail.

Q Okay. I want you to just take a minute to familiarize yourself with it.

John@InfoWars.com is John Baum; correct?

A I believe so, yes.

Q And Professor Tracy is Professor Jim Tracy who appeared on the Alex Jones show several times to discuss Sandy Hook; correct?

A Yes, I believe he did.

Q You see that this e-mail is dated January 8th, 2013?

A Yes.

Q So, less than a month after the Sandy Hook shooting; correct?

A Yes.

Page 678

Q And Mr. Balm informs Mr. Tracy that Free Speech Systems was on over 140 stations nationwide with a daily listener base of 3 million, possibly more; right?

A That's what the e-mail says.

Q Was that correct as of January of 2013?

A I don't know. I had this conversation with Alex and every time I talked to Alex about this, his position is I'm free to air, I'm on -- you can listen to me online, you can listen to me anywhere, I'm on the air waves. So, the entire plant is capable of listening to him, it really difficult to narrow it down.

As far as this e-mail goes, it looks like what it's referring to is there are 140 stations that we air on, and if you look at all of the stations and their approximate listener base or how many people it's potentially reaching just based on where they're broadcasting, it's 3 million people. So, that's what that e-mail is saying to me. But outside of what I see there and that what I just testified to, I can't say whether it's right or not.

Q Well, you've been produced by Free Speech Systems to testify concerning its audience. That's one of the subjects listed in the Notice of Deposition. You know that?

A I do. And I've made efforts to do that and

Page 679

that was the response that I received.

Q Okay.

Well, you would agree with me that on January 8th, 2013, John Baum was an employee of InfoWars; correct?

A Yes.

Q He was one of the producers of The Alex Jones Show; correct?

A I don't remember if he was a producer but he was employed there in this time period, yes.

Q It's fair to say that Free Speech Systems does not dispute that as of January 28th, 2013, The Alex Jones Show was airing an over 140 stations nationwide with a daily listener base of 3 million?

A I don't have any information that contests that, no.

Q Other than Alex Jones, who did you speak to regarding Free Speech Systems audience size?

A I think I just spoke to Alex about it.

Q Why don't you put up Exhibit 122. Let's just scroll through this.

Ms. Paz, have you ever seen this document before?

A I'm sorry, what is this?

Q I'll represent to you that this was produced as

Page 680

a transcript of the June 19th, 2017, broadcast of The Alex Jones Show?

A Okay.

I may have read something like this in a different format. The transcripts that I read of the shows were by Falzarano Reporters. So, I may have read this transcript, but it was just in a different format.

Q Okay.

You see the Bates number at the bottom as having -- as this being a document that was produced by Free Speech Systems?

A Yes.

Q And so Free Speech Systems agrees that this is in fact a transcript of The Alex Jones Show on June 19th, 2017; correct?

A That's what it appears, yes.

Q Directing your attention to page 8. Go up -- so, now we are on page 7 going to page 8. Go up a little further, please.

You see it, starting at 18:57, the transcript reflects that Alex Jones is speaking?

A Yes, that's what it says.

Q And if you go down. If you see there where Mr. Jones is referring to a video that Mr. Michael Cernovich published on his Facebook page concerning Megyn

Page 681

Kelly; correct?

A That's what it looks like, yes.

Q And Mr. Jones reported to his audience that according to Mr. Cernovich's internal analytics, which were contained on his phone and that Mr. Jones had viewed, the video had 4.5 million views and then another version had 2 million views on somebody else's channel; and our channel had a million views and then all my other videos together were over 15 million views; do you see that?

A Yes.

Q You understand that Mr. Jones was discussing the total views of videos he had published concerning Megyn Kelly; correct?

A It says, All of my other videos together at 15 million views. It's unclear how many videos he's talking about; but the views of however many videos that is.

Q Once again, if you go down to the next paragraph, Mr. Jones said, so, with his views, referring to Mr. Cernovich, that's 22-plus million views in the last week on videos we put out online; right?

A That's what it says.

Q Mr. Jones was essentially saying in the last week, Free Speech Systems videos had received 22 million views; correct?

Page 682

A Including Mr. Cernovich's video, right. That's what it says.

Q Which Free Speech Systems republished.

A Right, that's what it says.

Q Can you keep going down, please. A little bit further.

You see going down further, Mr. Jones says to his audience, Ladies and gentlemen, my Sunday show is only half the size of my weekday broadcast, but I like to get ahead of the news. It's got over 100 affiliates conservatively according to the ad agencies that get the big spectrum of ratings that come in. It has close to 2 million listeners on average that tune in.

He's talking about a Sunday broadcast; right?

A That's what it looks like.

Q Which he reports gets close to 2 million listeners on average, which is half of what his week day show would get; right?

A That's what it says.

Q And that's only on radio. If you go down further, that doesn't include the Internet and live streams; correct?

A Right. It looks like he's only talking about his Sunday broadcast. So, it's not talking about -- His Sunday broadcast being posted on YouTube and then the

Page 683

subsequent views that it may get after; right.

Q Right.

So, fair to say that according to Mr. Jones at this time, his Sunday broadcast was getting 2 million radio listeners on average; correct?

A That's what it says, yes.

Q His week day broadcast was getting 4 million radio listeners; correct?

A If he says it's half, double of that would be four, so --

Q He actually says that. But that's on commercial radio?

A A week day almost 4 million over the three or four hours that that's rated. Yes, I see him saying that, yes.

Q And then he goes on and says, and then of course there's the internet and live streams and everything else. It's huge. We're talking conservatively 45 million different people that tune in each week. One away or the other, it affects 45 million people; right?

A That's what he said, yes.

Q And Free Speech Systems doesn't have any reason to dispute Mr. Jones's representation to his audience at this time, in June of 2017, that he was reaching 45

Page 684

million different people that tune in each week; correct?

A No, I don't have any reason to dispute that.

MR. MATTEI: Let's go to 123, please.

BY MR. MATTEI:

Q You have in front of you, Ms. Paz, an e-mail from Scott Bronson, an InfoWars employee to Robert Castaneda, also an InfoWars employee?

A Yes, I see it.

Q Why don't you just take a minute to review it and see if you can scroll down as Ms. Paz needs it.

A Okay.

Q So, what was Mr. Bronson's role at Free Speech Systems at the time he sent this e-mail?

A Affiliate relations.

Q Do you know that or are you just gleaning that from the e-mail?

A I'm gleaning it from the e-mail.

Q And what does that mean?

A So, affiliate -- our affiliates would be whichever or however many stations we broadcast on. So, this information is a summary of all of the platforms essentially that we broadcast on or that we are available to the public on and approximately how many people they reach. And it looks like a break down of who -- the types of people.

Page 685

Q And who is Mr. Castaneda?
A You know what, I'm not 100 percent sure of what his role was.
Q What about John Hanson, who is also copied on this e-mail?
A I'm not sure just because also his function has shifted over time. So, I'm not sure what function he had in this time period.
Q You agree with me that this e-mail was produced to the plaintiffs by the Jones defendants; correct?
A Can we scroll down just a minute, to the bottom?
Yes, it has a Bates stamp. So, yes.
Q This is a Free Speech Systems e-mail?
A Right.
Q The information that Mr. Bronson was sending to Mr. Castaneda, he wanted to be put on the Affiliate One sheet; what's the Affiliate One sheet?
A The Affiliate One sheet is just a very brief summary of all of the affiliates and where we appear on -- across all of the different stations and broadcast systems and how many people we reach. So, it's literally just a very short summary. Almost like a resume.
Q One of the purposes of the Affiliate One sheet is to go out an recruit more affiliates to air The Alex

Page 686

Jones Show by showing those affiliates just how broad his reach is; correct?
A Sure.
Q It's also used to recruit potential advertisers who may want to advertise against The Alex Jones Show to show those advertisers just how many people they can reach; correct?
A Sure.
Q And according to Mr. Bronson's -- Strike that.
According to Free Speech Systems at this time, at the time the e-mail was sent, Free Speech Systems had a radio show that had 6 million daily listeners; correct?
A The radio show, right, had 6 million listeners and there's an asterisk as to how they came to that information.
Q Do you want to explain that further as to how they came to that information?
A If we scroll town to what the asterisk said. Okay. So, that looks like information that they gleaned from talkers.com to produce this particular One sheet. So, that's where it came from.
Q And Free Speech Systems -- does Free Speech Systems acknowledge that as of the date of this e-mail, it did, indeed, have approximately 6 million individual

Page 687

daily listeners to The Alex Jones Show?
A I don't have any reason to dispute it. So, I'm not -- talkers.com said it and we were subscribing to it in this e-mail. So, no reason to dispute it as of that date.
Q As far as Free Speech Systems is concerned, that information is accurate; right?
A Right.
Q Right?
A Right. Sorry, I don't think you heard me.
MR. MATTEI: Let's go to 124.
BY MR. MATTEI:
Q I think what you will see, Ms. Paz, here is 124 is the actual One pager that was -- the contents of which were being summarized in that e-mail. Just take a look at 124.
Would you agree with me that 124 is, in fact, the One pagers that was being described in the e-mail with the date contained in the e-mail now published on the One page.
A This doesn't have a date on it, but it was produced by us, so it is one of our One pages. I just don't know if it links specifically to that e-mail for that date. But it is at least one of our Affiliate One pages.

Page 688

Q Okay.
A I just don't know if it links back to that specific date, that specific e-mail.
Q I will represent to you that, according to the meta data that was produced with this document, that it was created an April 4th, 2018, which is just two days after the e-mail we just reviewed.
A Okay. So, that makes sense. Okay.
Q And if that's the case, then if you see here on the radio icon there, it indicates that similar to e-mail, Free Speech Systems is reporting that as of April 2018, it had 6 million listeners on it's AM and FM radio stations; correct?
A Yes.
Q As far as Free Speech Systems is concerned, that was accurate at the time?
A Yes.
MR. MATTEI: Finally, let's go down to Exhibit 125, please.
BY MR. MATTEI:
Q Just take a look at this e-mail, Ms. Paz, and when had you a chance to review it I'll ask some questions about it.
A Okay.
Q All right.

So, Tom Pappert, in November 2019, was a Free Speech Systems employee; correct?

A Yes.

Q What was his role?

A Per this e-mail it looks like he was involved in marketing.

Q And Mr. Pappert, in this e-mail, is reaching out to Lisa@EverydayMedia for what purpose?

A This looks like we were trying to formulate a relationship with Henry. Henry is a manufacturer of a type of firearm. So, this looks like the person who would be in charge of such things, you know, such as advertising and such for Henry. And so, it looks like he was sending the contact person of who would be responsible for that an e-mail to see if we could do business with them.

Q And the business that Free Speech Systems was hoping to do with Henry USA was to have Henry USA be -- purchase advertising on Free Speech Systems programming; correct?

A Right.

Q In which it would advertise its firearms against Mr. Jones's programming; correct?

A Right.

Q And at this time, which was a little over a

year after the e-mails we were just recently looking at, Mr. Pappert was representing that the Alex Jones show had a 6 million daily radio listeners; correct?

A That's what the e-mail says.

Q And Free Speech Systems acknowledges that that data was accurate as of November 2019, approximately?

A I don't have any reason to dispute it, so yes.

Q Do you know whether Henry USA ever became an advertiser on any of Mr. Jones's programming?

A I don't know off the top of my head, but if you would like to refer back to the spreadsheets, it would be on there. The advertising income spreadsheets. So, if they are on there, then the answer is yes. And if they're not, then the answer is no.

Q Where does Free Speech Systems currently do it's banking?

A Most of our banking is done at Frost Bank, currently.

Q So, for example, all of Mr. Jones -- all of Free Speech Systems operating accounts are handled through Frost Bank; correct?

A Yes. I believe we did produce some spreadsheets with the bank account information as well.

MR. MATTEI: Why don't we bring up Ms. Paz's handwritten notes on the yellow note pad.

BY MR. MATTEI:

Q This is Exhibit 2, Ms. Paz.

A Mm-hm.

Q Do you see there under the first squiggly line there's the name Bob?

A Yes.

Q Am I correct that that marks the beginning of your notes with your conversation with Mr. Roe?

A Yes.

Q You had many -- not many, you had multiple conversations with Mr. Roe; correct?

A Yes.

Q In this particular conversation, if you look at the right-hand side of the page, it seems to indicate 70 million in sales; correct?

A Yes. Over 260 business days.

Q Okay.

So, what were you recording there from your conversation with Mr. Roe?

A I think we were trying to figure out how to quantify the sales that ultimately were done on, you know, via PQPR and had originated on InfoWars and figure out how that person got there. In other words, from where did they click to go and ultimately purchase items to try to figure out what amount of money, if any, Sandy

Hook content had produced to Free Speech. But I did not get a specific -- that's as specific as Bob was able to get for me. I got a better answer from Blake; but when I asked Bob the question, that was the turn the conversation took.

Q So, the question that you asked Mr. Roe was, in substance, is there any way to calculate PQPR sales in relation to Free Speech Systems' publication of Sandy Hook related content?

A Right, I was trying to link the Sandy Hook content to sales in some way.

Q What was he -- Did he offer a proposal for how you might do that?

A No. The next sentence under that was no way to determine which -- I'm not sure if that says likes or generated clicks -- which links generated clicks. So, that's as specific as he was able to get with me.

Q Okay.

Thank you for explaining what that sentence was.

A Sure.

Q But what about what appears to be some sort of fraction indicating 70 million in sales over 260 days? What does that refer to?

A There was $70 million in sales over 260

business days.
Q In which period?
A I don't know by looking at this. I'm not sure.
Q And then, if you go to the left where it says 2,500 sales per day. Is it your -- is that supposed to be the result of doing the division here?
A No, that's 2,500 total sales, not $2,500 of sales. So, it's 2,500 sales per day, totaling $70 million over 260 days.
Q But you have no idea what time frame this refers to?
A No, not by looking at this note, no. I'm not sure what year we were talking about.
Q Now, when Mr. Roe says, No way to determine which links generated clicks, what is he referring to?
A As I said, I think it's us talking about how to determine which content generated the conversion of sales on -- for the products.
Q But Mr. Roe is just an outside accountant; right?
A Right. Well, what I was asking him is, like, is there any way for him to determine this. And it didn't appear to me he was able to answer this question. So, like I said, I went somewhere else.
Q So, Mr. Roe -- fair to say that following your

conversation with Mr. Roe, Mr. Roe was not able to provide with you a satisfactory answer as to how you might go about calculating income in relation to the publication of content; correct?
A Right.
Q Fair enough.
You said, so you then went somewhere else. Who did you go to?
A I spoke to Blake Roddy.
Q Okay.
Is that conversation in the notes you produced today?
A No. The notes from today are based on a telephone conversation I had with him, but I met him when I was in Texas and I had a conversation with him in Texas.
Q Okay.
And Blake Roddy is who?
A Blake Roddy, as far as I'm aware, runs the advertising and marketing department.
Q All right.
And you asked him what question?
A So, I asked him if there was any way to quantify how much money had been made in sales directly as a result of Sandy Hook related content. And he was

able to produce a global analytics page of -- because when you click on an ad from a specific page -- so, for example, say it was one of Adan's articles relating to Sandy Hook, on that page there are ads on the side. If you click on that ad and are taken to the PQPR website where everything is sold, where the products are sold, the Google analytics will be able to track that that was the origin of the sale and there is a conversion. So, he was able to produce to me a Google analytics page, although, I mean, I think it's been produced here, in which it lists the Sandy Hook related content. I believe using search terms; and there was a dollar figure for how much of a conversion there was, purchases from those pages.
Q Okay.
MR. MATTEI: Attorney Reiland, I don't know if we have that document.
MR. REILAND: We'll get it for you.
MR. MATTEI: I'll need to -- unfortunately, Ms. Paz, I'll to have keep the deposition open on this particular issue because I'm not sure which Google analytics document you were provided versus ones we were provided.
BY MR. MATTEI:

Q Did you make a note of in that your notes that you had shown me that Google analytics document?
A I don't know. I produced to you many pages of notes and then there were also the typewritten notes that I produced as well. So, I'm -- I don't remember. I did not read them before today.
Q Did he show you the document or --
A He did.
Q Did he give you a copy of it?
A No, I didn't have a hard copy, I believe. So, at the time I was in Texas, this was in preparation for my Texas depositions. I believe he e-mailed it to Attorney Blott. But I do recall seeing it.
Q Did you actually examine the document and confirm what he was --
A Well, I talked to him about it, yes.
Q And what Mr. Roddy told you is that this particular document showed the number of sales that originated from somebody clicking on a link that appeared on a Sandy Hook related article on InfoWars.com?
A Correct.
Q It wouldn't have shown any income generated from sales during a time period when Mr. Jones was just talking about Sandy Hook; right?
A No. So, it would have been on those particular

articles. So, say Mr. Jones was talking about it on his show and then somebody -- I mean, he talks about a lot of topics on his shows, right. So, I don't know if there's a way to narrow down which particular topic drove a person to the website. But say just for argument's sake somebody hears about Sandy Hook, they want to then go to the website. They go to the website and maybe they click on the very first ad that's on the home page; and then they are linked to purchase products. I don't think there's a way for us to tell what drove them there just because it's on the home page. And if you look at the Google analytics the landing page is the most popular page, right. There are hundreds and hundreds of pages. The landing page is the most popular page. So, if people are clicking on ads on the landing page, I don't think there's a way to determine that.

Q So, your testimony is that your understanding of the document Mr. Roddy showed you was that it reflected Sandy Hook related articles that had been published on InfoWars.com as identified by him and the extent to which people had clicked on ads appearing in those articles over a particular period of time; correct? And whether those people had then --

A Purchased --

Q -- bought something?

A That's my understanding of the document, yes.

Q Do you know what the eighth most popular landing page on InfoWars.com?

A I think we talked about this last time. I think it's the Adan Salazar article, FBI says there were no homicides in Newtown for that year.

Q Other than the conversation you had with Mr. Roddy, the document he showed you, did you do any other work on this question of correlating revenue to Sandy Hook related content?

A No, I think that's as specific as it's able to get just because, as I said, you know, if Alex is on the air for three hours and he has a list of topics to talk about, you're not really sure if people are going to the website, what's driving them there -- which topic is driving them there. So, I think that's as specific as we're able to get with it.

Q I'm just asking whether you did any further work, the answer is no?

A Right.

Q When did Mr. Roe first start doing work for Free Speech Systems?

A I don't recall when he was retained. I'm sorry. I did know at a point, but I don't remember as I sit here.

Q So, is it Free Speech Systems' testimony that it is unable to calculate the amount of revenue it earned as a result of its publication of Sandy Hook related content?

A No. What I'm saying is the publication of those articles I can directly link to a conversion to product sale. But as far as Mr. Jones talking about it on the air, I don't think there's a way to quantify that.

Q Nor is --

A But the Adan's articles, I can link those because there's an ad on all those articles. And if you click on that link and then subsequently purchase an item --

Q Even if you're just looking at that article and then you back out of that article and you access infowarsstore.com or infowarsshop.com some other way, the data you got wouldn't tell you whether that person had encountered Sandy Hook related material and then purchased a product; correct?

A I can't say whether they had ever encountered Sandy Hook material at all. So, they could have, they couldn't have. You know, I don't know. I don't know if it's the same person, you know what I'm saying. Somebody could be directed to a website and then it not converted, back out and then read other material and then click it

from another link. I don't know.

Q And Free Speech Systems also can't say whether people accessing Sandy Hook related content on social media or YouTube then purchased from the store; correct?

A You mean, are there ads on the YouTube channel?

Q I'm not talking about ads. I'm talking about -- you're aware, obviously, that Free Speech Systems, as a matter of practice, attempted to maximize the visibility of its on at the point on social media; correct?

A Sure.

Q That included Sandy Hook related content; right?

A Well, all of its content.

Q Right.

So, getting back to this issue of whether Free Speech Systems is able to make any calculation concerning the amount of revenue it realized as a result of it's publication of Sandy Hook related content. I take it that Free Speech Systems is not in a position to calculate the amount of revenue derived from people who encountered Sandy Hook related content on social media and then came to the store to purchase products; correct?

I want you to be careful?

A You guess it would depend on the platform.
Q Let's take Facebook.
A Okay.
Q We went over these documents the last time. Billions of impressions on Facebook --
A Right.
Q -- for InfoWars; right?
A Right.
Q Correct?
A Right.
Q InfoWars audience member accesses an article or a video on social media that Free Speech Systems published concerning Sandy Hook; correct?
A Okay.
Q Just stick with me.
A Okay.
Q Does Free Speech Systems have any way of knowing whether that person, after having encountered that material on social media, then came to InfoWars store to purchase a product?
A Unless it was a direct link to the InfoWars store to purchase the products or if it's, say, the post says something to the effect of, you know, oh, here's Adan's article and then it link's to Adan's article and then from there they go and click on an ad, then I can

track that. But if it's a post that says, you know, check out Alex's, you know, broadcast today and it's a link to a video with his broadcast and then a link from there just to the general story, there's no way for me to tell how or why they went to the store.
But if it's -- like I said, if it's a link directly to the Sandy Hook content on the website, I would be able to track that.
Q I'm talking about total revenue to Free Speech Systems brought in by people who encountered Sandy Hook related content. Free Speech Systems is not able to calculate that total revenue in any way; correct?
A Unless it's a specific link from a specific article, then no.
Q Can you go down to page 13 of that exhibit, please.
Before we get there -- Are you there? Okay.
THE WITNESS: Can we take a bathroom break at some point?
MR. MATTEI: Yeah. Let me ask these next two questions; is that okay?
THE WITNESS: Sure. Yup.
BY MR. CERAME:
Q If you look at the top of page 13, you see there your note marketing and then PQPR with an arrow to

FSS?
A Yes.
Q Can you read the next two lines?
A You are asking me to interpret my handwriting. That's difficult.
Q Not interpret yet, I just want you to read it.
A That's difficult, too.
Based on how many ads -- I'm not really sure after that -- Based on how many ads and on average monthly about 566,000. So, this is what PQPR pays to FSS to market on our website?
Q Can you tell who gave you that information?
A It wasn't Daria.
Q Let's go down further then to see if there's any context below that that might help, Ms. Paz.
A This might have been from my conversation with Blake; because I spoke to him about he was explaining to me that exit page -- wait -- yeah, that's a different person.
He was explaining to me the Google analytics and how to read it. So, if you look at it says we have two Google accounts, one is for the store?
Q Where are you?
A In the middle of the page. It says two accounts.

Q Okay.
A So, one is the store where the products are sold and you could see where the traffic is coming from. Right. So, that's the basis of the prior testimony of, you know, I can see how people are coming on to the store to purchase items as long as they're clicking -- like, where they're clicking the ads from. And then the InfoWars website has its own separate Google analytics.
So, I believe this whole page is my conversation with Blake.
Q Why do you have Zimmerman there?
A He may have -- he may have come up in the conversation. But I didn't put anything after that, so I'm not really sure what we were talking about.
Q It's your testimony that Blake Roddy told you that PQPR was paying Free Speech Systems approximately $566,000 a month to advertise products on Free Speech Systems platforms?
A I mean, again, this is just based on my notes. That's what I think. But I'm not 100 percent sure.
Q Do you have a time frame?
A It just says monthly. So, every month.
Q So, you don't know whether that was every month during 2020 or every month from 2012 to 2020? You have no idea?

Page 705

A I don't know. But it will be on the ledger. So, like, for the primary spreadsheet that we were looking at earlier, I can't remember the exhibit number it was on, but if you look on that, the credits that Free Speech was given from PQPR, those are on there. So that would have included these credits for marketing. Because, remember, Free Speech owes PQPR money for the product, but PQPR owes Free Speech money for the advertising. So, on that spreadsheet, Free Speech is being given a credit for that advertising on that sheet.

Q Is it Free Speech's position that the credits reflected in that spreadsheet concerning transaction between Free Speech Systems and PQPR were not actual payments but simply credits? Do you know what I mean by that?

A That's what it appears to me when I asked Mr. Roe about that question, he said that instead of for that time period --

Q Which time period are wing talking about?

A From 2012 to 2018, for that particular spreadsheet they were being given credits.

Q Okay. So, let me --

A And -- okay, go ahead.

Q Let me just ask the question then. From 2012 to 2018, Free Speech Systems didn't receive any cash

Page 706

payments from PQPR for its advertising, it just basically received an IOU; correct?

A It credited their account, right. So, it credited --

Q You understand what I mean?

A -- what Free Speech Systems owed PQPR.

Q Hang on a second.

You know what I mean? Like, if PQPR is buying advertising from Free Speech Systems --

A There's no money exchanged. That's what you're asking. There was no money exchanged.

Q There's never any money exchanged?

A Right. That's correct.

Q PQPR didn't actually pay Free Speech Systems, it just accounted for whatever the value of those payments might have been?

A And then adjusted the balance that Free Speech Systems owed accordingly.

Q Is it Free Speech Systems' testimony that that method of accounting occurred in realtime from 2012 through 2020?

A Oh, I don't know when it occurred. I know it's not occurring any more. But during that time period, that's what was happening. I don't know how -- what time period -- if it was happening monthly --

Page 707

Q What I'm asking you is in 2013, let's just take 2013 for an example. In 2013, was it being recorded in Free Speech Systems's general ledger in realtime that PQPR owed Free Speech Systems money for advertising that had not been paid?

A I don't think there was -- I don't know that there was an expectation that they pay it. I think that at the time there was an expectation that the account get credited. So, all of that was being done in realtime. Like, so, PQPR were sending these invoices, we were updating our ledger that we owed this money to PQPR, and we were also updating our ledger that owed us for accounting -- or --

Q Is Free Speech Systems sending PQPR invoices for the advertising that PQPR had done on Free Speech Systems platforms?

A I believe so, yes. I did much a conversation with Mr. Roe at some point, basically about how the advertising is calculated. And there is a formula. I'm not sure if there's a spreadsheet on it. I may have seen a spreadsheet. But it's basically cost per click or costs per ad or banner on the website. So, there was a way in which they were calculating these things and billing them out to PQPR.

Q But my question was who was in charge of -- who

Page 708

was the top accountant at Free Speech Systems in 2013?

A I don't know.

Q Let me represent to you that Lydia Zapada-Hernandez was the top accountant at Free Speech Systems?

A Okay.

Q In 2013, free Speech Systems' testimony is that it would invoice PQPR for any advertising that it aired on PQPR's behalf; right?

A Right.

Q And that would initially be recorded in Free Speech Systems's books under accounts receivable; correct?

A Honestly, I don't know. You have to look at the general ledger, I don't know.

Q Is it Free Speech Systems' testimony though that once that invoice was generated, it would appear in realtime in Free Speech Systems's general ledger?

A Yes. Because they are recorded as credits that were being given from PQPR. So, yes.

Q I understand they are recorded now. I understand that is what has been presented to us, okay, in that spreadsheet.

That spreadsheet was created for purposes of litigation; correct? The PQPR/Free Speech Systems

transactions?

A Right, but those were in the 2012 ledgers.

Q That's what I'm asking you.

A Right. They were in the 2012 legers.

Q Well, hang on a second.

A Yup.

Q It's Free Speech Systems' testimony that any advertising sold to PQPR by Free Speech Systems was entered in realtime as it occurred; correct?

A Well, yes. And the reason why I know that is because when I spoke to Bob and he produced that spreadsheet, those were numbers that he took specifically from those years' ledgers. So, those ledgers, those were in there for those years. So, yes.

Q When Mr. Roe reviewed them they were in there?

A Yes, I mean obviously I didn't review them myself, but yes.

Q Is it Free Speech Systems' testimony that the ledgers that have been produced in this case for the years 2012 to 2020 are the ledgers that existed at the time? And have not been since altered?

