```
1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3    Avi Moshenberg,              )  CASE NO:  22-60043
                                  )  ADVERSARY
4                 Plaintiffs,     )
                                  )  Houston, Texas
5        Vs.                      )
                                  )  Wednesday, August 3, 2022
6    Free Speech Systems LLC,                       )
                                  )  10:02 a.m. - 5:05 p.m.
7                 Defendants.     )
     -----------------------------)
8

9                               TRIAL

10        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For Plaintiffs:        MARCEL FONTAINE
                            McDowell Hetherington LLP
14                          1001 Fannin Suite 2700
                            Houston, Texas 77002
15
     For Defendant:         RAY BATTAGLIA
16                          Law Offices of Ray Battaglia, PLLC
                            66 Granburg Circle
17                          San Antonio, Texas 78218

18   Court Reporter:

19   Courtroom Deputy:      Zilde Martinez

20   Transcribed by:        Veritext Legal Solutions
                            330 Old Country Road, Suite 300
21                          Mineola, NY 11501
                            Tel: 800-727-6396
22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

```
 1                              INDEX

 2   PLAINTIFFS' WITNESSES    DIRECT   CROSS    REDIRECT   RECROSS

 3

 4

 5   DEBTOR'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

 6   W. Marc Schwartz       52        101,       228

 7                                    159,

 8                                    177,

 9                                    223

10   PLAINTIFFS' EXHIBITS                        RECEIVED

11

12   DEBTOR'S EXHIBITS                           RECEIVED

13   Exhibit 1      CV of W. Marc Schwartz       52

14   Exhibit 3      Plan Support Agreement       59

15   Exhibit 2      Engagement letter between

16                  W. Marc Schwartz and FSS     60

17   Exhibit 8      Forbearance agreement        70

18   Exhibit 4      8/13/20 promissory note      74

19   Exhibit 5      8/2020 security agreement    75

20   Exhibit 6      11/10/2021 promissory note   76

21   Exhibit 7      UCC 1 Financing Statement    77

22   Exhibit 11     Critical Vendor List         89

23

24

25
```

```
 1        HOUSTON, TEXAS; WEDNESDAY, AUGUST 3, 2022; 10:02 A.M.

 2                          (Call to Order)

 3        THE COURT:  Good morning, everyone.  This is Judge

 4   Lopez.  Today is August 3rd.  I'm going to call the Free

 5   Speech Systems case here on first days.  I've completely

 6   muted to the phone line so I'm going to take appearances in

 7   the courtroom then I'm going to take appearances for anyone

 8   on the phone.  If you wish to be recognized, you just need

 9   to hit five star, give me a second and I will unmute your

10   line.

11        I'll just remind everyone who may be appearing, by

12   video that appearing by video is just the same as appearing

13   live in Court.  So, I would just ask that everyone please

14   observe the decorum that you would use if you were live in

15   the courtroom, that you would exercise that same judgment if

16   you were appearing by video.

17        So, with that said, let me go ahead and take

18   appearances.  And I will begin in the courtroom.

19        MR. BATTAGLIA:  Good morning, Your Honor.  I

20   assume this microphone is working.  Your technology is --

21        THE COURT:  We're good today.

22        MR. BATTAGLIA:  Okay, good.  Ray Battaglia on

23   behalf of Free Speech Systems.  Appearing with me today are

24   Hyung Lee and RJ Shannon.  Also present in the courtroom is

25   Marc Schwartz, the Chief Restructuring Officer for my
```

1    client.  And on the telephone, Norm Pattis, the Counsel for

2    the Debtor in the Connecticut State Court litigation.

3           THE COURT:  Okay, thank you.  And if -- I can --

4    good to see you in person, Mr. Battaglia.

5           MR. BATTAGLIA:  Good to see you, Judge.

6           THE COURT:  Good morning.

7           MR. MOSHENBERG:  Good morning, Your Honor.  How

8    are you?

9           THE COURT:  Good.  Good morning.

10         MR. MOSHENBERG:  I'm here on behalf of the Texas

11    Plaintiffs, Avi Moshenberg.  And also, as we had hoped, we

12    have secured Jarrod Martin and Marty Brimmage as our

13    bankruptcy counsel on behalf of the Texas Plaintiffs, Your

14    Honor.

15         THE COURT:  Okay, good morning.

16         MR. CHAPPLE:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. CHAPPLE:  Nice to see you again.  Ryan Chapple

19    on behalf of the Connecticut Plaintiffs.  I have my

20    colleague, Eleanor Sterling here in the courtroom.

21         THE COURT:  Good to see you.

22         MR. CHAPPLE:  And Mr. Chris Mattei on the line as

23    well.

24         THE COURT:  Okay, good morning.

25         MR. NGUYEN:  Good morning, Your Honor, Ha Nguyen

1    appearing on behalf of the United States Trustee.  Also with
2    me in the courtroom is Assistant U.S. Trustee Millie Sall.
3              THE COURT:  Oh, pleasure.  Seen the name, a
4    pleasure.  Nice to see you.
5              MR. LEMMON:  Your Honor, Steve Lemmon.  I
6    represent PQPR Holdings Limited.
7              THE COURT:  Oh, good morning.
8              MS. HASELDEN:  Good morning, Your Honor.  Melissa
9    Haselden, the Chapter 5 Trustee.
10             THE COURT:  Good morning, Ms. Haselden.  Anyone
11   else in the courtroom wish to make an appearance?
12             MR. CHAPPLE:  Your Honor, my apologies.  I
13   neglected to make clear and introduce Mr. Brimmage as
14   counsel for the Connecticut Plaintiffs as well.
15             THE COURT:  Oh, okay, good morning.  Okay.  I
16   think we've taken all the appearances in the courtroom.  If
17   anyone wishes to make an appearance who's on the line, why
18   don't you hit five star and I will unmute your line.  Okay.
19   I've got a 361 area code.
20             MR. JORDAN:  Judge, Shelby Jordan.  I represent
21   Alex Jones.
22             THE COURT:  Okay, good morning.  Mr. Jordan, I'm
23   going to mute --
24             MR. JORDAN:  Good morning, Judge.
25             THE COURT:  -- I'm going to leave the other line

1  unmuted.  If you could just keep your phone on mute during

2  the time, but if you wish to make a statement, obviously,

3  I'll keep your line unmuted.  You don't need to hit five

4  star again.

5       MR. JORDAN:  All right, thanks.  Thank you.

6       THE COURT:  Anyone else wish to make an

7  appearance?  Okay, I've got an area code 203.

8       MR. PATTIS:  Judge, this is Norm Pattis.  I don't

9  have an appearance in the file, but I was asked to make

10  myself available today, so I am here.

11       THE COURT:  Okay.  Thank you.  Mr. Pattis, just

12  for clarification, you represent just FSS in the Connecticut

13  --

14       MR. PATTIS:  I'm sorry, sir?

15       THE COURT:  Just want --

16       MR. PATTIS:  No sir.  I represent --

17       THE COURT:  Go ahead.

18       MR. PATTIS:  I apologize, sir.  I represent Free

19  Speech Systems and Alex Jones in the Connecticut Litigation.

20       THE COURT:  Okay, thank you.  Now, I'll keep your

21  line unmuted as well.  And just keep your phone on mute,

22  sir.  Thank you.

23       MR. PATTIS:  Yes, sir.

24       THE COURT:  Would anyone else wish to make an

25  appearance?  Okay, now that we've taken all the appearances,

1    Mr. Battaglia, I'll turn it over to you.

2           MR. BATTAGLIA:  Thank you, Your Honor.  Ray

3    Battaglia for Free Speech Systems.  The matters before the

4    Court today are Docket Number 6, the cash collateral motion.

5    And with that motion, Your Honor, we have an issue that

6    lingers with the -- I'll call them the Plaintiffs' Group --

7           THE COURT:  Mm hmm.

8           MR. BATTAGLIA:  -- that I'll come back to and

9    discuss in a moment, and we can decide how to proceed.

10          THE COURT:  Mm hmm.

11          MR. BATTAGLIA:  With respect to the motion to

12   provide adequate assurance for payment of utilities, Docket

13   Number 7, the Court had suggested that a two-week segregated

14   escrow be established.  I'm wise enough to -- and have

15   inserted that in the proposed form of order.  And unless the

16   Court requires more, there's no opposition to that motion

17   with that change.

18          THE COURT:  Okay.

19          MR. BATTAGLIA:  Generally, the motion provides

20   pretty standard procedures for a utility to come in and

21   request additional adequate assurance if they think -- and

22   then a protocol for how that proceeds.  But generally,

23   between the two-week escrow and the ability to generate cash

24   flow, we've offered that as adequate assurance at this

25   juncture.

```
1              THE COURT:  Okay.  Let me hear from Mr. Nguyen.
2    Mr. Nguyen, have you had an opportunity to --
3              MR. NGUYEN:  Yes, Your Honor.  I've also spoke
4    with Mr. Battaglia.  We have no objection to the utilities
5    motion.
6              THE COURT:  Okay.  Is there a revised proposed
7    form of order that I can --
8              MR. BATTAGLIA:  I will upload an order this
9    evening, Your Honor.
10             THE COURT:  Okay.  Let me just hear this -- I
11   spoke to the utilities motion, which is at Docket Number 7.
12   Anyone wish to be heard in connection with that particular
13   emergency motion?  Okay, anyone on the line?  Let me just
14   check.  And if you do, you need to hit five star.
15             Okay.  I would just note then for the record that
16   at Docket Number 7, it was an emergency motion seeking entry
17   of an order approving the Debtor's proposed form of adequate
18   assurance of payment for future utility services and
19   approving adequate assurance procedures.
20             A very common first day motion to provide adequate
21   assurance to utility providers without adequate assurance,
22   Section 366 of the Bankruptcy Code would allow utility
23   providers to not -- essentially not provide services if they
24   so wish to.  So, upon the furnishing of adequate protection
25   -- actually, adequate assurance and the related procedures,
```

1    I'm going to ask the Debtor to ease into the Chapter 11

2    process and still maintain all of its utilities on an

3    ongoing basis.

4            So, I have proposed at the last hearing, and Mr.

5    Battaglia has kindly agreed, to take the Court's

6    consideration of a two-week deposit at -- in a segregated

7    account that would serve as adequate assurance.  Any utility

8    can come in and ask for additional assurance, but I am

9    comfortable with a two-week in a segregated account.

10           And Mr. Battaglia, it can be placed -- I've got a

11   question about the bank accounts, just so I understand the

12   cash management system.  But theoretically, I'm comfortable

13   with just it segregated with -- still held by the Debtors.

14           MR. BATTAGLIA:  Separate account, Your Honor, or

15   just accounting segregated?

16           THE COURT:  Just accounting segregation for my

17   purposes is fine.  Just something that utilities cand feel

18   comfortable, that they could look to that's accounted for on

19   the books.

20           MR. BATTAGLIA:  We are in the process of opening

21   DIP accounts with Access Bank.

22           THE COURT:  Okay.

23           MR. BATTAGLIA:  And moving the Debtor's accounts

24   to that bank.

25           THE COURT:  Okay.  It just makes it easier.  And

1    at the end of the case, then if -- depending on where we end

2    up, one can provide an order and a plan or something that,

3    you know, the deposit would then go back at the end of the

4    case.  It just makes it a little bit easier.

5         So, with the proposed change, I'll grant the

6    emergency motion at Docket Number 7.  I would just ask that

7    you run the proposed order by Mr. Nguyen before you get it

8    on file.  Make sure the Trustee's okay with it, and then

9    file it on the Docket and I'll take a look at it.  If it

10   looks good, I'll sign it, okay?

11        MR. BATTAGLIA:  Depending upon how late we go

12   today, I'll leave the -- well, Mr. Nguyen, by tomorrow,

13   Judge.

14        THE COURT:  Okay, and if any other party asks to

15   see it, just -- can I just make sure that everyone takes a

16   look at it before you upload it?  But I find this to be

17   fairly routine.  So --

18        MR. BATTAGLIA:  Your Honor, Docket Number 8 is the

19   Debtor's emergency motion for authority to pay critical

20   vendors.

21        THE COURT:  Why don't we take up 9 first and then

22   we can kind of take up 6 and 8 together?  Because I think

23   they relate.

24        MR. BATTAGLIA:  That's fine, Judge.  The Docket

25   Number 9 is the Debtor's emergency motion to extend time to

1    file schedules and statements of affairs.  There's no

2    opposition to the relief requested in that motion.

3         THE COURT:  Okay.  Does anyone wish to be heard in

4    connection with the motion to file -- I should say to extend

5    the time to file schedules and statements?  Just checking

6    online.  Okay.  This is another what I consider to be

7    procedural ordinary course, it's just providing for

8    essentially a two-week extension of the time.  I want the

9    Debtor to get the schedules right and to take the time to

10   get it right so there's no filing of amendments if that's --

11   it has the right to do that, but I'd rather you come out

12   with what you feel is right.  So --

13        MR. BATTAGLIA:  And Your Honor, the proposed

14   order, the 15th day falls on a Sunday, so I've put a date

15   certain of the following Monday.

16        THE COURT:  Okay.

17        MR. BATTAGLIA:  The Code authorizes only a 15-day

18   extension for a Sub B case without further cause.

19        THE COURT:  No, it's fine.  The 29th is fine.  I

20   want you to -- if that's the date you'll feel you can get it

21   right by, then let's do that.  Let me just -- I'm signing

22   that order right now and I'm going to send it off to

23   Docketing.

24        Mr. Nguyen, can you just talk to me, just

25   generally at the 10,000-foot level?  I just want to

1    understand the Debtor's cash management -- current cash

2    management system.  Where does it hold bank accounts and

3    what's going on there?

4              MR. BATTAGLIA:  The current bank account is at

5    Security Bank in Crawford, and it'll be moved to Access Bank

6    as a DIP account.  Security, not a DIP approved account.

7              THE COURT:  Okay.  Is Access?

8              MR. BATTAGLIA:  Yes.

9              THE COURT:  Okay.  And Mr. Nguyen, I'm sure you'll

10    -- I'm just going to -- you'll be working with them on the -

11    -

12             MR. NGUYEN:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MR. NGUYEN:  We'll check the bank account to make

15    sure it's properly collateralized and approved -- on the

16    approved list.  I believe it is, but (indiscernible) I

17    imagine it is.  I haven't seen the list.

18             THE COURT:  Okay, I'll -- but if any issues come

19    up, then you'll just let me know, but I'm going to assume

20    that, if I grant debt relief related, that there's no issues

21    with the cash management system now, and we'll be -- you all

22    continue to work on that, so there's no issue for me to take

23    up on that.

24             MR. BATTAGLIA:  Yes, sir.

25             THE COURT:  Okay.  (Indiscernible) how many

1    employees (indiscernible) right now?

2          MR. BATTAGLIA:  There are 58 employees.  They're

3    employed through a PEO with ADP.  And we're current on

4    payroll.  We paid the payroll through the filing date to

5    avoid having any disruption with employees.

6          THE COURT:  Okay.  So, it's just a related

7    question, so I want to look at the budget for employee

8    payroll, that's not including any pre-petition amount?

9          MR. BATTAGLIA:  It will not.

10         THE COURT:  Okay.  How much cash on hand does the

11   Debtor have from the petition date?

12         MR. BATTAGLIA:  Your Honor, it's --

13         THE COURT:  Just roughly.

14         MR. BATTAGLIA:  -- I'll let (indiscernible) give

15   the current --

16         THE COURT:  Just on the back of the envelope.  I

17   won't hold you to the number.  I'm just trying to understand

18   just generally.

19         MR. BATTAGLIA:  As of filing date, approximately

20   $1.3 million, of which about $800,000 was not cash

21   collateral.

22         THE COURT:  About $800,000?

23         MR. BATTAGLIA:  One of the -- yeah, the Debtors

24   you will learn, receives large donations on occasion.

25         THE COURT:  Mm hmm.  Okay.

1          MR. BATTAGLIA:  And obviously there's great

2    variability in that in the sense --

3          THE COURT:  So that half a million of just what

4    you would consider cash collateral, about $1.3 million and

5    about $800,000 we would call restricted for now, and then

6    another half a million --

7          MR. BATTAGLIA:  My estimate, yes, sir.

8          THE COURT:  Okay.

9          MR. BATTAGLIA:  Now, that's the full accounting.

10         THE COURT:  So, and we'll get into this, and I

11   kind of just want to understand before we get into the cash

12   collateral motion, just when I looked at the budget, it's

13   your 13-week cash flow using -- it's just simply going week-

14   by-week.  I don't -- I didn't see kind of a beginning cash,

15   ending cash analysis there.  And that's why I was asking.

16   So, are you comfortable --

17         MR. BATTAGLIA:  It was not in the -- because as of

18   the time we filed the motion, we didn't know what the

19   beginning cash balance would be.

20         THE COURT:  Okay.

21         MR. BATTAGLIA:  But we obviously can provide that.

22         THE COURT:  Okay.

23         MR. BATTAGLIA:  It's now, as we understand it,

24   about $1.3 million.  And you know, in-flows, Judge, the

25   nature of the cash generation aspects of this business,

1    obviously the broadcast generally in and of itself doesn't

2    produce revenue except by advertising, and also by

3    generating product sales.  And product sales are dependent

4    on a number of things.  One of them is Alex Jones being the

5    broadcaster.

6              THE COURT:  Mm hmm.

7              MR. BATTAGLIA:  And another one is the

8    availability of inventory, which has been an issue in the

9    first quarter of this year, and one that we are rapidly

10   solving for.

11             THE COURT:  Okay.  And I'm going to let you turn

12   to your presentation.  I apologize for -- I just had a

13   couple of questions to understand.

14             MR. BATTAGLIA:  I'm here to answer the Court's

15   questions, Judge.

16             THE COURT:  So, I understand that the -- just from

17   the -- my knowledge from the prior cases, there were cases

18   pending in Austin and in Connecticut.  There was one of the

19   litigation claims as continuing out of assigned, an order

20   lifting a stay.  We still had the fraudulent transfer action

21   in Austin.  So, those are the two Austin actions that I was

22   aware of.  And there was, what we call the Sandy Hook

23   litigation in and -- pending in Connecticut.

24             MR. BATTAGLIA:  There's one other lawsuit in

25   Austin.  It's the Fontaine lawsuit, which is not

1    consolidated with Austin (indiscernible) lawsuit --

2           THE COURT:  Oh, that's right.

3           MR. BATTAGLIA:  -- and is not currently in trial.

4           THE COURT:  Got it, okay.  That was the --

5           MR. MOSHENBERG:  There's also -- yeah, thank you.

6    There's the Posner case, also, Your Honor.  It's another

7    Sandy Hook litigation.

8           THE COURT:  Right, yeah, no, no.  That's exactly

9    right.  But they're all kind of related.

10           MR. MOSHENBERG:  Yes sir.

11           THE COURT:  They're -- those were the ones that

12   were released on a case -- I get it there were several cases

13   on it, but this -- I'm thinking just in buckets.  In the

14   Connecticut litigation, I do remember that there were

15   potentially several lawsuits pending, but they were overall

16   related.  The same kind of set of Plaintiffs there.  Are

17   there -- is there any additional litigation with respect to

18   this Debtor that's different than the --

19           MR. BATTAGLIA:  Your Honor, I think --

20           THE COURT:  I guess what I'm looking at --

21           MR. BATTAGLIA:  Sandy Hook related?

22           THE COURT:  Well, I'm thinking -- I remember the

23   three Debtors were all actually Defendants in the -- in all

24   of these litigation, in one way or the other, whether the

25   InfoW, IW Health, and Prison Planet.  Is FSS asserting any

1   claims against -- any cross-claims, any counter-claims

2   against any other parties related to this litigation?  Are

3   they being sued separately by any party in any parts of this

4   litigation?  I'm just trying to understand.

5           I understood the last Debtors I had.  I just --

6   I'm just trying to get up to speed so if folks start

7   mentioning litigation claims, then I'm up to speed.  Is

8   there any other litigation that I should be aware of that

9   relates to Mr. Jones, any of his entities, as it relates to

10  FSS that's different or in addition to the ones that I

11  mentioned?

12          MR. BATTAGLIA:  Yes, sir.  With respect to the

13  Sandy Hook litigation, the extent the -- and I'll call it

14  the IW Defendants --

15          THE COURT:  Mm hmm.

16          MR. BATTAGLIA:  -- have been dismissed with

17  prejudice.  There are no cross-claims or counter-claims

18  between those parties.

19          There is I think one piece of litigation that does

20  join both IW and FSS, and that was a lawsuit filed in

21  Florida that the Debtor and its affiliates were successful

22  and won at trial.  And it's up on appeal.  It was a -- no

23  damages, shall we say acquittal judgment entered in the

24  Florida case.  That case has been pending for a while with

25  no action ongoing.

 1          THE COURT:  Okay.

 2          MR. BATTAGLIA:  In terms of other litigation, I'm

 3    aware of, and there could be a few more, but these are the

 4    ones I'm aware of, I know that FSS was sued for intellectual

 5    property improper use, copyright infringement, a lawsuit

 6    which is not extraordinary for this business.

 7          And that is probably a couple of months past

 8    answer date.  And there is a lawyer representing the Debtor.

 9    And then I am aware of another lawsuit filed in New York, I

10    think Federal Court -- don't hold me to that -- that alleged

11    that an ADA violation for not making its website accessible

12    or its purchasing website accessible to, I think it was

13    visually impaired individuals.  And that -- it was filed at

14    or about the same time as the copyright infringement case.

15          THE COURT:  Okay.

16          MR. BATTAGLIA:  Those are the ones I'm aware of.

17          THE COURT:  Thank you.

18          MR. LEE:  Your Honor, Kyung Lee for the record.  I

19    just want to supplement that -- what Mr. Battaglia said.

20          THE COURT:  If you can just get closer to the mic.

21    I want to make sure everybody can hear you.  I appreciate

22    it.

23          MR. LEE:  I'll just tell Mr. Battaglia --

24          THE COURT:  And just considering these are

25    preliminary questions, I just want to make sure that I

1    understand the lay of the land before we --

2            MR. LEE:  For purposes of complete transparency,

3    Your Honor, there was an indemnity claim that Mr. Jones

4    filed against FSS in the Connecticut litigation last week,

5    which has been stricken by the Connecticut Judge, Honorable

6    Bellis yesterday.

7            So, I just want you to know that there was an

8    indemnity claim made by Alex Jones against FSS.  So, that's

9    another claim that existed.  And I think Mr. Jones is also

10   going to assert a proof of claim in the FSS bankruptcy case.

11           THE COURT:  Okay.

12           MR. LEE:  I just wanted to let you know that.

13           THE COURT:  So, but you said that litigation, that

14   cause of action is it -- doesn't seem like it's live

15   anymore, is that --

16           MR. BATTAGLIA:  There is an update, obviously, of

17   developments from yesterday.  And I am going to give the

18   straight version without any color on either side.

19           THE COURT:  Okay.

20           MR. BATTAGLIA:  It is that the judge preceded with

21   hearings yesterday in Connecticut and did strike the cross-

22   claim.  And then apparently, suggested that the litigation

23   should go forward and pick a jury, although FSS was still a

24   party to that litigation and had not been settled.  As a

25   consequence, FSS filed a notice of removal of that

1    litigation.

2            THE COURT:  Okay.

3            MR. BATTAGLIA:  We didn't feel it was appropriate

4    with --

5            THE COURT:  Where is it pending now, in front of a

6    bankruptcy court, like an adversary proceeding in front of

7    bankruptcy court or something?

8            MR. BATTAGLIA:  It will be pending in front of a

9    Bankruptcy Court.  Is it Bridgeport?

10           MR. LEE:  Yes.

11           MR. BATTAGLIA:  It's in Bridgeport.

12           THE COURT:  Okay, okay.

13           MR. BATTAGLIA:  So, that's the status of it.  And

14   I know the parties are having some conversation about what

15   that means for Friday, the emergency motion to lift stay.

16   Nothing further to report on it.

17           THE COURT:  Okay.  No, no, no, I just -- I

18   appreciate it.  I know that there's a lot of moving pieces

19   and I just want to just understand that before we got into

20   the motion, just so we're all on the same page.  I think you

21   answered all my basic questions.  I just wanted to

22   understand kind of the employees' insurance.  Any issues

23   with insurance that I should be aware of?

24           MR. BATTAGLIA:  We have insurance coverage.  And I

25   believe part of the payments in the critical vendor include

1    payment of the policy.

2              THE COURT:  Okay.  All righty.  I will stay quiet

3    and let you --

4              MR. BATTAGLIA:  No, you won't, Judge.

5              THE COURT:  -- turn it back over to you.

6              MR. BATTAGLIA:  This is your courtroom.

7              So, the remaining two matters, Your Honor, are the

8    cash collateral motion and the critical vendor motion.  And

9    where we stand on those, Mr. Martin and I have had several

10   conversations on the cash collateral motion.  There's

11   certain accommodations being made, and I'll -- the biggest

12   one relates to a $250,000 payment to PQPR that is shown in

13   the budget.  That is a -- the way the Debtor operates with

14   PQPR in inventory, if PQPR purchase inventory, pays for it,

15   sells it through our sales channel, the Debtor gets 20

16   percent of the net.  PQPR gets 80 percent of the net.  If

17   it's FSS's inventory, and obviously, FSS is Free Speech

18   Systems, 90 percent goes to the Debtor and 10 percent goes

19   to PQPR for its involvement in the purchasing and

20   involvement in the -- as I understand it, supplements have

21   to have, and don't hold me to this word -- be sold under

22   some certification, and Dr. Jones individually, PQPR holds

23   that certification.  That's my very basic understanding.

24             And so, there is inventory that we have agreed to

25   purchase from PQPR.  It has not been delivered yet, that

1    it's pre-paid $750,000 for.  We would like to move that

2    inventory into the FSS inventory category and sell it and

3    receive 90 percent of the net.  The profit margin on

4    supplements can be anywhere from 3X to 5X, so we think it's

5    a good investment for this estate.  And the accommodation

6    that the Plaintiffs have requested is that they have a 30-

7    day look claw back window look -- to file something, if they

8    think the payment is inappropriate.  And we're amenable to

9    that.

10            There are some other changes we've agreed to,

11   particularly strengthening the reservation and the no waiver

12   provisions that aren't intended.  We have proposed a

13   replacement lien to the equivalent validity and priority of

14   the existing PQPR pre-petition liens.  Obviously, if there's

15   no pre-petition lien, there's no replacement lien.  And the

16   -- I think the remaining -- there was also a request that we

17   limit any insider payments to not more than $20,000,

18   exclusive of that $250,000 payment I just mentioned.  And

19   we're amenable to that.  We'll put that in an order.

20            So, the hang-up here that we have, and we can

21   discuss it in a little more detail later, is that they've

22   requested that they be given challenge rights with respect

23   to the PQPR liens, like, basically, Louisiana World

24   Exposition rights.  And the Debtor is not amenable to that.

25            We have two options as far as proceeding.  One of

1   course, is just to go forward with the full-blown hearing.

2   And the other is for, I guess Mr. Martin and I, and I'm not

3   sure who else, to stand up and say why we think the creation

4   of the Tort Committee is a good idea or a bad idea at this

5   point in time, and let the Court give us some direction on

6   that.  I'm amenable to whatever the Court would like to do.

7   But other than that, there's no opposition to the use of

8   cash collateral.

9            THE COURT:  Okay.  And with respect to the

10   critical vendor motion, where do things stand?

11            MR. BATTAGLIA:  The only comment I received was

12   from Mr. Nguyen, who asked that I make a proffer of the

13   critical nature of the vendors.  Otherwise, there's no

14   opposition of the critical vendors.

15            THE COURT:  Okay.  And the critical vendors, when

16   is it generally?  And we haven't taken any evidence, but I

17   just want to understand it.  When are those payments due?

18   When do you need them?  When does the Debtor need to make

19   those payments?

20            MR. BATTAGLIA:  I think they do come in.  They're

21   probably staggered, but some of them are very important.

22   You know, obviously, you're in the broadcast business in the

23   modern world.  Access to the internet and satellite and

24   other things is vital.  And if you go dark, it's extremely

25   costly.

001556

```
 1              So, I don't know specifically.  And Mr. Schwartz
 2    may or may not know precisely when those payments are due.
 3    But certainly, I would say within the next two weeks, we
 4    have to make -- we have to commence making payments.
 5              THE COURT:  Okay.
 6              MR. BATTAGLIA:  I think they're not broken out as
 7    critical vendor payments in the budget.  They're included
 8    within the expense items.
 9              THE COURT:  Okay, thank you.
10              MR. BATTAGLIA:  So --
11              THE COURT:  Let me hear from -- go ahead.
12              MR. BATTAGLIA:  And then as far as the remaining
13    things, you had asked at the last hearing to have Mr.
14    Schwartz address the relationship with IW.  I'm prepared to
15    do that however the Court would like.  And you know, I have
16    to make one comment.  I kept hitting five star the other day
17    because I kept hearing about $62 million going to Alex Jones
18    in the last two years -- and I think it's in the objection.
19    $62 million has been drawn on account of Alex Jones over 15
20    years, over $30 million of which was to pay income taxes,
21    which this is a flowthrough entity, and the LLC has an
22    obligation to pay the tax obligations.
23              I understand those payments were directly from FSS
24    to the IRS.  So, I just -- I'm not going to go any further
25    than that to say I can't leave that -- the misinformation
```

1    going out across the globe without offering some

2    explanation, because it's highly prejudicial.  But I'm

3    prepared to proceed however the Court would direct me.

4              THE COURT:  Okay.

5              MR. BATTAGLIA:  You want me to turn the podium

6    over?

7              THE COURT:  Yeah, let me just hear if anyone --

8    what other parties may have to say at this time.

9              MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

10   again, on behalf of the Connecticut Plaintiffs.  And I --

11   just a little logistics today.  And I'm sure you know

12   because you read the pleadings.  The Connecticut Plaintiffs

13   and the Texas Plaintiffs filed a joint objection.

14             THE COURT:  Mm hmm.

15             MR. CHAPPLE:  So, today, I believe Mr. Moshenberg,

16   Mr. Brimmage, and myself, collectively refer to the group as

17   the Sandy Hook Plaintiffs.

18             THE COURT:  Okay.

19             MR. CHAPPLE:  A few comments about what Mr.

20   Battaglia said with regard to just the narrow issue of cash

21   collateral.  I think it was an accurate recitation of where

22   we are in the back and forth between the parties.  But I

23   want to add a little color to one issue, and then I want to

24   raise one issue that Mr. Battaglia didn't mention.

25             The issue that he didn't mention, that has been

1   part of the discussion is discovery, the opportunity for the

2   Sandy Hook Plaintiffs, between now and a final hearing on

3   cash collateral, to depose Mr. Schwartz and a representative

4   of PQPR and to obtain written discovery from both of those

5   parties relating to the underlying debt that is really at

6   the key of all of this cash collateral discussion.  So, I

7   believe we're on the same page there, but I just wanted to

8   raise that and let the Court know that issue.

9           THE COURT:  Yeah, yeah --

10          MR. BATTAGLIA:  Ray Battaglia for FSS.  We have

11  agreed to reasonable discovery.  We're not going to oppose

12  that.  There may be some timing issues.  Apparently, this is

13  vacation time of the world and I'm happy to say that I never

14  take a vacation, so it's not my --

15          THE COURT:  I was going to say, when did people

16  start doing that?  Just kidding, everyone.  I'm glad

17  everyone takes vacation.  Go ahead.

18          MR. CHAPPLE:  So, Your Honor, that's just --

19  that's issue one that I wanted to raise, that he didn't

20  speak about earlier.  The other issue, and the issue -- he's

21  right.  The impasse that we've reached, the issue that is

22  crucial to the Sandy Hook Plaintiffs is the lien issue and

23  the ability to challenge this lien.

24          THE COURT:  So, tell me, your clients -- well,

25  from the Sandy Hook Plaintiffs' side's perspective, what

1    should a cash collateral order look like, if you had your

2    way today?  What should an interim order look like today?

3              MR. CHAPPLE:  Today, the interim order should --

4              THE COURT:  What do you want in it?  What do you

5    want out of it?

6              MR. CHAPPLE:  We are agreeable, and I think it'll

7    be a short back and forth between the Debtor and the

8    Connecticut, or excuse me, the Sandy Hook Plaintiffs, going

9    line by line in the 14-day budget that they have.  We've

10   made some modifications.  The original 14-day budget I

11   believe had payments of $54,000 to Mr. Jones.  We've reduced

12   that amount.  So, we've kind of gone back and forth on all

13   of those issues.  I think the sticking point --

14             THE COURT:  So, there's an agreed form of -- well,

15   let's just call it interim -- a proposed form of interim

16   budget, where there -- the line items is -- there may be

17   agreement on buckets for line items for the next couple of

18   weeks.

19             MR. CHAPPLE:  Yes.

20             THE COURT:  Okay.

21             MR. CHAPPLE:  Yes, Your Honor.

22             THE COURT:  Okay.

23             MR. CHAPPLE:  The sticking point is whether or not

24   the Sandy Hook Plaintiffs or any party in this litigation,

25   any party in interest, has standing to challenge the

1    purported lien that PQPR has over the cash that's in the

2    hand of Free Speech Systems.  And so -- go ahead.

3              THE COURT:  No, no, so your objection asks for

4    some language basically saying that I'm not making any

5    findings about whether there's a lien -- a valid lien or

6    not.  If that language is included, what else do you need

7    for purposes now?  Do you want me to grant you standing on

8    an interim basis, do you?  Is that what you're asking?

9              MR. CHAPPLE:  If we --

10             THE COURT:  I'm just trying to understand.

11             MR. CHAPPLE:  Sure, sure, sure.  No, and I

12   appreciate that.  If we have the language that we put in the

13   proposed objection that basically makes the finding that you

14   just --

15             THE COURT:  Mm hmm.

16             MR. CHAPPLE:  -- that you just recited, then I

17   would want just a few minutes to confer with my co-counsel,

18   but I believe we are okay there.

19             The other thing, Your Honor, that we were talking

20   about in the hall right before this, that Mr. Battaglia

21   mentioned, is the Court's ability to appoint a Plaintiffs --

22   a Tort Plaintiffs Committee similar to what Judge Isgur did

23   in the Watson Grinding case, that gives that oversight and

24   power to a committee to challenge those liens and to

25   investigate the validity of those liens.

```
1              THE COURT:  Right.  So, I will -- I'll tell you,

2    Mr. Battaglia's going to have to tell me, and how he feels

3    about that language.  I'm not telling you to agree to it or

4    not.  I just need to understand what your position is, if

5    that language is included for purposes of an interim order,

6    then I'm -- the Court isn't making any findings as to

7    whether there's a lien or not.  You'll have to let me know

8    about that.

9              MR. BATTAGLIA:  Your Honor, I'll do that after the

10   other side is complete -- whoever is going to present --

11             THE COURT:  Okay.  You know, I agreed 1102(a)(3) -

12   -

13             MR. CHAPPLE:  Your Honor, may I go grab my --

14             THE COURT:  Oh absolutely.  And I'm not saying

15   this is what you're asking for --

16             MR. CHAPPLE:  Mm hmm.

17             THE COURT:  -- I'm just noting 1102(a)(3) says

18   that unless the Court for cause orders otherwise of

19   committee creditors may it not be appointed in a small

20   business case or a case under Sub Chapter 5.

21             So, I'm of -- I don't believe I have authority to

22   do anything today, but I do think if someone filed a motion,

23   and we take it up as -- and then we'd find whether there

24   would be cause, unless someone can show me cause today.

25             So, if -- I'm not comfortable agreeing me just
```

1    ordering it over the objection of a party.  Someone's going

2    to have to show cause, and if there's cause then you win.

3    But someone's going to have to tee the issue up as to

4    whether there's cause to appoint a committee.  And if there

5    is -- and maybe that's what you're asking for, is to say

6    that if you're asking for a committee like the Watson

7    Grinding Committee, and that was, I believe, and Trustee

8    will have to tell me, it felt like an official committee.

9    What maybe was a -- someone will have to tell me.  But I

10   think Sub Chapter 5 is a little different.

11           MR. CHAPPLE:  Mm hmm.

12           THE COURT:  So, I don't -- the answer may not --

13   the answer just may be no today, but maybe at some point,

14   maybe you do get it at a final, if you can prove cause or

15   not.  But someone will have to show me where I would have

16   authority to do it today and based on what.  And maybe that

17   evidence comes out today.  But those'll be the questions

18   that I've got.

19           MR. CHAPPLE:  I understand, and I appreciate that

20   clarification, Your Honor.  I think what we do now is take a

21   short recess, let me confer with my colleagues on kind of

22   the question you had about the language that's in the

23   objection, and if that gets us there in the interim.  And

24   then also, I know we were absolutely interested in moving

25   for the creation of a committee for cause.  And we can also

1    talk about that dynamic, and whether or not we feel like if

2    we move forward today in -- while we're objecting to the

3    motion for interim use of cash collateral, we can also prove

4    up the cause needed to form the committee.  So, if the Court

5    will give me that latitude, we can visit for just a few

6    minutes and come back.

7             THE COURT:  You're asking for time to meet, yeah.

8    Mr. Battaglia, I just would need to know, and I'm not

9    telling you one way or the other what you should do.

10   Obviously, I'm already suggesting it one way or the other.

11   I just need to understand that was some requested language

12   in an objection that I read, and I just need to understand

13   whether you'd be comfortable with that.  Because again, I'm

14   just trying to understand.  We haven't taken any evidence or

15   anything.  I just need to understand.

16            But I would need to hear as well -- Mr. Lemmon,

17   you have to tell me one way or the other whether there's a

18   lot of proposed changes to an order, and PQPR would have to

19   let me know whether they'd be amenable to that as well.  And

20   I'll give them the latitude to say yes or no.

21            MR. BATTAGLIA:  Your Honor, I think the changes

22   that Mr. Martin and I exchanged by email last night that are

23   agreed to are a cap on insider distributions of $20,000,

24   individual insiders.

25            THE COURT:  Mm hmm.

```
1              MR. BATTAGLIA:  The $250,000 inventory purchase
2    payment with the claw back provision.  The -- there's
3    nothing in my proposed order that has this Court validating
4    any liens or debts of anybody.  It simply says that there is
5    a replacement lien of equal stature.  That's it.  But
6    they've requested some reservation sand non-waiver language,
7    and -- at least what I saw last night, and I don't know that
8    I recall whether it's the same in the objection, we've
9    agreed to insert that language.  We've agreed to reasonable
10   discovery.
11             And Your Honor, the problem I have with a Tort
12   Committee at this juncture, aside from the fact that there's
13   no motion, aside from the fact that we've agreed to a level
14   of discovery so they can at least take a look behind the
15   curtain, is that creation of a Tort Committee on behalf of
16   creditors who at this point have no -- they have a claim,
17   but they have an unliquidated claim, we don't know whether
18   that claim is going to swamp this Debtor or whether it's
19   going to be manageable and can be paid from operations of
20   the estate, which renders pursuit of, you know, fraudulent
21   conveyance claims as kind of a tomorrow issue.
22             But there's no limitations running on any of these
23   questions.  We just don't see it as a today issue.  If you
24   appoint a Tort Committee with the Debtor's sort of start-up
25   growth back into revenue with product deliveries, the costs
```

1    of that committee are going to swamp this case.  They just

2    are.  They're going to hire a lawyer and they're going to

3    charge it to the estate and they're going to swamp this

4    case.  We think that let them take a look and we can come

5    back and revisit the issue when it's before the Court.

6    That's our position on appointment of a committee at this

7    point.

8          THE COURT:  Okay.  So, you're okay with inserting

9    -- and I want you to confirm that -- the only language that

10   I've read obviously is the language that was in the

11   objection.  Maybe during the break, you can take a look at -

12   -

13         MR. BATTAGLIA:  I will, I will.

14         THE COURT:  -- that language, or maybe Mr. Martin

15   can confirm what that -- you know, I still want to -- and

16   again, and I know there -- still have to put up some

17   evidence.  I still need an evidentiary basis.  And maybe Mr.

18   Schwartz's declaration does the trick or whatever to support

19   critical vendor and cash collateral.

20         MR. BATTAGLIA:  Absolutely.

21         THE COURT:  And I know that.  And again, and at

22   the same time there, maybe I can -- at that time, you can

23   provide the -- I don't know, the clarity that I was looking

24   for with respect to Mr. Schwartz's relationship now with

25   these Debtors as opposed to the last cases.

1           MR. BATTAGLIA:  And if the Court's okay with a

2    proffer at that point, I'm happy to do it.  If not, I'll

3    call Mr. Schwartz (indiscernible).

4           THE COURT:  Okay, I'll let you all figure it out

5    and we'll see if we got a contested hearing or not and

6    whether the declaration's going to work or not.  So --

7           MR. CHAPPLE:  Yes, sir.

8           THE COURT:  It is 10:42.  How much time do you

9    think you all need?  Okay, I'll come back at 10:52, more or

10   less.

11          MR. LEE:  Your Honor?

12          THE COURT:  Yes?

13          MR. LEE:  I have one housekeeping administrative

14   matter.

15          THE COURT:  Okay.

16          MR. LEE:  I just wanted to alert this Court to.

17   Since we're all here today -- Kyung Lee for the record --

18   you know that we have ECF Number 15, the emergency motion

19   for relief from automatic stay scheduled for Friday --

20          THE COURT:  Mm hmm.

21          MR. LEE:  -- at 10 a.m.  And based upon some of

22   the activities that have taken place in Connecticut --

23          THE COURT:  Mm hmm.

24          MR. LEE:  -- especially the removal of the

25   litigation that took place yesterday, I've consulted, or

1   I've asked the counsel for the Connecticut Plaintiffs,

2   whether or not the hearing on Friday is moot because there

3   is no -- going to be a jury selection, as I understand it,

4   which was the basis for the emergency motion, whether there

5   is going to be any jury selection on Monday, next Monday.

6          So, I just wanted to raise that issue because I'd

7   rather have Mr. Schwartz go up to Austin and work on other

8   stuff rather than be here in the courtroom this week.  So,

9   just wanted to raise that.

10          THE COURT:  I'll let the Connecticut Plaintiffs

11   tell me what you want to do.

12          MR. LEE:  Right.

13          THE COURT:  You asked for an emergency hearing,

14   I'll grant you one.  And if you want to come back another

15   day, you can do that.  If you want to go forward on Friday

16   with the Southern District of Texas, you'll get your day, if

17   you want it.  And you just tell me what you want to do.

18          If you want to take some time and talk about it,

19   I'll come back in 10 minutes, and we can talk about

20   everything.

21          MR. CHAPPLE:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MR. CHAPPLE:  As of now, we still want to go

24   forward on Friday.  We're still discussing it.  And one

25   other thing, I -- it always takes a little bit longer than I

1    want it to.  Could we do the top of the hour?  Could we do

2    11:00 instead of 10:42?

3         THE COURT:  Well, I was going to tell you that --

4    that was going to get tricky for me then.

5         MR. CHAPPLE:  Oh wait -- I don't want it to be

6    tricky.

7         THE COURT:  No, I'd rather -- what I was going to

8    say, I would rather just round up, so if someone would come

9    back and ask me for more time.  So, it's 10:43.  I'm going

10   to come back at 11:00, and then I'll check in.  If the

11   parties want more time, you let me know, okay?

12        MR. CHAPPLE:  Thank you, Your Honor.

13        THE COURT:  For the folks who are on the line, I'm

14   going to mute the audio.  But -- I'm going to mute the line.

15   I'm going to let the parties in here have the ability to

16   talk freely.  If there's someone you need to talk to, then

17   call them by the cell, but I'm going to mute the line

18   because I'm stepping off and I'll come back on.

19      (Recess)

20        CLERK:  All rise.

21        THE COURT:  Okay.  I'm back in on the record in

22   Free Speech Systems.  Mr. Battaglia, why don't you tell me

23   where we are?

24        MR. BATTAGLIA:  As far as the language that was

25   suggested, the -- I added one word, moreover nothing herein

```
 1    shall grant or prejudice the rights of -- it goes on to talk
 2    about the rights to challenge the liens and challenge the
 3    debt.  We don't dispute any creditor and party in interest
 4    that has a right to contest the debt of PQPR and the liens.
 5          At this point, I just don't want it to infer going
 6    further that there's any additional rights that are
 7    conferred by this order.
 8          THE COURT:  Okay.  Kind of status quo.  Okay.  And
 9    --
10          MR. BATTAGLIA:  They stand as far as the --
11          THE COURT:  Yeah.
12          MR. BATTAGLIA:  -- Tort Committee issue.
13          THE COURT:  So --
14          MR. CHAPPLE:  Thank you, Your Honor.  Ryan
15    Chapple, thank you for the time.  Appreciate it.  We've had
16    discussions between the Connecticut Plaintiffs and Texas
17    Plaintiffs.  And our position is that cause exists today to
18    appoint a committee.  And the reason that cause exists is
19    even if we have protective language in an interim order,
20    there's still no party that has standing in this case to
21    challenge the validity of those liens.
22          And we believe that the lack of standing for any
23    party to challenge the validity of a lien is cause to
24    appoint a plaintiffs committee today.  And we think it's
25    consistent with the thoughts that the U.S. Trustee has
```

1    espoused on Monday, and I believe it will espouse again

2    today about the need for oversight here.

3             And really, this underlying debt and this lien is

4    a fundamental issue in this bankruptcy case.  And we feel

5    like we have to have a mechanism and the most logical

6    mechanism is a plaintiffs committee that would have the

7    oversight and the ability to challenge those liens.

8             I know that Mr. Brimmage wants to make some --

9    make a few remarks as well, but I wanted to reiterate that,

10   and I believe Mr. Ha would like to make a few remarks as

11   well.

12            THE COURT:  Okay, thank you.

13            MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to touch base with some of

15   the first day motion.  The first thing is the critical

16   vendor motion.  Mr. Battaglia and I, we worked out some

17   language.

18            THE COURT:  Okay.

19            MR. NGUYEN:  He's going to put on some evidence to

20   show the necessity of the payments.  Every time there's a

21   payment outside the statutory scheme, you know, we need

22   (indiscernible) any (indiscernible) --

23            THE COURT:  No, no, no, I agree.  I'm looking for

24   it.

25            MR. NGUYEN:  And then, in addition to that, in the

1    proposed order, there's going to be a redline for the

2    critical vendor, there's going to be a mechanism that allows

3    people to know which critical vendor gets paid.  And then

4    there's a billing objection period that we put in the order

5    to allow other creditors who object.  And then there's

6    potential claw back from the critical vendor.  And that --

7    you're going to see it once we submit the proposed --

8         THE COURT:  The claw back, if someone doesn't

9    provide ordinary --

10        MR. NGUYEN:  Correct, Your Honor.  Or they can

11   challenge the critical nature of that particular vendor.

12        THE COURT:  Yeah.

13        MR. NGUYEN:  It's going to be in a proposed order

14   that Mr. Battaglia's going to file.  And as to the cash

15   collateral, I just wanted to make sure the Court understands

16   that we -- the U.S. Trustee, we do have concerns with the

17   underlying transaction.  I said it on Monday.

18        THE COURT:  Mm hmm.

19        MR. NGUYEN:  It is an affiliate insider debt.

20   When you look at the breakdown of the company, you know, 20

21   percent essentially is owned by Dr. Jones and Alex Jones'

22   wife.  The other 80 percent is indirectly owned by another

23   company that Alex Jones has a majority stake in, someone --

24   there is dealing between parties who are -- you know,

25   there's an insider here.  They're dealing with family

1    members.  We pay particular important attention to it.

2            And I think it's particularly important for

3    someone to be able to take a look at this lien and be able

4    to tell the Court whether we have a legitimate debt or not.

5    And I think that's one of the burden that Debtor needs to

6    prove.  It's that before you can actually approve the use of

7    cash collateral, you've got to prove that there's an

8    underlying debt and it needs to be a valid debt.

9            There's a lot of discussion about Tort Committee.

10   On Monday, I mentioned that, you know, this is not your

11   typical Sub Chapter 5 case.  You usually don't have a $60

12   million loan in a Sub Chapter 5 case.  You don't have $62

13   million in (indiscernible) draws in a Sub Chapter 5 case.

14           And I've always urged the Court to slow the

15   process down, and also consider whether additional

16   protections are needed in this case.  And one of the things

17   I point to is maybe there is a need for a Tort Committee to

18   actually take a look at this loan.  Because usually in any

19   cash collateral case -- in any case where there's a cash

20   collateral, one of the first things I do is I always go in

21   and I preserve the challenge period for the lien for any

22   committee.  That's ordinary.  That's routine.  And any case

23   before you, where I think there's going to be a formation of

24   a committee, we preserve that challenge period.  There's no

25   challenge period here.  Quite frankly, because you know,

 1    there's no one who has that standing to bring that challenge

 2    to the cash collateral.

 3              I'm not advocating one way or the other for the

 4    Tort Committee, but I let the Court know, you know, once the

 5    Court orders the forming of the committee, my office stands

 6    ready, and we will get on it and we will move, and we will

 7    have an appointment as quickly as possible.

 8              That's all I have to say, Your Honor, and thank

 9    you very much.

10              THE COURT:  Thank you.  Mr. Brimmage, good to see

11    you.

12              MR. BRIMMAGE:  Good morning, Your Honor.  It's

13    good to be before the Court.  Marty Brimmage with Akin Gump

14    Strauss Hauer & Feld here on behalf of the Texas Defendant

15    or Texas Plaintiffs as well as the Connecticut Plaintiffs.

16              It's always funny to me when the judge on the

17    bench starts citing a code and starts looking at it and

18    everybody starts scrambling to find their code and remind

19    themselves what it said.

20              But I'm glad you did that because 1102(a)(3) says

21    exactly what you said it did.  Unless the Court for cause

22    orders otherwise --

23              THE COURT:  Mm hmm.

24              MR. BRIMMAGE:  Meaning, the Court can order for

25    cause.

1          THE COURT:  Mm hmm.

2          MR. BRIMMAGE:  And I think that's exactly what you

3    have right here, right now.  It doesn't say upon an

4    evidentiary hearing and findings, and you know, dah, dah,

5    dah, in a contested matter where there's whatever the Court

6    finds cause.

7          It says, the Court for cause.  And I think you

8    have for cause, for the reasons articulated by the U.S.

9    Trustee and the reasons articulated in the cash collateral

10   order that you're being asked to consider right now.  There

11   is nobody -- if there -- typically, there's a challenge

12   period at some point, right?  30, 60, 90 days come in and

13   challenge.  There is nobody that could come in and seek

14   standing to challenge that lien right now.  Maybe by design,

15   maybe not.  That is your cause, Your Honor.  You're going to

16   enter a cash collateral order where nobody can challenge the

17   underlying lien.

18         And now, I'm not asking you to prejudge standing.

19   That's a whole different gig and we'll deal with that in due

20   time.  But right here right now, I think you have cause

21   because without it, you need to have a body that can come

22   and seek standing and attempt to prove that they should have

23   standing and go and check out these liens.  As the U.S.

24   Trustee articulated, that doesn't exist right now.

25         So, Your Honor, for all the reasons that have been

1    articulated to you right now, I think cause exists, and I

2    think under 1102(a)(3), the Court for cause can order a Tort

3    Committee.

4           You have heard about the litigation that's

5    surrounding and involved in this case.  It's predominantly,

6    overwhelmingly, 99.9 percent related to the Sandy Hook

7    Plaintiffs, whether it's a TUFTA action or it's the

8    Connecticut Plaintiffs or it's the Texas Plaintiffs.  And I

9    don't want to say they're all exactly the same, but they all

10   derive from the same facts and circumstances and the same

11   issues.

12          THE COURT:  Mm hmm.

13          MR. BRIMMAGE:  That is who the Tort Committee I

14   think should be comprised of.  We'll leave it to the U.S.

15   Trustee, who said that he can act quickly.  The U.S.

16   Trustee's Office stands ready to act quickly, so that -- and

17   that's what I think we need, Your Honor, and I think that's

18   what you need.  You need that acted quickly so that this

19   case can be adjudicated on the merits, and that we can

20   determine the validity of that lien once and for all from a

21   body that has the authority to seek standing.

22          And with that, Your Honor, I'd answer any

23   questions the Court may have.

24          THE COURT:  Yeah.  I'm going to sit here and

25   listen to a little evidence now and see where things go.

1          MR. BRIMMAGE:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. LEMMON:  Your Honor, if I may, Steve Lemmon on

4     behalf of the secured creditor, PQPR.

5          THE COURT:  Mm hmm.

6          MR. LEMMON:  I just want to make a couple of

7     observations, Judge.

8          THE COURT:  Mm hmm.

9          MR. LEMMON:  First of all, I started with a 20-

10    page cash collateral order, and -- that had a number of

11    findings, had a number of protections for my client, had all

12    the things that we use.  And I determined that in this

13    particular case, with the level of suspicion that's out

14    there in the world, not evidence right now, but suspicion

15    that's out there in the world, that it'd be inappropriate

16    perhaps to do that, just so we could avoid this kind of

17    problem.

18         I believe that the current cash collateral order

19    is really nothing more than a recitation of what the law is.

20    If my client has a lien and if the cash collateral is being

21    used, then I get a replacement lien to the extent that I

22    have a valid lien.  Nothing in it is a finding that

23    prohibits anybody, any party in interest from challenging

24    the lien.

25         Now, Judge, my observation right now is that right

 1   now the evidentiary record is nil.  And in this case, I

 2   mean, I -- we heard the U.S. Trustee say that they want to

 3   perhaps slow things down.  I don't see anything going really

 4   fast right now from my perspective in this case.  I'm one of

 5   the people with a vacation that is going to bollocks up

 6   formal discovery in the next couple of weeks.  And I know

 7   that there are other vacations.

 8          But I've offered informal discovery, Judge, just

 9   so people can assuage some of their fears, some of their

10   concerns so that they can find out what's going on.  And I'm

11   not asking anybody to give up any of their rights right now

12   in connection with this cash collateral order.  It is the

13   most bland cash collateral order I have ever seen in my

14   career.

15          And so, I -- you know, I tried to avoid this fight

16   by giving up all the things I normally would negotiate for,

17   and -- in thinking that we would just address that later in

18   a final order.  This is an interim order.  We're willing to

19   consent to it in order to let this Debtor try its business

20   plan.

21          And that's all I have to say.

22          THE COURT:  Thank you.  Mr. Battaglia, you know,

23   there's one question.  It's related, but not entirely on

24   point.  But I want to make sure I ask you the question.  And

25   it's the question that every judge asks at the beginning of

1    every case.  What does the Debtor hope to accomplish through

2    this Chapter 11 process?

3         MR. BATTAGLIA:  Well, Your Honor, the impetus for

4    filing with the Debtor's just inability to be in two places

5    and fund two trials at one time.  And you know, ultimately,

6    we don't know what the number's going to be in terms of the

7    potential exposure in Connecticut and in Texas.  Eventually,

8    some tribunal is going to give us a number.  Will it be

9    appealed?  I think there's a virtual certainty it's going to

10   be appealed, probably from either side at the end of the

11   day.

12        But this Debtor entity, which has the capacity to

13   generate significant revenue has been harmed by the manner

14   in which it operates.  And by that, let me just -- what I

15   probably said, and my co-counsel's probably getting tired of

16   hearing me.  This is kind of like the garage band that

17   became the boy band overnight, and had his girlfriend

18   running the books, and the head roadie being the business

19   manager.

20        The entity has never -- it's been run like a

21   family business.  It's never had appropriate management and

22   accounting controls.  It's an inverted T as far as

23   management, where a lot of fiefdoms exist and they go to

24   Alex, who wants to run a show.  He's not a business manager.

25        And so, implementing Mr. Schwartz and Jeff Schultz

1    into the process has really changed things considerably in a

2    very short period of time.  There have been a lot of changes

3    in a matter of months, both in the sense of getting the

4    accounting up to date, changing the manner in which product

5    is purchased and sold to increase the revenues, increasing

6    advertising revenue on the program, you know, changing the

7    cost structure in the way that fulfillment is handled of

8    product sales to reduce the overall overhead to the estate,

9    producing the headcount to the estate.  So, a lot of changes

10   have been made that we expect will generate revenue.

11          And if the goal of this bankruptcy at the end of

12   the day is to have FSS be able to pay its creditors, then

13   that effort is worthwhile to everybody in this room.  And

14   so, if you're asking me, what does the plan look like today?

15   I can't tell you.  It's premature.

16          THE COURT:  It's fine.  I wish -- what the -- the

17   estate --

18          MR. BATTAGLIA:  There are so many options that are

19   available out there in this world today, and in terms of

20   raising funds or monetizing this asset that could be

21   explored, depending again on what the numbers turn out to

22   be.

23          THE COURT:  Okay.

24          MR. BATTAGLIA:  So, that's kind of a broad brush,

25   Judge, but --

1          THE COURT:  Okay.

2          MR. BATTAGLIA:  I do want to say, I'm not clear.

3     I understand that standing to file an avoidance action is

4     limited, but I don't understand that these parties don't

5     already have the right to contest the debt.  Any party can

6     file an objection to a claim and any party can take 2004,

7     you know, examinations and, you know, we'll agree to --

8     we've already agreed to discovery.

9          So, I'm not sure that as it stands today, in terms

10    of making an initial evaluation of this claim, that they

11    don't already have the standing to do that.  They don't need

12    anything more.  They don't need a Louisiana World Exposition

13    case at this juncture.  And honestly, I mean, the cynical me

14    says I want to get a committee appointed so that the estate

15    can pay for it.  And we can't.  We'll never be able to.

16    We'll kill this case, and all of the promise that Mr.

17    Schwartz is generating through changes and operations that

18    he's made will be for naught.

19          It won't stop Alex Jones from broadcasting.

20    There'll be -- somewhere, a platform for him to continue.

21    So, if the goal here is to silence him, that's simply never

22    going to happen.  It may just kill FSS.

23          THE COURT:  Okay.  And I really want to be clear

24    about this.  We're going to run a case and focusing on the

25    Debtor that's in front of me.  And I understand that there

1   are a lot of moving pieces and a lot of folks involved and a

2   lot of emotions on both sides.  We're going to run a case

3   and I'm going to leave it there.

4              MR. BATTAGLIA:  Yes, sir.

5              THE COURT:  And we'll see where we go.  Why don't

6   you call -- what evidence do you have to support either

7   position?  How do you wish to proceed?

8              MR. BATTAGLIA:  Your Honor, if I can, I'll just

9   proffer Mr. Schwartz, and he's available and he's in the

10  courtroom.

11             THE COURT:  Oh.  Let me just ask.  Is there any

12  objection to the proffer of the witness?

13             MR. BRIMMAGE:  Your Honor, yes, we --

14             THE COURT:  Okay.  Mr. Schwartz, come on and take

15  the stand.  Let me just -- I'm going to swear the witness

16  in.  Are you -- do you swear to tell the truth, the whole

17  truth, and nothing but the truth?

18             THE WITNESS:  Yes, I do.

19             THE COURT:  Okay.  You may have a seat, sir.

20             Mr. Battaglia, how do you wish to proceed with

21  respect to any exhibits, if you wish to --

22             MR. BATTAGLIA:  I have emailed exhibits to all of

23  the parties last night, and I have a bound version to hand

24  to the witness.

25             THE COURT:  Okay.

```
 1              MR. BATTAGLIA:  And they're filed on the record.
 2              THE COURT:  So, I want to make sure folks can
 3    follow online, so if you can -- are they -- is there any --
 4    let me ask you this.  Is there any -- let me ask the
 5    Connecticut side or the U.S. Trustees.  Is there any
 6    agreement on any of the exhibits, or how are we doing this?
 7              MR. BATTAGLIA:  May I approach the witness, Your
 8    Honor?
 9              THE COURT:  Yeah.  Just a second.  I just want to
10    know, what's -- are you providing the exhibits that are
11    filed at Docket Number 26?
12              MR. BATTAGLIA:  Yes, Your Honor.
13              THE COURT:  Okay.  And Connecticut, tell me what
14    they want to do.  On 1 through 26, was there any agreement
15    on any of this?
16              MR. BRIMMAGE:  Your Honor, the Tort Plaintiffs can
17    agree to the admissibility of Exhibits -- Debtor Exhibits 1,
18    2, 9, and 10.
19              THE COURT:  1, 2, 9, and 10?
20              MR. BRIMMAGE:  Yes, Your Honor.
21              THE COURT:  Okay.  That's what there's agreement
22    on.  Mr. Nguyen?
23              MR. NGUYEN:  Yeah.  Your Honor, Ha Nguyen for the
24    U.S. Trustee.  I don't have any objection to Exhibit 1, 2,
25    3, 9, 10, 11, 12.  The rest needs to be -- foundation needs
```

1    to be laid.

2              THE COURT:  You said -- can you repeat those

3    numbers?

4              MR. NGUYEN:  1, 2, 3, 9, 10, 11, and 12.  No

5    objection from the U.S. Trustee for those exhibits.

6              THE COURT:  Okay.  All right.  It looks like there

7    is agreement on 1, 2, 9, and 10.  Everything else, you're

8    going to have to prove up.

9              MR. BATTAGLIA:  Yes, sir.  And 12 does not need to

10   be offered at this point.  It related to a motion the Court

11   has granted.

12             THE COURT:  That's correct.

13             MR. BATTAGLIA:  May I approach the witness, Your

14   Honor?

15             THE COURT:  Yes.  Just for anyone following online

16   on the Docket, you look at the Court's Docket, exhibits that

17   are -- will be shown to the witness -- Mr. Schwartz, I'm

18   going to ask that you let the examination direct you to

19   where you're going in the exhibit list.  You know, some of

20   those exhibits have not been admitted into evidence, and I

21   want to make sure that you just answer the questions that

22   are asked of you.  If there is any objection, I ask that you

23   give me an opportunity to resolve the objection, and then

24   I'll let you know if you can answer the question or not,

25   okay?

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Okay.  All righty.  Mr. Battaglia, you
 3    may proceed.
 4              MR. BATTAGLIA:  Has the witness been sworn, Your
 5    Honor?
 6              THE COURT:  Yes.
 7              MR. BATTAGLIA:  I'm sorry, I didn't hear that.
 8              DIRECT EXAMINATION OF W. MARC SCHWARTZ
 9    BY MR. BATTAGLIA:
10    Q    Good morning, Mr. Schwartz.  Would you state your name
11    for the record?
12    A    Marc Schwartz.
13    Q    Would you turn to Exhibit Number 1?  Is that your CV?
14         (Exhibit 1 received into evidence)
15    BY MR. BATTAGLIA:
16    A    Yes, it is.
17    Q    Is it true, correct, and accurate?
18    A    True, correct, and I believe it is still accurate.
19    Q    Mr. Schwartz, without going into excruciating detail,
20    can you tell the Court who you are and what you do?
21    A    I'm a CPA.  I'm accredited in financial -- certified in
22    financial forensics by the American Institute of CPAs.  I'm
23    a certified fraud examiner from the Association of Certified
24    Fraud Examiners, and I'm a licensed private investigator in
25    the State of Texas.  I have practiced as a CPA since
```

1    approximately 1974, I think.

2         Became involved in working in the bankruptcy world in

3    the 80s with the collapse of the energy and real estate and

4    banking industry in Texas.  And worked in that field, along

5    with my -- I was an auditor in public accounting.  Up until

6    that point, continued as a financial statement auditor --

7    following that, but also worked extensively with litigation

8    and in restructuring and bankruptcy, primarily working for

9    Chapter 7 Trustees.

10        '93 I left my -- the firm I was associated with,

11   started my own practice, and began working as a Chapter 11

12   Trustee for the Southern District and the Western Districts

13   of Texas.  And here with that work, working also as a

14   examiner -- examiner with expanded powers.  And doing civil

15   litigation, financial economic expert witness work.

16        And the -- sometime in the back -- in the dim back --

17   dim past, I was asked to serve as a Federal Court Receiver

18   in a Federal -- in a Federal Trade Commission matter where I

19   was a receiver over two groups of companies that were

20   involved in defending themselves from a FTC matter in

21   Federal Court, and then became involved in and asked to

22   serve as a State Court Receiver.

23        So, today our practice involves Financial Restructuring

24   involving in and out of bankruptcy expert witness work in

25   the civil courts, civil litigation primarily, and as a

```
 1    receiver in Federal and State Court matters.

 2    Q    Thank you, sir.  The Judge had asked some questions at

 3    the last hearing about the -- your relationship with the

 4    InfoW and affiliated bankruptcy cases filed in this Court,

 5    so I want to discuss that for a moment.  What was your role

 6    in the InfoW cases, and by that I'm referring to all three

 7    related entities?

 8    A    I was engaged to be the CRO of those companies prior to

 9    their filing.

10    Q    And is that case pending today?

11    A    Oh, the bankruptcy is not pending.

12    Q    And why was the case dismissed from your perspective?

13    A    Well, from my perspective the goal of the case was to

14    bring the Texas -- let's refer to the Texas and the

15    Connecticut litigation into a resolution process where we

16    could get the -- liquidation of the damages and develop a

17    plan for that.  The parties -- the Plaintiffs entered into

18    an agreement with us to dismiss their claims against the

19    Debtors with prejudice, ultimately, and as a result of that,

20    they were no longer involved in litigation.  We had two or

21    three minor creditors, which we had handled outside of

22    litigation.  So, if -- that determined to be a lot cheaper

23    to resolve that case by dismissing it, which the U.S.

24    Trustee agreed with, and let us resolve these things outside

25    of the bankruptcy process.
```

1    Q    And do you recall approximately when the Plaintiffs,

2    Texas and Connecticut, agreed to dismiss their claims of

3    prejudice?

4    A    I'm -- in terms of the approximate date, I don't

5    recall.  I believe the motion to dismiss, at least one of

6    them was granted on -- I think it was May 19th, that was on

7    the Texas Plaintiffs.  I don't -- I'm not recalling the

8    Connecticut Plaintiffs' date.

9    Q    Who, at the time the cases were filed, the IW cases

10   were filed, owned the interest in IW?

11   A    Concerning -- (indiscernible) the three companies?

12   Q    Yes, sir.

13   A    It was owned by a trust that had been set up prior to

14   the filing of bankruptcy, which was to be the vehicle for

15   funding, any resolution that could be -- if that had

16   occurred.

17   Q    So, what claims does, or do any of the IW affiliates

18   have against Free Speech Systems as we stand here today?

19   A    None that I'm aware of.

20   Q    What claims does Free Speech Systems have against any

21   of the IW affiliates?

22   A    None that I'm aware of.

23   Q    And how was the Plan to be funded in the IW cases?

24   A    Initially with funds submitted -- injected by Mr. Jones

25   from personal assets of his.  As I recall, it was also to be

1    funded, I think once it went effective, with the -- with

2    revenues provided -- not revenues, with income from --

3    earned by FSS, which would fund it over a five-year period.

4    Q    And what was the operative document by which those

5    revenue contributions were to be made?

6    A    It was called a Plan -- it was named a Plan Support

7    Agreement.

8    Q    Could you turn to Exhibit 3 in your binder, please?

9    Take a moment and look through it, and when you're done let

10   me know if that's a true and correct copy of the Plan

11   Support Agreement.

12   A    Yes, sir, it appears to be.

13        MR. BATTAGLIA:  Your Honor, I would offer Exhibit

14   3.

15        THE COURT:  Any objection?

16        MR. BRIMMAGE:  (Indiscernible).

17        THE COURT:  All right, a little bit more

18   foundation, Mr. Battaglia.

19        MR. BATTAGLIA:  Yes, sir.

20   BY MR. BATTAGLIA:

21   Q        You're familiar with the books and records of the

22   InfoW entity?

23   A    Entities?  Yes.  Yes.

24   Q    And did InfoWars enter into this agreement -- into a

25   Plan Funding Agreement?

1          MR. BRIMMAGE:  Your Honor, (indiscernible).

2          MR. BATTAGLIA:  Your Honor --

3          MR. BRIMMAGE:  (Indiscernible).

4          THE COURT:  Mr. Battaglia?

5          MR. BATTAGLIA:  Your Honor, the witness was the

6     CRO for these entities, and this is a business record, and

7     that's where we're headed.

8          THE COURT:  Okay, just ask him that question.

9          MR. BATTAGLIA:  Sure.

10         THE COURT:  And I'll sustain the objection.

11         MR. BATTAGLIA:  Sure.

12     BY MR. BATTAGLIA:

13     Q       Is this a record that was maintained within the

14     files of the InfoW entities?

15     A     Yes.

16     Q     And were you the custodian of those records?

17     A     Yes, I guess so.

18     Q     And --

19         MR. BRIMMAGE:  Your Honor, (indiscernible) --

20         THE COURT:  Yeah, I -- why don't you just ask a

21     few more questions.  I'm going to sustain the objection, why

22     don't you ask a few more foundational questions.  I think

23     you'll get there.

24     BY MR. BATTAGLIA:

25     Q     So, with respect to the business records of InfoW, you

1   were in physical possession of some of those records, were

2   you not?

3   A     Yes, I am.

4   Q     And is the Plan Support Agreement one of the records

5   that you maintained physical possession of?

6   A     Yes, it is.

7   Q     And you're familiar with the manner and means in which

8   those business records were maintained within your auspices

9   as a CRO?

10  A     Yes.

11  Q     And is Exhibit 3 a document that was within your

12  control and held as a business record of IW, and the

13  affiliated entities?

14  A     Yes, it is.

15  Q     And do you recognize Exhibit 3?

16  A     Yes, I do.

17  Q     Is it a true and correct copy of the business record

18  that was the Plan Support Agreement?

19  A     Yes.

20            MR. BATTAGLIA:  I would offer Exhibit 3.

21            MR. BRIMMAGE:  (Indiscernible).

22            THE COURT:  I'm going to overrule the objection.

23  I'm going to admit 3 for what it is.  It's a Plan Support

24  Agreement, and it's a public document as well.  It's been

25  filed on the Docket in the prior case in which it was the

Page 59

```
1    CRO, so, Mr. Brimmage, you can ask -- you can cross-examine

2    about all that stuff.

3         (Exhibit 3 received into evidence)

4    BY MR. BATTAGLIA:

5    Q    Would you turn to section eight of Exhibit 3?

6              THE COURT:  I do want to make one clarification,

7    and this could be a very hyper-technical point, but the

8    version that's on the Docket is highlighted, and the version

9    that I'm admitting, for the record, that I want a clean copy

10   of it, the version that I'm seeing on Docket 26 has certain

11   language highlighted, and that's not what I'm admitting.  If

12   you're asking me for a publicly filed version of you know,

13   22-6002063, Document 63 without highlights --

14             MR. BATTAGLIA:  Yes, sir.

15             THE COURT:  I'm okay with that.  But if you're

16   asking to admit what you've -- well, the Docket Number 26,

17   that I won't admit, but I'm -- a clean version can be

18   admitted into the record.

19             MR. BATTAGLIA:  Shall I supplement, Your Honor?

20             THE COURT:  Yeah.  Yes, please.

21   BY MR. BATTAGLIA:

22   Q    When you look at the -- Section Eight, what does it

23   provide for?

24   A    It's the termination provision of the agreement.

25   Q    Under the terms under Section Eight, what is your
```

1    understanding about whether this agreement remains in

2    effect?

3    A    My understanding is the agreement was terminated.

4    Q    And is it true that the bankruptcy cases for the IW

5    entities were dismissed?

6    A    Yes, it is.

7    Q    Is it true that there was no order approving the

8    Litigation Settlement Trustees by April 30, 2022?

9    A    That is correct.

10   Q    And that there was no Plan on file by April 30, 2022?

11   A    That is correct.

12   Q    What is your involvement on behalf of FSS, the Debtor?

13   A    I was hired to be its Chief Restructuring Officer.

14   Q    And, can you turn to Exhibit 2, please?  And this has

15   been admitted into evidence, is that your engagement

16   agreement with Free Speech Systems?

17        (Exhibit 2 received into evidence)

18   A    Yes, it is.

19   Q    And when was that dated?

20   A    It was dated May 19th, 2022.

21   Q    When was it executed?

22   A    I believe it was June 7th.

23   Q    Of 2022?

24   A    2022.  Yes, June 6th, excuse me, of 2022.

25   Q    Can you describe what level of authority over the

```
 1    Debtor and its operations you were afforded under this
 2    agreement?
 3    A    Really, it's absolute authority over the operations.  I
 4    agreed to consult with Mr. Jones on major decisions.
 5    Q    So, who has control over the bank accounts?
 6    A    I do.
 7    Q    Who has control over payroll?
 8    A    I do.
 9    Q    Who has control over hiring and firing of employees?
10    A    I do.
11    Q    Who has control over the records of the Debtor?
12    A    I do.
13    Q    And is it within your unilateral power to hire and fire
14    employees?
15    A    Yes.
16    Q    To open and close bank accounts?
17    A    Yes.
18    Q    Who will be the signatory on the Access DIP account?
19    A    I will be.
20    Q    Anybody else?
21    A    No.
22    Q    Do you have authority to make operational changes
23    within the Debtor's operations?
24    A    Yes.
25    Q    Have you in fact made such changes?
```

1    A    Yes.

2    Q    What role does Alex Jones play in any of the areas

3    we've just discussed?

4    A    Because of his experience, obviously, with the company,

5    and his knowledge of the customers -- and customers -- of

6    the vendors, and the personnel, when he's available to me to

7    consult with to get more guidance information on, if I had a

8    -- several changes I've implementing -- am implementing, I

9    went and said, this is what I'm going to do, do you have a

10   problem with it?  If it is, tell me what that problem is.

11   Q    At the time you were installed as the Chief

12   Restructuring Officer, what was the management structure of

13   Free Speech Systems?

14   A    Someone in the process of this case referred it to --

15   referred to it as an inverted T, and I think that's a good

16   description.  There is Alex, and then there's everybody

17   else.

18   Q    And is that -- in your experience, the way a successful

19   business is, or should be managed?

20   A    No.

21   Q    What was the status of the accounting controls on the

22   date that you became CRO?

23   A    As far as I can tell they were non-existent.

24   Q    Who performed the accounting on behalf of Free Speech

25   Systems?

1    A    At what time?

2    Q    Prior to you becoming a CRO.

3    A    Oh, the 17 months or so prior to my becoming CRO, it

4    appeared to me nobody did.

5    Q    Was there anybody with an accounting degree or

6    background that provided accounting services?

7    A    There was a consultant who had been hired, Mr. Roe,

8    who's a CPA, who provided some advisory consulting services.

9    He was not involved and was not permitted to be involved in

10   the actual accounting process.  The people responsible for

11   maintaining the books and records did not have accounting

12   degrees.

13   Q    What was the state of the company's accounting books

14   when you became CRO?

15   A    2021, I had -- this was on June 6th date.  2021 had not

16   been closed, which means the books were not completed, and

17   year-end closed.  There had been no recording of any entries

18   in 2022 other than automatic downloads from the bank

19   transactions.  So, they were -- 20 -- 2021 was at -- was

20   incomplete and had not -- was not able to produce any

21   financial statements of meaning, and 2022 was untouched.

22   Q    Were you able to find typical accounting reports on

23   your entry in as CRO?

24   A    No.

25   Q    So, balance sheets, income statements, there were no

1   current --

2   A     There were no financial reports that I could -- there

3   were no financial reports at all, that had ever been

4   produced in at least the last 18 months.

5   Q     What, at the time that you became CRO, what was the

6   Debtor's business relationship with PQPR Holdings, Limited?

7   And I'll just call it PQPR.

8   A     At the time I became CRO, PQPR was facilitating the

9   purchase of inventory by FSS.  In addition, PQPR was

10  purchasing and selling its own inventory and FSS was selling

11  PQPR inventory as well.

12  Q     And who to your knowledge owns PQPR?

13  A     Carol and David Jones, who are Mr. Alex Jones' parents.

14  And in -- through an intermediary entity, Mr. Alex Jones

15  himself owns.  So, about -- the -- turns out about 80 -- 72

16  percent of the interest is indirectly owned by Mr. Alex

17  Jones, and the 18 percent balance -- if that's right -- 28

18  percent balance, is owned by Carol and David Jones.

19            MR. BRIMMAGE:  (Indiscernible).

20            THE COURT:  I'm just going to -- I'm going to

21  allow it just as his understanding, and not for the truth of

22  the matter asserted.  All right.  It's a -- just testifying

23  as his understanding of the corporate structure, and I'll

24  allow him to do it.

25  BY MR. BATTAGLIA:

1    Q    So, prior to your joining FSS, what -- how were

2    proceeds of inventory sales allocated?

3    A    I've identified at least two methods.  For a period of

4    years, it appears PQPR purchased --

5              MR. BRIMMAGE:  Your Honor, I hate to interrupt.

6    (Indiscernible).

7              THE COURT:  Yeah, I think you -- yeah, I'm going

8    to sustain that objection.  Well, maybe you can ask a few

9    more background questions there.

10   BY MR. BATTAGLIA:

11   Q    Sure.  Have you reviewed the historical operations

12   between the Debtor and PQPR?

13   A    Yes.

14   Q    And what is your understanding of the allocation of

15   proceeds between PQPR and FSS from inventory sales?

16   A    Up to some date in 2021, which I don't recall the exact

17   date, I think it was in November, PQPR purchased inventory

18   at the request of FSS.  It then marked up that inventory and

19   sold it to FSS, which then marked up the inventory for sale

20   to the public.

21             MR. BRIMMAGE:  (Indiscernible).

22             THE COURT:  I'm going to let you -- I'm going to

23   just allow it just as his understanding of what it is, I'm

24   going to let you explore though -- the door's open.  I'm

25   going to let you explore, sir, where he gained that

1    information.

2    BY MR. BATTAGLIA:

3    Q    And based on your review of the books, and your

4    discussions with -- well, your review of the books and

5    records and contracts that you've seen, how did that

6    relationship change?  You said that up until November of

7    2021 --

8    A    Yeah, it changed on -- I believe it was November 2021,

9    to where the -- as opposed to marking up and selling

10   inventory to FSS, they entered into -- the arrangement

11   changed to where FSS would sell the unmarked inventory and

12   receive 20 percent of the proceeds, and 80 percent of the

13   proceeds would be paid to PQPR.

14   Q    How does the Debtor -- or how, I guess, how does the

15   Debtor effectuate sales transactions?

16   A    It's almost all over the internet.

17   Q    So --

18   A    Credit card charges by the -- through the internet.

19   Q    And, what did the Debtor pay for credit card

20   processing, prior to your involvement?

21   A    Prior to my involvement, it was paying in total about

22   14.5 to 14.9 percent.  Four point -- well, there was 10

23   percent going to a facilitator, if you will, and the balance

24   of that 14.9, 14.8, whatever it was, goes to the actual

25   credit card processor.

1   Q    Why was the Debtor paying such a high rate?

2   A    Because it needed to -- they had been de-platformed and

3   had lost its credit card processor, so the facilitator was

4   brought in as an intermediary to receive the proceeds from

5   the credit card processor, and to be in fact the face that

6   the Fed credit card processor saw, and it then distributes

7   the money, the funds, to PQPR and FSS.

8   Q    How were sales fulfilled, and what do you understand

9   when I use the word fulfilled?

10  A    Yeah, what do I understand, you mean?

11  Q    Yes, yes.

12  A    Yes, well, fulfillment was and to me is once the

13  customer places an order, that someone has to go pull

14  merchandise out of the warehouse, package it, box it, put

15  postage or whatever you'd use, whether it's UPS, the UPS

16  stamp on it, there's -- put a sticker on it, and ship it to

17  the customer.  So, fulfillment's that process of -- but also

18  includes here, warehousing, managing the warehouse with

19  product in it, and that -- that is -- from when it's

20  received to the warehouse to when it's shipped to the

21  customers is fulfillment.

22  Q    And who employed the individuals that were doing

23  fulfillment prior to you becoming CRO?

24  A    FSS employed -- well, FSS employed them for a period of

25  time, and then they were transferred -- excuse me.  FSS uses

1    ADP for its payroll.  These employees were on that payroll.

2    Subsequently, they're then charging the fulfillment payroll

3    to PQPR, although they stayed -- still stayed on -- on the

4    FSS ADP payroll account.

5    Q    Let's turn and talk about what's happened since you

6    became the CRO.  Can you tell the Court where the Debtors

7    stands in its accounting records currently?

8    A    Well, we've closed through May 2022, those were

9    included -- those financials were included in the material

10   we filed in connection with the bankruptcy.  The -- June,

11   we've gotten all the transactions in, we have to go back and

12   do closing review and make sure that we've -- well, one

13   thing we did and critical, we got the bank accounts

14   reconciled.  I forgot to mention, there'd never been a bank

15   -- there hadn't been a bank account reconciliation we could

16   find, so we reconciled the bank accounts through May.  I

17   believe July's are done also.

18        So, we're current, we've produced financial statements,

19   we have not yet started working on we've -- going down and

20   digging up, producing managing accounting statements, but

21   we've got the primary financials done.

22   Q    Okay.  And who is responsible, primarily responsible

23   for maintenance of the accounting records for FSS?

24   A    Right now it's -- you mentioned Mr. Schultz, as I hired

25   Mr. -- we hired -- FSS hired Mr. Schultz to come in and take

1    over as business manager.  But the actual

2    bookkeeping/accounting work is being taken over by -- so, of

3    my low -- my personnel, my bookkeeping personnel, until we

4    get a bookkeeping service in place there.  So, the

5    accounting was handled by, essentially us through -- as FA's

6    and by the business manager.

7    Q    And are you familiar with Mr. Schultz's accounting

8    qualifications?

9    A    Yes.

10   Q    And what are they?

11   A    He has a bachelor's degree in accounting from

12   University of Houston.  He served as a CFO -- I mean, not

13   immediately, but through a period of years, and most

14   recently, CFO, and then CEO of companies, so he's very

15   knowledgeable of that -- accounting and financial reporting

16   aspects.

17   Q    Earlier you talked about prior relationship with PQPR,

18   has it changed?

19   A    Yes.  The entered -- FSS and PQPR entered a new

20   agreement under which sharing ratios changed, where FSS

21   inventory -- FSS gets 90 percent of the proceeds from the

22   sale of it, PQPR gets 10 percent, and inventory that is

23   acquired by PQPR for its own account, they -- and if it's

24   sold, it's 80 percent of that goes to PQPR, and 20 percent

25   goes to FSS.

```
 1   Q    And in the process of changing that relationship, what
 2   was done regarding the credit card processing costs?
 3   A    I -- one of my -- I insisted that that be reduced, and
 4   it was negotiated down to four percent.
 5   Q    So four plus the 4.9 charged --
 6   A    Correct.
 7   Q    -- by the banks.
 8   A    Yeah, this is for the intermediary, four percent, and
 9   then the 4.9, is their regular bank processing charge.  And
10   that, by the way, varies by the type of credit cards used.
11   Q    Turn to Exhibit 8, please.  Tell the Court what that
12   is.
13   A    This is the Forbearance Agreement entered into on July
14   10th of 2022.
15   Q    And were you involved in negotiation and drafting of
16   this document?
17   A    Negotiating the document and reviewing the draft, yes.
18   Q    And is this a true and correct copy of the Forbearance
19   Agreement entered into between the parties?
20   A    Yes, it is.
21        MR. BATTAGLIA:  Your Honor, I would offer Exhibit
22   8 into evidence.
23        THE COURT:  Any objection?  It's admitted.  26-8
24   is admitted.
25        (Exhibit 8 received into evidence)
```

```
 1              MR. BATTAGLIA:  Thank you, Your Honor.

 2    BY MR. BATTAGLIA:

 3    Q    Have there been any changes in the manner in which

 4    fulfillment of product sales is handled?

 5    A    Yes.

 6    Q    What are those changes?

 7    A    A significant one was prior to filing bankruptcy, we

 8    engaged a third-party fulfillment service to take over

 9    fulfillment for FSS's and PQPR's products, and FSS's

10    products.

11    Q    Who employs the individuals who actually pull product

12    and ship it?

13    A    The fulfillment service we hired.

14    Q    And how do you pay fulfillment?  Is it a flat rate per

15    month, or what's the term?

16    A    It's a flat rate per shipment.

17    Q    And overall, shifting to this vehicle, what's the

18    effect on the Debtor's expenses?

19    A    It -- based on my analysis, it should be a push in the

20    sense that there should not be much of a net increase, if

21    any, and cost -- of the actual cost, the fulfillment should

22    be -- improve our efficiency though, because that would be

23    not something that we have to manage and worry about.

24    Q    And would that answer change if volumes increased

25    significantly?
```

```
 1    A    No, it should not.

 2    Q    Let's talk about --

 3    A    Let me stop.  It may actually it probably -- if volumes

 4    increase, our cost of fulfillment per dollar may actually go

 5    down, could go down.

 6    Q    I want to talk about the PQPR debt now.  As the Chief

 7    Restructuring Officer, do you control the business records

 8    of FSS?

 9    A    Yes.

10    Q    And are you familiar with the business records of FSS?

11    A    Yes.

12    Q    And the manner in which they're maintained?

13    A    Yes.

14    Q    Do you recognize Exhibit 4?

15    A    Yes.

16    Q    What is it?

17    A    The promissory note dated August 13th, 2020 between

18    Free Speech Systems, LLC and PQPR Holdings Limited, LLC.

19    Q    Is this a true and correct copy of the promissory note

20    that is within the business records of the Debtor?

21         MR. BRIMMAGE:  Your Honor, (indiscernible).

22    Hearsay.  (Indiscernible) prove this up.  (Indiscernible)

23    and any further testimony (indiscernible).

24         MR. BATTAGLIA:  Your Honor, if I may respond?

25         THE COURT:  Yes, please.
```

1          MR. BATTAGLIA:  It's an absurd suggestion that a

2     custodian is ineligible to testify to the authenticity of a

3     business record, and that what one must do is find someone

4     who is employed by the Debtor as the custodian back at the

5     time the document was originated.  There is no requirement

6     that a party -- that a custodian be a signatory to every

7     document, that's equally an absurd evidentiary requirement.

8     There's no way business records would ever come in if those

9     requirements were required.

10          MR. BRIMMAGE:  (Indiscernible).

11          MR. BATTAGLIA:  He can authenticate a business

12     record, which is what he's done.  And legal documents are

13     business records, just as accounting records are, and any

14     other document within the control of an entity of a party.

15          MR. BRIMMAGE:  (Indiscernible).

16          THE COURT:  I'm going to admit it as a business

17     record.  I think custodian doesn't need -- just that the

18     reports that are -- it just has to be a circumstantial

19     guarantee of trustworthiness of the document, and it can be

20     brought in by someone who was just a custodian, and he's the

21     CRO.  The question that I have for you, Mr. Schwartz, is

22     when did you first view this -- have you ever viewed this

23     document before today?

24          THE WITNESS:  Oh yes, I have.

25          THE COURT:  When did you view this document for

1    the first time?  Do you recall what month?

2            THE WITNESS:   I would have -- June of this year.

3            THE COURT:  Okay.

4            THE WITNESS:  I would say early June.  I'd have to

5    look back at my time record so you can tell (indiscernible).

6            THE COURT:  No, it's one and the same.  I'll admit

7    it.  It's --

8        (Exhibit 4 received into evidence)

9            MR. BRIMMAGE:  Your Honor, (indiscernible).

10            THE COURT:  I'll let you take him up on cross.

11    I'm going to let you take him up on cross.

12    BY MR. BATTAGLIA:

13    Q    Can you turn to Exhibit 5, please?  Can you tell the

14    Court what that is?

15    A    This is a security agreement entered into between PKR

16    Holdings and FSS, dated August 2020.

17    Q    That's your --

18    A    Yes, I'm sorry.

19    Q    Sorry.  And have you seen this document before?

20    A    Yes.

21    Q    Would it be true you saw it at or about the same time

22    you saw the prior exhibit?

23    A    Yes.

24    Q    Does this appear to be a true and correct copy of the

25    document that is maintained within the business records of

```
 1   Free Speech Systems?

 2   A    Yes.

 3         MR. BATTAGLIA:  Your Honor, I would offer Exhibit

 4   5.

 5         MR. BRIMMAGE:  Objection.

 6         THE COURT:  Yeah, I understand.  I'm going to

 7   admit it as a business record, but -- and I know you're

 8   going to have questions for -- and I'm going to let you ask

 9   those questions about the scope of his knowledge of it, this

10   document, and questions about it.  It's in evidence, so you

11   get to ask questions about it, and it's relevant to the cash

12   collateral motion and critical vendors.  So, you may

13   proceed, counsel.

14         (Exhibit 5 received into evidence)

15         MR. BATTAGLIA:  Thank you, Your Honor.

16   BY MR. BATTAGLIA:

17   Q    Could you turn to Exhibit 6, please?

18   A    Yes, sir.

19   Q    And can you tell the Court what that is?

20   A    This is another promissory note that's been dated

21   November 10th, 2021 between Free Speech Systems and PQPR

22   Holdings in the amount of 25,300,000.

23   Q    And does that -- have you seen this document on or

24   about the same time as you responded to the preceding

25   documents?
```

1    A    Yes.

2    Q    And does this appear to be a true and correct copy of

3    that promissory note that is within the business records of

4    the Debtor?

5    A    Yes, it is.

6              MR. BATTAGLIA:  Offer Exhibit 6.

7              MR. BRIMMAGE:  (Indiscernible).

8              THE COURT:  Understood, overruled.  It's admitted.

9         (Exhibit 6 received into evidence)

10   BY MR. BATTAGLIA:

11   Q    Can you turn to Exhibit 7, please?  Can you tell the

12   Court what that is?

13   A    This is a copy of UCC financing statement, November

14   18th of 2020 for --

15   Q    And was this -- did you see this document for the first

16   time about the same time as the preceding documents?

17   A    Yes.

18   Q    And is this document maintained as a business record in

19   the Debtor's files and records?

20   A    Yes.

21   Q    Does this appear to be a true and correct copy of the

22   UCC 1 financing statement?

23   A    Yes.

24   Q    Does it bear a filing number with the Secretary of

25   State's office?

```
 1   A    Yes, it does.

 2              MR. BATTAGLIA:  Offer Exhibit 7.

 3              THE COURT:  Any objection?  It's admitted.

 4        (Exhibit 7 received into evidence)

 5   BY MR. BATTAGLIA:

 6   Q    If you would turn to Exhibit 9 and keep your finger on

 7   Exhibit 10.

 8   A    Yes, sir.

 9   Q    Okay, do you recognize Exhibit 9?

10   A    Yes.

11   Q    What is it?

12   A    This is a copy of the 13-week cash flow forecast that I

13   had prepared for Free Speech Systems.

14   Q    Now, we're here today on an interim motion, can you

15   turn to Exhibit 10 please, and keep your finger on 9?

16   A    Yes, sir.

17   Q    What is that?

18   A    Exhibit 10 is a blow up of the first three weeks of the

19   cash flow forecast on Exhibit 9.

20   Q    They're identical in terms of the numbers displayed for

21   the three-week period, yes?  Go back to 9.  Would you tell

22   the Court generally what authority you're seeking today, to

23   use cash collateral today?  What do you want to pay?

24   A    The bills.

25   Q    A little more detail.
```

```
 1   A     The bills and the cost of operating the Debtor.

 2   Q     Payroll?

 3   A     Payroll, lights, electricity, a lot of

 4   telecommunications or internet-related vendors who provide

 5   the backbone for the telemarketing and the production or --

 6   of the show, if you will.

 7   Q     What about product cost?

 8   A     There's some product cost in here.

 9   Q     There's one entry in here of a $250,000 proposed

10   payment to PQPR.  Can you tell the Court what that's for?

11   A     Yes, PQPR advanced $750,000 towards the purchase of

12   inventory --

13   Q     Advanced to who?

14   A     Advanced to FSS towards the purchase of merchandise

15   inventory.

16   Q     Did they advance to FSS or to the supplier?

17   A     The money was paid to a supplier as part of a million-

18   and-a-half-dollar prepayment that was made to -- in order --

19   to order inventory from that supplier.

20   Q     Why is it advantageous to pay to acquire -- and there's

21   two installments to pay for inventory, are there not?

22   A     Well, there are --

23   Q     PQPR inventory, I'm sorry.

24   A     Now, I'm confused.

25   Q     Okay.  So, there's a $250,000 payment --
```

```
 1    A    Oh, yes.  There's --

 2    Q    -- included in the budget.

 3    A    There's $250,000, and there's subsequently a $500,000

 4    payment in the budget to repay PQPR for that $750,000.

 5    Q    Why is it advantageous for FSS to acquire that

 6    inventory that PQPR is purchasing?

 7    A    Because PQPR essentially was out of -- not PQPR.  FSS

 8    was out of inventory essentially, of any -- of that was

 9    high-value and had a high marketability to it.  And that had

10    to be replaced in order to make this plan work and make the

11    company work.  So.

12    Q    What does the Debtor get if its PQPR products sold

13    through the Debtor's sales channel?

14    A    Well, this is -- this -- well, I mean, it depends on

15    what -- which way you look at this.

16    Q    If you didn't buy it.

17    A    If we didn't buy it, that PQ -- wait a minute.

18    Q    If FSS did not pay this $250,000, what would this --

19    how would the sales proceeds be allocated?

20    A    80 percent PQPR, 20 percent Debtor.

21    Q    How are they allocated if you're allowed to purchase

22    the inventory from PQPR?

23    A    10 percent PQPR, 90 percent Debtor.

24    Q    And what's the markup on products of the type that are

25    being purchased?
```

1    A    300 to 400 percent.

2    Q    In your business judgment, is it better to pay the 250

3    or not pay the 250 to PQPR?

4    A    It's better to pay the 250.

5    Q    So, in coming up with these projections, can you

6    describe for the Court a little bit what your basic

7    assumptions are?

8    A    The inventories that we -- that were acquired, and that

9    are being rolled into the sales, they're being shipped in at

10   intervals as they're produced.  We had a one shipment about

11   two weeks before filing, three weeks before filing.  We had

12   a second shipment within a -- the week before filing.  As

13   those products come into the warehouse, Alex Jones starts

14   pushing them on the shelf, and we can see a marked increase

15   in daily sales, we get daily sales reports.

16        And so, what we did in watch -- and I did in watching

17   these, and one of the things I asked for was give me time to

18   see the impact of these sales.  We were able to see a

19   various -- an increase, definitely an increase, significant

20   increase in daily sales.  So, prior to filing, just prior to

21   filing, let's just look at the last five business days of

22   sales, and that's what we use as our base.  As we're -- have

23   more product coming in, we're seeing they -- these are

24   increasing sales, and they're being attracted to the market.

25        And I said, okay, well take that times 125 percent and

1   that will be our weekly sales budget, and we should be able

2   to accommodate that.

3   Q    Do you -- would you tell the Court; do you perceive

4   that as aggressive or a conservative income budgeting?

5   A    I see it as conservative.  We had -- this was two of

6   the six products, which we're still operating with these two

7   products.  The next one's coming in next week.  So, we've

8   got a layering effect coming, but -- on this, but it's not

9   at all what I consider aggressive.  If you ask Mr. Jones,

10  his -- he -- and he has the experience, he believes he'll be

11  substantially -- these are substantial understatements.

12          MR. BRIMMAGE:  (Indiscernible).

13          THE COURT:  Sustained.

14  BY MR. BATTAGLIA:

15  Q    Can you tell the Court, is there a correlation between

16  sales and Mr. Jones' broadcasting, or someone else, or a

17  repeat broadcast?

18          MR. BRIMMAGE:  (Indiscernible).

19          THE COURT:  We'll see what he -- let's hear his

20  answer.

21  BY MR. BATTAGLIA:

22  Q    Have you examined that to determine whether there's a

23  correlation?

24  A    Have I examined it?  I have -- I've had -- there are

25  people at FSS that keep track of that information.  So --

1   Q    And have you looked at that information to --

2   A    Yes.

3   Q    -- make a determination?

4         THE COURT:  And I don't think you answered the

5   question.  Why don't you ask the question again.  I don't

6   think you actually answered the question.

7         MR. BATTAGLIA:  I'm not sure I remember precisely

8   what the question was, Judge, I'm sorry.

9         THE WITNESS:  Is there a correlation?

10        THE COURT:  Yeah, is -- well, is there a

11  correlation, and --

12  BY MR. BATTAGLIA:

13  Q    Have you reviewed books and records to see if there's a

14  correlation between sales when Mr. Jones' on air or not?

15  A    Well, I've asked, what is the correlation; and I've

16  been told what it is.

17        THE COURT:  That's -- you're not answering the

18  question.  The question is, have you reviewed documents to

19  determine whether there's a correlation?  It's --

20        THE WITNESS:  I have not received a document at

21  this time.

22  BY MR. BATTAGLIA:

23  Q    You have an understanding of whether there's a

24  correlation between when Mr. Jones is on the air or not?

25  A    Yes.

1    Q    What is that understanding?

2              MR. BRIMMAGE:  (Indiscernible) I've been told.

3              THE COURT:  Yeah.  I'm going to -- I guess the

4    question that would then follow is what is your

5    understanding based on?  And that's going to then inform

6    what your answer will be.  You said you had -- you developed

7    an understanding of it.  You haven't reviewed a document,

8    but you've developed an understanding.  What is that

9    understanding based on?

10             THE WITNESS:  The person in charge of e-commerce

11   which track -- and he -- one of the things he does is he

12   tracks daily sales of product and tracks hours of all people

13   on the air, but particularly, he'll actually focus on Alex

14   Jones.  And when Alex Jones is not on the air, we see a 30 -

15   - we could see a 30 percent drop in sales.

16             THE COURT:  Yeah, but what --

17             THE WITNESS:  That's what he's --

18             THE COURT:  You're saying we.

19             THE WITNESS:  (Indiscernible), sorry, Your Honor.

20             THE COURT:  No, no, no, I mean we as in -- you

21   said you haven't reviewed a document, so what's that based

22   on?  That 30 percent?  Is that based on something someone

23   told you?

24             THE WITNESS:  Correct, that's based on Mr. Roddy's

25   data that he maintains.

```
 1              THE COURT:  Have you reviewed that data?

 2              THE WITNESS:  I -- no, I've actually been tied up

 3    getting ready for this hearing.

 4              THE COURT:  Okay.  I'm going to sustain the

 5    objection.

 6    BY MR. BATTAGLIA:

 7    Q    If you are not authorized to use cash collateral today,

 8    what's the -- going to be the effect on the Debtor's

 9    business?

10    A    As I think I mentioned earlier, we have about 800,000

11    of cash that is not cash collateral, so we can pay our bills

12    this first week it looks -- I believe.  We could pay a --

13    most of our bills this first week, not all of them.

14    Q    And if you don't pay your bills, what's going to happen

15    to the Debtor?

16    A    It depends on which ones we don't pay, but it's going

17    to be a -- if we can't pay critical -- the critical vendors,

18    then we will be shut down.

19    Q    Well, let's turn and talk about critical vendors.

20              MR. BRIMMAGE:  Your Honor, (indiscernible).

21              THE COURT:  That's just this -- I'm going to --

22    I'm just going to (indiscernible) it -- that wasn't based on

23    any evidence, I think he's going to have to testify as to

24    why, give me a little bit more as to why.  But he's allowed

25    to say what he thinks.  Why he thinks that I think is
```

```
 1    probably the more relevant question, and I think we'll get

 2    there.  I think that's where Mr. Battaglia is going anyway.

 3              MR. BATTAGLIA:  Yes, actually I was going to turn

 4    to critical vendors, they're very related, but I'll just ask

 5    that question now and put it to rest.

 6              THE COURT:  Well --

 7    BY MR. BATTAGLIA:

 8    Q    Why do you think that it would shut the business down?

 9    A    Well, if we can't broadcast, we can't sell.  So, if we

10    lose a vendor who's critical to our ability to broadcast, if

11    we can't operate our e-commerce platform, we can't sell,

12    even if we could broadcast.  If we can't fulfill orders,

13    then we're not going to be able to fulfill what we've been

14    paid for, and those revenues have to go back to those --

15    will have to go back to those customers.  So, it's -- and

16    all of these are -- we're, you know, the company's in a

17    situation right now where there's not a lot of breathing

18    room.

19    Q    Let's pick an example, it's one of the critical

20    vendors.  Do you know who Cloudflare Inc. is?

21    A    I have a bit of knowledge about Cloudflare, yes.

22    Q    What do they do?

23    A    They're part of our e-commerce platforming.

24    Q    And they provide security for purchasers, right?

25    A    Right.
```

1    Q    And for transactions over the internet?

2    A    Right.

3    Q    What happens if Cloudflare does not continue providing

4    services?

5    A    We're out of business.  We're shut down.  We're not out

6    of business, we're shut down until we can find a

7    replacement, if we can find one.

8    Q    There are other vendors who are identified as

9    providing, I'm going to call it internet access, I'm not a

10   troglodyte, but I'm only marginally above that, but let's

11   say contact to content users, you know who I'm talking

12   about, internet providers, satellite providers, and the

13   like.  What happens if the Debtor is unable to pay those?

14   A    The same thing, we're shut off.  We can't -- if you

15   don't have access to the satellite, you can't broadcast.

16   Q    What happens if the Debtor's unable to pay its

17   employees?

18   A    Well, I suspect that would be, it was a big issue with

19   the ability to keep going if we don't have any employees.

20   Q    If you would please turn to Exhibit 11.

21        THE COURT:  Mr. Battaglia, you were talking about

22   critical vendors, and then you talked about employees.

23        MR. BATTAGLIA:  Your Honor, I was just using the

24   critical vendors as an example of some of the uses of cash

25   collateral.  Obviously, they're critical vendors as well,

1    and I'll get to the critical vendors here.

2                THE COURT:  Okay.  But --

3                MR. BATTAGLIA:  Separately.

4                THE COURT:  -- are the employees viewed as

5    critical vendors?

6                MR. BATTAGLIA:  No, sir, but they're being paid

7    under the cash collateral budget.

8                THE COURT:  Okay.  Okay.

9                MR. BATTAGLIA:  And that was my point.

10               THE COURT:  I just wanted to make sure that we

11   were clear.

12               MR. BATTAGLIA:  Yes, sir.

13   BY MR. BATTAGLIA:

14   Q    You got Exhibit 11 in front of you?

15   A    Yes, I do.

16   Q    And do you recognize this document?

17   A    Yes, I do.

18               MR. BATTAGLIA:  Your Honor, this is attached to

19   the motion and/or order that were filed requesting the

20   authority to pay critical vendors.

21   BY MR. BATTAGLIA:

22   Q    Is this a true and correct copy of the list of vendors

23   that you proposed to have authority to pay under the

24   critical vendor motion?

25   A    Yes, it is.

1          MR. BATTAGLIA:  Your Honor, I would offer Exhibit

2     11 into evidence.

3          THE COURT:  Any objection?

4          MR. BRIMMAGE:  (Indiscernible).

5          THE COURT:  Okay.  It show for -- what truth of

6     the matter is asserted, it is a -- I can just admit it -- or

7     I'll accept it for the purpose of these are the -- that you

8     seek to pay.  And those are the amounts that you believe

9     that you need to pay them.

10         (Exhibit 11 received into evidence)

11         MR. BATTAGLIA:  That's fine, Your Honor.

12    BY MR. BATTAGLIA:

13    Q    So, there's a list of, I see 20 vendors here.  I want

14    to talk, first of all, generally about FSS's ability to

15    identify and contract with suppliers of goods and services.

16    Generally, in -- do you have an understanding as to whether

17    or not it's easy for this Debtor to replace vendors?

18    A    Yes.

19    Q    What is that understanding?

20         MR. BRIMMAGE:  (Indiscernible).

21         THE COURT:  I don't know.  Overrule it to the

22    extent of -- I want to hear it, how do you?  You can answer

23    the question.

24    BY MR. BATTAGLIA:

25    A    Yes, I do.

1    Q    What is that understanding?

2    A    It can be very difficult.  The -- starting around, I

3    think 2018, but -- today, I'd say today, if we lose a

4    vendor, it can be hard to find a replacement vendor.  Most

5    recent examples I'm aware of are the impact on the bank card

6    processing, where we ended up having to get an intermediary

7    vendor, if you will, to shield the processor from our

8    identity, if you will.  The -- (indiscernible) are unable to

9    find a bank to bank with, going from one of the big

10   international banks to a small rural, Texas State bank.

11        Even an issue of me trying to transfer our banking to

12   Access, which is a major bank on the east coast.  It's

13   actually a savings institution, does a lot of work in the

14   bankruptcy field.  And I wanted to move our banking there

15   prior to filing so that we could easily just transition

16   right into the DIP accounts without changing anything.  And

17   they concluded they would not do it per the bankruptcy

18   without an order from the Bankruptcy Court, and I could not

19   a -- they would not open the banking.  And they require that

20   I be the single signatory, period.

21   Q    Have you had experience attempting to replace the

22   controller position or bookkeeper position?

23   A    Yes, it has been very hard.

24   Q    Why?

25   A    The company's located in Austin, Texas.  And they've

1    had real trouble with finding companies who would be willing

2    to be associated with FSS in Austin, Texas.  And finding

3    somebody (indiscernible) accept having an FSS on their

4    resume.  We just lost one employee, he's coming back as a

5    consultant, contract employee.  He did not want FS -- he

6    wanted to get FSS off his resume.

7    Q    So, understanding that there's -- due to Alex Jones'

8    notoriety, there are limitations on the pool of suppliers of

9    goods and services; is that a fair statement?

10              MR. BRIMMAGE:  (Indiscernible).

11              THE COURT:  Sustained.

12   BY MR. BATTAGLIA:

13   Q    What is your understanding about the effect of Alex

14   Jones' notoriety on the ability to attract alternate

15   suppliers of goods and services?

16   A    It makes it difficult.

17              THE COURT:  Can I tell you on the critical vendor,

18   and for my purposes, Mr. Battaglia, I -- maybe you can focus

19   on -- I'm say, (indiscernible) to go into this question for

20   me, Mr. Battaglia, maybe I can ask the witness, but there

21   are three insurance providers, there's -- right?  There's a

22   -- there are three insurance providers here.  Someone who

23   does trash service, and someone that does the alarm service.

24   But I don't think you need to focus on those.  I mean,

25   unless -- but you tell me the insurance was all paid up, so

1    what is this insurance?

2            MR. BATTAGLIA:  I think they are periodic

3    installments, Your Honor, based on --

4            THE COURT:  Okay.

5            MR. BATTAGLIA:  -- the size of these.

6            THE COURT:  Okay.  All right.

7            MR. BATTAGLIA:  Your Honor, I'll -- and I'll focus

8    on the larger ones, and --

9            THE COURT:  No, I just, to me -- I can --

10   (indiscernible) can object if they want, but I don't think

11   they will.  I suspect they're more focused on the analysis

12   that went into creating this list.  But if you're telling --

13   yeah, the Debtor wants insurance, and maybe that's the

14   better answer for that.  And you've got to maintain

15   insurance.  And you can tell me why you need to maintain the

16   insurance, and that will probably get me over the hump on

17   those.  But maybe you can ask questions.  I think you've

18   already touched on Cloudflare, but maybe you can talk a

19   little bit about what Amazon Web Services does and the

20   security folks.

21           MR. BATTAGLIA:  Yes, sir.

22           THE COURT:  Okay.

23   BY MR. BATTAGLIA:

24   Q    If you'll look at Exhibit 11, and I'll just kind of run

25   down and focus on some of the more substantial -- what does

1    Amazon Web Services provide?

2    A    They do what it says, they provide our web services.

3    Amazon has a huge commercial web service operation they

4    developed for their own internal use for selling a product,

5    and which they now make available to third-parties.

6    Q    Yeah.  How important is that to Debtor's ongoing

7    operation, to maintain that relationship?

8    A    Again, it's critical, it's another component to get to

9    the -- get up -- get to the customers is having access to

10   commercial web services.

11   Q    ATXHD is a satellite uplink why are they critical to

12   the Debtor's business?

13   A    Again, to broadcast across United States is done by

14   satellite.

15   Q    And what happens if they terminate services?

16   A    We won't be broadcasting across the United States until

17   we find an alternative.

18   Q    Austin Security and Investigation is $28,000.  Why is

19   security vital to this Debtor?

20   A    Security's vital because the company and Mr. Jones are

21   extremely in the public eye, and they are extremely

22   controversial.  So, we have -- or FSS has armed security 24

23   hours a day, seven days a week in their facilities.

24            THE COURT:  Is this armed security in the

25   building?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  Okay.

3              THE WITNESS:  And the buildings, there's no names

4    on the buildings.

5              THE COURT:  Okay.

6              THE WITNESS:  When you drive by you don't know

7    what's in there.

8    BY MR. BATTAGLIA:

9    Q    Cloudflare you've touched upon, so let's move to the

10   next largest one.  Getty Images, Inc., you -- tell the Court

11   what that's for?

12   A    Getty Images is a major supplier.  Think about any

13   program, talk show, whatever you've seen on television,

14   they'll bring up pictures of this, that, or the other.  They

15   get it from Getty, so it's for content for the show.  At

16   least, the shows are -- if you haven't watched one, are

17   operated as talk shows.  So, images, clips, et cetera are

18   all a very important part of the production.

19   Q    Hay Vision Network Video.  What do they do?

20   A    This is, again, I've moved a little bit up the

21   technical ladder of streaming bandwidth, which I really

22   didn't know anything about, but I know a little bit more

23   now.  But essentially, having the bandwidth to push out.  If

24   you think about streaming video and it stops and starts and

25   stops and starts, well, the bigger the bandwidth you get,

1    the better that experience is.  So, that provides the

2    ability to stream a lot of gigabytes of visuals and sound

3    out to the market.

4    Q    And if the Debtor didn't have that added bandwidth,

5    what effect would it have on the experience?

6    A    It would again, the shows would be absolutely

7    unwatchable.

8    Q    With respect to the smaller dollar items in here, are

9    each of them, to your opinion, vital to the continued

10   operations of the Debtor?

11   A    Yes.

12   Q    With respect to the insurance, can you give the Court a

13   flavor as to why those are one of the relatively minor, but

14   -- let's see towards the bottom, the Hartford, and

15   Travelers, I think there's two.

16   A    Hartford, Travelers, and then there's the Frost.  Just,

17   you know, this capacity of having insurance for the property

18   and casualty insurance on the assets.  There is a tremendous

19   investment in -- there are four studios onsite and the

20   technology in each one of those is quite large and

21   expensive.  There's a lot of dollars there to be insured and

22   protected.  If something happens, a fire in the building,

23   whatever, that's a lot of assets we've got to protect.

24   Q    Now, are you specifically asking the Court to allow you

25   to pay these, or order you to pay these amounts?

1    A    No.

2    Q    What are you asking for?

3    A    I'm asking to be able to pay up to these amounts.

4    Q    So, for example, I see Amazon Web Services at $77,000.

5    It's unusual to have a flat number like that.  What is the

6    basis for that?

7    A    These were -- what we did was go back and look at the

8    last three or four months and developed an average.

9    (Indiscernible), I suspect the average got rounded to

10   77,000.

11              MR. BRIMMAGE:  Objection, testifying, speculating.

12              THE COURT:  I'll sustain that objection.

13   BY MR. BATTAGLIA:

14   Q    Is it fair to assume that perhaps you don't have the

15   invoice yet for pre-petition services from Amazon Web

16   Services?

17              MR. BRIMMAGE:  Objection, leading.

18              THE COURT:  Sustained.

19   BY MR. BATTAGLIA:

20   Q    What information have you received about the pre-

21   petition amounts owed to Amazon Web Services to this date?

22   A    I have not received a bill yet, so I don't know.

23              MR. BATTAGLIA:  Your Honor, may I have a minute

24   consult with my co-counsel?

25              THE COURT:  Absolutely.

Page 96

```
1              MR. BATTAGLIA:  Thank you.

2    BY MR. BATTAGLIA:

3    Q    What conditions are imposed on the vendors if you pay

4    them under this -- if the Court grants the relief requested?

5    What do they have to do?

6    A    Continue to provide service.

7    Q    On what terms?

8    A    Normal.  Their normal terms we've been operating under

9    pre-bankruptcy.

10   Q    And if they don't?

11   A    If they don't?

12   Q    The order allows you to claw back --

13   A    Yeah, I can claw back but I mean from a business

14   standpoint --

15             MR. BATTAGLIA:  One more moment.  Pass the

16   witness, Your Honor

17             THE COURT:  Okay.

18             MR. BATTAGLIA:  I don't know when it would be

19   appropriate.  I think Mr. Schwartz is drying out there.

20             THE COURT:  Yeah, I was just going to ask folks.

21   I want to be respectful of -- I know folks need to -- may

22   need to eat, and I want to be respectful of that.  Does it

23   make sense to break now, come back, I don't know, 45

24   minutes, and then come back and pick up?  Okay.  Why don't

25   we come back on the record at 1:15.
```

1          Mr. Schwartz, I would remind you that you're still

2    under oath so you're not able to talk to anyone about your

3    testimony.

4          So, we will continue.  We'll break for lunch and

5    come back at 1:15.  I am going to keep Go to Meeting open.

6    I'm going to hang up the line, and then we will come back on

7    the line -- I think we will open up the line about 10

8    minutes before we start.  So, it will be sometime between

9    1:00 and 1:05, but I'll make sure if anyone's dialed in,

10   that you'll be able to hear everything.  But we'll hang up

11   the line and I'll keep Go to Meeting open for now.  Okay?

12   Thank you.

13         MR. BATTAGLIA:  Thank you, Your Honor.

14     (Off the record)

15         CLERK:  All rise.  Please be seated.

16         MR. BATTAGLIA:  Your Honor, is it okay if I have

17   this?

18         THE COURT:  Absolutely.

19         MR. BATTAGLIA:  Thank you.

20         THE COURT:  Okay.  This is Judge Lopez.  The time

21   is 1:22, back on the record in Free Speech.  Let me just --

22   I think we're going to turn to the cross-examination at this

23   time.

24         Mr. Schwartz, I remind you that you're still under

25   oath.  Okay?

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  Okay.  Mr. Moshenberg.

3           MR. MOSHENBERG:  Yes, Your Honor.  If it's all

4    right with the Court, I'm going to be cross-examining Mr.

5    Schwartz on behalf of the Texas Plaintiffs and Mr. Brimmage

6    will be cross-examining Mr. Schwartz on behalf of the

7    Connecticut Plaintiffs, Your Honor.

8           THE COURT:  No problem.

9           MR. BATTAGLIA:  Your Honor, I understand Mr.

10   Brimmage represents both of them.  I mean, I don't --

11   there's no sense in having the same party taking multiple

12   shots here.

13          THE COURT:  Well, they're -- they both filed a

14   joint objection.  So, I'm going to give both of them an

15   opportunity for cross.  If I do see overlap, I will -- so.

16   Go for it.

17          MR. MOSHENBERG:  Fair enough, thank you.

18          THE COURT:  They filed a joint objection, but they

19   are different.  They've always been different from the very

20   beginning.

21          MR. BATTAGLIA:  Yes, but Mr. Brimmage represents

22   both.

23          THE COURT:  He does, he does.  He's picking today.

24   Let's just see where it goes.  All your rights are

25   preserved.  If it starts to get a little out of hand, I'll

1    handle it.

2           MR. MOSHENBERG:  Your Honor, I'm going to Austin

3    later to attend the trial happening in Austin, so I have

4    every incentive to get out of here as soon as we can.

5           THE COURT:  I don't, so take your time.

6           MR. MOSHENBERG:  Fair enough.  Thank you, Your

7    Honor.

8           THE COURT:  Let me ask you this, in terms of

9    exhibits, how do you intend to show the witness?  Do you

10   have --

11          MR. MOSHENBERG:  We do have an exhibit list, Your

12   Honor.  We're going to pull them up, as --

13          THE COURT:  Well, let me ask it before you begin.

14          MR. MOSHENBERG:  Yes, Your Honor.

15          THE COURT:  Maybe I can then ask the same

16   questions.  Are you looking to -- by pull them up, is

17   someone going to ask me for permission to -- how do you

18   intend on doing this, Mr. Martin?  Okay.  Are you -- do you

19   intend to show exhibits out of 28, from Exhibit 28?  Docket

20   28, I should say.

21          Jarrod Martin, where are you?  There you are.  Mr.

22   Martin, I'm going to make you the presenter.  Let me make

23   you a presenter.  Is there -- just before you show anything.

24   Let's see, you have a number of exhibits at 28.  You just

25   want to go through them or are the parties -- is there

1    anything the parties can stipulate to now?  There may be

2    some overlap, right?

3              MR. BATTAGLIA:  Your Honor, I'm afraid that this

4    was filed while I was in my car on my way here, so I

5    actually haven't had an opportunity to look at them.

6              THE COURT:  Well, let's look at them now.  I think

7    a lot of this is public, by the way.  If you want to, Mr.

8    Battaglia, if you want to take a moment, I'll give you a

9    moment to just review them.  If not, we can just take them

10   up one by one.

11             I'll give you a few minutes to review.  It's a

12   first-day hearing, so everybody filed witness and exhibit

13   lists late.  So, I'm going to -- I will say for the parties

14   who are online, in the Go to Meeting feature, if you were to

15   hover your mouse around the right side, you'll see a plus

16   and minus.  And so, depending on the way it's shown on the

17   scroll, you'll still be able to zoom in or zoom out to be

18   able to view a particular document that is shown on the

19   screen.

20             MR. MOSHENBERG:  Your Honor, it may make more

21   sense to go one by one as we go because I may not use all

22   these exhibits anyway.  If the Court is more comfortable

23   doing that, I don't mind proceeding that way.

24             THE COURT:  It's your presentation, counsel, I'll

25   let you --

1          MR. MOSHENBERG:  Yeah, my vote is to just start

2    with the cross and I'll admit what I try to admit and take

3    them one by one.

4          THE COURT:  That works.

5          MR. BATTAGLIA:  I have no issues with 1, 2, and 3,

6    Your Honor.

7          MR. MOSHENBERG:  Your Honor, I may not try to

8    admit those, but it's good to know that there is no

9    objection to 1, 2, or 3.

10         THE COURT:  Well, now it just sounds like we ought

11   to just start.

12         MR. MOSHENBERG:  Okay, fair enough.

13              CROSS-EXAMINATION OF W. MARC SCHWARTZ

14   BY MR. MOSHENBERG:

15   Q    All right.  Mr. Schwartz, you made some declarations in

16   this case, correct?

17   A    I believe I did one.

18   Q    Okay.  And you understand that the statements you made

19   in that declaration was under oath?

20   A    Yes.

21   Q    And that's the same oath that you're under today,

22   correct?

23   A    Yes.

24   Q    And you understand that it's important to tell the

25   truth in a declaration, correct?

1    A    Yes.

2    Q    You agree that it's important to tell the truth period,

3    correct?

4    A    I don't know what you mean by telling the truth period.

5    It's important to tell the truth.

6    Q    Okay.  And that's what I'm trying to confirm.  You

7    agree it's important to tell the truth.

8    A    I did agree with you.

9    Q    Okay.  You were hired as the CRO in the InfoW

10   bankruptcy, correct?

11   A    Yes.

12   Q    Do you recall that you spoke at the first day hearing

13   for that bankruptcy?

14   A    I recall I spoke at the first day hearing, yes.

15   Q    Do you recall that at the time you said you hadn't even

16   heard of Alex Jones before being approached to be the CRO?

17   A    Yes.

18   Q    That's still the truth?

19   A    That fact hasn't changed.  I still hadn't heard of him

20   before then.

21   Q    Do you recall telling the Court that you don't really

22   agree with his views and something to the effect of that you

23   put them in the same group as the people who denied the

24   landing on the moon?

25   A    I've missed the first part of it.  I don't agree with

1    his views?

2    Q    Sure.

3    A    I don't necessarily agree with his views.

4    Q    That's what I was confirming.  You don't agree with his

5    views, and I think he even said something to the effect of,

6    you know, you put him in the same category as the moon

7    landing deniers?

8    A    Correct.  I think I said that.

9    Q    And the point I'm raising here is that you told the

10   Court that you did not find Jones to be credible; is that

11   right?

12   A    I have to revisit what I said at that time.  I mean it

13   was -- I have to see what I said.

14   Q    Is it your testimony today that you do find Alex Jones

15   to be a credible person?

16   A    Credible, in certain respects, yes.

17   Q    Okay.  The respects relating to this bankruptcy; is

18   that what your testimony is?

19   A    Respect in leading to this bankruptcy?

20   Q    In respect to this bankruptcy is that your testimony?

21          MR. BATTAGLIA:  Objection, Your Honor.  It's

22   overbroad.

23          THE WITNESS:  Yeah, I'm confused by the question.

24          THE COURT:  Hold on a second.  I'm going to

25   sustain that objection.  You can ask a different one.

1           MR. MOSHENBERG:  Okay.

2    BY MR. MOSHENBERG:

3    Q    Well, we'll explore that in a minute.  You understand,

4    though, that in some contexts, Alex Jones does not tell the

5    truth.  You understand that, correct?

6    A    I believe that some people believe he does not tell the

7    truth.  That's obvious from the from the litigation.

8    Q    Okay.  I also want you to answer my question though.

9    You understand that in some context, Alex Jones does not

10   tell the truth.

11          MR. BATTAGLIA:  Again, Your Honor, I'm going to

12   object.  This line of questioning is irrelevant

13   (indiscernible) be overbroad.

14          THE COURT:  What's the relevance of the questions?

15          MR. MOSHENBERG:  Your Honor, he's the CRO.  He's

16   relying on the information that the sole owner of the

17   company, Alex Jones, is providing him.

18          THE COURT:  Why don't you ask him if he's relying

19   on it?

20          MR. MOSHENBERG:  Okay.

21   BY MR. MOSHENBERG:

22   Q    Have you relied on any information Alex Jones has

23   provided to you directly or through his attorneys?

24   A    Well, I mean, yes, but it's information I've

25   corroborated.

 1   Q   Okay.  So, you're relying on information he provided

 2   you.  And what I want to know is do you understand that in

 3   certain context, Alex Jones does not tell the truth?

 4   A   Like all human beings, including yourself, he does not

 5   always tell the truth.

 6   Q   Okay.  Well, let's talk about an instance where he

 7   definitely didn't.  You understand that Jones and Free

 8   Speech Systems were determined by two different courts to be

 9   liable for intentionally lying, for defamation.  You

10   understand that, correct?

11           MR. BATTAGLIA:  Your Honor, again, I'm going to

12   object.  The entire line of questioning is irrelevant to the

13   issues before the Court today.  This is interim cash

14   collateral hearing.

15           THE COURT:  Why don't you help me with the

16   relevance of where you're going, counsel?

17           MR. MOSHENBERG:  Your Honor, what I want to

18   understand right now in a Subchapter 5 context, Your Honor,

19   where we have the CRO and we have the information that the

20   CRO is given by people who have been already adjudicated by

21   several courts to be liars, not just in underlying causes of

22   action, but also the abuses of the legal process.

23           THE COURT:  Okay.  I just asked you what the

24   relevance is.  I know you're trying to sneak stuff in, but -

25   -

```
 1            MR. MOSHENBERG:  It's going to go to the

 2   credibility.  I'm not trying to sneak anything, Your Honor.

 3   Just to be clear, I'm just going to the credibility of the

 4   of the witness.  That's all I'm trying to get at, Your

 5   Honor.

 6            THE COURT:  The credibility of this witness?

 7            MR. MOSHENBERG:  Yes, Your Honor.

 8            THE COURT:  Okay.  I'll allow a little bit of it

 9   to some extent, but don't go too far.

10            MR. MOSHENBERG:  All right, Your Honor.

11   BY MR. MOSHENBERG:

12   Q    Of course, you're not Alex Jones, and I hope that at

13   least you'd agree with me that it's important in bankruptcy

14   to have transparency, oversight in an investigation.  You'd

15   agree with that?

16   A    I believe in bankruptcy, there should be transparency

17   for certain.  That's why we have oversight.  I mean, I've

18   got the Court, I've got a Sub 5 Trustee.  I'm going to not

19   intentionally obfuscate anything.

20   Q    Now, you've never worked for Free Speech Systems,

21   correct?

22   A    Before this engagement, no.

23   Q    Okay.  And before this engagement, you were never

24   contracted by Free Speech Systems in any way?

25   A     No.
```

1    Q    Okay.

2    A    Not that I'm aware of.

3    Q    Have you ever been contracted by Alex Jones or PQPR

4    before, at all, actually?

5    A    No.  I never knew they existed prior to the first

6    bankruptcy.

7    Q    Now, you -- I want to cover your declaration.  Exhibit

8    3.  (Indiscernible).  Now, Mr. Schwartz, can you see that?

9    A    Yes.

10   Q    Okay.  And that is your declaration, correct?

11   A    It appears to be, at least the second page -- the first

12   page of it.

13   Q    Okay.  And this is your statement under penalty of

14   perjury, correct?

15   A    Correct.

16   Q    I want to turn to Paragraph 4 for a moment.  It says

17   "Except as otherwise indicated, all facts as set forth in

18   this declaration are based upon my personal knowledge, my

19   review of relevant documents, or my opinion based on

20   experience, knowledge and information concerning the Debtor.

21   If called upon to testify, I would testify competently to

22   the facts set forth in this declaration."  Did I read that

23   correctly?

24   A    Yes, you did.

25   Q    What relevant documents did you review when you refer

1    to them in Paragraph 4?

2    A    Thousands of would-be pages if we printed them, out of

3    accounting records.  Of course, the general ledgers, the

4    prior general ledgers, financial statements drawn from those

5    general ledgers, contracts.  I don't have an inventory of

6    those items, but that's generally the types of documents I

7    looked at, would have looked at, and I'm sure there are

8    numerous others.

9    Q    Okay.

10   A    There's some various financial analyses, I remember

11   that.

12   Q    When  you say contracts, what contracts did you review?

13   A    Well, the -- I saw the notes.  I saw --

14   Q    Where those notes something that --

15   A    I think I saw other contracts.  I just don't recall

16   them.  If I can finish my answer.

17   Q    Sure.  I thought you were done.  Those contracts, the

18   promissory notes, were that -- was that just something you

19   found in the file when you started your investigation or

20   were those given to you?

21   A    They're probably given to me.

22   Q    They were given to you by the lawyers?

23   A    No, I don't think so.  I -- they were all recorded in

24   the books of account.  So, I said, okay, I need -- what are

25   these?  Let me see these.  And I believe Mr. Roe gave them

1    to me.

2    Q    Do you find Mr. Roe to be a credible person?

3    A    I think.  Yes, I think it's incredible like all of us,

4    we have our weaknesses.

5    Q    What sort of steps did you take to determine that Mr.

6    Roe a credible person?

7    A    Well, I worked with him for a couple of months in

8    connection with the first bankruptcy, so I had an

9    opportunity to see him in action, work with him.  I found he

10   did not try to hide things from me.  And I did test him to

11   see if he would.  He was confident, knows accounting,

12   understood accounting, and understood the problems in the

13   financial records.  So --

14   Q    Is it fair to say beyond your interactions with him

15   over a few weeks, that you didn't do any other vetting of

16   him?

17   A    No, I don't think we did any formal vetting of him.

18   Q    Okay.

19             THE COURT:  Just a second.  Just a second.  I was

20   hearing some background noise and it looks like the line got

21   unmuted.  I'm muting the line again.  If anybody wishes to

22   be heard at some point, you'll need to hit five star.  I

23   apologize.  I just wanted to make sure that you weren't

24   interrupted with background noise.

25             MR. MOSHENBERG:  Thank you, Your Honor.  I

1    appreciate it.

2            Can we look at Exhibit 10, please?  Can you scroll

3    down a little bit more?  I want to make sure Mr. Schwartz

4    has a chance to look at it.  I'm going to ask him if he's

5    ever looked at this document before.

6    BY MR. MOSHENBERG:

7    Q    So, Mr. Schwartz, when you're ready, just let me know

8    whether you've ever reviewed it.

9    A    I don't believe I've seen this before.

10   Q    Okay.  Do you have any reason to doubt that this is the

11   default judgment that was entered in the Connecticut

12   Plaintiffs' case in Connecticut?

13           MR. BATTAGLIA:  Objection, Your Honor, asked and

14   answered.  He said he has never seen it.

15           THE COURT:  I'll sustain.

16           MR. MOSHENBERG:  Okay.

17   BY MR. MOSHENBERG:

18   Q    My question is do you have any reason to doubt that

19   this is the default judgment?

20           MR. BATTAGLIA:  Objection, Your Honor, same

21   objection.  How can the witness answer when he said he has

22   never it before?

23           THE COURT:  Yeah.  That was sustained.

24   BY MR. MOSHENBERG:

25   Q    This is a publicly filed document granting the default

1   judgment against Alex Jones.  I'll represent that to you.

2   And what I want to look at is Page 7 --

3            MR. BATTAGLIA:  Your Honor, I'm going to object to

4   him asking questions about a document that's not in

5   evidence.  It's (indiscernible) --

6            MR. MOSHENBERG:  It's a public document, Your

7   Honor.  It's the same standard as --

8            MR. BATTAGLIA:  There's no indicia of reliability

9   here.  It's a certified document and I've never seen it

10  either.

11           THE COURT:  Why don't you -- I don't -- you're

12  asking the question to a witness about a document that's not

13  been admitted into evidence.  Maybe you should move for it

14  to be admitted.

15           MR. MOSHENBERG:  Sure.  Your Honor, I would like

16  to move to admit Exhibit 10 into evidence.

17           MR. BATTAGLIA:  Objection.  No foundation.

18           THE COURT:  What's your response, counsel?

19           MR. MOSHENBERG:  Well, it's part of a publicly

20  filed document in Connecticut, Your Honor, if you go to the

21  top page.  It is a court default judgment in the Connecticut

22  Plaintiffs' case.

23           MR. BATTAGLIA:  It's not a certified copy.  There

24  is no representation that this is valid.  I've never seen it

25  before.  I have no idea what's --

1          MR. MOSHENBERG:  And it's also your --

2          MR. BATTAGLIA:  Excuse me, counsel.

3          THE COURT:  You got let him finish the objection

4    and then you can answer.  Go ahead.

5          MR. BATTAGLIA:  There's no indicia here that this

6    in accurate document.  Where it is or not, I have no idea.

7    no idea.  I've never seen it before, neither has the

8    witness.

9          MR. MOSHENBERG:  Your Honor, I'm offering it for

10   impeachment purposes only.   I don't even need to prove it

11   for the truth of the matter asserted.

12         THE COURT:  What is the purpose for the

13   impeachment that you're seeking?  On what point are you

14   seeking to impeach the witness?

15         MR. MOSHENBERG:  The court in the Connecticut case

16   determined that Mr. Roe was not credible, actually did not

17   consider his evidence because he did not find the witness to

18   be credible and that the witness had sanitized records.

19         THE COURT:  Well, what does it have to do with Mr.

20   Schwartz?

21         MR. MOSHENBERG:  He relied on him as part of this

22   bankruptcy.

23         THE COURT:  What is the impeached -- what is the,

24   what is the statement that he made that you're impeaching

25   him on?

1          MR. MOSHENBERG:  Well, excuse me.  What I mean is

2    it's going to his credibility, that he's relying on as the

3    CRO information done by Mr. Roe, who has been adjudicated by

4    a judge in Connecticut as not providing reliable

5    information.

6          THE COURT:  I'm going to sustain the objection.

7    You can come up with something that will -- maybe you can

8    come up with something, but that he hasn't said anything

9    within the scope of his direct that would warrant an

10   impeachment on that point.  And maybe this is a certified

11   copy, maybe it's not.  Maybe you can come up with something.

12   But I'm also struggling to see the relevance of this in

13   connection with a critical vendor motion and a cash

14   collateral motion.  But maybe you can get me there as well.

15         MR. MOSHENBERG:  All right, Your Honor.  Well, I'm

16   going to focus for a moment on ways to get this in before

17   you in a reliable way.

18         THE COURT:  Okay.

19         MR. MOSHENBERG:  I'm going to move on in the

20   meantime, Your Honor.  And I'll tie that to that.

21         THE COURT:  I'm sure Mr. Brimmage is already

22   thinking of stuff.  But go ahead.

23   BY MR. MOSHENBERG:

24   Q    So I have here accounting records, prior ledgers,

25   financial statements, contracts, inventory, financial

1    analyses.  Is there anything else that you relied on in your

2    work so far that you reviewed?

3    A     I'm certain there are.

4    Q     Okay.  Does anything else come to mind?

5    A     Purchase orders, sales orders, invoices.

6    Q     Is that all?

7    A     Give me a chance to think.  I mean you're asking me off

8    the top of my head.

9    Q     Sure.  Did you read any depositions?

10   A     No, not off -- I don't think so.

11   Q     Okay.  All right.  So, aside from the documents you

12   reviewed, what else did you do to make yourself comfortable

13   with the information that you're relying on, and that Free

14   Speech provided you?

15   A     Well, I talked to people, asked them -- pertinent

16   people who had knowledge of those areas.

17   Q     Okay.  Which individuals did you talk to?

18   A     Blake Roddy is one, Bob Roe is another one.  Alex Jones

19   is another one.  David Jones.  Anthony (indiscernible).   I

20   visited some with Melinda Flores.  A gentleman named

21   Zimmerman.

22   Q     Say that again, please.

23   A     A gentleman named Zimmerman.  A gentleman last name

24   Elmo, I don't remember his first name.  I believe it's Elmo.

25   Of course, I talked to counsel.  They were reviewing

1    documents as well.  Patrick -- oh, and you asked me in

2    connection with the declaration, Patrick Riley.  Those are

3    the names I can recall.

4    Q    Okay.  Let's go to Paragraph 11.  And I'm back at

5    Exhibit 3 right now.  This is your declaration we covered

6    earlier.

7              THE COURT:  Just to be clear, this is the

8    declaration that was filed in this case?

9              MR. MOSHENBERG:  Yes, Your Honor.

10             THE COURT:  Okay, thank you.

11   BY MR. MOSHENBERG:

12   Q    Okay.  I want to look at Paragraph 11 please.  It says

13   that Alex Jones, it says born in 1974, Alex Jones or Jones,

14   is the son of Carol Jones, a homemaker, David Jones, a

15   prominent dentist.  Jones moved from Dallas to Austin as a

16   teenager.  Did I read that correctly?

17   A    Yes.

18   Q    That is not based on your personal knowledge; is it?

19   A    No.

20   Q    Okay.  But you testified, you swore in this declaration

21   that that was based on -- that fact is based on your

22   personal knowledge, but you don't know that.

23   A    I said my, my declaration said it was based on

24   documents I reviewed.  I put up the three categories we

25   already talked about.  This was I saw, I read an article

1    that mentioned, I believe, it was an article that stated

2    this.

3    Q    And you just took that to be true?  You read an article

4    and you determined that it was true?

5    A    It was one of the documents I reviewed.  I mean, take

6    any one of the documents, you can say did I take it as true?

7    No, I took a look.  You know, it's a piece of information

8    that may or may not be true.  It appears to be true.  But I

9    said I saw in a couple of places and the press reported it,

10   so, my God, it must be right.

11   Q    So, let me understand this.  You didn't know if

12   something was true.  You saw it.  You thought it was true

13   and that was enough for you to swear it was true in this

14   Court --

15   A    No, I consulted with my attorneys as well, or the

16   attorneys on this case as well.  You know, it's if we go

17   through this, we got to, you know, are we certain this is

18   all right.

19   Q    And so you had no idea.  You just relied on other

20   people, and you swore to that being true?

21   A    Everything I've done in this is based on information

22   provided by others.  I didn't create any of the data I

23   looked at, any of the documents I looked at, or anything.

24   Some, you know, they could all have been fabricated and that

25   -- but I don't believe they were.  So, it's based, all based

1    on someone giving me something.  And I, to some -- some

2    vetted more than others.  And I asked, this is one that I

3    remember talking to counsel about this one.  Are we sure

4    this, we know this, are we comfortable with our references

5    on this?  I saw the article.  Are we comfortable using it?

6    Q    But you don't know if it's true and you swore that it's

7    true to this Court?

8         MR. BATTAGLIA:  Objection, Your Honor.  Asked and

9    answered.  Frankly, it's badgering at this point.

10        THE COURT:  Well, no, see I think -- I think, I

11   think you get to explore a little bit.  Can we go up a

12   little bit.  I'm going to overrule the objection.  Kind of

13   scroll up to the very beginning.  Paragraphs 1 or 2.  Okay.

14        So, tell me where in this declaration it says that

15   the statements that you made are based on conversations with

16   other people?  It says, based on personal knowledge, your

17   review of relevant documents, or your opinion based upon

18   experience, knowledge, and information concerning the

19   Debtor.  And then you --

20        THE WITNESS:  I don't -- it doesn't say based on

21   conversations, but it should be because I talked to a lot of

22   people as I said.

23        THE COURT:  Okay.  You can ask your question.  I'm

24   going to overrule the objection.

25   BY MR. MOSHENBERG:

1   Q    So, you didn't know whether it was true, but you swore

2   that this was true, what Paragraph 11 says.  That's what I

3   wanted to confirm with you today.

4   A    Well, based on my -- it's based on my information,

5   knowledgeable, and belief at the time.  And it may not be

6   true.  Maybe he wasn't born in '74.  That --

7   Q    Not, you could know --

8        THE COURT:  I just want you to let him finish the

9   answer and then --

10       MR. MOSHENBERG:  Yes, Your Honor, I apologize.

11   BY MR. MOSHENBERG:

12   A    Based on the information I had and based on my vetting

13   of that information, I took that piece of information as

14   true.  It is important?  I don't know.

15   Q    I'm fine with you following up, but I do want to answer

16   to my question, which is you didn't know whether this was

17   true, but you swore that it was true.  And I just wanted to

18   confirm that today.  You didn't know if this was true, but

19   you swore to it.

20   A    Well, I believed it was true.  But the knowledge like

21   you knowing about 64 million, you didn't know that was true.

22   But you said it.  It's the same thing.  I didn't, you know,

23   I believed this was true.  I said it.  I believe it's still

24   true.

25   Q    But you don't know whether it's true.

```
 1   A    I did not see him get born.

 2   Q    Okay.  Let's look at Paragraph 12.  Take a moment and

 3   review it.

 4   A    Okay.

 5   Q    Is it fair to say that you don't have any personal

 6   knowledge of whether he was -- about Austin, about in the

 7   early 1990s, Austin was a dirt-cheap home to artists,

 8   musicians, and sign makers.  And according to Shannon Burke,

 9   who's a local talk show radio host said all this

10   information.  Do you know any of these things to be

11   personally true?  Did you have personal knowledge of this?

12   A    No, you -- the -- this was cited.  I actually cited the

13   source for that.

14   Q    Okay.  And you actually reviewed that source.  Is that

15   your sworn testimony?

16   A    I looked at that.  I read it.  Yes.

17            THE COURT:  You read the Buzzfeed article?

18            THE WITNESS:  Yes, I did.  I remember this one,

19   reading it.

20            THE COURT:  Okay.

21   BY MR. MOSHENBERG:

22   Q    Okay.  How about Paragraph 13 then.  Take a moment and

23   read that.

24   A    That's also in the Buzzfeed article.

25   Q    Okay.  So, you don't actually know whether that's true.
```

001652

1    You're just relying on the Buzzfeed article, correct?

2    A    Yes.

3    Q    Okay.  And are you saying you don't know whether this

4    is true in this, anywhere in here?  Do you ever make that

5    qualification?  You acknowledge Buzzfeed, but you represent

6    this as being a true statement.  You're swearing that this

7    is a true statement, sir, based on something you read on

8    Buzzfeed.

9    A    Well, I'm citing Buzzfeed to say this is where I got

10   the information from.

11   Q    Where does it say that?  It says Buzzfeed.  Where does

12   it -- where is that qualification here?

13   A    When I footnoted it -- when we footnoted it with the

14   citation, that tells you the source of it.  And that I can -

15   - you know, I'm relying on Buzzfeed and their reporting, but

16   it doesn't say that I've done anything to verify that

17   Buzzfeed did the job they were supposed to do.

18   Q    Right.  And you swore that this statement is true

19   though.  You acknowledge Buzzfeed, but you don't say I don't

20   know if this is true or not, but this is what Buzzfeed says.

21   You swore in a declaration to its truth.

22   A    That's the truth, that's a true quote from Buzzfeed.

23   Q    That's not what you wrote.  You didn't say according to

24   Buzzfeed, they said this, and I don't know if it's true.

25   You represented this as true.

```
 1   A    I represented this came from Buzzfeed.

 2   Q    You don't know if it's true?

 3   A    No.

 4        MR. BATTAGLIA:  Your Honor, we're just being

 5   argumentative.

 6        THE COURT:  I think, I think we just got the

 7   answer.  I think he just said no.  And I think you're going

 8   to ask another question.

 9   BY MR. MOSHENBERG:

10   Q    Okay.  I'll speed this along.  Why don't we look, why

11   don't you take a moment and look at Paragraphs 14, 15.  Is

12   it the same issue?  You don't know whether it's true, you're

13   just relying on other sources?

14   A    Yes.  Those are both relying on other sources.

15   Q    Right, because you don't know whether those statements

16   are true, whether those allegations, those factual

17   statements are actually true.  You don't know?

18   A    No.

19   Q    How about Alex Jones was a natural, Number 16?  How did

20   you know that he was a natural in all of this?  Or is it you

21   didn't know?

22   A    That's a quote.  That's not something --

23   Q    I don't see a quotation mark.

24   A    I agree with you.  It's not, and it's cited directly,

25   but that should have been cited.
```

1   Q    That's something that you're swearing as being true in

2   your declaration.

3   A    Well, based on the evidence I've seen, which is the

4   operating results, at least from 1907 -- 2007 forward, he's

5   obviously, extremely successful at this.

6   Q    But you saw some documents and you decided based on

7   those some documents that was so true that you swore to it

8   being true in a declaration to this Court?

9   A    That Alex Jones is a natural, I don't, I don't think I

10  have a problem with that at all based on what I saw from

11  2007 forward.

12  Q    Right.

13  A    But the evidence I'm used to saying, which is numbers.

14  Q    I thought you said you hadn't heard of him until this

15  engagement.  How did you know he was a natural?

16  A    I just told you; I look at his numbers from 2007

17  forward as well.

18  Q    Okay.

19          THE COURT:  What do you mean by looking at his

20  numbers?  What --

21          THE WITNESS:  Financial results.

22          THE COURT:  From FSS?

23          THE WITNESS:  Yeah, FSS, I think started business

24  in 2007.

25          THE COURT:  I just wanted to clarify what you

```
 1    meant by his financial numbers.  Not -- you mean --
 2              THE WITNESS:  FSS's financials.
 3              THE COURT:  Okay, thank you.
 4    BY MR. MOSHENBERG:
 5    Q    I mean, we can speed this along.  Why don't we look at
 6    17, 18, 19, those three paragraphs.  Take a moment and
 7    review them.  I'll ask my questions when you're ready.
 8    A    Okay.
 9    Q    Same problem, you're swearing these things are true and
10    you don't know whether they are.  You just looked at some
11    sources and you swore that those things were true?
12    A    I swear, yeah, these are cites from those sources.
13    Q    Right, but you don't at all say this is what these
14    sources reported, but I don't know whether they're true.
15    You swore to them being true.
16    A    Well, I swear that these are proper cites from these
17    sources.
18    Q    Where does it say that?
19    A    Well, because it's based on the information I had,
20    these sources said this.  This si -- I'm telling you this is
21    what these sources said.
22    Q    That that big qualification you just gave, where's that
23    in your declaration?
24    A    I don't think you'll see that that specific wording in
25    the declaration.
```

001656

1    Q    Right, because in your declaration, you say the

2    following, I swear under penalty of perjury is true based on

3    my personal knowledge.  And you don't know whether these

4    things are true.  You just looked at some sources and swore

5    they were true.

6    A    Well, it's -- my declaration says my personal knowledge

7    is based on the documentation I reviewed as well as the

8    other two factors like we've already covered in Paragraph 3,

9    I think.  It's based on that.  See, none of the documents

10   that I reviewed did I create everywhere.  So, you can say

11   the whole thing is not based on my knowledge.

12   Q    I agree.  And I want be very clear that my point is I

13   understand you review things, but lots of people can review

14   stuff and then not decide whether it's true or not.  You

15   reviewed those things and you decided to swear to this Court

16   without knowing whether it actually was that it's true

17   without any of your own personal knowledge.

18   A    I mean, obviously, I do what I do.  I look at other

19   stuff and I interpret it.  In this case this is material,

20   it's -- you know, that people -- other people wrote.  I

21   didn't say it's my source.  I cited to the sources they came

22   from.  But I -- yeah, everything I do is based on

23   information that has existed even before I heard the name

24   Alex Jones.

25   Q    Are you done with your answer, sir?

1    A    Yes.

2    Q    Let's look at the first sentence of Paragraph 19.

3    "When Jones started broadcasting on the radio in the late

4    1990s, he closely followed the talk radio playbook.  He

5    built a large, devoted audience of far-right conspiracy

6    believers."  Did I read that correctly?

7    A    Yes.

8    Q    There's no cite there.  Do you agree with that?

9    A    I think that all this paragraph is in SPLC, where it

10   came from.  Excuse me, there's a -- it came out of

11   Intelligencer, is what it says.

12   Q    Where does it say that?

13   A    On the last -- second to the last line.  Right.  I see

14   that sentence has the Intelligencer cited.  I'm talking

15   about the first sentence.  You represented that was true.

16   There's no cite there.  There's no qualification at all.

17   You just said it.

18   A    I think all of that, all of that came from the

19   Intelligencer.  The only thing that didn't was the last

20   sentence about the hundred stations, which came from SPLC.

21   Q    There's no cite there.  You agree with that?

22   A    I don't agree with that at all.

23        THE COURT:  That one has been asked and answered.

24   BY MR. MOSHENBERG:

25   Q    Okay.  All right.  Well, let's go to the next

```
 1   paragraph.  Take a moment and look at that please.  Again,
 2   you didn't have any personal knowledge of anything in there,
 3   correct?  And take your time reading it.
 4   A    Correct.  As I said, none of this is personal, well
 5   except for my analysis of numbers, which I don't have
 6   personal knowledge of.  But this, excuse me, could you put
 7   that paragraph back?
 8   Q    Number 20, thank you.
 9             THE COURT:  Number 20.
10   BY MR. MOSHENBERG:
11   A    I believe that I did talk about this with Dr. Jones.
12   Q    Okay.  But you didn't know personally whether it was
13   true or not.  You just relied on Dr. Jones.  You didn't know
14   if it was true.
15   A    Right, I don't have personal knowledge of anything.
16   Q    But you swore to it being a fact.
17             MR. BATTAGLIA:  Your Honor, I'm going to object.
18   Counsel keeps saying that he says personal knowledge based
19   on documents, experience, knowledge, and information.
20             THE COURT:  I think the testimony is, is that he's
21   citing to documents, but those documents didn't really form
22   his personal knowledge.  It's just citing stuff.  I think
23   that's what this -- these paragraphs are showing.  Unless
24   Mr. Schwartz wants to tell me that he developed personal
25   knowledge based on -- personal knowledge, I should say,
```

```
1    based on news articles and the deposition reference.  It
2    sounds like you're just, in this citing --
3              MR. MOSHENBERG:  It's not a brief, Your Honor.
4    It's a declaration.
5              THE COURT:  No, no, no.  I'm just going -- I think
6    at the core of what you're doing is just citing articles to
7    try to provide background information.  Do I understand that
8    correctly?
9              THE WITNESS:  Yes.  That's correct, Your Honor.
10             THE COURT:  Okay.  I'm just going to caution you.
11   The way your declaration is drafted, and I will be honest
12   with you, it does say you developed personal knowledge based
13   on this.  And as I read this, I knew this line of
14   questioning was coming.  So, that's why I'm allowing it.
15             THE WITNESS:  I apologize, Your Honor.
16             THE COURT:  I'm sure next time you'll cut all this
17   out and get right to the stuff you know.  But today, they
18   get to ask questions about it, and we'll figure out what you
19   know.
20   BY MR. MOSHENBERG:
21   Q   It is fair to say --
22             MR. MOSHENBERG:  Thank you, Your Honor.  I didn't
23   mean to cut you off.
24             THE COURT:  No, no, no.  I didn't mean to
25   interrupt your examination.
```

```
 1   BY MR. MOSHENBERG:

 2   Q    Is it fair to say sort of based on this exchange --

 3   because earlier I asked if you read any depositions and you

 4   hadn't, correct?

 5   A    Yes.  I don't recall.  I may have -- I don't recall

 6   reading any depositions.  I don't even recall, like, reading

 7   it -- I may have read an excerpt of this deposition, but I

 8   don't recall it.

 9   Q    Yeah.  Well, you agree in Paragraph 20 you cite to a

10   deposition that you haven't read?

11   A    Correct.

12   Q    And it's the same problem, right, on 21, 22, 24, you're

13   citing to this deposition, and you hadn't read it.

14   A    That is correct.

15   Q    And you swore -- based on a deposition you never read;

16   you swore these things were true based on your personal

17   knowledge?

18   A    Correct.

19   Q    Let's take a break from your declaration, sir.  Why

20   don't we go --

21        MR. MOSHENBERG:  Can you pull up Exhibit 1,

22   please?  I think Jarrod quit the case because I asked him to

23   pull up exhibits for me.

24        MR. BRIMMAGE:  We are going to have to take a

25   quick break, Your Honor.  I'm sorry.  I have a Mac.
```

```
 1                THE COURT:  No, no worries.  But I think I
 2    probably need to make you a presenter.
 3                MR. BRIMMAGE:  Well, I'm on Jarrod's machine.
 4                THE COURT:  Oh.  Do you want to take a break?
 5                MR. MOSHENBERG:  I think it'll just be one moment,
 6    Your Honor.  We're looking at exhibit one please.
 7                MR. BRIMMAGE:  (Indiscernible).  And I did want
 8    (indiscernible) the issue.  Thanks, Your Honor.
 9                MR. MOSHENBERG:  We're looking at Exhibit 1,
10    please.
11                THE COURT:  What's the exhibit you're going to?
12                MR. MOSHENBERG:  Number 1, Your Honor.
13                THE COURT:  Number 1.
14                MR. MOSHENBERG:  Yes, Your Honor.
15                THE COURT:  Mr. Martin, I believe you're still the
16    presenter.  If anything has changed, if you need me to do
17    anything, you let me know.  I don't see you.  That's what --
18    oh, there you are.  You're still the presenter.
19    BY MR. MOSHENBERG:
20    Q    Can you see the document, sir?
21    A    Are you talking about the petition?  Yes, sir.
22    Q    Yes.
23    A    Yes, sir.
24    Q    I almost called you Your Honor.  Now, the -- you've
25    seen this document before, correct?
```

```
 1    A    Yes.

 2    Q    Okay.  I want to look on this first page.  And Part IV,

 3    it says Debtor's address.  It says principal place of

 4    business.  Do you see that?

 5    A    Yes.

 6    Q    Okay.  It looks like it's in Austin, Texas.

 7    A    Yes, sir.

 8    Q    Okay.  And I think I remember looking in your

 9    declaration too, but it is your understanding that they are

10    based in Austin, correct?

11    A    They being FSS?  Yes.

12    Q    Right.  They've got an office building there.  And I

13    think also a warehouse you mentioned.

14    A    Yes.

15    Q    Okay.  All right.  Let's go to Page 3, please, Section

16    XI.  Do you see Section XI, check all that apply?  Why is

17    this case fall to this District?

18    A    Yes.

19    Q    And can you read the box that's checked please?

20    A    There it said, its domicile place, principal place of

21    business or principal assets in this district for 180 days

22    immediately preceding the date of this petition or for a

23    longer part of such 180 days than in any other district.

24    Q    Okay.  That statement is not correct; is it?

25    A    I believe it --
```

1              MR. BATTAGLIA:  Objection, Your Honor.  I believe

2     that calls for a legal conclusion of what the definition of

3     domicile is.

4              THE COURT:  Yeah, I'm going to sustain that

5     objection.

6     BY MR. MOSHENBERG:

7     Q    What activities are occurring in Houston on behalf of

8     Free Speech Systems?

9     A    In Houston, I don't know.

10    Q    What about in the Southern District?

11    A    Southern District --

12    Q    Yes.

13    A    Well, its business activities are occurring in the

14    state of Texas, and I understand that's the domicile.

15    Q    My understanding is it's all happening in the Austin

16    area, correct?

17    A    Well, I mean all the physical activity is in the Austin

18    area.

19    Q    Right.

20    A    But they sell all over the country.

21    Q    Right.  But you're not aware of anything in particular

22    happening in the Houston area, correct?

23    A    No.

24    Q    Galveston, Victoria, nothing there?

25    A    No.

1    Q    Okay.  So, what was the basis for you checking that

2    box?

3    A    My understanding from counsel is that there's case law

4    out there that a quick Texas entity is domiciled in the

5    state of Texas, and you can pick any district.

6    Q    Okay.  And this is -- of course, if we go to the next

7    page, Page 4, you're swearing under the penalty of perjury

8    that what's in here is correct, correct?

9    A    Correct.

10    Q    So, is it fair to put this in the same bucket of things

11    that you swore as being true even though you didn't really

12    know if it was true or not?

13    A    Well, I'm not a lawyer, so I don't consider my reading

14    of the case law definitive.  But based on the case law I

15    read; this is correct.

16    Q    That their domicile is in this district?

17    A    Yes.

18    Q    Okay.  Even though you're aware of no activities

19    happening in this area?

20         MR. BATTAGLIA:  Objection, Your Honor, asked and

21    answered.

22         THE COURT:  I'm going to sustain that.

23    BY MR. MOSHENBERG:

24    Q    Actually, let's go to Page 13 of that document.  Were

25    you the one that prepared this balance sheet?

1    A    I'm sorry.  What are you referring to?

2    Q    I'm looking on Page 13 of 17.  Excuse me, balance

3    sheet.

4    A    If you look at Page 13 of 17, at the very top, it says

5    "Comparative Profit and Loss Statement."

6    Q    I think that's 12.  Oh, it's the exhibit.  Can you go

7    to the next page, please?  I'm looking at the balance sheet.

8    Were you the one that prepared this?

9    A    No, I think I had one of my staff prepare this.

10    Q    And it's no secret I want to talk to you about the

11    numbers across the bottom.

12    A    Okay.

13    Q    The reports in 2021, 61 million, almost $62 million in

14    member draws; isn't that right?

15    A    Let me clarify your statement for you.  It reports that

16    as of 12/31/21, member draws totaled $61,937,000 -- 938,000.

17    Q    Your testimony is that there were no $61 million in

18    draws in 2021?

19    A    Draws, the total of all draws was $61 million at

20    12/31/21.  That number is correct.

21    Q    And your testimony here is when it says as of

22    12/31/2021, that means as of the date the company was

23    formed?  As of and then to 12/31/2021?

24         MR. BATTAGLIA:  Your Honor, I'm going to object to

25    the form of the question.  I'm not quite sure I understood

```
1    it.

2              THE WITNESS:  I didn't understand it.

3              THE COURT:  Well, that makes three of us.

4    BY MR. MOSHENBERG:

5    Q    Okay.  My point is where on this document does it say

6    the beginning date?

7    A    It doesn't.

8    Q    Right.  So, there's no -- nothing, here that represents

9    what you're saying that years earlier there was a $61

10   million in draws.

11   A    What represents that is that member draws was

12   61,937,000 as of 12/31/2021.  That's what that number

13   represents.  That is -- that's a balance sheet.  It's a

14   basic accounting.

15   Q    And you're relying on the financials that were provided

16   to your assistant in order to report that?

17   A    No.

18   Q    What were you relying on relying on?

19   A    We were relying on the general ledgers that were the --

20   QuickBooks system, which is the accounting system.  If you

21   allow me to explain the answer.

22   Q    I'd like to know what you were relying on.

23   A    Okay.  I'm relying on the general ledgers.

24   Q    Okay.  And didn't you say in your beginning testimony

25   earlier today that the financials were all messed up?
```

```
1    A    I said that 12/31/21 had not been closed when we were
2    engaged and 12/31/22 had not been posted.
3    Q    Okay.  You said more than that though.  I think you're
4    saying that the financials were a mess, right?
5              MR. BATTAGLIA:  Your Honor, I object to the
6    characterizing the witness's testimony.  He said what he
7    said.
8              THE COURT:  All right.  Well, Mr. Schwartz, do you
9    recall saying that the statements were -- financial
10   statements were a mess?
11             MR. SCHWARTZ:  I said 12/21 and 12/22 were a mess.
12   We didn't do anything to -- have to do anything to 12/20 and
13   prior.
14   BY MR. MOSHENBERG:
15   Q    Well, you said -- all right.
16             THE COURT:  Go ahead.
17   BY MR. MOSHENBERG:
18   A    You said --
19   Q    You said that the people that kept the books beforehand
20   didn't even have accounting degrees, right?
21   A    The people who were -- no.  The people who kept the
22   books when I came on board had no accounting degrees.
23   Q    Mm hmm.
24   A    My predecessor -- I do not know when she was terminated
25   but I've had several people tell me that she was an
```

1    excellent accountant.

2    Q    And it's based on that solely that you determined that

3    those numbers are right, the $62 million in draws.

4    A    No.  I -- okay.  This is what the financial statements

5    reflect.  I did not have to do, and I have not gone back --

6    and for any reason -- I had no reason to go back and audit

7    2020 and prior.  But I had to get 2021 and 2022 up to date

8    and current and posted.  As of 12/31/21, I will clarify for

9    the Court, from 2007 when this company was formed to

10   12/31/21, net draw was -- by Mr. Jones -- was -- to Mr.

11   Jones -- for $62 million, rounded.  From the period of -- if

12   I did that right -- what is that, 14 years, 15 years -- 14

13   years.

14   Q    Okay.  And since the lawsuits were filed, the

15   defamation cases by the Sandy Hook families, how much money

16   in draws did Alex Jones take?

17   A    My -- probably about --

18           THE COURT:  Why don't we put a date on it?  Why

19   don't we just put a date on it just so we're -- we have a

20   clean record --

21           MR. MOSHENBERG:  It was in 2018, Your Honor.

22           THE COURT:  -- because there were multiple

23   lawsuits and I just want to make sure that we're all clear.

24   So, your question if from the beginning, since 2018?

25           MR. MOSHENBERG:  Sure.  Yes, Your Honor.

1    Actually, since April of 2018.

2              THE COURT:  Okay.

3              THE WITNESS:  I can't answer since April of 2018.

4    I've not just gone -- I've got the information.  It's

5    available to me.  I haven't gone back and looked at that.

6    I'm --

7              THE COURT:  Do you know what the draws would have

8    been over the last three years?  Why don't we say it that --

9              THE WITNESS:  For the last -- well, okay.  In 20 -

10   -

11             THE COURT:  I think you can say what the -- yeah.

12   Just (indiscernible) --

13             THE WITNESS:  Did you -- okay.  2022, it was

14   $254,000 through May.  2021, I think it was $2 million.

15   2020, 2019, probably 7 million, maybe.  And this --

16             THE COURT:  Total or each year?

17             THE WITNESS:  Each year, and these are total

18   draws.  The taxes on the income of FSS are also accounted

19   for as draws when they're taken out and paid.  So, for

20   example, the $64 million, we know $30 million of that I

21   think -- what was it -- over the last -- since 2012, was

22   paid to the IRS.

23   BY MR. MOSHENBERG:

24   Q    $30 million?  How much income do you need to have pay

25   $30 million to the IRS?

1    A    You can -- well, divide that by  point four, and that's

2    the taxable income.

3    Q    That was Alex Jones' tax income?

4    A    Well, FFS is a -- this -- disregarded, thank you --

5    entity and so --

6              THE COURT:  Hold on.  So, Mr. Battaglia, I --

7    yeah.

8              THE WITNESS:  I apologize.  I'm at that age where

9    it takes time -- it takes a few minutes to --

10             THE COURT:  No.  Well, I don't --

11             THE WITNESS:  -- pull things out.  A disregarded

12   entity, so all of the income and expenses of FSS appear on

13   Mr. Jones' personal tax return and he has to pay the tax.

14   So, when there's taxable income, FSS has to -- FSS pays the

15   money to the IRS.  It doesn't flow through Mr. Jones'

16   personal accounts.

17   BY MR. MOSHENBERG:

18   Q    Okay.  Are you -- have you seen any sort of document --

19   did you know, I should say, that there was document produced

20   in the Sandy Hook litigation in Texas -- in the Fontaine

21   litigation -- by Free Speech Systems' corporate

22   representative, showing draws between 2018 and 2021 of $18

23   million?  Did you know that?

24   A    No, I'd have to see that.

25   Q    Okay.  Based on your numbers, does that sound right?

1    Between 2018 and 2021, $18 million in draws were taken out

2    of the company.

3    A    I mean, I'd have to look at the -- look at it.  I don't

4    think that ties.  We're looking -- we were looking at total

5    draws -- 60-something million and -- I do know this, that of

6    the total draws, less than half occurred after 2018.  There

7    was actually more in draws before 2018.

8    Q    Okay.  So --

9    A    But I'd have to look -- the details of the numbers, I

10   don't have them with me.

11   Q    Okay.  So, when we're talking about 2018 to present, 30

12   million-ish, that's what you were talking about?

13   A    In total draws?

14   Q    Yeah.

15   A    I don't think it's -- that's not -- I mean, we have the

16   exact number.  I don't want to give you a number that's

17   going to be -- you know, you deserve the right number not

18   that one, not something off the top of my head.

19   Q    Those are considerable draws though, you agree?

20   A    It would be to me.

21   Q    Yeah.  And you don't know what Free Speech System

22   received in return for those draws, correct?

23   A    By, you don't -- draws are the equivalent of dividends

24   in a C corp.

25   Q    Right.

1    A    Or an S corp.  So, you don't get anything in return for

2    paying -- giving return of the -- of capital or your return

3    of income to your investors.  That's what they're entitled

4    to from -- for investing in you in the first place.

5    Q    Right.  They don't receive any sort of value in return

6    for giving this draw out.

7    A    Same way you don't get -- you know, the question is, do

8    you get any in -- value in return for paying the interest on

9    the debt.

10   Q    You don't.

11   A    Or you -- you know, you receive the debt, you receive

12   the equity.

13   Q    But at the time the draw was made, there was no value

14   given to Free Speech Systems?  Like you were saying, it's

15   like a dividend.  There was no benefit to --

16   A    It's like a dividend.  It's a return of -- it's, you

17   know -- what Free Speech System got was the initial

18   investment and then the buildup of equity over time to use

19   it to invest in the business as long-term capital.

20   Q    That's not what they got when they made a draw.  When

21   they made a draw, they got nothing.  They just lost money.

22            MR. BATTAGLIA:  Objection.  Again, counsel --

23   (indiscernible) asked and answered.

24            THE COURT:  Yeah.  I -- on that one, I'm tending

25   to agree, so I'm going to sustain that objection.

```
1    BY MR. MOSHENBERG:

2    Q    If Alex Jones hadn't taken $62 million out of the

3    company in that time period or $30 million or $18 million

4    since 2018, he hadn't taken money out of the company, there

5    wouldn't have been a bankruptcy, correct?

6              MR. BATTAGLIA:  Objection, Your Honor.  Calls for

7    speculation.

8              THE COURT:  Sustained.

9    BY MR. MOSHENBERG:

10   Q    In your opinion, would it have needed to file

11   bankruptcy if that money had still been in there?

12             MR. BATTAGLIA:  Objection.  Calls for speculation.

13             THE COURT:  I did analyze the case and authorized

14   the filing.  You can answer that.

15   BY MR. MOSHENBERG:

16   A    If $30 million had been in the company, depending on

17   the nature of the asset it was invested in, it might or

18   might not have been bankrupt.  If it was sitting there in

19   the bank account, then no, we wouldn't be in bankruptcy.  If

20   he hadn't paid the IRS, we wouldn't -- well, we would have

21   been shut down, so --

22   Q    All right.  You've got a background in investigating

23   fraud is my understanding, correct?

24   A    I have done some of that.

25   Q    Are you familiar with what fraudulent transfers are?
```

1   A   I have some understanding of that.

2   Q   Okay.  You understand that Alex Jones and Free Speech

3   Systems have been accused of making fraudulent transfers to

4   insiders?

5   A   I have heard that.  I have not read the complaint.

6   Q   Okay.  You're not familiar with what the actual lawsuit

7   alleges?

8   A   I'm -- well, I understand it alleges a fraudulent

9   transfer.  A fraudulent transfer is -- that's about the

10  extent of my knowledge.

11  Q   Okay.  You don't know any of the details supporting

12  those allegations?

13  A   Not at this time I don't.

14  Q   Okay.  You understand that Free Speech Systems and

15  Jones were in fact sued for making -- let me skip that

16  question.  Have you investigated at all whether any of the

17  draws were in fact fraudulent transfers?

18  A   No.

19  Q   I want to go back to Exhibit 3, Paragraph 35.  Can you

20  read that statement out loud, please?

21  A   "The CRO's continuing to evaluate where the estate has

22  causes of action to claw back any payments or distributions

23  to Alex Jones."

24  Q   Is it fair to say that at the time this was written

25  that you hadn't evaluated it yet from your prior answer?

1    A    Correct.  We had not.

2    Q    Okay.  So, this isn't true that you're continuing to

3    evaluate?

4    A    No, we're -- I mean, we continue to be aware of the

5    possibility and if we see any evidence of it -- we have not

6    done any conservative investigation of that.

7    Q    Okay.  The statement should say --

8         THE COURT:  Let me get you where you're going.

9    The question is, are you continuing to evaluate.  Is that

10   statement accurate?

11        THE WITNESS:  Yes.  I have not made a decision

12   either way.  Are there actionable distributions or are there

13   not?  We just have not, you know, we're aware of it's -- of

14   the situation.  It's common in any company bankruptcy and if

15   we see something, we will note it and keep track of it so

16   that at least once we get started on that phase of the

17   engagement, we'll have that knowledge already.

18        MR. MOSHENBERG:  Object as nonresponsive, Your

19   Honor.

20        THE COURT:  Sustained.

21   BY MR. MOSHENBERG:

22   Q    Your testimony is you hadn't even started

23   investigating.  That's what you just me.  You hadn't started

24   yet.  So, you're not continuing, you haven't started.

25   A    Well, I don't read this this way and you're always

1   evaluating.  It's just part of the job.  Now, I have not

2   started the actual -- okay, now let's start the formal

3   investigation and start putting together the evidence and

4   focus on that.  That is not just where our focus is right

5   now.

6   Q    Okay.  So, you haven't started, correct?

7   A    Yeah.  So, like I said, our focus -- we have not

8   directed our focus there as of yet.

9   Q    You -- are the draws -- the significant draws that Alex

10  Jones has taken out of the company, do you think those

11  warrant an investigation as to whether those fraudulent

12  transfers?

13  A    I don't think whether I think they're warranted or not,

14  I think I'm obligated to look at that.

15  Q    Okay.  But from what you know right now, do you know --

16  do you think it's warranted to investigate whether those are

17  fraudulent transfers?

18  A    I don't care whether it's warranted or not.  I have to

19  look at it, so I'm going to look at it.

20  Q    I understand but I'd like an answer to my question.

21  A    Well, I don't know what warrant has to do with it.  It

22  just -- I think draws are always warranted in

23  investigations.  So, then in that context, then yes, they

24  warrant investigation because they -- draws should always be

25  investigated in a bankruptcy.

```
 1   Q     Okay.  Now, when you were the CRO of InfoW, you were

 2   part of the attempt to secure a release of Alex Jones and

 3   Free Speech Systems as part of that bankruptcy plan.

 4   Correct?

 5   A     Not -- as I recall, that was part of a revision in the

 6   Plan Support Agreement that had certain events occurred --

 7   certain payments were made -- that they would get a release.

 8   Q     Right.  And the goal was to pay $10 million to those

 9   claimants, right?

10   A     I note the number on the table it was $10 million.

11   That's what was -- had been committed to at that time, in

12   the beginning.

13   Q     Okay.  And so, we were saying a moment ago, 18 million,

14   30 million, 60 million, the draws are something that need to

15   be investigated, whether they're fraudulent transfers.  But

16   you were trying to secure a release in that bankruptcy of

17   Jones and Free Speech Systems for $10 million while you were

18   the CRO of InfoW --

19              MR. BATTAGLIA:  Your Honor --

20   BY MR. MOSHENBERG:

21   A     -- and you hadn't disclosed --

22   MR. MOSHENBERG:  Let me finish my question, please BY MR.

23   MOSHENBERG:

24   A     -- and you hadn't disclosed that at the time that you

25   were part of that effort, you were the CRO for Free Speech
```

001678

1   Systems as well, or that you were at least being engaged to

2   be.

3           MR. BATTAGLIA:  Your Honor, I'm going to object on

4   a couple of grounds.  One, relevance of any of this to a

5   cash collateral -- interim cash collateral -- hearing,

6   number one.  Number two, counsel is -- if he wants to talk

7   about what the Plan Support Agreement says, it's in

8   evidence.  It doesn't say a release for 10 million.  It says

9   a release for (indiscernible) over and over and over again.

10  So, he's mischaracterizing the record, the documents in

11  evidence --

12          THE COURT:  I'll sustain the objection on that

13  ground, and I do think he can answer the question about how

14  he was negotiating -- whether he was negotiating the Plan

15  Support Agreement or parties to Plan Support Agreement on

16  behalf of InfoW debtors and was soliciting was to be the CRO

17  of Free Speech at that same time.  And I think that goes to

18  credibility and I think you can --

19          THE WITNESS:  Is that the --

20          THE COURT:  Well, I think you can answer that

21  question.  You know, and I mean, you can ask that question

22  again but if you do want to ask a question about the Plan

23  Support Agreement, I do think it makes more sense to just --

24  it's in evidence.  You can just ask the questions about that

25  and show him a document and that way we can at least have a

1   clean record.

2           THE WITNESS:  Sure.

3   BY MR. MOSHENBERG:

4   Q    So, what's the answer?

5   A    To the Court's question?

6   Q    Yes.

7   A    The Plan Support Agreement had been terminated by April

8   30th because conditions precedent to it had not been met.

9           THE COURT:  Let me take over.  That was never --

10  was that ever told to (indiscernible)?

11          THE WITNESS:  I believe you pointed out in your --

12  at one point from the bench there, you said, this has to be

13  -- if we don't know this by April 30th, this thing's dead,

14  isn't it?

15          THE COURT:  And everybody was assuring me at the

16  time that they were going to extend it and keep working.

17          THE WITNESS:  Well, it never got signed.  Later,

18  we did continue working but by -- in May -- by May 19th for

19  certain, or prior to May 19th, we were negotiating with the

20  Plaintiffs in both cases --

21          THE COURT:  Let me get the question -- I might as

22  well ask it now because it's a good spot.  I can wait until

23  the end, or I can ask it now and don't read too much into

24  it.  I just need to understand it.  On May 19th, there was a

25  hearing before me where on May 18th, there was a request for

1    a continuation on a motion to dismiss.  The hearing on the

2    motion to dismiss -- we held an emergency hearing on the

3    19th where there was a proposed stipulation presented to me

4    to dismiss -- allow the dismissal -- of the -- what I would

5    call the Austin -- one portion of the Austin litigation, and

6    I signed it on that day.

7            And in this case, there is a letter dated by you

8    to Free Speech dated the same day.  I may be reading much

9    into this, but it seems to me that you -- either you wrote

10   the letter that day or you had been in conversation with

11   Free Speech before you wrote that -- before that day you

12   sent the letter.  And I just need to understand -- none of

13   this was ever disclosed to me in connection with the case

14   and the cases were dismissed on June the 10th officially,

15   which tells me that Mr. Jones signed a retention letter.

16   So, you were actively retained before these cases were

17   dismissed -- the last cases were dismissed -- and I just

18   need to understand, one, why that was never disclosed to me,

19   and two, when did you begin to start soliciting or having

20   conversations about representing Free Speech Systems.

21           Why don't -- that's a compound question.  I think

22   that's unfair.  When did you begin to have conversations

23   with anyone from Free Speech Systems about potentially

24   representing them?

25           THE WITNESS:  I had conversations with Mr. Lee, in

1    I believe --

2              THE COURT:  Mr. Lee was representing the Debtors

3    too.

4              THE WITNESS:  -- and Mr. Jordan who represented --

5    I think still does represent Mr. Jones.  I don't know when

6    those were, but it was after we had been substantially

7    convinced that we were going to be terminating the InfoWars

8    bankruptcy.

9              THE COURT:  You wrote the letter on May 19th.

10             THE WITNESS:  On May 19th, Mr. Lee asked me to

11   send him an engagement letter for Free Speech -- the Free

12   Speech engagement.

13             THE COURT:  Okay.

14             THE WITNESS:  And to be quite honest with you, I

15   didn't even think about it at that time.

16             THE COURT:  No, I appreciate the honesty.  I

17   appreciate disclosure.  It seeks a retainer.  When did you

18   receive that retainer?

19             THE WITNESS:  Lord --

20             THE COURT:  That month?

21             THE WITNESS:  No, it was --

22             THE COURT:  Let just say if the letter was signed

23   on June -- the letter was officially signed on June 6th --

24             THE WITNESS:  June 6th.

25             THE COURT:  When did you -- did you receive it

1    before or after you were retained, or right about that time?

2              THE WITNESS:  It was -- no, it was not right

3    around -- it was after, definitely.

4              THE COURT:  After.  Okay.

5              THE WITNESS:  You know, it was several weeks after

6    at least.

7              THE COURT:  Okay.  Okay.  Sorry.  That was the

8    question -- that was the clarification that I had mentioned

9    I had wanted to understand the day before.  I guess Mr. Lee

10   a few questions as well at some point, but I'll need to

11   understand that as well, but today's not that day.  Today's

12   cash collateral, and so I do want -- and I know I took this

13   off on tangent.  Now, I'm going to bring it back.  I did

14   want to focus on cash collateral, and I want to focus on

15   critical vendor, and I want to understand -- I've given you

16   some leeway.  Maybe that's the better way of saying.  I've

17   given you some leeway to kind of have general conversation

18   about the CRO role and what investigation and he's done to

19   formulate in connection with the budget, but now I'm going

20   to ask you to laser focus on these two motions.

21   BY MR. MOSHENBERG:

22   Q    Okay.  Let's look at that part of Exhibit 3, the ledger

23   (indiscernible).  I want to focus on the part where it

24   provides for a budget for Alex Jones of $54,000 every other

25   week.  Do you see that part?

```
 1    A    Not yet.

 2    Q    Can you see it?

 3    A    Yes.

 4    Q    Okay.  And in total, it ends up being about $379,000,

 5    correct?

 6    A    I can't tell.  He's -- whatever it says.  I mean, I

 7    can't see that.  Would you have your associate or partner

 8    reduce the size?  Thank you.

 9    Q    Yeah.  (Indiscernible) $379,000 and that's over a 13-

10    week period, correct?

11    A    Correct.

12    Q    Okay.  And if you translate $379,000 over a 13-week

13    period, that translates to about a salary of $1.5 million.

14    Do you understand that?

15    A    Well, I don't believe that's correct.  Mr. Jones --

16    this is a -- Mr. Jones has an appointment agreement for 1.3

17    million.  Some amount of it and I think it's about 8,000 of

18    (indiscernible) Patriot is paid through the payroll system.

19    This should be that difference.  So, you got 26 pay periods

20    in the year so you can do the math.  It will be -- should

21    add up to 1.3, those two components.

22    Q    Well, I did 379 -- 13 weeks is a quarter of a year,

23    right, 52 weeks --

24    A    Yeah, but we can't do -- you've got to do it by --

25    because we pay a biweekly, not semi-monthly.
```

1    Q    Okay.

2    A    So, that's -- something about the math in that

3    calculation -- you got to multiply that number by 26 to get

4    an annual rate.

5    Q    Okay.  So -- but your point is, $1.3 million salary.

6    A    Total -- his total is 1.3 million.

7    Q    Okay.

8              THE COURT:  I'm just going to tell everyone.

9    Judge -- math and don't claim to be -- (indiscernible) in

10   excel spreadsheet for you, but it's essentially treading a

11   $54,000 bimonthly, you know, but that -- if you take that

12   over 26 periods -- you multiply the 54,000 times -- you get

13   to like a $1.4 million number.

14             THE WITNESS:  That case, well --

15             THE COURT:  If you multiply it times 24, you get

16   to the 1.3.  It's --

17             THE WITNESS:  Oh, shoot.  I apologize, Your Honor.

18             THE COURT:  It's okay.

19             THE WITNESS:  Okay.

20   BY MR. MOSHENBERG:

21   Q    And that's salary separate from the draws that he's

22   taking out of the company, right?

23   A    Correct.

24   Q    Okay.  You understand that in the Free Speech Systems

25   corporate representative, that position, the document that

1    produced showed that he had an annual salary of about

2    $625,000.

3          MR. BATTAGLIA:  Objection, Your Honor.  The

4    question is about a deposition he was not present at and --

5          THE COURT:  Yeah.  I'm going to sustain that.  I

6    want you focused on the questions -- I've given you plenty

7    of room --

8          MR. MOSHENBERG:  Sure.

9          THE COURT:  -- and Mr. Brimmage is going to ask

10   questions too and I want him -- I want you all focused on --

11   you got questions about the budget, ask the budget.

12         MR. MOSHENBERG:  Well, what I'm trying to

13   understand is, if there were documents produced to us by

14   Free Speech showing that his salary was $625,000 a year, why

15   is he receiving a $1.3 million salary under this budget.

16         THE COURT:  Do you have those documents?

17         MR. MOSHENBERG:  Yes, Your Honor.  They were notes

18   provide as part of the deposition --

19         THE COURT:  No, I'm asking you are they on your

20   witness and exhibit list?

21         MR. MOSHENBERG:  They are, Your Honor.

22         THE COURT:  Why don't you show that then?

23         MR. MOSHENBERG:  It's Exhibit 12.

24   BY MR. MOSHENBERG:

25   Q    These were notes that were provided by the corporate

1   representative based on her review in preparing for her

2   30(b)(6) deposition.  They were admitted as part of the

3   deposition.  And if you look, about halfway down, it says,

4   AJ paid a salary of $625,000 a year.

5   A    As of what date?  Do you know?

6   Q    Well, this deposition occurred in -- February 15th of

7   2022, this year.

8   A    I'd have to look back and see the date of the

9   employment agreement that I was -- given to me that I have,

10   which is what the 1.3 is based on.

11   Q    Right.  And that employment agreement was created in

12   April of this year, correct?

13   A    You're probably -- you may be right.  I think you're

14   right.

15   Q    Right.  It was kind of about the same time as all the

16   bankruptcies with the InfoW started happening, right,

17   leading up to the Alex Jones trial that was first set in

18   April, 2022, right?

19   A    I don't know about the first setting of the Alex Jones

20   trial, but I do recall -- I'd have to look back and see when

21   I got involved with the InfoWars bankruptcy, if it was in

22   April or not or prior to -- after that.  I don't know when

23   they actually got started.  It was before I had -- the

24   planning for that started before I ever got involved.

25   Q    Okay.

```
 1   A     Sometime before I got involved.

 2   Q     But you relied on that $1.3 million based on an

 3   agreement that was created in April of 2022, correct?

 4   A     Right.  That's the contract I have (indiscernible) --

 5   Q     It wasn't based on prior pay that he was receiving?

 6   A     No.

 7   Q     So, in --

 8         THE COURT:  Okay.  Mr. Moshenberg, he's answered

 9   the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11         MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13   Q     You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16         THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19   Q     Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21   A     No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24   Q     And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other
```

1    week.

2    A    I -- no, what I decided was, look, the agreement says

3    1.3 million.  I'm going to put you -- I'm putting into your

4    payroll.  That's what the contract says.  You know, if it

5    gets thrown, it gets thrown out.  Whatever --

6    Q    There's no emergency, right?  There's no emergency to

7    pay him those funds.  Isn't that the reality?  You were

8    saying a moment ago he wasn't even making any money.  Well,

9    what is the emergency in this motion that he receive $54,000

10   every other week?

11   A    I can't say there's an emergency.

12   Q    He doesn't need it.

13   A    I wouldn't -- I don't know.  I mean, I can't there was

14   an emergency.  He didn't --

15   Q    Certainly, from the Debtor's part, there's no

16   emergency.  There's no, we have to pay him this or Alex

17   Jones is going to quit, right?  We're not worried about

18   that.

19   A    I don't believe that's the case.

20   Q    Yeah, I don't think so either.

21           THE COURT:  Mr. Moshenberg, now is the time that

22   you start reading the room.  I want you to focus on

23   questions that relate to the budget for cash collateral or -

24   -

25           MR. MOSHENBERG:  Okay.  Fair enough, Your Honor.

1    Give me one moment, Your Honor.

2         THE COURT:  Take your time.

3         MR. MOSHENBERG:  Your Honor, if it works for you,

4    what I'll do to save time is, if I could save my line of

5    questions for recross if needed --

6         THE COURT:  Sure.

7         MR. MOSHENBERG:  --  but we'll just do it that way

8    instead just to speed things along.

9         THE COURT:  Okay.  But before you go, is -- maybe

10   the parties can help me, and I'm just -- as I think through

11   this -- I know it's not official, but my understanding was

12   that the parties were agreeing -- and to my knowledge, Mr.

13   Jones hasn't objected to it, and if there's somebody let me

14   know -- that the $54,000 number was going to count on the

15   20,000, right?

16        MR. BATTAGLIA:  20,000 for the interim cash

17   collateral period.  Yes, sir.

18        THE COURT:  Okay.  I just wanted to make sure that

19   I understood.

20        MR. BATTAGLIA:  Yes.

21        THE COURT:  Okay.  Okay.  Actually, the reason I'm

22   asking all the questions -- regardless if it's 625 or 1.3

23   for the interim period, it would be some number below even

24   the 625 for purposes of interim, and I want to make sure all

25   of his rights are reserved to come back and prove that at

1    one point who has the right number.  I'm not getting into

2    that.  I just want to make sure that I understand what's on

3    the table now.

4            Mr. Schwartz, let me ask, are you ready to

5    continue or do you need five minutes to use the restroom or

6    something?

7            THE WITNESS:  I think I'm okay, Your Honor.

8            THE COURT:  Okay.

9            THE WITNESS:  If I turn yellow, I'll raise my

10   hand, Your Honor.

11           THE COURT:  Okay.

12           MR. BATTAGLIA:  Judge, my rule is I never waste an

13   opportunity to a bathroom (indiscernible) --

14           THE COURT:  No, no, no.  I just -- it's the

15   witness so -- just maybe two minutes?

16           MR. MOSHENBERG:  No, Your Honor.

17           THE COURT:  Okay.

18           MR. MOSHENBERG:  (Indiscernible).

19           THE COURT:  That's fine.  I'm just trying to

20   understand the deal --

21           MR. MOSHENBERG:  Yeah.

22           THE COURT:  -- where things stood --

23           MR. MOSHENBERG:  Well --

24           THE COURT:  -- and maybe they've changed.  That's

25   what I'm trying to get to.

```
 1            MR. MOSHENBERG:  Yeah.  (Indiscernible).

 2            MR. BATTAGLIA:  I didn't know that need was a

 3   basis here as entitlement to.  I mean, I don't necessarily

 4   my salary.  I'm not sure whether you need your more --

 5            THE COURT:  I get it.

 6            MR. BRIMMAGE:  By the way, there is no

 7   (indiscernible) --

 8            THE COURT:  The record says what it says, and I'll

 9   let parties make the argument based on what they want.

10            MR. NGUYEN:  Thank you, Your Honor --

11            THE COURT:  So, why don't we -- why don't you ask

12   your question and then we'll take a five-minute break and

13   then we'll continue with the cross-examination.

14            MR. NGUYEN:  Thank you, Your Honor.  I will be --

15            THE COURT:  No, no, no.  I want you to take as

16   much time as you need.  That's not --

17            MR. NGUYEN:  -- as brief as possible.

18            THE COURT:  -- that I'm trying to rush you.

19            MR. NGUYEN:  Understood, Your Honor.

20   BY MR. NGUYEN:

21   Q    I just have a couple of question, Mr. Schwartz, about

22   your engagement with FFS and your prior engagement with

23   InfoW.  The Judge asked you some questions.  I still --

24   there's still a little bit of gaps in the timeline and I

25   just -- if you can help me, just walk me through your
```

```
 1   engagement.  So, Mr. Schwartz, can you just tell me exactly
 2   when your engagement with the InfoW entities began?
 3   A    I don't have -- I don't recall the date of that
 4   engagement letter.
 5   Q    The cases were filed back in, I believe, April --
 6   A    Yeah.  It would have been in April right before the
 7   case was filed.
 8   Q    And presently, are you still the chief restructuring
 9   officer for the InfoW entities?
10   A    Yes, I am.
11   Q    And who at the InfoW entities would have the right to
12   terminate your engagement as the CRO?
13   A    I've asked that question.  I don't know the answer.
14   Q    Well, who hired you as the CRO for the InfoW entities?
15   A    The interim Trustee.
16   Q    And who is that?
17   A    Robert Dew.
18   Q    And did Mr. Dew sign the engagement letter for the
19   InfoW entities or was it, Alex Jones?
20   A    No, it was -- well, I'm pretty sure it was Robert Dew.
21   I may have to look at that.
22   Q    And overall, how much money were you paid for your
23   services as the CRO in the InfoW entities?
24   A    I'm -- I'd have to speculate.  I don't recall.  I know
25   had leftovers from my retainer.
```

```
 1   Q    How much was the retainer?
 2   A    You would ask me that.  It was over $30,000, I know
 3   that.
 4   Q    You said you had leftovers?
 5   A    Yes.
 6   Q    Okay.  And who paid the retainer?
 7   A    That was paid by Mr. Jones, but I -- it was paid by Mr.
 8   Jones' lawyer.  I assume it was Mr. Jones' funds but --
 9   Q    And as the CRO for the InfoW entities, you were the one
10   that had the authority to enter into the stipulation with
11   U.S. Trustee to dismiss those cases?
12   A    Yes, I believe I did.
13   Q    Did you need to get authority from Mr. Jones to enter
14   into that stipulation?
15   A    No.
16   Q    And earlier, you mentioned that there was an engagement
17   letter sent to FFS around -- I believe the conversation was
18   May 19th, but I think the actual engagement letter was May
19   16th; is that correct?
20   A    I believe it was May 19th.  That's -- Mr. Lee asked for
21   it.  I don't know when it got to FSS.
22   Q    And how did you got word that FSS was looking for a
23   chief restructuring officer for you to send in an engagement
24   letter to FSS?
25   A    Mr. Lee called me and asked me to send an engagement
```

1    letter.

2    Q    Did you speak to Mr. Jones about being the CRO for FSS?

3    A    Not until June 6th.

4    Q    Do you -- in the InfoW cases, did you file an

5    application to be employed as the CRO for the InfoW

6    entities?

7    A    I didn't file it, but it was filed.  There was one

8    filed.

9    Q    Did you submit a verified statement with your

10   application?

11   A    Yes, I believe so.

12   Q    And in your verified statement, did you disclose

13   anywhere in there that you were seeking employment from FSS?

14   A    I don't believe so.

15   Q    And you serve as a bankruptcy professional that's been

16   appointed and approved by the court before in other cases?

17   A    Yes.  But on your former question, I have -- I was not

18   talking to FSS about serving as their CRO when I was engaged

19   by InfoW.

20   Q    In your experience as a bankruptcy professional, do you

21   think there's a continuing obligation for professionals that

22   appear before the court to supplement their disclosures and

23   tell the court of any connections that occurred during the

24   case?

25   A    Yeah.  The appointment orders require that.

1   Q   And that didn't happen in InfoW cases, correct?

2   A   Correct.  There was no appointment.

3   Q   But you still had a verified statement that was filed

4   with the Court, and you didn't supplement that verified

5   statement.

6   A   No, I didn't -- I was never appointed, so --

7   Q   And earlier, Mr. Battaglia talked about your authority

8   as the CRO for FSS.  Who do you get your direction from as

9   the CRO?

10   A   Me and the Court.

11   Q   Okay.  So, if Mr. Battaglia files a Chapter 11 Plan in

12   this case, you don't have to seek Alex Jones' approval of

13   that plan before it's submitted to the Court?

14   A   No.  We wouldn't look for his approval.  We'd look for

15   his input.

16   Q   Can Mr. Jones fire you as the CRO?

17   A   No.  Well, I guess he -- he'd have to (indiscernible)

18   here to get permission first.  I think actually the Court

19   would fire me.

20   Q   And earlier, there was a discussion of the PQPR notes,

21   one for about 29 million and the other was about 25 million

22   and some change.

23   A   Yes, sir.

24   Q   Do you recall that conversation?  Have you taken any

25   steps to verify that amount of the debt under the promissory

1    notes to ensure that those amounts are accurate?

2    A    All I've done so far is I have seen calculation of the

3    makeup of the amount that was in the first note and some of

4    the supporting documentation.  And I said I have seen it.

5    I've done nothing on vetting that.  On the second note, I

6    don't think I've seen anything.  And quite frankly, that's -

7    - right now, we're still trying to get this company

8    operating and fighting fires before we get to looking at --

9    we're going to have to do that.  We know that.

10   Q    And in your declaration at Paragraph 53 -- Karen, can

11   you blow up the declaration?

12           THE COURT:  I've got to make Mr. Martin a

13   presenter again.

14           MR. NGUYEN:  Thank you, Your Honor.

15           THE COURT:  No, no worries.  I -- it was a

16   document that was up a bit earlier and I just wanted to make

17   sure that it was taken down.  Mr. Martin, if I've done

18   anything wrong -- if I need to do it again, let me know.

19   Okay.

20           MR. NGUYEN:  Paragraph 53, Mr. Martin.

21   BY MR. NGUYEN:

22   Q    Mr. Schwartz, can you see Paragraph 53 in your

23   declaration?

24   A    Yes.

25   Q    And it says, on or about August 13th, 2020, FSS and

```
1    PQPR executed a promissory note in the principal amount of

2    29,588,000 made payable to PQPR which memorialized their

3    accrued obligations of FSS to PQPR through December 31st,

4    2018.  Do you see that?

5    A    Yes.

6    Q    How do you know to put in your declaration under

7    penalty of perjury that this amount was memorialized with

8    the accrued obligations?

9    A    This is one where I said I saw the detail of the

10   calculation and some of the supporting documents in it.  It

11   identifies the transactions going back -- actually, it

12   should be from 12/31/2018.

13   Q    And you mentioned some supporting documents.  What are

14   some of those supporting documents?

15   A    These were schedules of billings, (indiscernible) PQPR

16   for inventory and credits, i.e., payments, applied to those

17   billings and they were developed out of the general ledger

18   system there, accounting transactions pulled out of the

19   general ledger system.  We didn't go beyond that.

20   Q    You didn't look at any -- have you -- did you seen any

21   invoices?

22   A    No.  We haven't done that.  It's --

23   Q    Have you seen any bank statements that show some

24   payments from PQPR?

25   A    Not in this time period.  We have not gone back that
```

1    far yet.

2    Q    Are there any bank statements?

3    A    Well, that's good question.  Right now, there aren't.

4    I've got to go back and check and make sure when we change

5    banks, we don't lose access to those bank statements.

6    Q    So, when you put in your disclosure this was the amount

7    that was memorialized in accrued obligations, you don't know

8    that for a fact.

9    A    Well, I know for a fact and that they showed me -- I

10   have the calculation for the amount of the 29,588,000 and I

11   see from the source date that it is from invoices and

12   payments records.

13   Q    But you don't --

14   A    To me, as an accountant, that tells me that's what I'm

15   looking at.

16   Q    But you haven't seen the billings or the invoices or

17   the --

18   A    We have not vouched it yet to ensure it's actually

19   properly calculated.

20   Q    And in your declaration, you -- on the cash collateral,

21   you mentioned that there was extensive and difficult

22   negotiation with PQPR over the use of cash collateral.  Do

23   you recall that part of your declaration?

24   A    Yes.

25   Q    Who did you communicate with at the PQPR to extensively

1    negotiate the use of cash collateral?

2    A    It was primarily David Jones and his -- and Steve

3    Lemmon.

4    Q    And did Alex Jones have any input in the use of -- in

5    the negotiations for the use of cash collateral?

6    A    Yes.  He would come in to the negotiating sessions

7    intermittently.

8    Q    And is it your understanding that the 80 percent

9    ownership of PQPR is owned by an entity that Alex Jones

10   owns?

11   A    Yes.

12   Q    And I just want to take a look at the budget.  The

13   Plaintiff went over the salary to Mr. Jones, but there is --

14   there's a line item on the budget for an American Express

15   payment of about $172,000.  I think it was the first week in

16   August.  Can you just tell me what that is?

17   A    That's the amount we -- of American Express.

18   Q    So, it's a pre-petition debt?

19   A    No.  That's -- okay.  Excuse me.  Let me fix that.

20   You're right.  It's not a pre-petition debt.  Based on our

21   spending history, this is the amount that will be -- come

22   due.  Well, maybe, you know -- and that's -- you probably

23   hit it on the head.  That probably is pre-petition.

24   Q    So, why is it necessary to pay American Express for a

25   pre-petition debt in the cash collateral 13-week budget?

1    A    Well, I would have argued we should -- well, it's --

2    we're probably going to have to just let American Express

3    shave the wind and see what we can do.  We have some charges

4    that go through them but they would be on the critical

5    vendor's list so we can take care of that there.

6    Q    Have you seen the invoices for the American Express

7    charges?

8    A    I have received -- seen some of them.  They're

9    extensive.  We're spending $300,000 a month on average with

10   American Express, and one of the problems we have is the

11   accounting staff did not distribute those charges.  So, all

12   we have is, if you look at the income statement, there's a

13   line item for American Express, because we can't tell you

14   whether it's for electricity, entertainment, or electronic

15   supplies for the production studio.

16   Q    Does Mr. Jones run any of his personal expenses through

17   this American Express card?

18   A    Yes.

19   Q    What are those expenses?

20   A    I've not done an extensive look at it other than I've

21   looked at the charges being -- those are charges against his

22   distribution account, his draw account.  But there -- his

23   housekeeper has charges on it, you know, cleaning,

24   housekeeping type stuff.  And that's the biggest number of

25   line items I recall seeing is her.

1    Q    So, help me understand.  Why is it an emergency for

2    this Court to approve a payment to American Express to pay

3    Mr. Jones' housekeeper?

4    A    Well, like I said, the company has been paying the

5    credit card, but those charges are charged as distributions

6    against him.  I would not -- I'm not intending that going

7    forward by any means, and we've informed him he can't put

8    those on his credit card.

9    Q    And how long have Mr. Jones used the American Express

10   credit card to charge his personal expenses?

11   A    It goes back quite a ways.  I don't -- I didn't -- you

12   know, I looked at some of the history on the account the

13   last 18 months and said, you know, I'm not -- you know, the

14   last 18 months, it's been regular.

15   Q    How about the vehicle leases on the budget, about 14 --

16   I believe it's 14 on every two weeks.  Whose car is that?

17   A    Those are actually vans, I believe, that the production

18   studio uses.

19   Q    Does the company pay for Mr. Jones' car?

20   A    No, not that I -- not that I have seen.  I'm told not,

21   and I haven't seen evidence of it.

22   Q    And earlier, one of the questions that the Judge asked

23   you is, what do you hope to accomplish in this bankruptcy

24   case, and I believe I missed your answer, or I believe Mr.

25   Battaglia answered the question.  But, you know, what is the

1    purpose of this bankruptcy case?

2    A    I think Mr. Battaglia answered that question when asked

3    by the Judge.  It's, quite frankly, the -- we can't go to

4    trial in Connecticut and be -- I mean, we have a trial team

5    stuck here if this needs to go to Connecticut to help try

6    that case.  We don't have the money to pay for that at this

7    point in time.  That's a huge problem right there.  So, it's

8    -- we just can't afford the Connecticut case, the time, or

9    the dollars right now.  Now, it's -- Alex Jones being off

10   the air for two months is not acceptable.  We won't be here.

11   We won't last two weeks in that situation, so we have to

12   work out a way to make all this happen.

13   Q    And as the Chief Restructuring Officer of FSS and Mr.

14   Jones being the sole owner and member of FSS, have you had

15   an opportunity to talk to Mr. Jones about the purpose of

16   this bankruptcy case?

17   A    Yes.

18   Q    And is his purpose aligned with what you just stated to

19   the Court as the purpose of the filing of this bankruptcy?

20   A    Yeah.  He knows we can't go double team.  We cannot do

21   it.  I think he'd like to get it out of the Connecticut

22   court, but I don't -- you know, we told him that ain't going

23   to work.

24   Q    You know, in your declaration, Mr. Schwartz, you

25   describe Mr. Jones as a natural radio personality and the --

1    and I'm assuming you've had some opportunity to observe some

2    of the content aired by InfoWars.

3    A     Is that a question?

4    Q     Yes, Your Honor -- sorry, Mr. Schwartz.

5    A     Then you assume -- I have had tried to look at the

6    program a few times.

7    Q     Are you aware that after the hearing that we had on

8    Monday, Mr. Jones appeared on his radio show, and he

9    expressly told listeners of FSS about the purpose of this

10   bankruptcy filing.  Are you aware of that video?

11   A     No.

12   Q     Okay.  And you said that based on your conversation

13   with Mr. Jones, that it's your understanding that Mr. Jones'

14   purpose here is to make sure you don't fight multiple fronts

15   in terms of litigation.  You want to bring it all here and

16   that's the purpose of the bankruptcy filing, correct?

17   A     That's -- I mean, the discussions I've been involved

18   with him, you know, relating to that is, I mean, that's been

19   an expression what we have to do.  We can't do this.

20   Q     And the purpose of the bankruptcy is not to tie up the

21   damages from the Plaintiff for years and years and years?

22   A     No.  That could be done by appeal.  You don't need to -

23   -

24   Q     Okay.

25              MR. NGUYEN:  Mr. Martin, can blow up the

1    (indiscernible) --

2              THE COURT:  Actually, just two questions on the

3    budget.  And just to -- just so I understand, can you just

4    go back to the budget, Mr. Martin?  Just go to the first

5    page.  It's just two simple questions.  There's a line item

6    for outsourced services and -- for about -- yeah, just on

7    the first page.  There's a line item -- let's see -- it is -

8    - where is it?  It's by the total office and admin expense.

9    Now, where'd you go?  Yeah, there's a line item for

10   outsource --

11             THE WITNESS:  Outsource services?

12             THE COURT:  -- and then consulting services.

13   Those are the only two that I just didn't -- those are the

14   two that popped out to me that I just wanted to get some

15   clarification on.

16             THE WITNESS:  Those are two categories we have got

17   to investigate.

18             THE COURT:  Okay.

19             THE WITNESS:  Because, first off, we have to get -

20   - presumably, these are contractual relationships and I want

21   to see the contracts --

22             THE COURT:  Okay.

23             THE WITNESS:  -- which I have not seen, and I want

24   to know exactly what they're doing and why we need to keep

25   paying them to do it.

1              THE COURT:  Okay.

2              THE WITNESS:  There's this -- there are quite a

3    number of -- I'd say, 10 or 12 entities in these two

4    categories combined that --

5              THE COURT:  Okay.

6              THE WITNESS:  I put them in there because we've

7    been -- they're in their regular expenditure and --

8              THE COURT:  Can you give me an example of an

9    outsourced service and a consulting service?

10             THE WITNESS:  Oh, for one, for example is --

11   there's an individual who does -- the Sound Simplistic does

12   web design.  What he does -- he does very sophisticated web

13   design for the company, based on a retainer of 25,000 a

14   month.  That is a little -- seems a little bit --

15             THE COURT:  That's an outsource service or

16   consulting --

17             THE WITNESS:  I believe that is consulting

18   services.

19             THE COURT:  Okay.

20             THE WITNESS:  Now -- yeah, no, that's an outsource

21   service.

22             THE COURT:  Okay.  And then what's an example of a

23   consulting service?

24             THE WITNESS:  Well, consulting services -- I'm

25   drawing a blank on an entity.  Consulting on the marketing.

1    You're selling product into this audience group and part of

2    it is looking at that, I believe, and --

3              THE COURT:  Okay.

4              THE WITNESS:  That's what I'm -- it's a marketing

5    service as a -- what would the market service we need be.

6    It's got to be something to do with reaching out and how do

7    we touch those people most effectively.

8              THE COURT:  Okay.

9              THE WITNESS:  That's why I said, it's -- that's

10   looking at -- it's what I think I'm going to see.  Now I

11   want to -- show me what it really is.

12             THE COURT:  Okay.

13             THE WITNESS:  Those are very definitely two areas

14   we have got to dig into.

15             THE COURT:  Okay.  Thank you.  Mr. Nguyen, I'm

16   sorry.

17             MR. NGUYEN:  No problem, Your Honor.

18   BY MR. NGUYEN:

19   Q    And before I get to Exhibit 8, I just want to clarify a

20   point.  You mention earlier that the Court was the one that

21   appoints you and the Court was the one that fired you --

22   that can fire you.  Do you remember that testimony?

23   A    Yes.  I guess I would modify that this way, by saying,

24   since I'm not appointed yet, Mr. Jones did hire me.

25   Arguably, I guess he could fire me before I'm appointed.

1    Q    So based on corporate formalities, you're an officer of

2    the company, correct?

3    A    As CRO, I am an officer of the company.

4    Q    And the owner of the company is who?

5    A    Alex Jones.

6    Q    Okay.

7         MR. NGUYEN:  Mr. Martin, can you (indiscernible)?

8    I'm almost done, Your Honor.  I would just like to

9    (indiscernible) questions (indiscernible) Exhibit

10   (indiscernible) there was a admitted (indiscernible).

11        THE COURT:  I'm sorry, Mr. Martin.  I can't hear

12   you.  Can you just get close to a mic?  I'm going to tell

13   you, why don't you go to another question.  I'm not

14   interested.

15        MR. NGUYEN:  Okay.  Your Honor, I will pass the

16   witness.  Thank you.

17        THE COURT:  Thank you.  Why don't we -- and again,

18   I don't want anyone to read one way or the other.  I'm

19   focused on cash collateral and critical vendor.  And why

20   don't we take a five-minute break.  Mr. Brimmage, can you

21   just -- I don't want to -- I want you to take as much time

22   as you want.  I just -- from a scheduling standpoint, how

23   long do you think you'll go?  Okay.

24        MR. BRIMMAGE:  (Indiscernible) start at 10 after

25   the hour.  (Indiscernible).

```
 1              THE COURT:  Okay.  Okay.

 2              MR. BRIMMAGE:  (Indiscernible).

 3              THE COURT:  Okay.  Like, I know how it is.  I'm

 4   just trying to get a sense from scheduling and timing.  Oh,

 5   that's fine.  Okay.  Let's all take a -- I'll come back on

 6   at 3:15.

 7              Mr. Schwartz, you're again under oath

 8   (indiscernible) remind you.  Okay.  I'll come back.

 9       (Recess)

10              CLERK:  All rise.

11              THE COURT:  Anyhow.  Before we start, Mr.

12   Brimmage, in terms of your presentation, are you going to

13   have -- are you going use Mr. Martin to show --

14              MR. BRIMMAGE:  I am, Your Honor.

15              THE COURT:  Okay.

16              MR. BRIMMAGE:  What I'm going to hope to do is

17   minimize the document use and refer to documents he's --

18   we've already looked at --

19              THE COURT:  Okay.

20              MR. BRIMMAGE:  -- and kind of move from there.

21   But if we need to pull it up, we'll put it up and keep it.

22              THE COURT:  Okay.  I just want to make sure that -

23   - Mr. Martin, I'm going to make -- I think you -- oh, you're

24   still the presenter so you'll be able to proceed.  Okay.

25              And Mr. Schwartz, you understand that you're still
```

1    under oath?

2            THE WITNESS:  Yes.

3            THE COURT:  Okay.  Mr. Brimmage, you may proceed.

4    BY MR. BRIMMAGE:

5    Q    Mr. Schwartz, my name is Marty Brimmage and I'm with

6    Akin Gump Strauss Hauer & Feld and I'm going to question you

7    today on behalf of the Connecticut Plaintiffs.  You and I

8    have never met before that I recall; is that right?

9    A    I do not recall meeting you either.

10   Q    Okay.

11   A    I know the name.  I don't know why.

12   Q    Okay.  Good.  I'm glad my memory isn't quite that

13   faulty.  What I'm going to attempt to do is what I call

14   quick hits.  I'm going to -- some of the things I'm going to

15   talk about, I'm going to refer to your prior testimony

16   today, but I'm not going to intend to repeat that.  I'm

17   going to try to maybe ask some follow up.  So, I'm going to

18   try to be efficient with your time.  I would appreciate if

19   you would do the same.  Does that sound fair?

20   A    If I can.

21   Q    Okay.  Did you have a chance to confer with your

22   counsel during the break?

23   A    About the case?  No.

24   Q    Okay.  Did you have a chance to talk to your counsel

25   during the break?

1   A    Oh, yeah.

2   Q    Okay.  All right.  Let's pick up on a few things if we

3   could.  I think you have testified in a variety of ways to

4   what I'm going to -- I'm going to try to paraphrase -- the

5   sloppy status of the financial records when you became the

6   CRO; is that correct?

7   A    I've talked about it.  I know that.  I don't how many

8   times I've done it.

9   Q    Fair enough to say, it's sloppy records, right?

10  A    Well, that's one description.  I would say something

11  not -- they don't come up to sloppy.

12  Q    Okay.  And when you took over, the 2021 general ledger

13  had not been completed and the books had not closed, right?

14  A    Correct.

15  Q    And as a result, no financial statements were produced

16  for FSS for the 18 months preceding your engagement, right?

17  A    Well, the fact is, no financial statements were

18  produced, charity I'm saying, as a result.  Had they been

19  updated; I don't know if they would have been produced

20  financial statements even then.

21  Q    So, is my statement true?

22  A    Well, that's -- I mean, I've made assumption of a

23  result of the books not being -- but I do know they did not

24  produce financial statements.

25  Q    So that's a yes.

1    A    Yes, sir.

2    Q    Okay.  And you found no bank reconciliations for 2021

3    or 2022, right?

4    A    Correct.

5    Q    You found that FSS personnel expressed no criticism of

6    not receiving any financial reports to assist them in doing

7    their functional responsibilities, right?

8    A    Correct.

9    Q    They were -- appeared unaware of information that would

10   be available to them to timely prepare their financials,

11   right?

12   A    Timely prepare their financials?

13   Q    Right.

14   A    That statement confuses me.

15   Q    Okay.

16   A    Are you talking about the statement beforehand?

17   Q    Did you find that FSS personnel appeared to be unaware

18   of the management -- that the management information was

19   available to them from -- unaware that -- let me start over.

20   It's easy for me to say, right?

21        Were you aware that FSS personnel appeared to be

22   unaware of the management information that was available to

23   them to prepare timely and detailed financial statements and

24   analysis?

25   A    I was aware that management personnel seemed unaware of

1    the information available to them to do their jobs.  That

2    would be accounting's responsible to actually prepare

3    financial statements.  That's what -- that point there Is

4    what threw me.

5    Q    Fair enough.  You would agree with me that internal

6    accounting controls were inadequate, right?

7    A    Yes.

8    Q    There was a lack of segregation of duties?

9    A    Yes.

10   Q    Lack of supervisory review?

11   A    Yes.

12   Q    Including billings to PQPR Holdings, right?

13   A    Correct.

14   Q    When did you come on to FSS?

15   A    June 6th is when I was hired.

16   Q    And so, all these findings that we're talking about are

17   subsequent to June 6th, right?

18   A    Yes.

19   Q    Okay.

20   A    And well, let me step back.  I've been told by Mr. Roe

21   that the general ledgers were not up to speed.  I did not

22   realize the significance of that statement when he told it

23   to me.  That was prior to June 6th.

24   Q    Yeah.  You didn't realize just how bad all the

25   financials and accounting were until you got on the scene,

```
 1   right?

 2   A    Correct.

 3   Q    They were a mess, right?

 4   A    They were nonexistent.

 5   Q    That's worse than a mess.

 6   A    Yep.

 7   Q    All right.  You would agree with me that the --

 8   locating accurate financial records is a tedious task at

 9   FSS, right?

10   A    Locating accurate financial records?

11   Q    Is a tedious task at FSS, isn't it?

12   A    In general, yes.

13   Q    And specifically yes, right?

14   A    Well, I mean, some banks can -- you know, are

15   accessible.  But in general, don't expect them to be.

16            MR. BRIMMAGE:  Mr. Martin, can we pull up

17   Defendant's -- I'm sorry -- I think it's Exhibit 3, the

18   declaration of Mr. Schwartz in this case, and go to

19   Paragraph 94, please?

20   BY MR. BRIMMAGE:

21   Q    We'll blow it up for you, Mr. Schwartz.

22   A    Oh, I can probably read it.

23   Q    Okay.  If you'll just read it to yourself.  I'm not

24   going to attempt to impeach you.  I'm just going to ask the

25   question again and see if we can move it quickly.  Does that
```

```
 1    sound fair?

 2    A    Yes.

 3    Q    Okay.  Tell me when you're done.

 4    A    Okay.  I'm done.

 5    Q    All right.  Isn't it true that locating financial

 6    records is a tedious task at FSS?

 7    A    I think when you asked me that a minute ago, I

 8    responded with another word than tedious.

 9    Q    Mr. Schwartz, is that a yes or a no?

10    A    That is what this says.

11    Q    Is that true or not true?

12    A    That is not true today.

13    Q    Okay.  Do you recall when you signed your declaration?

14    A    Sometime around the time of filing.

15    Q    July 29th?

16    A    Okay.  Would you leave that paragraph up, please, or go

17    back to it?

18    Q    July 29th?

19    A    Yes.  Sounds about right.

20    Q    So it was true on July 29th?

21    A    I believed it to be true on July 29th.

22    Q    Well, hang on.  You believed it to be true, or it was

23    true?  I want the Court to understand.

24    A    No, I mean --

25    Q    You tell us.  You pick.  Was it true, or you believed
```

1    it to be true?

2    A    I believed it to be true.  Like everything else in

3    here, I believed it to be true.

4    Q    But it may not be true; is that correct?

5    A    True.  And everyone says something's true, it may not

6    be, and in this case, I found out that was not true.

7    Q    I think we are getting a clear picture of what you

8    think the truth is.  Let me ask you the next one.  The

9    recordkeeping for orders, invoices, expense reports,

10   American Express charge reports are not well organized;

11   isn't that correct?

12   A    That's correct.

13   Q    And other records on the computer system also require

14   additional time to retrieve, correct?

15   A    Correct.

16   Q    You testified in your declaration that you have

17   extensive experience serving as a fiduciary in bankruptcy.

18   Do you recall that?

19   A    Yes.

20   Q    What is a fiduciary in bankruptcy?

21   A    It's the same, in my opinion, a fiduciary in any --

22   many other capacities.  It's someone who takes possession of

23   assets belonging to another and owes a duty to the

24   beneficial ownership of those assets that put that -- the

25   interests of the beneficial owner first.

1    Q    Anything else?

2    A    I mean, there are some other components of fiduciary,

3    but that's the primary one that I've always known.

4    Q    Okay.  The assets in the FSS bankruptcy, who's going to

5    be the beneficial owner of those assets?

6    A    Well, the beneficial -- the beneficiary of those assets

7    right now would be the creditors, (indiscernible) first.

8    Q    Creditors.  Anybody else?

9    A    No.  First off is creditors, secured and unsecured.

10   Q    In all your experience as a fiduciary in bankruptcy,

11   who do you see as the creditors in this case?

12   A    The people that the estate owes money to.

13   Q    Who is that?

14   A    In this case we have secured creditors.  You have

15   unsecured creditors.  You have administrative claimants.

16   You have the -- and well -- I mean, yeah.  Government

17   creditors, I think they classify as unsecured, but higher

18   class.

19   Q    Okay.  What analysis or investigation did you do to

20   determine who the creditors or potential creditors are in

21   this bankruptcy?

22   A    Really, we haven't completed -- they haven't even done

23   the schedules yet.

24   Q    Okay.

25   A    We looked at who we owed money to as of the filing date

1    and listed them.  Those are creditors.

2    Q    That's all you did up to the filing date, right?

3    A    Well, I mean, we read the loan agreements and the

4    security instrument, but I can't think of a -- I mean, I

5    don't know what there was to do with the -- we know about

6    the contingent claimants in terms of your clients.  So, I

7    don't think we did any more investigation than that at this

8    time.

9    Q    No more investigation than that before you started

10   seeking the cash collateral order that you're asking the

11   Court to approve, correct?

12   A    Correct.

13   Q    Okay.  You've not done any investigation into what I'm

14   going to call the Plaintiffs -- the Texas and the

15   Connecticut and the TUFTA collective group, Plaintiffs'

16   claims, correct?

17   A    Correct.

18   Q    You don't have an opinion one way or another whether

19   they were wronged or not; is that right?

20   A    The TUFTA claimants and your clients?

21   Q    Yes.

22   A    No.  That's for a tryer.

23   Q    Have you done any analysis or estimation of potential

24   amounts of the claims that could be had?

25   A    No.

1    Q    Have you asked for any analysis or estimation of that?

2    A    No.

3    Q    Do you believe it's your job to ask for that or to look

4    into that?

5    A    No.

6    Q    Why is it not your job?

7    A    Well, it's up the courts to decide, liquidate those

8    claims.

9    Q    Okay.

10   A    If he came to me and said what could we settle them

11   for, you know, I may be able to come up with a number that

12   we could provide, but it's not going to be the value of the

13   claim, I suspect.

14   Q    You've testified about Mr. Jones -- I guess Alex --

15   there's multiple Joneses, right?

16   A    There's two I'm aware of.

17   Q    And who are the two?

18   A    Alex Jones and Dr. Jones was who I call them.

19   Q    Who's Dr. Jones?

20   A    Alex Jones' father.

21   Q    What's the first name of Dr. Jones?

22   A    David.

23   Q    So, father/son Alex/David Jones, right?

24   A    Yes.

25   Q    All right.  You testified that Alex Jones puts personal

1    expenses on the American Express card, right?

2    A    Yes.

3    Q    Do others put personal expenses on the American Express

4    card?

5    A    I don't know that.  I would --

6    Q    (Indiscernible)

7    A    -- not be surprised.

8    Q    -- if you don't know.

9    A    I don't know that yet.

10   Q    Yeah, you don't know.  You haven't looked into that?

11   A    No.

12   Q    Okay.  They could, right?

13   A    They could, yes.

14   Q    And you're asking the Court to use cash collateral to

15   pay American Express?

16   A    Yes.

17   Q    Okay.  But no investigation?

18   A    That hasn't been done yet.

19   Q    You also testified that you intend Alex Jones to not

20   charge the American Express going forward, right?

21   A    No.  He can use the American Express, but not for his

22   personal expenses.

23   Q    All right.  Have you confirmed, as you're testifying

24   today in front of this Court, that Mr. Alex Jones has not

25   used the AMEX for any personal expenses since the

1   bankruptcy's been filed?

2   A    No.  I have not had a chance to do that.

3   Q    Have you done anything to cut off Mr. Jones or anybody

4   else from using the AMEX for personal expenses?

5   A    We've started collecting the cards from all the

6   employees.  That is something to be done.

7   Q    Okay.

8   A    Okay?

9   Q    What else?

10  A    We started to collecting the cards.  I have -- as I

11  said, I have not had a chance to look at Alex's charges

12  since the filing.

13  Q    Okay.

14  A    But we'll do that.  And I was in -- I believe -- I

15  don't know if David Jones has a card or not.  We'll find --

16  we'll see what his charges are if they've come against FSS.

17  Q    You don't know if David Jones has a card, right?

18  A    I do not.

19  Q    How many cards are there?

20  A    I don't know.

21  Q    You haven't collected Mr. Alex Jones' card yet, have

22  you?

23  A    No.

24  Q    How many cards have you collected?

25  A    I don't know.  They're doing that today.

1   Q    No idea how many they've collected?

2   A    As I said, I don't know.  It's being done today.

3   Q    Before today, is it fair to say no cards were

4   collected?

5   A    That's -- not by me.  No, we have not collected cards

6   before today.

7   Q    Okay.  And you don't have any personal knowledge that

8   as you're testifying right now, any cards have actually been

9   collected, right?

10  A    No.  I've been here all day.

11  Q    So, that's correct.  You have no personal knowledge?

12  A    That's what I said.  I don't know.  I've been here all

13  day.

14  Q    Okay.  When you were asked about Mr. Jones' car, you

15  said you didn't know.  You said, I didn't -- I don't think

16  so, but I don't know.

17  A    I got confused.  I mean, the question was whether the

18  company pays for Mr. Jones' car.

19  Q    Right.

20  A    And I said no.

21  Q    No, and no expenses associated with the car; is that

22  right?

23  A    Not unless they come through on the American Express

24  and they're -- what I saw, they're charged to his draw.  So,

25  to that extent, the company paid -- would pay for them, but

```
 1    they're charged -- they were being charged to his draw.

 2    Q    Okay.  But the company initially pays for them?

 3    A    Yes, because it pays the AMEX bill.

 4    Q    Okay.

 5    A    Now, and we say initially.  It's probably on there --

 6    where he works, that'd be charged to his draw before the

 7    AMEX bill gets paid.  So --

 8    Q    Yeah.

 9    A    You know, he gets charged for them before AMEX gets

10    paid.

11    Q    If there's a large judgment in the Austin lawsuit,

12    how's it going to get paid?

13    A    That I don't know.

14    Q    You testified that there's $800,000 in unencumbered

15    cash right now, right?

16    A    Correct.

17    Q    And where did you say -- what did you say the source of

18    that cash was?

19    A    Donations.

20    Q    Donations.  Have you done an analysis of donations over

21    the past five years?

22    A    What do you mean by an analysis of donations?

23    Q    The analysis of how many -- how much money has come in

24    for donations for FSS in the last five years?

25    A    I have looked at that number.  I -- what do you mean by
```

 1    analysis?  I have looked at the number, the amount of the

 2    donations over the last five years, seven years.

 3    Q    How much is it annually?

 4    A    Could I look at Exhibit -- I think it's B, the income

 5    statement that's attached to the --

 6    Q    Let me just ask -- we can go there if you need to --

 7    can you not answer without looking at a document?

 8    A    No.  You're asking me for the number.

 9    Q    Can you give us a ballpark?

10    A    It varies.  It's been -- seven figures.

11    Q    Seven figures?

12    A    Yeah.

13    Q    All right.  So, in the next -- well, how much in -- and

14    is it true all the cash donations are unencumbered?

15    A    Yes.  I asked -- I asked that specific question of my

16    lawyers, is that cash collateral also?  And they said no.

17    Q    When you asked your lawyers, who did you ask?

18    A    Mr. Lee and Mr. Battaglia.  I guess they're not my

19    lawyers; they're the Debtor's lawyers.

20    Q    You have your own lawyer though, right?

21    A    No.

22    Q    You don't?

23    A    No.

24    Q    You don't have your own lawyer?

25    A    No.

1    Q    Okay.

2    A    Should I get one?

3    Q    I'm going to leave it.  Do you recall your engagement

4    letter that you talked about, with FSS?

5    A    It depends on what you're asking me to recall from it.

6    Q    Well, it was Exhibit 2 that you spoke to about your

7    lawyers.  It was actually one of the documents that was

8    admitted by agreement.  The May 19, 2022 --

9    A    Right.

10   Q    -- engagement letter?

11   A    Right.

12   Q    Do you recall that?

13   A    Yes.

14   Q    Okay.  It says in there that's CRO's counsel.  That

15   ring a bell with you?

16   A    Yeah, I believe there was a provision in there that I

17   would be permitted to engage counsel.  I have not done that.

18   Q    Okay.  It says FFS will fund $20,000 retainer to be

19   paid to SA LLC, so that SA LLC can engage Mike Ridulfo, of

20   Kane Russell Coleman Logan, to serve as legal counsel to the

21   CRO, correct?

22   A    Correct.

23   Q    You have not engaged Mr. Ridulfo?

24   A    No.

25   Q    Did the $20,000 retainer get paid?

1    A    No.

2    Q    So, prior to the commencement of the engagement, that

3    retainer was not paid?

4    A    Correct.  No retainer was paid prior to the signing of

5    that engagement letter.

6    Q    Even though the engagement letter required it?

7    A    Yes, sir.

8    Q    Do you have an opinion one way or another about whether

9    not the engagement letter is enforceable or not?

10   A    Well, I think --

11   Q    I don't think it's that funny.

12   A    What I -- I'm doing -- I think it's terribly

13   enforceable, but I'm not a lawyer and I haven't, you know --

14   I don't think anyone -- I have not asked a lawyer to look at

15   it from enforceability standpoint.

16   Q    Okay.  And you haven't required the -- all of the

17   requirements in the engagement letter to be met; is that

18   correct?

19   A    Well, I -- no, the retainer was paid.  It just wasn't

20   paid in the terms of the agreement.

21   Q    You just testified that the retainer for Mr. Ridulfo

22   was never paid.

23   A    That retainer has not been paid.

24   Q    So --

25   A    I was asked not to engage Mr. Ridulfo.

```
 1    Q    Who asked you not to?

 2    A    Mr. Battaglia.

 3    Q    What did he ask you that?

 4    A    Concerned over costs.

 5    Q    Concerned over costs.  So let me make sure we're clear,

 6    Mr. Schwartz.  You're using Mr. Battaglia as your own

 7    personal CRO attorney as well as the FSS attorney, right?

 8              MR. BATTAGLIA:  Objection, Your Honor.

 9    (Indiscernible) question.  He can ask a question, but he's

10    putting words in the witness' mouth.  If he wants to know if

11    I'm his lawyer individually, ask that.

12              THE COURT:  I think that's what he did.

13              MR. BRIMMAGE:  I did.

14              MR. BATTAGLIA:  (indiscernible) what he asked

15    (indiscernible).

16    BY MR. BRIMMAGE:

17    A    Well, the answer is, Mr. Battaglia is not my lawyer.

18    He asked me for -- you know, very simply.  He said, I'm

19    concerned about the legal cost.  Do you need

20    (indiscernible).  And I said, well, I don't -- it doesn't

21    seem like it right now, so I'll hold off.

22    Q    The engagement letter negotiated the right for you to

23    seek your own attorney, correct?

24    A    It did.

25    Q    In fact, it said FSS will find $20,000 prior to
```

1   commencing the engagement, right?

2   A    Correct.

3   Q    And you took advice from FSS counsel not to engage your

4   own CRO counsel, correct?

5   A    I don't --

6   Q    That's what you just testified to.

7   A    I don't think I testified that that was advice.  He

8   asked me not to do it.  He said he's concerned about the

9   legal costs.

10   Q    Okay.

11   A    And after -- you know, I said, okay, I don't see that

12   I'm going to have to have my own counsel here; $20,000 ain't

13   going to pay for much anyway.

14   Q    As the CRO, the only counsel you consult with are FSS

15   counsel?

16   A    Correct.

17   Q    Now, let's stick with your engagement letter while

18   we're here for a little bit, Exhibit 2.  It's dated May

19   19th, 2022, correct?

20   A    Correct.

21   Q    And -- but it's signed by Mr. Jones on June 6th, 2022,

22   right?

23   A    Correct.

24   Q    Why the discrepancy?

25   A    I believe Mr. Jones was committed to signing it and

1    ready to sign it until June 6th.

2    Q    Why is that?

3    A    Well, you'd have to ask Mr. Jones.  I know we had a

4    meeting with him on June 6th to discuss the terms of the

5    engagement letter.

6    Q    Was he concerned about any particular term?

7    A    Yes.  He was concerned about the amount of authority I

8    had.

9    Q    All right.  Let's talk about amount of authority.  Was

10   he concerned about anything else?

11   A    Not specifically, no.

12   Q    Okay.  Now, I'm confused about your prior testimony,

13   and I just want to clarify.  Isn't it true that Mr. Jones

14   can fire you right here, right now, if he wanted to?

15   A    That's -- from my reading of the engagement letter,

16   that's my interpretation.  That he has -- still has the

17   authority to terminate me.

18   Q    Okay.  For whatever reason he wants to, right?

19   A    Yes.  I don't think there's a qualifier in there on

20   termination.

21   Q    Okay.  And along those lines, you testified -- and it's

22   been a while -- that you have full authority over a lot of

23   stuff, except major decisions.  Do you recall that

24   testimony?

25   A    No, I didn't say that.

1    Q    You did.

2    A    No, I didn't say that.  If I did, it's misunderstood.

3    I don't -- I had authority over major decisions, but I

4    agreed I would consult with Mr. Jones before I executed any

5    of those decisions.  I did not say that I could not execute

6    any decision I deemed necessary.

7    Q    What constitutes a major decision that you would

8    consult with Mr. Jones over?

9    A    Well, a major decision would be product line changes,

10   for example.  That would be a significant decision.  A major

11   decision would be, there are certain key personnel on the

12   area of marketing in the production area, which I think

13   would be major decisions if I determined I needed to

14   terminate somebody in those categories.  I consulted with

15   him on the termination of the previous accountant because

16   she had been there for a long time and had been a

17   significant role in the company.  Those were decisions that

18   -- and ramifications throughout the organization or in the

19   operation of the business.  And it would be insane of me to

20   have executed some decision like that without talking to Mr.

21   Jones about it.

22   Q    What about the decision to file for bankruptcy?

23   A    I mean, that was --

24   Q    Whose decision was that?

25   A    The final decision?  That's a good question.  Mr. Jones

1    agreed that we needed to file bankruptcy.  The selection of

2    the date, he concurred with.  The recommendation of the date

3    came from others.

4    Q    Well, let's be clear, Mr. Schwartz.  You were hired

5    because the decision was made to file for bankruptcy.

6    A    Well --

7    Q    You were hired to be the CRO.  You did not make that

8    decision.  That decision was already made, which is why you

9    came on the scene; isn't that right?

10   A    Well, I mean, yes.  The perception was that they needed

11   to file bankruptcy, needed to file bankruptcy.  The question

12   was, could they?  And that was part of my job was to

13   determine if the company could actually file bankruptcy.

14   Q    Okay.  Whose perception, was it?

15   A    I think it was Mr. Jones' and his counsel.

16   Q    Which counsel was that?

17   A    That would be Mr. Jordan, in addition, Mr. Lee and Mr.

18   Battaglia and Mr. Shannon.

19   Q    Okay.  They all -- FSS counsel and Mr. Alex Jones'

20   counsel all got together on whether or not to file

21   bankruptcy -- put FSS into bankruptcy?

22   A    That was that they decided it was a definite option and

23   I got -- I became involved when it was -- it didn't get

24   finalized --

25   Q    All right.

1    A    -- initially.  It wasn't final when I became -- got

2    involved that we would be filing bankruptcy.

3    Q    And when you say they, that's who you're talking about,

4    those -- that group of counsel, right?

5    A    Yes.

6    Q    For all those different Alex Jones-related entities,

7    right, and Alex Jones himself?

8    A    Well, no, these -- they represented FSS and Alex Jones,

9    that group.

10   Q    Okay.

11   A    What other entities I -- we're not there.

12   Q    Who represented the InfoWars Three Debtors prior, that

13   you were the CRO for them?

14   A    Prior was Mr. Lee, Mr. Shannon, I believe, and Mr.

15   Battaglia was involved in that.

16   Q    The same lawyers --

17   A    I'm not sure if they all represented the three of them.

18   Q    Yeah.  Same lawyers we've got here?

19   A    Yes.

20   Q    Okay.

21        MR. BRIMMAGE:  Yeah.  We're going to let the

22   witness answer.

23        MAN 1:  Sorry about that.

24        MR. BRIMMAGE:  That's okay.

25   BY MR. BRIMMAGE:

1    Q    So, let me just circle back make sure that we're clear.

2         Your testimony earlier that only the Court can fire

3    you, that's not the case right now, right?  That's not true?

4    A    I don't believe so.

5    Q    Okay.  I appreciate that.  Let's circle back, if we

6    could, to this donation topic.  Is it true that FSS has

7    received donations in cryptocurrency?

8    A    Mr. Jones received some donations in cryptocurrency.

9    Q    Were those directly to him personally, or are those to

10   FSS?

11   A    They were to his personal -- whatever accounts you call

12   those things.

13   Q    Okay.  They were not to FSS?

14   A    No.

15   Q    Is your --

16   A    Not directly.

17   Q    You've investigated that, and you're rock-solid

18   positive under oath in front of this Court today that that

19   was not to FSS, right?

20   A    No.  I mean, what I'm telling you right now is those

21   donations were given to Mr. Jones.  The -- I have not -- we

22   have not done an investigation as to should they have been

23   Jones' or FSS's.

24   Q    I'm more confused than when I started.  The donations

25   were made to FSS and FSS gave those cryptocurrency donations

1   to Mr. Jones?

2   A    No.  FSS did not touch those currencies.  They went to

3   Mr. Jones.

4   Q    Directly?

5   A    Directly.

6   Q    You haven't investigated whether they should have come

7   to FSS?

8   A    We have not.  Although we have looked at -- no, we have

9   not done that investigation.  We've done -- seen some

10  preliminary information.

11  Q    Okay.  Was -- is the amount this year so far around $8

12  million?

13  A    I'm -- well, I haven't seen a full accounting.  We were

14  told it was $9 million.

15  Q    I'll take $9 million.  And so, the cryptocurrency, $9

16  million were donated to InfoWars, InfoWars.com?

17  A    Not to --

18  Q    Is that right?

19  A    Not to my knowledge.  I don't --

20  Q    Okay.  Well, tell the Court where -- who received those

21  donations from the very beginning, the $9 million in

22  cryptocurrency, what entity, what person received them

23  first?

24          MR. BATTAGLIA:  Objection, Your Honor.  Asked and

25  answered.  He said that it was received by Mr. Jones,

1    several times.

2             THE COURT:  He can clarify.  (Indiscernible).

3    BY MR. BRIMMAGE:

4    A    I'm not sure (indiscernible) clarify that.  They went -

5    - to my -- my understanding is that they went to Mr. Jones.

6    As I said, we have not investigated that.  But that's what

7    I've been told; that they went directly to Mr. Jones.

8    Q    Okay.  Thank you.  Does Mr. Jones have a direct place

9    where people can make donations directly to him personally?

10   A    Well, on the -- I'm not a cryptocurrency guy.  But

11   these were made, apparently, to his cryptocurrency vault, or

12   whatever they call that thing.  So, to that extent, yes, he

13   has his own bank account, people can make donations to that

14   if they have it.

15   Q    Okay.  So, it can be made directly to him --

16   A    Yes.

17   Q    Okay.  Mr. Schwartz, when I'm flipping pages, I'm

18   saving both of us a lot of time.  So, be patient with me.

19   You talked with your attorney about the Plan Support

20   Agreement, which was Exhibit 3.  Do you recall that?

21   A    Yes.

22   Q    All right.  And that was April 15, 2022 is when it was

23   signed, right?

24   A    The -- was that --

25   Q    I'll represent to you that's what it says.

1    A    Okay.  Thank you.

2    Q    That was before your time as CRO, right?

3    A    I'm not sure -- was that before I was CRO there?  I --

4    I'm out at -- and I don't remember when I was hired as CRO.

5    I thought it was prior to that.

6    Q    Hired as CRO for which entity?

7    A    The three -- all three are on the engagement letter.

8    InfoWars, IWHealth, and Prison Planet.

9    Q    What about the FSS engagement?

10    A    That was by FSS, a separate engagement letter.

11    Q    Right.  And that was after April 15th, 2022, right?

12    A    Correct.

13    Q    And you didn't do any investigation or analysis

14    regarding the Plan Support Agreement, correct?

15    A    I'm not sure what you mean.

16    Q    You -- it was given to you, right?

17    A    No.  I was -- a draft was given to me to read and

18    comment on and make recommended changes to it.

19    Q    A draft back -- before it was signed on April 15 --

20    A    Yes.

21    Q    When you were the InfoWars CRO?

22    A    Yes.

23    Q    Okay.  Got it, got it, got it.  Thank you.  Let's go to

24    the two promissory notes that you testified to.  Can we do

25    that?  I'm going to try to do them in one, but if we need to

Page 204

1   break them up, we can.  Isn't it true that you've done

2   nothing to date to determine the validity of those notes?

3   A    I believe I've described to Mr. -- somebody already,

4   that all I've done is look at an analysis showing the

5   computation of the note balances and some of the supporting

6   documentation.

7   Q    But --

8   A    That is not nothing, but that is -- that's the limit of

9   it.

10  Q    For one of the notes?

11  A    For one of the notes, correct?

12  Q    But not for the other note?

13  A    I don't believe I've seen anything on the other note.

14  Q    Okay.  And for the one note that you did see something,

15  you didn't do any investigation about the veracity of the

16  information that you were provided.  You just looked at the

17  information you were provided and accepted it as true for

18  now; is that correct?

19  A    Well, I looked at it.  I did not -- have not gone -- we

20  have not started tracing out the information.  So, I -- I

21  mean, you say I looked at it and took it for true.  I don't

22  take it for anything.  It's not true.  It's not false.  It's

23  not proven.

24  Q    Okay.

25  A    To me.

1    Q    All right.  Fair enough.  You don't know, testifying

2    today, whether the notes are valid and enforceable or not,

3    correct?

4    A    Yeah.  That would be more of a legal question for me.

5    Q    Okay.  Where did you get the notes from?

6    A    Well, I was at FSS's offices, so --

7    Q    Have you had discussions with counsel about the notes?

8    A    Yes.  I was about to say I may have gotten them from

9    counsel, because they were looking all of the documentation

10   before I ever got involved.

11   Q    Right.  And if you got them from counsel, do you recall

12   which counsel might have given them to you?

13   A    No.

14   Q    Okay.  Fair to say you've had conversations with

15   counsel about the notes?

16   A    Yes.

17   Q    Other than your conversations though, you've done no

18   investigations or analysis regarding the veracity of the

19   notes, correct?

20   A    That's correct.  That's not on the -- that's not come

21   up to the top of the to-do list yet.

22   Q    When does that get to the top of the to-do list?

23   A    When we get this -- get this thing stabilized and

24   operating and we didn't -- and turned it, investigating

25   claims.

```
 1   Q    You're asking for use of cash collateral in large part

 2   based on the notes, right?

 3   A    No.  I'm asking to use the cash collateral because

 4   we've got the notes out there showing the collateral right

 5   now, or the -- well, I mean, noteholders do.

 6   Q    Have you investigated whether or not you can forbear

 7   paying on the notes during the pendency of the bankruptcy

 8   for now?

 9   A    Well, we entered into a forbearance agreement prior to

10   filing of the bankruptcy.

11   Q    Now, you've filed for bankruptcy.

12   A    Right.  And then part of that agreement, we can reduce

13   the payments on the notes.  But -- so now we're in

14   bankruptcy.

15   Q    Now, you're in bankruptcy.  Have you investigated what

16   your rights are as a CRO of a debtor with regard to paying

17   the notes or holding off on paying the notes for right now?

18   A    I have not had that conversation with the lawyers.

19   Q    Okay.

20   A    And I would have to talk to them.

21   Q    I get that.  But you haven't looked into that yet,

22   right?

23   A    No.

24   Q    Has anybody told you, you have to make these payments

25   right here, right now, with the cash collateral you're
```

1    seeking from the -- the authority from the Court?  Has

2    anybody told you, you have to do it, you must do it?

3    A    No.  I mean, I don't think I'd be here, because --

4    Q    Okay.  That's fair.  That's fair.  And so, you don't

5    know that you have to do it, right?

6    A    No.  If the Court says no, then we don't have to do it.

7    Q    I kind of like the sound of that.  Let's go to these

8    critical vendors.

9            MR. BATTAGLIA:  Objection to the sidebar.

10           THE COURT:  I'll sustain.

11   BY MR. BRIMMAGE:

12   Q    Let's go to the critical vendors, if we could.  You've

13   already talked a lot about this, so I just want to make

14   sure.  The uniform security, that's a lot of money, right?

15   A    It's a lot of security.  It's 24/7.

16   Q    And is that -- is that -- if Mr. Jones wasn't there,

17   would you still need all that security?

18   A    If he was not in the building that day?

19   Q    Yeah.  Or no, not in the building.

20   A    If he was not in InfoWars at all?

21   Q    Yeah.

22   A    Very probably not.

23   Q    Okay.  All right.  Did you look at that with regard to

24   that -- whether or not that's a personal expense that should

25   be borne by Mr. Jones and paid for with his cryptocurrency

1    money or other money?

2    A    No.  It's an expense.  It's the provided security to

3    the employees working there.

4    Q    Well, but if Mr. Jones wasn't there, you just testified

5    the employees don't need that kind of security.

6    A    Well, they don't need that because there wouldn't be

7    any business.

8    Q    Now, you talked to the Court about the three insurance

9    companies, right?

10    A    Right.

11    Q    And you said, look, there's a lot of important assets

12    here that are vital, right?

13    A    Yes.

14    Q    Can you describe for the Court the difference between

15    the three insurance policies and what they cover?

16    A    Not -- no, I don't -- no.  Just their names.

17    Q    You don't have any --

18    A    Property casualty.  We have general liability and -- I

19    don't know what the third one is.

20    Q    I get that.

21    A    Drawing a blank.

22    Q    Apologize.  I get that.  But you can't describe for the

23    Court the three different policies and what they cover,

24    correct?

25    A    Correct.

```
 1   Q    Has anybody told you that you need all three and you
 2   must pay them right now?
 3   A    Yes.  That was how -- that was the --
 4   Q    Who told you that?
 5   A    Well, no one told me that.  They told the people I put
 6   in charge of preparing this list.  And that was based on
 7   going to the employees and saying, okay, what do you have?
 8   What do you have, what vendors do you use, and tell us how
 9   important they are and what we need -- why we need to have
10   them on this list?
11   Q    You were talking to the Court about this little bit,
12   and you talked about claw back.  Do you recall that?
13   A    On Mr. Jones?  Yes.
14   Q    Well, I'm talking about payments to the critical
15   vendors.  You --
16   A    No.
17   Q    -- this -- you (indiscernible) a little bit?
18   A    Yes.
19   Q    And you started saying it, but you didn't finish.  You
20   said, but if we pay them, we have the right to claw back.
21   But you would agree with me, practically, that's not going
22   to happen, right?
23   A    If they're critical vendors and we want to claw back,
24   we have to assess what's the risk to the business of doing
25   that.  So, there may be a legal right, but it may not be
```

```
 1   something we'd be able to execute on.
 2   Q    And even -- that's correct.  And even if you decided
 3   you wanted to claw it back and no longer have a relationship
 4   with that vendor, the chances are you're not getting that
 5   money back, right?
 6   A    It'd be a fight.
 7            MR. BRIMMAGE:  Your Honor, I'm not going to make
 8   my time, but I'm going to keep moving.
 9            THE COURT:  Sounds like I need to see the claw
10   back language.
11   BY MR. BRIMMAGE:
12   Q    In your declaration -- I'm going to do some quick hits
13   -- you talked about personal knowledge, relevant documents
14   in your opinion, right?
15   A    Mm hmm.  Yes.
16   Q    You would agree with me that nothing happened -- that
17   happened before your engagement that you have personal
18   knowledge of, right?
19   A    I think I even said that earlier.  But --
20   Q    Okay.  You also said that -- I'm not going to go
21   paragraph by paragraph, but a lot of your testimony is based
22   on conversations with others or stuff you've read but know
23   is true, correct?
24   A    Correct.
25   Q    And at least as we're sitting here today, the Court has
```

001743

1    no way of knowing when you testify whether or not it's true

2    and you have personal knowledge of it, or whether you're

3    just relying on someone else, and you don't know if it's

4    true; isn't that correct?

5            MR. BATTAGLIA:  Objection, Your Honor.

6    Argumentative.

7            THE COURT:  Yeah.  Mr. Brimmage, can you break

8    that question up a little bit?  I --

9            MR. BRIMMAGE:  I --

10           THE COURT:  -- couldn't follow it myself.

11           MR. BRIMMAGE:  Absolutely.

12   BY MR. BRIMMAGE:

13   Q    We're going back to your testimony and your personal

14   knowledge.

15           MR. BRIMMAGE:  And Your Honor, I think I need to

16   ask the predicate question one more time.  It's a repeat,

17   but it gives me momentum.

18   BY MR. BRIMMAGE:

19   Q    So, you testified that some of the stuff that you've

20   testified to in your declaration and otherwise is based on

21   stuff you've read or been told, right?

22   A    Yes.

23   Q    And some of the stuff you've been -- that you've read,

24   you don't know if it's true or not true, right?

25   A    Some of the stuff I've been told; I don't know if it's

1    true or not true.

2    Q    That was my next question.  Thank you.  So, there's no

3    way for this Court to know when you're testifying in that

4    box whether or not your statements are actually true or not

5    true, correct?

6    A    Nothing that we are looking at in here, including the

7    13-week budget, is based on information that we created.

8    It's information that was -- we compiled from the records of

9    the company we booked.  But everything in there is based on

10   those records.

11            MR. BRIMMAGE:  Let me object as nonresponsive,

12   Your Honor, and let me try it one more time.

13            THE COURT:  I'm going to overrule that.  I think

14   he's trying to answer the question, but I know where you're

15   going.  But you can ask another question.

16            MR. BRIMMAGE:  All right.

17   BY MR. BRIMMAGE:

18   Q    As a fiduciary, do you have an obligation to know what

19   the truth is?  Yes, or no?

20   A    Well, I'm -- you know, sorry, I'm not a philosopher,

21   but I can tell you I can -- I have an obligation to tell the

22   truth as I know it.  But I may not know the truth.

23   Q    And if you don't know the truth, as a fiduciary do you

24   have an obligation to not make a statement unless you know

25   it's true?

```
 1   A    If I believe it's true, then I believe it's true, then
 2   I may -- and I may be wrong.  If I knew it wasn't the truth,
 3   I wouldn't say it.
 4   Q    But you could believe it's true based on something you
 5   read or heard, right?
 6   A    I could believe it's true based on an analysis of a
 7   schedule.
 8   Q    The last paragraph of your declaration says, "I declare
 9   under penalty of perjury that the foregoing is true and
10   correct."  Do you recall that?
11   A    Yes.
12   Q    Okay.  Who drafted your declaration?
13   A    For the most part, Mr. Lee drafted a lot of it, and I
14   drafted a lot of it.
15   Q    When you drafted it and put like a citation of where it
16   came from, so-and-so's deposition, was that you or Mr. Lee,
17   or somebody else?
18   A    That -- well, my understanding that it was Mr. Lee.
19   Q    Okay.  All those citations were not yours, right?
20   A    Correct.
21   Q    Those came from Mr. Lee, right?  And do you recall the
22   deposition that was cited in here?  I'm looking for it for
23   the name and I don't recall it.
24   A    Jacobson.
25   Q    Jacobson.  Did you read Jacobson's deposition?
```

1   A    I don't recall reading it.

2   Q    I think that's what you testified to before.  I just

3   wanted to see if that -- if I heard it right.

4        Let's go to the bankruptcy filing, in your head.

5   You've already talked about this, but I had a follow-up.

6   Paragraph 11 is the one you talked to counsel about already,

7   about -- in the district for 180 days, right?  Did you rely

8   on counsel in making that checkmark on that box for this

9   document?

10  A    Yes.

11  Q    Okay.  I think you said the case law you saw -- did you

12  read cases to help you get comfortable with checking that

13  box?

14  A    I read the -- I read the case; I understand which is

15  the one we're relying on by Judge Hale.

16  Q    But what case is that?

17  A    I knew you were going to ask me that.  Erg, or

18  something like that.  E-R-G, maybe, something like that.

19  Q    Judge Hale?

20  A    Judge Hale of the Western -- up in Fort Worth.

21  Q    Okay.  The Northern District of Texas?

22  A    Yeah.

23  Q    All right.  Who gave you that case?

24  A    I believe Mr. Lee gave it to me.

25  Q    Okay.  And when Mr. Lee gave it to you and when you

1    read that case, did you ask, what does it mean when it says

2    principal assets in this district?  Did you ask that

3    question of any -- Mr. Lee or anybody else?

4    A    I don't recall.  We looked at -- I looked at that case

5    back in the filing of first bankruptcy.

6    Q    Okay.  Do you know what in this district means?

7    A    Yeah.  I assume it refers to the Federal District.

8    Q    Do you think it means the Southern District of Texas,

9    where this Court is sitting?

10   A    That's the way I always interpreted it.

11   Q    Okay.  But just to summarize, you don't recall -- you

12   testified there are no assets of FSS in the Southern

13   District, right?

14   A    Not that I'm aware of.

15   Q    Okay.  Okay.  All right.  I might get in trouble for

16   going over this because you talked to the Judge about it a

17   little bit.  So, I would like to follow up a little bit.

18   A    Okay.

19   Q    This is the discussion you had regarding when you were

20   the CRO -- you still are -- for what I call the InfoWars

21   Debtors, right, the three?

22   A    Yes.

23   Q    Right?  And your declaration or your statement of

24   disinterestedness, right?

25   A    Yes.

1    Q    And the involvement of FSS, that wasn't disclosed to

2    the Court or anybody else, right?

3    A    Correct.  When you say anybody else, I mean the people

4    involved with the InfoWars that were aware of it.

5    Q    Okay.  The public wasn't aware, right?

6    A    I don't believe so.

7    Q    And the Judge wasn't aware, right?

8    A    No.

9    Q    And the Plaintiffs' lawyers from Texas and Connecticut

10   to the best of your knowledge weren't aware or made aware,

11   right?

12   A    To the best of my knowledge.

13   Q    When you say that you were disinterested, what does

14   that mean to you?

15   A    Well, I'm -- in my opinion, it means I have no

16   conflict.  I -- there's no party that I'm involved with is

17   adverse or has an interest in what I'm doing.

18   Q    Did FSS play a role at all in the InfoWar bankruptcy?

19   A    FSS agreed to provide -- was going to provide cash flow

20   to the settlement fund.

21   Q    And who on behalf of FSS was going to authorize that or

22   approve that?

23   A    That would have been Mr. Jones.

24   Q    Mr. Jones.  And you were -- but you were the CRO at the

25   time of the InfoWar entities, right?

1    A    I was CRO of the InfoWar entities.

2    Q    Right.  So FSS was a counterparty that was going to

3    provide money to fund some of the issues in the InfoWar

4    bankruptcy, right?

5    A    Yes, under the Plan Support Agreement.

6    Q    And FSS had their own counsel, or did they have the

7    same counsel?

8    A    I have no idea who FSS's counsel was in that.

9    Q    Okay.

10    A    I don't know.

11    Q    You don't know?

12    A    Mm mm.

13    Q    When you were the CRO of the InfoWar Debtor entities,

14    did you have fiduciary duties then?

15    A    Through those Debtor entities, yes.

16    Q    Did you have fiduciary duties at that time to FSS?

17    A    Not that I'm aware of.

18    Q    Okay.  Let me ask you just a couple of what I think are

19    follow-up questions.  This goes back to the general ledgers

20    that were a mess when you arrived on the scene.  Do you

21    recall that discussion?

22    A    We had several, I believe so.

23    Q    Okay.  Does Melinda Flores ring a bell to you?

24    A    The name does, yes.

25    Q    Who is that?

1   A     She was the -- I think her title was Controller when I

2   came on the scene as CRO of FSS.

3   Q     And do you know what time period she was responsible

4   for preparing the FSS books?

5   A     As I recall, she closed the 2020 books.  So, at least

6   sometime in 2020, if not prior thereto.  She may have been

7   there in 2019.  I just don't -- you know -- I might have

8   heard that.  I don't know.  I know she closed the 2020

9   books.

10  Q     You haven't looked into that at this point, right?

11  A     Yeah.  Unless -- I mean, unless someone shows me

12  there's a need for me to look into --

13  Q     Okay.

14  A     -- her administration.

15  Q     Okay.  All right.  Okay.

16          MR. BRIMMAGE:  Your Honor, if I can just have like

17  60 seconds for a quick --

18          THE COURT:  Absolutely.  Take your time.

19          MR. BRIMMAGE:  -- and continue my -- I'll consult

20  with him, but I'm also going to look at my notes real quick.

21  BY MR. BRIMMAGE:

22  Q     Mr. Schwartz, just a couple more final questions.  And

23  thank you for your patience.  Have you assisted in preparing

24  any of the witnesses that have been deposed in any of these

25  State Court actions?

```
 1   A     No.  Oh, wait a minute.  Excuse me.  There was a --
 2   yes, I did talk to somebody.
 3   Q     Do you recall who the somebody was?
 4   A     She was a corporate rep.
 5   Q     Corporate rep for who?
 6   A     That I don't know.  I assume FSS, but I don't know.
 7   Q     Why did you help prepare this witness?
 8   A     Because the knowledge we had gained on the accounting
 9   and accounting records, I was asked to talk to her and
10   answer specific questions she might have to fill out her
11   knowledge.  Because prior to what we had done, the
12   accounting records were absolutely unreliable for '21 and
13   '22.
14   Q     And you don't know if you talked to her because she was
15   being deposed on behalf of FSS or some other entity,
16   correct?
17   A     She was being deposed.  I remember that.  And --
18              THE COURT:  Do you recall when that was?
19              THE WITNESS:  Might have been early in July, is
20   what I think; mid -- maybe mid-July.  But it seems like by
21   then we were heavy into --
22              THE COURT:  Okay.
23              THE WITNESS:  -- other stuff.  But we were -- it
24   had taken us until then to get enough of the accounting
25   records up to date where they were usable information coming
```

```
 1   out.
 2   BY MR. BRIMMAGE:
 3   Q    Could it have been June 27th that the deposition took
 4   place?
 5   A    Is it -- Brittany is her name?
 6   Q    Brittany Paz?
 7   A    Yeah.  Okay.  If that was the date, then it was a
 8   couple of days prior to that.
 9   Q    It was prior to that, right?
10   A    Yeah.
11   Q    So you had been on the scene --
12   A    Not long.
13   Q    Less than a month?
14   A    Yes.
15   Q    Right?  All right.  With books and records that are a
16   mess, right?
17   A    Yep.
18   Q    Okay.  Have you read any of the Plaintiffs' lawsuit
19   complaints?
20   A    I read the -- was that the Fourth Amended Complaint, I
21   believe by the Connecticut complainants.  I read that
22   recently.
23   Q    Any others?
24   A    I don't -- I probably read some of the Texas complaints
25   at some point in this process.  Seems like I did but then --
```

1    I had to read the Fourth for some --  I guess recently to

2    prep for, I think, for something -- for some of this stuff

3    this week.

4    Q    Are you keeping up with the Austin trial?

5    A    Very little time to keep up with that then.

6    Q    You would agree with me that the Austin trial result

7    could have a significant impact on this bankruptcy, right?

8    A    I don't know.  I mean, it's going to -- I expect to

9    have a big judgment, and if we don't have a big judgment,

10   even a little judgement's going to have a -- both would have

11   an effect on the bankruptcy.  We have to recognize that.

12   Q    What is a big judgment?  What effect does --

13   A    I know that I understand that the Plaintiffs' opening

14   statements they asked for $145 million.  That would be a big

15   judgment.

16   Q    And if there's a big judgment, what impact do you

17   foresee on this bankruptcy?

18        MR. BATTAGLIA:  Objection, Your Honor.  Calls for

19   speculation.

20        THE COURT:  Yeah, well, just find out where we're

21   going with this one, Mr. Brimmage?

22        MR. BRIMMAGE:  Yeah.  Where I'm going, Your Honor

23   --

24        THE COURT:  Might have gone out of bounds on it.

25        MR. BRIMMAGE:  Absolutely.  I think what we're

1    hearing is that Mr. Schwartz has done nothing -- well, I'm

2    going to say this, and then I'm going to try to elicit the

3    testimony, so here we go -- has done --

4              THE COURT:  Well, just --

5              MR. BRIMMAGE:  -- nothing to look after the

6    Plaintiffs' --

7              THE COURT:  Well, no, no.  Just elicit the

8    testimony and then you can make the argument at the end.

9              MR. BRIMMAGE:  Okay.

10   BY MR. BRIMMAGE:

11   Q    Let me ask you this.  You already -- we've already

12   talked about, and you already testified that you've not done

13   anything to assess or analyze the veracity of the various

14   lawsuits by the Plaintiffs across the country, right?

15   A    Correct.

16   Q    And if you are not looking after those potential or

17   actual unsecured, unliquidated, contingent creditors, whose

18   job in this bankruptcy is it to look after them?

19   A    I'm not sure what you mean by not looking after them in

20   this.  My job, as I understand it, and always understood it,

21   is to -- is to get the estate back onto a reasonable basis

22   and generating income, whether that's going to sufficient to

23   pay the creditors or not.  But I can't do anything more than

24   protect the assets and try to increase the value of the

25   estate.  That is -- I mean, I'm not a tryer of fact, so I

1    can't do much on the case side.

2    Q    I appreciate that.  But it's -- you don't believe it's

3    your job to look after the various Plaintiffs and their

4    unsecured claims in this case; is that correct?

5             MR. BATTAGLIA:  Your Honor, I'm going to object.

6    I think he answered that question --

7             THE COURT:  Yeah.

8             MR. BATTAGLIA:  -- in his prior answer.

9             THE COURT:  I think he's answered the question,

10   Mr. Brimmage.

11            MR. BRIMMAGE:  All right.  I appreciate it, Mr.

12   Schwartz.  Your Honor, what I'm getting at is we need a Tort

13   Committee.  Thank you.

14            THE COURT:  Thank you.  Mr. Lemmon?

15            MR. LEMMON:  Thank you, Your Honor.

16   BY MR. LEMMON:

17   Q    Mr. Schwartz, you and I have known each other

18   professionally for over 30 years, right?

19   A    Since you were a baby lawyer.

20   Q    Yes, sir.

21            MR. BRIMMAGE:  Your Honor, just (indiscernible) --

22            THE COURT:  I was going to --

23            MR. BRIMMAGE:  -- because it seems

24   (indiscernible).

25            MR. LEMMON:  I'm getting to that point with my

```
 1   next question, Your Honor.

 2              THE COURT:  Let's see where this goes.

 3   BY MR. LEMMON:

 4   Q    But in this case, our relationship has been -- we've

 5   got a good relationship, you and I, professionally and we're

 6   friendly, aren't we?

 7   A    Most of the time.

 8   Q    Okay.  In this particular case, our relationship has

 9   been adversarial; is that correct?

10   A    Extremely so.

11   Q    Now, you remember, and you've been asked about the

12   discussions -- the negotiations about the forbearance

13   agreement, right?

14   A    Are you asking me if I remember the negotiations?

15   Q    Right.

16   A    I sure do.

17   Q    And those negotiations were heated, weren't they?

18              MR. BRIMMAGE:  (Indiscernible).

19              THE COURT:  Yeah.

20              MR. LEMMON:  Your Honor --

21              MR. BRIMMAGE:  (Indiscernible).

22              MR. LEMMON:  Your Honor, I'm adverse --

23              MR. BRIMMAGE:  (Indiscernible).

24              THE COURT:  Let me ask this.  How are you adverse

25   to -- at this time?
```

1          MR. LEMMON:  I'm adverse to the Debtor with

2     regards to issues concerning the cash collateral.  I have,

3     on behalf of my client, consented to the form of order that

4     was proposed by the Debtor.  But that was also after

5     negotiations.  So, I am not opposed to the relief that the

6     that the Debtor is seeking on an interim basis today.  But I

7     want to make clear my client's position and our

8     separateness.  And my client's position has been attacked

9     here today.

10          THE COURT:  I think you've done it.  I think you

11    done it.

12    BY MR. LEMMON:

13    Q    Why was the forbearance agreement important from the

14    Debtor's perspective?

15    A    The forbearance agreement, we needed -- needed the

16    reduction in the cost of the processor fee.  We needed to

17    change the ratio of sharing the sales proceeds.  Those two

18    were critical to the survival of the Debtor.

19    Q    And is the Debtor trying to change its business plan;

20    in other words, I mean the way it does business, the way it

21    acquires product and sells product?

22    A    Well, yes and no.  We are trying to be much more

23    selective in the product we acquire.  We are trying very

24    hard to separate so it's clear what's our product and what

25    is not because we think we get higher margins on our

1    product.  I shouldn't say ours -- the FSS's.  From the

2    standpoint of the overall business operation, it needs

3    organization.  It needs a lot of training.  Personnel are --

4    grew up in their jobs, but they don't know what they should

5    be doing and what they --how they should be making decisions

6    and on what data they should be making decisions.

7    Q    Is the Debtor attempting, in part, to transition away

8    from mostly buying products from my client to buying

9    products on its own?

10    A    Yes.

11            MR. BRIMMAGE:  Objection.

12            THE COURT:  Yeah, and Mr. Lemmon, I think none of

13    us discussed any of this.  I'm going to, kind of, keep you

14    within the bounds of where things are going.  So, if you've

15    got a couple of questions, I'm --

16            MR. LEMMON:  Thank you, Your Honor.

17    BY MR. LEMMON:

18    Q    Do you have an estimate of the legal expenses that the

19    Debtor has incurred in the Sandy Hook litigation?

20    A    I have a number, which from the accounting records, I

21    do not believe it's accurate.  And the reason is, the

22    recording of entries and legal fees don't -- the description

23    does not always tell you what case or even what firm it

24    relates to.  But best that what we can identify is what we

25    know being related to this -- the Texas case is, it's a --

```
 1              MR. BRIMMAGE:  Objection.  (Indiscernible).

 2              THE COURT:  Yeah, I'm going to let him finish the

 3    answer because I think he's just giving his thoughts.  But

 4    again, I'm -- those kinds of questions about cash collateral

 5    or the critical and the emotional, I'll let you go there,

 6    Mr. Lemmon, but is it really -- I just -- with your client,

 7    those are cash collaterals are nothing that you're

 8    interested in.

 9              MR. LEMMON:  That's true, but I believe that this

10    question has to do, in part, with that.  And so, if the

11    witness could be allowed to finish his question -- his

12    answer.

13              THE COURT:  Okay, well, I'll allow it.

14    BY MR. LEMMON:

15    A    From what I can tell, FSS identified payments of

16    approximately $4.5 million through 2022, from 2018 through

17    2022.

18    Q    You were asked a few questions about cryptocurrency,

19    and whether that cryptocurrency was cash collateral.  Do you

20    recall having discussions with me and with my client where

21    we were trying to establish that it was cash collateral?

22              MR. BRIMMAGE:  Objection.  (Indiscernible).

23              THE COURT:  Sustained.

24    BY MR. LEMMON:

25    Q    Do you recall any discussions with me and my client on
```

1    that subject?

2    A    Yes.

3    Q    And to your knowledge, do you know whether we did an

4    investigation trying to prove that it was cash collateral?

5              MR. BRIMMAGE:  Objection.  (Indiscernible).

6              THE COURT:  Yeah, I'm going to sustain that.  Mr.

7    Lemmon, if your client has a position on it, then they can

8    file something or make an argument about it.  But whether

9    you've done an analysis or not, I'm sure you'll tell me at

10   some time, at some point.

11             MR. LEMMON:  Thank you, Your Honor.

12             THE COURT:  But all your rights are reserved.  I

13   mean --

14             MR. LEMMON:  Of course.  Thank you.  Thank you,

15   Your Honor.  That's all I have.

16             THE COURT:  Okay.  I'll give you a brief redirect.

17             MR. BATTAGLIA:  Your Honor, I'll be

18   proportionately brief.

19             REDIRECT EXAMINATION OF W. MARC SCHWARTZ

20   BY MR. BATTAGLIA:

21   Q    So, you were asked an awful lot of questions on cross

22   about the things that you haven't done about validating Mr.

23   Jones' draws, about validating or examining the precise

24   amounts that were advanced by PQPR, about valuating the

25   Plaintiffs' litigation claims.  Tell me again when you were

1   retained.

2   A      June the 6th of 2022.

3   Q      And tell me again when this bankruptcy case was filed.

4   A      July 29th.

5   Q      Good Lord, Mr. Schwartz, what have you been doing?  Why

6   haven't you evaluated those matters?

7   A      We have spent most of that time, substantially all of

8   the time, getting accounting books up to date so we could

9   determine what our cash flows looked like and what we --

10  whether we could or could not even file.

11  Q      And what amount of your workday is focused on FSS

12  business?

13  A      Post-petition?  I get about two hours a day, if I'm

14  lucky, on the business side.

15  Q      Okay.  But on the non-business side of FSS, total time

16  delegated to FSS?

17  A      Oh, my total time on FSS is -- honestly speaking, I'm

18  not the only one, but it's easy eight to nine hours a day.

19  Q      And are there -- how many people within the Schwartz

20  and Associates firm are dedicating time to the FSS file?

21  A      Four and a half or so.

22  Q      And you mentioned a Mr. Schultz, Schultz --

23  A      Schultz, it's pronounced Schultz.

24  Q      How much of his time is being dedicated towards FSS?

25  A      He's full-time.

1    Q     And so, all these people dedicating all this time,

2    again, you mentioned getting the books and records, what

3    else have you focused on, aside from getting the books and

4    records in a usable state?

5    A     Trying to figure out why we are constantly being

6    surprised with invoices that we didn't know were sitting out

7    there getting old.

8    Q     What about product orders?

9    A     Product orders.  Yes, definitely product orders and

10   reconciling deposits.  For example, we have one vendor that

11   we -- $1.5 million was sent to, a little over $1.5 million,

12   and $1,350,000 worth of product was actually ordered.  We

13   have a 250-something thousand- dollar credit sitting there,

14   which we were unaware of.  We had to find that, reconcile

15   that, and discuss that with Mr. Jones.  Why is that here?

16   Q     So, your focus has been on normalizing the business of

17   this juncture?

18   A     Yes.

19             MR. BRIMMAGE:  Your Honor, objection.  Leading.

20             THE COURT:  Sustained.

21   BY MR. BATTAGLIA:

22   Q     What has your focus been on this since your engagement?

23   A     I've been trying to get my arms around it and get it

24   into a standard operating mechanism where people go to work,

25   they know what their job is going to be that day, they do

 1   it, and we get rid of the last-minute catastrophes that have

 2   to be handled.  And that stated, we are literally right now

 3   in the -- oh, you've got to pay this bill because, you know,

 4   it's way past due and we're going to get cut off.

 5   Q    In order of priority, to protect and preserve the value

 6   of the estate and generate revenue, what are the most

 7   important things to do?

 8   A    Get control of the costs and get the revenue coming in

 9   the door.

10   Q    Where does evaluating Alex Jones' draw come on that

11   list?

12   A    That comes when you've got all -- got the business

13   running on an even keel, maybe I can start those processes.

14   Q    Where does evaluating the PQPR debt?

15   A    It comes in the same category.

16   Q    Where does evaluating the Plaintiffs' claims fit in

17   that regard?

18   A    Well, right now, with them sitting in the courts, I

19   mean, the Court's going to determine the Plaintiffs' claims.

20   I don't -- it's hard for me to see what I need to do to

21   evaluate -- to quantify the Plaintiffs' claims.  It's not a

22   matter to come to me.

23   Q    What is your role in the litigation, the Plaintiffs'

24   litigation?

25   A    I'm -- obviously, to the extent there's discovery, my

1    role is to cooperate and assist in that, try to make sure --

2    I have the perception that information was requested that we

3    didn't have, or at least I've been told that that's not

4    something we track.  But that clearly was not made known,

5    and I also have a perception there was a lot of stuff put

6    out there by people who just didn't know what they were

7    doing.

8    Q    Did Debtor have legal representation in both of those

9    lawsuits?

10   A    Yes.

11   Q    And it's not Mr. Lee or myself?

12   A    Correct.

13   Q    What is your intention regarding investigating the

14   matters that have been discussed here, the Alex Jones draws,

15   the note balance, and ultimately, I guess, the Plaintiffs'

16   claims?

17   A    Well, there are a number of -- they fall in the

18   category of the number of deadlines we have to investigate.

19   And they are, you know, once we get past fire drill and get

20   this thing under control, which hopefully is within sight of

21   happening, we have to do a little bit more hiring.  Then we

22   can turn around and start, you know, get into the more

23   routine -- supporting the bankruptcy, supporting the Chapter

24   5 Trustee, and starting to evaluate and investigate the

25   claims.

1    Q     You were asked a series of questions regarding Mr.

2    Jones' draw -- historical draws and salary.  I want to visit

3    that a little bit here.  You've at least reviewed, from the

4    general ledger, what the distributions were to Mr. Jones for

5    the period from 2012, say, to 2022?

6    A     I've seen them, yes.

7    Q     And how -- there were some questions asked about post-

8    April 2018 draws.  Can you tell the Court, comparatively

9    speaking in the three or so years before 2018 or four years

10   -- and the four years following 2018, were they different,

11   the same?  How did they compare?

12   A     No, the draws declined following 2018 from the previous

13   period.

14   Q     The Debtor broadcast, the primary broadcast that FSS

15   transmits is called what?

16   A     The Alex Jones Show.

17   Q     Huh.  Is he important to that show?

18   A     Very much so, yes.

19   Q     In your opinion, is Mr. Jones valuable to FSS in his

20   ability to generate revenue in the future?

21   A     Yes, very much so.

22   Q     Why is that?

23   A     He has -- he's a salesman.  He's a -- his forte is

24   selling, and he's very, very, very good at it, and he can

25   sell to his audience.

1  Q    In your opinion, who at FSS is more valuable than Alex

2  Jones?

3  A    Who is more valuable?

4  Q    Yes.

5  A    Nobody.

6  Q    Do you have an opinion as to whether or not a salary of

7  a $1.3 million is appropriate for Mr. Jones and what he

8  contributes to this venture?

9  A    Well, I don't think it's anywhere near representing the

10 value that he provides.  It's quite appropriate from the

11 standpoint of FSS.  You know, it's good for FSS because I

12 think it's far below, way below what he could achieve and

13 has achieved in the past.

14 Q    You were asked some questions about why did FSS file

15 and I think you said something about because of the state of

16 litigation.  What other purposes were primary in your

17 decision to proceed with filing?

18 A    Well, the other purpose is, as I pointed out, the --

19 this organization, this business needs to be reorganized.

20 It has to become -- it's -- it does not have the internal

21 information loop to identify when it's heading into the

22 ditch and to help it make decisions to avoid that.  It has

23 gotten itself in the position where he has to get fully into

24 the ditch until it realizes it has a survival problem.  That

25 takes a reorganization and rethinking.  That takes managers

1    who begin to monitor the financial information related,

2    their operation and the overall operation.

3    Q    In 2021, now that you've closed the books, to what

4    degree was the Debtor profitable or unprofitable?

5    A    It was unprofitable.  It lost about $10 million in

6    2021.

7    Q    And to date, has that trend changed?

8    A    Well, through May 31st, I think we reported a profit

9    around a million dollars or so, but a significant part of

10   that was donations.  Donations are not operating results, so

11   it's hard to account for them.  So, it's definitely improved

12   from what it was in 2021, but I don't think we're anywhere

13   near a sound basis yet.

14   Q    Lots of questions about accounting issues, which you

15   were asked on direct and cross and everybody wants to call

16   it mess and terrible.  Was the ledger, at least up to 2021,

17   reliable?

18   A    It appears to be, yes.

19   Q    And the problem in 2022 is, that there had been no

20   postings as of --

21   A    Correct.

22   Q    Okay.  So, what information that was necessary to close

23   2021 and to book entries in 2022 was not made available to

24   you?

25            THE COURT:  I think you've covered that road.  I

1    think you've covered that road, Mr. Battaglia.

2    BY MR. BATTAGLIA:

3    Q    I just want to ask, have you been provided access to

4    all the information you need to do your job?

5    A    Yes.

6         MR. BATTAGLIA:  May I have one minute with my co-

7    counsel?

8         THE COURT:  Absolutely.

9         MR. BATTAGLIA:  I'll pass the witness.  Thank you,

10   Mr. Schwartz.

11        THE COURT:  Okay.  I think I'm ready.  I want to

12   note two technical things and then I'll get into the

13   rulings.  One is -- and I'm going to consider it an

14   oversight, but I want it corrected today.  I looked at the

15   Debtor's petition, voluntary petition, and Mr. Battaglia,

16   you didn't sign it.  I need you to sign it today.  It's --

17   I'm just looking -- I don't -- I see where your name is

18   listed, but I don't see -- I'm going to share my screen.

19   I'm going to consider that just an oversight, but I want it

20   corrected.  It's required on a voluntary petition and that's

21   what I see on the voluntary petition, so I want that

22   corrected.  I want it corrected today, unless there's an

23   amended on file, and if there is, someone let me know.

24        This case was filed in the Victoria Division and

25   in May 19th -- on May 19th, excuse me.

```
 1          MR. BATTAGLIA:  (Indiscernible) this case?

 2          THE COURT:  No, no, no.  I'm saying -- I'm saying,

 3    this case was filed in Victoria and on May 19th --

 4          MR. BATTAGLIA:  Okay.

 5          THE COURT:  -- Bankruptcy Court entered a General

 6    Order 22-3.  It deals with Division of filing locations, and

 7    it amends Local Rule 1002-1, and it says, (indiscernible)

 8    that cases must be filed in the division of the Debtor's

 9    principal location.  Principal location, if the Debtor has

10    none, the principal location is the Houston Division, and

11    that's what would have qualified in this case.

12          I'm going to -- you know, (indiscernible) the

13    Houston Division, based on my experience with the prior

14    cases and the efficiency and the best interests of the

15    estate, I'm going to transfer the case to the Houston

16    Division, and I'm going to transfer it to myself and keep

17    the case and we're going to keep the same case number.  But

18    it should be in Houston.  I want to make sure that we're

19    observing the local rules as done.  Parties have their

20    rights, but I want to make sure that those two technical

21    things, one I'll take care of on the back end, one, Mr.

22    Battaglia, you need to sign a declaration.

23          So, that -- but before the Court are two matters,

24    the utility -- I've signed schedules extension that's on the

25    docket.  Utilities you're going to tweak.  What's left now
```

1    is cash collateral and the critical vendor motion.

2              And let me just excuse you.  You can have a seat.

3              Here's what I'm going to do.  I'm both -- I'm just

4    going to note that notice of today's hearings was proper,

5    the Court considered the evidence on the record, as well as

6    the testimony of Mr. Schwartz.  I appreciate Mr. Schwartz's

7    candor and his testimony.  Some of it I found very helpful.

8    Some of it I found honestly troubling.  Some of it is not

9    surprising for a Debtor early on in a case.  Management may

10   not be completely able to have its arms around a case so

11   that doesn't surprise me.  But everybody knows why these

12   last cases were filed, or the driving impetus, but driving

13   the last case and this case and that's -- there are some

14   major lawsuits going on in Austin and in Connecticut, and

15   they're very serious lawsuits that make some very serious

16   allegations.

17             It's not for me to comment on the merits of any of

18   them.  Those processed -- the process in Austin will run and

19   I don't want to say anything one way or the other about

20   what's happening in that lawsuit.  I just know that it is a

21   significant action, and I do know, and I don't want to make

22   light of it, that there are some -- they are real people and

23   real faces behind each one of them, they're real Plaintiffs

24   who have experienced real pain.  And I think Mr. Jones is --

25   and these Debtors are entitled to put on their defense and

1    it's not for me to comment one way or the other.  I just

2    know that there's a lot of seriousness and I take it as

3    such.

4           And so, I take each case that is filed before me

5    with the same degree of focus, preparation as one would hope

6    that a bankruptcy judge would.  And I've took the last cases

7    really seriously and prepared really hard and I've done the

8    same here.

9           So, there's two motions here, and really the

10   question is, is how you stabilize the company now.  There's

11   also been -- there's been oral request for the appointment

12   of a committee, and that can be done by the Court for cause.

13   I'm not going to grant that today, but I am going to express

14   some real concerns about what I heard, and I'll express what

15   they are.

16          You know, whether you realize it or not, Mr.

17   Schwartz was negotiating on both sides of a deal.  And what

18   was represented to me in the last case was that there was --

19   the parties were going to propose mediation and there was a

20   Plan Support Agreement and asking me to approve  Plan

21   Support Agreement entry into where parties were going to try

22   to -- at least what was stated to me in the last case was

23   that, parties were going to ask for mediation and to try to,

24   you know, ask the Plan, there were milestones, and third-

25   party contributors consisting of Mr. Jones and Free Speech

1    were at least offering to put some money on the table to see

2    if there could be a deal that was worked out and that didn't

3    happen.  And I'm not saying it should have happened.  Again,

4    I'm just saying the fact it did not happen, so I'm not

5    saying there was not a good reason that it shouldn't have

6    happened.  Again, I'm just pointing to the fact that that

7    did not occur.

8         But Mr. Schwartz, you spoke with both third-party

9    contributors at the time, and at least what you're telling

10   me, Mr. Lee was involved as well at the time, then both

11   parties were representing the InfoW Debtors who were --

12   quite frankly, membership interests had been transferred to

13   a trust.  And so, I haven't fully thought through, but I'm

14   concerned that you still may represent the InfoW Debtors as

15   their CRO and how you're purporting to act as the CRO in

16   this case.  And I don't -- at some point, someone's going to

17   have to make some really hard decisions.  I'm -- quite

18   frankly, I'm a little surprised you hadn't read some of the

19   litigation because at least InfoW was involved in the

20   litigation for every one of these last time.  So -- and that

21   was supposedly the purpose of the litigation.

22        So, I'm a little surprised that the CRO is telling

23   me today that he hasn't read, at least, the -- or has a good

24   working knowledge of the lawsuits, including the fraudulent

25   transfer litigation.  I didn't know whether the fraudulent

1   transfer litigation has any merit.  I don't know whether --
2   I've heard today about the potential indemnity that Mr.
3   Jones may have against FSS.  And you may file a proof of
4   claim.  He may file a proof of claim, he may not.  That's
5   not surprising in a case whereas -- but the Debtor is going
6   to have to make some tough decisions at some point.  And
7   it's going to have to really analyze those claims and see
8   whether those claims have any merit and whether there are
9   claims that the estate has that it may bring on its own, and
10  I don't know if there are any.  That's certainly not for me
11  to comment on, but someone's going to have to do the hard
12  work, and I don't know how that hard work gets done from
13  what I'm hearing.
14          And I'm not sure that parties who were introduced
15  in the last case could fill that role either.  But the
16  Debtor needs to hear that from me, and I think debtors are
17  entitled, especially early on in a case, to think about what
18  the judge may have to say.  And these are certainly rare
19  comments, but these are certainly uncommon cases.
20          And I don't want to -- there's a request for the
21  appointment of a Tort Committee and I think it's not wholly
22  unfounded to ask for one.  And I think I owe them a real
23  answer as to why I'm not going to appoint one today.  The
24  fact that a Debtor has got to get its books right, that
25  doesn't surprise -- that's -- I think professionals can get

1    their hands wrapped around that and can drink from the

2    firehose from it and stabilize the company.  But I think

3    there's going to be some hard decisions that have to get

4    made, and maybe the answer is that there are no claims.

5    Maybe the answer is that everybody's entitled to what

6    they're saying they are.  Maybe the answer is that, you

7    know, the secured creditor is a valid secured creditor, it's

8    a validity priority to the extent that there's liens that's

9    valid.  I have no idea, but I know somebody's got to go do

10   that work.

11          Someone has to do the hard work on that, and I

12   don't know who is going to do the work.  I don't know who is

13   going to make the call if there really is something there to

14   do.  And I think the Debtor is going to have to really give

15   some thought about who is truly independent and whether

16   someone can convince me otherwise about that.

17          But for purposes of today, I'm not going to

18   appoint one, but certainly it's without prejudice and maybe

19   I hear something that tips me over.  I'm sure this is not

20   going to be the last time a request is made, but I do read

21   it as my call.  Mr. -- but I do know that if I do appoint

22   something or authorize one, that I will turn it over to the

23   Office of the United States Trustee, who will then do their

24   work.  I won't get involved in that part of it.  But I'm not

25   going to appoint one today.  I think the Debtor has to think

1    about what I'm saying today.

2         But for purposes of today, I'm going to authorize

3    the use of cash collateral on a limited basis.  And here's

4    what I'm going to approve on this, and I've got a, kind of,

5    an additional request at the end.  I have a line item,

6    "Outsource Services/Consulting Services", there'll be

7    repayments on those.  That's about $45,980, $22,670.  I've

8    heard no evidence that any of that is an emergency and

9    should be authorized today.  You can come ask for it on a

10   final.  It's without prejudice but will not get paid in the

11   interim.  The American Express bill, no.  It's about

12   $172,000.  That bill will not be -- I'm not authorizing

13   payment on -- any payments on that card.  You can ask for it

14   on a final.  Mr. Jones' employment salary.  I think the

15   parties had initially talked about a reduction to $20,000.

16   I'll authorize the payment of $20,000 for Mr. Jones.  I

17   think the employees -- my understanding is that none of the

18   work that they would be paid for is pre-petition and I want

19   -- the employees do the work, they should get paid.  So, I'm

20   going to authorize the payments up to the amounts.

21        The language that the (indiscernible) Plaintiffs

22   requested in their objection must be put in any order.  I

23   also want in the order, that I am also making no findings --

24   and this order won't be construed in any way in a similar

25   way with respect to any donations that we heard about today,

1   restricted, unrestricted, how they can be used.  I'm making

2   no findings about that.  I want to make sure that the order

3   also says that no draws are permitted in my interim order.

4          I'm going to set a final hearing on this on -- I

5   think the parties can do it August 15th I think is when cash

6   collateral runs out anyway.  Come back on August 15th at

7   10:00 a.m., and we'll just go till we're done on that.  It's

8   going to be an interim order.

9          Before the order, Mr. Schwartz, it says that it's

10  in evidence.  Your engagement letter says that you were

11  delegated those managerial duties, either Paragraph 8.01 of

12  the Free Speech Systems Company Agreement.  I don't know

13  what that is, and I want you filing it.  I want -- to the

14  extent if it's -- I don't -- I think it should be a public

15  document.  But if anybody wants to tell me it should be

16  filed under seal, it should be.  But if a CRO is going to --

17  I need to understand what your role is and what those

18  managerial duties are under 8.01.  I want that filed on the

19  Docket so all parties can see and have the ability to ask

20  questions about it.

21         And will tell you, on the -- it sounds like under

22  the budget, some of those are buckets based on historicals,

23  and that's fine.  Mr. Schwartz, you're to use your judgment.

24  I don't want to hear about some insider payments.  I don't

25  want to hear about something -- use your judgment.  If it

1    borders on problematic, the answer is kick it to the final.

2            With respect to the critical vendor motion, I'm

3    going to authorize -- I'm going to grant the critical vendor

4    motion.  But Subchapter 5 Trustee and -- has to be involved

5    and it has to see what -- exactly where these payments are

6    going to go.  It sounds like there are buckets here and I

7    want to know that these payments are being made in the

8    ordinary course of business.  In other words, if there's a

9    payment due at the end of the month, nothing is getting

10   prepaid.  If the bill is due and it's one of those entities

11   and the bill is $20,000, then that's just what they're going

12   to pay before they come to a final.  They can come ask for

13   the remainder at a final.

14           I want to see the order for the claw back.  I will

15   assure, you know, that I want that order to have some teeth.

16   And I'm not asking for anything extra and what is ordinary

17   in a critical vendor motion in the Southern District of

18   Texas.  There are plenty of examples of that.  Mr. Brimmage

19   has seen them a million times.  I'm sure Debtor's counsel

20   has seen them as well, and the Trustee can point to a

21   million examples.  Everybody knows what the standard

22   language looks like.  Put it in there.

23           But if I sign the order, it's going to have some

24   teeth, which is why I'm saying just, you know, I don't think

25   they need to sign anything saying, you know, I don't think

1   they need a critical vendor agreement for the trash person,

2   but they need to understand, and it needs to be explained to

3   them if they don't, if they can -- they don't, and I do

4   intend to enforce that order.  And so, it sounds like you

5   all are going to upload three orders, so we could sit here

6   and hack one out old school.  I'll leave it up to you.  What

7   do you want to do?

8            MR. BATTAGLIA:  Your Honor, let me take a stab

9   because I think most of the terms we've talked about prior

10  to hearing as far as cash collateral and the critical

11  vendor, the U.S. Trustees can tell me if they have any

12  federal language on claw back.  I think there's language in

13  there and I'm -- this will shock the world, but I think I

14  got the form of motion and order from a pleading that Mr.

15  Brimmage is on.  So -- but I'll run it by --

16           THE COURT:  That doesn't mean he didn't object to

17  it when he got to a hearing on it though.

18           MR. BATTAGLIA:  Understood.  And if I could have a

19  central point of contact, if Mr. Martin is the person, I

20  will share drafts of all of these orders as they're revised

21  with --

22           THE COURT:  As soon as they're signed -- I should

23  say or upon uploaded, just let my case manager know, Ms.

24  Saldana.  Have them take a look at it and if it looks okay

25  to me --

1          MR. BATTAGLIA:  Share them with all three and take

2    comments --

3          THE COURT:  Yeah.

4          MR. BATTAGLIA:  -- and criticisms and they'll --

5    I'll have their agreement before we upload them.

6          THE COURT:  You know, I'm nervous.  I mean, I get

7    cash collateral in trial, but utilities should not trail.

8    That one should get done pretty quickly and you should be

9    able to add some language in the critical vendor motion, and

10   Ms. Haselden, if there's anything that you are concerned

11   about, then just kick it to a final order.  You can have a

12   hearing within two days, 24 hours on any one-off that you

13   think that you all can't agree on.  I just want -- the

14   bucket is based on historicals, and I want to make sure if

15   it's assurance and trash, I'm -- I don't need to see any of

16   those, but that relates to the business.  You know, if it

17   relates to someone -- to anything personal, don't do it.

18   That's not what I'm authorizing.  I'm only authorizing what

19   is essential for the business.  Everybody's rights are

20   preserved.

21          I think the Debtor needs to look forward to having

22   a more robust conversation with the Debtor on the 15th about

23   the things I've talked about and I'm going to give some

24   thought, as well, to where we are.  Maybe there's a good

25   answer, maybe there's not, but I take it from the

1    Connecticut Plaintiffs and the Texas Plaintiffs that if you

2    want to file something, file something.  If you want to

3    renew at a final, I don't -- I'm fine either way.  I don't -

4    - the Code doesn't require anything in writing, and so, I'm

5    not going to hold you all to that.  I think you can -- if

6    there's anything you wish to supplement before the final in

7    connection with a final, and I think that's standard, quite

8    frankly, then do so.  If there's some reasonable discovery,

9    then go for it.  I don't need to be involved in that, but if

10   you need me, let me know.  But that's -- I take it there's

11   going to be a lot of work between now and the 15th, but it

12   is what it is.

13          Mr. Lemmon?

14          MR. LEMMON:  The Court may recall the discussion

15   earlier this morning about the vacation schedules.

16          THE COURT:  Yep.

17          MR. LEMMON:  I am out that whole week of the 15th.

18          THE COURT:  Okay.

19          MR. LEMMON:  And I'm leaving this Sunday and out -

20   - well, I get back that Friday of that week.  I would --

21          THE COURT:  The Debtor runs out of leave -- I

22   think it runs through the 15th, so that's why I --

23          MR. LEMMON:  Yes, and so, I think it's highly

24   likely that it'll be important to -- you know, I'm just

25   saying I think it would be highly likely that we'll need to

1    have a further interim.  But I don't want to delay the

2    discovery process, and so I'd like to start some informal

3    discovery and I've mentioned that to the Plaintiffs' counsel

4    to, you know, just start, so that -- start getting some

5    information.  But I wanted to let the Court know about that

6    impending problem on the 15th.

7              THE COURT:  Okay.  Mr. Brimmage?

8              MR. BRIMMAGE:  Can I address that impending

9    problem?

10             THE COURT:  Yep.

11             MR. BRIMMAGE:  We have several on our team that

12   that week is very problematic for too.

13             THE COURT:  Okay.

14             MR. BRIMMAGE:  So --

15             THE COURT:  What works best?

16             MR. MARTIN:  We agree on it.

17             THE COURT:  I just don't want the Debtor to run

18   out of cash or have to come back.  So --

19             MR. MARTIN:  Yeah.  Yeah.  Totally in agreement.

20             THE COURT:  So --

21             MR. MARTIN:  Yeah, yeah.  Totally understand.

22             MR. BATTAGLIA:  Your Honor, I asked for 14 days,

23   but the three-week budget is included.  And I don't recall

24   if --

25             THE COURT:  So, what works best?  I'm not going to

1    -- yeah --

2          MR. MARTIN:  We discussed previously, Your Honor,

3    about extending the interim to the 23rd or 24th of August.

4          THE COURT:  All right.

5          MR. MARTIN:  To accommodate for both my vacation

6    schedule and Mr. Lemmon's vacation schedule.

7          THE COURT:  I'm looking.  Okay, I'm looking.

8          MR. BATTAGLIA:  Or the 24th and the 23rd, if

9    possible, Your Honor.

10         THE COURT:  Or the 24th?  What do I have?

11         MR. BATTAGLIA:  I have a charitable entity that

12   I'm the Board Chair of that I have a Board meeting that

13   morning, but it would be the second one I've missed in 10

14   years, so, I could miss the 24th.  I'm available the 23rd.

15         THE COURT:  You just ask -- Ms. Saldana, can you

16   take a look on the 24th, I've got something at 4:00 p.m. --

17         MR. MARTIN:  The 24th for half a day, there is a

18   Subchapter 5 Trustee Committee meeting that I've committed

19   to, but I can certainly --

20         THE COURT:  All right.  Well, you're going to take

21   a loss on that one.

22         MR. MARTIN:  I'm happy to do that.  I'll get the

23   play-by-play from Judge Norman later.

24         THE COURT:  On the 24th, Ms. Saldana, I think --

25   can I do the 24th or is there something there?  I know I've

1   got a pre-trial conference at 4:00 p.m.  Do I have anything

2   earlier?  All right.

3           MR. LEE:  Your Honor, we have an economic issue in

4   light of going to the 24th.  In light of some of the carve

5   outs you made with respect to things that we cannot pay.

6   So, that's what they're talking about right now, between Mr.

7   Schwartz and --

8           THE COURT:  Okay.  And look, if you need a break

9   to get to the 24th, and -- but if the 24th works, why don't

10  we do 10:00 a.m. on the 244th.  We'll just pencil it in and

11  if anything changes.  Do the parties -- the parties here

12  agree, if the -- what I'll call the Collective Sandy Hook

13  Plaintiff, PQPR, and the Debtor agree on a date and time and

14  some breaks, then I'm not going to stand in the way of that.

15          MR. BATTAGLIA:  So, Your Honor, I can include the

16  budgets for the three-week budget and attach that as the

17  approval on the 14 days?

18          THE COURT:  Yeah, if you all are --

19          MR. BATTAGLIA:  Thank you, Your Honor.

20          THE COURT:  Well, hold on a second.  Let me take a

21  look at that.

22          MR. BATTAGLIA:  Understood if there's --

23          THE COURT:  Because I think -- if you go out that

24  extra wait, doesn't that add a really big payment in there?

25  Another -- let me take a look at week three.  Are we going -

1    - between the 24th, right?  You're going to have to hold off

2    on the half a million dollar -- I'm just telling you now.

3    Just on the 24th.

4            MR. BATTAGLIA:  What day was that to be paid on?

5    Do you know?

6            THE COURT:  Yeah, the (indiscernible) may not be

7    (indiscernible), but I'm not going to feel comfortable with

8    a half a million-dollar payment without a final.

9            MR. BATTAGLIA:  I assumed as much, Your Honor.

10           THE COURT:  Okay.

11           MR. BATTAGLIA:  So, we'll remove that from the

12   budgeting.

13           THE COURT:  And then, I think Mr. Jones' salary

14   comes up again.  I think you can budget for the 20, but it

15   could be 54 at the final.  He has the right to come in and

16   ask on that.

17           MR. BATTAGLIA:  We're just going to do 20 in this

18   order.

19           THE COURT:  Okay.

20           MR. BATTAGLIA:  We're limiting it to 20.  We're

21   not going to change it.

22           THE COURT:  Okay.  Just subject to a final?

23           MR. BATTAGLIA:  Yes, sir.

24           THE COURT:  Okay.  And obviously continuing, no

25   AMEX, no consultant, those payments will continue.  Just --

1    so it's essentially, kind of, it should be in a lot of ways,

2    what I've approved in Week 1.  Week 3 should mirror Week 1

3    minus the $500,000 payment.

4            MR. BATTAGLIA:  Mr. Schwartz does have a concern

5    that some of those consultants may really be vital, and I

6    understand --

7            THE COURT:  Just -- no, I'm saying, just ask for a

8    hearing in two or three days and --

9            MR. BATTAGLIA:  That's what I explained to him.

10   First, we'll try to deal with counsel on the other side if

11   we can --

12           THE COURT:  Okay.  And if the parties already

13   agreed it and you all stick to it and they're necessary and

14   there's no fight about.  If not, you can get a hearing in 24

15   hours.

16           MR. BATTAGLIA:  I'll try to work on it informally

17   and if not --

18           THE COURT:  Okay, Ms. Haselden, I'm going to -- I

19   want you to take a look at that, as well, on those.

20           Mr. Brimmage?

21           MR. BRIMMAGE:  Your Honor, point of clarification

22   with regard to the motion to appoint a Tort Committee.

23           THE COURT:  Mm hmm.

24           MR. BRIMMAGE:  I just want to make sure I'm clear.

25   Are you denying that?  Are you just holding that?  What

 1   would you like from us?  I just want to make sure we're

 2   clear because we would want this record to be part of

 3   whatever that effort is.

 4          THE COURT:  No, no, I think it continues.  I

 5   think, you know --

 6          MR. BRIMMAGE:  Okay.

 7          THE COURT:  I think you've raised the issue today.

 8   It wasn't -- you haven't filed anything.  You made a formal

 9   request today.  But there was a request, and I had the

10   authority.  I waived to do it today and I'm just telling

11   folks I didn't do it, but everything is cumulative.

12          MR. BRIMMAGE:  Okay.

13          THE COURT:  I don't expect, in a full evidentiary

14   record, next I mean --

15          MR. BRIMMAGE:  Okay.  You would like us to file

16   something and tee it up again and we can use today's record

17   with whatever other record we need and take it from there?

18          THE COURT:  If that's what you all want to do,

19   yeah, and we can pick a date, yeah.

20          MR. BRIMMAGE:  Okay.  All right.  Thank you, Your

21   Honor.

22          THE COURT:  Mm hmm.

23          MR. BRIMMAGE:  Do we need to do that -- can we do

24   that on an expedited basis?  Not a two-day notice, but not a

25   21-day notice?

1          THE COURT:  No, look I --

2          MR. BRIMMAGE:  We'll see?

3          THE COURT:  I know you'll be back on the 15th, so

4  I know if you --

5          MR. BRIMMAGE:  Or the 24th.  Okay.

6          THE COURT:  Oh, and that's not the 15th, the 24th.

7  Yes, that's exactly right.  So, that would make sense.  If

8  you've got something --

9          MR. BRIMMAGE:  Okay.

10          THE COURT:  -- on file this week, then just tee up

11  the issue, then maybe we can just take it up on the 24th at

12  that time, yeah.

13          MR. BRIMMAGE:  Thank you, Your Honor.

14          THE COURT:  That's what I mean.  That's a -- and

15  now that we're going further out, I think it provides -- I

16  think the Debtor needs time to think about what I said.  But

17  I think the Debtor would need a thorough and fair

18  opportunity to respond to anything, especially if something

19  got filed, and I wouldn't dare do that on short notice.  I

20  think the Debtor is entitled to that, so -- okay.  Anything

21  else we need to take care of today?

22          MR. BRIMMAGE:  No, sir.

23          THE COURT:  Okay.  So, you all are going to upload

24  orders and then get them to Ms. Saldana.  I will assure you,

25  24 hours you may get an email from her just to make sure --

1              MR. BATTAGLIA:  I'm going to try to turn them

2    tonight if I can get home quick enough.

3              THE COURT:  Yeah.

4              MR. BATTAGLIA:  If not, it'll be in the morning,

5    and I'll turn them to the parties.

6              THE COURT:  Good luck.  Thank you.  Take care.

7    Have a good day.

8              MR. LEMMON:  Thank you, Your Honor.

9         (Proceedings adjourned at 5:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7     *Sonya N. Ledanski Hyde*

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 12, 2022

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 12, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## ORDER MODIFYING INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On August 11, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral* after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     Motion Granted. The Motion is hereby granted on an interim basis as set forth herein.

2.     Interim Order. The Interim Order shall be modified as follows:

The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the Motion, from the daily settlement contemporaneously with the distributions to FSS and PQPR

3.     Reporting.  The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Connecticut and Texas plaintiffs.

4.     The remaining terms, findings and provisions of the Interim Order are not amended or modified and remain in effect.

Signed:  August 12, 2022

Christopher Lopez
United States Bankruptcy Judge

001791

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 12, 2022
Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:                                  §
                                        §
FREE SPEECH SYSTEMS, LLC                §      CASE NO: 22-60043
                                        §
   Debtor                               §
                                        §
                                        §      CHAPTER  11

## SUBCHAPTER V DEADLINES ORDER

The deadline to file the status report required under 11 U.S.C. § 1188(c) is September 13, 2022.

The Court will conduct a status conference required under 11 U.S.C. § 1188(a) on September 20, 2022 at 1:00 p.m. (CT).

Unless extended by Court order, the deadline to file a chapter 11 plan is October 27, 2022.

Signed:  August 12, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

001792

**SmBus, PlnDue, DsclsDue, ReqSepNtc, Subchapter_V, APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 22-60043

|  |  |
|---|---|
| *Date filed:* | 07/29/2022 |
| *Date of Intradistrict transfer:* | 08/04/2022 |
| *341 meeting:* | 09/07/2022 |
| *Deadline for filing claims:* | 10/07/2022 |
| *Deadline for filing claims (govt.):* | 02/07/2023 |
| *Deadline for objecting to discharge:* | 03/10/2023 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
Asset

*Debtor*
**Free Speech Systems LLC**
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741
TRAVIS-TX
SSN / ITIN: xxx-xx-0005

represented by **Raymond William Battaglia**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
2106019405
Email: rbattaglialaw@outlook.com

**Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**R. J. Shannon**
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002
713-714-5770
Email: rshannon@shannonpllc.com

**Christina Walton Stephenson**
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201
214-420-2163
Email: Crissie.Stephenson@crowedunlevy.com

*Trustee*
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

represented by **Elizabeth Carol Freeman**
The Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208-1209
832-779-3580
Email: liz@lizfreemanlaw.com

**Melissa Anne Haselden**
Haselden Farrow PLLC

001793

Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

**U.S. Trustee**
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

**Creditor Committee**
**Official Committee of Unsecured Creditors**
**of Alexander E. Jones**
c/o Marty L. Brimmage, Jr.
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
214-969-2800

represented by **Marty L Brimmage**
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
214-969-2885
Fax : 214-969-4343
Email: mbrimmage@akingump.com

| Filing Date | # | Docket Text |
|---|---|---|
| 08/12/2022 | �e66 | Courtroom Minutes. Time Hearing Held: 1:00 PM. Appearances: RJ Shannon, Raymond Battaglia, Ryan Chapple, Marty Brimmage, Ha Nguyen, Kyung Lee, Melissa Haselden. (Related document(s): 55 Motion to Amend). Arguments heard. Evidence Presented. Witnesses: W. Marc Schwartz, Patrick Riley. For the reasons stated on the record, Motion Granted. Order Signed. **Hybrid Status Conference to be held on 9/20/2022 at 01:00 PM.** Debtor's exhibits 58-2 and 58-3 were admitted into evidence. (ZildeMartinez) (Entered: 08/12/2022) |

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 8/12/2022 1:05:47 PM |
| Audio File Name : | 4bk2022-60043_20220812-130547.mp3 |
| Audio File Size : | 117071 KB |
| Audio Run Time : | [04:03:54] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

> **This digital recording is a copy of a court proceeding and is provided as a convenience to the public. In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In    Free Speech Systems LLC | |
| Re:    Debtor | Case No.: 22−60043 |
| | Chapter:  11 |

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

*Please Read Instructions:*

**FOR COURT USE ONLY**

**DUE DATE:**

| 1. NAME Ryan Chapple | | 2. PHONE NUMBER (512) 477-5000 | 3. DATE 8/15/2022 | |
|---|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL rchapple@cstrial.com; aprentice@cstrial.com | | 5. CITY Austin | 6. STATE TX | 7. ZIP CODE 78701 |
| 8. CASE NUMBER 22-60043 | 9. JUDGE Lopez | DATES OF PROCEEDINGS | | |
| | | 10. FROM 8/12/2022 | 11. TO 8/12/2022 | |
| 12. CASE NAME In re Free Speech Systems, LLC | | LOCATION OF PROCEEDINGS | | |
| | | 13. CITY Houston | 14. STATE TX | |

15. ORDER FOR

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☒ OPENING STATEMENT (Plaintiff) | 8/12/2022 | | |
| ☒ OPENING STATEMENT (Defendant) | 8/12/2022 | | |
| ☒ CLOSING ARGUMENT (Plaintiff) | 8/12/2022 | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☒ CLOSING ARGUMENT (Defendant) | 8/12/2022 | | |
| ☒ OPINION OF COURT | 8/12/2022 | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | 8/12/2022 |
| ☐ SENTENCING | | ENTIRE HEARING | |
| ☐ BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☒ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | NO. OF COPIES | | |

CERTIFICATION (18. & 19.)
By signing below, I certify that I will pay all charges (deposit plus additional).

ESTIMATE TOTAL 0.00

| 18. SIGNATURE /s/ Ryan Chapple | PROCESSED BY |
|---|---|
| 19. DATE 8/15/2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

001797

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**NOTICE OF FILING OF
ORDER GRANTING EMERGENCY MOTIONS FOR REMAND**

PLEASE TAKE NOTICE that David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Connecticut Plaintiffs) filed, on August 3, 2022, in Adv. Pro. Nos. 22-05019, 22-05020, and 22-05021 in the United States Bankruptcy Court for the District of Connecticut (the Connecticut Adversary Proceedings), their *Emergency Motions for Remand* (the Motions for Remand) in response to Free Speech Systems, LLC (FSS) filing its *Notices of Removal* initiating each of the three Connecticut Adversary Proceedings. Objections were filed to the Motions for Remand, and an expedited hearing was held on August 12, 2022. The Court entered the *Order Granting Emergency Motions for Remand* on August 15, 2022 in each of the Connecticut Adversary Proceedings (the Order Granting Remand). A true and correct copy of the Order Granting Remand is attached hereto as **Exhibit A**.

The Connecticut Plaintiffs file this Notice to:

(i)     provide the Court with a courtesy copy of the Order Granting Remand;

(ii)    respectfully inform the Court that the Order Granting Remand specifically notes that: "remand will not have a negative effect on the administration of

FSS's bankruptcy estate;" "the Connecticut Superior Court agreed that jury selection and the trial could not proceed against FSS due to the automatic stay it received when it filed its Chapter 11 case on July 29, 2022;" and "(i)f remand does not occur, the prejudice to the Plaintiffs is much greater than any possible prejudice to FSS;" and

(iii)   respectfully inform the Court that the undersigned counsel will attempt to confer with Debtor's counsel to reach an agreement to lift the automatic stay as to the Debtor so it may have the opportunity to participate in the underlying litigation.

Respectfully submitted this 16th day of August 2022.

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262
ATTORNEYS FOR
CONNECTICUT PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Filing has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 16th day of August 2022.

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple

001800

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERICA LAFFERTY; DAVID WHEELER; FRANCINE WHEELER; JACQUELINE BARDEN; MARK BARDEN; NICOLE HOCKLEY; IAN HOCKLEY; JENNIFER HENSEL; JEREMY RICHMAN; DONNA SOTO; CARLEE SOTO-PARISI; CARLOS M. SOTO; JILLIAN SOTO; AND WILLIAM ALDENBERG, <br> Plaintiffs, <br> v. <br> ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, <br> Defendants. | Adv. Pro. No. 22-05019 <br> ECF No. 5 |
| WILLIAM SHERLACH, <br> Plaintiff, <br> v. <br> ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, <br> Defendants. | Adv. Pro. No. 22-05020 <br> ECF No. 5 |
| WILLIAM SHERLACH & ROBERT PARKER, <br> Plaintiffs, <br> v. <br> ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, <br> Defendants. | Adv. Pro. No. 22-05021 <br> ECF No. 5 |

## ORDER GRANTING EMERGENCY MOTIONS FOR REMAND

### I.  Introduction

On December 5, 2018, Erica Garbatini f/k/a Erica Lafferty (the "Debtor") filed a Chapter 7 case in this Court, which remains pending.  The Debtor is a plaintiff in the first of the three above-referenced adversary proceedings, Adv. Pro. No. 22-05019.  On July 29, 2022, Free Speech Systems, LLC ("FSS"), filed a Chapter 11 petition in the United States Bankruptcy Court

001802

for the Southern District of Texas, Case No. 22-60043, which remains pending. FSS is a defendant in all three of the above-referenced adversary proceedings.

On August 2, 2022, FSS commenced the adversary proceedings in this Court by filing Notices of Removal of three consolidated Connecticut Superior Court actions.[1] On August 3, 2022, the Plaintiffs filed Emergency Motions to Remand the adversary proceedings to the Connecticut Superior Court (the "Motions for Remand"). Among other things, the Motions for Remand assert that FSS filed the Notices of Removal after jury trial began in the Connecticut Superior Court.

FSS filed objections to the Motions for Remand (the "Objections"). The Objections do not dispute that the Notices of Removal were filed after jury selection began. The Objections also do not dispute that a trial in the Connecticut Superior Court is scheduled to begin on September 6, 2022.

An expedited hearing on the Motions for Remand and the Objections was held on August 12, 2022. After consideration of the record in these adversary proceedings, the arguments asserted in the Motions for Remand, the Objections, and advanced by the parties during the hearing, and for the reasons set forth below, the Motions for Remand are GRANTED.

---

[1] This is not the first time the Connecticut Superior Court actions have been removed to this Court. On April 18, 2022, three entities related to FSS—Infowars, LLC, Infowars Health, LLC and Prison Planet TV, LLC (collectively, the "Debtors"), filed Chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas. Also on April 18, 2022, the Debtors filed Notices of Removal of the Connecticut Superior Court actions in this Court (Adv. Pro. Nos. 22-05004, 22-05005, and 22-05006). In connection with the dismissal of the Debtors' bankruptcy cases in the United States Bankruptcy Court for the Southern District of Texas, this Court ordered that the Notices of Removal be withdrawn, which resulted in the Plaintiffs' actions being remanded to the Connecticut Superior Court on June 1, 2022. *See, e.g.*, ECF No. 36 in Adv. Pro. No. 22-05004.

2

001803

## II.    Jurisdiction

28 U.S.C. § 1452(a) permits a party to remove a claim or cause of action in a civil action to the district court for the district in which such claim or action is pending.  FSS asserts that this Court has jurisdiction over the removed cases pursuant to section 1452(a) because of the Debtor's Chapter 7 case.  The Plaintiffs do not dispute that this Court has jurisdiction over the removed cases which are now the subject of the adversary proceedings.

Section 1334(b) provides that the district courts have jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases under title 11.  This Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. § 157(b)(1) and the District Court's General Order of Reference dated September 21, 1984.

## III.    Discussion

Because the parties do not agree on whether the claims in Connecticut Superior Court actions are core or non-core proceedings, mandatory abstention by this Court under 28 U.S.C. § 1334(c)(2) is not appropriate.  *See*, *e.g.*, *In re National Eastern Corporation*, 391 B.R. 663 (Bankr. D. Conn. 2008).  However, permissive abstention may be appropriate under section 1334(c)(1).  *Id*. at 669.  Furthermore, 28 U.S.C. § 1452(b) specifically address removal of claims related to bankruptcy cases and permits a court to remand a removed action on any equitable ground.  28 U.S.C. § 1452(b).

In general, courts look to the following factors to decide whether to permissibly abstain from a case or to equitably remand a case: (1) the effect on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the complexity of the state law issues; (4) comity; (5) the relatedness/remoteness of the action to the main bankruptcy case; (6) the right to a jury trial; and (7) the prejudice to the involuntarily removed parties.  *In re National*

001804

*Eastern Corporation*, 391 B.R. 663, 670.  The list of factors is non-exclusive and the determination of whether an equitable ground exists to remand involves an assessment of what makes sense under the specific facts and circumstances presented to a court.  *Id*. at 671.

A review of the first factor, the effect on the efficient administration of the bankruptcy estate, weighs in favor of remand.  A remand will not have a negative effect on the administration of FSS's bankruptcy estate.  The parties dispute whether the Plaintiffs' claim are core or non-core claims.  If the claims are non-core, this Court cannot enter a final judgment on the Plaintiffs' claims.  Regardless of whether the claims are core or non-core, the claims must be adjudicated, and the Connecticut Superior Court is ready to do so.  It is undisputed that jury selection had already begun when the Notices of Removal were filed and trial is scheduled to begin on September 6, 2022.  A trial of the Plaintiffs' claims in the Connecticut Superior Court may assist with the administration of FSS's bankruptcy estate and will alleviate the need for another court to determine if the Plaintiffs' claim are core or non-core.  *See e.g.*, *In re National Eastern Corporation*, 391 B.R. at 670.  In addition, FSS asserts that remand will have a negative impact on the administration of its bankruptcy estate because of the costs associated with the trial of the Plaintiffs' claims.  However, FSS is proceeding forward with the administration of its bankruptcy estate, including recently obtaining an order allowing it to increase its use of cash collateral based upon increased income due to better than projected sales of products since its bankruptcy case was filed.  *See In re Free Speech Systems LLC*, United States Bankruptcy Court for the Southern District of Texas, Case No. 22-60043, ECF Nos. 55, 64.  For these reasons, remand will not negatively impact the administration of FSS's bankruptcy estate.

The second factor, the extent to which issues of state law predominate, also weighs in favor of remand.  The Plaintiffs' claims are exclusively based on state law even though, as FSS

4

argues, the claims relate only to damages. *See e.g.*, *In re Granoff*, 242 B.R. 216, 220 (Bank. D. Conn. 1999). Such claims include negligent and intentional infliction of emotional distress, violations of the Connecticut Unfair Trade Practices Act, and defamation. The Defendants' challenges to the sufficiency of the Plaintiffs' claims have not succeeded in the Connecticut Superior Court. Furthermore, the Plaintiffs' claims have been pending before the same judge for more than four years. The Connecticut Superior Court has extensive knowledge and familiarity with the claims and the parties. The docket of the Superior Court actions attached to the Objections demonstrate that there are more than 800 docket entries in the cases and that the Connecticut Superior Court has issued many substantive rulings. The Connecticut Superior Court has acted on all matters that needed to be decided before trial and was overseeing jury selection on August 2, 2022, when the Notices of Removal were filed. Under the circumstances surrounding these adversary proceedings, issues of state law predominate and the Connecticut Superior Court is in the best position to decide the Plaintiffs' state law claims.

The third and fourth factors, the complexity of the state law issues and principles of comity, also weigh in favor of remand. The Plaintiffs' state law claims are extensive and complex. A trial of the claims will require a resolution of factual, legal, and evidentiary issues based on Connecticut law. Despite several attempts by FSS and related entities to remove the actions from the Connecticut Superior Court, the claims are ready to be tried in the Connecticut Superior Court.[2] The claims arise under Connecticut common law and the Connecticut Unfair Trade Practices Act. Both comity and respect for state law supports remanding the actions to the

___

[2] In addition to the prior Notices of Removal filed in this Court, FSS and related entities twice removed the Connecticut Superior Court actions to the United States District Court for the District of Connecticut and on both occasions the actions were remanded to the Connecticut Superior Court. *See*, *e.g.*, *Lafferty v. Jones* (3:18-cv-01156-JCH) and *Lafferty v. Jones* (3:20-cv-01723-JCH).

001806

Connecticut Superior Court for the interpretation of common law and state statutes. *In re Granoff*, 242 B.R. at 220.

The fifth factor, the relatedness/remoteness of the Connecticut Superior Court actions to the FSS bankruptcy case, also supports remand. The Plaintiffs' claim arose years before FSS filed its Chapter 11 case. As previously noted, FSS does not dispute that it filed the Notices of Removal after jury selection was underway in the Connecticut Superior Court. During a hearing held on August 2, 2022, before jury selection began, the Connecticut Superior Court agreed that jury selection and the trial could not proceed against FSS due to the automatic stay it received when it filed its Chapter 11 case on July 29, 2022. However, the Connecticut Superior Court determined that jury selection and trial could proceed against the Defendant Alex Emric Jones ("Jones"), because FSS has not sought or obtained an order extending the automatic stay to Jones. See ECF No. 5 at 5-8, p. 14-18. The Connecticut Superior Court then proceeded with jury selection as to the claims against Jones and not FSS, supporting the finding that there is a remoteness between the continuation of the Connecticut Superior Court actions and the FSS bankruptcy estate.

The Plaintiffs' right to a jury trial, the sixth factor, additionally supports remand. Although the parties dispute whether the Plaintiffs' claims are core or non-core, this Court cannot conduct a jury trial on non-core claims. In addition, it is clear that the parties do not consent to a jury trial being conducted by this Court. A jury is in the process of being selected in the Connecticut Superior Court. The Plaintiffs' rights to have that process continue in the Connecticut Superior Court should not be disturbed.

The seventh and final factor, the prejudice to the involuntarily removed parties, weighs heavily in favor of remand. The Plaintiffs have been pursuing their claims against FSS and

6

others for more than four years.  The pursuit of these claims has occurred not only in the Connecticut Superior Court, but in other courts as well.  On multiple occasions, the Plaintiffs have had to pursue their claims in the United States District Court for the District of Connecticut, the United States Bankruptcy Court for the Southern District of Texas, and this Court.  During jury selection and just weeks before trial is scheduled to begin in the Connecticut Superior Court, the Plaintiffs were involuntarily removed to this Court.  The Plaintiffs' claims are ready to be tried in the Connecticut Superior Court.   If remand does not occur, the prejudice to the Plaintiffs is much greater than any possible prejudice to FSS.

Upon a review of the circumstances surrounding these adversary proceedings and consideration of the factors to be analyzed when deciding a motion for remand, the Court finds that is it appropriate to abstain and remand the adversary proceedings to the Connecticut Superior Court in accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b).

Finally, although the Plaintiff seeks an award of fees and costs pursuant to 28 U.S.C. § 1447(c), the Court declines to award fees and costs at this time.

## IV.   CONCLUSION

Accordingly, it is hereby

**ORDERED:** In accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b), the Motions for Remand are GRANTED and Adversary Proceedings 22-05019, 22-05020, and 22-05021 are remanded to the Connecticut Superior Court; and it is further

**ORDERED**:  The Plaintiffs' request for fees and costs pursuant to 28 U.S.C. § 1447(c) is DENIED; and it is further

7

001808

**ORDERED:** Any pending motions in Adversary Proceedings 22-05019, 22-05020, and 22-05021 are moot due to the remand of the adversary proceedings.

Dated at Bridgeport, Connecticut this 15th day of August, 2022.

Julie A. Manning
United States Bankruptcy Judge
District of Connecticut

8

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                    )  CASE NO: 22-60043
                                      )
 4    FREE SPEECH SYSTEMS LLC,         )
                                      )  Houston, Texas
 5            Debtor.                  )
                                      )  Monday, August 1, 2022
 6                                    )
                                      )  8:32 a.m. to 9:30 a.m.
 7                                    )
      ------------------------------)
 8

 9                               TRIAL

10         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
11

12    APPEARANCES:

13    For Debtor:              KYUNG LEE
                               RJ SHANNON
14                             Shannon & Lee LLP
                               700 Milam Street, Suite 1300
15                             Houston, TX 77002

16    For Connecticut
      Plaintiffs:              RYAN CHAPPLE
17                             RANDY WILLIAMS
                               Cain & Skarnulis, PLLC
18                             303 Colorado Street, Suite 2850
                               Austin, TX 78701
19
                               ALINOR STERLING
20                             Koskoff & Bieder PC
                               27 Elm Street
21                             New Haven, CT 06510

22    For Texas Plaintiffs:    AVI MOSHENBERG
                               McDowell Hetherington LLP
23                             1001 Fannin Street, Suite 2700
                               Houston, TX 77002
24

25
```

001810

```
 1                              CORDT AKERS
                               The Akers Firm, PLLC
 2                             3401 Allen Parkway, Suite 101
                               Houston, TX 77019
 3
     For Proposed
 4   Subchapter 5 Trustee:     MELISSA HASELDEN
                               Haselden Farrow, PLLC
 5                             700 Milam Street, Suite 1300
                               Houston, TX 77002
 6
     For Unites States
 7   Trustee:                  HA NGUYEN
                               Office of the United States Trustee
 8                             515 Rusk Street, Suite 3516
                               Houston, TX 77002
 9

10   Courtroom Deputy:         ZILDE MARTINEZ

11   Transcribed by:           Veritext Legal Solutions
                               330 Old Country Road, Suite 300
12                             Mineola, NY 11501
                               Tel: 800-727-6396
13


14


15   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
16


17


18


19


20


21


22


23


24


25
```

001811

```
 1          HOUSTON, TEXAS; MONDAY, AUGUST 1, 2022; 8:32 AM

 2                        (Call to Order)

 3          THE COURT:  Please be seated.  All right.  Good

 4   morning, everyone.  This is Judge Lopez.  I'm going to call

 5   the 8:30 docket.  Let me -- let me call 22-60043.  I'm going

 6   to ask everyone to please put your phone on mute.  If you're

 7   the person on audio, the line is completely unmuted.  I'm

 8   going to try to see if we can do this if everyone mutes

 9   their line.  If I have to mute the line, then everyone's

10   going to have to hit 5* and you have to -- in order to be

11   recognized.

12          Let me just remind everyone for those of you who

13   are participating by video and phone, you're more than

14   welcome.  Again, please put your phone on mute.  I'm also

15   going to remind everyone on video that appearing by video is

16   the same as appearing in court live.  So I'd ask that you

17   please respect all decorum that you would normally expect in

18   the court.

19          Let me start by taking appearances.  I'll start in

20   the courtroom and then we will proceed with any party who

21   wishes to make an appearance by video and phone.  Thank you.

22          Mr. Lee, good morning.

23          MR. LEE:  Good morning, Your Honor.  Good to see

24   you again.  For the record, Kyung Lee, L-E-E, and RJ

25   Shannon, with the law firm of Shannon & Lee, LLP, as co-
```

1    counsel for the debtor, Free Speech Systems, LLC.

2              On video with us today is Ray Battaglia, B-A-T-T-

3    A-G-L-I-A.  He is lead counsel for Free Speech Systems, LLC

4    and he's out of San Antonio, Texas.  And at counsel's table

5    today is W. Marc Schwartz, the chief restructuring officer

6    of Free Speech Systems, LLC.

7              THE COURT:  Okay.

8              MR. LEE:  Thank you, Your Honor.

9              THE COURT:  Good morning.

10             MR. SHANNON:  Good morning.

11             MR. CHAPPLE:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. CHAPPLE:  Ryan Chapple.  Good to see you again

14   (indiscernible) my colleague, Randy Williams, on the line,

15   as well as (indiscernible) also have Alinor Sterling, who is

16   present in the courtroom on behalf of the Connecticut --

17             THE COURT:  Good to see you.  I just saw you on

18   video, on a box before.

19             Counsel, if I can just get you to just -- there's

20   a mic right there.  I just want to make sure you can have

21   access to it so we can all hear you online.

22             MR. CHAPPLE:  Absolutely.  We represent David and

23   Francine Wheeler, Jaqueline Barden, Mark Barden, Nicole

24   Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee

25   Soto-Parisi, Carlos Soto, Jillian Soto-Marino, William

1    Aldenberg, William Sherlach and Robert Parker.

2         And, Your Honor, I will refer to these folks as

3    the Connecticut movants, the Connecticut plaintiffs

4    interchangeably as we go throughout.

5         AUTOMATED VOICE:  Conference muted.

6         THE COURT:  All righty, folks.  Somebody didn't

7    mute their line, and I've muted the entire line on the

8    phone.  If you -- after we take appearances, anybody wishes

9    to be recognized, you'll have to hit 5*.

10        MR. MOSHENBERG:  Good day, Your Honor.  I'm Avi

11   Moshenberg.  I have with me Cordt Akers.  We represent the

12   Texas plaintiffs, Your Honor, Neil Heslin, Scarlett Lewis,

13   Leonard Pozner, Veronica de la Rosa, Marcel Fontaine.

14        We are securing bankruptcy counsel, and it looks

15   like our bankruptcy team is going to be led by Marty

16   Brimmage and his firm.  He's here today, and also Jarrod

17   Martin and his firm, Your Honor.

18        THE COURT:  Okay.

19        MR. MOSHENBERG:  I'll be doing the talking today

20   though, Your Honor.

21        THE COURT:  Thank you.  And yes, you might have

22   noticed we've gotten technical upgrades.  So all the mics

23   (indiscernible) than the last time you all were here.

24        MS. HASELDEN:  Good morning, Your Honor.  Melissa

25   Haselden, proposed Subchapter 5 trustee.

1          THE COURT:  Good to see you, Ms. Haselden.  Anyone

2     else in the courtroom wish to make an appearance?  Okay.  If

3     anyone on the phone wishes to make an appearance, please hit

4     5* and I'll recognize you.  Okay.  I've got a 626 area code.

5          MR. NGUYEN:  Good day, Your Honor.  Ha Nguyen,

6     appearing on behalf of the United States trustee.

7          THE COURT:  Okay.  Mr. Nguyen, if you keep your

8     phone on mute, I'm going to keep your line unmuted, okay?

9          MR. NGUYEN:  Thank you, Your Honor.

10          THE COURT:  Anyone else wish to be recognized?

11          Okay.  Mr. Lee, I'm going to turn it over to you.

12          MR. LEE:  Thank you, Your Honor.  I have in the

13     courtroom with me -- I don't think I have enough for

14     everybody.  But I do have some paper, a witness and exhibit

15     list for today's hearing.

16          May I approach, Your Honor?

17          THE COURT:  Yes, please.  Thank you.  And if you

18     can speak into the mic, I want to make sure that we can all

19     hear you, and I think that mic can move.

20          MR. LEE:  May it please the Court, Your Honor.

21     Kyung Lee, for the record.  On Friday, Free Speech Systems,

22     LLC filed for bankruptcy with this Court, and before we get

23     into the matter at hand --

24          THE COURT:  Mr. Lee, if I can just get you to get

25     closer -- just -- I want you to just move that mic over.

1           MR. LEE:  Where is the mic?

2           THE COURT:  Right --

3           MR. LEE:  Oh, this one right here.

4           THE COURT:  Yeah.

5           MR. LEE:  Sorry about that.

6           THE COURT:  Maybe I -- oh, we're still upgrading.

7   You can go ahead and just speak.  It's fine.  That's

8   perfect.  It'll be able to pick you up.

9           MR. LEE:  For the record, Your Honor, Kyung Lee,

10  for the debtor, Free Speech Systems, LLC.  As I was saying,

11  the debtor filed Chapter 11 on Friday with this Court, and

12  we need to proceed today on a motion to get the stay lifted

13  for the Heslin and Lewis state court suits to continue the

14  judgement.

15          So that the Court has a little bit of a sense of

16  what the debtor is about, I'm going to take the Court

17  through a bit of one of the exhibits here and then Mr.

18  Shannon will make the legal arguments on the Heslin suit.

19  And then to the extent the Court needs some evidence, Mr.

20  Schwartz is here to provide that evidence.  So if I may --

21          THE COURT:  Yeah.

22          MR. LEE:  If the Court will turn to Exhibit Number

23  2, which is the declaration of Mr. Schwartz, and turn with

24  me to Page 6, Paragraphs 27, 28, 29, 30 and 31, and the

25  reason why I ask you to turn to those paragraphs, I think

1    those are the paragraphs that clearly delineate what the

2    business of Free Speech Systems is and, as it describes in

3    Paragraph 27, FSS is presently engaged in the business of

4    producing and syndicating Mr. Jones's radio and video talk

5    shows and selling products targeted to Jones's loyal fan

6    base via the internet.  And Paragraph 28 discusses the

7    supplements and the non-supplements that are stored on

8    InfowarsStores.com.

9         Paragraph 29 discusses the majority of the

10   revenues being derived from the supplement sales.  Paragraph

11   30 talks about the number of employees we have, the

12   buildings where they are located.  And Paragraph 31 breaks

13   down the type of revenues that we get from the sales that

14   the company conducts.

15        And if the Court will indulge me, if we will turn

16   to Exhibit A, which is the income statement attached at the

17   back of this on Page 31 of 38, work done by Mr. Schwartz, it

18   shows that this company, FSS, as of 2021, lost $10 million

19   last year, and as you can see, one of the reasons why this

20   company needed to file bankruptcy.  So that is by way of

21   background for this company and a little bit of a history

22   about who -- what FSS does.

23        Your Honor, we filed an emergency motion when we

24   filed the bankruptcy on Friday, which is Tab Number 1, the

25   ECF Number 2, and it is the emergency motion for an order

1    modifying the automatic stay to allow the Heslin and Lewis

2    state court to continue judgment.  I don't think I need to

3    recite the facts there.  The pleading itself talks about the

4    two lawsuits that are proceeding to trial at this time in

5    the Traffic County court.

6         And what the debtor seeks to do is to have the

7    stay lifted so that that lawsuit can continue on.  In fact,

8    I think the jury is supposed to return this morning around 9

9    a.m., and we've announced at 5 p.m. on Friday to Judge

10   Gamble that we would be here before Your Honor to get the

11   relief that we need so that they can continue the trial, if

12   in fact the Court grants the relief.

13        THE COURT:  Okay.

14        MR. LEE:  So with that short introduction, I'm

15   going to turn it over to Mr. Shannon, to the extent that

16   he's going to argue the legal points.

17        THE COURT:  Well --

18        MR. LEE:  And if you wish to have witness

19   testimony --

20        THE COURT:  Well, I just have a couple of

21   questions.

22        MR. LEE:  Yes, Your Honor.

23        THE COURT:  So I just want to understand the

24   nature of the relationships between your firm and Mr.

25   Schwartz now as it relates to the last debtors, to the

1    current case.

2              MR. LEE:  Yes, Your Honor.

3              THE COURT:  So InfoW, IWHealth, Prison Planet in

4    the last case were sold to a trust and Mr. Schwartz was

5    retained by the trust.

6              So what is the status of your relationship with

7    those debtors and Mr. Schwartz's relationship with those

8    debtors?  I'm just trying to understand how they're related.

9    But my understanding was that they were previously sold

10   entities.  So they were independent of this Debtor.

11             MR. LEE:  Yes, Your Honor.  Let me state the

12   following.  Number one, the membership interest in the three

13   entities that went into bankruptcy, InfoW, IWHealth and

14   Prison Planet, prior to their bankruptcies, those interests

15   were transferred into a trust.  And they remain in that

16   trust today.  Mr. Schwartz was not retained by the trust.

17   Mr. Schwartz was retained by the three entities as their

18   chief restructuring officer --

19             THE COURT:  Right.

20             MR. LEE:  -- for their bankruptcy case.

21             THE COURT:  Right.

22             MR. LEE:  Schwartz & Associates was retained by

23   the three companies as their financial advisor.  At that

24   time -- at that time, Parkins Lee & Rubio was retained as

25   bankruptcy counsel for those entities.  And then when I left

1    the firm, Kyung S. Lee, PLLC was retained --

2              THE COURT:  Right.

3              MR. LEE:  -- as the bankruptcy counsel.  To this

4    day, Mr. Schwartz is still the CRO of those entities, and

5    Kyung S. Lee, PLLC is no longer in existence.

6              THE COURT:  Right.

7              MR. LEE:  It's now with Shannon & Lee, LLP.  And

8    we have not done any work on behalf of InfoW or the other

9    two debtors since approximately June 7th when the case was

10   concluded, and that is the last time we've billed the client

11   for any work.  So while we have a relationship today by

12   virtue of an engagement letter, we have not performed any

13   work for that entity since then.

14             THE COURT:  And does the plan support agreement

15   still exist?

16             MR. LEE:  No, Your Honor.  It's basically been

17   terminated as a result of the case being dismissed, Your

18   Honor.

19             THE COURT:  Okay.  Thank you, and when did Mr.

20   Schwartz begin working for Free Speech?

21             MR. LEE:  It's right in the declaration, Your

22   Honor.  I believe there's an engagement letter that was

23   signed as of May 9th.  But it was signed, and then it was

24   executed later on.

25             So let me turn to that.  It's on Paragraph 9 in

1    Exhibit Number 2.  On June 7th, the Debtor confirmed his

2    retention as the debtor's chief restructuring officer and

3    Schwartz & Associates as financial advisors as of May 19,

4    2022.  So basically he sent them an engagement letter on May

5    19th, and then the client, Alex Jones, through FSS, signed

6    the engagement letter on June 7, 2022.

7              THE COURT:  Okay.  Thank you.

8              MR. LEE:  Thank you, Your Honor.

9              THE COURT:  Mr. Shannon, good morning.

10             MR. SHANNON:  Good morning, Your Honor.  RJ

11   Shannon, on behalf of the Debtor, Free Speech Systems, LLC.

12   As Mr. Lee said, we're here on an emergency motion to modify

13   the automatic stay to allow the state court litigation to go

14   forward.  And, Your Honor, I think this is going to be a

15   pretty simple motion that I don't think anyone is going to

16   oppose.  I guess we'll see.

17             But, you know, for relief -- or to modify the

18   automatic stay, the standard is cause.  Under Bankruptcy

19   Code Section 362(d), that is what's required, cause.  And

20   it's not defined in the Bankruptcy Code.  And, you know,

21   therefore courts must look at the particular facts of any

22   particular situation.

23             But generally relief from the automatic stay

24   should be granted to liquidate an unsecured claim when and

25   only when the balance of hardships favors allowing a claim

1    to be determined in another forum other than the bankruptcy

2    court.  I believe, Your Honor, cause is very clear here.  A

3    jury has been empaneled in the state court.  The litigation

4    is ongoing.  The trial has commenced.

5         Both the plaintiffs and the debtor have

6    participated in that trial and the trial court will be able

7    to liquidate that claim very quickly.  It could be as early

8    as the end of this week.  The debtor's trial counsel has

9    already been paid for that state court trial.  So it does

10   not -- there's no increased cost to the debtor to liquidate

11   the claim through the state court.

12        Additionally, Your Honor, we believe that

13   liquidating that claim in the bankruptcy court would

14   increase the cost.  We think there would be a fight about

15   whether the bankruptcy court could liquidate this claim and

16   it would also require both the bankruptcy counsel for the

17   Debtor and the state court counsel for the Debtor to both be

18   involved in that liquidation.  We believe it would add, you

19   know, a high five- to low six-figure additional cost to

20   liquidate the claim.

21        You know, Your Honor, we also believe that

22   judicial economy would be served by allowing the trial to

23   continue because it's already begun.  And generally the

24   debtor's business judgment is that the trial should

25   continue.  Based on that, Your Honor, we believe there is

1   cause to allow or to modify the automatic stay to allow the

2   trial to continue to final judgment.

3              THE COURT:  Thank you.

4              MR. SHANNON:  Thank you.

5              THE COURT:  Yes.  Does anyone wish to be heard in

6   connection with the emergency motion for relief from the

7   automatic stay to allow what I will call the Texas state

8   lawsuit to continue?

9              Mr. Moshenberg?

10             MR. MOSHENBERG:  Thank you, Your Honor.  Again,

11  I'm here on behalf of those Texas plaintiffs.  We are of

12  course unopposed to the motion to lift the stay.  I do want

13  to have an opportunity to make some remarks about what's

14  being said.  I think Connecticut counsel did want to talk

15  first.  But as it relates to your question about the motion

16  to lift the stay --

17             THE COURT:  Let me just tell you, my understanding

18  is that, based on what Mr. Shannon has told me and Mr. Lee,

19  there's another matter that's set to begin in about 12

20  minutes and if no party opposes it, I'm willing to grant it

21  right now and allow that to continue and someone can get

22  notice to, you know, counsel who are sitting in a courtroom

23  in Austin that I'm going to authorize and allow them to

24  continue.

25             Then we can have a conversation about other

1    matters that relate.  There are a number of first day

2    hearing -- first day pleadings that are on file, and I think

3    we can have a conversation about that.  So I just want to

4    deal with the emergency motion now and then give everyone a

5    full and fair opportunity to talk about, you know,

6    everything else while we're here today.

7            MR. MOSHENBERG:  I appreciate -- I appreciate

8    that, Your Honor, and I think we're unopposed to the motion

9    to lift the stay.

10           THE COURT:  Okay.  Does anyone else -- okay.  So

11   I'd just note that just for the record that there was --

12   this bankruptcy case was filed on July 29th for Free Speech

13   Systems, LLC.

14           A first day hearing was set just -- well,

15   essentially just for to consider this emergency motion.  The

16   Court has some familiarity with this litigation.  There were

17   three debtors who were involved in that litigation several

18   months ago that appeared as debtors before me and I became

19   familiar with that litigation.  So I don't go into this

20   blindly.

21           This is an emergency motion to allow litigation to

22   continue in Austin.  There was a stipulation filed in the

23   last case dismissing the three debtors that were before me

24   to allow the litigation to proceed against two parties, one

25   of them which is a debtor here today.  It appears that that

1   litigation has continued, and, based on the representations

2   of counsel, there would be no additional cost to the estate

3   in terms of legal fees, and the debtor is requesting to be

4   able to continue with that litigation.

5           I do note, you know, when there's such an early

6   filing in a case, the Court, in a lot of ways, stands --

7   gives that extra scrutiny even on an emergency motion

8   because of the short amount of time that has gone out for

9   parties for due process.

10          But an emergency motion has been filed and I have

11   granted it and considered it, and the Bankruptcy Code

12   authorizes the Court to lift the automatic stay upon the

13   request of a party in interest for cause.  And here we have

14   the debtor who is a defendant seeking to lift the stay and

15   the plaintiffs do not oppose that relief.

16          So here I do find that there is cause to lift the

17   stay on an emergency basis, although I take each one of --

18   each emergency motion that is filed before me, especially

19   early stages in the case, on their own merit.

20          In this case, I'm going to sign the proposed order

21   that was filed.  I'm going to allow that litigation to

22   continue.  I'm going to sign that order now, and I'm going

23   to enter it on the docket now.

24          With that said, I did give Mr. Lee an opportunity

25   to address the Court generally.  However the parties wish to

1    proceed and tell me about anything else that you wish to at

2    this time in terms of opening remarks, you're free to do so

3    now.

4              MR. MOSHENBERG:  Thank you, Your Honor.  And if

5    it's all right with the Court, I think I'd like to have

6    Connecticut counsel start with the opening remarks and then

7    I'd like to follow them.

8              THE COURT:  Absolutely.  Let me just say before

9    you begin, I'm going to enter the order right now.  Mr. Lee,

10   if you want to get notice to the folks in Austin that I am

11   granting the motion and am signing the order, feel free to

12   do so.

13             MR. LEE:  I'll do that right now by text.

14             THE COURT:  Okay.  Thank you.  I just want to make

15   sure everybody was comfortable.  You're free to do that.

16   I'm entering the order now.

17             MR. LEE:  Thank you, Your Honor.

18             THE COURT:  Okay.  It should hit the docket any

19   minute.

20             Good morning, sir.

21             MR. CHAPPLE:  Good morning.  Thank you, Your

22   Honor.  Ryan Chapple, again, for the Connecticut plaintiffs.

23             THE COURT:  Good to see you again, sir.

24             MR. CHAPPLE:  Good to see you.  Yes, sir.  Your

25   Honor, I appreciate the opportunity to address the Court

1    this morning.  I wanted to cover a few topics.  Last night,

2    early evening, my clients filed an emergency motion to lift

3    the automatic stay as well.

4              THE COURT:  Mm-hmm.

5              MR. CHAPPLE:  I wanted to educate the Court a

6    little bit on where we are procedurally in Connecticut.  The

7    Connecticut case was set to begin picking a jury in the

8    morning on Tuesday, August 2nd.  There is currently a trial

9    setting of September 6th.  The jury selection process in

10   Connecticut is very different than what we have here in

11   Texas.

12             In a few moments I'm going to give my colleague,

13   Alinor Sterling, who practices regularly in Connecticut and

14   who is counsel in the underlying defamation litigation, an

15   opportunity to talk to the Court about that process and

16   about the way it works and the reason for the emergency

17   basis of our request to have our motion to lift stay heard

18   as early as we can.

19             THE COURT:  Okay.

20             MR. CHAPPLE:  Ms. Sterling will expand on this a

21   little bit.  But it's my understanding that if we can get a

22   hearing on our emergency motion any time this week and if we

23   are able to show the Court that there is cause to get the

24   stay lifted, that the jury selection process can begin early

25   next week, and that would allow the Connecticut litigation

1    to hold that September 6th trial date.  It's my

2    understanding that the current Texas litigation is -- that

3    the trial is going to be finalized by Friday this week.  I

4    believe that's the deadline that Judge Gamble provided.

5         So from our perspective, and really for all of the

6    reasons that Mr. Shannon argued previously on the debtor's

7    motion to lift stay, it would absolutely make sense for the

8    stay to be lifted as to the Connecticut litigation and for

9    us to proceed.  there wouldn't be an overlap conflict with

10   the trial going on in Texas right now, and we would be able

11   to hold our September 6th trial date.

12        Ms. Sterling will talk to the Court a little bit

13   about all of the time and effort and expense that's gone

14   into trial preparation to hold this September 6th trial

15   date.  So that's one thing, Your Honor, and we would

16   respectfully request a hearing on our emergency motion for

17   relief some time this week if the Court has available --

18        THE COURT:  Okay.

19        MR. CHAPPLE:  -- for that -- for that scheduling

20   purpose.  The other thing that I would like to address with

21   the Court, Your Honor, and I believe, again, Ms. Sterling

22   may follow up and I know counsel for the Texas plaintiffs

23   and potentially counsel for the U.S. trustee would like to

24   talk to this Court about, overall with the filing, we have

25   some grave concerns about the structure of this bankruptcy

1    case and in particular the cash collateral motion that I

2    know the debtor is going to set for first day hearings.

3              In particular, Your Honor, we are very concerned

4    about the relationship between the purported secured lender,

5    PQPR, which is owned and controlled by Mr. Jones, and the

6    purported secured creditor, as outlined in the cash

7    collateral motion for the debtor.

8              Now one thing that I didn't see in Mr. Schwartz's

9    declaration is a note that PQPR, the purported secured

10   lender, along with Free Speech Systems, the debtor here,

11   along with Mr. Jones, along with a slew of other entities

12   that he owns and controls are defendants in a fraudulent

13   transfer action currently pending in Travis County that

14   attacks the validity of that purported debt.

15             So we are concerned that the debtor may try to use

16   this bankruptcy court and that cash collateral motion as a

17   means to attempt to legitimate that debt and attempt to

18   legitimate any purported liens that relate to that debt.

19   It's very important to the Connecticut plaintiffs, I know to

20   the Texas plaintiffs and I believe you'll hear from the U.S.

21   trustee for all of the parties and creditors to have an

22   opportunity to conduct full discovery on that relationship

23   between the debtor and PQPR, written discovery.  We need to

24   depose Mr. Schwartz.

25             All of those things, Your Honor, we would like to

1    happen as soon as possible so we can all, including the

2    Court, go into this cash collateral hearing with a full

3    knowledge base of that relationship, all of the

4    documentation relating to that relationship.  And I just

5    wanted to highlight that for the Court.

6              I'd also -- as I said, Your Honor, Ms. Sterling

7    came down from Connecticut.  I'd like for her to be able to

8    talk to the Court --

9              THE COURT:  Absolutely.

10             MR. CHAPPLE:  -- about what's going on in

11   Connecticut and provide a little bit more color to the cash

12   collateral issues that I was just talking about.

13             THE COURT:  Okay.  Thank you.

14             MR. CHAPPLE:  Thank you.

15             THE COURT:  Good morning.

16             MS. STERLING:  Good morning.  For the record,

17   Alinor Sterling.  And let me spell that since you don't have

18   an appearance yet from me on file.  Alinor, A-L-I-N-O-R,

19   last name Sterling, S-T-E-R-L-I-N-G.  Thank you very much,

20   Your Honor, for letting me make remarks this morning.  I

21   appreciate it, and it's nice to be here in person.

22             THE COURT:  Welcome to Houston.

23             MS. STERLING:  Thank you.  So I represent the

24   Sandy Hook families.  That's nine families who -- and these

25   are the families who have brought cases in Connecticut, 14

1    individuals.  Their cases started over four years ago, and

2    due to a series of delays, we're only now reaching jury

3    selection.

4         We're fully underway with trial preparations,

5    which has involved preparing expert witnesses, the

6    expenditure of time and cost to do that, preparing fact

7    witnesses, putting witnesses under subpoena, investing

8    counsels' time on both sides.  And there's also another

9    dimension to preparation which is very human, which is the

10   investment of mental energy as well as logistical energy for

11   our 14 clients to prepare to be present for as much of jury

12   selection and trial as they can be.

13        So I understand right now the issue is scheduling,

14   and I'm confining my remarks very much to that because I

15   understand the issue is when can the Court hear our motion

16   to lift the stay.  So what I wanted to do was touch on what

17   -- how Connecticut trial scheduling is different from Texas

18   because I realize that it may be somewhat confusing to hear

19   that our jury selection date is tomorrow, but we don't start

20   evidence until September 6th, and that does seem like a long

21   gap.

22        And so why the urgency in our motion?  And here's

23   why the urgency.  In Connecticut, individual voir dire for

24   civil litigants is a state constitutional right.  Both

25   parties are exercising that right.  And so our individual

1   voir dire process can take several weeks.  Our trial court

2   and counsel built that time in, and that is the time that we

3   would need, we believe, to hold a start of evidence on

4   September 6th.  So that's the urgency in trying to commence

5   jury selection.

6          Now that being said, we have looked hard at the

7   schedule, and we believe that we have a week flexibility so

8   that if we were to defer jury selection until the very

9   beginning of next week, we could possibly make up the lost

10  time.  And so we've requested the Court set the lift of stay

11  motion for this week with that very much in mind.

12         Then leaving aside the trial date issue, there's

13  another issue I'd like to address, which -- and this is a

14  much broader point, although the entry to it concerns the

15  scheduling of the cash collateral motion.  I know my clients

16  appeared as very reluctant participants in the most recent

17  bankruptcy by InfoW and those other entities, and I wanted

18  to communicate to the Court that from our perspective this

19  bankruptcy is very, very different.

20         The right entity has now filed.  And we intend to

21  participate fully in this process, and we feel that the

22  transparency that should be available through the bankruptcy

23  process is actually going to be critically important, both

24  to ensure the preservation of the debtor's estate and to

25  ensure our clients' rights.

```
 1              And the reason for that is because we have very
 2    serious concerns based on the discovery that we have done in
 3    Connecticut that Alex Jones has been systematically
 4    siphoning large amounts of money out of Free Speech Systems,
 5    that he has been doing so since our case and the Texas cases
 6    were filed and that this supposed loan between Free Speech
 7    Systems, the debtor, and PQPR is just one example of that
 8    pattern and practice.  The cash collateral motion is the
 9    first time this issue will come up.  But we expect it will
10    not be the last.
11              And so it is critically important in addressing
12    those issues to build in time for us to take discovery of
13    Mr. Schwartz and PQPR, to make a clear presentation to the
14    Court on those issues and for the Court to have time to
15    consider that presentation.  Thank you very much, Your
16    Honor.
17              THE COURT:  Thank you very much.  Does anyone else
18    wish to address -- oh, go -- go for it, Mr. Moshenberg.
19              MR. MOSHENBERG:  Thank you, Your Honor.  As I
20    mentioned, we are securing bankruptcy counsel.  the reason I
21    wanted to give some remarks today is because Cordt Akers and
22    I are spearheading the Texas litigation under the fraudulent
23    transfer claims, Your Honor.  There is a pending trial on
24    damages right now for these defamation and intentional
25    infliction of emotional distress claims.
```

1           THE COURT:  Right.

2           MR. MOSHENBERG:  The Court lifted the stay today.

3     What I can't stress enough is that trial is purely on

4     damages because Free Speech Systems and Alex Jones abused

5     the discovery process and the litigation process to such a

6     degree that the Court had no choice but to render a default

7     judgment.

8           Now even in that abuse of the discovery system,

9     what we were able to uncover in that case were evidence that

10    judgments -- that, excuse me -- that Free Speech Systems and

11    Alex Jones were siphoning money, diverting assets to shell

12    entities owned indirectly by Jones and his parents,

13    benefiting him and his children in order to make Free Speech

14    Systems and Alex Jones judgment-proof in the current trial,

15    Your Honor.

16          That's precisely -- that reality is precisely why

17    Cordt Akers and I were retained to bring this TUFTA case.

18    And I bring that up because I want to make clear that --

19          THE COURT:  What is the status of that litigation?

20          MR. MOSHENBERG:  The status of the litigation is

21    all the defendants have answered and the discovery is

22    ongoing, Your Honor.  Disclosures have been done.  Discovery

23    requests have been served.  That's where we are.  The suit

24    was filed in April of this year, Your Honor.  So we're in

25    the early stages.  But we are very much in the case.

```
 1              THE COURT:  And can you remind me who the

 2    defendants -- all the defendants are in the fraudulent

 3    transfer?

 4              MR. MOSHENBERG:  There is an alphabet soup of

 5    shell entities.  So I'm sure I'm going to get them all wrong

 6    right now.  But the idea --

 7              THE COURT:  I remember the three debtors that were

 8    before me --

 9              MR. MOSHENBERG:  Yes.

10              THE COURT:  -- were parties to that litigation.

11              MR. MOSHENBERG:  No, Your Honor.  Only Infowars --

12              THE COURT:  Only Info -- only InfoW was.

13              MR. MOSHENBERG:  Yes, Your Honor.

14              THE COURT:  That's right.

15              MR. MOSHENBERG:  They've been nonsuited into the

16    litigation.

17              THE COURT:  So who's -- Free Speech is involved?

18              MR. MOSHENBERG:  Yes, Your Honor.

19              THE COURT:  Okay.

20              MR. MOSHENBERG:  And so is Alex Jones.  PQPR,

21    entities that control and own PQPR is basically the body of

22    parties that we're dealing with, and like I said, they all

23    have a bunch of crazy names.  But there's an AEJ Trust

24    Holdings, various trusts and holding companies that are

25    affiliated with that.
```

1          THE COURT:  Okay.

2          MR. MOSHENBERG:  And the evidence shows, and what

3     we've discovered so far is that money is being moved out of

4     Free Speech and Alex Jones to those insider companies.  And

5     I think the reality is no one really disputes that PQPR is

6     an insider.

7          I mean, they've filed under Subchapter 5 claiming

8     a $54 million debt to PQPR, and I'm sure the only reason

9     they can do that is because the Subchapter 5 definition

10    excludes insiders when counting -- setting a liability cap

11    at $7.5 million.  So it's not just us claiming that PQPR is

12    an insider.  Their own filing confirms it.

13         I bring all this up, Your Honor, not to ask for

14    any sort of resolution today, but so the Court understands

15    this is obviously not a normal bankruptcy and that the

16    discovery abuses that resulted in default judgments and

17    that, in our view, culminated in this bankruptcy need to be

18    investigated and we need to be mindful of those things as we

19    proceed with bankruptcy.

20         We are big believers in the bankruptcy process.

21    The bankruptcy process allows for transparency, oversight

22    and investigation normally.  That said, in a Subchapter 5,

23    at least under the default settings of a Subchapter 5, Your

24    Honor, a lot of that transparency, oversight and

25    investigation is not available because it's a process

1   designed to expedite small businesses getting back to work.
2   And this is hardly a small business, Your Honor.  The reason
3   they filed now and not at the end of the week is because
4   they know that there was about to be a liquidated claim
5   against them that exceeds $7.5 million.  They tried to jam
6   this in this week in order to qualify under Subchapter 5 in
7   order to get that lack of oversight and transparency that we
8   normally find in a Chapter 11.  That's why they did that
9   today, Your Honor, and I want to make sure the Court is
10  aware of that.
11          And I want to make sure the Court is aware that
12  there are lots of red flags circling this bankruptcy
13  already.  For months we've been trying to get financials
14  from Free Speech Systems and Alex Jones, and we couldn't get
15  them.  That was one of the reasons why $1 million sanctions
16  were issued against Free Speech and Alex Jones in the
17  defamation case because we couldn't get these financials.
18          But what we've learned in this bankruptcy filing
19  is that the financials really do confirm the fraudulent
20  transfers.  Of course they filed for bankruptcy because they
21  have relatively few assets compared to their relatively
22  large debts.  Here is why they have relatively few assets,
23  Your Honor.
24          Under their own bankruptcy schedules, right, under
25  their own filing, Alex Jones -- it says Alex Jones received

1    $62 million -- $62 million in draws in 2021 and 2022.

2    That's why it doesn't have assets, because Alex Jones drew

3    $62 million out of the business before filing for

4    bankruptcy.  And of course it's not just that he lacks

5    assets.  He claims to have large debts, or when I say he, I

6    mean Free Speech Systems.  But the debt that they're citing

7    to you is a $54 million to PQPR that has no record of

8    existence before the defamation cases commenced.

9         There is no email, no document that shows that

10   there is an actual debt to PQPR before those lawsuits

11   commenced.  The promissory notes that are referred to were

12   created during the defamation cases.  In fact, the same week

13   that the Austin Court of Appeals affirmed the trial court's

14   denial of a motion to dismiss and allowed the defamation

15   cases to proceed, that same week a promissory note for $25

16   million was signed by Alex Jones on behalf of Free Speech

17   Systems to pay back PQPR.  And then a default judgment was

18   rendered in September of 2021.

19        And just months later, another $25 million note to

20   PQPR on behalf of Free Speech Systems was created, Your

21   Honor.  It was also created the same week that the

22   Connecticut claimants obtained a default judgment in their

23   case against Alex Jones.

24        Now we're not asking the Court to make any sort of

25   holdings today.  There's a process for that and we're going

1    to raise the appropriate motions.  But I bring all this up

2    today, Your Honor, because the last thing that I want to

3    have happen and what I hope the Court can understand, as we

4    put on the motions and present the evidence is that we

5    cannot have the normal Subchapter 5 under the normal default

6    settings of a Subchapter 5.

7            Thankfully Subchapter 5 and other provisions in

8    Chapter 11 authorize other strengths and allowances for

9    oversight and investigation that we think are appropriate in

10   this case.  It allows for claimants' committees.  It can

11   strengthen the trustee, the authorities and powers of the

12   trustee.  And we think the trustee has the duty to

13   investigate anyway those things under Subchapter 5.

14           But we certainly are going to consider adding any

15   protections and strengths necessary to allow for a

16   transparent process, to allow this debtor and Alex Jones and

17   his shell entities to be fully investigated so there's

18   oversight and transparency and ultimately so that the Sandy

19   Hook families can bring Alex Jones and his company to

20   justice by liquidating these claims and by recovering on

21   them.

22           That's what we're here to do, Your Honor.  And I

23   wanted to make sure that in no uncertain terms that what we

24   hope to have happen in this bankruptcy process, which we

25   believe can be a benefit, is that we have that oversight,

1    transparency and investigation, Your Honor.

2              I will also add that that cash collateral motion,

3    as Mr. Chapelle mentioned, is very concerning.  And of

4    course cash collateral motions are important to the

5    bankruptcy process, and there's an interim and final

6    process.  And we understand that some of these things will

7    probably need to get done.  But that cash collateral motion

8    asks this Court to hold -- literally the proposed order says

9    that the PQPR notes are legitimate.  They ask the Court to

10   say that, and they're asking for replacement liens.  And of

11   course those underlying notes themselves are not legitimate.

12             And what they're asking to do is through this

13   bankruptcy process, through you, Your Honor, they want this

14   Court to turn fraudulent promissory notes into legitimate

15   ones.  And so while some cash collateral may need to be

16   issued on an emergency basis, what we want to make sure we

17   do is we reserve all rights, that the Court not make any

18   sort of holdings or findings as to the legitimate of that

19   underlying note.

20             I understand that some money needs to go out.  But

21   what we want to caution against is making some sort of

22   finding that this debt, this supposed encumbrance is an

23   actual true debt and a true security interest, Your Honor.

24             The other things I want to mention, just to

25   preview for this cash collateral motion, this 13-week budget

1   provides Alex Jones, who's already reaped $62 million in

2   member draws in the last two years, this proposed judgment

3   in 13 weeks allows, Judge, Alex Jones to receive almost

4   $400,000.  It also says that PQPR in the same 13-week period

5   is going to get over $500,000.  And there's apparently a

6   line for an Amex credit card that authorizes another million

7   dollars in payments.  We don't know what that credit card is

8   for.  And of course that budget provides no amount at all

9   for any sort of investigation and oversight into the

10  dealings of Free Speech Systems, especially as it relates to

11  PQPR and Alex Jones, Your Honor.

12          Those are huge issues, and we want to bring that

13  to the Court's attention.  Again we're not asking -- we

14  don't have a motion on file yet.  We not asking the Court to

15  resolve anything now.  But there are some serious issues

16  that require serious oversight under the normal bankruptcy

17  processes, and we hope that the Court will apply those

18  processes in this matter.

19          THE COURT:  Thank you.  Thank you.  Does anyone

20  else wish to address the Court at this time?

21          MR. NGUYEN:  Good morning, Your Honor.  Ha Nguyen,

22  for the United States trustee.

23          THE COURT:  Yes, Mr. Nguyen.

24          MR. NGUYEN:  Can you hear me okay?

25          THE COURT:  Just fine.

 1              MR. NGUYEN:  I apologize -- I apologize I can't be

 2      there in person.  I've been out with COVID for the last

 3      week.

 4              THE COURT:  Hope you're doing okay.  Please, thank

 5      you.

 6              MR. NGUYEN:  Thank you.  Thank you, Your Honor.

 7      Your Honor, I've spoken to the (indiscernible) and in

 8      evaluating this case, my office has taken the position

 9      (indiscernible) fresh eyes.  We know what happened in the

10      past with InfoW.  Our office had very small positions in

11      those bankruptcy cases.

12              But we're committed to seeing this process

13      through.  If Mr. Alex Jones and the debtor are here for

14      legitimate reorganizational purposes, we're going to go

15      through the process with the debtors.  However

16      (indiscernible) for this case, transparency is a hundred

17      percent crucial in this case.  And based on the declarations

18      that Mr. Schwartz filed, you know, at Paragraph 35 in the

19      declaration, they made assertions about, yes, the CRO is

20      looking at potential claw-backs from Alex Jones.

21              What else is in that paragraph is that there was

22      $62 million that left Free Speech Systems within 2021 and

23      2022.  I've never seen a Subchapter 5 case where the inside

24      has taken $62 million out prior to the filing of a case.

25      This is not a typical Subchapter 5 case.  I agree with the

1    plaintiffs that there need to be additional protections.

2    Maybe a (indiscernible) is appropriate (indiscernible)

3    appropriate parties move for and we want to do our job

4    (indiscernible).

5            Your Honor, we also have very, very grave concern

6    about the underlying (indiscernible) cash collateral motion.

7    We (indiscernible) Mr. Schwartz's declaration, like

8    Paragraph 42, he states that (indiscernible) prior to his

9    engagement, there are no financial statements.  There are no

10   bank records (indiscernible) how do we really know that

11   those underlying transactions were really legitimate

12   transactions.

13           And we're not picking on this particular case

14   because it is the debtor and the debtor's business.  But any

15   case that comes before you, whether it's an insider loan, an

16   insider affiliate transaction, we examine the transaction

17   with extra scrutiny.  And I would ask the Court to slow down

18   the process for the cash collateral, give the parties the

19   appropriate time to take a look at (indiscernible) and if

20   the Court is willing to grant some sort of cash collateral

21   use, it should be (indiscernible) in terms of the budget.

22           Your Honor, those are the U.S. trustee's comments.

23   We are committed to the process.  We're going to examine

24   the case, and we're going to (indiscernible) file the

25   appropriate motions when necessary, as it's appropriate.

```
 1              THE COURT:  Thank you.  And look, today's not the
 2    day to take up first day relief related to cash collateral.
 3    But I do appreciate today's the day we set the scheduling
 4    for it, which is a little (indiscernible) in the sense that
 5    normally debtor would file its first day motions and then
 6    would have a hearing on those motions.  Folks would file
 7    objections.
 8              Today was a little bit unique because there was an
 9    emergency motion to lift the automatic stay which I think
10    was the right thing to do, to allow that litigation to
11    continue based on the statements that the debtors made.
12              So I want to talk scheduling.  But let me just say
13    overall I do agree with the overall statements of all the
14    parties, including the debtors.  And I think transparency's
15    going to be really important.  It's the heart of the
16    bankruptcy process is transparency.  Debtors file and have
17    the protection of the automatic stay, which is incredibly
18    powerful and occurs automatically just upon a bankruptcy
19    filing.
20              And in return, the Bankruptcy Code requires
21    transparency for all parties in interest as they can
22    exercise their rights, state law rights and proceed against
23    the debtor or property of the estate.  They're entitled to
24    transparency.  And parties get to file motions and the Court
25    will take them up in the order in which they are taken.  So
```

1    I will note since we're talking transparency that today's

2    not the day to answer the question.

3         But Mr. Schwartz, I have a -- I need to better

4    understand -- we can take this up when we take up the first

5    day motions.  I need to better understand your role in this

6    case and your role with this debtor, what authority you

7    have.  I need to understand as well on May 19th, which was

8    you were representing three debtors who are on the opposite

9    side of a proposed plan support agreement we never took up.

10   But you were also seeking retention from Free Speech at the

11   same time, and I don't think I ever knew about that.

12        I need to understand how you were representing

13   three debtors on one side of a plan support agreement and

14   Free Speech, at least signing a proposed engagement letter

15   to a party on the opposite side of a plan support agreement

16   who was a third party contributor at the time.  I need to

17   understand that.  It goes to the overall question of -- and

18   I've been talking about this in the last case as well --

19   there's got to be a true independent who can really make

20   decisions on behalf of the estate.

21        I need to understand better what your proposed

22   role is in this case and what the restructuring advisor's

23   roles are.  We'll have that conversation a little bit later.

24   Why don't we talk scheduling.

25        So Mr. Lee, when do you want to come back for a

1    first day hearing?  How soon do you want one?

2           MR. LEE:  Mr. Schwartz -- good morning, Your

3    Honor.  Mr. Schwartz tells me that with respect to the first

4    day motions, we need some authority to use cash collateral

5    as well as pay critical vendors by August 3rd, Wednesday.

6           THE COURT:  Okay.

7           MR. LEE:  So we'd like to be able to come back and

8    get some relief on August 3rd --

9           THE COURT:  Okay.  Yeah.  Let me -- let's do

10   August 3rd.  I will tell you we'll set -- why don't we do

11   August 3rd at 10 AM.

12          MR. LEE:  And I believe, just for the record, Your

13   Honor, there is a critical vendor motion, a motion to extend

14   time to file schedules, a cash collateral motion and a

15   utility motion.

16          THE COURT:  Yeah.

17          MR. LEE:  I think those are the four motions that

18   need to be heard at that time.

19          THE COURT:  And I will -- just so that everybody

20   knows, as you can tell, they're doing some technical

21   upgrades to this courtroom.  So we will have a hearing.

22   Parties will be able to appear by video, GoToMeeting, that

23   system.  We may be in a different courtroom.  So I'd just

24   ask everyone just get a little bit early.  If it's this

25   courtroom, great.  If not, we'll put up a sign and I'll get

1    you plenty of notice.

2            I just need to just confirm what courtroom we'll

3    be in.  But we will be in this building on August -- on

4    August 3rd.  It may just be here on another floor.  But I

5    promise to give everyone plenty of notice on that.  I will

6    tell you on the utilities motion, I want you all to think

7    about a two-week deposit that could be in a segregated

8    account.  I want you to think about that.

9            MR. LEE:  Absolutely, Your Honor.

10           THE COURT:  And we'll take up the other motions.

11   Parties can file objections, regular first day.  You can

12   file objections.  We'll take it up and we'll have an

13   evidentiary hearing on those matters to the extent

14   necessary.  And we'll take up, just for the record, Docket

15   Numbers 6, 7, 8 and 9 at that time.

16           Okay.  But I am going to start off the hearing by

17   I still want to better understand -- and maybe it'll come

18   out in the testimony of Mr. Schwartz's support of the

19   motions.  But I do need to understand the corporate

20   structure a little bit more and how the parties intend to

21   proceed --

22           MR. LEE:  Yes, Your Honor.

23           THE COURT:  -- in this case.  With respect to the

24   motion for relief from stay, let me hear from you, Mr. Lee.

25   What is your -- there's certainly been remarks asking me for

001847

1    an emergency hearing.  What are your thoughts on that?  I

2    want to give you -- I should say I'll give you an

3    opportunity to respond.

4            MR. LEE:  Let me do this.  Let me confer with Mr.

5    Shannon for just a minute before I do that.

6            THE COURT:  Absolutely.

7            MR. LEE:  Your Honor, with respect to the

8    emergency motion by the Connecticut plaintiffs, while we do

9    believe that the debtor will prevail on the Curtis factors,

10   I think we have to accommodate them as a matter of fairness

11   for a hearing by this Friday.

12           That is something we've requested, and I don't

13   think I can legitimately sit here and tell you we can't have

14   the hearing before Friday out of fairness, and that's fine.

15   But we'll be ready to argue the points.

16           THE COURT:  Okay.  Let's set it.  Let me just take

17   a look at my calendar.  Can we do Friday, August 5th at 10

18   AM?  And I'm confident we'll be in this courtroom for that

19   one.  Okay.  Any response by the debtor?  Just -- I'm not

20   going to put a time limit.

21           But -- I'm not going to put a time limit on that.

22   But obviously if you file something on Friday morning, the

23   closer we get to the hearing, you know, the more to the

24   point (indiscernible) --

25           MR. LEE:  (indiscernible) read it, so we'll get it

Page  40

1    to you before then, Your Honor.

2              THE COURT:  No, no.  I mean, I get up here really

3    early.

4              MR. LEE:  Right.

5              THE COURT:  And I stay up late.  So don't worry

6    about the ability -- we'll be able to go -- the parties are

7    ready.  I would ask though if there are any witness and

8    exhibit list in connection with that hearing, that you file

9    them really by Thursday, August the 4th, by 12 noon our

10   time.  Just witness -- like a witness and exhibit list,

11   Thursday at noon, just so I have an idea what's coming.  And

12   again our exhibits -- I'll have to give it some thought.

13   But our local rules are now requiring exhibits be filed

14   online now with the demarcation, you know, filing 10-1, 10-

15   2, 10-3.  So we'll go from there.

16              Okay.  Maybe I would ask the parties to at least

17   speak before the hearing with respect to the exhibits.

18   Maybe there can be some agreement on what exhibits can be

19   agreed upon and what exhibits the parties are going to need

20   to dispute about in terms of admissibility.  And we'll take

21   that up.  But maybe we can just at least short-circuit some

22   of that.  Okay.

23              MR. LEE:  Thank you, Your Honor.

24              THE COURT:  Okay.  Mr. Chapple, anything -- yes?

25              MR. CHAPPLE:  Your Honor, I certainly understand

1    the Court's rationale with regard to setting the first day

2    motions on Wednesday.  As we've said, we have these

3    significant concerns.  We want to conduct discovery as soon

4    as possible.

5            I'm wondering if there's any way that Mr. Schwartz

6    can be made available for deposition tomorrow before the

7    hearings on Wednesday and also whether or not -- we just

8    have -- we have very serious concerns about any sort of

9    action from the Court that legitimizes that PQPR debt.  I

10   know we'll get into the substance on Wednesday.

11           But to the extent I can, I wanted to re-urge to

12   the Court our earnest hope to be able to get into some

13   discovery before we have those hearings and just raise that

14   issue.

15           THE COURT:  Okay.  I understand that.  But

16   typically if there would have been a regular, we wouldn't

17   have had the emergency motion.  The parties would have come

18   in and the debtor would have been able to make its case on a

19   first day without scheduling, you know, a deposition.  They

20   would have just come in.  I would have set a first day

21   hearing and the parties would have come in.

22           If that's what the debtor wants, I'm going to give

23   the debtor the opportunity to make whatever case they have

24   and you'll have whatever -- you'll have the ability to

25   cross-examine Mr. Schwartz on all these issues if that's

1    what they want.  You've certainly raised some questions.  We

2    didn't take up any evidence.  But I think the debtor would

3    have an opportunity to do so.  But you're certainly free to

4    raise it here.

5         But I'm not going to require a deposition before

6    Wednesday.  But the debtor can -- I'll let the debtor take

7    it up.  We're going to go on Wednesday at 10 o'clock in the

8    morning.  The debtor can put on its best case and you'll be

9    able to cross-examine the witness.

10        MR. CHAPPLE:  Understood, Your Honor.

11        MR. LEE:  Your Honor, Kyung Lee, for the record.

12   I just want to add that with respect to the cash collateral

13   issue that Mr. Chapple is concerned about, we're only going

14   for an interim order, Your Honor, for 14 days.

15        So I just want to give him some comfort that we're

16   not locking parties in.  It's an interim cash collateral

17   order that we're asking for.  So I just wanted to give you

18   some comfort (indiscernible) --

19        THE COURT:  Yeah.  It's a regular first day cash

20   collateral order, and parties will contest at the cash

21   collateral hearing.  This is not -- nothing is new here.

22   The parties will gear up.  And you've got two days to go,

23   and we'll be ready.  Anything else we need to talk about

24   today?

25        MR. LEE:  Thank you for accommodating us this

1    morning, Your Honor.

2            THE COURT:  No, not a problem.  And let me just

3    note -- let's just -- let me just take a look at this

4    schedule just one last time.  The order has been entered, by

5    the way, folks, on the --

6            MR. LEE:  Thank you, Your Honor.

7            THE COURT:  Okay.  I would note that even though

8    the courtroom will be different, the dial-in and the

9    GoToMeeting will still be the same regardless of what

10   courtroom we're in.

11           So if parties are appearing by video, there may be

12   a physical change to the courtroom on Wednesday.  But that

13   will not affect the ability of parties to participate on

14   GoToMeeting.  So I'll make sure that that's -- whatever you

15   used to dial in for today, you can use on Wednesday.  Okay.

16   Anything else?

17           MR. CHAPPLE:  No, Your Honor.

18           THE COURT:  All righty, folks.  Thank you.  I'll

19   see everyone on Wednesday.

20           MR. LEE:  Thank you, Your Honor.

21       (Proceedings adjourned at 9:30 AM)

22

23

24

25

1                          CERTIFICATION

2

3       I certify that the foregoing is a correct transcript from

4       the electronic sound recording of the proceedings in the

5       above-entitled matter.

6

7       *Sonya M. Ledanski Hyde*

8

9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  August 16, 2022

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In | Free Speech Systems LLC | Case No.: 22−60043 |
| Re: | Debtor | Chapter: 11 |

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

---

**DEBTOR'S RESPONSE TO EMERGENCY MOTION FOR RELIEF FROM THE**
**AUTOMATIC STAY**

---

Free Speech Systems LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), hereby files this response to the *Emergency Motion for Relief from the Automatic Stay* [ECF No. 15] (the "Lift Stay Motion") filed by David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs") as follows:

## PRELIMINARY STATEMENT

1.      The automatic stay is one of the central features of the U.S. bankruptcy system. It protects the debtor's assets, provides temporary relief from creditors, and enables equity of distribution by preventing a race to the courthouse. *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985).  The purpose of the automatic stay is to give an ailing business "a breathing spell and time to work constructively with its creditors" without the financial and operational pressure from ongoing or new litigation. H.R. Rep. 95-595, 174, 1978 U.S.C.C.A.N. 5963, 6135.

2.      The automatic stay goes hand-in-hand with the traditional bankruptcy function embodied in the claims allowance process whereby claims against a debtor's bankruptcy estate are

adjudicated through summary proceedings to provide for the orderly allocation of estate property. *See In re Brown*, 521 B.R. 205, 213 (Bankr. S.D. Tex. 2014). Together, the automatic stay and claims allowance process provide a mechanism to efficiently adjudicate claims against a debtor's estate without undue expense, thereby maximizing the value of the estate for all creditors and enabling equitable distribution of that value.

3.       Because of the importance of the automatic stay to the bankruptcy process, relief from the automatic stay should be granted to liquidate an unsecured claim only where the "balance of hardships" favors determining the claim in the creditors preferred forum. *See In re UTEX Communs. Corp.*, 457 B.R. 549, 570 (Bankr. W.D. Tex. 2011) (quoting *In re U.S. Brass Corp*., 173 B.R. 1000 (Bankr. E.D. Tex. 1994); *see also In re Kao*, No. 15-31193-H3-13, 2015 Bankr. LEXIS 4293, at *6 (Bankr. S.D. Tex. Dec. 21, 2015); *In re Young*, No. 06-80397-G3-7, 2006 Bankr. LEXIS 2934, at *6 (Bankr. S.D. Tex. Oct. 20, 2006).

4.       The balance of harms here favors maintaining the automatic stay with respect to the Connecticut Action while the Debtor continues its efforts to increase revenue. The costs of litigating the Connecticut Plaintiffs claims for the next 2 ½ months plus the revenue lost by Alex Jones being off the air would place at risk the improvements to the Debtor's financial condition in recent weeks and its ability to ultimately pay creditors under a plan of reorganization in this chapter 11 case.[1] On the other hand, the Connecticut Plaintiffs allege no pecuniary loss from the continuation of the automatic stay.[2]

---

[1] Prior to the Petition Date, the Debtor significantly reoriented its business and anticipates increasing revenues over the course of this chapter 11 case. Assuming these increased revenues materialize, the Debtor may be able to afford to go forward with a jury trial in the Connecticut Action after the early stages of this case.

[2] Despite the allegations in the Lift Stay Motion, the Connecticut Action has never been delayed by any actions of the Debtor or Alex Jones.

5. The other factors pointed to by the Connecticut Plaintiffs also do not support lifting the automatic stay at this time. The applicable case law from this district indicates that a tort must involve physical injury to be a "personal injury tort" within the meaning of 28 U.S.C. § 157(b)(5). *See Hurtado v. Blackmore*, No. B-06-149, 2007 U.S. Dist. LEXIS 108019, at *5 (S.D. Tex. July 18, 2007). The assertions in the Lift Stay Motion that the Connecticut Plaintiffs' claims cannot be determined without a jury trial are not supported by applicable case law. If the Connecticut Plaintiff's desired jury trial is not available after the Debtor's financial condition stabilizes, the Connecticut Plaintiffs' claims can be determined through the claims allowance process at substantially less expense to the estate and the Connecticut Plaintiffs.

6. Liquidation of the Connecticut Plaintiffs' claims through a jury trial may be appropriate later, but only if and when doing so does not jeopardize the Debtor's continued operations and ability to reorganize. The benefits that the Connecticut Plaintiffs assert that they would obtain from a jury trial (but not through the more efficient claims allowance process)—i.e., holding the Debtor accountable for its actions in the eyes of the public and finding personal closure for the harms done them, Lift Stay Motion ¶ 28—would still available if the stay remains in place until a jury trial is feasible. The Debtor therefore requests that the Court deny the Lift Stay Motion without prejudice.

## **RESPONSE**

### A.  **Applicable Standards.**

7. Under Bankruptcy Code § 362(d)(1), "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause." The party seeking relief from the automatic stay must first make an initial showing of "cause." *In re Mosher*, 578 B.R. 765, 772 (Bankr. S.D.

Tex. 2017). Only after the movant establishes cause does the burden shift to the Debtor on all other issues, including retaining the automatic stay in place notwithstanding the cause shown. *Id.*

8.      Courts in this district have employed the twelve-factor analysis originating from *In re Curtis*, 40 B.R. 795, 804 (Bankr. D. Utah 1984), to guide their decision on motions for relief from stay to continue prepetition litigation. These twelve (12) factors are:

> 1) whether the relief will result in a partial or complete resolution of the issues; 2) lack of any connection with or interference with the bankruptcy case; 3) whether the other proceeding involves debtor as a fiduciary; 4) whether a specialized tribunal has been established to hear the particular cause of action; 5) whether the debtor's insurer has assumed full responsibility; 6) whether the action primarily involves third parties; 7) whether litigation in the other forum would prejudice the interests of other creditors; 8) whether the judgment claim arising from the other action is subject to equitable subordination; 9) whether movant's success would result in a judicial lien avoidable by the debtor; 10) interests of judicial economy and the expeditious and economical resolution of litigation; 11) whether the proceedings have progressed to the point that parties are ready for trial; and 12) impact of the stay on the parties and the balance of harm.

*In re Mosher*, 578 B.R. at 773 (quoting *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014)). Not every factor is relevant to each case. *See In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. at 112.

9.      In the context of a creditor seeking relief from stay to liquidate an unsecured claim in the creditor's preferred forum, relief from stay should be granted only where the "balance of hardships" favors such relief. *See In re UTEX Communs. Corp.*, 457 B.R. 549, 570 (Bankr. W.D. Tex. 2011) (quoting *In re U.S. Brass Corp.*, 173 B.R. 1000 (Bankr. E.D. Tex. 1994); *see also In re Kao*, No. 15-31193-H3-13, 2015 Bankr. LEXIS 4293, at *6 (Bankr. S.D. Tex. Dec. 21, 2015); *In re Young*, No. 06-80397-G3-7, 2006 Bankr. LEXIS 2934, at *6 (Bankr. S.D. Tex. Oct. 20, 2006). Where relief from the stay would harm the Debtor more than it would benefit the moving creditors, it should be denied.

4

**B. The Balance of Harms Favors Leaving the Automatic Stay in Place with respect to the Connecticut Litigation.**

10.     The Debtor cannot presently afford to litigate the Connecticut Action through a jury trial at this time without significant disruptions to its ability to operate and reorganize.[3] The Debtor estimates that it would incur legal fees of approximately $550,000 to its trial counsel to litigate the Connecticut Action to judgment, plus expenses of approximately $50,000. Even more damaging to the Debtor's estate is that Alex Jones would not be able to host his show for the Debtor.[4] The Debtor has historically experienced a significant decrease in revenue on days when Jones is not hosting his program. The Debtor believes that the decrease would be more pronounced if Jones was required to have an extended absence over the course of the Connecticut trial and the Debtor lacked the ability to set up an alternative studio in Connecticut.

11.     The Debtor would also face difficulties in securing representation in the Connecticut Action if the automatic stay was lifted to allow the Connecticut Action to proceed. The Debtor's state court trial counsel—Pattis & Smith Law Firm and The Reynal Law Firm—have not been retained as special counsel for the Debtor. And the Connecticut Superior Court judge overseeing the Connecticut Action has initiated disciplinary proceedings against the Debtor's prepetition counsel for the possible improper disclosure of confidential discovery material and it

---

[3] The Debtor undertook efforts prior to the Petition Date that may have enabled the Debtor to afford to continue to litigate the Connecticut Action but were ultimately unsuccessful. On May 27, 2022, the Debtor and Jones filed the Defendants' Partially Unopposed Motion to Correct/Modify "Order on Attorney's Fees for Plaintiffs' Motion for Sanctions Regarding Corporate Deposition [SIC]" in the Travis County District Court (the "Motion to Modify"), a true and correct copy of which is attached hereto as Exhibit A. In the Motion to Modify, the Debtor sought an order of the Texas state deferring the payment deadline of sanctions ordered in the Texas litigation because immediate payment would burden the Debtor's access to the Courts. *See* Motion to Modify at p. 3-4. The Travis County court denied the requested relief on June 27, 2022, as reflected in the *Order on Defendants' Motions to Modify and/or Clarify*, a true and correct copy of which is attached as Exhibit B hereto. Sanctions of $1.1 million were paid by the Debtor to counsel for the Texas plaintiffs the week prior to the Petition Date, leaving the Debtor with insufficient funds to continue the Connecticut Action at this time.

[4] This issue was not present in the Heslin and Lewis matter because that trial was proceeding in Austin, Texas, where the Debtor maintains its studio facilities.

5

is not currently clear whether the Debtor's prepetition counsel would be available to be retained by the Debtor.[5] Finding replacement counsel—if possible given the tortured history of the Connecticut Action—would likely cost *substantially* more than having the Debtor's prepetition state court attorneys litigate the matter.

12.     The Debtor would also have to overcome procedural hurdles to obtain Connecticut state court counsel. The Connecticut Plaintiffs vigorously opposed the retention of any professionals in the InfoW, LLC cases. Emergency retention of state court counsel here would likely be opposed no matter how necessary. The Debtor would also need to obtain use of cash collateral for the payment of state court counsel fees and expenses. Simply obtaining interim use of cash collateral so that the Debtor could ship increased orders garnered objections and required a four-hour hearing even though the Texas and Connecticut Plaintiffs' ostensible position is that the asserted lien on cash collateral is invalid (which would mean that the Debtor's cash is not collateral requiring an order to use in the ordinary course). The same kind of fight would ensue if the Debtor was required to obtain counsel to litigate the Connecticut Action in state court, at significant cost to the estate and distracting the Debtor from moving this case forward.

13.     The Connecticut Plaintiffs, on the other hand, do not allege that they would face *any* pecuniary harm from the continuation of the automatic stay. Although they assert that "substantial costs for litigation have already been borne," Lift Stay Motion ¶ 27, and that the "[Connecticut Plaintiffs] and their counsel have expended considerable time and expense preparing for the August 2 *voir dire* and September 6 trial[,]" Lift Stay Motion ¶ 28, continuation of the automatic stay until the Debtor can afford to litigate the Connecticut Action will not destroy

---

[5] Copies of the Connecticut Court's show cause order and the related transcript of the August 10, 2022, hearing are attached as <u>Exhibit C</u> and <u>Exhibit D</u>, respectively.

the value of the work already done, whether the claims are determined through a jury trial at a later date or through the claims allowance process.

14.      The Connecticut Plaintiffs will have the same opportunity to obtain the non-pecuniary benefits that they hope to achieve through a jury trial if the stay remains in effect until the Debtor's business is stabilized. The Connecticut Plaintiffs assert that they "look to a jury trial to hold the Jones Defendants accountable for their actions in the eyes of the public; to find personal closure for the harms done to them, to the extent possible; and to liquidate their damages." Lift Stay Motion ¶ 28. But the Lift Stay Motion is silent about any material harm by the continuation of the automatic stay for the period necessary for the Debtor to realize the benefits of the business and operational changes it initiated prior to the Petition Date.

15.      Further, the Connecticut Plaintiffs' non-pecuniary benefits and their costs in preparing for the litigation will be realized even if the automatic stay remains in place and their claims are liquidated through the claims allowance process. The Connecticut Superior Court is continuing the litigation of the claims against only Alex Jones individually in a bifurcated proceeding.[6]  Jury selection has begun and would need to start from scratch to go forward against the Debtor, which has not participated in *voir dire* of the jury to this point. Lifting the automatic stay to allow a consolidated proceeding would *delay* the vindication the Connecticut Plaintiffs seek through a jury trial.[7]

---

[6] Although the Debtor remains a party to the litigation, the Connecticut Superior Court is proceeding only as to Alex Jones as reflected in the transcript of the August 2, 2022, hearing before the Connecticut Superior Court attached hereto as Exhibit E.

[7] Recognizing the issues that could result from proceeding in the manner decided by the Connecticut Superior Court, the Debtor removed the Connecticut Action; however, the action was remanded by the U.S. Bankruptcy Court for the District of Connecticut.

## C.  The Automatic Stay Furthers Judicial Economy.

16.     The U.S. District Court for the Southern District of Texas has held that only torts that results in a physical injury are "personal injury tort" claims for purposes of 28 U.S.C. § 157(b)(5). *Hurtado v. Blackmore*, No. B-06-149, 2007 U.S. Dist. LEXIS 108019, at \*5 (S.D. Tex. July 18, 2007) ("[T]o hold that a tort with no resulting physical injury constitutes a 'personal injury tort' under  § 157 'would contradict the statute's text, Congressional intent, and the majority of relevant judicial decisions.'"); *accord Belcher v. Doe*, Civil Action No. SA-06-CA-1068-WWJ, 2008 U.S. Dist. LEXIS 143761, at \*8 (W.D. Tex. Mar. 11, 2008) ("[T]his Court will adopt the narrow understanding of 'personal injury tort.'"). The Connecticut Plaintiffs' claims could therefore be liquidated in the bankruptcy court and such resolution would promote judicial economy by avoiding the lengthy *voir dire* process required in Connecticut courts. *See* Lift Stay Motion ¶ 18. Judicial economy does not weigh in favor of relief from the stay.

## D.  Comity is Not a Ground for Granting Relief from the Automatic Stay.

17.     The Lift Stay Motion does not reference any authority that supports the proposition that comity is a factor that applies to this Court's decision whether to grant relief from the automatic stay or argument on how it should be applied.

18.     The sole case cited by the Connecticut Plaintiffs—*In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106 (Bankr. S.D. Tex. 2014)—involved a request to lift the stay to proceed on a motion for criminal contempt against a non-debtor equityholder. *Id.* at 108. The court held in the alternative that (a) the automatic stay did not apply to the non-debtor under the facts at issue in that matter; (b) if the automatic stay did apply to the non-debtor, the criminal contempt proceeding would not be stayed pursuant to operation of Bankruptcy Code § 362(b)(1); and (c) if the automatic stay did apply to the non-debtor and Bankruptcy Code § 362(b)(1) did not except criminal

8

contempt proceedings from the automatic stay, the court would grant relief from stay. *Id.* at 109. The word "comity" does not appear anywhere in the opinion.

19.     The facts of *In re Xenon Anesthesia of Texas, PLLC* and the rationale of that decision are completely different from those at issue here. The Connecticut Plaintiffs are seeking relief from the stay to proceed to a jury trial, in a civil matter, against the Debtor. The decision is inapposite.

## ADMISSIONS AND DENIALS

The Debtor responds to the factual allegations in the Lift Stay Motion pursuant to Local Bankruptcy Rule 4001-1(a)(10) and Rule 8 of the Federal Rules of Civil Procedure, for purposes of the contested matter initiated by the Lift Stay Motion only, as follows:

1.     The Debtor admits that (a) the factual allegations of the first sentence of Paragraph 1 of the Lift Stay Motion; (b) Alex Jones or other individuals on programs that were broadcast by the Debtor stated the words quoted in the third sentence of Paragraph 1 of the Lift Stay Motion as further detailed in Ex. A to the Lift Stay Motion, Complaint ¶ 185 (Jones); ¶ 223 (Jones); ¶¶ 140-41 (Wolfgang Halbig and Jones); ¶¶ 117, 273 (Jones), ¶¶ 138, 149, 223 (Jones); ¶ 295 (Steve Pieczenik); ¶¶ 112, 120-21, 185, 197 (Jones); (c) Alex Jones urged his audience to "investigate"; (d) as the result of a default judgement entered in the Connecticut Action the factual assertions in the Connecticut Plaintiffs respective complaints have been deemed admitted for purposes of the Connecticut Action; and (e) Exhibits A-C to the Lift Stay Motion are copies of the complaints in the three consolidated causes currently pending in Connecticut. The Debtor specifically denies that Mr. Jones knew his audience would respond to his urge to "investigate" by cyberstalking, harassing, and/or threatening the Connecticut Plaintiffs. By way of further answer, the Debtor asserts that (x) Mr. Jones has since retracted his statements and apologized to the Connecticut

9

Plaintiffs and (y) the Debtor disputes that the default judgement entered in the Connecticut Action was justified under the facts and applicable non-bankruptcy law.

2. The Debtor admits that (a) it is the debtor and debtor-in-possession in this chapter 11 case; (b) the liability of the Debtor and Alex Jones has been established in the Connecticut Action as the result of the disciplinary default; and (c) in the abstract, wasting significant resources would be both imprudent and inefficient. The Debtor specifically denies that (w) Alex Jones or the Debtor have sought to use the bankruptcy process to delay trial in the Connecticut Action against Mr. Jones or the Debtor; (x) the Connecticut trial court entered orders against Jones and the Debtor as the result of egregious litigation tactics; (y) Mr. Jones or the Debtor have previously delayed the adjudication of the Connecticut Action; and (z) that the claims of the Connecticut Plaintiffs cannot be liquidated in this Court. By way of further answer, the Debtor asserts that (a) the chapter 11 cases of InfoW, LLC and its affiliated Debtors were not filed by the Debtor or Jones; (b) the Connecticut Action has not been previously delayed by action of the Debtor or Jones; and (c) the default ruling in the Connecticut Action was based on findings that Jones and the Debtor failed to provide required discovery, including the failure to produce subsidiary ledgers for InfoW, LLC, IWHealth, LLC, Prison Planet TV, LLC (which the Connecticut Plaintiffs now assert in the Lift Stay Motion had no operations), corrections to FSS trial ledgers by an expert retained by the Debtor, and purported failure to produce Google and social media analytics.

3. The Debtor admits that (a) the Connecticut Action has been pending for approximately four years; (b) the Connecticut Action is pending in the Connecticut Superior Court in the Judicial District of Waterbury, Connecticut, before the Honorable Barbara Bellis; (c) Judge Bellis has presided over the Connecticut Action since its inception; and (d) jury selection was scheduled to commence on August 2, 2022, with evidence following on September 6, 2022, at the

10

time the Lift Stay Motion was filed. The Debtor specifically denies that (u) Mr. Jones or the Debtor previously used the bankruptcy process to evade or derail the trial in the Connecticut Action; (v) liquidating the Connecticut Plaintiffs' claims in state court is the better course; (w) InfoW, LLC, IWHealth, LLC, and Prison Planet TV, LLC were owned and controlled by Mr. Jones when those entities filed for chapter 11 bankruptcy; (x) it required "great efforts" of the Connecticut Plaintiffs to maintain the trial date in the Connecticut Action; (y) the efforts of the Connecticut Plaintiffs and Texas plaintiffs were the cause of the dismissal of the InfoW, LLC chapter 11 cases; and (z) emergency relief should be granted to allow adjudication of the Connecticut Action to proceed as to the Debtor.

4.      The Debtor admits that (a) the Debtor filed an emergency motion to modify the automatic stay with respect to the Heslin/Lewis matter pending in Texas state court that was filed at ECF No. 2; (b) the Heslin/Lewis trial was commenced on July 25, 2022, and was pending when the Lift Stay Motion was filed; (c) the Connecticut Plaintiff's seek emergency consideration of the Lift Stay Motion. The Debtor specifically denies that the factors that justified modification of the automatic stay with respect to the Heslin/Lewis matter also justify modification of the automatic stay with respect to the Connecticut Action.

5.      The Debtor admits that (a) the Court has the authority indicated in Paragraph 5 of the Lift Stay Motion under 11 U.S.C. § 105(a), Bankruptcy Rule 9006(c)(1), and Local Bankruptcy Rule 9013-1(i) and (b) the Connecticut Plaintiffs are seeking the relief indicated in Paragraph 5 of the Lift Stay Motion. The Debtor specifically denies that the relief requested in the Lift Stay Motion is justified for the reasons indicated in Paragraph 5 of the Lift Stay Motion or otherwise.

6.      The Debtor admits that (a) the Connecticut Plaintiffs assert claims against Alex Jones and the Debtor in the Connecticut Action for the alleged actions of Jones set out in Paragraph

11

6 of the Lift Stay Motion; (b) the Connecticut Plaintiffs did not loan Jones money or become the victim of some fraudulent scheme designed to take their money; and (c) the facts alleged in Paragraph 6 of the Lift Stay Motion are deemed admitted in the Connecticut Action to the extent they are contained in the relevant pleadings of the Connecticut Plaintiffs. The Debtor specifically denies that (a) the Connecticut Plaintiffs are not creditors in a sense to which the Court is accustomed; (b) Jones began asserting that the Sandy Hook Elementary School shooting was a hoax and that the Connecticut Plaintiffs where crisis actions almost immediately after the shooting on December 14, 2012; and (c) Jones made repeated falsehoods directly about the Connecticut Plaintiffs.

7.      The Debtor admits (a) Alex Jones or other individuals on programs that were broadcast by the Debtor stated the words quoted in the third sentence of Paragraph 7 of the Lift Stay Motion as further detailed in Ex. A, Complaint ¶ 185 (Jones); ¶ 223 (Jones); ¶¶ 140-41 (Wolfgang Halbig and Jones); ¶¶ 117, 273 (Jones), ¶¶ 138, 149, 223 (Jones); ¶ 295 (Dr. Steve Pieczenik); ¶¶ 112, 120-21, 185, 197 (Jones) and (b) Alex Jones urged his audience to "investigate." The Debtor specifically denies that (x) Jones targeted the Connecticut Plaintiffs through the Debtor or those killed in the Sandy Hook Shooting for more than five years and (y) Jones knew that his audience would respond to his urge to "investigate" by cyberstalking, harassing, and/or threatening the Connecticut Plaintiffs.

8.      The Debtor admits that (a) the Connecticut Action has proceeded in Connecticut Superior Court for approximately four years and is currently before that court; (b) the Connecticut Action was removed to the U.S. District Court for the District of Connecticut twice and remanded twice; (c) the Debtor and Jones were sanctioned in June 2019 on grounds that included violations of the state court's discovery orders; (d) Jones was sanctioned in June 2019 on the grounds that he

had threatened the Connecticut Plaintiffs' counsel and the sanction was affirmed by the Connecticut Supreme Court; (e) the Debtor and Jones moved to recuse the Connecticut Superior Court judge who presided over the case since its inception, which was denied; (f) the Connecticut state court entered a default against the Debtor and Jones on November 15, 2021, as indicated in the ruling reflected in Exhibit D to the Lift Stay Motion; and (g) the Connecticut state court ruled that the default would be binding. The Debtor specifically denies that (u) Jones and the Debtor resisted the authority of the Connecticut Superior Court by every conceivable means; (v) the Debtor was sanctioned for threatening counsel to the Connecticut Plaintiffs; (w) the denial of the existence of certain of the financial records was false; (x) the Debtor produced fabricated financial records; (y) the Debtor simply refused to produce analytics data concerning revenue and content distribution; and (z) the motion to recuse was filed because the Debtor or Jones knew a sanction of default was likely imminent.

9.      The Debtor admits that (a) the Debtor is wholly owned by Alex Jones; (b) the Debtor was previously completely subject to the control of Jones; and (c) default orders were entered in the Connecticut Action and certain lawsuits in Texas and the basis for such orders were findings that Jones and the Debtor engaged in discovery misconduct. The Debtor specifically denies that (x) the Debtor is currently completely subject to the control of Jones and (y) that the default orders were justified under applicable law and the facts.

10.     The Debtor admits the factual allegations contained in Paragraph 10 of the Lift Stay Motion.

11.     The Debtor admits that (a) InfoW, LLC, IWHealth, LLC, and Prison Planet TV LLC (the "Former Debtors") were previously defendants in the Connecticut Action and filed petitions for relief under chapter 11, subchapter v, of the Bankruptcy Code; and (b) the Former

001867

Debtors filed notices of removal the Connecticut Action and the actions in Texas within hours after the Former Debtors' petitions were filed to remove the actions to the United States Bankruptcy Courts for Connecticut and Western District of Texas on the basis of "related to" jurisdiction and the Former Debtors' bankruptcy. The Debtor specifically denies that (x) the Former Debtors' bankruptcy cases were attempts by Jones to use the bankruptcy process to stall or evade the Connecticut Action or the actions in Texas; (y) the removals effectively stayed the Connecticut Action and actions in Texas in their entirety; and (z) the Former Debtors are best described as "shell companies."

12.     The Debtor admits that (a) the Former Debtors had no assets used in active operations by the Former Debtors and (b) the U.S. Trustee filed a motion to dismiss the Former Debtors' chapter 11 cases and made the arguments indicated in Paragraph 12 of the Lift Stay Motion. The Debtor specifically denies that (x) the Former Debtors held no assets that could be liquidated and (y) the Former Debtors had no businesses to reorganize or liquidate. By way of further answer, the Debtor asserts that (a) among the grounds for the default orders entered by the Connecticut and Texas courts were assertions by the Connecticut Plaintiffs and the plaintiff in the actions pending in Texas that the Former Debtors and the Debtor *did* engage in business and failed to provide financial information demonstrating that business and (b) the assertions that the Connecticut Plaintiffs make here, and previously made in the Former Debtors' chapter 11 cases, are inconsistent with their assertions in the Connecticut Action, which were adopted by the Connecticut state court in entering default judgment against the Debtor.

13.     The Debtor admits that (a) the Connecticut Plaintiffs promptly moved to dismiss the Former Debtors' chapter 11 cases on the grounds that the cases were filed in bad faith and (b) the Connecticut Plaintiffs dismissed their state-court causes of action against the Former Debtors

14

and the remaining proceeding was remanded to the Connecticut Superior Court from the U.S. Bankruptcy Court for the District of Connecticut. The Debtor lacks information sufficient to form a belief as to the truth of the allegation that obtaining immediate remand and retaining the trial date motivated the Connecticut Plaintiffs decision to dismiss their causes of action against the Former Debtors. The Debtor specifically denies that the briefing schedule on the Connecticut Plaintiffs' motion to dismiss would have resulted in delay that was likely to affect the Connecticut Plaintiff's state-court trial date.

14.     The Debtor admits the factual allegations in Paragraph 14 of the Lift Stay Motion.

15.     The Debtor admits the factual allegations in Paragraph 15 of the Lift Stay Motion.

16.     The Debtor admits the factual allegations in Paragraph 16 of the Lift Stay Motion.

17.     The Debtor admits the factual allegations in Paragraph 17 of the Lift Stay Motion.

18.     The Debtor admits the factual allegations in Paragraph 18 of the Lift Stay Motion.

19.     The Debtor admits the factual allegations in Paragraph 19 of the Lift Stay Motion.

20.     The Debtor admits the factual allegations in Paragraph 20 of the Lift Stay Motion.

21.     The Debtor specifically denies the factual allegations in Paragraph 21 of the Lift Stay Motion. By way of further answer, the Debtor asserts that (a) the Connecticut Action has not been delayed or disrupted by the bankruptcy system and (b) the Connecticut Plaintiffs' claims against the Debtor can be liquidated in this Court.

22.     The Debtor admits the factual allegations in Paragraph 22 of Lift Stay Motion.

23.     The Debtor admits that the Connecticut Plaintiffs seek the relief indicated in Paragraph 23 of the Lift Stay Motion. The Debtor specifically denies that the relief requested is necessary or warranted.

24.     The Debtor admits that the statement of law regarding the automatic stay in sentences one through five of Paragraph 24 of the Lift Stay is generally accurate, subject to the more specific description of the applicable law set forth in this Response. The Debtor specifically denies that (a) the timing of the Debtor's filing weighs heavily in favor of lifting the automatic stay; (b) there is any ongoing abuse of the judicial process by the Debtor; and (c) that any other unspecified factor in Paragraph 24 of the Lift Stay Motion weighs heavily in favor of lifting the automatic stay.

25.     The Debtor admits that certain bankruptcy courts, including at times courts in this district, have utilized the three-factor test indicated in Paragraph 25 of the Lift Stay Motion for determining when the automatic stay should be lifted. The Debtor specifically denies that (a) all three prongs of the test weigh in favor of the relief requested in the Lift Stay Motion and (b) that the three-factor test, as described in the Lift Stay Motion, is the appropriate test here. By way of further answer, the Debtor asserts that relief from stay is appropriate to liquidate an unsecured claim is appropriate *only* where the balance of hardships favors relief from the automatic stay, notwithstanding the other considerations. *See In re UTEX Communs. Corp.*, 457 B.R. 549, 570 (Bankr. W.D. Tex. 2011) (quoting *In re U.S. Brass Corp.*, 173 B.R. 1000 (Bankr. E.D. Tex. 1994); *see also In re Kao*, No. 15-31193-H3-13, 2015 Bankr. LEXIS 4293, at *6 (Bankr. S.D. Tex. Dec. 21, 2015); *In re Young*, No. 06-80397-G3-7, 2006 Bankr. LEXIS 2934, at *6 (Bankr. S.D. Tex. Oct. 20, 2006).

26.     The Debtor admits that (a) the claims of the Connecticut Plaintiffs require adjudication for purposes of distribution in the bankruptcy case absent a consensual resolution; (b) except as modified by the Bankruptcy Code and related statutes, the Connecticut Plaintiffs have preserved their rights to a jury trial and the Connecticut Action was set for jury selection to

16

commence on August 2, 2022; (c) the Connecticut Plaintiffs' claims exist and must be resolved in some fashion; (d) the automatic stay currently prevents adjudication of the Connecticut Plaintiffs' claims against the Debtor; (e) the automatic stay was not intended to indefinitely prevent adjudication of claims, provided that such adjudication is generally through the claims allowance process in bankruptcy court; and (f) courts often grant creditors relief from the automatic stay so they can adjudicate their unliquidated claims against a debtor outside of bankruptcy court, particularly when the claims are already the subject of pending litigation. The Debtor specifically denies that (x) the Connecticut Plaintiffs are personal injury tort claimants excluded from liquidation in this chapter 11 case through the claims allowance process or estimation procedure, *see Hurtado v. Blackmore*, No. B-06-149, 2007 U.S. Dist. LEXIS 108019, at *5 (S.D. Tex. July 18, 2007) ("[T]o hold that a tort with no resulting physical injury constitutes a 'personal injury tort' under § 157 'would contradict the statute's text, Congressional intent, and the majority of relevant judicial decisions.'"); *Belcher v. Doe*, Civil Action No. SA-06-CA-1068-WWJ, 2008 U.S. Dist. LEXIS 143761, at *8 (W.D. Tex. Mar. 11, 2008) ("[T]his Court will adopt the narrow understanding of "personal injury tort.") and (y) that the only issue before the Court is when the Connecticut Plaintiffs' Claims should move forward in a jury trial.

27.     The Debtor admits that (a) the Connecticut Plaintiffs' claims therein have been pending in the Connecticut Action for approximately four years; (b) the Connecticut Plaintiffs' claims have been substantially investigated; (c) the Debtor's liability has been established by default in the Connecticut Action with the only damages remaining to be decided, subject to the Debtor's appellate rights; and (d) the Debtor and Alex Jones have actively sought and received contributions from supporters defending the Connecticut Action and the actions pending in Texas. The Debtor lacks information sufficient to form a belief as to the truth of the allegations that (x)

17

the Connecticut Plaintiffs' claims have been prepared for trial and (y) the Connecticut Plaintiffs have already borne substantial costs for litigation. The Debtor specifically denies that (a) the Connecticut Plaintiffs' claims have been substantially litigated; (b) there will be no prejudice to the Debtor in adjudicating the Connecticut Plaintiffs' claims to final judgment in the Connecticut Action in state court; and (c) judicial efficiency and conservation of party resources are best served by permitting adjudication of the Connecticut Action in state court.

28.     The Debtor admits that (a) lifting of the Automatic Stay is necessary for the Connecticut Plaintiffs to adjudicate their claims against the Debtor in Connecticut state court; (b) the Connecticut Plaintiffs are the immediate family members of children and educators killed in the Sandy Hook Elementary School shooting on December 14, 2012, and one first responder to the shooting; (c) the for the purposes of pleading, that the Connecticut Plaintiffs desire a jury trial for the reasons indicated in sentence 5 of Paragraph 28 of the Lift Stay Motion; and (d) bankruptcy does not relieve the Debtor of the burden of ultimately liquidating existing claims in some forum. The Debtor lacks information sufficient to form a belief as to the truth of the allegations that (v) the harm of the Connecticut Plaintiffs have endured is inherent in the nature of their claims[8]; (w) the Connecticut Plaintiffs and their counsel have expended considerable time and expense preparing for the August 2 *voir dire* and September 6 trial date; (x) pretrial motions have been drafted based on the current record; (w) travel arrangements have been made and parties and expert and fact witnesses schedules have been coordinated; and (z) the Connecticut Plaintiffs have prepared themselves mentally for trial. The Debtor specifically denies that (a) that the Connecticut Plaintiffs claims cannot be adjudicated through the claims allowance process in the bankruptcy court without relief from the automatic stay; (b) the characterization of the Connecticut Plaintiffs

---

[8] The Debtor contends that the meaning of this allegation is ambiguous.

18

as victims of Jones's lies; (c) that the trial of the Connecticut Action has been delayed and frustrated by obstruction by the Debtor or Jones; (d) that failure to grant relief from the automatic stay will impose a great hardship on the Connecticut Plaintiffs; (e) that the hardship of the automatic stay on the Connecticut Plaintiffs outweighs the hardship that the Debtor would face if relief from stay was granted; (f) the procedural posture of the Connecticut Action limits the burden on the Debtor; and (g) the continuation of the automatic stay will increase the burden faced by the Debtor or the Connecticut Plaintiffs..

29.     The Debtor admits that (a) in the abstract, even a slight probability of success on the merits may be sufficient to satisfy the prong of the three-part test advanced by the Connecticut Plaintiffs regarding probability of success; (b) the Debtor's liability in the Connecticut Action has been established. The Debtor denies (x) that there will be no more litigation with respect to the Connecticut Action after damages are determined and (y) that the Connecticut Plaintiffs are assured to obtain damages. By way of further answer, the Debtor anticipates that it or Alex Jones would likely appeal any substantial final judgment from the Connecticut Action.

30.     The Debtor admits that (a) bankruptcy courts have considered the *Curtis* factors in connection with the motions for relief from the automatic stay; (b) the *Curtis* factors need not be assigned equal weight and only the relevant factors to the particular case need to be considered; and (c) courts have held that a decision to lift the automatic stay may be upheld on the ground of judicial economy alone under certain facts. By way of further answer, the Debtor asserts that the impact of the stay on the parties and the balance of harms is the most important factor.

31.     The Debtor denies the factual allegations in Paragraph 31 of the Lift Stay Motion. By way of further answer, in addition to the argument set out above, the Debtor asserts that (a) the Connecticut Action is estimated to require approximately 2½ months of continuous litigation; (b)

001873

this chapter 11 case could continue without immediate liquidation of the Connecticut Plaintiffs' claims; (c) it has yet to be determined whether the Connecticut Plaintiffs' claims will be the largest creditors in this case; (d) continuing to litigate the Connecticut Action would increase the Debtor's financial distress as the result of the costs of such litigation and the interreference with the Debtor's operations.

32.     The Debtor admits that (a) the Connecticut Action is ready for jury trial in the state court of Connecticut on the limited issue of damages after *voir dire* is conducted with respect to the Debtor and (b) the Connecticut Plaintiffs are not seeking relief from the stay to pursue collection against the Debtor. The Debtor specifically denies that (x) proceeding with the Connecticut Action will not interfere with the Debtor's chapter 11 case; (y) denial of the relief requested in the Lift Stay Motion will result in substantial harm to the Connecticut Plaintiffs; and (z) lifting the automatic stay will not prejudice other creditors.

33.     The Debtor admits that (a) the Connecticut Plaintiffs have a right to a jury trial except as altered by the claims allowance process in this bankruptcy case and (b) all of the issues in the Connecticut Action are based on issues of state law. The Debtor specifically denies all remaining factual allegations in Paragraph 33 of the Lift Stay Motion.

34.     The Debtor admits that (a) the Connecticut trial judge has presided over the Connecticut Action for approximately four years; (b) the trial date for the Connecticut Action was scheduled approximately one year ago; and (c) for the purposes of pleading, the Connecticut court and the Connecticut Plaintiffs are prepared to proceed to trial. The Debtor specifically denies that (x) judicial economy favors lifting the stay; (y) allowing the Connecticut Action to proceed is the most efficient use of judicial resources; and (z) that the Debtor has trial counsel that is prepared to proceed to trial in Connecticut state court. By way of further answer, the Debtor asserts that (a)

20

the month-long jury selection process required if the Connecticut Plaintiffs' claims against the Debtor are determined in the Connecticut Trial court would increase the costs and judicial resources required compared to the claims allowance process in this Court and (b) the Debtor's prepetition trial counsel has not been retained in this chapter 11 case.

35.     The Debtor admits that (a) comity considerations should generally be taken into account by this Court; (b) the Debtor and Jones were sanctioned in the Connecticut Action; and (c) in *In re Xenon Anesthesia of Texas, PLLC*, the bankruptcy court, as an alternative holding, granted relief from stay to proceed with a criminal contempt action in state court. The Debtor specifically denies that (x) comity considerations favor granting relief from the automatic stay here; (y) the fact that the Connecticut Superior Court has issued sanctions previously is grounds for the relief sought in the Lift Stay Motion; and (z) the Court should lift the automatic stay to permit the Connecticut Plaintiffs to proceed against the Debtor in the Connecticut Action.

36.     The Debtor admits that the Connecticut Plaintiffs are requesting the relief indicated in Paragraph 36 of the Lift Stay Motion.

Pursuant to Rule 8(b)(3) of the Federal Rules of Civil Procedure, the Debtor generally denies all allegations except those specifically admitted or about which the Debtor has indicated it lacks knowledge or information sufficient to form a belief as to truth.

## STATEMENT OF EFFORTS TO REACH AGREEMENT

The Debtor, through its counsel, has engaged in discussions with counsel for the Connecticut Plaintiffs in an attempt to resolve the Lift Stay Motion and anticipates in engaging in further negotiation efforts prior to the hearing thereon. As of the date of this Response, however, no agreement has been reached.

001875

## CONCLUSION

Based on the foregoing, the Debtor requests that the Court deny the Lift Stay Motion without prejudice. The prejudice to the Debtor significantly outweighs the prejudice to the Connecticut Plaintiffs. The relief requested by the Connecticut Plaintiffs is simply not justified at this time.

Dated: August 17, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

001876

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within one hour of filing, by email on the following parties:

Ryan Chapple
CAIN & SKARNULIS PLLC
303 Colorado Street Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Melissa Haselden
Subchapater V Trustee
700 Milam, Suite 1300
mhaselden@haseldenfarrow.com

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, Texas 77581
rww@bymanlaw.com

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave STE 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov

*/s/R. J. Shannon*
R. J. Shannon

23

001877

**EXHIBIT A**

Motion to Modify

5/27/2022 11:59 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Victoria Benavides

Cause No.: D-1-GN-18-1835

| | |
|---|---|
| NEIL HESLIN and SCARLETT LEWIS, | IN THE DISTRICT COURT OF |
| Plaintiffs, | |
| v. | TRAVIS COUNTY, TEXAS, |
| ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and OWEN SHROYER, | |
| Defendants, | 261st JUDICIAL DISTRICT |

Cause No.: D-1-GN-18-1842

| | |
|---|---|
| LEONARD POZNER and VERONIQUE DE LA ROSA, | IN THE DISTRICT COURT OF |
| Plaintiffs, | |
| v. | TRAVIS COUNTY, TEXAS, |
| ALEX E. JONES, INFOWARS, LLC, & FREE SPEECH SYSTEMS, LLC. | |
| Defendants, | 345th JUDICIAL DISTRICT |

**DEFENDANTS' PARTIALLY UNOPPOSED MOTION TO CORRECT/MODIFY "ORDER ON ATTORNEY'S FEES FOR PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSTION [SIC|"**

Alex Jones, Free Speech Systems, LLC ("FSS"), and Owen Shroyer, Defendants in the above entitled and numbered causes, file this partially unopposed request that the Court modify its April 15, 2022, sanction order.

**I.      The Order should be modified to reflect that only FSS is being sanctioned.**

On April 1, 2022 in Cause Numbers D-1-GN-18-001835 and D-1-GN-18-001842 the Court issued an Order (the Sanctions Order) against "Defendants" arising from allegations that Defendant FSS failed to properly produce a corporate representatives, awarding, among other things, attorneys fees and costs.

The Court's order provided that Plaintiffs could submit their claim for attorneys fees and costs and further provided Defendants could file an objection on or before April 15, 2022.   Prior to the deadline, on April 15, 2022, the Court issued a second Order in these cases requiring Defendants to pay Plaintiffs as a sanction, $966,182.73 in the aggregate (the "Second Order").

The Order is titled "Order on Attorney's Fees for Plaintiffs' Motion For Sanctions Regarding Corporate Depostion [Sic]."  In paragraph two of the Order the Court writes "Defendants shall pay." The Court's use of the plural rather than the singular has prompted Defendants to file this partially unopposed motion[1], requesting that the Court correct its use of the plural so that the order is directed only at Defendant FSS and not Alex Jones or Owen Shroyer.

As written, the sanctions ordered by the Court apply to all Defendants, including Alex Jones and Owen Shroyer.  Jones and Shroyer are natural persons who were sued in their individual capacity. Neither had the obligation to produce a corporate representative for deposition nor were either Jones or Shroyer asked to do so.

Trial courts may not impose sanctions against parties from whom discovery was not sought. *See Arkla, Inc. v. Harris*, 846 S.W.2d 623, 628–29 (Tex. App.—Houston [14th Dist.] 1993, orig. proceeding) (immediate trial setting constitutes improper sanction when not all parties participated in discovery abuse); *Ramirez v. Otis Elevator Co.*, 837 S.W.2d 405, 411 (Tex. App.—Dallas 1992, writ

---

[1] Plaintiffs' agree that the Order should not apply to Mr. Shroyer but dispute whether it should apply to Mr. Jones.

denied) ("extent of the parties' personal responsibility" is one factor to consider in determining whether death penalty sanctions are proper).

Jones and Shroyer are not complaining about the effect that the sanction on their corporate co-defendant will have on them indirectly; rather, the glaring issue is that, unless the Order is corrected, they are being asked to pay the amount individually.

It is inappropriate to hold one party liable for another party's misconduct. *Bodnow Corp. v. Hondo*, 721 S.W.2d 839, 840 (Tex. 1986). In *Hondo*, it was held inappropriate to impose joint and several liability on an intervenor for the misconduct of other plaintiffs. *Id.* The Court reasoned, "[m]aking a party liable for discovery expenses that are caused by another party's misconduct does not further any of the purposes that discovery sanctions were intended to further." *Id.* The Texas Supreme Court has repeatedly reaffirmed this principle. Sanctions must be imposed against the "true offender." *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). The direct relationship requirement "means that the sanction should be visited on the offender," and the trial court must attempt to determine against whom "the offensive conduct is attributable." *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). Because there is no evidence that Mr. Jones or Mr. Shroyer committed any wrongdoing viz-a-viz the corporate representative deposition, neither was the true offender.

## II.     If paid now, the sanctions would materially impair Defendants' ability to continue the litigation.

Under *Braden v. Downey*, 811 S.W.2d 922 (Tex. 1991) this Court should either defer the payment deadline until rendition of an appealable judgement or hold a hearing and make specific written findings about the impact payment would have on Defendants' willingness and ability to continue the litigation through appeal.

001881

Under Texas Rule of Civil Procedure 215.2 sanctions orders are generally not reviewed on mandamus because the sanctioned party has an adequate remedy on appeal. However, large sanction awards that have the potential to materially burden a party's access to the courts, such as the one issued by the Court here, do have some procedural safeguards. These safeguards exist because "monetary sanctions should not ordinarily be used to dispose of litigation." *Id*. at 929. So, when the imposition of a sanction threatens a party's ability to continue the litigation through appeal, it should be deferred until entry of a final judgement, or the Court should hold a hearing and issue specific findings as to why the award will not have a preclusive effect on Defendants' willingness and ability to continue the litigation. *Id*. Finally, when a sanction is so large as to expose risk of repayment if reversed on appeal, payment should be deferred until entry of final judgment.

### III. Conclusion

Defendants request that the Court issue an Order modifying its previous order to make it effective only against FSS and defer payment until entry of final judgment. If the Court chooses not to defer payment, Defendants request that the Court hold a hearing and issue specific written findings regarding whether ordering immediate payment will burden Defendants' access to the courts.

Respectfully submitted this
27th day of May 2022,

/s/ F. Andino Reynal.
Federico Andino Reynal
SBN: 24060482
917 Franklin; Suite 600
Houston, TX 77002
[Tel.]  (713) 228-5900
areynal@frlaw.us

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been delivered this 27th day of May 2022 (by electronic filing) to all counsel and parties of record on the e-filing system.

/s/ F. Andino Reynal
_____

**F. Andino Reynal**

### CERTIFICATE OF CONFERENCE

On May 26, 2022 1 conferred by email with Plaintiffs' Counsel who indicated that they agreed that the Court's Order should not apply to Owen Shroyer but believed it should apply to Alex Jones and FSS and that the sanction should not be deferred.

/s/ F. Andino Reynal
_____

**F. Andino Reynal**

001883

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tish Swearington on behalf of F. Reynal
Bar No. 24060482
tish@frlaw.us
Envelope ID: 64927422
Status as of 6/2/2022 1:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 5/27/2022 11:59:01 AM | SENT |
| Joshua ARomero | | jromero@jw.com | 5/27/2022 11:59:01 AM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 5/27/2022 11:59:01 AM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 5/27/2022 11:59:01 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 5/27/2022 11:59:01 AM | SENT |
| William Ogden | | bill@fbtrial.com | 5/27/2022 11:59:01 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/27/2022 11:59:01 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/27/2022 11:59:01 AM | SENT |
| Andrew Grant | | aj@fbtrial.com | 5/27/2022 11:59:01 AM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 5/27/2022 11:59:01 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 5/27/2022 11:59:01 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 5/27/2022 11:59:01 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 5/27/2022 11:59:01 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 5/27/2022 11:59:01 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 5/27/2022 11:59:01 AM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Federico Reynal | 24060482 | areynal@frlaw.us | 5/27/2022 11:59:01 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/27/2022 11:59:01 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 5/27/2022 11:59:01 AM | SENT |

Associated Case Party: OWEN SHROYER

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tish Swearington on behalf of F. Reynal
Bar No. 24060482
tish@frlaw.us
Envelope ID: 64927422
Status as of 6/2/2022 1:20 PM CST

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph C. Magliolo | 12821600 | jmagliolo@frlaw.us | 5/27/2022 11:59:01 AM | SENT |
| Tish Swearington | | tish@frlaw.us | 5/27/2022 11:59:01 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 5/27/2022 11:59:01 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/27/2022 11:59:01 AM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 5/27/2022 11:59:01 AM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 5/27/2022 11:59:01 AM | SENT |
| William R.Ogden | | bill@fbtrial.com | 5/27/2022 11:59:01 AM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 5/27/2022 11:59:01 AM | SENT |

**EXHIBIT B**

Order Denying Motion to Modify

Filed in The District Court
of Travis County, Texas

JUN 2 7 2022  CJ

At _____3:20_____ ＰM.

Velva L. Price, District Clerk

## D-1-GN-18-001835

| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

### ORDER ON DEFENDANTS' MOTIONS TO MODIFY AND/OR CLARIFY

---

On this day, the Court considered Defendants' May 27, 2022 "Defendants' Partially

Unopposed Motion to Correct/Modify 'Order on Attorney's Fees for Plaintiffs' Motion for

Sanctions Regarding Corporate Deposition'" relating to a Sanctions Order issued on April 15,

2022. After considering the pleadings and evidence, and after holding a hearing on June 24,

2022, the Court makes the following findings:

1)        The Court finds that Defendants failed to meet their burden to show the

Court's April 15th sanctions have a preclusive effect under *Braden*.

3)        The Court finds that pursuant to the default judgment, Alex Jones and Free

Speech Systems, LLC are admitted to be alter egos. Even absent the default judgment, the

Court notes that the record supports a finding that Alex Jones and Free Speech Systems, LLC

1

001887

are alter egos. The Court further finds that both Mr. Jones and Free Speech Systems, LLC are both "a party...whose conduct necessitated the motion" under Rule 215.1(d).

4)    Having considered Plaintiffs' evidence of attorney's fees, and having considered Defendants' April 15th objections to those fees, the Court continues to find that the fees are reasonable and the sanction is appropriate and just.

5)    The Court GRANTS Defendants' Motion with regard to D-1-GN-18-001835 (the *Heslin* matter) as it concerns Owen Shroyer.  Therefore, it is ORDERED that Mr. Shroyer has no obligation to satisfy the sanctions award of April 15, 2022. Defendants' Motions to Correct/Modify are in all other respects DENIED.

6)    Defendants are ordered to pay the sanctions within 20 days of this order.

Dated June 24, 2022.

Hon. Maya Guerra Gamble

2

001888

**EXHIBIT C**

Show Cause Order

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

8/11/2022

ORDER

The following order is entered in the above matter:

ORDER:

The initial show cause hearing for Attorney Andino Reynal, juris number 443753 , will take place on the record as scheduled on Wednesday, August 17, 2022, at 10:00 a.m. but will be conducted remotely. The evidentiary show cause hearing for Attorney Norman Pattis, juris number 408681,will follow at 10:30 a.m., and will be conducted in person.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

**EXHIBIT D**

Transcript of August 10, 2022, Show Cause Hearing

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY.

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  AUGUST 10, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

           BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S :


    Representing the Plaintiff(s):

        ATTORNEY CHRISTOPHER MATTEI



    Representing the Defendant(s):

        ATTORNEY NORMAN PATTIS for Jones Defendants
        ATTORNEY WESLEY MEAD for Norman Pattis
        ATTORNEY BRIAN STAINES for Chief Disciplinary Counsel


                              Recorded By:
                              Darlene Orsatti

                              Transcribed By:
                              Darlene Orsatti
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT 06702

001892

1         THE COURT:  All right.  Good afternoon.  This is

2    Judge Bellis; we are on the record in the show cause

3    hearing for Attorney Pattis in the Lafferty matters.

4    If counsel could please identify themselves for the

5    record.

6         ATTY. MATTEI:  Good afternoon, your Honor.  This

7    is Chris Mattei on behalf of the plaintiffs.

8         ATTY. STAINES:  Good afternoon, your Honor.  I

9    am Brian Staines, Chief Disciplinary Counsel.

10        THE COURT:  Good afternoon.

11        ATTY. PATTIS:  Norm Pattis, judge.

12        THE COURT:  Good afternoon.

13        ATTY. PATTIS:  I think Mr. Mead is on mute.

14        ATTY. MEAD:  I'm sorry, Judge.  I apologize.

15   Wesley Mead for Mr. Norm Pattis, your Honor.  Good

16   afternoon.

17        THE COURT:  Good afternoon.  Welcome.  All

18   right.  So let's take up first the housekeeping

19   matter.  There was an objection to the filming or

20   recording of this civil procedure.  And Practice Book

21   111b controls the burden of proving that electronic

22   coverage should be limited or precluded, is on

23   counsel for Attorney Pattis, who has objected to the

24   coverage.  So you have the floor, Attorney Mead.

25        ATTY. MEAD:  Judge, my objection is two-fold.

26   One is the issue that I raised is that in most

27   jurisdictions these proceedings are confidential

1      until a attorney's deemed to have been – committed a

2      grievable offense in this instance.  And the reason

3      that is judge, is because as I stated in my

4      objection, it exposes attorneys in general, to damage

5      to their reputation and character, which sometimes

6      can't be restored.

7          And that's the one objection I cited, both the

8      New York Statue and the Connecticut – the Connecticut

9      Statute in that regard.  The other issue too judge,

10     is as you know, I've requested that the – that these

11     proceedings be adjourned due to my Covid issue.  I

12     certainly don't – I'm not inclined normally to have

13     my home, you know – part of a livestream.  I was

14     anticipating that the Court would have adjourned this

15     to another date.  It didn't do so.  So based on both

16     of those reasons I had requested the livestreaming

17     not occur.  And that is my application, judge.

18         THE CLERK:  You're muted, your Honor.

19         THE COURT:  Thank you.  Thank you, Attorney

20     Mead.  So under the Practice Book, the Court has to

21     determine whether the coverage would undermine the

22     legal rights of a party or significantly compromise

23     the safety or a witness, or other interested person,

24     or impact significant privacy concerns.  This is of

25     course different than the normal disciplinary

26     proceeding, where the matter is private until there's

27     a finding of probable cause.  This obviously is a

1       show cause hearing that the Court is conducting.

2           I would also point out that I only learned of

3       this issue by reading headlines.  And I understand

4       that it was a part of a very public trial that was

5       livestreamed.  For those reasons I am going to

6       overrule the objection.  So to the extent that any of

7       the media has logged on, they can now log off and

8       they are permitted to broadcast.

9           All right.  So I am mindful that you have – some

10      of you have a 3 o'clock bankruptcy conference, and I

11      don't expect to be long, especially given Attorney

12      Mead's situation.  So I'll be as brief as possible.

13      Of course originally this was the show cause hearing,

14      but given Attorney Mead's situation, I'll just go

15      through the history and the background, and lay

16      everything out, and then we can pick a date for the

17      show cause hearing.

18          ATTY. MATTIE:  Your Honor –

19          THE COURT:  I want to –

20          ATTY. MATTIE:  Just for clarity's sake.  The

21      3 o'clock bankruptcy proceeding has been moved to

22      Friday.  So that will not be happening at 3 o'clock

23      today.

24          THE COURT:  Okay.  Thank you.

25          So I want this proceeding to be fair and

26      transparent, so I am going to go into considerable

27      detail regarding prior disciplinary issues in this

1   case.  And the questions that I want addressed in

2   connection with what appears to be improper

3   disclosure of highly protected records.

4        ATTY. MEAD:  Judge, I apologize.  Before we

5   begin.  I just wanted to preserve my clients right to

6   an objection as to jurisdiction, and ask your Honor

7   just for the record, if I may request a briefing

8   schedule on jurisdiction.  There is a bankruptcy stay

9   in this case.  I've done a little research; I don't

10  believe this Court has jurisdiction.  I saw the show

11  cause notice.  I believe your Honor is - seemed to

12  have carved out an exception, because it allegedly

13  relates to attorney discipline.  However, the issues

14  that your Honor will be having to delve into in order

15  to decide that issue, relate directly to the

16  confidentially order -

17       THE COURT:  All right.  So, Attorney Mead -

18       ATTY. MEAD:  - in this case, which is now -

19       THE COURT:  - I am going to interrupt you.

20       ATTY. MEAD:  Yes, your Honor.

21       THE COURT:  And I'm going to ask all counsel to

22  mute their devices.  I see some other devices are not

23  muted, because I am getting some feedback.  This

24  matter is not an issue in the actual lawsuits that

25  are being filed.  So this is not sanctions against

26  the parties.  This issue is between the Court and

27  Attorney Pattis, and next week it will between the

1    Court and Attorney Reynal.  So certainly Attorney

2    Mead, you can raise whatever issue you think is

3    appropriate.  I'm certainly not going to enter in a

4    briefing schedule.  I know for a fact that the Court

5    always has jurisdiction over the conduct of the

6    attorneys that appear before it.  So I will not delay

7    this.

8         If by some chance that you happen to be right,

9    which I do not believe in any way, shape, or form, to

10   be the case.  Then my actions of course would be void

11   and not voidable, as is with any bankruptcy

12   proceeding.  But again, just to make it clear.  This

13   issue is between the Court and Attorney Pattis today.

14   It is not any – no parties are being sanctioned here.

15   All right.  But I do note your concern for the

16   record, so…

17        All right.  So on August 4th 2022, the Court

18   issued an order for Attorney Pattis to show cause as

19   to whether he should be referred to disciplinary

20   authorities or sanctioned by the Court directly, if

21   appropriate, Pursuant to Practice Book Section 245.

22   Regarding the release of medical records of the

23   plaintiff's, which I understand may include

24   psychiatric records to unauthorized individuals.

25        And as I said before Attorney Mead, in order to

26   accommodate you, we will schedule the actual show

27   cause hearing for one day next week, hopefully in

1    person.  And I am pleased to see that you are here

2    appearing for Attorney Pattis, as this is a serious

3    matter.  And I will tell you now, in the interest of

4    candor.  That I do intend to handle this matter

5    directly, rather than making a referral to

6    disciplinary authorities.  And I am also thankful

7    that Attorney Staines, as Chief Disciplinary Counsel,

8    is attending today and will participate in these

9    proceedings.

10        So I will just state for the record, especially

11    since Attorney Mead is not necessarily familiar with

12    the entire background here.  But the show cause

13    hearing for Attorney Pattis, and the show cause

14    hearing for Attorney Reynal next week, are the third

15    and fourth disciplinary issues involving the Jones

16    defendants defense counsel.  So four disciplinary

17    hearings for three attorneys in the same lawsuit, is

18    unprecedented.  Just one is highly unusual, and here

19    we are now on our third and fourth.

20        The first disciplinary issue also involved

21    Attorney Pattis.  It involved an affidavit of Alex

22    Jones that was sworn to and filed with the Court by

23    Attorney Pattis.  Where the signature of Mr. Jones on

24    the affidavit was not actually that of Mr. Jones.

25    The local - and the Court, instead of it doing a show

26    cause hearing, as it is now, referred the matter to

27    Disciplinary Counsel.  And I understand Attorney

1    Pattis to his accredit, also referred the matter

2    himself.

3         The local grievance panel found probable cause

4    for misconduct, and a public hearing and a public

5    decision followed.  And I am going to read three or

6    four sentences from that public decision.  The

7    respondent, Attorney Pattis, acknowledged that he

8    made a mistake in connection with the execution of

9    the affidavit.  When the respondent realized his err,

10   he immediately corrected it.

11        We find the respondent credible.  That he made a

12   mistake and had no intent to deceive the Court or

13   opposing counsel.  Notwithstanding, we are critical

14   of the respondents' level of diligence in researching

15   how to handle an affidavit involving an attorney, in

16   fact, acting under a Texas power of attorney and a

17   Connecticut civil proceeding.  It is the opinion of

18   this reviewing committee, that the respondent's

19   practice was sloppy with regard to the execution of

20   the affidavit, and that he exercised bad judgment.

21   Further, it was inappropriate not to request the

22   power of attorney document for review.  Finally,

23   since we conclude that the respondent did not violate

24   the rules of professional conduct, we dismissed the

25   complaint.

26        The second disciplinary matter involved the

27   Jones defendant's former attorney Jay Wolman.  And

1    that involved deposition misconduct at the deposition

2    of a former employee of the defendant, Free Speech

3    Systems.  Following a show cause hearing, the Court

4    issued a formal reprimand as to Attorney Wolman, and

5    that reprimand and decision is also a public record.

6    That brings us to the present show cause hearings

7    involving Attorney Pattis, and next week, Attorney

8    Reynal.

9        So the history is as follows:  On July 6, 2022,

10   Attorney Pattis filed with the Court an application

11   for permission for Attorney Reynal to appear pro hac

12   vice in this matter.  In the application, Attorney

13   Pattis, as is required by our Rules of Practice,

14   agreed to sign all filings with the Court.  Assumed

15   full responsibility for all court filings.  And

16   assumed full responsibility for the conduct of the

17   cause or proceeding, and of Attorney Reynal.  The

18   Court granted the pro hac application on July 22,

19   2022.  But before Attorney Reynal even filed an

20   appearance in the underlying lawsuits, Attorney

21   Reynal was removed from the case by agreement on July

22   26, '22, having never filed an appearance in the

23   case.

24       So that brings us to why we are here.  It

25   appears that the medical and/or psychiatric records

26   of the plaintiff's in the underlying lawsuits, were

27   recently provided to unauthorized individuals.

1       Whether it was by Attorney Pattis and/or Attorney

2       Reynal.  Disciplinary counsel is now involved, and I

3       expect to hear evidence at our show cause hearing,

4       relating to who sent the records.  When they were

5       sent.  The level of technological expertise the

6       sender had.  If the staff sent the records, under

7       what attorney's supervision.  What records were sent.

8       Were they medical and psychiatric records, or other

9       records subject to the Court's protective order?  I

10      want to know exactly who received the records.  And

11      if that requires testimony from lawyers or others in

12      the Texas case, so be it.

13          I want to know whether any records were involved

14      that were subject to this Court's order.  This Court

15      had entered orders regarding confidential records,

16      highly confidential record, and attorney eyes only

17      records.  So I want evidence on what if any of the

18      records were subject to the protective order.  And I

19      am obviously very concerned about the unauthorized

20      release of confidential private records that were

21      protected under the Court's protective order.  And

22      I'm troubled that medical records that are protected

23      under state and federal law.  And psychiatric or

24      psychological, or counseling records, which enjoy a

25      very high level of protection under the law, might

26      have been improperly released to unauthorized

27      individuals.

1        So in short.  With respect to any of the

2   plaintiff's medical records or other records that

3   were subject to the Courts order, I want to know

4   whether they got sent to unauthorized individuals.

5   How did they get sent?  Who sent them?  When did they

6   get there?  I want the details of the transmissions.

7   I want specifics.  Were electronic files sent?  Were

8   the files named?  Were the actual files sent, or were

9   they converted?  And did they have a Bates number?

10       And I want to know what steps specifically were

11  taken by Attorney Pattis, or anyone that he was

12  supervising.  Whether it was Attorney Reynal at the

13  period that Attorney Reynal had pro hac status.  Or

14  any attorney's or office staff, what step – what

15  training they had and what steps were taken to flag

16  confidential or protected materials.

17       And then importantly, I want to know exactly

18  what steps were taken by Attorney Pattis or anyone

19  that he was supervising, to remedy any improper

20  disclosure, if in fact there was improper disclosure.

21  So not only the transmission of these records, but

22  then what if anything was done to remedy any improper

23  disclosure.  I want to know as well, whether

24  plaintiffs' counsel in the underlying lawsuit was

25  ever notified of any improper disclosure, if there

26  was an improper disclosure.  I do note that no

27  disclosure was ever made to this Court.  I don't know

1    whether the disclosure was ever made to the

2    Bankruptcy Court for the Alex Jones case that was

3    removed to Bankruptcy Court.

4         All right.  I do want to mark as a court

5    exhibit, Mr. Ferraro, the protective order in the

6    underlying lawsuits, which is entry number 850.  That

7    is the most recent protective order that was granted

8    by the Court.  And I imagine that will be utilized in

9    the show cause proceeding.

10        So with respect to notice of the specific

11   possible rules of professional conduct violations.

12   The Court is concerned with the possible following

13   violations.  Rule 1.1, competence.  Did Attorney

14   Pattis have the requisite technological knowledge and

15   skill necessary to conduct electronic discovery.  If

16   in fact that was done here.  Rule 3.4(3).  Whether

17   Attorney Pattis knowingly disobeyed an obligation

18   under the rules of the Court with respect to the

19   handling of the plaintiffs' confidential records.

20   Both in the disclosure of documents to unauthorized

21   individuals.  If that happened.  And then steps that

22   were taken or not taken to remedy any unauthorized

23   disclosure.

24        Rule 5.1b.  Whether Attorney Pattis, by having

25   supervisory authority over Attorney Reynal, made all

26   reasonable efforts to ensure that Attorney Reynal

27   conformed to the Rules of Professional Conduct.  And

12

```
1        5.1(c)1 and 2.  Whether Attorney Pattis either

2        ratified Attorney Reynal's conduct, or knew of the

3        conduct, and failed to take any reasonable necessary

4        remedial action.  Or 5.3.  Whether Attorney Pattis

5        bears any responsibility to the extent any

6        non-lawyers were involved in the transmission of the

7        records.  Rule 8.4(4).  Whether Attorney Pattis

8        engaged in any conduct that is prejudicial to the

9        administration of justice.

10            Basically all of the concerns that the Court has

11       relates to the possible dissemination of the

12       plaintiff's confidential records.  Whether they were

13       made confidential under the Court's order in the

14       underlying lawsuits, or whether they were statutorily

15       protected.  At this point I'm not even sure, and we

16       will find out at the hearing, whether Attorney

17       Reynal, who never filed an appearance and was only

18       accorded pro hac status on July 20th, whether it was

19       even permissible under the Court's order for Attorney

20       Pattis to send the documents to Attorney Reynal.

21       Whether it was intentional to send them to Attorney

22       Reynal, unintentional, and who else they might be –

23       might have been sent to.  I have no idea at this

24       point.

25            So, these are the Courts' concerns about

26       possible rules of professional conduct violations.

27       And I hope by giving all these details, that I've
```

1          sufficiently conveyed to your client, Attorney Mead,

2          how concerned the Court is about the events and the

3          purported release of protected records of the

4          plaintiffs in the underlying lawsuit.  So at this

5          point, unless Attorney Staines or Attorney Mead wants

6          to be heard, we can consult our schedules.  Attorney

7          Mead and Attorney Staines and pick the date for the

8          actual show cause hearing.  And I anticipate a

9          briefing schedule following the close of the show

10         cause hearing when we're done with any witnesses or

11         evidence.  I will then – we can then come up with a

12         briefing schedule.  All right.  So, I think you gave

13         some dates next week, Attorney Mead, that you were

14         available?

15              ATTY. MEAD:  Yeah.  Judge, I did.  I gave –

16         before I get into that.  I gave 8/17 and 8/19, I

17         believe next week.  But, as you know, your Honor, in

18         one of these proceedings, the character witnesses are

19         available to be presented to my – on the defense of

20         Mr. Pattis, if necessary.  So I would – I'm going to

21         be checking with potential character witnesses, to

22         see if they're available on any either those dates.

23              The other issue, Judge.  Is, I took – you cut

24         out a couple times.  I got most of what you said

25         about the – the alleged disciplinary issues.  As far

26         as your Honors' orders – with the notice –

27              THE COURT:  Well, I'm going to just interrupt

1    you for one second, Attorney Mead, because you

2    actually have been breaking up on and off throughout

3    your conversations.

4         ATTY. MEAD:  Okay.

5         THE COURT:  But I will order a transcript of my

6    comments, and I'll put the transcript in the file,

7    and so you will have that.

8         ATTY. MEAD:  Okay.

9         THE COURT:  And I understand that we're going to

10   pick the date, hopefully one of the dates that you

11   gave next week that fit into your schedule.  And I

12   surely understand that witnesses may or may not be

13   available.  And I don't necessarily even need to do

14   this one the record.  I don't have a problem,

15   Attorney Mead, with you and Attorney Staines off the

16   record, speaking with Attorney Ferraro.

17        But I don't want this – I want to handle it

18   sooner rather than later.  But certainly I want you

19   both to have time to prepare, since frankly I just

20   laid out all the Courts' concerns today.  All right.

21   So would you prefer to do that?  Would you prefer

22   Attorney Mead and Attorney Staines to –

23        ATTY. MEAD:  Yes.  I can consult with Mr.

24   Ferraro and Mr. Mattie, and we can select a date that

25   works for your Honor as well.

26        THE COURT:  Well, Attorney Mattie, I'm not so

27   worried about.  No offense, Attorney Mattie.  But

1        he's not – this is as I keep saying.  This is a show

2        cause hearing between the Court and Attorney Pattis.

3        So really, Attorney Mattie, I'm sure – I shouldn't

4        say, I'm sure, but may very well be involved as a

5        witness.  But the schedules that I really care about

6        besides Ron's because Ron needs to be available, is

7        myself, you, and Attorney Staines.  Okay.  So that's

8        really what I'm looking to do.  So if – unless there

9        are any other issues to address, we can adjourn and –

10            ATTY. MEAD:  Just – just one, Judge.  If I may?

11       And I hope you can hear me all right now.  I'm trying

12       to speak slowly.  You referenced the State and

13       Federal Statutes in your show cause notice.  Which

14       State and Federal Statutes are you referring to?  So

15       I can properly advise my client.

16            THE COURT:  I'm not really here to answer those

17       kind of questions.  I put you on notice of what the

18       concerns were and what the practice – Code of

19       Professional Responsibility potential rule violations

20       are.  And I laid out that it looks like medical

21       records.  It could be psychiatrist records,

22       psychological records, counseling records.  I don't

23       know.  But I am clearly gravely concerned about what

24       I had to hear in headlines on the news.  It was never

25       reported to me by counsel that there were any issues.

26       But just what I read in the news.  And it may be that

27       there were no violations.  And that would be

1       wonderful for everyone that's involved.

2            But clearly, Attorney Mead, you can look at the

3       statutes.  You'll see if you're not already familiar.

4       That there are separate statues because these are

5       such highly protected records.  If we're talking

6       about sex abuse counseling records, there's a statute

7       for that.  Domestic violence records, there's a

8       statute for that.  Marital counseling records,

9       there's a statute for that.  But since I don't know

10      what records have been disclosed, I can't list all

11      the statutes for you.  But I suggest you go pull the

12      volumes out and take a look, because there's all

13      separate statues.  Psychological records has its own

14      statute.  Psychiatric records have its own statute.

15      So I think that you – that's not something that we

16      need to discuss today.

17           Any other issues?  Seeing none, we're adjourned.

18  (The matter concluded.)

19

20

21

22

23

24

25

26

27

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  AUGUST 10, 2022
DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

                         *C E R T I F I C A T I O N*


    I hereby certify the foregoing pages are a true and correct
transcription of the audio recording of the above-referenced
case, heard in Superior Court, G.A. #4, Waterbury, Connecticut,
before the Honorable Barbara Bellis, Judge, on the 10th day of
August, 2022.



        Dated this 10th day of August, 2022 in Waterbury,
Connecticut.




                                    _____

                                    Darlene Orsatti

                                    Court Recording Monitor

**EXHIBIT E**

August 2, 2022, Transcript of Hearing in Connecticut Action

1

```
DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  AUGUST 2, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

          BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY MATT BLUMENTHAL

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS


                              Recorded and Transcribed by:
                              Debbie Ellis
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT  06702

2

1          THE COURT:  We are on the record in the three

2     related Lafftery versus Jones matters.  Lead docket

3     number Waterbury CV186046436.  I'm going to ask counsel

4     to please identify themselves for the record.

5          ATTY. MATTEI:  Good morning, your Honor.  Chris

6     Mattei on behalf of the plaintiffs.  With me is my

7     colleague Matt Blumenthal.

8          THE COURT:  Good morning.

9          ATTY. PATTIS:  Norm Pattis on behalf of Mr. Jones,

10    Free Speech Systems, Judge.  Good morning.

11         THE COURT:  Good morning.

12         ATTY. WILLIAMS:  Good morning, your Honor.  John

13    Williams with a special appearance on behalf of

14    Mr. Jones.

15         THE COURT:  Good morning.  So I think I may be

16    able to avoid the first issue with respect to the

17    objection for the media request.  Mr. Ferraro, have you

18    seen any members of the media here today?

19         THE CLERK:  There's one but nobody who had

20    requested to record.

21         THE COURT:  Okay.  So in light of the fact that no

22    one is here, I can avoid that issue.

23         THE CLERK:  Your Honor, I apologize.  I do think

24    the Connecticut Public Radio person is on his way.  He

25    called me and asked about the address but I don't see

26    him yet.

27         THE COURT:  All right.  I'm not going to delay the

3

1   proceedings for that, so he will not be able to film

2   today.  Okay.

3       So this may be less than five minutes or we may be

4   here all day depending on how this works.  So my first

5   question and this is really a yes or a no or an I don't

6   know.  That's what I want.  I don't want long

7   explanations.  I'm not looking for argument, just a yes

8   or a no or I don't know.  I'll start with Attorney

9   Mattei and then I will ask Attorney Pattis.

10      So my question is, whether the bankruptcy court

11  granted a motion to extend the bankruptcy stay to Alex

12  Jones who has not filed for bankruptcy?  So Attorney

13  Mattei, yes, no or I don't know?

14      ATTY. MATTEI:  No, your Honor.

15      THE COURT:  Okay.  Attorney Pattis, do you agree

16  or disagree with that, sir?

17      ATTY. PATTIS:  Neither.  I don't know is my

18  answer.

19      THE COURT:  Okay.  I'm happy to pass the matter

20  since your client would know, I assume, since you're

21  representing your client.  Would you like me to pass it

22  for a few minutes and we can make a call?

23      ATTY. PATTIS:  He's testifying today.  I tried to

24  reach him yesterday, a per your order and was

25  unsuccessful.  I don't know if I can reach his trial

26  counsel but I'll try.

27      THE COURT:  I know that you had mentioned, I think

4

1      you had reached out to Mr. Stuckel actually since

2      Mr. Ferraro was getting back from his Italy trip, with

3      respect to having bankruptcy counsel use the link to

4      watch it on Microsoft Teams so, I assume, they're

5      available.

6               ATTY. PATTIS:  I assume so too.

7               THE COURT:  So maybe they would be the ones that

8      you could try to reach.  And I just simply want to know

9      whether the bankruptcy court granted a motion to extend

10     the bankruptcy stay to Alex Jones who, to my knowledge,

11     has not filed bankruptcy.

12               ATTY. PATTIS:  I will find out, Judge.

13               THE COURT:  Okay.  So we'll take a five-minute

14     recess.  Thank you.

15               (Whereupon, there was a recess.)

16               THE COURT:  You could be seated.  That was quick,

17     Attorney Pattis.

18               ATTY. PATTIS:  It still took two phone calls.

19               THE COURT:  And the answer?

20               ATTY. PATTIS:  No such motion was filed,

21     therefore, no such motion is granted.

22               THE COURT:  Thank you.

23               So the automatic stay that is in effect as to Free

24     Speech System, LLC who filed for bankruptcy, I believe,

25     on Friday, does not automatically extend to solvent

26     codefendants even where they are similarly legal or

27     factually, so and I don't see that any motion for stay

5

1    has been filed here.

2         I'm going to next turn to the, I have to say

3    untimely cross claim.  I will give Attorney Williams an

4    opportunity to be heard but I do want to start out by

5    saying that it is, everyone has their responsibilities

6    and obligations in this case.  And one of my

7    responsibilities is to maintain the orderly procedure

8    of the court docket and cases and to prevent any

9    interference with the fair administration of justice.

10        And my concern here, Mr. Williams, and I'll give

11   you as much time as you need to respond, is that the

12   cross claim is untimely, improper, and that it delays

13   the trial.  And so I am considering using my statutory

14   authority and inherent authority in sua sponte

15   dismissing or striking the claim at this time.  So I'm

16   happy to have you be heard.

17        I do want to mention one thing before I forget is

18   that your appearance, you're going to need to correct

19   your appearance because your appearance, you didn't use

20   the right form.  There's a specific form that has to be

21   used for limited appearance and that form has different

22   language on it then the standard appearance form that

23   we're all used to.  So, for example, in the limited

24   appearance form you only agree to accept service on

25   your particular issue.  So I do want to tell you that

26   right now you are in for Mr. Jones full force and that

27   you'll need to correct that probably by way of a motion

6

1          or whatever you think is appropriate.

2               But in any event, let me hear you with respect to

3          your cross claim.

4               ATTY. WILLIAMS:  Your Honor, your Honor has raised

5          as I understand it and I apologize my hearing leaves a

6          lot to be desired but as I understand it, your Honor

7          has raised the question of untimeliness and

8          specifically as I look at the docket, there's no notice

9          of closed pleadings.  The case is proceeding as I

10         understand it as a hearing in damages.  It seems to me

11         that the cross claim is completely collateral to that.

12         There should not in any way have an impact on this

13         trial and in deed is the sort of thing that might well

14         be deferred until the end of the trial.

15              So if I have done something, your Honor used the

16         word improper, if I did something that was improper, I

17         can only tell your Honor it was certainly not my

18         intention and I apologize to the court for any offense

19         that I have given to you or inconvenience to anybody

20         else.  It was in no way my intention.

21              THE COURT:  No offense taken but we just need to

22         follow the rules, that's all.  So I raise the issue of

23         the untimeliness being improper and form and the delay

24         that it would work on the trial.  Is there anything

25         else that you wanted to add?

26              ATTY. WILLIAMS:  Well, your Honor, I didn't

27         believe that it was untimely.  But obviously the Free

7

1          Speech Systems I would have expected would oppose that

2          if they felt that it was untimely.  Your Honor, as

3          again said it's improper, I don't understand in what

4          way it would be improper except that I didn't request

5          your permission, which I didn't understand was required

6          and I didn't believe it would have any impact on the

7          case.

8              I have read the motion to strike.  Counsel there

9          indicates that --

10             THE COURT:  You're ahead of me Mr. Williams

11         because I haven't read it but --

12             ATTY. WILLIAMS:  I didn't hear you, your Honor.

13             THE COURT:  I said you're ahead of me because I

14         didn't read the motion to strike because it would now

15         require us to engage in pleading practice, request

16         to -- motion to strike, answer, special defenses,

17         motions for summary judgment and obviously we're down

18         for jury selection today.

19             ATTY. WILLIAMS:  Well, your Honor, all I can say

20         is that I did not intend any -- to do anything

21         improper.  I thought I was proceeding appropriately.

22         If I wasn't, I can only say that I am humbly apologetic

23         to the court.

24             THE COURT:  So I don't -- when I say untimely, and

25         please be seated if you like or remain standing

26         wherever you're most comfortable.  But when I say

27         untimely, it was filed well beyond the close of

8

1    pleadings deadline and the operative scheduling order.

2    I can't even find the last scheduling order, it's so

3    old.  And the deadline for the close of pleadings has

4    long passed.  It was not listed in the joint trial

5    management report which was ordered to be filed.  It

6    wasn't filed when the Jones defendants filed their

7    denials with their notice of defenses and their special

8    defenses and it's obviously filed on the eve of trial.

9         And when I say improper, I don't mean that you,

10   sir, did anything, you know, improperly to offend the

11   court by any means, so please don't think that.  But

12   what you would need to do with such a pleading is file

13   either a request to file the pleading, you know, beyond

14   the deadlines, file a motion with it, file a motion to

15   amend pleadings, something because otherwise, nothing

16   would prevent you from in the middle of evidence, you

17   or anyone else just dropping a pleading in the file and

18   expecting the parties and the court to adjudicate it.

19   So, we can't just have generally what we say with an

20   answer is an answer in cross claim or an answer in

21   counterclaim, certainly there was no answer here given

22   the default but there was the denial and the notice as

23   the defenses and the special defenses and I would have

24   expected it bare minimum to have it filed then.

25        And, you know, with respect to the delay, it would

26   delay the trial as it was filed five days before jury

27   selection.  So I have to say that Mr. Jones is not in

9

1    compliance with his obligations to plead in accordance

2    with our rules of practice and the scheduling order.

3        So pursuant to Connecticut General Statute 52-97

4    and Connecticut Practice Book Section 10-21, the cause

5    of action set forth in the untimely cross claim cannot

6    conveniently be heard with the main complaint.  And the

7    issues raised on the cross claim, even had the cross

8    claim been timely and properly filed, do not arise out

9    of the transaction which is the subject of the

10   plaintiff's complaint, which is required by Practice

11   Book 10-10.

12       For example, one of the basis for relief is an

13   injunction requiring someone from Free Speech Systems

14   to attend the trial.  So in short, it would be

15   impossible to hear and adjudicate the cross claim given

16   that jury selection starts today as it cannot

17   conveniently be heard with the main complaint.

18       So for these reasons, the court directs that the

19   cross claim be deleted or dismissed from this case and,

20   of course, nothing prevents Mr. Jones from filing a

21   separate action and if that does occur in the normal

22   course of business, the parties will be at notice that

23   the court will exercise jurisdiction over that matter

24   and bring it to this docket.  That is the most

25   efficient way to proceed.  But it will not be part of

26   this present case.

27       ATTY. WILLIAMS:  Thank you, your Honor.

10

1      THE COURT:  You're welcome.

2      So I have a couple of housekeeping matters.  I was

3  happy to see that you could agree on the number of

4  alternates which I understand was four and that you had

5  a total of five challenges, but I wasn't sure how you

6  were breaking it down.  Are you doing four and one or

7  three and two?

8      ATTY. MATTEI:  We agree that they be unrestricted,

9  your Honor.

10      THE COURT:  I will not, that I will not agree too.

11  I stick with the statute.  I like that statute.

12      ATTY. MATTEI:  My proposal then, Judge and I --

13      THE COURT:  Why don't you discuss it off the

14  record and then let me know if you have an agreement on

15  it.  Okay.  Thank you.

16      Mr. Pattis, there was one and I didn't pull it up,

17  but there was going to be one late motion in limine.

18  You had an attorney in your office who was not

19  available to file it due to some health issues.  And

20  I'm not sure if that was a motion in limine on behalf

21  of Mr. Jones and Free Speech Systems or just Free

22  Speech Systems because if it is on behalf of Mr. Jones,

23  it's well past filing, so what would you suggest?

24      ATTY. PATTIS:  It was both, but we're not going to

25  file it now.

26      THE COURT:  Okay.

27      ATTY. PATTIS:  He did not get out of the hospital

11

1    yet.

2         THE COURT:  Sorry to hear that.

3         ATTY. PATTIS:  Yeah, as are we.

4         Given the law of the case and the way things seem

5    to be evolving given the motion practice we can address

6    that interest in the other motions that are to be

7    argued later.

8         THE COURT:  Very good.

9         ATTY. PATTIS:  So there will not be another --

10        THE COURT:  And then I looked last night and I

11   thought yesterday was the deadlines for the replies to

12   the objections to the motions in limine, I saw the

13   plaintiffs' replies, are you not filing replies or are

14   you planning on filing them today because they were due

15   yesterday?

16        And again, I don't know if they're just are

17   directed to Free Speech Systems and of course we're not

18   adjudicating that now.

19        ATTY. PATTIS:  I have been advised by bankruptcy

20   counsel that the stay binds my hands as to Free Speech

21   Systems, and that I cannot act on his behalf it would

22   act as his peril.  They would pertain to both, so I

23   took the position that the stay was applicable as to

24   that.  I understand -- I'm here as to your order and I

25   don't mean to be defiant, but I've been told I act at

26   my peril if I act as to Free Speech Systems.

27        THE COURT:  So you don't want to act on behalf of

12

1    Mr. Jones in filing replies since you do represent

2    Mr. Jones and Mr. Jones is a nondebtor and there's no

3    stay at this point?  Listen, I'm not saying that at any

4    point the bankruptcy counsel can't file a motion in

5    bankruptcy court and have the stay extended to

6    Mr. Jones but right now, you're telling me that's why I

7    asked, that's why I started --

8         ATTY. PATTIS:  No, I understand.

9         THE COURT:  -- but there is no stay that extends

10   to Mr. Jones.

11        ATTY. PATTIS:  But there is as to a party that I

12   represent so I feel like I have a conflict at this

13   point, because I'm told I can't act with respect to one

14   and should act with respect to others and now I'm in a

15   position where I've got to parse what to do with

16   respect to each and that strikes me as that sort of

17   1.73 issue that I would need a little bit more time,

18   not an infinite amount of time to address.

19        And, you know, the issue you raised about whether

20   they should file the stay to extend to Mr. Jones that

21   hadn't occurred to me, I'm not a bankruptcy -- I had

22   altercate hands.

23        THE COURT:  Well, I think the law is clear that

24   when one defendant in a case files for bankruptcy it

25   doesn't automatically extend to all other defendants

26   even if they are similarly factually or legally and you

27   would have to move in bankruptcy court to extend the

13

1    stay.

2        Now last time we had this issue when Info Wars and

3    Prison Planet maybe, when they filed for bankruptcy, we

4    had the exact same situation and I believe I entered a

5    very similar order in response to that and then I think

6    what happened and you correct me if I'm wrong, I think

7    that you removed the remaining case to bankruptcy

8    court.  So that it wasn't so much --

9        ATTY. PATTIS:  I understand that.

10       THE COURT:  So here I didn't see and I checked

11   before I came out on the record, I didn't see any

12   removal to bankruptcy court of the pending claims and I

13   didn't see anything about a stay.

14       ATTY. PATTIS:  I was instructed not to file

15   removal papers by bankruptcy counsel for reasons of

16   their own that I didn't inquire as to.  And so I am

17   left in this awkward position now where if we proceed

18   as to Jones but not as to Free Speech that operates

19   almost constructively as a severance and I believe the

20   law is clear that a severance that adversely affects a

21   debtor is prohibited once the debtor is in bankruptcy.

22       So it's my request that and it's my understanding

23   that, I don't know if it's Houston, I don't recall what

24   city in Texas, in the Texas bankruptcy court there's a

25   hearing Friday morning with respect to the plaintiff's

26   emergency motion for relief from stay.

27       THE COURT:  But that emergency motion is a relief

14

1         from stay as to the debtor, Free Speech Systems --

2              ATTY. PATTIS:  Right.

3              THE COURT:  -- we are all on the same page here.

4         Everyone is on the same page.  They're under federal

5         bankruptcy law which, I believe me, respect.  There is

6         an automatic stay as to the debtor, Free Speech

7         Systems, LLC.  If you told me this is why I started

8         asking this question, if you said to me, yes -- because

9         I tried to look last night and I could not access the

10        through Pacer the records or I would have cancelled

11        this if I saw that it was extended.  As I'm

12        understanding it, clearly there's no doubt that there

13        was no extension of that stay to the solvent remaining

14        defendant Mr. Jones, nor has such a motion been filed,

15        so there is an active claim right now against Alex

16        Jones.  There's causes of action and we're down for

17        jury selection.

18             So, I can't, you know, I can't solve for you what

19        instructions you're getting from your client or

20        bankruptcy counsel but I have a remaining claim, but I

21        understand from what you're telling me it's your

22        position, well you can tell me your position why don't

23        you.

24             ATTY. PATTIS:  I'm asking for a recess until a

25        motion is heard on Friday.  I find myself in a position

26        where I cannot satisfy my obligations to both clients.

27        Mr. Jones expects a defense as does Free Speech.

15

1          I am told Free Speech the action will not proceed

2     as to they may or may not have identical interest in

3     every instance but I don't see how I can proceed as to

4     one client and not the other.

5          THE COURT:  So and then let's just hypothetically

6     say that we either didn't pick until Friday and Friday

7     the motion is heard and the motion it's a motion to --

8          ATTY. PATTIS:  For relief from stay.

9          THE COURT:  Okay, let's say that --

10         ATTY. PATTIS:  That's my understanding of it.  I

11    haven't filed it.

12         THE COURT:  So let's say that's denied and so the

13    stay is in effect as to Free Speech System.

14         ATTY. PATTIS:  At this point, Judge, I would be in

15    touch with bankruptcy counsel saying you left me

16    hanging here without a motion for an application as to

17    Jones or a removal, the trial court takes the position

18    that its capable -- that as a matter of law it would be

19    appropriate to proceed with Mr. Jones and I might have

20    to seek independent ethic's counsel advice because I'm

21    starting to feel a 1.73 (inaudible) because I'm now in

22    a position where I can meet the needs of one client but

23    not the other in a proceeding and I've not been in this

24    position before.

25         THE COURT:  Attorney Mattei.

26         ATTY. MATTEI:  Your Honor, what I see Attorney

27    Pattis be doing is asking for making an oral motion for

16

1    continuance for jury selection.  We oppose that motion

2    for continuance.  Mr. Jones is more than adequate

3    represented in bankruptcy court in Houston.  They are

4    well aware of this jury selection.  They actually filed

5    a motion to lift the stay as to the ongoing trial in

6    Texas.  And so they're well aware of the implications

7    that --

8         THE COURT:  So that -- excuse me.  The motion to

9    lift the stay was as to the debtor?

10        ATTY. MATTEI:  As to the debtor Free Speech

11   Systems.  And so they're more than aware of occasions

12   of not moving the stay with respect to Mr. Jones,

13   they've not done that knowing that jury selection is

14   scheduled for today.

15        The bankruptcy, which was filed on Friday,

16   Mr. Pattis has had the weekend and now Monday to

17   investigate the extent to which any conflict prevents

18   him from proceeding today on behalf of Mr. Jones.  But

19   the facts of the case establishes that there is no

20   conflict and there can be no conflict because Mr. Jones

21   and Free Speech Systems are all egos to one another.

22   They have been represented by the same counsel

23   throughout.  There's no suggestion or evidence that any

24   position taken by Mr. Jones here would be adverse to a

25   company that he 100 percent controls, Free Speech

26   Systems.

27        And so there's just no basis to grant a

17

1    continuance here where Mr. Jones is the one that has

2    manufactured this situation on the eve of jury

3    selection to prevent us from going forward.  So we want

4    to proceed today with jury selection.

5        THE COURT:  So here's what I would say, we are

6    going to proceed but if and when a motion is granted in

7    the bankruptcy court, that extends the stay to

8    Mr. Jones, the court needs to be notified immediately

9    and we will cease activity because that would then stay

10   the claim against Mr. Jones as well.  But short of

11   that, listen I suppose Mr. Jones could file for

12   bankruptcy and that would stay the rest of the case

13   under federal law or the bankruptcy court can extend

14   the stay to Mr. Jones.

15       So if either one of those happens, I'm sure you'll

16   let me know immediately and we will stop our

17   proceedings.

18       All right.  So we're going to start jury selection

19   at 10:00.  Just as a reminder please no snapshots or

20   screen shots or whatever you want to call it of the

21   jury confidential jury questionnaires.  Anyone who --

22   so if your clients are here at any point either during

23   jury selection or trial the trial will be in the

24   courtroom next door.

25       But during jury selection and during trial anyone

26   who's seated at counsel table or in the well of the

27   courtroom would have to wait for a recess to leave or

18

1    you can leave in between jurors if you understand what

2    I'm saying.  I don't want people in the well of the

3    courtroom getting up and leaving in the middle of the

4    voir dire, if they're in the well of the courtroom.

5    Now people in the gallery they can come and go as they

6    please but for trial as well, if we're not in a recess

7    any of your clients or other lawyers that are in the

8    well of the courtroom would have to wait for recess.  I

9    don't want people coming and going.  But if there's any

10   believe me any need for a quick break because someone

11   needs to leave or you have an emergency or whatever,

12   I'm happy to take another recess, so you just let me

13   know and ask for a recess and I'm sure we'll take a

14   recess.  I just don't want any commotion.

15       During the -- I am going to remain on the bench at

16   least for the immediate future.  I don't have any other

17   conflicts right now.  I don't know if that's going to

18   remain the whole time but the juror, potential juror

19   will sit next to me up here.  I don't know if you want,

20   I guess, Mr. Ferraro, maybe we can move the lectern up

21   for the lawyers.

22       THE CLERK:  Wherever counsel wants to.

23       THE COURT:  Why don't you discuss where you want

24   it but I'm telling you now I want you to give the

25   jurors space.  I don't want you leaving that lectern

26   area and clouding the jurors and I'm going to say the

27   same thing for witnesses as well.  So I don't want

19

1       anybody invading their space.

2            So here's what I would say on the replies to the

3       motions in limine by Mr. Jones.  If Mr. Jones wishes,

4       he's not ordered to, he doesn't have to but if he

5       wishes to file replies to the motions in limine, and

6       that was due yesterday, Mr. Jones will have until the

7       end of business tomorrow to file his replies if he

8       wants to.

9            I'm prepared to go on the introduction to the

10      panel.  I have, thank you, I have all the information

11      that you gave us with respect to the parties and the

12      witnesses and so forth.  So I think for the

13      introduction to the panel, you're going to be very

14      brief.  You're just going to simply say who you are and

15      what other lawyers are with you and if you want to

16      mention if you have clients here or not, that's fine.

17      But I don't want to hear anything beyond that, no

18      description of the case.  It's going to be very very

19      brief otherwise I am going to cut you off.  That's not

20      the opportunity to start any further details.

21           All right.  So we will be back right at 10:00 p.m.

22      for jury selection.

23           ATTY. MATTEI:  Your Honor, I'm sorry.  One

24      housekeeping matter.  I sent to Mr. Stuckel this

25      morning a proposed revised description of the case for

26      the court to consider giving to the jury in light of

27      the fact we now only have one defendant for whom we are

20

1      picking.  The initial jointly agreed upon statement

2      referred to both defendants and I sent the revision to

3      Mr. Stuckel.  Attorney Pattis I spoke to him

4      beforehand, he indicated that he objects so I just want

5      to flag the court given that right now we are only

6      picking with respect to Mr. Jones.

7           THE COURT:  Well, I planned on deleting Free

8      Speech Systems in the language as a defendant.  I

9      understand that you're objecting basically, Attorney

10     Pattis, even going forward into the proceeding and such

11     but do you have any suggestions on the proposed

12     language or not?

13          ATTY. PATTIS:  Yes.  I don't believe the court can

14     refer to Free Speech Systems.  I don't think the court

15     can refer to Mr. Jones as acting through Free Speech

16     Systems without adversely affecting Free Speech Systems

17     in violation of the stay, so that's the basis of my

18     disagreement.

19          If the court's going to proceed as to Mr. Jones I

20     think it should delete reference to Free Speech Systems

21     from the proposed joint statement.

22          ATTY. MATTEI:  I just in response regardless of

23     Free Speech Systems status that fact is established as

24     a result of fault not, so there's not any question that

25     that is true to be evidence in the case regardless of

26     whether Free Speech --

27          ATTY. PATTIS:  That will be a litigated issue

21

1    whether he'll be evidence, we think any evidence to

2    that effect would be in violation of the stay because

3    it acts to the detriment of Free Speech Systems while

4    it's --

5        THE COURT:  I think we can be very clear in our

6    preliminary instructions and our jury instructions that

7    this case is proceeding only as to Mr. Jones

8    individually so I'm not concerned that they're going to

9    be confused.  So if you can't come up with your own

10   language I'm more than capable of coming up with my own

11   language.  Okay.

12       ATTY. WILLIAMS:  Your Honor, may I be excused?

13       THE COURT:  Well, Mr. Williams, sure but you're

14   going to have to file --

15       ATTY. WILLIAMS:  A motion to withdraw.

16       THE COURT:  Unless you can somehow assure me as an

17   officer of the court that Mr. Jones retained you solely

18   for the purposes of the cross claim and not for any

19   other reason.  Because I explained to you the issue.

20       ATTY. WILLIAMS:  I understand.

21       THE COURT:  And I don't want to be hasty and make

22   mistakes and informally let you out of the case if in

23   fact that's not true.

24       ATTY. WILLIAMS:  Your Honor, I assure you as an

25   officer of the court that that was the sole purpose

26   that he retained me and I have no other interest in

27   this case whatsoever.

22

1           THE COURT:  All right.  Do you agree with that,

2     Attorney Pattis?

3           ATTY. PATTIS:  I reviewed the papers and I agree.

4           THE COURT:  I'm sorry.

5           ATTY. PATTIS:  I've reviewed the engagement

6     letter, I agree that there's no ambiguity with respect

7     to that.

8           THE COURT:  So your client, Mr. Jones, is not

9     going to object if I informally let Mr. Williams out.

10           ATTY. PATTIS:  On behalf of Mr. Jones, I'll make

11     that representation.

12           THE COURT:  And Attorney Mattei, you don't want to

13     be heard on this, correct?

14           ATTY. MATTEI:  No, your Honor.

15           THE COURT:  All right.  So ordered.

16           ATTY. WILLIAMS:  Thank you, your Honor.

17           THE COURT:  We'll take a recess.

18           (Whereupon, there was a recess.)

19        *          *          *          *          *

20

21

22

23

24

25

26

27

001932

23

```
DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  AUGUST 2, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

E L E C T R O N I C
C E R T I F I C A T I O N

I hereby certify the electronic version is a true and

correct transcription of the audio recording of the

above-referenced case, heard in Superior Court, G.A. 4 of

Waterbury, Connecticut before the Honorable Barbara N. Bellis,

Judge, on August 2, 2022.


Dated this 2nd day of August, 2022 in Waterbury,

Connecticut.

_____

Debbie A. Ellis
Court Recording Monitor

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In     Free Speech Systems LLC
Re:    Debtor                       Case No.: 22–60043

                                      Chapter:  11

---

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250–5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

001934

United States Bankruptcy Court
Southern District of Texas

In re:                                                                          Case No. 22-60043-cml

Free Speech Systems LLC                                                         Chapter 11
     Debtor

# CERTIFICATE OF NOTICE

| District/off: 0541-4 | User: ADIuser | Page 1 of 3 |
|---|---|---|
| Date Rcvd: Aug 15, 2022 | Form ID: ntctran | Total Noticed: 8 |

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ^ | Addresses marked '^' were sent via mandatory electronic bankruptcy noticing pursuant to Fed. R. Bank. P. 9036. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Aug 17, 2022:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Free Speech Systems LLC, 3019 Alvin Devane Blvd. STE 300, Austin, TX 78741-7417 |
| cr | + | David Wheeler, et al., c/o Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, TX 78701-4653 |
| cr | + | Leonard Pozner, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Marcel Fontaine, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Neil Heslin, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Scarlett Lewis, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Veronique De La Rosa, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |

TOTAL: 7

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| cr | ^ | MEBN | Aug 15 2022 20:11:04 | Texas Comptroller of Public Accounts, Revenue Acco, Christopher J. Dylla, P.O. Box 12548, Austin, TX 78711-2548 |

TOTAL: 1

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | ADP TotalSource, Inc. |
| intp | | David Ross Jones |
| intp | | Shelby A Jordan |

TOTAL: 3 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Aug 17, 2022                         Signature:        /s/Gustava Winters

| District/off: 0541-4 | User: ADIuser | Page 2 of 3 |
| --- | --- | --- |
| Date Rcvd: Aug 15, 2022 | Form ID: ntctran | Total Noticed: 8 |

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on August 15, 2022 at the address(es) listed below:**

| Name | Email Address |
| --- | --- |
| Avi Moshenberg | on behalf of Creditor Neil Heslin avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Scarlett Lewis avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Leonard Pozner avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Veronique De La Rosa avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Marcel Fontaine avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Christopher Dylla | on behalf of Creditor Texas Comptroller of Public Accounts  Revenue Accounting Division bk-cdylla@oag.texas.gov, Sherri.Simpson@oag.texas.gov |
| Ha Minh Nguyen | on behalf of U.S. Trustee US Trustee ha.nguyen@usdoj.gov |
| Jarrod B. Martin | on behalf of Creditor Neil Heslin jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Marcel Fontaine jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Veronique De La Rosa jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Scarlett Lewis jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Leonard Pozner jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jayson B. Ruff | on behalf of U.S. Trustee US Trustee jayson.b.ruff@usdoj.gov |
| Joseph S.U. Bodoff | on behalf of Creditor ADP TotalSource  Inc. jbodoff@rubinrudman.com |
| Kyung Shik Lee | on behalf of Debtor Free Speech Systems LLC kslee50@gmail.com  Courtnotices@kasowitz.com |
| Melissa A Haselden | mhaselden@haseldenfarrow.com haseldenbankruptcytrustee@gmail.com;mhaselden@ecf.axosfs.com;haselden.melissaa.r104367@notify.bestcase.com |
| R. J. Shannon | on behalf of Debtor Free Speech Systems LLC rshannon@shannonpllc.com rshannon@shannonleellp.com;7044075420@filings.docketbird.com |
| Randy W Williams | on behalf of Creditor David Wheeler  et al. rww@bymanlaw.com, rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com |
| Raymond William Battaglia | on behalf of Debtor Free Speech Systems LLC rbattaglialaw@outlook.com  rwbresolve@gmail.com |
| Ryan E Chapple | on behalf of Creditor David Wheeler  et al. rchapple@cstrial.com, aprentice@cstrial.com |
| Shelby A Jordan | on behalf of Interested Party Shelby A Jordan cmadden@jhwclaw.com |
| Stephen A Roberts | on behalf of Interested Party David Ross Jones sroberts@srobertslawfirm.com  1222805420@filings.docketbird.com |

District/off: 0541-4                    User: ADIuser                         Page 3 of 3
Date Rcvd: Aug 15, 2022                 Form ID: ntctran                      Total Noticed: 8

US Trustee
                        USTPRegion07.HU.ECF@USDOJ.GOV


TOTAL: 23

001937

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **FREE SPEECH SYSTEMS, LLC.** | § | **CASE NO. 22-60043** |
| | § | **Chapter 11 (Subchapter V)** |
| | § | |
| | § | **CHAPTER 11** |
| **DEBTOR.** | § | |

**NOTICE OF APPEARANCE, REQUEST FOR ALL NOTICES,**
**AND DEMAND FOR SERVICE OF ALL PLEADINGS AND FILINGS**

PLEASE TAKE NOTICE that the undersigned appears as the Subchapter V Trustee pursuant to Section 1109(b) of Title 11 of the United States Code ("**Bankruptcy Code**") and Rule 9010 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and hereby submits this notice of appearance and requests notice of all hearings and conferences herein and makes demand for service of all papers herein, including all papers and notices pursuant to Bankruptcy Rules 2002, 3017, and 9007. All notices given or required shall be served upon:

> Melissa A. Haselden
> Subchapter V Trustee
> State Bar No. 00794778
> 700 Milam, Suite 1300
> Pennzoil Place
> Houston, Texas 77002
> Telephone: (832) 819-1149
> Facsimile: (866) 405-6038
> Email:mhaselden@haseldenfarrow.com

Please take further notice that the foregoing request includes notices and papersreferred to in the Bankruptcy Rules and includes, without limitation, any plans  of reorganization, notices of hearings, orders, pleadings, motions, applications, complaints, demands, requests, petitions, disclosure statements, memoranda, briefs

and any other documents brought before this Court with respect to these proceedings, whether formal or informal, whether written or oral, whether transmitted or conveyed by mail, hand delivery, telephone, telecopier, telegraph, or telex.

DATED: August 18, 2022          Respectfully submitted,

**HASELDEN FARROW, PLLC**

By: */s/ Melissa A. Haselden*
MELISSA A. HASELDEN
State Bar No. 00794778
700 Milam, Suite 1300
Pennzoil Place
Houston, Texas 77002
Telephone: (832) 819-1149
Facsimile: (866) 405-6038
Email: mhaselden@haseldenfarrow.com
**SUBCHAPTER V TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2022, a copy of the foregoing *Notice of Appearance* was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF System.

Raymond William Battaglia on behalf of Debtor Free Speech Systems LLC
rbattaglialaw@outlook.com, rwbresolve@gmail.com

Joseph S.U. Bodoff on behalf of Creditor ADP TotalSource, Inc.
jbodoff@rubinrudman.com

Ryan E Chapple on behalf of Creditor David Wheeler, et al.
rchapple@cstrial.com, aprentice@cstrial.com

Christopher Dylla on behalf of Creditor Texas Comptroller of Public Accounts, Revenue Accounting Division
bk-cdylla@oag.texas.gov, Sherri.Simpson@oag.texas.gov

Melissa A Haselden
mhaselden@haseldenfarrow.com, haseldenbankruptcytrustee@gmail.com;mhaselden@ecf.axosfs.com;haselden.melissaa.r104367@notify.bestcase.com

Shelby A Jordan on behalf of Interested Party Shelby A Jordan
cmadden@jhwclaw.com

Notice of Appearance – Subchapter V Trustee          2

Kyung Shik Lee on behalf of Debtor Free Speech Systems LLC
kslee50@gmail.com, Courtnotices@kasowitz.com

Jarrod B. Martin on behalf of Creditor Leonard Pozner
jarrod.martin@chamberlainlaw.com,
Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com

Jarrod B. Martin on behalf of Creditor Marcel Fontaine
jarrod.martin@chamberlainlaw.com,
Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com

Jarrod B. Martin on behalf of Creditor Neil Heslin
jarrod.martin@chamberlainlaw.com,
Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com

Jarrod B. Martin on behalf of Creditor Scarlett Lewis
jarrod.martin@chamberlainlaw.com,
Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com

Jarrod B. Martin on behalf of Creditor Veronique De La Rosa
jarrod.martin@chamberlainlaw.com,
Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com

Avi Moshenberg on behalf of Creditor Leonard Pozner
avi.moshenberg@mhllp.com, ana.sanchez@mhllp.com

Avi Moshenberg on behalf of Creditor Marcel Fontaine
avi.moshenberg@mhllp.com, ana.sanchez@mhllp.com

Avi Moshenberg on behalf of Creditor Neil Heslin
avi.moshenberg@mhllp.com, ana.sanchez@mhllp.com

Avi Moshenberg on behalf of Creditor Scarlett Lewis
avi.moshenberg@mhllp.com, ana.sanchez@mhllp.com

Avi Moshenberg on behalf of Creditor Veronique De La Rosa
avi.moshenberg@mhllp.com, ana.sanchez@mhllp.com

Ha Minh Nguyen on behalf of U.S. Trustee US Trustee
ha.nguyen@usdoj.gov

Stephen A Roberts on behalf of Interested Party David Ross Jones
sroberts@srobertslawfirm.com, 1222805420@filings.docketbird.com

Jayson B. Ruff on behalf of U.S. Trustee US Trustee
jayson.b.ruff@usdoj.gov

R. J. Shannon on behalf of Debtor Free Speech Systems LLC
rshannon@shannonpllc.com, rshannon@shannonleellp.com;7044075420@filings.docketbird.com

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

Randy W Williams on behalf of Creditor David Wheeler, et al.
rww@bymanlaw.com,
rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com

/s/ Melissa A. Haselden
MELISSA A. HASELDEN

```
 1                     UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF TEXAS
 2                            HOUSTON DIVISION

 3                                    )  CASE NO: 22-60043-cml
                                      )
 4      FREE SPEECH SYSTEMS, LLC,     )  Houston, Texas
                                      )
 5                       Debtor.      )  Friday, August 12, 2022
                                      )
 6                                    )  1:01 P.M. to 5:09 P.M.
                                      )
 7      ------------------------------)

 8                            MOTION HEARING

 9           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                   UNITED STATES BANKRUPTCY JUDGE
10

11      APPEARANCES:

12      For Debtor:              RAYMOND W. BATTAGLIA
                                 R.J. SHANNON
13                               KYUNG SHIK LEE
                                 Law Offices of Ray Battaglia, PLLC
14                               66 Granburg Circle
                                 San Antonio, TX 78218
15
        For Texas Plaintiffs:    MARTY BRIMMAGE
16                               Akin Gump
                                 1111 Louisiana Street
17                               44th Floor
                                 Houston, TX 77002
18
        For the Subchapter V
19      Trustee:                 MELISSA A. HASELDEN
                                 Haselden Farrow PLLC
20                               Pennzoil Place
                                 700 Milam, Suite 1300
21                               Houston, TX 77002

22      For David Wheeler,
        et al.:                  RYAN E. CHAPPLE
23                               Cain & Skarnulis, PLLC
                                 303 Colorado Street, Suite 2850
24                               Austin, TX 78701

25
```

```
 1   For U.S. Trustee:        HA MINH NGUYEN
                              Office of the United States Trustee
 2                            515 Rusk Street
                              Suite 3516
 3                            Houston, TX 77002

 4   Court Reporter:          ZILDE MARTINEZ

 5   Courtroom Deputy:        ZILDE MARTINEZ

 6   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
 7                            Mineola, NY 11501
                              Tel: 800-727-6396
 8

 9

10   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                            INDEX

2

3    DEBTOR'S WITNESSES     DIRECT    CROSS    REDIRECT    RECROSS

4    W. Marc Schwartz          21     44         87          92

5                                     82

6    Patrick Riley             97    114

7

8

9

10   DEBTOR'S EXHIBITS                          RECEIVED

11   Exhibit 2      13-Week Cash Collateral

12                  Budget                       20

13   Exhibit 3      Blue Ascension Price List    20

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            HOUSTON, TEXAS; FRIDAY, AUGUST 12, 2022; 1:01 P.M.

 2                      (Call to Order)

 3            THE COURT:  Good afternoon, everyone.  This is

 4   Judge Lopez.  I'm going to call the 1 o'clock case, Free

 5   Speech Systems LLC, here on a motion to amend the cash

 6   collateral order, 22-60043.  There are a number of parties

 7   on the line.  I'm just asking everyone to please keep your

 8   phone on mute.  I'm trying to avoid muting the entire line.

 9   But I will if I need to.  If you're addressing the Court,

10   you're obviously free to unmute the line.

11            Let me go ahead and take appearances.  Why don't I

12   start with the Debtor.  Okay.  Who wishes to make an

13   appearance on behalf of the Debtor?  Let's give some folks a

14   moment to log in again.

15            MR. SHANNON:  Your Honor, this is RJ Shannon, on

16   behalf of the Debtor, although I believe that Mr. Battaglia

17   or Mr. Lee will be presenting the arguments today.

18            THE COURT:  Okay.  I know --

19            MR. SHANNON:  They just --

20            THE COURT:  I think everybody's just dialing back

21   in.

22            MR. BATTAGLIA:  Good afternoon, Your Honor.

23            THE COURT:  No, no worries.  Go ahead, Mr.

24   Battaglia.  Why don't you make an appearance.

25            MR. BATTAGLIA:  Yes, sir, Your Honor.  Apparently
```

1    my phone disconnected.  Ray Battaglia, on behalf of the

2    Debtor, Free Speech Systems.

3               THE COURT:  Okay, and who's here?  Mr. Lee and Mr.

4    Shannon are here on behalf of Free Speech Systems as well.

5               MR. LEE:  Yes, Your Honor.  Yes, Your Honor.

6               THE COURT:  And see -- folks, all right, I'm going

7    to -- please mute your line, everyone.

8               Okay.  Mr. Nguyen, I see you here on behalf of the

9    United States Trustee.  I see Melissa Haselden on behalf of

10   the Subchapter 5 Trustee.  Good afternoon to you as well.

11   Okay.

12              On behalf of the Connecticut plaintiffs, who

13   wishes to make an appearance?

14              MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan

15   Chappelle, and can you hear me okay, first of all, Your

16   Honor?

17              THE COURT:  Just fine.  Thank you.

18              MR. CHAPPLE:  Okay.  Thank you.  Ryan Chappelle,

19   and I believe Alinor Sterling is on the line as well.

20              THE COURT:  Okay.  Good afternoon, and on behalf

21   of the Austin plaintiffs, who wishes to make an appearance?

22              MR. BRIMMAGE:  Good afternoon, Your Honor.  Marty

23   Brimmage, with Akin Gump Strauss Hauer & Feld, here on

24   behalf of what we call the Texas plaintiffs.

25              THE COURT:  Okay.  Thank you.  Okay.  Does anyone

1    else wish to make an appearance for purposes of this

2    hearing?

3            Okay.  Before we get started, folks, I want to

4    just make a statement, very brief, before we get into

5    things.  There was a witness and exhibit list filed at

6    Docket 61 and 62, or excuse me, 60 and 61.  And there was

7    Exhibit 6, at Docket 60, Exhibit 7, at Docket 71, I sealed

8    before today's hearing.  I believe the public should know

9    that I'm the one who did it.  There were -- nothing has been

10   admitted into evidence.

11           There are a series of text messages that included

12   just general pictures of someone holding their child, young

13   child and I'm not putting that out there for display.  I'm

14   not doing that.  I thought it was -- somebody wants to show

15   sensitive information, you can file a motion to seal.  But

16   there's no way that I'm allowing that exhibit to show in

17   public, and it's not going to be taken up today.  And I ask

18   the parties to exercise better judgment when publicly filing

19   documents in this case.

20           With that said, let me turn it over to Mr.

21   Battaglia or whoever's going to take lead on behalf of the

22   Debtors today.

23           MR. BATTAGLIA:  Your Honor, Ray Battaglia, on

24   behalf of Free Speech Systems.  I will be taking the lead.

25   I'm sorry to take you from your -- our understanding is the

1    Court's under the weather.  My apologies.

2              THE COURT:  No worries.  I'm here.

3              MR. BATTAGLIA:  But it's an emergency that we just

4    couldn't avoid.

5              THE COURT:  Let's go ahead.

6              MR. BATTAGLIA:  Your Honor, this is a problem of a

7    little over a week ago we presented a budget to you that had

8    proposed projected sales figures based on prior history and

9    it had based on that fulfillment costs and they're directly

10   correlated; the more sales, the more orders, the more the

11   fulfillment costs.  And it's apparent we have a problem of

12   riches, I guess.  It's a good problem to have.

13             (indiscernible) sales have exploded.  Sales are

14   vastly outstripping what Mr. Schwartz estimated in the 13-

15   week budget, and the net effect of that is we don't have

16   (indiscernible) sufficient budget to handle the fulfillment

17   costs, and the problem with that is if orders aren't timely

18   shipped and essentially someone charges, it hits their

19   credit card that day and the shipment is supposed to take

20   place.

21             But if the orders don't ship, it could result and

22   does result often in cancellations, order cancellations and

23   chargebacks, which of course affects the willingness of the

24   credit card issuers to continue to service this particular

25   account.  That's a true danger for what should be something

1    that we're celebrating, is that sales have exceeded

2    projected volumes by something on the order of 60-plus

3    percent.

4              And so the purpose for this -- the reason for this

5    hearing is so that we don't run into that problem, so we can

6    find a means to fund the fulfillment costs and timely ship

7    the orders and increase the amount of money that this Estate

8    has in it, which I understand to be the purpose of

9    bankruptcy is to pay creditors, and to pay creditors, we

10   have to have money.

11             There are issues raised in the objection that if I

12   -- if I take people at their word, their concerns are who is

13   Blue Ascension, why would he change to Blue Ascension and

14   some explanation of the cost structure that Blue Ascension

15   charges.  We're prepared to present evidence through Mr.

16   Schwartz and through Patrick Riley, who is the sole owner of

17   Blue Ascension, those points.

18             Your Honor, I think to keep things short, I'll

19   just leave that as my opening remarks here.  We've got a

20   good problem to have, but one that needs to be cured

21   immediately and the proposal that we've suggested is that we

22   allow the credit card processor to fund the shipment

23   fulfillment costs directly that includes the shipping costs

24   which are paid for by the customer and a $6 handling charge

25   that Blue Ascension charges so that we don't miss fulfilling

1    orders, and the problem with coming to you with just another

2    budgeted number of a higher number is that we're receiving

3    product even as we speak and expect more product next week.

4    And with the events ongoing in the world, I think the

5    expectation here is that we could have days that approximate

6    or are close to the sales figures that were projected for a

7    single week.

8            And so it's difficult for Mr. Schwartz to say I

9    need X dollars on this week when we can't accurately project

10   what the sales are going to be because there's too many

11   variables out there.  So we've proposed a solution to allow

12   the credit card processor to fund the orders directly, and

13   that's what we're here asking the Court to do.

14           THE COURT:  Okay.  Just one question, and maybe

15   Mr. Schwartz or somebody can answer it for me.

16           MR. BATTAGLIA:  Yes, sir.

17           THE COURT:  The interim cash collateral order

18   provides for use of about $95,000 with a 10 percent variance

19   on that.  If approved, what you're requesting today, what

20   then, if any -- how is one going to account for the $105,000

21   essentially that's been approved under the order?

22           MR. BATTAGLIA:  Your Honor, three weeks of the

23   $105,000 have been paid and applied to Blue Ascension.

24   There's one week of budget left.

25           THE COURT:  Got it.

 1          MR. BATTAGLIA:  I frankly would assume that what

 2     we would do is we would remove that line item, and what

 3     we've proposed, of course, is to provide reporting of what

 4     the weekly sales were a couple of days in arrears and how

 5     the money was allocated.

 6          So we're trying to be transparent, and this is a

 7     matter that I've had conversations with the U.S. trustee's

 8     office, the sub 5 trustee, more Mr. Martin who I was told

 9     would be the conduit to the plaintiffs over the last several

10     days (indiscernible).

11          THE COURT:  Okay.  Thank you.  Let me -- does

12     anyone wish to -- let me just open it up.  Does anyone wish

13     to address the Court in connection just in the form of a

14     short opening on where we are?

15          MR. CHAPPLE:  Your Honor, this is Ryan Chapple.  I

16     would like that opportunity.

17          THE COURT:  Okay.  Please go -- please proceed.

18     Folks, there's somebody that needs to put their phone on

19     mute.  I might have to mute the entire line.  Okay.  Let's

20     see how this goes.  I may have to mute the entire line.  But

21     go ahead, Mr. Chapple.

22          MR. CHAPPLE:  Thank you, Your Honor, and thank you

23     for the time today.  Your Honor, as we say in the objection,

24     sorry, the Connecticut plaintiffs aren't necessarily opposed

25     to reasonable adjustments to the cash collateral -- to the

1    use of cash collateral.  Your Honor, the Debtor's emergency

2    motion, it does raise many questions that we have.  It

3    essentially greenlights a blank check payment scheme to an

4    entity that Debtor's counsel has represented to us was very

5    recently formed, is found and owned by a longtime employee

6    of the Debtor and its staffed really with the entire

7    fulfillment staff of the Debtor.  It's my understanding that

8    they just came over a few weeks ago.

9         We've seen no evidence demonstrating why the

10   Debtor's fulfillment duties were outsourced just weeks

11   before filing, why they were outsourced to an entity owned

12   and controlled by the Debtor's former employee, if any other

13   fulfillment logistics companies were considered, whether

14   this company can adequately perform, if any analysis was

15   done to determine that outsourcing this function makes the

16   most economic sense for the Debtor, whether or not there's a

17   contract in existence between the Debtor and Blue Ascension.

18        So, Your Honor, I think we're here, the

19   Connecticut plaintiffs, along with the Texas plaintiffs,

20   just want to make sure that there's an adequate level of

21   transparency to the process and that we understand -- that

22   we understand the relationships between these parties and

23   that we get satisfactory answers today through the question-

24   and-answer section with Mr. Schwartz and with Mr. Riley as

25   well.  So with that, I'm at any time happy to answer

```
 1    questions that the Court has.  I'm happy to follow up at the

 2    end of the proceeding.  I believe, excuse me, Mr. Brimmage,

 3    is going to handle any cross that we deem necessary.  I'll

 4    turn it back to the Court now.  Thank you, Your Honor.

 5              THE COURT:  Thank you.  Anyone else wish to

 6    address the Court at this time?

 7              MR. BRIMMAGE:  Your Honor?  Your Honor, Marty

 8    Brimmage, just briefly if I could.

 9              THE COURT:  Mm-hmm.

10              MR. BRIMMAGE:  I'd like to address two issues.

11    First, let me address the Court's sealing of the text

12    exhibits.  What I really want to say, Your Honor, is thank

13    you.  That is absolutely appropriate.  I think in the haste

14    of getting some stuff on file, we missed some things.  And

15    so, I just want to say thank you.  That was totally

16    appropriate, and I apologize for us not catching that before

17    you caught it.  But we appreciate it, and it won't happen

18    again.

19              The second point I would just like to say, Your

20    Honor, is there's nothing business as usual about what

21    you're being asked to do.  There's nothing business as

22    usual.  And what you're going to hear from the evidence is

23    all this is new.  Not a word was spoken about any of the

24    things you're about to hear at the first day hearing which

25    was just a mere little over a week ago.  So I think we would
```

1    respectfully request that the Court be diligent in its

2    discretion about what's going on here and let's see where

3    the evidence takes us.  Thank you, Your Honor.

4                 THE COURT:  Thank you.  Anyone else wish to be

5    heard at this time?

6                 MR. NGUYEN:  Your Honor, Ha Nguyen, for the U.S.

7    trustee, if I can just take a brief moment to address the

8    Court.

9                 THE COURT:  Okay.

10                MR. NGUYEN:  Your Honor, right now the concerns I

11   have about this transaction is just the lack of transparency

12   that has occurred.  We were (indiscernible) August 3rd, Mr.

13   Schwartz was on the witness stand for almost six hours and

14   we heard nothing about Blue Ascension.

15                We heard nothing about the changing in the

16   fulfillment.  A week prior to the filing of the case,

17   $95,000 was approved on August 3rd, but it was approved

18   based on the lack of information, crucial information that

19   the parties were entitled to explore (indiscernible) --

20                THE COURT:  Hold on a second, Mr. Nguyen.

21                AUTOMATED VOICE:  Conference muted.

22                THE COURT:  Go ahead and hit 5*.

23                MR. NGUYEN:  Can you hear me?

24                THE COURT:  Mr. Nguyen?

25                MR. NGUYEN:  Can you hear me, Your Honor?

 1            THE COURT:  Yes, I can, just fine.  Please

 2   continue.  I apologize.

 3            MR. NGUYEN:  Thank you so much for muting the

 4   line.  Your Honor, there is a problem with transparency

 5   (indiscernible) first day hearing, if the Debtor comes in,

 6   they're a hundred percent transparent, we'll (indiscernible)

 7   them through the process and we'll work with them.

 8            The fact that we didn't learn about Blue Ascension

 9   until yesterday and the fact that the Court approved $95,000

10   of payments to Blue Ascension for what (indiscernible)

11   information on the first -- on the August 3rd hearing, I

12   think there was a 40-page declaration filed in support of

13   the first day motion.  No mention of this change.  No

14   mention of (indiscernible) no mention of this relationship

15   between former FFS employees (indiscernible) and opening up

16   a new fulfillment center.

17            And what bothers me about this transaction is

18   weather stamped by the CRO a week prior to the filing and

19   there's no contract.  There's only a price sheet.  And, Your

20   Honor, I'm here with an open mind (indiscernible) as Mr.

21   Battaglia said, this is a good problem.  You know, at the

22   end of the day, more sales, more revenue means more payment

23   at the end of the day for the plaintiffs.  But at the same

24   time, we need transparency.  We need to make sure that the

25   process is done correctly, and we want to make sure that the

1    parties have all the necessary information in terms of

2    evaluating how the case is going to go.

3            With that said, you know, I'm here with an open

4    mind.  I'm ready to hear the evidence that Mr. Battaglia is

5    going to present.  But right off the bat, I do have concerns

6    about the transparency and just the lack of disclosure of

7    the relationship since we first met on August 3, 2020, about

8    a week-and-a-half ago.

9            THE COURT:  Okay.  Thank you.  Anyone else wish to

10   address the Court, I'm going to ask that you hit 5*.  Okay.

11   There's a 361 area code.

12           Mr. Battaglia, why don't you just hit 5* now.

13   Who's going to present the direct evidence?  Again, folks, I

14   was really trying to avoid this.  But clearly some folks

15   could not put their phone on mute.

16           Mr. Battaglia, if you'd hit 5*, your line.  There

17   you go.

18           MR. LEE:  -- will be presenting our --

19           THE COURT:  Okay.

20           MR. LEE:  I just (indiscernible) Mr. Battaglia

21   will be presenting our case, Your Honor.

22           THE COURT:  Okay.  Thank you.  Mr. Battaglia, did

23   I unmute your line?

24           MR. BATTAGLIA:  Your Honor?  Am I live now?

25           THE COURT:  Yes, you are.  Thank you.

1          MR. BATTAGLIA:  I think so.  Yes, sir.

2          THE COURT:  Okay.

3          MR. BATTAGLIA:  Judge, I just -- I do have to

4     respond a little bit.  There was testimony of Mr. Schwartz

5     that they had changed performance operators and that it was

6     profitable at the first day hearing.

7          So I'm a little concerned about the allegation of

8     lack of transparency inasmuch as I've been on the phone with

9     every one of these parties to discuss this issue and sent

10    emails and we've responded, providing information, not to

11    Mr. Brimmage directly but to Mr. Martin, who supposedly was

12    the conduit, as I understood things as we left them at the

13    first hearing.  So was the name Blue Ascension used?  I

14    don't recall that it was.  But I don't know that it

15    particularly matters inasmuch as Blue Ascension is not an

16    insider.

17         But with that, Your Honor, unless the Court has

18    questions, I'll go ahead and call Mr. Marc Schwartz.

19         THE COURT:  Okay.  Mr. Schwartz, why don't you hit

20    5*.  And Mr. Brimmage, why don't you hit 5*.  It looks like

21    you're handling the cross.  So I'll let you -- Mr. Schwartz,

22    can you hear me okay?  Mr. Schwartz, can you hear me?  You

23    may have muted your own line, Mr. Schwartz.

24         MR. SCHWARTZ:  Yes, sir.  Can you hear me?

25         THE COURT:  Just fine.  Thank you.  Mr. Brimmage,

1   can you hear me okay?

2          MR. BRIMMAGE:  Yes, Your Honor.  Thank you.

3          THE COURT:  Okay.  Is there anyone else?  Mr.

4   Nguyen, why don't -- I think your line is unmuted now.

5          MR. NGUYEN:  Yes, Your Honor.  Thank you.

6          THE COURT:  Okay.  Anyone need their line unmuted

7   for purposes of this examination, I'd ask that you hit 5*

8   now.

9          Okay.  Mr. Schwartz, let me ask you, raise your

10  right hand.  Do you swear to tell the truth, the whole truth

11  and nothing but the truth?

12         MR. SCHWARTZ:  Yes, I do.

13         THE COURT:  Okay, and you understand the oath that

14  you took is the same that you would take as if you were live

15  in the courtroom here with me today?

16         MR. SCHWARTZ:  Yes, I do.

17         THE COURT:  Okay.  Mr. Schwartz, before we begin,

18  we're doing this virtually.  So I'm going to ask that you

19  please inform me who, if anyone, is in the room with you

20  now.

21         MR. SCHWARTZ:  It's just me.

22         THE COURT:  Okay, and I'm going to ask that you

23  please put any papers or notes that you may have near you

24  far away.  Can I confirm for now that there are no documents

25  in front of you that we can't see?

Page 18

```
 1              MR. SCHWARTZ:  No.  There are no documents in

 2     front of me that you cannot see.

 3              THE COURT:  Okay.  Okay.  Again, there may be

 4     parties who object to a question.  I'm going to ask that you

 5     please don't refrain from answering and just give me an

 6     opportunity to resolve the objection.  And once I have, I'll

 7     either let you know you can answer the question or if

 8     counsel needs to ask a new one, okay?

 9              MR. SCHWARTZ:  Yes, sir.

10              THE COURT:  Okay, and in terms of handling

11     documents -- I'm going to get there, Mr. Brimmage.  In terms

12     of handling documents and sharing documents, Mr. Battaglia,

13     how do you wish to proceed on that?

14              MR. BATTAGLIA:  Your Honor, I think I'm capable of

15     sharing if you give me rights.  But I haven't done that on

16     GoToMeeting.  So --

17              THE COURT:  If it's easier for you, for purposes

18     of today, you don't have many exhibits.  Why don't you -- I

19     can share my screen and I can --

20              MR. BATTAGLIA:  Yes, sir.

21              THE COURT:  -- just kind of (indiscernible) that

22     way just to make sure we're efficient on time.

23              MR. BATTAGLIA:  Yes, sir.  That's fine, Judge.

24              THE COURT:  Mr. Brimmage, you had a question?  Mr.

25     Brimmage, I believe you had a question.  I want to be able
```

1   to --

2           MR. BRIMMAGE:  Yes.  Yes, Your Honor.  Just as a

3   matter of standard protocol, can we confirm with Mr.

4   Schwartz that he doesn't have a phone in view or any other

5   method of electronic communications other than what we're

6   seeing related to the virtual, you know, testimony and his

7   picture and so forth?

8           THE COURT:  I think it's a fair question.

9           Mr. Schwartz?

10          MR. SCHWARTZ:  (indiscernible)

11          THE COURT:  Okay, and can you confirm, Mr.

12  Schwartz, there's no other electronic device near you or

13  that we can't see?

14          MR. SCHWARTZ:  I've got -- I've got an iWatch and

15  it talks to me sometimes.

16          THE COURT:  All right.  Well, just look straight

17  ahead, okay?  We'll make sure that we keep this as -- all

18  righty.

19          So okay, Mr. Battaglia, so I'm going to operate --

20  let's see -- will you be using -- you filed a witness and

21  exhibit list at 58.  Exhibit 1 is --

22          MR. BATTAGLIA:  I expect, Your Honor, only to use

23  two and three.

24          THE COURT:  Okay.  Is two the -- two is the 13-

25  week cash collateral budget.  Is two the budget that was

1    used in the interim order that I approved or is this a new

2    one?

3            MR. BATTAGLIA:  It is -- well, the first four

4    weeks were used in the interim order and attached to the

5    interim order (indiscernible) yes, sir.

6            THE COURT:  Okay.  Let me just ask is there any

7    objection, just preliminarily to the use of -- well, one you

8    don't need to admit into evidence.  It's just a motion --

9    but two or three?  Is there any objection?

10           MR. BRIMMAGE:  Your Honor, hang on one second,

11   please, if I could.

12           THE COURT:  Yeah.  I believe three is actually one

13   of you all's exhibits, Mr. Brimmage, as well.

14           MR. BRIMMAGE:  These are -- these are the emails

15   that (indiscernible) --

16           THE COURT:  No.  No, no.  I'm sorry.  Docket 58.

17   One is the 13-week cash collateral budget, and the third is

18   what's labeled as a Blue Ascension price list.

19           MR. BRIMMAGE:  Yes.  We're fine with both of

20   those, Your Honor.

21           THE COURT:  Okay.  So I'm going to admit two and

22   three into evidence.

23       (Exhibit 2 received into evidence)

24       (Exhibit 3 received into evidence)

25           THE COURT:  One, Mr. Battaglia, is just your

1    motion, and I don't think you need to admit that.

2              MR. BATTAGLIA:  No, sir.

3              THE COURT:  Okay.  Mr. Battaglia, if you just let

4    me -- I'm going to share my -- I'll have my screen shared,

5    and everyone will be able to see.  You just direct me to,

6    you know, page numbers and we'll proceed, okay?

7              MR. BATTAGLIA:  Thank you, Your Honor.

8              THE COURT:  Okay.  You may proceed.

9              DIRECT EXAMINATION OF W. MARC SCHWARTZ

10   BY MR. BATTAGLIA:

11   Q    Mr. Schwartz, you testified about your background and

12   your relationship with Free Speech Systems just a little

13   over a week ago.  Has anything changed in the week?

14   A    I mean, now, you know, just more work for the

15   bankruptcy.

16   Q    So I'm going to pass by your background here and skip

17   to the chase here.  How does Free Speech Systems make money?

18   A    It sells merchandise over the internet, primarily

19   dietary supplements for the most part is the largest part of

20   their revenue stream.

21   Q    How do customers pay for the products that they

22   purchase?

23   A    (indiscernible) it's by credit card.

24   Q    When does the Debtor receive settlement of the credit

25   card payments by customers?  How long a delay is there?

1   A      The Debtor receives the settlement the next day --

2   well, the first business day following the date of the sale.

3   Q      With respect to the orders placed by customers, who

4   pays for shipping?

5   A      Well, the customers are charged an average of about

6   $13.40, $14 for shipping and handling.  The balance, which

7   is the total shipping and handling averages $20 an order and

8   the balance of $6 is paid by the Debtor.

9   Q      Okay.  So I'm clear, the shipping cost is essentially a

10  passthrough.

11  A      Two-thirds of it is a passthrough.  Yes.

12  Q      Well, the shipping alone, Mr. Schwartz (indiscernible)

13  --

14  A      The shipping -- yes.  Correct.  That's correct.  The

15  shipping is -- correct, the shipping is a passthrough.

16  Q      What is the dollar amount of the average order?

17  A      The dollar amount of the average order last week was

18  $186 up from $120 prefiling.

19  Q      Would you describe for the Court how orders are

20  processed and filled?

21  A      Once the customer makes the purchase and the credit

22  card is charged, the fulfillment officer in the warehouse

23  gets the report of the sale and they, you know, put out a

24  (indiscernible) for one of the workers to go ahead and go

25  through the warehouse picking up the merchandise that was

1    ordered and then package it in a box and print out a label

2    with the (indiscernible) shipping charge on it.

3    Q    Who handles fulfillment for the Debtor?

4    A    Blue Assistance.

5    Q    Is it Ascension, Mr. --

6    A    Ascension.  We spell it differently.

7    Q    And has the manner in which the Debtor has handled

8    fulfillment changed since you became CRO?

9    A    The manner, no.  It's all pretty much done the same

10   way.  However when I was initially hired as CRO it was being

11   done by FSS as opposed to Ascension.

12   Q    And approximately when did that change occur?

13   A    That change occurred early in July, around the 1st,

14   2nd, 3rd of July, somewhere around there, I believe.

15   Q    Why was the change made?

16   A    It was my understanding --

17        MR. BRIMMAGE:  Your Honor, I'll object.  I'll

18   object -- I'll object at this point to any further response.

19   If it's his understanding, he doesn't have personal

20   knowledge, and so we would object to any further response to

21   that question.

22        THE COURT:  Mr. Battaglia?

23        MR. BATTAGLIA:  Your Honor, the witness is the

24   CRO.  He's involved in the operations involved in the

25   fulfillment, obviously not on a hands-on level, but he has

1    access to information about how manners -- how fulfillment

2    was handled and how it is handled now.  And he can testify

3    to what he knows and understands about what it was changed.

4         THE COURT:  Okay.  I'm going to sustain the

5    objection.  Why don't you get a little bit more foundation

6    and then see if the question works.

7    BY MR. BATTAGLIA:

8    Q    So in your opinion, why was the manner of fulfillment

9    changed?

10        MR. BRIMMAGE:  Your Honor, lacks -- I'll object as

11   it lacks foundation.  He has no basis for an opinion of

12   that.

13        THE COURT:  I'm going -- I'm going to overrule

14   that.  I mean, he can answer.  It's his understanding of it,

15   for what it's worth.

16        MR. BRIMMAGE:  Your Honor, I assume this is a lay

17   opinion.

18        THE COURT:  Yes, yes.  Certainly.  Absolutely.

19        THE WITNESS:  Two reasons.  One (indiscernible)

20   greater efficiencies in the process of fulfillment and, two,

21   fulfillment is not -- is an important but not a core

22   function to (indiscernible) of the entity which is the

23   publishing of the radio shows and fulfilling of merchandise,

24   for getting it out of the company (indiscernible) and

25   there's no management (indiscernible) for efficiency.

1    BY MR. BATTAGLIA:

2    Q    And what --

3    A    We had been --

4    Q    Go ahead.  I'm sorry.

5    A    We had been discussing with the Debtor, but since we

6    got (indiscernible) need to try to (indiscernible) core

7    competencies.

8    Q    And is this a change that you would have made as CRO?

9          MR. BRIMMAGE:  Your Honor, I'll object.  That

10    calls for speculation, and it also highlights that he wasn't

11    there and didn't make the change and shouldn't be testifying

12    about the basis for the change.

13          THE COURT:  I'll sustain.

14    BY MR. BATTAGLIA:

15    Q    Mr. Schwartz, when did you arrive on the scene at Free

16    Speech Systems.

17    A    I think it was about June 6th.

18    Q    And you testified that this change occurred in early to

19    mid-July?

20    A    I believe that was implemented, yes, in early to mid-

21    July.

22    Q    So based on your evaluation of the operations of the

23    Debtor from June 6th, what is your opinion about whether

24    this was a valid change to make?

25          MR. BRIMMAGE:  Your Honor, I'll object.  I don't

1    know what valid change to make means.  He's already

2    testified that he wasn't involved in the change.  He gave

3    his opinion and guessed what he thought the change might

4    have been made because of.  But whether or not it's a valid

5    change, and he's not an expert to determine whether or not

6    it should be valid.

7             THE COURT:  Yeah.  Well, he's the CRO.  I'm going

8    to overrule.  He can testify as to what he thought, and you

9    can cross and ask him his reasons and his understanding of

10   it.  I'll allow it.

11            Mr. Schwartz, you can answer the question.

12            THE WITNESS:  Mr. Battaglia, could you repeat the

13   question?

14   BY MR. BATTAGLIA:

15   Q    Yes, sir.  Based on your involvement with the Debtor,

16   was this is, I'll change the word, an appropriate change to

17   make?

18            MR. BRIMMAGE:  Same objection.

19            THE COURT:  Overruled.

20            THE WITNESS:  For purposes of what it was trying

21   to accomplish, yes.  What I -- what I was interested in is

22   its impact on cost of fulfillment and there's some

23   (indiscernible) indication that the cost of fulfillment has

24   actually come down from what it was pre -- prior to -- prior

25   to the change.  Just preliminary numbers, it's not

 1   (indiscernible) we haven't had enough time to really filter

 2   out all the numbers and reconcile everything.  But

 3   preliminary it looks (indiscernible) it's costing us less.

 4   BY MR. BATTAGLIA:

 5   Q    So can you describe for the Court what investigation

 6   you did of Mr. Riley and/or Blue Ascension?

 7   A    I met with Mr. Riley.  We had a rather lengthy meeting.

 8   Talked a lot about fulfillment and particularly the cost

 9   economics of it.  I did have a -- we did a background check

10   on Mr. Riley and (indiscernible) anything that popped up

11   there that caused me some concern.

12       That's -- in the amount of time we had, that's -- you

13   know, I've worked with him subsequently since this

14   particularly when we realized the problem we were in.  But

15   that's been two weeks with some involvement.

16   Q    And what investigation did you do regarding Mr. Riley's

17   relationship with Alex Jones and his other insider entities?

18   A    Well, initially --

19           MR. BRIMMAGE:  Your Honor (indiscernible)

20   clarification, about what point in time are we talking

21   about?

22           THE COURT:  I think it's a fair question.  Mr.

23   Battaglia, why don't you ask your question a little

24   differently.  I'll sustain.

25           MR. BATTAGLIA:  Your Honor (indiscernible) first,

1    I guess I'll ask a leading question.

2    BY MR. BATTAGLIA:

3    Q    Have you conducted an investigation into the

4    relationships with Mr. Jones?

5    A    It's been (indiscernible) but yes.

6    Q    And when did you start asking questions about the

7    relationship?

8    A    Subsequent to July 18th.

9    Q    And what have you determined as to any relationships

10   with Mr. Jones and Mr. Riley?

11   A    Well since then I've not -- other than I know -- I know

12   they knew each other before Blue Ascension was formed.  Mr.

13   Riley worked at FSS for a number of years.  Mr. Riley, Mr.

14   Jones both told me on several occasions there is no business

15   relationship --

16            MR. BRIMMAGE:  Your Honor, I'll object to any

17   further testimony about what he heard based on

18   conversations.

19            THE COURT:  Mr. Battaglia?

20            MR. BRIMMAGE:  He said what -- what they told me,

21   and he's going to regurgitate what they told him.

22            MR. BATTAGLIA:  Your Honor, it's not offered for

23   the truth of the matter.  It's offered for what his

24   understanding is based on.

25            THE COURT:  I'll allow it.  It's got to be limited

 1   to the -- his investigation and what he believes -- whether

 2   it was a result of his investigation.

 3        So Mr. Schwartz, with that admonition, you can

 4   answer the question.

 5        THE WITNESS:  As part of my investigation, I asked

 6   both Mr. Jones on several occasions and Mr. Riley on several

 7   occasions about potential business relationships between

 8   Blue Ascension, Mr. Riley, and Mr. Jones, Mr. Jones's

 9   family, other employees of FSS, other former employees of

10   FSS and that disclosed nothing.  When I ran a background

11   check, I did not find any possible associations between any

12   identified employees of FSS that I knew and Mr. Riley or

13   Blue Ascension.

14        THE COURT:  Just a question.  When you said it

15   revealed nothing based on your conversations with Mr. Jones

16   and Mr. Riley, what did you mean by that?

17        THE WITNESS:  I guess there weren't any

18   relationships of any sort with anybody (indiscernible) so

19   from that standpoint (indiscernible) they told me and I ran

20   the background check, that's independent and it just showed

21   nothing.

22        THE COURT:  Okay.  Thank you.

23        MR. BRIMMAGE:  Your Honor, if I can jump in here,

24   it just dawns on me do we know if Mr. Riley is attending the

25   hearing and listening to Mr. Schwartz's testimony?

```
 1            THE COURT:  I do see Mr. Riley at least on

 2    GoToMeeting.  I don't know if he's listening.

 3            MR. BRIMMAGE:  Your Honor, at this point then we

 4    would invoke the rule from this point forward on Mr.

 5    Schwartz's testimony.

 6            THE COURT:  Okay.  Mr. Riley, if you can hear me,

 7    and I want to make sure that someone -- maybe Mr. Lee can

 8    get in contact with Mr. Riley.  The rule has been invoked,

 9    and Mr. Riley, I'd ask that you hang up from the line, and

10    I'm going to -- I'm asking that you also remove yourself

11    from GoToMeeting.  I'll give you about 30 seconds to do so.

12    If not, I'll remove you.  Well, it sounds like he heard me.

13    He's removed himself from GoToMeeting.

14            And Mr. Lee -- Mr. Riley, if you're listening to

15    me, Mr. Lee, I want to make sure that he can hear me at

16    least on this point, that he is to just remain -- not listen

17    to any of this testimony but remain available.  Maybe we can

18    take a five-minute break after Mr. Schwartz's testimony and

19    make sure that he can get on.  But just want to make sure

20    that he's made available if needed to testify today.

21            MR. BRIMMAGE:  Thank you, Your Honor.

22            MR. LEE:  Kyung Lee, for the record, Your Honor.

23    I'll take care of that, Your Honor.

24            THE COURT:  Okay.  All righty.  Do we have -- Mr.

25    Lee, can you confirm -- and maybe we can just take a second.
```

1    Can you confirm that Mr. Riley is off the line?  I know he's

2    off GoToMeeting.

3              MR. LEE:  Your Honor?  Your Honor, this is Kyung

4    Lee for the record.  I'll take care of it right now, Your

5    Honor.

6              THE COURT:  Thank you.  Okay.  Why don't we just

7    wait a minute, and then we'll proceed.

8              MR. BATTAGLIA:  Yes.

9              THE COURT:  Okay.  Mr. Battaglia, why don't you

10   continue.

11             MR. BATTAGLIA:  Yes, Your Honor.

12   BY MR. BATTAGLIA:

13   Q    What does Blue Ascension do for Free Speech Systems?

14   A    (indiscernible) it performs certain functions that

15   (indiscernible) what happens after an order is placed, what

16   fulfillment is involved.  It's taking the pick ticket.  It's

17   then pulling the merchandise.  It's packing the merchandise.

18   It's sealing it.  It's labeling it and turning it over to

19   the delivery service.

20   Q    Who is responsible for receiving and shelf-stocking of

21   inventory?

22   A    They perform that function as well.  They have direct

23   control of the warehouse.  So they receive inventory and

24   stock it, shelve it, whatever you call it.

25   Q    Who provides inventorying services?

```
1    A     That's a combination of the inventory personnel, the

2    warehouse personnel who work for Blue Ascension.  They

3    actually do the counting.  But the inventory management is

4    controlled by FSS.  So we know what the (indiscernible)

5    inventory system.  So we know what inventory is supposed to

6    be there.  So when you do inventory, we do cyclical ones,

7    both entities are involved which is the way it should be

8    done.

9              MR. BATTAGLIA:  Your Honor, could you share

10   Debtor's Exhibit 3, please?

11             THE COURT:  Okay.  Give me a second.

12   BY MR. BATTAGLIA:

13   Q     Can you see that, Mr. Schwartz?

14   A     I can see the top third of it, it looks like.

15   Q     This has been admitted into evidence as the Blue

16   Ascension price list.  Do you recognize it?

17   A     Yes.  I do.

18   Q     And does it appear to be a true and correct copy of the

19   price list negotiated between the Debtor and Blue Ascension?

20   A     Yes.  It does.

21   Q     So tell the Court, if you would, what contracts govern

22   the relationship between Blue Ascension and Free Speech

23   Systems.

24   A     There are no contracts, unless you consider a price

25   list a contract.
```

Page 33

1  Q    Why did the Debtor not require a contract as opposed to

2  a price list?

3  A    Quite honestly, I was (indiscernible) when I learned of

4  Blue Ascension and what it was supposed to be doing.  I was

5  aware that Mr. Riley had a background with the company.  I

6  decided that I did not want a contract.  I wanted a price

7  list because if I needed to get out of this, I wanted to be

8  able to do it very quickly.  But I also (indiscernible) --

9  Q    (indiscernible)

10  Q    Go ahead --

11        THE COURT:  I'm sorry.  Mr. Schwartz, can you

12  finish that last part of your question?  Thank you.

13  BY MR. BATTAGLIA:

14  Q    Yes, sir.

15  A    Yes.  If you go -- if you look towards the bottom, this

16  is good for 90 days.  So it gave me a (indiscernible) a lot

17  of the time we could build (indiscernible) we could go

18  through and be working together and develop the data cost-

19  wise, what it's ultimately costing us compared to what we

20  were paying (indiscernible) advantage.  It's advantageous to

21  us.  But I did not want a contract.  Mr. Riley wanted the

22  contract.  I told him, no, I'd do a price list.

23  Q    And who negotiated the pricing in this price list?

24  A    Well, Mr. Riley and I (indiscernible) Riley was

25  involved.  But the push back and forth came between Riley

1   and me.

2   Q    I want to turn and talk about order backlogs.  Is there

3   currently a backlog of unshipped orders?

4   A    Yes, sir.  (indiscernible)

5   Q    Why haven't those shipped?

6   A    Blue Ascension would not work with us on credit.  They

7   wanted the cash in hand before they fulfill.  What happened

8   is (indiscernible) behind the week before the filing.

9   Numbers were just astronomical (indiscernible) than we had

10  been experiencing and we hadn't paid enough money in.  So we

11  (indiscernible) about 14,000 units in backlog at the day we

12  filed bankruptcy.

13      Subsequent to that we've had a week-and-a-half more of

14  orders.  We reached a peak of 30,000 or so that were in the

15  backlog which is now down to about -- I read the report from

16  yesterday.  It's something like 26,000, something, 25,000.

17      So it's really a function of having enough money to

18  (indiscernible) the project was based on approximately the

19  equivalent of 5,000 orders a week, 4,000 to 5,000.  We're

20  doing 10,000 or more and that is what's -- it's just

21  $100,000 (indiscernible) just to keep up with that

22  (indiscernible) --

23  Q    (indiscernible) I'll explore that a little further with

24  you later.  But what are the consequences of customer orders

25  going unshipped?

1   A    Well, the first one is customers get unhappy and cancel

2   their orders.  So you have to return their money to them.

3   Secondarily, if you start having a lot of complaints, stop

4   orders not being shipped, it comes to the attention of the

5   credit card processor and they can -- if they feel that it's

6   a dangerous situation (indiscernible) customer, they will

7   cancel us, can cancel us.  And so it's two negatives and

8   plus it's bad for customer relationships.

9           MR. BATTAGLIA:  So let's turn to the projections,

10  and Your Honor, if you can share Exhibit 2, please.

11          THE COURT:  Okay.  Just give me a second.

12  BY MR. BATTAGLIA:

13  Q    Can you see that, Mr. Schwartz?

14  A    Yes.

15  Q    Can you describe for the Court the correlation between

16  sales volume and fulfillment cost?

17  A    The purpose of this budget -- fulfillment cost is based

18  on the volume of sales.  It was projected I believe it was

19  at --

20  Q    I guess I'll ask the question simpler.  Is there a

21  correlation, and what is it?

22  A    Well, the correlation is it's about a 1:1 relationship.

23  For every $1 increase in sales, you're going to have about a

24  28, 25 percent increase in fulfillment cost.

25  Q    What was the basis -- up at the top, you have a line

1   item of -- let's see what it is here -- product sales.

2              MR. BATTAGLIA:  And, Your Honor, you might have to

3   scroll up just a bit.

4              THE COURT:  Okay.

5              THE WITNESS:  We took --

6              MR. BATTAGLIA:  Your Honor --

7   BY MR. BATTAGLIA:

8   Q    All right.  Go ahead.

9   A    We looked at the actual reported sales for the week

10  prior to the filing of bankruptcy.  So that would have been

11  the week ending the 22nd of July, those five days.  And we

12  knew (indiscernible) new product that hadn't been in the

13  warehouse for some time.  Mr. Jones told us we could expect

14  significant increases in sales.  So we took that number for

15  that week and put it up by 25 percent to 595 you see here

16  (indiscernible) jump in sales that was pretty significant.

17  Q    And what -- go ahead.  I'm sorry.  I don't mean to cut

18  you off.

19  A    No.  Go ahead.  And that, if you can see, is our

20  (indiscernible) as we got more sales, we got more sales

21  (indiscernible) come back and ask for modification of the

22  budget.

23  Q    And what (indiscernible)

24  A    (indiscernible)

25  Q    That had actual sales experience proven --

001977

```
 1    A    (indiscernible)

 2           THE COURT:  Just a second.  Mr. Schwartz, I want

 3    Mr. Battaglia to ask you the question and then you can

 4    answer it.  Go ahead.

 5           Can you repeat your question, Mr. Battaglia?

 6           MR. BATTAGLIA:  Yes, sir.

 7    BY MR. BATTAGLIA:

 8    Q    What --

 9           MR. BATTAGLIA:  Yes, sir.

10    BY MR. BATTAGLIA:

11    Q    What are your actual -- what are FSS's actual sales for

12    the week ending July 29th and going forward?

13    A    Week ending July 29th, it was something like $900,000

14    or so, $920,000, maybe something like that, if I recall.

15    The next week, we were down to -- let's see, the 29th, that

16    would be August 5th -- the week ending July 29th, we had

17    $900,000.

18           The week ending August 5th, we were at $880,000,

19    $890,000, something like that.  This week (indiscernible)

20    currently running at a rate of $750,000 and we expect as new

21    product productions will kick sales up again next week and

22    the week following for certain.

23    Q    What products are being received or anticipated to be

24    received in the following week?

25    A     Well, the first two products (indiscernible) that was
```

1   the first we kicked off prior to the filing of the

2   bankruptcy.  Then the vitamin/mineral fusion, another

3   product, and that one has been extremely successful since

4   the filing of the bankruptcy.

5       The next one coming I believe is a male vitality

6   product which has a very strong sales history in the past

7   and it's coming back into this market new.  That one's

8   expected to be -- it's going to put the other two products

9   to shame in terms of the sales.  I can't tell you the name

10  of these things.  I'm still trying to learn them.

11  Q    That's okay.  What I guess I'm curious about is would

12  product arrivals -- how does that affect your ability to

13  project sales on a week-to-week basis?

14  A    It is extremely hard.  We had -- I could locate data in

15  the amount of time we had to base any projections

16  (indiscernible) when we started putting the budget --

17  originally putting the budget together.  And quite frankly

18  the salesman -- Mr. Jones is a salesman, and telling me how

19  great sales are.

20      I've had -- my experience with that is you discount it.

21  So I did.  I still can't quite get a handle on it.  You

22  know, they said to expect up to $450,000 a day.  That's a

23  possibility, $350,000 on day is an average which is again

24  almost twice the volume we've been doing already.

25  Q    And if the Debtor were to achieve those levels of

1   sales, would -- can you describe for the Court whether the

2   fulfillment line item in this budget is adequate?

3   A    It's absolutely inadequate.  It's not adequate for the

4   sales that have already been, and they're going to be

5   nothing compared to what's needed.

6   Q    Why aren't you able to tell Judge Lopez that you need

7   for next week some certain number in order to satisfy

8   fulfillment costs?

9   A    Because I really have no data on which to base

10  (indiscernible) estimate of what the sales will be.  You

11  know, I had this discussion at length last night with Mr.

12  Jones.  And I said, look Alex, you know, you're telling me

13  $450,000.  How many days at $450,000?  I don't know.

14      I said, well, I've got to be able to plan for $450,000

15  if that's the high point.  That's why I want to try to go to

16  this more variable whereas when volume goes up, fulfillment

17  dollars go up.  Volume goes down, fulfillment dollars go

18  down.

19  Q    And so what are you asking the Court to allow you to do

20  with this motion today?

21  A    Well, each day we receive a settlement statement, and

22  it takes the credit card charges and determines, you know,

23  some product is owned by PQPR.  So it divides the sales

24  between whose product is sold.  It pays the processing cost

25  from the processor's fee and calculates, you know, how much

1    amount of money that it brings FSS.  It also withholds

2    $1,000 a day for debt service on the PQPR debt.

3         I mean (indiscernible) really that process, to make

4    that analysis and just as easily and say, okay, I'm going to

5    take $20 per order and send that directly to Blue Ascension

6    so it has the money to fill that order the day it should

7    start filling that order, so I'm not longer having to run

8    around trying to make sure we send the money to Blue

9    Ascension as needed.

10        This way we can get it right away.  It's there when

11   they need it, and it's more effect on bottom line

12   (indiscernible) we'd have to send them except stopping

13   shipping and saying, oh, by the way, we're out of money

14   again, send us some more.

15   Q    And what do you propose to do to ensure that this is

16   transparent to the creditors and the Court?

17   A    Well actually the information will be disclosed on

18   here, and this already discloses the other deductions that

19   are made.  There's a (indiscernible) so it's clear what they

20   are.  But we would simply -- fulfillment would become the

21   amount that's going to Blue Ascension under this

22   methodology.

23        And so if you go to product sales, what we'll have is

24   product sales.  It'll have merchant card processing, the

25   processor fee, the Blue Ascension fee and the PQPR.  It's

1    all laid out there.  That's what we get every day -- what we

2    get every day on the settlement statement.  And we could

3    also --

4    Q    (indiscernible)

5    A    (indiscernible) number of orders because that would

6    also be informative to everybody.

7    Q    And what do you propose to do with that report that you

8    just discussed?

9    A    We plan to produce it every Tuesday when we do our --

10   as part of our reporting.  Every Tuesday, we -- I itemize --

11   I want -- I do check the (indiscernible) engagements.  We

12   compare the budget to the actual so we know where we're

13   going.  So we can just produce that every Tuesday to

14   whoever's interested in it.

15   Q    The net effect of the growth in sales has -- what

16   effect has it had on the Debtor's cash balances?

17   A    It has -- when we came into bankruptcy, we had about

18   $600,000 of what is clearly cash collateral.  On the 9th, I

19   believe, when I did this analysis, it was $1 million, $1.1

20   million or something like that --

21   Q    And that's exclusive of the donation number?

22   A    Yeah.  Correct.  That does not include the donation

23   number.

24   Q    I'm sorry.  Did I cut you off?

25   A    That does not include donations.

1    Q    Yes, sir.

2              MR. BATTAGLIA:  Your Honor, I'll pass the witness.

3              THE COURT:  So before I open it up, Mr. Schwartz,

4    just a couple of -- I want to make sure that we have a clear

5    record for me on just a couple of questions.  I'm looking at

6    the budget, and it's showing $595,049.01, you know, for the

7    next three weeks, if you will, which is really what we're

8    talking about here in connection with, the outstanding

9    order.

10             Do you have a sense of how much more money, if

11   could be provided, if the relief was granted, in terms of

12   additional sales above the $595,000?  Do you have any sense

13   of that number?

14             THE WITNESS:  Well, Your Honor, we've already hit

15   $900,000 (indiscernible) we should hit --

16             THE COURT:  $900,000?

17             THE WITNESS:  -- up to $2 million --

18             THE COURT:  I'm sorry?  $900,000?

19             THE WITNESS:  Right.  $900,000.

20             THE COURT:  So is that through July 29th?  Did I

21   get that right?

22             THE WITNESS:  Yeah.  Correct.  Through July 29th.

23   The week that we filed, our sales were over $900,000.  That

24   number, product sales, was over $900,000.

25             THE COURT:  What do you project --

```
1                    THE WITNESS:  It was $880,000 --

2                    THE COURT:  Go ahead.

3                    THE WITNESS:  It was $880,000 the week we filed,

4         the week ending August 5th.  It looks like this week it's

5         going to be around $750,000.  Then new product will hit, and

6         we should see a jump.  So it could easily double.

7                    THE COURT:  Okay.

8                    THE WITNESS:  And matter of fact, we should

9         probably look at it and if it doesn't double, ask why not.

10                   THE COURT:  So let me ask you another question.

11        If I don't grant the relief today, is the Debtor able to

12        fulfill these orders on its own?  Do you know?

13                   THE WITNESS:  We don't have the employees anymore

14        to -- we don't have the employees to do it.  I could -- not

15        our reorders, no.  We could probably help if we used the

16        donated money, which it's unclear if that is or is not cash

17        collateral.

18                   But if it's not cash collateral, it will help.

19        But it will not get us there, and if we're doing -- we're

20        doing twice the orders we're doing this week, then next

21        week, we won't be able to catch up.

22                   THE COURT:  Okay.

23                   THE WITNESS:  That'll be 20,000 orders.

24                   THE COURT:  Okay.  Does anyone have any questions

25        for this witness who supports the relief requested?  And if
```

1    you are, I'm going to ask that you hit 5*.  If you support

2    the relief requested, I'm asking that you hit 5*.  Okay, and

3    if I've missed anyone, I want you to put your hand up.  But

4    I don't see anyone who has hit 5*.  So I will turn to

5    parties who oppose the relief or wish to question Mr.

6    Schwartz in the form of a cross-examination more than a

7    direct, if you will.

8            Mr. Brimmage, I hear you're taking the lead on

9    that.  So unless someone else tells me otherwise, I will

10   turn it over to you.

11           MR. BRIMMAGE:  Your Honor, I am happy to go next

12   or if the U.S. trustee would like to go, I would defer to

13   him, whoever he prefers.

14           THE COURT:  Okay.

15           MR. NGUYEN:  Judge, Your Honor, Mr. Brimmage can

16   go first.  Thank you.

17           MR. BRIMMAGE:  Mutual deferral society, Your

18   Honor.

19               CROSS-EXAMINATION OF W. MARC SCHWARTZ

20   BY MR. BRIMMAGE:

21   Q    Okay.  Mr. Schwartz, Marty Brimmage, with Akin Gump

22   Strauss Hauer & Feld here on behalf of the Texas plaintiffs.

23   You and I met for the first time on August the 3rd.  We had

24   a little chat in the court.  Do you recall that?

25   A    I did.  I do.

```
1    Q    Let's continue -- let's continue that, if we could.  I
2    kind of want to pick up right where you left off with the
3    judge just to make sure I'm clear.  So sales have gone up,
4    right?  You testified to that.
5    A    Yes.
6    Q    Donations have also gone up, right?
7    A    No.  A little bit.  I mean, not much at all.  We're
8    (indiscernible) but it's -- donations, if I may, you have
9    sometimes some big donations pop in sporadically and you
10   have, you know, a few thousand dollars a month of small
11   dollar donations (indiscernible) --
12   Q    Do you have an accurate count -- do you have an
13   accurate number for donations as you're testifying right now
14   for the Court, total donations to FSS as of right now?
15   A    As of today?  No.  We haven't booked today.
16   Q    As of yesterday.
17   A    No.
18   Q    As of the day before?
19   A    I think we had a number on that.
20   Q    What's the number?
21   A    I don't know.  I don't have the general ledger in front
22   of me.
23   Q    The day before that, what's your best guess on -- or
24   best recollection on what that number is for the donations?
25   A    For what period of time?
```

Page 46

```
 1   Q    The current amount of donations on hand that FSS has.
 2   Do you know --
 3   A    (indiscernible)
 4   Q    Tell the Court what the dollar amount is.
 5   A    How much we have on hand is about $459,000.
 6   Q    All right.  It was $800,000 on the petition date.  Do I
 7   recall that correctly?
 8   A    No.  I don't think so.  I don't think it was that.
 9   Q    Am I confused?  You didn't testify that it was $800,000
10   on August the 3rd?
11   A    I'm trying to think back.  I mean, I made the entry to
12   book it as of the petition date.  I don't remember it being
13   $800,000.
14   Q    All right.  Is it your testimony that right here now
15   you don't know how much you testified earlier were
16   donations?
17   A    I don't recall.  (indiscernible) maybe review my
18   testimony.
19   Q    Do you recall testifying that the donations in your
20   mind were not encumbered?
21   A    Yes.  That was my understanding from counsel.
22   Q    All right, and you're not changing that today, right?
23   A    Changing what?  My prior testimony?  My testimony?  No.
24   I (indiscernible) so I haven't changed it.
25   Q    Okay, and so whatever is available for donations is
```

001987

1    available.  It's not encumbered and it's available to

2    fulfill orders, correct?

3    A    That is not my understanding today.

4    Q    And why is that not available to fulfill orders?

5    A    Because my counsel advised me that Judge Lopez

6    indicated it wasn't certain whether it was or was not cash

7    collateral and therefore it's not available for me to use.

8    Q    Okay.  I understand.  Okay.  All right.  So it's money

9    that is there.  But you can't use it because it's your

10   understanding that Judge Lopez won't let you use it at this

11   time, right?

12   A    My understanding is Judge Lopez did not indicate

13   whether it was or was not.  He hadn't decided that, and

14   therefore we --

15   Q    Okay.

16   A    I could not use it.

17   Q    Okay., and do you know from the time that you took over

18   to now or the time from the petition date to now, do you

19   know how much have been made in donations to FSS?

20   A    No.  I mean, that's -- we had a lot of small dollar

21   checks and we're just now adding those up.

22   Q    Okay.  You don't have an answer for that today, right?

23   A    I don't know.  No.  It was -- no, I don't.

24   Q    Okay.  I appreciate that.  Let's go to this Blue

25   Ascension.  At one point you called it Blue Assistance.  I

```
 1   want to go into -- it's crystal clear from your testimony

 2   that was not your decision to stop fulfilling orders at FSS

 3   and start using Blue Ascension, correct?

 4   A    Correct.

 5   Q    All right.  Whose decision was it?

 6   A    I was not there when that decision was made.  I can

 7   only assume.

 8   Q    You think it was Alex Jones, don't you?

 9   A    Well, I think Alex Jones is involved with it.  I know

10   it's something -- he's told me since then it's something he

11   wanted.

12   Q    Okay, and if there's something Alex Jones wants, and he

13   controls these businesses, Alex Jones gets it, right?

14   A    Not necessarily.  That's not a true statement.

15   Q    Okay.  Name one thing that you're aware of that Alex

16   Jones has wanted in these businesses and he hasn't gotten.

17   A    Well, let's see.  He wanted Mr. Riley to apparently --

18   I assume it would be something involved with the inventory

19   control, that Mr. Riley should set up a separate

20   (indiscernible) to do that.

21   Q    Wait.  Wait a second.  When you say you assume, that

22   tells me you don't have personal knowledge.  Do you know

23   firsthand what you're testifying to or do you not?

24   A    Well, I -- well, you asked me what Mr. Jones wanted

25   that he didn't get.  So my only source of that is what Mr.
```

```
 1    Jones tells me.  So --
 2    Q    Okay.  Fair enough.  All right.  All right.  You don't
 3    have any personal knowledge of something Mr. Jones, Alex
 4    Jones has wanted and not gotten, correct?  You don't have
 5    any personal knowledge.  You only know what someone might
 6    have told you, including Mr. Jones, right?
 7    A    I do have personal knowledge.
 8    Q    Okay.  All right.  So let's keep going.  You were --
 9    you came on as the CRO somewhere around June the 6th; is
10    that right?
11    A    Something like that.
12    Q    Blue Ascension came on the scene somewhere around July
13    the 2nd or 3rd; is that right?
14    A    Well, Blue Ascension, as you know, was organized back
15    in March.  Blue Ascension (indiscernible)
16    Q    (indiscernible)
17    A    Blue Ascension (indiscernible) --
18    Q    (indiscernible)
19         THE COURT:  Hold on.  Hold on, folks.  I just want
20    to make sure that we're getting one question and one answer
21    and we're not talking over each other.  It gets a little
22    tricky on video.  Just want to make sure.
23         So Mr. Schwartz, why don't you finish the answer
24    that you were going to provide and then Mr. Brimmage can ask
25    another question.
```

1          THE WITNESS:  Well, I really have a question now

2    based on his answer.  So when you say on the scene --

3          THE COURT:  Well, you don't get to ask questions.

4          THE WITNESS:  I don't know what he means.

5          THE COURT:  Then just you don't know what he

6    means.  I just want to make sure -- you don't get to ask

7    questions.  He gets to ask them, and you get to answer them.

8    And if you don't know the answer, then just say you can't

9    answer the question.

10          THE WITNESS:  Okay.  I can't answer the question.

11          THE COURT:  Mr. Brimmage, why don't you ask

12    another question.

13    BY MR. BRIMMAGE:

14    Q    Mr. Schwartz -- Mr. Schwartz, when did Blue Ascension

15    start providing fulfillment services for FSS?

16    A    I don't have an exact date.  It was -- it was I believe

17    close to the day -- I take that back.  It was shortly prior

18    to my meeting with Blue Ascension.  So I asked to go over

19    the calculus of what happened.

20    Q    All right.  When was your meeting with Blue Ascension?

21    A    I believe July 18th.

22    Q    All right.  That's the date of the price sheet that we

23    looked at, right?

24    A    Correct.

25    Q    Okay.  Let's go backwards a little bit.  I'm just

1    trying to make sure that we and the Court are crystal clear

2    about what happened here.  Blue Ascension started providing

3    fulfillment services shortly before your meeting on July

4    18th, correct?

5    A    That appears to be the date, yes.

6    Q    And shortly before -- well, so they were already

7    providing fulfillment services for FSS when you had your

8    meeting; is that right?

9    A    Yes.

10   Q    In fact you said you were caught flatfooted, right?

11   A    I believe that's what I said.

12   Q    You did.  And so I'm just trying to make sure I'm

13   clear.  When were the FSS employees terminated and rehired

14   by Blue Ascension, if you know?

15   A    The payroll we were working on, on July 18th, they had

16   been -- they had already been moved from the payroll at that

17   time.  So they were paid --

18   Q    Okay.

19   A    They were not paid on that payroll by FSS.

20   Q    So when were they terminated from FSS?

21   A    Like I said, all I know is they left the payroll.  They

22   had already been moved off the FSS payroll when we were

23   preparing to pay that payroll.  So (indiscernible) it would

24   have been effective the beginning of that payroll.

25   Q    All right.  Were they fired?

1    A    Yeah.  They would have been just, you know, terminated

2    and rehired, I believe, by Blue Ascension.

3    Q    Okay.  Is it fair to say that the name of their

4    employer just changed?

5    A    Well, their employer changed.  They no longer were on

6    the ADP payroll that we operate.  They're not an

7    intercompany charge or anything like that.

8    Q    But they're doing the same thing they were doing

9    before, right?

10   A    Well, the job (indiscernible) is essentially the same.

11   I don't know if they're doing it the same way.  I mean,

12   Patrick Riley, they have their own processes and procedures.

13   Q    Do you have personal knowledge of the different

14   processes and procedures that they brought in?

15   A    No.  That's why I said I don't know if they're doing

16   the same thing.

17   Q    Okay.  They're providing the same service to FSS that

18   they were providing to FSS before the name of their employer

19   changed, right?

20        MR. BATTAGLIA:  Your Honor, I'm going to object.

21   I'm going to object.  That question's been asked and

22   answered.

23        THE COURT:  I'll sustain.

24        MR. BRIMMAGE:  Okay.  Fair enough.

25   BY MR. BRIMMAGE:

1    Q     You weren't involved in terminating the employees,

2    right?

3    A     I'm sorry.  I didn't hear the earlier part.  Weren't

4    involved?

5    Q     You weren't involved in terminating the employees,

6    correct?

7    A     I was not involved, correct.

8    Q     You weren't involved in the employees being rehired by

9    Ascension, Blue Ascension, right?

10   A     Correct.

11   Q     And are the employees working in the same space that

12   they worked in before they left FSS?

13   A     Yes.  They would be in (indiscernible) --

14         THE COURT:  Mr. Schwartz, I think something broke

15   up.  Can you repeat that answer?

16         THE WITNESS:  They are working in the FSS

17   warehouse.

18         THE COURT:  Thank you.

19   BY MR. BRIMMAGE:

20   Q     All right, and so Blue Ascension operates out of the

21   FSS warehouse, right?

22   A     Well, when they're working for us, they do.

23   Q     Okay.

24   A     Working for FSS, I mean.

25   Q     Right.  Same warehouse that FSS employees worked in

```
 1    before Blue Ascension came on, right?

 2    A    And some FSS employees still work there.

 3    Q    Okay.  Which warehouse is this?

 4    A    It's the one on Strassman.

 5    Q    Let me switch gears a little bit.  You said you did

 6    some due diligence into Blue Ascension, right?

 7    A    I described what I did.  Yes.

 8    Q    And I just want to make sure the timeframe of that was

 9    about the time of your meeting with Mr. Riley, right?

10    A    It was after my meeting with Mr. Riley.

11    Q    After the meeting with Mr. Riley.  Okay, and your

12    meeting with Mr. Riley was on July 18th, right?

13    A    Correct.

14    Q    Okay.  So you didn't do any due diligence on Blue

15    Ascension or Mr. Riley prior to that.  I just want to make

16    sure, right?

17    A    No, other than asking who he was.

18    Q    Okay.

19    A    But (indiscernible) --

20    Q    And I want to make sure we're clear on what your due

21    diligence was.  Your due diligence was you talked to Mr.

22    Riley, right?

23    A    Correct.

24    Q    You talked to Mr. Jones, Alex Jones, right?

25    A    Correct.
```

1    Q    You ran a background check, right?

2    A    Correct.

3    Q    Anything else?

4    A    Well, I mentioned I talked to Mr. Roddy.

5    Q    Anything else?

6    A    I may have spoken to Mr. Jones -- Dr. Jones, excuse me.

7    Q    Okay.  Anything else?

8    A    I believe that was essentially it.

9    Q    Okay.  Just for the Court, who is Mr. Roddy?

10   A    Blake Roddy is -- I believe he was the man in charge of

11   inventory and purchasing.

12   Q    For FSS?

13   A    Yes.

14   Q    Okay, and then the background check, what kind of

15   background check did you do?

16   A    I had a -- it's not a complete check.  I did criminal

17   and we did known associates, his employment history,

18   location history, property ownership, liens, litigation.

19   Q    Did you personally do this or you had someone do it?

20   A    I personally did it.  It didn't take five minutes.

21   Q    Okay.  So you spent five minutes on a background check

22   and you personally did it, right?

23   A    Correct.

24   Q    Okay.  All right.  So (indiscernible) --

25   A    Well (indiscernible) the report.  But I read it.  It

1    was a very extensive report.

2    Q    All right.  Let's go to -- you have seen the, is that

3    right, the Blue Ascension article of formation documents.

4    Do I have that right?

5    A    I have seen some things the secretary of state showing

6    the registration and organization of the LLC.  I've not seen

7    any member agreements, (indiscernible) agreement or articles

8    of association or organization, just the SOS filing.

9    Q    All right.  You haven't seen anything else other than

10   the SOS filing, right?

11   A    That's what I just said.

12   Q    Did you ask for any other documents regarding Blue

13   Ascension?

14   A    No.

15   Q    So part of your due diligence did not include for

16   asking for those.  Got it.  Blue Ascension, do you know how

17   to spell -- how it's spelled, ascension?

18   A    Probably not because it's A-S-E-N -- I mean, it's S-T-

19   I-O-N or not.

20   Q    Okay, and when did you look at the SOS document?

21   A    I don't recall.

22   Q    Where did you get it?

23   A    We probably pulled it down, I guess.  I'm trying to

24   think -- well, I don't remember.  But I know we had it

25   pulled down.

1    Q    Did you personally do that or did someone give it to

2    you?

3    A    I did not do it.  I had one of my staff would have

4    given it to me.  I didn't do that.

5    Q    Well, I mean, let's be clear.  Do you or do you not

6    know, under oath, where you got the SOS formation document

7    for Blue Ascension?

8    A    Well, I've gotten several recently from various filings

9    (indiscernible) but prior to that I don't know where I got

10   the one I remember seeing.

11   Q    All right.  You saw it was formed in March of 2022?

12   A    Correct.

13   Q    All right.  Any idea why it was formed when it was

14   formed?

15   A    That'd just be really conjecture on my part.

16   Q    You don't know, right?

17   A    (indiscernible) Alex Jones told me why it was

18   (indiscernible) --

19   Q    Okay.  All right, and you have not done any due

20   diligence into who might have an ownership interest in Blue

21   Ascension, right?

22   A    Other than, like I said, asking Mr. Riley and Mr. Jones

23   and possibly Dr. Jones.  But other than that, I've not

24   looked at any books and records on ownership.

25   Q    And you haven't asked for the organizational documents.

1    We just talked about that.  So you don't know one way or

2    another whether or not anybody other than Mr. Riley has an

3    ownership interest in Blue Ascension, correct?

4    A    I have no knowledge, personal knowledge of that.

5    Q    All right.  One way or another, right?

6    A    I just said I have no personal knowledge of it.

7    Q    Okay.  You do know that Mr. Riley has a history with

8    FSS, right?  He was employed by FSS, right?

9    A    Yes.  I'm aware of that.

10   Q    Yeah, and what kinds of jobs did he do for FSS?

11   A    From what I understand, he worked in fulfillment with

12   them for a number of years, in total up to six years.  I

13   know he -- well, I don't know.  I've heard -- I know he

14   trained, physically trained with Mr. Jones.  I don't know if

15   it was as a job or they liked to work out together.

16   Q    All right.  You say you understand he worked in

17   fulfilment.  Where is that understanding from, and do you

18   know that for a fact?

19   A    Again, I wasn't there then.  So I don't have any

20   personal knowledge of when he started work and when he left

21   work employed by FSS.  My understanding is based on what

22   I've been told.  I've been led to believe by Mr. Jones and I

23   think something I saw in connection with this hearing.

24   Q    Okay.  You know he used to work out or maybe still does

25   with Mr. Jones, right?

1   A    Well, I heard that he worked out with Mr. Jones.

2   Q    Okay.  Do you know that he also did other errands for

3   Mr. Jones?

4   A    I don't know.

5   Q    You don't know?

6   A    No.

7   Q    What was his title in -- what was his title in the

8   fulfillment group when he was with FSS?

9   A    I have no idea.  I don't know what anyone's title is

10  there.

11  Q    What were his job responsibilities when you think he

12  was in the fulfillment group at FSS?

13  A    Well the document (indiscernible) I'm sorry.

14  Q    I need to apologize.  I think I gave you two questions.

15  Let's start with what was his title in the fulfillment group

16  for FSS.

17  A    I don't know.

18  Q    What were his responsibilities in the fulfillment group

19  for FSS?

20  A    My understanding is he managed fulfillment which would

21  have been the same role in the process.

22  Q    When you say your understanding, what's your

23  understanding based on?

24  A    From talking to him about his knowledge of fulfillment

25  operations at FSS and the cost structure.

1    Q    Okay, and did you see any documents that identified him

2    actually doing any of those things at FSS?

3    A    No.  I have not seen any.

4    Q    You didn't see any documents that identified him as

5    actually having a title and working in the fulfillment

6    services group, did you?

7    A    Well, I haven't seen any documents that have titles for

8    anybody except maybe Alex Jones.  So it's very hard to find

9    out what people's titles are, if they have any.

10   Q    All right.  You don't know for a fact that he even

11   worked in the fulfillment services group, right?

12   A    No.  I've not researched if he actually was employed

13   there.

14   Q    Okay.  Let's look at a couple of emails, if we could.

15              MR. BRIMMAGE:  Your Honor, these are not those

16   emails.  These are these emails.  So let's look at Exhibit

17   2, if we could.

18              THE COURT:  So --

19              MR. BRIMMAGE:  And that would be -- I'm sorry.

20              THE COURT:  Go ahead, Mr. Brimmage.

21              MR. BRIMMAGE:  It's -- yeah, I'm messing up the

22   title of them, Your Honor.  It would be Document 60-2, which

23   --

24              THE COURT:  Okay.

25              MR. BRIMMAGE:  -- should be -- have we found it?

```
1              THE COURT:  Just give me a second.

2              MR. BRIMMAGE:  Can we -- if we can admit Nicholas

3    Lombardi --

4              THE COURT:  Sure.  Let me just --

5              MR. BRIMMAGE:  I think he can put it up there or,

6    Your Honor, if you would rather do it, if it's more

7    efficient --

8              THE COURT:  No, no, no, no.  If Mr. Lombardi is

9    there, I certainly will -- I've just got to find him.

10             MR. BRIMMAGE:  Okay.

11             THE COURT:  Oh, I see him there.  All righty.  Mr.

12   Lombardi, I'm going to make you a presenter.

13             MR. BRIMMAGE:  All right.  There we go.  If we can

14   go to the next page, Nick, which is the only page of the

15   actual document.  And we're going to have to blow it up a

16   lot if Mr. Schwartz and I'm going to be able to see it.  All

17   right.  A little bit more.  Is that possible?

18   BY MR. BRIMMAGE:

19   Q    Mr. Schwartz, do you have a magnifying glass?

20   A    Oh, I can see the lower half.  I can't see the upper

21   half.

22   Q    Okay.  Good.  All right.  Let's look at the lower half

23   because, as you know, you read emails backwards.  And then

24   we'll go to the upper half.  Does that sound fair?

25             MR. BATTAGLIA:  Your Honor, I'm going to object to
```

002002

1   him asking a witness to testify to an exhibit that's not in

2   evidence.

3            THE COURT:  Mr. Brimmage?

4            MR. BRIMMAGE:  Your Honor, Mr. Schwartz has

5   testified about his due diligence.  I'm not offering this

6   for the truth of the matter asserted therein.  I want to

7   know if he knows anything about any of it.  We're not going

8   to spend a lot of time on it.

9            But I want to know if he knows about any of the

10  roles that Mr. Riley actually did play or that these emails

11  say he might have played.  And if he doesn't, he doesn't and

12  we'll just reaffirm that he didn't look at these in his due

13  diligence.  It doesn't have to be in evidence to talk about

14  it.

15           THE COURT:  I agree.

16           MR. BATTAGLIA:  Notwithstanding everything Mr.

17  Brimmage just said, it's not in evidence and he's asking

18  this witness to testify to a document.  It has no

19  provenance, no foundation.

20           THE COURT:  Mr. Brimmage --

21           MR. BATTAGLIA:  And it's hearsay.

22           THE COURT:  I'm going to sustain that objection.

23  Mr. Brimmage, maybe you can get it in another way.  I just -

24  - you're not offering this to impeach the witness or in

25  cross-examination.  You're asking this witness about his due

1    diligence.  Why don't you ask him about it?

2           MR. BRIMMAGE:  Okay.  That's fair enough, Your

3    Honor.

4    BY MR. BRIMMAGE:

5    Q    Mr. Schwartz, did you look at any emails that Mr. Riley

6    was a party to in any of your due diligence?

7           THE COURT:  Counsel, before you do that, let me

8    ask the presenter to take this email down.  All righty.

9    Thank you.

10          Go ahead, Mr. Brimmage.  Mr. Brimmage?

11   BY MR. BRIMMAGE:

12   Q    Did you look, Mr. Schwartz?

13   A    Did I look?

14   Q    At any emails on which Mr. Riley was a recipient,

15   sender, cc, to identify what roles that he has played for

16   FSS prior to establishing the Ascension entity?

17   A    I did not look at any emails Mr. Riley was sender,

18   receiver, copied, mentioned at any time.

19   Q    Okay.  So whatever role he was playing in FSS, the

20   bottom line is you didn't do any due diligence to identify

21   specifically what his role was in the years leading up to

22   Blue Ascension; is that correct?

23          MR. BATTAGLIA:  Objection, Your Honor.  Asked and

24   answered.  This witness has talked about the due diligence

25   he's done and I'm not going to -- Mr. Brimmage can frame it

```
 1    how he wants.  But the testimony stands as his testimony.

 2              THE COURT:  I'll sustain.

 3    BY MR. BRIMMAGE:

 4    Q    Did you do any due diligence into other alternatives

 5    for fulfillment services other than Blue Ascension?

 6    A    At the -- when?  Excuse me.  Could you (indiscernible)

 7    timeframe?

 8    Q    Ever.  Ever.

 9    A    Yes.

10    Q    When?

11    A    After filing the bankruptcy, I started trying to

12    familiarize myself with providers of the service in the

13    Austin market.

14    Q    All right.  Now this is when FSS was still providing

15    fulfillment services, right?

16    A    No.  Blue Ascension was providing fulfillment services

17    with --

18    Q    Not the --

19    A    (indiscernible) filing of the bankruptcy.

20    Q    Ah, I thought you meant -- okay, so before and after.

21    All right.  So before filing bankruptcy, you looked at other

22    fulfillment services; is that right?

23    A    No.  No.  I did it after.

24    Q    After the bankruptcy?

25    A    Correct.
```

```
1    Q    All right.  Did you look at Amazon fulfillment?

2    A    Actually they're one that I did look at (indiscernible)

3    --

4    Q    Did you look at FedEx fulfillment?

5    A    No.  I haven't looked at FedEx.

6    Q    Did you look at ShipBob fulfillment?

7    A    Yes.

8    Q    Do you have any documents that demonstrate that you

9    looked at Amazon fulfillment?

10   A    I didn't bother putting it into the bucket of

11   possibles.

12   Q    Did you have any documents -- do you have any documents

13   that demonstrate any due diligence that you did into other

14   fulfillment services for FSS?

15   A    I think I have a couple emails from ShipBob.

16   Q    Okay.

17   A    And with another (indiscernible) there's another one --

18   excuse me.  There's another one I've got some documentation

19   on.  I can't remember its name.

20   Q    So you've got emails from two is your testimony, right?

21   A    No.  I have documents from two.

22   Q    All right.  Do you have documents from any others other

23   than the two?

24   A    I may.  I don't know if I've (indiscernible) any others

25   yet at this time.
```

1  Q    All right.  Not that you can testify to, right?

2  A    Correct.

3  Q    All right, and you would agree with me, if you did some

4  due diligence, because we have that other fulfillment

5  services can do it less expensively than Blue Ascension,

6  correct?

7  A    Not sure I would agree with that based on what I have

8  seen.  In the industry it's a little hard to determine

9  unless you get really down into the nitty-gritty

10 (indiscernible) --

11 Q    All right, and is it fair to say then you haven't

12 gotten down to the nitty-gritty of your exact job for FSS in

13 fulfillment services to be able to determine whether or not

14 a fulfillment service can do it less expensively?

15 A    Well, first off, that is not only the criteria.  So I

16 have not gotten down to that level.  But I have not

17 requested proposals at this time.  I'm not ready to.

18 Q    Is that a yes, Mr. Schwartz?

19 A    I have no idea.

20        MR. BATTAGLIA:  Objection, Your Honor.

21        THE COURT:  I think he can answer the question.

22        THE WITNESS:  What was the question again then?

23 BY MR. BRIMMAGE:

24 Q    Isn't it fair to say at this point in time your

25 testimony is you have not gotten down to the nitty-gritty to

1    determine whether or not another fulfillment service can

2    provide less expensive fulfillment services to FSS than Blue

3    Ascension?

4          MR. BATTAGLIA:  Objection to form.  Nitty-gritty

5    is a rather imprecise term.

6          THE COURT:  I'm sure Mr. --

7          MR. BRIMMAGE:  I'm trying to use the witness's

8    term.

9          THE COURT:  Hold on a second, folks.

10         MR. BRIMMAGE:  Maybe I didn't.

11         THE COURT:  I'm sure Mr. Schwartz knows what that

12   means or, if not, he can explain what his understanding is

13   and answer the question.

14         THE WITNESS:  At this time I have not requested

15   proposals from anybody.  But I would like to point out that

16   price is only one factor and maybe not the most important in

17   this situation.

18   BY MR. BRIMMAGE:

19   Q    Have you done -- well, isn't it true though, Mr.

20   Schwartz, you also haven't done due diligence into the other

21   fulfillment services providers to see whether or not they

22   can provide the other services that you see are equally more

23   important?  You haven't done that work to date, correct?

24   A    Correct.  I'm still looking through potential

25   candidates and trying to get an understanding of the

1    industry in Austin.

2    Q    And why haven't you done that work?

3    A    Something called a bankruptcy and cash collateral order

4    and sales going through the roof and trying to fulfill

5    orders.  It's just -- when you look at the list of

6    priorities, it's up there.  But it's underneath burning

7    fires.

8    Q    Now going to the price list, the price list is not a

9    contract, right?

10   A    Correct.  It is not.  At least I don't think it is.

11   Q    Yeah.  It's not signed, is it?

12   A    Correct.

13   Q    You didn't sign it and Blue Ascension didn't sign it.

14        MR. BATTAGLIA:  Objection, asked and answered.

15        THE COURT:  Sustained.

16   BY MR. BRIMMAGE:

17   Q    FSS is free to change fulfillment services at any point

18   in time, correct?

19   A    Correct.

20   Q    When Blue Ascension was formed, did you do any due

21   diligence on how it was capitalized?

22   A    I wasn't there when it was formed.  So no, I didn't.

23   Q    Do you know sitting here today how it was capitalized?

24   A    I do not know.

25   Q    Do you know whether or not Mr. Alex Jones provided

1   money to Blue Ascension to get it going?

2   A    I know he told me he did not.  But I have not seen his

3   bank account or Blue Ascension's.

4   Q    If he did not, did you ever ask anybody where the money

5   came to capitalize Blue Ascension to get it started?

6   A    I asked Mr. Riley, and he said it came from his

7   personal account.

8   Q    How much did it take to capitalize Blue Ascension?

9   A    I don't know.

10   Q    How long did Mr. Riley work for FSS or Alex Jones prior

11   to becoming involved in Blue Ascension?

12   A    I think, as I said, I've been told six years.  But I

13   don't know that.

14   Q    Have you looked into FSS bringing the fulfillment

15   services back in-house?

16   A    If we changed, that would probably be the easiest thing

17   to do.  But I have not looked at it.

18   Q    Give me just one second, Mr. Schwartz.  I'm going over

19   my notes.  And as you and I discussed before, that's always

20   a good thing.  Mr. Schwartz, what was Mr. Riley's salary at

21   FSS?

22   A    I don't know.

23   Q    Did you ever look for an organization chart of FSS that

24   would identify where Mr. Riley fit in the org chart?

25   A    I can't say I looked for it.  I asked for it.

```
 1   Q    Okay.  Did you see it?

 2   A    I was told there is none, and I've never seen one.

 3   Q    Who told you that?  Who told you that?

 4   A    Mr. Rowe told me that.

 5             THE COURT:  I'm sorry --

 6   BY MR. BRIMMAGE:

 7   Q    I apologize, Mr. Schwartz.  Could you repeat it?

 8   Because it just blanked out and I didn't hear it.  I'm

 9   sorry.  Just say it again, please.

10             THE COURT:  Yeah.

11             THE WITNESS:  Mr. Rowe told me.

12   BY MR. BRIMMAGE:

13   Q    Who is Mr. Rowe?

14   A    He's a consultant that was employed by either FSS or

15   PQPR prior to my arriving on the scene.

16   Q    Okay.  Do you know who Mr. Wheldon is?

17   A    I knew a Mr. Wheldon, but he's dead.

18   Q    Associated with FSS?

19   A    I'm sorry.  You broke up on me.  I'm missing the first

20   two or three words.  But I think you're -- my Wheldon was

21   not associated with FSS.

22   Q    Are you familiar with a Mr. Wheldon that is associated

23   or was associated with FSS?

24   A    No.  I'm not.

25   Q    Are you familiar -- well, are you familiar with a Mr.
```

1    Henson at FSS?

2    A      Henson?  No.

3    Q      H-E-N-S-O-N.

4    A      H-E-N-S -- no.

5    Q      So if a Mr. Henson has been involved in inventory

6    fulfillment services at FSS, you're not aware of it; is that

7    right?

8    A      Correct.  Only Mr. Riley (indiscernible) associated

9    with fulfillment services (indiscernible) associated with

10   fulfillment services.  I take that back.  I met a young lady

11   who was involved in that, a supervisor.

12   Q      She was a supervisor in the FSS fulfillment services?

13   A      She was at a supervisory level.  I'm not going to say

14   that was her title.  But she was at a supervisory level at

15   the warehousing operation.

16   Q      What is her name?

17   A      I don't remember.

18   Q      Is she now with Blue Ascension?

19   A      I don't know.  I'd have to look and see.  I would

20   assume so.  But I haven't looked.

21   Q      You don't know.  Okay.  Who is Mr. Rowe?

22   A      He's a CPA.

23   Q      Does he work for FSS?

24   A      He works for a company called Acuity.  He's a

25   consultant (indiscernible) I guess we technically hired

```
 1    Acuity to provide consultant (indiscernible) he's a
 2    consulting service to them (indiscernible) FSS and/or PQPR
 3    employed him.  I'm not too sure on that.
 4             THE COURT:  Mr. Schwartz, what's Mr. Rowe's first
 5    name?
 6             THE WITNESS:  Bob.
 7             THE COURT:  Bob Rowe.  And you said the name of a
 8    company.  Can you -- I think sometimes on the audio gets a
 9    little tricky.  Can you just, just so we have a clean
10    record, articulate the name of the company and sometimes --
11    maybe just spell it out just to make sure we've got a clean
12    record.
13             THE WITNESS:  Yes, sir.  My understanding is its
14    name is -- well, I've seen it, A-C-U-I-T-Y.
15             THE COURT:  Oh, Acuity.
16             THE WITNESS:  Yes, sir.
17             THE COURT:  Okay.  Thank you.
18    BY MR. BRIMMAGE:
19    Q    So you asked Mr. Rowe for an org chart.  Did you ask
20    anybody else at FSS for an org chart?
21    A    Yeah.  I hired a business manager and they did an
22    organization chart (indiscernible) trying to build one.
23    Q    Other than the new guy you hired and this consultant
24    that doesn't work for FSS directly, is it true you didn't
25    ask anybody else for an org chart of the FSS organization?
```

Page 73

1   A    No.  I wouldn't say that's a true statement.

2   Q    Okay.  Who else did you ask?

3   A    I (probably indiscernible) a few people.  I don't

4   remember.

5   Q    Mr. Schwartz, yeah, let's be clear.  When you say I

6   probably did something, I need you to testify under oath

7   what you did or didn't do.  So can you tell the Court right

8   here, right now, other than Mr. Rowe, who's a CPA not

9   employed by FSS, a consultant, and the new guy that you

10  hired, who else did you ask for an org chart.

11  A    I asked -- I recall asking if there was an org chart

12  from a couple other people.  But again, I'm not totally

13  certain who they were.  And very likely Blake Roddy would

14  have been one of them because I talked to him a lot.

15  Q    And I guess it's true, Mr. Schwartz, you never found an

16  org chart for the FSS organization, correct?

17  A    That's what I said.

18           MR. BATTAGLIA:  Objection, asked and answered.

19           THE COURT:  I think he can answer.  I want to hear

20  the confirmation on this as well.

21           THE WITNESS:  Yeah.  That's what I said earlier.

22           THE COURT:  Okay.  Thank you.

23  BY MR. BRIMMAGE:

24  Q    Okay.  How many orders are for $30 or less?

25  A    I don't -- I didn't hear what you said.

Page  74

```
 1    Q    How many orders are placed for $30 or less?

 2    A    I don't know that.

 3    Q    How many orders are placed for $20 or less?

 4    A    I've not looked at the distribution of orders yet

 5    (indiscernible) --

 6    Q    Okay.  Have you done any analysis to determine if you

 7    pay up front $20 per order, how many orders you will lose

 8    money on?

 9              MR. BATTAGLIA:  Objection, form.  I don't know

10    whether Mr. Brimmage's question says $20 includes the

11    shipping charge of $10 or not.

12              THE COURT:  I don't know where the $10 came from.

13    But your point is well taken.  Why don't you ask it a

14    different way, Mr. Brimmage?

15              MR. BRIMMAGE:  I appreciate that.

16    BY MR. BRIMMAGE:

17    Q    So the cost -- let me just build it up here and make

18    sure I'm okay with -- or I'm on board with this.  So there's

19    $14 for shipping cost, right, shipping and handling?

20    A    Approximately, yes.

21    Q    And $6 for fulfillment cost, right?

22    A    Correct.

23    Q    So that's $20, right?

24    A    Correct.

25    Q    And tell us all what is the Debtor asking the Court to
```

1    do today.

2    A    The Debtor is asking the Court to allow us to charge

3    our credit card settlement for $20 for each order placed

4    since that is what we're going to be billed for fulfilling

5    those orders.

6    Q    Okay.  Have you done any analysis to determine how much

7    money the Debtor will lose on orders that are $20 or less if

8    the Court grants this relief?

9    A     No.  We've not looked at how many orders, if any, are

10   $20 or less.  I think the -- well, I won't --

11   Q    Who is the credit card processor?

12         MR. BATTAGLIA:  Your Honor, I'm going to object.

13   This is highly sensitive, and if the answer is to be given,

14   I do want it to be given under seal.  As we've explained

15   previously, the surest way to shut the Debtor down is to

16   have its credit card processor attacked in a new platform

17   and fashion and it would be literally instant death.  So I'm

18   going to object and ask that if we're going to do this, it

19   somehow needs to be under seal, which is rather unwieldly

20   inasmuch as this is a video presentation.

21         THE COURT:  Yeah.  Mr. Brimmage, for purposes of

22   today, I think we can just proceed with the credit card

23   purchaser.  But who -- just keep it basic.  But for purposes

24   of disclosure, I think everybody's rights are preserved.  I

25   think you do get to ask who it is at some point.  But I'm

 1   going to ask the parties to work through that.  For the

 2   purposes of today, I don't think it's relevant for the

 3   analysis that I'm doing today.

 4           MR. BRIMMAGE:  Your Honor, can I see if I can work

 5   around it a little bit --

 6           THE COURT:  Yeah.

 7           MR. BRIMMAGE:  -- to get what I'm really trying to

 8   get at?  Okay.

 9           THE COURT:  Absolutely.

10   BY MR. BRIMMAGE:

11   Q    Let me ask you this, Mr. Schwartz.  Do you know who the

12   credit card processor is?

13   A    I know the name.  I may not have it exactly right.

14   Q    Have you been involved in negotiating the terms

15   directly with the credit card processor?

16   A    It may be helpful at this point, I mean, to make sure

17   what terms are, clarify terms.  When we refer to the

18   processor, that is not the company that actually clears the

19   credit card.

20           That is a company that takes that -- the information

21   and is funded from the credit card company and goes through

22   the analysis that we went through earlier to divide the

23   money up between us and PQPR and to pay -- make sure the

24   charges are processed by the credit cards and that the

25   processes are okay.  So that, when you refer to the

```
 1   processes, that's what we're talking about.  That's the
 2   intermediate entity.
 3   Q    And that's helpful, and I appreciate that.  Are there
 4   terms negotiated with the intermediary processor?
 5   A    Yes.
 6   Q    And have you been personally involved in negotiating
 7   those terms?
 8   A    I was personally involved in renegotiating those terms
 9   after I was engaged.
10   Q    And is the intermediary processor entity in any way
11   related to any person or entity associated with FSS?
12   A    Could you tell me what -- I don't know what related
13   means.
14   Q    Well, has any sort of relationship of any kind.
15   A    Well, I know that the people at the processor know
16   people at FSS.
17   Q    Are they relatives?
18   A    Not to my knowledge.  I don't believe so.
19   Q    Okay.
20   A    But I've not looked into that.
21   Q    And why haven't you looked into that?
22   A    At this point I haven't had any reason to since the
23   agreement predated my coming onboard and we're
24   (indiscernible) in this bankruptcy to determine if there's
25   something there that we need to go after.
```

Page 78

```
 1   Q    Okay.  All right.  So if there's affiliated
 2   relationships between the intermediary processor and FSS or
 3   its related entities or people, you haven't investigated
 4   that to date, correct?
 5   A    I have not.  That is correct.
 6   Q    How long has the current intermediary processor been
 7   used?
 8   A    Mr. Brimmage, I heard almost none of that question.  I
 9   got it's been used.
10   Q    How long has the current intermediator processor been
11   used?
12   A    I'd have to go back and look at the year to get the
13   date.
14   Q    Is it a newly formed entity like Blue Ascension?
15   A    You mean like in 2022?  No.  No.  It's older than that.
16   Q    2021?
17   A    I think it's earlier than that.  But I'm -- I don't
18   want to get much more beyond that.  I don't know for certain
19   (indiscernible) --
20   Q    All right.  Let me just ask this.  Does the
21   intermediary current credit card processors, does it provide
22   or present the same privacy concerns that Mr. Battaglia
23   mentioned earlier?
24        MR. BRIMMAGE:  And Mr. Battaglia, you may want to
25   answer that.
```

```
 1              MR. BATTAGLIA:  It does.  I think we're talking
 2    about the same entity, Mr. Brimmage.  And I'll take the
 3    Court up on its suggestion that we find a way to deal with
 4    confidentiality on this point --
 5              THE COURT:  Yeah.
 6              MR. BATTAGLIA:  -- at an appropriate time.
 7              THE COURT:  I'm going to reiterate that, and I'm
 8    also going to tell Mr. Brimmage I've given you a lot of
 9    leeway to explore some questions.  But I want to make sure
10    that we get back on point in terms of the ask for today.
11              MR. BRIMMAGE:  I appreciate that, Your Honor.
12    BY MR. BRIMMAGE:
13    Q    Let's go back to the agreement with Blue Ascension.
14    There is no agreement other than the term sheet, right?
15              MR. BATTAGLIA:  I object, asked and answered.
16              THE COURT:  Sustained.
17              MR. BRIMMAGE:  All right.
18    BY MR. BRIMMAGE:
19    Q    So here's my question.  Sometimes in fulfilling orders,
20    product gets damaged, correct?
21    A    Correct.
22    Q    Without an agreement or a contract, how is it decided
23    how Blue Ascension is liable for any such damage?
24    A    Well, it'd have to be determined what caused the damage
25    and we've got the shipper more frequently ends up being the
```

1    source of damage.  But if it's not the shipper's, then it's

2    got to be in the packaging which would be Blue Ascension's

3    problem.  It's that simple.  It's just (indiscernible) --

4    Q    There's no contract term or agreement between r Blue

5    Ascension and FSS on how to handle damage that Blue

6    Ascension causes to product when it's fulfilling its

7    services, correct?

8    A    Correct.  That'd be just pick up a phone and call each

9    other and say you're responsible, your responsible.

10   Q    So Blue Ascension we've established is using the same

11   warehouse that FSS is using, right?

12   A    Correct.

13   Q    And does FSS own that warehouse?

14   A    No.

15   Q    Who owns the warehouse?

16   A    They lease it to us.  I don't know who they are.

17   Q    Okay.  Who pays the insurance for Blue Ascension to

18   operate as a business?

19   A    Blue Ascension pays for their insurance.

20   Q    And have you confirmed that they actually have

21   insurance for any accidents or other damage that's caused in

22   the warehouse that FSS is leasing?

23   A    I have not done that.

24   Q    If an employee gets hurt, a Blue Ascension employee

25   gets hurt in the FSS warehouse, there's no agreement that

1    controls how that will be handled, right?

2    A    That is incorrect.  They have an insurance policy,

3    their own insurance policy is the only thing I can think of.

4    Q    But you haven't confirmed that they actually have an

5    insurance policy, Blue Ascension, correct?

6    A    Correct.

7    Q    Okay.  What rent is Blue Ascension paying to FSS to use

8    the warehouse?

9    A    At this time, they're not paying rent.  We're paying

10   the rent.  We're paying the rent and utilities.

11   Q    Okay.  I'm looking at my notes, Mr. Schwartz.

12            MR. BRIMMAGE:  Your Honor, at this time I'm going

13   to pass -- well, let me ask one quick question.

14   BY MR. BRIMMAGE:

15   Q    Mr. Schwartz, did you read the Debtor's emergency

16   motion before it was filed?

17   A    This one for this hearing?  Yes.

18   Q    Yes?  You did?  Okay, and did you make any comments to

19   it before it was filed?

20   A    I believe so.  I commented on everything that's been

21   sent to me.

22   Q    All right.  You were good with everything that was said

23   in the motion; is that correct?

24   A    I think so, yes.

25            MR. BRIMMAGE:  Your Honor, at this point, I'll

1    pass the witness.

2         THE COURT:  Okay.  Thank you.  Does anyone else

3    have any questions in the form of cross-examination for this

4    witness?

5         MR. NGUYEN:  Your Honor, this is Ha Nguyen, from

6    the U.S. trustee's office.  I only have a couple of

7    questions, if I may.

8         THE COURT:  Okay.  You may proceed.

9         CROSS-EXAMINATION OF W. MARCH SCHWARTZ

10   BY MR. NGUYEN:

11   Q    Mr. Schwartz,  my name is Ha Nguyen.  I represent the

12   United States trustee, and I just have a couple of follow-up

13   questions.  Mr. Brimmage was very extensive with his cross.

14   So I won't be too long.

15        Mr. Schwartz, fulfillment is a critical function of FSS

16   operations; is that correct?

17   A    That is correct.

18   Q    And under the price list with Ascension, this is a

19   multimillion dollar a year engagement; is that correct?

20   A    The -- I'm sorry.  The fulfillment services is a

21   multimillion dollar a year?  Depending on what our sales do,

22   yes, it would be a significant engagement.

23   Q    As the chief restructuring officer for many companies,

24   do you often enter into multimillion dollar deals without a

25   contract?

1          MR. BATTAGLIA:  Objection, form, Your Honor.

2     There is no -- there is no multimillion dollar contract.  I

3     object to the characterization of the evidence.

4          THE COURT:  Mr. Nguyen, why don't you ask it a

5     different way?

6          MR. NGUYEN:  Your Honor, Mr. Schwartz testified --

7     yes, Your Honor.

8     BY MR. NGUYEN:

9     Q    Mr. Schwartz, you've testified that fulfillment is a

10    critical function of FSS and do you normally entrust a third

11    party to carry out the obligations that are critical to the

12    operation of FSS without a written contract and proper

13    terms?

14    A    I don't know what you mean by proper terms.  But it all

15    depends on a situation.  Most of the time, if you can, you

16    try to have -- you have a contract.  There's no doubt about

17    that, or a contract or an order from the Court that

18    essentially lays out responsibilities (indiscernible) --

19    Q    And you mentioned (indiscernible) what proper terms

20    were.  Can you tell me what are Blue Ascension's obligations

21    under the price list if it defaults on its obligations to do

22    fulfillment for FSS?

23    A    What is its obligation?  Its obligation is to if it

24    takes the money (indiscernible) fulfill the product, it

25    needs to fulfill the product.  It needs to ship the product.

1    That's the reason it accepts the money.

2    Q    And Mr. Schwartz, you signed a 39-, 40-page declaration

3    in support of the first day motion.  Do you recall that

4    declaration?

5    A    I recall -- I recall the declaration.  I don't recall

6    everything in it.  As I've already demonstrated, my memory's

7    not that good.

8    Q    And in your declaration, the word fulfillment was cited

9    about three times.  But it doesn't discuss anything about

10   Blue Ascension; is that correct?

11   A    That is correct.

12   Q    Have you been on the Infowars store?

13   A    Yes.

14   Q    How many items on the Infowars store are under $20?

15   A    I don't know (indiscernible) --

16   Q    Are you familiar with the item, I looked it up this

17   morning, (indiscernible) fluoride-free toothpaste?

18   A    Yes.  I'm familiar with it in that I know of it.

19   Q    And that item is listed at about $9.95 and the shipping

20   is about $10.  The tax is $1.65.  So if I go and purchase

21   that item for $21.60, how much of those revenue goes to the

22   Debtor if I make that purchase of $21.60?

23   A    Well effectively it all goes to the Debtor.  Well, I

24   guess technically the tax doesn't ever actually reach the

25   Debtor's hands.  The Debtor holds it.  The rest of it goes

1    to the Debtor effectively and then --

2    Q    Let me ask it a -- let me ask it a different way.  How

3    much of the $21.60 goes to Blue Ascension?

4    A    Well, $20 would go to Blue Ascension.

5    Q    And earlier you testified you haven't done an analysis

6    of how many of these under $20 orders exist, correct?

7    A    Correct.  I looked at the average order.

8    Q    And I'm (indiscernible) the fluoride-free toothpaste

9    and FSS has to pay for this product, correct?

10   A    Correct.

11   Q    And FSS will get nothing from this sale, correct?

12   A    Well, I mean, yeah, the $20 would eat up basically

13   everything but the taxes.

14   Q    So earlier you described the $20 fulfillment as a

15   passthrough.  It's not exactly a passthrough under this

16   scenario, correct?

17   A    No, it is in looking at the overall (indiscernible)

18   maybe $6 an order on average.  We have small orders.  Yes.

19   It's hard to make money on the small orders.

20   Q    All right.  Let's talk about -- well, that answered my

21   question.  The $21.60, there's no passthrough.  The Debtor

22   loses money if someone purchases this toothpaste, correct?

23   A    Well, that's actually not correct.  If it's all you

24   purchase is the tube of toothpaste.  If you want to buy a

25   $21 tube of toothpaste then, you know, we don't make any

1    money on that.  The Debtor doesn't make any money on that.

2    Q    Okay.  You actually lose money on that purchase,

3    correct?

4    A    On a single tube of toothpaste, yes, all day long.

5    Q    Does Blue Ascension employees operate in any other

6    warehouse other than the FSS warehouse?

7    A    To my knowledge, not at this time.

8    Q    Okay.  Are all of the Blue Ascension employees the same

9    employees that worked for FSS?

10   A    I can't say that all of them are.  I mean --

11   Q    Okay.  Blue Ascension isn't -- it isn't a charitable

12   organization, correct?  It needs to make money.

13   A    Well, I don't know about how their feelings on that.

14   To my knowledge, they're not organized as a Texas charity.

15   Q    Well, Blue Ascension has to charge FSS to cover its

16   costs, correct, from the business end?

17   A    Well, yes and no.  Ultimately it's going to be in the

18   interest of making money, but it is -- my understanding, not

19   all of its costs are being charged to FSS.

20   Q    Does Blue Ascension have any other customers?

21   A    I don't know.

22   Q    Have you ever asked?

23   A    I asked Mr. Riley on the 18th.  But I haven't talked to

24   him since about that issue.

25   Q    And what was Mr. Riley's response when you asked if

1    Blue Ascension had any other customers?

2    A    That he was working to -- that was his goal, to get

3    more customers and one of the reasons he created Blue

4    Ascension and (indiscernible) was to establish himself as a

5    niche, in this market niche.  I don't know if he's done it,

6    started with other customers or not since then.

7    Q    But as far as you know, there are no other customers of

8    Blue Ascension besides FSS at this time?

9    A    As I said, I have no idea.

10             MR. NGUYEN:  Okay.  Give me one second, Your

11   Honor.  I just want to make sure -- Mr. Brimmage covered

12   most of everything.  I just want to make sure.  Your Honor,

13   I will pass the witness.  Thank you for the opportunity.

14             THE COURT:  Okay.  Thank you.  Let's see.  Does

15   anyone else have any questions for this witness?

16             MR. BATTAGLIA:  I do have some redirect, Your

17   Honor.

18             THE COURT:  Okay.  I'm just making sure we've --

19             MR. BATTAGLIA:  Yes, sir.

20             THE COURT:  -- cleared the road on this one way.

21             Okay.  Mr. Battaglia, I'll turn it over to you for

22   redirect.

23             MR. BATTAGLIA:  Thank you.  Thank you, Your Honor.

24             REDIRECT EXAMINATION OF W. MARC SCHWARTZ

25   BY MR. BATTAGLIA:

```
 1   Q     How many times have you been to the warehouse?

 2   A     Have I been to the warehouse?

 3   Q     Yes, sir.

 4   A     Maybe twice.

 5   Q     And how long have you spent in the warehouse?  Let me

 6   rephrase that question.  Describe your ability to observe

 7   the manner and means in which the fulfillment was provided

 8   in the warehouse.

 9   A     I've been right in the middle of it.  I've been

10   watching from the picking to the packing to the labeling.

11   Q     Based on your interactions with Mr. Riley and Blue

12   Ascension, do you have an opinion on Blue Ascension's

13   competency to provide the fulfillment services to the

14   Debtor?

15   A     Well, I'm having -- we've been with them for a few

16   weeks now.  I can tell you that it appears they're competent

17   and they know what they're doing.  They're efficient

18   (indiscernible) appears that our actual cost of fulfillment

19   per unit is coming down, which I was (indiscernible) there

20   had been a period where what I expected to be when we

21   started working with Blue Ascension and as compared to our

22   own historical experience in FSS in fulfilling, the cost of

23   fulfillment.  So I was not expecting to see that it would

24   come down below that.  It looks like it is.

25   Q     And so your opinion on their competencies?
```

Page 89

1    A     Yes.  They appear to be competent.

2    Q     And finally if the work --

3    A     (indiscernible)

4    Q     Sorry.  What as CRO would you do if you found a

5    supplier, a fulfillment service company that was capable and

6    willing to provide services for a lower price?

7          MR. BRIMMAGE:  Your Honor, I'll object as it calls

8    for speculation and he's already testified that he hasn't

9    done the underlying work to get to that conclusion.

10         THE COURT:  I'll overrule it.  The question is

11   what would he do if he did find someone.

12         Mr. Schwartz, you can answer the question.

13         THE WITNESS:  Okay.  What if I found someone who

14   could (indiscernible) we would evaluate the cost of the

15   transition and what that might involve.  I'd be very -- I'd

16   be crazy to not look at moving fulfillment services over,

17   you know, to someone who has the capabilities and have been

18   around the business and a willingness to work with us.

19   BY MR. BATTAGLIA:

20   Q     (indiscernible) what do you mean by a willingness to

21   work with us?

22   A     A lot of the vendors are not willing to work with Alex

23   Jones or his companies.  The most recent example is ADP has

24   terminated us, not something they normally do with

25   bankruptcies.

1   Q    What are your intentions to continue to investigate

2   alternate fulfillment providers?

3   A    My intention is that -- well, we have a 90-day window

4   to give Blue Ascension a chance to show itself and to

5   demonstrate the economics that work, and I have that time to

6   begin to look at alternatives and investigate ones that are

7   willing to work with us.

8        And if that's their -- you know, if that situation

9   presents that you've described that they're competent and at

10  a lower cost for an extended period of time, then yeah, we

11  would definitely -- I'd definitely consider coming back to

12  the Court and saying we wanted to change.

13  Q    Are you able to change fulfillment vendors today and

14  have someone in place on Monday?

15  A    No.

16  Q    What would the transition time and cost be?  What do

17  you believe it would be?

18  A    Well, it depends --

19       MR. BRIMMAGE:  Your Honor, I'll object.  Lacks

20  foundation and, as he just said, it depends.

21       THE COURT:  No, he can -- I'm going to overrule.

22  He can answer the question if he has any idea.

23       You can --

24       THE WITNESS:  It just depends on the number --

25  excuse me, Your Honor.

1          THE COURT:  No.  Go ahead.

2          THE WITNESS:  On the number and the costs out

3   there, what that (indiscernible) you have to look at

4   warehousing, which is okay, not so bad (indiscernible)

5   warehouses aren't in Texas.  So if you cut out that, you've

6   got issues of technology integration.  Does it work with our

7   technology or what's it going to cost to change technology?

8          So that has to be worked out.  If we find one that

9   would fit in like a glove tomorrow or Monday, and who would

10  be willing to work with us at a price that's sensible, I

11  think that would be extremely, extremely hard to do.

12  BY MR. BATTAGLIA:

13  Q   Mr. Nguyen asked you about the $9 toothpaste.  How many

14  tubes of $9 toothpaste are you paying $21 for?

15         THE COURT:  Let me -- let me just stop you, Mr.

16  Battaglia.  I'm not interested in the toothpaste.

17         MR. BATTAGLIA:  Fine.

18         THE COURT:  I got it.  I understand why you had to

19  cover it.

20         MR. BATTAGLIA:  Okay.

21         THE COURT:  I just --

22         MR. BATTAGLIA:  With that, Your Honor, I'll pass

23  the witness.

24         THE COURT:  Okay.  Mr. Brimmage, I'll give you an

25  opportunity for a brief recross on issues if you need it.

```
 1              MR. BRIMMAGE:  Ever so -- ever so brief.

 2                 RECROSS-EXAMINATION OF W. MARC SCHWARTZ

 3    BY MR. BRIMMAGE:

 4    Q    Mr. Schwartz, isn't it true that you have no way to

 5    compare the competency of Blue Ascension to the FSS

 6    fulfillment services that occurred prior to your

 7    involvement, correct?

 8    A    At this point in time, no, I don't have the metrics

 9    from the FSS operation.

10    Q    And you never observed the FSS fulfillment operations,

11    correct?

12    A    No.  I did.  I did when I visited the warehouse the

13    first time.

14    Q    Okay.  That was the FSS?

15    A    Yes, sir.

16    Q    But it's the exact same people, right?

17              MR. BATTAGLIA:  Objection, asked and answered.

18    BY MR. BRIMMAGE:

19    Q    You didn't talk to --

20    A    Yeah.  I mean, then it's (indiscernible) --

21              THE COURT:  No.  Hold on a sec.  Mr. Schwartz,

22    hold on a second.  I'm going to sustain that.

23              THE WITNESS:  Sorry.

24              THE COURT:  He has answered that question.  It is

25    what it is.
```

```
 1               MR. BRIMMAGE:  Okay.

 2    BY MR. BRIMMAGE:

 3    Q    Just to be clear, Mr. Schwartz, you said you have a 90-

 4    day window.  There's no 90-day required window, right?

 5    A    Well, if you look at the footnote to the price list, it

 6    says 90-day commitment.  So we kind of look at that as,

 7    okay, 90 days, we've got to look at all of this.  We've got

 8    a lot of things in this facility that has to be worked out.

 9    Q    But you could terminate it tomorrow if you wanted.

10    There's no obligation for 90 days.

11    A    That's the reason I did a price list.  I wanted to be

12    able to terminate if I needed to.

13               MR. BRIMMAGE:  Okay.  I'll pass the witness, Your

14    Honor.

15               THE COURT:  Okay.  Mr. Nguyen, anything else?

16               MR. NGUYEN:  No questions, Judge.  Thank you.

17               THE COURT:  Okay.  Mr. Schwartz, I've got no

18    further questions.  So thank you very much.

19               Mr. Battaglia, do you -- are you going to put on

20    the next witness?

21               MR. BATTAGLIA:  Yes, Your Honor.  I think the

22    Court wants to hear from Mr. Riley.  So we'll call Mr.

23    Riley.

24               THE COURT:  No, no.  Don't worry about what the

25    Court -- don't worry about what the Court wants to hear.  I
```

1    want you to put on your presentation as you see fit.

2         MR. BATTAGLIA:  Yes, sir.  Everybody wants to hear

3    from Mr. Riley.  I'm going to call Mr. Riley, Your Honor,

4    and I know we need to get him back online.

5         THE COURT:  Okay.

6         MR. BATTAGLIA:  I don't know whether the Court

7    wants a break to do that.

8         THE COURT:  Okay.  Why don't we do that.  So why

9    don't we just take -- would ten minutes work, Mr. Battaglia?

10        MR. BATTAGLIA:  I believe so.  Yes, sir.

11        THE COURT:  Okay.  So it is 3:25.  I will -- I'm

12   going to keep the line on and the line is -- so please,

13   everyone, just kind of keep that in mind, and I'll keep the

14   camera, and I'll keep the recorder going.  We'll just step

15   off and I'll come back on in ten minutes, turn my camera on

16   in ten minutes and we'll see if Mr. Riley's here.  Thank

17   you.

18        MR. BATTAGLIA:  Thank you, Your Honor.

19      (Recess)

20        THE COURT:  Okay.  Good afternoon.  Back on the

21   record in Free Speech Systems.  This is Judge Lopez.

22        Mr. Battaglia, are you there?

23        MR. BATTAGLIA:  Your Honor, I can't hear you.

24        THE COURT:  Mr. Brimmage, can you hear me?  All

25   righty, folks.

1          Mr. Nguyen, can you hear me?

2          MR. NGUYEN:  Yes, Your Honor.  I can hear you just

3    fine.

4          THE COURT:  Okay.  Mr. Brimmage, can you hear me

5    okay?  Okay.  Mr. Battaglia, can you hear me?  I don't

6    believe I've got you on 5*.  Oh, there you go.

7          MR. BATTAGLIA:  There we go.

8          THE COURT:  Mr. Battaglia, is that you?

9          MR. BATTAGLIA:  It is, Your Honor.  I'm sorry.

10         THE COURT:  Okay.  No, no.  No worries.

11         MR. BATTAGLIA:  I had to get off the line and

12   restart the video.

13         THE COURT:  All right.  Let's see.  Let's see.

14   Mr. Riley, can you hit 5*?  I want to make sure I can

15   recognize you, sir.  Mr. Riley, can you hear me okay?  I

16   think you might be on mute as well maybe.

17         Mr. Riley, can you say something?  I just want to

18   make sure we can hear you.  You may need to hit 5*.  Mr.

19   Riley?

20         MR. RILEY:  Hi, Your Honor.

21         THE COURT:  Perfect.  Thank you.

22         MR. RILEY:  Yes, sir.

23         THE COURT:  Okay.  Back on the record in Free

24   Speech Systems.  I believe we've got Mr. Brimmage, Mr.

25   Battaglia, Mr. Nguyen, Mr. Riley.  We're ready to proceed.

 1          MR. BATTAGLIA:  Yes, sir.

 2          MR. BRIMMAGE:  I am, Your Honor.

 3          THE COURT:  Okay.  Mr. Riley, let me have you

 4   raise your right hand.  Do you swear to tell the truth, the

 5   whole truth and nothing but the truth?

 6          MR. RILEY:  Yes, sir.  I do.

 7          THE COURT:  Okay.  You can put your hand down.

 8   And do you understand that the oath that you took is the

 9   same that you would take if you were live in court on the

10   witness stand?

11          MR. RILEY:  Yes, sir.

12          THE COURT:  Okay.  Being that we're doing this

13   virtually, I want to make sure that we have a couple just

14   questions to ask just to confirm.  Can you confirm who's in

15   the room with you?

16          MR. RILEY:  No one.

17          THE COURT:  Okay, and how are you viewing us now?

18   What electronic device are you using?

19          MR. RILEY:  My laptop.

20          THE COURT:  Okay.  Can you confirm that there are

21   not notes in front of you or any papers in front of you?

22   Okay.  And I'm going to ask -- do you have a cell phone near

23   you?

24          Okay.  Can you just put that phone away to make

25   sure that no one is going to send a text message or anything

1    and I want to make sure that you're looking straight here.

2    Every time throughout the examination, Mr. Battaglia is

3    going to ask you some questions.  There might be some

4    parties who object.  I'm going to ask that you please give

5    me an opportunity to resolve the objection and then I'll let

6    you know if you can answer the question or if the attorneys

7    need to ask another one, okay?

8             MR. RILEY:  Yes, Your Honor.

9             THE COURT:  Okay.  Mr. Battaglia, you may proceed.

10             DIRECT EXAMINATION OF PATRICK RILEY

11   BY MR. BATTAGLIA:

12   Q    Good afternoon, Mr. Riley.  I'm Ray Battaglia.  I

13   represent Free Speech Systems.  This is the first time the

14   Court has heard or seen from you.  Can you tell the judge a

15   little bit about you?

16   A    My name is Patrick Riley.  I live in Austin, Texas, and

17   I run and operate Blue Ascension Logistics, a third party

18   logistics company.

19   Q    And let's go back a little bit further.  Tell the Court

20   about your college and beyond education and work background.

21   A    I went to the University of Texas.  I studied

22   kinesiology and business.  I did the business foundations

23   degree.  It's essentially a business major.  I worked for

24   myself, self-employed, for a little over a decade running a

25   personal training health and wellness company.  In 2016, I

1    began work for Free Speech Systems as my employer.

2    Q    So let's back up and talk about your prior -- the

3    history of your relationship with Alex Jones.  Can you give

4    the Court a sense of when you met Alex, how you met him and

5    what your relationship has been?

6    A    Yes.  I met Alex in 2014 (indiscernible) amongst my

7    other clients.  We developed a good working relationship.

8    And he, in 2016, offered me a full-time job that I took the

9    opportunity to come onboard.

10   Q    So what were you originally brought onboard to do for

11   Free Speech Systems?

12   A    He wanted me to help him and his buyers maintain good

13   health and be a beacon of wellness (indiscernible) rather

14   and in addition to that he wanted me to come and just help

15   organize and handle problems if they came up.

16   Q    And did your role change from time to time with Free

17   Speech Systems?

18   A    I don't know if it was ever consistent at all.  But

19   yes, it's dramatically changed off and on.  There's a big

20   range of variability.

21   Q    Can you describe for the Court the range of things that

22   you did during your tenure at Free Speech Systems?

23   A    It's a lot of just kind of communicating, you know,

24   what he may have wanted, whether it be from one department

25   to another or ensuring that a process got done.  It could be

1    something, you know, on the personal side.  It could be

2    something on the work side.  It could be telling somebody to

3    change something that they did or to ensure that somebody

4    got a project done.  It changed dramatically in 2020 when

5    our operations manager left.  I assumed many more

6    responsibilities at that time.  But yeah, it varied over the

7    five-plus, almost six years.

8    Q    Can you describe for the Court what your relationship

9    historically has been with PQPR?  And you know who I'm

10   talking about when I say PQPR?

11   A    No.  I don't.

12   Q    PQPR Holdings, Limited.

13   A    Oh, yes.  PQPR.  Yeah.  Essentially it's a product

14   company that supplies products for Free Speech Systems.  And

15   my involvement essentially was, you know, somewhat similar

16   in the same regards of just facilitating --

17   Q    Go ahead.  I'm sorry.  I didn't mean to cut you off.

18   A    No.  Go ahead.

19   Q    Okay, and what about a prior relationship with David

20   Jones.  You know who Dr. David Jones is?

21   A    Yeah.  Same thing.  I try to help him in his health and

22   wellness capacity and, you know, similar to Alex.

23   Q    Let's talk about your current relationships.  Are you

24   on Free Speech Systems' payroll?

25   A    No.  I felt Free Speech Systems in February of this

1    year.

2    Q    Do you own any interest in Free Speech Systems?

3    A    No.

4    Q    What interest, if any, do you own in PQPR?

5    A    None.

6    Q    What interest do you own in any entity that you're

7    aware is owned in whole or in part by Alex Jones?

8    A    None.

9    Q    What background do you have in fulfillment with Free

10   Speech Systems?

11   A    I was around, you know, when I was in a variable state

12   of proximity to the warehouse.  Originally the warehouse was

13   by the production studio and then the late operations

14   manager ended up moving it and expanding the capacity of the

15   warehouse to provide larger abilities for fulfillment, just

16   kind of ramping things up in regard of being robust.  So

17   kind of learning as it expanded and learning the processes.

18   Q    And from time to time have you had a role in

19   fulfillment, a direct role in fulfillment?

20   A    Absolutely.  From, you know, obtaining product from the

21   fulfillment house to potentially handling whatever

22   logistical integration issues to now managing my own 3PL.

23   Q    That's a 3PL?

24   A    Third-party logistics.  It's essentially a company that

25   can warehouse, store, receive, pick, pack and ship products

1    that are linked up to the back end of an e-commerce store.

2    Q    What is Blue Ascension LLC?

3    A    Blue Ascension is my company, my logistics company.

4    Q    And as an LLC, it's owned by members.  Who are the

5    members of Blue Ascension LLC?

6    A    I'm the sole member.

7    Q    Who are the managers and/or officers of Blue Ascension

8    LLC?

9    A    I'm the only manager.

10   Q    When was it formed?

11   A    March of this year.

12   Q    Why was it formed?

13   A    Because there was a need for a fulfillment company to

14   take over (indiscernible) and fulfillment of shipments and

15   it was an opportunity to start a business.

16   Q    What was the impetus for starting Blue Ascension?

17   A    Free Speech Systems essentially getting out of the

18   fulfillment business.  It was not necessarily

19   (indiscernible) efficiencies in place, and to my

20   understanding it was something that they didn't want to do

21   anymore.

22   Q    What role did Alex Jones have in your formation and

23   startup of Blue Ascension?

24   A    He was willing to give me an opportunity to fulfill for

25   Free Speech Systems.

1    Q    Did Alex Jones or Free Speech Systems provide you with

2    startup capital to form Blue Ascension?

3    A    No.  I provided my own.

4    Q    Where did -- okay.  So Blue Ascension, how many

5    employees does it have?

6    A    Currently we have 12 employees, including myself, and

7    anywhere from two to four temporary employees.  Currently we

8    have two temps.

9    Q    How many of those employees were formerly Free Speech

10   Systems employees?

11   A    The majority of employees, not all, but the majority of

12   employees were Free Speech Systems employees.

13   Q    And what experience generally do your topline employees

14   at Blue Ascension have in the fulfillment arena?

15   A    I mean, they're from the base floor of a pick packer

16   which is someone who just picks things off of a line

17   essentially and a packer that packs them into a box.

18   There's an integration manager that essentially deals with

19   the technical issues at hand, whether it be from the store

20   side or from the warehouse management system side.  We've

21   got team leads that help people on the floor and essentially

22   a daily manager or a floor manager as well.

23   Q    And this is -- I want to be real clear about this and I

24   want to talk about Blue Ascension's relationships with Alex.

25   What interest does Alex Jones have in Blue Ascension?

 1   A     Zero.

 2   Q     What agreements, written, unwritten, handshake is there

 3   between you and/or Blue Ascension and Alex Jones to acquire

 4   any interest in Blue Ascension?

 5   A     There is none.

 6   Q     What contractual agreements do you or Blue Ascension

 7   have with Alex Jones?

 8   A     What contractual obligations?  None, other than to

 9   fulfill for Free Speech Systems.

10   Q     What compensation does Blue Ascension or you pay to

11   Alex Jones?

12   A     Zero.

13   Q     If I were to ask you the same series of questions about

14   PQPR, would your answers be different?

15   A     No.  They'd be the same.  They have no interest.  I

16   have not taken any money.

17   Q     How about Dr. David Jones?  Would your answers be

18   different?

19   A     They would be the exact same.

20   Q     How about any other Jones family member?

21   A     No.

22   Q     How many customers does Blue Ascension provide

23   fulfillment services for?

24   A     Seven or eight.

25   Q     And what are your intentions about growth of the

1   business to additional customers?

2   A     Since we started the company, we have been

3   (indiscernible) trying to bring in and onboard new vendors

4   to fulfill for.  We've been doing personal outreach, you

5   know, cold calls, knocking on people's doors, introducing

6   ourselves, going to fairs, you know, working with the

7   marketing team to try to specifically do some marketing in

8   our efforts to obtain new clients.

9   Q     Do you recall or can you tell the Court when it was

10  that Blue Ascension started providing fulfillment services

11  for FSS?  And when I say FSS, you know I'm speaking about

12  Free Speech Systems?

13  A     Yes.  Mid- to late July, sometime around there.

14  Q     What options are available to Free Speech Systems to

15  outsource fulfillment other than Blue Ascension?

16  A     I don't think they're --

17        MR. BRIMMAGE:  Your Honor, I'll object -- I'll

18  object as it lacks foundation, calls for speculation.  He

19  doesn't work for FSS anymore.

20        THE COURT:  Yeah.

21        MR. BATTAGLIA:  He's involved in the fulfillment

22  business, Your Honor, and he's actively pursuing clients and

23  he is aware and has information regarding this.

24        THE COURT:  I'll overrule it.  We'll see where it

25  goes.

```
 1   BY MR. BATTAGLIA:

 2   Q    Do you recall the question, Mr. Riley?

 3   A    Yes.  In regards to what other options could they have

 4   for fulfillment; is that correct?

 5   Q    Yes, sir.

 6   A    I would say little to none.  I reached out to, prior to

 7   Blue Ascension having any fulfillment relationships with

 8   Free Speech Systems, and I did not receive any callbacks or

 9   get any response from any of the surrounding Austin-based

10   fulfillment centers.  That's probably due to the company.

11        And in addition to that, the size of orders that come

12   through monthly, I mean, I run a crew of 12 people in two

13   tents.  It's a substantial undertaking.  So it's not

14   something that anybody can generally take on, you know,

15   having the capacity to take on without wasting a ton of

16   money on labor.

17   Q    How many products are available for sale to customers

18   in the warehouse approximately just in different product

19   lines?

20   A    Free Speech Systems products?

21   Q    Yes, sir.

22   A    I would say 50 to 150, something like that.  I mean, if

23   I'm counting like individual t-shirts and stuff, maybe even

24   more.

25   Q    And what effect does the broad range of product
```

```
 1   availability have on the universe of fulfillment companies

 2   that would be willing to undertake Free Speech as a

 3   customer?

 4   A    Most --

 5        MR. BRIMMAGE:  Your Honor, I object as it calls

 6   for speculation and lacks foundation, what the company might

 7   or might not do.

 8        THE COURT:  I'll sustain.

 9        THE WITNESS:  Can you ask that again, please?

10        THE COURT:  No.  He cannot.  He's going to ask

11   another question, Mr. Riley.

12        MR. BATTAGLIA:  Your Honor, can you share Exhibit

13   3 on your screen, which was the price list that we've seen?

14        THE COURT:  Sure.  Just give me a second.

15   BY MR. BATTAGLIA:

16   Q    Can you see that, Mr. Riley?

17   A    Yes, sir.

18   Q    Okay.  First I want to ask you in normal business

19   operations with Blue Ascension customers, what documents do

20   you typically require be executed to form a business

21   relation to?

22   A    A lot of times it's a price sheet.  We have recently

23   developed a master services agreement as well as a statement

24   of work agreement.

25   Q    What is the requirement that Blue Ascension has that a
```

1    customer execute a contractual arrangement as opposed to a

2    price list?

3    A    I mean, a lot of these have been good faith gestures

4    and basically if they can agree to that, that we do that.

5    But like I said, I was making the master services agreement

6    and the statement of work that just got completed the end of

7    this last month.

8    Q    With respect to Exhibit 3 on the screen, the price

9    list, who did you negotiate with regarding the fee

10   structure?

11   A    Mr. Schwartz.

12   Q    And pursuant to this arrangement, what services does

13   Blue Ascension provide to FSS?

14   A    Just like the list says, I mean, receiving, storage,

15   pick/pack, order inserts, supplies, returns, labels, packing

16   supplies, all the normal things that a fulfillment company

17   would do to manage the inventory, cycle counting and

18   inventory control, impact of issues with software

19   integration, that's basically making sure that the orders

20   are coming through to our management system, our warehouse

21   management system, those types of things.  Returns is a big

22   one as well.  I think I listed that.

23   Q    I believe it's further down, but yes.  So the pricing

24   that's provided --

25   A    Shipping --

1    Q    Yes, sir.  So the pricing that you've provided here,

2    how does it compare to what Blue Ascension charges its other

3    customers?

4    A    It's the same fulfillment fee across the board.

5    Q    Now let's talk about the shipping cost and I think it

6    says $14.  Where does the money come from for paying

7    shipping costs?  Originally what's the direct source, the

8    original source, excuse me.

9    A    From clients purchasing products on the website.  It's

10   an automated software based on the number of products that

11   go into the order and there's an automation involved with

12   the amount that's essentially taken in for shipping and

13   that's also based on the carrier and essentially what level

14   of shipping they're choosing.  It can vary drastically.

15   Q    I want to talk about the fulfillment services are

16   provided where.

17   A    The fulfillment services are provided in the warehouse.

18   Q    And who is the tenant in that warehouse?

19   A    The tenants of the warehouse is Free Speech Systems.

20   Q    And what efforts have you made to assume that lease

21   obligation?

22   A    Communicating --

23   Q    By you, I mean Blue Ascension.  I'm sorry.  Go ahead.

24   A    Yeah.  Just getting further down the road, trying to

25   figure all of this out and basically ready to make whatever

1   contractual agreement is necessary.  A lot of it is

2   standardized.  For instance, on the storage side of things,

3   that was included.  But essentially if anything were to

4   change as far as lease responsibilities and that type of

5   thing, we would then also have to charge for storage which

6   is an industry standard.

7   Q    The Debtor in its budget budgeted approximately

8   $104,000 per week for fulfillment.  Can you tell the Court

9   how does that compare with the current weekly fulfillment

10  cost incurred for FSS fulfillment?

11  A    It's not sufficient to cover the fulfillment needs.

12  Essentially that covers

13  A    It's not sufficient to cover the fulfillment needs.

14  Essentially that covers, you know, 25 -- 5,000 orders,

15  something like that.  You divide that by 20, right?  So it

16  doesn't -- it doesn't go very far insofar as sustaining the

17  fulfillment shipment services.

18  Q    And if Blue Ascension does not get paid to ship, what

19  does Blue Ascension do with the orders?

20  A    Essentially they stack up.  But in an effort to utilize

21  our staff and to not make them just sit and twiddle their

22  thumbs, we try our best to be proactive in the sense that we

23  do the first half of our job.  So when we're allowed and we

24  get paid to do the second half of our job, we're in a great

25  position.

1    So essentially the, you know, receiving continues.  The

2    storage continues as far as the storage, the allocations of

3    inventory, both in bulk and in the pick locations, and in

4    addition to that, we've had to be innovative in the sense

5    that we're essentially pre-picking a lot of these shipments

6    and essentially putting them -- sequestering them in totes,

7    bins, boxes, even gone to the point of, you know, putting

8    them on pallets, wrapping them so they're safe and putting

9    them on the racks for when we do receive the money for

10    fulfillment.

11    Q    Based on your experience both at Blue Ascension and

12    with FSS, what happens when orders aren't shipped?

13    A    Well, it's a slow breakdown of the business.

14    Essentially it is, you know, starting at kind of the end of

15    the process and it ultimately goes back to affect the

16    beginning of the process which is the orders being

17    cancelled, loss of revenue.  Depending on how long the

18    orders have sat not being fulfilled, it could also be a

19    chargeback nightmare for the credit processor.

20    Q    What's the total number of current backlogged orders

21    for FSS?

22    A    Probably somewhere between 23,000 and 28,000.  It was

23    down from 32,000, 33,000, you know, mid- to end of last

24    week, something like that.  It's fluctuated a lot.  It's

25    hard to say what the actual backorder is.  As we process

1    orders, it can fluctuate between 2,000, over 3,000 a day.

2         It greatly depends on the size of the orders.

3    Nothing's standardized.  No orders are the same.  As we

4    fulfill those orders, new orders continuously come in.  So

5    it's a lot to try to say.  But as of right now, the

6    backlog's probably mid-20,000, something like that.

7    Q    In connection with what you do for FSS, are you

8    familiar with products that are anticipated to be received?

9    A    Do we --

10   Q    Do you know what inventory -- do you know what

11   inventory is coming in before it's received?

12   A    Yeah.  It's up to the vendors and our client success

13   manager to communicate an order to make sure we know what

14   inventory is coming in and that way we can prepare for it.

15   And preferably they should also let us know upcoming sales,

16   that kind of thing, so we can prepare our work staff for it.

17   Q    Based on what you know to be imminent, imminently

18   arriving, what are your expectations about the level of

19   sales going forward?

20         MR. BRIMMAGE:  Your Honor, this I'll object to.

21   There's no foundation on his alleged expertise or experience

22   in sales.

23         THE COURT:  Sustained.

24         THE WITNESS:  So I don't see our sales --

25         THE COURT:  No.  Mr. --

```
1            MR. BATTAGLIA:  Hold on, hold on, hold on.  Hold
2   on.
3            THE WITNESS:  Sorry.
4            THE COURT:  Mr. Gruber -- Mr. Riley, I should say,
5   when I sustain an objection, sometimes it means that Mr.
6   Battaglia can ask another question.  I'll let you know when
7   you can answer him, and I'll do a really -- I'll do a better
8   job of letting you know if someone's going to ask another
9   question or someone -- or you can answer that question.
10           THE WITNESS:  Sorry, Your Honor.
11           THE COURT:  No, no, no.  No.  I'm going to do a
12  better job making sure that you understand.  Thank you.
13           Mr. Battaglia, why don't you ask another question.
14           MR. BATTAGLIA:  Yes, sir.
15  BY MR. BATTAGLIA:
16  Q    What arrangements has Blue Ascension made with Alex
17  Jones to provide some funding to clear the backlog?
18  A    Alex has done a onetime payment in an attempt to make
19  sure and guarantee that his customers are getting their
20  product, to ensure that the fulfillment is paid for in the
21  event that assuming the courts and the attorneys can't
22  figure it out.
23  Q    What does Alex Jones receive in return for this
24  factoring relationship?
25  A    There's nothing.  There's no interest, nothing like
```

1    that.  And if Free Speech pays, then I believe he gets his

2    money back.  If not, then the money goes into fulfillment.

3    Q    Based on what you've received to date, what is your

4    anticipation of when Blue Ascension will stop fulfilling

5    current orders?

6    A    With all of the funds or just the funds that I've

7    received from Free Speech or the funds that I've received

8    from everyone?

9    Q    Free Speech.

10   A    Free Speech, as of today, has 2,800 orders that were

11   prepaid.  So beginning this morning, 2,800 -- it's 2,809 or

12   something like that, I believe, orders were still prepaid to

13   be fulfilled.

14   Q    And how long will it take for those to be shipped?

15   A    Oh, we'll be done with the majority of that by tomorrow

16   -- or by today.  Today's Friday.  So come Monday, we may not

17   have anymore funds directly from Free Speech to have -- for

18   prepaid fulfillment.

19           MR. BATTAGLIA:  Your Honor, I'll pass the witness.

20           THE COURT:  Okay.  Does anyone have any questions

21   for Mr. Riley who may be in support of this relief request

22   before I turn to cross?  I don't believe there was anyone

23   last time.

24           Let's see.  Mr. Brimmage, are you handling this

25   examination as well?

```
 1              MR. BRIMMAGE:  Yes, Your Honor.  I am.
 2              THE COURT:  Okay.  Okay.  Let's turn to cross-
 3    examination.
 4              Mr. Brimmage, you may proceed.
 5              MR. BRIMMAGE:  Thank you, Your Honor.
 6                  CROSS-EXAMINATION OF PATRICK RILEY
 7    BY MR. BRIMMAGE:
 8    Q    Mr. Riley, my name is Marty Brimmage.  I'm with the law
 9    firm of Akin Gump Strauss Hauer & Feld, and I represent what
10    we refer to as the plaintiffs, the Texas plaintiffs group in
11    this action, which would include the Austin lawsuit that
12    concluded I believe last week, maybe a week ago.  You're
13    familiar with that lawsuit, right?
14    A    Yes.
15    Q    All right.  Have you had any discussions with any of
16    the attorneys that represent the Debtors, including Mr.
17    Battaglia, about your testimony today?
18    A    I spoke with Mr. Battaglia and Mr. -- I'm sitting in
19    his office right now.  Let me find him on the screen.  And
20    Mr. Jordan, Shelby Jordan.  I'm so sorry.
21    Q    Okay, and Mr. Battaglia represents the Debtors in this
22    case.  Is that your understanding?
23    A    The Debtors?  Possibly.  I'm not too sure --
24    Q    If you know.
25    A    I don't know.
```

1   Q     Let me try it again, Mr. Riley.  Mr. Battaglia

2   represents FSS, right?

3   A     Yes, sir.

4   Q     And Mr. Jordan represents Alex Jones, right?

5   A     I assume so.  Yes, sir.

6   Q     And none of them represent you, right?

7   A     Correct.

8   Q     All right.  Why were you having discussions with Mr.

9   Jordan?

10  A     Just in regards to having this conversation here in the

11  office today.

12  Q     About your testimony that you're providing to the Court

13  today?

14  A     I spoke to -- I spoke to Ray over the phone about it in

15  Mr. Jordan's office.

16  Q     All right.  You were in Mr. Jordan's office?

17  A     I was in a conference room; yes, sir.

18  Q     A conference room in Mr. Jordan's office?

19  A     Yes, sir.

20  Q     Yeah.  And were they -- just tell me, in general, was

21  this one conversation or more than one?

22  A     Just one conversation, this morning.

23  Q     All right.

24  A     Or not this morning; this afternoon, I should say.

25  Q     When this afternoon?

1    A    Before the -- before this hearing was beginning, 12:00,

2    11:30, 12 -- I don't know what time.  I think it started at

3    12:30, so sometime before that.

4    Q    All right.  That's the only time you talked to Mr.

5    Battaglia or Mr. Jordan or anybody -- any other attorney

6    about your testimony today?

7    A    Yes.

8    Q    Okay.  And prior to today, you've never spoken to Mr.

9    Battaglia.  Is that right?

10   A    No.

11   Q    Prior today -- no, that's not right, or no, you

12   haven't?  I'm sorry.

13   A    No.  No, I haven't.

14   Q    Okay.

15   A    I mean, I've --

16   Q    (indiscernible).  Go ahead, Mr. Riley.  I'm sorry.

17   A    Go ahead.

18   Q    It's my fault.  You go ahead.

19   A    No, prior to today, outside of just making sure that I

20   was going to be, you know, here to participate via email, I

21   have not had any discussions with him other than the one

22   today.

23   Q    What about Mr. Jordan?

24   A    Have I had prior discussions with Mr. Jordan?  I've

25   talked to Mr. Jordan a few times; yes, sir.  Not about

1    today, though, I mean.

2    Q    What have you spoken to Mr. Jordan about?

3    A    Just any questions that he may have had, I guess, in

4    reference to Alex's needs, or questions regarding Alex.

5    Q    Like what?  What regarding Alex's needs or regarding

6    Alex?

7    A    I can't recall (indiscernible).

8    Q    Okay.  All right.  When were those discussions?

9    A    Maybe -- I'm not too sure.  In the past few months, I

10   mean, I can't recall.

11   Q    Okay.

12   A    They're not -- they're not very frequent.

13   Q    All right.  And before the hearing today, you spoke to

14   Mr. Battaglia and Mr. Jordan about your upcoming testimony.

15   Is that right?

16   A    Yeah, I was emailed that I had to -- to appear in the

17   court.

18   Q    Did you have any other email communications with

19   Mr. Battaglia or Mr. Jordan or any other attorneys in this

20   case?

21   A    No, sir, I don't believe so.

22   Q    Okay.

23   A    There's been --

24   Q    So, I want to follow up on --

25   A    There -- there's been, you know, all kinds of

1   correspondence with a revolving door of attorneys, but in

2   regards to correspondence about today, no.

3   Q    Okay.  Help me out, then.  The revolving door of

4   attorneys regarding what?

5   A    Regarding anything in regards to, you know, somebody

6   needing to have Alex call them or anything like that.  Just

7   more of a message to the messenger kind of thing or getting

8   something possibly linked up on a schedule.  I don't control

9   the schedule, but just relaying messages -- messages of

10  needing to communicate.

11  Q    Yeah, and that's one of the things that I wanted to

12  talk to you about, Mr. Riley.  Isn't it true that a lot of

13  people look to you to set up and get in touch with Mr. Jones

14  -- Alex Jones, that is?

15  Q    People have tried to get me to help communicate with

16  Alex or get in touch with Alex or poke Alex for Alex to call

17  them, whatever it may be.

18  Q    Including attorneys in this case, right?

19  A    I guess that you might have to be more specific.

20  Q    Well, I think you said, the revolving door of

21  attorneys, and maybe I misunderstood that, have communicated

22  with you about a variety of --

23  A    Yeah --

24  Q    -- let me finish the question, Mr. Riley, and then -- I

25  know it's hard, virtually.  And I've been more guilty than

1    you, so I'm going to try to be better.

2    A     (indiscernible).

3    Q     But I think you said, the revolving door of attorneys

4    and others that contact you about Mr. Jones's needs and to

5    get in contact with Mr. Jones.  Did I hear that correctly?

6    A     Yes, sir.

7    Q     Okay.  And it's true that's one of the roles you play

8    with regard to Mr. Jones, right?

9    A     At times.

10   Q     Okay.  Would you consider yourself a close friend of

11   Mr. Jones'?

12   A     I would say I have a close relationship.

13   Q     Would you agree with me that Mr. Jones has reached out

14   to you to help him on both personal and professional matters

15   over the years?

16   A     Yes.

17   Q     Including, without going into detail if you don't have

18   to, Mr. Riley, very personal issues, right?

19   A     All kinds of issues.

20   Q     Including very personal issues, right?

21              MR. BATTAGLIA:  Your Honor, I'm going to object to

22   form.  And again, I don't know what relevance it is, either.

23   He has a close relationship, he's testified.  What they've

24   talked about is really not particularly relevant to anything

25   before the Court today.

```
 1            THE COURT:  Yeah, I'm going to sustain that.  I
 2   want to make sure we're staying focused on the company and
 3   what I'm being asked to do today.
 4            MR. BRIMMAGE:  Your Honor, I appreciate that, and
 5   I will move on.  But this is the guy that set up a company,
 6   and we just heard about money that Alex Jones sent him, so I
 7   do think they're connected.  But let me move on.
 8   BY MR. BRIMMAGE:
 9   Q    You set up Blue Ascension in March.  Is that correct?
10   A    Yes, sir.
11   Q    All right.  And have you ever set up an LLC before?
12   A    I have; yes, sir.
13   Q    How many times?
14   A    A few, several.
15   Q    All right.  Did anybody help you with this one, or did
16   you do it on your own?
17   A    I believe I paid a company to do it.
18   Q    And you had left FSS in February, the month before,
19   right?
20   A    That's correct.
21   Q    Okay.  You were aware of all the lawsuits against
22   Mr. Jones and FSS at the time you left, right?
23   A    Yes.
24   Q    Had you been involved in any discussions about FSS
25   filing for bankruptcy at the time you left?
```

1    A    Well, he says stuff on air all the time about filing

2    for bankruptcy and all kinds of things, so I'm not too sure.

3    There's always that comment of, you know, he might need to

4    do it.

5    Q    Okay.  So, when you left, you were aware that that was

6    a possibility, right?

7    A    Yeah, I think that was a (indiscernible) possibility

8    for some period of time.

9    Q    Had you had any direct conversations with Mr. Jones

10   about FSS filing bankruptcy at the time you left?

11   A    No, not really.

12   Q    Okay.  Now, you testified about your varying jobs and

13   varying responsibilities over the years, correct?

14   A    Yes.

15   Q    What was your title when you were there?

16   A    I had (indiscernible) different titles.  I'm not too

17   sure what, you know, my official title may have been.  I was

18   kind of just a loose manager of sorts, just to organize, but

19   I was not under any department or anything like that.

20   Q    Okay.  So, if we looked at an org chart, would you be

21   in the marketing department, would you know?

22   A    No, I was more of a fitness, wellness manager more than

23   any other form of manager.

24   Q    All right.  But you would agree with me we wouldn't

25   find you in the fulfillment services department of FSS

1   before you left, right?

2   A    You wouldn't find me in any department.  Again, I was

3   kind of an admin, to a certain degree.

4   Q    Okay.  Now, you said the operations manager left in

5   2020.  Do you remember that?

6   A    Yes, I believe it was in the end of 2020.

7   Q    Was that Mr. Fruze or Frood?  I may not be saying it

8   correctly.

9   A    Yes.

10   Q    All right.  And was he replaced by Mr. Roddy?

11   A    Again, I don't believe that he was necessarily

12   replaced.  I think it was an acquisition of

13   responsibilities, kind of in a totality sense.

14   Q    Was Mr. Roddy in charge of fulfilment services for FSS

15   after Mr. Fruze left?

16   A    I don't know if he was necessarily responsible for it.

17   He was away of fulfilment and what fulfilment may have

18   needed, but he was not managing fulfilment, to my

19   understanding, or --

20   Q    Who --

21   A    -- service.

22   Q    Who was managing fulfilment for FSS at the time you

23   left?

24   A    I mean, if you had to put somebody as a name in the

25   position, it was Kelly Hebert.

Page 123

```
 1   Q    Kelly Hebert?

 2   A    Yes.

 3   Q    All right.  And did Kelly Hebert leave FSS and has now

 4   joined Blue Ascension?

 5   A    Yes.

 6   Q    Doing basically the same thing Kelly Hebert was doing

 7   before?

 8   A    Yes and no.

 9   Q    Okay.  And all the employees that are currently at Blue

10   Ascension were former FSS employees; is that right?

11   A    No.  Like I said earlier, the majority of employees

12   were Free Speech Systems employees, but not all.  We've had

13   to add to the roster.

14   Q    All right.  I'm going to try to get you to walk me

15   through this a little bit.  Let's go from a timeline

16   standpoint.  You organized this entity in March of 2022,

17   correct?

18   A    I formed the company in March of 2022.

19   Q    All right.  The operations of this company are in the

20   warehouse that FSS used to operate in its fulfilment

21   services, correct?

22   A    Correct.

23   Q    And that's -- Blue Ascension has never operated

24   fulfilment services in any other location, right?

25   A    Correct.
```

1    Q    All right.  When did you start operating, Blue

2    Ascension, that is, in the FSS warehouse?

3    A    It was mid-May, when we first began to sell the

4    services.

5    Q    All right.  But that wasn't for FSS at the time?

6    A    Correct.

7    Q    All right.  Where did the employees come from for mid-

8    May fulfilment services?

9    A    I hired the former Free Speech Systems employees to

10   work for Blue Ascension, initially as independent

11   contractors, and then moved them to W-2 employees.

12   Q    That's my next question.  How did the employees get

13   from FSS to Blue Ascension?  Can you walk me through that

14   process?  When and how did that work?

15   A    I offered them the job, and I told them that I was

16   starting a fulfilment company to do true 3PL, which is, you

17   know, third-party logistics, being able to fulfil for more

18   than just Free Speech Systems.

19   Q    Okay.  So, did they quit FSS and came and joined you,

20   or were they terminated by FSS, if you know?

21   A    I don't know.  I believe that they left Free Speech.

22   I'm not for sure if they were terminated.  I believe they

23   were terminated.

24   Q    Okay.  And so, did you coordinate with FSS when this

25   was going to happen and how it was going to happen?

1   A    I don't know what you mean by coordinating.

2   Q    Well, you didn't just walk into FSS's building and say,

3   hey, I'm going to hire you guys, without communicating with

4   FSS, did you?

5   A    No, no, not at all.  But as I said earlier, you know, I

6   did have an opportunity to begin fulfilment services.  There

7   was essentially a plan to -- for me to hire who I needed to

8   hire and take them, essentially, onto my payroll.

9   Q    All right.  Who did you coordinate that with, that

10  plan?

11  A    I spoke to -- I spoke to Alex a little bit about it,

12  but I mean, I don't know if there was so much a dedicated

13  plan as a, I think, you know, we can make this -- I can make

14  a successful business out of this and I can bring you on as

15  a vendor.

16  Q    Okay.  And so, you --

17  A    A lot of us here that -- I'm so sorry.

18  Q    Go ahead.

19  A    No, go ahead.  I apologize.

20  Q    So you did speak to Alex Jones about this, right?

21  A    I mean, yes, a little bit.

22  Q    You wouldn't have taken over FSS's fulfilment services

23  without Alex's -- Jones' blessing, right?

24  A    Essentially.

25  Q    Okay.  So, when -- you transitioned the employees from

1   FSS to Blue Ascension in May.  Is that what I understand?

2   A    Yes.  I started -- I started pay them as contractors.

3   Q    When did you start fulfilling FSS orders?

4   A    Free Speech System wasn't fulfilled until mid/late

5   July, just recently.

6   Q    Who fulfilled FSS Systems' orders after you took the

7   employees over to Blue Ascension?

8   A    They were still employees, Free Speech Systems'

9   warehouse employees over there, like packers and such.

10  Q    All right.  How many employees did you -- well, how

11  many employees were in FSS's fulfilment services at the time

12  you took your first group?

13  A    Not many.  I mean, 10 or 12, possibly more.

14  Q    How many did you take in May?

15  A    (indiscernible).

16  Q    How many did you take in May?

17  A    I took my -- I took the original crew, minus,

18  essentially everybody that we have now, back in May.  So,

19  everybody that came back in May -- there hasn't really been

20  any Free Speech employees hired on after the first lot of

21  Free Speech employees that were starting to be employed by

22  Blue Ascension.

23  Q    Okay.  So, is it fair to say that between the time you

24  started fulfilling Blue -- FSS inventory orders, nobody was

25  fulfilling them in that interim gap because you had taken

1    the FSS employees?

2    A    No, Free Speech Systems' (indiscernible) was being

3    fulfilled.

4    Q    But you had taken all the employees.  I guess I'm not

5    understanding.  Help me out.

6    A    No, there were, I think, four employees left at the

7    time, and they were still fulfilling orders.

8    Q    Okay.  Did a backlog -- did a backlog get created

9    because a lot of the employees had gone over to you, and you

10   weren't yet fulfilling FSS Services?

11   A    At the time, I don't believe that there was a steady

12   backlog when this initiated, and I don't believe the backlog

13   began until the surge of sales in the past few weeks.  You

14   know, we're talking a good distance of time between when

15   Blue Ascension began and, you know, shifted the employees

16   over to the backlog that we have right now.

17   Q    But we're not talking about a long period of time

18   between when you started fulfilling FSS orders, right?  Less

19   than a month.

20   A    No.  Again, I just started fulfilling Free Speech

21   orders the end of -- the end of last month, mid to end of

22   last month, July into August.

23   Q    All right.  And so, four employees fulfilled the FSS

24   orders from March to mid to late July.  Is that right?

25   A    From May -- there's still -- can you ask the question

1   again?

2   Q    Yeah.  Maybe it is May.  Four employees handled FSS's

3   fulfilment services from May, when you brought the employees

4   over, to mid to late July, when you started taking over

5   FSS's fulfillment services, right?

6   A    Yes, and we continue to fulfil for Free Speech Systems.

7   Q    Okay.  You said you capitalized the new company on your

8   own, right?

9   A    Yes.

10  Q    What did it cost to capitalize that company?

11  A    It was really just figuring out the feasibility of the

12  systems, quantitative measurement, if that would

13  (indiscernible) going forward as far as (indiscernible) and

14  such.  Maybe, you know, $6,000, $7,000, $8,000 dollars as

15  far as hardware.  Essentially, that's it.  The rest was

16  signing myself up for services that essentially were --

17  didn't require payments up front, the warehouse management

18  system, the integration software.  It really wasn't costly

19  at all until we started printing shipping tickets, which is

20  the crux of the business.

21  Q    So the upfront capital cost was roughly, all-in, what?

22  A    Less than $10,000.  Again, you don't have to pay

23  employees for two weeks, payment on a two-week interim, you

24  know, outside of literally having the hardware, which is

25  basically the only requirement to start all this.

```
1    Q    And you had free rent, right?

2    A    The agreement was, yeah, to essentially be able to

3    operate in that space until there was a resolution.

4    Q    Now, who was that agreement with?

5    A    Alex.

6    Q    You had an agreement with Alex Jones for free rent when

7    you started this company?

8    A    There was a verbal conversation in which he said, if

9    you find, you know, opportunity in starting a business, then

10   that's fine, and that's what began back in May.

11   Q    So the answer is yes, free rent?

12   A    Yes.

13        MR. BATTAGLIA:  Judge, objection, Your Honor.  The

14   witness gave an answer.  If Mr. Brimmage doesn't like it, he

15   doesn't get to rephrase it.

16        THE COURT:  Yeah, I'll allow it.  He gave an

17   answer.  You've got your answer, Mr. Brimmage.

18   BY MR. BRIMMAGE:

19   Q    Other than payroll, what other expenses do you have --

20   well, payroll and operating expenses, what other expenses do

21   you have in operating this business?

22   A    There's software.  There's supplies, packaging,

23   payroll, payroll insurance, all the public -- you know, we

24   provide health insurance, dental and vision for our

25   employees.  There's obviously the cost of shipping.  It has
```

1    to be prepaid.  One parcel company requires upfront payment.

2    Another parcel company does like a net terms, essentially.

3    Q    And did you basically inherit the infrastructure of

4    FSS's fulfillment services when you got started with your

5    FSS work?

6    A    No.  These are all my -- I had to initiate all standing

7    (indiscernible) contracts.  We didn't -- outside of, you

8    know, the temporary agreement for rental -- rental space, or

9    access to the rental space rather, there was no

10   piggybacking, essentially, of any type of systems.  Like I

11   said, I had to sign annual contracts for a lot of these

12   software integration companies, the warehouse management

13   systems, so on and so forth.

14   Q    And Mr. Jones has given you a capital infusion, right?

15            MR. BATTAGLIA:  Objection, Your Honor; asked and

16   answered.

17            THE COURT:  Yeah, sustained.

18            MR. BATTAGLIA:  Because he already said he got no

19   capital infusion.

20            THE COURT:  Yeah.

21            MR. BATTAGLIA:  Well --

22            THE COURT:  No, no, I just want to limit everyone.

23   I know I've given a little bit of leeway on the speaking

24   objections and -- but Mr. Battaglia is correct, it's been

25   asked and answered.  I want to just focus on where we're

```
 1   going with this motion.  What else do you have,

 2   Mr. Brimmage.

 3           MR. BRIMMAGE:  Yeah, so maybe I'm confused, Your

 4   Honor, but I'm absolutely confident that he testified that

 5   Alex gave him a one-time payment, so I want to explore the

 6   one-time payment.  He didn't talk about (indiscernible).

 7           THE COURT:  I think that's the portion that was --

 8           MR. BATTAGLIA:  I object to the

 9   characterization --

10           THE COURT:  Hold on a second, folks.  I think

11   that's what I am saying was asked and answered.  But if you

12   have another question, then maybe you can ask it, and we can

13   go from there.

14   BY MR. BRIMMAGE:

15   Q    How much did Alex Jones give you in this payment?

16   A    Alex just recently sent the (indiscernible) to my bank

17   this week, and that was in the amount of $400,000 to help

18   clear the backlog.  Free Speech Systems and Alex Jones had

19   not given me any amount of money until mid to late, or maybe

20   late July at the earliest, whatsoever, so there was no cash

21   infusion from Free Speech Systems early on whatsoever.

22   Q    Is there a contract that memorializes any terms

23   associated with this $400,000 payment that you received from

24   Alex Jones?

25   A    Yes, there's a -- I forget what you call it, but
```

1   there's an agreement that says that he didn't get an

2   interest, and if Free Speech doesn't pay for their

3   fulfillment (indiscernible), then there's no, you know,

4   money going back to Alex Jones.

5   Q    Did you sign this agreement?

6   A    Yes.

7   Q    Did Alex Jones sign this agreement?

8   A    I believe so.

9   Q    Do you have the agreement?

10  A    I just signed the agreement today.

11  Q    Okay.  And Mr. Jones signed the agreement when you

12  signed the agreement?

13  A    I can't recall.

14  Q    You signed it today, but you don't know if Mr. Jones

15  has signed it?

16  A    There's an issue with the spelling of Blue Ascension's

17  name, which was intentional, by the way, and the original

18  contract, Alex did sign.  I don't know if he had signed the

19  current agreement.  I don't -- I don't -- I don't know if he

20  did.

21  Q    Did you sign this agreement when you were in

22  Mr. Jordan's office today?

23  A    Yes.

24  Q    And why is there an intentional misspelling in

25  Ascension's name?

1    A    Because I liked the way Blue Ascension was as far as

2    (indiscernible) and phrase, and I believe there was some

3    possible reason as to why the Security of State wouldn't

4    grant me Ascension.  So, I liked -- I liked the word

5    ascension, and spelled wrong, most people can't probably

6    spell it right, so it wasn't a concern of mine.  I just

7    liked the -- liked the two words put together.

8    Q    Let me apologize if I've asked you this.  Mr. Battaglia

9    will scream if I have, but I don't think I did, but

10    (indiscernible).  Isn't it true that you weren't in charge

11    of fulfillment services at FSS at any time before you left?

12    A    My involvement with fulfillment services varied over

13    the years.

14    Q    Isn't it true, Mr. Riley, that you were not in charge

15    of FSS's fulfillment services at any time, up until the time

16    you left?

17    A    Correct.

18    Q    And isn't it true that you had never owned or operated

19    a fulfillment services company before you started Blue

20    Ascension?

21    A    Correct.

22    Q    And isn't it true that you talked to Alex Jones before

23    you formed Blue Ascension?

24    A    Possibly.  I mean, I told him that, you know, if there

25    was an opportunity to do it, that I would -- I would do it.

1    I have the confidence in myself and my ability to run

2    something like a fulfillment company, if that's what you're

3    asking.

4    Q    Are you still providing personal training services to

5    Mr. Jones?

6    A    When he shows up, I try -- I endeavor to get him to a

7    state of healthiness.

8            THE COURT:  Mr. Brimmage, Mr. Brimmage, let me --

9    let's -- I'm sure many folks may be interested in that, but

10   I just happen not to be one of them.  Let's stick to kind of

11   where we are.

12           MR. BRIMMAGE:  Your Honor, if you're not

13   interested, I'm not interested.

14           THE COURT:  Appreciate it.

15           MR. BRIMMAGE:  Hang on one second, Mr. Riley.  I'm

16   going to look at my notes real quick.

17           MR. BATTAGLIA:  Judge, (indiscernible) Mr.

18   Brimmage says that.

19   BY MR. BRIMMAGE:

20   Q    I am going to have to ask this:  Other than in your

21   capacity as owner or whatever your title is with Blue

22   Ascension, what other services do you provide for Mr. Jones

23   these days, of any kind?

24   A    I mean, he still -- he still tries to, you know, get me

25   to help out on whatever, a lot less now that I've taken on

1    this endeavor.  But, I mean, I still, on good faith, you

2    know, continue to, you know, attempt to do some personal

3    training, which I'm (indiscernible), and that's essentially

4    it.  But that doesn't stop him from, you know, possibly

5    requesting something else.  But I mean, that's pretty much

6    the nuts and bolts of it.

7              MR. BRIMMAGE:  Your Honor, with that, I will pass

8    the witness.  Thank you.

9              THE COURT:  Okay.  Mr. Nguyen, do you have any

10   questions?

11             MR. NGUYEN:  No, Your Honor, not for this witness.

12   Thank you.

13             THE COURT:  Okay.  Mr. Battaglia, any redirect?

14             MR. BATTAGLIA:  No, Your Honor.

15             THE COURT:  Okay.  Mr. Riley, thank you very much

16   for your time.  You are (indiscernible) off the virtual

17   witness stand.

18             MR. RILEY:  Thank you, Your Honor.

19             THE COURT:  Okay.  Mr. Battaglia, where do we go

20   next?

21             MR. BATTAGLIA:  Your Honor, I have no further

22   evidence and rest.

23             THE COURT:  Okay.  Mr. Brimmage, anything from the

24   Texas Plaintiffs' side?

25             MR. BRIMMAGE:  No, Your Honor.  We rest our case

1    as well.  Thank you.

2            THE COURT:  Okay.  Does anyone have any additional

3    evidence they wish to present at this time?  It sounds like

4    both sides are resting.

5            Okay.  Mr. Battaglia, I'm just going through to

6    see if anyone's hitting five, star, Mr. Battaglia.  That's

7    all I'm doing right now.

8            Okay, I'll give -- and again, we've heard a lot of

9    evidence, and I appreciate the parties' participation.

10   Mr. Battaglia, is there anything you wish to say in closing?

11   I'll give each side a brief opportunity to provide any

12   closing statement.

13           MR. BATTAGLIA:  Yes, Your Honor.  I will be brief.

14   We've tried desperately to be transparent.  We understand

15   the relationships of the parties here and some of the issues

16   that relate to Mr. Jones.  And Mr. Schwartz, of course, is

17   not Mr. Jones.  He is drinking a bit from a firehose here.

18   He's done his best to try to make changes to this business

19   to make it more profitable, to eliminate costs, and to

20   increase sales.  And, of course, has he done it either

21   perfectly or timely?  He's been around since June 6, and

22   this case has been on trial for two weeks.  So, yes, there's

23   more work that needs to be done, and he doesn't have perfect

24   knowledge of everything that goes on with the business.

25           But what we do know is that there are changes that

```
 1   have been made, that one of the changes was Blue Ascension;

 2   that it has been good, according to Mr. Schwartz's

 3   testimony, for the Debtor; that it eliminated an aspect of

 4   business this Debtor did not need to be in; and it's been a

 5   good change.  Does Mr. Riley have a relationship with Mr.

 6   Jones?  Absolutely.  Is he an insider?  No.  Is he a friend?

 7   Perhaps.  But I recall somewhere, someone said, gee, you're

 8   doing business with a friend, as an accusation.  And his

 9   answer was, who am I supposed to do business with, my

10   enemies?  I think Mr. Riley testified and showed his ability

11   and understanding of the business, and he has been an honest

12   broker.  He is not an insider.  He is not an affiliate.  He

13   knows Mr. Jones.  Those were the questions I heard.  I think

14   he's demonstrated ability here, and the Debtor does not have

15   any issues in terms of performance.  The Debtor's issues are

16   payment.

17            And I wish that Mr. Schwartz had been able to

18   budget with great foresight on what the sales of this

19   company would do, but he wasn't.  He wasn't able to, for

20   reasons well beyond his control.  They're variable numbers.

21   And the good news is, those variable numbers have gone up,

22   and gone up considerably, not down, and they're not affected

23   by (indiscernible) did not budget adequately for fulfillment

24   services.

25            So, what are the options?  I haven't heard anybody
```

1   come up with a good option here.  I assume everybody wants

2   to see the Debtor generate greater revenue and greater cash

3   and to fulfil its obligations as a debtor under the

4   Bankruptcy Code, which is to pay creditors.  And that

5   they've answered the questions that were raised in the

6   objection about the relationship between the parties, and

7   this is a profitable relationship, and it needs to go

8   forward.  But it can't go forward with the budgeted number.

9   They need to make a change.  And I wish, and I assure you

10  that I queried Mr. Schwartz at length, and (indiscernible)

11  number.  And his answer is, no.  You heard his testimony.

12  He has grave concerns that we could have broad numbers in

13  the coming days, if not weeks, due to product arrivals.  And

14  I certainly don't have to point out to the Court that with

15  what's going on both nationally and locally in the trial in

16  Austin, that traffic has increased to this website -- new

17  eyeballs, potentially more sales, with more product.

18          This is a good problem to have, and we've come to

19  you with what we think is a rational solution.  We're

20  willing to be transparent about it, allowed everybody access

21  to information, and keep growing the revenue of this company

22  so that there's more money in the estate to pay creditors.

23  And I think I'll leave it at that, Judge.

24          THE COURT:  Thank you.  Let me turn --

25  Mr. Brimmage.  Actually, you know what?  Let me turn to

1   Mr. Nguyen first.  Mr. Nguyen, let me hear from the US

2   Trustee, give you an opportunity, Mr. Nguyen.  Certainly,

3   you don't have to take it.  I'm just -- you know, we're

4   doing this virtually, so I'm just kind of going around and

5   giving you the opportunity.  Mr. Brimmage, I'll let you go

6   last.

7           MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

8   the US Trustee.  Your Honor, this deal, it happened to be 10

9   days before the filing of bankruptcy.  Mr. Schwartz

10  testified that, you know, he looked at it, and I'm very

11  concerned about the due diligence of what has been put into

12  analyzing this particular deal.

13          I'm also concerned that, you know, we had a cash

14  collateral hearing on August 3, and this wasn't brought up

15  (indiscernible) declaration, and no mention of it.  So, I'm

16  concerned that the transaction itself, a lot of other

17  transactions that occurred in the case, there's a lot of

18  alarm bells going on.  And, Your Honor, I have no opposition

19  to the Debtor (indiscernible) more cash.  At the end of the

20  day, it's going to pay of the creditors, it's going to pay

21  off the families.  That is not the issue.

22          The issue is whether the $20 per fulfillment is

23  the appropriate deal for this particular Debtor.  It hasn't

24  been market tested.  It wasn't properly documented.

25  (indiscernible) on a price list, and Mr. Schwartz took about

1    a day to analyze this and accepted that that is the best

2    deal that the Debtor would get.

3            So, Your Honor, if the Court is going to craft any

4    remedy, I would not recommend giving Mr. Schwartz a blank

5    check to pay this particular vendor.  It should be interim

6    relief.  It should be very limited, and potentially, a claw-

7    back if the payment to Blue Ascension is not appropriate.

8            I have concern with just the -- how this deal came

9    about, the timing of it, and just right before the filing of

10   the case, all of a sudden, you know, there's this deal, a

11   one-sheet deal, $20 per order is going to leave the estate.

12   Mr. Schwartz hasn't done any investigation in terms of

13   (indiscernible) orders.  We don't fully know the economic

14   impact of this particular deal.

15           So, if the Court is going to grant relief, again,

16   I'd ask that it be very limited, it be very (indiscernible),

17   including the Plaintiffs to take a look at whether these

18   payments are appropriate or not.  Thank you, Your Honor.

19           THE COURT:  Okay.  Mr. Chapple, do you have any

20   statements?  Yeah, you may be on mute, Mr. Chapple, or I may

21   need to unmute you on five, star.  Give me an opportunity.

22   Mr. Chapple, go ahead and try again, see if I can hear you.

23   No, why don't you -- why don't you hit five, star again.

24   Let me see if -- oh, I see you there.  Mr. Chapple, can you

25   hear me?

1              MR. CHAPPLE:  I can hear you.  Can you hear me,

2      Your Honor?

3              THE COURT:  Ah, perfect.  Please proceed.

4              MR. CHAPPLE:  Okay.  Thank you very much, and

5      thank you again for the opportunity.

6              Your Honor, you're correct; we have heard a lot of

7      testimony today, from both Mr. Schwartz and from Mr. Riley.

8      And I think one thing continues to shine through that

9      carries over from the first-day hearings that we had last

10     week, and that is that we have an accumulation and more and

11     more evidence that we have a CRO who, despite what he says

12     in his declaration about being in charge and about having

13     the ultimate say, he's not in charge.  We see key decisions

14     that were made with regard to fulfilment that came after

15     Mr. Schwartz was retained and that I believe his own

16     testimony says he was caught flatfooted.  He didn't know

17     anything about it.

18             And the fulfillment process, as we understand it

19     in this business, is one of the most important operational

20     aspects.  So, we continue to see Mr. Jones, Alex Jones,

21     making decisions after Mr. Schwartz's retention and without

22     Mr. Schwartz's knowledge.  I think that calls for what we've

23     been saying, additional oversight, more oversight.

24             We've also been told that there was no analysis to

25     determine whether or not the Debtor needed to make this

002082

1   change.  We have a very new business that is owned and

2   operated, allegedly, by someone whose only exposure to the

3   fulfillment or logistics business is as an employee of Free

4   Speech Systems over time.  We still haven't been told why

5   the change was made, why the switch was made from in-house

6   from Free Speech to Blue Ascension.  And I believe the

7   testimony showed, through Mr. Riley, that apparently, this

8   fulfillment obligation for Free Speech Systems was performed

9   by four Free Speech Systems employees over a period of

10  months, from May to July.  So, again, if these obligations

11  were met with four in-house employees over a period of

12  months, we still haven't heard any testimony as to why the

13  switch was made.

14        We've also been told about a $400,000 payment that

15  was made on the same day that Mr. Riley signed a contract.

16  He couldn't articulate the terms of the contract.  We don't

17  understand what the obligations are to pay back or anything

18  like that.  So, we're again in a situation where we have a

19  huge ask from the Debtor to change their operations, to

20  change the way that they -- that they run their fulfillment

21  business, and we just don't have very much information.

22        THE COURT:  Mr. Chapple, let me ask you this.

23        MR. CHAPPLE:  Yes.

24        THE COURT:  And, Mr. Brimmage, I'm going to ask

25  you the same question.  I heard what the -- from Mr. Nguyen

Page 143

1    what -- he's saying, Your Honor, look, if you're going to

2    grant relief, if you're going to, you may -- Judge, we ask

3    that you not grant relief, but if you're going to grant

4    relief, then it be limited (indiscernible) reserve.  What is

5    the specific request that the -- I know you've objected, but

6    what are you asking this Court to do today?

7            MR. CHAPPLE:  Your Honor, can I answer first, and

8    then Mr. Brimmage can answer --

9            THE COURT:  No, no, no, I'm going to ask you -- I

10   was just giving -- I was telling -- I wanted to ask you that

11   question, and then I was going to tell Mr. Brimmage I'm

12   going to ask him the same question, so I want him to think

13   about it, just what the specific ask is in light of

14   everything that you've heard in terms of summation.  I've

15   heard from, obviously, Mr. Battaglia.  I've heard from Mr.

16   Nguyen.  I want to just make sure -- I'm not saying you

17   haven't answered the question.  I just want there to be

18   rock-solid clarity on what it is that you're asking from me

19   today.

20           MR. CHAPPLE:  Understood, Your Honor.  And you're

21   right; I believe -- if you were inclined to grant the relief

22   that the Debtors are seeking today here in any way, I think

23   that we would want --

24           THE COURT:  Mr. Chapple, let me put it to you --

25   let me put it to you this way.  What is it that your client

002084

1    is advocating today?  That's what I'm asking.

2         MR. CHAPPLE:  My client is advocating that we, the

3    Connecticut Plaintiffs, as well as the Texas Plaintiffs, as

4    well as the United States Trustee, have the opportunity to

5    continue to look back at these payments, to have some sort

6    of oversight to examine whether or not this is the most

7    efficient way to conduct this business -- or excuse me,

8    these fulfillment responsibilities -- and that we have claw-

9    back rights similar to what we talked about in the initial

10   cash collateral hearing, Your Honor, where we can look at

11   the payments that are being made, we can monitor them.  We

12   can monitor the volume of money that is going to Blue

13   Ascension from Free Speech Systems.  And we can also monitor

14   operationally, Your Honor, what is happening with regard to

15   -- if Blue Ascension falls short of its -- of the

16   performance that it is supposed to engage in here, what are

17   the repercussions?  What can the Debtor do to try to claw

18   back those $20 payments when they're made from the initial

19   purchase?

20        So, I think, Your Honor, claw-back rights, regular

21   information sharing so we can have transparency and we can

22   understand the way the payments that -- the way the payments

23   are being made and what the payments being made are keyed

24   off of.

25        THE COURT:  Thank you, Mr. Chapple.  Mr. Brimmage?

```
 1              MR. BRIMMAGE:  Thank you, Your Honor.  And just
 2     for the record, Marty Brimmage here on behalf of the Texas
 3     Plaintiffs group.  I'll be brief, because I thought Mr.
 4     Chapple just did a fantastic job.
 5              Your Honor, in order for you to grant the relief
 6     that you've been asked to grant today, the story has been
 7     told to you that this is a legit deal; everything is
 8     straight up; it's an arms-length transaction.  That's what
 9     you have been told, and that's what they're trying to sell
10     you on.  But I want to look at a couple of critical facts
11     that will demonstrate to you this is anything but business
12     as usual, and this is not an arms-length transaction.  It
13     isn't even close.
14              Let's look at -- let's look at what the facts are
15     that you heard today.  The leader of this Blue Ascension
16     organization was never in charge of fulfillment, like
17     Mr. Schwartz thought he was, at FSS -- not even close.  He
18     was a variety guy.  He did whatever Mr. Jones needed and
19     asked, including being the go-between.  I'm not knocking him
20     for it, but that's not a guy that was equipped to go set up
21     his own standalone fulfillment services.
22              What else do we know?  Free rent.  That's not
23     arms-length.  What else do we know?  He got $400,000 very,
24     very recently.  By the way, he's testifying today, and he is
25     required to go into Alex Jones' attorney's office and sign a
```

1    document today before he testifies.  That's not normal, Your

2    Honor.  That's not business as usual.  There's no contract.

3          Look, I feel for Mr. Schwartz, but Mr. Schwartz

4    has left FSS completely exposed (indiscernible).  And when I

5    -- I say that, completely exposed.  Blue Ascension could

6    shut down tomorrow, and no contractual obligations, no

7    nothing -- no bond, no nothing.  By the way, no insurance

8    requirement.  That's not normal.  Nothing to cover FSS.

9          Why is Mr. Schwartz comfortable with that?

10   Because Alex Jones is backing the whole thing.  This isn't

11   an arms-length deal.  This is a very friendly, behind-the-

12   scenes deal.  That's what this is.  There's no other way to

13   interpret the absolute, undisputed facts, Your Honor.  The

14   strong ties to Alex Jones is what makes this work, and the

15   only thing that makes this work.  It's the same employees.

16         This isn't a gift, Your Honor.  None of this is a

17   gift.  There's something else that you're just not being

18   told about.  So, leaving this company totally exposed makes

19   absolutely no sense.  Your Honor, I just don't think you can

20   buy the story that you've been given to give the relief that

21   you are being asked to give.

22         Having said that, I am absolutely confident you're

23   being torn to provide this relief.  And what you asked

24   Mr. Chapple, I think, is the critical question, and that is,

25   what do the Plaintiffs need to protect themselves going

1    forward?  One may be claw-back rights, maybe greater

2    oversight over what's really going on here.  I mean, you

3    have to admit, the timing of this Blue Ascension thing, the

4    timing of Mr. Schwartz, the lack of due diligence into

5    alternatives, I mean, all of this snowballs into, what the

6    heck is going on?

7         We need regular and timely information sharing,

8    and I want to emphasize timely, not this, well, I don't

9    know, because it's been a few days and I'm busy.  We need --

10   and we need transparency, Your Honor.  Those are the

11   protections that I think the Court absolutely must impose if

12   it's going to grant this relief.

13        And I think going forward, Your Honor, I think you

14   ought to fold this into the same story you heard at the

15   first-day with Mr. Schwartz on the stand, with a little bit

16   of a skeptical eye about what's really going on here and the

17   overlapping attorneys, the overlapping CRO, and the

18   overlapping parties and all the relationships here.

19        So, with that, Your Honor, we respectfully request

20   that you deny the relief that's been requested by the

21   Debtors.  But if you grant it, any and all possible

22   protections that you and anybody else can think of should be

23   baked into that order.  And with that, Your Honor, I'll

24   answer any questions that the Court has.

25        THE COURT:  I have no further questions, no.  I

1    appreciate the arguments of the parties.  Let me just note

2    that there was a motion to amend the interim cash collateral

3    order filed at Docket Number 55.  It was filed yesterday,

4    and the Court granted emergency consideration of the motion.

5    I'm going to find that notice of today's hearing has been

6    proper, under the circumstances.  I don't take granting

7    emergency hearings lightly, but when parties and Debtors

8    request them for emergency reasons and there's a valid basis

9    to do so, I grant them.  And I'm going to (indiscernible)

10   emergency consideration of today's request is appropriate,

11   and I believe that the Debtor has satisfied its burden that

12   today's request on an emergency basis, and that's

13   appropriate.

14          Based on Mr. Schwartz's testimony, and Mr. Riley,

15   the Debtor is going to need additional (indiscernible) and a

16   long-term cash collateral order to provide for fulfillment

17   services.  So, the number that's budgeted in the order that

18   I signed is not going to be adequate and no longer adequate

19   as of today.  So, I think Mr. Brimmage is right that, you

20   know, it's a difficult decision for a Court as to what to do

21   in these circumstances.

22          I'm going to grant the requested relief, and I'm

23   going to explain why, and I'm going to kind of give some

24   conditions here.  The reality is, is that the Debtor, based

25   on the testimony that I've heard, is experiencing a large

1    number of sales of vitamin products, health products, and

2    (indiscernible) that opportunity.  The more sales that come

3    in, the more money this estate makes; it's in the best

4    interest of the estate for that continue.  And the more

5    folks that want to buy the products, the more money the

6    estate makes; that's a good thing for the estate, and I

7    think the Debtor makes a valid point on that.

8           Reality is, as well, this is certainly a unique

9    business relationship between Mr. Riley and FSS.  I think

10   Mr. Brimmage certainly brought a lot of those facts out.

11   The Court is obviously concerned about hearing about large

12   numbers of payments today, the nature of the relationship,

13   the lack of rent that's being paid.  Those are all valid

14   concerns, and parties are allowed to explore that as another

15   example of another relationship that needs to be explored.

16          But I take Mr. Schwartz at his word that he

17   negotiated the best deal that he could under the

18   circumstances, and because he needed to get things out and

19   didn't want to enter into a contract because he wanted the

20   flexibility.  He wanted the flexibility to get out if he

21   could, if he found a better deal, and I'm not going to

22   second guess him on that.  That's just, that's what he did,

23   and -- but the relationship is certainly one that needs

24   closer examination.

25          (indiscernible) I'm granting the relief,

1    potentially, I don't know.  But certainly, the testimony

2    shows upwards of additional $1 million, maybe more, that

3    could come in, and it should come in.  And according to the

4    testimony that I've heard, there's no one other -- as of

5    today that can provide the fulfillment services, other than

6    Blue Ascension, not the Debtor, and it's going to be too

7    hard to find someone else to go do that.

8            And also, I'm really only granting the relief for

9    12 days.  There is an interim order.  There has to be a

10   final order, and everybody's rights are reserved as to what

11   happens on the final order.  The request that the Debtor

12   made was to modify the interim order, and I'm going to do

13   that.  The interim order provides that the US Trustee, the

14   Subchapter 5 Trustee, and counsel to the Plaintiffs, I

15   believe it's Mr. Jarrod Martin, are going to receive a

16   weekly report every Tuesday -- we're really only talking two

17   Tuesdays -- as to what those reports are going to be, and

18   then the parties are going to come back on the 24th.  And

19   just because it's in the interim, that doesn't mean it's

20   going to be in the final.

21           So, I'm only granting relief for 12 days, and I

22   think there's nothing -- well, there certainly is testimony

23   that Mr. Schwartz negotiated, you know, the $20 and whether

24   the, you know, $14 for shipping, $6 for essentially other

25   costs.  That wasn't market tested, really.  Mr. Riley

1    testified that that's what he charges across the board.  You

2    know, if it turns out that that's not what he charges across

3    the board, then we'll take that up; then we'll deal with

4    that.  There are other remedies.

5         I don't think there needs to be a claw-back.  I

6    think we'll keep this going for 12 days, and if something

7    comes up that says that something was -- someone was not

8    entirely accurate or dishonest, then we'll deal with that on

9    the back end.  But I haven't heard anything other than that

10   today, so I'm going to grant the relief requested.  And

11   again, this is just for 12 days.  I don't want anyone to --

12   I want all orders fulfilled that can be fulfilled.  I want

13   the Debtor to have every opportunity to be in the best

14   position it can while it's in this Chapter 11 case.  And

15   again, this is just modifying the interim order.

16   Everybody's rights are reserved.  Nothing that is provided

17   on the interim carries to the final.  The final has its own

18   hearing, and I'm sure we'll take this up at a final.

19        So, I'm going to enter the order.  Everybody's

20   rights are reserved.  If someone believes that there should

21   be a claw-back at some point, then we'll take it up, but

22   it's going to have to be based on evidence presented.  And

23   I'm sure folks are going to ask a lot of questions about the

24   nature of the relationships and what they've heard today, so

25   I suspect the 24th is going to be an interesting hearing,

1    and we'll see where all of that goes.

2           I want the parties to know that, since the last

3    hearing, I've been giving a lot of thought to various

4    sections of the bankruptcy code, and I want to make sure

5    everybody's really focused on them as well.  This is a

6    Subchapter 5 case, and everyone should really be thinking

7    about them as well.  I don't want to list which sections I'm

8    thinking about, because then that tends to create more.

9    But, everyone, just understand that we're operating under

10   Subchapter 5, and there are various code provisions.  There

11   are duties that the Debtor has under Subchapter 5.  There

12   are duties that other parties have, and I'm giving them a

13   close look, and I encourage all parties to do so as well.

14          Since I have all the parties here, I have to enter

15   a Subchapter 5, essentially what is a (indiscernible) order,

16   a very basic order (indiscernible) citing bankruptcy code

17   sections, 1188 of the bankruptcy code requires the Court to

18   conduct a status conference no later than 60 days after the

19   petition date and requires the Debtor, within 46 days of the

20   petition date, to file a status report.  And so, using what

21   I call -- they used to call it lawyer math, but judge math,

22   that roughly puts the status -- the Debtor (indiscernible)

23   file the status report September 13, 2022.  I'll need to

24   hold a status conference on September 27, and that falls on

25   a Tuesday.  And I'd like to see if I can do it at 1:00 p.m.

1    I put in this order, and it's something I like to enter on

2    every Subchapter 5 case, just so that the record is clear.

3    And unless the Court orders otherwise, the deadline to file

4    a Chapter 11 plan would be October 27, 2022.

5              And are the -- let me ask, Mr. Battaglia

6    (indiscernible) be available to September 27, and I'd like

7    the Subchapter 5 trustee (indiscernible) as well.

8              MR. BATTAGLIA:  Yes, Your Honor, I'm available.

9    Mr. Schwartz is on the line.  I think he can say if he's got

10   an issue with those dates (indiscernible) I'm pretty sure

11   we're all available.

12             THE COURT:  Ms. Haselden, I forgot, I actually got

13   to hit star, five.  Ms. Haselden, why don't you hit star,

14   five?  Let me recognize you just for a second.  All right,

15   you did.

16             MR. LEE:  For the record, Your Honor, Kyung

17   (indiscernible).  We're available on the 27th.

18             THE COURT:  Okay.  Ms. Haselden, I can't find you.

19   Can I just get (indiscernible) whether you're available on

20   the 27th?  Okay, I got the head nod.  That's what I needed.

21   Oh, I see you there.

22             MS. HASELDEN:  Yes, Your Honor, Melissa Haselden,

23   Subchapter 5 Trustee.  I'm available at the time; thank you.

24             THE COURT:  Okay.  (indiscernible).  We'll see

25   where this goes.  I really much -- Mr. Schwartz even

```
 1    testified, I think at the beginning (indiscernible) that
 2    you've been drinking from a firehose.  I suspect you will
 3    continue to drink from that firehose for quite some time.
 4    But just want to make sure that everybody's Septembers are
 5    clear.  We'll see where this goes.
 6              MR. SCHWARTZ:  Your Honor?
 7              THE COURT:  Yes, as long as someone identifies
 8    who's speaking.
 9              MR. SCHWARTZ:  Marc Schwartz.
10              THE COURT:  Yes, Mr. Schwartz.
11              MR. SCHWARTZ:  I actually believe I'm in Europe on
12    September 27th or approximately that date.
13              THE COURT:  Okay.
14              MR. SCHWARTZ:  I can't see my calendar on my
15    iPhone, so...
16              THE COURT:  No.  Let's see.  Could you do -- could
17    you do September -- could you do the 19th or the 20th in the
18    afternoon?  The code mandates that we do it no later than 60
19    days --
20              MR. SCHWARTZ:  Right.  I'm trying to get my
21    calendar up, Your Honor.  Just --
22              THE COURT:  No worries.  Take your time.
23              MR. SCHWARTZ:  You said September --
24              THE COURT:  The 19th or the 20th.
25              MR. SCHWARTZ:  Yes, I can.
```

```
1              THE COURT:  What day is better?

2              MR. SCHWARTZ:  Tuesday.

3              THE COURT:  Can we do the 20th at 1:00 p.m.?

4              MR. SCHWARTZ:  That's fine with me.

5              THE COURT:  Ms. Haselden, I need you here.

6              MS. HASELDEN:  Yes, Your Honor, that works for me.

7              THE COURT:  Okay.  I'll set it for September 20 at

8    1:00 p.m. Central Time.  Anything else we need to talk about

9    today?

10             MR. BATTAGLIA:  Thank you, Your Honor.  No, Your

11   Honor, we're grateful for you coming out of your sick bed

12   here and (indiscernible) well.

13             THE COURT:  No, I'm just fine.  I'm fine.  Don't

14   you worry about me.  So, okay, folks.  Y'all have a good

15   day.  Thank you.

16        (Proceedings adjourned at 05:09 p.m.)

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3     I certify that the foregoing is a correct transcript from

 4     the electronic sound recording of the proceedings in the

 5     above-entitled matter.

 6

 7     Sonya M. Ledanski Hyde

 8

 9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 19, 2022
```

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In    Free Speech Systems LLC
Re:   Debtor

Case No.: 22–60043

Chapter: 11

---

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E–Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250–5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

002098

United States Bankruptcy Court
Southern District of Texas

In re:                                                                  Case No. 22-60043-cml

Free Speech Systems LLC                                                 Chapter 11
        Debtor

# CERTIFICATE OF NOTICE

District/off: 0541-4                        User: ADIuser                        Page 1 of 3
Date Rcvd: Aug 17, 2022                     Form ID: ntctran                     Total Noticed: 8

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ^ | Addresses marked '^' were sent via mandatory electronic bankruptcy noticing pursuant to Fed. R. Bank. P. 9036. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Aug 19, 2022:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Free Speech Systems LLC, 3019 Alvin Devane Blvd. STE 300, Austin, TX 78741-7417 |
| cr | + | David Wheeler, et al., c/o Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, TX 78701-4653 |
| cr | + | Leonard Pozner, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Marcel Fontaine, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Neil Heslin, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Scarlett Lewis, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Veronique De La Rosa, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |

TOTAL: 7

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| cr | ^ | MEBN | Aug 17 2022 20:01:29 | Texas Comptroller of Public Accounts, Revenue Acco, Christopher J. Dylla, P.O. Box 12548, Austin, TX 78711-2548 |

TOTAL: 1

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | ADP TotalSource, Inc. |
| intp | | David Ross Jones |
| intp | | Shelby A Jordan |

TOTAL: 3 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Aug 19, 2022                    Signature:    /s/Gustava Winters

002099

| District/off: 0541-4 | User: ADIuser | Page 2 of 3 |
| Date Rcvd: Aug 17, 2022 | Form ID: ntctran | Total Noticed: 8 |

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on August 17, 2022 at the address(es) listed below:**

| Name | Email Address |
| --- | --- |
| Avi Moshenberg | on behalf of Creditor Neil Heslin avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Scarlett Lewis avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Leonard Pozner avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Veronique De La Rosa avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Marcel Fontaine avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Christopher Dylla | on behalf of Creditor Texas Comptroller of Public Accounts  Revenue Accounting Division bk-cdylla@oag.texas.gov, Sherri.Simpson@oag.texas.gov |
| Ha Minh Nguyen | on behalf of U.S. Trustee US Trustee ha.nguyen@usdoj.gov |
| Jarrod B. Martin | on behalf of Creditor Neil Heslin jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Marcel Fontaine jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Veronique De La Rosa jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Scarlett Lewis jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Leonard Pozner jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jayson B. Ruff | on behalf of U.S. Trustee US Trustee jayson.b.ruff@usdoj.gov |
| Joseph S.U. Bodoff | on behalf of Creditor ADP TotalSource  Inc. jbodoff@rubinrudman.com |
| Kyung Shik Lee | on behalf of Debtor Free Speech Systems LLC kslee50@gmail.com  Courtnotices@kasowitz.com |
| Melissa A Haselden | mhaselden@haseldenfarrow.com haseldenbankruptcytrustee@gmail.com;mhaselden@ecf.axosfs.com;haselden.melissaa.r104367@notify.bestcase.com |
| R. J. Shannon | on behalf of Debtor Free Speech Systems LLC rshannon@shannonpllc.com rshannon@shannonleellp.com;7044075420@filings.docketbird.com |
| Randy W Williams | on behalf of Creditor David Wheeler  et al. rww@bymanlaw.com, rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com |
| Raymond William Battaglia | on behalf of Debtor Free Speech Systems LLC rbattaglialaw@outlook.com  rwbresolve@gmail.com |
| Ryan E Chapple | on behalf of Creditor David Wheeler  et al. rchapple@cstrial.com, aprentice@cstrial.com |
| Shelby A Jordan | on behalf of Interested Party Shelby A Jordan cmadden@jhwclaw.com |
| Stephen A Roberts | on behalf of Interested Party David Ross Jones sroberts@srobertslawfirm.com  1222805420@filings.docketbird.com |

District/off: 0541-4                     User: ADIuser                          Page 3 of 3
Date Rcvd: Aug 17, 2022                  Form ID: ntctran                       Total Noticed: 8

US Trustee
                       USTPRegion07.HU.ECF@USDOJ.GOV


TOTAL: 23

002101

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) <u>GRANTING RELATED RELIEF</u>**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "<u>Debtor</u>" or "<u>FSS</u>"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), hereby moves for entry of an order substantially in the form attached hereto (the "<u>Proposed Order</u>") pursuant to sections 105(a) and 327 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") authorizing the retention of W. Marc Schwartz (the "<u>CRO</u>" or "<u>Schwartz</u>") of Schwartz Associates, LLC ("<u>SALLC</u>") as the Chief Restructuring Officer (the "<u>Application</u>") pursuant to that certain engagement letter agreement by

and between the Debtor and SALLC, a copy of which is attached hereto as <u>Exhibit A</u> (the "<u>Engagement Agreement</u>").[1] In support of the Application, the Debtor submits the Declaration of W. Marc Schwartz attached hereto as <u>Exhibit B</u> (the "<u>Schwartz Declaration</u>") and respectfully represents as follows:

## <u>REQUESTED RELIEF</u>

1.      Entry of the Proposed Order (a) approving the appointment and employment of Schwartz and to perform the services set forth in the Engagement Agreement as the CRO for FSS is necessary for the Debtor to adequately perform its duties as a debtor-in-possession, including overseeing daily business affairs and operations of FSS, interfacing with Alex Jones ("<u>Alex Jones</u>" or "<u>Jones</u>"), PQPR Holdings Limited, LLC ("<u>PQPR</u>") and vendors on selection of Supplements and Non-Supplements to stock,  preparation of schedules of assets and liabilities, compliance with reporting requirements and various orders of this Court, preparation of financial information and testimony and formulation of bankruptcy strategy and plan of reorganization for FSS and (b) approving the employment of SALLC in connection with the CRO's duties.

2.      Especially for a subchapter v debtor, this Court's approval of the retention of the CRO and SALLC by the Debtor is critical and indispensable to assuring that the chapter 11 process begins smoothly, and, that the Debtor has the optimal managers to help formulate a sound business and reorganization plan quickly. Without the CRO and SALLC, the Debtor cannot survive in chapter 11.

## <u>JURISDICTION</u>

3.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core

---

[1] The Engagement Agreement references paragraph 8.01 of the Debtor's company agreement. A copy of the Company agreement is attached hereto as <u>Exhibit C</u>.

2

proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

4.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

5.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

6.      The Debtor continue to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

7.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.  The Debtor

8.      Alex E. Jones ("Jones") owns one hundred percent (100%) of the equity in FSS.

9.      FSS is presently engaged in the business of producing and syndicating Jones' and other radio and video talk shows and selling products targeted to Jones' audience via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) and other programs from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.     On its InfowarsStore.com website, FSS makes available to customers dietary supplements, including Bodease, Vitamin Mineral Fusion, Vitamin D3 Gummies, Ultimate

3

Immune Support Pack, Pollen Block, Tea Tree Shampoo, and other health products (collectively, "Supplements"). The website also has available books, videos, t-shirts and other products (collectively, "Non-Supplements") Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of Supplements which have traditionally been supplied by or through PQPR, an affiliated entity.

11.     As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.  This is the building where Jones produces his shows, including The Alex Jones Show. An  adjacent  building  contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.     FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

13.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from InfowarsStore.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

14.     Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones.

15.     PQPR formulates supplements for FSS to market on its shows.  Ultimately, FSS relied on PQPR to supply the Supplements as other vendors would not supply FSS. PQPR ordered

002105

and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018, FSS has had difficulty finding third parties willing and able to fulfill product sales.  In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.

18.     Recently, FSS retained a fulfillment company to take over this function.  All former FSS employees responsible for fulfillment have been hired by this company.  The fulfillment company charges FSS a flat fee per order regardless of size.

**C.  Pending Litigation Against the Debtor**

19.     The Debtor's financial distress stems primarily from statements of Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Various parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

20.     The relatives of the Sandy Hook victims and certain other parties (the "Sandy Hook Plaintiffs") assert, among other things, that Jones and other employees of FSS made defamatory statements and inflicted emotional distress. In 2018, the Sandy Hook Plaintiffs brought actions in Texas and Connecticut (collectively, the "Sandy Hook Lawsuits") against Jones, FSS and certain affiliates of the Debtor. The crux of the allegations in the Sandy Hook Lawsuits is that Jones and

5

FSS employees damaged the Sandy Hook Plaintiffs by saying or implying that the Sandy Hook shooting did not occur, and that the entire incident was a "false flag" hoax.

21.     Jones, FSS, and the Debtor have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits. Despite the substantial amount spent, both the Texas and Connecticut courts have ruled that Jones and the Debtor failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default.

22.     The jury in the Heslin\Lewis State Court Action returned  jury verdicts against FSS and Jones ordering them to pay $45,200,000 in punitive damages on top of $4,100,000 in compensatory damages on Thursday and Friday August 4 and 5, 2022. The Debtor requires the services of the CRO to assist it in managing the business of FSS while it reviews the next steps in the Sandy Hook Lawsuits.

### D.  The Debtor Needs a CRO and SALLC

23.     Since inception, FSS has been a "single talent business", *to wit*, without Alex Jones and his show, there would neither be an InfoWars nor any internet sales. Despite the rapid growth in the diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems. FSS failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. The Debtor and its employees continued to run the business with an inverted T structure, as though it was still a family business.

24.     In 2022, Alex Jones retained professionals to evaluate FSS. Since May 2022, FSS has retained Schwartz as its CRO with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. Schwartz retained his firm Schwartz Associates to perform various accounting and forensic work associated with his mandate.

6

25.     Throughout the review conducted by the CRO and his team, they have been given complete access to FSS employees, books and records.

26.     Among the preliminary conclusions reached in Schwartz' analysis of FSS are: (a) Although the company had a controller and two bookkeepers (none of which appear to have any formal accounting background), the 2021 general ledger had not been completed and the books for that period were not closed; (b) Few transactions had been recorded in the 2022 general ledger; (c) No financial statements were produced for the company for the 18 months preceding Schwartz' engagement; (d) The bank accounts had not been reconciled in 2021 or 2022; and (e) Internal accounting controls were completely inadequate, including lack of segregation of duties, absence of written monthly, quarterly and annual closing schedules, lack of supervisory review of key accounting functions, including vendor set up, bank reconciliations, inventory reconciliations, or intercompany billings; (f) Payments to vendors were debited to an expense account, but not to the specific vendor account; and (g) Credit card transactions were not recorded to specific expense accounts.

27.     Since their engagement, Schwartz and his team have closed the books for 2021 and made significant progress fixing past bookkeeping omissions and oversights. As a result of these actions, the CRO has a vastly improved understanding of FSS's financial standing and its ability to operate profitably going forward.  Schwartz has also renegotiated business terms with PQPR on the allocation of proceeds from product sales to be more favorable to FSS.

**E.  Proposed Employment of Schwartz as the CRO**

   *i.   Scope of Employment*

28.     The Debtor seeks to engage Schwartz as the CRO to advise and lead the day-to-day restructuring efforts of the Debtor, pursuant to the Engagement Agreement. The Debtor contemplates that the CRO will perform some or all the following tasks:

7

a.   Make business and debt restructuring decisions, including as it relates to business strategy(ies) and other key elements of the business;

b.   Manage due diligence requests and other items requested by various constituents as part of the restructuring process;

c.   Prepare cash flow forecasts and related financial and business models;

d.   Identify and implement short and long-term liquidity initiatives;

e.   Prepare Statement of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the Court, as well as provide necessary testimony before the Court on matters within CRO's areas of expertise;

f.   Review inventory marketability and provide monetization alternatives;

g.   Make operating decisions;

h.   Implement cost containment measures;

i.   Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and other parties-in-interest and submit proposals to the Court;

j.   Work to maximize the value of the Debtor;

k.   Oversee all business decisions of Debtor, as necessary or required, utilizing CRO's business judgment;

l.   Execute all documents and take all other acts necessary to effectuate the restructuring of the Debtor; and

m.   The Debtor also seeks authority for other staff of SALLC to perform services required to assist the CRO within the scope of this engagement.

ii.   _Necessity of Employment_

29.   The Debtor believes that the retention and employment of the CRO is necessary and appropriate to operate the Debtor's business properly and administer the Chapter 11 Case and ultimately prepare and obtain confirmation of a plan of reorganization. While Alex Jones produces his show and markets products on his show, the Debtor needs a professional with financial

002109

expertise to serve as an officer of the Debtor to perform the services indicated in the Engagement Agreement.

     *iii.*   <u>*Reasons for Selection*</u>

30.     The Debtor believes that the CRO is well qualified to provide management services that will assist and enhance the Debtor's efforts to maximize value to their creditors.

31.     Schwartz is a licensed CPA with more than 40 years' experience providing expert witness and financial restructuring services. He frequently serves as a chief restructuring officer, and as a federal and state court appointed receiver, in bankruptcy and non-bankruptcy proceedings. Mr. Schwartz is one of approximately 200 full members of the National Association of Federal Equity Receivers. He understands how to be a fiduciary.

     *iv.*   <u>*Proposed Compensation & Reimbursement*</u>

32.     The Debtor intends to file a motion to establish interim compensation procedures in this case. Schwartz and SALLC intend to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including sections 330 and 331, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim compensation order entered in these Chapter 11 Case.

33.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, the Debtor proposes to pay on an hourly basis the CRO and SALLC, as set out in the Engagement Agreement and summarized in the following chart:

| BILLER | RATE |
|---|---|
| W. Marc Schwartz (CRO) | $690.00 per hour |
| M. Christian Schwartz | $470.00 per hour |
| Managers | $350.00 per hour |
| Associates | $280.00 per hour |
| Analysts | $210.00 per hour |
| Administrative Staff | $95.00 per hour |

002110

34.     Additionally, the Engagement Agreement provides that the Debtor shall be responsible for the reasonable and necessary documented out-of-pocket costs and expenses incurred by CRO and SALLC in connection with the engagement. SALLC will submit detailed documentation of all expenses incurred in connection with requests for reimbursement.

35.     The Debtor believes that the agreed terms of reimbursement, compensation, and hourly rates are reasonable. The CRO will notify the Debtor of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

### v.     *Retainer*

36.     The Debtor engaged the CRO prior to the Petition Date. The CRO and SALLC received a retainer of $75,000.00 and a total payment of $78,811.39 for pre-petition work performed for FSS. The source of the retainer and the payment of the invoices is FSS.

37.     Pursuant to the Engagement Agreement, the Debtor proposes that SALLC will hold the Retainer to be applied to SALLC's final fees and expenses at the conclusion of the engagement. The Proposed Order modifies the Engagement Agreement such that the CRO and SALLC shall not draw on the Retainer except upon order of the Court awarding final compensation and reimbursement in the Chapter 11 Case.

### vi.     *Disinterested*

38.     Neither Schwartz nor SALLC is a creditor, equity security holder or an insider of FSS. Under Bankruptcy Code § 101(31)(B), the "corporation" is the closest entity similar to an LLC, which FSS is.  An "insider" if the debtor is a corporation, includes " (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).

002111

39.    Schwartz and SALLC do not qualify as an insider under (i), (iv), (v) and (vi).

40.    Schwartz served since May 19, 2022, as the CRO of the Debtor, and therefore may qualify under (ii). SALLC does not.

41.    Schwartz and SALLC do not qualify as a "person in control" of the debtor, as Schwartz had delegated to it managerial duties of the LLC, but those duties under Texas law cannot be supplanted by the rights of the owners of the LLC. Schwartz and SALLC do not qualify as an insider under (iii).

42.    Neither Schwartz nor SALLC have been within 2 years before the date of filing of the petition, a director, officer, or employee of the debtor. Again, Schwartz served as the CRO of FSS prior to the Petition Date.

43.    Neither Schwartz nor SALLC have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason. Prior to entry into the Engagement Agreement, Schwartz and SALLC did not have a materially adverse interest to FSS.

44.    Their acting in a similar role at InfoWDebtors did not create an "interest materially adverse" to the interest of FSS's creditors or equity security holders. First, there was no dispute between FSS and InfoW over the licensing agreement over the name and the tradename. Second, the CRO and SALLC's mandate to "lead InfoW's management and personnel through the restructuring process" had for all practical purposes concluded by May 19, and for sure by June 6. May 19 is when the Texas and Connecticut Plaintiffs dismissed all of their claims against the InfoWDebtors via stipulations or motions. June 6 is when the Bankruptcy Court signed the Stipulation for Dismissal of the Chapter 11 Cases of the InfoWDebtors.

11

*vii.*    *Connections*

45.    The Schwartz Declaration sets out the connections of the CRO and SALLC with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, neither the CRO nor SALLC hold any connections other than those disclosed in the Schwartz Declaration.

46.    Schwartz has familiarity with the players involved in FSS as he served as the CRO of InfoWDebtors. As described in the Schwartz Declaration, Schwartz continues to serve as the CRO for the three (3) companies, InfoW, LLC, IWHealth, LLC and Prison Planet, tv Ltd. The bankruptcy cases of those three companies have been dismissed and Schwartz has not been asked to undertake any new assignments for these three companies.  At the present time, Schwartz's only duties with respect to the InfoWDebtors is to receive and deposit the return of the excess of the funds paid to the subchapter v Trustee in that case and the amount allowed in her final fee application.

47.    At the time Schwartz was engaged  on June 6, 2022 as CRO by FSS, he was the CRO of the InfoWDebtors. By that time,  the InfoWDebtors' bankruptcy cases were substantially over in that the CRO had negotiated the release with prejudice of the InfoWDebtors from the Texas and Connecticut litigation and had reached an agreement with the United States Trustee to move for dismissal of the subject bankruptcy cases.

48.    The Debtor believes that neither the CRO nor SALLC holds or represents any disqualifying interest that is adverse to the estate, and each is a "disinterested person." If any new relevant facts or relationships are discovered, the CRO and SALLC will supplement its disclosure to the Court and the U.S. Trustee.

12

## BASIS FOR RELIEF

49.     Subject to Court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." Bankruptcy Code § 327(c) says that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

50.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

a.     Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

b.     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

c.     Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**A.  The CRO and SALLC Meet the Requirements of Bankruptcy Code § 327(a)**

13

51.     Based on the Schwartz Declaration, the Debtor submits that neither the CRO nor SALLC hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

52.     The Bankruptcy Code defines what it means to be a "disinterested person" Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

The Schwartz Declaration discloses no connections with the Debtor that would disqualify the CRO or SALLC as a "disinterested person" and the Debtor is not aware of any connections in addition to those disclosed in the Schwartz Declaration.

**B.  This Application and the Schwartz Declaration Meet the Requirements of Bankruptcy Rule 2014.**

53.     This Application and the Schwartz Declaration meet the requirements as set out in Bankruptcy Rule 2014. The Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, and the proposed arrangement for compensation. The Schwartz Declaration is a verified statement pursuant to 28 U.S.C. § 1746 that sets out all connections that the CRO and SALLC has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtor is not aware of any other connections in addition to those disclosed in the Schwartz Declaration.

14

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form of the Proposed Order approving the employment of the CRO and SALLC effective as of the Petition Date, pursuant to the terms of the Engagement Agreement and grant any other appropriate relief.

Dated: August 20, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

002116

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division

PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

*/s/R. J. Shannon*

002118

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

18

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T                                    Justin Lair
PO Box 5001                             1313 Lookout Ave
Carol Stream, IL 60197-5001             Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple                         Jarrod B. Martin
Cain & Skarnulis PLLC                   Chamberlain Hrdlicka
303 Colorado Street, Suite 2850         1200 Smith Street, Suite 1400
Austin, Texas 78701                     Houston, TX 77002

Randy W. Williams                       Christopher J. Dylla
Byman & Associates PLLC                 Assistant Attorney General
7924 Broadway, Suite 104                Bankruptcy & Collections Division
Pearland, TX 77581                      PO Box 12548
                                        Austin, TX 78711-2548
Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

002120

**Additional Notice Parties**

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

002121

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtor's Application for Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1]; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.     The Application is granted, to the extent set forth herein.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

2.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain W. Marc Schwartz, effective as of the Petition Date, as its chief restructuring officer (the "CRO"), under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.      The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Alexander E. Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Case.

4.      The CRO is authorized to delegate appropriate tasks to Schwartz Associates, LLC ("SALLC"), pursuant to the terms of the Engagement Agreement.

5.      The CRO and SALLC shall be compensated for their services and reimbursed for actual expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules, and any orders of this Court; *provided*, *however*, that the CRO and SALLC shall not seek reimbursement from the Debtor's estate for any fees incurred in defending any fee applications in this Chapter 11 Case.

6.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

002123

7.     Notwithstanding anything to the contrary in the Engagement Agreement, the CRO and SALLC shall hold any prepetition retainer, pending a final order allowing compensation and reimbursement in these cases or order otherwise directing disposition of the retainer amounts.

8.     Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the CRO and SALLC shall not be entitled to reimbursement or fees and expenses in connection with any objection to their fees, without further order of the Court.

9.     The CRO and SALLC shall provide ten (10) business days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

10.    The CRO and SALLC shall use reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals in this Chapter 11 Case.

11.    The CRO and SALLC will review their files periodically during the pendency of the Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and SALLC will use reasonable efforts to identify such further developments and will promptly file a supplemental Declaration, as required by Fed. R. Bankr. P. 2014(a).

12.    To the extent the Application, the Schwartz Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

002124

13.     The Debtor, the CRO, and SALLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

14.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated this ___ day of August, 2022.

_____
UNITED STATES BANKRUPTCY JUDGE

4

002125

# **EXHIBIT A**

**Engagement Agreement**



**Schwartz** Associates

May 19,2022

**VIA EMAIL**

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of
Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free
Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring
Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts
involving the scope described herein, potentially including a filing under the United States
Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain
SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

SALLC understands that the purpose of the engagement is to continue stable
operations while maximizing the values of FSS' assets, including negotiations with
creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best
chance of recoveries on their claims. CRO will work to maximize returns and to
assure a fair pro rata distribution to all unsecured creditors.

**I.     Scope of Engagement**

CRO will lead FSS' management and personnel through the restructuring process.
It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to
   business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be
   requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating
   Reports, and other similar regular Chapter 11 administrative, financial, and
   accounting reports required by the United States Bankruptcy Court
   ("Bankruptcy Court") as well as providing necessary testimony before the
   Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as
   deemed appropriate;

1

EXHIBIT

4

002127



**Schwartz**Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;
10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.
11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

**II.      Indemnification**

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

2



**Schwartz** Associates

### III.     Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.     Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.     Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3



**Schwartz** Associates

### VI.    Term & Termination

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

### VII.    Compensation

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

#### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

002130



**Schwartz** Associates

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII.   CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX.   Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5



**Schwartz**Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

## **EXHIBIT B**

**Schwartz Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## <u>DECLARATION OF W. MARC SCHWARTZ</u>

I, W. Marc Schwartz, declare under penalty of perjury as follows:

1.      I am a CPA and a founder and chairman of Schwartz Associates, LLC ("<u>SALLC</u>"). On my behalf and SALLC's, I am duly authorized to execute this Declaration in support of the Application filed by Free Speech Systems, LLC  (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>") seeking approval to retain me as the chief restructuring officer ("<u>CRO</u>") and SALLC to assist me in those duties.

2.      Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, upon the client and matter records of SALLC reviewed by me or SALLC staff under my supervision and direction or derived from information available to me that I believe to be true and correct or my opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**A.  Application to Employ CRO**

3.      I have reviewed the Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief (the "Application"). The Application accurately describes my proposed role as the CRO.

**B.  Disclosure of Connections**

4.      SALLC performed the following actions to determine whether it or any of its professionals has any disclosable connections to the Debtor, creditors, any other party in interest, their attorneys or accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas:

  a.      First, SALLC staff sent emails to all email account holders within SALLC requesting the recipient respond to any representation known to be adverse or otherwise connected to the Debtor or its estate. Neither I nor my staff received any responses indicating that a conflict or connection exists.

  b.      Second, SALLC staff conducted a computerized search of all clients of SALLC using the list of parties in interest listed in Schedule 1 hereto.

  c.      No connections or potential connections were identified.

  d.      Analyzed with FSS bankruptcy counsel whether having previously served as the CRO of InfoW, LLC, IWHealth LLC and Prison Planet TV LLC created a disqualifying connection or constituted a connection requiring disclosure in the Rule 2014 Statement.

5.      The email and computerized search uncovered no connections other than I and SALLC have worked with many of the same parties and creditors in connection with serving as the CRO and SALLC serving as my staff in the InfoWDebtors bankruptcy cases. The equity in and to the InfoWDebtors had been transferred by Alex Jones to a separate trust, so that Mr. Jones

2

had no ownership interest or control over the equity of those entities. On the other hand, Alex Jones is the sole owner and managing member of FSS.

6.      The Creditors and Parties in Interest and Attorneys for Creditors and Parties in Interest in Schedule 1 is similar to the creditors and parties in interest in the InfoWDebtors bankruptcy cases. As a result of their decision to withdraw their claims against the InfoWDebtors, these same parties are no longer creditors and parties in interest against InfoWDebtors.

7.      The Creditors and Parties in Interest here are adverse to FSS, similar to the position they were against InfoWDebtors. Applicant submits that previously serving as CRO for InfoWDebtors does not create an actual or potential conflict of interest as against the Creditors and Parties in Interest.

8.      Out of an abundance of caution, Applicant sets forth below the chronology of his involvement with InfoWDebtors, and, FSS, to establish that he did not start serving as the CRO for FSS until his mandate under the InfoWDebtors Engagement Agreement had terminated.

9.      *"Connection" to the InfoWDebtors.*  InfoW, LLC, f/k/a Infowars, LLC, IW Health, LLC f/k/a Infowars Health, LLC, Prison Planet TV, LLC (the "InfoWDebtors") were not financially healthy companies with no need to reorganize. Each of the Plaintiffs brought and continued lawsuits against one or more of the InfoWDebtors for over four (4) years. Both the Texas and Connecticut Plaintiffs had obtained judgments with respect to liability. Absent restructuring, the InfoWDebtors did not have the ability to pay any significant judgment or even the already-imposed sanctions. Chapter 11 relief was necessary for the InfoWDebtors.

10.     On April 17 and 18, 2022 (the "Petition Date"), each of the InfoWDebtors commenced a bankruptcy case by filing a petition for relief under chapter 11, subchapter v, of the

002136

Bankruptcy Code with the United States Bankruptcy Court, Southern District of Texas, Victoria Division.

11.      In the InfoWDebtors' bankruptcy cases, Alex Jones and FSS agreed to pay into a trust pursuant to a Plan Support Agreement ("PSA") to be distributed according to a confirmed plan of reorganization (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters.

12.      Immediately after the Petition Date, the Texas Plaintiffs, the Connecticut Plaintiffs and the U.S. Trustee all filed emergency motions to dismiss the bankruptcy cases of the InfoWDebtors. The Texas and Connecticut Plaintiffs did not want to engage in negotiations over the proposed plan treatment with the Debtors, FSS or Alex Jones.

13.      While the InfoWDebtors had filed a series of emergency pleadings to have the former Bankruptcy Judges Nelms and Schmidt to Serve as Trustees of the 2022 Litigation Settlement Trust [ECF No. 6](the "Trustee Motion") and Marc Schwartz serve as the CRO for InfoWDebtors approved [ECF No. 7]("CRO Application"), the Texas Plaintiffs, Connecticut Plaintiffs and the U.S. Trustee all opposed hearings on those emergency motions and requested the Court to consider their emergency motions to dismiss the Chapter 11 Cases first. By the time of dismissal of the InfoWDebtors' bankruptcy cases in June, 2022, the Court had not ruled on the Trustee Motion and the CRO Application.

14.      By May 6, 2022, *only 18 days after the Petition Date*, counsel for both the Texas and Connecticut Plaintiffs announced that they were dismissing their claims against the InfoWDebtors from their respective lawsuits. I directed my bankruptcy counsel to work with Plaintiffs' counsel to make sure that their claims were withdrawn with prejudice against the

4

InfoWDebtors.   The Connecticut Plaintiffs filed motions to dismiss their claims against the InfoWDebtors with prejudice on or about May 13, 2022. The InfoWDebtors finalized, submitted and had the Bankruptcy Court approve the Stipulations of Dismissal of the Texas Plaintiffs Claims with Prejudice by May 19, 2022.

15.      Upon dismissal of the Plaintiffs' claims against the InfoWDebtors, the purpose for the PSA no longer existed and it terminated by its own terms.  While counsel for FSS and Alex Jones advised the Court that the parties would extend the PSA deadlines beyond April, the Amended PSA was negotiated but never executed and the Litigation Trustee's never approved the amendment.

16.      I then conferred with my bankruptcy counsel to determine whether continuation of the subchapter v bankruptcy cases was in the best interest of the estates. First, the InfoWDebtors still had to litigate with the U.S. Trustee as to whether the InfoWDebtors were proper subchapter v debtors. Second, the *raison d'etre* for the bankruptcy (to have the Plaintiffs participate as claimants under the plan of reorganization) no longer existed. Third, I had limited access to funds to administer the estates, in light of breaches under the PSA. Fourth, the dismissals of both Texas and Connecticut Plaintiffs' claims with prejudice left the estate with only four (4) remaining creditors.

17.      I had to decide whether I needed the cost and expense of a chapter 11 to handle the four (4) remaining claims against the InfoWDebtors. I concluded I did not. I then immediately directed my bankruptcy counsel to work with the U.S. Trustee's office in order to have the InfoWDebtors' bankruptcy cases dismissed.

002138

18.     On June 1, 2022, the U.S. Trustee and the Debtors filed a Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. On June 6, 2022, the Bankruptcy Court approved the Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases.

19.     Neither I nor SALLC was contacted about serving as a CRO for Free Speech Systems, LLC until May 19, 2022, when my assignment in the InfoWDebtors bankruptcy case had reached a favorable outcome for those debtors. For all practical purposes, my mandate to reorganize the InfoWDebtors had concluded because the bankruptcy cases no longer had the necessary participants to implement the global settlement. I had nothing to restructure or reorganize of InfoWDebtors at that point. The balance of the work I was performing was ministerial.

20.     As of May 19, 2022 and continuing through today, there is no adversity between any of the dismissed InfoWDebtors and FSS. No default exists under the license agreement between InfoW and FSS. To the best of my knowledge, there are no claims that exist between FSS and the InfoWDebtors. Furthermore, my mandate under the InfoW Engagement Agreement to be "in charge of the Client's restructuring process" terminated by its own terms. InfoW Engagement Agreement, P1. InfoWDebtors no longer needed anyone in charge of the restructuring process because the major claims against them had been withdrawn with prejudice.

21.     Out of an abundance of caution and to assure that the Court and the FSS parties that the CRO does not have biases, I submitted a written resignation of my position as CRO and the resignation of SALLC as my staff to InfoWDebtors to the Trustee of the InfoWDebtors prior to my filing this Declaration.

22.     The results of the foregoing connections search process and Declaration confirm that neither I, SALLC, nor any of its employees or shareholders, to the best of my knowledge, have

6

any disqualifying connections. Neither I nor SALLC (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

### C. Affirmative Statement of Disinterestedness

23.　Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and SALLC are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

24.　I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

25.　SALLC is not a creditor, an equity security holder, or an insider of the Debtor; SALLC is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and SALLC does not have any interest materially adverse to the interests of the Debtor' bankruptcy estates or any class of creditors or equity security holders.

26.　My having previously served as the CRO of InfoWDebtors and the connections to the same parties from that case will not in the slightest degree color my independent and impartial attitude required by the Code. In fact, I believe my previous experience with the parties involved will allow me to negotiate in good faith, foster communication among the constituents and often allow parties to achieve negotiated results rather than litigation.

27.　My previous service as the CRO of InfoWDebtors demonstrates that I faithfully will execute my fiduciary duties. Concerns were expressed at the inception of the InfoWDebtors bankruptcy case whether I would be serving Alex Jones or the creditors of InfoWDebtors. While it would have been beneficial to Alex Jones to contest the withdrawal of claims against the Debtors

7

and prolong those bankruptcy cases, I directed counsel to assure only one thing in those negotiations: Assure that the InfoWDebtors had no more claims that could be asserted against it by the Texas and Connecticut Plaintiffs. Once that was accomplished, I quickly assessed that the best course for those debtors was to solve the remaining debtor-creditor issues outside of chapter 11.

28.     I do not possess or have any economic interest that would tend to lessen the value of the FSS bankruptcy estate. Nor one that would create either an actual or potential dispute in the which the two estates are rival claimants. Even if such a dispute were to arise, I would be representing FSS at this time, as I have resigned from being a CRO at InfoWDebtors. Furthermore, I would most likely have to recuse myself if it involved a matter on which I had done work for InfoWDebtors prior to my being engaged by FSS.

29.     I do not possess a pre-disposition under the circumstances that render such a bias against the estate. I can serve as an effective disinterested fiduciary at FSS.

30.     Finally, SALLC and I were retained pursuant to the Engagement Letter prior to the Petition Date to prepare for the filing. My understanding is that Bankruptcy Code § 1107(b) provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

### D.  Bankruptcy Rule 2016(b) Disclosures

31.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, neither I nor SALLC have shared or agreed to share (a) any of its compensation from the employment by the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.

002141

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 20, 2022,                    By: _____
                                                      W. Marc Schwartz

9

# SCHEDULE 1

## TO SCHWARTZ DECLARATION

### SEARCHED PARTIES

Debtor & Professionals

    Law Office of Ray Battaglia        Shannon  & Lee, PLLC

Debtor's Equity

    Alexander E. Jones

Creditors & Parties in Interest

| | |
|---|---|
| Brennan Gilmore | Leonard Pozner |
| Carlee Soto-Parisi | Marcel Fontaine |
| Carlos Soto | Mark Barden |
| Christopher Sadowski | Neil Heslin |
| Dona Soto | Nicole Hockley |
| Erica Lafferty | PQPR Holdings Limited, LLC |
| Francine Wheeler | Robert Parker |
| Free Speech Systems, LLC | Scarlett Lewis |
| Ian Hockley | Veronique De La Rosa |
| Jacqueline Barden | William Sherlach |
| Jennifer Hensel | William Aledenberg |
| Jeremy Richman | Larry Klayman |
| Jillian Soto | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | McDowell Heterhington LLP |
| Koskoff Koskoff & Bieder | The Akers Law Firm PLLC |
| Fertitta & Reynal LLP | Copycat Legal PLLC |
| Pattis & Smith, LLC | Waller Lansden Dortch & Davis, |
| Zeisler & Zeisler P.C. | LLP |
| Jordan & Ortiz, P.C. | |

U.S. Bankruptcy Judges and Staff

002143

Chief Judge David R. Jones             Tracey Conrad
Judge Marvin Isgur                     Jeannie Chavez
Judge Christopher M. Lopez             LinhThu Do
Judge Jeffrey P. Norman                Tyler Laws
Judge Eduardo V. Rodriguez             Kimberly Picota
Albert Alonzo                          Vriana Portillo
Ana Castro                             Mario Rios


U.S. Trustee Personnel

Alicia Barcomb                         Jayson B. Ruff
Jacqueline Boykin                      Millie Sall
Luci Johnson-Davis                     Patricia Schmidt
Hector Duran                           Christy Simmons
Barbra Griffin                         Gwen Smith
Brian Henault                          Stephen Statham
Linda Motton                           Christopher R. Travis
Ha Nguyen                              Clarissa Waxton
Glenn Otto                             Jana Whitworth
Yasmin Rivera

002144

## <u>EXHIBIT C</u>

**FSS Company Agreement**

### COMPANY AGREEMENT OF
### FREE SPEECH SYSTEMS, LLC

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

1. **Formation of the Company.**

    **1.01  Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

    **1.02  Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

    **1.03  Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

2. **Organization of the Company.**

    **2.01  Name of the Company.** The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

    **2.02  Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

    **2.03  Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

2.04  **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3.  **Definitions.**

3.01  **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Agreement**" means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

"**Capital Contribution**" means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

"**Code**" means to the Internal Revenue Code of 1986, as it has been and may be amended.

"**Company**" means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

"**Company Minimum Gain**" shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Company Property**" or "**Company Properties**" means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

002147

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company.  The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

- 3 -

002148

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interest**" means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

"**Person**" means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

"**Profits**" and "**Losses**" means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

"**Required Interest**" means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

"**Standard Rate**" means a per annum rate of interest equal to ten percent (10%), compounded annually.

"**Tax Distribution**" with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

"**TBOC**" means the Texas Business Organizations Code, as it may be amended from time to time.

002149

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

**3.02   Other Defined Terms.**   Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

**4.   Capital of the Company.**

**4.01   Initial Capital Contributions.** Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

**4.02   Additional Capital Contributions.**  The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers.  For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

**4.03   Failure to Make Additional Capital Contributions.** If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

**4.04   Capital Accounts.**  A Capital Account shall be established and maintained for each Member.  It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations.  In that regard, each Member's Capital Account shall be:

(a)   Increased by:

- 5 -

002150

(i)     The amount of money contributed by that Member to the Company;

(ii)     The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)     Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)     Decreased by:

(i)     The amount of money distributed to that Member by the Company;

(ii)     The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)     Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)     Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

**4.05     Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine.  All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

5.     **Allocations.**

**5.01     Allocation of Profits.** After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

- 6 -

002151

(a)     First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)     Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02    **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)     Losses for any taxable year shall be allocated in the following order and priority;

(i)     First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)     The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03    **Special Allocations.** The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations.   Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)     Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

- 8 -

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

     **5.04**   **Curative Allocations.**  The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04.  Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

     **5.05**   **Section 704(c) Allocations.**  In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

     **5.06**   **Other Allocation Rules.**  In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

     **5.07**   **Allocations on Transfer.**  Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

        (a)    For the months prior to the transfer, to the assignor;

        (b)    For the months subsequent to the transfer, to the assignee; and

002154

(c)     For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6.     **Distributions.**

6.01     **Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.02     **Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)     Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.03     **Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

002155

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

7. **Fiscal Matters; Books and Records.**

**7.01   Bank Accounts; Investments.**  Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments.  Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**7.02   Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

**7.03   Books and Records of Account.**  The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

**7.04   Tax Returns and Information.**  The Members intend for the Company to be treated as a partnership for tax purposes.  The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file.  Within the shorter of:  (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

**7.05   Tax Elections.**  The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

**7.06   "Tax Matters Member."**  The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

002156

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

## 8.    Management of the Company.

**8.01    Management.**  The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation.  The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

**8.02    Powers of Managers/Delegation of Authority.**  The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04.  Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

**8.03    Action by Managers.**  Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held.  No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

## 9.    Membership in the Company.

**9.01    Rights, Powers and Obligations of Members.**  No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**9.02    Action by Members.**  Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

- 12 -

002157

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

### 10.   Restrictions Upon Membership Interests.

**10.01  Generally.**  The ownership and transferability of Interests in the Company are substantially restricted.  Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business.  Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02  Authorized Transfers at Death.**  An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.  However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03  Authorized Estate Planning Transfers.**  An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

- 13 -

**10.04  Nonrecognition of an Unauthorized Transfer.**  The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer").  If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05  Effect of Unauthorized Transfers.**  If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)  The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)  The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)  Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)  Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)  In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate.  The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid.  The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)  Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)  Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06  Deemed Unauthorized Transfers.**  In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

002159

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

(a)     the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

(b)     the Bankruptcy of a Member;

(c)     the appointment of a receiver for all or substantially all of the assets of a Member;

(d)     the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

(e)     a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07   Admission of Substituted Members.

(a)     Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require.   Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

(b)     Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

(i)     the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

(ii)     the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

(iii)     the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

- 15 -

(iv)    the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)    such other conditions as the Managers may reasonably impose.

(c)    In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08  Status of a Substituted Member.**  A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company.  Any such Substituted Member shall be treated as a Member.  In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09  Assignee of a Membership Interest.**  Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10  Membership Interest Pledge or Encumbrance.**  No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest.  It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

## 11.   Dissolution and Winding Up.

**11.01  Events Causing Dissolution.**  The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02  Winding Up.**  If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    Appointment of Liquidator.  The winding up of the Company's affairs shall be supervised by a Liquidator.  The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)    Powers of Liquidator.  In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)     First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)     Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.**  Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 12.    Miscellaneous.

**12.01    Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee.  For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02    Governing Law.**  This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03    Successors and Assigns.**   This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04    Amendment.**  Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05    Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter.  Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06    Creditors Not Benefited.**   Nothing in this Agreement is intended to benefit any creditor of the Company or a Member.  No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07    Arbitration.**  Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

- 18 -

002163

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief.  The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement.  The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

      **12.08  Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

      This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

002164

EXECUTED to be effective as of the Effective Date.

**Members:**

_____
Kelly Jones

_____
Alex Jones

**Managers:**

_____
Alex Jones

SIGNATURE PAGE

002165

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $49.00 | 49% |
| Totals: | $100.00 | 100.00% |

## SCHEDULE B

### DETERMINATION OF FAIR MARKET VALUE
### OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A.  The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B.  Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement.  If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party.  If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed.  Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser.  If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest.  If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C.  For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding.  The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser.  The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D.  During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended.  Upon the final determination of fair market value, all time limits shall automatically commence.

002167

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DEBTOR'S APPLICATION TO EMPLOY THE LAW OFFICES OF RAY BATTAGLIA,
PLLC AS BANKRUPTCY CO-COUNSEL EFFECTIVE AS OF JULY 29, 2022**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ' CONFERENCE ROOM NUMBER IS 590153. YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGELOPEZ" IN THE GOTOMEETTING APP OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE IN THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT-HAND CORNER AND ENTER YOUR NAME UNDER PERSONAL INFORMATION SETTING

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in

the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby file this application (the

"Application") to employ the Law Offices of Ray Battaglia, PLLC (the "Firm") as bankruptcy co-

counsel. Subject to approval by the Bankruptcy Court, the Debtor has engaged the Firm to represent

1

002168

the Debtor as co-counsel commencing as of July 29, 2022, pursuant to an Engagement Agreement, attached hereto as <u>Exhibit A</u>.  In support of the Application, the Debtor submits the Declaration of Ray Battaglia (the "<u>Battaglia Declaration</u>"), attached as <u>Exhibit B</u> hereto, and respectfully states as follows:

<u>**JURISDICTION**</u>

1.      This Court has jurisdiction over this application pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The basis for the relief sought are sections 327(a) and 330 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2014, 2016, and 6003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 2014-1 of the Local Rules for the U.S. Bankruptcy Court for the Southern District of Texas (the "<u>Local Rules</u>").

<u>**BACKGROUND**</u>

**A.      The Debtor**

4.      On July 29, 2022 (the "<u>Petition Date</u>"), the Debtor commenced the Chapter 11 Case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code.

5.      The Debtor continues to operate its business and manage its assets as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.      Proposed Employment of The Firm**

     *i.      Scope of Employment*

6.      Subject to the Court's approval, the Firm will serve as general bankruptcy co-counsel along with Shannon & Lee LLP ("<u>THE FIRM</u>") in connection with the Debtor's Chapter 11 Case.

7.      The Firm is being retained to serve as co-counsel along with THE FIRM.  The two

2

law firms have agreed to a division of labor substantially similar to the manner which multiple attorneys within the same law firm would handle a similar case. Each firm is aware of the need to avoid duplication of effort and have taken steps to minimize the degree to which their services will overlap. THE FIRM will be primarily responsible for the day to day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case. The Firm will provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy. The firms will allocate primary responsibility as appropriate for drafting pleadings and handling contested matters and meetings with the Debtor and opposing counsel. For certain matters it will be necessary to involve more than one lawyer and the firms will jointly handle such matters, mindful of the need to avoid duplication whenever possible.

    *ii.*  *Necessity of Employment*

  8.  The Debtor believes that the assistance of counsel specializing in bankruptcy is necessary and appropriate to administer this Chapter 11 Case. The Debtor cannot proceed in chapter 11 without counsel and would face extreme difficulty complying with the provisions of the Bankruptcy Code and successfully reorganizing their financial affairs for the benefit of their creditors without attorneys who focus their practice on corporate bankruptcy.

    *iii.*  *Reasons for Selection*

  9.  The Debtor selected the Firm as its restructuring co-counsel because of the Firm's recognized expertise in the field of debtors' and creditors' rights and business reorganizations and asset sales under chapter 11 of the Bankruptcy Code. The Debtor believes that the Firm, together THE FIRM as co-counsel, have the knowledge and experience necessary to deal effectively with the issues that will arise in the Chapter 11 Case and that the Firm's representation of the Debtor is critical to the success of the Debtor's reorganization efforts.

  10.  The Debtor believes that the Firm, and especially Mr. Battaglia, are well-qualified

and able to represent the Debtor in this Chapter 11 Case in an efficient and timely manner, together THE FIRM as co-counsel.

    *iv.*      *Proposed Compensation & Reimbursement*

    11.    The Firm intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), and any orders of this Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred during its representation of the Debtor.

    12.    Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, the Debtor proposes to pay the Firm as set out in the Engagement Agreement attached hereto as Exhibit B and as summarized in the following chart:

| BILLER | HOURLY RATE |
|---|---|
| Raymond Battaglia | $500 |

    13.    The Debtor believes that the Firm's agreed terms of reimbursement, compensation, and hourly rates are reasonable. the Firm will notify the Debtor of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

    *v.*      *Retainer*

    14.    In connection with entry into the engagement of the Firm, the Debtor agreed that a retainer (the "Retainer") would be applied to the Firm's professional fees, charges, and disbursements. The Retainer in the amount of $72,000 was paid to the Firm on July 29, 2022, through a wire transfer from Schwartz & Associates. That deposit together with the balance remaining in the firm's Trust Account of from prior representation of FSS left a balance in the retainer account of $77,235.00 as of the

002171

Petition Date.  The Retainer will remain in the Firm's IOLTA trust account as a post-petition retainer to be applied against post-petition fees and expenses after application to and approval by the Court.

15.     As of the Petition Date, the Firm had collected fees and expense in the total amount of $22,150.00 to pay prepetition fees and expenses owed to the Firm in connection with the FSS bankruptcy.

*vi.*     *Connections*

16.     The Battaglia Declaration sets out the Firm's connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, the Firm does not hold any connections other than those disclosed in the Battaglia Declaration.

17.     The Debtor believes that the Firm neither holds nor represents a disqualifying interest that is adverse to the estate and is a "disinterested person."  If any new relevant facts or relationships are discovered, the Firm will supplement its disclosure to the Court.

## **RELIEF REQUESTED**

18.     The Debtor requests that the Court enter an order substantially in the form of the proposed order attached hereto (the "Proposed Order") authorizing the Debtor to retain the Firm as general bankruptcy counsel, pursuant to the terms of the Engagement Agreement, commencing on July 29, 2022.

## **BASIS FOR RELIEF**

19.     Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes trustees—and debtors-in-possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in performing the trustee's duties . . .." Bankruptcy Code § 327(c) provides that "[i]n a case under chapter 7, 12, or 11 of this

5

title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

20.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

> (a)     Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

> (b)     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

### A.     The Firm Meets the Requirements of Bankruptcy Code § 327(a)

21.     Based on the Battaglia Declaration, the Debtor submits that the Firm neither holds nor represents a disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

22.     The term "disinterested person" is defined by the Bankruptcy Code. According to Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

6

23.     The Battaglia Declaration discloses no connections with the Debtor that would disqualify the Firm as a "disinterested person" and the Debtor is aware of no connections in addition to those disclosed in the Battaglia Declaration.

**B.      This Application and the Battaglia Declaration Meet the Requirements of Bankruptcy Rule 2014**

24.     This Application and the Battaglia Declaration meet the requirements as set out in Bankruptcy Rule 2014.  This Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation.  The Battaglia Declaration is a verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that the Firm has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.  The Debtor is not aware of any other connections in addition to those disclosed in the Battaglia Declaration.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the Proposed Order approving the employment of the Firm commencing on July 29, 2022 and grant any other relief that is just and proper.

Dated:August 20, 2022

Respectfully submitted,

W. Marc Schwartz

Chief Restructuring Officer and Authorized Representative of Free Speech Systems, LLC, Debtor and Debtor-in-Possession

7

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

002175

Melissa Haselden                           Attn: Ha M. Nguyen, Jayson B. Ruff
Subchapter V Trustee                       Office of U.S. Trustee
700 Milam, Suite 1300                      515 Rusk, Suite 3516
Houston, TX 77002                          Houston, TX 77002
mhaselden@haseldenfarro.com                ha.nguyen@usdoj.gov
                                           jayson.b.ruff@usdoj.gov


                        /s/ R. J. Shannon
                        R. J. Shannon

002176

## USPS Service List

## Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic

600 New Jersey Avenue, NW
Washington, DC 20001
Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

002177

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

Carol Stream, IL 60197-5001


Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

AT&T
PO Box 5001

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

11

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher Mattei,
Matthew Blumenthal
Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

002179

## **Exhibit A**

Engagement Agreement

**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 GRANBURG CIRCLE
SAN ANTONIO, TEXAS 78218

RAYMOND W. BATTAGLIA [1]
210 601-9405
rbattaglialaw@outlook.com

June 6, 2022

Free Speech Systems LLC                    Via Email: aj76@alexjones.net
Attn: Alex Jones, Manager
3019 Alvin DeVane, Suite 350
Austin, Texas 78741

     Re:    Free Speech Systems, LLC - Chapter 11 Bankruptcy Case

We appreciate being selected to represent Free Speech Systems, LLC ("FSS"). This letter sets forth terms of our engagement. If we provide services to FSS before a signed copy of this letter is returned to us, such services are provided under the terms of this letter. If you have any questions about these terms, please call me.

### Client

Our client is FSS. All communications (including statements for services) will be addressed to you on behalf of FSS. Our representation in this matter is limited to FSS, and the term "FSS" does not include, and our representation of FSS does not mean that we represent any entity owned or controlled by FSS or any of its officers, directors, employees, or agents.

### Scope of Work

We have been engaged by FSS to serve as bankruptcy counsel. Generally, we have been engaged to advise FSS regarding filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. In this regard, we will prepare a voluntary petition together with other pleadings and documents necessary to file for relief under chapter 11 of Title 11 of the U.S. Code in conformity with the requirements of the Bankruptcy Courts for the Southern District of Texas. We will act as FSS's counsel and give advice in connection with the contemplated Chapter 11 proceeding.

We will render such ordinary and necessary legal services as may be required in the course of the Chapter 11 case, including:

    a.  Advising FSS of its rights, powers, and duties as debtors-in-possession in continuing to operate and manage its assets;

    b.  Advising FSS concerning, and assisting in a negotiation of documentation of debtor-in-possession financing agreements, debt restructuring, cash collateral orders and related transactions;

    c.  Reviewing the nature and validity of agreements related to FSS business and assets and

---

[1] BOARD CERTIFIED IN BUSINESS BANKRUPTCY LAW
BY THE TEXAS BOARD OF LEGAL SPECIALIZATION

Free Speech Systems, LLC
June 6, 2022
Page 2

      advising FSS in connection therewith;

d.   Reviewing the nature and validity of liens asserted against FSS and advising FSS concerning the enforceability of such liens;

e.   Advising FSS concerning the actions to be taken to collect and recover property for the benefit of its estate;

f.   Reviewing and assisting FSS with the preparation of all necessary and appropriate applications, motions, pleadings, orders, notices, schedules, and other documents, and reviewing all financial and other reports to be filed in FSS's Chapter 11 case;

g.   Advising FSS concerning, and preparing responses to, applications, motions, pleadings, notices, and other papers which may be filed in FSS's Chapter 11 case;

h.   Counseling FSS in connection with the formulation, negotiation, and promulgation of plans of reorganization and related documents; and

i.   Performing all other legal services which may be necessary or appropriate in the administration of FSS's Chapter 11 case.

Our engagement is limited to providing legal services and does not include accounting, financial, management, or other non-legal services. Additionally, our engagement does not include any existing or future lawsuits which have been or may be filed against FSS. If FSS desires to hire us to represent it in any lawsuit pending or which may be filed, that engagement will be the subject of a separate engagement letter.

**Conflicts of Interest**

You have provided us with a list of the secured creditors of FSS. We understand that the principal parties that are adverse to FSS are plaintiffs in the following lawsuits:

      Marcel Fontaine vs. Alex E., Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels, Cause No. D-1-GN-18-001605 in the 459th Judicial District Court of Travis County, Texas;

      Neil Heslin vs. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC, Cause No. D-1-GN-18-001835 in the 261st Judicial District Court of Travis County, Texas;

      Veronique de la Rosa and Leonard Pozner vs. Alex E. Jones, Inforwars, LLC, and Free Speech Systems, LLC, Cause No. D-1-GN-18-001842 in the 345th Judicial District Court of Travis County, Texas;

Free Speech Systems, LLC - Engagement Letter

002182

Free Speech Systems, LLC
June 6, 2022
Page 3

      Scarlett Lewis vs. Alex E. Jones, Inforwars, LLC, Free Speech Systems, LLC and Owen Shroyer, Cause No. D-1-GN-18-006623 in the 98th Judicial District Court of Travis County, Texas;

      Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

      William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046437-S in the Superios Court of Connecticut, Waterbury Division;

      William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., Cause No. X06-UWY-CV-18-6046438-S in the Superios Court of Connecticut, Waterbury Division; and

      Brennan M. Gilmore v. Alexander ("Alex") E. Jones, Infowars, LLC, Free Speech Systems, LLC, Lee Stanahan, Lee Ann McAdoo a/k/a Lee Ann Fleissner, Scott Creighton, James ("Jim") Hoft, Allen B. West, Derrick Wilburn, Michelle Hickford, and Words-n-Ideas, LLC, Cause No. 3:18-cv-00017-GEC in the United States District Court for the Western District of Virginia, Charlottesville Division;

Additional parties that may be adverse to FSS includes PQPR Holdings Limited. We have checked our conflict of interest records and have found no indication of any current or prior representation that would be a conflict of interest in our representation of FSS. Please note that we previously represented you individually in an unrelated matter, but we are comfortable, that our prior representation does not present any conflicts issues.

If during the course of our representation FSS becomes aware of any other person or entity with interests adverse to FSS in connection with this matter, FSS should promptly advise us so that we can check our records for any conflict

## Cooperation

We will need the full cooperation of FSS and timely and full disclosure of facts. We assume and must rely on the accuracy and completeness of the facts disclosed to us in providing our advice. This is

Free Speech Systems, LLC
June 6, 2022
Page 4

particularly important in order to provide the information necessary to complete the Schedules and Statements of Affairs required to be filed in a chapter 11 case. Accuracy of information is particularly important because many pleadings filed with the Court are filed under penalty of perjury. Failure to provide full disclosure may have other ramifications cause the court to impose sanctions; these may be severe and may include striking defenses or claims, imposing monetary fines or dismissal of the chapter 11 case.

### Certain Relationships

From time to time we represent or may be represented by other lawyers and law firms. We also refer matters to and are referred matters by lawyers and law firms; in some cases, these law firm relationships may be long-standing and involve a network of law firms that regularly refer matters to each other. We do not attempt to determine if any of the lawyers or law firms involved in those relationships are also involved as counsel for any adverse party. We will not advise nor seek the consent of FSS prior to establishing an attorney-client or business referral relationship with a lawyer or law firm in the future.

As a result, it is possible that a party with interests adverse to FSS's interests may be represented by an attorney with a relationship to us of the types described above. None of those relationships will adversely affect or limit our representation of FSS. However, if FSS has concerns regarding specific lawyers or law firms or about our policies generally, please let us know so that we can address those concerns at the outset.

### Personnel

I will have the primary responsibility for representing FSS. On rare occasions, I may sub-contract with other lawyers (including younger lawyers or lawyers who work in different areas from mine), and legal assistants may be involved when I believe it would be beneficial to FSS. We will not charge FSS for services rendered by a lawyer I have retained to assist in this representation without first consulting with FSS and obtaining FSS's approval to engage such a lawyer.

### Evaluations

Although we have discussed the merits of the case, and I may have expressed some tentative views about possible legal strategies that might ultimately lead to a successful result, and we may do so again from time to time, we do not guarantee the outcome of any particular legal controversy or issue. A successful result is not always possible under the applicable facts and law. All of our communications in this matter must necessarily be limited by our knowledge of the facts and will be based on the state of the law as it then exists.

### Records

FSS should retain all originals and copies of documents it desires for future reference. At the conclusion of our representation, we ask that FSS take possession of its file. We will be entitled to make copies if we choose. With respect to all documents FSS delivers to us it is your responsibility to take possession of all documents, such as original contracts, that FSS believe are important and

Free Speech Systems, LLC
June 6, 2022
Page 5

that may be in FSS's file. We shall have no responsibility with regard to such documents.

If FSS does not take possession of FSS's file at the conclusion of the representation, we may store such portions of the file as we believe appropriate for a limited period of time only. Our storage of FSS's file is only for our convenience. We assume no liability for the acts or omissions of the storage facility or for the safekeeping of FSS's file. We may elect at any time to discontinue such storage. During the time that we store the file, FSS may at any time request possession of the file. Ultimately the file will be destroyed if FSS has not taken possession of it. We will not contact FSS prior to such destruction.

## Disclosure to Third Parties

From time to time we use services provided by third parties. These include litigation support, storage, document management, computer systems, information technology services, accounting and financial services, and similar services. We also may use contract lawyers and non-lawyers in certain matters. As a result, these parties may have access to confidential client information. We endeavor to deal only with providers who understand our obligation to maintain the confidences of our clients. If FSS has any concerns about this, please contact us so that we may address those concerns.

## Fees

Our fee is generally based on the time spent by each attorney and legal assistant and the hourly rates we establish based upon the level of expertise of each attorney or legal assistant. The time for which we charge includes all time spent in representing your interests and will include, for example, telephone and office conferences with FSS and its representatives, counsel for other parties, conferences among our legal and non-legal personnel, research and investigation, responses to requests for information, and travel time. Our time is billed in minimum increments of one-tenth of an hour. However, fees derived from these calculations may be modified when we consider other factors involved, such as the novelty and difficulty of the issues involved, the skill required to perform the legal services properly, time constraints which may necessitate extraordinary effort, the amount involved and the results obtained through our services, the likelihood that such employment will preclude other employment, the fee customarily charged by others for similar services, and the nature and length of our relationship with you.

While we do not anticipate doing so, we specifically reserve the right to request that the Bankruptcy Court presiding over the FSS bankruptcy case award enhanced or bonus fees in this case should circumstances (including, but not limited to risk of non-payment and results obtained) warrant such a request.

My current hourly rate for this engagement is $500.00. Our rates are reviewed periodically and may be adjusted without notice.

## Additional Charges

We do not charge for normal internal office expenses such as long-distance telephone charges and facsimile charges, document copying, printing and scanning expenses, computerized legal and other

Free Speech Systems, LLC
June 6, 2022
Page 6

research systems. We will bill at our actual cost travel expenses, filing and recording fees, charges from outside vendors for printing and postage associated with discovery or service of pleadings, as well as charges for messenger and special delivery services. Charges assessed by outside vendors will be billed at our cost.

If consultants or other support services (e.g., mediators, arbitrators, court reporters, investigators, etc.) are retained or required, FSS will be responsible for paying the fees directly to these individuals or firms. We will advise these providers that they are being retained by FSS and for its benefit and that FSS is responsible for payment of their fees. Those providers may bill FSS directly or may send their bills to us, in which case we will forward them for payment directly to the provider. These invoices should be paid upon allowance by the Court.

### Billing Practices and Payment

Prior to filing the bankruptcy petition, we will apply a portion of the retainer to pay the balance of pre-petition fees and expenses, including the court filing fee. After filing the petition, we are not entitled to receive any compensation from the FSS bankruptcy estate, except upon application as provided by the Bankruptcy Code, Bankruptcy Rules, and Local Rules of Bankruptcy Procedure, and only after the Bankruptcy Court's approval. The Bankruptcy Court may establish an interim compensation procedure, under which we would be authorized to be paid by FSS's bankruptcy estate on a periodic basis during the case, with those payments credited against our final fee award. You authorize us to request the Bankruptcy Court to approve such a procedure, under which we may be paid regularly based upon normal guidelines and hourly rates.

We may, subject to ethical requirements and any limitations imposed by a court, terminate our representation of, or cease further work for FSS if its bankruptcy estate is unable to pay our fees and reimbursable expenses.

### Fee Estimates

We may, from time to time, give you estimates of fees and expenses for the matter. However, actual fees and expenses that are incurred are determined by a number of factors, many of which are beyond our control, particularly when other parties are involved. Our estimate is only an estimate, not a budget or cap, and our fees may exceed the estimate.

### Retainer

When undertaking work for a new client, we require a retainer. Our retainer for this particular matter is $72,000.00. The requested retainer is not an estimate of our fees and expenses in this matter. The retainer will be deposited in our trust account, and we will draw against this retainer to satisfy our invoices as of the date of the bankruptcy filing and thereafter as allowed by the Court, copies of all invoices will be sent to you. To the extent funds placed in our pooled trust account bear interest, such interest will be paid to a charitable foundation in accordance with rules of the State Bar of Texas.

Free Speech Systems, LLC
June 6, 2022
Page 7

The retainer may be paid by physical check, eCheck or wire transfer at your election. If you wish to pay by eCheck, I will send you an electronic retainer request containing a link and instructions. If you prefer to pay by wire transfer, our wire transfer information is as follows:

Broadway National Bank
ABA/Routing #: 114021933
For Further Credit to:
Law Offices of Ray Battaglia PLLC
IOLTA Account 4100058943

### Termination

FSS may terminate our employment at any time by notifying us. We may withdraw from our representation of FSS by notifying FSS in writing. In either case, our withdrawal will be accomplished subject to applicable ethical requirements and any necessary court approval. Upon termination of our representation, FSS will be obligated to pay us for all services rendered and expenses incurred through the date of termination.

### Applicable Law

This engagement letter and FSS's and our rights and obligations hereunder are governed by the laws of the State of Texas.

### Independent Legal Review

We have written this engagement letter on our own behalf. FSS should feel free to seek independent legal advice from independent legal counsel regarding this engagement letter. We will provide FSS with names of counsel with whom to discuss the terms of this engagement letter if FSS requests.

### Attorney Complaint Information

Although we intend to maintain the high standard of ethical conduct towards FSS and others as set out and enforced by the State Bar of Texas, if for any reason FSS believes an attorney in our Firm has violated the written rules of professional conduct for lawyers and has questions prior to filing a grievance, FSS may either contact the Office of the Chief Disciplinary Counsel of the State Bar of Texas by calling 1-866-224-5999 (toll free) or writing to P. O. Box 12487, Austin, Texas 78711-2487. Please note that by signing the grievance form any attorney-client privilege which would otherwise keep discussions between FSS's attorney and FSS confidential will be waived.

### Electronic Mail

In the course of our representation, we may have occasion to communicate with FSS and with others by electronic mail. Such communications will not be encrypted. Although interception of such communications by a third party would constitute a violation of federal law, we can offer no assurance that such interception will not occur. We will abide by any instructions FSS may give us concerning electronic mail communications; in the absence of such instructions, we will use our own judgment

Free Speech Systems, LLC - Engagement Letter

Free Speech Systems, LLC
June 6, 2022
Page 8

regarding the advisability of using such means of communication.

**Texas Lawyer's Creed**

On November 7, 1989, the Supreme Court of Texas adopted the Texas Lawyer's Creed - a Mandate for Professionalism. Paragraph II, subparagraph 1 of the Creed requires us to advise FSS of its contents when we undertake representation. A copy of the Creed is enclosed. We intend to abide by the Creed.

Our representation in this matter will not commence until we have received a signed copy of the engagement letter and all other items required by it. Please sign and return the enclosed copy of this letter together with the fixed fee set out above. We look forward to representing FSS.
Very truly yours,

THE LAW OFFICES OF RAY BATTAGLIA, PLLC

BY: _____
Ray Battaglia, Managing Member


Enclosure


**FREE SPEECH SYSTEMS, LLC AGREES TO RETAIN
THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
ON THE FOREGOING TERMS.**


By: _____
Name: Alex Jones.
Managing Member


Dated: __6 - 6 , 22_____

# THE TEXAS LAWYER'S CREED—
# A MANDATE FOR PROFESSIONALISM

### Adopted November 7, 1989

*Table of Contents*

ORDER OF ADOPTION

THE TEXAS LAWYER'S CREED–A MANDATE
FOR PROFESSIONALISM

I.   Our Legal System
II.  Lawyer to Client.
III. Lawyer to Lawyer.
IV.  Lawyer to Judge.

---

## ORDER OF ADOPTION

The conduct of a lawyer should be characterized at all times by honesty, candor, and fairness. In fulfilling his or her primary duty to a client, a lawyer must be ever mindful of the profession's broader duty to the legal system.

The Supreme Court of Texas and the Court of Criminal Appeals are committed to eliminating a practice in our State by a minority of lawyers of abusive tactics which have surfaced in many parts of our country. We believe such tactics are a disservice to our citizens, harmful to clients, and demeaning to our profession.

The abusive tactics range from lack of civility to outright hostility and obstructionism. Such behavior does not serve justice but tends to delay and often deny justice. The lawyers who use abusive tactics instead of being part of the solution have become part of the problem.

The desire for respect and confidence by lawyers from the public should provide the members of our profession with the necessary incentive to attain the highest degree of ethical and professional conduct. These rules are primarily aspirational. Compliance with the rules depends primarily upon understanding and voluntary compliance, secondarily upon re-enforcement by peer pressure and public opinion, and finally, when necessary, by enforcement by the courts through their inherent powers and rules already in existence.

These standards are not a set of rules that lawyers can use and abuse to incite ancillary litigation or arguments over whether or not they have been observed.

We must always be mindful that the practice of law is a profession. As members of a learned art, we pursue a common calling in the spirit of public service. We have a proud tradition. Throughout the history of our nation, the members of our citizenry have looked to the ranks of our profession for leadership and guidance. Let us now as a profession each rededicate ourselves to practice law so we can restore public confidence in our profession, faithfully serve our clients, and fulfill our responsibility to the legal system.

The Supreme Court of Texas and the Court of Criminal Appeals hereby promulgate and adopt "The Texas Lawyer's Creed–A Mandate for Professionalism" as attached hereto and made a part hereof.

In Chambers, this 7th day of November 1989.

## THE TEXAS LAWYER'S CREED–A MANDATE FOR PROFESSIONALISM

I am a lawyer. I am entrusted by the People of Texas to preserve and improve our legal system. I am licensed by the Supreme Court of Texas. I must therefore abide by the Texas Disciplinary Rules of Professional Conduct, but I know that professionalism

## TEXAS LAWYER'S CREED

requires more than merely avoiding the violation of laws and rules. I am committed to this creed for no other reason than it is right.

## I. OUR LEGAL SYSTEM

A lawyer owes to the administration of justice personal dignity, integrity, and independence. A lawyer should always adhere to the highest principles of professionalism.

1. I am passionately proud of my profession. Therefore, "My word is my bond."

2. I am responsible to assure that all persons have access to competent representation regardless of wealth or position in life.

3. I commit myself to an adequate and effective pro bono program.

4. I am obligated to educate my clients, the public, and other lawyers regarding the spirit and letter of this Creed.

5. I will always be conscious of my duty to the judicial system.

## II. LAWYER TO CLIENT

A lawyer owes to a client allegiance, learning, skill, and industry. A lawyer shall employ all appropriate legal means to protect and advance the client's legitimate rights, claims, and objectives. A lawyer shall not be deterred by any real or imagined fear of judicial disfavor or public unpopularity, nor be influenced by mere self-interest.

1. I will advise my client of the contents of this creed when undertaking representation.

2. I will endeavor to achieve my client's lawful objectives in legal transactions and in litigation as quickly and economically as possible.

3. I will be loyal and committed to my client's lawful objectives, but I will not permit that loyalty and commitment to interfere with my duty to provide objective and independent advice.

4. I will advise my client that civility and courtesy are expected and are not a sign of weakness.

5. I will advise my client of proper and expected behavior.

6. I will treat adverse parties and witnesses with fairness and due consideration. A client has no right to demand that I abuse anyone or indulge in any offensive conduct.

7. I will advise my client that we will not pursue conduct which is intended primarily to harass or drain the financial resources of the opposing party.

8. I will advise my client that we will not pursue tactics which are intended primarily for delay.

9. I will advise my client that we will not pursue any course of action which is without merit.

10. I will advise my client that I reserve the right to determine whether to grant accommodations to opposing counsel in all matters that do not adversely affect my client's lawful objectives. A client has no right to instruct me to refuse reasonable requests made by other counsel.

11. I will advise my client regarding the availability of mediation, arbitration, and other alternative methods of resolving and settling disputes.

## III. LAWYER TO LAWYER

A lawyer owes to opposing counsel, in the conduct of legal transactions and the pursuit of litigation, courtesy, candor, cooperation, and scrupulous observance of all agreements and mutual understandings. Ill feelings between clients shall not influence a lawyer's conduct, attitude, or demeanor toward opposing counsel. A lawyer shall not engage in unprofessional conduct in retaliation against other unprofessional conduct.

1. I will be courteous, civil, and prompt in oral and written communications.

2. I will not quarrel over matters of form or style, but I will concentrate on matters of substance.

3. I will identify for other counsel or parties all changes I have made in documents submitted for review.

4. I will attempt to prepare documents which correctly reflect the agreement of the parties. I will not include provisions which have not been agreed upon or omit provisions which are necessary to reflect the agreement of the parties.

5. I will notify opposing counsel, and, if appropriate, the Court or other persons, as soon as practicable, when hearings, depositions, meetings, conferences, or closings are cancelled.

6. I will agree to reasonable requests for extensions of time and for waiver of procedural formalities, provided legitimate objectives of my client will not be adversely affected.

## TEXAS LAWYER'S CREED

7.   I will not serve motions or pleadings in any manner that unfairly limits another party's opportunity to respond.

8.   I will attempt to resolve by agreement my objections to matters contained in pleadings and discovery requests and responses.

9.   I can disagree without being disagreeable.   I recognize that effective representation does not require antagonistic or obnoxious behavior.   I will neither encourage nor knowingly permit my client or anyone under my control to do anything which would be unethical or improper if done by me.

10.   I will not, without good cause, attribute bad motives or unethical conduct to opposing counsel nor bring the profession into disrepute   by   unfounded   accusations   of impropriety.   I will avoid disparaging personal remarks   or   acrimony   towards   opposing counsel, parties, and witnesses.   I will not be influenced by any ill feeling between clients.   I will abstain from any allusion to personal peculiarities or idiosyncrasies of opposing counsel.

11.   I will not take advantage, by causing any default or dismissal to be rendered, when I know the identity of an opposing counsel, without first inquiring about that counsel's intention to proceed.

12.   I will promptly submit orders to the Court.   I will deliver copies to opposing counsel before or contemporaneously with submission to the Court.   I will promptly approve the form of orders which accurately reflect the substance of the rulings of the Court.

13.   I will not attempt to gain an unfair advantage by sending the Court or its staff correspondence or copies of correspondence.

14.   I will not arbitrarily schedule a deposition, court appearance, or hearing until a good faith effort has been made to schedule it by agreement.

15.   I will readily stipulate to undisputed facts in order to avoid needless costs or inconvenience for any party.

16.   I will refrain from excessive and abusive discovery.

17.   I will comply with all reasonable discovery requests.   I will not resist discovery requests which are not objectionable.   I will not make objections nor give instructions to a witness for the purpose of delaying or obstructing the discovery process.   I will encourage witnesses to respond to all deposition questions which are reasonably understandable.   I will neither encourage nor permit my witness to quibble about words where their meaning is reasonably clear.

18.   I will not seek Court intervention to obtain discovery which is clearly improper and not discoverable.

19.   I will not seek sanctions or disqualification unless it is necessary for protection of my client's lawful objectives or is fully justified by the circumstances.

## IV. LAWYER AND JUDGE

Lawyers and judges owe each other respect, diligence, candor, punctuality, and protection   against   unjust   and   improper criticism and attack.   Lawyers and judges are equally responsible to protect the dignity and independence of the Court and the profession.

1.   I will always recognize that the position of judge is the symbol of both the judicial system and administration of justice.   I will refrain from conduct that degrades this symbol.

2.   I will conduct myself in Court in a professional manner and demonstrate my respect for the Court and the law.

3.   I will treat counsel, opposing parties, the Court, and members of the Court staff with courtesy and civility.

4.   I will be punctual.

5.   I will not engage in any conduct which offends the dignity and decorum of proceedings.

6. I will not knowingly misrepresent, mischaracterize, misquote or miscite facts or authorities to gain an advantage.

7.   I will respect the rulings of the Court.

8.   I will give the issues in controversy deliberate, impartial and studied analysis and consideration.

9.   I will be considerate of the time constraints and pressures imposed upon the Court, Court staff and counsel in efforts to administer justice and resolve disputes.

**<u>EXHIBIT B</u>**

Battaglia Declaration

002192

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DECLARATION OF RAYMOND W. BATTAGLIA IN SUPPORT OF THE DEBTOR'S**
**APPLICATION TO EMPLOY THE LAW OFFICES OF RAY BATTAGLIA, PLLC AS**
**BANKRUPTCY CO-COUNSEL**

I, Raymond W. Battaglia, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State of Texas, the United States District Court for the Southern, Western and Northern Districts of Texas, and the Fifth Circuit Court of Appeals. As of July 29, 2022, I am a sole member of the Law Offices of Ray Battaglia, PLLC ("the Firm"), located at 66 Granburg Circle, San Antonio, Texas 78218. My email address is rbattaglialaw@outlook.com.

2.      I am making this Declaration in support of the Debtor's Application to Employ the Law Offices of Ray Battaglia, PLLC as Bankruptcy Co-Counsel, Commencing as of July 29, 2022 (the "Application").  Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed in the Application.

3.      Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, upon the client and matter records of the Firm reviewed by me or derived from information available to me that I believe to be true and correct.

1

002193

A.      **Scope of Services**

4.      Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, the Firm will serve as bankruptcy co-counsel to the Debtor in connection with the Chapter 11 Case for the period commencing on July 29, 2022. In connection with this representation, the Firm will take all necessary and appropriate actions to administer the Debtor's Chapter 11 Case.

B.      **Proposed Compensation**

5.      the Firm will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtor.

6.      Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, the Firm intends to request the allowance of its compensation as set out in the Engagement Agreement and as summarized in the following chart:

| BILLER | HOURLY RATE |
|---|---|
| Raymond Battaglia | $500 |

7.      These rates reflect the rates that the Firm ordinarily charges clients in bankruptcy and non-bankruptcy matters and are less than or equal to the rates of similarly skilled and experienced attorneys who practice in this district on similar chapter 11 bankruptcy cases. the Firm submits that these agreed terms of reimbursement, compensation, and hourly rates are reasonable. the Firm will notify the Debtor of any change in the hourly rates charged for services rendered.

002194

**C.      Retainer & Prepetition Payments**

8.      The Debtor engaged the Firm to advise the Debtor regarding filing bankruptcy prior to the Petition Date on June 6, 2022.

9.      In connection with entry into the engagement of the Firm, the Debtor agreed that a retainer (the "<u>Retainer</u>") would be applied to the Firm's professional fees, charges, and disbursements. The Initial Retainer in the amount of $72,000 was received which, combined with the balance of the retainer held by the Firm in connection with its prior engagement, resulted in a balance in the Retainer of $77,235 as of the Petition Date.  Prior to the Petition Date, the Firm had been paid $22,150 to pay prepetition fees and expenses owed to the Firm.  The balance of Retainer will remain in the Firm's IOLTA trust account as a post-petition retainer to be applied against post-petition fees and expenses after application to and approval by the Court.

**D.      Disclosure of Connections**

10.      the Firm performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtor, creditors, any other party in interest, their respect attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas.  I conducted a search of the Firm files to determine using the list of parties listed in Schedule 1 hereto whether the firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the Firm has previously represented Alex Jones in connection with an involuntary petition filed by his ex-wife in the U.S. Bankruptcy Court for the Western District of Texas (the "Involuntary").

11.      The Firm substituted in the Involuntary while pending and after prior counsel had filed a motion for summary judgment.  The Firm was engaged on or about May 5, 2020.  The court presiding over the Involuntary granted summary judgment and dismissed the case on May 27, 2020.  The Firm

3

terminated its engagement on the Involuntary and has had no further representation of Alex Jones and has never represented any entity owned, controlled, or affiliated with him.

12.     The only other connection to any of the parties on Schedule 1 is by virtue of having represented the Debtor immediately prior to the Petition Date.

13.     I may have represented in the last 40 years of my practice a party or parties related to a creditor in the Chapter 11 Case. If such connections exist, they would be on matters wholly unrelated to the service for which the Debtor seeks to engage the Firm.

**E.     Affirmative Statement of Disinterestedness**

14.     Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I am able to ascertain, the Firm is a "disinterested person" within the meaning of Bankruptcy Code § 101(14).  the Firm is not a creditor, an equity security holder, or an insider of the Debtor; the Firm is not and was not within 2 years before the Petition Date a director, officer, or employee of the Debtor; and the Firm does not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

**F.     Bankruptcy Rule 2016(b) Disclosures**

15.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, the Firm has not shared or agreed to share (a) any of its compensation from the representation of the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.


*[Remainder of Page Intentionally Left Blank]*


4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2022,                    By: _____
                                                        Raymond W. Battaglia

002197

## SCHEDULE 1 TO BATTAGLIA DECLARATION

## SEARCHED PARTIES

Debtor & Professionals

     Shannon & Lee, LLP                Schwartz Associates

Debtor's Equity

     Alexander E. Jones

Largest 20 Unsecured Creditors & Litigation Claimants

| | |
|---|---|
| Elevated Solutions Group | Dona Soto |
| Atomial LLC | Erica Lafferty |
| Cloudfare, Inc. | Francine Wheeler |
| Jacquelyn Blott | Ian Hockley |
| Joel Skousen | Jacqueline Barden |
| eCommerce CDN LLC | Jennifer Hensel |
| Paul Watson | Jeremy Richman |
| Greenair, Inc. | Jillian Soto |
| Edgecast, Inc. | Leonard Pozner |
| Ready Alliance Group, Inc. | Marcel Fontaine |
| Getty Images, Inc. | Mark Barden |
| RatsMedical.com | Neil Heslin |
| David Icke Books Limited | Nicole Hockley |
| WWCR | PQPR Holdings Limited, LLC |
| CustomTattoNow.com | Robert Parker |
| AT&T | Scarlett Lewis |
| Justin Lair | Veronique De La Rosa |
| Brennan Gilmore | William Sherlach |
| Carlee Soto-Parisi | William Aledenberg |
| Carlos Soto | Larry Klayman |
| Christopher Sadowski | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | McDowell Heterhington LLP |
| Koskoff & Bieder | The Akers Law Firm PLLC |
| Fertitta & Reynal LLP | Copycat Legal PLLC |
| Pattis & Smith, LLC | Waller Lansden Dortch & Davis, LLP |
| Zeisler & Zeisler P.C. | Akin Gump Strauss Hauer & Feld LLP |
| Jordan & Ortiz, P.C. | |

U.S. Bankruptcy Judges and Staff

     Chief Judge David R. Jones            Judge Marvin Isgur

Judge Christopher M. Lopez          Jeannie Chavez
Judge Jeffrey P. Norman             LinhThu Do
Judge Eduardo V. Rodriguez          Tyler Laws
Albert Alonzo                       Kimberly Picota
Ana Castro                          Vriana Portillo
Tracey Conrad                       Mario Rios


U.S. Trustee Personnel

    Alicia Barcomb
    Jacqueline Boykin
    Luci Johnson-Davis
    Hector Duran
    Barbra Griffin
    Brian Henault
    Linda Motton
    Ha Nguyen
    Glenn Otto
    Yasmin Rivera
    Jayson B. Ruff
    Millie Sall
    Patricia Schmidt
    Christy Simmons
    Gwen Smith
    Stephen Statham
    Christopher R. Travis
    Clarissa Waxton
    Jana Whitwort

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**ORDER APPROVING DEBTOR'S APPLICATION TO EMPLOY**
**THE LAW OFFICES OF RAY BATTAGLIA, PLLC**
**<u>AS BANKRUPTCY COUNSEL COMMNECING ON JULY 29, 2022</u>**

Upon the application (the "<u>Application</u>") [1] filed by the Debtor to employ the Law Offices of

Ray Battaglia, PLLC ("<u>the Firm</u>") as bankruptcy co-counsel commencing on July 29, 2022,

pursuant to Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, as more fully set

forth in the Application and all exhibits and attachments to the Application; and upon the Court's

finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334;(ii) this is a

core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28

U.S.C. §§ 1408 and 1409; (iv) the Application and the Battaglia Declaration are in full compliance

with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules,

and Orders and procedures of this Court; (v) the Firm does not represent an interest adverse to the

Debtor's estate with respect to the matters upon which it is to be engaged and is a "disinterested

person" within the meaning of that term under § 101(14) of the Bankruptcy Code; (vi) the Firm is

qualified to represent the Debtor's estate under § 327 of the Bankruptcy Code; (vii) the terms of the

Firm's employment have been disclosed and are reasonable under the circumstances; (viii) proper

and adequate notice of the Application, the deadline to file any objections to the Application, and the

hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual bases

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application

set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interests of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at any hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain the Firm commencing on July 29, 2022, as bankruptcy co-counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as <u>Exhibit B</u>.

2.      The Firm is authorized to perform any and all legal services for the Debtor that are necessary or appropriate in connection with the Chapter 11 Case.

3.      The Firm shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      The Firm shall continue to hold the Retainer (as defined in the Application) in trust on behalf of the Debtor, until further order of the Court.

5.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

6.      The Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

7.      The Firm shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

8.      The Firm will review its files periodically during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

9.      This order shall be immediately effective and enforceable upon entry.

10.     This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

11.     The Debtor and the Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

12.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

002202

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTHORIZING EMPLOYMENT
OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR,
AND (B) GRANTING RELATED RELIEF**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU
OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING
PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT
AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.
YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS
WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION
SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF
MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE
APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE
HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER
EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession

in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves for entry of an

order, substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a)

and 327 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of Shannon &

Lee LLP ("S&L" or the "Firm") as bankruptcy co-counsel for FSS (the "Application") pursuant

to that certain engagement letter agreement by and between the Debtor and S&L, a copy of which

is attached hereto as Exhibit A (the "Engagement Agreement"), as modified by the Proposed

Order. In support of the Application, the Debtor submits the Declaration of Kyung S. Lee attached hereto as Exhibit B (the "Lee Declaration") and respectfully represents as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

2.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

3.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (the "Chapter 11 Case") with the Court.

4.      The Debtor continues to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

5.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.     Proposed Employment of S&L

      *i.       Scope of Employment*

6.      Subject to the Court's approval, S&L will serve as bankruptcy co-counsel in connection with the Debtor's Chapter 11 Case, commencing on July 29, 2022.

002204

ii.      *Necessity of Employment*

7.      The Debtor believes that the assistance of counsel specializing in bankruptcy was and is necessary and appropriate to administer this Chapter 11 Case with the goal of ultimately confirming a plan of reorganization. The Debtor cannot proceed in chapter 11 without counsel and would face extreme difficulty complying with the provisions of the Bankruptcy Code and successfully reorganizing its financial affairs for the benefit of its creditors without attorneys who focus their practice on corporate bankruptcy.

iii.     *Reasons for Selection*

8.      The Debtor seeks to retain S&L because of the extensive experience of its attorneys. Mr. Shannon and Mr. Lee have extensive experience in all aspects of corporate bankruptcy and in representing chapter 11 debtors in this district. Further, due to their involvement in the bankruptcy cases of the InfoWDebtors (defined below), S&L attorneys have familiarity with the Debtor's corporate structure, the litigation brought against the Debtor related to statements after the Sandy Hook mass shooting (the "Sandy Hook Litigation"), and many of the relevant creditors and parties in interest.  Familiarity with the Sandy Hook Litigation has been particularly important in the early stages of the Chapter 11 Case.

9.      S&L is familiar with the Debtor's financial condition in connection with the preparation of the Debtor's petition, schedules, and statement prior to the Petition Date. Substantial effort was also expended by the CRO to bringing the books and records of FSS up to speed prior to the Petition Date. The CRO also spent significant time to understanding the commercial and vendor relationship forming the core basis of FSS's business.  S&L was intimately involved in that entire learning process.

3

10.     Any other firm would need to expend significant time and effort to become familiar with the Debtor's business and business model that would delay making progress in administering the Chapter 11 Case.

11.     The Debtor therefore believes that S&L is well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner as bankruptcy co-counsel for FSS.

    *iv.*     *Proposed Compensation & Reimbursement*

12.     S&L intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the U.S. Trustee, and any orders of this Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred during its representation of the Debtor.

13.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, the Debtor proposes to pay S&L as set out in the Engagement Agreement attached hereto as Exhibit B and as summarized in the following chart:

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| RJ Shannon | $650 |
| Associate Attorneys | $300 - $650 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

14.     The Debtor believes that S&L's agreed terms of reimbursement, compensation, and hourly rates are reasonable. S&L will notify the Debtor and the U.S. Trustee of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

002206

*v.*      *Retainer*

15.      Effective as of June 1, 2022, Kyung Lee and R. J. Shannon formed the law firm of Shannon & Lee LLP to practice corporate bankruptcy law. Mr. Shannon and Lee are the only two attorneys of S&L. On June 6, 2022, FSS executed the Engagement Letter and retaining S&L.[1] FSS paid S&L a retainer of $100,000 on or about June 7, 2022, that was held in trust in S&L's IOLTA account.

16.      On July 28, 2022, (a) FSS paid S&L $84,034.12 for work performed by S&L during the month of June 2022 and (b) S&L took into income $99,177.32 from the $100,000 retainer for work performed by S&L from July 1 to July 29, 2022.[2] $822.68 remained in the S&L IOLTA account.

17.      On July 29, 2022, prior to the filing of its petition for chapter 11 relief, FSS replenished S&L's IOLTA account with a wire transfer of $50,000. The total amount of retainer S&L held in its IOLTA account on behalf of FSS on the Petition Date was $50,822.68 (the "Retainer"). S&L continues to hold the Retainer in trust in its IOLTA Account.

18.      The Proposed Order provides that S&L shall continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

*vi.*      *Connections*

19.      The Lee Declaration sets out S&L's connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and

---

[1] The Engagement Letter was effective May 24, 2022, on which date Kyung Lee began providing services to FSS, practicing through Kyung S. Lee PLLC ("KSLPLLC"). KSLPLLC received payment from the Debtor of $21,986.59 for services provided to FSS from May 24, 2022, through May 31, 2022.

[2] This amount included an estimate of six hours of services for each of Mr. Shannon and Mr. Lee on July 28 and July 29, 2022. The actual time expended exceeded the estimate.

002207

any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, S&L does not hold any connections other than those disclosed in the Lee Declaration.

20.     Mr. Shannon and Mr. Lee previously represented InfoW, LLC, IWHealth, LLC, and Prison Planet TV, LLC (the "InfoWDebtors"), in the cases jointly administered as Case No. 22-60020 before this Court.[3] One or more of the InfoWDebtors were defendants in the Sandy Hook Litigation. On May 13, 2022, the Connecticut Sandy Hook plaintiffs filed notices of dismissal with prejudice as to their claims against the InfoWDebtors.[4] *See* Dkt. No. 98, Case No. 22-60020 (Bankr. S.D. Tex.). On May 18, 2022, the Texas Sandy Hook plaintiffs and the InfoWDebtors entered a stipulation to resolve their claims against the InfoWDebtors, which was approved and ordered by the Court on May 19, 2022. *See* Dkt. Nos. 96 and 98, Case No. 22-60020 (Bankr. S.D. Tex.). The InfoWDebtors and the U.S. Trustee agreed to the dismissal of the InfoWDebtors' chapter 11 cases on June 1, 2022, which dismissal was ordered by the Court on June 10, 2022. Dkt. Nos. 110 and 114, Case No. 22-60020 (Bankr. S.D. Tex.). The Debtor does not have any claims against the InfoWDebtors and does not believe that the InfoWDebtors have any claims against the Debtor.

21.     The Debtor believes that S&L neither holds nor represents a disqualifying interest that is adverse to the estate and is a "disinterested person."  If any new relevant facts or relationships are discovered, S&L will supplement its disclosure to the Court.

---

[3] The InfoWDebtors' applications to employ of Parkins & Rubio LLP and KSLPLLC were never approved in the InfoWDebtors' chapter 11 cases.

[4] Upon the dismissal with prejudice of the Connecticut Sandy Hook plaintiffs' claims against the InfoWDebtors—and the then forthcoming dismissal of claims with prejudice of the Texas Sandy Hook plaintiffs—the restructuring contemplated by the Plan Support Agreement at in the InfoWDebtors' bankruptcy case was no longer possible.

002208

*vii.*    *Co-Counsel Relationship*

22.    S&L is being retained to serve as co-counsel for FSS along with The Law Offices of Ray W. Battaglia, PLLC (the "<u>Battaglia Firm</u>").  The two law firms have agreed to a division of labor substantially like the manner which multiple attorneys within the same law firm would handle a similar case.  Each firm is aware of the need to avoid duplication of effort and have taken steps to minimize the degree to which their services will overlap.  S&L will be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case.  The Battaglia Firm will provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy.  The firms will allocate primary responsibility as appropriate for drafting pleadings and handling contested matters and meetings with the Debtor and opposing counsel.  For certain matters it will be necessary to involve more than one lawyer and the firms will jointly handle such matters, mindful of the need to avoid duplication whenever possible.

## RELIEF REQUESTED

23.    The Debtor requests that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtor to retain S&L as bankruptcy co-counsel, pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order, effective as of July 29, 2022.

## BASIS FOR RELIEF

24.    Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the

7

trustee's duties . . . ."  Bankruptcy Code § 327(c) provides that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

25.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

> (a)     Be filed by the trustee or committee and served on the United States Trustee (except in case under chapter 9 of the Bankruptcy Code);
>
> (b)     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and
>
> (c)     Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**A.     S&L Meets the Requirements of Bankruptcy Code § 327(a)**

26.     Based on the Lee Declaration, the Debtor submits that S&L neither holds nor represents a disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

27.     The term "disinterested person" is defined by the Bankruptcy Code. According to Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have

8

> an interest materially adverse to the interest of the estate or of any
> class of creditors or equity security holders, by reason of any direct
> or indirect relationship to, connection with, or interest in, the debtor,
> or for any other reason.

28.     The Lee Declaration discloses no connections with the Debtor that would disqualify S&L as a "disinterested person" and the Debtor is aware of no connections in addition to those disclosed in the Lee Declaration.

**B.      This Application and the Lee Declaration Meet the Requirements of Bankruptcy Rule 2014**

29.     This Application and the Lee Declaration meet the requirements as set out in Bankruptcy Rule 2014.  This Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation.  The Lee Declaration is a verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that S&L has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.  The Debtor is not aware of any other connections in addition to those disclosed in the Lee Declaration.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the Proposed Order approving the employment of S&L commencing on July 29, 2022, and grant any other relief that is just and proper.

[*Remainder of Page Intentionally Left Blank*]

9

Dated: August 20, 2022

Respectfully submitted,

W. Marc Schwartz
Chief Restructuring Officer and Authorized
Representative of Free Speech Systems,
LLC, Debtor and Debtor-in-Possession

10

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

*/s/R. J. Shannon*

12

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

002215

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

14

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

15

002217

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

ORDER APPROVING DEBTOR'S APPLICATION
TO EMPLOY SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL

Upon the application (the "Application")[1] filed by the Debtor to retain and employ Shannon

& Lee LLP ("S&L") pursuant to Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule

2014-1, as more fully set forth in the Application and all exhibits and attachments to the

Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter

pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii)

venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the

Lee Declaration are in full compliance with all applicable provisions of the Bankruptcy Code,

Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) S&L

does not represent an interest adverse to the Debtor's estate with respect to the matters upon which

it is to be engaged and is a "disinterested person" within the meaning of that term under § 101(14)

of the Bankruptcy Code; (vi) S&L is qualified to represent the Debtor's estate under § 327 of the

Bankruptcy Code; (vii) the terms of S&L's employment have been disclosed and are reasonable

under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file

any objections to the Application, and the hearing thereon was given, and no other or further notice

---

[1]     Capitalized terms not defined herein have the meaning set forth in the Application.

is necessary; (ix) the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interest of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain S&L commencing on the Petition Date, as bankruptcy co-counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.      S&L is authorized to perform any and all legal services for the Debtor that are necessary or appropriate in connection with the Chapter 11 Case.

3.      S&L shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      S&L shall continue to hold the Retainer (as defined in the Application) in trust on behalf of the Debtor, until further order of the Court.

5.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

6.      This order shall be immediately effective and enforceable upon entry.

7.      This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

8.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, S&L shall not be entitled to reimbursement of expenses or fees from the Debtor in connection with any objection to its fees, without further order of the Court.

9.      S&L shall not charge a markup to the Debtor with respect to any fees billed by contract attorneys who are hired by S&L to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflicts checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

10.     S&L shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

11.     S&L shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

12.     S&L will review its files periodically during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, S&L will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

13.     To the extent that any of the Application, the Lee Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

14.     The Debtor and S&L are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

002221

## **Exhibit A**

Engagement Agreement



**Kyung S. Lee**
Attorney at Law

Pennzoil Place
700 Milam St.
Suite 1300
Houston, TX 77002

## SHANNON & LEE LLP

klee@kslpllc.com | Direct: 713-301-4751

June 6, 2022

**PRIVILEGED AND CONFIDENTIAL**

Alex E. Jones
Managing Member
Free Speech Systems, LLC
910 West Mary Street
Austin, Texas 78704

      Re: <u>Attorney Engagement Letter of Shannon & Lee LLP by Free Speech Systems, LLC</u>

Dear Mr. Jones:

      Thank you for selecting Shannon & Lee LLP ("<u>S&L</u>" or the "<u>Firm</u>") as legal counsel for Free Speech Systems, LLC ("<u>FSS</u>", "<u>you</u>" or "<u>Client</u>"). We appreciate the trust and confidence that your decision places in us and we look forward to building a close and mutually rewarding relationship.

      The purpose of this letter and the attached Terms of Retention (together, the "<u>Engagement Letter</u>") is to set forth the terms of legal representation of the above referenced Client.

      *Scope of Engagement.* S&L shall serve as attorney and legal counsel for the Client in connection with the following (the "<u>Matter</u>"): Serve as co-restructuring counsel for the Client, effective as of May 24, 2022.[1]

      *Legal Fees and Expenses.* For the work performed by S&L for the Client, S&L shall be entitled to a fee in the amount equal to the time expended by each attorney, paralegal and other staff member multiplied by the hourly rates set forth in the attached Hourly Billing Rate Schedule. The Client is responsible for reimbursing the Firm for expenses incurred on behalf of the Client pursuant to the attached Client Expense Policy.

---

[1] As S&L was formed on June 1, 2022, fees earned prior to June 1, 2022 shall be allocated to the respective professional liability company between the two partners. For work performed and fees earned after June 1, 2022, such fees shall be deemed to be earned by S&L. This notice is being provided due to recent departure of the two partners from their previous law firms and practice of law with their respective limited liability companies during the stub period of May 15, 2022 through June 1, 2022.

Alex E. Jones
June 6, 2022
Page 2 of 11

*Retainer.* As a condition to S&L accepting this engagement on your behalf, you have agreed to provide a retainer of $1000,000.00 (the "<u>Retainer</u>") in connection with this Matter. The instructions for remitting the retainer funds to the Firm will be provided in a separate electronic correspondence. The Retainer will serve as a security deposit and will be applied towards your final invoice for this Matter. Any balance will be returned to you. If you do not pay your invoices timely, the Firm may apply the Retainer to an unpaid invoice. The Firm reserves the right to have the Retainer replenished by the Client if the Firm anticipates that there is a risk in collecting future attorney's fees and/or reimbursement of costs. Prior to filing for bankruptcy, the Firm shall take into income any fees and costs incurred and invoiced such that the Firm and the Client do not have a debtor-creditor relationship as of the filing date.

*Invoices/Fee Statements.* The Firm's invoices will be issued to you during the month, if not more often, following the month that services are provided. The invoice will include a fee statement providing the details of the legal services performed, and the expenses incurred, for the Client. The invoices shall be informational only and shall be paid upon allowance by a Bankruptcy Court order.

*Conflicts.* The Firm has conducted an initial conflicts search based on information you provided. The Firm did not identify any connection that would prevent the Firm from representing you in this Matter. S&L may conduct additional conflicts searches following the commencement of this engagement. If the Firm identifies any conflict, then the Firm shall immediately notify the Client and the Firm and the Client shall take further actions as may reasonably be required to satisfy the Firm's ethical obligations and duties to the Client, all as more particularly described in the Terms of Retention.

The two partners of S&L have acted as general bankruptcy counsel for InfoW, LLC, IWHealth, LLC and Prison Private tv Ltd. These three companies were affiliates of FSS, have license agreements with FSS and are in the process of having their Subchapter v bankruptcy cases dismissed. If any issues arise in connection with the license agreement between the FSS and InfoW, S&L intends to have co-counsel or conflict counsel matters related to such dispute. Otherwise, the Firm does not believe that such connection precludes it from representing FSS on the matters to which it is being asked to be engaged.

*General Prospective Waiver and Informed Consent.* The Firm represents many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future Clients will have disputes or transactions with you. You agree that we may continue to represent or may undertake in the future to represent existing or new Client in any business or transactional matter that is not substantially related to our work for you, even if the interests of such Client in those other matters are directly adverse to you. We are not aware of any such matters at the present time. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage. <u>*You are not giving the Firm a prospective waiver as to conflicting representation related to a litigation matter against you.*</u> We encourage you to seek independent counsel regarding the import of the potential conflicts and prospective waiver discussed and this acknowledgment, waiver and informed consent. We

Alex E. Jones
June 6, 2022
Page 3 of 11

emphasize that you remain completely free to seek independent counsel at any time even if you decide to sign this Engagement Letter agreeing to its terms and the Terms of Retention.

Please call me with any questions you have after you complete your review of this Engagement Letter including the Terms of Retention. If the Engagement Letter is acceptable to you in this form, please indicate so by signing, dating, and returning it to me and funding the Retainer.

Very truly yours,

*Kyung S. Lee*

Kyung S. Lee
Kyung S. Lee PLLC
Shannon & Lee LLP

ACCEPTED AND AGREED:

Free Speech Systems, LLC

Authorized Officer of Free Speech Systems, LLC

Dated

Alex E. Jones
June 6, 2022
Page 4 of 11

## ADDENDUM TO ENGAGEMENT LETTER

The appropriate Client point of contact to address payment status:

Name:
Title:
Phone:
Work Email:


Invoices are to be delivered as follows:

☐ By email: _____

    Email: _____

☐ By regular mail:

Address: _____

    _____

    _____

Alex E. Jones
June 6, 2022
Page 5 of 11

## TERMS OF RETENTION

These Terms of Retention are part of the S&L Engagement Letter. Because they are an integral part of our agreement to provide legal services, we ask that you review this document carefully. If you have any questions after reading it, please contact us promptly.

*Who Will Provide Legal Services?* In most cases, one attorney will be your principal contact. From time to time, that attorney may delegate parts of your work to other attorneys or to legal assistants or non-legal professionals in the Firm. We do this to involve those with special knowledge or experience in an area and to provide services to you in a timely, efficient, and cost-effective manner. I will be the primary attorney from our Firm who will be representing the Client.

*Scope of the Representation.* As a Firm, we undertake to provide representation and advice on the legal matters for which we are engaged, and it is important that we both have a clear understanding of the legal services that the Firm has agreed to provide. In our Engagement Letter with you, we specify the matter in which we will provide representation and the scope of the services we will provide. Please note that we do not provide legal advice regarding any tax issues or effects nor are we responsible for notifying any insurance carrier of any lawsuit. If there are any questions about the terms of engagement, including the scope of the representation that we are to provide in the matter, please raise those questions promptly with your principal contact at the Firm.

*Identity of Client.* It is our policy to represent only the person or entity identified in our Engagement Letter and not any affiliates. For example, unless otherwise specifically stated in our Engagement Letter, if you are a business organization (corporation, partnership, LLC, etc.), our representation does not include any parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies); if you are an individual, our representation does not include your employer, partners, spouse, siblings, or other family members.

*Your Cooperation.* To enable us to provide effective representation, you agree to: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us.

*Outcomes.* We cannot and do not guarantee the outcome of any matter. Any expression of our professional judgment regarding your matter or the potential outcome is, of course, limited by our knowledge of the facts and based on the law at the time of expression. It is also subject to any unknown or uncertain factors or conditions beyond our control. Any expressions on our part concerning the outcome of the representation, or any other legal matters, are based on our professional judgment and are not guarantees.

*Conflicts of Interest.* We attempt to identify actual and potential conflicts at the outset of any engagement. In some instances, the applicable rules of professional conduct may limit our ability to represent Client with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from representing another. In other situations, we may be permitted to represent a client only if both or all

Alex E. Jones
June 6, 2022
Page 6 of 11

Client consent to that representation. If a controversy unrelated to the subject matter of the representation develops between you and any other client of the Firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either you or the other client in the unrelated matter. Unfortunately, sometimes conflicts arise or become apparent after work begins on an engagement. If this happens, we will do our best to address and resolve the situation in the manner that best serves the interests of all of our affected Client. Rules concerning conflicts of interest vary with the jurisdiction. In order to avoid any uncertainty, the Texas Disciplinary Rules of Professional Conduct will be applicable to the representation.

Texas law requires that we inform the Client of the existence of a grievance process. The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of Chief Disciplinary Counsel will provide you with information about how to file a complaint. Please call 1-800-932-1900 for more information. Also, the Supreme Court of Texas has promulgated The Texas Lawyer's Creed - A Mandate for Professionalism, which states that an attorney should inform a client of the creed's contents when undertaking a representation. We will send you a copy of the creed upon request. It is also available online at https://www.texasbar.com.

*Fees.* The basis for determining our fee for legal services is set forth in the Engagement Letter itself. If you are unclear about the basis for determining your fee, please contact the attorney responsible for your representation. Clients frequently ask us to estimate the fees and other charges they are likely to incur in connection with a particular matter. We are pleased to respond to such requests, whenever possible, with an estimate based upon our professional judgment. This estimate always carries the understanding that, unless we agree otherwise in writing, it does not represent a maximum, minimum, or fixed-fee quotation.

*Expenses.* Our Firm may incur and pay a variety of charges on your behalf in connection with the engagement. Whenever we incur such charges on your behalf, we will bill them to you as part of your invoice in accordance with the attached Client Expense Policy.

*Delinquent Account and Withdrawal of Engagement.* We will bill you on a periodic basis, for fees and other charges, as described in the Engagement Letter. Should your account become delinquent and satisfactory payment terms are not arranged, as permitted under the rules regulating our profession, we will be required to withdraw from the representation. In most cases, and except as prohibited by ethical considerations, if your account becomes more than 30 days delinquent, we will cease representation until we can arrive at a mutually satisfactory arrangement for payment of the delinquent account and the resumption of services. At such time we may charge interest on the outstanding amount due of one and a half percent per month or the maximum amount allowed under applicable law, whichever is less.

*Additional Retainer.* If the representation will require a concentrated period of activity, such as a trial, arbitration, or hearing, we reserve the right to require the payment of all amounts then owing to us and the payment to us of an additional retainer for the fees and expenses we estimate will be incurred in preparing for and completing the trial, arbitration, or hearing, as well as arbitration fees likely to be assessed. If you fail to timely pay any   retainer deposit requested, we will have the right to cease performing further work for you and withdraw from the representation.

Alex E. Jones
June 6, 2022
Page 7 of 11

*Obligation to Pay Fees and Expenses.* Unless your Engagement Letter expressly provides that a third-party is agreeing to pay your attorney's fees and such third-party has agreed in writing, regardless of whether you are insured to cover the particular risk or you are pursuing parties for recovery of attorneys' fees and other charges, it remains your obligation to pay all amounts due to us within the time periods reflected in the Engagement Letter.

*Retention of Complementary Counsel.* From time to time in the course of our engagement it may become prudent to engage additional counsel to work with and complement our representation of you. That complementary representation will only be done with your prior written consent and on terms and conditions which you approve. The engagement of complementary counsel may be done directly with you or through our firm, depending on the nature and extent of the representation involved.

*Conclusion of Engagement.* Because our Firm has been engaged to provide legal services in connection with the representation in the matter as specifically defined in our Engagement Letter, the attorney-client relationship terminates upon our completion of our services related to the representation in the matter. After completion of the representation, upon written notification by the Firm that the matter is terminated, changes may occur in the applicable laws or regulations that could affect your future rights and liabilities in regard to the matter. Unless we are actually engaged after the completion of the representation to provide additional legal services, the Firm has no continuing obligation to give advice with respect to any future legal developments that may relate to the matter.  If you later retain us to perform further or additional services, our attorney-client relationship will be subject to the terms of engagement agreed to at that time; in the absence of any specific agreement, these Additional Terms of Engagement shall apply to the further or additional representation.

*Termination.* We look forward to the opportunity to complete our representation of you on the specified matter. You may, however, terminate our representation at any time, with or without cause, by notifying us in writing. We will return your papers and other property to you promptly upon receipt of your request for those materials unless they are appropriately subject to a lien. You agree that we will own and retain our own files pertaining to the matter or case, including, for example, Firm administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal attorney's work product such as drafts, notes, internal memoranda, and legal and factual research including investigative reports, prepared by or for the internal use of attorneys. Your termination of our services will not affect your responsibility for payment of legal services rendered and other charges incurred before termination and in connection with an orderly transition of the matter.

*Document Retention.* You acknowledge and agree that the Firm may maintain all documents related to your matter digitally. The Firm is not required to maintain physical copies of any documents. At the conclusion of our representation of you, it is our firm's policy to return to you any physical documents to you. We will provide you with copies of any other documents you specifically request (such as copies of depositions, court documents, etc.), and you agree to pay for the associated copying costs and any professional time incurred in identifying any such documents you request. You agree that our Firm may elect to keep at its own expense, copies of any documents related to this matter or otherwise returned to you. Anytime following seven (7) years after the conclusion of our representation of you, the Firm may destroy or delete any files related to your engagement.

Alex E. Jones
June 6, 2022
Page 8 of 11

*Dispute Resolution.* The Engagement Letter is being entered and is to be performed within the State of Texas. The Engagement Letter shall be interpreted in accordance with Texas law (without application of choice of law principles). All parties to the Engagement Letter agree that Houston, Harris County, Texas is the only permitted location (the venue) for the resolution of all disputes that arise under or relate in any way to the Engagement Letter or to any of the services provided by our Firm.

*Binding Arbitration.* Any dispute arising out of or relating to this agreement, our interactions leading to it, or our performance of the agreement or of the representation of you shall be resolved through binding arbitration in Harris County, Texas. First, sixty (60) days before filing any arbitration proceeding, the party requesting relief must demand and attend mandatory mediation before a mutually acceptable mediator to attempt to resolve any dispute. In the event the parties are unable to resolve such dispute, the affected party shall initiate an arbitration proceeding utilizing the rules of (but not employing) the American Arbitration Association ("AAA") for the arbitration of complex commercial cases. In any dispute of less than $250,000, the parties shall jointly appoint a single arbitrator. In any dispute of a greater amount, each party shall appoint his/her or its own party arbitrator, and these two-party arbitrators shall in turn appoint a third, neutral arbitrator. All party arbitrators' conduct and tests for eligibility shall be governed by AAA rules of disinterest. The time limits hereunder shall not apply in the event emergency injunctive relief is required, but only to the extent of such emergency injunctive relief itself. The decision by the arbitration panel will be final and binding.

You should know that for your agreement to arbitrate to be effective under Texas law, you as the client must receive sufficient information about the differences between litigation and arbitration to permit you to make an informed decision about whether to agree to binding arbitration. Under the Texas Rules of Disciplinary Procedure, we can explain the significant advantages and disadvantages of binding arbitration to the extent we reasonably believe is necessary for an informed decision by you. The scope of the explanation will depend on the sophistication, education and experience of the client.

In the case of a highly sophisticated client such as a large business entity that frequently employs outside lawyers, no explanation at all may be necessary. In situations involving Clients who are individuals or small businesses, we normally advise the client of the following possible advantages and disadvantages of arbitration as compared to a judicial resolution of disputes: (1) the cost and time savings frequently found in arbitration, (2) the waiver of significant rights, such as the right to a jury trial, (3) the possible reduced level of discovery, (4) the relaxed application of the rules of evidence, and (5) the loss of the right to a judicial appeal because arbitration decisions can be challenged only on very limited grounds.

Additional factors you as the client should consider are: (1) the privacy of the arbitration process compared to a public trial; (2) the method for selecting arbitrators; and (3) the obligation, if any, of the client to pay some or all of the fees and costs of arbitration, if those expenses could be substantial. Although the disclosure can vary from client to client, depending on the circumstances, the overriding concern is that we should provide information necessary for the client to make an informed decision.

Alex E. Jones
June 6, 2022
Page 9 of 11

*By returning the executed Engagement Letter, you acknowledge that you have been provided ample opportunity to have counsel explain to you the advantages and disadvantages of binding arbitration to make an informed decision about agreeing to the provision.*

*Modifications.* The Engagement Letter and these Additional Terms of Engagement reflect our entire agreement on the terms of this engagement. These written terms of engagement are not subject to any oral agreements or understandings, and any change in those terms can only be made in writing signed by you and the Firm.

Alex E. Jones
June 6, 2022
Page 10 of 11

## Hourly Billing Rate Schedule

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| R.J. Shannon | $650 |
| Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50 - $100 |

Alex E. Jones
June 6, 2022
Page 11 of 11

Client Expense Policy

In connection with the representation of a client, the Firm may incur expenses. Unless the Engagement Letter expressly provides to the contrary, the Firm's and the Client's rights and responsibilities related to such expenses are as follows:

*Legal Research and Related Services.* The Firm subscribes to certain online research services. These subscription-based services are part of the Firm's overhead and not charged to the Client. Certain services are charged on a per-transaction including, without limitation, the following examples: UCC searches, lien searches, title searches and other record searches. The Client is responsible for these pre-transaction charges. The Firm will advance the costs for all such services and submit bills to you for reimbursement. The Firm may seek prior approval from you if the anticipated aggregate monthly expense for such services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Document Management and eDiscovery Services.* The Firm subscribes to advanced document management software systems. These subscription-based systems are part of the Firm's overhead and not charged to the Client. The Client is responsible for eDiscovery services. eDiscovery service providers typically charge per gigabyte of information stored. Additional services from the outside vendor may be required other than storage of the information and typically these are separately charged. If the Firm uses an eDiscovery service during the representation, then the Firm will seek the Client's prior approval before incurring expenses for such services. Rather than billing these expenses through the Firm, the Firm reserves the right to have the Client contract directly with the outside vendor to pay for these expenses. For the avoidance of doubt, the Client is responsible to the Firm for the payment of all fees and expenses incident to the firm's review and processing of discovery materials that are not handled by an outside vendor.

*Printing, Shipping, Postage and Related Expenses.* For all printing, shipping, postage, and related services the Firm may handle them in house or use an outside vendor. The Client is responsible for all such printing, shipping, postage, and related services at costs or the prevailing market rate if handled in house. The Firm may seek prior approval from the Client if the anticipated aggregate monthly expense for printing, shipping, postage, and related services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Travel Expenses.* The Client will reimburse the Firm for expenses incurred in connection with out-of-town travel, but only for coach class travel and, where appropriate, the cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances. The Firm will advance all such travel expenses and submit bills to you for reimbursement which will be included in the regular invoices to the Client. The attorney handling your matter will confer with you prior to traveling for your matter. Consistent with local bankruptcy rules, the Firm bills travel at ½ billable hourly rate when the lawyer is not working on the Client matter while travelling. The Firm will endeavor to locate a substitute service agent.

*Court Costs.* If requested by the Firm, the Client will advance court filing fees and all similar expenses prior to the Firm incurring such expenses. Any such expenses incurred by the Firm, will be included in the Firm's invoices to the Client for payment.

## **Exhibit B**

Lee Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DECLARATION OF KYUNG S. LEE IN SUPPORT OF**
**THE DEBTOR' APPLICATION TO EMPLOY**
**SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL**

I, Kyung S. Lee, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State of Texas and United States District Court for the Southern District of Texas.  As of June 1, 2022, I am a partner in the Houston office of the law firm Shannon & Lee LLP ("S&L"), located at 700 Milam Street, Suite 1300, Houston, Texas 77002.

2.      I am making this declaration in support of the Debtor's Application to Employ Shannon & Lee LLP as Bankruptcy Co-Counsel, effective as of July 29, 2022 (the "Application"). Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed to such terms in the Application.

3.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of S&L reviewed by me or derived from information available to me that I believe to be true and correct or opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

002235

### A.      Scope of Services

4.      Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, S&L will serve as bankruptcy co-counsel to the Debtor in connection with the Chapter 11 Case for the period commencing on July 29, 2022.   In connection with this representation, S&L will take all necessary and appropriate actions to administer the Debtor's Chapter 11 Case.

### B.      Proposed Compensation

5.      S&L will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtor.

6.      Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, S&L intends to request the allowance of its compensation as set out in the Engagement Agreement and as summarized in the following chart:

| BILLER | RATE |
| --- | --- |
| Kyung S. Lee | $850 |
| R.J. Shannon | $650 |
| Other Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

7.      These rates reflect the rates that S&L ordinarily charges clients in bankruptcy and non-bankruptcy matters and are less than or equal to the rates of similarly skilled and experienced attorneys in this district.   S&L submits that these agreed terms of reimbursement, compensation,

002236

and hourly rates are reasonable. S&L will notify the Debtor of any change in the hourly rates charged for services rendered.

### C.    Retainer & Prepetition Payments

8.    Pursuant to the Engagement Agreement, FSS retained S&L to represent it in connection with its restructuring, effective as of May 24, 2022. Pursuant to the Engagement Agreement, FSS paid S&L a $100,000 retainer.

9.    S&L invoiced FSS for work it did during the month of June 2022 in the total amount of $84,034.12. Prior to the Petition Date, FSS paid the June invoice.

10.    S&L then invoiced FSS for work it did during the period July 1-July 29, 2022 in the total amount of $99,177.32. Prior to the Petition Date, the Firm took into income $99,177.32 from the Retainer, leaving a balance of $822.68 in S&L's IOLTA account.

11.    Prior to the Petition Date, FSS wired $50,000 to S&L's IOLTA account to replenish the Retainer. As of the Petition Date, S&L's IOLTA account balance was $50,822.68 (the "Retainer").

12.    Under the proposed employment with the Debtor, S&L will continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

### D.    Disclosure of Connections

*i.    Search and General Descriptions of Connections*

13.    S&L performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas.

14.     I conducted a search of S&L files to determine using the list of parties in interest listed in <u>Schedule 1</u> hereto whether the Firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the Firm had and did not represent any of the parties listed on Schedule 1. S&L may have provided services to creditors or other parties in interest inadvertently omitted from Schedule 1 or the description above. If such connections exist, they would be on matters wholly unrelated to the service for which FSS seeks to engage S&L.

15.     The email and computerized search uncovered no connections other than the following:

    a.   S&L represented the Debtor prior to the Petition Date.

    b.   Mr. Shannon and I previously represented the InfoWDebtors in their chapter 11 cases jointly administered under Case No. 22-60020. Certain creditors of the InfoWDebtors are also creditors of FSS. Additionally, Mr. Shannon and I represented the InfoWDebtors in the negotiations of the Plan Support Agreement under which FSS and Alex Jones committed to provide funding for the InfoWDebtors' contemplated reorganization, prior to the dismissal of the Sandy Hook plaintiffs' decision to dismiss their claims against the InfoWDebtors with prejudice.

    c.   Mr. Schwartz was the CRO of the InfoWDebtors while S&L attorneys represented the InfoWDebtors.

    d.   Mr. Shannon was previously employed by Akin Gump Strauss Hauer & Feld LLP.

    *ii.*   *Further Description of Connections to the InfoWDebtors*

16.     Beginning on or about March 23, 2022, I, as a partner of Parkins Lee & Rubio LLP, and R.J. Shannon, as an associate, represented the InfoWDebtors in connection with their chapter 11 cases that were filed on April 17 and 18, 2022. On May 15, 2022, I began representing the InfoWDebtors, practicing under Kyung S. Lee PLLC. On June 1, 2022, S&L began business and provided services to the InfoWDebtors in connection with the hearing on the stipulation and order dismissing the InfoWDebtors cases and final administrative matters after the dismissal of the cases.

4

17.     After extensive negotiations prior to filing their petitions, Alex Jones assigned his interests in the InfoWDebtors to a litigation Settlement Trust (the "LST") and Mr. Jones and FSS entered into a Plan Support Agreement (the "PSA"). Mr. Shannon and I represented the InfoWDebtors in connection with those negotiations.

18.     Section 8 of the PSA contained various provisions under which the PSA and the obligations of the parties thereto would terminate. The provisions under which the PSA would terminate under its terms included, among other things: (i) dismissal of the InfoWDebtors' chapter 11 cases; (ii)  failure to obtain appointment of the trustees for LST; (iii) failure to file a plan pursuant to the terms of the PSA; (iv) failure to obtain confirmation of a plan pursuant to the terms of the PSA; and (v) the remand of the Sandy Hook Actions and continuation of the state court proceedings.

19.     On April 17 and April 18, 2022, the InfoWDebtors filed petitions for relief under chapter 11, subchapter v, of the Bankruptcy Code.

20.     The Texas Sandy Hook plaintiffs, the Connecticut Sandy Hook plaintiffs, and the U.S. Trustee immediately filed emergency motions to dismiss the bankruptcy cases of the InfoWDebtors.

21.     Although the InfoWDebtors filed emergency motions to appoint trustees for the LST and retain W. Marc Schwartz to serve as the CRO for InfoWDebtors, the Texas Sandy Hook plaintiffs, Connecticut Sandy Hook plaintiffs, and the U.S. Trustee each opposed hearings on those emergency motions prior to their motions to dismiss.

22.     By May 6, 2022, counsel for both the Texas and Connecticut plaintiffs announced that they were dismissing their claims against the InfoWDebtors from their respective lawsuits. CRO Schwartz directed me to work with plaintiffs' counsel to make sure that their claims were

002239

withdrawn with prejudice against the InfoWDebtors.  The InfoWDebtors finalized, submitted and had the Bankruptcy Court approve the Stipulations of Dismissal of the Texas plaintiffs Claims with prejudice by May 19, 2022. The Connecticut plaintiffs filed pleadings to dismiss their claims against the InfoWDebtors with prejudice in the removed actions on or about May 13, 2022.

23.     After dismissal of the Sandy Hook plaintiffs' claims against the InfoWDebtors, the PSA could no longer serve its intended purpose and had terminated by its own terms. While counsel for Alex Jones and FSS advised the Court that the parties would extend the PSA deadlines beyond April 30, 2022, the Amended PSA was negotiated but never executed because the LST trustees were never appointed.

24.     The CRO of the InfoWDebtors and I then analyzed the best way to go forward with the remaining claims against the InfoWDebtors and concluded that, in light of the U.S. Trustee's continued opposition to the bankruptcy cases, dismissal of the InfoWDebtors' bankruptcy cases was in the best interest of the estate.  First, the InfoWDebtors still had to litigate with the U.S. Trustee regarding dismissal. Second, the *raison d'etre* for the bankruptcy (to have the plaintiffs participate as claimants under the plan of reorganization) no longer existed. Third, the estate had limited access to funds to administer the estate, in light of the termination of the PSA. Fourth, dismissals of both Texas and Connecticut plaintiffs' claims with prejudice left the estate with only four remaining creditors.

25.     The CRO then directed me to work with the U.S. Trustee's office to have the InfoWDebtors' bankruptcy cases dismissed. On June 1, 2022, the U.S. Trustee and the Debtors filed a Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. On June 10, 2022, the Bankruptcy Court approved the Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases.

002240

26.     The first services any attorney of Shannon & Lee LLP provided to FSS occurred on May 24, 2022, were provided by me through Kyung S. Lee PLLC when I traveled to Austin, Texas to discuss the potential restructuring relating to FSS. The InfoWDebtors were negotiating the terms of the stipulation with the U.S. Trustee to dismiss the case that was filed on June 1, 2022, at this time.

27.     As of May 19, 2022, and continuing through today, the InfoWDebtors and FSS are not adverse. No default exists under the license agreement between InfoW and FSS. To the best of my knowledge, there are no claims between FSS and the InfoWDebtors.

28.     Out of an abundance of caution and to assure the Court and the FSS creditors that S&L does not have a bias or an adverse interest against FSS or its estate, Kyung S. Lee PLLC submitted a written resignation of its engagement to serve as restructuring counsel to InfoWDebtors prior to submission of the Application.

29.     The results of the foregoing connections search process confirm that neither I, S&L, nor any of its employees or partners, to the best of my knowledge, have any disqualifying connections. Neither I, S&L, or any partner of S&L (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

**E.  Affirmative Statement of Disinterestedness**

30.     Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and S&L are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

31.     I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any

7

interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

32.     S&L is not a creditor, an equity security holder, or an insider of the Debtor; S&L is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and S&L does not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

33.     S&L does not possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate. S&L also does not possess or assert any economic interest that would create either an actual or potential dispute in which the estate is a rival claimant. S&L does not have any incentive to act contrary to the best interests of the estate and its creditors.

F.     **Bankruptcy Rule 2016(b) Disclosures**

34.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, S&L has not shared or agreed to share (a) any of its compensation from the representation of the Debtor with any other persons, or (b) any compensation any other persons have received, may have received, or will receive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August  20, 2022,

By: /s/*Kyung S. Lee*_____
        Kyung S. Lee

8

002242

**SCHEDULE 1**

**TO LEE DECLARATION**

**SEARCHED PARTIES**

Debtor & Professionals

    Law Office of Ray Battaglia                     Schwartz Associates

Debtor's Equity

    Alexander E. Jones

Largest 20 Unsecured Creditors & Litigation Claimants

| | |
|---|---|
| Elevated Solutions Group | Dona Soto |
| Atomial LLC | Erica Lafferty |
| Cloudfare, Inc. | Francine Wheeler |
| Jacquelyn Blott | Ian Hockley |
| Joel Skousen | Jacqueline Barden |
| eCommerce CDN LLC | Jennifer Hensel |
| Paul Watson | Jeremy Richman |
| Greenair, Inc. | Jillian Soto |
| Edgecast, Inc. | Leonard Pozner |
| Ready Alliance Group, Inc. | Marcel Fontaine |
| Getty Images, Inc. | Mark Barden |
| RatsMedical.com | Neil Heslin |
| David Icke Books Limited | Nicole Hockley |
| WWCR | PQPR Holdings Limited, LLC |
| CustomTattoNow.com | Robert Parker |
| AT&T | Scarlett Lewis |
| Justin Lair | Veronique De La Rosa |
| Brennan Gilmore | William Sherlach |
| Carlee Soto-Parisi | William Aledenberg |
| Carlos Soto | Larry Klayman |
| Christopher Sadowski | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | Jordan & Ortiz, P.C. |
| Koskoff Koskoff & Bieder | McDowell Heterhington LLP |
| Fertitta & Reynal LLP | The Akers Law Firm PLLC |
| Pattis & Smith, LLC | Copycat Legal PLLC |
| Zeisler & Zeisler P.C. | |

Waller Lansden Dortch & Davis,
LLP

Akin Gump Strauss Hauer & Feld
LLP

U.S. Bankruptcy Judges and Staff

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro

Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

U.S. Trustee Personnel

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera

Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**STIPULATION AND AGREED ORDER**

The above-captioned debtor and debtor-in-possession (the Debtor) and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the Texas Plaintiffs) and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the Connecticut Plaintiffs) (together the Sandy Hook Families) hereby enter into this stipulation and agreed order (Stipulation) as follows:

WHEREAS, on July 29, 2022 (the Petition Date), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court).

WHEREAS, on July 29, 2022, the Debtor filed its Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender (the Cash Collateral Motion) [Dkt. 6].

WHEREAS, on August 2, 2022, the Sandy Hook Families filed their Objection to Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of

002245

Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 27].

WHERAS, on August 5, 2022, the Court entered the Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection (the Interim Order) [Dkt. 41].

WHEREAS, on August 11, 2022, the Debtor filed its Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 55].

WHEREAS, on August 12, 2022, the Connecticut Plaintiffs filed their Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 56].

WHEREAS, on August 12, 2022, the Texas Plaintiffs filed their Joinder to the Connecticut Plaintiffs' Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 57].

WHEREAS, on August 12, 2022, the Court entered the Order Modifying Interim Order Authorizing the Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64].

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against the Debtor styled *Lafferty, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury.

WHEREAS, on July 31, 2022, the Connecticut Plaintiffs filed their Emergency Motion for Relief from the Automatic Stay (the Emergency Motion) [Dkt. 15].

WHEREAS, on August 17, 2022, the Debtor filed its Response to Emergency Motion for Relief from the Automatic Stay [Dkt. 78].

WHEREAS, a hearing on the Cash Collateral Motion and the Emergency Motion is set for August 24, 2022 at 10 a.m.

WHEREAS, the deadline to file exhibit and witness lists pursuant to LR-9013-2 is August 22, 2022 at 12:00 p.m.

WHEREAS, the Parties are in discussions to reach a resolution on both the Cash Collateral Motion and the Emergency Motion.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUTPCY COURT, ORDERED THAT:

1.      The deadline to file an exhibit and witness list for the hearing on the Emergency Motion and the Cash Collateral Motion is extended to August 23, 2022 at 12:00 p.m.


Signed: _____                    _____

                                                                Christopher Lopez
                                                                United States Bankruptcy Judge

STIPULATED AND AGREED ON AUGUST 22, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

      /s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

-and-

**THE TEXAS PLAINTIFFS**

      /s/ Avi Moshenberg
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
P: 713-337-5580
F: 713-337-8850

and

Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
T: 713-356-1280
F: 713-658-2553

-and-

**FREE SPEECH SYSTEMS, LLC**


        /s/Kyung S. Lee
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
Tel: (210) 601-9405

and

Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
**SHANNON & LEE LLP**
700 Milam Street, Suite 1300
Houston, Texas 77002
Tel: (713) 714-5770

002249

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In      Free Speech Systems LLC
Re:     Debtor                                    Case No.: 22−60043

                                                  Chapter:  11

---

**NOTICE OF FILING OF OFFICIAL TRANSCRIPT**

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 22, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

### STIPULATION AND AGREED ORDER

The above-captioned debtor and debtor-in-possession (the Debtor) and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the Texas Plaintiffs) and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the Connecticut Plaintiffs) (together the Sandy Hook Families) hereby enter into this stipulation and agreed order (Stipulation) as follows:

WHEREAS, on July 29, 2022 (the Petition Date), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court).

WHEREAS, on July 29, 2022, the Debtor filed its Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender (the Cash Collateral Motion) [Dkt. 6].

WHEREAS, on August 2, 2022, the Sandy Hook Families filed their Objection to Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of

Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 27].

WHERAS, on August 5, 2022, the Court entered the Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection (the Interim Order) [Dkt. 41].

WHEREAS, on August 11, 2022, the Debtor filed its Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 55].

WHEREAS, on August 12, 2022, the Connecticut Plaintiffs filed their Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 56].

WHEREAS, on August 12, 2022, the Texas Plaintiffs filed their Joinder to the Connecticut Plaintiffs' Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 57].

WHEREAS, on August 12, 2022, the Court entered the Order Modifying Interim Order Authorizing the Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64].

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against the Debtor styled *Lafferty, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury.

WHEREAS, on July 31, 2022, the Connecticut Plaintiffs filed their Emergency Motion for Relief from the Automatic Stay (the Emergency Motion) [Dkt. 15].

WHEREAS, on August 17, 2022, the Debtor filed its Response to Emergency Motion for Relief from the Automatic Stay [Dkt. 78].

WHEREAS, a hearing on the Cash Collateral Motion and the Emergency Motion is set for August 24, 2022 at 10 a.m.

WHEREAS, the deadline to file exhibit and witness lists pursuant to LR-9013-2 is August 22, 2022 at 12:00 p.m.

WHEREAS, the Parties are in discussions to reach a resolution on both the Cash Collateral Motion and the Emergency Motion.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUTPCY COURT, ORDERED THAT:

1.    The deadline to file an exhibit and witness list for the hearing on the Emergency Motion and the Cash Collateral Motion is extended to August 23, 2022 at 12:00 p.m.


 Signed: August 22, 2022

                                                    _____
                                                    Christopher Lopez
                                                    United States Bankruptcy Judge

STIPULATED AND AGREED ON AUGUST 22, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

-and-

**THE TEXAS PLAINTIFFS**

_____/s/ Avi Moshenberg_____
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
P: 713-337-5580
F: 713-337-8850

and

002254

Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
T: 713-356-1280
F: 713-658-2553

-and-

**FREE SPEECH SYSTEMS, LLC**


_____/s/Kyung S. Lee_____
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
Tel: (210) 601-9405

and

Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
**SHANNON & LEE LLP**
700 Milam Street, Suite 1300
Houston, Texas 77002
Tel: (713) 714-5770

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | CASE NO. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC | § | |
| | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | |

## TRAVIS COUNTY'S NOTICE OF APPEARANCE AND
## REQUEST FOR SERVICE OF NOTICE AND OTHER DOCUMENTS

Notice is hereby given that Jason A. Starks, Assistant Travis County Attorney, will appear as counsel for Travis County in the above-entitled case and requests that service of notices and other documents be made upon this attorney of record.

Respectfully submitted,

**DELIA GARZA**
Travis County Attorney
P.O. Box 1748
Austin, TX  78767
(512) 854-9092 Telephone
(512) 854-9316 Telecopier

By:    /s/ Jason A. Starks
**JASON A. STARKS**
Assistant County Attorney
Texas Bar No. 24046903
Jason.Starks@traviscountytx.gov

1070150-1

002256

## <u>CERTIFICATE OF SERVICE</u>

       I, Jason A. Starks, Assistant County Attorney, hereby certify that a true and correct copy of **Travis County's Notice of Appearance and Request for Service of Notice and Other Documents** has been sent to all interested parties registered for electronic service with the U. S. Bankruptcy Clerk's Office on or about the time this document was electronically filed with the Clerk on this 23rd day of **August, 2022** and mailed by United States First Class Mail to any party listed below that is not registered.

                               */s/ Jason A. Starks*

                             JASON A. STARKS

**<u>DEBTORS</u>**
Free Speech Systems, LLC
P.O. Box 19549
Austin, Texas 78760-9549

**<u>DEBTORS' ATTORNEY</u>**
Raymond W. Battaglia
LAW OFFICES OF RAY BATTAGLIA, PLLC
66 Granburg Circle
San Antonio, Texas 78218
(served electronically)

Kyung Shik Lee
KYUNG S. LEE PLLC
4723 Oakshire Drive, Apt. B
Houston, Texas 77027
(served electronically)

R.J. Shannon
SHANNON & LEE LLP
700 Milam Street, Suite 1300
Houston, Texas 77002
(served electronically)

**<u>TRUSTEE</u>**
Melissa A. Haselden
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
(served electronically)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**AMENDED STIPULATION AND AGREED ORDER**

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "<u>Texas Plaintiffs</u>") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "<u>Connecticut Plaintiffs</u>") (together the "<u>Sandy Hook Families</u>") hereby enter into this stipulation and agreed order (the "<u>Stipulation</u>") as follows:

WHEREAS, on July 29, 2022 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>").

WHEREAS, on July 29, 2022, the Debtor filed its Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender (the "<u>Cash Collateral Motion</u>") [Dkt. 6].

WHEREAS, on August 2, 2022, the Sandy Hook Families filed their Objection to Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 27].

WHERAS, on August 5, 2022, the Court entered the Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection (the "Interim Order") [Dkt. 41].

WHEREAS, on August 11, 2022, the Debtor filed its Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 55].

WHEREAS, on August 12, 2022, the Connecticut Plaintiffs filed their Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 56].

WHEREAS, on August 12, 2022, the Texas Plaintiffs filed their Joinder to the Connecticut Plaintiffs' Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 57].

WHEREAS, on August 12, 2022, the Court entered the Order Modifying Interim Order Authorizing the Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64].

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against the Debtor styled *Lafferty, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v.*

*Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury.

WHEREAS, on July 31, 2022, the Connecticut Plaintiffs filed their Emergency Motion for Relief from the Automatic Stay (the "Emergency Motion") [Dkt. 15].

WHEREAS, on August 17, 2022, the Debtor filed its Response to Emergency Motion for Relief from the Automatic Stay [Dkt. 78].

WHEREAS, a hearing on the Cash Collateral Motion and the Emergency Motion is set for August 24, 2022 at 10 a.m.

WHEREAS, the deadline to file exhibit and witness lists pursuant to LR-9013-2 is August 22, 2022 at 12:00 p.m.

WHEREAS, the parties agreed to extend the deadline to file exhibit and witness list until August 23, 2022 at 12:00 p.m. with a Stipulation and Agreed Order, which the Bankruptcy Court approved;

WHEREAS, the Parties are in still in discussions to reach a resolution on both the Cash Collateral Motion and the Emergency Motion and seek to conserve resources.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUTPCY COURT, ORDERED THAT:

1.     The deadline to file an exhibit and witness list for the hearing on the Emergency Motion and the Cash Collateral Motion is extended to August 23, 2022 at 7:00 p.m.

Signed: _____          _____
                                  Christopher Lopez
                                  United States Bankruptcy Judge

STIPULATED AND AGREED ON AUGUST 23, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

-and-

**THE TEXAS PLAINTIFFS**

_____/s/ Jarrod B. Martin_____
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
P: 713-337-5580
F: 713-337-8850

and

Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**Chamberlain, Hrdlicka, White, Williams & Aughtry, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
T: 713-356-1280
F: 713-658-2553

-and-

**FREE SPEECH SYSTEMS, LLC**


         /s/Kyung S. Lee
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**Law Offices of Ray Battaglia, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
Tel: (210) 601-9405

and

Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
**Shannon & Lee LLP**
700 Milam Street, Suite 1300
Houston, Texas 77002
Tel: (713) 714-5770

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 23, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

### AMENDED STIPULATION AND AGREED ORDER

The above-captioned debtor and debtor-in-possession (the "Debtor") and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "Connecticut Plaintiffs") (together the "Sandy Hook Families") hereby enter into this stipulation and agreed order (the "Stipulation") as follows:

WHEREAS, on July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

WHEREAS, on July 29, 2022, the Debtor filed its Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender (the "Cash Collateral Motion") [Dkt. 6].

WHEREAS, on August 2, 2022, the Sandy Hook Families filed their Objection to Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 27].

WHERAS, on August 5, 2022, the Court entered the Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection (the "<u>Interim Order</u>") [Dkt. 41].

WHEREAS, on August 11, 2022, the Debtor filed its Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 55].

WHEREAS, on August 12, 2022, the Connecticut Plaintiffs filed their Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 56].

WHEREAS, on August 12, 2022, the Texas Plaintiffs filed their Joinder to the Connecticut Plaintiffs' Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 57].

WHEREAS, on August 12, 2022, the Court entered the Order Modifying Interim Order Authorizing the Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64].

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against the Debtor styled *Lafferty, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v.*

*Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury.

WHEREAS, on July 31, 2022, the Connecticut Plaintiffs filed their Emergency Motion for Relief from the Automatic Stay (the "Emergency Motion") [Dkt. 15].

WHEREAS, on August 17, 2022, the Debtor filed its Response to Emergency Motion for Relief from the Automatic Stay [Dkt. 78].

WHEREAS, a hearing on the Cash Collateral Motion and the Emergency Motion is set for August 24, 2022 at 10 a.m.

WHEREAS, the deadline to file exhibit and witness lists pursuant to LR-9013-2 is August 22, 2022 at 12:00 p.m.

WHEREAS, the parties agreed to extend the deadline to file exhibit and witness list until August 23, 2022 at 12:00 p.m. with a Stipulation and Agreed Order, which the Bankruptcy Court approved;

WHEREAS, the Parties are in still in discussions to reach a resolution on both the Cash Collateral Motion and the Emergency Motion and seek to conserve resources.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUTPCY COURT, ORDERED THAT:

1.     The deadline to file an exhibit and witness list for the hearing on the Emergency Motion and the Cash Collateral Motion is extended to August 23, 2022 at 7:00 p.m.

Signed:  August 23, 2022

Christopher Lopez
United States Bankruptcy Judge

STIPULATED AND AGREED ON AUGUST 23, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

-and-

**THE TEXAS PLAINTIFFS**

_____/s/ Jarrod B. Martin_____
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
P: 713-337-5580
F: 713-337-8850

and

Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
T: 713-356-1280
F: 713-658-2553

-and-

**FREE SPEECH SYSTEMS, LLC**


          /s/Kyung S. Lee
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
Tel: (210) 601-9405

and

Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
**SHANNON & LEE LLP**
700 Milam Street, Suite 1300
Houston, Texas 77002
Tel: (713) 714-5770

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

*Please Read Instructions:*

| FOR COURT USE ONLY |
|---|
| DUE DATE: |

| 1. NAME Ryan Chapple | 2. PHONE NUMBER (512) 477-5000 | 3. DATE 8/15/2022 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL rchapple@cstrial.com; aprentice@cstrial.com | 5. CITY Austin | 6. STATE TX | 7. ZIP CODE 78701 |

| 8. CASE NUMBER 22-60043 | 9. JUDGE Lopez | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 8/12/2022 | 11. TO 8/12/2022 |
| 12. CASE NAME In re Free Speech Systems, LLC | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY Houston | 14. STATE TX |

15. ORDER FOR

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☒ OPENING STATEMENT (Plaintiff) | 8/12/2022 | | |
| ☒ OPENING STATEMENT (Defendant) | 8/12/2022 | | |
| ☒ CLOSING ARGUMENT (Plaintiff) | 8/12/2022 | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☒ CLOSING ARGUMENT (Defendant) | 8/12/2022 | | |
| ☒ OPINION OF COURT | 8/12/2022 | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) ENTIRE HEARING | 8/12/2022 |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☒ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

CERTIFICATION (18. & 19.)
By signing below, I certify that I will pay all charges (deposit plus additional).

| ESTIMATE TOTAL | 0.00 |
|---|---|

| 18. SIGNATURE /s/ Ryan Chapple | PROCESSED BY |
|---|---|
| 19. DATE 8/15/2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |
| DEPOSIT PAID | | |
| TRANSCRIPT ORDERED | | |
| TRANSCRIPT RECEIVED | | |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | |
| PARTY RECEIVED TRANSCRIPT | | |

| DEPOSIT PAID | |
|---|---|
| TOTAL CHARGES | 0.00 |
| LESS DEPOSIT | 0.00 |
| TOTAL REFUNDED | |
| TOTAL DUE | 0.00 |

DISTRIBUTION: COURT COPY TRANSCRIPTION COPY ORDER RECEIPT ORDER COPY

002268

AO 435
(Rev. 04/18)

**INSTRUCTIONS**

## GENERAL

**Use.**  Use this form to order the transcription of proceedings.  Complete a separate order form for each case number for which transcripts are ordered.

**Completion**.  Complete Items 1-19.  Do *not* complete shaded areas which are reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Submitting to the Court.**  Submit the form in the format required by the court.

**Deposit Fee.**  The court will notify you of the amount of the required deposit fee which may be mailed or delivered to the court.  Upon receipt of the deposit, the court will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee or for transcripts ordered by the federal government from the date of receipt of the signed order form.

**Completion of Order.**  The court will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the court will notify you of the balance due which must be paid prior to receiving the completed order.

## SPECIFIC

Items 1-19.    These items should always be completed.
Item 8.         Only one case number may be listed per order.
Item 15.        Place an "X" in each box that applies.
Item 16.        Place an "X" in the box for each portion requested.  List specific date(s) of the proceedings for which transcript is requested.  Be sure that the description is clearly written to facilitate processing.  Orders may be placed for as few pages of transcript as are needed.
Item 17.        *Categories.*  There are six (6) categories of transcripts which may be ordered.  These are:
               *Ordinary*.  A transcript to be delivered within thirty (30) calendar days after receipt of an order.  (Order is considered received upon receipt of the deposit.)
               *14-Day*.  A transcript to be delivered within fourteen (14) calendar days after receipt of an order.
               *Expedited*.  A transcript to be delivered within seven (7) calendar days after receipt of an order.
               *3-Day*.  A transcript to be delivered within three (3) calendar days after receipt of an order.
               *Daily*.  A transcript to be delivered following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
               *Hourly*.  A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours.
               *Realtime*.  A draft unedited transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

**NOTE**: Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 calendar days, payment would be at the ordinary delivery rate.

               *Ordering*.  Place an "X" in each box that applies.  Indicate the number of additional copies ordered.
               *Original*.  Original typing of the transcript.  An original must be ordered and prepared prior to the availability of copies.  The original fee is charged only once.  The fee for the original includes the copy for the records of the court.
               *First Copy*.  First copy of the transcript after the original has been prepared.  All parties ordering copies must pay this rate for the first copy ordered.
               *Additional Copies*.  All other copies of the transcript ordered by the same party.
Item 18.        Sign in this space to certify that you will pay all charges.  (This includes the deposit plus any additional charges.)
Item 19.        Enter the date of signing.

Shaded Area.  Reserved for the court's use.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Case No. 22--60043 |
| | § | |
| DEBTOR. | § | Chapter 11 (Subchapter V) |
| | § | |

**EMERGENCY APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTHORIZING**
**EMPLOYMENT OF PATTIS & SMITH LLC UNDER 11 U.S.C. § 327(e) AND 328(a)**
**AS SPECIAL COUNSEL *NUNC PRO TUNC***
**TO AUGUST 1, 2022, AND (B) GRANTING RELATED RELIEF**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ' CONFERENCE ROOM NUMBER IS 590153. YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGELOPEZ" IN THE GOTOMEETTING APP OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE IN THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT-HAND CORNER AND ENTER YOUR NAME UNDER PERSONAL INFORMATION SETTING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

THE DEBTOR WILL SEEK APPROVAL OF THIS APPLICATION ON AUGUST 24, 2022, AT 10:00 A.M. AT THE SAME TIME WHEN AGREEMENTS ARE ANNOUNCED

REGARDING THE EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY [ECF. NO. 15]

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves for entry of an order, substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) 327(e) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of Pattis & Smith LLC ("P&SLLC" or the "Firm") as special counsel for FSS (the "Application") pursuant to that certain engagement letter agreement by and between the Debtor and P&SLLC, a copy of which is attached hereto as Exhibit A (the "Engagement Agreement"), as modified by the Proposed Order. In support of the Application, the Debtor submits the Declaration of Norm A. Pattis attached hereto as Exhibit B (the "Pattis Declaration") and respectfully represents as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

2.      The bases for the relief requested herein are sections 105, 327(e), 328(a), 330, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

002271

## BACKGROUND

### A.  Case Background

3.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

4.      The Debtor continues to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

5.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.      Proposed Employment of P&SLLC

   *i.*   *Scope of Employment*

6.      Subject to the Court's approval, the Debtor desires to employ and retain P&SLLC *nunc pro tunc* to August 1, 2022, as its special counsel pursuant to Bankruptcy Code § 327(e) and 328(a) in connection the following cases in Connecticut:

> Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones and Free Speech Systems, LLC, Case No., X06-UWY-CV-18-6046436-S (the "Lafferty Matter")

> William Sherlach v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046437-S

> William Sherlach and Robert Parker v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046438-S

> All the proceedings described above are before the Connecticut Superior Court, Waterbury District and consolidated in the Lafferty matter state court litigation (collectively, the "Sandy Hook Lawsuits").

   *ii.*   *Necessity of Employment*

7.      The Debtor desires to retain P&SLLC to represent them as its litigation and trial counsel in the Sandy Hook Lawsuits because (a) the Firm has extensive experience and knowledge

3

with Connecticut trial practice and procedure, with the partners at P&SLLC having tried many cases in Connecticut state courts over the last 40 years; (b) the Firm is intimately familiar with the discovery, the docket, the evidence adduced to date and the law applicable to the Sandy Hook Lawsuits, having represented FSS and other co-defendants prior to the Petition Date; (c) the Firm is already involved in jury selection for a co-defendant and, therefore, is familiar with all the remaining work necessary to meet a trial date in September 2022; (d) due to the subject matter of the Sandy Hook Lawsuits and the parties the Firm is representing, it would be virtually impossible to replace the Firm at this point of the case, without causing great prejudice to FSS and its creditors (even if it could be done, the cost to have a new firm learn the extensive record and discovery in this case, would far exceed the budgeted cost for retaining the Firm).

8.      The professional services the Firm may be required to render, in a special counsel role on the Sandy Hook Lawsuits, include but are not limited to: a) handling all pre-trial matters, including but not limited to jury selection, motions in limine, attending pre-trial conferences with Judge Bellis and opposing counsel, b) preparing and submitting any written pleadings or memoranda of law and other documents necessary to represent FSS, c) acting as trial counsel for FSS, d) handling post-trial motions and briefing, e) participating in negotiations on all matters relating to the resolution of the Sandy Hook Lawsuits and f) counseling FSS on any appellate actions to take at the appropriate time, if necessary (collectively, "Professional Services").

9.      The Debtor believes that the Firm is well qualified to perform the requested Professional Services.

10.     Under the Engagement Letter, the Firm proposes to provide the Professional Services to FSS for a fixed fee of $100,000 per month, which includes all professional fees and out-of-pocket expenses incurred by FSS, beginning as of August 1, 2022. The fixed $100,000 per

4

month fee arrangement is consistent with the fees charged by the Firm to FSS prior to the Petition Date.

11.    The Firm is not receiving any compensation for Professional Services by any other defendant in the Sandy Hook Lawsuits.

12.    P&SLLC does not charge clients on an hourly basis in its normal practice and is not willing to represent the Debtor in the Sandy Hook Lawsuits on an hourly basis. The Debtor, through its CRO, has made a business judgement that retaining P&SLLC on a fixed fee basis to handle the trial of the Sandy Hook Lawsuits is in the best interest of the FSS bankruptcy estate. The Debtor believes that it would be unsuccessful in finding alternative counsel to represent the Sandy Hook Lawsuits and that any representation on an hourly fee basis would result in fees exceeding the fixed fee agreed with P&SLLC.

13.    No agreement exists, nor will any be made, to share any compensation received by the Firm for its services with any other person or firm, except as permitted by 11 U.S.C. § 504(b) and Bankruptcy Rule 2016.

14.    No promises have been made to or received by the Firm as to payment or compensation in connection with the FSS bankruptcy case, other than in accordance with the provisions of the Bankruptcy Code and applicable Bankruptcy Rule.

15.    To the best of the Debtor's knowledge, and, as set forth in the proposed attorney's declaration (the "Pattis Declaration") attached to this Motion as Exhibit B, the Firm does not have an adverse interest with respect to the matter on which the Firm is to be employed as required by 11 U.S.C.§ 327(e).

16.    In light of the Application being under Bankruptcy Code § 327(e) and 328(a), P&SLLC will  comply with applicable orders of this Court for allowance of its fees in accordance

with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the U.S. Trustee, and any orders of this Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred during its representation of the Debtor.

17.     The Debtor believes that P&SLLC's agreed terms of compensation are reasonable.

iii.     *The Sound Business Judgement Basis for a Fixed Fee Agreement*

18.     The retention of a professional by a debtor on a fixed fee is not prohibited by the Bankruptcy Code. 11 U.S.C. § 328(a) (a debtor may retain a professional person on any reasonable terms and conditions including on a fixed fee).

19.     A determination of whether, and, in what amount, a fixed fee, much like a retainer, should be paid is best left to the parties and the discretion of the Bankruptcy Court. Such a determination is made on a case-by-case basis.

20.     The moving party has the burden to establish that the proposed terms and conditions of professional employment proposed on a fixed fee basis under Bankruptcy Code § 328(a) in a bankruptcy case are reasonable.

21.     The Bankruptcy Court must consider several recognized factors, plus special factors which include, but are not limited to: (1) the fixed fee's economic impact on the debtor's ongoing business operation; (2) the fixed fee's economic impact on the ability of the debtor to reorganize; (3) the amount and reasonableness of the fixed fee; (4) the reputation of the special counsel; and (5) the ability of special counsel to disgorge such payments at the conclusion of the case should this Court determine that the fixed fees paid to counsel are not justified.

6

002275

22.     Here, P&SLLC's request for the $100,000 monthly fixed fee for P&SLLC satisfies the 5 factor criteria: (1) FSS's business, since it has been in chapter 11, has had a positive cash flow, and surge in sales with the delivery of previously unavailable products and marketing of new Supplements; (2) the amount of the fixed fee is modest. $100,000 represents the monthly flat fee in many cases handled by the Firm. Retaining the Firm on an hourly basis would far exceed the $100,000 per month in fixed fee, especially in August, September and October, 2022, when the Connecticut Lawsuits are going to trial; (3) the economic impact of the flat monthly fee on FSS's operations and ability to reorganize is slight; (4) FSS must have competent counsel represent it in the Sandy Hook Lawsuits, as the Plaintiffs are represented by a top-tier Connecticut personal injury law firm, and, the claim arising from the result of the Connecticut Lawsuits will have a bearing on what other unsecured creditors of FSS will receive under a plan of reorganization; (5) P&SLLC is a premier criminal defense and white collar litigation and trial boutique law firm in Connecticut, and its partners have national reputation for defending tough cases, and (6) the ability of the Court to successfully order special counsel to disgorge fees paid is strong, should it become necessary. As the trial is anticipated to conclude by the end of October 2022, this Court will have the right to review the final fee application or pleading the Court wishes from the Firm regarding the Professional Services provided by the Firm. The flat fee protects the Firm from having the payment of its fees and expenses it incurs on the trial of the Connecticut Lawsuits to be stretched out over the term of a plan. The Firm does not have the ability to finance its representation of FSS in the Connecticut Litigation.

## NUNC PRO TUNC RELIEF IS APPROPRIATE

23.     Pursuant to the Debtor's request, the Firm has agreed to serve as special counsel on and after August 1, 2022, with assurances that the Debtor would seek approval of its employment

7

002276

and retention *nunc pro tunc* to August 1, 2022, on an emergency basis so that the Firm may be compensated for services it has provided FSS prior to the filing of this Application. No party in interest should be prejudiced as the Firm is providing valuable services in the Sandy Hook Lawsuits at this time, especially with the state court not having taken definite action to "sever" FSS, and, yet continuing with jury selection.

## RELIEF REQUESTED

24.     The Debtor requests that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtor to retain P&SLLC as special counsel, pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order, effective as of August 1, 2022.

## BASIS FOR RELIEF

25.     Bankruptcy Code § 327(e) provides that subject to bankruptcy court approval, trustees—and debtor-in-possession—"may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and, if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e).

26.     Bankruptcy Code § 328(a) provides for the retention of special litigation counsel on a fixed fee basis:

> The trustee. . . with the court's approval, may employ or authorize the employment of a professional person under section 327. . . of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a ***fixed*** or percentage ***fee*** basis, or on a contingent *fee* basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the ***fixing*** of such terms and conditions.

8

002277

27.     To gain approval for the employment of ***special*** litigation ***counsel*** under § 328(a) the terms of such employment must be "reasonable." *In re Contractor Technology, Ltd., 2006 U.S. Dist. LEXIS 34466, 2006 WL 1492250 at \*10 (S.D. Tex. 2006)* (Atlas, J.). "A trustee is given great latitude in the employment of *counsel*." Id.

28.     Retaining P&SLLC under an hourly arrangement would far exceed the proposed $100,000 per month fixed fee arrangement. Mr. Pattis, the lead trial lawyer, for FSS on behalf of Pattis & Smith, when he does bill at an hourly rate, charges $800.00 per hour. If he were to work alone in a month, he would consume the $100,000 fixed fee by working 125 hours in a month. It is anticipated that the Firm's lawyers will spend more than 125 hours per month during August, September and October 2022 on the Connecticut Lawsuits.

29.     P&SLLC is being paid $100,000 per month by FSS to be in trial in Connecticut. Jury selection has commenced, and it is projected to take the entire month of August 2022, based on the single juror voir dire practice in Connecticut state court system. Moreover, trial has been scheduled by Judge Bellis to commence on September 13, 2022. From August 1 through October 30, 2022, the three months for which P&SLLC is authorized to be paid on a fixed fee, it is anticipated that the Firm will be in pre-trial, trial or post-trial activity, which will consume far more than 125 hours of Mr. Pattis' time.

30.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

(a)     Be filed by the trustee or committee and served on the United States Trustee (except in case under chapter 9 of the Bankruptcy Code).

(b)     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in

9

interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

(c)     Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

## A.     P&SLLC Meets the Requirements of Bankruptcy Code § 327(e)

31.     Based on the Pattis Declaration, the Debtor submits that P&SLLC neither holds nor represents a disqualifying adverse interest. 11 U.S.C. § 327(e).

32.     The Pattis Declaration also discloses no connections with the Debtor that would disqualify P&SLLC. The Debtor is not aware of any connections in addition to those disclosed in the Pattis Declaration.

## B.     P&SLLC Meets the Requirements of Bankruptcy Code § 328(a)

33.     The flat fee arrangement, as discussed above, is reasonable. The fees to try the Sandy Hook Lawsuits by the Firm on an hourly basis would far exceed the $100,000.00 monthly flat fee. Moreover, the Engagement Letter provides for a proportional return of the $100,000.00 flat fee in the event of termination, in accordance with applicable bar association ethical rules for fixed fee agreements. FSS must have competent counsel to try the Sandy Hook Lawsuits. The Firm's Engagement Letter should be approved under Bankruptcy Code § 328(a) because, among other things, the agreement is fair and reasonable to FSS.

## C.     This Application and the Pattis Declaration Meet the Requirements of Bankruptcy Rule 2014

34.     This Application and the Pattis Declaration meet the requirements as set out in Bankruptcy Rule 2014. This Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation. The Pattis Declaration is a

10

verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that P&SLLC has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.  The Debtor is not aware of any other connections in addition to those disclosed in the Pattis Declaration.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the Proposed Order approving the employment of P&SLLC commencing on August 1, 2022, under Bankruptcy Code § 327(e) and 328(a), and grant any other relief that is just and proper.

*[Remainder of Page Intentionally Left Blank]*

11

Dated: August 22, 2022

Respectfully submitted,

/s/ *W. Marc Schwartz*
W. Marc Schwartz
Chief Restructuring Officer and Authorized
Representative of Free Speech Systems,
LLC, Debtor and Debtor-in-Possession

12

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 24 hours of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

/s/Kyung S. Lee

14

002283

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

002284

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

## **Parties Claiming Interest or Lien Affected**

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## **Parties Filing Notice of Appearance**

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## **Subchapter V Trustee**

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## **U.S. Trustee**

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## **Additional Notice Parties**

16

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

17

002286

## EXHIBIT A

**Pattis & Smith Engagement Letter**

# PATTIS & SMITH, LLC

## 383 ORANGE STREET, FIRST FLOOR
## NEW HAVEN, CT 06511
## TELEPHONE  203-393-3017
## FACSIMILE   203-393-9745

NORMAN A. PATTIS, ESQ. (npattis@pattisandsmith.com)
KEVIN M. SMITH, ESQ. (ksmith@pattisandsmith.com)
ZACHARY E. REILAND, ESQ. (zreiland@pattisandsmith.com)
CHRISTOPER T. DeMATTEO, ESQ. (cdematteo@pattisandsmith.com)
SHARON ABRAMSON, OFFICE MANAGER (sabramson@pattisandsmith.com)
JONATHAN BRUCE, PARALEGAL (jbruce@pattisandsmith.com)

## PRIVILEGED AND CONFIDENTIAL

Via E-Mail: mschwartz@schwartzassociates.us

Marc Schwartz
Chief Restructuring Officer
Free Speech Systems, LLC
3019 Alvin Devane Blvd-Suite 300
Austin, Texas 78704

August 21, 2022

Re: Attorney Engagement Letter for Pattis & Smith, LLC

Gentlemen:

Thank you for selecting Pattis & Smith, LLC (the "Firm" or "P&SLLC") as special litigation and trial counsel for Free Speech Systems, LLC ("FSS", "you" or "Client") in connection with the lawsuits set out in **Exhibit A** hereto (the "Connecticut Lawsuits"). We appreciate the trust and confidence that your decision places in us and we look forward to a close and mutually rewarding relationship.

The purpose of this letter and the attached Terms of Retention (together, the "Engagement Letter") is to set forth the terms of legal representation of the above referenced Client.

*Scope of Engagement.* The Firm shall serve as attorney and legal counsel for the Client in connection with the following (the "Matter") effective as of August 1, 2022: The Firm shall act as special litigation and trial counsel for FSS in connection with the Connecticut Lawsuits (the "Professional Services").

Free Speech Systems, LLC
August 21, 2022
Page 2 of 7

*Legal Fees and Expenses.* This is a flat fee agreement. Client understands that Client is NOT entering into an hourly fee arrangement. This means that the Firm will devote such time to the representation as is necessary, but the Firm's fees will not increase or decrease based upon the number of hours spent by the attorneys and paraprofessionals at the Firm.

The Client agrees to pay the Firm $100,000.00 for Professional Services performed during the month of August 2022 upon entry of a Bankruptcy Court order approving the retention of P&SLLC in accordance with this Engagement Letter. The Client will then pay the Firm $100,000.00 on the first of each month for Professional Services to be performed by the Firm for each month thereafter. The maximum number of months the Firm may be retained under this Engagement Letter is three (3) months, provided that the engagement may be extended until the entry of a judgment in the Connecticut Lawsuits and any post-judgment motions and notices of appeal by filing a Notice of Extension specifying cause for such extension with the U.S. Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"). If an objection to a Notice of Extension is filed, the Client shall seek by way of an emergency motion an extension of the duration of the Engagement Letter.

**<u>These Fees Are Earned upon Receipt</u>**. The fees paid under this Engagement Letter shall be earned by the Firm when due and upon receipt. By signing below, the Client indicates that the Client understands that these payments will not be deposited into the Firm's IOLTA or Lawyer Trust Account.

The Firm shall bear all the normal and ordinary course out-of-pocket expenses of a trial and litigation counsel, which amounts have been considered in the $100,000,00 per month fee.

*Conflicts.* The Firm has conducted an initial conflicts search based on information you provided. The Firm did not identify any connection that would prevent the Firm from representing you in this Matter. The firm may conduct additional conflicts searches following the commencement of this engagement. If the Firm identifies any conflict, then the Firm shall immediately notify the Client and the Firm and the Client shall take further actions as may reasonably be required to satisfy the Firm's ethical obligations and duties to the Client, all as more particularly described in the Terms of Retention.

While not a conflict, P&SLCC discloses that Alex E. Jones, a co-defendant, in all of the Connecticut Lawsuits, is also a client of the Firm. P&SLCC have represented both FSS and Alex Jones prior to July 29, 2022, the date on which FSS filed its petition for chapter 11 relief (the "<u>Petition Date</u>") and will continue to do so in the Connecticut Litigation.

*General Prospective Waiver and Informed Consent.* The Firm represents many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future Clients will have disputes or transactions with you. You agree that we may continue to represent or may undertake in the future to represent existing or new Client in any business or transactional matter that is not substantially related to our work for you, even if the interests of such Client in those other matters are directly adverse to you. We are not aware of any such matters at the present time. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, because of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, that, if known to

Free Speech Systems, LLC
August 21, 2022
Page 3 of 7

such other client, could be used in any such other matter by such client to your material disadvantage. _You are not giving the Firm a prospective waiver as to conflicting representation related to a litigation matter against you._ We encourage you to seek independent counsel regarding the import of the potential conflicts and prospective waiver discussed and this acknowledgment, waiver, and informed consent. We emphasize that you remain completely free to seek independent counsel at any time even if you decide to sign this Engagement Letter agreeing to its terms and the Terms of Retention.

Please call me with any questions you have after you complete your review of this Engagement Letter including the Terms of Retention. If the Engagement Letter is acceptable to you in this form, please indicate so by signing, dating, and returning it to me and filing an Emergency Application to Retain the Firm as Special Litigation and Trial Counsel.

Very truly yours,

NORMAN A. PATTIS

Pattis & Smith LLC


ACCEPTED AND AGREED:

Free Speech Systems, LLC. Debtor and Debtor in Possession

/s/ W. Marc Schwartz, Chief Restructuring Officer
Authorized Officer of Free Speech Systems, LLC

Dated: August 22, 2022



cc:

Shelby Jordan, esq (via email to sjordan@jhwclaw.com)

Free Speech Systems, LLC
August 21, 2022
Page 4 of 7

## TERMS OF RETENTION

These Terms of Retention are part of the Pattis & Smith, LLC Engagement Letter. Because they are an integral part of our agreement to provide legal services, we ask that you review this document carefully. If you have any questions after reading it, please contact us promptly.

*Who Will Provide Legal Services?* In most cases, one attorney will be your principal contact. From time to time, that attorney may delegate parts of your work to other attorneys or to legal assistants or non-legal professionals in the Firm. We do this to involve those with special knowledge or experience in an area and to provide services to you in a timely, efficient, and cost-effective manner. Norman Pattis will be the primary attorney from our Firm who will be representing the Client.

*Scope of the Representation.* As a Firm, we undertake to provide representation and advice on the legal matters for which we are engaged, and it is important that we both have a clear understanding of the legal services that the Firm has agreed to provide. In our Engagement Letter with you, we specify the Matter in which we will provide representation and the scope of the services we will provide. Please note that we do not provide legal advice regarding any tax issues or effects nor are we responsible for notifying any insurance carrier of any lawsuit. If there are any questions about the terms of engagement, including the scope of the representation that we are to provide in the Matter, please raise those questions promptly with your principal contact at the Firm.

*Identity of Client.* It is our policy to represent only the person or entity identified in our Engagement Letter and not any affiliates. For example, unless otherwise specifically stated in our Engagement Letter, if you are a business organization (corporation, partnership, LLC, etc.), our representation does not include any parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies); if you are an individual, our representation does not include your employer, partners, spouse, siblings, or other family members.

*Your Cooperation.* To enable us to provide effective representation, you agree to: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us.

*Outcomes.* We cannot and do not guarantee the outcome of any matter. Any expression of our professional judgment regarding your matter or the potential outcome is, of course, limited by our knowledge of the facts and based on the law at the time of expression. It is also subject to any unknown or uncertain factors or conditions beyond our control. Any expressions on our part concerning the outcome of the representation, or any other legal matters, are based on our professional judgment and are not guarantees.

*Conflicts of Interest.* We attempt to identify actual and potential conflicts at the outset of any engagement. In some instances, the applicable rules of professional conduct may limit our ability to represent Client with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from

002291

Free Speech Systems, LLC
August 21, 2022
Page 5 of 7

representing another. In other situations, we may be permitted to represent a client only if both or all Client consent to that representation. If a controversy unrelated to the subject matter of the representation develops between you and any other client of the Firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either you or the other client in the unrelated matter. Unfortunately, sometimes conflicts arise or become apparent after work begins on an engagement. If this happens, we will do our best to address and resolve the situation in the manner that best serves the interests of all of our affected Client. Rules concerning conflicts of interest vary with the jurisdiction. To avoid any uncertainty, the Connecticut Rules of Professional Conduct will be applicable to the representation.

*Fees.* The basis for determining our fee for legal services is set forth in the Engagement Letter itself. If you are unclear about the basis for determining your fee, please contact the attorney responsible for your representation. Clients frequently ask us to estimate the fees and other charges they are likely to incur in connection with a particular matter. We are pleased to respond to such requests, whenever possible, with an estimate based upon our professional judgment. This estimate always carries the understanding that, unless we agree otherwise in writing, it does not represent a maximum, minimum, or fixed-fee quotation.

*Expenses.* Our Firm may incur and pay a variety of charges on your behalf in connection with the engagement. Whenever we incur such charges on your behalf, we have agreed to pay them. You as the Client will have no further payment obligation other than the monthly $100,000.00 payment.

*Delinquent Account and Withdrawal of Engagement.* Should your account become delinquent and satisfactory payment terms are not arranged, as permitted under the rules regulating our profession, we will be required to withdraw from the representation.

*Retention of Complementary Counsel.* From time to time during our engagement it may become prudent to engage additional counsel to work with and complement our representation of you. That complementary representation will only be done with your prior written consent and on terms and conditions which you approve. The engagement of complementary counsel may be done directly with you or through our firm, depending on the nature and extent of the representation involved, and shall be done only after written notice and approval of such retention by the Bankruptcy Court.

*Conclusion of Engagement.* Because our Firm has been engaged to provide legal services in connection with the representation in the Matter as specifically defined in our Engagement Letter, the attorney-client relationship terminates upon our completion of our services related to the representation in the Matter. After completion of the representation, upon written notification by the Firm that the matter is terminated, changes may occur in the applicable laws or regulations that could affect your future rights and liabilities regarding the Matter. Unless we are engaged after the completion of the representation to provide additional legal services, the Firm has no continuing obligation to give advice with respect to any future legal developments that may relate to the Matter. If you later retain us to perform further or additional services, our attorney-client relationship will be subject to the terms of engagement agreed to at that time; in the absence of any specific agreement, these Additional Terms of Engagement shall apply to the further or additional representation.

Free Speech Systems, LLC
August 21, 2022
Page 6 of 7

*Termination.* We look forward to the opportunity to complete our representation of you on the specified matter. You may, however, terminate our representation at any time, with or without cause, by notifying us in writing. We will return your papers and other property to you promptly upon receipt of your request for those materials unless they are appropriately subject to a lien. You agree that we will own and retain our own files pertaining to the matter or case, including, for example, Firm administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal attorney's work product such as drafts, notes, internal memoranda, and legal and factual research including investigative reports, prepared by or for the internal use of attorneys. Your termination of our services will not affect your responsibility for payment of legal services rendered and other charges incurred before termination and in connection with an orderly transition of the matter.

Subject to Bankruptcy Court approval, the Client may discharge the Firm upon providing appropriate written notice. In that event, the Client may be entitled to a refund of all or part of the flat monthly fee calculated based on number of days the Firm provided services prior to its termination. Hypothetically, if the Client pays the Firm $100,000 on September 1, 2022, and, the Client terminates the Firm on September 10, 2022, then the Client would be entitled to a refund based on the following formular: number of days remaining in month divided by number of days in the month multiplied by $100,000.00. So in this example, the Firm would be entitled to a refund equal to (20/30 x $100,000) which is $66,666.66.

*Document Retention.* You acknowledge and agree that the Firm may maintain all documents related to your matter digitally. The Firm is not required to maintain physical copies of any documents. At the conclusion of our representation of you, it is our firm's policy to return to you any physical documents to you. We will provide you with copies of any other documents you specifically request (such as copies of depositions, court documents, etc.), and you agree to pay for the associated copying costs and any professional time incurred in identifying any such documents you request. You agree that our Firm may elect to keep at its own expense, copies of any documents related to this matter or otherwise returned to you. Anytime following seven (7) years after the conclusion of our representation of you, the Firm may destroy or delete any files related to your engagement.

*Dispute Resolution.* The Engagement Letter is being entered and is to be performed within the State of Connecticut. The Engagement Letter shall be interpreted in accordance with Connecticut law (without application of choice of law principles).

*By returning the executed Engagement Letter, you acknowledge that you have been provided ample opportunity to have counsel explain to you the advantages and disadvantages of binding arbitration to make an informed decision about agreeing to the provision.*

*Modifications.* The Engagement Letter and these Additional Terms of Engagement reflect our entire agreement on the terms of this engagement. These written terms of engagement are not subject to any oral agreements or understandings, and any change in those terms can only be made in writing signed by you and the Firm.

Free Speech Systems, LLC
August 21, 2022
Page 7 of 7

## EXHIBIT A

### Matters For Which FSS is Retaining P&SLLC

Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones and Free Speech Systems, LLC, Case No., X06-UWY-CV-18-6046436-S (the "Lafferty Matter")

William Sherlach v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046437-S

William Sherlach and Robert Parker v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046438-S

All the proceedings described above are before the Connecticut Superior Court, Waterbury District and consolidated in the Lafferty matter.

**<u>EXHIBIT B</u>**

**Pattis Declaration**

002295

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DECLARATION OF NORMAN A. PATTIS IN SUPPORT OF
THE DEBTOR' APPLICATION TO EMPLOY
PATTIS & SMITH LLC UNDER 11 U.S.C. § 327(e) AND 328(a)
AS SPECIAL COUNSEL, NUNC PRO TUNC TO AUGUST 1, 2022**

I, Norman A. Pattis, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State

of Connecticut and United States District Court for the District of Connecticut.  I am a founding

partner in the New Haven office of the law firm Pattis & Smith LLC (the "Firm" or "P&SLLC"),

located at 383 Orange Street, First Floor, New Haven, Connecticut 06511.

2.      I am making this declaration in support of the Debtor's Application to Employ

Pattis & Smith, LLC under 11 U.S.C.§ 327(e) and 328(a), as special counsel, effective as of August

1, 2022 (the "Application").  Unless otherwise indicated, capitalized terms used but not defined

herein have the meanings ascribed to such terms in the Application.

3.      Except as otherwise noted, all facts set forth in this declaration are based upon my

personal knowledge, upon the client and matter records of P&SLLC reviewed by me or derived

from information available to me that I believe to be true and correct or opinion based upon

experience, knowledge and information concerning the restructuring of debtor-creditor

relationships, workouts, chapter 11 process, and the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

### A.     Scope of Services

4.      Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, P&SLLC will serve as special counsel to the Debtor in connection with the Sandy Hook Lawsuits.  More specifically, the Firm shall serve as litigation and trial counsel for FSS as to the Sandy Hook Lawsuits ("Professional Services").

### B.     Proposed Compensation

5.      The Debtor shall pay P&SLLC a flat monthly fee of $100,000.00 for the months of August, September and October 2022. The first $100,000 shall be paid upon entry of the order approving the retention of the Firm under Bankruptcy Code § 327(e) and 328(a). The second and third $100,000 payments will be made on the first of each month.

6.      The $100,000 flat fee shall cover the fees for all Professional Services of the Firm for the month along with all the out-of-pocket expenses attributable to FSS during that month.

7.      P&SLLC will not receive compensation from any other defendant during the same three (3) month period for which the Firm is retained by FSS.

8.      Because the Firm is on a fixed fee agreement with FSS, the Firm abide by will abide by any direction by the Court for final allowance of compensation in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtor.

2

**C.     Disclosure of Connections**

    *i.     Search and General Descriptions of Connections*

9.      P&SLLC performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas.

10.      I conducted a search of P&SLLC files to determine using the list of parties in interest listed in <u>Schedule 1</u> hereto whether the Firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the Firm did not represent any of the parties listed on Schedule 1. P&SLLC may have provided services to creditors or other parties in interest inadvertently omitted from Schedule 1 or the description above. If such connections exist, they would be on matters wholly unrelated to the service for which FSS seeks to engage P&SLLC.

11.      The results of the foregoing connections search process confirm that neither I, P&SLLC, nor any of its employees or partners, to the best of my knowledge, have any disqualifying connections.

12.      Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and P&SLLC do not hold an interest adverse to the Debtor or the estate with respect to the matter on which the Firm is to be employed.

13.      I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

002298

14.     P&SLLC is not a creditor, an equity security holder, or an insider of the Debtor; P&SLLC is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and P&SLLC does not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

15.     P&SLLC does not possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate. P&SLLC also does not possess or assert any economic interest that would create either an actual or potential dispute in which the estate is a rival claimant. P&SLLC does not have any incentive to act contrary to the best interests of the estate and its creditors.

**D.     Bankruptcy Rule 2016(b) Disclosures**

16.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, P&SLLC has not shared or agreed to share (a) any of its compensation from the representation of the Debtor with any other persons, or (b) any compensation any other persons have received, may have received, or will receive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2022,

By: /s/ *Norm A. Pattis* _____
             Norm A. Pattis

4

## SCHEDULE 1

## TO PATTIS DECLARATION

## SEARCHED PARTIES

Debtor & Professionals

    Law Office of Ray Battaglia        Schwartz Associates

    Shannon & Lee LLP


Debtor's Equity

    Alexander E. Jones

Largest 20 Unsecured Creditors & Litigation Claimants

| | |
|---|---|
| Elevated Solutions Group | Dona Soto |
| Atomial LLC | Erica Lafferty |
| Cloudfare, Inc. | Francine Wheeler |
| Jacquelyn Blott | Ian Hockley |
| Joel Skousen | Jacqueline Barden |
| eCommerce CDN LLC | Jennifer Hensel |
| Paul Watson | Jeremy Richman |
| Greenair, Inc. | Jillian Soto |
| Edgecast, Inc. | Leonard Pozner |
| Ready Alliance Group, Inc. | Marcel Fontaine |
| Getty Images, Inc. | Mark Barden |
| RatsMedical.com | Neil Heslin |
| David Icke Books Limited | Nicole Hockley |
| WWCR | PQPR Holdings Limited, LLC |
| CustomTattoNow.com | Robert Parker |
| AT&T | Scarlett Lewis |
| Justin Lair | Veronique De La Rosa |
| Brennan Gilmore | William Sherlach |
| Carlee Soto-Parisi | William Aledenberg |
| Carlos Soto | Larry Klayman |
| Christopher Sadowski | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | Zeisler & Zeisler P.C. |
| Koskoff Koskoff & Bieder | Jordan & Ortiz, P.C. |
| Fertitta & Reynal LLP | McDowell Heterhington LLP |

The Akers Law Firm PLLC
Copycat Legal PLLC
Waller Lansden Dortch & Davis, LLP

Akin Gump Strauss Hauer & Feld LLP

## U.S. Bankruptcy Judges and Staff

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro

Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

## U.S. Trustee Personnel

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera

Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Case No. 22-60043 |
| | § | |
| DEBTOR. | § | Chapter 11 (Subchapter V) |
| | § | |

**ORDER APPROVING DEBTOR'S APPLICATION**
**TO EMPLOY PATTIS & SMITH LLC UNDER 11 U.S.C. § 327(e) AND 328(a),**
**AS SPECIAL COUNSEL, NUNC PRO TUNC AUGUST 1, 2022**

Upon the application (the "Application")[1] filed by the Debtor to retain and employ Pattis

& Smith LLC  ("P&SLLC") pursuant to Bankruptcy Code §§ 327(e), 328(a)  and 330 and

Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and

attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over

this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. §

157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the

Application and the Pattis Declaration are in full compliance with all applicable provisions of the

Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this

Court; (v) P&SLLC does not represent an interest adverse to the Debtor's estate with respect to

the matters upon which it is to be engaged; (vi) P&SLLC is qualified to represent the Debtor's

estate under § 327(e) of the Bankruptcy Code; (vii) the terms of P&SLLC's employment have

been disclosed and are reasonable under the circumstances under § 328(a) of the Bankruptcy Code;

(viii) proper and adequate notice of the Application, the deadline to file any objections to the

---

[1]      Capitalized terms not defined herein have the meaning set forth in the Application.

Application, and the hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interest of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(e) and 328(a) and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain P&SLLC commencing on August 1, 2022, as special counsel, under the terms and conditions set forth in the Application, the Engagement Letter attached to the Application as <u>Exhibit B and this Order</u>.

2.      P&SLLC is authorized to perform the Professional Services for the Debtor that are necessary or appropriate in connection with serving as special counsel in connection with the Sandy Hook Lawsuits.

3.      P&SLLC shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 328(a), 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      This order shall be immediately effective and enforceable upon entry.

5.      This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

6.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, P&SLLC shall not be entitled to

2

reimbursement of expenses or fees from the Debtor in connection with any objection to its fees, without further order of the Court.

7.     P&SLLC will review its files periodically during the pendency of this Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, P&SLLC will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

8.     To the extent that any of the Application, the Pattis Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

9.     The Debtor and P&SLLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

10.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

3

002304

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**EMERGENCY APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTHORIZING EMPLOYMENT OF THE REYNAL LAW FIRM, P.C., UNDER 11 U.S.C. § 327(e), AS SPECIAL COUNSEL, *NUNC PRO TUNC* TO JULY 29, 2022, AND (B) GRANTING RELATED RELIEF**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ' CONFERENCE ROOM NUMBER IS 590153. YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGELOPEZ" IN THE GOTOMEETTING APP OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE IN THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT-HAND CORNER AND ENTER YOUR NAME UNDER PERSONAL INFORMATION SETTING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

THE DEBTOR WILL SEEK APPROVAL OF THIS APPLICATION ON AUGUST 24, 2022, AT 10:00 A.M. AT THE SAME TIME WHEN AGREEMENTS ARE ANNOUNCED

REGARDING THE EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC
STAY [ECF. NO. 15]

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession

in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves for entry of an

order, substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a)

and 327(e) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of The

Reynal Law Firm, P.C. (the "Reynal Firm" or the "Firm") as special counsel to FSS (the

"Application") pursuant to that certain engagement letter agreement by and between the Debtor

and The Reynal Firm, a copy of which is attached hereto as Exhibit A (the "Engagement

Agreement"), as modified by the Proposed Order. In support of the Application, the Debtor

submits the Declaration of Andino Reynal attached hereto as Exhibit B (the "Reynal Declaration")

and respectfully represents as follows:

**JURISDICTION**

1.      The United States Bankruptcy Court for the Southern District of Texas (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core

proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28

U.S.C. § 1408.

2.      The bases for the relief requested herein are sections 105, 327(e), 330, and 363(b)

of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1of the Local Rules

for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

2

# **BACKGROUND**

### A. Case Background

3.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

4.      The Debtor continues to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

5.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.      Proposed Employment of The Reynal Firm

####       i.        Scope of Employment

6.      Subject to the Court's approval, the Debtor desires to employ and retain The Reynal Firm *nunc pro tunc* to July 29, 2022 (the "Petition Date"), as its special counsel in connection the following cases (the "Matters"):

 Fontaine v. Free Speech Systems, LLC, et al., D-1-GN-18-001605 (459th District Court, Travis County, Texas)

Heslin, et al. v. Free Speech Systems, LLC, et al, D-1-GN18-001835 (459th District Court, Travis County, Texas)

Pozner, et al. v. Free Speech Systems, LLC, et al. D-1-GN-18-001842 (459th District Court, Travis County, Texas)

Corsi et al. v. Free Speech Systems, LLC, et al., 21-50954 (5th Cir. Court of Appeals)

Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones and Free Speech Systems, LLC, Case No., X06-UWY-CV-18-6046436-S (the "Lafferty Matter") *

William Sherlach v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046437-S*

William Sherlach and Robert Parker v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046438-S*

3

\*All these proceedings are before the Connecticut Superior Court, Waterbury District and consolidated in the Lafferty matter

  ii.  *Necessity of Employment*

7. The Debtor desires to retain The Reynal Firm to (a) act as FSS's primary special litigation and trial counsel on the three Travis County suits and the Corsi appeal, and (b) assist Pattis & Smith in connection with the trial of the Lafferty Matter in Connecticut, including preparing witnesses for trial, consulting on presentation of the case and briefing on any issues that may arise during the course of the trial  (collectively, the "Professional Services").

8. The Debtor desires to retain The Reynal Firm to represent it as its litigation and trial counsel on these Matters because (a) the Firm has extensive experience and knowledge with trial practice and procedure, with the partners at The Reynal Firm having tried many cases in Texas courts and handled many appeals before the Fifth Circuit Court of Appeals; (b) the Firm is intimately familiar with the facts and issues in each of the Matters, including the pleadings filed on the docket, the discovery undertaken, the evidence adduced to date and the law applicable to the Matters, having represented FSS and other co-defendants on these Matters prior to the Petition Date; (c) the Firm has already tried the Heslin\Lewis suit pending in Travis County and is prepared to handle post-jury verdict issues arising from that trial; (d) due to the subject matter of the Matters and the parties involved, it would be virtually impossible to replace the Firm at this point, without causing great prejudice to FSS and its creditors (even if it could be done, the cost to have a new firm learn the extensive record and discovery in this case, would far exceed the budgeted cost for retaining the The Renyal Firm on an hourly basis).

9. The Debtor believes that the Firm is well qualified to perform the requested Professional Services.

4

10.     The Firm's proposed compensation shall continue at the Firm's normal hourly rates set out in the Engagement Letter. While the Firm had charged a flat fee prior to the Petition Date, the Firm has agreed to provide the Professional Services at the hourly rates because the Firm does not believe it will be in trial on the Texas and Court of Appeals matters, and will be consulting with Pattis & Smith, and not actually trying the cases in Connecticut. The hourly rate structure is beneficial to the FSS estate based on the projected type of work The Reynal Firm will be doing in the foreseeable future for the Debtor. If circumstances change, the Debtor will seek an amendment of the retention of The Reynal Firm.

11.     No agreement exists, nor will any be made, to share any compensation received by the Firm for its services with any other person or firm, except as permitted by 11 U.S.C. § 504(b) and Bankruptcy Rule 2016.

12.     No promises have been made to or received by the Firm as to payment or compensation in connection with the FSS bankruptcy case, other than in accordance with the provisions of the Bankruptcy Code and applicable Bankruptcy Rule.

13.     To the best of the Debtor's knowledge, and, as set forth in the proposed attorney's declaration (the "Reynal Declaration") attached to this Motion as Exhibit B, the Firm does not have an adverse interest with respect to the matter on which the Firm is to be employed as special litigation counsel as required by 11 U.S.C.§ 327(e).

14.     The Reynal Firm intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the U.S. Trustee, and any orders of this

5

Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred during its representation of the Debtor.

15.     The Debtor believes that The Reynal Firm's agreed terms of reimbursement, compensation, and hourly rates are reasonable. The Reynal Firm will notify the Debtor and the U.S. Trustee of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

*iii.*     *Retainer*

16.     The payment of a post-petition retainer is not prohibited by the Bankruptcy Code. 11 U.S.C. § 328(a) (a debtor may retain a professional person on any reasonable terms and conditions including on a retainer).

17.      A determination of whether, and, in what amount, a retainer should be paid is best left to the parties and the discretion of the Bankruptcy Court. Such a determination is made on a case-by-case basis.

18.     The moving party has the burden to establish that the proposed terms and conditions of professional employment proposed in a bankruptcy case are reasonable.

19.     The Bankruptcy Court must consider several recognized factors, plus special factors which include, but are not limited to: (1) the retainer's economic impact on the debtor's ongoing business operation; (2) the retainer's economic impact on the ability of the debtor to reorganize; (3) the amount and reasonableness of the retainer; (4) the reputation of the special counsel; and (5) the ability of special counsel to disgorge such payments at the conclusion of the case should this Court determine that the fees paid to counsel are not justified.

20.     Here, The Reynal Firm's request for the $50,000 post-petition retainer satisfies the 5 factor criteria: (1) FSS's business, since it has been in chapter 11, has had a positive cash flow,

6

and surge in sales with the delivery of previously unavailable products and marketing of new Supplements; (2) the amount of the proposed retainer is modest; (3) the economic impact of the retainer on FSS's operations and ability to reorganize is slight; (4) FSS must have competent counsel represent it in the Matters, as the Plaintiffs are represented by a top-tier personal injury law firm, and, the claims arising from the results of those matters will have a bearing on what other unsecured creditors of FSS will receive under a plan of reorganization; (5) The Reynal Firm is a premier criminal defense and white collar litigation and trial boutique law firm in Texas; and (6) the ability of the Court to successfully order special counsel to disgorge fees paid is strong, should it become necessary. The Firm is seeking to obtain a retainer but has agreed to hold it and not take the retainer into income until the last invoice.

21.     The Proposed Order provides that The Reynal Firm shall continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

## NUNC PRO TUNC RELIEF IS APPROPRIATE

22.     Pursuant to the Debtor's request, the Firm has agreed to serve as special counsel on and after the Petition Date, with assurances that the Debtor would seek approval of its employment and retention *nunc pro tunc* to July 29, 2022, so that the Firm may be compensated for services it has provided FSS prior to the filing of this Application. No party in interest should be prejudiced as the Firm is providing valuable services on the Matters at this time.

## RELIEF REQUESTED

23.     The Debtor requests that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtor to retain The Reynal Firm as special counsel, pursuant to

002311

the terms of the Engagement Agreement, as modified by the Proposed Order, effective as of July 29, 2022.

## BASIS FOR RELIEF

24.     Bankruptcy Code § 327(e) provides that subject to bankruptcy court approval, trustees—and debtor-in-possession—"may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and, if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e).

25.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

(a)     Be filed by the trustee or committee and served on the United States Trustee (except in case under chapter 9 of the Bankruptcy Code).

(b)     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

(c)     Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

002312

**A.      The Reynal Firm Meets the Requirements of Bankruptcy Code § 327(e)**

26.      Based on the Reynal Declaration, the Debtor submits that The Reynal Firm neither holds nor represents a disqualifying adverse interest. 11 U.S.C. § 327(e).

27.      The Reynal Declaration also discloses no connections with the Debtor that would disqualify The Reynal Firm. The Debtor is not aware of any connections in addition to those disclosed in the Reynal Declaration.

**B.      This Application and the Reynal Declaration Meet the Requirements of Bankruptcy Rule 2014**

28.      This Application and the Reynal Declaration meet the requirements as set out in Bankruptcy Rule 2014.  This Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation.  The Reynal Declaration is a verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that The Reynal Firm has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.  The Debtor is not aware of any other connections in addition to those disclosed in the Reynal Declaration.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the Proposed Order approving the employment of The Reynal Firm commencing on July 29, 2022, and grant any other relief that is just and proper.

[*Remainder of Page Intentionally Left Blank*]

9

Dated: August 22, 2022

Respectfully submitted,

_/s/ W. Marc Schwartz_
W. Marc Schwartz
Chief Restructuring Officer and Authorized
Representative of Free Speech Systems,
LLC, Debtor and Debtor-in-Possession

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 24 hours of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

*/s/Kyung S. Lee*

12

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

002317

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

**Parties Claiming Interest or Lien Affected**

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

**Parties Filing Notice of Appearance**

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

**Subchapter V Trustee**

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

**U.S. Trustee**

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

**Additional Notice Parties**

14

002318

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

15

## **Exhibit A**

Engagement Agreement

# THE REYNAL LAW FIRM, P.C.

### PRIVILEGED AND CONFIDENTIAL

Via E-Mail: Mschwartz@schwartzassociates.us

Marc Schwartz
Chief Restructuring Officer
Free Speech Systems, LLC
3019 Alvin Devane Blvd-Suite 300
Austin, Texas 78704

August 21, 2022

Re: **Legal Services Agreement:** Lawsuits Set Out in Exhibit "1"

Gentlemen:

You have asked me and my firm The Reynal Law Firm, P.C. (the "Reynal Firm" or "Firm") to act as special litigation and trial counsel for Free Speech Systems, LLC ("FSS", "you" or "Client") on certain matters described below. Pursuant to a February 28, 2022, engagement letter among Alex Jones, Infowars LLC and Free Speech Systems, LLC, those entities retained Fertitta & Reynal LLP to represent them in connection with suits brought against them by plaintiffs Fontaine, Heslin, Pozner and Lewis in Texas (the "Original Engagement Agreement"). A true and correct copy of the Original Engagement Agreement is attached hereto as **Exhibit "2"** and incorporated by reference as if fully set out. This Engagement Letter amends certain provisions of the Original Engagement Agreement for the new work you want us to handle during FSS's bankruptcy case.

As a result of our expertise and experience with the trial on the Heslin\Lewis matter, you have asked me and my Firm to act as special litigation and trial counsel for FSS in connection with the lawsuits set out in **Exhibit "1",** including three (3)  defamation and intentional infliction of emotional distress suits in Texas pending in Travis County (two arising from the Sandy Hook shootings and one involving the shooting in Parkland, Florida) , an appeal brough by Jerome Corsi to the Fifth Circuit Court of Appeals and the Lafferty Matter, defined in Exhibit "1". FSS understands that with respect to the Lafferty Matter, it is retaining Pattis & Smith as its primary litigation and trial counsel. Based on the experience the Firm has with trying the Heslin\Lewis's suit in Travis County last month, you have asked us to consult on and assist Pattis & Smith with the Lafferty Matter, preparing witnesses for trial, consulting on presentations to the court and briefing on any issues requiring legal research. We appreciate the trust and confidence that your decision places in us and we look forward to a close and mutually rewarding relationship.

The purpose of this letter (the "Engagement Letter") is to set forth the terms of legal representation of FSS, as a debtor-in-possession, specify the scope of engagement and amend the Original Engagement Agreement for the matters. Except as otherwise amended by this Engagement

Free Speech Systems, LLC
August 21, 2022
Page 2 of 12

Letter, all the other terms and conditions of the Original Engagement Agreement shall control the retention of the Firm by FSS.

*Scope of Engagement.* The Firm shall serve as attorney and legal counsel for the Client in connection with the following (the "Matters") effective as of July 29, 2022 (the "Petition Date"): The Firm shall act as special litigation and trial counsel for FSS in connection with the lawsuits described in **Exhibit "1"** (the "Professional Services").

*Legal Fees and Expenses.* The Firm shall be compensated for Professional Services provided to the Client on the Matters, in accordance with the Original Engagement Agreement, as amended by this Engagement Agreement. **None of the provisions relating to a flat fee arrangement contained in the Original Engagement Agreement shall apply to these Matters**.

For Professional Services provided to Client by the Firm, the Firm shall be entitled to a fee in the amount equal to the time expended by each attorney, multiplied by the hourly rates set forth in the attached Hourly Billing Rate Schedule. The Client is responsible for reimbursing the Firm for expenses incurred on behalf of the Client pursuant to the attached Client Expense Policy.

*Retainer.* As a condition to The Reynal Firm accepting this engagement, you have agreed to provide a retainer of $50,000.00 (the "Retainer") in connection with these Matters, subject to such payment being approved by the United States Bankruptcy Court, Southern District of Texas, Houston Division (the "Bankruptcy Court"). The instructions for remitting the retainer funds to the Firm will be provided in a separate electronic correspondence. The Retainer will serve as a security deposit and will be applied towards our final invoice for these Matters. Any balance will be returned to you. If you do not pay your invoices timely, the Firm may apply the Retainer to an unpaid invoice. Subject to Bankruptcy Court approval, the Firm reserves the right to have the Retainer replenished by the Client if the Firm anticipates that there is a risk in collecting future attorney's fees and/or reimbursement of costs. Notwithstanding anything contrary contained herein, the Firm understands and agrees that payment of its fees and expenses is subject to Bankruptcy Court approval, either on an interim basis pursuant to an order approving a procedure for interim compensation or pursuant a fee application.

*Invoices/Fee Statements.* The Firm's invoices will be issued to you during the month, if not more often, following the month that services are provided. The invoice will include a fee statement providing the details of the legal services performed, and the expenses incurred, for the Client. The invoices shall be informational only and shall only be paid upon allowance by a Bankruptcy Court order or pursuant to an order approving interim compensation of professionals.

*Conflicts.* The Firm has conducted an initial conflicts search based on information you provided. The Firm did not identify any connection that would prevent the Firm from representing you in this Matter. The firm may conduct additional conflicts searches following the commencement of this engagement. If the Firm identifies any conflict, then the Firm shall immediately notify the Client and the Firm and the Client shall take further actions as may reasonably be required to satisfy the Firm's ethical obligations and duties to the Client, all as more particularly described in the Terms of Retention.

002322

Free Speech Systems, LLC
August 21, 2022
Page 3 of 12

      While not a conflict, The Reynal Firm discloses that Alex E. Jones, a co-defendant, in all the lawsuits set out in Exhibit A, is also a client of the Firm.  The Reynal Firm has represented both FSS and Alex Jones prior to the Petition Date and will continue to do so on most of these Matters.

      *General Prospective Waiver and Informed Consent*. The Firm represents many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future Clients will have disputes or transactions with you. You agree that we may continue to represent or may undertake in the future to represent existing or new Client in any business or transactional matter that is not substantially related to our work for you, even if the interests of such Client in those other matters are directly adverse to you. We are not aware of any such matters at the present time. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, because of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage. *You are not giving the Firm a prospective waiver as to conflicting representation related to a litigation matter against you*. We encourage you to seek independent counsel regarding the import of the potential conflicts and prospective waiver discussed and this acknowledgment, waiver, and informed consent. We emphasize that you remain completely free to seek independent counsel at any time even if you decide to sign this Engagement Letter agreeing to its terms and the Terms of Retention.

      Please call me with any questions you have after you complete your review of this Engagement Letter including the Terms of Retention. If the Engagement Letter is acceptable to you in this form, please indicate so by signing, dating, and returning it to me and filing an Emergency Application to Retain the Firm as Special Litigation and Trial Counsel.

                         Very truly yours,

                         *Andino Reynal*

                         The Reynal Law Firm, P.C.

ACCEPTED AND AGREED:

Free Speech Systems, LLC

  /s/ *W. Marc Schwartz*
Authorized Officer of Free Speech Systems, LLC

   8/22/22
Dated

Free Speech Systems, LLC
August 21, 2022
Page 4 of 12

## ADDENDUM TO ENGAGEMENT LETTER

The appropriate Client point of contact to address payment status:

Name:
Title:
Phone:
Work Email:

Invoices are to be delivered as follows:

☐ By email:      _____

    Email:      _____

☐ By regular mail:

Address:      _____

             _____

             _____

Free Speech Systems, LLC
August 21, 2022
Page 5 of 12

TERMS OF RETENTION

These Terms of Retention are part of The Reynal Firm Engagement Letter. Because they are an integral part of our agreement to provide legal services, we ask that you review this document carefully. If you have any questions after reading it, please contact us promptly.

*Who Will Provide Legal Services?* In most cases, one attorney will be your principal contact. From time to time, that attorney may delegate parts of your work to other attorneys or to legal assistants or non-legal professionals in the Firm. We do this to involve those with special knowledge or experience in an area and to provide services to you in a timely, efficient, and cost-effective manner. Andino Reynal will be the primary attorney from our Firm who will be representing the Client.

*Scope of the Representation.* As a Firm, we undertake to provide representation and advice on the legal matters for which we are engaged, and it is important that we both have a clear understanding of the legal services that the Firm has agreed to provide. In our Engagement Letter with you, we specify the matter in which we will provide representation and the scope of the services we will provide. Please note that we do not provide legal advice regarding any tax issues or effects nor are we responsible for notifying any insurance carrier of any lawsuit. If there are any questions about the terms of engagement, including the scope of the representation that we are to provide in the matter, please raise those questions promptly with your principal contact at the Firm.

*Identity of Client.* It is our policy to represent only the person or entity identified in our Engagement Letter and not any affiliates. For example, unless otherwise specifically stated in our Engagement Letter, if you are a business organization (corporation, partnership, LLC, etc.), our representation does not include any parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies); if you are an individual, our representation does not include your employer, partners, spouse, siblings, or other family members.

*Your Cooperation.* To enable us to provide effective representation, you agree to: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us.

*Outcomes.* We cannot and do not guarantee the outcome of any matter. Any expression of our professional judgment regarding your matter or the potential outcome is, of course, limited by our knowledge of the facts and based on the law at the time of expression. It is also subject to any unknown or uncertain factors or conditions beyond our control. Any expressions on our part concerning the outcome of the representation, or any other legal matters, are based on our professional judgment and are not guarantees.

*Conflicts of Interest.* We attempt to identify actual and potential conflicts at the outset of any engagement. In some instances, the applicable rules of professional conduct may limit our ability to represent Client with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from representing another. In other situations, we may be permitted to represent a client only if both or all

Free Speech Systems, LLC
August 21, 2022
Page 6 of 12

Client consent to that representation. If a controversy unrelated to the subject matter of the representation develops between you and any other client of the Firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either you or the other client in the unrelated matter. Unfortunately, sometimes conflicts arise or become apparent after work begins on an engagement. If this happens, we will do our best to address and resolve the situation in the manner that best serves the interests of all our affected Client. Rules concerning conflicts of interest vary with the jurisdiction. To avoid any uncertainty, the Connecticut Rules of Professional Conduct will be applicable to the representation.

*Fees.* The basis for determining our fee for legal services is set forth in the Engagement Letter itself. If you are unclear about the basis for determining your fee, please contact the attorney responsible for your representation.  Clients frequently ask us to estimate the fees and other charges they are likely to incur in connection with a particular matter. We are pleased to respond to such requests, whenever possible, with an estimate based upon our professional judgment. This estimate always carries the understanding that, unless we agree otherwise in writing, it does not represent a maximum, minimum, or fixed-fee quotation.

*Expenses.* Our Firm may incur and pay a variety of charges on your behalf in connection with the engagement. Whenever we incur such charges on your behalf, we will bill them to you as part of your invoice in accordance with the attached Client Expense Policy.

*Delinquent Account and Withdrawal of Engagement.* Because FSS is a chapter 11 debtor, the charging of fees and termination of services are subject to Bankruptcy Court approval.

*Additional Retainer.* Subject to Bankruptcy Court approval, if the representation will require a concentrated period of activity, such as a trial, arbitration, or hearing, we reserve the right to require the payment of all amounts then owing to us and the payment to us of an additional retainer for the fees and expenses we estimate will be incurred in preparing for and completing the trial, arbitration, or hearing, as well as arbitration fees likely to be assessed. If you fail to timely pay any  retainer deposit requested, we will have the right to cease performing further work for you and withdraw from the representation.

*Obligation to Pay Fees and Expenses.* Unless your Engagement Letter expressly provides that a third-party is agreeing to pay your attorney's fees and such third-party has agreed in writing, regardless of whether you are insured to cover the particular risk or pursuing parties for recovery of attorneys' fees and other charges, it remains your obligation to pay all amounts due to us within the time periods reflected in the Engagement Letter, as may be modified by an order of the Bankruptcy Court.

*Retention of Complementary Counsel.* From time to time during our engagement it may become prudent to engage additional counsel to work with and complement our representation of you. That complementary representation will only be done with your prior written consent and on terms and conditions which you approve. The engagement of complementary counsel may be done directly with you or through our firm, depending on the nature and extent of the representation involved, and shall be done only after written notice and approval of such retention by the Bankruptcy Court.

Free Speech Systems, LLC
August 21, 2022
Page 7 of 12

*Conclusion of Engagement.* Because our Firm has been engaged to provide legal services in connection with the representation in the Matter as specifically defined in our Engagement Letter, the attorney-client relationship terminates upon our completion of our services related to the representation in the Matter. After completion of the representation, upon written notification by the Firm that the matter is terminated, changes may occur in the applicable laws or regulations that could affect your future rights and liabilities regarding the Matter. Unless we are engaged after the completion of the representation to provide additional legal services, the Firm has no continuing obligation to give advice with respect to any future legal developments that may relate to the Matter.  If you later retain us to perform further or additional services, our attorney-client relationship will be subject to the terms of engagement agreed to at that time; in the absence of any specific agreement, these Additional Terms of Engagement shall apply to the further or additional representation.

*Termination.* We look forward to the opportunity to complete our representation of you on the specified matter. You may, however, terminate our representation at any time, with or without cause, by notifying us in writing. We will return your papers and other property to you promptly upon receipt of your request for those materials unless they are appropriately subject to a lien. You agree that we will own and retain our own files pertaining to the matter or case, including, for example, Firm administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal attorney's work product such as drafts, notes, internal memoranda, and legal and factual research including investigative reports, prepared by or for the internal use of attorneys. Your termination of our services will not affect your responsibility for payment of legal services rendered and other charges incurred before termination and in connection with an orderly transition of the matter.

*Document Retention.* You acknowledge and agree that the Firm may maintain all documents related to your matter digitally. The Firm is not required to maintain physical copies of any documents. At the conclusion of our representation of you, it is our firm's policy to return to you any physical documents to you. We will provide you with copies of any other documents you specifically request (such as copies of depositions, court documents, etc.), and you agree to pay for the associated copying costs and any professional time incurred in identifying any such documents you request. You agree that our Firm may elect to keep at its own expense, copies of any documents related to this matter or otherwise returned to you. Anytime following seven (7) years after the conclusion of our representation of you, the Firm may destroy or delete any files related to your engagement.

*Dispute Resolution.* The Engagement Letter is being entered and is to be performed within the State of Texas.  The Engagement Letter shall be interpreted in accordance with Texas law (without application of choice of law principles). FSS is under supervision of the Bankruptcy Court. Therefore, this Engagement Letter amends the Original Engagement Letter to delete all references and requirement for either party to arbitrate any disputes under this Engagement Agreement. Instead, all disputes regarding this Engagement Agreement shall be subject to review by the United States Bankruptcy Court.

*By returning the executed Engagement Letter, you acknowledge that you have been provided ample opportunity to have counsel explain to you the advantages and disadvantages of binding arbitration to make an informed decision about agreeing to the provision.*

Free Speech Systems, LLC
August 21, 2022
Page 8 of 12

*Modifications.* The Engagement Letter and these Additional Terms of Engagement reflect our entire agreement on the terms of this engagement. These written terms of engagement are not subject to any oral agreements or understandings, and any change in those terms can only be made in writing signed by you and the Firm.

Free Speech Systems, LLC
August 21, 2022
Page 9 of 12

## Hourly Billing Rate Schedule

| BILLER | RATE |
|---|---|
| F. Andino Reynal | $800 |
| Joseph Magliolo | $800 |
| Lynn Hardaway | $800 |
| West Medlin | $400 |

Free Speech Systems, LLC
August 21, 2022
Page 10 of 12

Client Expense Policy

In connection with the representation of a client, the Firm may incur expenses. Unless the Engagement Letter expressly provides to the contrary, the Firm's and the Client's rights and responsibilities related to such expenses are as follows:

*Legal Research and Related Services.* The Firm subscribes to certain online research services. These subscription-based services are part of the Firm's overhead and not charged to the Client. Certain services are charged on a per-transaction including, without limitation, the following examples: UCC searches, lien searches, title searches and other record searches. The Client is responsible for these pre-transaction charges. The Firm will advance the costs for all such services and submit bills to you for reimbursement. The Firm may seek prior approval from you if the anticipated aggregate monthly expense for such services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Document Management and eDiscovery Services.* The Firm subscribes to advanced document management software systems. These subscription-based systems are part of the Firm's overhead and not charged to the Client. The Client is responsible for eDiscovery services. eDiscovery service providers typically charge per gigabyte of information stored. Additional services from the outside vendor may be required other than storage of the information and typically these are separately charged.  If the Firm uses an eDiscovery service during the representation, then the Firm will seek the Client's prior approval before incurring expenses for such services. Rather than billing these expenses through the Firm, the Firm reserves the right to have the Client contract directly with the outside vendor to pay for these expenses. For the avoidance of doubt, the Client is responsible to the Firm for the payment of all fees and expenses incident to the firm's review and processing of discovery materials that are not handled by an outside vendor.

*Printing, Shipping, Postage and Related Expenses.* For all printing, shipping, postage, and related services the Firm may handle them in house or use an outside vendor. The Client is responsible for all such printing, shipping, postage, and related services at costs or the prevailing market rate if handled in house. The Firm may seek prior approval from the Client if the anticipated aggregate monthly expense for printing, shipping, postage, and related services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Travel Expenses.* The Client will reimburse the Firm for expenses incurred in connection with out-of-town travel, but only for first class travel and, where appropriate, the cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances. The Firm will advance all such travel expenses and submit bills to you for reimbursement which will be included in the regular invoices to the Client. The attorney handling your matter will confer with you prior to traveling for your matter. Consistent with local bankruptcy rules, the Firm bills travel at ½ billable hourly rate when the lawyer is not working on the Client matter while travelling. The Firm will endeavor to locate a substitute service agent.

*Court Costs.* If requested by the Firm, the Client will advance court filing fees and all similar expenses prior to the Firm incurring such expenses. Any such expenses incurred by the Firm, will be included in the Firm's invoices to the Client for payment.

Free Speech Systems, LLC
August 21, 2022
Page 11 of 12

## EXHIBIT "1"

## Matters For Which FSS is Retaining The Reynal Firm

Fontaine v. Free Speech Systems, LLC, et al., D-1-GN-18-001605 (459th District Court, Travis County, Texas)

Heslin, et al. v. Free Speech Systems, LLC, et al, D-1-GN18-001835 (459th District Court, Travis County, Texas)

Pozner, et al. v. Free Speech Systems, LLC, et al. D-1-GN-18-001842 (459th District Court, Travis County, Texas)

Corsi et al. v. Free Speech Systems, LLC, et al., 21-50954 (5th Cir. Court of Appeals)

Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones and Free Speech Systems, LLC, Case No., X06-UWY-CV-18-6046436-S (the "Lafferty Matter") *

William Sherlach v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046437-S*

William Sherlach and Robert Parker v. Alex Emric Jones and Free Speech Systems, LLC, X06-UWY-CV-18-6046438-S*

*All these proceedings are before the Connecticut Superior Court, Waterbury District and consolidated in the Lafferty matter.

Free Speech Systems, LLC
August 21, 2022
Page 12 of 12

**<u>Exhibit "2"</u>**

**<u>Original Engagement Letter, Dated February 28, 2022</u>**

# Fertitta & Reynal LLP

February 28, 2022

Alex Jones
Infowars, LLC.
Free Speech Systems, LLC.

**LEGAL SERVICES AGREEMENT (Subject to Binding Arbitration)** —*Fontaine v. Jones*, D-1-GN-18-001605; *Heslin v. Jones*, D-1-GN18-001835; *Pozner v. Jones*, D-1-GN-18-001842; *Lewis v. Jones*, D-1-GN-18-006623.

Dear Mr. Jones,

You have asked that Fertitta & Reynal LLP (the law firm) represent you; Infowars, LLC; and Free Speech Systems, LLC. in the above-referenced matters. "You" and "Clients" in this agreement refer to the clients to be represented and not to a person who pays any legal fees or expenses for the benefit of the client (a person who pays legal fees for another person is not the client).

We have met, discussed this case, and agreed that the law firm will handle this case based on monthly flat fee of $100,000, beginning March 1, 2022. We have further agreed that if the trials, currently scheduled to commence in April and May, are delayed for any reason, then the firm's monthly fee will be $50,000 per month until such time as the cases are set for trial again, at which point the fee would once more become $100,000 per month for trial.

The scope of our representation at this time is limited to our engagement to represent you regarding these cases and no other matter, including but not limited to any criminal, administrative, civil, forfeiture, immigration, or other matter. Any other legal services will require a written engagement agreement for that purpose.

You have carefully reviewed this letter and asked any questions that you had about the meaning of any language in this agreement (including the scope of representation and any applicable fees), we have agreed on the flat fee arrangement described above. Prior to your signature below on this agreement, we discussed the alternative of charging you on an hourly fee basis, instead of a flat fee. Specifically, we discussed the potential advantages and disadvantages of flat fees versus a fee

1

_____
(Your initials)

based on hourly fees calculated as an hourly rate multiplied by each hour or portion of an hour for all time involved in this representation. For example, Fertitta Reynal's hourly rate is at least $800 an hour, depending on various factors, so the applicable hourly charges would be multiplied by the amount of time spent as measured by the hour (or increment of each hour).   You have consulted with an attorney and determined independently that a monthly flat fee arrangement is to your advantage.

The law firm includes F. Andino Reynal, Zachary Fertitta, Joseph Magliolo, and Lynn Hardaway, and any one of these may work on your case (in addition to interns, law clerks, and other sub-contracted attorneys for legal research and writing that the law firm employs at its own expense, assuming a flat fee) at Fertitta Reynal's discretion. With notice to you, the firm is authorized to employ such other persons who it deems necessary for the proper handling of your case; however, you will be asked to approve the employment of other persons not in our law firm and may be ~~required to pay for their services by advance fee retainer or otherwise.~~ *If mutually agreed* These "other persons" may include (but are not limited to) consulting and/or testifying experts, investigators, consultants, translators, and other attorneys.

Court costs, deposition costs, duplication costs, consultant's fees and expenses, room and board, travel, translators, and other professional fees incurred on your behalf will be paid directly by you, or when advanced by the firm, will be borne by and paid for by you upon receipt of a statement for said expenses.  Certain expenses will be forwarded to you for payment directly. *as mutually agreed*

The firm will provide to you, upon request, at monthly or otherwise appropriate intervals, an itemized statement setting forth in reasonable detail all advances for the above-mentioned expenses and a description in reasonable detail of all work performed on your behalf in these matters with the cost for services performed. Full payment is due on receipt of the statement of expenses.   Interest will be charged at the rate of ten percent (10%) per annum on any balance, whether for fees or expenses, more than thirty (30) days past due.

You understand that no representations have been made concerning the successful outcome of any actions that may be taken on your behalf.

In the event that you desire to terminate the firm and retain other counsel to represent your interests in any manner encompassed by this employment, it is understood that you agree to pay all fees, costs and expenses incurred by you or on your behalf up to and including the date of termination.

_____
(Your initials)

713.228.5900        917 Franklin, Sixth Floor, Houston, Texas 77002     www.frlaw.us002334

The firm may withdraw from your representation in this matter at any time for any reason permitted by law including, but not limited to, if you render the representation unreasonably difficult for the firm to carry out, insist that the firm engage in conduct that is contrary to the judgment and advice of the attorneys and/or ethical requirements or other law, or fail to cooperate and comply fully with all reasonable requests by the firm on any matter encompassed by or made the basis of this representation or contract. The firm may also withdraw from your representation for non-payment of fees and expenses under this contract.

The firm shall withdraw if discharged by you. Such discharge shall be communicated in writing by you to the firm.  If permission for withdrawal from employment is required by the rules of the court, the firm shall withdraw if the court approves.

You and the law firm agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this agreement or otherwise, and any claim or dispute related to this agreement or the attorney-client relationship or legal duties contemplated under this argument, including the validity of this arbitration clause, shall be resolved by binding arbitration.

If a dispute should arise under this agreement, either party may make a demand for arbitration by filing a demand in writing with the other.

The parties to this agreement may agree on a single arbitrator, but in the event that they cannot so agree, there shall be three arbitrators, one named in writing by each of the parties within thirty (30) days after demand for arbitration is made, and a third to be chosen by the two arbitrators so named.  Should either party fail to timely join in the appointment of the arbitrators, the arbitrators shall be appointed in accordance with the provisions of Texas Civil Practice and Remedies Code Section 171.041.

Any arbitration hearing conducted under the terms of this agreement, and all proceedings to enforce any of the provisions of this agreement, shall take place in Harris County, Texas only or a venue agreed upon by you and the law firm.  The hearing before the arbitrator(s) of the matter to be arbitrated shall be at the time and place within that county selected by the arbitrator(s).  Notice of hearing shall be given and the hearing conducted in accordance with the provisions of Section 171.044 et seq. of the Texas Civil Practice and Remedies Code.  The arbitrator(s) shall hear and determine the matter and shall execute and acknowledge the award

3

_____
(Your initials)

in writing and deliver a copy thereof to each of the parties by registered or certified mail.

If there is only one arbitrator, his or her decision shall be binding and conclusive on the parties.  If there are three arbitrators, the decision by any two shall be binding and conclusive.  The submission of a dispute to the arbitrator(s) and the rendering of the arbitrator(s)' decision shall be a condition precedent to any right of legal action on the dispute.   A judgment confirming the award of the arbitrators may be rendered by any court having jurisdiction; or the court may vacate, modify, or correct the award in accordance with the provisions of the Texas General Arbitration Act (Texas Civil Practice and Remedies Code Section 171.087 et seq.).

The cost and expenses of arbitration, including the fees of arbitrator(s), shall be borne by the losing party, or in such proportions as the arbitrator(s) shall determine. These fees, costs and expenses could be substantial.

The law firm advises you, regarding the advantages and disadvantages of arbitration as compared with a judicial (in court) determination of disputes, the following:

(1)     There could be cost and time savings with an arbitration; however, these cost and time savings are not guaranteed and arbitration could, in some instances, be more expensive and take longer than a judicial determination of a dispute.

(2)     Participation in arbitration results in the waiver of significant rights, such as the right to trial by jury.

(3)     Arbitration could possibly result in a reduced level of discovery; which has the potential of saving costs, but savings are not guaranteed.

(4)     Arbitration generally has the relaxed application of rules of evidence, which has the potential of saving costs, but savings are not guaranteed—and relaxed application of the rules of evidence may mean that certain evidence may be admitted or excluded in ways inconsistent with such rules.

(5)     Arbitration awards are generally final and results in the loss of the right to judicial review because arbitration decisions can be challenged only on very limited grounds; and

4

_____
(Your initials)

(6)     Generally, arbitrations are more private compared to a public trial (i.e., arbitrations are confidential and not open to the public—unlike what occurs in court).

We cite these factors and considerations so that you will be aware that there are some significant advantages and disadvantages of arbitration. Should you need more information about arbitration before signing this agreement, the law firm encourages you to ask questions, until you feel your questions are answered, and encourage you to seek independent counsel to advise you before signing this agreement if you feel that a third party could help you better understand your responsibility under this agreement. While it is not necessary for you to get advice from a third party, the law firm encourages you to do so if you still have questions before signing this agreement. By signing this agreement, you are representing that all your questions have been satisfactorily answered and that you either have, or have not, sought advice from independent counsel and that you are satisfied that entering into this contact of representation with an arbitration provision to handle disputes concerning it, is in your best interest, and you want to proceed accordingly.

Following the final disposition of your case, the firm will place your file in storage. The firm will destroy your file no earlier than five years from the date of the final disposition of your case. Please immediately contact me if you would like anything, especially any original documents or items, from the file.

If you use a credit card to pay legal fees or expenses, a 3% (three percent) convenience/processing fee will be added to the charge. For example, if you pay $1,000 in fees on your credit card, the law firm will charge the card for $1,030. You understand and agree to this charge if you use a credit card. If you do not want to incur the convenience/processing fee, then you are welcome to use another form of payment such as cash, check, money order, cashier's check, or bank wire.

All terms and conditions of our agreement are set forth in this letter and can only be modified in a subsequent writing that you and I sign. Please read this letter carefully and feel free to ask me any questions. If you are satisfied with this letter and the reasonableness of its terms and conditions, sign your initials and name where indicated as evidence that you have fully read, understand, and agree to the terms and conditions. I will provide you with a photocopy of the signed letter. Further, if any language or provision in this agreement is determined by an arbitrator or court to be invalid or unenforceable, then the remaining provisions and language are preserved and shall be interpreted to give them full legal force and effect.

5

_____
(Your initials)

713.228.5900          917 Franklin, Sixth Floor, Houston, Texas 77002     www.frlaw.us 002337

Sincerely,

F. ANDINO REYNAL

I have carefully read, understand, and agree to the terms and conditions as set forth in this fee agreement for legal services.  If I had any questions about the meaning of anything in this agreement, I asked those questions before signing below.

AGREED:

Alex Jones, individually and on behalf of
Infowars, LLC. and Free Speech Sytems, LLC.

6

_____
(Your initials)

713.228.5900        917 Franklin, Sixth Floor, Houston, Texas 77002      www.frlaw.us 002338

**<u>Exhibit B</u>**

Reynal Declaration

002339

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DECLARATION OF FEDERICO REYNAL IN SUPPORT OF**
**THE DEBTOR' APPLICATION TO EMPLOY THE REYNAL LAW FIRM, P.C.**
**UNDER 11 U.S.C. § 327(e), AS SPECIAL COUNSEL,**
*NUNC PRO TUNC* **TO JULY 29, 2022**

I, Federico Reynal, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State of Texas, United States District Court for the Southern District of Texas and the Fifth Circuit Court of Appeals.  I am the founder of the Houston office of The Reynal Law Firm, P.C. (the "Firm" or "The Reynal Firm"), located at 917 Franklin, Sixth Floor, Houston, Texas 77002.

2.      I am making this declaration in support of the Debtor's Application to Employ The Reynal Law Firm, P.C. Under 11 U.S.C. § 327(e), as Special Counsel, *Nunc Pro Tunc*, to July 29, 2022 (the "Application").  Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed to such terms in the Application.

3.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of The Reynal Firm reviewed by me or derived from information available to me that I believe to be true and correct or opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor

relationships, workouts, chapter 11 process, and the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**A.      Scope of Services**

4.      Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, The Reynal Firm will serve as special counsel to the Debtor in connection with the Matters, specified in the Engagement Letter and the Application.  More specifically, the Firm shall serve as primary litigation and trial counsel for FSS involving suits against FSS in Travis County and the appeal by Corsi to the Fifth Circuit Court of Appeals. The Reynal Firm will also be retained to assist Pattis & Smith LLC to prepare witnesses for trial, consult on presentation of the case and brief any issues that may arise during the course of the trial with respect to the Lafferty Matter.

**B.      Proposed Compensation**

5.      The Reynal Firm will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtor.

6.      Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, The Reynal Firm intends to request the allowance of its compensation as set out in the Engagement Agreement. These rates reflect the rates that The Reynal Firm ordinarily charges clients in bankruptcy and non-bankruptcy matters and are less than or equal to the rates of similarly skilled and experienced attorneys in this district. The Reynal Firm submits that these agreed terms of reimbursement, compensation, and hourly

2

rates are reasonable. The Reynal Firm will notify the Debtor of any change in the hourly rates charged for services rendered.

**C.      Retainer.**

7.      Under the proposed employment with the Debtor, The Reynal Firm seeks a $50,000 post-petition retainer and agrees it will continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

**D.      Disclosure of Connections**

*i.      Search and General Descriptions of Connections*

8.      The Reynal Firm performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas.

9.      I conducted a search of The Reynal Firm files to determine using the list of parties in interest listed in Schedule 1 hereto whether the Firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the Firm had and did not represent any of the parties listed on Schedule 1. The Reynal Firm may have provided services to creditors or other parties in interest inadvertently omitted from Schedule 1 or the description above. If such connections exist, they would be on matters wholly unrelated to the service for which FSS seeks to engage The Reynal Firm.

10.      The results of the foregoing connections search process confirm that neither I, The Reynal Firm, nor any of its employees or partners, to the best of my knowledge, have any disqualifying connections.

11.     Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and The Reynal Firm do not hold an interest adverse to the Debtor or the estate with respect to the matter on which the Firm is to be employed.

12.     I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

13.     The Reynal Firm is not a creditor, an equity security holder, or an insider of the Debtor; The Reynal Firm is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and The Reynal Firm does not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

14.     The Reynal Firm does not possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate. The Reynal Firm also does not possess or assert any economic interest that would create either an actual or potential dispute in which the estate is a rival claimant. The Reynal Firm does not have any incentive to act contrary to the best interests of the estate and its creditors.

### E.     Bankruptcy Rule 2016(b) Disclosures

15.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, The Reynal Firm has not shared or agreed to share (a) any of its compensation from the representation of the Debtor with any other persons, or (b) any compensation any other persons have received, may have received, or will receive.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2022,

By: /s/*Federico Reynal*
Federico Reynal

5

002344

## SCHEDULE 1

## TO REYNAL DECLARATION

### SEARCHED PARTIES

Debtor & Professionals

      Law Office of Ray Battaglia           Schwartz Associates

      Shannon & Lee LLP

Debtor's Equity

      Alexander E. Jones

Largest 20 Unsecured Creditors & Litigation Claimants

| | |
|---|---|
| Elevated Solutions Group | Dona Soto |
| Atomial LLC | Erica Lafferty |
| Cloudfare, Inc. | Francine Wheeler |
| Jacquelyn Blott | Ian Hockley |
| Joel Skousen | Jacqueline Barden |
| eCommerce CDN LLC | Jennifer Hensel |
| Paul Watson | Jeremy Richman |
| Greenair, Inc. | Jillian Soto |
| Edgecast, Inc. | Leonard Pozner |
| Ready Alliance Group, Inc. | Marcel Fontaine |
| Getty Images, Inc. | Mark Barden |
| RatsMedical.com | Neil Heslin |
| David Icke Books Limited | Nicole Hockley |
| WWCR | PQPR Holdings Limited, LLC |
| CustomTattoNow.com | Robert Parker |
| AT&T | Scarlett Lewis |
| Justin Lair | Veronique De La Rosa |
| Brennan Gilmore | William Sherlach |
| Carlee Soto-Parisi | William Aledenberg |
| Carlos Soto | Larry Klayman |
| Christopher Sadowski | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | Zeisler & Zeisler P.C. |
| Koskoff Koskoff & Bieder | Jordan & Ortiz, P.C. |
| Fertitta & Reynal LLP | McDowell Heterhington LLP |

The Akers Law Firm PLLC
Copycat Legal PLLC
Waller Lansden Dortch & Davis,
LLP

Akin Gump Strauss Hauer & Feld
LLP

<u>U.S. Bankruptcy Judges and Staff</u>

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro

Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

<u>U.S. Trustee Personnel</u>

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera

Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**ORDER APPROVING DEBTOR'S APPLICATION**
**TO EMPLOY THE REYNAL LAW FIRM, P.C. UNDER 11 U.S.C. § 327(e),**
**AS SPECIAL COUNSEL, NUNC PRO TUNC JULY 29, 2022**

Upon the application (the "Application")[1] filed by the Debtor to retain and employ The Reynal Law Firm, P.C. ("The Reynal Firm") pursuant to Bankruptcy Code §§ 327(e) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Reynal Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) The Reynal Firm does not represent an interest adverse to the Debtor's estate with respect to the Matters upon which it is to be engaged; (vi) The Reynal Firm is qualified to represent the Debtor's estate under § 327(e) of the Bankruptcy Code; (vii) the terms of The Reynal Firm's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application.

bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interest of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.     In accordance with Bankruptcy Code §§ 327(e) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain The Reynal Firm commencing on July 29, 2022, as special counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.     The Reynal Firm is authorized to perform Professional Services for the Debtor that are necessary or appropriate in connection with serving as special counsel in connection with the Matters.

3.     The Reynal Firm shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.     Pursuant to the Engagement Letter, FSS is authorized to provide The Reynal Firm the requested retainer of $50,000 (the "Retainer"). The Secured Lender consents to the provision of the Retainer to The Reynal Firm. Also, in accordance with the Engagement Letter, The Reynal Firm shall hold the Retainer in trust on behalf of the Debtor, until further order of the Court.

5.     All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned bankruptcy case shall be paid after further application to

2

002348

and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

6.      This order shall be immediately effective and enforceable upon entry.

7.      This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

8.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, The Reynal Firm shall not be entitled to reimbursement of expenses or fees from the Debtor in connection with any objection to its fees, without further order of the Court.

9.      The Reynal Firm shall not charge a markup to the Debtor with respect to any fees billed by contract attorneys who are hired by The Reynal Firm to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflicts checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

10.     The Reynal Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code. Furthermore, the Court retains the right to review any rate increases pursuant to § 330 of the Bankruptcy Code.

11.     The Reynal Firm shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

12.     The Reynal Firm will review its files periodically during the pendency of this chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If

002349

any new relevant facts or relationships are discovered or arise, The Reynal Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

13.    To the extent that any of the Application, the Reynal Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

14.    The Debtor and The Reynal Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

15.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
|     **Debtor.** | § | |

**DEBTOR'S NOTICE OF PQPR INVENTORY INSTALLMENT PAYMENT**
**TO PQPR HOLDINGS LIMITED, LLC.**

PLEASE TAKE NOTICE that on August 5, 2022 the Court entered its *Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* [Dkt. No. 41] (the "Interim Order").  In part, the Interim Order authorized the Free Speech Systems, LLC ("Debtor") to pay PQPR Holdings Limited, LLC ("PQPR") $250,000 to "Repay PQPR Inventory".  The Interim Order required the Debtor to file notice on the Court's docket that the payment has been issued.

PLEASE TAKE FURTHER NOTICE that the Debtor paid $250,000 to PQPR on August 23, 2022.

002351

Respectfully submitted.

LAW OFFICES OF RAY BATTAGLIA, PLLC

/s/ RAYMOND W. BATTAGLIA
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/ *Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor
and Debtor in Possession*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing,

/s/Raymond W. Battaglia
Raymond W. Battaglia

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion").   In the Motion,  the Debtor  requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of  title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein.  The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral.  The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.      Interim Order. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      DIP Account. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "DIP Account). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      Terms of Cash Collateral Use. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "Interim Period") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.      Payment to PQPR for Inventory Purchase. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "PQPR Payment"). Creditors and parties in interest shall have thirty (30) days from the date

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7.      Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.      Adequate Protection – Replacement Liens.      The adequate protection and related carve outset forth in the First Interim Order are incorporated in the Second Interim Order.

10.      Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.      Credit Card Processing. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.      Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     Discovery. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15.     Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 9:30 a.m. Central time.

Houston, Texas
Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|
| Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | |
| Product Sales | $ 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | $ 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | $ 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | |
| Inventory Purchase | $ (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | $ (250,000.00) | | $ (500,000.00) | | $ (750,000.00) |
| Merchant Account Fees | $ (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | $ (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | $ (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | $ (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | $ (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | |
| **Advertising & Promotion** | | | | | |
| Advertising & Promotion | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | |
| Internet & TV services | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | $ - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | $ - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | $ - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | $ - |
| Bank Fees & Service Charges | $ (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | $ (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | $ (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | $ (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| Outsourced Services | $ - | $ - | $ - | $ - | |
| Consulting Services | $ - | $ - | $ - | $ - | |
| **Utilities** | | | | | |
| Electricity | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | $ - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | |
| Rent | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | $ - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | $ - |
| Salaries & Wages - Base | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

002357

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| Total Personnel Expenses | | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | | $ - |
| Mileage/Parking/Tolls | | $ (150.67) | $ (167.41) | $ (167.41) | $ (167.41) | $ (652.90) |
| Vehicle Leases | | $ - | $ - | $ (1,470.56) | $ - | $ (1,470.56) |
| **Total Travel Expenses** | | $ (150.67) | $ (167.41) | $ (1,637.97) | $ (167.41) | $ (2,123.46) |
| **Total Operating Expenses** | | $ (647.10) | $ (577,137.87) | $ (2,189.56) | $ (209,456.72) | $ (789,431.24) |
| ***Non-Operating Expenses*** | | | | | | $ - |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | $ - |
| **Total Other Expenses** | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | $ (25,000.00) | $ (25,000.00) |
| Fulfillment Expert | | $ (12,500.00) | $ - | $ - | $ - | $ (12,500.00) |
| Witness expenses and cost | | | | | | |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (50,000.00) | $ - | $ (50,000.00) |
| SALLC Fees | | $ - | $ - | $ - | | $ - |
| Shannon & Lee LLP | | $ - | $ - | | | $ - |
| Ray Battaglia | | $ - | $ - | | | $ - |
| **Total Professional Fees** | | $ (12,500.00) | $ - | $ (150,000.00) | $ (25,000.00) | $ (187,500.00) |
| **Total Cash Flow** | | $ 727,435.62 | $ (33,948.36) | $ (225,531.18) | $ 192,201.66 | $ 660,157.73 |

002358

# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

In ref to Continued Cash Collateral and Motion for Relief from Stay.

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 8/24/2022 9:59:58 AM |
| Audio File Name : | 4bk2022-60043_20220824-095958.mp3 |
| Audio File Size : | 19615 KB |
| Audio Run Time : | [00:40:52] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

> **This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 24, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.      <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.      <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "<u>PQPR Payment</u>").  Creditors and parties in interest shall have thirty (30) days from the date

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7.      Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.      Adequate Protection – Replacement Liens.      The adequate protection and related carve outset forth in the First Interim Order are incorporated in the Second Interim Order.

10.     Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.     Credit Card Processing. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.     Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.    Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.    Discovery. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15.    Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 1:00 p.m. Central time.

Signed:  August 24, 2022

Christopher Lopez
United States Bankruptcy Judge

002363

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | | |
| Product Sales | | $ 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | | $ 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | | $ (250,000.00) | | $ (500,000.00) | | $ (750,000.00) |
| Merchant Account Fees | | $ (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | | $ (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | | $ (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | | $ (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | | $ - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | | $ - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | | $ - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | $ - |
| Bank Fees & Service Charges | | $ (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | | $ (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | | $ (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| Outsourced Services | | $ - | $ - | $ - | $ - | |
| Consulting Services | | $ - | $ - | $ - | $ - | |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | $ - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | $ - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

002364

**Free Speech Systems LLC**
**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-<br>08/26/2022 | 08/27/2022-<br>09/02/2022 | 09/03/2022-<br>09/09/2022 | 09/10/2022-<br>09/16/2022 | Total |
|---|---|---|---|---|---|---|
| **Total Personnel Expenses** | | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | | $ - |
| Mileage/Parking/Tolls | | $ (150.67) | $ (167.41) | $ (167.41) | $ (167.41) | $ (652.90) |
| Vehicle Leases | | $ - | $ - | $ (1,470.56) | $ - | $ (1,470.56) |
| **Total Travel Expenses** | | $ (150.67) | $ (167.41) | $ (1,637.97) | $ (167.41) | $ (2,123.46) |
| **Total Operating Expenses** | | $ (647.10) | $ (577,137.87) | $ (2,189.56) | $ (209,456.72) | $ (789,431.24) |
| ***Non-Operating Expenses*** | | | | | | $ - |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | $ - |
| **Total Other Expenses** | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | $ (25,000.00) | $ (25,000.00) |
| Fulfillment Expert | | $ (12,500.00) | $ - | $ - | $ - | $ (12,500.00) |
| Witness expenses and cost | | | | | | |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (50,000.00) | $ - | $ (50,000.00) |
| SALLC Fees | | $ - | $ - | $ - | | $ - |
| Shannon & Lee LLP | | $ - | $ - | $ - | | $ - |
| Ray Battaglia | | $ - | $ - | $ - | | $ - |
| **Total Professional Fees** | | $ (12,500.00) | $ - | $ (150,000.00) | $ (25,000.00) | $ (187,500.00) |
| **Total Cash Flow** | | $ 727,435.62 | $ (33,948.36) | $ (225,531.18) | $ 192,201.66 | $ 660,157.73 |

002365

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 22-60043 |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

<u>**NOTICE OF HEARINGS SET FOR AUGUST 29, 2022**</u>
**[Relates to ECF Nos. 15, 93 and 94]**

**PLEASE TAKE NOTICE** that a hearing on the Emergency Motion for Relief from the Automatic Stay [ECF No. 15] filed by David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker originally scheduled for Friday, August 5, 2022, and continued by agreement to Wednesday, August 24, 2022, has been rescheduled to be heard on Monday, August 29, 2022, at 1:00 p.m. (Central Standard Time) before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, 515 Rusk, 4th Floor Courtroom 404, Houston, Texas 77002 (the "<u>Bankruptcy Court</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Emergency Application of Debtor for an Order (A) Authorizing Employment of Pattis & Smith LLC under 11 U.S.C. § 327(e) and 328(a) as Special Counsel *Nunc Pro Tunc* to August 1, 2022, and (B) Granting Related Relief [ECF No. 93] (the "<u>Pattis Application</u>") has been scheduled to be heard on Monday, August 29, 2022, at 1:00 p.m. (Central Standard Time) before the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Emergency Application of Debtor for an Order (A) Authorizing Employment of The Reynal Law Firm, P.C., Under 11 U.S.C. § 327(e), as Special Counsel, Nunc Pro Tunc to July 29, 2022, and (B) Granting Related Relief (the

"<u>Reynal Application</u>") has been scheduled to be heard on Monday, August 29, 2022 at 1:00 p.m. (Central Standard Time) before the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that any party wishing to call witnesses or introduce exhibits at the August 29, 2022, 1:00 p.m. hearing (the "<u>Hearing</u>") must exchange exhibits and file the witness and exhibit lists required by Bankruptcy Local Rule 9013-2 by no later than Friday, August 26, 2022.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted in person and teleconference. Parties wishing to participate in the hearing by teleconference must dial in by telephone at **1-832-917-1510** and enter conference code **590153** when prompted. Parties may also participate via remote video conference by going to <u>https://www.gotomeet.me/JudgeLopez</u> and clicking the "join the meeting" button. Parties may join the video conference by entering the meeting code: JudgeLopez. Audio connections by phone are required for all video participants.

[*Remainder of Page Intentionally Left Blank*]

002367

Dated: August 24, 2022           LAW OFFICES OF RAY BATTAGLIA, PLLC

/s/ *Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/ *R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

002368

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 24 hours of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankston
William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterling
Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
The Reynal Law Firm, P.C.
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Hetherington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarrow.com

4

Attn: Ha M. Nguyen
Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

Attn: Norman Pattis
Pattis & Smith LLC
383 Orange Street
New Haven, CT 06511
npattis@pattisandsmith.com

Attn: Jason Starks
Office of Travis County Attorney
P.O. Box 1748
Austin, TX 78767
jason.starks@traviscountytx.gov

Attn: Stephen A. Roberts
Stephen A. Roberts, PC
1400 Marshal Ln
Austin, TX 78703
sroberts@srobertslawfirm.com

Joseph S.U. Bodoff
Rubin and Rudman LLP
53 State Street
Boston, MA 02109
jbodoff@rubinrudman.com

*/s/R. J. Shannon*

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001
Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

6

002371

**Parties Claiming Interest or Lien Affected**

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

**Parties Filing Notice of Appearance**

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Jason A. Starks
Delia Garza
Travis County Attorney
P.O. Box 1748
Austin, Texas 78767

Stephen A. Roberts
Stephen A. Roberts PC
1400 Marshall Ln
Austin, Texas 78703

Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002

**Subchapter V Trustee**

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

**U.S. Trustee**

Attn: Ha M. Nguyen
Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

7

**<u>Additional Notice Parties</u>**

Attn: Mark Bankson
William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling
Christopher Mattei
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

8

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

In    Free Speech Systems LLC
Re:    Debtor               Case No.: 22−60043

                                       Chapter:   11

---

### NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

United States Bankruptcy Court
Southern District of Texas

In re:                                                            Case No. 22-60043-cml

Free Speech Systems LLC                                          Chapter 11
    Debtor

# CERTIFICATE OF NOTICE

District/off: 0541-4                        User: ADIuser                                Page 1 of 3
Date Rcvd: Aug 22, 2022                     Form ID: ntctran                             Total Noticed: 8

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ^ | Addresses marked '^' were sent via mandatory electronic bankruptcy noticing pursuant to Fed. R. Bank. P. 9036. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Aug 24, 2022:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Free Speech Systems LLC, 3019 Alvin Devane Blvd. STE 300, Austin, TX 78741-7417 |
| cr | + | David Wheeler, et al., c/o Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, TX 78701-4653 |
| cr | + | Leonard Pozner, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Marcel Fontaine, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Neil Heslin, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Scarlett Lewis, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Veronique De La Rosa, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |

TOTAL: 7

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| cr | ^ | MEBN | | Texas Comptroller of Public Accounts, Revenue |
| | | | Aug 22 2022 19:50:25 | Acco, Christopher J. Dylla, P.O. Box 12548, Austin, TX 78711-2548 |

TOTAL: 1

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | ADP TotalSource, Inc. |
| intp | | David Ross Jones |
| intp | | Shelby A Jordan |

TOTAL: 3 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Aug 24, 2022                        Signature:        /s/Gustava Winters

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on August 22, 2022 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Avi Moshenberg | on behalf of Creditor Neil Heslin avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Scarlett Lewis avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Leonard Pozner avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Veronique De La Rosa avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Marcel Fontaine avi.moshenberg@mhllp.com ana.sanchez@mhllp.com |
| Christopher Dylla | on behalf of Creditor Texas Comptroller of Public Accounts Revenue Accounting Division bk-cdylla@oag.texas.gov, Sherri.Simpson@oag.texas.gov |
| Ha Minh Nguyen | on behalf of U.S. Trustee US Trustee ha.nguyen@usdoj.gov |
| Jarrod B. Martin | on behalf of Creditor Neil Heslin jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Marcel Fontaine jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Veronique De La Rosa jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Scarlett Lewis jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Leonard Pozner jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jayson B. Ruff | on behalf of U.S. Trustee US Trustee jayson.b.ruff@usdoj.gov |
| Joseph S.U. Bodoff | on behalf of Creditor ADP TotalSource Inc. jbodoff@rubinrudman.com |
| Kyung Shik Lee | on behalf of Debtor Free Speech Systems LLC kslee50@gmail.com Courtnotices@kasowitz.com |
| Melissa A Haselden | mhaselden@haseldenfarrow.com haseldenbankruptcytrustee@gmail.com;mhaselden@ecf.axosfs.com;haselden.melissaa.r104367@notify.bestcase.com |
| Melissa Anne Haselden | on behalf of Trustee Melissa A Haselden mhaselden@haseldenfarrow.com haseldenbankruptcy@gmail.com,haselden.melissaa.r104367@notify.bestcase.com |
| R. J. Shannon | on behalf of Debtor Free Speech Systems LLC rshannon@shannonpllc.com rshannon@shannonleellp.com;7044075420@filings.docketbird.com |
| Randy W Williams | on behalf of Creditor David Wheeler et al. rww@bymanlaw.com, rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com |
| Raymond William Battaglia | on behalf of Debtor Free Speech Systems LLC rbattaglialaw@outlook.com rwbresolve@gmail.com |
| Ryan E Chapple | on behalf of Creditor David Wheeler et al. rchapple@cstrial.com, aprentice@cstrial.com |
| Shelby A Jordan | |

District/off: 0541-4                               User: ADIuser                               Page 3 of 3
Date Rcvd: Aug 22, 2022                            Form ID: ntctran                            Total Noticed: 8

                                    on behalf of Interested Party Shelby A Jordan cmadden@jhwclaw.com

Stephen A Roberts
                                    on behalf of Interested Party David Ross Jones sroberts@srobertslawfirm.com  1222805420@filings.docketbird.com

US Trustee
                                    USTPRegion07.HU.ECF@USDOJ.GOV


TOTAL: 24

002377

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 22, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**STIPULATION AND AGREED ORDER**

The above-captioned debtor and debtor-in-possession (the Debtor) and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the Texas Plaintiffs) and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the Connecticut Plaintiffs) (together the Sandy Hook Families) hereby enter into this stipulation and agreed order (Stipulation) as follows:

WHEREAS, on July 29, 2022 (the Petition Date), the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court).

WHEREAS, on July 29, 2022, the Debtor filed its Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender (the Cash Collateral Motion) [Dkt. 6].

WHEREAS, on August 2, 2022, the Sandy Hook Families filed their Objection to Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of

Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 27].

WHERAS, on August 5, 2022, the Court entered the Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection (the Interim Order) [Dkt. 41].

WHEREAS, on August 11, 2022, the Debtor filed its Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 55].

WHEREAS, on August 12, 2022, the Connecticut Plaintiffs filed their Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 56].

WHEREAS, on August 12, 2022, the Texas Plaintiffs filed their Joinder to the Connecticut Plaintiffs' Objection to Debtor's Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral [Dkt. 57].

WHEREAS, on August 12, 2022, the Court entered the Order Modifying Interim Order Authorizing the Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64].

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against the Debtor styled *Lafferty, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury.

WHEREAS, on July 31, 2022, the Connecticut Plaintiffs filed their Emergency Motion for Relief from the Automatic Stay (the Emergency Motion) [Dkt. 15].

WHEREAS, on August 17, 2022, the Debtor filed its Response to Emergency Motion for Relief from the Automatic Stay [Dkt. 78].

WHEREAS, a hearing on the Cash Collateral Motion and the Emergency Motion is set for August 24, 2022 at 10 a.m.

WHEREAS, the deadline to file exhibit and witness lists pursuant to LR-9013-2 is August 22, 2022 at 12:00 p.m.

WHEREAS, the Parties are in discussions to reach a resolution on both the Cash Collateral Motion and the Emergency Motion.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUTPCY COURT, ORDERED THAT:

1.    The deadline to file an exhibit and witness list for the hearing on the Emergency Motion and the Cash Collateral Motion is extended to August 23, 2022 at 12:00 p.m.

Signed:  August 22, 2022

Christopher Lopez
United States Bankruptcy Judge

**STIPULATION AND AGREED ORDER—PAGE 3**

STIPULATED AND AGREED ON AUGUST 22, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

-and-

**THE TEXAS PLAINTIFFS**

_____/s/ Avi Moshenberg_____
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
P: 713-337-5580
F: 713-337-8850

and

Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
T: 713-356-1280
F: 713-658-2553

-and-

**FREE SPEECH SYSTEMS, LLC**


_____/s/Kyung S. Lee_____
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
Tel: (210) 601-9405

and

Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
**SHANNON & LEE LLP**
700 Milam Street, Suite 1300
Houston, Texas 77002
Tel: (713) 714-5770

United States Bankruptcy Court
Southern District of Texas

In re:                                                                  Case No. 22-60043-cml

Free Speech Systems LLC                                                 Chapter 11
     Debtor

# CERTIFICATE OF NOTICE

District/off: 0541-4                        User: ADIuser                            Page 1 of 3
Date Rcvd: Aug 22, 2022                     Form ID: pdf002                          Total Noticed: 8

The following symbols are used throughout this certificate:

| Symbol | Definition |
|---|---|
| + | Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP. |
| ^ | Addresses marked '^' were sent via mandatory electronic bankruptcy noticing pursuant to Fed. R. Bank. P. 9036. |

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Aug 24, 2022:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Free Speech Systems LLC, 3019 Alvin Devane Blvd. STE 300, Austin, TX 78741-7417 |
| cr | + | David Wheeler, et al., c/o Cain & Skarnulis PLLC, 303 Colorado Street, Suite 2850, Austin, TX 78701-4653 |
| cr | + | Leonard Pozner, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Marcel Fontaine, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Neil Heslin, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Scarlett Lewis, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |
| cr | + | Veronique De La Rosa, c/o McDowell Hetherington LLP, Attention: Avi Moshenberg, 1001 Fannin Street, Suite 2700 Houston, TX 77002-6774 |

TOTAL: 7

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|---|
| cr | ^ | MEBN | | |
| | | | Aug 22 2022 19:50:26 | Texas Comptroller of Public Accounts, Revenue Acco, Christopher J. Dylla, P.O. Box 12548, Austin, TX 78711-2548 |

TOTAL: 1

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| cr | | ADP TotalSource, Inc. |
| intp | | David Ross Jones |
| intp | | Shelby A Jordan |

TOTAL: 3 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Aug 24, 2022                 Signature:        /s/Gustava Winters

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on August 22, 2022 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Avi Moshenberg | on behalf of Creditor Neil Heslin avi.moshenberg@mhllp.com  ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Scarlett Lewis avi.moshenberg@mhllp.com  ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Leonard Pozner avi.moshenberg@mhllp.com  ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Veronique De La Rosa avi.moshenberg@mhllp.com  ana.sanchez@mhllp.com |
| Avi Moshenberg | on behalf of Creditor Marcel Fontaine avi.moshenberg@mhllp.com  ana.sanchez@mhllp.com |
| Christopher Dylla | on behalf of Creditor Texas Comptroller of Public Accounts  Revenue Accounting Division bk-cdylla@oag.texas.gov, Sherri.Simpson@oag.texas.gov |
| Ha Minh Nguyen | on behalf of U.S. Trustee US Trustee ha.nguyen@usdoj.gov |
| Jarrod B. Martin | on behalf of Creditor Neil Heslin jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Marcel Fontaine jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Veronique De La Rosa jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Scarlett Lewis jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jarrod B. Martin | on behalf of Creditor Leonard Pozner jarrod.martin@chamberlainlaw.com Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluestylus.com;ginger.davis@chamberlainlaw.com |
| Jayson B. Ruff | on behalf of U.S. Trustee US Trustee jayson.b.ruff@usdoj.gov |
| Joseph S.U. Bodoff | on behalf of Creditor ADP TotalSource  Inc. jbodoff@rubinrudman.com |
| Kyung Shik Lee | on behalf of Debtor Free Speech Systems LLC kslee50@gmail.com  Courtnotices@kasowitz.com |
| Melissa A Haselden | mhaselden@haseldenfarrow.com haseldenbankruptcytrustee@gmail.com;mhaselden@ecf.axosfs.com;haselden.melissaa.r104367@notify.bestcase.com |
| Melissa Anne Haselden | on behalf of Trustee Melissa A Haselden mhaselden@haseldenfarrow.com haseldenbankruptcy@gmail.com,haselden.melissaa.r104367@notify.bestcase.com |
| R. J. Shannon | on behalf of Debtor Free Speech Systems LLC rshannon@shannonpllc.com rshannon@shannonleellp.com;7044075420@filings.docketbird.com |
| Randy W Williams | on behalf of Creditor David Wheeler  et al. rww@bymanlaw.com, rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com |
| Raymond William Battaglia | on behalf of Debtor Free Speech Systems LLC rbattaglialaw@outlook.com  rwbresolve@gmail.com |
| Ryan E Chapple | on behalf of Creditor David Wheeler  et al. rchapple@cstrial.com, aprentice@cstrial.com |
| Shelby A Jordan | |

District/off: 0541-4                    User: ADIuser                              Page 3 of 3
Date Rcvd: Aug 22, 2022                Form ID: pdf002                        Total Noticed: 8

                                        on behalf of Interested Party Shelby A Jordan cmadden@jhwclaw.com

Stephen A Roberts

                                        on behalf of Interested Party David Ross Jones sroberts@srobertslawfirm.com  1222805420@filings.docketbird.com

US Trustee

                                        USTPRegion07.HU.ECF@USDOJ.GOV


TOTAL: 24

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| **Debtor.** | § | |

---

### THE SANDY HOOK FAMILIES' MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION

---

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ( the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "**Connecticut Plaintiffs**") (together the "**Sandy Hook Families**"),[1] creditors and parties-in-interest move to appoint a tort claimants' committee and remove Free Speech Systems, LLC ("**FSS**" or "**Debtor**") as debtor in possession. For the following reasons, these essential measures should be taken to increase transparency, oversight, and the unsecured creditors' ability to participate in the process:

### I.     PRELIMINARY STATEMENT

1.     FSS has proven, both prepetition and since filing, that it cannot be trusted to operate its business or this bankruptcy in a way that maximizes the bankruptcy estate's

---

[1] Marcel Fontaine was not defamed as to the Sandy Hook mass-shooting but as to the Parkland mass-shooting. For ease of reference, however, this objection refers to all tort claimants as the Sandy Hook Families.

---

value and the corresponding benefit to its creditors.  Since the Sandy Hook Families filed their lawsuits, the Debtor has systematically transferred millions of dollars to Alex Jones and his relatives and insider entities.  It claims to owe a massive, secured debt to an insider that was first documented as a loan when the Sandy Hook Families were securing key wins in Connecticut and Texas, but no records show that an actual debt existed before the Sandy Hook Families sued.

2.      The Debtor's appointment of W. Marc Schwartz as its Chief Restructuring Officer has not cured—and cannot cure—these fundamental problems.  Rather, Mr. Schwartz's conduct and testimony have contributed to the Debtor's lack of credibility and transparency in the following ways: (1) Mr. Schwartz assumed fiduciary duties to the Debtor here while still owing fiduciary duties to the Infowars Debtors; (2) he was not candid with the Court nor the litigants about those conflicting fiduciary duties; (3) he actively made decisions implicating FSS and the Infowars Debtors despite that conflict; (4) he has presumed, despite the obvious insider relationships that have been present since the Infowars Debtors' Bankruptcy, that the supposed debt between PQPR Holdings Limited, LLC ("**PQPR**") and FSS is valid; and (5) he has acted on that presumption, despite significant evidence that it is not valid.  In short, it appears that Jones chose a fiduciary he could control, and Mr. Schwartz has proved to be just that.

3.      The solution is simple and authorized by subchapter V.  The Court should: (1) appoint a tort claimants' committee to investigate the Debtor's conduct and operations and offer input in the plan process; and (2) remove FSS as the debtor in possession. These

measures will ensure transparency, accountability, and maximize the Debtor's Estate for all creditors.

## II.       FACTUAL BACKGROUND

### A. The Sandy Hook Families sue Jones and the Debtor for intentional infliction of emotional distress and defamation.

4.      As this Court knows, in 2018 the Sandy Hook Families sued Jones and other entities he owns and controls, including the Debtor, (collectively the "**Jones Defendants**") for intentional infliction of emotional distress and defamation, among other claims (the "**Sandy Hook Cases**").  These Sandy Hook Cases are based on lies and conspiracy theories the Jones Defendants espoused through Jones's media outlets.[2]

5.      Except Fontaine, the claims of the Sandy Hook Families—parents and family of children and educators slain at Sandy Hook and a first responder—stem from lies the Jones Defendants spread that the mass shooting was a hoax.  Fontaine's claims arose from falsehoods the Jones Defendants spread that he murdered 17 people at a high school in Parkland, Florida.

---

[2] Cause No. D-1-GN-18-001835, *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*, In the 261st Judicial District Court of Travis County, Texas; Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*, In the 345th Judicial District Court of Travis County, Texas; Cause No. D-1-GN-19-004651, *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*, In the 261st Judicial District Court of Travis County, Texas; Cause No. D-1-GN-18-006623, *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*, In the 98th Judicial District Court of Travis County, Texas; Cause No. D-1-GN-18-001605, *Marcel Fontaine v Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*, In the 459th Judicial District Court of Travis County, Texas; Cause No. FSB-CV18-6075078-S, *Wheeler, et al. v. Alex Jones, et al.*, In the Judicial District of Fairfield at Bridgeport, Connecticut; Cause No. FBT-CV18-6076475-S, *Sherlock et al. v. Alex Jones, et al.*, In the Judicial District of Fairfield at Bridgeport, Connecticut; and Cause No. FBT-CV18-6081366, *Parker, et al. v. Alex Jones, et al.*, In the Judicial District of Fairfield at Bridgeport, Connecticut.

6.     The Sandy Hook Cases have been pending for over four years.  From the beginning, the Jones Defendants tried to obstruct the prosecution of these cases—including repeatedly removing cases to federal court; filing numerous appeals; blatantly refusing to comply with discovery orders (especially as to financial documentation); producing falsified and fabricated financial records; and moving to recuse the presiding state court judge to avoid sanctions.  Their conduct has been so egregious that courts in Texas and Connecticut entered default judgments against them on liability in September and November 2021.  Jones and FSS are the only Jones Defendants in the Connecticut and Texas cases.

## B. The Sandy Hook Families sue Jones and the Debtor for committing fraudulent transfers.

7.     The Sandy Hook Families' investigation over the course of the Sandy Hook Cases revealed that in the summer of 2021, as defaults were entered in Texas and a default in Connecticut appeared imminent, the Debtor was transferring between $11,000 per day and $11,000 per week plus 60–80% of its sales revenue to insider PQPR, which is owned and operated directly and indirectly by Jones and his parents.  The Debtor claims these payments are part of a "financial disentanglement between the two companies[.]"[3]  The Sandy Hook families claim they are fraudulent transfers designed to siphon off the Debtor's assets to make it judgment-proof.  The Debtor; Alex Jones; PQPR Holdings Limited LLC; JLJR Holdings, LLC; PLJR Holdings, LLC; Carol Jones; David Jones; PQPR Holdings, LLC; JLJR Holdings Limited, LLC; AEJ Holdings, LLC; and AEJ Trust 2018 are all

---

[3] Ex. A, FSS Dep. at 200, Feb. 15, 2022.

defendants in the fraudulent-transfer case: *Heslin v. Jones*, Cause No. D-1-GN-22-001610, in the 200th Judicial District Court of Travis County, Texas.  The Texas Plaintiffs started this action in April 2022 (the "**Fraudulent-Transfer Case**").  The Connecticut Plaintiffs later joined it in June 2022.

## C.  The Debtor's books and records are unreliable.

8.      The Sandy Hook Families' litigation against the Jones Defendants has developed a robust evidentiary record.  The Debtor appeared for ten deposition sessions in the Sandy Hook Cases spanning 2019–2022.  Jones also testified under oath in seven sessions in that time.  Many of Debtor's employees were also deposed.  This evidentiary record establishes Jones's complete control over the Debtor.[4]  In a June 2021 deposition, the Debtor's corporate representative acknowledged Jones's exclusive control over its operations and finances.[5]

9.      In this bankruptcy, the Debtor's own CRO described its books and financial records as unreliable and inadequate as he reached the following preliminary conclusions:

- Though the company had a controller and two bookkeepers (none who appear to have any formal accounting background), the 2021 general ledger was not completed and the books for that period were not closed;

---

[4] Jones's sworn interrogatories filed in the Connecticut cases on behalf of Jones and FSS also establish his exclusive control:

> Identify: a. All business organizations and/or other entities in which you have ownership and/or control[;] b. The officers or members of all organizations and/or entities responsive to part (a)[;] c. The shareholders or other owners of all organizations and/or entities responsive to part (a)…

> ANSWER: a. I, Alex Jones, have ownership and/or control of the following business organizations and/or other entities: Free Speech Systems LLC. . . b. I am the sole officer and member of all the organizations and/or entities responsive to part (a). c. I am the sole shareholder and owner of all organizations and/or entities responsive to part (a).

Ex. B, Jones and FSS Sworn Interrogs.

[5] Ex. C, FSS Dep. at 89–90, Jun. 24, 2021.

- Few transactions had been recorded in the 2022 general ledger;

- No financial statements were produced for the company for the 18 months preceding Mr. Schwartz's engagement;

- The bank accounts had not been reconciled in 2021 or 2022;

- Internal accounting controls were completely inadequate, including lack of segregation of duties, absence of written monthly, quarterly and annual closing schedules, lack of supervisory review of key accounting functions, including vendor set up, bank reconciliations, inventory reconciliations, or intercompany billings;

- Payments to vendors were debited to an expense account, but not to the specific vendor account; and

- Credit card transactions were not recorded to specific expense accounts.[6]

10.    The Sandy Hook Families' litigation experience indicates that the books are not only unreliable and inadequate but also "sanitized" to show what Jones wants them to show and conceal what Jones wants hidden.   For example, Robert Roe, an outside consultant the Debtor retained to prepare its books, was found to be not credible by the Connecticut Superior Court in a sanctions ruling: "The Court rejected Roe's statements in his affidavit as not credible in light of the circumstances."[7]  In fact, trial balances produced in discovery in Connecticut were found to be "sanitized and incomplete":

> The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by the Jones defendants' outside accountant were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that their own accounting manager had

---

[6] ECF 9, ¶ 14.
[7] Ex. D, CT Super. Ct. Ruling, at 7:15–17, Nov. 15, 2021.

produced, and they contain trial balances that did not balance.  These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the Court's order.[8]

11.     The Debtor's subchapter V petition, signed by Mr. Schwartz as CRO, includes FSS Balance Sheets as of May 31, 2022; a cash-flow statement for the year ended December 31, 2021 and the five months ended May 31, 2022; a comparative profit-and-loss statement for the same time-periods; and a comparative balance sheet, also for the same time-periods.[9]  Despite the Debtor's concessions about the state of its financial records, these statements are presented to the Court as if they are complete and accurate. No notation on any of these financial statements disclaims that information is missing or that the numbers cannot be relied on.

**D.  The Debtor alleges it owes insider PQPR $54 million.**

12.     A centerpiece of Jones's plan to avoid compensating the Sandy Hook Families is the claim that FSS owes PQPR an enormous debt.  The Debtor claims this debt is $53,655,082.29 in principal and $11,794.19 in interest as of the Petition Date under promissory notes and a security agreement it entered in 2020 and 2021.[10]

13.     In November 2020, just three weeks after the Connecticut Supreme Court affirmed major discovery sanctions against Jones and the Debtor, and three months after the last appellate-court decision allowing the Texas Plaintiffs litigation to proceed, PQPR filed a UCC Financing Statement claiming a security interest on substantially all the

---

[8] *Id.* at 9:9–21.
[9] ECF 1, at 9–13.
[10] ECF 6.

Debtor's assets for an alleged $54 million debt.  The Debtor admits that the supposed debt was first memorialized in 2020—*and the supposed security interest created in 2020*—even though it claims this obligation had been accruing since some time "in the past" and by 2020 amounted to $29 million dollars.  The Debtor also admits that PQPR continued to supply it with supplements during the entire period of claimed nonpayment, even though the claimed debt ballooned to $54 million.  PQPR continues to supply FSS even now.

14.    There are several troubling facts relating to this supposed debt: (1) its beneficiaries are insiders, with 72% of payments to PQPR going to Jones and the rest to his mother and father;[11] (2) even in the Debtor's best version of the facts, PQPR is controlled by Jones's father, David Jones;[12] (3) the "formula" for paying PQPR offers no actual benefit to the estate, given that "if PQPR purchase[s] inventory, pays for it, sells it through our sales channel, the Debtor gets 20 percent of the net.  PQPR gets 80 percent of the net";[13] (4) the supposed debt dwarfs the Debtor's other long-term liabilities by 50-fold;[14] and (5) a $54 million supposed debt to insiders coupled with $61 million in member draws,[15] depicts a company being drained into insolvency to benefit insiders to the detriment of creditors.

15.    As Mr. Schwartz himself states, the Debtor's financial records do not suffice to establish the PQPR debt's legitimacy: "Internal accounting controls were inadequate,

---

[11] ECF 10, ¶¶ 46–47.

[12] *Id.*, ¶ 45.

[13] Ex. E, Hrg. Tr. at 21, Aug. 3, 2022 (remarks of Mr. Battaglia).

[14] *See* ECF 1, at 13.

[15] *See id.*

including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR[.]"[16]

### E.  The CRO concludes the PQPR debt is legitimate without any investigation.

16.     While a debtor should have a compelling interest in avoiding a large, questionable debt, Mr. Schwartz seems set on validating it.  He already concluded the debt is legitimate—and swore to the truth of that conclusion in the first-day filings: "Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million."[17]  Mr. Schwartz admitted on cross-examination that this conclusion was based on his review of FSS financial records, not based on his review of invoices or bank statements.[18]  He testified this statement was based on "schedules of billings, (indiscernible) PQPR for inventory and credits, *i.e.*, payments, applied to those billings and they were developed out of the general ledger system there, accounting transactions pulled out of the general ledger system."[19]  He said, "*they showed me* -- I have the calculation for the amount of the 29,588,000 and I see from the source date that it is from invoices and payments records."[20]  In other words, someone prepared information for Mr. Schwartz to support the claimed FSS–PQPR debt,

---

[16] ECF 10, ¶ 42(c).

[17] *Id.* at ¶ 42(d).

[18] Ex. E, Hrg. Tr. at 165-66, Aug. 3, 2022.

[19] *Id.*

[20] *Id.*

and he just accepted it and swore to it even though he knew FSS financials were inaccurate and unreliable and he had never seen invoices or bank statements proving the debt.[21]

**F. The Debtor denies the debt in its first Sandy Hook deposition only to remember its existence in another deposition taken months after default judgments were rendered.**

17.    FSS's testimony in the Sandy Hook Cases confirms the claimed debt is a cover for Jones to pay himself out of FSS's profits, while claiming FSS is insolvent.  In June 2021, FSS presented its representative, Michael Zimmerman, for deposition. Zimmerman testified that he prepared himself to testify about the Debtor's financial condition and its relationship with PQPR, in part by speaking with Jones and the Debtor's long-time CPA, Bill Love.[22]  Mr. Schwartz recently testified that Mr. Love will no longer work with FSS.

18.    Through Zimmerman, FSS testified it was "unaware" of any debt it had taken on since 2012.[23]   Before his deposition, Zimmerman asked Jones about "Free Speech Systems' business relationship with PQPR."[24]  Zimmerman revealed that Jones advised only that "PQPR is a company that basically develops and procures supplements that are then sold on the Infowars store by Free Speech Systems."[25]  Despite having Zimmerman testify on FSS's financial relationship with PQPR, Jones never mentioned the massive

---

[21] *See* ECF 10, ¶ 42; *see also* Ex. E, Hrg. Tr. at 165-66, Aug. 3, 2022.

[22] Ex. C, FSS Dep. at 27, Jun. 24, 2021.

[23] *Id*. at 88:12-16.

[24] *Id.* at 46.

[25] *Id.* at 46–47.

alleged debt to PQPR the Debtor now claims—and which, if real, could jeopardize the business.

19.    Zimmerman also discussed the relationship between the Debtor and PQPR with Love.[26]  *Love did not describe "any contractual relationship between PQPR and Free Speech Systems."*[27]  That Love never referenced a debt to PQPR is telling, given that Jones testified that Love had a role in PQPR's finances too.[28]  In other words, in June 2021— when it allegedly owed over $50 million to PQPR under two promissory notes and a security agreement—the Debtor testified that it was "unaware" of any debt it had taken on since 2012.[29]

20.    This earliest testimony about FSS's debt came three months before default judgments were rendered in Texas and five months before the default in Connecticut.  But after those defaults were rendered, FSS's story about PQPR changed.

21.    In June 2022, about a year after FSS's first deposition, Jones produced: (1) a supposed promissory note between FSS and PQPR dated August 2020; (2) a supposed security agreement creating a security interest in the note, also dated August 2020; and (3) another supposed promissory note dated November 2021.[30]

22.    On June 27, 2022, the Debtor appeared for deposition on the PQPR–FSS relationship.  Mr. Schwartz prepared the representative, Ms. Paz, to testify about the

---

[26] *Id.* at 31.

[27] *Id*. (emphasis added).

[28] Ex. F, Jones Dep. at 451-53, Apr. 6, 2022.

[29] Ex. C, FSS Dep. at 88:12-16, Jun. 24, 2021.

[30] Ex. G, Jones Dep. at 900-901, Jul. 21, 2022.

alleged PQPR debt.[31]  The Debtor's trial counsel informed Ms. Paz that Schwartz "was the best person to speak to regarding the financial questions . . . noticed in the deposition," which included transactions and agreements between the Debtor and PQPR.[32]   Mr. Schwartz, as CRO, met twice with Paz to prepare her to testify for the Debtor.[33]  Their first meeting was June 17, 2022 and included Ms. Paz, Mr. Schwartz, and the Debtor's trial counsel.[34]  The second meeting was just days before her deposition—and the first time she saw the supposed promissory notes and security agreement.[35]   Based on his own description of FSS's records, Mr. Schwartz was not in a position to prepare FSS to give testimony under oath on the PQPR–FSS relationship, any more than he could under oath himself.  He did so anyway.

23.    At the June 2022 deposition, the Debtor, through Ms. Paz, told a new story about its relationship with PQPR.  In this new version, PQPR provided significant services to FSS along with supplying products.  The Debtor testified that PQPR handles sales transactions occurring over the websites infowarsstore.com and infowarsshop.com;[36] that PQPR "does all the fulfillment of the order, it houses all of the products and it, you know, generally just fulfills all of the orders;"[37] and that PQPR had its own employees and those employees performed the fulfillment and warehouse functions, not the Debtor's

---

[31] Ex. H, FSS Dep. at 557-68, Jun. 27, 2022.

[32] *Id*. at 559–61.

[33] *Id*. at 568.

[34] *Id*. at 558–59.

[35] *Id*. at 568.

[36] *Id*. at 577–78.

[37] *Id*. at 583.

employees.[38]  None of this is true.  PQPR performs no services, has no employees, and has no warehouse.

24.     When asked who authorized the Debtor to assume this supposed debt, the Debtor's June 2022 testimony was that "I don't think it was a conscious decision on anyone's part . . . I don't think I would use the word 'authorized.'"[39]

25.     In other respects, the June 2022 story resembled Mr. Schwartz's.  The Debtor testified that in December 2014, it started accruing a debt to PQPR when it failed to pay for PQPR's products.[40]  The Debtor testified the debt was "[f]or costs associated with the products, for purchasing the products.  So, PQPR purchases the products, costs associated with housing the products."[41]  But when pressed, FSS conceded that debt's basis was "billing . . . for the products":

> Q.  So, but is Free Speech Systems buying the product from PQPR?  Because that I could understand, right.  Hey, you're buying this product from us, we're selling it to you, Free Speech Systems, pay us. . . . What I understood you to be saying is PQPR buys the products and sells the products; right?
>
> A.  PQPR, I believe, buys the products and then stores the products and handles the sale end of the products and packaging the products.  *But ultimately Free Speech pays PQPR for the product.  So, it is billing Free Speech for the products.*[42]

---

[38] *Id*. at 584-86, 593–94.

[39] *Id.* at 624.

[40] *Id.* at 625.

[41] *Id*. at 625.

[42] *Id*. at 627-28 (emphasis added); *see also id.* at 631.

26.     In this deposition, FSS testified that it received monthly invoices from PQPR requesting payment for product purchased by PQPR.[43]  But no invoice was ever produced in the years of the Sandy Hook Cases—despite being requested.

**G. Jones's story about the Debtor's alleged $54 million debt to his other company, PQPR, also evolves as needed.**

27.     On June 21, 2022, the Connecticut Plaintiffs deposed Jones on the supposed debt, and he told yet another story.  Jones admitted that "since PQPR's formation, [he], either directly or indirectly, ha[s] had a controlling majority ownership stake."[44]  He testified that PQPR pays FSS most of its profits to compensate FSS for advertising.[45]  He failed to explain why PQPR would send most of its revenue to FSS when it also claims FSS owes it $54 million.

28.     Jones also testified that most of that supposed debt accrued after he was sued by the Connecticut Plaintiffs in May 2018.[46]  But he was unable to describe the nature of the debt itself:

> Q.  I understand from your testimony that you believe that David Jones is claiming that under PQPR's agreement with Free Speech Systems, Free Speech Systems was supposed to send a percentage of sale proceeds to PQPR?
>
> A.  Yeah, I forget the exact agreement.  You'd have to -- I forget the exact agreement.  The point is it's not being paid under what the agreement is.

---

[43] *Id*. at 625, 631.

[44] Ex. I, Jones Dep. at 866, Jun. 21, 2022.

[45] *Id*. at 870.

[46] *Id*. at 878-79.

Q.  Right.  And I'm just trying to figure out what's not being paid.  I take it that you -- it's a percentage of the sale proceeds that PQPR claims it was owed --

A. I don't know.  It's something -- I don't remember.[47]

Shortly after professing ignorance concerning the nature of his company's debt, Jones declared that of all the Debtor's current employees, he knows most about FSS's relationship with PQPR.[48]

29.    A month later, on July 21, 2022, Jones appeared for another deposition—scheduled specifically so he could testify about the PQPR promissory notes and the security agreement.  This time, he presented another story for the alleged debt.  He testified that the August 2020 note came about because "[a]fter deplatforming approximately four years ago and legal bills from lawsuits, we began to have to spend basically all the money from profits from PQPR to build new infrastructure and pay legal bills and taxes and when the, when the debt got so large we, we developed a plan to start pay -- try to pay down that debt, at least not to have it grow, and so that's, that's what I remember the reason it was done."[49] He later agreed that the debt started to accrue "about four years ago when this deplatforming took place."[50]  This testimony makes the Sandy Hook Families' point precisely: the Jones family ("we" in Jones's words) is using PQPR and FSS as one operating entity, with charges being shifted between PQPR and FSS as they please.

**H.  Money the Debtor pays PQPR ends up in Jones's pockets.**

---

[47] *Id*. at 878–79.

[48] *Id*. at 886.

[49] Ex. G, Jones Dep. at 902, Jul. 21, 2022.

[50] *Id*. at 905, 913-14.

30.     Jones is the beneficiary of payments the Debtor now makes to service its debt to PQPR.   Through Ms. Paz, the Debtor testified that from PQPR's inception Jones controlled it through his 90% ownership interest in PLJR, which, in turn, had a 80% ownership interest in PQPR.[51]   Then in 2018—the same year the Sandy Hook Cases began—Jones formed the AEJ Trust 2018.[52]  He then transferred his ownership interest in PLJR to the AEJ Trust 2018 and made himself its income beneficiary.[53]   The Debtor's claimed debt-service payments of $11,000 a day were then routed through PQPR to the AEJ Trust 2018 and then onto Jones himself:

Q.  The trust does generate income; correct?

A.  It is generating income, yes.

Q.  How is it generating income?

A.  It is generating income on the basis of the notes that Free Speech pays to PQPR.

Q.  Which started when?

A.  So, those payments, I believe, started at the end of last year, some time toward the end of last year, maybe November.

Q.  That is November of 2021?

A.  Right.  So those payments are approximately $11,000 per business day from Free Speech to PQPR.

Q.   And the initiation of those payments of $11,000 from Free Speech Systems to PQPR was initiated why?

A.  To pay down the debt between the two companies.

---

[51] Ex. H, FSS Dep. at 595, 604, Jun. 27, 2022.

[52] *Id.* at 605.  AEJ are Alex Emric Jones's initials.

[53] *Id.* at 605–06, 615.

002401

. . .

Q.  Free Speech Systems isn't aware of anybody else who could authorize Free Speech Systems to make $11,000 daily payment to another corporate entity; correct?

A.  No, I think Alex would have to authorize it.  He owns Free Speech.

. . .

Q.  Whatever income the trust is generating, whether it be the $11,000 daily payments beginning in November 2021 or some additional income beyond that, none of that income is being paid to any of Mr. Jones's children; correct?

A.  That's right. Yes.

Q.  It's being paid to Mr. Jones; correct?

A.  Mr. Jones is an income beneficiary of the trust, yes.

Q.  Are there any other income beneficiaries?

A.  I don't believe so, no.

. . .

Q.  So he is the sole beneficiary of any income that flows to AEJ Trust as a result of its ownership of PQPR's debt; correct?

A.  Through the trust, yes.[54]

## I.  The CRO mismanages estate resources to Jones's benefit.

31.     Mr. Schwartz simply does not seem to have an objective base of knowledge concerning the Debtor's operations—and, more to the point, does not seem inclined to get one.[55]  Since May 2022, the Debtor retained Mr. Schwartz as its CRO with "broad powers to review the company's past financial performance, analyze the condition of FSS's books

---

[54] *Id*. at 606–615.
[55] *See supra* § II(C)-(H).

and records and evaluate whether FSS is a business that can be reorganized."[56]   Mr. Schwartz "retained his firm Schwartz Associates to perform various accounting and forensic work associated with his mandate."[57]   Yet, in another example of mismanagement, the website FSS controls, Infowars.com, has "wallets" to receive donations.   Close to the time of Mr. Schwartz's retention, in April and May 2022, one wallet linked to the website started to receive large donations in cryptocurrency.[58]   A donation for over $1 million was received on April 23rd; another for over $1 million was received on April 30th; and another for $5.9 million was received on May 19th.[59]   After May 19th—the same day Mr. Schwartz undertook duties as CRO—Jones personally cashed out $4-5 million of those donations and put it into his personal bank account.[60]   He alleges he intended to transfer "most of it" to FSS "as a capital injection."[61]   When questioned more closely, Jones said "some has gone directly into Free Speech Systems, other has gone directly into legal bills, but the things, generally, you know, dealing with the operation of the company."[62]   Jones indicated that:

> [S]ome company bills have been [paid] directly out of my bank account, my private bank account, just for expediency.   Instead of just transferring it into Free Speech Systems and having that, but more than 2 million has been transferred into Free Speech Systems and paid out for back bills.   And then others has [sic] gone to legal bills.   And then other has gone to buy product so that we have product to sell . . . I may keep some to reimburse myself for past

---

[56] ECF 83, ¶ 24.

[57] Id.

[58] Ex. I, Jones Dep. at 845-46, Jun. 21, 2022.

[59] Id. at 846-47.

[60] Id. at 848-49, 851.

[61] Id. at 848.

[62] Id. at 849-50.

-- because I'm paid privately, but my intent is to currently spend about 90 percent of it in -- into keeping Free Speech afloat[.]"[63]

Jones stated he had also paid a $344,000 bill associated with this bankruptcy from these funds.[64]

## J. The CRO has a conflict of interest but fails to disclose it.

32.     On April 17 and 18, 2022, Jones directed three of the Jones Defendants, InfoW, LLC (fka Infowars, LLC), IWHealth, LLC (fka Infowars Health, LLC), and Prison Planet TV, LLC (collectively the "**Infowars Debtors**"), to petition for bankruptcy relief under subchapter V.[65]  Mr. Schwartz, also appeared in these bankruptcies as the Infowars Debtors' CRO.  Mr. Schwartz signed the petition on behalf of the Infowars Debtors on April 18, 2022, and, in connection with that filing, presented an affidavit, in which he indicated that he had been retained to act as CRO in April 2022 but left the specific date of the retention blank.[66]  Mr. Schwartz was presumably retained before April 14th, because the Trustee of the 2022 FSS Litigation Settlement Trust, Robert Dew, indicated he authorized Mr. Schwartz to file the petition as of April 14, 2022.[67]  In connection with his retention, Mr. Schwartz received a retainer of $50,000.[68]

33.     Mr. Schwartz states that in preparing to file that bankruptcy petition, he met "with Bob Roe, a CPA retained to delve into the books of account of various entities

---

[63] *Id.* at 851.

[64] *Id.* at 852.

[65] *See In re InfoW, LLC, et al.*, No. 22-60020 (Bankr. S.D. Tex.) (the "**Infowars Bankruptcy**").

[66] Infowars Bankruptcy ECF 1, Schwartz. Decl. ¶ 6.

[67] *Id.*, attachment to Schwartz Decl.

[68] Infowars Bankruptcy ECF 7, ¶ 31.

affiliated with the Debtors and assist those entities to prepare accurate financials statements which could be relied upon by the reader to accurately reflect the financial condition and activities of the entities.  I have also met with counsel for the Debtors and Jones to obtain an understanding of the Debtors' operations.  I have also reviewed lists of assets owned by the Debtors."[69]

34.    Through May 18, 2022, Mr. Schwartz had active decision-making responsibilities as to the Infowars Debtors.  Specifically, the Infowars Debtors represented in a motion to continue various deadlines filed on May 18 that, although the Sandy Hook Families would be dismissing or withdrawing their actions against the Infowars Debtors, "the three debtors still have a number of creditors that must be treated.  Marc Schwartz, the proposed Chief Restructuring Officer, has not yet had a chance to focus on the remaining creditors.  He intends to turn his attention to determine how best to resolve them as soon as he finalizes the agreements with the Texas and Connecticut Plaintiffs . . . He could proceed to confirmation of a plan by re-negotiating the Plan Support Agreement, or he could dismiss the Chapter 11 Cases, after notice and a hearing, and handle the remaining claims outside of Chapter 11."[70]   The Infowars Debtors sought an extension to give Mr. Schwartz "a short amount of time to analyze which option to pursue,"[71] which was granted on the record in a May 19th status conference.

---

[69] Infowars Bankruptcy ECF 1, Schwartz. Decl. ¶ 7.  Prior to this, the Connecticut Superior Court had determined Mr. Roe's statements concerning the Debtor's books to be inaccurate and unreliable.  *See* Ex. D, CT Super. Ct. Ruling, at 7:15–17, 9:9–21, Nov. 15, 2021.

[70] Infowars Bankruptcy ECF 95, ¶¶ 16-17.

[71] *Id.* at ¶ 17.

35.     During the time Mr. Schwartz was supposedly working on resolving the Infowars Bankruptcy, Mr. Schwartz apparently also agreed to serve as CRO for FSS—a third-party funder of the litigation settlement trust in the Infowars Bankruptcy.   Mr. Schwartz's declaration in this bankruptcy states he acted as FSS's CRO as early as May 19, even though the retainer letter was not signed until June 7.[72]   Mr. Schwartz's affidavit makes this point in two separate paragraphs:

> Paragraph 9: "On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the 'CRO') and SALLC as its financial advisors *as of May 19, 2022*."[73]

> Paragraph 40: "Since *May 19, 2022*, FSS has retained Schwartz as its Chief Restructuring Officer ('CRO'), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized.   SALLC was retained to perform various accounting and forensic work associated with his mandate."[74]

This declaration was filed with FSS's first-day motions, before Mr. Schwartz and Debtor's counsel were alerted to the Court's concerns, expressed on August 1, about the conflict between Mr. Schwartz's role as CRO for the Infowars Debtors and FSS.

36.     When testifying before the Court two days later, Mr. Schwartz contradicted his declaration and claimed he did not act as CRO until June 6th, when the retainer letter was signed. He swore he talked with Lee and Jordan while the Infowars Bankruptcy was pending; then he wrote the May 19 retainer letter at Lee's request; and "I didn't even think

---

[72] ECF 10, Schwartz Decl. ¶¶ 9, 40.
[73] ECF 10, Schwartz Decl. ¶ 9 (emphasis added).
[74] ECF 10, Schwartz Decl. ¶ 40 (emphasis added).

about it at the time," and "the letter was officially signed June 6," "June 6 is when I was hired."[75]  Mr. Schwartz's declaration is definite that he took on CRO responsibilities for FSS on May 19th.  His August 3rd about-face suggests he did not take on CRO responsibilities until June 6th.  Now, Debtor is affirming it retained Mr. Schwartz on May 19th in its application to authorize his employment.[76]

37.    If Schwartz's declaration and Debtor's application to employ Mr. Schwartz are accurate, he acted as the Debtor's CRO as of May 19—while he also had a duty of loyalty to the Infowars Debtors and actively made decisions for those entities.[77]  This retention was confirmed on June 7th after it became clear the Infowars Bankruptcy would be dismissed.[78]  But it was not disclosed to the Court in the Infowars Bankruptcy, despite Schwartz attending a status conference on May 19 and June 10th in that bankruptcy.  At that time, neither Mr. Schwartz nor the Infowars Debtors' counsel disclosed to the Court Mr. Schwartz's retention by FSS as CRO.

38.    In moving to dismiss the Infowars Bankruptcy for bad faith, the U.S. Trustee argued that "Jones and FSS hand-picked . . . three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in

---

[75] Ex. E, Hrg. Tr. at 149, 180, Aug. 3, 2022.

[76] ECF 83, ¶¶ 24, 40.

[77] For example, on June 1, the Infowars Debtors represented in a stipulation seeking dismissal of that bankruptcy that "Marc Schwartz, the Chief Restructuring Officer of the Debtors, has determined that it is in the best interest of the Debtors' estates and their creditors not to continue the Chapter 11 Cases[.]"  Infowars Bankruptcy ECF 110, at 2.  These decisions included how to handle the claims of the Randazza Legal Group, one of the Infowars Debtors' remaining creditors.  *See* Infowars Bankruptcy ECF 61, Part 2, No. 3.23 (listing Randazza Legal Group as an unsecured creditor).  The Randazza Legal Group represented the Infowars Debtors and FSS in connection with the Sandy Hook Families' cases and is presumably also a creditor of FSS.

[78] *See* ECF 10, Schwartz Decl. ¶ 9.

interest a full accounting of their assets, and to deny individuals their day in court and imminent recovery for established liability."[79]  That Mr. Schwartz's role as CRO for FSS and the Infowars Debtors was concealed during the Infowars Bankruptcy bolsters the U.S. Trustee's conclusion that this was a "scheme."

39.    Rather than acknowledging the conflict in Mr. Schwartz's testimony to the Court on this critical issue, and rather than acknowledging Mr. Schwartz's post-May 19 conflict of interest and his failure to raise it with the Court, the Debtor attempts to minimize the problem by broadly alleging that Mr. Schwartz "acting in a similar role [for the Infowars Debtors] did not create an 'interest materially adverse' to the interests of FSS's creditors or equity security holders."[80]  The Debtor denies a dispute between it and the Infowars Debtors, disregarding clear issues with the control, management, and financial documentation across these entities.[81]  The Debtor adds that Schwartz's "mandate to lead [the Infowars Debtors'] management and personnel through the restructuring process had for all practical purposes concluded May 19," disregarding the Infowars Debtors' own assertions at that same time that Mr. Schwartz required more time to fulfill his duties to them.[82]

## K.  Jones squeezes FSS into bankruptcy as a small business before time runs out.

40.    The Sandy Hook Families' dismissals of the Infowars Debtors from their cases freed those cases to proceed in Texas and Connecticut.  In Texas, the *Heslin* and

---

[79] Infowars Bankruptcy, ECF 50, at 16.

[80] ECF 83, ¶ 44.

[81] *See id.*

[82] *Compare* ECF 83, ¶ 44 (internal quotations omitted), *with* Infowars Bankruptcy, ECF 95, ¶¶ 16-17.

*Lewis* case, brought by parents of slain six-year-old Jesse Lewis, started July 25 and was scheduled to run 10 days.  In Connecticut, the *Lafferty* cases, which involves claims of 14 family members and a first responder, was set to begin jury selection August 2 with trial starting September 6, 2022.

41.    Five days into the *Heslin/Lewis* trial, Jones had FSS petition for bankruptcy relief under subchapter V.  Days later, the jury returned verdicts of over $49 million—dwarfing the liquidated-debt eligibility limit under subchapter V by over $40 million.

## III.    <u>ARGUMENT & AUTHORITIES</u>

42.    Congress enacted subchapter V "to streamline the reorganization process for small business debtors because small businesses have often struggled to reorganize" under chapter 11.[83]    As part of this streamlining, many procedural safeguards that protect creditors in large reorganizations were curtailed or even eliminated.[84]    The intended beneficiaries of this process are "[s]mall businesses—typically family-owned businesses, startups, and other entrepreneurial ventures."[85]    FSS is not the type of debtor Congress envisioned needed protections under subchapter V—a debtor that earns tens of millions of dollars in yearly revenues; alleges over $54 million in secured debt; and has nearly $50 million in unsecured debt owed to two Sandy Hook plaintiffs, liquidated days after filing,

---

[83] *In re Ventura*, 615 B.R. 1, 12 (Bankr. E.D.N.Y. 2020), *r'ved on other grounds*, 638 B.R. 499 (E.D.N.Y. 2022).

[84] *See, e.g.* 11 U.S.C. § 1181 (only allowing creation of a creditor's committee for cause); 11 U.S.C. § 1183 (authorizing court to enhance default powers of subchapter V trustee).

[85] *In re Ventura*, 615 B.R. at 12 (quoting 11. H.R. Rep. No. 116-171, at 1-2 (2019)).

and with more judgments imminent.

43.     The Debtor alleges it meets the subchapter V debt limits—which it has the burden to prove—by securing alleged debt with an entity subject to Jones and his family's control and filing bankruptcy before the Sandy Hook Families' claims were liquidated.[86] It sought protection under this subchapter to avoid the necessary transparency and oversight that accompanies normal chapter 11 reorganizations.  But FSS's conduct leading up to and since filing this bankruptcy reveals an out-of-control debtor that is still operated by Jones for the sole benefit of Jones.  On its face, CRO appointments typically indicate a good-faith attempt to right the ship, but Mr. Schwartz has proven he is unable or unwilling to operate with competency and impartiality.  For the reasons here, the Court should appoint a tort claimants' committee and remove FSS as debtor in possession.

**A.  The Court has cause to appoint a tort claimants' committee.**

44.     Under subchapter V, a creditors' committee is not appointed "unless the court for cause orders otherwise."[87]  "[T]he appointment of a committee in a Subchapter V case is within the discretion of the court."[88]  While "cause" under subchapter V case is

---

[86] *See* 11 U.S.C. § 1182(1) (defining debtors under subchapter V, in part, as having liquidated debts not exceeding $7.5 million, excluding debts to affiliates or insiders).

[87] 11 U.S.C. § 1102 (a)(3); *see also* 11 U.S.C. § 1181(b).

[88] *In re Wildwood Villages, LLC*, No. 3:20-bk-02569-RCT, 2021 WL 1784408, at *4 (Bankr. M.D. Fla. May 4, 2021) (comparing the court's discretion in subchapter V to allow for a class proof of claim to the court's discretion to appoint a committee, "[t]he Court can envision possible scenarios where a creditors' committee or a class claim may be an efficient and appropriate vehicle in a Subchapter V case, particularly while the debt limits are set at a higher level"); *see also* Ex. J, *In re Sharity Ministries, Inc.*, Case No. 21-11001 (JTD) (Bankr. D. Del.), Hrg. Tr. at 60:16-25, Aug. 9, 2021 (Judge Dorsey appointing creditors' committee *sua sponte* in subchapter V case); *cf. In re Haskell-Dawes, Inc.*, 188 B.R. 515, 520 (Bankr. E.D. Pa. 1995) (explaining with respect to prior version of § 1102(a)(2) that "Congress could have altogether eliminated the requirement that a creditors' committee be appointed in cases involving small businesses.  It did not.").

undefined, at least one court has considered three factors in deciding whether "cause" exists to appoint a subchapter V committee: (1) whether a committee is necessary to provide effective oversight of the Debtor; (2) whether a committee will assist in the prompt resolution of a case; and (3) whether a committee will improve recoveries to creditors.[89] Under that standard, appointing a tort claimants' committee is not only appropriate but also critical to a fair outcome.

### i.   A tort claimants' committee is necessary for effective oversight of the Debtor.

45.   Cause exists to appoint a tort claimants' committee to provide effective oversight of the Debtor.  The Debtor's conduct and actions before and after filing this bankruptcy case demonstrate the need for close oversight.[90]  The Debtor is one of many entities subject to Jones's control and management that he uses to funnel funds for his own personal benefit.  Under Jones's control, the Debtor's financial records and documentation have been deemed unreliable, inadequate, and at times intentionally altered.[91]  At Jones's direction, Debtor blatantly refused to comply with discovery orders and took efforts to avoid disclosure of its financial affairs, subjecting it to default judgments on liability.  To avoid the liquidation of these claims, Jones directed multiple entities to file multiple bankruptcies.[92]  Jones then sought to retain the same CRO across these bankruptcies,

---

[89] *See In re Bonert*, 619 B.R. 248, 253-254 (Bankr. C.D. Cal. 2020) (setting forth the three factors to consider for the existence of a committee of creditors in a subchapter V case).

[90] *See id.* at 254.

[91] *See* Ex. D, CT Super. Ct. Ruling, at 9:9-21, Nov. 15, 2021 (finding that Debtor produced "sanitized" and "inaccurate" trial balances during discovery); *see also* ECF 9, ¶ 14 (CRO acknowledging Debtor's financial records were unreliable and inadequate).

[92] ECF 1; Infowars Bankruptcy ECF 1, 8.

despite apparent conflicts of interest, and utilized this CRO to legitimize unsupported transfers and claims between entities under Jones's direct and indirect control. Significantly, the retention of a CRO has failed to prevent Jones from personally cashing out $4–5 million in donations to FSS and placing those funds in his personal bank account.[93]  Further, since filing for bankruptcy with a CRO in place, the Debtor has proved itself unable to properly manage estate resources—allowing, for example, Amex payments to Jones's housekeeper.

46.    A tort claimants' committee would provide necessary oversight and a platform for an independent fiduciary to promote transparency and "provide access to information for creditors."[94]  The committee would be authorized to, among other powers, "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan"; "participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan"; and "perform such other services as are in the interest of those represented."[95]  Investigation and participation by a committee would ensure that essential safeguards are in place to protect creditors in this bankruptcy.

---

[93] Ex. I, Jones Dep. at 848, 851, Jun. 21, 2022.

[94] 11 U.S.C. § 1102(b)(3)(A).

[95] 11 U.S.C. § 1103(c)(2)-(3), (5).

### ii.     A tort claimants' committee will help resolve this case promptly.

47.     Cause also exists to appoint a tort claimants' committee to promptly resolve the bankruptcy case.   There are significant issues with Debtors' operations and management that impede resolution.   Appointment of a tort claimants' committee will streamline the resolution of these major issues.[96]  Specifically, a tort claimants' committee will provide a streamlined process to independently evaluate the Debtor's operations, financial records, alleged PQPR notes, pre- and post-petition conduct—including issues the Court already identified (like the CRO's conflicts of interest) without shifting the burden of such investigations onto individual creditors.  A committee also provides a single counterparty with which the Debtor can negotiate and resolve issues as they arise.[97] Further, the tort claimants' deep knowledge of this Debtor and its related entities and operations, gained from years of litigation, would be a huge asset to a committee.

### iii.    A tort claimants' committee will improve the creditors' recoveries.

48.     Finally, cause exists to appoint a tort claimants' committee because doing so will improve creditor recoveries.[98]  A critical factor in creditor recoveries here is the fate of the alleged secured debt owed to PQPR.  Specifically, the Debtor claims to owe a massive, secured debt to PQPR—an admitted insider—in the form of notes conveniently documented when the Sandy Hook Families were securing key wins in the Texas and

---

[96] *See In re Bonert*, 619 B.R. at 254.

[97] See *In re Yahweh Ctr., Inc.*, No. 16-04306-5-JNC, 2016 WL 5417363, at *3 (Bankr. E.D.N.C. Sept. 28, 2016) (considering in appointing a committee "the likelihood that effective committee counsel will aid rather than hinder the chapter 11 case process").

[98] *See In re Bonert*, 619 B.R. at 254.

Connecticut cases.  The legitimacy of the PQPR debt is already a focal point of the Sandy Hook Families' Fraudulent-Transfer Case against the Debtor and other entities directly and indirectly controlled by Jones.  In contrast, Debtor's CRO concluded the PQPR debt was legitimate without investigation or reliable documentation and admitted he had not read the Fraudulent-Transfer Case despite serving as CRO in both this and the InfoWars Bankruptcies.  The Court rightly spotted this troubling reality:

> . . . I'm concerned that you still may represent the InfoW Debtors as their CRO and how you're purporting to act as the CRO in this case.  And I don't -- at some point, someone's going to have to make some really hard decisions.  I'm – quite frankly, I'm a little surprised you hadn't read some of the litigation because at least InfoW was involved in the litigation for every one of these last time.  So -- and that was supposedly the purpose of the litigation."[99]

A full and fair investigation of the validity and nature of this debt by an independent fiduciary is needed to ensure that creditors are treated fairly, and a tort claimants' committee is the most appropriate and efficient vehicle to conduct such an investigation.[100]

### iv.    A tort claimants' committee is needed even with the subchapter V Trustee.

49.    The appointment of the subchapter V Trustee does not diminish the need for a tort claimants' committee.  A committee is still best situated to represent the interests of similarly situated creditors.[101]  Further, a tort claimants' committee can investigate the

---

[99] Ex. E, Hrg. Tr. at 240:8-25, Aug. 3, 2022.

[100] *See* 11 U.S.C. § 1103(c)(2) (authorizing committee to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor").

[101] *See* 11 U.S.C. § 1102(b)(3)(A)-(B) (committee is authorized to "provide access to information for creditors who . . . hold claims of the kind represented by that committee and . . . are not appointed to the committee" and to "solicit and receive comments" from those creditors).

Debtor and its transactions and select and employ counsel and financial experts.[102]   The subchapter V Trustee cannot without further court order.[103]   Moreover, the statutes describing the subchapter V Trustee's authority—11 U.S.C. §§ 1183(b), 704(a), and 1106(a)—do not authorize the Trustee to litigate against the Debtor.  While the subchapter V Trustee will play crucial roles in this bankruptcy, there is also a crucial role for a tort claimants' committee.

50.     The Debtor may argue that appointing a tort claimants' committee would add costs to the bankruptcy estate, but the "truism that the appointment of a creditors' committee may result in additional costs to the debtor could be advanced by every small business seeking relief . . . ." and thus is insufficient to defeat such a request in cases where, as here, the oversight provided by such a committee is necessary to fairly adjudicate a chapter 11 case.[104]   Indeed, treatment of the Debtor's primary creditor constituency—the tort claimants—is the "paramount issue" here.  It is therefore critical that tort claimants have a voice.  Moreover, and especially given the nature of the creditor body here, the costs of participation by tort claimants in a fiduciary capacity and for the benefit of all similarly-situated creditors should not—and cannot—be borne by the individual victims of the Debtor's and Jones's conduct.[105]   The unique circumstances of this subchapter V case

---

[102] *See* 11 U.S.C. § 1103(a).

[103] *See* 11 U.S.C. §§ 1183(b), 704(a), 1106(a) (collectively providing that a subchapter V trustee cannot investigate a debtor absent further court order); Paul W. Bonapfel, *A Guide to the Small Business Reorganization Act of 2019*, 93 Am. Bankr. L.J. 571 (2019) (identifying that "a sub V trustee, like a chapter 12 trustee, does not have the duty to investigate the financial affairs of the debtor.").

[104] *In re Haskell-Dawes, Inc.*, 188 B.R. 515, 520 (Bankr. E.D. Pa. 1995).

[105] *See* Ex. J, *In re Sharity Ministries, Inc.*, Case No. 21-11001 (JTD) (Bankr. D. Del.), Hrg. Tr. at 60:16-25, Aug. 9, 2021 (finding appointment of a creditors committee in a subchapter V case appropriate where the treatment of certain

---

coupled with the benefits that could be achieved through the efforts of a tort claimants'

committee greatly and unequivocally outweigh any generalized assertions about potential

costs.

**B.  The Court has cause to remove FSS as a debtor in possession.**

51.   So long as FSS possesses its assets and controls its operations, the Sandy

Hook Families' prospects of a full and fair recovery remain in jeopardy.  Along with a tort

committee, the Court should also invoke the subchapter V protection of removing FSS as

debtor in possession.  Section 1185 governs this issue.  And it requires the Court to rescind

the debtor's authority to operate its business as debtor in possession if there is "cause":

> On request of a party in interest, and after notice and a hearing, the court shall
> order that the debtor shall not be a debtor in possession for cause, including
> fraud, dishonesty, incompetence, or gross mismanagement of the affairs of
> the debtor, either before or after the date of commencement of the case, or
> for failure to perform the obligations of the debtor under a plan confirmed
> under this subchapter.[106]

In other words, removing the debtor as debtor in possession is mandatory when cause

exists.[107]

52.   This standard for removing a debtor in possession in a subchapter V case

mirrors the standard to appoint a trustee in traditional chapter 11 cases under § 1104.

Section 1104 provides that courts shall appoint a trustee "for cause, including fraud,

---

creditors would be "the paramount issue" of the case and that those creditors must therefore "have a voice in how they
are going to be treated without individual [creditors] having to incur the costs of doing so."); *see also In re Hills Stores
Co.*, 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992) ("[T]he potential added cost is not sufficient in itself to deprive the creditors
of the formation of an additional committee if one is otherwise appropriate").

[106] 11 U.S.C. §§ 1185.

[107] *In re Neosho Concrete Prod. Co.*, No. 20-30314, 2021 WL 1821444, at *8 (Bankr. W.D. Mo. May 6, 2021).

dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause[.]"[108] Given the parallel language between § 1104 and § 1185, courts interpreting § 1185 have relied on caselaw addressing whether cause exists to appoint a trustee under § 1104.[109]

53.     The statutory grounds for removing a debtor in possession and appointing of a traditional chapter 11 trustee (or examiner) are not exhaustive.[110]  Still under that caselaw, the Court has discretion to determine whether cause for removal exists.[111]  In doing so, it may consider: (1) the materiality of any misconduct, (2) the debtor in possession's evenhandedness or lack of it in dealings with insiders and affiliates when compared to other creditors, (3) the existence of pre-petition voidable preferences or fraudulent conveyances, (4) whether any conflicts of interest on the part of the debtor in possession interfere with its ability to fulfill its fiduciary duties, and (5) whether there has been self-dealing or squandering of estate assets.[112]

54.     Through that lens, cause exists here to remove FSS from debtor in possession

---

[108] 11 U.S.C. § 1104(a)(1).

[109] *In re Peak Serum, Inc.*, 623 B.R. 609, 614 (Bankr. D. Colo. 2020) (finding "where cause would exist to appoint a Chapter 11 trustee in a standard Chapter 11 case, Subchapter V affords parties-in-interest comparable remedies, including removal of the debtor-in-possession and expansion of the Subchapter V trustee's duties"); *In re Neosho Concrete Prod. Co.*, 2021 WL 1821444, at *8 (finding "[b]ecause § 1104(a) and § 1185(a) use the same language, the court may rely on authority construing § 1104 in determining whether to remove a debtor in possession under § 1185"); *In re Pittner*, 638 B.R. 255, 258-59 (Bankr. D. Mass. 2022).

A party seeking the appointment of a trustee (or, by extension, seeking removal of a subchapter V debtor in possession) has "the burden of proving appropriate grounds exist for such appointment by the preponderance of the evidence." *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015).

[110] *In re Pittner*, 638 B.R. at 258-60 (removal of subchapter V DIP); *In re Sillerman*, 605 B.R. 631, 641–42 (Bankr. S.D.N.Y. 2019) (collecting cases appointing trustee for various grounds of cause).

[111] *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011).

[112] *Id.*

---

given the facts already known:

- As the U.S. Trustee's office observed, Jones and his company FSS previously attempted to exploit the subchapter V bankruptcy system to avoid paying the Sandy Hook Families.[113]

- Months before FSS commenced this bankruptcy, the Sandy Hook Families had already sued Jones and FSS in the Fraudulent-Transfer Case for committing fraudulent conveyances under the Texas Uniform Fraudulent Transfer Act based on what they discovered in the Sandy Hook Cases.[114]

- During the Sandy Hook Cases against Jones and FSS, Jones drew between $18 million and $62 million from FSS—even though it was supposedly insolvent because of its debt to insider PQPR.[115]

- After over a decade of owning and running FSS, Jones finally decided to enter into an employment agreement with FSS in April 2022, in which he increased his salary from about $625,000 a year to over $1.3 million—not including draws.[116]

- Weeks before filing this bankruptcy, Jones pocketed millions of dollars in cryptocurrency donations FSS solicited from fans to rehabilitate FSS.[117]

- The Debtor's CRO appears to have performed no inquiry into Jones's transfers—barely knowing any details about these millions in crypto donations that belong to the Debtor.[118]

- Weeks before commencing this bankruptcy, FSS outsourced the product-fulfillment operation it had done in-house for years to Blue Asension—a startup created by Jones's close friend and personal trainer,

---

[113] *See* Infowars Bankruptcy, ECF No. 50, at 16 ("Jones and FSS hand-picked these three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in interest a full accounting of their assets, and to deny individuals their day in court and imminent recovery for established liability.").

[114] Cause No. D-1-GN-22-001610; *Heslin v. Jones*, In the 200th Judicial District Court of Travis County, Texas.

[115] *See* ECF 1, at 13.

[116] Ex. E, Hrg. Tr. at 150-55, Aug. 3, 2022.

[117] Ex. I, Jones Dep. at 845-52, Jun. 21, 2022.

[118] *See supra* at § II(I).

who not only poached FSS's entire fulfillment team without issue but also enjoys the use of FSS's warehouse to operate from at no expense.[119]

- The Debtor's CRO failed to disclose that FSS overhauled its in-house fulfillment process just weeks before bankruptcy. Instead, the CRO testified that Jones's personal trainer had spearheaded fulfillment at FSS beforehand, but the personal trainer admitted this was incorrect.[120]

- FSS hired the same CRO as Jones's other shell entities that first filed for bankruptcy without the CRO disclosing to the Court that he was working for both the Infowars Debtors and the Debtor here, which was supposed to fund the Infowars Bankruptcy in return for a release.[121]

- While the Sandy Hook Cases were pending, FSS concocted a $54 million secured debt to PQPR, which Jones (72% interest) and his parents own directly and indirectly through various shells. Specifically, FSS signed two secured promissory notes totaling over $50 million to PQPR to cover alleged past debts—even though no records of any debt to PQPR exist before the Sandy Hook Cases started. The second note, for over $25 million, was created just months after default judgments were rendered against Jones and FSS. Soon after, FSS started paying PQPR $11,000 a day. Not surprisingly Jones's and FSS's explanation for this debt and its relationship with PQPR is an evolving story with one consistent theme: PQPR is a Jones family repository designed to shift assets and obligations as best suits their needs.[122]

- Despite noting potential claw-back payments by FSS, its CRO has not investigated any fraudulent transfers and has not even read the Sandy Hook Families' TUFTA suit, which focuses on Jones's improper draws and FSS's fake secured debt to insider PQPR.[123] Instead, the CRO attested to the PQPR debt's legitimacy without investigation and asked that the Court to recognize the debt's legitimacy in a cash-collateral order.[124]

- FSS filed for bankruptcy as a small business under subchapter V mid-

---

[119] *See* ECF 55, ¶¶ 9-11; Ex. K, Blue Asension Logistics, LLC Certificate of Formation; *see also* Ex. L, Hrg. Tr. at 50-60, 97-104, 121-26 Aug. 12, 2022.

[120] Ex. L, Hrg. Tr. at 50-60, 97-104, 121-26 Aug. 12, 2022.

[121] *See supra* at § II(J).

[122] *See supra* at § II(D)-(H).

[123] Ex. E, Hrg. Tr. at 240:8-25, Aug. 3, 2022.

[124] *See supra* at § II(E); *see also* ECF 10, Schwartz Decl. ¶¶ 89-92, 97-103.

trial, days before the jury returned a verdict against it for over $49 million, which exceeds subchapter V's liquidated-debt limit by about seven-fold.[125]

55.     These facts illuminate the Debtor's misconduct, its misdealing with insiders, its pre-petition fraudulent transfers, the conflicts preventing it from fulfilling its fiduciary duties, and its squandering of estate assets.  They, therefore, establish that cause exists to remove FSS as the debtor in possession.  And because cause exists, § 1185 mandates that it be removed.[126]

56.     There are no honest debtors here.  By controlling Debtor on one side and other insider companies, including PQPR, on the other, Jones is attempting to abuse subchapter V to avoid paying the Sandy Hook Families.  The Sandy Hook Families therefore ask this Court to remove FSS as a debtor in possession under 11 U.S.C. § 1185.  And upon doing so, it should authorize and direct the subchapter V Trustee to perform the duties specified in 11 U.S.C. §§ 704(a)(8) and 1106(a)(1), (2), and (6) under 11 U.S.C. § 1183(b)(5) as subchapter V instructs.[127]

## IV.     CONCLUSION AND RESERVATION OF RIGHTS

For these reasons, the Sandy Hook Families respectfully ask that the Court grant this motion and that the Court invoke the added protections available under subchapter V by appointing a tort claimants' committee and removing FSS as the debtor in possession.

Date: August 25, 2022

---

[125] *See supra* at § II(K).

[126] *See* 11 U.S.C. § 1185(a) ("the court shall order that the debtor shall not be a debtor in possession for cause"); *see also In re Neosho Concrete Prod. Co.*, 2021 WL 1821444, at *8.

[127] *See* 11 U.S.C. § 1183(b)(5).

Respectfully submitted,

**MᴄDᴏᴡᴇʟʟ Hᴇᴛʜᴇʀɪɴɢᴛᴏɴ LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

**Cʜᴀᴍʙᴇʀʟᴀɪɴ, Hʀᴅʟɪᴄᴋᴀ, Wʜɪᴛᴇ,
     Wɪʟʟɪᴀᴍs & Aᴜɢʜᴛʀʏ, PC**

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**Cᴀɪɴ & Sᴋᴀʀɴᴜʟɪs PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

*Bankruptcy Counsel for Connecticut Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 25, 2022, a true and correct copy of the foregoing Motion was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Jarrod B. Martin*
Jarrod B. Martin

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| Debtor. | § | |

## ORDER APPROVING THE SANDY HOOK FAMILIES' MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION

On August 25, 2022, the Sandy Hook Families (as defined in the Motion) filed their Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession (the "**Motion**"). The Court finds and concludes that cause exists to appoint a tort claimants committee and remove the Debtor in Possession.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      The United States Trustee is directed to immediately appoint an official committee of tort claimants.

2.      The Court removes the debtor in possession pursuant to 11 U.S.C. § 1185(a). The Chapter 11, Subchapter V Trustee, Melissa Haselden, is appointed to manage the affairs of the debtor.

**Houston, Texas**
**Dated: August ___, 2022**

_____
        **CHRISTOPHER M. LOPEZ**
        **UNITED STATES BANKRUPTCY JUDGE**

002423