**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC | § | CHAPTER 11 |
| | § | |
| DEBTOR | § | |

**UNITED STATES TRUSTEE'S WITNESS AND EXHIBIT LIST FOR HEARING**
**SCHEDULED FOR SEPTEMBER 20, 2022, AT 1:00 PM**

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S.

Trustee") submits this Witness and Exhibit List for the hearing scheduled for September 20, 2022,

at 1:00 p.m., Central Time (or as such hearing may be continued or rescheduled).

| Case No: 22-60043 | Name of Debtor:<br>Free Speech Systems, LLC |
|---|---|
| | |
| | |
| | |
| | Judge: **Christopher Lopez** |
| | |
| | Hearing Date: September 20, 2022 |
| | Hearing Time: 1:00 PM |
| | Party's Name: United States Trustee |
| | Attorney's Name: Ha M. Nguyen |
| | Attorney's Phone: 202-590-7962 |
| | |

**WITNESSES**

The U.S. Trustee may examine:

1. W. Marc Schwartz;
2. Kyung S. Lee;
3. Any witness called by any other party; and
4. Any witness(es) necessary to rebut the testimony of any witness(es) called or designated
   by any other party

004030

## MOTIONS TO BE HEARD

Application to Employ W. Marc Schwartz and Schwartz Associates LLC as Chief Restructuring Officer. (Attachments: # 1 Proposed Order # 2 Exhibit A - Engagement Agreement # 3 Exhibit B - Schwartz Declaration # 4 Exhibit C - FSS Company Agreement)

Application to Employ Shannon & Lee LLP as Bankruptcy Co-Counsel to the Debtor. (Attachments: # 1 Proposed Order # 2 Exhibit A - Engagement Agreement # 3 Exhibit B - Lee Declaration)

## EXHIBITS

| Ex. # | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1. | Free Speech System LLC's Schedules [Dkt. No. 121] | | | | |
| 2. | Free Speech Systems LLC's Statement of Financial Affairs [Dkt. No. 122] | | | | |
| 3. | InfoW Debtors' Application to Employ Kyung S. Lee PLLC as Bankruptcy Counsel Effective as of May 16, 2022 [Dkt. No. 97 in Case No. 22-60020] | | | | |
| 4. | InfoW Debtors' Emergency Application for Interim and Final Orders (a) Authorizing the Employment of W. Marc Schwartz as Chief Restructuring Officer, (b) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (c) Granting Related Relief | | | | |
| 5. | E-Mails between Jayson Ruff, Kyung Lee, and others re: Dates relating to Motion to Dismiss | | | | |

2

| | | | | |
|---|---|---|---|---|
| 6. | InfoW Debtors' Emergency Motion to (a) Extend Answer Date, (b) Extend Exhibit Designation Date, (c) Toll Discovery Deadlines, (d) Continue Hearing on Motions to Dismiss and (e) Grant Related Relief [Dkt. No. 95 in Case No. 22-60020] | | | |
| 7. | InfoW Debtors' Omnibus Response to Motions to Dismiss [Dkt. No. 112 in Case No. 22-60020] | | | |
| 8. | Free Speech Systems, LLC's Application to Employ W. Marc Schwartz as Chief Restructuring Officer [Dkt. No. 83] | | | |
| 9. | Free Speech Systems, LLC's Application to Employ Shannon & Lee as Bankruptcy Co-Counsel [Dkt. No. 85] | | | |
| 10. | Pre-petition billing invoices for KSLPLLC from 5.24.22 to 5.31.22 (Free Speech Systems) | | | |
| 11. | Pre-petition billing invoices for Shannon & Lee LLP from 6-1-22 to 6-30-22 (Free Speech Systems, LLC) | | | |
| 12. | Detailed time report for Schwartz Associates from 5-24-22 to 6-08-22 (Free Speech Systems, LLC) | | | |
| 13. | Detailed time report for Schwartz Associates from 5-01-22 to 6-09-22 (InfoW Debtors) | | | |

3

| | | | | | |
|---|---|---|---|---|---|
| 14. | Transcript of Hearing May 19, 2022 | | | | |
| 15. | Transcript of Hearing August 3, 2022 | | | | |
| 16. | Demonstrative Exhibit of Timeline | | | | |
| 17. | Any exhibit introduced by any other party | | | | |
| 18. | Any exhibit identified or offered by any other party | | | | |
| | | | | | |

The U.S. Trustee reserves the right to supplement or amend this Witness and Exhibit List at any time prior to the Hearing.

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: <u>September 16, 2022</u>

<u>/s/ HA M NGUYEN</u>
Ha Nguyen, Trial Attorney
CA Bar #305411
FED ID NO. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

004033

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND
DISCLAIMER REGARDING DEBTOR'S SCHEDULES AND STATEMENTS**

    The Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed by Free Speech Systems, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") are unaudited and were prepared pursuant to section 521 of Title 11 of the United States Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by the Debtor's chief restructuring officer (the "CRO"). While the CRO has made reasonable efforts to file complete and accurate Schedules and Statements based upon information available at the time of preparation, the Schedules and Statements remain subject to further review and verification by the Debtor. Subsequent information may result in material changes in financial and other data contained in the Schedules and Statements. The Debtor reserves the right to amend its Schedules and Statements from time to time as may be necessary or appropriate. The Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements (the "Global Notes") is incorporated by reference in, and comprises an integral part of, the Schedules and Statements and should be referred to and reviewed in connection with any review of the Schedules and Statements.

    1.    <u>Description of the Cases and "As Of" Information Date</u>. On July 29, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor currently operates its business and possess its property as a debtor-in-possession under section 1184 of the Bankruptcy Code. Unless otherwise noted, all asset and liability information is as of the Petition Date.

    2.    <u>Basis of Presentation</u>. These Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

    3.    <u>Causes of Action</u>. Despite its reasonable efforts, as described above, the Debtor may not have set forth all of its claims, causes of actions and potential recoveries in its Schedules and Statements. The Debtor reserves all rights with respect to any causes of action it may possess, and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such causes of action.

4.  <u>Insiders</u>. The listing or failure to list a person or other entity as an "insider" in the Schedules and Statements is not intended to be nor should it be construed as a binding admission that such person or entity is or is not an insider. The Debtor reserves the right to dispute or challenge the designation of any individual or entity in connection with any other matter arising in the Debtor's chapter 11 case.

5.  <u>Intellectual Property Rights</u>. Any omission of intellectual property from the Schedules and Statements shall not be an admission that such intellectual property rights have been abandoned, have been terminated or otherwise expired by their terms or have been assigned or otherwise transferred pursuant to a sale, acquisition or other transaction. In accordance with the foregoing, the Debtor reserves all of its rights with respect to the legal status of any and all intellectual property rights, regardless of whether such intellectual property rights are or are not listed in the Schedules and Statements.

6.  <u>Summary of Significant Reporting Policies</u>. The Schedules and Statements have been signed by W. Marc Schwartz, the CRO to the Debtor. In reviewing and signing the Schedules and Statements, Mr. Schwartz has necessarily relied upon the efforts, statements, and representations of the Debtor's business records and personnel. Mr. Schwartz has not personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors. The Debtor made reasonable efforts to accurately report asset, liability, disbursement and other information on its Statements and Schedules, and the Debtor adopted the following conventions in the preparation of the Schedules and Statements.

a.  <u>Fair Market Value; Book Value</u>. Unless otherwise noted, the value of each asset and liability of the Debtor is shown on the basis of the book value of such asset or liability in the Debtor's accounting books and records. As applicable, assets that have been fully depreciated or were expensed for accounting purposes have no net book value. As a result, the value of the Debtor's assets and liabilities set forth on the Schedules and Statements may not always reflect the current market values of such property and/or liabilities. The Debtor reserves its right to amend or adjust the value of each asset or liability set forth herein.

b.  <u>Liabilities</u>. The Debtor reserves the right to dispute any liability indicated in its Schedules notwithstanding the designation in the Schedules and Statements.

c.  <u>Claims</u>. The Debtor's Schedules and Statements list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date. The Bankruptcy Court has authorized the Debtor to, among other things make payments to certain critical vendors and utility providers. As a result, the actual unpaid claims of creditors that ultimately may be allowed in this case may differ from the amounts set forth in the Schedules and Statements. The inclusion of any such amounts in the Schedules and Statements shall not be deemed to obligate the Debtor to pay such amounts in and of themselves.

d.  <u>Disputed, Contingent and/or Unliquidated Claims</u>. Schedules D and E/F permit the Debtor to designate a claim as disputed, contingent and/or unliquidated. A failure

2

to designate a claim on any of these Schedules as disputed, contingent and/or unliquidated does not constitute an admission that such claim is not subject to objection. The Debtor reserves the right to dispute, or assert offsets or defenses to, any claim reflected on these Schedules as to amount, liability, or status. Moreover, the Debtor reserves the right to amend its Schedules and Statements as necessary and appropriate.

7.   <u>General Conventions Relating to the Schedules of Assets and Liabilities</u>. The Debtor adopted the following conventions in connection with the preparation of the Schedules:

a.   <u>Schedule D</u>. Except as otherwise agreed pursuant to a stipulation or agreed order entered by the Bankruptcy Court, the Debtor reserves the right to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D of the Debtor. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims, the Debtor reserve all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim. The descriptions provided on Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens. Nothing in the Global Notes or the Schedules and Statements shall be deemed a modification or interpretation of the terms of such agreements.

b.   <u>Schedule G</u>. While reasonable efforts have been made to ensure the accuracy of the Schedule of Executory Contracts, inadvertent errors or omissions may have occurred. The Debtor hereby reserves all rights to dispute the validity, status or enforceability of any contract, agreement or lease set forth on Schedule G and to amend or supplement such Schedule as necessary. The contracts, agreements and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the real property leases listed on Schedule G may contain renewal options, guarantees of payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties and obligations are not set forth on Schedule G. Certain of the executory agreements may not have been memorialized and could be subject to dispute. Additionally, the Debtor may be parties to various other agreements concerning real property, such as easements, rights of way, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements. Such agreements, if any, are not set forth on Schedule G. Certain of the agreements listed on

3

Schedule G may be in the nature of conditional sales agreements or secured financings. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease. The Debtor reserves all rights, claims and causes of action with respect to the contracts and agreements listed on these Schedules and Statements, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument.

c.      <u>Schedule H</u>. Codefendants in litigation matters involving the Debtor are not listed in Schedule H unless the trial court has made a ruling that results in an identity of interest between the Debtor and such co-defendant.

[*Remainder of Page Intentionally Left Blank*]

004037

**Fill in this information to identify the case:**

Debtor name      Free Speech Systems, LLC  ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

United States Bankruptcy Court for the:     Southern  _____      District of     Texas  _____
                                                                                           (State)

Case number (If known):     22-60043  _____

☐ Check if this is an amended filing

## Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals                    12/15

---

**Part 1:**  **Summary of Assets**

---

1. ***Schedule A/B: Assets–Real and Personal Property*** (Official Form 206A/B)

   1a. **Real property:**
       Copy line 88 from *Schedule A/B* ..........................................................................   $ 1,335,971.23

   1b. **Total personal property:**
       Copy line 91A from *Schedule A/B* ........................................................................   $ 13,327,463.23

   1c. **Total of all property:**
       Copy line 92 from *Schedule A/B* ..........................................................................   $ 14,663,434.46

---

**Part 2:**  **Summary of Liabilities**

---

2. ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* ................   $ 53,646,687.84

3. ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
       Copy the total claims from Part 1 from line 5a of *Schedule E/F* ...........................................   $ _____

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
       Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F* ..........................   + $ 995,824.64

4. **Total liabilities** ..........................................................................................   $ 54,642,512.48
   Lines 2 + 3a + 3b

---

**Fill in this information to identify the case:**

Debtor name  Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern          District of  Texas
                                                                    (State)

Case number (if known):  22-60043

☐ Check if this is an
amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property          12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:    Cash and cash equivalents**

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**                                                                 $ 951.31

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*
   Please see attached schedule for additional Bank accounts

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. ▮▮▮▮▮ | Checking | 8 5 6 3 | $ 118,999.04 |
| 3.2. ▮▮▮▮▮ | Checking | 8 5 1 4 | $ 1,163,808.79 |

   *See continuation sheet*

4. **Other cash equivalents** *(Identify all)*

   4.1. __                                                                          __      $_____
   4.2. _____                                   $_____

5. **Total of Part 1**                                                                      $1,284,759.14
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

**Part 2:    Deposits and prepayments**

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit
   7.1. ▮▮▮▮▮ (Credit card processing)                                              $ 500,000.00
   7.2. LIT Industrial (Security Deposit)                                           $ 33,360.00

Debtor   Free Speech Systems, LLC
     Name

Case number *(if known)* 22-60043

---

8  **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**    Please see attached schedule
for additional prepayments

Description, including name of holder of prepayment

8.1. The Travelers Companies (Prepaid Insurance) ............................................................... $ 1,224.50

8.2. The Hartford (Prepaid Insurance) .................................................................................. $ 1,444.31

\* See continuation sheet\*

9.  **Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.    $ 687,969.95

---

## Part 3:   Accounts receivable

10.  **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

|  |  |  |  | Current value of debtor's interest |
|---|---|---|---|---|
| 11  Accounts receivable |  |  |  |  |
| 11a. 90 days old or less: | 0.00<br>face amount | – | 0.00<br>doubtful or uncollectible accounts | = ....→ | $ 0.00 |
| 11b. Over 90 days old: | 9,788,413.22<br>face amount | – | 0.00<br>doubtful or uncollectible accounts | = ....→ | $ 9,788,413.22 |

12  **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.    $ 9,788,413.22

---

## Part 4:   Investments

13.  **Does the debtor own any investments?**

☑ No. Go to Part 5.

☐ Yes. Fill in the information below.

|  | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|
| 14.  **Mutual funds or publicly traded stocks not included in Part 1** |  |  |
| Name of fund or stock: |  |  |
| 14.1. _____ | _____ | $ _____ |
| 14.2. _____ | _____ | $ _____ |

15.  **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

| Name of entity: | % of ownership: |  |  |
|---|---|---|---|
| 15.1. _____ | _____ % | _____ | $ _____ |
| 15.2. _____ | _____ % | _____ | $ _____ |

16.  **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

| 16.1. _____ | _____ | $ _____ |
|---|---|---|
| 16.2. _____ | _____ | $ _____ |

17.  **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.    $ 0.00

---

Debtor    Free Speech Systems, LLC
          _____
          Name

Case number (if known) 22-60043

---

## Part 5:   Inventory, excluding agriculture assets

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.

☑ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |
| **20. Work in progress** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |
| **21. Finished goods, including goods held for resale** | | | | |
| Merchandise | 07/29/2022 MM / DD / YYYY | $ 1,327,107.43 | Net Book Value | $ 1,327,107.43 |
| **22. Other inventory or supplies** | | | | |
| _____ | MM / DD / YYYY | $_____ | _____ | $_____ |

**23. Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ 1,327,107.43

**24. Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value _89,882.37_    Valuation method _Net Book Value_    Current value _89,882.37_

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

## Part 6:   Farming and fishing-related assets (other than titled motor vehicles and land)

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| **29. Farm animals** *Examples*: Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $___ | _____ | $_____ |

Debtor    Free Speech Systems, LLC
_____    Case number (if known) 22-60043
          Name

**33. Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85.

$ 0.00

**34. Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

    ☐ No

    ☐ Yes

**35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

**36. Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

**37. Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

| **Part 7:** | **Office furniture, fixtures, and equipment; and collectibles** |
|---|---|

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39. Office furniture** | | | |
| Rugs, Chairs, Lamps and other Office Furnitures | $ 3,285.92 | Net Book Value | $ 3,285.92 |
| **40. Office fixtures** | | | |
| | $ ___ | _____ | $ _____ |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| Computer Equipments and Software | $ 44,180.49 | Net Book Value | $ 44,180.49 |
| **42. Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 Artwork | $ 73.00 | Net Book Value | $ 73.00 |
| 42.2 _____ | $ _____ | _____ | $ _____ |
| 42.3 _____ | $ _____ | _____ | $ _____ |

**43. Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86.

$ 47,539.41

**44. Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☑ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

004042

Debtor _____Free Speech Systems, LLC_____   Case number (*if known*)___22-60043_____
　　　　　　　　Name

---

**Part 8:   Machinery, equipment, and vehicles**

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
☑ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e , VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1 2021 Winnebago Adventurer Model 35F (VIN:1F66F5DN1LOA03038) | $ 0.00 | Net Book Value | $ 0.00 |
| 47 2 2015 Ford F-450 Model F45 (VIN: 1FDUF4HT0FEC06013) | $ 148,890.74 | Net Book Value | $ 148,890.74 |
| 47 3 _____ | $_____ | _____ | $_____ |
| 47.4 _____ | $_____ | _____ | $_____ |

48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 _____ | $_____ | _____ | $_____ |
| 48.2 _____ | $_____ | _____ | $_____ |

49. **Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 _____ | $_____ | _____ | $_____ |
| 49 2 _____ | $_____ | _____ | $_____ |

50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| Production and Other Equipments | $ 40,262.53 | Net Book Value | $ 40,262.53 |

51. **Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87.

$ 189,153.27 _____

52. **Is a depreciation schedule available for any of the property listed in Part 8?**
☐ No
☑ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
☑ No
☐ Yes

Debtor   Free Speech Systems, LLC
         _____          Case number (if known)  22-60043
         Name

## Part 9:   Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 Warehouse Improvement (3019 Alvin Devane Blvd Austin, TX 78741) | Leasehold Improvement | $ 1,335,971.23 | Net Book Value | $ 1,335,971.23 |
| 55.2 | | $ | | $ |
| 55.3 | | $ | | $ |
| 55.4 | | $ | | $ |
| 55.5 | | $ | | $ |
| 55.6 | | $ | | $ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 1,335,971.23

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☑ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 10:   Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | $ | | $ |
| **61. Internet domain names and websites** Domain Names, Websites and Website Developments | $ 2,520.81 | Net Book Value | $ 2,520.81 |
| **62. Licenses, franchises, and royalties** | $ | | $ |
| **63. Customer lists, mailing lists, or other compilations** | $ | | $ |
| **64. Other intangibles, or intellectual property** | $ | | $ |
| **65. Goodwill** | $ | | $ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 2,520.81

Debtor   Free Speech Systems, LLC
_____
Name

Case number (if known) 22-60043
_____

67. **Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?**
- ☑ No
- ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
- ☐ No
- ☑ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
- ☑ No
- ☐ Yes

**Part 11:   All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.
- ☑ No. Go to Part 12.
- ☐ Yes. Fill in the information below.

|  | Current value of debtor's interest |
|---|---|

71. **Notes receivable**

Description (include name of obligor)

_____   _____  —  _____  = ➔   $_____
                                    Total face amount      doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____   Tax year _____   $_____
_____   Tax year _____   $_____
_____   Tax year _____   $_____

73. **Interests in insurance policies or annuities**

_____                          $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____                          $

Nature of claim       _____

Amount requested   $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____                          $_____

Nature of claim       _____

Amount requested   $__        ____

76. **Trusts, equitable or future interests in property**

_____                          $_____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____                          $_____
_____                          $_____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.                $ 0.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
- ☐ No
- ☐ Yes

004045

Debtor  Free Speech Systems, LLC
_____
        Name

Case number *(if known)* 22-60043   ____

---

**Part 12:   Su mma ry**

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 1,284,759.14 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 687,969.95 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 9,788,413.22 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 1,327,107.43 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 47,539.41 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 189,153.27 | |
| 88. **Real property.** *Copy line 56, Part 9.* ................................ ➔ | | $ 1,335,971.23 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 2,520.81 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column............................ 91a. | $ 13,327,463.23 | ＋ 91b. $ 1,335,971.23 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ................................................... $ 14,663,434.46

---

Debtor: Free Speech Systems, LLC                    Case Number: 22 - 60043

Part 1.
3. Additional checking, savings, money market, or financial brokerage accounts

| Name of Institution | Account Type | Last 4 digits of Account Number | Current value of debtor's Interest |
|---|---|---|---|
| ███████████ | Checking | 8522 | $1,000.00 |
| ███████████ | Checking | 8621 | $0.00 |
| ███████████ | Checking | 5675 | $0.00 |
| ███████████ | Checking | 8746 | $0.00 |

Part 2.
8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent

| Description, including name of holder of prepayment | Current value of debtor's Interest |
|---|---|
| Frost Insurance Agency | $4,899.14 |
| Stratus | $2,124.27 |
| Shannon & Lee LLP | $100,000.00 |
| ATXHD, Inc | $41,342.00 |
| Protection 1 Alarm | $2,559.73 |
| CubeSmart | $1,016.00 |

[To Supplement: Retainer of The Law ●ffices of Ray Battaglia, PLLC on the Petition Date - Est. $77,235.00]

**Fill in this information to identify the case:**

Debtor name ___Free Speech Systems, LLC___

United States Bankruptcy Court for the: ___Southern___   District of ___Texas___
                                                                                        (State)

Case number (If known): ___22-60043___

☐ Check if this is an
   amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☐ Yes. Fill in all of the information below.

**Part 1:    List Creditors Who Have Secured Claims**

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

|  |  | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1** **Creditor's name**<br>PQPR Holdings Limited LLC | **Describe debtor's property that is subject to a lien**<br>Please see attached | $ 53,646,687.84 | $ 14,663,434.46 |

**2.1**

**Creditor's name**
PQPR Holdings Limited LLC

**Creditor's mailing address**
3005 S Lamar Blvd Ste D109-317
Austin TX 78704-8864

**Creditor's email address, if known**
_____

**Date debt was incurred**   2020/08/13
**Last 4 digits of account
number**   ___ ___ ___ ___

**Do multiple creditors have an interest in the
same property?**
☐ No
☐ Yes. Specify each creditor, including this creditor,
   and its relative priority.
   _____
   _____

**Describe debtor's property that is subject to a lien**
Please see attached

**Describe the lien**
Uniform Commercial Code Lien

**Is the creditor an insider or related party?**
☐ No
☐ Yes

**Is anyone else liable on this claim?**
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**2.2**

**Creditor's name**
_____

**Creditor's mailing address**
_____
_____

**Creditor's email address, if known**
_____

**Date debt was incurred**   _____
**Last 4 digits of account
number**   ___ ___ ___ ___

**Do multiple creditors have an interest in the
same property?**
☐ No
☐ Yes. Have you already specified the relative
   priority?
   ☐ No. Specify each creditor, including this
      creditor, and its relative priority.
      _____
   ☐ Yes. The relative priority of creditors is
      specified on lines _____

**Describe debtor's property that is subject to a lien**
_____

**Describe the lien**
_____

**Is the creditor an insider or related party?**
☐ No
☐ Yes

**Is anyone else liable on this claim?**
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

$_____   $_____

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional
   Page, if any.**    $_____

004048

Debtor      Free Speech Systems, LLC
            _____
            Name

Case number (if known) 22-60043

---

**Part 2:**  **List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |

Free Speech Systems, LLC

## 2.1    Describe debtor's property that is subject to a lien

(1) All fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Haappease, Gut Fution, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Incuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survivial Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and all gross revenue, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with repect to any of the foregoing

**Fill in this information to identify the case:**

Debtor _____Free Speech Systems LLC_____

United States Bankruptcy Court for the: ___Southern___ District of __Texas__
                                                                    (State)

Case number ___22-60043_____
(If known)

☐ Check if this is an
   amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

## Part 1:   List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ☑ No. Go to Part 2.
   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|     |                                                                              | Total claim | Priority amount |
|-----|------------------------------------------------------------------------------|-------------|-----------------|

**2.1** Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** ___ ___ ___ ___

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

**As of the petition filing date, the claim is:** $_____   $_____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

**2.2** Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** ___ ___ ___ ___

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

**As of the petition filing date, the claim is:** $_____   $_____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

**2.3** Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** ___ ___ ___ ___

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

**As of the petition filing date, the claim is:** $_____   $_____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

004051

Debtor _____Free Speech Systems LLC_____ Case number (if known)___22-60043_____
          Name

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

|  |  | Amount of claim |
|---|---|---|

**3.1** Nonpriority creditor's name and mailing address
Addshoppers, Inc

15806 Brookway Dr Ste 200
Huntersville, NC 28078

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 2,989.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.2** Nonpriority creditor's name and mailing address
Air Supply of North Texas aka Precision Oxygen

2829 Fort Worth Avenue
Dallas, TX 75211

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 105.48

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.3** Nonpriority creditor's name and mailing address
Airco Mechanical, LTD

PO Box 1598
Round Rock, TX 78680

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 17,268.71

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.4** Nonpriority creditor's name and mailing address
AT&T Mobile

PO Box 5001
Carol Stream, IL 60197-5001

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 5,167.41

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.5** Nonpriority creditor's name and mailing address
Atomial, LLC

1920 E. Riverside Drive Suite A-120 #124
Austin, TX 78741

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 50,400.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.6** Nonpriority creditor's name and mailing address
Austin Security & Investigation Solutions

PO Box 2904
Pflugerville, TX 78691

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

$ 5,961.87

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

004052

| | |
|---|---|
| Debtor | Free Speech Systems, LLC |
| | Name |
| Case number *(if known)* | 22-60043 |

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.7** Nonpriority creditor's name and mailing address
Blott, Jacquelyn, Attorney at Law

200 University Boulevard Suite 225 #251

Round Rock, TX 78665

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 58,280.00

---

**3.8** Nonpriority creditor's name and mailing address
City of Austin

PO Box 2267

Austin, TX 78783

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 6,532.68

---

**3.9** Nonpriority creditor's name and mailing address
CTRMA Processing

PO Box 734182

Dallas, TX 75373

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 24.23

---

**3.10** Nonpriority creditor's name and mailing address
eCommerce CDN, LLC

221 E 63rd Street

Savannah, GA 31405

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 27,270.00

---

**3.11** Nonpriority creditor's name and mailing address
Elevated Solutions Group

706 W Ben White Blvd, Bldg B, Ste 188

Austin, TX 78740

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 319,148.16

---

004053

Debtor    Free Speech Systems, LLC
          _____
          Name

          Case number (if known)  22-60043
          _____

| Part 2: | Additional Page |

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.12** Nonpriority creditor's name and mailing address

Getty Images, Inc

PO Box 953604

St. Louis, MO 63195-3604

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 9,201.25

---

**3.13** Nonpriority creditor's name and mailing address

Gibson, Ronald

4012 Pleasant Grove Church Rd

Shelby NC, 28150-2842

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 3,000.00

---

**3.14** Nonpriority creditor's name and mailing address

Gracenote Media Services, LLC

29421 Network Place

Chicago, IL 60673-1294

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 119.98

---

**3.15** Nonpriority creditor's name and mailing address

Greenair, Inc

23569 Center Ridge Road

Westlake, OH 44145

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 12,240.00

---

**3.16** Nonpriority creditor's name and mailing address

Impact Fire Services LLC

PO Box 735063

Dallas, TX 75373-5063

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 165.00

---

004054

| Debtor | Free Speech Systems, LLC | Case number *(if known)* | 22-60043 |
|---|---|---|---|
| | Name | | |

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

---

**3.17** **Nonpriority creditor's name and mailing address**

JCE SEO

6101 Broadway

San Antonio, TX 78209

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 5,000.00

---

**3.18** **Nonpriority creditor's name and mailing address**

JW JIB Productions, LLC

2921 Carvelle Drive

Riviera Beach, FL 33404

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 7,000.00

---

**3.19** **Nonpriority creditor's name and mailing address**

Konica Minolta Premier Finance

PO Box 41602

Philadelphia, PA 19101-1602

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 1,847.87

---

**3.20** **Nonpriority creditor's name and mailing address**

Kount An Equifax Company

PO Box 740253

Atlanta, GA 30374

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 11,172.00

---

**3.21** **Nonpriority creditor's name and mailing address**

Lumen/Level 3 Communications

PO Box 910182

Denver, CO 80291-0182

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 7,906.43

---

004055

Debtor   Free Speech Systems LLC
         _____
         Name                                          Case number (if known) 22-60043
                                                       _____

| Part 2: | Additional Page |
|---|---|

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.22** Nonpriority creditor's name and mailing address

Lyman, Daniel

5832 Elton Road

Venice, FL 34293

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 3,500.00

---

**3.23** Nonpriority creditor's name and mailing address

PQPR Holdings

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.24** Nonpriority creditor's name and mailing address

MRJR Holdings, LLC

PO Box 27740

Las Vegas, NV 89426

As of the petition filing date, the claim is:
Check all that apply.
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.25** Nonpriority creditor's name and mailing address

Sparkletts & Sierra Springs

PO Box 660579

Dallas, TX 75266-0579

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 1,084.14

---

**3.26** Nonpriority creditor's name and mailing address

Texas Gas Service

PO Box 219913

Kansas City, MO 64121

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 1,078.28

---

004056

Debtor _____    Case number (if known) __22-60043__
        Free Speech Systems, LLC
        Name

## Part 2:    Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.27** Nonpriority creditor's name and mailing address

Willow Grove Productions

1810 Rockcliff Road

Austin, TX 78746

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,700.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

---

**3.28** Nonpriority creditor's name and mailing address

WMQM-AM 1600

21 Stephen Hill Road

Atoka, TN 38004

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,500.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

---

**3.29** Nonpriority creditor's name and mailing address

American Express

200 Vesey Street

New York, NY 10285

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 54,279.78

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

---

**3.30** Nonpriority creditor's name and mailing address

David Jones

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 150,000.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

---

**3.31** Nonpriority creditor's name and mailing address

Campco

4625 W. Jefferson Blvd

Los Angeles, CA 90016

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

004057

Debtor    Free Speech Systems LLC
          _____
          Name                                                          Case number (if known) 22-60043
                                                                        _____

| Part 2: | Additional Page |

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |

---

**3.32** | **Nonpriority creditor's name and mailing address**

CustomTattoNow.com

16107 Kensington Dr #172

Sugar Land, TX 77479

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.33** | **Nonpriority creditor's name and mailing address**

David Icke Books Limited

1a Babbington Lane

Derby, England DE11SU

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.34** | **Nonpriority creditor's name and mailing address**

American Media/Reality Zone

PO Box 4646

Thousand Oaks, CA 91359

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.35** | **Nonpriority creditor's name and mailing address**

Justin Lair

1313 Lookout Ave

Klamath Falls, OR 97601

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.36** | **Nonpriority creditor's name and mailing address**

RatsMedical.com

1211 E Bridle Trail Rd

Draper, UT 84020

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

004058

| Debtor | Free Speech Systems LLC | Case number *(if known)* | 22-60043 |
|---|---|---|---|
| | Name | | |

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.37** Nonpriority creditor's name and mailing address

▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.38** Nonpriority creditor's name and mailing address

Skousen, Joel

PO Box 565

Spring City, UT 84662

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.39** Nonpriority creditor's name and mailing address

Wisconsin Dept. of Revenue

PO Box 3028

Milwaukee, WI 53201-3028

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.40** Nonpriority creditor's name and mailing address

Watson, Paul

9 Riverdale Road Ranmoor Sheffield

South Yorkshire, United Kingdom S10 3FA

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.41** Nonpriority creditor's name and mailing address

Verizon Wireless

PO Box 660108

Dallas, TX 75266

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

004059

Official Form 206E/F          Schedule E/F: Creditors Who Have Unsecured Claims          page 9 of 17

| Debtor | Free Speech Systems, LLC | Case number (if known) | 22-60043 |
|---|---|---|---|
| | Name | | |

## Part 2:    Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.42** **Nonpriority creditor's name and mailing address**

Miller, Sean

PO Box 763

Wyalusing, PA 18853

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.43** **Nonpriority creditor's name and mailing address**

Spectrum Enterprise aka Time Warner Cable

PO Box 60074

City of Industry, CA 91716

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Basis for the claim:** _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.44** **Nonpriority creditor's name and mailing address**

Ready Alliance Group, Inc

PO Box 1709

Sandpoint, ID 83864

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Basis for the claim:** _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3. 45** **Nonpriority creditor's name and mailing address**

One Party America, LLC

6700 Woodlands Parkway Suite 230-309

The Woodlands, TX 77382

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Basis for the claim:** _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.46** **Nonpriority creditor's name and mailing address**

LCJ Pictures LLC

PO Box 19549

Austin, TX 78760

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:** _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 89,882.37

---

004060

Debtor   Free Speech Systems LLC                                    Case number *(if known)*   22-60043
          Name

---

**Part 2:**   **Additional Page**

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.47** Nonpriority creditor's name and mailing address
Brennan Gilmore

c/o Civil Rights Clinic, 600 New Jersey Ave NW
Washington, DC 20001

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim:   Litigation Settlement

$ 50,000.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.48** Nonpriority creditor's name and mailing address
Christopher Sadowski

c/o Copy Cat Legal PLLC, 3111 N. University Drive,
Coral Springs, FL 33065

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Asserted copyright

$ 90,000.00

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.49** Nonpriority creditor's name and mailing address
Neil Heslin

c/o Jarrod B. Martin, Chamberlain Hrdlicka
1200 Smith Street, Suite 1400, Houston TX 77002

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation claim

$ 0.00

Date or dates debt was incurred   2018
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.50** Nonpriority creditor's name and mailing address
Scarlett Lewis

c/o Jarrod B. Martin, Chamberlain Hrdlicka
1200 Smith Street, Suite 1400, Houston TX 77002

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation Claim

$ 0.00

Date or dates debt was incurred   2018
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

**3.51** Nonpriority creditor's name and mailing address
Leonard Pozner

c/o Jarrod B. Martin, Chamberlain Hrdlicka
1200 Smith Street, Suite 1400, Houston TX 77002

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:   Litigation Claim

$ 0.00

Date or dates debt was incurred   2018
Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

---

004061

Debtor  Free Speech Systems LLC _____   Case number (if known) 22-60043
        Name

| Part 2: | Additional Page |
|---------|-----------------|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

**3.52** Nonpriority creditor's name and mailing address

Veronique De La Rosa

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred        2018
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.53** Nonpriority creditor's name and mailing address

Marcel Fontaine

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred        2018
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.54** Nonpriority creditor's name and mailing address

David Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred        2018
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.55** Nonpriority creditor's name and mailing address

Francine Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred        2018
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

**3.56** Nonpriority creditor's name and mailing address

Jacqueline Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: Litigation Claim

$ 0.00

Date or dates debt was incurred        2018
Last 4 digits of account number        __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

004062

Debtor   Free Speech Systems LLC
         _____
         Name                                                    Case number *(if known)*  22-60043

## Part 2:   Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

---

**3.57**  **Nonpriority creditor's name and mailing address**

Mark Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred         2018

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:**   Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.58**  **Nonpriority creditor's name and mailing address**

Nicole Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

Date or dates debt was incurred         2018

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**   Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.59**  **Nonpriority creditor's name and mailing address**

Ian Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred         2018

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**   Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3. 60**  **Nonpriority creditor's name and mailing address**

Jennifer Hensel

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred         2018

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**   Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.61**  **Nonpriority creditor's name and mailing address**

Donna Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred         2018

Last 4 digits of account number    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**   Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

004063

Debtor    Free Speech Systems, LLC                                    22-60043
          Name                                          Case number (if known)

| Part 2: | Additional Page |
|---------|-----------------|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.62** | **Nonpriority creditor's name and mailing address**
Carlee Soto Parisi

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.63** | **Nonpriority creditor's name and mailing address**
Carlos M. Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.64** | **Nonpriority creditor's name and mailing address**
Jillian Soto-Marino

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.65** | **Nonpriority creditor's name and mailing address**
William Aldenberg

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

**3.66** | **Nonpriority creditor's name and mailing address**
William Sherlach

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number     __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Litigation Claim

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

---

004064

Debtor ___Free Speech Systems LLC___
Name

Case number *(if known)* ___22-60043___

## Part 2: Additional Page

| | Amount of claim |
|---|---|
| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | |

**3.67** Nonpriority creditor's name and mailing address

Robert Parker

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred ___2018___

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: ___Litigation Claim___

Is the claim subject to offset?
☐ No
☐ Yes

$ ___0.00___

**3.68** Nonpriority creditor's name and mailing address

Yan Luis

c/o Noor A. Sabb, 280 North Broadway, STE 300

Jericho, New York 11753

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: ___ADA Claim___

Is the claim subject to offset?
☐ No
☐ Yes

$ ___0.00___

**3.__** Nonpriority creditor's name and mailing address

_____

_____

_____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ ___0.00___

**3.__** Nonpriority creditor's name and mailing address

_____

_____

_____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ ___0.00___

**3.__** Nonpriority creditor's name and mailing address

_____

_____

_____

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ ___0.00___

004065

Debtor _____ Free Speech Systems LLC _____     Case number *(if known)* _____
                        Name

| Part 3: | List Others to Be Notified About Unsecured Claims |

4.   List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| **4.1.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.2.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.3.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.4.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **41.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.5.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.6.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.7.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.8.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.9.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.10.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |
| **4.11.** | Line ____  ☐ Not listed. Explain _____ | __ __ __ __ |

004066

Debtor   Free Speech Systems, LLC                                 Case number (if known)_____
         Name

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---------|---------------------------------------------------------------|

5.  **Add the amounts of priority and nonpriority unsecured claims.**

|  |  | Total of claim amounts |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | $ 0.00 |
| 5b. **Total claims from Part 2** | 5b. **+** | $ 995,824.64 |
| 5c. **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $ 995,824.64 |

**Fill in this information to identify the case:**

Debtor name ___Free Speech Systems, LLC___

United States Bankruptcy Court for the: ___Southern___ District of ___Texas___
(State)

Case number (If known): ___22-60043___ Chapter ___11___

☐ Check if this is an amended filing

Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases
12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| **2.1** | State what the contract or lease is for and the nature of the debtor's interest | Financial services Agreement<br>For Credit Card Processing and Other Financial Service | ▮▮▮▮▮▮▮▮▮▮▮ |
| | State the term remaining | 9 years and 2 months | PQPR Holdings Limited LLC: PO Box 19549 Austin TX 78760 - 9549 |
| | List the contract number of any government contract | | |
| **2.2** | State what the contract or lease is for and the nature of the debtor's interest | Employment Agreement<br>For Employment of Alex Jones | Alex Jones: 3019 Alvin Devane Blvd Austin TX 78741 |
| | State the term remaining | "At will" Basis | |
| | List the contract number of any government contract | | |
| **2.3** | State what the contract or lease is for and the nature of the debtor's interest | Lease Agreement<br>Studio Lease | BCC UBC LLC: 901 S. Mopac Expressway Plaza I, Suite 60, Austin , TX 78746 |
| | State the term remaining | 2 years and 5 Months | |
| | List the contract number of any government contract | | |
| **2.4** | State what the contract or lease is for and the nature of the debtor's interest | Service Agreement<br>For Back Ground Checks and Investigative Services | Austin Security and Investigation Solutions LLC: PO Box 2904 Pflugerville, TX 78691 |
| | State the term remaining | 9 Months, Renews Automatically | |
| | List the contract number of any government contract | | |
| **2.5** | State what the contract or lease is for and the nature of the debtor's interest | Building and Land Lease Agreement<br>Warehouse Lease | Expo Glo, LLC: 1717 McKinney Ave, Suite 1900 Dallas, TX 75202-1236 |
| | State the term remaining | Renews Monthly | |
| | List the contract number of any government contract | | |

004068

**Fill in this information to identify the case:**

Debtor name _Free Speech Systems, LLC_

United States Bankruptcy Court for the: _Southern_ _____ District of _Texas_
(State)

Case number (If known): _22-60043_

☐ Check if this is an amended filing

Official Form 206H
## Schedule H: Codebtors
12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Does the debtor have any codebtors?**

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☑ Yes

**2.** In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.* Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| **Name** / **Mailing address** | | **Name** | **Check all schedules that apply:** |
| 2.1 Alex E. Jones | 3019 Alvin Devane Blvd. (Street) / Austin, TX 78741 (City / State / ZIP Code) | Niel Heslin | ☐ D ☑ E/F ☐ G |
| 2.2 Alex E. Jones | 3019 Alvin Devane Blvd. (Street) / Austin, TX 78741 (City / State / ZIP Code) | Scarlett Lewis | ☐ D ☑ E/F ☐ G |
| 2.3 Alex E. Jones | 3019 Alvin Devane Blvd. (Street) / Austin, TX 78741 (City / State / ZIP Code) | Leonard Pozner | ☐ D ☑ E/F ☐ G |
| 2.4 Alex E. Jones | 3019 Alvin Devane Blvd. (Street) / Austin, TX 78741 (City / State / ZIP Code) | Veronique De La Rosa | ☐ D ☑ E/F ☐ G |
| 2.5 Alex E. Jones | 3019 Alvin Devane Blvd. (Street) / Austin, TX 78741 (City / State / ZIP Code) | Marcel Fontaine | ☐ D ☑ E/F ☐ G |
| 2.6 | (Street) / (City / State / ZIP Code) | | ☐ D ☐ E/F ☐ G |

004069

**Fill in this information to identify the case and this filing**

Debtor Name __Free Speech Systems, LLC__

United States Bankruptcy Court for the: __Southern__     District of __Texas__
(State)

Case number (*If known*): __22-60043__

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors     12/15

An individual who is authori ed to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that re uires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual s position or relationship to the debtor, the identity of the document, and the date.  Ban ruptcy Rules 1008 and 9011.

ARNIN   -- Ban ruptcy fraud is a serious crime.  Ma ing a false statement, concealing property, or obtaining money or property by fraud in connection with a ban ruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18  .S.C.    152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☒ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☒ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☒ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☒ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☒ *Schedule H: Codebtors* (Official Form 206H)

☒ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule*

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒ Other document that requires a declaration __Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements.__

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __08/29/2022__     ✗ _W. Marc Schwartz_
MM / DD /                          Signature of individual signing on behalf of debtor

W. Marc Schwartz
Printed name

Chief Restructuring Officer
Position or relationship to debtor

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND
DISCLAIMER REGARDING DEBTOR'S SCHEDULES AND STATEMENTS**

The Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed by Free Speech Systems, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") are unaudited and were prepared pursuant to section 521 of Title 11 of the United States Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by the Debtor's chief restructuring officer (the "CRO"). While the CRO has made reasonable efforts to file complete and accurate Schedules and Statements based upon information available at the time of preparation, the Schedules and Statements remain subject to further review and verification by the Debtor. Subsequent information may result in material changes in financial and other data contained in the Schedules and Statements. The Debtor reserves the right to amend its Schedules and Statements from time to time as may be necessary or appropriate. The Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements (the "Global Notes") is incorporated by reference in, and comprises an integral part of, the Schedules and Statements and should be referred to and reviewed in connection with any review of the Schedules and Statements.

1.      Description of the Cases and "As Of" Information Date. On July 29, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor currently operates its business and possess its property as a debtor-in-possession under section 1184 of the Bankruptcy Code. Unless otherwise noted, all asset and liability information is as of the Petition Date.

2.      Basis of Presentation. These Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

3.      Causes of Action. Despite its reasonable efforts, as described above, the Debtor may not have set forth all of its claims, causes of actions and potential recoveries in its Schedules and Statements. The Debtor reserves all rights with respect to any causes of action it may possess, and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such causes of action.

4. <u>Insiders</u>. The listing or failure to list a person or other entity as an "insider" in the Schedules and Statements is not intended to be nor should it be construed as a binding admission that such person or entity is or is not an insider. The Debtor reserves the right to dispute or challenge the designation of any individual or entity in connection with any other matter arising in the Debtor's chapter 11 case.

5. <u>Intellectual Property Rights</u>. Any omission of intellectual property from the Schedules and Statements shall not be an admission that such intellectual property rights have been abandoned, have been terminated or otherwise expired by their terms or have been assigned or otherwise transferred pursuant to a sale, acquisition or other transaction. In accordance with the foregoing, the Debtor reserves all of its rights with respect to the legal status of any and all intellectual property rights, regardless of whether such intellectual property rights are or are not listed in the Schedules and Statements.

6. <u>Summary of Significant Reporting Policies</u>. The Schedules and Statements have been signed by W. Marc Schwartz, the CRO to the Debtor. In reviewing and signing the Schedules and Statements, Mr. Schwartz has necessarily relied upon the efforts, statements, and representations of the Debtor's business records and personnel. Mr. Schwartz has not personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors. The Debtor made reasonable efforts to accurately report asset, liability, disbursement and other information on its Statements and Schedules, and the Debtor adopted the following conventions in the preparation of the Schedules and Statements.

    a. <u>Fair Market Value; Book Value</u>. Unless otherwise noted, the value of each asset and liability of the Debtor is shown on the basis of the book value of such asset or liability in the Debtor's accounting books and records. As applicable, assets that have been fully depreciated or were expensed for accounting purposes have no net book value. As a result, the value of the Debtor's assets and liabilities set forth on the Schedules and Statements may not always reflect the current market values of such property and/or liabilities. The Debtor reserves its right to amend or adjust the value of each asset or liability set forth herein.

    b. <u>Liabilities</u>. The Debtor reserves the right to dispute any liability indicated in its Schedules notwithstanding the designation in the Schedules and Statements.

    c. <u>Claims</u>. The Debtor's Schedules and Statements list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date. The Bankruptcy Court has authorized the Debtor to, among other things make payments to certain critical vendors and utility providers. As a result, the actual unpaid claims of creditors that ultimately may be allowed in this case may differ from the amounts set forth in the Schedules and Statements. The inclusion of any such amounts in the Schedules and Statements shall not be deemed to obligate the Debtor to pay such amounts in and of themselves.

    d. <u>Disputed, Contingent and/or Unliquidated Claims</u>. Schedules D and E/F permit the Debtor to designate a claim as disputed, contingent and/or unliquidated. A failure

2

to designate a claim on any of these Schedules as disputed, contingent and/or unliquidated does not constitute an admission that such claim is not subject to objection. The Debtor reserves the right to dispute, or assert offsets or defenses to, any claim reflected on these Schedules as to amount, liability, or status. Moreover, the Debtor reserves the right to amend its Schedules and Statements as necessary and appropriate.

7.    <u>General Conventions Relating to the Schedules of Assets and Liabilities</u>. The

Debtor adopted the following conventions in connection with the preparation of the Schedules:

a.    <u>Schedule D</u>. Except as otherwise agreed pursuant to a stipulation or agreed order entered by the Bankruptcy Court, the Debtor reserves the right to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D of the Debtor. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims, the Debtor reserve all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim. The descriptions provided on Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens. Nothing in the Global Notes or the Schedules and Statements shall be deemed a modification or interpretation of the terms of such agreements.

b.    <u>Schedule G</u>. While reasonable efforts have been made to ensure the accuracy of the Schedule of Executory Contracts, inadvertent errors or omissions may have occurred. The Debtor hereby reserves all rights to dispute the validity, status or enforceability of any contract, agreement or lease set forth on Schedule G and to amend or supplement such Schedule as necessary. The contracts, agreements and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the real property leases listed on Schedule G may contain renewal options, guarantees of payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties and obligations are not set forth on Schedule G. Certain of the executory agreements may not have been memorialized and could be subject to dispute. Additionally, the Debtor may be parties to various other agreements concerning real property, such as easements, rights of way, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements. Such agreements, if any, are not set forth on Schedule G. Certain of the agreements listed on

3

Schedule G may be in the nature of conditional sales agreements or secured financings. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease. The Debtor reserves all rights, claims and causes of action with respect to the contracts and agreements listed on these Schedules and Statements, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument.

c.   <u>Schedule H</u>. Codefendants in litigation matters involving the Debtor are not listed in Schedule H unless the trial court has made a ruling that results in an identity of interest between the Debtor and such co-defendant.

[*Remainder of Page Intentionally Left Blank*]

004074

**Fill in this information to identify the case:**

Debtor name: Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern District of Texas (State)

Case number (If known): 22-60043

☐ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy  04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

| Part 1: | Income |
|---|---|

**1. Gross revenue from business**

☐ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From 01/01/2022<br>MM / DD / YYYY | to Filing date | ☑ Operating a business<br>☐ Other _____ | $ 20,989,725.21 |
| For prior year: | From 01/01/2021<br>MM / DD / YYYY | to 12/31/2021<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other _____ | $ 31,670,153.75 |
| For the year before that: | From 01/01/2020<br>MM / DD / YYYY | to 12/31/2020<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other _____ | $ 35,231,342.69 |

**2. Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From _____<br>MM / DD / YYYY | to Filing date | _____ | $_____ |
| For prior year: | From _____<br>MM / DD / YYYY | to _____<br>MM / DD / YYYY | _____ | $_____ |
| For the year before that: | From _____<br>MM / DD / YYYY | to _____<br>MM / DD / YYYY | _____ | $_____ |

| Debtor | Free Speech Systems, LLC | Case number (if known) | 22-60043 |
|--------|--------------------------|------------------------|----------|
| | Name | | |

## Part 2: List Certain Transfers Made Before Filing for Bankruptcy

**3.** **Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|---|
| 3.1. | American Express<br>Creditor's name<br>200 Vesey Street<br>Street<br>New York    NY    10285<br>City    State    ZIP Code | 07/05/22<br><br>06/29/22<br><br>06/13/22 | $ 1,013,825.21 | ☐ Secured debt<br>☑ Unsecured loan repayments<br>☑ Suppliers or vendors<br>☑ Services<br>☐ Other _____ |
| 3.2. | PQPR Holdings Limited<br>Creditor's name<br>3005 S Lamar Blvd Ste D109-317<br>Street<br>Austin    TX    78704-8864<br>City    State    ZIP Code | 07/26/22<br><br>06/30/22<br><br>06/28/22 | $ 1,728,051.95 | ☑ Secured debt<br>☑ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other _____ |

*See Continuation in Attached*

**4.** **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | PQPR Holdings Limited<br>Insider's name<br>3005 S Lamar Blvd Ste D109-317<br>Street<br>Austin    TX    78704-8864<br>City    State    ZIP Code<br><br>Relationship to debtor<br>72% Owned by Owner | 07/26/22<br><br>06/30/22<br><br>06/28/22 | $ 3,078,934.33 | Payments on Promissory Note and Advances |
| 4.2. | David Jones<br>Insider's name<br>3019 Alvin Devane Blvd, Ste 300<br>Street<br>Austin    TX    78741<br>City    State    ZIP Code<br><br>Relationship to debtor<br>Relative of the Owner | 10/7/21 | $ 150,000.00 | Payments on Advances |

Debtor    Free Speech Systems, LLC                                    Case number (if known) 22-60043
_____
          Name

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | | | | $_____ |
| | Creditor's name | | | |
| | Street | | | |
| | | | | |
| | City          State     ZIP Code | | | |
| 5.2. | | | | $_____ |
| | Creditor's name | | | |
| | Street | | | |
| | | | | |
| | City          State     ZIP Code | | | |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|
| | | | $_____ |
| Creditor's name | | | |
| Street | | | |
| | Last 4 digits of account number: XXXX– __ __ __ __ | | |
| City          State     ZIP Code | | | |

## Part 3:   Legal Actions or Assignments

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Leonard Pozner, Veronique De La Rosa v. Free Speech Systmes LLC | 01 Determination of removed claim o | U.S. Bankruptcy Court Western District of Texas (Austin) | ☐ Pending |
| | | | Name | ☐ On appeal |
| | **Case number** | | 903 San Jacinto Blvd., Suite 322 | ☑ Concluded |
| | | | Street | |
| | 22-01021-hcm | | Austin          TX          78701 | |
| | | | City          State          ZIP Code | |
| 7.2. | Marcel Fontaine v. Alex E. Jones, InfoWars, LLC, Free Speech Systems, | 01 Determination of removed claim o | U.S. Bankruptcy Court Western District of Texas (Austin) | ☐ Pending |
| | | | Name | ☐ On appeal |
| | **Case number** | | 903 San Jacinto Blvd., Suite 322 | ☑ Concluded |
| | | | Street | |
| | 22-01022-hcm | | Austin          TX          78701 | |
| | | | City          State          ZIP Code | |

*See Continuation in Attached*

Debtor    Free Speech Systems, LLC
_____
Name

Case number (if known) 22-60043
_____

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| | _____ | $_____ |
| Custodian's name | | |
| _____ | **Case title** | **Court name and address** |
| Street | _____ | |
| _____ | | Name |
| City       State       ZIP Code | **Case number** | Street |
| | _____ | _____ |
| | **Date of order or assignment** | City       State       ZIP Code |
| | _____ | |

## Part 4:    Certain Gifts and Charitable Contributions

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☐ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| 9.1. Bartlett Emergency Group, PA | Cash | 09/02/2021 | $ 10,000.00 |
| Recipient's name | | | |
| 349 Bartlett Road | _____ | | |
| Street | | | |
| Crane       TX       79731 | | | |
| City       State       ZIP Code | | | |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |
| 9.2. _____ | _____ | _____ | $ _____ |
| Recipient's name | | | |
| _____ | _____ | | |
| Street | | | |
| _____ | | | |
| City       State       ZIP Code | | | |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |

## Part 5:    Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| _____ | _____ | _____ | $_____ |

004078

Debtor  Free Speech Systems, LLC
_____  Case number *(if known)* 22-60043
Name

---

| **Part 6:** | **Certain Payments or Transfers** |

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | Shannon & Lee LLP | | 06/06/2022 | $ 100,000.00 (retainer) |
| | **Address** | | 07/28/2022 | $84,034.12 |
| | 700 Milam Street, Suite 1300 | | 07/29/2022 | $50,000 (retainer) |
| | Street | | | |
| | Houston              TX       77002 | | | |
| | City                    State    ZIP Code | | | |
| | **Email or website address** | | | |
| | https://www.shannonleellp.com/ | | | |
| | **Who made the payment, if not debtor?** | | | |
| | Payments made through SALLC trust account | | | |

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | Schwartz Associates LLC | | 06/10/2022 | $ 398,030.00 |
| | **Address** | | | |
| | 712 Main Street, Suite 1830 | | | |
| | Street | | | |
| | Houston              TX       77002 | | | |
| | City                    State    ZIP Code | | | |
| | **Email or website address** | | | |
| | https://schwartzassociates.us/ | | | |
| | **Who made the payment, if not debtor?** | | | |

[To Supplement: Payments to The Law Offices of Ray Battaglia, PLLC - Total value est. $127,074.00]

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.

Do not include transfers already listed on this statement.

☑ None

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|
| | | | $_____ |
| **Trustee** | | | |
| | | | |

---

Debtor   Free Speech Systems, LLC
         _____   Case number (if known) 22-60043
         Name

---

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | _____ | _____ | $_____ |
| | **Address** | _____ | | |
| | Street | | | |
| | City          State      ZIP Code | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | Who received transfer? | _____ | _____ | $_____ |
| | _____ | _____ | | |
| | **Address** | | | |
| | Street | | | |
| | City          State      ZIP Code | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

---

**Part 7:   Previous Locations**

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

| | Address | | Dates of occupancy | |
|---|---|---|---|---|
| 14.1. | _____ | | From _____ | To _____ |
| | Street | | | |
| | City          State      ZIP Code | | | |
| 14.2. | _____ | | From _____ | To _____ |
| | Street | | | |
| | City          State      ZIP Code | | | |

---

004080

Debtor    Free Speech Systems, LLC
_____
          Name

Case number (if known)  22-60043
_____

| Part 8: | Health Care Bankruptcies |
|---------|--------------------------|

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

|      | Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|------|---------------------------|----------------------------------------------------------------------------------|---------------------------------------------------------------------------|
| 15.1.| Facility name | | |
|      | Street | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept? |
|      | City      State      ZIP Code | | Check all that apply: ☐ Electronically ☐ Paper |
|      | **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
| 15.2.| Facility name | | |
|      | Street | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept? |
|      | City      State      ZIP Code | | Check all that apply: ☐ Electronically ☐ Paper |

| Part 9: | Personally Identifiable Information |
|---------|------------------------------------|

**16. Does the debtor collect and retain personally identifiable information of customers?**

☐ No.

☑ Yes. State the nature of the information collected and retained.  Name, address, credit card information

Does the debtor have a privacy policy about that information?

☐ No

☑ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.

☐ Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|--------------|-------------------------------------------|
|              | EIN: ___ ___ – ___ ___ ___ ___ ___ ___ ___ |

Has the plan been terminated?

☐ No

☑ Yes

Debtor    Free Speech Systems, LLC
_____
          Name

Case number (if known) 22-60043

---

| **Part 10:** | **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units** |

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| | Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | Name _____ Street _____ City   State   ZIP Code | XXXX–___ ___ ___ ___ | ☐ Checking ☐ Savings ☐ Money market ☐ Brokerage ☐ Other_____ | _____ | $_____ |
| 18.2. | Name _____ Street _____ City   State   ZIP Code | XXXX–___ ___ ___ ___ | ☐ Checking ☐ Savings ☐ Money market ☐ Brokerage ☐ Other_____ | | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| Name _____ Street _____ City   State   ZIP Code | _____ _____ _____ Address _____ _____ | _____ _____ _____ | ☐ No ☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| Name _____ Street _____ City   State   ZIP Code | _____ _____ _____ Address _____ | _____ _____ _____ | ☐ No ☐ Yes |

---

004082

| Debtor | Free Speech Systems, LLC | Case number *(if known)* 22-60043 |
|---|---|---|
| | Name | |

---

## Part 11:   Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| | | | $ _____ |
| Name | | | |
| Street | | | |
| City          State          ZIP Code | | | |

---

## Part 12:   Details About Environmental Information

For the purpose of Part 12, the following definitions apply:

■ *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

■ *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

■ *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| | | | ☐ Pending |
| Case number | Name | | ☐ On appeal |
| | Street | | ☐ Concluded |
| | City          State          ZIP Code | | |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| | | | _____ |
| Name | Name | | |
| Street | Street | | |
| City          State          ZIP Code | City          State          ZIP Code | | |

---

004083

Debtor    Free Speech Systems, LLC                                    Case number *(if known)* 22-60043
_____                              _____
          Name

---

24. **Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| | | | _____ |
| Name | Name | _____ | |
| Street | Street | _____ | |
| | | | |
| City          State     ZIP Code | City          State     ZIP Code | | |

---

| Part 13: | Details About the Debtor's Business or Connections to Any Business |
|---|---|

25. **Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case.
Include this information even if already listed in the Schedules.

☑ None

|  | Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|---|
| 25.1. | _____<br>Name<br>_____<br>Street<br>_____<br>City          State     ZIP Code | _____<br>_____<br>_____ | EIN: ___ ___ – ___ ___ ___ ___ ___ ___ ___<br>**Dates business existed**<br><br>From _____   To _____ |
| 25.2. | _____<br>Name<br>_____<br>Street<br>_____<br>City          State     ZIP Code | _____<br>_____<br>_____ | EIN: ___ ___ – ___ ___ ___ ___ ___ ___ ___<br>**Dates business existed**<br><br>From _____   To _____ |
| 25.3. | _____<br>Name<br>_____<br>Street<br>_____<br>City          State     ZIP Code | _____<br>_____<br>_____ | EIN: ___ ___ – ___ ___ ___ ___ ___ ___ ___<br>**Dates business existed**<br><br>From _____   To _____ |

---

004084

Debtor  Free Speech Systems, LLC
        _____
        Name

Case number *(if known)* 22-60043
                        _____

---

26. **Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | Dates of service |
|---|---|
| 26a.1. | Schwartz Associates LLC<br>Name<br>712 Main Street, Ste. 1830<br>Street | From 05/19/2022   To Present |
| | Houston                    TX           77006<br>City                             State        ZIP Code | |
| 26a.2. | Melinda Flores<br>Name<br>261 Ashleaf Dr<br>Street | From 09/26/2016   To 07/29/2022 |
| | Buda                        TX           78610<br>City                             State        ZIP Code | |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| Name and address | Dates of service |
|---|---|
| 26b.1. | Schwartz Associates LLC<br>Name<br>712 Main Street, Ste. 1830<br>Street | From 05/19/2022   To Present |
| | Houston                    TX           77006<br>City                             State        ZIP Code | |
| 26b.2. | Bob Roe<br>Name<br>219 Black Wolf Run<br>Street | From _____   To _____ |
| | Austin                      TX           78738<br>City                             State        ZIP Code | |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.        Please see attached

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.1. | Schwartz Associates LLC<br>Name<br>712 Main Street, Ste. 1830<br>Street | _____<br>_____ |
| | Houston                    TX           77006<br>City                             State        ZIP Code | |

Debtor    Free Speech Systems, LLC       Case number *(if known)* 22-60043
       Name

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| 26c.2.   Melinda Flores | _____ |
|    Name | |
|    261 Ashleaf Dr | _____ |
|    Street | _____ |
|    Buda      TX      78610 | |
|    City      State      ZIP Code | |

*See Continuation in Attached*

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

| Name and address |
|---|
| 26d.1. |
|    Name |
|    Street |
|    City      State      ZIP Code |

| Name and address |
|---|
| 26d.2. |
|    Name |
|    Street |
|    City      State      ZIP Code |

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☐ No

☑ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $_____ |

| Name and address of the person who has possession of inventory records |
|---|
| 27.1. |
|    Name |
|    Street |
|    City      State      ZIP Code |

Debtor    Free Speech Systems, LLC                                    Case number (if known)    22-60043
_____                                    _____
          Name

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $ _____ |

| Name and address of the person who has possession of inventory records |
|---|

27.2.  _____
       Name

       _____
       Street

       _____
       City                              State        ZIP Code

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Alex Jones | 3019 Alvin Devane Blvd Austin TX 78741 | Owner | 100% |
| Marc Schwartz | 712 Main Street Ste. 1830 Houston TX 77002 | Chief Restructuring Officer | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| _____ | _____ | _____ | From _____ To _____ |
| _____ | _____ | _____ | From _____ To _____ |
| _____ | _____ | _____ | From _____ To _____ |
| _____ | _____ | _____ | From _____ To _____ |

30. **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
☑ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1. | | | |
| Alex Jones | 932,277.89 | 7/27/22 | Draws |
| Name | | | |
| 3019 Alvin Devane Blvd | | 7/8/22 | |
| Street | | | |
| Austin                TX        78741 | | 6/29/22 | |
| City              State    ZIP Code | | | |
| Relationship to debtor | | 6/15/22 | |
| Owner | | 6/13/22 | |

Debtor   Free Speech Systems, LLC
_____
Name

Case number (if known)   22-60043
_____

| | Name and address of recipient | | 3,078,934.33 | 7/26/22 | Loans and Advances |
|---|---|---|---|---|---|
| 30.2 | PQPR Holdings Limited LLC | | | 6/30/22 | |
| | Name | | | | |
| | 3005 S Lamar Blvd Ste D109-317 | | | 6/28/22 | |
| | Street | | | | |
| | Austin | TX | 78704-8864 | 6/13/22 | |
| | City | State | ZIP Code | | |
| | Relationship to debtor | | | 5/31/22 | |
| | Affiliate - >20% Owned by or for the benefit of AEJ | | | | |

*See Continuation in Attached*

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| | EIN: ___ ___ – ___ ___ ___ ___ ___ ___ ___ |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|
| | EIN: ___ ___ – ___ ___ ___ ___ ___ ___ ___ |

**Part 14:**   **Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   08/29/2022
_____
MM / DD / YYYY

✗ _____
Signature of individual signing on behalf of the debtor

Printed name   W. Marc Schwartz
_____

Position or relationship to debtor   Chief Restructuring Officer
_____

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☐ No
☑ Yes

**Part 2.3. Payments to Creditors wihtin 90 days**

| Date | Name | Address | Reasons for Payment | Amount |
|------|------|---------|---------------------|--------|
| 07/22/2022 | Addshoppers, Inc | 15806 Brookway Dr Ste 200 Huntersville, NC 28078 | Seuppliers or Vendors | 2,989.00 |
| 07/22/2022 | Addshoppers, Inc | 15807 Brookway Dr Ste 200 Huntersville, NC 28078 | Seuppliers or Vendors | 2,989.00 |
| 06/10/2022 | Addshoppers, Inc | 15808 Brookway Dr Ste 200 Huntersville, NC 28078 | Seuppliers or Vendors | 2,989.00 |
| 05/09/2022 | Addshoppers, Inc | 15809 Brookway Dr Ste 200 Huntersville, NC 28078 | Seuppliers or Vendors | 2,989.00 |
| 05/26/2022 | Air Supply of North Texas aka Precision Oxygen | 2829 Fort Worth Avenue Dallas, TX 75211 | Seuppliers or Vendors | 229.18 |
| 07/22/2022 | Airco Mechanical, LTD | PO Box 1598 Round Rock, TX 78680 | Seuppliers or Vendors | 6,491.86 |
| 06/13/2022 | Airco Mechanical, LTD | PO Box 1598 Round Rock, TX 78681 | Seuppliers or Vendors | 641.39 |
| 05/23/2022 | Airco Mechanical, LTD | PO Box 1598 Round Rock, TX 78682 | Seuppliers or Vendors | 3,824.52 |
| 08/19/2022 | AT&T Mobile | PO Box 5001 Carol Stream, IL 60197-5001 | Seuppliers or Vendors | 5,167.41 |
| 06/03/2022 | AT&T Mobile | PO Box 5001 Carol Stream, IL 60197-5002 | Seuppliers or Vendors | 3,919.83 |
| 05/05/2022 | AT&T Mobile | PO Box 5001 Carol Stream, IL 60197-5003 | Seuppliers or Vendors | 3,919.80 |
| 07/22/2022 | Atomial, LLC | 1920 E. Riverside Drive Suite A-120 #124  Austin, TX 78741 | Seuppliers or Vendors | 25,200.00 |
| 06/01/2022 | Atomial, LLC | 1921 E. Riverside Drive Suite A-120 #124  Austin, TX 78741 | Seuppliers or Vendors | 25,200.00 |
| 05/25/2022 | Atomial, LLC | 1922 E. Riverside Drive Suite A-120 #124  Austin, TX 78741 | Seuppliers or Vendors | 25,200.00 |
| 05/03/2022 | Atomial, LLC | 1923 E. Riverside Drive Suite A-120 #124  Austin, TX 78741 | Seuppliers or Vendors | 25,200.00 |
| 08/19/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78691 | Seuppliers or Vendors | 16,019.35 |
| 08/12/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78692 | Seuppliers or Vendors | 28,044.34 |
| 07/28/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78693 | Seuppliers or Vendors | 2,037.69 |
| 07/28/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78694 | Seuppliers or Vendors | 6,208.14 |
| 07/22/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78695 | Seuppliers or Vendors | 6,348.86 |
| 07/18/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78696 | Seuppliers or Vendors | 5,829.26 |
| 07/12/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78697 | Seuppliers or Vendors | 6,397.58 |
| 06/27/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78698 | Seuppliers or Vendors | 6,397.58 |
| 06/10/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78699 | Seuppliers or Vendors | 6,397.58 |
| 06/10/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78700 | Seuppliers or Vendors | 6,397.58 |
| 05/31/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78701 | Seuppliers or Vendors | 6,486.88 |
| 05/31/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78702 | Seuppliers or Vendors | 3,382.81 |
| 05/31/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78703 | Seuppliers or Vendors | 3,972.78 |
| 05/19/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78704 | Seuppliers or Vendors | 3,972.78 |
| 05/19/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78705 | Seuppliers or Vendors | 2,029.69 |
| 05/11/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78706 | Seuppliers or Vendors | 3,972.78 |
| 05/09/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78707 | Seuppliers or Vendors | 4,541.09 |
| 05/02/2022 | Austin Security & Investigation Solutions | PO Box 2904 Pflugerville, TX 78708 | Seuppliers or Vendors | 4,010.66 |
| 05/25/2022 | Blott, Jacquelyn, Attorney at Law | 200 University Boulevard Suite 225 #251 Round Rock, TX 78665 | Seuppliers or Vendors | 20,000.00 |
| 07/05/2022 | City of Austin | PO Box 2267 Austin, TX 78783 | Seuppliers or Vendors | 855.76 |
| 07/05/2022 | City of Austin | PO Box 2267 Austin, TX 78784 | Seuppliers or Vendors | 550.69 |
| 07/05/2022 | City of Austin | PO Box 2267 Austin, TX 78785 | Seuppliers or Vendors | 3,246.03 |
| 07/05/2022 | City of Austin | PO Box 2267 Austin, TX 78786 | Seuppliers or Vendors | 1,213.48 |
| 06/01/2022 | City of Austin | PO Box 2267 Austin, TX 78787 | Seuppliers or Vendors | 1,031.78 |
| 06/01/2022 | City of Austin | PO Box 2267 Austin, TX 78788 | Seuppliers or Vendors | 491.21 |
| 06/01/2022 | City of Austin | PO Box 2267 Austin, TX 78789 | Seuppliers or Vendors | 727.55 |
| 06/01/2022 | City of Austin | PO Box 2267 Austin, TX 78790 | Seuppliers or Vendors | 2,974.75 |
| 05/03/2022 | City of Austin | PO Box 2267 Austin, TX 78791 | Seuppliers or Vendors | 4,826.58 |
| 06/03/2022 | CTRMA Processing | PO Box 734182 Dallas, TX 75373 | Seuppliers or Vendors | 87.00 |
| 05/23/2022 | CTRMA Processing | PO Box 734182 Dallas, TX 75374 | Seuppliers or Vendors | 107.21 |
| 05/23/2022 | CTRMA Processing | PO Box 734182 Dallas, TX 75375 | Seuppliers or Vendors | 93.40 |
| 04/29/2022 | CTRMA Processing | PO Box 734182 Dallas, TX 75376 | Seuppliers or Vendors | 84.39 |
| 06/24/2022 | eCommerce CDN, LLC | 221 E 63rd Street Savannah, GA 31405 | Seuppliers or Vendors | 27,270.00 |
| 06/08/2022 | eCommerce CDN, LLC | 222 E 63rd Street Savannah, GA 31405 | Seuppliers or Vendors | 12,270.00 |
| 05/21/2022 | eCommerce CDN, LLC | 223 E 63rd Street Savannah, GA 31405 | Seuppliers or Vendors | 15,000.00 |
| 05/09/2022 | eCommerce CDN, LLC | 224 E 63rd Street Savannah, GA 31405 | Seuppliers or Vendors | 13,635.00 |
| 06/17/2022 | Getty Images, Inc | PO Box 953604 St. Louis, MO 63195-3604 | Seuppliers or Vendors | 9,201.25 |
| 06/03/2022 | Getty Images, Inc | PO Box 953604 St. Louis, MO 63195-3605 | Seuppliers or Vendors | 9,201.25 |
| 05/11/2022 | Getty Images, Inc | PO Box 953604 St. Louis, MO 63195-3606 | Seuppliers or Vendors | 9,201.25 |
| 06/13/2022 | Gibson, Ronald | 4012 Pleasant Grove Church Rd Shelby NC, 28150-2842 | Seuppliers or Vendors | 1,500.00 |
| 04/30/2022 | Gibson, Ronald | 4013 Pleasant Grove Church Rd Shelby NC, 28150-2842 | Seuppliers or Vendors | 1,500.00 |
| 06/17/2022 | Gracenote Media Services, LLC | 29421 Network Place Chicago, IL 60673-1294 | Seuppliers or Vendors | 119.98 |
| 06/03/2022 | Gracenote Media Services, LLC | 29422 Network Place Chicago, IL 60673-1294 | Seuppliers or Vendors | 119.98 |
| 05/20/2022 | Gracenote Media Services, LLC | 29423 Network Place Chicago, IL 60673-1294 | Seuppliers or Vendors | 119.98 |
| 06/24/2022 | JCE SEO | 6101 Broadway San Antonio, TX 78209 | Seuppliers or Vendors | 5,000.00 |
| 06/09/2022 | JCE SEO | 6102 Broadway San Antonio, TX 78209 | Seuppliers or Vendors | 5,000.00 |

**Part 2.3. Payments to Creditors wihtin 90 days**

| Date | Name | Address | Reasons for Payment | Amount |
|---|---|---|---|---|
| 05/21/2022 | JCE SEO | 6103 Broadway San Antonio, TX 78209 | Seuppliers or Vendors | 5,000.00 |
| 05/09/2022 | JCE SEO | 6104 Broadway San Antonio, TX 78209 | Seuppliers or Vendors | 5,000.00 |
| 07/22/2022 | JW JIB Productions, LLC | 2921 Carvelle Drive Riviera Beach, FL 33404 | Seuppliers or Vendors | 3,500.00 |
| 06/24/2022 | JW JIB Productions, LLC | 2922 Carvelle Drive Riviera Beach, FL 33404 | Seuppliers or Vendors | 3,600.00 |
| 06/09/2022 | JW JIB Productions, LLC | 2923 Carvelle Drive Riviera Beach, FL 33404 | Seuppliers or Vendors | 3,500.00 |
| 05/27/2022 | JW JIB Productions, LLC | 2924 Carvelle Drive Riviera Beach, FL 33404 | Seuppliers or Vendors | 7,000.00 |
| 05/18/2022 | JW JIB Productions, LLC | 2925 Carvelle Drive Riviera Beach, FL 33404 | Seuppliers or Vendors | 3,500.00 |
| 07/22/2022 | Konica Minolta Premier Finance | PO Box 41602 Philadelphia, PA 19101-1602 | Seuppliers or Vendors | 1,761.27 |
| 06/27/2022 | Konica Minolta Premier Finance | PO Box 41602 Philadelphia, PA 19101-1603 | Seuppliers or Vendors | 1,847.87 |
| 05/23/2022 | Konica Minolta Premier Finance | PO Box 41602 Philadelphia, PA 19101-1604 | Seuppliers or Vendors | 1,761.27 |
| 05/09/2022 | Konica Minolta Premier Finance | PO Box 41602 Philadelphia, PA 19101-1605 | Seuppliers or Vendors | 1,847.87 |
| 06/03/2022 | Lumen/Level 3 Communications | PO Box 910182 Denver, CO 80291-0182 | Seuppliers or Vendors | 8,960.63 |
| 05/23/2022 | Lumen/Level 3 Communications | PO Box 910182 Denver, CO 80291-0183 | Seuppliers or Vendors | 10,560.15 |
| 05/20/2022 | Lumen/Level 3 Communications | PO Box 910182 Denver, CO 80291-0184 | Seuppliers or Vendors | 9,900.70 |
| 06/22/2022 | Lyman, Daniel | 5832 Elton Road Venice, FL 34293 | Seuppliers or Vendors | 3,500.00 |
| 05/20/2022 | Lyman, Daniel | 5833 Elton Road Venice, FL 34293 | Seuppliers or Vendors | 3,500.00 |
| 06/24/2022 | MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89426 | Seuppliers or Vendors | 12,000.00 |
| 06/17/2022 | MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89427 | Seuppliers or Vendors | 24,000.00 |
| 05/20/2022 | MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89428 | Seuppliers or Vendors | 12,000.00 |
| 05/18/2022 | MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89429 | Seuppliers or Vendors | 12,000.00 |
| 05/12/2022 | MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89430 | Seuppliers or Vendors | 12,000.00 |
| 05/06/2022 | MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89431 | Seuppliers or Vendors | 12,000.00 |
| 07/01/2022 | Sparkletts & Sierra Springs | PO Box 660579 Dallas, TX 75266-0579 | Seuppliers or Vendors | 948.12 |
| 06/03/2022 | Sparkletts & Sierra Springs | PO Box 660579 Dallas, TX 75266-0580 | Seuppliers or Vendors | 945.19 |
| 05/23/2022 | Sparkletts & Sierra Springs | PO Box 660579 Dallas, TX 75266-0581 | Seuppliers or Vendors | 1,454.39 |
| 05/23/2022 | Texas Gas Service | PO Box 219913 Kansas City, MO 64121 | Seuppliers or Vendors | 172.48 |
| 07/22/2022 | Willow Grove Productions | 1810 Rockcliff Road Austin, TX 78746 | Seuppliers or Vendors | 2,700.00 |
| 05/18/2022 | Willow Grove Productions | 1811 Rockcliff Road Austin, TX 78746 | Seuppliers or Vendors | 2,450.00 |
| 06/17/2022 | WMQM-AM 1600 | 21 Stephen Hill Road Atoka, TN 38004 | Seuppliers or Vendors | 2,500.00 |
| 05/23/2022 | WMQM-AM 1600 | 22 Stephen Hill Road Atoka, TN 38004 | Seuppliers or Vendors | 2,500.00 |
| 05/20/2022 | WMQM-AM 1600 | 23 Stephen Hill Road Atoka, TN 38004 | Seuppliers or Vendors | 2,500.00 |
| 05/12/2022 | American Media/Reality Zone | PO Box 4646 Thousand Oaks, CA 91359 | Seuppliers or Vendors | 801.00 |
| 06/22/2022 | ███████ | ███████ | Seuppliers or Vendors | 25.00 |
| 06/22/2022 | ███████ | ███████ | Seuppliers or Vendors | 25.00 |
| 06/14/2022 | ███████ | ███████ | Seuppliers or Vendors | 15.00 |
| 06/14/2022 | ███████ | ███████ | Seuppliers or Vendors | 15.00 |
| 06/10/2022 | ███████ | ███████ | Seuppliers or Vendors | 15.00 |
| 05/27/2022 | ███████ | ███████ | Seuppliers or Vendors | 15.00 |
| 05/23/2022 | ███████ | ███████ | Seuppliers or Vendors | 15.00 |
| 05/23/2022 | ███████ | ███████ | Seuppliers or Vendors | 25.00 |
| 05/06/2022 | ███████ | ███████ | Seuppliers or Vendors | 15.00 |
| 05/03/2022 | ███████ | ███████ | Seuppliers or Vendors | 25.00 |
| 06/22/2022 | Watson, Paul | 9 Riverdale Road Ranmoor Sheffield South Yorkshire, United Kingdom S10 3FA | Seuppliers or Vendors | 25,000.00 |
| 05/23/2022 | Watson, Paul | 10 Riverdale Road Ranmoor Sheffield South Yorkshire, United Kingdom S10 3FA | Seuppliers or Vendors | 25,000.00 |
| 05/03/2022 | Watson, Paul | 11 Riverdale Road Ranmoor Sheffield South Yorkshire, United Kingdom S10 3FA | Seuppliers or Vendors | 25,000.00 |
| 07/22/2022 | Verizon Wireless | PO Box 660108 Dallas, TX 75266 | Seuppliers or Vendors | 531.80 |
| 06/03/2022 | Verizon Wireless | PO Box 660108 Dallas, TX 75267 | Seuppliers or Vendors | 513.13 |
| 05/20/2022 | Verizon Wireless | PO Box 660108 Dallas, TX 75268 | Seuppliers or Vendors | 524.18 |
| 06/22/2022 | Miller, Sean | PO Box 763 Wyalusing, PA 18853 | Seuppliers or Vendors | 3,200.00 |
| 05/20/2022 | Miller, Sean | PO Box 763 Wyalusing, PA 18854 | Seuppliers or Vendors | 3,200.00 |
| 07/01/2022 | Spectrum Enterprise aka Time Warner Cable | PO Box 60074 City of Industry, CA 91716 | Seuppliers or Vendors | 2,106.03 |
| 06/03/2022 | Spectrum Enterprise aka Time Warner Cable | PO Box 60074 City of Industry, CA 91717 | Seuppliers or Vendors | 2,072.17 |
| 05/20/2022 | Spectrum Enterprise aka Time Warner Cable | PO Box 60074 City of Industry, CA 91718 | Seuppliers or Vendors | 4,176.54 |
| 06/24/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83864 | Seuppliers or Vendors | 10,125.81 |

**Part 2.3. Payments to Creditors wihtin 90 days**

| Date | Name | Address | Reasons for Payment | Amount |
|---|---|---|---|---|
| 06/21/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83865 | Seuppliers or Vendors | 23,036.81 |
| 06/14/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83866 | Seuppliers or Vendors | 9,667.30 |
| 06/14/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83867 | Seuppliers or Vendors | 45,000.00 |
| 06/14/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83868 | Seuppliers or Vendors | 23,349.52 |
| 05/28/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83869 | Seuppliers or Vendors | 47,349.37 |
| 05/27/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83870 | Seuppliers or Vendors | 49,292.22 |
| 05/25/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83871 | Seuppliers or Vendors | 57,369.70 |
| 05/23/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83872 | Seuppliers or Vendors | 85,823.99 |
| 05/20/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83873 | Seuppliers or Vendors | 1,962.00 |
| 05/20/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83874 | Seuppliers or Vendors | 29,216.11 |
| 05/16/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83875 | Seuppliers or Vendors | 42,347.58 |
| 05/13/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83876 | Seuppliers or Vendors | 35,160.81 |
| 05/12/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83877 | Seuppliers or Vendors | 27,760.85 |
| 05/11/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83878 | Seuppliers or Vendors | 32,455.68 |
| 05/06/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83879 | Seuppliers or Vendors | 54,634.23 |
| 05/03/2022 | Ready Alliance Group, Inc | PO Box 1709 Sandpoint, ID 83880 | Seuppliers or Vendors | 29,043.77 |
| 07/01/2022 | One Party America, LLC | 6700 Woodlands Parkway Suite 230-309 The Woodlands, TX 77382 | Seuppliers or Vendors | 50,000.00 |
| 06/24/2022 | One Party America, LLC | 6700 Woodlands Parkway Suite 230-309 The Woodlands, TX 77382 | Seuppliers or Vendors | 70,000.00 |

## Part 2.4 (Payments to Insiders)
### Payments to PQPR
#### July 29, 2021 - July 29, 2022

| Date | Transaction Type | Num | Name | Memo/Description | Account | Split | Amount |
|---|---|---|---|---|---|---|---|
| 7/26/2022 | Journal Entry | 140 | | To record principal payment on Note 2 between July 1 and July 26 2022 | 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note | -Split- | -45,722.54 |
| 6/30/2022 | Journal Entry | 40 | | To record Jun 2022 Note 2 Principal Payment | $25,300,000 Note | -Split- | -152,664.03 |
| 6/28/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 8555 4572368 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -300,000.00 |
| 6/13/2022 | Transfer | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 8555 4862320 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -150,000.00 |
| 5/31/2022 | Journal Entry | 39 | | To record May 2022 Note 2 Principal Payment | 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note | -Split- | -147,207.82 |
| 5/31/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 1550 4179825 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -250,000.00 |
| 5/24/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 1550 4006193 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -75,000.00 |
| 5/24/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 1550 4006193 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -200,000.00 |
| 5/23/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 1550 3766594 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -200,000.00 |
| 4/30/2022 | Journal Entry | | | | Interest Payable 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note | -Split- | -2,622.17 |
| 4/30/2022 | Journal Entry | 38 | | To record Apr 2022 Note 2 Principal Payment | 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note | -Split- | -154,835.39 |
| 4/29/2022 | Expense | | | | Advances from PQPR | 10000 Cash:10130 Depository Account - Security Bank | -50,000.00 |
| 4/28/2022 | Expense | | | | Advances from PQPR | 10000 Cash:10130 Depository Account - Security Bank | -50,000.00 |
| 4/26/2022 | Expense | | | | Advances from PQPR | 10000 Cash:10130 Depository Account - Security Bank | -100,000.00 |
| 4/18/2022 | Expense | | | | Advances from PQPR | 10000 Cash:10130 Depository Account - Security Bank | -50,000.00 |
| 4/14/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8563 TO CHK 1550 7502977 | Advances from PQPR | 10000 Cash:10130 Depository Account - Security Bank | -75,000.00 |
| 4/1/2022 | Expense | | | INTERNET TRANSFER FROM CHK 8514 TO CHK 1550 3118799 | Advances from PQPR | 10000 Cash:10100 Operating Account - Security Bank | -175,000.00 |
| 3/31/2022 | Journal Entry | 37 | | To record Mar 2022 Note 2 Principal Payment | 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note | -Split- | -171,342.36 |
| 2/28/2022 | Journal Entry | 36 | | To record Feb 2022 Note 2 Principal Payment | 27000 Note Due to PQPR/2021/11/10 $25,300,000 Note | -Split- | -126,689.16 |
| 2/18/2022 | Expense | | | | Advances from PQPR | 10000 Cash:10130 Depository Account - Security Bank | -160,000.00 |
| 1/31/2022 | Journal Entry | 35 | | To record Jan 2022 Note 2 Principal Payment | $25,300,000 Note | -Split- | -135,256.08 |
| 12/31/2021 | Journal Entry | 40 | | To record Dec 2021 Principal payment on Note 2 | 29000 Note Payable PQPR | -Split- | -170,676.17 |
| 12/31/2021 | Journal Entry | 42 | | To reverse incorrect Dec Entries | 29000 Note Payable PQPR | -Split- | 8,000.00 |
| 12/10/2021 | Journal Entry | Aur121021 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 12/9/2021 | Journal Entry | Aur120921 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 12/8/2021 | Journal Entry | Aur120821 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 12/7/2021 | Journal Entry | Aur120721 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |

| Date | Type | Num | Name | Memo | Account | Split | Amount |
|---|---|---|---|---|---|---|---|
| 12/6/2021 | Journal Entry | Aur120621 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 12/3/2021 | Journal Entry | Aur120321 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 12/2/2021 | Journal Entry | Aur120121 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 12/2/2021 | Journal Entry | Aur120221 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/30/2021 | Journal Entry | 39 | | To record Nov 2021 Interest payment on Note 2 | 29000 Note Payable PQPR | -Split- | -87,102.25 |
| 11/30/2021 | Journal Entry | 39 | | To record Nov 2021 Interest payment on Note 2 | 29000 Note Payable PQPR | -Split- | -20,650.61 |
| 11/30/2021 | Journal Entry | 41 | | To reverse incorrect Nov Entries | 29000 Note Payable PQPR | -Split- | 19,000.00 |
| 11/30/2021 | Journal Entry | Aur113021 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/29/2021 | Journal Entry | Aur112921 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/26/2021 | Journal Entry | Aur112621 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/24/2021 | Journal Entry | Aur112421 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/23/2021 | Journal Entry | Aur112321 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/22/2021 | Journal Entry | Aur112221 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/22/2021 | Journal Entry | Aur111921 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/19/2021 | Journal Entry | Aur111821 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/18/2021 | Journal Entry | Aur111721 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/17/2021 | Journal Entry | Aur111621 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/16/2021 | Journal Entry | Aur111521 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/15/2021 | Journal Entry | Aur111221 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/12/2021 | Journal Entry | Aur111021 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/10/2021 | Journal Entry | Aur110921 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/9/2021 | Journal Entry | Aur110821 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/8/2021 | Journal Entry | Aur110521 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/5/2021 | Journal Entry | Aur110421 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/4/2021 | Journal Entry | Aur110321 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/3/2021 | Journal Entry | Aur110221 | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/2/2021 | Journal Entry | | | Note Payable PQPR | 29000 Note Payable PQPR | -Split- | -1,000.00 |
| 11/4/2021 | Check | WIRE | PQPR Holdings Limited, LLC | PQPR/FSS 081320 Note Payment 14 - Interest & Principle | 29000 Note Payable PQPR | 10710 SECURITY BANK OF CRAWFORD:Sec Bank of Crawford Depository | -5,825.16 |

| Date | Type | Name | Num | Memo | Account | Split | Amount |
|---|---|---|---|---|---|---|---|
| 9/28/2021 | Check | PQPR Holdings Limited, LLC | WIRE | PQPR/FSS 081320 Note Payment 13 - Interest & Principle | 29000 Note Payable PQPR | 10710 SECURITY BANK OF CRAWFORD:Sec Bank of Crawford Depository | -13,654.89 |
| 9/20/2021 | Journal Entry | | 33 | | 29000 Note Payable PQPR | -Split- | -1,708.05 |
| 8/24/2021 | Check | PQPR Holdings Limited, LLC | WIRE | PQPR/FSS 081320 Note Payment 10 - Interest & Principle | 29000 Note Payable PQPR | 10710 SECURITY BANK OF CRAWFORD:Sec Bank of Crawford Depository | -6,559.05 |
| 8/11/2021 | Check | PQPR Holdings Limited, LLC | WIRE | PQPR/FSS 081320 Note Payment 9 - Interest & Principle | 29000 Note Payable PQPR | 10710 SECURITY BANK OF CRAWFORD:Sec Bank of Crawford Depository | -1,418.60 |

(3,078,934.33)

Part 3.

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits (Continued)**

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| Neil Heslin v. Alexander E. Jones, InfoWars, LLC, Free Speech Systems, LLC and Owen Shroyer | 01 Determination of removed claim or cause | U.S. Bankruptcy Court Western District of Texas (Austin) — Name<br>903 San Jacinto Blvd., Suite 322 — Street | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number**<br>22-01023-hcm | | Austin — City   TX — State   78701 — ZIP Code | |
| Scarlett Lewis v. Alexander E. Jones, InfoWars, LLC, and Free Speech Systems, LLC | 01 Determination of removed claim or cause | U.S. Bankruptcy Court Western District of Texas (Austin) — Name<br>903 San Jacinto Blvd., Suite 322 — Street | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number**<br>22-01024-hcm | | Austin — City   TX — State   78701 — ZIP Code | |
| Gilmore v. Jones et al | 320 Assault Libel & Slander | U.S. District Court Western District of Virginia (Charlottesville) — Name<br>255 W. Main Street Room 304 — Street | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number**<br>3:18-cv-00017-NKM-JCH | | Charlottesville — City   VA — State   22902 — ZIP Code | |
| Klayman v. Infowars, LLC et al | 320 Assault Libel & Slander | U.S. District Court for the Southern District of Florida (Ft Lauderdale) — Name<br>299 East Broward Boulevard #108 — Street | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number**<br>0:20-cv-61912-AMC | | Fort Lauderdale — City   FL — State   33301 — ZIP Code | |
| Murdock v. Jones et al | 890 Other Statutory Actions | U.S. District Court District of New Jersey (Trenton) — Name<br>402 East State Street — Street | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number**<br>3:21-cv-13184-MAS-DEA | | Trenton — City   NJ — State   08608 — ZIP Code | |

004095

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| Free Speech Systems, LLC v. Federal Aviation Administration et al | 440 Civil Rights: Other | U.S. District Court Western District of Texas (Austin) | ☐ Pending ☐ On appeal ☑ Concluded |

**Case number:** 1:21-cv-00826-RP

**Name**

501 West Fifth Street, Suite 1100
**Street**

| Austin | TX | 78701 |
|---|---|---|
| City | State | ZIP Code |

---

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| Yan Luis v. Free Speech Systems LLC | 446 Civil Rights: Americans with Disabilities - Other | U.S. District Court Southern District of New York (Foley Square) | ☑ Pending ☐ On appeal ☐ Concluded |

**Case number:** 1:22-cv-01594-PAE

**Name**

40 Foley Square
**Street**

| New York | NY | 10007 |
|---|---|---|
| City | State | ZIP Code |

---

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| Larry Klayman v. Infowars, LLC, et al | 320 Assault Libel & Slander | U.S. Court of Appeals, Eleventh Circuit | ☑ Pending ☐ On appeal ☐ Concluded |

**Case number:** 22-11230

**Name**

56 Forsyth Street, N.W.
**Street**

| Atlanta | GA | 30303 |
|---|---|---|
| City | State | ZIP Code |

---

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc | 01 Determination of removed claim or cause | U.S. Bankruptcy Court District of Connecticut (Bridgeport) | ☐ Pending ☐ On appeal ☑ Concluded |

**Case number:** 22-05004

**Name**

915 Lafayette Boulevard
**Street**

| Bridgeport | CT | 06604 |
|---|---|---|
| City | State | ZIP Code |

---

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| William Sherlach v. Alex E. Jones, Free Speech Systems LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc and Midas Resources Inc | 01 Determination of removed claim or cause | U.S. Bankruptcy Court District of Connecticut (Bridgeport) | ☐ Pending ☐ On appeal ☑ Concluded |

**Case number:** 22-05005

**Name**

915 Lafayette Boulevard
**Street**

| Bridgeport | CT | 06604 |
|---|---|---|
| City | State | ZIP Code |

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| William Sherlach v. Alex E. Jones, Free Speech Systems LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc and Midas Resources Inc | 01 Determination of removed claim or cause | U.S. Bankruptcy Court District of Connecticut (Bridgeport)<br>Name: 915 Lafayette Boulevard<br>Bridgeport, CT 06604 | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number** 22-05006 | | | |
| Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique de la Rosa, Marcel Fontaine v. Info W, LLC, Alex E. Jones, Free Speech Systems, LLC | 01 Determination of removed claim or cause | U.S. Bankruptcy Court Western District of Texas (Waco)<br>Name: 800 Franklin Avenue, #140<br>Waco, TX 76701 | ☐ Pending ☐ On appeal ☑ Concluded |
| **Case number** 22-06004-mmp | | | |
| Dennis Clark v. Free Speech Systems, LLC | 820 Copyright | U.S. District Court Western District of Texas (Austin)<br>Name: 501 West Fifth Street, Suite 1100<br>Austin, TX 78701 | ☑ Pending ☐ On appeal ☐ Concluded |
| **Case number** 1:22-cv-00061-JRN | | | |
| Corsi v. Infowars | 320 Assault Libel & Slander | U.S. Court of Appeals, Fifth Circuit<br>Name: 600 S. Maestri Place, Suite 115<br>New Orleans, LA 70130-3408 | ☑ Pending ☐ On appeal ☐ Concluded |
| **Case number** 21-50964 | | | |
| Free Speech Systems, LLC, Infowars, LLC, Prison Planet TV, LLC v. Erica L . Garbatini | 68 Dischargeability - 523(a)(6), willful and malicious injury | U.S. Bankruptcy Court District of Connecticut (Bridgeport)<br>Name: 915 Lafayette Boulevard<br>Bridgeport, CT 06604 | ☑ Pending ☐ On appeal ☐ Concluded |
| **Case number** 21-05009 | | | |
| Free Speech Systems, LLC v. Federal Aviation Administration et al | 440 Civil Rights: Other | U.S. District Court Western District of Texas (Del Rio)<br>Name: 111 East Broadway, Room L100<br>Del Rio, TX 78840 | ☑ Pending ☐ On appeal ☐ Concluded |
| **Case number** 2:21-cv-00051-AM | | | |

004097

**Part 13. 26c.**

List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

| Name | Address |
|---|---|
| Stephen Lemmon | 1801 South MoPac Expressway, Suite 320 Austin, TX 78746 |
| Jeffrey Shulse | 3511 Pinemont #C5 Houston, TX 77018 |

**Part 13. 30.**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

| Name | Address | Amount | Dates |
|---|---|---|---|
| MRJR Holdings, LLC | PO Box 27740 Las Vegas, NV 89126 | $240,000.00 | 08/13/2021 - 06/24/2022 |

**Relationship to Debtor**: Sister Company
**Reasons for Providing Value**: For Consulting Services Provided

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  |  |
|---|---|
| In re: | Case No. 22 - 60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

## DEBTORS' APPLICATION TO EMPLOY KYUNG S. LEE PLLC AS BANKRUPTCY COUNSEL EFFECTIVE AS OF MAY 16, 2022

IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE HONORABLE CHRISTOPHER LOPEZ,
UNITED STATES BANKRUPTCY JUDGE:

InfoW, LLC ("InfoW"), IWHealth, LLC ("IW Health"), and Prison Planet TV, LLC ("Prison Planet TV", and together with InfoW and IW Health, the "Debtors"), the debtors in the above-captioned bankruptcy cases (the "Chapter 11 Cases"), hereby file this application (the "Application") to employ Kyung S. Lee PLLC ("KSLPLLC") as bankruptcy counsel, effective as of May 16, 2022.  As discussed in detail below, Mr. Kyung S. Lee, the partner at Parkins Lee & Rubio LLP ("PLR") exclusively handling the  representation of the Debtors, withdrew as a partner

---

[1]    The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

004099

from PLR as of May 15, 2022 and went back to practice under Kyung S. Lee PLLC starting on

May 16, 2022.  Subject to approval by the Bankruptcy Court, the Chief Restructuring Officer,

Marc Schwartz, the Chief Restructuring Officer of the Debtors has engaged KSLPLLC to represent

the Debtors commencing as of May 16, 2022, pursuant to an Engagement Agreement, attached

hereto as Exhibit B.  In support of the Application, the Debtors submit the Declaration of Kyung

S. Lee (the "Lee Declaration"), attached as Exhibit A hereto, and respectfully states as follows:

## JURISDICTION

1.      This Court has jurisdiction over this application pursuant to 28 U.S.C. § 1334.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief sought are sections 327(a) and 330 of title 11 of the United

States Code (the "Bankruptcy Code"), Rules 2014, 2016, and 6003 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2014-1 of the Local Rules for the U.S.

Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.      The Debtors

4.      On April 18, 2022 (the "Petition Date"), each of the Debtors commenced the

Chapter 11 Cases by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy

Code.

5.      Marc Schwartz is the Chief Restructuring Officer of the Debtors. No request for the

removal of the Debtors as debtors-in-possession has been made in these Chapter 11 Cases.

6.      Additional background information on the Debtors can be found in the Debtors'

*Emergency Motion For Order Authorizing Appointment of Russell F. Nelms and Richard S.*

*Schmidt As Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief* [Dkt No. 6].

**B.      Proposed Employment of Kyung S. Lee PLLC**

    *i. Scope of Employment*

7. Subject to the Court's approval, KSLPLLC will serve as general bankruptcy counsel in connection with the Debtors' Chapter 11 Cases, commencing on May 16, 2022.

    *ii. Necessity of Employment*

8. The Debtors believe that the assistance of counsel specializing in bankruptcy is necessary and appropriate to administer these Chapter 11 Cases. The Debtors cannot proceed in chapter 11 without counsel and would face extreme difficulty complying with the provisions of the Bankruptcy Code and successfully reorganizing their financial affairs for the benefit of their creditors without attorneys who focus their practice on corporate bankruptcy.

    *iii. Reasons for Selection*

9. The Debtors are retaining KSLPLLC because of the extensive experience of Mr. Lee, in all aspects of corporate bankruptcy and representing chapter 11 debtors in this district and because of his familiarity with the Debtors and the Chapter 11 Cases, having been the primary partner in charge of the cases while he was at PLR.

10. Mr. Lee is familiar with the Debtors' financial condition in connection with the preparation of the Debtors' Petitions, Schedules, and SOFAs. The Debtors expended substantial efforts prior to the Petition Date to developing a structure for a global resolution of litigation claims against the Debtors and affiliated co-defendants. Mr. Lee was intimately involved in that process.

11. Since the Petition Date, Mr. Lee has been involved in all aspects of the Debtors' Chapter 11 Cases, ranging from reporting to the Court at Status Conferences to negotiating with

counsel for the Texas and Connecticut Plaintiffs regarding their withdrawal of claims and dismissals of suits with prejudice.

12.     Any other firm would need to spend significant time and effort to become familiar with the Debtors, the Plan Support Agreement, the Debtors' liabilities, and related agreements that would delay administering the subchapter v bankruptcy cases.

13.     The Debtors therefore believe that KSLPLLC, and especially Mr. Lee, is well-qualified and uniquely able to represent the Debtors in these Chapter 11 Cases in an efficient and timely manner.

 iv.    *Proposed Compensation & Reimbursement*

14.     KSLPLLC intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), and any orders of this Court in these Chapter 11 Cases (the "Orders"), for all services performed and expenses incurred during its representation of the Debtors.

15.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, the Debtors propose to pay KSLPLLC as set out in the Engagement Agreement attached hereto as Exhibit B and as summarized in the following chart:

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| Other Associate Attorneys | $300 - $650 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

16.     The Debtors believe that KSLPLLC's agreed terms of reimbursement, compensation, and hourly rates are reasonable. KSLPLLC will notify the Debtors of any change in the hourly rates charged for services rendered while the Chapter 11 Cases are pending.

    *v.*     *Retainer*

17.     The Debtors did not engage KSLPLLC prior to the Petition Date.   Although KSLPLLC has requested a retainer, KSLPLLC has not received a retainer to secure the payment of KSLPLLC's fees in connection with the representation as of the time of filing the Application. KSLPLLC shall report to the Court if circumstances change, and a retainer is provided to the firm.

    *vi.*     *Connections*

18.     The Lee Declaration sets out KSLPLLC's connections with the Debtors, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtors' knowledge, KSLPLLC does not hold any connections other than those disclosed in the Lee Declaration.

19.     The Debtors believe that KSLPLLC neither holds nor represents a disqualifying interest that is adverse to the estate and is a "disinterested person."  If any new relevant facts or relationships are discovered, KSLPLLC will supplement its disclosure to the Court.

## **RELIEF REQUESTED**

20.     The Debtors request that the Court enter an order substantially in the form of the proposed order attached hereto (the "Proposed Order") authorizing the Debtors to retain KSLPLLC as general bankruptcy counsel, pursuant to the terms of the Engagement Agreement, commencing on May 16, 2022.

## **BASIS FOR RELIEF**

21.     Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes

trustees—and debtors-in-possession—to "employ one or more attorney's accountants, appraisers,

auctioneers, or other professional persons, that do not hold or represent an interest adverse to the

estate, and that are disinterested persons, to represent or assist the trustee in carrying out the

trustee's duties . . . ." Bankruptcy Code § 327(c) provides that "[i]n a case under chapter 7, 12, or

11 of this title, a person is not disqualified for employment under this section solely because of

such person's employment by or representation of a creditor, unless there is objection by another

creditor or the United States trustee, in which case the court shall disapprove such employment if

there is an actual conflict of interest."

22.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order

approving the employment of a professional. According to Bankruptcy Rule 2014, the application

must:

     (a)     Be filed by the trustee or committee and served on the United States Trustee
(except in cases under chapter 9 of the Bankruptcy Code);

     (b)     State the specific facts showing the necessity for the employment, the name
of the person to be employed, the reasons for the selection, the professional services to be
rendered, any proposed arrangement for compensation, and, to the best of the applicant's
knowledge, all of the person's connections with the debtor, creditors, any other party in
interest, their respective attorneys and accountants, the United States Trustee, or any person
employed in the office of the United States Trustee; and

     (c)     Be accompanied by a verified statement of the person to be employed
setting forth the person's connections with the debtor, creditors, any other party in interest,
their respective attorneys and accountants, the United States trustee, or any person
employed in the office of the United States trustee.

**A.      KSLPLLC Meets the Requirements of Bankruptcy Code § 327(a)**

23.     Based on the Lee Declaration, the Debtors submit that KSLPLLC neither holds nor

represents a disqualifying adverse interest and is a "disinterested person" as that term is defined in

§ 101(14) of the Bankruptcy Code.

24.     The term "disinterested person" is defined by the Bankruptcy Code. According to

Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a
> creditor, an equity security holder, or an insider; (B) is not and was
> not, within 2 years before the date of the filing of the petition, a
> director, officer, or employee of the debtor; and (C) does not have
> an interest materially adverse to the interest of the estate or of any
> class of creditors or equity security holders, by reason of any direct
> or indirect relationship to, connection with, or interest in, the debtor,
> or for any other reason.

25.     The Lee Declaration discloses no connections with the Debtors that would

disqualify KSLPLLC as a "disinterested person" and the Debtors are aware of no connections in

addition to those disclosed in the Lee Declaration.

**B.      This Application and the Lee Declaration Meet the Requirements of
Bankruptcy Rule 2014**

26.     This Application and the Lee Declaration meet the requirements as set out in

Bankruptcy Rule 2014. This Application is made by the Debtors and sets out the necessity for the

employment, the name of the person to be employed, the reasons for the selection, the professional

services to be rendered, the proposed arrangement for compensation. The Lee Declaration is a

verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that KSLPLLC has

with the Debtors, creditors, any other party in interest, their respective attorneys and accountants,

the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtors are not

aware of any other connections in addition to those disclosed in the Lee Declaration.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form of the Proposed Order approving the employment of KSLPLLC commencing on May 16, 2022 and grant any other relief that is just and proper.

Dated: May 19, 2022

Respectfully submitted,

W. Marc Schwartz
Chief Restructuring Officer and Authorized
Representative of InfoW, LC, IW Health,
LLC and Prison Planet TV, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2022, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on the parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Norman A Pattis, Cameron L. Atkinson
Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Ray Battaglia
Law Office of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX
rbattaglialaw@outlook.com

Attn: Avi Moshenberg, Nick Lawson, Matthew
Caldwell
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com
nick.lawson@mhllp.com
matthew.caldwell@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Richard S. Schmidt
615 Leopard, #635
Corpus Christi, TX 78401
rss@judgerss.com

Russell F. Nelms
115 Kay Lane
Westworth Village, TX 76114
rfargar@yahoo.com

Attn: W. Marc Schwartz
Schwartz Associates
712 Main Street, Ste. 1830
Houston, TX 77002
mschwartz@schwartzassociates.us

Attn: Matthew Okin
Okin Adams LLP
1113 Vine St., Ste. 240
Houston, TX 77002
mokin@okinadams.com

*/s/ Kyung S. Lee*
Kyung S. Lee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) |
| INFOW, LLC, *et al.*, | ) Case No. 22 - 60020 |
| | ) |
| Debtors.[2] | ) Chapter 11 (Subchapter V) |
| | ) |
| | ) Jointly Administered |
| | ) |

**DECLARATION OF KYUNG S. LEE IN SUPPORT OF**
**THE DEBTORS' APPLICATION TO EMPLOY**
**KYUNG S. LEE PLLC AS BANKRUPTCY COUNSEL**

I, Kyung S. Lee, declare under penalty of perjury as follows:

1.        I am an attorney at law duly admitted and in good standing to practice in the State

of Texas and New York, the  United States District Court for the Southern District of Texas, the

Fifth Circuit Court of Appeals and the United State Supreme Court.  As of May 16, 2022, I am a

sole member of the law firm Kyung S. Lee PLLC ("KSLPLLC"), located at 700 Milam Street,

Suite 1300, Houston, Texas 77002. My email address is klee@kslpllc.com.

2.        I am making this Declaration in support of the Debtors' Application to Employ

Kyung S. Lee PLLC as Bankruptcy Counsel, Commencing As of May 16, 2022 (the

"Application").  Unless otherwise indicated, capitalized terms used but not defined herein have the

meanings ascribed in the Application.

3.        Except as otherwise noted, all facts set forth in this Declaration are based upon my

personal knowledge, upon the client and matter records of KSLPLLC reviewed by me or derived

from information available to me that I believe to be true and correct.

---

[2]        The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax
identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a
Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO
Box 1819, Houston, TX 77251-1819.

**A.**     **Scope of Services**

4.      Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, KSLPLLC will serve as bankruptcy counsel to the Debtors in connection with the Chapter 11 Cases for the period commencing on May 16, 2022.  In connection with this representation, KSLPLLC will take all necessary and appropriate actions to administer the Debtors' Chapter 11 Cases.

**B.**     **Proposed Compensation**

5.      KSLPLLC will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtors.

6.      Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, KSLPLLC intends to request the allowance of its compensation as set out in the Engagement Agreement and as summarized in the following chart:

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| Other Associate Attorneys | $ 300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $ 50-$100 |

7.      These rates reflect the rates that KSLPLLC ordinarily charges clients in bankruptcy and non-bankruptcy matters and are less than or equal to the rates of similarly skilled and experienced attorneys who practice in this district on similar chapter 11 bankruptcy cases. KSLPLLC submits that these agreed terms of reimbursement, compensation, and hourly rates are

2

reasonable. KSLPLLC will notify the Debtors of any change in the hourly rates charged for services rendered.

### C.     Retainer & Prepetition Payments

8.     The Debtors did not engage KSLPLLC to advise the Debtors regarding filing bankruptcy prior to the Petition Date.

9.     KSLPLLC has requested a retainer, but as of the filing of the Application, a retainer has not been provided to the firm. If circumstances change, KSLPLLC shall notify the Court of receipt of any retainers and its disposition by KSLPLLC.

### D.     Disclosure of Connections

10.     KSLPLLC performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtors, creditors, any other party in interest, their respect attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas. I conducted a search of KSLPLLC files to determine using the list of parties listed in Schedule 1 hereto whether the firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the firm had not and did not presently represent any of the parties listed on Schedule 1.

11.     The results of the foregoing connections search process confirm that neither I, KSLPLLC, nor any of its employees or shareholders, to the best of my knowledge, have any disqualifying connections.  KSLPLLC does not hold any debt or equity securities in the Debtors, is not an insider of the Debtors, and was not a creditor of the Debtors on the Petition Date.

12.     The only connection to any of the parties on Schedule 1 is by virtue of having represented the three Debtors while a partner at PLR.

3

13.     As to Marc Schwartz, the Chief Restructuring Officer, I, as a partner in a previous firm, represented a party adverse to Mr. Schwartz, in a bankruptcy case where Mr. Schwartz acted as the chapter 7 trustee. That cases conclude over 10 years ago.

14.     More recently, I have acted as special fee counsel for Mr. Schwartz when he served as a state court receiver. My representation of Mr. Schwartz as a receiver on that matter concluded in 2021.

15.     I have also worked with Mr. Schwartz as the Chief Restructuring Officer of Consolidated Wealth Management, a debtor before Judge Jones. I have not worked with him in that capacity since my departure from PLR on May 15, 2022.

16.     I may have represented in the last 40 years of my practice a party or parties related to a creditor in the Chapter 11 Cases. If such connections exist, they would be on matters wholly unrelated to the service for which the Debtors seeks to engage KSLPLLC.

**E.      Affirmative Statement of Disinterestedness**

17.     Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I am able to ascertain, KSLPLLC is a "disinterested person" within the meaning of Bankruptcy Code § 101(14).  KSLPLLC is not a creditor, an equity security holder, or an insider of the Debtors; KSLPLLC is not and was not within 2 years before the Petition Date a director, officer, or employee of the Debtors; and KSLPLLC does not have any interest materially adverse to the interests of the Debtors' bankruptcy estates or any class of creditors or equity security holders.

**F.      Bankruptcy Rule 2016(b) Disclosures**

18.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, KSLPLLC has not shared or agreed to share (a) any of its compensation from the representation of the Debtors with

4

any other persons or (b) any compensation any other persons have received, may have received, or will receive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 19, 2022.            By: /s/*Kyung S. Lee*
                                          Kyung S. Lee

5

004113

## <u>SCHEDULE 1 TO LEE DECLARATION</u>

### SEARCHED PARTIES

<u>Debtors & Professionals</u>

> InfoWars, LLC
> InfoWars Health, LLC
> Prison Planet TV, LLC
> Free Speech Systems LLC
> Russell Nelms
> Richard Schmidt

<u>Debtors' Equity</u>

> Alex Jones

<u>Creditors & Parties in Interest</u>

> Leonard Pozner
> Veronique De La Roase
> Erica Lafferty
> Neil Heslin
> Scarlet Lewis

2



**Kyung S. Lee**
Attorney at Law

Pennzoil Place
700 Milam St.
Suite 1300
Houston, TX 77002

# Kyung S. Lee PLLC

klee@KSLPLLC.com | Direct: 713-301-4751

May 16, 2022

## PRIVILEGED AND CONFIDENTIAL

*Via email mschwartz@schwartzassociates.us*

W. Marc Schwartz
Chief Restructuring Officer of
InfoW, LLC
c/o SchwartzAssociates
712 Main Street-Suite 1830
Houston, Texas 77002

W. Marc Schwartz
Chief Restructuring Officer of
IWHealth, LLC
c/o SchwartzAssociates
712 Main Street-Suite 1830
Houston, Texas 77002

W. Marc Schwartz
Chief Restructuring Officer of
Prison Planet TV, LLC
c/o SchwartzAssociates
712 Main Street-Suite 1830
Houston, Texas 77002

Re: Attorney Engagement Letter by InfoW, LLC, Debtor ("Infowars") IWHealth LLC, Debtor ("Health") and Prison Planet TV, LLC, Debtor ("Planet")(collectively "you" or "Clients")

Dear Mr. Schwartz:

Thank you for selecting Kyung S. Lee PLLC ("KSLPLLC" or the "Firm") as legal counsel for the above referenced entities. We appreciate the trust and confidence that your decision places in us and we look forward to building a close and mutually rewarding relationship.

The purpose of this letter and the attached Terms of Retention (together, the "Engagement Letter") is to set forth the terms of legal representation of the above referenced Clients.

004115

W. Marc Schwartz
May 16, 2022
Page 2 of 11

*Scope of Engagement.* Subject to Bankruptcy Court approval, KSLPLLC shall serve as attorney and legal counsel for the Clients in connection with the following (the "Matter"): Serve as general bankruptcy counsel for the Debtors, effective as of May 16, 2022.

*Legal Fees and Expenses.* For the work performed by KSLPLLC for the Clients, KSLPLLC shall be entitled to a fee in the amount equal to the time expended by each attorney, paralegal and other staff member multiplied by the hourly rates set forth in the attached Hourly Billing Rate Schedule. The Clients are responsible for reimbursing the Firm for expenses incurred on behalf of the Clients pursuant to the attached Client Expense Policy.

*Retainer.* The Firm has not requested a retainer from the Client in connection with this Matter. The Firm reserves the right to request a retainer and to have the retainer replenished by the Client if the Firm anticipates that there is a risk in collecting future attorney's fees and/or reimbursement of costs.

*Invoices/Fee Statements.* The Firm's invoices will be issued to you during the month, if not more often, following the month that services are provided. The invoice will include a fee statement providing the details of the legal services performed, and the expenses incurred, for the Clients. The invoices shall be informational only and shall be paid upon allowance by a Bankruptcy Court order.

*Conflicts.* The Firm has conducted an initial conflicts search based on information you provided. The Firm did not identify any connection that would prevent the Firm from representing you in this Matter. KSLPLLC may conduct additional conflicts searches following the commencement of this engagement. If the Firm identifies any conflict, then the Firm shall immediately notify the Clients and the Firm and the Clients shall take further actions as may reasonably be required to satisfy the Firm's ethical obligations and duties to the Clients, all as more particularly described in the Terms of Retention.

*General Prospective Waiver and Informed Consent.* The Firm represents many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future clients will have disputes or transactions with you. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any business or transactional matter that is not substantially related to our work for you, even if the interests of such clients in those other matters are directly adverse to you. We are not aware of any such matters at the present time. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage. *You are not giving the Firm a prospective waiver as to conflicting representation related to a litigation matter against you.* We encourage you to seek independent counsel regarding the import of the potential conflicts and prospective waiver discussed and this acknowledgment, waiver and informed consent. We emphasize that you remain completely free to seek independent counsel at any time even if you decide to sign this Engagement Letter agreeing to its terms and the Terms of Retention.

W. Marc Schwartz
May 16, 2022
Page 3 of 11

Please call me with any questions you have after you complete your review of this Engagement Letter including the Terms of Retention. If the Engagement Letter is acceptable to you in this form, please indicate so by signing, dating, and returning it to me and funding the Retainer.

Very truly yours,

*Kyung S. Lee*

Kyung S. Lee
Kyung S. Lee PLLC

ACCEPTED AND AGREED:

InfoW, LLC
*W. Marc Schwartz*

_____
Chief Restructuring Officer of InfoW, LLC
*May 18, 2022*

_____
Dated

IWHealth, LLC
*W. Marc Schwartz*

_____
Chief Restructuring Officer of IWHealth, LLC
*May 18, 2022*

_____
Dated

Prison Planet TV, LLC
*W. Marc Schwartz*

_____
Chief Restructuring Officer of Prison Planet TV, LLC
*May 18, 2022*

_____
Dated

W. Marc Schwartz
May 16, 2022
Page 4 of 11

## ADDENDUM TO ENGAGEMENT LETTER

The appropriate Client point of contact to address payment status:

Name:
Title:
Phone:
Work Email:


Invoices are to be delivered as follows:

☐ By email:        _____

   Email:          _____

☐ By regular mail:

Address:       _____

               _____

               _____

004118

W. Marc Schwartz
May 16, 2022
Page 5 of 11

<div align="center">TERMS OF RETENTION</div>

These Terms of Retention are part of the KSLPLLC Engagement Letter. Because they are an integral part of our agreement to provide legal services, we ask that you review this document carefully. If you have any questions after reading it, please contact us promptly.

*Who Will Provide Legal Services?* In most cases, one attorney will be your principal contact. From time to time, that attorney may delegate parts of your work to other attorneys or to legal assistants or non-legal professionals in the Firm. We do this to involve those with special knowledge or experience in an area and to provide services to you in a timely, efficient, and cost-effective manner. I will be the primary attorney from our Firm who will be representing the Clients.

*Scope of the Representation.* As a Firm, we undertake to provide representation and advice on the legal matters for which we are engaged, and it is important that we both have a clear understanding of the legal services that the Firm has agreed to provide. In our Engagement Letter with you, we specify the matter in which we will provide representation and the scope of the services we will provide. Please note that we do not provide legal advice regarding any tax issues or effects nor are we responsible for notifying any insurance carrier of any lawsuit. If there are any questions about the terms of engagement, including the scope of the representation that we are to provide in the matter, please raise those questions promptly with your principal contact at the Firm.

*Identity of Clients.* It is our policy to represent only the person or entity identified in our Engagement Letter and not any affiliates. For example, unless otherwise specifically stated in our Engagement Letter, if you are a business organization (corporation, partnership, LLC, etc.), our representation does not include any parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies); if you are an individual, our representation does not include your employer, partners, spouse, siblings, or other family members.

*Your Cooperation.* To enable us to provide effective representation, you agree to: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us.

*Outcomes.* We cannot and do not guarantee the outcome of any matter. Any expression of our professional judgment regarding your matter or the potential outcome is, of course, limited by our knowledge of the facts and based on the law at the time of expression. It is also subject to any unknown or uncertain factors or conditions beyond our control. Any expressions on our part concerning the outcome of the representation, or any other legal matters, are based on our professional judgment and are not guarantees.

*Conflicts of Interest.* We attempt to identify actual and potential conflicts at the outset of any engagement. In some instances, the applicable rules of professional conduct may limit our ability to represent clients with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from representing another. In other situations, we may be permitted to represent a client only if both or all

W. Marc Schwartz
May 16, 2022
Page 6 of 11

clients consent to that representation. If a controversy unrelated to the subject matter of the representation develops between you and any other client of the Firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either you or the other client in the unrelated matter. Unfortunately, sometimes conflicts arise or become apparent after work begins on an engagement. If this happens, we will do our best to address and resolve the situation in the manner that best serves the interests of all of our affected clients. Rules concerning conflicts of interest vary with the jurisdiction. In order to avoid any uncertainty, the Texas Disciplinary Rules of Professional Conduct will be applicable to the representation.

Texas law requires that we inform clients of the existence of a grievance process. The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of Chief Disciplinary Counsel will provide you with information about how to file a complaint. Please call 1-800-932-1900 for more information. Also, the Supreme Court of Texas has promulgated The Texas Lawyer's Creed - A Mandate for Professionalism, which states that an attorney should inform a client of the creed's contents when undertaking a representation. We will send you a copy of the creed upon request. It is also available online at https://www.texasbar.com.

*Fees.* The basis for determining our fee for legal services is set forth in the Engagement Letter itself. If you are unclear about the basis for determining your fee, please contact the attorney responsible for your representation. Clients frequently ask us to estimate the fees and other charges they are likely to incur in connection with a particular matter. We are pleased to respond to such requests, whenever possible, with an estimate based upon our professional judgment. This estimate always carries the understanding that, unless we agree otherwise in writing, it does not represent a maximum, minimum, or fixed-fee quotation.

*Expenses.* Our Firm may incur and pay a variety of charges on your behalf in connection with the engagement. Whenever we incur such charges on your behalf, we will bill them to you as part of your invoice in accordance with the attached Client Expense Policy.

*Delinquent Account and Withdrawal of Engagement.* We will bill you on a periodic basis, for fees and other charges, as described in the Engagement Letter. Should your account become delinquent and satisfactory payment terms are not arranged, as permitted under the rules regulating our profession, we will be required to withdraw from the representation. In most cases, and except as prohibited by ethical considerations, if your account becomes more than 30 days delinquent, we will cease representation until we can arrive at a mutually satisfactory arrangement for payment of the delinquent account and the resumption of services. At such time we may charge interest on the outstanding amount due of one and a half percent per month or the maximum amount allowed under applicable law, whichever is less.

*Additional Retainer.* If the representation will require a concentrated period of activity, such as a trial, arbitration, or hearing, we reserve the right to require the payment of all amounts then owing to us and the payment to us of an additional retainer for the fees and expenses we estimate will be incurred in preparing for and completing the trial, arbitration, or hearing, as well as arbitration fees likely to be assessed. If you fail to timely pay any   retainer deposit requested, we will have the right to cease performing further work for you and withdraw from the representation.

W. Marc Schwartz
May 16, 2022
Page 7 of 11

*Obligation to Pay Fees and Expenses.* Unless your Engagement Letter expressly provides that a third-party is agreeing to pay your attorney's fees and such third-party has agreed in writing, regardless of whether you are insured to cover the particular risk or you are pursuing parties for recovery of attorneys' fees and other charges, it remains your obligation to pay all amounts due to us within the time periods reflected in the Engagement Letter.

*Retention of Complementary Counsel.* From time to time in the course of our engagement it may become prudent to engage additional counsel to work with and complement our representation of you. That complementary representation will only be done with your prior written consent and on terms and conditions which you approve. The engagement of complementary counsel may be done directly with you or through our firm, depending on the nature and extent of the representation involved.

*Conclusion of Engagement.* Because our Firm has been engaged to provide legal services in connection with the representation in the matter as specifically defined in our Engagement Letter, the attorney-client relationship terminates upon our completion of our services related to the representation in the matter. After completion of the representation, upon written notification by the Firm that the matter is terminated, changes may occur in the applicable laws or regulations that could affect your future rights and liabilities in regard to the matter. Unless we are actually engaged after the completion of the representation to provide additional legal services, the Firm has no continuing obligation to give advice with respect to any future legal developments that may relate to the matter. If you later retain us to perform further or additional services, our attorney-client relationship will be subject to the terms of engagement agreed to at that time; in the absence of any specific agreement, these Additional Terms of Engagement shall apply to the further or additional representation.

*Termination.* We look forward to the opportunity to complete our representation of you on the specified matter. You may, however, terminate our representation at any time, with or without cause, by notifying us in writing. We will return your papers and other property to you promptly upon receipt of your request for those materials unless they are appropriately subject to a lien. You agree that we will own and retain our own files pertaining to the matter or case, including, for example, Firm administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal attorney's work product such as drafts, notes, internal memoranda, and legal and factual research including investigative reports, prepared by or for the internal use of attorneys. Your termination of our services will not affect your responsibility for payment of legal services rendered and other charges incurred before termination and in connection with an orderly transition of the matter.

*Document Retention.* You acknowledge and agree that the Firm may maintain all documents related to your matter digitally. The Firm is not required to maintain physical copies of any documents. At the conclusion of our representation of you, it is our firm's policy to return to you any physical documents to you. We will provide you with copies of any other documents you specifically request (such as copies of depositions, court documents, etc.), and you agree to pay for the associated copying costs and any professional time incurred in identifying any such documents you request. You agree that our Firm may elect to keep at its own expense, copies of any documents related to this matter or otherwise returned to you. Anytime following seven (7) years after the conclusion of our representation of you, the Firm may destroy or delete any files related to your engagement.

W. Marc Schwartz
May 16, 2022
Page 8 of 11

*Dispute Resolution.* The Engagement Letter is being entered and is to be performed within the State of Texas. The Engagement Letter shall be interpreted in accordance with Texas law (without application of choice of law principles). All parties to the Engagement Letter agree that Houston, Harris County, Texas is the only permitted location (the venue) for the resolution of all disputes that arise under or relate in any way to the Engagement Letter or to any of the services provided by our Firm.

*Binding Arbitration.* Any dispute arising out of or relating to this agreement, our interactions leading to it, or our performance of the agreement or of the representation of you shall be resolved through binding arbitration in Harris County, Texas. First, sixty (60) days before filing any arbitration proceeding, the party requesting relief must demand and attend mandatory mediation before a mutually acceptable mediator to attempt to resolve any dispute. In the event the parties are unable to resolve such dispute, the affected party shall initiate an arbitration proceeding utilizing the rules of (but not employing) the American Arbitration Association ("AAA") for the arbitration of complex commercial cases. In any dispute of less than $250,000, the parties shall jointly appoint a single arbitrator. In any dispute of a greater amount, each party shall appoint his/her or its own party arbitrator, and these two-party arbitrators shall in turn appoint a third, neutral arbitrator. All party arbitrators' conduct and tests for eligibility shall be governed by AAA rules of disinterest. The time limits hereunder shall not apply in the event emergency injunctive relief is required, but only to the extent of such emergency injunctive relief itself. The decision by the arbitration panel will be final and binding.

You should know that for your agreement to arbitrate to be effective under Texas law, you as the client must receive sufficient information about the differences between litigation and arbitration to permit you to make an informed decision about whether to agree to binding arbitration. Under the Texas Rules of Disciplinary Procedure, we can explain the significant advantages and disadvantages of binding arbitration to the extent we reasonably believe is necessary for an informed decision by you. The scope of the explanation will depend on the sophistication, education and experience of the client.

In the case of a highly sophisticated client such as a large business entity that frequently employs outside lawyers, no explanation at all may be necessary. In situations involving clients who are individuals or small businesses, we normally advise the client of the following possible advantages and disadvantages of arbitration as compared to a judicial resolution of disputes: (1) the cost and time savings frequently found in arbitration, (2) the waiver of significant rights, such as the right to a jury trial, (3) the possible reduced level of discovery, (4) the relaxed application of the rules of evidence, and (5) the loss of the right to a judicial appeal because arbitration decisions can be challenged only on very limited grounds.

Additional factors you as the client should consider are: (1) the privacy of the arbitration process compared to a public trial; (2) the method for selecting arbitrators; and (3) the obligation, if any, of the client to pay some or all of the fees and costs of arbitration, if those expenses could be substantial. Although the disclosure can vary from client to client, depending on the circumstances, the overriding concern is that we should provide information necessary for the client to make an informed decision.

W. Marc Schwartz
May 16, 2022
Page 9 of 11

*By returning the executed Engagement Letter, you acknowledge that you have been provided ample opportunity to have counsel explain to you the advantages and disadvantages of binding arbitration to make an informed decision about agreeing to the provision.*

*Modifications.* The Engagement Letter and these Additional Terms of Engagement reflect our entire agreement on the terms of this engagement. These written terms of engagement are not subject to any oral agreements or understandings, and any change in those terms can only be made in writing signed by you and the Firm.

*Joint Representation Agreement and Waiver.* The Clients have requested that KSLPLLC represent the Clients jointly for both strategic and cost reasons. Because joint representations involve unique issues of conflicts of interest and confidentiality, we wanted to clarify the terms of our joint representation as set forth herein. The Firm is willing to undertake this joint representation in the Matter so long as the following terms and conditions are understood and agreed to by each Client. Each Client waives any objection to, or any possible conflict in, our joint representation of each other Client in the Matter, and each consent to our joint representation of each other Client in the Matter. Each Client acknowledges and agree that communications between the Firm and any or all of you concerning the Matter will be treated by us as confidential and not disclosed to anyone other than the Clients without your consent or as otherwise provided by law. The Clients further acknowledge and agree that whatever communications or information the Firm receives from any one or more of you concerning the Matter will be shared with each of you as we deem appropriate. If we receive material information about any one of you from one of the others that we believe any other Client should have to make decisions regarding your interests, we will give you that information. The Clients acknowledge and agree that there exists the possibility that a conflict of interest may arise during the multiple representation by the Firm.

The Clients acknowledge and agree that in the event a conflict of interest arises regarding the joint representation by the Firm, then we may withdraw from the representation of the Client who has created the conflict (the "conflicted Client") and may continue to represent the other Client(s). In such event, the conflicted Client understands that he/she/it would be responsible for obtaining his/her/its own legal representation and for the cost of that representation. The Clients acknowledge and agree that if the Firm withdraws as one or more of their attorneys, we may continue to represent the other remaining Clients, even if such representation is contrary to the interests of the conflicted Client. Moreover, in the unlikely event that you commence litigation against one another regarding the subject of the joint representation, you each understand that our advice to you and our prior communications with each of you during the joint representation may not be shielded from disclosure in such litigation. Finally, in the event a conflict of interest arises regarding the multiple representations by the Firm, a court may nevertheless disqualify us from continuing our representation of any of the Clients, notwithstanding the terms of this Engagement Letter. KSLPLLC is advising you of these possibilities solely to comply with our ethical requirements and are not suggesting that you may have claims against one another.

W. Marc Schwartz
May 16, 2022
Page 10 of 11

### Hourly Billing Rate Schedule

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50 - $100 |

W. Marc Schwartz
May 16, 2022
Page 11 of 11

<div align="center">Client Expense Policy</div>

In connection with the representation of a client, the Firm may incur expenses. Unless the Engagement Letter expressly provides to the contrary, the Firm's and the Client's rights and responsibilities related to such expenses are as follows:

*Legal Research and Related Services.* The Firm subscribes to certain online research services. These subscription-based services are part of the Firm's overhead and not charged to the Client. Certain services are charged on a per-transaction including, without limitation, the following examples: UCC searches, lien searches, title searches and other record searches. The Client is responsible for these pre-transaction charges. The Firm will advance the costs for all such services and submit bills to you for reimbursement. The Firm may seek prior approval from you if the anticipated aggregate monthly expense for such services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Document Management and eDiscovery Services.* The Firm subscribes to advanced document management software systems. These subscription-based systems are part of the Firm's overhead and not charged to the Client. The Client is responsible for eDiscovery services. eDiscovery service providers typically charge per gigabyte of information stored. Additional services from the outside vendor may be required other than storage of the information and typically these are separately charged. If the Firm uses an eDiscovery service during the representation, then the Firm will seek the Client's prior approval before incurring expenses for such services. Rather than billing these expenses through the Firm, the Firm reserves the right to have the Client contract directly with the outside vendor to pay for these expenses. For the avoidance of doubt, the Client is responsible to the Firm for the payment of all fees and expenses incident to the firm's review and processing of discovery materials that are not handled by an outside vendor.

*Printing, Shipping, Postage and Related Expenses.* For all printing, shipping, postage, and related services the Firm may handle them in house or use an outside vendor. The Client is responsible for all such printing, shipping, postage, and related services at costs or the prevailing market rate if handled in house. The Firm may seek prior approval from the Client if the anticipated aggregate monthly expense for printing, shipping, postage, and related services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Travel Expenses.* The Client will reimburse the Firm for expenses incurred in connection with out-of-town travel, but only for coach class travel and, where appropriate, the cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances. The Firm will advance all such travel expenses and submit bills to you for reimbursement which will be included in the regular invoices to the Client. The attorney handling your matter will confer with you prior to traveling for your matter. Consistent with local bankruptcy rules, the Firm bills travel at ½ billable hourly rate when the lawyer is not working on the Client matter while travelling. The Firm will endeavor to locate a substitute service agent.

*Court Costs.* If requested by the Firm, the Client will advance court filing fees and all similar expenses prior to the Firm incurring such expenses. Any such expenses incurred by the Firm, will be included in the Firm's invoices to the Client for payment.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC, *et al.*, | ) | Case No. 22 - 60020 |
| | ) | |
| Debtors.[1] | ) | Chapter 11 (Subchapter V) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |

## ORDER APPROVING DEBTORS' APPLICATION TO EMPLOY KYUNG S. LEE PLLC AS BANKRUPTCY COUNSEL COMMNECING ON MAY 16, 2022 [RELATES TO DKT. NO. ___]

Upon the application (the "Application")[2] filed by the Debtors to employ Kyung S. Lee

PLLC ("KSLPLLC") as bankruptcy counsel commencing on May 16, 2022, pursuant to

Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in

the Application and all exhibits and attachments to the Application; and upon the Court's finding

that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core

proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; (iv) the Application and the Lee Declaration are in full compliance with all

applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and

Orders and procedures of this Court; (v) KSLPLLC does not represent an interest adverse to the

Debtors' estates with respect to the matters upon which it is to be engaged and is a "disinterested

person" within the meaning of that term under § 101(14) of the Bankruptcy Code; (vi) KSLPLLC

---

[1]    The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

[2]    Capitalized terms not defined herein have the meaning set forth in the Application.

is qualified to represent the Debtors' estates under § 327 of the Bankruptcy Code; (vii) the terms of KSLPLLC's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interests of the Debtors' estates; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at any hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtors are authorized to employ and retain KSLPLLC  commencing on May 16, 2022, as bankruptcy counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.      KSLPLLC is authorized to perform any and all legal services for the Debtors that are necessary or appropriate in connection with the Chapter 11 Cases.

3.      KSLPLLC shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Cases shall be paid after further application to

2

and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

5.      This order shall be immediately effective and enforceable upon entry.

6.      This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

7.      The Debtors and KSLPLLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

8.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - 60020 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - 60021 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - 60022 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**DEBTORS' EMERGENCY APPLICATION FOR INTERIM AND FINAL ORDERS (A)
AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF
RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF
SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF
RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED AND IF THE COURT CONSIDERS THIS MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN TWENTY-ONE (21) DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF, OR IF YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED ON OR BEFORE **APRIL 22, 2022**.

InfoW, LLC ("InfoW"), IWHealth, LLC ("IW Health"), and Prison Planet TV, LLC ("Prison Planet TV", and together with InfoW and IW Health, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby move for entry of an order substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of W. Marc Schwartz (the "Proposed CRO") of Schwartz Associates, LLC ("SALLC") as their Chief Restructuring Officer (the "Application") pursuant to that certain engagement letter agreement by and between the Debtors and SALLC, a copy of which is attached hereto as Exhibit A (the "Engagement Agreement"). In support of the Application, the Debtors submit the Declaration of W. Marc Schwartz attached hereto as Exhibit B (the "Schwartz Declaration") and respectfully represent as follows:

<center>2</center>

## REQUEST FOR EMERGENCY HEARING

1.      The Debtors seek emergency consideration of this Application on or before **April 22, 2022**, or as soon after as the Court's schedule will allow. Appointment of a chief restructuring office to perform the services set forth in the Engagement Agreement is necessary for the Debtors to adequately perform their duties as debtors-in-possession, including preparation of schedules of assets and liabilities, compliance with reporting requirements, and preparation of financial information and testimony.

## JURISDICTION

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

3.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2016-1 of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

4.      On April 18, 2022 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

004131

6.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

**B. The Debtors**

7.      The Debtors are holding companies for certain intellectual property assets. Debtor InfoW, owns copyrights and domain names related to "Infowars.com." Debtor IWHealth owns cash flow from royalties and/or an agreement with Youngevity. Debtor Prison Planet TV owns copyrights and domain names related to prisonplanet.tv.

8.       "Infowars"—a conspiracy-oriented website and media company—is operated by Free Speech Systems, LLC ("FSS"), which does business under a registered trademark for that name.  InfoW and Prison Planet TV license their intellectual property and domain names to FSS for use in its business but the Debtors do not produce or have any control over the content of Infowars. FSS maintains and operates the website https://www.infowars.com/.[1]

9.      Alex E. Jones ("Jones") owns one hundred percent (100%) of the equity in FSS. Prior to the Petition Date, Jones also owned one hundred percent (100%) of the equity in InfoW, IWHealth and Prison Planet TV. He assigned these equity interests to the 2022 Litigation Settlement Trust (the "Litigation Settlement Trust") before the Petition Date.

**C. Pending Litigation Against the Debtors**

10.      The Debtors' financial distress stems primarily from statements of Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Various parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

---

[1] The Debtors have been advised that all the assets of FSS serve as collateral to repay obligations to PQPR Holdings.

004132

11.    The relatives of the Sandy Hook victims and certain other parties (the "Sandy Hook Plaintiffs") assert, among other things, that Jones and other employees of FSS made defamatory statements and inflicted emotional distress. In 2018, the Sandy Hook Plaintiffs brought actions in Texas and Connecticut (collectively, the "Sandy Hook Lawsuits") against Jones, FSS, and certain of the Debtors. The crux of the allegations in the Sandy Hook Lawsuits is that Jones and FSS employees damaged the Sandy Hook Plaintiffs by saying or implying that the Sandy Hook shooting did not occur, and that the entire incident was a "false flag" hoax.

12.    The Debtors are also defendants in other pending litigation unrelated to the events at Sandy Hook Elementary School:[2]

- *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605, pending before the 459th District Court for Travis County, Texas—This case involves an article authored by an FSS employee about the shooter at Marjory Stoneman Douglas High School in Parkland, Florida. Iterations of the article included a photograph of the plaintiff, even though the plaintiff was not involved with the shooting or even in Florida at the time.

- *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, pending before the 200th District Court for Travis County, Texas—This lawsuit was brought by the plaintiffs in the other Texas lawsuits under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). The allegations are that Jones diverted his assets to companies owned by insiders like his parents, his children, and himself. The Plaintiffs seek judgment allowing them to take possession and execute on the assets.

- *Larry Klayman v Infowars, LLC, et al.*, Case No. 20-61912, before the U.S. District Court for the Southern District of Florida, Fort Lauderdale Division—The plaintiff in this case brought claims against InfoWars, LLC, Free Speech Systems, LLC, Alex Jones, David Jones, and Owen Shroyer for defamation, Florida Deceptive and Unfair Trade Practices Act, tortious interference, and violation of the Lanham Act for publishing disparaging statements about the plaintiff. On April 14, 2022, the District Court entered a take-nothing judgment in favor of the InfoW and the other defendants. The plaintiff has appealed to the Eleventh Circuit Court of Appeals.

---

[2] On April 11, 2022, the U.S. District Court for the Western District of Virginia entered a Stipulation and Order [Dkt. No. 504], resolving the defamation action in Brennan M. Gilmore v Alexander E. Jones, et. al., Case No. 3:18-cv-00017-NKM-JCH, resolving that litigation in exchange for a $50,000 settlement to the plaintiff.

004133

13.     Jones, FSS, and the Debtors have spent more than $10.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits. Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones, FSS, and the Debtors failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default.[3] No court has yet to quantify the amount of the damages.

14.     The pending litigation presents a classic "race to the courthouse." The Texas court is scheduled to be the first damages case to go to trial and is set to commence with jury selection on April 25, 2022. The damages trial in the Texas actions is scheduled for months before the damages will be determined in the actions pending in Connecticut.

15.     Given the limited cash on hand available to the Debtors, Jones, and FSS, there is a substantial likelihood that efforts to collect on a judgment of the Texas actions would result in leaving nothing left for the Connecticut Sandy Hook Plaintiffs or other creditors. Indeed, prior to even liquidating their claims, the Texas plaintiffs sought execution by initiating the TUFTA litigation.

**D.  2022 Litigation Settlement Trust**

16.     To address the Sandy Hook Lawsuits and other litigation, and preserve assets for equal distribution to all creditors, the Debtors, Jones, and FSS have created the 2022 Litigation Settlement Trust (the "Litigation Settlement Trust") to provide a mechanism for the payment in full of the litigation claims.

17.     The Litigation Settlement Trust removes control of the Debtors and settlement funds from Jones and ensures that any settlement of or judgment in the Sandy Hook Lawsuits and

---

[3] The applicable Debtors do not intend to challenge any determination of liability entered by the respective state courts unless the claimant elects to liquidate their claims through continuation of the litigation.

004134

other litigation will be paid according to the terms of the Declaration of Trust and any plan of reorganization in these Chapter 11 Cases. The Litigation Trust has been initially funded pursuant to the funding agreement attached to the Declaration of Trust and the Plan Support Agreement, as may be amended (the "PSA"). The "Initial Trust Funding" of $725,000 for administration of these Chapter 11 Cases has been paid to the interim trustee or the Debtors' professionals from exempt personal assets of Jones. Upon confirmation of a plan, the Litigation Trust is expected to be funded with additional funds, including $2,000,000 in cash on the effective date.

18. Contemporaneously with this Application, the Debtors have requested an order authorizing the appointment of former bankruptcy judges Russell F. Nelms and Richard S. Schmidt to serve as trustees of the Litigation Settlement Trust (the "Litigation Settlement Trustees").

### E. Proposed Employment of Schwartz as Chief Restructuring Officer

*i. Scope of Employment*

19. The Debtors seek to engage the Proposed CRO as chief restructuring officer to advise and lead the day-to-day restructuring efforts of the Debtors, pursuant to the Engagement Agreement. The Debtors contemplate that the Proposed CRO will perform some or all the following tasks:

a. Make business and debt restructuring decisions, including as it relates to business strategy(ies) and other key elements of the business;

b. Manage due diligence requests and other items requested by various constituents as part of the restructuring process;

c. Prepare cash flow forecasts and related financial and business models;

d. Identify and implement short and long-term liquidity initiatives;

e. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the Court, as well as provide necessary testimony before the Court on matters within CRO's areas of expertise;

7

f.   Review inventory marketability and provide monetization alternatives;

g.   Make operational decisions with advice of appropriate governance body;

h.   Implement cost containment measures;

i.   Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest and submit proposals for payment to Third Party Funding Contributors, trustees and the Court;

j.   Maximize value of the Debtors;

k.   Oversee all business decisions of Debtors, as necessary or required, utilizing CRO's business judgment.

l.   Be authorized, during normal business hours, to (a) review and analyze the books of account, bank accounts, accounting source documents and financial statements of FSS and Jones including, but not limited to, QuickBooks accounts, bank statements and included documents, invoices, credit card processing reports, other documents reflecting cash receipts, invoices received and issued, and other accounting source documents, (b) have read-only access to bank accounts used by FSS Jones in the conduct of their businesses, and (c) have access to the personnel, managers, and/or financial professionals of FSS and Jones to interview and request additional documents or information.

m.   Execute all documents and take all other acts necessary to effectuate the restructuring of the Debtors, including in any case before the Court, subject to approval of the trustees of the Litigation Settlement Trustees.

20.   The Proposed CRO will be subject to the oversight and direction of the Litigation Settlement Trustees, who will have full governance authority over the Debtors.

21.   Additionally, the Debtors seek authority for other staff of SALLC to perform services required to assist the Proposed CRO within the scope of this engagement.

ii.   _Necessity of Employment_

22.   The Debtors believe that the retention and employment of the Proposed CRO is necessary and appropriate to administer these Chapter 11 Cases and ultimately prepare and obtain confirmation of a plan of reorganization. While the Litigation Settlement Trustees will have oversight of the Proposed CRO and direct the overall direction of these Chapter 11 Cases, the

004136

Debtors need a professional with financial expertise to serve as an officer of the Debtors to perform the services indicated in the Engagement Agreement.

23.     The litigation between the Sandy Hook Plaintiffs and the defendants has been acrimonious, littered with sanctions, and rages on unabated year after year. For example, when Jones filed an offer of compromise pursuant to Connecticut procedure, the Connecticut plaintiffs responded that the "so-called offer is a transparent and desperate attempt by Alex Jones to escape a public reckoning under oath with his deceitful, profit-driven campaign against the plaintiffs and the memory of their loved ones lost at Sandy Hook." There is no reasonable prospect of a resolution which allows for a fair distribution of recoveries to all affected parties.

24.     Some of the defendants have faced and been hit with "death penalty" discovery sanctions. Whether these problems were the result of bad faith or merely the lack of someone with the adequate experience and ability,[4] a qualified financial professional answering to independent fiduciaries to wit, the Litigation Settlement Trustees, is necessary for any negotiations that will result in a consensual plan that provides for payment in full to creditors.

 iii.    *Reasons for Selection*

25.     The Debtors believe that the Proposed CRO is well qualified to provide management services that will assist and enhance the Debtors' efforts to maximize value to their creditors.

26.     Marc Schwartz is a licensed CPA with more than 40 years' experience providing expert witness and financial restructuring services. He frequently serves as a chief restructuring officer, and as a federal and state court appointed receiver, in bankruptcy and non-bankruptcy

---

[4] For the avoidance of doubt, the Debtors reserve their rights to contest the sanctions on appeal absent consensual resolution.

004137

proceedings. Mr. Schwartz is one of approximately 200 full members of the National Association of Federal Equity Receivers. He understands how to be a fiduciary.

     *iv.*    <u>*Proposed Compensation & Reimbursement*</u>

27.    The Debtor intends to file a motion to establish interim compensation procedures in this case. The CRO proposes to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including sections 330 and 331, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim compensation order entered in these Chapter 11 Cases.

28.    Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, the Debtors propose to pay on an hourly basis the Proposed CRO and SALLC from funds of the Litigation Settlement Trust, as set out in the Engagement Agreement and summarized in the following chart:

| BILLER | RATE |
|---|---|
| W. Marc Schwartz (Proposed CRO) | $690.00 per hour |
| M. Christian Schwartz | $470.00 per hour |
| Managers | $350.00 per hour |
| Associates | $280.00 per hour |
| Analysts | $210.00 per hour |
| Administrative Staff | $95.00 per hour |

29.    Additionally, the Engagement Agreement provides that the Debtors shall be responsible for the reasonable and necessary documented out-of-pocket costs and expenses incurred by Proposed CRO and SALLC in connection with the engagement. SALLC will submit detailed documentation of all expenses incurred in connection with requests for reimbursement.

30.    The Debtors believe that the agreed terms of reimbursement, compensation, and hourly rates are reasonable. The CRO will notify the Debtors of any change in the hourly rates charged for services rendered while the Chapter 11 Cases are pending.

004138

v.     *Retainer*

31.    The Debtors engaged the Proposed CRO prior to the Petition Date. The CRO received a retainer of $50,000 (the "Retainer"). The Proposed CRO has worked against the Retainer, and, as of the Petition Date, the amount remaining in the Retainer is approximately $20,018.00.[5]

32.    Pursuant to the Engagement Agreement, the Debtors propose that SALLC will hold the Retainer to be applied to SALLC's final fees and expenses at the conclusion of the engagement. The Proposed Order modifies the Engagement Agreement such that the Proposed CRO and SALLC shall not draw on the Retainer except upon order of the Court awarding final compensation and reimbursement in the Chapter 11 Cases.

vi.    *Connections*

33.    The Schwartz Declaration sets out the connections of the Proposed CRO and SALLC with the Debtors, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtors' knowledge, neither the Proposed CRO nor SALLC hold any connections other than those disclosed in the Schwartz Declaration.

34.    The Debtors believe that neither the Proposed CRO nor SALLC holds or represents any disqualifying interest that is adverse to the estate and each is a "disinterested person." If any new relevant facts or relationships are discovered, the Proposed CRO and SALLC will supplement its disclosure to the Court and the U.S. Trustee.

---

[5] The CRO will furnish the exact number left in the Retainer at any hearing on this Application or in a supplement.

004139

## RELIEF REQUESTED

35.     The Debtors request that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtors to retain the Proposed CRO and SALLC, effective as of the Petition Date pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order.

## BASIS FOR RELIEF

36.     Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes trustees—and debtors-in-possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." Bankruptcy Code § 327(c) says that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

37.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

    a.    Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

    b.    State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

12

c.   Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

## A.   The Proposed CRO and SALLC Meet the Requirements of Bankruptcy Code § 327(a)

38.   Based on the Schwartz Declaration, the Debtors submit that neither the Proposed CRO nor SALLC hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

39.   The Bankruptcy Code defines what it means to be a "disinterested person" Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

40.   The Schwartz Declaration discloses no connections with the Debtors that would disqualify the Proposed CRO or SALLC as a "disinterested person" and the Debtors are aware of no connections in addition to those disclosed in the Schwartz Declaration.

## B.   This Application and the Schwartz Declaration Meet the Requirements of Bankruptcy rule 2014.

41.   This Application and the Schwartz Declaration meet the requirements as set out in Bankruptcy Rule 2014. The Application is made by the Debtors and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation. The Schwartz Declaration is a verified statement pursuant to 28 U.S.C. § 1746 that sets out all connections that the Proposed CRO and SALLC has with the Debtors, creditors, any other party in interest, their respective

13

attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtors are not aware of any other connections in addition to those disclosed in the Schwartz Declaration.

[*Remainder of Page Intentionally Left Blank*]

004142

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order approving the employment of the Proposed CRO and SALLC effective as of the Petition Date, pursuant to the terms of the Engagement Agreement and grant any other appropriate relief.

Dated: April 18, 2022

**PARKINS LEE & RUBIO LLP**

*/s/R.J. Shannon*
Kyung S. Lee
TX Bar No. 12128400
R.J. Shannon
TX Bar No. 24108062
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: klee@parkinslee.com
          rshannon@parkinslee.com
Phone: 713-715-1660
Fax:    713-715-1699

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/R.J. Shannon*
R.J. Shannon

004143

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2022, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on the parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Norman A Pattis, Cameron L. Atkinson
Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Ray Battaglia
Law Office of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX
rbattaglialaw@outlook.com

Attn: Avi Moshenberg, Nick Lawson, Matthew
Caldwell
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com
nick.lawson@mhllp.com
matthew.caldwell@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Richard S. Schmidt
615 Leopard, #635
Corpus Christi, TX 78401
rss@judgerss.com

Russell F. Nelms
115 Kay Lane
Westworth Village, TX 76114
rfargar@yahoo.com

Attn: W. Marc Schwartz
Schwartz Associates
712 Main Street, Ste. 1830
Houston, TX 77002
mschwartz@schwartzassociates.us

Attn: Matthew Okin
Okin Adams LLP
1113 Vine St., Ste. 240
Houston, TX 77002
mokin@okinadams.com

_/s/ R. J. Shannon_
R. J. Shannon

2

004145

Alex E. Jones
c/o Jordan & Ortiz, P.C.
Attn: Shelby Jordan
500 North Shoreline Blvd, STE 900
Corpus Christi, TX 78401


Brennan Gilmore
c/o Civil Rights Clinic
ATTN: Andrew Mendrala
600 New Jersey Avenue, NW
Washington, DC 20001


Carlee Soto-Parisi
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Carlos Soto
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive Ste. 301
Coral Springs, FL 33065


Dona Soto
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Erica Lafferty
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Francine Wheeler
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604

Free Speech Systems, LLC
c/o Law Office of Raymond W. Battaglia
66 Granburg Circle
San Antonio, TX 78218


Ian Hockley
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jacqueline Barden
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jennifer Hensel
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jeremy Richman
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Jillian Soto
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Leonard Pozner
c/o Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


Marcel Fontaine
c/o Kaster, Lynch, Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


Mark Barden
c/o Koskoff Koskoff & Bieder

350 Fairfield Ave
Bridgeport, CT 06604


Neil Heslin
c/o Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


Nicole Hockley
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


PQPR Holdings Limited, LLC
c/o Eric Taub, Waller
100 Congress Ave STE 1800
Austin, TX 78701


Robert Parker
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


Scarlett Lewis
c/o Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008


Veronique De La Rosa
c/o Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, TX 77008


William Sherlach
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604


William Aldenberg
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604

004148

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

Randazza Legal Group
2764 Lake Sahara Dr STE 109
Las Vegas, NV 89117

004149

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - 60020 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - 60021 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - 60022 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**INTERIM ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ
AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF
STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF
RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Application for Interim and Final Orders (A) Authorizing*

*Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of*

*Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C)*

*Granting Related Relief* (the "Application")[1] filed on April 18, 2022; and the Court having

jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §

1334; and consideration of the Application and the requested relief being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Application having been provided, and it

appearing that no other or further notice need be provided; and the Court having determined that

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the
Application.

the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.     Subject to a final hearing to be scheduled by the Court and any objections to the Application, the Application is granted on an interim basis, to the extent set forth herein. Any objections to the entry of a final order granting the Application must be filed with the Court and served according to Bankruptcy Local Rule 9013-1 on or before **May 9, 2022**.

2.     In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain W. Marc Schwartz (the "CRO") effective as of the Petition Date, as chief restructuring officer, under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.     The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Alexander E. Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Cases.

4.     The CRO is authorized to delegate appropriate tasks to Schwartz Associates, LLC ("SALLC"), pursuant to the terms of the Engagement Agreement.

5.     The CRO and SALLC shall be compensated for their services and reimbursed for actual expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules, and any orders of this Court; *provided*, *however*, that the CRO and SALLC shall not seek reimbursement from

2

the Debtors' estates for any fees incurred in defending any fee applications in these bankruptcy cases.

6.     All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned chapter 11 case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

7.     Notwithstanding anything to the contrary in the Engagement Agreement, the CRO and SALLC shall hold the prepetition retainer pending a final order allowing compensation and reimbursement in these cases or order otherwise directing disposition of the retainer amounts.

8.     Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the CRO and SALLC shall not be entitled to reimbursement or fees and expenses in connection with any objection to their fees, without further order of the Court.

9.     The CRO and SALLC shall provide ten (10) business days' notice to the Debtors and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

10.    The CRO and SALLC shall use reasonable efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

3

11. The CRO and SALLC will review their files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and SALLC will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a).

12. The Litigation Settlement Trustees may, at any time and in their sole discretion, terminate the employment of the CRO and SALLC without further order of the Court, *provided*, *however*, that such termination shall not affect the validity of the CRO or SALLC's employment under this Order or any Final Order prior to such termination.

13. To the extent the Application, the Schwartz Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

14. The Debtors, the CRO, and SALLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

15. This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____     _____
                                     UNITED STATES BANKRUPTCY JUDGE

004153

# **EXHIBIT A**

**Engagement Agreement**

004154



**Schwartz** Associates

712 Main Street, Suite 1830, Houston, TX 77002

April 7, 2022

<u>**VIA EMAIL**</u>

InfoWars, LLC
InfoWars Health, LLC
Prison Planet TV, LLC

VIA EMAIL: Shelby Jordan

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that InfoW, LLC; InfoHealth, LLC; and, Prison Planet TV, LLC ("<u>Clients</u>") have engaged W. Marc Schwartz ("<u>Consultant</u>") of Schwartz Associates, LLC ("<u>SALLC</u>") to act as their Chief Restructuring Officer ("<u>CRO</u>"), effective as of March 31, 2022, to advise and lead its restructuring efforts involving the scope described herein, including a filing of the Clients under Subchapter V of the Bankruptcy Code.

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of Clients' assets, including negotiations with creditors of Clients and affiliates of the Clients to assure that creditors of the Clients have the best chance of recoveries on their claims. Consultant will work to maximize return and to assure a fair pro rata distribution to all unsecured creditors.

I.      **Scope of Engagement**

Subject to oversight by the Client's governing body, Consultant shall be in charge of Clients' restructuring process. It is agreed that Consultant's authority shall include, but not be limited to, the following:

1. Make business and debt restructuring decisions, including as it relates to business strategy and other key elements of the business;
2. Manage due diligence requests and other items requested by various constituents as part of the restructuring process;
3. Prepare cash flow forecast and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("<u>Bankruptcy Court</u>") as well as provide necessary testimony before the Bankruptcy Court on matters within Consultant's areas of expertise;

1

004155



**Schwartz** Associates

712 Main Street, Suite 1830, Houston, TX 77002

6. Review inventory marketability and provide monetization alternatives;
7. Make operational decisions with advice of appropriate governance body;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest and submit proposal for payment to Third Party Funding Contributors, trustees and the bankruptcy court;
10. Maximize value of Clients;
11. Be in charge of all business decisions of Clients, as necessary or required, utilizing Consultant's business judgment.
12. Be authorized, during normal business hours, to (a) review and analyze the books of account, bank accounts, accounting source documents and financial statements of Free Speech Systems, LLC ("FSS") including, but not limited to, QuickBooks accounts, bank statements and included documents, invoices, credit card processing reports, other documents reflecting cash receipts, invoices received and issued, and other accounting source documents (b) have read only access to all bank accounts used by FSS in the conduct of its business (c) have access to the personnel, managers, and /or financial professionals of FSS to interview and request additional documents or information.
13. Execute all documents and take all other acts necessary to effectuate restructuring of the Debtors, including in any case before the Bankruptcy Court, subject to approval of the trustees of the 2022 FSS Litigation Settlement Trusty (the "Litigation Settlement Trustees") or Boards of Directors or managers as applicable.

## II. Indemnification

Clients agree to indemnify, defend, and hold harmless Consultant, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as, and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for the Clients under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as as financial advisor ("FA") or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

Clients will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing,

2



**Schwartz** Associates

712 Main Street, Suite 1830, Houston, TX 77002

pending or threatened litigation against the party; provided, however, that the Clients shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by Clients. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at the Clients' expense. Such funds shall be made available to the Clients as part of the monies to be requested under the Plan Support Agreement during and after the bankruptcy case of the Debtors.

### III.    Materials Provided

Clients agree to provide Consultant and SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. Consultant and SALLC agree to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.    Work Product

Consultant and SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: i) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; ii) with Client's written consent; iii) when legally required to do so; or iv) if such information is available from public sources.

All records of Clients obtained by SALLC will be promptly returned to the Clients at the conclusion of this engagement.

### V.    Disclosures

Clients shall not disclose any work or analyses of SALLC or Consultant to any third party (other than any direct or indirect equity holder of the Clients) without prior written consent of Consultant, which shall not be unreasonably withheld. Neither SALLC nor Consultant shall disclose any information respecting the business, properties, books, and records of the Clients except to professionals hired by the Clients for purposes of this engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLC, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You

3



**Schwartz** Associates

712 Main Street, Suite 1830, Houston, TX 77002

agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to Clients' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this engagement. You agree that party shall not have responsibility to Clients relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to Clients.

SALLC has performed an internal search for any such conflict of interest with respect to the Clients, its officers, directors, creditors, and other parties and has found no conflicts of interest.

**VI. Term & Termination**

This agreement shall remain in effect until the earlier of i) the completion of the Support Period of the Clients, ii) Execution of a comprehensive debt restructuring agreement, iii) Confirmation and completion of a plan of reorganization, iv) SALLC or Consultant's resignation, or v) Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if Clients fail to make payments when due hereunder.

**VII. Compensation**

For services provided described herein, SALLC shall be compensated for the services of Consultant on an hourly fee bases of $690.00 per hour.

If, in consultant's sole judgment, it is determined that additional services are required to assist with the scope of this engagement as outlined by this Agreement, consultant may employ SALLC, which shall be compensated at the following hourly rates

| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

Clients shall be responsible for Consultant's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connect with this

4

004158



**Schwartz** Associates

712 Main Street, Suite 1830, Houston, TX 77002

engagement. SALLC will provide to Clients detailed documentation of all expenses incurred.

SALLC acknowledges that, should Clients seek relief under Title 11 of the United States Code, and the Clients apply for authorization to retain and employ Consultant and SALLC, the Clients' payment of consultant's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $50,000 for the representation of Clients. The retainer will be held and applied to SALLC's final fees and expenses at the conclusion of the engagement. However, SALLC reserves the right to apply the retainer, at any time, to any outstanding fees and expenses owed to SALLC by Clients. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. If this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to Clients within thirty days.

### B. Invoicing

Prior to filing bankruptcy invoices reflecting the services of SALLC, including the services of Consultant, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter through draws on the retainer. In the event the retainer balance is exhausted Client shall pay the invoice within seven (7) business days and deposit and replenish the retainer balance to $50,000.. In case of a disputed invoice, Client agrees to pay undisputed part of any fees. Expense charges shall be submitted to Clients no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII. Authorization

The Clients represent that this Agreement outlines the engagement and has been approved by Clients' Boards of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of the Clients has been duly authorized to do so, including express consent of the Litigation Settlement Trustees, Boards of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or liquidation cannot be guaranteed. The monthly fees and related expenses to be paid by Clients to Consultant and SALLC are not contingent upon the results of this engagement and neither consultant

5



**Schwartz** Associates

712 Main Street, Suite 1850, Houston, TX 77002

nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and have your client do the same by signing and dating below. Once executed, a copy will be delivered to you via email. If you have any questions regarding this engagement letter, please call me at (832) 583-7021.

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

InfoW, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

InfoHealth, LLC

By: _____

Date: _____

Prison Planet TV, LLC

By: _____

Date: _____

6

**EXHIBIT B**

**Schwartz Declaration**

004161

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - _____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - _____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - _____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

## DECLARATION OF W. MARC SCHWARTZ

I, W. Marc Schwartz, declare under penalty of perjury as follows:

1.      I am a CPA and a founder and chairman of Schwartz Associates, LLC ("SALLC"). On my behalf and SALLC, I am duly authorized to execute this declaration in support of the application filed by the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") seeking approval to retain me as the chief restructuring officer ("CRO") and SALLC to assist me in those duties.

2.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of SALLC reviewed by me or SALLC staff under my supervision and direction or derived from information available to me that I believe to be true and correct.

004162

### A. Application

3.      I have reviewed the Debtors' Emergency Application for Interim and Final Orders (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief (the "Application"). The Application accurately describes my proposed role as chief restructuring officer.

### B. Disclosure of Connections

4.      SALLC performed the following actions to determine whether it or any of its professionals has any disclosable connections to the Debtors, creditors, any other party in interest, their attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas:

> a.      First, SALLC staff sent emails to all email account holders within SALLC requesting the recipient respond to any representation known to be adverse or otherwise connected to the Debtors or their estates. Neither I nor my staff received any responses indicating that a conflict or connection exists.
>
> b.      Second, SALLC staff conducted a computerized search of all clients of SALLC using the list of parties in interest listed in Schedule 1 hereto.
>
> c.      No connections or potential connections were identified.

5.      The search uncovered no connections other than (a) SALLC has worked with certain of the professionals on matters unrelated to the Debtors, and (b) SALLC has worked on matters before the U.S. Bankruptcy Court for the Southern District of Texas unrelated to the Debtors.

6.      I personally reviewed the list of parties in interest listed in Schedule 1 hereto. I do not have any connections with searched parties other than (a) I have worked with certain of the professionals on matters unrelated to the Debtors and (b) I have worked on matters before the U.S. Bankruptcy Court for the Southern District of Texas unrelated to the Debtors.

2

7. The results of the foregoing connections search process confirm that neither I, SALLC, nor any of its employees or shareholders, to the best of my knowledge, have any disqualifying connections. Neither I nor SALLC (a) have any debt or equity securities in the Debtors, (b) are an insider of the Debtors, or (c) was a creditor of the Debtors on the Petition Date.

### C. Affirmative Statement of Disinterestedness

8. Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and SALLC are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

9. I am not a creditor, an equity security holder, or an insider of the Debtors; I am not and was not within 2 years before the Petition Date a director of the Debtors; and I do not have any interest materially adverse to the interests of the Debtors' bankruptcy estate or any class of creditors or equity security holders.

10. SALLC is not a creditor, an equity security holder, or an insider of the Debtor; SALLC is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtors; and SALLC does not have any interest materially adverse to the interests of the Debtors' bankruptcy estates or any class of creditors or equity security holders.

11. Notwithstanding the foregoing, SALLC and I were retained pursuant to the Engagement Letter prior to the Petition Date to prepare for the filing. My understanding is that Bankruptcy Code § 1107(b) provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

004164

**D. Bankruptcy Rule 2016(b) Disclosures**

12.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, neither I nor SALLC have shared or agreed to share (a) any of its compensation from the employment by the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.

*[Remainder of Page Intentionally Left Blank]*

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2022,        By: _____
                                        W. Marc Schwartz

004166

## SCHEDULE 1 TO SCHWARTZ DECLARATION

## SEARCHED PARTIES

Debtor & Professionals

InfoW, LLC                        IWHealth, LLC
Prison Planet TV, LLC             Parkins Lee & Rubio LLP

Debtor's Equity & Trustees

Alexander E. Jones                Richard Schmidt
Robert Dew, Trustee               Russell Nelms

Creditors & Parties in Interest

Brennan Gilmore                   Leonard Pozner
Carlee Soto-Parisi                Marcel Fontaine
Carlos Soto                       Mark Barden
Christopher Sadowski              Neil Heslin
Dona Soto                         Nicole Hockley
Erica Lafferty                    PQPR Holdings Limited, LLC
Francine Wheeler                  Robert Parker
Free Speech Systems, LLC          Scarlett Lewis
Ian Hockley                       Veronique De La Rosa
Jacqueline Barden                 William Sherlach
Jennifer Hensel                   William Aledenberg
Jeremy Richman                    Larry Klayman
Jillian Soto                      Randazza Legal Group

Attorneys for Creditors and Parties in Interest

Kaster Lynch Farrar & Ball LLP    McDowell Heterhington LLP
Koskoff Koskoff & Bieder          The Akers Law Firm PLLC
Fertitta & Reynal LLP             Law Office of Ray Battaglia, PLLC
Pattis & Smith, LLC               Copycat Legal PLLC
Zeisler & Zeisler P.C.            Waller Lansden Dortch & Davis,
Jordan & Ortiz, P.C.              LLP

U.S. Bankruptcy Judges and Staff

Chief Judge David R. Jones      Tracey Conrad
Judge Marvin Isgur      Jeannie Chavez
Judge Christopher M. Lopez      LinhThu Do
Judge Jeffrey P. Norman      Tyler Laws
Judge Eduardo V. Rodriguez      Kimberly Picota
Albert Alonzo      Vriana Portillo
Ana Castro      Mario Rios

U.S. Trustee Personnel

Alicia Barcomb      Jayson B. Ruff
Jacqueline Boykin      Millie Sall
Luci Johnson-Davis      Patricia Schmidt
Hector Duran      Christy Simmons
Barbra Griffin      Gwen Smith
Brian Henault      Stephen Statham
Linda Motton      Christopher R. Travis
Ha Nguyen      Clarissa Waxton
Glenn Otto      Jana Whitworth
Yasmin Rivera

| | |
|---|---|
| **From:** | Kyung S. Lee |
| **To:** | Ruff, Jayson B. (USTP); Nguyen, Ha (USTP); Melissa Haselden |
| **Cc:** | Marc Schwartz; Christian Schwartz; Harold Lee |
| **Subject:** | [EXTERNAL] Re: InfoW, LLC et al. 22-60020 Deposition and Document Requests |
| **Date:** | Wednesday, May 18, 2022 3:55:00 PM |
| **Attachments:** | image003.png |
| | image003.png |
| | image004.png |
| | image005.png |

Sorry I was away filing so  I missed the email. If I said it incorrectly in ¶ 22, I have no problem with your clarifying with the Court.

I am good having hearing tomorrow or Friday. Tomorrow obviously would be better for the Debtors so I don't have to stay up drafting answers all Thursday night. But I guess  that is part of the job.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Wednesday, May 18, 2022 at 3:46 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>
**Subject:** RE: InfoW, LLC et al. 22-60020 Deposition and Document Requests

Kyung,

Understood.  One small but important point of clarification.  We do not necessarily "want" any continuance.  We would not be in opposition a shorter continuance set forth in my email below.

Are you hoping to have this heard tomorrow or Friday?  Let me know when you can.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Wednesday, May 18, 2022 3:37 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>
**Subject:** [EXTERNAL] Re: InfoW, LLC et al. 22-60020 Deposition and Document Requests

1. I am going to file my Motion for Continuance with the dates Marc and I need to do our jobs. I will state US Trustee wants a shorter continuance.
2. I am fine pushing the Proposed Trustee Motion out to the new date.
3. I am also fine pushing out the Bar Date Motion out to the new date.
4. I need to go forward and get Marc retained and approved as CRO. You should file objection and we should have a hearing on this matter so that it is cleared up.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Wednesday, May 18, 2022 at 3:28 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>
**Subject:** RE: InfoW, LLC et al. 22-60020 Deposition and Document Requests

Kyung,

The UST does not oppose a short extension, but would only be supportive of extending for approximately two weeks to somewhere around June 10th (depending on the Court's availability).  Assuming the hearing is pushed, we can also push the discovery dates out to a

later agreed time approximately a week before the reset hearing along with the answer date. Reply and Exhibit date can be two business days prior to the reset hearing.

Assuming everything is pushed out, if Debtors are able to provide us with the documents we are seeking in our request prior to the 341, then we will try to use that time to question Marc with respect to those documents and perhaps reduce what is needed to be covered at the deposition.  We understand that may not be possible, but I just want to put that possibility out there.

As a part of our agreement to support pushing the hearing on dismissal, I would also need all other motions to be pushed to the same date to be heard immediately following the dismissal motion (including the CRO motion).

Please let me know your thoughts.

Kind regards,


*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Wednesday, May 18, 2022 11:01 AM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <MSchwartz@schwartzassociates.us>; Christian Schwartz

<cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>
**Subject:** [EXTERNAL] Re: InfoW, LLC et al. 22-60020 Deposition and Document Requests

Jayson, Ha and Melissa:

Marc and I discussed the situation the 3 debtors face with still yet uncompleted agreements with Texas Plaintiffs, status conferences next week with Connecticut Plaintiffs and looming deadlines on 3 motions (or is it 1 motion to dismiss) and desire to use resources wisely.

To permit parties to handle the matters carefully, and, to make sure no one is rushed and makes mistake, Marc has suggested to me that the Debtors seek a continuance of a) Answer date of May 20, 2022 until June 17, 2022, b) Exhibit due date of May 25, 2022 until June 22, 2022,  c) the hearing date on either 1 or 3 motions to dismiss from May 27 to June 24, 2022 and d) any concomitant extensions on discovery deadlines.

This way the parties can finalize the dismissals with prejudice in Texas and Connecticut timely and accurately, and, then Marc can consider whether he needs to move forward negotiating a new funding agreement or resolve claims outside of bankruptcy. Please let me know if the US Trustee opposes the relief we will be seeking with the Court.

I am working on the Emergency Motion to Continue so let me know your views as soon as you are able.

Kyung S. Lee
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Wednesday, May 18, 2022 at 10:25 AM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Cc:** Marc Schwartz <MSchwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Subject:** InfoW, LLC et al. 22-60020 Deposition and Document Requests

Kyung,

Good morning.  Following on our prior communications, attached is a subpoena for production of documents and a notice for the deposition of Marc Schwartz.  Please confirm if you will accept service of these on behalf of your client.

If there are any concerns, please let us know.

Kind regards,

*Jayson B. Ruff*

Trial Attorney

Office of the United States Trustee

515 Rusk St., Suite 3516

Houston, Texas 77002

713-718-4650 Ext 252 (office)

202-573-6960 (mobile)

jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC | ) | Case No. 22 - _60020_____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| IWHEALTH, LLC | ) | Case No. 22 - _60021_____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| In re: | ) | |
| | ) | |
| PRISON PLANET TV, LLC | ) | Case No. 22 - _60022_____ |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |

**DEBTORS' EMERGENCY MOTION TO (A) EXTEND ANSWER DATE, (B) EXTEND EXHIBIT DESIGNATION DATE, (C) TOLL DISCOVERY DEADLINES, (D) CONTINUE HEARING DATE ON MOTIONS TO DISMISS AND (E) GRANT RELATED RELIEF**
[Relates to DKT. 36, 42 and 59)

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED AND IF THE COURT CONSIDERS THIS MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN TWENTY-ONE (21) DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF, OR IF YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED ON OR BEFORE **MAY 20, 2022**.

InfoW, LLC ("InfoW"), IWHealth, LLC ("IW Health"), and Prison Planet TV, LLC ("Prison Planet TV", and together with InfoW and IW Health, the "Debtors"), the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby move for entry of an order substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7016(b)(4) of the Federal Rules of Civil Procedure continuing deadlines and hearing date on the motions to dismiss.

## **REQUEST FOR EMERGENCY HEARING**

1.     The Debtors seek emergency consideration of this Motion on or before **May 20, 2022**, or as soon after as the Court's schedule will allow. Responses to three (3) Motions to Dismiss Chapter 11 Cases are due on May 20, 2022, which may not be necessary, if the withdrawal of claims by the Texas and Connecticut Plaintiffs can be accomplished by the parties, and the U. S.

2

Trustee's Motion to Dismiss may also be obviated based on the evaluation of the remaining claims by the Chief Restructuring Officer prior to the continued hearing date.

## JURISDICTION

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

3.     The bases for the relief requested herein is section 105 of title 11 of the United States Code (the "Bankruptcy Code") and the applicable Federal and Bankruptcy Rules of Procedure, including Fed. R. Civ. P. 16(b)(4).

## BACKGROUND

### A.  Case Background

4.     On April 18, 2022 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

5.     As of the filing of this Motion, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

6.     Melissa A. Haselden is the Subchapter v Trustee of the Debtors. Dkt. 12.

### B.  Motions to Dismiss Bankruptcy Cases

7.     On April 26, 2022, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs") filed their Emergency Motion to Dismiss Chapter 11 Cases and

3

Objection to Debtors' Designation as Subchapter V Small Vendors, Dkt. 36 ("Connecticut Plaintiffs MTD").

8.     On April 27, 2022, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Litigation Plaintiffs") (a) joined the Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Debtor's Designation as Subchapter V Small Vendors  Dkt. 36  (the "Connecticut Motion"); and (b) filed their Supplemental Motion to Dismiss Petition, Dkt. 42  (the "Texas Plaintiffs MTD").

9.     On April 29, 2022, the United States Trustee filed its Motion to Dismiss Case, Dkt. 50 ("US Trustee MTD"). The three (3) motions to dismiss shall hereinafter be referred to as Motions to Dismiss.

10.    Since then, the Court established a) May 20, 2022 as the deadline to answer or respond to the Motions to Dismiss ("Original Answer Date"); b) May 25, 2022 as the date for submission of exhibits to be used at hearing on the Motions to Dismiss ("Original Exhibit Designation Date"); c) May 27, 2022, 9:00 a.m. as the date for hearing on the Motions to Dismiss ("Original Hearing Date"). The parties were allowed to undertake discovery among each other on a voluntary basis.

### C. Key Developments in the Bankruptcy Cases

11.    The Texas and Connecticut Plaintiffs have stated that they do not want to be creditors of the Debtors.

12.    The Debtors and the Plaintiffs have been discussing and implementing the withdrawal of claims and dismissals with prejudice of the three debtors from the underlying state court suits in Texas and Connecticut.

13.    The Texas Plaintiffs and the Debtors have exchanged Stipulations and hope to reach agreement, which will allow them to submit the Stipulations to this Court for approval.

4

14.     The Connecticut Plaintiffs are proceeding by way of motion in the Connecticut Bankruptcy Court, where the state court lawsuits involving the debtors were removed on the Petition Date. The Connecticut Bankruptcy Court has scheduled a Status Conference on remand matters for Tuesday May 24, 2022.

15.     Even after the withdrawal of the claims of the Texas and Connecticut Plaintiffs from the Debtors' estates, the U.S Trustee has announced his intention to proceed with his Motion to Dismiss. Discovery against the Debtors has been sought by the U.S. Trustee for the week of May 23, 2022.

16.     After the complete withdrawal of claims by the Texas and Connecticut Plaintiffs, the three debtors still have a number of creditors that must be treated. Marc Schwartz, the proposed Chief Restructuring Officer, has not yet had a chance to focus on the remaining creditors. He intends to turn his attention to determine how best to resolve them as soon as he finalizes the agreements with the Texas and Connecticut Plaintiffs.

17.     The CRO has several options on how to proceed after the claims of the Connecticut and Texas Plaintiffs are eliminated against the Debtors. He could proceed to confirmation of a plan by re-negotiating the Plan Support Agreement, or he could dismiss the Chapter 11 Cases, after notice and a hearing, and handle the remaining claims outside of Chapter 11. The CRO must have a short amount of time to analyze which option to pursue.

## **RELIEF REQUESTED**

18.     The Debtors request that the Court enter an order substantially in the form of the Proposed Order a) extending Original Answer Date to June 17, 2022; b) extending the Original Exhibit Designation Date to June 22, 2022, c) continuing hearing on the Motions to Dismiss to

004178

June 24, 2022, or a date first available to the Court, d) and extending any discovery deadlines to authorize parties to undertake discovery among them prior to the new hearing date.

**BASIS FOR RELIEF**

19.      Extending the various deadlines and continuing the Original Hearing Date on the Motions to Dismiss until June will save the estate significant resources and eliminate waste of estate, creditor and judicial resources.

20.      Today, the Debtors must respond to three (3) Motions to Dismiss. Two of the Motions to Dismiss will be withdrawn once the parties implement the agreed to dismissals with prejudice of the Debtor defendants from the state court lawsuits. The Debtors are very close to finalizing a Stipulation with the Texas Plaintiffs. The Debtors should have a much better idea of where the process is after the Status Conference with the United States Bankruptcy Court for the District of Connecticut on May 24, 2022. Requiring the Debtors to respond and answer three Motions to Dismiss on May 20, 2022, when two of them may become moot next week, is not an optimal use of Debtors' limited financial resources.

21.      Continuing the Original Hearing Date until June will also permit the CRO who has been engulfed in evaluating the dismissals with prejudice issues to now focus on the remaining creditors of the Debtors. The CRO will be able to evaluate either before or by the June hearing date whether he should proceed with trying to confirm a subchapter v plan of reorganization or handle these claims outside of bankruptcy. Again, such effort will be wise use of limited financial resources. Such an approach will also save valuable judicial resources.

22.      Debtors have polled the Texas and Connecticut Plaintiffs and the U.S. Trustee regarding this Motion but did not receive a response prior to filing of the Motion from the Texas

and Connecticut Plaintiffs. The U.S. Trustee seeks a shorter continuance than the one proposed by the Debtors.

[*Remainder of Page Intentionally Left Blank*]

7

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the proposed order extending the various deadlines and continuing the hearing on the Motions to Dismiss until no earlier than June 24 and grant such other relief.

Dated: May 18, 2022

**KYUNG S. LEE PLLC**

*/s/Kyung S. Lee*
Kyung S. Lee
TX Bar No. 12128400
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: klee@kslpllc.com
Phone: 713-301-4751

*Proposed Counsel to the Debtors*

8

## CERTIFICATE OF ACCURACY

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).


_/s/Kyung S. Lee_____
Kyung S. Lee

9

004182

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2022, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on the parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Norman A Pattis, Cameron L. Atkinson
Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Ray Battaglia
Law Office of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX
rbattaglialaw@outlook.com

Attn: Avi Moshenberg, Nick Lawson, Matthew
Caldwell
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com
nick.lawson@mhllp.com
matthew.caldwell@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Richard S. Schmidt
615 Leopard, #635
Corpus Christi, TX 78401
rss@judgerss.com

Russell F. Nelms
115 Kay Lane
Westworth Village, TX 76114
rfargar@yahoo.com

Attn: W. Marc Schwartz
Schwartz Associates
712 Main Street, Ste. 1830
Houston, TX 77002
mschwartz@schwartzassociates.us

Attn: Matthew Okin
Okin Adams LLP
1113 Vine St., Ste. 240
Houston, TX 77002
mokin@okinadams.com

*/s/ Kyung S. Lee*
Kyung S. Lee

2

004184

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| INFOW, LLC, *et al.*, | ) | Case No. 22 - __60021_____ |
| | ) | |
| Debtors.[1] | ) | Chapter 11 (Subchapter V) |

## ORDER (A) EXTENDING ORIGINAL ANSWER DATE, (B) EXTENDING ORIGINAL EXHIBIT DESIGNATION DATE; (C) TOLLING DISCOVERY DEADLINES, (D) CONTINUING ORIGINAL HEARING DATE, AND (E) GRANTING RELATED RELIEF

Upon the *Debtors' Emergency Motion to (A) Extend Answer Date, (B) Extend Exhibit Designation Date, (C) Toll Discovery Deadlines, (D) Continue Hearing Date on Motion to Dismiss and (e) Grant Related Relief (the "Motion")*[2] filed on May 18, 2022; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. The Original Answer Date on the Motions to Dismiss be and hereby is now June __, 2022;

2. The Original Exhibit Designation Date be and hereby is now June __, 2022;

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

[2] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

3.      Any discovery deadline in this contested matter shall be tolled and the parties shall be entitled to take discovery from each other prior to the rescheduled hearing date;

4.      The Original Hearing Date be and hereby is now continued until June __, 2022.

5.      This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


Dated: _____      _____

                                     _____
                                       UNITED STATES BANKRUPTCY JUDGE

004186

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22 - 60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

## DEBTORS' OMNIBUS RESPONSE TO MOTIONS TO DISMISS

InfoW, LLC ("InfoW"), IWHealth, LLC ("IWH"), and Prison Planet TV, LLC ("PTV," and together with InfoW and IWH, the "Debtors"), the debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases, hereby file this response to (a) *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Designation as Subchapter V Small Business Vendors* (sic) [ECF No. 36] (the "Connecticut Plaintiffs' MTD"); (b) *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] (the "Texas Plaintiffs' MTD"); and (c) *Motion to Dismiss Debtors' Chapter 11 Cases*, [ECF No. 50] (the "UST MTD") and together with the Connecticut Plaintiffs' MTD and the Texas Plaintiffs' MTD, the "Motions to Dismiss"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Connecticut Plaintiffs' MTD and Texas Plaintiffs' MTD are moot. The Texas Plaintiffs' claims against the Debtors were released and the Texas Plaintiffs' MTD was withdrawn

---

[1] The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

[2] The Debtors have made the business decision to dismiss these chapter 11 cases and have filed the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110]. This Response is filed to make sure that the allegations in any of the Motions to Dismiss are not in any way construed by any party as an admission by the Debtors for any purpose and to preserve the Debtors' rights if the Court declines to enter an order approving the stipulation.

by the Stipulation and Order entered on May 19, 2022 [ECF No. 99] (the "Texas Plaintiffs' Stipulation"). The U.S. Bankruptcy Court for the District of Connecticut entered an order dismissing the Connecticut Plaintiffs claims against the Debtors with prejudice on May 26, 2022, as reflected in the Order attached hereto as Exhibit A (the "Connecticut Plaintiffs' Dismissal Order"). The Connecticut and Texas Plaintiffs are no longer creditors in or affected by these chapter 11 cases.

      2.      The U.S. Trustee still seeks dismissal of the cases.[3] Although the Debtors have at least $140,000 of asserted claims against them that could be satisfied through the chapter 11 case, the ability to pay those claims and administrative expenses, and valuable assets that could be liquidated if funds were not otherwise available.[4] The Debtors' former link to Alex Jones is too great a sin in the U.S. Trustee's eyes for the Debtors to overcome—despite the U.S. Trustee's paradoxical objection to the appointment of independent management for the Debtors.[5]

      3.      The U.S. Trustee's assertions in the UST MTD cannot be the *actual* reasons that the U.S. Trustee still wants these cases dismissed. The crux of the argument in the UST MTD is that the chapter 11 cases were just a litigation tactic and thus were filed in bad faith. But the litigation that the U.S. Trustee claims was the sole, bad-faith purpose of these cases is no longer affected. Despite the resolution of the litigation vis-à-vis the Debtors, however, the U.S. Trustee still seeks dismissal.

---

[3] References to the "U.S. Trustee" are to the U.S. Trustee in his official capacity and includes his agents. The Debtors adopt the style of reference used in the UST MTD (e.g., referring to the U.S. Trustee as "he") without asserting that the actions or knowledge attributed to the U.S. Trustee are the actions or knowledge of Kevin M. Epstein personally.

[4] Debtor InfoW owns the domain name "infowars.com." Although it licenses that name to Free Speech Systems, LLC ("FSS"), a condition of that license—negotiated by the Debtors' prepetition—was that $715,000 of initial funding under the PSA would be paid to satisfy the administrative expenses of these chapter 11 cases. FSS's failure to deliver the funds would be a breach of the license agreement and allow InfoW to sell or license the domain name.

[5] *See Objection of United States Trustee to Debtors' Emergency Motion for Order Authorizing Appointment of Russell F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief* [ECF No. 18].

004188

4.      The U.S. Trustee's other arguments in the UST MTD are similarly belied by logic or the U.S. Trustee's inconsistent actions in these cases. The chapter 11 cases put *these three Debtors* in a position to pay more to their creditors than would have been possible absent chapter 11—approximately $10.0 million, even before the proposed litigation settlement trustees (the "Proposed Trustees") were in place to give the Debtors an opportunity for further negotiations with the third-party funding contributors. But apparently the U.S. Trustee does not believe that paying creditors more than they would receive in a liquidation is a valid reorganizational purpose. The U.S. Trustee complains that the PSA and LST were negotiated by insiders but objected when the Debtors sought to put in place independent third-party fiduciaries in the form of the Proposed Trustees to enable further negotiations.[6] The U.S. Trustee argues that the lawsuits that precipitated the chapter 11 cases primarily concerned non-debtors even though the Debtors had been *defendants* in those lawsuits for four years and faced death penalty sanctions when they claimed they did not have financial information to produce in discovery. And finally, the U.S. Trustee asserts that the Debtors are attempting to abuse subchapter v of chapter 11 of the Bankruptcy Code despite not directly claiming that the Debtors fail to meet the requirements for such relief under the Bankruptcy Code.

5.      While the above dubious positions could be attributed to overzealousness, the U.S. Trustee's statements regarding the Debtors' goals in chapter 11 come perilously close to outright deception. On April 17, 2022, the Debtors provided Assistant U.S. Trustee Millie Sall a copy of their contemplated plan of reorganization, as reflected in Exhibit B hereto. The U.S. Trustee was

---

[6] As the Court is aware and the U.S. Trustee indicated, further negotiations with respect to the PSA and LST *did* occur even before the U.S. Trustee filed the UST MTD. *See Notice of Amended and Restated Declaration of Trust and Plan Support Agreement* [ECF No. 48]. The U.S. Trustee asserts that the amended and restated PSA and LST "simply attempt to obfuscate what the earlier version make clear—that the Debtors are using these cases to benefit Alex Jones and FSS, not the Sandy Hook Plaintiffs." UST MTD at p.4 n.6. The evidentiary support the U.S. Trustee has for that representation to the Court, as required by Rule 11, will unfortunately likely remain a mystery.

3

*aware* that the Debtors (a) were not contemplating any third-party releases, (b) did not intend to deprive the plaintiffs of their jury trial rights, and (c) the contemplated estimation would be voluntary with respect to allowance.[7] To propose that contemplated plan, however, the Debtors needed appointment and buy-in from the Proposed Trustees, as the U.S. Trustee was aware. Conveniently, the U.S. Trustee opposed the appointment of the proposed trustees even though the appointment would have resolved several of the issues raised in the UST MTD.

6.      The facts are that these chapter 11 cases were filed in good faith and would still serve a valid bankruptcy purpose. Nonetheless, the Debtors, under the management of their independent CRO, recognize that the dismissal is in the best interests of the Debtors and their estates because the U.S. Trustee continued opposition to the cases. The U.S. Trustee has decided to run up the administrative expense of these cases even though no party with a remaining pecuniary interest has a problem. That clearly does not square with the U.S. Trustees claimed role in the bankruptcy process, but that is neither here nor there.

7.      The duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering. The Debtors have therefore agreed to the dismissal of the chapter 11 cases pursuant to the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110] (the "Stipulation of Dismissal"). The dismissal of the Chapter 11 Cases should be according to the Stipulation and not any of the Motions to Dismiss, which should be denied as moot or on the merits.

---

[7] It should not be a surprise that the Debtors were (prior to the dismissal of claims against them with prejudice ) and Jones and FSS still are likely to appeal any significant judgment. The contemplated plan provided that there would be no appeal or other challenge if the plaintiffs *elected* to determine their claims through an estimation-like claims allowance process. The Debtors submit that kind of voluntary give and take is indisputably appropriate.

004190

## ARGUMENT

**A. The Motions to Dismiss Are or Will Be Moot Upon Entry of the Stipulation of Dismissal.**

8.     "A pleading is moot when a court's decision on a pending motion will be 'hypothetical or academic' or 'without any practical significance.'" *Halton v. Triplett (In re Triplett)*, Nos. 19-42570, 20-04059, 2022 Bankr. LEXIS 64, at *5 (Bankr. E.D. Tex. Jan. 10, 2022) (quoting *Scarborough-St. James Corp. v. 67500 S. Main St., Richmond, LLC (In re Scarborough-St. James Corp.)*, 554 B.R. 714, 720 (D. Del. 2016)) (internal quotation marks omitted).

9.     Each of the Motions to Dismiss are already moot or will be moot upon approval of the Stipulation of Dismissal. The Texas Plaintiffs' MTD was withdrawn pursuant to the Texas Plaintiffs' Stipulation. But if not, it would be moot because the movants are no longer creditors and have stated they want no further involvement in these chapter 11 cases. The movants with respect to the Connecticut Plaintiffs' MTD are also no longer creditors of the Debtors pursuant to the Connecticut Plaintiffs' Dismissal Order and have told this Court that they want nothing more to do with these chapter 11 cases. The UST Motion either is or will be moot pursuant to the Stipulation of Dismissal.

**B. The Debtors Filed their Bankruptcy Petitions in Good Faith.**

10.     To the extent that the Court finds that the Motions to Dismiss are not moot, they should be denied on the merits. The Debtors filed their petitions in good faith and these chapter 11 cases have a valid reorganizational purpose.

*i.     Standard for dismissal for bad faith dismissal.*

11.     Bankruptcy relief requires good faith in the commencement, prosecution, and confirmation of bankruptcy proceedings. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986). The Fifth Circuit has instructed that courts should look to a debtor's financial condition,

5

motives, and local financial realities. *Id.* at 1072. The "traditional" bankruptcy case is where a debtor is facing financial difficulties that pose an existential threat. *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 280–81 (Bankr. N.D. Tex. 2021); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) ("Courts . . . have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."). "Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d at 1072.

12. To amount to "bad faith" that precludes bankruptcy relief, the facts must "rise to the level of egregiousness necessary to conclude that the reorganization process is being perverted . . . ." *In re Little Creek Dev. Co.*, 779 F.2d. at 1073; *accord In re StatePark Bldg. Grp., Ltd.*, 316 B.R. 466, 476 (Bankr. N.D. Tex. 2004) ("To find bad faith, the court must find that the facts surrounding the filing of the petition are particularly egregious."); *see also In re Greene Ave. Restoration II Corp.*, 597 B.R. 202, 217 (Bankr. E.D.N.Y. 2019) ("Dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."); *In re MBM Ent., LLC*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) "[A] bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution."). The question is not whether bankruptcy could have been avoided with the benefit of hindsight, but rather whether the Debtor's management could properly conclude that chapter 11 was an appropriate way to address existing or potential difficulties. *See In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *8 (Bankr. N.D. Tex. Jan. 26, 2005). The purpose of the analysis is to "prevent[] abuse of the bankruptcy process by debtors whose overriding motive is to delay

6

creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d. at 1072.

        ii.    *The chapter 11 cases have valid reorganizational purposes.*

13.      The Debtors were not a financially healthy companies with no need to reorganize. Each of the plaintiffs brought and continued lawsuits against one or more of the Debtors. Those plaintiffs had obtained judgments with respect to liability. Absent restructuring, the Debtors did not have the ability to pay any significant judgment or even the already-imposed sanctions.[8] Chapter 11 relief was necessary for these three Debtors.

14.      The plaintiffs eventually decided that a jury verdict against Alex Jones and FSS was more important to them than maximizing their recovery. That is, of course, their prerogative but it is entirely irrelevant to bad faith. If creditor protestations were indicative of bad faith, virtually every chapter 11 case filed would be subject to dismissal. The Debtors did not try to prevent the plaintiffs from dismissing the cases with prejudice and indeed attempted to *expedite* the process.

15.      The U.S. Trustee's apparent problem is that Alex Jones and FSS would have also received a benefit under the Debtors' contemplated restructuring. Not for nothing, but that is why those parties were willing to pay into a trust to be distributed according to a plan (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters. If the bankruptcy was just to delay, the money did not need to be on the table.[9] Rather, those funds going to creditors for their claims against the Debtors was the *entire point* of these chapter 11 cases.

---

[8] Sanctions were assessed against InfoW for the failure of *FSS* to present a corporate representative who was properly prepared to testify on the designated topics.

[9] The Debtors had to *negotiate* for these funds prepetition with an eye to using the appointment of the litigation settlement trustees to get even more consideration. That appears to be a foreign concept to the U.S. Trustee.

004193

16. Reading between the lines, the U.S. Trustee seems to imply that it would have been preferable for the Debtors to have filed for chapter 11 without the $7.7+ million commitment from Jones and FSS. That is completely unreasonable, to put it charitably.

17. There is no evidence that the funds that the Debtors negotiated for their former creditors was insufficient—it would have adduced in an estimation proceeding for feasibility if it existed—much less that it was so little that it amounts to a "perversion" of the bankruptcy process or egregious conduct. Courts have held under more problematic facts that the concept the Debtors proposed could potentially result in a confirmable plan of reorganization that made dismissal for bad faith appropriate. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 407-09 (Bankr. D.N.J. 2022).[10]

18. Paying joint claims of FSS and Alex Jones in a chapter 11 plan would have also served the bankruptcy purpose of maximizing the value of the Debtors' assets. The key intellectual property owned by the Debtors is the domain name "infowars.com." That domain name is most valuable while FSS is operating and Alex Jones is on the air. Additionally, the funds from Youngevity received by IWH are related to FSS's operations. While the Plaintiffs—and perhaps the U.S. Trustee—would prefer Alex Jones to not have a platform, that is irrelevant to these chapter 11 cases. Bankruptcy is about putting dollars in the pockets of creditors.

     *iii.*    <u>*The U.S. Trustee's arguments about the PSA and LST are meritless, disingenuous, or inapposite.*</u>

19. The U.S. Trustee's arguments about the PSA and LST (paragraphs 37-42) were and remain baseless. The U.S. Trustee's complaints are essentially as follows:

---

[10] In LTL, a Johnson & Johnson ("J&J") subsidiary was organized in Texas, another J&J subsidiary with tort liabilities merged into that Texas entity, the newly merged entity conducted a divisive merger in which all of the tort liabilities were put into a new non-operating entity, J&J entered into a funding agreement with the liable entity, and the entity was moved to a different district where it filed bankruptcy. The Debtors here have been defendants in the litigation for years and filed for bankruptcy in the district in which they were domiciled. Also, there are no allegations that the Debtors' actions killed anyone or caused them to develop cancer.

004194

a. The PSA and LST provided that financial information of Jones and FSS relevant to the contemplated restructuring are (i) subject to confidentiality provisions by the proposed trustees and the Debtors' professionals and may be provided to other parties only with a protective order and (ii) related to estimated claims rather than actual claims;

b. The PSA requires an estimation procedure;

c. The "handwriting is on the wall" that the Debtors are going to seek extension of the automatic stay to Jones and involuntary non-consensual releases; and

d. The creditors did not participate in the negotiation of the PSA or LST before the Debtors filed their petitions.

The U.S. Trustee wants the Court to rule that those "facts" are evidence that the Debtors' bankruptcy cases are an attempt to "pervert" the bankruptcy process. Despite the U.S. Trustee's presumably faux outrage, they show nothing of the sort.

20.     Companies and individuals typically require confidentiality provisions before providing non-public financial information and would want a protective order before that information is shared. And even if Alex Jones and FSS were Debtors, the only financial information that would be *public* would be their schedules, statements, and monthly operating reports. Any other non-public financial could only be compelled by a Rule 2004 examination or other discovery and would almost certainly be subject to a protective order if requested. The U.S. Trustee's argument on this point has absolutely no merit.

21.     The U.S. Trustee's arguments with respect to the estimation procedures and non-consensual third-party releases gets close to being disingenuous. As reflected in Exhibit B hereto, the Debtors provided the U.S. Trustee's office a copy of the Debtor's contemplated plan of reorganization on April 17, 2022. The U.S. Trustee was or should have been aware that the estimation procedures contemplated by the Debtors were only (a) for purposes of feasibility or (b) upon election by litigation claimholders. Rather than using the information the U.S. Trustee had

9

available, however, the UST MTD decided to engage in flights of fancy because it better suited his position.

22.    Whether "handwriting was on the wall" as to the extension of the stay to FSS and Jones is a matter of opinion. In any event, it certainly did not happen. The Debtors sought central adjudication of the claims against them but that is hardly tantamount to an extension of the automatic stay.[11]

23.    Finally, that the Debtors did not engage the plaintiffs in the formation of the PSA or LST is inapposite. The U.S. Trustee cannot seriously contend that failure to have a prepackaged chapter 11 case is an indication of bad faith. That is especially true here where the Debtors negotiated a mechanism expressly for the purpose of further negotiations in the appointment of the Proposed Trustees. The entire point of the Proposed Trustees was to give creditors someone unquestionably neutral with whom to negotiate.

      *iv.*   *One or more of the Debtors were defendants in each of the Sandy Hook Lawsuits and liability had already been established prior to resolution during these chapter 11 cases.*

24.    The U.S. Trustee makes noise about the fact that Sandy Hook Lawsuits "do not arise from the Debtors' conduct" but rather "from the allegedly tortious, intentional conduct of Alex Jones and FSS (through its employees) . . . ." UST MTD ¶ 44. The Debtors agree with the U.S. Trustee that the Debtors were entitled to judgment as a matter of law based on the pleadings in the Sandy Hook Litigation. But the relevant state courts—whose opinions actually matter— decided differently. These two state courts even entered judgment against the Debtors.

25.    Ironically, the U.S. Trustee's argument directly cuts against the assertion that the Debtors are not "honest but unfortunate debtors." According to the U.S. Trustee, the Debtors did

---

[11] Moreover, centralized adjudication of claims is one of the central features of the U.S. bankruptcy process.

004196

nothing to cause liability but were still found liable. The *plaintiffs* made the decision to sue these Debtors, pursue litigation against them, and obtain judgments even though there was no basis for liability. The Debtors' use of bankruptcy to resolve those claims—by attempting to paying them in full—was appropriate. When the plaintiffs agreed to have their claims against the Debtors resolved through dismissals with prejudice, the Debtors were more than happy to oblige and worked with the plaintiffs to expedite that process.

     *v.*     <u>*The Debtors qualify for subchapter v of chapter 11*</u>

26.      The U.S. Trustee never asserts that the Debtors do not qualify for subchapter v. Rightly so. It is hard to imagine *how* the Debtors could have possibly incurred any liability except through engaging in business activities. They did not run up their credit cards on trips to Cabo.

27.      Instead, the U.S. Trustee takes issue with Bankruptcy Code § 1182 not including unliquidated liabilities in the calculation of maximum debt to qualify as a subchapter v debtor. The U.S. Trustee wants this Court to unabashedly and directly modify the language that Congress enacted in the Small Business Restructuring Act of 2019 because the U.S. Trustee thinks it should be different.[12] The U.S. Trustee may very well know better than Congress, but obviously that is inappropriate.

     *vi.*     <u>*The chapter 11 cases were not merely a litigation tactic*</u>

28.      As indicated above, the Debtors had valid reorganizational purposes that they sought to accomplish through these chapter 11 cases. The Debtors were prepared with a plan that would have provided as much as $10.0 million for the resolution and payment of claims in a way

---

[12] The U.S. Trustee asserts that "[l]ittle doubt exists that the total damage award against the Debtors, Alex Jones, FSS, and other non-debtor solvent entities of the Alex Jones Enterprise would exceed the debt limit currently in place for subchapter V." UST MTD ¶ 48. There are 21 plaintiffs and the debt limit for subchapter v is $3,024,725. The Debtors severely doubt the U.S. Trustee has a factual basis to assert that the damages of *any* of the plaintiffs exceeds $144,035.71 other than sheer speculation.

11

that had the potential to shortcut months of successive jury trials and years of appeals. And again, the U.S. Trustee was in possession of that contemplated plan when he filed the UST MTD.

29.     The U.S. Trustee also points to the statements of Alex Jones's personal lawyer that the goal of the bankruptcy was to force estimation.[13] But Jones has no control over the Debtors. And, if anything, it shows *why* the Debtors locked Jones and FSS in under the PSA and LST. At the end of the day, the desires of Alex Jones matter even less to the Debtors than the U.S. Trustee's desire to re-write Bankruptcy Code § 1182.

30.     The Debtors' conduct during the chapter 11 cases confirms that the point of the bankruptcy cases was to resolve the claims against the Debtors. Although the Debtors opposed the plaintiffs' dubious dismissals *without* prejudice, their position was consistently that they would gladly resolve the claims against them through dismissal *with* prejudice rather than money from Jones and FSS.[14] After the issues were resolved, the Debtors took actions to expedite the process.

## C.  The Debtors Agree That Dismissal is in the Best Interests of Creditors in Light of the U.S. Trustee's Unreasonable Position.

31.     The U.S. Trustee has made it clear that he will continue to oppose the Debtor's efforts to pay its remaining creditors through these chapter 11 cases even though there is no remaining creditor opposition.

32.     Under these circumstances, the Debtors' CRO has determined that dismissal would be in the best interests of the Debtors and their creditors. While the U.S. Trustee is free to ignore the proclaimed mission of the U.S. Trustee Program "to promote the integrity and efficiency of

---

[13] Perhaps the U.S. Trustee believes that Jones should have been willing to contribute $7.7+ million for nothing, but that is not the way the world works outside of government.

[14] The problem with dismissal *without* prejudice would have been that the plaintiffs could have arguably filed proofs of claim, thereby continuing to assert claims while removing the Debtors' ability to pay them in full. Although the statute of limitations would have run absent bankruptcy, the effect of the automatic stay and the claims bar date may have tolled the applicable limitations period.

004198

the bankruptcy system for the benefit of all stakeholders[,]" the Debtors and their professionals are bound by their fiduciary duties. The Debtors have therefore entered into Stipulation of Dismissal, under which the Debtors seek dismissal of these chapter 11 cases.

## CONCLUSION

33.     Based on the foregoing, the Debtors do not oppose dismissal of these chapter 11 cases, but such dismissal not under any of the grounds set forth in the Motions to Dismiss. Instead, the Court should enter the Stipulation of Dismissal agreed to by the Debtors, the U.S. Trustee, and the Subchapter V Trustee.

[*Remainder of Page Intentionally Left Blank*]

004199

Dated: June 2, 2022

**KYUNG S. LEE PLLC**

*/s/ Kyung S. Lee*
Kyung S. Lee
TX Bar No. 12128400
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: klee@kslpllc.com
Phone: 713-301-4751

*Proposed Counsel to the Debtors*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing document was served at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service.

*/s/Kyung S. Lee*
Kyung S. Lee

004200

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) <u>GRANTING RELATED RELIEF</u>

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "<u>Debtor</u>" or "<u>FSS</u>"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), hereby moves for entry of an order substantially in the form attached hereto (the "<u>Proposed Order</u>") pursuant to sections 105(a) and 327 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") authorizing the retention of W. Marc Schwartz (the "<u>CRO</u>" or "<u>Schwartz</u>") of Schwartz Associates, LLC ("<u>SALLC</u>") as the Chief Restructuring Officer (the "<u>Application</u>") pursuant to that certain engagement letter agreement by

and between the Debtor and SALLC, a copy of which is attached hereto as <u>Exhibit A</u> (the "<u>Engagement Agreement</u>").[1] In support of the Application, the Debtor submits the Declaration of W. Marc Schwartz attached hereto as <u>Exhibit B</u> (the "<u>Schwartz Declaration</u>") and respectfully represents as follows:

<div align="center"><b><u>REQUESTED RELIEF</u></b></div>

1.     Entry of the Proposed Order (a) approving the appointment and employment of Schwartz and to perform the services set forth in the Engagement Agreement as the CRO for FSS is necessary for the Debtor to adequately perform its duties as a debtor-in-possession, including overseeing daily business affairs and operations of FSS, interfacing with Alex Jones ("<u>Alex Jones</u>" or "<u>Jones</u>"), PQPR Holdings Limited, LLC ("<u>PQPR</u>") and vendors on selection of Supplements and Non-Supplements to stock,  preparation of schedules of assets and liabilities, compliance with reporting requirements and various orders of this Court, preparation of financial information and testimony and formulation of bankruptcy strategy and plan of reorganization for FSS and (b) approving the employment of SALLC in connection with the CRO's duties.

2.     Especially for a subchapter v debtor, this Court's approval of the retention of the CRO and SALLC by the Debtor is critical and indispensable to assuring that the chapter 11 process begins smoothly, and, that the Debtor has the optimal managers to help formulate a sound business and reorganization plan quickly. Without the CRO and SALLC, the Debtor cannot survive in chapter 11.

<div align="center"><b><u>JURISDICTION</u></b></div>

3.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core

---

[1] The Engagement Agreement references paragraph 8.01 of the Debtor's company agreement. A copy of the Company agreement is attached hereto as <u>Exhibit C</u>.

<div align="center">2</div>

proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

4.    The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A. Case Background

5.    On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

6.    The Debtor continue to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

7.    As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B. The Debtor

8.    Alex E. Jones ("Jones") owns one hundred percent (100%) of the equity in FSS.

9.    FSS is presently engaged in the business of producing and syndicating Jones' and other radio and video talk shows and selling products targeted to Jones' audience via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) and other programs from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.    On its InfowarsStore.com website, FSS makes available to customers dietary supplements, including Bodease, Vitamin Mineral Fusion, Vitamin D3 Gummies, Ultimate

3

Immune Support Pack, Pollen Block, Tea Tree Shampoo, and other health products (collectively, "Supplements"). The website also has available books, videos, t-shirts and other products (collectively, "Non-Supplements") Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of Supplements which have traditionally been supplied by or through PQPR, an affiliated entity.

11.     As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios. This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.     FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

13.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from InfowarsStore.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

14.     Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones.

15.     PQPR formulates supplements for FSS to market on its shows. Ultimately, FSS relied on PQPR to supply the Supplements as other vendors would not supply FSS. PQPR ordered

004204

and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018, FSS has had difficulty finding third parties willing and able to fulfill product sales. In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.

18.     Recently, FSS retained a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company. The fulfillment company charges FSS a flat fee per order regardless of size.

**C. Pending Litigation Against the Debtor**

19.     The Debtor's financial distress stems primarily from statements of Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Various parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

20.     The relatives of the Sandy Hook victims and certain other parties (the "<u>Sandy Hook Plaintiffs</u>") assert, among other things, that Jones and other employees of FSS made defamatory statements and inflicted emotional distress. In 2018, the Sandy Hook Plaintiffs brought actions in Texas and Connecticut (collectively, the "<u>Sandy Hook Lawsuits</u>") against Jones, FSS and certain affiliates of the Debtor. The crux of the allegations in the Sandy Hook Lawsuits is that Jones and

5

FSS employees damaged the Sandy Hook Plaintiffs by saying or implying that the Sandy Hook shooting did not occur, and that the entire incident was a "false flag" hoax.

21.     Jones, FSS, and the Debtor have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits. Despite the substantial amount spent, both the Texas and Connecticut courts have ruled that Jones and the Debtor failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default.

22.     The jury in the Heslin\Lewis State Court Action returned jury verdicts against FSS and Jones ordering them to pay $45,200,000 in punitive damages on top of $4,100,000 in compensatory damages on Thursday and Friday August 4 and 5, 2022. The Debtor requires the services of the CRO to assist it in managing the business of FSS while it reviews the next steps in the Sandy Hook Lawsuits.

### D.  The Debtor Needs a CRO and SALLC

23.     Since inception, FSS has been a "single talent business", *to wit*, without Alex Jones and his show, there would neither be an InfoWars nor any internet sales. Despite the rapid growth in the diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems. FSS failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. The Debtor and its employees continued to run the business with an inverted T structure, as though it was still a family business.

24.     In 2022, Alex Jones retained professionals to evaluate FSS. Since May 2022, FSS has retained Schwartz as its CRO with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. Schwartz retained his firm Schwartz Associates to perform various accounting and forensic work associated with his mandate.

6

25.     Throughout the review conducted by the CRO and his team, they have been given complete access to FSS employees, books and records.

26.     Among the preliminary conclusions reached in Schwartz' analysis of FSS are: (a) Although the company had a controller and two bookkeepers (none of which appear to have any formal accounting background), the 2021 general ledger had not been completed and the books for that period were not closed; (b) Few transactions had been recorded in the 2022 general ledger; (c) No financial statements were produced for the company for the 18 months preceding Schwartz' engagement; (d) The bank accounts had not been reconciled in 2021 or 2022; and (e) Internal accounting controls were completely inadequate, including lack of segregation of duties, absence of written monthly, quarterly and annual closing schedules, lack of supervisory review of key accounting functions, including vendor set up, bank reconciliations, inventory reconciliations, or intercompany billings; (f) Payments to vendors were debited to an expense account, but not to the specific vendor account; and (g) Credit card transactions were not recorded to specific expense accounts.

27.     Since their engagement, Schwartz and his team have closed the books for 2021 and made significant progress fixing past bookkeeping omissions and oversights. As a result of these actions, the CRO has a vastly improved understanding of FSS's financial standing and its ability to operate profitably going forward.  Schwartz has also renegotiated business terms with PQPR on the allocation of proceeds from product sales to be more favorable to FSS.

**E.  Proposed Employment of Schwartz as the CRO**

  *i.  Scope of Employment*

28.     The Debtor seeks to engage Schwartz as the CRO to advise and lead the day-to-day restructuring efforts of the Debtor, pursuant to the Engagement Agreement. The Debtor contemplates that the CRO will perform some or all the following tasks:

004207

a.    Make business and debt restructuring decisions, including as it relates to business strategy(ies) and other key elements of the business;

b.    Manage due diligence requests and other items requested by various constituents as part of the restructuring process;

c.    Prepare cash flow forecasts and related financial and business models;

d.    Identify and implement short and long-term liquidity initiatives;

e.    Prepare Statement of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the Court, as well as provide necessary testimony before the Court on matters within CRO's areas of expertise;

f.    Review inventory marketability and provide monetization alternatives;

g.    Make operating decisions;

h.    Implement cost containment measures;

i.    Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and other parties-in-interest and submit proposals to the Court;

j.    Work to maximize the value of the Debtor;

k.    Oversee all business decisions of Debtor, as necessary or required, utilizing CRO's business judgment;

l.    Execute all documents and take all other acts necessary to effectuate the restructuring of the Debtor; and

m.    The Debtor also seeks authority for other staff of SALLC to perform services required to assist the CRO within the scope of this engagement.

ii.    *Necessity of Employment*

29.    The Debtor believes that the retention and employment of the CRO is necessary and appropriate to operate the Debtor's business properly and administer the Chapter 11 Case and ultimately prepare and obtain confirmation of a plan of reorganization. While Alex Jones produces his show and markets products on his show, the Debtor needs a professional with financial

004208

expertise to serve as an officer of the Debtor to perform the services indicated in the Engagement Agreement.

### iii. *Reasons for Selection*

30.     The Debtor believes that the CRO is well qualified to provide management services that will assist and enhance the Debtor's efforts to maximize value to their creditors.

31.     Schwartz is a licensed CPA with more than 40 years' experience providing expert witness and financial restructuring services. He frequently serves as a chief restructuring officer, and as a federal and state court appointed receiver, in bankruptcy and non-bankruptcy proceedings. Mr. Schwartz is one of approximately 200 full members of the National Association of Federal Equity Receivers. He understands how to be a fiduciary.

### iv. *Proposed Compensation & Reimbursement*

32.     The Debtor intends to file a motion to establish interim compensation procedures in this case. Schwartz and SALLC intend to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including sections 330 and 331, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim compensation order entered in these Chapter 11 Case.

33.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, the Debtor proposes to pay on an hourly basis the CRO and SALLC, as set out in the Engagement Agreement and summarized in the following chart:

| BILLER | RATE |
|---|---|
| W. Marc Schwartz (CRO) | $690.00 per hour |
| M. Christian Schwartz | $470.00 per hour |
| Managers | $350.00 per hour |
| Associates | $280.00 per hour |
| Analysts | $210.00 per hour |
| Administrative Staff | $95.00 per hour |

004209

34.     Additionally, the Engagement Agreement provides that the Debtor shall be responsible for the reasonable and necessary documented out-of-pocket costs and expenses incurred by CRO and SALLC in connection with the engagement. SALLC will submit detailed documentation of all expenses incurred in connection with requests for reimbursement.

35.     The Debtor believes that the agreed terms of reimbursement, compensation, and hourly rates are reasonable. The CRO will notify the Debtor of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

     *v.*     *Retainer*

36.     The Debtor engaged the CRO prior to the Petition Date. The CRO and SALLC received a retainer of $75,000.00 and a total payment of $78,811.39 for pre-petition work performed for FSS. The source of the retainer and the payment of the invoices is FSS.

37.     Pursuant to the Engagement Agreement, the Debtor proposes that SALLC will hold the Retainer to be applied to SALLC's final fees and expenses at the conclusion of the engagement. The Proposed Order modifies the Engagement Agreement such that the CRO and SALLC shall not draw on the Retainer except upon order of the Court awarding final compensation and reimbursement in the Chapter 11 Case.

     *vi.*     *Disinterested*

38.     Neither Schwartz nor SALLC is a creditor, equity security holder or an insider of FSS. Under Bankruptcy Code § 101(31)(B), the "corporation" is the closest entity similar to an LLC, which FSS is.  An "insider" if the debtor is a corporation, includes " (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).

004210

39.     Schwartz and SALLC do not qualify as an insider under (i), (iv), (v) and (vi).

40.     Schwartz served since May 19, 2022, as the CRO of the Debtor, and therefore may qualify under (ii). SALLC does not.

41.     Schwartz and SALLC do not qualify as a "person in control" of the debtor, as Schwartz had delegated to it managerial duties of the LLC, but those duties under Texas law cannot be supplanted by the rights of the owners of the LLC. Schwartz and SALLC do not qualify as an insider under (iii).

42.     Neither Schwartz nor SALLC have been within 2 years before the date of filing of the petition, a director, officer, or employee of the debtor. Again, Schwartz served as the CRO of FSS prior to the Petition Date.

43.     Neither Schwartz nor SALLC have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason. Prior to entry into the Engagement Agreement, Schwartz and SALLC did not have a materially adverse interest to FSS.

44.      Their acting in a similar role at InfoWDebtors did not create an "interest materially adverse" to the interest of FSS's creditors or equity security holders. First, there was no dispute between FSS and InfoW over the licensing agreement over the name and the tradename. Second, the CRO and SALLC's mandate to "lead InfoW's management and personnel through the restructuring process" had for all practical purposes concluded by May 19, and for sure by June 6. May 19 is when the Texas and Connecticut Plaintiffs dismissed all of their claims against the InfoWDebtors via stipulations or motions. June 6 is when the Bankruptcy Court signed the Stipulation for Dismissal of the Chapter 11 Cases of the InfoWDebtors.

11

vii.    _Connections_

45.    The Schwartz Declaration sets out the connections of the CRO and SALLC with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, neither the CRO nor SALLC hold any connections other than those disclosed in the Schwartz Declaration.

46.    Schwartz has familiarity with the players involved in FSS as he served as the CRO of InfoWDebtors. As described in the Schwartz Declaration, Schwartz continues to serve as the CRO for the three (3) companies, InfoW, LLC, IWHealth, LLC and Prison Planet, tv Ltd. The bankruptcy cases of those three companies have been dismissed and Schwartz has not been asked to undertake any new assignments for these three companies.  At the present time, Schwartz's only duties with respect to the InfoWDebtors is to receive and deposit the return of the excess of the funds paid to the subchapter v Trustee in that case and the amount allowed in her final fee application.

47.    At the time Schwartz was engaged  on June 6, 2022 as CRO by FSS, he was the CRO of the InfoWDebtors. By that time,  the InfoWDebtors' bankruptcy cases were substantially over in that the CRO had negotiated the release with prejudice of the InfoWDebtors from the Texas and Connecticut litigation and had reached an agreement with the United States Trustee to move for dismissal of the subject bankruptcy cases.

48.    The Debtor believes that neither the CRO nor SALLC holds or represents any disqualifying interest that is adverse to the estate, and each is a "disinterested person." If any new relevant facts or relationships are discovered, the CRO and SALLC will supplement its disclosure to the Court and the U.S. Trustee.

## **BASIS FOR RELIEF**

49.     Subject to Court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." Bankruptcy Code § 327(c) says that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

50.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

    a.    Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

    b.    State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

    c.    Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

### A.  The CRO and SALLC Meet the Requirements of Bankruptcy Code § 327(a)

004213

51.     Based on the Schwartz Declaration, the Debtor submits that neither the CRO nor SALLC hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

52.     The Bankruptcy Code defines what it means to be a "disinterested person" Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

The Schwartz Declaration discloses no connections with the Debtor that would disqualify the CRO or SALLC as a "disinterested person" and the Debtor is not aware of any connections in addition to those disclosed in the Schwartz Declaration.

**B. This Application and the Schwartz Declaration Meet the Requirements of Bankruptcy Rule 2014.**

53.     This Application and the Schwartz Declaration meet the requirements as set out in Bankruptcy Rule 2014. The Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, and the proposed arrangement for compensation. The Schwartz Declaration is a verified statement pursuant to 28 U.S.C. § 1746 that sets out all connections that the CRO and SALLC has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtor is not aware of any other connections in addition to those disclosed in the Schwartz Declaration.

14

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form of the Proposed Order approving the employment of the CRO and SALLC effective as of the Petition Date, pursuant to the terms of the Engagement Agreement and grant any other appropriate relief.

Dated: August 20, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

004215

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division

PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

*/s/R. J. Shannon*

17

004217

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

18

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T                                    Justin Lair
PO Box 5001                             1313 Lookout Ave
Carol Stream, IL 60197-5001             Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple                         Jarrod B. Martin
Cain & Skarnulis PLLC                   Chamberlain Hrdlicka
303 Colorado Street, Suite 2850         1200 Smith Street, Suite 1400
Austin, Texas 78701                     Houston, TX 77002

Randy W. Williams                       Christopher J. Dylla
Byman & Associates PLLC                 Assistant Attorney General
7924 Broadway, Suite 104                Bankruptcy & Collections Division
Pearland, TX 77581                      PO Box 12548
                                        Austin, TX 78711-2548
Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

004219

**Additional Notice Parties**

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

004220

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF

Upon the *Debtor's Application for Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1]; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. The Application is granted, to the extent set forth herein.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

2.     In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain W. Marc Schwartz, effective as of the Petition Date, as its chief restructuring officer (the "CRO"), under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.     The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Alexander E. Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Case.

4.     The CRO is authorized to delegate appropriate tasks to Schwartz Associates, LLC ("SALLC"), pursuant to the terms of the Engagement Agreement.

5.     The CRO and SALLC shall be compensated for their services and reimbursed for actual expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules, and any orders of this Court; *provided*, *however*, that the CRO and SALLC shall not seek reimbursement from the Debtor's estate for any fees incurred in defending any fee applications in this Chapter 11 Case.

6.     All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

2

7.      Notwithstanding anything to the contrary in the Engagement Agreement, the CRO and SALLC shall hold any prepetition retainer, pending a final order allowing compensation and reimbursement in these cases or order otherwise directing disposition of the retainer amounts.

8.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the CRO and SALLC shall not be entitled to reimbursement or fees and expenses in connection with any objection to their fees, without further order of the Court.

9.      The CRO and SALLC shall provide ten (10) business days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

10.     The CRO and SALLC shall use reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals in this Chapter 11 Case.

11.     The CRO and SALLC will review their files periodically during the pendency of the Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and SALLC will use reasonable efforts to identify such further developments and will promptly file a supplemental Declaration, as required by Fed. R. Bankr. P. 2014(a).

12.     To the extent the Application, the Schwartz Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

3

13.     The Debtor, the CRO, and SALLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

14.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated this ___ day of August, 2022.

_____
UNITED STATES BANKRUPTCY JUDGE

4

# EXHIBIT A

**Engagement Agreement**

004225



**Schwartz** Associates

May 19,2022

**VIA EMAIL**

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. CRO will work to maximize returns and to assure a fair pro rata distribution to all unsecured creditors.

## I.     Scope of Engagement

CRO will lead FSS' management and personnel through the restructuring process. It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

1

**EXHIBIT**

4

tabbies®

004226



**Schwartz** Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;
10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.
11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

## II.    Indemnification

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

2



**Schwartz**Associates

### III. Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV. Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V. Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3



**Schwartz** Associates

**VI.    Term & Termination**

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

**VII.    Compensation**

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

**A.  Retainer**

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

4



**Schwartz** Associates

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII. CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX. Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5

004230



**Schwartz** Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

004231

# **EXHIBIT B**

**Schwartz Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## <u>DECLARATION OF W. MARC SCHWARTZ</u>

I, W. Marc Schwartz, declare under penalty of perjury as follows:

1.      I am a CPA and a founder and chairman of Schwartz Associates, LLC ("<u>SALLC</u>"). On my behalf and SALLC's, I am duly authorized to execute this Declaration in support of the Application filed by Free Speech Systems, LLC  (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>") seeking approval to retain me as the chief restructuring officer ("<u>CRO</u>") and SALLC to assist me in those duties.

2.      Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, upon the client and matter records of SALLC reviewed by me or SALLC staff under my supervision and direction or derived from information available to me that I believe to be true and correct or my opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**A. Application to Employ CRO**

3.      I have reviewed the Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief (the "Application"). The Application accurately describes my proposed role as the CRO.

**B. Disclosure of Connections**

4.      SALLC performed the following actions to determine whether it or any of its professionals has any disclosable connections to the Debtor, creditors, any other party in interest, their attorneys or accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas:

   a.      First, SALLC staff sent emails to all email account holders within SALLC requesting the recipient respond to any representation known to be adverse or otherwise connected to the Debtor or its estate. Neither I nor my staff received any responses indicating that a conflict or connection exists.

   b.      Second, SALLC staff conducted a computerized search of all clients of SALLC using the list of parties in interest listed in Schedule 1 hereto.

   c.      No connections or potential connections were identified.

   d.      Analyzed with FSS bankruptcy counsel whether having previously served as the CRO of InfoW, LLC, IWHealth LLC and Prison Planet TV LLC created a disqualifying connection or constituted a connection requiring disclosure in the Rule 2014 Statement.

5.      The email and computerized search uncovered no connections other than I and SALLC have worked with many of the same parties and creditors in connection with serving as the CRO and SALLC serving as my staff in the InfoWDebtors bankruptcy cases. The equity in and to the InfoWDebtors had been transferred by Alex Jones to a separate trust, so that Mr. Jones

2

had no ownership interest or control over the equity of those entities. On the other hand, Alex Jones is the sole owner and managing member of FSS.

6.      The Creditors and Parties in Interest and Attorneys for Creditors and Parties in Interest in Schedule 1 is similar to the creditors and parties in interest in the InfoWDebtors bankruptcy cases. As a result of their decision to withdraw their claims against the InfoWDebtors, these same parties are no longer creditors and parties in interest against InfoWDebtors.

7.      The Creditors and Parties in Interest here are adverse to FSS, similar to the position they were against InfoWDebtors. Applicant submits that previously serving as CRO for InfoWDebtors does not create an actual or potential conflict of interest as against the Creditors and Parties in Interest.

8.      Out of an abundance of caution, Applicant sets forth below the chronology of his involvement with InfoWDebtors, and, FSS, to establish that he did not start serving as the CRO for FSS until his mandate under the InfoWDebtors Engagement Agreement had terminated.

9.      *"Connection" to the InfoWDebtors.* InfoW, LLC, f/k/a Infowars, LLC, IW Health, LLC f/k/a Infowars Health, LLC, Prison Planet TV, LLC (the "InfoWDebtors") were not financially healthy companies with no need to reorganize. Each of the Plaintiffs brought and continued lawsuits against one or more of the InfoWDebtors for over four (4) years. Both the Texas and Connecticut Plaintiffs had obtained judgments with respect to liability. Absent restructuring, the InfoWDebtors did not have the ability to pay any significant judgment or even the already-imposed sanctions. Chapter 11 relief was necessary for the InfoWDebtors.

10.     On April 17 and 18, 2022 (the "Petition Date"), each of the InfoWDebtors commenced a bankruptcy case by filing a petition for relief under chapter 11, subchapter v, of the

3

Bankruptcy Code with the United States Bankruptcy Court, Southern District of Texas, Victoria Division.

11.     In the InfoWDebtors' bankruptcy cases, Alex Jones and FSS agreed to pay into a trust pursuant to a Plan Support Agreement ("PSA") to be distributed according to a confirmed plan of reorganization (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters.

12.     Immediately after the Petition Date, the Texas Plaintiffs, the Connecticut Plaintiffs and the U.S. Trustee all filed emergency motions to dismiss the bankruptcy cases of the InfoWDebtors. The Texas and Connecticut Plaintiffs did not want to engage in negotiations over the proposed plan treatment with the Debtors, FSS or Alex Jones.

13.     While the InfoWDebtors had filed a series of emergency pleadings to have the former Bankruptcy Judges Nelms and Schmidt to Serve as Trustees of the 2022 Litigation Settlement Trust [ECF No. 6](the "Trustee Motion") and Marc Schwartz serve as the CRO for InfoWDebtors approved [ECF No. 7]("CRO Application"), the Texas Plaintiffs, Connecticut Plaintiffs and the U.S. Trustee all opposed hearings on those emergency motions and requested the Court to consider their emergency motions to dismiss the Chapter 11 Cases first. By the time of dismissal of the InfoWDebtors' bankruptcy cases in June, 2022, the Court had not ruled on the Trustee Motion and the CRO Application.

14.     By May 6, 2022, *only 18 days after the Petition Date*, counsel for both the Texas and Connecticut Plaintiffs announced that they were dismissing their claims against the InfoWDebtors from their respective lawsuits. I directed my bankruptcy counsel to work with Plaintiffs' counsel to make sure that their claims were withdrawn with prejudice against the

4

InfoWDebtors. The Connecticut Plaintiffs filed motions to dismiss their claims against the InfoWDebtors with prejudice on or about May 13, 2022. The InfoWDebtors finalized, submitted and had the Bankruptcy Court approve the Stipulations of Dismissal of the Texas Plaintiffs Claims with Prejudice by May 19, 2022.

15.     Upon dismissal of the Plaintiffs' claims against the InfoWDebtors, the purpose for the PSA no longer existed and it terminated by its own terms. While counsel for FSS and Alex Jones advised the Court that the parties would extend the PSA deadlines beyond April, the Amended PSA was negotiated but never executed and the Litigation Trustee's never approved the amendment.

16.     I then conferred with my bankruptcy counsel to determine whether continuation of the subchapter v bankruptcy cases was in the best interest of the estates. First, the InfoWDebtors still had to litigate with the U.S. Trustee as to whether the InfoWDebtors were proper subchapter v debtors. Second, the *raison d'etre* for the bankruptcy (to have the Plaintiffs participate as claimants under the plan of reorganization) no longer existed. Third, I had limited access to funds to administer the estates, in light of breaches under the PSA. Fourth, the dismissals of both Texas and Connecticut Plaintiffs' claims with prejudice left the estate with only four (4) remaining creditors.

17.     I had to decide whether I needed the cost and expense of a chapter 11 to handle the four (4) remaining claims against the InfoWDebtors. I concluded I did not. I then immediately directed my bankruptcy counsel to work with the U.S. Trustee's office in order to have the InfoWDebtors' bankruptcy cases dismissed.

004237

18.     On June 1, 2022, the U.S. Trustee and the Debtors filed a Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. On June 6, 2022, the Bankruptcy Court approved the Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases.

19.     Neither I nor SALLC was contacted about serving as a CRO for Free Speech Systems, LLC until May 19, 2022, when my assignment in the InfoWDebtors bankruptcy case had reached a favorable outcome for those debtors. For all practical purposes, my mandate to reorganize the InfoWDebtors had concluded because the bankruptcy cases no longer had the necessary participants to implement the global settlement. I had nothing to restructure or reorganize of InfoWDebtors at that point. The balance of the work I was performing was ministerial.

20.     As of May 19, 2022 and continuing through today, there is no adversity between any of the dismissed InfoWDebtors and FSS. No default exists under the license agreement between InfoW and FSS. To the best of my knowledge, there are no claims that exist between FSS and the InfoWDebtors. Furthermore, my mandate under the InfoW Engagement Agreement to be "in charge of the Client's restructuring process" terminated by its own terms. InfoW Engagement Agreement, P1. InfoWDebtors no longer needed anyone in charge of the restructuring process because the major claims against them had been withdrawn with prejudice.

21.     Out of an abundance of caution and to assure that the Court and the FSS parties that the CRO does not have biases, I submitted a written resignation of my position as CRO and the resignation of SALLC as my staff to InfoWDebtors to the Trustee of the InfoWDebtors prior to my filing this Declaration.

22.     The results of the foregoing connections search process and Declaration confirm that neither I, SALLC, nor any of its employees or shareholders, to the best of my knowledge, have

004238

any disqualifying connections. Neither I nor SALLC (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

### C. Affirmative Statement of Disinterestedness

23.     Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and SALLC are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

24.     I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

25.     SALLC is not a creditor, an equity security holder, or an insider of the Debtor; SALLC is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and SALLC does not have any interest materially adverse to the interests of the Debtor' bankruptcy estates or any class of creditors or equity security holders.

26.     My having previously served as the CRO of InfoWDebtors and the connections to the same parties from that case will not in the slightest degree color my independent and impartial attitude required by the Code. In fact, I believe my previous experience with the parties involved will allow me to negotiate in good faith, foster communication among the constituents and often allow parties to achieve negotiated results rather than litigation.

27.     My previous service as the CRO of InfoWDebtors demonstrates that I faithfully will execute my fiduciary duties. Concerns were expressed at the inception of the InfoWDebtors bankruptcy case whether I would be serving Alex Jones or the creditors of InfoWDebtors. While it would have been beneficial to Alex Jones to contest the withdrawal of claims against the Debtors

004239

and prolong those bankruptcy cases, I directed counsel to assure only one thing in those negotiations: Assure that the InfoWDebtors had no more claims that could be asserted against it by the Texas and Connecticut Plaintiffs. Once that was accomplished, I quickly assessed that the best course for those debtors was to solve the remaining debtor-creditor issues outside of chapter 11.

28.     I do not possess or have any economic interest that would tend to lessen the value of the FSS bankruptcy estate. Nor one that would create either an actual or potential dispute in the which the two estates are rival claimants. Even if such a dispute were to arise, I would be representing FSS at this time, as I have resigned from being a CRO at InfoWDebtors. Furthermore, I would most likely have to recuse myself if it involved a matter on which I had done work for InfoWDebtors prior to my being engaged by FSS.

29.     I do not possess a pre-disposition under the circumstances that render such a bias against the estate. I can serve as an effective disinterested fiduciary at FSS.

30.     Finally, SALLC and I were retained pursuant to the Engagement Letter prior to the Petition Date to prepare for the filing. My understanding is that Bankruptcy Code § 1107(b) provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

### D.  Bankruptcy Rule 2016(b) Disclosures

31.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, neither I nor SALLC have shared or agreed to share (a) any of its compensation from the employment by the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.

004240

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 20, 2022,

By: _W. Marc Schwartz_____
     W. Marc Schwartz

9

**SCHEDULE 1**

**TO SCHWARTZ DECLARATION**

**SEARCHED PARTIES**

Debtor & Professionals

    Law Office of Ray Battaglia        Shannon & Lee, PLLC


Debtor's Equity

    Alexander E. Jones

Creditors & Parties in Interest

| | |
|---|---|
| Brennan Gilmore | Leonard Pozner |
| Carlee Soto-Parisi | Marcel Fontaine |
| Carlos Soto | Mark Barden |
| Christopher Sadowski | Neil Heslin |
| Dona Soto | Nicole Hockley |
| Erica Lafferty | PQPR Holdings Limited, LLC |
| Francine Wheeler | Robert Parker |
| Free Speech Systems, LLC | Scarlett Lewis |
| Ian Hockley | Veronique De La Rosa |
| Jacqueline Barden | William Sherlach |
| Jennifer Hensel | William Aledenberg |
| Jeremy Richman | Larry Klayman |
| Jillian Soto | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | McDowell Heterhington LLP |
| Koskoff Koskoff & Bieder | The Akers Law Firm PLLC |
| Fertitta & Reynal LLP | Copycat Legal PLLC |
| Pattis & Smith, LLC | Waller Lansden Dortch & Davis, |
| Zeisler & Zeisler P.C. | LLP |
| Jordan & Ortiz, P.C. | |

U.S. Bankruptcy Judges and Staff

004242

Chief Judge David R. Jones                    Tracey Conrad
Judge Marvin Isgur                            Jeannie Chavez
Judge Christopher M. Lopez                    LinhThu Do
Judge Jeffrey P. Norman                       Tyler Laws
Judge Eduardo V. Rodriguez                    Kimberly Picota
Albert Alonzo                                 Vriana Portillo
Ana Castro                                    Mario Rios


U.S. Trustee Personnel

Alicia Barcomb                                Jayson B. Ruff
Jacqueline Boykin                             Millie Sall
Luci Johnson-Davis                            Patricia Schmidt
Hector Duran                                  Christy Simmons
Barbra Griffin                                Gwen Smith
Brian Henault                                 Stephen Statham
Linda Motton                                  Christopher R. Travis
Ha Nguyen                                     Clarissa Waxton
Glenn Otto                                    Jana Whitworth
Yasmin Rivera

**EXHIBIT C**

**FSS Company Agreement**

004244

**COMPANY AGREEMENT OF**
**FREE SPEECH SYSTEMS, LLC**

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

1.    **Formation of the Company.**

    **1.01    Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

    **1.02    Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

    **1.03    Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

2.    **Organization of the Company.**

    **2.01    Name of the Company.** The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

    **2.02    Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

    **2.03    Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

2.04   **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3.   **Definitions.**

3.01   **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Agreement**" means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

"**Capital Contribution**" means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

"**Code**" means to the Internal Revenue Code of 1986, as it has been and may be amended.

"**Company**" means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

"**Company Minimum Gain**" shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Company Property**" or "**Company Properties**" means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

- 2 -

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company.  The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

- 3 -

004247

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interest**" means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"Permitted Transferee" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

"**Person**" means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

"**Profits**" and "**Losses**" means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

"**Required Interest**" means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

"**Standard Rate**" means a per annum rate of interest equal to ten percent (10%), compounded annually.

"**Tax Distribution**" with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

"**TBOC**" means the Texas Business Organizations Code, as it may be amended from time to time.

004248

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

**3.02    Other Defined Terms.**  Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

**4.    Capital of the Company.**

**4.01    Initial Capital Contributions.** Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

**4.02    Additional Capital Contributions.**  The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers.  For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

**4.03    Failure to Make Additional Capital Contributions.** If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

**4.04    Capital Accounts.**  A Capital Account shall be established and maintained for each Member.  It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations.  In that regard, each Member's Capital Account shall be:

(a)    Increased by:

- 5 -

(i)    The amount of money contributed by that Member to the Company;

(ii)    The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)    Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)    Decreased by:

(i)    The amount of money distributed to that Member by the Company;

(ii)    The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)    Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)    Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

**4.05** **Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

**5.** **Allocations.**

**5.01** **Allocation of Profits.** After giving effect to the special allocations set forth in <u>Section 5.03</u>, Profits for each taxable year shall be allocated in the following order and priority:

- 6 -

(a) First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b) Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02   **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a) Losses for any taxable year shall be allocated in the following order and priority;

(i) First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii) Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b) The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03   **Special Allocations.** The following special allocations shall be made in the following order:

(a) **Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b) **Member Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)     Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

- 8 -

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

**5.04**   **Curative Allocations.** The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04.   Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

**5.05**   **Section 704(c) Allocations.** In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

**5.06**   **Other Allocation Rules.** In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

**5.07**   **Allocations on Transfer.** Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

(a)   For the months prior to the transfer, to the assignor;

(b)   For the months subsequent to the transfer, to the assignee; and

- 9 -

(c)     For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6.     **Distributions.**

6.01     **Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.02     **Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)     Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.03     **Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

- 10 -

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

7. **Fiscal Matters; Books and Records.**

7.01 **Bank Accounts; Investments.** Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

7.02 **Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

7.03 **Books and Records of Account.** The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

7.04 **Tax Returns and Information.** The Members intend for the Company to be treated as a partnership for tax purposes. The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of: (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

7.05 **Tax Elections.** The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

7.06 **"Tax Matters Member."** The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

- 11 -

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

8.    **Management of the Company.**

**8.01    Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation.  The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

**8.02    Powers of Managers/Delegation of Authority.** The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04.  Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

**8.03    Action by Managers.** Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held.  No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

9.    **Membership in the Company.**

**9.01    Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**9.02    Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

- 12 -

004256

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

### 10.    Restrictions Upon Membership Interests.

**10.01  Generally.**    The ownership and transferability of Interests in the Company are substantially restricted.  Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business.  Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02  Authorized Transfers at Death.**   An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.  However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03  Authorized Estate Planning Transfers.**   An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

004257

**10.04 Nonrecognition of an Unauthorized Transfer.** The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer"). If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05 Effect of Unauthorized Transfers.** If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a) The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b) The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c) Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d) Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e) In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate. The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid. The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f) Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g) Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06 Deemed Unauthorized Transfers.** In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

- 14 -

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

(a)     the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

(b)     the Bankruptcy of a Member;

(c)     the appointment of a receiver for all or substantially all of the assets of a Member;

(d)     the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

(e)     a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07  Admission of Substituted Members.

(a)     Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require.   Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

(b)     Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

(i)     the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

(ii)     the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

(iii)     the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

- 15 -

004259

(iv)    the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)    such other conditions as the Managers may reasonably impose.

(c)    In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08  Status of a Substituted Member.**  A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company.  Any such Substituted Member shall be treated as a Member.  In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09  Assignee of a Membership Interest.**  Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10  Membership Interest Pledge or Encumbrance.**  No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest.  It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

## 11.    Dissolution and Winding Up.

**11.01  Events Causing Dissolution.**  The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02  Winding Up.**  If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    Appointment of Liquidator.  The winding up of the Company's affairs shall be supervised by a Liquidator.  The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)    Powers of Liquidator.  In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)  First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)  Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

004261

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

### 12. Miscellaneous.

**12.01 Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee. For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02 Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04 Amendment.** Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05 Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06 Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or a Member. No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07 Arbitration.** Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

004262

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief. The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement. The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

      **12.08** **Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

      This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

- 19 -

EXECUTED to be effective as of the Effective Date.

**Members:**

_____
Kelly Jones

_____
Alex Jones

**Managers:**

_____
Alex Jones

SIGNATURE PAGE

004264

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $49.00 | 49% |
| Totals: | $100.00 | 100.00% |

## SCHEDULE B

### DETERMINATION OF FAIR MARKET VALUE
### OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A.   The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B.   Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement.   If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party.   If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed.   Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser.   If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest.   If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C.   For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding.   The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser.   The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D.   During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended.   Upon the final determination of fair market value, all time limits shall automatically commence.

004266

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

## APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTHORIZING EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR, AND (B) GRANTING RELATED RELIEF

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves for entry of an order, substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) and 327 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of Shannon & Lee LLP ("S&L" or the "Firm") as bankruptcy co-counsel for FSS (the "Application") pursuant to that certain engagement letter agreement by and between the Debtor and S&L, a copy of which is attached hereto as Exhibit A (the "Engagement Agreement"), as modified by the Proposed

Order. In support of the Application, the Debtor submits the Declaration of Kyung S. Lee attached hereto as Exhibit B (the "Lee Declaration") and respectfully represents as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

2.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

3.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (the "Chapter 11 Case") with the Court.

4.      The Debtor continues to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

5.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.      Proposed Employment of S&L

#### *i.      Scope of Employment*

6.      Subject to the Court's approval, S&L will serve as bankruptcy co-counsel in connection with the Debtor's Chapter 11 Case, commencing on July 29, 2022.

2

ii.     *Necessity of Employment*

7.      The Debtor believes that the assistance of counsel specializing in bankruptcy was and is necessary and appropriate to administer this Chapter 11 Case with the goal of ultimately confirming a plan of reorganization. The Debtor cannot proceed in chapter 11 without counsel and would face extreme difficulty complying with the provisions of the Bankruptcy Code and successfully reorganizing its financial affairs for the benefit of its creditors without attorneys who focus their practice on corporate bankruptcy.

iii.    *Reasons for Selection*

8.      The Debtor seeks to retain S&L because of the extensive experience of its attorneys. Mr. Shannon and Mr. Lee have extensive experience in all aspects of corporate bankruptcy and in representing chapter 11 debtors in this district. Further, due to their involvement in the bankruptcy cases of the InfoWDebtors (defined below), S&L attorneys have familiarity with the Debtor's corporate structure, the litigation brought against the Debtor related to statements after the Sandy Hook mass shooting (the "Sandy Hook Litigation"), and many of the relevant creditors and parties in interest. Familiarity with the Sandy Hook Litigation has been particularly important in the early stages of the Chapter 11 Case.

9.      S&L is familiar with the Debtor's financial condition in connection with the preparation of the Debtor's petition, schedules, and statement prior to the Petition Date. Substantial effort was also expended by the CRO to bringing the books and records of FSS up to speed prior to the Petition Date. The CRO also spent significant time to understanding the commercial and vendor relationship forming the core basis of FSS's business. S&L was intimately involved in that entire learning process.

004269

10.     Any other firm would need to expend significant time and effort to become familiar with the Debtor's business and business model that would delay making progress in administering the Chapter 11 Case.

11.     The Debtor therefore believes that S&L is well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner as bankruptcy co-counsel for FSS.

    *iv.     Proposed Compensation & Reimbursement*

12.     S&L intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the U.S. Trustee, and any orders of this Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred during its representation of the Debtor.

13.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, the Debtor proposes to pay S&L as set out in the Engagement Agreement attached hereto as Exhibit B and as summarized in the following chart:

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| RJ Shannon | $650 |
| Associate Attorneys | $300 - $650 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

14.     The Debtor believes that S&L's agreed terms of reimbursement, compensation, and hourly rates are reasonable. S&L will notify the Debtor and the U.S. Trustee of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

4

*v.*    *Retainer*

15.    Effective as of June 1, 2022, Kyung Lee and R. J. Shannon formed the law firm of Shannon & Lee LLP to practice corporate bankruptcy law. Mr. Shannon and Lee are the only two attorneys of S&L. On June 6, 2022, FSS executed the Engagement Letter and retaining S&L.[1] FSS paid S&L a retainer of $100,000 on or about June 7, 2022, that was held in trust in S&L's IOLTA account.

16.    On July 28, 2022, (a) FSS paid S&L $84,034.12 for work performed by S&L during the month of June 2022 and (b) S&L took into income $99,177.32 from the $100,000 retainer for work performed by S&L from July 1 to July 29, 2022.[2] $822.68 remained in the S&L IOLTA account.

17.    On July 29, 2022, prior to the filing of its petition for chapter 11 relief, FSS replenished S&L's IOLTA account with a wire transfer of $50,000. The total amount of retainer S&L held in its IOLTA account on behalf of FSS on the Petition Date was $50,822.68 (the "Retainer"). S&L continues to hold the Retainer in trust in its IOLTA Account.

18.    The Proposed Order provides that S&L shall continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

*vi.*    *Connections*

19.    The Lee Declaration sets out S&L's connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and

---

[1] The Engagement Letter was effective May 24, 2022, on which date Kyung Lee began providing services to FSS, practicing through Kyung S. Lee PLLC ("KSLPLLC"). KSLPLLC received payment from the Debtor of $21,986.59 for services provided to FSS from May 24, 2022, through May 31, 2022.

[2] This amount included an estimate of six hours of services for each of Mr. Shannon and Mr. Lee on July 28 and July 29, 2022. The actual time expended exceeded the estimate.

5

any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, S&L does not hold any connections other than those disclosed in the Lee Declaration.

20.    Mr. Shannon and Mr. Lee previously represented InfoW, LLC, IWHealth, LLC, and Prison Planet TV, LLC (the "InfoWDebtors"), in the cases jointly administered as Case No. 22-60020 before this Court.[3] One or more of the InfoWDebtors were defendants in the Sandy Hook Litigation. On May 13, 2022, the Connecticut Sandy Hook plaintiffs filed notices of dismissal with prejudice as to their claims against the InfoWDebtors.[4] *See* Dkt. No. 98, Case No. 22-60020 (Bankr. S.D. Tex.). On May 18, 2022, the Texas Sandy Hook plaintiffs and the InfoWDebtors entered a stipulation to resolve their claims against the InfoWDebtors, which was approved and ordered by the Court on May 19, 2022. *See* Dkt. Nos. 96 and 98, Case No. 22-60020 (Bankr. S.D. Tex.). The InfoWDebtors and the U.S. Trustee agreed to the dismissal of the InfoWDebtors' chapter 11 cases on June 1, 2022, which dismissal was ordered by the Court on June 10, 2022. Dkt. Nos. 110 and 114, Case No. 22-60020 (Bankr. S.D. Tex.). The Debtor does not have any claims against the InfoWDebtors and does not believe that the InfoWDebtors have any claims against the Debtor.

21.    The Debtor believes that S&L neither holds nor represents a disqualifying interest that is adverse to the estate and is a "disinterested person."  If any new relevant facts or relationships are discovered, S&L will supplement its disclosure to the Court.

---

[3] The InfoWDebtors' applications to employ of Parkins & Rubio LLP and KSLPLLC were never approved in the InfoWDebtors' chapter 11 cases.

[4] Upon the dismissal with prejudice of the Connecticut Sandy Hook plaintiffs' claims against the InfoWDebtors—and the then forthcoming dismissal of claims with prejudice of the Texas Sandy Hook plaintiffs—the restructuring contemplated by the Plan Support Agreement at in the InfoWDebtors' bankruptcy case was no longer possible.

004272

### vii.    Co-Counsel Relationship

22.    S&L is being retained to serve as co-counsel for FSS along with The Law Offices of Ray W. Battaglia, PLLC (the "Battaglia Firm").  The two law firms have agreed to a division of labor substantially like the manner which multiple attorneys within the same law firm would handle a similar case.  Each firm is aware of the need to avoid duplication of effort and have taken steps to minimize the degree to which their services will overlap.  S&L will be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case.  The Battaglia Firm will provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy.  The firms will allocate primary responsibility as appropriate for drafting pleadings and handling contested matters and meetings with the Debtor and opposing counsel.  For certain matters it will be necessary to involve more than one lawyer and the firms will jointly handle such matters, mindful of the need to avoid duplication whenever possible.

### RELIEF REQUESTED

23.    The Debtor requests that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtor to retain S&L as bankruptcy co-counsel, pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order, effective as of July 29, 2022.

### BASIS FOR RELIEF

24.    Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the

7

trustee's duties . . . ." Bankruptcy Code § 327(c) provides that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

25.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

(a)     Be filed by the trustee or committee and served on the United States Trustee (except in case under chapter 9 of the Bankruptcy Code);

(b)     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

(c)     Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

## A.     S&L Meets the Requirements of Bankruptcy Code § 327(a)

26.     Based on the Lee Declaration, the Debtor submits that S&L neither holds nor represents a disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

27.     The term "disinterested person" is defined by the Bankruptcy Code. According to Bankruptcy Code § 101(14):

The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have

8

> an interest materially adverse to the interest of the estate or of any
> class of creditors or equity security holders, by reason of any direct
> or indirect relationship to, connection with, or interest in, the debtor,
> or for any other reason.

28.     The Lee Declaration discloses no connections with the Debtor that would disqualify S&L as a "disinterested person" and the Debtor is aware of no connections in addition to those disclosed in the Lee Declaration.

**B.      This Application and the Lee Declaration Meet the Requirements of Bankruptcy Rule 2014**

29.     This Application and the Lee Declaration meet the requirements as set out in Bankruptcy Rule 2014.  This Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation.  The Lee Declaration is a verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that S&L has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.  The Debtor is not aware of any other connections in addition to those disclosed in the Lee Declaration.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the Proposed Order approving the employment of S&L commencing on July 29, 2022, and grant any other relief that is just and proper.

*[Remainder of Page Intentionally Left Blank]*

9

Dated: August 20, 2022

Respectfully submitted,

W. Marc Schwartz
Chief Restructuring Officer and Authorized
Representative of Free Speech Systems,
LLC, Debtor and Debtor-in-Possession

10

004276

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

*/s/R. J. Shannon*

004278

**USPS Service List**

**Twenty Largest Unsecured Creditors**

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

13

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

14

004280

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

15

004281

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**ORDER APPROVING DEBTOR'S APPLICATION**
**TO EMPLOY SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL**

Upon the application (the "<u>Application</u>")[1] filed by the Debtor to retain and employ Shannon & Lee LLP ("<u>S&L</u>") pursuant to Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Lee Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) S&L does not represent an interest adverse to the Debtor's estate with respect to the matters upon which it is to be engaged and is a "disinterested person" within the meaning of that term under § 101(14) of the Bankruptcy Code; (vi) S&L is qualified to represent the Debtor's estate under § 327 of the Bankruptcy Code; (vii) the terms of S&L's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application.

is necessary; (ix) the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interest of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain S&L commencing on the Petition Date, as bankruptcy co-counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.      S&L is authorized to perform any and all legal services for the Debtor that are necessary or appropriate in connection with the Chapter 11 Case.

3.      S&L shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      S&L shall continue to hold the Retainer (as defined in the Application) in trust on behalf of the Debtor, until further order of the Court.

5.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

6.      This order shall be immediately effective and enforceable upon entry.

004283

7.     This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

8.     Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, S&L shall not be entitled to reimbursement of expenses or fees from the Debtor in connection with any objection to its fees, without further order of the Court.

9.     S&L shall not charge a markup to the Debtor with respect to any fees billed by contract attorneys who are hired by S&L to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflicts checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

10.     S&L shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

11.     S&L shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

12.     S&L will review its files periodically during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, S&L will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

004284

13.     To the extent that any of the Application, the Lee Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

14.     The Debtor and S&L are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

4

004285

**Exhibit A**

Engagement Agreement



Kyung S. Lee
Attorney at Law

Pennzoil Place
700 Milam St.
Suite 1300
Houston, TX 77002

# SHANNON & LEE LLP

klee@kslpllc.com| Direct: 713-301-4751

June 6, 2022

**PRIVILEGED AND CONFIDENTIAL**

Alex E. Jones
Managing Member
Free Speech Systems, LLC
910 West Mary Street
Austin, Texas 78704

Re: <u>Attorney Engagement Letter of Shannon & Lee LLP by Free Speech Systems, LLC</u>

Dear Mr. Jones:

Thank you for selecting Shannon & Lee LLP ("<u>S&L</u>" or the "<u>Firm</u>") as legal counsel for Free Speech Systems, LLC ("<u>FSS</u>", "<u>you</u>" or "<u>Client</u>"). We appreciate the trust and confidence that your decision places in us and we look forward to building a close and mutually rewarding relationship.

The purpose of this letter and the attached Terms of Retention (together, the "<u>Engagement Letter</u>") is to set forth the terms of legal representation of the above referenced Client.

*Scope of Engagement.* S&L shall serve as attorney and legal counsel for the Client in connection with the following (the "<u>Matter</u>"): Serve as co-restructuring counsel for the Client, effective as of May 24, 2022.[1]

*Legal Fees and Expenses.* For the work performed by S&L for the Client, S&L shall be entitled to a fee in the amount equal to the time expended by each attorney, paralegal and other staff member multiplied by the hourly rates set forth in the attached Hourly Billing Rate Schedule. The Client is responsible for reimbursing the Firm for expenses incurred on behalf of the Client pursuant to the attached Client Expense Policy.

---

[1] As S&L was formed on June 1, 2022, fees earned prior to June 1, 2022 shall be allocated to the respective professional liability company between the two partners. For work performed and fees earned after June 1, 2022, such fees shall be deemed to be earned by S&L. This notice is being provided due to recent departure of the two partners from their previous law firms and practice of law with their respective limited liability companies during the stub period of May 15, 2022 through June 1, 2022.

004287

Alex E. Jones
June 6, 2022
Page 2 of 11

*Retainer.* As a condition to S&L accepting this engagement on your behalf, you have agreed to provide a retainer of $1000,000.00 (the "<u>Retainer</u>") in connection with this Matter. The instructions for remitting the retainer funds to the Firm will be provided in a separate electronic correspondence. The Retainer will serve as a security deposit and will be applied towards your final invoice for this Matter. Any balance will be returned to you. If you do not pay your invoices timely, the Firm may apply the Retainer to an unpaid invoice. The Firm reserves the right to have the Retainer replenished by the Client if the Firm anticipates that there is a risk in collecting future attorney's fees and/or reimbursement of costs. Prior to filing for bankruptcy, the Firm shall take into income any fees and costs incurred and invoiced such that the Firm and the Client do not have a debtor-creditor relationship as of the filing date.

*Invoices/Fee Statements.* The Firm's invoices will be issued to you during the month, if not more often, following the month that services are provided. The invoice will include a fee statement providing the details of the legal services performed, and the expenses incurred, for the Client. The invoices shall be informational only and shall be paid upon allowance by a Bankruptcy Court order.

*Conflicts.* The Firm has conducted an initial conflicts search based on information you provided. The Firm did not identify any connection that would prevent the Firm from representing you in this Matter. S&L may conduct additional conflicts searches following the commencement of this engagement. If the Firm identifies any conflict, then the Firm shall immediately notify the Client and the Firm and the Client shall take further actions as may reasonably be required to satisfy the Firm's ethical obligations and duties to the Client, all as more particularly described in the Terms of Retention.

The two partners of S&L have acted as general bankruptcy counsel for InfoW, LLC, IWHealth, LLC and Prison Private tv Ltd. These three companies are affiliates of FSS, have license agreements with FSS and are in the process of having their Subchapter v bankruptcy cases dismissed. If any issues arise in connection with the license agreement between the FSS and InfoW, S&L intends to have co-counsel or conflict counsel matters related to such dispute. Otherwise, the Firm does not believe that such connection precludes it from representing FSS on the matters to which it is being asked to be engaged.

*General Prospective Waiver and Informed Consent.* The Firm represents many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future Clients will have disputes or transactions with you. You agree that we may continue to represent or may undertake in the future to represent existing or new Client in any business or transactional matter that is not substantially related to our work for you, even if the interests of such Client in those other matters are directly adverse to you. We are not aware of any such matters at the present time. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage. <u>You are not giving the Firm a prospective waiver as to conflicting representation related to a litigation matter against you.</u> We encourage you to seek independent counsel regarding the import of the potential conflicts and prospective waiver discussed and this acknowledgment, waiver and informed consent. We

Alex E. Jones
June 6, 2022
Page 3 of 11

emphasize that you remain completely free to seek independent counsel at any time even if you decide to sign this Engagement Letter agreeing to its terms and the Terms of Retention.

Please call me with any questions you have after you complete your review of this Engagement Letter including the Terms of Retention. If the Engagement Letter is acceptable to you in this form, please indicate so by signing, dating, and returning it to me and funding the Retainer.

Very truly yours,

*Kyung S. Lee*

Kyung S. Lee
Kyung S. Lee PLLC
Shannon & Lee LLP

ACCEPTED AND AGREED:

Free Speech Systems, LLC

Authorized Officer of Free Speech Systems, LLC

Dated

Alex E. Jones
June 6, 2022
Page 4 of 11

## ADDENDUM TO ENGAGEMENT LETTER

The appropriate Client point of contact to address payment status:

Name:
Title:
Phone:
Work Email:


Invoices are to be delivered as follows:

☐ By email:                _____

    Email:                 _____

☐ By regular mail:

Address:          _____

                  _____

                  _____

Alex E. Jones
June 6, 2022
Page 5 of 11

TERMS OF RETENTION

These Terms of Retention are part of the S&L Engagement Letter. Because they are an integral part of our agreement to provide legal services, we ask that you review this document carefully. If you have any questions after reading it, please contact us promptly.

*Who Will Provide Legal Services?* In most cases, one attorney will be your principal contact. From time to time, that attorney may delegate parts of your work to other attorneys or to legal assistants or non-legal professionals in the Firm. We do this to involve those with special knowledge or experience in an area and to provide services to you in a timely, efficient, and cost-effective manner. I will be the primary attorney from our Firm who will be representing the Client.

*Scope of the Representation.* As a Firm, we undertake to provide representation and advice on the legal matters for which we are engaged, and it is important that we both have a clear understanding of the legal services that the Firm has agreed to provide. In our Engagement Letter with you, we specify the matter in which we will provide representation and the scope of the services we will provide. Please note that we do not provide legal advice regarding any tax issues or effects nor are we responsible for notifying any insurance carrier of any lawsuit. If there are any questions about the terms of engagement, including the scope of the representation that we are to provide in the matter, please raise those questions promptly with your principal contact at the Firm.

*Identity of Client.* It is our policy to represent only the person or entity identified in our Engagement Letter and not any affiliates. For example, unless otherwise specifically stated in our Engagement Letter, if you are a business organization (corporation, partnership, LLC, etc.), our representation does not include any parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies); if you are an individual, our representation does not include your employer, partners, spouse, siblings, or other family members.

*Your Cooperation.* To enable us to provide effective representation, you agree to: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us.

*Outcomes.* We cannot and do not guarantee the outcome of any matter. Any expression of our professional judgment regarding your matter or the potential outcome is, of course, limited by our knowledge of the facts and based on the law at the time of expression. It is also subject to any unknown or uncertain factors or conditions beyond our control. Any expressions on our part concerning the outcome of the representation, or any other legal matters, are based on our professional judgment and are not guarantees.

*Conflicts of Interest.* We attempt to identify actual and potential conflicts at the outset of any engagement. In some instances, the applicable rules of professional conduct may limit our ability to represent Client with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from representing another. In other situations, we may be permitted to represent a client only if both or all

004291

Alex E. Jones
June 6, 2022
Page 6 of 11

Client consent to that representation. If a controversy unrelated to the subject matter of the representation develops between you and any other client of the Firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either you or the other client in the unrelated matter. Unfortunately, sometimes conflicts arise or become apparent after work begins on an engagement. If this happens, we will do our best to address and resolve the situation in the manner that best serves the interests of all of our affected Client. Rules concerning conflicts of interest vary with the jurisdiction. In order to avoid any uncertainty, the Texas Disciplinary Rules of Professional Conduct will be applicable to the representation.

Texas law requires that we inform the Client of the existence of a grievance process. The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of Chief Disciplinary Counsel will provide you with information about how to file a complaint. Please call 1-800-932-1900 for more information. Also, the Supreme Court of Texas has promulgated The Texas Lawyer's Creed - A Mandate for Professionalism, which states that an attorney should inform a client of the creed's contents when undertaking a representation. We will send you a copy of the creed upon request. It is also available online at https://www.texasbar.com.

*Fees.* The basis for determining our fee for legal services is set forth in the Engagement Letter itself. If you are unclear about the basis for determining your fee, please contact the attorney responsible for your representation. Clients frequently ask us to estimate the fees and other charges they are likely to incur in connection with a particular matter. We are pleased to respond to such requests, whenever possible, with an estimate based upon our professional judgment. This estimate always carries the understanding that, unless we agree otherwise in writing, it does not represent a maximum, minimum, or fixed-fee quotation.

*Expenses.* Our Firm may incur and pay a variety of charges on your behalf in connection with the engagement. Whenever we incur such charges on your behalf, we will bill them to you as part of your invoice in accordance with the attached Client Expense Policy.

*Delinquent Account and Withdrawal of Engagement.* We will bill you on a periodic basis, for fees and other charges, as described in the Engagement Letter. Should your account become delinquent and satisfactory payment terms are not arranged, as permitted under the rules regulating our profession, we will be required to withdraw from the representation. In most cases, and except as prohibited by ethical considerations, if your account becomes more than 30 days delinquent, we will cease representation until we can arrive at a mutually satisfactory arrangement for payment of the delinquent account and the resumption of services. At such time we may charge interest on the outstanding amount due of one and a half percent per month or the maximum amount allowed under applicable law, whichever is less.

*Additional Retainer.* If the representation will require a concentrated period of activity, such as a trial, arbitration, or hearing, we reserve the right to require the payment of all amounts then owing to us and the payment to us of an additional retainer for the fees and expenses we estimate will be incurred in preparing for and completing the trial, arbitration, or hearing, as well as arbitration fees likely to be assessed. If you fail to timely pay any   retainer deposit requested, we will have the right to cease performing further work for you and withdraw from the representation.

Alex E. Jones
June 6, 2022
Page 7 of 11

*Obligation to Pay Fees and Expenses.* Unless your Engagement Letter expressly provides that a third-party is agreeing to pay your attorney's fees and such third-party has agreed in writing, regardless of whether you are insured to cover the particular risk or you are pursuing parties for recovery of attorneys' fees and other charges, it remains your obligation to pay all amounts due to us within the time periods reflected in the Engagement Letter.

*Retention of Complementary Counsel.* From time to time in the course of our engagement it may become prudent to engage additional counsel to work with and complement our representation of you. That complementary representation will only be done with your prior written consent and on terms and conditions which you approve. The engagement of complementary counsel may be done directly with you or through our firm, depending on the nature and extent of the representation involved.

*Conclusion of Engagement.* Because our Firm has been engaged to provide legal services in connection with the representation in the matter as specifically defined in our Engagement Letter, the attorney-client relationship terminates upon our completion of our services related to the representation in the matter. After completion of the representation, upon written notification by the Firm that the matter is terminated, changes may occur in the applicable laws or regulations that could affect your future rights and liabilities in regard to the matter. Unless we are actually engaged after the completion of the representation to provide additional legal services, the Firm has no continuing obligation to give advice with respect to any future legal developments that may relate to the matter. If you later retain us to perform further or additional services, our attorney-client relationship will be subject to the terms of engagement agreed to at that time; in the absence of any specific agreement, these Additional Terms of Engagement shall apply to the further or additional representation.

*Termination.* We look forward to the opportunity to complete our representation of you on the specified matter. You may, however, terminate our representation at any time, with or without cause, by notifying us in writing. We will return your papers and other property to you promptly upon receipt of your request for those materials unless they are appropriately subject to a lien. You agree that we will own and retain our own files pertaining to the matter or case, including, for example, Firm administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal attorney's work product such as drafts, notes, internal memoranda, and legal and factual research including investigative reports, prepared by or for the internal use of attorneys. Your termination of our services will not affect your responsibility for payment of legal services rendered and other charges incurred before termination and in connection with an orderly transition of the matter.

*Document Retention.* You acknowledge and agree that the Firm may maintain all documents related to your matter digitally. The Firm is not required to maintain physical copies of any documents. At the conclusion of our representation of you, it is our firm's policy to return to you any physical documents to you. We will provide you with copies of any other documents you specifically request (such as copies of depositions, court documents, etc.), and you agree to pay for the associated copying costs and any professional time incurred in identifying any such documents you request. You agree that our Firm may elect to keep at its own expense, copies of any documents related to this matter or otherwise returned to you. Anytime following seven (7) years after the conclusion of our representation of you, the Firm may destroy or delete any files related to your engagement.

Alex E. Jones
June 6, 2022
Page 8 of 11

*Dispute Resolution.* The Engagement Letter is being entered and is to be performed within the State of Texas. The Engagement Letter shall be interpreted in accordance with Texas law (without application of choice of law principles). All parties to the Engagement Letter agree that Houston, Harris County, Texas is the only permitted location (the venue) for the resolution of all disputes that arise under or relate in any way to the Engagement Letter or to any of the services provided by our Firm.

*Binding Arbitration.* Any dispute arising out of or relating to this agreement, our interactions leading to it, or our performance of the agreement or of the representation of you shall be resolved through binding arbitration in Harris County, Texas. First, sixty (60) days before filing any arbitration proceeding, the party requesting relief must demand and attend mandatory mediation before a mutually acceptable mediator to attempt to resolve any dispute. In the event the parties are unable to resolve such dispute, the affected party shall initiate an arbitration proceeding utilizing the rules of (but not employing) the American Arbitration Association ("AAA") for the arbitration of complex commercial cases. In any dispute of less than $250,000, the parties shall jointly appoint a single arbitrator. In any dispute of a greater amount, each party shall appoint his/her or its own party arbitrator, and these two-party arbitrators shall in turn appoint a third, neutral arbitrator. All party arbitrators' conduct and tests for eligibility shall be governed by AAA rules of disinterest. The time limits hereunder shall not apply in the event emergency injunctive relief is required, but only to the extent of such emergency injunctive relief itself. The decision by the arbitration panel will be final and binding.

You should know that for your agreement to arbitrate to be effective under Texas law, you as the client must receive sufficient information about the differences between litigation and arbitration to permit you to make an informed decision about whether to agree to binding arbitration. Under the Texas Rules of Disciplinary Procedure, we can explain the significant advantages and disadvantages of binding arbitration to the extent we reasonably believe is necessary for an informed decision by you. The scope of the explanation will depend on the sophistication, education and experience of the client.

In the case of a highly sophisticated client such as a large business entity that frequently employs outside lawyers, no explanation at all may be necessary. In situations involving Clients who are individuals or small businesses, we normally advise the client of the following possible advantages and disadvantages of arbitration as compared to a judicial resolution of disputes: (1) the cost and time savings frequently found in arbitration, (2) the waiver of significant rights, such as the right to a jury trial, (3) the possible reduced level of discovery, (4) the relaxed application of the rules of evidence, and (5) the loss of the right to a judicial appeal because arbitration decisions can be challenged only on very limited grounds.

Additional factors you as the client should consider are: (1) the privacy of the arbitration process compared to a public trial; (2) the method for selecting arbitrators; and (3) the obligation, if any, of the client to pay some or all of the fees and costs of arbitration, if those expenses could be substantial. Although the disclosure can vary from client to client, depending on the circumstances, the overriding concern is that we should provide information necessary for the client to make an informed decision.

Alex E. Jones
June 6, 2022
Page 9 of 11

*By returning the executed Engagement Letter, you acknowledge that you have been provided ample opportunity to have counsel explain to you the advantages and disadvantages of binding arbitration to make an informed decision about agreeing to the provision.*

*Modifications.* The Engagement Letter and these Additional Terms of Engagement reflect our entire agreement on the terms of this engagement. These written terms of engagement are not subject to any oral agreements or understandings, and any change in those terms can only be made in writing signed by you and the Firm.

Alex E. Jones
June 6, 2022
Page 10 of 11

## Hourly Billing Rate Schedule

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| R.J. Shannon | $650 |
| Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50 - $100 |

Alex E. Jones
June 6, 2022
Page 11 of 11

Client Expense Policy

In connection with the representation of a client, the Firm may incur expenses. Unless the Engagement Letter expressly provides to the contrary, the Firm's and the Client's rights and responsibilities related to such expenses are as follows:

*Legal Research and Related Services.* The Firm subscribes to certain online research services. These subscription-based services are part of the Firm's overhead and not charged to the Client. Certain services are charged on a per-transaction including, without limitation, the following examples: UCC searches, lien searches, title searches and other record searches. The Client is responsible for these pre-transaction charges. The Firm will advance the costs for all such services and submit bills to you for reimbursement. The Firm may seek prior approval from you if the anticipated aggregate monthly expense for such services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Document Management and eDiscovery Services.* The Firm subscribes to advanced document management software systems. These subscription-based systems are part of the Firm's overhead and not charged to the Client. The Client is responsible for eDiscovery services. eDiscovery service providers typically charge per gigabyte of information stored. Additional services from the outside vendor may be required other than storage of the information and typically these are separately charged. If the Firm uses an eDiscovery service during the representation, then the Firm will seek the Client's prior approval before incurring expenses for such services. Rather than billing these expenses through the Firm, the Firm reserves the right to have the Client contract directly with the outside vendor to pay for these expenses. For the avoidance of doubt, the Client is responsible to the Firm for the payment of all fees and expenses incident to the firm's review and processing of discovery materials that are not handled by an outside vendor.

*Printing, Shipping, Postage and Related Expenses.* For all printing, shipping, postage, and related services the Firm may handle them in house or use an outside vendor. The Client is responsible for all such printing, shipping, postage, and related services at costs or the prevailing market rate if handled in house. The Firm may seek prior approval from the Client if the anticipated aggregate monthly expense for printing, shipping, postage, and related services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Travel Expenses.* The Client will reimburse the Firm for expenses incurred in connection with out-of-town travel, but only for coach class travel and, where appropriate, the cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances. The Firm will advance all such travel expenses and submit bills to you for reimbursement which will be included in the regular invoices to the Client. The attorney handling your matter will confer with you prior to traveling for your matter. Consistent with local bankruptcy rules, the Firm bills travel at ½ billable hourly rate when the lawyer is not working on the Client matter while travelling. The Firm will endeavor to locate a substitute service agent.

*Court Costs.* If requested by the Firm, the Client will advance court filing fees and all similar expenses prior to the Firm incurring such expenses. Any such expenses incurred by the Firm, will be included in the Firm's invoices to the Client for payment.

004297

**Exhibit B**

Lee Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DECLARATION OF KYUNG S. LEE IN SUPPORT OF**
**THE DEBTOR' APPLICATION TO EMPLOY**
**SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL**

I, Kyung S. Lee, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State of Texas and United States District Court for the Southern District of Texas.  As of June 1, 2022, I am a partner in the Houston office of the law firm Shannon & Lee LLP ("S&L"), located at 700 Milam Street, Suite 1300, Houston, Texas 77002.

2.      I am making this declaration in support of the Debtor's Application to Employ Shannon & Lee LLP as Bankruptcy Co-Counsel, effective as of July 29, 2022 (the "Application"). Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed to such terms in the Application.

3.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of S&L reviewed by me or derived from information available to me that I believe to be true and correct or opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**A.     Scope of Services**

4.     Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, S&L will serve as bankruptcy co-counsel to the Debtor in connection with the Chapter 11 Case for the period commencing on July 29, 2022.   In connection with this representation, S&L will take all necessary and appropriate actions to administer the Debtor's Chapter 11 Case.

**B.     Proposed Compensation**

5.     S&L will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtor.

6.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, S&L intends to request the allowance of its compensation as set out in the Engagement Agreement and as summarized in the following chart:

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| R.J. Shannon | $650 |
| Other Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

7.     These rates reflect the rates that S&L ordinarily charges clients in bankruptcy and non-bankruptcy matters and are less than or equal to the rates of similarly skilled and experienced attorneys in this district.   S&L submits that these agreed terms of reimbursement, compensation,

2

and hourly rates are reasonable. S&L will notify the Debtor of any change in the hourly rates charged for services rendered.

### C. Retainer & Prepetition Payments

8.  Pursuant to the Engagement Agreement, FSS retained S&L to represent it in connection with its restructuring, effective as of May 24, 2022. Pursuant to the Engagement Agreement, FSS paid S&L a $100,000 retainer.

9.  S&L invoiced FSS for work it did during the month of June 2022 in the total amount of $84,034.12. Prior to the Petition Date, FSS paid the June invoice.

10. S&L then invoiced FSS for work it did during the period July 1-July 29, 2022 in the total amount of $99,177.32. Prior to the Petition Date, the Firm took into income $99,177.32 from the Retainer, leaving a balance of $822.68 in S&L's IOLTA account.

11. Prior to the Petition Date, FSS wired $50,000 to S&L's IOLTA account to replenish the Retainer. As of the Petition Date, S&L's IOLTA account balance was $50,822.68 (the "Retainer").

12. Under the proposed employment with the Debtor, S&L will continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

### D. Disclosure of Connections

*i.*   *Search and General Descriptions of Connections*

13. S&L performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas.

3

14.    I conducted a search of S&L files to determine using the list of parties in interest listed in <u>Schedule 1</u> hereto whether the Firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the Firm had and did not represent any of the parties listed on Schedule 1. S&L may have provided services to creditors or other parties in interest inadvertently omitted from Schedule 1 or the description above. If such connections exist, they would be on matters wholly unrelated to the service for which FSS seeks to engage S&L.

15.    The email and computerized search uncovered no connections other than the following:

   a.   S&L represented the Debtor prior to the Petition Date.

   b.   Mr. Shannon and I previously represented the InfoWDebtors in their chapter 11 cases jointly administered under Case No. 22-60020. Certain creditors of the InfoWDebtors are also creditors of FSS. Additionally, Mr. Shannon and I represented the InfoWDebtors in the negotiations of the Plan Support Agreement under which FSS and Alex Jones committed to provide funding for the InfoWDebtors' contemplated reorganization, prior to the dismissal of the Sandy Hook plaintiffs' decision to dismiss their claims against the InfoWDebtors with prejudice.

   c.   Mr. Schwartz was the CRO of the InfoWDebtors while S&L attorneys represented the InfoWDebtors.

   d.   Mr. Shannon was previously employed by Akin Gump Strauss Hauer & Feld LLP.

   *ii.    Further Description of Connections to the InfoWDebtors*

16.    Beginning on or about March 23, 2022, I, as a partner of Parkins Lee & Rubio LLP, and R.J. Shannon, as an associate, represented the InfoWDebtors in connection with their chapter 11 cases that were filed on April 17 and 18, 2022. On May 15, 2022, I began representing the InfoWDebtors, practicing under Kyung S. Lee PLLC. On June 1, 2022, S&L began business and provided services to the InfoWDebtors in connection with the hearing on the stipulation and order dismissing the InfoWDebtors cases and final administrative matters after the dismissal of the cases.

4

17.     After extensive negotiations prior to filing their petitions, Alex Jones assigned his interests in the InfoWDebtors to a litigation Settlement Trust (the "LST") and Mr. Jones and FSS entered into a Plan Support Agreement (the "PSA"). Mr. Shannon and I represented the InfoWDebtors in connection with those negotiations.

18.     Section 8 of the PSA contained various provisions under which the PSA and the obligations of the parties thereto would terminate. The provisions under which the PSA would terminate under its terms included, among other things: (i) dismissal of the InfoWDebtors' chapter 11 cases; (ii)  failure to obtain appointment of the trustees for LST; (iii) failure to file a plan pursuant to the terms of the PSA; (iv) failure to obtain confirmation of a plan pursuant to the terms of the PSA; and (v) the remand of the Sandy Hook Actions and continuation of the state court proceedings.

19.     On April 17 and April 18, 2022, the InfoWDebtors filed petitions for relief under chapter 11, subchapter v, of the Bankruptcy Code.

20.     The Texas Sandy Hook plaintiffs, the Connecticut Sandy Hook plaintiffs, and the U.S. Trustee immediately filed emergency motions to dismiss the bankruptcy cases of the InfoWDebtors.

21.     Although the InfoWDebtors filed emergency motions to appoint trustees for the LST and retain W. Marc Schwartz to serve as the CRO for InfoWDebtors, the Texas Sandy Hook plaintiffs, Connecticut Sandy Hook plaintiffs, and the U.S. Trustee each opposed hearings on those emergency motions prior to their motions to dismiss.

22.     By May 6, 2022, counsel for both the Texas and Connecticut plaintiffs announced that they were dismissing their claims against the InfoWDebtors from their respective lawsuits. CRO Schwartz directed me to work with plaintiffs' counsel to make sure that their claims were

004303

withdrawn with prejudice against the InfoWDebtors. The InfoWDebtors finalized, submitted and had the Bankruptcy Court approve the Stipulations of Dismissal of the Texas plaintiffs Claims with prejudice by May 19, 2022. The Connecticut plaintiffs filed pleadings to dismiss their claims against the InfoWDebtors with prejudice in the removed actions on or about May 13, 2022.

23.     After dismissal of the Sandy Hook plaintiffs' claims against the InfoWDebtors, the PSA could no longer serve its intended purpose and had terminated by its own terms. While counsel for Alex Jones and FSS advised the Court that the parties would extend the PSA deadlines beyond April 30, 2022, the Amended PSA was negotiated but never executed because the LST trustees were never appointed.

24.     The CRO of the InfoWDebtors and I then analyzed the best way to go forward with the remaining claims against the InfoWDebtors and concluded that, in light of the U.S. Trustee's continued opposition to the bankruptcy cases, dismissal of the InfoWDebtors' bankruptcy cases was in the best interest of the estate. First, the InfoWDebtors still had to litigate with the U.S. Trustee regarding dismissal. Second, the *raison d'etre* for the bankruptcy (to have the plaintiffs participate as claimants under the plan of reorganization) no longer existed. Third, the estate had limited access to funds to administer the estate, in light of the termination of the PSA. Fourth, dismissals of both Texas and Connecticut plaintiffs' claims with prejudice left the estate with only four remaining creditors.

25.     The CRO then directed me to work with the U.S. Trustee's office to have the InfoWDebtors' bankruptcy cases dismissed. On June 1, 2022, the U.S. Trustee and the Debtors filed a Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. On June 10, 2022, the Bankruptcy Court approved the Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases.

004304

26. The first services any attorney of Shannon & Lee LLP provided to FSS occurred on May 24, 2022, were provided by me through Kyung S. Lee PLLC when I traveled to Austin, Texas to discuss the potential restructuring relating to FSS. The InfoWDebtors were negotiating the terms of the stipulation with the U.S. Trustee to dismiss the case that was filed on June 1, 2022, at this time.

27. As of May 19, 2022, and continuing through today, the InfoWDebtors and FSS are not adverse. No default exists under the license agreement between InfoW and FSS. To the best of my knowledge, there are no claims between FSS and the InfoWDebtors.

28. Out of an abundance of caution and to assure the Court and the FSS creditors that S&L does not have a bias or an adverse interest against FSS or its estate, Kyung S. Lee PLLC submitted a written resignation of its engagement to serve as restructuring counsel to InfoWDebtors prior to submission of the Application.

29. The results of the foregoing connections search process confirm that neither I, S&L, nor any of its employees or partners, to the best of my knowledge, have any disqualifying connections. Neither I, S&L, or any partner of S&L (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

**E. Affirmative Statement of Disinterestedness**

30. Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and S&L are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

31. I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any

7

interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

32.     S&L is not a creditor, an equity security holder, or an insider of the Debtor; S&L is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and S&L does not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

33.     S&L does not possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate. S&L also does not possess or assert any economic interest that would create either an actual or potential dispute in which the estate is a rival claimant. S&L does not have any incentive to act contrary to the best interests of the estate and its creditors.

**F.      Bankruptcy Rule 2016(b) Disclosures**

34.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, S&L has not shared or agreed to share (a) any of its compensation from the representation of the Debtor with any other persons, or (b) any compensation any other persons have received, may have received, or will receive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August  20, 2022,

                                        By: /s/ *Kyung S. Lee*
                                               Kyung S. Lee

004306

**SCHEDULE 1**

**TO LEE DECLARATION**

**SEARCHED PARTIES**

Debtor & Professionals

    Law Office of Ray Battaglia               Schwartz Associates

Debtor's Equity

    Alexander E. Jones

Largest 20 Unsecured Creditors & Litigation Claimants

| | |
|---|---|
| Elevated Solutions Group | Dona Soto |
| Atomial LLC | Erica Lafferty |
| Cloudfare, Inc. | Francine Wheeler |
| Jacquelyn Blott | Ian Hockley |
| Joel Skousen | Jacqueline Barden |
| eCommerce CDN LLC | Jennifer Hensel |
| Paul Watson | Jeremy Richman |
| Greenair, Inc. | Jillian Soto |
| Edgecast, Inc. | Leonard Pozner |
| Ready Alliance Group, Inc. | Marcel Fontaine |
| Getty Images, Inc. | Mark Barden |
| RatsMedical.com | Neil Heslin |
| David Icke Books Limited | Nicole Hockley |
| WWCR | PQPR Holdings Limited, LLC |
| CustomTattoNow.com | Robert Parker |
| AT&T | Scarlett Lewis |
| Justin Lair | Veronique De La Rosa |
| Brennan Gilmore | William Sherlach |
| Carlee Soto-Parisi | William Aledenberg |
| Carlos Soto | Larry Klayman |
| Christopher Sadowski | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | Jordan & Ortiz, P.C. |
| Koskoff Koskoff & Bieder | McDowell Heterhington LLP |
| Fertitta & Reynal LLP | The Akers Law Firm PLLC |
| Pattis & Smith, LLC | Copycat Legal PLLC |
| Zeisler & Zeisler P.C. | |

004307

Waller Lansden Dortch & Davis, LLP

Akin Gump Strauss Hauer & Feld LLP

U.S. Bankruptcy Judges and Staff

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro

Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

U.S. Trustee Personnel

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera

Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

# Kyung S. Lee PLLC

700 Milam, Suite 1300
Houston, Texas 77002

# INVOICE

Invoice # 2
Date: 06/07/2022
Due On: 07/07/2022

W. Marc Schwartz
Free Speech Systems, LLC
712 Main Street-Suite 1830
HOUSTON, Texas 77002

## 00003-Free Speech Systems, LLC

## Represent FSS in connection with preparation of FSS for potential filing of bankruptcy as a Subchapter v Debtor.

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 05/24/2022 | Research and email RJ Shannon on background research of FSS so as to be prepared for discussion in Austin (1.5); travel to and from Austin, Texas and not working (charged at 1/2 time of 6 hours)(3); extended conference with client, Schwartz Associates, B. Roe, S. Jordan, and RJ Shannon to discuss options and issues with FSS restructuring (5.0) | 9.50 | $850.00 | $8,075.00 |
| Service | 05/25/2022 | Follow-up with research on background facts relating to how FSS came about, operational history and litigation history of same for purposes of drafting First Day Declaration of Marc Schwartz (3.0) | 3.00 | $850.00 | $2,550.00 |
| Service | 05/25/2022 | Follow-up on data received at meeting, new data gathered and research for prose on historical operations of FSS (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/26/2022 | Review and analyze 2 Valuation Reports for PQPR and FSS, analyze same for background information on FSS for pleadings and determine status of case information in both (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/27/2022 | Coordinate with State Court counsel on sanctions issues and explain approach to handling same (.5); numerous conferences with S. Lemmon, counsel for PQPR (1.0); locate critical documents for S. Lemmon and forward (.5) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/28/2022 | Analyze State Court litigation production to determine data produced to opposing counsel in state court and collect key documents to share with parties (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/29/2022 | Continue to review financial data discovered during search of State Court litigation production and analyze same (2.0) | 2.00 | $850.00 | $1,700.00 |

004309

| Service | 05/30/2022 | Review and analyze background corporate documents and additional documents discovered from reviewing State Court production in DropBox files (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/31/2022 | Work on Declaration for Marc Schwartz as CRO for FSS and incorporate facts learned through investigation (4.0) | 4.00 | $850.00 | $3,400.00 |

|  |  |  |  | **Total** | **$24,225.00** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 7 | 07/07/2022 | $184.09 | $0.00 | $184.09 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2 | 07/07/2022 | $24,225.00 | $0.00 | $24,225.00 |
|  |  |  | **Outstanding Balance** | **$24,409.09** |
|  |  |  | **Total Amount Outstanding** | **$24,409.09** |

Please make all amounts payable to: Kyung S. Lee PLLC

Please pay within 30 days.

004310

 **SHANNON & LEE LLP**

# INVOICE

Invoice # 10
Date: 07/05/2022
Due On: 08/04/2022

700 Milam, Suite 1300
Houston, Texas 77002
United States

Free Speech Systems, LLC

## 00008-Free Speech Systems, LLC
## Financial Restructuring

### Services

| Date | Attorney | Description | Hours | Rate | Total |
|------|----------|-------------|-------|------|-------|
| 06/01/2022 | KSL | Continue to gather agreements, data from state court receiver discovery and share new discovery on financial data with counsel and CRO that affects restructuring strategy (.5) | 0.50 | $850.00 | $425.00 |
| 06/02/2022 | KSL | Handle issues relating to FSS bankruptcy preparation and follow-up with calls and Zoom meetings with co-counsel to discuss how to approach FSS and key issues relating to same (1); continue to scour State Court discovery and pull key discovery that could affect bankruptcy case (1.) | 2.00 | $850.00 | $1,700.00 |
| 06/03/2022 | KSL | Review issues relating to ████ Agreement, and other arrangements relating to transactions between PQPR and FSS and analyze same; extended t/c with S. Lemmon to understand position of David Jones and Anthony on issues from PQPR and ████; further calls with Marc Schwartz to discuss schedule of preparation for filing; t/c with R. Battaglia to discuss same (2) | 2.00 | $850.00 | $1,700.00 |
| 06/05/2022 | RJS | Conference with K. Lee re PQPR re PQPR lien and note; draft memo re PQPR lien and note . | 3.60 | $625.00 | $2,250.00 |
| 06/05/2022 | KSL | Handle call with Marc Schwartz and RJ Shannon on results of analysis of ████ Agreement and impact of percentages in agreement on ability of FSS to make any income (1.0) | 1.00 | $850.00 | $850.00 |
| 06/06/2022 | RJS | Travel to and return from Austin re meeting about restructuring and goals (1/2 rate) | 5.00 | $312.50 | $1,562.50 |
| 06/06/2022 | RJS | Meeting in Austin re restructuring and potential bankruptcy among FSS professionals and conference with separate attorneys from Alex Jones and PQPR. | 4.50 | $625.00 | $2,812.50 |

| 06/06/2022 | KSL | Travel to and from Austin, Texas for FSS meetings (3)(6 hours billed at 1/2 travel time); meeting with counsel, CRO and SchwartzAssociates and B. Roe to discuss preparing for FSS bankruptcy case (5.0)(meeting joined by Shelby Jordan and Steve Lemmon at different portions of the meeting) | 8.00 | $850.00 | $6,800.00 |
| 06/07/2022 | KSL | Extended conference call to clarify position of FSS and its advisors relating to restructuring and its goals (1.0); further review of issues relating to projected timeline for filing, what has to be accomplished prior to that time and whether it is feasible to do so (1.0) | 2.00 | $850.00 | $1,700.00 |
| 06/08/2022 | KSL | O/c with Marc Schwartz to highlight new issues to handle relating to FSS preparation for bankruptcy (.5); analyze data from State Court discovery and handle new data and share with other parties, mark and note for inclusion into Marc Schwarz declaration (1.5) | 2.00 | $0.00 | $0.00 |
| 06/09/2022 | KSL | Continue to review State Court Discovery files to determine a) Cash movement from Security Bank accounts for Cash Management Motion, b) net worth discovery folder to determine whether financials produced contradict true condition of FSS as analyzed by Marc Schwartz, and c) review death penalty sanctions and why it occurred and what it means (3)) | 3.00 | $850.00 | $2,550.00 |
| 06/10/2022 | RJS | Review NDA for Axos Bank and revise same for March Schwartz. | 0.50 | $625.00 | $312.50 |
| 06/11/2022 | RJS | Review various emails and docket entries re Conn. sanctions motion; gather various relevant documents relevant to the same; draft email to N. Pattis re same. | 0.80 | $625.00 | $500.00 |
| 06/13/2022 | RJS | Teleconference re various litigation and restructuring matters. | 1.00 | $625.00 | $625.00 |
| 06/13/2022 | KSL | Focus on assisting Marc Schwartz on assuring FSS does not suffer any additional penalties and sanctions in connection with corporate representative depositions in Connecticut by reviewing State Court discovery to analyze scope of corporate representative discovery, depositions taken to date, and handle any financial data discussed during such discovery as it relates to present efforts to analyze financial condition of FSS (4) | 4.00 | $850.00 | $3,400.00 |
| 06/14/2022 | RJS | Call re restructuring matters. | 1.00 | $625.00 | $625.00 |
| 06/14/2022 | KSL | Review Motion for Sanctions for Bad Faith Removal in preparation for responding to same or assisting Norm Pattis and Cameron Atkinson (1.5); lunch meeting with Marc Schwartz to discuss FSS issues and catch up on work to be done (1.5); extended call with team to review issues on project timeline and what work needs to be done (1.0); review notices of deposition for corporate representatives (.5); review motions for sanctions and response available to Connecticut and | 5.00 | $850.00 | $4,250.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | Texas counsel (.5) | | | |
| 06/15/2022 | RJS | Email Marc re next steps in matter in response to email re information (.3); analyze corporate rep. deposition in Conn matter and email team re same (.2); analyze Texas sanctions motion re removal (.5); draft email re same to team (.3); gather relevant documents re same (2.0); draft detailed email re same to A. Reynal (.4). | 3.70 | $625.00 | $2,312.50 |
| 06/15/2022 | KSL | O/c with Marc Schwartz after the ROCC breakfast to discuss status of financial statement preparation for FSS (.5); analyze Norm Pattis emails on status of bankruptcy preparation and timing of when case will be ready for filing (.5); emails with RJ Shannon on new issues raised by FSS (.5); t/c with S. Lemmon, counsel for PQPR on restructuring issues (.5); analyze and handle conference calls among CRO, counsel and PQPR on various business and negotiating issues on transaction between the parties (1) | 3.00 | $850.00 | $2,550.00 |
| 06/16/2022 | KSL | Continue to gather factoids from State Court Discovery folders and depositions to incorporate into Marc Schwartz Declaration (1.0); analyze and restructure form of Schwartz Declaration (1.0) | 2.00 | $850.00 | $1,700.00 |
| 06/17/2022 | KSL | Continue review of State Court Discovery files to gather factoids for Schwartz Declaration and create inserts for various sections of Schwartz Declaration (2) | 2.00 | $850.00 | $1,700.00 |
| 06/19/2022 | RJS | Travel to Austin re meeting re restructuring (1/2 rate). | 2.50 | $625.00 | $1,562.50 |
| 06/20/2022 | KSL | Travel to and from Austin, Texas for meetings at FSS headquarters on Alvin Devane with counsel, B. Roe, Alex Jones, Shelby Jordan, Ray Battaglia and Marc Schwartz (3.0)(6.0 hours at 1/2 travel time per US Trustee Guidelines); attend meeting at FSS with counsel and business people to discuss status of FSS case preparation (4.0) | 7.00 | $850.00 | $5,950.00 |
| 06/20/2022 | RJS | Attend meeting in Austin, TX re restructuring. | 4.00 | $625.00 | $2,500.00 |
| 06/21/2022 | RJS | Gather documents needed for Axos bank; draft email to M. Schwartz, K. Lee, and R. Battaglia attaching same. | 0.20 | $625.00 | $125.00 |
| 06/21/2022 | KSL | Review outline of to dos to prepare for Chapter 11 filing for FSS (.5); analyze status of State Court Discovery files to determine additional documents and data to be used in Marc Schwartz Declaration (2.5); lunch meeting with Marc Schwartz and Jeff Shulse to determine status of financial information preparation for FSS Bankruptcy Filing (2.0) | 5.00 | $850.00 | $4,250.00 |
| 06/22/2022 | RJS | Attention to email from Texas SOS re certificate of fact; draft email re same to M. Schwartz; attention to email from R. Battaglia and M. Schwartz re meeting with PQPR; draft response re same suggesting Zoom meeting; draft email to A. Reynal re sanctions motion | 0.40 | $625.00 | $250.00 |

004313

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | hearing on 6/14/22. | | | |
| 06/22/2022 | RJS | Draft Declaration re sanctions motion re removal. | 5.73 | $625.00 | $3,581.25 |
| 06/23/2022 | RJS | Finalize Declaration re Texas sanctions motion and gather exhibits; draft email to A. Reynal and team re same. | 1.91 | $625.00 | $1,193.75 |
| 06/23/2022 | KSL | Review and edit Declaration of RJ Shannon in Response and in Support of Opposition to Bad Faith Removal Motions by Plaintiffs (1.0); review Exhibits 23, 24 and 25 of the Declaration and determine whether they support arguments made in the Declaration and response of Heslin Plaintiff to same (1.0); conference calls and review of exhibits on latest status of ability of Schwartz to generate accurate financial information for FSS to file chapter 11 and sustain company in Chapter 11 (1); review new issues raised by State Court actions and hearings on attorneys' fees in Texas State Court (1.0) | 4.00 | $850.00 | $3,400.00 |
| 06/24/2022 | RJS | Attend hearing on motion re amending sanctions order; organize notes re same. | 1.04 | $625.00 | $650.00 |
| 06/24/2022 | RJS | Attention to K. Lee email re FSS-PQPR memorandum; provide comments to same; draft email re same to K. Lee. | 0.58 | $625.00 | $362.50 |
| 06/24/2022 | KSL | Review and analyze MOU to determine whether arrangement works and is feasible; listen to response from S. Lemmon on MOU; discuss same with client and opposing counsel and determine approach that is equitable for both parties; review corporate deposition transcript of Zimmerman, Dew and several others on various topics to determine whether factoids available for Marc Schwartz Declaration; review David Jones deposition to do same (3) | 3.00 | $850.00 | $2,550.00 |
| 06/25/2022 | RJS | Attention to emails re Friday hearing; draft email to K. Lee, R. Battaglia, M. Schwartz re same. | 0.48 | $625.00 | $300.00 |
| 06/27/2022 | RJS | Obtain transcript of 6/10/22 hearing in IW bankruptcy case; draft email to team re same; attention to response from A. Reynal; initial call re modification of PQPR deal. | 0.50 | $625.00 | $312.50 |
| 06/27/2022 | RJS | Call with S. Lemmon, M. Schwartz, K. Lee, and R. Battaglia re amending PQPR relationship. | 1.30 | $625.00 | $812.50 |
| 06/27/2022 | KSL | Complete review of Exhibits 23, 24 and 25 to RJ Declaration to assure that "bad faith" arguments are addressed and supported by response filed (1.0); Handle fall out from issues relating to circulation of MOU by J. Shulse and why such proposal is opposed by S. Lemmon (1.0); Call with M. Schwartz to discuss issues relating to financial information for FSS (.5); edit and revise latest draft of M. Schwartz Declaration (1.0); | 4.50 | $850.00 | $3,825.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | Conference call with R. Battaglia and R. Shannon to discuss strategy on how to handle State Court cases (1.0) | | | |
| 06/28/2022 | RJS | Finalize declaration re Texas sanctions motion; send same to A. Reynal; review pleadings in Texas state court in advance of 3 pm call with S. Jordan, R. Battaglia, K. Lee, and A. Reynal. | 2.84 | $625.00 | $1,775.00 |
| 06/28/2022 | RJS | Prepare response re email re PQPR; prepare for and attend 3 pm meeting re litigation. | 1.90 | $625.00 | $1,187.50 |
| 06/28/2022 | RJS | Prepare WIP List for filing | 3.17 | $625.00 | $1,981.25 |
| 06/28/2022 | KSL | Write emails to M. Schwartz on financials and status of when they will be ready, negotiations on revised arrangements with PQPR and new agreements to be entered into among the parties (.5); extended conference call among Ray Battaglia and S. Lemmon to discuss latest developments on PQPR and SFF (.5); Call on FSS with team on MOU and action plan required on same (1.0); continue to review depositions of corporate representatives and Alex Jones to determine factoids critical to Marc Schwartz Declaration (1.0) | 3.00 | $850.00 | $2,550.00 |
| 06/29/2022 | RJS | Draft email re CODI tax implications to R. Battaglia, S. Jordan, and K. Lee; finish drafting WIP/Task List for bankruptcy filing; draft email to K. Lee and R. Battaglia re same; | 2.20 | $625.00 | $1,375.00 |
| 06/29/2022 | KSL | Outline topics on which data is required from SchwartzAssociates to complete (1.0); review status of Schwartz Declaration to determine new topics to include for finalization (1.0); Lunch with Marc Schwartz and RJ Shannon to review issues on FSS and how to break log jam in financial data requirements to make progress for filing chapter 11 (1.0); t/c with R. Battaglia and Steve Lemmon to discuss issues relating to new agreement between the parties (1.0); continue to edit and revise Schwartz Declaration (1.0) | 5.00 | $850.00 | $4,250.00 |
| 06/30/2022 | RJS | Zoom call with M. Schwartz and K. Lee re PQPR financials; attention to K. Lee email re same and S. Lemmon request to destroy same; research and draft detailed email re same; teleconference with M. Schwartz, C. Schwartz, K. Lee, R. Battaglia, and S. Jordan re same. | 4.70 | $625.00 | $2,937.50 |
| 06/30/2022 | RJS | Research SOL issues re malpractice claims; draft email to team re same. | 0.40 | $625.00 | $250.00 |
| 06/30/2022 | KSL | T/c with R. Battaglia on latest developments in case (.5); review financials provided by M. Schwartz (1.0); t/c with S. Lemmon on PQPR Financials (.4); review issues relating to return of financials (.6); review issues relating to 13 week cash flow forecasts for FSS (.5); | 6.00 | $850.00 | $5,100.00 |

|  | edit and revise M. Schwartz Declaration as it relates to history of FSS, years 2009-2014 and add in excerpts from deposition transcripts (2.0); conference call with client and legal team to discuss PQPR Financials (.5); review data on cash management system at FSS and locate pleadings relating to same (.5) |
|---|---|

| | | |
|---|---|---|
| | **Quantity Subtotal** | **127.95** |
| | **Services Subtotal** | **$93,356.25** |

## Expenses

| Type | Date | Description | Quantity | Rate | Total |
|------|------|-------------|----------|------|-------|
| Expense | 06/21/2022 | Texas SOS Search and Filings: Texas SOS search and certificate of fact for Free Speech Systems, LLC | 1.00 | $15.00 | $15.00 |
| | | | **Expenses Subtotal** | | **$15.00** |

| Time Keeper | Position | Hours | Rate | Total |
|-------------|----------|-------|------|-------|
| Kyung Lee | Attorney | 72.0 | $850.00 | $61,200.00 |
| Kyung Lee | Attorney | 2.0 | $0.00 | $0.00 |
| R. J. Shannon | Attorney | 48.95 | $625.00 | $30,593.75 |
| R. J. Shannon | Attorney | 5.0 | $312.50 | $1,562.50 |

| | |
|---|---|
| **Quantity Total** | **127.95** |
| **Subtotal** | **$93,371.25** |
| **Invoice Discount** | **10.0% (-$9,337.13)** |
| *Agreed 10% discount* | |
| **Total** | **$84,034.12** |
| **Payment (07/28/2022)** | **-$84,034.12** |
| **Balance Owing** | **$0.00** |

# Detailed Statement of Account

## Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|

| | | | | | | |
|---|---|---|---|---|---|---|
| 10 | | 08/04/2022 | $84,034.12 | | $84,034.12 | $0.00 |

## IOLTA Trust Account

| Date | Type | Description | Matter | Receipts | Payments | Balance |
|------|------|-------------|--------|----------|----------|---------|
| 06/18/2022 | Retainer | Retainer for representation | 00008-Free Speech Systems, LLC | | $100,000.00 | $100,000.00 |
| 07/28/2022 | | Payment for invoice #12 | 00008-Free Speech Systems, LLC | $99,177.32 | | $822.68 |
| 07/29/2022 | Retainer | Retainer in advance of bankruptcy filing. | 00008-Free Speech Systems, LLC | | $50,000.00 | $50,822.68 |
| | | | **IOLTA Trust Account Balance** | | **$0.00** | |

Please make all amounts payable to: Shannon & Lee LLP

Please pay within 30 days.

# Detailed time report

## Schwartz Associates, LLC

| | | | | | |
|---|---|---|---|---|---|
| Timeframe | **05/01/2022 – 06/10/2022** | | 1 Client | **Free Speech Systems** | |
| Total | **33.08 Hours** | | Projects | **All projects** | |
| | **0.00 Uninvoiced billable hours** | | Tasks | **All tasks** | |
| | | | 1 Team | **Marc Schwartz** | |

| Client | Project | Task | Roles | Person | Hours |
|---|---|---|---|---|---|
| 05/24/2022 | | | | | 7.25 |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 5.00 |
| Meeting with counsel in Austin | | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 2.25 |
| RT Travel to Austin for meeting with counsel, 4.5 hours, billed 2.25 | | | | | |
| 05/25/2022 | | | | | 1.00 |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.10 |
| Read Bankston email on proposed sanctions against Reynal and Taube | | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.90 |
| Call with Axos on DIP accounts and merchant services | | | | | |
| 06/01/2022 | | | | | 0.30 |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| Meet with K Lee and discuss status, email to legal group plus Rao and C Schwartz to request meeting of group. | | | | | |
| 06/02/2022 | | | | | 0.90 |
| | | | | **Total** | **33.08** |

004318

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.90 |

call with counsel

| 06/03/2022 | | | | | 4.10 |
|---|---|---|---|---|---|

| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 3.00 |
|---|---|---|---|---|---|

Reviewing documents produced, email to B Roe on Axos information request and obtaining Merchant Service reports, Emails with K Lee and R Shannon on documents produced, read B&V valuation of PQPR Holdings

| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.60 |
|---|---|---|---|---|---|

Call with K Lee, RJ Shannon, C Schwartz on current results of FSS document review. Start analysis of PQPR sales and estimated cost of sales.

| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
|---|---|---|---|---|---|

Work on analysis of impact of agreement on EBITDA

| 06/04/2022 | | | | | 1.53 |
|---|---|---|---|---|---|

| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
|---|---|---|---|---|---|

Complete analysis of impact of agreement on FSS EBITDA

| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.18 |
|---|---|---|---|---|---|

Research RMA comparable data for FSS

| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.85 |
|---|---|---|---|---|---|

Read David Jones deposition

| 06/05/2022 | | | | | 1.60 |
|---|---|---|---|---|---|
| | | | | **Total** | **33.08** |

004319

| Client | Project | Task | Roles | Person | Hours |
|---|---|---|---|---|---|
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| Review additional documents sent by K Lee for review | | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 1.30 |
| prepare for and meet via Zoom with proposed debtor counsel | | | | | |
| 06/06/2022 | | | | | 8.30 |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 6.00 |
| meeting with B Roe and then Roe, Battaglia, Lee, Shannon, C Schwartz, S Lemmon, A Jones, S Jordan | | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 2.30 |
| travel time to and from Austin for meeting, 4.5 hours, billed at 50% | | | | | |
| 06/07/2022 | | | | | 2.00 |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| Meeting with C Schwartz, T Hogge, H Lee to go over initial planning | | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| Call with K Lee and S Lemmon | | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 1.00 |
| Attend to email traffic, calls with B Roe on setting up call with D Jones, Anthony. Review followup from Monday meeting | | | | | |
| 06/08/2022 | | | | | 6.10 |
| | | | | **Total** | **33.08** |

004320

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 2.30 |
| | Rt travel to FSS for meetings, 1/2 time billed to reach 50% of rates | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | Meet with B Roe and C Schwartz | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 1.30 |
| | Meet with D Jones and Anthony | | | | |
| Free Speech Systems | [2211013] FSS | Billable Time | Expert, Manager | Marc Schwartz | 2.00 |
| | Work with B Roe and C Schwartz on GL accounting issues and brief C Schwartz on results of meeting with D Jones and Anthony | | | | |
| | | | | **Total** | **33.08** |

004321

# Detailed time report

## Schwartz Associates, LLC

| | | | | |
|---|---|---|---|---|
| Timeframe | **05/01/2022 – 06/10/2022** | Clients | **All clients** | |
| Total | **38.87 Hours** | 1 Project | **InfoWars Prebankruptcy** | |
| | **0.00 Uninvoiced billable hours** | Tasks | **All tasks** | |
| | | 1 Team | **Marc Schwartz** | |

| Client | Project | Task | Roles | Person | Hours |
|---|---|---|---|---|---|
| 05/01/2022 | | | | | 2.84 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.80 |
| | Read transcript of 4/29/22 status conference | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Read K Lee, R Shannon, and S Rodgers emails on Friday hearing and open tasks to complete | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.24 |
| | LST Section 2.2, questioned by Judge Lopez | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | prison planet websites | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.00 |
| | IW Zoom Meeting with counsel | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.10 |
| | Emll Prison Planet websites' screen shots to counsel | | | | |

**Total    38.87**

004322

| Client | Project | Task | Roles | Person | Hours |
|---|---|---|---|---|---|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.10 |
| | Email to Suzy Ginsburg to set up call. | | | | |
| 05/02/2022 | | | | | 4.08 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.80 |
| | Call with S Ginsberg concerning public relations assistance | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | email to attorney group on my discussions with S Ginsberg | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.60 |
| | Review InfoW and Prison Planet license agreements with FSS and email to attorneys | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.98 |
| | Comparing provisions of LST and PSA | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.50 |
| | Call with K Lee, R J Shannon, H Lee to discuss impact of Conn. case non-suit on debtors | | | | |
| 05/03/2022 | | | | | 0.80 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Call with M Ridulfo and reading and forwarding emails relating to Conn. dismissal | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |

|  |  | | | **Total** | **38.87** |

004323

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| | Call with K Lee, JR Shannon and M Ridulfo on Connecticut dismissal | | | | |
| **05/04/2022** | | | | | 2.51 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.00 |
| | call with K Lee, RJ Shannon and S Rodgers | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Call and email to M Boyd concerning bank accounts | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Call with M Boyd about setting up DIP bank accounts | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.81 |
| | Reading emails from counsel relating to dismissals and May 27 hearing. | | | | |
| **05/05/2022** | | | | | 3.14 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.30 |
| | Reviewing SOFAs | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Refiew IDI report for InfoW and send to Harold to fix others before I review | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Revieiwing, editing and signing IDI Reports | | | | |
| | | | | **Total** | **38.87** |

004324

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  Review Motions to Dismiss | Billable Time | Expert, Manager | Marc Schwartz | 0.25 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  Zoom conference call with counsel | Billable Time | Expert, Manager | Marc Schwartz | 0.99 |
| 05/06/2022 | | | | | 3.60 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  Call with M Ridulfo on status | Billable Time | Expert, Manager | Marc Schwartz | 0.15 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  Gong thru Docu Sign to open bank account for Info Health | Billable Time | Expert, Manager | Marc Schwartz | 0.29 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  PLR Application to employ | Billable Time | Expert, Manager | Marc Schwartz | 0.34 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  Call with Bob Roe on Budgets for Debtors | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  email to C Schwartz, H Lee and Bob Roe detailing elements of proposed Debtors five year budgets needed | Billable Time | Expert, Manager | Marc Schwartz | 0.52 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy  Reading UST comments on Motion to employ WMS including cross referencing to proposed order | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |

**Total**       **38.87**

004325

| Client | Project | Task | Roles | Person | Hours |
|---|---|---|---|---|---|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | Zoom Meeting with K Lee and M Ridulfo on addressing change in counsel and needed resources. | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.60 |
| | Call with Ridulfo to discuss PLR pending withdrawal. | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | ReadPLR motion to withdraw, read emails from K Lee and L Parkins concerning possible solution to representation issues raised by withdrawal. | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Call to K Lee to discuss using PLR personnel as a solution to resource issues raised by PLR withdrawal. | | | | |
| 05/07/2022 | | | | | 0.35 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.35 |
| | Docusign for Axos bank account for IWHealth and InfoW | | | | |
| 05/08/2022 | | | | | 0.90 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.70 |
| | IW Zoom Meeting with R Battaglia, RJ Shannon, K Lee, M Ridulfo and H Lee | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Call with M Ridulfo | | | | |
| 05/09/2022 | | | | | 0.80 |
| | | | | **Total** | **38.87** |

004326

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Review and file new account documents | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.10 |
| | ReadingChris Sadiwski demand | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | getting bank account documents in and done, preparing and sending new W-9s | | | | |
| 05/10/2022 | | | | | 1.21 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.28 |
| | Email with Axos over IHealth alternative to Operating Agreement, commence completing form and send to S Rodgers for signature | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Attention to emails from counsel related to upcoming status conference and banking | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.53 |
| | Working on proposed five year financial plan for debtors | | | | |
| 05/11/2022 | | | | | 1.86 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Read draft stipulation | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |

| | | | | **Total** | **38.87** |

004327

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| | Attention to emails concerning outstanding claims, resolution of Fontaine claim, scheduling a meeting. | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.00 |
| | Conference call with counsel., Bob Roe and FA | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.36 |
| | Reading new draft of Stipulation | | | | |
| 05/13/2022 | | | | | 2.30 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | review PLR application to employ | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Review KSLPLLC engagement letter | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Review of final PLR application to employ and sign | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.80 |
| | Attend status conference in Judge Lopez' court room | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | Review with counsel expected items to be discussed at status conference | | | | |
| 05/14/2022 | | | | | 0.50 |
| | | | | **Total** | **38.87** |

004328

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | Log onto Youngevity account 100921162, attempted to log onto 1942701 without success, read statements of account activity sent by RJ Shannon. Requested log in info for account 1942701 | | | | |
| 05/17/2022 | | | | | 3.88 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.40 |
| | call with counsel to discuss preparation for upcoming hearings | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.50 |
| | Prepare funding request for Debtors and transmit to B Roe | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Working on opening Prison Planet bank account and activating IWHealth account | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Axos document request on Prison Planet | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Call with R Battaglia | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Review current draft of Texas Stipulation | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.24 |
| | Application to employ KSLLLP | | | | |
| | | | | **Total** | **38.87** |

004329

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.64 |
| | Reading draft motion to dismiss response | | | | |
| 05/18/2022 | | | | | 2.74 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Discuss with K Lee alternative solutions to Debtors bankruptcies | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Read proposed changes from M Beatty adn provide comment to K Lee | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Meeting with C Schwartz and H Lee to discuss events in case including motion for extension on Motion to Dismiss hearing | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.17 |
| | Read latest draft of Motion to Extend | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.25 |
| | Reading drafts of stipulations as of 3pm today | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.56 |
| | Review and sign IDI reports | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.34 |
| | Review long form stipulations for Texas Plaintiffs | | | | |
| | | | | **Total** | **38.87** |

004330

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.42 |
| | Read revised stipulation from M Beatty | | | | |
| 05/19/2022 | | | | | 2.20 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Final review and sign application to employ KSLPLLC | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.00 |
| | Status call with attorneys | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.00 |
| | Hearing on motion for continuation on Motion to Dismiss | | | | |
| 05/20/2022 | | | | | 3.07 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.40 |
| | Status call to introduce Howard Magaliff to case and to discuss developments | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.15 |
| | Review IDR in preparation for initial debtor meeting | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 1.30 |
| | ID Meeting | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.22 |

| | | | | **Total** | **38.87** |

004331

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| | Ridulfo engagement documents | | | | |
| **05/31/2022** | | | | | 1.03 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Review of RJ Shannon and K Lee drafts of Motion to Dismiss case | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.30 |
| | Review revised Stipulation and Agreed Order Dismissing Cases | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.33 |
| | Respond to B Roe email on amounts owed. | | | | |
| **06/01/2022** | | | | | 0.10 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.10 |
| | Review and edit motion to dismiss | | | | |
| **06/07/2022** | | | | | 0.60 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.20 |
| | Review mors | | | | |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.40 |
| | Work up final funding request | | | | |
| **06/09/2022** | | | | | 0.36 |
| Litigation Settlement Trust | [2211008] InfoWars Prebankruptcy | Billable Time | Expert, Manager | Marc Schwartz | 0.36 |
| | | | | **Total** | **38.87** |

004332

| Client | Project | Task | Roles | Person | Hours |
|--------|---------|------|-------|--------|-------|
| | Call with RJ on hearing tomorrow on motion to dismiss | | | | |

| | | | | **Total** | **38.87** |

004333

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                 )  CASE NO: 22-60020-cml
                                   )
 4    INFOW, LLC. and IWHealth,    )  Houston, Texas
      LLC.,                        )
 5                                 )  Thursday, May 19, 2022
                Debtors.           )
 6                                 )  2:01 p.m. - 2:28 p.m.
                                   )
 7    -----------------------------)

 8                               MOTION

 9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For U.S. Trustee:          JASON RUFF
                                 HA NGUYEN
13                               MELISSA HAZELTON
                                 U.S. Trustee
14                               950 Pennsylvania Avenue NW
                                 Washington, D.C. 20530
15
      For Debtor:                KYUNG S. LEE
16                               MARK SCHWARTZ
                                 Kyung S. Lee, PLLC
17                               700 Milan Street, Suite 1300
                                 Houston, TX 77002
18
      For Connecticut Plaintiff:
19                               RANDY WILLIAMS
                                 Byman & Associates, PLLC
20                               7924 Broadway, Suite 104
                                 Pearland, TX 77581
21
                                 RYAN CHAPPLE
22                               Cain & Skarnulis, PLLC
                                 303 Colorado Street, Suite 2850
23                               Austin, TX 78701

24

25
```

```
 1    For Texas Plaintiff:      MAX BEATTY
                                The Beatty Law Firm
 2                              1127 Eldridge Parkway, Suite 300
                                Houston, TX 77077
 3                              AVI MOSHENBERG
                                McDowell Hetherington
 4                              First City Tower
                                1001 Fannin Street, #2700
 5                              Houston, TX 77002

 6    For Free Speech Systems:  RAY BATTAGLIA
                                Law Offices of Ray Battaglia, PLLC
 7                              66 Granburg Circle
                                San Antonio, TX 78218
 8

 9    Court Reporter:           KIMBERLY PICOTA

10    Courtroom Deputy:         KIMBERLY PICOTA

11    Transcribed by:           Veritext Legal Solutions
                                330 Old Country Road, Suite 300
12                              Mineola, NY 11501
                                Tel: 800-727-6396
13

14

15    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

```
 1          HOUSTON, TEXAS; THURSDAY, MAY 19, 2022; 2:01 P.M.
 2          THE COURT:  Okay.  Okay.  Good afternoon,
 3     everyone.  This is Judge Lopez here on an emergency request
 4     for a continuance in Infowars.  Why don't we take
 5     appearances.  Why don't I begin with appearances in the
 6     courtroom.
 7          Mr. Lee?
 8          MR. LEE:  Good afternoon, Your Honor.  Kyung Lee
 9     with the law firm of Kyung S. Lee PLLC for the three
10     debtors.  I am here in the courtroom with Mr. Mark Schwartz,
11     the chief restructuring officer of the three debtors.
12          THE COURT:  Okay.  Good afternoon, sir.
13          MR. SCHWARTZ:  Thank you, Your Honor.
14          THE COURT:  Mr. Ruff, good afternoon.
15          MR. RUFF:  Yes.  Good afternoon, Your Honor.  With
16     me today -- Jayson Ruff on behalf of the U.S. Trustee's
17     Office.  And Ha Nguyen with me today.
18          THE COURT:  Okay.  Good afternoon.
19          MR. WILLIAMS:  Good afternoon, Your Honor.  Randy
20     Williams for the Connecticut plaintiffs.  Ryan Chapple and
21     Connecticut counsel are all on the Zoom.
22          THE COURT:  Okay.  Good afternoon.
23          MR. BEATTY:  Your Honor, Max Beatty on behalf of
24     the Texas plaintiffs.  I also have Mr. Avi Moshenberg with
25     me here today.
```

```
 1          THE COURT:  Good afternoon.  Good afternoon to
 2    both of you.
 3          Okay.  Anyone else in the courtroom wish to make
 4    an appearance?  Okay.
 5          Ms. Hazelton, I see you there, the Subchapter V
 6    trustee.  Good afternoon.  I think -- oh, I muted you,
 7    didn't I?  I've got everyone muted.  So if anyone wishes to
 8    make an appearance, you can hit five-start.  Ms. Hazelton,
 9    just hit it just so I know that -- and I'll keep your line
10    unmuted.  All right.  There is a 210-601 number.
11          MR. BATTAGLIA:  Yes, Your Honor.  This is Ray
12    Battaglia on behalf of Free Speech Systems.  I don't know
13    that I will be participating today, but I will make an
14    appearance.
15          THE COURT:  Okay.  And I'll keep your line
16    unmuted, Mr. Battaglia, just in case.  Good afternoon, sir.
17          MR. BATTAGLIA:  Thank you, Judge.
18          THE COURT:  Okay.  Ms. Hazelton, can you hit five-
19    star?  I want to make sure I've got your line unmuted as
20    well.  There's a 281-846 number.
21          MS. HAZELTON:  Your Honor, Melissa Hazelton,
22    Subchapter V Trustee.
23          THE COURT:  Okay.  Good afternoon.  Does anyone
24    else wish to make an appearance on the phone?  Just hit
25    five-star and I will recognize you.  Okay.
```

1          Mr. Lee, why don't I turn it over to you, sir.

2          MR. LEE:  Good afternoon, Your Honor.  May it

3    please the Court.  Before I hit emergency motion Docket 95

4    requesting the continuances of the hearing for next week as

5    well as the various answer dates, I would like to address

6    the Court with respect to some of the procedural issues that

7    are taking place --

8          THE COURT:  Okay.

9          MR. LEE:  -- and update you on those.  Number one,

10   the initial debtor interview is taking place tomorrow

11   afternoon.  And Mr. Schwartz and I will be handling that

12   with the U.S. Trustee's Office.  The data has been provided

13   to them yesterday, and we will handle that hearing or the

14   call tomorrow.

15         Number two, Mr. Beatty and I concluded

16   negotiations and finalization of the dismissals with

17   prejudice of the Texas plaintiff's lawsuits yesterday, and

18   Mr. Beatty will probably want to speak to you about those

19   issues today.  But that is done.

20         THE COURT:  Okay.

21         MR. LEE:  And so wanted you to know that.  And I

22   believe the stipulation, the general one has been filed.

23   There are subsidiary stipulations which you also agreed to,

24   and he can speak to those issues if you'd like to have him

25   discuss those.

1          THE COURT:  Okay.

2          MR. LEE:  Number Three.  The Connecticut

3     plaintiffs have decided to move by way of motion to dismiss

4     their lawsuits in Connecticut against the three debtors.

5     And there is a status conference that Judge Manning has set

6     for next Tuesday at 2:00 p.m. Eastern Standard time, and

7     there is going to be a conference call on that matter for

8     that time.

9          THE COURT:  Okay.

10         MR. LEE:  So I can tell you a little bit more

11    about that after it's occurred, but I just wanted to let you

12    know the timing on that.

13         THE COURT:  Thank you.

14         MR. LEE:  Number four.  The 341 meeting of

15    creditors will take place next Thursday, on May 26th.  And

16    Mr. Ruff and I have talked about what we need to get ready

17    to do that.

18         Number five.  I just got a notice during lunch

19    today that the Western District of Texas has set a hearing

20    on June 21-22 in connection with the removal and abstention

21    and remand hearing on the "TUFTA" lawsuit that some of the

22    plaintiffs filed against the debtors and other parties.  And

23    again, I think that can be handled administratively, but I

24    just wanted you to know that matter is out there for setting

25    at that time.

```
 1                THE COURT:  Thank you.

 2                MR. LEE:  Now, addressing Docket 95.  And I don't

 3      think I need to go into it in any substantive detail.  But I

 4      just wanted to let you know that what we moved to do was to

 5      extend the answer date from May 20th to June 17th, the

 6      exhibit designation date from May 25th to June 22nd, and we

 7      requested a hearing date from May 27th through June 24th and

 8      to have discovery be available to especially Mr. Ruff, who

 9      has been working with -- on behalf of the U.S. Trustee's

10      Office so that he could have discovery pending.

11                It is contemplated that after this week, there

12      should be only one motion to dismiss or on file that should

13      be active, hopefully.  But again, the implementation of the

14      dismissals with prejudice has taken a little longer time

15      than I expected.  And again, I built in when I filed my

16      emergency motion time to be able to carefully implement all

17      of those.  And again, that's the reason for the time that

18      I've requested so that I don't have to prepare for the

19      motions to dismiss as well as trying to get all those things

20      correctly done.

21                I'm happy to work and do both if I'm forced to do

22      that.  But as I set out in my motion, I think it's not a

23      good use of judicial or financial resources of this estate

24      to do that.  And that's why I've asked for some time.

25                Mr. Ruff has indicated that he wants a shorter
```

```
 1    time.  And I've tried to discuss that with him this morning.
 2    And it's all been very friendly.  And so again, I am
 3    amenable to another deadline, a shorter deadline if they
 4    wish.  But again, the reasons for the requests I've made for
 5    my deadlines is because I anticipate having to implement all
 6    the dismissals.  And I want to make sure I have done it
 7    correctly and that I've given the other courts other than
 8    the home court here time to get those things done.  And
 9    that's the basis for my asking for the specific dates I
10    have.
11            Again, I am also amenable to the idea of having a
12    shorter period but having -- an intermediate status
13    conference would be like every Friday where we can check in
14    and say, Your Honor, we need more time or we're good with
15    the time schedule that we have.  So we are very flexible on
16    that.  And again, Mr. Schwartz and I are going to evaluate
17    whether after the dismissals would prejudice the Texas and
18    Connecticut plaintiffs, whether these debtors need to
19    proceed with trying to confirm a plan with an amended plan
20    support agreement or whether we are able to handle these
21    creditors, the remaining creditors, outside of bankruptcy.
22            THE COURT:  Okay.
23            MR. LEE:  So that's an evaluation we are going to
24    make.  And we hope to do that very quickly.
25            THE COURT:  Thank you.  Actually, sir, is it okay
```

1    if I hear from Mr. Beatty first?

2         MR. RUFF:  That would be just fine, Your Honor.

3    It's your court.

4         THE COURT:  No, no, no.  I'm just -- I saw the

5    stipulation.  I just wanted to hear from you, Mr. Beatty,

6    just confirmation.  Does the stip that is on file cover what

7    we would call the Texas litigation?

8         MR. BEATTY:  Yes, Your Honor, it does.  And Mr.

9    Lee referred to some other stipulations that I would call

10   them supporting stipulations.  They're just simplified to

11   make it easy for the Court in each of the Western District

12   cases.  So we do have this larger stipulation that we filed

13   with the Bankruptcy Court, but Mr. Lee and I have already

14   passed back and forth, agreed, and actually put on file the

15   Rule 41 stipulations of dismissal with the court for the

16   Western District of Texas.  One of the cases.  The TUFTA

17   case is a little bit different in the following sense.

18   There's a couple of procedural differences there dealing

19   with whether or not the parties were served and whether or

20   not the removal was done correctly.  There we have actually,

21   due to concurrent jurisdiction with both the Western

22   District of Texas as well as the underlying state court, we

23   have filed a non-suit in the state court with prejudice

24   there.  So we think we've implemented the initial steps on

25   whatever we have to do for those to get everything

```
 1    dismissed.  It's really the remand that Mr. Lee referred to
 2    it as taking some amount of time there.  We did file
 3    yesterday additional motions for remand noting our
 4    agreement.  Hopefully those things can be resolved rather
 5    quickly.
 6              THE COURT:  Okay.  I guys the question is are you
 7    -- maybe I -- Mr. Ruff, Ms. Hazelton, is there any issue
 8    with me signing this right now?
 9              MR. RUFF:  Your Honor, the stipulation that was
10    filed?
11              THE COURT:  Mm-hmm.
12              MR. RUFF:  No issue from the U.S. Trustee's Office
13    perspective.
14              THE COURT:  Ms. Hazelton?
15              MS. HAZELTON:  No issues here, Your Honor.
16              THE COURT:  Anyone in the room?  Anyone have any
17    issues?  Okay.  I'm going to sign it now.
18              MR. BEATTY:  Thank you, Your Honor.
19              THE COURT:  The parties are in agreement with
20    that.  I told everybody I wasn't going to stand in the way
21    of an agreement.  I have read it.  It's the parties'
22    agreement.  I'll sign it.  I'll sign it right now.  It at
23    least allows the parties the clarity I think that they need,
24    and I think it will certainly -- something you can present
25    to the courts in the Western District of Texas.  And I think
```

1     it at least clears a little bit of the road that Mr. Lee was

2     referring to in terms of what may be coming for him at a

3     future point in time.

4          MR. BEATTY:  And that was the intent, Your Honor.

5     And what we had hoped to do is I was actually going to ask

6     you to sign it today because our intent is to in addition to

7     the stipulation that we filed already, to take this

8     stipulation with the Court's signature, file it in the

9     Western District of Texas so that there the court can be

10    comfortable that you had the opportunity to look at it as

11    the home court and that you're also comfortable with what we

12    are doing.

13         THE COURT:  Okay.  I have signed it.  It is off to

14    docketing and it will hit the docket in the next ten, 15

15    minutes, Mr. Beatty.

16         MR. BEATTY:  Thank you, Your Honor.  Mr. Beatty, I

17    don't know what that means for your participating going

18    forward, but I would say in a few minutes you'll have

19    greater clarity on that as well.

20         MR. BEATTY:  Well, I think the answer is that

21    means you won't get to see my smiling face here anymore.

22    But yes, thank you very much, Your Honor.

23         THE COURT:  Okay.  Thank you.  Mr. Ruff, I just

24    wanted to -- actually, go ahead.  Go ahead.  Let me hear

25    from the Connecticut plaintiffs.

```
 1          Let me just say I was able to read the pleadings
 2   that were filed.  I very much appreciate the notice.  Was
 3   very helpful for me to just kind of keep track of what's
 4   going on.  So I thought the updates were very helpful, and I
 5   very much appreciate it.  I'm not going to comment obviously
 6   on what's going to happen in Connecticut.  But I just would
 7   ask if Judge Manning issues any rulings or anything
 8   substantive happens, if someone can just provide an update
 9   just like you did, I think it would be very helpful for me
10   if she enters something.  I don't need any commentary or
11   anything.  I just need more of a docket entry just to
12   understand if anything happened or if there is any further
13   hearing schedule.  It just helps me kind of keep track of
14   stuff.
15          MR. WILLIAMS:  Yes, Your Honor.  I just wanted to
16   make the announcement on behalf of the Connecticut
17   plaintiffs that as to the Debtor's emergency motion to
18   continue, we really believe those issues are now between
19   them and the U.S. Trustee as far as timing because we had
20   filed the motions to dismiss with prejudice.  That was put
21   in the notice.
22          THE COURT:  Got it.
23          MR. WILLIAMS:  The Court has now set that for
24   status conference on Tuesday.  We're going to ask the Court
25   since there is no opposition to that, to enter the
```

```
 1    dismissal.  And then once it's dismissed, the Debtors have
 2    agreed they will no longer have objection to remand and that
 3    the Court then pick that up and remand the cases.  So
 4    hopefully by next Tuesday we will -- after that's concluded
 5    and if that happened, then we would be filing our notice of
 6    withdrawal of our motion to dismiss.  But until we hear from
 7    the Connecticut court, we're not able to do that.  But we
 8    will -- to the extent we are still in it, because we are
 9    waiting on that, whatever the Court decides between the
10    Debtors and the U.S. Trustee as far as timing, we are not
11    going to impose on that.  We'll follow the Court's guidance
12    with what their argument are and timing.
13              THE COURT:  Okay.  Thank you very much.
14              MR. RUFF:  Again, Your Honor.  Thank you.  You
15    know what, the U.S. Trustee's Office, we appreciate and are
16    supportive of the Plaintiffs being able to resolve their
17    issues with these debtors and the way that they're doing
18    that.  And we certainly are agreeable to pushing out the
19    hearing on our motion so that those issues can be resolved
20    definitively.  That's fine.
21              But, Your Honor, I still don't think that we
22    really need more than a couple-week extension.  And that
23    would be our preference.  You know, we are happy to move
24    forward as soon as possible.  It seems, based on
25    representations that have been made by both Plaintiff's
```

1    counsel that Texas plaintiffs are out.  They're withdrawn

2    now as of today.  And it sounds like Connecticut, as soon as

3    they get their answer and the court up in Connecticut there,

4    that they will agree to withdraw as well, too.  So if they

5    do that, then Mr. Lee no longer has to focus on their

6    motions to dismiss and he no longer has to worry about

7    those.  It will just be ours.  And we would like to move

8    forward with it as expeditiously as possible. After that.

9         The only other comment I would say is to the

10   extent that the Court does push that out, assuming these

11   cases are dismissed, then we don't think that any of the

12   other pending motions applications should be heard until

13   that same date after that time.  We have already provided

14   comments as far as the CRO motion assuming that these case

15   are going to go forward.  So we've already started that

16   process.  We're not just waiting until the very last moment

17   on that.  To the extent that there are any substantive

18   issues, we can work those out and resolve those.

19        But, for example, it's a little unclear, and I

20   think Mr. Lee has to -- is working out with his client as

21   far as the -- there is no longer a litigation settlement

22   trust and there's no longer that mechanism of management by

23   the trustees I don't think, or the service managers for the

24   equity of these debtors that the CRO would report to.  So I

25   think things like that need to be cleaned up if these cases

```
 1   are to continue.  If these cases aren't to continue, then
 2   none of that is really necessary.  The cases can get
 3   dismissed.  You know, the debtors can go ahead and pay their
 4   creditors, including their professionals however they want
 5   to.  The only thing we probably would want to have some
 6   treatment for in the dismissal order, again, assuming that's
 7   the route that we end up toing, is to allow for Ms. Hazelton
 8   to apply for her fees and make sure that this Court retains
 9   jurisdiction for the payment of her fees.
10          THE COURT:  So Mr. Ruff, are you agreeing to a
11   continuance or not?
12          MR. RUFF:  Yes.  We are not opposed to a
13   continuance, Your Honor.
14          THE COURT:  And how long?
15          MR. RUFF:  Two weeks.  That's what we think would
16   be -- somewhere around June 10th is what we had proposed.
17          THE COURT:  Okay.  Okay.  Mr. Beatty, your stip
18   has hit the docket.
19          MR. BEATTY:  Thank you, Your Honor.
20          THE COURT:  I'm not kicking you out.  I'm just
21   telling you.
22          MR. BEATTY:  As much as you'd like to.
23          THE COURT:  Okay.  Mr. Lee, why do you need more
24   time than the 10th?
25          MR. LEE:  Your Honor, things tend to take a longer
```

1    time than we initially planned.  I think it was four weeks

2    ago everybody declared that they did not want to be

3    creditors of this estate.  And it started off with

4    dismissals without prejudice and having to negotiate all of

5    those to get it right.  And it's not because we didn't want

6    to get it right or do it the right way, but it just takes

7    some time in light of the fact that the parties have been

8    litigating these issues and there's a lot of distrust.  And

9    we've had to build that.

10        With respect to the implementation of the

11   dismissals, I don't think it's as simple as Mr. Ruff

12   describes it.  It's not just a matter of dismissals that

13   takes place and then we're done.  There is implementation

14   that has to take place both in Connecticut and in Texas.

15   And the Debtors are going to have to be involved in that

16   process and implementing that.  So I need some time to do

17   that.

18        And secondly, there are claims that need to be

19   addressed in connection with the remaining estate that our

20   creditors have nothing to do with the Sandy Hook issues.

21        And then number three, Your Honor, the other part

22   that I have to do is renegotiate a plan support agreement if

23   the debtors intend to move forward with respect to a smaller

24   subchapter V plan to see if we can get something confirmed.

25        So I've built in some time to be able to do all of

1    that without having the -- sort of Damocles sword over me

2    every two weeks in saying I've got to go and try a motion to

3    dismiss.  But if the Court thinks that that sword should be

4    over me, I'm fine with that, too.

5            THE COURT:  I don't want to say it's a sword,

6    because I don't think it is.  I think the Debtor filed a

7    case and people have filed motions, and they get a chance

8    for a hearing.  And the Debtor has to respond to it.  I'm

9    assuming the Debtor was prepared to go on the 27th.  So if

10   we push it out for June the 10th, that feels right to me.

11   And I'm going to tell you why.

12           I certainly understand the dynamics of change.

13           MR. LEE:  Yes, Your Honor.

14           THE COURT:  And I still don't how much -- look, I

15   know according to the schedules and the statements, the

16   Debtor has no cash.  I don't know where cash is coming from.

17   The Debtor doesn't generate income.  I don't know who the --

18   if there's a trust, I don't know how administrative expenses

19   are going to get paid.  And this is still a Subchapter V

20   case.  We are about 30 days in.  I think everybody is going

21   to have to put their cards on the table and figure out

22   what's there.  And I think you and Mr. Schwartz are going to

23   have to figure out -- it sounds like Connecticut plaintiffs

24   are out, signed the order for the Texas plaintiffs.  I think

25   you all have got to figure out now that that's gone,

1   assuming that everything goes through -- and again, I don't

2   want to wish -- I don't want to speak for any other court

3   and the work that they have to do.  But assuming that they

4   go, Mr. Lee, I think you're going to have to ask yourself

5   what's left and what kind of case and what chapter it should

6   proceed in.  And I think the trustee gets a right to know

7   what your plans are.  To me, that's where I see the

8   extension for.  I think they've got to kind of figure out

9   what's left and how do you proceed.  Is it still under

10  Subchapter V?  Is it something else?  And so I think you've

11  got to figure all that out.  But I don't know -- pushing it

12  out a month without knowing where there's any source of

13  revenue coming from and what the third-party contributors

14  are or are not doing, I think we've got to know some answers

15  before then to see what kind of case -- if we have a case at

16  all.  And I'm not saying we don't.  I just don't know what's

17  out there.

18           MR. LEE:  Your Honor, let me allay your concerns.

19           THE COURT:  I'm not sure you're going to be able

20  to do it today.

21           MR. LEE:  I'm going to do it today for you, Your

22  Honor, by saying --

23           THE COURT:  That would be impressive.

24           MR. LEE:  You're actually right.  I'm not going to

25  argue with trying to get any more time.  They've set it for

1    June 10th.  We'll be ready.  We'll work like dogs to get

2    there.  And if we don't, we'll come back to you and ask for

3    more time if we run into a jam.  But I hear all the concerns

4    that you're saying.  I think they are very legitimate as

5    Debtor's counsel and as you pronounced it.  And let's get it

6    on.  Let's do it on June 10th.  And let's just get it done.

7              THE COURT:  Okay.

8              MR. LEE:  I agree with you.

9              THE COURT:  Mr. Lee, I've got one question for

10   you.  Just since -- and this has nothing to do with what we

11   were just describing.  It's just trying to understand -- I

12   understand kind of procedurally where the Texas Plaintiffs

13   are and the Connecticut plaintiffs.

14             MR. LEE:  Sure.

15             THE COURT:  The trust.  Is the initial trustee

16   still involved, Mr. Du?

17             MR. LEE:  Yes.

18             THE COURT:  And who represents Mr. Du?

19             MR. LEE:  I don't know right now.  I just know

20   that Mr. Du is the trustee of the trust that was given the

21   obligation to put the company into bankruptcy.

22             THE COURT:  Okay.  Okay.  I know Mr. Du had

23   noticed parties in the trustee agreement, but I didn't know

24   if those remained the noticed parties for the trust or

25   whether Mr. Du was still involved.  So Mr. Schmidt and Mr.

```
 1    (indiscernible) are at this point not -- they're still

 2    waiting?

 3         MR. LEE:  Yes, Your Honor.  That's correct.  That

 4    is correct.  And I think by virtue of the Texas and

 5    Connecticut plaintiff having withdrawn, I think the bigger

 6    concept of trying to go global resolution, that's probably

 7    become moot at this point in time.

 8         THE COURT:  Okay.

 9         MR. LEE:  So yes, Your Honor.  And you have made

10    all the issues that you've identified.  We are on it.

11         THE COURT:  I know.  I know I'm not raising -- I'm

12    just trying to -- we are all here.  I might as well just try

13    to understand kind of procedurally where we are and kind of

14    where the case is.  I think I -- look, I like where we are

15    going.  The Trustee is not opposed to a two-week extension.

16    Let's do a two-week extension.  And without prejudice,

17    obviously, to the ability to come back to ask for more time.

18         MR. LEE:  Absolutely.

19         THE COURT:  But I'm going to tell you though, if

20    we go further out, I'm going to need all parties to agree to

21    it.  If not, we'll just have to take them up and see where

22    we go.  I don't want to take up any other motions before

23    then because I don't know what kind of case we have and

24    what's going on.  And I want to give you an opportunity to

25    get it done.  So we'll push this out for a couple of weeks.
```

1    And I'm sure -- and I would ask you as well, Mr. Beatty, if

2    there's any updates, if you will.  I know that with respect

3    to what happens in the Texas courts, just -- I think just

4    providing for informational purposes.  I mean it.  I want no

5    spin on any of it.  I mean, as boring as it comes, I am at

6    docket entry and I don't need whereas clauses, and I know I

7    have jurisdiction.  I mean, where we are, just plain docket

8    entries.  And I would ask the Connecticut plaintiffs to do

9    as well.  Just the notice.  Just so everybody knows what's

10   going on and everybody can just see and we all have

11   transparency in the process.

12         MR. WILLIAMS:  More than happy to do so.

13         THE COURT:  Okay.  Thank you.  So that would push

14   out the hearing to Friday, June 10th at -- what time are we

15   -- we were going to start at 9:00 a.m.  Why don't we start

16   at 9:00 a.m. on Friday, June 10th.  And the witness and

17   exhibit list would then get pushed out to Wednesday, June

18   8th.

19         MR. LEE:  Yes.

20         THE COURT:  Okay.  And the objection deadline,

21   what are we going to do about -- what are you all agreeing

22   on that?

23         MR. LEE:  We had talked about objection deadline

24   of being a week before whenever the hearing is.

25         THE COURT:  So maybe June 3rd?

1             MR. LEE:  So June 3rd.

2             THE COURT:  Okay.

3             MR. LEE:  And then a reply deadline be the same

4    day as the witness and exhibit on the 8th.

5             THE COURT:  Okay.  So I would ask June 8th at noon

6    exhibits, June 3rd, just any time on June 3rd for your

7    response, Mr. Lee.

8             MR. LEE:  That's perfectly fine with the Debtor's,

9    Your Honor.

10            THE COURT:  I don't care what time you get it on

11   file there.

12            Mr. Ruff, your response is fine with me.  I don't

13   care when you --

14            MR. RUFF:  We'll get it on file before close of

15   business, Your Honor.  It won't be a midnight filling.

16            THE COURT:  Okay.

17            MR. RUFF:  We'll give Your Honor some time to read

18   it.

19            THE COURT:  No, no.  Old habits die hard.  So I'm

20   up early and stay up late.  So don't worry about me.

21            I think we had a hearing scheduled for June 3rd.

22   It probably makes sense to push that out, don't you think?

23            MR. LEE:  Could we move it all to the June 10th?

24            THE COURT:  Yeah.

25            MR. RUFF:  We agree with that, Your Honor.

```
 1              THE COURT:  What did we have on June --
 2              MR. LEE:  Both the trustee motion, and I think the
 3    CRO motion has been on a 21-day notice as well as the bar
 4    date motion, Your Honor.
 5              THE COURT:  Oh yeah.  I don't want to touch those
 6    until we know what -- yeah.  But I agree.  We'll take them
 7    up -- original plan.  Take them up after we know on the
 8    motion to dismiss.
 9              MR. RUFF:  We'll be ready to go, Your Honor.
10              THE COURT:  Okay.
11              MR. LEE:  Your Honor?
12              THE COURT:  Yes.
13              MR. LEE:  I do want you to know that Mr. Schwartz
14    in his fiduciary capacity is evaluating all alternatives.
15              THE COURT:  Oh, I'm sure he is.
16              MR. LEE:  I just want you to know that.
17              THE COURT:  No doubt.  I've got no doubt.  And I'm
18    sure -- I've got no doubt about that.  I know Mr. Schwartz
19    is professional.  He's doing his job.  I've got no doubt
20    about it.
21              MR. LEE:  Thank you, Your Honor.
22              THE COURT:  Okay.  Anyone in the courtroom,
23    anything else anyone wishes to say at this time?  Anyone on
24    the phone, if you wish to hit five-star.
25              Okay.  All right, folks.  It sounds like we will
```

```
 1    not see each other on the 27th.  It looks like we will see

 2    each other potentially on June 10th.  Thanks, everyone.

 3    Have a good day.

 4              (Whereupon these proceedings were concluded at

 5    2:28 PM)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    *Sonya M. Ledanski Hyde*

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 23, 2022

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    Avi Moshenberg,              )   CASE NO:  22-60043
                                   )   ADVERSARY
 4              Plaintiffs,        )
                                   )   Houston, Texas
 5         Vs.                     )
                                   )   Wednesday, August 3, 2022
 6    Free Speech Systems LLC,                      )
                                   )   10:02 a.m. - 5:05 p.m.
 7              Defendants.        )
      ----------------------------)

 8

 9                               TRIAL

10        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE

11

12    APPEARANCES:

13    For Plaintiffs:          MARCEL FONTAINE
                               McDowell Hetherington LLP
14                             1001 Fannin Suite 2700
                               Houston, Texas 77002
15
      For Defendant:           RAY BATTAGLIA
16                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
17                             San Antonio, Texas 78218

18    Court Reporter:

19    Courtroom Deputy:        Zilde Martinez

20    Transcribed by:          Veritext Legal Solutions
                               330 Old Country Road, Suite 300
21                             Mineola, NY 11501
                               Tel: 800-727-6396
22

23

24    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
25
```

```
 1                                    INDEX

 2   PLAINTIFFS' WITNESSES     DIRECT    CROSS    REDIRECT    RECROSS

 3

 4

 5   DEBTOR'S WITNESSES     DIRECT    CROSS    REDIRECT    RECROSS

 6   W. Marc Schwartz       52        101,     228

 7                                    159,

 8                                    177,

 9                                    223

10   PLAINTIFFS' EXHIBITS                       RECEIVED

11

12   DEBTOR'S EXHIBITS                          RECEIVED

13   Exhibit 1      CV of W. Marc Schwartz      52

14   Exhibit 3      Plan Support Agreement      59

15   Exhibit 2      Engagement letter between

16                  W. Marc Schwartz and FSS    60

17   Exhibit 8      Forbearance agreement       70

18   Exhibit 4      8/13/20 promissory note     74

19   Exhibit 5      8/2020 security agreement   75

20   Exhibit 6      11/10/2021 promissory note  76

21   Exhibit 7      UCC 1 Financing Statement   77

22   Exhibit 11     Critical Vendor List        89

23

24

25
```

```
 1        HOUSTON, TEXAS; WEDNESDAY, AUGUST 3, 2022; 10:02 A.M.

 2                      (Call to Order)

 3        THE COURT:  Good morning, everyone.  This is Judge

 4   Lopez.  Today is August 3rd.  I'm going to call the Free

 5   Speech Systems case here on first days.  I've completely

 6   muted to the phone line so I'm going to take appearances in

 7   the courtroom then I'm going to take appearances for anyone

 8   on the phone.  If you wish to be recognized, you just need

 9   to hit five star, give me a second and I will unmute your

10   line.

11        I'll just remind everyone who may be appearing, by

12   video that appearing by video is just the same as appearing

13   live in Court.  So, I would just ask that everyone please

14   observe the decorum that you would use if you were live in

15   the courtroom, that you would exercise that same judgment if

16   you were appearing by video.

17        So, with that said, let me go ahead and take

18   appearances.  And I will begin in the courtroom.

19        MR. BATTAGLIA:  Good morning, Your Honor.  I

20   assume this microphone is working.  Your technology is --

21        THE COURT:  We're good today.

22        MR. BATTAGLIA:  Okay, good.  Ray Battaglia on

23   behalf of Free Speech Systems.  Appearing with me today are

24   Hyung Lee and RJ Shannon.  Also present in the courtroom is

25   Marc Schwartz, the Chief Restructuring Officer for my
```

```
 1   client.  And on the telephone, Norm Pattis, the Counsel for

 2   the Debtor in the Connecticut State Court litigation.

 3               THE COURT:  Okay, thank you.  And if -- I can --

 4   good to see you in person, Mr. Battaglia.

 5               MR. BATTAGLIA:  Good to see you, Judge.

 6               THE COURT:  Good morning.

 7               MR. MOSHENBERG:  Good morning, Your Honor.  How

 8   are you?

 9               THE COURT:  Good.  Good morning.

10               MR. MOSHENBERG:  I'm here on behalf of the Texas

11   Plaintiffs, Avi Moshenberg.  And also, as we had hoped, we

12   have secured Jarrod Martin and Marty Brimmage as our

13   bankruptcy counsel on behalf of the Texas Plaintiffs, Your

14   Honor.

15               THE COURT:  Okay, good morning.

16               MR. CHAPPLE:  Good morning, Your Honor.

17               THE COURT:  Good morning.

18               MR. CHAPPLE:  Nice to see you again.  Ryan Chapple

19   on behalf of the Connecticut Plaintiffs.  I have my

20   colleague, Eleanor Sterling here in the courtroom.

21               THE COURT:  Good to see you.

22               MR. CHAPPLE:  And Mr. Chris Mattei on the line as

23   well.

24               THE COURT:  Okay, good morning.

25               MR. NGUYEN:  Good morning, Your Honor, Ha Nguyen
```

1 appearing on behalf of the United States Trustee.  Also with

2 me in the courtroom is Assistant U.S. Trustee Millie Sall.

3    THE COURT:  Oh, pleasure.  Seen the name, a

4 pleasure.  Nice to see you.

5    MR. LEMMON:  Your Honor, Steve Lemmon.  I

6 represent PQPR Holdings Limited.

7    THE COURT:  Oh, good morning.

8    MS. HASELDEN:  Good morning, Your Honor.  Melissa

9 Haselden, the Chapter 5 Trustee.

10    THE COURT:  Good morning, Ms. Haselden.  Anyone

11 else in the courtroom wish to make an appearance?

12    MR. CHAPPLE:  Your Honor, my apologies.  I

13 neglected to make clear and introduce Mr. Brimmage as

14 counsel for the Connecticut Plaintiffs as well.

15    THE COURT:  Oh, okay, good morning.  Okay.  I

16 think we've taken all the appearances in the courtroom.  If

17 anyone wishes to make an appearance who's on the line, why

18 don't you hit five star and I will unmute your line.  Okay.

19 I've got a 361 area code.

20    MR. JORDAN:  Judge, Shelby Jordan.  I represent

21 Alex Jones.

22    THE COURT:  Okay, good morning.  Mr. Jordan, I'm

23 going to mute --

24    MR. JORDAN:  Good morning, Judge.

25    THE COURT:  -- I'm going to leave the other line

```
 1    unmuted.  If you could just keep your phone on mute during
 2    the time, but if you wish to make a statement, obviously,
 3    I'll keep your line unmuted.  You don't need to hit five
 4    star again.
 5              MR. JORDAN:  All right, thanks.  Thank you.
 6              THE COURT:  Anyone else wish to make an
 7    appearance?  Okay, I've got an area code 203.
 8              MR. PATTIS:  Judge, this is Norm Pattis.  I don't
 9    have an appearance in the file, but I was asked to make
10    myself available today, so I am here.
11              THE COURT:  Okay.  Thank you.  Mr. Pattis, just
12    for clarification, you represent just FSS in the Connecticut
13    --
14              MR. PATTIS:  I'm sorry, sir?
15              THE COURT:  Just want --
16              MR. PATTIS:  No sir.  I represent --
17              THE COURT:  Go ahead.
18              MR. PATTIS:  I apologize, sir.  I represent Free
19    Speech Systems and Alex Jones in the Connecticut Litigation.
20              THE COURT:  Okay, thank you.  Now, I'll keep your
21    line unmuted as well.  And just keep your phone on mute,
22    sir.  Thank you.
23              MR. PATTIS:  Yes, sir.
24              THE COURT:  Would anyone else wish to make an
25    appearance?  Okay, now that we've taken all the appearances,
```

1    Mr. Battaglia, I'll turn it over to you.

2              MR. BATTAGLIA:  Thank you, Your Honor.  Ray

3    Battaglia for Free Speech Systems.  The matters before the

4    Court today are Docket Number 6, the cash collateral motion.

5    And with that motion, Your Honor, we have an issue that

6    lingers with the -- I'll call them the Plaintiffs' Group --

7              THE COURT:  Mm hmm.

8              MR. BATTAGLIA:  -- that I'll come back to and

9    discuss in a moment, and we can decide how to proceed.

10             THE COURT:  Mm hmm.

11             MR. BATTAGLIA:  With respect to the motion to

12   provide adequate assurance for payment of utilities, Docket

13   Number 7, the Court had suggested that a two-week segregated

14   escrow be established.  I'm wise enough to -- and have

15   inserted that in the proposed form of order.  And unless the

16   Court requires more, there's no opposition to that motion

17   with that change.

18             THE COURT:  Okay.

19             MR. BATTAGLIA:  Generally, the motion provides

20   pretty standard procedures for a utility to come in and

21   request additional adequate assurance if they think -- and

22   then a protocol for how that proceeds.  But generally,

23   between the two-week escrow and the ability to generate cash

24   flow, we've offered that as adequate assurance at this

25   juncture.

1            THE COURT:  Okay.  Let me hear from Mr. Nguyen.

2    Mr. Nguyen, have you had an opportunity to --

3            MR. NGUYEN:  Yes, Your Honor.  I've also spoke

4    with Mr. Battaglia.  We have no objection to the utilities

5    motion.

6            THE COURT:  Okay.  Is there a revised proposed

7    form of order that I can --

8            MR. BATTAGLIA:  I will upload an order this

9    evening, Your Honor.

10           THE COURT:  Okay.  Let me just hear this -- I

11   spoke to the utilities motion, which is at Docket Number 7.

12   Anyone wish to be heard in connection with that particular

13   emergency motion?  Okay, anyone on the line?  Let me just

14   check.  And if you do, you need to hit five star.

15           Okay.  I would just note then for the record that

16   at Docket Number 7, it was an emergency motion seeking entry

17   of an order approving the Debtor's proposed form of adequate

18   assurance of payment for future utility services and

19   approving adequate assurance procedures.

20           A very common first day motion to provide adequate

21   assurance to utility providers without adequate assurance,

22   Section 366 of the Bankruptcy Code would allow utility

23   providers to not -- essentially not provide services if they

24   so wish to.  So, upon the furnishing of adequate protection

25   -- actually, adequate assurance and the related procedures,

1    I'm going to ask the Debtor to ease into the Chapter 11

2    process and still maintain all of its utilities on an

3    ongoing basis.

4            So, I have proposed at the last hearing, and Mr.

5    Battaglia has kindly agreed, to take the Court's

6    consideration of a two-week deposit at -- in a segregated

7    account that would serve as adequate assurance.  Any utility

8    can come in and ask for additional assurance, but I am

9    comfortable with a two-week in a segregated account.

10           And Mr. Battaglia, it can be placed -- I've got a

11   question about the bank accounts, just so I understand the

12   cash management system.  But theoretically, I'm comfortable

13   with just it segregated with -- still held by the Debtors.

14           MR. BATTAGLIA:  Separate account, Your Honor, or

15   just accounting segregated?

16           THE COURT:  Just accounting segregation for my

17   purposes is fine.  Just something that utilities cand feel

18   comfortable, that they could look to that's accounted for on

19   the books.

20           MR. BATTAGLIA:  We are in the process of opening

21   DIP accounts with Access Bank.

22           THE COURT:  Okay.

23           MR. BATTAGLIA:  And moving the Debtor's accounts

24   to that bank.

25           THE COURT:  Okay.  It just makes it easier.  And

1   at the end of the case, then if -- depending on where we end

2   up, one can provide an order and a plan or something that,

3   you know, the deposit would then go back at the end of the

4   case.  It just makes it a little bit easier.

5          So, with the proposed change, I'll grant the

6   emergency motion at Docket Number 7.  I would just ask that

7   you run the proposed order by Mr. Nguyen before you get it

8   on file.  Make sure the Trustee's okay with it, and then

9   file it on the Docket and I'll take a look at it.  If it

10  looks good, I'll sign it, okay?

11         MR. BATTAGLIA:  Depending upon how late we go

12  today, I'll leave the -- well, Mr. Nguyen, by tomorrow,

13  Judge.

14         THE COURT:  Okay, and if any other party asks to

15  see it, just -- can I just make sure that everyone takes a

16  look at it before you upload it?  But I find this to be

17  fairly routine.  So --

18         MR. BATTAGLIA:  Your Honor, Docket Number 8 is the

19  Debtor's emergency motion for authority to pay critical

20  vendors.

21         THE COURT:  Why don't we take up 9 first and then

22  we can kind of take up 6 and 8 together?  Because I think

23  they relate.

24         MR. BATTAGLIA:  That's fine, Judge.  The Docket

25  Number 9 is the Debtor's emergency motion to extend time to

1   file schedules and statements of affairs.  There's no

2   opposition to the relief requested in that motion.

3           THE COURT:  Okay.  Does anyone wish to be heard in

4   connection with the motion to file -- I should say to extend

5   the time to file schedules and statements?  Just checking

6   online.  Okay.  This is another what I consider to be

7   procedural ordinary course, it's just providing for

8   essentially a two-week extension of the time.  I want the

9   Debtor to get the schedules right and to take the time to

10  get it right so there's no filing of amendments if that's --

11  it has the right to do that, but I'd rather you come out

12  with what you feel is right.  So --

13          MR. BATTAGLIA:  And Your Honor, the proposed

14  order, the 15th day falls on a Sunday, so I've put a date

15  certain of the following Monday.

16          THE COURT:  Okay.

17          MR. BATTAGLIA:  The Code authorizes only a 15-day

18  extension for a Sub B case without further cause.

19          THE COURT:  No, it's fine.  The 29th is fine.  I

20  want you to -- if that's the date you'll feel you can get it

21  right by, then let's do that.  Let me just -- I'm signing

22  that order right now and I'm going to send it off to

23  Docketing.

24          Mr. Nguyen, can you just talk to me, just

25  generally at the 10,000-foot level?  I just want to

1  understand the Debtor's cash management -- current cash

2  management system.  Where does it hold bank accounts and

3  what's going on there?

4         MR. BATTAGLIA:  The current bank account is at

5  Security Bank in Crawford, and it'll be moved to Access Bank

6  as a DIP account.  Security, not a DIP approved account.

7         THE COURT:  Okay.  Is Access?

8         MR. BATTAGLIA:  Yes.

9         THE COURT:  Okay.  And Mr. Nguyen, I'm sure you'll

10  -- I'm just going to -- you'll be working with them on the -

11  -

12         MR. NGUYEN:  Yes, Your Honor.

13         THE COURT:  Okay.

14         MR. NGUYEN:  We'll check the bank account to make

15  sure it's properly collateralized and approved -- on the

16  approved list.  I believe it is, but (indiscernible) I

17  imagine it is.  I haven't seen the list.

18         THE COURT:  Okay, I'll -- but if any issues come

19  up, then you'll just let me know, but I'm going to assume

20  that, if I grant debt relief related, that there's no issues

21  with the cash management system now, and we'll be -- you all

22  continue to work on that, so there's no issue for me to take

23  up on that.

24         MR. BATTAGLIA:  Yes, sir.

25         THE COURT:  Okay.  (Indiscernible) how many

1    employees (indiscernible) right now?

2             MR. BATTAGLIA:  There are 58 employees.  They're

3    employed through a PEO with ADP.  And we're current on

4    payroll.  We paid the payroll through the filing date to

5    avoid having any disruption with employees.

6             THE COURT:  Okay.  So, it's just a related

7    question, so I want to look at the budget for employee

8    payroll, that's not including any pre-petition amount?

9             MR. BATTAGLIA:  It will not.

10            THE COURT:  Okay.  How much cash on hand does the

11   Debtor have from the petition date?

12            MR. BATTAGLIA:  Your Honor, it's --

13            THE COURT:  Just roughly.

14            MR. BATTAGLIA:  -- I'll let (indiscernible) give

15   the current --

16            THE COURT:  Just on the back of the envelope.  I

17   won't hold you to the number.  I'm just trying to understand

18   just generally.

19            MR. BATTAGLIA:  As of filing date, approximately

20   $1.3 million, of which about $800,000 was not cash

21   collateral.

22            THE COURT:  About $800,000?

23            MR. BATTAGLIA:  One of the -- yeah, the Debtors

24   you will learn, receives large donations on occasion.

25            THE COURT:  Mm hmm.  Okay.

1           MR. BATTAGLIA:  And obviously there's great

2      variability in that in the sense --

3           THE COURT:  So that half a million of just what

4      you would consider cash collateral, about $1.3 million and

5      about $800,000 we would call restricted for now, and then

6      another half a million --

7           MR. BATTAGLIA:  My estimate, yes, sir.

8           THE COURT:  Okay.

9           MR. BATTAGLIA:  Now, that's the full accounting.

10          THE COURT:  So, and we'll get into this, and I

11     kind of just want to understand before we get into the cash

12     collateral motion, just when I looked at the budget, it's

13     your 13-week cash flow using -- it's just simply going week-

14     by-week.  I don't -- I didn't see kind of a beginning cash,

15     ending cash analysis there.  And that's why I was asking.

16     So, are you comfortable --

17          MR. BATTAGLIA:  It was not in the -- because as of

18     the time we filed the motion, we didn't know what the

19     beginning cash balance would be.

20          THE COURT:  Okay.

21          MR. BATTAGLIA:  But we obviously can provide that.

22          THE COURT:  Okay.

23          MR. BATTAGLIA:  It's now, as we understand it,

24     about $1.3 million.  And you know, in-flows, Judge, the

25     nature of the cash generation aspects of this business,

1    obviously the broadcast generally in and of itself doesn't

2    produce revenue except by advertising, and also by

3    generating product sales.  And product sales are dependent

4    on a number of things.  One of them is Alex Jones being the

5    broadcaster.

6              THE COURT:  Mm hmm.

7              MR. BATTAGLIA:  And another one is the

8    availability of inventory, which has been an issue in the

9    first quarter of this year, and one that we are rapidly

10   solving for.

11             THE COURT:  Okay.  And I'm going to let you turn

12   to your presentation.  I apologize for -- I just had a

13   couple of questions to understand.

14             MR. BATTAGLIA:  I'm here to answer the Court's

15   questions, Judge.

16             THE COURT:  So, I understand that the -- just from

17   the -- my knowledge from the prior cases, there were cases

18   pending in Austin and in Connecticut.  There was one of the

19   litigation claims as continuing out of assigned, an order

20   lifting a stay.  We still had the fraudulent transfer action

21   in Austin.  So, those are the two Austin actions that I was

22   aware of.  And there was, what we call the Sandy Hook

23   litigation in and -- pending in Connecticut.

24             MR. BATTAGLIA:  There's one other lawsuit in

25   Austin.  It's the Fontaine lawsuit, which is not

 1   consolidated with Austin (indiscernible) lawsuit --

 2        THE COURT:  Oh, that's right.

 3        MR. BATTAGLIA:  -- and is not currently in trial.

 4        THE COURT:  Got it, okay.  That was the --

 5        MR. MOSHENBERG:  There's also -- yeah, thank you.

 6   There's the Posner case, also, Your Honor.  It's another

 7   Sandy Hook litigation.

 8        THE COURT:  Right, yeah, no, no.  That's exactly

 9   right.  But they're all kind of related.

10        MR. MOSHENBERG:  Yes sir.

11        THE COURT:  They're -- those were the ones that

12   were released on a case -- I get it there were several cases

13   on it, but this -- I'm thinking just in buckets.  In the

14   Connecticut litigation, I do remember that there were

15   potentially several lawsuits pending, but they were overall

16   related.  The same kind of set of Plaintiffs there.  Are

17   there -- is there any additional litigation with respect to

18   this Debtor that's different than the --

19        MR. BATTAGLIA:  Your Honor, I think --

20        THE COURT:  I guess what I'm looking at --

21        MR. BATTAGLIA:  Sandy Hook related?

22        THE COURT:  Well, I'm thinking -- I remember the

23   three Debtors were all actually Defendants in the -- in all

24   of these litigation, in one way or the other, whether the

25   InfoW, IW Health, and Prison Planet.  Is FSS asserting any

1  claims against -- any cross-claims, any counter-claims

2  against any other parties related to this litigation?  Are

3  they being sued separately by any party in any parts of this

4  litigation?  I'm just trying to understand.

5          I understood the last Debtors I had.  I just --

6  I'm just trying to get up to speed so if folks start

7  mentioning litigation claims, then I'm up to speed.  Is

8  there any other litigation that I should be aware of that

9  relates to Mr. Jones, any of his entities, as it relates to

10  FSS that's different or in addition to the ones that I

11  mentioned?

12          MR. BATTAGLIA:  Yes, sir.  With respect to the

13  Sandy Hook litigation, the extent the -- and I'll call it

14  the IW Defendants --

15          THE COURT:  Mm hmm.

16          MR. BATTAGLIA:  -- have been dismissed with

17  prejudice.  There are no cross-claims or counter-claims

18  between those parties.

19          There is I think one piece of litigation that does

20  join both IW and FSS, and that was a lawsuit filed in

21  Florida that the Debtor and its affiliates were successful

22  and won at trial.  And it's up on appeal.  It was a -- no

23  damages, shall we say acquittal judgment entered in the

24  Florida case.  That case has been pending for a while with

25  no action ongoing.

1              THE COURT:  Okay.

2              MR. BATTAGLIA:  In terms of other litigation, I'm

3    aware of, and there could be a few more, but these are the

4    ones I'm aware of, I know that FSS was sued for intellectual

5    property improper use, copyright infringement, a lawsuit

6    which is not extraordinary for this business.

7              And that is probably a couple of months past

8    answer date.  And there is a lawyer representing the Debtor.

9    And then I am aware of another lawsuit filed in New York, I

10   think Federal Court -- don't hold me to that -- that alleged

11   that an ADA violation for not making its website accessible

12   or its purchasing website accessible to, I think it was

13   visually impaired individuals.  And that -- it was filed at

14   or about the same time as the copyright infringement case.

15             THE COURT:  Okay.

16             MR. BATTAGLIA:  Those are the ones I'm aware of.

17             THE COURT:  Thank you.

18             MR. LEE:  Your Honor, Kyung Lee for the record.  I

19   just want to supplement that -- what Mr. Battaglia said.

20             THE COURT:  If you can just get closer to the mic.

21   I want to make sure everybody can hear you.  I appreciate

22   it.

23             MR. LEE:  I'll just tell Mr. Battaglia --

24             THE COURT:  And just considering these are

25   preliminary questions, I just want to make sure that I

1    understand the lay of the land before we --

2         MR. LEE:  For purposes of complete transparency,

3    Your Honor, there was an indemnity claim that Mr. Jones

4    filed against FSS in the Connecticut litigation last week,

5    which has been stricken by the Connecticut Judge, Honorable

6    Bellis yesterday.

7         So, I just want you to know that there was an

8    indemnity claim made by Alex Jones against FSS.  So, that's

9    another claim that existed.  And I think Mr. Jones is also

10   going to assert a proof of claim in the FSS bankruptcy case.

11        THE COURT:  Okay.

12        MR. LEE:  I just wanted to let you know that.

13        THE COURT:  So, but you said that litigation, that

14   cause of action is it -- doesn't seem like it's live

15   anymore, is that --

16        MR. BATTAGLIA:  There is an update, obviously, of

17   developments from yesterday.  And I am going to give the

18   straight version without any color on either side.

19        THE COURT:  Okay.

20        MR. BATTAGLIA:  It is that the judge preceded with

21   hearings yesterday in Connecticut and did strike the cross-

22   claim.  And then apparently, suggested that the litigation

23   should go forward and pick a jury, although FSS was still a

24   party to that litigation and had not been settled.  As a

25   consequence, FSS filed a notice of removal of that

1  litigation.

2          THE COURT:  Okay.

3          MR. BATTAGLIA:  We didn't feel it was appropriate

4  with --

5          THE COURT:  Where is it pending now, in front of a

6  bankruptcy court, like an adversary proceeding in front of

7  bankruptcy court or something?

8          MR. BATTAGLIA:  It will be pending in front of a

9  Bankruptcy Court.  Is it Bridgeport?

10         MR. LEE:  Yes.

11         MR. BATTAGLIA:  It's in Bridgeport.

12         THE COURT:  Okay, okay.

13         MR. BATTAGLIA:  So, that's the status of it.  And

14  I know the parties are having some conversation about what

15  that means for Friday, the emergency motion to lift stay.

16  Nothing further to report on it.

17         THE COURT:  Okay.  No, no, no, I just -- I

18  appreciate it.  I know that there's a lot of moving pieces

19  and I just want to just understand that before we got into

20  the motion, just so we're all on the same page.  I think you

21  answered all my basic questions.  I just wanted to

22  understand kind of the employees' insurance.  Any issues

23  with insurance that I should be aware of?

24         MR. BATTAGLIA:  We have insurance coverage.  And I

25  believe part of the payments in the critical vendor include

1    payment of the policy.

2           THE COURT:  Okay.  All righty.  I will stay quiet

3    and let you --

4           MR. BATTAGLIA:  No, you won't, Judge.

5           THE COURT:  -- turn it back over to you.

6           MR. BATTAGLIA:  This is your courtroom.

7           So, the remaining two matters, Your Honor, are the

8    cash collateral motion and the critical vendor motion.  And

9    where we stand on those, Mr. Martin and I have had several

10   conversations on the cash collateral motion.  There's

11   certain accommodations being made, and I'll -- the biggest

12   one relates to a $250,000 payment to PQPR that is shown in

13   the budget.  That is a -- the way the Debtor operates with

14   PQPR in inventory, if PQPR purchase inventory, pays for it,

15   sells it through our sales channel, the Debtor gets 20

16   percent of the net.  PQPR gets 80 percent of the net.  If

17   it's FSS's inventory, and obviously, FSS is Free Speech

18   Systems, 90 percent goes to the Debtor and 10 percent goes

19   to PQPR for its involvement in the purchasing and

20   involvement in the -- as I understand it, supplements have

21   to have, and don't hold me to this word -- be sold under

22   some certification, and Dr. Jones individually, PQPR holds

23   that certification.  That's my very basic understanding.

24          And so, there is inventory that we have agreed to

25   purchase from PQPR.  It has not been delivered yet, that

1    it's pre-paid $750,000 for.  We would like to move that

2    inventory into the FSS inventory category and sell it and

3    receive 90 percent of the net.  The profit margin on

4    supplements can be anywhere from 3X to 5X, so we think it's

5    a good investment for this estate.  And the accommodation

6    that the Plaintiffs have requested is that they have a 30-

7    day look claw back window look -- to file something, if they

8    think the payment is inappropriate.  And we're amenable to

9    that.

10         There are some other changes we've agreed to,

11   particularly strengthening the reservation and the no waiver

12   provisions that aren't intended.  We have proposed a

13   replacement lien to the equivalent validity and priority of

14   the existing PQPR pre-petition liens.  Obviously, if there's

15   no pre-petition lien, there's no replacement lien.  And the

16   -- I think the remaining -- there was also a request that we

17   limit any insider payments to not more than $20,000,

18   exclusive of that $250,000 payment I just mentioned.  And

19   we're amenable to that.  We'll put that in an order.

20         So, the hang-up here that we have, and we can

21   discuss it in a little more detail later, is that they've

22   requested that they be given challenge rights with respect

23   to the PQPR liens, like, basically, Louisiana World

24   Exposition rights.  And the Debtor is not amenable to that.

25         We have two options as far as proceeding.  One of

1   course, is just to go forward with the full-blown hearing.

2   And the other is for, I guess Mr. Martin and I, and I'm not

3   sure who else, to stand up and say why we think the creation

4   of the Tort Committee is a good idea or a bad idea at this

5   point in time, and let the Court give us some direction on

6   that.  I'm amenable to whatever the Court would like to do.

7   But other than that, there's no opposition to the use of

8   cash collateral.

9           THE COURT:  Okay.  And with respect to the

10   critical vendor motion, where do things stand?

11           MR. BATTAGLIA:  The only comment I received was

12   from Mr. Nguyen, who asked that I make a proffer of the

13   critical nature of the vendors.  Otherwise, there's no

14   opposition of the critical vendors.

15           THE COURT:  Okay.  And the critical vendors, when

16   is it generally?  And we haven't taken any evidence, but I

17   just want to understand it.  When are those payments due?

18   When do you need them?  When does the Debtor need to make

19   those payments?

20           MR. BATTAGLIA:  I think they do come in.  They're

21   probably staggered, but some of them are very important.

22   You know, obviously, you're in the broadcast business in the

23   modern world.  Access to the internet and satellite and

24   other things is vital.  And if you go dark, it's extremely

25   costly.

1              So, I don't know specifically.  And Mr. Schwartz

2    may or may not know precisely when those payments are due.

3    But certainly, I would say within the next two weeks, we

4    have to make -- we have to commence making payments.

5              THE COURT:  Okay.

6              MR. BATTAGLIA:  I think they're not broken out as

7    critical vendor payments in the budget.  They're included

8    within the expense items.

9              THE COURT:  Okay, thank you.

10             MR. BATTAGLIA:  So --

11             THE COURT:  Let me hear from -- go ahead.

12             MR. BATTAGLIA:  And then as far as the remaining

13   things, you had asked at the last hearing to have Mr.

14   Schwartz address the relationship with IW.  I'm prepared to

15   do that however the Court would like.  And you know, I have

16   to make one comment.  I kept hitting five star the other day

17   because I kept hearing about $62 million going to Alex Jones

18   in the last two years -- and I think it's in the objection.

19   $62 million has been drawn on account of Alex Jones over 15

20   years, over $30 million of which was to pay income taxes,

21   which this is a flowthrough entity, and the LLC has an

22   obligation to pay the tax obligations.

23             I understand those payments were directly from FSS

24   to the IRS.  So, I just -- I'm not going to go any further

25   than that to say I can't leave that -- the misinformation

```
 1   going out across the globe without offering some

 2   explanation, because it's highly prejudicial.  But I'm

 3   prepared to proceed however the Court would direct me.

 4            THE COURT:  Okay.

 5            MR. BATTAGLIA:  You want me to turn the podium

 6   over?

 7            THE COURT:  Yeah, let me just hear if anyone --

 8   what other parties may have to say at this time.

 9            MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

10   again, on behalf of the Connecticut Plaintiffs.  And I --

11   just a little logistics today.  And I'm sure you know

12   because you read the pleadings.  The Connecticut Plaintiffs

13   and the Texas Plaintiffs filed a joint objection.

14            THE COURT:  Mm hmm.

15            MR. CHAPPLE:  So, today, I believe Mr. Moshenberg,

16   Mr. Brimmage, and myself, collectively refer to the group as

17   the Sandy Hook Plaintiffs.

18            THE COURT:  Okay.

19            MR. CHAPPLE:  A few comments about what Mr.

20   Battaglia said with regard to just the narrow issue of cash

21   collateral.  I think it was an accurate recitation of where

22   we are in the back and forth between the parties.  But I

23   want to add a little color to one issue, and then I want to

24   raise one issue that Mr. Battaglia didn't mention.

25            The issue that he didn't mention, that has been
```

1    part of the discussion is discovery, the opportunity for the

2    Sandy Hook Plaintiffs, between now and a final hearing on

3    cash collateral, to depose Mr. Schwartz and a representative

4    of PQPR and to obtain written discovery from both of those

5    parties relating to the underlying debt that is really at

6    the key of all of this cash collateral discussion.  So, I

7    believe we're on the same page there, but I just wanted to

8    raise that and let the Court know that issue.

9              THE COURT:  Yeah, yeah --

10             MR. BATTAGLIA:  Ray Battaglia for FSS.  We have

11   agreed to reasonable discovery.  We're not going to oppose

12   that.  There may be some timing issues.  Apparently, this is

13   vacation time of the world and I'm happy to say that I never

14   take a vacation, so it's not my --

15             THE COURT:  I was going to say, when did people

16   start doing that?  Just kidding, everyone.  I'm glad

17   everyone takes vacation.  Go ahead.

18             MR. CHAPPLE:  So, Your Honor, that's just --

19   that's issue one that I wanted to raise, that he didn't

20   speak about earlier.  The other issue, and the issue -- he's

21   right.  The impasse that we've reached, the issue that is

22   crucial to the Sandy Hook Plaintiffs is the lien issue and

23   the ability to challenge this lien.

24             THE COURT:  So, tell me, your clients -- well,

25   from the Sandy Hook Plaintiffs' side's perspective, what

1    should a cash collateral order look like, if you had your

2    way today?  What should an interim order look like today?

3                   MR. CHAPPLE:  Today, the interim order should --

4                   THE COURT:  What do you want in it?  What do you

5    want out of it?

6                   MR. CHAPPLE:  We are agreeable, and I think it'll

7    be a short back and forth between the Debtor and the

8    Connecticut, or excuse me, the Sandy Hook Plaintiffs, going

9    line by line in the 14-day budget that they have.  We've

10   made some modifications.  The original 14-day budget I

11   believe had payments of $54,000 to Mr. Jones.  We've reduced

12   that amount.  So, we've kind of gone back and forth on all

13   of those issues.  I think the sticking point --

14                   THE COURT:  So, there's an agreed form of -- well,

15   let's just call it interim -- a proposed form of interim

16   budget, where there -- the line items is -- there may be

17   agreement on buckets for line items for the next couple of

18   weeks.

19                   MR. CHAPPLE:  Yes.

20                   THE COURT:  Okay.

21                   MR. CHAPPLE:  Yes, Your Honor.

22                   THE COURT:  Okay.

23                   MR. CHAPPLE:  The sticking point is whether or not

24   the Sandy Hook Plaintiffs or any party in this litigation,

25   any party in interest, has standing to challenge the

```
 1   purported lien that PQPR has over the cash that's in the

 2   hand of Free Speech Systems.  And so -- go ahead.

 3            THE COURT:  No, no, so your objection asks for

 4   some language basically saying that I'm not making any

 5   findings about whether there's a lien -- a valid lien or

 6   not.  If that language is included, what else do you need

 7   for purposes now?  Do you want me to grant you standing on

 8   an interim basis, do you?  Is that what you're asking?

 9            MR. CHAPPLE:  If we --

10            THE COURT:  I'm just trying to understand.

11            MR. CHAPPLE:  Sure, sure, sure.  No, and I

12   appreciate that.  If we have the language that we put in the

13   proposed objection that basically makes the finding that you

14   just --

15            THE COURT:  Mm hmm.

16            MR. CHAPPLE:  -- that you just recited, then I

17   would want just a few minutes to confer with my co-counsel,

18   but I believe we are okay there.

19            The other thing, Your Honor, that we were talking

20   about in the hall right before this, that Mr. Battaglia

21   mentioned, is the Court's ability to appoint a Plaintiffs --

22   a Tort Plaintiffs Committee similar to what Judge Isgur did

23   in the Watson Grinding case, that gives that oversight and

24   power to a committee to challenge those liens and to

25   investigate the validity of those liens.
```

```
 1              THE COURT:  Right.  So, I will -- I'll tell you,
 2    Mr. Battaglia's going to have to tell me, and how he feels
 3    about that language.  I'm not telling you to agree to it or
 4    not.  I just need to understand what your position is, if
 5    that language is included for purposes of an interim order,
 6    then I'm -- the Court isn't making any findings as to
 7    whether there's a lien or not.  You'll have to let me know
 8    about that.
 9              MR. BATTAGLIA:  Your Honor, I'll do that after the
10    other side is complete -- whoever is going to present --
11              THE COURT:  Okay.  You know, I agreed 1102(a)(3) -
12    -
13              MR. CHAPPLE:  Your Honor, may I go grab my --
14              THE COURT:  Oh absolutely.  And I'm not saying
15    this is what you're asking for --
16              MR. CHAPPLE:  Mm hmm.
17              THE COURT:  -- I'm just noting 1102(a)(3) says
18    that unless the Court for cause orders otherwise of
19    committee creditors may it not be appointed in a small
20    business case or a case under Sub Chapter 5.
21              So, I'm of -- I don't believe I have authority to
22    do anything today, but I do think if someone filed a motion,
23    and we take it up as -- and then we'd find whether there
24    would be cause, unless someone can show me cause today.
25              So, if -- I'm not comfortable agreeing me just
```

1    ordering it over the objection of a party.  Someone's going

2    to have to show cause, and if there's cause then you win.

3    But someone's going to have to tee the issue up as to

4    whether there's cause to appoint a committee.  And if there

5    is -- and maybe that's what you're asking for, is to say

6    that if you're asking for a committee like the Watson

7    Grinding Committee, and that was, I believe, and Trustee

8    will have to tell me, it felt like an official committee.

9    What maybe was a -- someone will have to tell me.  But I

10   think Sub Chapter 5 is a little different.

11            MR. CHAPPLE:  Mm hmm.

12            THE COURT:  So, I don't -- the answer may not --

13   the answer just may be no today, but maybe at some point,

14   maybe you do get it at a final, if you can prove cause or

15   not.  But someone will have to show me where I would have

16   authority to do it today and based on what.  And maybe that

17   evidence comes out today.  But those'll be the questions

18   that I've got.

19            MR. CHAPPLE:  I understand, and I appreciate that

20   clarification, Your Honor.  I think what we do now is take a

21   short recess, let me confer with my colleagues on kind of

22   the question you had about the language that's in the

23   objection, and if that gets us there in the interim.  And

24   then also, I know we were absolutely interested in moving

25   for the creation of a committee for cause.  And we can also

1    talk about that dynamic, and whether or not we feel like if

2    we move forward today in -- while we're objecting to the

3    motion for interim use of cash collateral, we can also prove

4    up the cause needed to form the committee.  So, if the Court

5    will give me that latitude, we can visit for just a few

6    minutes and come back.

7            THE COURT:  You're asking for time to meet, yeah.

8    Mr. Battaglia, I just would need to know, and I'm not

9    telling you one way or the other what you should do.

10   Obviously, I'm already suggesting it one way or the other.

11   I just need to understand that was some requested language

12   in an objection that I read, and I just need to understand

13   whether you'd be comfortable with that.  Because again, I'm

14   just trying to understand.  We haven't taken any evidence or

15   anything.  I just need to understand.

16           But I would need to hear as well -- Mr. Lemmon,

17   you have to tell me one way or the other whether there's a

18   lot of proposed changes to an order, and PQPR would have to

19   let me know whether they'd be amenable to that as well.  And

20   I'll give them the latitude to say yes or no.

21           MR. BATTAGLIA:  Your Honor, I think the changes

22   that Mr. Martin and I exchanged by email last night that are

23   agreed to are a cap on insider distributions of $20,000,

24   individual insiders.

25           THE COURT:  Mm hmm.

```
 1              MR. BATTAGLIA:  The $250,000 inventory purchase
 2    payment with the claw back provision.  The -- there's
 3    nothing in my proposed order that has this Court validating
 4    any liens or debts of anybody.  It simply says that there is
 5    a replacement lien of equal stature.  That's it.  But
 6    they've requested some reservation sand non-waiver language,
 7    and -- at least what I saw last night, and I don't know that
 8    I recall whether it's the same in the objection, we've
 9    agreed to insert that language.  We've agreed to reasonable
10    discovery.
11              And Your Honor, the problem I have with a Tort
12    Committee at this juncture, aside from the fact that there's
13    no motion, aside from the fact that we've agreed to a level
14    of discovery so they can at least take a look behind the
15    curtain, is that creation of a Tort Committee on behalf of
16    creditors who at this point have no -- they have a claim,
17    but they have an unliquidated claim, we don't know whether
18    that claim is going to swamp this Debtor or whether it's
19    going to be manageable and can be paid from operations of
20    the estate, which renders pursuit of, you know, fraudulent
21    conveyance claims as kind of a tomorrow issue.
22              But there's no limitations running on any of these
23    questions.  We just don't see it as a today issue.  If you
24    appoint a Tort Committee with the Debtor's sort of start-up
25    growth back into revenue with product deliveries, the costs
```

1    of that committee are going to swamp this case.  They just

2    are.  They're going to hire a lawyer and they're going to

3    charge it to the estate and they're going to swamp this

4    case.  We think that let them take a look and we can come

5    back and revisit the issue when it's before the Court.

6    That's our position on appointment of a committee at this

7    point.

8            THE COURT:  Okay.  So, you're okay with inserting

9    -- and I want you to confirm that -- the only language that

10   I've read obviously is the language that was in the

11   objection.  Maybe during the break, you can take a look at -

12   -

13           MR. BATTAGLIA:  I will, I will.

14           THE COURT:  -- that language, or maybe Mr. Martin

15   can confirm what that -- you know, I still want to -- and

16   again, and I know there -- still have to put up some

17   evidence.  I still need an evidentiary basis.  And maybe Mr.

18   Schwartz's declaration does the trick or whatever to support

19   critical vendor and cash collateral.

20           MR. BATTAGLIA:  Absolutely.

21           THE COURT:  And I know that.  And again, and at

22   the same time there, maybe I can -- at that time, you can

23   provide the -- I don't know, the clarity that I was looking

24   for with respect to Mr. Schwartz's relationship now with

25   these Debtors as opposed to the last cases.

```
 1            MR. BATTAGLIA:  And if the Court's okay with a

 2   proffer at that point, I'm happy to do it.  If not, I'll

 3   call Mr. Schwartz (indiscernible).

 4            THE COURT:  Okay, I'll let you all figure it out

 5   and we'll see if we got a contested hearing or not and

 6   whether the declaration's going to work or not.  So --

 7            MR. CHAPPLE:  Yes, sir.

 8            THE COURT:  It is 10:42.  How much time do you

 9   think you all need?  Okay, I'll come back at 10:52, more or

10   less.

11            MR. LEE:  Your Honor?

12            THE COURT:  Yes?

13            MR. LEE:  I have one housekeeping administrative

14   matter.

15            THE COURT:  Okay.

16            MR. LEE:  I just wanted to alert this Court to.

17   Since we're all here today -- Kyung Lee for the record --

18   you know that we have ECF Number 15, the emergency motion

19   for relief from automatic stay scheduled for Friday --

20            THE COURT:  Mm hmm.

21            MR. LEE:  -- at 10 a.m.  And based upon some of

22   the activities that have taken place in Connecticut --

23            THE COURT:  Mm hmm.

24            MR. LEE:  -- especially the removal of the

25   litigation that took place yesterday, I've consulted, or
```

1    I've asked the counsel for the Connecticut Plaintiffs,

2    whether or not the hearing on Friday is moot because there

3    is no -- going to be a jury selection, as I understand it,

4    which was the basis for the emergency motion, whether there

5    is going to be any jury selection on Monday, next Monday.

6          So, I just wanted to raise that issue because I'd

7    rather have Mr. Schwartz go up to Austin and work on other

8    stuff rather than be here in the courtroom this week.  So,

9    just wanted to raise that.

10         THE COURT:  I'll let the Connecticut Plaintiffs

11   tell me what you want to do.

12         MR. LEE:  Right.

13         THE COURT:  You asked for an emergency hearing,

14   I'll grant you one.  And if you want to come back another

15   day, you can do that.  If you want to go forward on Friday

16   with the Southern District of Texas, you'll get your day, if

17   you want it.  And you just tell me what you want to do.

18         If you want to take some time and talk about it,

19   I'll come back in 10 minutes, and we can talk about

20   everything.

21         MR. CHAPPLE:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MR. CHAPPLE:  As of now, we still want to go

24   forward on Friday.  We're still discussing it.  And one

25   other thing, I -- it always takes a little bit longer than I

1   want it to.  Could we do the top of the hour?  Could we do

2   11:00 instead of 10:42?

3          THE COURT:  Well, I was going to tell you that --

4   that was going to get tricky for me then.

5          MR. CHAPPLE:  Oh wait -- I don't want it to be

6   tricky.

7          THE COURT:  No, I'd rather -- what I was going to

8   say, I would rather just round up, so if someone would come

9   back and ask me for more time.  So, it's 10:43.  I'm going

10  to come back at 11:00, and then I'll check in.  If the

11  parties want more time, you let me know, okay?

12         MR. CHAPPLE:  Thank you, Your Honor.

13         THE COURT:  For the folks who are on the line, I'm

14  going to mute the audio.  But -- I'm going to mute the line.

15  I'm going to let the parties in here have the ability to

16  talk freely.  If there's someone you need to talk to, then

17  call them by the cell, but I'm going to mute the line

18  because I'm stepping off and I'll come back on.

19     (Recess)

20         CLERK:  All rise.

21         THE COURT:  Okay.  I'm back in on the record in

22  Free Speech Systems.  Mr. Battaglia, why don't you tell me

23  where we are?

24         MR. BATTAGLIA:  As far as the language that was

25  suggested, the -- I added one word, moreover nothing herein

1    shall grant or prejudice the rights of -- it goes on to talk

2    about the rights to challenge the liens and challenge the

3    debt.  We don't dispute any creditor and party in interest

4    that has a right to contest the debt of PQPR and the liens.

5              At this point, I just don't want it to infer going

6    further that there's any additional rights that are

7    conferred by this order.

8              THE COURT:  Okay.  Kind of status quo.  Okay.  And

9    --

10             MR. BATTAGLIA:  They stand as far as the --

11             THE COURT:  Yeah.

12             MR. BATTAGLIA:  -- Tort Committee issue.

13             THE COURT:  So --

14             MR. CHAPPLE:  Thank you, Your Honor.  Ryan

15    Chapple, thank you for the time.  Appreciate it.  We've had

16    discussions between the Connecticut Plaintiffs and Texas

17    Plaintiffs.  And our position is that cause exists today to

18    appoint a committee.  And the reason that cause exists is

19    even if we have protective language in an interim order,

20    there's still no party that has standing in this case to

21    challenge the validity of those liens.

22             And we believe that the lack of standing for any

23    party to challenge the validity of a lien is cause to

24    appoint a plaintiffs committee today.  And we think it's

25    consistent with the thoughts that the U.S. Trustee has

1    espoused on Monday, and I believe it will espouse again

2    today about the need for oversight here.

3            And really, this underlying debt and this lien is

4    a fundamental issue in this bankruptcy case.  And we feel

5    like we have to have a mechanism and the most logical

6    mechanism is a plaintiffs committee that would have the

7    oversight and the ability to challenge those liens.

8            I know that Mr. Brimmage wants to make some --

9    make a few remarks as well, but I wanted to reiterate that,

10   and I believe Mr. Ha would like to make a few remarks as

11   well.

12           THE COURT:  Okay, thank you.

13           MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to touch base with some of

15   the first day motion.  The first thing is the critical

16   vendor motion.  Mr. Battaglia and I, we worked out some

17   language.

18           THE COURT:  Okay.

19           MR. NGUYEN:  He's going to put on some evidence to

20   show the necessity of the payments.  Every time there's a

21   payment outside the statutory scheme, you know, we need

22   (indiscernible) any (indiscernible) --

23           THE COURT:  No, no, no, I agree.  I'm looking for

24   it.

25           MR. NGUYEN:  And then, in addition to that, in the

1    proposed order, there's going to be a redline for the

2    critical vendor, there's going to be a mechanism that allows

3    people to know which critical vendor gets paid.  And then

4    there's a billing objection period that we put in the order

5    to allow other creditors who object.  And then there's

6    potential claw back from the critical vendor.  And that --

7    you're going to see it once we submit the proposed --

8              THE COURT:  The claw back, if someone doesn't

9    provide ordinary --

10             MR. NGUYEN:  Correct, Your Honor.  Or they can

11   challenge the critical nature of that particular vendor.

12             THE COURT:  Yeah.

13             MR. NGUYEN:  It's going to be in a proposed order

14   that Mr. Battaglia's going to file.  And as to the cash

15   collateral, I just wanted to make sure the Court understands

16   that we -- the U.S. Trustee, we do have concerns with the

17   underlying transaction.  I said it on Monday.

18             THE COURT:  Mm hmm.

19             MR. NGUYEN:  It is an affiliate insider debt.

20   When you look at the breakdown of the company, you know, 20

21   percent essentially is owned by Dr. Jones and Alex Jones'

22   wife.  The other 80 percent is indirectly owned by another

23   company that Alex Jones has a majority stake in, someone --

24   there is dealing between parties who are -- you know,

25   there's an insider here.  They're dealing with family

1    members.  We pay particular important attention to it.

2           And I think it's particularly important for

3    someone to be able to take a look at this lien and be able

4    to tell the Court whether we have a legitimate debt or not.

5    And I think that's one of the burden that Debtor needs to

6    prove.  It's that before you can actually approve the use of

7    cash collateral, you've got to prove that there's an

8    underlying debt and it needs to be a valid debt.

9           There's a lot of discussion about Tort Committee.

10   On Monday, I mentioned that, you know, this is not your

11   typical Sub Chapter 5 case.  You usually don't have a $60

12   million loan in a Sub Chapter 5 case.  You don't have $62

13   million in (indiscernible) draws in a Sub Chapter 5 case.

14          And I've always urged the Court to slow the

15   process down, and also consider whether additional

16   protections are needed in this case.  And one of the things

17   I point to is maybe there is a need for a Tort Committee to

18   actually take a look at this loan.  Because usually in any

19   cash collateral case -- in any case where there's a cash

20   collateral, one of the first things I do is I always go in

21   and I preserve the challenge period for the lien for any

22   committee.  That's ordinary.  That's routine.  And any case

23   before you, where I think there's going to be a formation of

24   a committee, we preserve that challenge period.  There's no

25   challenge period here.  Quite frankly, because you know,

1    there's no one who has that standing to bring that challenge

2    to the cash collateral.

3            I'm not advocating one way or the other for the

4    Tort Committee, but I let the Court know, you know, once the

5    Court orders the forming of the committee, my office stands

6    ready, and we will get on it and we will move, and we will

7    have an appointment as quickly as possible.

8            That's all I have to say, Your Honor, and thank

9    you very much.

10           THE COURT:  Thank you.  Mr. Brimmage, good to see

11   you.

12           MR. BRIMMAGE:  Good morning, Your Honor.  It's

13   good to be before the Court.  Marty Brimmage with Akin Gump

14   Strauss Hauer & Feld here on behalf of the Texas Defendant

15   or Texas Plaintiffs as well as the Connecticut Plaintiffs.

16           It's always funny to me when the judge on the

17   bench starts citing a code and starts looking at it and

18   everybody starts scrambling to find their code and remind

19   themselves what it said.

20           But I'm glad you did that because 1102(a)(3) says

21   exactly what you said it did.  Unless the Court for cause

22   orders otherwise --

23           THE COURT:  Mm hmm.

24           MR. BRIMMAGE:  Meaning, the Court can order for

25   cause.

1          THE COURT:  Mm hmm.

2          MR. BRIMMAGE:  And I think that's exactly what you

3     have right here, right now.  It doesn't say upon an

4     evidentiary hearing and findings, and you know, dah, dah,

5     dah, in a contested matter where there's whatever the Court

6     finds cause.

7          It says, the Court for cause.  And I think you

8     have for cause, for the reasons articulated by the U.S.

9     Trustee and the reasons articulated in the cash collateral

10    order that you're being asked to consider right now.  There

11    is nobody -- if there -- typically, there's a challenge

12    period at some point, right?  30, 60, 90 days come in and

13    challenge.  There is nobody that could come in and seek

14    standing to challenge that lien right now.  Maybe by design,

15    maybe not.  That is your cause, Your Honor.  You're going to

16    enter a cash collateral order where nobody can challenge the

17    underlying lien.

18          And now, I'm not asking you to prejudge standing.

19    That's a whole different gig and we'll deal with that in due

20    time.  But right here right now, I think you have cause

21    because without it, you need to have a body that can come

22    and seek standing and attempt to prove that they should have

23    standing and go and check out these liens.  As the U.S.

24    Trustee articulated, that doesn't exist right now.

25          So, Your Honor, for all the reasons that have been

1    articulated to you right now, I think cause exists, and I

2    think under 1102(a)(3), the Court for cause can order a Tort

3    Committee.

4         You have heard about the litigation that's

5    surrounding and involved in this case.  It's predominantly,

6    overwhelmingly, 99.9 percent related to the Sandy Hook

7    Plaintiffs, whether it's a TUFTA action or it's the

8    Connecticut Plaintiffs or it's the Texas Plaintiffs.  And I

9    don't want to say they're all exactly the same, but they all

10   derive from the same facts and circumstances and the same

11   issues.

12        THE COURT:  Mm hmm.

13        MR. BRIMMAGE:  That is who the Tort Committee I

14   think should be comprised of.  We'll leave it to the U.S.

15   Trustee, who said that he can act quickly.  The U.S.

16   Trustee's Office stands ready to act quickly, so that -- and

17   that's what I think we need, Your Honor, and I think that's

18   what you need.  You need that acted quickly so that this

19   case can be adjudicated on the merits, and that we can

20   determine the validity of that lien once and for all from a

21   body that has the authority to seek standing.

22        And with that, Your Honor, I'd answer any

23   questions the Court may have.

24        THE COURT:  Yeah.  I'm going to sit here and

25   listen to a little evidence now and see where things go.

1          MR. BRIMMAGE:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. LEMMON:  Your Honor, if I may, Steve Lemmon on

4    behalf of the secured creditor, PQPR.

5          THE COURT:  Mm hmm.

6          MR. LEMMON:  I just want to make a couple of

7    observations, Judge.

8          THE COURT:  Mm hmm.

9          MR. LEMMON:  First of all, I started with a 20-

10   page cash collateral order, and -- that had a number of

11   findings, had a number of protections for my client, had all

12   the things that we use.  And I determined that in this

13   particular case, with the level of suspicion that's out

14   there in the world, not evidence right now, but suspicion

15   that's out there in the world, that it'd be inappropriate

16   perhaps to do that, just so we could avoid this kind of

17   problem.

18          I believe that the current cash collateral order

19   is really nothing more than a recitation of what the law is.

20   If my client has a lien and if the cash collateral is being

21   used, then I get a replacement lien to the extent that I

22   have a valid lien.  Nothing in it is a finding that

23   prohibits anybody, any party in interest from challenging

24   the lien.

25          Now, Judge, my observation right now is that right

1    now the evidentiary record is nil.  And in this case, I

2    mean, I -- we heard the U.S. Trustee say that they want to

3    perhaps slow things down.  I don't see anything going really

4    fast right now from my perspective in this case.  I'm one of

5    the people with a vacation that is going to bollocks up

6    formal discovery in the next couple of weeks.  And I know

7    that there are other vacations.

8            But I've offered informal discovery, Judge, just

9    so people can assuage some of their fears, some of their

10   concerns so that they can find out what's going on.  And I'm

11   not asking anybody to give up any of their rights right now

12   in connection with this cash collateral order.  It is the

13   most bland cash collateral order I have ever seen in my

14   career.

15           And so, I -- you know, I tried to avoid this fight

16   by giving up all the things I normally would negotiate for,

17   and -- in thinking that we would just address that later in

18   a final order.  This is an interim order.  We're willing to

19   consent to it in order to let this Debtor try its business

20   plan.

21           And that's all I have to say.

22           THE COURT:  Thank you.  Mr. Battaglia, you know,

23   there's one question.  It's related, but not entirely on

24   point.  But I want to make sure I ask you the question.  And

25   it's the question that every judge asks at the beginning of

```
 1    every case.  What does the Debtor hope to accomplish through
 2    this Chapter 11 process?
 3          MR. BATTAGLIA:  Well, Your Honor, the impetus for
 4    filing with the Debtor's just inability to be in two places
 5    and fund two trials at one time.  And you know, ultimately,
 6    we don't know what the number's going to be in terms of the
 7    potential exposure in Connecticut and in Texas.  Eventually,
 8    some tribunal is going to give us a number.  Will it be
 9    appealed?  I think there's a virtual certainty it's going to
10    be appealed, probably from either side at the end of the
11    day.
12          But this Debtor entity, which has the capacity to
13    generate significant revenue has been harmed by the manner
14    in which it operates.  And by that, let me just -- what I
15    probably said, and my co-counsel's probably getting tired of
16    hearing me.  This is kind of like the garage band that
17    became the boy band overnight, and had his girlfriend
18    running the books, and the head roadie being the business
19    manager.
20          The entity has never -- it's been run like a
21    family business.  It's never had appropriate management and
22    accounting controls.  It's an inverted T as far as
23    management, where a lot of fiefdoms exist and they go to
24    Alex, who wants to run a show.  He's not a business manager.
25          And so, implementing Mr. Schwartz and Jeff Schultz
```

1    into the process has really changed things considerably in a

2    very short period of time.  There have been a lot of changes

3    in a matter of months, both in the sense of getting the

4    accounting up to date, changing the manner in which product

5    is purchased and sold to increase the revenues, increasing

6    advertising revenue on the program, you know, changing the

7    cost structure in the way that fulfillment is handled of

8    product sales to reduce the overall overhead to the estate,

9    producing the headcount to the estate.  So, a lot of changes

10   have been made that we expect will generate revenue.

11        And if the goal of this bankruptcy at the end of

12   the day is to have FSS be able to pay its creditors, then

13   that effort is worthwhile to everybody in this room.  And

14   so, if you're asking me, what does the plan look like today?

15   I can't tell you.  It's premature.

16        THE COURT:  It's fine.  I wish -- what the -- the

17   estate --

18        MR. BATTAGLIA:  There are so many options that are

19   available out there in this world today, and in terms of

20   raising funds or monetizing this asset that could be

21   explored, depending again on what the numbers turn out to

22   be.

23        THE COURT:  Okay.

24        MR. BATTAGLIA:  So, that's kind of a broad brush,

25   Judge, but --

1          THE COURT:  Okay.

2          MR. BATTAGLIA:  I do want to say, I'm not clear.

3   I understand that standing to file an avoidance action is

4   limited, but I don't understand that these parties don't

5   already have the right to contest the debt.  Any party can

6   file an objection to a claim and any party can take 2004,

7   you know, examinations and, you know, we'll agree to --

8   we've already agreed to discovery.

9          So, I'm not sure that as it stands today, in terms

10  of making an initial evaluation of this claim, that they

11  don't already have the standing to do that.  They don't need

12  anything more.  They don't need a Louisiana World Exposition

13  case at this juncture.  And honestly, I mean, the cynical me

14  says I want to get a committee appointed so that the estate

15  can pay for it.  And we can't.  We'll never be able to.

16  We'll kill this case, and all of the promise that Mr.

17  Schwartz is generating through changes and operations that

18  he's made will be for naught.

19          It won't stop Alex Jones from broadcasting.

20  There'll be -- somewhere, a platform for him to continue.

21  So, if the goal here is to silence him, that's simply never

22  going to happen.  It may just kill FSS.

23          THE COURT:  Okay.  And I really want to be clear

24  about this.  We're going to run a case and focusing on the

25  Debtor that's in front of me.  And I understand that there

```
 1    are a lot of moving pieces and a lot of folks involved and a

 2    lot of emotions on both sides.  We're going to run a case

 3    and I'm going to leave it there.

 4              MR. BATTAGLIA:  Yes, sir.

 5              THE COURT:  And we'll see where we go.  Why don't

 6    you call -- what evidence do you have to support either

 7    position?  How do you wish to proceed?

 8              MR. BATTAGLIA:  Your Honor, if I can, I'll just

 9    proffer Mr. Schwartz, and he's available and he's in the

10    courtroom.

11              THE COURT:  Oh.  Let me just ask.  Is there any

12    objection to the proffer of the witness?

13              MR. BRIMMAGE:  Your Honor, yes, we --

14              THE COURT:  Okay.  Mr. Schwartz, come on and take

15    the stand.  Let me just -- I'm going to swear the witness

16    in.  Are you -- do you swear to tell the truth, the whole

17    truth, and nothing but the truth?

18              THE WITNESS:  Yes, I do.

19              THE COURT:  Okay.  You may have a seat, sir.

20              Mr. Battaglia, how do you wish to proceed with

21    respect to any exhibits, if you wish to --

22              MR. BATTAGLIA:  I have emailed exhibits to all of

23    the parties last night, and I have a bound version to hand

24    to the witness.

25              THE COURT:  Okay.
```

```
 1              MR. BATTAGLIA:  And they're filed on the record.
 2              THE COURT:  So, I want to make sure folks can
 3    follow online, so if you can -- are they -- is there any --
 4    let me ask you this.  Is there any -- let me ask the
 5    Connecticut side or the U.S. Trustees.  Is there any
 6    agreement on any of the exhibits, or how are we doing this?
 7              MR. BATTAGLIA:  May I approach the witness, Your
 8    Honor?
 9              THE COURT:  Yeah.  Just a second.  I just want to
10    know, what's -- are you providing the exhibits that are
11    filed at Docket Number 26?
12              MR. BATTAGLIA:  Yes, Your Honor.
13              THE COURT:  Okay.  And Connecticut, tell me what
14    they want to do.  On 1 through 26, was there any agreement
15    on any of this?
16              MR. BRIMMAGE:  Your Honor, the Tort Plaintiffs can
17    agree to the admissibility of Exhibits -- Debtor Exhibits 1,
18    2, 9, and 10.
19              THE COURT:  1, 2, 9, and 10?
20              MR. BRIMMAGE:  Yes, Your Honor.
21              THE COURT:  Okay.  That's what there's agreement
22    on.  Mr. Nguyen?
23              MR. NGUYEN:  Yeah.  Your Honor, Ha Nguyen for the
24    U.S. Trustee.  I don't have any objection to Exhibit 1, 2,
25    3, 9, 10, 11, 12.  The rest needs to be -- foundation needs
```

1    to be laid.

2              THE COURT:  You said -- can you repeat those

3    numbers?

4              MR. NGUYEN:  1, 2, 3, 9, 10, 11, and 12.  No

5    objection from the U.S. Trustee for those exhibits.

6              THE COURT:  Okay.  All right.  It looks like there

7    is agreement on 1, 2, 9, and 10.  Everything else, you're

8    going to have to prove up.

9              MR. BATTAGLIA:  Yes, sir.  And 12 does not need to

10   be offered at this point.  It related to a motion the Court

11   has granted.

12             THE COURT:  That's correct.

13             MR. BATTAGLIA:  May I approach the witness, Your

14   Honor?

15             THE COURT:  Yes.  Just for anyone following online

16   on the Docket, you look at the Court's Docket, exhibits that

17   are -- will be shown to the witness -- Mr. Schwartz, I'm

18   going to ask that you let the examination direct you to

19   where you're going in the exhibit list.  You know, some of

20   those exhibits have not been admitted into evidence, and I

21   want to make sure that you just answer the questions that

22   are asked of you.  If there is any objection, I ask that you

23   give me an opportunity to resolve the objection, and then

24   I'll let you know if you can answer the question or not,

25   okay?

1             THE WITNESS:  Yes, sir.

2             THE COURT:  Okay.  All righty.  Mr. Battaglia, you

3   may proceed.

4             MR. BATTAGLIA:  Has the witness been sworn, Your

5   Honor?

6             THE COURT:  Yes.

7             MR. BATTAGLIA:  I'm sorry, I didn't hear that.

8             DIRECT EXAMINATION OF W. MARC SCHWARTZ

9   BY MR. BATTAGLIA:

10  Q    Good morning, Mr. Schwartz.  Would you state your name

11  for the record?

12  A    Marc Schwartz.

13  Q    Would you turn to Exhibit Number 1?  Is that your CV?

14       (Exhibit 1 received into evidence)

15  BY MR. BATTAGLIA:

16  A    Yes, it is.

17  Q    Is it true, correct, and accurate?

18  A    True, correct, and I believe it is still accurate.

19  Q    Mr. Schwartz, without going into excruciating detail,

20  can you tell the Court who you are and what you do?

21  A    I'm a CPA.  I'm accredited in financial -- certified in

22  financial forensics by the American Institute of CPAs.  I'm

23  a certified fraud examiner from the Association of Certified

24  Fraud Examiners, and I'm a licensed private investigator in

25  the State of Texas.  I have practiced as a CPA since

1    approximately 1974, I think.

2         Became involved in working in the bankruptcy world in

3    the 80s with the collapse of the energy and real estate and

4    banking industry in Texas.  And worked in that field, along

5    with my -- I was an auditor in public accounting.  Up until

6    that point, continued as a financial statement auditor --

7    following that, but also worked extensively with litigation

8    and in restructuring and bankruptcy, primarily working for

9    Chapter 7 Trustees.

10        '93 I left my -- the firm I was associated with,

11   started my own practice, and began working as a Chapter 11

12   Trustee for the Southern District and the Western Districts

13   of Texas.  And here with that work, working also as a

14   examiner -- examiner with expanded powers.  And doing civil

15   litigation, financial economic expert witness work.

16        And the -- sometime in the back -- in the dim back --

17   dim past, I was asked to serve as a Federal Court Receiver

18   in a Federal -- in a Federal Trade Commission matter where I

19   was a receiver over two groups of companies that were

20   involved in defending themselves from a FTC matter in

21   Federal Court, and then became involved in and asked to

22   serve as a State Court Receiver.

23        So, today our practice involves Financial Restructuring

24   involving in and out of bankruptcy expert witness work in

25   the civil courts, civil litigation primarily, and as a

1    receiver in Federal and State Court matters.

2    Q    Thank you, sir.  The Judge had asked some questions at

3    the last hearing about the -- your relationship with the

4    InfoW and affiliated bankruptcy cases filed in this Court,

5    so I want to discuss that for a moment.  What was your role

6    in the InfoW cases, and by that I'm referring to all three

7    related entities?

8    A    I was engaged to be the CRO of those companies prior to

9    their filing.

10   Q    And is that case pending today?

11   A    Oh, the bankruptcy is not pending.

12   Q    And why was the case dismissed from your perspective?

13   A    Well, from my perspective the goal of the case was to

14   bring the Texas -- let's refer to the Texas and the

15   Connecticut litigation into a resolution process where we

16   could get the -- liquidation of the damages and develop a

17   plan for that.  The parties -- the Plaintiffs entered into

18   an agreement with us to dismiss their claims against the

19   Debtors with prejudice, ultimately, and as a result of that,

20   they were no longer involved in litigation.  We had two or

21   three minor creditors, which we had handled outside of

22   litigation.  So, if -- that determined to be a lot cheaper

23   to resolve that case by dismissing it, which the U.S.

24   Trustee agreed with, and let us resolve these things outside

25   of the bankruptcy process.

 1   Q    And do you recall approximately when the Plaintiffs,

 2   Texas and Connecticut, agreed to dismiss their claims of

 3   prejudice?

 4   A    I'm -- in terms of the approximate date, I don't

 5   recall.  I believe the motion to dismiss, at least one of

 6   them was granted on -- I think it was May 19th, that was on

 7   the Texas Plaintiffs.  I don't -- I'm not recalling the

 8   Connecticut Plaintiffs' date.

 9   Q    Who, at the time the cases were filed, the IW cases

10   were filed, owned the interest in IW?

11   A    Concerning -- (indiscernible) the three companies?

12   Q    Yes, sir.

13   A    It was owned by a trust that had been set up prior to

14   the filing of bankruptcy, which was to be the vehicle for

15   funding, any resolution that could be -- if that had

16   occurred.

17   Q    So, what claims does, or do any of the IW affiliates

18   have against Free Speech Systems as we stand here today?

19   A    None that I'm aware of.

20   Q    What claims does Free Speech Systems have against any

21   of the IW affiliates?

22   A    None that I'm aware of.

23   Q    And how was the Plan to be funded in the IW cases?

24   A    Initially with funds submitted -- injected by Mr. Jones

25   from personal assets of his.  As I recall, it was also to be

```
 1   funded, I think once it went effective, with the -- with

 2   revenues provided -- not revenues, with income from --

 3   earned by FSS, which would fund it over a five-year period.

 4   Q    And what was the operative document by which those

 5   revenue contributions were to be made?

 6   A    It was called a Plan -- it was named a Plan Support

 7   Agreement.

 8   Q    Could you turn to Exhibit 3 in your binder, please?

 9   Take a moment and look through it, and when you're done let

10   me know if that's a true and correct copy of the Plan

11   Support Agreement.

12   A    Yes, sir, it appears to be.

13             MR. BATTAGLIA:  Your Honor, I would offer Exhibit

14   3.

15             THE COURT:  Any objection?

16             MR. BRIMMAGE:  (Indiscernible).

17             THE COURT:  All right, a little bit more

18   foundation, Mr. Battaglia.

19             MR. BATTAGLIA:  Yes, sir.

20   BY MR. BATTAGLIA:

21   Q         You're familiar with the books and records of the

22   InfoW entity?

23   A    Entities?  Yes.  Yes.

24   Q    And did InfoWars enter into this agreement -- into a

25   Plan Funding Agreement?
```

```
 1              MR. BRIMMAGE:  Your Honor, (indiscernible).

 2              MR. BATTAGLIA:  Your Honor --

 3              MR. BRIMMAGE:  (Indiscernible).

 4              THE COURT:  Mr. Battaglia?

 5              MR. BATTAGLIA:  Your Honor, the witness was the

 6   CRO for these entities, and this is a business record, and

 7   that's where we're headed.

 8              THE COURT:  Okay, just ask him that question.

 9              MR. BATTAGLIA:  Sure.

10              THE COURT:  And I'll sustain the objection.

11              MR. BATTAGLIA:  Sure.

12   BY MR. BATTAGLIA:

13   Q         Is this a record that was maintained within the

14   files of the InfoW entities?

15   A    Yes.

16   Q    And were you the custodian of those records?

17   A    Yes, I guess so.

18   Q    And --

19              MR. BRIMMAGE:  Your Honor, (indiscernible) --

20              THE COURT:  Yeah, I -- why don't you just ask a

21   few more questions.  I'm going to sustain the objection, why

22   don't you ask a few more foundational questions.  I think

23   you'll get there.

24   BY MR. BATTAGLIA:

25   Q    So, with respect to the business records of InfoW, you
```

```
 1   were in physical possession of some of those records, were

 2   you not?

 3   A     Yes, I am.

 4   Q     And is the Plan Support Agreement one of the records

 5   that you maintained physical possession of?

 6   A     Yes, it is.

 7   Q     And you're familiar with the manner and means in which

 8   those business records were maintained within your auspices

 9   as a CRO?

10   A     Yes.

11   Q     And is Exhibit 3 a document that was within your

12   control and held as a business record of IW, and the

13   affiliated entities?

14   A     Yes, it is.

15   Q     And do you recognize Exhibit 3?

16   A     Yes, I do.

17   Q     Is it a true and correct copy of the business record

18   that was the Plan Support Agreement?

19   A     Yes.

20           MR. BATTAGLIA:  I would offer Exhibit 3.

21           MR. BRIMMAGE:  (Indiscernible).

22           THE COURT:  I'm going to overrule the objection.

23   I'm going to admit 3 for what it is.  It's a Plan Support

24   Agreement, and it's a public document as well.  It's been

25   filed on the Docket in the prior case in which it was the
```

1  CRO, so, Mr. Brimmage, you can ask -- you can cross-examine

2  about all that stuff.

3      (Exhibit 3 received into evidence)

4  BY MR. BATTAGLIA:

5  Q    Would you turn to section eight of Exhibit 3?

6      THE COURT:  I do want to make one clarification,

7  and this could be a very hyper-technical point, but the

8  version that's on the Docket is highlighted, and the version

9  that I'm admitting, for the record, that I want a clean copy

10  of it, the version that I'm seeing on Docket 26 has certain

11  language highlighted, and that's not what I'm admitting.  If

12  you're asking me for a publicly filed version of you know,

13  22-6002063, Document 63 without highlights --

14      MR. BATTAGLIA:  Yes, sir.

15      THE COURT:  I'm okay with that.  But if you're

16  asking to admit what you've -- well, the Docket Number 26,

17  that I won't admit, but I'm -- a clean version can be

18  admitted into the record.

19      MR. BATTAGLIA:  Shall I supplement, Your Honor?

20      THE COURT:  Yeah.  Yes, please.

21  BY MR. BATTAGLIA:

22  Q    When you look at the -- Section Eight, what does it

23  provide for?

24  A    It's the termination provision of the agreement.

25  Q    Under the terms under Section Eight, what is your

```
 1   understanding about whether this agreement remains in
 2   effect?
 3   A    My understanding is the agreement was terminated.
 4   Q    And is it true that the bankruptcy cases for the IW
 5   entities were dismissed?
 6   A    Yes, it is.
 7   Q    Is it true that there was no order approving the
 8   Litigation Settlement Trustees by April 30, 2022?
 9   A    That is correct.
10   Q    And that there was no Plan on file by April 30, 2022?
11   A    That is correct.
12   Q    What is your involvement on behalf of FSS, the Debtor?
13   A    I was hired to be its Chief Restructuring Officer.
14   Q    And, can you turn to Exhibit 2, please?  And this has
15   been admitted into evidence, is that your engagement
16   agreement with Free Speech Systems?
17        (Exhibit 2 received into evidence)
18   A    Yes, it is.
19   Q    And when was that dated?
20   A    It was dated May 19th, 2022.
21   Q    When was it executed?
22   A    I believe it was June 7th.
23   Q    Of 2022?
24   A    2022.  Yes, June 6th, excuse me, of 2022.
25   Q    Can you describe what level of authority over the
```

1    Debtor and its operations you were afforded under this

2    agreement?

3    A    Really, it's absolute authority over the operations.   I

4    agreed to consult with Mr. Jones on major decisions.

5    Q    So, who has control over the bank accounts?

6    A    I do.

7    Q    Who has control over payroll?

8    A    I do.

9    Q    Who has control over hiring and firing of employees?

10   A    I do.

11   Q    Who has control over the records of the Debtor?

12   A    I do.

13   Q    And is it within your unilateral power to hire and fire

14   employees?

15   A    Yes.

16   Q    To open and close bank accounts?

17   A    Yes.

18   Q    Who will be the signatory on the Access DIP account?

19   A    I will be.

20   Q    Anybody else?

21   A    No.

22   Q    Do you have authority to make operational changes

23   within the Debtor's operations?

24   A    Yes.

25   Q    Have you in fact made such changes?

1    A    Yes.

2    Q    What role does Alex Jones play in any of the areas

3    we've just discussed?

4    A    Because of his experience, obviously, with the company,

5    and his knowledge of the customers -- and customers -- of

6    the vendors, and the personnel, when he's available to me to

7    consult with to get more guidance information on, if I had a

8    -- several changes I've implementing -- am implementing, I

9    went and said, this is what I'm going to do, do you have a

10   problem with it?  If it is, tell me what that problem is.

11   Q    At the time you were installed as the Chief

12   Restructuring Officer, what was the management structure of

13   Free Speech Systems?

14   A    Someone in the process of this case referred it to --

15   referred to it as an inverted T, and I think that's a good

16   description.  There is Alex, and then there's everybody

17   else.

18   Q    And is that -- in your experience, the way a successful

19   business is, or should be managed?

20   A    No.

21   Q    What was the status of the accounting controls on the

22   date that you became CRO?

23   A    As far as I can tell they were non-existent.

24   Q    Who performed the accounting on behalf of Free Speech

25   Systems?

1    A    At what time?

2    Q    Prior to you becoming a CRO.

3    A    Oh, the 17 months or so prior to my becoming CRO, it

4    appeared to me nobody did.

5    Q    Was there anybody with an accounting degree or

6    background that provided accounting services?

7    A    There was a consultant who had been hired, Mr. Roe,

8    who's a CPA, who provided some advisory consulting services.

9    He was not involved and was not permitted to be involved in

10   the actual accounting process.  The people responsible for

11   maintaining the books and records did not have accounting

12   degrees.

13   Q    What was the state of the company's accounting books

14   when you became CRO?

15   A    2021, I had -- this was on June 6th date.  2021 had not

16   been closed, which means the books were not completed, and

17   year-end closed.  There had been no recording of any entries

18   in 2022 other than automatic downloads from the bank

19   transactions.  So, they were -- 20 -- 2021 was at -- was

20   incomplete and had not -- was not able to produce any

21   financial statements of meaning, and 2022 was untouched.

22   Q    Were you able to find typical accounting reports on

23   your entry in as CRO?

24   A    No.

25   Q    So, balance sheets, income statements, there were no

1   current --

2   A    There were no financial reports that I could -- there

3   were no financial reports at all, that had ever been

4   produced in at least the last 18 months.

5   Q    What, at the time that you became CRO, what was the

6   Debtor's business relationship with PQPR Holdings, Limited?

7   And I'll just call it PQPR.

8   A    At the time I became CRO, PQPR was facilitating the

9   purchase of inventory by FSS.  In addition, PQPR was

10  purchasing and selling its own inventory and FSS was selling

11  PQPR inventory as well.

12  Q    And who to your knowledge owns PQPR?

13  A    Carol and David Jones, who are Mr. Alex Jones' parents.

14  And in -- through an intermediary entity, Mr. Alex Jones

15  himself owns.  So, about -- the -- turns out about 80 -- 72

16  percent of the interest is indirectly owned by Mr. Alex

17  Jones, and the 18 percent balance -- if that's right -- 28

18  percent balance, is owned by Carol and David Jones.

19              MR. BRIMMAGE:  (Indiscernible).

20              THE COURT:  I'm just going to -- I'm going to

21  allow it just as his understanding, and not for the truth of

22  the matter asserted.  All right.  It's a -- just testifying

23  as his understanding of the corporate structure, and I'll

24  allow him to do it.

25  BY MR. BATTAGLIA:

1   Q    So, prior to your joining FSS, what -- how were

2   proceeds of inventory sales allocated?

3   A    I've identified at least two methods.  For a period of

4   years, it appears PQPR purchased --

5           MR. BRIMMAGE:  Your Honor, I hate to interrupt.

6   (Indiscernible).

7           THE COURT:  Yeah, I think you -- yeah, I'm going

8   to sustain that objection.  Well, maybe you can ask a few

9   more background questions there.

10  BY MR. BATTAGLIA:

11  Q    Sure.  Have you reviewed the historical operations

12  between the Debtor and PQPR?

13  A    Yes.

14  Q    And what is your understanding of the allocation of

15  proceeds between PQPR and FSS from inventory sales?

16  A    Up to some date in 2021, which I don't recall the exact

17  date, I think it was in November, PQPR purchased inventory

18  at the request of FSS.  It then marked up that inventory and

19  sold it to FSS, which then marked up the inventory for sale

20  to the public.

21          MR. BRIMMAGE:  (Indiscernible).

22          THE COURT:  I'm going to let you -- I'm going to

23  just allow it just as his understanding of what it is, I'm

24  going to let you explore though -- the door's open.  I'm

25  going to let you explore, sir, where he gained that

1   information.

2   BY MR. BATTAGLIA:

3   Q    And based on your review of the books, and your

4   discussions with -- well, your review of the books and

5   records and contracts that you've seen, how did that

6   relationship change?  You said that up until November of

7   2021 --

8   A    Yeah, it changed on -- I believe it was November 2021,

9   to where the -- as opposed to marking up and selling

10   inventory to FSS, they entered into -- the arrangement

11   changed to where FSS would sell the unmarked inventory and

12   receive 20 percent of the proceeds, and 80 percent of the

13   proceeds would be paid to PQPR.

14   Q    How does the Debtor -- or how, I guess, how does the

15   Debtor effectuate sales transactions?

16   A    It's almost all over the internet.

17   Q    So --

18   A    Credit card charges by the -- through the internet.

19   Q    And, what did the Debtor pay for credit card

20   processing, prior to your involvement?

21   A    Prior to my involvement, it was paying in total about

22   14.5 to 14.9 percent.  Four point -- well, there was 10

23   percent going to a facilitator, if you will, and the balance

24   of that 14.9, 14.8, whatever it was, goes to the actual

25   credit card processor.

1    Q     Why was the Debtor paying such a high rate?

2    A     Because it needed to -- they had been de-platformed and

3    had lost its credit card processor, so the facilitator was

4    brought in as an intermediary to receive the proceeds from

5    the credit card processor, and to be in fact the face that

6    the Fed credit card processor saw, and it then distributes

7    the money, the funds, to PQPR and FSS.

8    Q     How were sales fulfilled, and what do you understand

9    when I use the word fulfilled?

10   A     Yeah, what do I understand, you mean?

11   Q     Yes, yes.

12   A     Yes, well, fulfillment was and to me is once the

13   customer places an order, that someone has to go pull

14   merchandise out of the warehouse, package it, box it, put

15   postage or whatever you'd use, whether it's UPS, the UPS

16   stamp on it, there's -- put a sticker on it, and ship it to

17   the customer.  So, fulfillment's that process of -- but also

18   includes here, warehousing, managing the warehouse with

19   product in it, and that -- that is -- from when it's

20   received to the warehouse to when it's shipped to the

21   customers is fulfillment.

22   Q     And who employed the individuals that were doing

23   fulfillment prior to you becoming CRO?

24   A     FSS employed -- well, FSS employed them for a period of

25   time, and then they were transferred -- excuse me.  FSS uses

1    ADP for its payroll.  These employees were on that payroll.

2    Subsequently, they're then charging the fulfillment payroll

3    to PQPR, although they stayed -- still stayed on -- on the

4    FSS ADP payroll account.

5    Q    Let's turn and talk about what's happened since you

6    became the CRO.  Can you tell the Court where the Debtors

7    stands in its accounting records currently?

8    A    Well, we've closed through May 2022, those were

9    included -- those financials were included in the material

10    we filed in connection with the bankruptcy.  The -- June,

11    we've gotten all the transactions in, we have to go back and

12    do closing review and make sure that we've -- well, one

13    thing we did and critical, we got the bank accounts

14    reconciled.  I forgot to mention, there'd never been a bank

15    -- there hadn't been a bank account reconciliation we could

16    find, so we reconciled the bank accounts through May.  I

17    believe July's are done also.

18        So, we're current, we've produced financial statements,

19    we have not yet started working on we've -- going down and

20    digging up, producing managing accounting statements, but

21    we've got the primary financials done.

22    Q    Okay.  And who is responsible, primarily responsible

23    for maintenance of the accounting records for FSS?

24    A    Right now it's -- you mentioned Mr. Schultz, as I hired

25    Mr. -- we hired -- FSS hired Mr. Schultz to come in and take

1   over as business manager.  But the actual

2   bookkeeping/accounting work is being taken over by -- so, of

3   my low -- my personnel, my bookkeeping personnel, until we

4   get a bookkeeping service in place there.  So, the

5   accounting was handled by, essentially us through -- as FA's

6   and by the business manager.

7   Q    And are you familiar with Mr. Schultz's accounting

8   qualifications?

9   A    Yes.

10   Q    And what are they?

11   A    He has a bachelor's degree in accounting from

12   University of Houston.  He served as a CFO -- I mean, not

13   immediately, but through a period of years, and most

14   recently, CFO, and then CEO of companies, so he's very

15   knowledgeable of that -- accounting and financial reporting

16   aspects.

17   Q    Earlier you talked about prior relationship with PQPR,

18   has it changed?

19   A    Yes.  The entered -- FSS and PQPR entered a new

20   agreement under which sharing ratios changed, where FSS

21   inventory -- FSS gets 90 percent of the proceeds from the

22   sale of it, PQPR gets 10 percent, and inventory that is

23   acquired by PQPR for its own account, they -- and if it's

24   sold, it's 80 percent of that goes to PQPR, and 20 percent

25   goes to FSS.

```
 1   Q    And in the process of changing that relationship, what

 2   was done regarding the credit card processing costs?

 3   A    I -- one of my -- I insisted that that be reduced, and

 4   it was negotiated down to four percent.

 5   Q    So four plus the 4.9 charged --

 6   A    Correct.

 7   Q    -- by the banks.

 8   A    Yeah, this is for the intermediary, four percent, and

 9   then the 4.9, is their regular bank processing charge.  And

10   that, by the way, varies by the type of credit cards used.

11   Q    Turn to Exhibit 8, please.  Tell the Court what that

12   is.

13   A    This is the Forbearance Agreement entered into on July

14   10th of 2022.

15   Q    And were you involved in negotiation and drafting of

16   this document?

17   A    Negotiating the document and reviewing the draft, yes.

18   Q    And is this a true and correct copy of the Forbearance

19   Agreement entered into between the parties?

20   A    Yes, it is.

21        MR. BATTAGLIA:  Your Honor, I would offer Exhibit

22   8 into evidence.

23        THE COURT:  Any objection?  It's admitted.  26-8

24   is admitted.

25        (Exhibit 8 received into evidence)
```

```
 1            MR. BATTAGLIA:  Thank you, Your Honor.
 2   BY MR. BATTAGLIA:
 3   Q     Have there been any changes in the manner in which
 4   fulfillment of product sales is handled?
 5   A     Yes.
 6   Q     What are those changes?
 7   A     A significant one was prior to filing bankruptcy, we
 8   engaged a third-party fulfillment service to take over
 9   fulfillment for FSS's and PQPR's products, and FSS's
10   products.
11   Q     Who employs the individuals who actually pull product
12   and ship it?
13   A     The fulfillment service we hired.
14   Q     And how do you pay fulfillment?  Is it a flat rate per
15   month, or what's the term?
16   A     It's a flat rate per shipment.
17   Q     And overall, shifting to this vehicle, what's the
18   effect on the Debtor's expenses?
19   A     It -- based on my analysis, it should be a push in the
20   sense that there should not be much of a net increase, if
21   any, and cost -- of the actual cost, the fulfillment should
22   be -- improve our efficiency though, because that would be
23   not something that we have to manage and worry about.
24   Q     And would that answer change if volumes increased
25   significantly?
```

1    A    No, it should not.

2    Q    Let's talk about --

3    A    Let me stop.  It may actually it probably -- if volumes

4    increase, our cost of fulfillment per dollar may actually go

5    down, could go down.

6    Q    I want to talk about the PQPR debt now.  As the Chief

7    Restructuring Officer, do you control the business records

8    of FSS?

9    A    Yes.

10   Q    And are you familiar with the business records of FSS?

11   A    Yes.

12   Q    And the manner in which they're maintained?

13   A    Yes.

14   Q    Do you recognize Exhibit 4?

15   A    Yes.

16   Q    What is it?

17   A    The promissory note dated August 13th, 2020 between

18   Free Speech Systems, LLC and PQPR Holdings Limited, LLC.

19   Q    Is this a true and correct copy of the promissory note

20   that is within the business records of the Debtor?

21        MR. BRIMMAGE:  Your Honor, (indiscernible).

22   Hearsay.  (Indiscernible) prove this up.  (Indiscernible)

23   and any further testimony (indiscernible).

24        MR. BATTAGLIA:  Your Honor, if I may respond?

25        THE COURT:  Yes, please.

```
 1            MR. BATTAGLIA:  It's an absurd suggestion that a

 2    custodian is ineligible to testify to the authenticity of a

 3    business record, and that what one must do is find someone

 4    who is employed by the Debtor as the custodian back at the

 5    time the document was originated.  There is no requirement

 6    that a party -- that a custodian be a signatory to every

 7    document, that's equally an absurd evidentiary requirement.

 8    There's no way business records would ever come in if those

 9    requirements were required.

10            MR. BRIMMAGE:  (Indiscernible).

11            MR. BATTAGLIA:  He can authenticate a business

12    record, which is what he's done.  And legal documents are

13    business records, just as accounting records are, and any

14    other document within the control of an entity of a party.

15            MR. BRIMMAGE:  (Indiscernible).

16            THE COURT:  I'm going to admit it as a business

17    record.  I think custodian doesn't need -- just that the

18    reports that are -- it just has to be a circumstantial

19    guarantee of trustworthiness of the document, and it can be

20    brought in by someone who was just a custodian, and he's the

21    CRO.  The question that I have for you, Mr. Schwartz, is

22    when did you first view this -- have you ever viewed this

23    document before today?

24            THE WITNESS:  Oh yes, I have.

25            THE COURT:  When did you view this document for
```

1    the first time?  Do you recall what month?

2              THE WITNESS:  I would have -- June of this year.

3              THE COURT:  Okay.

4              THE WITNESS:  I would say early June.  I'd have to

5    look back at my time record so you can tell (indiscernible).

6              THE COURT:  No, it's one and the same.  I'll admit

7    it.  It's --

8         (Exhibit 4 received into evidence)

9              MR. BRIMMAGE:  Your Honor, (indiscernible).

10             THE COURT:  I'll let you take him up on cross.

11   I'm going to let you take him up on cross.

12   BY MR. BATTAGLIA:

13   Q    Can you turn to Exhibit 5, please?  Can you tell the

14   Court what that is?

15   A    This is a security agreement entered into between PKR

16   Holdings and FSS, dated August 2020.

17   Q    That's your --

18   A    Yes, I'm sorry.

19   Q    Sorry.  And have you seen this document before?

20   A    Yes.

21   Q    Would it be true you saw it at or about the same time

22   you saw the prior exhibit?

23   A    Yes.

24   Q    Does this appear to be a true and correct copy of the

25   document that is maintained within the business records of

1    Free Speech Systems?

2    A    Yes.

3              MR. BATTAGLIA:  Your Honor, I would offer Exhibit

4    5.

5              MR. BRIMMAGE:  Objection.

6              THE COURT:  Yeah, I understand.  I'm going to

7    admit it as a business record, but -- and I know you're

8    going to have questions for -- and I'm going to let you ask

9    those questions about the scope of his knowledge of it, this

10   document, and questions about it.  It's in evidence, so you

11   get to ask questions about it, and it's relevant to the cash

12   collateral motion and critical vendors.  So, you may

13   proceed, counsel.

14        (Exhibit 5 received into evidence)

15             MR. BATTAGLIA:  Thank you, Your Honor.

16   BY MR. BATTAGLIA:

17   Q    Could you turn to Exhibit 6, please?

18   A    Yes, sir.

19   Q    And can you tell the Court what that is?

20   A    This is another promissory note that's been dated

21   November 10th, 2021 between Free Speech Systems and PQPR

22   Holdings in the amount of 25,300,000.

23   Q    And does that -- have you seen this document on or

24   about the same time as you responded to the preceding

25   documents?

```
 1    A    Yes.

 2    Q    And does this appear to be a true and correct copy of

 3    that promissory note that is within the business records of

 4    the Debtor?

 5    A    Yes, it is.

 6              MR. BATTAGLIA:  Offer Exhibit 6.

 7              MR. BRIMMAGE:  (Indiscernible).

 8              THE COURT:  Understood, overruled.  It's admitted.

 9         (Exhibit 6 received into evidence)

10    BY MR. BATTAGLIA:

11    Q    Can you turn to Exhibit 7, please?  Can you tell the

12    Court what that is?

13    A    This is a copy of UCC financing statement, November

14    18th of 2020 for --

15    Q    And was this -- did you see this document for the first

16    time about the same time as the preceding documents?

17    A    Yes.

18    Q    And is this document maintained as a business record in

19    the Debtor's files and records?

20    A    Yes.

21    Q    Does this appear to be a true and correct copy of the

22    UCC 1 financing statement?

23    A    Yes.

24    Q    Does it bear a filing number with the Secretary of

25    State's office?
```

1    A    Yes, it does.

2              MR. BATTAGLIA:  Offer Exhibit 7.

3              THE COURT:  Any objection?  It's admitted.

4        (Exhibit 7 received into evidence)

5    BY MR. BATTAGLIA:

6    Q    If you would turn to Exhibit 9 and keep your finger on

7    Exhibit 10.

8    A    Yes, sir.

9    Q    Okay, do you recognize Exhibit 9?

10   A    Yes.

11   Q    What is it?

12   A    This is a copy of the 13-week cash flow forecast that I

13   had prepared for Free Speech Systems.

14   Q    Now, we're here today on an interim motion, can you

15   turn to Exhibit 10 please, and keep your finger on 9?

16   A    Yes, sir.

17   Q    What is that?

18   A    Exhibit 10 is a blow up of the first three weeks of the

19   cash flow forecast on Exhibit 9.

20   Q    They're identical in terms of the numbers displayed for

21   the three-week period, yes?  Go back to 9.  Would you tell

22   the Court generally what authority you're seeking today, to

23   use cash collateral today?  What do you want to pay?

24   A    The bills.

25   Q    A little more detail.

1    A    The bills and the cost of operating the Debtor.

2    Q    Payroll?

3    A    Payroll, lights, electricity, a lot of

4    telecommunications or internet-related vendors who provide

5    the backbone for the telemarketing and the production or --

6    of the show, if you will.

7    Q    What about product cost?

8    A    There's some product cost in here.

9    Q    There's one entry in here of a $250,000 proposed

10   payment to PQPR.  Can you tell the Court what that's for?

11   A    Yes, PQPR advanced $750,000 towards the purchase of

12   inventory --

13   Q    Advanced to who?

14   A    Advanced to FSS towards the purchase of merchandise

15   inventory.

16   Q    Did they advance to FSS or to the supplier?

17   A    The money was paid to a supplier as part of a million-

18   and-a-half-dollar prepayment that was made to -- in order --

19   to order inventory from that supplier.

20   Q    Why is it advantageous to pay to acquire -- and there's

21   two installments to pay for inventory, are there not?

22   A    Well, there are --

23   Q    PQPR inventory, I'm sorry.

24   A    Now, I'm confused.

25   Q    Okay.  So, there's a $250,000 payment --

1    A    Oh, yes.  There's --

2    Q    -- included in the budget.

3    A    There's $250,000, and there's subsequently a $500,000

4    payment in the budget to repay PQPR for that $750,000.

5    Q    Why is it advantageous for FSS to acquire that

6    inventory that PQPR is purchasing?

7    A    Because PQPR essentially was out of -- not PQPR.  FSS

8    was out of inventory essentially, of any -- of that was

9    high-value and had a high marketability to it.  And that had

10   to be replaced in order to make this plan work and make the

11   company work.  So.

12   Q    What does the Debtor get if its PQPR products sold

13   through the Debtor's sales channel?

14   A    Well, this is -- this -- well, I mean, it depends on

15   what -- which way you look at this.

16   Q    If you didn't buy it.

17   A    If we didn't buy it, that PQ -- wait a minute.

18   Q    If FSS did not pay this $250,000, what would this --

19   how would the sales proceeds be allocated?

20   A    80 percent PQPR, 20 percent Debtor.

21   Q    How are they allocated if you're allowed to purchase

22   the inventory from PQPR?

23   A    10 percent PQPR, 90 percent Debtor.

24   Q    And what's the markup on products of the type that are

25   being purchased?

1    A    300 to 400 percent.

2    Q    In your business judgment, is it better to pay the 250

3    or not pay the 250 to PQPR?

4    A    It's better to pay the 250.

5    Q    So, in coming up with these projections, can you

6    describe for the Court a little bit what your basic

7    assumptions are?

8    A    The inventories that we -- that were acquired, and that

9    are being rolled into the sales, they're being shipped in at

10   intervals as they're produced.  We had a one shipment about

11   two weeks before filing, three weeks before filing.  We had

12   a second shipment within a -- the week before filing.  As

13   those products come into the warehouse, Alex Jones starts

14   pushing them on the shelf, and we can see a marked increase

15   in daily sales, we get daily sales reports.

16        And so, what we did in watch -- and I did in watching

17   these, and one of the things I asked for was give me time to

18   see the impact of these sales.  We were able to see a

19   various -- an increase, definitely an increase, significant

20   increase in daily sales.  So, prior to filing, just prior to

21   filing, let's just look at the last five business days of

22   sales, and that's what we use as our base.  As we're -- have

23   more product coming in, we're seeing they -- these are

24   increasing sales, and they're being attracted to the market.

25        And I said, okay, well take that times 125 percent and

1    that will be our weekly sales budget, and we should be able

2    to accommodate that.

3    Q    Do you -- would you tell the Court; do you perceive

4    that as aggressive or a conservative income budgeting?

5    A    I see it as conservative.  We had -- this was two of

6    the six products, which we're still operating with these two

7    products.  The next one's coming in next week.  So, we've

8    got a layering effect coming, but -- on this, but it's not

9    at all what I consider aggressive.  If you ask Mr. Jones,

10   his -- he -- and he has the experience, he believes he'll be

11   substantially -- these are substantial understatements.

12             MR. BRIMMAGE:  (Indiscernible).

13             THE COURT:  Sustained.

14   BY MR. BATTAGLIA:

15   Q    Can you tell the Court, is there a correlation between

16   sales and Mr. Jones' broadcasting, or someone else, or a

17   repeat broadcast?

18             MR. BRIMMAGE:  (Indiscernible).

19             THE COURT:  We'll see what he -- let's hear his

20   answer.

21   BY MR. BATTAGLIA:

22   Q    Have you examined that to determine whether there's a

23   correlation?

24   A    Have I examined it?  I have -- I've had -- there are

25   people at FSS that keep track of that information.  So --

1    Q    And have you looked at that information to --

2    A    Yes.

3    Q    -- make a determination?

4         THE COURT:  And I don't think you answered the

5    question.  Why don't you ask the question again.  I don't

6    think you actually answered the question.

7         MR. BATTAGLIA:  I'm not sure I remember precisely

8    what the question was, Judge, I'm sorry.

9         THE WITNESS:  Is there a correlation?

10        THE COURT:  Yeah, is -- well, is there a

11   correlation, and --

12   BY MR. BATTAGLIA:

13   Q    Have you reviewed books and records to see if there's a

14   correlation between sales when Mr. Jones' on air or not?

15   A    Well, I've asked, what is the correlation; and I've

16   been told what it is.

17        THE COURT:  That's -- you're not answering the

18   question.  The question is, have you reviewed documents to

19   determine whether there's a correlation?  It's --

20        THE WITNESS:  I have not received a document at

21   this time.

22   BY MR. BATTAGLIA:

23   Q    You have an understanding of whether there's a

24   correlation between when Mr. Jones is on the air or not?

25   A    Yes.

1    Q    What is that understanding?

2              MR. BRIMMAGE:  (Indiscernible) I've been told.

3              THE COURT:  Yeah.  I'm going to -- I guess the

4    question that would then follow is what is your

5    understanding based on?  And that's going to then inform

6    what your answer will be.  You said you had -- you developed

7    an understanding of it.  You haven't reviewed a document,

8    but you've developed an understanding.  What is that

9    understanding based on?

10             THE WITNESS:  The person in charge of e-commerce

11   which track -- and he -- one of the things he does is he

12   tracks daily sales of product and tracks hours of all people

13   on the air, but particularly, he'll actually focus on Alex

14   Jones.  And when Alex Jones is not on the air, we see a 30 -

15   - we could see a 30 percent drop in sales.

16             THE COURT:  Yeah, but what --

17             THE WITNESS:  That's what he's --

18             THE COURT:  You're saying we.

19             THE WITNESS:  (Indiscernible), sorry, Your Honor.

20             THE COURT:  No, no, no, I mean we as in -- you

21   said you haven't reviewed a document, so what's that based

22   on?  That 30 percent?  Is that based on something someone

23   told you?

24             THE WITNESS:  Correct, that's based on Mr. Roddy's

25   data that he maintains.

1      THE COURT:  Have you reviewed that data?

2      THE WITNESS:  I -- no, I've actually been tied up

3   getting ready for this hearing.

4      THE COURT:  Okay.  I'm going to sustain the

5   objection.

6   BY MR. BATTAGLIA:

7   Q    If you are not authorized to use cash collateral today,

8   what's the -- going to be the effect on the Debtor's

9   business?

10  A    As I think I mentioned earlier, we have about 800,000

11  of cash that is not cash collateral, so we can pay our bills

12  this first week it looks -- I believe.  We could pay a --

13  most of our bills this first week, not all of them.

14  Q    And if you don't pay your bills, what's going to happen

15  to the Debtor?

16  A    It depends on which ones we don't pay, but it's going

17  to be a -- if we can't pay critical -- the critical vendors,

18  then we will be shut down.

19  Q    Well, let's turn and talk about critical vendors.

20      MR. BRIMMAGE:  Your Honor, (indiscernible).

21      THE COURT:  That's just this -- I'm going to --

22  I'm just going to (indiscernible) it -- that wasn't based on

23  any evidence, I think he's going to have to testify as to

24  why, give me a little bit more as to why.  But he's allowed

25  to say what he thinks.  Why he thinks that I think is

1    probably the more relevant question, and I think we'll get

2    there.  I think that's where Mr. Battaglia is going anyway.

3            MR. BATTAGLIA:  Yes, actually I was going to turn

4    to critical vendors, they're very related, but I'll just ask

5    that question now and put it to rest.

6            THE COURT:  Well --

7    BY MR. BATTAGLIA:

8    Q    Why do you think that it would shut the business down?

9    A    Well, if we can't broadcast, we can't sell.  So, if we

10   lose a vendor who's critical to our ability to broadcast, if

11   we can't operate our e-commerce platform, we can't sell,

12   even if we could broadcast.  If we can't fulfill orders,

13   then we're not going to be able to fulfill what we've been

14   paid for, and those revenues have to go back to those --

15   will have to go back to those customers.  So, it's -- and

16   all of these are -- we're, you know, the company's in a

17   situation right now where there's not a lot of breathing

18   room.

19   Q    Let's pick an example, it's one of the critical

20   vendors.  Do you know who Cloudflare Inc. is?

21   A    I have a bit of knowledge about Cloudflare, yes.

22   Q    What do they do?

23   A    They're part of our e-commerce platforming.

24   Q    And they provide security for purchasers, right?

25   A    Right.

1    Q    And for transactions over the internet?

2    A    Right.

3    Q    What happens if Cloudflare does not continue providing

4    services?

5    A    We're out of business.  We're shut down.  We're not out

6    of business, we're shut down until we can find a

7    replacement, if we can find one.

8    Q    There are other vendors who are identified as

9    providing, I'm going to call it internet access, I'm not a

10   troglodyte, but I'm only marginally above that, but let's

11   say contact to content users, you know who I'm talking

12   about, internet providers, satellite providers, and the

13   like.  What happens if the Debtor is unable to pay those?

14   A    The same thing, we're shut off.  We can't -- if you

15   don't have access to the satellite, you can't broadcast.

16   Q    What happens if the Debtor's unable to pay its

17   employees?

18   A    Well, I suspect that would be, it was a big issue with

19   the ability to keep going if we don't have any employees.

20   Q    If you would please turn to Exhibit 11.

21         THE COURT:  Mr. Battaglia, you were talking about

22   critical vendors, and then you talked about employees.

23         MR. BATTAGLIA:  Your Honor, I was just using the

24   critical vendors as an example of some of the uses of cash

25   collateral.  Obviously, they're critical vendors as well,

1    and I'll get to the critical vendors here.

2              THE COURT:  Okay.  But --

3              MR. BATTAGLIA:  Separately.

4              THE COURT:  -- are the employees viewed as

5    critical vendors?

6              MR. BATTAGLIA:  No, sir, but they're being paid

7    under the cash collateral budget.

8              THE COURT:  Okay.  Okay.

9              MR. BATTAGLIA:  And that was my point.

10             THE COURT:  I just wanted to make sure that we

11   were clear.

12             MR. BATTAGLIA:  Yes, sir.

13   BY MR. BATTAGLIA:

14   Q    You got Exhibit 11 in front of you?

15   A    Yes, I do.

16   Q    And do you recognize this document?

17   A    Yes, I do.

18             MR. BATTAGLIA:  Your Honor, this is attached to

19   the motion and/or order that were filed requesting the

20   authority to pay critical vendors.

21   BY MR. BATTAGLIA:

22   Q    Is this a true and correct copy of the list of vendors

23   that you proposed to have authority to pay under the

24   critical vendor motion?

25   A    Yes, it is.

1           MR. BATTAGLIA:  Your Honor, I would offer Exhibit

2    11 into evidence.

3           THE COURT:  Any objection?

4           MR. BRIMMAGE:  (Indiscernible).

5           THE COURT:  Okay.  It show for -- what truth of

6    the matter is asserted, it is a -- I can just admit it -- or

7    I'll accept it for the purpose of these are the -- that you

8    seek to pay.  And those are the amounts that you believe

9    that you need to pay them.

10          (Exhibit 11 received into evidence)

11          MR. BATTAGLIA:  That's fine, Your Honor.

12   BY MR. BATTAGLIA:

13   Q    So, there's a list of, I see 20 vendors here.  I want

14   to talk, first of all, generally about FSS's ability to

15   identify and contract with suppliers of goods and services.

16   Generally, in -- do you have an understanding as to whether

17   or not it's easy for this Debtor to replace vendors?

18   A    Yes.

19   Q    What is that understanding?

20          MR. BRIMMAGE:  (Indiscernible).

21          THE COURT:  I don't know.  Overrule it to the

22   extent of -- I want to hear it, how do you?  You can answer

23   the question.

24   BY MR. BATTAGLIA:

25   A    Yes, I do.

1    Q    What is that understanding?

2    A    It can be very difficult.  The -- starting around, I

3    think 2018, but -- today, I'd say today, if we lose a

4    vendor, it can be hard to find a replacement vendor.  Most

5    recent examples I'm aware of are the impact on the bank card

6    processing, where we ended up having to get an intermediary

7    vendor, if you will, to shield the processor from our

8    identity, if you will.  The -- (indiscernible) are unable to

9    find a bank to bank with, going from one of the big

10   international banks to a small rural, Texas State bank.

11        Even an issue of me trying to transfer our banking to

12   Access, which is a major bank on the east coast.  It's

13   actually a savings institution, does a lot of work in the

14   bankruptcy field.  And I wanted to move our banking there

15   prior to filing so that we could easily just transition

16   right into the DIP accounts without changing anything.  And

17   they concluded they would not do it per the bankruptcy

18   without an order from the Bankruptcy Court, and I could not

19   a -- they would not open the banking.  And they require that

20   I be the single signatory, period.

21   Q    Have you had experience attempting to replace the

22   controller position or bookkeeper position?

23   A    Yes, it has been very hard.

24   Q    Why?

25   A    The company's located in Austin, Texas.  And they've

1    had real trouble with finding companies who would be willing

2    to be associated with FSS in Austin, Texas.  And finding

3    somebody (indiscernible) accept having an FSS on their

4    resume.  We just lost one employee, he's coming back as a

5    consultant, contract employee.  He did not want FS -- he

6    wanted to get FSS off his resume.

7    Q    So, understanding that there's -- due to Alex Jones'

8    notoriety, there are limitations on the pool of suppliers of

9    goods and services; is that a fair statement?

10            MR. BRIMMAGE:  (Indiscernible).

11            THE COURT:  Sustained.

12   BY MR. BATTAGLIA:

13   Q    What is your understanding about the effect of Alex

14   Jones' notoriety on the ability to attract alternate

15   suppliers of goods and services?

16   A    It makes it difficult.

17            THE COURT:  Can I tell you on the critical vendor,

18   and for my purposes, Mr. Battaglia, I -- maybe you can focus

19   on -- I'm say, (indiscernible) to go into this question for

20   me, Mr. Battaglia, maybe I can ask the witness, but there

21   are three insurance providers, there's -- right?  There's a

22   -- there are three insurance providers here.  Someone who

23   does trash service, and someone that does the alarm service.

24   But I don't think you need to focus on those.  I mean,

25   unless -- but you tell me the insurance was all paid up, so

1   what is this insurance?

2          MR. BATTAGLIA:  I think they are periodic

3   installments, Your Honor, based on --

4          THE COURT:  Okay.

5          MR. BATTAGLIA:  -- the size of these.

6          THE COURT:  Okay.  All right.

7          MR. BATTAGLIA:  Your Honor, I'll -- and I'll focus

8   on the larger ones, and --

9          THE COURT:  No, I just, to me -- I can --

10  (indiscernible) can object if they want, but I don't think

11  they will.  I suspect they're more focused on the analysis

12  that went into creating this list.  But if you're telling --

13  yeah, the Debtor wants insurance, and maybe that's the

14  better answer for that.  And you've got to maintain

15  insurance.  And you can tell me why you need to maintain the

16  insurance, and that will probably get me over the hump on

17  those.  But maybe you can ask questions.  I think you've

18  already touched on Cloudflare, but maybe you can talk a

19  little bit about what Amazon Web Services does and the

20  security folks.

21         MR. BATTAGLIA:  Yes, sir.

22         THE COURT:  Okay.

23  BY MR. BATTAGLIA:

24  Q    If you'll look at Exhibit 11, and I'll just kind of run

25  down and focus on some of the more substantial -- what does

1   Amazon Web Services provide?

2   A    They do what it says, they provide our web services.

3   Amazon has a huge commercial web service operation they

4   developed for their own internal use for selling a product,

5   and which they now make available to third-parties.

6   Q    Yeah.  How important is that to Debtor's ongoing

7   operation, to maintain that relationship?

8   A    Again, it's critical, it's another component to get to

9   the -- get up -- get to the customers is having access to

10  commercial web services.

11  Q    ATXHD is a satellite uplink why are they critical to

12  the Debtor's business?

13  A    Again, to broadcast across United States is done by

14  satellite.

15  Q    And what happens if they terminate services?

16  A    We won't be broadcasting across the United States until

17  we find an alternative.

18  Q    Austin Security and Investigation is $28,000.  Why is

19  security vital to this Debtor?

20  A    Security's vital because the company and Mr. Jones are

21  extremely in the public eye, and they are extremely

22  controversial.  So, we have -- or FSS has armed security 24

23  hours a day, seven days a week in their facilities.

24            THE COURT:  Is this armed security in the

25  building?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Okay.

 3              THE WITNESS:  And the buildings, there's no names

 4    on the buildings.

 5              THE COURT:  Okay.

 6              THE WITNESS:  When you drive by you don't know

 7    what's in there.

 8    BY MR. BATTAGLIA:

 9    Q    Cloudflare you've touched upon, so let's move to the

10    next largest one.  Getty Images, Inc., you -- tell the Court

11    what that's for?

12    A    Getty Images is a major supplier.  Think about any

13    program, talk show, whatever you've seen on television,

14    they'll bring up pictures of this, that, or the other.  They

15    get it from Getty, so it's for content for the show.  At

16    least, the shows are -- if you haven't watched one, are

17    operated as talk shows.  So, images, clips, et cetera are

18    all a very important part of the production.

19    Q    Hay Vision Network Video.  What do they do?

20    A    This is, again, I've moved a little bit up the

21    technical ladder of streaming bandwidth, which I really

22    didn't know anything about, but I know a little bit more

23    now.  But essentially, having the bandwidth to push out.  If

24    you think about streaming video and it stops and starts and

25    stops and starts, well, the bigger the bandwidth you get,
```

1    the better that experience is.  So, that provides the

2    ability to stream a lot of gigabytes of visuals and sound

3    out to the market.

4    Q    And if the Debtor didn't have that added bandwidth,

5    what effect would it have on the experience?

6    A    It would again, the shows would be absolutely

7    unwatchable.

8    Q    With respect to the smaller dollar items in here, are

9    each of them, to your opinion, vital to the continued

10   operations of the Debtor?

11   A    Yes.

12   Q    With respect to the insurance, can you give the Court a

13   flavor as to why those are one of the relatively minor, but

14   -- let's see towards the bottom, the Hartford, and

15   Travelers, I think there's two.

16   A    Hartford, Travelers, and then there's the Frost.  Just,

17   you know, this capacity of having insurance for the property

18   and casualty insurance on the assets.  There is a tremendous

19   investment in -- there are four studios onsite and the

20   technology in each one of those is quite large and

21   expensive.  There's a lot of dollars there to be insured and

22   protected.  If something happens, a fire in the building,

23   whatever, that's a lot of assets we've got to protect.

24   Q    Now, are you specifically asking the Court to allow you

25   to pay these, or order you to pay these amounts?

1    A    No.

2    Q    What are you asking for?

3    A    I'm asking to be able to pay up to these amounts.

4    Q    So, for example, I see Amazon Web Services at $77,000.

5    It's unusual to have a flat number like that.  What is the

6    basis for that?

7    A    These were -- what we did was go back and look at the

8    last three or four months and developed an average.

9    (Indiscernible), I suspect the average got rounded to

10   77,000.

11             MR. BRIMMAGE:  Objection, testifying, speculating.

12             THE COURT:  I'll sustain that objection.

13   BY MR. BATTAGLIA:

14   Q    Is it fair to assume that perhaps you don't have the

15   invoice yet for pre-petition services from Amazon Web

16   Services?

17             MR. BRIMMAGE:  Objection, leading.

18             THE COURT:  Sustained.

19   BY MR. BATTAGLIA:

20   Q    What information have you received about the pre-

21   petition amounts owed to Amazon Web Services to this date?

22   A    I have not received a bill yet, so I don't know.

23             MR. BATTAGLIA:  Your Honor, may I have a minute

24   consult with my co-counsel?

25             THE COURT:  Absolutely.

```
 1              MR. BATTAGLIA:  Thank you.

 2   BY MR. BATTAGLIA:

 3   Q     What conditions are imposed on the vendors if you pay

 4   them under this -- if the Court grants the relief requested?

 5   What do they have to do?

 6   A     Continue to provide service.

 7   Q     On what terms?

 8   A     Normal.  Their normal terms we've been operating under

 9   pre-bankruptcy.

10   Q     And if they don't?

11   A     If they don't?

12   Q     The order allows you to claw back --

13   A     Yeah, I can claw back but I mean from a business

14   standpoint --

15              MR. BATTAGLIA:  One more moment.  Pass the

16   witness, Your Honor

17              THE COURT:  Okay.

18              MR. BATTAGLIA:  I don't know when it would be

19   appropriate.  I think Mr. Schwartz is drying out there.

20              THE COURT:  Yeah, I was just going to ask folks.

21   I want to be respectful of -- I know folks need to -- may

22   need to eat, and I want to be respectful of that.  Does it

23   make sense to break now, come back, I don't know, 45

24   minutes, and then come back and pick up?  Okay.  Why don't

25   we come back on the record at 1:15.
```

1              Mr. Schwartz, I would remind you that you're still

2    under oath so you're not able to talk to anyone about your

3    testimony.

4              So, we will continue.  We'll break for lunch and

5    come back at 1:15.  I am going to keep Go to Meeting open.

6    I'm going to hang up the line, and then we will come back on

7    the line -- I think we will open up the line about 10

8    minutes before we start.  So, it will be sometime between

9    1:00 and 1:05, but I'll make sure if anyone's dialed in,

10   that you'll be able to hear everything.  But we'll hang up

11   the line and I'll keep Go to Meeting open for now.  Okay?

12   Thank you.

13             MR. BATTAGLIA:  Thank you, Your Honor.

14        (Off the record)

15             CLERK:  All rise.  Please be seated.

16             MR. BATTAGLIA:  Your Honor, is it okay if I have

17   this?

18             THE COURT:  Absolutely.

19             MR. BATTAGLIA:  Thank you.

20             THE COURT:  Okay.  This is Judge Lopez.  The time

21   is 1:22, back on the record in Free Speech.  Let me just --

22   I think we're going to turn to the cross-examination at this

23   time.

24             Mr. Schwartz, I remind you that you're still under

25   oath.  Okay?

1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  Okay.  Mr. Moshenberg.

3              MR. MOSHENBERG:  Yes, Your Honor.  If it's all

4    right with the Court, I'm going to be cross-examining Mr.

5    Schwartz on behalf of the Texas Plaintiffs and Mr. Brimmage

6    will be cross-examining Mr. Schwartz on behalf of the

7    Connecticut Plaintiffs, Your Honor.

8              THE COURT:  No problem.

9              MR. BATTAGLIA:  Your Honor, I understand Mr.

10   Brimmage represents both of them.  I mean, I don't --

11   there's no sense in having the same party taking multiple

12   shots here.

13             THE COURT:  Well, they're -- they both filed a

14   joint objection.  So, I'm going to give both of them an

15   opportunity for cross.  If I do see overlap, I will -- so.

16   Go for it.

17             MR. MOSHENBERG:  Fair enough, thank you.

18             THE COURT:  They filed a joint objection, but they

19   are different.  They've always been different from the very

20   beginning.

21             MR. BATTAGLIA:  Yes, but Mr. Brimmage represents

22   both.

23             THE COURT:  He does, he does.  He's picking today.

24   Let's just see where it goes.  All your rights are

25   preserved.  If it starts to get a little out of hand, I'll

 1   handle it.

 2           MR. MOSHENBERG:  Your Honor, I'm going to Austin

 3   later to attend the trial happening in Austin, so I have

 4   every incentive to get out of here as soon as we can.

 5           THE COURT:  I don't, so take your time.

 6           MR. MOSHENBERG:  Fair enough.  Thank you, Your

 7   Honor.

 8           THE COURT:  Let me ask you this, in terms of

 9   exhibits, how do you intend to show the witness?  Do you

10   have --

11           MR. MOSHENBERG:  We do have an exhibit list, Your

12   Honor.  We're going to pull them up, as --

13           THE COURT:  Well, let me ask it before you begin.

14           MR. MOSHENBERG:  Yes, Your Honor.

15           THE COURT:  Maybe I can then ask the same

16   questions.  Are you looking to -- by pull them up, is

17   someone going to ask me for permission to -- how do you

18   intend on doing this, Mr. Martin?  Okay.  Are you -- do you

19   intend to show exhibits out of 28, from Exhibit 28?  Docket

20   28, I should say.

21           Jarrod Martin, where are you?  There you are.  Mr.

22   Martin, I'm going to make you the presenter.  Let me make

23   you a presenter.  Is there -- just before you show anything.

24   Let's see, you have a number of exhibits at 28.  You just

25   want to go through them or are the parties -- is there

1    anything the parties can stipulate to now?  There may be

2    some overlap, right?

3            MR. BATTAGLIA:  Your Honor, I'm afraid that this

4    was filed while I was in my car on my way here, so I

5    actually haven't had an opportunity to look at them.

6            THE COURT:  Well, let's look at them now.  I think

7    a lot of this is public, by the way.  If you want to, Mr.

8    Battaglia, if you want to take a moment, I'll give you a

9    moment to just review them.  If not, we can just take them

10   up one by one.

11           I'll give you a few minutes to review.  It's a

12   first-day hearing, so everybody filed witness and exhibit

13   lists late.  So, I'm going to -- I will say for the parties

14   who are online, in the Go to Meeting feature, if you were to

15   hover your mouse around the right side, you'll see a plus

16   and minus.  And so, depending on the way it's shown on the

17   scroll, you'll still be able to zoom in or zoom out to be

18   able to view a particular document that is shown on the

19   screen.

20           MR. MOSHENBERG:  Your Honor, it may make more

21   sense to go one by one as we go because I may not use all

22   these exhibits anyway.  If the Court is more comfortable

23   doing that, I don't mind proceeding that way.

24           THE COURT:  It's your presentation, counsel, I'll

25   let you --

1          MR. MOSHENBERG:  Yeah, my vote is to just start

2     with the cross and I'll admit what I try to admit and take

3     them one by one.

4          THE COURT:  That works.

5          MR. BATTAGLIA:  I have no issues with 1, 2, and 3,

6     Your Honor.

7          MR. MOSHENBERG:  Your Honor, I may not try to

8     admit those, but it's good to know that there is no

9     objection to 1, 2, or 3.

10         THE COURT:  Well, now it just sounds like we ought

11    to just start.

12         MR. MOSHENBERG:  Okay, fair enough.

13             CROSS-EXAMINATION OF W. MARC SCHWARTZ

14    BY MR. MOSHENBERG:

15    Q    All right.  Mr. Schwartz, you made some declarations in

16    this case, correct?

17    A    I believe I did one.

18    Q    Okay.  And you understand that the statements you made

19    in that declaration was under oath?

20    A    Yes.

21    Q    And that's the same oath that you're under today,

22    correct?

23    A    Yes.

24    Q    And you understand that it's important to tell the

25    truth in a declaration, correct?

1    A    Yes.

2    Q    You agree that it's important to tell the truth period,

3    correct?

4    A    I don't know what you mean by telling the truth period.

5    It's important to tell the truth.

6    Q    Okay.  And that's what I'm trying to confirm.  You

7    agree it's important to tell the truth.

8    A    I did agree with you.

9    Q    Okay.  You were hired as the CRO in the InfoW

10   bankruptcy, correct?

11   A    Yes.

12   Q    Do you recall that you spoke at the first day hearing

13   for that bankruptcy?

14   A    I recall I spoke at the first day hearing, yes.

15   Q    Do you recall that at the time you said you hadn't even

16   heard of Alex Jones before being approached to be the CRO?

17   A    Yes.

18   Q    That's still the truth?

19   A    That fact hasn't changed.  I still hadn't heard of him

20   before then.

21   Q    Do you recall telling the Court that you don't really

22   agree with his views and something to the effect of that you

23   put them in the same group as the people who denied the

24   landing on the moon?

25   A    I've missed the first part of it.  I don't agree with

1    his views?

2    Q    Sure.

3    A    I don't necessarily agree with his views.

4    Q    That's what I was confirming.  You don't agree with his

5    views, and I think he even said something to the effect of,

6    you know, you put him in the same category as the moon

7    landing deniers?

8    A    Correct.  I think I said that.

9    Q    And the point I'm raising here is that you told the

10   Court that you did not find Jones to be credible; is that

11   right?

12   A    I have to revisit what I said at that time.  I mean it

13   was -- I have to see what I said.

14   Q    Is it your testimony today that you do find Alex Jones

15   to be a credible person?

16   A    Credible, in certain respects, yes.

17   Q    Okay.  The respects relating to this bankruptcy; is

18   that what your testimony is?

19   A    Respect in leading to this bankruptcy?

20   Q    In respect to this bankruptcy is that your testimony?

21         MR. BATTAGLIA:  Objection, Your Honor.  It's

22   overbroad.

23         THE WITNESS:  Yeah, I'm confused by the question.

24         THE COURT:  Hold on a second.  I'm going to

25   sustain that objection.  You can ask a different one.

```
 1              MR. MOSHENBERG:  Okay.

 2    BY MR. MOSHENBERG:

 3    Q   Well, we'll explore that in a minute.  You understand,

 4    though, that in some contexts, Alex Jones does not tell the

 5    truth.  You understand that, correct?

 6    A   I believe that some people believe he does not tell the

 7    truth.  That's obvious from the from the litigation.

 8    Q   Okay.  I also want you to answer my question though.

 9    You understand that in some context, Alex Jones does not

10    tell the truth.

11              MR. BATTAGLIA:  Again, Your Honor, I'm going to

12    object.  This line of questioning is irrelevant

13    (indiscernible) be overbroad.

14              THE COURT:  What's the relevance of the questions?

15              MR. MOSHENBERG:  Your Honor, he's the CRO.  He's

16    relying on the information that the sole owner of the

17    company, Alex Jones, is providing him.

18              THE COURT:  Why don't you ask him if he's relying

19    on it?

20              MR. MOSHENBERG:  Okay.

21    BY MR. MOSHENBERG:

22    Q   Have you relied on any information Alex Jones has

23    provided to you directly or through his attorneys?

24    A   Well, I mean, yes, but it's information I've

25    corroborated.
```

1    Q    Okay.  So, you're relying on information he provided

2    you.  And what I want to know is do you understand that in

3    certain context, Alex Jones does not tell the truth?

4    A    Like all human beings, including yourself, he does not

5    always tell the truth.

6    Q    Okay.  Well, let's talk about an instance where he

7    definitely didn't.  You understand that Jones and Free

8    Speech Systems were determined by two different courts to be

9    liable for intentionally lying, for defamation.  You

10   understand that, correct?

11             MR. BATTAGLIA:  Your Honor, again, I'm going to

12   object.  The entire line of questioning is irrelevant to the

13   issues before the Court today.  This is interim cash

14   collateral hearing.

15             THE COURT:  Why don't you help me with the

16   relevance of where you're going, counsel?

17             MR. MOSHENBERG:  Your Honor, what I want to

18   understand right now in a Subchapter 5 context, Your Honor,

19   where we have the CRO and we have the information that the

20   CRO is given by people who have been already adjudicated by

21   several courts to be liars, not just in underlying causes of

22   action, but also the abuses of the legal process.

23             THE COURT:  Okay.  I just asked you what the

24   relevance is.  I know you're trying to sneak stuff in, but -

25   -

```
 1              MR. MOSHENBERG:  It's going to go to the

 2   credibility.  I'm not trying to sneak anything, Your Honor.

 3   Just to be clear, I'm just going to the credibility of the

 4   of the witness.  That's all I'm trying to get at, Your

 5   Honor.

 6              THE COURT:  The credibility of this witness?

 7              MR. MOSHENBERG:  Yes, Your Honor.

 8              THE COURT:  Okay.  I'll allow a little bit of it

 9   to some extent, but don't go too far.

10              MR. MOSHENBERG:  All right, Your Honor.

11   BY MR. MOSHENBERG:

12   Q    Of course, you're not Alex Jones, and I hope that at

13   least you'd agree with me that it's important in bankruptcy

14   to have transparency, oversight in an investigation.  You'd

15   agree with that?

16   A    I believe in bankruptcy, there should be transparency

17   for certain.  That's why we have oversight.  I mean, I've

18   got the Court, I've got a Sub 5 Trustee.  I'm going to not

19   intentionally obfuscate anything.

20   Q    Now, you've never worked for Free Speech Systems,

21   correct?

22   A    Before this engagement, no.

23   Q    Okay.  And before this engagement, you were never

24   contracted by Free Speech Systems in any way?

25   A    No.
```

1   Q     Okay.

2   A     Not that I'm aware of.

3   Q     Have you ever been contracted by Alex Jones or PQPR

4   before, at all, actually?

5   A     No.  I never knew they existed prior to the first

6   bankruptcy.

7   Q     Now, you -- I want to cover your declaration.  Exhibit

8   3.  (Indiscernible).  Now, Mr. Schwartz, can you see that?

9   A     Yes.

10  Q     Okay.  And that is your declaration, correct?

11  A     It appears to be, at least the second page -- the first

12  page of it.

13  Q     Okay.  And this is your statement under penalty of

14  perjury, correct?

15  A     Correct.

16  Q     I want to turn to Paragraph 4 for a moment.  It says

17  "Except as otherwise indicated, all facts as set forth in

18  this declaration are based upon my personal knowledge, my

19  review of relevant documents, or my opinion based on

20  experience, knowledge and information concerning the Debtor.

21  If called upon to testify, I would testify competently to

22  the facts set forth in this declaration."  Did I read that

23  correctly?

24  A     Yes, you did.

25  Q     What relevant documents did you review when you refer

1    to them in Paragraph 4?

2    A    Thousands of would-be pages if we printed them, out of

3    accounting records.  Of course, the general ledgers, the

4    prior general ledgers, financial statements drawn from those

5    general ledgers, contracts.  I don't have an inventory of

6    those items, but that's generally the types of documents I

7    looked at, would have looked at, and I'm sure there are

8    numerous others.

9    Q    Okay.

10   A    There's some various financial analyses, I remember

11   that.

12   Q    When  you say contracts, what contracts did you review?

13   A    Well, the -- I saw the notes.  I saw --

14   Q    Where those notes something that --

15   A    I think I saw other contracts.  I just don't recall

16   them.  If I can finish my answer.

17   Q    Sure.  I thought you were done.  Those contracts, the

18   promissory notes, were that -- was that just something you

19   found in the file when you started your investigation or

20   were those given to you?

21   A    They're probably given to me.

22   Q    They were given to you by the lawyers?

23   A    No, I don't think so.  I -- they were all recorded in

24   the books of account.  So, I said, okay, I need -- what are

25   these?  Let me see these.  And I believe Mr. Roe gave them

004466

1   to me.

2   Q    Do you find Mr. Roe to be a credible person?

3   A    I think.  Yes, I think it's incredible like all of us,

4   we have our weaknesses.

5   Q    What sort of steps did you take to determine that Mr.

6   Roe a credible person?

7   A    Well, I worked with him for a couple of months in

8   connection with the first bankruptcy, so I had an

9   opportunity to see him in action, work with him.  I found he

10  did not try to hide things from me.  And I did test him to

11  see if he would.  He was confident, knows accounting,

12  understood accounting, and understood the problems in the

13  financial records.  So --

14  Q    Is it fair to say beyond your interactions with him

15  over a few weeks, that you didn't do any other vetting of

16  him?

17  A    No, I don't think we did any formal vetting of him.

18  Q    Okay.

19         THE COURT:  Just a second.  Just a second.  I was

20  hearing some background noise and it looks like the line got

21  unmuted.  I'm muting the line again.  If anybody wishes to

22  be heard at some point, you'll need to hit five star.  I

23  apologize.  I just wanted to make sure that you weren't

24  interrupted with background noise.

25         MR. MOSHENBERG:  Thank you, Your Honor.  I

 1    appreciate it.

 2            Can we look at Exhibit 10, please?  Can you scroll

 3    down a little bit more?  I want to make sure Mr. Schwartz

 4    has a chance to look at it.  I'm going to ask him if he's

 5    ever looked at this document before.

 6    BY MR. MOSHENBERG:

 7    Q   So, Mr. Schwartz, when you're ready, just let me know

 8    whether you've ever reviewed it.

 9    A   I don't believe I've seen this before.

10    Q   Okay.  Do you have any reason to doubt that this is the

11    default judgment that was entered in the Connecticut

12    Plaintiffs' case in Connecticut?

13            MR. BATTAGLIA:  Objection, Your Honor, asked and

14    answered.  He said he has never seen it.

15            THE COURT:  I'll sustain.

16            MR. MOSHENBERG:  Okay.

17    BY MR. MOSHENBERG:

18    Q   My question is do you have any reason to doubt that

19    this is the default judgment?

20            MR. BATTAGLIA:  Objection, Your Honor, same

21    objection.  How can the witness answer when he said he has

22    never it before?

23            THE COURT:  Yeah.  That was sustained.

24    BY MR. MOSHENBERG:

25    Q   This is a publicly filed document granting the default

1    judgment against Alex Jones.  I'll represent that to you.

2    And what I want to look at is Page 7 --

3         MR. BATTAGLIA:  Your Honor, I'm going to object to

4    him asking questions about a document that's not in

5    evidence.  It's (indiscernible) --

6         MR. MOSHENBERG:  It's a public document, Your

7    Honor.  It's the same standard as --

8         MR. BATTAGLIA:  There's no indicia of reliability

9    here.  It's a certified document and I've never seen it

10   either.

11        THE COURT:  Why don't you -- I don't -- you're

12   asking the question to a witness about a document that's not

13   been admitted into evidence.  Maybe you should move for it

14   to be admitted.

15        MR. MOSHENBERG:  Sure.  Your Honor, I would like

16   to move to admit Exhibit 10 into evidence.

17        MR. BATTAGLIA:  Objection.  No foundation.

18        THE COURT:  What's your response, counsel?

19        MR. MOSHENBERG:  Well, it's part of a publicly

20   filed document in Connecticut, Your Honor, if you go to the

21   top page.  It is a court default judgment in the Connecticut

22   Plaintiffs' case.

23        MR. BATTAGLIA:  It's not a certified copy.  There

24   is no representation that this is valid.  I've never seen it

25   before.  I have no idea what's --

```
 1               MR. MOSHENBERG:  And it's also your --

 2               MR. BATTAGLIA:  Excuse me, counsel.

 3               THE COURT:  You got let him finish the objection

 4     and then you can answer.  Go ahead.

 5               MR. BATTAGLIA:  There's no indicia here that this

 6     in accurate document.  Where it is or not, I have no idea.

 7     no idea.  I've never seen it before, neither has the

 8     witness.

 9               MR. MOSHENBERG:  Your Honor, I'm offering it for

10     impeachment purposes only.   I don't even need to prove it

11     for the truth of the matter asserted.

12               THE COURT:  What is the purpose for the

13     impeachment that you're seeking?  On what point are you

14     seeking to impeach the witness?

15               MR. MOSHENBERG:  The court in the Connecticut case

16     determined that Mr. Roe was not credible, actually did not

17     consider his evidence because he did not find the witness to

18     be credible and that the witness had sanitized records.

19               THE COURT:  Well, what does it have to do with Mr.

20     Schwartz?

21               MR. MOSHENBERG:  He relied on him as part of this

22     bankruptcy.

23               THE COURT:  What is the impeached -- what is the,

24     what is the statement that he made that you're impeaching

25     him on?
```

```
1              MR. MOSHENBERG:  Well, excuse me.  What I mean is
2    it's going to his credibility, that he's relying on as the
3    CRO information done by Mr. Roe, who has been adjudicated by
4    a judge in Connecticut as not providing reliable
5    information.
6              THE COURT:  I'm going to sustain the objection.
7    You can come up with something that will -- maybe you can
8    come up with something, but that he hasn't said anything
9    within the scope of his direct that would warrant an
10   impeachment on that point.  And maybe this is a certified
11   copy, maybe it's not.  Maybe you can come up with something.
12   But I'm also struggling to see the relevance of this in
13   connection with a critical vendor motion and a cash
14   collateral motion.  But maybe you can get me there as well.
15             MR. MOSHENBERG:  All right, Your Honor.  Well, I'm
16   going to focus for a moment on ways to get this in before
17   you in a reliable way.
18             THE COURT:  Okay.
19             MR. MOSHENBERG:  I'm going to move on in the
20   meantime, Your Honor.  And I'll tie that to that.
21             THE COURT:  I'm sure Mr. Brimmage is already
22   thinking of stuff.  But go ahead.
23   BY MR. MOSHENBERG:
24   Q    So I have here accounting records, prior ledgers,
25   financial statements, contracts, inventory, financial
```

```
 1   analyses.  Is there anything else that you relied on in your
 2   work so far that you reviewed?
 3   A    I'm certain there are.
 4   Q    Okay.  Does anything else come to mind?
 5   A    Purchase orders, sales orders, invoices.
 6   Q    Is that all?
 7   A    Give me a chance to think.  I mean you're asking me off
 8   the top of my head.
 9   Q    Sure.  Did you read any depositions?
10   A    No, not off -- I don't think so.
11   Q    Okay.  All right.  So, aside from the documents you
12   reviewed, what else did you do to make yourself comfortable
13   with the information that you're relying on, and that Free
14   Speech provided you?
15   A    Well, I talked to people, asked them -- pertinent
16   people who had knowledge of those areas.
17   Q    Okay.  Which individuals did you talk to?
18   A    Blake Roddy is one, Bob Roe is another one.  Alex Jones
19   is another one.  David Jones.  Anthony (indiscernible).   I
20   visited some with Melinda Flores.  A gentleman named
21   Zimmerman.
22   Q    Say that again, please.
23   A    A gentleman named Zimmerman.  A gentleman last name
24   Elmo, I don't remember his first name.  I believe it's Elmo.
25   Of course, I talked to counsel.  They were reviewing
```

1    documents as well.  Patrick -- oh, and you asked me in

2    connection with the declaration, Patrick Riley.  Those are

3    the names I can recall.

4    Q    Okay.  Let's go to Paragraph 11.  And I'm back at

5    Exhibit 3 right now.  This is your declaration we covered

6    earlier.

7            THE COURT:  Just to be clear, this is the

8    declaration that was filed in this case?

9            MR. MOSHENBERG:  Yes, Your Honor.

10            THE COURT:  Okay, thank you.

11   BY MR. MOSHENBERG:

12   Q    Okay.  I want to look at Paragraph 11 please.  It says

13   that Alex Jones, it says born in 1974, Alex Jones or Jones,

14   is the son of Carol Jones, a homemaker, David Jones, a

15   prominent dentist.  Jones moved from Dallas to Austin as a

16   teenager.  Did I read that correctly?

17   A    Yes.

18   Q    That is not based on your personal knowledge; is it?

19   A    No.

20   Q    Okay.  But you testified, you swore in this declaration

21   that that was based on -- that fact is based on your

22   personal knowledge, but you don't know that.

23   A    I said my, my declaration said it was based on

24   documents I reviewed.  I put up the three categories we

25   already talked about.  This was I saw, I read an article

1   that mentioned, I believe, it was an article that stated

2   this.

3   Q    And you just took that to be true?  You read an article

4   and you determined that it was true?

5   A    It was one of the documents I reviewed.  I mean, take

6   any one of the documents, you can say did I take it as true?

7   No, I took a look.  You know, it's a piece of information

8   that may or may not be true.  It appears to be true.  But I

9   said I saw in a couple of places and the press reported it,

10  so, my God, it must be right.

11  Q    So, let me understand this.  You didn't know if

12  something was true.  You saw it.  You thought it was true

13  and that was enough for you to swear it was true in this

14  Court --

15  A    No, I consulted with my attorneys as well, or the

16  attorneys on this case as well.  You know, it's if we go

17  through this, we got to, you know, are we certain this is

18  all right.

19  Q    And so you had no idea.  You just relied on other

20  people, and you swore to that being true?

21  A    Everything I've done in this is based on information

22  provided by others.  I didn't create any of the data I

23  looked at, any of the documents I looked at, or anything.

24  Some, you know, they could all have been fabricated and that

25  -- but I don't believe they were.  So, it's based, all based

1    on someone giving me something.  And I, to some -- some

2    vetted more than others.  And I asked, this is one that I

3    remember talking to counsel about this one.  Are we sure

4    this, we know this, are we comfortable with our references

5    on this?  I saw the article.  Are we comfortable using it?

6    Q    But you don't know if it's true and you swore that it's

7    true to this Court?

8            MR. BATTAGLIA:  Objection, Your Honor.  Asked and

9    answered.  Frankly, it's badgering at this point.

10           THE COURT:  Well, no, see I think -- I think, I

11   think you get to explore a little bit.  Can we go up a

12   little bit.  I'm going to overrule the objection.  Kind of

13   scroll up to the very beginning.  Paragraphs 1 or 2.  Okay.

14           So, tell me where in this declaration it says that

15   the statements that you made are based on conversations with

16   other people?  It says, based on personal knowledge, your

17   review of relevant documents, or your opinion based upon

18   experience, knowledge, and information concerning the

19   Debtor.  And then you --

20           THE WITNESS:  I don't -- it doesn't say based on

21   conversations, but it should be because I talked to a lot of

22   people as I said.

23           THE COURT:  Okay.  You can ask your question.  I'm

24   going to overrule the objection.

25   BY MR. MOSHENBERG:

1    Q    So, you didn't know whether it was true, but you swore

2    that this was true, what Paragraph 11 says.  That's what I

3    wanted to confirm with you today.

4    A    Well, based on my -- it's based on my information,

5    knowledgeable, and belief at the time.  And it may not be

6    true.  Maybe he wasn't born in '74.  That --

7    Q    Not, you could know --

8         THE COURT:  I just want you to let him finish the

9    answer and then --

10        MR. MOSHENBERG:  Yes, Your Honor, I apologize.

11   BY MR. MOSHENBERG:

12   A    Based on the information I had and based on my vetting

13   of that information, I took that piece of information as

14   true.  It is important?  I don't know.

15   Q    I'm fine with you following up, but I do want to answer

16   to my question, which is you didn't know whether this was

17   true, but you swore that it was true.  And I just wanted to

18   confirm that today.  You didn't know if this was true, but

19   you swore to it.

20   A    Well, I believed it was true.  But the knowledge like

21   you knowing about 64 million, you didn't know that was true.

22   But you said it.  It's the same thing.  I didn't, you know,

23   I believed this was true.  I said it.  I believe it's still

24   true.

25   Q    But you don't know whether it's true.

1   A    I did not see him get born.

2   Q    Okay.  Let's look at Paragraph 12.  Take a moment and

3   review it.

4   A    Okay.

5   Q    Is it fair to say that you don't have any personal

6   knowledge of whether he was -- about Austin, about in the

7   early 1990s, Austin was a dirt-cheap home to artists,

8   musicians, and sign makers.  And according to Shannon Burke,

9   who's a local talk show radio host said all this

10  information.  Do you know any of these things to be

11  personally true?  Did you have personal knowledge of this?

12  A    No, you -- the -- this was cited.  I actually cited the

13  source for that.

14  Q    Okay.  And you actually reviewed that source.  Is that

15  your sworn testimony?

16  A    I looked at that.  I read it.  Yes.

17           THE COURT:  You read the Buzzfeed article?

18           THE WITNESS:  Yes, I did.  I remember this one,

19  reading it.

20           THE COURT:  Okay.

21  BY MR. MOSHENBERG:

22  Q    Okay.  How about Paragraph 13 then.  Take a moment and

23  read that.

24  A    That's also in the Buzzfeed article.

25  Q    Okay.  So, you don't actually know whether that's true.

1    You're just relying on the Buzzfeed article, correct?

2    A    Yes.

3    Q    Okay.  And are you saying you don't know whether this

4    is true in this, anywhere in here?  Do you ever make that

5    qualification?  You acknowledge Buzzfeed, but you represent

6    this as being a true statement.  You're swearing that this

7    is a true statement, sir, based on something you read on

8    Buzzfeed.

9    A    Well, I'm citing Buzzfeed to say this is where I got

10   the information from.

11   Q    Where does it say that?  It says Buzzfeed.  Where does

12   it -- where is that qualification here?

13   A    When I footnoted it -- when we footnoted it with the

14   citation, that tells you the source of it.  And that I can -

15   - you know, I'm relying on Buzzfeed and their reporting, but

16   it doesn't say that I've done anything to verify that

17   Buzzfeed did the job they were supposed to do.

18   Q    Right.  And you swore that this statement is true

19   though.  You acknowledge Buzzfeed, but you don't say I don't

20   know if this is true or not, but this is what Buzzfeed says.

21   You swore in a declaration to its truth.

22   A    That's the truth, that's a true quote from Buzzfeed.

23   Q    That's not what you wrote.  You didn't say according to

24   Buzzfeed, they said this, and I don't know if it's true.

25   You represented this as true.

1   A    I represented this came from Buzzfeed.

2   Q    You don't know if it's true?

3   A    No.

4        MR. BATTAGLIA:  Your Honor, we're just being

5   argumentative.

6        THE COURT:  I think, I think we just got the

7   answer.  I think he just said no.  And I think you're going

8   to ask another question.

9   BY MR. MOSHENBERG:

10  Q    Okay.  I'll speed this along.  Why don't we look, why

11  don't you take a moment and look at Paragraphs 14, 15.  Is

12  it the same issue?  You don't know whether it's true, you're

13  just relying on other sources?

14  A    Yes.  Those are both relying on other sources.

15  Q    Right, because you don't know whether those statements

16  are true, whether those allegations, those factual

17  statements are actually true.  You don't know?

18  A    No.

19  Q    How about Alex Jones was a natural, Number 16?  How did

20  you know that he was a natural in all of this?  Or is it you

21  didn't know?

22  A    That's a quote.  That's not something --

23  Q    I don't see a quotation mark.

24  A    I agree with you.  It's not, and it's cited directly,

25  but that should have been cited.

```
 1    Q    That's something that you're swearing as being true in

 2    your declaration.

 3    A    Well, based on the evidence I've seen, which is the

 4    operating results, at least from 1907 -- 2007 forward, he's

 5    obviously, extremely successful at this.

 6    Q    But you saw some documents and you decided based on

 7    those some documents that was so true that you swore to it

 8    being true in a declaration to this Court?

 9    A    That Alex Jones is a natural, I don't, I don't think I

10    have a problem with that at all based on what I saw from

11    2007 forward.

12    Q    Right.

13    A    But the evidence I'm used to saying, which is numbers.

14    Q    I thought you said you hadn't heard of him until this

15    engagement.  How did you know he was a natural?

16    A    I just told you; I look at his numbers from 2007

17    forward as well.

18    Q    Okay.

19              THE COURT:  What do you mean by looking at his

20    numbers?  What --

21              THE WITNESS:  Financial results.

22              THE COURT:  From FSS?

23              THE WITNESS:  Yeah, FSS, I think started business

24    in 2007.

25              THE COURT:  I just wanted to clarify what you
```

1    meant by his financial numbers.  Not -- you mean --

2              THE WITNESS:  FSS's financials.

3              THE COURT:  Okay, thank you.

4    BY MR. MOSHENBERG:

5    Q    I mean, we can speed this along.  Why don't we look at

6    17, 18, 19, those three paragraphs.  Take a moment and

7    review them.  I'll ask my questions when you're ready.

8    A    Okay.

9    Q    Same problem, you're swearing these things are true and

10   you don't know whether they are.  You just looked at some

11   sources and you swore that those things were true?

12   A    I swear, yeah, these are cites from those sources.

13   Q    Right, but you don't at all say this is what these

14   sources reported, but I don't know whether they're true.

15   You swore to them being true.

16   A    Well, I swear that these are proper cites from these

17   sources.

18   Q    Where does it say that?

19   A    Well, because it's based on the information I had,

20   these sources said this.  This si -- I'm telling you this is

21   what these sources said.

22   Q    That that big qualification you just gave, where's that

23   in your declaration?

24   A    I don't think you'll see that that specific wording in

25   the declaration.

1    Q    Right, because in your declaration, you say the

2    following, I swear under penalty of perjury is true based on

3    my personal knowledge.  And you don't know whether these

4    things are true.  You just looked at some sources and swore

5    they were true.

6    A    Well, it's -- my declaration says my personal knowledge

7    is based on the documentation I reviewed as well as the

8    other two factors like we've already covered in Paragraph 3,

9    I think.  It's based on that.  See, none of the documents

10   that I reviewed did I create everywhere.  So, you can say

11   the whole thing is not based on my knowledge.

12   Q    I agree.  And I want be very clear that my point is I

13   understand you review things, but lots of people can review

14   stuff and then not decide whether it's true or not.  You

15   reviewed those things and you decided to swear to this Court

16   without knowing whether it actually was that it's true

17   without any of your own personal knowledge.

18   A    I mean, obviously, I do what I do.  I look at other

19   stuff and I interpret it.  In this case this is material,

20   it's -- you know, that people -- other people wrote.  I

21   didn't say it's my source.  I cited to the sources they came

22   from.  But I -- yeah, everything I do is based on

23   information that has existed even before I heard the name

24   Alex Jones.

25   Q    Are you done with your answer, sir?

1    A    Yes.

2    Q    Let's look at the first sentence of Paragraph 19.

3    "When Jones started broadcasting on the radio in the late

4    1990s, he closely followed the talk radio playbook.  He

5    built a large, devoted audience of far-right conspiracy

6    believers."  Did I read that correctly?

7    A    Yes.

8    Q    There's no cite there.  Do you agree with that?

9    A    I think that all this paragraph is in SPLC, where it

10   came from.  Excuse me, there's a -- it came out of

11   Intelligencer, is what it says.

12   Q    Where does it say that?

13   A    On the last -- second to the last line.  Right.  I see

14   that sentence has the Intelligencer cited.  I'm talking

15   about the first sentence.  You represented that was true.

16   There's no cite there.  There's no qualification at all.

17   You just said it.

18   A    I think all of that, all of that came from the

19   Intelligencer.  The only thing that didn't was the last

20   sentence about the hundred stations, which came from SPLC.

21   Q    There's no cite there.  You agree with that?

22   A    I don't agree with that at all.

23         THE COURT:  That one has been asked and answered.

24   BY MR. MOSHENBERG:

25   Q    Okay.  All right.  Well, let's go to the next

1   paragraph.  Take a moment and look at that please.  Again,

2   you didn't have any personal knowledge of anything in there,

3   correct?  And take your time reading it.

4   A    Correct.  As I said, none of this is personal, well

5   except for my analysis of numbers, which I don't have

6   personal knowledge of.  But this, excuse me, could you put

7   that paragraph back?

8   Q    Number 20, thank you.

9        THE COURT:  Number 20.

10  BY MR. MOSHENBERG:

11  A    I believe that I did talk about this with Dr. Jones.

12  Q    Okay.  But you didn't know personally whether it was

13  true or not.  You just relied on Dr. Jones.  You didn't know

14  if it was true.

15  A    Right, I don't have personal knowledge of anything.

16  Q    But you swore to it being a fact.

17       MR. BATTAGLIA:  Your Honor, I'm going to object.

18  Counsel keeps saying that he says personal knowledge based

19  on documents, experience, knowledge, and information.

20       THE COURT:  I think the testimony is, is that he's

21  citing to documents, but those documents didn't really form

22  his personal knowledge.  It's just citing stuff.  I think

23  that's what this -- these paragraphs are showing.  Unless

24  Mr. Schwartz wants to tell me that he developed personal

25  knowledge based on -- personal knowledge, I should say,

1    based on news articles and the deposition reference.  It

2    sounds like you're just, in this citing --

3             MR. MOSHENBERG:  It's not a brief, Your Honor.

4    It's a declaration.

5             THE COURT:  No, no, no.  I'm just going -- I think

6    at the core of what you're doing is just citing articles to

7    try to provide background information.  Do I understand that

8    correctly?

9             THE WITNESS:  Yes.  That's correct, Your Honor.

10            THE COURT:  Okay.  I'm just going to caution you.

11   The way your declaration is drafted, and I will be honest

12   with you, it does say you developed personal knowledge based

13   on this.  And as I read this, I knew this line of

14   questioning was coming.  So, that's why I'm allowing it.

15            THE WITNESS:  I apologize, Your Honor.

16            THE COURT:  I'm sure next time you'll cut all this

17   out and get right to the stuff you know.  But today, they

18   get to ask questions about it, and we'll figure out what you

19   know.

20   BY MR. MOSHENBERG:

21   Q   It is fair to say --

22            MR. MOSHENBERG:  Thank you, Your Honor.  I didn't

23   mean to cut you off.

24            THE COURT:  No, no, no.  I didn't mean to

25   interrupt your examination.

1    BY MR. MOSHENBERG:

2    Q    Is it fair to say sort of based on this exchange --

3    because earlier I asked if you read any depositions and you

4    hadn't, correct?

5    A    Yes.  I don't recall.  I may have -- I don't recall

6    reading any depositions.  I don't even recall, like, reading

7    it -- I may have read an excerpt of this deposition, but I

8    don't recall it.

9    Q    Yeah.  Well, you agree in Paragraph 20 you cite to a

10   deposition that you haven't read?

11   A    Correct.

12   Q    And it's the same problem, right, on 21, 22, 24, you're

13   citing to this deposition, and you hadn't read it.

14   A    That is correct.

15   Q    And you swore -- based on a deposition you never read;

16   you swore these things were true based on your personal

17   knowledge?

18   A    Correct.

19   Q    Let's take a break from your declaration, sir.  Why

20   don't we go --

21        MR. MOSHENBERG:  Can you pull up Exhibit 1,

22   please?  I think Jarrod quit the case because I asked him to

23   pull up exhibits for me.

24        MR. BRIMMAGE:  We are going to have to take a

25   quick break, Your Honor.  I'm sorry.  I have a Mac.

1          THE COURT:  No, no worries.  But I think I

2    probably need to make you a presenter.

3          MR. BRIMMAGE:  Well, I'm on Jarrod's machine.

4          THE COURT:  Oh.  Do you want to take a break?

5          MR. MOSHENBERG:  I think it'll just be one moment,

6    Your Honor.  We're looking at exhibit one please.

7          MR. BRIMMAGE:  (Indiscernible).  And I did want

8    (indiscernible) the issue.  Thanks, Your Honor.

9          MR. MOSHENBERG:  We're looking at Exhibit 1,

10   please.

11         THE COURT:  What's the exhibit you're going to?

12         MR. MOSHENBERG:  Number 1, Your Honor.

13         THE COURT:  Number 1.

14         MR. MOSHENBERG:  Yes, Your Honor.

15         THE COURT:  Mr. Martin, I believe you're still the

16   presenter.  If anything has changed, if you need me to do

17   anything, you let me know.  I don't see you.  That's what --

18   oh, there you are.  You're still the presenter.

19   BY MR. MOSHENBERG:

20   Q    Can you see the document, sir?

21   A    Are you talking about the petition?  Yes, sir.

22   Q    Yes.

23   A    Yes, sir.

24   Q    I almost called you Your Honor.  Now, the -- you've

25   seen this document before, correct?

```
 1    A     Yes.

 2    Q     Okay.  I want to look on this first page.  And Part IV,

 3    it says Debtor's address.  It says principal place of

 4    business.  Do you see that?

 5    A     Yes.

 6    Q     Okay.  It looks like it's in Austin, Texas.

 7    A     Yes, sir.

 8    Q     Okay.  And I think I remember looking in your

 9    declaration too, but it is your understanding that they are

10    based in Austin, correct?

11    A     They being FSS?  Yes.

12    Q     Right.  They've got an office building there.  And I

13    think also a warehouse you mentioned.

14    A     Yes.

15    Q     Okay.  All right.  Let's go to Page 3, please, Section

16    XI.  Do you see Section XI, check all that apply?  Why is

17    this case fall to this District?

18    A     Yes.

19    Q     And can you read the box that's checked please?

20    A     There it said, its domicile place, principal place of

21    business or principal assets in this district for 180 days

22    immediately preceding the date of this petition or for a

23    longer part of such 180 days than in any other district.

24    Q     Okay.  That statement is not correct; is it?

25    A     I believe it --
```

1          MR. BATTAGLIA:  Objection, Your Honor.  I believe

2     that calls for a legal conclusion of what the definition of

3     domicile is.

4          THE COURT:  Yeah, I'm going to sustain that

5     objection.

6     BY MR. MOSHENBERG:

7     Q    What activities are occurring in Houston on behalf of

8     Free Speech Systems?

9     A    In Houston, I don't know.

10    Q    What about in the Southern District?

11    A    Southern District --

12    Q    Yes.

13    A    Well, its business activities are occurring in the

14    state of Texas, and I understand that's the domicile.

15    Q    My understanding is it's all happening in the Austin

16    area, correct?

17    A    Well, I mean all the physical activity is in the Austin

18    area.

19    Q    Right.

20    A    But they sell all over the country.

21    Q    Right.  But you're not aware of anything in particular

22    happening in the Houston area, correct?

23    A    No.

24    Q    Galveston, Victoria, nothing there?

25    A    No.

1    Q    Okay.  So, what was the basis for you checking that

2    box?

3    A    My understanding from counsel is that there's case law

4    out there that a quick Texas entity is domiciled in the

5    state of Texas, and you can pick any district.

6    Q    Okay.  And this is -- of course, if we go to the next

7    page, Page 4, you're swearing under the penalty of perjury

8    that what's in here is correct, correct?

9    A    Correct.

10   Q    So, is it fair to put this in the same bucket of things

11   that you swore as being true even though you didn't really

12   know if it was true or not?

13   A    Well, I'm not a lawyer, so I don't consider my reading

14   of the case law definitive.  But based on the case law I

15   read; this is correct.

16   Q    That their domicile is in this district?

17   A    Yes.

18   Q    Okay.  Even though you're aware of no activities

19   happening in this area?

20             MR. BATTAGLIA:  Objection, Your Honor, asked and

21   answered.

22             THE COURT:  I'm going to sustain that.

23   BY MR. MOSHENBERG:

24   Q    Actually, let's go to Page 13 of that document.  Were

25   you the one that prepared this balance sheet?

Page 133

```
 1    A    I'm sorry.  What are you referring to?

 2    Q    I'm looking on Page 13 of 17.  Excuse me, balance

 3    sheet.

 4    A    If you look at Page 13 of 17, at the very top, it says

 5    "Comparative Profit and Loss Statement."

 6    Q    I think that's 12.  Oh, it's the exhibit.  Can you go

 7    to the next page, please?  I'm looking at the balance sheet.

 8    Were you the one that prepared this?

 9    A    No, I think I had one of my staff prepare this.

10    Q    And it's no secret I want to talk to you about the

11    numbers across the bottom.

12    A    Okay.

13    Q    The reports in 2021, 61 million, almost $62 million in

14    member draws; isn't that right?

15    A    Let me clarify your statement for you.  It reports that

16    as of 12/31/21, member draws totaled $61,937,000 -- 938,000.

17    Q    Your testimony is that there were no $61 million in

18    draws in 2021?

19    A    Draws, the total of all draws was $61 million at

20    12/31/21.  That number is correct.

21    Q    And your testimony here is when it says as of

22    12/31/2021, that means as of the date the company was

23    formed?  As of and then to 12/31/2021?

24               MR. BATTAGLIA:  Your Honor, I'm going to object to

25    the form of the question.  I'm not quite sure I understood
```

1    it.

2              THE WITNESS:  I didn't understand it.

3              THE COURT:  Well, that makes three of us.

4    BY MR. MOSHENBERG:

5    Q    Okay.  My point is where on this document does it say

6    the beginning date?

7    A    It doesn't.

8    Q    Right.  So, there's no -- nothing, here that represents

9    what you're saying that years earlier there was a $61

10   million in draws.

11   A    What represents that is that member draws was

12   61,937,000 as of 12/31/2021.  That's what that number

13   represents.  That is -- that's a balance sheet.  It's a

14   basic accounting.

15   Q    And you're relying on the financials that were provided

16   to your assistant in order to report that?

17   A    No.

18   Q    What were you relying on relying on?

19   A    We were relying on the general ledgers that were the --

20   QuickBooks system, which is the accounting system.  If you

21   allow me to explain the answer.

22   Q    I'd like to know what you were relying on.

23   A    Okay.  I'm relying on the general ledgers.

24   Q    Okay.  And didn't you say in your beginning testimony

25   earlier today that the financials were all messed up?

1    A    I said that 12/31/21 had not been closed when we were

2    engaged and 12/31/22 had not been posted.

3    Q    Okay.  You said more than that though.  I think you're

4    saying that the financials were a mess, right?

5              MR. BATTAGLIA:  Your Honor, I object to the

6    characterizing the witness's testimony.  He said what he

7    said.

8              THE COURT:  All right.  Well, Mr. Schwartz, do you

9    recall saying that the statements were -- financial

10   statements were a mess?

11             MR. SCHWARTZ:  I said 12/21 and 12/22 were a mess.

12   We didn't do anything to -- have to do anything to 12/20 and

13   prior.

14   BY MR. MOSHENBERG:

15   Q    Well, you said -- all right.

16             THE COURT:  Go ahead.

17   BY MR. MOSHENBERG:

18   A    You said --

19   Q    You said that the people that kept the books beforehand

20   didn't even have accounting degrees, right?

21   A    The people who were -- no.  The people who kept the

22   books when I came on board had no accounting degrees.

23   Q    Mm hmm.

24   A    My predecessor -- I do not know when she was terminated

25   but I've had several people tell me that she was an

1    excellent accountant.

2    Q    And it's based on that solely that you determined that

3    those numbers are right, the $62 million in draws.

4    A    No.  I -- okay.  This is what the financial statements

5    reflect.  I did not have to do, and I have not gone back --

6    and for any reason -- I had no reason to go back and audit

7    2020 and prior.  But I had to get 2021 and 2022 up to date

8    and current and posted.  As of 12/31/21, I will clarify for

9    the Court, from 2007 when this company was formed to

10   12/31/21, net draw was -- by Mr. Jones -- was -- to Mr.

11   Jones -- for $62 million, rounded.  From the period of -- if

12   I did that right -- what is that, 14 years, 15 years -- 14

13   years.

14   Q    Okay.  And since the lawsuits were filed, the

15   defamation cases by the Sandy Hook families, how much money

16   in draws did Alex Jones take?

17   A    My -- probably about --

18              THE COURT:  Why don't we put a date on it?  Why

19   don't we just put a date on it just so we're -- we have a

20   clean record --

21              MR. MOSHENBERG:  It was in 2018, Your Honor.

22              THE COURT:  -- because there were multiple

23   lawsuits and I just want to make sure that we're all clear.

24   So, your question if from the beginning, since 2018?

25              MR. MOSHENBERG:  Sure.  Yes, Your Honor.

1    Actually, since April of 2018.

2              THE COURT:  Okay.

3              THE WITNESS:  I can't answer since April of 2018.

4    I've not just gone -- I've got the information.  It's

5    available to me.  I haven't gone back and looked at that.

6    I'm --

7              THE COURT:  Do you know what the draws would have

8    been over the last three years?  Why don't we say it that --

9              THE WITNESS:  For the last -- well, okay.  In 20 -

10   -

11             THE COURT:  I think you can say what the -- yeah.

12   Just (indiscernible) --

13             THE WITNESS:  Did you -- okay.  2022, it was

14   $254,000 through May.  2021, I think it was $2 million.

15   2020, 2019, probably 7 million, maybe.  And this --

16             THE COURT:  Total or each year?

17             THE WITNESS:  Each year, and these are total

18   draws.  The taxes on the income of FSS are also accounted

19   for as draws when they're taken out and paid.  So, for

20   example, the $64 million, we know $30 million of that I

21   think -- what was it -- over the last -- since 2012, was

22   paid to the IRS.

23   BY MR. MOSHENBERG:

24   Q    $30 million?  How much income do you need to have pay

25   $30 million to the IRS?

1    A     You can -- well, divide that by  point four, and that's

2    the taxable income.

3    Q     That was Alex Jones' tax income?

4    A     Well, FFS is a -- this -- disregarded, thank you --

5    entity and so --

6              THE COURT:  Hold on.  So, Mr. Battaglia, I --

7    yeah.

8              THE WITNESS:  I apologize.  I'm at that age where

9    it takes time -- it takes a few minutes to --

10             THE COURT:  No.  Well, I don't --

11             THE WITNESS:  -- pull things out.  A disregarded

12   entity, so all of the income and expenses of FSS appear on

13   Mr. Jones' personal tax return and he has to pay the tax.

14   So, when there's taxable income, FSS has to -- FSS pays the

15   money to the IRS.  It doesn't flow through Mr. Jones'

16   personal accounts.

17   BY MR. MOSHENBERG:

18   Q     Okay.  Are you -- have you seen any sort of document --

19   did you know, I should say, that there was document produced

20   in the Sandy Hook litigation in Texas -- in the Fontaine

21   litigation -- by Free Speech Systems' corporate

22   representative, showing draws between 2018 and 2021 of $18

23   million?  Did you know that?

24   A     No, I'd have to see that.

25   Q     Okay.  Based on your numbers, does that sound right?

Page 139

```
1    Between 2018 and 2021, $18 million in draws were taken out
2    of the company.
3    A    I mean, I'd have to look at the -- look at it.  I don't
4    think that ties.  We're looking -- we were looking at total
5    draws -- 60-something million and -- I do know this, that of
6    the total draws, less than half occurred after 2018.  There
7    was actually more in draws before 2018.
8    Q    Okay.  So --
9    A    But I'd have to look -- the details of the numbers, I
10   don't have them with me.
11   Q    Okay.  So, when we're talking about 2018 to present, 30
12   million-ish, that's what you were talking about?
13   A    In total draws?
14   Q    Yeah.
15   A    I don't think it's -- that's not -- I mean, we have the
16   exact number.  I don't want to give you a number that's
17   going to be -- you know, you deserve the right number not
18   that one, not something off the top of my head.
19   Q    Those are considerable draws though, you agree?
20   A    It would be to me.
21   Q    Yeah.  And you don't know what Free Speech System
22   received in return for those draws, correct?
23   A    By, you don't -- draws are the equivalent of dividends
24   in a C corp.
25   Q    Right.
```

1    A    Or an S corp.  So, you don't get anything in return for

2    paying -- giving return of the -- of capital or your return

3    of income to your investors.  That's what they're entitled

4    to from -- for investing in you in the first place.

5    Q    Right.  They don't receive any sort of value in return

6    for giving this draw out.

7    A    Same way you don't get -- you know, the question is, do

8    you get any in -- value in return for paying the interest on

9    the debt.

10   Q    You don't.

11   A    Or you -- you know, you receive the debt, you receive

12   the equity.

13   Q    But at the time the draw was made, there was no value

14   given to Free Speech Systems?  Like you were saying, it's

15   like a dividend.  There was no benefit to --

16   A    It's like a dividend.  It's a return of -- it's, you

17   know -- what Free Speech System got was the initial

18   investment and then the buildup of equity over time to use

19   it to invest in the business as long-term capital.

20   Q    That's not what they got when they made a draw.  When

21   they made a draw, they got nothing.  They just lost money.

22           MR. BATTAGLIA:  Objection.  Again, counsel --

23   (indiscernible) asked and answered.

24           THE COURT:  Yeah.  I -- on that one, I'm tending

25   to agree, so I'm going to sustain that objection.

1   BY MR. MOSHENBERG:

2   Q   If Alex Jones hadn't taken $62 million out of the

3   company in that time period or $30 million or $18 million

4   since 2018, he hadn't taken money out of the company, there

5   wouldn't have been a bankruptcy, correct?

6          MR. BATTAGLIA:  Objection, Your Honor.  Calls for

7   speculation.

8          THE COURT:  Sustained.

9   BY MR. MOSHENBERG:

10  Q   In your opinion, would it have needed to file

11  bankruptcy if that money had still been in there?

12         MR. BATTAGLIA:  Objection.  Calls for speculation.

13         THE COURT:  I did analyze the case and authorized

14  the filing.  You can answer that.

15  BY MR. MOSHENBERG:

16  A   If $30 million had been in the company, depending on

17  the nature of the asset it was invested in, it might or

18  might not have been bankrupt.  If it was sitting there in

19  the bank account, then no, we wouldn't be in bankruptcy.  If

20  he hadn't paid the IRS, we wouldn't -- well, we would have

21  been shut down, so --

22  Q   All right.  You've got a background in investigating

23  fraud is my understanding, correct?

24  A   I have done some of that.

25  Q   Are you familiar with what fraudulent transfers are?

1    A    I have some understanding of that.

2    Q    Okay.  You understand that Alex Jones and Free Speech

3    Systems have been accused of making fraudulent transfers to

4    insiders?

5    A    I have heard that.  I have not read the complaint.

6    Q    Okay.  You're not familiar with what the actual lawsuit

7    alleges?

8    A    I'm -- well, I understand it alleges a fraudulent

9    transfer.  A fraudulent transfer is -- that's about the

10   extent of my knowledge.

11   Q    Okay.  You don't know any of the details supporting

12   those allegations?

13   A    Not at this time I don't.

14   Q    Okay.  You understand that Free Speech Systems and

15   Jones were in fact sued for making -- let me skip that

16   question.  Have you investigated at all whether any of the

17   draws were in fact fraudulent transfers?

18   A    No.

19   Q    I want to go back to Exhibit 3, Paragraph 35.  Can you

20   read that statement out loud, please?

21   A    "The CRO's continuing to evaluate where the estate has

22   causes of action to claw back any payments or distributions

23   to Alex Jones."

24   Q    Is it fair to say that at the time this was written

25   that you hadn't evaluated it yet from your prior answer?

1    A    Correct.  We had not.

2    Q    Okay.  So, this isn't true that you're continuing to

3    evaluate?

4    A    No, we're -- I mean, we continue to be aware of the

5    possibility and if we see any evidence of it -- we have not

6    done any conservative investigation of that.

7    Q    Okay.  The statement should say --

8            THE COURT:  Let me get you where you're going.

9    The question is, are you continuing to evaluate.  Is that

10   statement accurate?

11           THE WITNESS:  Yes.  I have not made a decision

12   either way.  Are there actionable distributions or are there

13   not?  We just have not, you know, we're aware of it's -- of

14   the situation.  It's common in any company bankruptcy and if

15   we see something, we will note it and keep track of it so

16   that at least once we get started on that phase of the

17   engagement, we'll have that knowledge already.

18           MR. MOSHENBERG:  Object as nonresponsive, Your

19   Honor.

20           THE COURT:  Sustained.

21   BY MR. MOSHENBERG:

22   Q    Your testimony is you hadn't even started

23   investigating.  That's what you just me.  You hadn't started

24   yet.  So, you're not continuing, you haven't started.

25   A    Well, I don't read this this way and you're always

1   evaluating.  It's just part of the job.  Now, I have not

2   started the actual -- okay, now let's start the formal

3   investigation and start putting together the evidence and

4   focus on that.  That is not just where our focus is right

5   now.

6   Q    Okay.  So, you haven't started, correct?

7   A    Yeah.  So, like I said, our focus -- we have not

8   directed our focus there as of yet.

9   Q    You -- are the draws -- the significant draws that Alex

10  Jones has taken out of the company, do you think those

11  warrant an investigation as to whether those fraudulent

12  transfers?

13  A    I don't think whether I think they're warranted or not,

14  I think I'm obligated to look at that.

15  Q    Okay.  But from what you know right now, do you know --

16  do you think it's warranted to investigate whether those are

17  fraudulent transfers?

18  A    I don't care whether it's warranted or not.  I have to

19  look at it, so I'm going to look at it.

20  Q    I understand but I'd like an answer to my question.

21  A    Well, I don't know what warrant has to do with it.  It

22  just -- I think draws are always warranted in

23  investigations.  So, then in that context, then yes, they

24  warrant investigation because they -- draws should always be

25  investigated in a bankruptcy.

1    Q    Okay.  Now, when you were the CRO of InfoW, you were

2    part of the attempt to secure a release of Alex Jones and

3    Free Speech Systems as part of that bankruptcy plan.

4    Correct?

5    A    Not -- as I recall, that was part of a revision in the

6    Plan Support Agreement that had certain events occurred --

7    certain payments were made -- that they would get a release.

8    Q    Right.  And the goal was to pay $10 million to those

9    claimants, right?

10   A    I note the number on the table it was $10 million.

11   That's what was -- had been committed to at that time, in

12   the beginning.

13   Q    Okay.  And so, we were saying a moment ago, 18 million,

14   30 million, 60 million, the draws are something that need to

15   be investigated, whether they're fraudulent transfers.  But

16   you were trying to secure a release in that bankruptcy of

17   Jones and Free Speech Systems for $10 million while you were

18   the CRO of InfoW --

19              MR. BATTAGLIA:  Your Honor --

20   BY MR. MOSHENBERG:

21   A    -- and you hadn't disclosed --

22   MR. MOSHENBERG:  Let me finish my question, please BY MR.

23   MOSHENBERG:

24   A    -- and you hadn't disclosed that at the time that you

25   were part of that effort, you were the CRO for Free Speech

```
 1    Systems as well, or that you were at least being engaged to
 2    be.
 3         MR. BATTAGLIA:  Your Honor, I'm going to object on
 4    a couple of grounds.  One, relevance of any of this to a
 5    cash collateral -- interim cash collateral -- hearing,
 6    number one.  Number two, counsel is -- if he wants to talk
 7    about what the Plan Support Agreement says, it's in
 8    evidence.  It doesn't say a release for 10 million.  It says
 9    a release for (indiscernible) over and over and over again.
10    So, he's mischaracterizing the record, the documents in
11    evidence --
12         THE COURT:  I'll sustain the objection on that
13    ground, and I do think he can answer the question about how
14    he was negotiating -- whether he was negotiating the Plan
15    Support Agreement or parties to Plan Support Agreement on
16    behalf of InfoW debtors and was soliciting was to be the CRO
17    of Free Speech at that same time.  And I think that goes to
18    credibility and I think you can --
19         THE WITNESS:  Is that the --
20         THE COURT:  Well, I think you can answer that
21    question.  You know, and I mean, you can ask that question
22    again but if you do want to ask a question about the Plan
23    Support Agreement, I do think it makes more sense to just --
24    it's in evidence.  You can just ask the questions about that
25    and show him a document and that way we can at least have a
```

```
 1   clean record.

 2           THE WITNESS:  Sure.

 3   BY MR. MOSHENBERG:

 4   Q     So, what's the answer?

 5   A     To the Court's question?

 6   Q     Yes.

 7   A     The Plan Support Agreement had been terminated by April

 8   30th because conditions precedent to it had not been met.

 9           THE COURT:  Let me take over.  That was never --

10   was that ever told to (indiscernible)?

11           THE WITNESS:  I believe you pointed out in your --

12   at one point from the bench there, you said, this has to be

13   -- if we don't know this by April 30th, this thing's dead,

14   isn't it?

15           THE COURT:  And everybody was assuring me at the

16   time that they were going to extend it and keep working.

17           THE WITNESS:  Well, it never got signed.  Later,

18   we did continue working but by -- in May -- by May 19th for

19   certain, or prior to May 19th, we were negotiating with the

20   Plaintiffs in both cases --

21           THE COURT:  Let me get the question -- I might as

22   well ask it now because it's a good spot.  I can wait until

23   the end, or I can ask it now and don't read too much into

24   it.  I just need to understand it.  On May 19th, there was a

25   hearing before me where on May 18th, there was a request for
```

1    a continuation on a motion to dismiss.  The hearing on the

2    motion to dismiss -- we held an emergency hearing on the

3    19th where there was a proposed stipulation presented to me

4    to dismiss -- allow the dismissal -- of the -- what I would

5    call the Austin -- one portion of the Austin litigation, and

6    I signed it on that day.

7            And in this case, there is a letter dated by you

8    to Free Speech dated the same day.  I may be reading much

9    into this, but it seems to me that you -- either you wrote

10   the letter that day or you had been in conversation with

11   Free Speech before you wrote that -- before that day you

12   sent the letter.  And I just need to understand -- none of

13   this was ever disclosed to me in connection with the case

14   and the cases were dismissed on June the 10th officially,

15   which tells me that Mr. Jones signed a retention letter.

16   So, you were actively retained before these cases were

17   dismissed -- the last cases were dismissed -- and I just

18   need to understand, one, why that was never disclosed to me,

19   and two, when did you begin to start soliciting or having

20   conversations about representing Free Speech Systems.

21           Why don't -- that's a compound question.  I think

22   that's unfair.  When did you begin to have conversations

23   with anyone from Free Speech Systems about potentially

24   representing them?

25           THE WITNESS:  I had conversations with Mr. Lee, in

1    I believe --

2              THE COURT:  Mr. Lee was representing the Debtors

3    too.

4              THE WITNESS:  -- and Mr. Jordan who represented --

5    I think still does represent Mr. Jones.  I don't know when

6    those were, but it was after we had been substantially

7    convinced that we were going to be terminating the InfoWars

8    bankruptcy.

9              THE COURT:  You wrote the letter on May 19th.

10             THE WITNESS:  On May 19th, Mr. Lee asked me to

11   send him an engagement letter for Free Speech -- the Free

12   Speech engagement.

13             THE COURT:  Okay.

14             THE WITNESS:  And to be quite honest with you, I

15   didn't even think about it at that time.

16             THE COURT:  No, I appreciate the honesty.  I

17   appreciate disclosure.  It seeks a retainer.  When did you

18   receive that retainer?

19             THE WITNESS:  Lord --

20             THE COURT:  That month?

21             THE WITNESS:  No, it was --

22             THE COURT:  Let just say if the letter was signed

23   on June -- the letter was officially signed on June 6th --

24             THE WITNESS:  June 6th.

25             THE COURT:  When did you -- did you receive it

1    before or after you were retained, or right about that time?

2            THE WITNESS:  It was -- no, it was not right

3    around -- it was after, definitely.

4            THE COURT:  After.  Okay.

5            THE WITNESS:  You know, it was several weeks after

6    at least.

7            THE COURT:  Okay.  Okay.  Sorry.  That was the

8    question -- that was the clarification that I had mentioned

9    I had wanted to understand the day before.  I guess Mr. Lee

10   a few questions as well at some point, but I'll need to

11   understand that as well, but today's not that day.  Today's

12   cash collateral, and so I do want -- and I know I took this

13   off on tangent.  Now, I'm going to bring it back.  I did

14   want to focus on cash collateral, and I want to focus on

15   critical vendor, and I want to understand -- I've given you

16   some leeway.  Maybe that's the better way of saying.  I've

17   given you some leeway to kind of have general conversation

18   about the CRO role and what investigation and he's done to

19   formulate in connection with the budget, but now I'm going

20   to ask you to laser focus on these two motions.

21   BY MR. MOSHENBERG:

22   Q    Okay.  Let's look at that part of Exhibit 3, the ledger

23   (indiscernible).  I want to focus on the part where it

24   provides for a budget for Alex Jones of $54,000 every other

25   week.  Do you see that part?

1    A    Not yet.

2    Q    Can you see it?

3    A    Yes.

4    Q    Okay.  And in total, it ends up being about $379,000.

5    correct?

6    A    I can't tell.  He's -- whatever it says.  I mean, I

7    can't see that.  Would you have your associate or partner

8    reduce the size?  Thank you.

9    Q    Yeah.  (Indiscernible) $379,000 and that's over a 13-

10   week period, correct?

11   A    Correct.

12   Q    Okay.  And if you translate $379,000 over a 13-week

13   period, that translates to about a salary of $1.5 million.

14   Do you understand that?

15   A    Well, I don't believe that's correct.  Mr. Jones --

16   this is a -- Mr. Jones has an appointment agreement for 1.3

17   million.  Some amount of it and I think it's about 8,000 of

18   (indiscernible) Patriot is paid through the payroll system.

19   This should be that difference.  So, you got 26 pay periods

20   in the year so you can do the math.  It will be -- should

21   add up to 1.3, those two components.

22   Q    Well, I did 379 -- 13 weeks is a quarter of a year,

23   right, 52 weeks --

24   A    Yeah, but we can't do -- you've got to do it by --

25   because we pay a biweekly, not semi-monthly.

1    Q    Okay.

2    A    So, that's -- something about the math in that

3    calculation -- you got to multiply that number by 26 to get

4    an annual rate.

5    Q    Okay.  So -- but your point is, $1.3 million salary.

6    A    Total -- his total is 1.3 million.

7    Q    Okay.

8            THE COURT:  I'm just going to tell everyone.

9    Judge -- math and don't claim to be -- (indiscernible) in

10   excel spreadsheet for you, but it's essentially treading a

11   $54,000 bimonthly, you know, but that -- if you take that

12   over 26 periods -- you multiply the 54,000 times -- you get

13   to like a $1.4 million number.

14           THE WITNESS:  That case, well --

15           THE COURT:  If you multiply it times 24, you get

16   to the 1.3.  It's --

17           THE WITNESS:  Oh, shoot.  I apologize, Your Honor.

18           THE COURT:  It's okay.

19           THE WITNESS:  Okay.

20   BY MR. MOSHENBERG:

21   Q    And that's salary separate from the draws that he's

22   taking out of the company, right?

23   A    Correct.

24   Q    Okay.  You understand that in the Free Speech Systems

25   corporate representative, that position, the document that

1    produced showed that he had an annual salary of about

2    $625,000.

3              MR. BATTAGLIA:  Objection, Your Honor.  The

4    question is about a deposition he was not present at and --

5              THE COURT:  Yeah.  I'm going to sustain that.  I

6    want you focused on the questions -- I've given you plenty

7    of room --

8              MR. MOSHENBERG:  Sure.

9              THE COURT:  -- and Mr. Brimmage is going to ask

10   questions too and I want him -- I want you all focused on --

11   you got questions about the budget, ask the budget.

12             MR. MOSHENBERG:  Well, what I'm trying to

13   understand is, if there were documents produced to us by

14   Free Speech showing that his salary was $625,000 a year, why

15   is he receiving a $1.3 million salary under this budget.

16             THE COURT:  Do you have those documents?

17             MR. MOSHENBERG:  Yes, Your Honor.  They were notes

18   provide as part of the deposition --

19             THE COURT:  No, I'm asking you are they on your

20   witness and exhibit list?

21             MR. MOSHENBERG:  They are, Your Honor.

22             THE COURT:  Why don't you show that then?

23             MR. MOSHENBERG:  It's Exhibit 12.

24   BY MR. MOSHENBERG:

25   Q    These were notes that were provided by the corporate

1    representative based on her review in preparing for her

2    30(b)(6) deposition.  They were admitted as part of the

3    deposition.  And if you look, about halfway down, it says,

4    AJ paid a salary of $625,000 a year.

5    A    As of what date?  Do you know?

6    Q    Well, this deposition occurred in -- February 15th of

7    2022, this year.

8    A    I'd have to look back and see the date of the

9    employment agreement that I was -- given to me that I have,

10   which is what the 1.3 is based on.

11   Q    Right.  And that employment agreement was created in

12   April of this year, correct?

13   A    You're probably -- you may be right.  I think you're

14   right.

15   Q    Right.  It was kind of about the same time as all the

16   bankruptcies with the InfoW started happening, right,

17   leading up to the Alex Jones trial that was first set in

18   April, 2022, right?

19   A    I don't know about the first setting of the Alex Jones

20   trial, but I do recall -- I'd have to look back and see when

21   I got involved with the InfoWars bankruptcy, if it was in

22   April or not or prior to -- after that.  I don't know when

23   they actually got started.  It was before I had -- the

24   planning for that started before I ever got involved.

25   Q    Okay.

 1   A     Sometime before I got involved.

 2   Q     But you relied on that $1.3 million based on an

 3   agreement that was created in April of 2022, correct?

 4   A     Right.  That's the contract I have (indiscernible) --

 5   Q     It wasn't based on prior pay that he was receiving?

 6   A     No.

 7   Q     So, in --

 8         THE COURT:  Okay.  Mr. Moshenberg, he's answered

 9   the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11         MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13   Q     You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16         THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19   Q     Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21   A     No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24   Q     And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other

1    week.

2    A    I -- no, what I decided was, look, the agreement says

3    1.3 million.  I'm going to put you -- I'm putting into your

4    payroll.  That's what the contract says.  You know, if it

5    gets thrown, it gets thrown out.  Whatever --

6    Q    There's no emergency, right?  There's no emergency to

7    pay him those funds.  Isn't that the reality?  You were

8    saying a moment ago he wasn't even making any money.  Well,

9    what is the emergency in this motion that he receive $54,000

10   every other week?

11   A    I can't say there's an emergency.

12   Q    He doesn't need it.

13   A    I wouldn't -- I don't know.  I mean, I can't there was

14   an emergency.  He didn't --

15   Q    Certainly, from the Debtor's part, there's no

16   emergency.  There's no, we have to pay him this or Alex

17   Jones is going to quit, right?  We're not worried about

18   that.

19   A    I don't believe that's the case.

20   Q    Yeah, I don't think so either.

21           THE COURT:  Mr. Moshenberg, now is the time that

22   you start reading the room.  I want you to focus on

23   questions that relate to the budget for cash collateral or -

24   -

25           MR. MOSHENBERG:  Okay.  Fair enough, Your Honor.

1    Give me one moment, Your Honor.

2            THE COURT:  Take your time.

3            MR. MOSHENBERG:  Your Honor, if it works for you,

4    what I'll do to save time is, if I could save my line of

5    questions for recross if needed --

6            THE COURT:  Sure.

7            MR. MOSHENBERG:  --  but we'll just do it that way

8    instead just to speed things along.

9            THE COURT:  Okay.  But before you go, is -- maybe

10   the parties can help me, and I'm just -- as I think through

11   this -- I know it's not official, but my understanding was

12   that the parties were agreeing -- and to my knowledge, Mr.

13   Jones hasn't objected to it, and if there's somebody let me

14   know -- that the $54,000 number was going to count on the

15   20,000, right?

16           MR. BATTAGLIA:  20,000 for the interim cash

17   collateral period.  Yes, sir.

18           THE COURT:  Okay.  I just wanted to make sure that

19   I understood.

20           MR. BATTAGLIA:  Yes.

21           THE COURT:  Okay.  Okay.  Actually, the reason I'm

22   asking all the questions -- regardless if it's 625 or 1.3

23   for the interim period, it would be some number below even

24   the 625 for purposes of interim, and I want to make sure all

25   of his rights are reserved to come back and prove that at

1    one point who has the right number.  I'm not getting into

2    that.  I just want to make sure that I understand what's on

3    the table now.

4            Mr. Schwartz, let me ask, are you ready to

5    continue or do you need five minutes to use the restroom or

6    something?

7            THE WITNESS:  I think I'm okay, Your Honor.

8            THE COURT:  Okay.

9            THE WITNESS:  If I turn yellow, I'll raise my

10   hand, Your Honor.

11           THE COURT:  Okay.

12           MR. BATTAGLIA:  Judge, my rule is I never waste an

13   opportunity to a bathroom (indiscernible) --

14           THE COURT:  No, no, no.  I just -- it's the

15   witness so -- just maybe two minutes?

16           MR. MOSHENBERG:  No, Your Honor.

17           THE COURT:  Okay.

18           MR. MOSHENBERG:  (Indiscernible).

19           THE COURT:  That's fine.  I'm just trying to

20   understand the deal --

21           MR. MOSHENBERG:  Yeah.

22           THE COURT:  -- where things stood --

23           MR. MOSHENBERG:  Well --

24           THE COURT:  -- and maybe they've changed.  That's

25   what I'm trying to get to.

```
 1              MR. MOSHENBERG:  Yeah.  (Indiscernible).

 2              MR. BATTAGLIA:  I didn't know that need was a

 3    basis here as entitlement to.  I mean, I don't necessarily

 4    my salary.  I'm not sure whether you need your more --

 5              THE COURT:  I get it.

 6              MR. BRIMMAGE:  By the way, there is no

 7    (indiscernible) --

 8              THE COURT:  The record says what it says, and I'll

 9    let parties make the argument based on what they want.

10              MR. NGUYEN:  Thank you, Your Honor --

11              THE COURT:  So, why don't we -- why don't you ask

12    your question and then we'll take a five-minute break and

13    then we'll continue with the cross-examination.

14              MR. NGUYEN:  Thank you, Your Honor.  I will be --

15              THE COURT:  No, no, no.  I want you to take as

16    much time as you need.  That's not --

17              MR. NGUYEN:  -- as brief as possible.

18              THE COURT:  -- that I'm trying to rush you.

19              MR. NGUYEN:  Understood, Your Honor.

20    BY MR. NGUYEN:

21    Q    I just have a couple of question, Mr. Schwartz, about

22    your engagement with FFS and your prior engagement with

23    InfoW.  The Judge asked you some questions.  I still --

24    there's still a little bit of gaps in the timeline and I

25    just -- if you can help me, just walk me through your
```

1  engagement.  So, Mr. Schwartz, can you just tell me exactly

2  when your engagement with the InfoW entities began?

3  A    I don't have -- I don't recall the date of that

4  engagement letter.

5  Q    The cases were filed back in, I believe, April --

6  A    Yeah.  It would have been in April right before the

7  case was filed.

8  Q    And presently, are you still the chief restructuring

9  officer for the InfoW entities?

10  A    Yes, I am.

11  Q    And who at the InfoW entities would have the right to

12  terminate your engagement as the CRO?

13  A    I've asked that question.  I don't know the answer.

14  Q    Well, who hired you as the CRO for the InfoW entities?

15  A    The interim Trustee.

16  Q    And who is that?

17  A    Robert Dew.

18  Q    And did Mr. Dew sign the engagement letter for the

19  InfoW entities or was it, Alex Jones?

20  A    No, it was -- well, I'm pretty sure it was Robert Dew.

21  I may have to look at that.

22  Q    And overall, how much money were you paid for your

23  services as the CRO in the InfoW entities?

24  A    I'm -- I'd have to speculate.  I don't recall.  I know

25  had leftovers from my retainer.

1   Q    How much was the retainer?

2   A    You would ask me that.  It was over $30,000, I know

3   that.

4   Q    You said you had leftovers?

5   A    Yes.

6   Q    Okay.  And who paid the retainer?

7   A    That was paid by Mr. Jones, but I -- it was paid by Mr.

8   Jones' lawyer.  I assume it was Mr. Jones' funds but --

9   Q    And as the CRO for the InfoW entities, you were the one

10   that had the authority to enter into the stipulation with

11   U.S. Trustee to dismiss those cases?

12   A    Yes, I believe I did.

13   Q    Did you need to get authority from Mr. Jones to enter

14   into that stipulation?

15   A    No.

16   Q    And earlier, you mentioned that there was an engagement

17   letter sent to FFS around -- I believe the conversation was

18   May 19th, but I think the actual engagement letter was May

19   16th; is that correct?

20   A    I believe it was May 19th.  That's -- Mr. Lee asked for

21   it.  I don't know when it got to FSS.

22   Q    And how did you got word that FSS was looking for a

23   chief restructuring officer for you to send in an engagement

24   letter to FSS?

25   A    Mr. Lee called me and asked me to send an engagement

1    letter.

2    Q    Did you speak to Mr. Jones about being the CRO for FSS?

3    A    Not until June 6th.

4    Q    Do you -- in the InfoW cases, did you file an

5    application to be employed as the CRO for the InfoW

6    entities?

7    A    I didn't file it, but it was filed.  There was one

8    filed.

9    Q    Did you submit a verified statement with your

10   application?

11   A    Yes, I believe so.

12   Q    And in your verified statement, did you disclose

13   anywhere in there that you were seeking employment from FSS?

14   A    I don't believe so.

15   Q    And you serve as a bankruptcy professional that's been

16   appointed and approved by the court before in other cases?

17   A    Yes.  But on your former question, I have -- I was not

18   talking to FSS about serving as their CRO when I was engaged

19   by InfoW.

20   Q    In your experience as a bankruptcy professional, do you

21   think there's a continuing obligation for professionals that

22   appear before the court to supplement their disclosures and

23   tell the court of any connections that occurred during the

24   case?

25   A    Yeah.  The appointment orders require that.

1    Q    And that didn't happen in InfoW cases, correct?

2    A    Correct.  There was no appointment.

3    Q    But you still had a verified statement that was filed

4    with the Court, and you didn't supplement that verified

5    statement.

6    A    No, I didn't -- I was never appointed, so --

7    Q    And earlier, Mr. Battaglia talked about your authority

8    as the CRO for FSS.  Who do you get your direction from as

9    the CRO?

10   A    Me and the Court.

11   Q    Okay.  So, if Mr. Battaglia files a Chapter 11 Plan in

12   this case, you don't have to seek Alex Jones' approval of

13   that plan before it's submitted to the Court?

14   A    No.  We wouldn't look for his approval.  We'd look for

15   his input.

16   Q    Can Mr. Jones fire you as the CRO?

17   A    No.  Well, I guess he -- he'd have to (indiscernible)

18   here to get permission first.  I think actually the Court

19   would fire me.

20   Q    And earlier, there was a discussion of the PQPR notes,

21   one for about 29 million and the other was about 25 million

22   and some change.

23   A    Yes, sir.

24   Q    Do you recall that conversation?  Have you taken any

25   steps to verify that amount of the debt under the promissory

1    notes to ensure that those amounts are accurate?

2    A    All I've done so far is I have seen calculation of the

3    makeup of the amount that was in the first note and some of

4    the supporting documentation.  And I said I have seen it.

5    I've done nothing on vetting that.  On the second note, I

6    don't think I've seen anything.  And quite frankly, that's -

7    - right now, we're still trying to get this company

8    operating and fighting fires before we get to looking at --

9    we're going to have to do that.  We know that.

10   Q    And in your declaration at Paragraph 53 -- Karen, can

11   you blow up the declaration?

12         THE COURT:  I've got to make Mr. Martin a

13   presenter again.

14         MR. NGUYEN:  Thank you, Your Honor.

15         THE COURT:  No, no worries.  I -- it was a

16   document that was up a bit earlier and I just wanted to make

17   sure that it was taken down.  Mr. Martin, if I've done

18   anything wrong -- if I need to do it again, let me know.

19   Okay.

20         MR. NGUYEN:  Paragraph 53, Mr. Martin.

21   BY MR. NGUYEN:

22   Q    Mr. Schwartz, can you see Paragraph 53 in your

23   declaration?

24   A    Yes.

25   Q    And it says, on or about August 13th, 2020, FSS and

Page 165

1    PQPR executed a promissory note in the principal amount of

2    29,588,000 made payable to PQPR which memorialized their

3    accrued obligations of FSS to PQPR through December 31st,

4    2018.  Do you see that?

5    A    Yes.

6    Q    How do you know to put in your declaration under

7    penalty of perjury that this amount was memorialized with

8    the accrued obligations?

9    A    This is one where I said I saw the detail of the

10   calculation and some of the supporting documents in it.  It

11   identifies the transactions going back -- actually, it

12   should be from 12/31/2018.

13   Q    And you mentioned some supporting documents.  What are

14   some of those supporting documents?

15   A    These were schedules of billings, (indiscernible) PQPR

16   for inventory and credits, i.e., payments, applied to those

17   billings and they were developed out of the general ledger

18   system there, accounting transactions pulled out of the

19   general ledger system.  We didn't go beyond that.

20   Q    You didn't look at any -- have you -- did you seen any

21   invoices?

22   A    No.  We haven't done that.  It's --

23   Q    Have you seen any bank statements that show some

24   payments from PQPR?

25   A    Not in this time period.  We have not gone back that

```
 1   far yet.
 2   Q    Are there any bank statements?
 3   A    Well, that's good question.  Right now, there aren't.
 4   I've got to go back and check and make sure when we change
 5   banks, we don't lose access to those bank statements.
 6   Q    So, when you put in your disclosure this was the amount
 7   that was memorialized in accrued obligations, you don't know
 8   that for a fact.
 9   A    Well, I know for a fact and that they showed me -- I
10   have the calculation for the amount of the 29,588,000 and I
11   see from the source date that it is from invoices and
12   payments records.
13   Q    But you don't --
14   A    To me, as an accountant, that tells me that's what I'm
15   looking at.
16   Q    But you haven't seen the billings or the invoices or
17   the --
18   A    We have not vouched it yet to ensure it's actually
19   properly calculated.
20   Q    And in your declaration, you -- on the cash collateral,
21   you mentioned that there was extensive and difficult
22   negotiation with PQPR over the use of cash collateral.  Do
23   you recall that part of your declaration?
24   A    Yes.
25   Q    Who did you communicate with at the PQPR to extensively
```

1   negotiate the use of cash collateral?

2   A    It was primarily David Jones and his -- and Steve

3   Lemmon.

4   Q    And did Alex Jones have any input in the use of -- in

5   the negotiations for the use of cash collateral?

6   A    Yes.  He would come in to the negotiating sessions

7   intermittently.

8   Q    And is it your understanding that the 80 percent

9   ownership of PQPR is owned by an entity that Alex Jones

10   owns?

11   A    Yes.

12   Q    And I just want to take a look at the budget.  The

13   Plaintiff went over the salary to Mr. Jones, but there is --

14   there's a line item on the budget for an American Express

15   payment of about $172,000.  I think it was the first week in

16   August.  Can you just tell me what that is?

17   A    That's the amount we -- of American Express.

18   Q    So, it's a pre-petition debt?

19   A    No.  That's -- okay.  Excuse me.  Let me fix that.

20   You're right.  It's not a pre-petition debt.  Based on our

21   spending history, this is the amount that will be -- come

22   due.  Well, maybe, you know -- and that's -- you probably

23   hit it on the head.  That probably is pre-petition.

24   Q    So, why is it necessary to pay American Express for a

25   pre-petition debt in the cash collateral 13-week budget?

1   A    Well, I would have argued we should -- well, it's --

2   we're probably going to have to just let American Express

3   shave the wind and see what we can do.  We have some charges

4   that go through them but they would be on the critical

5   vendor's list so we can take care of that there.

6   Q    Have you seen the invoices for the American Express

7   charges?

8   A    I have received -- seen some of them.  They're

9   extensive.  We're spending $300,000 a month on average with

10  American Express, and one of the problems we have is the

11  accounting staff did not distribute those charges.  So, all

12  we have is, if you look at the income statement, there's a

13  line item for American Express, because we can't tell you

14  whether it's for electricity, entertainment, or electronic

15  supplies for the production studio.

16  Q    Does Mr. Jones run any of his personal expenses through

17  this American Express card?

18  A    Yes.

19  Q    What are those expenses?

20  A    I've not done an extensive look at it other than I've

21  looked at the charges being -- those are charges against his

22  distribution account, his draw account.  But there -- his

23  housekeeper has charges on it, you know, cleaning,

24  housekeeping type stuff.  And that's the biggest number of

25  line items I recall seeing is her.

1    Q    So, help me understand.  Why is it an emergency for

2    this Court to approve a payment to American Express to pay

3    Mr. Jones' housekeeper?

4    A    Well, like I said, the company has been paying the

5    credit card, but those charges are charged as distributions

6    against him.  I would not -- I'm not intending that going

7    forward by any means, and we've informed him he can't put

8    those on his credit card.

9    Q    And how long have Mr. Jones used the American Express

10   credit card to charge his personal expenses?

11   A    It goes back quite a ways.  I don't -- I didn't -- you

12   know, I looked at some of the history on the account the

13   last 18 months and said, you know, I'm not -- you know, the

14   last 18 months, it's been regular.

15   Q    How about the vehicle leases on the budget, about 14 --

16   I believe it's 14 on every two weeks.  Whose car is that?

17   A    Those are actually vans, I believe, that the production

18   studio uses.

19   Q    Does the company pay for Mr. Jones' car?

20   A    No, not that I -- not that I have seen.  I'm told not,

21   and I haven't seen evidence of it.

22   Q    And earlier, one of the questions that the Judge asked

23   you is, what do you hope to accomplish in this bankruptcy

24   case, and I believe I missed your answer, or I believe Mr.

25   Battaglia answered the question.  But, you know, what is the

1    purpose of this bankruptcy case?

2    A    I think Mr. Battaglia answered that question when asked

3    by the Judge.  It's, quite frankly, the -- we can't go to

4    trial in Connecticut and be -- I mean, we have a trial team

5    stuck here if this needs to go to Connecticut to help try

6    that case.  We don't have the money to pay for that at this

7    point in time.  That's a huge problem right there.  So, it's

8    -- we just can't afford the Connecticut case, the time, or

9    the dollars right now.  Now, it's -- Alex Jones being off

10   the air for two months is not acceptable.  We won't be here.

11   We won't last two weeks in that situation, so we have to

12   work out a way to make all this happen.

13   Q    And as the Chief Restructuring Officer of FSS and Mr.

14   Jones being the sole owner and member of FSS, have you had

15   an opportunity to talk to Mr. Jones about the purpose of

16   this bankruptcy case?

17   A    Yes.

18   Q    And is his purpose aligned with what you just stated to

19   the Court as the purpose of the filing of this bankruptcy?

20   A    Yeah.  He knows we can't go double team.  We cannot do

21   it.  I think he'd like to get it out of the Connecticut

22   court, but I don't -- you know, we told him that ain't going

23   to work.

24   Q    You know, in your declaration, Mr. Schwartz, you

25   describe Mr. Jones as a natural radio personality and the --

1   and I'm assuming you've had some opportunity to observe some

2   of the content aired by InfoWars.

3   A    Is that a question?

4   Q    Yes, Your Honor -- sorry, Mr. Schwartz.

5   A    Then you assume -- I have had tried to look at the

6   program a few times.

7   Q    Are you aware that after the hearing that we had on

8   Monday, Mr. Jones appeared on his radio show, and he

9   expressly told listeners of FSS about the purpose of this

10  bankruptcy filing.  Are you aware of that video?

11  A    No.

12  Q    Okay.  And you said that based on your conversation

13  with Mr. Jones, that it's your understanding that Mr. Jones'

14  purpose here is to make sure you don't fight multiple fronts

15  in terms of litigation.  You want to bring it all here and

16  that's the purpose of the bankruptcy filing, correct?

17  A    That's -- I mean, the discussions I've been involved

18  with him, you know, relating to that is, I mean, that's been

19  an expression what we have to do.  We can't do this.

20  Q    And the purpose of the bankruptcy is not to tie up the

21  damages from the Plaintiff for years and years and years?

22  A    No.  That could be done by appeal.  You don't need to -

23  -

24  Q    Okay.

25          MR. NGUYEN:  Mr. Martin, can blow up the

 1   (indiscernible) --

 2            THE COURT:  Actually, just two questions on the

 3   budget.  And just to -- just so I understand, can you just

 4   go back to the budget, Mr. Martin?  Just go to the first

 5   page.  It's just two simple questions.  There's a line item

 6   for outsourced services and -- for about -- yeah, just on

 7   the first page.  There's a line item -- let's see -- it is -

 8   - where is it?  It's by the total office and admin expense.

 9   Now, where'd you go?  Yeah, there's a line item for

10   outsource --

11            THE WITNESS:  Outsource services?

12            THE COURT:  -- and then consulting services.

13   Those are the only two that I just didn't -- those are the

14   two that popped out to me that I just wanted to get some

15   clarification on.

16            THE WITNESS:  Those are two categories we have got

17   to investigate.

18            THE COURT:  Okay.

19            THE WITNESS:  Because, first off, we have to get -

20   - presumably, these are contractual relationships and I want

21   to see the contracts --

22            THE COURT:  Okay.

23            THE WITNESS:  -- which I have not seen, and I want

24   to know exactly what they're doing and why we need to keep

25   paying them to do it.

1          THE COURT:  Okay.

2          THE WITNESS:  There's this -- there are quite a

3     number of -- I'd say, 10 or 12 entities in these two

4     categories combined that --

5          THE COURT:  Okay.

6          THE WITNESS:  I put them in there because we've

7     been -- they're in their regular expenditure and --

8          THE COURT:  Can you give me an example of an

9     outsourced service and a consulting service?

10         THE WITNESS:  Oh, for one, for example is --

11    there's an individual who does -- the Sound Simplistic does

12    web design.  What he does -- he does very sophisticated web

13    design for the company, based on a retainer of 25,000 a

14    month.  That is a little -- seems a little bit --

15         THE COURT:  That's an outsource service or

16    consulting --

17         THE WITNESS:  I believe that is consulting

18    services.

19         THE COURT:  Okay.

20         THE WITNESS:  Now -- yeah, no, that's an outsource

21    service.

22         THE COURT:  Okay.  And then what's an example of a

23    consulting service?

24         THE WITNESS:  Well, consulting services -- I'm

25    drawing a blank on an entity.  Consulting on the marketing.

1    You're selling product into this audience group and part of

2    it is looking at that, I believe, and --

3          THE COURT:  Okay.

4          THE WITNESS:  That's what I'm -- it's a marketing

5    service as a -- what would the market service we need be.

6    It's got to be something to do with reaching out and how do

7    we touch those people most effectively.

8          THE COURT:  Okay.

9          THE WITNESS:  That's why I said, it's -- that's

10   looking at -- it's what I think I'm going to see.  Now I

11   want to -- show me what it really is.

12         THE COURT:  Okay.

13         THE WITNESS:  Those are very definitely two areas

14   we have got to dig into.

15         THE COURT:  Okay.  Thank you.  Mr. Nguyen, I'm

16   sorry.

17         MR. NGUYEN:  No problem, Your Honor.

18   BY MR. NGUYEN:

19   Q    And before I get to Exhibit 8, I just want to clarify a

20   point.  You mention earlier that the Court was the one that

21   appoints you and the Court was the one that fired you --

22   that can fire you.  Do you remember that testimony?

23   A    Yes.  I guess I would modify that this way, by saying,

24   since I'm not appointed yet, Mr. Jones did hire me.

25   Arguably, I guess he could fire me before I'm appointed.

1    Q    So based on corporate formalities, you're an officer of

2    the company, correct?

3    A    As CRO, I am an officer of the company.

4    Q    And the owner of the company is who?

5    A    Alex Jones.

6    Q    Okay.

7              MR. NGUYEN:  Mr. Martin, can you (indiscernible)?

8    I'm almost done, Your Honor.  I would just like to

9    (indiscernible) questions (indiscernible) Exhibit

10   (indiscernible) there was a admitted (indiscernible).

11             THE COURT:  I'm sorry, Mr. Martin.  I can't hear

12   you.  Can you just get close to a mic?  I'm going to tell

13   you, why don't you go to another question.  I'm not

14   interested.

15             MR. NGUYEN:  Okay.  Your Honor, I will pass the

16   witness.  Thank you.

17             THE COURT:  Thank you.  Why don't we -- and again,

18   I don't want anyone to read one way or the other.  I'm

19   focused on cash collateral and critical vendor.  And why

20   don't we take a five-minute break.  Mr. Brimmage, can you

21   just -- I don't want to -- I want you to take as much time

22   as you want.  I just -- from a scheduling standpoint, how

23   long do you think you'll go?  Okay.

24             MR. BRIMMAGE:  (Indiscernible) start at 10 after

25   the hour.  (Indiscernible).

1           THE COURT:  Okay.  Okay.

2           MR. BRIMMAGE:  (Indiscernible).

3           THE COURT:  Okay.  Like, I know how it is.  I'm

4    just trying to get a sense from scheduling and timing.  Oh,

5    that's fine.  Okay.  Let's all take a -- I'll come back on

6    at 3:15.

7           Mr. Schwartz, you're again under oath

8    (indiscernible) remind you.  Okay.  I'll come back.

9      (Recess)

10          CLERK:  All rise.

11          THE COURT:  Anyhow.  Before we start, Mr.

12   Brimmage, in terms of your presentation, are you going to

13   have -- are you going use Mr. Martin to show --

14          MR. BRIMMAGE:  I am, Your Honor.

15          THE COURT:  Okay.

16          MR. BRIMMAGE:  What I'm going to hope to do is

17   minimize the document use and refer to documents he's --

18   we've already looked at --

19          THE COURT:  Okay.

20          MR. BRIMMAGE:  -- and kind of move from there.

21   But if we need to pull it up, we'll put it up and keep it.

22          THE COURT:  Okay.  I just want to make sure that -

23   - Mr. Martin, I'm going to make -- I think you -- oh, you're

24   still the presenter so you'll be able to proceed.  Okay.

25          And Mr. Schwartz, you understand that you're still

```
 1    under oath?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Mr. Brimmage, you may proceed.

 4    BY MR. BRIMMAGE:

 5    Q    Mr. Schwartz, my name is Marty Brimmage and I'm with

 6    Akin Gump Strauss Hauer & Feld and I'm going to question you

 7    today on behalf of the Connecticut Plaintiffs.  You and I

 8    have never met before that I recall; is that right?

 9    A    I do not recall meeting you either.

10    Q    Okay.

11    A    I know the name.  I don't know why.

12    Q    Okay.  Good.  I'm glad my memory isn't quite that

13    faulty.  What I'm going to attempt to do is what I call

14    quick hits.  I'm going to -- some of the things I'm going to

15    talk about, I'm going to refer to your prior testimony

16    today, but I'm not going to intend to repeat that.  I'm

17    going to try to maybe ask some follow up.  So, I'm going to

18    try to be efficient with your time.  I would appreciate if

19    you would do the same.  Does that sound fair?

20    A    If I can.

21    Q    Okay.  Did you have a chance to confer with your

22    counsel during the break?

23    A    About the case?  No.

24    Q    Okay.  Did you have a chance to talk to your counsel

25    during the break?
```

```
1    A    Oh, yeah.

2    Q    Okay.  All right.  Let's pick up on a few things if we

3    could.  I think you have testified in a variety of ways to

4    what I'm going to -- I'm going to try to paraphrase -- the

5    sloppy status of the financial records when you became the

6    CRO; is that correct?

7    A    I've talked about it.  I know that.  I don't how many

8    times I've done it.

9    Q    Fair enough to say, it's sloppy records, right?

10   A    Well, that's one description.  I would say something

11   not -- they don't come up to sloppy.

12   Q    Okay.  And when you took over, the 2021 general ledger

13   had not been completed and the books had not closed, right?

14   A    Correct.

15   Q    And as a result, no financial statements were produced

16   for FSS for the 18 months preceding your engagement, right?

17   A    Well, the fact is, no financial statements were

18   produced, charity I'm saying, as a result.  Had they been

19   updated; I don't know if they would have been produced

20   financial statements even then.

21   Q    So, is my statement true?

22   A    Well, that's -- I mean, I've made assumption of a

23   result of the books not being -- but I do know they did not

24   produce financial statements.

25   Q    So that's a yes.
```

1    A    Yes, sir.

2    Q    Okay.  And you found no bank reconciliations for 2021

3    or 2022, right?

4    A    Correct.

5    Q    You found that FSS personnel expressed no criticism of

6    not receiving any financial reports to assist them in doing

7    their functional responsibilities, right?

8    A    Correct.

9    Q    They were -- appeared unaware of information that would

10   be available to them to timely prepare their financials,

11   right?

12   A    Timely prepare their financials?

13   Q    Right.

14   A    That statement confuses me.

15   Q    Okay.

16   A    Are you talking about the statement beforehand?

17   Q    Did you find that FSS personnel appeared to be unaware

18   of the management -- that the management information was

19   available to them from -- unaware that -- let me start over.

20   It's easy for me to say, right?

21        Were you aware that FSS personnel appeared to be

22   unaware of the management information that was available to

23   them to prepare timely and detailed financial statements and

24   analysis?

25   A    I was aware that management personnel seemed unaware of

Page 180

1    the information available to them to do their jobs.  That

2    would be accounting's responsible to actually prepare

3    financial statements.  That's what -- that point there Is

4    what threw me.

5    Q    Fair enough.  You would agree with me that internal

6    accounting controls were inadequate, right?

7    A    Yes.

8    Q    There was a lack of segregation of duties?

9    A    Yes.

10   Q    Lack of supervisory review?

11   A    Yes.

12   Q    Including billings to PQPR Holdings, right?

13   A    Correct.

14   Q    When did you come on to FSS?

15   A    June 6th is when I was hired.

16   Q    And so, all these findings that we're talking about are

17   subsequent to June 6th, right?

18   A    Yes.

19   Q    Okay.

20   A    And well, let me step back.  I've been told by Mr. Roe

21   that the general ledgers were not up to speed.  I did not

22   realize the significance of that statement when he told it

23   to me.  That was prior to June 6th.

24   Q    Yeah.  You didn't realize just how bad all the

25   financials and accounting were until you got on the scene,

1    right?

2    A    Correct.

3    Q    They were a mess, right?

4    A    They were nonexistent.

5    Q    That's worse than a mess.

6    A    Yep.

7    Q    All right.  You would agree with me that the --

8    locating accurate financial records is a tedious task at

9    FSS, right?

10   A    Locating accurate financial records?

11   Q    Is a tedious task at FSS, isn't it?

12   A    In general, yes.

13   Q    And specifically yes, right?

14   A    Well, I mean, some banks can -- you know, are

15   accessible.  But in general, don't expect them to be.

16          MR. BRIMMAGE:  Mr. Martin, can we pull up

17   Defendant's -- I'm sorry -- I think it's Exhibit 3, the

18   declaration of Mr. Schwartz in this case, and go to

19   Paragraph 94, please?

20   BY MR. BRIMMAGE:

21   Q    We'll blow it up for you, Mr. Schwartz.

22   A    Oh, I can probably read it.

23   Q    Okay.  If you'll just read it to yourself.  I'm not

24   going to attempt to impeach you.  I'm just going to ask the

25   question again and see if we can move it quickly.  Does that

```
 1    sound fair?

 2    A    Yes.

 3    Q    Okay.  Tell me when you're done.

 4    A    Okay.  I'm done.

 5    Q    All right.  Isn't it true that locating financial

 6    records is a tedious task at FSS?

 7    A    I think when you asked me that a minute ago, I

 8    responded with another word than tedious.

 9    Q    Mr. Schwartz, is that a yes or a no?

10    A    That is what this says.

11    Q    Is that true or not true?

12    A    That is not true today.

13    Q    Okay.  Do you recall when you signed your declaration?

14    A    Sometime around the time of filing.

15    Q    July 29th?

16    A    Okay.  Would you leave that paragraph up, please, or go

17    back to it?

18    Q    July 29th?

19    A    Yes.  Sounds about right.

20    Q    So it was true on July 29th?

21    A    I believed it to be true on July 29th.

22    Q    Well, hang on.  You believed it to be true, or it was

23    true?  I want the Court to understand.

24    A    No, I mean --

25    Q    You tell us.  You pick.  Was it true, or you believed
```

1    it to be true?

2    A    I believed it to be true.  Like everything else in

3    here, I believed it to be true.

4    Q    But it may not be true; is that correct?

5    A    True.  And everyone says something's true, it may not

6    be, and in this case, I found out that was not true.

7    Q    I think we are getting a clear picture of what you

8    think the truth is.  Let me ask you the next one.  The

9    recordkeeping for orders, invoices, expense reports,

10   American Express charge reports are not well organized;

11   isn't that correct?

12   A    That's correct.

13   Q    And other records on the computer system also require

14   additional time to retrieve, correct?

15   A    Correct.

16   Q    You testified in your declaration that you have

17   extensive experience serving as a fiduciary in bankruptcy.

18   Do you recall that?

19   A    Yes.

20   Q    What is a fiduciary in bankruptcy?

21   A    It's the same, in my opinion, a fiduciary in any --

22   many other capacities.  It's someone who takes possession of

23   assets belonging to another and owes a duty to the

24   beneficial ownership of those assets that put that -- the

25   interests of the beneficial owner first.

1    Q    Anything else?

2    A    I mean, there are some other components of fiduciary,

3    but that's the primary one that I've always known.

4    Q    Okay.  The assets in the FSS bankruptcy, who's going to

5    be the beneficial owner of those assets?

6    A    Well, the beneficial -- the beneficiary of those assets

7    right now would be the creditors, (indiscernible) first.

8    Q    Creditors.  Anybody else?

9    A    No.  First off is creditors, secured and unsecured.

10   Q    In all your experience as a fiduciary in bankruptcy,

11   who do you see as the creditors in this case?

12   A    The people that the estate owes money to.

13   Q    Who is that?

14   A    In this case we have secured creditors.  You have

15   unsecured creditors.  You have administrative claimants.

16   You have the -- and well -- I mean, yeah.  Government

17   creditors, I think they classify as unsecured, but higher

18   class.

19   Q    Okay.  What analysis or investigation did you do to

20   determine who the creditors or potential creditors are in

21   this bankruptcy?

22   A    Really, we haven't completed -- they haven't even done

23   the schedules yet.

24   Q    Okay.

25   A    We looked at who we owed money to as of the filing date

1    and listed them.  Those are creditors.

2    Q    That's all you did up to the filing date, right?

3    A    Well, I mean, we read the loan agreements and the

4    security instrument, but I can't think of a -- I mean, I

5    don't know what there was to do with the -- we know about

6    the contingent claimants in terms of your clients.  So, I

7    don't think we did any more investigation than that at this

8    time.

9    Q    No more investigation than that before you started

10   seeking the cash collateral order that you're asking the

11   Court to approve, correct?

12   A    Correct.

13   Q    Okay.  You've not done any investigation into what I'm

14   going to call the Plaintiffs -- the Texas and the

15   Connecticut and the TUFTA collective group, Plaintiffs'

16   claims, correct?

17   A    Correct.

18   Q    You don't have an opinion one way or another whether

19   they were wronged or not; is that right?

20   A    The TUFTA claimants and your clients?

21   Q    Yes.

22   A    No.  That's for a tryer.

23   Q    Have you done any analysis or estimation of potential

24   amounts of the claims that could be had?

25   A    No.

Page 186

```
 1   Q    Have you asked for any analysis or estimation of that?

 2   A    No.

 3   Q    Do you believe it's your job to ask for that or to look

 4   into that?

 5   A    No.

 6   Q    Why is it not your job?

 7   A    Well, it's up the courts to decide, liquidate those

 8   claims.

 9   Q    Okay.

10   A    If he came to me and said what could we settle them

11   for, you know, I may be able to come up with a number that

12   we could provide, but it's not going to be the value of the

13   claim, I suspect.

14   Q    You've testified about Mr. Jones -- I guess Alex --

15   there's multiple Joneses, right?

16   A    There's two I'm aware of.

17   Q    And who are the two?

18   A    Alex Jones and Dr. Jones was who I call them.

19   Q    Who's Dr. Jones?

20   A    Alex Jones' father.

21   Q    What's the first name of Dr. Jones?

22   A    David.

23   Q    So, father/son Alex/David Jones, right?

24   A    Yes.

25   Q    All right.  You testified that Alex Jones puts personal
```

1    expenses on the American Express card, right?

2    A    Yes.

3    Q    Do others put personal expenses on the American Express

4    card?

5    A    I don't know that.  I would --

6    Q    (Indiscernible)

7    A    -- not be surprised.

8    Q    -- if you don't know.

9    A    I don't know that yet.

10   Q    Yeah, you don't know.  You haven't looked into that?

11   A    No.

12   Q    Okay.  They could, right?

13   A    They could, yes.

14   Q    And you're asking the Court to use cash collateral to

15   pay American Express?

16   A    Yes.

17   Q    Okay.  But no investigation?

18   A    That hasn't been done yet.

19   Q    You also testified that you intend Alex Jones to not

20   charge the American Express going forward, right?

21   A    No.  He can use the American Express, but not for his

22   personal expenses.

23   Q    All right.  Have you confirmed, as you're testifying

24   today in front of this Court, that Mr. Alex Jones has not

25   used the AMEX for any personal expenses since the

Page 188

1    bankruptcy's been filed?

2    A    No.  I have not had a chance to do that.

3    Q    Have you done anything to cut off Mr. Jones or anybody

4    else from using the AMEX for personal expenses?

5    A    We've started collecting the cards from all the

6    employees.  That is something to be done.

7    Q    Okay.

8    A    Okay?

9    Q    What else?

10   A    We started to collecting the cards.  I have -- as I

11   said, I have not had a chance to look at Alex's charges

12   since the filing.

13   Q    Okay.

14   A    But we'll do that.  And I was in -- I believe -- I

15   don't know if David Jones has a card or not.  We'll find --

16   we'll see what his charges are if they've come against FSS.

17   Q    You don't know if David Jones has a card, right?

18   A    I do not.

19   Q    How many cards are there?

20   A    I don't know.

21   Q    You haven't collected Mr. Alex Jones' card yet, have

22   you?

23   A    No.

24   Q    How many cards have you collected?

25   A    I don't know.  They're doing that today.

```
 1   Q    No idea how many they've collected?

 2   A    As I said, I don't know.  It's being done today.

 3   Q    Before today, is it fair to say no cards were

 4   collected?

 5   A    That's -- not by me.  No, we have not collected cards

 6   before today.

 7   Q    Okay.  And you don't have any personal knowledge that

 8   as you're testifying right now, any cards have actually been

 9   collected, right?

10   A    No.  I've been here all day.

11   Q    So, that's correct.  You have no personal knowledge?

12   A    That's what I said.  I don't know.  I've been here all

13   day.

14   Q    Okay.  When you were asked about Mr. Jones' car, you

15   said you didn't know.  You said, I didn't -- I don't think

16   so, but I don't know.

17   A    I got confused.  I mean, the question was whether the

18   company pays for Mr. Jones' car.

19   Q    Right.

20   A    And I said no.

21   Q    No, and no expenses associated with the car; is that

22   right?

23   A    Not unless they come through on the American Express

24   and they're -- what I saw, they're charged to his draw.  So,

25   to that extent, the company paid -- would pay for them, but
```

```
 1    they're charged -- they were being charged to his draw.
 2    Q    Okay.  But the company initially pays for them?
 3    A    Yes, because it pays the AMEX bill.
 4    Q    Okay.
 5    A    Now, and we say initially.  It's probably on there --
 6    where he works, that'd be charged to his draw before the
 7    AMEX bill gets paid.  So --
 8    Q    Yeah.
 9    A    You know, he gets charged for them before AMEX gets
10    paid.
11    Q    If there's a large judgment in the Austin lawsuit,
12    how's it going to get paid?
13    A    That I don't know.
14    Q    You testified that there's $800,000 in unencumbered
15    cash right now, right?
16    A    Correct.
17    Q    And where did you say -- what did you say the source of
18    that cash was?
19    A    Donations.
20    Q    Donations.  Have you done an analysis of donations over
21    the past five years?
22    A    What do you mean by an analysis of donations?
23    Q    The analysis of how many -- how much money has come in
24    for donations for FSS in the last five years?
25    A    I have looked at that number.  I -- what do you mean by
```

 1    analysis?  I have looked at the number, the amount of the

 2    donations over the last five years, seven years.

 3    Q    How much is it annually?

 4    A    Could I look at Exhibit -- I think it's B, the income

 5    statement that's attached to the --

 6    Q    Let me just ask -- we can go there if you need to --

 7    can you not answer without looking at a document?

 8    A    No.  You're asking me for the number.

 9    Q    Can you give us a ballpark?

10    A    It varies.  It's been -- seven figures.

11    Q    Seven figures?

12    A    Yeah.

13    Q    All right.  So, in the next -- well, how much in -- and

14    is it true all the cash donations are unencumbered?

15    A    Yes.  I asked -- I asked that specific question of my

16    lawyers, is that cash collateral also?  And they said no.

17    Q    When you asked your lawyers, who did you ask?

18    A    Mr. Lee and Mr. Battaglia.  I guess they're not my

19    lawyers; they're the Debtor's lawyers.

20    Q    You have your own lawyer though, right?

21    A    No.

22    Q    You don't?

23    A    No.

24    Q    You don't have your own lawyer?

25    A    No.

```
1    Q    Okay.

2    A    Should I get one?

3    Q    I'm going to leave it.  Do you recall your engagement

4    letter that you talked about, with FSS?

5    A    It depends on what you're asking me to recall from it.

6    Q    Well, it was Exhibit 2 that you spoke to about your

7    lawyers.  It was actually one of the documents that was

8    admitted by agreement.  The May 19, 2022 --

9    A    Right.

10   Q    -- engagement letter?

11   A    Right.

12   Q    Do you recall that?

13   A    Yes.

14   Q    Okay.  It says in there that's CRO's counsel.  That

15   ring a bell with you?

16   A    Yeah, I believe there was a provision in there that I

17   would be permitted to engage counsel.  I have not done that.

18   Q    Okay.  It says FFS will fund $20,000 retainer to be

19   paid to SA LLC, so that SA LLC can engage Mike Ridulfo, of

20   Kane Russell Coleman Logan, to serve as legal counsel to the

21   CRO, correct?

22   A    Correct.

23   Q    You have not engaged Mr. Ridulfo?

24   A    No.

25   Q    Did the $20,000 retainer get paid?
```

1    A    No.

2    Q    So, prior to the commencement of the engagement, that

3    retainer was not paid?

4    A    Correct.  No retainer was paid prior to the signing of

5    that engagement letter.

6    Q    Even though the engagement letter required it?

7    A    Yes, sir.

8    Q    Do you have an opinion one way or another about whether

9    not the engagement letter is enforceable or not?

10   A    Well, I think --

11   Q    I don't think it's that funny.

12   A    What I -- I'm doing -- I think it's terribly

13   enforceable, but I'm not a lawyer and I haven't, you know --

14   I don't think anyone -- I have not asked a lawyer to look at

15   it from enforceability standpoint.

16   Q    Okay.  And you haven't required the -- all of the

17   requirements in the engagement letter to be met; is that

18   correct?

19   A    Well, I -- no, the retainer was paid.  It just wasn't

20   paid in the terms of the agreement.

21   Q    You just testified that the retainer for Mr. Ridulfo

22   was never paid.

23   A    That retainer has not been paid.

24   Q    So --

25   A    I was asked not to engage Mr. Ridulfo.

1    Q    Who asked you not to?

2    A    Mr. Battaglia.

3    Q    What did he ask you that?

4    A    Concerned over costs.

5    Q    Concerned over costs.  So let me make sure we're clear,

6    Mr. Schwartz.  You're using Mr. Battaglia as your own

7    personal CRO attorney as well as the FSS attorney, right?

8              MR. BATTAGLIA:  Objection, Your Honor.

9    (Indiscernible) question.  He can ask a question, but he's

10   putting words in the witness' mouth.  If he wants to know if

11   I'm his lawyer individually, ask that.

12             THE COURT:  I think that's what he did.

13             MR. BRIMMAGE:  I did.

14             MR. BATTAGLIA:  (indiscernible) what he asked

15   (indiscernible).

16   BY MR. BRIMMAGE:

17   A    Well, the answer is, Mr. Battaglia is not my lawyer.

18   He asked me for -- you know, very simply.  He said, I'm

19   concerned about the legal cost.  Do you need

20   (indiscernible).  And I said, well, I don't -- it doesn't

21   seem like it right now, so I'll hold off.

22   Q    The engagement letter negotiated the right for you to

23   seek your own attorney, correct?

24   A    It did.

25   Q    In fact, it said FSS will find $20,000 prior to

1    commencing the engagement, right?

2    A    Correct.

3    Q    And you took advice from FSS counsel not to engage your

4    own CRO counsel, correct?

5    A    I don't --

6    Q    That's what you just testified to.

7    A    I don't think I testified that that was advice.  He

8    asked me not to do it.  He said he's concerned about the

9    legal costs.

10   Q    Okay.

11   A    And after -- you know, I said, okay, I don't see that

12   I'm going to have to have my own counsel here; $20,000 ain't

13   going to pay for much anyway.

14   Q    As the CRO, the only counsel you consult with are FSS

15   counsel?

16   A    Correct.

17   Q    Now, let's stick with your engagement letter while

18   we're here for a little bit, Exhibit 2.  It's dated May

19   19th, 2022, correct?

20   A    Correct.

21   Q    And -- but it's signed by Mr. Jones on June 6th, 2022,

22   right?

23   A    Correct.

24   Q    Why the discrepancy?

25   A    I believe Mr. Jones was committed to signing it and

1    ready to sign it until June 6th.

2    Q    Why is that?

3    A    Well, you'd have to ask Mr. Jones.  I know we had a

4    meeting with him on June 6th to discuss the terms of the

5    engagement letter.

6    Q    Was he concerned about any particular term?

7    A    Yes.  He was concerned about the amount of authority I

8    had.

9    Q    All right.  Let's talk about amount of authority.  Was

10   he concerned about anything else?

11   A    Not specifically, no.

12   Q    Okay.  Now, I'm confused about your prior testimony,

13   and I just want to clarify.  Isn't it true that Mr. Jones

14   can fire you right here, right now, if he wanted to?

15   A    That's -- from my reading of the engagement letter,

16   that's my interpretation.  That he has -- still has the

17   authority to terminate me.

18   Q    Okay.  For whatever reason he wants to, right?

19   A    Yes.  I don't think there's a qualifier in there on

20   termination.

21   Q    Okay.  And along those lines, you testified -- and it's

22   been a while -- that you have full authority over a lot of

23   stuff, except major decisions.  Do you recall that

24   testimony?

25   A    No, I didn't say that.

1    Q    You did.

2    A    No, I didn't say that.  If I did, it's misunderstood.

3    I don't -- I had authority over major decisions, but I

4    agreed I would consult with Mr. Jones before I executed any

5    of those decisions.  I did not say that I could not execute

6    any decision I deemed necessary.

7    Q    What constitutes a major decision that you would

8    consult with Mr. Jones over?

9    A    Well, a major decision would be product line changes,

10   for example.  That would be a significant decision.  A major

11   decision would be, there are certain key personnel on the

12   area of marketing in the production area, which I think

13   would be major decisions if I determined I needed to

14   terminate somebody in those categories.  I consulted with

15   him on the termination of the previous accountant because

16   she had been there for a long time and had been a

17   significant role in the company.  Those were decisions that

18   -- and ramifications throughout the organization or in the

19   operation of the business.  And it would be insane of me to

20   have executed some decision like that without talking to Mr.

21   Jones about it.

22   Q    What about the decision to file for bankruptcy?

23   A    I mean, that was --

24   Q    Whose decision was that?

25   A    The final decision?  That's a good question.  Mr. Jones

1    agreed that we needed to file bankruptcy.  The selection of

2    the date, he concurred with.  The recommendation of the date

3    came from others.

4    Q    Well, let's be clear, Mr. Schwartz.  You were hired

5    because the decision was made to file for bankruptcy.

6    A    Well --

7    Q    You were hired to be the CRO.  You did not make that

8    decision.  That decision was already made, which is why you

9    came on the scene; isn't that right?

10   A    Well, I mean, yes.  The perception was that they needed

11   to file bankruptcy, needed to file bankruptcy.  The question

12   was, could they?  And that was part of my job was to

13   determine if the company could actually file bankruptcy.

14   Q    Okay.  Whose perception, was it?

15   A    I think it was Mr. Jones' and his counsel.

16   Q    Which counsel was that?

17   A    That would be Mr. Jordan, in addition, Mr. Lee and Mr.

18   Battaglia and Mr. Shannon.

19   Q    Okay.  They all -- FSS counsel and Mr. Alex Jones'

20   counsel all got together on whether or not to file

21   bankruptcy -- put FSS into bankruptcy?

22   A    That was that they decided it was a definite option and

23   I got -- I became involved when it was -- it didn't get

24   finalized --

25   Q    All right.

1    A    -- initially.  It wasn't final when I became -- got

2    involved that we would be filing bankruptcy.

3    Q    And when you say they, that's who you're talking about,

4    those -- that group of counsel, right?

5    A    Yes.

6    Q    For all those different Alex Jones-related entities,

7    right, and Alex Jones himself?

8    A    Well, no, these -- they represented FSS and Alex Jones,

9    that group.

10    Q    Okay.

11    A    What other entities I -- we're not there.

12    Q    Who represented the InfoWars Three Debtors prior, that

13    you were the CRO for them?

14    A    Prior was Mr. Lee, Mr. Shannon, I believe, and Mr.

15    Battaglia was involved in that.

16    Q    The same lawyers --

17    A    I'm not sure if they all represented the three of them.

18    Q    Yeah.  Same lawyers we've got here?

19    A    Yes.

20    Q    Okay.

21         MR. BRIMMAGE:  Yeah.  We're going to let the

22    witness answer.

23         MAN 1:  Sorry about that.

24         MR. BRIMMAGE:  That's okay.

25    BY MR. BRIMMAGE:

 1   Q    So, let me just circle back make sure that we're clear.

 2        Your testimony earlier that only the Court can fire

 3   you, that's not the case right now, right?  That's not true?

 4   A    I don't believe so.

 5   Q    Okay.  I appreciate that.  Let's circle back, if we

 6   could, to this donation topic.  Is it true that FSS has

 7   received donations in cryptocurrency?

 8   A    Mr. Jones received some donations in cryptocurrency.

 9   Q    Were those directly to him personally, or are those to

10   FSS?

11   A    They were to his personal -- whatever accounts you call

12   those things.

13   Q    Okay.  They were not to FSS?

14   A    No.

15   Q    Is your --

16   A    Not directly.

17   Q    You've investigated that, and you're rock-solid

18   positive under oath in front of this Court today that that

19   was not to FSS, right?

20   A    No.  I mean, what I'm telling you right now is those

21   donations were given to Mr. Jones.  The -- I have not -- we

22   have not done an investigation as to should they have been

23   Jones' or FSS's.

24   Q    I'm more confused than when I started.  The donations

25   were made to FSS and FSS gave those cryptocurrency donations

1    to Mr. Jones?

2    A    No.  FSS did not touch those currencies.  They went to

3    Mr. Jones.

4    Q    Directly?

5    A    Directly.

6    Q    You haven't investigated whether they should have come

7    to FSS?

8    A    We have not.  Although we have looked at -- no, we have

9    not done that investigation.  We've done -- seen some

10   preliminary information.

11   Q    Okay.  Was -- is the amount this year so far around $8

12   million?

13   A    I'm -- well, I haven't seen a full accounting.  We were

14   told it was $9 million.

15   Q    I'll take $9 million.  And so, the cryptocurrency, $9

16   million were donated to InfoWars, InfoWars.com?

17   A    Not to --

18   Q    Is that right?

19   A    Not to my knowledge.  I don't --

20   Q    Okay.  Well, tell the Court where -- who received those

21   donations from the very beginning, the $9 million in

22   cryptocurrency, what entity, what person received them

23   first?

24          MR. BATTAGLIA:  Objection, Your Honor.  Asked and

25   answered.  He said that it was received by Mr. Jones,

1   several times.

2          THE COURT:  He can clarify.  (Indiscernible).

3   BY MR. BRIMMAGE:

4   A    I'm not sure (indiscernible) clarify that.  They went -

5   - to my -- my understanding is that they went to Mr. Jones.

6   As I said, we have not investigated that.  But that's what

7   I've been told; that they went directly to Mr. Jones.

8   Q    Okay.  Thank you.  Does Mr. Jones have a direct place

9   where people can make donations directly to him personally?

10  A    Well, on the -- I'm not a cryptocurrency guy.  But

11  these were made, apparently, to his cryptocurrency vault, or

12  whatever they call that thing.  So, to that extent, yes, he

13  has his own bank account, people can make donations to that

14  if they have it.

15  Q    Okay.  So, it can be made directly to him --

16  A    Yes.

17  Q    Okay.  Mr. Schwartz, when I'm flipping pages, I'm

18  saving both of us a lot of time.  So, be patient with me.

19  You talked with your attorney about the Plan Support

20  Agreement, which was Exhibit 3.  Do you recall that?

21  A    Yes.

22  Q    All right.  And that was April 15, 2022 is when it was

23  signed, right?

24  A    The -- was that --

25  Q    I'll represent to you that's what it says.

1    A    Okay.  Thank you.

2    Q    That was before your time as CRO, right?

3    A    I'm not sure -- was that before I was CRO there?  I --

4    I'm out at -- and I don't remember when I was hired as CRO.

5    I thought it was prior to that.

6    Q    Hired as CRO for which entity?

7    A    The three -- all three are on the engagement letter.

8    InfoWars, IWHealth, and Prison Planet.

9    Q    What about the FSS engagement?

10   A    That was by FSS, a separate engagement letter.

11   Q    Right.  And that was after April 15th, 2022, right?

12   A    Correct.

13   Q    And you didn't do any investigation or analysis

14   regarding the Plan Support Agreement, correct?

15   A    I'm not sure what you mean.

16   Q    You -- it was given to you, right?

17   A    No.  I was -- a draft was given to me to read and

18   comment on and make recommended changes to it.

19   Q    A draft back -- before it was signed on April 15 --

20   A    Yes.

21   Q    When you were the InfoWars CRO?

22   A    Yes.

23   Q    Okay.  Got it, got it, got it.  Thank you.  Let's go to

24   the two promissory notes that you testified to.  Can we do

25   that?  I'm going to try to do them in one, but if we need to

Page 204

1    break them up, we can.  Isn't it true that you've done

2    nothing to date to determine the validity of those notes?

3    A    I believe I've described to Mr. -- somebody already,

4    that all I've done is look at an analysis showing the

5    computation of the note balances and some of the supporting

6    documentation.

7    Q    But --

8    A    That is not nothing, but that is -- that's the limit of

9    it.

10   Q    For one of the notes?

11   A    For one of the notes, correct?

12   Q    But not for the other note?

13   A    I don't believe I've seen anything on the other note.

14   Q    Okay.  And for the one note that you did see something,

15   you didn't do any investigation about the veracity of the

16   information that you were provided.  You just looked at the

17   information you were provided and accepted it as true for

18   now; is that correct?

19   A    Well, I looked at it.  I did not -- have not gone -- we

20   have not started tracing out the information.  So, I -- I

21   mean, you say I looked at it and took it for true.  I don't

22   take it for anything.  It's not true.  It's not false.  It's

23   not proven.

24   Q    Okay.

25   A    To me.

004562

1    Q    All right.  Fair enough.  You don't know, testifying

2    today, whether the notes are valid and enforceable or not,

3    correct?

4    A    Yeah.  That would be more of a legal question for me.

5    Q    Okay.  Where did you get the notes from?

6    A    Well, I was at FSS's offices, so --

7    Q    Have you had discussions with counsel about the notes?

8    A    Yes.  I was about to say I may have gotten them from

9    counsel, because they were looking all of the documentation

10   before I ever got involved.

11   Q    Right.  And if you got them from counsel, do you recall

12   which counsel might have given them to you?

13   A    No.

14   Q    Okay.  Fair to say you've had conversations with

15   counsel about the notes?

16   A    Yes.

17   Q    Other than your conversations though, you've done no

18   investigations or analysis regarding the veracity of the

19   notes, correct?

20   A    That's correct.  That's not on the -- that's not come

21   up to the top of the to-do list yet.

22   Q    When does that get to the top of the to-do list?

23   A    When we get this -- get this thing stabilized and

24   operating and we didn't -- and turned it, investigating

25   claims.

1   Q    You're asking for use of cash collateral in large part

2   based on the notes, right?

3   A    No.  I'm asking to use the cash collateral because

4   we've got the notes out there showing the collateral right

5   now, or the -- well, I mean, noteholders do.

6   Q    Have you investigated whether or not you can forbear

7   paying on the notes during the pendency of the bankruptcy

8   for now?

9   A    Well, we entered into a forbearance agreement prior to

10  filing of the bankruptcy.

11  Q    Now, you've filed for bankruptcy.

12  A    Right.  And then part of that agreement, we can reduce

13  the payments on the notes.  But -- so now we're in

14  bankruptcy.

15  Q    Now, you're in bankruptcy.  Have you investigated what

16  your rights are as a CRO of a debtor with regard to paying

17  the notes or holding off on paying the notes for right now?

18  A    I have not had that conversation with the lawyers.

19  Q    Okay.

20  A    And I would have to talk to them.

21  Q    I get that.  But you haven't looked into that yet,

22  right?

23  A    No.

24  Q    Has anybody told you, you have to make these payments

25  right here, right now, with the cash collateral you're

Page 207

```
 1    seeking from the -- the authority from the Court?  Has
 2    anybody told you, you have to do it, you must do it?
 3    A    No.  I mean, I don't think I'd be here, because --
 4    Q    Okay.  That's fair.  That's fair.  And so, you don't
 5    know that you have to do it, right?
 6    A    No.  If the Court says no, then we don't have to do it.
 7    Q    I kind of like the sound of that.  Let's go to these
 8    critical vendors.
 9              MR. BATTAGLIA:  Objection to the sidebar.
10              THE COURT:  I'll sustain.
11    BY MR. BRIMMAGE:
12    Q    Let's go to the critical vendors, if we could.  You've
13    already talked a lot about this, so I just want to make
14    sure.  The uniform security, that's a lot of money, right?
15    A    It's a lot of security.  It's 24/7.
16    Q    And is that -- is that -- if Mr. Jones wasn't there,
17    would you still need all that security?
18    A    If he was not in the building that day?
19    Q    Yeah.  Or no, not in the building.
20    A    If he was not in InfoWars at all?
21    Q    Yeah.
22    A    Very probably not.
23    Q    Okay.  All right.  Did you look at that with regard to
24    that -- whether or not that's a personal expense that should
25    be borne by Mr. Jones and paid for with his cryptocurrency
```

1    money or other money?

2    A    No.  It's an expense.  It's the provided security to

3    the employees working there.

4    Q    Well, but if Mr. Jones wasn't there, you just testified

5    the employees don't need that kind of security.

6    A    Well, they don't need that because there wouldn't be

7    any business.

8    Q    Now, you talked to the Court about the three insurance

9    companies, right?

10   A    Right.

11   Q    And you said, look, there's a lot of important assets

12   here that are vital, right?

13   A    Yes.

14   Q    Can you describe for the Court the difference between

15   the three insurance policies and what they cover?

16   A    Not -- no, I don't -- no.  Just their names.

17   Q    You don't have any --

18   A    Property casualty.  We have general liability and -- I

19   don't know what the third one is.

20   Q    I get that.

21   A    Drawing a blank.

22   Q    Apologize.  I get that.  But you can't describe for the

23   Court the three different policies and what they cover,

24   correct?

25   A    Correct.

```
 1    Q    Has anybody told you that you need all three and you
 2    must pay them right now?
 3    A    Yes.  That was how -- that was the --
 4    Q    Who told you that?
 5    A    Well, no one told me that.  They told the people I put
 6    in charge of preparing this list.  And that was based on
 7    going to the employees and saying, okay, what do you have?
 8    What do you have, what vendors do you use, and tell us how
 9    important they are and what we need -- why we need to have
10    them on this list?
11    Q    You were talking to the Court about this little bit,
12    and you talked about claw back.  Do you recall that?
13    A    On Mr. Jones?  Yes.
14    Q    Well, I'm talking about payments to the critical
15    vendors.  You --
16    A    No.
17    Q    -- this -- you (indiscernible) a little bit?
18    A    Yes.
19    Q    And you started saying it, but you didn't finish.  You
20    said, but if we pay them, we have the right to claw back.
21    But you would agree with me, practically, that's not going
22    to happen, right?
23    A    If they're critical vendors and we want to claw back,
24    we have to assess what's the risk to the business of doing
25    that.  So, there may be a legal right, but it may not be
```

```
 1    something we'd be able to execute on.
 2    Q    And even -- that's correct.  And even if you decided
 3    you wanted to claw it back and no longer have a relationship
 4    with that vendor, the chances are you're not getting that
 5    money back, right?
 6    A    It'd be a fight.
 7             MR. BRIMMAGE:  Your Honor, I'm not going to make
 8    my time, but I'm going to keep moving.
 9             THE COURT:  Sounds like I need to see the claw
10    back language.
11    BY MR. BRIMMAGE:
12    Q    In your declaration -- I'm going to do some quick hits
13    -- you talked about personal knowledge, relevant documents
14    in your opinion, right?
15    A    Mm hmm.  Yes.
16    Q    You would agree with me that nothing happened -- that
17    happened before your engagement that you have personal
18    knowledge of, right?
19    A    I think I even said that earlier.  But --
20    Q    Okay.  You also said that -- I'm not going to go
21    paragraph by paragraph, but a lot of your testimony is based
22    on conversations with others or stuff you've read but know
23    is true, correct?
24    A    Correct.
25    Q    And at least as we're sitting here today, the Court has
```

```
 1   no way of knowing when you testify whether or not it's true
 2   and you have personal knowledge of it, or whether you're
 3   just relying on someone else, and you don't know if it's
 4   true; isn't that correct?
 5            MR. BATTAGLIA:  Objection, Your Honor.
 6   Argumentative.
 7            THE COURT:  Yeah.  Mr. Brimmage, can you break
 8   that question up a little bit?  I --
 9            MR. BRIMMAGE:  I --
10            THE COURT:  -- couldn't follow it myself.
11            MR. BRIMMAGE:  Absolutely.
12   BY MR. BRIMMAGE:
13   Q   We're going back to your testimony and your personal
14   knowledge.
15            MR. BRIMMAGE:  And Your Honor, I think I need to
16   ask the predicate question one more time.  It's a repeat,
17   but it gives me momentum.
18   BY MR. BRIMMAGE:
19   Q   So, you testified that some of the stuff that you've
20   testified to in your declaration and otherwise is based on
21   stuff you've read or been told, right?
22   A   Yes.
23   Q   And some of the stuff you've been -- that you've read,
24   you don't know if it's true or not true, right?
25   A   Some of the stuff I've been told; I don't know if it's
```

1   true or not true.

2   Q    That was my next question.  Thank you.  So, there's no

3   way for this Court to know when you're testifying in that

4   box whether or not your statements are actually true or not

5   true, correct?

6   A    Nothing that we are looking at in here, including the

7   13-week budget, is based on information that we created.

8   It's information that was -- we compiled from the records of

9   the company we booked.  But everything in there is based on

10  those records.

11         MR. BRIMMAGE:  Let me object as nonresponsive,

12  Your Honor, and let me try it one more time.

13         THE COURT:  I'm going to overrule that.  I think

14  he's trying to answer the question, but I know where you're

15  going.  But you can ask another question.

16         MR. BRIMMAGE:  All right.

17  BY MR. BRIMMAGE:

18  Q    As a fiduciary, do you have an obligation to know what

19  the truth is?  Yes, or no?

20  A    Well, I'm -- you know, sorry, I'm not a philosopher,

21  but I can tell you I can -- I have an obligation to tell the

22  truth as I know it.  But I may not know the truth.

23  Q    And if you don't know the truth, as a fiduciary do you

24  have an obligation to not make a statement unless you know

25  it's true?

Page 213

```
 1   A    If I believe it's true, then I believe it's true, then

 2   I may -- and I may be wrong.  If I knew it wasn't the truth,

 3   I wouldn't say it.

 4   Q    But you could believe it's true based on something you

 5   read or heard, right?

 6   A    I could believe it's true based on an analysis of a

 7   schedule.

 8   Q    The last paragraph of your declaration says, "I declare

 9   under penalty of perjury that the foregoing is true and

10   correct."  Do you recall that?

11   A    Yes.

12   Q    Okay.  Who drafted your declaration?

13   A    For the most part, Mr. Lee drafted a lot of it, and I

14   drafted a lot of it.

15   Q    When you drafted it and put like a citation of where it

16   came from, so-and-so's deposition, was that you or Mr. Lee,

17   or somebody else?

18   A    That -- well, my understanding that it was Mr. Lee.

19   Q    Okay.  All those citations were not yours, right?

20   A    Correct.

21   Q    Those came from Mr. Lee, right?  And do you recall the

22   deposition that was cited in here?  I'm looking for it for

23   the name and I don't recall it.

24   A    Jacobson.

25   Q    Jacobson.  Did you read Jacobson's deposition?
```

1    A    I don't recall reading it.

2    Q    I think that's what you testified to before.  I just

3    wanted to see if that -- if I heard it right.

4         Let's go to the bankruptcy filing, in your head.

5    You've already talked about this, but I had a follow-up.

6    Paragraph 11 is the one you talked to counsel about already,

7    about -- in the district for 180 days, right?  Did you rely

8    on counsel in making that checkmark on that box for this

9    document?

10   A    Yes.

11   Q    Okay.  I think you said the case law you saw -- did you

12   read cases to help you get comfortable with checking that

13   box?

14   A    I read the -- I read the case; I understand which is

15   the one we're relying on by Judge Hale.

16   Q    But what case is that?

17   A    I knew you were going to ask me that.  Erg, or

18   something like that.  E-R-G, maybe, something like that.

19   Q    Judge Hale?

20   A    Judge Hale of the Western -- up in Fort Worth.

21   Q    Okay.  The Northern District of Texas?

22   A    Yeah.

23   Q    All right.  Who gave you that case?

24   A    I believe Mr. Lee gave it to me.

25   Q    Okay.  And when Mr. Lee gave it to you and when you

1    read that case, did you ask, what does it mean when it says

2    principal assets in this district?  Did you ask that

3    question of any -- Mr. Lee or anybody else?

4    A    I don't recall.  We looked at -- I looked at that case

5    back in the filing of first bankruptcy.

6    Q    Okay.  Do you know what in this district means?

7    A    Yeah.  I assume it refers to the Federal District.

8    Q    Do you think it means the Southern District of Texas,

9    where this Court is sitting?

10   A    That's the way I always interpreted it.

11   Q    Okay.  But just to summarize, you don't recall -- you

12   testified there are no assets of FSS in the Southern

13   District, right?

14   A    Not that I'm aware of.

15   Q    Okay.  Okay.  All right.  I might get in trouble for

16   going over this because you talked to the Judge about it a

17   little bit.  So, I would like to follow up a little bit.

18   A    Okay.

19   Q    This is the discussion you had regarding when you were

20   the CRO -- you still are -- for what I call the InfoWars

21   Debtors, right, the three?

22   A    Yes.

23   Q    Right?  And your declaration or your statement of

24   disinterestedness, right?

25   A    Yes.

Page 216

1   Q    And the involvement of FSS, that wasn't disclosed to

2   the Court or anybody else, right?

3   A    Correct.  When you say anybody else, I mean the people

4   involved with the InfoWars that were aware of it.

5   Q    Okay.  The public wasn't aware, right?

6   A    I don't believe so.

7   Q    And the Judge wasn't aware, right?

8   A    No.

9   Q    And the Plaintiffs' lawyers from Texas and Connecticut

10  to the best of your knowledge weren't aware or made aware,

11  right?

12  A    To the best of my knowledge.

13  Q    When you say that you were disinterested, what does

14  that mean to you?

15  A    Well, I'm -- in my opinion, it means I have no

16  conflict.  I -- there's no party that I'm involved with is

17  adverse or has an interest in what I'm doing.

18  Q    Did FSS play a role at all in the InfoWar bankruptcy?

19  A    FSS agreed to provide -- was going to provide cash flow

20  to the settlement fund.

21  Q    And who on behalf of FSS was going to authorize that or

22  approve that?

23  A    That would have been Mr. Jones.

24  Q    Mr. Jones.  And you were -- but you were the CRO at the

25  time of the InfoWar entities, right?

Page 217

```
 1   A     I was CRO of the InfoWar entities.

 2   Q     Right.  So FSS was a counterparty that was going to

 3   provide money to fund some of the issues in the InfoWar

 4   bankruptcy, right?

 5   A     Yes, under the Plan Support Agreement.

 6   Q     And FSS had their own counsel, or did they have the

 7   same counsel?

 8   A     I have no idea who FSS's counsel was in that.

 9   Q     Okay.

10   A     I don't know.

11   Q     You don't know?

12   A     Mm mm.

13   Q     When you were the CRO of the InfoWar Debtor entities,

14   did you have fiduciary duties then?

15   A     Through those Debtor entities, yes.

16   Q     Did you have fiduciary duties at that time to FSS?

17   A     Not that I'm aware of.

18   Q     Okay.  Let me ask you just a couple of what I think are

19   follow-up questions.  This goes back to the general ledgers

20   that were a mess when you arrived on the scene.  Do you

21   recall that discussion?

22   A     We had several, I believe so.

23   Q     Okay.  Does Melinda Flores ring a bell to you?

24   A     The name does, yes.

25   Q     Who is that?
```

1   A    She was the -- I think her title was Controller when I

2   came on the scene as CRO of FSS.

3   Q    And do you know what time period she was responsible

4   for preparing the FSS books?

5   A    As I recall, she closed the 2020 books.  So, at least

6   sometime in 2020, if not prior thereto.  She may have been

7   there in 2019.  I just don't -- you know -- I might have

8   heard that.  I don't know.  I know she closed the 2020

9   books.

10  Q    You haven't looked into that at this point, right?

11  A    Yeah.  Unless -- I mean, unless someone shows me

12  there's a need for me to look into --

13  Q    Okay.

14  A    -- her administration.

15  Q    Okay.  All right.  Okay.

16       MR. BRIMMAGE:  Your Honor, if I can just have like

17  60 seconds for a quick --

18       THE COURT:  Absolutely.  Take your time.

19       MR. BRIMMAGE:  -- and continue my -- I'll consult

20  with him, but I'm also going to look at my notes real quick.

21  BY MR. BRIMMAGE:

22  Q    Mr. Schwartz, just a couple more final questions.  And

23  thank you for your patience.  Have you assisted in preparing

24  any of the witnesses that have been deposed in any of these

25  State Court actions?

```
 1    A      No.  Oh, wait a minute.  Excuse me.  There was a --
 2    yes, I did talk to somebody.
 3    Q      Do you recall who the somebody was?
 4    A      She was a corporate rep.
 5    Q      Corporate rep for who?
 6    A      That I don't know.  I assume FSS, but I don't know.
 7    Q      Why did you help prepare this witness?
 8    A      Because the knowledge we had gained on the accounting
 9    and accounting records, I was asked to talk to her and
10    answer specific questions she might have to fill out her
11    knowledge.  Because prior to what we had done, the
12    accounting records were absolutely unreliable for '21 and
13    '22.
14    Q    And you don't know if you talked to her because she was
15    being deposed on behalf of FSS or some other entity,
16    correct?
17    A      She was being deposed.  I remember that.  And --
18              THE COURT:  Do you recall when that was?
19              THE WITNESS:  Might have been early in July, is
20    what I think; mid -- maybe mid-July.  But it seems like by
21    then we were heavy into --
22              THE COURT:  Okay.
23              THE WITNESS:  -- other stuff.  But we were -- it
24    had taken us until then to get enough of the accounting
25    records up to date where they were usable information coming
```

Page 220

```
 1    out.
 2    BY MR. BRIMMAGE:
 3    Q    Could it have been June 27th that the deposition took
 4    place?
 5    A    Is it -- Brittany is her name?
 6    Q    Brittany Paz?
 7    A    Yeah.  Okay.  If that was the date, then it was a
 8    couple of days prior to that.
 9    Q    It was prior to that, right?
10    A    Yeah.
11    Q    So you had been on the scene --
12    A    Not long.
13    Q    Less than a month?
14    A    Yes.
15    Q    Right?  All right.  With books and records that are a
16    mess, right?
17    A    Yep.
18    Q    Okay.  Have you read any of the Plaintiffs' lawsuit
19    complaints?
20    A    I read the -- was that the Fourth Amended Complaint, I
21    believe by the Connecticut complainants.  I read that
22    recently.
23    Q    Any others?
24    A    I don't -- I probably read some of the Texas complaints
25    at some point in this process.  Seems like I did but then --
```

1   I had to read the Fourth for some --  I guess recently to

2   prep for, I think, for something -- for some of this stuff

3   this week.

4   Q    Are you keeping up with the Austin trial?

5   A    Very little time to keep up with that then.

6   Q    You would agree with me that the Austin trial result

7   could have a significant impact on this bankruptcy, right?

8   A    I don't know.  I mean, it's going to -- I expect to

9   have a big judgment, and if we don't have a big judgment,

10  even a little judgement's going to have a -- both would have

11  an effect on the bankruptcy.  We have to recognize that.

12  Q    What is a big judgment?  What effect does --

13  A    I know that I understand that the Plaintiffs' opening

14  statements they asked for $145 million.  That would be a big

15  judgment.

16  Q    And if there's a big judgment, what impact do you

17  foresee on this bankruptcy?

18        MR. BATTAGLIA:  Objection, Your Honor.  Calls for

19  speculation.

20        THE COURT:  Yeah, well, just find out where we're

21  going with this one, Mr. Brimmage?

22        MR. BRIMMAGE:  Yeah.  Where I'm going, Your Honor

23  --

24        THE COURT:  Might have gone out of bounds on it.

25        MR. BRIMMAGE:  Absolutely.  I think what we're

```
 1    hearing is that Mr. Schwartz has done nothing -- well, I'm
 2    going to say this, and then I'm going to try to elicit the
 3    testimony, so here we go -- has done --
 4              THE COURT:  Well, just --
 5              MR. BRIMMAGE:  -- nothing to look after the
 6    Plaintiffs' --
 7              THE COURT:  Well, no, no.  Just elicit the
 8    testimony and then you can make the argument at the end.
 9              MR. BRIMMAGE:  Okay.
10    BY MR. BRIMMAGE:
11    Q    Let me ask you this.  You already -- we've already
12    talked about, and you already testified that you've not done
13    anything to assess or analyze the veracity of the various
14    lawsuits by the Plaintiffs across the country, right?
15    A    Correct.
16    Q    And if you are not looking after those potential or
17    actual unsecured, unliquidated, contingent creditors, whose
18    job in this bankruptcy is it to look after them?
19    A    I'm not sure what you mean by not looking after them in
20    this.  My job, as I understand it, and always understood it,
21    is to -- is to get the estate back onto a reasonable basis
22    and generating income, whether that's going to sufficient to
23    pay the creditors or not.  But I can't do anything more than
24    protect the assets and try to increase the value of the
25    estate.  That is -- I mean, I'm not a tryer of fact, so I
```

```
 1    can't do much on the case side.

 2    Q    I appreciate that.  But it's -- you don't believe it's

 3    your job to look after the various Plaintiffs and their

 4    unsecured claims in this case; is that correct?

 5              MR. BATTAGLIA:  Your Honor, I'm going to object.

 6    I think he answered that question --

 7              THE COURT:  Yeah.

 8              MR. BATTAGLIA:  -- in his prior answer.

 9              THE COURT:  I think he's answered the question,

10    Mr. Brimmage.

11              MR. BRIMMAGE:  All right.  I appreciate it, Mr.

12    Schwartz.  Your Honor, what I'm getting at is we need a Tort

13    Committee.  Thank you.

14              THE COURT:  Thank you.  Mr. Lemmon?

15              MR. LEMMON:  Thank you, Your Honor.

16    BY MR. LEMMON:

17    Q    Mr. Schwartz, you and I have known each other

18    professionally for over 30 years, right?

19    A    Since you were a baby lawyer.

20    Q    Yes, sir.

21              MR. BRIMMAGE:  Your Honor, just (indiscernible) --

22              THE COURT:  I was going to --

23              MR. BRIMMAGE:  -- because it seems

24    (indiscernible).

25              MR. LEMMON:  I'm getting to that point with my
```

```
 1    next question, Your Honor.

 2              THE COURT:  Let's see where this goes.

 3    BY MR. LEMMON:

 4    Q    But in this case, our relationship has been -- we've

 5    got a good relationship, you and I, professionally and we're

 6    friendly, aren't we?

 7    A    Most of the time.

 8    Q    Okay.  In this particular case, our relationship has

 9    been adversarial; is that correct?

10    A    Extremely so.

11    Q    Now, you remember, and you've been asked about the

12    discussions -- the negotiations about the forbearance

13    agreement, right?

14    A    Are you asking me if I remember the negotiations?

15    Q    Right.

16    A    I sure do.

17    Q    And those negotiations were heated, weren't they?

18              MR. BRIMMAGE:  (Indiscernible).

19              THE COURT:  Yeah.

20              MR. LEMMON:  Your Honor --

21              MR. BRIMMAGE:  (Indiscernible).

22              MR. LEMMON:  Your Honor, I'm adverse --

23              MR. BRIMMAGE:  (Indiscernible).

24              THE COURT:  Let me ask this.  How are you adverse

25    to -- at this time?
```

1              MR. LEMMON:  I'm adverse to the Debtor with

2       regards to issues concerning the cash collateral.  I have,

3       on behalf of my client, consented to the form of order that

4       was proposed by the Debtor.  But that was also after

5       negotiations.  So, I am not opposed to the relief that the

6       that the Debtor is seeking on an interim basis today.  But I

7       want to make clear my client's position and our

8       separateness.  And my client's position has been attacked

9       here today.

10             THE COURT:  I think you've done it.  I think you

11      done it.

12      BY MR. LEMMON:

13      Q     Why was the forbearance agreement important from the

14      Debtor's perspective?

15      A     The forbearance agreement, we needed -- needed the

16      reduction in the cost of the processor fee.  We needed to

17      change the ratio of sharing the sales proceeds.  Those two

18      were critical to the survival of the Debtor.

19      Q     And is the Debtor trying to change its business plan;

20      in other words, I mean the way it does business, the way it

21      acquires product and sells product?

22      A     Well, yes and no.  We are trying to be much more

23      selective in the product we acquire.  We are trying very

24      hard to separate so it's clear what's our product and what

25      is not because we think we get higher margins on our

1   product.  I shouldn't say ours -- the FSS's.  From the

2   standpoint of the overall business operation, it needs

3   organization.  It needs a lot of training.  Personnel are --

4   grew up in their jobs, but they don't know what they should

5   be doing and what they --how they should be making decisions

6   and on what data they should be making decisions.

7   Q    Is the Debtor attempting, in part, to transition away

8   from mostly buying products from my client to buying

9   products on its own?

10  A    Yes.

11            MR. BRIMMAGE:  Objection.

12            THE COURT:  Yeah, and Mr. Lemmon, I think none of

13  us discussed any of this.  I'm going to, kind of, keep you

14  within the bounds of where things are going.  So, if you've

15  got a couple of questions, I'm --

16            MR. LEMMON:  Thank you, Your Honor.

17  BY MR. LEMMON:

18  Q    Do you have an estimate of the legal expenses that the

19  Debtor has incurred in the Sandy Hook litigation?

20  A    I have a number, which from the accounting records, I

21  do not believe it's accurate.  And the reason is, the

22  recording of entries and legal fees don't -- the description

23  does not always tell you what case or even what firm it

24  relates to.  But best that what we can identify is what we

25  know being related to this -- the Texas case is, it's a --

Page 227

```
 1              MR. BRIMMAGE:  Objection.  (Indiscernible).

 2              THE COURT:  Yeah, I'm going to let him finish the

 3    answer because I think he's just giving his thoughts.  But

 4    again, I'm -- those kinds of questions about cash collateral

 5    or the critical and the emotional, I'll let you go there,

 6    Mr. Lemmon, but is it really -- I just -- with your client,

 7    those are cash collaterals are nothing that you're

 8    interested in.

 9              MR. LEMMON:  That's true, but I believe that this

10    question has to do, in part, with that.  And so, if the

11    witness could be allowed to finish his question -- his

12    answer.

13              THE COURT:  Okay, well, I'll allow it.

14    BY MR. LEMMON:

15    A    From what I can tell, FSS identified payments of

16    approximately $4.5 million through 2022, from 2018 through

17    2022.

18    Q    You were asked a few questions about cryptocurrency,

19    and whether that cryptocurrency was cash collateral.  Do you

20    recall having discussions with me and with my client where

21    we were trying to establish that it was cash collateral?

22              MR. BRIMMAGE:  Objection.  (Indiscernible).

23              THE COURT:  Sustained.

24    BY MR. LEMMON:

25    Q    Do you recall any discussions with me and my client on
```

1    that subject?

2    A    Yes.

3    Q    And to your knowledge, do you know whether we did an

4    investigation trying to prove that it was cash collateral?

5              MR. BRIMMAGE:  Objection.  (Indiscernible).

6              THE COURT:  Yeah, I'm going to sustain that.  Mr.

7    Lemmon, if your client has a position on it, then they can

8    file something or make an argument about it.  But whether

9    you've done an analysis or not, I'm sure you'll tell me at

10   some time, at some point.

11             MR. LEMMON:  Thank you, Your Honor.

12             THE COURT:  But all your rights are reserved.  I

13   mean --

14             MR. LEMMON:  Of course.  Thank you.  Thank you,

15   Your Honor.  That's all I have.

16             THE COURT:  Okay.  I'll give you a brief redirect.

17             MR. BATTAGLIA:  Your Honor, I'll be

18   proportionately brief.

19             REDIRECT EXAMINATION OF W. MARC SCHWARTZ

20   BY MR. BATTAGLIA:

21   Q    So, you were asked an awful lot of questions on cross

22   about the things that you haven't done about validating Mr.

23   Jones' draws, about validating or examining the precise

24   amounts that were advanced by PQPR, about valuating the

25   Plaintiffs' litigation claims.  Tell me again when you were

1    retained.

2    A       June the 6th of 2022.

3    Q       And tell me again when this bankruptcy case was filed.

4    A       July 29th.

5    Q       Good Lord, Mr. Schwartz, what have you been doing?  Why

6    haven't you evaluated those matters?

7    A       We have spent most of that time, substantially all of

8    the time, getting accounting books up to date so we could

9    determine what our cash flows looked like and what we --

10   whether we could or could not even file.

11   Q       And what amount of your workday is focused on FSS

12   business?

13   A       Post-petition?  I get about two hours a day, if I'm

14   lucky, on the business side.

15   Q       Okay.  But on the non-business side of FSS, total time

16   delegated to FSS?

17   A       Oh, my total time on FSS is -- honestly speaking, I'm

18   not the only one, but it's easy eight to nine hours a day.

19   Q       And are there -- how many people within the Schwartz

20   and Associates firm are dedicating time to the FSS file?

21   A       Four and a half or so.

22   Q       And you mentioned a Mr. Schultz, Schultz --

23   A       Schultz, it's pronounced Schultz.

24   Q       How much of his time is being dedicated towards FSS?

25   A       He's full-time.

1    Q    And so, all these people dedicating all this time,

2    again, you mentioned getting the books and records, what

3    else have you focused on, aside from getting the books and

4    records in a usable state?

5    A    Trying to figure out why we are constantly being

6    surprised with invoices that we didn't know were sitting out

7    there getting old.

8    Q    What about product orders?

9    A    Product orders.  Yes, definitely product orders and

10   reconciling deposits.  For example, we have one vendor that

11   we -- $1.5 million was sent to, a little over $1.5 million,

12   and $1,350,000 worth of product was actually ordered.  We

13   have a 250-something thousand- dollar credit sitting there,

14   which we were unaware of.  We had to find that, reconcile

15   that, and discuss that with Mr. Jones.  Why is that here?

16   Q    So, your focus has been on normalizing the business of

17   this juncture?

18   A    Yes.

19            MR. BRIMMAGE:  Your Honor, objection.  Leading.

20            THE COURT:  Sustained.

21   BY MR. BATTAGLIA:

22   Q    What has your focus been on this since your engagement?

23   A    I've been trying to get my arms around it and get it

24   into a standard operating mechanism where people go to work,

25   they know what their job is going to be that day, they do

1   it, and we get rid of the last-minute catastrophes that have

2   to be handled.  And that stated, we are literally right now

3   in the -- oh, you've got to pay this bill because, you know,

4   it's way past due and we're going to get cut off.

5   Q    In order of priority, to protect and preserve the value

6   of the estate and generate revenue, what are the most

7   important things to do?

8   A    Get control of the costs and get the revenue coming in

9   the door.

10   Q    Where does evaluating Alex Jones' draw come on that

11   list?

12   A    That comes when you've got all -- got the business

13   running on an even keel, maybe I can start those processes.

14   Q    Where does evaluating the PQPR debt?

15   A    It comes in the same category.

16   Q    Where does evaluating the Plaintiffs' claims fit in

17   that regard?

18   A    Well, right now, with them sitting in the courts, I

19   mean, the Court's going to determine the Plaintiffs' claims.

20   I don't -- it's hard for me to see what I need to do to

21   evaluate -- to quantify the Plaintiffs' claims.  It's not a

22   matter to come to me.

23   Q    What is your role in the litigation, the Plaintiffs'

24   litigation?

25   A    I'm -- obviously, to the extent there's discovery, my

1   role is to cooperate and assist in that, try to make sure --

2   I have the perception that information was requested that we

3   didn't have, or at least I've been told that that's not

4   something we track.  But that clearly was not made known,

5   and I also have a perception there was a lot of stuff put

6   out there by people who just didn't know what they were

7   doing.

8   Q    Did Debtor have legal representation in both of those

9   lawsuits?

10  A    Yes.

11  Q    And it's not Mr. Lee or myself?

12  A    Correct.

13  Q    What is your intention regarding investigating the

14  matters that have been discussed here, the Alex Jones draws,

15  the note balance, and ultimately, I guess, the Plaintiffs'

16  claims?

17  A    Well, there are a number of -- they fall in the

18  category of the number of deadlines we have to investigate.

19  And they are, you know, once we get past fire drill and get

20  this thing under control, which hopefully is within sight of

21  happening, we have to do a little bit more hiring.  Then we

22  can turn around and start, you know, get into the more

23  routine -- supporting the bankruptcy, supporting the Chapter

24  5 Trustee, and starting to evaluate and investigate the

25  claims.

1    Q    You were asked a series of questions regarding Mr.

2    Jones' draw -- historical draws and salary.  I want to visit

3    that a little bit here.  You've at least reviewed, from the

4    general ledger, what the distributions were to Mr. Jones for

5    the period from 2012, say, to 2022?

6    A    I've seen them, yes.

7    Q    And how -- there were some questions asked about post-

8    April 2018 draws.  Can you tell the Court, comparatively

9    speaking in the three or so years before 2018 or four years

10   -- and the four years following 2018, were they different,

11   the same?  How did they compare?

12   A    No, the draws declined following 2018 from the previous

13   period.

14   Q    The Debtor broadcast, the primary broadcast that FSS

15   transmits is called what?

16   A    The Alex Jones Show.

17   Q    Huh.  Is he important to that show?

18   A    Very much so, yes.

19   Q    In your opinion, is Mr. Jones valuable to FSS in his

20   ability to generate revenue in the future?

21   A    Yes, very much so.

22   Q    Why is that?

23   A    He has -- he's a salesman.  He's a -- his forte is

24   selling, and he's very, very, very good at it, and he can

25   sell to his audience.

1    Q    In your opinion, who at FSS is more valuable than Alex

2    Jones?

3    A    Who is more valuable?

4    Q    Yes.

5    A    Nobody.

6    Q    Do you have an opinion as to whether or not a salary of

7    a $1.3 million is appropriate for Mr. Jones and what he

8    contributes to this venture?

9    A    Well, I don't think it's anywhere near representing the

10   value that he provides.  It's quite appropriate from the

11   standpoint of FSS.  You know, it's good for FSS because I

12   think it's far below, way below what he could achieve and

13   has achieved in the past.

14   Q    You were asked some questions about why did FSS file

15   and I think you said something about because of the state of

16   litigation.  What other purposes were primary in your

17   decision to proceed with filing?

18   A    Well, the other purpose is, as I pointed out, the --

19   this organization, this business needs to be reorganized.

20   It has to become -- it's -- it does not have the internal

21   information loop to identify when it's heading into the

22   ditch and to help it make decisions to avoid that.  It has

23   gotten itself in the position where he has to get fully into

24   the ditch until it realizes it has a survival problem.  That

25   takes a reorganization and rethinking.  That takes managers

 1   who begin to monitor the financial information related,

 2   their operation and the overall operation.

 3   Q    In 2021, now that you've closed the books, to what

 4   degree was the Debtor profitable or unprofitable?

 5   A    It was unprofitable.  It lost about $10 million in

 6   2021.

 7   Q    And to date, has that trend changed?

 8   A    Well, through May 31st, I think we reported a profit

 9   around a million dollars or so, but a significant part of

10   that was donations.  Donations are not operating results, so

11   it's hard to account for them.  So, it's definitely improved

12   from what it was in 2021, but I don't think we're anywhere

13   near a sound basis yet.

14   Q    Lots of questions about accounting issues, which you

15   were asked on direct and cross and everybody wants to call

16   it mess and terrible.  Was the ledger, at least up to 2021,

17   reliable?

18   A    It appears to be, yes.

19   Q    And the problem in 2022 is, that there had been no

20   postings as of --

21   A    Correct.

22   Q    Okay.  So, what information that was necessary to close

23   2021 and to book entries in 2022 was not made available to

24   you?

25                THE COURT:  I think you've covered that road.  I

1   think you've covered that road, Mr. Battaglia.

2   BY MR. BATTAGLIA:

3   Q    I just want to ask, have you been provided access to

4   all the information you need to do your job?

5   A    Yes.

6        MR. BATTAGLIA:  May I have one minute with my co-

7   counsel?

8        THE COURT:  Absolutely.

9        MR. BATTAGLIA:  I'll pass the witness.  Thank you,

10   Mr. Schwartz.

11        THE COURT:  Okay.  I think I'm ready.  I want to

12   note two technical things and then I'll get into the

13   rulings.  One is -- and I'm going to consider it an

14   oversight, but I want it corrected today.  I looked at the

15   Debtor's petition, voluntary petition, and Mr. Battaglia,

16   you didn't sign it.  I need you to sign it today.  It's --

17   I'm just looking -- I don't -- I see where your name is

18   listed, but I don't see -- I'm going to share my screen.

19   I'm going to consider that just an oversight, but I want it

20   corrected.  It's required on a voluntary petition and that's

21   what I see on the voluntary petition, so I want that

22   corrected.  I want it corrected today, unless there's an

23   amended on file, and if there is, someone let me know.

24        This case was filed in the Victoria Division and

25   in May 19th -- on May 19th, excuse me.

1          MR. BATTAGLIA:  (Indiscernible) this case?

2          THE COURT:  No, no, no.  I'm saying -- I'm saying,

3     this case was filed in Victoria and on May 19th --

4          MR. BATTAGLIA:  Okay.

5          THE COURT:  -- Bankruptcy Court entered a General

6     Order 22-3.  It deals with Division of filing locations, and

7     it amends Local Rule 1002-1, and it says, (indiscernible)

8     that cases must be filed in the division of the Debtor's

9     principal location.  Principal location, if the Debtor has

10    none, the principal location is the Houston Division, and

11    that's what would have qualified in this case.

12         I'm going to -- you know, (indiscernible) the

13    Houston Division, based on my experience with the prior

14    cases and the efficiency and the best interests of the

15    estate, I'm going to transfer the case to the Houston

16    Division, and I'm going to transfer it to myself and keep

17    the case and we're going to keep the same case number.  But

18    it should be in Houston.  I want to make sure that we're

19    observing the local rules as done.  Parties have their

20    rights, but I want to make sure that those two technical

21    things, one I'll take care of on the back end, one, Mr.

22    Battaglia, you need to sign a declaration.

23         So, that -- but before the Court are two matters,

24    the utility -- I've signed schedules extension that's on the

25    docket.  Utilities you're going to tweak.  What's left now

1   is cash collateral and the critical vendor motion.

2           And let me just excuse you.  You can have a seat.

3           Here's what I'm going to do.  I'm both -- I'm just

4   going to note that notice of today's hearings was proper,

5   the Court considered the evidence on the record, as well as

6   the testimony of Mr. Schwartz.  I appreciate Mr. Schwartz's

7   candor and his testimony.  Some of it I found very helpful.

8   Some of it I found honestly troubling.  Some of it is not

9   surprising for a Debtor early on in a case.  Management may

10  not be completely able to have its arms around a case so

11  that doesn't surprise me.  But everybody knows why these

12  last cases were filed, or the driving impetus, but driving

13  the last case and this case and that's -- there are some

14  major lawsuits going on in Austin and in Connecticut, and

15  they're very serious lawsuits that make some very serious

16  allegations.

17          It's not for me to comment on the merits of any of

18  them.  Those processed -- the process in Austin will run and

19  I don't want to say anything one way or the other about

20  what's happening in that lawsuit.  I just know that it is a

21  significant action, and I do know, and I don't want to make

22  light of it, that there are some -- they are real people and

23  real faces behind each one of them, they're real Plaintiffs

24  who have experienced real pain.  And I think Mr. Jones is --

25  and these Debtors are entitled to put on their defense and

1    it's not for me to comment one way or the other.  I just

2    know that there's a lot of seriousness and I take it as

3    such.

4            And so, I take each case that is filed before me

5    with the same degree of focus, preparation as one would hope

6    that a bankruptcy judge would.  And I've took the last cases

7    really seriously and prepared really hard and I've done the

8    same here.

9            So, there's two motions here, and really the

10   question is, is how you stabilize the company now.  There's

11   also been -- there's been oral request for the appointment

12   of a committee, and that can be done by the Court for cause.

13   I'm not going to grant that today, but I am going to express

14   some real concerns about what I heard, and I'll express what

15   they are.

16           You know, whether you realize it or not, Mr.

17   Schwartz was negotiating on both sides of a deal.  And what

18   was represented to me in the last case was that there was --

19   the parties were going to propose mediation and there was a

20   Plan Support Agreement and asking me to approve  Plan

21   Support Agreement entry into where parties were going to try

22   to -- at least what was stated to me in the last case was

23   that, parties were going to ask for mediation and to try to,

24   you know, ask the Plan, there were milestones, and third-

25   party contributors consisting of Mr. Jones and Free Speech

Page 240

```
1    were at least offering to put some money on the table to see
2    if there could be a deal that was worked out and that didn't
3    happen.  And I'm not saying it should have happened.  Again,
4    I'm just saying the fact it did not happen, so I'm not
5    saying there was not a good reason that it shouldn't have
6    happened.  Again, I'm just pointing to the fact that that
7    did not occur.
8            But Mr. Schwartz, you spoke with both third-party
9    contributors at the time, and at least what you're telling
10   me, Mr. Lee was involved as well at the time, then both
11   parties were representing the InfoW Debtors who were --
12   quite frankly, membership interests had been transferred to
13   a trust.  And so, I haven't fully thought through, but I'm
14   concerned that you still may represent the InfoW Debtors as
15   their CRO and how you're purporting to act as the CRO in
16   this case.  And I don't -- at some point, someone's going to
17   have to make some really hard decisions.  I'm -- quite
18   frankly, I'm a little surprised you hadn't read some of the
19   litigation because at least InfoW was involved in the
20   litigation for every one of these last time.  So -- and that
21   was supposedly the purpose of the litigation.
22           So, I'm a little surprised that the CRO is telling
23   me today that he hasn't read, at least, the -- or has a good
24   working knowledge of the lawsuits, including the fraudulent
25   transfer litigation.  I didn't know whether the fraudulent
```

1    transfer litigation has any merit.  I don't know whether --

2    I've heard today about the potential indemnity that Mr.

3    Jones may have against FSS.  And you may file a proof of

4    claim.  He may file a proof of claim, he may not.  That's

5    not surprising in a case whereas -- but the Debtor is going

6    to have to make some tough decisions at some point.  And

7    it's going to have to really analyze those claims and see

8    whether those claims have any merit and whether there are

9    claims that the estate has that it may bring on its own, and

10   I don't know if there are any.  That's certainly not for me

11   to comment on, but someone's going to have to do the hard

12   work, and I don't know how that hard work gets done from

13   what I'm hearing.

14        And I'm not sure that parties who were introduced

15   in the last case could fill that role either.  But the

16   Debtor needs to hear that from me, and I think debtors are

17   entitled, especially early on in a case, to think about what

18   the judge may have to say.  And these are certainly rare

19   comments, but these are certainly uncommon cases.

20        And I don't want to -- there's a request for the

21   appointment of a Tort Committee and I think it's not wholly

22   unfounded to ask for one.  And I think I owe them a real

23   answer as to why I'm not going to appoint one today.  The

24   fact that a Debtor has got to get its books right, that

25   doesn't surprise -- that's -- I think professionals can get

Page 242

1   their hands wrapped around that and can drink from the

2   firehose from it and stabilize the company.  But I think

3   there's going to be some hard decisions that have to get

4   made, and maybe the answer is that there are no claims.

5   Maybe the answer is that everybody's entitled to what

6   they're saying they are.  Maybe the answer is that, you

7   know, the secured creditor is a valid secured creditor, it's

8   a validity priority to the extent that there's liens that's

9   valid.  I have no idea, but I know somebody's got to go do

10  that work.

11          Someone has to do the hard work on that, and I

12  don't know who is going to do the work.  I don't know who is

13  going to make the call if there really is something there to

14  do.  And I think the Debtor is going to have to really give

15  some thought about who is truly independent and whether

16  someone can convince me otherwise about that.

17          But for purposes of today, I'm not going to

18  appoint one, but certainly it's without prejudice and maybe

19  I hear something that tips me over.  I'm sure this is not

20  going to be the last time a request is made, but I do read

21  it as my call.  Mr. -- but I do know that if I do appoint

22  something or authorize one, that I will turn it over to the

23  Office of the United States Trustee, who will then do their

24  work.  I won't get involved in that part of it.  But I'm not

25  going to appoint one today.  I think the Debtor has to think

1    about what I'm saying today.

2         But for purposes of today, I'm going to authorize

3    the use of cash collateral on a limited basis.  And here's

4    what I'm going to approve on this, and I've got a, kind of,

5    an additional request at the end.  I have a line item,

6    "Outsource Services/Consulting Services", there'll be

7    repayments on those.  That's about $45,980, $22,670.  I've

8    heard no evidence that any of that is an emergency and

9    should be authorized today.  You can come ask for it on a

10   final.  It's without prejudice but will not get paid in the

11   interim.  The American Express bill, no.  It's about

12   $172,000.  That bill will not be -- I'm not authorizing

13   payment on -- any payments on that card.  You can ask for it

14   on a final.  Mr. Jones' employment salary.  I think the

15   parties had initially talked about a reduction to $20,000.

16   I'll authorize the payment of $20,000 for Mr. Jones.  I

17   think the employees -- my understanding is that none of the

18   work that they would be paid for is pre-petition and I want

19   -- the employees do the work, they should get paid.  So, I'm

20   going to authorize the payments up to the amounts.

21        The language that the (indiscernible) Plaintiffs

22   requested in their objection must be put in any order.  I

23   also want in the order, that I am also making no findings --

24   and this order won't be construed in any way in a similar

25   way with respect to any donations that we heard about today,

Page 244

1    restricted, unrestricted, how they can be used.  I'm making

2    no findings about that.  I want to make sure that the order

3    also says that no draws are permitted in my interim order.

4            I'm going to set a final hearing on this on -- I

5    think the parties can do it August 15th I think is when cash

6    collateral runs out anyway.  Come back on August 15th at

7    10:00 a.m., and we'll just go till we're done on that.  It's

8    going to be an interim order.

9            Before the order, Mr. Schwartz, it says that it's

10   in evidence.  Your engagement letter says that you were

11   delegated those managerial duties, either Paragraph 8.01 of

12   the Free Speech Systems Company Agreement.  I don't know

13   what that is, and I want you filing it.  I want -- to the

14   extent if it's -- I don't -- I think it should be a public

15   document.  But if anybody wants to tell me it should be

16   filed under seal, it should be.  But if a CRO is going to --

17   I need to understand what your role is and what those

18   managerial duties are under 8.01.  I want that filed on the

19   Docket so all parties can see and have the ability to ask

20   questions about it.

21           And will tell you, on the -- it sounds like under

22   the budget, some of those are buckets based on historicals,

23   and that's fine.  Mr. Schwartz, you're to use your judgment.

24   I don't want to hear about some insider payments.  I don't

25   want to hear about something -- use your judgment.  If it

1    borders on problematic, the answer is kick it to the final.

2         With respect to the critical vendor motion, I'm

3    going to authorize -- I'm going to grant the critical vendor

4    motion.  But Subchapter 5 Trustee and -- has to be involved

5    and it has to see what -- exactly where these payments are

6    going to go.  It sounds like there are buckets here and I

7    want to know that these payments are being made in the

8    ordinary course of business.  In other words, if there's a

9    payment due at the end of the month, nothing is getting

10   prepaid.  If the bill is due and it's one of those entities

11   and the bill is $20,000, then that's just what they're going

12   to pay before they come to a final.  They can come ask for

13   the remainder at a final.

14        I want to see the order for the claw back.  I will

15   assure, you know, that I want that order to have some teeth.

16   And I'm not asking for anything extra and what is ordinary

17   in a critical vendor motion in the Southern District of

18   Texas.  There are plenty of examples of that.  Mr. Brimmage

19   has seen them a million times.  I'm sure Debtor's counsel

20   has seen them as well, and the Trustee can point to a

21   million examples.  Everybody knows what the standard

22   language looks like.  Put it in there.

23        But if I sign the order, it's going to have some

24   teeth, which is why I'm saying just, you know, I don't think

25   they need to sign anything saying, you know, I don't think

004603

1    they need a critical vendor agreement for the trash person,

2    but they need to understand, and it needs to be explained to

3    them if they don't, if they can -- they don't, and I do

4    intend to enforce that order.  And so, it sounds like you

5    all are going to upload three orders, so we could sit here

6    and hack one out old school.  I'll leave it up to you.  What

7    do you want to do?

8         MR. BATTAGLIA:  Your Honor, let me take a stab

9    because I think most of the terms we've talked about prior

10   to hearing as far as cash collateral and the critical

11   vendor, the U.S. Trustees can tell me if they have any

12   federal language on claw back.  I think there's language in

13   there and I'm -- this will shock the world, but I think I

14   got the form of motion and order from a pleading that Mr.

15   Brimmage is on.  So -- but I'll run it by --

16        THE COURT:  That doesn't mean he didn't object to

17   it when he got to a hearing on it though.

18        MR. BATTAGLIA:  Understood.  And if I could have a

19   central point of contact, if Mr. Martin is the person, I

20   will share drafts of all of these orders as they're revised

21   with --

22        THE COURT:  As soon as they're signed -- I should

23   say or upon uploaded, just let my case manager know, Ms.

24   Saldana.  Have them take a look at it and if it looks okay

25   to me --

1          MR. BATTAGLIA:  Share them with all three and take

2     comments --

3          THE COURT:  Yeah.

4          MR. BATTAGLIA:  -- and criticisms and they'll --

5     I'll have their agreement before we upload them.

6          THE COURT:  You know, I'm nervous.  I mean, I get

7     cash collateral in trial, but utilities should not trail.

8     That one should get done pretty quickly and you should be

9     able to add some language in the critical vendor motion, and

10    Ms. Haselden, if there's anything that you are concerned

11    about, then just kick it to a final order.  You can have a

12    hearing within two days, 24 hours on any one-off that you

13    think that you all can't agree on.  I just want -- the

14    bucket is based on historicals, and I want to make sure if

15    it's assurance and trash, I'm -- I don't need to see any of

16    those, but that relates to the business.  You know, if it

17    relates to someone -- to anything personal, don't do it.

18    That's not what I'm authorizing.  I'm only authorizing what

19    is essential for the business.  Everybody's rights are

20    preserved.

21          I think the Debtor needs to look forward to having

22    a more robust conversation with the Debtor on the 15th about

23    the things I've talked about and I'm going to give some

24    thought, as well, to where we are.  Maybe there's a good

25    answer, maybe there's not, but I take it from the

1    Connecticut Plaintiffs and the Texas Plaintiffs that if you

2    want to file something, file something.  If you want to

3    renew at a final, I don't -- I'm fine either way.  I don't -

4    - the Code doesn't require anything in writing, and so, I'm

5    not going to hold you all to that.  I think you can -- if

6    there's anything you wish to supplement before the final in

7    connection with a final, and I think that's standard, quite

8    frankly, then do so.  If there's some reasonable discovery,

9    then go for it.  I don't need to be involved in that, but if

10   you need me, let me know.  But that's -- I take it there's

11   going to be a lot of work between now and the 15th, but it

12   is what it is.

13        Mr. Lemmon?

14        MR. LEMMON:  The Court may recall the discussion

15   earlier this morning about the vacation schedules.

16        THE COURT:  Yep.

17        MR. LEMMON:  I am out that whole week of the 15th.

18        THE COURT:  Okay.

19        MR. LEMMON:  And I'm leaving this Sunday and out -

20   - well, I get back that Friday of that week.  I would --

21        THE COURT:  The Debtor runs out of leave -- I

22   think it runs through the 15th, so that's why I --

23        MR. LEMMON:  Yes, and so, I think it's highly

24   likely that it'll be important to -- you know, I'm just

25   saying I think it would be highly likely that we'll need to

```
1    have a further interim.  But I don't want to delay the

2    discovery process, and so I'd like to start some informal

3    discovery and I've mentioned that to the Plaintiffs' counsel

4    to, you know, just start, so that -- start getting some

5    information.  But I wanted to let the Court know about that

6    impending problem on the 15th.

7              THE COURT:  Okay.  Mr. Brimmage?

8              MR. BRIMMAGE:  Can I address that impending

9    problem?

10             THE COURT:  Yep.

11             MR. BRIMMAGE:  We have several on our team that

12   that week is very problematic for too.

13             THE COURT:  Okay.

14             MR. BRIMMAGE:  So --

15             THE COURT:  What works best?

16             MR. MARTIN:  We agree on it.

17             THE COURT:  I just don't want the Debtor to run

18   out of cash or have to come back.  So --

19             MR. MARTIN:  Yeah.  Yeah.  Totally in agreement.

20             THE COURT:  So --

21             MR. MARTIN:  Yeah, yeah.  Totally understand.

22             MR. BATTAGLIA:  Your Honor, I asked for 14 days,

23   but the three-week budget is included.  And I don't recall

24   if --

25             THE COURT:  So, what works best?  I'm not going to
```

1   -- yeah --

2          MR. MARTIN:  We discussed previously, Your Honor,

3   about extending the interim to the 23rd or 24th of August.

4          THE COURT:  All right.

5          MR. MARTIN:  To accommodate for both my vacation

6   schedule and Mr. Lemmon's vacation schedule.

7          THE COURT:  I'm looking.  Okay, I'm looking.

8          MR. BATTAGLIA:  Or the 24th and the 23rd, if

9   possible, Your Honor.

10          THE COURT:  Or the 24th?  What do I have?

11          MR. BATTAGLIA:  I have a charitable entity that

12   I'm the Board Chair of that I have a Board meeting that

13   morning, but it would be the second one I've missed in 10

14   years, so, I could miss the 24th.  I'm available the 23rd.

15          THE COURT:  You just ask -- Ms. Saldana, can you

16   take a look on the 24th, I've got something at 4:00 p.m. --

17          MR. MARTIN:  The 24th for half a day, there is a

18   Subchapter 5 Trustee Committee meeting that I've committed

19   to, but I can certainly --

20          THE COURT:  All right.  Well, you're going to take

21   a loss on that one.

22          MR. MARTIN:  I'm happy to do that.  I'll get the

23   play-by-play from Judge Norman later.

24          THE COURT:  On the 24th, Ms. Saldana, I think --

25   can I do the 24th or is there something there?  I know I've

1   got a pre-trial conference at 4:00 p.m.  Do I have anything

2   earlier?  All right.

3            MR. LEE:  Your Honor, we have an economic issue in

4   light of going to the 24th.  In light of some of the carve

5   outs you made with respect to things that we cannot pay.

6   So, that's what they're talking about right now, between Mr.

7   Schwartz and --

8            THE COURT:  Okay.  And look, if you need a break

9   to get to the 24th, and -- but if the 24th works, why don't

10  we do 10:00 a.m. on the 244th.  We'll just pencil it in and

11  if anything changes.  Do the parties -- the parties here

12  agree, if the -- what I'll call the Collective Sandy Hook

13  Plaintiff, PQPR, and the Debtor agree on a date and time and

14  some breaks, then I'm not going to stand in the way of that.

15           MR. BATTAGLIA:  So, Your Honor, I can include the

16  budgets for the three-week budget and attach that as the

17  approval on the 14 days?

18           THE COURT:  Yeah, if you all are --

19           MR. BATTAGLIA:  Thank you, Your Honor.

20           THE COURT:  Well, hold on a second.  Let me take a

21  look at that.

22           MR. BATTAGLIA:  Understood if there's --

23           THE COURT:  Because I think -- if you go out that

24  extra wait, doesn't that add a really big payment in there?

25  Another -- let me take a look at week three.  Are we going -

1    - between the 24th, right?  You're going to have to hold off

2    on the half a million dollar -- I'm just telling you now.

3    Just on the 24th.

4            MR. BATTAGLIA:  What day was that to be paid on?

5    Do you know?

6            THE COURT:  Yeah, the (indiscernible) may not be

7    (indiscernible), but I'm not going to feel comfortable with

8    a half a million-dollar payment without a final.

9            MR. BATTAGLIA:  I assumed as much, Your Honor.

10            THE COURT:  Okay.

11            MR. BATTAGLIA:  So, we'll remove that from the

12    budgeting.

13            THE COURT:  And then, I think Mr. Jones' salary

14    comes up again.  I think you can budget for the 20, but it

15    could be 54 at the final.  He has the right to come in and

16    ask on that.

17            MR. BATTAGLIA:  We're just going to do 20 in this

18    order.

19            THE COURT:  Okay.

20            MR. BATTAGLIA:  We're limiting it to 20.  We're

21    not going to change it.

22            THE COURT:  Okay.  Just subject to a final?

23            MR. BATTAGLIA:  Yes, sir.

24            THE COURT:  Okay.  And obviously continuing, no

25    AMEX, no consultant, those payments will continue.  Just --

1    so it's essentially, kind of, it should be in a lot of ways,

2    what I've approved in Week 1.  Week 3 should mirror Week 1

3    minus the $500,000 payment.

4            MR. BATTAGLIA:  Mr. Schwartz does have a concern

5    that some of those consultants may really be vital, and I

6    understand --

7            THE COURT:  Just -- no, I'm saying, just ask for a

8    hearing in two or three days and --

9            MR. BATTAGLIA:  That's what I explained to him.

10   First, we'll try to deal with counsel on the other side if

11   we can --

12           THE COURT:  Okay.  And if the parties already

13   agreed it and you all stick to it and they're necessary and

14   there's no fight about.  If not, you can get a hearing in 24

15   hours.

16           MR. BATTAGLIA:  I'll try to work on it informally

17   and if not --

18           THE COURT:  Okay, Ms. Haselden, I'm going to -- I

19   want you to take a look at that, as well, on those.

20           Mr. Brimmage?

21           MR. BRIMMAGE:  Your Honor, point of clarification

22   with regard to the motion to appoint a Tort Committee.

23           THE COURT:  Mm hmm.

24           MR. BRIMMAGE:  I just want to make sure I'm clear.

25   Are you denying that?  Are you just holding that?  What

1    would you like from us?  I just want to make sure we're

2    clear because we would want this record to be part of

3    whatever that effort is.

4              THE COURT:  No, no, I think it continues.  I

5    think, you know --

6              MR. BRIMMAGE:  Okay.

7              THE COURT:  I think you've raised the issue today.

8    It wasn't -- you haven't filed anything.  You made a formal

9    request today.  But there was a request, and I had the

10   authority.  I waived to do it today and I'm just telling

11   folks I didn't do it, but everything is cumulative.

12             MR. BRIMMAGE:  Okay.

13             THE COURT:  I don't expect, in a full evidentiary

14   record, next I mean --

15             MR. BRIMMAGE:  Okay.  You would like us to file

16   something and tee it up again and we can use today's record

17   with whatever other record we need and take it from there?

18             THE COURT:  If that's what you all want to do,

19   yeah, and we can pick a date, yeah.

20             MR. BRIMMAGE:  Okay.  All right.  Thank you, Your

21   Honor.

22             THE COURT:  Mm hmm.

23             MR. BRIMMAGE:  Do we need to do that -- can we do

24   that on an expedited basis?  Not a two-day notice, but not a

25   21-day notice?

Page 255

```
1                THE COURT:  No, look I --

2                MR. BRIMMAGE:  We'll see?

3                THE COURT:  I know you'll be back on the 15th, so

4     I know if you --

5                MR. BRIMMAGE:  Or the 24th.  Okay.

6                THE COURT:  Oh, and that's not the 15th, the 24th.

7     Yes, that's exactly right.  So, that would make sense.  If

8     you've got something --

9                MR. BRIMMAGE:  Okay.

10               THE COURT:  -- on file this week, then just tee up

11    the issue, then maybe we can just take it up on the 24th at

12    that time, yeah.

13               MR. BRIMMAGE:  Thank you, Your Honor.

14               THE COURT:  That's what I mean.  That's a -- and

15    now that we're going further out, I think it provides -- I

16    think the Debtor needs time to think about what I said.  But

17    I think the Debtor would need a thorough and fair

18    opportunity to respond to anything, especially if something

19    got filed, and I wouldn't dare do that on short notice.  I

20    think the Debtor is entitled to that, so -- okay.  Anything

21    else we need to take care of today?

22               MR. BRIMMAGE:  No, sir.

23               THE COURT:  Okay.  So, you all are going to upload

24    orders and then get them to Ms. Saldana.  I will assure you,

25    24 hours you may get an email from her just to make sure --
```

```
 1              MR. BATTAGLIA:  I'm going to try to turn them

 2   tonight if I can get home quick enough.

 3              THE COURT:  Yeah.

 4              MR. BATTAGLIA:  If not, it'll be in the morning,

 5   and I'll turn them to the parties.

 6              THE COURT:  Good luck.  Thank you.  Take care.

 7   Have a good day.

 8              MR. LEMMON:  Thank you, Your Honor.

 9        (Proceedings adjourned at 5:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7    Sonya M. Ledanski Hyde

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 12, 2022
```

## April 2022

- **April 14th** – InfoW Plan Support Agreement and Litigation Settlement Trust executed.
- **April 17-18th** – InfoW Debtors' Petitions filed.
- **April 18th** – InfoW Debtors' Application to Employ Schwartz as CRO filed.
- **April 26th** – CT Plaintiffs' Motion to Dismiss InfoW Cases filed and joined by TX Plaintiffs.
- **April 29th** – U.S. Trustee's Motion to Dismiss InfoW Cases filed.

## May 2022

- **May 13th** – InfoW Debtors' Application to Employ Parkins Lee and Rubio filed.
- **May 18th**
  – U.S. Trustee receives E-mail from Kyung Lee informing he would be moving forward on Application to Employ Schwartz as CRO rather than push it out in connection with hearing on Motion to Dismiss InfoW Debtors.
  - Kyung Lee files Emergency Motion for Continuance of Hearings on Motion to Dismiss InfoW Chapter 11 Cases.
- **May 19th**
  – InfoW Debtors' Application to Employ Kyung S. Lee PLLC filed.
  - Kyung Lee appears at hearing on Emergency Motion for Continuance of Hearings on Motion to Dismiss.
  - Marc Schwartz sends CRO Engagement Letter to FSS.
  - TX Plaintiffs' Stipulation to dismiss claims against InfoW Debtors filed.
- **May 23rd** – Status conference held in Connecticut On CT Plaintiffs' Unopposed Motion to Dismiss InfoW Debtors.
- **May 24th** – Kyung Lee begins billing time to FSS.
  - K. Lee, M. Schwartz, and RJ Shannon meet with FSS to discuss restructuring options.
- **May 26th** – Kyung S. Lee Appears for InfoW Debtors at their 341 Meeting of Creditors.

## June 2022

- **June 1st** – Kyung Lee stipulates on behalf of InfoW Debtors With the U.S. Trustee to Dismiss InfoW's Chapter 11 Cases.
- **June 2nd** – Kyung Lee files response to U.S. Trustee's Motion to Dismiss.
- **June 6th** – Alex Jones signs engagement letters with S&L and Schwartz on behalf of FSS.
- **June 10th** – Court approves dismissal of InfoW cases.

004616

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**DEBTOR'S REPLY TO UNITED STATES TRUSTEE'S AMENDED OBJECTION TO THE APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTORIZING EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR, AND (B) GRANTING RELATED RELIEF**

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, replies to the U.S. Trustee's amended objection [ECF. No. 154] (the "Objection") to the Application of Debtor for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief [ECF No. 85] (the "S&L Application") as follows:

**PRELIMINARY STATEMENT**

1.      The U.S. Trustee does not dispute any of the allegations in the S&L Application or contend that S&L does not meet the requirement to be employed under Bankruptcy Code § 327(a). There is no disagreement that (a) S&L does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 21 & 26); (b) the FSS Lee Declaration disclosed all relevant connections in this case (Application ¶ 29); (c) S&L is well qualified and uniquely able to represent FSS in its chapter 11 case in an efficient and timely manner (Application ¶ 11); (d) the familiarity of S&L professionals with the Sandy Hook Litigation was particularly important to the Debtor as debtor in possession in the early parts of the case (Application ¶ 8); or (e) S&L's agreed terms of reimbursement,

compensation, and hourly rates are reasonable (Application ¶ 14). Nor does the U.S. Trustee assert that denial of the S&L Application would benefit the Debtor's estate or aid administration of the case.

2.      Instead, the basis for the Objection is that Kyung Lee did not supplement his declaration (the "IW Lee Declaration") in support of the IW Debtors' application to employ Kyung S. Lee PLLC ("KSLPLLC") in Case No. 22-60022 (the "IW Cases") in the four (4) business days between May 24, 2022, when Mr. Lee met with FSS regarding its potential restructuring, and June 1, 2022, when the U.S. Trustee and the IW Debtors agreed to the dismissal of the IW Cases.[1] The U.S. Trustee wants this Court to not only find that Mr. Lee's disclosure violated Bankruptcy Rule 2014, but also that the violation was so severe that it warrants what is in effect imposing a sanction in a *different* case by denying the application of a *different* Debtor to employ a *different* law firm. The U.S. Trustee's position is not supported by the law or facts.

3.      Bankruptcy Rule 2014 requires a verified statement disclosing connections to accompany an application to employ, and courts have held that Bankruptcy Code 327(a) implies that the obligation continues for professionals that are employed by or are seeking employment by the estate. But Mr. Lee and KSLPLLC were no longer seeking to be employed in the IW Debtors' cases when he began providing services to FSS on May 24, 2022.[2] After reaching agreements resolving the claims of the Connecticut Plaintiffs (on May 13, 2022) and the Texas Plaintiffs (on May 18, 2022), the IW Debtors decided to agree to dismiss their cases as demanded by the U.S.

---

[1] Of the seven (7) total days the trustee takes issue with, May 28-30, 2022, comprised the Memorial Day weekend. On May 25, Mr. Lee informed the U.S. Trustee and the Subchapter V Trustee by email that the IW Debtors intended to dismiss their case. A copy of this email is attached as Exhibit A hereto. On May 26, Mr. Lee attended the section 341 meeting of creditors for the IW Debtors, at which he informed the parties in attendance that the IW Debtors had decided to agree to the dismissal of their cases, as requested by the U.S. Trustee, and would work to effectuating such dismissal. On May 27, 2022, Mr. Lee was negotiating the stipulation of dismissal with the U.S. Trustee that was ultimately filed with the Court on June 1.

[2] Mr. Lee was not formally retained by FSS until June 6, 2022. The services provided by Mr. Lee in May 2022 were related to becoming familiar with FSS and its financial condition.

Trustee. By May 23, 2022, Mr. Lee had drafted a motion to dismiss the IW Cases. Mr. Lee was not at that time seeking to be retained as an estate professional in any meaningful way. IW Debtors had already decided not to employ Mr. Lee or any other professionals.

4.      Further, even if Mr. Lee was required by Bankruptcy Rule 2014 and Bankruptcy Code 327(a) to supplement his disclosure of connections despite the IW Debtors' decision to dismiss, that oversight would not justify denying *this* Debtor's application to employ Shannon & Lee LLP in *this* chapter 11 case. None of the authorities cited in the Objection support that position and the relief would be entirely unprecedented.[3] While the Court has discretion to consider factors beyond just compliance with Bankruptcy Code 327(a), that discretion should be reasonably applied. What matters is whether employing S&L benefits the Debtor's estate and furthers administration of its chapter 11 case. The U.S. Trustee does not dispute these issues favor approving the employment of S&L.

5.      Whether Mr. Lee's disclosures in the IW Cases were sufficient should be addressed separately from the Application. The procedurally proper way for the U.S. Trustee to raise the issue would be to reopen the IW Cases and seek sanctions against Mr. Lee. Inflicting collateral damage on the Debtor, its estate, and the administration of this chapter 11 case by denying the Application is entirely unjustified.

## **ARGUMENT**

### **A.  Mr. Lee's Disclosures in the IW Cases Complied with Bankruptcy Rule 2014.**

6.      Bankruptcy Rule 2014 requires applications to employ professionals to "be accompanied by a verified statement of the person to be employed setting forth the person's

---

[3] While this might seem like hyperbole, it is not. Attached as Exhibit B hereto is a summary and analysis of each of the twenty-seven cases cited in the Objection. Not a *single* case cited in the Objection supports what the U.S. Trustee asks the Court to do here.

004619

connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." As the U.S. Trustee states in the Objection, the "one primary purpose" of these disclosures is "to facilitate strict compliance with section 327." Objection ¶ 45.

7.      Although the text of Bankruptcy Rule 2014 does not require continuing disclosures, courts have held that Bankruptcy Code § 327 implies this obligation. *See, e.g.*, *In re C & C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex 2001) (holding that although Rule 2014(a) does not expressly require supplemental or continuing disclosure, duty is implied pursuant to § 327); *In re Keller Fin. Serv. of Florida*, 243 B.R. 806, 813 (Bankr. M.D.Fla. 1999) (duty of continuing disclosure under Rule 2014(a) is implied by requirements of § 327); *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (Section 327(a) implies a duty of continuing disclosure and requires professionals to reveal connections that arise after their retention.). The reasoning is that ongoing disclosures are necessary to ensure that the professionals that have been retained remain conflict free. The Fifth Circuit Court of Appeals has adopted this reasoning and held that professionals employed or seeking employment as estate professionals must "to promptly notify the court if any potential for conflict arises." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005).

8.      No court has held that Bankruptcy Rule 2014 requires ongoing disclosure by persons that are *not* seeking to be employed as an estate professional, such as when a case has been That makes sense—the "one primary purpose" of the disclosures required under Bankruptcy Rule 2014 no longer exists when the professional will not be employed under Bankruptcy Code § 327. The U.S. Trustee is asking for the Court to create law, not apply it.

004620

9.      When Mr. Lee met with FSS on May 24, 2022, the IW Debtors had already determined to dismiss their chapter 11 cases when Mr. Lee first provided services to FSS.  At that time the IW Debtors were no longer seeking to employ KSPLLC or any other party in interest as an estate professional. By May 18, 2022, the IW Debtors had effectively resolved all the claims of the Texas Plaintiffs [*see* Case No. 22-60020, Dkt No. 96] and the Connecticut Plaintiffs [*see* Case No. 22-60020, Dkt. No. 98]. Soon after the IW Debtors determined that continuing their cases in the face of the U.S. Trustee's continued opposition did not benefit the IW Debtors or their remaining creditors. By Monday, May 23, 2022, Mr. Lee had drafted a motion to dismiss the IW Debtors' bankruptcy cases.[4] And Mr. Lee promptly informed the U.S. Trustee by email on May 25, 2022, and other parties in interest at the 341 meeting on Thursday, May 26, 2022, that the IW Debtors intended to seek dismissal of their cases. Mr. Lee then promptly negotiated a stipulation of dismissal with the U.S. Trustee that was finalized and filed with the Court on June 1, 2022.

10.     Under these circumstances, Mr. Lee did not have an obligation to supplement his disclosures related to the IW Debtors' application to employ KSLPLLC. On May 24, the IW Debtors were no longer seeking to employ KSLPPC or Mr. Lee under Bankruptcy Code § 327(a). The statute therefore did not imply a duty to provide further disclosures at that time. The Objection presents cites no authority to the contrary.

11.     If the U.S. Trustee believed that ongoing disclosure of connections in the IW Cases was necessary to maintain the integrity of the bankruptcy process, the motion to dismiss those cases should have been withdrawn. The thrust of the U.S. Trustee's motion to dismiss—that the IW Cases were a litigation tactic—no longer applied because the Texas Plaintiffs and the Connecticut Plaintiffs no longer asserted claims against the IW Debtors. Supplemental disclosures

---

[4] A copy of an email from Mr. Lee to Marc Schwartz, Christian Schwartz, and Harold Lee of Schwartz & Associates LLC reflecting that Mr. Lee had drafted a motion to dismiss the IW Cases is attached as Exhibit C hereto.

5

would have of course been necessary if the IW Cases had continued and the IW Debtors sought to employ KSLPLLC. But the U.S. Trustee opposed the IW Debtors remaining in bankruptcy the cases and the IW Debtors believed that the expense of that fight would outweigh any benefit. Ultimately, the U.S. Trustee's demands are the reason that a supplemental disclosure by Mr. Lee was not necessary.[5]

**B.   Even *if* Mr. Lee Should Have Supplemented His Disclosures in the IW Cases, the Debtor's Application to Employ Shannon & Lee LLP in this Case Should Be Approved.**

12.     Of course, the sufficiency of Mr. Lee's disclosure of KSLPLLC's connections related to the IW Debtors' application to employ KSLPLLC in their cases is not the issue that the Court has to decide in the Application. The issue before the Court is whether it should authorize FSS to employ Shannon & Lee LLP as bankruptcy co-counsel in this chapter 11 case. The Court should reject the U.S. Trustee's improper request to indirectly punish Mr. Lee through this contested matter and grant the Application.

13.     The U.S. Trustee does not dispute that the Application and S&L meet all the requirements of Bankruptcy Code 327(a) and Bankruptcy Rule 2014 for employment in the Debtor's chapter 11 case. Nor does the U.S. Trustee dispute the allegations in the Application that (a) S&L does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 21 & 26); (b) Mr. Lee's declaration in this chapter 11 case disclosed all relevant connections in this case (Application ¶ 29); (c) S&L is well qualified and uniquely able to represent FSS in its chapter 11 case in an

---

[5] As indicated in the May 17, 2022, email from Jayson Ruff to Mr. Lee, attached hereto as Exhibit D, the U.S. Trustee's took the position in the IW Cases was that the remaining creditors—including holders of administrative claims— should be paid outside of the bankruptcy process from FSS and/or Alex Jones. That the U.S. Trustee now complains that "the Court never had the opportunity to rule on [KSLPLLC's] employment application in the InfoW Cases" is nothing but hypocrisy.

6

efficient and timely manner (Application ¶ 11); (d) the familiarity of S&L professionals with the Sandy Hook Litigation was particularly important to the Debtor as debtor in possession in the early parts of the case (Application ¶ 8); or (e) S&L's agreed terms of reimbursement, compensation, and hourly rates are reasonable (Application ¶ 14). Most importantly, the U.S. Trustee does not contend that Debtor's employment of S&L is not the best interests of the Debtor's bankruptcy estate or useful to administration of the chapter 11 case.

14.    *Every* decision that the U.S. Trustee cites in the objection that is relevant to the topic indicates that the effect on the bankruptcy estate and administration of the case are the proper considerations that should guide the Court's discretion. The most clearly relevant include:

a.  *In re LTHM Houston-Operations, LLC*, 2014 WL 5449737 (Bankr. S.D. Tex. 2014)—In *LTHM*, the U.S. Bankruptcy Court for the Southern District of Texas held that it "is instructed to exercise its discretion by taking into account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system. Section 327(a) acknowledges that the purpose of the professional's employment is to represent or assist the trustee in carrying out the trustee's duties under this title. Accordingly, the Court must consider whether the benefits of employing [the professional] exceed the potential impact it may have on the trustee's ability to fulfill his duties to the estate." *Id.* at *5 (internal citations and quotation marks omitted).

b.  *In re Bigler, LP*, 422 B.R. 638 (Bankr. S.D. Tex. 2010)—In *Bigler*, the U.S. Bankruptcy Court for the Southern District of Texas considered an application to employ an investment bankruptcy firm that included a "tail period" provision under which the proposed professional would receive compensation even if the debtors consummated a transaction after terminating the employment agreement. The court held that in exercising its broad discretion, the court "focuses on whether the proposed terms are reasonable." *Id.* at 643.

c.  *In re Smith*, 507 F.3d 64 (2d Cir. 2007)— As directly quoted in the Objection, the Second Circuit Court of Appeals reasoned in *Smith* that "[i]n exercising its approval function, however, the bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." *Id.* at 71.

d.  *Harold & Williams Dev. Co.*, 977 F.2d 906 (4th Cir. 1992)—The Fourth Circuit Court of Appeals was even more clear in *Harold & Williams*, instructing that "once the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327 . . . the discretion of the bankruptcy court must be exercised in a

7

way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding." *Id.* at 910 (internal citations omitted).

The U.S. Trustee does not present a single case that even *suggests* that the Court should exercise its discretion to deny an application to employ a professional that meets the requirements of Bankruptcy Code § 327 because the circumstances created by the U.S. Trustee's demand for immediate dismissal in a previous case is contrary to his new-found appreciation and desire for the disclosures that would have been required absent such dismissal.[6]

15.     Denying the Debtor's Application to employ Shannon & Lee LLP would harm the Debtor's bankruptcy estate and hinder administration of this chapter 11 case. Although Mr. Battaglia is an excellent bankruptcy attorney—as he has demonstrated several times in this case— this matter is not a one-man job. And retaining any other attorney would not possess the significant knowledge and experience of the Debtor and the relevant litigation for which the Debtor retained S&L in this case. Again, the U.S. Trustee does not assert otherwise in the Objection.

**C. If the Court Determines that Some Action Should Be Taken in this Chapter 11 Case to Address Mr. Lee's Disclosures in the IW Cases, the Debtor Submits that the Court Should Limit Shannon & Lee LLP's Compensation in this Case by an Appropriate Amount Considering the Novelty of the Issue.**

16.     The U.S. Trustee is in effect seeking a sanction against Mr. Lee for actions related to a different case, for a different client, and for a different law firm with the Debtor as collateral damage. *See, e.g.*, *In re EBW Laser, Inc.*, 333 B.R. 351, 359-60 (Bankr. M.D.N.C. 2005) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required by Rule 2014.") (quoted by the U.S. Trustee); *In re*

---

[6] The U.S. Trustee has not filed any motion to enforce Bankruptcy Rule 2019 in these cases, so disclosure and transparency appear to be important to the U.S. Trustee only sometimes.

004624

*Granite Partners, L.P.*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) (analyzing disqualification for failure to disclose connections as a sanction). That request is inappropriate, is not supported by applicable law, and should be denied.

17.     However, if the Court concludes that Mr. Lee's disclosure in the IW Cases was deficient and that some action should be taken in *this* chapter 11 case, the Debtor submits that a reasonable action would be that the compensation for S&L allowed in this case should be reduced by the compensation received by KSLPLLC received from FSS prior to June 1, 2022. These amounts total $24,409.09.[7]

18.     In the alternative, *In re Byington*, 454 B.R. 648 (Bankr. W.D. Va. 2011), may present a framework for an appropriate way to address any failure by Mr. Lee to disclose connections in the IW Cases. In *Byington*, the attorney for two individual chapter 11 debtors did not disclose payments from the debtors' son—against whom the estate had potential avoidance action claims—that were used to pay the debtors' filing fee. *Id.* at 660. Although the court determined that the attorney's disclosures were insufficient, it declined to deny the debtors' application to employ the attorney because of the apparent novelty of the issue and instead ruled that compensation would not be approved for the attorney's services relating to correcting the deficiency or in asserting that the disclosure was not required. *Id.* Here, the U.S. Trustee's assertions are entirely unprecedented.

19.     While not justified, either of these options would better proportioned to the conduct that the U.S. Trustee asserts violated Bankruptcy Rule 2014—Mr. Lee not disclosing his meeting with FSS in the four (4) business days that elapsed before the filing of the stipulation of dismissal

---

[7] A copy of KSLPLLC's invoice for the period from May 24, 2022, to May 31, 2022, is attached hereto as <u>Exhibit E</u>.

004625

in the IW Cases—than denying the Application and derailing the Debtor's chapter 11 case. If the Court takes any action, it should be a measured one.

## **CONCLUSION**

20.     If the U.S. Trustee believes that Bankruptcy Rule 2014 required Mr. Lee to disclose his meeting with FSS in the IW Cases, even though the IW Debtors had at that time agreed to the U.S. Trustee's own motion to dismiss, there is a way to raise that issue. But it is not in objecting to the employment of a different law firm, by a different debtor, in a different case.  There is no dispute that S&L meets the requirements for employment or that its employment will benefit the estate and administration of this chapter 11 case. The Application should therefore be granted.

*[Remainder of Page Intentionally Left Blank]*

10

Dated: September 16, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*

Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*R. J. Shannon*

Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within one hour of filing, by email on the following parties:

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave,  STE 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov

Melissa Haselden
SUBCHAPTER V TRUSTEE
700 Milam, Suite 1300
Houston, TX
mhaselden@haseldenfarrow.com

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Elizabeth Freeman
JACKSON WALKER LLP
1401 McKinney St., Suite 1900
Houston, TX 77010
efeeman@jw.com

Ryan Chapple
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, TX 78701
rchapple@cstrial.com

Avi Moshenberg
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Jarrod B. Martin
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS, & AUGHTRY, PC
1200 Smith Street, Suite 1400
Houston, Texas 77002
jarrod.martin@chamberalinlaw.com

/s/R. J. Shannon
R. J. Shannon

004628

# **EXHIBIT A**

004629

**Subject:** InfoW\Update

**Date:** Wednesday, May 25, 2022 at 12:29:13 PM Central Daylight Time

**From:** Kyung S. Lee <klee@kslpllc.com>

**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>

**CC:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>

Marc Schwartz and I wanted to report to the group as follows:

1. The Texas Plaintiffs and Debtors agreed on Stipulations of Dismissals last week. Judge Lopez approved them last Thursday. Judge Mott signed orders remanding cases earlier this week. The Texas Plaintiffs are no longer creditors or hold claims against the Debtors.
2. The removal Connecticut Bankruptcy Court held a status conference yesterday. Connecticut Plaintiffs are to submit orders of dismissal by Thursday 5.26.22. Judge Manning said she would sign them Friday 5.27.22. Debtors are to submit dismissals of motions to remove by Monday 5.30.22.
3. Marc has instructed me to file Motions to Dismiss the Chapter 11 Cases on Tuesday 5.31.22 and eliminate any continuing administrative expenses.
4. We have a conflict as to the 341 Meeting of Creditors for tomorrow and the Debtors will not have a representative attend.

Thanks.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

# **EXHIBIT B**

004631

**Summary and Analysis of Cases Cited by the U.S. Trustee in the Objection**

| No. | Cases Cited in the Objection | Summary and Analysis |
|-----|------------------------------|----------------------|
| 1 | *United States v. Rodgers*, 461 U.S. 677, 706 (1983). | Overview:<br><br>*Rodgers* involved an appeal of a decision holding that government could seek a sale, under the Internal Revenue Code of 1954, 26 U.S.C.S. § 7403, of only the respondent delinquent taxpayers' interests in their property and not the entire property.<br><br>Analysis:<br><br>The U.S. Trustee cites this case for the proposition that courts have entirely unbound discretion to approve or decline to approve an application of a chapter 11 debtor in possession to employ a professional that meets the statutory requirements and quotes in a parenthetical that " 'the word 'may',' when used in a statute, usually implies some degree of discretion[.]" (Objection ¶ 41).<br><br>The Court should ignore the U.S. Trustee's spin on the Supreme Court's language. As the immediately following sentence in Rodgers indicates, "[t]his common-sense principle of statutory construction is by no means invariable, however, . . . and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute. . . ." While bankruptcy courts do have *some* discretion to consider factors beyond technical compliance with Bankruptcy Code § 327 that are germane to the purposes of Bankruptcy Code § 327, the discretion is not unlimited and should be guided by precedent. Precedent indicates that it is the interests of the estate and administration of the bankruptcy case that are relevant to that discretion. |
| 2 | *In re Jackson*, 484 B.R. 141, 154 (Bankr. S.D. Tex. 2012). | Overview:<br><br>*Jackson* involved the request by a chapter 7 trustee to employ his law firm under Bankruptcy Code § 327(a) to represent him in his role as trustee of the bankruptcy estate and, in particular prosecuting potential patent infringement actions. The court denied the application without prejudice because (a) the description of the need for retention of the particular attorney on this matter was insufficient, (b) the disclosure of connections did not describe any search of potential defendants in the patent matters, and (c) the application was not adequate for the Court to determine that the attorney selected was in the best interests of the estate as required for a trustee to retain his own firm.<br><br>Analysis:<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). However, *Jackson* held that the application at issue did not meet the requirements |

1

004632

under Bankruptcy Code § 327 or Bankruptcy Rule 2014. The Trustee does *not* assert that the Debtor's Application to employ S&L fails to meet this requirement.

| | | |
|---|---|---|
| 3 | *In re Bigler, LP*, 422 B.R. 638, 643 (Bankr. S.D. Tex. 2010). | **Overview:**<br><br>*Bigler* involved an application to employ an investment banking firm that included a "tail period" provision under which the firm would receive compensation if the debtors consummated a transaction within 12 months after termination of the agreement. The court approved the application to employ the investment banker despite the because of the testimony of the debtors' CRO that the terms were negotiated and because compensation was subject to approval under section 330.<br><br>**Analysis:**<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). While this decision does support such discretion, the court specifically states that "[i]n exercising this discretion, this Court focuses on whether the proposed terms are reasonable." |
| 4 | *Miller v. United States Trustee*, 197 F.3d 13, 17 (1st Cir. 1999). | **Overview:**<br><br>*Miller* was an appeal of a bankruptcy court's order disqualifying debtor's counsel and disgorging retainers and fees after the debtor's counsel violated the retention order by drawing against the retainer and receiving post-petition payments in violation of the court's order. The attorney argued on appeal that drawing against the retainer was proper and that the bankruptcy court abused its discretion by ordering disgorgement of all fees. The First Circuit Court of Appeals affirmed the bankruptcy court's ruling.<br><br>**Analysis:**<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The First Circuit Court of Appeals did reason that "[b]ankruptcy courts historically been accorded wide discretion to oversee the terms and conditions of a debtor's engagement . . . ." However, the reasoning of the Court of Appeals was also based on the bankruptcy court's "continuing authority to revisit an order employing a particular attorney to represent a debtor." The facts are also entirely inapposite. |
| 5 | *Interwest Bus. Equip. v. United States Trustee*, 23 F.3d 311, 315 (10th Cir. 1994). | **Overview:**<br><br>*Interwest* involved an appeal of a bankruptcy court's denial of an application to employ debtor's counsel. The bankruptcy court denied the application to employ the attorney because of a conflict of interest arising from the attorney's representation multiple debtors who held claims against one another. The bankruptcy court had determined that there was an actual conflict of interest that required representation by separate counsel. The Tenth Circuit Court of Appeals affirmed the decision of the bankruptcy court.<br><br>**Analysis:** |

2

| 6 | *Harold & Williams Dev. Co.*, 977 F.2d 906, 909 (4th Cir. 1992). | The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The Tenth Circuit Court of Appeals did conclude that it would not "second guess" a decision not to approve professionals under section 327 "unless it exhibits a clear abuse of discretion, circumstances not present in the case at hand." However, the discretion that the bankruptcy court in *Interwest* exercised was regarding whether the representation of multiple debtors created an *actual* conflict. Further, the Tenth Circuit also reasoned that the discretion was "to ensure professionals are disinterested and do not represent interests adverse to the estate" rather than the unprincipled discretion the U.S. Trustee seeks in the Objection.

Overview:

*Harold* involved an appeal of a bankruptcy court's decision to deny the application of a single person to serve as both lawyer and accountant for the estate. The bankruptcy court ruled that there was a per se rule against the employment of a single person in both roles. The district court rejected the imposition of the per se rule but held that the bankruptcy court did not abuse its discretion. The Fourth Circuit Court of Appeals reversed the lower decisions, holding that there was no per se rule and that the bankruptcy court abused its discretion.

Analysis:

The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The Fourth Circuit Court of Appeals did conclude that bankruptcy courts had discretion but further stated that:

Thus, once the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327, *see* Bankr. Rule 2014(a), the discretion of the bankruptcy court must be exercised in a way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding. *Cf. In re BH & P*, 949 F.2d at 1316.

*Harold* stands for the proposition that what matters is the interests of the bankruptcy estate and its creditors. The U.S. Trustee does not dispute that employment of S&L is in best interest of the debtor and its estate. That is directly contrary to the U.S. Trustee's position in the Objection. |

3

004634

| | | |
|---|---|---|
| 7 | *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987). | **Overview:**<br><br>*Martin* involved a novel factual situation. To pay for their legal services pre-petition, the debtors delivered a note secured by a second lien on the debtors real property. The note was outstanding when the debtors filed for chapter 11 relief. The case was converted to chapter 7 and there was an objection to the attorney's fees because it was not a disinterested party by way of the secured note. The bankruptcy court allowed the attorney's compensation (subject to non-allowable compensation) but invalidated the note and lien. The First Circuit Court of Appeals determined that there was no per se rule that applied and remanded the matter to the bankruptcy court to determine whether the attorney's security interest was allowable under the particular facts.<br><br>**Analysis:**<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." *See* Objection ¶ 42.  The First Circuit Court of Appeals stated—as partially quoted by the U.S. Trustee—that "[h]istorically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals." The Court of Appeals also noted that "horrible imaginings alone cannot be allowed to carry the day."<br><br>*Martin* does not support the U.S. Trustee's overall position in the Objection. The discretion at issue in Martin was with respect to the factual determination of whether the attorney was a disinterested person. The U.S. Trustee does not dispute that S&L is disinterested. |
| 8 | *Elias v. Lisowski Law Firm (In re Elias)*, 215 B.R. 600, 603 (B.A.P. 9th 1997). | **Overview:**<br><br>*Elias* involved a post-bankruptcy fee dispute in which an attorney employed in a bankruptcy case sought to enforce its rights in state court after dismissal of the debtor's bankruptcy case. The Ninth Circuit BAP summarized the facts as follows:<br><br>After the debtor's chapter 11 case was dismissed, her bankruptcy attorney filed a state-court lawsuit against her for $ 10,000.00 of unpaid chapter 11 attorney's fees. The debtor filed a motion for summary judgment in the state-court action, arguing that her former attorney was not entitled to any fees because he had secured his employment in the bankruptcy case fraudulently by failing to disclose his prior connection with the debtor, the fee he received for the bankruptcy retainer, or his receipt of a potential $ 3,000.00 preference from the debtor on the eve of filing.<br><br>Prior to ruling on the motion for summary judgment, the state court requested that the bankruptcy court rule upon the viability of the attorney's lien, the status of the attorney's employment in the bankruptcy case, and whether a preference claim against the attorney could affect his ability to collect a fee. |

4

Pursuant to the state court's request, the debtor filed a motion in the bankruptcy court seeking to vacate the order authorizing counsel's employment, cancel the attorney's lien, and determine that counsel was not entitled to any fees.

Exercising its discretion, the bankruptcy court denied the debtor's motion. The bankruptcy court also found that it had no jurisdiction to enter further orders concerning the disputed fees. The debtor appealed.

The Ninth Circuit BAP affirmed the decision of the bankruptcy court.

Analysis:

The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." *See* Objection ¶ 42. While the Ninth Circuit Court of Appeals stated in dicta that the appellate standard of review for a bankruptcy court decision with respect to an application to employ, its holding was that the bankruptcy court lacked jurisdiction:

We are not satisfied either that the bankruptcy court had jurisdiction to grant the relief requested by the Debtor, or that there has been a showing that the bankruptcy court abused its discretion in refusing to reopen the dismissed case in order to review pending state-court issues concerning disputed attorneys' fees. We therefore AFFIRM the decision of the bankruptcy court.

*Elias* does not support the U.S. Trustee's overall position in the Objection.

---

**9** | *In re LTHM Houston-Operations, LLC,* 2014 WL 5449737, at *5 (Bankr. S.D. Tex. 2014).

2014 Bankr. LEXIS 4495, at *1 (Bankr. S.D. Tex. Oct. 24, 2014).

Overview:

The issue presented in *LTHM* was wither Bankruptcy Code § 327(a) & (d) necessarily precluded the employment of a consulting firm with which the chapter 7 trustee had a significant professional relationship. The chapter 7 trustee sought to hire his firm as his financial advisor and accountant. The court ultimately re-set the hearing on the application to focus on the benefits and risks created by the firm's employment.

Analysis:

The U.S. Trustee quotes the following language from *LTHM*:

- "Even if the technical requirements of disinterestedness and not holding or representing an interest adverse to the estate are met, the Court has the discretion to deny the application." (Objection ¶ 43).
- In the exercise of its discretion under Section 327, the Court is instructed "into taking account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." (Objection ¶ 44).

However, the U.S. Trustee leaves out the following paragraph of the opinion that indicates the considerations that guide the exercise of that discretion:

004636

5

| | | |
|---|---|---|
| | | The Court is instructed to exercise its discretion by taking into account "the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." *Id.* at 10. *Section 327(a) acknowledges that the purpose of the professional's employment is "to represent or assist the trustee in carrying out the trustee's duties under this title." 327(a). Accordingly, the Court must consider whether the benefits of employing Claro exceed the potential impact it may have on the trustee's ability to fulfill his duties to the estate.*<br><br>(emphasis added).<br><br>*LTHM* does not support the U.S. Trustee's position in the Objection. As that case indicates, the discretion of the court to consider issues beyond technical compliance with Bankruptcy Code § 327 are about the benefit to the estate. The U.S. Trustee does not dispute that employment of S&L is in the best interests of the Debtor's estate or administration of its chapter 11 case. |
| 10 | *In re Kurtzman*, 220 B.R. 538, 542 (S.D.N.Y. 1998). | <u>Overview:</u><br><br>*Kurtzman* involved appeals related to a chapter 7 trustee's applications to (a) employ his law firm in several cases because the court determined that employment of the trustee's firm was not in the best interest of the estates based on the court's prior dealings with the firm and (b) an unrelated firm because the rates it charged were too high. The U.S. District Court for the Southern District of New York affirmed the decisions.<br><br><u>Analysis:</u><br><br>The U.S. Trustee quotes the following language from *Kurtzman*:<br><br>• Additionally, "while disinterestedness and the absence of conflicts may be central to the inquiry, they are by no means exclusive. Indeed, section 327(a) vests the authority for 'approval' within the sound discretion of the court. That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons…" (Objection ¶ 43).<br><br>• … finding that the bankruptcy court did not abuse its discretion when it denied the retention of counsel based on "prior problems involving time records, billing errors, professional conduct, and overall costs of legal services that had led to its conclusion of loss of confidence in the firm") (Objection ¶ 44).<br><br>However, the U.S. Trustee conspicuously leaves out the example of the "other reasons" that *Kurtzman* identifies are proper to guide the bankruptcy court's discretion and breezes over the facts at issue in that case. The full sentence that the U.S. Trustee partially quotes in paragraph 43 of the Objection is: "That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons *such as, for example, inexperience*." (emphasis added). Further, *Kurtzman*, like |

6

every other case, makes clear that the other factors that courts should consider in exercising of discretion relate to what was in the best interests of the bankruptcy estate:

> By its very nature, the "best interest of the estate" under § 327(d) is a concept that affords the court considerable discretion in making evaluations and comparisons regarding the performance of counsel. In light of this discretion, the Court below was entitled to rely on its own first-hand observations and, based on those observations, to draw its own conclusions regarding professional performance. Here, the presiding judge was in a unique position to observe the conduct of counsel over a significant period of time, and to compare counsel's performance with that of other attorneys performing similar work. The Court articulated and specified its concerns, which admittedly were of a conclusory nature, and afforded Appellant an opportunity to respond. Since the "right" that Appellant seeks to vindicate rests in the final analysis with the discretion of the Court, we cannot conclude that the hearing afforded Appellant failed to meet constitutional standards.

*Kurtzman* does not support the U.S. Trustee's position in the Objection. There is no dispute that it is in the best interests of the Debtor's bankruptcy estate to retain S&L and that doing so will further administration of the Debtor's chapter 11 case.

**Overview:**

*Harris* involved the denial of an official committee's application to employ counsel. The bankruptcy court denied the retention of counsel because the rates that were significantly higher than the prevailing local rates and there was no evidence that the case required national counsel. The committee appealed. The Tenth Circuit Court of Appeals affirmed the Bankruptcy Court's decision.

**Analysis:**

The U.S. Trustee cites *Harris* with a parenthetical that the case stands for the proposition that consideration of compensation terms was not reversible error. That is an accurate representation of the holding in *Harris* but it is inapposite to the Debtor's chapter 11 case here. The U.S. Trustee does not dispute that S&L's fees are reasonable.

| 11 | *Official Comm. of Unsecured Creditors v. Harris (In re Southwest Food Distribs., LLC)*, 561 F.3d 1106, 1112-13 (10th Cir. 2009). |

7

| | |
|---|---|
| *In re Downs*, 103 F.3d. 472, 480 (6th Cir. 1996). | **Overview:** Among other issues, *Downs* involved an appeal of a bankruptcy court's order imposing sanctions on an attorney for failing to disclose his fee arrangement with the debtor, which was paid by a creditor, as required by Bankruptcy Code § 329 and Bankruptcy Rule 2016. The Sixth Circuit Court of Appeals affirmed the sanctions.<br><br>**Analysis:** The U.S. Trustee quotes the following language from *Downs*: "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." (Objection ¶¶ 44 & 47). But *Downs* does not deal with Bankruptcy Code § 327 or Bankruptcy Rule 2014. The case is inapplicable to the issue in the Application. |
| 12 | *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991). | **Overview:** In *Doors & More*, the bankruptcy court denied an application to employ counsel. The application to employ the attorney contained numerous problems, including it was not signed by the Debtor, did not state the reasons for the attorney's section, and did not indicate whether the attorney had any present connections with any of the creditors. Based on those and other issues, the bankruptcy court determined that (a) the attorney could not provide competent representation to the estate, (b) it would not be in the best interest of the estate for the court to approve the attorney's appointment, and (c) the attorney's appointment would not aid in administration of the case.<br><br>**Analysis:** The U.S. Trustee quotes the following language from *Doors & More*:<br>• "Plainly, the Court will not approve the employment of counsel that does not comport with the applicable ethical and disciplinary regulations." (Objection ¶ 44).<br>• "In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her own best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate." (Objection ¶ 44, n.5).<br><br>The ethical issues presented in *Doors & More* was where the attorney could provide competent representation. According to the bankruptcy court:<br><br>Both the Michigan Rules of Professional Conduct and the best interest of a bankruptcy estate require that the attorney selected to represent the estate must be able to provide competent representation. In a Chapter 11 case, an attorney can provide competent representation to the estate only if the attorney is thoroughly familiar with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Bankruptcy, and especially Chapter 11 bankruptcy, is a highly specialized area of law. An attorney for a debtor in possession must have expert knowledge of bankruptcy law in order to achieve a successful result. Experience indicates that a business that files a Chapter 11 case, by definition, is already in |

8

trouble. Although competent counsel can by no means insure a successful reorganization, incompetent counsel will almost certainly insure failure. Only an attorney with expert knowledge of bankruptcy law can properly aid in the administration of the case.

The U.S. Trustee does not dispute that S&L is familiar with bankruptcy and competent to represent the Debtor in its chapter 11 case.

| 13 | *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007). | **Overview:** |

Overview:

In *Smith*, the chapter 7 trustee obtained an order to remove the debtor's preferred choice of special personal injury counsel and denied the debtor's motion to dismiss the chapter 7 case. The district court and the Second Circuit Court of Appeals affirmed the bankruptcy court's ruling.

Analysis:

The U.S. Trustee quotes the following language from *Smith*: "[T]he bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." (Objection ¶ 44, n.5). *Smith* is *directly* contrary to the U.S. Trustee's position in the Objection.

Indeed, *Smith* is also instructive on the considerations beyond simply compliance with Bankruptcy § Code 327 that are appropriate to guide the Court's discretion:

Thus, section 327(a) does not give a bankruptcy court authority to reject a trustee's choice of counsel solely because of an objection by the debtor. Rather, the debtor's objection is relevant only to a bankruptcy court's consideration of the best interest of the estate, or of whether the chosen special counsel is conflicted.

Applying these principles here, we find no error in the Bankruptcy Court's determination that there were "no circumstances" that would give it reason to interfere with Geltzer's decision to remove Schwartz as special personal injury counsel. There was no indication or allegation that the attorney with whom Geltzer chose to replace Schwartz was conflicted or unqualified to litigate the personal injury action, and ample evidence supported the Bankruptcy Court's conclusion that the best interest of the estate would not be served by requiring Geltzer to continue to be represented by Schwartz, including, inter alia, Schwartz's delay in amending the state court caption and his transferring the personal injury file to Ginsberg without court or trustee approval. Indeed, the only factor weighing in favor of rejecting Geltzer's motion was Smith's preference to have Schwartz and Ginsberg prosecute the personal injury action. But that preference alone is insufficient to turn this into one of the "rarest cases" in which interference with the trustee's choice could be justified.

9

004640

| | | |
|---|---|---|
| 14 | *In re Leslie Fay Companies, Inc.,* 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994). | **Overview:**<br><br>As *Smith* indicates, the relevant factors guiding courts' discretion are (a) the best interest of the estate, (b) the qualifications of the proposed attorney, and (c) and whether the chosen counsel has a conflict. The U.S. Trustee does object to S&L's employment on any of those grounds.<br><br>*Leslie Fay* involved the failure of the chapter 11 debtor's counsel to disclose connections with potential targets of litigation by the debtor and the debtor's seventh largest creditor. The bankruptcy court appointed an examiner and the examiner determined that the attorney was not disinterested in the matter. The United States trustee for the district sought to disqualify the attorney on the grounds of failure to disclose the connections under Bankruptcy Rule 2014 and because the attorney was not disinterested. The bankruptcy court found that the attorney represented interests that were materially adverse at the time of its retention and failed to properly disclose its connections under Bankruptcy Rule 2014. The bankruptcy court determined that the best interests of the estate warranted (a) allowing the attorney to complete the services it had begun and see the case through reorganization and finish the pending contested matters and adversary proceedings, while requiring replacement counsel to handle new matters and (b) imposing an economic sanction in the amount of the costs of the examiner's investigation and the failure to disclose.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Leslie Fay*: "[T]he requirements of Fed. R. Bankr. P. 2014 are more encompassing than those governing disinterestedness inquiry under section 327. For while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014, 'all connections' that are not so remote as to be de minimis must be disclosed." (Objection ¶ 46). As set out in the Reply, however, this disclosure is required of professionals who are employed by the bankruptcy estate or seeking to be employed by the bankruptcy estate. The attorney at issue in *Leslie Fay* was employed by the debtor pursuant to Bankruptcy Code § 327(a). The facts are not the same as those present here and the case does not support the U.S. Trustee's position. |
| 15 | *In re Woodcraft Studios, Inc.,* 464 B.R. 1, 8 (N.D. Cal. 2011). | **Overview:**<br><br>In *Woodcraft Studios*, the bankruptcy court denied a fee application filed by the attorney to a chapter 11 debtor after the case was converted to chapter 7 and ordered the disgorgement of the prepetition retainer. The attorney affirmatively stated in the application to employ and Bankruptcy Rule 2014 disclosure that the attorney did not represent the debtor prior to the petition date or have any connections to parties in interest in the case. After conversion, the bankruptcy court determined that the attorney represented and received fees from the debtor prior to the petition date. On appeal, the U.S. District Court for the Northern District of California affirmed the bankruptcy court's ruling |

10

| | | |
|---|---|---|
| | | **Analysis:**<br><br>The U.S. Trustee quotes the following language from *Woodcraft Studios*: The applicant has the duty to disclose all relevant information to the court and "may not exercise any discretion to withhold information." (Objection ¶ 46). However, the opinion goes on the state the following:<br><br>    "The purpose of such disclosure is to permit the Court and parties in interest to determine whether the connection disqualifies the applicant from the employment sought, or whether further inquiry should be made before deciding whether to approve the employment. This decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment." *In re Lee*, 94 B.R. 172, 176 (Bankr. C.D. Cal.1988).<br><br>*Woodcraft Studios* does not stand for the proposition that Bankruptcy Rule 2014 imposes a duty to supplement disclosures of connections after the professional is no longer seeking to be retained in the bankruptcy case. It does not support the U.S. Trustee's position in the Objection that Mr. Lee's disclosures were deficient. |
| 16 | *U.S. v. Gallene*, 182 F.3d 578, 588 (7th Cir. 1999). | **Overview:**<br><br>*Gallene* involved a criminal case in which the district court entered convictions and sentences against a bankruptcy attorney for knowingly and fraudulently making a false material declaration in a bankruptcy case. A jury returned verdicts finding that attorney for a chapter 11 debtor failed to disclose connections of his firm to a debtor's senior secured creditor and related parties. The issue was raised among the attorney's firm two months before the debtor filed bankruptcy and the bankruptcy court held hearings about other connections that were disclosed in the attorney's 2014 declaration. When the court ordered the attorney to file a supplemental declaration, the connection with the senior secured creditor were still not disclosed.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Gallene*: "Thus, 'professionals "cannot pick or choose which connections are irrelevant or trivial."'" (Objection ¶ 46). However, other portions of the same paragraph from which the U.S. Trustee draws its quotation indicates that the obligation to disclose connections is limited:<br><br>    The Bankruptcy Code requires that attorneys *who seek to be employed as counsel for a debtor* apply for the bankruptcy court's approval of that employment. See In re Crivello, 134 F.3d 831, 835-36 (7th Cir. 1998). *Bankruptcy Rule 2014 requires the potential attorney for the debtor* to set forth under oath any "connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr. P. 2014(a).<br><br>*Gallene* does not support the U.S. Trustee's position in the Objection. |

11

| 17 | *In re The Harris Agency*, 462 B.R. 514, 524 (E.D. Pa. 2011). | **Overview:**<br><br>In *Harris Agency* the attorney for a chapter 11 debtor failed to disclose that a creditor had agreed to pay the attorney's fees for representing the debtor and that the debtor had agreed to repay the amounts advanced by that creditor. The bankruptcy court entered an order disqualifying the attorney from further representation of the debtor in the chapter 11 case but did not disqualify the attorney from the beginning of the case. In connection with a subsequent fee application, the court found that the attorney had also previously entered an appearance for a non-debtor affiliate of the debtor prior to disqualification. The bankruptcy court entered a second order disqualifying the attorney as of the date of the conflicting representation, partially disallowing fees and expenses, and mandating disgorgement of fees received in excess of the amount allowed. The U.S. District Court for the Eastern District of Pennsylvania affirmed the bankruptcy court's rulings.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Harris Agency*: "The duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and 'requires 'spontaneous, timely, and complete disclosure.''" (Objection ¶ 46). A more complete quote is as follows:<br><br>***Attorneys who seek approval by the court to represent a debtor, pursuant to § 327(a)***, must file an application for employment that complies with the disclosure requirements of Rule 2014. Rule 2014(a) requires that "[t]he application shall state . . . to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest," and "shall be accompanied by a verified statement . . . setting forth the person's connections with the debtor, creditors, [and] any other party in interest . . . ." The duty to disclose under Rule 2014 ***continues throughout an attorney's representation of the debtor***, and requires "spontaneous, timely, and complete disclosure . . . ." Rome v. Braunstein, 19 F.3d 54, 59 (1st Cir. 1994).<br><br>Again, the U.S. Trustee cherry-picks quotes to arrive at a misleading result. *Harris Agency* does not support the U.S. Trustee's position. |
| 18 | *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998). | **Overview:**<br><br>In *Granite Partners*, the attorney retained by a chapter 11 trustee retained the attorney to represent the estate represented a larger creditor that was an investigation target in five open matters that were not disclosed in the attorney's Bankruptcy Rule 2014 disclosures. During the course of the attorney's representation of the chapter 11 trustee, the attorney opened approximately 400 additional matters for the creditor resulting in $9 million in fees that it did not disclose. The matter was not disclosed until the attorney filed its final fee application and the bankruptcy court appointed a fee examiner who determined that the attorney represented interests adverse to the estate. The bankruptcy court denied all of the attorney's fees related to investigative services and reduced the fee award by 15% for non-investigative disclosures. |

12

| 19 | *In re Griffin*, 313 B.R. 757, 763 (Bankr. N.D. Ill. 2004). | **Analysis:**<br><br>The U.S. Trustee cites *Granite Partners* for the proposition that "[t]he duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and requires spontaneous, timely, and complete disclosure" and the parenthetical that "'court[s] should not have to 'rummage through files or conduct independent fact-finding investigations' to determine whether the professional should be disqualified.'" (Objection ¶ 46).<br><br>However, the *Granite Partners* makes clear that the purpose of Bankruptcy Rule 2014 disclosures is "***to determine qualification under section 327.***" The attorney in *Granite Partners* was employed as an estate professional and further was sanctioned only to the extent necessary to prevent compensation for matters on which the attorney could not be retained under section 327. Nothing in *Granite Partners* supports sanctioning a *different* law firm in a *different* case for the actions of an attorney that was not, at the time of the asserted non-disclosure, seeking to be retained by the bankruptcy estate. The case does not support the U.S. Trustee's position in the Objection. |
| | | **Overview:**<br><br>In *Griffin*, the attorney to a chapter 7 debtor sought payment from the estate for post-petition services provided to the debtor. The attorney was never retained by the chapter 7 trustee. Additionally, the debtors took a post-petition loan to pay the attorney's fees for work related to redeeming the debtor's vehicle (pursuant to a prepetition retainer agreement). The bankruptcy court held that the fees were not allowable, were not properly disclosed pursuant to Bankruptcy Code § 329 or Bankruptcy Rule 2016, and had to be disgorged if already paid.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Griffin*: "The disclosure requirements in Rule 2014 are 'rooted in the fiduciary relationship between courts and attorneys.'" (Objection ¶ 47). The U.S. Trustee appears to misrepresent the following language from *Griffin* in the Objection:<br><br>Section 329 of the Code and Rule 2016(b) are rooted in the fiduciary relationship between courts and attorneys.<br><br>In any event, as important as Bankruptcy Rule 2014 may be, that is not a reason to use the important requirement as a club against this Debtor as requested by the U.S. Trustee. |
| 20 | *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012). | **Overview:**<br><br>In *American International Refinery*, the liquidating trustee in a chapter 11 case brought an adversary proceeding against the chapter 11 debtors' former attorneys seeking disgorgement of fees during the bankruptcy. The bankruptcy court ordered a sanction of $135,000 for the attorney's failure to adequately |

13

disclose various connections it had to the debtors and creditors, but found that the attorney did not have a disqualifying adverse interest and did not disgorge the remaining $607,000 that the attorney received in the case. The liquidating trustee appealed. The Fifth Circuit Court of Appeals affirmed the decision of the bankruptcy court.

Analysis:

The U.S. Trustee quotes the following language from *American International Refinery*: "Applicants 'who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.'" (Objection ¶ 47).

Again, considering the broader language from which the U.S. Trustee derived its quotation is necessary to understand what the case actually said:

> Courts may deny all compensation to professionals who fail to make adequate disclosure, and "counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *West Delta Oil*, 432 F.3d at 355 (quotation marks omitted); *see also Rome v. Braunstein*, 19 F.3d 54, 59-60 (1st Cir. 1994) ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and [Rule] 2014(a), court-appointed counsel proceed at their own risk."). In determining an appropriate sanction, an important consideration is whether the failure was intentional. *Crivello*, 134 F.3d at 839 (stating that "a bankruptcy court should punish a willful failure to disclose the connections . . . as severely as an attempt to put forth a fraud on the court.").

*American International Refinery* supports the proposition that *if* Mr. Lee had failed to disclose his connections with FSS in the IW Cases, been employed by the IW Debtors' bankruptcy, and sought compensation, the Court would have discretion to deny such requested fees. Because of the U.S. Trustee's insistence on dismissing the IW Cases, that never happened. The Fifth Circuit's decision does not support for the U.S. Trustee's position in the Objection.

Overview:

In *Midway*, in connection with a final fee application after conversion of a case from chapter 11 to chapter 7, counsel for a chapter 11 debtor sought compensation that included amounts due under an undisclosed contingency fee arrangement, and attorney lien claim. The U.S. trustee and certain creditors objected to the fee application because of the failure to disclose the connections under Bankruptcy Rule 2014 and the waiver implied thereby. The bankruptcy court allowed only approximately 55% of the attorney's fees, considering, among other things, the period of time it took the attorney to make the disclosure and the certain prejudice to the estate caused by such non-disclosure. The bankruptcy court disallowed the attorney lien claim.

| 21 | *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001). | |

14

004645

Analysis:

The U.S. Trustee quotes the following language from *Midway*: "'[L]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice.'" (Objection ¶ 47). The context of the quote is as follows:

> Trittipo argues that the lack of disclosure has not caused any prejudice to the estate in general. This argument ignores the objective of requiring disclosure. The objective of requiring disclosure is not so much to protect against prejudice to the estate, but to ensure undivided loyalty and untainted advice from professionals. *Crivello*, 134 F.3d at 836. That is why lack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice. *Filene's Basement*, 239 B.R. at 849. Trittipo's lack of prejudice argument is relevant, however, in assessing the amount of disallowance, which is discussed below. *See Diamond Mortgage*, 135 B.R. at 96.

*Midway* does not support the U.S. Trustee's position in the Objection. There is no dispute that S&L has disclosed relevant connections in the Debtor's chapter 11 case. The decision does not indicate that a professional who is no longer seeking to be retained as an estate professional has an obligation to supplement disclosures. Nor does the decision indicate that a failure of an attorney in a previous case, for a different client, at a different law firm, should be disqualifying.

| | | |
|---|---|---|
| 22 | *In re Rabex Amuru of N.C., Inc.*, 198 B.R. 892, 897 (Bankr. M.D.N.C. 1996). | Overview:<br><br>*Rabex* involved an application by a chapter 11 debtor to employ an attorney. There was a dispute about the ownership of the equity interests in the debtor between to potential parent companies and the debtor was a named defendant in related state court litigation. One of these parent companies paid the retainer for the debtor's proposed attorney, was continuing to make the attorney's payment during the chapter 11 case, and authorized the bankruptcy filing. The bankruptcy court determined that these facts created the appearance of a conflict of interest sufficient that the attorney was not a disinterested person despite the lack of any wrongdoing by the attorney.<br><br>Analysis:<br><br>The U.S. Trustee cites *Rabex* for the proposition that "'[l]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice'" and indicates in the parenthetical that "attorneys for debtor removed because of the appearance of impropriety, even though no harm done to the debtor[.]'" (Objection ¶ 47). That is not an accurate representation of what the case stands for—there was no issue with disclosure in Rabex, and the bankruptcy court held that being paid by one of the disputed owners of the debtor amounted to attorney no longer being a disinterested person.<br><br>In any event, the facts of *Rabex* are not relevant to the Trustee's position in the Objection. |

15

| 23 | *In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011). | **Overview:**<br><br>The relevant issue in *Byington* was whether there was an obligation to disclose a pre-filing transfer by the debtors' son for the filing fee for the chapter 11 case. The bankruptcy court held that the pre-filing transfer from the debtors' son should have been disclosed. Because of the novelty of the issue, however, the bankruptcy court held that the failure to disclose the payment was not sufficient to deny the application to employ the attorney but that the attorney would not be entitled to compensation for correcting the deficiency or in asserting that the disclosure was not required.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Byington*: "Professionals must 'be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action.'" (Objection ¶ 47)<br><br>Again, looking at the context of the language quoted by the U.S. Trustee makes clear that this obligation only applies to professionals who are actively seeking to be employed by the estate:<br><br>Published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their attorneys, ***whose employment is sought to be approved***, be meticulous in disclosing "all connections" with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action.<br><br>*Byington* does not support the U.S. Trustee's position that Mr. Lee was required to supplement his disclosure for KSLPLLC after the IW Debtors had decided to dismiss their cases, as demanded by the U.S. Trustee, and no longer intended to pursue Mr. Lee's employment as an estate professional. It certainly does not support the U.S. Trustee's position that this should be imputed on *this* Debtor seeking to employ S&L in *this* chapter 11 case.<br><br>Moreover, *Byington* suggests what would be an appropriate action for the Court to take here if it determines that Mr. Lee's disclosure of connections in the IW Cases was deficient. Like the bankruptcy court in *Byington* did, the Court should simply not allow Mr. Lee compensation for asserting the disclosure was not required. Denial of the Debtor's application to employ S&L and harm to the Debtor's estate and administration if its chapter 11 case is not called for here. |
| 24 | *In re EBW Laser Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005). | **Overview:**<br><br>In EBW Laser, an attorney was retained as special counsel to a chapter 11 debtor on a contingency fee basis to pursue litigation against a third-party. The chapter 11 case was converted to a case under chapter 7 and the chapter 7 trustee, acting as his own counsel, negotiated a settlement with the defendant in which the bankruptcy estate received a cash payment. The attorney submitted an application for compensation based on the |

16

| | | |
|---|---|---|
| | | contingency fee agreement under which he was retained in the chapter 11 case. The bankruptcy court rejected the attorney's argument for contingency fees but held that the attorney was entitled to reasonable compensation for the post-petition, pre-conversion services provided as a chapter 11 administrative expense claim.<br><br>Among the issues raised by the chapter 7 trustee in his objection to the attorney's fee application was that the attorney inadequately disclosed the terms of the prepetition engagement of the attorney by the debtor. The attorney claimed that there was a side agreement that was essential to the chapter 7 trustee's ultimate settlement but that side agreement was not disclosed. Although the bankruptcy court held that the attorney's affidavit provided largely met the requirements of Bankruptcy Rule 2014, the court reduced the compensation awarded to the attorney by $3,000 (10%) because of the failure to disclose the side agreement.<br><br><u>Analysis:</u><br><br>The U.S. Trustee quotes the following language from *EBW Laser*: "The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required." (Objection ¶ 47). While the quoted language was contained in the opinion, that is not what the bankruptcy court did.<br><br>*EBW Laser* also demonstrates that what the U.S. Trustee is seeking through the Objection is in fact a sanction. The Application in *this* case by *this* Debtor is not the appropriate place for the U.S. Trustee to seek or the Court to impose that sanction. |
| 25 | *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). | <u>Overview:</u><br><br>In *eToys*, a shareholder and administrative claimant of a chapter 11 debtor, and the U.S. trustee filed motions seeking various relief against attorneys and consultants for the debtor and committee, including disgorgement of fees. Certain of the motions were settled or addressed for procedural reasons while others were decided on the merits. Among other things, the bankruptcy court found that the debtor's attorney had a disqualifying conflict and failed to adequately disclose that connection. The bankruptcy court ordered the attorney's fees paid in the case for matters related to that conflict to be disgorged.<br><br><u>Analysis:</u><br><br>The U.S. Trustee quotes the following language from *eToys* in the Objection:<br><br>It "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure *by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a)* and to make an informed decision on whether the engagement is in the best interest of the estate." *Id.* |

17

004648

| | | |
|---|---|---|
| | | (Objection ¶ 48) (emphasis added). The very language quoted by the U.S. Trustee in the Objection indicates that the reasoning does not apply to Mr. Lee under the facts present here. *eToys* does not support the U.S. Trustee's position in the Objection. |
| 26 | *In re Matco Elec. Group, Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008). | Overview:<br><br>In *Matco*, the U.S. trustee field a motion seeking to disallow and disgorge fees paid to former counsel to the an official committee in a chapter 11 case. In its Bankruptcy 2014 declaration accompanying the application to employ the attorney, it disclosed that one of the members of its firm was related to an officer and shareholder of one of the debtor's significant creditors. The U.S. trustee asserted that the disclosure was insufficient. The bankruptcy court agreed that the disclosure of the connection was purposely vague and reduced the attorney's final fees by one-half of the amount of holdback of interim fees awarded in the case.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Matco*:<br><br>As noted, Rule 2014 "is not intended to condone a game of cat and mouse where the ***professional seeking appointment*** provides only enough disclosure to whet the appetite of the UST, the court, and other parties in interest, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure."<br><br>(Objection ¶ 48). Again, the language that the U.S. Trustee decided to quote in the Objection indicates that the obligation to make disclosures only applies to professionals that are seeking to be employed as estate professionals. *Matco* does not support the U.S. Trustee's position that a professional is obligated to supplement disclosures under Bankruptcy Rule 2014 after the debtor has decided to agree with the U.S. trustee to dismiss its case and the professional is no longer seeking employment (or compensation) in the case. |
| 27 | *In re Bradley*, 495 B.R. 747, 786 (Bankr. S.D. Tex. 2013). | Overview:<br><br>In *Bradley* the bankruptcy court imposed on an attorney, his firm, and the attorney's assistant because (a) the attorney allowing his non-lawyer assistant to prepare conversion schedules and statement of financial affairs and file such documents without requiring the debtors to review and sign them and (b) the attorney allowed an unprepared appearance attorney to represent the debtors at section 341 meetings without disclosing the amount paid to such attorney.<br><br>Analysis:<br><br>The U.S. Trustee cites *Bradly* for the proposition that "[b]y remaining whether in pleadings, at hearings, or by failing to amend the InfoW Lee Declaration, Attorney Lee misrepresented his connections to the Court and violated the ethical duties of candor and diligence" with the parenthetical explanation that an "[a]ttorney's failure to correct misstatements demonstrated a lock of candor and respect to the Court). (Objection ¶ 50). |

With such a bold statement one might think that the U.S. Trustee would have equally bold support. But the facts at issue in *Bradley* are just as inapposite as every other authority cited by the U.S. Trustee in the Objection. The conduct that the bankruptcy court found violated ethical duties in *Bradley* were as follows:

[Attorney] breached Guideline D in at least the following respects: (1) he filed the Defective Pleadings without obtaining the Debtors' signatures, [Finding of Fact Nos. 25(a), 32(b), 35(b)]; (2) he allowed his legal assistant (i.e., Gutierrez) to forge the Debtors' original signatures on the Defective Pleadings, [Finding of Fact Nos. 25, 31, 32(b), 34]; (3) he instructed Gutierrez to file the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA despite knowing that those documents contained inaccuracies or knowing that he had not checked to confirm that the information contained therein was entirely accurate, [Finding of Fact Nos. 32(c), 36]; (4) he failed to inform the Debtors that Carter would represent them at their meetings of creditors, [Finding of Fact No. 38(d)]; (5) he did not prepare Carter for either of the Debtors' meetings of creditors, [Finding of Fact Nos. 38, 53]; (6) he filed, or allowed to be filed, an incorrect Rule 2016 Disclosure, [Finding of Fact No. 37]; and (7) he failed to own up to these transgressions until after the Chapter 7 Trustee brought them to the attention of the Court. Each of these actions alone is cause for concern; taken together, they seriously undermine Aduwa's personal integrity and professional reputation.

In turn, Mr. Lee did not amend his Bankruptcy Rule 2014 disclosures in the three (3) business days after first meeting with FSS because the IW Debtors had decided to agree with the U.S. Trustee to dismiss their cases and were no longer seeking to retain Mr. Lee as an estate professional.

19

# **EXHIBIT C**

004651

**Subject:** InfoW\Motion to Dismiss Chapter 11 Cases
**Date:** Monday, May 23, 2022 at 8:25:59 PM Central Daylight Time
**From:** Kyung S. Lee <klee@kslpllc.com>
**To:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>

**Attachments:** InfoW_MotiontoDismissChapter11Cases_5_23_22_8PM.docx

Everyone: Here is a first draft of the Motion to Dismiss the Chapter 11 Cases. Please review and provide me your comments. I would like to at least have in my mind know that we have done what we were supposed to have done as fiduciaries for the 3 debtors and have concluded with the CRO that dismissal is the route to go and is in the best interest of the Debtors, their estates and creditors.

I would like to file this Motion to Dismiss by Wednesday and skip the 341 Meeting of Creditors on Thursday, which will be more waste of fees and expenses of these 3 debtors for the CRO and his professionals.

**Kyung S. Lee**
Kyung S. Lee PLLC
**Pennzoil Place**
**700 Milam-Suite 1300**
**Houston, Texas 77002**
Email: klee@kslpllc.com
**Cell: (713) 301-4751**
Alternate Email: kslee50@gmail.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# **EXHIBIT D**

004653

**Subject:**    InfoW

**Date:**    Tuesday, May 17, 2022 at 8:34:29 AM Central Daylight Time

**From:**    Ruff, Jayson B. (USTP)

**To:**    kslee50@gmail.com

**Attachments:** image001.png

***Settlement Communication Subject to FRE 408***

Kyung,

Following on our conversation yesterday, please let me know when you have had a chance to discuss these matters with Marc.  As I mentioned yesterday, the UST still believes that the best option is for these cases to be dismissed and we intend to push forward with our motion.  That will include getting discovery from your client.  I have been holding off on doing that at your request, but time is running very short so we will need to resolve these matters very soon or you will need to give me a date early next week for a deposition of Marc.  As set forth in our pleadings, these cases have the badges of a bad faith filing.  Even with all of the Sandy Hook Plaintiffs "leaving the party" so to speak, that does not change how these cases arrived.  I understand that there are a few creditors that remain, but each of those can be paid following dismissal and payment agreements could be made outside of bankruptcy.

A few things to consider:

- I would note that according to the schedules filed by these Debtors, Mr. Jones and FSS (the "Jones Parties") are co-liable for all of the Debtors' remaining debts.  Given that the Jones Parties are also the primary source of funding for these Debtors' cases, they can agree to fund payment of these claims outside of bankruptcy as well.
- Inside of bankruptcy, it would appear that because Mr. Jones was taking royalty payments that belonged to IWHealth prepetition, that Debtors' estates would have claims against Mr. Jones for the return of those funds anyway.  Another reason for the Jones Parties to agree to pay the Debtors' remaining creditors outside of bankruptcy.  I am sure the royalty payments he received exceeds the amount of the Debtors' remaining debts.
- The Jones Parties are the primary funding sources for Debtors inside of and outside of bankruptcy.  They have already committed $725k toward resolving the claims of these Debtors.  Is there any reason why those funds could not be used to pay the remaining creditors of the Debtor following dismissal?  Seems like that amount may be more than enough.  Continuing in the bankruptcy will likely require significantly more funding.
- Based on the declarations filed with the petitions and statements made in court, it appears these Debtors are simply holding companies with no operations to speak of.  What is there to even reorganize?  Seems that dismissal or possibly conversion even are the better options for these Debtors.  Although, I understand that conversion would mean that the Jones Parties ability to use the IP held by the Debtors may then be at risk.  Another reason for them to agree to pay those creditors outside of bankruptcy.
- Dismissal is the more efficient and cheaper option for these Debtors as it will save from administrative and litigation costs and will still allow Debtors options to resolve their claims.

More can be said, but I believe the foregoing is enough.  I am hopeful that we can come to an agreement soon.  Please let me know when you believe you will be in a position to discuss these matters further.

Kinds regards,

*Jayson B. Ruff*

Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov

PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

# **EXHIBIT E**

004656

# Kyung S. Lee PLLC

# INVOICE

700 Milam, Suite 1300
Houston, Texas 77002

Invoice # 2
Date: 06/07/2022
Due On: 07/07/2022

W. Marc Schwartz
Free Speech Systems, LLC
712 Main Street-Suite 1830
HOUSTON, Texas 77002

## 00003-Free Speech Systems, LLC

## Represent FSS in connection with preparation of FSS for potential filing of bankruptcy as a Subchapter v Debtor.

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 05/24/2022 | Research and email RJ Shannon on background research of FSS so as to be prepared for discussion in Austin (1.5); travel to and from Austin, Texas and not working (charged at 1/2 time of 6 hours)(3); extended conference with client, Schwartz Associates, B. Roe, S. Jordan, and RJ Shannon to discuss options and issues with FSS restructuring (5.0) | 9.50 | $850.00 | $8,075.00 |
| Service | 05/25/2022 | Follow-up with research on background facts relating to how FSS came about, operational history and litigation history of same for purposes of drafting First Day Declaration of Marc Schwartz (3.0) | 3.00 | $850.00 | $2,550.00 |
| Service | 05/25/2022 | Follow-up on data received at meeting, new data gathered and research for prose on historical operations of FSS (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/26/2022 | Review and analyze 2 Valuation Reports for PQPR and FSS, analyze same for background information on FSS for pleadings and determine status of case information in both (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/27/2022 | Coordinate with State Court counsel on sanctions issues and explain approach to handling same (.5); numerous conferences with S. Lemmon, counsel for PQPR (1.0); locate critical documents for S. Lemmon and forward (.5) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/28/2022 | Analyze State Court litigation production to determine data produced to opposing counsel in state court and collect key documents to share with parties (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/29/2022 | Continue to review financial data discovered during search of State Court litigation production and analyze same (2.0) | 2.00 | $850.00 | $1,700.00 |

004657

| | | | | | |
|---|---|---|---|---|---|
| Service | 05/30/2022 | Review and analyze background corporate documents and additional documents discovered from reviewing State Court production in DropBox files (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/31/2022 | Work on Declaration for Marc Schwartz as CRO for FSS and incorporate facts learned through investigation (4.0) | 4.00 | $850.00 | $3,400.00 |

|  |  |
|---|---|
| **Total** | **$24,225.00** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 7 | 07/07/2022 | $184.09 | $0.00 | $184.09 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2 | 07/07/2022 | $24,225.00 | $0.00 | $24,225.00 |

| | |
|---|---|
| **Outstanding Balance** | **$24,409.09** |
| **Total Amount Outstanding** | **$24,409.09** |

Please make all amounts payable to: Kyung S. Lee PLLC

Please pay within 30 days.

004658

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: § | |
| § | **Chapter 11** |
| **Free Speech Systems LLC** § | |
| § | **Case No. 22-60043 (CML)** |
| Debtor. § | |
| § | |

<u>**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE**</u>

**PLEASE TAKE NOTICE** that Richard A. Cochrane of Akin Gump Strauss Hauer & Feld

LLP is appearing on behalf of Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa,

and Marcel Fontaine (collectively, the "<u>Texas Plaintiffs</u>") and David Wheeler, Francine Wheeler,

Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto,

Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach,

and Robert Parker (collectively, the "<u>Connecticut Plaintiffs</u>," together with the Texas Plaintiffs, the

"<u>Sandy Hook Families</u>"),[1] creditors and parties-in-interest in the above-captioned case, pursuant

to section 1109(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 9010(b)

of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and respectfully requests,

pursuant to Bankruptcy Rules 2002, 3017, and 9007 and Bankruptcy Code sections 342 and

1109(b), that copies of all notices given or required to be given in the above captioned cases and

all papers served or required to be served in such cases be served upon the following:

---

[1] Marcel Fontaine was not defamed relating to the Sandy Hook tragedy. Instead, he was defamed relating to the Parkland shooting. For ease of reference, however, all tort claimants shall be referred to as the Sandy Hook Families.

1

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Richard A. Cochrane
Texas State Bar No. 24116209
2300 N. Field Street, Suite 1800
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343
email:  rcochrane@akingump.com

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Code section 1109(b), the foregoing request includes not only the notices and papers referred to in the Bankruptcy Rules specified above, but also includes, without limitation, notices of any application, complaint, demand, hearing, motion, petition, order, pleading, or other request, whether formal or informal, whether written or oral and whether transmitted or conveyed by mail, hand delivery, telephone, electronic mail, or otherwise, that is filed or given in connection with the above-captioned cases.

**PLEASE TAKE FURTHER NOTICE** that neither this Notice of Appearance nor any subsequent appearance, pleading, claim, or suit is intended or shall be deemed or construed to be a waiver of any substantive or procedural rights of this request shall not be deemed or construed to be a waiver of any substantive or procedural rights of the Sandy Hook Families, including, without limitation:  (i) to have final orders in non-core matters entered only after *de novo* review by the United States District Court for the Southern District of Texas (the "District Court"); (ii) to have a trial by jury in any proceeding related to these cases or any case, controversy or proceeding related to these cases; (iii) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; and (iv) any other rights, claims, actions or defenses to which the Sandy Hook Families may be entitled in law, in equity, or otherwise, all of which rights, claims, actions and defenses are expressly reserved.

004660

**PLEASE TAKE FURTHER NOTICE** that the aforementioned attorney requests that he be added to the official service list for notice of all contested matters, adversary proceedings, and other proceedings in these cases.

Dated: September 16, 2022                     Respectfully Submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/  Richard A. Cochrane*

Richard A. Cochrane
Texas State Bar No. 24116209
2300 N. Field Street, Suite 1800
Dallas, TX  75201-2481
Telephone: (214) 969-2800
Facsimile:  (214) 969-4343
email: rcochrane@akingump.com

***Counsel to the Sandy Hook Families***

3

004661

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 16, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


<u>/s/   Richard A. Cochrane</u>
Richard A. Cochrane

004662

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22-60043 (CML)** |
| Debtor. | § | |
| | § | |

## NOTICE OF APPEARANCE AND REQUEST FOR SERVICE

**PLEASE TAKE NOTICE** that Nicholas R. Lombardi of Akin Gump Strauss Hauer & Feld LLP is appearing on behalf of Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs," together with the Texas Plaintiffs, the "Sandy Hook Families"),[1] creditors and parties-in-interest in the above-captioned case, pursuant to section 1109(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and respectfully requests, pursuant to Bankruptcy Rules 2002, 3017, and 9007 and Bankruptcy Code sections 342 and 1109(b), that copies of all notices given or required to be given in the above captioned cases and all papers served or required to be served in such cases be served upon the following:

---

[1] Marcel Fontaine was not defamed relating to the Sandy Hook tragedy.  Instead, he was defamed relating to the Parkland shooting.  For ease of reference, however, all tort claimants shall be referred to as the Sandy Hook Families.

1

004663

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Nicholas R. Lombardi
Texas State Bar No. 24128023
2300 N. Field Street, Suite 1800
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343
email:  nlombardi@akingump.com

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Code section 1109(b), the foregoing request includes not only the notices and papers referred to in the Bankruptcy Rules specified above, but also includes, without limitation, notices of any application, complaint, demand, hearing, motion, petition, order, pleading, or other request, whether formal or informal, whether written or oral and whether transmitted or conveyed by mail, hand delivery, telephone, electronic mail, or otherwise, that is filed or given in connection with the above-captioned cases.

**PLEASE TAKE FURTHER NOTICE** that neither this Notice of Appearance nor any subsequent appearance, pleading, claim, or suit is intended or shall be deemed or construed to be a waiver of any substantive or procedural rights of this request shall not be deemed or construed to be a waiver of any substantive or procedural rights of the Sandy Hook Families, including, without limitation:  (i) to have final orders in non-core matters entered only after *de novo* review by the United States District Court for the Southern District of Texas (the "District Court"); (ii) to have a trial by jury in any proceeding related to these cases or any case, controversy or proceeding related to these cases; (iii) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; and (iv) any other rights, claims, actions or defenses to which the Sandy Hook Families may be entitled in law, in equity, or otherwise, all of which rights, claims, actions and defenses are expressly reserved.

2

**PLEASE TAKE FURTHER NOTICE** that the aforementioned attorney requests that he be added to the official service list for notice of all contested matters, adversary proceedings, and other proceedings in these cases.

Dated: September 16, 2022                              Respectfully Submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

/s/   *Nicholas R. Lombardi*

Nicholas R. Lombardi
Texas State Bar No. 24128023
2300 N. Field Street, Suite 1800
Dallas, TX  75201-2481
Telephone: (214) 969-2800
Facsimile:  (214) 969-4343
email: nlombardi@akingump.com

***Counsel to the Sandy Hook Families***

3

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 16, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/   *Nicholas R. Lombardi*
Nicholas R. Lombardi

4

UNITED STATES BANKRUPTCY COURT            SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | David M. Zensky<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 41st Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 2176691 |
|---|---|

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest | |
|---|---|
| Dated: 9/16/2022 | Signed: /s/ David M. Zensky _____ |

| COURT USE ONLY: The applicant's state bar reports their status as: _____ . |
|---|
| Dated: | Signed: _____ <br> Deputy Clerk |

Order

This lawyer is admitted *pro hac vice*.

Dated: _____              _____
                                                United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

004667

UNITED STATES BANKRUPTCY COURT             SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____New York_____ :

| | |
|---|---|
| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | Melanie Miller<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 43rd Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 5604202 |

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest |
|---|
| Dated: 9/16/2022      Signed: /s/ Melanie Miller |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. |
|---|
| Dated:      Signed: _____<br>                        Deputy Clerk |

Order

This lawyer is admitted *pro hac vice.*

Dated: _____          _____
                                United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

004668

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22–60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | **Subchapter V** |
| | § | |

---

### THE TEXAS PLAINTIFFS' NOTICE OF DEPOSITION TO FREE SPEECH SYSTEMS, LLC PURSUANT TO FED. R. CIV. P. 30(b)(6)

---

**TO:   Free Speech Systems, LLC, Debtor
3019 Alvin Devane Boulevard, Suite 300
Austin, TX 78741**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, applicable to this proceeding under Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ("**Texas Plaintiffs**") will conduct the oral deposition of one or more officers, directors, agents or other representatives of Free Speech Systems, LLC ("**FSS**") on **September 23, 2022 at 10:00 a.m., prevailing central time, at the law offices of Akin, Gump, Strauss, Hauer & Feld, LLP, 1111 Louisiana St., 44th Floor, Houston, TX 77002.**

FSS shall produce one or more officers, directors, agents or other representatives most knowledgeable and prepared to testify regarding the topics described in **Exhibit A**. The Texas Plaintiffs request that FSS provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on FSS's behalf.

---

004669

The deposition shall be taken before a person duly authorized by law to administer oaths, and may be recorded by stenographic, audiographic, and/or videotaped means. The deposition shall continue from day to day thereafter or as otherwise agreed by the parties, until completed.

Dated: September 16, 2022

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By: */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tara T. LeDay
Texas Bar No. 24083068
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tara.leday@chamberlainlaw.com

***Bankruptcy Counsel for Texas Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on September 16, 2022, a true and correct copy of the foregoing document was served via electronic transmission to all registered ECF users appearing in the case and will be sent via first-class, postage prepaid, United States mail on September 19, 2022 as follows:

Free Speech Systems, LLC, Debtor
3019 Alvin Devane Boulevard, Suite 300
Austin, TX 78741

Raymond William Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218

Kyung Shik Lee
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

R.J. Shannon
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

*/s/ Jarrod B. Martin*
Jarrod B. Martin

## EXHIBIT A

In accordance with Fed. R. Civ. P. 30(b)(6), Texas Plaintiffs designate the matters identified below for examination.

1.      Communications and documents FSS exchanged with Blue Asension.

2.      FSS's internal communications and documents about outsourcing Free Speech Systems' product-fulfillment services.

3.      Communications and documents exchanged with PQPR Holdings Limited, LLC ("**PQPR**") regarding any debts, agreements, contracts, promissory notes, invoices, product orders, product sales, and forbearance agreements—including any negotiations regarding these items.

4.      Communications between W. Marc Schwartz ("**Mr. Schwartz**") and PQPR relating to FSS's alleged debt to PQPR.

5.      The items budgeted for in the Debtor's proposed 13-week budget in support of its cash-collateral motion.

6.      Alex Jones's annual compensation, including salaries and draws and any other form of payment, from FSS since the company's inception.

7.      Declarations of Mr. Schwartz in connection with this bankruptcy case.

8.      Communications and documents produced by FSS in response to discovery requests in this bankruptcy.

9.      Deposition testimony of FSS in any of the cases brought by the Texas or Connecticut Plaintiffs as it relates to PQPR, product fulfillment, and any items in Free Speech Systems' proposed 13-week budget in support of its cash-collateral motion.

10.     Communications and documents exchanged between Free Speech Systems and Alex Jones regarding Jones's compensation from FSS (including draws, salary, and any other compensation).

11.     Communications and documents exchanged between FSS and David Jones since January 1, 2018 as it relates to PQPR, product fulfillment, and any items in FSS's proposed 13-week budget in support of its cash-collateral motion.

12.     Communications and documents exchanged between FSS and Carol Jones since January 1, 2018 as it relates to PQPR, product fulfillment, and any items in FSS's proposed 13-week budget in support of its cash-collateral motion.

13.     Communications and documents exchanged between FSS and Alex Jones regarding donations (including cryptocurrency) that FSS has received since January 1, 2018.

14.     Internal communications and documents regarding donations (including cryptocurrency) that FSS has received since January 1, 2018.

15.     FSS's accounting and bookkeeping since January 1, 2012—including (1) who was responsible for or helped with its accounting and bookkeeping; (2) what systems and software were used for accounting and bookkeeping; and (3) how accounting and bookkeeping records were created and kept in the ordinary course of business.

16.     The offices and facilities FSS owns, leases, or operates since January 1, 2012.

17.     The claimed debt FSS owes PQPR and any investigation by Schwartz regarding the validity of that debt.

18.     Any filed or contemplated objection or response by FSS or any other party in interest to the Motion by the Sandy Hook Families to (i) Appoint Tort Claimants Committee and (ii) Remove the Debtor in Possession.

19.     The selection and role of Mr. Schwartz and Schwartz Associates, LLC to act as Restructuring Advisors, including the identity of the party that employed Mr. Schwartz and any communications.

20.     All Communications between any owner, manager, board member, or employee of Schwartz Associates, LLC and Alex Jones or anyone acting on Alex Jones's behalf.

21.     Any agreements between FSS and Mr. Schwartz and Schwartz Associates, LLC concerning compensation.

22.     Any discussions with any advisors between Mr. Schwartz and Schwartz Associates, LLC, including any attorneys retained and advice sought.

23.     All work performed by Mr. Schwartz and Schwartz Associates LLC on behalf of the bankruptcy estate and any efforts taken to obtain FSS's prepetition financial records.

24.     Any evaluation or analysis of any claims that FSS believes it holds against other entities arising out of its chapter 11 case, including claims that Mr. Schwartz evaluated and the merits of pursuing those claims.

25.     Any common interest agreement between PQPR and FSS.

26.     Any confidentiality agreements between PQPR and FSS.

27.     Communications between FSS and Auriam, including Auriam's relationship with FSS.

28.     The memorandum of understanding between FSS, PQPR, and Auriam.

29.     The relationship between FSS and any credit card processor or financial institution it does business with.

30.     FSS's bank accounts and accounts with any financial institution pre-petition.

31.     The Debtors' impressions and evaluations of the trustworthiness of any person with whom its done business or employed, including Alex Jones.

32.     All documents, communications, and evidence concerning the accrual of debt to PQPR memorialized by the notes between PQPR and the Debtor.

33.     The timing and circumstances of the reasons that FSS sought Chapter 11 bankruptcy.

34.     Factual statements FSS agrees with and disagrees with in the Motion by the Sandy Hook Families to (i) Appoint Tort Claimants Committee and (ii) Remove the Debtor in Possession.

*****

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22–60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Chapter 11** |
| | § | **Subchapter V** |
| **Debtor.** | § | |

---

## THE TEXAS PLAINTIFFS' NOTICE OF DEPOSITION TO PQPR HOLDINGS LIMITED, LLC PURSUANT TO FED. R. CIV. P. 30(B)(6)

---

**TO:**  **PQPR Holdings Limited, LLC**
   **2621 Ridgepoint Drive**
   **Austin, TX 78754**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, applicable to this proceeding under Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ("**Texas Plaintiffs**") will conduct the oral deposition of one or more officers, directors, agents or other representatives of PQPR Holdings Limited, LLC ("**PQPR**") on **October 4, 2022 at 10:00 a.m.,** prevailing central time, at the law offices of Akin, Gump, **Strauss, Hauer & Feld, LLP, 1111 Louisiana St., 44th Floor, Houston, TX 77002.**  PQPR shall produce one or more officers, directors, agents or representatives most knowledgeable and prepared to testify regarding the topics described in **Exhibit A**. The Texas Plaintiffs request that PQPR provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on PQPR's behalf.

The deposition shall be taken before a person duly authorized by law to administer oaths, and may be recorded by stenographic, audiographic, and/or videotaped means. The deposition shall continue from day to day thereafter or as otherwise agreed by the parties, until completed.

Dated: September 16, 2022

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By:  */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tara T. LeDay
Texas Bar No. 24083068
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tara.leday@chamberlainlaw.com

***Bankruptcy Counsel for Texas Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on September 16, 2022, a true and correct copy of the foregoing document was served via electronic transmission to all registered ECF users appearing in the case and will be sent via first-class, postage prepaid, United States mail on September 19, 2022 as follows:

PQPR Holdings Limited, LLC
2621 Ridgepoint Drive
Austin, TX 78754

Stephen W. Lemmon
Streusand, Landon, Ozburn & Lemmon, LLP
1801 S. MoPac Expressway
Suite 320
Austin, Texas 78746

*/s/ Jarrod B. Martin*
Jarrod B. Martin

## EXHIBIT A

In accordance with Fed. R. Civ. P. 30(b)(6), Texas Plaintiffs designate the matters identified below for examination.

1.     Payments to Alex Jones (directly or indirectly through entities he controls or has an ownership interest in) since PQPR's inception.

2.     Payments to David Jones (directly or indirectly through entities he controls or has an ownership interest in) since PQPR's inception.

3.     Payments to Carol Jones (directly or indirectly through entities she controls or has an ownership interest in) since PQPR's inception.

4.     Communications and documents PQPR exchanged with Blue Asension.

5.     PQPR's communications and documents about its product-fulfillment services or the product fulfillment of Free Speech Systems, LLC ("**FSS**").

6.     Communications and documents exchanged with FSS regarding any debts, agreements, contracts, promissory notes, invoices, product orders, product sales, and forbearance agreements—including any negotiations regarding these items.

7.     Communications between W. Marc Schwartz and PQPR relating to FSS's alleged debt to PQPR.

8.     The item pertaining to PQPR budgeted for in FSS's proposed 13-week budget in support of its cash-collateral motion.

9.     Documents and communications exchanged with FSS regarding FSS's petition for bankruptcy.

10.     Internal documents and communications regarding FSS's petition for bankruptcy.

11.     Communications and documents produced by PQPR in response to discovery requests in this bankruptcy.

12.     Communications and documents exchanged between PQRP and Alex Jones regarding Jones's compensation (including draws, salary, and any other compensation).

13.     Communications and documents exchanged between PQPR and David Jones since January 1, 2018.

14.     Communications and documents exchanged between PQPR and Carol Jones since January 1, 2018.

15.     PQPR's accounting and bookkeeping since January 1, 2012—including (i) who was responsible for or helped with its accounting and bookkeeping; (ii) what systems and software were used for accounting and bookkeeping; and (iii) how accounting and bookkeeping records were created and kept in the ordinary course of business.

16.     All employees of PQPR since January 1, 2012.

17.     The offices and facilities PQPR owns, leases, or operates since January 1, 2012.

*****

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22–60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | **Subchapter V** |
| | § | |

---

## NOTICE OF DEPOSITION TO W. MARC SCHWARTZ

---

**TO:    W. Marc Schwartz**
   **c/o Shannon & Lee LLP**
   **Pennzoil Place – 13th Floor**
   **700 Milam**
   **Houston, TX 77002**

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(1) of the Federal Rules of Civil Procedure, applicable to this proceeding under Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ("**Texas Plaintiffs**") will conduct the oral deposition of W. Marc Schwartz ("**Mr. Schwartz**") on **September 23, 2022 at 10:00 a.m., prevailing central time, at the law offices of Akin, Gump, Strauss, Hauer & Feld, LLP, 1111 Louisiana St., 44th Floor, Houston, TX 77002.** The deposition shall be taken before a person duly authorized by law to administer oaths, and may be recorded by stenographic, audiographic, and/or videotaped means. The deposition shall continue from day to day thereafter or as otherwise agreed by the parties, until completed.

Dated: September 16, 2022

---

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.**

By: */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tara T. LeDay
Texas Bar No. 24083068
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tara.leday@chamberlainlaw.com

***Bankruptcy Counsel for the Texas Plaintiffs***

004681

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on September 16, 2022, a true and correct copy of the foregoing document was served via electronic transmission to all registered ECF users appearing in the case and will be sent via first-class, postage prepaid, United States mail on September 19, 2022 as follows:

W. Marc Schwartz
c/o Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

Raymond William Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218

Kyung Shik Lee
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

R.J. Shannon
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

*/s/ Jarrod B. Martin*
Jarrod B. Martin

004682

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 17, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | David M. Zensky<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 41st Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 2176691 |
|---|---|

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest | |
|---|---|
| Dated: 9/16/2022 | Signed: /s/ David M. Zensky |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. | |
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

Signed: September 17, 2022

Christopher Lopez
United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

004683

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 17, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

### MOTION AND ORDER
### FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | Melanie Miller<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 43rd Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 5604202 |
|---|---|

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest |
|---|
| Dated: 9/16/2022          Signed: /s/ Melanie Miller |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. |
|---|
| Dated:          Signed: _____<br>Deputy Clerk |

Signed:  September 17, 2022

Christopher Lopez
United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**DEBTOR'S REPLY TO UNITED STATES TRUSTEE'S OBJECTION TO THE**
**APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT**
**OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B)**
**AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN**
**DISCHARGE OF HIS DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C)**
**GRANTING RELATED RELIEF**

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession

in the above-captioned chapter 11 case, replies to the U.S. Trustee's objection [ECF. No. 145] (the

"Objection") to the Application of Debtor for an Order (A) Authorizing Employment of W. Marc

Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz

Associates, LLC In Discharge of His Duties as Chief Restructuring Officer, and (B) Granting

Related Relief [ECF No. 83] (the "Application") as follows:

**LIES, FABRICATIONS AND MISREPRESENTATIONS BY THE U.S. TRUSTEE**

1.      In the 22-page Objection, the U.S. Trustee never once questions, disputes, or

contests any of the representations in the Schwartz Application or otherwise contends that Marc

Schwartz (the "Proposed CRO" or "Schwartz") and Schwartz Associates LLC (the "Schwartz

Firm") the firm selected to assist him (the Proposed CRO and the Schwartz Firm, collectively, the

"Applicant") (a) do not hold or represent any disqualifying adverse interest and is a "disinterested

person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 38, 48 & 52); (b)

disclosed all relevant connections in this case (Application ¶¶ 45 & 53); (c) are well qualified to

1

provide management services that will assist and enhance the Debtor's efforts to maximize value to creditors (Application ¶¶ 30 & 31). The U. S. Trustee also does not challenge the proposed terms of reimbursement, compensation, and hourly rates of the Applicant and that they are reasonable (Application ¶ 35). Finally, the U.S. Trustee does not claim that denial of the Application would benefit the Debtor's estate.

2.    Instead, the *sole* basis for the Objection is that "Schwartz failed to disclose his connections to FSS in the bankruptcy cases of InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC (collectively, "InfoW Debtors")" in Case No. 22-60022 (the "InfoW Bankruptcy Cases"). (Objection ¶1). To support the Objection, the U.S Trustee sprinkles his 22-page missive with fake-tabloid headlines, fabrications, and misrepresentation without any credible evidence.[1] The fabrications of the U.S Trustee in the Objection are glaring and unethical.

3.    For the sake of denying the Schwartz Application here, the U.S. Trustee simply grabs out of thin air the idea that one case is a continuation of the other without any evidence. Paragraph 2 of the Objection begins by trying to tie the FSS case as a "continuation" of the InfoW Debtor cases, when in fact they have no such relationship.  "The Court should address the issue in this case, which is, in many ways, a continuation of the previous case."[2] Objection ¶ 2. The FSS case is not a continuation of the InfoW Bankruptcy Cases. The Plaintiffs all dismissed their claims against those three debtors. Those three debtors are not involved in any of the Sandy Hook

---

[1] Applicant and the Debtor reserve the right to request that costs in replying to the Objection be taxed against the U.S. Trustee or other appropriate relief pursuant to Rule 11 of the Federal Rules of Civil Procedure, made applicable to this contested matter by Bankruptcy Rule 9011, or the Court's inherent power to sanction vexatious conduct. The U.S. Trustee, despite the name, is just another party in bankruptcy proceedings and must comply with Rule 11 and other requirements when filing pleadings and making representations to the Court.

[2] US Trustee repeats without any evidence with mantra that "the current case is related to the prior cases and includes substantially all the same players" Objection ¶ 39. There are *many* more creditors involved in the Debtor's chapter 11 case than were involved in the InfoW bankruptcy Cases.

004686

Litigation in Texas and Connecticut. Those three companies are out of bankruptcy and do not face the same claims faced by FSS.  Making this headline grabbing argument without any evidence is especially heinous for a party who has been intimately involved in both cases and knows that it is not true.

4.      In a bold contradiction that the U. S. Trustee hoped no one would catch, he plainly contradicts his own statements in his Objection. Paragraphs 14 and 15 of the Objection describe the disclosures Schwartz make about Free Speech Systems, LLC in the InfoW Bankruptcy Cases. The U.S. Trustee describes that as of April 18, 2022, Schwartz disclosed in a declaration in support of his application in the InfoW Bankruptcy Cases that he was aware of FSS, and made all "disclosable connections".  Objection ¶¶ 14, 15. Yet without batting an eye, the U.S. Trustee then writes 34-35 paragraphs later in paragraph 49 of the Objection, "***Schwartz did not disclose his connections to FSS or Jones during the InfoW Cases***." That is not true—the Applicant *did* disclose his connections to FSS and Jones in his April 18, 2022, declaration. There were no connections to disclose on April 18, 2022. What the U.S. Trustee takes issue with is that the Applicant did not make a supplemental disclosure after the InfoW Debtors had decided to agree to the U.S. Trustee's motion to dismiss their cases and Applicant was taking actions to effectuate that dismissal.

5.      The U.S. Trustee also mischaracterizes the timing of events (which is critical to this matter). In paragraph 50 of the Objection, the U.S. Trustee claims that "[e]ven after the InfoW Debtors reached agreement with the Sandy Hook Plaintiffs, the InfoW Debtors, taking their direction from Schwartz, did not agree to dismiss the InfoW Cases until ***June 1, 2022***." Objection ¶ 50. Yet the very same attorney signing the Objection was a recipient of an email on May 25, 2022, in which he was told by Attorney Lee that the CRO of the InfoW Debtors had made his

3

decision to dismiss and instructed him to file a motion to dismiss the InfoW Bankruptcy Cases. A subsequent email by his colleague that same day suggests that the dismissal be done by stipulation. Attached as Exhibit A hereto is a true and correct copy of the May 25, 2022, email to attorneys Jayson Ruff and Ha Nguyen of the U.S. Trustee's Office and the subsequent discussion with Attorney Ruff regarding the dismissal.

6.     The recitation in paragraph 50 of the Objection is an intentional misrepresentation to this Court, plain and simple. The U.S. Trustee's attorneys are in possession of their own emails which could have been—and should have been—checked before making that false statement to malign the Applicant, instead of attempting to tell the Court the truth of what took place to the Court. The attorney for the U.S. Trustee who signed the Objection had personal knowledge that the representation was not true. While always inappropriate, it is nothing short of shocking that an attorney signing a pleading accusing others of ethical violations would attempt to mislead the Court in this way.

7.     Not being content just ignoring (or, more accurately, failing to disclose) the facts easily discovered by a quick look through an email inbox, the U.S. Trustee then broadcasts falsely in paragraph 54 of the Objection that "***When FSS was represented to be on the opposite side of the negotiations with the InfoW Debtors, Schwartz was employed by FSS while pleadings filed and statements made to the Court at the time indicated that all estate professionals, including himself and Attorney Lee, were independent and without outside influences***." Objection ¶ 54.

8.     First, Applicant and Attorney Lee had no outside influences or connection to FSS when InfoW Debtors participated in negotiations with FSS. The negotiations by Applicant and Attorney Lee occurred prior to and at the beginning of the InfoW Bankruptcy Cases and led to the Plan Support Agreement having the consideration of $750,000 cash for professionals, $2,000,000

004688

of cash on the Effective Date of the Plan, and quarterly dividends to be made available to the Trusts for a total distribution of up to $10,000,000 during the duration of a confirmed plan. <u>Second</u>, Applicant and Attorney Lee did not represent FSS when the Plan Support Agreement underwent revisions during the InfoW Bankruptcy Cases and the amended agreements were filed with the Court on April 29, 2022 [Case No. 22-60020, Dkt. No. 48]. <u>Third</u>, Schwartz did not engage in negotiations with FSS or Jones over additional funding under the Plan Support Agreement because Schwartz exercised his judgment that it did not make good business sense for the InfoW Debtors' estates to incur the cost of litigating with the U.S. Trustee over its motion to dismiss the InfoW Bankruptcy Cases (the "<u>Motion to Dismiss</u>"). There were no negotiations with FSS or Jones, and, therefore, it was impossible for Applicant and Attorney Lee to be on both sides of the negotiation. This myth has been perpetuated by the U.S. Trustee by pointing the lynching mob to the May 19 date of the FSS engagement letter, rather than any other fact associated with the retention of Applicant by FSS.

9.    Just as problematic is that the U.S. Trustee appears to think that full candor is not required to this Court when discussing the applicable law. An example is found in paragraph 53 of the Objection wherein the U.S. Trustee relies on *Delta Oil* for the proposition that "'Although this provision does not explicitly require ongoing disclosure case law has uniformly held that under Rule 2014(a)(1), full disclosure is a *continuing responsibility*, and (2) [the professional] is under a duty to promptly notify the court if any potential for conflict arises.' *In re W. Delta Oil Co. Inc.*, 432 F.3d 347, 355 (5th Cir. 2005) (emphasis added)." But the U.S. Trustee fails to point out to the Court the sentences before and after the quoted language that is critical to the instant matter:

> In addition, Federal Rule of Bankruptcy Procedure 2014(a) requires ***any professional applying for employment*** to set forth "to the best of the applicant's knowledge" all known connections of the applicant with the "debtor, creditors, or any other party in interest,

5

their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Although this provision does not explicitly require ongoing disclosure, "case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises." Although this provision does not explicitly require ongoing disclosure, "case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises." "Though this provision allows the fox to guard the proverbial hen house, counsel who fail to disclose timely and completely their connections proceed at their own risk *because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.*

*Id.* (citations omitted). At the U.S. Trustee's insistence, no employment order was entered or compensation requested in the InfoW Bankruptcy Cases.[3]

10.    After May 19, 2022, the only party that opposed the continuation of the InfoW Bankruptcy Cases with an active motion to dismiss was the U.S. Trustee. The Applicant made the business decision to dismiss the InfoW Bankruptcy Cases within four (4) days after May 19 and prior to meeting with FSS on May 24. That decision was not just wholly supported by the U.S. Trustee, but *demanded* but the U.S. Trustee. At that point in time, Applicant was not seeking employment as a CRO in the InfoW Bankruptcy Cases. The Debtor submits that distinction is important, especially when the U.S. Trustee actively negotiated for a resolution of the InfoW bankruptcy Cases where the Applicant would **NOT** to be retained by the estate.

11.    The Applicant exercised business judgment during a compressed period, wherein its attention was focused on (1) making sure the estate did not have lingering claims from the Texas and Connecticut Plaintiffs after their dismissals and (2) minimizing the administrative cost of

---

[3] If the U.S. Trustee was focused on the integrity of the bankruptcy process—rather than sound bites—he would have acknowledged this contrary language in the authority he cited in the Objection and argued why his position was nevertheless correct. Instead, he attempted to mislead the Court about the applicable law.

004690

determining how to handle the estate after eliminating the Texas and Connecticut Plaintiffs' claims. The period in which these events took place was between May 19 and June 1, and Applicant did not believe during that period of time that it was still seeking to be retained under section 327 of the Bankruptcy Code as an estate professional.[4] In fact, the Applicant was specifically told by the U.S. Trustee's counsel that he would oppose any consideration of the pending application to employ in the InfoW Bankruptcy Cases until after the Court considered the U.S. Trustee's Motion to Dismiss.

### THE U.S. TRUSTEE MISUSES VALID QUESTIONS RAISED BY THE COURT AND FAILS TO CONDUCT ANY INVESTIGATION OR PROVIDE CONTEXT

12.     Not being satisfied besmirching Applicant and Attorney Lee with innuendos, lies, and misrepresentations, the U.S. Trustee decided to pour gasoline on an ember by quoting the concerns expressed by the Bankruptcy Court without providing useful context or information from any investigation or the evidence within the U.S. Trustee's possession. Instead, the U.S. Trustee attempts to use the Court's questions as evidence of wrongdoing, even though the information in the U.S. Trustee's own possession would resolve the Courts' concerns.

---

[4] The U.S. Trustee specifically demanded that the InfoW Debtor's application to employ not be considered until after the U.S. Trustee's Motion to Dismiss was considered. As the U.S. Trustee's attorney Jayson Ruff stated to the Court at the May 19, 2022, status conference in the InfoW Bankruptcy Cases:

> The only other comment I would say is to the extent that the Court does push that out, assuming these cases are dismissed, then we don't think that any of the other pending motions applications should be heard until that same date after that time.

May 29, 2022, Hrg. Tr. at 14:9-13. Attorney Ruff further represented to the Court:

> If these cases aren't to continue, then none of that is really necessary. The cases can get dismissed. You know, the debtors can go ahead and pay their creditors, *including their professionals* however they want to. The only thing we probably would want to have some treatment for in the dismissal order, again, assuming that's the route that we end up toing, is to allow for Ms. Hazelton to apply for her fees and make sure that this Court retains jurisdiction for the payment of her fees.

*Id.* at at 15:1-9 (emphasis added). While it is now clear that taking the U.S. Trustee's statements to this Court as true and accurate is pure folly, the Applicant's belief was reasonable at that time, even if the Court determines that Attorney Ruff misrepresented the situation to the Court at the May 19, 2022, status conference and the Applicant's the belief based on Attorney Ruff's misrepresentation was incorrect.

7

13.     The U.S. Trustee recites in paragraphs 32, 33 and 34 of its Objection the concerns raised by the Court. The Applicant and the Debtor shall addresses these below.

14.     In paragraph 32 of the Objection, the U.S Trustee writes:

32. On August 1, 2022, at the consent of FSS and the Texas Plaintiffs, the Court entered an order lifting the automatic stay and allowing the trial in Austin to proceed to judgment. Further, at this hearing, the Court expressed concerns about transparency in the bankruptcy process, specifically the May 19th engagement between Schwartz and FSS while the InfoW Cases were pending. The Court asked the following:

*I need to understand as well, on May 19th, you were representing three debtors who are on the opposite side of a proposed plan support agreement. We never took action, but you were also seeking retention from Free Speech at the same time? I don't think I ever knew about that.*

15.     As will be demonstrated in Court at the September 20 hearing on the Application, the following is the timeline of events, of which the U.S. Trustee was aware:

i.    On May 3, 2022, both the Texas and Connecticut Plaintiffs gave notice of their intent to dismiss the InfoW Debtors from their lawsuits and not be creditors of the InfoW Debtors. Therefore, all the documents and agreements, including the Amended Plan Support Agreement [Case No. 22-60020, Dkt. No. 48] negotiated and filed with the Court on April 28, 2022, only 5 days before, essentially became unsustainable, as the major condition for funding could not possibly occur.

ii.   By May 19, 2022, both the Texas and Connecticut Plaintiffs, comprising what was estimated to be the large majority of the creditors of the InfoW Debtors, had released or taken action to dismiss with prejudice their claims against the Debtors.

iii.  On May 19, 2022, FSS had **NOT** retained Applicant in any capacity. The Applicant prepared a proposed engagement letter on May 19, 2022, but an approved representative of FSS did not sign and engage Applicant for FSS until June 6, 2022.

iv.   Assuming May 19, 2022, is the operative date (which the Debtor and Applicant do not concede), the Plan Support Agreement had expired under its terms and did not have any support from FSS or Alex Jones to renegotiate the Plan Support Agreement. The whole purpose of the Plan Support Agreement—to have the Plaintiffs be part of the settling group—disappeared between May 3, 2022, when the Plaintiffs informed the Court that they intended to dispose of their claims against the InfoW Debtors, and  May 18,

8

2022, when the Connecticut Plaintiffs filed their notice of dismissals with prejudice and the Texas Plaintiffs entered into the stipulation resolving their claims.

16.     It is true that Attorney Lee said on May 19 that he would need to consider re-negotiating the PSA but, as all responsible bankruptcy lawyers understand, he was obligated to explore all alternatives with his clients (whether they turned out to be feasible or not) and explain the risks and benefits of the available options.[5] Attorney Lee's statements did not mean that the InfoW Debtors thought that it made business sense to undertake those negotiations or to continue the InfoW Bankruptcy Cases with further funding. Based on advice of his professionals and exercise of his business judgment, including the cost of litigation with the U.S. Trustee over its Motion to Dismiss, Applicant made an independent determination that the InfoW Debtors should dismiss their case rather than attempt to secure additional funding just so they could afford a fight with the U.S. Trustee. After the announcements in open court on May 19, the InfoW Debtors,

---

[5] Attorney Lee also noted that InfoW Debtors might decide to instead dismiss their cases and address the remaining claims outside of bankruptcy. Attorney Lee's representation to the Court was:

> And again, Mr. Schwartz and I are going to evaluation whether after the dismissals [with] prejudice [of] the Texas and Connecticut Plaintiffs, whether these debtors need to proceed with trying to confirm a plan with an amended plan support agreement or whether we are able to handle these creditors, the remaining creditors, outside of bankruptcy.

May 29, 2022, Hrg. Tr. at 8:16-21. What Attorney Lee said to the Court was entirely true.

At that same hearing, attorney Jayson Ruff, on behalf of the U.S. Trustee, represented to the Court:

> If these cases aren't to continue, then none of that is really necessary. The cases can get dismissed. You know, the debtors can go ahead and pay their creditors, ***including their professionals*** however they want to. The only thing we probably would want to have some treatment for in the dismissal order, again, assuming that's the route that we end up going, is to allow for Ms. Hazelton to apply for her fees and make sure that this Court retains jurisdiction for the payment of her fees.

*Id.* at 15:1-9 (emphasis added). The U.S. Trustee's position in the Objection is entirely contrary to the one represented to the Court on May 19, 2022, by Attorney Ruff.

9

through Attorney Lee, informed the U.S. Trustee on May 25, 2022 (6 days later) that the InfoW Debtors would agree with the U.S. Trustee's demand that their bankruptcy cases be dismissed.

17.     Finally, Schwartz never addressed or discussed the issues regarding the InfoW Debtors when he attended the meetings with FSS starting on May 24, 2022—other than to confirm the InfoW Debtors intent to obtain dismissal of their cases—or at any time thereafter for FSS. Applicant never sat on both sides of negotiations regarding the Plan Support Agreement. Any negotiations with FSS regarding any matters under the Plan Support Agreement on behalf of the InfoW Debtors occurred prior to (a) the filing of the InfoW Debtors' cases on April 17, 2022, (b) the filing of Notice of Amended and Restated Declaration of Trust and Plan Support Agreement [ECF. 48], and (c) the April 29, 2022, status conference.

18.     In paragraphs 33 and 34 of the Objection, the U.S. Trustee writes:

> 33.     On August 3, 2022, the Court conducted a cash collateral hearing (the "August 3rd     hearing"). At the hearing, Schwartz, who was now acting as the CRO for FSS, testified for several hours. Again, a point of concern raised by the Court was the nondisclosure of connections between the estate professionals[4] in the InfoW Cases and FSS and Jones. The Court asked the following:
>
> > *Let me get the question – I might as well ask it now because it's a good spot...I just need to understand it. On May 19th, there was a hearing before me where on May 18th, there was a request for a continuation on a motion to dismiss…and in this case, there is a letter dated by you to Free Speech dated the same day. I may be reading much into this, but it seems to me that you – either you wrote the letter that day or you had been in conversation with Free Speech before you wrote that – before that day you sent the letter. And I just need to understand – none of this was ever disclosed to me in connection with the case and the cases were dismissed on June the 10th officially, which tells me that Mr. Jones signed a retention letter. So, you were actively retained before these cases were dismissed – the last cases were dismissed – and I just need to understand, one, why that was never disclosed to me, and two, when did you begin to start soliciting or having conversations about representing Free Speech Systems.*

10

Tr. August 3, 2022, at 147-148, 21:19.

In response to the Court's questions, Schwartz stated that he could not recall the date but assured the Court that conversations concerning the FSS engagement only occurred "after we had been substantially convinced that we were going to be terminating the InfoWars bankruptcy." Tr. August 3, 2022, at 149, 4-8.

34.     After listening to several hours of testimony at the August 3rd Hearing and upon the Sandy Hook Families' oral request for the formation of a tort claimant committee, the Court stated the following

> *There's been oral request for the appointment of a committee, and that can be done by the Court for cause. I'm not going to grant that today, but I am going to express some real concerns about what I heard, and I'll express what they are. You know, whether you realize it or not, Mr. Schwartz was negotiating on both sides of a deal.*

Tr. August 3, 2022, at 239, 9:17.

19.     First, FSS did not sign the Applicant's engagement letter on May 19, 2022. On May 24, 2022, the Schwartz attended a meeting with FSS where he obtained information about FSS and its financial condition. From May 24 through June 6, 2022, Applicant started work on FSS matters, even though FSS had not signed the agreement.[6] But no one made any promises to Applicant that Applicant would be retained without question. Alex Jones finally signed the Applicant's engagement letter on June 6, 2022.

20.     Second, Schwartz did not even know about the potential for his engagement by FSS assignment until after nearly all of the claims against InfoW Debtors were released or about to be

---

[6] The services provided to FSS  by the Applicant prior to June 1, 2022, when the stipulation agreeing to dismissal of the InfoW Cases was filed consisted of the following:

- May 24, 2022—7.25 hours related to travel to Austin, TX and meeting regarding the potential representation and background information on FSS.

- May 25, 2022—1.0 hour related to call with Axos bank re potential for DIP accounts and merchant services for FSS.

dismissed with prejudice. On or about May 19, 2022, a FSS representative contacted Attorney Lee and asked whether he and Schwartz could work with FSS on its restructuring. Attorney Lee did not mention or discuss this possible new assignment to Schwartz until *AFTER* the 2:00 p.m. hearing on Thursday May 19, 2022, wherein the Bankruptcy Court approved the dismissal with prejudice of claims held by the Texas Plaintiffs. On May 13, 2022, the Connecticut Plaintiffs had already filed their Motions to Dismiss with Prejudice their Claims Against the InfoW Debtors in Connecticut. When he did mention the new assignment, Attorney Lee requested Schwartz to carefully evaluate whether the InfoW Debtors should fight with the U.S. Trustee to continue their cases and only take on further representation if he came to that conclusion. Prior to providing any services to FSS, Schwartz determined that the InfoW Bankruptcy Cases should be dismissed.

21.     Third, Attorney Lee and Schwartz engaged in the good faith analysis of whether any (1) further work required the Applicant's attention in the InfoW Bankruptcy Case, and (2) whether there were any other issues to cover before embarking on a new project, and (3) whether the work for FSS would create a conflict of interest for Applicant, *to wit*, did it make Schwartz no longer disinterested. The InfoW Debtors had been dismissed by the Plaintiffs and therefore no longer had any claims of contribution or indemnity between each other. Second, the license agreement between the two entities was in place and no breach or dispute existed between the two parties (even if such a dispute occurred, Schwartz and Attorney Lee recognized that conflict counsel for FSS would have to handle such a matter).

22.     Fourth, FSS and the InfoW Debtors companies had 3 or 4 creditors to which they were jointly liable, and, hence, a reorganization of FSS would benefit the InfoW companies as FSS had more cash flow and assets to satisfy the creditors than did the InfoW Debtors after dismissal

12

of their bankruptcy cases. While not memorialized, the following are the topics that were considered and discussed between Schwartz and Attorney Lee, and the actions taken to enact their conclusions.

    a. To save costs and reduce administrative expenses, Attorney Lee immediately started drafting a motion to dismiss the InfoW Bankruptcy Cases. By May 23, 2022, Schwartz had determined that it was best to dismiss the cases and Attorney Lee had completed a draft of the motion to dismiss.

    b. On Wednesday May 25, 2022, Attorney Lee relayed Schwartz's decision to the U.S. Trustee. Both parties then worked in earnest to document that dismissal of the InfoW Bankruptcy Cases.

    c. From May 26, 2022, through May 31, 2022, Applicant spent zero hours working on matters for FSS matters and 1.33 hours working on matters for the InfoW Debtors. The matters for the InfoW Debtors comprised review of the stipulation dismissing the InfoW Bankruptcy Cases.

    d. On June 1, 2022, InfoW Debtors and U. S. Trustee filed Stipulation to Dismiss the InfoW Bankruptcy Cases [Case No. 22-60020, Dkt. No. 110].

    e. On June 10, 2022, the Bankruptcy Court approved the Stipulation and dismissed the IW Bankruptcy cases [Case No. 22-60020, Dkt. No. 114].

    23. The InfoW Bankruptcy Cases lasted from April 17, 2022, through June 10, 2022: a total of 55 days and 40 business days. The duration between the dismissal of the Texas Plaintiffs' claims on May 19 and the decision to dismiss the InfoW Cases on May 23 was 4 days total and 1 business day. It took 9 total days and 6 business days from the decision to dismiss the InfoW Bankruptcy Cases and the filing of the stipulation of dismissal agreed with the U.S. Trustee.

    24. Applicant and the Debtor do not contend or suggest that the short duration of the InfoW Bankruptcy Cases excuses any requirement to disclose under Bankruptcy Rule 2014. The recitation is set out to demonstrate that (1) the Applicant knew (and  will testify about) that he **_could not_** "negotiate on both sides of a deal", (2) the Applicant made a business decision that it was not in the best interest of the estate to even re-negotiate a revised PSA after May 19, 2022,

13

and (3) that his failure to amend his Rule 2014 at that time was because, for all practical purposes the InfoW Bankruptcy Cases had concluded, especially with the U.S. Trustee wanting to have the bankruptcy cases dismissed, opposing the retention of any professionals by the estate, and asserting that the remaining claims could be handled outside of the bankruptcy process.

25.     While the Court's comments were absolutely an appropriate basis for the U.S. Trustee to investigate, that is not what happened. The U.S. Trustee took no action for 42 days after he heard the concerns of the Court. Debtor's counsel was not called. No letter was sent. A Rule 2004 exam was never held. An informal interview to explain the facts was never requested. While the Court's valid questions went uninvestigated by the very agency responsible for overseeing the integrity of the bankruptcy process, the U.S. Trustee did not hesitate to use them to carelessly lob serious allegations against a well-qualified Applicant in the Objection, along with other material misrepresentations, and without providing the Court any context or additional information. The U.S. Trustee had information that would have addressed the Court's concerns but the Objection fails to provide any context, including that the U.S. Trustee played a direct role and advocated for the very circumstances with which the U.S. Trustee now take issue.

## **THE APPLICATION SHOULD BE GRANTED**

26.     The U.S. Trustee wants this Court to not only find that Schwartz' disclosure violated Bankruptcy Rule 2014 in the InfoW Bankruptcy Cases, but that the violation was so severe that it warrants what is in effect a sanction against Schwartz in against Schwartz in a *different* case for a *different* debtor. The U.S. Trustee's position is not supported by the law or the facts and is inconsistent with the role the U.S. Trustee Program is supposed to fill in the bankruptcy process.

004698

27.     Bankruptcy Rule 2014 requires a verified statement disclosing connections to accompany an application to employ and courts have held that Bankruptcy Code 327(a) implies that the obligation continues for professionals that *are employed by* or *are seeking employment by* the estate. After reaching agreements resolving the claims of the Connecticut Plaintiffs (on May 13, 2022) and the Texas Plaintiffs (on May 18, 2022), the InfoW Debtors decided to agree to dismiss their cases as demanded by the U.S. Trustee. By May 23, 2022, the InfoW Debtors had decided to agree to the U.S. Trustee's demands to dismiss their cases and Attorney Lee had drafted a motion to dismiss the InfoW Bankruptcy Cases. Schwartz was no longer seeking to be employed as an estate professional on May 24, 2022, when he attended the meeting with FSS.

28.     Further, even if Schwartz was required by Bankruptcy Rule 2014 and Bankruptcy Code 327(a) to supplement his disclosure of connections despite the InfoW Debtors' decision to dismiss, that oversight would not justify denying *this* Debtor's application to employ Applicant in *this* chapter 11 case. None of the authorities cited in the Objection support that position and the relief would be entirely unprecedented.[7] While the Court has discretion to consider factors beyond just technical compliance with Bankruptcy Code 327(a), that discretion should be reasonably applied. What matters is whether employing Applicant benefits the Debtor's estate and furthers administration of its chapter 11 case. The U.S. Trustee does not dispute these issues favor approving the employment of Applicant.

29.     The U.S. Trustee does not dispute that the Application and Applicant meet all the requirements of Bankruptcy Code 327(a) and Bankruptcy Rule 2014 for employment in the

---

[7] Attached as Exhibit B to the reply to the U.S. Trustee's objection to the Debtor's application to employ Shannon & Lee LLP is an analysis of the cases cited in the Objection. Not a *single* case cited in the Objection supports what the U.S. Trustee asks the Court to do here.

004699

Debtor's chapter 11 case. Nor does the U.S. Trustee dispute the allegations in the Application that the Applicant (a) does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 38, 48 & 52); (b) disclosed all relevant connections in this case (Application ¶¶ 45 & 53); (c) is well qualified to provide management services that will assist the an enhance the Debtor's efforts to maximize value to creditors (Application ¶¶ 30 & 31). The U. S. Trustee also does not challenge the proposed terms of reimbursement, compensation, and hourly rates of the Applicant are reasonable (Application ¶ 35). Most importantly, the U.S. Trustee does not dispute that Debtor's employment of Applicant is in the best interests of the Debtor's bankruptcy estate.

30. The Applicant's work for the Debtors was and continues to be critical to the Debtor's ability to operate in chapter 11 and administer this case. Among other things the Applicant:

a. Obtained a bank account with an approved depository when the Debtor's previous efforts to find banking failed;

b.  Worked to get the Debtor's books for 2021 and so far in 2022 posted and closed;

c. Renegotiated the Debtor's credit card processing to reduce the cost by 6% of the Debtor's gross revenue;

d. Found and hired a business manager for the Debtor;

e. Developed a plan to finance a significant increase in inventory without risking the Debtor's current assets or incur debt obligation through a consignment agreement with an unrelated party and is working to effectuate such plan;

f.  Is working to obtain further reductions to the Debtor's cost of processing credit card charges;

g. Replaced the Debtor's health insurance program, reducing the Debtor's annual cost by an estimated $80,000 while also decreasing costs to employees;

h. Employed an operations manager and new bookkeeper;

  i. Continues to be involved in formulating a plan of reorganization and directing other aspects of the Debtor's chapter 11 case.

Based on this, the Court should approve the Application so the Applicant can continue to provide these services to the Debtor and lead this chapter 11 case to a confirmed plan of reorganization.

31. As the arguments and the legal authorities relied on by the U.S. Trustee in his Objection to the Applicant are substantially the same as the ones asserted by the U.S. Trustee in his objection to the Debtor's application to employ Shannon & Lee LLP, Applicant and the Debtor adopt and incorporate by reference the additional responses, arguments, and authorities set forth in the Debtor's reply to such objection [ECF No. 166].

## **CONCLUSION**

32. If the U.S. Trustee believes that Bankruptcy Rule 2014 required the Applicant to submit a supplemental disclosure in the InfoW Bankruptcy Cases despite that the InfoW Debtors had agreed to the U.S. Trustee's own Motion to Dismiss prior to obtaining authority to employ any professionals, there is a way to raise that issue. But it is not in objecting to the employment of the Applicant in a different case by a different Debtor. There is no dispute that Applicant meets the requirements for employment and that its employment will benefit the estate and administration of these bankruptcy cases. The Application should therefore be granted.

*[Remainder of Page Intentionally Left Blank]*

17

Dated: September 18, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

18

004702

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within one hour of filing, by email on the following parties:

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave, Suite 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov

Melissa Haselden
SUBCHAPTER V TRUSTEE
700 Milam, Suite 1300
Houston, TX
mhaselden@haseldenfarrow.com

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, Texas 77581
rww@bymanlaw.com

Elizabeth Freeman
JACKSON WALKER LLP
1401 McKinney St., Suite 1900
Houston, TX 77010
efreeman@jw.com

Ryan Chapple
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Avi Moshenberg
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Jarrod B. Martin
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS, & AUGHTRY, PC
1200 Smith Street, Suite 1400
Houston, Texas 77002
jarrod.martin@chamberalinlaw.com

/s/Kyung S. Lee
Kyung S. Lee

19

004703

## EXHIBIT A

**Emails Among Kyung Lee and Jayson Ruff from May 25, 2022, to June 1, 2022**

**Subject:**    RE: InfoW\Update

**Date:**    Wednesday, June 1, 2022 at 10:28:55 AM Central Daylight Time

**From:**    Ruff, Jayson B. (USTP)

**To:**    Kyung S. Lee, Nguyen, Ha (USTP), Melissa Haselden

**CC:**    Marc Schwartz, Christian Schwartz, Harold Lee

**Attachments:** image001.png, image002.png, image003.png, UST Revisions to
InfoWars_KSLDraftNo.1_Proposed Stipulated Order for Dismissal 5.31.22@3PM.docx

Kyung,

Attached is a markup of your proposed stipulation showing our comments. So long as Melissa is ok with the changes you have made concerning payment of her fees, then we are too. I have left those sections unchanged and will let Melissa indicated if she has any comments.

I removed the references to the CT and TX Plaintiffs' Motions to Dismiss from the related to reference near the top. We cannot stipulate concerning relief sought by other parties (i.e. the TX and CT Plaintiffs). If you want the references to their motions and dismissals in recitations in for context, that is ok, but this order is not a resolution of their motions to dismiss. Their motions may be moot already and will certainly be moot once the court actually dismisses these cases.

In paragraph 1, I did not understand the references to 105 and 305, so I removed them. We are agreeing that there is cause to dismiss pursuant to 1112 and not any of the other sections of the code.

Also, given the retention of jurisdiction in the last paragraph of the order I removed the reference at the end of paragraph 1 as it seemed duplicative.

Finally, we cannot and will not stipulate to exculpation. So that has been removed as well.

Please review these revisions with your client and advise if acceptable. If so, then we can file with the court and email chambers advising that the stipulation has been filed and that the hearing on June 10, 2022 won't be necessary. We can also offer to make ourselves available for a status conference should the court have any questions concerning the proposed stipulation. Otherwise I think we would be all set.

I am hoping we can get this resolved today. I will be in a hearing for the bulk of the afternoon, but will make myself available as soon as possible thereafter to address any open issues on this. Assuming we can get this on file today, then I intend to continue the 341 again to a date beyond June 10, 2022. However, if this is still ongoing then we will need to go forward with the 341 tomorrow.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Tuesday, May 31, 2022 4:41 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>
**Subject:** [EXTERNAL] Re: InfoW\Update

Jayson, Ha and Melissa, please see the form of Stipulation and Order for Dismissal of the Chapter 11 Cases. Please review and see if we can finalize. We can then go together to Judge Lopez and ask him to approve at a Status Conference before Thursday or on Thursday. I think with the Texas and Connecticut Plaintiffs having dismissed the three debtors and no longer holding claims against the Debtors, we should be good to go and minimize administrative expenses.

Kyung S. Lee
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Friday, May 27, 2022 at 3:16 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** RE: InfoWUpdate

Kyung,

Attached is a proposed stipulated dismissal.  Please review with your client and let me know if this is acceptable.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee

515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov

PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Wednesday, May 25, 2022 2:06 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>; Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** [EXTERNAL] Re: InfoW\Update

1. Yes, I can get on if you would give me a dial in number and time. I have it at 10AM.
2. We can stipulate to a dismissal and so you know the basis of why Marc is dismissing, we no longer have a need for chapter 11 because we have no creditors to resolve except for the few that will be handled by the Debtors outside of bankruptcy and the balance of the administrative expense claimants will also be handled outside of bankruptcy, which has always been your suggestions.
3. Provisions are being made to escrow $25,000 for Melissa, again subject to fee application and allowance of her fees.
4. I am giving you answers as counsel, and, I need to make sure Marc has had a chance to review and approve, which I will ask him to do.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Wednesday, May 25, 2022 at 1:36 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** RE: InfoWUpdate

**Subject:** RE: InfoWUpdate

Kyung,

Appreciate the report.  Couple of questions.  First, I do intend to open the line up tomorrow in case any creditors call in.  Is it possible that you can get on the line briefly to provide this update on behalf of the debtors?  Second, since we already have a pending motion to dismiss, is there any reason we can't just stipulate to dismissal?  That would save some time and the necessity of Debtors having to have a motion drafted.  It could be just be a simple stipulation that dismisses the cases and allows some time for Melissa to file for and be paid her fees.  Let me know your thoughts and I can discuss dismissing via stipulation with my client as well.

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov

PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Wednesday, May 25, 2022 12:29 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>; Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** [EXTERNAL] InfoW\Update

Marc Schwartz and I wanted to report to the group as follows:

1. The Texas Plaintiffs and Debtors agreed on Stipulations of Dismissals last week. Judge Lopez approved them last Thursday. Judge Mott signed orders remanding cases earlier this week. The Texas Plaintiffs are no longer creditors or hold claims against the Debtors.
2. The removal Connecticut Bankruptcy Court held a status conference yesterday. Connecticut Plaintiffs are to submit orders of dismissal by Thursday 5.26.22. Judge Manning said she would sign them Friday 5.27.22. Debtors are to submit dismissals of motions to remove by Monday

5.30.22.

3. Marc has instructed me to file Motions to Dismiss the Chapter 11 Cases on Tuesday 5.31.22 and eliminate any continuing administrative expenses.

4. We have a conflict as to the 341 Meeting of Creditors for tomorrow and the Debtors will not have a representative attend.

Thanks.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

# TRANSCRIPT ORDER

| 1. NAME<br>Anush Khatri | 2. PHONE NUMBER<br>(609) 206-9588 | 3. DATE<br>9/19/2022 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL<br>akhatri@reorg.com | 5. CITY<br>New York | 6. STATE<br>NY | 7. ZIP CODE<br>10010 |

| 8. CASE NUMBER<br>22-60043 | 9. JUDGE<br>Christopher M. Lopez | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 9/13/2022 | 11. TO 9/13/2022 |
| 12. CASE NAME<br>Free Speech Systems | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY Houston | 14. STATE Texas |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☒ | ☒ | NO. OF COPIES<br>1 | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE<br>Anush Khatri | PROCESSED BY |
|---|---|
| 19. DATE<br>9/15/2022 | PHONE NUMBER |

| TRANSCRIPT TO BE PREPARED BY<br>Veritext Legal Solutions<br>Houston, TX<br>888-792-4576 (Option 4) | COURT ADDRESS |
|---|---|

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED<br>TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

**DISTRIBUTION:** COURT COPY TRANSCRIPTION COPY ORDER RECEIPT ORDER COPY

004710

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22--60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | |
| DEBTOR. | § | **Chapter 11 (Subchapter V)** |
| | § | |

### SUPPLEMENTAL EXHIBIT LIST

| | |
|---|---|
| Judge: | Hon. Christopher M. Lopez |
| Hearing Date: | Tuesday, September 20, 2022 |
| Hearing Time: | 1:00 p.m. (Central Standard Time) |
| Party's Name: | Free Speech Systems, LLC |
| Attorney's Name: | Ray Battaglia; Kyung S. Lee; RJ Shannon |
| Attorney's Phone: | (713) 714-5770 |
| Nature of Proceeding: | Hearing on:<br>• Application of Debtor for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor, and (B) Granting Related [ECF No. 85] (the "S&L Application")<br>• Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC In Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related [ECF No. 83] (the "CRO Application") |

Free Speech Systems, LLC, the debtor and debtor in possession in the above captioned chapter 11 case (the "Debtor"), hereby submits this supplemental exhibit list in connection with the hearing to be held on Tuesday, September 20, 2022, at 1:00 p.m. (Central Standard Time) (the "Hearing") on the S&L Application and the CRO Application.

## SUPPLEMENTAL EXHIBITS

In addition to the exhibits designated by the Debtor on September 16, 2022 [ECF No. 163], the Debtor may offer for admission into evidence any of the following exhibits, and any exhibit designated by any other party, at the Hearing:

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 35 | Emails dated June 5, 2022, among Kyung Lee and Marc Schwartz re Schwartz Engagement Letter. | | | | |
| 36 | Kyung Lee comments to Marc Schwartz draft of Engagement Letter on June 5, 2022 | | | | |
| 37 | Additional Emails dated June 5, 2022, among Kyung Lee and Marc Schwartz re Schwartz Engagement Letter. | | | | |

The Debtor reserves the right to supplement, amend or delete any witness and exhibits prior to the hearing.  The Debtor also reserves the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document.  The Debtor finally reserves the right to introduce exhibits previously admitted.

[*Remainder of Page Intentionally Left Blank*]

2

Dated: September 20, 2022

LAW OFFICES OF RAY BATTAGLIA, PLLC

Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/ *R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

3

| | |
|---|---|
| **Subject:** | Re: Schwartz as CRO for FSS |
| **Date:** | Sunday, June 5, 2022 at 3:04:47 PM Central Daylight Time |
| **From:** | Kyung S. Lee <klee@kslpllc.com> |
| **To:** | Marc Schwartz <mschwartz@schwartzassociates.us> |
| **CC:** | rshannon@shannonpllc.com <rshannon@shannonpllc.com>, 'rbattaglialaw@outlook.com' <rbattaglialaw@outlook.com> |
| **Attachments:** | FSS_KSLREDLINE_Schwartz Retention Agreement_6.5.223PM.docx |

These revisions are based on my review of FSS's Company Agreement.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Sunday, June 5, 2022 at 9:16 AM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Subject:** RE: Schwartz as CRO for FSS

Attached

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Sunday, June 5, 2022 7:29 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Cc:** rshannon@shannonpllc.com
**Subject:** Schwartz as CRO for FSS

Marc, can you send me your proposed engagement letter for FSS? I am revieing the FSS Company Agreement and would like to better your letter than the one we did at InfoW.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
**Pennzoil Place**
**700 Milam-Suite 1300**
**Houston, Texas 77002**
**Email: klee@kslpllc.com**
**Cell: (713) 301-4751**
**Alternate Email: kslee50@gmail.com**

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)

promoting, marketing or recommending to another party any transaction or matter addressed herein.



712 Main Street, Suite 1830, Houston, TX 77002

May    ,2022   KSL REDLINE 6.5.22

**VIA EMAIL**

Free Speech Systems, LLC

VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that ~~Alex E. Jones has delegated to~~ ~~Free Speech Systems, LLC ("FSS") has engaged~~ W. Marc Schwartz ~~("Consultant")~~ of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts. ~~Chapter 7 or Chapter 11 proceeding.~~

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. ~~Consultant~~CRO will work to maximize return~~s~~ and to assure a fair pro rata distribution to all unsecured creditors.

**I.    Scope of Engagement**

~~Consultant~~CRO will lead FSS' management and personnel through the restructuring process. It is agreed that ~~Consultant~~CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and

1

004716



712 Main Street, Suite 1830, Houston, TX 77002

accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within ~~Consultant~~CRO's areas of expertise;

6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;

8. Implement cost containment measures;

9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;

10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing ~~Consultant~~CRO's business judgment in aid of the restructuring.

11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

## II.     Indemnification

FSS agrees to indemnify, defend, and hold harmless ~~Consultant~~CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a

2



712 Main Street, Suite 1830, Houston, TX 77002

potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

### III.    Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.    Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.    Disclosures

FSS shall not disclose any work or analyses of SALLC or ~~Consultant~~CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of ~~Consultant~~CRO, which shall not be unreasonably withheld. Neither SALLC nor ~~Consultant~~CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of ~~c~~Competent ~~j~~Jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC~~S~~ possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

004718



712 Main Street, Suite 1830, Houston, TX 77002

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

## VI.     Term & Termination

This agreement shall remain in effect until the earlier of i. Tthe completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or ~~Consultant~~CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

## VII.     Compensation

For ~~provided~~ services provided described herein, SALLC shall be compensated for the services of ~~Consultant~~CRO on an hourly fee basis of $690.00 per hour.

If, in ~~consultant~~CRO's sole judgment, it is determined that additional services are required to assist with the scope of this eEngagements as outlined by this Agreement, ~~consultant~~CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for ~~Consultant~~CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under ~~Title 11 of the United States Code~~the Bankruptcy Code, and FSS apply for authorization to retain and employ ~~Consultant~~CRO and SALLC, FSS' payment of ~~consultant~~CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

## A.  Retainer

4



712 Main Street, Suite 1830, Houston, TX 77002

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS.  SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

### B.  Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of ~~Consultant~~CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of ~~f~~Fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month.  Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII.  CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX.  Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to ~~Consultant~~CRO and SALLC are not contingent upon the results of this engagement and neither ~~consultant~~CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special,

004720



712 Main Street, Suite 1830, Houston, TX 77002

incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and ~~have your client do the same~~ by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

**Subject:** Re: Schwartz as CRO for FSS

**Date:** Sunday, June 5, 2022 at 5:06:19 PM Central Daylight Time

**From:** Kyung S. Lee <klee@kslpllc.com>

**To:** Marc Schwartz <mschwartz@schwartzassociates.us>

I want you to make the changes, and bring both redline and clean, to Austin tomorrow, so we can show it to Ray and client and have it signed. It is too difficult and confusing to do it otherwise. Do u see what I am saying? .

Kyung S. Lee
Kyung S. Lee PLLC
Partner
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
Mobile (713) 301-4751
Klee@kslpllc.com
www.kslpllc.com

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Sent:** Sunday, June 5, 2022 4:20:54 PM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Subject:** RE: Schwartz as CRO for FSS

I am fine with the changes, do you want me to PDF, sign and then do you send it to Ray or me?

I need to read para 8.01 of the Company Agreement.

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Sunday, June 5, 2022 3:05 PM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Cc:** rshannon@shannonpllc.com; 'rbattaglialaw@outlook.com' <rbattaglialaw@outlook.com>
**Subject:** Re: Schwartz as CRO for FSS

These revisions are based on my review of FSS's Company Agreement.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Sunday, June 5, 2022 at 9:16 AM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Subject:** RE: Schwartz as CRO for FSS

Attached

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Sunday, June 5, 2022 7:29 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Cc:** rshannon@shannonpllc.com
**Subject:** Schwartz as CRO for FSS

Marc, can you send me your proposed engagement letter for FSS? I am revieing the FSS Company Agreement and would like to better your letter than the one we did at InfoW.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
**Pennzoil Place**
**700 Milam-Suite 1300**
**Houston, Texas 77002**
**Email:** klee@kslpllc.com
**Cell: (713) 301-4751**
**Alternate Email:** kslee50@gmail.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

```
 1                   UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3                              )  CASE NO: 22-60043-cml
                                )
 4    FREE SPEECH SYSTEMS, LLC,  )  Houston, Texas
                                )
 5            Debtor.            )  Tuesday, September 13, 2022
                                )
 6                              )  1:03 p.m. - 1:49 p.m.
      -----------------------------)
 7

 8                              TRIAL

 9           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Free Speech Systems,  R.J. SHANNON
                                Shannon & Lee LLP
13                              700 Milam Street, Suite 1300
                                Houston, TX 77002
14
                                RAYMOND WILLIAM BATTAGLIA
15                              Law Offices of Ray Battaglia, PLLC
                                66 Granburg Circle
16                              San Antonio, TX 78218

17    For Veronique De La       AVI MOSHENBERG
      Rosa, et al.:             McDowell Hetherington, LLP
18                              1001 Fannin, Suite 2700
                                Houston, TX 77002
19
                                JARROD B. MARTIN
20                              Chamberlain, Hrdlicka, White,
                                Williams & Aughtry P.C.
21                              1200 Smith Street, Suite 1400
                                Houston, TX 77002
22
      For David Wheeler,        RYAN E. CHAPPLE
23    et al.:                   Cain & Skarnulis PLLC
                                303 Colorado Street, Suite 2850
24                              Austin, TX 78701

25
```

```
 1   For the U.S. Trustee:    HA MINH NGUYEN
                              Office of the United States Trustee
 2                            515 Rusk Street, Suite 3516
                              Houston, TX 77002
 3
     For PQPR:                STEPHEN LEMMON
 4                            Streusand Landon Ozburn and Lemmon
                              1801 S Mopac Expressway, Suite 320
 5                            Austin, TX 78746

 6   For the SubChapter V     MELISSA ANNE HASELDEN
     Trustee:                 Haselden Farrow, PLLC
 7                            Pennzoil Place
                              700 Milam, Suite 1300
 8                            Houston, TX 77002

 9   Court Reporter:          ZILDE MARTINEZ

10   Courtroom Deputy:        ZILDE MARTINEZ

11   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
12                            Mineola, NY 11501
                              Tel: 800-727-6396
13


14


15   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
16


17


18


19


20


21


22


23


24


25
```

004725

Page 3

```
1          HOUSTON, TEXAS; TUESDAY, SEPTEMBER 13, 2022; 1:03 PM

2                        (Call to Order)

3          CLERK:  All rise.

4          MAN 1:  I was actually -- my door was shut because

5  I was in the restroom when they came by.  I saw them walk

6  past --

7          THE COURT:  This is Judge Lopez.

8          MAN 1:  (indiscernible).

9          THE COURT:  Might want to put your phone on mute.

10         WOMAN 1:  -- like it scared me because we came

11 around the corner (indiscernible) and like --

12         MAN 1:  Yeah, it --

13         WOMAN 1:  You had the door shut.

14         THE COURT:  Folks, this is Judge Lopez.  I can

15 hear everything.  Yes.  I'll do it.

16         This is Judge Lopez, folks.  Good afternoon.  It

17 is now 1:03.  I'm going to call Free Speech here on

18 September 13th, one o'clock docket.  Something just got

19 filed.  My understanding is we're going to take up cash

20 collateral and then we will also take up -- talk about

21 emergency motion to compel.  So why don't I take

22 appearances.  Why don't I start in the courtroom.

23         MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi

24 Moshenberg and Jarrod Martin here on behalf of the Texas

25 plaintiffs, Your Honor.
```

1            THE COURT:  Okay.

2            MR. MOSHENBERG:  Jarrod Martin has a hearing at

3    1:30, so he may be stepping out in regard to that matter.

4    And then just so the Court understands, I'm going to be

5    handling the motion to compel issue and Jarrod Martin is

6    spearheading the discussions with the other side about cash

7    collateral, so let him speak to those issues.

8            THE COURT:  Why don't we take -- well, we'll see

9    where this goes.  Okay, thank you.

10            MR. MOSHENBERG:  Thank you, Your Honor.

11            MR. NGUYEN:  Good afternoon, Your Honor.  Ha

12    Nguyen for the U.S. Trustee.  I also have Millie Sall from

13    the U.S. Trustee's office here with me.

14            THE COURT:  Good afternoon.

15            MR. LEMMON:  Your Honor, Steve Lemmon on behalf of

16    PQPR.

17            THE COURT:  Good afternoon.

18            MR. SHANNON:  Good afternoon, Your Honor.  RJ

19    Shannon on behalf of the Debtor, Free Speech Systems LLC.

20            THE COURT:  Okay.  Good afternoon.

21            MR. SHANNON:  And believe on the telephone or on

22    the -- electronically Ray Battaglia may be on as well.

23            THE COURT:  Okay.

24            MR. SHANNON:  Thank you.

25            THE COURT:  Sounds great.  Good afternoon.  Ms.

1   Haselden, good afternoon.

2          MS. HASELDEN:  Good afternoon, Your Honor.

3   Melissa Haselden and I also have with me Elizabeth Freeman,

4   proposed counsel for Subchapter V Trustee.

5          THE COURT:  Okay.  Good afternoon.  Okay.  We have

6   covered the courtroom.  Let me just open it up.  Does anyone

7   wish to make an appearance who's on video.  Mr. Chapple, I

8   see you there.  Do you wish to make an appearance?

9          MR. CHAPPLE:  Yes, Your Honor.  Thank you for

10  recognizing me.  Ryan Chapple on behalf of the Connecticut

11  plaintiffs.

12         THE COURT:  Okay.  Folks the line is completely

13  unmuted.  I'm going to try to keep it completely unmuted so

14  I don't have to -- I can focus on the arguments and -- but

15  anyone else wish to make an appearance?

16         MR. BATTAGLIA:  Yes, Your Honor.  Good afternoon.

17  This is Ray Battaglia.  On behalf of Free Speech Systems.

18         THE COURT:  Good afternoon, Mr. Battaglia.  Anyone

19  else?  Okay.  Might be easier for me if we talked about cash

20  collateral first and then took up the motions to compel.  So

21  why don't we start there.  I did see that something got

22  filed.  Read it briefly and I'm still reading it.  Maybe you

23  can give me the high points.

24         MR. MARTIN:  I can give you high points, Your

25  Honor, and Mr. Battaglia can chime in as well.  We are able

```
 1   to reach another agreement on interim use of cash
 2   collateral.  The only material changes are the PQPR payment
 3   provisions from before regarding the clawback, those were
 4   removed and instead there's a language in there that
 5   preserves the clawback rights in the previous interim
 6   orders.  To date, out of that $750,000, $250,000 has been
 7   paid.  The other $500,000 has not yet been paid so you have
 8   one clock kind of ticking on that.
 9            Obviously, that's reserving all rights relating
10   to, you know, broader litigation, but specifically as to
11   those payments as to whether they were proper in this course
12   of business.  That's --
13            THE COURT:  Okay,
14            MR. MARTIN:  -- what the clock is ticking as far
15   as -- and then there's an updated budget as well and Mr.
16   Battaglia can speak to that.
17            THE COURT:  I did see that you all need a final
18   cash collateral hearing as well, right?
19            MR. MARTIN:  Correct, Your Honor.
20            THE COURT:  Or a time, I should say.
21            MR. MARTIN:  And we had proposed having that heard
22   at the same time as the tort committee hearing.
23            THE COURT:  Okay.  Do you think 10 a.m. would work
24   for everyone, if we're going to work through the day on
25   that?  I don't think there's a lot of hearings that are
```

1   going to go on at the same time there.  Would 10 a.m. work

2   for October 12th?

3           MR. MARTIN:  It's okay for the Texas plaintiffs,

4   Your Honor.

5           THE COURT:  Okay.  Mr. Battaglia, would that work

6   for you?

7           MR. BATTAGLIA:  Yes, Your Honor, and I've had

8   conversations with Mr. Martin -- this is Ray Battaglia, for

9   FSS -- about frankly at the end of the day probably doing

10  another interim at that time.

11          THE COURT:  Okay.

12          MR. BATTAGLIA:  Just -- I think we're fine running

13  on that basis, but yes.  That'd be fine.

14          THE COURT:  Okay.  Is there anything you wish to

15  tell me about --

16          MR. BATTAGLIA:  And I guess one more thing, Your

17  Honor, I should point out is that Ms. Freeman had asked for

18  a couple of -- minor modification to the proposed order

19  regarding payments to insiders and that the words directly

20  or indirectly were inserted, and I don't think that does

21  injustice to anyone who had previously signed off on the

22  proposed order, but I wanted to at least mention it.

23          THE COURT:  Okay.  I looked at the budget.  There

24  were two items that I just want somebody to clarify for me.

25  One of them says Alex Jones trial cost, what is that, for

Page 8

1      $80,000?

2                MR. BATTAGLIA:  Your Honor, Mr. Jones is -- has

3      required to appear at trial in Connecticut and he's unable

4      to travel, like perhaps your or I can in the sense he does

5      require security when he goes somewhere and he doesn't stay

6      in a hotel.

7                THE COURT:  Why is the Debtor paying that?

8                MR. BATTAGLIA:  I don't think that we're providing

9      --

10               THE COURT:  He's a defendant.

11               MR. BATTAGLIA:  Because --

12               THE COURT:  Isn't he -- Mr. Battaglia, isn't he a

13     defendant in the same lawsuit?

14               MR. BATTAGLIA:  He is a defendant as well as FSS.

15     Yes, Your Honor, and we had provisions in the lift stay

16     order that we could include a budget for his travel

17     expenses.  And I think some of his travel expenses really

18     relate to his being there on behalf of FSS.

19               THE COURT:  I received this 15 minutes ago.  We're

20     not going to do that.  You all can come back and ask for it,

21     but we're not paying for travel expenses for co-defendant on

22     15 minutes' notice to the Court about that.  Never seen that

23     before.  I'm not aware of it.  Somebody wants to come back

24     on additional notice, you're more than happy to do so.  It's

25     not a no, but it's not a today.  I need more information on

1   that.  So I'm just telling -- what are the other witness

2   expenses and trial costs?  What does that relate to?  Does

3   that relate to specifically to FSS or something else?

4           MR. BATTAGLIA:  They are employees of FSS that

5   plaintiffs have requested to be present or alternatively

6   FSS' counsel has requested to be present.

7           THE COURT:  Okay.

8           MR. BATTAGLIA:  At trial.

9           THE COURT:  Okay.

10          MR. BATTAGLIA:  And also was included in the lift

11  stay order that those expenses would be allowed to be

12  reimbursed.

13          THE COURT:  Relates to the FSS' defense.  I think

14  lifting the automatic stay makes perfect -- I entered an

15  order lifting the stay.  You're going to have to provide

16  some additional information, if somebody -- provide the

17  evidence today, we can take is up.  But if you want me to

18  sign an order today providing expenses for co-defendant in

19  litigation, I'm going to need more than just the parties'

20  agreement on that.  I think I have an independent duty to

21  take a look at this and I don't understand it.

22          But that's -- that just means somebody can come

23  back and ask for it.  It just means that literally this got

24  filed 15 minutes before the hearing and I've reviewed it and

25  you want me to sign it today.  That's what I'm wanting to

 1    do.

 2              Mr. Lemmon, let me ask you.  You're the -- far as

 3    I know.  It sounds like there's agreement between the tort

 4    plaintiffs and the Debtors.  You're still listed as a

 5    secured party.

 6              MR. LEMMON:  Yes, Your Honor.

 7              THE COURT:  Your client is still listed as a

 8    secured party.  I just need to make sure that you're okay

 9    with this order.  It says an agreed cash collateral order.

10              MR. LEMMON:  Yes, Your Honor.  I reviewed the form

11    of order and my client has no objection.

12              THE COURT:  Okay.  Thank you.  So I know you got a

13    1:30 and Mr. Battaglia, you can tell me otherwise, but I'm

14    willing to sign the order today extending the use of cash

15    collateral to October the 12th at a hearing on the budget.

16    The rest of the budget looks fine to me.  Actually had one

17    more question.  And there was an increased cost to the

18    fulfillment expert.  What is that?  I did -- or who is that?

19              MR. BATTAGLIA:  It's Blue Ascension, Your Honor,

20    and this was the subject of the modification to the cash

21    collateral order.  It -- really travels based on estimated

22    sales for the period.

23              THE COURT:  Okay.

24              MR. BATTAGLIA:  And they're not completely

25    connected because of course the sales are presented to you

1    and all these expenses on an approval basis, but they don't

2    track day-to-day the shipping.  They happen a week later or

3    several days later, but it's an estimate of what's expected

4    to pay for both the shipping and the fulfillment cost that

5    has been presented or discussed in front of the Court

6    before.

7              THE COURT:  And that's different than the

8    fulfillment services line?  There's a line --

9              MR. BATTAGLIA:  Your Honor, I'm afraid I don't --

10             THE COURT:  There's a line item for fulfillment

11   services.

12             MR. BATTAGLIA:  I need to --

13             THE COURT:  There's a line item for fulfillment

14   services and then I see one for a fulfillment expert.  It

15   was there last time.  It just went up this time around.  I

16   just --

17             MR. BATTAGLIA:  I'm sorry --

18             THE COURT:  -- need to make sure --

19             MR. BATTAGLIA:  I'm sorry, Your Honor.  The

20   fulfillment expert is after the hearing in which Blue

21   Ascension became something of an issue.  Mr. Schwartz, in

22   trying to fulfill his obligations and resolve the questions

23   that had been presented, has hired someone to come in and

24   evaluate the fulfillment operations of Blue Ascension and to

25   evaluate the cost structure.

Page 12

```
 1              THE COURT:  I remember that.

 2              MR. BATTAGLIA:  And under --

 3              THE COURT:  I remember that.

 4              MR. BATTAGLIA:  So.

 5              THE COURT:  I remember that.  Yeah.

 6              MR. BATTAGLIA:  That's what that line item is for.

 7              THE COURT:  Got it.  Got it.  Got it.  Yeah, I

 8    remember that and I do remember Mr. Schwartz talking about

 9    that at the last interim hearing on August 24.  So that

10    makes sense to me.  I have no additional questions.

11              Mr. Nguyen, Ms. Haselden, are you all okay with --

12    if I sign this order with the provisions that I've set

13    forth?

14              MR. NGUYEN:  Yes, Your Honor.  We have no

15    objections to the cash collateral.  It was the deal that was

16    struck and we were involved.  I've taken a look at it.

17              THE COURT:  Okay.

18              MR. NGUYEN:  I'm fine with the order.  Thank you.

19              THE COURT:  Thank you.

20              MS. HASELDEN:  Yes, Your Honor.  We have no

21    objection with the changes that are --

22              THE COURT:  Okay.

23              MS. HASELDEN:  -- Ms. Freeman --

24              THE COURT:  And again, with the other part, people

25    -- I just, I don't have any evidence as to why that's
```

1   necessary or how it's -- why FSS should pay for it.  I'm

2   happy to hear evidence on it, if there is any.  If not,

3   we're all going to --

4          MR. BATTAGLIA:  Your Honor --

5          THE COURT:  We're all going to come back in a

6   couple weeks.  It's just -- I haven't, I'm not comfortable

7   doing it today.

8          MR. BATTAGLIA:  Your Honor, this is Ray Battaglia

9   again.  I understand.  I'll -- if you would like, I'll

10  revise the budget accordingly or with the Court, made their

11  --

12         THE COURT:  No.

13         MR. BATTAGLIA:  -- certainly says if the budget

14  doesn't, so I'll -- whatever the Court --

15         THE COURT:  I can --

16         MR. BATTAGLIA:  -- favors and then we'll come back

17  and ask the Court for --

18         THE COURT:  Okay.  I can --

19         MR. BATTAGLIA:  -- those expenses with more

20  explanation.

21         THE COURT:  I can figure it out on my end and I

22  think it's just a short line or something, either in the

23  order or just striking it --

24         MR. BATTAGLIA:  Yes, sir.

25         THE COURT:  -- from the budget, but I can sign it.

1    Mr. Lemmon, if you can just confirm you're okay with me

2    signing the order as provided.

3                THE LEMMON:  Yes, Your Honor.  My client has no

4    objection.

5                THE COURT:  Okay.  Okay.  Thank you.  And I've

6    heard from the United States Trustee.  I've heard from

7    Subchapter V Trustee.  I will sign that order.  Looks like

8    sales are still doing really well, which is good for FSS.

9                So, okay.  I will now turn things over to, guess

10   Mr. Moshenberg, you filed the motion.  Turn it over to you,

11   sir.

12               MR. MOSHENBERG:  Thank you, Your Honor.

13               THE COURT:  You can move that mic closer to you.

14               MR. MOSHENBERG:  Sure.

15               THE COURT:  No problem.

16               MR. MOSHENBERG:  Can you hear me all right, Your

17   Honor?

18               THE COURT:  Just fine.  Thank you.

19               MR. MOSHENBERG:  Thank you very much and thank you

20   for hearing this issue so quickly, Your Honor.  So as the

21   Court is well aware, this cash collateral issue is something

22   the parties are continuing to debate and do discovery on and

23   we're preparing for that cash collateral hearing, looks like

24   on October 12th.

25               One of the issues in that cash collateral motion

1    has to do with the nature of the PQPR debt, as the Court

2    knows.  It's not only the nature of the debt but also how

3    that debt was arrived at and the actual amount of the debt

4    itself.  As the Court knows, we've worked together with Free

5    Speech Systems in terms of reaching interim cash collateral

6    orders, same thing with PQPR, and that's something we've

7    been very proud of, the fact that we've been able to work

8    with them when needed.

9            And one of the agreements that the parties reached

10   and the Court entered an order on was Document 98 which is

11   the second cash collateral order.  And Paragraph No. 14,

12   Your Honor, really codifies the agreement that the Court

13   blessed that the parties to do discovery as it relates to

14   the cash collateral order and what it says is it provides

15   that PQPR as well as FSS, but really we're focused on PQPR

16   today, PQPR was supposed to provide documents in response to

17   document -- to discovery requests and provide other

18   discovery responses by certain date.  Then after that date,

19   the parties were going to have a deposition of PQPR's

20   corporate representative.

21           Paragraph 14 of Document 98 also says that if

22   there's some sort of dispute relating to the discovery, then

23   that the parties can move on an emergency basis.  Now, that

24   being agreed to, the parties did issue discovery requests

25   and the Texas plaintiffs served discovery requests that were

1    focused on this targeted issue about the nature of the PQPR

2    debt and the amount of the PQPR debt.

3            And just so the Court understands, Exhibits 1, 2,

4    and 3 to the motion to compel, I've conferred with opposing

5    counsel and their finding that admitted.  That way Jarrod

6    can leave a little sooner without having to get those

7    documents in.

8            THE COURT:  Let's make him stay.  Just fine.

9    Thank you.

10           MR. MOSHENBERG:  But Documents 1, 2, and 3 in

11   support of that motion or exhibits, rather, it's the

12   discovery request, the responses, and then the attempt to

13   meet and confer.  Now, the cash collateral motion, you know,

14   of course the underlying notes, the cash collateral here

15   that PQPR has with Free Speech Systems, it's not an ordinary

16   note that you would find, for instance, when a bank is

17   giving out a secured loan for a promissory note.

18           What you have here is you've got promissory notes

19   that are basically memorializing 50-some million dollars,

20   $53 million in past obligations owed.  So it's not future

21   money being paid out under a security arrangement.  It's

22   supposedly some legal obligation to pay a debt that was

23   incurred in the past.

24           And so a lot of our discovery requests were

25   focused on figuring out what's the nature of that underlying

1    debt that preceded the promissory notes.  And that's why we

2    just served those discovery responses that are in Exhibit 1

3    and the responses that are in Exhibit 2.  The problem is --

4    and this is in Exhibit 2 -- is that the responses PQPR

5    provided list a bunch of boilerplate objections and then it

6    just states what documents PQPR has decided to produce.

7         What we have a problem with their responses is

8    first of all, there's really two issues.  The first one is,

9    we don't really know whether responsive documents are being

10   withheld on the basis of an objection.  They just provide

11   these boilerplate objections saying we object to this

12   request, here's what we'll produce.  It's unclear from the

13   responses, are there other responsive documents out there

14   that are responsive to that request that are being withheld.

15        THE COURT:  Have the parties conferred?

16        MR. MOSHENBERG:  We have tried to.  We did speak

17   this morning, Your Honor.  So we tried to confer for several

18   days, as Exhibit 3 shows to our motion.  We didn't hear

19   anything for a long time, Your Honor.  Finally, yesterday,

20   after they filed their response, there was a brief

21   communication where they sort of invited us to send another

22   email and explain what we want, and we did that.

23        We sent a long email detailing the documents we

24   want and why we want them, and they responded and they

25   basically said the effect of well, you don't need to have

1    these documents.  First, take the deposition and then see if

2    you need the documents.  Obviously, that's not what the

3    discovery rules contemplate.  If there's responsive

4    documents out there and they're discoverable, then we have a

5    right to receive them.

6         Of course, in practice, you need the documents in

7    order to take a meaningful deposition.  So legally, I don't

8    really understand why that's a reason to not turn over a

9    responsive document.  Doesn't make any sense in normal

10   practice of law, but especially doesn't make sense given

11   that the parties already agreed that they were going to turn

12   over responsive documents before the deposition, and that's

13   what Document 98, Paragraph 14 shows.  So I don't really

14   understand the basis for that.

15        The other issue that they mention is they sort of

16   indicate there might be some responsive documents.  There

17   may not be other ones.  They don't exist.  If -- and this

18   really is a big part of the issue.  We don't want responsive

19   documents being held on the basis of an objection.  If there

20   are no responsive documents, they're required under Rule 34

21   to say so.  We just want to know that there's no documents

22   out there that are being withheld.  And it seems like for

23   some of these discovery requests, that may be the case.

24        What they need to do is withdraw their improper

25   objections and just say, there's no responsive documents in

1    --

2              THE COURT:  Do you think some of these requests

3    are overly broad?

4              MR. MOSHENBERG:  I don't, Your Honor.  I'm happy

5    to handle any specific --

6              THE COURT:  Let's start.

7              MR. MOSHENBERG:  Sure.

8              THE COURT:  We're talking about cash collateral.

9              MR. MOSHENBERG:  Yes, Your Honor.

10             THE COURT:  Produce all agreements, contracts, and

11   -- all agreements between FSS and PQPR.  What purpose does

12   that serve with cash collateral --

13             MR. MOSHENBERG:  It's --

14             THE COURT:  -- unrelated to the debt?

15             MR. MOSHENBERG:  Well -- and so when we --

16             THE COURT:  I'll give you a few.  Produce all

17   documents evidencing any agreements between FSS and PQPR.

18   Right?  Regardless if it relates to the debt.  Say there's

19   an agreement -- what do you mean by agreements, right?

20   That's different from contracts and promissory notes.  All

21   of them.  Produce -- let's see.  Produce all employee lists

22   for PQPR from September 1st, 2013 to the present.  Why do

23   you need to know who works at PQPR in 2013 to determine

24   whether the debt is owed at that amount or not?  I'm just

25   asking.  It's the kind of -- all documents and

1   communications evidencing, so every communication evidencing

2   the ownership of PQPR from its inception.  You don't find

3   that to be a little overly broad?

4           MR. MOSHENBERG:  No, I --

5           THE COURT:  Documents just saying, we formed PQPR

6   in 2013, so I'm going to have to go back in 30 days' notice

7   and file -- and find every email that shows every time that

8   they say that they're the owner from 2013 in connection with

9   a cash collateral hearing that was schedule to occur today?

10           MR. MOSHENBERG:  Well, not necessarily, Your

11   Honor.  But to be clear, we detailed in an email yesterday,

12   we talked to them about what we were specifically looking --

13           THE COURT:  -- not what you said.  You said you

14   didn't think some of these were overly broad.

15           MR. MOSHENBERG:  Sure.  And let me be clear, and

16   we can always -- of course, the rules allow us to narrow it

17   to the extent it is discoverable and I want to be --

18           THE COURT:  Taking you up on your first statement.

19           MR. MOSHENBERG:  Sure, Your Honor.  I don't think

20   the way that you read the question, Your Honor, the request

21   --

22           THE COURT:  I read it the way you wrote it.

23           MR. MOSHENBERG:  Sure.  And I want to be clear.  I

24   didn't perceive it that way.  When we as a group circulated

25   these drafts, what we're referring to, the draft contracts,

1   agreements, however they want to call it, between Free

2   Speech Systems and PQPR.

3          THE COURT:  -- I'm going.

4          MR. MOSHENBERG:  Sure.

5          THE COURT:  I think some of these are really

6   broad, but it could be narrowed to address what you need and

7   then I think Mr. Lemmon is going to have to tell me if these

8   -- some of these requests were narrowly tailored towards

9   cash collateral and the debt that exists, I understand your

10   initial -- his initial response, but maybe he was jammed for

11   time.  But now we're a couple of weeks out now and we're

12   going to go further, even further out.  I don't understand.

13   I think some of these requests can be narrowly tailored in a

14   way to specifically address the issue and I would need to

15   understand from PQPR whether they would still have an

16   objection to that.

17          But I -- you're asking me whether I think an

18   organizational chart is appropriate.  I do.  If you're

19   asking me whether they need to identify all facilities and

20   offices used by them, I don't know.  You'll have to tell me

21   whether that's appropriate or not, but I do think that the

22   parties could talk and narrowly tailor this in a way that

23   really gets to the heart.  I do understand the issue.

24          There were -- there was a large amount of debt

25   that was -- this is different.  This is not just a loan

```
 1   agreement where money was advanced, a loan agreement was
 2   signed and then funds were advanced on a loan and there was
 3   security taken on that.  This seems to be a little different
 4   and you're -- I think you're entitled to get documents that
 5   are based on that.
 6            MR. MOSHENBERG:  Sure.
 7            THE COURT:  I just want -- I just think things can
 8   be narrowly tailored in a way that really addresses what
 9   you're doing that relates to cash collateral, and I'm happy
10   to do that, but I think the parties could really sit down
11   and see if that could get done, with my guidance.
12            I think there's a difference between seeking
13   documents for other purposes, and I'm not saying that's what
14   you did.  I just -- if we're going to limit it to cash
15   collateral, which is what's going on, then I think you can
16   get the docs and I think there are.  And I agree with you,
17   if all you are receiving is the underlying loan documents
18   and some worksheets, I think Mr. Lemmon is going to have to
19   tell me if there's more or admit that there's more or not.
20            But I think some of these can be more narrowly
21   tailored to address the debt, but that's a simple thing.
22            MR. MOSHENBERG:  I totally agree, Your Honor, and
23   candidly, my normal practice, I usually am able to meet and
24   confer and reach some sort of deal.  The reason the motion
25   was filed is because we just heard nothing for about a week
```

1    and we tried our best and, you know, it turns out Mr. Lemmon

2    was busy meeting with Ms. Haselden and trying to promote his

3    motion to investigate instead of doing the discovery he

4    promised to do under our agreement.

5         THE COURT:  That's right.  The motion to

6    investigate is still out there as well.

7         MR. MOSHENBERG:  Yes, Your Honor.  And we totally

8    agree.  You know, if there's room to narrow it, absolutely.

9    We're not looking for every document under the sun, so I

10   agree with you and I think we'll be able to work it out.

11   But I do want to be clear and I would love some guidance

12   from the Court.  I mean, our wish list is essentially to

13   make sure that if there are no responsive documents that

14   they withdraw their objections and say there's no responsive

15   documents, assuming that it's been tailored as the Court has

16   discussed.

17        And then if there are responsive documents that

18   are tailored as was discussed, that absolutely produce them.

19   And I'm happy to work with Mr. Lemmon on that.  I think we

20   could probably do that, and if not, we can come back to the

21   Court soon if that works.

22        THE COURT:  Okay.  That's perfect.  Thank you.

23   Let me hear from Mr. Lemmon.

24        MR. LEMMON:  Judge, I'm chagrined to be here on a

25   discovery motion.  I don't think I've appeared on a

1    contested discovery motion in federal court in 20 years, but

2    part of this is on me, and that is that Mr. Martin reached

3    out to me on Labor Day by email and I read his briefly.  It

4    was to me and to Mr. Battaglia and I believe --

5            AUTOMATED VOICE:  Conference muted.

6            MR. LEMMON:  -- the first part of it dealt with a

7    privilege log, right, which I didn't really find applicable

8    and I did not give his email, when I read it on my iPhone

9    when I got off the golf course, the -- in the way that I

10   should have.

11           The follow-up email again came to me and I read it

12   on my iPhone the day before the creditors meeting and it was

13   Mr. Martin's suggestion we visit after the creditors

14   meeting.  I completely zoned on those.  Just didn't see

15   them.  So I was surprised when I got the emergency motion.

16   I called Mr. Martin because the Court will recall I'm the

17   person that offered discovery informally at the time of the

18   August -- I think it was -- 3rd hearing.  And -- because I

19   was going on vacation.

20           I wanted everybody to be able to get what we had

21   and we have somebody who did the forensic accounting

22   relating to the underlying debt and was instrumental in the

23   -- knows about the execution of the notes and that's the

24   person I've offered and whose work papers I've sent.  And

25   we've offered him repeatedly for deposition.  That

1    deposition is currently set for October 4th and I suppose

2    that the plaintiffs will go forward taking it this time.

3           I had talked originally with Mr. Martin and I

4    thought we had an agreement that I was going to produce the

5    documents related to the existence of the debt which I

6    viewed as the key issue related to cash collateral.  And we

7    will.  We will absolutely produce everything related to the

8    existence of the debt or reasonably related to the existence

9    of the debt, Your Honor, and I don't have a problem with

10   that.

11          THE COURT:  You think that includes negotiations

12   surrounding the formulation of the debt?

13          MR. LEMMON:  I believe that there are no documents

14   regarding the negotiations regarding the formation of the

15   debt.  The way the debt occurred, Your Honor, was that PQPR

16   sold to FSS on open account and they kept a ledger, right.

17   And so those accounting issue -- entries are all, of course,

18   relevant, right.  My problem is that -- and when we got the

19   document requests while I was on vacation, it demanded a

20   response in eight days at that time.

21          We weren't able to do that.  My problem is that

22   that ledger has a lot of other things in it, right, such as

23   every purchase my client's ever made.  Right, it's my

24   client's general ledger and we don't find that to be germane

25   to any of the discussions.  So what we have is we have a

1    compilation done by the forensic accountant of all of those

2    and we can work with everybody to get them what they need

3    regarding the existence of the debt.  I don't have a problem

4    with that, Your Honor.

5           Just want to say one other thing, and that is

6    yesterday I called Mr. Martin and I said, what is it that

7    you guys really want.  And he said well, we need your

8    spreadsheets in native format and I agreed immediately.  I

9    said, they won't be Bates labeled that way, but we'll give

10   them to you.  And he said Mr. Moshenberg may want something

11   different.  I got an extensive email from him last night.  I

12   responded.  I called him.  Finally reached him this morning.

13          I said, what is it that you really want on an

14   emergency basis.  He said, I need you to withdraw every

15   single one of your objections and produce every single

16   document.  Judge, we will absolutely work with him.

17          Let me just mention one other thing, Your Honor,

18   that's a concern to us and that is we have asked for a

19   protective order in this case and we've circulated.  We

20   think we have agreement on the protective order, but there

21   are parties that are downloading our documents that we sent

22   to them and I don't know who those parties are exactly.

23          And so I've asked for them to tell us who has

24   signed off on the protective order but this illustrates one

25   of the problems in this case and that is, you know, this is

1    my client's proprietary information and we do not want it

2    traveling around the world.  So -- and so the protective

3    order that everybody has agreed to is just the standard

4    Southern District protective order with no changes

5    whatsoever.  But for that reason, we have concerns about

6    production in this case and we do need the signed signature

7    pages on the protective order before people are downloading

8    our documents.

9         So with all that said, Your Honor, we absolutely

10   will produce all of the documents relating to the debt.  You

11   know, we just need this tailored a little bit and we'll get

12   them all of that.

13        THE COURT:  Let me -- what I'm thinking about

14   doing, a couple of things and Mr. Lemmon, (indiscernible)

15   stand here, I want you to -- give the opportunity to react

16   to what I'm saying.  I'm going to deny your request for

17   emergency consideration to appoint the Subchapter V Trustee.

18   I'm going to -- expand the powers of the Subchapter V

19   Trustee.  I want to take everything up at one time.  I want

20   to take everything up on the 12th.  I want to think about

21   everything and I'm going to make a decision about

22   everybody's requests at that time.

23        That doesn't mean that the Subchapter V Trustee

24   can't, if she's doing whatever work she has, I'm not here to

25   impede whatever she's doing.  I'm just saying I want to take

004750

1    up the consideration and sign whatever I'm going to sign

2    because what I don't want to do is, quite frankly, limit her

3    or limit myself in any way.  I want to have the full range

4    of options to -- based on evidence that I hear as to what I

5    think the Subchapter V may or may not be doing.  May want to

6    do more.  May want to do a little bit less.  Just -- I just

7    need to hear what the evidence is and I want to take it up

8    all at the same time.

9            I'm also going to say I don't think I need to rule

10   on anything today, but everybody reserves the right to come

11   back and tell me.  I am asking all of the professionals in

12   this case -- I understand the history here.  Understand that

13   there's a lot of tension between clients but I expect the

14   professionals to work together and to do it, so I think I'm

15   really reaching out to both sides, asking everyone to really

16   consider the rhetoric in the papers and the -- what gets

17   presented at the hearing.

18           I just am asking all the professionals to really

19   talk about what they want in connection with this hearing

20   and what you need in connection with cash collateral.  And

21   if the parties can't work it out, then come back to me but -

22   - I'll leave it there.

23           I think there's a way for you -- comes to

24   questions about protective orders, I think that's standard.

25   I think professionals should be able to work through that

1    really easy.  So I hope no one is downloading information

2    and taking advantage of information without protection, if

3    that's what folks are looking for.  At the same, Mr. Lemmon,

4    when it comes to PQPR, if there are additional documents

5    that are responsive, at some point someone's going to have

6    to say I do agree with Mr. Moshenberg; here's all I've got

7    and I've got nothing else, and I think that representation

8    is standard.

9         I don't think you need to remove your objection,

10   quite frankly, but I do think at some point people need to

11   know, you know, this is all you've got so that when they

12   show up to a hearing, they know that they've received all

13   responsive documents -- responsive nonprivileged documents.

14   So -- and I know the professionals here.  I'm talking very

15   basic standard things here, so I'll leave it there.

16        MR. LEMMON:  And Judge, just so I'm clear, and we

17   will produce everything related to the debt.  We would

18   produce an org chart.  I'm told there is not one.  But we

19   don't have a problem at all with that and we'll take all

20   these things up on the 12th, I suppose.

21        THE COURT:  That's when I want to take it up.  If

22   parties have different views on all this, they can certainly

23   take it up, but I don't want to take it up.  I don't know

24   what I'm going to hear on the 12th.

25        MR. LEMMON:  Sure.

1                THE COURT:  And regardless of how I rule on the

2      12th, I think the Subchapter V Trustee has to do her job and

3      do her job the way she sees fit, so that's not for me to --

4                MR. LEMMON:  May --

5                THE COURT:  -- up now.

6                MR. LEMMON:  May I say one thing, Your Honor?

7                THE COURT:  Sure.

8                MR. LEMMON:  And -- the meeting we had yesterday

9      with the Subchapter V Trustee and counsel was characterized

10     as some sort of sales job.  Would that I was such a great

11     advocate that I could put a sales job over on Ms. Freeman or

12     --

13               THE COURT:  I don't want to get into it.

14               MR. LEMMON:  -- you know, Ms. Haselden and it's --

15     it was informational.  We're happy to cooperate to the

16     fullest extent with the Sub V Trustee, so.

17               MR. MOSHENBERG:  (indiscernible).

18               THE COURT:  Yeah, absolutely.

19               MR. MOSHENBERG:  I am confident we're going to be

20     able to work together and figure out the scope of what is

21     discoverable, but I do want to make sure we're on the same

22     page about timing, Your Honor.  We have a deposition on the

23     4th.  His position has been that you can get the documents

24     after the deposition.  We think we're entitled to them

25     beforehand.  That was what was agreed to.

1           THE COURT:  I feel really confident that that's

2     probably not going to be the case after today.

3           MR. MOSHENBERG:  That -- I'm sorry.

4           THE COURT:  That you will receive the documents in

5     time to take a deposition.

6           MR. MOSHENBERG:  That we will?

7           THE COURT:  Yeah.

8           MR. MOSHENBERG:  Okay.

9           THE COURT:  I feel pretty confident about that,

10    without me having to get involved.

11          MR. MOSHENBERG:  I appreciate that, Your Honor,

12    and --

13          THE COURT:  I feel really confident that you're

14    not going to get them, like, October 1st, either.  You know,

15    that you'll get them in due course as quickly as possible on

16    a rolling basis.

17          MR. MOSHENBERG:  I appreciate that.

18          THE COURT:  That sounds right to me.

19          MR. MOSHENBERG:  I appreciate that, Your Honor.

20          THE COURT:  And look, I'm here on 24 hours'

21    notice, so if you get nervous, if things are getting tight

22    and you don't think things are going the way they are, I can

23    -- you know, it's just an email to my case manager, right,

24    and we can get on the phone in less than 24 hours we can

25    have a hearing, or the same day.  So this isn't saying I'm

```
 1    continuing everything, right, and maybe the issue become
 2    moot.  Maybe it doesn't.  But I'm here and I'm just hoping
 3    that the professionals can -- I'm asking the professionals
 4    to get in a room and have a serious meeting about what's
 5    needed.  I think you're probably entitled to a lot of what
 6    you've asked for but maybe it just needs to be narrowed in a
 7    way that would make sense in light of the timing in terms of
 8    where we are, and I think that can be accomplished in fairly
 9    short order.  The documents either exist or they don't.  Mr.
10    Lemmon either can produce them or not and we'll see where it
11    goes.
12              MR. MOSHENBERG:  That's fair, Your Honor.
13              THE COURT:  And everybody's rights are reserved.
14    Everybody's rights are reserved, U.S. Trustee's rights, any
15    other creditors' rights, Subchapter V Trustee's rights,
16    Debtor's rights, everybody's rights are reserved on these
17    issues.  I think we've just got to get to the 12th and then
18    see where things go, right, and if this gets -- we'll see
19    where things are at that time.  But I'm really, really
20    asking the professionals to hear what I'm saying and I don't
21    think anyone has to agree on anything.
22              I do think it makes sense to be civil and work
23    through these issues as the professionals, take care and do
24    it.
25              Is there anything -- I'm going to sign that order,
```

```
 1    cash collateral extension order today.  Let me ask the U.S.

 2    Trustee, since I've got you here.  Is there anything -- I

 3    saw that you filed objections to certain retention

 4    applications.  Two of those individuals aren't here, so I

 5    don't want to pick a date to take that up.  I don't want to

 6    take it up on the 12th.  That seems like a lot --

 7              MR. NGUYEN:  Understood, Your Honor.  Mr. Shannon

 8    --

 9              THE COURT:  -- in one day.  Mr. Shannon, I just --

10    but maybe you all can get together and we can pick a date

11    and just reach out to my case manager at that time.  I don't

12    need to comment.  I haven't read them -- haven't read

13    anything.

14              MR. NGUYEN:  Sure --

15              THE COURT:  I just say that it got filed, but

16    maybe we can pick a date.  There's a lot, I think, scheduled

17    for the 12th and I think there's -- has to be a day where we

18    can do retentions on a separate track.

19              MR. SHANNON:  Yeah.  Your Honor, one thing that --

20    there is a status hearing set in this case for September

21    20th.

22              THE COURT:  Yes, that's --

23              MR. SHANNON:  And I think that's probably about

24    the -- you know, it's quick, but still has some time for

25    gathering the required information.  So Your Honor, we would
```

1    request setting those applications to employ the CRO and

2    Shannon and Lee LLP on that date, if possible.

3           THE COURT:  You want to take it up at that hearing

4    on the 20th?

5           MR. SHANNON:  Yes, on September 20th.

6           MR. NGUYEN:  Your Honor, I have no problem with

7    that.  I understand Mr. Shannon doesn't want to put his

8    employment at risk.  He doesn't want to work longer than,

9    you know, Your Honor's --

10          THE COURT:  No, no, no.

11          MR. NGUYEN:  I'm certainly -- you know, we'll work

12   with the schedule.  I told Mr. Shannon this morning,

13   whenever he wants to do it, we'll be ready.  We'll raise our

14   objections and go forward with it.

15          THE COURT:  Let me just take a look at something.

16   Scheduled at one o'clock for the 20th?  Is that right?

17          MR. SHANNON:  I believe so, Your Honor.

18          THE COURT:  Okay.  Okay.  Yeah, let's take it up

19   at one.  Okay.  That works for me, September 20th at 1 p.m.

20          MR. NGUYEN:  And just for clarity, Your Honor, Mr.

21   Shannon and I spoke this morning.  He requested a little bit

22   more clarity on my objection.  I use an entity instead of an

23   individual.  I normally do that to tone down the rhetoric,

24   but Mr. Shannon asked me to be more clear in terms of when I

25   make the --

```
1              THE COURT:  I understand.
2              MR. NGUYEN:  I'm going to file a corrected motion.
3   If he wants me to be clear, I'm happy to do it and I'm not -
4   - I just want to make sure the record's clear.  That
5   corrected motion is going to be filed sometime this
6   afternoon or by the end of the day.
7              And then the second thing is, we talked about some
8   limited discovery.  It's very limited in terms of the scope
9   of the employment -- the scope of the engagement that
10  occurred between May 24th through May 31st, and Mr. Lee in
11  his declaration, there was about $21,000 of services.  I
12  asked Mr. Shannon to explain what those services are and we
13  just need some records of that to go forward with twenty --
14  other than that, I don't intend at the hearing on the 20th
15  it's going to go long.
16             THE COURT:  Okay.  No, no.  I'll give it as much
17  time as we need.  It's important, but I appreciate it so
18  that -- really appreciate you thinking about that.  So can
19  we -- do you think, Mr. Schwartz, we can take that up on the
20  20th as well?
21             MR. SHANNON:  I believe Mr. Schwartz will be here
22  anyway.
23             THE COURT:  For the status report?
24             MR. SHANNON:  For the status report.
25             THE COURT:  Okay.
```

1          MR. SHANNON:  And again, Your Honor, I do believe

2     that the U.S. Trustee's primary objection is about the

3     disclosures in the InfoW case.  That's really the crux of

4     the objection and what will need to be investigated, so it's

5     not -- I don't think it goes beyond that.

6          MR. NGUYEN:  That's correct.  There was a prior

7     nondisclosure that occurred before you.  There's going to be

8     some legal arguments on how you should address that, but

9     that's where we are with the objection.

10          THE COURT:  I can -- we'll take it up on the 20th

11     and if Mr. Schwartz, you can just -- I will assume Mr.

12     Schwartz will be here, but if anything changes just reach

13     out to Ms. Saldana and let her know, but I will -- we will

14     set Schwartz' application as CRO and Shannon and Lee and

15     take it up at -- on the 20th.

16          Ms. Haselden, anything we need to talk about?

17     Anything from your perspective before the 20th?

18          MS. HASELDEN:  (indiscernible).

19          THE COURT:  All right.  I do note -- and this is a

20     hyper technical point and I want to -- well, you're telling

21     me.  If there's anything you want to talk about, I'll take a

22     look at something.

23          MS. HASELDEN:  Your Honor knows this case is very

24     unusual and because of the motions that have been filed by

25     both the parties in the case, the Debtor and the plaintiffs,

1    seeking to expand my role, I mean, I've found it necessary

2    first to go ahead and engage counsel.  And then, you know,

3    Mr. Lemmon had requested that we meet with his client and

4    because of the nature and the posture of the case, we went

5    ahead and set the meeting.  I think, you know, at some point

6    we will need a little clarification on exactly what I need

7    to do.

8         Normally, some of this investigatory work, you

9    know, is not necessary, so I guess between now and the 12th,

10   I'll try to figure out --

11        THE COURT:  Yeah, look, I mean, I'm interested to

12   know your thoughts as well on -- you know.  That's why I

13   don't want to -- I don't want to take anything up on a rush.

14   I don't know what the evidence is.  I don't know what the

15   evidence is going to show.  May show something, may show

16   nothing.

17        I think I'd want to know if, you know, as I

18   consider expanding the role of the Subchapter V Trustee,

19   what you would see that role to be and what you think it

20   should be as well, if anything.  I don't want to put any

21   words or thoughts in your -- in you.  I just want to know

22   that I -- you're an important part of the Subchapter V

23   process and I want to know what you think.  Okay?

24        MS. HASELDEN:  Thank you, Your Honor.  Yes.  We're

25   learning and the parties are all at this point cooperating

```
 1    and providing information.

 2              THE COURT:  So Mr. Shannon, the only hyper

 3    technical point is 1188(c) requires the report get filed on

 4    the docket before the meeting, 14 days before.

 5              MR. SHANNON:  Yes, Your Honor.  I believe you --

 6              THE COURT:  The hearing.

 7              MR. SHANNON:  I believe you filed an order that

 8    set the date that the --

 9              THE COURT:  I did.

10              MR. SHANNON:  -- status report needs to be filed.

11              THE COURT:  I did.

12              MR. SHANNON:  And I believe it's today, is what

13    that order says.

14              THE COURT:  No.  That's what I was trying to --

15              MR. SHANNON:  I'm sorry.  I don't remember the

16    docket number, unfortunately.

17              THE COURT:  Yeah.

18              MR. SHANNON:  Around 50 or so.

19              THE COURT:  That makes two of us.  Let's see.  If

20    today's the day, I just want to make sure something gets

21    filed so we comply with the code.  That's where I was going.

22    It wasn't to -- anything other than that.  I just want to

23    make sure that we're complying with -- that a status report

24    gets filed so that we're compliant with the Bankruptcy Code.

25              MR. SHANNON:  Yes, Your Honor.  And I just went,
```

```
 1   what your order said rather than --

 2            THE COURT:  No, no, no, you should.  You should.

 3            MR. SHANNON:  Okay.

 4            THE COURT:  No, no, no.  You absolutely should.

 5   No, I -- we set them for a reason on that date and I

 6   remember and I just want to make sure that we're all on the

 7   same page.  Yeah, it's Docket 65, so --

 8            MR. SHANNON:  Yes, Your Honor.  I believe

 9   originally the status report, the idea was to actually have

10   it a week after that.  Mr. Schwartz will be out of the

11   country during that week, so I believe that the date for the

12   status conference got pushed back a week and the report did

13   move as well.

14            THE COURT:  No, no, no.  I think we're all on the

15   same page.  Think we're all on the same -- yeah.  Today's

16   your day.

17            MR. SHANNON:  All right.  Thank you, Your Honor.

18            THE COURT:  Sounds like you're having some fun

19   this afternoon.  All right, folks.  Anything else we need to

20   talk about?  All right.  Thank you, everyone.

21            CLERK:  All rise.

22

23        (Proceedings adjourned at 1:49 p.m.)

24

25
```

```
 1                    CERTIFICATION

 2

 3   I certify that the foregoing is a correct transcript from

 4   the electronic sound recording of the proceedings in the

 5   above-entitled matter.

 6

 7   Sonya M. Ledanski Hyde

 8

 9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 20, 2022
```

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Case No. 22--60043 |
| | § | |
| DEBTOR. | § | Chapter 11 (Subchapter V) |
| | § | |

### ORDER APPROVING DEBTOR'S APPLICATION TO EMPLOY
### THE LAW OFFICES OF RAY BATTAGLIA, PLLC
### <u>AS BANKRUPTCY COUNSEL COMMNECING ON JULY 29, 2022</u>

Upon the application (the "<u>Application</u>")[1] filed by the Debtor to employ the Law Offices of Ray Battaglia, PLLC ("the Firm") as bankruptcy co-counsel commencing on July 29, 2022, pursuant to Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334;(ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Battaglia Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) the Firm does not represent an interest adverse to the Debtor's estate with respect to the matters upon which it is to be engaged and is a "disinterested person" within the meaning of that term under § 101(14) of the Bankruptcy Code; (vi) the Firm is qualified to represent the Debtor's estate under § 327 of the Bankruptcy Code; (vii) the terms of the Firm's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual bases

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application

set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interests of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at any hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain the Firm commencing on July 29, 2022, as bankruptcy co-counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.      The Firm is authorized to perform any and all legal services for the Debtor that are necessary or appropriate in connection with the Chapter 11 Case.

3.      The Firm shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      The Firm shall continue to hold the Retainer (as defined in the Application) in trust on behalf of the Debtor, until further order of the Court.

5.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

004765

6.     The Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

7.     The Firm shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

8.     The Firm will review its files periodically during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

9.     This order shall be immediately effective and enforceable upon entry.

10.     This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

11.     The Debtor and the Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

12.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Signed:  September 20, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

3

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**ORDER (A) DENYING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) DENYING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

This application is denied for the reasons stated on the record at the September 20, 2022 hearing.

Signed: September 20, 2022

Christopher Lopez
United States Bankruptcy Judge

004767

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**ORDER DENYING DEBTOR'S APPLICATION
TO EMPLOY BANKRUPTCY CO-COUNSEL**

The application to employ co-counsel at Docket 85 is denied for the reasons stated on the record at the September 20, 2022 hearing.

Signed:  September 20, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

004768

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**ORDER EXPANDING THE SUBCHAPTER V TRUSTEE'S DUTIES
PURSUANT TO 11 U.S.C. § 1183(b)(2) OF THE BANKRUPTCY CODE**

For the reasons stated on the record at the September 20, 2022 hearing, the Subchapter V Trustee's duties in this bankruptcy case are expanded under 11 U.S.C. § 1183(b)(2). The Subchapter V Trustee is directed to investigate the Debtor and file a report pursuant to 11 U.S.C. §§ 1106(a)(3) & (4) as soon as practicable.

Signed:  September 20, 2022

Christopher Lopez
United States Bankruptcy Judge

004769

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

| 1. NAME Ryan Chapple | 2. PHONE NUMBER (512) 477-5000 | 3. DATE 9/21/2022 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL rchapple@cstrial.com; aprentice@cstrial.com | 5. CITY Austin | 6. STATE TX | 7. ZIP CODE 78701 |

| 8. CASE NUMBER 22-60043 | 9. JUDGE Lopez | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 9/20/2022 | 11. TO 9/20/2022 |
| 12. CASE NAME In re Free Speech Systems, LLC | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY Houston | 14. STATE TX |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☒ OPENING STATEMENT (Plaintiff) | 9/20/2022 | | |
| ☒ OPENING STATEMENT (Defendant) | 9/20/2022 | | |
| ☒ CLOSING ARGUMENT (Plaintiff) | 9/20/2022 | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☒ CLOSING ARGUMENT (Defendant) | 9/20/2022 | | |
| ☒ OPINION OF COURT | 9/20/2022 | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | 9/20/2022 |
| ☐ SENTENCING | | ENTIRE HEARING | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☒ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

CERTIFICATION (18. & 19.)
By signing below, I certify that I will pay all charges (deposit plus additional).

ESTIMATE TOTAL

0.00

| 18. SIGNATURE /s/ Ryan Chapple | PROCESSED BY |
|---|---|
| 19. DATE 9/20/2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

004770

DISTRIBUTION:    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In      Free Speech Systems LLC
Re:     Debtor

Case No.: 22−60043

Chapter:  11

---

**NOTICE OF FILING OF OFFICIAL TRANSCRIPT**

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

004771

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 9/20/2022 1:03:06 PM |
| Audio File Name : | 4bk2022-60043_20220920-130306.mp3 |
| Audio File Size : | 173254 KB |
| Audio Run Time : | [06:00:57] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file,
click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

This digital recording is a copy of a court proceeding and is provided as
a convenience to the public.  In accordance with 28 U.S.C. § 753 (b)
"[n]o transcripts of the proceedings of the court shall be considered as
official except those made from the records certified by the reporter or
other individual designated to produce the record."

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

Status Conference-1

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 9/20/2022 1:03:10 PM |
| Audio File Name : | 4bk2022-60043_20220920-130310.mp3 |
| Audio File Size : | 115812 KB |
| Audio Run Time : | [04:01:16] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

> **This digital recording is a copy of a court proceeding and is provided as a convenience to the public. In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

Status Conference-2

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time : | 9/20/2022 5:23:34 PM |
| Audio File Name : | 4bk2022-60043_20220920-172334.mp3 |
| Audio File Size : | 57305 KB |
| Audio Run Time : | [01:59:23] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon. Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 22-60043 (CML) |
| Free Speech Systems LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| DEBTOR | § | |

**NOTICE OF WITHDRAWAL OF PQPR HOLDINGS LIMITED, LLC'S AMENDED
MOTION TO DIRECT SUBCHAPTER V TRUSTEE TO INVESTIGATE FINANCIAL
OPERATIONS OF THE DEBTOR**

PLEASE TAKE NOTICE that PQPR Holdings Limited, LLC, hereby withdraws as moot its *Amended Motion to Direct Subchapter V Trustee to Investigate Financial Operations of the Debtor* [Dkt. 127] filed on August 31, 2022, given the Court's Order of September 20, 2022 [Dkt. 183].

Dated: September 22, 2022

Respectfully submitted,

STREUSAND, LANDON, OZBURN &
LEMMON, LLP

By:     /s/ *Stephen W. Lemmon*
        Stephen W. Lemmon
        Texas Bar No. 12194500
        1801 South Mopac Expressway, Ste. 320
        Austin, Texas 78746
        Telephone: (512) 236-9900
        Facsimile: (512) 236-9904
        lemmon@slollp.com

**ATTORNEY FOR
PQPR HOLDINGS LIMITED, LLC**

004775

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2022 a true and correct copy of the foregoing document was served on all parties entitled to notice through this Court's CM/ECF System, including, but not limited to, Debtor, Debtor's Counsel, Trustee, and U.S. Trustee.


*/s/ Stephen W. Lemmon*
Stephen W. Lemmon

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

| 1. NAME | | 2. PHONE NUMBER | 3. DATE |
|---|---|---|---|
| Kyung S. Lee | | (713) 301-4751 | 9/23/2022 |

| 4. DELIVERY ADDRESS OR EMAIL | 5. CITY | 6. STATE | 7. ZIP CODE |
|---|---|---|---|
| klee@shannonleellp.com | Houston | TX | 77002 |

| 8. CASE NUMBER | 9. JUDGE | DATES OF PROCEEDINGS | |
|---|---|---|---|
| 22-60043 | Hon. Christopher Lopez | 10. FROM 9/20/2022 | 11. TO 9/20/2022 |

| 12. CASE NAME | LOCATION OF PROCEEDINGS | |
|---|---|---|
| Free Speech Systems LLC | 13. CITY Houston | 14. STATE Texas |

**15. ORDER FOR**

- [ ] APPEAL
- [ ] CRIMINAL
- [ ] CRIMINAL JUSTICE ACT
- [x] BANKRUPTCY
- [ ] NON-APPEAL
- [ ] CIVIL
- [ ] IN FORMA PAUPERIS
- [ ] OTHER

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [ ] OPENING STATEMENT (Plaintiff) | | | |
| [ ] OPENING STATEMENT (Defendant) | | | |
| [ ] CLOSING ARGUMENT (Plaintiff) | | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [ ] CLOSING ARGUMENT (Defendant) | | | |
| [ ] OPINION OF COURT | | | |
| [ ] JURY INSTRUCTIONS | | [x] OTHER (Specify) | |
| [ ] SENTENCING | | Entire proceeding | 09//20/2022 |
| [ ] BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [ ] | [ ] | NO. OF COPIES | | |
| 14-Day | [ ] | [ ] | NO. OF COPIES | | |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES | | |
| 3-Day | [x] | [ ] | NO. OF COPIES | | |
| DAILY | [ ] | [ ] | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |
| REALTIME | | | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE | PROCESSED BY |
|---|---|
| /s/ Kyung S. Lee | |

| 19. DATE | PHONE NUMBER |
|---|---|
| 9/23/2022 | |

| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|
| | |

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |

| DEPOSIT PAID | | DEPOSIT PAID | |
|---|---|---|---|
| TRANSCRIPT ORDERED | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | TOTAL DUE | 0.00 |

004777

**DISTRIBUTION:** COURT COPY TRANSCRIPTION COPY ORDER RECEIPT ORDER COPY

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                 )  CASE NO: 22-60043-cml
                                   )
 4    FREE SPEECH SYSTEMS, LLC,    )  Houston, Texas
                                   )
 5              Debtor.            )  Tuesday, September 20, 2022
                                   )
 6                                 )  1:03 p.m. - 7:30 p.m.
      -----------------------------)
 7

 8                              TRIAL

 9           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Free Speech Systems: R.J. SHANNON
                                Shannon & Lee LLP
13                              700 Milam Street, Suite 1300
                                Houston, TX 77002
14
                                RAYMOND WILLIAM BATTAGLIA
15                              Law Offices of Ray Battaglia, PLLC
                                66 Granburg Circle
16                              San Antonio, TX 78218

17                              KYUNG SHIK LEE
                                Kyung S. Lee PLLC
18                              4723 Oakshire Drive, Apt. B
                                Houston, TX 77027
19
      For Veronique De La       JARROD B. MARTIN
20    Rosa, et al.:             Chamberlain, Hrdlicka, White,
                                Williams & Aughtry P.C.
21                              1200 Smith Street, Suite 1400
                                Houston, TX 77002
22
      For David Wheeler,        RYAN E. CHAPPLE
23    et al.:                   Cain & Skarnulis PLLC
                                303 Colorado Street, Suite 2850
24                              Austin, TX 78701

25
```

```
 1    For the U.S. Trustee:     HA MINH NGUYEN
                                JAYSON B. RUFF
 2                              Office of the United States Trustee
                                515 Rusk Street, Suite 3516
 3                              Houston, TX 77002

 4    For PQPR:                 STEPHEN LEMMON
                                Streusand Landon Ozburn and Lemmon
 5                              1801 S Mopac Expressway, Suite 320
                                Austin, TX 78746
 6
      For the SubChapter V      MELISSA ANNE HASELDEN
 7    Trustee:                  Haselden Farrow, PLLC
                                Pennzoil Place
 8                              700 Milam, Suite 1300
                                Houston, TX 77002
 9
      Court Reporter:           ZILDE MARTINEZ
10
      Courtroom Deputy:         ZILDE MARTINEZ
11
      Transcribed by:           Veritext Legal Solutions
12                              330 Old Country Road, Suite 300
                                Mineola, NY 11501
13                              Tel: 800-727-6396

14


15
      Proceedings recorded by electronic sound recording;
16    Transcript produced by transcription service.

17


18


19


20


21


22


23


24


25
```

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | Case No. 22-60034 |
| FREE SPEECH SYSTEMS, LLC, | Chapter 11 |
| DEBTOR. | (Subchapter V Debtor) |

**ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION**
**AND REIMBURSEMENT OF EXPENSES OF RETAINED PROFESSIONALS**

This matter coming before the Court on the *Debtor's Motion for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* (the "Motion"),[1] filed by Free Speech Systems, LLC (the "Debtor"); the Court having reviewed the Motion and having considered the statements of counsel with respect to the Motion at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. § 1409, (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (d) notice of the Motion and the Hearing was sufficient under the circumstances and (e) the Compensation Procedures set forth below are reasonable and appropriate for this Chapter 11 Case; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

004780

2.      Except as otherwise provided in an order of the Court authorizing the retention of a particular professional, the professionals specifically retained pursuant to an order of the Court in the Chapter 11 Case and the subchapter v trustee and her professionals (collectively, the "Retained Professionals") may seek interim payment of compensation and reimbursement of expenses in accordance with the following procedures (collectively, the "Compensation Procedures"):

a.  Each Retained Professional seeking monthly compensation must submit a monthly fee statement (a "Monthly Fee Statement"), which submission may be via hand delivery, overnight courier, first class mail or e-mail, so as to be received no later than 30 days after the end of the month for which the fees are sought, to the following parties (collectively, the "Notice Parties"):

i.   The Debtor, the Chief Restructuring Officer of FSS, at the address indicated in this Court's docket;
ii.  The Debtor' Counsel, Law Offices of Ray Battaglia, PLLC, 766 Granburg Circle, San Antonio, Texas 78218 (Attn: Ray Battaglia, rbattaglialaw@outlook.com);
iii. Ha Minh Nguyen, Office of the United States Trustee, 515 Rusk St. Ste 3516, Houston, TX 77002 (ha.nguyen@usdoj.gov);
iv.  Melissa Anne Haselden, Haselden Farrow PLLC, Pennzoil Place, 700 Milam, Suite 1300, Houston, TX 77002 (mhaselden@haseldenfarrow.com); and
v.   Any other parties that the Court may designate.

b.  Unless otherwise provided in the order authorizing the Retained Professional's retention, each Retained Professional's Monthly Fee Statement, in accordance with Local Bankruptcy Rule 2016-1, shall include (i) a monthly invoice with fee and expense detail that describes the fees and expenses incurred by such Retained Professional and (ii) any additional information required by the Local Bankruptcy Rules, the Bankruptcy Rules, the Court, or applicable law.

c.  Time spent traveling without actively working on the Chapter 11 Case shall be billed at 50% of the professional's normal hourly rate.

d.  Any Retained Professional who fails to submit a Monthly Fee Statement for a particular month or months may subsequently submit a consolidated Monthly Fee Statement for multiple months provided that separate fee and expense information for each applicable month is provided in the consolidated statement.

e.  All Monthly Fee Statements shall comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and applicable law.

f.  Each Notice Party will have 14 days after service of a Monthly Fee Statement to object to such statement (the "Objection Deadline"). Upon the expiration of the

Objection Deadline, the Debtor will be authorized to pay each Retained Professional an amount (the "Authorized Payment") equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Statement (the "Maximum Payment") and (ii) the aggregate amount of fees and expenses not subject to an unresolved objection pursuant to paragraph 2(g) below.

g.   If any Notice Party objects to a Retained Professional's Monthly Fee Statement, it must serve on the affected Retained Professional and each of the other Notice Parties a written objection (the "Objection") so that it is received on or before the Objection Deadline.  Thereafter, the objecting party and the affected Retained Professional may attempt to resolve the Objection on a consensual basis.  If the parties are unable to reach a resolution of the Objection within 14 days after service of the Objection, or such later date as may be agreed upon by the objecting Notice Party and the affected Retained Professional, the affected Retained Professional may either:  (i) file a response to the Objection with the Court, together with a request for payment of the difference, if any, between the Maximum Payment and the Authorized Payment made to the affected Retained Professional (the "Incremental Amount") and schedule such matter for hearing on at least 14 days' notice; or (ii) forego payment of the Incremental Amount until the next interim or final fee application hearing, at which time the Court will consider and dispose of the Objection if requested  by the affected Retained Professional.  Failure by a Notice Party to object to a Monthly Fee Statement shall not constitute a waiver of any kind nor prejudice that Notice Party's right to object to any Interim Fee Application (as defined below) subsequently filed by a Retained Professional.

h.   Following the Objection Deadline, each Retained Professional that has not already submitted an electronic bill to the Debtor shall email to account@freespeechsytems.com an invoice reflecting amounts then payable pursuant to paragraph 2(f) above to the Debtor's e-billing system in .PDF format (or in such other format reasonably requested by the Debtor).

i.   Each Retained Professional may submit its first Monthly Fee Statement on or before September 15, 2022 and such Monthly Fee Statement shall be for the period from July 29, 2022 through and including August 31, 2022.

j.   Commencing with the four-month period ending November 29, 2022, and at four-month intervals thereafter (each, an "Interim Fee Period"), each of the Retained Professionals will file with the Court and serve on the Notice Parties an application pursuant to sections 330 and 331 of the Bankruptcy Code (an "Interim Fee Application") for interim Court approval and allowance of the compensation and reimbursement of expenses sought by the Retained Professional in its Monthly Fee Statements for the applicable Interim Fee Period, including: (i) any revisions to the fee detail previously submitted with a Monthly Fee Statement; (ii) any consensual resolution of an Objection to one or more Monthly Fee Statements; and (iii) any

4

difference between any amounts owed to the Retained Professional and the Authorized Payments made with respect to the Interim Fee Period. Retained Professionals also will file a notice of opportunity for hearing in accordance with Local Bankruptcy Rule 9013-1(d), which shall be served on the Notice Parties and all parties that have filed a notice of appearance with the Clerk of this Court and requested such notice.  To the extent practicable, all Interim Fee Applications will be noticed together to be heard on the same hearing date and with the same objection deadline.

k.   Interim Fee Applications must be filed on or before the 40th day after the end of the Interim Fee Period for which the application seeks allowance of fees and reimbursement of expenses. An Interim Fee Application must include a basic summary of the Monthly Fee Statements that are the subject of the request and any other information requested by the Court or required by the Bankruptcy Rules and the Local Bankruptcy Rules.  A Retained Professional filing an Interim Fee Application shall comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and applicable law.

l.   The first Interim Fee Application must be filed on or before December 10, 2022 for the Interim Fee Period from July 29, 2022 through November 29, 2022.  Any objections to an Interim Fee Application (an "Additional Objection") shall be filed with the Court and served upon the affected Retained Professional and the Notice Parties so as to be received on or before the 14th day (or the next business day if such day is not a business day) following the filing and service of the Interim Fee Application, which service may be via e-mail, hand delivery, overnight courier or first class mail.  If no Objections are pending and no Additional Objections are timely filed, the Court may grant an Interim Fee Application without a hearing. Upon allowance by the Court of a Retained Professional's Interim Fee Application, the Debtor shall be authorized to promptly pay such Retained Professional all requested fees and expenses not previously paid (including any Incremental Amount).

m.   Upon allowance by the Court of a Retained Professional's Interim Fee Application, with or without a hearing, Retained Professionals shall email to account@freespeechsytems.com an invoice reflecting all allowed, requested fees and expenses not previously paid (including any Incremental Amount) to the Debtor's e-billing system in .PDF format (or in such other format reasonably requested by the Debtor).  For the avoidance of doubt, Retained Professional shall not be required to include in such invoices fee and expense detail or other information already submitted to the Notice Parties in connection with Monthly Fee Statements or otherwise.

n.   The pendency of an Objection or Additional Objection or the entry of a Court order holding that the prior payment of compensation or the reimbursement of expenses

004783

was improper as to a particular Monthly Fee Statement will not disqualify a Retained Professional from the future payment of compensation or reimbursement of expenses as set forth above, unless the Court orders otherwise.

o.   There will be no penalties for failing to file a Monthly Fee Statement or an Interim Fee Application in a timely manner; provided, however, that if any Interim Fee Application covers  more than a four-month period, the Bankruptcy Administrator shall have an additional 14 days beyond the period set forth in  paragraph 2(l) above to file an Additional Objection.

p.   Neither (i) the payment of or the failure to pay, in whole or in part, interim compensation and reimbursement of expenses under the Compensation Procedures nor (ii) the filing of, or failure to file, an Objection to any Monthly Fee Statement or an Additional Objection to any Interim Fee Application will bind any party in interest or the Court with respect to the final applications for allowance of compensation and reimbursement of expenses of Retained Professionals.

q.   Any Notice Party may request that a Retained Professional deliver a Monthly Fee Statement or an Interim Fee Application in an electronically searchable format mutually acceptable to the parties.

3.      Notice given in accordance with the Compensation Procedures is deemed sufficient and adequate and in full compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

4.      The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

5.      This Court shall retain exclusive jurisdiction over all matters arising from or related to the implementation, enforcement or interpretation of this Order.

Houston, Texas
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

6

004784

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 30, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | Case No. 22-60034 |
| FREE SPEECH SYSTEMS, LLC, | Chapter 11 |
| DEBTOR. | (Subchapter V Debtor) |

**ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION
AND REIMBURSEMENT OF EXPENSES OF RETAINED PROFESSIONALS**

This matter coming before the Court on the *Debtor's Motion for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* (the "Motion"),[1] filed by Free Speech Systems, LLC (the "Debtor"); the Court having reviewed the Motion and having considered the statements of counsel with respect to the Motion at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. § 1409, (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (d) notice of the Motion and the Hearing was sufficient under the circumstances and (e) the Compensation Procedures set forth below are reasonable and appropriate for this Chapter 11 Case; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

2.      Except as otherwise provided in an order of the Court authorizing the retention of a particular professional, the professionals specifically retained pursuant to an order of the Court in the Chapter 11 Case and the subchapter v trustee and her professionals (collectively, the "Retained Professionals") may seek interim payment of compensation and reimbursement of expenses in accordance with the following procedures (collectively, the "Compensation Procedures"):

a.   Each Retained Professional seeking monthly compensation must submit a monthly fee statement (a "Monthly Fee Statement"), which submission may be via hand delivery, overnight courier, first class mail or e-mail, so as to be received no later than 30 days after the end of the month for which the fees are sought, to the following parties (collectively, the "Notice Parties"):

   i.   The Debtor, the Chief Restructuring Officer of FSS, at the address indicated in this Court's docket;
   ii.  The Debtor' Counsel, Law Offices of Ray Battaglia, PLLC, 766 Granburg Circle, San Antonio, Texas 78218 (Attn: Ray Battaglia, rbattaglialaw@outlook.com);
   iii. Ha Minh Nguyen, Office of the United States Trustee, 515 Rusk St. Ste 3516, Houston, TX 77002 (ha.nguyen@usdoj.gov);
   iv.  Melissa Anne Haselden, Haselden Farrow PLLC, Pennzoil Place, 700 Milam, Suite 1300, Houston, TX 77002 (mhaselden@haseldenfarrow.com); and
   v.   Any other parties that the Court may designate.

b.   Unless otherwise provided in the order authorizing the Retained Professional's retention, each Retained Professional's Monthly Fee Statement, in accordance with Local Bankruptcy Rule 2016-1, shall include (i) a monthly invoice with fee and expense detail that describes the fees and expenses incurred by such Retained Professional and (ii) any additional information required by the Local Bankruptcy Rules, the Bankruptcy Rules, the Court, or applicable law.

c.   Time spent traveling without actively working on the Chapter 11 Case shall be billed at 50% of the professional's normal hourly rate.

d.   Any Retained Professional who fails to submit a Monthly Fee Statement for a particular month or months may subsequently submit a consolidated Monthly Fee Statement for multiple months provided that separate fee and expense information for each applicable month is provided in the consolidated statement.

e.   All Monthly Fee Statements shall comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and applicable law.

f.   Each Notice Party will have 14 days after service of a Monthly Fee Statement to object to such statement (the "Objection Deadline"). Upon the expiration of the

Objection Deadline, the Debtor will be authorized to pay each Retained Professional an amount (the "Authorized Payment") equal to the lesser of (i) 80% of the fees and 100% of the expenses requested in the Monthly Fee Statement (the "Maximum Payment") and (ii) the aggregate amount of fees and expenses not subject to an unresolved objection pursuant to paragraph 2(g) below.

g.  If any Notice Party objects to a Retained Professional's Monthly Fee Statement, it must serve on the affected Retained Professional and each of the other Notice Parties a written objection (the "Objection") so that it is received on or before the Objection Deadline.  Thereafter, the objecting party and the affected Retained Professional may attempt to resolve the Objection on a consensual basis.  If the parties are unable to reach a resolution of the Objection within 14 days after service of the Objection, or such later date as may be agreed upon by the objecting Notice Party and the affected Retained Professional, the affected Retained Professional may either:  (i) file a response to the Objection with the Court, together with a request for payment of the difference, if any, between the Maximum Payment and the Authorized Payment made to the affected Retained Professional (the "Incremental Amount") and schedule such matter for hearing on at least 14 days' notice; or (ii) forego payment of the Incremental Amount until the next interim or final fee application hearing, at which time the Court will consider and dispose of the Objection if requested  by the affected Retained Professional.  Failure by a Notice Party to object to a Monthly Fee Statement shall not constitute a waiver of any kind nor prejudice that Notice Party's right to object to any Interim Fee Application (as defined below) subsequently filed by a Retained Professional.

h.  Following the Objection Deadline, each Retained Professional that has not already submitted an electronic bill to the Debtor shall email to account@freespeechsytems.com an invoice reflecting amounts then payable pursuant to paragraph 2(f) above to the Debtor's e-billing system in .PDF format (or in such other format reasonably requested by the Debtor).

i.  Each Retained Professional may submit its first Monthly Fee Statement on or before September 15, 2022 and such Monthly Fee Statement shall be for the period from July 29, 2022 through and including August 31, 2022.

j.  Commencing with the four-month period ending November 29, 2022, and at four-month intervals thereafter (each, an "Interim Fee Period"), each of the Retained Professionals will file with the Court and serve on the Notice Parties an application pursuant to sections 330 and 331 of the Bankruptcy Code (an "Interim Fee Application") for interim Court approval and allowance of the compensation and reimbursement of expenses sought by the Retained Professional in its Monthly Fee Statements for the applicable Interim Fee Period, including: (i) any revisions to the fee detail previously submitted with a Monthly Fee Statement; (ii) any consensual resolution of an Objection to one or more Monthly Fee Statements; and (iii) any

4

difference between any amounts owed to the Retained Professional and the Authorized Payments made with respect to the Interim Fee Period. Retained Professionals also will file a notice of opportunity for hearing in accordance with Local Bankruptcy Rule 9013-1(d), which shall be served on the Notice Parties and all parties that have filed a notice of appearance with the Clerk of this Court and requested such notice. To the extent practicable, all Interim Fee Applications will be noticed together to be heard on the same hearing date and with the same objection deadline.

k.  Interim Fee Applications must be filed on or before the 40th day after the end of the Interim Fee Period for which the application seeks allowance of fees and reimbursement of expenses. An Interim Fee Application must include a basic summary of the Monthly Fee Statements that are the subject of the request and any other information requested by the Court or required by the Bankruptcy Rules and the Local Bankruptcy Rules. A Retained Professional filing an Interim Fee Application shall comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and applicable law.

l.  The first Interim Fee Application must be filed on or before December 10, 2022 for the Interim Fee Period from July 29, 2022 through November 29, 2022. Any objections to an Interim Fee Application (an "Additional Objection") shall be filed with the Court and served upon the affected Retained Professional and the Notice Parties so as to be received on or before the 14th day (or the next business day if such day is not a business day) following the filing and service of the Interim Fee Application, which service may be via e-mail, hand delivery, overnight courier or first class mail. If no Objections are pending and no Additional Objections are timely filed, the Court may grant an Interim Fee Application without a hearing. Upon allowance by the Court of a Retained Professional's Interim Fee Application, the Debtor shall be authorized to promptly pay such Retained Professional all requested fees and expenses not previously paid (including any Incremental Amount).

m. Upon allowance by the Court of a Retained Professional's Interim Fee Application, with or without a hearing, Retained Professionals shall email to account@freespeechsytems.com an invoice reflecting all allowed, requested fees and expenses not previously paid (including any Incremental Amount) to the Debtor's e-billing system in .PDF format (or in such other format reasonably requested by the Debtor). For the avoidance of doubt, Retained Professional shall not be required to include in such invoices fee and expense detail or other information already submitted to the Notice Parties in connection with Monthly Fee Statements or otherwise.

n.  The pendency of an Objection or Additional Objection or the entry of a Court order holding that the prior payment of compensation or the reimbursement of expenses

was improper as to a particular Monthly Fee Statement will not disqualify a Retained Professional from the future payment of compensation or reimbursement of expenses as set forth above, unless the Court orders otherwise.

o.   There will be no penalties for failing to file a Monthly Fee Statement or an Interim Fee Application in a timely manner; provided, however, that if any Interim Fee Application covers  more than a four-month period, the Bankruptcy Administrator shall have an additional 14 days beyond the period set forth in  paragraph 2(l) above to file an Additional Objection.

p.   Neither (i) the payment of or the failure to pay, in whole or in part, interim compensation and reimbursement of expenses under the Compensation Procedures nor (ii) the filing of, or failure to file, an Objection to any Monthly Fee Statement or an Additional Objection to any Interim Fee Application will bind any party in interest or the Court with respect to the final applications for allowance of compensation and reimbursement of expenses of Retained Professionals.

q.   Any Notice Party may request that a Retained Professional deliver a Monthly Fee Statement or an Interim Fee Application in an electronically searchable format mutually acceptable to the parties.

3.   Notice given in accordance with the Compensation Procedures is deemed sufficient and adequate and in full compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

4.   The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

5.   This Court shall retain exclusive jurisdiction over all matters arising from or related to the implementation, enforcement or interpretation of this Order.

Houston. Texas

Signed:  September 30, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

6

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**FOR COURT USE ONLY**

**DUE DATE:**

**TRANSCRIPT ORDER**

*Please Read Instructions:*

| 1. NAME U.S. Trustee's Office - Linda Motton | 2. PHONE NUMBER (713) 718-4650 | 3. DATE 10/3/2022 |
|---|---|---|

| 4. DELIVERY ADDRESS OR EMAIL linda.j.motton@usdoj.gov and ha.nguyen@usdoj.gov | 5. CITY Houston | 6. STATE TX | 7. ZIP CODE 77002 |
|---|---|---|---|

| 8. CASE NUMBER 22-60043 | 9. JUDGE Christopher Lopez | DATES OF PROCEEDINGS |||
|---|---|---|---|---|
| | | 10. FROM 9/20/2022 | 11. TO 9/20/2022 ||

| 12. CASE NAME Free Speech Systems, LLC | LOCATION OF PROCEEDINGS ||
|---|---|---|
| | 13. CITY Houston | 14. STATE TX |

**15. ORDER FOR**

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☒ OPENING STATEMENT (Plaintiff) | 9/20/2022 | | |
| ☒ OPENING STATEMENT (Defendant) | 9/20/2022 | | |
| ☒ CLOSING ARGUMENT (Plaintiff) | 9/20/2022 | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☒ CLOSING ARGUMENT (Defendant) | 9/20/2022 | | |
| ☒ OPINION OF COURT | 9/20/2022 | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | Entire Hearing at 1:00 p.m. | September 20, 2022 |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☒ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE Linda Motton | PROCESSED BY |
|---|---|

| 19. DATE 10/3/2022 | PHONE NUMBER |
|---|---|

| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |
|---|---|

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |

| DEPOSIT PAID | | DEPOSIT PAID | |
|---|---|---|---|
| TRANSCRIPT ORDERED | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | TOTAL DUE | 0.00 |

004790

DISTRIBUTION:    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

AO 435
(Rev. 04/18)

**INSTRUCTIONS**

## GENERAL

**Use.**  Use this form to order the transcription of proceedings.  Complete a separate order form for each case number for which transcripts are ordered.

**Completion**.  Complete Items 1-19.  Do *not* complete shaded areas which are reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Submitting to the Court.**  Submit the form in the format required by the court.

**Deposit Fee.**  The court will notify you of the amount of the required deposit fee which may be mailed or delivered to the court.  Upon receipt of the deposit, the court will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee or for transcripts ordered by the federal government from the date of receipt of the signed order form.

**Completion of Order.**  The court will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the court will notify you of the balance due which must be paid prior to receiving the completed order.

## SPECIFIC

Items 1-19.  These items should always be completed.
Item 8.  Only one case number may be listed per order.
Item 15.  Place an "X" in each box that applies.
Item 16.  Place an "X" in the box for each portion requested.  List specific date(s) of the proceedings for which transcript is requested.  Be sure that the description is clearly written to facilitate processing.  Orders may be placed for as few pages of transcript as are needed.
Item 17.  *Categories.*  There are six (6) categories of transcripts which may be ordered.  These are:
    *Ordinary*.  A transcript to be delivered within thirty (30) calendar days after receipt of an order.  (Order is considered received upon receipt of the deposit.)
    *14-Day*.  A transcript to be delivered within fourteen (14) calendar days after receipt of an order.
    *Expedited*.  A transcript to be delivered within seven (7) calendar days after receipt of an order.
    *3-Day*.  A transcript to be delivered within three (3) calendar days after receipt of an order.
    *Daily*.  A transcript to be delivered following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.
    *Hourly*.  A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours.
    *Realtime*.  A draft unedited transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

**NOTE**: Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 calendar days, payment would be at the ordinary delivery rate.

    *Ordering*.  Place an "X" in each box that applies.  Indicate the number of additional copies ordered.
    *Original*.  Original typing of the transcript.  An original must be ordered and prepared prior to the availability of copies.  The original fee is charged only once.  The fee for the original includes the copy for the records of the court.
    *First Copy*.  First copy of the transcript after the original has been prepared.  All parties ordering copies must pay this rate for the first copy ordered.
    *Additional Copies*.  All other copies of the transcript ordered by the same party.
Item 18.  Sign in this space to certify that you will pay all charges.  (This includes the deposit plus any additional charges.)
Item 19.  Enter the date of signing.

Shaded Area.  Reserved for the court's use.

1                                    INDEX

2     PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3     KYUNG LEE

4     MARC SCHWARTZ

5

6     GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

7

8

9

10

11    PLAINTIFFS' EXHIBITS                                  RECEIVED

12

13

14

15    GOVERNMENT'S EXHIBITS                                 RECEIVED

16

17

18

19

20

21

22

23

24

25

1        HOUSTON, TEXAS; TUESDAY, SEPTEMBER 20, 2022; 1:03 PM

2                        (Call to Order)

3              THE COURT:  Okay.  Good afternoon, everyone.  This

4       is Judge Lopez.  Today is September 20th.  We are here in

5       Free Speech Systems here at the Subchapter V status

6       conference and also to take up a few retention applications,

7       one for Mark Schwartz and Schwartz & Associates as financial

8       advisors, Shannon & Lee as counsel to the Debtor, and also

9       Mr. Battaglia as counsel to you and the Debtors.

10             So let me go ahead and take appearances, first in

11      the courtroom and then we'll see where this goes.

12             Good morning.  I should say good afternoon.

13             MR. SHANNON:  Good afternoon, Your Honor.  R.J. of

14      Shannon & Lee LLP, on behalf of the Debtor.  Also in the

15      courtroom is Mr. Lee here and Mr. Battaglia is here also on

16      behalf of the Debtor.

17             One correction, Your Honor, at least there was no

18      objection to Mr. Battaglia.

19             THE COURT:  I still have an independent duty to

20      take it up.  Just because nobody objects doesn't mean we

21      don't take it up.

22             MR. SHANNON:  Yes, Your Honor.  I will say that

23      there are -- you know, the witness and exhibit list did not

24      contemplate this, but Mr. Battaglia is here.

25             THE COURT:  I'm not saying we're going to spend a

1    lot of time on it, but we have to take it up.

2              MR. SHANNON:  Got you.

3              THE COURT:  Okay.

4              MR. NGUYEN:  Good afternoon.  Ha Hguyen for the

5    U.S. Trustee.  Also from my office is Jayson Ruff and also

6    Christopher Roth Travis.

7              THE COURT:  Okay, good afternoon.

8              MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

9    Martin for Texas plaintiffs.

10             THE COURT:  Okay, good afternoon.

11             MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan

12   Chapple for the Connecticut plaintiffs.

13             THE COURT:  Good afternoon, sir.

14             MS. HASELDEN:  Good afternoon, Your Honor.

15   Elizabeth Haselden, Subchapter 5 Trustee, and I have with me

16   Elizabeth Freeman.

17             THE COURT:  Okay, good afternoon.  Anyone else in

18   the courtroom wish to make an appearance?  Okay.  I've muted

19   the line.  If you wish to make an appearance, you'll need to

20   hit 5 star.  There are a number of people on the line, and I

21   think it's just easier to go that route.  Anyone else wish

22   to make an appearance at this time, just hit 5 star.

23             Okay, going with a 512375.

24             MR. LEMMON:  Your Honor, Steve Lemmon for PQPR.

25             THE COURT:  Good afternoon, Mr. Lemmon.  Mr.

Page 6

1    Lemmon, I'm going to leave your unmuted, okay?  Just please

2    keep your phone on mute.

3              MR. LEMMON:  Yes, sir.

4              THE COURT:  Okay, thank you.  Anyone else?  Seems

5    to be it on the line.  Why don't we, I guess, the status

6    conference that is required under the Bankruptcy Code.  I'd

7    like to start with that to satisfy the statutory duty of the

8    Debtor and make sure that we comply with the Bankruptcy Code

9    and get a status update as to where these cases are, and

10   then let's take up the retentions.

11             But before we do that, that's the order.  If

12   there's anything anyone wishes to tell me at a high level

13   picture for purposes of today and where things stand, now's

14   the time to tell me or we can take it up in due course.

15             Okay.  If we can start with the status conference,

16   that'd be great.  Thank you.

17             Good afternoon, Mr. Battaglia.  Good to see you.

18             MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray

19   Battaglia for the Debtors.  The Debtor filed its status

20   report at the time dictated by the Court's prior order.

21   It's a relatively brief status report.  Obviously, things

22   have happened in front of this Court and the parties are

23   well aware of.

24             THE COURT:  Can you just get that mic just a

25   little bit closer to you or just curve it a little bit, make

1    sure the folks on the line can hear you.

2              MR. BATTAGLIA:  Is that better, Judge.

3              THE COURT:  Oh, much better.  Thank you.

4              MR. BATTAGLIA:  Thank you.  Many things have

5    happened in the Court that primarily relate to operating

6    issues, and I'll not belabor the record with a recitation of

7    those.  If the Court wants to ask regarding developments in

8    those, I'll be happy to discuss them.

9              Obviously, we have hearings set on a number of

10   matters on October 12th, and I don't think there's a need to

11   belabor where we are on those.  There is discovery, the

12   deposition of Mr. Schwartz that will happen Friday.  Mr.

13   Rowe's deposition is set for October 4th.

14             THE COURT:  Who's Mr. Rowe?

15             MR. BATTAGLIA:  Mr. Rowe was a consultant that was

16   retained to assist in evaluating the numbers that formed the

17   PQPR debt.

18             THE COURT:  Okay.

19             MR. BATTAGLIA:  So he was instrumental in that

20   effort and, therefore, he's someone with knowledge and

21   information that is requested.  And ultimately, currently

22   he's an employee or he's employed by, at least as a

23   consultant on a contract basis, by PQPR.

24             THE COURT:  Okay.

25             MR. BATTAGLIA:  With respect to really the

1  fundamental push of this case, the plan of reorganization,

2  we have a draft of a plan of reorganization that we're fine

3  tuning a little bit.  I've had conceptual conversations with

4  Mr. Lemmon on behalf of PQPR, Mr. Jordan on behalf of Alex

5  Jones, the Sub V Trustee and her counsel, we've had a more

6  thorough conversation.  And this morning, Mr. Martin and I

7  had a conversation.  I haven't had a time to circle back to

8  the Texas plaintiffs, but, hopefully, those discussions have

9  been shared.

10       Our goal, as opposed to filing it, just filing it

11  when we think we're ready, is to share it with the other

12  parties.  I have no allusions that we'll come to a

13  consensual plan, but I'm certainly willing to try.  The

14  conversations with Mr. Martin were fruitful.  I've had

15  conversations in the past that I've sort of equated it to

16  Lucy was holding the football today.  Whether that football

17  will be there when I kick, I don't know.  But in the past,

18  Lucy didn't even have the football, so that's progress in my

19  mind, and I hope we can do something.

20       Because at the end of the day, my charge and the

21  Debtors' charge in this case as I see it is to maximize the

22  asset value and pay creditors who are owed money with a lot

23  of claims, and that's all I'm here to do.  And if that's the

24  goal of the plaintiffs is to maximize the return on account

25  of their claims, then we have common ground to discuss.

1          And conceptually, of course, the timing of the

2     allowance of those claims of plaintiffs is going to be,

3     without settlement, will be a longer road because there will

4     be appeals and that process will take whatever time it

5     takes.  But the Debtor does generate, we anticipate will

6     continue to generate, net disposable income that can be

7     dedicated to a plan.  Obviously, proceeding under a Sub V

8     changes the confirmation dynamic tremendously for this Court

9     and the burden's on the Debtor to prove are certainly

10    smaller.

11         Mr. Martin and I discussed today possibilities.

12    I'm not saying anybody's agreed to any of this at this

13    point, but perhaps once the plan is shared, that it might be

14    fruitful to seek a mediation in front of perhaps Judge

15    Isgur.  I know he's got a docket now that's been a little

16    more burdened lately, but that's a possibility.

17         And whether it would be more fruitful to proceed

18    to negotiate the plan, as opposed to October 12th hearings.

19    Again, nobody's agreed, nobody's suggesting that's tenable

20    at all.  But ultimately, in my mind as Debtors' counsel, if

21    the plaintiffs were successful in removing the Debtor, the

22    Debtor is still the only party who can propose a plan of

23    reorganization.  And the plan as proposed and confirmed, the

24    Debtor's back in, what are we doing here, so I don't know.

25    We'll see where that goes.  I know Mr. Martin has to circle

1    back to a number of people to see whether anything that we

2    discuss this morning germinates and it may or may not, but

3    our goal is to file a plan of reorganization in the next

4    week to two weeks, and that's where we are, Judge.

5              THE COURT:  Okay.

6              MR. BATTAGLIA:  Happy to answer any questions the

7    Court may have.

8              THE COURT:  I had a couple of questions.  Mr.

9    Schwartz wasn't here last time.  They were kind of financial

10   questions.  And here as we kind of proceeded along, I had a

11   couple of real technical questions, and I can lay them out

12   and anyone can answer them.

13             One was, and I still was looking for a little bit

14   of clarity.  In connection with the last proposed cash

15   collateral order, there was an $80,000 or so request for --

16   I think it was labeled, like, Alex Jones trial travel or

17   something.

18             MR. BATTAGLIA:  Yes, sir.

19             THE COURT:  What did that relate to?

20             MR. BATTAGLIA:  Your Honor, I can answer that.

21   The lift stay order that we presented to you to allow the

22   Connecticut litigation to proceed, part of the agreement

23   that was encompassed in that order was that the Connecticut

24   plaintiffs would not object to the travel expenses for Mr.

25   Jones or for employees.

1           THE COURT:  I understand they didn't object.  I

2    just want to know what it related to.

3           MR. BATTAGLIA:  I understand.

4           THE COURT:  No one told me.

5           MR. BATTAGLIA:  So the budget item there, $34,000

6    of the $80,000 related to just security expenses.  Mr. Jones

7    does not travel freely without security in this world that

8    we're in today and particularly, I guess, being in the

9    backyard of the Sandy Hook disaster.

10          THE COURT:  Why is the estate paying for that?

11          MR. BATTAGLIA:  Well, he is an estate witness as

12   well.  His appearance is just as vital for us as it is for

13   Alex Jones.

14          THE COURT:  Was he paying for any of his travel?

15          MR. BATTAGLIA:  He was not, and you suggested that

16   we needed to come back to you with -- and my conversation

17   with Mr. Jones's counsel was he proceeds, and we'll go back

18   to the Court and ask what the Court thinks is appropriate to

19   pay.

20          THE COURT:  And I'm being honest, I don't know

21   what to do with every time there's a motion filed that we

22   start off with 100 percent we pay for the owner's personal

23   expenses.  And then, like, if the Court has to find it,

24   identify it, notify parties that he's noticed it, and then

25   people come back with their requests.

1            I don't -- who's negotiating this on behalf of the

2   estate?  Like, why am I finding issues that are 100 percent

3   in a case where there's two defendants.  I just want to

4   understand what's happening.

5            MR. BATTAGLIA:  Your Honor, the last item in the

6   budget that we were waiting on to be able to present to

7   parties was the cost of the travel related to the trial.

8            THE COURT:  The 34,000 was for?

9            MR. BATTAGLIA:  Was for security.

10           THE COURT:  And what was the remaining, I don't

11  know, 36,000 or 46,000?

12           MR. BATTAGLIA:  So there's obviously airline fees,

13  which we've priced based at a premium economy rate, not a

14  first class rate, for the security personnel and for Mr.

15  Jones.  There was lodging, there were food and other typical

16  expenses associated with travel, vehicles.  And, again, this

17  is for, you know, not just Mr. Jones, but the security

18  personnel who are attending.

19           THE COURT:  Okay.

20           MR. BATTAGLIA:  So we heard you.  We'll accumulate

21  receipts and come back to the Court with an appropriate...

22           THE COURT:  I thought folks heard me when I said I

23  had issues with Mr. Andino and other counsel when that was

24  100 to zero.  I just want to know exactly what's being on

25  the table.  It feels like I'm finding these things, because

1    I asked everyone at the last hearing is there anything I

2    should know about this cash collateral budget, and everyone

3    stayed quiet.

4              MR. BATTAGLIA:  It came together, again, at the

5    last minute.  I submitted the budget, along with the draft

6    revised order on the Sunday prior to that hearing, which was

7    on a Tuesday as I recall.

8              THE COURT:  Okay.

9              MR. BATTAGLIA:  You know, it --

10             THE COURT:  I got it.

11             MR. BATTAGLIA:  -- came together rather quickly,

12   Judge.

13             THE COURT:  I appreciate that.  And if that's the

14   answer, that's the answer.

15             I had another question that just related to the

16   schedules.  I saw in the schedules -- and normally, this is

17   what happens at a status conference.  The Debtors filed

18   schedules and the Court asks questions about things like

19   that.

20             There was a payment of about a million dollars to

21   American Express, and if I remember correctly, American

22   Express related to personal expenses.  I'll show it on my

23   screen.  I just want to make sure and maybe it related to

24   something different.  I just wanted to understand.  Let me

25   share my screen here.  Excuse me in the SOFAs, not in the

1   schedules, but in the SOFAs.

2        There were three payments totaling a million

3   dollars, like, leading up to this case to American Express,

4   but I'll let Mr. Schwartz in connection with the first day

5   hearings and cash collateral.  That related to personal

6   expenses.  Are those personal expenses that million dollars?

7        MR. BATTAGLIA:  No, sir.  I'm not going to suggest

8   to the Court that there are no personal expenses in and

9   amongst the million dollars.  But the Debtor had, under

10   prior operations, had a bad habit of using the AmEx card to

11   pay for everything.

12        THE COURT:  Okay, business expense.  Okay, that

13   makes sense to me.

14        MR. BATTAGLIA:  And consequently, a lot of vendors

15   didn't even show up on the accounts payable list because

16   they were paid through AmEx.

17        THE COURT:  Okay.

18        MR. BATTAGLIA:  I would venture to guess a

19   significant, substantial portion of that million related to

20   technical purchases or vendors or suppliers related to the

21   business itself.

22        THE COURT:  Okay.

23        MR. BATTAGLIA:  But I won't tell the Court

24   standing here today that all of it is.

25        MR. BATTAGLIA:  And the $3.1 million to PQPR, who

004803

1   authorized that; was that Mr. Schwartz?

2            MR. BATTAGLIA:  That would have been payments to

3   insiders over a one-year period.  It was under an agreement

4   that --

5            THE COURT:  This looks like it was done over the

6   last 30 days before the case filed.  It's happened before,

7   don't get me wrong.  I'm just trying to understand who

8   authorized these payments.

9            MR. BATTAGLIA:  I'm not aware of the 3 million.

10  There was the prior deal that existed before Mr. Schwartz

11  came into place that paid $11,000 per business day in

12  service of the debt.  But it's not entirely impossible that

13  this also relates to inventory purchases.  PQPR was the

14  primary source of inventory.

15           THE COURT:  That's why I seen that it was in

16  combination of the --

17           MR. BATTAGLIA:  So it maybe a combination of the

18  two and it does say both.

19           THE COURT:  Okay.

20           MR. BATTAGLIA:  No payments in advances.

21           THE COURT:  Okay.  No one is seeing my screen,

22  right?  Somebody needs to talk to me.  No one's been seeing

23  anything I've been looking at.  All righty, that's helpful.

24  Let me share my screen right this time.  That's helpful, now

25  we're looking at stuff.  Miss Santos, you all stop me if you

1    think I'm doing something wrong.

2              That was the $3.1 million.  A million-dollar

3    payment was here on AmEx, $150,000.  Was Mr. Jones an

4    employee, Mr. David Jones an employee?

5              MR. BATTAGLIA:  At certain times, he had been, but

6    he is obviously the Debtors' principal's father.  He's Alex

7    Jones's father.

8              THE COURT:  Okay.  And I know this is October of

9    2021, so that was a while back.  I just want to make sure I

10   understand.

11             MR. SCHWARTZ:  He was not an employee --

12             THE COURT:  At the time?

13             MR. SCHWARTZ:  -- at that time.  That was an

14   advance.

15             THE COURT:  Okay.  Okay, payment on advance.  I

16   couldn't tell if it related to the PQPR.

17             MR. SCHWARTZ:  He just got $150,000.

18             THE COURT:  Okay.  Those were my questions and

19   some of that stuff we covered last time, so I think I have

20   what I need.  Does anyone have any statements or any

21   questions that anybody wants to talk about in connection

22   with the status conference?

23             Oh, I forgot to ask, is assuming the Connecticut

24   litigation has started --

25             MR. BATTAGLIA:  It has, Your Honor.

```
 1              THE COURT:  -- or is ongoing.  Is there a time --

 2              MR. BATTAGLIA:  I think Mr. Jones is on the stand.

 3              THE COURT:  Does anyone know, like, when it's

 4     supposed to end?

 5              MR. LEE:  Your Honor, this is Kyung Lee for the

 6     record.

 7              THE COURT:  Yes, sir.

 8              MR. CHAPPLE:  Your Honor, Ryan Chapple for the --

 9              THE COURT:  I don't want any commentary or spin on

10     it.  I just want to know, like, if there's any timetable.

11              MR. CHAPPLE:  Absolutely.  I believe

12     conservatively, maybe a week and a half or two more weeks is

13     my general understanding, but that answer changes daily.

14              THE COURT:  No, no, no, I understand.

15              MR. CHAPPLE:  So that's the last I  heard.

16              THE COURT:  Okay, but it has started and it's

17     proceeding.  Is it still in the -- it sounds like it's

18     started started, not just jury selection.

19              MR. LEE:  That's correct, Your Honor.

20              MR. CHAPPLE:  There are witnesses.  They're taking

21     witnesses, live witnesses.

22              THE COURT:  Okay.

23              MR. CHAPPLE:  And I heard previously longer time

24     estimates, so I mean...

25              THE COURT:  Okay, yeah, and I got it.  I got it,
```

1   okay.  Does anyone have any statements they wish to make at

2   this time in connection with the status report?  Okay.  Then

3   the easiest thing to do maybe -- I know Mr. Battaglia's

4   retention is up as well.  I saw no objections.  I looked it,

5   I reviewed, and I'm comfortable with the representations

6   there.  Anyone object to the retention of Mr. Ray Battaglia?

7           May I ask the U.S. Trustee on this, so you're okay

8   with the proposed form of order that was filed?

9           MR. NGUYEN:  Yes, Your Honor.  I have no problem

10  with Mr. Battaglia's order.

11          THE COURT:  Okay.  Mr. Battaglia, I'm going to

12  note that for the record, there was an application to retain

13  you as counsel for FSS.  I'm going to find that there's been

14  proper notice of today's hearing on it and service of the

15  application.  It's also been proper.  The Court has reviewed

16  the standards under 327 and finds that they've been

17  satisfied.  I also note that there's been no objection and

18  the U.S. Trustee has also approved the proposed form of

19  order.

20          Miss Haselden, I will ask you as well, and you can

21  give me a thumbs up if you're there.  Are you okay with the

22  proposed form of order?  Okay, okay.

23          Then, Mr. Battaglia, I will approve that retention

24  application and I'll get it signed and on the docket this

25  afternoon.

1          MR. BATTAGLIA:  Thank you, Your Honor.  Your

2     Honor, I would note one thing is that I was retained as co-

3     counsel, and obviously what happens today will be a --

4          THE COURT:  No, no, no, no, I understand that, and

5     I didn't mean to imply anything.  I just -- you were

6     employed as co-counsel and I guess what I meant to say is

7     I'm approving your retention application.

8          MR. BATTAGLIA:  And I appreciate it, Your Honor.

9          THE COURT:  Maybe that's the easiest way of saying

10    it.  I got it.

11         Okay, let's see.  FSS filed the remaining

12    applications.  I'll let you take lead.

13         MR. SHANNON:  Thank you, Your Honor.  As the Court

14    has noted, we're here on two applications.  They are

15    applications by the Debtor, Free Speech Systems LLC, to

16    employ Marc Schwartz as its CRO, and Schwartz & Associates

17    LLC to help him with that; that is Docket No. 83.  We're

18    also here on an application by the Debtor to employ Shannon

19    & Lee LLP as bankruptcy co-counsel; that's Docket No. 85.

20         The U.S. Trustee has objected to both

21    applications; they're at Docket No. 145 and Docket No. 154.

22    The plaintiffs have joined those objections, filed by

23    joinders.

24         And, Your Honor, there's no dispute that Mr.

25    Schwartz and Shannon & Lee LLP meet the requirements for

 1     employment under Section 327(a).  That's not what the

 2     objection is about.  There's no dispute that the CRO,

 3     proposed CRO and Shannon & Lee are disinterested in this

 4     case.  There's no dispute that the retention of these

 5     applicants is in the best interests of the Debtors'

 6     bankruptcy estate.  That's not what the U.S. Trustee is

 7     objecting about.

 8          There's no dispute that administration of these

 9     Chapter 11 cases will be furthered by the retention of the

10     applicants.  There's really no contention on anything about

11     this case -- that's Case No. 22-643 -- will be furthered by

12     denying the application of the Debtor to employ these

13     applicants.

14          The U.S. Trustee's contention is that the

15     applications to employ should be denied because Mr. Schwartz

16     and Mr. Lee did not amend and supplement their disclosures

17     in the InfoW bankruptcy cases, and that's the entire basis

18     for the objection.

19          And I believe that the U.S. Trustee's position is

20     that after Mr. Schwartz and Mr. Lee met with FSS on May

21     24th, that they should have done a supplemental disclosure

22     in the InfoW cases.

23          THE COURT:  What do you think?

24          MR. SHANNON:  Well, Judge --

25          THE COURT:  You were there.  What do you think?

1          MR. SHANNON:  Well, and actually on May 19th, I

2     was not there, but I was at the May 24th meeting.

3          THE COURT:  You were at the May 19th hearing.  You

4     understand, you were involved in the last cases.  What do

5     you think?

6          MR. SHANNON:  Well, Judge, I don't think that's

7     what Bankruptcy Rule 2014 requires.

8          THE COURT:  Okay.

9          MR. SHANNON:  It's not in the text of the rule.

10    The cases that have looked at it and said there is a

11    continuing duty to disclosure, they all say it's because of

12    Section 327(a).  In 327(a), you can only be employed as an

13    estate professional if you're a disinterested party.

14    Section 328 also says you can only be compensated if you're

15    a disinterested professional.

16          At that time, at the time of the May 24th meeting,

17    the InfoW debtors had already decided to dismiss their

18    cases.  They had -- that decision was made, you know, around

19    the May 19th hearing, sometime between then.  By May 23rd,

20    Mr. Lee had put together a motion to dismiss and he had

21    advised Mr. Schwartz that the cases should be dismissed;

22    that was his analysis.  On May 23rd, he had a draft motion

23    to dismiss prepared and they informed the U.S. Trustee of

24    that decision on May 25th.

25          At that point, Your Honor, neither Mr. Schwartz

1   nor Mr. Lee were seeking to be employed by the bankruptcy

2   estate.  They never were employed by the bankruptcy estate,

3   but they also at that point were not seeking to be employed

4   by the bankruptcy estate.

5          And when you look at the cases that talk about

6   this, that is what is important.  It's whether the

7   professional is seeking to be employed or has been employed

8   by an order of the Court.

9          Judge, I'll give you just a timeline of events,

10  just a little bit of a broader one.

11         THE COURT:  Okay.

12         MR. SHANNON:  The InfoW cases were filed on April

13  17th and April 18th.  April 29th, the Debtor files an

14  amended trust agreement and plan and support agreement.  And

15  that agreement was never signed by the parties and the

16  reason why was because that same day, the U.S. Trustee filed

17  a motion to dismiss.

18         And then on May 3rd, the plaintiffs came and said,

19  look, we just to release our claims against these InfoW

20  debtors.  We don't want to be involved in this bankruptcy

21  case; we don't want to deal with it.  And that took a little

22  while to effectuate.  So between May 3rd -- by May 13th, the

23  Connecticut plaintiffs had filed pleadings to dismiss the IW

24  debtors from their actions, again, because they didn't want

25  to be involved in the IW debtors' bankruptcy cases.

1           By May 18th, the Texas plaintiffs and the IW

2      debtors had reached a stipulation resolving their claims;

3      that was filed with the Court.  And then on May 19th at 2:00

4      p.m., the IW debtors or this Court entered that stipulation

5      resolving the claims of the Texas plaintiffs against the IW

6      debtors, not this debtor; there's no argument there.

7           Now that same day earlier, Mr. Lee files his

8      application to employ or filed the IW debtors application to

9      employ Kyung S. Lee PLLC.  Now at that time, there was

10     nothing to disclose.  Later that day, FSS contacted Mr. Lee

11     about a potential meeting in Austin the following Tuesday.

12     It was very clear to everyone that the PSA was dead, that

13     that wasn't going to be the way to go.  And Mr. Lee told

14     this Court that the IW debtors were considering to try to

15     get more funding from somewhere else, to try to go with a

16     plan without that, or to just dismiss the cases as the U.S.

17     Trustee demanded.

18          May 21st -- and this will be all in the evidence -

19     - on May 21st, Mr. Lee sent an email to Marc Schwartz, and I

20     believe May 21st was a Saturday.  In that email, Mr. Lee

21     outlined the reasons why the IW debtors should agree with

22     the U.S. Trustee and dismiss their cases, and in particular,

23     it was because it wasn't worth the expense of litigating

24     with the U.S. Trustee over those cases.  There were only, at

25     the time, I think they believed there were four creditors

1    remaining; turns out there were actually only three.  Mr.

2    Gilmore, one of the creditors that was remaining in the IW

3    cases actually had been paid, or at least I believe had been

4    paid at that time, definitely been paid by now.

5            On May 23rd, as I said, Mr. Lee had drafted a

6    motion to dismiss for the IW debtors and had circulated it

7    to Mr. Schwartz.  May 24th was the meeting in Austin where

8    they talked about the potential representation of FSS.  May

9    25th, Mr. Lee informed the U.S. Trustee of the IW debtors'

10   intent to dismiss their cases; that had been decided

11   previously.

12           As part of those communications, the U.S.

13   Trustee's attorney informed Mr. Lee, don't file a motion to

14   dismiss; just stipulate and agree to our motion to dismiss

15   that's already pending.

16           On May 26th, Mr. Lee attended the 341 meeting for

17   the IW debtors.  At that 341 meeting, Mr. Lee announced that

18   the IW debtors had decided to dismiss their cases.

19           THE COURT:  What date was that?  What date was

20   that?

21           MR. SHANNON:  That was May 26th.

22           THE COURT:  Thank you.

23           MR. SHANNON:  On June 1st, the stipulation of

24   dismissal agreed to between the IW debtors and the U.S.

25   Trustee was filed.  And it wasn't until June 5th that Mr.

```
 1    Schwartz had finalized an application -- or finalized a
 2    draft engagement letter.  They had sent it to Mr. Lee.  Mr.
 3    Lee commented on it, sent it back to him with these
 4    comments.  And that June 5th engagement letter is the
 5    engagement letter that ultimately continues and that
 6    ultimately that FSS seeks to retain Mr. Schwartz under the
 7    debt.
 8             On June 6th, both the engagement letter by Mr. Lee
 9    and Mr. Schwartz were signed, and then on June 10th, the
10    Court entered the order dismissing the IW cases.
11             That's also the date that FSS is actually, you
12    know, paid retainers to Lee and Schwartz.  I believe in the
13    application, Shannon & Lee had said it was on or about June
14    7th.  There is an email saying it was going to be paid on
15    June 7th, and we actually looked at the bank and confirmed
16    that; it wasn't actually until June 10th.
17             THE COURT:  Okay.
18             MR. SHANNON:  And again, Your Honor, I just -- at
19    the May 24th meeting, which is the first time there was a
20    disclosable connection, a connection that meant something,
21    the IW debtors had decided to dismiss their case.
22             But I don't think that's even the whole argument
23    here, Your Honor, because even if Mr. Lee and Mr. Schwartz,
24    you know, should have disclosed that connection to the
25    Court, even though the case had been decided to be
```

1    dismissed, even though they were no longer seeking to be

2    employed, that's not really what we're here for.  What we're

3    here for is whether FSS should be allowed to retain these

4    two parties.

5         Judge, you could -- the U.S. Trustee could go

6    back, could reopen the IW cases and seek sanctions, and

7    that's what the Courts call the proper solution to a, you

8    know, failure to disclose under Rule 2014; they call it

9    sanctions.  And I don't think that those sanctions are

10   appropriate to be imposed on the Debtor FSS, and that's

11   really what the U.S. Trustee is asking you to do.  There are

12   no cases that say that's an appropriate sanction, none, none

13   that I could find.

14        THE COURT:  I'm not sure there's many cases where

15   a debtor's professional started working for another plan

16   support party either, so I don't know if you're going to

17   find facts like that either.  So I understand what you mean,

18   but I read that argument and you got to -- it's not just

19   that easy.  There aren't many cases where two parties to a

20   plan, a debtor was working for one plan support party under

21   a trust taking direction from a trust and then starts

22   working for another plan support party and never discloses

23   it to the Court.  I'm not sure you're going to find many

24   cases like that.

25        MR. SHANNON:  That's true, Your Honor, but there's

1    also --

2          THE COURT:  I can promise you every case is

3    distinguishable, right?

4          MR. SHANNON:  But, you know --

5          THE COURT:  The question is what's the legal

6    principle that apples.

7          MR. SHANNON:  Sure.  The legal principle that

8    applies is about who is getting punished here, and they're

9    trying to see get punished essentially FSS.  I mean, what

10   this is and what the effect would be, would be to decapitate

11   this debtor.

12         THE COURT:  And I'm going to tell you something

13   because I want you to engage in a dialogue with me.  The

14   concern, when you really boil it down, I think you're

15   looking at this too -- you know, looking at this kind of

16   through a check the box perspective, right?  If the

17   behavior, the non-disclosures began in one case and it there

18   are potential conflicts through acts that Mr. Schwartz and

19   Mr. Lee have taken that continue into this case, then the

20   history is important.

21         For example, if, for example, you know, Mr. Lee or

22   Mr. Schwartz's relationship with Mr. Jones or PQPR is

23   concerning, it raises an issue as to whether either one of

24   them can provide sound legal advice to the estate or sound

25   financial advice to the estate, then the history is

1    important, right?

2            So you can't just -- I understand your point that

3    if there's a lack of disclosure in one case, you should look

4    at it as that case and it shouldn't essentially carry

5    forward as a penalty into the new case.  The question is, is

6    there a throughline essentially; that's the question that

7    you've got to answer today, at least that's where I'm

8    focused on.

9            If you're asking me, you know, how I --

10            MR. SHANNON:  Yes, Your Honor.  I'll just state --

11            THE COURT:  -- think about it, that's the way I

12    think about it.  So, for example, so when Mr. Lee is working

13    -- I think you described in May, and Mr. Schwartz are

14    working in late May and have decided that there's no hope

15    for InfoW, what do I do with the fact that there's a

16    pleading filed with me in this case that says on June 2nd,

17    the Debtor is still considering all options, right?

18            How then do I view that, right?  That's the real

19    question, right, and whether that, the changing of the

20    jersey in essence, you know, whether that had already

21    occurred, but no one told me, right.  And so, that's the,

22    hey, we're still considering all options, hey, as a

23    fiduciary, we're thinking about everything, and five days

24    later, you're in a meeting in Austin, you know, with the two

25    plan funding sources in the current case.

1          MR. SHANNON:  And Judge --

2          THE COURT:  The question is does that carry,

3    right, into FSS and into this case and it should be judged

4    into FSS.  And I know that that's where the evidence is; I'm

5    just telling you the way I'm thinking about this now.  So as

6    arguments get made, that's the way I -- that's what I'm

7    thinking about.

8          MR. SHANNON:  Sorry, Judge.  And I'll just say

9    that there is no allegation in the objection of anything

10   that you just said, and I agree that that would be something

11   to consider.

12         THE COURT:  I have an independent duty, though.

13   That's my concern, so you're going to have to address that.

14         MR. SHANNON:  I understand.  I understand, Your

15   Honor.

16         THE COURT:  They do mention the June 2nd pleading,

17   though, right?

18         MR. SHANNON:  I believe in the June 2nd pleading,

19   there had already been this stipulation.

20         THE COURT:  Not being disclosed to me, that's what

21   I'm saying.  Everybody may have known.  It's what was

22   represented to me and whether that continues into this case

23   is that's the question I've got to figure out.

24         So let me ask you, Mr. Shannon, did you work on

25   the responses to the objections?

1           MR. SHANNON:  I did, Your Honor.

2           THE COURT:  Okay.  I'm going to hand you a copy.

3    I want to take this up now before we take up the evidence.

4    That's a copy of what was filed, and there are serious

5    allegations in here.  And I can't avoid not paying attention

6    to them because if they're true, then we're going to have to

7    deal with them, okay.

8           I'm going to turn you to Paragraph 2.

9           MR. LEE:  Your Honor, can I interject?  This is

10   the Schwartz response?

11          THE COURT:  Yeah, yeah.  It's what was filed.

12          MR. LEE:  This is my work, Your Honor.

13          THE COURT:  Anyone can answer.  I asked if you

14   worked on them.

15          MR. LEE:  I'll take care of these, Your Honor.

16          THE COURT:  Okay.  So on Page 2, Paragraph 2.

17          MR. LEE:  Yes, Your Honor.

18          THE COURT:  You say that the U.S. Trustee

19   sprinkled, right, tabloid headlines, fabrications, and

20   misrepresentations.

21          MR. LEE:  Yes, Your Honor.

22          THE COURT:  And that their fabrications are

23   unethical.

24          MR. LEE:  Yes, Your Honor.

25          THE COURT:  I want you to point me to the language

```
1    in the -- I'm going to want you to -- and I'm going to print

2    you a copy of the objection.  I want you to tell me what

3    they are.

4              MR. LEE:  And, in fact, I do that in the pleading

5    in my view.

6              THE COURT:  I don't think you do.  This is real

7    serious.  I want to know what's unethical.

8              MR. LEE:  First of all, on Paragraph 4 --

9              THE COURT:  Okay.

10             MR. LEE:  -- where the U.S. Trustee argues that

11   Schwartz did not disclose -- on objection Paragraph 49 that

12   Schwartz did not disclose his connections to FSS or Jones

13   during the InfoW cases; that is a statement in the

14   objection.  And previously in Paragraphs 14 and 15 of the

15   objection, the U.S. Trustee says Schwartz made these

16   declarations in the beginning.

17             THE COURT:  Did he make them to me?

18             MR. LEE:  They were in the pleading filed with the

19   Bankruptcy Court, Your Honor.  That's what I'm saying.  They

20   made the representations in a pleading filed with the Court,

21   and then he changes them --

22             THE COURT:  Schwartz disclosed his connections to

23   me during the InfoWar cases?

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  When?
```

1          MR. LEE:  In the application that he filed with

2     the Court.

3          THE COURT:  In the InfoW cases?

4          MR. LEE:  Yes, Your Honor, absolutely.

5          THE COURT:  What did he disclose?

6          MR. LEE:  He disclosed that he -- if I may, Your

7     Honor, may I turn to the exhibits?

8          THE COURT:  Mm hmm.  What did he disclose?  Did he

9     tell me he was working for them?

10         MR. LEE:  No.  He filed an application at the very

11    beginning of the case which was Exhibit No. -- I believe one

12    of the early exhibits that got postponed.

13         THE COURT:  Their argument is that nothing was

14    supplemented.  Was there ever a disclosure to the Court that

15    Mr. Schwartz started working for FSS during the InfoWars

16    cases?

17         MR. LEE:  The answer is no, you're not.

18         THE COURT:  So that's not a lie.  Can you tell me

19    what's unethical here?

20         MR. LEE:  But, Your Honor, if I may --

21         THE COURT:  Point me out to what's unethical.  No,

22    because that's serious allegations, right.  You're saying

23    that a branch of the Department of Justice is conducting

24    unethical behavior; that's real serious.  So point me to the

25    unethical behavior that you're describing in this objection.

1          MR. LEE:  Well, that's number one in my view, Your

2     Honor.

3          THE COURT:  You think that's unethical?

4          MR. LEE:  Well, I think that if you say something

5     that's untrue on one page and then you say something else

6     different on another page, then I think that --

7          THE COURT:  Just established that it wasn't --

8     that what you're saying, Schwartz did not disclose his

9     connections to FSS or Jones during the InfoWars.  I never

10    knew about that, so that's a true statement to me.  It's

11    true to me.  It's absolutely true to me, and you just

12    confirmed that I never knew about that, no one never told

13    me, so how is that unethical?

14         I think their whole argument is that no one ever

15    described anything to the Court.

16         MR. LEE:  Your Honor, my statement in Paragraph 4

17    was pointing that in the earlier paragraphs, he pointed out

18    that he made the disclosures at the beginning of the

19    bankruptcy case, which he did in the application.

20         THE COURT:  And he never updated them.

21         MR. LEE:  And, Your Honor, there's no dispute that

22    from May 19th on, neither Lee nor Schwartz made a

23    supplemental disclosure.

24         THE COURT:  That's what they're arguing, though.

25    That's what I read the objection to say is that, Judge, that

```
 1    should have weight.  Tell me where the fact -- where the
 2    unethical behavior is.
 3              MR. LEE:  Well --
 4              THE COURT:  I can print you a copy of their
 5    objection because I want you to point me out.
 6              MR. LEE:  No, Your Honor.  I apologize if you took
 7    it that way, but my percept- --
 8              THE COURT:  I'm just going to interrupt you.  So
 9    let's go to Page 5.
10              MR. LEE:  Yes, Your Honor.
11              THE COURT:  Last paragraph, last in Paragraph 8,
12    okay, "The myth has been perpetuated by the United States
13    Trustee by pointing to the lynching mob at the May 19th," --
14    who is the, what is this mob that you're describing?
15              MR. LEE:  The mob that I'm describing is the fact
16    that everyone knew this --
17              THE COURT:  That's how dangerous that language is?
18              MR. LEE:  Well, Your Honor, one of the reasons why
19    is because, in fact, every time an event takes place in this
20    case, every conduct that we're subject to is somehow
21    misconstrued, misinterpreted.  And no one comes to this
22    Court and tells you the context in which certain things
23    occur.
24              THE COURT:  Well, I'm asking you.  We're going to
25    put you on the stand.
```

```
 1              MR. LEE:  Yes, Your Honor.

 2              THE COURT:  But tell me what's the -- who are

 3   these people that constitute this mob?

 4              MR. LEE:  Well, in the case of --

 5              THE COURT:  No, in accordance with your statement;

 6   who are you describing in this?

 7              MR. LEE:  I think in this instance, I'm describing

 8   the U.S. Trustee's office.

 9              THE COURT:  That's the mob?

10              MR. LEE:  Yes, Your Honor.

11              THE COURT:  I understand, okay.  Let's go then to

12   Page 7, Paragraph 12.  I'm assuming that there are -- you're

13   saying you're being besmirched with lies.

14              MR. LEE:  Yes, Your Honor.

15              THE COURT:  And that the U.S. Trustee decided to

16   pour gasoline on an ember.

17              MR. LEE:  Yes, Your Honor.

18              THE COURT:  And quoting my concerns.

19              MR. LEE:  Yes, Your Honor.

20              THE COURT:  Has anyone addressed my concerns in

21   any of these pleadings?  Has anybody told me about -- has

22   anyone addressed in any of the pleadings in here why the

23   Court was never informed?  Is there a sentence in your

24   response or the response to Mr. Schwartz that addresses the

25   concern that I raised at the beginning of the case; that no
```

1    one informed me about anything that happened in the InfoW

2    cases.

3           MR. LEE:  The point is precisely that, you know.

4           THE COURT:  Can you tell me a sentence where my

5    concern was addressed?

6           MR. LEE:  Your Honor --

7           THE COURT:  In your response, can you tell me --

8    can you point me to a sentence anywhere in this here that

9    you describe where the gasoline is being drawn on because of

10   the comments that I made.

11          MR. LEE:  No, Your Honor.  It's not the fact that

12   your comments were creating the fire.  It's the fact --

13          THE COURT:  No, no, no.  They poured gasoline on

14   my comment.

15          MR. LEE:  Your comments --

16          THE COURT:  Tell me where the gasoline is.

17          MR. LEE:  The gasoline is the suggestion that

18   there was some type of unethical conduct when, if they had

19   asked about the sequence and they should have investigated

20   it after you made those comments to us, we could have told

21   them the sequence of events that took place here.

22          THE COURT:  I'm going to tell you, the question

23   I'm going to ask is why didn't you tell me.  Why did you

24   stand up and tell me that -- why did you stand up on May

25   19th --

 1          MR. LEE:  Yes, Your Honor.

 2          THE COURT:  -- and tell me that you all were

 3   pursuing other options, and then five days later, you're in

 4   a meeting and you're drafting first day declarations a week

 5   later; that's what's going to come out.  And I'm just

 6   telling you those are the questions that I'm going to ask

 7   you, but I want it under oath.

 8          MR. LEE:  Your Honor, I'm happy to go under oath

 9   and tell you that.

10          THE COURT:  No, no.  I think you're going to have

11   to because I think there's been an objection.  So why don't

12   we just -- I'm just telling you where this is going.

13          MR. LEE:  Your Honor, I'm --

14          THE COURT:  I'm just concerned about the inflamm-

15   -- I asked, and Mr. Shannon was here.  I asked all parties

16   to really -- this is an emotional case and I get it.  And

17   I'm not one to -- I think people should defend themselves

18   vigorously, especially with what's at stake, and I think

19   there's strong emotions on both sides.  I asked everyone to

20   really consider the rhetoric that was here.  In one matter,

21   I had to seal something because of inflammatory language.

22   I've even stopped exhibits from being shown.

23          So when I start hearing that the U.S. Trustee has

24   engaged in unethical behavior, I take those things really

25   seriously.  I'm going to tell you, maybe you can point me

1    out to something, but as of right now, I would have an

2    ethical duty to report any such behavior, and I find none.

3    So I'm satisfied that I've taken care of my duties to

4    investigate whether there was anything in this -- anywhere

5    in this response that really displayed unethical behavior or

6    whether there were flat out lies in these statements, and I

7    find none.

8           That doesn't mean, and I want the U.S. Trustee to

9    understand, I don't mean I don't approve the application.

10   It just means that the reporting obligation that I would

11   have if I found some unproper behavior on behalf of the

12   United States Trustee, I believe has been satisfied.

13          So, Mr. Shannon, how do you want to proceed?

14          MR. SHANNON:  Thank you, Your Honor.

15          THE COURT:  You can take them up at the same time,

16   however you want.  How do you feel comfortable proceeding

17   with Mr. Schwartz and Mr. Lee.  I want you to put on your

18   presentation.  I had to take care of that first because I

19   can't deal with that in the middle of a hearing where there

20   are allegations that go beyond the scope of what we're

21   talking about today.  I had to address that.

22          MR. SHANNON:  Understood, Your Honor.  Your Honor,

23   you basically heard my argument.  But to respond to what you

24   were raising before, there are --

25          THE COURT:  Which portion of it?

```
1              MR. SHANNON:  I'm sorry.

2              THE COURT:  I apologize.

3              MR. SHANNON:  The Court had raised the issue that,

4   well, if there was something that affected this case, if

5   there was a connection or some kind of conflict in this

6   case.  The evidence will show that there is none.

7              THE COURT:  Okay.

8              MR. SHANNON:  And ready to have evidence unless

9   you have any questions for me.

10             THE COURT:  No, no.  I want to give the United

11  States Trustee an opportunity to just kind of make a brief

12  opening if that's what they choose to do.

13             And, Mr. Hguyen, I see it.  I just want to make

14  sure -- got a lot of people listening in.  I want to make

15  sure everybody has an opportunity to hear everything.

16             MR. NGUYEN:  Understood, Your Honor.

17             THE COURT:  Just get close to a mic whenever you

18  do speak.

19             MR. NGUYEN:  Your Honor, we filed two objections

20  in this case, and we don't take these objections lightly.

21  You know, the matter before the Court is primarily focused

22  on disclosure.  Disclosure is looked at most important.  And

23  I remember the first day we were in here and I told the

24  Court, you know, we're going to look at this case with fresh

25  eyes, but as long as everyone operated with complete
```

1    transparency and if there is any lack of transparency, we

2    would be bringing it before the Court.

3         And, Your Honor, during Mr. Shannon's

4    presentation, I don't -- he didn't say, but he seems to

5    suggest that somehow we knew about the connections in the

6    InfoW cases.  I can tell the Court that none of that was

7    told to us.  We found out the same time you found out.

8         So, Your Honor, since transparency in bankruptcy

9    cases in general, you know, plays a very important role.

10   The Debtor has to be transparent, creditors have to be

11   transparent when they file proof of claim, and there's a

12   high standard of transparency that's imposed to almost all

13   the professionals that appear in front of you.

14        The professionals need to come out and lay bare

15   all of their connections.  There's discussions of

16   disclosable connections, material connections, or

17   disqualifying connections.  That's not the standard under

18   Rule 2014.  You disclose all your connections.  You don't

19   pick and choose which connections to disclose and not

20   disclose and, quite frankly, that's what happened in the

21   InfoW case.

22        They decided on May 24th in a room up in Austin to

23   not proceed with the bankruptcy case.  You know, the Court

24   wasn't in that room and understanding (sound glitch)

25   plaintiffs were in that room.  So based on that decision,

1   they made the determination not to disclose to Your Honor

2   their connection with FSS beginning May 24th.

3          And, Your Honor, I think the connection actually

4   began on May 19th when Mr. Lee picked up that phone call and

5   he acted as the recruiter for FSS and asked Mr. Schwartz,

6   who was the CRO, the guy who is in the driver's seat for

7   InfoW cases, to pretty much change his jersey and then work

8   for FSS.  You know that day, May 19th, was when the

9   connection occurred.  And that's under the rule, under Rule

10   2014, that is when they needed to disclose that connection.

11          I know there's discussion about, well, you know,

12   it was May 24th, maybe it was June 6th when we executed

13   agreement.  The date seems to fluctuate, but it all comes

14   down to that May 19th, as far as we know, because the

15   conversation could have occurred before, but we know there

16   was a phone call on May 19th.

17          And remember on May 19th, we were all in this

18   courtroom and there were discussions about Mr. Schwartz

19   needed to -- he needed a month, I think that's what the

20   original request was, to handle the remaining creditors.

21   But all of a sudden within that afternoon, Mr. Schwartz was

22   ready to send that engagement letter to FSS to change his

23   role.

24          And FSS, no matter we're not -- you know, under

25   the rules, all connection, but the connection to FSS was so

1     central to the InfoW case.  This is not talking about your

2     neighbor's mailman's sister.  This is the counterparty that

3     was sitting at a negotiation table in the FSS case.

4             THE COURT:  Mr. Nguyen, let me ask you.  The

5     argument raised by Mr. Shannon is, look, that's we're

6     rehashing InfoW issues, and you have your rights as to

7     whatever it is in the InfoW case.  But when we look at the

8     FSS case, it's different and you should look at FSS.  And

9     what you're seeking to do is inject, you know, potential

10    non-disclosure issues in the InfoW case and infect them into

11    this case.  What's your response to that?

12            MR. NGUYEN:  Your Honor, we're obligated, we are

13    obligated to bring this objection in this case.  Remember,

14    FSS was the connection that they did not tell you in the

15    InfoW case.

16            Now, they're coming into this case asking you to

17    approve -- you're actually -- if you approve these

18    applications, you're actually compounding the disclosure

19    failures in the other case, because FSS is the connection

20    that was not disclosed to you from May 19th all the way to

21    June 10th.  It wasn't disclosed to the Sandy Hook family, it

22    wasn't disclosed to the U.S. Trustee.  I don't believe the

23    Subchapter V Trustee knew about it.

24            The reason why we're objecting is this is the very

25    connection.  The Court is a witness to this.  The Court was

```
 1   not told about any of this.  And you say, oh, now it's
 2   improper for us to raise this objection while you're asking
 3   the Court to bless a connection that wasn't disclosed?  It's
 4   relevant here, Your Honor.  They didn't disclose the
 5   connection to FSS.  This is the client, the same -- I mean,
 6   there are some -- I call them distractions.  There are some
 7   distractions saying, oh well, it was a different law firm.
 8           Well, you know, when we were talking about 327,
 9   we're talking about professionals.  Change your letterhead,
10   doesn't matter, we're talking about professionals.  We're
11   talking about the same people, we're talking about the same
12   connection that was not disclosed to you.
13           And it's, in many ways, a continuation of the
14   previous case because this is the connection that -- I don't
15   want to -- I'm trying to use my words carefully.  There was
16   an non-disclosure of this connection and they're asking you
17   to bless this connection, so that's my response to that.
18           And I'm not obligated to object to this.  I'm
19   obligated to bring this before the Court and I'm not doing
20   this for any unethical reasons.
21           And, you know, I'm glad Your Honor went through
22   that reply.  I wasn't going to do it, but that -- I wasn't
23   going to address it, but I think it's important that there
24   were a serious attacks on my character and also Mr. Ruff's
25   character.  And all I got to say about that is, you know,
```

1    Mr. Ruff and myself appear in front of Your Honor all the

2    time.  You know what type of lawyers we are, and I will just

3    leave it at that, Your Honor.  I won't address the language

4    that was in the reply.

5         But, Your Honor, all we're saying here is there

6    was a serious non-disclosure that occurred with this very

7    connection.  I think under Rule 2014, there is a proverbial

8    fox that guards the henhouse.  What we're asking is harsh,

9    but, you know, disclosure violations when they occur, you

10   know, sometimes the consequences are harsh.  A lot of cases,

11   you might get disqualified.  A lot of cases, you lose all

12   your fees.  But sometimes, that's what it takes to uphold

13   the integrity of the bankruptcy system and that's why we're

14   asking for Your Honor to deny the two applications that are

15   before you.

16        THE COURT:  Thank you.  Is there anyone else who

17   wishes to make any form of an opening if you will.  Mr.

18   Battaglia.

19        MR. BATTAGLIA:  Yes, Your Honor.  Ray Battaglia

20   for Free Speech Systems.  I was Free Speech Systems' counsel

21   in the IW bankruptcy cases.  I guess ultimately my

22   perspective on this, since I've been --

23        THE COURT:  Can you just get closer to the mic?  I

24   want to make sure folks can hear you.

25        MR. BATTAGLIA:  All right.  The continuity I have

1   with this is I am the representative, legal representative

2   of FSS in both cases.  And obviously, there was a certain

3   logic to retaining counsel that had some familiarity with

4   the players and the baseline issues existing here with

5   litigation and the like.

6           So it can't be extraordinary to anybody that prior

7   counsel and prior CRO would be logical selections, not the

8   least of which is the number of people who are willing to

9   take representation of an Alex Jones-related entity is

10  small.  It's a very small universe of professionals.

11          But my perspective on this is did they meet the

12  standard of disinterestedness.  I can't comment on the

13  disclosure issues in the IW case, but my perspective on it

14  is were they disinterested at the time that communication

15  was established about them coming to provide services to

16  FSS.

17          By, I believe it was May 19th, if not before, the

18  litigation claims against the IW debtors had been dismissed

19  with prejudice, and, therefore, as of that date or slightly

20  before then, IW and FSS were ships passing in the night.

21  They did not have common ownership; they did not have common

22  creditors.  There just was no connection at that point in

23  that they'd been disconnected by the dismissals with

24  prejudice, a decision that the plaintiffs themselves decided

25  to make.  Texas plaintiffs actually made that decision the

1   day of or just prior to the filing of the IW cases.

2   Connecticut plaintiffs took a little bit longer and filed

3   their dismissal pleadings in the Connecticut cases.

4           So as far as I could tell from my perspective,

5   they were disinterested; they met the standard.  They didn't

6   represent common shareholders, they didn't represent parties

7   who had common claims against themselves.  And the PSA,

8   which I know is important to you -- and you raised this

9   before when we talked about how it terminated in its own

10  terms and you had asked would there be an extension, and I

11  told you we would agree to extend it and we submitted the

12  draft that was negotiated with the litigation trustees with

13  a new date.

14          It was never executed because by the time it came

15  up, there was no purpose to be served anymore by a PSA.  The

16  PSA was exclusively designed to pay the Connecticut and

17  Texas plaintiffs' claims.  They didn't exist against IW, so

18  there was no purpose served by the PSA at that point.  It

19  was a dead document.  The relationships between the

20  entities, the IW and the FSS entities had ceased to exist by

21  the dismissals.

22          And so, from the Debtors' perspective in selecting

23  counsel and selecting a CRO, we found someone who we believe

24  to be completely disinterested at the time that we engaged

25  them.

```
 1                THE COURT:  Thank you.  Anyone else?  Mr. Chapple.
 2                MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple
 3      again on behalf of the Connecticut plaintiffs.
 4                Your Honor, we did, along with the Texas
 5      plaintiffs, filed a joinder to the objections to the
 6      employment objections.  The only note that I would make here
 7      is that candor and disclosure are important with the
 8      parties.  It's always of the utmost importance, especially
 9      in this context, especially when we have these two cases
10      abutting back to back.
11                And when the latter case was filed under
12      Subchapter V, which by statute does not have all of the
13      components relating to oversight and there's typically no
14      committee.  There's typically the creditors who do
15      participate are not as sophisticated as the creditors you
16      see in a typical large Chapter 11.
17                So I believe the only point that the Connecticut
18      plaintiffs, and I believe the Texas plaintiffs as well,
19      would make is that candor and disclosure is absolutely of
20      the utmost importance here, and that's why we filed our
21      joinder to the Trustee's objections.
22                That's all I have right now, Your Honor.
23                THE COURT:  Thank you.  Okay, Mr. Shannon.  The
24      only request I'm going to make is anytime anyone speaks, I
25      just want to make sure -- just get as close as you can to
```

1    one of the mics.  If you've got a booming voice, you're

2    good; if you have a soft voice, I just ask that you get a

3    little closer.  I want to make sure that we have a good

4    record.  And obviously, the hearing's being recorded, so I

5    want to make sure that we have a good record for today.

6              Mr. Shannon, I apologize.

7              MR. SHANNON:  Yes, thank you, Your Honor.  I guess

8    first before the hearing --

9              THE COURT:  Actually, I want to talk -- before you

10   get into any argument, exhibits.  Was there any agreement on

11   exhibits as to what the parties could agree to up front?

12             MR. SHANNON:  Yes, Your Honor.  I believe that all

13   of the exhibits are agreed, and those would be --

14             THE COURT:  Hold on.  Let me just make sure we

15   have a good record.  I just want to pull docket numbers and

16   make sure that we're all good on that.  So I see one at 163,

17   Mr. Shannon, where you have exhibits --

18             MR. SHANNON:  One through 34.

19             THE COURT:  -- 1 through 34.  Any objection to

20   that?

21             MR. NGUYEN:  No objection, Your Honor.  We've

22   agreed for all the exhibits.

23             THE COURT:  Okay, let me just go one by one then.

24   So what about 165; that's the U.S. Trustee's, I believe.

25             MR. SHANNON:  No objection, Your Honor, from the

1    debtor.

2           THE COURT:  Okay, so that is Exhibits 1 through

3    16?

4           MR. SHANNON:  Yes, Your Honor.  I do believe that

5    on Exhibit 16 is a --

6           THE COURT:  Demonstrative?

7           MR. SHANNON:  -- demonstrative.

8           MR. NGUYEN:  One through 15, Your Honor, so 16

9    doesn't need to go in.

10          THE COURT:  Okay, 1 through 15 at Docket No. 165.

11   You filed one, an additional one today, Mr. Shannon.  Is

12   there any objection to that?

13          MR. NGUYEN:  No, Your Honor.  We discussed it, no

14   objection.

15          THE COURT:  Okay, so then that would be at 178,

16   Exhibits 35 through 37?

17          MR. NGUYEN:  That's correct, Your Honor.

18          THE COURT:  Okay.  So then we have essentially 1

19   through 37 on behalf of Free Speech and U.S. Trustee

20   Exhibits 1 through 15.  Did I get that right?

21          MR. NGUYEN:  Yes, Your Honor.

22          THE COURT:  Okay.  All right, that was the last

23   housekeeping piece.

24          Mr. Shannon, I'm really going to stay quiet this

25   time.  I apologize.

```
 1            MR. SHANNON:  Yes, Your Honor.  I mean, I don't

 2   know if you would like to hear a response from me or we

 3   could just start evidence.

 4            THE COURT:  I want you to proceed.

 5            MR. SHANNON:  Great.  You know, Your Honor, my

 6   understanding from what I hear is that what this Court is

 7   interested in hearing is whether there is anything that

 8   creates a conflict that does not allow Shannon & Lee LLP or

 9   Mr. Schwartz to exercise their fiduciary duties.

10            THE COURT:  I think it's a factor for sure.  I

11   mean, it's the test, right.

12            MR. SHANNON:  So, Your Honor, with that, I would

13   just --

14            THE COURT:  But I want you to put on whatever

15   presentation you want.  I put out that thought because, you

16   know, obviously, I think there could be a connection between

17   the two cases, but you're free to tell me there is none,

18   one, but I just inquire as to that.  But I want you to put

19   on your full presentation.

20            MR. SHANNON:  Your Honor, I would just like to go

21   to evidence and call Mr. Lee.

22            THE COURT:  Okay.  Mr. Lee, please take the stand.

23   I'll get you close to a mic.  There is a binder on the

24   stand.  Who's binder?

25            MR. SHANNON:  Both of those are the Debtors, Your
```

1    Honor.  The large binder would be Exhibits 1 through 35, and

2    the small binder is Exhibits -- or 1 through 34, I'm sorry.

3              THE COURT:  And then 35 through 37?

4              MR. SHANNON:  That's correct.

5              THE COURT:  Okay.

6              MR. LEE:  Your Honor, I have in my possession a

7    blank calendar for 2022.

8              THE COURT:  Okay.

9              MR. LEE:  Because the dates are -- I'm just...

10             THE COURT:  Understood.  Raise your right hand.

11   Do you swear to tell the truth, the whole truth, and nothing

12   but the truth.

13             MR. LEE:  I do.

14             THE COURT:  Okay.  You may be seated, sir.

15                  DIRECT EXAMINATION OF KYUNG LEE

16   BY MR. SHANNON:

17   Q    Good afternoon, Mr. Lee.  Can you state your full name

18   for the record.

19   A    Kyung, K-Y-U-N-G, middle name Shik, S-H-I-K, last name

20   Lee, L-E-E.

21   Q    And do you understand that you're here for the

22   consideration of the application for the CRO and Shannon &

23   Lee LLP by the Debtor, Free Speech Systems?

24   A    I am.

25   Q    What is your role in this bankruptcy cases?

1    A     In the FSS bankruptcy case, I am a partner with Shannon

2    & Lee, and I'm being put up as a co-counsel for the Debtor,

3    FSS.

4    Q     And, Mr. Lee, when was Shannon & Lee LLP founded?

5    A     In June 1, 2022.

6    Q     Mr. Lee, are you a licensed attorney?

7    A     I am.

8    Q     How long have you been a licensed attorney?

9    A     Since September of 1984.

10   Q     And can you describe your practice for the Court?

11   A     My focus is on corporate bankruptcy work, either for

12   the debtor, committees, or creditors, and I've been doing it

13   since 1984.  Practiced with Sheinfeld Maley & Kay for a

14   number of years and went off for the group in 1993 with

15   Verner Kiipfert and practiced with them as their bankruptcy

16   group for 10 years, and then went off with a small group to

17   join a boutique called Diamond McCarthy, was their

18   bankruptcy group for a number of years until 2018.

19            And then I left to work for Kasowitz Benson for

20   one year, and then formed my own firm as of 2019 and

21   practiced for about six months by myself and then partnered

22   up with my former partner, Mr. Leonard Parkins and Charles

23   Rubio, as of August 1, 2020, and practiced with them two

24   years until May 15th, 2022, when I departed and practiced

25   law with myself for 15 days, from May 15, 2022 to June 1,

1    2022, and then I formed a partnership with you to form

2    Shannon & Lee LLP as of June 1, 2022.

3    Q    Thank you, Mr. Lee.  Are you involved in any

4    professional groups related to your practice?

5    A    I am.  I'm a member of the American Bar Association.

6    I'm a member of the American Bankruptcy Institute.  I belong

7    to the TMA organization here in Houston.  I'm an active

8    member of the American Bar Association Business Bankruptcy

9    Committee, serve on the subcommittee on government powers.

10   I also have acted in the past with the Texas Disciplinary

11   Committee in sanctioning and disciplining attorneys who are

12   in violation of ethical obligations and served on that

13   committee for about five years in the last 1980s, and also

14   serve on several other committees in connection with

15   minority attorneys.

16   Q    Thank you.  If you could turn in the large exhibit book

17   there to Tab No. 1.

18   A    Yes, sir.

19   Q    Take a look at that exhibit and let me know if you're

20   familiar with this document.

21   A    I am.

22   Q    Can you explain what this document is?

23   A    Exhibit No. 1 is an application of Shannon & Lee to be

24   retained as bankruptcy co-counsel in the FSS bankruptcy

25   case.

1    Q    Mr. Lee, when you say co-counsel, what is your

2    understanding of what Shannon & Lee LLPs role would be if

3    the application to employ is granted?

4    A    Shannon & Lee will work together with the Law Offices

5    of Ray Battaglia to represent Debtor FSS in the bankruptcy

6    case.  The division of responsibility will be like in a

7    large law firm where Mr. Battaglia would have certain

8    responsibilities because he's technically the lead counsel

9    and have overall strategy, global kind of responsibility

10   about the case.

11           And it's contemplated that Shannon & Lee will take

12   over a lot of the issues relating to the daily operations of

13   the business and assist Mr. Schwartz in implementing many of

14   the operational issues, as well as assisting Mr. Battaglia

15   in all the work that has to be done in the case.

16   Q    And to date, what kind of things have you been involved

17   in with the Debtor, what matters?

18   A    Since the filing of the bankruptcy case, I've been

19   involved in most of the daily operational issues that have

20   confronted the company, in drafting pleadings with you.  I

21   guess primarily my work has been investigating sort of the

22   capital structure of the company, understanding its business

23   background so as to be able to draft the declaration for Mr.

24   Schwartz in connection with the filing of the bankruptcy

25   case.

1          Number two, understanding the finances of the

2    company so as to be able to determine what would be an

3    acceptable disposable net income for the next three years

4    for a plan of reorganization, as well as understanding the

5    company's capital structure in order to be able to complete

6    the financials and also the schedules and the monthly

7    operating reports, and strategize with respect to the plan

8    of reorganization.

9    Q    Mr. Lee, do you have familiarity with the Debtors'

10   corporate structure?

11   A    I do.

12   Q    How did you get that familiarity?

13   A    It started on May 24th, 2022, when we were invited to

14   come to a meeting in Austin, Texas, and we started the data

15   gathering process at that point in time with Mr. Schwartz

16   and with the company people that were available at that

17   time.  It was an arduous task because the company's books

18   and records were not in the best shape.  And so, by the time

19   we got through June 5th or June 6th at that time, we

20   gathered very few documents and were still looking for

21   documents regarding what the company's capital structure

22   looked like, and we're still gathering those document.

23          To this day, we have some of the documents.  But

24   for example, as a major secured creditor, Security Bank of

25   Crawford, we have a proof of claim that still doesn't make

```
 1   sense and we still don't have their corporate documents as
 2   to their secured claim, so we're still missing documents.
 3   Q    Mr. Lee, do you have familiarity with the litigation
 4   against the Debtors?
 5   A    I do.
 6   Q    How did you get that familiarity?
 7   A    I got the familiarity by studying the state court
 8   lawsuits that have been filed.  The state court litigators
 9   in Texas made available to me their state court discovery,
10   and so, I studied the thousands of pages of documents that
11   were produced and went through those files to understand
12   what the issues were, as well as what had been produced in
13   the last four years of litigation, in order to determine
14   what documents had been produced relating to the financial
15   aspects of the company, so as to understand what had been
16   represented to the state court litigators so as to
17   understand what will be presented against us in a bankruptcy
18   case.
19   Q    And, Mr. Lee, to date, have you been involved at all in
20   preparing the proposed plan of reorganization that will come
21   in this case?
22   A    I have.
23   Q    And about how much time would you say you've spent on
24   that?
25   A    I've spent, I would say, I can't give you quite a
```

1   number, but I can tell you that I've been involving staying

2   up quite late in drafting a plan of reorganization

3   internally.  I've had strategy sessions with the company

4   internally with you, as well as Mr. Schwartz and Mr.

5   Battaglia, over the classification of various claims, as

6   well as the treatment of various creditors and the concepts

7   of how to put disposable net income and calculate those and

8   had discussions with how to proceed to confirmation on such

9   a plan, and also how to dedicate the avoidance actions and

10  to whom they should be dedicated.

11  Q    Thank you, Mr. Lee.  When was Shannon & Lee LLP first

12  retained by the Debtor, Free Speech Systems LLC?

13  A    My recollection is that the engagement letter was

14  executed on June 6, 2022, when Mr. Alex Jones signed the

15  engagement letter when we were in Austin, Texas.

16  Q    Did Shannon & Lee LLP receive a retainer?

17  A    We did.

18  Q    And when was that retainer received?

19  A    To my knowledge, the retainer was received on June 10,

20  2022, and was sent to us by FSS.

21  Q    Thank you.  If you could look at this Exhibit 1 and

22  turn to Paragraph 15.

23  A    I'm there.

24  Q    You beat me there.  If you could just review Paragraph

25  15.

1    A    I have.

2    Q    And let me know if anything in that needs to be

3    changed.

4    A    It does.  The last sentence where it says that the

5    retainer was received on or about June 7, 2022 was

6    incorrect.  We received an email saying that it was sent on

7    June 7th, but it turns out that our bank records show that

8    the receipt was on June 10, 2022.

9    Q    Thank you, Mr. Lee.  If you could turn in your exhibit

10   book to Exhibit 3.

11   A    Yes, sir.  I'm there.

12   Q    Could you tell me what this -- or are you familiar with

13   this document?

14   A    I am.

15   Q    Can you tell me what this document is?

16   A    It's the engagement letter we prepared for FSS that was

17   prepared on or about June 5, 2022, and executed by Mr. Jones

18   on June 6, 2022, retaining Shannon & Lee for the company

19   FSS.

20         THE COURT:  Mr. Shannon, is there any objection to

21   me showing this on the screen, just so --

22         MR. SHANNON:  No, Your Honor.

23         THE COURT:  I want to make sure because normally,

24   our local rules require that exhibits get filed on the

25   docket.  I don't mind waiving it today, but I just want to

1   make sure we can all follow along.

2            MR. SHANNON:  Yes.  And, Your Honor, the exhibits

3   were filed on the docket.

4            THE COURT:  Oh, I know, and just no one's -- we're

5   not putting them up.  I just want to make sure that

6   everybody who may be watching or in the courtroom can follow

7   along, if it's okay, but I'm only going to go to the pages

8   that you point to.

9            MR. SHANNON:  Okay.  Thank you, Your Honor.

10           THE COURT:  Okay, thank you.

11   BY MR. SHANNON:

12   Q    Okay, Mr. Lee, if you could turn to Exhibit 4 in that

13   book.

14   A    Yes.

15   Q    Are you familiar with this document?

16   A    I am.

17   Q    Can you describe what this document is?

18   A    This is the declaration that I prepared in connection

19   with the filing of our application in the FSS bankruptcy

20   case, and it recites the declaration of disinterestedness

21   that we're required to file in connection with our

22   application.

23   Q    And did you review this document before coming to court

24   today?

25   A    I did.  And, in fact, I'm responsible for having

1    drafted this document in the first place.

2    Q    And are there any corrections that need to be made to

3    this document?

4    A    I don't believe so.

5    Q    Thank you.  Could you turn to Tab No. 5 and take a look

6    through that.  Are you familiar with this document?

7    A    I'm generally familiar with this document.  It's a

8    conflicts check.  Yes, I'm generally familiar with it.

9    Q    What is this document?

10   A    The document is a conflicts check that you ran in

11   connection with our Clio software program showing the

12   conflicts check that you performed in connection with the

13   potential representation of FSS in this bankruptcy case,

14   which is also Document Nos. 5 and 6.  It shows the hits that

15   we received, if any, in doing the conflicts check before we

16   undertook the representation.

17   Q    And can you tell based on this document on or about

18   what date it was created?

19   A    Performed, it looks like one was performed on August

20   16, 2022, and the other one, Exhibit No. 6, was performed on

21   or about September 16, 2022 if that's correct.

22   Q    Well, okay, let's turn to Exhibit 6 then.  You kind of

23   jumped ahead of me there.

24   A    Sure, sorry about that.

25   Q    Are you familiar with this document and, if so, what is

1    it?

2    A    It's another conflicts check performed by you.

3    Q    Okay.  And you had just said that this one was

4    performed on 9/16.

5    A    That's correct.

6    Q    Okay.  If there were any conflicts -- let me retract

7    that.  What does this document show; what does it determine?

8    A    It determines that there are no conflicts that we're

9    aware of within our firm system that are creditors of the

10   FSS corporation that would create any kind of issue for the

11   firm being able to undertake the representation or that

12   would create a problem of disinterestedness for us.

13   Q    And do you know how this document is -- how it runs,

14   how it's created?

15   A    I have a general idea of it, but it looks like it does

16   kind of a computer search and then it hits on these words

17   that are within our computer system, and if there's a hit,

18   it hits it.  But that's about the best way I know -- I'm not

19   a -- even though I'm not a science major.

20   Q    That's fine.  Let me just ask you, and I'm not asking

21   whether it's in these documents.

22   A    Right.

23   Q    Does Shannon & Lee LLP have any connection to PQPR?

24   A    No.

25   Q    Did it ever represent PQPR?

1    A    We have never represented PQPR.  And again...

2    Q    What connections does Shannon & Lee have to Alex Jones.

3    A    Well, before you -- I want to answer the question about

4    PQPR.  Counsel to PQPR, Mr. Steve Lemmon, was a former

5    partner of mine at Sheinfeld Maley & Kay between 1984 and

6    1993.  Again, I haven't disclosed that, but that's one

7    connection that is there.  Another connection is that Millie

8    Saul was an associate that I trained for four years between

9    1998 and 1992, which I also did not disclose.  But those are

10   as a result of practicing in the bankruptcy area, you tend

11   to have a lot of connections.  And those are the two that I

12   guess, depending upon the day, maybe I should have

13   disclosed; I didn't.  But I didn't disclose them because I

14   don't think they have any impact on my ability to be fair

15   and unbiased in this estate.

16   Q    Thank you, Mr. Lee.  So now a question about Alex

17   Jones.

18   A    Yes, sir.

19   Q    Does Shannon & Lee LLP represent Alex Jones?

20   A    We do not.

21   Q    Has -- strike that question.  Has the Debtor, Free

22   Speech Systems LLC, in this bankruptcy case ever taken any

23   position contrary to Alex Jones?

24   A    Yes.

25   Q    And could you describe one of them?

1    A    In this bankruptcy case, as an example?

2    Q    Yes.

3    A    We've taken lots of adverse positions to Alex Jones.

4    One, there's been a request by Mr. Jones to extend the

5    automatic stay to him; we've told him we can't do that.

6    Number two, he's asked us to bear 100 percent of the costs

7    of all these things, including legal, in connection with

8    these lawsuits; we've told him we're not going to do that,

9    and we've had to fight him on that.

10            THE COURT:  Mr. Lee.

11            THE WITNESS:  Yes, Your Honor.

12            THE COURT:  On the state court litigation, isn't

13   that what FSS filed originally was a request to pay for 100

14   percent of the legal expenses for Mr. -- the two counsels

15   that are in the litigation in Connecticut?

16            THE WITNESS:  We did, Your Honor.  And then once

17   you told us that we couldn't do that, when we filed the

18   retention pleadings for Mr. Martin, the appellate lawyer, we

19   already told them that we could only bear either 50 to 60

20   percent of those costs.

21            THE COURT:  But I'm saying that you said that you

22   went against Mr. Jones on that.  That was at the request of

23   the United States Trustee and the Court that said that they

24   weren't going to approve without paying their fair share.

25   How did Shannon & Lee take a contrary position?  The

1    application was filed requesting 100 percent of the fees on

2    an emergency basis.

3             THE WITNESS:  Your Honor, that is correct.  We did

4    file an emergency basis saying -- to bear the 100 percent

5    and then negotiations subsequently took place.  And, you're

6    right, I need to correct my testimony.

7             THE COURT:  You're talking about after?

8             THE WITNESS:  Yes, Your Honor.

9             THE COURT:  Okay.

10            THE WITNESS:  Yes, Your Honor, absolutely.

11            THE COURT:  Thank you.  Thank you.

12            THE WITNESS:  We did file it as 100 percent, and

13   then subsequently, there were negotiations that resulted in

14   the reduction to 50 and 40 percent, I believe -- 60 percent.

15   Yes, Your Honor, absolutely.

16   BY MR. SHANNON:

17   Q    And, Mr. Lee, just to clarify.  So in the most recent

18   application to employ litigation counsel, the appellate

19   counsel.

20   A    Yes.

21   Q    In that one, there was not a request to pay the full

22   amount.

23   A    That's correct.  We already made -- we already told Mr.

24   Jones's counsel that Mr. Jones would have to bear a

25   proportionate share and they've agreed to bear 40 percent

1   and we agreed to bear 60 percent.  And the arguments were

2   that Mr. Jones has already been cut back on some of his

3   regular salary and we had an arm's length negotiations over

4   that issue and came down to a 40/60 split.

5   Q    And what about PQPR; were there any, you know, contrary

6   positions taken?

7   A    To be blunt about it, there were almost fistfights over

8   the negotiations between PQPR and FSS and Mr. Jones, so to

9   suggest that we're all in bed together is just nonsense.

10   We've had many disputes over all the terms of the

11   relationship among us, and there's not been one group of

12   people getting into bed together and arranging something

13   secret.  It has been very hardily fought.  It's been very

14   hardily -- it's been negotiated very hard and there have

15   been terms that had to require lots of negotiations to get

16   to a final resolution.

17   Q    Thank you, Mr. Lee.  If you could turn in the exhibit

18   book to Exhibit 7.

19   A    I'm there.

20   Q    Are you familiar with this document?

21   A    I am.

22   Q    And if so, what is it?

23   A    It's the invoice for Shannon & Lee for the month of

24   June 2022 for FSS and the time records for what we did for

25   them during the month of June 2022.

```
 1    Q    If you could look through this document and see if you

 2    can determine how many hours Shannon & Lee LLP professionals

 3    worked on this matter in that month.

 4    A    On Page 6 of 7 on Exhibit No. 7, it says that the total

 5    was 127 hours and 95 minutes for the month of June 2022.

 6    Q    It's .95 hours.

 7    A    I'm sorry, .95.  127 hours and .95 whatever hours.

 8    Q    Could you turn to Exhibit 8.  Are you familiar with

 9    this document and what is it?

10    A    I am.  This is the July invoice that Shannon & Lee

11    supplied to the client, FSS, for the work we did in the

12    month of July 2022.

13    Q    And same question, how many hours does this reflect

14    spent on the matter?

15    A    On Page 5 of 7, it reflects it looks like 140 -- I'm

16    sorry -- I think it's 140.85 hours.

17    Q    Thank you, Mr. Lee.

18         THE COURT:  I have a question on this page and I'm

19    going to ask you anyway.  So on Page 1, you attended a focus

20    group hosted by someone and participated on a jury

21    perception of Alex Jones.  That was work for FSS?

22         THE WITNESS:  Yes, Your Honor.  We're co-

23    defendant.

24         THE COURT:  Okay.

25         THE WITNESS:  We're co-defendant.
```

```
 1              THE COURT:  I understand.  Thank you.

 2   BY MR. SHANNON:

 3   Q    And, Mr. Lee, let's actually talk about that particular

 4   time.  What was that time entry the Judge just brought up

 5   about the focus group?  Can you describe what you did during

 6   that time?

 7   A    Yes.  I was asked by Andino Reynal, and I spelled this

 8   wrong here, who was our state court litigator who was

 9   conducting focus groups to come in at 10:00 and listen to

10   what the group was saying and how they reacted, and I ended

11   up participating and listening and watching it to determine

12   how the group was reacting to some of the questions and

13   issues that were being brought up about the soon-to-be tried

14   case and getting a sense of the various ranges of jury

15   verdicts that they would give for certain claims.

16              And I was asked to listen to those and get a sense

17   of this so that I could have an idea of the kind of range of

18   estimation of claims that we could kind of get an idea of.

19   Again, just a way of approximating a range of claims for

20   purposes of getting ready for the bankruptcy.

21   Q    And you said the case that was soon to be tried.  Do

22   you know what case that you were talking about?

23   A    I believe it was the Texas case called the Heslin/Lewis

24   suits that went to trial in Texas.

25   Q    And did that case play -- that state court litigation
```

1    have anything that was filed in the bankruptcy case about

2    that?  Was anything filed in the bankruptcy case about it?

3    A    In this case or in the last --

4    Q    In this case.

5    A    The Heslin/Lewis suit, yes.  In fact, that was the

6    motion that was filed on the first day of the FSS bankruptcy

7    case in which the Debtor, FSS, agreed to lift the automatic

8    stay so that that lawsuit could proceed to trial to

9    judgment.  And we filed the motion to lift stay on the very

10   first day and we went and came before Judge Lopez to get

11   relief so that that lawsuit could proceed to judgment before

12   Judge Gamble.

13   Q    And, Mr. Lee, do you remember who argued that motion on

14   behalf of the Debtor?

15   A    It was either you or Mr. Battaglia, I believe; that's

16   my best recollection.  I apologize, but I just don't -- I

17   don't have a good recollection of that day.

18   Q    That's fine, Mr. Lee.  If you could turn in the exhibit

19   book to Tab 9.

20   A    I'm there.

21   Q    What is this document?

22   A    This is an invoice that I submitted to Mr. Schwartz for

23   work that I did on behalf of Free Speech between the period

24   of 5/24 and June 1, when I was practicing alone as Kyung S.

25   Lee PLLC, and that was the invoice I sent to Mr. Schwartz

1    for the work I was doing during that period of time.

2    Q    Okay.  And now why is this for -- you know, why does it

3    say Kyung S. Lee PLLC and not Shannon & Lee LLP?

4    A    Because I was asked to depart at Parkins Lee & Rubio

5    because of a positional conflict that my partners, Parkins &

6    Rubio, discovered on a case that we had brought together in

7    the LTL bankruptcy case.  So when I left the firm on May

8    15th, I did not have another shop to go to, so I went back

9    to my own and practiced by myself for 15 days.

10            And then you and I ended up practicing law

11   together starting on June 1, so I practiced law by myself

12   under Kyung S. Lee PLLC.  And at that point in time, InfoW

13   debtors did not have counsel and so, I thought it was

14   important for me to get myself situation so that I could

15   help Mr. Schwartz finish up the InfoW case, and I did it

16   under the rubric of Kyung S. Lee PLLC, which is a PLLC which

17   I had set up after I left Kasowitz Benson in 2018.

18   Q    Mr. Lee, if you could just summarize the work you did,

19   how would you do that?

20   A    I think the best way to say it is what I've already

21   said before.  These were organizational and informational

22   gathering meetings that we were invited to come to Austin to

23   discuss FSS.  And as you can see by my time entries there

24   starting on May 24th, we were gathering documents and data

25   to understand the company, what it did, what its capital

1    structure was, what its history was, and to gather documents

2    to understand and verify what its corporate and capital

3    structure was and to understand, moreover, what had been

4    produced in the state court system because there had been

5    four years of litigation and my concern was to make sure

6    that I understood what had been produced there so as to be

7    able to manage what we would be -- what would be used

8    against us in the bankruptcy court once...

9            If the company had to go into bankruptcy, I wanted

10   to find out what financial data had been produced so that we

11   wouldn't be contradicting what we'd be saying in the

12   bankruptcy court versus what had been produced previously.

13   Q    And was there ever an engagement letter with Kyung S.

14   Lee PLLC and FSS?

15   A    I think there must have been one.  I just don't

16   remember right now off the top of my head whether there was

17   one or not, but...

18   Q    You don't remember whether --

19   A    I just don't remember it because I remember there was

20   so many things going on and it was for a 15-day period, and

21   I just don't remember.  Most likely, there would have been

22   one, but I just don't know.  I can't answer you accurately

23   right now off the top of my head, but I'm happy to go look

24   in my records and see if there was one.

25   Q    Well, I don't think we need to do that.  Could you turn

1    back to Exhibit 3 for me.

2    A    Sure.

3    Q    And if you could go to the second page of that

4    document.

5    A    I'm there.

6    Q    And if you could read that Footnote 1 and let me know

7    if that refreshes your recollection.

8    A    Footnote 1 says, "As S&L was formed on June --

9    Q    I don't need you to read it.

10   A    Okay.

11   Q    Does it refresh your recollection?

12   A    It does not refresh my recollection as to whether there

13   was a written engagement letter.  But I put the client on

14   notice that I have been practicing by myself May 15th and

15   June 1 and that to the extent the fees were paid, that they

16   would be allocated to my PLLC for that period of time to

17   make sure the client knew that there was a separation of

18   entities.

19   Q    Okay.  All right, and so, Mr. Lee, what is your

20   understanding of what the U.S. Trustee's objection is in

21   this case?

22   A    The U.S. Trustee's objection, as I understand it, is

23   that Kyung S. Lee, Mr. Lee I guess, that I failed to make

24   the appropriate disclosures when I was getting involved with

25   FSS as of May 24, 2022.  And more accurately, that I failed

1   to disclose to them and to the Court and to the creditors my

2   involvement starting as of May 19, 2022 with FSS and going

3   through the June 10th period of time.

4   Q    Okay, thank you.  I'm going to skip quite a number of

5   these exhibits, but if you could just tell me briefly what

6   your involvement in the InfoW cases was.

7   A    My involvement in the InfoW case was I was the primary

8   partner in charge of representing the three debtors, along

9   with you as my primary associate at Parkins Lee & Rubio, and

10  we were the primary bankruptcy counsel for the three

11  debtors.

12  Q    And what was the -- what was trying to be accomplished

13  in those InfoW cases?

14  A    Prior to the filing of the bankruptcy case, Alex Jones

15  and FSS and the debtors had agreed to a plan structure in

16  which, number one, Mr. Jones dedicated the equity interest

17  in the three debtors into a trust agreement so that he would

18  have no interest in the three companies, first of all, so

19  that he would lose all interest in that.

20         Number two, the trust would be manned by two

21  former bankruptcy judges, Judges Nelms and Schmidt, who

22  would basically be the trustees over the three entities

23  during the bankruptcy case, as well as on a post-

24  confirmation basis.

25         Number three, the plan contemplated that the trust

004861

1    would oversee a plan of reorganization whereby the plan

2    contributors -- that would be FSS and Alex Jones -- would

3    contribute the following things upon confirmation of the

4    plan: (a) $2 million on the effective date of the plan; (b)

5    approximately, I believe, some amount of money each quarter

6    -- I think it was either $200,000 or $500,000 a quarter,

7    such that for the next X number of years, the total

8    consideration was going to be $10 million to the total group

9    of tort and contingent unsecured claimants at that time.

10            And then number three, the trust had been funded

11   with approximately $725,000 of cash, which would be enough

12   funds to fund the Chapter 11 administrative process so that

13   the InfoW debtors could get the plan confirmed with these

14   elements in it: the LST trust, the plan support agreement,

15   as well as funding during the Chapter 11 case, which all was

16   predicated on the idea of getting the Connecticut plaintiffs

17   and the Texas plaintiffs under one roof so they could all be

18   adjudicated and handled in one roof under the bankruptcy

19   Court.

20   Q    Okay.

21   A    Was that clear?  I just want to make sure.

22   Q    It was clear.  It was clear.  If you could turn to Tab

23   No. 12.

24   A    I'm there.

25   Q    Are you familiar with this document and, if so, what is

1    it?

2    A     This is the emergency application that the debtor

3    drafted in order to --

4    Q     You said the debtor.  Who do you mean?

5    A     Oh, I apologize.  This is the application or emergency

6    application submitted by the InfoW debtors to put in place

7    the two liquidation trustees, former Judge Nelms and former

8    Judge Schmidt, so they could oversee the trust that would

9    essentially be supervising the plan of reorganization, as

10   well as the Chapter 11 process when they were in place to

11   further negotiate the plan support agreement.

12   Q     And just from your memory without looking at the

13   exhibit, do you remember if the plan support agreement you

14   just talked about had a termination date?

15   A     Yes.

16   Q     Do you remember what that date was?

17   A     There were several: April 30, 2022, I believe was one.

18   Number two, there were other conditions, including I believe

19   Paragraph 8 of the plan support agreement contains several

20   termination provisions, including the necessity for filing a

21   plan of reorganization by April 30th.  There was also a

22   provision requiring that the LST trustees be appointed by

23   the bankruptcy court by April 30th.  And those are the two

24   ones that I remember specifically which were contained in

25   Paragraph 8 of the plan support agreement that I remember

1    reading.

2    Q    Okay.  And what was -- under the plan support

3    agreement, there were other parties that were funding this,

4    not the IW debtors, correct?

5    A    That is correct.

6    Q    And why were they doing that?

7    A    The whole idea was that Mr. Jones and FSS would be

8    funding the trust in order to get what they called a full

9    release.  In other words, there would never be a release

10   like in the Purdue or these Boy Scouts cases.  The idea was

11   that they would get a full release only and only -- if and

12   only when the creditors in the trust got paid in full.  And

13   the idea was that they would dedicate the amount of monies

14   into the plan over the period of the plan so that only when

15   those creditors in the plan got paid in full would they get

16   a release.

17   Q    And was that agreement you just talked about ever

18   renegotiated in the IW cases?

19   A    It was.

20   Q    Can you describe that renegotiation?

21   A    I can give you only just general terms because I myself

22   and Mr. Schwartz, we were not involved in it intimately

23   because we were on the operational side.  The major

24   negotiations took place between the potential trustee's

25   counsel, which was Mr. Okin for Mr. Nelms and Mr. Schmidt,

1   and I believe the counsel for Mr. Jones, which was Shelby

2   Jordan, and counsel for FSS, which was Mr. Battaglia, and I

3   believe you were involved in looking at the documents.

4           They all got renegotiated so as to take in the

5   concerns of this Court and the creditors and they got filed

6   on the Court as Document ECF No. 48 on April 29, 2022, and

7   they were redlined to reflect all the changes that were made

8   by the parties and also a clean copy was filed at ECF No.

9   48.

10  Q    If you could turn in the exhibit binder to Tab 14.

11  A    Yes, sir.

12  Q    Take a look at this exhibit and, I guess, first, are

13  you familiar with it?

14  A    I am.

15  Q    And what is this document?

16  A    This is ECF 48 on InfoW case.  This is a document

17  that's the notice that was filed attaching both the clean

18  and the redline copies of the trust, as well as the PSA, the

19  plan support agreement, that was renegotiated between April

20  17th, the petition date, and April 29, 2022, among the

21  parties and filed with the Court to reflect the changes that

22  the parties were making as the case progressed.

23  Q    Okay.  Who negotiated this agreement on behalf of Free

24  Speech Systems?

25  A    Ray Battaglia as I remember.

1    Q    Okay.  Who did you represent in the limited

2    negotiations you just testified?

3    A    The three debtors, InfoW debtors.

4    Q    And what about Mr. Schwartz.

5    A    InfoW debtors.

6    Q    Okay.  And I guess just to ask, who did I represent in

7    that?

8    A    InfoW debtors.

9    Q    Were the amended PSA reflected in here ever executed?

10   A    No.

11   Q    And why not?

12   A    Number one, the emergency motion to appoint the

13   trustees, Exhibit No. 5 or the one that we just talked

14   about.  I'm going to go back to it, just a minute, one

15   second to be clear.  Exhibit No. 12, which was the emergency

16   motion to appoint the trustees; that was never approved by

17   the Court, and it kept on being passed and continued, so

18   that was never done.

19         Number two, the documents that were renegotiated

20   that the people worked on day in and day out that got filed

21   on April 29th.  The role changed completely on May 3rd when

22   the Connecticut plaintiffs and the Texas plaintiffs filed a

23   notice with this Court saying, Your Honor, we need a status

24   conference with you because we have some news that we want

25   to tell you about certain things we have done in our

1    respective state court, which was specifically we're going

2    to dismiss InfoW debtors from our respective state court

3    litigation, and that's the notice they sent.

4            So the Court set a hearing, I believe, on or about

5    May 6, 2022, in which they came to Court and said, Your

6    Honor, we think this case -- we don't want to be part of

7    this case anymore and here are the pleadings we're filing in

8    the respective state courts to show that we're dismissing

9    the three InfoW debtors from both the Connecticut and the

10   Texas state courts in the Sandy Hook lawsuits.

11   Q    Well, when you say state courts, were those litigations

12   removed through the Federal Bankruptcy Court at that time?

13   A    I apologize for not clarifying that.  On the day that

14   we had filed bankruptcy for the three debtors, InfoW debtors

15   on April 17 and 18, 2022.

16   Q    Is that a yes?

17   A    Yes, I'm sorry.  Yes, I apologize.

18   Q    And so, is that what you meant when you said state

19   court litigation, the removed state court litigation?

20   A    I did.  I'm getting ahead of myself.

21   Q    If you could turn to Tab 16.

22   A    Yes.

23   Q    Are you familiar with this document and, if so, what is

24   it?

25   A    This is the -- let me just look at the date.  This is

004867

1    the filing made by the, I believe the Connecticut plaintiffs

2    on May 2nd in which they're requesting an expedited status

3    conference with Judge Lopez in which they want to announce

4    to the Court that they had basically filed motions to

5    dismiss their claims against the InfoW debtors in

6    Connecticut state court litigation.

7    Q    Okay.  And so, when you referenced May 3rd, is this one

8    of the documents you were --

9    A    I am, that's correct.  I apologize for the mistaken

10   date.

11   Q    No need to apologize.  If you could turn to Tab 17.

12   A    Yes.

13   Q    Same questions.  Are you familiar with this and, if so,

14   what is it?

15   A    This is the same document.  This is a document that was

16   filed by the Texas plaintiffs stating that on May 6, 2022,

17   they want to join in the request by the Connecticut

18   plaintiffs for a status conference with Judge Lopez, also

19   wanting to say we're dismissing the InfoW debtors from their

20   respective lawsuits in Texas.

21   Q    And this is the other one that you had just talked

22   about as affecting the PSA.

23   A    Correct.

24   Q    Okay.  If you could turn to Tab 18.

25   A    Yes, I'm there.

1   Q   What is this -- are you familiar with this document

2   and, if so, what is it?

3   A   The document is an email from Mr. Ruff from the U.S.

4   Trustee's office on May 17th in which memorializes our

5   discussion that we've had regarding the direction of the

6   case.  It's a memorialization of our conversation he and I

7   have had, which we've had many of during the case regarding

8   the direction of the case, and he's setting forth his

9   arguments of why, at least from his perspective, he believes

10   that the cases should be dismissed as soon as possible.

11   Q   And if you could look down that and read that last

12   bullet point there out loud.

13   A   The last bullet points says from Mr. Ruff, "Dismissal

14   is the more efficient and cheaper option for these debtors

15   as it will save from administrative and litigation costs and

16   will still allow debtors options to resolve their claims."

17   Q   And, Mr. Lee, did you -- you received this email,

18   correct?

19   A   I did.

20   Q   Did you evaluate it?

21   A   I did, and I also evaluated it with Mr. Schwartz.

22   Every time one of these came, Mr. Schwartz and I discussed

23   it, we evaluated all the things that Mr. Ruff was saying and

24   considered it with all the other factors that we had to deal

25   with in the bankruptcy case, in the InfoW bankruptcy case.

1    Q    Okay.  If you could turn to Tab No. 19.

2    A    Yes, I'm there.

3    Q    Are you familiar with this document and, if so, what is

4    it?

5    A    It is, 19 is a copy of my application for Kyung S. Lee

6    PLLC.  It's the application to be retained in the bankruptcy

7    case of InfoW, which I filed on May 19, 2022.  And my

8    recollection is that I filed this application probably first

9    thing or early in the morning on May 19th because we had the

10   status conference with Judge Lopez at 2:00 p.m. that day in

11   which we were going to the Court and tell the Judge that we

12   had reached final agreement with the Texas plaintiffs about

13   the stipulation regarding their dismissal of their claims

14   against the debtors with prejudice.

15   Q    And, Mr. Lee, did you have any connection with FSS when

16   this was filed?

17   A    Absolutely none, other than the fact that they were

18   counterparties to the PSA when we first started the

19   bankruptcy case.  And, in fact, that's a point that I want

20   to clarify for this Court, and that is not until after I

21   finished the status conference with Judge Lopez on that

22   date, May 19th, that I received a call from Mr. Battaglia to

23   come to Austin and that's the point that I've been trying to

24   tell everyone since.  And that's the reason why, even if I

25   were able to make that disclosure, I couldn't make the

1    disclosure to Judge Lopez at 2:00 p.m. because I didn't

2    receive the call from FSS about coming to a meeting before

3    2:00 p.m.

4    Q    Okay, thank you.  If you could turn to Tab 20.

5    A    Yes.

6    Q    Are you familiar with this document and, if so, what is

7    it?

8    A    This is the document, as I recall, that the Connecticut

9    plaintiffs filed on or about May 19th before the hearing in

10   which they gave notice that in Connecticut that they had

11   filed their motions to dismiss with prejudice their claims

12   against the debtors, InfoW debtors, by motion.  There had

13   been a mistrust by the Connecticut plaintiffs to do any kind

14   of stipulations with the debtors because they thought that

15   it would be used later against them by one of the co-

16   defendants to say something that it didn't say, so they

17   proceeded by motion, while the Texas plaintiffs did

18   stipulations with the InfoW debtors that Mr. Battaglia and I

19   worked on that we presented to Judge Lopez on May 19th at

20   2:00 p.m.

21   Q    If you can talk about that stipulation, if you could

22   turn to Tab 21.

23   A    Yes.

24   Q    Are you familiar with this document and, if so, what is

25   it?

 1   A    I am.  Exhibit No. 21 is the stipulation that the Texas

 2   plaintiffs and I worked on behalf of the debtor InfoW, Mr.

 3   Battaglia and I negotiated this during the week before May

 4   19th and we filed this either the day before on the Court's

 5   docket and then we came to Court on May 19th and asked Judge

 6   Lopez to approve it.  And then Mr. Battaglia, I believe,

 7   took it and he filed it in the Western District of Texas so

 8   that Judge Mott and others could rule on their motions to

 9   remand.

10   Q   Mr. Lee, I have a question.  How did this benefit FSS,

11   this stipulation and order?

12   A    This stipulation had nothing to do with FSS.  I was not

13   thinking about FSS.  This was for the benefit of the debtor.

14   It was for the fact that they were dismissing the claims.

15   And my charge from Mr. Schwartz, ever since we were told

16   that the plaintiffs in both Connecticut and Texas were

17   dismissing us, my charge from Mr. Schwartz to me was make

18   sure that they dismiss us with prejudice, that there are no

19   longer creditors, and make sure that those dismissals are

20   absolutely clean and that they are gone forever from these

21   estates.

22       That was my duty and he told me to go implement

23   that and that's what I was told to do from May 19th until

24   these things got done -- from May 3rd until May 19th; that

25   was my charge, that's what I worked on.

1    Q    And you said the debtor and you said the estates.  You

2    mean the InfoW debtors?

3    A    InfoW debtors, yes.

4    Q    I want you to turn to Tab 26.

5    A    I'm there.

6    Q    I want you to read through it and it goes on for a

7    couple of pages and tell me what this document or if you're

8    familiar with this document and, if so, what it is.

9    A    I'm familiar with the document.  This is an email which

10   starts the string on May 25, 2022, if you go back to Page 5

11   of 5 on Exhibit No. 26.  This is a document in which after I

12   had evaluated -- let me just start.  May 19th is when we go

13   to Court and tell Judge Lopez that the Texas plaintiffs have

14   stipulated to dismissal with prejudice.  Judge Lopez signs

15   the stipulation and we file it.

16        Thereafter, we start working.  Mr. Schwartz and I

17   start evaluating whether or not the company should proceed

18   to Chapter 11 or dismiss.  We make an evaluation, which

19   we'll talk about in some of these other emails.  But Mr.

20   Schwartz tells me, we've concluded, that we're going to

21   dismiss the case, and we make the announcement to the U.S.

22   Trustee on May 25th -- that's the first email that you see

23   at the very beginning on Page 5 of 5 -- at which point in

24   time, Mr. Ruff and I begin discussions on how to get the

25   dismissals done.

1          I'm telling Mr. Ruff I need some more time because

2    I want to do it right because I may take more time to get

3    some of these things done because I've been pressured to do

4    it so quickly, I don't want to make any mistakes.  He says,

5    Kyung, get it done quickly.  You can do it through a

6    stipulation of dismissal of our motion to dismiss.  So we

7    look at that idea and we start drafting a stipulation of

8    dismissal.  We go back and forth and --

9          MR. NGUYEN:  Objection, Your Honor.  I don't think

10   hearsay testimony.

11         THE WITNESS:  He's a party.

12         MR. NGUYEN:  He's explaining what Mr. Russ was

13   saying.  Mr. Ruff (indiscernible)

14         THE COURT:  There's an objection, a hearsay

15   objection.  What's your response?

16         MR. SHANNON:  Your Honor, he's talking about the

17   status of negotiations that are really the crux of the U.S.

18   Trustee's objection to the applications to employ.

19         THE COURT:  Overruled.  He can answer.

20         THE WITNESS:  So basically, this chain of emails

21   starts on May 25th, and then the next thing you see is Mr.

22   Ruff send us on May 27th a proposed stipulated dismissal on

23   May 27th.  The problem I had with the May 27th draft that he

24   sent me was it starts off by saying, "The motion to dismiss

25   by the U.S. Trustee is granted," and that wasn't our deal.

1    That wasn't what the agreement was.  The agreement was we're

2    going to dismiss the case because we had no further need for

3    the case.  And so, I had to then go and redraft the entire

4    thing and work with Mr. Schwartz and go get that process

5    too, so that's what I worked on so that took another day.

6              And then as you can see, we marked that, and by

7    June 1, we've gotten it back to Mr. Ruff and he's going

8    through it and he's eliminated a lot of things that I've

9    asked for, but we've now come to an agreement by June 1 on

10   that dismissal order or stipulation.

11             So this is what it reflects, but from May 25th to

12   June 1, only thing we're working on between me and him was

13   getting that document correct.

14   BY MR. SHANNON:

15   Q    Thank you, Mr. Lee.  And I actually got a little bit

16   out of order.  I jumped ahead of myself there.

17   A    Sorry about that.

18   Q    If you could go back to Tab 23.

19   A    Sure.

20   Q    Are you familiar with this document and, if so, what is

21   it?

22   A    It is.  This is an email I sent to Mr. Schwartz on May

23   24th -- or on May 19th at 5:24 p.m.  Recall we came to Court

24   on May 19th at 2:00 p.m. and the hearing before Judge Lopez

25   lasted from 2:00 to 2:28 p.m., in which we announced the

1    stipulation of dismissal and Judge Lopez signed the

2    stipulation.  I got the call from Mr. Battaglia afterwards

3    and he said, please come to Austin next Tuesday.  I had not

4    mentioned any of this to Mr. Schwartz because of all this

5    other work we were still doing.  And it was only at 5:24

6    that I sent him this email saying, hey, we've been invited

7    to come to Austin to talk about FSS, so let's -- I just want

8    you to know that's when the meeting is going to be.

9          And I didn't mention any of this stuff to him

10   until the hearing was over, until we had dismissed all the

11   claims and, at least in my mind, knew there was no

12   relationship between FSS and InfoW debtors at that point in

13   time because there were no claims that existed between the

14   litigation claimants and FSS, at least at one datapoint that

15   I had.

16   Q    Okay.  And if you could go to Tab 24.

17   A    Yes.

18   Q    Same questions.  Are you familiar with this document

19   and, if so, what is it?

20   A    I am.  This is a document that I prepared after I sent

21   the email on Thursday, May 19th.  I took time on Friday, May

22   20th, Saturday, May 21 to evaluate my InfoW file.  Because

23   one of the things I did not want to do is create this very

24   same problem that we're having right now, which is I did not

25   want the Court, the creditors, or anyone to think that we

1   were running from one project to go into another one

2   thinking that we had all these little issues.

3         So I took it upon myself to study the problem and

4   say, Marc, do we have a problem here, do we need to analyze

5   this, and I took it upon myself for two days to study this

6   and this was the conclusion that I reached, and it was sent

7   to him on Saturday, May 21 at 10:52 in the morning.  And I

8   said I've been evaluating these things and I said, here, I

9   started the evaluation ever since we saw Judge Lopez on

10  Thursday about the dismissals and whether we need to

11  evaluate any of these other things.

12        I said, I've continued to evaluate those issues

13  and reaching the conclusion that the cost to prosecute the

14  Subchapter V bankruptcies for the three debtors to

15  confirmation, especially with opposition from the U.S.

16  Trustee, the fact that the remaining claims or obligations

17  also jointly (indiscernible) by Free Speech Systems; (c) the

18  debtor should have sufficient funds; (d) debtor's reserve

19  and that there should be enough money for the Subchapter V

20  Trustee and that the most efficient way to administer the

21  debtors is to file as soon as possible a motion to dismiss

22  the bankruptcy case.  The motion to dismiss the bankruptcy

23  will be on 21 days' notice to all creditors.

24        I think it would behoove all of us to all agree

25  that this is the right conclusion, that we're moving to

1    implementation of dismissal as the goal.

2    Q    Okay.  So I just want to know, you testified earlier

3    about an email from Mr. Ruff.  Did what Mr. Ruff tell you

4    have any, you know, bearing on your decision here; did you

5    consider what he said in that?

6    A    Absolutely.  As of May 17th, Mr. Ruff had taken the

7    position that no applications for employment of

8    professionals would ever come before a hearing on a motion

9    to dismiss.  He had said that in his email on May 17th and

10   he had continued to take that position throughout any

11   discussions that we've had.

12          So in order for us to get our applications

13   approved in the InfoW case, the estate would have had to

14   spend monies to beat the U.S. Trustee on his motion to

15   dismiss to have the case approved as a Subchapter 11(sic)

16   only to feather our own nests at that point in time to get

17   our applications approved so that we could have final fee

18   applications.

19   Q    Okay.  Let's see, and if we could just go to Tab 25

20   now.

21          THE COURT:  Mr. Lee, hold on.  I'm going to ask

22   you a question about that.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Are you saying that if you would have

25   requested a hearing date in front of me about an application

1  that I wouldn't have considered it because of what the

2  United States Trustee was arguing?

3       THE WITNESS:  No, Your Honor.  I'm not suggesting

4  that at all.  What I'm suggesting is that the way that the

5  case had already been set, it was clear to me that the U.S.

6  Trustee had already set the motion to dismiss in front of

7  all the applications first.

8       And, number two, that in order to get the

9  applications heard, at least it was my perception, that the

10  U.S. Trustee would oppose that because he was saying that

11  the bankruptcy case was an improper bankruptcy case, and he

12  was saying that it would be improper to have professionals

13  employed in an improper bankruptcy case and, therefore, he

14  wasn't going to let that happen.

15       He wanted the case dismissed without the stamp of

16  a bankruptcy court allowing a professional to be employed.

17  That's the position I think took.  And so, I have to

18  evaluate those facts with Mr. Schwartz and say, was it worth

19  it for us to have that fight to get the fee apps approved.

20  Because as you will see, I again on May 30th, Mr. Schwartz,

21  should we have that fight just to get the protections for

22  us, the professionals, and Mr. Schwartz said to me again,

23  no, Kyung, that's stupid.  Why would you spend more estate

24  monies just to feather our own nest to get bulletproof

25  protection for our fee applications?

1          THE COURT:  Okay.

2          THE WITNESS:  That's just not worth it.  That's

3     the dialogue we were having internally.

4          THE COURT:  Thank you.

5          THE WITNESS:  Okay.

6     BY MR. SHANNON:

7     Q    Okay.  So, Mr. Lee, then let's go to Tab 25.

8     A    Yes, sir.

9     Q    Are you familiar with this document and, if so, what is

10    it?

11    A    This document is the email I sent to Marc Schwartz,

12    Chris Schwartz, and Harold on Monday, May 23rd.  Recall, May

13    19th, we have the hearing with the Court.  May 21, I give

14    the analysis.  And to make sure the estate is run lean, I've

15    drafted a motion to dismiss by May 23rd.

16    Q    Okay.  And so, it's after that that then the

17    conversation with the U.S. Trustee you talked about before

18    happened.

19    A    Takes place starting on May 25.

20    Q    Okay.  And on May 24 was the meeting with FSS --

21    A    Correct.

22    Q    -- that is at issue.

23    A    That's correct.

24    Q    Go to Exhibit 27.

25    A    Yes, sir.

1    Q     Same questions.  Are you familiar and, if so, what is

2    it briefly?

3    A     This is the stipulation that Mr. Ruff and I worked on

4    from May 25th until June 1, and then we filed it with the

5    Court.  And then it was on, I believe, 10 days' notice and

6    Judge Lopez signed it on June 10th.

7    Q     Okay.  Let me just ask you, was -- well, I guess it's

8    already clear.  Is it correct that KSL PLLC, Kyung S. Lee

9    PLLC, it was never employed in the IW bankruptcy case.

10   A     We were not.

11   Q     At what point did you believe that the IW debtors had

12   determined they were not going forward with that employment?

13   A     May 21.

14   Q     Okay.  And why did you believe that?

15   A     Because I had recommended to Mr. Schwartz that the case

16   be dismissed, and Mr. Schwartz had agreed with me.  And by

17   the time we were going to dismiss the case, there wasn't

18   going to be further need for retaining professionals.  And

19   then that was supplemented by my continuing dialogue with

20   Mr. Ruff from the U.S. Trustee's office, who said let's be

21   efficient in how we administer this Chapter 11 case.  You

22   can pay your professionals outside of bankruptcy and let's

23   dismiss the case and be done with it so that the only thing

24   we should be worrying about is Miss Haselden, Melissa

25   Haselden, the Subchapter V Trustee, and make sure that she

1    has enough -- that the estate has enough money to pay her

2    fees and let's get the case dismissed.

3    Q    And do you remember when you might have heard that from

4    Mr. Ruff?

5    A    It started with the email on May 17th, which we've

6    talked about already, and was repeated throughout the entire

7    negotiations process.  When I was asking for more time, he

8    was asking for dismissal and handle all your administrative

9    fees outside of the bankruptcy.

10   Q    Okay.  I'm just going to ask you straight up, Mr. Lee,

11   why was there never a supplemental Rule 2014 disclosure for

12   Kyung S. Lee PLLC?

13   A    Number one, as we've talked about in our papers, we

14   didn't move -- the idea of seeking employment disappeared as

15   far as the applicant was concerned when the case was going

16   to be dismissed shortly, number one.

17          Number two, if I didn't disclose this to the

18   Court, I apologize, but I think the only time I saw the

19   Court was on May 19th and then June 10th, I believe.  I

20   don't think there was a time between those two periods that

21   I saw the Court.  And as I indicated, I did not know about

22   the FSS meeting until after the May 19th hearing.

23          Number three, I just need to let people know there

24   was not a certainty when we went to this meeting on May 24

25   that Kyung Lee or Marc Schwartz was going to be retained.

1    The idea that there was a letter that Mr. Schwartz sent to

2    me on May 19th, got signed on May 19th, and he got engaged,

3    it's just not true; that's not what happened.  He sent the

4    letter, and it got lost in the ether and neither of our

5    engagement letters got signed until June 6, and we were just

6    there to see if we were going to be retained.

7            And again, I did my best to, on May 21, to

8    evaluate the situation internally with the client and the

9    client said, look, we're done with this case, there's

10   nothing more to do here, and there's no adversary between

11   FSS and InfoW debtors because there's no conflict, and we

12   didn't deal with any of these issues between the two

13   companies between that period of time.

14           And there was a lot of uncertainty because on the

15   other hand, especially for a professional like me, I have

16   client confidences I have to keep.  And so, there were a lot

17   of factors that were going in my mind, and I felt very

18   confident that, from my perspective, there was nothing

19   impinging on the estate because we weren't dealing with any

20   FSS issues at that point in time and had nothing to do with

21   them.

22           And again, if I erred, it's my fault.

23   Q    Okay.  I want you now to go to the small book.

24   A    Sure.

25   Q    And turn to Tab 1.  We're going to switch gears a

1    little bit and now we're going to talk about Mr. Schwartz

2    very briefly.

3    A    Sure.

4    Q    Same questions as always.  Are you familiar with this

5    document behind Tab 1?

6    A    I am.

7    Q    And, if so, what is it?

8    A    This is an email that I located last night at midnight

9    in searching through my outbox and it is an email that I

10   sent to Mr. Schwartz on June 5.

11          THE COURT:  Is this Docket 178?

12          MR. SHANNON:  Yes.

13          THE COURT:  Okay.  I just want to make sure.

14          THE WITNESS:  178-1.  It's an email that I found

15   last night at around midnight.  And what it is it's an email

16   that I sent to Mr. Schwartz on June 5, okay, and if you look

17   on your calendar, June 5 is a Sunday.  And it's an email I

18   sent to him saying, hey, I've made some revisions to your

19   engagement agreement, and I've done it based upon looking at

20   the company agreement of FSS.

21          And the reason why I was doing that was because

22   all the creditors were complaining mightily about, oh, Mr.

23   Schwartz is just the lackey in InfoW; he doesn't have any

24   authority.  So I took the company agreement of FSS, and I

25   tightened up the provisions about his authority, and I

1   redlined it, and I sent it to him on June 5th.

2          And when I looked at last night, I said, you know

3   what, this looks kind of funny, it looks very familiar.  So

4   when I looked at the redline which is attached and I took

5   the engagement letter that everyone's been saying was dated

6   May 19th and it's attached to his application, I took that,

7   and I looked at it and I compared it word for word, and I

8   realized that my redline is the engagement letter.

9   BY MR. SHANNON:

10  Q    Well, let's talk about the redline.  Let's go to Tab 2.

11  A    Sure.

12  Q    Is this the redline that you're talking about?

13  A    It is the redline I'm talking about.  And as you can

14  see, it's a redline that I did for Mr. Schwartz on June 5,

15  2022, in which I tightened up all these things and give him

16  really good powers I think.  And so, all these changes are

17  made, and if you look at the application letter that is

18  attached to his letter, the engagement letter, you will see

19  that every one of these changes are incorporated into it.

20         And so, it was impossible for Mr. Schwartz to have

21  given this letter, the one that he got signed to the company

22  FSS on May 19th.  It's impossible because I hadn't given him

23  these comments until June 5.  And you could see it because

24  at the top of this letter, you see the comma 2022; there's

25  no space between the two letters.  When you see the final

```
 1   engagement letter, it still has that same mistake on it.
 2   And I don't know why somebody put May 19th on the top as the
 3   final one, but it's got the same error.
 4            THE COURT:  Can I ask you a question, Mr. Lee.  I
 5   want you to take a look at the screen.  Take a look at the
 6   screen there.  It's a supplemental declaration filed by Mr.
 7   Reynal.  I'll stipulate that he filed this -- we'll get the
 8   date on it -- and that's special counsel.
 9            Here's what he said.  Do you consider this to be a
10   true and accurate statement -- I've got to deal with that
11   too -- to your knowledge?  He's saying that FSS retained
12   Schwartz on May 19th and that Schwartz asked him, who's a
13   criminal defense lawyer, whether Mr. Schwartz knew of any
14   financial executive.
15            So I understand what you're saying.  I'm also
16   looking at this and here's another statement filed by
17   someone under -- this was filed on September 12th --
18            THE WITNESS:  Yes.
19            THE COURT:  -- under penalty of perjury.
20            THE WITNESS:  Right.
21            THE COURT:  And it's speaking of an additional
22   relationship on May 19th.  And I will stipulate to you --
23   I'm just trying to see if I can put all the pieces together.
24            THE WITNESS:  Your Honor, I have an answer for
25   you.
```

1          THE COURT:  If you don't know it and you filed it.

2          THE WITNESS:  I drafted it.

3          THE COURT:  Oh, okay.

4          THE WITNESS:  I drafted it.  So until I discovered

5    this issue last night, I was also under the mistaken

6    impression that the letter was dated May 19th is what I'm

7    trying to tell you.

8          THE COURT:  So do you think Mr. Reynal is -- do

9    you think the statement that he's making here under penalty

10   of perjury is untrue?

11         THE WITNESS:  It is untrue because I wrote it for

12   him, and so it was my mistake too.

13         MR. SHANNON:  Judge, if I could --

14         THE COURT:  No, no, no.  We take witnesses.  You

15   get to ask questions and so do I.  I'm just trying to put

16   all the pieces together.

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  Thank you.

19         THE WITNESS:  It's my fault.

20         THE COURT:  No, no, no.

21         THE WITNESS:  It's my fault.

22   BY MR. SHANNON:

23   Q    All right.  Let's go to Tab -- actually, let's answer

24   that real quick.  If you go back to the big book.

25   A    Sure.

1    Q    And we'll go to towards the end here.

2              THE COURT:  Mr. Lee, I've got more questions.  So

3    in the previous exhibits that were shown, Mr. Schwartz is

4    attending meetings on May 24th.  So even if I accept that

5    the work was not -- maybe that the retention letter that Mr.

6    Schwartz is indicating, you know, was filed later, he's

7    certainly attending meetings in May in connection with a

8    potential FSS restructuring, right, because he was at the

9    May 25th meeting.

10             THE WITNESS:  May 24th.  Yes, Your Honor, he was.

11             THE COURT:  Okay.

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.

14             THE WITNESS:  No disagreement on that point.

15             THE COURT:  Okay.  I just wanted to understand.

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  I understand your point though.

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             MR. SHANNON:  Sorry, I'm going to take one second.

21             THE WITNESS:  Sure.

22             THE COURT:  Take your time.  So let me ask you

23    this as well, and I'm just trying to put all the pieces

24    together.  Here is Mr. Schwartz's declaration that he filed

25    in connection with the first day case, and he says May 19th

1    as well.  Are you telling me that Mr. Schwartz got it wrong

2    too?

3              THE WITNESS:  Your Honor, the reason why everyone

4    got it wrong is because I'm the person drafting all of

5    these, and I got --

6              THE COURT:  I'm assuming somebody's reading it

7    before they sign it.

8              THE WITNESS:  Your Honor, that's correct.  I can't

9    deny your sentence, what you just said.  But I'm the one

10   who's drafting these, and I did not know -- I did not

11   remember this until last night is what I'm trying to tell

12   Your Honor.

13             THE COURT:  I know, I understand.  It sounds like

14   Mr. Schwartz didn't either.

15             THE WITNESS:  No, no one did.  I apologize.  I

16   apologize.

17             THE COURT:  Okay.  I don't think you remembered it

18   when we first talked about it at the first hearing.

19             THE WITNESS:  That's correct.

20             THE COURT:  Okay.

21             THE WITNESS:  No one did, and I didn't remember it

22   until last night when I came across the email.

23             THE COURT:  Okay.

24   BY MR. SHANNON:

25   Q    Okay.  Well, Mr. Lee, can you go back to that big book

1    and go to Tab 30.

2    A    Sure.

3    Q    If you could go back to the big book and go to Tab 30.

4    A    Sure.

5    Q    Are you familiar with that document?

6    A    Yes, I am.

7    Q    Can you tell me what it is?

8    A    That is the attachment to Mr. Schwartz's application in

9    the FSS bankruptcy case.  It is a copy of his engagement

10   letter to FSS signed on or about June 6, 2022 by Mr. Jones.

11   Q    And what was this letter dated?

12   A    It's dated at the top as May 19, 2022.

13   Q    Okay, no further questions about that.  Okay, now back

14   to the small binder.  I'm sorry, wanted to clarify that.

15   All right, now if you could just go to Tab 3 in that small

16   binder.  Are you familiar with this document?

17   A    It is -- I am.  I am.

18   Q    Please describe to me what this is in relation to the

19   other (sound drops).

20   A    If you look from the bottom up, you will see that this

21   is the email that I sent to Mr. Schwartz on Sunday, where I

22   ask him for his Word document of the engagement letter so

23   that I could make the changes based upon my review of the

24   company engagement letter -- company agreement of FSS.  And

25   then I sent him at 3:05 p.m. certain revisions that we

Page 102

1    looked at are behind Exhibit No. 2.

2            And then at 4:20, he says to me, I'm fine with

3    these changes, and he says you want me to make them, and

4    then he says, I need to read Paragraph 8.01 of the company

5    agreement.  And I tell him I want you to make -- he tells me

6    I want -- I tell him, please make the changes and bring both

7    the redline and the clean to Austin so we can show it to

8    Ray, meaning Ray Battaglia, and client and have it signed.

9    It is too difficult and confusing to do it otherwise.  Do

10   you see what I'm saying?

11           And so, it's concluding our discussion about the

12   changes that need to be made to his engagement letter that

13   he needs to bring to Austin on June 6, the Monday, the next

14   day.

15   Q    So that's when the Schwartz engagement letter was

16   actually signed, irrespective of when the letter was dated.

17   A    That's correct.

18   Q    Okay.

19           MR. SHANNON:  Well, no further questions from me,

20   Your Honor.

21           THE COURT:  I just have one question.

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  So here is the Schwartz declaration

24   submitted in connection with his application.

25           THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Paragraph 19 and 20, he's referring to

2    May 19th again.  Is it your understanding that Mr. Schwartz

3    got that wrong too?

4          THE WITNESS:  Yes, Your Honor, because again --

5    (reads to himself) -- on this sentence, it's correct because

6    I called him after our hearing with you to come to Austin,

7    and that's what he's referring to there.

8          THE COURT:  Okay.  But is it possible that your

9    draft -- there was a draft on May 19th that was submitted,

10   and Mr. Schwartz started working for FSS around May 19th.

11   It's just the final draft of the document was dated -- with

12   the additional language and it was still dated May 19th

13   because that's when the work was done.  Happens all the time

14   in Chapter 11 cases.

15         THE WITNESS:  No, I understand what you're saying.

16   The answer is that Mr. Schwartz probably submitted something

17   to me, and I submitted something to Mr. Battaglia, but it

18   got lost in the paperwork and neither Shannon & Lee nor

19   Schwartz Associates or the CRO had an engagement letter

20   signed until June 6th.

21         THE COURT:  Okay.

22         THE WITNESS:  That's what happened.

23         THE COURT:  Completely understand.

24         THE WITNESS:  So whatever recitations I made about

25   May 19th, it was based upon an erroneous statement or

```
1    assumption that I made and all those were written by me with

2    that erroneous statement until I found this last night.

3              THE COURT:  Okay.

4              THE WITNESS:  That's my error.

5              MR. SHANNON:  I don't know if this would be a

6    redirect because I did say I pass the witness, Your Honor.

7              THE COURT:  You did.  You did.

8              MR. SHANNON:  I can wait.

9              THE COURT:  Okay.  So why don't we take five

10   minutes and let everybody just take a moment, let everyone

11   stretch their legs out.  Why don't we -- it's 3:17, why

12   don't we come back at 3:25.

13             THE WITNESS:  Okay.

14             THE COURT:  Okay, thank you.

15             CLERK:  All rise.

16             (Recess)

17             CLERK:  All rise.

18             THE COURT:  Okay, we are back on the record in

19   Free Speech.  Mr. Lee, I'll remind you that you're still

20   under oath.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Okay.  Mr. Nguyen, you may proceed

23   with cross examination and just get close to a mic.  I want

24   to make sure we can hear you.

25             MR. NGUYEN:  I will do my best, Your Honor.
```

1          THE COURT:  Thank you.

2          MR. NGUYEN:  Sometimes I forget.  Your Honor, I

3    got some assistance from Mr. Travis who will be --

4          THE COURT:  Okay.

5          MR. NGUYEN:  -- if I can ask Your Honor to give

6    him control, he's going to be -- I didn't, I was trying to

7    save paper.

8          THE COURT:  Okay.

9          MR. NGUYEN:  So he's going to be showing the

10   exhibits on the screen.  I can't see Mr. Lee's computer, but

11   is the screen --

12         THE COURT:  I think once I -- I think mister --

13   okay, you're good.  You should be --

14         MR. NGUYEN:  Okay.

15         THE COURT:  Okay.

16         MR. NGUYEN:  Great, and Mr. Travis, if you can

17   just go to 163-18 and we'll just start out with that email.

18   Maybe you can just make it a little bit bigger.

19              CROSS EXAMINATION OF KYUNG LEE

20   BY MR. NGUYEN:

21   Q    Mr. Lee -- nice to see you, Mr. Lee.

22   A    How are you, Mr. Nguyen?

23   Q    I'm doing well.  Thank you for asking.

24   A    Thank you.

25   Q    I just want to jump to this one before I forget.  This

1   was an email that you were discussing with Mr. Shannon about

2   -- I think the way you described it was this email was a

3   memorialization of a discussion between yourself and Mr.

4   Ruff.  Was that the testimony?

5   A    Based upon the first sentence.  "Following on our

6   conversation yesterday, please let me know when you've had a

7   chance to discuss these matters with Marc."

8   Q    Okay.  And did you respond to this email?

9   A    I don't know.

10  Q    You've attached Mr. Ruff's email, but -- and I think

11  you said he made some good points about the administrative

12  cost and the dismissal, but were you on board with

13  dismissing the InfoW cases on May 17th, when this email was

14  sent to you?

15  A    The answer is I don't think I made any kind of

16  decisions because I hadn't discussed it with Mr. Schwartz on

17  May 17th yet.

18  Q    So you think the Court should have the benefit of

19  seeing your response to this email just to determine your

20  mental state as of May 17th?

21          THE COURT:  (indiscernible).  Just curl the mic

22  down.  I want to make sure we can hear you.

23  BY MR. NGUYEN:

24  Q    You didn't attach your responses to the exhibit, right?

25  A    I didn't know what exhibits you're going to attach, so

1   no, I don't -- I didn't attach anything if that's what --

2   that's your question.

3           MR. NGUYEN:  Your Honor, I have a rebuttal

4   exhibit, if I can just hand it up to the party.

5           THE COURT:  Sure.

6           MR. NGUYEN:  And Your Honor, may I approach?

7           THE COURT:  Okay.

8           MR. NGUYEN:  I'm going to ask Mr. Shannon

9   (indiscernible).

10          MR. SHANNON:  Yeah, I'm not sure what this is in

11  rebuttal to that --

12          MR. NGUYEN:  Your Honor, the testimony was on May

13  17th.  There was a decision to dismiss the case based on --

14          MR. SHANNON:  I don't believe that was the

15  testimony, Your Honor.

16          THE COURT:  What's the --

17          MR. NGUYEN:  Your Honor, the use of this exhibit

18  without the response, they were making arguments that all

19  these were good points.  I'm just rebutting the fact that

20  they weren't on board at this time.

21          THE COURT:  If you want to impeach the testimony,

22  then --

23          MR. NGUYEN:  Sure.

24          THE COURT:  Then do that.

25          MR. NGUYEN:  Thank you, Your Honor.

1    BY MR. NGUYEN:

2    Q    Mr. Lee, did you respond to this email?

3    A    Looks like I responded to, based upon what you showed

4    me, looks like I did on 4:45 p.m.

5    Q    And did you describe the email that I believe is on

6    165-18 as a diatribe?

7    A    Yes.

8    Q    And you also told Mr. Ruff to send notice of

9    depositions for Mr. Schwartz?

10   A    Right.

11   Q    And at this time, you hadn't made the decision to

12   dismiss the case, right?

13   A    That's correct.

14   Q    And --

15   A    We're fighting with the U.S. Trustee on May 17th.  That

16   is correct.

17   Q    Yeah, and you also sent the DOJ legal manual to Mr.

18   Ruff and you told Mr. Ruff to read the DOJ manual, is --

19   A    That's correct.  I was very upset with him.

20   Q    Did Mr. Ruff ever tell you not to amend your

21   declaration in the InfoW case?

22   A    We never discussed my declaration in InfoW case.  No.

23   Q    Okay. And earlier, you mentioned that you've been

24   practicing bankruptcy law since September of 1984, right?

25   A    That's correct.

```
 1   Q    Thank you.  And you file a lot of bankruptcy cases?

 2   A    I filed cases.

 3   Q    Okay.  And you're familiar with Rule 2014, correct?

 4   A    Generally, I am.

 5   Q    Okay.  And earlier, we went through the little history

 6   with the law firms that you were with and just so I can get

 7   it clear as it relates to the InfoW case, at this time,

 8   you're currently with Shannon & Lee LLP, correct?

 9   A    I am.

10   Q    And that started on June 1st, 2022, correct?

11   A    That is correct.

12   Q    And prior to Shannon & Lee LLP, you were with Kyung S.

13   Lee PLLC; is that correct?

14   A    That is correct, for 15 days.

15   Q    And that started May 15 to May 31st, 2022?

16   A    May 16th, 2022 through May 31.  I think May has 31

17   days.

18   Q    Okay.  And prior to -- I'm going to call it KSL PLLC --

19   you were with Perkins, Lee, and Rubio LLC, correct?

20   A    From August 1, 2022 through May 15th, 2022.

21   Q    Okay, so when the InfoW cases were filed on April 17th

22   and -- it was a midnight filling, so there's some cases in

23   April 17th and there was some cases on April -- one case on

24   April 18th, you filed with the firm Perkins, Lee, and Rubio.

25   A    That is correct.
```

1    Q    Okay.  And prior to the filing -- prior to the filing

2    of the InfoW cases -- and when I talk about InfoW case, I'm

3    talking about InfoW, IWHealth, and Prison Planet, those

4    cases --

5    A    Yes, sir.

6    Q    You were involved in the negotiation of the plan

7    support agreement?

8    A    Yes.

9    Q    Okay.  And you were representing these three entities

10   in the negotiation of those plan -- in the negotiation of

11   the plan support agreement, correct?

12   A    Yes.

13   Q    Okay.  And when you were negotiating on behalf of the

14   InfoW Debtors, you were -- well, who were you negotiating

15   with on the plan support --

16   A    Against or with?

17   Q    Who were the parties to the plan support agreement?

18   A    There was -- Ray Battaglia was representing Free Speech

19   Systems and Mr. Jordan was representing Alex Jones.

20   Q    So it was Alex Jones, Free Speech Systems, and the

21   InfoW Debtor.

22   A    That's right.  We were the party that was going to be

23   the recipient of the funds from Free Speech Systems as well

24   as Alex Jones under the plan support agreement.

25   Q    So there was Alex Jones, Free Speech Systems, and InfoW

1    Debtors, correct?

2    A    That's correct.

3    Q    Okay, thank you.  And then after the bankruptcy case

4    was filed, there was, I believe -- it's a restated and

5    amended plan support agreement that was filed with the Court

6    on April 29th --

7    A    Incorrect.  There was a restated and amended trust

8    agreement, but only an amended plan support agreement.

9    Q    Got it.  So there was an amended plan support agreement

10   filed with the Court on April 29 --

11   A    Correct.

12        THE COURT:  And Nguyen, I want you to take the

13   microphone and just take it -- just turn it down a little a

14   bit.  (indiscernible).

15        MR. NGUYEN:  I'm going to leave it right here.

16        THE COURT:  Well -- that's perfect.  Thank you.

17   And I apologize.

18        MR. NGUYEN:  I apologize, Your Honor.  Sometimes I

19   -- zoned in and I forget.  I'll be more mindful.

20   BY MR. NGUYEN:

21   Q    And Mr. Lee, the parties -- I'm stepping away.  The

22   parties to the negotiation under the amended plan support

23   agreement were the InfoW Debtors, Alex Jones, and Free

24   Speech Systems.  Correct?

25   A    Incorrect.

Page 112

```
 1   Q    Who else?

 2   A    The trust lawyers.  LST.

 3   Q    Mr. Okin

 4   A    Mr. Okin and he represented the trust Trustees which

 5   were former Judge Nelms and former Judge Schmidt.  They were

 6   the primary ones involved in the negotiations because they

 7   were the ones who were going to take over direction of the

 8   case insofar as negotiations with the parties.

 9   Q    Mr. Lee, are you familiar with the U.S. Trustee's

10   motion to dismiss in the InfoW cases?

11   A    I am.

12   Q    Thank you.  And we'll get back to that in a little bit.

13   And before the U.S. Trustee filed a motion to dismiss, the

14   Connecticut plaintiff and Texas plaintiff also filed motion

15   to dismiss -- motions to dismiss in the InfoW cases,

16   correct?

17   A    That is correct.

18   Q    Yeah.  And if I remember correctly, the Court set a May

19   27th hearing date for all three motions; is that correct?

20   A    That is correct.

21   Q    Okay.  And then there were deadlines for yourself in

22   representing the InfoWars Debtors (indiscernible) to respond

23   to three motions by May 230th, 2022?

24   A    I can't remember the exact day, but there were certain

25   deadlines set for us to respond to.
```

1    Q    All right.  You had to respond to all three motions,

2    correct?

3    A    That is correct.

4    Q    And earlier, you mentioned -- on May 3rd, you described

5    it as the world changed on May 3rd, right?

6    A    I think that's correct.

7    Q    Okay.  So as we got closer to the May -- I'll just say

8    May 20th deadline for you to respond, your objective at the

9    time was not to take care of the motion to dismiss but to

10   dismiss the plaintiff's claims with prejudice; is that a

11   correct statement?

12   A    I don't understand your question.

13   Q    Okay.  So there's two competing tasks that you have to

14   do, right?  One is to respond to our motion to dismiss and

15   the other task is to make sure that the claims against the

16   InfoW Debtors were dismissed with prejudice and you were

17   more focused on the second task as opposed to responding to

18   our motion to dismiss --

19   A    That's a fair statement.

20   Q    Okay, thank you.  So on May 18th, 2022, you filed a

21   document with the Court and in that document you were

22   requesting additional time to -- you were requesting

23   additional time to -- especially kicking out the deadlines,

24   right, the May 27th deadline to June and then extending your

25   deadline to respond to the U.S. Trustee's motions; is that

1    correct?

2    A    That motion asked for several things and it was subject

3    of negotiation between Mr. Ruff and me to kick out the

4    deadlines, discovery deadlines and everything else until I

5    had sufficient time to finish up the negotiations and the

6    stipulations with the dismissing creditors.

7              MR. NGUYEN:  Okay.  And Mr. Travis, can you pull

8    up Exhibit 165-6?

9    BY MR. NGUYEN:

10   Q    And Mr. Lee, are you familiar with this document?

11   A    Can I see the whole thing?

12   Q    Sure.

13             MR. NGUYEN:  Can you please scroll down to Mr. Lee

14   can see the whole thing?

15   BY MR. NGUYEN:

16   A    Yes, generally I'm familiar with this.  This is the one

17   that we sought some more time.  Yes.

18   Q    And is this a document that you drafted?

19   A    Yes, it is.

20   Q    Okay.  And in this motion, you were asking the Court to

21   continue the May 27th date to June 24th, 2022; is that

22   correct?

23   A    I can't read it right now, but --

24   Q    Okay.

25   A    If you say, if you represent that to be the case --

Page 115

```
 1   Q    Well --

 2   A    -- then that's true.

 3   Q    Well, let's let you see it.

 4        MR. NGUYEN:  Can you scroll to Paragraph 18, Mr.

 5   Travis?  And then if you just go to Page 6 a little bit, Mr.

 6   Travis.

 7   BY MR. NGUYEN:

 8   Q    June 24th, 2022.  You see that?

 9   A    Yes.

10   Q    So in your motion, the basis for that is restated in

11   Paragraph 21.

12        MR. NGUYEN:  Can you scroll down to Paragraph 21?

13   BY MR. NGUYEN:

14   Q    Mr. Lee, can you read Paragraph 21?

15   A    Sure.  "Continuing the original hearing date until June

16   will also permit a CRO who has been engulfed in evaluating

17   dismissals with prejudice issues to now focus on the

18   remaining creditors of the Debtors.  The CRO will be able to

19   evaluate either before or by the June hearing date whether

20   he should proceed with trying to confirm a subchapter plan

21   of reorganization or handle these claims outside of

22   bankruptcy.  Again, such efforts would be wise use of the

23   limited financial resources.  Such an approach will also

24   save valuable judicial resources."

25   Q    Okay.  And the question is, on May 18th, why do you
```

1    need an entire month for the CRO to accomplish this?

2    A    Because one, I had not known what else needed to be

3    done with respect to the rest of the dismissals.  For

4    example, we had a Connecticut hearing to dismiss the actual

5    cases up in Connecticut.  That was number one.  That was

6    supposed to take place the week after May 17th.

7         And number two, I needed time to evaluate all the

8    things that Mr. Schwartz hadn't been focusing in on and I

9    was just asking for time in order to be able to do that and

10   that was just my best guess as to what we needed to be able

11   to calmly evaluate because we hadn't had one second of time

12   since April 17th because we had filed the bankruptcy on

13   April 17th and we'd been working around the clock to figure

14   out everything and things had changed very quickly.  And so

15   I was trying to get as much time as possible for the Trustee

16   and for the law firm -- for the lawyers on our side to

17   evaluate which way we should go.

18   Q    Thank you, Mr. Lee.  Did any of the InfoW Debtors have

19   any claims against Alex Jones or Free Speech Systems?

20   A    Not to my knowledge.

21   Q    Did you check?

22   A    Well, sure.  We --

23   Q    Okay.

24   A    -- checked in our schedules, et cetera.

25   Q    Right.  That's good.  So IWHealth LLC had royalty

004905

1    payments, correct?

2    A    That is correct.

3    Q    Was it Longevity or Yongevity?  I always mess it up?

4    A    It starts with a Y.  Yongevity.

5    Q    Okay.  And at a certain point, the royalty payments

6    were deposited into the InfoW Debtors' accounts, correct?

7    A    IWHealth's account.

8    Q    IWHealth account.  But --

9    A    That's correct.

10    Q    But prior to that, where were the funds for the royalty

11    payments --

12    A    They may have been diverted prior to the time -- some

13    of them may have been gone to somebody else rather than to

14    IWHealth.

15    Q    When you say somebody else, could've gone to Alex

16    Jones.

17    A    That is correct.  It could've gone to Alex Jones.

18    Q    Okay.  And how many of those payments went to Alex

19    Jones?

20    A    We don't know.

21    Q    Did you check?

22    A    No, we did not.  Not to my -- I did not check.

23    Q    So if payments that are supposed to go to IWHealth is

24    going to Alex Jones, you think IWHealth has a claim against

25    Alex Jones for those payments?

1    A    Sure.

2    Q    Okay, thank you.  Let's get back to that motion.  So

3    you filed on the 18th.  It was an emergency motion and the

4    Court, as always, gave you a hearing the very next day, May

5    19th.  Correct?

6    A    If you say so.

7    Q    Okay.  Well, May 19th is an important date, right?  We

8    were in Court on May 19th?

9    A    It was an important date, because that's when we went

10   to go get the stipulations approved.  That's when all the

11   parties wanted to get the Texas stipulations approved.

12   Q    Were we in Court on May 19th?

13   A    Yes.

14   Q    Okay, thank you.  And May 19th was also important

15   because that morning you file your application to be

16   employed for the InfoW Debtors with your new law firm, Kyung

17   S. Lee PLLC, correct?

18   A    That is the day I filed my application.  That is

19   correct.

20   Q    And the application requested retention as effective of

21   May 16th?

22   A    That is correct.

23   Q    Great.  And since 1984, I'm assuming you've encountered

24   the word connections far as it relates to a bankruptcy case;

25   is that correct?

1   A     I have.

2   Q     Great.  So let's talk about your application on -- that

3   was filed on -- I believe it was filed on May 19th.

4           MR. NGUYEN:  And Mr. Travis, can you go to Docket

5   No. 165-3 which is, I believe, Mr. Lee's application in the

6   InfoW case.  And if you can just scroll down to Paragraph

7   22.

8   BY MR. NGUYEN:

9   Q     Do you see Paragraph 22, Subparagraph C on the screen,

10  Mr. Lee?

11  A     Yes.

12  Q     And Paragraph C is actually just a restatement of

13  Bankruptcy Rule 2014, correct?

14  A     Yes.

15  Q     And do you see the word person's connections there on

16  Subparagraph C on the second line?

17  A     I do.

18  Q     Is there any qualifier in front of the word connections

19  besides the person's connection?  Does it say material

20  connection?

21  A     No.

22  Q     Okay.  It's just connection, right?

23  A     That's correct way to read that sentence.  Yes.

24  Q     Okay.  And let's flip over to your declaration which is

25  on same exhibit.  If you can just go to 13 of 30.  Scroll

1    down to Paragraph 10.  Do you see Paragraph 10 right there

2    on the screen, Mr. Lee?

3    A    I do.  I've got it also on paper here.

4    Q    Okay, great.  So the second line in Paragraph 10 talks

5    about disclosable connections.

6    A    That's correct.

7    Q    What is the difference between a disclosable connection

8    and just a regular connection?

9    A    From my perspective if it's, for example, if you have a

10    conflict that should be a disclosable connection.  If you

11    have a connection that could mean something like, you know,

12    somewhat remote like come connection -- like you work with

13    somebody in the U.S. Trustee's office or you know somebody

14    in the Court system.  Again, you know, as I said on the

15    direct testimony, I look at it as whether or not such a

16    connection could bias you in a case or create some kind of a

17    adverse problem for you as a lawyer in a case.  That's how I

18    look at it.  So it's my own version of what I think should

19    be disclosed as -- if it adversely impacts you is the way I

20    think about it.

21    Q    Well, let's look at Paragraph 11 down there.

22    A    Sure.

23    Q    It talks about disqualifying connections.

24    A    Right.

25    Q    What is the difference between a disclosable

1    connection, a disqualifying connection?  What's the

2    difference between the two?

3    A    I think the --

4         MR. BATTAGLIA:  Your Honor, I'm going to object.

5    He's asking legal conclusions.  Mr. Lee is a lawyer, but

6    he's here right now as a witness.

7         THE COURT:  We're just asking what he meant, I

8    think.  I'm going to overrule that.  I think the question is

9    just trying to clarify what he meant in his declaration, not

10   whether it's a legal conclusion or not, just trying to make

11   an understanding as to what he meant.

12   BY MR. NGUYEN:

13   A    I think what I meant in the (indiscernible)

14   disqualifying connections is it's not a connection such that

15   it disqualified me from being counsel by virtue of having

16   that connection under Rule 2014.  It's not a conflict, as an

17   example.  I don't have any -- I didn't have a conflict in

18   being able to represent this Debtor, is my statement there.

19   Q    Is it your understanding that Rule 2014 requires you to

20   disclose all connection, not just only disclosable

21   connection or disqualifying connection?

22   A    Well, from my perspective?

23   Q    Yeah, I'm asking for your understanding.

24   A    My understanding is is that there has to be some limit

25   as to what connections you should disclose because if you

1    took the word literally, connections literally, you'd have

2    to disclose everything under the world, especially if you've

3    been a bankruptcy lawyer or professional forever.  That's

4    why you have language in it that says, you know, I've been

5    practicing the law for many years and so you may have come

6    across certain parties, et cetera.

7         That's why you have all those caveats, so the purpose

8    of, in my view, of a 2014 disclosure is to let Courts know,

9    for example, you have a connection that could adversely

10   affect you in doing your job.  That's how I looked at it.

11   That's how I look at it when I do my 2014 disclosures.

12   That's the way I think about it, like I did on my May 21

13   email to my client saying, do we have an issue here that we

14   need to think about.

15   Q    Okay.  Thank you.

16        MR. NGUYEN:  And Mr. Travis, can you turn to Page

17   18 of 30?  And when I say 18 of 30, I'm talking about the

18   Bates stamp on top.

19   BY MR. NGUYEN:

20   Q    You see the third paragraph down there, Mr. Lee?  It

21   says retainer.

22   A    Yes.

23   Q    The firm there is capitalized and when it says the

24   firm, right, that's KSL PLLC; is that correct?

25   A    Yes.  If that engagement letter is with KSL PLLC.

1    Q    Yeah, we're in the same document.

2    A    Okay.

3    Q    So, and then client is capitalized there.  You see down

4    there, the firm has not requested a retainer from the

5    client?

6    A    Right.

7    Q    Client is the InfoW Debtors, correct?

8    A    Can you scroll up?  I just want to make sure if that's

9    the same letter.  If the client is defined as the InfoW

10   Debtors, yes.

11   Q    Okay, great.

12   A    That's correct.

13   Q    So from reading this paragraph on the retainer, is it

14   fair to say that KSL PLLC did not request a retainer from

15   the InfoW Debtors; is that correct?

16   A    That is correct.

17   Q    Okay.  And if we can just turn back to the declaration

18   at Page 13 of 30.  You see Paragraph 9 there, Mr. Lee?  It

19   says, KSL PLLC has requested a retainer.  I'm just going to

20   stop it there.

21   A    Yes.

22   Q    Who -- if you didn't request a retainer from Mr.

23   Schwartz who was representing InfoW Debtors, who did you

24   request a retainer from?

25   A    It's again -- the fault is mine.  It's -- number one, I

1  never requested a retainer.  The language in Paragraph 9 is

2  incorrect.

3  Q    Did you read the declaration before you filed --

4  A    I did and the language there saying as requested

5  retainer is incorrect.  What the -- statement in the

6  engagement letter is the correct one, that I never got one

7  and I never requested one.

8  Q    Okay.  So next time, I should rely on the engagement

9  letter, but not the declaration?

10  A    Mr. Nguyen, I told you, I made mistakes and I'm telling

11  you this is a mistake and I'm owning up to it, so you know,

12  that's my mistake.

13  Q    That's fine.  So you didn't request a retainer from

14  anyone else?  You didn't ask any of the third party funders

15  to pay your retainer?

16  A    No.  First of all, it was a post-petition matter and I

17  thought it was going to very hard to get a retainer and so I

18  didn't ask one for InfoW.

19  Q    That's --

20  A    That's the major reason.

21  Q    So just to recap, so May 18th, the motion to extend a

22  bunch deadlines was filed.  On May 19th, the morning of, you

23  file the KSL PLLC application and then there was a hearing

24  scheduled for the afternoon on May 19th; is that correct?

25  A    That is correct.

1    Q    And on the afternoon of May 19th, you were requesting

2    additional time.  I think you were asking for a month, but

3    Mr. Ruff had an issue with a month.  He thought it was too

4    long; is that correct?

5    A    Yes, I believe that's correct.

6    Q    Okay.  And one of the reasons -- and we can pull the

7    transcript if need be -- you told the Court that you needed

8    this additional time because if the InfoW Debtors were going

9    to remain in Subchapter V, you might have to renegotiate the

10   plan support agreement, correct?

11   A    Well, I may have said that, but --

12   Q    Thank you.

13   A    Wait, wait, wait --

14   Q    He -- Mr. Shannon can bring you on redirect.  That's

15   all I needed.

16   A    But that's not what I said.

17   Q    So -- and then also before the hearing adjourned on May

18   19th, you also told the Court Mr. Schwartz in his fiduciary

19   capacity is evaluating alternative.  Do you recall telling

20   the Court that?

21   A    I did.

22   Q    Okay.  And when you say fiduciary capacity, fiduciary

23   capacity to who?

24   A    To InfoW Debtors.

25   Q    Okay.  Was one of the alternatives that you were

1    thinking at the time that Mr. Schwartz would be the chief

2    restructuring officer for Free Speech Systems?

3    A    When I made that statement, I was addressing a

4    different issue raised by the Court.

5    Q    Great.  The consideration of whether Mr. Schwartz

6    should be the CRO for Free Speech Systems actually occurred

7    on May 19th, correct?

8    A    No.

9    Q    There was no consideration on May 19th?

10   A    No.

11   Q    Okay.  After the hearing on May 19th, did you receive a

12   phone call from someone at Free Speech Systems?

13   A    From Ray Battaglia.

14   Q    Okay.  And Mr. Battaglia was representing Free Speech

15   Systems at the time, correct?

16   A    That is correct.

17   Q    Were you still in the courthouse when you received this

18   phone call?

19   A    No.

20   Q    How long was the conversation?

21   A    Very short, I believe.

22   Q    During the call, were there any discussions regarding

23   your potential engagement with FSS?

24   A    No.  It was a call basically saying please come to

25   Austin.

1    Q    Okay.  Was there any discussion of Mr. Schwartz'

2    potential engagement with FSS on May 19th?

3    A    No.  In fact, the discussion really revolved around the

4    need for somebody with a contact with a commercial bank,

5    Axos Bank, that needed a commercial banking relationship.

6    Q    After the phone call on May 19th with Mr. Battaglia,

7    you contact Mr. Schwartz and you said that on May 24th, you

8    were going to meet with -- I'm not sure who -- well, let's

9    step back.  There is an email from you on May 19th to Mr.

10   Schwartz telling Mr. Schwartz that you were going to make it

11   up to Austin on May 24th, correct?

12   A    Well, let's be real clear.  The email that I sent him

13   was what I sent him, at 5:24 p.m.  It's --

14   Q    Well --

15   A    -- three-line sentence email that says, "We are asked

16   to come to a meeting in Austin on May 24th."

17   Q    So the meeting on May 24th was scheduled on May 19th;

18   is that a fair statement?

19   A    It says, "I told Ray we can be there by 11:30 and see

20   if he can set up a meeting to start then.  We can do

21   Connecticut status hearing at 1 p.m. and continue with FSS

22   meeting thereafter in Austin."

23   Q    So --

24   A    That was at 5:24 p.m.

25   Q    So is it fair to say that on May 19th, there was a

1    meeting scheduled for May 24th in Austin?

2    A    Yes.

3    Q    Okay.

4    A    Yes.

5    Q    And excuse my ignorance.  I'm a northerner from Chicago

6    and I moved down here it's very cold in Chicago and I'm not

7    familiar with distances.  How long does it take to get from

8    Houston to Austin?

9    A    Three hours.  Or two-and-a-half hours, depending how

10   fast you drive.

11   Q    And does Mr. Battaglia live in Austin?

12   A    San Antonio.

13   Q    So how long does it take to drive from San Antonio to

14   Austin?

15   A    One-and-a-half hours or one hour, depending on how Ray

16   drives.

17   Q    Fair enough.

18        THE COURT:  Sorry.

19   BY MR. NGUYEN:

20   Q    The meeting on May twenty -- well, let me ask --

21        MR. BATTAGLIA:  To be fair, it's more traffic.

22   BY MR. NGUYEN:

23   Q    So the meeting that was scheduled on May 24, that

24   wasn't a meeting to renegotiate a plan support agreement,

25   was it?

1    A    Absolutely not.

2    Q    Okay.  Fair enough.  It was a meeting to discuss

3    potential restructuring for FSS; is that correct?

4    A    It was a meeting to discuss FSS generally and it was

5    just walking about the state of FSS condition and for people

6    to get background documentation on FSS.

7    Q    Where did you meet on May 24th?

8    A    At the offices of FSS.

9    Q    In Alvin Devane?  Is that how you --

10   A    That's correct, it's on Alvin Devane with all the

11   shaded windows and studios.  That's correct.

12   Q    And earlier we -- when we were going through the KSL

13   PLLC and we were going through connections and disqualifying

14   connection and disclosable connection, you think this was a

15   connection that needed to be disclosed?

16   A    The answer is, from my perspective, I didn't know yet

17   what it was because I didn't know what they wanted.  I

18   didn't know if they were going to retain me.  I didn't know

19   what was going on.  I just had an idea that we had -- we

20   were asked to come to a meeting.  We were going to discuss

21   things and I knew that insofar as it could involve that

22   representation, but nobody had promised me anything except

23   come to a meeting.

24   Q    And normally, do you drive three hours just to get

25   information from a potential client?

1    A    As a debtor counsel, I fly on airplanes to go to

2    meetings.  Yes.  Prospective clients.  Yes, I do.

3    Q    So let me understand.  So you don't think the

4    connection should've been disclosed on May 19th?

5    A    Well, here's the reason why.

6    Q    Well --

7    A    There was nothing I could disclose when I was here in

8    Court at 2 p.m., is what I'm trying to tell you, because I

9    didn't get the call until after I left the Court.

10   Q    So after you got the phone call after Court from Mr.

11   Battaglia and after you sent the email to Mr. Schwartz, you

12   -- at that point, there was a connection that was required

13   to be disclosed?

14   A    The answer is, I had -- I don't think I had a

15   connection that I could disclose because I didn't know what

16   that connection was.

17   Q    Who was at the meeting on May 24th?

18   A    Mr. Battaglia, Mr. Schwartz, I think Mr. Jordan showed

19   up for -- on behalf of -- and Mr. Jones.  I believe Mr.

20   Shannon showed up for the meeting.  And then at some point

21   in time, I believe Mr. Jones attended the meeting to give us

22   his views on things and also sign some of the agreements.

23   And I believe there may have been some other participants,

24   but those are the ones that I remember primarily.  Mr.

25   Schwartz was there and Mr. Battaglia and -- yeah, those are

Page 131

1    the primary people.

2              MR. NGUYEN:  And Mr. Travis, can you go to 165-10?

3    BY MR. NGUYEN:

4    Q    So prior to coming to the meeting, you did some

5    research on FSS and then you emailed background research to

6    Mr. Shannon; is that correct?

7    A    Yes.

8    Q    Okay.  Thank you. And you see on the bottom there, it

9    says "Extended conference with client, Schwartz Associates,

10   B. Rowe, S. Jordan, and RJ Shannon to discuss options and

11   issues with FSS restructuring."  You see that?

12   A    Yes, I do.

13   Q    You see it says five hours there?

14   A    Yes.

15   Q    It says client there.  Who's the client?

16   A    I guess I was referring to FSS at that point in time.

17   Q    Was it Mr. Jones?

18   A    No.

19   Q    Mr. Jones, the owner of the company wasn't the client

20   at the time?

21   A    Mr. Nguyen, we've never represented Mr. Jones.  I've

22   never represented Mr. Jones.

23   Q    So who are you referring to client?  Because you list

24   everyone else.

25   A    Well, the memo, the invoice is being sent to FSS and

1    therefore I'm making it to FSS.  If I'd represented Mr.

2    Jones, I wouldn't be sitting here representing FSS today.

3    Q    Let me ask you.  Mr. Jordan.  Mr. Jordan was at that

4    meeting.  Who does Mr. Jordan represent?

5    A    Represents Mr. Jones.

6    Q    And on May 25th, you spent about three hours driving,

7    depending how fast you drive, and about five hours actually

8    meeting people at the facilities at FSS; is that correct?

9    A    You mean on May 24th, not 25th?

10   Q    I'm sorry, May 24th.

11   A    Yes.

12   Q    And --

13   A    That's right.

14   Q    And at that point -- and earlier, we talked about

15   connections and I won't go to -- you think there was a

16   connection on May 24th that needed to be disclosed?

17   A    No.

18   Q    No connection that needed to be disclosed to the Court?

19   A    No.

20   Q    You start billing for FSS on May 24th and you don't

21   think there's a connection that needed to be disclosed to

22   the Court?

23   A    I did not.

24   Q    Okay.  You think it's a problem that in your

25   declaration on -- in the KSL PLLC that there's a pending

1   declaration with the Court that says that you had no

2   connections to FSS and Alex Jones, you think that's an

3   issue?

4   A    Well, to me it was not, because the case was going to

5   be dismissed and we were not seeking employment anymore.

6   Q    And Mr. Schwartz was at this meeting, correct?

7   A    That's correct.

8   Q    Did Mr. Schwartz billed for this meeting?

9   A    I don't know.

10  Q    Does Mr. Schwartz generally do stuff without billing?

11  A    Lots of times he does.

12  Q    Good.  And the meeting as you notate on the entry, it

13  was to discuss options and issues with FSS restructuring,

14  correct?

15  A    Correct.

16  Q    Okay.  And I'm sure there's going to be an attorney-

17  client privilege.  I won't ask about the conversation, so

18  we'll just move on.  Prior to June 10th, did you tell any of

19  the Sandy Hook plaintiff or their attorneys that you were

20  doing work for FSS on May 24th?

21  A    No.

22  Q    Prior to June 10th, you didn't tell anyone at the U.S.

23  Trustee's office that you were working for FSS on May 24th;

24  is that correct?

25  A    That is correct.

1   Q    Prior to June 10th, you didn't tell the Court that you

2   were working for FSS on May 24th; is that correct?

3   A    That is correct.

4   Q    As a matter of fact, your trip to Austin on May 24th

5   was not disclosed to the Court until August 20th when you

6   filed your declaration in the Shannon & Lee application; is

7   that correct?

8   A    That's accurate.

9   Q    That's the first time you ever told any -- either the

10  Court, the U.S. Trustee, or the creditors that you made the

11  trip up to Austin on May 24th; is that correct?

12  A    That is accurate.

13  Q    And on May 24th, just to be clear, you were still

14  representing the InfoW Debtors, correct?

15  A    That is correct.

16  Q    So I just want to go back to -- if you go back to 165-

17  3.  So on May -- I believe May 19th, in your declaration at

18  Paragraph 19, if you can just go there.

19       MR. NGUYEN:  Paragraph 19, Mr. Travis.  Give me

20  one second.  I apologize.  Paragraph 19 on the motion.

21  BY MR. NGUYEN:

22  Q    Mr. Lee, can you read Paragraph 19 to me?

23  A    "The Debtors believe that KSL PLLC neither holds nor

24  represents a disqualifying interest that is adverse to the

25  estate and is a disinterested person.  If any new relevant

Page 135

1    facts or relationships are discovered, KSL PLLC will

2    supplement its disclosure to the Court."

3    Q    But you told the Court this statement on May 19th,

4    correct?

5    A    That is correct.

6    Q    But you didn't supplement it, correct?

7    A    That's correct.

8         MR. NGUYEN:  Okay.  And let's go back to 165-10.

9    I apologize, Mr. Travis.  I'm jumping around a little bit.

10   BY MR. NGUYEN:

11   Q    Let's go through some of these time entries and just

12   make sure I understand what you were doing for FSS during

13   this time.  So on May 26, you were still representing the

14   InfoW Debtors, but you were looking at valuation reports for

15   PQPR on behalf of FSS; is that correct?

16   A    I was reviewing two reports that I found out about that

17   were historical regarding PQPR and FSS that had been

18   discovered that were like basically 2012, 2013 reports.

19   Q    So is that a yes to my question, sir?

20   A    Yes, it is.

21   Q    Okay, thank you.  And on May 28th and May 29th, you

22   were analyzing data from the state court counsel; you see

23   that?

24   A    Yes.

25   Q    Is that what you did on May 28th and May 29th?

```
 1   A    Yes.

 2   Q    Okay.  And when we think about state court litigation,

 3   we're really thinking about the Texas litigation and the

 4   Connecticut litigation, correct?

 5   A    Well, what I'm referring to there is just merely the

 6   Texas state court litigation, because I didn't have access

 7   to the discovery in the Connecticut litigation.

 8   Q    Who gave you the state court litigation production that

 9   you were analyzing on May 28th?

10   A    I'm trying to think.  It must've been the Reynal firm.

11   Q    And it wasn't any documents from Connecticut, correct?

12   A    No.  It was not.

13   Q    Okay.  And towards the end of this, so from May -- I

14   believe May 24th to May 31st, you billed for a total amount

15   of $24,409.09; is that correct?

16   A    That is correct.

17   Q    Were you paid this amount?

18   A    Yes, I was.

19        MR. NGUYEN:  Okay.  If we can just go back to

20   Exhibit 165-9.  And if you go to Page 5 on the motion, Mr.

21   Travis.

22   BY MR. NGUYEN:

23   Q    Mr. Lee, do you see the footnote there on Page 5?  And

24   I'm going to read it to you.  "KSL PLLC received payment

25   from the Debtor of $21,986.59 for services provided to FSS
```

1    from May 24th, 2022 through May 31st, 2022."  And the

2    question is, did I read that correctly?

3    A    You did read that correctly.

4    Q    Okay.  Thank you.  And when were you paid for the legal

5    services for KSL PLLC?

6    A    I don't know it off the top of my head, but it's

7    something I could give you -- to you if you need that.  I

8    just don't know, but I think it was sometime in June or

9    July.  June.

10   Q    Okay.

11   A    I just don't know the answer off the top of my head.

12   Q    And you assisted Mr. Schwartz in the preparation of the

13   schedules and Statement of Financial Affairs in the FSS

14   case?

15   A    Yes.

16   Q    And you've been doing this for a while.  You know in

17   the Statement of Financial Affairs, there's a section that

18   requires disclosure of payments related to bankruptcy

19   services.  Are you familiar with that section?

20   A    I am.

21   Q    Okay.

22        MR. NGUYEN:  Let's -- if you can go to 165-2, Mr.

23   Travis.  And if you can turn to Page 9 of 28, right.

24   BY MR. NGUYEN:

25   Q    Do you see any payments disclosed to KSL PLLC on Line

1    11?

2    A    I think that we addressed that in the global head

3    notes, in the global notes with respect to the fact that

4    there were certain payments made and they were distributed

5    to the -- Schwartz Associates.  I think we were going to

6    supplement that also with the Ray Battaglia PLLC.

7    Q    You see how the payment to Shannon & Lee was disclosed

8    --

9    A    Yes.

10   Q    -- through the SA LLC Trust?

11   A    Yes.

12   Q    But the question is, do you see the KSL PLLC payments

13   here?

14   A    I do not.

15   Q    Okay, thank you.

16   A    I do not.

17   Q    And the Statement of Financial Affairs is signed under

18   penalty of perjury by Mr. Schwartz, correct?

19   A    That is correct.

20   Q    Okay.  And --

21   A    That is correct.

22   Q    And did you know, did Mr. Schwartz, do you know if he

23   looked over the Statement of Financial Affairs before it was

24   filed with the bankruptcy court?

25   A    He did, because --

1    Q    Okay.

2    A    He did.

3    Q    Would you agree with me that the payment to KSL PLLC

4    should be listed on the Statement of Financial Affairs?

5    A    Most likely.

6    Q    Is that a yes?

7    A    It is a yes.

8    Q    Thank you.

9    A    Yeah.

10   Q    So let's just talk about the InfoW cases and the

11   stipulations.  Beginning May 27th, you and -- and tell me if

12   it's before May 27 -- you and Mr. Ruff, you actually began

13   exchanging draft of a stipulated dismissal on May 27.

14   That's when the actual change of language happened, correct?

15   A    If you tell me that's what happened.  All I know is I

16   told him it was May 25th.  He sent me something based upon

17   the emails that I have, was -- I believe the first one he

18   sent me was probably on May 27th.

19   Q    Yeah. Don't look at the document --

20   A    Okay.

21   Q    -- ask you.  If you don't know the answer --

22   A    I don't know the answer to -- off the top of my head.

23   I have to look at a document.

24   Q    Fair enough.

25         MR. NGUYEN:  Mr. Travis, can you go to 163-26?  If

1    you scroll to -- can you scroll up a little bit, Mr. Travis,

2    please?  See the dates here.  Scroll all the way to the

3    bottom of this email chain.  If you scroll up one more to

4    the next email by Mr. Ruff.  If you can go to --

5    BY MR. NGUYEN:

6    Q    On May 27th, at about 3:16 p.m., Mr. Ruff sent you a

7    draft of the proposed stipulated dismissal, correct?

8    A    This email says that.  That's correct.

9    Q    Okay.  And on May 31st, if we scroll up, you circulated

10   some comments to the draft.

11   A    It's a rewrite.

12   Q    Right, and one of the issue you took with the

13   stipulated dismissal order that Mr. Ruff draft was, it says,

14   the motion to dismiss is granted.

15   A    That's correct.

16   Q    Okay.  And so we were exchanging language as of May

17   31st, but there wasn't no agreement to dismiss the case,

18   correct?

19   A    Mr. Nguyen --

20   Q    Was there signatures on --

21   A    The answer to your question about the signatures is

22   there was no --

23   Q    Okay.

24   A    -- the concept of this agreement --

25   Q    And --

1    A    -- authority in place.

2    Q    And then on June 1st, there's an email from Mr. Ruff.

3    Do you see that?  It's a long email in response to your

4    draft of the stipulated dismissal.  Mr. Ruff had some issues

5    with how your draft was drafted, correct?

6    A    Yes, sir.

7    Q    And one of the issues he took was there were

8    exculpations on your draft of the stipulated dismissal,

9    correct?

10   A    That is correct.

11   Q    Okay.  Why did you feel the need to include an

12   exculpation clause?

13   A    Well, in light of the fact that the Trustee was

14   opposing the professionals from getting retained and that if

15   we would -- gotten retained and gotten final fee

16   applications approved, we would've had the protections of

17   the bankruptcy court, so since the Trustee was saying they

18   wanted the cases dismissed and did not want the

19   professionals to be retained, we thought at least that we

20   should ask for exculpation in light of the fact that the

21   Trustee was standing in the way of us getting retained.  I

22   thought that was a reasonable ask.

23   Q    And so after this email, we cleaned up the stipulated

24   dismissal order and the stipulation was actually filed with

25   the Court on June 1st, correct?

1    A    That is correct.

2    Q    Okay.  And prior -- well, let me strike that.  And you

3    understand on June 1st, even though my office and yourself

4    agreed to dismissal via our stipulation, the cases weren't

5    dismissed until Judge Lopez put his signature on that

6    stipulation, correct?

7    A    I do agree with that.

8    Q    Okay.  So on June 1st, the representations of the InfoW

9    Debtors was not over.

10   A    That is correct.

11   Q    And so the stipulation was filed on June 1st and then

12   on June 2nd, you file on behalf of InfoW, Debtors' omnibus

13   response to motion to dismiss.  Is that correct?

14   A    That's correct.

15   Q    Okay.  You drafted this response?

16   A    Mr. Shannon and I both worked on it.

17   Q    Okay.  What was the point of filing a response to the

18   motion to dismiss if the parties already stipulated?

19   A    There were several reasons for it.  Number one, there

20   were allegations that were outstanding that people were

21   going to use against the InfoW Debtors in a negative way and

22   so we felt as a fiduciary it was it was incumbent upon us to

23   set the record straight as to what happened in the case.

24   That was number one.  Number two, everybody thought that the

25   case had been filed in bad faith and made those allegations

004931

1    as the central core of any pleading they filed, and I

2    thought it was important for the Debtor to set the record

3    straight before the case was dismissed so that things like

4    this wouldn't happen again.

5    Q    Okay.

6    A    So it was incumbent upon us to file that as a fiduciary

7    to set the record straight.  And number three, we didn't

8    want pleadings that were filed that didn't go unchallenged

9    in that case because of the publicity and all the issues

10   that surrounded it.  So we thought it was incumbent upon the

11   Debtors to set the record straight before the cases got

12   dismissed completely.

13   Q    And it was setting the record straight as to

14   allegations against the InfoW Debtors.  The purpose of the

15   response was not to defend Alex Jones and Free Speech

16   Systems, the client you were representing on the day that

17   you filed the response, correct?

18   A    Mr. Nguyen, we were representing the InfoW Debtors.  As

19   you will read in the response, it was a response by the

20   three Debtors.

21   Q    Okay.  Let me ask -- so the purpose of the response was

22   not to defend Alex Jones and Free Speech Systems, correct?

23   A    There is not one word in that response, docket number

24   whatever it is, that defends FSS or Alex Jones.  It defends

25   the rationale for filing the InfoW Debtors' bankruptcy cases

Page 144

1    and it defends the allegations that made by the U.S. Trustee

2    and the plaintiff saying it was a bad faith filing.

3    Q    And in your response on June 2nd, you used the word

4    independent to describe the CRO.  Isn't it a little bit

5    misleading to describe the CRO as independent when the CRO

6    is working for Free Speech Systems?  It's a yes or no

7    question.  Is it misleading to --

8    A    It is not misleading, Mr. Nguyen.

9    Q    Thank you.  And earlier you testified I think around

10   May 24, you were no longer seeking to be employed by the

11   InfoW Debtors, correct?

12   A    That is an incorrect statement of what I testified to.

13   I testified that as of May 21, I'd already decided based

14   upon the position you had -- your office had taken and the

15   analysis that I'd done that we were no longer seeking to be

16   retained as of Saturday, May 21 when I finished my memo and

17   analysis.

18   Q    Okay.

19          MR. NGUYEN:  (indiscernible) just pull up -- if

20   you can pull up 165-7.

21   BY MR. NGUYEN:

22   Q    Let me ask you this.  On June 2nd, did you still have

23   fiduciary duties to the InfoW Debtors?

24   A    I did.

25   Q    Even though you were not seeking employment?

Page 145

1    A    I did.

2    Q    Okay.  And isn't it a little bit misleading to say that

3    the fiduciary duties were clear and unwavering when you were

4    employed by FSS at that time?

5    A    No.  The duties that I had to InfoW Debtors were

6    unwavering and they were fulfilled to 1,000 percent on June

7    2nd through June 10th.

8    Q    Okay, so -- but on June 2nd, you were drafting the

9    first day declaration for FSS, correct?

10   A    What has that got to do with the fiduciary duty

11   obligations that I had to InfoW Debtors?  I fulfilled every

12   one of them.

13   Q    Again, on June 2nd, you were drafting the first day

14   declaration for Mr. Schwartz for the FSS --

15   A    The answer is, Mr. Nguyen, I was putting together a

16   draft declaration for Mr. Schwartz as CRO for FSS, which had

17   nothing to do with InfoW Debtors.  The three Debtors had

18   been dismissed by the plaintiffs.  They had no relationship

19   with FSS at that time except for one relationship which was

20   stable and no dispute between them.

21   Q    So in that June 2nd filing, nowhere in that filing did

22   you mention you started working for FSS; is that correct?

23   A    That is accurate.  That's correct.

24   Q    Nowhere in that filing did you mention that Mr.

25   Schwartz was at this time working for FSS; is that correct?

1    A    That is also accurate.

2    Q    And earlier, you mentioned that by the time you filed

3    this, I guess it's a response on June 2nd, you were no

4    longer seeking employment from the InfoW Debtors.

5            MR. NGUYEN:  Mr. Travis, can you scroll down to

6    the signature line?  Go up one, to the motion, the signature

7    line on the motion.  All the way at the bottom.  At the

8    bottom of the motion.

9    BY MR. NGUYEN:

10   Q    You see where it says proposed counsel for the Debtor?

11   Who were you proposing to be counsel to the Debtor when you

12   signed that signature?

13   A    The Debtors, the InfoW Debtors.

14   Q    And you were proposing to the Court to be the Debtor,

15   right, when you signed that signature?

16   A    That's how I called myself.  That is correct.

17   Q    Okay.

18   A    And so I call myself that the entire time between May

19   19th through June 10th.

20   Q    And until the end of June 10th, you didn't resolve the

21   KSL PLLC application, correct?

22   A    That is also correct, Mr. Nguyen.

23   Q    Mr. Schwartz didn't withdraw his application as of June

24   10th, correct?

25   A    That is also correct.

1   Q    And there was no amendment, no supplements to any of --

2   to either of the applications in the InfoW case, correct?

3   A    That is correct.

4   Q    And on June 10th, the Court conducted a hearing on the

5   stipulated dismissal, correct?

6   A    I think the Court really conduct -- took up the

7   stipulation.  I don't know if it conducted a hearing, but

8   basically took up the stipulation.

9   Q    Fair enough.  And you appeared at the June 10th hearing

10  but you were on video.  I believe at the time, you were with

11  your mother in California?

12  A    I was at my niece's high school graduation.

13  Q    Right.

14  A    So Mr. Shannon was here in person and I appeared via

15  video.

16  Q    Okay.  So Mr. Shannon was here and was -- Mr. Schwartz

17  was here as well?

18  A    I don't recall whether he attended or not.

19  Q    And do you recall Mr. Shannon making the announcement

20  that there was a new firm, Shannon & Lee LLP at the time?

21  A    I believe so.

22  Q    Okay.  But there was no announcement of any connections

23  to FSS on June 10th; is that correct?

24  A    That is -- I don't recall any.

25  Q    Okay.  And let me ask you this.  Like, when did the

1    representation of the InfoW Debtors end?  Did it end with

2    the stipulated dismissal?

3    A    In my view, it ended -- it terminated really all for

4    practical purposes when the case was dismissed, because

5    there was no longer need for counsel to aid them in their

6    restructuring which was the scope of our engagement.

7    Q    Okay.

8    A    And so that's how I viewed it, because the scope of our

9    engagement was, the matter was to help them in their

10   restructuring.  When the case got dismissed as of June 10th,

11   the purpose of our engagement and the scope of our matter

12   disappeared.

13   Q    Okay.  Give me one second --

14   A    Sure.

15        THE COURT:  I think he meant me, Mr. Lee.

16        THE WITNESS:  I'm sorry.  I apologize.  I'm sorry,

17   Your Honor.  You know, when you get sitting up here, you

18   kind of fade away.  I apologize.

19   BY MR. NGUYEN:

20   Q    Mr. Lee, when the Texas plaintiff and the Connecticut

21   plaintiff dismissed their claims against the InfoW Debtors,

22   were there remaining claims?

23   A    Yes.

24   Q    About $140,000 in claims?  Is that --

25   A    I think there were closed to $190,000 of claims and

1   then there were still unknown facts, but there were about

2   four claimants and it turns out that maybe one of them had

3   been paid and -- so, but there was uncertainty about them,

4   but there was about four claims remaining.

5   Q    And was FSS a joint Debtor to those claims?

6   A    Yes, they were.

7   Q    Thank you.

8        MR. NGUYEN:  No further questions, Your Honor.

9   Thank you for --

10       THE COURT:  Okay.

11       MR. NGUYEN:  -- opportunity.

12       THE COURT:  Mr. Shannon -- well, let me, before

13  you go there, let me ask, does any other party who opposes

14  the retention of either Mr. Lee or Ms. Schwartz have any

15  questions?  Okay.  Mr. Shannon, any redirect?

16       MR. SHANNON:  Yes, Your Honor, just a couple

17  questions.

18       THE COURT:  Okay.  Before you begin, I'm going to

19  take back the power of the screen, just so -- yep.  Perfect.

20  Thank you.  Mr. Shannon, please proceed.

21            REDIRECT EXAMINATION OF KYUNG LEE

22  BY MR. SHANNON:

23  Q    Mr. Lee, I just want to clarify something.  Who does

24  Shannon & Lee LLP propose to represent in this case?

25  A    Free Speech Systems LLC, the Debtor.

1    Q    Has Shannon & Lee LLP ever represented Alex Jones?

2    A    We have never represented Alex Jones.

3    Q    Have you ever represented Alex Jones?

4    A    I have never represented Alex Jones.

5    Q    Mr. Lee, did you sign the Debtor's schedules and

6    Statement of Financial Affairs?

7    A    I did not.

8    Q    I want to talk a little bit about the request for

9    exculpation and the reason for the response.  Has there

10   been, in these cases or -- rewind that.  In the InfoW cases

11   and the surrounding litigation, has there been a history of

12   sanctions sought?

13   A    Yes.

14   Q    Has there been sanctions that were sought against the

15   attorney who removed those cases?

16   A    Absolutely.

17   Q    And the bankruptcy court -- I'm actually talking about

18   particularly the cases, the Texas cases that were removed

19   from Austin State District Court to the Texas Bankruptcy

20   Court -- Western District of Texas Bankruptcy Court.  Were

21   there requests for sanctions against the attorneys who

22   provided services to the InfoW Debtors in that?

23   A    Yes.

24   Q    Now, where those sanctions against Shannon & Lee LLP?

25   A    Not necessarily.  Some of them could be, but they were

1   asserted against state court counsel and we didn't know how

2   far they could reach.

3   Q    And those are attorneys who provided services to the

4   InfoW Debtors, correct?

5   A    That's correct.

6   Q    Okay.

7            MR. SHANNON:  No further questions, Your Honor.

8            THE COURT:  Okay.  Any further redirect?  Okay.

9   Mr. Lee, thank you for your time.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Mr. Shannon, do you have any other

12   witnesses or any other evidence?

13           MR. SHANNON:  Yes, Your Honor.  If it's okay with

14   the Court, Mr. Lee was going to now handle questions of Mr.

15   Schwartz.

16           THE COURT:  Okay.

17           MR. LEE:  Call Mr. Schwartz.

18           THE COURT:  Okay.

19           MR. NGUYEN:  Your Honor (indiscernible).

20           THE COURT:  All right.  Good to see you, again.

21   Do you swear to tell the truth, the whole truth, and nothing

22   but the truth?

23           THE WITNESS:  I do.

24           THE COURT:  Okay.  Please have a seat.  And if you

25   can pull that microphone close to you.  Just want to make

```
 1    sure that we can all hear each other.  Mr. Lee, just from --
 2    I want you to take as much time as you want.  I'm just
 3    thinking from a timing standpoint, we can -- we're going to
 4    go until we're done today.
 5             MR. LEE:  Thirty minutes?
 6             THE COURT:  Okay.  No, no, no, I just -- so why
 7    don't we then do a direct, take a short break, and then
 8    we'll come back and do cross like we did before.  Okay?
 9             MR. LEE:  Okay.
10             THE COURT:  Okay.  Thank you.
11                  DIRECT EXAMINATION OF MARC SCHWARTZ
12    BY MR. LEE:
13    Q    State your name for the record.
14    A    Marc Schwartz.
15    Q    And how many years have you been in the financial
16    restructuring business?
17    A    Since around 1984.
18    Q    And during that period of time, have you generally been
19    keeping up with your ethical requirements of practicing in
20    the bankruptcy court?
21    A    Trying to.
22    Q    What does that mean?
23    A    Well, I have to meet ethical requirements.  I'm a CPA.
24    Specific requirements are laid out every two years.  In the
25    bankruptcy arena, I don't have that formality, but I am
```

1    trying to stay aware of the issues as -- what's come up.  I

2    do (indiscernible) the AICPA's code of ethics usually works

3    pretty well.

4    Q    Now, you've testified before this Court in this case,

5    correct?

6    A    Yes.

7    Q    And you've also appeared before this Court in the InfoW

8    bankruptcy case, correct?

9    A    Yes.

10   Q    So could you tell the Court generally just your

11   educational background and we'll talk about your other

12   background after that, but tell the Court where you went to

13   school -- college.

14   A    College.  I had bachelor of economics from Princeton

15   University, master in accounting and finance from University

16   of Chicago's Booth School of Business.

17   Q    And you finished your MBA in how many years?

18   A    One-and-a-half.

19   Q    All right.  And how were you able to do that?

20   A    Well, I went summer school and I (indiscernible)

21   economics (indiscernible) Princeton.  I placed out of a lot

22   of courses, so I was able to (indiscernible) prior hours

23   with -- you know, (indiscernible) classes.

24   Q    So after you graduated from University of Chicago, what

25   did you do in your career?

1    A    I went to work as a junior accountant for firm of --

2    became PriceWaterhouseCoopers in its Chicago office.

3    Q    And how long did you stay there?

4    A    I was with (indiscernible) Coopers and Lybrand for 20

5    years.

6    Q    And were you working in the restructuring financial

7    advisory space at that point in time?

8    A    Yeah.  I was technically still in the audit practice

9    and I had significant audit clients, but I was in charge of

10   the forensic evaluation services practice in Houston, which

11   included -- I started doing my bankruptcy work with them in

12   '84 and continued that, doing that bankruptcy work here.

13   Q    Have you been working in the bankruptcy field since

14   '84?

15   A    Yes.

16   Q    And in that time period, what type of work have you

17   been doing in the bankruptcy field?

18   A    Well, '84 we started doing work for Chapter 7 Trustees

19   in the area of compliance work, i.e., tax compliance.  In

20   addition in connection with litigation, we got involved

21   working with -- for the Trustees on some of the larger

22   litigation projects.  I mean, (indiscernible) I had 1,100

23   Chapter 7 cases open.

24   Q    How about your experience in the Chapter 11 arena?

25   A    I worked in Chapter 11, really, that in 1993, for me.

1    I did some Chapter 11 work prior to that, doing some

2    committee work in the '80s, '90s, doing some debtor --

3    assistant counsel for debtors, preparing companies' filing

4    and then serving during the bankruptcy itself.  And in '93,

5    when I left Coopers and U.S. Trustee's office called me and

6    asked me to get involved in a Chapter 11 as Trustee and

7    that's when I started doing trustee work which expanded to

8    trusteeships, examiners, examiners with expanded powers.  I

9    still do get some debtor-creditor work as well.

10   Q    Now, do you also do receiver work?

11   A    Yes.

12   Q    Now, do you understand the concept of being a

13   fiduciary?

14   A    I believe I do, yes.

15   Q    Can you tell the Court and the parties here what your

16   understanding of what a fiduciary means?

17   A    Being a fiduciary means that (indiscernible) a

18   fiduciary, you owe a duty to the party whose assets, whose

19   business, whose -- you've been placed in responsibility

20   over.  And that means that that duty is their interest

21   supersedes your interest.

22   Q    Since you've been involved in this area of

23   restructuring and financial advisory, have you ever been

24   reported for violations of any of your ethical obligations

25   to a client or to a party?

1    A    No.

2    Q    Mr. Schwartz, I want to first turn your attention to

3    the topic of your May 19th letter and if you'll take a look

4    at the small binder that's in front of you.  First of all,

5    before you go into this binder and look at these two

6    exhibits or three exhibits, can you explain to the Court the

7    controversy that you're aware of regarding the -- your

8    engagement letter of May 19th, 2022?  Are you familiar with

9    the various allegations and challenges to that letter?

10   A    Well, I'm (indiscernible) the fact there's -- that the

11   (indiscernible) of the letter has brought a lot of attention

12   and I will right now tell you (indiscernible) what you said,

13   I'm the one who put the May 19 on there.

14   Q    Let's talk about -- let's give the judge and the

15   parties exactly the reasons why the confusion was first

16   created.  Because as I read the objection, you were asked

17   certain questions at a previous court hearing and you seemed

18   to indicate that you sent this letter on or about May 19th.

19   A    I did.  I sent the letter to you.  (indiscernible)

20   asked me to get a draft of an engagement letter.

21   Q    All right.

22   A    I sent you all a draft.  I (indiscernible) had

23   everything.

24   Q    Now, did that letter that you sent to me as you now

25   discover turn out to be the letter that was signed by the

1    client FSS on June 6, 2022?

2    A    No.  It was not my draft.

3    Q    Okay.  Now let's turn to Exhibit No. 178-1, 178-2, 178-

4    3.  That's in front of you, that little binder.

5    A    Okay.  I'm sorry.

6    Q    Okay?  Mr. Schwartz, take a look at it and I don't know

7    if --

8              MR. LEE:  Have these been admitted, Mr. Nguyen?

9              THE COURT:  Yes, they have.

10   BY MR. LEE:

11   Q    Can you tell the Court, first of all, when I showed you

12   these emails regarding these letters, this exchange?

13   A    Well, recently, like yesterday, yeah.  I mean, because

14   I'd forgotten about this exchange.

15   Q    And so tell the Court what happened here that -- and

16   summarize it for the Court on Exhibits 1, 2, and 3 and how

17   the engagement letter that was ultimately signed and

18   attached to your application came about.

19   A    Well, May 19th, as I said, I believe I sent it to you.

20   You asked me to re-send it to you on Sunday, June 5th which

21   fits with (indiscernible) kind of got lost somewhere.

22   (indiscernible) modifications to it and sent me back those

23   revisions on Sunday, June 5th at 3:40 in the afternoon.  I

24   accepted those revisions and had -- where it is -- yeah.

25   Yeah, I accepted those revisions at 4:20 that day

Page 158

1    (indiscernible) asked me to go ahead and print out.  When I

2    did that, I went ahead and put the date of May 19th on it

3    because that's when I originally drafted it.  May 24th, a

4    few business days later is when we -- I visited Austin with

5    you.

6    Q    Okay.

7    A    (indiscernible).  I think, Judge, you mentioned it

8    happens in bankruptcy.  I sit there and with all this is

9    because I did not put in front of this, as of May 19th, this

10   letter.  That was what my thinking was.

11   Q    so the engagement letter that you sent on May 19th was

12   never executed, correct?

13   A    Correct.

14            MR. CHAPPLE:  (indiscernible).

15            THE COURT:  Sustained.

16   BY MR. LEE:

17   Q    Which engagement letter was executed by the client on

18   June 6, 2022?

19   A    The one that (indiscernible) took to Austin on

20   (indiscernible) on June 5th is my -- yeah, I would've

21   prepared it on June 5th.

22            THE COURT:  Overruled.

23   BY MR. LEE:

24   Q    Mr. Schwartz, I want you to turn to Exhibit 23 in your

25   big binder, please.

1    A    I have it.

2    Q    Do you recognize the Exhibit No. 23?

3    A    (indiscernible) be related to the Austin visit starting

4    at 11:30.

5    Q    To the best of your recollection, do you recall whether

6    or not I or anyone else from any other party mentioned to

7    you to come to a meeting regarding FSS prior to my sending

8    you this email on May 19th, 2022 -- 5:24?

9         MR. CHAPPLE:  Objection (indiscernible).

10        THE COURT:  Sustained.

11   BY MR. LEE:

12   Q    Mr. Schwartz, do you recall reading this email at 5:24

13   on that date?

14   A    Yes.

15   Q    Was this the first time you read this email?

16   A    Yeah, five -- yes.  That date at 5/24 was the first

17   time I read it.

18   Q    And was this the first time the subject matter came up

19   that's contained in this email?

20   A    Yes.

21   Q    Had you ever had this subject come up before this time?

22   A    No.

23   Q    And what did you do in response to this email?

24   A    What did I do in response?

25   Q    Yes, sir.  If anything.

1   A    Okay, I looked at my calendar to see if I could be in

2   Austin with you on the 24th.

3   Q    Now turn to -- looking to Exhibit No. 24.

4           THE COURT:  Before you go there.  So the email

5   says, "I told Ray we can be there by 11:30."  What did you

6   understand that, if the topic had never come up?

7           THE WITNESS:  The 11:30?

8           THE COURT:  It said --

9           THE WITNESS:  (indiscernible).

10          THE COURT:  It said, "I told Ray we can be there

11  by 11:30."  The question before you was that before this

12  email the topic had never come up and I'm just trying to

13  understand then what did you understand that you were going

14  -- be there by 11:30.  What did you understand at that time?

15          THE WITNESS:  My typical experience is when

16  someone asks, like a lawyer or someone asks me to a meeting,

17  they have a project in mind.

18          THE COURT:  So you knew at some point before this

19  email that you were going to be asked to go to a meeting?

20          THE WITNESS:  No.  I didn't know until I -- that I

21  was going to be asked.

22          THE COURT:  That's what confusing.  The email

23  starts and says, "I told Ray we can be there by 11:30."  So

24  --

25          THE WITNESS:  (indiscernible), Mr. Lee told me

1    that Ray had said can you come to Austin for a meeting.

2              THE COURT:  That's what I was trying to --

3              THE WITNESS:  -- on the 24th.

4              THE COURT:  -- understand.  And that was -- was

5    that before this email?

6              THE WITNESS:  Yeah, because then this is the

7    confirming the time.

8              THE COURT:  Do you recall when that --

9              THE WITNESS:  That would've been -- this is --

10   well, it had to have been after the hearing because we

11   didn't know about it before the hearing.  So (indiscernible)

12   --

13             THE COURT:  Okay.

14             THE WITNESS:  -- five or 4:30.

15             THE COURT:  Thank you.

16   BY MR. LEE:

17   Q    All right.  Mr. Schwartz, I asked you to take a look at

18   Exhibit No. 24 and see if you recognize that document.

19   A    Yes.

20   Q    Can you describe that document to the Court?

21   A    (indiscernible) a summary I prepared and sent of

22   (indiscernible) evaluation of the situation we were in with

23   the three debtors and possible approaches and, quite

24   frankly, look at the economics of various alternatives we

25   had.

1    Q    Okay.  Mr. Schwartz, had you been thinking about how to

2    proceed with the InfoW cases before I wrote you this email

3    on May 21?

4    A    I'd been thinking about it since we got the first word

5    that they wanted to dismiss us at the time without

6    prejudice.  So I knew, okay, if they're smart they're going

7    to (indiscernible) dismiss us with prejudice and we need to

8    think about what happens then.

9    Q    So tell the Court what you did in response to the --

10   once you read this email from me on Saturday, May 21.  What

11   type of actions or response, if any, you did in reaction to

12   my email that I sent you.

13   A    I told you we have to stop this through -- get this

14   case dismissed.  We can't afford to keep us working on this

15   when there's (indiscernible) benefit to the estate of us

16   doing that, nor economic benefit.

17   Q    And what kind of analysis did you do in order to come

18   to that conclusion?

19   A    My analysis (indiscernible) whole lot.  I -- you know,

20   what's, you know, we don't have any assets to recover.  We

21   can incur fees.  We had seventy-something thousand dollars

22   in the bank (indiscernible) I'm going to blow this $70,000

23   and what do we have to show for it.  Nothing.  And if we get

24   out of here there's still $50,000 in the estate.

25   Q    Now, was there at some point in time -- look at Exhibit

1    No. 25.  Do you recognize Exhibit No. 25?

2    A    Yes.

3    Q    And what is that document?

4    A    This is an email you sent me attaching a draft of the

5    motion to dismiss, the 5/23/22 draft telling me about that

6    and also telling me we're going to skip the 341 meeting.

7    Q    And was the -- what was the rationale for us moving as

8    quickly as we did to try to get these cases dismissed at

9    that point in time?

10    A    Because it's just costing money.  You know, it's

11    costing expensive professional time.

12    Q    So do you recall also that I had attended a hearing on

13    May 19th with the bankruptcy court?

14    A    Yes.

15    Q    And that I explained to the Court that we had to

16    evaluate alternatives; do you recall that?

17          MR. CHAPPLE:  (indiscernible).

18          THE COURT:  Sustained.

19    BY MR. LEE:

20    Q    Do you recall what I told the Court on May 19th

21    regarding the future of the bankruptcy case?

22    A    Yes.

23    Q    And what -- do you recall what I had told the Court?

24    A    You just said, we're looking at alternatives.  I went,

25    okay, fine.  He (indiscernible) lawyer.  I said, dismiss it.

1  Q    All right.  Now, one of the things that's been asked of

2  you or alleged against you is that you had apparently been

3  on both sides of the transaction.  Are you aware of that

4  allegation?

5  A    I'm aware of the allegation.

6  Q    Mr. Schwartz, in your job over the last 40 years in the

7  bankruptcy arena as a financial advisor, do you understand

8  the term being on both sides of a transaction?

9  A    Yes.

10  Q    Tell everyone here what that means to you.

11  A    What it means to me is quite literally wearing two

12  hats, your hats are negotiating with each other and you're -

13  - so you're really negotiating with yourself.  Or some

14  portion of it's yourself.

15  Q    So let's talk about the plan support agreement.  Before

16  the bankruptcy was filed, tell the Court what role you

17  played on behalf of InfoWar debtors with respect to the

18  negotiation of the plan support agreement, if any.  And I

19  remember you came on the scene, so tell the Court what role

20  you played in formulating that document before the petition

21  date of April 17th.

22  A    In formulating, I'm almost none -- none other than, I

23  mean, the last (indiscernible) I had to review, but the

24  substantive economics were established before I came along.

25  The concept of the trust, the concept of the trustees, the

1    concept of the (indiscernible) judges preexisted

2    (indiscernible).  I always (indiscernible) to look for

3    implications that I could (indiscernible) for the Debtors

4    that (indiscernible) may not like but -- and just generally

5    doesn't make sense to me or is there anything confusing in

6    it, but it --

7    Q    And then do you recall so far the testimony that those

8    agreements, the declaration of trust as well as the plan

9    support agreement went -- underwent revision from April 17th

10   to April 29th?  Do you recall that testimony?

11             MR. CHAPPLE:  Objection.

12             THE COURT:  Overruled.

13   BY MR. LEE:

14   A    (indiscernible) those revisions.

15   Q    What role did you play in those discussions and

16   negotiations?

17   A    None.

18   Q    And why was that?

19   A    That was because the judges had their counsel looking

20   at it and they basically went away and looked at it and

21   worked on it and worked on it and worked on it, and then all

22   of a sudden, there was the product.

23   Q    And do you recall that it was on, what, April 29th,

24   2022 as ECF 48 which got filed on the record?

25   A    Yes.

1    Q    Would it still be -- would it be fair to say that the

2    world changed for InfoW Debtors on June 3rd or 6th when the

3    plaintiffs decided to dismiss the claims against the Debtor?

4    A    June 3rd --

5    Q    Third.

6    A    (indiscernible).

7    Q    I'm sorry, May 3rd.

8    A    Yeah.  Yes.

9    Q    And tell the Court why that was.

10   A    Well, the PSA, plan support agreement, and the trust

11   were structured in order to bring the Texas and the

12   Connecticut plaintiffs into the Court for the process of

13   hopefully efficiently and fairly getting their claims

14   liquidated for an amount that they would be paid by the

15   trust.  With the plaintiffs moving to dismiss us from the

16   cases, we -- there would be no standing for us that the

17   trust, the Debtors and the trust -- the Debtors wouldn't be

18   there, so there would be no standing to (indiscernible)

19   plaintiffs' claims into the (indiscernible) offices of the

20   bankruptcy court.

21   Q    Now, before we reach the May 19th hearing date, do you

22   recall the direction that you gave me with respect to what I

23   needed to do for the InfoW Debtors' bankruptcy case as to

24   those stipulations?

25   A    Stipulations of the Texas (indiscernible), I said

 1   absolutely (indiscernible).  Can't dismiss it

 2   (indiscernible) out of there, (indiscernible) unless we get

 3   (indiscernible) with prejudice.  I was (indiscernible) that.

 4   Q    So your focus to me was to make sure those got done

 5   correctly; is that accurate?

 6   A    yes.

 7   Q    And do you also recall that with respect to the

 8   Connecticut plaintiffs, they decided to proceed by way of

 9   motion, not by stipulation, correct?

10   A    Right --

11          MR. RUFF:  There was an objection, Your Honor.

12          THE COURT:  Overruled.

13          MR. RUFF:  Thank you.

14   BY MR. LEE:

15   Q    You also recall whether or not there was tension

16   between the Debtor, especially counsel for the Debtor, Mr.

17   Lee -- me -- and Mr. Ruff before May 19th with respect to

18   the speed at which we wanted to get -- both parties wanted

19   to get the --

20          MR. RUFF:  Objection, Your Honor.  Calls for

21   speculation.

22          THE COURT:  Sustained.

23          MR. LEE:  I haven't even finished my question,

24   Your Honor.

25          THE COURT:  Really obvious.

```
 1              MR. LEE:  I apologize.

 2              THE COURT:  No worries.

 3    BY MR. LEE:

 4    Q    Do you know whether or not there were -- based on

 5    reviewing the emails between me and Mr. Ruff where there was

 6    tension between the Debtors' counsel and the U.S. Trustee's

 7    counsel before May 19th as to the disposition of this case?

 8    A    Yes.

 9    Q    What was that dispute?

10    A    That -- I recall it was whether or not dismiss -- our

11    filing was legitimate should've been allowed.  I mean

12    (indiscernible) from the very beginning.

13    Q    Okay.  And do you recall where your application to

14    retain was placed insofar as being heard by the Court?

15    A    I don't think it had a date.

16    Q    Do you recall my reporting to you as to the results of

17    the hearing on May 19th, 2022 after the dismissal of the

18    Texas and the Connecticut plaintiffs?

19    A    Yes.

20    Q    And do you recall my telling you the conversations I

21    had with respect to the dismissal of the cases by the U.S.

22    Trustee and their position about the case?

23    A    I remember you discussing with me their position.  I

24    don't think at that time it had significantly changed in

25    terms of our view (indiscernible) accomplished.
```

1    Q    So going back to Exhibit No. 24 in front of you, as of

2    May 21, 2022, had you made a decision or -- had you made a

3    decision as to whether or not the InfoW Debtors' cases would

4    continue in Chapter 11 or be dismissed?

5    A    By this date, I was convinced it was not -- they were

6    not going to continue.

7    Q    And by May 23rd, 2022, when I had forwarded to you a

8    draft of the motion to dismiss Chapter 11 cases, had your

9    views in any way changed about dismissing the cases?

10   A    No.

11   Q    And so did you direct me then on May 25, 2022 to advise

12   the U.S. Trustee that the Debtors were dismissing their

13   cases?

14   A    Yeah, we talked about that, somewhere (indiscernible)

15   May 25 that I told do it.

16   Q    So as of at least May 25, was there any expectation

17   that you as a CRO or Schwartz & Associates would be retained

18   as an estate professional in the InfoW Debtors bankruptcy

19   cases?

20   A    No expectation, no.  I figured at that point, it wasn't

21   going to happen.

22   Q    And in fact, did you learn from me through the emails I

23   forwarded to you that the U.S. Trustee did not want you to

24   be retained as an estate professional?

25   A    Yes, I did.

```
 1    Q    And that included any other professionals including

 2    lawyers; is that correct?

 3    A    Right.  That's what I understood.

 4    Q    Would it have made business sense for you as a chief

 5    restructuring officer to have spent the monies and the

 6    administrative claim to fight the U.S. Trustee and get the

 7    case in place in order to have our applications heard and

 8    our fee applications then blessed by this Bankruptcy Court

 9    in the InfoW bankruptcy case?

10    A    In my opinion, if I had done that, then I would've been

11    guilty of violating my fiduciary responsibilities.

12    Q    Mr. Schwartz, in your work since -- prior to April

13    17th, the petition date of InfoW Debtors to now, have you

14    ever worked directly for Mr. Alex Jones?

15    A    No.

16    Q    All right.  And insofar as your present duties today as

17    the chief restructuring officer or proposed chief

18    restructuring officer of FSS, tell the Court the kind of

19    interaction you had with Mr. Jones in your capacity as the

20    CRO.  How does -- how do you interact with him?

21    A    Well, it's pleasant.  We speak frequently.  He

22    sometimes will call me two or three times a day, sometimes

23    in 30 minutes.  Usually, he has problems.  He needs my

24    (indiscernible) help him resolve or he's asking permission

25    to do something.  They're cordial.  And that or I call him
```

1    to (indiscernible) focus on something.

2    Q    Does he get to direct what you do and how you operate

3    your business at FSS as a CRO?

4    A    No.  I operate the business and I direct the business.

5    I -- no.

6    Q    So what role, if any, does he -- is he involved in your

7    business decision making at FSS?

8    A    Well, first off, he is the leading key sales guy.

9    Nothing really gets sold of any substance but by him, so he

10   is (indiscernible) component to the business.  He also has -

11   - because of that and his tremendous understanding and

12   knowledge of the products that we sell, particularly in the

13   supplements and compounds or -- (indiscernible) say

14   compounds, the chemical products that we sell and the market

15   demand for them.  He's (indiscernible) very well and

16   (indiscernible) the suppliers to a great extent, so he's an

17   important from the standpoint of (indiscernible) important

18   as a source of information and to help me (indiscernible) we

19   should be doing on the product side.

20   Q    Now, because of these things he does, have you given

21   him any preferential treatment insofar as paying his claims

22   or treating him differently because of his role in this

23   bankruptcy case in any way?

24   A    I don't think so.

25   Q    Insofar as wages are concerned that he's entitled to,

1   has he been afforded his full wages under the cash

2   collateral order to date?

3   A    The amount has been allowed.  He's been paid.

4   Q    Is that the full amount that he's entitled to under his

5   employment contract that he was with FSS today?

6   A    It is not the amount.

7   Q    How much is it lower by?

8   A    (indiscernible) a million-three annual salary, if you

9   will, the employment agreement.  We're currently paying him

10   $20,000 a pay period so that's about $480,000 at that rate.

11   And prior to this, we paid him $10,000 or $20,000 a pay -- a

12   month -- $40,000 a month, $20,000 a month.  So he's getting

13   less than half of his -- what his agreement calls for.

14   Q    Mr. Schwartz, you've also highlighted in your

15   declaration and previous testimony some of the issues that

16   you discovered at FSS when you came on the scene.  Do you

17   remember that?

18   A    Yes.

19   Q    And can you tell the Court in a brief summary some of

20   the, I guess, problems you encountered and found and what

21   you've done about them to date?

22   A    Well, we -- the time the declaration we had

23   substantially brought the books current (indiscernible) on

24   the bookkeeping (indiscernible).  The inventory has been a

25   continuing problem, having the right inventory.  We don't

```
 1    have a good system yet for inventory management in the sense
 2    of information flow.  (indiscernible) working on that.  We -
 3    - our cost of processing of credit cards was extremely high,
 4    about 14, 15 percent, extremely high.  I got it down to 4
 5    percent.  Negotiated that and we're currently
 6    (indiscernible) to try to reduce that cost.
 7         We're looking at alternative sources of inventory
 8    financing which will get us more inventory (indiscernible)
 9    for the Christmas holiday sales and sustain our company
10    going forward.  What have I missed?  I've hired a CRO --
11    excuse me, an operating manager and I've hired
12    (indiscernible) bookkeeper, keeping operations
13    (indiscernible) bringing someone on board in the offices at
14    FSS as an employee of FSS and in contracting with the
15    bookkeeping services.  Matter of fact, I have meetings with
16    them tomorrow.  So it's a few of the things we -- you know,
17    we're facing.  You know (indiscernible) a chapter in the
18    book but we're (indiscernible) that under control and we are
19    close to getting prepaid credit cards.  We've been in -- we
20    had a couple of (indiscernible), but I think we've got a
21    vendor now who's not afraid.
22    Q    Let's talk about the schedules that Mr. --
23    A    Yeah.
24    Q    -- asked me about and some of the omissions he alluded
25    to.  Tell the Court what is the stage of amending the
```

1   schedules after the Debtor submitted them last week.  Can

2   you talk -- tell the Court what is going on there?

3   A    The specific (indiscernible) and I discussed that at

4   the 341 meeting that if you noticed where there's no mention

5   of Shannon & Lee, there's Schwartz & Associates.  That's

6   like a $380,000 payment.  What happened is (indiscernible)

7   was wired to me to my trust account and then we distributed

8   it to Shannon & Lee and Kyung S. Lee PLLC and I think even

9   some to Mr. Battaglia, so I (indiscernible) that schedule

10   was -- I've got it on (indiscernible) for that page where I

11   have the tale.  (indiscernible) got what laid out there so

12   it -- but it was for prepetition fees or retainers and so

13   we're working on that.

14        I just learned Friday of a transaction that was booked

15   as other income which was actually a contribution of capital

16   by (indiscernible).  That will change the schedules with

17   that booked right.  That was done in July prepetition.

18   There are the -- there's a question of why on the payments

19   to creditors there was no (indiscernible).  That was asked

20   and that has been -- actually what happened is the

21   (indiscernible) report to July 22nd, not July 29th so we've

22   added seven more days of payments on there.

23        So it's come forward.  I'm going to go back through and

24   see, okay, what else have we got in here.  We've got at

25   least one unsecured creditor who's told me, I'm not owed

1    anything.  I owe you people money.  So --

2    Q    So would it be fair to say that you're still drinking

3    from a fire hose?

4    A    It's a smaller fire hose, but it's still a fire hose.

5    Q    And would it still be accurate to say that you are

6    constantly correcting, amending, updating data in order to

7    make them as accurate as possible and not hiding things from

8    creditors or the Court?

9    A    Yeah, we're not trying to hide anything.

10   Q    So let's go back to talking about the issue of being on

11   both sides of the transaction.  Do you recall us talking

12   about that.  Did you ever end up being on both sides of the

13   transaction after May 19th, 2022 when I left this Court and

14   told the Court we would either evaluate dismissing the case

15   or having to go back and negotiate either an amendment to

16   the PSA or a new funding agreement, did you, while you were

17   going up and sitting at FSS' office end up negotiating for

18   InfoW for more money or trying to do that?

19   A    No.

20   Q    And tell the Court why not.

21   A    Well, again, I mean, let me put it this way.  The

22   description of the situation we were in after that date, we

23   were trying to decide do we continue or do we dismiss.  At

24   that point in time, we -- I think all the professionals

25   involved -- were in that position where it would've been

1   more beneficial for us financially to keep going.

2   Q     For the professionals?

3   A     For the professionals.  So we were in that -- that

4   happens. Regularly in bankruptcy and receiverships.  You get

5   to a point where, hey, keep going or stop?  And I can make

6   more money if I keep going.  That was -- that's exactly that

7   situation.  I did not go out of turn to negotiate more money

8   for the plan sponsors.  First off, I couldn't give a -- I

9   can't come up with a reason why they should give us money.

10  And two, there is no benefit to doing it.

11  Q     Now, another criticism that's been leveled against you

12  and me is that we came here and we told the Court that we're

13  going to do our fiduciary duty.  Do you recall that

14  criticism?

15  A     I remember very strongly the judge's words on that.

16  Q     Do you recall that one of the issues that came up when

17  the plaintiffs dismissed their claims, that one of the

18  concerns that the parties had is that the Debtor, InfoW

19  Debtors, would not accept their dismissal and would try to

20  perpetuate the bankruptcy cases?  Do you recall that, sir?

21             MR. CHAPPLE:  Objection.

22             THE COURT:  Sustained.

23  BY MR. LEE:

24  Q     Do you recall one of the objectives that the plaintiffs

25  were saying that the InfoW Debtors would be trying to do

 1   after the plaintiffs trying to dismiss their cases?

 2   A    I recall that they didn't trust us and were trying to

 3   figure out what were we up to.  That's what made it so hard

 4   to get -- and actually, I thought it would be, you know,

 5   what's so hard about with prejudice in a dismissal and it

 6   actually became an issue.  But it was because of the

 7   distrust out there.

 8            MR. CHAPPLE:  Objection.

 9            THE COURT:  I'll overrule.  He can --

10   BY MR. LEE:

11   Q    And so Mr. Schwartz, at the end of the day, did you

12   conclude that dismissal of the bankruptcy cases as of May

13   21, '22, when I sent you the email was in the best interest

14   of this estate?

15   A    Yes.

16            THE COURT:  Okay.  Overruled.

17   BY MR. LEE:

18   Q    During the time between May 19th through June 10th,

19   were you ever involved in discussions with any party, any

20   part, in which you took an adverse position to InfoW Debtors

21   on any topic?

22            MR. LEE:  Pass the witness, Your Honor.

23            THE COURT:  Okay.  Before we take a break, there

24   are two questions I've been -- forgot to ask you earlier

25   (indiscernible) relevant now.  What is (indiscernible)

1    prepared like a budget to actual, just comparing essentially

2    the cash collateral budgets to what has been actually spent?

3    I've only seen estimated budgets in the cash collateral.

4    I'd love to see kind of a reconciliation of budget to

5    actual.  What I mean for that -- by that, I'm just

6    (indiscernible) explaining in general if cash collateral

7    budget would budget a million dollars in potential gross

8    receipts over a period of time.  Maybe you took in a

9    million.  Maybe you took in a million-five.  Maybe you took

10   in a half a million.  Has there been any reconciliation of

11   budget to actual?

12            THE WITNESS:  What we did is every -- except for

13   today because today is Tuesday, the day it's due, we do a

14   budget to actual.  What I actually do now is -- and we've

15   done this every week -- is budget this is week seven, I

16   think.  Last week is week seven.  So we budget -- the budget

17   we had for cash collateral, the actuals, the variance, and

18   then the bankruptcy to date where you can see the whole

19   picture.

20            THE COURT:  Okay.

21            THE WITNESS:  That's done every week.

22            THE COURT:  Okay.  I was just curious.  Just -- I

23   hadn't seen it, but I know that sometimes it gets filed with

24   an MOR or --

25            THE WITNESS:  I didn't even --

```
1              THE COURT:  Just a question.

2              THE WITNESS:  I don't think it's getting filed.

3              THE COURT:  It may not.  Just something I, at some

4    point, I'd mention.  I'd like to see just to understand the

5    true financials.  There's something else and -- apologize.

6    And if you look at your screen, whenever it decides to load.

7    The dot, dot, dots make it look like it's -- it's your first

8    day declaration with the exhibits.  See if I can get this to

9    load up in a faster way, what I'm looking for.  Always meant

10   to ask you this question.

11             It's always when you want something to load

12   quickly.  All right.  So you recall there were the -- those

13   exhibits you filed, the comparative profit -- P&L

14   statements.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  So here's something I've always meant

17   to ask you.  So in 2021, InfoWars Health and Prison Planet

18   paid -- looks like FSS book income from InfoWars Health and

19   Prison Planet in 2021, but in -- they didn't in 2022.  Do

20   you know what the income was attributed to in 2021 for

21   InfoWars Health or Prison Planet?

22             THE WITNESS:  I may have to go back and look, Your

23   Honor.  I mean, I -- InfoWars Health is tone one who owns --

24   that monthly royalty is about $38,000 and so, and Prison

25   Planet, I --
```

```
 1                    THE COURT:  But InfoWars Health had paid FSS, is
 2       that -- was that the correct way to book it?
 3                    THE WITNESS:  It'd all depend on what the -- that
 4       relationship is actually controlled by Dr. David Jones and
 5       sometimes they move these around.
 6                    THE COURT:  So in 2022, would InfoWars Health have
 7       owed FSS any funds?
 8                    THE WITNESS:  No.  No, that funds -- my
 9       understanding, those -- 2022, those funds, we were told,
10       that royalty relation actually belongs to Health, to Health.
11                    THE COURT:  Got it.
12                    THE WITNESS:  And that that's when I said --
13       actually the one who said no, I need that money --
14                    THE COURT:  You need that money.
15                    THE WITNESS:  -- right now.
16                    THE COURT:  I remember.  That's why I was
17       wondering.  I know at some point, it turned and you turned
18       it around to start receiving it.
19                    THE WITNESS:  Once it -- I actually don't know
20       where it is now because --
21                    THE COURT:  Okay.
22                    THE WITNESS:  I hadn't (indiscernible) signer on
23       the bank account for IWHealth.  Haven't found a way to
24       unravel that mess.
25                    THE COURT:  Okay.
```

1          THE WITNESS:  And haven't seen any more money come

2     in.

3          THE COURT:  And for Prison Planet, do you know

4     what that 5,000 --

5          THE WITNESS:  No.

6          THE COURT:  Okay.  Okay.  Those are my only

7     questions.  I just been meaning to ask you.  I needed to

8     understand just the relationship.  Why don't we -- who's

9     going to ask questions on cross?  Mr. Ruff?  Mr. Chapple,

10    are you going to have any examination?  Okay.  So why don't

11    we -- it's 5:15.  Why don't we come back on in five minutes,

12    let everyone take a break and then we'll come back in five

13    minutes and we'll continue with cross.

14         CLERK:  All rise.

15         (Recess)

16         THE COURT:  We are back on the record in Free

17    Speech.  Mr. Schwartz, I remind you are still under oath and

18    Mr. Ruff, I have one more question and I'm going to take the

19    liberty.

20         MR. RUFF:  Go ahead, Your Honor.

21         THE COURT:  And it was a question that I asked Mr.

22    Lee and I wanted to -- you're the better person to ask just

23    to understand it.  I'm trying to -- again, just trying to

24    put the timing together and I put it up on the screen

25    earlier and I'm going to see if I can find it again.  Just

```
 1    give me a second.  This is just the docket entry.  This is

 2    what I meant to ask you.  Well, I'll take the drama out.

 3    The question had to do with the declaration that was filed

 4    by Mr. Andino Reynal saying in that -- here we go.

 5          That statement -- I just want you to look at

 6    paragraphs 5 and 6.  It says that in May of -- May 19th, FSS

 7    retained you as a CRO and that you contacted Mr. Reynal if

 8    you knew of any financial executive that was able to come

 9    and work at FSS, and that criminal defense lawyer

10    recommended Mr. Jeffrey Schultz and -- with essentially the

11    -- with his recommendation that FSS hire Mr. Schultz.  Can

12    you confirm the accuracy of statements in paragraph 5 or 6

13    is there anything that you would clarify?

14          THE WITNESS:  Well, the only thing I want --

15          THE COURT:  You didn't sign this so I'm just -- so

16    I want to be very clear about that.   You didn't sign this.

17    This is saying something about what happened in May

18    regarding -- including, as it pertains to you and I'm just

19    trying to understand what your understanding was.

20          THE WITNESS:  Well, in terms of the hiring of Jeff

21    Schultz --

22          THE COURT:  Maybe I can ask it this --

23          THE WITNESS:  There's more to the process than

24    just me recommending Schultz.

25          THE COURT:  But was it in May of 2022 that you --
```

Page 183

```
1              THE WITNESS:  Oh, yeah.  I think so.  I'd have to
2    go back and look at my calendar.
3              THE COURT:  But did you -- this --
4              THE WITNESS:  No, wait a minute.  May?  I'm sorry.
5    I don't know if that's right.
6              THE COURT:  Okay.  This also -- you think it was
7    May or sometime after May?
8              THE WITNESS:  I know it was after May because I've
9    been -- my engagement letter wasn't signed until June 7th
10   (indiscernible) as of May 19th and that's where he got a
11   date, but he's wrong on the month of May because I can tell
12   you right off the bat -- I mean, we didn't do much of
13   anything until the retainer came in because under my
14   agreement, I had to get the retainer too for the engagement
15   to be effective.  So June 10th, we're working.  Now June
16   10th I'm screaming, I need somebody.  So it would have been
17   in June.
18             THE COURT:  Did you contact Mr. Reynal and ask if
19   he knew of --
20             THE WITNESS:  Yes, I asked all -- everybody.  So
21   it was kind of a blanket request.  Nobody -- and he --
22   Andino called me up and said, I got somebody but let me tell
23   you the situation.
24             THE COURT:  May I just ask a silly question.
25   You're a professional with over 40 years of experience.  Why
```

```
 1    did you contact a criminal defense lawyer about someone to

 2    hire as a potential accountant in a business?

 3              THE WITNESS:  I actually -- just let all the

 4    lawyers know -- I mean, he was, you know, just in the room

 5    because he defends -- he's defending the Texas cases.

 6              THE COURT:  Right.

 7              THE WITNESS:  So he was there and I said, you

 8    know, I'm looking for somebody.

 9              THE COURT:  Oh, I understand.  Thank you for the

10    clarification, sir.  Thank you.

11                                          EXAMINATION

12    BY MR. RUFF:

13    Q    Good afternoon, Mr. Schwartz.

14    A    Mr. Ruff, you have a halo around you now.

15    Q    Do I?  Don't be deceived.

16    A    Believe me, I'm not.

17    Q    Now Mr. Schwartz, you have more than 40 years of

18    experience in the restructuring business.  Correct?

19              THE COURT:  That's my line.

20              MR. RUFF:  Oh.

21              THE WITNESS:  So it must be right.

22              THE COURT:  I'm sorry.  Go ahead.

23    BY MR. RUFF:

24    Q    And during these 40-plus years, you have frequently

25    served as a chief restructuring officer or CRO.  Is that
```

Page 185

1    correct?

2    A     Not that frequently.  That's a relatively new concept

3    to me anyway.  I mean, back then, the owner in charge --

4    Chapter 11 trustee -- only in (indiscernible) years have we

5    -- have I been doing CROs.  But I distinguish between the

6    trustee and the CRO, though -- the concept of the -- you

7    know, the trustee, I get paid less but I also have more

8    protection from the court.  CRO, I get paid more.  I still

9    have to do the same work.

10             MR. RUFF:  Can you -- Mr. Ross is going to be --

11             THE COURT:  All right.

12             MR. RUFF:  Then if you could go to Page 9.  It

13   will be Paragraph 26 (indiscernible).

14   BY MR. RUFF:

15   Q    Mr. Schwartz, would you mind reading the second

16   sentence in Paragraph 26 for me?

17   A     Yes.  He frequently serves as a chief restructuring

18   officer, as a federal and state court appointed receiver in

19   bankruptcy and non-bankruptcy and -- what happened --

20   proceedings, and that he's -- do you want me to read the

21   rest?

22   Q    No, that's all I needed you to read.  So this was your

23   application for employment and it -- in there, it

24   represented that you frequently served as a chief

25   restructuring officer.

1   A    Wait a minute.  I think -- I says -- could you go back

2   to that page?  Frequently serves as a chief restructuring

3   officer, as a federal and state court appointed receiver, in

4   bankruptcy.  So I frequently serve in those capacities, as a

5   receiver and as a CRO and probably what I should say is --

6   well, as an examiner also, but that's kind of gone passe.

7   Q    Would it be accurate to say that you frequently have

8   served as a professional in bankruptcy?

9   A    That's accurate.

10  Q    Okay.  Very good.  And so you are familiar with the

11  need to disclose connections when seeking employment in a

12  bankruptcy case.  Is that correct?

13  A    Yes.

14  Q    Okay.  And, Mr. Schwartz, you were the chief

15  restructuring officer in the -- what I will refer to as the

16  Info W cases.  Is that correct?

17  A    Yes.

18  Q    All right.  Now in the Info W cases, there was a plan

19  support agreement and a litigation settlement trust.  Is

20  that correct?

21  A    Correct.

22  Q    All right.  Now those agreements were negotiated prior

23  to your being retained as the chief restructuring officer or

24  after?

25  A    Substantively, prior.  Like I said, the -- do you have

1   -- well -- the structure of what was being planned, i.e.,

2   the structure of the trust and the proposed trustees, the

3   litigation of the PSA, extensively had been developed.  The

4   financing had all been negotiated prior to my arrival.  That

5   was pretty well known.  I mean, if there was any question,

6   that was minor on that so there was -- the agreements

7   themselves were still being -- going through the editing

8   stages, but the -- substantially, you know, the car was

9   designed and chassis built and they were just finishing off

10  the waxing.

11  Q    Now -- and again, in the Info W cases under those

12  agreements, Alex Jones and Free Speech Systems -- FSS --

13  were the third-party funders who were going to contribute

14  funds under the litigation settlement trust to pay the

15  creditors in the Info W cases.  Is that correct?

16  A    Well, they were contributing funds to the trust and

17  they were setting aside funds for the professional costs.

18  Q    So there was no -- under those agreements, there was no

19  consideration or funds being given for the creditors of the

20  Info W debtors?

21  A    Well, I said there's funds -- there are funds being set

22  aside in the trust for the benefit of the creditors and

23  there were funds being set aside -- I think they were

24  actually held in an (indiscernible) account to pay the

25  professionals.  That money all came from -- was coming from

1    Mr. Jones and FSS.

2    Q    Is it your recollection that there was approximately or

3    maybe $10 million to be funded under those agreements?

4    A    Well, the estimation of the amount that would

5    ultimately be funded is 10 million.  There was $2 million,

6    as I recall, of cash up front.  There was another amount --

7    $40,000 -- 500,000 -- $480,000 a year for five years.  That

8    was coming from another source, and then FSS itself would

9    devote its net income to the trust as well.  (indiscernible)

10   But some of that depending on which estimate you use for

11   FSS, is 10, 12, $15 million.

12   Q    And you were the -- as the chief restructuring officer,

13   you were the party designated to represent the interest of

14   the Info W Debtors under those agreements.  Correct?

15   A    Yes.

16   Q    And that's in the negotiation of those agreements?

17   Correct?

18   A    Well, yes, once I came on board.

19   Q    Okay.  And there was testimony earlier about an amended

20   plan support agreement and a litigation settlement trust

21   being filed with the court on April 19th.  Do you recall

22   that?

23   A    Yes.

24   Q    Okay.  So the parties were in negotiation again,

25   yourself on behalf on the Info W Debtors, Alex Jones for

1    himself, FSS for itself, and the proposed trustees under the

2    litigation settlement trust.  Is that correct?

3    A    (No audible response)

4    Q    So those were -- let me rephrase.  Yeah.  So the

5    parties that were negotiating at the time were the Info W

6    Debtors, Alex Jones, Free Speech Systems, and the litigation

7    -- proposed litigation -- settlement trustees.  Is that

8    correct?

9    A    Yes.

10   Q    All right.  And more negotiations were required because

11   the trustees or the proposed trustees of the litigation

12   settlement trust had not agreed to that document yet.  Is

13   that correct?

14   A    Correct.  They had not signed off on it.

15   Q    So as of April 29th when that was filed, you were on

16   opposite sides of the table from FSS.  Is that correct?

17   A    Well, I guess that's one way to look at it.  Yeah, we

18   were -- they were negotiating -- well --

19   Q    I'll take your answer.  If yes is the answer -- yes or

20   no and you said yes.  I'll take it.

21   A    Well, I (indiscernible) opposite sides because we're

22   not fighting.  But, yes, we're not -- we're each looking for

23   our own interest or our own constituents' interest.

24   Q    Very well.  I'll take that as well too.  So you were

25   there for the interest of the Info W Debtors.  Correct?  You

Page 190

```
 1    were not there for the interest of FSS at that time.
 2    A     Correct.  And then -- you say Debtors and the primary
 3    responsibility is to the Debtor's creditors, obviously.  So
 4    that's what I'm mostly concerned about.
 5    Q     Now moving on, on April 18th, 2022, the Info W Debtors
 6    filed an application to request authority to employ you as
 7    their chief restructuring officer in the Info W cases.
 8    Correct?
 9    A     Okay.  Sorry.  I don't recall the date but --
10    Q     Does that sound correct to you?
11    A     Yes, that sounds correct.
12    Q     Now prior to the application being filed on April 18th,
13    you reviewed the application.  Correct?
14    A     Yes.
15    Q     Okay.  And you also reviewed your declaration before it
16    was filed.  Correct?
17    A     Yes.
18    Q     Okay.  Who drafted your declaration?
19    A     (indiscernible), I believe.
20    Q     Okay.  But ultimately, since the declaration was signed
21    by you -- correct -- the declaration was signed by you.
22    Correct?
23    A     Yes.
24    Q     Okay.  And do you understand that you're responsible
25    for the content within the declaration?
```

 1    A    Yes.

 2    Q    Okay.  And the declaration was signed under penalty of

 3    perjury.  Correct?

 4    A    That's what I remember.

 5    Q    Okay.  And when you sign a document under penalty of

 6    perjury, you're signed attesting to the fact that it's true

 7    and accurate.  Correct?

 8              MR. LEE:  Objection.  He's asking the witness for

 9    a legal conclusion.

10              THE COURT:  I think he's just testifying to what

11    the words say at the bottom of the declaration.

12              MR. LEE:  As long as that's the case.

13              THE COURT:  Yeah.  I'll overrule.  To your

14    knowledge.

15              THE WITNESS:  To my -- okay.  That it's true and

16    correct?  Yes, to the best of my knowledge -- the best of my

17    knowledge, it's true and correct.

18              MR. RUFF:  Okay.

19    BY MR. RUFF:

20    Q    Do you recall who filed the employment application in

21    the Info W cases?  Which attorney?

22    A    The employment applications?

23    Q    For yourself.  Yeah, who filed that?

24    A    I believe Mr. Lee did as counsel for the Debtor --

25    Debtors.

1   Q    All right.  Prior to them filing it, they got your

2   authorization to file that application.  Is that correct?

3   A    Yes.

4   Q    Okay.  Now attached to the application, was an

5   engagement letter.  Do you recall who signed the engagement

6   on behalf on the Info W Debtors?

7   A    No, I do not.

8   Q    All right.  I think you're on the same exhibit.  It

9   will be I think Page 32.  Scroll down.  There you go.  No,

10  back down where the signatures are.  All right.  Do you

11  recall this document, Mr. Schwartz?

12  A    Yes.

13  Q    All right.  What is this document to your recollection?

14  A    This appears to be our engagement letter.

15  Q    With the Info W Debtors?  Is that correct?

16  A    Yes.

17  Q    Okay.  And do you see who signed on behalf of --

18  A    Yes.

19  Q    Who signed that?

20  A    Alex Jones.

21  Q    Okay.  Thank you.  Now on the declaration filed on the

22  Info W cases, you affirmatively stated that there was no

23  connection to Free Speech Systems, LLC.  Is that correct?

24  A    Correct.

25  Q    And on the declaration filed in the Info W cases, you

1    also affirmatively stated that there was connection to Alex

2    Jones.  Is that correct?

3    A    That's correct.

4    Q    All right.  So from April 18th, 2022, to the dismissal

5    of the Info W cases which happened on June 10th, 2022, you

6    did not provide any subsequent amendments to the

7    declaration.  Is that correct?

8    A    I don't recall doing any.  I don't think so.

9    Q    Now let's if anything changes in your declaration and a

10   new connection developed.  Do you understand that you were

11   required to supplement your declaration?

12   A    Yes.

13   Q    Okay.  But you didn't supplement it at any time, did

14   you?

15   A    I did not.

16   Q    Okay.  Now fast forwarding a little bit to May 19th,

17   2022, you sent an engagement letter to FSS outlining the

18   terms upon which you would serve as its CRO.  Is that

19   correct?

20   A    That's incorrect.

21   Q    Okay.  Can you clear that up for me?  Did you -- let me

22   back then.  Restate the question.  Did you draft an

23   engagement letter for FSS on -- for your -- excuse me --

24   strike.

25        Did you draft an engagement letter to serve as CRO of

1    FSS on May 19th, 2022?

2    A    Yes.

3    Q    Okay.  Did you send that engagement letter to anyone on

4    May 19th, 2022?

5    A    Yes.

6    Q    Who did you send it to?

7    A    Mr. Lee.

8    Q    Okay.  So you were actively seeking an engagement to

9    serve as the CRO of FSS as early as May 19th, 2022?

10    A    I wouldn't -- you know, I was -- Mr. Lee asked me to

11    put together an engagement letter but we'd not had any

12    discussions with FSS or any of its principals or any of its

13    counsel -- I had not -- about employment.  So I did

14    (indiscernible) gave him a draft of the engagement letter so

15    he could see the terms under which I would take the job on,

16    but we had not sat down with anybody and even gotten

17    background information at that point.  I can't say I'm

18    actively seeking.  I'm actively seeking information.

19    Q    So it's your testimony today that when you send out an

20    engagement letter, you're not seeking to be engaged?

21    A    Most of the time when I get asked to send an engagement

22    letter, they're asked -- they want to look at the -- look at

23    the terms of my engagement.  That's typically what happens

24    and they will call back and if you're got a problem or not.

25    So (indiscernible) anticipating an engagement but it doesn't

Page 195

1    always happen.  You know, some people just like certain

2    clauses that we don't give on.  It's whatever.  And we

3    (indiscernible) ask for a draft and I sent a draft

4    engagement letter.  Yeah, I think it was draft.  And -- but

5    we had not sat down and talked with anybody about it at that

6    point in time.

7    Q    So is it your testimony then that as of May 19th, you

8    were desiring in an engagement with FSS as its chief

9    restructuring officer?

10   A    I'd say I was interested in it for certain.

11   Q    Okay.  Very good.  Now serving as the chief

12   restructuring officer of FSS, that an important role.

13   Correct?

14   A    Well, some people think so.  Some people don't.

15   Q    I'm asking you if you think it's an important role.

16   A    Well, I mean, it's a responsible role.  I mean, you

17   have to take it seriously.

18   Q    Okay.  In that role now you actually run FSS.  Correct?

19   A    Well, as much as any one person could run 50 people.

20   Q    Okay.

21   A    They still have their own -- I mean, I am the chief --

22   I (indiscernible) call it CRO because (indiscernible) chief

23   executive officers at this level so I have the

24   responsibility for everything going on but I don't do

25   everything.

```
 1   Q    So it wasn't your testimony earlier that -- let me back

 2   up.  Strike that.

 3        You testified earlier that Alex Jones doesn't control

 4   FSS now.  Correct?

 5   A    That is -- Alex -- that is correct but Alex Jones has a

 6   lot of influence over the employees there still.

 7   Q    Okay.  But it also was your testimony that you make all

 8   management decisions.  Is that correct?

 9   A    That is correct.  He comes to me.

10   Q    Okay.  So that's a pretty significant role then at FSS.

11   Is it not?

12   A    It's a lot of responsibility so, yeah, I mean --

13   Q    Okay.  And it was certainly a connection, wasn't it?

14   A    It was -- (indiscernible) it's --

15   Q    In the --

16   A    (indiscernible) it's a connection today.

17   Q    Okay.

18   A    But InfoWars is not a connection today.

19   Q    When you're -- but when you were seeking employment as

20   the chief restructuring officer and drafting any engagement

21   letter, you didn't see that as a connection at that time?

22   A    No.

23   Q    Okay.  When did you believe that there was connection?

24   A    Well, I believe we were still negotiating working with

25   the PSA and that was in force, definitely there was a
```

1    connection because they were the funding source for the --

2    one of the funding sources for the PSA, but once that PSA

3    was voided -- I mean, they've had -- (indiscernible) they

4    were an independent -- they were no longer involved.  They

5    were no longer an influential entity and (indiscernible)

6    they had no part -- no place at the table.

7    Q    Now you had a meeting in Austin on May 24th.  Is that

8    correct?

9    A    Correct.

10   Q    Okay.  And that was to discuss the FSS restructuring.

11   Is that correct?

12   A    That was to get introduced to it and they explained

13   that -- you know, they -- (indiscernible) doing

14   (indiscernible) saw a lot of them going over the proposed

15   structure of the (indiscernible) trust and the PSA and the

16   funding sources and we had some quite discussions about the

17   funding sources.

18   Q    So on May 24th, you were talking about the PSA for the

19   Info W Debtors?

20   A    I'm sorry.  May -- I apologize.  You're right.  My

21   brain just jumped back two months because I remember that

22   vividly.  Yeah, May 24th, we discussed the FSS bankruptcy

23   and some of the issues involved.

24   Q    Okay.  So as of May 24th, there was already a planned

25   FSS bankruptcy being talked about?

1   A    I wouldn't say it was a plan.  There was a -- the

2   possibility of a bankruptcy was being talked about.

3   Q    Okay.  And you were seeking to serve as or being

4   considered as the chief restructuring officer of FSS in that

5   plan.  Is that correct?

6   A    I believe I was being interviewed for it, yes.

7   Q    Okay.  And you didn't think that that was an important

8   connection?

9   A    As it goes to InfoWars, no, I did not, again, because

10  FSS was no longer in the InfoWars bankruptcy.  They were

11  gone.

12  Q    Was FSS jointly liable for all of the Info W Debtor's

13  debts?

14  A    No.  They'd all been dismissed from our standpoint.

15  Q    What about the remaining debts?

16  A    Oh, the other three?  I was actually -- yes, that's one

17  of the considerations we had was why should we spend money

18  here.  I mean, they got all the money and they're the ones -

19  - they are jointly liable for that.

20  Q    Now the U.S. Trustee filed a motion to dismiss the Info

21  W cases on April 29th.  Correct?

22  A    I believe that's correct.

23  Q    All right.  And the motion was set to be heard on May

24  27th.  Correct?

25  A    Correct.

1   Q    All right.  And on May 18th, the Info W Debtors filed a

2   motion seeking to continue the hearing to June 24th.  Is

3   that correct?

4   A    Correct.

5   Q    Did you authorize the filing of that motion to continue

6   the hearings?

7   A    Yeah.  I'm -- I never actually said I authorize you to

8   do this (indiscernible) but I was aware of it.  You know, we

9   were talking about it.

10   Q    He made you aware that he wanted to file the motion and

11   you didn't object to it.  Is that accurate?

12   A    Correct.  That's fine.

13   Q    All right.

14   A    (indiscernible) but I understand that.

15   Q    I'm sorry.  You wanted --

16   A    I wanted it sooner but I could understand the need to

17   (indiscernible) more time than June 10th.

18   Q    What did you think might need more be happen sooner?

19   A    Well, my hope you could do is get an agreement on

20   getting the bankruptcy dismissed.

21   Q    All right.  And then the hearing on the motion to

22   continue the dates was on May 19th, 2022.  Correct?

23   A    That was busy day so I'm going to have to accept your

24   word for the 19th.  I just --

25   Q    Well, the motion was filed on the 18th.  Correct?

1    A    The motion for the continuance?

2    Q    Yes.

3    A    I'm sorry.  Yes.

4    Q    And then the hearing for the continuance was on the

5    19th.  Correct?

6    A    Right.

7    Q    Okay.  And the motion was never withdrawn at any point.

8    Correct?

9    A    The motion to --

10   Q    Continue.

11   A    -- continue?  I don't recall one way or the other.

12   Q    So there was not any sort of final decision to dismiss

13   the Info W cases as of May 19th then.  Correct?

14   A    Well, it was dependent on being able to work out with

15   you a mutual -- mutually agreed way of doing it.  So the --

16   Q    All right.

17        MR. RUFF:  I'm going to object as nonresponsive,

18   Your Honor.  I asked him if there was a decision to --

19        THE COURT:  I'm going to overrule.  He can answer

20   the question.

21        THE WITNESS:  Oh, (indiscernible) I definitely

22   knew in my mind I wanted to withdraw.  But (indiscernible) I

23   think I said earlier, once the Texas and Connecticut

24   Defendants released us with -- dismissed us with prejudice,

25   I mean, I knew at that moment, we're going to have to

```
 1   terminate this bankruptcy and that's what we ended up with.

 2   BY MR. RUFF:

 3   Q    So if you knew you wanted to terminate the bankruptcy

 4   right away, why were the Info W Debtors seeking to continue

 5   to push it out until June 24th?

 6   A    Because Mr. Lee was working on how he was going to get

 7   this accomplished.  Plus we had to make sure everything was

 8   finalized with the Texas and Connecticut matters in terms of

 9   the state courts and, you know, what they had to do on the

10   dismissals.  I believe that was -- we were having to wait

11   for some of that time and then we had to allow time to work

12   -- negotiate with the U.S. Trustee's Office.

13   Q    And now Mr. Lee had sent an email to you on May 21st

14   that he was going over with you earlier recommending the

15   dismissal of the bankruptcy cases.  Correct?

16   A    Right.

17   Q    Okay.  Had he made a recommendation to dismiss the

18   bankruptcy cases before that?

19   A    I can't he made a recommendation.  We had discussed it.

20   I think he wanted to, you know, sit down and go logically

21   through it and make sure he wasn't -- we were covering all

22   the bases.

23   Q    And you let him know on May 23rd, yes, go forward.

24   Let's get these things dismissed.  Is that correct?

25   A    Yes.
```

1   Q    All right.  But that was all after May 19th.  Correct?

2   Nothing before that?

3   A    I mean, I can't say we didn't have discussions before

4   that.  I don't think he was yet committed to the -- you

5   know, to do it.  He hadn't gone through his legal analysis

6   and I looked at it from a practical business standpoint and

7   says, you know, there's no point in us being here.

8   Q    Okay.

9   A    But I -- you know, he represents the Debtors and he's

10   got to go through the legal process and tell me how we're

11   going to get it done and make sure we can -- everything is

12   taken care of.  So the final decision to pull the trigger

13   was May 23rd but that -- I had no doubt where we were going.

14   Q    Do you recall having a phone call with Mr. Battaglia on

15   May 17th?

16   A    On May 17th?  You going to have to help me out.  I

17   don't remember it.

18        MR. RUFF:  Pull up 155-13.  Can you go to Page 8,

19        please?  All right.  Can you blow up to 33

20        (indiscernible)?

21   BY MR. RUFF:

22   Q    Do you recognize this document, Mr. Schwartz?

23   A    It looks a copy of our time records.

24   Q    Okay.  Do you see that time entry there right where the

25   cursor is blinking?

1    A    I do.

2    Q    Can you read that for me?

3    A    It says call with R. Battaglia.

4    Q    Who is the R. Battaglia that's being referred to in

5    that time entry?

6    A    That's Ray Battaglia.

7    Q    Okay.  Do you recall what that call was about?

8    A    No, I do not and that's -- what's the date on that one?

9    May 17th?  No, I don't recall.

10   Q    Okay.  But Mr. Battaglia was representing Free Speech

11   Systems at that time.  Correct?

12   A    Right.

13   Q    Was that your understanding?

14   A    Yes.  He did represent Free Speech Systems.

15   Q    Okay.  But you have no recollection of what that call

16   is?

17   A    No.  I mean, access document -- (indiscernible) wait a

18   minute.  It may have been about access.  I don't know but

19   that's just because the entry above it's about access --

20   (indiscernible).  Working on the bank accounts.  No, I don't

21   know.

22   Q    So moving on, on May 25th, you had directed Mr. Lee is

23   prepare a motion to dismiss the Info W cases.  Is that

24   correct?

25   A    I directed him to get them dismissed so I guess that

1    means I directed him to get a motion or to work out with you

2    a motion.

3    Q    Okay.  But before that time, you -- there had been

4    discussions about a possible dismissal but no direction from

5    you to get the cases dismissed.  Is that correct?

6    A    Right.

7    Q    Okay.  Now ultimately, the United Stated Trustee and

8    the Info W Debtors stipulated to a dismissal of the Info W

9    cases on June 1st.  Correct?

10   A    Correct.

11   Q    All right.  But the cases were not dismissed until June

12   10th after the court held a hearing.  Correct?

13   A    Correct.

14   Q    All right.  At no time prior to the cases being

15   dismissed did you file a supplemental declaration.  Correct?

16   A    Correct.

17   Q    And at no time prior to the dismissal did you have your

18   employment application withdrawn.  Correct?

19   A    Correct.

20   Q    So you were still serving as the chief restructuring

21   officer of the Info W Debtors when their cases were

22   dismissed.  Correct?

23   A    Correct.

24   Q    But at no time prior to the Info W cases being

25   dismissed did you disclose to the Court or to the United

1    States Trustee your connection with Free Speech Systems as

2    its chief restructuring officer.  Correct?

3    A    That's is correct.  I didn't consider them an

4    interested party.

5    Q    So you didn't think that a co-liable debtor was a party

6    and interest to the Info W Debtors?

7    A    Co-viable?

8    Q    Co-liable.

9    A    Co-liable.  Okay.  I'm sorry.  It sounded like co-

10   viable.  No, I didn't.

11   Q    Is that usually your judgment that parties who are

12   jointly liable for a debt are not parties and interest?

13   A    I can't see -- I'd have to think about that.  I'm not

14   sure I agree with that.  I think it depends on a lot of

15   things but FSS was out of the picture as far as I was

16   concerned and they had no interest in InfoWars.  InfoWars

17   didn't have any interest in them.  I'm not sure if it's

18   called liable in this makes it necessarily an interested

19   party or not.

20            MR. RUFF:  I have no further questions

21   (indiscernible).

22            THE COURT:  Okay.  Mr. Lee, do you have any

23   redirect?

24            MR. LEE:  Two questions.

25            THE COURT:  Okay.

```
 1                    REDIRECT EXAMINATION

 2   BY MR. LEE:

 3   Q    Mr. Schwartz, between the period of May 19th through

 4   June 10th, '22, was there ever a matter of where you acted

 5   adversely to the interest of Info W Debtor?

 6   A    No.

 7   Q    Between the period of May 19th through June 10th, '22,

 8   was there ever a matter that involved a dispute between FSS

 9   and Info W Debtors on which you had to act?

10   A    No.

11   Q    Let's talk about the remaining creditors that we talked

12   about and the joint liability.  Do you recall whether or not

13   we discussed the remaining claimants before we went on

14   embarking on a new project?  Do you recall --

15   A    Yes.

16   Q    Okay.

17   A    We talked about that in the process of deciding whether

18   or not to terminate the bankruptcy.

19   Q    And tell the Court what you -- what we discussed.

20   A    Well, I remember that we discussed, one, it could be

21   better handled outside; two, because FSS is the -- and Mr.

22   Jones are the -- essentially, they're the big pocketbooks.

23   We had -- at that time, we had $70,000 for three companies.

24   That was it -- all the money.  So, you know, there was not

25   much -- you know, it was going to get resolved but it had to
```

```
 1   -- let them resolve when they resolve -- let them -- handled
 2   it and then in that process, resolve those claims on
 3   InfoWars -- the InfoWar Debtors.
 4   Q    And tell the Court and the creditors here whether any
 5   of the actions you took in the Info W Debtors cases while
 6   you were acting and consulting with FSS starting on May 24th
 7   -- did it adversely affect anything you did in the Info W
 8   Debtors' bankruptcy cases?
 9   A    No.
10           MR. LEE:  Pass the witness, Your Honor.
11           THE COURT:  Okay.  Any re-cross?  Okay.  Thank you
12   very much, sir.
13           THE WITNESS:  Thank you.
14           THE COURT:  Okay.  Mr. Shannon, any other
15   witnesses?
16           MR. SHANNON:  No other witnesses for us, Your
17   Honor.
18           THE COURT:  Okay.  Can I consider, I should say,
19   the evidence on your side completed?
20           MR. SHANNON:  Yes.
21           THE COURT:  Okay.  Turning now to the other side,
22   does anyone present any witness or any --
23           MR. RUFF:  No, Your Honor.
24           THE COURT:  Okay.  Mr. (indiscernible)?  Okay.
25   Okay.  What do you wish to tell me, sir?  Why don't we give
```

1   you -- everyone a brief opportunity to present any closing

2   statements and then give me a few minutes and I'll rule.

3          MR. SHANNON:  And I will keep it very brief, Your

4   Honor.

5          THE COURT:  I want you to take your time.  Don't -

6   - we'll go until we're done.

7          MR. SHANNON:  Your Honor, as we said in the

8   beginning, there is no dispute about these bankruptcy cases

9   -- this bankruptcy case -- the FSS bankruptcy case.  There's

10  no dispute that the applicants that this Debtor wants to

11  employ are disinterested, that they do not hold or represent

12  any interest adverse to this Debtors' bankruptcy estate.

13  There's no dispute there.

14         Again, the issue that the U.S. Trustee has brought

15  up and the only issue that the evidence has brought up is

16  this potential failure to supplement 2014 disclosures in the

17  Info W bankruptcy case.  And maybe the U.S. Trustee's

18  (indiscernible) agrees then it's not something that I knew

19  before.  Maybe it's -- maybe the U.S. Trustee is right, that

20  even though the agreement to dismiss the case has been

21  reached, you know what, Mr. Lee and Mr. Schwartz should have

22  supplemented their disclosures.

23         And if that's the case, though, Your Honor, it's

24  still not a good reason to decapitate this Debtor in this

25  case and basically shut FSS down, and there's been no

1    argument that denial of these applications to employ will

2    benefit the estate, and the case law says that's what

3    important.  There's been no argument or no evidence that

4    denial of these applications to employ will further

5    administration of these bankruptcies -- of this bankruptcy.

6    It simply wouldn't -- removing, you know, more than half of

7    the Debtors' attorneys -- it wouldn't help.

8         Now again, Your Honor, if there was a failure to

9    supplement the disclosures, I believe the Debtor has

10   submitted a reasonable alternative to what the sanctions

11   should be and that sanction should not be to deny the

12   application to employ.  You know what, if Mr. Lee made a

13   mistake, it's that he should have waited to dismiss the case

14   -- dismiss the Info W Debtors' cases before representing

15   FSS.  I'm sure if he went back that's what he would do.  And

16   the alternative that the Debtors suggest is disallow Shannon

17   & Lee, LLP's fees in that amount -- $24,409, and that would

18   basically put everybody in the situation that the U.S.

19   Trustee says people should have been in.  That actually puts

20   the Debtor in a better position, right, because they got --

21   they would have gotten free legal services.  That is -- the

22   Debtor's fine with that.  I believe that Shannon & Lee, LLP,

23   will continue to represent the Debtor if that's the Court's

24   ruling.

25         But there is no case law that mandates that

```
 1    outcome.  It's not supported by the evidence which all the

 2    evidence has -- all the evidence you've heard is that Mr.

 3    Lee and Mr. Schwartz tried to do their fiduciary duties to

 4    the Info W Debtors.  They've been trying to do their

 5    fiduciary duties to this Debtor.  They've stood up to some

 6    pressure from these parties that are supposedly or

 7    potentially -- you know, that there potentially could be,

 8    you know, insiders that I guess is what the U.S. Trustee is

 9    worried about.  That's all the evidence that's been in front

10    of this Court.

11            So with that, Your Honor, unless you have any

12    questions from me, that's my presentation.

13            THE COURT:  I just have one.  So nobody's actually

14    talked about the fifth circuit standards for retention.

15    There's been responses to -- (indiscernible) gone back and

16    forth which was the problem with the pleadings and no one

17    ever talked about, right, what it means to hold an adverse

18    interest to the debtor or to the estate.

19            When you look at West Delta Oil, right, fifth

20    circuit said -- you look -- a professional possesses or

21    asserts any economic interest that would tend to lessen the

22    value of the estate or that would create an actual potential

23    dispute in which the estate in a rival claim (indiscernible)

24    to possess a predisposition under circumstances that render

25    such a bias against the estate.  That was a Utah case that
```

1    the fifth circuit was looking on and said, look, that's a

2    good definition.  You got to look at it with the eyes and

3    attention to circumstances which may impair a professional's

4    ability to offer impartial disinterested advice to his or

5    her client, right.  That's what it means to have an adverse

6    interest.

7         And you look at cases like West Delta Oil and

8    Waldron versus Adams and Reese case and that case says --

9    I'm going to ask the United States Trustee the same

10   question.  It says attorneys engaged in the conduct of a

11   bankruptcy case should be free of the slightest personal

12   interest which might be reflected in their decisions

13   concerning the matters of the debtors (indiscernible) which

14   might impair the high degree of impartiality or detached

15   judgment expected of them.

16        I got it that you're saying no one should look to

17   the last case.  What's your answer to what the fifth circuit

18   requires me to look at?

19        MR. SHANNON:  Well, I would say, look, the

20   question is about Mr. Schwartz and Shannon & Lee, LLP, and

21   whether they have either an economic interest or some

22   interest that is adverse to this bankruptcy.  That's not the

23   case, Your Honor, and I believe that everything -- all the

24   evidence is support of that.  I believe that was clear based

25   on the application and there has -- none of the parties have

1   disputed that.

2          THE COURT:  Do you think Shannon & Lee, Mr.

3   Schwartz -- let's just get the real question, right.  Do you

4   think Shannon & Lee or Mr. Schwartz can render solid advice

5   or impartial advice to FSS if it meant taking an action

6   against an insider?

7          MR. SHANNON:  Your Honor, absolutely and I can

8   tell you that both Mr. Lee and I have taken that position.

9          THE COURT:  I didn't hear one today.  Which one

10  did you take?  The one that Mr. -- when he testified to that

11  was me.  Which one did you take?

12         MR. SHANNON:  Oh, that Mr. -- Mr. Jones -- Alex

13  Jones --

14         THE COURT:  Again, I -- this case is -- what

15  complicates this case is that there are well known people

16  involved in it.  I just want you to take all that out.  Just

17  --

18         MR. SHANNON:  No, I understand --

19         THE COURT:  -- and the facts that you have today -

20  - can a professional who is engaged in the -- all the

21  evidence that the United States Trustee has (indiscernible)

22  setting aside and let's just call it company A, owner A --

23  could Shannon & Lee provide -- give the Court comfort that

24  Shannon & Lee or Mr. Schwartz can provide impartial advice

25  to the estate based on what we've heard today, right?  And I

1   know -- just let me finish -- I know that you're saying that

2   I should just look at the last case as nothing, but, right,

3   I was here.  So what do I -- in considering the cases that

4   I'm thinking about, how do you then -- what weight or what

5   consideration should I give to what happened in the last

6   case as I consider whether you can render impartial -- fair

7   and impartial advice to the estate in this case?

8           MR. SHANNON:  Your Honor, I would actually point

9   out the track record, right.  I mean, it did not benefit

10  Alex Jones or FSS to not fight the Texas Plaintiffs or the

11  Connecticut Plaintiffs getting rid of their claims in the

12  Info W cases.  That was -- did not help those parties.  The

13  Info W Debtors said, that's not what -- and Mr. Schwartz

14  obviously was the one making this decision ultimately -- you

15  know, the decision that was made was how does it benefit

16  this estate and these Debtors.  That was the focus in those

17  cases.  It was not what benefits the owner.  It's not what

18  benefits the related parties.

19          I believe in this case, there was, you know, some

20  requests to do things that the Debtor didn't believe were

21  the best interest of the Debtor's estate.  Mr. Schwartz as

22  the CRO, you know, Shannon & Lee, LLP representing the

23  Debtor, obviously Mr. Battaglia as well, said those things

24  do not benefit the estate and that's what Mr. Lee testified

25  to about extending the automatic stay to Alex Jones.  He

1    said, no, we're not going to do that.  So I would actually

2    look at the track record in this case and the last case to

3    give the Court that comfort.

4              THE COURT:  What evidence can you point me to in

5    the record?  That's what today's about, right?

6              MR. SHANNON:  Well, Mr. Lee's testimony that he --

7    you know, that the Debtor here, FSS, denied or pushed back

8    on that request from Alex Jones.

9              THE COURT:  Thank you.

10             MR. SHANNON:  So that's in the record.  I also

11   believe that Mr. Lee's email on May 21st, right -- it really

12   points out what was considered in that decision.  It was not

13   any pressure from FSS, and again, frankly, I believe that

14   the -- you know, the dismissal or the not putting up any

15   opposition to the dismissal by the Texas Plaintiffs and the

16   Connecticut Plaintiffs in the Info W cases -- that was not

17   for the benefit of anyone else other than those Debtors.

18   And so that's the evidence I think the Court should consider

19   on that issue.

20             THE COURT:  What about Mr. Schwartz?  What about -

21   - I think -- I understand your position with Shannon & Lee.

22   What about Mr. Schwartz?

23             MR. SHANNON:  Well, Mr. Schwartz was the ultimate

24   decision maker.

25             THE COURT:  Well, I thought he was taking

Page 215

1    direction from the initial trustee.

2         MR. SHANNON:  The initial trustee gave no

3    direction at all in that first case.  If you remember, that

4    was the emergency behind getting the former judges appointed

5    because the initial trustee had no role in that case.  The

6    initial trustee, frankly, is someone who is very close to

7    Mr. Jones.

8         THE COURT:  The conflict that I'm having in my

9    mind -- and again, I don't like it when judges don't share

10   their thoughts -- so Mr. Schwartz testified that, you know,

11   the owner has no authority on decisions as it related to the

12   bankruptcy case.  It certainly has influence and there's no

13   denying that, right, and it's an important consideration.

14   Who's putting in the cash collateral budget to pay for an

15   $80,000 travel expense where the (indiscernible) pays for

16   everything, right?  Like who's putting that in?  That's Mr.

17   Schwartz making that decision?  Is that -- that's Mr.

18   Schwartz saying, pay 100 percent of the legal expenses in

19   the Connecticut litigation?  That's Mr. Schwartz saying,

20   let's go 40/60 on an appeal on a case in which you're going

21   to get ready to file plan?  That's Mr. Schwartz saying, pay

22   PQPR, you know, $750,000 in the first -- that's Mr.

23   Schwartz?

24        MR. SHANNON:  It is ultimately Mr. Schwartz,

25   Judge, but I will say this.

```
1                THE COURT:  Maybe it is.

2                MR. SHANNON:  There are arms length negotiations

3      in that --

4                THE COURT:  That's what I'm saying, but who's the

5      (indiscernible) let's put in an $80,000 travel expense or

6      let's go 60 -- let's go 100 -- we'll pay 100 percent of the

7      state court litigation that's already started in

8      Connecticut?  Who's making that decision?  That's what --

9      where's the arms length there?

10               MR. SHANNON:  The demand would be by Mr. Jones and

11     really through Mr. Jones's counsel, saying, this is what we

12     need to do.  Otherwise, it's not worth Mr. Jones, you know,

13     continuing on in this company.

14               THE COURT:  Do you see the tension with this case

15     and as it relates to -- this case is interesting because

16     there's active litigation --

17               THE COURT:  And, Your Honor, the one thing I will

18     say --

19               THE COURT:  -- right, the Debtor and owners are

20     co-Defendants in litigation and so that's what makes this

21     tricky aside from the issue and it involves tortes.

22               MR. SHANNON:  The one thing I'll say, Your Honor,

23     is that if the CRO -- the application employed the CRO is

24     not done then who is making the entire decision.  There is

25     no other party to --
```

005005

1          THE COURT:  I'm asking, who's making the decision

2     now?

3          MR. SHANNON:  It's Mr. Schwartz.

4          THE COURT:  Okay.

5          MR. SHANNON:  And that's why you have the first

6     day of this hearing Mr. Lee did not remember.  I can ask the

7     Court to take judicial notice.  I was the one there.

8          THE COURT:  Oh, I know why you asked the question.

9          MR. SHANNON:  That's why we agreed ultimately to

10    extend or to allow a relief from the automatic stay for the

11    Connecticut Plaintiffs to go forward.  That's no something

12    Mr. Jones wanted.  That's something that the Debtor believed

13    was in the best interest of this estate and that Mr.

14    Schwartz believed was in the best interest of this estate.

15         THE COURT:  Okay.

16         MR. SHANNON:  And so I think that's the evidence,

17    Your Honor, that it -- if Mr. Jones or if this Debtor was

18    acting strictly for the benefit of Mr. Jones, those things

19    wouldn't have happened, right.  And sure, there are -- there

20    is some give and take there, right, and he is the most

21    important person (indiscernible).

22         THE COURT:  No question.

23         MR. SHANNON:  But there is --

24         THE COURT:  That's not surprising in companies,

25    right.  That's not surprising especially in the nature of

1    the business in which the Debtor's involved in.  That's not

2    surprising.  So I don't want anyone to think that it's rare.

3              MR. SHANNON:  So, Your Honor, that's the answer I

4    have to your question.

5              THE COURT:  Thank you very much.

6              MR. SHANNON:  Thank you, Your Honor.

7              THE COURT:  Okay.  Mr. Battaglia.  Yes, sir.

8              MR. BATTAGLIA:  Thank you, Your Honor.  Ray

9    Battaglia for Free Speech Systems.

10             A lot of what I heard today relates to what the

11   standard I know the Court holds attorneys to in terms of

12   their disclosures, in terms of the accuracy of what they put

13   in front of this Court, and I wish Mr. Lee had done a little

14   better on some of the dates and some of the other things.  I

15   understand the ambiguity over whether or not there was a

16   conflict based on the context of what was going on in the IW

17   case at that particular time.

18             It was clear well before you signed the

19   stipulation dismissing the case or the order dismissing the

20   case that this case was going to be dismissed.  There was

21   nobody propping up the case, not the Debtor, not my client

22   FSS, not Mr. Jones, not the Connecticut Plaintiffs, not the

23   U.S. Trustee's Office.  Everybody wanted the case dismissed

24   and well before you signed that order and well before May

25   19th if that's the key date, it was pretty clear that this

1    case was going to be dismissed.  The structure of how it was

2    be accomplished, what the literal language of an order or

3    stipulation would say, had some things to be worked out, but

4    there really wasn't any question that this case was -- that

5    that case -- the IW case -- was filed for the purpose of

6    trying to create a vehicle to settle litigation claims.

7           Once those litigants dismissed their claims with

8    prejudice -- claim that by the way they had held dearly,

9    steadfastly for four years against those Debtors -- they

10   just dismissed them literally overnight.  And so the purpose

11   of that case was gone, the purpose of the PSA, the purpose

12   of the litigation and trust -- all of those things were

13   gone, and so can someone hold up a candle and say, well,

14   there should have been a disclosure the first time you had a

15   conversation with me or a meeting in Austin on the 24th of

16   May.  Perhaps.  But at that point, FSS had gone from an

17   active participant to almost a stranger to the case, and so

18   -- I'm a firm believer that better to ask permission than

19   beg forgiveness and I think what you're hearing is some

20   begging of forgiveness today that it could have been done

21   better and cleaner, and I guess I could lay claim to

22   perfection.

23           I can't.  I screw up.  It happens.  I've been

24   doing this for 39 years.  I guarantee you I see pleadings

25   that I use as a template for the next case and go, oh, my

Page 220

1    God, I can't believe I didn't catch that.  It happens every

2    day.  We're human.  But I think the real issue for the Court

3    is, what does that mean in terms of these parties' ability

4    to act on behalf of FSS and its creditors, and I don't think

5    it affects their abilities at all.  And as Mr. Lee

6    testified, there have been occasions where I assure you the

7    principles of the Debtor are not in league with FSS --

8    filing the immediate motion to lift the stay to allow Texas

9    case to go forward.  You could probably assume Mr. Jones

10    didn't like the idea of having to continue in that trial.

11    Filing the motion to lift the stay to allow the Connecticut

12    litigation to go forward and not proceed with other remedies

13    that are recognized by this Court and other courts about

14    injunctive relief and extension of the automatic stay.  Even

15    the removal that was done of the Connecticut litigation was

16    done with great hesitance and reluctance on our part but

17    only because it was unclear what the Connecticut court had

18    done, vis-à-vis FSS.  Not Alex Jones -- FSS.

19         So there have been numerous occasions where I

20    assure the Court that Mr. Jones and Mr. Jordan have had some

21    very terse conversations with us about what he thinks we

22    ought to be doing and we haven't done it.  And Mr. Lee and -

23    - I'll tell you, Mr. Shannon has had some terse

24    conversations with me on those topics as well.  So there's

25    no pushovers here.  There's nobody's doing Mr. Jones's

1    bidding other than his lawyers who represent him, and I
2    appreciate that the Court is concerned about the fee issues
3    on the litigation and I accept that.  I understand it.
4           I think that the thing that the Court doesn't get
5    to hear is what's Mr. Jones's ability to pay.  What happens
6    if he can't pay?  What happens if his state court lawyer
7    who's set for trial and we want to negotiate to lift the
8    automatic stay say, I won't go forward.  How do we deal with
9    that?  We're liable for that claim.  FSS is liable for that
10   claim.  We've agreed to produce Mr. Jones and through
11   negotiations that were extensive about who would show up at
12   trial.  The idea of making sure he shows up and -- you know,
13   that's a cost.  I told you it came in late in the day.  With
14   more time would we have rethought it and done better?
15   Perhaps.  Perhaps not.  It's just -- it's important that he
16   be there.  I'm important to me that he be there.  It's
17   important to him as well, but it's important to me and on
18   behalf of FSS.
19          So I hear the issues and I don't want to say
20   they're gotchas because they're not.  I mean, things should
21   have been done better in the IW cases.  There should have
22   been perhaps some more disclosure.  There should have been
23   some dates that were fixed.  I assure you I wouldn't have
24   contacted anybody had I thought there was a conflict of
25   interest coming into this case.  But the idea that I would

1    contact people who had familiarity with the issues involved

2    in the case, it can't be foreign to the Court.  I mean, it

3    makes complete sense and as I said, if you were to decide

4    that these parties can't be retained, I don't know where to

5    go.

6               I came into this as co-counsel.  I've been a solo

7    practitioner now for seven years.  I'm not with a big firm

8    anymore.  I can't -- and I'm hitting my later years of

9    hopefully practicing law, I can't run this hard anymore.  I

10   can't -- I couldn't possibly handle this case without co-

11   counsel and I don't know who out there would even consider

12   for a moment jumping in if it wasn't Shannon & Lee.  So when

13   Mr. Shannon says decapitate the Debtor, that's exactly what

14   would happen here and that clearly wouldn't be in anybody's

15   best interest, particularly as we're negotiating hopefully a

16   plan to proceed.

17              You know, we've made significant advances in

18   fixing this Debtor to the point where it can contribute net

19   cash (indiscernible).  The goal here is, as I said in the

20   very first hearing in front of you, I understand what this

21   bankruptcy code is about is paying creditors and that's all

22   I'm about.  It's my job to maximize the value of this estate

23   to pay creditors who are owed legitimate claims and that's

24   what I intend to do, but it isn't going to happen without

25   the help of a CRO and one who knows the business and without

1    assistance of effective co-counsel.

2         I can't do it myself.  I'm not -- when I told you

3    earlier that I had applied to be co-counsel, the point I was

4    driving home is, I don't know what --

5         THE COURT:  Right.

6         MR. BATTAGLIA:  -- your ruling to day will do to

7    me because I couldn't conceivably professionally stay in

8    this case and say, I can deliver the results that I'm

9    required to deliver to a client in zealous representation.

10   So that's really what I meant and I'll be happy to answer

11   any questions.

12        THE COURT:  Thank you for your time.

13        MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to make some comments to Mr.

15   Battaglia's statement.  He has a very grasp on disclosure.

16   He understands what needs to be disclosed and I think

17   partially that's why one of the reasons his application is

18   not being objected to, but what you heard on evidence today

19   -- you heard both Mr. Schwartz and you heard Mr. Lee -- they

20   sat up there and they said, you know, as of May 24th, they

21   didn't think there was a need for disclosure on May 24th.

22        Your Honor, that -- the case law in rule 2014,

23   that is not a decision for them to make.  2014 is about

24   laying all of your connections out on the table for the

25   Court and the parties to examine.

1          THE COURT:  Why should it carry -- why should that

2     carry into this case?

3          MR. NGUYEN:  Your Honor, because this is the very

4     connection that was concealed from you.  Your Honor, it's so

5     important.  I mean, we have the technical requirements of

6     327.  I agree with you.  The fifth circuit in Delta Oil

7     explains it well.  But then there's another piece to this,

8     and that piece is the disclosure piece.  And disclosure in

9     the bankruptcy system is -- it's self-policed.  It's self-

10    policed by these professionals.

11         Like I said earlier, it's about the fox guarding

12    the henhouse, right.  So when you have a disclosure

13    violation, the Court should respond strongly because, you

14    know, that is what motivates other professionals to fully

15    disclose all of their connections.  Consequences for non-

16    disclosures are often harsh.  Sometimes people get

17    disqualified.  Sometimes people get full disgorgement of

18    their fees.  These are harsh remedies.  I understand.  But

19    they are required remedies to protect the integrity of the

20    bankruptcy system.

21         And, Your Honor, there was -- there is always --

22    since the beginning of this case, there was always a cloud

23    and I think Mr. Schwartz recognized it when he put in his

24    declaration.  There was always a question of loyalty here --

25    loyalty to Alex Jones or FSS.  That question has always been

1   a big issue in this case, and, you know, I go back to the --

2   I guess the August 3rd hearing when we found out that there

3   was American Express payment on the cash collateral budget

4   that was going to pay Alex Jones's housekeeper.  I think

5   that was the testimony at the time.

6          Who made that decision?  But Mr. Schwartz was the

7   one sitting up there testifying about the American Express.

8   Your Honor brings a good point about the 50/50 split for Mr.

9   Reynal and Mr. Pattis.  You know, I had many conversations

10  with Mr. Lee over that weekend and it's like, I don't -- Mr.

11  Lee was fighting for 40/60 for both of the applications.

12  And I said, Mr. Lee, like why are we giving Mr. Jones a

13  discount because one was 40/60 the other was 50/50.  It was

14  an argument of, hey, you should do 40/60 for this -- you

15  know, for this one as well.

16         And I was asking Mr. Lee, why are we shooting

17  ourselves in the foot. I want the state to have a fair deal,

18  but why are you arguing for 40/60 to give Mr. Jones an extra

19  10 percent discount.  So we ultimately ended up on the

20  50/50.  And then there was another counsel that was filed --

21  I think the appellate counsel in the Texas litigation -- and

22  I had the same objections there.  They did 40/60.  I don't

23  understand why 40/60.  They should be 50/50.

24         THE COURT:  That will get reconsidered after

25  today, after reading (indiscernible) but --

```
 1            MR. NGUYEN:  It needs to be 50/50, Your Honor.  So
 2   on top of all of these concerns about potential bias, you
 3   have the non-disclosure that happened in the prior case.
 4   Remember, all of these parties were hired by Alex Jones.
 5   Look at the engagement letter.  Alex Jones drew out --
 6            THE COURT:  But that's typical in a small case,
 7   all right.  I mean, it's not small in number but in terms of
 8   small business where, you know, the owner hires everybody.
 9   That's not surprising in a sub-Chapter 5 case.  So I'm --
10            MR. NGUYEN:  I agree, Your Honor, but think about
11   -- and like I said at the beginning of the opening, the
12   Court is a witness to everything that's gone on here.  We're
13   not talking about something that happened before a different
14   judge in a different case.  You were here throughout the
15   entire thing.  Statements were made to you, declarations
16   were filed.  Candor was important in the prior case.  Candor
17   is important in the case, and as Your Honor was going
18   through some of the exhibits, you know, there's an issue --
19   there's -- there are statements in Mr. Schwartz's
20   declaration that says May 19th and it turns out that that's
21   incorrect.  Mr. Schwartz testified he read his declaration,
22   but there's mistakes all over the place.
23            So that big issue -- that non-disclosure issue --
24   I just don't think you can get away from it.  And I think
25   it's important to remember what happened in the prior cases
```

Page 227

1   because of May 19th, Mr. Battaglia said he would have

2   amended and disclosed, but the professional that sat up

3   here, they -- we asked them, you know, was this a connection

4   that should have been disclosed.  They all said no.  They

5   are still defiant about their duty to disclose.  Most

6   professionals would just come and file a supplement but

7   these professionals were --

8           THE COURT:  Well, I'm sure they're do it now if

9   you'll give them a chance.  You know, the question should

10  the -- you know --

11          MR. NGUYEN:  Your Honor, I --

12          THE COURT:  Go ahead.

13          MR. NGUYEN:  There was a connection that was not

14  disclosed.  Declarations were filed.  They were incorrect.

15  Statements were made to you to the contrary, that

16  (indiscernible) indicated that they were independent.  There

17  were multiple opportunities to disclose Free Speech System

18  as a connection.

19          Now they're coming in.  They're asking you to

20  approve this connection that they didn't disclose.  We can't

21  just -- we can't do that in terms of -- that just can't be

22  the case when there is an utter failure of disclosure, a

23  lack of acknowledgment from the professional, and now

24  they're asking you to bless it.  By blessing the application

25  now, you're actually compounding the non-disclosure in the

1    prior case because you're essentially approving it, and

2    that's the problem we have.

3           So there is a sense of bias here.  There are

4    questions and then you compound it by having this non-

5    disclosure that they refused to acknowledge.  I think it's a

6    huge problem, Your Honor, and I would ask the Court to

7    consider just integrity of the process -- integrity for

8    these creditors who are here, who are demanding candor.

9    Candor is important.  So I would ask the Court to deny these

10   two applications.  The system demands it -- of it.  I just

11   don't know how else to put it.

12          There will be harsh consequences to it, but, you

13   know, that's -- sometimes that happens when you're not

14   upfront about your connections with the Court.  And so, Your

15   Honor, that's all I have.  I won't belabor the point.  We've

16   been here for a while.  We take a strong position on it

17   because the system demands a strong response to a non-

18   disclosure of this sort.

19          THE COURT:  Thank you.

20          MR. SHANNON:  If I could just make one correction

21   --

22          THE COURT:  Sure.

23          MR. SHANNON:  There was no misrepresentation in

24   either Mr. Lee or Mr. Schwartz' declarations in the Info W

25   cases.  They weren't (indiscernible).  And I just want to

1    correct it and this is I think why Mr. Lee got so upset and

2    obviously filed a reply that he should not have.  There was

3    --

4              THE COURT:  Well, I think he can file what he

5    wants.  I just think I get questions based upon what gets

6    filed.

7              MR. SHANNON:  Exactly.  So I just -- I want to

8    make that one clarification, that it was not a declaration

9    that was mistakenly (indiscernible).  It was just not

10   supplemented maybe as it should be.

11             THE COURT:  Okay.  Thank you.  Folks, it's 6:32.

12   I'm going to take a look at something.  I'm going to come

13   out at 6:40.  I'm going to rule on it.  Thank you.

14             CLERK:  All rise.

15             (Recess)

16             THE COURT:  Okay, so we are back on the record in

17   Free Speech.  I'll just note for the record, Mr. Battaglia,

18   I did get a chance to look, and your order is on the docket,

19   so I just -- okay.

20             So what is remaining, two retention applications,

21   and they are filed at Docket Numbers 83 and 85.  They were

22   filed on August 12th.  The application to employ Shannon and

23   Lee as bankruptcy co-counsel to the Debtor and the

24   application to employ W. Marc Schwartz and Schwartz

25   Associates LLC (indiscernible) essentially as financial

1    advisors as well.  This is a court proceeding under 28

2    U.S.C. 157(b)(2)(A).

3            Court finds that there's been proper service of

4    the application and then proper notice of today's hearing.

5    The Court has considered the evidence, and here's my ruling

6    on the applications.  I do note, before I begin that -- here

7    is just the -- or -- or Free Speech -- well, we'll disagree,

8    but what the Court has done, that's just the nature of what

9    the Court has to do.  The Court is required to weigh the

10   evidence and apply the law as faithfully as I can and that's

11   what I believe that I'm doing now.

12           So the Debtor FSS seeks to employ Mr. Schwartz as

13   chief restructuring officer and his firm Schwartz Associates

14   LLC as advisors on Section 327(a) of the Bankruptcy Code.

15   FSS also seeks to employ Shannon and Lee as bankruptcy co-

16   counsel.  US Trustee objects to both employment

17   applications.  The Trustee argues that these professionals

18   failed to disclose important connections required under

19   Bankruptcy Rule 2014 and recently dismissed bankruptcy

20   cases.  The Sandy Hook plaintiffs filed a statement joining

21   in and supporting the US Trustee's objection.

22           In response, FSS argues (indiscernible) motion by

23   Schwartz and Lee that previously dismissed bankruptcy cases

24   are not a valid basis to deny retention of these

25   professionals in these cases.  FSS argues that these

1    professionals satisfy the requirements for employment under

2    Section 327(a) of the Bankruptcy Code in this case.  Based

3    on our evidence and applicable law, the Court is going to

4    deny the applications to retain Schwartz as CRO and

5    Schwartz's LLC Associates as financial advisors and Shannon

6    and Lee as co-counsel to FSS.

7            On July 29, FSS started this --

8            Yes.  That's fine.  I'm still writing.  Do you

9    want to get him back on the line?

10           RECORDED VOICE:  -- are ten attendees in this

11    conference.  Your host has joined.

12           Conference muted.

13           THE COURT:  Okay.  As I said, based on the

14    evidence and applicable law, I'm going to deny both

15    retention applications.  On July 29, FSS started this case.

16    About three weeks later, FSS filed applications to employ

17    Schwartz as CRO along with his firm as financial advisors,

18    and Shannon and Lee as co-counsel.  Mr. Ray Battaglia has

19    always represented FSS as the (indiscernible) other proposed

20    counsel and has been approved today.  No party objected to

21    his retention, so he is retained as bankruptcy counsel to

22    FSS at this point.

23           Schwartz submitted a declaration in support of his

24    retention, stating that neither him nor Schwartz Associates

25    was contacted about serving as CRO for Free Speech until

005020

1    July 19th, 2022, when (indiscernible) in the Debtor's

2    bankruptcy cases has reached a favorable outcome for those

3    debtors.  He says that for all practical purposes,

4    (indiscernible) to reorganize the InfoW debtors had

5    concluded because the bankruptcy cases no longer had the

6    necessary participants to implement the global settlement.

7    He had (indiscernible) to restructure and reorganize InfoW

8    debtors at that point and that also the work he was

9    performing was ministerial.

10           The Shannon and Lee retention application included

11   a declaration by Mr. Lee.  It states, and I quote, "The

12   first services of our attorneys, Shannon and Lee, provided

13   to FSS, occurred on July 24th, 2022.  They were provided by

14   Lee through Kyung S. Lee PLLC."

15           The application also disclosed that Mr. Lee

16   received payment for services rendered between May 24th and

17   May 31st, 2022.  Section 327(a) of the Bankruptcy Code

18   authorizes a Chapter 11 Debtor with the Court's approval to

19   employ one or another attorneys, accountants, or other

20   professional persons do not hold or represent the interests

21   adverse to the estate and other disinterested persons to

22   represent or help the Debtor carry out its duties under

23   Chapter 11.

24           I want to be really clear.  Debtors have the right

25   the choose their lawyers.  The Bankruptcy Court has the duty

1    to ensure Section 327 is satisfied.  The text of 327(a)

2    states that retention is subject to court approval.

3    Assuming that the technical requirements of Section 327 are

4    satisfied, the Bankruptcy Code gives a bankruptcy court

5    discretion to deny an application.  That should be used, in

6    my opinion, very sparingly.  But this Court must consider

7    the facts of each case.

8         The text of Section 327(a) also requires

9    application for two-prong tests for employment of

10   professionals.  In order to (indiscernible) employ a

11   professional that one, does not hold or represent an

12   interest adverse to the estate and is a disinterested

13   person.  The term "disinterested person" is defined under

14   Section 101(14) of the Bankruptcy Code.  Neither one of

15   these two prongs overlap because the definition -- Part C of

16   the definition of "disinterested person" includes a person

17   who does not have an interest materially adverse to the

18   estate.

19        The application to employ a professional requires

20   an accompanied verified statement of the proposed retention

21   requirement of Bankruptcy Rule 2014.  Under that, a

22   professional must disclose all known connections the

23   professional has with the debtor, including insiders with

24   the debtor, creditors and other parties in interest in the

25   case, other proposed professionals the debtor seeks to

1    retain, and the Office of the United States Trustee.

2         Such public disclosure provides important

3    transparency to the Bankruptcy process and helps bankruptcy

4    courts evaluate if a professional is disinterested and

5    doesn't hold an adverse interest to the estate.  We

6    emphasize the professional has to be disinterested and not

7    hold an adverse interest to the estate.  Professionals

8    retained under the Section 327 represent the estate.  Thus,

9    in some cases, a professional representation of the estate

10   may conflict with the interest of shareholders and secured

11   and unsecured creditors.

12        So what does it mean to represent or hold any

13   interest adverse to the estate and to be disinterested?

14   Bankruptcy Code does not define the phrase "represent or

15   hold any interest adverse to the debtor to the estate."  The

16   Fifth Circuit (Indiscernible) that the oil company 432 F.3rd

17   347, Fifth Circuit 2005 reviewed and adopted -- or reviewed

18   a definition used by other circuits.  And that was to

19   possess or assert any economic interest that would tend to

20   lessen the value of the bankruptcy estate that would either

21   create either an actual or potential dispute in which the

22   estate is a rival claimant or to possess a predisposition

23   under circumstances that render such bias against the

24   estate.

25        The Fifth Circuit held that while the definition

1    was helpful, had to be employed with an eye to the specific

2    facts of each case and with attention to circumstances that

3    may impair a professional's ability to offer impartial,

4    disinterested advice to the client.  The Fifth Circuit has

5    also held that the standards for (indiscernible) conflict

6    are strict and professionals engaged in the conduct of a

7    bankruptcy case "should be free of the slightest personal

8    interest which might be reflected in their decisions

9    concerning matters of the debtors' estates or which impair -

10   - might impair" -- excuse me -- "a high degree of

11   impartiality and detached judgment expected by them during

12   the course of administration."

13           I want to start with the oil, 432 F.3d at 355.

14   I'll also cite to Waldron v. Adams & Reese in re, right,

15   American International Refinery, Inc. 676 F.3d 455, pincite

16   462 Fifth Circuit 2012.  Under Section 101(14), the term

17   "disinterested person" means a person that's not a creditor,

18   an equity security holder, or an insider.  That's A; B, is

19   or was not within two years before the date of the filing of

20   the petitioner, a director, officer, or an employee of the

21   debtor; and C, does not have an interest materially adverse

22   to the interest of the estate or any class of creditors or

23   equity security holders by reason, any direct or indirect

24   relationship to or in connection with or interest in the

25   debtor, or for any other reason.

1          I'd say Lee and Schwartz satisfy parts A and B of

2     the definition of disinterested.  And I acknowledge that

3     Schwartz was retained as CRO pre-petition, but the actual

4     entity retained by FSS is Schwartz Associates LLC.  Right,

5     and so Schwartz Associates is not a creditor, equity

6     security holder, an insider and was not within two years of

7     the filing of the petition date a director, officer, or an

8     employee of the Debtor.  It's a fine distinction.  That's

9     why individuals who work for Schwartz LLC, as in Mr.

10    Schwartz, can be retained pre-petition and still not be held

11    to be an officer.  It's the entity that got retained, not

12    him individually.

13         The question for any other reason, what does that

14    mean?  It's also known as the catch-all clause.  It's

15    sufficiently broad to include any professional with an

16    interest or relationship that would even faintly counter the

17    independence or impartial attitude required by the Code.

18         I'll cite to Judge Iscara's decision on -- it's

19    either LTHM Houston Operations LLC 2014 WL 5449737

20    Bankruptcy Seventh District of Texas 2014.  In this the Code

21    requires that there may be additional instances based on the

22    facts where a professional may have an interest material

23    adverse to the estate.  The US Trustee objects to the

24    retentions mainly based on actions and failures to disclose

25    in three recently dismissed bankruptcy cases.  FSS really

1    wants the Court to overlook the history of the past as not

2    really relevant, but this case cannot be divorced from the

3    history of the prior cases.

4          Before FSS started this case, Schwartz served as

5    proposed CRO and Lee served as proposed counsel in

6    Subchapter 5 bankruptcy cases of InfoW LLC, IW Health LLC,

7    and Prison Planet TV LLC.  These entities were original

8    affiliates of FSS.  Mr. Jones owned 100 percent of the

9    equity in FSS.  He also owned 100 percent of the equity in

10   the InfoW entities.  FSS, Mr. Jones, and the InfoW entities

11   were also defendants in what I would call Sandy Hook-related

12   litigation, defamation lawsuits pending in Texas and

13   Connecticut State courts.

14         InfoW, IW Health, and Prison Planet filed

15   bankruptcy cases in the Southern District of Texas in April

16   of 2022.  Shortly before the filing, Mr. Jones assigned his

17   equity and his interest in these entities to a 2022

18   litigation settlement trust.  This Court was informed in

19   that case that the litigation settlement trust removed

20   control of the InfoW debtors from Mr. Jones.  The trust was

21   managed by an actual trustee and was supposed to be

22   eventually managed by two new trustees.  The trustees would

23   then have full governance authority over the Debtors.  The

24   litigation trust was first funded by Jones and FSS.

25         FSS, Mr. Jones, and the InfoW debtors also signed

Page 238

1    a plan support agreement.  Part of the stated goal of the

2    InfoW cases was to negotiate a financial settlement between

3    the InfoW debtors and the Sandy Hook plaintiffs to resolve

4    defamation lawsuits pending in Texas and Connecticut.  Such

5    a settlement would have also resolved litigation against the

6    third-party contributors to the litigation trust, which

7    included FSS.

8         On April 29th -- well, I'll note, at least at the

9    beginning of the case, Mr. Schwartz was proposed CRO was

10   subject to the oversight and the direction of the initial

11   trustee, at least according to the court filings of the

12   litigation trust.  Mr. Lee was also proposed counsel for the

13   InfoW debtors and was taking direction from Mr. Schwartz as

14   CRO.  On April 29th, the US Trustee moved to dismiss the

15   InfoW cases, alleging, among other things, that the cases

16   were filed in bad faith and engineered to shield Mr. Jones

17   and FSS from liability.  An evidentiary hearing was

18   originally scheduled for May 27th.

19        The Court held a hearing on May 19th.  You've

20   heard a lot about that hearing today.  It's an important

21   hearing both for what was stated to the Court and what

22   wasn't disclosed.  Texas plaintiffs announced that they were

23   dismissing their claims against the InfoW debtors with

24   prejudice in the Texas defamation lawsuits, thus leaving Mr.

25   Jones and FSS as defendants in the Texas litigation.  The

 1    Court also signed a stipulation on that day to that effect,

 2    authorizing the parties to proceed in the Texas litigation.

 3          Around that same time, the plaintiffs in the

 4    Connecticut State litigation had filed a notice of dismissal

 5    to claimants against the InfoW Debtors in the Connecticut

 6    State court, which again, would have also left Mr. Jones and

 7    FSS as defendants.  To allow the parties time to finalize

 8    these state court dismissals with prejudice, which was the

 9    issue at the time, Mr. Lee requested more time to respond to

10    the US Trustee's motion to dismiss the InfoW cases.  Among

11    the basis stated for the continuance was that Mr. Schwartz

12    needed more time to fulfill his fiduciary duties to other

13    creditors.

14          Mr. Lee also stated on the record at that hearing

15    that the other part that I have to do is renegotiate the

16    plan support agreement.  The debtors intended to

17    (indiscernible) with respect to a small Subchapter 5 plan.

18    Mr. Lee, with Mr. Schwartz right next to him, also told the

19    Court that they want me to know that Mr. Schwartz in his

20    fiduciary capacity is evaluating all alternatives.  Based on

21    his representations and agreements between the parties, the

22    Court reset an evidentiary hearing on the motion to dismiss

23    for some time in June.

24          What was unknown to the Court at this time, it

25    sounds like there was a meeting shortly after that hearing,

 1    was that Schwartz and Lee would soon plan to start working

 2    for FSS.  On May 25th, Mr. Lee starts working on a first-day

 3    declaration for FSS, according to the time records admitted

 4    into evidence, which means that around that time, Mr.

 5    Schwartz was also part of the FSS team.  This continued into

 6    early June, which means that Mr. Lee's statement about

 7    exploring all options, if truthful -- and I don't doubt his

 8    sincerity at the time -- but if it would have been played

 9    out, then Mr. Schwartz would have then potentially found

10    himself negotiating as the CRO for the InfoW debtors on one

11    side and CRO for FSS on the other side.

12           Considering the history of the prior cases is

13    important, and that's why it's important, because what was

14    told to me on May 19th is that Mr. Schwartz was exploring

15    all options.  When you look at the statements filed in the

16    declarations in support of retentions, it's impossible to

17    recognize -- to reconcile, excuse me, that statement with

18    Mr. Schwartz's declaration that his duties are

19    (indiscernible) and that he had nothing to restructure or

20    reorganize.

21           Based on all (indiscernible) submitted by Mr. Lee

22    to Mr. Schwartz on -- Mr. Lee submitted an invoice to Mr.

23    Schwartz on behalf of FSS, stating that Lee and his comrade,

24    Mr. Shannon, met with Mr. Schwartz and counsel to Mr. Jones

25    to discuss issues about an FSS restructuring on May 24th for

1    five hours.  And that's -- right, that's five days after the

2    hearing.  On May 25th, Mr. Lee researched the information to

3    prepare first a declaration for Mr. Schwartz in connection

4    with an FSS bankruptcy.  On May 26th, he was organizing PQPR

5    valuation reports.  On May 27th, he coordinated with state

6    court counsel on state court sanction (indiscernible), and

7    "located critical documents for counsel to PQPR."  PQPR is

8    managed by Mr. Jones's father.

9         The next few days, Mr. Lee spent time analyzing

10   the data produced to state court counsel even though what

11   was represented -- even though, at that time, the InfoW

12   debtors were in the process of being dismissed with

13   prejudice.  On May 31st, they kept looking at a declaration

14   for Schwartz as CRO for FSS.  During this time, Mr. Schwartz

15   spent a lot of time working for FSS, hiring staff in order

16   with PQPR, its owners, and Mr. Jones.

17        Thus, at the time the bankruptcy strategy to

18   implement -- to be implemented in the InfoW cases

19   essentially failed and a group of parties went in order to

20   proceed with a new strategy for FSS.  Lee and Schwartz took

21   part in this strategy even though they were technically

22   supposed to work as fiduciaries for the InfoW Debtors.

23        I need to stress here, too, weren't they per se

24   (indiscernible) with secure letters and its counsel pre-

25   petition?  It happens all the time in large Chapter 11

1   bankruptcy cases.  Right?  It happens very often before

2   Chapter 11 cases are filed, either in an effort to avoid

3   bankruptcy or offer to negotiate in connection with the

4   Chapter 11 case.  Right?  Including the use of cash

5   collateral.  Right?  Debtors often want to have a consensual

6   use of cash collateral on the first day, try to enter

7   sometimes -- debtors may around the country enter into

8   restructuring support agreements and plan support agreements

9   or entering into pre-packaged Chapter 11 plans or --

10  various, many reasons to enter into negotiations with a

11  secured creditor.  Right?

12          What makes this case different is that Schwartz

13  and Lee were working for FSS.  They were also technically

14  working for the InfoW debtors.  Right?  And at some point,

15  the litigation trust and (indiscernible) broke down and who

16  was represented to the Court that Mr. Schwartz was taking

17  direction from?  Apparently that all had broke down.  So

18  there was a (indiscernible) separation between his affiliate

19  entities and the (indiscernible).  And there are other -- a

20  breach of corporate formalities disclosed in public

21  documents or things just went away.  And they could have

22  expired on their own.  Not to say that any of those things

23  were wrong.

24          It's just that, again, on June 2nd -- right, and

25  this is why things get tricky, but just leave it there.

1    Maybe there's nothing wrong, but on June 2nd, the InfoW's

2    response to the US Trustee's motion to dismiss.  Response

3    was filed by counsel for the debtors.  And despite their

4    representations and the declarations of that ministerial

5    work happening in May in this case, in the adjoined

6    pleading, professionals represented to the Court and to the

7    public that the InfoW cases still served our bankruptcy

8    purposes -- would they say -- nonetheless, the debtor's own

9    acknowledgment of their independent CRO.  How are you

10   independent if you're working for and hiring for FSS at that

11   time?  I don't really -- how are you -- what does

12   independence mean at that time?  I recognize that this also

13   was in the best interest of the debtors and their estates.

14   Right?

15          The InfoW cases are dismissed on June 10th, based

16   on internal records.  In July of 2022, Mr. Lee is assistant

17   counsel to Mr. Jones on the data issues between Mr. Jones

18   and FSS.  (Indiscernible) FSS for attending a focus group

19   and participated in a jury perception of Mr. Jones.  It was

20   a separate defendant in the Connecticut and Texas cases.

21   You're paid to do no effort, no evidence, of no effort to

22   separate your performance for the debtor and work performed

23   for FSS or potential claims that folks may have against each

24   other at that time.  The issue is that that's continued

25   post-petition and FSS's responses failed to appreciate this

Page 244

1    point.

2            FSS's response focuses primarily on trying to cast

3    the US Trustee's Office in a negative light, rather than

4    proving that these professionals don't hold an adverse

5    interest to the estate and are disinterested.  During the

6    case, for example, FSS sought approval of a cash collateral

7    lawyer providing for approximately $80,000 in travel

8    expenses for the lawyer of FSS.  All of the travel expenses

9    for him and others were to be paid 100 percent by the FSS

10   estate.  I will tell you that no one called that out to me.

11   It was the Court who highlighted that issue.  And maybe

12   $80,000 is what's required for people to travel.  Of course,

13   that's not really the question.

14           The question is, who was negotiating on behalf of

15   the estate as to this 100 percent of all travel expenses to

16   go participate in a defamation trial on damages as a co-

17   defendant, 100 percent to be paid for by an entity in

18   bankruptcy?

19           In August of '22, FSS filed application to retain

20   two special counsels to represent it in the Connecticut

21   State court trial.  FSS's initial request was to, again, pay

22   for full legal fees on behalf of itself and the co-

23   defendant.  In a tort trial on damages, the estate proposed

24   to pay 100 percent for the legal fees for itself and its

25   owner as a separate defendant in the case.  Again, the Court

1    highlights that issue.  I must say I do believe that -- I

2    pre-empted the United States Trustee who has also stood up

3    right away and said this was an issue that we had, if I

4    remember that hearing correctly.

5           In September '22, in (indiscernible), special

6    counselor to FSS, who's one of the aforementioned special

7    counsel, filed a supplemental declaration which was drafted

8    by Mr. Lee.  And he states that since May 19th, FSS retained

9    Schwartz as its CRO and that Schwartz, as counsel for FSS, a

10   (indiscernible) defense lawyer (indiscernible) financial

11   executive was able to come and work at FSS in their

12   accounting department.  According to the declaration, he

13   recommends Jeffrey Schwartz as CRO.

14          I would note that Mr. Schwartz could not remember

15   if the retention occurred in May or later.  And there was

16   great confusion, although May 19th was cited in multiple

17   declarations filed in this case, FSS, Mr. Schwartz, Mr. Lee

18   essentially argue that maybe that was closer to June when it

19   was -- when those retention application, excuse me, when

20   those engagement letters were sent in by Mr. Jones in June.

21   But certainly the work, regardless of when the applications

22   were dated, certainly there was a meeting on the 24th when

23   the work started.

24          Mr. Schwartz also disclosed that FSS's books and

25   records were in disarray when he started working

1    (indiscernible), that the 2021 ledger had not been

2    completed, and the books had not been closed.  There was no

3    transaction that had been recorded in the 2022 ledger.  As a

4    result, both financial statements were produced for FSS for

5    the 18 years before his engagement.  Schwartz and Associates

6    also found out that reconciliations for 2021 are in 2022 and

7    were inadequate, out of their control -- actually, they

8    (indiscernible) controls, including lack of segregation of

9    duties, lack of supervision, reveal of accounting functions

10   -- this is all in Mr. Schwartz's declarations earlier in

11   this case -- more billings to PQPR.

12          I have issues about the relationship with FSS and

13   PQR, with their professionals certainly engaged extensively

14   with pre-petition.  The Court really -- I didn't hear any

15   evidence that they've analyzed it seriously post-petition.

16   And the estate made no claims against PQPR.  And recall that

17   PQPR is managed by an outsider.  They're approximately --

18   according to what was noted, right, in August of 2020 and

19   November 2021, there were security agreements signed on and

20   proto-signed on to the total of approximately $54 million.

21   That is subject to a fraudulent transfer litigation pending

22   outside of this district.  That may be 100 percent

23   legitimate and properly secured.  I don't know.  Someone

24   needs to do this work.

25          In this case, the professionals prior to post-

1   petition actions and this Court's assessment based on the

2   evidence colors the independence and the impartiality

3   required by the Bankruptcy Code.  Not just an appearance of

4   conflict of interest.  There are adverse interests to the

5   estate based on the evidence related to Mr. Jones and PQPR.

6   The lack of transparency and the lack of disclosures

7   required under Bankruptcy Rule 2014, which says any

8   connections, give this Court a lot of concern about whether

9   these professionals can impartially represent FSS, which may

10  include making difficult decisions about other parties, if

11  necessary.

12          The estate may -- I have no idea -- hold claims,

13  defenses to claims, and costs of actions against third

14  parties.  For instance, based on the time records entered

15  into evidence, Mr. Jones may allege a right to an indemnity

16  from FSS.  I know that he's been seeking personal expenses

17  paid.  Right?

18          And I know that Exhibit 163-8, there's a July 11th

19  time entry where counsel assisted Mr. Jones as counsel on

20  indemnity issues between FSS and Mr. Jones.  Right?  He had

21  first a cash collateral motion.  It was the Court who

22  questioned the material (indiscernible) for about $172,000

23  that consisted primarily of personal charges not related to

24  the business.

25          FSS's schedules also list pre-petition payments to

1    the same vendor for about a million dollars.

2    (Indiscernible) attorney at this time how much relates to

3    purely FSS's business expenses, but that work needs to get

4    done.  So consider I'm the Fifth Circuit guidance and an eye

5    to the specific facts here and with attention to

6    circumstances, there is evidence showing circumstances and

7    instances that have and may in fact impact future ability to

8    offer impartial and disinterested advice to FSS.

9         And I understand that that has consequences, and I

10   hope everyone hears it in my voice.  This is not easy for me

11   to do, but I'm required to make these decisions under law

12   and Bankruptcy Code affords me the discretion to do so.  And

13   I'm not even sure this is a discretion issue.  I think

14   there's a material adverse interest to the estate.

15        And I stress that this decision is based on the

16   facts presented in this case.  I really want to stress this

17   because I know a lot of people are listening.  No one should

18   read this decision as a critique of using local counsel or

19   using co-counsel in a case.  I understand that debtors needs

20   sometimes not to retain multiple law firms when appropriate.

21        Again, I stress debtors have an absolute right to

22   seek to retain professionals that will assist in their

23   Chapter 11 case.  I'm a firm believer in that.  This

24   decision has no application in those instances.  None.  This

25   decision also has no application whenever professionals

1    (indiscernible) by a group of affiliated debtors.  It

2    happens all the time in Chapter 11.  A debtor, sometimes a

3    financial advisor, sometimes an investment banker gets

4    retained by Company A and all of its related entities.

5           And sometimes that means a debtor, right, a group

6    of debtors file at the beginning because you're trying to

7    keep a group of entities out of bankruptcy as you negotiate.

8    And sometimes, right, debtors counsel has to advise clients

9    that, well, another subset has to go in at a later time.

10   And it often happens in restructurings.  Those often --

11   those instances are much different in the -- in this case.

12   In this case, you know, a proposed CRO and counsel were

13   actively representing the InfoW debtors.  Right?

14          Let's not forget whose interests are held by a

15   litigation trust and are solely represented, (indiscernible)

16   affiliated entities.  I also note that FSS is not without

17   counsel to continue this case.  I take what Mr. Battaglia

18   really said -- I really take it to heart.  I don't -- I

19   don't like where we are today.  I think I'm making the right

20   decision under the law.  I think I'm commanded by the law,

21   the Fifth Circuit case law, to make this decision.

22          I also know that what occurred today is limited to

23   today.  I think Shannon and Lee and Mr. Schwartz and

24   Schwartz and Associates can appear in another case in front

25   of me with no issues.  I mean zero.  I really mean that.  I

1    hope they can take comfort in that.  And any future case is

2    going to be just judged on those facts and nothing today or

3    in this case changes that for me or any professional.  I

4    hope to never make a similar decision as long as I'm on the

5    bench.  But judges are required to make difficult decisions

6    sometimes and this is one of those today.

7           I noted earlier, and I'll note it again, I find

8    there was some strong language used in the response to the

9    US Trustee's objection.  And I find nothing improper about

10   the arguments raised in those objections, not because I

11   ruled in the way that I did, but also just looking at it

12   independently, I take statements very seriously in the court

13   and filed with the Court, sometimes better to ask than to

14   make assumptions.  So something else I need to do today

15   based on what I've heard.  So Chapter 5 is the new addition,

16   relatively new addition, to the Bankruptcy Code.  And it

17   provides a streamlined process for small businesses to

18   reorganize.

19          So Chapter 5 involves the appointment of a

20   Subchapter 5 trustee to provide oversight of the debtor in

21   possession and helps facilitate negotiation of what will be

22   hopefully or consensually reorganized, reorganization plan.

23   As with any case, a Subchapter 5 bankruptcy requires a

24   debtor to be forthcoming about its affairs.  The Subchapter

25   5 trustee, the court, and its creditors are all

1    stakeholders.  Interestingly, the debtor in Subchapter 5 is

2    not mandated to investigate its own acts, conduct, and

3    liabilities in financial condition.

4           But 11 U.S.C. 1183(b)(2), a court for cost and on

5    the request of a party of interest, the trustee or the

6    United States Trustee may order an expansion of the

7    Subchapter 5 trustee's power to include the power specified

8    in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code.

9    1106(a)(3) says, "Except to the extent the Court orders

10   otherwise, the trustee shall investigate the acts, conducts,

11   assets, liabilities, and the financial condition of the

12   debtor, the operation of the debtor's business, and the

13   design or ability of the continuance of such business, and

14   any other matter relevant to the case or to formulation of

15   the plan, and as soon as practical, upon a statement of an

16   investigation conducted, including any fact ascertained

17   pertaining to fraud, dishonesty, incompetent, misconduct,

18   mismanagement, or irregularity in the mismanagement of the

19   affairs of the debtor or to a cause of action available to

20   the estate."

21          It's not on a cause.  A cause is not defined in

22   the Bankruptcy Code.  When you look at cases, trying to

23   define a cause in the Fifth Circuit, or how a cause is

24   viewed, according to the Fifth Circuit apply a flexible

25   standard, giving the bankruptcy courts flexibility to

1   determine whether a cause exists.  And it's a fact in

2   (indiscernible) inquiry that must be determined on a case-

3   by-case basis.

4            The leading treatise (indiscernible) on bankruptcy

5   law provides that the standard for cause under 1183(b)(2)

6   should not be higher than the standard for cause, say, for

7   example, removing a Subchapter 5 trustee.  I agree with

8   that.  There always ought to be cause.  Weigh the facts and

9   the evidence and make a determination as to whether there's

10  cause based on the facts.

11           I don't like the factors because not all the

12  factors apply in every case, and this case is not different

13  -- it's far different than a Subchapter 5 case where someone

14  is trying to keep a pizza shop going.  Section 105(a) of the

15  Bankruptcy Code authorizes a court to sua sponte expand the

16  Subchapter 5 trustee's duties under 1183(b)(2) even though

17  the subsection requires -- uses the phrase "on request of a

18  party in interest" when you look at 105(a).  I do note that

19  a party has already requested that.  That hearing was set

20  for another date and under certain circumstances.  I believe

21  it was PQPR.  And I'm going to expand that today sua sponte.

22           There's a clear and pressing need to expand the

23  role of the Subchapter 5 trustee and to direct her to

24  investigate.  That doesn't mean that there's anything wrong.

25  It just means that in this particular case, there has to be

005041

Page 253

1    work done for the debtor to really understand the scope of
2    its assets and potential claims and liabilities.  I do note,
3    there's been a lot of talk about candor and how the Court
4    feels about it.  I'm would note and I do think there was a
5    lack of candor under Rule -- Bankruptcy Rule 2014 in the
6    last case.  And I do think there was some lack of candor in
7    this case.

8           I've expressed concern since the first hearing
9    about what happened.  And as this case has progressed and
10   based on what I've heard today and the evidence that I was
11   able to review, those concerns continue to exist.  And I
12   think if someone's going to investigate the Debtor in this
13   case, it really has to be someone impartial, someone with no
14   connection from the InfoW cases, who represented a party in
15   interest.  And I believe that's the Subchapter 5 trustee who
16   is independent and remains independent.

17          Someone has to do the work, and the Bankruptcy
18   Code gives the answer.  It's the Subchapter 5 trustee.  I
19   won't rehash the concerns that I have.  You heard them
20   earlier.  For other reasons I stated earlier about the
21   concerns that I've had with disclosure, lack of candor
22   leading into this case, there is cause to expand the
23   Subchapter 5 trustee's duties under Section 1183(b)(2), to
24   include exactly what the code says, investigate the acts,
25   conduct, assets, liabilities, and financial condition of the

1    Debtor, the operation of the Debtor's business, and the

2    desirability of the continuation of the business.

3            I want to give the Subchapter 5 trustee some

4    guiding.  I think that includes investigating the

5    approximately $54 million security claim listed in favor of

6    PQPR Holdings Limited LLC described in Schedule D at Docket

7    Number 121, investigating Free Speech Systems credit card

8    processor, solely for any insider relationship.  That's what

9    I'm focused on, the inside, if there's any potential insider

10   relationship that I should be aware of or anything that

11   gives the Subchapter 5 trustee any concern.  Right?

12           There maybe -- I don't think at this stage, I

13   don't think there's a need to disclose who it is.  And if

14   there is, I want there to be real caution before that's

15   done.  But if there's an insider, that needs to be

16   disclosed.  I think there also -- there has also been much

17   discussion about the $61 million, maybe $62 million member

18   draw 2021 and $254,000 member draw 2022 listed in the Free

19   Speech Systems comparative balance sheet as of December 31,

20   2021 and May 31, 2022 attached to Mr. Schwartz's declaration

21   filed at Docket Number 10.

22           Under 1106(a)(4), the trustee is to get to work

23   and file a statement detailing her findings as soon as

24   practicable, as described under 1106(a)(4).  Look, I realize

25   that there are other pending motions filed by the Sandy Hook

1    families to appoint a tort claimants' committee and to

2    remove Free Speech as a debtor in possession.

3         I'm not ruling on any of those issues and I'm not

4    describing any of them now.  I may need to take up one of

5    them soon.  I also note, and I state for the record, it is

6    rare, I think, in Subchapter 5 cases for -- the need for a

7    Subchapter 5 trustee to hire counsel or professionals to

8    assist in the duties.  And I think this is the case where

9    it's required.  So Ms. Hazleton, I think you need to find --

10   you need to get a team.  And I'm telling you, I want folks

11   with no connection to any of these cases to assist you in

12   your work.  It looks like you've already found one person.

13        Let's start the process of retaining what you

14   need.  I've charged you to do work and I need you to do it

15   as quickly as possible, but you can't do it on your own.  So

16   no one should read this as a Subchapter 5 trustee and think

17   that you know, I should -- don't cite this case as the

18   reason that you need to hire counsel.  There may be other

19   reasons.  I just think this case is different for all the

20   above reasons.  And again, I'm not saying anything is wrong.

21   You may find all the investigations are proper and that you

22   don't find anything.  Fine with me.  File that and say that.

23        But there has to be greater transparency in this

24   case.  I understand that PQPR may want to have discussions

25   about what that means, but it's going to cost what it costs.

```
1    I'm just telling you now.  Right?  You can work on a budget,
2    but I'm charging the trustee to do the work, and it'll cost
3    what it costs.  And I understand that that may require
4    negotiations with a secured lender as to what that means and
5    we already have a hearing teed up where we can take all that
6    up.
7            I don't know -- and really -- what you see in my
8    face is really listening to what Mr. Battaglia said and
9    weighing on me.  I don't want to rule anymore.  That's
10   enough for me today.  I think people have a right to listen
11   to what I said.  I'll enter some orders today, and I'll say
12   for the reasons stated on the record.  I will say this and I
13   don't want -- yeah, I'll say this.
14           I understand that that's going to require some
15   questions as to where that leaves Shannon and Lee and Mr.
16   Schwartz in terms of you know, retention and the work that
17   they've done.  And I'll be looking to the Subchapter 5
18   trustee for guidance here, but there was good work done
19   here.  And I think Schwartz and Associates, right, helped
20   the process.  We've got cash collateral budgets in place and
21   there was folks who would answer phone calls.  From what I
22   hear, what Mr. Schwartz encountered -- and I don't want
23   anyone to leave thinking that I don't think they should be
24   compensated for -- for good work in this case.
25           The US Trustee is free to disagree with me on
```

```
1     that.  And I'll be looking to guidance from the Subchapter 5
2     trustee as to what I heard in my gut is right or if I should
3     be concerned about something.  Everybody's rights are
4     reserved on this.  I don't want anyone to think anything
5     about these professionals.  I've ruled.  I didn't say
6     anything about them.  It just talks about the ruling, the
7     very difficult decision I had to make in this case.  That's
8     it.  That's what it means to me.
9            If it means something to anyone else, then you're
10    not paying attention to what I really said.  I have a great
11    amount of respect for people and the work that professionals
12    do in bankruptcy cases is not easy.  And I know that the
13    work that gets done when people aren't here across the
14    United States is difficult work.  It requires bankruptcy
15    lawyers.  Bankruptcy professionals have to balance a great
16    number of things.  The process is incredibly important as
17    well along the way.  Without process and without
18    transparency, people lose faith in the process.
19           And so standards must be satisfied to ensure that
20    the process can continue and people can have faith in the
21    process.  But also, right, Congress writes laws.  Judges
22    apply them as faithfully as possible.  And that's what I've
23    done today.  I wish everyone the best.  That's -- that's
24    enough for me today, folks.  You all have a good day.
25           Yes, sir.  Mr. Battaglia.
```

1            MR. BATTAGLIA:  Mr. Schwartz's deposition was set

2     pursuant to the cash collateral hearing for Friday.

3     Obviously, he won't be appearing.  There was a 30(b)(6)

4     deposition notice that we had other opposition to, but I

5     honestly have no idea who I can even present, so I have no -

6     -

7            THE COURT:  Yeah, I understand that.  And I

8     understand that.

9            MR. BATTAGLIA:  (Indiscernible).

10           THE COURT:  I understand that there are decisions

11    that I've made that may have consequences.  And everybody's

12    going to have to think about what I did today.

13           MR. BATTAGLIA:  I understand, Your Honor.  I just

14    (indiscernible) parties should know --

15

16           THE COURT:  No, no, I understand.  That's what --

17    I'm looking at them, so I -- you all need to think --

18    everybody needs to think about that.  So I agree.

19           MR. BATTAGLIA:  And there's a lot for me to sort

20    out in my own mind in terms of who I pick up the phone and

21    call about a business issue tomorrow.

22           THE COURT:  Yeah.

23           MR. BATTAGLIA:  I'm not sure who that'll be.  We

24    were already cooperating with the Sub-B trustee on

25    investigation issues, so that's fine.  We'll keep doing

Page 259

```
 1    that.  I don't know what it means for me.  I will not

 2    continue to represent a -- I don't -- never run away from a

 3    representation --

 4              THE COURT:  I understand.

 5              MR. BATTAGLIA:  -- in my life.  But if I can't

 6    meet my obligations as counsel --

 7              THE COURT:  I understand.

 8              MR. BATTAGLIA:  -- (indiscernible) what it means.

 9    And I'll file appropriate pleadings if -- once I have some

10    time to digest this and figure out how we might be able to

11    move.

12              THE COURT:  I understand.

13              MR. BATTAGLIA:  Thank you.

14              THE COURT:  Have a good day, everyone.

15              CLERK:  All rise.

16              (Whereupon these proceedings were concluded at

17    6:32 PM)

18

19

20

21

22

23

24

25
```

1                    I N D E X

2

3                    RULINGS

4                                        Page        Line

5    Applications for Retention of Co-Counsel

6    and CRO DENIED                      228         9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>CERTIFICATION</u>

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7     _Sonya M. Ledanski Hyde_

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 23, 2022

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In | Free Speech Systems LLC | |
| Re: | Debtor | Case No.: 22−60043 |
| | | Chapter:  11 |

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

005051