# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## EMERGENCY APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT OF PATRICK MAGILL AS CHIEF RESTRUCTURING OFFICER AND (B) GRANTING RELATED RELIEF

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

**EMERGENCY RELIEF HAS BEEN REQUESTED**. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ' CONFERENCE ROOM NUMBER IS 590153. YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGELOPEZ" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE IN THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE

CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT-HAND CORNER AND ENTER YOUR NAME UNDER PERSONAL INFORMATION SETTING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves for entry of an order substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) and 327 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of Patrick Magill (the "CRO" or "Magill") of Magill PC ("Firm") as the Chief Restructuring Officer (the "Application") pursuant to that certain engagement letter agreement by and between the Debtor and Magill, a copy of which is attached hereto as Exhibit A (the "Engagement Agreement"). In support of the Application, the Debtor submits the Declaration of Magill attached hereto as Exhibit B (the "Magill Declaration") and respectfully represents as follows:

## REQUESTED RELIEF

1.      Appointment of Magill to perform the services set forth in the Engagement Agreement as the CRO for FSS is necessary for the Debtor to adequately perform its duties as a debtor-in-possession, including overseeing daily business affairs and operations of FSS, interfacing with the Sub Chapter V Trustee, the creditors, Alex Jones ("Jones"), PQPR Holdings Limited, LLC ("PQPR") and vendors on selection of Supplements and Non-Supplements to stock, preparation of schedules of assets and liabilities, compliance with reporting requirements and various orders of this Court, preparation of financial information and testimony and formulation of bankruptcy strategy and plan of reorganization for FSS.

2.      Especially for a subchapter v debtor, this Court's approval of the retention of the CRO and Firm by the Debtor is critical and indispensable to assuring that the chapter 11 process

005053

begins smoothly, and, that the Debtor has the optimal managers to help formulate a sound business and reorganization plan quickly. Without the CRO and Firm, the Debtor cannot survive in chapter 11.

## JURISDICTION

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

4.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

5.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

6.      The Debtor continue to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

7.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.  The Debtor

8.      Jones owns one hundred percent (100%) of the equity in FSS.

9.      FSS is presently engaged in the business of producing and syndicating Jones' and other radio and video talk shows and selling products targeted to Jones' audience via the Internet.

3

Today, FSS produces Jones' syndicated news/talk show (The Alex Jones Show) and other programs from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.     On its InfowarsStore.com website, FSS makes available to customers dietary supplements, including Bodease, Vitamin Mineral Fusion, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, Tea Tree Shampoo, and other health products (collectively, "Supplements"). The website also has available books, videos, t-shirts, and other products (collectively, "Non-Supplements") Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of Supplements which have traditionally been supplied by or through PQPR, an affiliated entity.

### C.  The Debtor Needs a CRO and Firm

11.     Since inception, FSS has been a "single talent business," *to wit*, without Jones and his show, there would neither be an InfoWars nor any internet sales.  Despite the rapid growth in the diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems. FSS failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. The Debtor and its employees continued to run the business with an inverted T structure, as though it was still a family business.

12.     In June of 2022, FSS retained W. Marc Schwartz as its CRO with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. W. Marc Schwartz retained his Firm Schwartz & Associates to perform various accounting and forensic work associated with his mandate.

4

13.     This Court denied the application to retain W. Marc Schwartz as CRO and Schwartz & Associates.  The Debtor's counsel sought input from the Subchapter V trustee and her counsel, counsel for the secured creditor, PQPR, and counsel for the Texas and Connecticut tort plaintiffs in selecting a replacement CRO.  The Debtor was particularly focused on the ability of a CRO to take over primary operating responsibilities and the cost to the estate.

14.     Emergency relief is necessary to replace W. Marc Schwartz as CRO and Schwartz & Associates.  The prior CRO replaced the prior accounting staff of the Debtor with the CRO's staff and was the sole signatory on the Debtor's accounts.  The lack of a CRO leaves the debtor without day to day operational and financial management.

**D.  Proposed Employment of Magill as the CRO**

*i.     Scope of Employment*

15.     The Debtor seeks to engage Magill as the CRO to advise and lead the day-to-day restructuring efforts of the Debtor, pursuant to the Engagement Agreement. The Debtor contemplates that the CRO will perform some or all the following tasks:

a.  Assist in managing the day-to-day operation and business FSS

b.  Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process

c.   Prepare cash flow forecasts and related financial and business models

d.  Hire and terminate professionals

e.  Assist FSS in seeking to obtain credit as needed

f.  Prepare Amended Statements of Financial Affairs and Schedules, as necessary

g.  Prepare Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court

h.  Review inventory marketability and provide monetization alternatives as deemed appropriate

005056

i.   Make operational decisions, with consultation of current ownership, directed to maximizing the value of FSS. Notwithstanding the same, CRO shall be solely responsible for making all operational decisions

j.   Supervise the banking relationships, cash management and budgeting process of FSS and act as a primary signatory and authority on all bank accounts, with full rights to add or remove any signatory authority

k.   Supervise management, employees, and other personnel of FSS

l.   Hire and terminate personnel of FSS

m.   Develop and implement restructuring plans, including plans contemplating restructuring of debts, sales of assets, divestitures, liquidations, or dispositions of assets of FSS

n.   Formulate all strategic direction and alternatives

o.   Implement cost containment measures

p.   Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties in interest

q.   Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring

r.   Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in the Bankruptcy Case, in consultation with current ownership

## ii.   _Necessity of Employment_

16.   The Debtor believes that the retention and employment of the CRO is necessary and appropriate to operate the Debtor's business properly and administer the Chapter 11 Case and ultimately prepare and obtain confirmation of a plan of reorganization. While Jones produces his show and markets products on his show, the Debtor needs a professional with financial expertise to serve as an officer of the Debtor to perform the services indicated in the Engagement Agreement.

005057

*iii.    Reasons for Selection*

17.     The Debtor believes that the CRO is well qualified to provide management services that will assist and enhance the Debtor's efforts to maximize value to their creditors. A copy of Magill's CV is included with the Engagement Agreement as hereto as Exhibit "A."

18.     Magill is a licensed CPA (in retired status) with more than 40 years' experience providing as an accountant, with significant experience as an officer of public and private corporations, investment banker, expert witness, and financial advisor to financially troubled companies.  He frequently serves as a chief restructuring officer, and as a federal and state court appointed receiver, in bankruptcy and non-bankruptcy proceedings. He understands how to be a fiduciary.  Magill is the only professional in the Firm.

19.     Further, the Subchapter V Trustee has indicated support for the selection of Magill as CRO.

*iv.    Proposed Compensation & Reimbursement*

20.     Mr. Magill has agreed to act as CRO on the following terms. The compensation to be paid to Mr. Magill shall be a flat rate of $50,000 per month, payable semi-monthly in the amount of $25,000 per payment.  Mr. Magill shall not be required to file a fee application or Monthly Fee Statement.  Mr. Magill shall also require remittance of a retainer in the amount of $50,000 which shall be held in trust and applied as a credit at the conclusion of Magill's engagement as the CRO.

21.     The Debtor believes that the agreed terms of compensation are reasonable.

*v.    Disinterested*

22.     Neither Magill nor Firm is a creditor, equity security holder or an insider of FSS. Under Bankruptcy Code § 101(31)(B), the "corporation" is the closest entity similar to an LLC, which FSS is.  An "insider" if the debtor is a corporation, includes " (i) director of the debtor; (ii)

7

officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).

23.    Neither Magill nor Firm are insiders under 11 U.S.C. § 101(31)(B).

24.    Neither Magill nor Firm have been within 2 years before the date of filing of the petition, a director, officer, or employee of the debtor.

25.    Neither Magill nor Firm have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason. Prior to entry into the Engagement Agreement, Magill and Firm did not have a materially adverse interest to FSS.

*vi.    Connections*

26.    The Magill Declaration sets out the connections of the CRO and Firm with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, neither the CRO nor Firm hold any connections other than those disclosed in the Magill Declaration.

27.    The Debtor believes that neither the CRO nor Firm holds or represents any disqualifying interest that is adverse to the estate, and each is a "disinterested person." If any new relevant facts or relationships are discovered, the CRO and Firm will supplement its disclosure to the Court and the U.S. Trustee.

8

## RELIEF REQUESTED

28.     The Debtor requests that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtor to retain the CRO and Firm, effective as of the Petition Date pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order.

## BASIS FOR RELIEF

29.     Subject to Court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." Bankruptcy Code § 327(c) says that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

30.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

     a.    Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

     b.    State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

     c.    Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in

9

interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**E.   The CRO and Firm Meet the Requirements of Bankruptcy Code § 327(a)**

31.     Based on the Magill Declaration, the Debtor submits that neither the CRO nor Firm hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

32.     The Bankruptcy Code defines what it means to be a "disinterested person" Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

The Magill Declaration discloses no connections with the Debtor that would disqualify the CRO or Firm as a "disinterested person" and the Debtor is not aware of any connections in addition to those disclosed in the Magill Declaration.

**F.   This Application and the Magill Declaration Meet the Requirements of Bankruptcy Rule 2014.**

33.     This Application and the Magill Declaration meet the requirements as set out in Bankruptcy Rule 2014. The Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, and the proposed arrangement for compensation. The Magill Declaration is a verified statement pursuant to 28 U.S.C. § 1746 that sets out all connections that the CRO and Firm has with the Debtor, creditors, any other party in interest, their respective attorneys and

10

accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtor

is not aware of any other connections in addition to those disclosed in the Magill Declaration.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially

in the form of the Proposed Order approving the employment of the CRO and Firm effective as of

the Petition Date, pursuant to the terms of the Engagement Agreement and grant any other

appropriate relief.

Dated: October 3, 2022

**FREE SPEECH SYSTEMS, LLC**

*/s/ Ray Battaglia*
Law Office of Raymond W. Battaglia
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218

Counsel to FSS, Debtor and Debtor-in-Possession

## **CERTIFICATE OF ACCURACY**

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Raymond W. Battaglia* .
Raymond W. Battaglia

11

005062

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 24 hours of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersFirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov


*/s/ Raymond W. Battaglia*

13

005064

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

005065

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479


AT&T                                            Justin Lair
PO Box 5001                                     1313 Lookout Ave
Carol Stream, IL 60197-5001                     Klamath Falls, OR 97601


## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple                                 Jarrod B. Martin
Cain & Skarnulis PLLC                           Chamberlain Hrdlicka
303 Colorado Street, Suite 2850                 1200 Smith Street, Suite 1400
Austin, Texas 78701                             Houston, TX 77002

Randy W. Williams                               Christopher J. Dylla
Byman & Associates PLLC                         Assistant Attorney General
7924 Broadway, Suite 104                        Bankruptcy & Collections Division
Pearland, TX 77581                              PO Box 12548
                                                Austin, TX 78711-2548
Attn: Shelby Jordan
Jordan & Ortiz, P.C.                            Richard A. Cochrane
500 N. Shoreline Blvd. Suite 900                Akin Gump Strauss Hauer & Feld
Corpus Christi, Texas 78401                     2300 N. Field Street
                                                Suite 1800
John D Malone                                   Dallas, TX 75201
Attorney at Law
5400 Bosque Blvd., Ste. 650                     Stephen A Roberts
Waco, TX 76710                                  Stephen A Roberts, P.C.
                                                1400 Marshall Ln
Jason Starks                                    Austin, TX 78703
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

005066

## **Subchapter V Trustee**

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## **U.S. Trustee**

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

# **EXHIBIT A**

**Engagement Agreement**

005068

# MAGILL PC

### Accountants & Business Advisors

September 30, 2022

*Via Email: rbattaglialaw@outlook.com*
Free Speech Systems, LLC
c/o Ray Battaglia

> Reference: Bankruptcy Case No 22-60043 filed by Free Speech Systems, LLC, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Bankruptcy Case"); Engagement of Financial Adviser and Chief Restructuring Officer for Free Speech Systems LLC

Gentlemen:

Magill PC (MAGILL) is pleased to assist Free Speech Systems LLC ("FSS") as financial adviser ("FA") and J. Patrick Magill as Chief Restructuring Officer ("CRO") in the design, development and implementation of an appropriate strategy for the confirmation of a Chapter 11 bankruptcy plan in the Bankruptcy Case

MAGILL understands that FSS ownership desires to develop and execute a business strategy to confirm a bankruptcy plan in the Bankruptcy Case that will maximize the return to creditors and stakeholders. Magill acknowledges that time is of the essence.

The services will be provided by MAGILL with your knowledge, and the FSS team will remain an integral participant in the overall effort. The estimated timeframe for consummating the confirmation of a Chapter 11bankruptcy plan cannot be accurately determined.

This Agreement shall be effective as of the date set forth above and shall continue in effect until the first to occur: (i) the successful completion of a Chapter 11 bankruptcy plan, (ii) expiration of a period of time ending on **DATE**, (iii) the point in time when either party provides written notice of its intention to terminate this Agreement, subject to Bankruptcy court approval.

**MAGILL Participation**

Mr. Patrick Magill, will be directly involved in the effort and will diligently work in a concentrated timeframe to achieve the desired end result. Mr. Magill will have day-to-day responsibility for the effort and will work directly with the FSS representative and employees to complete the activities in support of this effort.

In order to make the most efficient use of the time and efforts of both FSS and MAGILL resources, the FSS representatives and employees will work under my direction on a first priority basis in order to complete this effort in a timely manner.



EXHIBIT

A

005069

Scanned with CamScanner

**Fees and Expenses**

Based on the scope, resources, and duration of this engagement, our fees will consist of an initial, refundable $50,000 contract retainer, payable at the time this Agreement is accepted and signed. MAGILL will charge FSS a fixed fee of $50,000.00 per month.  The retainer shall be held by MAGILL in trust and applied as a credit at the conclusion of MAGILL's engagement.

Documented out of pocket and travel expenses will be billed separately. Payment for professional fees will be due at the end of each calendar month; out of pocket documented expenses will be due and payable upon receipt of the invoice. Applicable state and local taxes, if any, will be applied.

**Indemnification**

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and Magill PC, its affiliates, the respective partners, directors, officers, agents, contractors, and employees of Magill PC from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which arc asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with (i) any act or omission by party related to engagement as FA or CRO  under the Agreement or (ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

**Other Terms and Conditions**

•       As FSS is currently in bankruptcy, any professional fees paid by FSS would need the approval of the bankruptcy court. To avoid the time, expense and uncertainty of filing a fee application with the bankruptcy court, MAGILL requests the fixed fee under Section 328(a).


•       Neither FSS nor MAGILL shall be liable to the other for more than the fees to be paid under this letter. In no event shall either party be liable for consequential, incidental, or punitive loss, damage or expenses (including lost profits).

•       In addition, the CRO and FA shall, subject to FSS's certificate of incorporation and Bylaws, be given the authority to take whatever actions the CRO deems necessary, including, without limitation, the authority to:

1. Assist in managing the day-to-day operation and business FSS
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process
3. Prepare cash flow forecasts and related financial and business models
4. Hire and terminate professionals
5. Assist FSS in seeking to obtain credit as needed
6. Prepare Amended Statements of Financial Affairs and Schedules, as needed
7. Prepare Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court
8. Review inventory marketability and provide monetization alternatives as deemed appropriate

Scanned with CamScanner

9. Make operational decisions, with consultation of current ownership, directed to maximizing the value of FSS. Notwithstanding the same, CRO shall be solely responsible for making all operational decisions.

10. Supervise the banking relationships, cash management and budgeting process of FSS and act as a primary signatory and authority on all bank accounts, with full rights to add or remove any signatory authority

11. Supervise management, employees and other personnel of FSS

12. Hire and terminate personnel of FSS

13. Develop and implement restructuring plans, including plans contemplating restructuring of debts, sales of assets, divestitures, liquidations or dispositions of assets of FSS

14. Formulate all strategic direction and alternatives of FSS

15. Implement cost containment measures

16. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties in interest

17. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.

18. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in the Bankruptcy Case, in consultation with current ownership

• FSS and MAGILL mutually agree that any disputes regarding the interpretation of this Agreement if not settled amicably between FSS and MAGILL, will be presented to the United States Bankruptcy Court for the Southern District of Texas which is presiding over the FSS Bankruptcy.

This Agreement and the terms stated herein set forth the entire understanding between the parties and supersedes all prior agreements, arrangements and communications, whether oral or written, with respect to the subject matter hereof. Neither this letter nor the terms stated herein may be modified or amended except by the mutual written agreement of the parties. The laws of the State of Texas prevail in all disputed matters.

We are pleased to be of service to you, and look forward to assisting you in this important effort. Please indicate your acceptance of this Agreement by signing, dating, and returning this letter to me. Should you have any questions, please contact me at (713) 829-0069

Sincerely,

J. Patrick Magill
Magill PC

Accepted and Agreed: Free Speech Systems, LLC, Debtor in Possession

Alex Jones, sole member

Date: October 3, 2022

# J. Patrick Magill

**January 2014- Present**

## Magill, P.C.

Principal of accounting firm providing business advisory, management services, accounting, business valuations and bankruptcy and workout services to small and middle market privately held companies in Texas.  Current industries served are healthcare, manufacturing and energy service industries, including pipeline construction and oil field tool manufacturing.

**August 2000- December 31, 2013**

## MCR Capital Advisors Corporation
*Houston, Texas*
### Senior Partner

Serving as senior partner, lead performance in investment banking, capital advisory, bankruptcies, corporate workouts and financial consulting services from our Houston office to our clients comprised of small and mid-size companies located in the Southwest.  Specific industry expertise includes health care, financial services and professional service corporations.  Successful projects include bankruptcy reorganizations; completed merger & acquisitions in various industries, including healthcare, technology and light manufacturing; debt restructures for client companies ranging up to $7,500,000; and business advisory services including strategic planning, valuation services, and creditor/ debtor services for pre and post bankruptcies.

**May 1996 – August 2000**

## Health Advance Institute
*Houston, Texas*
### President  & Chief Executive Officer

While President and Chief Executive Officer of this multi-site national clinical research company, our company improved its profit margin from 29% to 47% and reduced operating expenses by 44%.  Enrollment in the company's clinical research studies has increased to 94% and all operating sites were profitable. Operating improvements resulted from the closing of under performing clinics, eliminating overstaffing, implementing entrepreneurial operating procedures at the clinic level and consolidating corporate functions.  The hiring of heavily

experienced industry savvy individuals reinvigorated the marketing staff, enhanced revenues and interjected new product confidence with our clientele.

Promotion to the senior level position by the board of directors came after two and one half years at the subsidiary level. Board of Directors presented this opportunity to revamp the company operations and take advantage of my previous experience in directing a clinical research company. Company is now in a position to expand beyond its current capital structure and is reviewing merger opportunities.

### Director Clinical Operations- Houston Texas

After merger of Predecessor Company to Health Advance Institute, remained with company to direct research operations in the largest operating unit in the company, which included 35 direct employees, 24 Principal Investigators and 60 ongoing or enrolling research studies involving most specialty areas. Initiated, organized and chaired an advisory board consisting of five experienced physicians to strategically plan for further development of business opportunities, study recruitment and physician recruitment. Worked directly with other divisions to develop and enhance standard operating procedures, revenue recognition reports, study enrollment activity tracking system and worked directly with industry leaders to promote corporate development. Developed activities in five new therapeutic areas for Houston clinical studies and completed working agreements with area clinics to expand the study capabilities in the Houston region.

### reSearch For Health, Inc.
(Merged with Health Advance Institute in July 1997)
*Houston, Texas*
### President & Chief Financial Officer

Hired by Chief Executive Officer and co-founder to take full operating and financial responsibilities for this one site, twelve year old research company, with the initial goal to identify expansion and growth opportunities. During first year, company revenues increased 25% with a pre-tax profit margin of 17%.

Within the first fifteen months, completed a strategic plan, arranged company's first independent audit, computerized the accounting system, secured a $500,000 commercial bank credit arrangement to fund growth and completed corporate strategic plan. Completed initial offer to acquire additional clinical research sites across the country. During this activity, the company received two offers to sell 100% of its outstanding shares and consolidate operations with other research facilities. Negotiated a successful merger with Health Advance Institute in July 1997.

**June 1990 to April 1996**

**Davey, Magill & Ounanian**
**Investment Banking Group**
*Houston, Texas*
**Partner**

Established healthcare investment banking activities primarily with regional healthcare companies to provide mezzanine financing, joint venture partnerships, business valuations, strategic alliances and merger and acquisition activities. Arranged client financing from $500,000 to $5,000,000 for mezzanine financing and acquisitions. Evaluated and initiated public and non-public sale and acquisition transactions ranging from $2,000,000 to $5,000,000 and assisted in negotiations and acted as financial advisors to client companies. Conducted detailed business valuations and management consultation for small to medium size companies.

**June 1982 to June 1990**

**HEI Corporation**
*Houston, Texas*
**Vice President-Operations**
**Secretary, Treasurer**

Directed operations at this $100 million publicly traded diversified healthcare company with operations in Texas and Missouri. Promoted to this combined position as part of the senior management team to develop and execute revised business plan. Company owned and operated seven hospitals; several hospital based home healthcare agencies, a durable medical equipment company, medical office buildings and a medical publishing company. Duties encompassed all aspects of healthcare operations within the company. As Secretary, interacted with Securities & Exchange Commission, shareholders and members of the Board of Directors. As Treasurer, established and maintained commercial banking relationship, arranged company financing and worked on the management team during the sale of the company to Columbia Healthcare in June 1990.

**Vice President of Mergers & Acquisitions**

Promoted to Vice President-Mergers & Acquisitions after work was completed in publishing division. Identified and implemented synergistic healthcare operations to the primary care operations of seven hospitals. Acquired and financed home healthcare and durable medical equipment companies ranging in value from $300,000 to $1,000,000. Responsible for the renovation, expansion and construction of company owned facilities from $50,000 to $7,000,000.

**General Manager & Controller**
**HEI Publishing**
(Division of HEI Corporation)

General operational and financial responsibilities for recently acquired medical publishing division, owner of *Medical World News*, a bi-weekly national news magazine for primary care physicians. Initially moved publishing operations from New York City to Houston, Texas without production interruption. Hired replacement staff in Houston, Texas and expanded circulation to 500,000 primary care physicians nationwide. Developed additional publications for specialized physician groups until the sale of magazine in 1986. Concurrently worked with senior management on Initial Public Offering in 1983.

**May 1979 to June 1982**

**Southwest Chemical Services, Inc.**
**Division of Thiokol Corporation**
*Houston, Texas*
**Director of Corporate Accounting**

Completed the development of an automated accounting system that integrated domestic and foreign operations and consolidated information to the corporate office. Developed platform to convert manual accounting system to automated system and successfully completed system testing in 12-month period. Consolidated monthly financial information from six domestic and two foreign subsidiaries within reporting corporate deadlines. Worked directly with Chief Financial Officer on various projects including financial analysis of operating units and foreign exchange issues.

**June 1978 to May 1979**

**Frazier Construction**
*Houston, Texas*
**Controller**

Opportunity to work in every aspect of the entire accounting function of this petrochemical construction company was the motivation to move from my previous job. This controller position was created immediately prior to my employment, which allowed for the development of an in-house accounting system and the hiring of a staff of two to produce financial statements, job cost analysis and cash management. Worked directly with the board of directors to establish a bank line of credit to fund long-term construction projects.

A downturn in the industry forced the shareholders to sell the business in 1979, thus eliminating the controller position.

**July 1977 to June 1978**

005075

**United Salt Corporation**
*Houston, Texas*

**Staff Accountant**

Hired to maintain subsidiary financial records of multiple subsidiaries.  Position reported to assistant controller and duties required significant accounting knowledge that included bank reconciliations, general ledger postings, job cost and subsidiary ledger maintenance.  Special accounting projects were an integral part of the staff accountant position.

**Education & Certifications:**

Bachelor of Business Administration- University of Houston- 1977
Texas State Board of Public Accountancy- Certification # 27735 **(Retired Status)**

**Contact Information:**

Cell: (713) 829-0069
E-mail Address: Patrick@MagillPC.com

005076

**Magill P.C.**
**Client List**

| | | |
|---|---|---|
| **Litgation Support** | **Valuations** | **Bankruptcy/Workout** |

**Litgation Support**

David J. Moore vs Tel-Tex Network Cabling, Inc,
Terecor, Inc. d/b/a Tel-Tex Communications,
Mascomm Enterprises, Inc. and Thomas W. Moore, Jr. Individually
2001-Cicack

**Herrington- Cause # H-00-2656**
Herrington Equipment, Inc. and Robert N. Herrington
vs Orix Credit Alliance
2001-2002- Cicack/Evans

**Reproduction Equipment Services-Cause # H-2000-36834**
Reproductive Equipment Service, Inc. vs. Chris E, Rucker,
Robert S. Williams and William H. Pierson, Jr., Individually and
D/B/A Yourprintshop.com
In the 151st Judicial District Court of Harris County, Texas
2002- Cicack

**Arthur Gallegher Cause# 2003-59265**
HealthHelp, Inc., vs Arthur J. Gallagher, Inc., Healthcare First,
and Gallagher Healthcare Insurance Services, Inc;
In the 157th Judicial District Court of Harris County, Texas
2006- Cicack

**Optima International-Cause# 2005-54028**
TrueStar Petroleum Corporation, Trinity Barnett, LLC,
tinity Americas, Inc., Charles A Kohlhaas, Dwain M. Immel
vs Optima Services International, Ltd., p/k/a Optima International
Trust Company Limited, The Balaton Group, Robert J. Kubbernus,
M. Carol Coale, John S. Burns and Frederick Bryson Farrill
vs. J.W. Rhea, IV and Robert Chamberlain vs. Thomas F. Cooke,
In 157th Judicial Districk Court of Harris County, Texas
2007-2008- Cicack

**Airgas- Cause # 2006-64492**
IWS Gas & Supply of Texas, Ltd, Jerry D. Barton,
Robert M. Morton, Jr., Steven P. Lynch and
Ruben G. Pena vs. Airgas-Southwest, Inc:
In the 269th Judicial District Court, Harris County Tex
2007-2008- Butler/Wilcox

**Valuations**

**Applied Logic Associates**

**Conceptual Software, Inc**

**Dupre Industries, Inc.**

**Gatlin Education Services**

**Lone Star Ambualnce Inc.**

**Primary Medicine Center LLC**

**Automation Solutions, Inc.**

**Bankruptcy/Workout**

**Wood, Lucksinger & Epstein**
liquidating trustee

**O'Dell Geer Corporation**
No. 3-62039
creditor advisory services to
**Wright Asphalt Company**

**Goldstar EMS**
Case no. 05-36446-144-11
Chief Restructing Officer

**Diagnostic Clinic of Houston**
Case No. 07-30396
Chief Restructing Officer

**Repros Therapeutics**
debtor advisory services

**Apex- Katy Pin Oak Medical**
Case No. 12-31848
debtor advisory services

**Westbury Hospital**
pre-bankrusptcy
creditor advisory services to
Downtown Hospital LLC

**Watkins Eye Clinic**
debtor advisory services

**Victory Healthcare**
Case No. 15-42373
Chief Restructing Officer

**American Nation Carbide**
Case No 16-30992
debtor advisory services

**The Tifaro Group Ltd**
Case No 17-80171
Liquidating Trustee

005077

# **EXHIBIT B**

**Magill Declaration**

005078

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## DECLARATION OF PATRICK MAGILL

I, Patrick Magill ("Magill"), declare under penalty of perjury as follows:

34.     I am a CPA (in retired status) and a founder and the owner of Magill P.C. ("Firm"). On my behalf and on behalf of the Firm, I am duly authorized to execute this Declaration in support of the Application filed by Free Speech Systems, LLC (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Chapter 11 Case") seeking approval to retain me as the chief restructuring officer ("CRO") and Firm to assist me in those duties.

35.     Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, upon the client and matter records of Firm reviewed by me   or derived from information available to me that I believe to be true and correct or my opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**G.  Application to Employ CRO**

36.     I have reviewed the Application of Debtor for an Order (A) Authorizing Employment of Magill as Chief Restructuring Officer, and (B) Granting Related Relief (the

2

005079

"Application"). The Application accurately describes my proposed role as chief restructuring

officer (the "CRO").

**H. Disclosure of Connections**

37.     Firm performed the following actions to determine whether it or any of its

professionals has any disclosable connections to the Debtor, creditors, any other party in interest,

their attorneys or accountants, the U.S. Trustee, any person employed in the office of the U.S.

Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas:

   a.     First, I reviewed the following related to the FSS bankruptcy case: case docket sheet, Voluntary Petition, list of 20 largest unsecured, schedules, Statement of Financial Affairs, and Master Service list;

   b.     .

   c.     Second, I conducted a review of all active clients of Firm using the list of parties in interest listed in Schedule 1 hereto.

   d.     No connections or potential connections were identified except as described below.

   e.     Analyzed with FSS bankruptcy counsel whether having previously served as the CRO, consultant or liquidating trustee in cases in which Melissa Haselden served as the subchapter V trustee or debtor's counsel constituted a conflict of interest.

38.     The above referenced searches uncovered no connections other than I and Firm

have or may have worked with some of the same parties and creditors in connection with serving

as the CRO in unrelated cases. I have also identified the following:

   a.     I am acquainted with Charlie Cicak who is a vendor of and does business with FSS. I have known Mr. Cicack's father, Walter Cicack, an attorney in Houston, since around 1990 on a personal and social basis and have worked Walter Cicack on several unrelated bankruptcy and other cases.

   b.     I have served as a consultant, CRO, or liquidating trustee in several cases in which Melissa Haselden has been engaged as counsel to the Debtor or as the subchapter

3

V trustee. Those cases are unrelated to FSS and the matters upon which I am to be retained.[2]

    c.   Iron Mountain is a creditor in Cypress Creek Emergency Medical Services Association, case no 21,33733 in which I have served as CRO. There is currently an ongoing dispute with Iron Mountain.

    d.   Travelers Insurance provided insurance coverage in Cypress Creek Emergency Medical Services Association, case no 21,33733 and participated in the mediation in that case.

39.    I do not believe that any of these connections are disqualifying or create an adverse relationship with the Debtor.

40.    The results of the foregoing connections search process confirm that neither I, Firm, nor any of its employees or shareholders, to the best of my knowledge, have any disqualifying connections. Neither I nor Firm (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

**I.   Affirmative Statement of Disinterestedness**

41.    Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and Firm are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

42.    I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

---

[2] I worked with Ms. Haselden in the following chapter 11 bankruptcy cases: Cypress Creek Emergency Medical Services Association, case no 21,33733, GoldStar EMS, case no. 05-36446, Diagnostic Clinic of Houston, case no 07-30396, Apex Katy Pin Oak Medical, case no 12-31848, Victory Healthcare, case 15-42373 (N.C. TX) Tifaro, case no 17-80171.

005081

43.     The Firm is not a creditor, an equity security holder, or an insider of the Debtor; Firm is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and Firm does not have any interest materially adverse to the interests of the Debtor' bankruptcy estates or any class of creditors or equity security holders.

44.     I have been informed that the third prong of Bankruptcy Code § 101 - the absence of a materially adverse interest - is often referred to as a "catch-all" provision designed to prevent the retention of a professional "who in the slightest degree might have some relationship that would color the independent and impartial attitude required by the Code. *In re Consolidated Bancshares, Inc.*, 785. F.2d 1249, 1256 (5th Cir. 1986).

45.     My having previously served as the in a professional capacity in other cases that may have involved some of the same counsel in this case will not in the slightest degree color my independent and impartial attitude required by the Code. In fact, I believe my previous experience with the parties involved will allow me to negotiate in good faith, foster communication among the constituents and often allow parties to achieve negotiated results rather than litigation.

46.     Holding an interest adverse to the estate, I have been advised, also means "to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate that would create either an actual or potential dispute in which the estate is a rival claimant," or "to possess a pre-disposition under circumstances that render such a bias against the estate."[3] *In re West Delta Oil Co., Inc.*, 432 F.3d 347, 356 (5th Cir. 2005). Such an interest creates a meaningful incentive for a professional "to act contrary to the best interests of the estate and its sundry creditors - an incentive to place those parties at more than acceptable risk - or the reasonable perception of one." *In re Martin*, 817 F.2d 175, 179 n. 4 (1st Cir. 1987).

---

[3] The existence of an adverse interest is inherently fact-bound and must be determined on a case-by-case basis.

5

47.     I do not possess a pre-disposition under the circumstances that render such a bias against the estate. I can serve as an effective disinterested fiduciary at FSS."

**J.  Bankruptcy Rule 2016(b) Disclosures**

48.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, neither I nor Firm have shared or agreed to share (a) any of its compensation from the employment by the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 3, 2022,                          By
                                                       Patrick Magill

005083

## SCHEDULE 1

## TO MAGILL DECLARATION

## SEARCHED PARTIES

Debtor & Professionals

 Law Office of Ray Battaglia    Shannon & Lee, PLLC


Debtor's Equity

 Alexander E. Jones

Creditors & Parties in Interest

| | |
|---|---|
| Brennan Gilmore | Leonard Pozner |
| Carlee Soto-Parisi | Marcel Fontaine |
| Carlos Soto | Mark Barden |
| Christopher Sadowski | Neil Heslin |
| Dona Soto | Nicole Hockley |
| Erica Lafferty | PQPR Holdings Limited, LLC |
| Francine Wheeler | Robert Parker |
| Free Speech Systems, LLC | Scarlett Lewis |
| Ian Hockley | Veronique De La Rosa |
| Jacqueline Barden | William Sherlach |
| Jennifer Hensel | William Aledenberg |
| Jeremy Richman | Larry Klayman |
| Jillian Soto | Randazza Legal Group |

Attorneys for Creditors and Parties in Interest

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | Melissa Haselden, subchapter V Trustee |
| Koskoff & Bieder | |
| Fertitta & Reynal LLP | Elizabeth Freeman, Jackson Walker PC |
| Pattis & Smith, LLC | |
| Zeisler & Zeisler P.C. | Haselden Farrow PLLC |
| Jordan & Ortiz, P.C. | |
| McDowell Heterhington LLP | |
| The Akers Law Firm PLLC | |
| Copycat Legal PLLC | |
| Waller Lansden Dortch & Davis, LLP | |

005084

U.S. Bankruptcy Judges and Staff

    Chief Judge David R. Jones               Albert Alonzo
    Judge Marvin Isgur                     Ana Castro
    Judge Christopher M. Lopez        Tracey Conrad
    Judge Jeffrey P. Norman           Jeannie Chavez
    Judge Eduardo V. Rodriguez       LinhThu Do
    Tyler Laws
    Kimberly Picota
    Vriana Portillo
    Mario Rios
    Glenn Otto
    Yasmin Rivera
    Jayson B. Ruff
    Millie Sall

U.S. Trustee Personnel     Patricia Schmidt

    Alicia Barcomb                  Christy Simmons
    Jacqueline Boykin             Gwen Smith
    Luci Johnson-Davis          Stephen Statham Christopher R.
    Hector Duran                 Travis
    Barbra Griffin                 Clarissa Waxton
    Brian Henault                 Jana Whitworth
    Linda Motton
    Ha Nguyen

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**ORDER (A) AUTHORIZING EMPLOYMENT OF PATRICK MAGILL AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF MAGILL PC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtor's Application for Order (A) Authorizing Employment of Patrick Magill as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Magill, PC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1]; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      The Application is granted, to the extent set forth herein.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

2.      In accordance with Bankruptcy Code §§ 327(a) , 328 and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain Magill, effective as of the Petition Date, as its chief restructuring officer (the "CRO"), under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.      The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Case or (i) as otherwise required to be disclosed pursuant to an order of the court or (ii) for use in the ordinary course of Debtor's business.

4.      The compensation to be paid to Magill P.C. and J. Patrick Magill shall be a flat rate of $50,000 per month, payable semi-monthly in the amount of $25,000 and shall constitute an administrative expense of Debtor's estate.

5.      Magill PC and J. Patrick Magill shall not be required to file fee applications or Monthly Fee Statements.

6.      .

7.      The CRO and Firm will review their files periodically during the pendency of the Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental Declaration, as required by Fed. R. Bankr. P. 2014(a).

8.      To the extent the Application, the Magill Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

005087

9.      The Debtor, the CRO, and Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

10.      This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated this __ day of October 2022.

_____
UNITED STATES BANKRUPTCY JUDGE

3

005088

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**SHANNON & LEE LLP'S MOTION PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE FOR REHEARING ON THE ISSUE OF DISINTERESTEDNESS WITH RESPECT TO THE DEBTOR'S APPLICATION TO EMPLOY SHANNON & LEE LLP**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Shannon & Lee LLP ("S&L") hereby moves pursuant to Rule 59 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for rehearing to present additional evidence on the issue of disinterestedness with respect to the Debtor's Application to Employ S&L. In support of this motion (the "Motion"), S&L respectfully states as follows:

**BACKGROUND AND PRELIMINARY STATEMENT**

1.     On August 20, 2022, Free Speech Systems, LLC ("FSS"), the debtor and debtor-in-possession in the above captioned case, filed its *Application of Debtor for an Order (A)*

*Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor, and (B) Granting Related Relief* [ECF No. 85] (the "S&L Employment Application"). FSS sought to employ S&L to "be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case." S&L Employment Application ¶ 22. FSS sought to retain The Law Offices of Ray Battaglia (the "Battaglia Firm") to "provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy." *Id.*

2.      The U.S. Trustee objected to the S&L Employment Application on September 12, 2022, and filed an amended objection on September 14, 2022 [ECF No. 154] (the "UST Objection"). The Sandy Hook Plaintiffs joined the amended UST Objection on September 15, 2022 [ECF No. 159]. FSS replied to the UST Objection on September 16, 2022 [ECF No. 166].

3.      The UST Objection argued that the Court should deny the S&L Employment Application because of the failure of S&L partner Kyung Lee to supplement his disclosures required under Bankruptcy Rule 2014 in the cases of (the "IW Cases") of InfoW, LLC, IWHealth, LLC, and Prison Planet, LLC (the "IW Debtors") to reflect that he had begun working for FSS prior to the dismissal of those cases. The UST Objection did not dispute that S&L was disinterested in FSS's chapter 11 case, but rather argued that it was "appropriate for the Court to exercise its broad discretion under Section 327(a) to address Attorney Lee's prior acts in the related cases— which this case is essentially a continuation of—and deny the S & L Application." UST Objection ¶ 51. FSS's reply addressed this argument.

4.      The Court held a hearing on the S&L Employment Application on September 20, 2022 (the "September 20 Hearing"). No party-in-interest contended that S&L held an interest adverse to the FSS bankruptcy estate and the issue was not raised before the close of evidence.

2

The UST Objection did not assert that S&L was disinterested or assert that the firm held an interest adverse to the FSS bankruptcy estate. As FSS asserted in its opening statement, there was no dispute as to disinterestedness at that time. The Court also stated that the focus of the hearing and the evidence should be on the non-disclosures in the IW Cases. According to the Court:

> And I'm going to tell you something because I want you to engage in a dialogue with me. The concern, when you really boil it down, I think you're looking at this too -- you know, looking at this kind of through a check the box perspective, right? If the behavior, the non-disclosures began in one case and [if] there are potential conflicts through acts that Mr. Schwartz and Mr. Lee have taken that continue into this case, then the history is important.

> For example, if, for example, you know, Mr. Lee or Mr. Schwartz's relationship with Mr. Jones or PQPR is concerning, it raises an issue as to whether either one of them can provide sound legal advice to the estate or sound financial advice to the estate, then the history is important, right?

> So you can't just -- I understand your point that if there's a lack of disclosure in one case, you should look at it as that case and it shouldn't essentially carry forward as a penalty into the new case. The question is, is there a throughline essentially; that's the question that you've got to answer today, at least that's where I'm focused on.

> If you're asking me, you know, how I . . . think about it, that's the way I think about it. So, for example, so when Mr. Lee is working -- I think you described in May, and Mr. Schwartz are working in late May and have decided that there's no hope for InfoW, what do I do with the fact that there's a pleading filed with me in this case that says on June 2nd, the Debtor is still considering all options, right?

> ***

> How then do I view that, right? That's the real question, right, and whether that, the changing of the jersey in essence, you know, whether that had already occurred, but no one told me, right. And so, that's the, hey, we're still considering all options, hey, as a fiduciary, we're thinking about everything, and five days later, you're in a meeting in Austin, you know, with the two plan funding sources in the current case.

> ***

005091

> The question is does that carry, right, into FSS and into this case and
> it should be judged into FSS. And I know that that's where the
> evidence is; I'm just telling you the way I'm thinking about this now.
> So as arguments get made, that's the way I -- that's what I'm thinking
> about.

Hrg. Tr. 27:12-29:12. And despite the Court's invitation, the U.S. Trustee did not argue at the

September 20 Hearing that S&L was not disinterested with respect to the FSS bankruptcy estate

or that any relationship Mr. Lee or S&L had with Alex Jones ("AEJ") or PQPR created a bias

against the interests of the FSS bankruptcy estate.[1] Nor did the U.S. Trustee adduce evidence that

S&L or Mr. Lee had any bias with respect to the FSS bankruptcy estate.

     5.     After considering the evidence and the arguments presented, the Court denied the

S&L Employment Application. The core of the Court's ruling was that pre- and post-petition

actions related to FSS caused S&L to hold an adverse interest to FSS's bankruptcy estate with

respect to decisions against AEJ or PQPR under the "catch-all" provision of Bankruptcy Code §

101(14)(C). *See* Hrg. Tr. 236:1-2, 236:13-14, 247:4-5. In addition to the non-disclosure of the

connection to FSS in the IW Cases, the Court found problematic (a) Mr. Lee's attendance at the

focus group regarding the jury perception of AEJ, Hrg. Tr. 243:18-19; (b) the proposed cash

collateral budget providing for payment AEJ's travel expenses and security during the Connecticut

Sandy Hook trial, Hrg. Tr. 244:5-12; (c) FSS's initial proposed payment of all legal fees for

Connecticut state court counsel, Hrg. Tr. 244:21-25; and (d) AEJ's asserted indemnity, Hrg. Tr.

---

[1] As indicated in the U.S. Trustee's opening statement, the only issue raised by the U.S. Trustee was the sanction for
Mr. Lee's failure to supplement his disclosure in the IW Cases:

> [A]ll we're saying here is there was a serious non-disclosure that occurred with
> this very connection. I think under Rule 2014, there is a proverbial fox that guards
> the henhouse. What we're asking is harsh, but, you know, disclosure violations
> when they occur, you know, sometimes the consequences are harsh. A lot of cases,
> you might get disqualified. A lot of cases, you lose all your fees. But sometimes,
> that's what it takes to uphold the integrity of the bankruptcy system and that's why
> we're asking for Your Honor to deny the two applications that are before you.

Hrg. Tr. 44:7-15.

247:14-16. The Court entered the order denying the S&L Application to Employ [ECF No. 182] (the "Order Denying Employment") that evening.

6.      Through this Motion, S&L requests a rehearing to allow S&L to present evidence regarding these additional issues on disinterestedness raised by the Court. Under Rule 59(a) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to the S&L Employment Application by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court may grant a new hearing "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court" is authorized to "take additional testimony" and "amend findings of fact and conclusions of law or make new ones . . . ." Where a completely new issue is suddenly raised, a new trial or hearing is required. *See Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 111-12 (5th Cir. 1982) ("This Court has limited reversible error from unfair surprise to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify.").

7.      The additional evidence, summarized below, will demonstrate that S&L is disinterested and has no bias adverse to the FSS estate with respect to issues involving AEJ or PQPR. S&L has no predisposition hindering its ability to recommend or pursue positions contrary to AEJ and PQPR. The evidence will address the items Court found problematic, but which S&L did not address because they were not raised prior to the close of evidence or in the UST Objection. S&L submits that the additional evidence will show S&L is a "disinterested person" and the S&L Employment Application should be granted.

8.      In the alternative, S&L submits that the additional evidence will demonstrate that S&L neither holds nor represents any adverse interest with respect to the enumerated matters to be S&L's primary responsibility as set out in the S&L Employment Application. This consists of (a)

5

administrative matters such as preparing and filing of notices, serving pleadings, complying with the Bankruptcy Local Rules, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by FSS or lead bankruptcy counsel. S&L submits that employment on these limited matters is appropriate under Bankruptcy Code § 327(e).

9.     Bankruptcy Code § 327(e) authorizes the employment of an attorney for a specified special purpose other than to represent the trustee or debtor-in-possession in conducting the case, where the attorney previously represented the debtor, the retention is in the best interest of the estate, and the attorney does not represent or hold an any interest adverse to the to the debtor or to the estate with respect to the matter on which such attorney is to be employed. Courts have held that counsel may be employed under section 327(e) to handle discrete bankruptcy issues where another counsel has been retained to "conduct the case" by formulating the plan of reorganization, addressing claims, and conducting required investigations.

10.    As set out below, the additional evidence will demonstrate that S&L is disinterested with respect to these limited matters. S&L submits that the existing evidence already demonstrates that S&L represented FSS prior to the petition date, and that S&L's familiarity with the Sandy Hook Litigation was essential to enable the Heslin/Lewis Suit and Connecticut Litigation to continue to judgment. Employment of S&L under section 327(e) is therefore appropriate.

11.    FSS may not need further services from S&L if it obtains replacement co-counsel or the contemplated mediation is successful. Even so, however, the Court should consider and grant the Motion allow S&L to present evidence that would have been presented at the September 20 Hearing if the issue of S&L's disinterestedness was raised prior to the close of evidence.

005094

## ARGUMENT

**A. Rehearing to Allow Additional Evidence on the Issue of S&L's Disinterestedness is Appropriate Here.**

12.     Bankruptcy Rule 9023 makes Federal Rule 59 applicable to proceedings under the Bankruptcy Code.[2] Federal Rule 59(a)(1)(B) provides that courts may grant a new trial on some or all issues after a non-jury trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Federal Rule 59(a)(2) provides that the court may "open the judgement if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."

13.     Among the reasons for granting a new trial or rehearing is surprise that is inconsistent with substantial justice. *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 111-12 (5th Cir. 1982). The Fifth Circuit Court of Appeals has held that it is reversible error to deny a Rule 59(a) motion—i.e., a retrial or rehearing is required—where a new issue is suddenly raised. *Id.* at 12 (citing *F & S Offshore, Inc. v. K.O. Steel Castings, Inc.*, 662 F.2d 1104, 1108 (5th Cir. 1981); *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978)).

14.     The U.S. Trustee was the only party to file an objection to the S&L Employment Application, which was joined by the Sandy Hook Plaintiffs. The UST Objection raised only a single issue—whether the Court should deny the S&L Employment Application under Bankruptcy Code § 327(a) because attorney Kyung Lee failed to supplement his Bankruptcy Rule 2014 disclosure in the IW Cases to reflect that he had begun providing services to FSS prior to the dismissal of those cases. The U.S. Trustee did not dispute in the UST Objection or at the September 20 Hearing that S&L is a "disinterested person" in the FSS bankruptcy case or that S&L neither holds nor represents any interest adverse to the FSS bankruptcy estate.

---

[2] Under Bankruptcy Rule 9023, a motion under Federal Rule 59 must be brought within 14 days in bankruptcy matters.

005095

15.     Bankruptcy Local Rule 9013-1(g) requires parties opposing the entry of relief requested from the Court to file a response to such motion and provides that Bankruptcy Rule 7008—which, in turn, incorporates Federal Rule 8—applies to such responses.[3] Federal Rule 8(b)(6) provides that allegations are deemed admitted if a responsive pleading is required and the allegation is not denied in a response.

16.     Based on that, FSS and S&L were not aware that S&L's disinterestedness was a disputed issue at the September 20 Hearing. The U.S. Trustee had evaluated the disclosures in the S&L Application and determined that S&L was a disinterested person. The Plaintiffs—after obtaining discovery regarding the prepetition negotiations between the FSS and PQPR—did not dispute that S&L was disinterested. As announced at the September 13, 2022, hearing before the Court, the Debtor, S&L, and the U.S. Trustee believed that the issues surrounding the S&L Employment Application centered on the events in May and June of 2022. The only issue raised or argued by the U.S. Trustee or the Plaintiffs was whether the Court should exercise its discretion to deny the S&L Employment Application because of Mr. Lee's failure to supplement his disclosures in the IW Cases.

17.     As the Court noted during closing arguments, "nobody's actually talked about the fifth circuit standards for retention . . . which was the problem with the pleadings and no one ever talked about, right, what it means to hold an adverse interest to the debtor or to the estate." Hrg. Tr. 211:13-18. While it is appropriate for the Court to raise that issue *sua sponte*, evidence had closed. FSS pointed to the relevant evidence in the record—that FSS had refused AEJ's urgings to seek extension of the automatic stay to AEJ and instead reached an agreement with the Connecticut

---

[3] Bankruptcy Local Rule 9013-1(g)(1) does not apply to motions for relief from the automatic stay. However, Bankruptcy Local Rule 4001-1(a)(10) requires an itemization of issues in dispute or compliance with Federal Rule 8 in responses to motions for relief from stay.

005096

Plaintiffs to lift the automatic stay to allow their litigation to go forward. Hrg. Tr. 213:19-214:3. The reason that this was the only evidence in the record was that the issue had not been raised previously.[4]

**B. The Additional Evidence Presented at Rehearing Will Demonstrate that S&L Has No Material Adverse Interest to the Estate.**

18.     The surprise regarding the issue of disinterestedness and whether S&L has an interest materially adverse to the interest of the estate at the September 20 Hearing prejudiced the S&L Employment Application. But for the surprise, S&L would have been able to present evidence establishing that S&L does not have any material adverse interest to the estate and is a disinterested person.[5]

19.     A professional is not a "disinterested person" if it (a) possesses or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant, or (b) possesses a predisposition under circumstances that render such a bias against the estate. *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005) (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985)). The inquiry "speaks in the present tense and only examines present interests." *In re Empire State Conglomerates, Inc.*, 546 B.R. 306, 315 (Bankr. S.D.N.Y. 2016).

---

[4] S&L's ability to provide this information at the September 20 Hearing without it being previously was limited. In the absence of *allegations* in a proceeding concerning the lawyer's representation of the client, Rule 1.05(d)(2)(iii) does not expressly authorize the disclosure of unprivileged client information. While such information could arguably be revealed under some other provision of 1.05(d)—e.g., implicit authorization or to carry out the representation effectively—that is open to interpretation. Now that the issue has been raised by the Court's ruling, however, non-privileged information can be presented.

[5] The Court indicated in its ruling that Mr. Lee satisfied subsections (A) and (B) of Bankruptcy Code § 101(14). Hrg. Tr. 236:1-2. The Court ruled, however, that Mr. Lee had a material adverse interest for "any other reason" as set out in subsection (C) that was imputed on S&L. *See* Hrg. Tr. 236:13-14.

005097

20.     The catchall provision "for any other reason" does not allow for disqualification of a professional for the mere appearance of conflicts. *In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998); *accord In re Contractor Tech., Ltd.*, Nos. H-05-3212, 05-37623-H1-7, 2006 U.S. Dist. LEXIS 34466, at *29 (S.D. Tex. May 30, 2006). The question is not whether the connection or predisposition could be imagined to create bias—it is whether that bias actually exists or would exist under certain circumstances that could occur. *See In re Marvel Entm't Grp.*, 140 F.3d at 477.

21.     In its ruling at the September 20 Hearing, the Court noted several issues other than Mr. Lee's nondisclosure in the IW Cases that appear to have factored into its determination that S&L has a material adverse interest to FSS's bankruptcy estate. S&L requests that the Court grant a rehearing to allow S&L to present evidence addressing these issues that were not raised prior to close of the evidence at the September 20 Hearing.

22.     The additional evidence that S&L seeks admitted into the record at a hearing is set out below. Based on this additional evidence, S&L submits that the Court should find that S&L is disinterested and grant the S&L Employment Application, at least for services provided prior to September 20 Hearing.

        i.     *Ability to Provide Impartial Advice with Respect to PQPR's Asserted Secured Claim*

23.     In its ruling, the Court questioned the ability of S&L to be unbiased with respect to PQPR under the record before it. The additional evidence that S&L seeks to admit at a rehearing would demonstrate that S&L does not have any predisposition that limits or interferes with the ability of S&L to provide unbiased advice with respect to PQPR.

        a)     Evidence Regarding Prepetition Analysis of PQPR's Asserted Secured Claim and Related Negotiations

24.     The very first work product S&L produced for the Debtor, prior to the Petition Date, was an analysis of PQPR's asserted lien and note (the "PQPR Memo"). Subject to obtaining

10

permission from FSS to present this privileged document, S&L will seek admission of this document into evidence at a rehearing.[6] After S&L prepared and circulated the PQPR Memo internally among FSS's professionals, FSS began negotiations with PQPR. During those negotiations, S&L emphasized to counsel for PQPR that the alternative to a superior negotiated solution was an immediate challenge to PQPR's asserted claim and lien through an avoidance action in the contemplated bankruptcy case. FSS ultimately negotiated deals with PQPR that were superior to what FSS could have accomplished by immediately challenging PQPR's secured claim.

25.    First, FSS negotiated the Forbearance Agreement attached hereto as <u>Exhibit A</u>. Under the Forbearance Agreement, the Debtor modified the business relationship set out in the Memorandum of Understanding attached as <u>Exhibit B</u>. The Forbearance Agreement provided that (a) PQPR received $2,500 per business day on account of its asserted secured claim and (b) that FSS would acquire product directly—including $750,000 of product previously paid for by PQPR—and receive a 90% of the proceeds of the sales (with PQPR receiving 10%). Under the Memorandum of Understanding that previously governed the relationship between PQPR and FSS, PQPR received $11,000 per day and 80% of the proceeds (with the Debtor only receiving 20%). FSS believed that PQPR was necessary for its business and the Forbearance Agreement reflected an outcome that could not have been achieved by challenging PQPR's claim.

26.    Second, FSS negotiated with PQPR a consensual cash collateral order which did not contain any of the traditional and usual protections for a secured lender [ECF No. 6-1]. The proposed cash collateral order provided that FSS waived no claims against PQPR, did not find that

---

[6] S&L discussed with Mr. Battaglia, who is serving as the sole counsel for FSS, obtaining authority to disclose this privileged document as an attachment to this Motion. However, FSS did not have a person in place who could authorize waiving attorney-client privilege. FSS filed an application to retain Patrick Magill as a replacement chief restructuring officer on October 3, 2022 [ECF No. 205]. S&L will seek authority from Mr. Magill to disclose the potentially privileged evidence. The documents attached to this Motion are not privileged because they have been provided to other parties or presented in this chapter 11 case. Non-privileged information may be disclosed pursuant to Rule 1.05(d)(2) of the Texas Disciplinary Rules of Professional Conduct.

11

PQPR's lien or debt was valid, and did not place limitations on FSS or any other party with respect to challenging PQPR's asserted secured claim. As PQPR's attorney represented at the August 3, 2022, hearing, PQPR gave up all of the things that it would normally negotiate for. August 3, 2022, Hrg. Tr. 45:15-16. The proposed cash collateral order was ultimately modified, but there were no protections to PQPR that were removed.

27.     Third, there were preliminary discussions among FSS and PQPR about the possibility of subordinating any unsecured claim of PQPR or otherwise reaching a consensual resolution on the disputed claim and lien. Avoiding PQPR's lien but not the entirety of PQPR's notes would leave PQPR with a large unsecured claim. Depending on the outcome of the Sandy Hook Litigation, that amount could exceed the other unsecured claims in the FSS chapter 11 case.[7] Under Bankruptcy Code § 726(a)(4)—relevant because of section 1129(a)(7)(ii)—punitive damages are lower priority than compensatory damages. Working toward agreed subordination of PQPR's entire claim or other resolution would result in a better outcome for the FSS bankruptcy estate and creditors than avoiding PQPR's lien and leaving PQPR with an unsecured claim.

28.     Although FSS ultimately reached a better result through negotiations than could have been accomplished by immediately filing an avoidance action against PQPR, the evidence S&L seeks to present at a rehearing would demonstrate that S&L has no predisposition that that limits or interferes with the ability of S&L to provide unbiased advice with respect to PQPR.

b)   Analysis Regarding PQPR's Requested Destruction of Information.

29.     In connection with the negotiations regarding the Forbearance Agreement, PQPR provided FSS information that PQPR later requested that FSS destroy. S&L analyzed this request

---

[7] Although not determined at the time of the negotiations with PQPR, compensatory damages for the plaintiffs in the Heslin/Lewis Suit totaled $4.1 million. Carrying that through to all 19 plaintiffs would result in liability for compensatory damages totaling $38,950,000.

12

and advised the Debtor that the information (a) was not required to be destroyed and (b) should not be destroyed. The email chain reflecting this analysis is attached hereto as Exhibit C (the "PQPR P&L Email").[8]

30.     The PQPR P&L Email again demonstrates that S&L has no predisposition that limits or interferes with the ability of S&L to provide unbiased advice with respect to PQPR. S&L's conclusion was that FSS was not required to and should not destroy the information provided by PQPR provided despite PQPR's demand. Further, S&L advised maintaining any privilege with respect to the information if asserted by PQPR, demonstrating that S&L was not biased *against* PQPR.

c)   Scheduling PQPR's Asserted Secured Claim as Disputed

31.     FSS indicated on its schedules of assets and liabilities filed in this case [ECF No. 121] (the "Schedules") that PQPR's asserted secured claim was disputed. S&L advised FSS—through its then-proposed CRO March Schwartz—with respect to this matter. Subject to obtaining permission from FSS to disclose the confidential advice provided, S&L will seek to admit evidence with respect to S&L's advice.

32.     S&L contends that the contents of the advice provided with respect to the characterization of PQPR's claim as disputed on the Schedules would demonstrate that S&L has no predisposition that limits or interferes with the ability of S&L to provide unbiased advice with respect to PQPR, including matters related to the allegations of the Plaintiffs. Further, the outcome of listing the claim as disputed indicates that together, S&L and Schwartz had no conflict preventing them from taking positions contrary to PQPR.

---

[8] This communication was not privileged because the conclusion was provided to AEJ's bankruptcy attorney.

ii.   *Ability to Provide Impartial Advice with Respect to Alex Jones*

33.    The Court also indicated that it had concerns about S&L's disinterestedness with respect to issues adverse to AEJ based on the record. S&L seeks through this Motion to present evidence demonstrating that S&L does not have any predisposition that limits or interferes with the ability of S&L to provide unbiased advice with respect to AEJ.

a)   S&L's Analysis of Requested Extension of the Stay by Alex Jones Regarding Connecticut Litigation

34.    On August 2, 2022, the Connecticut Superior Court ruled that jury selection in the Connecticut Litigation could continue. In essence, the Connecticut Superior Court bifurcated the trial and was continuing only with respect to AEJ, despite not formally severing the actions against FSS. A copy of the transcript is attached hereto as Exhibit D (the "August 2 Connecticut Transcript").

35.    That got lost in translation from state court counsel. What FSS's proposed bankruptcy professionals were told was that the Connecticut state court was continuing with jury selection despite not severing FSS from the case.[9] While technically true, it missed the crux of the Connecticut Superior Court's action. The Connecticut counsel filed a notice of removal of the Connecticut litigation to prevent what appeared to be a violation of the automatic stay and to enable a single trial.[10]

36.    On August 15, 2022, the U.S. Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court") remanded the removed Connecticut Litigation. S&L represented FSS in the remand hearing. Despite remanding the case, the Connecticut Bankruptcy Court did not

---

[9] Mr. Battaglia referenced this confusion at the September 20 Hearing. Hrg. Tr. 220:14-18 ("Even the removal that was done of the Connecticut litigation was done with great hesitance and reluctance on our part but only because it was unclear what the Connecticut court had done, vis-à-vis FSS. Not Alex Jones -- FSS.").

[10] As reflected in the August 2 Connecticut Transcript (Ex. D), FSS had determined *not* to remove the Connecticut Litigation prior to its misunderstanding of the Connecticut Superior Court's ruling. August 2, 2022 Hrg. Tr 13:14-16.

14

award fees against FSS. The Connecticut Bankruptcy Court's order of remand is attached hereto as Exhibit E (the "Remand Order").

37.     After the Remand Order was entered, counsel for AEJ requested that FSS seek a stay of the Remand Order and take other action with respect to the Connecticut Litigation, including extending the automatic stay to AEJ. Mr. Shannon initially responded to this request as indicated in the email dated August 16, 2022—a copy of which is attached hereto as Exhibit F— informing AEJ's counsel that:

      a) FSS would not have removed if it was aware that the Connecticut Superior Court was in effect bifurcating the trial;

      b) There were reasons against extending the automatic stay, including that (i) separating claims against AEJ and FSS may be possible in Connecticut where it was not in Texas, (ii) the standard for extension of the stay to under applicable law did not appear to be met, (iii) it would harm FSS's position with respect to a then-yet-to-be-filed motion to appoint a tort committee and result in additional costs to the FSS bankruptcy estate, and (iv) estate funds might be better used litigating in Connecticut rather than the costs of seeking to extend the stay and the distraction from important restructuring matters was not worth it; and

      c) FSS needed to focus on things that would preserve and increase the value of the estate rather than incurring expenses fighting the Plaintiffs.

Mr. Shannon informed AEJ's attorney that he could not advise FSS's proposed CRO that seeking a stay would accomplishing anything other than incurring expenses for the estate.

38.     AEJ's attorney vigorously pursued his client's interests against FSS in response. As reflected in the August 16, 2022, email attached hereto as Exhibit G, AEJ's attorney stressed that he would "leave it to the Debtor[] to decide how to keep Alex supporting the efforts."[11] But notwithstanding AEJ's threats to walk off the job and cease supporting FSS's sales efforts, FSS did not cave, adopted S&L's recommendation, and decided that it would *not* (a) seek a stay of the

---

[11] These negotiations with AEJ and his counsel were among those referenced by Mr. Battaglia at the September 20 Hearing. Hrg. Tr. 220:19-221:3.

Remand Order, (b) move to extend the automatic stay to AEJ with respect to the Connecticut Litigation, or (c) seek a Bankruptcy Code § 105 stay.[12]

39.     S&L's preliminary response to the request of AEJ's attorney to seek a stay of the Remand Order and extension of the automatic stay—and FSS's ultimate decision to adopt S&L's recommendation despite pressure from AEJ—demonstrates that S&L has no predisposition limiting or interfering with S&L's ability to provide unbiased advice on behalf of FSS with respect to AEJ. S&L took contrary positions to AEJ because doing so was in the best interests of FSS's bankruptcy estate.

b)  S&L's Analysis of Indemnity Asserted by Alex Jones

40.     Another example of S&L's lack of any predisposition preventing unbiased advice with respect to AEJ is S&L's evaluation of AEJ's asserted indemnity claim.[13] Although the asserted indemnity had not been challenged by any other party-in-interest, S&L analyzed the issue and advised Mr. Battaglia and Mr. Schwartz of its conclusions in an email dated August 6, 2022. Subject to obtaining permission from FSS to disclose the privileged advice provided, S&L will seek to admit the August 6, 2022, email regarding that advice.

41.     Separate from the analysis provided on August 6, 2022, issues with AEJ's asserted indemnity claim were referenced in S&L's August 16, 2022, email (Ex. F) in response to AEJ's requested stay of the remand order and extension of the automatic stay. Mr. Shannon informed AEJ's counsel that: "I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022 . . . ."

---

[12] The final decision was reached after additional research into the issue and discussion among all of FSS's legal and financial advisory team. There was some support to take the actions demanded by AEJ, but FSS determined that seeking that relief was not in the best interests of its bankruptcy estate.

[13] Prior to the petition date, AEJ asserted the indemnity claim as a cross claim in the Connecticut Litigation. AEJ further filed Proof of Claim No. 1 in the FSS chapter 11 case asserting the indemnity claim.

16

42.     S&L contends that the August 16 email (Ex. F) and the contents of the August 6 email, if the privilege is waived, will demonstrate that S&L has no predisposition limiting or interfering with S&L's ability to provide unbiased advice with respect to AEJ. S&L is not and was not biased to assume that AEJ's asserted indemnity was valid.

     *iii.*     *Mr. Lee's Participation in Focus Group on Jurors' Perception of Alex Jones*

43.     The Court noted in its ruling that Mr. Lee participated in a focus group and jury perception of AEJ and that he did not separate his time for work performed for FSS or any other party. Tr. 243:15-24. This referenced work provided on July 1, 2022, and reflected in FSS's Exhibit 8 [ECF No. 163-8]. S&L seeks to present evidence that these services were provided solely for FSS.

44.     Mr. Lee was not providing these services—related to the Heslin/Lewis Suit—for any party other than FSS. As reflected in the order of the U.S. Bankruptcy Court for the Western District of Texas attached hereto as Exhibit H, InfoW, LLC was no longer a defendant in the Texas case to which the focus group was related.[14] Further, the order of the Travis County District Court attached hereto as Exhibit I shows that the Travis County court had found that the Alex Jones and FSS were alter egos with respect to the claims therein.[15] Jurors' perception of AEJ was directly relevant to the ultimate damages award against FSS.

---

[14] The other IW Debtors were never defendants in the Heslin/Lewis Suit.

[15] The Travis County District Court's order stated:

> The Court finds that pursuant to the default judgment, Alex Jones and Free Speech Systems, LLC are admitted to be alter egos. Even absent the default judgment, the Court notes that the record supports a finding that Alex Jones and Free Speech Systems, LLC are alter egos. The Court further finds that both Mr. Jones and Free Speech Systems, LLC are both "a party ... whose conduct necessitated the motion" under Rule 215.l(d).

Based on this finding, the jury's perception of AEJ in the Texas Litigation directly impacts FSS.

17

45.     S&L submits that this additional evidence would demonstrate that Mr. Lee's participation in the focus group does not indicate any predisposition interfering with or limiting S&L's ability to provide unbiased advice to the FSS estate. Critical issues in the first month of the chapter 11 case involved whether FSS should obtain on its own motion or consent to relief from the automatic stay for actions against FSS in which AEJ is a co-defendant. The effect of AEJ's presence in the case against FSS was critical to that evaluation. Further, the IW Debtors were no longer parties to the lawsuits and neither S&L or any of its attorneys have ever represented AEJ.

iv.     *$80,000 for AEJ Travel and Security Proposed in Interim Cash Collateral Budget*

46.     The Court noted in its ruling that the approximately $80,000 in travel expenses for AEJ provided for in the FSS proposed cash collateral budget was concerning. Hrg. Tr. 244:5-13. The Court was referring to the proposed order filed on September 13, 2022 [ECF No. 148] (the "September 13 Proposed Cash Collateral Order"). The Court questioned who was negotiating on behalf of the estate with respect to this amount. Hrg. Tr. 244:14-18. S&L seeks to present additional evidence showing that (a) S&L neither prepared, filed, nor presented the September 13 Proposed Cash Collateral Order to the Court and (b) the approximately $80,000 for travel expenses was significantly less than the first estimate of costs that FSS would incur to continue to trial in Connecticut and the reduction was the result of significant negotiations in which S&L participated.

47.     S&L was not directly involved in preparing, submitting, or presenting to the Court the September 13 Proposed Cash Collateral Order. The Battaglia Firm advised FSS with respect to the September 13 Proposed Cash Collateral Order, filed the proposed order with the Court, and presented the proposed order to the Court at the September 13, 2022, hearing before the Court.[16]

---

[16] At the September 13 hearing, S&L updated the Court with respect to the status report required by Bankruptcy Code § 1188(c) and the issues raised with respect to the U.S. Trustee's objections to the applications for employment of S&L and Schwartz & Associates.

005106

48.    S&L was, however, involved in reducing the total costs and lost revenue of continuing the Connecticut Litigation for the benefit of FSS's bankruptcy estate. To determine FSS's position with respect to the Connecticut Plaintiffs' motion for relief from stay [ECF No. 15] (the "Connecticut Lift Stay Motion"), Schwartz & Associates prepared a framework (the "Connecticut Trial Cost Framework") of the costs that FSS would incur to simultaneously (a) allow AEJ to attend the entire trial as demanded by AEJ and (b) not interfere with the business of FSS. Schwartz & Associates LLC prepared this document based on FSS's typical practice regarding travel. It was immediately clear that this was not practicable. Subject to obtaining permission from FSS to disclose the Connecticut Trial Cost Framework, S&L will seek to admit the document as evidence.

49.    To reduce the costs to FSS's bankruptcy estate of allowing the Connecticut Litigation to continue to judgment, FSS's proposed professionals focused their efforts on reducing the amount of time that AEJ would spend at the Connecticut trial rather than conducting his show and generating revenue for FSS. The trial in Connecticut was going to proceed at a minimum against AEJ because FSS had decided that it was not going to seek to extend the automatic stay to AEJ on that matter. As reflected in the August 17, 2022, email from AEJ's bankruptcy attorney attached hereto as Exhibit J, however, AEJ desired to attend the entire Connecticut trial and would not be available to host his show for FSS in that event. This required negotiations with both AEJ and the Connecticut Plaintiffs. In exchange for AEJ giving up his right to be present at the entire trial, FSS decided that it was willing to pay AEJ's travel expenses.

50.    These negotiations were conducted largely in connection with the Connecticut Lift Stay Motion. In the agreed order lifting the stay [ECF No. 117] (the "Connecticut Lift Stay Order"), AEJ was required to attend for "three trial days (not counting Mondays, which are not

19

evidence days)." This avoided many of the issues raised by FSS in its response to the Lift Stay Motion and the possibility of having two jury trials in Connecticut that would require additional absences of AEJ from conducting his show for FSS and earning revenue for the FSS bankruptcy estate.[17]

51.      S&L submits that this additional evidence would demonstrate that the approximately $80,000 in the September 13 Proposed Cash Collateral Order does not indicate that S&L has any predisposition limiting or interfering with its ability to provide unbiased advice with respect to FSS's estate. S&L was not involved directly in preparing the September 13 Proposed Cash Collateral Order but *was* involved with substantially reducing the estimated cost of the Connecticut Litigation for the benefit of the FSS bankruptcy estate.

> *v.*      *Initial Proposed Employment of Special Litigation Counsel with FSS Paying 100% of the Legal Fees.*

52.      The Court also referenced in its ruling that FSS initially sought to pay 100% of the legal fees of special litigation counsel representing both FSS and AEJ in the Connecticut Litigation. Hrg. Tr. 244:19-245:4. S&L seeks to present additional evidence that this issue was negotiated with AEJ and that FSS—through S&L—first took the position that FSS should only be responsible for a portion of the legal fees.

53.      As set out above, AEJ wanted FSS to extend the automatic stay to the Connecticut Plaintiffs claim against AEJ. Mr. Shannon responded that this did not appear to be a good use of estate resources. In that initial response to AEJ's attorney rejecting the demand to prevent the Connecticut Litigation from continuing against AEJ, Mr. Shannon noted that: "From your client's

---

[17] The Connecticut Plaintiffs has taken the position that their claims against FSS are 28 U.S.C. § 157(b)(5) personal injury tort claims requiring a jury trial. If there were two trials, FSS would lose revenue from AEJ needing to attend as a witness twice. As reflected in the Connecticut Trial Cost Framework, FSS estimated that each day AEJ was off the air cost FSS more than $40,000.

20

perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear ***some*** of the cost." Ex. F (emphasis added). AEJ's attorney vigorously represented his client's interest, stating that he would "leave it to the Debtor[] to decide how to keep Alex supporting the efforts[,]" Ex. G, and pointedly asking about the "Debtor['s] [p]lan when Alex sales go dark because he is in trial Connecticut[,]" Ex. J.

54.     Employment of Connecticut state court counsel was a major issue that needed to be addressed for the Connecticut Litigation to continue against both FSS and AEJ. Mr. Lee suggested that AEJ should pay some portion of the legal fees as reflected in the August 19-22, 2022, emails attached as <u>Exhibit K</u>.

55.     Through his bankruptcy counsel, AEJ asserted that FSS was required to pay for the representation if it had the funds to do so under FSS's indemnity of AEJ, as reflected in the August 19-22, 2022, emails.[18] While AEJ's asserted indemnity may ultimately be disputed, AEJ had significant leverage in these negotiations because (a) the compressed timeline to reach an agreement with the Connecticut Plaintiffs, (b) AEJ had the ability to prevent employment of the state court counsel by withholding his consent to the dual representation, (c) AEJ had the individual right to attend the entire trial in the Connecticut Litigation and cease conducting his show for FSS, and (d) Connecticut Plaintiffs required AEJ's agreement to certain aspects of the Connecticut Lift Stay Order. AEJ had the ability to block FSS from agreeing to lift the automatic stay on terms it

---

[18] AEJ's employment contract, a copy of which is attached hereto as <u>Exhibit L</u>, indicates that:

> Employer agrees to indemnify and holder harmless, and furnish and pay counsel of Employees choice, in the event that claims or suit are brought against Alex Jones arising out of his performance of this Employment Agreement, unless such claims are established by clear and convincing evidence to have arising from Alex Jones['s] actual fraud.

As indicated in the August 16, 2022, email from Mr. Shannon (Ex. F), S&L raised questions about the scope of this indemnity in negotiations with AEJ. AEJ asserted that the indemnity and/or common law indemnity covers the legal costs for the Connecticut Litigation.

005109

could agree to with the Connecticut Plaintiffs and force a contested hearing on the Connecticut Lift Stay Motion.

56.     Under these circumstances, FSS decided to file the applications to employ special counsel with FSS bearing 100% of the legal costs to enable FSS to agree to the Connecticut Lift Stay Motion. The evaluation was that, even paying the full legal costs, the deal reflected in the Connecticut Lift Stay Order was better for FSS's bankruptcy estate than litigating to conclusion (a) the Connecticut Lift Stay Motion, (b) a proceeding determining whether the Connecticut Plaintiffs claims were section 157(b)(5) personal injury tort claims, and (c) a subsequent estimation motion. When the Court and U.S. Trustee brought up the issue of FSS paying the full amount of the legal fees, FSS—through S&L—used this additional negotiating leverage to reopen negotiations with AEJ and obtain an agreed sharing of the legal costs. FSS did *not* adopt AEJ's assertion that FSS was required to pay these amounts.

57.     S&L submits that this additional evidence would demonstrate that FSS's initial proposed retention terms of the special litigation counsel does not indicate that S&L has any predisposition limiting or interfering with its ability to provide unbiased advice with respect to FSS's estate. The evidence indicates that that the predisposition of S&L attorneys was that AEJ should pay a portion of the legal costs related to the Connecticut Litigation. The evidence would also show that when FSS had additional leverage, S&L used that leverage to obtain a division of the legal fees for the benefit of FSS's estate despite AEJ's asserted indemnity.

**C.  In the Alternative, Additional Evidence will Demonstrate that S&L Has No Material Adverse Interest to the Estate Regarding the Limited Matters to Be S&L's Primary Responsibility in the S&L Employment Application.**

58.     S&L submits that the additional evidence will establish that S&L has no predisposition that renders a bias against FSS's estate. If, however, the Court is not convinced by the additional evidence that S&L is disinterested on all matters that might arise in the case, the

005110

additional evidence will nonetheless demonstrate that S&L had no predisposition that renders a bias against the estate with respect to the limited matters set out as S&L's primary responsibility in the S&L Employment Application. FSS sought to retain S&L for routine activities in the case and issues involving the Sandy Hook Litigation. S&L Employment Application ¶ 22. The Battaglia Firm was to have primary responsibility regarding strategy and implementation of that strategy. *Id.*

59.     If not approved under Bankruptcy Code § 327(a), the employment of S&L is appropriate under Bankruptcy Code § 327(e) for the limited purposes set out in the S&L Employment Application related to (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by FSS or lead bankruptcy counsel. Section 327(e) authorizes the employment of an attorney for a specified special purpose other than to represent the trustee or debtor-in-possession in conducting the case, where the attorney previously represented the debtor, the retention is in the best interest of the estate, and the attorney does not represent or hold an any interest adverse to the to the debtor or to the estate with respect to the matter on which such attorney is to be employed.[19]

60.     Courts have interpreted "conducting the case" to focus on the preparation of the chapter 11 plan, liquidating the estate, and assisting in the claims objection process. *In re Hart Oil & Gas, Inc.*, No. 11-12-13558 TA, 2013 Bankr. LEXIS 3128, at *8 (Bankr. D.N.M. Aug. 2, 2013) (collecting cases); *see also* 3 Collier on Bankruptcy ¶ 327.04[9][c] (16th 2022) ("The reference to 'conducting the case' in section 327(e) includes those matters that form a part of the administration

---

[19] Although the S&L Employment Application asserted that employment was appropriate under Bankruptcy Code § 327(a), it did not specify the subsection of section 327 under which the employment was sought. A professional that meets the requirements for employment under section 372(a) necessarily also meets the requirements under section 327(e).

005111

of the case under the Code. In a reorganization case, these matters include assisting in formulating a plan and assisting the trustee in carrying out required investigations . . . .).” Where there is another attorney serving as general bankruptcy counsel, special counsel may be retained for limited bankruptcy matters including obtaining court approval for the use of cash collateral, including obtaining approval for the use of cash collateral, selling assets and disposing of related executory contracts, and preparing and negotiating a key employee retention program and providing payment to critical personnel of the Debtor. *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 408 (D. Del. 2005).

61.     The additional evidence would establish that S&L does not hold any predisposition that renders a bias against FSS's estate with respect to its efforts and work on administrative matters unrelated to preparing a plan of reorganization or carrying out the required investigations or S&L's actions that allowed the Sandy Hook Litigation to continue in the respective state courts. The Court should allow S&L to present this additional evidence at a rehearing and, upon such evidence, authorize S&L's employment by the Debtor for such limited purpose prior to the September 20 Hearing.

62.     S&L submits that the existing evidence already establishes that other elements required for S&L's employment under Bankruptcy Code § 327(e). The existing evidence establishes that S&L was first retained by FSS prior to the petition date. Further, the evidence already submitted establishes that the employment of S&L to represent the estate on the limited matters set out above was in the best interests of the FSS bankruptcy estate. Mr. Battaglia represented to the Court that S&L's services were necessary to allow Mr. Battaglia to handle the case. S&L's familiarity with the Sandy Hook Litigation also enabled the Debtor to move for or

005112

agree to lifting of the with respect to sixteen of the nineteen Sandy Hook Litigation claims within the first month of this chapter 11 case.

## **CONCLUSION**

63.     For the reasons set out above, S&L requests that the Court grant the Motion and set a rehearing on the S&L Employment Application to allow additional evidence on the issue of S&L's disinterestedness. Even if FSS determines that it should go with alternative co-counsel to assist the Battaglia Firm, S&L should be allowed an opportunity to present evidence regarding disinterestedness with respect to the services it provided prior to September 20, 2022.

Dated: October 4, 2022.                           **SHANNON & LEE LLP**

                                                  /s/*R. J. Shannon*
                                                  Kyung S. Lee
                                                  State Bar No. 12128400
                                                  klee@shannonleellp.com
                                                  R. J. Shannon
                                                  State Bar No. 24108062
                                                  rshannon@shannonleellp.com
                                                  700 Milam Street, STE 1300
                                                  Houston, Texas 77002
                                                  Tel. (713) 714-5770

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within 24 hours of the filing, on the parties on the attached service list by U.S.P.S. first class mail.

                                                  /s/*R. J. Shannon*
                                                  R. J. Shannon

005113

## SERVICE LIST

Debtor and Counsel

Free Speech Systems, LLC
3019 Alvin Devane Blvd., STE 300
Austin, TX 78741

Attn: Ray Battalia
Law Offices of Raymond W. Battaglia
66 Granburg Cir.
San Antonio, TX 78218

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

26

005114

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway. Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 7870

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Attn: Shelby Jordan Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

John D Malone Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite
1400 Houston, TX 77002

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548 Austin, TX 78711-254

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street Suite 1800
Dallas, TX 7520

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln Austin, TX 7870

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

Attn: Elizabeth C. Freeman
Jackson Walker LLP
1401 McKinney St., STE 1900
Houston, TX 77010

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

27

005115

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22 - 60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | **Chapter 11 (Subchapter V)** |
| **DEBTOR.** | § | |

**ORDER GRANTING REHEARING PURSUANT TO RULE 59 OF THE FEDERAL
RULES OF CIVIL PROCEDURE**

Came for consideration the Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP (the "Motion"); and it appearing to the Court that notice of the Motion is adequate, appropriate, and sufficient under the circumstances of this case; and it further appearing to the Court that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      A rehearing (the "Rehearing") on the Application of Debtor for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related relief [ECF No 85]  (the "S&L Employment Application") shall be held on _____ at __:__ _.m. (Central Time).

2.      The evidence and arguments at the Rehearing shall be limited to (a) whether Shannon & Lee LLP is a "disinterested person" pursuant to 11 U.S.C. § 101(14) and (b) whether the S&L Employment Application should be granted in part pursuant to 11 U.S.C. § 327(e).

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT A

005117

**Forbearance Agreement**
**Summary of Indicative Terms and Conditions**
**Free Speech Systems, LLC.**
**July 10, 2022**

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

**Credit Card Processing Fee:**  The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees.

4% (FOUR percent) WMS

**Allocation of Net Sales Proceeds:**

**FSS Inventory**  FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory**  PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

EXHIBIT 8

| | |
|---|---|
| **Warehouse and Fulfillment Related Expenses** | FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory. |
| **PQPR Debt** | FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000.  Currently, FSS is paying PQPR $11,000 per business day.  As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement. |
| | FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens. |
| **Term:** | 60 Days |
| **Reservation:** | Subject to revision after implementation based on actual operational results. |

Executed this _12_ day of July 2022.

Free Speech Systems, LLC

By: _____

Marc Schwartz, Its Chief Restructuring Officer

PQPR Holdings Limited, LLC

By: _____

David Jones, Its Manager

LLC

By: _____ _____
_____ Its Manager

# EXHIBIT B

# Memorandum of Understanding

This Memorandum of Understanding is between ▮▮▮▮▮▮▮▮, as Manager, and Free Speech Systems LLC (FSS) and PQPR Holdings LLC (PQPR).

It is agreed that ▮▮▮▮▮▮▮▮ will manage all credit card transactions on behalf of FSS and PQPR. ▮▮▮▮▮▮▮▮ will perform daily settlements as follows:

A. ▮▮▮▮▮▮▮▮ will first pay the Merchant Account fees as charged by credit card processors.

B. After deducting credit card processing, remaining funds will be allocated as follows:

C. funds will be allocated firstly 10 percent to ▮▮▮▮▮▮▮▮ for its Services.

D. Next, 80 percent of the sales of PQPR products will be allocated to PQPR.

E. ▮▮▮▮▮▮▮▮ will pay the sum of $11,000 per calendar day and remit to PQPR Holdings LLC as payment on its prior outstanding balances.

F. Any remaining funds will be paid to FSS.

This agreement is effective October 6, 2021

Signed:

_____

Free Speech Systems LLC

_____

PQPR Holdings LLC

_____

▮▮▮▮▮▮▮▮

# EXHIBIT C

005123

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Thursday, June 30, 2022 2:57 PM |
| **To:** | Kyung S. Lee; MSchwartz@schwartzassociates.us; rbattaglialaw@outlook.com; jshulse@chartcapitalmgmt.com; sjordan@jhwclaw.com |
| **Subject:** | RE: A few questions |
| **Attachments:** | Rethinking Lawyer Ethics to Allow the Rules of Evidence Rules of.pdf |

My research into the case law and relevant ethical rules is that we are **_not required_** to delete or destroy the additional documents, which seems to just be the P&L. In light of the pending TUFTA action, I think we **_should not_** destroy the documents because it would arguably be spoilation of evidence.

(1) The documents were not wrongfully obtained.
  a. Melinda Flores—an FSS employee—provided these documents in response to the request of an FSS consultant. She had access to this information.
  b. This does not appear to be a misappropriation of a trade secret because PQPR did not take any actions to keep the information secret *from FSS* and it does not have independent value derived from being kept secret. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6).
  c. Factors for whether something is a trade secret are according to *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009):
      i. The extent to which the information is known outside of the business;
      ii. The extent to which it is known by employees involved in the business;
      iii. The extent of measures taking to guard the secrecy of the information;
      iv. The value of the information to the business and to its competitors;
      v. The amount of effort or money in developing the information; and
      vi. The ease or difficulty with which the information could be properly acquired or duplicated by others.
  d. Use of a trade secret requires attempting to use the trade secret for profit from commercial use. *Atl. Richfield Co. v. Misty Prods.*, Inc., 820 S.W.2d 414, 422 (Tex. App. 1991)
  e. There is no implied contract re confidentiality under Texas law. *See Sci. Mach. & Welding, Inc. v. Rose*, No. 03-20-00564-CV, 2022 Tex. App. LEXIS 1884, at *14 (Tex. App.—Austin Mar. 23, 2022)

(2) The documents are not privileged vis-à-vis FSS.
  a. I don't see any applicable privilege here. These were not created for litigation or contain attorney-client statements.
  b. Lemmon might argue that they are privileged w/r/t to other parties as a trade secret, but that's an issue for another time addressed in my recommendation below.
      i. Texas Rule of Evidence 507 allows a person to prevent other persons from disclosing trade secrets.
      ii. Lemmon could assert that privilege if FSS was required to disclose the Income Statement to someone else and argue that it is a trade secret. A holder of a trade secret may divulge information to a limited extent without destroying its status as a trade secret. *Schwimmer v. Presidio Indus. LLC*, No. 3:10-CV-2213-P, 2011 U.S. Dist. LEXIS 161754, at *16 (N.D. Tex. Feb. 11, 2011).
      iii. Texas Rule of Evidence 511(b)(2) and Rule of Civil Procedure 193.3(d) would prevent a waiver of privilege if made in discovery.

(3) The applicable ethical rules do not require destruction of the documents.

1

a. Attached law review article details the changes to the ABA model rules that the Texas courts have used as persuasive authority before.

b. The Texas Disciplinary Rules do not contain anything about this and the Texas Rules of Evidence merely state that inadvertent disclosures maintain their privilege.

(4)  The applicable case law does not require destruction of the documents.

a. There is some caselaw that allows for (but does not require) the disqualification of attorneys where they have and use **_privileged_** information obtained by their client. *See In re Meador*, 968 S.W.2d 346, 351 (Tex. 1998).

    i. The Texas Supreme Court identified the following factors for disqualification for use of privileged documents outside of formal discovery: 1) Whether the attorney knew or should have known the material was privileged; 2) The promptness with which the attorney notices the opposing side that he or she has received the its privileged information; 3) The extent to which the attorney reviews and digests the privileged information; 3) The significance of the privileged information; 4) The extent to which the movant may be at fault for the unauthorized disclosure; 5) The extent to which the non-movant will suffer prejudice from the disqualification.

    ii. Each of these factors other than No. 3 is in our favor even if it is technically privileged for one reason or another.

b. Further, those cases talk about harm whereas here the document should be discoverable in any dispute where they are relevant.

c. Texas Rules of Evidence do not apply since the document was not sent inadvertently for was it in response to a discovery request. Melinda must have intended to send these exact documents but apparently just did not listen to what David said.

I would tell Lemmon that our research indicates that we are not required to destroy the additional document and we are concerned that doing so may be spoliation of evidence regarding the TUFTA action but **_(a)_** we are happy to hear from him to reconsider if we are missing something, **_(b)_** we will hold the information confidential subject to obtaining the document in discovery if there is a dispute with PQPR, and **_(c)_** we will inform Lemmon if we are compelled to produce it to a third party so that PQPR can assert any relevant privilege against production by FSS. Splits the baby nicely, and if we are right that it is not privileged as a trade secret, we would be able to obtain in discovery.

What do you all think?
--
R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Kyung S. Lee <klee@shannonleellp.com>
**Sent:** Thursday, June 30, 2022 12:35 PM
**To:** MSchwartz@schwartzassociates.us; rbattaglialaw@outlook.com; R. J. Shannon <rshannon@shannonleellp.com>; jshulse@chartcapitalmgmt.com; sjordan@jhwclaw.com
**Subject:** Re: A few questions

Let's give everyone a little time to think about the issues. I propose we have a Zoom somewhere between 3-6 depending on folks' schedules.

For right now, I will propose a Zoom at 3PM CST today among us. If anyone has a conflict, please speak up. Marc, can you circulate Zoom Room for 3 now and if people have conflicts we can use that same Zoom Room for a different time that fits everyone's schedule?

005125

**Kyung S. Lee**
Partner
**Shannon & Lee LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Cell: (713) 301-4751
klee@shannonleellp.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Thursday, June 30, 2022 at 12:32 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, R. J. Shannon (FIRM) <rshannon@shannonleellp.com>, Jeffrey Shulse <jshulse@chartcapitalmgmt.com>, Shelby Jordan <sjordan@jhwclaw.com>
**Subject:** RE: A few questions

Should we Zoom?

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Thursday, June 30, 2022 12:29 PM
**To:** rbattaglialaw@outlook.com; R. J. Shannon (FIRM) <rshannon@shannonleellp.com>; Marc Schwartz <MSchwartz@schwartzassociates.us>; Jeffrey Shulse <jshulse@chartcapitalmgmt.com>; Shelby Jordan <sjordan@jhwclaw.com>
**Subject:** Re: A few questions

Gentlemen: Lemmon is not happy these documents were sent to us. Apparently, David Jones only authorized the balance sheet of PQPR to be sent to us. Here are PQPR's instructions on how to handle these erroneously produced documents. I have not encountered this situation before, so I need guidance or a little research on this point to make sure we are doing what is right for Schwartz and FSS.

**Kyung S. Lee**
**Shannon & Lee LLP**
Cell: 713-301-4751
klee@shannonleellp.com

---

**From:** Stephen Lemmon <lemmon@slollp.com>
**Date:** Thursday, June 30, 2022 at 12:24 PM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Cc:** rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, R. J. Shannon (FIRM)

<rshannon@shannonleellp.com>
**Subject:** Re: A few questions

This is a mistake.  The documents need to be returned and all copies destroyed.

Sent from my iPhone


On Jun 30, 2022, at 12:14 PM, Kyung S. Lee <klee@kslpllc.com> wrote:


Please review and let's chat.

Kyung S. Lee
Kyung S. Lee PLLC
Partner
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
Mobile (713) 301-4751
Klee@kslpllc.com
www.kslpllc.com



**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Sent:** Thursday, June 30, 2022 12:05:50 PM
**To:** Kyung S. Lee <klee@kslpllc.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FW: A few questions



**From:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
**Sent:** Thursday, June 30, 2022 10:47 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Subject:** Fwd: A few questions

These don't make any sense to me … there are some huge numbers on the balance sheet that net against other huge numbers … I'm digging into it

Sent from my iPhone

Begin forwarded message:

> **From:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
> **Date:** June 30, 2022 at 10:36:42 AM CDT
> **To:** Jeffrey Shulse <jshulse@outpostcc.com>
> **Subject: Fwd: A few questions**


Sent from my iPhone

4

Begin forwarded message:

> **From:** Melinda Flores <melinda@freespeechsystems.com>
> **Date:** June 30, 2022 at 9:56:46 AM CDT
> **To:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
> **Cc:** Melinda Flores <melinda@freespeechsystems.com>
> **Subject: Re: A few questions**
>
>
> Jeff,
> Attached is the payroll information you requested as well as the PQPR reports.  You can call me at 11....512-497-0948
> Thanks,
>
> Melinda
>
> ----- Original Message -----
> From: "Jeffrey Shulse" <jshulse@chartcapitalmgmt.com>
> To: "Melinda Flores" <melinda@freespeechsystems.com>
> Sent: Wednesday, June 29, 2022 7:25:26 PM
> Subject: Re: A few questions
>
> Yes … sounds good
>
> Sent from my iPhone
>
>> On Jun 29, 2022, at 6:14 PM, Melinda Flores <melinda@freespeechsystems.com> wrote:
>>
>> This will be fine, Jeff.  Will 11 am work for you?  I can send some reports over to you before then for review if you'd like.
>>
>> Melinda
>>
>> ----- Original Message -----
>> From: "Jeffrey Shulse"
>> <jshulse@chartcapitalmgmt.com>
>> To: "Melinda Flores"
>> <melinda@freespeechsystems.com>
>> Sent: Wednesday, June 29, 2022 9:54:53 AM
>> Subject: Re: A few questions
>>
>> And my first day was 6/21 … just fyi
>>
>> Sent from my iPhone

5

On Jun 29, 2022, at 9:52 AM, Jeffrey Shulse <jshulse@chartcapitalmgmt.com> wrote:

If you want to talk remotely tomorrow … I don't want you to change everything around for me … and I don't have a need to drive to Austin just to drive to Austin

Remote tomorrow is fine with me if it works for you?

Sent from my iPhone

> On Jun 29, 2022, at 9:44 AM, Melinda Flores <melinda@freespeechsystems.com> wrote:

Hi Jeff,

Sorry I missed you yesterday.  I wasn't aware you were coming in and I had some back to back up appointments in the afternoon.

I received your paperwork and all looks good.  We didn't get the background check in time to include you in this Friday's payday

6

005129

so your first payday will be 07/15/22 and will cover the pay period that started Monday 06/27/22 and ends 07/10/22 in addition to the last couple of days of the period that just ended. Your first pay will be a live check that will need to be deposited. Your direct deposit will start on the following pay period.

I spoke to Dr. Jones yesterday and gave me the go ahead and give you financials for 2021. I can have that ready for you tomorrow and we can actually sit in the conference room and remote in to QuickBooks if need be.

I can also provide the payroll information for you as well.

I usually work remotely on Tuesdays and Thursdays but since you're coming in tomorrow I'll be here in the office. More likely I will work from home on Friday this week.

Thanks,

Melinda

----- Original Message -----

7

From: "Jeffrey Shulse"
<jshulse@chartcapitalm
gmt.com>

To: "Melinda Flores"
<melinda@infowars.co
m>

Sent: Tuesday, June 28,
2022 2:23:06 PM

Subject: A few
questions

Melinda,

I believe you are out
this afternoon… so a
few quick items

Did you get my new
hire paperwork I put in
your basket last
week?  Any questions
or issues ?  When is
payroll ?  I assume we
are paid on Friday's ?

I need financial info for
PQPR … Bob Roe is
going to give you the
"all clear" … but I need
to sift through the last
12 months of info to
figure out some costs …
say 1/1/2021 to
12/31/21 and maybe
Q1 of 2022?  Again, I
need to do some cost
analysis to figure out
some fair revenue
sharing percentages

It would also be helpful
to see ADP payroll info
for the last 6-8 months
… how about 10/1/21
to 5/31/22?  I need to
put together an org
chart by company that

8

actually pays the salary, what company they actually do work for … FSS or PQPR and what "department" they work in … if you already have something like that …. It would be a helpful start

I will be back in Austin on Thursday morning… what is your schedule for the next few days ?

Thanks

Jeff Shulse

Sent from my iPhone

005132

# EXHIBIT D

1

```
DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  AUGUST 2, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES



        BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE



A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY MATT BLUMENTHAL

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS


                         Recorded and Transcribed by:
                         Debbie Ellis
                         Court Recording Monitor
                         400 Grand Street
                         Waterbury, CT  06702
```

2

1          THE COURT:  We are on the record in the three

2     related Lafftery versus Jones matters.  Lead docket

3     number Waterbury CV186046436.  I'm going to ask counsel

4     to please identify themselves for the record.

5          ATTY. MATTEI:  Good morning, your Honor.  Chris

6     Mattei on behalf of the plaintiffs.  With me is my

7     colleague Matt Blumenthal.

8          THE COURT:  Good morning.

9          ATTY. PATTIS:  Norm Pattis on behalf of Mr. Jones,

10    Free Speech Systems, Judge.  Good morning.

11         THE COURT:  Good morning.

12         ATTY. WILLIAMS:  Good morning, your Honor.  John

13    Williams with a special appearance on behalf of

14    Mr. Jones.

15         THE COURT:  Good morning.  So I think I may be

16    able to avoid the first issue with respect to the

17    objection for the media request.  Mr. Ferraro, have you

18    seen any members of the media here today?

19         THE CLERK:  There's one but nobody who had

20    requested to record.

21         THE COURT:  Okay.  So in light of the fact that no

22    one is here, I can avoid that issue.

23         THE CLERK:  Your Honor, I apologize.  I do think

24    the Connecticut Public Radio person is on his way.  He

25    called me and asked about the address but I don't see

26    him yet.

27         THE COURT:  All right.  I'm not going to delay the

3

1    proceedings for that, so he will not be able to film

2    today.  Okay.

3         So this may be less than five minutes or we may be

4    here all day depending on how this works.  So my first

5    question and this is really a yes or a no or an I don't

6    know.  That's what I want.  I don't want long

7    explanations.  I'm not looking for argument, just a yes

8    or a no or I don't know.  I'll start with Attorney

9    Mattei and then I will ask Attorney Pattis.

10        So my question is, whether the bankruptcy court

11   granted a motion to extend the bankruptcy stay to Alex

12   Jones who has not filed for bankruptcy?  So Attorney

13   Mattei, yes, no or I don't know?

14        ATTY. MATTEI:  No, your Honor.

15        THE COURT:  Okay.  Attorney Pattis, do you agree

16   or disagree with that, sir?

17        ATTY. PATTIS:  Neither.  I don't know is my

18   answer.

19        THE COURT:  Okay.  I'm happy to pass the matter

20   since your client would know, I assume, since you're

21   representing your client.  Would you like me to pass it

22   for a few minutes and we can make a call?

23        ATTY. PATTIS:  He's testifying today.  I tried to

24   reach him yesterday, a per your order and was

25   unsuccessful.  I don't know if I can reach his trial

26   counsel but I'll try.

27        THE COURT:  I know that you had mentioned, I think

4

1    you had reached out to Mr. Stuckel actually since

2    Mr. Ferraro was getting back from his Italy trip, with

3    respect to having bankruptcy counsel use the link to

4    watch it on Microsoft Teams so, I assume, they're

5    available.

6         ATTY. PATTIS:  I assume so too.

7         THE COURT:  So maybe they would be the ones that

8    you could try to reach.  And I just simply want to know

9    whether the bankruptcy court granted a motion to extend

10   the bankruptcy stay to Alex Jones who, to my knowledge,

11   has not filed bankruptcy.

12        ATTY. PATTIS:  I will find out, Judge.

13        THE COURT:  Okay.  So we'll take a five-minute

14   recess.  Thank you.

15        (Whereupon, there was a recess.)

16        THE COURT:  You could be seated.  That was quick,

17   Attorney Pattis.

18        ATTY. PATTIS:  It still took two phone calls.

19        THE COURT:  And the answer?

20        ATTY. PATTIS:  No such motion was filed,

21   therefore, no such motion is granted.

22        THE COURT:  Thank you.

23        So the automatic stay that is in effect as to Free

24   Speech System, LLC who filed for bankruptcy, I believe,

25   on Friday, does not automatically extend to solvent

26   codefendants even where they are similarly legal or

27   factually, so and I don't see that any motion for stay

5

1    has been filed here.

2         I'm going to next turn to the, I have to say

3    untimely cross claim.  I will give Attorney Williams an

4    opportunity to be heard but I do want to start out by

5    saying that it is, everyone has their responsibilities

6    and obligations in this case.  And one of my

7    responsibilities is to maintain the orderly procedure

8    of the court docket and cases and to prevent any

9    interference with the fair administration of justice.

10        And my concern here, Mr. Williams, and I'll give

11   you as much time as you need to respond, is that the

12   cross claim is untimely, improper, and that it delays

13   the trial.  And so I am considering using my statutory

14   authority and inherent authority in sua sponte

15   dismissing or striking the claim at this time.  So I'm

16   happy to have you be heard.

17        I do want to mention one thing before I forget is

18   that your appearance, you're going to need to correct

19   your appearance because your appearance, you didn't use

20   the right form.  There's a specific form that has to be

21   used for limited appearance and that form has different

22   language on it then the standard appearance form that

23   we're all used to.  So, for example, in the limited

24   appearance form you only agree to accept service on

25   your particular issue.  So I do want to tell you that

26   right now you are in for Mr. Jones full force and that

27   you'll need to correct that probably by way of a motion

6

1      or whatever you think is appropriate.

2           But in any event, let me hear you with respect to

3      your cross claim.

4           ATTY. WILLIAMS:  Your Honor, your Honor has raised

5      as I understand it and I apologize my hearing leaves a

6      lot to be desired but as I understand it, your Honor

7      has raised the question of untimeliness and

8      specifically as I look at the docket, there's no notice

9      of closed pleadings.  The case is proceeding as I

10     understand it as a hearing in damages.  It seems to me

11     that the cross claim is completely collateral to that.

12     There should not in any way have an impact on this

13     trial and in deed is the sort of thing that might well

14     be deferred until the end of the trial.

15          So if I have done something, your Honor used the

16     word improper, if I did something that was improper, I

17     can only tell your Honor it was certainly not my

18     intention and I apologize to the court for any offense

19     that I have given to you or inconvenience to anybody

20     else.  It was in no way my intention.

21          THE COURT:  No offense taken but we just need to

22     follow the rules, that's all.  So I raise the issue of

23     the untimeliness being improper and form and the delay

24     that it would work on the trial.  Is there anything

25     else that you wanted to add?

26          ATTY. WILLIAMS:  Well, your Honor, I didn't

27     believe that it was untimely.  But obviously the Free

7

1      Speech Systems I would have expected would oppose that

2      if they felt that it was untimely.  Your Honor, as

3      again said it's improper, I don't understand in what

4      way it would be improper except that I didn't request

5      your permission, which I didn't understand was required

6      and I didn't believe it would have any impact on the

7      case.

8          I have read the motion to strike.  Counsel there

9      indicates that --

10         THE COURT:  You're ahead of me Mr. Williams

11     because I haven't read it but --

12         ATTY. WILLIAMS:  I didn't hear you, your Honor.

13         THE COURT:  I said you're ahead of me because I

14     didn't read the motion to strike because it would now

15     require us to engage in pleading practice, request

16     to -- motion to strike, answer, special defenses,

17     motions for summary judgment and obviously we're down

18     for jury selection today.

19         ATTY. WILLIAMS:  Well, your Honor, all I can say

20     is that I did not intend any -- to do anything

21     improper.  I thought I was proceeding appropriately.

22     If I wasn't, I can only say that I am humbly apologetic

23     to the court.

24         THE COURT:  So I don't -- when I say untimely, and

25     please be seated if you like or remain standing

26     wherever you're most comfortable.  But when I say

27     untimely, it was filed well beyond the close of

8

1      pleadings deadline and the operative scheduling order.

2      I can't even find the last scheduling order, it's so

3      old.  And the deadline for the close of pleadings has

4      long passed.  It was not listed in the joint trial

5      management report which was ordered to be filed.  It

6      wasn't filed when the Jones defendants filed their

7      denials with their notice of defenses and their special

8      defenses and it's obviously filed on the eve of trial.

9           And when I say improper, I don't mean that you,

10     sir, did anything, you know, improperly to offend the

11     court by any means, so please don't think that.  But

12     what you would need to do with such a pleading is file

13     either a request to file the pleading, you know, beyond

14     the deadlines, file a motion with it, file a motion to

15     amend pleadings, something because otherwise, nothing

16     would prevent you from in the middle of evidence, you

17     or anyone else just dropping a pleading in the file and

18     expecting the parties and the court to adjudicate it.

19     So, we can't just have generally what we say with an

20     answer is an answer in cross claim or an answer in

21     counterclaim, certainly there was no answer here given

22     the default but there was the denial and the notice as

23     the defenses and the special defenses and I would have

24     expected it bare minimum to have it filed then.

25          And, you know, with respect to the delay, it would

26     delay the trial as it was filed five days before jury

27     selection.  So I have to say that Mr. Jones is not in

9

1    compliance with his obligations to plead in accordance

2    with our rules of practice and the scheduling order.

3         So pursuant to Connecticut General Statute 52-97

4    and Connecticut Practice Book Section 10-21, the cause

5    of action set forth in the untimely cross claim cannot

6    conveniently be heard with the main complaint.  And the

7    issues raised on the cross claim, even had the cross

8    claim been timely and properly filed, do not arise out

9    of the transaction which is the subject of the

10   plaintiff's complaint, which is required by Practice

11   Book 10-10.

12        For example, one of the basis for relief is an

13   injunction requiring someone from Free Speech Systems

14   to attend the trial.  So in short, it would be

15   impossible to hear and adjudicate the cross claim given

16   that jury selection starts today as it cannot

17   conveniently be heard with the main complaint.

18        So for these reasons, the court directs that the

19   cross claim be deleted or dismissed from this case and,

20   of course, nothing prevents Mr. Jones from filing a

21   separate action and if that does occur in the normal

22   course of business, the parties will be at notice that

23   the court will exercise jurisdiction over that matter

24   and bring it to this docket.  That is the most

25   efficient way to proceed.  But it will not be part of

26   this present case.

27        ATTY. WILLIAMS:  Thank you, your Honor.

10

1          THE COURT:  You're welcome.

2          So I have a couple of housekeeping matters.  I was

3     happy to see that you could agree on the number of

4     alternates which I understand was four and that you had

5     a total of five challenges, but I wasn't sure how you

6     were breaking it down.  Are you doing four and one or

7     three and two?

8          ATTY. MATTEI:  We agree that they be unrestricted,

9     your Honor.

10         THE COURT:  I will not, that I will not agree too.

11    I stick with the statute.  I like that statute.

12         ATTY. MATTEI:  My proposal then, Judge and I --

13         THE COURT:  Why don't you discuss it off the

14    record and then let me know if you have an agreement on

15    it.  Okay.  Thank you.

16         Mr. Pattis, there was one and I didn't pull it up,

17    but there was going to be one late motion in limine.

18    You had an attorney in your office who was not

19    available to file it due to some health issues.  And

20    I'm not sure if that was a motion in limine on behalf

21    of Mr. Jones and Free Speech Systems or just Free

22    Speech Systems because if it is on behalf of Mr. Jones,

23    it's well past filing, so what would you suggest?

24         ATTY. PATTIS:  It was both, but we're not going to

25    file it now.

26         THE COURT:  Okay.

27         ATTY. PATTIS:  He did not get out of the hospital

11

1      yet.

2              THE COURT:  Sorry to hear that.

3              ATTY. PATTIS:  Yeah, as are we.

4          Given the law of the case and the way things seem

5      to be evolving given the motion practice we can address

6      that interest in the other motions that are to be

7      argued later.

8              THE COURT:  Very good.

9              ATTY. PATTIS:  So there will not be another --

10             THE COURT:  And then I looked last night and I

11     thought yesterday was the deadlines for the replies to

12     the objections to the motions in limine, I saw the

13     plaintiffs' replies, are you not filing replies or are

14     you planning on filing them today because they were due

15     yesterday?

16         And again, I don't know if they're just are

17     directed to Free Speech Systems and of course we're not

18     adjudicating that now.

19             ATTY. PATTIS:  I have been advised by bankruptcy

20     counsel that the stay binds my hands as to Free Speech

21     Systems, and that I cannot act on his behalf it would

22     act as his peril.  They would pertain to both, so I

23     took the position that the stay was applicable as to

24     that.  I understand -- I'm here as to your order and I

25     don't mean to be defiant, but I've been told I act at

26     my peril if I act as to Free Speech Systems.

27             THE COURT:  So you don't want to act on behalf of

12

1      Mr. Jones in filing replies since you do represent

2      Mr. Jones and Mr. Jones is a nondebtor and there's no

3      stay at this point?  Listen, I'm not saying that at any

4      point the bankruptcy counsel can't file a motion in

5      bankruptcy court and have the stay extended to

6      Mr. Jones but right now, you're telling me that's why I

7      asked, that's why I started --

8           ATTY. PATTIS:  No, I understand.

9           THE COURT:  -- but there is no stay that extends

10     to Mr. Jones.

11          ATTY. PATTIS:  But there is as to a party that I

12     represent so I feel like I have a conflict at this

13     point, because I'm told I can't act with respect to one

14     and should act with respect to others and now I'm in a

15     position where I've got to parse what to do with

16     respect to each and that strikes me as that sort of

17     1.73 issue that I would need a little bit more time,

18     not an infinite amount of time to address.

19          And, you know, the issue you raised about whether

20     they should file the stay to extend to Mr. Jones that

21     hadn't occurred to me, I'm not a bankruptcy -- I had

22     altercate hands.

23          THE COURT:  Well, I think the law is clear that

24     when one defendant in a case files for bankruptcy it

25     doesn't automatically extend to all other defendants

26     even if they are similarly factually or legally and you

27     would have to move in bankruptcy court to extend the

13

1     stay.

2          Now last time we had this issue when Info Wars and

3     Prison Planet maybe, when they filed for bankruptcy, we

4     had the exact same situation and I believe I entered a

5     very similar order in response to that and then I think

6     what happened and you correct me if I'm wrong, I think

7     that you removed the remaining case to bankruptcy

8     court.  So that it wasn't so much --

9          ATTY. PATTIS:  I understand that.

10         THE COURT:  So here I didn't see and I checked

11    before I came out on the record, I didn't see any

12    removal to bankruptcy court of the pending claims and I

13    didn't see anything about a stay.

14         ATTY. PATTIS:  I was instructed not to file

15    removal papers by bankruptcy counsel for reasons of

16    their own that I didn't inquire as to.  And so I am

17    left in this awkward position now where if we proceed

18    as to Jones but not as to Free Speech that operates

19    almost constructively as a severance and I believe the

20    law is clear that a severance that adversely affects a

21    debtor is prohibited once the debtor is in bankruptcy.

22         So it's my request that and it's my understanding

23    that, I don't know if it's Houston, I don't recall what

24    city in Texas, in the Texas bankruptcy court there's a

25    hearing Friday morning with respect to the plaintiff's

26    emergency motion for relief from stay.

27         THE COURT:  But that emergency motion is a relief

14

1       from stay as to the debtor, Free Speech Systems --

2               ATTY. PATTIS:  Right.

3               THE COURT:  -- we are all on the same page here.

4       Everyone is on the same page.  They're under federal

5       bankruptcy law which, I believe me, respect.  There is

6       an automatic stay as to the debtor, Free Speech

7       Systems, LLC.  If you told me this is why I started

8       asking this question, if you said to me, yes -- because

9       I tried to look last night and I could not access the

10      through Pacer the records or I would have cancelled

11      this if I saw that it was extended.  As I'm

12      understanding it, clearly there's no doubt that there

13      was no extension of that stay to the solvent remaining

14      defendant Mr. Jones, nor has such a motion been filed,

15      so there is an active claim right now against Alex

16      Jones.  There's causes of action and we're down for

17      jury selection.

18              So, I can't, you know, I can't solve for you what

19      instructions you're getting from your client or

20      bankruptcy counsel but I have a remaining claim, but I

21      understand from what you're telling me it's your

22      position, well you can tell me your position why don't

23      you.

24              ATTY. PATTIS:  I'm asking for a recess until a

25      motion is heard on Friday.  I find myself in a position

26      where I cannot satisfy my obligations to both clients.

27      Mr. Jones expects a defense as does Free Speech.

15

1          I am told Free Speech the action will not proceed

2     as to they may or may not have identical interest in

3     every instance but I don't see how I can proceed as to

4     one client and not the other.

5          THE COURT:  So and then let's just hypothetically

6     say that we either didn't pick until Friday and Friday

7     the motion is heard and the motion it's a motion to --

8          ATTY. PATTIS:  For relief from stay.

9          THE COURT:  Okay, let's say that --

10         ATTY. PATTIS:  That's my understanding of it.  I

11    haven't filed it.

12         THE COURT:  So let's say that's denied and so the

13    stay is in effect as to Free Speech System.

14         ATTY. PATTIS:  At this point, Judge, I would be in

15    touch with bankruptcy counsel saying you left me

16    hanging here without a motion for an application as to

17    Jones or a removal, the trial court takes the position

18    that its capable -- that as a matter of law it would be

19    appropriate to proceed with Mr. Jones and I might have

20    to seek independent ethic's counsel advice because I'm

21    starting to feel a 1.73 (inaudible) because I'm now in

22    a position where I can meet the needs of one client but

23    not the other in a proceeding and I've not been in this

24    position before.

25         THE COURT:  Attorney Mattei.

26         ATTY. MATTEI:  Your Honor, what I see Attorney

27    Pattis be doing is asking for making an oral motion for

16

1        continuance for jury selection.  We oppose that motion

2        for continuance.  Mr. Jones is more than adequate

3        represented in bankruptcy court in Houston.  They are

4        well aware of this jury selection.  They actually filed

5        a motion to lift the stay as to the ongoing trial in

6        Texas.  And so they're well aware of the implications

7        that --

8            THE COURT:  So that -- excuse me.  The motion to

9        lift the stay was as to the debtor?

10           ATTY. MATTEI:  As to the debtor Free Speech

11       Systems.  And so they're more than aware of occasions

12       of not moving the stay with respect to Mr. Jones,

13       they've not done that knowing that jury selection is

14       scheduled for today.

15           The bankruptcy, which was filed on Friday,

16       Mr. Pattis has had the weekend and now Monday to

17       investigate the extent to which any conflict prevents

18       him from proceeding today on behalf of Mr. Jones.  But

19       the facts of the case establishes that there is no

20       conflict and there can be no conflict because Mr. Jones

21       and Free Speech Systems are all egos to one another.

22       They have been represented by the same counsel

23       throughout.  There's no suggestion or evidence that any

24       position taken by Mr. Jones here would be adverse to a

25       company that he 100 percent controls, Free Speech

26       Systems.

27           And so there's just no basis to grant a

17

1    continuance here where Mr. Jones is the one that has

2    manufactured this situation on the eve of jury

3    selection to prevent us from going forward.  So we want

4    to proceed today with jury selection.

5         THE COURT:  So here's what I would say, we are

6    going to proceed but if and when a motion is granted in

7    the bankruptcy court, that extends the stay to

8    Mr. Jones, the court needs to be notified immediately

9    and we will cease activity because that would then stay

10   the claim against Mr. Jones as well.  But short of

11   that, listen I suppose Mr. Jones could file for

12   bankruptcy and that would stay the rest of the case

13   under federal law or the bankruptcy court can extend

14   the stay to Mr. Jones.

15        So if either one of those happens, I'm sure you'll

16   let me know immediately and we will stop our

17   proceedings.

18        All right.  So we're going to start jury selection

19   at 10:00.  Just as a reminder please no snapshots or

20   screen shots or whatever you want to call it of the

21   jury confidential jury questionnaires.  Anyone who --

22   so if your clients are here at any point either during

23   jury selection or trial the trial will be in the

24   courtroom next door.

25        But during jury selection and during trial anyone

26   who's seated at counsel table or in the well of the

27   courtroom would have to wait for a recess to leave or

18

1   you can leave in between jurors if you understand what

2   I'm saying.  I don't want people in the well of the

3   courtroom getting up and leaving in the middle of the

4   voir dire, if they're in the well of the courtroom.

5   Now people in the gallery they can come and go as they

6   please but for trial as well, if we're not in a recess

7   any of your clients or other lawyers that are in the

8   well of the courtroom would have to wait for recess.  I

9   don't want people coming and going.  But if there's any

10  believe me any need for a quick break because someone

11  needs to leave or you have an emergency or whatever,

12  I'm happy to take another recess, so you just let me

13  know and ask for a recess and I'm sure we'll take a

14  recess.  I just don't want any commotion.

15      During the -- I am going to remain on the bench at

16  least for the immediate future.  I don't have any other

17  conflicts right now.  I don't know if that's going to

18  remain the whole time but the juror, potential juror

19  will sit next to me up here.  I don't know if you want,

20  I guess, Mr. Ferraro, maybe we can move the lectern up

21  for the lawyers.

22      THE CLERK:  Wherever counsel wants to.

23      THE COURT:  Why don't you discuss where you want

24  it but I'm telling you now I want you to give the

25  jurors space.  I don't want you leaving that lectern

26  area and clouding the jurors and I'm going to say the

27  same thing for witnesses as well.  So I don't want

19

1          anybody invading their space.

2              So here's what I would say on the replies to the

3          motions in limine by Mr. Jones.  If Mr. Jones wishes,

4          he's not ordered to, he doesn't have to but if he

5          wishes to file replies to the motions in limine, and

6          that was due yesterday, Mr. Jones will have until the

7          end of business tomorrow to file his replies if he

8          wants to.

9              I'm prepared to go on the introduction to the

10         panel.  I have, thank you, I have all the information

11         that you gave us with respect to the parties and the

12         witnesses and so forth.  So I think for the

13         introduction to the panel, you're going to be very

14         brief.  You're just going to simply say who you are and

15         what other lawyers are with you and if you want to

16         mention if you have clients here or not, that's fine.

17         But I don't want to hear anything beyond that, no

18         description of the case.  It's going to be very very

19         brief otherwise I am going to cut you off.  That's not

20         the opportunity to start any further details.

21             All right.  So we will be back right at 10:00 p.m.

22         for jury selection.

23             ATTY. MATTEI:  Your Honor, I'm sorry.  One

24         housekeeping matter.  I sent to Mr. Stuckel this

25         morning a proposed revised description of the case for

26         the court to consider giving to the jury in light of

27         the fact we now only have one defendant for whom we are

20

1        picking.  The initial jointly agreed upon statement

2        referred to both defendants and I sent the revision to

3        Mr. Stuckel.  Attorney Pattis I spoke to him

4        beforehand, he indicated that he objects so I just want

5        to flag the court given that right now we are only

6        picking with respect to Mr. Jones.

7            THE COURT:  Well, I planned on deleting Free

8        Speech Systems in the language as a defendant.  I

9        understand that you're objecting basically, Attorney

10       Pattis, even going forward into the proceeding and such

11       but do you have any suggestions on the proposed

12       language or not?

13           ATTY. PATTIS:  Yes.  I don't believe the court can

14       refer to Free Speech Systems.  I don't think the court

15       can refer to Mr. Jones as acting through Free Speech

16       Systems without adversely affecting Free Speech Systems

17       in violation of the stay, so that's the basis of my

18       disagreement.

19           If the court's going to proceed as to Mr. Jones I

20       think it should delete reference to Free Speech Systems

21       from the proposed joint statement.

22           ATTY. MATTEI:  I just in response regardless of

23       Free Speech Systems status that fact is established as

24       a result of fault not, so there's not any question that

25       that is true to be evidence in the case regardless of

26       whether Free Speech --

27           ATTY. PATTIS:  That will be a litigated issue

21

1          whether he'll be evidence, we think any evidence to

2          that effect would be in violation of the stay because

3          it acts to the detriment of Free Speech Systems while

4          it's --

5               THE COURT:  I think we can be very clear in our

6          preliminary instructions and our jury instructions that

7          this case is proceeding only as to Mr. Jones

8          individually so I'm not concerned that they're going to

9          be confused.  So if you can't come up with your own

10         language I'm more than capable of coming up with my own

11         language.  Okay.

12              ATTY. WILLIAMS:  Your Honor, may I be excused?

13              THE COURT:  Well, Mr. Williams, sure but you're

14         going to have to file --

15              ATTY. WILLIAMS:  A motion to withdraw.

16              THE COURT:  Unless you can somehow assure me as an

17         officer of the court that Mr. Jones retained you solely

18         for the purposes of the cross claim and not for any

19         other reason.  Because I explained to you the issue.

20              ATTY. WILLIAMS:  I understand.

21              THE COURT:  And I don't want to be hasty and make

22         mistakes and informally let you out of the case if in

23         fact that's not true.

24              ATTY. WILLIAMS:  Your Honor, I assure you as an

25         officer of the court that that was the sole purpose

26         that he retained me and I have no other interest in

27         this case whatsoever.

22

1          THE COURT:  All right.  Do you agree with that,

2     Attorney Pattis?

3          ATTY. PATTIS:  I reviewed the papers and I agree.

4          THE COURT:  I'm sorry.

5          ATTY. PATTIS:  I've reviewed the engagement

6     letter, I agree that there's no ambiguity with respect

7     to that.

8          THE COURT:  So your client, Mr. Jones, is not

9     going to object if I informally let Mr. Williams out.

10         ATTY. PATTIS:  On behalf of Mr. Jones, I'll make

11    that representation.

12         THE COURT:  And Attorney Mattei, you don't want to

13    be heard on this, correct?

14         ATTY. MATTEI:  No, your Honor.

15         THE COURT:  All right.  So ordered.

16         ATTY. WILLIAMS:  Thank you, your Honor.

17         THE COURT:  We'll take a recess.

18         (Whereupon, there was a recess.)

19       *            *            *            *            *

20

21

22

23

24

25

26

27

23

1

DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

2

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY

3
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  AUGUST 2, 2022

4

5

DKT NO:  X06-UWY-CV186046437-S

6

WILLIAM SHERLACH
V.
7
ALEX EMRIC JONES

8

DKT NO:  X06-UWY-CV186046438-S

9

WILLIAM SHERLACH
10
V.
ALEX EMRIC JONES

11

E L E C T R O N I C
12
C E R T I F I C A T I O N

13        I hereby certify the electronic version is a true and

14   correct transcription of the audio recording of the

15   above-referenced case, heard in Superior Court, G.A. 4 of

16   Waterbury, Connecticut before the Honorable Barbara N. Bellis,

17   Judge, on August 2, 2022.

18

19        Dated this 2nd day of August, 2022 in Waterbury,

20   Connecticut.

21

22

23

24                    _____

25                         Debbie A. Ellis
                       Court Recording Monitor

26

27

005156

# EXHIBIT E

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ERICA LAFFERTY; DAVID WHEELER; FRANCINE WHEELER; JACQUELINE BARDEN; MARK BARDEN; NICOLE HOCKLEY; IAN HOCKLEY; JENNIFER HENSEL; JEREMY RICHMAN; DONNA SOTO; CARLEE SOTO-PARISI; CARLOS M. SOTO; JILLIAN SOTO; AND WILLIAM ALDENBERG, Plaintiffs, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Adv. Pro. No. 22-05019 ECF No. 5 |
| WILLIAM SHERLACH, Plaintiff, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | ) ) ) ) ) ) ) | Adv. Pro. No. 22-05020 ECF No. 5 |
| WILLIAM SHERLACH & ROBERT PARKER, Plaintiffs, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | ) ) ) ) ) ) | Adv. Pro. No. 22-05021 ECF No. 5 |

## <u>ORDER GRANTING EMERGENCY MOTIONS FOR REMAND</u>

**I.    Introduction**

On December 5, 2018, Erica Garbatini f/k/a Erica Lafferty (the "Debtor") filed a Chapter

7 case in this Court, which remains pending.  The Debtor is a plaintiff in the first of the three

above-referenced adversary proceedings, Adv. Pro. No. 22-05019.  On July 29, 2022, Free

Speech Systems, LLC ("FSS"), filed a Chapter 11 petition in the United States Bankruptcy Court

for the Southern District of Texas, Case No. 22-60043, which remains pending.  FSS is a defendant in all three of the above-referenced adversary proceedings.

On August 2, 2022, FSS commenced the adversary proceedings in this Court by filing Notices of Removal of three consolidated Connecticut Superior Court actions.[1]  On August 3, 2022, the Plaintiffs filed Emergency Motions to Remand the adversary proceedings to the Connecticut Superior Court (the "Motions for Remand").  Among other things, the Motions for Remand assert that FSS filed the Notices of Removal after jury trial began in the Connecticut Superior Court.

FSS filed objections to the Motions for Remand (the "Objections").  The Objections do not dispute that the Notices of Removal were filed after jury selection began.  The Objections also do not dispute that a trial in the Connecticut Superior Court is scheduled to begin on September 6, 2022.

An expedited hearing on the Motions for Remand and the Objections was held on August 12, 2022.  After consideration of the record in these adversary proceedings, the arguments asserted in the Motions for Remand, the Objections, and advanced by the parties during the hearing, and for the reasons set forth below, the Motions for Remand are GRANTED.

---

[1] This is not the first time the Connecticut Superior Court actions have been removed to this Court.  On April 18, 2022, three entities related to FSS—Infowars, LLC, Infowars Health, LLC and Prison Planet TV, LLC (collectively, the "Debtors"), filed Chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas.  Also on April 18, 2022, the Debtors filed Notices of Removal of the Connecticut Superior Court actions in this Court (Adv. Pro. Nos. 22-05004, 22-05005, and 22-05006).  In connection with the dismissal of the Debtors' bankruptcy cases in the United States Bankruptcy Court for the Southern District of Texas, this Court ordered that the Notices of Removal be withdrawn, which resulted in the Plaintiffs' actions being remanded to the Connecticut Superior Court on June 1, 2022.  *See, e.g.*, ECF No. 36 in Adv. Pro. No. 22-05004.

005159

## II.    Jurisdiction

28 U.S.C. § 1452(a) permits a party to remove a claim or cause of action in a civil action to the district court for the district in which such claim or action is pending.  FSS asserts that this Court has jurisdiction over the removed cases pursuant to section 1452(a) because of the Debtor's Chapter 7 case.  The Plaintiffs do not dispute that this Court has jurisdiction over the removed cases which are now the subject of the adversary proceedings.

Section 1334(b) provides that the district courts have jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases under title 11.  This Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. § 157(b)(1) and the District Court's General Order of Reference dated September 21, 1984.

## III.    Discussion

Because the parties do not agree on whether the claims in Connecticut Superior Court actions are core or non-core proceedings, mandatory abstention by this Court under 28 U.S.C. § 1334(c)(2) is not appropriate.  *See*, *e.g.*, *In re National Eastern Corporation*, 391 B.R. 663 (Bankr. D. Conn. 2008).  However, permissive abstention may be appropriate under section 1334(c)(1).  *Id*. at 669.  Furthermore, 28 U.S.C. § 1452(b) specifically address removal of claims related to bankruptcy cases and permits a court to remand a removed action on any equitable ground.  28 U.S.C. § 1452(b).

In general, courts look to the following factors to decide whether to permissibly abstain from a case or to equitably remand a case: (1) the effect on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the complexity of the state law issues; (4) comity; (5) the relatedness/remoteness of the action to the main bankruptcy case; (6) the right to a jury trial; and (7) the prejudice to the involuntarily removed parties.  *In re National*

005160

*Eastern Corporation*, 391 B.R. 663, 670. The list of factors is non-exclusive and the determination of whether an equitable ground exists to remand involves an assessment of what makes sense under the specific facts and circumstances presented to a court. *Id*. at 671.

A review of the first factor, the effect on the efficient administration of the bankruptcy estate, weighs in favor of remand. A remand will not have a negative effect on the administration of FSS's bankruptcy estate. The parties dispute whether the Plaintiffs' claim are core or non-core claims. If the claims are non-core, this Court cannot enter a final judgment on the Plaintiffs' claims. Regardless of whether the claims are core or non-core, the claims must be adjudicated, and the Connecticut Superior Court is ready to do so. It is undisputed that jury selection had already begun when the Notices of Removal were filed and trial is scheduled to begin on September 6, 2022. A trial of the Plaintiffs' claims in the Connecticut Superior Court may assist with the administration of FSS's bankruptcy estate and will alleviate the need for another court to determine if the Plaintiffs' claim are core or non-core. *See e.g.*, *In re National Eastern Corporation*, 391 B.R. at 670. In addition, FSS asserts that remand will have a negative impact on the administration of its bankruptcy estate because of the costs associated with the trial of the Plaintiffs' claims. However, FSS is proceeding forward with the administration of its bankruptcy estate, including recently obtaining an order allowing it to increase its use of cash collateral based upon increased income due to better than projected sales of products since its bankruptcy case was filed. *See In re Free Speech Systems LLC*, United States Bankruptcy Court for the Southern District of Texas, Case No. 22-60043, ECF Nos. 55, 64. For these reasons, remand will not negatively impact the administration of FSS's bankruptcy estate.

The second factor, the extent to which issues of state law predominate, also weighs in favor of remand. The Plaintiffs' claims are exclusively based on state law even though, as FSS

4

argues, the claims relate only to damages. *See e.g.*, *In re Granoff*, 242 B.R. 216, 220 (Bank. D. Conn. 1999). Such claims include negligent and intentional infliction of emotional distress, violations of the Connecticut Unfair Trade Practices Act, and defamation. The Defendants' challenges to the sufficiency of the Plaintiffs' claims have not succeeded in the Connecticut Superior Court. Furthermore, the Plaintiffs' claims have been pending before the same judge for more than four years. The Connecticut Superior Court has extensive knowledge and familiarity with the claims and the parties. The docket of the Superior Court actions attached to the Objections demonstrate that there are more than 800 docket entries in the cases and that the Connecticut Superior Court has issued many substantive rulings. The Connecticut Superior Court has acted on all matters that needed to be decided before trial and was overseeing jury selection on August 2, 2022, when the Notices of Removal were filed. Under the circumstances surrounding these adversary proceedings, issues of state law predominate and the Connecticut Superior Court is in the best position to decide the Plaintiffs' state law claims.

The third and fourth factors, the complexity of the state law issues and principles of comity, also weigh in favor of remand. The Plaintiffs' state law claims are extensive and complex. A trial of the claims will require a resolution of factual, legal, and evidentiary issues based on Connecticut law. Despite several attempts by FSS and related entities to remove the actions from the Connecticut Superior Court, the claims are ready to be tried in the Connecticut Superior Court.[2] The claims arise under Connecticut common law and the Connecticut Unfair Trade Practices Act. Both comity and respect for state law supports remanding the actions to the

---

[2] In addition to the prior Notices of Removal filed in this Court, FSS and related entities twice removed the Connecticut Superior Court actions to the United States District Court for the District of Connecticut and on both occasions the actions were remanded to the Connecticut Superior Court. *See*, *e.g.*, *Lafferty v. Jones* (3:18-cv-01156-JCH) and *Lafferty v. Jones* (3:20-cv-01723-JCH).

005162

Connecticut Superior Court for the interpretation of common law and state statutes. *In re Granoff*, 242 B.R. at 220.

The fifth factor, the relatedness/remoteness of the Connecticut Superior Court actions to the FSS bankruptcy case, also supports remand. The Plaintiffs' claim arose years before FSS filed its Chapter 11 case. As previously noted, FSS does not dispute that it filed the Notices of Removal after jury selection was underway in the Connecticut Superior Court. During a hearing held on August 2, 2022, before jury selection began, the Connecticut Superior Court agreed that jury selection and the trial could not proceed against FSS due to the automatic stay it received when it filed its Chapter 11 case on July 29, 2022. However, the Connecticut Superior Court determined that jury selection and trial could proceed against the Defendant Alex Emric Jones ("Jones"), because FSS has not sought or obtained an order extending the automatic stay to Jones. See ECF No. 5 at 5-8, p. 14-18. The Connecticut Superior Court then proceeded with jury selection as to the claims against Jones and not FSS, supporting the finding that there is a remoteness between the continuation of the Connecticut Superior Court actions and the FSS bankruptcy estate.

The Plaintiffs' right to a jury trial, the sixth factor, additionally supports remand. Although the parties dispute whether the Plaintiffs' claims are core or non-core, this Court cannot conduct a jury trial on non-core claims. In addition, it is clear that the parties do not consent to a jury trial being conducted by this Court. A jury is in the process of being selected in the Connecticut Superior Court. The Plaintiffs' rights to have that process continue in the Connecticut Superior Court should not be disturbed.

The seventh and final factor, the prejudice to the involuntarily removed parties, weighs heavily in favor of remand. The Plaintiffs have been pursuing their claims against FSS and

6

others for more than four years. The pursuit of these claims has occurred not only in the Connecticut Superior Court, but in other courts as well. On multiple occasions, the Plaintiffs have had to pursue their claims in the United States District Court for the District of Connecticut, the United States Bankruptcy Court for the Southern District of Texas, and this Court. During jury selection and just weeks before trial is scheduled to begin in the Connecticut Superior Court, the Plaintiffs were involuntarily removed to this Court. The Plaintiffs' claims are ready to be tried in the Connecticut Superior Court. If remand does not occur, the prejudice to the Plaintiffs is much greater than any possible prejudice to FSS.

Upon a review of the circumstances surrounding these adversary proceedings and consideration of the factors to be analyzed when deciding a motion for remand, the Court finds that is it appropriate to abstain and remand the adversary proceedings to the Connecticut Superior Court in accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b).

Finally, although the Plaintiff seeks an award of fees and costs pursuant to 28 U.S.C. § 1447(c), the Court declines to award fees and costs at this time.

## IV.    <u>CONCLUSION</u>

Accordingly, it is hereby

**ORDERED:** In accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b), the Motions for Remand are GRANTED and Adversary Proceedings 22-05019, 22-05020, and 22-05021 are remanded to the Connecticut Superior Court; and it is further

**ORDERED**: The Plaintiffs' request for fees and costs pursuant to 28 U.S.C. § 1447(c) is DENIED; and it is further

005164

**ORDERED:** Any pending motions in Adversary Proceedings 22-05019, 22-05020, and 22-05021 are moot due to the remand of the adversary proceedings.

Dated at Bridgeport, Connecticut this 15th day of August, 2022.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

8

# EXHIBIT F

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Tuesday, August 16, 2022 9:56 AM |
| **To:** | Shelby Jordan; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors **\*are\*** met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

1

c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

2

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

### Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

### Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

4

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

# EXHIBIT G

005172

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Tuesday, August 16, 2022 2:06 PM |
| **To:** | Ray Battaglia; Kyung S. Lee |
| **Cc:** | R. J. Shannon |
| **Subject:** | Re: Isn't this our case in Conn |

Ray and Kyung:  Based on RJ's total rejection of all defenses and all matters filed in Conn I do not think a conference to discuss how to protect the ongoing business is a total waste of time.

> "The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate."

So, after 300 words of negative, I leave it to the Debtors to decide how to keep Alex supporting the efforts.   I'm sure RJ has an answer since Alex will be left to fighting these battles on his own.

Shelby

---

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just

1

uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors **\*are\*** met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

   c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

   d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee

005174

<klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

3

005175

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

4

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

005178

# EXHIBIT H

005179

**The relief described hereinbelow is SO ORDERED.**


**Signed May 20, 2022.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| CASE PENDING ANOTHER DISTRICT | § | |
| (*In re INFOW, LLC, ET AL.,* | § | |
| case no. 22-60020, | § | |
| U.S. Bankruptcy Court, | § | |
| Southern District of Texas | § | |
| Victoria Division) | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| NEIL HESLIN and | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 22-01023-hcm |
| ALEXANDER E. JONES; | § | |
| INFOWARS, LLC; | § | |
| FREE SPEECH SYSTEMS, LLC; and | § | |
| OWEN SHROYER | § | |
| Defendants. | § | |

### ORDER REMANDING SUIT
### TO 459TH DISTRICT COURT OF TRAVIS COUNTY, TEXAS

This adversary proceeding was initiated by the removal of a Texas state court suit

styled *Neil Heslin v. Alexander E. Jones, InfoWars, LLC, Free Speech Systems, LLC, and*

*Owen Shroyer,* cause no. D-1-GN-18-001835 ("Heslin Suit"), originally filed in the 261st

1

District Court of Travis County, Texas. On April 18, 2022, Defendant InfoW, LLC f/k/a InfoWars, LLC ("InfoW") filed a Notice of Removal (dkt# 1) of the Heslin Suit to this Court, which caused the Heslin Suit to be assigned adversary proceeding no. 22-01023 in this Court.

Prior to the removal, a state court suit styled *Scarlett Lewis v. Alexander E. Jones, InfoWars, LLC, and Free Speech Systems, LLC,* cause no. D-1-GN-18-006623 ("Lewis Suit") filed in the 98th District Court of Travis County, Texas, was consolidated with the Heslin Suit ("Consolidated Suit"), and the Consolidated Suit was assigned to the 459th District Court of Travis County, Texas ("State Court").  On April 18, 2022, Defendant InfoW filed a separate Notice of Removal of the Lewis Suit to this Court, which caused the Lewis Suit to be assigned adversary proceeding no. 22-01024 in this Court.

InfoW is a debtor that filed a voluntary Chapter 11 petition in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division ("SDTX Bankruptcy Court") on April 17, 2022. The Chapter 11 bankruptcy case of InfoW is pending in jointly administered case no. 22-60020 ("SDTX Bankruptcy Case").

A Motion for Abstention and Remand ("Motion")(dkt# 7) has been filed by Neil Heslin and Scarlett Lewis ("Plaintiffs") with this Court. On May 18, 2022, Plaintiffs and InfoW filed a Stipulation with this Court ("Stipulation")(dkt# 13). In part, the Stipulation provides that (a) all of Plaintiffs' claims against InfoW in the Consolidated Suit are dismissed with prejudice; (b) Plaintiffs' claims against Alex E. Jones, Free Speech Systems, LLC, and Owen Shroyer are not affected by the Stipulation; and (c) InfoW does not oppose Plaintiffs' Motion to Remand the Consolidated Suit to State Court. The substance of the Stipulation filed in this Court has previously been approved by

2

Stipulation and Order dated May 18, 2022, entered by the SDTX Bankruptcy Court on May 19, 2022 (dkt# 15).

Based on the foregoing, this Court finds that the Motion should be granted, and the following Order should be entered.

### IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOW:

1.      The Motion for Abstention and Remand ("Motion")(dkt# 7) filed by Plaintiffs is hereby GRANTED.

2.      The consolidated suit styled *Neil Heslin and Scarlett Lewis v. Alexander E. Jones, InfoWars, LLC, Free Speech Systems, LLC, and Owen Shroyer,* cause no. D-1-GN-18-001835/D-1-GN-18-006623 ("Consolidated Suit") is hereby REMANDED to the 459th District Court of Travis County, Texas, for adjudication and disposition.

3.      InfoW, LLC f/k/a InfoWars, LLC is no longer a Defendant in the Consolidated Suit.

4.      The Clerk of this Court may close this adversary proceeding.

###

005182

# EXHIBIT I

005183

Filed in The District Court
of Travis County, Texas

JUN 2 7 2022  CJ

At_____3:20____ㄹM.
Velva L. Price, District Clerk

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## ORDER ON DEFENDANTS' MOTIONS TO MODIFY AND/OR CLARIFY

On this day, the Court considered Defendants' May 27, 2022 "Defendants' Partially

Unopposed Motion to Correct/Modify 'Order on Attorney's Fees for Plaintiffs' Motion for

Sanctions Regarding Corporate Deposition'" relating to a Sanctions Order issued on April 15,

2022. After considering the pleadings and evidence, and after holding a hearing on June 24,

2022, the Court makes the following findings:

1)       The Court finds that Defendants failed to meet their burden to show the

Court's April 15th sanctions have a preclusive effect under *Braden*.

3)       The Court finds that pursuant to the default judgment, Alex Jones and Free

Speech Systems, LLC are admitted to be alter egos. Even absent the default judgment, the

Court notes that the record supports a finding that Alex Jones and Free Speech Systems, LLC

1

are alter egos. The Court further finds that both Mr. Jones and Free Speech Systems, LLC are both "a party...whose conduct necessitated the motion" under Rule 215.1(d).

4)      Having considered Plaintiffs' evidence of attorney's fees, and having considered Defendants' April 15th objections to those fees, the Court continues to find that the fees are reasonable and the sanction is appropriate and just.

5)      The Court GRANTS Defendants' Motion with regard to D-1-GN-18-001835 (the *Heslin* matter) as it concerns Owen Shroyer.  Therefore, it is ORDERED that Mr. Shroyer has no obligation to satisfy the sanctions award of April 15, 2022. Defendants' Motions to Correct/Modify are in all other respects DENIED.

6)      Defendants are ordered to pay the sanctions within 20 days of this order.


Dated June 24, 2022.


Hon. Maya Guerra Gamble

005185

# EXHIBIT J

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Wednesday, August 17, 2022 8:38 AM |
| **To:** | R. J. Shannon; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

RJ - I have been waiting since this email to hear the Debtors Plan when Alex sales go dark because he is in trial in Conn.  If you have one, please forward so I may share with Alex.  In light of your opinions  in your email, this is a critical request.

Shelby

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an

1

example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

b.  I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors **\*are\*** met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

c.  It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d.  Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)  The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

005188

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

005189

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

4

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

005192

# EXHIBIT K

005193

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Monday, August 22, 2022 2:32 PM |
| **To:** | Kyung S. Lee; R. J. Shannon |
| **Cc:** | Marc Schwartz; Ray Battaglia |
| **Subject:** | Re: Engagement Letter in word |

I'm checking with Alex but I suspect with the indemnity his answer is none if FSS has funds. Let me talk to him.

**From:** "Kyung S. Lee" <klee@shannonleellp.com>
**Date:** Friday, August 19, 2022 at 3:28 PM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Shelby Jordan <sjordan@jhwclaw.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Ray Battaglia <rbattaglialaw@outlook.com>
**Subject:** FW: Engagement Letter in word

1. Can you look at your Connecticut Removal file and send me a WORD document with the "captions" of the Sandy Hook Lawsuits? Is there just one, or several? I need this for the Engagement Letter for Norm to make sure it is right.
2. Marc, note Norm's request that the post-petition retainer be increased from $25,000 to $100,000.
3. Shelby, I am sure the Court and creditors are going to want to know what Alex will be funding of Norm's fees and retainers. I wanted to raise it now.
4. I am going to start working on the Application for Pattis & Smith so we don't have any estoppel arguments from the Plaintiffs' counsel.

Kyung S. Lee
Shannon & Lee LLP
Cell: 713-301-4751
klee@shannonleellp.com

**From:** Norm Pattis <NPattis@pattisandsmith.com>
**Date:** Friday, August 19, 2022 at 1:25 PM
**To:** Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: Engagement Letter in word

Kyung

Sharon is out today.

If this covers the CT cases, too, can you make the retainer amount $100,000?

Otherwise, fine.

Norm

**From:** Kyung S. Lee <klee@shannonleellp.com>
**Sent:** Friday, August 19, 2022 2:07 PM

005194

**To:** Sharon Abramson <sabramson@pattisandsmith.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>; Shelby Jordan <sjordan@jhwclaw.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** Re: Engagement Letter in word

Sharon, here is a redline of the original Engagement Letter, marked with my changes. Please review  and let me know if you have any questions. Once you tell me you are good with the changes, I can turn it into a final and circulate to Alex and Marc.

Kyung S. Lee
Shannon & Lee LLP
Cell: 713-301-4751
klee@shannonleellp.com

---

**From:** Sharon Abramson <sabramson@pattisandsmith.com>
**Date:** Thursday, August 18, 2022 at 3:45 PM
**To:** Kyung S. Lee <klee@shannonleellp.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Engagement Letter in word

Good afternoon:

Engagement letter in word is attached.

Kind regards,

Sharon Abramson
Office Manager

Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
T: (203) 393-3017
F: (203) 393-9745
https://www.pattislawfirm.com/

Confidentiality Notice: This email message (including attachments) is from Pattis and Smith LLC and is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sec. 2510-2521. The information contained in this transmittal, including any attachment, is privileged and confidential information and is intended only for the person or entity to which it is addressed. If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying or distribution or the taking of any action in reliance on the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please contact the sender immediately and delete this transmittal from any computer or other data bank. Thank you.

005195

# EXHIBIT L

# FREE SPEECH SYSTEMS, LLC
# EMPLOYMENT AGREEMENT
## and accompanying
### EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN

This Employment Agreement and accompanying Employee Annuity and Life Insurance Plan is entered into by and between Employer **Free Speech Systems, LLC**, (herein the "Company" or the "Employer") and Alex Jones, Employee on April 4, 2022, as follows:

Whereas, it is the intention of the Employer to employ Alex Jones to render his personal services to Employer in exchange for compensation for his personal services ("Current Wages" or "Wage") upon and subject to the terms and conditions hereinafter set out; and

Whereas, it is the intention of the Employer to provide an employer plan and program (herein the Company" and its Annuity and Life Insurance Program" or the "Plan") whereby an Employee Alexander Jones (as described herein) of the Company may, through this Company's Plan, make designations of dedication of Wages and salaries, compensation, bonus or other compensation for Employees personal services rendered ("Compensation" or "Current Wages") to and at the direction of Employer are to be used for the purchase in the name of the Employee by Employer as and if earned, and from time to time, Annuity Contracts as described and defined in of Article § 1108.001 *et seq* of the Texas Insurance Code and other applicable laws of the State of Texas and the United States of America, whereby the Employee's Current Wages for services rendered to or for the benefit of the Company are administered so as to be paid directly by the Company, pursuant to this Employer Annuity and Life Insurance Plan provided in the statute, to an insurance company issuing the Plan administered annuity and life insurance.

NOW, THEREFORE Alex Jones and the Employer agree as follows:

## I.
## EMPLOYMENT AGREEMENT

1.      The Employer employs Alex Jones and Alex Jones hereby accepts employment with the Company, upon and subject to the terms and conditions hereinafter set forth.

2.      Alex Jones shall be employed by Employer to continue to broadcast his public programing and Employer shall continue to furnish all assistance necessary to allow Alex Jones to continue his public broadcast.

3.      Alex Jones shall further to continue to promote products and services agreed to by Employer and Employer shall continue to furnish all assistance necessary, including processing of credit card charges for the products and services.

4.      Alex Jones shall have the unrestricted right to use the Employer's trademarks, tradenames, intellectual property and web cites maintained, including the Inforwar web site and

Page 1 of 10

web domain for all purposes in furtherance of his public broadcast.

5    Alex Jones agrees to devote all of the time necessary to continue his public broadcasts and allow his brand to be used in advertising and promotions as he has done in the past and Employer agrees to furnish all support staff and facilities to continue such support as it has done in the past and to maintain Employer's trademarks, tradenames, intellectual property and websites maintained, including the Inforwar web site and web domain for all purposes in furtherance of his public broadcast.

6.    Alex Jones agrees to devote such time as necessary to accomplish his continued public broadcast but shall not be restricted in other projects or programs from time to time in the sole discretion of Alex Jones.

7.    As Wages for his personal services under this Employment Agreement Alex Jones will be paid the annual sum of $1,300,000.00 in bi-monthly payments and shall reimburse Alex Jones for all expenses incurred in this employment and in any efforts to promote the broadcast, including travel, meals, lodging, cell phone, and other expenses.   All Wages for personal services by Alex Jones will be subject to the EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN attached hereto as Exhibit "1" which terms are incorporated herein by reference for all purposes as if set out herein verbatim.

8.    The Employment of Alex Jones is on an "at will" basis which may be terminated by either party without cause.  Upon termination Alex Jones shall have (i). all wages accrued to him under this Employment Agreement subject to the Annuity election as set out in Exhibit "1"; and (ii)  an irrevocable assignment of the exclusive use (but not the ownership) for a period of four years after termination, of all of Employer's trademarks, tradenames, intellectual property and websites maintained, including the Inforwar web site and web domain.

9.    The Parties agree that other than claims of Alex Jones arising under the Annuity and Life Insurance Program, or the Indemnity portion herein below, in no event will any dispute between the Parties result in a claim or the aggregate of all claims, of more than $5,000.00 and such claims made not paid within 30 days of the demand shall be subject to a ½ day arbitration that must be started and commenced not more than 60 days from the written demand.

10.    Employer agrees to indemnify and hold harmless, and furnish and pay counsel of Employees choice, in the event that claims or suit are brought against Alex Jones arising out of his performance of this Employment Agreement, unless such claims are established by clear and convincing evidence to have arisen from Alex Jones actual fraud.

11.    This Employment Agreement may be amended or modified from time to time by written agreement of the Parties.

12.    There are no third-party beneficiaries intended to be entitled to any rights or remedies under or pursuant to the terms of this Employment Agreement.
13.    This Agreement shall be interpreted in accordance with and governed by the laws

Employment Agreement and
Annuit Plan

005198

of Texas without regard to any conflict of laws principles. All disputes arising out of or in connection with this Agreement shall be subject to the sole and exclusive jurisdiction of the state or federal courts of, and located in, Harris County, Texas.

14.     No portion of this Employment Agreement is severable and no waiver of any of the provisions of this Agreement shall be effective unless made in writing and signed both Parties.

15.     Because of the nature of the relationship of Employee to Employer, the Employer waives any and all fiduciary duties or fiduciary obligations that otherwise may arise from this relationship, and the parties agree that Alex Jones has no liability to Employer except for acts of actual fraud, established by final order under clear and convincing evidence.

16.     This Employment Agreement may be executed in multiple counterparts each of which shall be deemed an original.

REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK

Employment Agreement and
Annuit Plan

005199

**EMPLOYER:**
**FREE SPEECH SYSTEMS, LLC**

Melinda Flores, authorized agent
Internal Accounting and Records

EMPLOYEE:  **ALEX JONES**

**Attachment:**  Exhibit "1"  **EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN**

Page 4 of 10

Employment Agreement and
Annuit Plan

005200

# EXHIBIT "1".
## EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN

This Plan shall be implemented effective April 1, 2022, and shall apply, at the election of the Employee, to all Current Wages due to the Employee as salary, wages, and bonuses for personal services rendered to the Company earned after the "Effective Date." The Plan shall include the following provisions, as may be amended from time to time:

## ARTICLE I
## DEFINITIONS

1.01   <u>EXECUTIVE COMMITTEE</u>.   Executing and administering this Company Annuity and Life Insurance Program is: Free Speech Systems L.L.C., (herein the "Executive Committee") as named from time to time by the member or manager of Employer. This Plan is effective and in full force notwithstanding a vacancy in the position an executive or Committee Member.

1.02   <u>PLAN</u>. The name of the Plan as adopted by the Company is:  FREE SPEECH SYSTEMS, LLC EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN.

1.03   <u>EMPLOYEE</u>. The following Employees are eligible to participate in the Plan:
   (a)       No exclusions, except as provided in Article II.
   (b)       An Employee having prior service with the Company (or its predecessor) on a full time basis for longer than two (2) consecutive years shall be entitled to designate a portion of that Employee's Current Wages for personal services the Employee has rendered to the Company (and for which the Company is otherwise obligated to compensate the Employee) for payment by the Company directly to the designated insurance company issuing the annuity and life insurance for the purchase of an annuity and life insurance qualified under Article § 1108.001 *et seq* of the Texas Insurance Code, as amended, in the name of and for the sole benefit of the Employee or his/her designated beneficiaries.

1.04   <u>DISTRIBUTIONS</u>.
**Treatment of Elective Distributions**.

   (a)       "Contribution" as used herein is the elective contributions of the Employee,  of that portion of the Current Wages for personal services rendered to Company, to be paid over by the Company on the Employee's behalf to the insurance company issuing the Employee designated annuity and life insurance exclusively in the name of the Employee and for the exclusive benefit of the Employee.  Wages shall include a set salary together with any bonus or earn-out payments based upon an agreed percentage of product sales gross earnings by the Employer, as reported by Employer (collectively "Wage" or "Wages").
   (b)       The annuity and life insurance to be purchased shall be as designated by the

Page 5 of 10

005201

Employee, and the Company shall have no responsibility to make such designation or to ensure that such designation is in any manner a safe, proper or adequate investment;  provided however, so long as the Employee elects to remain in the Plan, the Employee may not make any payments on the designated purchased annuity and life insurance except through this Plan.

(c)     In addition, each Employee shall be required to sign a written designation naming each insurance company issuing any annuity and life insurance elected by the Employee which such designation shall include a complete release of Company for any liability with respect to the Company's dealings with such insurance company.  In particular, the release shall also caution the Employee that their designation of the insurance company  and the purchase by the Company of the annuity and life insurance on behalf of the Employee will not be investigated at any time by the Company for the purpose of determining the soundness of the insurance company, the appropriateness of the investment, or the future likelihood of return on the investment, the protection afforded by law of the investment, or otherwise.

(d)     In every case the Company shall have no liability to the Employee or the particular insurance company except to turn over exclusively for the Employee's benefit all such designated Wages, including all Annuities purchased from time to time.

(e)     Upon such proper written designation, and upon the qualification of the Employee under the requirements of any such insurance company's requirements to issue an annuity and life insurance to or for the benefit of such Employee, the Company shall withhold from the Employee the gross  amount of Current Wages (after deduction of all tax obligations imposed upon the Company and the Employee by law, if any, including the FICA and withholding tax obligations of the Employee) necessary to equal the amount of "Net Wages" designated to be paid to the insurance company to purchase the annuity and life insurance.

(f)     Upon proper designation by the Employee, only the Company shall directly distribute to such insurance company issuing the Employee designated annuity and life insurance, all such Net Wages designated by the Employee in writing from time to time.

(g)     Once the proper payment has been made by the Company to the insurance company issuing the annuity and life insurance, the Company shall have no further responsibility or liability for the payment of such Net Wage and the Employee agrees to, and shall specifically be deemed to have, released the Company for all claims arising out of the payment by Company to the insurance company issuing the annuity and life insurance.

(h)     In the event that the Employer is joined in, or named in, any attachment, garnishment, collection proceeding at law or in equity, the Employer may at its election withhold such wages and deposit same into the registry of the Court having or asserting jurisdiction over such funds so as to determine the respective rights to the wages being withheld from the Employee, in which event the Employer shall be entitled to recover its reasonable attorneys fees and costs either from the creditor or party seeking attachment, garnishment, or the like, or from the wages as the Court may order.

(i)     Once the life insurance or annuity payment has been made by the Company, the treatment of such payments by the insurance company, by the Internal Revenue Service, any third parties claiming an interest or by the Employee shall be subject to all existing tax laws; that is, the Employee shall own the policy or annuity and shall remain liable for all taxes accrued, if any, upon such Net Wages paid to the insurance company over and above the amounts required to be withheld by law by the Company, and the Company shall withhold any Employee portion as may be required by applicable tax law in the same amount as if such payment had been made

Page 6 of 10

directly to the Employees. Such withheld portion shall be held in trust by the Employer and timely turned over to the appropriate taxing unit as required by such law, directly by the Company.

(j)     At any time after the annuity and life insurance has been issued and taken out, except as otherwise herein provided, the Company shall own no interest in the annuity and life insurance and its sole responsibility shall be to timely turn over the Current Wages designated by the Employee to the insurance company for the purpose of application of such funds to the purchase of the qualified annuity and/or life insurance.

(k)     The Company shall keep an accurate record of, and shall administer only, the payments made to the insurance company issuing the annuity and life insurance, and all of the requests for such payment made by the Employee to the Company. Additionally, the Employee shall only be permitted to make twelve (12) Payment Designations per year, which would include, however, twelve (12) pay periods and/or twelve (12) bonus pay periods.

### 1.05   PLAN YEAR/LIMITATION YEAR.
**Plan Year**. Plan Year means: The 12 consecutive month period ending every December 31st of each year (the first Plan year consisting, beginning on the Effective Date and ending on December 31 of that year).

### 1.06   EFFECTIVE DATE.
**New Plan**. The "Effective Date" of the Plan is:  December 31, 2021, after which Current Wages earned may become subject to this Plan.

### 1.07   HOUR OF SERVICE.  The crediting method for Wages Earned is: The actual method set out in any employment agreement between Employer and Employee providing for salary and salary earn-outs for sales performance, and such other compensation based on a minimum number of Platform shows or interviews per quarter
.

## ARTICLE II
## EMPLOYEE PARTICIPANTS

### 2.01   ELIGIBILITY
**Eligibility conditions**. To become a Participant in the Plan, an Employee must satisfy the following eligibility conditions:
(a)     Attainment of age 21
(b)     Service requirement. ONE year of full-time service without an intervening Break in Service (including service of the Company's predecessor businesses).
**Time of Participation**. An Employee may become a Participant immediately following the date the Employee completes the eligibility conditions and deliver a Payment Designation Form to the Executive Committee.
### 2.02   YEAR OF SERVICE - PARTICIPATION.
**Hours of Service**. An Hourly Employee must complete 1,500 Hours per year to be considered in Service. A non-hourly employee must earn and be eligible for payment of commission wages before becoming eligible as set out herein.

Employment Agreement and
Annuit Plan

## ARTICLE III
## EMPLOYER CONTRIBUTIONS AND FORFEITURES

3.01   <u>AMOUNT</u>.  The amount of the Employer's annual contribution to the Annuity and Life Insurance will be as follows:

(a)   The Company will not contribute to the Plan with respect to any period unless provided by special designation in writing of the Company and provided that such contributions are deemed wages for personal services rendered or bonus designated to a particular Employee.

(b)   The Company shall not be entitled to any part or portion of the Annuity and Life Insurance benefit, and no forfeiture rights inure to the Company in any Contributions made by the Employee.

(c)   The Company shall administer the payment of funds to the insurance company, shall account to the Employee for all record keeping concerning any annuities purchased, and shall, from time to time in the sole discretion of the Company, report to the Employee concerning the annuity and life insurance transactions, values, and other information furnished to the Company by the insurance company or other sources.

3.02   <u>INTERFERENCE WITH PLAN</u>.  Consistent with Section 5.02 hereinbelow, The Company shall not honor nor in any circumstance pay or turn over to any third party, whether individual, private entity, or governmental entity on any claim made against the subject of this Plan, it being the express intention of the parties to this Plan that every Employee right earned under his or her participation in this Plan shall be exempt from any such claim, seizure, garnishment, attachment, or other action or proceeding and shall be treated for all purposes as if a spendthrift trust as to any unpaid Current Wages, and as fully exempt property as to any earned Annuity Contract or Life Insurance purchased by the Company, as well as all proceeds thereof paid at any time to or for the benefit of Employee.

3.03.   Defense and Indemnity:   Employer shall defend this Plan and the protection provided under this plan for the Annuities and Life Insurance purchased which if purchased pursuant to the Texas statutory provisions shall be exempt as to the contracts or policies and proceeds thereof.  Employer will defend against any claim made by any third party and only if such defense is successful, all costs of defense may be assessed against any future purchase of any Annuity or Life Insurance under this Plan.

## ARTICLE IV
## TERMINATION OF SERVICE - PARTICIPANT VESTING

4.01   <u>NORMAL RETIREMENT</u>.  Normal Retirement Age under the Plan is the later of the date the Participant attains sixty-five (65) years of age or the fifth (5th) anniversary of the first day of the Plan Year in which the Participant commenced participation in the Plan. However, the Employee may terminate participation in the Plan at any time without forfeiture of any earned Income

Employment Agreement and
Annuit Plan

005204

4.02   <u>VESTING SCHEDULE</u>.   The Company elects the following vesting schedule: Immediate vesting, 100% nonforfeitable at all times.   Employee may not assign nor encumber his or her interest in or rights under this Plan prior the issuance, from time to time, of the Annuities provided herein.   This Plan, to the extent that assets are held from wages of the Employee, is in the nature of a spendthrift trust that cannot be attached, levied, garnished, or otherwise encumbered by any third party.

## ARTICLE V
## TIME AND METHOD OF PAYMENTS OF BENEFITS

5.01   <u>TIME OF PAYMENT OF ACCRUED BENEFIT</u>.

**Distribution date**.

(a)      The Employee elects any distribution dates through dealings directly with the annuity and life insurance issuer subject to the provisions of this Plan.   Any penalty for early distribution shall be the sole responsibility of the Employee.

(b)      The Employee may terminate participation under this Plan at any time and be entitled to a distribution as the particular annuity and life insurance contract selected by the Employee and may deal with such insurance or annuity at the Employee's sole discretion.   This right, however, is non-alienable, and shall not terminate any exemption rights pursuant to Texas law (including the Texas Insurance Code) and is further subject to Section 5.02 hereof.

5.02   <u>ALIENATION</u>
(a)      Subject to the exceptions provided below, and while the Employer is a participant in this Plan or is the owner of any annuity and life insurance acquired as a participant of this Plan, no benefit which shall be payable out of the Annuity and Life Insurance Fund to any person (including a Participant Employee or his Beneficiary) nor shall any benefit be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any such person nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.   It is the intention of Employer to protect the insurance benefits and annuity benefits provided in this program as set forth in the Texas Insurance Code and any other Texas exemption law protecting individual's assets from garnishment, attachment, sequestration, alienation, involuntary sale, transfer, or assignment, or voluntary pledge, encumbrance, or charge which would defeat any exemption right of the Employee.
(b)      This provision shall not apply to the extent a Participant or Beneficiary withdraws from participation in the Plan in whole or in part, and:
(i)      has canceled or terminated the annuity and life insurance acquired while a Plan participant, in whole or in part (and if not in whole, then as applicable to the partial termination); or
(ii)      has the annuity and life insurance or any particular annuity and life

Page 9 of 10

insurance previously acquired as a participant of this Plan administered by the individual participant Employee, with respect, however, only to premiums paid after the Employee has completely withdrawn from the Plan.

## ARTICLE VI
## EXECUTIVE COMMITTEE - DUTIES WITH RESPECT
## TO PARTICIPANT'S ACCOUNTS

6.01 The Executive Committee duties herein shall be only to

    a.    determine from time to time the eligibility of any Employee request to participate in the Plan; and

    b.    to insure that the Company is keeping accurate books and records of this Plan distribution and administration of the Employee's designated wages; and

    c.    institute such procedures or Plan rules as necessary to accomplish the Plan purpose, including, but not limited to, Employee relations regarding Plan participation or administration, and to selection (only at the request of an Employee) of an annuity and life insurance contract.

6.02    The Company shall fully indemnify and hold harmless each and every Executive Committee member from any and all claims by any third party arising out of this Plan.

## ARTICLE VII
## AMENDMENT, MODIFICATION OR TERMINATION

7.01    Upon recommendation of the Executive Committee, the Board of Directors of the Company may amend, modify, or terminate this Plan provided, however, no amendment shall in any manner reduce or impair the Employee's rights in acquired Annuities or Insurance Policies, no impair the entitlement and exemption afforded by law in favor of the Employee.

A full copy of this Plan and any modifications or changes may be obtained from the offices of the Executive Committee at the Employer's office.

Employment Agreement and
Annuit Plan

005206

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Case No. 22 - 60043 |
| | § | |
| DEBTOR. | § | Chapter 11 (Subchapter V) |
| | § | |

**MOTION OF W. MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC
PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE FOR
REHEARING ON THE ISSUE OF DISINTERESTEDNESS WITH RESPECT TO THE
DEBTOR'S APPLICATION TO EMPLOY W. MARC SCHWARTZ AND SCHWARTZ
ASSOCIATES, LLC**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU
OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY
TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU
MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST
FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS
SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT
BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE
GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND
HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS
THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE
HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

W. Marc Schwartz and Schwartz Associates, LLC ("collectively "Schwartz") hereby move

pursuant to Rule 59 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable

by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for

rehearing to present additional evidence on the issue of disinterestedness with respect to the

Debtor's Application to Employ Schwartz.[1] In support of this motion (the "Motion"), Schwartz

respectfully states as follows:

---

[1] Schwartz also joins in the Motion for Reconsideration filed by Shannon & Lee LLP ("S&L") at ECF No. 206.

## BACKGROUND AND PRELIMINARY STATEMENT

1.      On August 20, 2022, Free Speech Systems, LLC ("FSS"), the debtor and debtor-in-possession in the above captioned case, filed its *Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Grating Related Relief* [ECF No. 83] (the "Schwartz Employment Application").

2.      The U.S. Trustee objected to the Schwartz Employment Application on September 12, 2022 [ECF No. 145] (the "UST Objection"). The Sandy Hook Plaintiffs joined the amended UST Objection on September 15, 2022 [ECF No. 159]. FSS replied to the UST Objection on September 16, 2022 [ECF No. 166].

3.      The UST Objection argued that the Court should deny the Schwartz Employment Application because of the failure of Schwartz to supplement his disclosures required under Bankruptcy Rule 2014 in the cases of (the "IW Cases") of InfoW, LLC, IWHealth, LLC, and Prison Planet, LLC (the "IW Debtors") to reflect that he had begun working for FSS prior to the dismissal of those cases. The UST Objection did not dispute that Schwartz was disinterested in FSS's chapter 11 case, but rather argued that the Court should exercise broad discretion under Section 327(a) to address Schwartz's prior acts in the related cases—with this case alleged to be a continuation of the related cases -- and deny the Schwartz Application. UST Objection ¶ 2.

4.      The Court held a hearing on the Schwartz Employment Application on September 20, 2022 (the "September 20 Hearing"). Like S&L, FSS indicated in its opening statement that there was no dispute as to disinterestedness of Schwartz. The UST Objection did not contest that

Schwartz was disinterested or assert that Schwartz held an interest adverse to the FSS bankruptcy

estate during the opening arguments.

5.      At the beginning of the hearing, the Court also stated that the focus of the hearing

and the evidence should be on the non-disclosures in the IW Cases. According to the Court:

> And I'm going to tell you something because I want you to engage
> in a dialogue with me. The concern, when you really boil it down, I
> think you're looking at this too -- you know, looking at this kind of
> through a check the box perspective, right? If the behavior, the non-
> disclosures began in one case and [if] there are potential conflicts
> through acts that Mr. Schwartz and Mr. Lee have taken that continue
> into this case, then the history is important.

> For example, if, for example, you know, Mr. Lee or Mr. Schwartz's
> relationship with Mr. Jones or PQPR is concerning, it raises an
> issue as to whether either one of them can provide sound legal
> advice to the estate or sound financial advice to the estate, then the
> history is important, right?

> So you can't just -- I understand your point that if there's a lack of
> disclosure in one case, you should look at it as that case and it
> shouldn't essentially carry forward as a penalty into the new case.
> The question is, is there a throughline essentially; that's the question
> that you've got to answer today, at least that's where I'm focused on.

> If you're asking me, you know, how I . . . think about it, that's the
> way I think about it. So, for example, so when Mr. Lee is working -
> - I think you described in May, and Mr. Schwartz are working in late
> May and have decided that there's no hope for InfoW, what do I do
> with the fact that there's a pleading filed with me in this case that
> says on June 2nd, the Debtor is still considering all options, right?

> ***

> How then do I view that, right? That's the real question, right, and
> whether that, the changing of the jersey in essence, you know,
> whether that had already occurred, but no one told me, right. And
> so, that's the, hey, we're still considering all options, hey, as a
> fiduciary, we're thinking about everything, and five days later,
> you're in a meeting in Austin, you know, with the two plan funding
> sources in the current case.

> ***

> The question is does that carry, right, into FSS and into this case and it should be judged into FSS. And I know that that's where the evidence is; I'm just telling you the way I'm thinking about this now. So as arguments get made, that's the way I -- that's what I'm thinking about.

Hrg. Tr. 27:12-29:12.

6.      Despite the Court's invitation, the U.S. Trustee did not argue during the September 20 Hearing that Schwartz was not disinterested with respect to the FSS bankruptcy estate or that any relationship Schwartz had with Alex Jones ("AEJ") or PQPR created a bias against the interests of the FSS bankruptcy estate.[2] Nor did the U.S. Trustee adduce evidence that Schwartz had any bias with respect to the FSS bankruptcy estate.

7.      After considering the evidence and the arguments presented, the Court denied the Schwartz Employment Application. The core of the Court's ruling was that pre- and post-petition actions related to FSS caused Schwartz to hold an adverse interest to FSS's bankruptcy estate with respect to decisions against AEJ or PQPR under the "catch-all" provision of Bankruptcy Code § 101(14)(C). *See* Hrg. Tr. 236:13-17. The Court entered the order denying the Schwartz Employment Application [ECF No. 181] (the "Order Denying Employment") that evening.

8.      Through this Motion, Schwartz requests a rehearing to allow Schwartz to present evidence regarding these additional issues on disinterestedness raised by the Court. Under Rule 59(a) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to the

---

[2] As indicated in the U.S. Trustee's opening statement, the only issue raised by the U.S. Trustee was the sanction for the failure to supplement his disclosure in the IW Cases:

> [A]ll we're saying here is there was a serious non-disclosure that occurred with this very connection. I think under Rule 2014, there is a proverbial fox that guards the henhouse. What we're asking is harsh, but, you know, disclosure violations when they occur, you know, sometimes the consequences are harsh. A lot of cases, you might get disqualified. A lot of cases, you lose all your fees. But sometimes, that's what it takes to uphold the integrity of the bankruptcy system and that's why we're asking for Your Honor to deny the two applications that are before you.

Hrg. Tr. 44:7-15.

Schwartz Employment Application by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court may grant a new hearing "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court" is authorized to "take additional testimony" and "amend findings of fact and conclusions of law or make new ones . . . ." Where a completely new issue is suddenly raised, a new trial or hearing is required. *See Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 111-12 (5th Cir. 1982) ("This Court has limited reversible error from unfair surprise to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify.").

9.      The additional evidence, summarized below, will demonstrate that Schwartz is disinterested and has no bias adverse to the FSS estate with respect to issues involving AEJ or PQPR. Schwartz has no predisposition hindering its ability to recommend or pursue positions contrary to AEJ and PQPR when doing so benefits the FSS estate and its creditors. The evidence will address the items Court found problematic, but which Schwartz could not address because they were not raised prior to the close of evidence or in the UST Objection.

10.      FSS may not need further services from Schwartz if it obtains a replacement CRO or the contemplated mediation is successful.[3] Even so, Schwartz respectfully submits that the Court should consider and grant the Motion and allow Schwartz to present evidence that would have been presented at the September 20 Hearing if the issue of Schwartz's disinterestedness was raised prior to the close of evidence.

---

[3] An Application to Employ Patrick Magill as CRO was filed on October 14, 20022 at ECF No. 205.

## ARGUMENT

**A. Rehearing to Allow Additional Evidence on the Issue of Schwartz's Disinterestedness is Appropriate Here.**

11.     Bankruptcy Rule 9023 makes Federal Rule 59 applicable to proceedings under the Bankruptcy Code.[4] Federal Rule 59(a)(1)(B) provides that courts may grant a new trial on some or all issues after a non-jury trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Federal Rule 59(a)(2) provides that the court may "open the judgement if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."

12.     Among the reasons for granting a new trial or rehearing is surprise that is inconsistent with substantial justice. *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 111-12 (5th Cir. 1982). The Fifth Circuit Court of Appeals has held that it is reversible error to deny a Rule 59(a) motion—i.e., a retrial or rehearing is required—where a new issue is suddenly raised. *Id.* at 12 (citing *F & S Offshore, Inc. v. K.O. Steel Castings, Inc.*, 662 F.2d 1104, 1108 (5th Cir. 1981); *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978)).

13.     The U.S. Trustee was the only party to file an objection to the Schwartz Employment Application, which was joined by the Sandy Hook Plaintiffs. The UST Objection raised only a single issue—whether the Court should deny the Schwartz Employment Application under Bankruptcy Code § 327(a) because Schwartz failed to supplement his Bankruptcy Rule 2014 disclosure to reflect that he had begun providing services to FSS prior to the dismissal of the IW Cases. The U.S. Trustee did not dispute in the UST Objection or at the September 20 Hearing that Schwartz was a "disinterested person" or that Schwartz neither holds nor represents any adverse interest to the FSS bankruptcy estate.

---

[4] Under Bankruptcy Rule 9023, a motion under Federal Rule 59 must be brought within 14 days in bankruptcy matters.

14.     Bankruptcy Local Rule 9013-1(g) requires parties opposing the entry of relief requested by the Court to file a response to such motion and provides that Bankruptcy Rule 7008—which, in turn, incorporates Federal Rule 8—applies to such responses.[5] Federal Rule 8(b)(6) provides that allegations are deemed admitted if a responsive pleading is required and the allegation is not denied in a response.

15.     Based on that, FSS and Schwartz were not aware that Schwartz's disinterestedness was a disputed issue at the September 20 Hearing. The U.S. Trustee had evaluated the disclosures in the Schwartz Employment Application and determined that Schwartz was a disinterested person. The Plaintiffs—after obtaining discovery regarding the prepetition negotiations between the Debtor and PQPR—did not dispute that Schwartz was disinterested.

16.     As announced at the September 13, 2022, hearing before the Court, the Debtor, Schwartz, and the U.S. Trustee believed that the issues surrounding the Schwartz Employment Application centered on the events in May and June of 2022. The only issue raised or argued by the U.S. Trustee or the Plaintiffs was whether the Court should exercise its discretion to deny the Schwartz Employment Application because of Schwartz's failure to supplement his disclosures in the IW Cases.

17.     As the Court noted during closing arguments, "nobody's actually talked about the fifth circuit standards for retention . . . which was the problem with the pleadings and no one ever talked about, right, what it means to hold an adverse interest to the debtor or to the estate." *See* Hrg. Tr. 211:13-18. While it is appropriate for the Court to raise that issue *sua sponte*, evidence had closed. FSS pointed to the relevant evidence that had been presented in the record—that FSS

---

[5] Bankruptcy Local Rule 9013-1(g)(1) does not apply to motions for relief from the automatic stay. However, Bankruptcy Local Rule 4001-1(a)(10) requires an itemization of issues in dispute or compliance with Federal Rule 8 in responses to motions for relief from stay.

had refused AEJ's urgings to seek extension of the automatic stay to AEJ and instead reached an agreement with the Connecticut Plaintiffs to lift the automatic stay to allow their litigation to go forward. *See* Hrg. Tr. 213:19-214:3. The reason that this was the only evidence in the record was that the issue had not been raised previously.

**B.   The Additional Evidence Presented at Rehearing Will Demonstrate that Schwartz Has No Material Adverse Interest to the Estate.**

18.     The surprise regarding the issue of disinterestedness and whether Schwartz has an interest materially adverse to the interest of the estate at the September 20 Hearing prejudiced the Schwartz Employment Application. But for the surprise, Schwartz would have been able to present evidence establishing that Schwartz does not have any material adverse interest to the estate and is a disinterested person.[6]

19.     A professional is not a "disinterested person" if it (a) possesses or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant, or (b) possesses a predisposition under circumstances that render such a bias against the estate. *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005) (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985)). The inquiry "speaks in the present tense and only examines present interests." *In re Empire State Conglomerates, Inc.*, 546 B.R. 306, 315 (Bankr. S.D.N.Y. 2016).

20.     The catchall provision "for any other reason" does not allow for disqualification of a professional for the mere appearance of conflicts. *In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998); *accord In re Contractor Tech., Ltd.*, Nos. H-05-3212, 05-37623-H1-7, 2006 U.S.

---

[6] The Court indicated in its ruling that Schwartz satisfied subsections (A) and (B) of Bankruptcy Code § 101(14). Hrg. Tr. 236:1-2. The Court ruled, however, that Schwartz had a material adverse interest for "any other reason" as set out in subsection (C) that was imputed on Schwartz. *See* Hrg. Tr. 236:13-14.

Dist. LEXIS 34466, at *29 (S.D. Tex. May 30, 2006). The question is not whether the connection or predisposition could be imagined to create bias—it is whether that bias actually exists or would exist in certain circumstances. *See In re Marvel Entm't Grp.*, 140 F.3d at 477.

21.     In its ruling at the September 20 Hearing, the Court noted several issues other than Schwartz's nondisclosure in the IW Cases that appear to have factored into its determination that Schwartz has a material adverse interest to FSS's bankruptcy estate. Schwartz requests that the Court grant a rehearing to allow Schwartz to present evidence addressing these issues that were not raised prior to close of the evidence at the September 20 Hearing.

22.     The additional evidence that Schwartz seeks admitted into the record at a hearing is set out below. Based on this additional evidence, Schwartz submits that the Court should find that Schwartz is disinterested and grant the Schwartz Employment Application, at least for services provided prior to September 20 Hearing.

        i.   *Ability to Provide Impartial Advice with Respect to PQPR's Asserted Secured Claim*

23.     In its ruling, the Court questioned the ability of Schwartz to be unbiased with respect to PQPR under the record before it. The additional evidence that Schwartz seeks to admit at a rehearing would demonstrate that Schwartz does not have any predisposition that limits or interferes with the ability of Schwartz to provide unbiased advice with respect to PQPR.

            a)   Evidence Regarding Prepetition Analysis of PQPR's Asserted Secured Claim and Related Negotiations

24.     One of the very first legal work product Schwartz reviewed from S&L, prior to the Petition Date, was an analysis of PQPR's asserted lien and note (the "PQPR Memo"). Subject to obtaining permission from FSS to present this privileged document, Schwartz will seek admission of this document into evidence at a rehearing.

25. After S&L prepared and circulated the PQPR Memo internally among FSS's professionals (including Schwartz), FSS began negotiations with PQPR. During those negotiations, S&L (with Schwartz's authorization) emphasized to counsel for PQPR that the alternative to a superior negotiated solution was an immediate challenge to PQPR's asserted claim and lien through an avoidance action in the contemplated bankruptcy case. FSS (with Schwartz's participation) ultimately negotiated deals with PQPR that were superior to what FSS could have accomplished by immediately challenging PQPR's secured claim.

26. First, FSS (through Schwartz) negotiated the Forbearance Agreement attached hereto as Exhibit A. Under the Forbearance Agreement, the Debtor modified the business relationship set out in the Memorandum of Understanding attached as Exhibit B. The Forbearance Agreement provided that (a) PQPR received $2,500 per business day on account of its asserted secured claim and (b) that FSS would acquire product directly—including $750,000 of product previously paid for by PQPR—and receive a 90% of the proceeds of the sales (with PQPR receiving 10%). Under the Memorandum of Understanding that previously governed the relationship between PQPR and FSS, PQPR received $11,000 per day and 80% of the proceeds (with the Debtor only receiving 20%). FSS (with Schwartz's participation) believed that PQPR was necessary for its business and the Forbearance Agreement reflected an outcome that could not have been achieved by challenging PQPR's claim.

27. Second, FSS (with the advice and consent of Schwartz) negotiated with PQPR a consensual cash collateral order which did not contain any of the traditional and usual protections for a secured lender [ECF No. 6-1]. The proposed cash collateral order provided that FSS waived no claims against PQPR, did not find that PQPR's lien or debt was valid, and did not place limitations on FSS or any other party with respect to challenging PQPR's asserted secured claim.

As PQPR's attorney represented at the August 3, 2022, hearing, PQPR gave up all of the things that it would normally negotiate for. *See*, Hrg. Tr. 45:15-16. The proposed cash collateral order was ultimately modified, but there were no protections to PQPR that were removed.  Schwartz was involved in these discussions and agreed with the ultimate outcome.

28.     Third, there were preliminary discussions among FSS (including Schwartz) and PQPR about the possibility of subordinating any unsecured claim of PQPR or otherwise reaching a consensual resolution on the disputed claim and lien. Avoiding PQPR's lien but not the entirety of PQPR's notes would leave PQPR with a large unsecured claim. Depending on the outcome of the Sandy Hook litigation, that amount could exceed the other unsecured claims in the FSS chapter 11 case.[7] Under Bankruptcy Code § 726(a)(4)—relevant because of section 1129(a)(7)(ii)—punitive damages are lower priority than compensatory damages. Working toward agreed subordination of PQPR's entire claim or other resolution would result in a superior outcome avoiding PQPR's lien through litigation and PQPR asserting an unsecured claim.  Schwartz supervised these discussions as the CRO for FSS and agreed with the ultimate outcome.

29.     Although FSS ultimately reached a better result through negotiations than could have been accomplished by immediately filing an avoidance action against PQPR, the evidence Schwartz seeks to present at a rehearing would demonstrate that Schwartz has no predisposition that limits the ability of Schwartz to make unbiased decisions with respect to PQPR. Schwartz used the analysis and knowledge contained in the PQPR Memo to negotiate, rather than litigate, a business agreement for the FSS estate that has been beneficial for the chapter 11 estate of FSS during the entire course of the FSS bankruptcy case. Schwartz's conduct and behavior towards

---

[7] Although not determined at the time of the negotiations with PQPR, compensatory damages for the plaintiffs in the Heslin/Lewis Suit totaled $4.1 million. Carrying that through to all 19 plaintiffs would result in liability for compensatory damages totaling $38,950,000.

PQPR, Schwartz submits, does not demonstrate a bias against the FSS chapter 11 estate. FSS saved significant estate funds by being able to achieve a negotiated cash collateral agreement, as even the negotiated agreement took over 6 hours of court time to have it approved the first time.

      b)  Scheduling PQPR's Asserted Secured Claim as Disputed

30.      FSS indicated on its schedules of assets and liabilities filed in this case [ECF No. 121] (the "Schedules") that PQPR's asserted secured claim was disputed. S&L advised FSS— through Schwartz—with respect to this matter. Subject to obtaining permission from FSS to disclose the confidential advice provided, S&L and Schwartz will seek to admit evidence with respect to this advice.

31.      This example again demonstrates that Schwartz has no predisposition that limits or interferes with the ability of Schwartz to make unbiased decisions with respect to PQPR, including matters related to the allegations of the Plaintiffs. Further, the outcome of listing the claim as disputed indicates that together, Schwartz, acted on advice of FSS counsel, and had no conflict preventing him from taking positions contrary to PQPR.

      ii.   *Ability to Provide Impartial Advice with Respect to Alex Jones*

32.      The Court also indicated that it had concerns about Schwartz's disinterestedness with respect to issues adverse to AEJ based on the record. Schwartz seeks through this Motion to present evidence demonstrating that Schwartz does not have any predisposition that limits or interferes with the ability of Schwartz to make unbiased decisions with respect to AEJ.

      a)  Analysis of Requested Extension of the Stay by Alex Jones Regarding Connecticut Litigation

33.      On August 2, 2022, the Connecticut Superior Court ruled that jury selection in the Connecticut Litigation could continue. In essence, the Connecticut Superior Court bifurcated the trial and was continuing only with respect to AEJ, despite not formally severing the actions against

FSS. A copy of the transcript is attached hereto as <u>Exhibit C</u> (the "<u>August 2 Connecticut</u> <u>Transcript</u>").

34.     That got lost in translation from state court counsel. What FSS's proposed bankruptcy professionals were told was that the Connecticut state court was continuing with jury selection despite not severing FSS from the case.[8] While technically true, it missed the crux of the Connecticut Superior Court's action. The Connecticut counsel filed a notice of removal of the Connecticut litigation to prevent what appeared to be a violation of the automatic stay and to enable a single trial.[9]

35.     On August 15, 2022, the U.S. Bankruptcy Court for the District of Connecticut (the "<u>Connecticut Bankruptcy Court</u>") remanded the removed Connecticut Litigation. S&L represented FSS in the remand hearing. Despite remanding the case, the Connecticut Bankruptcy Court did not award fees against FSS. The Connecticut Bankruptcy Court's order of remand is attached hereto as <u>Exhibit D</u> (the "<u>Remand Order</u>").

36.     After the Remand Order was entered, counsel for AEJ requested that FSS seek a stay of the Remand Order and take other action with respect to the Connecticut Litigation, including extending the automatic stay to AEJ. Mr. Shannon initially responded to this request as indicated in the email dated August 16, 2022—a copy of which is attached hereto as <u>Exhibit E</u>— informing AEJ's counsel that:

> a) FSS would not have removed if it was aware that the Connecticut Superior Court was in effect bifurcating the trial;
>
> b) There were reasons against extending the automatic stay, including that (i) separating claims against AEJ and FSS may be possible in Connecticut where

---

[8] Mr. Battaglia referenced this confusion at the September 20 Hearing. Hrg. Tr. 220:14-18 ("Even the removal that was done of the Connecticut litigation was done with great hesitance and reluctance on our part but only because it was unclear what the Connecticut court had done, vis-à-vis FSS. Not Alex Jones -- FSS.").

[9] As reflected in the August 2 Connecticut Transcript (Ex. D), FSS had determined *not* to remove the Connecticut Litigation prior to its misunderstanding of the Connecticut Superior Court's ruling. August 2, 2022 Hrg. Tr 13:14-16.

it was not in Texas, (ii) AEJ did not appear to meet the standard for extension of the stay under applicable law, (iii) it would harm FSS's position  the then-yet-to-be-filed motion to appoint a tort committee and result in additional costs to the FSS bankruptcy estate, and (iv) estate funds might be better used litigating in Connecticut rather than the costs of seeking to extend the stay and distraction from important restructuring matters was not worth it; and

c) FSS needed to focus on things that would preserve and increase the value of the estate rather than incurring expenses fighting the Plaintiffs.

Mr. Shannon informed AEJ's attorney that he could not advise FSS's proposed CRO that seeking a stay would accomplishing anything other than incurring expenses for the estate.

37.   AEJ's attorney vigorously pursued his client's interests against FSS in response. As reflected in the August 16, 2022, email attached hereto as Exhibit F, AEJ's attorney stressed that he would "leave it to the Debtor[] to decide how to keep Alex supporting the efforts."[10] But notwithstanding AEJ's threats to walk off the job and cease supporting the FSS's sales efforts, FSS did not cave, adopted S&L's recommendation, and decided that it would *not* (a) seek a stay of the Remand Order, (b) move to extend the automatic stay to AEJ with respect to the Connecticut Litigation, or (c) seek a Bankruptcy Code § 105 stay.[11]

38.   Schwartz adopted S&L's preliminary response to the request of AEJ's attorney to seek a stay of the Remand Order and extension of the automatic stay—and FSS's ultimate decision to adopt S&L's recommendation despite pressure from AEJ. This is another action demonstrating that Schwartz has no predisposition limiting or interfering with his ability to provide unbiased business decision making on behalf of FSS with respect to AEJ. Schwartz took contrary positions

---

[10] These negotiations with AEJ and his counsel were among those referenced by Mr. Battaglia at the September 20 Hearing. Hrg. Tr. 220:19-221:3.
[11] The final decision was reached after additional research into the issue and discussion among all of FSS's legal and financial advisory team. There was some support to take the actions demanded by AEJ, but FSS determined that seeking that relief was not in the best interests of its bankruptcy estate.

to AEJ, after being advised by his counsel, because doing so was in the best interests of FSS's bankruptcy estate.

39.     Schwartz has no predisposition limiting or interfering with Schwartz's ability to make unbiased decisions for FSS on issues where AEJ is adverse, including not assuming that AEJ's asserted indemnity was valid just because that was AEJ's asserted position.

    *iii.*   *$80,000 for AEJ Travel and Security Proposed in Interim Cash Collateral Budget*

40.     The Court noted in its ruling that cash collateral budget providing for approximately $80,000 in travel expenses for AEJ concerned him. *See* Hrg. Tr. 244:5-13. The Court was referring to the proposed order filed on September 13, 2022 [ECF No. 148] (the "September 13 Proposed Cash Collateral Order"). The Court questioned who was negotiating on behalf of the estate with respect to this amount. *See* Hrg. Tr. 244:14-18. Schwartz seeks to present additional evidence showing (a) Schwartz's involvement in the Cash Collateral Budget on behalf of the FSS estate, and (b) that the approximately $80,000 for travel expenses was significantly less than the first estimate of costs that FSS would incur to continue to trial in Connecticut and the reduction was the result of significant negotiations in which Schwartz directed.

41.     To determine FSS's economic or business position with respect to the Connecticut Plaintiffs' Motion for Relief from Stay [ECF No. 15] (the "Connecticut Lift Stay Motion"), Schwartz prepared a framework (the "Connecticut Trial Cost Framework") of the costs that FSS would incur to simultaneously (a) allow AEJ to attend the entire trial and (b) not interfere with the business of FSS. Schwartz prepared this document based on FSS's typical practice regarding travel. Under either scenario, it was immediately clear that this was not practicable. Subject to obtaining permission from FSS to disclose the Connecticut Trial Cost Framework, Schwartz will seek to admit the document as evidence.

42.     To reduce the costs to FSS's bankruptcy estate of allowing the Connecticut Litigation to continue to judgment, FSS's proposed professionals focused their efforts on reducing the amount of time that AEJ would spend at the Connecticut trial rather than conducting his show and generating revenue for FSS. The trial in Connecticut was going to proceed at a minimum against AEJ because FSS had decided that it was not going to seek to extend the automatic stay to AEJ on that matter. As reflected in the August 17, 2022, email from AEJ's bankruptcy attorney attached hereto as Exhibit G, however, AEJ desired to attend the entire Connecticut trial and would not be available to host his show for FSS in that event. This required negotiations with both AEJ and the Connecticut Plaintiffs. In exchange for AEJ giving up his right to be present at the entire trial, FSS decided it was willing to pay AEJ's travel expenses.

43.     These negotiations were conducted largely in connection with the Connecticut Lift Stay Motion. In the agreed order lifting the stay [ECF No. 117] (the "Connecticut Lift Stay Order"), AEJ was required to attend for "three trial days (not counting Mondays, which are not evidence days)." This avoided many of the issues raised by FSS in its response to the Lift Stay Motion and the possibility of having two jury trials in Connecticut that would require additional absences of AEJ from conducting his show for FSS and earning revenue for the bankruptcy estate.[12]

44.     Schwartz submits that this additional evidence would demonstrate that the approximately $80,000 in the September 13 Proposed Cash Collateral Order does not indicate that Schwartz has any predisposition in favor of AEJ or was biased against the FSS estate. Instead, the additional evidence will demonstrate that Schwartz, from the first instance the matter came up,

---

[12] The Connecticut Plaintiffs has taken the position that their claims against FSS are 28 U.S.C. § 157(b)(5) personal injury tort claims requiring a jury trial. If there were two trials, FSS would lose revenue from AEJ needing to attend as a witness twice. As reflected in the Connecticut Trial Cost Framework, FSS estimated that each day AEJ was off the air cost FSS more than $40,000.

carefully navigated a thorny topic, with absolutely no predisposition in favor of AEJ or bias against FSS, with a key employee\co-defendant, keenly focused on protecting the FSS estate economically, and, yet making sure the Connecticut counsel had the necessary resources in order to defend FSS properly in the Connecticut Sandy Hook trial.

## CONCLUSION

45.     For the reasons set out above, Schwartz requests that the Court grant the Motion and set a rehearing on the Schwartz Employment Application to allow additional evidence on the issue of Schwartz's disinterestedness. Even if FSS determines that it should go with alternative CRO and financial advisors to assist the new CRO, Schwartz should be allowed an opportunity to present evidence regarding disinterestedness with respect to the services it provided prior to September 20, 2022.

Dated: October 4, 2022.               **KANE RUSSELL COLEMAN LOGAN**

                                       /s/ *Michael P. Ridulfo*
                                       Michael P. Ridulfo
                                       State Bar no. 1690202000
                                       Federal Bar No. 27086
                                       mridulfo@krcl.com
                                       5151 San Felipe, Suite 800
                                       Houston, Texas 77056
                                       Telephone:  (713) 425-7442
                                       Facsimile:  (713) 425-7700
                                       Counsel for W. Marc Schwartz and Schwartz
                                       Associates, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within 24 hours of the filing, on the parties on the attached service list by U.S.P.S. first class mail.

                                       /s/*Michael P. Ridulfo*
                                       Michael P. Ridulfo

## SERVICE LIST

### Debtor and Counsel

Free Speech Systems, LLC
3019 Alvin Devane Blvd., STE 300
Austin, TX 78741

Attn: Ray Battalia
Law Offices of Raymond W. Battaglia
66 Granburg Cir.
San Antonio, TX 78218

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

Joel Skousen
PO Box 565
Spring City, UT 84662

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

005224

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway. Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 7870

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Attn: Shelby Jordan Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

John D Malone Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite
1400 Houston, TX 77002

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548 Austin, TX 78711-254

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street Suite 1800
Dallas, TX 7520

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln Austin, TX 7870

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

Attn: Elizabeth C. Freeman
Jackson Walker LLP
1401 McKinney St., STE 1900
Houston, TX 77010

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

005225

# Exhibit A

005226

**Forbearance Agreement**
**Summary of Indicative Terms and Conditions**
**Free Speech Systems, LLC.**
**July 10, 2022**

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

**Credit Card Processing Fee:**   The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees.

*[handwritten] 4X ( Four percent) WMS*

**Allocation of Net Sales Proceeds:**

**FSS Inventory**   FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory**   PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

EXHIBIT
8

| | | |
|---|---|---|
| **Warehouse and Related Expenses** | **Fulfillment** | FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory. |

**PQPR Debt**

FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000. Currently, FSS is paying PQPR $11,000 per business day. As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement.

FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens.

**Term:**                     60 Days

**Reservation:**              Subject to revision after implementation based on actual operational results.

Executed this _12_ day of July 2022.

Free Speech Systems, LLC

By: _____

Marc Schwartz, Its Chief Restructuring Officer

PQPR Holdings Limited, LLC

By: _____

David Jones, Its Manager

LLC

By: _____  Solmaz Arly S
      Solmaz Velazquez  Its Manager

# Exhibit B

005230

# Memorandum of Understanding

This Memorandum of Understanding is between ███████████, as Manager, and Free Speech Systems LLC (FSS) and PQPR Holdings LLC (PQPR).

It is agreed that ████████████ will manage all credit card transactions on behalf of FSS and PQPR. ████████████ will perform daily settlements as follows:

    A. ████████████ will first pay the Merchant Account fees as charged by credit card processors.

    B. After deducting credit card processing, remaining funds will be allocated as follows:

    C. funds will be allocated firstly 10 percent to ████████████ for its Services.

    D. Next, 80 percent of the sales of PQPR products will be allocated to PQPR.

    E. ████████████ will pay the sum of $11,000 per calendar day and remit to PQPR Holdings LLC as payment on its prior outstanding balances.

    F. Any remaining funds will be paid to FSS.

This agreement is effective October 6, 2021

Signed:

_____

Free Speech Systems LLC

_____

PQPR Holdings LLC

_____

████████████

# Exhibit C

# EXHIBIT E

August 2, 2022, Transcript of Hearing in Connecticut Action

005233

1

DKT NO:   X06-UWY-CV18046436-S     :   COMPLEX LITIGATION

ERICA LAFFERTY                     :   JUDICIAL DISTRICT WATERBURY
v.                                 :   AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                   :   AUGUST 2, 2022


DKT NO:   X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:   X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES



         BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE



A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY MATT BLUMENTHAL

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS


                              Recorded and Transcribed by:
                              Debbie Ellis
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT  06702

2

1    THE COURT:  We are on the record in the three

2    related Lafftery versus Jones matters.  Lead docket

3    number Waterbury CV186046436.  I'm going to ask counsel

4    to please identify themselves for the record.

5        ATTY. MATTEI:  Good morning, your Honor.  Chris

6    Mattei on behalf of the plaintiffs.  With me is my

7    colleague Matt Blumenthal.

8        THE COURT:  Good morning.

9        ATTY. PATTIS:  Norm Pattis on behalf of Mr. Jones,

10   Free Speech Systems, Judge.  Good morning.

11       THE COURT:  Good morning.

12       ATTY. WILLIAMS:  Good morning, your Honor.  John

13   Williams with a special appearance on behalf of

14   Mr. Jones.

15       THE COURT:  Good morning.  So I think I may be

16   able to avoid the first issue with respect to the

17   objection for the media request.  Mr. Ferraro, have you

18   seen any members of the media here today?

19       THE CLERK:  There's one but nobody who had

20   requested to record.

21       THE COURT:  Okay.  So in light of the fact that no

22   one is here, I can avoid that issue.

23       THE CLERK:  Your Honor, I apologize.  I do think

24   the Connecticut Public Radio person is on his way.  He

25   called me and asked about the address but I don't see

26   him yet.

27       THE COURT:  All right.  I'm not going to delay the

3

1    proceedings for that, so he will not be able to film

2    today.  Okay.

3         So this may be less than five minutes or we may be

4    here all day depending on how this works.  So my first

5    question and this is really a yes or a no or an I don't

6    know.  That's what I want.  I don't want long

7    explanations.  I'm not looking for argument, just a yes

8    or a no or I don't know.  I'll start with Attorney

9    Mattei and then I will ask Attorney Pattis.

10        So my question is, whether the bankruptcy court

11   granted a motion to extend the bankruptcy stay to Alex

12   Jones who has not filed for bankruptcy?  So Attorney

13   Mattei, yes, no or I don't know?

14        ATTY. MATTEI:  No, your Honor.

15        THE COURT:  Okay.  Attorney Pattis, do you agree

16   or disagree with that, sir?

17        ATTY. PATTIS:  Neither.  I don't know is my

18   answer.

19        THE COURT:  Okay.  I'm happy to pass the matter

20   since your client would know, I assume, since you're

21   representing your client.  Would you like me to pass it

22   for a few minutes and we can make a call?

23        ATTY. PATTIS:  He's testifying today.  I tried to

24   reach him yesterday, a per your order and was

25   unsuccessful.  I don't know if I can reach his trial

26   counsel but I'll try.

27        THE COURT:  I know that you had mentioned, I think

4

1    you had reached out to Mr. Stuckel actually since

2    Mr. Ferraro was getting back from his Italy trip, with

3    respect to having bankruptcy counsel use the link to

4    watch it on Microsoft Teams so, I assume, they're

5    available.

6         ATTY. PATTIS:  I assume so too.

7         THE COURT:  So maybe they would be the ones that

8    you could try to reach.  And I just simply want to know

9    whether the bankruptcy court granted a motion to extend

10   the bankruptcy stay to Alex Jones who, to my knowledge,

11   has not filed bankruptcy.

12        ATTY. PATTIS:  I will find out, Judge.

13        THE COURT:  Okay.  So we'll take a five-minute

14   recess.  Thank you.

15        (Whereupon, there was a recess.)

16        THE COURT:  You could be seated.  That was quick,

17   Attorney Pattis.

18        ATTY. PATTIS:  It still took two phone calls.

19        THE COURT:  And the answer?

20        ATTY. PATTIS:  No such motion was filed,

21   therefore, no such motion is granted.

22        THE COURT:  Thank you.

23        So the automatic stay that is in effect as to Free

24   Speech System, LLC who filed for bankruptcy, I believe,

25   on Friday, does not automatically extend to solvent

26   codefendants even where they are similarly legal or

27   factually, so and I don't see that any motion for stay

005237

5

1    has been filed here.

2        I'm going to next turn to the, I have to say

3    untimely cross claim.  I will give Attorney Williams an

4    opportunity to be heard but I do want to start out by

5    saying that it is, everyone has their responsibilities

6    and obligations in this case.  And one of my

7    responsibilities is to maintain the orderly procedure

8    of the court docket and cases and to prevent any

9    interference with the fair administration of justice.

10        And my concern here, Mr. Williams, and I'll give

11    you as much time as you need to respond, is that the

12    cross claim is untimely, improper, and that it delays

13    the trial.  And so I am considering using my statutory

14    authority and inherent authority in sua sponte

15    dismissing or striking the claim at this time.  So I'm

16    happy to have you be heard.

17        I do want to mention one thing before I forget is

18    that your appearance, you're going to need to correct

19    your appearance because your appearance, you didn't use

20    the right form.  There's a specific form that has to be

21    used for limited appearance and that form has different

22    language on it then the standard appearance form that

23    we're all used to.  So, for example, in the limited

24    appearance form you only agree to accept service on

25    your particular issue.  So I do want to tell you that

26    right now you are in for Mr. Jones full force and that

27    you'll need to correct that probably by way of a motion

6

1      or whatever you think is appropriate.

2          But in any event, let me hear you with respect to

3      your cross claim.

4          ATTY. WILLIAMS:  Your Honor, your Honor has raised

5      as I understand it and I apologize my hearing leaves a

6      lot to be desired but as I understand it, your Honor

7      has raised the question of untimeliness and

8      specifically as I look at the docket, there's no notice

9      of closed pleadings.  The case is proceeding as I

10     understand it as a hearing in damages.  It seems to me

11     that the cross claim is completely collateral to that.

12     There should not in any way have an impact on this

13     trial and in deed is the sort of thing that might well

14     be deferred until the end of the trial.

15         So if I have done something, your Honor used the

16     word improper, if I did something that was improper, I

17     can only tell your Honor it was certainly not my

18     intention and I apologize to the court for any offense

19     that I have given to you or inconvenience to anybody

20     else.  It was in no way my intention.

21         THE COURT:  No offense taken but we just need to

22     follow the rules, that's all.  So I raise the issue of

23     the untimeliness being improper and form and the delay

24     that it would work on the trial.  Is there anything

25     else that you wanted to add?

26         ATTY. WILLIAMS:  Well, your Honor, I didn't

27     believe that it was untimely.  But obviously the Free

7

1   Speech Systems I would have expected would oppose that

2   if they felt that it was untimely.  Your Honor, as

3   again said it's improper, I don't understand in what

4   way it would be improper except that I didn't request

5   your permission, which I didn't understand was required

6   and I didn't believe it would have any impact on the

7   case.

8       I have read the motion to strike.  Counsel there

9   indicates that --

10      THE COURT:  You're ahead of me Mr. Williams

11  because I haven't read it but --

12      ATTY. WILLIAMS:  I didn't hear you, your Honor.

13      THE COURT:  I said you're ahead of me because I

14  didn't read the motion to strike because it would now

15  require us to engage in pleading practice, request

16  to -- motion to strike, answer, special defenses,

17  motions for summary judgment and obviously we're down

18  for jury selection today.

19      ATTY. WILLIAMS:  Well, your Honor, all I can say

20  is that I did not intend any -- to do anything

21  improper.  I thought I was proceeding appropriately.

22  If I wasn't, I can only say that I am humbly apologetic

23  to the court.

24      THE COURT:  So I don't -- when I say untimely, and

25  please be seated if you like or remain standing

26  wherever you're most comfortable.  But when I say

27  untimely, it was filed well beyond the close of

8

1    pleadings deadline and the operative scheduling order.
2    I can't even find the last scheduling order, it's so
3    old.  And the deadline for the close of pleadings has
4    long passed.  It was not listed in the joint trial
5    management report which was ordered to be filed.  It
6    wasn't filed when the Jones defendants filed their
7    denials with their notice of defenses and their special
8    defenses and it's obviously filed on the eve of trial.
9        And when I say improper, I don't mean that you,
10   sir, did anything, you know, improperly to offend the
11   court by any means, so please don't think that.  But
12   what you would need to do with such a pleading is file
13   either a request to file the pleading, you know, beyond
14   the deadlines, file a motion with it, file a motion to
15   amend pleadings, something because otherwise, nothing
16   would prevent you from in the middle of evidence, you
17   or anyone else just dropping a pleading in the file and
18   expecting the parties and the court to adjudicate it.
19   So, we can't just have generally what we say with an
20   answer is an answer in cross claim or an answer in
21   counterclaim, certainly there was no answer here given
22   the default but there was the denial and the notice as
23   the defenses and the special defenses and I would have
24   expected it bare minimum to have it filed then.
25       And, you know, with respect to the delay, it would
26   delay the trial as it was filed five days before jury
27   selection.  So I have to say that Mr. Jones is not in

9

1    compliance with his obligations to plead in accordance

2    with our rules of practice and the scheduling order.

3         So pursuant to Connecticut General Statute 52-97

4    and Connecticut Practice Book Section 10-21, the cause

5    of action set forth in the untimely cross claim cannot

6    conveniently be heard with the main complaint.  And the

7    issues raised on the cross claim, even had the cross

8    claim been timely and properly filed, do not arise out

9    of the transaction which is the subject of the

10   plaintiff's complaint, which is required by Practice

11   Book 10-10.

12        For example, one of the basis for relief is an

13   injunction requiring someone from Free Speech Systems

14   to attend the trial.  So in short, it would be

15   impossible to hear and adjudicate the cross claim given

16   that jury selection starts today as it cannot

17   conveniently be heard with the main complaint.

18        So for these reasons, the court directs that the

19   cross claim be deleted or dismissed from this case and,

20   of course, nothing prevents Mr. Jones from filing a

21   separate action and if that does occur in the normal

22   course of business, the parties will be at notice that

23   the court will exercise jurisdiction over that matter

24   and bring it to this docket.  That is the most

25   efficient way to proceed.  But it will not be part of

26   this present case.

27        ATTY. WILLIAMS:  Thank you, your Honor.

10

1      THE COURT:  You're welcome.

2      So I have a couple of housekeeping matters.  I was

3  happy to see that you could agree on the number of

4  alternates which I understand was four and that you had

5  a total of five challenges, but I wasn't sure how you

6  were breaking it down.  Are you doing four and one or

7  three and two?

8      ATTY. MATTEI:  We agree that they be unrestricted,

9  your Honor.

10      THE COURT:  I will not, that I will not agree too.

11  I stick with the statute.  I like that statute.

12      ATTY. MATTEI:  My proposal then, Judge and I --

13      THE COURT:  Why don't you discuss it off the

14  record and then let me know if you have an agreement on

15  it.  Okay.  Thank you.

16      Mr. Pattis, there was one and I didn't pull it up,

17  but there was going to be one late motion in limine.

18  You had an attorney in your office who was not

19  available to file it due to some health issues.  And

20  I'm not sure if that was a motion in limine on behalf

21  of Mr. Jones and Free Speech Systems or just Free

22  Speech Systems because if it is on behalf of Mr. Jones,

23  it's well past filing, so what would you suggest?

24      ATTY. PATTIS:  It was both, but we're not going to

25  file it now.

26      THE COURT:  Okay.

27      ATTY. PATTIS:  He did not get out of the hospital

11

1       yet.

2              THE COURT:  Sorry to hear that.

3              ATTY. PATTIS:  Yeah, as are we.

4          Given the law of the case and the way things seem

5       to be evolving given the motion practice we can address

6       that interest in the other motions that are to be

7       argued later.

8              THE COURT:  Very good.

9              ATTY. PATTIS:  So there will not be another --

10             THE COURT:  And then I looked last night and I

11      thought yesterday was the deadlines for the replies to

12      the objections to the motions in limine, I saw the

13      plaintiffs' replies, are you not filing replies or are

14      you planning on filing them today because they were due

15      yesterday?

16         And again, I don't know if they're just are

17      directed to Free Speech Systems and of course we're not

18      adjudicating that now.

19             ATTY. PATTIS:  I have been advised by bankruptcy

20      counsel that the stay binds my hands as to Free Speech

21      Systems, and that I cannot act on his behalf it would

22      act as his peril.  They would pertain to both, so I

23      took the position that the stay was applicable as to

24      that.  I understand -- I'm here as to your order and I

25      don't mean to be defiant, but I've been told I act at

26      my peril if I act as to Free Speech Systems.

27             THE COURT:  So you don't want to act on behalf of

12

1      Mr. Jones in filing replies since you do represent

2      Mr. Jones and Mr. Jones is a nondebtor and there's no

3      stay at this point?  Listen, I'm not saying that at any

4      point the bankruptcy counsel can't file a motion in

5      bankruptcy court and have the stay extended to

6      Mr. Jones but right now, you're telling me that's why I

7      asked, that's why I started --

8          ATTY. PATTIS:  No, I understand.

9          THE COURT:  -- but there is no stay that extends

10     to Mr. Jones.

11         ATTY. PATTIS:  But there is as to a party that I

12     represent so I feel like I have a conflict at this

13     point, because I'm told I can't act with respect to one

14     and should act with respect to others and now I'm in a

15     position where I've got to parse what to do with

16     respect to each and that strikes me as that sort of

17     1.73 issue that I would need a little bit more time,

18     not an infinite amount of time to address.

19         And, you know, the issue you raised about whether

20     they should file the stay to extend to Mr. Jones that

21     hadn't occurred to me, I'm not a bankruptcy -- I had

22     altercate hands.

23         THE COURT:  Well, I think the law is clear that

24     when one defendant in a case files for bankruptcy it

25     doesn't automatically extend to all other defendants

26     even if they are similarly factually or legally and you

27     would have to move in bankruptcy court to extend the

13

1    stay.

2         Now last time we had this issue when Info Wars and

3    Prison Planet maybe, when they filed for bankruptcy, we

4    had the exact same situation and I believe I entered a

5    very similar order in response to that and then I think

6    what happened and you correct me if I'm wrong, I think

7    that you removed the remaining case to bankruptcy

8    court.  So that it wasn't so much --

9         ATTY. PATTIS:  I understand that.

10        THE COURT:  So here I didn't see and I checked

11   before I came out on the record, I didn't see any

12   removal to bankruptcy court of the pending claims and I

13   didn't see anything about a stay.

14        ATTY. PATTIS:  I was instructed not to file

15   removal papers by bankruptcy counsel for reasons of

16   their own that I didn't inquire as to.  And so I am

17   left in this awkward position now where if we proceed

18   as to Jones but not as to Free Speech that operates

19   almost constructively as a severance and I believe the

20   law is clear that a severance that adversely affects a

21   debtor is prohibited once the debtor is in bankruptcy.

22        So it's my request that and it's my understanding

23   that, I don't know if it's Houston, I don't recall what

24   city in Texas, in the Texas bankruptcy court there's a

25   hearing Friday morning with respect to the plaintiff's

26   emergency motion for relief from stay.

27        THE COURT:  But that emergency motion is a relief

14

1   from stay as to the debtor, Free Speech Systems --

2         ATTY. PATTIS:  Right.

3         THE COURT:  -- we are all on the same page here.

4   Everyone is on the same page.  They're under federal

5   bankruptcy law which, I believe me, respect.  There is

6   an automatic stay as to the debtor, Free Speech

7   Systems, LLC.  If you told me this is why I started

8   asking this question, if you said to me, yes -- because

9   I tried to look last night and I could not access the

10  through Pacer the records or I would have cancelled

11  this if I saw that it was extended.  As I'm

12  understanding it, clearly there's no doubt that there

13  was no extension of that stay to the solvent remaining

14  defendant Mr. Jones, nor has such a motion been filed,

15  so there is an active claim right now against Alex

16  Jones.  There's causes of action and we're down for

17  jury selection.

18        So, I can't, you know, I can't solve for you what

19  instructions you're getting from your client or

20  bankruptcy counsel but I have a remaining claim, but I

21  understand from what you're telling me it's your

22  position, well you can tell me your position why don't

23  you.

24        ATTY. PATTIS:  I'm asking for a recess until a

25  motion is heard on Friday.  I find myself in a position

26  where I cannot satisfy my obligations to both clients.

27  Mr. Jones expects a defense as does Free Speech.

15

1       I am told Free Speech the action will not proceed

2  as to they may or may not have identical interest in

3  every instance but I don't see how I can proceed as to

4  one client and not the other.

5       THE COURT:  So and then let's just hypothetically

6  say that we either didn't pick until Friday and Friday

7  the motion is heard and the motion it's a motion to --

8       ATTY. PATTIS:  For relief from stay.

9       THE COURT:  Okay, let's say that --

10      ATTY. PATTIS:  That's my understanding of it.  I

11  haven't filed it.

12      THE COURT:  So let's say that's denied and so the

13  stay is in effect as to Free Speech System.

14      ATTY. PATTIS:  At this point, Judge, I would be in

15  touch with bankruptcy counsel saying you left me

16  hanging here without a motion for an application as to

17  Jones or a removal, the trial court takes the position

18  that its capable -- that as a matter of law it would be

19  appropriate to proceed with Mr. Jones and I might have

20  to seek independent ethic's counsel advice because I'm

21  starting to feel a 1.73 (inaudible) because I'm now in

22  a position where I can meet the needs of one client but

23  not the other in a proceeding and I've not been in this

24  position before.

25      THE COURT:  Attorney Mattei.

26      ATTY. MATTEI:  Your Honor, what I see Attorney

27  Pattis be doing is asking for making an oral motion for

16

1    continuance for jury selection.  We oppose that motion

2    for continuance.  Mr. Jones is more than adequate

3    represented in bankruptcy court in Houston.  They are

4    well aware of this jury selection.  They actually filed

5    a motion to lift the stay as to the ongoing trial in

6    Texas.  And so they're well aware of the implications

7    that --

8         THE COURT:  So that -- excuse me.  The motion to

9    lift the stay was as to the debtor?

10        ATTY. MATTEI:  As to the debtor Free Speech

11   Systems.  And so they're more than aware of occasions

12   of not moving the stay with respect to Mr. Jones,

13   they've not done that knowing that jury selection is

14   scheduled for today.

15        The bankruptcy, which was filed on Friday,

16   Mr. Pattis has had the weekend and now Monday to

17   investigate the extent to which any conflict prevents

18   him from proceeding today on behalf of Mr. Jones.  But

19   the facts of the case establishes that there is no

20   conflict and there can be no conflict because Mr. Jones

21   and Free Speech Systems are all egos to one another.

22   They have been represented by the same counsel

23   throughout.  There's no suggestion or evidence that any

24   position taken by Mr. Jones here would be adverse to a

25   company that he 100 percent controls, Free Speech

26   Systems.

27        And so there's just no basis to grant a

17

1    continuance here where Mr. Jones is the one that has
2    manufactured this situation on the eve of jury
3    selection to prevent us from going forward.  So we want
4    to proceed today with jury selection.
5        THE COURT:  So here's what I would say, we are
6    going to proceed but if and when a motion is granted in
7    the bankruptcy court, that extends the stay to
8    Mr. Jones, the court needs to be notified immediately
9    and we will cease activity because that would then stay
10   the claim against Mr. Jones as well.  But short of
11   that, listen I suppose Mr. Jones could file for
12   bankruptcy and that would stay the rest of the case
13   under federal law or the bankruptcy court can extend
14   the stay to Mr. Jones.
15       So if either one of those happens, I'm sure you'll
16   let me know immediately and we will stop our
17   proceedings.
18       All right.  So we're going to start jury selection
19   at 10:00.  Just as a reminder please no snapshots or
20   screen shots or whatever you want to call it of the
21   jury confidential jury questionnaires.  Anyone who --
22   so if your clients are here at any point either during
23   jury selection or trial the trial will be in the
24   courtroom next door.
25       But during jury selection and during trial anyone
26   who's seated at counsel table or in the well of the
27   courtroom would have to wait for a recess to leave or

1   you can leave in between jurors if you understand what
2   I'm saying.  I don't want people in the well of the
3   courtroom getting up and leaving in the middle of the
4   voir dire, if they're in the well of the courtroom.
5   Now people in the gallery they can come and go as they
6   please but for trial as well, if we're not in a recess
7   any of your clients or other lawyers that are in the
8   well of the courtroom would have to wait for recess.  I
9   don't want people coming and going.  But if there's any
10  believe me any need for a quick break because someone
11  needs to leave or you have an emergency or whatever,
12  I'm happy to take another recess, so you just let me
13  know and ask for a recess and I'm sure we'll take a
14  recess.  I just don't want any commotion.
15       During the -- I am going to remain on the bench at
16  least for the immediate future.  I don't have any other
17  conflicts right now.  I don't know if that's going to
18  remain the whole time but the juror, potential juror
19  will sit next to me up here.  I don't know if you want,
20  I guess, Mr. Ferraro, maybe we can move the lectern up
21  for the lawyers.
22       THE CLERK:  Wherever counsel wants to.
23       THE COURT:  Why don't you discuss where you want
24  it but I'm telling you now I want you to give the
25  jurors space.  I don't want you leaving that lectern
26  area and clouding the jurors and I'm going to say the
27  same thing for witnesses as well.  So I don't want

19

1    anybody invading their space.

2         So here's what I would say on the replies to the

3    motions in limine by Mr. Jones.  If Mr. Jones wishes,

4    he's not ordered to, he doesn't have to but if he

5    wishes to file replies to the motions in limine, and

6    that was due yesterday, Mr. Jones will have until the

7    end of business tomorrow to file his replies if he

8    wants to.

9         I'm prepared to go on the introduction to the

10   panel.  I have, thank you, I have all the information

11   that you gave us with respect to the parties and the

12   witnesses and so forth.  So I think for the

13   introduction to the panel, you're going to be very

14   brief.  You're just going to simply say who you are and

15   what other lawyers are with you and if you want to

16   mention if you have clients here or not, that's fine.

17   But I don't want to hear anything beyond that, no

18   description of the case.  It's going to be very very

19   brief otherwise I am going to cut you off.  That's not

20   the opportunity to start any further details.

21        All right.  So we will be back right at 10:00 p.m.

22   for jury selection.

23        ATTY. MATTEI:  Your Honor, I'm sorry.  One

24   housekeeping matter.  I sent to Mr. Stuckel this

25   morning a proposed revised description of the case for

26   the court to consider giving to the jury in light of

27   the fact we now only have one defendant for whom we are

20

1    picking.  The initial jointly agreed upon statement

2    referred to both defendants and I sent the revision to

3    Mr. Stuckel.  Attorney Pattis I spoke to him

4    beforehand, he indicated that he objects so I just want

5    to flag the court given that right now we are only

6    picking with respect to Mr. Jones.

7         THE COURT:  Well, I planned on deleting Free

8    Speech Systems in the language as a defendant.  I

9    understand that you're objecting basically, Attorney

10   Pattis, even going forward into the proceeding and such

11   but do you have any suggestions on the proposed

12   language or not?

13        ATTY. PATTIS:  Yes.  I don't believe the court can

14   refer to Free Speech Systems.  I don't think the court

15   can refer to Mr. Jones as acting through Free Speech

16   Systems without adversely affecting Free Speech Systems

17   in violation of the stay, so that's the basis of my

18   disagreement.

19        If the court's going to proceed as to Mr. Jones I

20   think it should delete reference to Free Speech Systems

21   from the proposed joint statement.

22        ATTY. MATTEI:  I just in response regardless of

23   Free Speech Systems status that fact is established as

24   a result of fault not, so there's not any question that

25   that is true to be evidence in the case regardless of

26   whether Free Speech --

27        ATTY. PATTIS:  That will be a litigated issue

21

1    whether he'll be evidence, we think any evidence to

2    that effect would be in violation of the stay because

3    it acts to the detriment of Free Speech Systems while

4    it's --

5         THE COURT:  I think we can be very clear in our

6    preliminary instructions and our jury instructions that

7    this case is proceeding only as to Mr. Jones

8    individually so I'm not concerned that they're going to

9    be confused.  So if you can't come up with your own

10   language I'm more than capable of coming up with my own

11   language.  Okay.

12        ATTY. WILLIAMS:  Your Honor, may I be excused?

13        THE COURT:  Well, Mr. Williams, sure but you're

14   going to have to file --

15        ATTY. WILLIAMS:  A motion to withdraw.

16        THE COURT:  Unless you can somehow assure me as an

17   officer of the court that Mr. Jones retained you solely

18   for the purposes of the cross claim and not for any

19   other reason.  Because I explained to you the issue.

20        ATTY. WILLIAMS:  I understand.

21        THE COURT:  And I don't want to be hasty and make

22   mistakes and informally let you out of the case if in

23   fact that's not true.

24        ATTY. WILLIAMS:  Your Honor, I assure you as an

25   officer of the court that that was the sole purpose

26   that he retained me and I have no other interest in

27   this case whatsoever.

22

1    THE COURT:  All right.  Do you agree with that,

2    Attorney Pattis?

3    ATTY. PATTIS:  I reviewed the papers and I agree.

4    THE COURT:  I'm sorry.

5    ATTY. PATTIS:  I've reviewed the engagement

6    letter, I agree that there's no ambiguity with respect

7    to that.

8    THE COURT:  So your client, Mr. Jones, is not

9    going to object if I informally let Mr. Williams out.

10   ATTY. PATTIS:  On behalf of Mr. Jones, I'll make

11   that representation.

12   THE COURT:  And Attorney Mattei, you don't want to

13   be heard on this, correct?

14   ATTY. MATTEI:  No, your Honor.

15   THE COURT:  All right.  So ordered.

16   ATTY. WILLIAMS:  Thank you, your Honor.

17   THE COURT:  We'll take a recess.

18   (Whereupon, there was a recess.)

19        *              *         *         *              *

20

21

22

23

24

25

26

27

23

```
 1    DKT NO:   X06-UWY-CV18046436-S    :  COMPLEX LITIGATION
 2
      ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY
 3    v.                                :  AT WATERBURY, CONNECTICUT
      ALEX EMRIC JONES                  :  AUGUST 2, 2022
 4

 5    DKT NO:   X06-UWY-CV186046437-S

 6    WILLIAM SHERLACH
      V.
 7    ALEX EMRIC JONES

 8
      DKT NO:   X06-UWY-CV186046438-S
 9
      WILLIAM SHERLACH
10    V.
      ALEX EMRIC JONES
11
                    E L E C T R O N I C
12                  C E R T I F I C A T I O N

13           I hereby certify the electronic version is a true and

14    correct transcription of the audio recording of the

15    above-referenced case, heard in Superior Court, G.A. 4 of

16    Waterbury, Connecticut before the Honorable Barbara N. Bellis,

17    Judge, on August 2, 2022.

18

19           Dated this 2nd day of August, 2022 in Waterbury,

20    Connecticut.

21

22

23

24                            _____

25                               Debbie A. Ellis
                                 Court Recording Monitor
26

27
```

# Exhibit D

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ERICA LAFFERTY; DAVID WHEELER; FRANCINE WHEELER; JACQUELINE BARDEN; MARK BARDEN; NICOLE HOCKLEY; IAN HOCKLEY; JENNIFER HENSEL; JEREMY RICHMAN; DONNA SOTO; CARLEE SOTO-PARISI; CARLOS M. SOTO; JILLIAN SOTO; AND WILLIAM ALDENBERG, Plaintiffs, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Adv. Pro. No. 22-05019 ECF No. 5 |
| WILLIAM SHERLACH, Plaintiff, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | ) ) ) ) ) ) ) | Adv. Pro. No. 22-05020 ECF No. 5 |
| WILLIAM SHERLACH & ROBERT PARKER, Plaintiffs, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | ) ) ) ) ) ) ) | Adv. Pro. No. 22-05021 ECF No. 5 |

## ORDER GRANTING EMERGENCY MOTIONS FOR REMAND

### I.   Introduction

On December 5, 2018, Erica Garbatini f/k/a Erica Lafferty (the "Debtor") filed a Chapter

7 case in this Court, which remains pending.  The Debtor is a plaintiff in the first of the three

above-referenced adversary proceedings, Adv. Pro. No. 22-05019.  On July 29, 2022, Free

Speech Systems, LLC ("FSS"), filed a Chapter 11 petition in the United States Bankruptcy Court

for the Southern District of Texas, Case No. 22-60043, which remains pending. FSS is a defendant in all three of the above-referenced adversary proceedings.

On August 2, 2022, FSS commenced the adversary proceedings in this Court by filing Notices of Removal of three consolidated Connecticut Superior Court actions.[1] On August 3, 2022, the Plaintiffs filed Emergency Motions to Remand the adversary proceedings to the Connecticut Superior Court (the "Motions for Remand"). Among other things, the Motions for Remand assert that FSS filed the Notices of Removal after jury trial began in the Connecticut Superior Court.

FSS filed objections to the Motions for Remand (the "Objections"). The Objections do not dispute that the Notices of Removal were filed after jury selection began. The Objections also do not dispute that a trial in the Connecticut Superior Court is scheduled to begin on September 6, 2022.

An expedited hearing on the Motions for Remand and the Objections was held on August 12, 2022. After consideration of the record in these adversary proceedings, the arguments asserted in the Motions for Remand, the Objections, and advanced by the parties during the hearing, and for the reasons set forth below, the Motions for Remand are GRANTED.

---

[1] This is not the first time the Connecticut Superior Court actions have been removed to this Court. On April 18, 2022, three entities related to FSS—Infowars, LLC, Infowars Health, LLC and Prison Planet TV, LLC (collectively, the "Debtors"), filed Chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas. Also on April 18, 2022, the Debtors filed Notices of Removal of the Connecticut Superior Court actions in this Court (Adv. Pro. Nos. 22-05004, 22-05005, and 22-05006). In connection with the dismissal of the Debtors' bankruptcy cases in the United States Bankruptcy Court for the Southern District of Texas, this Court ordered that the Notices of Removal be withdrawn, which resulted in the Plaintiffs' actions being remanded to the Connecticut Superior Court on June 1, 2022. See, e.g., ECF No. 36 in Adv. Pro. No. 22-05004.

005259

## II.    Jurisdiction

28 U.S.C. § 1452(a) permits a party to remove a claim or cause of action in a civil action to the district court for the district in which such claim or action is pending. FSS asserts that this Court has jurisdiction over the removed cases pursuant to section 1452(a) because of the Debtor's Chapter 7 case. The Plaintiffs do not dispute that this Court has jurisdiction over the removed cases which are now the subject of the adversary proceedings.

Section 1334(b) provides that the district courts have jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases under title 11. This Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. § 157(b)(1) and the District Court's General Order of Reference dated September 21, 1984.

## III.    Discussion

Because the parties do not agree on whether the claims in Connecticut Superior Court actions are core or non-core proceedings, mandatory abstention by this Court under 28 U.S.C. § 1334(c)(2) is not appropriate. *See, e.g., In re National Eastern Corporation*, 391 B.R. 663 (Bankr. D. Conn. 2008). However, permissive abstention may be appropriate under section 1334(c)(1). *Id.* at 669. Furthermore, 28 U.S.C. § 1452(b) specifically address removal of claims related to bankruptcy cases and permits a court to remand a removed action on any equitable ground. 28 U.S.C. § 1452(b).

In general, courts look to the following factors to decide whether to permissibly abstain from a case or to equitably remand a case: (1) the effect on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the complexity of the state law issues; (4) comity; (5) the relatedness/remoteness of the action to the main bankruptcy case; (6) the right to a jury trial; and (7) the prejudice to the involuntarily removed parties. *In re National*

3

005260

*Eastern Corporation*, 391 B.R. 663, 670. The list of factors is non-exclusive and the

determination of whether an equitable ground exists to remand involves an assessment of what

makes sense under the specific facts and circumstances presented to a court. *Id.* at 671.

A review of the first factor, the effect on the efficient administration of the bankruptcy

estate, weighs in favor of remand. A remand will not have a negative effect on the

administration of FSS's bankruptcy estate. The parties dispute whether the Plaintiffs' claim are

core or non-core claims. If the claims are non-core, this Court cannot enter a final judgment on

the Plaintiffs' claims. Regardless of whether the claims are core or non-core, the claims must be

adjudicated, and the Connecticut Superior Court is ready to do so. It is undisputed that jury

selection had already begun when the Notices of Removal were filed and trial is scheduled to

begin on September 6, 2022. A trial of the Plaintiffs' claims in the Connecticut Superior Court

may assist with the administration of FSS's bankruptcy estate and will alleviate the need for

another court to determine if the Plaintiffs' claim are core or non-core. *See e.g., In re National*

*Eastern Corporation*, 391 B.R. at 670. In addition, FSS asserts that remand will have a negative

impact on the administration of its bankruptcy estate because of the costs associated with the trial

of the Plaintiffs' claims. However, FSS is proceeding forward with the administration of its

bankruptcy estate, including recently obtaining an order allowing it to increase its use of cash

collateral based upon increased income due to better than projected sales of products since its

bankruptcy case was filed. *See In re Free Speech Systems LLC*, United States Bankruptcy Court

for the Southern District of Texas, Case No. 22-60043, ECF Nos. 55, 64. For these reasons,

remand will not negatively impact the administration of FSS's bankruptcy estate.

The second factor, the extent to which issues of state law predominate, also weighs in

favor of remand. The Plaintiffs' claims are exclusively based on state law even though, as FSS

4

005261

argues, the claims relate only to damages. *See e.g.*, *In re Granoff*, 242 B.R. 216, 220 (Bank. D. Conn. 1999). Such claims include negligent and intentional infliction of emotional distress, violations of the Connecticut Unfair Trade Practices Act, and defamation. The Defendants' challenges to the sufficiency of the Plaintiffs' claims have not succeeded in the Connecticut Superior Court. Furthermore, the Plaintiffs' claims have been pending before the same judge for more than four years. The Connecticut Superior Court has extensive knowledge and familiarity with the claims and the parties. The docket of the Superior Court actions attached to the Objections demonstrate that there are more than 800 docket entries in the cases and that the Connecticut Superior Court has issued many substantive rulings. The Connecticut Superior Court has acted on all matters that needed to be decided before trial and was overseeing jury selection on August 2, 2022, when the Notices of Removal were filed. Under the circumstances surrounding these adversary proceedings, issues of state law predominate and the Connecticut Superior Court is in the best position to decide the Plaintiffs' state law claims.

The third and fourth factors, the complexity of the state law issues and principles of comity, also weigh in favor of remand. The Plaintiffs' state law claims are extensive and complex. A trial of the claims will require a resolution of factual, legal, and evidentiary issues based on Connecticut law. Despite several attempts by FSS and related entities to remove the actions from the Connecticut Superior Court, the claims are ready to be tried in the Connecticut Superior Court.[2] The claims arise under Connecticut common law and the Connecticut Unfair Trade Practices Act. Both comity and respect for state law supports remanding the actions to the

---

[2] In addition to the prior Notices of Removal filed in this Court, FSS and related entities twice removed the Connecticut Superior Court actions to the United States District Court for the District of Connecticut and on both occasions the actions were remanded to the Connecticut Superior Court. *See, e.g.*, *Lafferty v. Jones* (3:18-cv-01156-JCH) and *Lafferty v. Jones* (3:20-cv-01723-JCH).

005262

Connecticut Superior Court for the interpretation of common law and state statutes. *In re Granoff*, 242 B.R. at 220.

The fifth factor, the relatedness/remoteness of the Connecticut Superior Court actions to the FSS bankruptcy case, also supports remand. The Plaintiffs' claim arose years before FSS filed its Chapter 11 case. As previously noted, FSS does not dispute that it filed the Notices of Removal after jury selection was underway in the Connecticut Superior Court. During a hearing held on August 2, 2022, before jury selection began, the Connecticut Superior Court agreed that jury selection and the trial could not proceed against FSS due to the automatic stay it received when it filed its Chapter 11 case on July 29, 2022. However, the Connecticut Superior Court determined that jury selection and trial could proceed against the Defendant Alex Emric Jones ("Jones"), because FSS has not sought or obtained an order extending the automatic stay to Jones. See ECF No. 5 at 5-8, p. 14-18. The Connecticut Superior Court then proceeded with jury selection as to the claims against Jones and not FSS, supporting the finding that there is a remoteness between the continuation of the Connecticut Superior Court actions and the FSS bankruptcy estate.

The Plaintiffs' right to a jury trial, the sixth factor, additionally supports remand. Although the parties dispute whether the Plaintiffs' claims are core or non-core, this Court cannot conduct a jury trial on non-core claims. In addition, it is clear that the parties do not consent to a jury trial being conducted by this Court. A jury is in the process of being selected in the Connecticut Superior Court. The Plaintiffs' rights to have that process continue in the Connecticut Superior Court should not be disturbed.

The seventh and final factor, the prejudice to the involuntarily removed parties, weighs heavily in favor of remand. The Plaintiffs have been pursuing their claims against FSS and

005263

others for more than four years.  The pursuit of these claims has occurred not only in the

Connecticut Superior Court, but in other courts as well.  On multiple occasions, the Plaintiffs

have had to pursue their claims in the United States District Court for the District of Connecticut,

the United States Bankruptcy Court for the Southern District of Texas, and this Court.  During

jury selection and just weeks before trial is scheduled to begin in the Connecticut Superior Court,

the Plaintiffs were involuntarily removed to this Court.  The Plaintiffs' claims are ready to be

tried in the Connecticut Superior Court.   If remand does not occur, the prejudice to the Plaintiffs

is much greater than any possible prejudice to FSS.

     Upon a review of the circumstances surrounding these adversary proceedings and

consideration of the factors to be analyzed when deciding a motion for remand, the Court finds

that is it appropriate to abstain and remand the adversary proceedings to the Connecticut

Superior Court in accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b).

     Finally, although the Plaintiff seeks an award of fees and costs pursuant to 28 U.S.C. §

1447(c), the Court declines to award fees and costs at this time.

## IV.   <u>CONCLUSION</u>

     Accordingly, it is hereby

**ORDERED:** In accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b), the

Motions for Remand are GRANTED and Adversary Proceedings 22-05019, 22-05020, and 22-

05021 are remanded to the Connecticut Superior Court; and it is further

**ORDERED:**  The Plaintiffs' request for fees and costs pursuant to 28 U.S.C. § 1447(c) is

DENIED; and it is further

7

005264

**ORDERED:** Any pending motions in Adversary Proceedings 22-05019, 22-05020, and 22-05021 are moot due to the remand of the adversary proceedings.

Dated at Bridgeport, Connecticut this 15th day of August, 2022.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

8

005265

# Exhibit E

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Tuesday, August 16, 2022 9:56 AM |
| **To:** | Shelby Jordan; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, and the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

005267

    c.  It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

    d.  Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)  The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

2

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

## Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

005269

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

4

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

# Exhibit F

005272

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Tuesday, August 16, 2022 2:06 PM |
| **To:** | Ray Battaglia; Kyung S. Lee |
| **Cc:** | R. J. Shannon |
| **Subject:** | Re: Isn't this our case in Conn |

Ray and Kyung:  Based on RJ's total rejection of all defenses and all matters filed in Conn I do not think a conference to discuss how to protect the ongoing business is a total waste of time.

> "The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate."

So, after 300 words of negative, I leave it to the Debtors to decide how to keep Alex supporting the efforts.   I'm sure RJ has an answer since Alex will be left to fighting these battles on his own.

Shelby

---

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just

1

005273

uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

    a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

    b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

    c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

    d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee

005274

<klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

3

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

4

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

5

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

005278

# Exhibit G

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Wednesday, August 17, 2022 8:38 AM |
| **To:** | R. J. Shannon; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

RJ - I have been waiting since this email to hear the Debtors Plan when Alex sales go dark because he is in trial in Conn. If you have one, please forward so I may share with Alex. In light of your opinions in your email, this is a critical request.

Shelby

---

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an

1

005280

example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

b.  I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

c.  It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d.  Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)  The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

From: Shelby Jordan <sjordan@jhwclaw.com>
Date: Tuesday, August 16, 2022 at 6:36 AM
To: R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
Subject: Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

005281

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

3

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

## Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

4

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

005285

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22 - 60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| DEBTOR. | § | |

## ORDER GRANTING REHEARING PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Came for consideration the *Motion of W. Marc Schwartz and Schwartz Associates, LLC* (collectively "Schwartz") *Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ W. Marc Schwartz and Schwartz Associates, LLC* (the "Motion"); and it appearing to the Court that notice of the Motion is adequate, appropriate, and sufficient under the circumstances of this case; and it further appearing to the Court that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.     A rehearing (the "Rehearing") on the Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Office; (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer; and (C) Granting Related relief [ECF No 83]  (the "Schwartz Employment Application") shall be held on _____ at __:__ _.m. (Central Time).

2.     The evidence and arguments at the Rehearing shall be limited to (a) whether Schwartz is a "disinterested person" pursuant to 11 U.S.C. § 101(14) and (b) whether the Schwartz Employment Application should be granted in part pursuant to 11 U.S.C. § 327(a).

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11 (Subchapter V)** |
| **FREE SPEECH SYSTEMS LLC,** | § | |
| | § | **Case No. 20-60043 (CML)** |
| **Debtor.** | § | |

**SUPPLEMENTAL DISCLOSURES TO VERIFIED STATEMENT OF**
**SUBCHAPTER V TRUSTEE**
[Relates to #22]

Melissa A. Haselden, duly appointed Subchapter V Trustee ("Trustee") in the captioned case, hereby files these supplemental disclosures to the Verified Statement of Subchapter V Trustee filed at Docket #22 as follows:

1. "Debtor seeks to employ J. Patrick Magill ("Mr. Magill") as CRO in the captioned case. I am currently the Subchapter V Trustee in the unrelated Subchapter V, Chapter 11 case filed by Cypress Creek Emergency Medical Services Association ("CCEMS") under Case No. 21-33733, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Mr. Magill has served as the CRO in the CCEMS bankruptcy case.

2. Also, in the past, at my prior firms of Weycer, Kaplan, Pulaski & Zuber, P.C. and HooverSlovacek, LLP, I worked with Mr. Magill on various, unrelated cases where my firm acted as Debtor's counsel and Mr. Magill acted as CRO to the Debtor, including the following bankruptcy cases:

   - *In re Goldstar Emergency Medical Services, Inc. and Goldstar EMS II, Inc*., Jointly Administered Under Case No. 05-36446 in the Southern District of Texas, Houston, Texas.

1

005287

- *In re Diagnostic Clinic of Houston, P.A.,* Case No. 07-30396 in the Southern District of Texas.

- *In re Apex Katy Pin Oak Medical*, Case No. 12-31848 in the Southern District of Texas

- *In re Victory Medical Center Mid-Cities, LP et al*, Jointly Administered Under Case No. 15-42373 in the Northern District of Texas, Fort Worth Division.

- *In re The Tifaro Group Ltd et al*, Jointly Administered Under Case No. 17-80171 in the Southern District of Texas.

3. I have also worked with Mr. Magill on other unrelated matters as have other attorneys at my prior firms.

4. In 2013-2014, at my prior firm, I also worked on Chapter 11 Case No 13-32101 filed by Mud King Products, Inc. "Mud King") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. My firm represented the Debtor in the Mud King bankruptcy case. During the pendency of the Mud King bankruptcy case, Andino Reynal represented the principal of Mud King in its bankruptcy case.

5. In connection with my expanded duties as Subchapter V Trustee, I plan to seek engagement of counsel to assist me with legal matters in this case.   I plan to retain  the firm Jackson Walker LLP as my counsel, with Elizabeth C. Freeman of Jackson as the lead attorney.   In the past, I have worked on various unrelated cases in which my firm represented debtors in bankruptcy and attorneys from Jackson Walker have represented creditors.  Also, in the past, attorneys at Jackson Walker have occasionally referred potential cases to me.

6. In the past, I also may have worked with some of the parties and creditors who have appeared in captioned case on unrelated cases or matters.

7. None of these connections creates a materially adverse interest to or conflict with the Debtor or its estate.

8. Further, due to the unusual nature of the captioned case and the expanded role of the Subchapter V Trustee, Elyse Farrow, an attorney and member of my firm, Haselden Farrow, PLLC, will assist me in carrying out my required duties.  Ms. Farrow's time will be billed as paraprofessional time at an hourly billing rate of $150.00, which is the firm's standard rate for billing paraprofessional time."

Dated: October 5, 2022                       **HASELDEN FARROW PLLC**

By: */s/ Melissa A. Haselden*
      MELISSA A. HASELDEN
      State Bar No. 00794778
      700 Milam, Suite 1300
      Pennzoil Place
      Houston, Texas 77002
      Telephone: (832) 819-1149
      Facsimile: (866) 405-6038
      mhaselden@haseldenfarrow.com

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

FOR COURT USE ONLY

DUE DATE:

*Please Read Instructions:*

| 1. NAME Jonathan O'Connell | 2. PHONE NUMBER (202) 360-3567 | 3. DATE 10/4/2022 |

| 4. DELIVERY ADDRESS OR EMAIL jonathan.oconnell@washpost.com | 5. CITY Washington | 6. STATE DC | 7. ZIP CODE 20011 |

| 8. CASE NUMBER 22-60043 | 9. JUDGE Christopher Lopez | DATES OF PROCEEDINGS |
| | | 10. FROM 8/12/2022 | 11. TO 9/20/2022 |

| 12. CASE NAME Free Speech Systems, LLC | LOCATION OF PROCEEDINGS |
| | 13. CITY Houston | 14. STATE Texas |

15. ORDER FOR

| [ ] APPEAL | [ ] CRIMINAL | [ ] CRIMINAL JUSTICE ACT | [X] BANKRUPTCY |
| [ ] NON-APPEAL | [ ] CIVIL | [ ] IN FORMA PAUPERIS | [ ] OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| [ ] VOIR DIRE | | [ ] TESTIMONY (Specify Witness) | |
| [X] OPENING STATEMENT (Plaintiff) | 8/12/2022 & 9/20/2022 | | |
| [X] OPENING STATEMENT (Defendant) | 8/12/2022 & 9/20/2022 | | |
| [X] CLOSING ARGUMENT (Plaintiff) | 8/12/2022 & 9/20/2022 | [ ] PRE-TRIAL PROCEEDING (Spcy) | |
| [X] CLOSING ARGUMENT (Defendant) | 8/12/2022 & 9/20/2022 | | |
| [X] OPINION OF COURT | 8/12/2022 & 9/20/2022 | | |
| [ ] JURY INSTRUCTIONS | | [X] OTHER (Specify) | |
| [ ] SENTENCING | | Entirety of both hearings | 8/12/2022 & 9/20/2022 |
| [ ] BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | [ ] | [ ] | NO. OF COPIES | | |
| 14-Day | [ ] | [ ] | NO. OF COPIES | | |
| EXPEDITED | [ ] | [ ] | NO. OF COPIES | | |
| 3-Day | [ ] | [X] | NO. OF COPIES | | |
| DAILY | | | NO. OF COPIES | | |
| HOURLY | [ ] | [ ] | NO. OF COPIES | | |
| REALTIME | | | | | |

CERTIFICATION (18. & 19.)
By signing below, I certify that I will pay all charges (deposit plus additional).

ESTIMATE TOTAL

0.00

| 18. SIGNATURE Jonathan O'Connell | PROCESSED BY |
| 19. DATE 10/4/2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY |
| ORDER RECEIVED | | |

| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

005290

DISTRIBUTION:     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FREE SPEECH SYSTEMS LLC, | ) Case No. 22-60043 |
| | ) |
| Debtor. | ) |
| | ) |

**<u>STIPULATION AND AGREED ORDER</u>**

Free Speech Systems, LLC ("Debtor") initiated the bankruptcy case on July 29, 2022 via the filing of a voluntary chapter 11 petition.  Alex E. Jones is the sole member of the Debtor ("Jones").  Melissa Haselden is the duly qualified and acting Subchapter V Trustee (the "Trustee").  PQPR Holdings Limited, LLC asserts a claim secured by substantially all assets of the Debtor ("PQPR"). Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ( the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "Connecticut Plaintiffs") (together the "Sandy Hook Families").  The Debtor, Jones, the Trustee, PQPR, and the Sandy Hook Families are referred to as the "Parties".

Upon the request and agreement of the Parties, it is ORDERED THAT.

1.      Judge Marvin Isgur is appointed as a mediator in this case. At all times in the performance of his mediation duties, Judge Isgur will be acting in his official capacity as a United States Bankruptcy Judge, with all of the privileges and immunities of a United States Bankruptcy Judge.

2.      The Court adopts Section S of the Procedures for Complex Cases in the Southern District of Texas (Effective August 1, 2021).

3.      <u>Effects of Mediation on Pending Matters</u>. Unless otherwise ordered by the Court, the assignment to mediation does not delay or stay discovery, pretrial hearing dates or trial schedules.

4.      <u>Time and Place of Mediation</u>. The mediator will schedule a time and place for the mediation and any pre-mediation conferences.

5.      <u>Submission Materials</u>. Each party must submit directly to the mediator such materials (the "Submission") in form and content as the mediator directs. Prior to the mediation, the mediator may talk with the participants to determine what materials would be helpful. The Submission must not be filed with the Court.

6.      <u>Protection of Information Disclosed at Mediation</u>. The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties in the course of the mediation. No person may rely on or introduce as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort, including but not limited to: (A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute; (B) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator, (C) proposals made or views expressed by the mediator; (D) statements or admissions made by a party in the course of the mediation; and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation. Without limiting the foregoing, the parties are bound by (i) FED. R. EVID. 408, and (ii) any applicable federal or state statute, rule, common law or judicial precedent relating to the privileged nature of settlement discussions, mediations or other alternative dispute resolution procedures. Information otherwise discoverable or admissible in evidence does not become exempt from discovery, or inadmissible in evidence, merely by being used by a party in the mediation.

7.      <u>Discovery from Mediator</u>. The mediator may not be compelled to disclose to the Court or to any person any of the records, reports, summaries, notes, communications or other documents received or made by the mediator while serving in such capacity. The mediator may not testify or be compelled to testify regarding the mediation in connection with any arbitral, judicial or other proceeding. The mediator will not be a necessary party in any proceedings relating to the mediation. Nothing contained in this paragraph prevents the mediator from reporting (i) the status, but not the substance, of the mediation effort to the Court; or (ii) whether a party failed to participate in good faith in the mediation.

8.      <u>Protection of Proprietary Information</u>. The parties, the mediator and all mediation participants shall protect proprietary information.

9.      <u>Preservation of Privileges</u>. The disclosure by a party of privileged information to the mediator does not waive or otherwise adversely affect the privileged nature of the information.

10.     <u>Service of Process</u>. No party may be served with a summons, subpoena, notice or other pleading during the mediation or at the location where the mediation is occurring.

11.     At least one representative with full settlement authority for each of Parties shall attend the mediation to occur with Judge Isgur at a date agreed upon by the Judge Isgur and the Parties.

12.     The scope, location, time and procedures for the mediation will be determined by Judge Isgur, following such consultation with the Parties as he deems appropriate.


SIGNED _____


_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

AGREED

/s/ *Shelby A. Jordan*
Shelby A. Jordan (TX State Bar # 11016700)
JORDAN & ORTIZ, P.C.
500 North Shoreline Blvd, Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com Copy to: cmadden@jhwclaw.com

**Counsel for Alex E. Jones**

/s/ *Raymond W. Battaglia*
Raymond W. Battaglia (TX State Bar # 01918055)
Law Offices of Raymond W. Battaglia
66 Granburg Circle
San Antonio, Texas 78218
Telephone: 210-601-9405
Email: rbattaglialaw@outlook.com

**Counsel for Free Speech Systems, LLC**

/s/ *Stephen W. Lemmon*
Stephen W. Lemmon (TX State Bar # 12194500)
1801 South Mopac Expressway, Ste. 320
Austin, Texas 78746
Telephone: (512) 236-9900
Facsimile: (512) 236-9904
Email: lemmon@slollp.com

**Counsel for PQPR Holdings Limited, LLC**

/s/ *Elizabeth Freeman*
Elizabeth Freeman (TX State Bar # 24009222)
**JACKSON WALKER LLP**
1401 McKinney Suite 1900
Houston, TX 77010
Federal I.D. 24564
Telephone: 713-752-4328
Facsimile: 713-752-4221
Email: efreeman@jw.com

**Counsel for Melissa Haselden, subchapter V trustee**

(Signatures Continued on Next Page)

/s/ *Jarrod B. Martin*
Jarrod B. Martin (TX State Bar # 24070221)
**CHAMBERLAIN HRDLICKA**
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone: 713.356.1280
Facsimile: 713.658.2553
Email: jarrod.martin@chamberlainlaw.com

**Counsel for Neil Heslin, Scarlett Lewis, Leonard Pozner,
Veronique De La Rosa, and Marcel Fontaine**


/s/ *Ryan E. Chapple*
Ryan E. Chapple (TX State Bar # 24036354)
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: 512-477-5000
Facsimile: 512-477-5011
Email: rchapple@cstrial.com

**Counsel for David Wheeler, Francine Wheeler,
Jacqueline Barden, Mark Barden, Nicole Hockley,
Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi,
Carlos M. Soto, Jillian Soto-Marino, William Aldenberg,
William Sherlach, and Robert Parker**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      A hearing (the "Hearing") is set for October 12, 2022, at 10:00 a.m. (prevailing Central Time) before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 401, 515 Rusk, Houston, TX  77002 (the "Court"), to consider the following matter:

**EMERGENCY APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT OF PATRICK MAGILL AS CHIEF RESTRUCTURING OFFICER AND (B) GRANTING RELATED RELIEF**

2.      Parties may attend the Hearing in person or electronically. Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GOTOMEETING platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JUDGELOPEZ". Click the settings icon in the upper right corner and enter your name under the personal information setting.

3.      Parties are encouraged to review the Court's procedures for telephonic appearances located on the Court's website at: https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-christopher m lopez

4.      The Court has invoked the protocol outlined in General Order 2020-4, as invoked by General Orders 2010 and 2020-10a and extended by General Order 2020-11. These orders may be found at: https://www.txs.uscourts.gov/bankruptcy/genord  Therefore, all persons may appear electronically via audio and video at the Hearing using the Court's electronic conference systems.

5.      Any exhibit offered by the Debtor will be filed on the Court's docket. Additionally, the Debtor may have demonstrative exhibits to aid in its presentation to the Court, copies of which may be obtained by any party by sending a request to the undersigned counsel to the Debtor at the email addresses listed below.

6.      If any party wishes to offer exhibits, these exhibits should be filed with the Clerk of the Court using the Court's CM/ECF system. Each exhibit should be filed as a separate attachment to an Exhibit List in compliance with Bankruptcy Local Rule 9013 and General Order 2020-04.

7.      Witnesses presented by the Debtor may appear in person or via audio and video

connection. Any person wishing to examine the witness will be permitted to do so during the hearing via audio and/or video, subject to approval of the Court.

Respectfully submitted this October 7, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com

By:  */s/ Raymond W. Battaglia*
     Raymond W. Battaglia
     Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN POSSESSION**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail on October 7, 2022, to the parties on the attached service list

*/s/ Raymond W. Battaglia*
Raymond W. Battaglia

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001
Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln
Austin, TX 78703

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002

The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065

John D Malone
Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street
Suite 1800
Dallas, TX 75201

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC,** | § | |
| | § | **Case No. 22-60043 (CML)** |
| Debtor. | § | |

**PQPR HOLDINGS LIMITED, LLC'S WITNESS AND EXHIBIT LIST FOR
OCTOBER 12, 2022 HEARING**

PQPR Holdings Limited, LLC ("PQPR"), the secured creditor of the Debtor and a party-in-interest, respectfully submits this Witness and Exhibit List for the hearing scheduled for October 12, 2022:

**WITNESS LIST**

1. Robert Roe
2. David Jones
3. Any witness identified by any other party

**EXHIBIT LIST**

| Exhibit No. | Description |
|---|---|
| PQPR-1 | PQPR August 13, 2020 Note, Exh 4 to Dkt. No. 26 |
| PQPR-2 | Security Agreement, Exh 5 to Dkt. No. 26 |
| PQPR-3 | PQPR November 10, 2021 Note, Exh 6 to Dkt. No. 26 |
| PQPR-4 | PQPR UCC-1 Financing Statement, Exh 7 to Dkt. No. 26 |
| PQPR-5 | PQPR Forbearance Term Sheet, Exh 8 to Dkt. No. 26 |
| PQPR-6 | 13 Week Budget, Exh 9 to Dkt. No. 26 |
| PQPR-7 | Interim Cash Collateral Budget, Exh 10 to Dkt. No. 26 |
| PQPR-8 | 2nd Interim Cash Collateral Order and Budget, Dkt. No. 98 |
| PQPR-9 | 3rd Interim Cash Collateral Order and Budget, Dkt. No. 151 |
| PQPR-10 | PQPR Proof of Claim, Claim No. 11 |
| | |
| | Any exhibits offered by any other party |

Dated: October 10, 2022

Respectfully submitted,

STREUSAND, LANDON & OZBURN, LLP

By:  /s/Stephen W. Lemmon
Stephen W. Lemmon
Texas Bar. No. 12194500

005302

STREUSAND, LANDON, OZBURN &
LEMMON, LLP
1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746
Telephone: (512) 236-9900
Facsimile: (512) 236-9904
lemmon@slollp.com
**ATTORNEYS FOR
PQPR HOLDINGS LIMITED, LLC**

## CERTIFICATE OF SERVICE

       I hereby certify that on October 10, 2022, the foregoing document was served via electronic mail and/or this Court's ECF notification system on the parties registered to receive such notification. I further certify and a true and correct copy of the foregoing was sent via email or United States first-class mail to the following parties:

Raymond W. Battaglia
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
rbattaglialaw@outlook.com
*Counsel to the Debtor and Debtor-In-Possession*

Kyung S. Lee
R. J. Shannon
**SHANNON & LEE LLP**
700 Milam Street, STE 1300
Houston, Texas 77002
klee@shannonleellp.com
rshannon@shannonleellp.com
*Proposed Counsel to the Debtor and Debtor-In-Possession*

Avi Moshenberg
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
E: AVi.Moshenberg@mhllp.com
*Counsel for the Texas Plaintiffs*

2

Jarrod B. Martin
**CHAMBERLAIN, HRDLICKA, WHITE,**
**WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
E: jarrod.martin@chamberlainlaw.com
***Bankruptcy Counsel for the Texas Plaintiffs***

Ryan E. Chapple
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
Email: rchapple@cstrial.com

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, Texas 77581
Email: rww@bymanlaw.com
***Bankruptcy Counsel for Connecticut Plaintiffs***

Melissa Haselden
Subchapater V Trustee
700 Milam, Suite 1300
mhaselden@haseldenfarrow.com
***Trustee***

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave STE 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov
***U.S. Trustee***

*/s/ Stephen W. Lemmon*
Stephen W. Lemmon

3

005304

# PROMISSORY NOTE

$29,588,000.00                    Austin, Texas                    August /3 , 2020

THIS PROMISSORY NOTE (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (**"Maker"**) and PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (**"Payee"**).

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty Nine Million Five Hundred Eighty-Eight Thousand and 00/100 Dollars ($29,588,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided hereinbelow.

1.    **Payment of Principal and Interest.**

(a)    Interest, as provided below, is due and payable annually on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) until August 1, 2050 (the **"Maturity Date"**), when the entire amount of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"**), then such payment shall be due on the Business Day next succeeding the payment date.

(b)    The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest on amounts advanced under this Note at the lesser of (i) **[one and 75/100 percent (1.75%)]** per annum (**"Contract Rate"**); (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

2.    **Maximum Interest Rate.** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in

EXHIBIT

4

exhibitsticker.com

the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until payment in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

3. **Prepayment.** Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

4. **Waiver.** Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

5. **Amendments.** Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

6. **Events of Default.** The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered

005306

against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

      **7.**    **Remedy.** Upon the occurrence of payment default as provided paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of thirty (30) days' notice and opportunity to cure, the entire principal amount and accrued interest of the Note then outstanding shall become immediately due and payable.

      **8.**    **Governing Law and Venue** . This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

      **9.**    **Attorneys' Fees and Expenses** In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee, reasonable fees and costs, including attorneys' fees and expenses of colletion.

      EXECUTED to be effective as of the date first above written.

MAKER:

Alexander E. Jones
Managing Member
Free Speech Systems, LLC

005307

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the **"Security Agreement"**) is entered into effective as of August 2, 2020 (the **"Effective Date"**) by and between PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (the **"Secured Party"**) and Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (the **"Debtor"** or the **"Company"**).

Section I.   <u>CREATION OF SECURITY INTEREST</u>

The Debtor hereby grants to the Secured Party a security interest in the Collateral described in Section II of this Security Agreement to secure performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the "**Note**") and any and all other obligations of Debtor to Secured Party of any kind or character, now owed or hereafter arising (collectively, the **"Obligations"**). Any capitalized term herein not specifically defined will have the meaning as defined in the limited liability company agreement of the Secured Party.

Section II.   <u>COLLATERAL</u>

In order to secure the payment when due of any and all Obligations, the Debtor hereby pledges to the Secured Party and grants to the Secured Party a security interest in the following collectively, (the **"Collateral"**):

(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and

(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

The Secured Party is hereby granted a first priority lien and security interest in the Collateral to secure the Obligations. Debtor authorizes Secured Party to file a financing statement describing the Collateral in each and every jurisdiction necessary to perfect the

EXHIBIT

5

security interest and lien granted herein.

Section III.    PAYMENT OBLIGATIONS OF THE DEBTOR

1.    Debtor is not authorized to sell, convey, dispose of encumber or dispose of the Collateral without Secured Party's agreement or until the Obligations are paid in full. The Debtor will account fully and faithfully to the Secured Party for proceeds from disposition of the collateral in any manner and will pay or turn over promptly in cash, negotiable instruments, drafts, assigned accounts or chattel paper, all the proceeds from each sale to be applied to the Debtor's Obligations to the Secured Party, subject if other than cash, to final payment or collection. Application of such proceeds to Obligations of the Debtor will be in the sole discretion of the Secured Party, provided such application of proceeds is made by the Secured Party in a reasonable manner.

2.    The Debtor will pay to the Secured Party on demand all expenses and expenditures, including reasonable attorney's fees and other legal expenses incurred or paid by the Secured Party in exercising or protecting its interests, rights and remedies under this Security Agreement.

3.    The Debtor will pay immediately, without notice, the entire unpaid Obligations of the Debtor to the Secured Party whether created or incurred pursuant to this Security Agreement or otherwise, upon the Debtor's default under Section V of this Security Agreement.

4.    Delivery of the Collateral.

(a)    All certificates and instruments evidencing or representing the Collateral (if any) will be delivered to the Secured Party upon the execution and delivery of this Security Agreement. All other certificates and instruments constituting, evidencing or representing the Collateral from time to time will be delivered to the Secured Party promptly upon the receipt thereof by and/or on behalf of the Debtor. All such certificates and instruments will be held by or on behalf of the Secured Party pursuant hereto, and will be delivered to the Secured Party in suitable form for transfer by delivery or will be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.

(b)    If the Debtor receives, by virtue of its being or having been an owner of any Collateral, any (i) certificate, promissory note or instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for the Collateral, or (iii) distributions on dissolution, in total liquidation or from capital, capital surplus or paid-in surplus, the Debtor will receive such certificate, promissory note, instrument, payment or distribution in trust for the benefit of the Secured Party, will segregate it from the Debtor's other assets and will deliver it forthwith to the Secured Party in the exact form received, with any necessary endorsement and assignment duly executed in blank, to be held by the Secured Party as Collateral and as additional collateral security for the Obligations.

Section IV.    DEBTOR'S REPRESENTATION, WARRANTIES AND AGREEMENTS

2

005309

The Debtor makes the following representations, warranties and agreements:

1.      The pledge of the Collateral creates a valid and perfected first priority security interest in the pledged Collateral securing payment of the Obligations.

2.      The Debtor will, at its own expense,, do, make, procure, execute and deliver all acts, things, writings and assurances as the Secured Party may at any time request to protect, assure or enforce its interests, rights and remedies created by, provided in or emanating from this Security Agreement.

3.      The Debtor will sign and execute alone or with the Secured Party a Financing Statement and any and all other documents requested by Secured Party  for perfection of the lien on the Collateral.

Section V.      EVENTS OF DEFAULT

The Debtor will be in default under this Security Agreement upon the happening of any condition or event set forth below (herein called an **"Event of Default"**):

1.      The Debtor's failure to pay when due any Obligations secured by this Security Agreement;

2.      Default by the Debtor in punctual performance of any of the obligations, covenants, terms or provisions contained or referred to in this Security Agreement or the Note;

3.      Any warranty, representation or statement contained in this Security Agreement or made or furnished to the Secured Party by or on behalf of the Debtor in connection with this Security Agreement or to induce the Secured Party to make a loan to Debtor proves to have been false in any respect when made or furnished;

4.      Loss, theft, sale (except as authorized in this Security Agreement) or encumbrance to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or

5.      The Debtor's dissolution, termination of existence, insolvency or business failure; the appointment of a receiver of all or any part of the property of the Debtor; an assignment for the benefit of creditors by the Debtor; the calling of a meeting of creditors of the Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against the Debtor.

6.      The Debtor shall have entered against it any judgment, arbitration award, fine or penalty for an amount in excess of $500,000, and such judgment, arbitration award, fine or penalty is not stayed or superseded within 30 days of entry.

Section VI.      SECURED PARTY'S RIGHTS AND  REMEDIES

A.      Rights Exclusive of Default.

1.      This Security Agreement, the Secured Party's rights hereunder or the Obligations

3

PQPR-2
005319

hereby secured may be assigned by Secured Party, and in any such case, the assignee will be entitled to all of the rights, privileges and remedies granted in this Security Agreement to the Secured Party.

2.     Upon the request of the Secured Party at any time, the Debtor will execute, sign, endorse, transfer or deliver in the name of the Debtor any other documents, necessary to perfect the security interest and obligations created by this Security Agreement.

3.     At its option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor agrees to reimburse the Secured Party on demand for any payment made, or expense incurred by the Secured Party pursuant to the foregoing authorization.

4.     Debtor will permit Secured Party, by its representatives and agents (a) to inspect the Collateral, (b) to examine and make copies of the records of Debtor relating to the Collateral, and (c) to discuss the Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers, employees, and accountants, all at such reasonable times and intervals as Secured Party may determine, and all at such Debtor's expense.

5.     Debtor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Secured Party such reasonable reports relating to the Collateral at such intervals as Secured Party shall from time to time request.  Debtor will give prompt notice in writing to Secured Party of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral in the aggregate amount of $100,000.00 or more per calendar year.

B.     <u>Rights in Event of Default</u>

1.     Upon the occurrence of an Event of Default, Secured Party, in its sole discretion, may demand that all payments and distributions made to Debtor upon or with respect to the Collateral shall be paid and delivered to Secured Party, and Debtor agrees to take all such action as Secured Party may deem necessary or appropriate to cause all such payments and distributions to be made to Secured Party.  Secured Party shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Secured Party.  Such issuer shall be fully protected in relying on the written statement of Secured Party that it then holds a security interest which entitles it to receive such payments and distributions. Any and all money and other property paid over to or received by Secured Party hereunder shall be retained by Secured Party as additional collateral hereunder and may be applied by Secured Party to payment of the Obligations in such manner and order as Secured Party may elect in its sole discretion.

2.     In addition, Secured Party is entitled to exercise any and all contractual rights provided in this Security Agreement or any other loan document between Debtor and Secured Party, and any and all legal rights and remedies available to a secured party (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement.

3.     Secured Party is also entitled to, without notice, sell, lease, assign, grant an option

4

005311

or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, credit or for future delivery, and upon such terms as Secured Party may deem commercially reasonable. Neither Secured Party's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale. Debtor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Debtor at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made. Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. Subject to the provisions of applicable law, Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Secured Party may further postpone such sale by announcement made at such time and place.

4.     Debtor waives (to the extent permitted by law) all rights of redemption, stay, and/ or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereinafter enacted.

5.     Further, Secured Party may at any time after the occurrence of an Event of Default require, in its sole discretion and with notice to Debtor, that any receivables, as described in Section II above, be paid directly to Secured Party. In such event, Debtor shall, and shall permit Secured Party to, promptly notify the parties that owe the receivables to Debtor of Secured Party's interest therein and direct such parties to make payment of all amounts then or thereafter due directly to Secured Party. Upon receipt of any such notice from Secured Party, Debtor shall thereafter hold in trust for Secured Party, all amounts and proceeds (as such term is defined in *Section 9.102(a)(65)* of the UCC) received by it with respect to the receivables and immediately and at all times thereafter deliver to Secured Party all such amounts and proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements. Secured Party shall hold and apply funds so in such manner and order as Secured Party may elect in its sole discretion. If after the occurrence of an Event of Default, any party owing receivables fails or refuses to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Secured Party shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Debtor agrees that Secured Party may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any receivable, accept in full payment of any receivable such amount as Secured Party in its sole discretion shall determine or abandon any receivable, and any such action by Secured Party shall be commercially reasonable so long as Secured Party acts in good faith based on information known to it at the time it takes any such action. Regardless of any other provision hereof, however, Secured Party shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone except Debtor to account for funds that it shall actually receive hereunder.

6.     Debtor will reimburse Secured Party for all reasonable expenses incurred by Secured Party in taking ownership of the Collateral, including payment of Secured Party's

5

PQPR-2

reasonable attorney's fees and legal expenses.

7.    The Secured Party may remedy any default and may waive any default without waiving any other prior or subsequent default.

8.    Upon request of Secured Party after an Event of Default, Debtor shall execute and deliver to Secured Party irrevocable lockbox agreements in the form provided by or otherwise acceptable to Secured Party, which agreements shall be accompanied by an acknowledgment by the bank where the lockbox is located of the lien of Secured Party granted hereunder and of irrevocable instructions to wire all amounts collected therein to a special collateral account at Secured Party.

9.    The remedies of the Secured Party hereunder are cumulative, and the exercise of any one or more of the remedies provided for herein will not be construed as a waiver of any of the other remedies of the Secured Party.

Section VII.   <u>ADDITIONAL AGREEMENTS</u>

1.    **"Secured Party" and "Debtor,"** as used in this instrument, include the heirs, executors or administrators, successors, representatives, receivers, trustees and assigns of those parties.

2.    No delay or omission of Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Secured Party and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Secured Party until the Secured Obligations have been paid in full.

3.    Should any Collateral come into the possession of Secured Party, Secured Party may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral. Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Secured Party in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Contract Rate (as defined in the Note) until repaid and, together with such interest, shall be payable by Debtor to Secured Party upon demand and shall become part of the secured Obligations. However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Debtor, and Secured Party shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to the Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

6

005313

4.     Except to the extent expressly otherwise provided herein and to the fullest extent permitted by applicable law, Debtor waives (a) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have; (b) with respect to any Collateral that is comprised of obligations, presentment and demand for payment, protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

5.     Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

6.     Debtor Remains Liable.   Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and Obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

7.     NO RELEASE OF DEBTOR.   THE OBLIGATIONS OF DEBTOR UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED OR TERMINATED, NOR SHALL DEBTOR BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (until the Obligations have been indefeasibly paid in full), including:

(a)     (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Obligations;

(b)     (i) any failure to obtain, (ii) any release, composition or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Note or other loan documents between Debtor and Secured Party;

(c)     (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any

7

PQPR-2
005314

release, compromise, settlement or extension of the time of payment of any Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any lien upon, (iv) any subordination of any lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of any lien or intended lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

**(d)** any termination of or change in any relationship between Debtor and Secured Party;

**(e)** any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of or other indulgence with respect to, any right, remedy or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Secured Party in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

**(f)** ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF DEBTOR UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF DEBTOR HEREUNDER OR DISCHARGE DEBTOR FROM ANY OBLIGATION HEREUNDER.

**8.** Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

**9.** Further, notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the Obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**10.** The section headings appearing in this instrument have been inserted for convenience only and will be given no substantive meaning or significance whatever in

PQPR-2
005315

construing the terms and provisions of this instrument. Terms used in this instrument which are defined in the Texas Uniform Commercial Code are used with the meanings as therein defined.

11.  The law governing this secured transaction will be that of the State of Texas in force at the date of this instrument. Venue for any dispute arising out of this Security Agreement will be in the state or federal courts located in Travis County, Texas.

12.  Debtor will not create, incur, or suffer to exist any lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) other liens permitted in writing by the Secured Party.

13.  The unenforceability of any provision of this Security Agreement will not affect the enforceability or validity of any other provision.

14.  This Security Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts taken together will constitute but one and the same instrument.

15.  THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED as of the Effective Date.

**DEBTOR:**

Free Speech Systems, LLC

Alexander E. Jones, Managing Member

**SECURED PARTY:**

PQPR Holdings Limited, LLC

David R. Jones, Manager

9

PQPR-2
005316

# PROMISSORY NOTE

$25,300,000.00                    Austin, Texas                    November 10, 2021

**THIS PROMISSORY NOTE** (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (**"Maker"**) and PQPR Holdings Limited, LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701 (**"Payee"**).

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty-Five Million Three Hundred Thousand and 00/100 Dollars ($25,300,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided herein below.

## 1. Payment of Principal and Interest; Security

**(a)** Principal and Interest (as provided below), are due and payable in annual installments of $1,939,644.81 on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) with the final payment being due and payable on November 10, 2036 (the **"Maturity Date"),** when the remaining balance of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"),** then such payment shall be due on the Business Day next succeeding the payment date.

**(b)** The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest at the lesser of (i) [**one and 80/100 percent (1.80%)**] per annum (**"Contract Rate"**); (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

**(c)** This Note is secured by a Security Agreement executed by Maker dated August 13, 2020 and evidenced by a UCC-1 recorded with the State of Texas on November 18, 2020.

2. **Maximum Interest Rate -** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be

EXHIBIT

6

PQPR-3

005317

paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until paid in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

**3. Prepayment –** Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

**4. Waiver -** Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

**5. Amendments -** Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

**6. Events of Default -** The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

**7. Remedy -** Upon the occurrence of payment default as provided paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of thirty (30) days' notice and opportunity to cure, the entire principal amount and accrued interest of the Note then outstanding shall become immediately due and payable.

PQPR-3

005318

**8. Governing Law and Venue** – This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

**9. Attorneys' Fees and Expenses** – In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee reasonable fees and costs, including attorneys' fees and expenses, of collection.

EXECUTED to be effective as of the date first above written.

**MAKER:**

Free Speech Systems, LLC

By _____

Alexander E. Jones, Manager

**ACKNOWLEDGEMENT BY PAYEE:**

PQPR Holdings Limited, LLC

By _____

David R. Jones, Manager

PQPR-3
005319

**UCC FINANCING STATEMENT**

**FOLLOW INSTRUCTIONS**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Acuity CxO LLC 5122929690 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| Acuity CxO LLC |
| 219 Black Wolf Run |
| Austin, TX 78738 |
| USA |

**FILING NUMBER:** 20-0058072731
**FILING DATE:** 11/18/2020   02:06 PM
**DOCUMENT NUMBER:** 1008390830002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | Free Speech Systems LLC | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3005 South Lamar Blvd, Suite D109-317 | Austin | TX | 78704 | USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | PQPR Holdings Limited LLC | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 100 Congress Avenue, 18th Floor | Austin | TX | 78701 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
(2)all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box. |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

EXHIBIT 7  exhibitsticker.com

PQPR-4

005320

**Forbearance Agreement**
**Summary of Indicative Terms and Conditions**
**Free Speech Systems, LLC.**
**July 10, 2022**

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

| | |
|---|---|
| **Credit Card Processing Fee:** | The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees. |

4% (Four percent) WMS

**Allocation of Net Sales Proceeds:**

**FSS Inventory**  FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory**  PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

EXHIBIT
8

Auriam.

| | |
|---|---|
| **Warehouse and Fulfillment Related Expenses** | FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory. |

**PQPR Debt**

FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000. Currently, FSS is paying PQPR $11,000 per business day. As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement.

FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens.

**Term:**  60 Days

**Reservation:**  Subject to revision after implementation based on actual operational results.

Executed this 12 day of July 2022.

Free Speech Systems, LLC

By: _____
        Marc Schwartz, Its Chief Restructuring Officer

PQPR Holdings Limited, LLC

By: _____
        David Jones, Its Manager

PQPR-5

LLC

By: _____ Salomon Arye

Solomon Velazques Its Manager

PQPR-5

## EXHIBIT A

**13-Week  Budget**

EXHIBIT

9

exhibitsticker.com

PQPR-6

Free Speech Systems LLC

## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| | Period 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $595,489.01 | $7,741,357.16 |
| Advertising | | | | 480,166.46 | | | | 480,166.46 | | | | | 480,166.46 | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 9,222,690.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | | (11,073.88) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | (266.50) | | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | | (719,717.72) |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | | | | (1,989.90) | | | | (1,989.90) | | | | | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | | | (5,107.63) | | | | (5,107.63) | | | | (5,107.63) | | | (15,322.89) |
| HVAC | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Off-Site Security | (33,111.90) | | | | (33,111.90) | | | | (33,111.90) | | | | | (99,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

006325

PQPR-6

**Free Speech Systems LLC**
## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | – | – | – | (18,337.88) | – | – | – | (18,337.88) | – | – | – | – | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages – Base | (168,467.44) | – | (168,467.44) | – | (168,467.44) | – | (168,467.44) | – | (168,467.44) | – | (168,467.44) | – | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | – | (13,971.09) | – | (13,971.09) | – | (13,971.09) | – | (13,971.09) | – | (13,971.09) | – | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | – | (54,166.67) | – | (54,166.67) | – | (54,166.67) | – | (54,166.67) | – | (54,166.67) | – | (54,166.67) | (379,166.67) |
| Total Personnel Expenses | (236,605.20) | – | (236,605.20) | – | (236,605.20) | – | (236,605.20) | – | (236,605.20) | – | (236,605.20) | – | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | (1,470.56) | – | – | – | (1,470.56) | – | – | – | (1,470.56) | – | – | – | – | (4,411.68) |
| Total Travel Expenses | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| Total Operating Expenses | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | – | (523,000.00) |
| AMEX Payment | (172,390.28) | – | (172,390.28) | – | (172,390.28) | – | (172,390.28) | – | (172,390.28) | – | (172,390.28) | – | – | (1,034,341.69) |
| Total Other Expenses | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | – | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | – | – | – | – | – | – | (52,992.00) | – | (35,328.00) | – | – | – | – | (88,320.00) |
| Financial Advisor Fee | – | – | – | – | – | – | (57,876.00) | – | (40,352.00) | – | – | – | – | (98,228.00) |
| Shannon & Lee LLP | – | – | – | – | – | – | (40,000.00) | – | (60,000.00) | – | – | – | – | (100,000.00) |
| Ray Battaglia | – | – | – | – | – | – | (24,000.00) | – | (24,000.00) | – | – | – | – | (48,000.00) |
| Total Professional Fees | – | – | – | – | – | – | (174,868.00) | – | (159,680.00) | – | – | – | – | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

005326

# Forecasted 3 Week Cash Flow Budget

## Between July 30, 2022 and August 19, 2022

| | *Period* | *07/30/2022-* | *08/06/2022-* | *08/13/2022-* |
|---|---|---|---|---|
| | | *08/05/2022* | *08/12/2022* | *08/19/2022* |
| | *Week Number* | *1* | *2* | *3* |

### Income

| | | | | |
|---|---|---|---|---|
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 |
| Advertising | - | - | - |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 |
| **Total Income** | **598,630.26** | **598,630.26** | **598,630.26** |

### Selling & Product Costs

| | | | |
|---|---|---|---|
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) |
| Repay PQPR Inventory | - | (250,000.00) | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) |
| eCommerce Store Maintenance | (27,270.00) | - | - |
| Texas Sales Tax | (5,337.87) | - | - |
| **Total Cost of Goods Sold** | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** |

### Operating Expenses

**Advertising & Promotion**

| | | | |
|---|---|---|---|
| Advertising & Promotion | (3,041.98) | - | - |
| Print Media | (3,000.00) | - | - |
| Radio Show Advertising | (11,500.00) | - | - |
| **Total Advertising & Promotion** | **(17,541.98)** | **-** | **-** |

**Computer/IT/IP Expense**

| | | | |
|---|---|---|---|
| Internet & TV services | (2,082.90) | - | (1,608.39) |
| Software License Fees | (140.80) | - | - |
| Server Hosting Service | (28,595.13) | - | - |
| CDN Video Cloud Storage | (55,728.00) | - | - |
| Satellite Service | (137,282.93) | - | - |
| Imaging License Fee | (9,201.25) | - | - |
| Software & Apps | (5,000.00) | - | - |
| Website Hosting | - | - | (266.50) |
| **Total Computer/IT/IP Expense** | **(238,031.01)** | **-** | **(1,874.89)** |
| Insurance | (2,166.50) | - | - |

**Office & Administrative Expense**

| | | | |
|---|---|---|---|
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) |
| Equipment Rental | (1,989.90) | - | - |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) |
| Business Meals | (280.46) | (280.46) | (280.46) |
| **Total Office & Administrative Expense** | **(2,318.36)** | **(328.46)** | **(328.46)** |

| | | | |
|---|---|---|---|
| Outsourced Services | (45,980.00) | - | - |
| Consulting Services | (22,670.00) | - | (12,000.00) |

**Utilities**

| | | | |
|---|---|---|---|
| Electricity | - | - | (5,107.63) |
| HVAC | (256.19) | - | - |

EXHIBIT

10

005327

PQPR-7

| | Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 |
|---|---|---|---|---|
| CAM Charges | | (20,364.16) | - | - |
| Water & Sewer | | (1,708.55) | - | - |
| Gas Service | | (132.09) | - | - |
| Pest Control | | (244.65) | - | - |
| Waste Management | | (351.81) | - | - |
| **Total Utilities** | | **(23,057.46)** | **-** | **(5,107.63)** |
| **Occupancy** | | | | |
| Rent | | (33,408.51) | - | - |
| Office Security | | (31,111.90) | - | - |
| Repair & Maintenance - Building | | (1,777.19) | - | - |
| Janitorial | | (5,983.33) | - | - |
| **Total Occupancy** | | **(72,280.93)** | **-** | **-** |
| Supplies | | (1,258.02) | - | - |
| Telephone | | (18,337.88) | - | - |
| **Personnel Expenses** | | | | |
| Salaries & Wages - Base | | (168,467.44) | - | (168,467.44) |
| Payroll Tax | | (13,971.09) | - | (13,971.09) |
| Alex Jones Salary | | (54,166.67) | - | (54,166.67) |
| **Total Personnel Expenses** | | **(236,605.20)** | **-** | **(236,605.20)** |
| **Travel** | | | | |
| Mileage/Parking/Tolls | | (99.69) | (99.69) | (99.69) |
| Vehicle Leases | | - | (1,470.56) | - |
| **Total Travel Expenses** | | **(99.69)** | **(1,570.25)** | **(99.69)** |
| **Total Operating Expenses** | | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** |
| ***Non-Operating Expenses*** | | | | |
| Payment on PQPR Note | | (12,500.00) | (15,500.00) | (27,500.00) |
| AMEX Payment | | (172,390.28) | - | (172,390.28) |
| **Total Other Expenses** | | **(184,890.28)** | **(15,500.00)** | **(199,890.28)** |
| **Professional Fees** | | | | |
| CRO Fees | | - | - | - |
| Financial Adviosr Fee | | - | - | - |
| Shannon & Lee LLP | | - | - | - |
| Ray Battaglia | | - | - | - |
| **Total Professional Fees** | | **-** | **-** | **-** |
| **Total Cash Flow** | | **$ (529,176.72)** | **$ 101,269.75** | **$ (87,237.70)** |

005328
PQPR-7

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
August 24, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |
| | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. Interim Use. The Court approves the interim use of cash collateral as set forth herein.

PQPR-6
005329

2.  <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.  <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.  <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.  <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.  <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "<u>PQPR Payment</u>"). Creditors and parties in interest shall have thirty (30) days from the date

005330

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.    The adequate protection and related carve out set forth in the First Interim Order are incorporated in the Second Interim Order.

10.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.    <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

005331

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Discovery</u>. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 1:00 p.m. Central time.

Signed:  August 24, 2022

Christopher Lopez
United States Bankruptcy Judge

005332

**Free Speech Systems LLC**
**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | | |
| Product Sales | | $ 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | | $ 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | | $ (250,000.00) | | $ (500,000.00) | | $ (750,000.00) |
| Merchant Account Fees | | $ (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | | $ (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | | $ (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | | $ (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | | $ - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | | $ - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | | $ - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | $ - |
| Bank Fees & Service Charges | | $ (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | | $ (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | | $ (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| **Outsourced Services** | | $ - | $ - | $ - | $ - | |
| Consulting Services | | $ - | $ - | $ - | $ - | |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | $ - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | $ - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | | $ - | $ (1,258.02) | | | $ (1,258.02) |
| Telephone | | | $ (18,337.88) | | | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

**Free Speech Systems LLC**
**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**
**Between August 20, 2022 and September 16, 2022**

| Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|
| **Total Personnel Expenses** | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | $ - |
| Mileage/Parking/Tolls | $ (150.67) | $ (167.41) | $ (167.41) | $ (167.41) | $ (652.90) |
| Vehicle Leases | $ - | $ - | $ (1,470.56) | $ - | $ (1,470.56) |
| **Total Travel Expenses** | $ (150.67) | $ (167.41) | $ (1,637.97) | $ (167.41) | $ (2,123.46) |
| **Total Operating Expenses** | $ (647.10) | $ (577,137.87) | $ (2,189.56) | $ (209,456.72) | $ (789,431.24) |
| ***Non-Operating Expenses*** | | | | | $ - |
| Payment on PQPR Note | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | $ - | $ - | $ - | $ - | $ - |
| **Total Other Expenses** | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | |
| Subchapter v Trustee retainer | | | | $ (25,000.00) | $ (25,000.00) |
| Fulfillment Expert | $ (12,500.00) | $ - | $ - | $ - | $ (12,500.00) |
| Witness expenses and cost | | | | | |
| Pattis & Smith | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | $ - | $ - | $ (50,000.00) | $ - | $ (50,000.00) |
| SALLC Fees | $ - | $ - | $ - | | $ - |
| Shannon & Lee LLP | $ - | $ - | $ - | | $ - |
| Ray Battaglia | $ - | $ - | $ - | | $ - |
| **Total Professional Fees** | $ (12,500.00) | $ - | $ (150,000.00) | $ (25,000.00) | $ (187,500.00) |
| **Total Cash Flow** | $ 727,435.62 | $ (33,948.36) | $ (225,531.18) | $ 192,201.66 | $ 660,157.73 |

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 13, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**THIRD INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION**

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. This order is the third interim order ("Third Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    Interim Use. The Court approves the interim use of cash collateral as set forth herein.

005335

2.    <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.    <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.    <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Third Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.    <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, either directly or indirectly, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.    <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

005336

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.      <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.      <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First and Second Interim Orders are incorporated in the Third Interim Order.

10.     <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.     <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.     <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

005337

13. <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October 12, 2022, at 10:00 a.m. Central time.

Signed: September 13, 2022

Christopher Lopez
United States Bankruptcy Judge

005338

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 8 | 9 | 10 | 11 | |
| **Income** | | | | | | |
| Product Sales | | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 4,000,000.00 |
| Advertising | | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 400,000.00 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 4,412,564.99 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (901,176.75) |
| Repay PQPR Inventory | | $ - | $ - | $ - | $ - | $ - |
| Merchant Account Fees | | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (196,000.00) |
| Shipping cost for drop ship orders | | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (53,144.99) |
| Fulfillment Services | | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (1,175,609.76) |
| Processor Fees | | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (160,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (621,482.87) | $ (654,090.74) | $ (621,482.87) | $ (621,482.87) | $ (2,518,539.36) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| 62410 Contract Broadcase Services | | $ (11,200.00) | | | | $ (11,200.00) |
| 62420 Contract Radio Show Production | | $ (25,000.00) | | | | $ (25,000.00) |
| 62430 Contract Video Production | | $ (10,000.00) | | | | $ (10,000.00) |
| 62470 Free Lance Contributors | | $ (3,500.00) | | | | $ (3,500.00) |
| Website Hosting | | $ - | $ - | $ - | $ - | |
| **Total Computer/IT/IP Expense** | | $ (49,700.00) | $ (238,031.01) | $ - | $ (1,608.39) | $ (289,339.41) |
| Insurance | | $ - | $ (2,166.50) | $ - | | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | | $ (77.08) | $ (77.08) | $ (77.08) | $ (77.08) | $ (308.34) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.53) | $ (3.53) | $ (3.53) | $ (3.53) | $ (14.11) |
| Business Meals | | $ (470.97) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,883.89) |
| **Total Office & Administrative Expense** | | $ (551.58) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,196.24) |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |

005339

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|---|
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | **$ -** | **$ (23,057.46)** | **$ -** | **$ (5,107.63)** | **$ (28,165.09)** |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | **$ -** | **$ (72,280.93)** | **$ -** | **$ -** | **$ (72,280.93)** |
| Supplies | | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | $ - | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | $ | - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |
| **Total Personnel Expenses** | | **$ -** | **$ (201,755.20)** | **$ -** | **$ (201,755.20)** | **$ (403,510.40)** |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | | $ (167.41) | $ (167.41) | $ (167.41) | $ (167.41) | $ (669.64) |
| Vehicle Leases | | $ - | $ - | $ - | $ (1,470.56) | $ (1,470.56) |
| **Total Travel Expenses** | | **$ (167.41)** | **$ (167.41)** | **$ (167.41)** | **$ (1,637.97)** | **$ (2,140.20)** |
| **Total Operating Expenses** | | **$ (50,419.00)** | **$ (577,137.87)** | **$ (719.00)** | **$ (210,660.78)** | **$ (838,936.64)** |
| **Non-Operating Expenses** | | | | | | |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | |
| **Total Other Expenses** | | **$ (5,000.00)** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (20,000.00)** |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | | |
| Fulfillment Expert | | $ (22,487.56) | $ - | $ - | $ - | $ (22,487.56) |
| Economic Loss Expert | | | | | | $ - |
| Alex Jones at Trial Cost | | $ (80,920.00) | | | | $ (80,920.00) |
| Witness expenses and trial costs | | $ (34,048.00) | | | | $ (34,048.00) |
| Brittany Paz | | | | | | $ - |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| SALLC Fees | | | $ - | $ - | $ (188,018.31) | $ (188,018.31) |
| Shannon & Lee LLP | | | $ - | $ - | $ (207,348.36) | $ (207,348.36) |
| Ray Battaglia | | | $ - | $ - | $ (47,316.80) | $ (47,316.80) |
| **Total Professional Fees** | | **$ (137,455.56)** | **$ -** | **$ (200,000.00)** | **$ (442,683.47)** | **$ (780,139.03)** |
| **Total Cash Flow** | | **$ 288,783.82** | **$ (133,087.37)** | **$ 275,939.38** | **$ (176,685.88)** | **$ 254,949.95** |



EXHIBIT

A

005349

**Fill in this information to identify the case:**

Debtor 1     Free Speech Systems, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Southern District of Texas

Case number   22-60043

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| 1. Who is the current creditor? | PQPR Holdings Limited LLC |
| --- | --- |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2. Has this claim been acquired from someone else? | ☑ No |
| --- | --- |
| | ☐ Yes. From whom? |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- | --- |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Streusand Landon Ozburn & Lemmon, LLP | Streusand Landon Ozburn & Lemmon, LLP |
| | Name | Name |
| | 1801 S. Mopac Expy., Suite 320 | 1801 S. Mopac Expy., Suite 320 |
| | Number        Street | Number        Street |
| | Austin              TX        78746 | Austin              TX        78746 |
| | City                State        ZIP Code | City                State        ZIP Code |
| | Contact phone   512-220-2688 | Contact phone   512-220-2688 |
| | Contact email   lemmon@slollp.com | Contact email   lemmon@slollp.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

| 4. Does this claim amend one already filed? | ☑ No |
| --- | --- |
| | ☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____ MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| --- | --- |
| | ☐ Yes.  Who made the earlier filing? _____ |

PQPR-10

005341
page 1

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____ 68,154,691.46  **Does this amount include interest or other charges?**

plus additional unpaid debt

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Goods sold, unpaid account, resulting in 2 Promissory Notes and subsequent additional unpaid goods sold.

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe: all assets of debtor

**Basis for perfection:** UCC-1

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ 68,154,691.46

**Amount of the claim that is secured:** $ 68,154,691.46

**Amount of the claim that is unsecured:** $_____ 0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____% per contract

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

PQPR-10

005342

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |
|---|---|

Executed on date   10 / 06 / 2022
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | David _____ R. _____ Jones _____ |
|---|---|
| | First name          Middle name          Last name |
| Title | _____ |
| Company | PQPR Holdings Limited LLC _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | _____ |
| | Number          Street |
| | _____ |
| | City                          State     ZIP Code |
| Contact phone | _____   Email   davidrossjones@aol.com |

PQPR-10

005343

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

PQPR
Due from FSS - Proof of Claim
7/29/2022

| | | |
|---|---|---:|
| **Open Account** | | |
| Advance to FSS | $ | 121,920.27 |
| Due to PQPR | $ | 23,808,367.00 |
| PQPR Reimbursement Receivable | $ | (9,538,413.22) |
| | | |
| Balance | $ | 14,391,874.05 |
| | | |
| **Notes** | | |
| Note 1 | $ | 29,538,183.63 |
| Note 2 | $ | 24,108,504.21 |
| | | |
| Total | $ | 53,646,687.84 |
| | | |
| **Accrued Interest 8/20/21 to 11/10/21** | | |
| Note 1 Balance | $ | 29,538,183.63 |
| Interest Rate | | 1.75% |
| Annual Interest | $ | 516,918.21 |
| | | |
| Daily | $ | 1,416.21 |
| | | |
| Days* | | 82 |
| | | |
| Accrued Interest | $ | 116,129.57 |
| | | |
| Total | $ | 68,154,691.46 |

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Acuity CxO LLC 5122929690 |

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Acuity CxO LLC
219 Black Wolf Run
Austin, TX 78738
USA

FILING NUMBER: 20-0058072731
FILING DATE: 11/18/2020      02:06 PM
DOCUMENT NUMBER: 1008390830002
FILED: Texas Secretary of State
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | **Free Speech Systems LLC** | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3005 South Lamar Blvd, Suite D109-317** | **Austin** | **TX** | **78704** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | **PQPR Holdings Limited LLC** | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **100 Congress Avenue, 18th Floor** | **Austin** | **TX** | **78701** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box. |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

EXHIBIT
7

PQPR-10
005345
PQPR-4

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

## SANDY HOOK FAMILIES'
## WITNESS AND EXHIBIT LIST

| Judge | Hon. Christopher M. Lopez |
|---|---|
| Hearing Date | Wednesday, October 12, 2022 |
| Hearing Time | 10:00 a.m. (CST) |
| Party's Name | Sandy Hook Families |
| Attorney's Names | Ryan Chapple, Randy Williams (Connecticut Plaintiffs)<br>Avi Moshenberg, Jarrod Martin (Texas Plaintiffs) |
| Attorney's Phone | 512-477-5000 (Ryan Chapple and Randy Williams)<br>713-337-5580 (Avi Moshenberg)<br>713-356-1280 (Jarrod Martin) |
| Nature of Proceeding | Cash Collateral Motion [Dkt. 6] |

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs" and together, the "Sandy Hook Families") hereby submit this Witness and Exhibit List in connection with the hearing on (i) *Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Cash Collateral Motion")

005346

[Dkt. 6]; to be held on Wednesday, October 12, 2022 at 10:00 a.m. (Central Standard Time):

The Sandy Hook Families reserve the right to supplement, amend, or revise this Witness and Exhibit List at any time prior to the hearing. The Sandy Hook Families reserve the right to supplement the Witness and Exhibit List with new witnesses and additional exhibits. Further, the Sandy Hook Families reserve the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document. The Sandy Hook Families further reserve the right to introduce exhibits previously admitted.

### WITNESS LIST

The Sandy Hook Families may call the following witnesses at the hearing:

1. Patrick Magill, proposed Chief Restructuring Officer of Debtor;
2. W. Marc Schwartz, former proposed Chief Restructuring Officer of Debtor;
3. Robert Roe, PQPR Holdings Limited, LLC corporate representative;
4. David Jones, managing member of JLJR Holdings, LLC, which is the managing member of PQPR Holdings Limited, LLC;
5. Any witness necessary to rebut the testimony of any witness called or designated by any other parties;
6. Any witness listed or called by any other party.

### EXHIBIT LIST

The Sandy Hook Families may offer for admission into evidence any of the following exhibits at the hearing:

| No. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1. | Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the | | | | |

005347

| | | | | | |
|---|---|---|---|---|---|
| | Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 6] | | | | |
| 2. | Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions [Dkt. 10] | | | | |
| 3. | Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 41] | | | | |
| 4. | Order Modifying Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64] | | | | |
| 5. | Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 98] | | | | |
| 6. | Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 151] | | | | |
| | Any document or pleading filed in the above-captioned case | | | | |
| | Any exhibits identified or offered by any other party | | | | |
| | Any exhibits necessary for impeachment and/or rebuttal purposes | | | | |

Respectfully submitted this 10th day of October 2022.

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, PC**

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

***Bankruptcy Counsel for the Texas
Plaintiffs***

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Bankruptcy Counsel for Connecticut
Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Witness and Exhibit List has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 10th day of October 2022.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S EMERGENCY MOTION FOR AN INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(B) AND (II) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDER**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the above-referenced chapter 11 case, hereby files this emergency motion (the "Motion") seeking an order from the Court (i) authorizing the use of cash collateral pursuant to Sections 105, 361, and 363

of the Bankruptcy Code and Bankruptcy Rule 4001(b); and (ii) granting adequate protection to the Debtor's pre-petition secured lenders. In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "<u>First Day Declaration</u>"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## **JURISDICTION AND VENUE**

1. On July 29, 2022 (the "<u>Petition Date</u>"), the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>").

2. The Debtor continues in the possession of its property and is operating and managing its businesses as debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

3. No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

4. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 361, and 363 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

## **FSS' BACKGROUND**[1]

6. Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum for Alex's first broadcast. In 1996 he transitioned to talk

---

[1] Additional factual background and information regarding the Debtor and its operations is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions*

005353

radio. After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees. Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7.    What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full blown studio, and employing over 60 people. By 2013, FSS started selling dietary supplements to its growing listener base.

8.    Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9.    FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.    On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11.    As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.

_____

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

3

This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13.     Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS.  The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14.     Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15.     FSS purchased to sell on its website two categories of products: (a) dietary supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to

4

advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales.  In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.  Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company.  The fulfillment company charges FSS a flat fee per order regardless of size.  Historically, fulfillment has cost an average of ten percent of sales, without considering payroll, the new agreement is estimated to cost sixteen percent of sales.

## PQPR INDEBTEDNESS

18.     As discussed above, PQPR ordered and paid for Supplements which it marked up and then sold to FSS. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

19.     The indebtedness to PQPR had accrued over a period of years from the sale of PQPR products through the Debtor's internet platform, generated by the Debtor and Alex Jones' sponsorship of those products.  The PQPR Note balance represents the unpaid share of the proceeds from product sales by PQPR to FSS over a four year period for which the Debtor did not fully remit the proceeds to PQPR.

5

20.     On or about August 13, 2020, the Debtor executed that certain Promissory Note in favor of PQPR in the original principal amount of $29,588,000.00 (the "PQPR Note"). A security agreement of the same date granted PQPR a security interest in all of the Debtor's personal property assets, including but not limited to the Debtor's tangible and intangible property, accounts, and proceeds derived from those assets (the "PQPR Security Agreement"). PQPR filed a UCC-1 financing statement with the Texas Secretary of State that on November 18, 2020.

21.     The PQPR Security Agreement secures the obligations under the PQPR Note and any future advances owing by the Debtor to PQPR.  Specifically, "Obligations" is defined in the PQPR Security Agreement to include "any and all other obligations of Debtor to [PQPR] of any kind or character, now owed or hereafter arising."

22.     Subsequent to the date of the PQPR Note, the Debtor accrued additional indebtedness to PQPR representing a portion of PQPR's share of the proceeds from product sales from the date of the PQPR Note through November 10, 2021, for which the Debtor did not fully remit the required proceeds to PQPR.  The Debtor executed a second promissory note ("Second PQPR Note" and together with the PQPR Note, collectively the "PQPR Notes") in the amount of $25,300,000.  The Second PQPR Note is also secured by the PQPR Security Agreement.

23.     As of the Petition Date, $53,655,082.29 of principal and $11,794,19 of interest are due and owing under the PQPR Notes.

## **RELIEF REQUESTED**

24.     Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of

6

rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." [6] 11 U.S.C. § 363(a).

25.     11 U.S.C. § 363(c)(2) states as follows:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
>> (A)        each entity that has an interest in such cash collateral consents; or
>> (B)        the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

26.     The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

27.     The Debtor requires the use of cash collateral to pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, inventory purchases, lease payments, marketing, taxes, and insurance. Those uses required in the next fourteen (14) days from the date of the emergency hearing are set forth on the budgets attached hereto as **Exhibit A** and incorporated herein by reference. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, and any other secured creditors purporting to hold an interest in the Debtor's cash collateral during the first fourteen (14) days of the Chapter 11 Cases (the "Interim Period"). The Debtor also requests that continued use of cash collateral is equally necessary to preserve the value of the Debtor's assets and rights of all of the constituencies with claims or interests in this Chapter 11 Case.

7

28.     Section 363 of the Bankruptcy Code authorizes a debtor to use cash collateral if those parties having an interest in such cash collateral consent or the court authorizes the use. *See* 11 U.S.C. § 363(c)(2). The use of cash collateral, however, may be prohibited or conditioned, upon proper request, as necessary to adequately protect any interest in cash collateral. *See* 11 U.S.C. §363(e).

29.     A court may authorize the use of cash collateral upon showing that those with an interest in the cash collateral are adequately protected. *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, (Bankr. S.D. Tex. 2009) ("in order for this Court to authorize the use of cash collateral, the Lender must be adequately protected); *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) (A debtor requesting court approval to use cash collateral has the burden of proof as to the issue of "adequate protection".) Adequate protection requires examination of the creditor(s)' aggregate collateral position, not simply protection of its lien on cash. Adequate protection may be provided by granting replacement or additional liens "to the extent [that the use of cash collateral] results in a decrease in the value of [an] entity's interest in property." *See* 11 U.S.C. § 361(2). Authorizing a debtor to use cash collateral on an interim basis is appropriate where, as here, continuing the business as a going concern will cause the generation of future revenues upon which the secured lender is granted replacement liens. *See, e.g., In re Neise, Inc.,* 16 B.R. 600 (Bankr. D. Fla. 1981); *In re Certified Corp.*, 51 B.R. 768 (Bankr. D. Haw. 1985); *In re Post- Tron Systems, Inc.*, 106 B.R. 345 (Bankr. D.R.I. 1989).

30.     By authorizing the Debtor to use cash collateral, the Court will place the Debtor in a position to fund its operating expenses and to operate as a going concern for the immediate future. The Debtor needs to use cash collateral in order to, *inter alia*, pay its employees, suppliers, and meet other on-going business obligations. Without the authority to use cash collateral, the Debtor will be unable to fund its business operations in a manner that will allow the Debtor to continue to operate, to the detriment of *all* of the Debtor's creditors, including the lenders referred to herein and the pool

005359

of unsecured creditors. Furthermore, without the ability to fund continuing operations, the Debtor and its estate will suffer immediate and irreparable harm. For example, employees will not continue to provide services if they are not paid the wages for which they have already worked, and vendors will not continue to provide necessary services or supplies if they are not paid. Therefore, the Debtor seeks the emergency relief requested herein.

31.     Attached to this Motion is a proposed form of the Interim Cash Collateral Order (the "Interim Cash Collateral Order") that authorizes the Debtor's use of cash collateral.

32.     The proposed offer of adequate protection on an interim basis is set forth in the attached proposed Interim Cash Collateral Order and incorporated by reference herein for the purpose of setting forth the proposed offer of adequate protection for lenders. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of each lender's collateral, if any, and failure of other forms of adequate protection provided by the Debtor. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, and court-approved administrative expense claims of estate professionals.

33.     The Debtor believes that the terms of the proposed Interim Cash Collateral Order as set forth above are fair and reasonable under the circumstances. The Debtor asserts that the value of PQPR's cash collateral will not diminish as a result of the use of cash in this case. The value of PQPR's interest in cash may fluctuate, but such value should not diminish, other than minimally, over the next fourteen (14) days, the period of interim relief requested.

34.     The Debtor believes that PQPR is entitled to the protections set forth in the proposed Interim Cash Collateral Order. The adequate protection provisions have been drafted to provide

005360

protection without taking undue or inappropriate value from the estate or its unsecured creditors. Given that the interests of the lenders will be adequately protected, it is in the best interest of the Debtor, its estate, and all of their creditors to be able to continue operations during the Interim Period and for the Debtor to be authorized to use cash collateral as requested herein.

35.     Therefore, the Debtor respectfully requests that it be authorized to use cash collateral as proposed herein for the purposes of paying necessary business expenses as allowed by Section 363 of the Bankruptcy Code, and that the Court grant PQPR a replacement lien on post-petition assets, as allowed by Sections 361, and/or 363 of the Bankruptcy Code, consistent with the terms and provisions contained in this Motion. The Debtor requests that this relief be granted on both an interim and final basis.

## RESERVATION OF RIGHTS

36.     The Debtor reserves any and all rights in connection with the Heslin\Lewis Suit. Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights or remedies.

## NO PRIOR REQUEST

37.     No previous request for the relief sought herein has been made to this Bankruptcy Court or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the Court (i) authorize the use of cash collateral pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b); (ii) grant adequate protection to the pre-petition secured lenders; and (iii) grant such other and further relief as the Court may deem proper.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ Raymond W. Battaglia

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

_/s/ Raymond W. Battaglia_____

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

005364

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

005365

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| In re: | ) Case No. 22- _60043_ |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

## INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August ___, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1. The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (this "Court").

2.     Debtor-in-Possession. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3.     Jurisdiction and Venue. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "Local Rules").

4.     Committee Formation.       To date, no official committee (a "Committee") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5.     Notice. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("PQPR"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule

2

4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6.     <u>Immediate Need for Use of Cash Collateral</u>.  The Debtor asserts that an immediate and critical need exists for the Debtor to use Cash Collateral in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

7.     <u>Conditional Consent to Use of Cash Collateral</u>. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to the Motion as Exhibit A (the "<u>Budget</u>") for the period (the "<u>Interim Period</u>") from the Petition Date through and including August 15, 2022 (the "<u>Termination Date</u>").

8.     <u>Good Cause/Fair and Reasonable Terms</u>. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the

005368

security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein. Any objections to the entry of this Order that have not been previously resolved or withdrawn are hereby overruled on their merits.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the

4

overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

6.     <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

7.     <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

8.     <u>Adequate Protection – Replacement Liens</u>.     As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "<u>Diminution in Value</u>"), the Pre-Petition Lender is hereby granted, effective  as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "<u>Replacement Liens</u>") in  all  currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding

5

avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "Adequate Protection Collateral"). The Replacement Liens granted pursuant to this Order shall have the same priority as each of the Pre-Petition Lender's properly perfected unavoidable pre-petition liens but shall be subject to the Carve Out.

9.     Adequate Protection – Priority Administrative Claim.  As additional partial adequate protection for the Debtor's use of Cash Collateral, to the extent of any Diminution in Value and a failure of the other adequate protection provided by this Order the pre-petition lenders shall have an allowed priority administrative expense claim in this Case and any successor case as provided in and to the fullest extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code and otherwise (the "Adequate Protection Priority Claim").

10.     Carve Out. The Replacement Liens and Adequate Protection  Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "Estate Professionals"),  for incurred but unpaid fees, expenses and other costs (all such carve-out amounts referenced above, collectively, the "Carve Out").

11.     Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

6

12.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August _____ 2022, at __:___.m. Central time.  Objections to the entry of a final order approving the Motion shall be filed and served on counsel for the Debtor and pre- petition lenders not later than 4:00 p.m. Central time on August _____ 2022.

Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

7

**EXHIBIT A**

**13-Week  Budget**

005373

Free Speech Systems LLC
# Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Period** | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | |
| **Week Number** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | $ 7,741,357.16 |
| Advertising | | | | 480,166.46 | | | | 480,166.46 | | | | 480,166.46 | | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | | (11,073.89) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | (266.50) | | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | | (719,717.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,950.90) | | | | (1,950.90) | | | | (1,950.90) | | | | | (5,369.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| HVAC | | | (5,107.63) | | | | (5,107.63) | | | | (5,107.63) | | | (15,322.89) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Off Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

006374

Free Speech Systems LLC

## Forecasted 13 Week Cash Flow Budget

Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | - | - | - | - | - | - | - | - | - | (15,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages – Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| Total Personnel Expenses | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | (1,470.56) | - | - | - | - | - | (1,470.56) | - | - | (4,411.68) |
| Total Travel Expenses | (99.69) | (1,570.25) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (5,707.66) |
| Total Operating Expenses | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| *Non-Operating Expenses* | | | | | | | | | | | | | | |
| Payment on PQPR Note | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| AMEX Payment | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | - | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| Total Other Expenses | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (172,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| Total Professional Fees | - | - | - | - | - | - | (174,868.00) | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | ) Case No. 22-_60043_____ |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

## DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF
## VOLUNTARY PETITION AND FIRST DAY MOTIONS

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      My name is W. Marc Schwartz ("Schwartz").

2.      I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3.      The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

1

5.      I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.  The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.      SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services    My firm represents individuals, companies and courts in a variety of assignments,  including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.      I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.      I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.      On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

005378

10.     On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.  Background to Creation of Free Speech Systems, LLC

11.     Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12.     In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13.     Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14.     From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

3

005379

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.     Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC")*.

16.     Alex Jones was a natural.

17.     The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.     Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.     When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.     The predecessor operation of FSS in 2004 was an operation with just a handful of employees.  Alex Jones had a tiny office in the far south of Austin. He had two employees at

4

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.     As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.     By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.     While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.     After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.     The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

26. Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B. Present Business of Free Speech Systems, LLC**

27. FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28. On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29. The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30. As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided. The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

6

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

**C.  The Relationship Between Alex Jones and FSS**

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected.  Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

005383

35.     The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

### D.  The Debtor' Owners and Management

36.     At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.     Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.      Since then, Alex Jones has been the Managing Member of FSS.

39.     Since inception, Alex Jones has been a "single talent business", _to wit_, without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.     Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.     In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies.  With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.     The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger.  As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b)  FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

### E. The Relationship of FSS and PQPR

*Background Information About PQPR*

43.     PQPR was founded in 2013. The business began operations in September 2013.

44.     PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.     PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.     The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47.     Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR"). Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.     Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49.     As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer.  FSS pays PQPR, as its agent, funds required to purchase product, which then pays

10

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50.     Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.     Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.     In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

### *The Entry into the Secured Notes*

53.     On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.     The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.     On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

11

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F.  FSS Needs a Credit Card Processor**

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.  Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

005388

62.     The key players in credit card processing are:

- **Customer** – the person making a purchase.
- **Merchant** – the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway** – this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor** – (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network** – (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank** – (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank** – (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63.     In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

64.     After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.     Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.     FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS.  A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.     FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.     In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.     In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

005390

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G. Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

005391

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and ***(e)*** *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74.    These two actions: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75.    As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76.    In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

16

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "<u>Connecticut State Court Litigation</u>" together with the Texas State Court Litigation are hereinafter referred to as the "<u>Sandy Hook Lawsuits</u>").

77.     As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78.     Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79.     Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80.     InfoW, LLC f/k/a Infowars, LLC ("<u>InfoW</u>" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "<u>InfoWDebtors</u>"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "<u>Bankruptcy Court</u>"), on April 18, 2022 (the "<u>Petition Date</u>"), initiating Case No. 22-60020 in that court (the "<u>Bankruptcy Case</u>").

81.     The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

---

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been  cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.      The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H.  Current Financial Condition of Debtor**

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

87.     Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88.     Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

## I.     Critical Motions to Commence the Chapter 11 Case

### First Day Motions

89.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

005395

- **Critical Vendors Motion**. *Debtor's Motion for an  Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**.  *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.     The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

20

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

**Procedural Motion**

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

21

005397

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.　　I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### **Operational Motions**

97.　　**Cash Collateral Motion[6]**. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.　　The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.　　Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

005398

100.    The use of cash collateral required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period").

101.    The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.    PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.    Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.    **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62. In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.

105.    After an extensive review and analysis of the Debtor's vendors, the Debtor and its professionals identified the vendors that supply products and services vital to the Debtor's continued operation. The Debtor relies on products and services from its Critical Vendors to operate its business, and, depend on the timely provision of specialized services to provide top-quality content and services to its customer base.

106.    The Critical Vendors procure and provide key services to producing and transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their mission-critical goods and services, the business of FSS would grind to a halt.

107.    I understand that the Debtor's trade relationship with its Critical Vendors is not governed by long-term contracts, and the Debtor believes those trade relationships will deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption and disturbances to the Debtor's business during the Chapter 11 Case.

108.    Subject to Court's approval, I understand the Debtor intends to pay Critical Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review, assess, and make payment on account of these claims. In return for paying these claims, the Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon each claimant's agreement to continue supplying goods and services to the Debtor in accordance

005400

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.    **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.    In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.    To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.    The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

005401

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.    The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### *Adequate Assurance Procedures*

115.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.    The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

005402

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

27

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118.    **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit.  Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119.    The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120.    The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

005404

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July,  2022.

W. Marc Schwartz, as Chief Restructuring
Officer of Free Speech Systems, LLC

---

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

005405

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

| Free Speech Systems LLC<br>Comparative Profit and Loss Statement<br>For the Year Ended December 31, 2021 and the Five Months<br>Ended May 31, 2021 |
|---|

|  | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| *Total Income* | *64,970,641.85* | *14,320,983.15* |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| *Gross Profit* | $ *13,092,308.12* | $ *9,384,529.36* |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| *Total Expenses* | *23,387,247.86* | *6,346,192.35* |
| *Net Operating Income* | $ *(10,294,939.74)* | $ *3,038,337.01* |
| **Other Income** | **507,168.04** | **1,019,713.81** |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| *Total Other Expenses* | *1,131,710.75* | *2,155,946.35* |
| *Net Other Income* | *(624,542.71)* | *(1,136,232.54)* |
| **Net Income** | $ *(10,919,482.45)* | $ *1,902,104.47* |

005407

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

**Exhibit B**

```
+--------------------------------------------------+
|          Free Speech Systems LLC                 |
|          Comparative Balance Sheet               |
|      As of December 31, 2021 and May 31, 2022    |
+--------------------------------------------------+
```

| | | 2021 | | 2022 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash | $ | 1,508,720.21 | $ | 1,159,247.90 |
| Accounts Receivable | | 10,187,121.95 | | 10,013,413.22 |
| **Other Current Assets** | | | | |
| Invenotry | | 1,732,603.13 | | 910,116.84 |
| Prepaid Expenses | | 446,475.64 | | 114,136.99 |
| Due from PQPR | | (500.00) | | - |
| Advance To Elevated Solutions | | 27,870.00 | | - |
| *Total Other Current Assets* | | *2,206,448.77* | | *1,024,253.83* |
| *Total Current Assets* | | *13,902,290.93* | | *12,196,914.95* |
| **Fixed Assets** | | 1,679,438.66 | | 1,580,779.46 |
| **Other Assets** | | | | |
| Intangible Assets | | 21,270.83 | | 15,333.33 |
| Security Deposits | | 534,560.00 | | 534,560.00 |
| *Total Other Assets* | | *555,830.83* | | *549,893.33* |
| *Total Assets* | $ | *16,137,560.42* | $ | *14,327,587.74* |
| **Liabilities and Equity** | | | | |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | $ | 4,732,966.89 | $ | 1,217,685.58 |
| Credit Cards | | 152,367.42 | | 207,984.04 |
| **Other Current Liabilities** | | | | |
| David Jones Advance | | 150,000.00 | | 150,000.00 |
| Advances from PQPR | | - | | 571,920.57 |
| Due to PQPR | | 23,058,367.00 | | 23,058,367.00 |
| *Total Other Current Liabilities* | | *23,208,367.00* | | *23,780,287.57* |
| *Total Current Liabilities* | | *28,093,701.31* | | *25,205,957.19* |
| **Long Term Liabilities** | | | | |
| Note Due to PQPR | | 54,580,405.22 | | 53,845,074.41 |
| Note Payable - Winnebago | | 93,505.62 | | 82,524.37 |
| *Total Long Term Liabilities* | | *54,673,910.84* | | *53,927,598.78* |
| *Total Liabilities* | $ | *82,767,612.15* | $ | *79,133,555.97* |
| **Equity** | | | | |
| Member's Equity | | (774,291.44) | | - |
| Member Draws | | (61,937,862.26) | | (254,014.00) |
| Member Contributions | | 4,305,810.14 | | 311,350.00 |
| Opening Balance Equity | | - | | (66,765,408.70) |
| Retained Earnings | | 2,695,774.28 | | |
| Net Income | | (10,919,482.45) | | 1,902,104.47 |
| *Total Equity* | $ | *(66,630,051.73)* | $ | *(64,805,968.23)* |
| *Total Liabilities and Equity* | $ | *16,137,560.42* | $ | *14,327,587.74* |

Exhibit "C"


Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**Exhibit C**

> **Free Speech Systems, LLC**
> **Statement of Cash Flows**
>
> **For the Year Ended December 31, 2021  and the Five Months Ended May 31, 2022**

|  | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| ***Net Income*** | **($10,919,482.45)** | **$1,902,104.47** |
| ***Adjustments to reconcile Net Income to Net Cash provided by*** | | |
| ***operations:*** | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| ***Net cash provided by operating activities*** | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| ***Net cash provided by investing activities*** | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| ***Net cash provided by financing activities*** | **22,850,016.65** | **(787,074.46)** |
| ***Net cash increase for period*** | **$952,374.76** | **($349,472.31)** |

005411

Exhibit "D"

13-Week Cash Flow Forecast for FSS

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period / Week Number | 07/30/2022-08/05/2022 (1) | 08/06/2022-08/12/2022 (2) | 08/13/2022-08/19/2022 (3) | 08/20/2022-08/26/2022 (4) | 08/27/2022-09/02/2022 (5) | 09/03/2022-09/09/2022 (6) | 09/10/2022-09/16/2022 (7) | 09/17/2022-09/23/2022 (8) | 09/24/2022-09/30/2022 (9) | 10/01/2022-10/07/2022 (10) | 10/08/2022-10/14/2022 (11) | 10/15/2022-10/21/2022 (12) | 10/22/2022-10/28/2022 (13) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | | | | 480,166.46 | | | | 480,166.46 | | | | 480,166.46 | | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | | (250,000.00) | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (229,961.80) | (479,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | | (11,073.89) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | (266.50) | | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | | (719,717.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Bank Fees & Service Charges | (1,789.90) | | | | (1,789.90) | | | | (1,789.90) | | | | | (5,369.69) |
| Equipment Rental | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Office Supplies/Printing/Copy | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| Business Meals | (200.00) | | | | (200.00) | | | | (200.00) | | | | | (600.00) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | | | (5,107.63) | | | | (5,107.63) | | | | (5,107.63) | | | (15,322.89) |
| HVAC | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.27) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

0064

Free Speech Systems LLC
## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022- 08/05/2022 | 08/06/2022- 08/12/2022 | 08/13/2022- 08/19/2022 | 08/20/2022- 08/26/2022 | 08/27/2022- 09/02/2022 | 09/03/2022- 09/09/2022 | 09/10/2022- 09/16/2022 | 09/17/2022- 09/23/2022 | 09/24/2022- 09/30/2022 | 10/01/2022- 10/07/2022 | 10/08/2022- 10/14/2022 | 10/15/2022- 10/21/2022 | 10/22/2022- 10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (1,470.56) | - | - | (4,411.68) |
| **Total Travel Expenses** | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | (52,992.00) | - | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | (57,876.00) | - | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | (40,000.00) | - | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | (24,000.00) | - | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | - | - | - | - | - | (174,868.00) | - | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 3

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
August 05, 2022
Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved by agreement or order of the Court or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1. The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the ~~Western~~ Southern District of Texas (this "Court").

2. Debtor-in-Possession. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner

has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3. <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "<u>Local Rules</u>").

4. <u>Committee Formation</u>. To date, no official committee (a "<u>Committee</u>") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5. <u>Notice</u>. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("<u>PQPR</u>"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule 4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6. <u>Immediate Need for Use of Cash Collateral</u>. The Debtor asserts that an immediate and critical need exists for the Debtor to use the alleged cash collateral[1] of PQPR as set forth in the budget defined below (the "<u>Cash Collateral</u>") in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

---

[1] As defined at 11 U.S.C. § 363(a).

7. <u>Conditional Consent to Use of Cash Collateral</u>. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to this Order as Exhibit A (the "<u>Budget</u>") for the period (the "<u>Interim Period</u>") from the Petition Date through and including August 26, 2022 (the "<u>Termination Date</u>"). The lender has agreed to the Debtor's use of Cash Collateral during the Interim Period exclusively in accordance with the terms, conditions, and limitations set forth in this Order and the Budget.

8. <u>Good Cause/Fair and Reasonable Terms</u>. The Debtor asserts that good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor

shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.    <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.    <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Payments to any insider during the Interim Period shall not exceed $20,000 in the aggregate.

6.    <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR $250,000 as provided in the Budget for "Repay PQPR Inventory" (the "<u>PQPR Payment</u>"). The PQPR Payment shall not be used to pay down the PQPR Notes (as defined in the Motion). Creditors and parties in interest shall have thirty (30) days from the date a notice is filed on the docket that the PQPR Payment has been issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment.

7.    <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall

remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    Adequate Protection – Replacement Liens.    As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "Diminution in Value"), the Pre-Petition Lender is hereby granted, effective as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "Replacement Liens") in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "Adequate Protection Collateral") to the same extent as existed on the Petition Date. The Replacement Liens granted pursuant to this Order shall be subject to the Carve Out.

10.    Carve Out. The Replacement Liens and Adequate Protection Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "Estate Professionals"), for incurred but unpaid fees, expenses and other costs; fees and expenses of the appointed Subchapter V Trustee (all such carve-out amounts referenced above, collectively, the "Carve Out").

11.    Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

12.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, the Subchapter V Trustee, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

13.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August 24, 2022, at 10:00 a.m. Central time.

Signed:  August 05, 2022

Christopher Lopez
United States Bankruptcy Judge

005421

# Forecasted Interim Cash Collateral Budget

**Between July 29, 2022 and August 26, 2022**

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 |
|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 |

### Income
| | | | | |
|---|---|---|---|---|
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 |
| Advertising | - | - | - | 480,166.46 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 |
| **Total Income** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** |

### Selling & Product Costs
| | | | | |
|---|---|---|---|---|
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) |
| Repay PQPR Inventory | - | (250,000.00) | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - |
| Texas Sales Tax | (5,337.87) | - | - | - |
| **Total Cost of Goods Sold** | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** | **(229,961.80)** |

### Operating Expenses
#### Advertising & Promotion
| | | | | |
|---|---|---|---|---|
| Advertising & Promotion | (3,041.98) | - | - | - |
| Print Media | (3,000.00) | - | - | - |
| Radio Show Advertising | (11,500.00) | - | - | - |
| **Total Advertising & Promotion** | **(17,541.98)** | **-** | **-** | **-** |

#### Computer/IT/IP Expense
| | | | | |
|---|---|---|---|---|
| Internet & TV services | (2,082.90) | - | (1,608.39) | - |
| Software License Fees | (140.80) | - | - | - |
| Server Hosting Service | (28,595.13) | - | - | - |
| CDN Video Cloud Storage | (55,728.00) | - | - | - |
| Satellite Service | (137,282.93) | - | - | - |
| Imaging License Fee | (9,201.25) | - | - | - |
| Software & Apps | (5,000.00) | - | - | - |
| Website Hosting | - | - | (266.50) | - |
| **Total Computer/IT/IP Expense** | **(238,031.01)** | **-** | **(1,874.89)** | **-** |

| | | | | |
|---|---|---|---|---|
| Insurance | (2,166.50) | | | |

#### Office & Administrative Expense
| | | | | |
|---|---|---|---|---|
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) |
| Equipment Rental | (1,989.90) | - | - | - |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) |
| **Total Office & Administrative Expense** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** |

| | | | | |
|---|---|---|---|---|
| Outsourced Services | - | - | - | - |
| Consulting Services | - | - | - | - |

#### Utilities
| | | | | |
|---|---|---|---|---|
| Utility Deposit | (10,000.00) | - | - | - |
| Electricity | - | - | (5,107.63) | - |
| HVAC | (256.19) | - | - | - |
| CAM Charges | (20,364.16) | - | - | - |
| Water & Sewer | (1,708.55) | - | - | - |
| Gas Service | (132.09) | - | - | - |
| Pest Control | (244.65) | - | - | - |
| Waste Management | (351.81) | - | - | - |
| **Total Utilities** | **(33,057.46)** | **-** | **(5,107.63)** | **-** |

#### Occupancy
| | | | | |
|---|---|---|---|---|
| Rent | (33,408.51) | - | - | - |
| Office Security | (31,111.90) | - | - | - |
| Repair & Maintenance - Building | (1,777.19) | - | - | - |
| Janitorial | (5,983.33) | - | - | - |



EXHIBIT

005422

A

| | Period+A5:E83 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 |
|---|---|---|---|---|
| **Total Occupancy** | **(72,280.93)** | - | - | - |
| Supplies | (1,258.02) | - | - | - |
| Telephone | (18,337.88) | - | - | |
| **Personnel Expenses** | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - |
| Payroll Tax | (13,087.76) | - | (13,087.76) | - |
| Alex Jones Salary | (10,000.00) | - | (10,000.00) | - |
| **Total Personnel Expenses** | **(191,555.20)** | **-** | **(191,555.20)** | **-** |
| **Travel** | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) |
| Vehicle Leases | - | (1,470.56) | - | - |
| **Total Travel Expenses** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** |
| **Total Operating Expenses** | **(576,647.03)** | **(1,898.71)** | **(198,965.88)** | **(428.15)** |
| ***Non-Operating Expenses*** | | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) |
| AMEX Payment | - | - | - | - |
| **Total Other Expenses** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** |
| **Professional Fees** | | | | |
| CRO Fees | - | - | - | - |
| Financial Adviosr Fee | - | - | - | - |
| Shannon & Lee LLP | - | - | - | - |
| Ray Battaglia | - | - | - | - |
| **Total Professional Fees** | **-** | **-** | **-** | **-** |
| **Total Cash Flow** | **$ (245,586.44)** | **$ 111,769.75** | **$ 164,702.59** | **$ 843,406.77** |

005423

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

---

# Sandy Hook Families' EXHIBIT 4

---

005424

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 12, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

<u>**ORDER MODIFYING INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH**</u>
<u>**COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION**</u>

On August 11, 2022, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>")

in the above-captioned chapter 11 case (the "<u>Case</u>"), filed its *Emergency Motion to Amend Interim Order*

*Authorizing the Use of Cash Collateral* after due deliberation and consideration and sufficient cause appearing

therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein.

2. <u>Interim Order</u>. The Interim Order shall be modified as follows:

The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the Motion, from the daily settlement contemporaneously with the distributions to FSS and PQPR

3. <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting

weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the

Connecticut and Texas plaintiffs.

4. The remaining terms, findings and provisions of the Interim Order are not amended or

modified and remain in effect.

Signed: August 12, 2022

Christopher Lopez
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

---

# Sandy Hook Families' EXHIBIT 5

---

005426

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5. <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6. <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "<u>PQPR Payment</u>"). Creditors and parties in interest shall have thirty (30) days from the date

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7.      Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.      Adequate Protection – Replacement Liens.      The adequate protection and related carve outset forth in the First Interim Order are incorporated in the Second Interim Order.

10.      Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.      Credit Card Processing. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.      Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     Discovery. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15.     Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 1:00 p.m. Central time.

Signed:  August 24, 2022

Christopher Lopez
United States Bankruptcy Judge

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | | |
| Product Sales | | $ 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | | $ 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | | $ (250,000.00) | | $ (500,000.00) | | $ (750,000.00) |
| Merchant Account Fees | | $ (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | | $ (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | | $ (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | | $ (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | | $ - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | | $ - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | | $ - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | $ - |
| Bank Fees & Service Charges | | $ (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | | $ (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | | $ (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| **Outsourced Services** | | $ - | $ - | $ - | $ - | |
| Consulting Services | | $ - | $ - | $ - | $ - | |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | $ - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | $ - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

**Free Speech Systems LLC**
**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| **Total Personnel Expenses** | | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | | $ - |
| Mileage/Parking/Tolls | | $ (150.67) | $ (167.41) | $ (167.41) | $ (167.41) | $ (652.90) |
| Vehicle Leases | | $ - | $ - | $ (1,470.56) | $ - | $ (1,470.56) |
| **Total Travel Expenses** | | $ (150.67) | $ (167.41) | $ (1,637.97) | $ (167.41) | $ (2,123.46) |
| **Total Operating Expenses** | | $ (647.10) | $ (577,137.87) | $ (2,189.56) | $ (209,456.72) | $ (789,431.24) |
| ***Non-Operating Expenses*** | | | | | | $ - |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | $ - |
| **Total Other Expenses** | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | $ (25,000.00) | $ (25,000.00) |
| Fulfillment Expert | | $ (12,500.00) | $ - | $ - | $ - | $ (12,500.00) |
| Witness expenses and cost | | | | | | |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (50,000.00) | $ - | $ (50,000.00) |
| SALLC Fees | | $ - | $ - | $ - | | $ - |
| Shannon & Lee LLP | | $ - | $ - | $ - | | $ - |
| Ray Battaglia | | $ - | $ - | $ - | | $ - |
| **Total Professional Fees** | | $ (12,500.00) | $ - | $ (150,000.00) | $ (25,000.00) | $ (187,500.00) |
| **Total Cash Flow** | | $ 727,435.62 | $ (33,948.36) | $ (225,531.18) | $ 192,201.66 | $ 660,157.73 |

005432

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

---

# Sandy Hook Families' EXHIBIT 6

---

005433

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 13, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## THIRD INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. This order is the third interim order ("Third Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.  <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.  <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.  <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Third Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.  <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, either directly or indirectly, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.  <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7. <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8. <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9. <u>Adequate Protection – Replacement Liens</u>. The adequate protection and related carve out set forth in the First and Second Interim Orders are incorporated in the Third Interim Order.

10. <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11. <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12. <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13. <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October 12, 2022, at 10:00 a.m. Central time.

Signed: September 13, 2022

Christopher Lopez
United States Bankruptcy Judge

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 8 | 9 | 10 | 11 | |
| **Income** | | | | | | |
| Product Sales | | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 4,000,000.00 |
| Advertising | | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 400,000.00 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 4,412,564.99 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (901,176.75) |
| Repay PQPR Inventory | | $ - | $ - | $ - | $ - | $ - |
| Merchant Account Fees | | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (196,000.00) |
| Shipping cost for drop ship orders | | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (53,144.99) |
| Fulfillment Services | | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (1,175,609.76) |
| Processor Fees | | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (160,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (621,482.87) | $ (654,090.74) | $ (621,482.87) | $ (621,482.87) | $ (2,518,539.36) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| 62410 Contract Broadcase Services | | $ (11,200.00) | | | | $ (11,200.00) |
| 62420 Contract Radio Show Production | | $ (25,000.00) | | | | $ (25,000.00) |
| 62430 Contract Video Production | | $ (10,000.00) | | | | $ (10,000.00) |
| 62470 Free Lance Contributors | | $ (3,500.00) | | | | $ (3,500.00) |
| Website Hosting | | $ - | $ - | $ - | $ - | |
| **Total Computer/IT/IP Expense** | | $ (49,700.00) | $ (238,031.01) | $ - | $ (1,608.39) | $ (289,339.41) |
| Insurance | | $ - | $ (2,166.50) | $ - | | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | | $ (77.08) | $ (77.08) | $ (77.08) | $ (77.08) | $ (308.34) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.53) | $ (3.53) | $ (3.53) | $ (3.53) | $ (14.11) |
| Business Meals | | $ (470.97) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,883.89) |
| **Total Office & Administrative Expense** | | $ (551.58) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,196.24) |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |

005438

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|
| Gas Service | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | **$ -** | **$ (23,057.46)** | **$ -** | **$ (5,107.63)** | **$ (28,165.09)** |
| **Occupancy** | | | | | |
| Rent | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | **$ -** | **$ (72,280.93)** | **$ -** | **$ -** | **$ (72,280.93)** |
| Supplies | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | $ - | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | $ - |
| Salaries & Wages - Base | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |
| **Total Personnel Expenses** | **$ -** | **$ (201,755.20)** | **$ -** | **$ (201,755.20)** | **$ (403,510.40)** |
| **Travel** | | | | | |
| Mileage/Parking/Tolls | $ (167.41) | $ (167.41) | $ (167.41) | $ (167.41) | $ (669.64) |
| Vehicle Leases | $ - | $ - | $ - | $ (1,470.56) | $ (1,470.56) |
| **Total Travel Expenses** | **$ (167.41)** | **$ (167.41)** | **$ (167.41)** | **$ (1,637.97)** | **$ (2,140.20)** |
| **Total Operating Expenses** | **$ (50,419.00)** | **$ (577,137.87)** | **$ (719.00)** | **$ (210,660.78)** | **$ (838,936.64)** |
| ***Non-Operating Expenses*** | | | | | |
| Payment on PQPR Note | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | $ - | $ - | $ - | $ - | |
| **Total Other Expenses** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (20,000.00)** |
| **Professional Fees** | | | | | |
| Subchapter v Trustee retainer | | | | | |
| Fulfillment Expert | $ (22,487.56) | $ - | $ - | $ - | $ (22,487.56) |
| Economic Loss Expert | | | | | $ - |
| Alex Jones at Trial Cost | $ (80,920.00) | | | | $ (80,920.00) |
| Witness expenses and trial costs | $ (34,048.00) | | | | $ (34,048.00) |
| Brittany Paz | | | | | $ - |
| Pattis & Smith | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| SALLC Fees | | $ - | $ - | $ (188,018.31) | $ (188,018.31) |
| Shannon & Lee LLP | | $ - | $ - | $ (207,348.36) | $ (207,348.36) |
| Ray Battaglia | | $ - | $ - | $ (47,316.80) | $ (47,316.80) |
| **Total Professional Fees** | **$ (137,455.56)** | **$ -** | **$ (200,000.00)** | **$ (442,683.47)** | **$ (780,139.03)** |
| **Total Cash Flow** | **$ 288,783.82** | **$ (133,087.37)** | **$ 275,939.38** | **$ (176,685.88)** | **$ 254,949.95** |



EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11 (Subchapter V)** |
| **FREE SPEECH SYSTEMS LLC,** | § | |
| | § | **Case No. 20-60043 (CML)** |
| Debtor. | § | |

**SECOND SUPPLEMENTAL DISCLOSURES TO VERIFIED STATEMENT OF**
**SUBCHAPTER V TRUSTEE**
[Relates to ##22, 209]

Melissa A. Haselden, duly appointed Subchapter V Trustee ("Trustee") in the captioned case, hereby files these second supplemental disclosures to the Verified Statement of Subchapter V Trustee filed at Docket ##22, 209 as follows:

1. "In April 2018, my prior firm, HooverSlovacek LLP, filed chapter 11 Case No. 18-32179 in the Southern District of Texas on behalf of Debtor Store It Reit, Inc.  Subsequently, W. Marc Schwartz was appointed as CRO in the Store It Reit case and was subsequently named as liquidating trustee under the terms of the Chapter 11 plan.  Sometime, post confirmation, Michael Ridulfo began representing Mr. Schwartz as liquidating trustee in the Store It Reit case.   Although I was not the attorney in charge of the Store It Reit case, I did provide nominal services in this case.   Upon information and belief, the HooverSlovacek fee application reflects a few time entries for services that I provided in the Store It Reit case.  Our bankruptcy team was also regularly briefed on case updates during our meetings.   During this time, I had, few, if any, interactions with Mr. Schwartz. To the best of my knowledge, I never interacted with Mr. Ridulfo on matters related to the Store It Reit case.

005440

2.  I have worked on other cases in which Mr. Ridulfo has represented creditors including, but not limited to *In re Midway Oilfield Constructors, Inc.*, Case No. 18-34567 in the Southern District of Texas – HooverSlovacek represented the Debtor in the Midway Oilfield Constructors case and Mr. Ridulfo represented a creditor; *In re Digerati Technologies, Inc.,* Case No.13-33264 - HooverSlovacek represented the Debtor and Mr. Ridulfo represented an interested party/creditor.

3.  Mr. Ridulfo also served as proposed counsel to Mr. Schwartz, who was proposed CRO to the Debtors, in the jointly administered cases of InfoW LLC, IWHealth, LLC and Prison Planet TV, LLC in which I was the Subchapter V Trustee."

Dated: October 10, 2022                               **HASELDEN FARROW PLLC**

By: */s/ Melissa A. Haselden*
       MELISSA A. HASELDEN
       State Bar No. 00794778
       700 Milam, Suite 1300
       Pennzoil Place
       Houston, Texas 77002
       Telephone: (832) 819-1149
       Facsimile: (866) 405-6038
       mhaselden@haseldenfarrow.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**UNOPPOSED EMERGENCY MOTION FOR
CONTINUANCE OF HEARING ON THE SANDY HOOK FAMILIES'
MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE
AND (II) REMOVE THE DEBTOR IN POSSESSION**
[Related to ECF Nos. 102, 103, and 104]

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

**Relief is requested on or before October 12, 2022 at 10:00 a.m.**

---

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach,

and Robert Parker (the "Connecticut Plaintiffs") (together with the Texas Plaintiffs, the "Sandy Hook Families"),[1] hereby file this unopposed emergency motion ("Motion for Continuance") for a continuance of the hearing on *The Sandy Hook Families' Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession* [Dkt. 102] (the "Tort Committee Motion"), and respectfully state as follows:

## I.    INTRODUCTION

1.      The Tort Committee Motion is currently set for hearing on October 12, 2022, at 10:00 a.m. (Prevailing Central Time).

2.      The *Emergency Application of the Debtor for an Order (A) Authorizing Employment of Patrick Magill as Chief Restructuring Officer and (B) Granting Related Relief* [Dkt. 205] (the "Magill CRO Application") is also set for hearing on October 12, 2022.

3.      On October 6, 2022, Subchapter V Trustee, Melissa Haselden, filed a proposed *Stipulation and Agreed Order* [Dkt. 211], which lays out the details for the parties' mediation.

4.      Given the upcoming mediation and the pending Magill CRO Application, the Sandy Hook Families request, on a consensual basis, that the Court continue the hearing on the Tort Committee Motion until November 16, 2022, or, alternatively, a date that is amenable to the Court, to preserve estate resources and for the reasons set forth herein.

---

[1] Marcel Fontaine was not defamed as to the Sandy Hook mass-shooting but as to the Parkland mass-shooting. For ease of reference, however, this document refers to all tort claimants as the Sandy Hook Families.

## II.   JURISDICTION AND VENUE

5.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.     Venue for this Motion for Continuance is proper in this Court pursuant to 28 U.S.C. § 1409.

## III.   SANDY HOOK FAMILIES' REQUEST FOR EMERGENCY RELIEF

7.     The Sandy Hook Families seek entry of an order continuing the Tort Committee Motion for approximately thirty-five (35) days to give ample time to engage in mediation and to allow the Court to decide the Magill CRO Application.   Because the current hearing on the Tort Committee Motion falls within the normal briefing period for this Motion for Continuance, and because the Motion for Continuance is unopposed, emergency consideration is appropriate.

## IV.   RELIEF REQUESTED

8.     The Sandy Hook Families request that the Court continue the hearing on the Tort Committee Motion currently set for October 12, 2022.   The requested continuance would give the parties an opportunity to reach a resolution that might vitiate the need for the Court to hear the Tort Committee Motion.  Similarly, the Court's decision with respect to the Magill CRO Application—also set for the October 12, 2022 hearing— may address concerns raised in the Tort Committee Motion.

9.     The Debtor and the Sandy Hook Families have conferred, and the Motion for Continuance is unopposed.  Counsel for the Debtor and the Sandy Hook Families have

agreed on continuing the hearing setting until November 16, 2022, or, alternatively, a date that is amenable to the Court.

V.     CONCLUSION

For the foregoing reasons, the Sandy Hook Families respectfully request this Court enter an order continuing the hearing on the Tort Committee Motion until November 16, 2022, or, alternatively, a date that is amenable to the Court, and grant the Sandy Hook Families such other and further relief to which they may be justly entitled.

Respectfully submitted this 10th day of October 2022.

MCDOWELL HETHERINGTON LLP

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, PC

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**Cain & Skarnulis PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**Byman & Associates PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Bankruptcy Counsel for Connecticut Plaintiffs***

## CERTIFICATE OF ACCURACY

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

_____*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Emergency Motion for Continuance has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 10th day of October 2022.

_____*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| **Debtor.** | § | |

**ORDER GRANTING UNOPPOSED EMERGENCY MOTION FOR
CONTINUANCE OF HEARING ON THE SANDY HOOK FAMILIES'
MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND
(II) REMOVE THE DEBTOR IN POSSESSION**

CAME ON FOR CONSIDERATION the *Unopposed Emergency Motion for Continuance of Hearing on the Sandy Hook Families' Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession* (the "Motion for Continuance") filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "Connecticut Plaintiffs") (together with the Texas Plaintiffs, the "Sandy Hook Families").  IT IS ORDERED THAT the Motion for Continuance is GRANTED and the hearing on the Motion is continued until _____ ____, 2022 at ___:___ _.m. (CST).

Dated: _____ ____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

1

005447

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC | § | Chapter 11 (Subchapter V) |
| Debtor. | § | |

**RESPONSE AND INITIAL OBJECTION OF ALEX E. JONES TO THE MOTION TO RECONSIDER THIS COURTS RULING DECLINING TO EMPLOY THE FIRM OF SHANNON AND LEE, PLLC [DKT #206] AND MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC [DKT #207] AND ALTERNATIVELY, FOR CONTINUANCE OF THE HEARING NOW SET FOR OCTOBER 12, 2022**

TO THE HON. CHRISTPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

ALEX E. JONES files this Initial OBJECTION to the Motions to Reconsider filed by Shannon & Lee, PLLC and Marc Schwartz and Marc Schwartz Associates, LLC (collectively "Movants") [Dkt #'s 206 and 207] (collectively the "Reconsideration Motions "or the "Motions") and would show as follows:

**I.**
**PRELIMINARY STATEMENT**

1.      Both Shannon & Lee, PLLC and Marc Schwartz and Schwartz Associates, LLC, "Movants" initially sought to be retained _by Motion of the Debtor Free Speech Systems, LLC_ ("FSS"), with the consent and approval of Alex E. Jones ("Alex Jones"), the sole managing member of FSS, by Application filed on August 20, 2022 [Dkt #'s 83 and 85]. The Motions sought to retain Movants _on behalf of the Debtor_ as its professionals, along with the existing professionals.

2.      The Reconsideration Motions were subject to Objections by the United States Trustee and after a properly noticed and full hearing on September 20, 2022, the Court entered its Order denying such relief. [Dkt #'s 181 and 182]. The Court stated on the record the reasons for its ruling.

Page 1

005448

3.      On October 4, 2022, the day the courts Order would have been final, Movants filed their Reconsideration Motion without any prior consultation with Alex Jones (then the sole managing member of FSS).  Most important:

    a.   The Debtor had not sought to retain either Movants subsequent to the denial of the Motions for Reconsideration and have not filed nor joined in the Motion to Reconsider filed by Movants.

    b.   Instead, the Debtor with the approval of Alex Jones, has determined to retain a new CRO and have spent hours in that effort unaided by Movants.

    c.   The Reconsiderations Motions do not allege that the Debtor is seeking the relief of reconsideration, nor do the Motions allege that the Debtor is in support of the Motions or even approves of the Motions.

    d.   The Motions filed by or on behalf of both Movants attach as Exhibits containing significant attorney client privileged and work product privileged communications involving communications only among counsel with, and subject to, common interests[1] with the Debtor and its sole owner.  This filing was without seeking the consent of the sole owner or the Debtor prior to disclosing the privileged and confidential attorney client communications and wok product.

    e.   The motive in Movants' publishing the privileged communications were to further their self-serving suggestion at a narrative on behalf of Movants,

---

[1]      The Debtor's Co-counsel Ray Battaglia, prior to filing of the Chapter 11, and Alex Jones counsel, along with litigation counsel Andino Reynal, executed a Common Interest Agreement designed to maintain counsels communications of their confidential attorney opinions, analysis and work product as privileged.  Although Movant Shannon & Lee were requested to sign the agreement, it is unclear whether one was executed.  In any event, all counsel knew of the Joint Communications Agreement and the need to share communications among the common interest counsel for Alex Jones and FSS and the need to protect that privileged communications and the work product reflected therein from publication, at least without a Court's order.

contrary and not supported by the common interest parties or communication, in an effort to apparently disclose the substantial debate among these common interests.  Even though such debate always takes place among common interest counsel, such debate is not the basis authorizing unilateral disclosures of those communications and work product (research, status of law, and prediction of court treatment of those issues) and in fact, there would be no disclosure or debate among common interest counsel if disagreeing with a counsel's opinion authorizes disclosures of such communications.

4.     Importantly, *previous to the September 20, 2022 hearing* this Court announced its concern about certain conduct of the Movants as initially serving before approval as prior Debtor's counsel and prior Debtor's CRO, including:

    a.   concerns of the failure by Movants to disclose certain potential or actual conflicts of the Movants involving prior affiliates' Chapter 11 cases; and

    b.   (at a hearing on the Debtor's operating budget) the expressed concerns by this Court on the record regarding certain of the Debtor's proposed budget payments for Connecticut litigation expenses (travel and legal fees) that included amounts to be incurred by Alex Jones yet budgeted to be paid for by only the Debtor; and

    c.   (alleged by Movants as an issue) Alex Jones[2] asserted indemnity by the Debtor reflected in his employment agreement and proof of claim filed in this case.

---

[2] The Court did not mention indemnity of Alex Jones by the Debtor as suggested by Movants, but in fact both by statute and by written agreement, Alex Jones has a right to be indemnified from all litigation costs, most recently of which he has paid 100% of his and FSS's professional fees. The Court did mention a possible indemnity by FSS of PQPR but that is not relevant to Alex Jones' requested costs and fees reimbursements.

005450

Remarkably nothing in the Movants' Applications or any pleading addressed any of these prior Court concerns, and in particular, the pleadings and the Affidavits/Declarations of the Movants contained repeated and multiple errors and mistakes (making certain facts alleged untrue), and statements of facts of experience and qualifications that were disclosed upon examination of the Movants by the United States Trustee ("UST") and the Court, to be of further concern.

5.      Also remarkable was the Movants' failure to acknowledge (or maybe realize) that the written Objection of the UST was based almost exclusively on the concerns expressed on the record *by this Court* and yet only one of the matters were partially addressed in any meaningful degree in writing.  Instead, Movants filed a Response to the Objection of the UST containing *ad hominem* attacks both personal and professional on the contents of the UST's objection and their dishonest and unethical motives in filing same  (filed without even showing, much less consulting, Alex Jones or co-counsel to the Debtor about the inflammatory and incorrect nature of this Response) [Dkt #176].

6.      By denial of the Movants' Applications to be employed, Alex Jones was returned to the status as the only operating member with authority to retain professionals.  The Debtor, under the direction of its remaining counsel and with assistance and input of Alex Jones, immediately began the process of a selection and replacement CRO.   On October 5-7, 2022 the current counsel for the Debtor, Alex Jones, along with key employees of the Debtor, met with and extensively interviewed, and ultimately approved a new Chief Restructuring Officer.  Application to approve and appoint Patrick Magill as the new CRO has been filed [Dkt #205].

7.      As with the prior CRO-Marc Schwartz, upon filing of the application (still subject to approval) the authority and powers of the new CRO will be as Managing Member or President

of the Debtor, with its only obligation to Alex Jones as the owner being consulted on material matters.

## II.
### RELIEF SOUGHT
### DENIAL OF THE MOTIONS TO RECONSIDER
### AND AUTHORITIES

8.      Professionals such as Movants seeking employment by and on behalf of a Chapter 11 Debtor have no standing to file an application on the proposed professional's own behalf, without the request of the Debtor.  In fact, all "Applications to Employ" are made by the Debtor usually with the agreement of the Professional(s).  *See*, Rule 2014(a) ["Application for and Order of Employment. An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to §327, §1103, or §1114 of the Code *shall be made **only on application of the trustee***" (Emphasis added.)].

9.      In this case, as to the Motion of Marc Schwartz, the Debtor has selected a new CRO and does not intend to request that Marc Schwartz remain in that position, except for transitional matters.

10.     It is the exclusive right of the Debtor to seek employment of its professionals, not that of a prospective professional seeking employment.  Once an application is denied, or at any time during that process or after, the Debtor may determine, in its discretion, not to retain the professional.  Neither of the Motions are filed by the Debtor and since this Court's Order a new CRO has been selected.

11.     Accordingly, pursuant to Bankruptcy Rule 2014(a), these professionals have no standing to seek employment of the Debtor without the Debtors' express request and without the Debtor making the application.

005452

12.     At the time these Motions to Reconsider were made by Movants, the Debtor was not only not the party making the Motions, but also not asked to file, or even agree with the Motions.

13.     In particular, Alex Jones was shocked that prior counsel and the prior CRO sought to publish and use confidential attorney client privileged joint communication documents to further their own narrative that begins with their failure to have furnished this Court with the clear and precise answers to the Court's expressed concerns [*See*, *e.g*., Exhibits "G" and "J" attached to the Motions].  This failure cannot now in some fashion be corrected by Movants' unilateral decision to disclose privileged communications of the Debtor and Alex Jones, the only parties that own these privileges.  Especially so when all parties were not even asked if they concurred, or would consent, or if there were other non-offensive methods to accomplish the results Movants desired.

14.     In fact, as to each question the Court sought specific and clear explanation of the Movants' conduct and decisions the Debtor and Alex Jones had relevant and reasonable answer – yet to date no pleading filed by these Movants nor facts testified by these Movants has addressed the Court's questions other than to touch on the "failure to disclose" topic.  Neither Movants made any effort to discuss, much less to clearly set out, the explanation and reasoning for the decisions regarding Alex Jones sharing of expenses.  Alex Jones intends to file his pleading shortly to deal with the Court's concerns about expense and cost sharing so that at least these as-yet unanswered questions regarding Alex Jones and expense sharing will be answered.[3]

### III.
### ALTERNATIVE RELIEF SOUGHT

---

[3]     This Court denied without prejudice the travel budget proposed by the Debtor pending an explanation as to why these and other litigation expenses were not being shared by Alex Jones.  The Court made clear it was not denying those budged reimbursements but also not allowing the budgeted expense *until the Court received an explanation* upon application for those reimbursements.  Up through the filing of these Reconsideration Motions, neither Movants has made any effort to furnish this Court with that explanation.  The Reconsideration Motion should be denied for that reason alone.

**ONLY IN THE EVENT MOVANTS MOTIONS ARE NOT DENIED, ALEX JONES SEEKS A CONTINUANCE ON THE HEARING SET FOR THESE MOTIONS TO RECONSIDER**

15.    Movants' Reconsideration Motions and the Exhibits published in support of the Motion were a complete shock to Alex Jones and his counsel.  Neither had been consulted about the Motions, much less the disclosure of attorney client jointly privileged communications, even though several of the attached privileged documents were sent and received by Alex Jones counsel (and included no outside third-parties to such communications).   In fact, it is in recognition of the application of a joint privilege that as among parties with "common interests" there will be debate over both facts, events, legal authority and legal strategies, as well as opinions expressed and predictions made by those counsel of the expected outcome of presenting those facts, legal theories and authorities to the courts. Were those communications not privileged, or if the mere "disagreement" as to privileged communication topics waived the privilege, no "common interest" counsel would ever risk participating, in particular, if a disagreement would allow one part to disclose to opposing parties in the litigation those communications.

16.    Here, after the Movants were no longer acting on behalf of the Debtor or the common interest of the parties, the Debtor's prior lawyer and prior CRO elected to disclose those privileged communications in a public filing to further a narrative for their own self-serving purpose of seeking to be re-employed by the Debtor.

17.    The extraordinary manner in which Movants seek reconsideration of their failure to have disclosed (i) potential or actual conflicts, and (ii)  the actual reasons for the expense sharing of these common interest parties, cannot be cured or reconsidered in the manner by which the Movants unilaterally disclose privileged and confidential communications to which they were participating parties.  This attempt by Movants to be re-employed by furthering a narrative of the

"give and take" among all counsel faced with common issues of law and strategy, legal arguments and predictions of likely or potential outcomes (communications evidenced by a written joint communication privilege agreement), cannot be addressed by Alex Jones in the brief period of time afforded from notice of the filing on October 4, 2022 to a hearing, *if on the merits*, on October 12, 2022.[4]  In fact, the difficulty of how to respond to these Motions in a manner that does not further cause breach the Debtor's and Alex Jones' right to maintain the joint attorney client common interest privileges,  and to fully address these Motions, requires more time than eight (8) days to accomplish.

18.     Alex Jones requests in good faith that in the event this Court determines to consider the Merits of the Reconsider Motions, that Alex Jones be given additional time to fully respond.

**IV.**
**CONCLUSION**

19.      Alex Jones seeks the denial of the Motions to Reconsider on the grounds set out above, including the lack of Movants' standing to file or prosecute these Motions without joinder or filing by the Debtor.  The Debtor is moving forward with its new CRO and does not seek the reconsideration of employment of the prior counsel.

20.      In the event this Court desires a hearing on the merits of this motion, Alex Jones requests a brief continuance of the October 12, 2022 scheduled hearing to allow a reasonable time for a response, hearing preparation, and participation.

Dated: October 10, 2022

---

[4]       However, Alex Jones does not believe a hearing is required under the law regarding employment of professionals on behalf of a Debtor.

005455

Respectfully submitted,

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
            aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF as shown in the attached service list on October 10, 2022.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

005456

**E-SERVICE LIST**

Raymond William Battaglia on behalf of Debtor Free Speech Systems LLC
rbattaglialaw@outlook.com, rwbresolve@gmail.com

Joseph S.U. Bodoff on behalf of Creditor ADP TotalSource, Inc.
jbodoff@rubinrudman.com

Ryan E Chapple on behalf of Creditor David Wheeler, et al.
rchapple@cstrial.com, aprentice@cstrial.com

Richard A. Cochrane on behalf of Creditor David Wheeler, et al.
rcochrane@akingump.com, jlangmack@akingump.com

Richard A. Cochrane on behalf of Creditor Leonard Pozner, Marcel Fontaine, Neil Heslin,
Scarlett Lewis, Veronique De La Rosa
rcochrane@akingump.com, jlangmack@akingump.com

Christopher Dylla on behalf of Creditor Texas Comptroller of Public Accounts, Revenue
Accounting Division
bk-cdylla@oag.texas.gov, Sherri.Simpson@oag.texas.gov

Elizabeth Carol Freeman on behalf of Trustee Melissa A Haselden
efreeman@jw.com, kgradney@jw.com;dtrevino@jw.com;jpupo@jw.com;JacksonWalkerLLP@
jubileebk.net

Melissa Anne Haselden on behalf of Trustee Melissa A Haselden
mhaselden@haseldenfarrow.com, haseldenbankruptcy@gmail.com,haselden.melissaa.r104367@
notify.bestcase.com

Kyung Shik Lee on behalf of Attorney Kyung Shik Lee
kslee50@gmail.com, Courtnotices@kasowitz.com

Stephen Wayne Lemmon on behalf of Creditor PQPR Holdings Limited, LLC
lemmon@slollp.com, mates@slollp.com

John D Malone on behalf of Creditor Security Bank of Crawford
myra@johnmalonepc.com, myra@johnmalonepc.com

Jarrod B. Martin on behalf of Creditor Leonard Pozner, Marcel Fontaine, Neil Heslin, Scarlett
Lewis and Veronique De La Rosa
jarrod.martin@chamberlainlaw.com, Lara.Coleman@chamberlainlaw.com;atty_jmartin@bluesty
lus.com;ginger.davis@chamberlainlaw.com

005457

Avi Moshenberg on behalf of Creditor Leonard Pozner, Marcel Fontaine, Neil Heslin, Scarlett Lewis, Veronique De La Rosa
avi.moshenberg@mhllp.com, patricia.flores@mhllp.com

Ha Minh Nguyen on behalf of U.S. Trustee US Trustee
ha.nguyen@usdoj.gov

Michael P Ridulfo on behalf of Other Prof. Schwartz Associates, LLC
mridulfo@krcl.com, rcoles@krcl.com

Stephen A Roberts on behalf of Interested Party David Ross Jones
sroberts@srobertslawfirm.com, 1222805420@filings.docketbird.com

Jayson B. Ruff on behalf of U.S. Trustee US Trustee
jayson.b.ruff@usdoj.gov

R. J. Shannon on behalf of Debtor Free Speech Systems LLC
rshannon@shannonpllc.com, rshannon@shannonleellp.com;7044075420@filings.docketbird.com

Jason Starks on behalf of Creditor Travis County
bkecf@traviscountytx.gov

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

Randy W Williams on behalf of Creditor David Wheeler, et al.
rww@bymanlaw.com, rw13@trustesolutions.com;rw13@trustesolutions.net;rw11@trustesolutions.net;rww.trustee1@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

---

**SHANNON & LEE LLP'S REPLY TO THE RESPONSE AND INITIAL OBJECTION OF
ALEX E. JONES TO SHANNON & LEE LLP'S RULE 59 MOTION**

---

Shannon & Lee LLP ("S&L") replies to the Response and Initial Objection of Alex E. Jones to the Motion to Reconsider this Court's Ruling Declining to Employ the Firm of Shannon and Lee, PLLC [sic] [Dkt # 206] and Marc Schwartz and Schwartz Associates, LLC [Dkt #207] and Alternatively, for Continuance of the Hearing Now Set for October 12, 2022 [ECF No. 217] (the "AEJ Response") as follows:

**PRELIMINARY STATEMENT**

1.      Alex E. Jones ("AEJ") objects to Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206] (the "Rule 59 Motion") on the basis that the Rule 59 Motion was not filed by Free Speech Systems, LLC ("FSS") as debtor in possession. The AEJ Response also asserts that the evidence S&L seeks to present at a rehearing on the issue of disinterestedness is subject to a common interest privilege. S&L responds to both points below.

## ARGUMENT

### A. S&L Has Standing to File the Motion for Reconsideration.

2.      Through the Rule 59 Motion, S&L seeks a rehearing on the issue of disinterestedness in connection with FSS's application to employ S&L as co-counsel [ECF No. 85]. S&L has statutory and constitutional standing to seek the relief requested in the Rule 59 Motion.

3.      Rule 59 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to the above-captioned chapter 11 case by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), provides in relevant part, that "[t]he court may grant a new trial on all or some of the issues—*and to any party* . . . ." (emphasis added). Neither Federal Rule 59 nor Bankruptcy Rule 9023 limit relief to the original moving party.

4.      Title 11 of the United States Code (the "Bankruptcy Code") provides expansive rights to be heard in chapter 11 cases. Bankruptcy Code § 1109(b) provides that any "party in interest . . . may raise and may appear and be heard on any issue in a case under [chapter 11]." A "party in interest" is a party with a personal stake in the outcome that can be addressed by a favorable decision. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 417 (Bankr. S.D. Tex. 2009); *see also In re Am. Appliance*, 272 B.R. 587, 595 (Bankr. D.N.J. 2002) (holding that the test for whether an entity is a "party in interest" is whether it has a sufficient stake in the outcome of the proceeding to require representation).

5.      Further, as the Bankruptcy Appellate Panel for the Sixth Circuit held in *Bingham Greenebaum Doll, LLP v. Glenview Health Care Facility, Inc. (In re Glenview Health Care Facility, Inc.)*, 620 B.R. 582 (B.A.P. 6th Cir. 2020), the pecuniary interest of a professional in its fees is sufficient for Article III and appellate standing with respect to a denied application to employ. *Id.* at 585; *see also KLG Gates LLP v. Brown*, 506 B.R. 177, 190 (E.D.N.Y. 2014) (holding that a disqualified attorney had standing to appeal the disqualification order). Addressing the exact

2

argument raised in the AEJ Response, the Sixth Circuit BAP noted that, as a procedural rule, Bankruptcy Rule 2014(a) does not limit or extend jurisdiction. *In re Glenview Health Care Facility, Inc.)*, 620 B.R. at 585, n.2. S&L has standing to bring the Rule 59 Motion because the outcome of the motion directly affects the firm.

**B. The Additional Evidence S&L Seeks to Submit is Not Subject to Common Interest Privilege.**

6.      Nor are any of the communications (the "<u>Disputed Communications</u>") attached to the Rule 59 subject to a common interest privilege.[1] For the common interest privilege to apply, the communication be (a) independently privileged but for the disclosure, and (b) be disclosed to an aligned party to further that common legal interest. *Osherow v. Vann (In re Hardwood P-G, Inc.)*, 403 B.R. 445, 460 (Bankr. W.D. Tex. 2009) (quoting *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 2008 U.S. Dist. LEXIS 45011, *26-27 (N.D. Ill. Jun. 9, 2008)). And "because the privilege is 'an obstacle to truth seeking,' it must 'be construed narrowly to effectuate necessary consultation between legal advisers and clients.'" *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).

> *i.    The Disputed Communications Do Not Contain Any Information of AEJ that Would Be Privileged but for Disclosure to FSS.*

7.      As the Fifth Circuit explained in *In re Santa Fe Int'l Corp.*, the common interest privilege makes "[d]isclosure of privileged information by an attorney to actual or potential co-defendants, or to their counsel, in the course of a joint defense does not constitute a waiver of the

---

[1] The AEJ Response references a "Common Defense Agreement." S&L was not a party to such agreement and was never asked to become a party to the agreement or a similar agreement. Further, to the extent that the AEJ Response is referring to the "Joint Defense Agreement Among Affiliates or Named Defendants" dated December 1, 2021, the agreement was limited by its terms to (a) written or oral information that is subject to the attorney-client privilege, the work produce doctrine, the privilege of self-critical analysis and any other applicable privileges or immunities or any other confidential research or commercial information including experts and persons or entities retained by counsel on behalf of their respective counsel that is (b) shared to defend or investigate the claims "arising out of allegations of defamation, intentional infliction of emotional distress, certain statutory claims, and damages." Even if the agreement *did* apply to S&L and binds FSS post-petition, it would not cover communications regarding AEJ's request for FSS to (a) seek a stay of the Connecticut Remand Order, (b) seek extension of the automatic stay, or (c) FSS to bear 100% of the litigation costs for the special counsel. It certainly would not cover AEJ's asserted indemnity against FSS.

attorney-client privilege." *Id.* at 712 (quoting *In re LTV Securities Litigation*, 89 F.R.D. 595 (N.D. Tex. 1981)). "It is not a separate privilege, in and of itself, but is instead 'a rule of non-waiver.'" *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC*, No. 4:12-CV-543, 2016 U.S. Dist. LEXIS 32967, at *15 (E.D. Tex. Mar. 15, 2016); *see also Finalrod IP, LLC v. John Crane, Inc.*, No. MO:15-CV-097-DC, 2019 U.S. Dist. LEXIS 105420, at *8-9 (W.D. Tex. Mar. 22, 2019) ("[T]he Court must first assess whether privilege exists as to the documents . . . .").

8.     The Disputed Communications do not contain any information from AEJ that would be privileged but for disclosure to FSS. Exhibit F to the Rule 59 Motion (S&L Exhibit 7) contains a request from AEJ's counsel for FSS to seek a stay of the Remand Order and the preliminary response by S&L on behalf of FSS. Exhibit G to the Rule 59 Motion (S&L Exhibit 8) contains a request from AEJ's counsel to discuss FSS's ongoing business considering FSS's decision to not take action to prevent the Connecticut Litigation from going forward against AEJ. Exhibit J to the Rule 59 Motion (S&L Ex. 11) is a request from AEJ's counsel for FSS's ideas of how to address the business fallout of AEJ being in trial in Connecticut.[2]   Exhibit K to the Rule 59 Motion (S&L Ex. 12) are emails between AEJ's counsel and Mr. Lee about the divisions of costs between AEJ and FSS for Connecticut Litigation Counsel with AEJ's counsel referencing an indemnity with respect to which AEJ had already filed a proof of claim.[3] None of this constitutes privileged information.

9.     Without underlying privileged information, AEJ's assertion of common interest privilege is a legal impossibility. The AEJ Response does not point out any such privileged information. There is not any. The additional evidence S&L seeks to submit with respect to the issue of disinterestedness is therefore not subject to any common interest privilege.

[2] There is also the obvious implied threat if no solution was reached, AEJ will attend the entire trial and drastically reduce FSS's revenue.

[3] Moreover, Mr. Lee referenced particularly that this was information that the Plaintiffs would want to know in connection with forthcoming applications to employ the special counsel.

4

> ii.   *There Was No Common Legal Interest with Respect to the Matters at Issue in the Disputed Communications.*

10.   The common interest privilege is also limited to communications or documents furthering a joint or common legal interest. *Ackerman McQueen, Inc. v. Stinchfield*, No. 3:19-cv-3016-X, 2020 U.S. Dist. LEXIS 241209, at *11 (N.D. Tex. Dec. 22, 2020) ("Communications may be protected by the common legal interest privilege only if those communications 'further a joint or common interest.'"). This requires more than simply desiring a successful outcome of the case but rather that the relevant *legal* interest is common to the parties. *See United States ex rel. Fisher v. Homeward Residential, Inc.*, No. 4:12-CV-461, 2016 U.S. Dist. LEXIS 32910, at *15 (E.D. Tex. Mar. 15, 2016) ("'A shared rooting interest in the "successful outcome of a case". . . is not a common legal interest.'").

11.   FSS and AEJ did not have common legal interests with respect to the matters at issue in the Disputed Communications. At the most fundamental level, FSS's interest is not necessarily minimizing the claims of the Connecticut Plaintiffs but rather liquidating the claims in a way that preserves the value of its estate for all creditors. But even looking more granularly, the legal interests of FSS and AEJ were not the same:

> a.   Exhibit F to Rule 59 Motion/S&L Ex. 7—In these communications, AEJ's counsel requested that FSS take action to seek a stay of the Connecticut Remand Order. In response, S&L informed AEJ's counsel that it did not make sense for FSS as debtor-in-possession to seek a stay of the Remand order or seek an extension of the automatic stay to AEJ. Because FSS was the only party that opposed the Connecticut Plaintiffs' motion to remand, it had a different legal interest from AEJ with respect to the Remand Order. FSS also had a different legal interest with respect to the automatic stay than AEJ.

> b.   Exhibit G to Rule 59 Motion/S&L Ex. 8—In this communication, AEJ's counsel requested to discuss FSS's ongoing business and indicated that he would "leave it to the Debtor[] to decide how to keep Alex supporting the efforts." In this communication AEJ's counsel points to the difference of legal interests between FSS as debtor-in-possession and AEJ as a non-debtor co-defendant in the Connecticut Litigation. Although FSS and AEJ may have had a common business interest that is insufficient. *See In re Hardwood P-G, Inc.*, 403 B.R. at 460.

5

      c.   <u>Exhibit J to Rule 59 Motion/S&L Ex. 11</u>—In this communication, AEJ's counsel indicated he was waiting to hear the Debtor[']s Plan when Alex['s] sales go dark because he is in trial in Conn." Again, this communication highlights the difference in legal interests between AEJ and FSS. AEJ had the legal right to attend the entire Connecticut Trial even though that would interfere with FSS's business and diminish FSS's estate. FSS sought to induce AEJ to give up that right for the benefit of the FSS bankruptcy estate.

      d.   <u>Exhibit K to Rule 59 Motion/S&L Ex. 12</u>—In these communications, S&L inquired about the portion of the costs of litigation counsel that AEJ would bear and AEJ's counsel responded that he believed the response would be "none if FSS has funds." This is despite FSS, through S&L, having already raised questions about the asserted indemnity. FSS and AEJ did not have a common legal interest in AEJ's asserted indemnity and were directly and unambiguously adverse with respect to who would bear the costs of the legal services.

12.    Further, each of the Disputed Communications are examples of S&L taking positions adverse to AEJ for the benefit of the FSS bankruptcy estate. Negotiations on issues where the parties are adverse is not protected by the common interest privilege. *Mack Energy Co. v. Red Stick Energy, L.L.C.*, No. 16-1696, 2019 U.S. Dist. LEXIS 167246, at *25 (W.D. La. Sep. 26, 2019) ("Communications in which the parties are negotiating issues on which they are adverse would be unlikely to be protected by the common-interest privilege.").

13.    While some communications among FSS and AEJ may be subject to common interest privilege—e.g., communications with state court counsel about trial strategy—the Disputed Communications do not fall into that category. Each communication must be evaluated separately where a parties are aligned on some interests and adverse on others. *Id.* at 24-25. "The fact that two parties share a common interest in in pending litigation does not cloak all of their communications with a privilege." *Id.* at 23-24. The Disputed Communications are related to matters on which AEJ and FSS, as debtor-in-possession, had diverging legal interests rather than the substance of the claims asserted against them jointly and therefore are not covered by any otherwise applicable common interest privilege.

**CONCLUSION**

14.     The Rule 59 Motion should be granted. S&L has standing to bring the Rule 59 Motion and the Disputed Communications are not subject to any common interest privilege. The reason behind the Rule 59 Motion is to present evidence that S&L is disinterested and does not have a predisposition limiting or interfering with its ability to represent positions adverse to AEJ and PQPR where those interests diverge from the interests of the FSS bankruptcy estate.

15.     In filing the Rule 59 Motion, S&L does not intend to force FSS to retain S&L. The point of the motion is to establish S&L's disinterestedness so the S&L Employment Application can be granted through September 20, 2022, removing the uncertainty around S&L's ability to receive compensation for services provided to FSS as debtor in possession prior to that date. While S&L submits that the evidence it seeks to adduce in a rehearing would conclusively establish the issue, the finding that S&L is not biased in favor of AEJ or PQPR is all S&L seeks from the Court.


Dated: October 10, 2022                         **SHANNON & LEE LLP**

                                                /s/*R. J. Shannon*
                                                Kyung S. Lee
                                                State Bar No. 12128400
                                                klee@shannonleellp.com
                                                R. J. Shannon
                                                State Bar No. 24108062
                                                rshannon@shannonleellp.com
                                                700 Milam Street, STE 1300
                                                Houston, Texas 77002
                                                Tel. (713) 714-5770


**CERTIFICATE OF SERVICE**

     I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.

                                                /s/*R. J. Shannon*


7

005465

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

| | | | | |
|---|---|---|---|---|
| In RE: | FREE SPEECH SYSTEMS LLC | § | Case Number: | 22-60043-CML-11 |
| | | § | | |
| | Debtor(s) | § | Chapter: | 11 |

## REQUEST FOR NOTICE UNDER BANKRUPTCY RULE 2002

PLEASE TAKE NOTICE THAT Ally Bank hereby gives notice as follows:

Pursuant to 11 U.S.C. §342(f)(1), AIS Portfolio Services, LLC hereby requests that:

    (i)          all notices given or required to be given in the case; and

    (ii)        all pleadings and correspondence served or required to be served in this case,

regarding Ally Bank should be directed to AIS Portfolio Services, LLC at the following mailing address effective immediately:

Attn:  Ally Bank Department
AIS Portfolio Services, LLC
Account:  XXXXXXX4978
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

This request encompasses all notices, copies and pleadings referred to in Rules 2002, 9007 or 9008 of the Bankruptcy Rules, including, without limitation, notices of any Orders, Motions, Demands, Complaints, Petitions, Pleadings, Requests, Applications, Schedules, Statements, Plans, and any other documents brought before this court in this case, whether formal or informal, written or oral, or transmitted or conveyed by mail, delivery, telephone, telecopier, telex, or otherwise which affects or seeks to affect the above case.

Respectfully submitted,

/s/ Arvind Nath Rawal
Arvind Nath Rawal

Claims Processor

Bankruptcy Servicer for Ally Bank
AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118
(888)455-6662, Fax (817) 461-8070
ECFNotices@aisinfo.com
File # 1465270

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

| In RE: | FREE SPEECH SYSTEMS LLC | § | Case Number: | 22-60043-CML-11 |
|---|---|---|---|---|
| | | § | | |
| | Debtor(s) | § | Chapter: | 11 |

## REQUEST FOR NOTICE UNDER BANKRUPTCY RULE 2002

PLEASE TAKE NOTICE THAT Ally Bank hereby gives notice as follows:

Pursuant to 11 U.S.C. §342(f)(1), AIS Portfolio Services, LLC hereby requests that:

(i)       all notices given or required to be given in the case; and

(ii)      all pleadings and correspondence served or required to be served in this case,

regarding Ally Bank should be directed to AIS Portfolio Services, LLC at the following mailing address effective immediately:

Attn:  Ally Bank Department
AIS Portfolio Services, LLC
Account:  XXXXXXXX4933
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

This request encompasses all notices, copies and pleadings referred to in Rules 2002, 9007 or 9008 of the Bankruptcy Rules, including, without limitation, notices of any Orders, Motions, Demands, Complaints, Petitions, Pleadings, Requests, Applications, Schedules, Statements, Plans, and any other documents brought before this court in this case, whether formal or informal, written or oral, or transmitted or conveyed by mail, delivery, telephone, telecopier, telex, or otherwise which affects or seeks to affect the above case.

Respectfully submitted,

/s/ Arvind Nath Rawal
Arvind Nath Rawal

Claims Processor

Bankruptcy Servicer for Ally Bank

AIS Portfolio Services, LLC

4515 N Santa Fe Ave. Dept. APS

Oklahoma City, OK 73118

(888)455-6662, Fax (817) 461-8070

ECFNotices@aisinfo.com

File # 1465268

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**REPLY OF W. MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC TO THE RESPONSE AND INITIAL OBJECTION OF ALEX E. JONES TO THE MOTION TO RECONSIDER THIS COURT'S RULING DECLINING TO EMPLOY THE FIRM OF SHANNON & LEE, LLP AND W. MARCH SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC AND, ALTERNATIVELY, FOR CONTINUANCE OF THE HEARING NOW SET FOR OCTOBER 12, 2022**

W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz") hereby submit this *Reply to the Response and Initial Objection of Alex E. Jones to the Motion to Reconsider this Court's Ruling Declining to Employ the Firm of Shannon & Lee, LLP and W. Marc Schwartz and Schwartz Associates, LLC and, Alternatively, for Continuance of the Hearing now Set for October 12, 2022* [ECF. No. 217] and state as follows:

1.	In support of this Reply, Schwartz joins in *Shannon & Lee, LLP's Reply to the Response and Initial Objection of Alex E. Jones to Shannon & Lee, LLP's Rule 59 Motion* [ECF No. 218].

WHEREFORE, Schwartz respectfully requests that the Court consider this Reply and grant such other and further relief to which Schwartz may be entitled.

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: */s/ Michael P. Ridulfo*
    Michael P. Ridulfo
    State Bar No. 16902020
    Federal Bar No. 27086
    5151 San Felipe, Suite 800
    Houston, Texas 77056
    Phone: (713) 425-7442
    Fax: (713) 425-7700
    mridulfo@krcl.com
    Attorney for W. Marc Schwartz and Schwartz
    Associates, LLC

## CERTIFICATE OF SERVICE

    I hereby certify that on October 11, 2022 a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service.

                        */s/ Michael P. Ridulfo*
                        Michael P. Ridulfo

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC,** | § | |
| | § | **Case No. 22-60043 (CML)** |
| **Debtor.** | § | |

**PQPR HOLDINGS LIMITED, LLC'S LIMITED OBJECTION TO DEBTOR'S**
**MOTION FOR AUTHORITY USE CASH COLLATERAL**

PQPR LIMITED, LLC ("PQPR") respectfully submits this Objection to Debtor's Motion for Authority to Use Cash Collateral [Docket No. 6] as follows:

1.      PQPR is a creditor secured by a perfected lien on virtually all assets of the Debtor, together with proceeds.

2.      PQPR, on a preliminary basis, agreed to allow the use of its cash collateral conditioned upon Debtor complying with its budgets.  PQPR made many concessions to what a secured creditor would normally require in order to allow the Debtor to attempt to perform on its business plan. Debtor apparently failed to do so since it has not been able to comply with the budget.

3.      Furthermore, Debtor's new Chief Restructuring Officer has not yet been able to articulate a viable business plan for the Debtor, let alone generate a budget on which the parties can rely.

4.      PQPR is ceasing ordering new product for the Debtor to sell, since the Debtor cannot say how it can repay PQPR.

5.     The parties have agreed to mediate, and PQPR is hopeful that a mediation may bring a resolution of the issues between all parties to the bankruptcy proceedings.  PQPR is at this time only willing to agree to the continued use of its cash collateral for 10 days.  PQPR recognizes the challenges facing the new CRO but there must be some semblance of a credible budget, and meaningful controls built into any cash collateral order.

Dated:  October 11, 2022                    Respectfully submitted,

                                            By: /s/ Stephen W. Lemmon
                                                Stephen W. Lemmon
                                                Texas Bar. No. 12194500
                                                STREUSAND, LANDON, OZBURN &
                                                LEMMON, LLP
                                                1801 S. MoPac Expressway, Suite 320
                                                Austin, Texas 78746
                                                Telephone: (512) 236-9900
                                                Facsimile: (512) 236-9904
                                                lemmon@slollp.com

                                                ATTORNEYS FOR
                                                PQPR HOLDINGS LIMITED, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, a true and correct copy of the foregoing instrument was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system, and/or U.S.P.S. first class mail, including the following:

Raymond W. Battaglia
**LAW OFFICES OF RAY BATTAGLIA,**
**PLLC**
66 Granburg Circle
San Antonio, Texas 78218
rbattaglialaw@outlook.com
***Proposed Counsel to the Debtor and***
***Debtor-In-Possession***

Kyung S. Lee
R. J. Shannon
**SHANNON & LEE LLP**
700 Milam Street, STE 1300
Houston, Texas 77002
klee@shannonleellp.com
rshannon@shannonleellp.com
***Proposed Counsel to the Debtor and***
***Debtor-In-Possession***

Avi Moshenberg
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
E: Avi.Moshenberg@mhllp.com
***Counsel for the Texas Plaintiffs***

Jarrod B. Martin
**CHAMBERLAIN, HRDLICKA, WHITE,**
**WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
E: jarrod.martin@chamberlainlaw.com
***Bankruptcy Counsel for the Texas Plaintiffs***

Ryan E. Chapple
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
Email: rchapple@cstrial.com

Randy W. Williams
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
Email: rww@bymanlaw.com
***Bankruptcy Counsel for***
***Connecticut Plaintiffs***

Melissa Haselden
Subchapater V Trustee
700 Milam, Suite 1300
mhaselden@haseldenfarrow.com
***Trustee***

Ha Nguyen
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave STE 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov
***U.S. Trustee***

005472

**USPS Service List**

**Twenty Largest Unsecured Creditors**

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

AtomialLLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire Sl0 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DEl 3EE
United Kingdom

WWCR
1300WWCRAve
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Outlook Ave.
Klamath Falls, OR 97601

*/s/ Stephen W. Lemmon*
Stephen W. Lemmon

4

005473

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 22-60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR** | § | |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO THE MOTIONS OF**
**SHANNON & LEE LLP AND W. MARC SCHWARTZ FOR REHEARING ON THE**
**ISSUE OF DISINTERESTEDNESS [DKT NOS. 206 AND 207]**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S.

Trustee"), by and through his undersigned counsel, hereby submits his omnibus objection (the

"Objection") to Shannon & Lee LLP's ("S & L") and W. Marc Schwartz's ("Schwartz") requests

(collectively referred to as the "Rehearing Motions") for a rehearing pursuant to Rule 59 of the

Federal Rules of Civil Procedure (the "Federal Rules"), made applicable by Rule 9023 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (Dkt. Nos. 206 and 207).

## **INTRODUCTION**[1]

The Court should deny the Rehearing Motions and uphold its decision denying the

Applications to employ S & L and Schwartz (collectively referred to as the "Professionals") for

the following reasons:

**First**, the Professionals do not have the requisite authority to seek reconsideration of the

Applications. The Rehearing Motions were signed by the Professionals. The Debtor, which

brought the underlying employment applications and is the only party with the authority to file

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them below.

005474

such a motion, did not seek reconsideration of its applications to employ the Professionals. On the contrary, the Debtor has already filed a motion to approve a different CRO.

**Second**, the Rehearing Motions fail to satisfy the requirements of Federal Rule 59 for a new hearing. The Professionals have not demonstrated (i) any manifest error of law or mistake of fact by the Court, (ii) any newly discovered evidence, nor (iii) any prejudicial error that crept into the record that would entitle them to a rehearing on the denial of the applications. The Professionals' arguments that they were "surprised" when questions of disinterestedness were asked, during a hearing where they had the burden to prove disinterestedness as a condition of their retention under the Bankruptcy Code, are without merit and contrary to the facts.

**Third**, and lastly, the purported additional evidence that the Professionals seek to admit was readily available and could have been raised at the hearing on September 20, 2022.

## PROCEDURAL HISTORY

1. On July 29, 2022, Free Speech Systems, LCC (the "Debtor") filed a chapter 11 voluntary petition and elected to proceed under Subchapter V of chapter 11.

2. On August 20, 2022, the Debtor filed applications to employ Schwartz as the Debtor's Chief Restructuring Officer ("CRO") and S & L as co-counsel (collectively referred to as the "Applications"). *See* Dkt. Nos. 83 and 85.

3. On September 12, 2022, the U.S. Trustee filed objections to both Applications.  *See* Dkt. Nos. 145 and 146. The Sandy Hook Families filed joinders to the objections. *See* Dkt. Nos. 147 and 159.

4. On September 20, 2022, the Court conducted an evidentiary hearing to consider the Applications (the "September 20 Hearing"). After hearing the evidence, the Court denied the Applications for the reasons stated on the record. *See* Dkt. Nos. 182 and 183.

005475

5.   The Debtor neither appealed the orders denying the Applications nor requested reconsideration of the Court's ruling. The time to appeal has expired. *See* Bankruptcy Rule 8002(a). Instead, the Debtor filed a motion to approve a new CRO, scheduled for hearing on the same date as the Rehearing Motions. *See* Dkt. No. 205.

## LEGAL STANDARD

6.   The Court may grant a motion for a new trial or hearing under Federal Rule 59 "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a)(1)(B). A Federal Rule 59 motion must clearly establish either a manifest error of law or fact or present newly discovered evidence, and it cannot be used to raise arguments which could and should have been made before the judgment was issued. *See Simon v. United States*, 891 F.2d. 1154, 1159 (5th Cir. 1990); *see also Reeves v. MCI Telecomms. Corp.*, 1991 WL 574975, at *1, *12 (S.D. Tex. June 5, 1991) (stating that the movant must show "manifest error of law, manifest error of fact, or newly discovered evidence" to prevail on a Federal Rule 59(a)(2) motion). Relief under Federal Rule 59 should be used sparingly as the movant must show that "it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (citations omitted).

## ARGUMENT

7.   The Rehearing Motions should be denied because the Professionals are not the appropriate party to bring this type of request—notably, the Debtor already filed a motion to replace one of the Professionals—and because they have not satisfied the requirements under Federal Rule 59 and are thus not entitled to a rehearing on the Applications. The Court conducted an evidentiary hearing on September 20, 2022, that was fair to all parties, and gave the Debtor more than ample

005476

opportunities to introduce evidence of the Professionals' disinterestedness. Indeed, as described more fully below, the subject matter of the additional evidence that the Professionals now seek to introduce was discussed in substance at the September 20 Hearing, and the Rehearing Motions appear to be an effort to relitigate the Applications. A Federal Rule 59 motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004).

**A. The Professionals Are Not the Appropriate Party to Seek Reconsideration.**

8.   The Bankruptcy Code provides a statutory scheme for retaining estate paid professionals under 11 U.S.C. § 327. Section 327(a) provides that the trustee may employ, with the Court's approval, professionals who are disinterested and who do not hold or represent an interest adverse to the estate. In turn, Section 1107 places the debtor-in-possession in the position of a fiduciary, with rights and powers of a trustee, and it requires the debtor to perform all duties of a trustee. Under this statutory scheme, only the Debtor may seek authority from the Court to employ an estate professional.

9.   Although the Debtor initially sought to retain the Professionals, the Court denied the Applications. The Debtor did not appeal the order denying the Applications nor did it request reconsideration of the Court's ruling. The time to appeal has expired. *See* Bankruptcy Rule 8002. With respect to Mr. Schwartz, the Debtor is presently seeking to employ a new chief restructuring officer and is not seeking to employ Mr. Schwartz. *See* Dkt. No. 205.[2] The Professionals cannot now unilaterally reinsert themselves into the case by improperly seeking reconsideration of the *Debtor's* Applications. The plain language of Section 327 provides that the authority to employ

---

[2] The Debtor is seeking to employ Patrick Magill as the Chief Restructuring Officer. Additionally, on October 10, 2022, Alex Jones, as the sole member of the Debtor, filed an objection to the Rehearing Motions stating that "[t]he Debtor is moving forward with its new CRO and does not seek the reconsideration of employment of prior counsel." *See* Dtk. No. 217, ¶ 19.

005477

estate professionals is within the sole purview of the Debtor as debtor-in-possession, and the Debtor is the appropriate party to seek reconsideration of the Applications. The Debtor did not do so here, and accordingly, the Professionals do not have the requisite authority to seek reconsideration.

### B. The Professionals Have Not Identified a Manifest Error of Law or Fact in the Court's Decision to Deny the Applications nor Any Newly Discovered Evidence.

10. The Professionals moved for a rehearing pursuant to Federal Rule 59, which applies in this matter under Bankruptcy Rule 9023. To be entitled to a new trial or hearing, "a party must show a manifest error of law, manifest error of fact, or newly discovered evidence." *Trevino v. Caliber Home Loans (In re Trevino)*, 564 B.R. 890, 909 (Bankr. S.D. Tex. 2017); *see also Templet v. HydroChem Inc*., 367 F.3d at 479 ("Rather, Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.") (internal quotation and citation omitted). A manifest error "is one that is plain and indisputable, and that amounts to a complete disregard of the controlling law." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)(internal quotation and citations omitted). Courts should consider "newly discovered evidence" that "(1) [would] probably change the outcome of the case; (2) could not have been discovered earlier by proper diligence; and (3) is not merely cumulative or impeaching." *Molina v. Equistar Chems LP*, 261 F. App'x 729, 733 (5th Cir. 2008).

11. Though it is not entirely clear, the Professionals do not appear to argue that the Court committed a manifest error of law or fact when it denied the Applications. Even if the Court had erred, which it did not, the error is not plain and indisputable, and does not amount to a complete disregard of controlling law.  Moreover, the Professionals do not argue that the additional evidence that they seek to admit satisfies the standard of newly discovered evidence under Federal Rule 59, which would entitle them to a rehearing on the Applications. Although proceeding under Federal

5

Rule 59, the Professionals have not articulated any of the general bases for which the Court may grant them a rehearing.

12. Instead, the Professionals argue that they were unable to address the issues of disinterestedness at the September 20 Hearing "because they were not raised prior to the close of evidence or in the UST Objection."[3] Rehearing Mot. ¶ 11.[4] The Professionals assert that "among the reasons for granting a new trial or rehearing is surprise that is inconsistent with substantial justice" and "but for the surprise, [the Professionals] would have been able to present evidence [of disinterestedness]." Rehearing Mot. ¶ 12. The Professionals cite to *Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir. 1982), as support for their request for a rehearing. *Id.*

13. The Professionals' assertions are contrary to both the law and the facts of this case. Most notably, as a requirement to employ the Professionals, the Debtor always had the burden to demonstrate disinterestedness. *See In re Bigler, LP*, 422 B.R. 638, 643 (Bankr. S.D. Tex. 2010)("It is the burden of the party who files the application to prove that the applicant should be retained"). Now, the Professionals attempt to improperly shift the burden to the U.S. Trustee, to wit: "[A]nd despite the Court's invitation, the U.S. Trustee did not argue at the September 20 Hearing that [the Professionals] [were] not disinterested with respect to FSS …or that any relationship [the Professionals] had with Alex Jones or PQPR created a bias…" Rehearing Mot. ¶ 4. But it was not the U.S. Trustee's burden to "adduce evidence that [the Professionals] had any bias with respect to the FSS bankruptcy estate" *Id.*; instead, it was the Debtor's burden to show that the Professionals

---

[3] S & L separately argues that its application should be approved pursuant to Section 327(e). The Debtor did not request this relief at the September 20 Hearing and S & L should not be authorized to use a Rule 59 motion to introduce a new legal theory to justify its retention. Rehearing Mot. 59.

[4] Both S & L and Schwartz make identical arguments in the Rehearing Motions. References to Rehearing Mot. refers to S & L's Rehearing Motion (Dkt. No. 206).

were disinterested as required by the plain language of Section 327(a).

14. Moreover, the Court has an independent duty to ensure that professionals are disinterested to meet the requirements of Section 327. *See In re HML Enters, LLC*, 2016 WL 5939737, at *1, *6 (Bankr. E.D. Tex.)(citing *Interwest Bus. Equip., Inc. v. U.S. Trustee (In re Interwest Bus. Equip., Inc.)*, 23 F.3d 311, 316 (10th Cir. 1994)). The Court correctly recognized this at the hearing: "I have an independent duty, though. That's my concern, so you're going to have to address that." Tr. September 20, 2022, at 29, 12-13.

15. As early as August 3, 2022, the Professionals were on notice that the Court was concerned about their ability to impartially represent the Debtor.[5] And the issue of disinterestedness was not raised after the close of evidence as the Professionals suggested; rather, at the outset of the Debtor's opening statement, the Court clearly signaled its concerns:

> And I'm going to tell you something because I want you to engage in a dialogue with me. The concern, when you really boil it down, I think you're looking at this too – you know, looking at this kind of through a check the box perspective, right? If the behavior, the non-disclosures began in one case and [if] there are potential conflicts through acts that Mr. Schwartz and Mr. Lee have taken that continue into this case, then the history is important.
>
> For example, if, for example, you know, Mr. Lee or Mr. Schwartz's relationship with Mr. Jones or PQPR is concerning, it raises an issue as to whether either one of them can provide sound legal advice to the estate or sound financial advice to the estate, then the history is important, right?

---

[5] At that hearing, the Court stated:

> [T]he Debtor is going to have to make some tough decisions at some point. And it's going to have to really analyze those claims and see whether those claims have any merit…[and] I'm not sure that parties who were introduced in the last case could fill that role either. But the Debtor needs to hear that from me, and I think debtors are entitled, especially early on in a case, to think about what the judge may have to say. And these are certainly rare comments, but these are certainly uncommon cases.

Tr. August 3, 2022, at 241, 5-19.

7

Tr. September 20, 2022, at 27, 12-25. The questions of control, independence, and loyalty were raised at prior hearings[6], in pleadings filed by creditors[7], and even acknowledged by Mr. Schwartz in his declaration, stating: "Concerns were expressed at the inception of the InfoW Debtors' bankruptcy case[s] whether I would be serving Alex Jones or the creditors of InfoW Debtors." Docket No. 83-3, ¶ 27. The Professionals ignored the history of this case, the Court's comments, and their burden to demonstrate their disinterestedness. Any suggestion that the Court's ruling on the basis of disinterestedness came at the eleventh hour and out of left field constituting a "surprise that is inconsistent with substantial justice" is not grounded in the reality of this case.

16. Lastly, the Professionals' reliance on *Conway v. Chemical Leaman Tank Lines, Inc*. is misplaced. The facts in *Conway* are not remotely aligned with the facts in this case. As the Fifth Circuit noted, the surprise in *Conway* consisted of the following:

> In the instant case, Hay was a previously unidentified witness who was called without any forewarning to testify as an expert at the second trial. Hay's testimony was not cumulative; rather, it introduced the theory that the questioned eastbound tire marks were asphalt marks from another vehicle. No other party—plaintiff or defendant—had presented this theory. Under the circumstances, plaintiffs had no time or opportunity to prepare a response to this unexpected turn of events. The interrogatories answered by the jury in the second trial leave no doubt that the jury was influenced by Hay's testimony.

687 F.2d. at 112.

17. As previously discussed, the facts in the present case provided the Debtor ample opportunity to address disinterestedness at the September 20 Hearing. Simply put, there is no surprise here that is inconsistent with substantial justice that is akin to the surprise described in *Conway*.

---

[6] *See* Tr. August 3, 2022, at 147-48, 21:19 & 241, 5-19.

[7] *See* Sandy Hook Families' Motion to (i) Appoint Tort Claimants Committee and (ii) Remove the Debtor in Possession (Dkt. No. 102), at ¶¶ 16, 31-39.

005481

**C. The Additional Evidence is Cumulative and the Professionals Seek to Relitigate the Applications.**

18. The Professionals seek to introduce additional evidence that is cumulative of the evidence previously heard at the September 20 Hearing in an effort to re-argue the Applications. "Whatever may be the purpose of Rule 59(e) it should not be supposed that it is intended to give an unhappy litigant one additional chance to sway the judge." *Atkins v. Marathon LeTourneau Co*., 130 F.R.D. 625, 626 (S.D. Miss. 1990)(citation omitted).

19. For example, the Professionals assert, in paragraphs 23 to 32 of the Rehearing Motions, that they should be allowed to introduce additional evidence to show that they can provide impartial advice with respect to PQPR's asserted claim. Rehearing Mot. ¶ 23-32. The proposed additional evidence is cumulative of other evidence introduced at the September 20 Hearing, during the Debtor's direct examination of Mr. Lee, and should have been introduced then and there. Specifically, Mr Lee was asked the following:

> Q And what about PQPR; were there any, you know, contrary positions taken?
>
> A To be blunt about it, there were almost fistfights over the negotiations between PQPR and FSS and Mr. Jones, so to suggest that we're all in bed together is just nonsense. We've had many disputes over all the terms of the relationship among us, and there's not been one group of people getting into bed together and arranging something secret. It has been very hardily fought. It's been very hardily – it's been negotiated very hard and there have been terms that had to require lots of negotiations to get to a final resolution.

Tr. September 20, 2022, at 65, 5-16.

20. As another example, the Professionals propose to introduce evidence of their analysis of a potential extension of the automatic stay to Alex Jones, *see* Rehearing Mot. ¶ 34, but the Debtor questioned Mr. Lee on this specific topic at the September 20, 2022, hearing.

> Q Has -- strike that question. Has the Debtor, Free

9

Speech Systems LLC, in this bankruptcy case ever taken any
position contrary to Alex Jones?

A Yes.

Q And could you describe one of them?

A In this bankruptcy case, as an example?

Q Yes.

A We've taken lots of adverse positions to Alex Jones. One, there's been
a request by Mr. Jones to extend the automatic stay to him; we've told him
we can't do that. Number two, he's asked us to bear 100 percent of the
costs of all these things, including legal, in connection with these lawsuits;
we've told him we're not going to do that, and we've had to fight him on
that .

Tr. September 20, 2022, at 62-63, 21:9.

21. The Rehearing Motions are devoid of any explanation as to why the proposed additional
evidence—which was all within the Debtor's and Professionals' possession and which appears to
simply be an attempt to bolster testimony already given—was not introduced at the September 20
Hearing. A Federal Rule 59 motion "is not the proper vehicle for rehashing evidence, legal
theories, or arguments that could have been offered or raised before the entry of judgment."
*Templet v. HydroChem Inc.*, 367 at 479. The Professionals' requested use of Federal Rule 59 for
the purpose of relitigating the Applications should be denied.

10

## CONCLUSION

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court deny the Rehearing

Motions and grant such other relief as is just and proper.

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: 10/11/2022                    */s/ HA M NGUYEN*
                                     Ha Nguyen, Trial Attorney
                                     CA Bar #305411
                                     FED ID NO. 3623593
                                     United States Department of Justice
                                     Office of the United States Trustee
                                     515 Rusk Street, Suite 3516
                                     Houston, Texas 77002
                                     E-mail: Ha.Nguyen@usdoj.gov
                                     Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means
via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 11th day
of October, 2022.

/s/ Ha M. Nguyen
Ha M. Nguyen

11

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|                       |     |                              |
|-----------------------|-----|------------------------------|
|                       | §   |                              |
| In re:                | §   | Chapter 11 (Subchapter V)    |
| FREE SPEECH SYSTEMS LLC, | §   |                              |
| .                     | §   | Case No. 22-60043 (CML)      |
|                       | §   |                              |
| Debtor.               | §   | Jointly Administered         |

---

**NOTICE OF RULE 2004 SUBPOENA DUCES TECUM**

TO:   Free Speech Systems, LLC, by and through its counsel of record, Raymond William Battaglia, Law Offices of Ray Battaglia, PLLC 66 Granburg Circle San Antonio, Texas 78218.

Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure and Rule 2004-1 of the Bankruptcy Local Rules of the Southern District of Texas, Melissa Haselden ("Subchapter V Trustee") hereby serves the attached Rule 2004 Request upon Free Speech Systems, LLC ("FSS") and requests production of the documents listed in **Exhibit A** attached hereto.

The Debtors must produce the requested documents listed on the Subpoena Duces Tecum attached hereto as **Exhibit A** to the undersigned counsel at the offices of Jackson Walker LLP, 100 Congress Ave. Suite 1100, Austin, Texas 78701 within fourteen (14) days of service of this Notice.   Alternatively to physical production, FSS may produce the requested documents electronically via ShareFile.

Dated: October 7, 2022

/s/ *Elizabeth Freeman*

**JACKSON WALKER LLP**
Elizabeth Freeman (TX Bar No. 2400922)
Sean Gallagher (TX Bar No. 24101781)

1

1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: efreeman@jw.com
Email: sgallagher@jw.com

*Proposed Counsel for Melissa Haselden,*
*Subchapter V Trustee*

005486

### CERTIFICATE OF SERVICE

I certify that on October 7, 2022 a true and correct copy of the above and foregoing was served via CM/ECF to all parties registered to receive electronic notice.

*/s/ Elizabeth Freeman*
Elizabeth Freeman

### CERTIFICATE OF CONFERENCE

I certify that on October 7, 2022, I conferred with counsel for FSS regarding this Notice of Rule 2004 Subpoena Duces Tecum.

*/s/ Elizabeth Freeman*
Elizabeth Freeman

## DEFINITIONS

All definitions apply throughout without regard to capitalization.  Terms are defined as follows:

1.      The terms "and" and "or" are to be read and applied inclusively to have the broadest reasonable meaning.

2.      The terms "any" or "all" are synonymous and are to be read and applied inclusively to have the broadest reasonable meaning.

3.      "Agreement" means a contract, arrangement, or understanding, formal or informal, oral or written.

4.      "████████ refers to ██████████████████.

5.      "Blue Ascension" refers to Blue Ascension Logistics, LLC the warehouse logistics company currently employed by or on behalf of FSS.

6.      "Communication" shall mean and include, without limitation, any documents, telephone conversations, discussions, facsimiles, e-mails, meetings, memorandum and any other medium through which any information is conveyed.

7.      The terms "concerning," "regarding," "relating to," "referring to," and "arising out of" are to be understood in their broadest sense and each means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing, consisting of, dealing with, comprising, or in any way pertaining to the subject matter identified, in whole or in part.

8.      The terms "document" or "documents" have the broadest meaning that can be ascribed to them, including, without limitation, all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted. Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, electronic mail, computer disks, compact disks, books, papers, letters, telegrams, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports, abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photographs, charts, graphs and other similar objects, summaries or records of telephone conversations, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

9.      "FSS" refers to Free Speech Systems, LLC.

10.     The terms "Person" and "Persons" mean any and all natural persons, male or female, and all types and kinds of businesses or other entities, including, but not limited to,

corporations, partnerships, joint ventures, sole proprietorships, and governmental agencies (state or federal) or their employees.

11.     "PQPR" refers to PQPR Holdings Limited, LLC.

12.     "Promissory Notes" refers to those certain agreements between FSS and PQPR executed on August 13, 2020 and November 10, 2021.

13.     The terms "you" and "your" shall mean FSS and each of its current or former subsidiaries, affiliates, parents, predecessors and successors, legacies, divisions, departments and operating units, funds, any Persons acting on its behalf or under its control, and its respective advisors, attorneys, agents, directors, employees, members, partners, representatives, and staff.

14.     The use of the singular form of any word includes the plural and vice versa.

15.     The past tense shall include the present tense and vice versa.

## <u>INSTRUCTIONS</u>

1.      In responding to these requests, furnish all information that is available to FSS regardless of whether the records are possessed directly by FSS or FSS's agents, attorneys, employees, representatives, superiors, or investigators.

2.      If any records cannot be produced in full, FSS should produce to the extent possible, specifying FSS's reason(s) for its inability to produce the records in full and stating whatever information, knowledge, or beliefs FSS has concerning the unproduced portion.

3.      For a record that no longer exists or cannot be located, identify the record, state how and when it passed out of existence or when it could no longer be located, and give the reasons for the disappearance. Also, identify each person having knowledge about the disposition or loss, and identify each document evidencing the existence or nonexistence of each record that cannot be located.

4.      If any record, or any part of a record, called for herein has been destroyed, discarded, lost, or otherwise disposed of or placed beyond FSS's custody or control, then it shall furnish a list setting forth as to each such record (a) the paragraph(s) of this request which call for the production of the record; (b) the type of record (e.g., statement of account, email); (c) the identity of the author(s) or prepare(s) of the record; (d) the identity of the addressee(s) and of every other person who received, read, viewed, or has had access to the record; (e) the date of the record; (f) the subject matter(s) of the record and title, if any, of the record; (g) the date of destruction or other disposition of the record; (h) the reason(s) for destruction or other disposition; (i) the person authorizing destruction or other disposition; and (j) the person(s) destroying or disposing of the record.

5.      If after producing the records, FSS obtains or become aware of any further records that are responsive to the requests for production, FSS must timely produce such additional records.

6.      If FSS, after investigation, determines that it has no records that are responsive to a Request, FSS's statement that it has no such records constitutes a representation that it has conducted a search for the records and represents that it has no records that are responsive.

7.      To the extent that FSS has previously produced in this case a record responsive to the requests contained herein, it need not produce such record again in connection with these requests.

8.      To the extent that any of the following requests for production may call for what FSS believes to be information subject to a claim of privilege, answer so much of each Request for Production and each part thereof as does not request, in FSS's view, privileged information and set forth, in writing in a privilege log, with particularity, the basis for FSS's claim of privilege with respect to the information it withholds, including the sender and recipient of the information and the date the information was created ("<u>Privilege Log</u>"), and provide a copy of the Privilege Log contemporaneously with FSS's production of the records requested in the Requests for Production.

9.      The scope, definitions, and instructions applicable to these discovery requests are coextensive with the applicable sections of the Federal Rules of Civil Procedure, and each discovery request requires the production of documents and information to the fullest extent permitted under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

10.     You are requested to serve copies of all responsive documents with your response pursuant to Federal Rule of Civil Procedure 34. However, if responsive documents are voluminous, produce the responsive documents for inspection at the office of Jackson Walker LLP, 100 Congress Ave. Suite 1100, Austin, Texas 78701.   You may also produce documents electronically to proposed counsel to the Subchapter V Trustee via email to **efreeman@jw.com** and **sgallagher@jw.com**.

11.     In producing documents, please produce them in their original form.  Documents shall be produced in the same sequence as they are contained or found in their original file folder.

## EXHIBIT A

### DOCUMENTS REQUESTED

**REQUEST FOR PRODUCTION NO. 1:**   All master services agreements between FSS and PQPR.

**REQUEST FOR PRODUCTION NO. 2:**   All written agreements between FSS and PQPR.

**REQUEST FOR PRODUCTION NO. 3:**   All communications between FSS and PQPR concerning the managerial relationship between FSS and PQPR.

**REQUEST FOR PRODUCTION NO. 4:**   All advertising agreements between FSS and PQPR.

**REQUEST FOR PRODUCTION NO. 5:**   All agreements between FSS and PQPR regarding product procurement.

**REQUEST FOR PRODUCTION NO. 6:**   All communications between FSS and PQPR regarding the Promissory Notes.

**REQUEST FOR PRODUCTION NO. 7:**   All internal communications or meeting minutes of FSS regarding the Promissory Notes.

**REQUEST FOR PRODUCTION NO. 8:**   All communications related to profit distributions by FSS from January 1, 2016 through the present.

**REQUEST FOR PRODUCTION NO. 9:**   All communications related to FSS's tax liability from January 1, 2016 through the present.

**REQUEST FOR PRODUCTION NO. 10:** Copies of all invoices received by FSS sent from PQPR from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 11:** Documents sufficient to show how the amounts FSS owed to PQPR were calculated or determined from June 2016 through December 2018.

**REQUEST FOR PRODUCTION NO. 12:** Documents sufficient to show how the amounts FSS paid to PQPR were calculated or determined from June 2016 through December 2018.

**REQUEST FOR PRODUCTION NO. 13:** All communications, agreements, or documents in 2014 related to the decision by FSS or PQPR to shift from FSS paying PQPR invoices to whole number payments.

**REQUEST FOR PRODUCTION NO. 14:** All communications to or from ██████ from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 15:** All documents related to any written agreements or understandings between FSS and ██████ or ████████████ from 2016 through the present.

**REQUEST FOR PRODUCTION NO. 16:** All communications to or from ████████████████ from 2016 through the present.

**REQUEST FOR PRODUCTION NO. 17:** All agreements between FSS and ██████

**REQUEST FOR PRODUCTION NO. 18:** All corporate governance documents or operating agreements for FSS from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 19:** All contracts with any credit processing providers from 2014 to the present.

**REQUEST FOR PRODUCTION NO. 20:** All agreements between FSS and Blue Ascension.

**REQUEST FOR PRODUCTION NO. 21:** Copies of FSS tax documents sent to members from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 22:** Copies of any and all payments, distributions, or draws from the last two years to and or from the following individuals and companies:

- PQPR;
- ██████
- ████████████;
- ██████████;

- o ███████████;

- o Blue Ascension;

- o Patrick Riley;

- o Elevated Solutions 512 Group Holdings, LLC fka ESG Holdings, LLC;

- o Patriot Collectibles;

- o Joe Dalessio;

- o MRJR;

- o Acuity CxO;

- o Robert Roe;

- o AEJ Holdings, Inc.;

- o AEJ Austin Holdings Logistics, LLC;

- o Alex Jones;

- o Dr. David Jones;

- o Dr. J's Naturals; and

- o Healthy Happy Body

**REQUEST FOR PRODUCTION NO. 23:** Copies of any and all payments made for rent or leasing of office, warehouse, studio, or storage space for the last two years.

**REQUEST FOR PRODUCTION NO. 24:** Documents sufficient to show the amounts and recipients of any distributions by FSS to its members from 2014 through the present.

**REQUEST FOR PRODUCTION NO. 25:** Documents sufficient to show the source(s) and amounts of FSS's initial capital contributions.

**REQUEST FOR PRODUCTION NO. 26:** All written agreements and term sheets between FSS and its product providers.

**REQUEST FOR PRODUCTION NO. 27:** Copies of any and all payments made for security services for FSS or Alex Jones for the last two years.

**REQUEST FOR PRODUCTION NO. 28:** Any agreements between FSS and any other entity related to invoice factoring services.

**REQUEST FOR PRODUCTION NO. 29:** Monthly bank statements for FSS from June 2014 through the present.

**REQUEST FOR PRODUCTION NO. 30:** Complete copies of the books and records maintained by FSS in the ordinary course of its business for 2014 through the present.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 (Subchapter V) |
| FREE SPEECH SYSTEMS LLC, | § | |
| . | § | Case No. 22-60043 (CML) |
| | § | |
| Debtor. | § | Jointly Administered |

## NOTICE OF RULE 2004 SUBPOENA DUCES TECUM

TO:   PQPR Holdings Limited, LLC, by and through its counsel of record, Stephen Lemmon, Streusand, Landon, Ozburn & Lemmon, LLP 1801 S. MoPac Expressway, Suite 320, Austin, Texas 78746.

Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure and Rule 2004-1 of the Bankruptcy Local Rules of the Southern District of Texas, Melissa Haselden ("Subchapter V Trustee") hereby serves the attached Rule 2004 Request upon PQPR Holdings Limited, LLC ("PQPR") and requests production of the documents listed in **Exhibit A** attached hereto.

The Debtors must produce the requested documents listed on the Subpoena Duces Tecum attached hereto as **Exhibit A** to the undersigned counsel at the offices of Jackson Walker LLP, 100 Congress Ave., Suite 1100, Austin, Texas 78701 within fourteen (14) days of service of this Notice.   Alternatively to physical production, PQPR may produce the requested documents electronically via ShareFile.

Dated: October 7, 2022

/s/ *Elizabeth Freeman*
**JACKSON WALKER LLP**
Elizabeth Freeman (TX Bar No. 2400922)
Sean Gallagher (TX Bar No. 24101781)

1

1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: efreeman@jw.com
Email: sgallagher@jw.com

*Proposed Counsel for Melissa Haselden,
Subchapter V Trustee*

2

## CERTIFICATE OF SERVICE

I certify that on October 7, 2022 a true and correct copy of the above and foregoing was served via CM/ECF to all parties registered to receive electronic notice.

/s/ Elizabeth Freeman
Elizabeth Freeman

## CERTIFICATE OF CONFERENCE

I certify that on October 7, 2022, I conferred with counsel for PQPR regarding this Notice of Rule 2004 Subpoena Duces Tecum.

/s/ Elizabeth Freeman
Elizabeth Freeman

## DEFINITIONS

All definitions apply throughout without regard to capitalization.  Terms are defined as follows:

1.      The terms "and" and "or" are to be read and applied inclusively to have the broadest reasonable meaning.

2.      The terms "any" or "all" are synonymous and are to be read and applied inclusively to have the broadest reasonable meaning.

3.      "Agreement" means a contract, arrangement, or understanding, formal or informal, oral or written.

4.      "███████ refers to ███████████████.

5.      "Blue Ascension" refers to Blue Ascension Logistics, LLC, the warehouse logistics company currently employed by or on behalf of PQPR.

6.      "Communication" shall mean and include, without limitation, any documents, telephone conversations, discussions, facsimiles, e-mails, meetings, memorandum and any other medium through which any information is conveyed.

7.      The terms "concerning," "regarding," "relating to," "referring to," and "arising out of" are to be understood in their broadest sense and each means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing, consisting of, dealing with, comprising, or in any way pertaining to the subject matter identified, in whole or in part.

8.      The terms "document" or "documents" have the broadest meaning that can be ascribed to them, including, without limitation, all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted. Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, electronic mail, computer disks, compact disks, books, papers, letters, telegrams, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports, abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photographs, charts, graphs and other similar objects, summaries or records of telephone conversations, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

9.      "FSS" refers to Free Speech Systems, LLC.

10.     The terms "Person" and "Persons" mean any and all natural persons, male or female, and all types and kinds of businesses or other entities, including, but not limited to,

corporations, partnerships, joint ventures, sole proprietorships, and governmental agencies (state or federal) or their employees.

11.    "PQPR" refers to PQPR Holdings Limited, LLC.

12.    "Promissory Notes" refers to those certain agreements between PQPR and FSS on August 13, 2020 and November 10, 2021.

13.    The terms "you" and "your" shall mean PQPR and each of its current or former subsidiaries, affiliates, parents, predecessors and successors, legacies, divisions, departments and operating units, funds, any Persons acting on its behalf or under its control, and its respective advisors, attorneys, agents, directors, employees, members, partners, representatives, and staff.

14.    The use of the singular form of any word includes the plural and vice versa.

15.    The past tense shall include the present tense and vice versa.

## <u>INSTRUCTIONS</u>

1.      In responding to these requests, furnish all information that is available to PQPR regardless of whether the records are possessed directly by the PQPR or the PQPR's agents, attorneys, employees, representatives, superiors, or investigators.

2.      If any records cannot be produced in full, PQPR should produce to the extent possible, specifying the PQPR's reason(s) for its inability to produce the records in full and stating whatever information, knowledge, or beliefs the PQPR has concerning the unproduced portion.

3.      For a record that no longer exists or cannot be located, identify the record, state how and when it passed out of existence or when it could no longer be located, and give the reasons for the disappearance. Also, identify each person having knowledge about the disposition or loss, and identify each document evidencing the existence or nonexistence of each record that cannot be located.

4.      If any record, or any part of a record, called for herein has been destroyed, discarded, lost, or otherwise disposed of or placed beyond the PQPR's custody or control, then it shall furnish a list setting forth as to each such record (a) the paragraph(s) of this request which call for the production of the record; (b) the type of record (e.g., statement of account, email); (c) the identity of the author(s) or prepare(s) of the record; (d) the identity of the addressee(s) and of every other person who received, read, viewed, or has had access to the record; (e) the date of the record; (f) the subject matter(s) of the record and title, if any, of the record; (g) the date of destruction or other disposition of the record; (h) the reason(s) for destruction or other disposition; (i) the person authorizing destruction or other disposition; and (j) the person(s) destroying or disposing of the record.

5.      If after producing the records, PQPR obtains or become aware of any further records that are responsive to the requests for production, PQPR must timely produce such additional records.

6.      If PQPR, after investigation, determines that it has no records that are responsive to a Request, PQPR's statement that it has no such records constitutes a representation that it has conducted a search for the records and represents that it has no records that are responsive.

7.      To the extent that PQPR has previously produced in this case a record responsive to the requests contained herein, it need not produce such record again in connection with these requests.

8.      To the extent that any of the following requests for production may call for what PQPR believes to be information subject to a claim of privilege, answer so much of each Request for Production and each part thereof as does not request, in PQPR's view, privileged information and set forth, in writing in a privilege log, with particularity, the basis for PQPR's claim of privilege with respect to the information it withholds, including the sender and recipient of the information and the date the information was created ("<u>Privilege Log</u>"), and provide a copy of the Privilege Log contemporaneously with PQPR's production of the records requested in the Requests for Production.

9.      The scope, definitions, and instructions applicable to these discovery requests are coextensive with the applicable sections of the Federal Rules of Civil Procedure, and each discovery request requires the production of documents and information to the fullest extent permitted under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

10.      You are requested to serve copies of all responsive documents with your response pursuant to Federal Rule of Civil Procedure 34. However, if responsive documents are voluminous, produce the responsive documents for inspection at the office of Jackson Walker LLP, 100 Congress Ave., Suite 1100, Austin, Texas 78701.  You may also produce documents electronically to proposed counsel to the Subchapter V Trustee via email to **efreeman@jw.com** and **sgallagher@jw.com**.

11.      In producing documents, please produce them in their original form.  Documents shall be produced in the same sequence as they are contained or found in their original file folder.

## EXHIBIT A

### DOCUMENTS REQUESTED

**REQUEST FOR PRODUCTION NO. 1:**  All master services agreements between PQPR and FSS.

**REQUEST FOR PRODUCTION NO. 2:**  Any written agreements between PQPR and FSS.

**REQUEST FOR PRODUCTION NO. 3:**  All communications between PQPR and FSS concerning the managerial relationship between PQPR and FSS.

**REQUEST FOR PRODUCTION NO. 4:**  All advertising agreements between PQPR and FSS.

**REQUEST FOR PRODUCTION NO. 5:**  All agreements between PQPR and FSS regarding product procurement.

**REQUEST FOR PRODUCTION NO. 6:**  All communications between PQPR and FSS regarding the Promissory Notes.

**REQUEST FOR PRODUCTION NO. 7:**  All internal communications or meeting minutes of PQPR regarding the Promissory Notes.

**REQUEST FOR PRODUCTION NO. 8:**  All communications related to profit distributions by PQPR from January 1, 2016 through the present.

**REQUEST FOR PRODUCTION NO. 9:**  All communications related to PQPR's tax liability from January 1, 2016 through the present.

**REQUEST FOR PRODUCTION NO. 10:**  Copies of all invoices relating to product PQPR sold through or supplied to FSS from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 11:** Documents sufficient to show how the amounts FSS owed to PQPR were calculated or determined from June 2016 through December 2018.

**REQUEST FOR PRODUCTION NO. 12:** Documents sufficient to show how the amounts FSS paid to PQPR were calculated or determined from June 2016 through December 2018.

**REQUEST FOR PRODUCTION NO. 13:** All communications, agreements, or documents in 2014 related to the decision by FSS or PQPR to shift from FSS paying PQPR invoices to whole number payments.

**REQUEST FOR PRODUCTION NO. 14:** All communications to or from ▮▮▮▮ from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 15:** All documents related to any written agreements or understandings between PQPR and ▮▮▮ or ▮▮▮▮▮ from 2016 through the present.

**REQUEST FOR PRODUCTION NO. 16:** All communications to or from ▮▮▮▮▮▮ from 2016 through the present.

**REQUEST FOR PRODUCTION NO. 17:** All agreements between PQPR and ▮▮▮

**REQUEST FOR PRODUCTION NO. 18:** All corporate governance documents or operating agreements for PQPR from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 19:** All contracts with any credit processing providers from 2014 to the present.

**REQUEST FOR PRODUCTION NO. 20:** All agreements between PQPR and Blue Ascension.

**REQUEST FOR PRODUCTION NO. 21:** Copies of PQPR books and records from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 22:** Copies of PQPR tax documents from 2016 to the present.

**REQUEST FOR PRODUCTION NO. 23:** Copies of any and all payments, distributions, or draws from the last two years to and or from the following individuals and companies:

- ○   FSS;
- ○   ▮▮▮▮

005504

- ███████████;
- ██████;
- ████████████;
- Blue Ascension;
- Patrick Riley;
- Elevated Solutions 512 Group Holdings, LLC fka ESG Holdings, LLC;
- Patriot Collectibles;
- Joe Dalessio;
- MRJR;
- Acuity CxO;
- Robert Roe;
- AEJ Holdings, Inc.;
- AEJ Austin Holdings Logistics, LLC;
- Alex Jones;
- Dr. David Jones;
- Dr. J's Naturals; and
- Healthy Happy Body

**REQUEST FOR PRODUCTION NO. 24:** Copies of any and all payments made for rent or leasing of office, warehouse, studio, or storage space for the last two years.

**REQUEST FOR PRODUCTION NO. 25:** Documents sufficient to show the amounts and recipients of any distributions by PQPR to its members from 2014 through the present.

**REQUEST FOR PRODUCTION NO. 26:** Copies of your last inventory report.

**REQUEST FOR PRODUCTION NO. 27:** Copies of any and all payments made for security services for the last two years.

**REQUEST FOR PRODUCTION NO. 28:** Copies of any and all advances made or received to or from any other entity or individual for the last four years.

**REQUEST FOR PRODUCTION NO. 29:** Documents sufficient to show the source(s) and amounts of PQPR's initial capital contributions.

**REQUEST FOR PRODUCTION NO. 30:** All written agreements and term sheets between PQPR and its product providers.

**REQUEST FOR PRODUCTION NO. 31:** Any agreements between PQPR and any other entity related to invoice factoring services.

**REQUEST FOR PRODUCTION NO. 32:** Monthly bank statements for PQPR from June 2014 through the present.

**REQUEST FOR PRODUCTION NO. 33:** Complete copies of the books and records maintained by PQPR in the ordinary course of its business for 2014 through the present.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor. | § | |

**SANDY HOOK FAMILIES' JOINDER TO UNITED STATES TRUSTEE'S
OMNIBUS OBJECTION TO THE MOTIONS OF
SHANNON & LEE LLP AND W. MARC SCHWARTZ
FOR REHEARING ON THE ISSUE OF DISINTERESTEDNESS
[Related to ECF Nos. 206, 207 and 223]**

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the Texas Plaintiffs) and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the Connecticut Plaintiffs) (and together with the Texas Plaintiffs, the Sandy Hook Families) hereby file this joinder (Joinder) to the *United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Rehearing on the Issue of Disinterestedness* (the Objection) [Dkt. 223], filed in response to: (i) *Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP* [Dkt. 206] and (ii) *Motion of W. Marc Schwartz and Schwartz Associates, LLC Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ W. Marc Schwartz and Schwartz Associates, LLC* [Dkt. 207] (collectively, the Motions to Reconsider).  In support of this Joinder, the Sandy Hook Families state as follows:

005507

1.      The Sandy Hook Families join in, and hereby incorporate by reference, the arguments made by the United States Trustee in the Objection.

2.      Shannon & Lee LLP and W. Marc Schwartz filed their Motions to Reconsider on October 4, 2022.

3.      The United States Trustee filed the Objection on October 11, 2022.

4.      For the reasons stated in the Objection and this Joinder, the Sandy Hook Families respectfully request that the Court deny the Motions to Reconsider and grant such other and further relief as it may deem just and proper.

Respectfully submitted this 11th day of October 2022.

McDOWELL HETHERINGTON LLP

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, PC

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Bankruptcy Counsel for Connecticut Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Joinder has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 11th day of October 2022.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

005509

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re**: | § | **Case No. 22-60043-11** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | |
| | § | |
| **Debtor** | § | **(Subchapter V)** |

## SUBCHAPTER V TRUSTEE'S FIRST INTERIM STATUS REPORT

TO THE HONORABLE CHRISTOPHER M. LOPEZ,  U.S. BANKRUPTCY JUDGE:

NOW COMES, MELISSA A. HASELDEN, Subchapter V Trustee ("Trustee") in the above-referenced bankruptcy proceeding, and files this Subchapter V Trustee's First Interim Status Report, and would respectfully show the Court as follows:

## I.
### BACKGROUND

1.      Debtor commenced this bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and electing to proceed under subchapter V of chapter 11 on July 29, 2022 (the "Petition Date").

2.      On August 2, 2022, the Office of the United States Trustee for Region 7 appointed Melissa A. Haselden as the Trustee in this case [Dkt. No. 22].

3.      On September 20, 2022, the Court entered its Order Expanding Subchapter V Trustee's Duties under 11 U.S.C. §1183(b)(2) and requiring Trustee to file a report pursuant to 11 U.S.C. §1106(a)(3) & (4) ("Trustee Order") [Docket #183].

Status Report
34211668v.2

## II.

### STATUS UPDATE

4.     Since the entry of the Trustee Order, Trustee engaged counsel and began the investigatory steps required by the Court.

5.     The Trustee and counsel toured Debtor's distribution center and twice visited the offices/studios.

6.     The Trustee interviewed the following parties:

      a.     Patrick Riley of Blue Ascension Group (fulfillment provider);

      b.     ███████████████████████████████████████

      c.     ██████████████████████████████████

      d.      Dr. David Jones of PQPR;

      e.     Joseph Dalessio of Elevated Solutions Group; and

      f.     Mark Schwartz.

7.     Additionally, the Trustee attended presentations by Bob Roe, consultant to PQPR, related to origination of PQPR debt, as well as an additional interview of Bob Roe by counsel for the Sandy Hook Families.

8.     The Trustee conferred on several occasions with counsel for the Sandy Hook Families, counsel for the Debtor and Counsel for Alex Jones.

9.     Trustee received certain financial information from the following parties related to transactions with the Debtor:

      a.     ██████████████████

2

       b.     PQPR

10.     Trustee served Rule 2004 document requests on the Debtor and PQPR.  Additionally, documents have been received or are forthcoming pursuant to request by the Trustee from numerous other parties, including Alex Jones.

11.     Trustee worked with counsel for the Debtor to locate a CRO.  Additionally, the Trustee identified and negotiated a proposed engagement of M3 Partners to assist her with her investigation.

12.     Trustee, through counsel, worked with the various constituencies in this case to facilitate a mediation amongst the parties in an effort to attain terms for a consensual plan.  Judge Marvin Isgur agreed to mediate this matter.

Respectfully Submitted,

**HASELDEN FARROW PLLC**

By: */s/ Melissa A. Haselden*
Melissa A. Haselden
State Bar No. 00794778
700 Milam, Suite 1300
Pennzoil Place
Houston, Texas 77002
Telephone: (832) 819-1149
Facsimile: (866) 405-6038
Email: mhaselden@haseldenfarrow.com
Subchapter V Trustee

3

34211668v.2

*/s/ Elizabeth C. Freeman*

**JACKSON WALKER LLP**
Elizabeth C. Freeman (TX Bar No. 24009222)
Sean Gallagher (TX Bar No. 24101781)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email: efreeman@jw.com
Email: sgallagher@jw.com


*Proposed Counsel to for Melissa Haselden*
*Subchapter V Trustee*

4

34211668v.2

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Subchapter V First Interim Status Report was served on the following parties in interest via ECF on October 11, 2022:

*/s/ Melissa A. Haselden*
Melissa A. Haselden

5

34211668v.2

005514

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### DEBTOR'S NOTICE OF FILING OF PROPOSED FOURTH INTERIM CASH COLLATERAL ORDER

PLEASE TAKE NOTICE that the Debtor is filing the attached "proposed" *Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* in connection with the hearing set for October 12, 2022.

Respectfully submitted.

LAW OFFICES OF RAY BATTAGLIA, PLLC

/S/ RAYMOND W. BATTAGLIA
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Counsel to the Debtor and Debtor-In-Possession*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing,

/s/Raymond W. Battaglia
Raymond W. Battaglia

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FOURTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. This order is the fourth interim order ("Fourth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:



EXHIBIT

A

005516

1.    <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.    <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.    <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.    <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fourth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.    <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.    <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second and Third Interim Orders are incorporated in the Fourth Interim Order.

10.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.    <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.    <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.    <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October ___, 2022, at _____ a.m. Central time.

Houston, Texas
Dated: October ___, 2022

_____
    UNITED STATES BANKRUPTCY JUDGE

| | NEW 2 WEEK BUDGET | | |
| --- | --- | --- | --- |
| Week Number | 10/15/2022-10/21/2022 12 | 10/22/2022-10/28/2022 13 | Total |
| **Income** | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 1,190,978.03 |
| Advertising | - | - | - |
| Donations | 3,141.25 | 25,000.00 | 28,141.25 |
| **Total Income** | **598,630.26** | **620,489.01** | **1,219,119.27** |
| **Selling & Product Costs** | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (152,310.35) |
| Repay PQPR Inventory | - | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (53,594.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (15,823.63) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (190,556.48) |
| Processor Fees | (23,819.56) | (23,819.56) | (47,639.12) |
| eCommerce Store Maintenance | (25,000.00) | - | (25,000.00) |
| Texas Sales Tax | - | - | - |
| **Total Cost of Goods Sold** | **(254,961.80)** | **(229,961.80)** | **(484,923.59)** |
| **Operating Expenses** | | | |
| **Advertising & Promotion** | | | |
| Advertising & Promotion | - | - | - |
| Print Media | - | - | - |
| Radio Show Advertising | - | - | - |
| **Total Advertising & Promotion** | **-** | **-** | **-** |
| **Computer/IT/IP Expense** | | | |
| Internet & TV services | (1,608.39) | - | (1,608.39) |
| Software License Fees | - | - | - |
| Server Hosting Service | - | - | - |
| CDN Video Cloud Storage | - | - | - |
| Satellite Service | - | - | - |
| Imaging License Fee | - | - | - |
| Software & Apps | - | - | - |
| Website Hosting | (266.50) | - | (266.50) |
| **Total Computer/IT/IP Expense** | **(1,874.89)** | **-** | **(1,874.89)** |
| **Office & Administrative Expense** | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (91.81) |
| Insurance | - | (5,000.00) | (5,000.00) |
| Equipment Rental | - | | |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (4.20) |
| Business Meals | (400.00) | (400.00) | (800.00) |
| **Total Office & Administrative Expense** | **(448.00)** | **(5,448.00)** | **(5,896.01)** |
| **Utilities** | | | |
| Utility Deposit | | | |
| Electricity | (5,107.63) | - | (5,107.63) |
| HVAC | - | - | - |
| CAM Charges | - | - | - |
| Water & Sewer | - | - | - |
| Gas Service | - | - | - |
| Pest Control | - | - | - |
| Waste Management | - | - | - |
| **Total Utilities** | **(5,107.63)** | **-** | **(5,107.63)** |
| **Occupancy** | | | |
| Rent | - | - | - |
| Office Security | (3,975.00) | (3,975.00) | (7,950.00) |
| Repair & Maintenance - Building | - | (2,500.00) | (2,500.00) |
| Supplies | (5,000.00) | (2,500.00) | (7,500.00) |
| Telephone | | | |

EXHIBIT A

005520

| | | | |
|---|--:|--:|--:|
| Janitorial | - | - | - |
| **Total Occupancy** | **(8,975.00)** | **(8,975.00)** | **(17,950.00)** |
| | | | |
| **Personnel Expenses** | | | |
| Salaries & Wages - Base | (140,000.00) | - | (140,000.00) |
| Payroll Tax | (11,200.00) | | (11,200.00) |
| 62410 Contract Broadcase Services | | (11,200.00) | (11,200.00) |
| 62420 Contract Radio Show Production | | (25,000.00) | (25,000.00) |
| 62430 Contract Video Production | | (10,000.00) | (10,000.00) |
| 62470 Free Lance Contributors | (3,500.00) | | (3,500.00) |
| Free Lance Contributors | - | - | - |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) |
| **Total Personnel Expenses** | **(174,700.00)** | **(46,200.00)** | **(220,900.00)** |
| | | | |
| **Travel** | | | |
| Mileage/Parking/Tolls | (100.00) | (100.00) | (200.00) |
| Vehicle Leases | - | - | - |
| **Total Travel Expenses** | **(100.00)** | **(100.00)** | **(200.00)** |
| | | | |
| **Total Operating Expenses** | **(191,205.53)** | **(60,723.00)** | **(251,928.53)** |
| | | | |
| ***Non-Operating Expenses*** | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (10,000.00) |
| **Total Other Expenses** | **(55,000.00)** | **(55,000.00)** | **(110,000.00)** |
| | | | |
| **Professional Fees** | | | |
| CRO Fees | - | (50,000.00) | (50,000.00) |
| Financial Adviosr Fee | - | - | - |
| Shannon & Lee LLP | - | - | - |
| Ray Battaglia | - | (30,000.00) | (30,000.00) |
| **Total Professional Fees** | **-** | **(80,000.00)** | **(80,000.00)** |
| | | | |
| **Total Cash Flow** | **97,462.94** | **194,804.21** | **292,267.15** |

005521