A I have no reason to believe they've been altered.

Q Have you seen any invoices Free Speech Systems sent to PQPR?

A Have I -- no, I have not asked for any ledgers or from invoices. Like I said, when I spoke to Bob on this particular topic, I believe he showed me what looked like a spreadsheet of how much each ad costs as is billed to PQPR. But other than that, I didn't see any invoices, no.

Q Other than PQPR, did Free Speech Systems accept credits from any other third-party advertiser that bought advertising from it?

A Accept credits? No, I don't believe so. I think we were paid for our advertising.

Q With the exception of PQPR?

A I believe so, yes.

THE WITNESS: I'm sorry, is now a good time for a bathroom break?

MR. MATTEI: I'm sorry, yes.

THE VIDEOGRAPHER: We are off the record. The time is 3:10 p.m.

(Recess from 3:10 p.m. to 3:19 p.m.)

THE VIDEOGRAPHER: We are now on the record. The time is 3:19.

BY MR. MATTEI:

Q Ms. Paz, before the break, you testified that you had had a conversation with Mr. Roe in which Mr. Roe described for you the formula for -- the formula that

Free Speech Systems uses to calculate the amount it charges advertisers to advertise on its platforms; correct?

A Yes, just with the exception of I don't know if it's all advertisers or if it's PQPR has a specific rate or if they get a discounted rate. I'm not sure of that, but yes, I do recall seeing a spreadsheet to that effect.

Q Okay.

You anticipated my next question: As you sit here today, Free Speech Systems is not prepared to testify as to whether it offers the same advertising rates to PQPR that it offers to third-party advertisers; correct?

A Right. I don't know. I would have to get a copy of the spreadsheet.

Q Okay.

And the spreadsheet that you're describing is one that Mr. Roe showed you but that you did not retain a copy of; correct?

A Right, he didn't send it to me.

Q And you described it as a spreadsheet showing how Free Speech Systems calculates it's advertising fees?

A Right. How it would bill at least PQPR for the advertising. So, if I recall correctly, it's a cost for the banner. So, like, if it's a banner ad, the cost for

that ad. In certain circumstances, it would be pay per click and how much money it would be per click. But I just don't have those figures.

Q And are you prepared to testify for what period of time Free Speech Systems used that particular formula as set out in that spreadsheet to charge PQPR?

A No, I don't know what time period that was.

MR. MATTEI: So that's another document. I'm sure that we don't have that, Zach.

MR. REILAND: Okay.

Chris, I'm sorry, can you summarize what the next document is that you're looking for?

MR. MATTEI: Sure. What Ms. Paz described as a spreadsheet that Mr. Roe showed her purporting to describe the way in which Free Speech Systems calculated advertising fees it charged to PQPR.

MR. REILAND: Got it.

BY MR. MATTEI:

Q I take it from your testimony, although you didn't say this expressly, that you understood that spreadsheet to be specific to rates charged to PQPR; not necessarily other third-party advertisers; right?

A That's how I took it.

Q Okay.

A What we're charging other people would be listed in the advertising income spreadsheets that we produced to you.
Q You're charging them, but the formula you used to reach those rates is not included?
A I don't know if it's the same rate, right.
Q You just don't know?
A I'm not sure.
MR. MATTEI: So, I think that that is all I have. I know Attorney Cerame's going to have some questions.
So, Mario, if you're ready, we can go ahead and begin.
THE WITNESS: Is he there?
MR. MATTEI: I wonder if he just didn't come back after the break.
MR. REILAND: He might have thought we were going to go longer than this. I'm going to shoot him a text.
MR. MATTEI: Here he is.
Mario, before you begin, is it possible for me to get audio -- I will get audio through that no matter what. Because I'm about to lose my power on my computer; all right.
MR. CERAME: You're all done?

MR. MATTEI: Yes.
MR. CERAME: Oh, even less that I thought. I thought you were going to have at least a few minutes. My goodness. Let me pull up my notes.
EXAMINATION BY MR. CERAME:
Q Attorney Paz, as you know, my name is Mario Cerame. I represent Genesis Communication Network, Incorporated in this action.
First off, I want to talk about how we know each other because there were a lot of questions on direct about how you knew Norm Pattis and so -- we went to law school together; right?
A Yes.
Q We were in the same class -- actual class of 2012; right?
A Yes, we were.
Q We were not in the same section?
A I don't believe we were.
Q Right.
So, do you remember whether we had any classes together aside from the clinic?
A Definitely not the first two years, maybe the third year.
Q Okay.

None come to mind, though, right?
A No.
Q And we both participated in the defense appellate clinic, but in different years; right?
A Yes.
Q So -- since graduation, aside from 2022, it's fair to say we have not interacted very much?
A I don't recall any conversations with you prior to this year --
Q Okay.
A -- after graduation.
Q Okay. That's great. Perfect. Perfect.
In April 2022, a mutual colleague of ours sent you my way for first amendment advice on a particular case; right?
A Yes. I'm a member of the Connecticut Criminal Defense Lawyers Association and I put out an inquiry because I had a potential first amendment issue and he re-directed me your way to see if you had any draft motions that I could take a look at.
Q Aside from that, I have never offered you legal advice or support or sent a referral of a case to you; right?
A Correct.
Q You do not refer cases to me on a regular basis?

A I don't think I've ever referred you a case.
Q Perfect.
Thank you.
So, first, I want to talk briefly about some of the things that were discussed today. First, I want to talk about the audience size questions that you answered.
A Sure.
Q You indicated when there were questions about the estimation of -- about these estimations, for example, the estimate that Alex -- you read an estimate today saying that Alex estimated his audience on a Sunday afternoon, his radio audience was two million.
A That was in the transcript to one of his videos, yes.
Q Right. You don't know what methodology he used to arrive at that number?
A No, I don't know what he's citing there.
Q You don't know whether he used any kind of scientific method to arrive that the number?
MR. MATTEI: Objection.
BY THE WITNESS:
A No, I don't.
Q Do you know -- do you have an idea of how audience size is determined in the radio industry?

A Based on my conversations with Alex, his position was he makes these estimations just by how many radio stations he is broadcast on; and if you go to those stations' websites, it will list their -- how many people, in estimation, they reach. And he estimates it often that way much but it's really difficult to do that because, like I said earlier, he's online, he's free to air; so, pretty much anyone anywhere can listen to his broadcast.

Q Attorney Paz, do you know whether that methodology is common in the industry, that is to be more particular, the methodology of looking at what is reported by radio stations to be their audience and coming up with some composite number based on that number, is that how the industry, how generally radio stations in the industry calculate their audience? Do you know whether that's true?

A That's my understanding based on my conversation with Mr. Jones.

Q So, aside from Mr. Jones, have you had any conversations with anyone else about determining audience size?

A I don't believe so, no.

Q Okay.

No one else -- certainly, no one else at your

client -- or I should say not your client -- certainly no one else at Free Speech Systems indicated to you how they calculate audience size?

A No one else besides Mr. Jones? No.

Q We also saw a document by Mr. John Tracy. Do you remember that document? It was an e-mail?

A Oh, the e-mail to Mr. Tracy?

Q I thought it was an e-mail from him. But if you remember it more correctly. It was an e-mail that Mr. Tracy was involved in the conversation?

A Yes, yes.

Q And there was submitted that there was an audience size number in the electronic media?

A Yes, I recall that. Yes.

Q You were asked the question if you had any reason to doubt that number and you answered that you did not.

A I don't have any information in my possession to contradict the number.

Q Do you have new information in your possession to affirm the number?

A No.

Q So, that sort of question was asked several times about calculations of audience size. Do you have any information -- aside from conversations had you with

Mr. Jones, do you have any information in your -- as Free Speech Systems, as to what the audience size has been over the last years?

MR. MATTEI: Objection.

BY THE WITNESS:

A No, I don't have any information to affirm or deny those numbers.

Q Okay.

So, as far as you know, the number is a guess?

MR. MATTEI: Objection.

BY THE WITNESS:

A I don't know what those numbers are based on. It could be, you know, in my conversations with Alex, Alex tends to exaggerate things sometimes. It could be an exaggeration. It could be based on Quantcast numbers, it could be based on some other numbers some other places. I don't know what it's based on.

Q You mentioned Quantcast. What is Quantcast, if you know?

A So, Quantcast came up a couple times and it appears to be some type of attempt to break down viewership in terms of demographics. So, I know there were a lot of questions about Quantcast data whether we use Quantcast data as far as the marketing. So, that's

my understanding of what it is.

Q With whom at Free Speech Systems did you discuss that?

A Given the questions in the notice of deposition, I asked Blake Roddy because he's currently in that position of in advertising and marketing.

Q What did he say about that data?

A Basically, his position was that it's been available but they never used it in terms of their marketing strategies. That it was available for production, but the only time they've ever logged in to get it was in connection with this litigation and maybe a couple of times if somebody asked him for it. But he never integrated it into the marketing strategies.

Q Did he share with you his opinion about it's reliability?

MR. MATTEI: Objection.

BY THE WITNESS:

A No, he didn't.

Q Did he tell why you they don't regularly use that data?

A It's just not something that they did. It's not how they -- it's not how they do advertising.

Q I understand that. And I have reasons why I might think that's true.

Page 721

Did he give you any indication, though, about why Free Speech Systems doesn't regularly or did not regularly use that data, except when it came to this lawsuit?

MR. MATTEI: Objection.

BY THE WITNESS:

A I mean, it seemed to me that their way of advertising was doing well and it didn't seem to me like they needed or wanted had. So, when I asked these questions, he basically said that they have -- they use a variety of different methods for retargeting, Google ads, Bing ads, things like that. They also have a newsletter from which they derive business, so it just -- from my conversation with him, it's just not something they needed and so they didn't use it.

Q Thank you for your answer. I'm sorry. Perhaps I'm not asking -- let me try a different way to approach the question.

Does Free Speech Systems have an opinion about the reliability of that data?

MR. MATTEI: Objection.

BY MR. CERAME:

Q It's a yes/no?

A No, I haven't had any conversations with anybody about the reliability or the opinions on the

Page 722

reliability of it. So, no.

Q So, Free Speech Systems does not have an opinion on whether the data is reliable or not?

MR. MATTEI: Objection.

BY THE WITNESS:

A No.

Q No, it does not have an opinion; correct? I'm sorry.

A That's correct.

Q Okay.

And -- but, nonetheless, notwithstanding the fact they do not have an opinion at this time, they do not use the data?

A That's correct.

Q Okay.

Do you know whether any other radio programs use that data?

MR. MATTEI: Objection.

BY THE WITNESS:

A I don't.

Q Do you know whether that data is relied on as an industry standard?

MR. MATTEI: Objection.

BY THE WITNESS:

A No, I don't.

Page 723

Q Mr. Tracy, who seems to be the origin of the -- of one of the estimations, he is not an employee of Genesis Communication Network to your knowledge; correct?

MR. MATTEI: Objection.

BY THE WITNESS:

A Is James Tracy an employee of Genesis?

Q Mr. Tracy.

A Okay, no, I don't believe he is an employee of Genesis.

Q Just making sure.

Do you know whether there's been any coordination or collaboration between Free Speech Systems and Genesis Communication Network or Ted Anderson as to determining audience size?

A No, I'm not aware of any such communications.

Q There was also discussion of a video and audience size vis-a-vis some video. Do you know whether there's any scientifically determined link between audience size on a video and audience size on the radio?

MR. MATTEI: Objection.

BY THE WITNESS:

A No.

And I will just say that it's hard to tell audience size when a video is posted because that's just based on the number of views. One person can view it

Page 724

numerous times. So, just because you have a number of views on the YouTube -- on, like, a YouTube video or a link that's posted to a video, doesn't mean that that's the number of people that have viewed it. So, I don't think there's a correlation between the two.

Q Okay.

Just because you didn't have a reason to dispute the numbers that were proffered today doesn't mean that you have a reason to find them accurate?

MR. MATTEI: Objection.

BY THE WITNESS:

A Right, I'm not subscribing to the numbers. I don't know either way.

Q Is Genesis Communication Network an affiliate, as you used the term earlier today?

MR. MATTEI: Objection.

BY THE WITNESS:

A I don't think I used the term "affiliate," I think Attorney Mattei used the term "affiliate." But I think that our shows are broadcast through Genesis Communications. So, however Attorney Mattei was using it.

Q So, do you know whether -- what is Genesis Communication Network as Free Speech Systems knows it?

A It is a platform over which we broadcast the

Page 725

show. So, our shows.
Q Is it currently being done through your show? Sorry. Strike that entirely.
Is Free Speech Systems currently using Genesis Communication Network as a platform?
A Currently?
Q Yes.
A I believe so.
Q Okay.
You said you do believe so or you don't?
A I do believe so.
Q And do you know how many radio shows Genesis Communication Network is such a platform for?
A I'm sorry, I don't.
Q Do you have an idea?
A I'm sure very many. We are not the only ones.
Q Why do you say you're sure there are very many?
A I know Genesis is a very large company and they broadcast a lot of shows.
Q Do you know whether Genesis Communication Network has a transmitter that it broadcasts radio directly to listeners?
A I don't know. I have no idea.
Q Okay.
So, you don't know any radio stations that

Page 726

are -- that Genesis Communication Network operates?
MR. MATTEI: Objection.
BY THE WITNESS:
A No, I don't know how many other stations they operate or how many other programs they operate.
Q You don't even know if they do operate any radio stations; correct?
A I don't know much about Genesis, to be honest.
Q Very well.
Who owns The Alex Jones Show? If Free Speech Systems knows.
A Well, Free Speech Systems broadcasts The Alex Jones Show and Free Speech Systems is owned by Alex Jones. So, Alex owns it.
Q Does anyone else have an ownership interest in it to your knowledge?
A Not to my knowledge.
Q I'm looking through some of my notes and some of the questions seemed to be good at the time.
Inasmuch as Genesis -- Let's assume for a moment Genesis provides a service for Free Speech Systems, do you know anything about the services it provides?
A Minimally.
Q Can you tell me what you -- what Free Speech

Page 727

Systems does know about the services Genesis provides?
A Aside from it being a platform by which we can broadcast the show, not very much.
Q Do you know whether it does anything in terms of sound production?
A I don't know.
Q Do you know anything about the economic relationship in terms of payments or structures of payments between Ted Anderson and Genesis and Free Speech Systems and Alex Jones and any combination of them?
MR. MATTEI: Objection.
BY THE WITNESS:
A Aside from what's in the general ledgers as payments being made or if there are any payments being made from Free Speech Systems to Genesis, then no.
Q Aside from the platform agreement, do you know of any other agreement between Genesis Communication Network and Free Speech Systems and Alex Jones?
A No.
Q Aside from this platform agreement, as you described it, platform service, do you know of any agreements between Ted Anderson and Free Speech Systems or Alex Jones?
A No.
Q What does Free Speech Systems know about Ted

Page 728

Anderson, as you sit here?
A I don't know very much about Ted Anderson, to be honest.
Q Give me a synopsis of what you do know?
A Aside from him owning the company, owning Genesis, I don't know anything else about him.
Q Do you know anything about business relationships between -- in the past, between Ted, in particular, and Alex Jones or Free Speech Systems?
A You mean, aside from the platform agreement? Aside from the platform agreement.
Q Yes?
A No.
Q Do you know anything about Ted's relationship to Midas Resources, a different company?
A No.
Q You don't know anything about any personal deals between Alex Jones and Ted Anderson?
A If there are any, I wouldn't know.
Q Do you know whether Ted Anderson and Alex Jones are social friends?
A I don't know that and I didn't ask Alex that.
Q That's fine.
Do you know anything about if they have been business -- I may already asked you that. You don't know

anything about any of their business relationships with one another; correct?

A I don't know if they've ever had any aside from this platform agreement. I don't know anything about their relationship.

Q Okay.

Does Free Speech Systems know about my client, Genesis Communication Network?

A Didn't we already talk about that?

Q I know I asked you about Ted and -- but -- so perhaps you did. If you could -- this may be one of my last questions.

A Okay.

Q I'm trying to wrap it up, if you will?

A All right.

Q Let me ask you again: What does Free Speech Systems know about my client, Genesis Communication Network?

A Aside from the fact that we have --

Q Aside from the platform agreement?

A Aside from the platform agreements and that you provide a platform by which we could broadcast the shows, the various shows, I don't know very much about it.

Q That is the sum of it?

A That is the sum of it, yes.

Q Okay.

Do you know whether Genesis Communication Network, in part of its work, does anything with satellites?

A I'm not sure.

Q Okay.

A And I don't want to guess.

Q That's fine.

Do you know anything about -- you don't know, you do not know anything about whether Ted Anderson has ever exercised editorial control over any of Free Speech Systems's content?

A I mean, I don't believe, based on any of my communications that anyone outside of Free Speech Systems, had anything to say about the content on -- that was being produced. Just based on my conversations with Alex, the other employees and the process by which the content is produced. So, I don't think that Mr. Anderson would have had any say in any of that.

Q Similarly, your response would apply equally to Genesis Communication Network, the company, not just to Ted. Genesis also did not have such control or -- ever?

A That's correct, just based on the process by which they were going about making -- creating this content on a daily basis, based on my communications with

Alex and all the other employees. So, they were not -- Genesis was not involved, Mr. Anderson was not involved. They have their own internal process on how they do that.

MR. CERAME: That's it. That's all I have. That's all the questions I have.

MR. MATTEI: Just a few more.

EXAMINATION BY MR. MATTEI:

Q Ms. Paz, are you aware, other than the two --

A I know. It's late in the day.

Q Other than the two promissory notes that we've reviewed, one dated August 2020 and another dated November 2021, is Free Speech Systems aware of any other written agreements between Free Speech Systems and PQPR?

A Written agreements, no. And I did inquire of Mr. Roe to make sure that those two agreements were the only written agreements that we have and those were the only two written agreements.

Q Okay.

So, there are no management agreements between Free Speech Systems and PQPR; correct?

A No. One of the big problems with, you know, Free Speech, in general, which was being tried to rectify is that a vast majority of the policies are not reduced to writing and had not been reduced to writing.

Q I'm not talking about Free Speech Systems

policies, I'm talking specifically about the relationship between two corporate entities?

A Right.

Q Free Speech Systems and PQPR. And the answer to the question as to whether or not there's any sort of management agreement between Free Speech Systems and PQPR is no?

A Yes, I don't have anything beside from those notes.

Q So, Free Speech Systems isn't in possession of any written agreements governing the relationship between Free Speech Systems and PQPR, other than the two promissory notes we reviewed today; correct?

A Right.

Q I did look through the text messages and e-mails that Attorney Reiland produced between you and Free Speech Systems' employees. You referred to an individual named Jay in text message with Mr. Jones. Who is Jay?

A Jay Blott.

Q Jay is short or Jacqueline Blott?

A She goes by Jay.

MR. MATTEI: Can you just bring up those text messages, Pritika, if you don't mind.

My video stopped working. Let me know

when they're up.

BY MR. MATTEI:

Q Can you scroll down to the text messages with Alex Jones, which I believe are on about page 7. And you see, Ms. Paz, that the text message appear to be screen grabs which you then e-mailed to Attorney Pattis; is that right?

A Yes, these are my screen shots.

Q So you just did the screen grab on your iPhone and sent them as JPEGs to Mr. Pattis?

A Correct.

Q And on February 13th, Mr. Jones texted you asking to get a late lunch; correct?

A Yes. This was the day before I had the Texas deposition scheduled.

Q Okay.

And so did you and Mr. Jones go out for lunch?

A No. We ended up having a phone conference, me, him and Attorney Pattis.

Q If you scroll down to the point in the text exchange where you and Mr. Jones are discussing getting lunch. Do you see after you say, We can do whatever, I'm open, just let me know what time and we can meet you?

A Yes.

Q And Mr. Jones then texted you a voice memo; correct?

A Yes.

Q That voice memo has not been produced to us. You still have it on your phone; right?

A Probably.

Q Okay.

I would ask that you send that to Attorney Reiland for production.

What did the voice mail say essentially; do you recall.

A I think he was talking about it being a problem getting to meet for lunch for whatever reason. I think he had some personal issues going on. So, that's why I said do you just want to do a three-way and I want him -- I wanted to make sure that he was comfortable with, you know, where I was before the deposition tomorrow.

Q Okay.

Meaning, you wanted to make sure Mr. Jones was comfortable with what you planned to testify about at the deposition the next day?

A Well, comfortable in a sense that, you know, I understood the structure of the company, I understood the material, that, you know, that I was prepared. Essentially.

Q Did you also want to check with Mr. Jones to make sure that the information that you had obtained and intended to testify to was accurate as far as he was concerned?

A I did verify a couple things with him, you know, if I had spoken to one employee and this person said this, is this accurate. I mean, I did have a conversation with him outside of that phone conversation. I met him in person and we went over a lot of that stuff, too.

Q Prior to your deposition?

A Prior to -- because I was down there for about a week.

Q Let's focus though on this particular series of text messages on February 13th. Did you, in fact, then meet with him before your deposition the next day?

A No, we had a telephone conference.

Q If you scroll down further, it has another voice memo that Mr. Jones left you that, at least according to this text message screen grab, appears to have been about 15 seconds; correct?

A That's what it looks like.

MR. MATTEI: We'll need that as well.

MR. REILAND: What is it?

BY THE WITNESS:

A Hopefully I can figure out how to get those in an e-mail. I'm not very technologically savvy. I'll figure it out.

Q Do you have your phone with you right now?

A Yeah.

Q Do you want to just play them into the record?

A Let's see if I can find them and then we will see.

Yeah, I still have them.

Q Okay.

So, why don't we play the first one, 21 second. Do you see the one Ms. Paz, Sunday, February 13th at 12:08 p.m.?

A Yep.

Q Okay.

Is that the one that you intend to play right now?

A Yes.

Q Go ahead.

RECORDING: Hey, Brittany, maybe we can go all go out and get dinner tomorrow night. I have some family stuff that I forgot I have to take care of. I just wanted to actually, you know, talk to you a little bit more about some ideas I've got

but I know you're meeting with Norm coming up about an hour and a half. So, how about I just call you towards the end of that conversation and we can have a discussion with Norm. Thank you. I really appreciate you coming on down and taking on this difficult job.

We can do it with Norm right up front at noon --

BY THE WITNESS:

A Sorry, that was the second one that just started playing automatically. Do you want me to start over?

Q Yes, I do. But hold on a second.

That exhibit we just played will be the next exhibit in sequence and then we'll just have you provide us with whatever audio file of it for the record?

MR. REILAND: Do you want me to still send them to you?

MR MATTIE: Yeah.

MR. REILAND: Okay.

MR. MATTEI: And we'll get that from the court reporter as well. That will be Exhibit number?

MS. SESHADRI: 129.

(Plaintiff's Exhibit 129 was marked for identification: Audio file.)

BY MR. MATTEI:

Q Why don't we play the next one which was sent, according to this screen grab at least, at February --

RECORDING: Or we can do it toward Sandy --

BY THE WITNESS:

A Sorry. I just -- I can't figure out how to start it over.

Q All right.

Anyway, what you are trying to do, Ms. Paz, is play the 15 second --

A I might to have to just let it cycle through and start over.

RECORDING: Go get lunch. Look forward to that. Just --

THE WITNESS: Okay, so I'll play it again and just tell me when you're ready.

MR. MATTEI: I am ready.

RECORDING: We can do it with Norm right up front at noon or we can do it towards the end your call. I just have to take care of some family stuff later today, so I could go get lunch. I was looking

forward to that. Just find out. Thanks.

THE WITNESS: And that's it.

MR. MATTEI: That will be Exhibit 130.

(Plaintiff's Exhibit 130 was marked for identification: Audio file.)

MR. MATTEI: Okay, that's all I have.

I want to put something on the record, but Mario, do you have any re-cross?

MR. CERAME: I do, I do.

EXAMINATION BY MR. CERAME:

Q It's really only one piece that was a discussion about agreements not being reduced to writing. I would ask if that's -- if your sense is that's very common for agreements -- business agreements, even substantial business agreements, to not be reduced to writing --

MR. MATTEI: Objection.

BY MR. CERAME:

Q -- between Free Speech Systems or between Alex and someone else?

MR. MATTEI: Objection.

BY THE WITNESS:

A I think it's very common in this particular situation with this company and with Mr. Jones, in particular. And it's what I have kind of seen about the

structure, lack thereof and hierarchy and organization of the business as a whole. Just based on the time I've spent interviewing people and going down there and spending time with everybody.

So, I do, in this particular circumstance, think it's common.

Q Okay.

And even for a long term business -- Well, strike that.

You would agree that Genesis Communication Network and Free Speech Systems or Genesis Communication Network and Alex Jones have had a business relationship for at least two decades, to the best of your knowledge?

A To the best of my knowledge, they have an ongoing business relationship, yes.

Q You have no reason to doubt that their business relationship has been in excess of 20 years?

A I don't have any reason to doubt it, no.

Q Even so, notwithstanding the fact there's been a business relationship for more than two decades to the best of your knowledge, it's not surprising that there are almost no agreements that have been reduced to writing?

MR. MATTEI: Objection.

BY THE WITNESS:

A That does not surprise me, no.

Q And can you tell me about why, if you have an understanding, why is that? Why are they not reduced to writing?

MR. MATTEI: Objection.

BY THE WITNESS:

A In this -- with, specifically related Free Speech? My understanding is just, you know, as I said in prior depositions, Alex is a radio personality. He doesn't -- he's not very -- he's not a good business person. A lot of the issues with the financial entanglements we were talking about, the lack of hierarchical structure within Free Speech. They continued growing and he didn't know how to control it and he's a very fly-by-the-seat-your-pants kind of person just based on my interactions with him. So, it's just, to me, and it's his business, he runs it, he is the sole person in charge of it and he just never had any need to reduce these things to writing. It was functioning okay at the time and so he just -- he just went along with it. And then, along the line and they got bigger and bigger and bigger it caused more problems. But the disorganization and the lack of structure is a very common theme that I've seen throughout my entire time representing Free Speech.

Q Is it fair to say that Mr. Jones is focused on creating content for his programs?

MR. MATTEI: Objection.

BY THE WITNESS:

A I would say that's 100 percent accurate. He is -- he has historically been not very involved in the financial aspect of it. You know, when I talk to people, they'll be like oh, well, every once in a while Alex will look at the accounts, he'll see we need -- we'll see we're low on money and he'll go to the warehouse see what we have in stock and then run an ad. It's very fly-by-the-seat-of-your-pants. It's very -- there's very little planning. It's just disorganized. He's not a very good business person.

Q Is it fair to say that Mr. Jones's time spent in preparing and in doing -- creating content interferes with his ability to make a written business agreement and that is part of why everything's oral?

MR. MATTEI: Objection.

BY THE WITNESS:

A I don't know if it's a time thing, but it's like a lot of attorneys I know, it's very common you know, a lot of attorneys I know are excellent attorneys and very poor business people and Alex is very good at what he does and what he does is create content. And he

is not very good at the other side of the business aspect. Which has caused a lot of issues as we have seen in this litigation. There's -- you know, we can't find material or it doesn't exist or -- and it should in the normal course of what you think of a big business you would think it should exist. But it doesn't exist and then when we tell people it doesn't exist, they are kind of incredulous that it doesn't exist.

So, that's what you've seen working with Free Speech and working with Mr. Jones. I just think he doesn't pay much attention to it because he's paying attention to his content. That's what he cares about, truly.

Q Okay.

MR. CERAME: That's what I needed to ask about. If you have any re-direct, Chris, I would ask that your redirect really actually follow from the scope at this point.

MR. MATTEI: I definitely have some redirect.

EXAMINATION BY MR. MATTEI:

Q Ms. Paz, you just testified that it's very common for Free Speech Systems to enter into unwritten agreements. Can you give me a single example of an unwritten agreement that Free Speech Systems has entered

into and been bound by?

A So, most of the agreements, like, for example, I haven't seen any agreements with any of our people that we provide marketing to. I don't know if any of them are reduced to writing. We do bill people for our third-party marketing. I don't know if they are reduced to any form of an agreement.

Aside from having -- from having employees sign certain things associated with their on-boarding process, I don't think that there's any really employment agreements or at least in the past. More recently there probably are.

Q Ms. Paz, I just need to stop you and ask that you just answer my question?

A I did answer your question.

Q You haven't.

The question was: Can you give me a single example, specific example of an unwritten agreement that Free Speech Systems has entered and been bound by?

MR. CERAME: Objection.

BY THE WITNESS:

A An unwritten agreement that they have been bound by. I guess I don't know how -- I don't understand the question.

Q Okay.

Well, you just testified that it is very common for Free Speech Systems to enter unwritten agreements, I'm asking you if you can give me a single specific example of such an unwritten agreement?

MR. CERAME: Objection.

BY THE WITNESS:

A Well, that's a different question. You asked me unwritten agreement that it has been bound by and then any unwritten agreement at all.

Q Let's start with the first one. Can you give me a specific example of any unwritten agreement that Free Speech Systems has entered regardless of whether it was bound by it or not?

MR. CERAME: Objection. I'm going to elaborate on the scope of my objection. It was asked and answered. She gave several examples.

BY THE WITNESS:

A I agree.

Q Give me a specific example that Free Speech Systems is prepared to testified under oath to today of an unwritten agreement it has entered?

MR. CERAME: Objection. Vagueness. Asked and answered.

BY THE WITNESS:

A As I said earlier, I think that none of the

agreements as far as the structure, who reports to who --

THE WITNESS: Do you need to do something about that?

BY THE WITNESS:

A So, I don't know that any of the -- there are any written agreements regarding the marketing to third parties. We bill for those --

Q You say you don't know. But I'm asking you what you do know. So, I understand that you're saying, I don't know whether among the unwritten agreements that I've referenced are agreements with third-party advertisers. Okay? I'm asking you what you do know. Okay?

MR. CERAME: Objection.

BY MR. MATTEI:

Q I'm asking specifically about unwritten agreements to which Free Speech Systems is a party?

MR. CERAME: You're asking about something that doesn't exist.

MR. MATTEI: Mario. Mario. Can you just please can let me ask my question.

MR. CERAME: Sure.

MR. MATTEI: Thank you.

BY MR. MATTEI:

Q You agree with me that you testified in

response to Mr. Cerame's questions that it was very common for Free Speech Systems to enter unwritten agreements. You testified to that, yes or no?

A My testimony was that it was common that agreements, in general, or anything regarding the structure or hierarchy or agreements between parties, there aren't any written agreements at all that I could find between anybody. So, regardless of whether it's agreements we're bound by or bound to us, I don't -- there are no agreements. There's just nothing in writing. Those two notes are the only thing that I could find that were in writing.

Q But, Ms. Paz, are you then intuiting from the fact that nobody showed you any written agreements that all agreements that Free Speech Systems enters must be unwritten?

MR. CERAME: Objection.

BY THE WITNESS:

A No.

Q Can you identify for me any unwritten agreement, any at all, to which Free Speech Systems is a party?

MR. CERAME: Objection.

BY THE WITNESS:

A I can't --

MR. REILAND: Objection. Asked and Answered.

BY THE WITNESS:

A I can't testify to a negative; but I've given you --

Q No, it isn't. It's not a negative.

A It is a negative.

Q Just because something is unwritten doesn't men mean it doesn't exist; right?

MR. CERAME: Objection.

BY THE WITNESS:

A I don't know how to answer that question. There are no written agreements that I could show you. I've asked for written agreements. They don't exist.

Q I'm not asking about written agreements. I'm asking about unwritten agreements. That is an agreement that Free Speech Systems made but did not reduce to writing. And I'm --

MR. CERAME: Objection.

BY MR. MATTEI:

Q -- asking whether you can give me a single example of such an agreement?

A I've given a couple examples.

Q I don't believe that you have. What you've said is I don't know. --

Page 749

A That's --
Q -- if certain agreements are written.
A That's not what I said.
Q Let's just make sure we get it out then.
MR. CERAME: Objection. Move to strike the colloquy.
BY MR. MATTEI:
Q Can you give me one example that you can testify to under oath of an unwritten agreement that Free Speech Systems has entered?
MR. CERAME: Objection.
BY THE WITNESS:
A I answered the question already.
Q You're going to answer it again and you are going to give me an example. If you have one. If you don't have one, that's fine.
A I've given an example.
Q Tell me what it is?
MR. CERAME: Objection.
BY THE WITNESS:
A I've given the example of employment agreements in the context of past practice. I've given examples in the sense of marketing agreements. For example, there are payments in the advertising ledger that I asked about from PQPR to Free Speech and it was just for the year

Page 750

2015 and I asked why these payments were being made. Nobody could answer me. I couldn't -- I don't have any agreement as to why it was that way and it was just for that one year. So, the agreement, obviously, was not reduced to writing. So, those are a couple of examples.
Q Wait a minute.
So, employees -- okay.
With what employees does Free Speech Systems have an unwritten agreement?
MR. CERAME: Objection.
BY THE WITNESS:
A Do you want me to go through all of the employees.
Q No, I just want you to give me one. With whom does Free Speech Systems have an unwritten agreement that -- among it's employees?
A In past or now?
Q At any time?
A In the past, there were no employment agreements. People were just kind of hired, they filled out their forms and then that was it. There were no employment agreements. But --
Q But with whom did they have an unwritten agreement?
MR. CERAME: Objection.

Page 751

BY MR. MATTEI:
Q In other words -- simply because there's not a written agreement doesn't therefore mean that there is an agreement. It's just unwritten. So, what I'm asking you is you've given me an example, you said in the past Free Speech Systems has unwritten agreements with employees. Give me one employee with whom it has entered and unwritten agreement?
A I can't answer a question. I don't know the answer to that question.
Q Fair enough. So, you can't identify --
A Correct.
Q -- specifically, any employment agreement that Free Speech Systems has entered that was unwritten; correct?
A I can't identify a specific person, no.
Q Okay.
And then you talked about marketing agreements.
A Mm-hm.
Q Give me one example of a advertiser with whom Free Speech Systems has entered an unwritten agreement.
A I just did.
Q Who?
A As I just testified there was a period of time in 2015 that I noticed in the advertising ledger that

Page 752

PQPR was paying or Free Speech Systems was paying PQPR when -- it's usually vice versa. So, I asked why were we making these payments and it was only for this one particular period of time, and the answer was, I don't know, but this was the time period that we were making the payments. But it ended after 2015.
Q Who did you ask that question?
A I asked Blake.
Q Okay.
You asked Blake --
A And I also asked Mark.
Q Mark Schwartz?
A Yes.
Q Blake and Mark Schwartz.
Why was Free Speech Systems making these payments to PQPR in 2015; correct?
A Right.
Q And the answer was, We don't know?
A Right.
Q The answer was not it was pursuant to an unwritten agreement; correct?
A That doesn't make any sense. There would have had to be some kind of agreement why they were paying that money, so, it doesn't make sense.
Q Nobody told you that there was an unwritten

Page 753

agreement governing Free Speech Systems' payments to PQPR in 2015; correct?
A I think that's common sense.
Q Did anybody tell you that?
A I don't think anybody could answer me why.
Q Right.
But if there was an unwritten agreement, wouldn't somebody have been able to tell you that the reason these payments were being made is because it was pursuant to an unwritten agreement?
MR. CERAME: Objection.
BY THE WITNESS:
A Not necessarily.
Q You don't know whether there was an unwritten agreement governing --
A I don't know why those payments were made.
MR. CERAME: Objection.
BY MR. MATTEI:
Q Would you care to try to give me another specific example of an unwritten agreement that Free Speech Systems entered?
A No, I will rely on my testimony.
Q So, there are no others that you're aware of correct?
A That's not what I said. I just said I don't

Page 754

care to do any more.
Q Then I will ask you. Are there any others that you're aware of?
MR. CERAME: Objection.
BY THE WITNESS:
A I don't know.
Q You don't know whether you're aware of any others?
A All I'm --
MR. REILAND: Objection.
BY THE WITNESS:
A At this point, my testimony is that this is not a company that reduces --
Q Ma'am, you don't get to testify without any questions.
A You asked me a question and I'm --
MR. REILAND: She's answering your question. You made your point.
BY THE WITNESS:
A I've answered the question.
Q The question I'm asking, Ms. Paz, is do you know whether there were any other unwritten agreements?
A And I answered it.
Q No. What you said is I don't know.
A And that was my answer.

Page 755

MR. REILAND: That's an answer.
BY MR. MATTEI:
Q So, you don't know whether there are any others?
A How many times do you want me to testify to that?
MR. CERAME: Objection.
BY MR. MATTEI:
Q What were the 2015 payments for that you asked Mr. Roddy and Mr. Schwartz about?
A I don't know. They weren't able to tell me. They were in the advertising income documents.
Q They were payments to PQPR or to Free Speech Systems?
A To PQPR.
Q And they were identified as advertising-related payments?
A They were in the advertising section of the account. So, it's broken down by account and so all of our payments for advertising are in a specific account and that was in that account. So I asked about those.
Q Prior to your involvement in this case, you had no prior experience concerning estimates of radio audience; correct?
A No.

Page 756

MR. CERAME: Objection. And I -- this is not within the scope of my redirect I would note.
BY MR. MATTEI:
Q The only information you have concerning radio audience size comes from your conversation with Mr. Jones; correct?
MR. CERAME: Objection.
BY THE WITNESS:
A And whatever information we've discussed and read.
Q You mean, during our deposition today?
MR. CERAME: Objection.
BY THE WITNESS:
A Not just during our deposition. I mean, I did read the transcripts of all of the videos. So, I did read all of those transcripts. So --
Q I guess it's fair to say you don't consider yourself qualified to discuss --
A Of course not.
Q -- what the industry standards are in measuring --
A Right.
Q -- audience size?
A Right. Of course not. No.

MR. CERAME: Objection.
MR. MATTEI: That's all I have.
MR. CERAME: I do have some redirect based on some of the questions that were asked.
EXAMINATION BY MR. CERAME:
Q Can you identify any employee with a written agreement between Free Speech Systems and the employee?
A Currently?
Q Let's say before 2016.
A Before 2016, no.
Q So, do you know -- Same thing. Before 2016, can you identify an advertiser with whom Free Speech Systems had a written agreement?
A No, because I don't believe that they were reduced to writing.
Q Okay.
Aside from -- Do you know about that 2016, 2017 memo between Free Speech Systems and Alex Jones and Genesis Communication Network?
MR. MATTEI: Objection.
BY THE WITNESS:
A No. I don't think I've seen such a memo.
Q So, aside from the possibility of such a memo that may or may not exist, you don't know of any written documents detailing a written agreement between Genesis

Communication Network and Free Speech Systems prior to 2016?
A Correct.
Q And you would agree that Free Speech Systems has been in business with advertisers?
A Oh, yes.
Q Okay.
And you would agree that there is an agreement between Free Speech Systems and the advertisers?
MR. MATTEI: Objection.
BY THE WITNESS:
A There would have to be some agreement.
Q So, let me make sure I understand this: You don't know the -- you don't know the details of the agreement, but as you sit here as the representative for Free Speech Systems, there is such an agreement you believe?
MR. MATTEI: Objection.
BY THE WITNESS:
A I would think there would have to be an agreement. It's not in writing.
Q Okay.
And similarly, between Free Speech Systems and Genesis Communication Network. Previously, we discussed how they had been working together for at least two

decades.
A Mm-hm.
Q That's a yes?
A Yes.
Q And you're not aware of any written agreements between them prior to 2015?
A No.
Q But you, as corporate representative, believe there is an agreement or have been business agreements between Genesis Communication Network and Free Speech Systems?
MR. MATTEI: Objection.
BY THE WITNESS:
A Well, I know they've been in business with each other for a great number of years. So, you would have to have some form of an agreement. But as I said, it's just not in writing.
Q So, the exchange of services and monies doesn't happen without an agreement as a matter of common sense; right?
MR. MATTEI: Objection.
BY THE WITNESS:
A Exactly.
Q Okay.
MR. CERAME: I have no further question.

EXAMINATION BY MR. MATTEI:
Q You testified in response to Attorney Cerame's questions that you're not aware of any agreements with Free Speech Systems' employees prior to 2016?
MR. CERAME: Objection.
BY THE WITNESS:
A Am I aware of any agreements? Of whether written agreements existed?
Q Between Free Speech Systems and its employees.
A I don't think there were any written agreements between their employees prior to 2016.
Q Ms. Paz, weren't there non-disclosure agreements entered as a regular course of hiring employees at Free Speech Systems?
MR. CERAME: Objection.
BY THE WITNESS:
A Prior to 2016?
Q Yeah.
A I don't know if it was prior to 2016. I know now it is.
Q Okay, so Free Speech Systems is unaware whether it required non-disclosure agreements to be entered by new hires prior to 2016?
A Prior to 2016, no, I don't know.
MR. CERAME: Objection.

BY THE WITNESS:

A But now I know it is.

Q Okay.

MR. MATTEI: That's all I got.

MR. CERAME: I have no questions in response. I suppose I should ask whether counsel does have any.

MR. REILAND: I have no questions.

MR. MATTEI: All right. So, the deposition is being kept open pending production of documents that were described here today. And we'll see if we have to come back.

MR. CERAME: I would just ask that any -- because those documents have nothing to do with the subject matter of my cross, I would ask that that be not be the subject -- that it's closed as to that subject of the issues that we raised during my cross. Except being inasmuch as I suppose the documents might reveal something relevant.

MR. MATTEI: I'm not going to --

MR. CERAME: I'm not going to enter into an agreement as to that. I'm going to note that then for the record.

MR. MATTEI: Thank you. Thank you everybody.

THE VIDEOGRAPHER: We are off the record at 4:19 and this concludes today's deposition given by Brittany Paz.

(Whereby, the deposition concluded at 4:19 p.m.)

* * * * * *

I, BRITTANY PAZ, have read the foregoing transcript of the testimony given at my deposition on June 27, 2022, and it is true and accurate to the best of my knowledge and belief as originally transcribed and/or with the changes as noted on the attached Correction Sheet.

________________________________________
BRITTANY PAZ

Subscribed and sworn to before me this this ___________ day of _____________________, 2022.

________________________________________
Notary Public

My Commission Expires October 31, 2025.

INDEX

EXAMINATION

| Witness Name | Page | Line |
|---|---|---|
| BRITTANY PAZ | | |
| Examination By Mr. Mattei | 554 | 6 |
| Examination By Mr. Cerame | 714 | 6 |
| Examination By Mr. Mattei | 731 | 7 |
| Examination By Mr. Cerame | 739 | 10 |
| Examination By Mr. Mattei | 743 | 21 |
| Examination By Mr. Cerame | 757 | 5 |
| Examination By Mr. Mattei | 760 | 1 |

PLAINTIFF'S EXHIBITS

(Exhibits 118-125 were pre-marked for this deposition)

| Exhibit | Description | Page | Line |
|---|---|---|---|
| 126 | Typewritten notes | 554 | 19 |
| 127 | Chart | 617 | 10 |
| 128 | Chart | 617 | 12 |
| 129* | Audio file | 738 | 1 |
| 130* | Audio file | 739 | 4 |

(*Exhibits 129-130 were retained by Counsel)

EXHIBITS REFERRED TO

| Exhibit | Page |
| --- | --- |
| 117, 118 | 566 |
| 106 | 580 |
| 117 | 608 |
| 106 | 623 |
| 117 | 640 |
| 118 | 644 |
| 108 | 660 |
| 121 | 677 |
| 122 | 679 |
| 123 | 684 |
| 124 | 687 |
| 125 | 688 |
| 2 | 691 |

REQUESTS FOR PRODUCTION

| Request | Page |
| --- | --- |
| # 1 | 567 |
| # 2 | 712 |
| # 3 | 734 |
| # 4 | 735 |

CERTIFICATE

STATE OF CONNECTICUT )
) SS SOUTHBURY
COUNTY OF NEW HAVEN )

I, VIKTORIA V. STOCKMAL, a Notary Public duly commissioned and qualified in and for the county of Fairfield, State of Connecticut, do hereby certify that pursuant to the notice of deposition, the said witness came before me at the aforementioned time and place and was duly sworn by me to testify to the truth and nothing but the truth of his/her knowledge touching and concerning the matters in controversy in this cause; and his/her testimony reduced to writing under my supervision; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney of nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th day of July, 2022.

Viktoria V. Stockmal
_______________________________
VIKTORIA V. STOCKMAL, RMR, CRR
Notary Public
CSR License #00251
My commission expires October 31, 2025

CORRECTION TO DEPOSITION

ERICA LAFFERTY, et al. v. ALEX EMRIC JONES, et al.
WILLIAM SHERLACH v. ALEX EMRIC JONES, et al.
WILLIAM SHERLACH, et al. v. ALEX EMRIC JONES, et al.
BRITTANY PAZ June 27, 2022

In order to make this deposition more nearly conform to the testimony given, the witness wishes to make the following changes:

| PAGE | LINE | NOW READS | SHOULD READ |
| --- | --- | --- | --- |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |

Subscribed and sworn to before me:
Dated this _____ day of ______________, 20___.

_________________________ (Notary Public)
_________________________ Deponent (signature)

My Commission Expires:

**Exhibits**

**EX 0118 Brittany Paz Vol. III 062722**
**EX 0119 Brittany Paz Vol. III 062722**
**EX 0120 Brittany Paz Vol. III 062722**
**EX 0121 Brittany Paz Vol. III 062722** 677:8
**EX 0122 Brittany Paz Vol. III 062722** 679:20
**EX 0123 Brittany Paz Vol. III 062722**
**EX 0124 Brittany Paz Vol. III 062722**
**EX 0125 Brittany Paz Vol. III 062722** 688:19
**EX 0126 Brittany Paz Vol. III 062722** 554:19,23
**EX 0127 Brittany Paz Vol. III 062722** 617:10
**EX 0128 Brittany Paz Vol. III 062722** 617:12

**#**

**#00251** 548:24

**$**

**$11,000** 606:13,15 607:9,20 609:20,21,25 610:2,4,6, 16,20 611:2, 9,22,25 613:4 614:1 615:4 616:12 618:6 619:5, 14,25 620:5, 15,19
**$181,925** 662:7
**$2,500** 693:7
**$25** 642:8
**$25.3** 645:20
**$29.5** 608:14 609:5 610:13 622:12 634:13 638:21 639:12
**$29.588** 644:8
**$30,000** 572:4,12
**$50.5** 666:11,17
**$54** 636:16 676:24
**$566,000** 704:17
**$6.79** 664:12
**$7,500** 572:16 573:17
**$70** 692:25 693:8
**$8** 653:24 654:19

**-**

**-X** 548:3,8,13, 18

**0**

**06106** 549:19
**06484** 553:14
**06511** 549:13
**06604** 549:4

**1**

**1** 618:3
**1.5** 611:1
**1.75** 609:9,10 610:13
**1.8** 646:11
**10** 564:15 566:15 603:19 604:3,20 620:17 644:23 646:15
**100** 633:11 641:5 642:5 665:1 682:10 685:2 704:20 742:5
**106** 580:18 623:15
**108** 660:23
**10:11** 548:25 552:10
**117** 566:1 599:19 608:2
**118** 566:1 599:19
**11:35** 616:1,2
**11:50** 616:3,5
**121** 677:8
**122** 679:20
**123** 684:3
**124** 687:11,13, 16,17
**125** 688:19
**126** 554:18,19,23
**127** 617:8,10,15 618:3
**128** 617:8,12,15
**129** 737:25 738:1
**12:08** 736:13
**12:42** 652:15,16
**12th** 558:18
**13** 566:4 640:22 702:15,24

**130**
739:3,4
**13th**
608:9 609:4 733:12 735:15 736:12
**140**
678:2,13 679:13
**15**
681:9,15 735:21 738:13
**15-year**
646:16
**16th**
554:12
**17th**
559:1 560:25 568:14
**18**
566:13
**18:57**
680:20
**18th**
641:6
**19th**
680:1,14
**1:38**
652:17,19

## 2

**2**
652:13 681:7 682:12,16 683:4 691:2
**2,500**
693:5,7,8
**2.06**
663:1,6
**2.064**
663:3
**20**
604:19 620:16 740:17
**2002**
580:9 581:14
**2012**
577:16 578:9,22 579:8 580:9 581:13 582:1,14 583:2,10,14 593:3 622:8, 20 659:23 663:6 665:23 666:5 669:2 704:24 705:20,24 706:20 709:2,4,20 714:16
**2013**
596:24 677:21 678:5 679:4,12 707:1,2 708:1,7
**2014**
596:16,23 622:8 623:23 624:20,21 625:1,15,18 629:8 630:10,21 632:24 634:13 635:14 637:3 644:13
**2015**
750:1 751:25 752:6,16 753:2 755:9 759:6
**2016**
662:5 757:9, 10,11,17 758:2 760:4, 11,17,19,23, 24
**2017**
556:4 664:10,20 680:1,15 683:25 757:17
**2018**
597:23 598:1,3,8,9 599:6,12,21 600:2,6,8,20 601:6,22 602:19 604:4 605:4,8,10 611:22 615:14 616:9 618:5 621:25 622:12 632:16 634:13 636:20,21 637:10,14, 16,17,21 638:17,23,25 639:12,16 640:7,10,12 644:1,13 645:1,17 688:6,12 705:20,25
**2019**
583:2 645:2, 5,12,17,24 646:3 689:1 690:6
**2020**
566:4 577:17 578:9,22 579:8 582:1, 14 583:10,14 599:22 608:9 609:4 610:3 611:5 635:5, 15,24 636:21 637:3,9,17, 20 638:2,8, 14,19,20 639:6,7,14, 23 640:17,22 643:25 644:17 645:2,12,17, 24 647:4 655:14,16,17 660:1 663:6 665:23 666:5 669:2 674:23,25 675:1 704:24 706:21 709:20 731:11
**2021**
566:15 599:22 606:11 607:14 611:12,15,23 612:18 614:1 615:5 616:13 644:23,25 645:6,9,11, 22 646:10 655:15,16, 19,23,24 656:5,23 657:1,6,16, 19,23 658:23,24,25 659:9,17 660:1 674:10,24,25 675:2,4 676:20 731:12
**2021's**
645:10
**2022**
548:25 552:9 555:14 654:6 656:17,20 659:16 715:6,13
**203-336-4421**
549:4

**203-393-3017**
549:14
**2036**
646:15
**2050**
610:10
**21**
736:11
**22**
681:24
**22-plus**
681:20
**25.3**
636:23
645:25
**260**
691:16
692:23,25
693:9
**27**
548:25
**27th**
552:9 558:17
**28th**
679:12
**29.5**
600:6 608:22
636:20

**3**

**3**
678:3,17
679:14
**30**
610:8,14
611:1
**30-year**
607:23
646:13
**3005**
641:3
**350**
548:22
**383**
549:13
**3:10**
710:18,19
**3:19**
710:19,21

**4**

**4**
553:13
555:14
562:19 563:6
589:3 683:7,13
**4.5**
681:6
**402**
553:13
**45**
652:10
683:19,20,25
**4:19**
762:4,7
**4th**
688:6

**5**

**5**
563:10
**5.98**
662:8
**50.5**
663:5
**50.515**
663:4
**53-plus-million**
668:25
**54**
636:19
**566,000**
703:10

**6**

**6**
589:3
686:12,14,25
688:12 690:3
**6.6**
664:16,20,23
**6.9**
664:19,23

**7**

**7**
680:18 733:4
**70**
691:14
692:23
**70s**
604:18
614:17
**72**
604:18,22
605:9 619:17
644:1
**72-some**
633:15

**8**

**8**
563:15
680:17,18
**80**
595:20
597:2,17
603:19,21
604:9,12,13,20 613:8
614:16,17
616:18,19
618:25
620:23
**860-527-9973**
549:19
**8th**
677:20 679:4

**9**

**9**
563:19
**90**
552:14
597:7,18
604:2,11
619:2

**A**

**a.m.**
548:25
552:10
616:2,3
**ability**
742:17
**able**
560:1,2,6
561:10
562:3,22
563:1,5,21,25 564:8
637:22 660:2
672:16
692:2,17
693:23 694:1
695:1,7,9
698:11,17
700:17
702:8,11
753:8 755:11
**above**
641:2
**accept**
710:7,10
**acceptable**
582:7
**access**
621:23
699:15
**accesses**
701:11
**accessing**
700:3

**accordance**
619:17
**account**
564:11 580:4 581:15 645:22 672:8,11,18, 20 676:2,11 690:23 706:3 707:8 755:19,20,21
**accountant**
559:11 564:20 565:1,8,9 660:14,20 670:13 693:19 708:1,4
**accountants**
555:9 645:13 657:18
**accounted**
607:1 706:15
**accounting**
584:23 585:5 670:15 673:1 706:20 707:13
**accounting-wise**
593:18
**accounts**
580:7 581:16 582:15 621:23 690:20 703:22,25 708:12 742:9
**accrual**
600:15 638:13 671:24 675:9
**accrue**
622:5 630:21 631:13 634:8 635:15
**accrued**
636:21 645:24
**accruing**
623:22 624:1 625:18 638:8 674:17
**accurate**
613:7 622:7 638:3 669:10,11 687:7 688:16 690:6 724:9 735:3,7 742:5
**acknowledge**
686:24
**acknowledges**
654:9 690:5
**across**
685:21
**act**
643:12
**action**
552:16 714:9
**actively**
650:16
**activities**
583:11,15 587:9,14 588:5 591:16 593:11 594:5
**activity**
556:17 561:7 647:17
**actual**
566:25 568:22,24 599:23 687:14 705:13 714:15
**ad**
648:4,9 682:11 695:2,5 697:8 699:11 701:25 707:22 710:4 711:25 712:1 742:11
**Adan**
698:5
**Adan's**
695:3 699:10 701:24
**add**
669:1
**added**
667:4
**addition**
568:4 572:12 618:5 619:14 662:9,15 665:12 666:23
**additional**
572:9,15 573:14 615:5 618:19
**address**
553:13
**adds**
660:16
**adjusted**
706:17
**administration**
552:25 580:22
**administrative**
587:14 591:15
**ads**
575:8,10,12, 14,15,16 584:7 627:7 647:21 695:4 697:15,21 700:5,6 703:8,9 704:7 721:11,12
**advance**
562:14 570:6 596:21
**advertise**
686:5 689:22 704:17 711:2
**advertisements**
575:20,24
**advertiser**
690:9 710:8 751:20 757:12
**advertisers**
686:4,6 711:2,5,12 712:23 746:12 758:5,9
**advertises**
560:4
**advertising**
555:7,13 560:4,5 561:6,12 562:5 563:6, 11 579:2 580:22 625:23,24 627:14,18 651:9,15,17, 22 689:13,19 690:12 694:20 705:9,10 706:1,9 707:4,15,19 708:8 709:8 710:9,11 711:11,22,24 712:16 713:2 720:6,23 721:8 749:24 751:25 755:12,18,20
**advertising-related**
755:16

**advice**
715:14,22
**AEJ**
595:21,24
598:8,9
599:6,12,13
601:22 602:3
605:6,10,23
611:21
612:10
613:8,18,19
615:14,18,21
616:9 618:5
619:18
620:20,25
621:25 644:1
**affected**
603:1
**affects**
683:20
**affiliate**
650:23
651:3,8,16,
18,25 652:4
684:14,19
685:17,18,
19,24 687:24
724:14,18,19
**affiliates**
682:10
684:19
685:20,25
686:1
**affirm**
718:21 719:6
**affirmed**
553:16
**afternoon**
716:13
**agencies**
682:11
**ago**
571:12 575:4
593:3 651:2
**agree**
601:5 679:3
685:9 687:17
740:10
745:18
746:25
758:4,8
**agreed**
550:3,9,14,
19 609:8,13
**agreeing**
610:13
**agreement**
552:6 572:14
573:24 574:2
608:6
727:16,17,20
728:10,11
729:4,20
732:6 742:17
743:25
744:7,18,22
745:4,8,9,
11,21 747:21
748:16,22
749:9 750:3,
4,9,15,24
751:3,4,8,
13,21
752:21,23
753:1,7,10,
15,20 757:7,
13,25 758:8,
12,15,16,21
759:9,16,19
761:24
**agreements**
727:22
729:21
731:13,14,
15,16,17,19
732:11
739:12,14,15
740:22
743:24
744:2,3,11
745:2 746:1,
6,10,11,17
747:3,5,6,7,
9,10,14,15
748:13,14,
15,16 749:2,
21,23
750:20,22
751:6,18
754:22
759:5,9
760:3,7,8,
10,13,22
**agrees**
552:25 553:6
680:13
**ahead**
596:21
598:22,24
618:12,19
682:10
705:23
713:13
736:19
**air**
587:24,25
678:8,9,13
685:25
698:13 699:8
717:8
**aired**
708:8
**airing**
679:13
**Alex**
548:7,12,17
549:10
551:15
552:12
570:25
597:8,16,17
599:5 606:20
607:4,11
620:16,21,24
621:10,19,22
632:9,13,16,
19,24,25
633:9,20
641:9,17
642:2
643:24,25
646:18 647:6
651:1 653:11
654:14,24
659:22
661:12,14
662:22,23
663:5 673:16
677:17 678:7
679:7,12,17,
19 680:2,14,
21 685:25
686:5 687:1
690:2 698:12
716:11,12
717:1
719:14,15
726:10,12,
13,14
727:10,18,23
728:9,18,20,
22 730:17
731:1 733:4
739:19
740:12 741:9
742:8,24
757:18
**Alex's**
702:2
**Alinor**
549:7 551:9
**alphabet**
594:24
595:20
**altered**
709:21,23
**Amazon**
651:24
**amendment**
715:14,18
**amount**
635:8 644:10
662:7,16,25
691:25 699:2
700:18,21
711:1
**amounts**
661:12,13,14
662:21
673:21

**analysis** 645:11 668:10
**analytics** 681:4 695:1, 7,9,22 696:2 697:12 703:20 704:8
**analyzes** 622:10
**and/or** 553:16 622:25
**Anderson** 723:13 727:9,22 728:1,2,18, 20 730:10,18 731:2
**annual** 609:9
**answer** 561:8,23,25 574:20 580:16 582:3,7,8 583:17 593:25 594:10 614:11 618:14 622:2,7 628:20 633:4 634:10,19 639:19 640:11 642:4 643:21 644:19 658:20 666:2,3,7 673:3 690:13,14 692:3 693:23 694:2 698:19 721:16 732:4 744:14,15 748:12 749:14 750:2 751:9,10 752:4,18,20 753:5 754:25 755:1
**answered** 716:7 718:16 745:16,23 748:2 749:13 754:20,23
**answering** 580:10 754:17
**anticipate** 572:9,12,20 573:4
**anticipated** 711:9
**anticipating** 573:18
**anybody** 559:7 571:6, 15 574:23 590:13 592:20 607:8 638:6,24 671:12 721:25 747:8 753:4,5
**anyone** 656:15 717:8,21 726:15 730:14
**anyone's** 624:17 632:1
**apparently** 662:6
**appeared** 571:12 677:17 696:19
**appearing** 549:7,21 697:21
**appears** 637:19 641:24 646:14 680:16 692:22 705:16 719:22 735:20
**appellate** 715:4
**applied** 580:20
**apply** 553:23 730:20
**applying** 646:11
**appreciate** 597:15 617:20 737:5
**approach** 721:17
**approximate** 678:15
**approximately** 595:4 606:13 608:14 611:15 644:1 653:24 654:19 668:25 684:23 686:25 690:6 704:16
**April** 688:6,11 715:13
**argument's** 697:5
**around** 588:25 589:7,14 638:7 642:2, 17,22 647:10
**arrangement** 610:17
**arrive** 607:19 610:2 716:17,20
**arrived** 610:4,24,25 672:6
**arrow** 702:25
**article** 627:9 696:20 698:5 699:14,15 701:11,24 702:14
**articles** 627:10 695:3 697:1,19,22 699:6,10,11
**asked** 561:20 563:24 564:3,4 567:5,17,18 579:5,7 602:10 605:16 622:1 624:2 631:12 647:19 658:4,9,14, 23 659:13,15 667:19 669:20 672:15 692:4,6 694:22,23 705:16 710:1 718:15,23 720:5,13 721:9 728:25 729:10 745:7,16,22 748:1,14 749:24 750:1 752:2,8,10, 11 754:16 755:9,21 757:4
**asking** 561:17,19 562:24 581:11,13

592:9,10 600:23,25 601:2 610:1, 25 618:16,17 621:7,15 627:19 630:7 637:23 638:4,5 651:4 653:20 654:3 657:9 663:13 664:3,4 671:20 693:21 698:18 703:4 706:11 707:1 709:3 721:17 733:13 745:3 746:8,12,16, 18 748:15, 16,21 751:4 754:21

**aspect**
591:18 651:23 668:22 742:7 743:2

**aspects**
555:10

**asset**
601:10,19 603:8

**assets**
601:15 602:17,21 603:6,7,9

**assist**
652:23 654:11

**assistant**
551:12

**associated**
564:11 625:20,22 631:4 638:6 744:9

**association**
663:24

715:17

**assume**
584:20 586:20 591:25 592:3 606:20 607:4 659:15 662:14 669:9 726:20

**assuming**
557:8

**asterisk**
686:15,19

**asterisks**
661:11

**asterling@ koskoff.com**
549:5

**attempt**
719:22

**attempted**
634:21 638:7 700:8

**attention**
632:10 680:17 743:11,12

**attorney**
551:17 553:4,8 554:5 559:4, 5,15 565:10 573:1,24 586:4 588:16 598:18 602:8 616:15 617:4 618:8 665:2 671:13 695:16 696:13 713:10 714:7 717:10 724:19,21 732:16 733:6,20 734:8 760:2

**attorneys**
549:2,9

657:18 742:22,23

**audience**
677:7 678:22 679:18 681:3 682:8 683:24 701:11 716:7,12,13, 25 717:13, 16,21 718:3, 13,24 719:2 723:14,17, 19,24 755:24 756:6,24

**audio**
713:22 737:17 738:2 739:5

**August**
566:4 599:22 608:9 609:4 610:3 611:5 635:5 637:3, 9,10 638:8, 14,19 639:23 640:17,22 643:25 644:17 647:4 731:11

**Austin**
586:5 588:8, 9 641:4,6

**authority**
550:6 643:11 647:13

**authorize**
579:25 607:8,11

**authorized**
606:18 607:5 624:9,11,18 631:12,24 653:8

**automatically**
737:12

**available**
573:4 655:25 656:1,10,15

657:11,14,25 658:1,5,8, 15,22 659:1, 2,5,10,17 660:5,8,19 684:22 720:9,10

**Avenue**
548:22 549:3 641:6

**average**
604:21 682:13,17 683:5 703:9

**aware**
552:3 565:17 568:13 574:8 575:1 576:21 577:13 594:20 607:7,8 614:8 616:11 620:16 621:18 631:6 634:20 635:6,9 637:4 638:4 639:22 640:3,4,14 642:13,16, 21,24 644:16 646:7 647:5, 9,12 653:4, 10,24 654:5, 13,14,18 655:18 670:11 673:10 676:19 694:19 700:7 723:15 731:8,12 753:23 754:3,7 759:5 760:3, 7

**B**

**B-2**
  668:15
**back**
  554:9,11
  575:8,10,16,
  25 584:6
  593:8,23
  594:19 602:2
  609:9 610:13
  623:10 627:7
  631:11,14
  639:14,16
  644:5
  647:21,22,24
  650:6,17,20
  688:2 690:11
  699:15,25
  700:16
  713:16
  761:13
**backup**
  654:4 661:17
**bad**
  604:24
**balance**
  580:25
  608:15,20,22
  609:23
  612:24 613:1
  636:21
  645:2,14,18
  706:17
**balances**
  645:14
  660:16
**balloon**
  607:24
**ballpark**
  588:23
**Balm**
  678:1
**bank**
  620:22
  621:23

690:17,21,23
**banking**
  690:16,17
**bankruptcy**
  565:14
**banner**
  648:6,9
  707:22
  711:25
**banners**
  627:10 648:7
**base**
  678:3,15
  679:14
**based**
  557:15
  565:10
  587:16
  607:21 610:3
  611:10
  639:10,12
  664:7 668:2,
  4 673:14
  675:8 678:16
  694:13
  703:8,9
  704:19
  717:1,14,18
  719:13,16,
  17,18 723:25
  730:13,16,
  23,25 740:2
  741:16 757:3
**basically**
  557:18
  570:14
  574:13
  585:22 706:1
  707:18,21
  720:8 721:10
**basing**
  616:21
  641:23
**basis**
  571:19
  587:19 606:5
  618:17,20
  629:5

643:11,16
  646:2 647:12
  668:7 675:22
  704:4 716:1
  730:25
**Bates**
  680:9 685:13
**bathroom**
  702:18
  710:15
**Baum**
  677:14 679:4
**began**
  596:24
**begin**
  578:5 606:18
  624:9 634:8
  713:13,21
**beginning**
  558:17
  601:13
  607:14 614:1
  615:4 616:13
  625:15
  628:23
  630:10,21
  632:23
  644:17 675:4
  691:7
**behalf**
  551:7,9
  552:19
  560:19
  565:15
  583:11,16
  641:9,13
  643:6,12,16,
  17 646:17,18
  647:1,13
  661:12,13
  708:9
**believe**
  554:10
  556:25
  557:17,19
  558:17
  559:11,25
  565:3,9

567:10,19
  569:8,17,25
  570:4 575:7,
  21 595:20
  596:6,16
  597:23
  598:10
  599:13 600:8
  604:17 606:8
  611:10
  615:13
  616:15 617:5
  626:17 628:5
  644:14
  650:15,19
  651:14
  652:24
  655:14 657:3
  661:3
  670:19,21
  671:8 672:1
  675:16
  676:18
  677:15,19
  690:22
  695:11
  696:10,12
  704:9 707:17
  709:22
  710:3,10,13
  714:19
  717:23 723:8
  725:8,10,11
  730:13 733:4
  748:24
  757:14
  758:17 759:8
**bell**
  653:3
**Bellis**
  582:6
**below**
  703:15
**beneficiaries**
  599:10
  615:12
**beneficiary**
  615:10,18,20

616:8 619:21 620:21
**benefit** 598:15 599:10 605:19,23 615:16
**beside** 732:8
**besides** 718:4
**best** 558:3,10 559:15 560:19 595:1 740:13,14,21
**better** 692:3
**Bidondi's** 649:13,19
**Bieder** 548:22 549:3
**big** 666:1 682:12 731:21 743:5
**bigger** 741:21,22
**biggest** 636:14
**bill** 632:2,5 711:23 744:5 746:7
**billed** 625:6 626:9 710:4
**billing** 612:3 619:7 626:8 628:8 629:1,10,22 630:9,11 645:8 707:24
**Billions** 701:5
**bills** 590:17 624:13,14, 15,22 625:2, 4 629:4 674:20 675:13
**Bing** 721:12
**bit** 562:17 568:18 593:17 603:25 628:10 682:5 736:25
**Blake** 555:6,14 556:20,21 590:1,2 692:3 694:9, 18,19 703:17 704:10,15 720:5 752:8, 10,14
**Blott** 586:4 588:16 671:13 696:13 732:20,21
**Bob** 555:8 557:18 691:5 692:2, 4 709:11 710:2
**body** 599:9 600:8 601:25 602:6,11 613:3
**bone** 648:10,16
**books** 584:24 645:10,13 655:15,21 657:4,16 658:25 659:11 660:9,11 676:8,11,15 708:12
**bottom** 557:7,14 568:20 569:16 680:9 685:12
**bought** 626:14 697:25 710:8
**Boulevard** 641:3
**bound** 744:1,19,23 745:8,13 747:9
**break** 554:17 584:2 596:8 602:9 613:22 614:10,24,25 615:24 616:7 617:4 649:4 652:8 684:24 702:18 710:15,23 713:16 719:22
**Bridgeport** 548:22 549:4
**brief** 685:19
**briefly** 617:17 716:5
**BRIGNOLE,BUSH** 549:18
**bring** 574:3,5 596:11 617:15 629:19 640:21 690:24 732:23
**Brittany** 548:20 552:8 656:11 736:20 762:5
**broad** 552:14 686:1
**broadcast** 680:1 682:9, 14,24,25 683:4,7 684:20,22 685:21 702:2,3 717:3,9 724:20,25 725:19 727:3 729:22
**broadcasting** 678:17
**broadcasts** 650:25 725:21 726:12
**broken** 755:19
**Bronson** 684:6 685:16
**Bronson's** 684:12 686:9
**broth** 648:10,17
**brought** 702:10
**business** 553:13 556:17 585:2 587:25 588:4,19 592:12,13 593:11 594:5 606:14 609:25 610:21 611:2 613:11,15 614:7 619:16 620:19 689:16,17 691:16 693:1 721:13 728:7,25 729:1 739:14,15

740:2,8,12, 15,16,20 741:10,17 742:14,17,24 743:1,5 758:5 759:9, 14
**businesses** 619:6
**buying** 626:5 627:23,25 706:8
**buys** 628:3,5

C

**calculate** 639:16 692:7 699:2 700:21 702:12 711:1 717:16 718:3
**calculated** 600:7 608:24 637:13,14 638:17 639:6 707:19 712:16
**calculates** 711:22
**calculating** 638:20 639:4 694:3 707:23
**calculation** 700:17
**calculations** 718:24
**calendar** 558:19,20, 21,22,25
**call** 558:22 559:3 568:1,5,8, 12,25 569:15 737:3 738:23
**called** 553:15 573:10 595:18,19 598:10
**calls** 557:18 569:22
**capable** 656:4 678:10
**capacity** 565:3,4 592:21
**caption** 563:20
**captioned** 566:4,14
**captioning** 563:23 564:6 672:12,16,18
**card** 579:25
**care** 736:23 738:24 753:19 754:1
**careful** 700:25
**cares** 743:12
**Carol** 603:20 604:3,21 620:17,18
**carrying** 645:20 676:12,13
**case** 553:23 556:24,25 571:21 594:18 597:6 635:20 655:9 663:25 664:5 670:18 688:9 709:19 715:15,22 716:2 755:22
**cases** 557:1 573:5 715:25
**cash** 613:24 705:25
**cashing** 654:25
**Castaneda** 684:7 685:1, 17
**caused** 741:22 743:2
**causing** 625:10
**Cerame** 549:21 551:3,13,23 553:3,8 554:5 573:1 617:16 702:23 713:25 714:2,6,8 721:22 731:4 739:9,10,18 743:15 744:20 745:5,14,22 746:14,18,22 747:17,23 748:10,19 749:5,11,19 750:10,25 753:11,17 754:4 755:7 756:1,8,13 757:1,3,5 759:25 760:5,15,25 761:5,14,23
**Cerame's** 713:10 747:1 760:2
**Cernovich** 680:25 681:20
**Cernovich's** 681:4 682:1
**certain** 579:2 670:12 671:25 712:1 744:9 749:2
**certainly** 717:25 718:1
**certainty** 665:20
**chance** 688:22
**change** 603:13 677:6
**changed** 598:4 603:16,17 650:9
**channel** 681:7,8 700:5
**character** 550:6
**charge** 555:6 675:11 689:12 707:25 712:6 741:18
**charged** 712:17,22
**charges** 711:2
**charging** 713:1,4
**chart** 617:11,13 618:3,21
**charts** 616:21,23 617:5 618:7 619:4
**check** 702:2 735:1
**children** 598:16 599:8 605:19,20,22 615:7

**Chris**
551:7 589:22 614:22 712:11 743:16
**CHRISTOPHER**
549:7
**circumstance**
740:5
**circumstances**
712:1
**citing**
716:18
**claim**
639:15
**claimed**
635:8
**claiming**
609:5 623:21
**claims**
630:1
**clarify**
621:3
**class**
714:15
**classes**
714:21
**clear**
561:3 581:22 591:3 593:7 599:18 607:2 621:17 636:25 639:19 664:3
**clearly**
582:7
**click**
627:10 648:4,8,13 691:24 695:2,5 697:7 699:12,25 701:25 707:21 712:2
**clicked**
697:21
**clicking**
696:19 697:15 704:6,7
**clicks**
627:10 692:16 693:15
**client**
718:1 729:7, 17
**clinic**
714:22 715:4
**close**
588:9 630:19 645:13 660:11 672:16 682:12,16
**closed**
563:19,23 564:5 645:10 655:15,21 656:14 657:5,16 658:25 659:11 660:8 672:12 675:1 761:18
**closely**
632:11
**cmattei@ koskoff.com**
549:5
**co-defendant**
551:15
**co-defendants**
551:16
**cogently**
560:11
**collaboration**
723:12
**colleague**
551:9 715:13
**collected**
560:18 561:4
**colloquy**
749:6
**column**
580:21 629:25 661:8,9,18, 23,24 662:16 663:2,4,11, 13,16 664:15,20,21 666:13 667:2
**columns**
669:1
**combination**
727:10
**come**
609:24 634:4 645:14 650:14 660:17,18 682:12 704:12 713:16 715:1 761:12
**comes**
584:15 610:5 611:2 756:6
**comfortable**
734:16,20,22
**commenced**
612:18 635:23,25
**commercial**
683:12
**common**
717:11 739:14,23 740:6 741:24 742:22 743:23 745:1 747:2,4 753:3 759:19
**Communication**
551:14 714:8 723:3,13 724:14,24 725:5,13,20 726:1 727:17 729:8,17 730:2,21 740:10,11 757:19 758:1,24 759:10
**communication s**
549:17 566:22 649:20 723:15 724:21 730:14,25
**companies**
564:16 565:15 590:15 606:17,25 620:7 634:3 635:17 639:3 673:5
**company**
561:1 574:7, 11 632:9,15, 24,25 633:5, 6 641:3,5 725:18 728:5,15 730:21 734:23 739:24 754:13
**company's**
574:9
**compel**
634:21 635:7 637:4
**compensated**
654:24 666:16 668:24
**compensation**
560:9 561:5, 13 562:4 563:15 572:6 573:14 595:10

653:21,23 655:2,7,11 656:4 657:7, 22 658:8,15, 21 659:9,22 660:1,25 664:25 665:7,22 666:4,20 667:9,13 668:14 669:5,8,22 670:4
**completely** 636:6
**COMPLEX** 548:2
**component** 646:6
**composite** 717:14
**comprises** 662:19 670:2
**computer** 556:2 713:24
**concerned** 669:7 687:6 688:15 735:4
**concluded** 762:6
**concludes** 762:4
**conduct** 668:9
**conducted** 553:2 577:23 581:24 582:13
**conducts** 578:4,7
**conference** 557:17 733:19 735:17
**confirm** 556:12 565:7 617:6 696:15
**confused** 579:13,17,18
**confusing** 628:11
**Congress** 641:5
**Connecticut** 548:1,23,25 553:14,18 556:25 570:19,22 571:21 572:6 573:11 715:16
**connection** 623:3 641:16 654:11 670:18,23 720:12
**conscious** 624:12,16 631:22,25 633:3,25 634:5,18
**conservatively** 682:11 683:19
**consider** 651:25 756:18
**consulting** 564:22 565:3
**contact** 564:24 565:6 689:14
**contacted** 559:18
**contained** 563:13 681:5 687:19
**contemplated** 572:16
**contending** 643:15
**content** 692:1,9,11 693:17 694:4,25 695:11 698:10 699:4 700:3,12,14, 19,22 702:7, 11 730:12, 15,18,25 742:2,16,25 743:12
**contents** 687:14
**contests** 679:15
**context** 649:23 703:15 749:22
**Continue** 563:9
**continued** 569:10 597:21 741:14
**continues** 645:2
**continuing** 645:7,18
**contractor** 650:4,10
**contradict** 718:19
**control** 621:1 730:11,22 741:14
**controlled** 580:6 581:15,16 582:15 632:20,22
**controlling** 595:15 632:20
**controls** 565:15
**conversation** 555:21 557:16,21 558:6,10 560:10 568:14,21 569:3,5 591:17 592:20 602:1 608:3 639:12 640:6 650:5, 8 678:6 691:8,13,19 692:5 694:1, 11,14,15 698:7 703:16 704:10,13 707:17 710:24 717:19 718:10 721:14 735:8 737:4 756:6
**conversations** 552:5 555:8, 11 557:15 566:25 587:16,18 591:6 599:1 611:10 635:19 638:22 639:3,10,25 640:5 673:14 691:11 715:8 717:1,21 718:25 719:14 721:24 730:16
**conversion** 693:17 695:8,13 699:6
**converted** 699:24
**coordination** 723:12

**copied**
685:4
**copies**
571:14 670:20 671:10,11
**copy**
554:14 570:18,19 696:9,10 711:15,19
**corporate**
572:5 595:15,18 599:2 607:10 669:20 671:15 732:2 759:8
**correct**
556:17,24 557:5,11,12 561:7 562:5 563:7 568:22 569:13,14,16 571:21 572:21 573:23 574:7,16 575:20,22 576:1 577:4, 5,8,14,18,23 578:2 580:1, 4 582:2,20 583:22 584:16,21,22 585:24 586:2,8,19 587:2,6 593:22 594:16 595:2,11,16 597:3,8,18 598:4 599:19,21 600:3,16,20 601:6,11 603:2 604:3, 9,14 605:6, 10,24 606:2 607:10 608:4 609:6,10 611:15,23 612:18 615:7,9,17, 22 616:9,13 619:11,18,22 621:12,20 622:17 624:1 625:2 629:2 630:5,12,23 631:7 632:17,21 633:1,12,18 635:18 637:7 640:3,17 641:10 642:11,14 643:3,7,9 644:2,8,13, 18 645:8 646:11,19 647:2,7,10, 13 653:12,22 654:12,16 655:19 656:6,17,20 657:7,13 659:23 660:1 661:19 662:9,12 663:8,18 664:8,13 665:8,13 666:6,17,20 667:1 668:10,16,18 669:3,6,15, 17,19,22,25 670:4,12 673:11 677:14,18,24 678:5 679:5, 8 680:15 681:1,14,25 682:22 683:5,8 684:1 685:10 686:2,7,13 688:13 689:2,20,23 690:3,21 691:7,11,15 694:4 696:21 697:22 699:19 700:4,10,24 701:9,13 702:12 706:2,13 708:13,25 709:9 711:3, 13,19 715:24 722:7,9,14 723:3 726:7 729:2 730:23 731:20 732:13 733:11,13 734:2 735:21 751:12,15 752:16,21 753:2,24 755:24 756:7 758:3
**correctly**
580:11 711:24 718:9
**correlating**
698:9
**correlation**
724:5
**cost**
581:3 626:2, 5,13 628:16, 19 629:1 630:22 631:5,16 645:7 646:4 707:21 711:24,25
**costs**
625:20,22, 23,24 707:22 710:4
**counsel**
550:4,10,15, 20 552:8,21, 24 553:10 557:17,22 558:11 586:7 587:18 642:9,10,14 761:7
**couple**
555:7 557:15,23,24 558:16 625:24 649:6 719:21 720:13 735:5 748:23 750:5
**course**
613:10,14 614:7 619:16 653:21 683:17 743:5 756:20,25 760:13
**court**
548:1 551:1, 4,20 552:21 553:20 737:23
**cover**
637:25 655:13
**create**
560:7 742:25
**created**
560:9 561:9 562:25 564:2 598:15 603:15 622:25 688:6 708:24
**creating**
730:24 742:2,16
**credit**
579:25 627:17 705:10

**credited**
706:3,4
707:9
**credits**
579:1
580:21,23
627:18
629:23
705:4,6,11,
14,21 708:19
710:8,10
**Criminal**
715:16
**cross**
761:16,19
**crossover**
593:1
**CRR**
548:23
**cryptocurrenc y**
653:25
654:5,20
655:1
**CT**
549:4,13,19
**current**
593:11,14
650:1,12
**customer**
579:23 581:6
585:23
628:15
**cycle**
738:14

**D**

**D109-317**
641:4
**dad**
673:16
**daily**
607:9
609:15,17,
18,19,21
610:16 615:4
618:6
619:14,25
678:2 679:14
686:12 687:1
690:3 730:25
**Dan**
649:13
**Daniel's**
570:8,11
**Daria**
703:13
**dash**
557:3
**data**
563:17 688:5
690:6 699:17
719:24,25
720:7,21
721:3,20
722:3,13,17,
21
**date**
555:4 557:24
558:5,6,7
595:5 599:21
638:2,18
641:1 645:6
659:23
674:18
686:24
687:5,19,21,
24 688:3
**date's**
558:8
**dated**
566:4,15
608:8 677:20
731:11
**dates**
599:23 601:7
637:24
652:25
**David**
563:16
620:17
635:11
641:12 643:6
647:1,12
**day**
555:1,3
572:22
588:18 589:7
606:14
609:25
610:2,6,21
611:2,25
619:5 620:5,
15,19 682:17
683:7,13
693:5,8
731:9 733:14
734:21
735:16
**day-to-day**
621:4,11,19
**days**
571:11
572:15
608:23 688:6
691:16
692:23
693:1,9
**deal**
666:2
**dealing**
671:2,6
**deals**
728:18
**dealt**
582:5
**debits**
580:24
629:20,25
**debt**
557:10
566:23 567:1
600:15,19
601:14,19,
23,24 602:4,
5,13,14,16
603:2
606:17,19,22
607:15
611:14
612:14,25
613:6 614:1
615:15,22
618:23
619:15 622:4
623:21
624:1,10
625:18
630:4,21
631:4,6,13
634:8,14
635:15
636:20 637:6
638:8,14
639:1,23
640:16 644:8
645:20,21,25
646:2,6,11
671:24
674:5,17
675:10
676:12,13,22
677:2
**debt-related**
676:19
**debts**
619:4 635:3
636:8 637:13
639:4
**decades**
740:13,20
759:1
**December**
623:22
624:21
625:1,15,17
629:8
630:10,21
635:14
636:20
644:13
645:24
**decides**
632:8
**deciding**
632:24
**decision**
624:12,16
631:20,23,25
633:3,22,25

634:6
**deductions** 665:1
**defendants** 548:7,12,17 549:9 551:18 553:6 554:4 685:10
**defense** 652:23 653:17 654:10,11 715:3,17
**defined** 661:12
**definitely** 611:17 644:20 714:23 743:19
**definitively** 592:25
**delineated** 593:16
**delineates** 607:25
**delineation** 607:3
**delivery** 589:4
**demographics** 719:23
**deny** 719:7
**department** 694:20
**depend** 701:1
**depo** 653:19,21
**deponent** 550:22
**deposed** 570:18
**deposition** 548:20 550:6,21 552:7 553:1, 5,25 554:10 555:1,2 556:20,22,23 557:5 559:17,24 561:14 562:9 569:21,23 570:5,6,8, 11,15,19,25 571:3,8 572:7,15,21 622:24 623:4 630:20 649:13 650:18 659:21,23 671:17 678:23 695:21 720:5 733:15 734:17,21 735:11,16 756:12,15 761:10 762:4,6
**depositions** 570:2 696:12 741:9
**derive** 721:13
**derived** 700:21
**describe** 712:15
**described** 562:2 563:6, 12 564:19 571:6 588:1 600:18 635:16 687:18 710:25 711:21 712:13 727:21 761:11
**describing** 564:5 575:25 586:13 591:16 600:12 636:11 647:16 671:23 675:20 711:17
**designated** 671:15
**designee** 599:2 639:21
**detailing** 757:25
**details** 758:14
**determine** 692:15 693:14,17,22 697:16
**determined** 716:25 723:18
**determining** 717:21 723:14
**Dew** 649:20 650:6
**Dew's** 571:3 650:1
**difference** 665:18
**different** 575:25 648:14 677:5 680:5,7 683:19 684:1 685:21 703:18 715:4 721:11,17 728:15 745:7
**difficult** 564:9 678:11 703:5,7 717:6 737:7
**dinner** 736:21
**direct** 701:21 714:12
**directed** 699:24
**Directing** 680:17
**directly** 556:1 564:3, 4 581:16 591:19 603:22 615:16 658:20 662:22 694:24 699:6 702:7 725:22
**disbursed** 661:12
**disclosed** 616:25
**disclosure** 567:14
**discounted** 711:6
**discuss** 564:15 566:8,10,18, 20,25 567:1, 24 568:9,10 630:18 671:14,22 677:7,17 720:3 756:19
**discussed** 563:18,19 661:7 671:20 716:6 756:10 758:24
**discussing** 681:12 733:22
**discussion** 632:12 638:25

723:16 737:4 739:12
**discussions** 638:12 640:15 671:19
**disentangle** 673:6,8,9, 10,18
**disorganization** 741:23
**disorganized** 742:13
**dispute** 679:12 683:24 684:2 687:2,4 690:7 724:8
**distinct** 587:9,11,12 588:1
**distinction** 591:23
**divide** 609:24 610:5 611:1
**division** 693:6
**DOCKET** 548:2
**document** 566:3,6,8, 14,16,20 568:24 569:9,11 596:18 597:12,13 603:3,4,22 604:6 608:10 618:2,3 642:25 643:24 644:12 664:4,5,6,12 679:22 680:10 688:5 695:17,23 696:2,7,14, 18 697:18 698:1,8 712:8,12 718:5,6
**documentation** 620:10
**documented** 601:18 635:22 636:8
**documents** 557:9 567:1, 4 568:9,22 590:19 599:1 600:4 601:6 605:13 620:12 624:3 629:13 635:1 701:4 755:12 757:25 761:11,15,20
**doing** 556:11 592:12 597:13 693:6 698:21 721:8 742:16
**dollar** 695:12
**dollars** 600:7 668:25
**domain** 648:22
**donations** 652:22 653:11,25 654:2,5,10, 15 655:1
**double** 683:9
**doubt** 718:16 740:16,18
**dough** 654:20
**dozen** 589:7
**draft** 715:19
**drafted** 643:2
**draw** 637:23 661:23 662:9,15,19 663:18 664:1,2,16 665:13,15,25 667:11 668:15,21
**drawn** 666:11,25
**draws** 661:8,10,11 662:21 665:10 666:14 667:6
**drew** 663:6 664:12 666:15
**Drive** 553:13
**driving** 698:15,16
**drove** 588:14,16 697:4,10
**due** 646:14 672:23
**duly** 553:16

**E**

**e-mail** 549:5,14,20 567:11 573:21 617:22 677:11,20 678:4,12,18 684:5,13,16, 17 685:5,9, 14 686:11,24 687:4,15,18, 19,23 688:3, 7,11,21 689:5,7,15 690:4 718:6, 7,8,9 736:2
**e-mailed** 567:5,6,8,9 616:24 617:17 696:12 733:6
**e-mails** 690:1 732:16
**e-tran** 551:22,25
**earlier** 558:15 583:21 591:16 593:9 599:19 616:14 618:4 623:8,18 644:11 647:16,19 654:20 655:15 660:25 665:11 671:23 705:3 717:7 724:15 745:25
**earned** 661:15 665:9 699:2
**easier** 596:4
**eastern** 552:10
**eat** 588:21
**economic** 727:7
**editorial** 730:11

**effect**
701:23 711:7
**effective**
604:17,18
**effort**
638:2 673:14
**efforts**
593:15 606:23 607:3 635:6,21,23 636:7 637:4, 5,21 645:12 673:6 678:25
**eight**
670:25
**eight-year**
666:11
**eighth**
698:2
**either**
557:4 571:25 572:21 582:8,9 590:24 632:5 647:11 654:7 660:9 724:13
**elaborate**
745:15
**electronic**
625:6 718:13
**Ellison**
589:22
**else's**
681:7
**employ**
583:7
**employed**
565:4 591:19 593:24 594:16 650:16 679:10
**employee**
591:22 592:10,13 594:4 679:4 684:6,7 689:2 723:2, 6,8 735:6 751:7 757:6, 7
**employees**
583:3,6,9,15 584:20,23 585:4,24 586:1,12 587:13,15 588:4,23 589:11 591:15,19 592:2 593:1, 4,10,20,24 594:6,7 730:17 731:1 732:17 744:8 750:7,8,13, 16 751:6 760:4,9,11, 14
**employing**
592:21
**employment**
650:9 744:10 749:21 750:19,22 751:13
**EMRIC**
548:7,12,17 549:10
**encountered**
699:18,20 700:22 701:18 702:10
**end**
580:25 600:5,7 606:9 607:24 611:12,18 622:12 628:6 637:14,21 638:17,20 639:7,11 640:7 644:20 645:17 655:17 674:21,22, 23,25 737:3 738:23
**ended**
733:19 752:6
**engaged**
583:15 587:24 651:3
**ensuing**
604:12
**entanglement**
606:24 634:2 635:17 636:3,10 673:5 675:20
**entanglements**
636:4 741:12
**enter**
743:23 745:2 747:2 761:23
**entered**
609:5 610:12 644:24 709:9 743:25 744:19 745:12,21 749:10 751:7,14,21 753:21 760:13,22
**enters**
747:15
**entire**
612:4,20 613:1,3 620:19 624:14 678:10 741:24
**entirely**
725:3
**entirety**
624:14 625:2,4 633:6,19 634:1 670:2
**entities**
585:8 588:2 592:3 630:19 652:5 732:2
**entitled**
676:3
**entity**
595:16,18 607:10
**entry**
558:20
**equally**
730:20
**equates**
609:22
**Erica**
548:4 552:11
**ESQ**
549:7,15,21
**essentially**
587:23 681:23 684:22 734:10,25
**established**
620:5
**estate**
597:25 598:1,12,13, 17 599:7 602:8
**estates**
598:18
**estimate**
716:11
**estimated**
716:12
**estimates**
717:5 755:23
**estimation**
716:10 717:5
**estimations**
716:10 717:2 723:2
**et al**
548:4,7,12, 14,17

**everybody** 551:5 591:3 740:4 762:2
**everything's** 742:18
**exact** 558:5
**exactly** 561:15 562:10 564:21 635:2 642:10 759:23
**exaggerate** 719:15
**exaggeration** 719:16
**EXAMINATION** 554:6 714:6 731:7 739:10 743:21 757:5 760:1
**examine** 696:14
**examined** 553:19
**examples** 636:10 745:16 748:23 749:22 750:5
**excellent** 742:23
**exception** 710:12 711:4
**excess** 740:17
**exchange** 733:22 759:18
**exchanged** 649:20 706:10,11,12
**excluding** 662:19
**execute** 648:16
**executed** 582:1 610:3 635:6,16 637:20,24 643:24 673:11 674:4 676:17
**executing** 673:17
**execution** 641:9
**exercised** 595:14 730:11
**exhibit** 554:15,19,23 580:18 608:2 617:10,12 623:13 660:23 677:8 679:20 688:19 691:2 702:15 705:3 737:15,16,23 738:1 739:3, 4
**Exhibits** 599:19
**exist** 601:6 743:4, 6,7,8 746:19 748:9,14 757:24
**existed** 709:20 760:8
**existence** 568:15 600:2
**exists** 574:11 654:13
**exit** 703:18
**expect** 573:13 605:1
**expectation** 707:7,8
**expected** 590:25
**expenses** 564:5
**experience** 755:23
**expires** 610:10
**explain** 554:24 560:2 561:10 562:3,8 563:1,5 661:6 686:17
**explained** 560:7 563:12,17
**explaining** 557:19 608:5 692:19 703:17,20
**explanation** 660:7
**expressly** 712:21
**extent** 588:3 697:21

**F**

**Facebook** 680:25 701:2,5
**facility** 586:18,19 590:12
**fact** 582:9 590:23 593:10 618:14 638:6 641:23 655:7 663:25 664:5 665:17 675:21 676:25 680:14 687:17 722:12 729:19 735:15 740:19 747:14
**facts** 618:15
**factual** 618:17,20
**failed** 553:20
**failure** 646:3
**fair** 594:14 664:9 679:11 683:3 693:25 694:6 715:7 742:1, 15 751:11 756:18
**Fairfield** 548:22 549:3
**Falzarano** 680:6
**familiar** 574:6 596:18
**familiarize** 677:13
**family** 736:22 738:24
**far** 562:18 571:19 588:10,11 593:18 594:18,20 612:17 659:18,19,20 669:7 678:12 687:6 688:15 694:19 699:7 719:9,25 735:3 746:1
**FBI** 698:5

**February**
733:12
735:15
736:12 738:5
**federal**
663:12,17
664:1,15,23
**fee**
572:16
**feel**
622:1
**fees**
711:22
712:16
**figure**
610:25
622:13
673:8,12
691:20,22,25
695:12
736:1,3
738:9
**figures**
661:9,24
712:3
**file**
657:15
737:17 738:2
739:5
**filed**
656:16,23
657:1,5
670:22
**fill**
569:11
**filled**
750:20
**final**
660:17
**finalized**
660:15
**Finally**
688:18
**finances**
592:24
**financial**
555:10
559:16,20,25
591:1 593:14
606:24 634:2
635:17
636:2,3
671:16
673:4,18
741:11 742:7
**financially**
552:16
**find**
596:7 724:9
736:7 739:1
743:3 747:8,
12
**fine**
551:25 666:1
728:23 730:8
749:16
**finish**
558:13
560:16
561:21,24
587:3
**finished**
572:24 573:2
**firearm**
689:11
**firearms**
689:22
**first**
549:13
553:16
555:12,15
567:3 570:15
574:6 595:14
600:5,6
603:11
607:23
608:8,13
622:5,13
635:5,15
637:13
638:16,17,21
639:4,7
640:6,21,25
641:1 645:16
650:6 672:21
673:1,7
675:5 676:17
691:4 697:8
698:21
714:10,23
715:14,18
716:5,6
736:11
745:10
**five**
598:1 614:22
**flat**
572:9,16
**Floor**
549:13 641:6
**Flores**
675:17
**flow**
616:20
618:25
619:1,9
620:20
**flowchart**
596:3
613:20,21
614:10,14
**flowing**
613:24
614:5,7
616:9,16,19
620:1,5
**flows**
613:15
615:21
619:16
**fly-by-the-seat-of-your-pants**
742:12
**fly-by-the-seat-your-pants**
741:15
**FM**
688:12
**focus**
735:14
**focused**
612:12
613:23 631:1
742:1
**follow**
743:18
**following**
676:16
693:25
**follows**
553:19
**food**
574:18,19,24
575:1
**force**
591:22
592:10,13
594:4,11
**foreclosed**
672:18
**forgot**
736:23
**fork**
594:14
**form**
550:16 554:2
578:10
587:19 744:7
759:16
**format**
680:5,7
**formation**
603:4
**formed**
591:22
592:11
595:4,14
596:1 597:16
599:6 600:3
601:10
602:19
**forms**
669:14
750:21
**formula**
707:19
710:25 712:5

713:4
**formulate** 598:17 689:9
**formulated** 598:5
**forth** 609:23 655:8 663:11
**forward** 599:8 618:24 619:6 673:21 674:14,18 675:2,9 738:17 739:1
**four** 598:2 683:10,14
**fraction** 692:23
**frame** 693:10 704:21
**free** 549:10 555:7,9 557:10 559:11,21 560:4,20 561:7,12 563:11,22 564:16,20,22 565:2,5 566:11,23 572:4 573:25 574:3,12 575:2,5,13, 19,22,23 576:8,13,19, 23 577:2,6, 10,12,18,21 578:3 579:1, 2 580:23 581:1,15,17, 22 582:8,11, 15,18,22 583:2,9,15 584:6,14 585:4 586:1, 7,21,25 587:4,10,15, 22 588:3,11, 12 589:10 590:6,17,23 591:23 592:5,12 593:4,23 594:1,9,14 596:19 600:16 606:6,14,16, 18 607:7,8, 12,13,15,19 608:9,11 609:4 610:11 611:4,13 612:3,6,17, 19,23 613:2, 9 615:15 616:17 618:15,18, 21,22 619:7, 11,13 620:3 621:9,18,22 622:5,11,16 623:21 624:9,13,21 625:1,5,10, 14,18 626:4, 10,11,18,20 627:15,17, 20,23 628:1, 8,9,13,18, 22,25 629:5, 7,22 630:2, 8,11,20 631:4,5,7, 12,15,16,20 632:2,13 633:11,17, 21,22 634:4, 7,12,20,21 635:6,7 636:3 637:3, 5 638:6,10, 12,25 639:15,21 640:2,14,16 641:2,10,15, 20 642:1,6, 12,13,16,21, 24 643:15 644:12,15, 16,24 645:6, 23 646:6,17, 18 647:6,21 648:2 650:1, 12,16,22 651:2,5 652:3,21 653:10,14, 16,25 654:6, 9,18,23 655:6,10,18 656:2,3,10, 19 657:1,6, 11 660:8 662:22 663:24 665:7,20,22 666:5 667:10,14, 19,21,23,24 668:5,14,20, 23,24 669:7, 16,19,20,22 670:8,11,13, 21 671:2,6, 24 672:3,21 673:19 674:3,9,19 675:5,21,25 676:1,7,18 677:7 678:1, 8,21 679:11, 18 680:11,13 681:24 682:3 683:23 684:12 685:14 686:10,11,23 687:6 688:11,15 689:1,17,19 690:5,15,20 692:1,8 698:22 699:1 700:2,7,16, 20 701:12,17 702:9,11 704:16,17 705:4,7,8,9, 11,13,25 706:6,9,14, 17,19 707:3, 4,14,15 708:1,4,7, 11,16,18 709:7,8,18, 24 710:7 711:1,10,22 712:5,15 717:7 718:2 719:1 720:2 721:2,19 722:2 723:12 724:24 725:4 726:10,12, 13,21,25 727:9,15,18, 22,25 728:9 729:7,16 730:11,14 731:12,13, 20,22,25 732:4,6,10, 12,17 739:19 740:11 741:7,13,25 743:9,23,25 744:19 745:2,12,19 746:17 747:2,15,21 748:17 749:9,25 750:8,15 751:5,14,21 752:1,15 753:1,20 755:13 757:7,12,18 758:1,4,9, 16,23 759:10 760:4,9,14, 21

**freeworldoutlet.com**
576:21,25
**Friday**
558:25
**friends**
728:21
**front**
556:2 562:12 623:11 640:23 677:10 684:5 737:9 738:22
**Frost**
690:17,21
**Fruge**
589:24 652:5
**Fruge's**
650:12
**FSS**
703:1,10
**fulfill**
584:9 585:5 591:4
**fulfilling**
585:22 594:4
**fulfillment**
580:22 581:2 583:23 584:3,21 585:9 586:13 587:14 591:15,18 594:3
**fulfills**
583:25
**full**
631:17 637:6 645:7
**function**
585:5,6 587:24 589:1 685:6,7
**functioning**
741:19
**fund**
603:6 653:12,17 654:2,10
**funded**
599:12,13 601:10
**future**
674:15

**G**

**gained**
667:22,23
**gathered**
567:14
**gave**
556:23 586:3 660:7 669:10 703:12 745:16
**general**
560:6 564:1, 10 620:9 655:20 666:14 667:1 668:5,10,13 672:2,8,22 673:2 702:4 707:3 708:15,18 727:13 731:22 747:5
**generally**
583:25 717:15
**generate**
606:2
**generated**
612:13 642:25 643:1 692:16 693:15,17 696:22 708:17
**generating**
606:3,4,5 615:3
**Genesis**
549:17 551:14 714:8 723:3,6,9,13 724:14,20,23 725:4,12,18, 20 726:1,8, 20,21 727:1, 9,15,17 728:6 729:8, 17 730:2,21, 22 731:2 740:10,11 757:19,25 758:24 759:10
**gentleman**
559:4
**gentlemen**
682:8
**getting**
579:13 628:13 631:11 683:4,7 700:16 733:22 734:13
**give**
556:9 558:24 561:1 595:5, 13 618:13 622:7 649:9, 23 696:9 721:1 728:4 743:24 744:17 745:3,10,19 748:21 749:8,15 750:14 751:7,20 753:19
**given**
564:23 579:1 599:24 620:23 627:17,18 705:5,10,21 708:20 720:4 748:4,23 749:17,21,22 751:5 762:5
**Givesendgo**
653:6
**giving**
572:20
**gleaned**
668:4 686:20
**gleaning**
684:15,17
**global**
695:1
**goes**
585:22 593:19 600:5 678:12 683:16 732:22
**going**
551:1 555:2 559:17 560:1,2 561:23 574:5 579:6 581:5, 9 587:18 593:23 594:19 596:7,22 599:8 612:24 613:3 618:24 620:11 628:14 638:21 639:16 640:25 649:7 650:6 658:10 673:12,21 675:9 680:18 682:5,7 698:14 713:10,18 714:3 730:24 734:14 740:3 745:14 749:14,15

761:22,23,24
**good**
554:7,8 649:3 650:15 710:14 726:19 741:10 742:14,24 743:1
**goodness**
714:4
**goods**
646:4
**Google**
695:7,9,22 696:2 697:12 703:20,22 704:8 721:11
**governing**
732:11 753:1,15
**grab**
733:9 735:20 738:5
**grabs**
733:6
**graces**
650:15
**grade**
671:18
**graduation**
715:6,11
**great**
558:23 562:7,16 715:12 759:15
**growing**
741:14
**guess**
579:12 596:16 625:16 629:11 672:25 675:4 701:1 719:10 730:7 744:23
756:18

**H**

**half**
589:6 652:9 682:9,17 683:9 737:2
**hand**
556:3
**handed**
554:14
**handle**
584:21,23 585:24 586:23 587:23
**handled**
579:1,11 642:2 690:20
**handles**
577:25 578:24 583:21 584:3,11 628:6
**handling**
579:3,7 581:2
**handwriting**
703:4
**handwritten**
555:23 569:18 690:25
**hang**
599:15,25 600:10 608:18 618:11 625:25 627:1,22 629:24 636:24 661:21 706:7 709:5
**Hanson**
685:4
**happen**
759:19
**happened**
558:6 592:25 593:21 634:6
**happening**
558:7 611:11 638:23 640:10 706:24,25
**hard**
614:12 696:10 723:23
**Hartford**
549:19
**Haven**
549:13
**he'll**
742:9,10
**head**
629:9 636:13 653:2 690:10
**headed**
555:13
**header**
556:19
**HEALTH**
549:11
**hear**
612:16
**heard**
687:10
**hears**
697:6
**held**
548:2 552:5 597:2,18 601:15,23
**help**
594:23,25 597:14 617:2 664:6 703:15
**helpful**
580:16
624:20
**helps**
585:20
**Henry**
689:10,13,18 690:8
**hereto**
550:4,10,15, 20
**Hey**
627:25 736:20
**hierarchical**
634:3 741:13
**hierarchy**
740:1 747:6
**hired**
592:2 750:20
**hires**
760:23
**hiring**
760:13
**historically**
742:6
**hold**
595:22 598:20 673:23 737:14
**holdings**
574:7 596:24 597:2,7,17 641:4,13
**home**
648:7,9 697:8,11
**homicides**
698:6
**honest**
576:15 603:7 605:17 726:8 728:3
**honestly**
555:25 636:1 662:2 708:14
**honesty**
573:16

**Hook**
677:18,23 692:1,9,10 694:25 695:4,11 696:20,24 697:6,19 698:10 699:3,18,21 700:3,12,19, 22 701:13 702:7,10
**hoping**
689:18
**hosts**
575:16
**hour**
565:22 652:9 737:2
**hours**
588:19 650:8 683:14 698:13
**house**
584:8
**housed**
588:11,12
**houses**
574:12 583:24
**housing**
625:22
**huge**
683:18
**hundred**
650:4
**hundreds**
697:13

**I**

**icon**
688:10
**idea**
603:1 693:10 704:25 716:24 725:15,23
**ideas**
736:25
**identification**
554:20 617:11,13 738:2 739:5
**identified**
668:13 697:20 755:16
**identify**
551:6 566:13 608:19 747:20 751:11,16 757:6,12
**identities**
562:20
**III**
548:3
**immediately**
611:5
**important**
630:17
**impression**
614:15
**impressions**
701:5
**include**
682:21
**included**
563:25 567:12 661:23 662:8 663:4,18 664:1,15 665:13,25 666:22 672:8 700:12 705:6 713:5
**includes**
668:21
**including**
661:13,15,16 662:23 665:14 682:1
**income**
605:25 606:2,3,4,5 611:22,24 612:12,16 613:15,19,24 614:5 615:3, 5,6,10,12, 14,16,18,20 616:8,12,16, 18 618:5,19 619:1,8,10, 12,15,20 620:4,10,11, 21,25 662:24 667:17,19 669:15,19 670:21 671:3,7 690:12 694:3 696:22 713:2 755:12
**Incorporated**
551:15 714:9
**incredulous**
743:8
**indeed**
686:25
**independent**
581:20 650:10 668:9
**indicate**
555:13 556:11,20 561:15 590:19 591:8,9 663:17 691:14
**indicated**
558:15 559:15 640:1 676:5 716:9 718:2
**indicates**
596:24 623:24 624:4 688:10
**indicating**
672:7 692:23
**indication**
721:1
**indications**
671:25
**indirect**
605:9
**indirectly**
604:13
**individual**
551:11 560:14 686:25 732:18
**industry**
716:25 717:11,15,16 722:22 756:21
**infer**
618:16
**inference**
638:1
**inferences**
637:23 639:20
**information**
555:17 556:5,9,14, 16 557:3,13 559:14 560:1,6,10, 18 561:2,6 563:5,13,22, 25 564:1,23 565:10 571:20 587:8 656:9,12 657:10,25 658:8,15,21, 24 659:8 660:4 665:12 669:10,13,21 670:3 679:15 684:21

685:16 686:16,18,20 687:7 690:23 703:12 718:18,20,25 719:1,6 735:2 756:5, 10

**informed**
560:25 565:8 587:12 592:11

**informs**
678:1

**Infowars**
549:10,11 575:9,16 653:17 654:15 679:4 684:6,7 691:22 701:7,11,19, 21 704:8

**Infowars.com**
575:14,20, 22,23 576:1 578:5 627:9 647:25 648:10 696:20 697:20 698:3

**Infowars.com.**
575:7

**infowarsshop.com**
576:12,18 577:12 578:9,20 579:9 580:8 581:25 582:14 583:1 627:3 699:16

**infowarsshop.com.**
581:12

**infowarsstore.com**
577:12 578:8,19 579:8 580:8 581:12,25 582:13 583:1 627:3 699:16

**initial**
568:13

**initially**
581:6 708:11

**initiated**
606:16

**initiation**
594:2 606:15 611:22

**inquire**
731:14

**inquiry**
715:17

**instructed**
657:21,24 660:3

**instrument**
557:10 603:1 605:12 647:7,10

**integrated**
720:14

**intend**
736:16

**intended**
735:3

**intention**
592:23

**inter**
580:18

**interacted**
715:7

**interactions**
741:16

**intercompany**
580:13 623:7

**interest**
590:7,9,20, 24 591:10 595:15,21 597:3,18 604:12,21 605:9 607:25 608:23 609:8,9,14, 22,23 610:14 620:24,25 632:17,20 633:14 643:13 644:1 646:10 726:15

**interested**
552:17

**interferes**
742:16

**internal**
584:25 585:2,14,18 671:19 681:4 731:3

**internet**
682:21 683:17

**interpret**
664:4 703:4, 6

**interrupt**
617:16 645:4

**interview**
555:14,18 556:6 557:4

**interviewing**
740:3

**introduce**
589:17,18

**introduced**
589:14

**intuit**
618:16

**intuiting**
747:13

**invoice**
573:19 625:6 626:12 631:2 675:8 708:8, 17

**invoiced**
573:21 625:8,9,19 633:23 673:22 674:16

**invoices**
619:8 625:10,14 630:22 636:15,17 674:20 675:6 676:10 707:10,14 709:24 710:2,5

**invoicing**
626:11 627:20 628:23 629:7 630:10 631:15 636:6

**involved**
565:17 583:3,10 586:9 588:2, 4 652:5 689:5 718:10 731:2 742:6

**involvement**
565:14 586:25 587:4 621:11,19 755:22

**involves**
585:10

**involving**
559:3 642:8

**IOU**
706:2

**iphone**
733:9

**issue**
662:11 695:21 700:16 715:18

**issues**
559:25 560:19 561:2

562:8 630:18 734:14 741:11 743:2 761:18
**item**
563:6 564:15 585:16 699:13
**itemized**
556:13
**items**
630:9 691:24 704:6
**IW**
618:2

**J**

**Jacqueline**
732:21
**James**
723:6
**January**
645:5,24 646:3 675:4 677:20 678:5 679:3,12
**Jay**
732:18,19, 20,21,22
**Jim**
677:16
**job**
737:7
**Joe**
552:13
**John**
677:14 679:4 685:4 718:5
**John@ infowars.com**
677:14
**joined**
551:8
**Jones**
548:7,12,17 549:10 551:15,18 552:12 553:5 554:3 555:3 563:15,16 587:17,20 595:14 597:8,18 599:3,5 603:20,22 604:2,3,13, 19,21 605:5, 8,18,24 610:2 615:9, 10,17,18 616:8 618:21 619:20 620:17,18,24 621:10,19,23 632:13,16, 19,20,24,25 633:9,11,20 635:11,12 641:9,12 642:2,13 643:6,24,25 646:17,18 647:1,6 651:1 653:11 654:14,24 655:19 656:5,22 657:7 658:8, 15 659:22 661:13,14,16 662:5 663:5, 7 664:11 665:8,22 666:25 667:9,14,24 668:14,24 669:5,15 670:12 673:16 677:17 679:7,12,17 680:2,14,21, 24 681:3,5, 12,19,23 682:7 683:3 685:10 686:1,5 687:1 690:2, 19 696:23 697:1 699:7 717:19,20 718:4 719:1 726:10,13,14 727:10,18,23 728:9,18,20 732:18 733:4,12,17, 22 734:1,19 735:1,19 739:24 740:12 742:1 743:10 756:7 757:18
**Jones'**
560:9 647:13 657:22 663:11
**Jones's**
561:5,12 562:4 565:14 570:25 571:6 595:10 597:25 598:12 603:20 615:6 653:21 655:11 659:9 660:25 663:17 666:4 669:21 670:6,17,22 671:1 683:24 689:23 690:9 742:15
**Joseph**
549:24
**JPEGS**
733:10
**Judge**
582:6
**June**
548:25 552:9 558:16,18,25 560:24 680:1,14 683:25

**K**

**keep**
596:22 682:5 695:20
**Kelly**
563:16 661:13,16 662:23 663:1,7 681:1,14
**KENNETH**
549:21
**kept**
761:10
**kind**
560:11 569:9 586:12 597:14 614:19 630:17 635:20 639:8,20,22 650:14 716:19 739:25 741:15 743:7 750:20 752:23
**knew**
558:7 714:12
**know**
554:15,16 556:2,8 561:8,9 562:25 564:21 565:4 570:7,14,15, 17 571:23 573:15 574:20 575:3 576:5,10,13, 18 577:5,9, 19,22,24

581:6,18,19, 23 582:9,16, 19,21 583:8, 17,18,24 584:17,18,25 585:2,13,19, 20,21 586:9, 14,22,23 589:3,18 590:4,5,13 591:11 592:14,15 593:4,5,18, 19,25 594:10,18 595:6 596:5 597:16 598:25 599:2 601:20,24 602:3,5,8,20 603:8 606:24 609:19 610:4,5,16, 24 611:6,16, 17,18,21 613:17 614:12 616:14,15 621:2,6,10, 16,22,24 622:1,18 624:2,12,17 625:3,16,24 627:4,5 628:20 630:16 631:15,22, 23,24,25 632:9,10,11 633:2,3,4,24 634:5,6,11, 17 635:25 636:1,12 638:8,20 639:2,17,18, 24 640:9,11, 18 641:19 642:4,15,19, 23 643:4,11, 19 644:19, 20,21 647:8, 11,14,15 648:21,22 649:25 650:9 651:12,22 652:6 653:1, 4,5,7,8,18 654:7,21 656:19,24 657:8,10,12, 24 665:3,11 666:21,25 667:18 669:18 670:6,8,10 671:9 673:3, 24 675:7 676:11,25 677:1,3 678:6,24 684:15 685:2 687:23 688:2 689:12 690:8,10 691:22 693:3 695:17 696:3 697:3 698:2, 12,24 699:22,23 700:1 701:23 702:1,2 704:5,23 705:1,14 706:8,22,24 707:6 708:2, 14,15 709:10 711:4,14 712:7 713:6, 7,10 714:7, 10 716:16, 18,19,24 717:10,17 719:9,13,14, 18,20,23 722:16,21 723:11,17 724:13,23 725:12,18, 20,23,25 726:4,6,8,22 727:1,4,6,7, 16,21,25 728:2,4,6,7, 14,17,19,20, 22,24,25 729:3,4,7, 10,17,23 730:2,9,10 731:9,21 732:25 733:24 734:17,22,24 735:6 736:24 737:1 741:8, 14 742:7,21, 22,23 743:3 744:4,6,23 746:5,8,9, 10,12 748:12,25 751:9 752:5, 18 753:14,16 754:6,7,22, 24 755:3,11 757:11,17,24 758:14 759:14 760:19,24 761:2

**knowing**
701:18

**knowledge**
664:7 723:3 726:16,17 740:13,14,21

**Koskoff**
548:21,22 549:3

**L**

**labeled**
585:17

**labels**
589:5

**lack**
740:1 741:12,23

**Ladies**
682:8

**Lafferty**
548:4 552:11

**Lamar**
641:3

**landing**
697:12,14,15 698:3

**large**
725:18

**late**
600:19 731:9 733:13

**law**
598:18,23 714:13

**lawsuit**
594:3 721:4

**Lawyers**
715:17

**leases**
584:18 586:18

**ledger**
560:6 564:1, 10 622:18,21 655:20 667:1,6 672:2,8,19, 22 673:2 705:1 707:3, 11,12 708:15,18 749:24 751:25

**ledgers**
622:17 666:15 668:5,6,10, 13 672:8 676:4 709:2, 13,19,20 710:1 727:13

**left** 693:4 735:19
**legal** 552:14,19 652:23 653:17 654:9,11 715:21
**legers** 709:4
**LEWIS** 549:18
**liability** 641:3,5 663:11,20 672:23
**license** 548:24
**life** 589:15
**likes** 692:15
**limited** 574:7 641:3, 4,5,13
**line** 691:4 741:21
**lines** 703:3
**lingering** 568:11
**link** 575:8,9,10, 16,25 627:7, 11 647:22 648:4 692:10 696:19 699:6,10,12 700:1 701:21 702:3,6,13 723:18 724:3
**link's** 701:24
**linked** 584:6 647:24 697:9
**links** 576:2 647:21 687:23 688:2 692:16 693:15
**Lisa@ everydaymedia** 689:8
**list** 556:13 698:13 717:4
**listed** 630:5,6 655:2 661:8, 23 662:16 663:1 664:11,20,21 665:12 667:1 668:18 671:16 678:23 713:2
**listen** 678:8,9 717:8
**listener** 678:3,15 679:14
**listeners** 682:13,17 683:5,8 686:12,14 687:1 688:12 690:3 725:22
**listening** 678:10
**listing** 596:22
**lists** 695:11
**literally** 685:22
**litigation** 548:2 622:16 649:21 654:12 708:25 720:12 743:3
**little** 562:17 568:18 593:17 596:22 603:25 628:10,11 652:11 680:18 682:5 689:25 736:25 742:13
**live** 682:21 683:17
**LLC** 549:10,11, 12,18 574:7 597:2 641:2, 5,13 643:20
**located** 552:14
**logged** 720:11
**long** 565:21 569:5 573:3 592:20 597:22 704:6 740:8
**longer** 586:10 713:18
**look** 558:19 566:13 578:25 581:7 582:4 600:4 613:16 614:10,13,14 653:19 663:23 678:14 687:15 688:21 691:13 697:11 702:24 703:21 705:4 708:14 715:20 732:15 738:16 742:9
**looked** 599:19 658:3 710:3
**looking** 580:12 581:7,19 614:12 618:20 619:3 623:7 629:12,15 630:13 639:14 644:11 690:1 693:3,12 699:14 705:3 712:12 717:12 726:18 738:25
**looks** 555:12 608:13 678:12 681:2 682:15,23 684:24 686:20 689:5,9,11, 13 735:22
**lose** 713:23
**loss** 676:5,6,7
**lot** 561:24 634:2,4 635:16 650:14 673:4 697:2 714:11 719:24 725:19 735:9 741:11 742:22,23 743:2

  **low**
742:10
**lunch**
588:20,22 589:8 649:8 651:13 652:8 733:13,18,23 734:13 738:16,25
**Lydia**
708:3

**M**

**made**
564:5 576:3 585:23 593:15 606:23 607:3 611:17,18 612:2 619:15 620:2 631:20 633:22 635:7,21 636:7 638:2 641:1 645:13 651:23 653:25 663:19 672:17 674:11 675:12 677:2 678:25 694:24 727:14,15 748:17 750:1 753:9,16 754:18
**mail**
589:3 734:10
**maintain**
591:23 594:10
**maintained**
594:3
**majority**
632:20,22,25 731:23
**make**
551:4 558:9 561:2 564:17,25 578:11 580:10 593:15 606:23,25 607:9 609:13 614:14 617:19 618:14 621:17 635:21 636:7 637:5 660:16 664:22 675:3,6,8 676:15 696:1 700:17 731:15 734:16,19 735:2 742:17 749:4 752:22,24 758:13
**makes**
566:11 596:4 688:8 717:2
**making**
611:4 612:5, 19,23 613:2, 10 616:17 637:21 638:1 644:16 672:9 673:21 674:15 675:11 676:20 723:10 730:24 752:3,5,15
**man**
589:14
**manage**
591:15 592:1,13
**management**
731:19 732:6
**manager**
589:2 643:9, 12
**managing**
587:5 641:20
**manufacturer**
689:10
**March**
554:11,12 555:14 571:10,11,12
**Mario**
549:21 551:13 553:8 713:12,21 714:7 739:8 746:20
**Mark**
555:8 557:16 559:4 560:13 562:22 752:11,12,14
**marked**
554:15,20 617:7,11,13 738:2 739:5
**market**
703:11
**marketing**
555:6,16 556:4 562:21 563:11 651:17 689:6 694:20 702:25 705:6 719:25 720:6,10,14 744:4,6 746:6 749:23 751:18
**marks**
691:7
**material**
699:18,21,25 701:19 734:24 743:4
**materials**
589:17
**math**
604:23,24,25 644:3
**Mattei**
549:7 551:7, 22 552:24 553:22 554:6,22 566:2 567:10,16 596:11,13 614:24 615:2,24 616:6 617:3, 9,14,23,25 618:1 623:13,16 624:7,8 646:22 649:5,11 652:8,20 684:3,4 687:11,12 688:18,20 690:24 691:1 695:16,19,25 702:20 710:16,22 712:8,13,19 713:9,15,20 714:1 716:21 719:4,11 720:17 721:5,21 722:4,18,23 723:4,20 724:10,16, 19,21 726:2 727:11 731:6,7 732:23 733:2 735:23 737:22 738:3,20 739:3,6,17, 21 740:24 741:5 742:3,

19 743:19,21 746:15,20, 23,24 748:20 749:7 751:1 753:18 755:2,8 756:4 757:2, 20 758:10,18 759:12,21 760:1 761:4, 9,22 762:1

**matter**
552:11 700:8 713:23 759:19 761:16

**MATTIE**
737:20

**maximize**
700:8

**mblumenthal@ koskoff.com**
549:6

**mcerame@ brignole.com**
549:20

**mean**
562:22 579:6 584:20,25 585:13,14 588:12 590:9,10,14 592:3 593:13,14 594:1 598:13,14, 15,17 602:7 609:24 611:24 612:2 613:21 620:2,4 621:2,3 624:11 629:15 632:9 633:25 635:19 636:5 637:19 642:18 643:1 650:24 651:1,8,20 655:20 660:12,21 663:12 666:1,10 667:2 672:5, 24 673:20 675:7,13 676:21 684:18 695:10 697:2 700:5 704:19 705:14 706:5,8 709:16 721:7 724:3,9 728:10 730:13 735:7 748:9 751:3 756:12,15

**meaning**
634:24,25 645:5 734:19

**means**
605:22 640:9 664:2

**meant**
553:23 609:17

**measuring**
756:22

**media**
700:4,9,22 701:12,19 718:13

**meet**
589:16 733:24 734:13 735:16

**meeting**
560:24 565:21 568:2,4 671:12 737:1

**Megyn**
680:25 681:14

**Melinda**
675:16,17

**member**
641:20 701:11 715:16

**memo**
734:1,4 735:19 757:18,22,23

**men**
748:8

**mentioned**
635:13 674:2 719:19

**Merchandise**
574:21

**message**
732:18 733:5 735:20

**messages**
732:15,24 733:3 735:15

**met**
572:7 590:2 671:4 694:14 735:9

**meta**
688:5

**method**
706:20 716:20

**methodology**
716:16 717:11,12

**methods**
721:11

**Michael**
680:24

**Midas**
728:15

**middle**
703:24

**million**
600:7 608:14,22 609:5 610:13 622:12 634:13 636:16,19, 20,23 638:22 639:12 642:8 644:8 645:20,25 653:24 654:19 662:8 663:1,3,4,5, 7 664:12,17, 20,23 666:11,17 676:24 678:3,17 679:14 681:6,7,8,9, 16,20,24 682:13,16 683:4,7,13, 19,20 684:1 686:12,14,25 688:12 690:3 691:15 692:23,25 693:9 716:13

**mind**
587:25 715:1 732:24

**mindful**
618:14

**Minimally**
726:24

**minus**
630:24 665:1

**minute**
588:10 677:12 684:9 685:11 750:6

**minutes**
569:6 652:10 714:4

**mislead**
593:5

**misstate**
614:13

**mm-hm** 580:2 613:12 626:15 629:17 632:7 637:2 648:8 675:15 691:3 751:19 759:2
**moment** 575:4 662:15 669:9 726:21
**Monday** 548:25 552:9 568:7
**money** 579:23 580:1,3 581:1,5 613:13,14 619:25 627:14 630:1 632:15 633:23 634:22 639:15 653:14,16 672:2,9 673:12 675:21 676:1,3,9 691:25 694:24 705:7,8 706:10,11,12 707:4,11 712:2 742:10 752:24
**monies** 644:12 662:23 759:18
**month** 677:23 704:17,22, 23,24
**monthly** 609:13,15,17 629:4 703:10 704:22 706:25
**morning** 554:7,8
**mother** 603:20
**motions** 715:20
**motivated** 607:15
**Move** 749:5
**moved** 555:3
**moving** 619:5 674:14,18 675:2 677:4
**multiple** 691:10
**mutual** 715:13

**N**

**name** 552:13 565:5 576:5 585:20 586:15 589:15,19 647:20 648:22 691:5 714:7
**named** 559:4 732:18
**names** 589:18
**narrow** 654:8 678:11 697:4
**nationwide** 678:2 679:13
**nature** 636:2 651:6
**necessarily** 712:23 753:13
**need** 572:22 595:5 660:15 665:16 695:19 735:23 741:18 742:9 744:13 746:2
**needed** 555:4 572:14 606:22 721:9,15 743:15
**needs** 684:10
**negative** 676:16 748:4,6,7
**negotiate** 573:13 638:7
**negotiated** 647:6
**negotiation** 642:22 647:10
**negotiations** 639:22 640:15 642:2,14,17
**neighs** 654:20
**net** 580:22
**Network** 549:17 551:14 714:8 723:3,13 724:14,24 725:5,13,21 726:1 727:18 729:8,18 730:3,21 740:11,12 757:19 758:1,24 759:10
**Nevada** 641:5
**never** 593:24 597:11 635:11 706:12 715:21 720:9,14 741:18
**news** 682:10
**newsletter** 721:12
**Newtown** 698:6
**night** 736:22
**non-disclosure** 760:12,22
**nonetheless** 722:11
**noon** 737:9 738:22
**Norm** 714:12 737:1,5,8 738:21
**Norm's** 617:19
**normal** 743:5
**Notary** 548:24 553:17
**notation** 555:14
**note** 566:4,15 599:13,22 600:5,6,7,8 601:20 602:11,12,13 603:8 607:21,22, 23,24 608:13 609:5,14,23

610:3,7,8, 12,17 611:5 612:25 622:13 635:5,15 636:22,23 637:13,16,20 638:16,17,21 639:5,7,11 640:6,21 641:1,8 644:5,7,17, 22,23,25 645:6,16,21 647:4 674:2, 22,23,24 676:15,17 690:25 693:12 696:1 702:25 756:3 761:24

**notes**
554:13,21,25 555:10,20, 22,23 556:10 557:3,7,8,20 565:23 566:10 568:10,15, 20,21,23,25 569:2,9,10, 13,15,18 570:10 599:16,24 600:2,22,24, 25 601:5 606:6 607:18 608:3,6 610:20,21 616:18 618:23 619:5 634:23,24 635:2,9 637:1,8,9, 12,24 640:20 672:6 673:11,17,20 674:5 676:21 690:25 691:8 694:11,13 696:1,4 704:19 714:5 726:18 731:10 732:9,13 747:11

**notice**
548:21 550:11 555:2 561:15 562:9 585:11 653:19,21 659:21 671:17 678:23 720:4

**noticed**
559:23 560:3 634:1 672:25 751:25

**notwithstandi ng**
722:11 740:19

**November**
566:15 599:22 606:10,11 607:14 611:15,23 612:18 614:1 615:5 616:13 644:23,25 645:6 646:10,14 674:10 676:20 677:1 689:1 690:6 731:12

**npattis@ pattisandsmit h.com**
549:14

**number**
604:17 607:20 609:20 610:2 623:13 651:3 662:9 664:16 666:25 667:6 672:8,12,15, 19,20 680:9 696:18 705:3 716:17,20 717:14,15 718:13,16, 19,21 719:9 723:25 724:1,4 737:24 759:15

**numbered**
565:25

**numbers**
561:15 604:22 619:25 644:14 655:16,17, 23,24 656:14 657:15 658:4,24 660:14,17 665:25 666:21 667:5 672:6 709:12 719:7,13,16, 17 724:8,12

**numerous**
724:1

**nutritional**
574:15

**O**

**oath**
553:1 582:12 657:12 665:16,20 745:20 749:9

**object**
578:10

**objection**
716:21 719:4,11 720:17 721:5,21 722:4,18,23 723:4,20 724:10,16 726:2 727:11 739:17,21 740:24 741:5 742:3,19 744:20 745:5,14,15, 22 746:14 747:17,23 748:1,10,19 749:5,11,19 750:10,25 753:11,17 754:4,10 755:7 756:1, 8,13 757:1, 20 758:10,18 759:12,21 760:5,15,25

**objections**
550:11,16 554:1

**obligations**
608:11

**observed**
554:13 588:24

**observing**
551:10

**obtain**
557:13

**obtained**
555:17 556:5,14 557:3 735:2

**obviously**
574:6 593:14 595:8 636:13 642:7 653:10 655:18 660:13 700:7 709:16 750:4

**occur**
578:19,22

**occurred**
642:17 706:20,22 709:9
**occurring**
578:8 706:23
**odd**
614:8
**offer**
692:12
**offered**
715:21
**offers**
711:11,12
**office**
617:5,17,19
**offices**
548:21
**official**
550:5 643:20
**oftentimes**
642:9
**okay**
558:2 559:2, 13,19 560:17 561:25 562:7 563:9 564:14 565:20 568:3 569:7,19 570:3 571:13,18 572:10,25 573:9 575:18 576:7,11 577:20 578:1,15 579:19 580:15 581:10,21 583:19 584:1,12,19 585:3 586:6, 16,24 589:9 590:3,21 591:13,20 592:16 594:12,22 595:7 596:1, 19 598:22 599:2 601:1, 17,21 602:22 603:10 605:1 607:6 610:9 611:7 617:3, 9 619:23 620:14 623:2 624:19 627:13 629:18,19 630:14 631:9 633:20 637:25 641:18,22 643:5,14,22 644:22 648:12 649:2 651:18 652:9 655:5,13 656:25 657:20 660:22 662:1,4,16, 17 668:8 673:25 677:12 679:2 680:3,8 684:11 686:20 688:1,8,24 691:17 692:18 694:10,17 695:15 701:3,14,16 702:17,21 704:1 705:22,23 708:6,22 711:8,16 712:10,25 714:25 715:10,12 717:24 719:8 722:10,15 723:8 724:6 725:9,24 729:6,13 730:1,6 731:18 733:16 734:7,18 736:10,15 737:21 738:18 739:6 740:7 741:19 743:14 744:25 746:12,13 750:7 751:17 752:9 757:16 758:7,22 759:24 760:21 761:3
**on-boarding**
744:9
**once**
581:25 585:23 681:18 708:17 742:8
**one**
551:23 556:13 557:17 558:24 560:3,8 561:4 562:19 563:4,18 567:15 570:23 571:10,25 594:13 595:8,13 599:16 600:10 601:14 602:1,17,21 608:8 613:25 614:2 618:7 621:7 625:25 626:12 628:23,25 630:4,17 632:24 633:5 636:5,6,9,14 639:11 649:9 667:10 670:20 674:2,3,7 678:22 679:7 683:20 685:17,18, 19,24 686:21 687:14,18, 20,22,24 695:3 703:22 704:2 711:18 716:14 717:25 718:2,4 723:2,25 729:2,11 731:11,21 735:6 736:11,12,16 737:11 738:4 739:11 745:10 749:8,15,16 750:4,14 751:7,20 752:3
**ones**
561:11 562:10 602:24 636:13 695:23 725:16
**ongoing**
740:15
**online**
647:16 678:9 681:21 717:7
**open**
695:21 733:24 761:10
**open-ended**
651:20
**operate**
726:5,6

**operates** 726:1
**operating** 690:20
**operation** 587:5 588:13 619:6
**operational** 621:1
**operations** 585:14 621:4,11,14, 20
**opinion** 720:15 721:19 722:3,7,12
**opinions** 721:25
**opposed** 587:15
**oral** 742:18
**Orange** 549:13
**order** 551:23 583:24 585:23 586:19 589:4 591:23 605:19
**orders** 551:21 583:25 584:9,21
**ordinary** 619:16
**Org** 618:2
**organization** 740:1
**organizational** 643:19 647:15
**Orient** 597:15
**origin** 695:8 723:1
**original** 650:7,20
**originally** 563:24
**originated** 691:22 696:19
**outcome** 552:17
**outlined** 609:16 663:13
**outlines** 608:14
**outside** 586:7 655:4 663:14 678:18 693:19 730:14 735:8
**owe** 609:5 623:22 626:4,14
**owed** 600:16 607:16 615:15 622:4 630:2 631:6 632:15 633:6 634:22 635:8 637:6 644:12 671:24 672:2,9,22 676:1,9 706:6,18 707:4,11,12
**owes** 581:1 639:15 673:13 675:22 705:7,8
**owned** 575:2 582:19 595:21 597:7,17 601:14,22 602:16 603:19,20, 22,23 604:2, 19 613:8 614:16 616:18 618:21 619:2 620:17 632:16,19,24 633:9 644:1 648:19 726:13
**owner** 633:1,11,15 642:5
**ownership** 590:12,20,24 594:21 597:3 598:3 603:13 604:14 605:5,9,13, 23 612:13 615:21 619:17 643:13,18 726:15
**owning** 728:5
**owns** 575:22,23 576:9,10,14, 19 577:11 582:21 584:15,17 586:18 590:5 601:24 602:3,5 607:12 627:5,8 632:9,13 648:2,20 726:10,14

**P**

**p.m.** 652:16,17 710:18,19 736:13 762:7
**package** 584:8
**packaging** 585:17 589:3,6,16 628:7
**pad** 690:25
**page** 641:9 646:23 648:7,8,9 680:17,18,25 687:20 691:14 695:1,2,4,9 697:8,11,12, 13,14,15 698:3 702:15,24 703:18,24 704:9 733:4
**pager** 687:14
**pagers** 687:18
**pages** 687:22,25 695:14 696:3 697:13
**paid** 560:4,5 563:10 572:4,13 573:17,18 606:23 607:1 612:12 613:14 615:6,9,14 619:5 625:4 632:5,6

634:9,10
636:6 655:19
656:5,19
657:7,22
659:22
661:13
662:6,21,23,
25 663:13
664:2,25
665:7
667:20,21,24
673:22
674:16,19
707:5 710:11

**paper**
625:6

**paperwork**
643:19

**Pappert**
689:1,7
690:2

**paragraph**
640:25
646:12
681:19

**paragraphs**
555:15

**part**
557:2 595:10
597:25
598:12
601:25
603:19 613:6
624:17
632:1,18,19
633:10 662:8
730:3 742:18

**Participants**
552:3

**participate**
559:7

**participated**
715:3

**particular**
644:5,7,24
647:10
664:16 666:7
686:21
691:13
695:21
696:18,25
697:4,22
705:20 710:3
712:5 715:14
717:12 728:9
735:14
739:23,25
740:5 752:4

**parties**
550:4,10,15,
20 552:16
553:25
562:21
563:10 642:9
651:15 746:7
747:6

**party**
641:12
746:17
747:22

**passes**
605:24

**past**
728:8 744:11
749:22
750:17,19
751:5

**Pattis**
549:12
559:4,15
565:10
573:25
714:12
733:6,10,20

**pay**
580:24 581:2
590:10,11
591:5 606:17
607:15 609:8
610:13
626:18
627:15
628:1,19
632:25
634:21 635:7
645:7 646:3
651:15 652:1
663:19
664:23
670:11
671:18 675:9
706:14 707:7
712:1 743:11

**payee**
580:1

**paying**
587:5 590:24
606:19 613:1
618:22,24
619:8 624:14
625:2 628:18
631:5,17,21
632:10
633:5,17
674:2
675:21,25
704:16
743:11
752:1,23

**payment**
607:9 609:22
610:17
619:15 620:1
637:5,6
646:16
675:6,14

**payments**
566:11
580:20
593:17
606:8,13,15
607:14
609:13,16,19
611:4,9,14,
16,23 612:2,
5,6,9,20,21,
23 613:2,3,
10 614:1,6
615:4
616:13,17
618:6,25
620:2 635:3
644:17
651:23
661:16
663:7,17,19
672:17
673:20
674:5,10,15
675:12
676:19,21,25
677:2 705:14
706:1,16
727:8,9,14
749:24 750:1
752:3,6,16
753:1,9,16
755:9,13,17,
20

**pays**
579:23 581:6
586:18
590:18 606:6
628:8,13
670:13
703:10

**Paz**
548:20
551:19 552:8
554:7,24
561:21
562:12
566:3,14
581:4 596:15
616:7 618:4
623:18 639:8
640:23 649:9
652:21
656:11
665:16
677:5,6,10
679:22
684:5,10
687:13
688:21 691:2
695:20
703:15
710:23
712:13 714:7
717:10 731:8
733:5 736:12
738:12

743:22 744:13 747:13 754:21 760:12 762:5
**Paz's** 690:25
**PC** 548:22 549:3
**peer** 658:21
**pending** 576:17 761:10
**people** 555:5 556:11 575:11 583:7 589:3,7,16 592:2,21 594:8 634:4 650:14 652:9 678:15,17 683:19,21 684:1,23,25 685:22 686:6 697:14,21,23 698:14 700:3,21 702:10 704:5 713:1 717:5 724:4 740:3 742:7,24 743:7 744:3, 5 750:20
**percent** 595:20 597:3,8,17, 18 603:19,21 604:2,3,9, 11,12,13,18, 19,20,22 605:9 609:10 611:1 613:8 614:16,17 616:18,19 619:1,2,17 620:16,18,23 633:11,15 642:5 644:2 646:11 650:4 665:1 685:2 704:20 742:5
**percentage** 608:23 632:22
**Perfect** 715:12 716:3
**period** 564:13 577:16 578:9 579:8 580:9 581:13 582:1,14,20 583:2,10,14 610:6 612:4 618:24 635:14 637:25 659:23 666:11 667:15 674:22 679:10 685:8 693:2 696:23 697:22 705:18,19 706:23,25 712:4,7 751:24 752:4,5
**periods** 655:12,13
**person** 559:16 565:5 588:25 689:11,14 691:23 697:5 699:17,23 701:18 703:19 723:25 735:6,9 741:11,15,18 742:14 751:16
**personal** 605:5 656:17 670:6,15,22 728:17 734:14
**personality** 741:9
**personally** 604:3,13 642:3 647:6
**personally--** 656:8
**pertained** 563:5 644:7
**pertains** 556:17
**petition** 565:14
**phone** 555:19,20 557:18 568:1,5,8,12 681:5 733:19 734:5 735:8 736:4
**piece** 585:9 631:2 646:11 739:11
**place** 557:22 558:11 601:19 674:19
**places** 575:20 719:18
**plaintiff** 548:10 552:25
**plaintiff's** 554:19 617:10,12 738:1 739:4
**plaintiffs** 548:5,15 549:2 551:8, 10 685:10
**Planet** 549:11 575:10
**planned** 734:20
**planning** 597:25 598:1,12,13, 17 599:7 742:13
**plant** 678:10
**platform** 701:1 724:25 725:5,13 727:2,16,20, 21 728:10,11 729:4,20,21, 22
**platforms** 651:16 684:21 704:18 707:16 711:2
**play** 736:6,11,16 738:4,13,18
**played** 737:15
**playing** 737:12
**please** 552:19 558:20 574:4 596:12 609:2 644:6 646:9, 23 680:19 682:5 684:3 688:19 702:16 746:21
**PLJR** 595:19,20,21 596:19 597:2,7,17, 18 603:19

604:2,8,12, 20 605:6 613:7 614:16 616:18,19 619:1 620:23 632:17 633:15
**PLJR's** 604:12
**point** 594:13 649:3,15 652:21 698:24 700:9 702:19 707:18 733:21 743:18 754:12,18
**policies** 731:23 732:1
**poor** 742:24
**popular** 697:12,14 698:2
**portion** 570:23,24 671:2,6
**portions** 670:23
**position** 556:8,10 560:19 561:1 655:10 678:8 700:20 705:11 717:2 720:6,8
**possession** 718:18,20 732:10
**possibility** 757:23
**possible** 596:6 713:21
**possibly** 678:3
**post** 556:7 599:21 701:22 702:1
**post-2017** 556:17
**post-2018** 556:7
**posted** 682:25 723:24 724:3
**potential** 662:20 667:9 686:4 715:18
**potentially** 678:16
**power** 713:24
**PQ** 628:24
**PQPR** 557:11 559:21 564:16 566:12,24 574:3,7,24 575:4,8,10, 15,19 576:3, 8,9,16 577:13,18,25 578:3,7,24 579:1,3,12, 16 580:24,25 581:1,2,16 583:5,6,7, 11,16,21 584:3,11,15, 20,23 585:1, 5,11,23 586:12,17,22 587:9,13,14, 21,22 588:2 589:11 590:5,16 591:14,19, 21,24 592:1, 6,8,11,12,13 593:4,10,12, 24 594:5,9, 14,15,21 595:4,14,21 596:24 597:3,16 598:3 600:16 601:14,23 602:5,16 603:13,18 604:9,12,14, 15,19 605:9, 24 606:6,14, 16 607:16 609:5 612:3, 7,9,14,20,24 613:6,10,14 614:7 616:17,18,19 618:22,24,25 619:7,10,16 620:3,10,24 621:1,4,11, 13,23 622:4, 11 623:22 624:10,12, 20,21 625:10,19,21 626:4,5,7, 13,19 627:11,15, 19,24 628:3, 5,8,12,19 629:1,7,22 630:1,9,11, 22,23 631:7, 15 632:16 633:10,15, 16,17 634:8, 21 635:7 636:4 637:4 638:7,13,25 639:15 640:17 641:4,13 643:7,12,16, 17,19 644:2, 12 645:7,8, 25 646:4 647:1,13,14, 17 648:19,25 671:24 672:3,9,23 673:19 674:20 675:5,22 676:1,3 691:22 692:7 695:5 702:25 703:10 704:16 705:5,7,8,13 706:1,6,8,14 707:4,10,11, 14,15,24 708:8,20 709:8,25 710:5,7,12 711:5,12,23 712:6,17,22 731:13,20 732:4,6,12 749:25 752:1,16 753:1 755:13,15
**PQPR's** 575:17 576:2 584:24 587:9 588:4 591:11 594:3 615:22 621:19 626:11,19 629:1 645:8 646:4 647:16 708:9
**PQPR/FREE** 708:25
**practice** 700:8 749:22
**pre-2018** 556:9
**preparation** 650:6,21 696:11
**prepare** 569:23 654:21 664:6

**prepared** 576:23 577:2,6 592:4 594:2 611:13 612:17 633:21 651:6 654:23 655:6 659:25 661:2,3 663:10 665:6 666:3,9,10, 12,16 667:2 668:6 669:4, 14 711:10 712:4 734:24 745:20
**prepares** 670:6,10
**preparetoday.com** 577:4
**preparewithalex.com** 577:8
**preparing** 742:16
**present** 549:23 551:5 553:5 561:19 671:12
**presented** 656:11 708:22
**presumably** 580:3 630:1
**pretty** 596:10 646:8 672:17 717:8
**previous** 570:1 618:23
**previously** 560:22 617:6 673:5 758:24
**primary** 705:2
**principal** 599:9 607:24,25 608:14,20,22 609:10,14,22
**printed** 564:12
**printing** 589:5
**prior** 556:8 604:4 605:8 607:2 611:15,17, 19,22 619:4 624:24 635:5 638:3,8,14 639:6,23 640:17 646:3 676:20 704:4 715:8 735:11,12 741:9 755:22,23 758:1 759:6 760:4,11,17, 19,23,24
**Prison** 549:11 575:9
**Pritika** 549:8 551:12 732:24
**privilege** 550:16
**probably** 558:4 567:13 573:13 588:21 589:2 598:1 622:7 734:6 744:12
**problem** 582:5 734:12
**problems** 731:21 741:22
**proceeding** 552:4
**proceedings** 634:1
**proceeds** 577:17 578:23 579:9,11 580:7 581:11,14,24
**process** 584:10 586:13 593:19 730:17,23 731:3 744:9
**processed** 577:18
**processes** 583:5 585:19
**processing** 583:3 625:14 675:13
**produce** 686:21 690:22 695:1,9
**produced** 557:9,19 565:23 596:6 600:13 617:6 622:24 624:3,5 649:24 651:14 655:9 678:21 679:25 680:10 685:9 687:22 688:5 692:1 694:11 695:10 696:3,5 709:11,19 713:3 730:16,18 732:16 734:4
**producer** 679:9
**producers** 679:7
**product** 574:11,13,14 578:24,25 579:14 580:24 585:11,12 587:23 588:2 589:4 590:17 591:5 626:8, 9,14,19 627:24,25 628:8,12,14, 16,19 629:20 630:4 699:7, 19 701:20 705:8
**production** 720:11 727:5 734:9 761:11
**products** 574:15,24 575:5,17 576:9 577:13 579:14 581:3 583:22,24 584:4,5,15, 16 625:20, 21,22 626:2, 5,7,8,13,20 627:6,12,21 628:3,4,5,6, 7,9 629:2 630:23 631:5,16 645:8 652:1, 2 693:18 695:6 697:9 700:23 701:22 704:2,17
**Professor** 677:16
**proffered** 724:8
**programming** 689:19,23 690:9

**programs**
722:16 726:5 742:2
**progressively**
674:17
**promissory**
566:4,15,23 610:12 641:1 673:11,17 674:4,22 731:10 732:13
**promoted**
654:14
**prompted**
568:15
**proof**
550:5
**properly**
673:22 674:16
**proposal**
692:12
**provide**
560:1 562:21 563:22 564:2,8 694:2 729:22 737:16 744:4
**provided**
565:11 567:12 658:16,17 661:4 667:21 669:25 670:12 671:11 695:23,24
**provides**
726:21,23 727:1
**public**
548:24 553:17 684:23
**publication**
692:8 694:4
699:3,5 700:19
**published**
680:25 681:13 687:19 697:20 701:13
**pull**
560:6 561:14 562:9,11 565:23 608:1 613:21 614:20,21 617:1 622:6, 20,22 623:10 672:17 677:9 714:4
**pulled**
585:16 608:8 672:19
**pulling**
585:11 589:4,5
**purchase**
574:11 575:11,17 591:7 626:19 627:11 648:16 689:19 691:24 697:9 699:12 700:23 701:20,22 704:6
**purchased**
630:23 697:24 699:19 700:4
**purchases**
576:3 625:21 626:7 674:15 695:13
**purchasing**
625:21
**purport**
637:25
**purported**
606:19 610:12 611:14 619:15 635:14 639:23 644:7
**purportedly**
601:23 607:16 615:15 622:4 637:6
**purporting**
557:9 644:11 712:15
**purports**
600:15 623:22 643:9 663:16
**purpose**
568:8 574:10,14 594:4 598:11 599:5,7,8,11 607:17 608:10 652:22 689:8
**purposes**
654:10 685:24 708:24
**pursuant**
548:21 553:2 608:12 609:14 752:20 753:10
**purview**
592:22
**put**
558:21 598:16,19 599:8 602:20 635:2 656:16 674:18 679:20 681:21 685:17
704:13 715:17 739:7
**putting**
589:6 597:13 676:10

**Q**

**qualified**
756:19
**Quantcast**
719:16,19, 21,24,25
**quantify**
691:21 694:24 699:8
**question**
560:16 561:8,20,23, 24 571:15 576:17 578:14 579:13,17,18 580:6,17 581:5 583:12,18 593:3 603:13 614:9,11 621:7 622:1 624:2 631:11,14 634:7 639:19 640:3 643:21 647:19 651:21 654:22 657:9 658:20 666:7 692:4,6 693:23 694:22 698:9 705:17,24 707:25 711:9 718:15,23 721:18 732:5 744:14,15, 17,24 745:7 746:21 748:12

749:13 751:9,10 752:7 754:16,18, 20,21 759:25
**questions** 555:5 559:16,20, 23,24 560:3, 8 568:10 581:10 672:5 677:4 688:23 702:21 713:11 714:11 716:7,9 719:24 720:4 721:10 726:19 729:12 731:5 747:1 754:15 757:4 760:3 761:5,8
**quick** 588:14 649:7
**quicker** 561:24
**quickly** 672:17
**quite** 558:8 582:6

**R**

**racked** 634:13
**radio** 677:7 682:20 683:5,8,12 686:12,14 688:10,12 690:3 716:13,25 717:3,13,15 722:16 723:19 725:12,21,25 726:7 741:9
755:23 756:5
**Raguso** 549:24 552:13
**raised** 761:19
**rate** 572:9 608:23 609:8,9,23 610:14 646:10 711:5,6 713:6
**rated** 683:14
**rates** 711:12 712:22 713:5
**ratings** 682:12
**re-cross** 739:8
**re-direct** 743:16
**re-directed** 715:19
**re-notice** 562:11
**re-paid** 636:8
**re-read** 570:20
**re-swear** 551:2
**reach** 684:24 685:22 686:2,7 713:5 717:5
**reaching** 678:16 683:25 689:7
**read** 553:24 570:9,15 571:22,23 627:16
639:11 640:25 650:20 662:2 663:22 680:4,5,6 696:6 699:25 703:3,6,21 716:11 756:11,16,17
**reading** 550:21 663:23
**ready** 713:12 738:19,20
**real** 634:3
**reality** 657:5
**realized** 700:18
**realm** 591:11
**realtime** 706:20 707:3,9 708:18 709:9
**reason** 603:11 624:15 653:20 683:23 684:2 687:2,4 690:7 709:10,22 718:16 724:7,9 734:13 740:16,18 753:9
**reasons** 595:8 720:24
**recall** 582:3,7 590:15 595:6 622:2 649:19,22 696:13
698:23 711:7,24 715:8 718:14 734:11
**receivable** 708:12
**receive** 567:3 572:16 605:23,25 617:18,20 705:25
**received** 572:6,8 619:16 654:19 662:8 663:18 665:22 675:6 679:1 681:24 706:2
**receives** 632:2
**receiving** 572:9,12 585:10 625:13 676:10
**recent** 565:14 571:8 593:21 658:4,7,14, 21 673:6
**recently** 690:1 744:11
**recess** 616:2 652:16 710:19
**recollection** 558:3,10 570:1,8 581:20 629:14 649:18
**record** 552:2,7 615:25 616:5 617:3 621:18 652:14,19 710:17,21

736:6 737:17 739:7 761:25 762:3
**recorded** 552:4,5,7 707:2 708:11,19,21
**recording** 672:22,24 691:18 736:20 738:6,16,21
**records** 584:24 591:1
**recruit** 685:25 686:4
**rectify** 731:22
**redirect** 743:17,20 756:2 757:3
**redirected** 648:13
**reduce** 741:19 748:17
**reduced** 731:23,24 739:12,15 740:22 741:3 744:5,6 750:5 757:15
**reduces** 754:13
**refer** 690:11 692:24 715:25
**reference** 667:4
**referenced** 746:11
**references** 667:5
**referencing** 601:3
**referral** 715:22
**referred** 562:3 622:16,21 647:17 672:1 716:2 732:17
**referring** 559:20 560:13 562:2 570:21 598:7 599:18 608:2,20 616:23 618:4 622:9,15,23 623:1,6,17 648:24 660:24 678:13 680:24 681:19 693:15
**refers** 557:8 693:11
**reflected** 557:13 644:10 697:19 705:12
**reflecting** 605:13 676:9
**reflects** 680:21
**refresh** 570:1,8 629:13 649:18
**regarding** 559:16 620:9 639:22 651:16 657:15 660:25 672:12 679:18 746:6 747:5
**regular** 612:5
613:10,14 614:6 674:5 715:25 760:13
**regularly** 720:20 721:2,3
**Reiland** 549:15 551:17,18,25 553:4 554:3 559:5 567:13 578:10 614:22 616:25 617:4,22 652:10,13 695:16,18 712:10,18 713:17 732:16 734:9 735:24 737:18,21 748:1 754:10,17 755:1 761:8
**related** 552:15 561:11 620:12,22 692:9 694:25 695:11 696:20 697:19 698:10 699:3,18 700:3,12,19, 22 702:11 741:7
**relating** 562:4 695:3
**relation** 692:8 694:3
**relations** 684:14
**relationship** 559:21 564:21,22
565:2 566:11 576:24 577:3,7 591:4 592:5 593:19 630:18 652:4 664:19 673:18 689:10 727:8 728:14 729:5 732:1,11 740:12,15, 17,20
**relationships** 650:23 651:3,7,8, 10,16,19 728:8 729:1
**relevant** 761:21
**reliability** 720:16 721:20,25 722:1
**reliable** 722:3
**relied** 722:21
**rely** 753:22
**relying** 670:3
**remaindermen** 598:16 605:20
**remember** 555:25 558:5 586:14,15 588:20 589:13,15,20 596:14 605:16 629:9,12 649:16,17,22 670:24 671:9 672:7,14 679:9 696:5 698:24

705:3,7
714:21
718:6,9
**remote**
552:25
**remotely**
549:7,21
552:23
**rent**
590:16,24
591:6
**rental**
590:16
**rents**
584:17 590:6
**reorienting**
672:3
**repayment**
635:4
**repeat**
578:16
583:12
**report**
622:22
**reported**
662:23 681:3
717:13
**reporter**
551:1,4,20
552:18,21
553:20
737:23
**Reporters**
680:6
**reporting**
688:11
**reports**
672:1 682:16
746:1
**represent**
551:14
576:12 585:1
586:8,22
592:1 621:14
647:14 661:9
679:25 688:4
708:3 714:8
**representation**
683:24
**representative**
572:5 638:11
651:5 669:21
671:16
758:15 759:8
**representatives**
638:12
**represented**
641:15
642:9,14
663:1,7
668:12
**representing**
690:2 741:25
**represents**
655:11
**republished**
682:3
**request**
552:6
**require**
674:5
**required**
573:6,8
592:4 595:9
760:22
**requires**
659:21
**requiring**
675:5,8
**Research**
553:13
**reserved**
550:17
553:24
**reserving**
554:1
**resources**
587:13
728:15
**respect**
582:25
662:11,14
**respective**
550:4,10,15,20
**responding**
603:12
**response**
640:2 679:1
730:20 747:1
760:2 761:6
**responsible**
577:22
587:13
625:13 626:5
689:15
**rest**
555:5
**restructuring**
597:24
**result**
598:25 604:8
612:13
615:15,21
630:22
653:15
654:25 693:6
694:25 699:3
700:18
**resulting**
622:12
**resume**
685:23
**retain**
711:18
**retained**
586:7 698:23
**retainer**
573:24 574:1
**retaining**
676:2
**retains**
620:23
**retargeting**
721:11
**return**
656:23
657:2,5
670:7,22,23
**returns**
670:18
671:1,6
**reveal**
761:20
**revenue**
698:9 699:2
700:18,21
702:9,12
**review**
557:5 570:25
649:13
650:21 684:9
688:22
709:16
**reviewed**
556:21
570:4,11
571:3 591:1
599:1 623:3
624:4
650:18,19
655:3,24
668:6,13
670:17 688:7
709:15
731:11
732:13
**reviewing**
569:20
649:19
**ride**
588:10,15
**right**
553:24
554:16
555:19
556:14,18
564:7,9
568:17,23
569:12
572:19
573:11,19
576:25
577:1,9
578:20,21
579:21,22,23

581:10 582:22 583:23 584:1,5,24 585:7,25 586:9 587:7 588:14,17, 20,22 589:9, 12 591:2 592:7 594:6, 17 595:24 596:2 599:3, 20,22,23 600:12,17 601:7,8,12, 15 602:5,13, 15,18 603:14,15,24 604:10 605:7,11,20, 25 606:12 608:7,25 609:11,12 610:15,21 611:16,20 612:1,8,11, 12,15 613:6, 24 614:20 615:8 616:7 617:25 618:2,23 620:6,17 621:16,21 624:22 625:12 626:9,16,23 627:15,16, 19,25 628:4, 16 629:3,12 630:1,2,6, 11,14,24 631:3,8,18, 19 632:4,6, 13 633:5,7, 8,19,24 635:19 636:22 637:11 639:16 640:12,14, 18,22 641:6, 13,25 644:3, 19 645:9,13 646:5 647:8, 25 648:2,3, 4,5,14,17,23 649:12 650:7,18 651:18,24 652:7 654:21 656:18 658:3,6 659:3,11 660:2,6,10 661:20 662:10,13 663:3,9,21, 22 664:11, 14,17,18 665:3,18,21 666:13,18 667:4,6,11, 12 668:1,17, 19,22 669:1, 12,18,23 670:5 674:3, 5,6,8,12,25 675:18,24 676:4,5,20 678:3,20 681:21 682:1,4,14, 18,23 683:1, 2,21 685:15 686:14 687:7,8,9,10 688:25 689:21,24 692:10 693:20,21 694:5,21 696:24 697:3,13 698:20 700:13,15 701:6,7,8,10 704:4 706:3, 13 708:9,10 709:2,4 711:14,20,23 712:23 713:6,24 714:13,16,20 715:1,4,15, 23 716:16 724:12 729:15 732:3,14 733:7 734:5 736:4,16 737:8 738:11,22 748:9 752:17,19 753:6 756:23,25 759:20 761:9

**right-hand**
691:14

**ring**
653:3

**RMR**
548:23

**Rob**
571:3 649:20 650:1,3,6

**Robert**
684:6

**Roddy**
555:6,14,17 556:5,14,20 557:4 569:10,20 590:1 694:9, 18,19 696:17 697:18 698:8 704:15 720:5 755:10

**Roddy's**
569:21 570:5

**Roe**
555:8 557:18 560:21 562:23 566:21,22 567:9,19,21 569:22 587:17 591:2,18 602:2,10,16 604:24 611:11 622:25 635:20,23 638:19,24 658:9,12,14, 19 659:2 660:4 661:3 664:7 668:2, 4,12 669:10 671:4,14 673:14 691:8,11,19 692:6 693:14,19,25 694:1 698:21 705:17 707:18 709:15 710:24 711:18 712:14 731:15

**role**
684:12 685:3 689:4

**room**
551:17 553:5 554:4

**round**
631:12

**routed**
578:23 580:3,7 581:14,16,17 582:15

**run**
593:10 742:11

**running**
569:9 600:19,21

**runs**
575:14

635:22 694:19 741:17

S

**sake** 697:5
**salary** 661:15,22 662:7,15,20 667:11 668:15,21
**Salazar** 698:5
**sale** 579:20 580:7 581:11,24 582:12 584:15 585:11 628:6 695:8 699:7
**sales** 577:13,17,23 578:4,18,22, 23,24,25 579:10,11,14 580:24,25 582:1 583:22 587:23 588:2 626:8,9 629:21 630:5 647:17 691:15,21 692:7,11,23, 25 693:5,7, 8,17 694:24 696:18,23
**Sandy** 677:18,23 691:25 692:8,10 694:25 695:4,11 696:20,24 697:6,19 698:10 699:3,18,21 700:3,12,19, 22 701:13 702:7,10 738:7
**sat** 570:21 571:11
**satellites** 730:4
**satisfactory** 694:2
**Save** 653:17 654:15
**Saveinfowars** 653:3
**savvy** 736:2
**saying** 556:16 590:23 612:16 616:14 626:13,16 628:3 629:21 638:16,18 639:10,17 675:23 678:18 681:23 683:14 699:5,23 716:12 746:9
**says** 556:18,19 557:2 597:4, 11 604:7 638:2 639:11 643:10 657:17,18,19 659:24 666:13 678:4 680:22 681:15,22 682:2,4,7,19 683:6,9,11, 16 690:4 692:15 693:4,14 698:5 701:23 702:1 703:21,24 704:22
**scheduled** 557:23 558:7,8 733:15
**school** 598:18,23 714:13
**Schwartz** 555:8 557:16,21 558:11 559:4,9 560:13,24 561:4 562:2, 22,24 563:2, 4,12,17,21 564:4,19 565:21 566:9,18 567:25 568:1,14,22 569:13,16,22 591:3 608:3 611:11 622:25 638:19 639:13,25 640:6 658:10 659:4,6,8,13 660:4 672:16 673:15 752:12,14 755:10
**Schwartz's** 565:13
**scientific** 716:20
**scientificall y** 723:18
**scope** 743:18 745:15 756:2
**Scott** 684:6
**screen** 580:12 733:5,8,9 735:20 738:5
**scroll** 562:17,19 564:17 608:15 609:9 641:8 646:9, 20,22 679:21 684:10 685:11 686:19 733:3,21 735:18
**search** 564:1,10 695:12
**second** 558:24 570:16,24 576:17 580:21 595:13,22 598:20 599:15,18,25 600:10 607:24 618:11 625:25 627:1,22 636:22,23,24 637:16 644:22 648:19 649:9 661:21 673:23 674:21,23,24 706:7 709:5 736:11 737:11,14 738:13
**seconds** 735:21
**section** 555:12

562:15 714:18 755:18
**secured** 641:12
**see** 551:11 567:17 569:1 570:23 590:14,17, 18,25 591:9 592:24 596:22,23,25 597:1 610:22 616:21 623:5 629:20 641:7 643:6 645:19 649:6,18 654:8 663:14 677:11,20 678:18 680:9,20,23 681:9 682:7 683:14 684:8,10 687:13 688:9 689:15 691:4 702:24 703:14 704:3,5 710:5 715:19 733:5,23 736:7,8,12 742:9,10 761:12
**seeing** 590:16 696:13 711:7
**segments** 570:14
**sell** 652:1
**selling** 626:6 628:1, 12
**sells** 574:13,15 575:4 584:5
626:7 628:4
**send** 580:1 627:11 711:20 734:8 737:18
**sending** 624:13,21 685:16 689:14 707:10,14
**sense** 664:23 675:3 688:8 734:22 739:13 749:23 752:22,24 753:3 759:19
**sentence** 692:14,19
**separate** 585:7,8 587:22 592:3,23 593:16 606:25 635:22 661:18 669:13 704:8
**September** 596:24
**sequence** 554:15 737:16
**series** 569:21 735:14
**serve** 671:15
**service** 562:21 563:11 726:21 727:21
**services** 555:16 556:4 563:6,20,23 564:6
670:12,14,15 726:22 727:1 759:18
**Seshadri** 549:8 551:12 554:18 566:1 617:8,24 623:15 737:25
**set** 554:13 609:23 610:17 652:22 653:5,7,8 654:9 655:8 663:11 712:6
**several** 635:13 677:17 718:23 745:16
**share** 644:2 720:15
**sheet** 685:18,19,24 686:21 705:10
**Shelton** 553:13
**shelves** 589:5
**SHERLACH** 548:9,14
**shifted** 685:7
**shipment** 585:12
**shipped** 585:18
**shipping** 585:12
**shoot** 713:19
**shooting** 677:24
**shopping** 651:24
**short** 568:12 569:5 685:23 732:21
**shorter** 646:15
**shots** 733:8
**show** 600:15 617:24 653:11 677:8,17 679:8,13 680:2,14 682:8,18 686:1,5,6, 12,14 687:1 690:2 696:7 697:2 725:1, 2 726:10,13 727:3 748:13
**showed** 585:15,16 586:12 588:25 589:14 596:14 600:19 671:1 696:18 697:18 698:8 710:3 711:18 712:14 747:14
**showing** 617:23 686:1 711:21
**shown** 670:19,22,24 671:5 696:2, 22
**shows** 613:19 680:6 697:3 724:20 725:1,12,19 729:22,23

**side**
636:6 691:14 695:4 743:1
**sign**
553:25 642:5,6,7 643:9,16,17 647:13 744:8
**signature**
641:24 646:22
**signed**
574:1 637:12 641:20 643:6 674:24
**signers**
641:8
**significant**
673:14
**signing**
550:21
**signs**
641:12 646:17,18 647:1
**similar**
647:4 688:10
**similarly**
730:20 758:23
**simply**
656:10 660:4 675:20 705:14 751:2
**single**
743:24 744:17 745:3 748:21
**sit**
582:11 591:9 616:11 638:10 656:6 698:25 711:9 728:1 758:15
**site**
575:11 647:20,23
**sits**
582:8
**sitting**
622:2 629:25
**situation**
593:12,14 632:23 739:24
**situations**
593:15
**size**
679:18 682:9 716:7,25 717:22 718:3,13,24 719:2 723:14,17, 19,24 756:6, 24
**sketch**
614:19
**SMITH**
549:12
**smoothly**
635:22
**social**
700:3,9,22 701:12,19 728:21
**software**
585:19
**sold**
574:12,24 575:1,7 576:9 579:14 626:20,24 627:2,6 628:17 695:6 704:3 709:8
**sole**
615:20 616:8 619:20 741:17
**solely**
607:15 641:23 668:2
**solicited**
653:11 654:15
**soliciting**
652:22 654:10
**some-odd**
605:9
**sort**
557:10 573:24 692:22 718:23 732:5
**sound**
727:5
**sounds**
565:2 665:5
**soup**
594:24 595:20
**source**
613:25 614:2 619:11 630:4 631:6
**sources**
619:12 667:9,13,17, 23 668:14 669:5,8,13, 16,18
**South**
641:3
**space**
590:6,16 591:6,7,11, 12
**speak**
555:4 559:16 573:1 650:3 659:6 679:17
**speaking**
561:3 569:20 656:2 658:9 680:21
**specific**
559:25 564:11 591:17 592:19 593:2 595:5 624:2 639:2 672:11,18 688:3 692:2, 17 695:2 698:11,16 702:13 711:5 712:22 744:18 745:3,11,19 751:16 753:20 755:20
**specifically**
559:21 560:23 561:3 562:1,24 568:8 572:17 587:20 605:18 613:24 622:23 629:14 672:9,14 687:23 709:12 732:1 741:7 746:16 751:13
**spectrum**
682:12
**speculate**
618:9
**speculating**
639:8
**speculation**
639:20
**Speech**
549:10 555:7,9 557:10 559:12,22 560:5,20 561:7,12 563:11,22 564:16,20,22 565:2,5

566:11,23 572:4 573:25 574:3,12 575:2,5,13, 19,22,23 576:8,13,19, 23 577:2,6, 10,11,12,18, 21 578:3 579:1,3 580:23 581:1,15,17, 22 582:8,11, 15,18,22 583:2,9,15 584:14 585:4 586:1,8,21, 25 587:4,10, 15,22 588:3, 11,12 589:10 590:7,18,23 591:23 592:5,12 593:4,23 594:1,9,14 596:19 600:16 606:6,14,16, 18 607:7,8, 12,15,19 608:9,11 609:4 610:11 611:4,13 612:3,4,6, 17,19,23 613:2,9 615:15 616:17 618:15,18, 21,22 619:7, 11,13 620:3 621:9,18,22 622:5,11,16 623:21 624:9,13,21 625:1,5,11, 14,19 626:4, 10,11,18,21 627:15,18, 20,23 628:1, 8,9,13,18, 22,25 629:5, 7,22 630:2, 8,11,20 631:4,5,7, 12,15,16,20 632:2,13 633:11,17, 21,22 634:4, 8,12,20,21 635:6,7 636:3 637:3, 5 638:6,10, 13 639:1,15, 21 640:2,14, 16 641:2,10, 15,21 642:1, 6,12,13,16, 21,24 643:15 644:12,15, 16,24 645:6, 23 646:7,18 647:6,22 648:2 650:2, 13,16,22 651:2,5 652:3,21 653:10,14, 16,25 654:6, 9,18,23 655:6,10,18 656:2,3,10, 20 657:1,7, 11 660:8 662:22 663:24 665:7,21,22 666:5 667:10,14, 20,21,24 668:14,20, 23,24 669:7, 16,19,20,22 670:11,13 671:2,24 672:3,21 673:19 674:4,9,19 675:5,21,25 676:2,7,19 677:7 678:1, 21 679:11,18 680:11,13 681:24 682:3 683:23 684:12 685:14 686:10,11,23 687:6 688:11,15 689:2,17,19 690:5,15,20 692:1,8 698:22 699:1 700:2,7,17, 20 701:12,17 702:9,11 704:16,17 705:5,7,8,9, 13,25 706:6, 9,14,17,19 707:3,4,14, 15 708:1,4, 7,12,16,18, 25 709:7,8, 18,24 710:7 711:1,10,22 712:5,16 718:2 719:2 720:2 721:2, 19 722:2 723:12 724:24 725:4 726:10,12, 13,21,25 727:9,15,18, 22,25 728:9 729:7,16 730:11,14 731:12,13, 20,22,25 732:4,6,10, 12,17 739:19 740:11 741:8,13,25 743:10,23,25 744:19 745:2,12,19 746:17 747:2,15,21 748:17 749:10,25 750:8,15 751:6,14,21 752:1,15 753:1,21 755:13 757:7,12,18 758:1,4,9, 16,23 759:10 760:4,9,14, 21

**Speech's**
584:6 607:13 668:5 670:21 671:7 705:11

**speed**
593:18

**spending**
740:4

**spent**
740:3 742:15

**spoke**
555:6,19 561:15 591:2 599:2 602:9 638:19 679:19 694:9 703:17 709:11 710:2

**spoken**
556:21 560:21 635:11,12 735:6

**spreadsheet**
560:9 564:3, 5 574:4 581:7,8,9, 10,19 582:4 600:13 613:17,19 622:9,10,23 623:17,24 629:15

630:8,15 636:20 644:11 655:3,4,8 658:16,17 660:24 661:2 662:6 663:15 667:8 668:7 669:24 670:2 705:2,9,12, 21 707:20,21 708:23,24 709:12 710:4 711:7,15,17, 21 712:6,14, 22

**spreadsheets** 557:19 560:7 561:5,6,9, 10,11,17 562:1,4,20, 25 563:4,13 578:25 600:5,19 601:2 622:6, 8 627:17 629:14 651:14 658:11 690:11,12,23 713:2

**spring** 654:1,6

**squiggly** 691:4

**staff** 584:7,20

**stake** 604:9,11

**stamp** 685:13

**standard** 722:22

**standards** 756:21

**start** 554:12 567:15 596:1 611:4,9 622:5,8 626:2 628:24 631:13 658:12 672:21 673:1 698:21 737:12 738:10,15 745:10

**started** 592:11 603:11 606:7,8 614:6 623:22 624:1 625:18 630:21 631:11 635:15 644:16 673:7 675:5 676:25 737:12

**starting** 676:15 680:20

**starts** 557:8

**State** 548:1,24 553:18

**statements** 620:22

**stations** 678:2,13,14 679:13 684:20 685:21 688:13 717:3,13,16 725:25 726:4,7

**stations'** 717:4

**status** 560:25 650:1,9,12

**staying** 628:2

**Sterling** 549:7 551:9

**stick** 701:15

**stipulate** 552:22 553:9

**STIPULATED** 550:3,9,14, 19

**stipulations** 553:21,23

**stock** 585:15 742:11

**Stockmal** 548:23 552:19 553:17

**stop** 608:25 609:2 631:21 658:6 744:13

**stopped** 625:3 650:17 732:25

**stops** 625:2

**storable** 574:18,19,23 575:1

**store** 584:7 700:4, 23 701:20,22 702:5 703:22 704:2,5

**stored** 584:16

**stores** 628:6

**story** 702:4

**strategies** 720:10,14

**streams** 682:22 683:17

**Street** 549:13,18 552:14

**strike** 578:5 653:15 670:9 686:9 725:3 740:9 749:5

**structure** 597:21 598:3 603:13 619:17 634:3 635:3 647:15 734:23 740:1 741:13,23 746:1 747:6

**structures** 727:8

**studio** 588:13

**stuff** 579:2 735:9 736:22 738:24

**subject** 761:16,17,18

**subjects** 671:16 678:23

**submission** 625:7

**submitted** 718:12

**subscribe** 631:24

**subscribing** 687:3 724:12

**Subsection** 608:21

**subsequent** 683:1

**subsequently** 699:12

**subsidiary** 622:17,18,20

**substance** 568:18 692:7

**substantial** 739:15
**sufficiency** 550:11
**suggesting** 618:4 672:2
**Suite** 553:13 641:4
**sum** 729:24,25
**summarize** 712:11
**summarized** 571:6,16 687:15
**summary** 580:13 623:6 684:21 685:20,23
**Sunday** 558:18 682:8,14,24, 25 683:4 716:12 736:12
**SUPERIOR** 548:1
**supplements** 574:16
**support** 552:19 715:22
**suppose** 761:6,20
**supposed** 693:5
**sure** 551:4 555:1 558:9,14 560:17 561:22 562:23 563:1 564:17,23,25 567:22 573:12 574:19 576:6,15,20 578:17 580:5,10 582:21 589:1 592:17 593:2,16,20 596:10 600:1,11 602:25 603:7,9,18 604:1 606:23 607:1 609:1, 15 611:1,3,8 614:15 616:21 617:1,19 618:14 619:12 621:17 622:19 624:15,25 626:1,3 627:7 633:25 635:21,25 636:7 640:12 644:19 647:20,23 648:12,20 649:10 650:4,10 651:20 652:6,24 655:20 656:21 658:13 660:16,19 661:25 662:3,10,11 664:22 665:1,4,18, 24 666:2,23 668:22 673:7,21 674:15 675:8,11 676:24 685:2,6,7 686:3,8 692:15,21 693:3,13 695:22 698:14 700:11 702:22 703:8 704:14,20 707:20 711:6 712:9,13 713:8 716:8 723:10 725:16,17 730:5 731:15 734:16,19 735:2 746:22 749:4 758:13
**surprise** 741:1
**surprising** 740:21
**swear** 552:20,22
**sworn** 553:7,16
**synopsis** 728:4
**System's** 563:23
**systems** 549:11 557:11 559:22 560:20 561:7 564:20 565:2 573:25 575:2,13,22 576:13,19,23 577:2,6,10, 11,12,18 581:15,18 582:8,11,15, 18,22 586:8, 21,25 587:4, 10 590:7,23 591:24 592:6,12 594:1,14 596:19 600:16 606:16,18 607:7,9,15, 19 609:4 611:4,13 612:7,17 613:9 615:15 618:15,21 619:11 621:18,22 622:5 623:21 624:9,22 625:1,5,11, 14,19 626:4, 12,18,21 627:15,20,23 628:1,13,18 629:5,8 630:2,8 631:5,6,7, 13,16,17,21 632:2,13 633:12,17, 21,22 634:8, 20,21 635:6, 7 637:4,5 638:6,13 639:1,15,21, 22 640:14,16 641:2,10,15 642:12,13, 16,21,24 643:15 644:12,16,24 645:6 646:7, 19 648:2 650:2,13,22 651:2 652:3, 4,21 653:10, 14,16 654:1, 6,9,18,23 655:6,18 656:2,10,20 657:1,7,11 660:8 663:24 665:7,21,23 666:5 667:10,14, 20,22 668:15,20,24 669:22

670:11
671:24
672:3,21
673:19
674:4,9,19
675:5,21,25
676:2,19
677:7 678:2,
22 679:11,18
680:11,13
681:24 682:3
683:23
684:13
685:14,22
686:10,11,
23,24 687:6
688:11,15
689:2,17,19
690:5,15,20
698:22
700:2,8,17,
20 701:12,17
702:10,11
704:16,18
705:13,25
706:6,9,14,
18 707:4,14,
16 708:1,5,
25 709:8,24
710:7 711:1,
10,22 712:5,
16 718:2
719:2 720:2
721:2,19
722:2 723:12
724:24 725:4
726:11,12,
13,22 727:1,
10,15,18,22,
25 728:9
729:7,17
730:15
731:12,13,
20,25 732:4,
6,10,12
739:19
740:11
743:23,25
744:19
745:2,12,20
746:17
747:2,15,21
748:17
749:10
750:8,15
751:6,14,21
752:1,15
753:21
755:14
757:7,13,18
758:1,4,9,
16,23 759:11
760:9,14,21

**Systems'**
561:12 572:5
574:3 575:5,
19 576:8
577:21 578:3
581:23
583:3,9,15
584:14 585:4
586:1 587:15
588:4 589:10
608:9,11
610:11
618:18
619:13 621:9
628:22,25
630:20
634:12 640:2
642:1 644:15
645:23 656:3
668:23
669:20 671:2
692:8 699:1
706:19
708:7,16
709:7,18
732:17 753:1
760:4

**Systems's**
622:16 636:3
638:11 651:5
655:10 707:3
708:12,18
730:12

**T**

**table**
596:22

**take**
555:22
557:22
568:20 581:9
585:9 590:22
593:9 605:4
614:22,24,25
615:24
619:10,13
621:9 624:7
647:4 649:7
652:8 662:5
664:10 674:1
677:12 684:9
687:15
688:21
700:19 701:2
702:18 707:1
712:20
715:20
736:23
738:24

**taken**
548:21 550:7
552:8 558:11
568:21
653:14,16
695:5

**takes**
573:3

**taking**
589:4 737:6

**talk**
560:19 588:6
594:21 637:1
640:20
698:13
714:10
716:5,7
729:9 736:24
742:7

**talked**
571:25
573:15 678:7
696:16 698:4
751:18

**talkers.com**
686:21 687:3

**talking**
560:23
568:24
575:13
580:21
588:21
603:11
612:6,9
636:19
637:10 639:5
656:8 672:15
681:16
682:14,23,24
683:18
693:13,16
696:24 697:1
699:7 700:6
702:9 704:14
705:19
731:25 732:1
734:12
741:12

**talks**
608:21 697:2

**tax**
656:23
657:1,5
663:11,17,19
664:1,2,15,
23,24,25
665:2 670:7,
12,17 671:1,
5

**taxes**
656:17
662:24
663:12 671:5

**technicalitie
s**
550:5

**technological
ly**
736:2

**Ted**
723:13
727:9,22,25
728:2,8,18,
20 729:10
730:10,22
**Ted's**
728:14
**Tel**
549:4,14,19
**telephone**
569:22
694:14
735:17
**telephonic**
569:3
**tell**
562:10
587:20 599:5
601:14
603:17 608:9
613:18 614:6
630:13
636:18
638:5,24
639:24
644:23
651:1,11
658:19
659:4,8
665:19,21
673:16
697:10
699:17 702:5
703:12
720:20
723:23
726:25
738:19 741:2
743:7 749:18
753:4,8
755:11
**ten**
569:6 588:10
593:3,23
670:25
**term**
610:7,8
646:13,15
724:15,18,19
740:8
**terms**
607:21
619:25
642:18 647:7
695:12
719:23 720:9
727:4,8
**testified**
553:19
571:20 572:3
575:4 578:18
583:21 590:5
595:2 616:7
626:12 632:3
651:2 665:11
671:25
672:11
678:19
710:23
743:22
745:1,20
746:25 747:3
751:24 760:2
**testify**
560:11
573:5,10
576:24
577:3,7,11
582:12
592:5,7
595:9,10
611:14
612:17
621:13
628:21 630:8
637:23
638:11
651:6,22
654:24
655:2,7,23
656:7,13
657:6,12,15,
19,21 658:1
659:22,25
662:7 663:10
664:4 665:6,
9,16 666:4,
9,10,12,19
668:20
669:4,14
672:10
678:22
711:11 712:4
734:20 735:3
748:4 749:9
754:14 755:5
**testifying**
561:18 587:9
618:15 656:4
665:20 670:3
**testimony**
569:8 571:1,
4,7,16
572:17,21
575:19 576:8
577:21
578:3,7
581:23
582:18
584:14
585:10
589:10
590:22 593:9
605:4
607:13,16
610:11
613:13
618:18
619:14 620:9
621:9 623:20
628:22,25
630:20
634:12 642:1
644:15
645:23 647:5
649:19 656:3
661:22
662:19
668:23
669:11
671:23 672:4
676:18
697:17 699:1
704:4,15
706:19
708:7,16
709:7,18
712:20 747:4
753:22
754:12
**Texas**
570:18
572:5,21
573:5 586:8
595:2 596:6
602:2 641:2,
4,6 670:20
671:5
694:15,16
696:11,12
733:14
**text**
649:20
713:19
732:15,18,24
733:3,5,21
735:15,20
**texted**
733:12 734:1
**texts**
649:22
**thank**
551:20 559:6
572:2
582:17,24
597:20 614:3
621:7 622:14
631:10
640:19
692:19 716:4
721:16 737:5
746:23 762:1
**Thanks**
739:1
**theme**
741:24
**thereof**
740:1
**thing**
553:9 560:12
628:17

659:14,16 674:3,7 742:21 747:11 757:11

**things**
579:2 585:1 628:23 629:1 630:24 631:1 649:6 673:9 674:1 689:12 707:23 716:6 719:15 721:12 735:5 741:19 744:9

**think**
551:3 555:3, 8,19 556:7,9 564:18 567:9,11 569:18 570:9,19,24 572:15,22,24 573:2,8 574:1 575:24 577:24 578:11 582:3,18 587:16,19 588:9 589:19 591:17 592:14,18,19 593:13,21,22 594:6 595:19 596:2,3,17 597:24 598:5,8 601:13,24 602:1,24 604:6 605:14 607:2,11,21 613:7,19 614:19 616:24 622:8,21,24 623:9 624:16,17 636:12 637:13 638:1,3 646:8 647:19 650:3,17,20 653:18 656:13,15 664:24 665:14 666:22 671:4,18 672:7,11 679:19 687:10,13 691:20 693:16 695:10 697:9,15 698:4,11,16 699:8 704:20 707:6,7 710:11 713:9 716:2 720:25 724:5,18,19, 20 730:18 734:12,13 739:23 740:6 743:5,6,10 744:10 745:25 753:3,5 757:22 758:20 760:10

**third**
562:20 563:10 651:14 714:24 746:6

**third-party**
563:6 628:14 651:4,23,25 710:8 711:12 712:23 744:6 746:11

**thought**
555:4 558:15 626:24 627:2 713:17 714:2,3 718:8

**three**
556:13 559:8 565:15 683:13 698:13

**three-way**
734:15

**thrown**
611:25

**Tim**
589:24,25 650:12,16 652:5

**time**
550:17 551:24 552:9,10,18 554:2 555:23 556:2 564:13 577:16 580:9 582:6,20 583:10,14 588:18 589:8 596:15,17 597:2,7,9, 15,23 600:19 601:18 606:9 610:6 612:4 614:25 616:1,5 618:24 624:10 625:17 633:14 635:14 637:10,25 643:23,25 652:15,19 655:12,13 658:21 667:14 676:1 678:7 679:10 683:4,25 684:13 685:7,8 686:10,11 688:16 689:25 693:10 696:11,23 697:22 698:4 701:4 704:21 705:18,19 706:23,24 707:8 709:21 710:15,18,21 712:5,7 720:11 722:12 726:19 733:24 740:2,4 741:20,24 742:15,21 750:18 751:24 752:4,5

**timely**
674:19 675:6,12,22

**times**
635:13 677:17 718:24 719:21 720:13 724:1 755:5

**title**
643:20

**titled**
623:9 664:15

**today**
551:10 554:12 555:3 558:16 560:11 562:11 568:7 569:24 570:6 572:18,24 573:2,18 576:24 577:3,7 582:9,11 597:6 607:13

611:13
612:18
616:11
630:20
638:10
649:14
650:20,21
654:24
656:3,6
663:10
665:6,19,21
666:3
694:12,13
696:6 702:2
711:10
716:6,12
724:8,15
732:13
738:24
745:20
756:12
761:12
**today's**
552:9 762:4
**told**
564:23 565:6
587:11
590:4,6,13
591:14
592:18
601:22
602:16
605:18 622:2
623:25
659:2,16
664:7 668:2
696:17
704:15
752:25
**Tom**
689:1
**tomorrow**
734:17
736:21
**top**
629:9 636:12
644:6 648:7
653:2 690:10

702:24
708:1,4
**topic**
562:15
651:12 677:5
697:4 698:15
710:3
**topics**
677:6 697:3
698:13
**total**
604:17
610:20
661:8,10,11,
23 663:1
664:25
665:6,10,22,
25 666:4,14,
19 667:20
668:15
681:13 693:7
702:9,12
**totaling**
693:8
**totally**
594:12
**tour**
584:9 585:14
586:3
**toured**
588:7
**town**
686:19
**track**
596:2 695:7
702:1,8
**Tracy**
677:16 678:1
718:5,7,10
723:1,6,7
**traffic**
704:3
**trail**
554:2
**training**
598:23

**transacted**
577:13,17
**transacting**
577:22
**transaction**
574:4 582:13
622:11,21
641:16
642:3,8,17,
22 672:1
705:12
**transactions**
564:13,15
577:25
578:4,8,18
579:4,7
580:14
581:24
582:25
583:4,5,21
590:14,16
591:8 599:24
623:7 672:20
709:1
**transacts**
577:25
**transcribed**
555:24
**transcript**
551:21
680:1,7,14,
20 716:14
**transcription**
563:20 564:6
**transcripts**
570:5 680:5
756:16,17
**transfer**
603:2 605:13
**transferred**
605:5
**transmitter**
725:21
**trial**
550:17
573:5,11

**true**
573:10
656:22
663:23
717:17
720:25
**trust**
595:21,24
598:5,7,8,9,
11,15,17
599:6,9,12,
13,14,17
600:3,9
601:10,15,
19,22,25
602:1,3,6,
10,11 603:2,
4,6,12,15,23
605:6,7,10,
21 606:1,2
611:21
612:10,13,25
613:4,5,8,
15,18,25
614:5,8,16
615:3,11,14,
19,21,23
616:9,12,15,
16,20 618:5,
8,19 619:2,
9,18 620:1,
4,5,11,13,
20,22,25
621:25 644:1
**trust's**
602:17
605:23
**trustee**
621:25
**trusts**
598:18
**try**
589:21
601:14
613:21
645:18
673:12
691:25

721:17 753:19
**trying** 601:9 614:4, 9 649:5 673:7 689:9 691:20 692:10 729:14 738:12
**tune** 682:13 683:19 684:1
**turn** 619:2 692:4
**TV** 549:11
**twice** 570:21
**two** 555:15 556:13 557:18 564:16 565:23 566:10 567:3 568:9 570:14 571:11,12 582:25 585:8 590:15 593:17 600:22,24 606:17,25 608:6 610:20 617:5 618:7 630:19 634:2 635:17 639:3 644:14 650:8 651:2 661:11 667:9,16 668:13 669:1,6,13 670:21 671:8 673:5,11,17 688:6 702:21 703:3,22,24 714:23 716:13 724:5 731:8,10,15, 17 732:2,12 740:13,20 747:11 758:25
**type** 555:22 590:20 689:11 719:22
**typed** 555:25 556:1
**types** 651:18 684:25
**typewritten** 554:13,20 696:4

**U**

**U.S.** 552:14
**Uh-huh** 640:24
**UHY** 596:11,18
**ultimately** 579:3 585:18 620:7,20 626:10,21 627:6 628:7 630:25 633:4 642:18 691:21,24
**unable** 699:2
**unaware** 667:16 760:21
**unclear** 681:16
**unconscious** 634:18
**unconsciously** 634:16
**understand** 555:15 558:9 565:1 578:13 594:12 596:4 598:25 601:9 612:21 613:5,9,25 614:4 623:20 627:24 628:10 638:18 639:17 642:8 657:20 660:11,13,14 661:9 663:16 675:19 681:12 706:5 708:21,22 720:24 744:23 746:9 758:13
**understanding** 559:9 565:13 571:20 574:9 580:16 586:17 591:21 607:17 608:10 609:21 619:19 662:18 676:14 697:17 698:1 717:18 720:1 741:3,8
**understood** 567:2 628:2, 3 660:20 712:21 734:23
**undertakes** 608:11
**unpaid** 630:22 636:15,16
**unwritten** 743:23,25 744:18,22 745:2,4,8,9, 11,21 746:10,16 747:2,16,20 748:8,16 749:9 750:9, 15,23 751:4, 6,8,14,21 752:21,25 753:7,10,14, 20 754:22
**updating** 707:11,12
**USA** 689:18 690:8
**usual** 553:21,22

**V**

**Vagueness** 745:22
**valuation** 596:12,15, 19,23
**value** 706:15
**variety** 721:11
**various** 651:15 729:23
**vast** 731:23
**vendors** 651:4
**Verbatim** 583:2
**verify** 650:11 735:5
**versa** 752:2
**version** 681:7
**versus** 552:11 636:7

695:23
**vice**
752:2
**video**
552:7 557:16,17 680:24 681:6 682:1 701:12 702:3 723:16,17, 19,24 724:2, 3 732:25
**videographer**
549:24 552:1,13 615:25 616:4 652:14,18 710:17,20 762:3
**videos**
681:9,13,15, 16,17,21,24 716:15 756:16
**videotaped**
548:20
**view**
723:25
**viewed**
681:6 724:4
**viewership**
719:23
**views**
681:6,7,8,9, 13,16,17,19, 20,25 683:1 723:25 724:2
**Viktoria**
548:23 552:18 553:17
**virtually**
571:12
**virtue**
557:4 604:11
**vis-a-vis**
723:17
**visibility**
700:9
**visit**
627:8,9
**voice**
734:1,4,10 735:19
**VOLUME**
548:3
**voluntarily**
561:18

**W**

**W-2**
661:15,18,22 662:15,20 665:10,12,24 666:21 667:10 668:21
**Wadsworth**
549:18
**wages**
661:20
**wait**
562:18 576:17 651:13 703:18 750:6
**waived**
550:7,12,22
**want**
551:1 556:12 558:9 561:2, 19 564:17,25 571:23 580:10 581:22 592:25 593:5,8,22 594:8 595:23 596:16 598:20,25 614:13,18,20 618:9,13,14 621:3 625:16 629:11 631:13 637:1,22 638:5,8 639:19,20 640:4,20 643:18 651:12 664:3 677:4,6,8,12 686:5,17 697:6 700:25 703:6 714:10 716:5,6 730:7 734:15 735:1 736:6 737:12,18 739:7 750:12,14 755:5
**wanted**
570:7 617:21 676:14 685:17 721:9 734:16,19 736:24
**warehouse**
584:8,9,16 585:15 586:3,18,23 587:5 588:7 590:4,6,8, 10,20,25 591:10 742:10
**watch**
627:16
**WATERBURY**
548:2
**waves**
678:10
**way**
571:7 583:20 638:7,11 647:11 648:10 654:7,25 656:16 692:7,11,14 693:14,22 694:23 697:4,10,16 699:8,16 701:17 702:4,12 707:23 712:15 715:14,19 717:6 721:7, 17 724:13 750:3
**website**
574:12 575:9,11,16, 17,25 576:2, 4,6,13,18, 21,25 577:4, 5,8,9 584:6, 7 626:21 627:8,9,11 647:17,18,22 648:14,19,25 652:22 653:1,3 654:15 695:5 697:5,7 698:15 699:24 702:7 703:11 704:8 707:22
**websites**
575:2,5,6 576:9,10 577:14,17,23 579:3,8,21 580:8 582:19 583:1 627:4, 5,7 717:4
**week**
557:9,25 558:1,4,17 565:24 567:7,12,19, 21,22,23 568:5,6 569:3 589:7 681:21,24

682:17 683:7,13,20 684:1 735:13
**weekday** 682:9
**weekend** 570:7,12
**weeks** 557:23,24 558:16 571:12 651:2
**went** 555:1 570:7 581:25 586:4,11 693:24 694:7 701:4 702:5 714:12 735:9 741:20
**whichever** 684:20
**who've** 594:9
**WILLIAM** 548:9,14
**wing** 705:19
**withhold** 633:22
**witness** 551:2 552:20,22 553:6,15,24 578:12 596:9 646:24 649:3,10 652:11 702:18,22 710:14 713:14 716:22 719:5,12 720:18 721:6 722:5,19,24 723:5,21 724:11,17 726:3 727:12 735:25 737:10 738:8,18 739:2,22 740:25 741:6 742:4,20 744:21 745:6,17,24 746:2,4 747:18,24 748:3,11 749:12,20 750:11 753:12 754:5,11,19 756:9,14 757:21 758:11,19 759:13,22 760:6,16 761:1
**wonder** 713:15
**word** 569:9 624:18 631:24 675:20
**words** 665:19 691:23 751:2
**work** 555:9 572:4 573:14 585:14 591:22 592:10,13 594:4,11 670:18 673:17 698:9,19,21 730:3
**worked** 594:9,13
**working** 559:11 564:20 594:9,15 732:25 743:9,10 758:25
**workings** 592:8
**works** 585:21 594:14 644:4
**worth** 636:16
**wrap** 615:1 649:6 729:14
**write** 569:4
**writing** 635:2 731:24 739:12,16 740:23 741:4,19 744:5 747:11,12 748:18 750:5 757:15 758:21 759:17
**written** 573:24 641:1 731:13,14, 16,17 732:11 742:17 746:6 747:7,14 748:13,14,15 749:2 751:3 757:6,13,24, 25 759:5 760:8,10
**wrong** 614:15
**wrote** 556:3

**X**

**X06-uwy-cv18-6046436-s** 548:6
**X06-uwy-cv18-6046437-s** 548:11
**X06-uwy-cv18-6046438-s** 548:16

**Y**

**yeah** 558:5,20 578:13 583:13 601:4 609:18 610:1 614:24 621:5 626:22 630:16 636:18 637:15 642:20 650:18 652:11 664:1 667:4 672:5 676:23 702:20 703:18 736:5,9 737:20 760:18
**year** 606:9 607:4 611:12,18 622:11 644:21 645:11,19,21 654:1,20 655:21 656:14 657:16 660:15 663:18 664:10,12 667:7 676:12,13,16 690:1 693:13 698:6 714:24 715:9 749:25 750:4

**years**
593:3,23 598:1,2 610:8,14 611:1 625:24 660:9 661:15 662:12 663:6 665:8,23 666:5,15,20 667:10 670:21,24,25 671:8,9,10 676:4 709:14,20 714:23 715:4 719:3 740:17 759:15

**years'**
709:13

**yellow**
690:25

**yes/no**
721:23

**York**
552:15

**Youtube**
682:25 700:4,5 724:2

**Yup**
702:22 709:6

**Z**

**Zach**
553:3 567:11 596:7 712:9

**Zachary**
549:15 551:18 553:4

**Zapada-hernandez**
708:4

**zero**
645:14,19 676:14,16

**Zimmerman**
704:11

**zone**
552:10

**Zoom**
551:8,12 558:22 559:3 568:2,4,24,25 569:15,21 618:2