**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FREE SPEECH SYSTEMS LLC, | ) | Case No. 22-60043 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## SUBCHAPTER V TRUSTEE'S APPLICATION TO RETAIN JACKSON WALKER LLP

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Melissa Haselden, Subchapter V Trustee ("Trustee"), files this application (this "Application") for entry of an order (the "Order"), authorizing the retention and employment of Jackson Walker LLP as her general bankruptcy counsel in the above-captioned bankruptcy case. In further support of this Application, the Trustee submits the Declaration of Elizabeth Freeman, a Partner with Jackson Walker (the "Freeman Declaration"), attached as Exhibit A, and represents as follows:

## I. APPLICATION

1.      The Trustee is the duly qualified and acting Subchapter V Trustee for the estate of the Free Speech Systems, LLC ("Debtor"). The Debtor initiated the bankruptcy case on July 29, 2022 (the "Petition Date") via the filing of a voluntary chapter 11 petition.

2.      On September 20, 2022, the Court entered the *Order Expanding the Subchapter V Trustee's Duties Pursuant to 11 U.S.C. § 1183(b)(2) of the Bankruptcy Code* [Docket No. 183].

3.      In recognition of the unique complexities involved in this matter, the Trustee seeks approval to retain Jackson Walker LLP as general bankruptcy counsel. The Trustee identified the need for JW as her general bankruptcy counsel to assist with general matters related to the investigation mandated by the Court as well as the fulfillment of her duties in this unusual case.

4.      To accomplish these goals, the Trustee hereby files this Application pursuant to §§ 327(a), 328, and 704 of the Bankruptcy Code. The Trustee requests authority to retain JW, as counsel pursuant to the terms of the attached proposed engagement agreement (the "Engagement Letter"), which is attached as Exhibit B. The Trustee requests that the employment be effective as of September 11, 2022.

5.      The Trustee selected JW to render professional services to her in her role as Subchapter V Trustee, which include, but are not limited to, the following:

a)  Conducting an investigation required by the Court;

b)  Assisting the Trustee in analyzing claims owned by the estate against third parties arising under chapter 5 of the Bankruptcy Code and other applicable law;

c)  Conducting appropriate examinations of witnesses, claimants, and other parties-in-interest in connection with the Trustee's duties in the case;

d)  Representing the Trustee in the bankruptcy case, any adversary proceedings, and other proceedings before the Bankruptcy Court, and in any other judicial or administrative proceeding;

e)  Performing any other legal services that may be appropriate in connection with the foregoing.

6.      The Trustee selected JW because its attorneys have extensive experience in matters relating to bankruptcy, commercial litigation, and asset collection.  This case presents unique questions of law and procedure.  JW has the expertise and capacity to address the needs of the estate.  The Trustee believes that JW can provide the estate with the required legal expertise to allow the Trustee to administer the estate and discharge her fiduciary duties under the circumstances effectively and prudently.  Because of the anticipated complexity investigating the matters ordered by the Court and facilitating development of a confirmable plan in this complicated case, the Trustee believes retention of JW is necessary due to its array of expertise in various, relevant areas of law and with complex bankruptcy matters.

7.      JW maintains its Houston offices at 1400 McKinney St., Suite 1900, Houston, Texas 77010.  JW's main Houston telephone number is (713) 752-4200 and Houston facsimile number is (713) 752-4221.  JW attorneys are duly licensed and qualified attorneys before this Court, and are qualified to act as general counsel for the Trustee.

## II. <u>COMPENSATION</u>[1]

8.      The Trustee negotiated a compensation agreement designed to fit the particular needs and possibilities of this case.  JW is sensitive to the equities of this case and therefore agreed to a reduction in compensation below its standard rates.  JW's standard hourly rates as of September 6, 2022, with a 20% discount, will apply.  JW agrees to not raise its rates with regards to the matters for which it is being retained without seeking further order of this Court.

9.      Elizabeth Freeman will be designated as attorney-in-charge and will be responsible for JW's representation of the Trustee as set forth in this Application.  The following is a list of JW attorneys and paraprofessionals who primarily will be providing services for the Trustee in

3

connection with this case in conjunction with Ms. Freeman, as well as their current standard hourly rates as discounted for this matter:

|  | |
|---|---|
| **Attorneys**: | Elizabeth C. Freeman - $750<br>Sean Gallagher - $492 |
| **Legal Assistants**: | Kendra E. Gradney - $164<br>Daniela M. Trevino - $156<br>Jolene Pupo - $148 |

10.     JW agreed to a 20% reduction in its standard rates for the General Representation in this matter. The rate of each professional working on this engagement will be clearly reflected in the invoices and fee applications. JW will maintain detailed records of costs and expenses incurred in connection with its legal services, and these will be set forth in detail as part of the invoices and fee applications.

11.     Ms. Freeman has been licensed to practice in the State if Texas since 1998 and is admitted to practice before the Southern District of Texas. Ms. Freeman has over 20 years of experience in complex bankruptcy and reorganization matters and representation of trustees.  Ms. Freeman is Board Certified in Business Bankruptcy Law by the Texas Board of Legal Specialization.

12.     Mr. Gallagher has been licensed to practice in the State of Texas since 2016 and is admitted to practice before the Southern District of Texas.  Mr. Gallagher has represented a variety of parties in a wide array of bankruptcy and litigation matters, including avoidance actions.

## STATEMENT REGARDING CONNECTION TO THE CASE

13.     To the best of the Trustee's knowledge, JW does not represent or hold any interest adverse to the Debtor, its estate, creditors, equity security holders, or affiliates that would preclude JW from serving as counsel for the purposes stated herein.  JW has no connection with the Trustee, Debtor, the creditors, or any other party-in-interest, their respective attorneys and advisors, the

4

United States Trustee, or any person employed in the office of the United States Trustee other than what is disclosed in the Freeman Declaration and are "disinterested persons" within the definition of § 101(14) of the Bankruptcy Code on the matters for which it is to be engaged as general bankruptcy counsel.

## **CONCLUSION**

14.     Section 327(a) authorizes the Trustee's retention of JW as general bankruptcy counsel for the Trustee to be compensated in accordance with § 328 as set forth herein and in the Engagement Agreement.  The Trustee has not given any compensation or promised any compensation to JW, except as set forth in the Engagement Agreement.  In addition, the Trustee has not sought or obtained leave to employ any other professional to represent the Trustee on the same matters as she proposes JW represent her.

15.     In reaching her decision, the Trustee has evaluated the estate's available resources, the complexity of the case, the investigation and associated risks.  Under the circumstances, the Trustee believes that the terms of the proposed compensation arrangement are both reasonable and prudent and provide her the necessary assistance for the case.

WHEREFORE, the Trustee respectfully requests that an order be entered (a) approving this Application and authorizing the Trustee to employ and retain Jackson Walker LLP to represent the Trustee as her general bankruptcy counsel consistent with the terms set forth herein and in the Engagement Agreement; and (b) granting the Trustee any other relief that is just and proper.

Dated: October 11, 2022.                    */s/ Melissa Haselden*
                                            Melissa Haselden, Subchapter V Trustee
                                            Free Speech Systems LLC

<div align="center">5</div>

## **<u>Certificate of Service</u>**

I certify that on October 11, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Elizabeth C. Freeman*
Elizabeth C. Freeman

## Exhibit A

**Engagement Letter**



Elizabeth Freeman
(713) 752-4328
mcavenaugh@jw.com

September 16, 2022

Melissa Haselden
Sub Chapter V Trustee Free Speech Systems LLC
Haselden Farrow PLLC
Pennzoil Place
700 Milam, Suite 1300
Houston, TX 77002

Re:   Retention of Counsel

Dear Ms. Haselden:

**_GENERAL_**.  We are honored that you have asked us to represent you in the Free Speech Systems LLC, Chapter 11 bankruptcy case as counsel to you, the subchapter V trustee ("Client"). We are pleased to do so.  This letter summarizes our billing and payment arrangements, and the terms of our agreement.

**_COOPERATION AND PRESERVATION_**.  In order to provide effective legal services to Client, it is essential that Client disclose to us fully and accurately all material facts pertaining to our engagement and inform us of all developments, and that Client give us prompt instructions. Additionally, Client will undertake to preserve relevant documents and materials, including electronic information that may be necessary for our representation of Client.

**_FEES_**.  Our fees are normally determined primarily on the basis of our time at current hourly rates.  Our rates vary with experience and seniority and are adjusted by us from time to time, normally once a year on October 1.  However, JW will not raise its rates in this matter without seeking approval of the Court.  I will be the lawyer primarily responsible for this matter.  Sean Gallagher will be the primary associate assisting on the matter.  For this matter, my rate will be $750.  Mr. Gallagher's rate will be $492.  JW agrees to discount our fees as of the date of this letter by 20%.  Any estimates of fees and expenses we may give are merely approximations and are often based on many circumstances not within our control.  Such estimates are not binding and the fees and expenses owed will be as set forth in our statements to Client.

**_EXPENSES_**.  Costs and expenses related to our legal services will be included in our statements.  Costs may include travel expenses, messenger charges, filing and recording fees, and other costs.  We intend to bill such expenses to Client at our cost.  Certain other expenses, such as photocopying will be billed in accordance with our standard schedule of charges.

005529

Melissa Haselden
September 16, 2022
Page 2

---

**STATEMENTS**.  Our statements are rendered monthly and are due upon receipt (**subject to bankruptcy court approval**).  If there is any question concerning a bill, we ask that it be raised within thirty (30) days.  In the event that our statements are not timely paid, we reserve the right to suspend our services until satisfactory payment arrangements are made, or if necessary, to terminate such services.

**RETAINER**.  As an accommodation to you, the Firm agreed to waive its requirement of a retainer.

**CLIENT AND SCOPE OF REPRESENTATION**.  In this engagement, our representation is solely of Client.  Our engagement is limited to the matter described above and if we agree to perform additional legal services, this letter will apply to such services.  Unless specifically agreed to by us in a letter like this one, we will not be representing other related persons or entities, including any subsidiaries, affiliates or shareholders. In addition, we will provide only legal advice and services, and not financial, accounting, business or other advisory services.

**TERMINATION**.  Client is free to terminate this engagement at any time for any reason, as are we.  If this engagement is terminated, Client remains responsible for the payment of fees and expenses incurred until termination, and since court approval is required, both of us will cooperate in obtaining it.

**CONTACT PERSON**.  Unless Client otherwise directs, I will be your principal contact. However, if Client wishes to address any concerns regarding this engagement with someone other than me, please feel free to contact Wade Cooper, our firm-wide Managing Partner.

**CONFLICTS**.  Please be aware that Jackson Walker represents many other companies and individuals.  It is possible that while we are representing Client, some of our present or future clients will have disputes or transactions with Client.  By entering into this engagement letter, Client agrees that Jackson Walker may continue to represent, or may undertake in the future to represent, existing or new clients in any matter that is not substantially related to our work for Client in this matter, even if the interests of such clients in those other matters are directly adverse to Client.  We agree, however, that Client's prospective consent shall not apply in any instance where, as a result of representing Client, we have obtained proprietary or other material, confidential, non-public information, that, if known to such other client, could be used by such client to Client's material disadvantage in the other matter.

**GUARANTEE DISCLAIMER**.  We will do our best to provide Client with the legal services reasonably necessary to achieve a result satisfactory to Client.  However, the outcome of all transactions or lawsuits is subject to uncertainties and risks, and we make no promises, warranties or guarantees to Client concerning the outcome of our legal representation. Any statements we may make are expressions of opinion only.

Melissa Haselden
September 16, 2022
Page 3

---

**_CONCLUSION AND DISPOSITION OF DOCUMENTS_**.  Our representation of Client will terminate when we send the final statement for services rendered.  Upon the conclusion of this matter, Client will promptly advise us which, if any, documents Client wish us to return to Client. Client agrees that we need not return or provide any electronic information, except upon payment of our reasonable costs. We may retain copies for our records. We will retain or dispose of any documents, including electronic information, in accordance with our record retention policy then in effect.

**_ONLY AGREEMENT_**. This written agreement supersedes all prior oral or written agreements and may be amended or changed only in writing signed by both parties.

Once again, we are very pleased to represent Client.  Please confirm acceptance of the terms of our engagement by having an authorized representative of Client sign the enclosed copy of this agreement in the space provided below and return it to me.

If you have any questions concerning this letter or the engagement, please do not hesitate to call.

Sincerely,

Elizabeth C. Freeman

Agreed to and accepted _10/11_, 2022.

MELISSA HASELDEN, SUB CHAPTER V TRUSTEE FOR FREE SPEECH SYSTEMS LLC.

By: _____
Name: _____
Title: _____

THE STATE BAR OF TEXAS INVESTIGATES AND PROSECUTES PROFESSIONAL MISCONDUCT COMMITTED BY TEXAS ATTORNEYS.  ALTHOUGH NOT EVERY COMPLAINT AGAINST OR DISPUTE WITH A LAWYER INVOLVES PROFESSIONAL MISCONDUCT, THE STATE BAR'S OFFICE OF GENERAL COUNSEL WILL PROVIDE YOU WITH INFORMATION ABOUT HOW TO FILE A COMPLAINT.  PLEASE CALL 1-800-932-1900 TOLL-FREE FOR MORE INFORMATION.

33993802v.1

## **<u>Exhibit B</u>**

**Freeman Declaration**

005532

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FREE SPEECH SYSTEMS LLC, | ) Case No. 22-60043 |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF ELIZABETH FREEMAN
IN SUPPORT OF THE APPLICATION TO RETAIN JACKSON WALKER LLP
AS COUNSEL FOR THE SUBCHAPTER V TRUSTEE**

The undersigned proposed attorney for the above-captioned debtor and debtor-in-possession submits this verified statement of disinterestedness pursuant to Bankruptcy Rule 2014(a).

1.      My name is Elizabeth Freeman.  I am over the age of 18 years, I am competent to make this declaration, and I have personal knowledge of the facts stated herein.  Each and every statement contained herein is true and correct.

2.      I am an attorney admitted to practice in the State of Texas and in this Court.

3.      I am a partner in the law firm of Jackson Walker LLP (the "Firm").  The Firm maintains offices for the practice of law in seven Texas cities including one at 1401 McKinney Street, Suite 1900, Houston, Texas 77010.  The Firm's main telephone number is (713) 752-4200 and the Firm's main facsimile number is (713) 752-4221.

4.      In conjunction with the Trustee's retention of JW, I directed a search of JW's conflict system for each of the Debtor, the Debtor's creditors, affiliates, and insiders, principals of the Debtor, officers and directors of the Debtors (the "Potential Parties in Interest").

34075192v.1

5.      The Firm may represent other affiliates whose identities and affiliation did not show up on the conflicts system.  It is possible that there are creditors whom the Debtor did not identify in their records that are clients of the Firm.  The following summarizes the findings gleaned from my review of the information available on the Firm's conflicts system divided into current clients of the Firm that are also creditors of the Debtor, former clients, and affiliates of current clients of the Firm that are also creditors of the Debtor, and my and the Firm's connections with the Debtors and their current and former officers, directors, and professionals.

**A.      The Firm's Prior Relationship to the Trustee**

6.      The Firm and the Trustee entered into the Engagement on October 11, 2022.  The Firm has no other representation of the Trustee.  The Trustee and I have known one another for a number of years and have worked on matters as opposing counsel and also as counsel representing parties with common interests.  On occasion, myself and others with JW refer potential clients to the Trustee.

**B.      Current Clients of the Firm that are Creditors of the Debtor**

7.      The Firm currently represents or has represented entities or affiliates of AT&T including, but not limited to AT&T Corporation, AT&T Mobility, AT&T Knowledge Ventures, L.P., and Southwestern Bell Telephone Company d/b/a AT&T Texas (collectively, the "AT&T Entities").  It appears that AT&T is a creditor of the Debtor.  In the event that any matters or issues arise that are directly adverse to these current clients of the Firm, these matters or issues will be handled by other counsel, as appropriate.  Revenues from the Firm's representation of AT&T is less than 1% of the Firm's annual revenues.

**C.      Creditors of the Debtor that are Adverse to the Firm's Clients**

8.      The Firm did not find that it represents, or has represented in the past, clients that are adverse or potentially adverse to numerous creditors (or affiliates of creditors) of the Debtor.

2

**D.**   **The Firm's Connections with the Debtor, Officers, and Professionals**

9.     Lucy Johnson-Davis, with the United States Trustee's Office in Houston, was previously employed by the Firm.

10.     Except as set forth herein, neither I nor the Firm have had any connection with the Debtor, insiders or affiliates of the Debtor, the Debtor's creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any other person employed in the Office of the United States Trustee, and are disinterested persons within the meaning of 11 U.S.C. § 101(14), to the best of my knowledge.

**E.**   **Statement Regarding United States Trustee Guidelines**

11.     The Firm shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's chapter 11 case in compliance with sections 330 and 331 of the Bankruptcy Code, and applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any other applicable procedures and orders of the Court. The Firm also intends to make a reasonable effort to comply with the United States Trustee's requests for information and additional disclosures as set forth in the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases Effective as of November 1, 2013 (the "U.S. Trustee Fee Guidelines"), both in connection with this Application as well as any interim and final fee applications that may be filed by the Firm in connection with this chapter 11 case.

12.     The Firm will periodically review both the changes in identifiable parties in interest of the Debtor and clients of the Firm as such information becomes available or relevant, and will update this disclosure as appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed October 11, 2022

/s/ *Elizabeth C. Freeman*
Elizabeth C. Freeman

4

005536

## Schedule 1

### Schedule of Searched Parties/Terms

Elevated Solution
Free Speech
Greenair
Christopher Sadowski
Copycat Legal
Edgecast
Atomial
Ready Alliance
Cloudfare
Getty Images
Jacquelyn Blott
RatsMed
Rapid Med
Joel Skousen
David Icke
Icke Book
Ickonic
Commerce Con
WWCR
Paul Watson
JW JIB
Brennan Gilmore
Civil Rights Clinic
CustomTattoo
AT&T
Justin Lair
PQPR

Stephen Lemmon
Melissa Haselden
Anthony Gucciardi
Aurium
Patrick Riley
Blue Ascension
Neil Heslin
Scarlett Lewis
Leonard Pozner
Veronique De La Rosa
Marcel Fontaine
David Wheeler
Francine Wheeler
Jacqueline Barden
Mark Barden
Nicole Hockley
Ian Hockley
Jennifer Hensel
Donna Soto
Carlee Soto Parisi
Carlos M. Soto
Jillian Soto-Marino
William Aldenberg
William Sherlach
Robert Parker
Joey Delassio
Elevated Solutions
Ray Battaglia

**Schedule 2**

| JW Client Name | Name Checked Against Database | Relation to Debtors | Status |
|---|---|---|---|
| AT&T Corporation | AT&T | | Client |
| AT&T Mobility | AT&T | | Client |
| AT&T Knowledge Ventures, L.P. | AT&T | | Client |
| Southwestern Bell Telephone Company d/b/a AT&T Texas | AT&T | | Client |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FREE SPEECH SYSTEMS LLC, | ) | Case No. 22-60043 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER AUTHORIZING THE RETENTION OF JACKSON WALKER LLP
AS COUNSEL FOR THE SUBCHAPTER V TRUSTEE**

CAME ON FOR CONSIDERATION the Application to Retain Jackson Walker LLP as Counsel the Subchapter V Trustee (the "Application"). Having reviewed the Application and the supporting documents thereto, and finding that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; that the Application was properly filed and served; that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and that venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and based upon good and sufficient cause appearing therefor; the Court ORDERS THAT:

1.     The Trustee is authorized to retain and employ Jackson Walker LLP ("Jackson Walker") as counsel upon the terms and conditions set forth in the Application and as modified herein.

2.     Jackson Walker shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's case in compliance with sections 330 and 331 of the Bankruptcy Code and applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any other applicable procedures and orders of the Court. For billing purposes, Jackson Walker shall keep its time in one tenth (1/10) hour increments. Jackson Walker

will use its best effort to avoid any duplication of services provided by any of the other professionals in this case.

3.     Jackson Walker will review its files periodically during the pendency of this chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, Jackson Walker will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a).

4.     To the extent that the Application or the Freeman Declaration is inconsistent with this Order, the terms of this Order shall govern.

5.     Notwithstanding anything to the contrary in the Application, Jackson Walker shall not be entitled to reimbursement for fees and expenses incurred in connection with any objection to its fees absent further order of this Court.

6.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2022

_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| DEBTOR. | § | **Chapter 11 (Subchapter V)** |

### WITNESS AND EXHIBIT LIST OF
### W. MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC

| Witnesses: | Judge:   Christopher M. Lopez |
|---|---|
| | Courtroom Deputy: |
| 1.      W. Marc Schwartz | Hearing Date:   October 12, 2022 |
| 2.      Any witness called by any other party | Hearing Time:   10:00 a.m. |
| 3.      Any witness needed for rebuttal | Party's Name:   W. Marc Schwartz and Schwartz Associates, LLC |
| | Attorney's Name:  Michael P. Ridulfo |
| | Attorney's Phone:   713-425-7442 |
| | Nature of Proceeding:  Motion to Reconsider |

### EXHIBITS

| Ex. # | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| S1 | 7/10/22 Forbearance Agreement | | | | |
| S2 | 10/6/21 Memorandum of Understanding | | | | |
| S3 | 8/2/22 Transcript, *Sherlach v. Jones;* Case No. X06-UWY-CV186046437-S in the Judicial District Court, Waterbury, Connecticut | | | | |
| S4 | 8/15/22 Order Granting Emergency Motion to Remand in *Lafferty, et al v. Jones, et al,* Adv. Pro. No. 22-05019 in the United States Bankruptcy Court, District of Connecticut | | | | |
| S5 | 8/16/22 – Email from RJ Shannon to Shelby Jordan, Ray Battaglia and Kyung Lee | | | | |
| S6 | 8/16/22 Email from Shelby Jordan to Ray Battaglia, Kyung Lee and RJ Shannon | | | | |
| S7 | 8/17/22 Email from Shelby Jordan to RJ Shannon, Ray Battaglia and Kyung Lee | | | | |

| | Any Exhibits introduced by any other party. | | | | |
| --- | --- | --- | --- | --- | --- |
| | Any Exhibits needed for rebuttal. | | | | |

W. Marc Schwartz and Schwartz Associates, LLC reserve the right to offer any rebuttal exhibits, witnesses, and or other evidence, and reserves the right to offer any witness or exhibit listed on any other party's witness and exhibit list.

DATED this the 12th day of October , 2022.

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: */s/ Michael P. Ridulfo*
    Michael P. Ridulfo
    State Bar No. 16902020
    Federal Bar No. 27086
    5151 San Felipe, Suite 800
    Houston, Texas 77056
    Phone: (713) 425-7400
    Fax: (713) 425-7700
    mridulfo@krcl.com
    Attorney for W. Marc Schwartz and Schwartz
    Associates, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) by email to those on the attached service list.

*/s/ Michael P. Ridulfo*
Michael P. Ridulfo

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

# Exhibit S-1

Forbearance Agreement
Summary of Indicative Terms and Conditions
Free Speech Systems, LLC.
July 10, 2022

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

**Credit Card Processing Fee:** The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees;

4% (Four percent) WMS

**Allocation of Net Sales Proceeds:**

**FSS Inventory** FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory** PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

@.id=VjN-p_a3BszvTcjMTWOKOgQswXcj37tGkI3mEABlhtkZ2-KkQrmuqWg...

EXHIBIT
5-7

| | |
|---|---|
| **Warehouse and Fulfillment Related Expenses** | FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory. |
| **PQPR Debt** | FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000. Currently, FSS is paying PQPR $11,000 per business day. As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement. |
| | FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens. |
| **Term:** | 60 Days |
| **Reservation:** | Subject to revision after implementation based on actual operational results. |

Executed this _12_ day of July 2022.


Free Speech Systems, LLC


By: _____

Marc Schwartz, Its Chief Restructuring Officer



PQPR Holdings Limited, LLC


By: _____

David Jones, Its Manager

LLC

By: _____

Its **Manager**

005547

# Exhibit S-2

## Memorandum of Understanding

This Memorandum of Understanding is between ████████████ as Manager, and Free Speech Systems LLC (FSS) and PQPR Holdings LLC (**PQPR**).

It is agreed that ████████████ will manage all credit card transactions on behalf of FSS and PQPR. ████████████ **will perform daily** settlements as follows:

A. ████████████ will first pay the Merchant Account fees as charged by credit card processors.

B. After deducting credit card processing, remaining funds will be allocated as follows:

C. funds will be allocated firstly 10 percent to ████████████ for its Services.

D. Next, 80 percent of the sales of PQPR products will be allocated to PQPR.

E. ████████████ will pay the sum of $11,000 per calendar day and remit to PQPR Holdings LLC as payment on its prior outstanding balances.

F. Any remaining funds will be paid to FSS.

This agreement is effective October 6, 2021

Signed:

Free Speech Systems LLC

PQPR Holdings LLC

**EXHIBIT**

S-2

005549

# Exhibit S-3

1

DKT NO:  X06-UWY-CV18046436-S    : COMPLEX LITIGATION

ERICA LAFFERTY                   : JUDICIAL DISTRICT WATERBURY
v.                               : AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 : AUGUST 2, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES

DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


       BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S :

  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY MATT BLUMENTHAL

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS

                 Recorded and Transcribed by:
                 Debbie Ellis
                 Court Recording Monitor
                 400 Grand Street
                 Waterbury, CT  06702



EXHIBIT
S-3

005551

2

THE COURT:  We are on the record in the three related Lafftery versus Jones matters.  Lead docket number Waterbury CV186046436.  I'm going to ask counsel to please identify themselves for the record.

ATTY. MATTEI:  Good morning, your Honor.  Chris Mattei on behalf of the plaintiffs.  With me is my colleague Matt Blumenthal.

THE COURT:  Good morning.

ATTY. PATTIS:  Norm Pattis on behalf of Mr. Jones, Free Speech Systems, Judge.  Good morning.

THE COURT:  Good morning.

ATTY. WILLIAMS:  Good morning, your Honor.  John Williams with a special appearance on behalf of Mr. Jones.

THE COURT:  Good morning.  So I think I may be able to avoid the first issue with respect to the objection for the media request.  Mr. Ferraro, have you seen any members of the media here today?

THE CLERK:  There's one but nobody who had requested to record.

THE COURT:  Okay.  So in light of the fact that no one is here, I can avoid that issue.

THE CLERK:  Your Honor, I apologize.  I do think the Connecticut Public Radio person is on his way.  He called me and asked about the address but I don't see him yet.

THE COURT:  All right.  I'm not going to delay the

3

1    proceedings for that, so he will not be able to film

2    today.  Okay.

3          So this may be less than five minutes or we may be

4    here all day depending on how this works.  So my first

5    question and this is really a yes or a no or an I don't

6    know.  That's what I want.  I don't want long

7    explanations.  I'm not looking for argument, just a yes

8    or a no or I don't know.  I'll start with Attorney

9    Mattei and then I will ask Attorney Pattis.

10          So my question is, whether the bankruptcy court

11    granted a motion to extend the bankruptcy stay to Alex

12    Jones who has not filed for bankruptcy?  So Attorney

13    Mattei, yes, no or I don't know?

14          ATTY. MATTEI:  No, your Honor.

15          THE COURT:  Okay.  Attorney Pattis, do you agree

16    or disagree with that, sir?

17          ATTY. PATTIS:  Neither.  I don't know is my

18    answer.

19          THE COURT:  Okay.  I'm happy to pass the matter

20    since your client would know, I assume, since you're

21    representing your client.  Would you like me to pass it

22    for a few minutes and we can make a call?

23          ATTY. PATTIS:  He's testifying today.  I tried to

24    reach him yesterday, a per your order and was

25    unsuccessful.  I don't know if I can reach his trial

26    counsel but I'll try.

27          THE COURT:  I know that you had mentioned, I think

4

1    you had reached out to Mr. Stuckel actually since

2    Mr. Ferraro was getting back from his Italy trip, with

3    respect to having bankruptcy counsel use the link to

4    watch it on Microsoft Teams so, I assume, they're

5    available.

6         ATTY. PATTIS:  I assume so too.

7         THE COURT:  So maybe they would be the ones that

8    you could try to reach.  And I just simply want to know

9    whether the bankruptcy court granted a motion to extend

10   the bankruptcy stay to Alex Jones who, to my knowledge,

11   has not filed bankruptcy.

12        ATTY. PATTIS:  I will find out, Judge.

13        THE COURT:  Okay.  So we'll take a five-minute

14   recess.  Thank you.

15        (Whereupon, there was a recess.)

16        THE COURT:  You could be seated.  That was quick,

17   Attorney Pattis.

18        ATTY. PATTIS:  It still took two phone calls.

19        THE COURT:  And the answer?

20        ATTY. PATTIS:  No such motion was filed,

21   therefore, no such motion is granted.

22        THE COURT:  Thank you.

23        So the automatic stay that is in effect as to Free

24   Speech System, LLC who filed for bankruptcy, I believe,

25   on Friday, does not automatically extend to solvent

26   codefendants even where they are similarly legal or

27   factually, so and I don't see that any motion for stay

005554

5

1   has been filed here.

2   I'm going to next turn to the, I have to say

3   untimely cross claim.  I will give Attorney Williams an

4   opportunity to be heard but I do want to start out by

5   saying that it is, everyone has their responsibilities

6   and obligations in this case.  And one of my

7   responsibilities is to maintain the orderly procedure

8   of the court docket and cases and to prevent any

9   interference with the fair administration of justice.

10   And my concern here, Mr. Williams, and I'll give

11   you as much time as you need to respond, is that the

12   cross claim is untimely, improper, and that it delays

13   the trial.  And so I am considering using my statutory

14   authority and inherent authority in sua sponte

15   dismissing or striking the claim at this time.  So I'm

16   happy to have you be heard.

17   I do want to mention one thing before I forget is

18   that your appearance, you're going to need to correct

19   your appearance because your appearance, you didn't use

20   the right form.  There's a specific form that has to be

21   used for limited appearance and that form has different

22   language on it then the standard appearance form that

23   we're all used to.  So, for example, in the limited

24   appearance form you only agree to accept service on

25   your particular issue.  So I do want to tell you that

26   right now you are in for Mr. Jones full force and that

27   you'll need to correct that probably by way of a motion

6

1    or whatever you think is appropriate.

2         But in any event, let me hear you with respect to

3    your cross claim.

4         ATTY. WILLIAMS:  Your Honor, your Honor has raised

5    as I understand it and I apologize my hearing leaves a

6    lot to be desired but as I understand it, your Honor

7    has raised the question of untimeliness and

8    specifically as I look at the docket, there's no notice

9    of closed pleadings.  The case is proceeding as I

10   understand it as a hearing in damages.  It seems to me

11   that the cross claim is completely collateral to that.

12   There should not in any way have an impact on this

13   trial and in deed is the sort of thing that might well

14   be deferred until the end of the trial.

15        So if I have done something, your Honor used the

16   word improper, if I did something that was improper, I

17   can only tell your Honor it was certainly not my

18   intention and I apologize to the court for any offense

19   that I have given to you or inconvenience to anybody

20   else.  It was in no way my intention.

21        THE COURT:  No offense taken but we just need to

22   follow the rules, that's all.  So I raise the issue of

23   the untimeliness being improper and form and the delay

24   that it would work on the trial.  Is there anything

25   else that you wanted to add?

26        ATTY. WILLIAMS:  Well, your Honor, I didn't

27   believe that it was untimely.  But obviously the Free

005556

7

1  Speech Systems I would have expected would oppose that
2  if they felt that it was untimely.  Your Honor, as
3  again said it's improper, I don't understand in what
4  way it would be improper except that I didn't request
5  your permission, which I didn't understand was required
6  and I didn't believe it would have any impact on the
7  case.
8      I have read the motion to strike.  Counsel there
9  indicates that --
10     THE COURT:  You're ahead of me Mr. Williams
11  because I haven't read it but --
12     ATTY. WILLIAMS:  I didn't hear you, your Honor.
13     THE COURT:  I said you're ahead of me because I
14  didn't read the motion to strike because it would now
15  require us to engage in pleading practice, request
16  to -- motion to strike, answer, special defenses,
17  motions for summary judgment and obviously we're down
18  for jury selection today.
19     ATTY. WILLIAMS:  Well, your Honor, all I can say
20  is that I did not intend any -- to do anything
21  improper.  I thought I was proceeding appropriately.
22  If I wasn't, I can only say that I am humbly apologetic
23  to the court.
24     THE COURT:  So I don't -- when I say untimely, and
25  please be seated if you like or remain standing
26  wherever you're most comfortable.  But when I say
27  untimely, it was filed well beyond the close of

8

1    pleadings deadline and the operative scheduling order.
2    I can't even find the last scheduling order, it's so
3    old.  And the deadline for the close of pleadings has
4    long passed.  It was not listed in the joint trial
5    management report which was ordered to be filed.  It
6    wasn't filed when the Jones defendants filed their
7    denials with their notice of defenses and their special
8    defenses and it's obviously filed on the eve of trial.
9        And when I say improper, I don't mean that you,
10   sir, did anything, you know, improperly to offend the
11   court by any means, so please don't think that.  But
12   what you would need to do with such a pleading is file
13   either a request to file the pleading, you know, beyond
14   the deadlines, file a motion with it, file a motion to
15   amend pleadings, something because otherwise, nothing
16   would prevent you from in the middle of evidence, you
17   or anyone else just dropping a pleading in the file and
18   expecting the parties and the court to adjudicate it.
19   So, we can't just have generally what we say with an
20   answer is an answer in cross claim or an answer in
21   counterclaim, certainly there was no answer here given
22   the default but there was the denial and the notice as
23   the defenses and the special defenses and I would have
24   expected it bare minimum to have it filed then.
25       And, you know, with respect to the delay, it would
26   delay the trial as it was filed five days before jury
27   selection.  So I have to say that Mr. Jones is not in

9

1   compliance with his obligations to plead in accordance

2   with our rules of practice and the scheduling order.

3          So pursuant to Connecticut General Statute 52-97

4   and Connecticut Practice Book Section 10-21, the cause

5   of action set forth in the untimely cross claim cannot

6   conveniently be heard with the main complaint.  And the

7   issues raised on the cross claim, even had the cross

8   claim been timely and properly filed, do not arise out

9   of the transaction which is the subject of the

10  plaintiff's complaint, which is required by Practice

11  Book 10-10.

12         For example, one of the basis for relief is an

13  injunction requiring someone from Free Speech Systems

14  to attend the trial.  So in short, it would be

15  impossible to hear and adjudicate the cross claim given

16  that jury selection starts today as it cannot

17  conveniently be heard with the main complaint.

18         So for these reasons, the court directs that the

19  cross claim be deleted or dismissed from this case and,

20  of course, nothing prevents Mr. Jones from filing a

21  separate action and if that does occur in the normal

22  course of business, the parties will be at notice that

23  the court will exercise jurisdiction over that matter

24  and bring it to this docket.  That is the most

25  efficient way to proceed.  But it will not be part of

26  this present case.

27         ATTY. WILLIAMS:  Thank you, your Honor.

10

1   THE COURT:  You're welcome.

2   So I have a couple of housekeeping matters.  I was

3   happy to see that you could agree on the number of

4   alternates which I understand was four and that you had

5   a total of five challenges, but I wasn't sure how you

6   were breaking it down.  Are you doing four and one or

7   three and two?

8   ATTY. MATTEI:  We agree that they be unrestricted,

9   your Honor.

10   THE COURT:  I will not, that I will not agree too.

11   I stick with the statute.  I like that statute.

12   ATTY. MATTEI:  My proposal then, Judge and I --

13   THE COURT:  Why don't you discuss it off the

14   record and then let me know if you have an agreement on

15   it.  Okay.  Thank you.

16   Mr. Pattis, there was one and I didn't pull it up,

17   but there was going to be one late motion in limine.

18   You had an attorney in your office who was not

19   available to file it due to some health issues.  And

20   I'm not sure if that was a motion in limine on behalf

21   of Mr. Jones and Free Speech Systems or just Free

22   Speech Systems because if it is on behalf of Mr. Jones,

23   it's well past filing, so what would you suggest?

24   ATTY. PATTIS:  It was both, but we're not going to

25   file it now.

26   THE COURT:  Okay.

27   ATTY. PATTIS:  He did not get out of the hospital

11

yet.

THE COURT:  Sorry to hear that.

ATTY. PATTIS:  Yeah, as are we.

Given the law of the case and the way things seem to be evolving given the motion practice we can address that interest in the other motions that are to be argued later.

THE COURT:  Very good.

ATTY. PATTIS:  So there will not be another --

THE COURT:  And then I looked last night and I thought yesterday was the deadlines for the replies to the objections to the motions in limine, I saw the plaintiffs' replies, are you not filing replies or are you planning on filing them today because they were due yesterday?

And again, I don't know if they're just are directed to Free Speech Systems and of course we're not adjudicating that now.

ATTY. PATTIS:  I have been advised by bankruptcy counsel that the stay binds my hands as to Free Speech Systems, and that I cannot act on his behalf it would act as his peril.  They would pertain to both, so I took the position that the stay was applicable as to that.  I understand -- I'm here as to your order and I don't mean to be defiant, but I've been told I act at my peril if I act as to Free Speech Systems.

THE COURT:  So you don't want to act on behalf of

005561

12

Mr. Jones in filing replies since you do represent

Mr. Jones and Mr. Jones is a nondebtor and there's no

stay at this point?  Listen, I'm not saying that at any

point the bankruptcy counsel can't file a motion in

bankruptcy court and have the stay extended to

Mr. Jones but right now, you're telling me that's why I

asked, that's why I started --

ATTY. PATTIS:  No, I understand.

THE COURT:  -- but there is no stay that extends

to Mr. Jones.

ATTY. PATTIS:  But there is as to a party that I

represent so I feel like I have a conflict at this

point, because I'm told I can't act with respect to one

and should act with respect to others and now I'm in a

position where I've got to parse what to do with

respect to each and that strikes me as that sort of

1.73 issue that I would need a little bit more time,

not an infinite amount of time to address.

And, you know, the issue you raised about whether

they should file the stay to extend to Mr. Jones that

hadn't occurred to me, I'm not a bankruptcy -- I had

altercate hands.

THE COURT:  Well, I think the law is clear that

when one defendant in a case files for bankruptcy it

doesn't automatically extend to all other defendants

even if they are similarly factually or legally and you

would have to move in bankruptcy court to extend the

13

1   stay.

2       Now last time we had this issue when Info Wars and

3   Prison Planet maybe, when they filed for bankruptcy, we

4   had the exact same situation and I believe I entered a

5   very similar order in response to that and then I think

6   what happened and you correct me if I'm wrong, I think

7   that you removed the remaining case to bankruptcy

8   court.  So that it wasn't so much --

9       ATTY. PATTIS:  I understand that.

10       THE COURT:  So here I didn't see and I checked

11   before I came out on the record, I didn't see any

12   removal to bankruptcy court of the pending claims and I

13   didn't see anything about a stay.

14       ATTY. PATTIS:  I was instructed not to file

15   removal papers by bankruptcy counsel for reasons of

16   their own that I didn't inquire as to.  And so I am

17   left in this awkward position now where if we proceed

18   as to Jones but not as to Free Speech that operates

19   almost constructively as a severance and I believe the

20   law is clear that a severance that adversely affects a

21   debtor is prohibited once the debtor is in bankruptcy.

22       So it's my request that and it's my understanding

23   that, I don't know if it's Houston, I don't recall what

24   city in Texas, in the Texas bankruptcy court there's a

25   hearing Friday morning with respect to the plaintiff's

26   emergency motion for relief from stay.

27       THE COURT:  But that emergency motion is a relief

14

1   from stay as to the debtor, Free Speech Systems --

2       ATTY. PATTIS:  Right.

3       THE COURT:  -- we are all on the same page here.

4   Everyone is on the same page.  They're under federal

5   bankruptcy law which, I believe me, respect.  There is

6   an automatic stay as to the debtor, Free Speech

7   Systems, LLC.  If you told me this is why I started

8   asking this question, if you said to me, yes -- because

9   I tried to look last night and I could not access the

10  through Pacer the records or I would have cancelled

11  this if I saw that it was extended.  As I'm

12  understanding it, clearly there's no doubt that there

13  was no extension of that stay to the solvent remaining

14  defendant Mr. Jones, nor has such a motion been filed,

15  so there is an active claim right now against Alex

16  Jones.  There's causes of action and we're down for

17  jury selection.

18      So, I can't, you know, I can't solve for you what

19  instructions you're getting from your client or

20  bankruptcy counsel but I have a remaining claim, but I

21  understand from what you're telling me it's your

22  position, well you can tell me your position why don't

23  you.

24      ATTY. PATTIS:  I'm asking for a recess until a

25  motion is heard on Friday.  I find myself in a position

26  where I cannot satisfy my obligations to both clients.

27  Mr. Jones expects a defense as does Free Speech.

15

1    I am told Free Speech the action will not proceed

2    as to they may or may not have identical interest in

3    every instance but I don't see how I can proceed as to

4    one client and not the other.

5    THE COURT:  So and then let's just hypothetically

6    say that we either didn't pick until Friday and Friday

7    the motion is heard and the motion it's a motion to --

8    ATTY. PATTIS:  For relief from stay.

9    THE COURT:  Okay, let's say that --

10    ATTY. PATTIS:  That's my understanding of it.  I

11    haven't filed it.

12    THE COURT:  So let's say that's denied and so the

13    stay is in effect as to Free Speech System.

14    ATTY. PATTIS:  At this point, Judge, I would be in

15    touch with bankruptcy counsel saying you left me

16    hanging here without a motion for an application as to

17    Jones or a removal, the trial court takes the position

18    that its capable -- that as a matter of law it would be

19    appropriate to proceed with Mr. Jones and I might have

20    to seek independent ethic's counsel advice because I'm

21    starting to feel a 1.73 (inaudible) because I'm now in

22    a position where I can meet the needs of one client but

23    not the other in a proceeding and I've not been in this

24    position before.

25    THE COURT:  Attorney Mattei.

26    ATTY. MATTEI:  Your Honor, what I see Attorney

27    Pattis be doing is asking for making an oral motion for

16

1  continuance for jury selection.  We oppose that motion

2  for continuance.  Mr. Jones is more than adequate

3  represented in bankruptcy court in Houston.  They are

4  well aware of this jury selection.  They actually filed

5  a motion to lift the stay as to the ongoing trial in

6  Texas.  And so they're well aware of the implications

7  that --

8      THE COURT:  So that -- excuse me.  The motion to

9  lift the stay was as to the debtor?

10     ATTY. MATTEI:  As to the debtor Free Speech

11  Systems.  And so they're more than aware of occasions

12  of not moving the stay with respect to Mr. Jones,

13  they've not done that knowing that jury selection is

14  scheduled for today.

15     The bankruptcy, which was filed on Friday,

16  Mr. Pattis has had the weekend and now Monday to

17  investigate the extent to which any conflict prevents

18  him from proceeding today on behalf of Mr. Jones.  But

19  the facts of the case establishes that there is no

20  conflict and there can be no conflict because Mr. Jones

21  and Free Speech Systems are all egos to one another.

22  They have been represented by the same counsel

23  throughout.  There's no suggestion or evidence that any

24  position taken by Mr. Jones here would be adverse to a

25  company that he 100 percent controls, Free Speech

26  Systems.

27     And so there's just no basis to grant a

17

1   continuance here where Mr. Jones is the one that has

2   manufactured this situation on the eve of jury

3   selection to prevent us from going forward.  So we want

4   to proceed today with jury selection.

5       THE COURT:  So here's what I would say, we are

6   going to proceed but if and when a motion is granted in

7   the bankruptcy court, that extends the stay to

8   Mr. Jones, the court needs to be notified immediately

9   and we will cease activity because that would then stay

10  the claim against Mr. Jones as well.  But short of

11  that, listen I suppose Mr. Jones could file for

12  bankruptcy and that would stay the rest of the case

13  under federal law or the bankruptcy court can extend

14  the stay to Mr. Jones.

15      So if either one of those happens, I'm sure you'll

16  let me know immediately and we will stop our

17  proceedings.

18      All right.  So we're going to start jury selection

19  at 10:00.  Just as a reminder please no snapshots or

20  screen shots or whatever you want to call it of the

21  jury confidential jury questionnaires.  Anyone who --

22  so if your clients are here at any point either during

23  jury selection or trial the trial will be in the

24  courtroom next door.

25      But during jury selection and during trial anyone

26  who's seated at counsel table or in the well of the

27  courtroom would have to wait for a recess to leave or

18

1    you can leave in between jurors if you understand what

2    I'm saying.  I don't want people in the well of the

3    courtroom getting up and leaving in the middle of the

4    voir dire, if they're in the well of the courtroom.

5    Now people in the gallery they can come and go as they

6    please but for trial as well, if we're not in a recess

7    any of your clients or other lawyers that are in the

8    well of the courtroom would have to wait for recess.  I

9    don't want people coming and going.  But if there's any

10   believe me any need for a quick break because someone

11   needs to leave or you have an emergency or whatever,

12   I'm happy to take another recess, so you just let me

13   know and ask for a recess and I'm sure we'll take a

14   recess.  I just don't want any commotion.

15        During the -- I am going to remain on the bench at

16   least for the immediate future.  I don't have any other

17   conflicts right now.  I don't know if that's going to

18   remain the whole time but the juror, potential juror

19   will sit next to me up here.  I don't know if you want,

20   I guess, Mr. Ferraro, maybe we can move the lectern up

21   for the lawyers.

22        THE CLERK:  Wherever counsel wants to.

23        THE COURT:  Why don't you discuss where you want

24   it but I'm telling you now I want you to give the

25   jurors space.  I don't want you leaving that lectern

26   area and clouding the jurors and I'm going to say the

27   same thing for witnesses as well.  So I don't want

19

1   anybody invading their space.

2       So here's what I would say on the replies to the

3   motions in limine by Mr. Jones.  If Mr. Jones wishes,

4   he's not ordered to, he doesn't have to but if he

5   wishes to file replies to the motions in limine, and

6   that was due yesterday, Mr. Jones will have until the

7   end of business tomorrow to file his replies if he

8   wants to.

9       I'm prepared to go on the introduction to the

10  panel.  I have, thank you, I have all the information

11  that you gave us with respect to the parties and the

12  witnesses and so forth.  So I think for the

13  introduction to the panel, you're going to be very

14  brief.  You're just going to simply say who you are and

15  what other lawyers are with you and if you want to

16  mention if you have clients here or not, that's fine.

17  But I don't want to hear anything beyond that, no

18  description of the case.  It's going to be very very

19  brief otherwise I am going to cut you off.  That's not

20  the opportunity to start any further details.

21      All right.  So we will be back right at 10:00 p.m.

22  for jury selection.

23      ATTY. MATTEI:  Your Honor, I'm sorry.  One

24  housekeeping matter.  I sent to Mr. Stuckel this

25  morning a proposed revised description of the case for

26  the court to consider giving to the jury in light of

27  the fact we now only have one defendant for whom we are

20

1    picking.  The initial jointly agreed upon statement

2    referred to both defendants and I sent the revision to

3    Mr. Stuckel.  Attorney Pattis I spoke to him

4    beforehand, he indicated that he objects so I just want

5    to flag the court given that right now we are only

6    picking with respect to Mr. Jones.

7        THE COURT:  Well, I planned on deleting Free

8    Speech Systems in the language as a defendant.  I

9    understand that you're objecting basically, Attorney

10   Pattis, even going forward into the proceeding and such

11   but do you have any suggestions on the proposed

12   language or not?

13       ATTY. PATTIS:  Yes.  I don't believe the court can

14   refer to Free Speech Systems.  I don't think the court

15   can refer to Mr. Jones as acting through Free Speech

16   Systems without adversely affecting Free Speech Systems

17   in violation of the stay, so that's the basis of my

18   disagreement.

19       If the court's going to proceed as to Mr. Jones I

20   think it should delete reference to Free Speech Systems

21   from the proposed joint statement.

22       ATTY. MATTEI:  I just in response regardless of

23   Free Speech Systems status that fact is established as

24   a result of fault not, so there's not any question that

25   that is true to be evidence in the case regardless of

26   whether Free Speech --

27       ATTY. PATTIS:  That will be a litigated issue

21

1   whether he'll be evidence, we think any evidence to

2   that effect would be in violation of the stay because

3   it acts to the detriment of Free Speech Systems while

4   it's --

5   THE COURT:  I think we can be very clear in our

6   preliminary instructions and our jury instructions that

7   this case is proceeding only as to Mr. Jones

8   individually so I'm not concerned that they're going to

9   be confused.  So if you can't come up with your own

10  language I'm more than capable of coming up with my own

11  language.  Okay.

12  ATTY. WILLIAMS:  Your Honor, may I be excused?

13  THE COURT:  Well, Mr. Williams, sure but you're

14  going to have to file --

15  ATTY. WILLIAMS:  A motion to withdraw.

16  THE COURT:  Unless you can somehow assure me as an

17  officer of the court that Mr. Jones retained you solely

18  for the purposes of the cross claim and not for any

19  other reason.  Because I explained to you the issue.

20  ATTY. WILLIAMS:  I understand.

21  THE COURT:  And I don't want to be hasty and make

22  mistakes and informally let you out of the case if in

23  fact that's not true.

24  ATTY. WILLIAMS:  Your Honor, I assure you as an

25  officer of the court that that was the sole purpose

26  that he retained me and I have no other interest in

27  this case whatsoever.

22

THE COURT:  All right.  Do you agree with that, Attorney Pattis?

ATTY. PATTIS:  I reviewed the papers and I agree.

THE COURT:  I'm sorry.

ATTY. PATTIS:  I've reviewed the engagement letter, I agree that there's no ambiguity with respect to that.

THE COURT:  So your client, Mr. Jones, is not going to object if I informally let Mr. Williams out.

ATTY. PATTIS:  On behalf of Mr. Jones, I'll make that representation.

THE COURT:  And Attorney Mattei, you don't want to be heard on this, correct?

ATTY. MATTEI:  No, your Honor.

THE COURT:  All right.  So ordered.

ATTY. WILLIAMS:  Thank you, your Honor.

THE COURT:  We'll take a recess.

(Whereupon, there was a recess.)

*          *          *          *          *

23

```
 1   DKT NO:  X06-UWY-CV18046436-S   :  COMPLEX LITIGATION

 2                                   :  JUDICIAL DISTRICT WATERBURY
     ERICA LAFFERTY                  :  AT WATERBURY, CONNECTICUT
 3   v.                              :  AUGUST 2, 2022
     ALEX EMRIC JONES                :

 4

 5   DKT NO:  X06-UWY-CV186046437-S

 6   WILLIAM SHERLACH
     V.
 7   ALEX EMRIC JONES

 8
     DKT NO:  X06-UWY-CV186046438-S
 9
     WILLIAM SHERLACH
10   V.
     ALEX EMRIC JONES
11                    E L E C T R O N I C
                    C E R T I F I C A T I O N
12
13        I hereby certify the electronic version is a true and

14   correct transcription of the audio recording of the

15   above-referenced case, heard in Superior Court, G.A. 4 of

16   Waterbury, Connecticut before the Honorable Barbara N. Bellis,

17   Judge, on August 2, 2022.

18
19        Dated this 2nd day of August, 2022 in Waterbury,

20   Connecticut.

21

22

23

24   _____

25          Debbie A. Ellis
        Court Recording Monitor
26

27
```

# Exhibit S-4

005574

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| ERICA LAFFERTY; DAVID WHEELER; FRANCINE WHEELER; JACQUELINE BARDEN; MARK BARDEN; NICOLE HOCKLEY; IAN HOCKLEY; JENNIFER HENSEL; JEREMY RICHMAN; DONNA SOTO; CARLEE SOTO-PARISI; CARLOS M. SOTO; JILLIAN SOTO; AND WILLIAM ALDENBERG, Plaintiffs, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | Adv. Pro. No. 22-05019 ECF No. 5 |
| WILLIAM SHERLACH, Plaintiff, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | Adv. Pro. No. 22-05020 ECF No. 5 |
| WILLIAM SHERLACH & ROBERT PARKER, Plaintiffs, v. ALEX EMRIC JONES; FREE SPEECH SYSTEMS, LLC, Defendants. | Adv. Pro. No. 22-05021 ECF No. 5 |

## ORDER GRANTING EMERGENCY MOTIONS FOR REMAND

### I.     Introduction

On December 5, 2018, Erica Garbatini f/k/a Erica Lafferty (the "Debtor") filed a Chapter

7 case in this Court, which remains pending.  The Debtor is a plaintiff in the first of the three

above-referenced adversary proceedings, Adv. Pro. No. 22-05019.  On July 29, 2022, Free

Speech Systems, LLC ("FSS"), filed a Chapter 11 petition in the United States Bankruptcy Court



EXHIBIT
S-4

005575

for the Southern District of Texas, Case No. 22-60043, which remains pending. FSS is a defendant in all three of the above-referenced adversary proceedings.

On August 2, 2022, FSS commenced the adversary proceedings in this Court by filing Notices of Removal of three consolidated Connecticut Superior Court actions.[1]  On August 3, 2022, the Plaintiffs filed Emergency Motions to Remand the adversary proceedings to the Connecticut Superior Court (the "Motions for Remand").  Among other things, the Motions for Remand assert that FSS filed the Notices of Removal after jury trial began in the Connecticut Superior Court.

FSS filed objections to the Motions for Remand (the "Objections").  The Objections do not dispute that the Notices of Removal were filed after jury selection began.  The Objections also do not dispute that a trial in the Connecticut Superior Court is scheduled to begin on September 6, 2022.

An expedited hearing on the Motions for Remand and the Objections was held on August 12, 2022.  After consideration of the record in these adversary proceedings, the arguments asserted in the Motions for Remand, the Objections, and advanced by the parties during the hearing, and for the reasons set forth below, the Motions for Remand are GRANTED.

---

[1] This is not the first time the Connecticut Superior Court actions have been removed to this Court.  On April 18, 2022, three entities related to FSS—Infowars, LLC, Infowars Health, LLC and Prison Planet TV, LLC (collectively, the "Debtors"), filed Chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas.  Also on April 18, 2022, the Debtors filed Notices of Removal of the Connecticut Superior Court actions in this Court (Adv. Pro. Nos. 22-05004, 22-05005, and 22-05006).  In connection with the dismissal of the Debtors' bankruptcy cases in the United States Bankruptcy Court for the Southern District of Texas, this Court ordered that the Notices of Removal be withdrawn, which resulted in the Plaintiffs' actions being remanded to the Connecticut Superior Court on June 1, 2022.  *See, e.g.*, ECF No. 36 in Adv. Pro. No. 22-05004.

2

**II.     Jurisdiction**

28 U.S.C. § 1452(a) permits a party to remove a claim or cause of action in a civil action to the district court for the district in which such claim or action is pending.  FSS asserts that this Court has jurisdiction over the removed cases pursuant to section 1452(a) because of the Debtor's Chapter 7 case.  The Plaintiffs do not dispute that this Court has jurisdiction over the removed cases which are now the subject of the adversary proceedings.

Section 1334(b) provides that the district courts have jurisdiction over all civil proceedings arising under title 11 or arising in or related to cases under title 11.  This Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. § 157(b)(1) and the District Court's General Order of Reference dated September 21, 1984.

**III.     Discussion**

Because the parties do not agree on whether the claims in Connecticut Superior Court actions are core or non-core proceedings, mandatory abstention by this Court under 28 U.S.C. § 1334(c)(2) is not appropriate.  *See, e.g., In re National Eastern Corporation*, 391 B.R. 663 (Bankr. D. Conn. 2008).  However, permissive abstention may be appropriate under section 1334(c)(1).  *Id.* at 669.  Furthermore, 28 U.S.C. § 1452(b) specifically address removal of claims related to bankruptcy cases and permits a court to remand a removed action on any equitable ground.  28 U.S.C. § 1452(b).

In general, courts look to the following factors to decide whether to permissibly abstain from a case or to equitably remand a case: (1) the effect on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the complexity of the state law issues; (4) comity; (5) the relatedness/remoteness of the action to the main bankruptcy case; (6) the right to a jury trial; and (7) the prejudice to the involuntarily removed parties.  *In re National*

3

*Eastern Corporation*, 391 B.R. 663, 670. The list of factors is non-exclusive and the determination of whether an equitable ground exists to remand involves an assessment of what makes sense under the specific facts and circumstances presented to a court. *Id.* at 671.

A review of the first factor, the effect on the efficient administration of the bankruptcy estate, weighs in favor of remand. A remand will not have a negative effect on the administration of FSS's bankruptcy estate. The parties dispute whether the Plaintiffs' claim are core or non-core claims. If the claims are non-core, this Court cannot enter a final judgment on the Plaintiffs' claims. Regardless of whether the claims are core or non-core, the claims must be adjudicated, and the Connecticut Superior Court is ready to do so. It is undisputed that jury selection had already begun when the Notices of Removal were filed and trial is scheduled to begin on September 6, 2022. A trial of the Plaintiffs' claims in the Connecticut Superior Court may assist with the administration of FSS's bankruptcy estate and will alleviate the need for another court to determine if the Plaintiffs' claim are core or non-core. *See e.g., In re National Eastern Corporation*, 391 B.R. at 670. In addition, FSS asserts that remand will have a negative impact on the administration of its bankruptcy estate because of the costs associated with the trial of the Plaintiffs' claims. However, FSS is proceeding forward with the administration of its bankruptcy estate, including recently obtaining an order allowing it to increase its use of cash collateral based upon increased income due to better than projected sales of products since its bankruptcy case was filed. *See In re Free Speech Systems LLC*, United States Bankruptcy Court for the Southern District of Texas, Case No. 22-60043, ECF Nos. 55, 64. For these reasons, remand will not negatively impact the administration of FSS's bankruptcy estate.

The second factor, the extent to which issues of state law predominate, also weighs in favor of remand. The Plaintiffs' claims are exclusively based on state law even though, as FSS

4

argues, the claims relate only to damages. *See e.g.*, *In re Granoff*, 242 B.R. 216, 220 (Bank. D. Conn. 1999). Such claims include negligent and intentional infliction of emotional distress, violations of the Connecticut Unfair Trade Practices Act, and defamation. The Defendants' challenges to the sufficiency of the Plaintiffs' claims have not succeeded in the Connecticut Superior Court. Furthermore, the Plaintiffs' claims have been pending before the same judge for more than four years. The Connecticut Superior Court has extensive knowledge and familiarity with the claims and the parties. The docket of the Superior Court actions attached to the Objections demonstrate that there are more than 800 docket entries in the cases and that the Connecticut Superior Court has issued many substantive rulings. The Connecticut Superior Court has acted on all matters that needed to be decided before trial and was overseeing jury selection on August 2, 2022, when the Notices of Removal were filed. Under the circumstances surrounding these adversary proceedings, issues of state law predominate and the Connecticut Superior Court is in the best position to decide the Plaintiffs' state law claims.

The third and fourth factors, the complexity of the state law issues and principles of comity, also weigh in favor of remand. The Plaintiffs' state law claims are extensive and complex. A trial of the claims will require a resolution of factual, legal, and evidentiary issues based on Connecticut law. Despite several attempts by FSS and related entities to remove the actions from the Connecticut Superior Court, the claims are ready to be tried in the Connecticut Superior Court.[2] The claims arise under Connecticut common law and the Connecticut Unfair Trade Practices Act. Both comity and respect for state law supports remanding the actions to the

---

[2] In addition to the prior Notices of Removal filed in this Court, FSS and related entities twice removed the Connecticut Superior Court actions to the United States District Court for the District of Connecticut and on both occasions the actions were remanded to the Connecticut Superior Court. *See, e.g.*, *Lafferty v. Jones* (3:18-cv-01156-JCH) and *Lafferty v. Jones* (3:20-cv-01723-JCH).

5

Connecticut Superior Court for the interpretation of common law and state statutes. *In re Granoff*, 242 B.R. at 220.

The fifth factor, the relatedness/remoteness of the Connecticut Superior Court actions to the FSS bankruptcy case, also supports remand. The Plaintiffs' claim arose years before FSS filed its Chapter 11 case. As previously noted, FSS does not dispute that it filed the Notices of Removal after jury selection was underway in the Connecticut Superior Court. During a hearing held on August 2, 2022, before jury selection began, the Connecticut Superior Court agreed that jury selection and the trial could not proceed against FSS due to the automatic stay it received when it filed its Chapter 11 case on July 29, 2022. However, the Connecticut Superior Court determined that jury selection and trial could proceed against the Defendant Alex Emric Jones ("Jones"), because FSS has not sought or obtained an order extending the automatic stay to Jones. See ECF No. 5 at 5-8, p. 14-18. The Connecticut Superior Court then proceeded with jury selection as to the claims against Jones and not FSS, supporting the finding that there is a remoteness between the continuation of the Connecticut Superior Court actions and the FSS bankruptcy estate.

The Plaintiffs' right to a jury trial, the sixth factor, additionally supports remand. Although the parties dispute whether the Plaintiffs' claims are core or non-core, this Court cannot conduct a jury trial on non-core claims. In addition, it is clear that the parties do not consent to a jury trial being conducted by this Court. A jury is in the process of being selected in the Connecticut Superior Court. The Plaintiffs' rights to have that process continue in the Connecticut Superior Court should not be disturbed.

The seventh and final factor, the prejudice to the involuntarily removed parties, weighs heavily in favor of remand. The Plaintiffs have been pursuing their claims against FSS and

6

others for more than four years.  The pursuit of these claims has occurred not only in the Connecticut Superior Court, but in other courts as well.  On multiple occasions, the Plaintiffs have had to pursue their claims in the United States District Court for the District of Connecticut, the United States Bankruptcy Court for the Southern District of Texas, and this Court.  During jury selection and just weeks before trial is scheduled to begin in the Connecticut Superior Court, the Plaintiffs were involuntarily removed to this Court.  The Plaintiffs' claims are ready to be tried in the Connecticut Superior Court.   If remand does not occur, the prejudice to the Plaintiffs is much greater than any possible prejudice to FSS.

Upon a review of the circumstances surrounding these adversary proceedings and consideration of the factors to be analyzed when deciding a motion for remand, the Court finds that is it appropriate to abstain and remand the adversary proceedings to the Connecticut Superior Court in accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b).

Finally, although the Plaintiff seeks an award of fees and costs pursuant to 28 U.S.C. § 1447(c), the Court declines to award fees and costs at this time.

IV.    **CONCLUSION**

Accordingly, it is hereby

**ORDERED:** In accordance with 28 U.S.C. § 1334(c)(1) and 28 U.S.C. § 1452(b), the Motions for Remand are GRANTED and Adversary Proceedings 22-05019, 22-05020, and 22-05021 are remanded to the Connecticut Superior Court; and it is further

**ORDERED:**  The Plaintiffs' request for fees and costs pursuant to 28 U.S.C. § 1447(c) is DENIED; and it is further

7

**ORDERED:** Any pending motions in Adversary Proceedings 22-05019, 22-05020, and 22-05021 are moot due to the remand of the adversary proceedings.

Dated at Bridgeport, Connecticut this 15th day of August, 2022.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut

8

# Exhibit S-5

005583

## R. J. Shannon

**From:** R. J. Shannon
**Sent:** Tuesday, August 16, 2022 9:56 AM
**To:** Shelby Jordan; Ray Battaglia; Kyung S. Lee
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

1



EXHIBIT

S-5

tabbies

005584

c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

From: Shelby Jordan <sjordan@jhwclaw.com>
Date: Tuesday, August 16, 2022 at 6:36 AM
To: R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
Subject: Re: Isn't this our case in Conn

RJ: I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

From: Shelby Jordan <sjordan@jhwclaw.com>
Date: Tuesday, August 16, 2022 at 6:31 AM
To: RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
Subject: Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

2

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

## Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

005586

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

### Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

### Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

4

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

# Exhibit S-6

005589

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Tuesday, August 16, 2022 2:06 PM |
| **To:** | Ray Battaglia; Kyung S. Lee |
| **Cc:** | R. J. Shannon |
| **Subject:** | Re: Isn't this our case in Conn |

Ray and Kyung:  Based on RJ's total rejection of all defenses and all matters filed in Conn I do not think a conference to discuss how to protect the ongoing business is a total waste of time.

> "The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate."

So, after 300 words of negative, I leave it to the Debtors to decide how to keep Alex supporting the efforts.   I'm sure RJ has an answer since Alex will be left to fighting these battles on his own.

Shelby

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just

1


EXHIBIT
S-6

005590

uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

   c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

   d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.


R. J. Shannon
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee

2

<klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ: I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

## Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

3

005592

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

## Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

4

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

<center>Abstention</center>

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

<center>5</center>

005594

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

6

005595

# Exhibit S-7

005596

## R. J. Shannon

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Wednesday, August 17, 2022 8:38 AM |
| **To:** | R. J. Shannon; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

RJ - I have been waiting since this email to hear the Debtors Plan when Alex sales go dark because he is in trial in Conn. If you have one, please forward so I may share with Alex. In light of your opinions in your email, this is a critical request.

Shelby

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an

1



**EXHIBIT**

S-7

005597

example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional Infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

From: Shelby Jordan <sjordan@jhwclaw.com>
Date: Tuesday, August 16, 2022 at 6:36 AM
To: R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
Subject: Re: Isn't this our case in Conn

RJ: I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

005598

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court —

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

3

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

### Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

4

005600

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

### Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

6

# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

---

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 10/12/2022 10:02:45 AM |
| Audio File Name : | 4bk2022-60043_20221012-100245.mp3 |
| Audio File Size : | 23817 KB |
| Audio Run Time : | [00:49:37] (hh:mm:ss) |

---

**Help using this file:**

> An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

> **This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 12, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FREE SPEECH SYSTEMS LLC, | ) | Case No. 22-60043 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## <u>STIPULATION AND AGREED ORDER</u>

Free Speech Systems, LLC ("Debtor") initiated the bankruptcy case on July 29, 2022 via the filing of a voluntary chapter 11 petition. Alex E. Jones is the sole member of the Debtor ("Jones"). Melissa Haselden is the duly qualified and acting Subchapter V Trustee (the "Trustee"). PQPR Holdings Limited, LLC asserts a claim secured by substantially all assets of the Debtor ("PQPR"). Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ( the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "Connecticut Plaintiffs") (together the "Sandy Hook Families"). The Debtor, Jones, the Trustee, PQPR, and the Sandy Hook Families are referred to as the "Parties".

Upon the request and agreement of the Parties, it is ORDERED THAT.

1.      Judge Marvin Isgur is appointed as a mediator in this case. At all times in the performance of his mediation duties, Judge Isgur will be acting in his official capacity as a United States Bankruptcy Judge, with all of the privileges and immunities of a United States Bankruptcy Judge.

2.      The Court adopts Section S of the Procedures for Complex Cases in the Southern District of Texas (Effective August 1, 2021).

005604

3.      Effects of Mediation on Pending Matters. Unless otherwise ordered by the Court, the assignment to mediation does not delay or stay discovery, pretrial hearing dates or trial schedules.

4.      Time and Place of Mediation. The mediator will schedule a time and place for the mediation and any pre-mediation conferences.

5.      Submission Materials. Each party must submit directly to the mediator such materials (the "Submission") in form and content as the mediator directs. Prior to the mediation, the mediator may talk with the participants to determine what materials would be helpful. The Submission must not be filed with the Court.

6.      Protection of Information Disclosed at Mediation. The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties in the course of the mediation. No person may rely on or introduce as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort, including but not limited to: (A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute; (B) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator, (C) proposals made or views expressed by the mediator; (D) statements or admissions made by a party in the course of the mediation; and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation. Without limiting the foregoing, the parties are bound by (i) FED. R. EVID. 408, and (ii) any applicable federal or state statute, rule, common law or judicial precedent relating to the privileged nature of settlement discussions, mediations or other alternative dispute resolution procedures. Information otherwise discoverable or admissible in evidence does not become exempt from discovery, or inadmissible in evidence, merely by being used by a party in the mediation.

7.      <u>Discovery from Mediator</u>. The mediator may not be compelled to disclose to the Court or to any person any of the records, reports, summaries, notes, communications or other documents received or made by the mediator while serving in such capacity. The mediator may not testify or be compelled to testify regarding the mediation in connection with any arbitral, judicial or other proceeding. The mediator will not be a necessary party in any proceedings relating to the mediation. Nothing contained in this paragraph prevents the mediator from reporting (i) the status, but not the substance, of the mediation effort to the Court; or (ii) whether a party failed to participate in good faith in the mediation.

8.      <u>Protection of Proprietary Information</u>. The parties, the mediator and all mediation participants shall protect proprietary information.

9.      <u>Preservation of Privileges</u>. The disclosure by a party of privileged information to the mediator does not waive or otherwise adversely affect the privileged nature of the information.

10.     <u>Service of Process</u>. No party may be served with a summons, subpoena, notice or other pleading during the mediation or at the location where the mediation is occurring.

11.     At least one representative with full settlement authority for each of Parties shall attend the mediation to occur with Judge Isgur at a date agreed upon by the Judge Isgur and the Parties.

12.     The scope, location, time and procedures for the mediation will be determined by Judge Isgur, following such consultation with the Parties as he deems appropriate.


Signed:  October 12, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

AGREED

/s/ *Shelby A. Jordan*
Shelby A. Jordan (TX State Bar # 11016700)
JORDAN & ORTIZ, P.C.
500 North Shoreline Blvd, Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
Email: sjordan@jhwclaw.com Copy to: cmadden@jhwclaw.com

**Counsel for Alex E. Jones**

/s/ *Raymond W. Battaglia*
Raymond W. Battaglia (TX State Bar # 01918055)
Law Offices of Raymond W. Battaglia
66 Granburg Circle
San Antonio, Texas 78218
Telephone: 210-601-9405
Email: rbattaglialaw@outlook.com

**Counsel for Free Speech Systems, LLC**

/s/ *Stephen W. Lemmon*
Stephen W. Lemmon (TX State Bar # 12194500)
1801 South Mopac Expressway, Ste. 320
Austin, Texas 78746
Telephone: (512) 236-9900
Facsimile: (512) 236-9904
Email: lemmon@slollp.com

**Counsel for PQPR Holdings Limited, LLC**

/s/ *Elizabeth Freeman*
Elizabeth Freeman (TX State Bar # 24009222)
**JACKSON WALKER LLP**
1401 McKinney Suite 1900
Houston, TX 77010
Federal I.D. 24564
Telephone: 713-752-4328
Facsimile: 713-752-4221
Email: efreeman@jw.com

**Counsel for Melissa Haselden, subchapter V trustee**

(Signatures Continued on Next Page)

/s/  *Jarrod B. Martin*
Jarrod B. Martin (TX State Bar # 24070221)
**CHAMBERLAIN HRDLICKA**
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone: 713.356.1280
Facsimile: 713.658.2553
Email: jarrod.martin@chamberlainlaw.com

**Counsel for Neil Heslin, Scarlett Lewis, Leonard Pozner,
Veronique De La Rosa, and Marcel Fontaine**


/s/ *Ryan E. Chapple*
Ryan E. Chapple (TX State Bar # 24036354)
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: 512-477-5000
Facsimile: 512-477-5011
Email: rchapple@cstrial.com

**Counsel for David Wheeler, Francine Wheeler,
Jacqueline Barden, Mark Barden, Nicole Hockley,
Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi,
Carlos M. Soto, Jillian Soto-Marino, William Aldenberg,
William Sherlach, and Robert Parker**

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 12, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| **Debtor.** | § | |

### ORDER GRANTING UNOPPOSED EMERGENCY MOTION FOR CONTINUANCE OF HEARING ON THE SANDY HOOK FAMILIES' MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION

CAME ON FOR CONSIDERATION the *Unopposed Emergency Motion for Continuance of Hearing on the Sandy Hook Families' Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession* (the "Motion for Continuance") filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "Connecticut Plaintiffs") (together with the Texas Plaintiffs, the "Sandy Hook Families").   IT IS ORDERED THAT the Motion for Continuance is GRANTED and the hearing on the Motion is continued until **November 16, 2022 at 10:00 a.m. (CT).**

Signed:  October 12, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

1

005609

**SmBus, PlnDue, DsclsDue, ReqSepNtc, Subchapter_V, APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 22-60043

| | |
|---|---|
| *Date filed:* | 07/29/2022 |
| *Date of Intradistrict transfer:* | 08/04/2022 |
| *341 meeting:* | 09/07/2022 |
| *Deadline for filing claims:* | 10/07/2022 |
| *Deadline for filing claims (govt.):* | 02/07/2023 |
| *Deadline for objecting to discharge:* | 03/10/2023 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
Asset

*Debtor*
**Free Speech Systems LLC**
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741
TRAVIS-TX
SSN / ITIN: xxx-xx-0005

represented by **Raymond William Battaglia**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
2106019405
Email: rbattaglialaw@outlook.com

**Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**R. J. Shannon**
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002
713-714-5770
Email: rshannon@shannonpllc.com

**Christina Walton Stephenson**
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201
214-420-2163
Email: Crissie.Stephenson@crowedunlevy.com

*Trustee*
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

represented by **Elizabeth Carol Freeman**
The Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208-1209
832-779-3580
Email: liz@lizfreemanlaw.com

**Melissa Anne Haselden**
Haselden Farrow PLLC

005610

Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

**U.S. Trustee**
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

**Creditor Committee**
**Official Committee of Unsecured Creditors**
**of Alexander E. Jones**
c/o Marty L. Brimmage, Jr.
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
214-969-2800

represented by **Marty L Brimmage**
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
214-969-2885
Fax : 214-969-4343
Email: mbrimmage@akingump.com

| Filing Date | # | Docket Text |
|---|---|---|
| 10/12/2022 | ⬤235 | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: Ray Battaglia, Stephen Lemmon, Ryan Chapple, Ha Nguyen, RJ Shannon, Mike Ridulfo, Shelby Jordan, Melissa Haselden, Jarod Martin, Patrick Magill, Elizabeth Freeman. (Related document(s):6 Final Cash Collateral Hearing, 127 Amended Motion to Direct Subchapter V Trustee, 205 Application to Employ, 206 Motion to Reconsider, 207 Motion to Reconsider). For the reasons stated on the record, Motions Granted. Parties are to upload a proposed order. **Further Cash Collateral Hearing on (Related Doc# 6) is scheduled for 10/26/2022 at 01:00 PM. Hybrid Hearing on (Related Doc# 206 and 207 Motions to Reconsider) are scheduled for 11/16/2022 at 10:00 AM.** (ZildeMartinez) (Entered: 10/12/2022) |

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| | § | |
| Debtor. | § | |

## FOURTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion").   In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein.  The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98].  On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151].  This order is the fourth interim order ("Fourth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral.  The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

005612

1.     <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.     <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.     <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.     <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fourth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.      <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.      <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second and Third Interim Orders are incorporated in the Fourth Interim Order.

10.      <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.      <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.      <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.    <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.    <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October ___, 2022, at _____ a.m. Central time.

Houston, Texas
Dated: October ___, 2022

_____
        UNITED STATES BANKRUPTCY JUDGE

| | NEW 2 WEEK BUDGET | | |
|---|---|---|---|
| Week Number | 10/15/2022-10/21/2022 **12** | 10/22/2022-10/28/2022 **13** | *Total* |
| **Income** | | | |
| Product Sales | $  595,489.01 | $  595,489.01 | $  1,190,978.03 |
| Advertising | - | - | - |
| Donations | 3,141.25 | 25,000.00 | 28,141.25 |
| **Total Income** | **598,630.26** | **620,489.01** | **1,219,119.27** |
| | | | |
| **Selling & Product Costs** | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (152,310.35) |
| Repay PQPR Inventory | - | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (53,594.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (15,823.63) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (190,556.48) |
| Processor Fees | (23,819.56) | (23,819.56) | (47,639.12) |
| eCommerce Store Maintenance | (25,000.00) | - | (25,000.00) |
| Texas Sales Tax | - | - | - |
| **Total Cost of Goods Sold** | **(254,961.80)** | **(229,961.80)** | **(484,923.59)** |
| | | | |
| **Operating Expenses** | | | |
| **Advertising & Promotion** | | | |
| Advertising & Promotion | - | - | - |
| Print Media | - | - | - |
| Radio Show Advertising | - | - | - |
| **Total Advertising & Promotion** | **-** | **-** | **-** |
| | | | |
| **Computer/IT/IP Expense** | | | |
| Internet & TV services | (1,608.39) | - | (1,608.39) |
| Software License Fees | - | - | - |
| Server Hosting Service | - | - | - |
| CDN Video Cloud Storage | - | - | - |
| Satellite Service | - | - | - |
| Imaging License Fee | - | - | - |
| Software & Apps | - | - | - |
| Website Hosting | (266.50) | - | (266.50) |
| **Total Computer/IT/IP Expense** | **(1,874.89)** | **-** | **(1,874.89)** |
| | | | |
| **Office & Administrative Expense** | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (91.81) |
| Insurance | - | (5,000.00) | (5,000.00) |
| Equipment Rental | - | | |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (4.20) |
| Business Meals | (400.00) | (400.00) | (800.00) |
| **Total Office & Administrative Expense** | **(448.00)** | **(5,448.00)** | **(5,896.01)** |
| | | | |
| **Utilities** | | | |
| Utility Deposit | | | |
| Electricity | (5,107.63) | - | (5,107.63) |
| HVAC | - | - | - |
| CAM Charges | - | - | - |
| Water & Sewer | - | - | - |
| Gas Service | - | - | - |
| Pest Control | - | - | - |
| Waste Management | - | - | - |
| **Total Utilities** | **(5,107.63)** | **-** | **(5,107.63)** |
| | | | |
| **Occupancy** | | | |
| Rent | - | - | - |
| Office Security | (3,975.00) | (3,975.00) | (7,950.00) |
| Repair & Maintenance - Building | - | (2,500.00) | (2,500.00) |
| Supplies | (5,000.00) | (2,500.00) | (7,500.00) |
| Telephone | | | |

EXHIBIT

A

005616

| | | | |
|---|---|---|---|
| Janitorial | - | - | - |
| **Total Occupancy** | **(8,975.00)** | **(8,975.00)** | **(17,950.00)** |
| | | | |
| **Personnel Expenses** | | | |
| Salaries & Wages - Base | (140,000.00) | - | (140,000.00) |
| Payroll Tax | (11,200.00) | | (11,200.00) |
| 62410 Contract Broadcase Services | | (11,200.00) | (11,200.00) |
| 62420 Contract Radio Show Production | | (25,000.00) | (25,000.00) |
| 62430 Contract Video Production | | (10,000.00) | (10,000.00) |
| 62470 Free Lance Contributors | (3,500.00) | | (3,500.00) |
| Free Lance Contributors | - | - | - |
| Alex Jones Salary | (20,000.00) | | (20,000.00) |
| **Total Personnel Expenses** | **(174,700.00)** | **(46,200.00)** | **(220,900.00)** |
| | | | |
| **Travel** | | | |
| Mileage/Parking/Tolls | (100.00) | (100.00) | (200.00) |
| Vehicle Leases | - | - | - |
| **Total Travel Expenses** | **(100.00)** | **(100.00)** | **(200.00)** |
| | | | |
| **Total Operating Expenses** | **(191,205.53)** | **(60,723.00)** | **(251,928.53)** |
| | | | |
| ***Non-Operating Expenses*** | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (10,000.00) |
| **Total Other Expenses** | **(55,000.00)** | **(55,000.00)** | **(110,000.00)** |
| | | | |
| **Professional Fees** | | | |
| CRO Fees | - | (50,000.00) | (50,000.00) |
| Financial Adviosr Fee | - | - | - |
| Shannon & Lee LLP | - | - | - |
| Ray Battaglia | - | (30,000.00) | (30,000.00) |
| **Total Professional Fees** | **-** | **(80,000.00)** | **(80,000.00)** |
| | | | |
| **Total Cash Flow** | **97,462.94** | **194,804.21** | **292,267.15** |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER (A) AUTHORIZING EMPLOYMENT OF PATRICK MAGILL AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF MAGILL PC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtor's Application for Order (A) Authorizing Employment of Patrick Magill as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Magill, PC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1]; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      The Application is granted, to the extent set forth herein.

2.      In accordance with Bankruptcy Code §§ 327(a), 328 and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain Magill, effective as of the Petition

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

Date, as its chief restructuring officer (the "CRO"), under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.      Notwithstanding anything else in this Order, the Motion, the Debtor's corporate governance documents, or any exhibits and attachments to any of the foregoing, during the pendency of this chapter 11 case:

        a.      Subparagraph 9 of the Engagement Agreement, attached as Exhibit A to the Motion, is modified to strike the second sentence.

        b.      Subparagraph 17 of the Engagement Agreement, attached as Exhibit A to the Motion, is modified to read as follows: "Make business decisions on behalf of FSS as necessary or required, utilizing the CRO's business judgment in aid of the restructuring."

        c.      The CRO shall report to the member(s) of the Debtor. This Order does not remove or displace any member of the Debtor under the Company Agreement of Free Speech Systems, LLC.

4.      The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Case or (i) as otherwise required to be disclosed pursuant to an order of the court or (ii) for use in the ordinary course of Debtor's business.

5.      The compensation to be paid to Magill P.C. and J. Patrick Magill shall be a flat rate of $50,000 per month, payable semi-monthly in the amount of $25,000 and shall constitute an administrative expense of Debtor's estate.

6.      Magill PC and J. Patrick Magill shall not be required to file fee applications or Monthly Fee Statements.

7.      The CRO and Firm will review their files periodically during the pendency of the Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental Declaration, as required by Fed. R. Bankr. P. 2014(a).

8.      To the extent the Application, the Magill Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

9.      The Debtor, the CRO, and Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

10.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated this __ day of October 2022.

_____
UNITED STATES BANKRUPTCY JUDGE

005621

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 13, 2022
Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FOURTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. This order is the fourth interim order ("Fourth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.     Interim Order. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.     DIP Account. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "DIP Account").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.     Terms of Cash Collateral Use. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fourth Interim Order (the "Interim Period") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     Payment to PQPR for Inventory Purchase. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second and Third Interim Orders are incorporated in the Fourth Interim Order.

10.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.    <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October 26, 2022, at 1:00 p.m. Central time.

Signed:  October 13, 2022

Christopher Lopez
United States Bankruptcy Judge

| | NEW 2 WEEK BUDGET | | |
|---|---|---|---|
| Week Number | 10/15/2022-10/21/2022 12 | 10/22/2022-10/28/2022 13 | *Total* |
| **Income** | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 1,190,978.03 |
| Advertising | - | - | - |
| Donations | 3,141.25 | 25,000.00 | 28,141.25 |
| **Total Income** | **598,630.26** | **620,489.01** | **1,219,119.27** |
| | | | |
| **Selling & Product Costs** | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (152,310.35) |
| Repay PQPR Inventory | - | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (53,594.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (15,823.63) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (190,556.48) |
| Processor Fees | (23,819.56) | (23,819.56) | (47,639.12) |
| eCommerce Store Maintenance | (25,000.00) | - | (25,000.00) |
| Texas Sales Tax | - | - | - |
| **Total Cost of Goods Sold** | **(254,961.80)** | **(229,961.80)** | **(484,923.59)** |
| | | | |
| **Operating Expenses** | | | |
| **Advertising & Promotion** | | | |
| Advertising & Promotion | - | - | - |
| Print Media | - | - | - |
| Radio Show Advertising | - | - | - |
| **Total Advertising & Promotion** | **-** | **-** | **-** |
| | | | |
| **Computer/IT/IP Expense** | | | |
| Internet & TV services | (1,608.39) | - | (1,608.39) |
| Software License Fees | - | - | - |
| Server Hosting Service | - | - | - |
| CDN Video Cloud Storage | - | - | - |
| Satellite Service | - | - | - |
| Imaging License Fee | - | - | - |
| Software & Apps | - | - | - |
| Website Hosting | (266.50) | - | (266.50) |
| **Total Computer/IT/IP Expense** | **(1,874.89)** | **-** | **(1,874.89)** |
| | | | |
| **Office & Administrative Expense** | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (91.81) |
| Insurance | - | (5,000.00) | (5,000.00) |
| Equipment Rental | - | - | - |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (4.20) |
| Business Meals | (400.00) | (400.00) | (800.00) |
| **Total Office & Administrative Expense** | **(448.00)** | **(5,448.00)** | **(5,896.01)** |
| | | | |
| **Utilities** | | | |
| Utility Deposit | | | |
| Electricity | (5,107.63) | - | (5,107.63) |
| HVAC | - | - | - |
| CAM Charges | - | - | - |
| Water & Sewer | - | - | - |
| Gas Service | - | - | - |
| Pest Control | - | - | - |
| Waste Management | - | - | - |
| **Total Utilities** | **(5,107.63)** | **-** | **(5,107.63)** |
| | | | |
| **Occupancy** | | | |
| Rent | - | - | - |
| Office Security | (3,975.00) | (3,975.00) | (7,950.00) |
| Repair & Maintenance - Building | - | (2,500.00) | (2,500.00) |
| Supplies | (5,000.00) | (2,500.00) | (7,500.00) |
| Telephone | | | |

EXHIBIT

A

005626

| | | | |
|---|---|---|---|
| Janitorial | - | - | - |
| **Total Occupancy** | **(8,975.00)** | **(8,975.00)** | **(17,950.00)** |
| | | | |
| **Personnel Expenses** | | | |
| Salaries & Wages - Base | (140,000.00) | - | (140,000.00) |
| Payroll Tax | (11,200.00) | | (11,200.00) |
| 62410 Contract Broadcase Services | | (11,200.00) | (11,200.00) |
| 62420 Contract Radio Show Production | | (25,000.00) | (25,000.00) |
| 62430 Contract Video Production | | (10,000.00) | (10,000.00) |
| 62470 Free Lance Contributors | (3,500.00) | | (3,500.00) |
| Free Lance Contributors | - | - | - |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) |
| **Total Personnel Expenses** | **(174,700.00)** | **(46,200.00)** | **(220,900.00)** |
| | | | |
| **Travel** | | | |
| Mileage/Parking/Tolls | (100.00) | (100.00) | (200.00) |
| Vehicle Leases | - | - | - |
| **Total Travel Expenses** | **(100.00)** | **(100.00)** | **(200.00)** |
| | | | |
| **Total Operating Expenses** | **(191,205.53)** | **(60,723.00)** | **(251,928.53)** |
| | | | |
| ***Non-Operating Expenses*** | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (10,000.00) |
| **Total Other Expenses** | **(55,000.00)** | **(55,000.00)** | **(110,000.00)** |
| | | | |
| **Professional Fees** | | | |
| CRO Fees | - | (50,000.00) | (50,000.00) |
| Financial Adviosr Fee | - | - | - |
| Shannon & Lee LLP | - | - | - |
| Ray Battaglia | - | (30,000.00) | (30,000.00) |
| **Total Professional Fees** | **-** | **(80,000.00)** | **(80,000.00)** |
| | | | |
| **Total Cash Flow** | **97,462.94** | **194,804.21** | **292,267.15** |

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 13, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER (A) AUTHORIZING EMPLOYMENT OF PATRICK MAGILL AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF MAGILL PC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

Upon the *Debtor's Application for Order (A) Authorizing Employment of Patrick Magill as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Magill, PC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1]; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      The Application is granted, to the extent set forth herein.

2.      In accordance with Bankruptcy Code §§ 327(a), 328 and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain Magill, effective as of the Petition

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

Date, as its chief restructuring officer (the "CRO"), under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.      Notwithstanding anything else in this Order, the Motion, the Debtor's corporate governance documents, or any exhibits and attachments to any of the foregoing, during the pendency of this chapter 11 case:

      a.      Subparagraph 9 of the Engagement Agreement, attached as Exhibit A to the Motion, is modified to strike the second sentence.

      b.      Subparagraph 17 of the Engagement Agreement, attached as Exhibit A to the Motion, is modified to read as follows: "Make business decisions on behalf of FSS as necessary or required, utilizing the CRO's business judgment in aid of the restructuring."

      c.      The CRO shall report to the member(s) of the Debtor. This Order does not remove or displace any member of the Debtor under the Company Agreement of Free Speech Systems, LLC.

4.      The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Case or (i) as otherwise required to be disclosed pursuant to an order of the court or (ii) for use in the ordinary course of Debtor's business.

5.      The compensation to be paid to Magill P.C. and J. Patrick Magill shall be a flat rate of $50,000 per month, payable semi-monthly in the amount of $25,000 and shall constitute an administrative expense of Debtor's estate.

6.      Magill PC and J. Patrick Magill shall not be required to file fee applications or Monthly Fee Statements.

7.      The CRO and Firm will review their files periodically during the pendency of the Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental Declaration, as required by Fed. R. Bankr. P. 2014(a).

8.      To the extent the Application, the Magill Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

9.      The Debtor, the CRO, and Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

10.      This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


Signed:  October 13, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

### MOTION TO WITHDRAW AS COUNSEL
### FOR CONNECTICUT PLAINTIFFS[1]

**This motion seeks an order that may adversely affect you.   If you oppose the motion, you should immediately contact the moving party to resolve the dispute.  If you and the moving party cannot agree, you must file a response and send a copy to the moving party.  You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted.  If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing.  Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, U.S. BANKRUPTCY JUDGE:

Byman & Associates PLLC, along with its individual attorney, Randy W. Williams (collectively, Movant), files this Motion to Withdraw as Counsel for Connecticut Plaintiffs, and respectfully shows:

---

[1] Connecticut Plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker.

MOTION TO WITHDRAW AS COUNSEL—PAGE 1

1.      Free Speech Systems, LLC filed its voluntary petition for bankruptcy protection on July 29, 2022 [Dkt. 1].

2.      On July 31, 2022, Movant filed a Notice of Appearance and Request for Service [Dkt. 13].

3.      Movant notified Connecticut Plaintiffs of its intent to seek withdrawal as counsel.

4.      Ryan E. Chapple and the law firm of Cain & Skarnulis PLLC will continue its representation of Connecticut Plaintiffs as lead counsel of record.

5.      For the reasons stated, Movant respectfully requests this Court grant this Motion to Withdraw as Counsel for Connecticut Plaintiffs.  Movant's individual attorney respectfully requests that he be removed from this Court's CM/ECF notification system as counsel for Connecticut Plaintiffs.  Movant further requests such other and further relief to which it may be justly entitled to receive.

Respectfully submitted this 20th day of October 2022.

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
**ATTORNEY FOR
CONNECTICUT PLAINTIFFS**

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**

005632

7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262
**WITHDRAWING ATTORNEY FOR
CONNECTICUT PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion to Withdraw as Counsel has been served on counsel for Debtor, Debtor, the Subchapter V Trustee, the U.S. Trustee, as well as all parties receiving or entitled to notice through CM/ECF and in accordance with the Rules on this 20th day of October 2022.

_____*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

005633

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

### ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL
### FOR CONNECTICUT PLAINTIFFS[1]

CAME ON to be considered the Motion to Withdraw as Counsel for Connecticut Plaintiffs filed on behalf of Byman & Associates PLLC and including withdrawal of its individual attorney Randy W. Williams.   After consideration of the motion and representations by Movant, responses and objections, if any, and argument of counsel, if any, the Court finds the Motion meritorious.  It is, therefore,

ORDERED that Movant Byman & Associates PLLC and its individual attorney Randy W. Williams are permitted to withdraw as counsel on behalf of Connecticut Plaintiffs.  It is further

ORDERED that that following individual attorney be removed from notifications for this proceeding from the Court's CM/ECF filing system: Randy W. Williams, rww@bymanlaw.com.

Dated: _____ ____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

---

[1] Connecticut Plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker.

ORDER—PAGE 1

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS

PLEASE TAKE NOTICE that PATRICK MAGILL is appearing as Chief Restructuring Officer in this case, and hereby requests service of all notices and papers herein upon the address listed below, pursuant to section 1109 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*., and rules 2002, 3017, 9007, and 9010 of the Federal Rules of Bankruptcy Procedure.

> Patrick Magill
> Chief Restructuring Officer,
> Free Speech Systems, LLC
> 3019 Alvin Devane Blvd. Ste 300
> Austin, Texas 78741
> patrick@magillpc.com

PLEASE TAKE FURTHER NOTICE that the foregoing request includes all pleadings of any kind, including, without limitation, all notices, motions, complaints, and orders, whether written or oral, formal, or informal, however transmitted, related in any way to the debtor, its property, or its estate. The undersigned requests that its name be added to the mailing matrix.

PLEASE TAKE FURTHER NOTICE that neither this *Notice of Appearance and Request for Service of Papers* (the "Notice") nor any later appearance, pleading, proof of claim, claim, or suit shall constitute a waiver of (i) the right to have final orders in noncore matters entered only after *de novo* review by a District Judge; (ii) the right to trial by jury in any proceeding triable in this case or any case, controversy, or proceeding related to this case; (iii) the right to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; (iv) any objection to the jurisdiction of this Bankruptcy Court for any purpose other than with respect to this Notice; (v) an election of remedy; and (vi) any other rights, claims,

NOTICE OF APPEARANCE

actions, defenses, setoffs, and recoupments as appropriate, in law or in equity, under any agreements, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

Dated: October 21, 2022

By: /s/ *Ray Battaglia*
Raymond W. Battaglia
  Texas Bar No. 01918055
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle San
Antonio, Texas 78218
Tel.: (210) 601-9405
rbattaglialaw@outlook.com

**Counsel for Free Speech Systems, LLCy**

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system on October 21, 2022:

/s/ *Raymond W. Battaglia*
Raymond W. Battaglia

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## DEBTOR'S EMERGENCY MOTION E FOR
## <u>EXTENSION OF TIME TO FILE A PLAN OF REORGANIZATION</u>

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

**EMERGENCY RELIEF HAS BEEN REQUESTED**. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ' CONFERENCE ROOM NUMBER IS 590153. YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGELOPEZ" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE IN THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT-HAND CORNER AND ENTER YOUR NAME UNDER PERSONAL INFORMATION SETTING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), respectfully files this *Motion for Extension of Time to File a Plan of Reorganization* ("Motion") requesting entry of an order substantially in the form attached hereto (the "Proposed Order") In support of the Application, the Debtor respectfully represents as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Western District of Texas has jurisdiction over this matter under 28 U.S.C. § 1334. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      The statutory bases for relief requested herein are pursuant to 11 U.S.C. §§ 105(a) and 1189 of the Bankruptcy Code, Rule 3016 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas ("L. Rule").

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

5.      The Debtor continue to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

6.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

7.      In June of 2022, FSS retained W. Marc Schwartz as its CRO with broad powers to review the company's past financial performance, analyze the condition of FSS's books and

2

records and evaluate whether FSS is a business that can be reorganized. W. Marc Schwartz retained his Firm Schwartz & Associates to perform various accounting and forensic work associated with his mandate.

8.      This Court denied the application to retain W. Marc Schwartz as CRO and Schwartz & Associates.  The lack of a CRO left the debtor without day to day operational and financial management for the period from September 13, 2022, until Patrick Magill was identified as a replacement CRO and his employment approved by this Court on October 12, 2022.

9.      Mr. Magill's immediate focus has been to address acute operational issues resulting from the management vacuum created by the absence of a CRO.  In addition, he has focused on addressing product acquisition, implementing operational cost cutting and as yet has not begun the effort to construct budgets and pro forma projections which are essential to confirmation of a plan of reorganization under subchapter V of chapter 11.

10.     In addition, on October 12, 2022, this Court entered a *Stipulation and Agreed Order* appointing Judge Isgur to mediate disputes which ultimately will involve terms of a plan.  The date for the mediation has not been set.

## RELIEF REQUESTED

11.     By this Motion, the Debtor seeks entry of an order extending the deadline in which a Subchapter V Plan may be filed for a period of not less than 70 days.

12.     The Debtor requests an emergency hearing on this Motion as the deadline for the Debtor to file a plan is imminent.

## BASES FOR RELIEF REQUESTED

13.     Pursuant to 11 U.S.C. § 1189(b), the Debtor is required to file its Plan of Reorganization within 90 days of the Petition Date, except that the Court may extend the period if

the need for the extension is attributable to circumstances for which the Debtor should not justly be held accountable.

14.     The deadline for the Debtor to file a plan of reorganization is Thursday, October 27, 2022

15.     The replacement of the CRO and the agreement to proceed to mediation as a means of potentially arriving at a resolution of a highly contentious case are circumstances for which the Debtor should not justly be held accountable.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form of the Proposed Order and grant any other appropriate relief.

Dated: October ___, 2022

                                        FREE SPEECH SYSTEMS, LLC


                                        /s/ Ray Battaglia
                                        Law Office of Raymond W. Battaglia
                                        Raymond W. Battaglia
                                        State Bar No. 01918055
                                        rbattaglialaw@outlook.com
                                        66 Granburg Circle
                                        San Antonio, Texas 78218

                                        Counsel to Free Speech Systems, LLC,
                                        Debtor and Debtor-in-Possession


## CERTIFICATE OF ACCURACY

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).


                                        /s/ Raymond W. Battaglia
                                        Raymond W. Battaglia

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 24 hours of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersFirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov


*/s/ Raymond W. Battaglia*

005642

**USPS Service List**

**Twenty Largest Unsecured Creditors**

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

7

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

8

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

005645

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## ORDER GRANTING MOTION FOR EXTENSION OF TIME TO FILE A PLAN OF REORGANIZATION

Upon the *Debtor's* Motion for Extension of Time to File a Plan of Reorganization ("Motion")[1]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY ORDERED THAT**:

1.     Pursuant to 11 U.S.C. § 1189(b), the time to file a plan of reorganization is hereby extended until January 5, 2023. This extension is without prejudice to requests for additional extensions.

2.     The Court retains exclusive jurisdiction with respect to all matters arising or related to the implementation, interpretation, and enforcement of this Order.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Motion.

Dated this __ day of October 2022.

_____
UNITED STATES BANKRUPTCY JUDGE

005647

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 21, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

### ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL
### FOR CONNECTICUT PLAINTIFFS[1]

CAME ON to be considered the Motion to Withdraw as Counsel for Connecticut Plaintiffs filed on behalf of Byman & Associates PLLC and including withdrawal of its individual attorney Randy W. Williams. After consideration of the motion and representations by Movant, responses and objections, if any, and argument of counsel, if any, the Court finds the Motion meritorious. It is, therefore,

ORDERED that Movant Byman & Associates PLLC and its individual attorney Randy W. Williams are permitted to withdraw as counsel on behalf of Connecticut Plaintiffs. It is further

ORDERED that that following individual attorney be removed from notifications for this proceeding from the Court's CM/ECF filing system: Randy W. Williams, rww@bymanlaw.com.

Signed: October 21, 2022

Christopher Lopez
United States Bankruptcy Judge

---

[1] Connecticut Plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker.

005648

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

### SANDY HOOK FAMILIES'
### WITNESS AND EXHIBIT LIST

| | |
|---|---|
| Judge | Hon. Christopher M. Lopez |
| Hearing Date | Wednesday, October 26, 2022 |
| Hearing Time | 1:00 p.m. (CST) |
| Party's Name | Sandy Hook Families |
| Attorney's Names | Ryan Chapple (Connecticut Plaintiffs)<br>Avi Moshenberg, Jarrod Martin (Texas Plaintiffs) |
| Attorney's Phone | 512-477-5000 (Ryan Chapple)<br>713-337-5580 (Avi Moshenberg)<br>713-356-1280 (Jarrod Martin) |
| Nature of Proceeding | Cash Collateral Motion [Dkt. 6] |

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs" and together, the "Sandy Hook Families") hereby submit this Witness and Exhibit List in connection with the hearing on (i) *Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Cash Collateral Motion")

[Dkt. 6]; to be held on Wednesday, October 26, 2022 at 1:00 p.m. (Central Standard Time):

The Sandy Hook Families reserve the right to supplement, amend, or revise this Witness and Exhibit List at any time prior to the hearing. The Sandy Hook Families reserve the right to supplement the Witness and Exhibit List with new witnesses and additional exhibits. Further, the Sandy Hook Families reserve the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document. The Sandy Hook Families further reserve the right to introduce exhibits previously admitted.

### WITNESS LIST

The Sandy Hook Families may call the following witnesses at the hearing:

1. Patrick Magill, Chief Restructuring Officer of Debtor;
2. W. Marc Schwartz, former proposed Chief Restructuring Officer of Debtor;
3. Robert Roe, PQPR Holdings Limited, LLC corporate representative;
4. David Jones, managing member of JLJR Holdings, LLC, which is the managing member of PQPR Holdings Limited, LLC;
5. Any witness necessary to rebut the testimony of any witness called or designated by any other parties;
6. Any witness listed or called by any other party.

### EXHIBIT LIST

The Sandy Hook Families may offer for admission into evidence any of the following exhibits at the hearing:

| No. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 1. | Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 6] | | | | |
| 2. | Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions [Dkt. 10] | | | | |
| 3. | Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 41] | | | | |
| 4. | Order Modifying Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64] | | | | |
| 5. | Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 98] | | | | |
| 6. | Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 151] | | | | |
| 7. | Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 238] | | | | |
| | Any document or pleading filed in the above-captioned case | | | | |
| | Any exhibits identified or offered by any other party | | | | |
| | Any exhibits necessary for impeachment and/or rebuttal purposes | | | | |

Respectfully submitted this 24th day of October 2022.

<div align="right">

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, PC**

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

***Bankruptcy Counsel for the Texas
Plaintiffs***

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

***Bankruptcy Counsel for Connecticut
Plaintiffs***

</div>

005652

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Witness and Exhibit List has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 24th day of October 2022.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

005653

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
|  | ) |  |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DEBTOR'S EMERGENCY MOTION FOR AN INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(B) AND (II) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDER**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the above-referenced chapter 11 case, hereby files this emergency motion (the "Motion") seeking an order from the Court (i) authorizing the use of cash collateral pursuant to Sections 105, 361, and 363

of the Bankruptcy Code and Bankruptcy Rule 4001(b); and (ii) granting adequate protection to the Debtor's pre-petition secured lenders. In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "First Day Declaration"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      On July 29, 2022 (the "Petition Date"), the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").

2.      The Debtor continues in the possession of its property and is operating and managing its businesses as debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

3.      No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 361, and 363 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

## FSS' BACKGROUND[1]

6.      Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum for Alex's first broadcast.  In 1996 he transitioned to talk

---

[1] Additional factual background and information regarding the Debtor and its operations is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions*

005656

radio. After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees. Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7.      What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full blown studio, and employing over 60 people. By 2013, FSS started selling dietary supplements to its growing listener base.

8.      Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9.      FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.      On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11.      As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.

---

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

3

This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12. FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13. Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS. The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14. Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15. FSS purchased to sell on its website two categories of products: (a) dietary supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to

4

advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales. In the past, both FSS and PQPR attempted to provide fulfillment services for product sales. Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company. The fulfillment company charges FSS a flat fee per order regardless of size. Historically, fulfillment has cost an average of ten percent of sales, without considering payroll, the new agreement is estimated to cost sixteen percent of sales.

## PQPR INDEBTEDNESS

18.     As discussed above, PQPR ordered and paid for Supplements which it marked up and then sold to FSS. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

19.     The indebtedness to PQPR had accrued over a period of years from the sale of PQPR products through the Debtor's internet platform, generated by the Debtor and Alex Jones' sponsorship of those products. The PQPR Note balance represents the unpaid share of the proceeds from product sales by PQPR to FSS over a four year period for which the Debtor did not fully remit the proceeds to PQPR.

005659

20.     On or about August 13, 2020, the Debtor executed that certain Promissory Note in favor of PQPR in the original principal amount of $29,588,000.00 (the "PQPR Note"). A security agreement of the same date granted PQPR a security interest in all of the Debtor's personal property assets, including but not limited to the Debtor's tangible and intangible property, accounts, and proceeds derived from those assets (the "PQPR Security Agreement"). PQPR filed a UCC-1 financing statement with the Texas Secretary of State that on November 18, 2020.

21.     The PQPR Security Agreement secures the obligations under the PQPR Note and any future advances owing by the Debtor to PQPR.  Specifically, "Obligations" is defined in the PQPR Security Agreement to include "any and all other obligations of Debtor to [PQPR] of any kind or character, now owed or hereafter arising."

22.     Subsequent to the date of the PQPR Note, the Debtor accrued additional indebtedness to PQPR representing a portion of PQPR's share of the proceeds from product sales from the date of the PQPR Note through November 10, 2021, for which the Debtor did not fully remit the required proceeds to PQPR.  The Debtor executed a second promissory note ("Second PQPR Note" and together with the PQPR Note, collectively the "PQPR Notes") in the amount of $25,300,000.  The Second PQPR Note is also secured by the PQPR Security Agreement.

23.     As of the Petition Date, $53,655,082.29 of principal and $11,794,19 of interest are due and owing under the PQPR Notes.

## **RELIEF REQUESTED**

24.     Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of

6

rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." [6] 11 U.S.C. § 363(a).

25.     11 U.S.C. § 363(c)(2) states as follows:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
>> (A)        each entity that has an interest in such cash collateral consents; or
>> (B)        the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

26.     The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral. Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR. Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

27.     The Debtor requires the use of cash collateral to pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, inventory purchases, lease payments, marketing, taxes, and insurance. Those uses required in the next fourteen (14) days from the date of the emergency hearing are set forth on the budgets attached hereto as **Exhibit A** and incorporated herein by reference. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, and any other secured creditors purporting to hold an interest in the Debtor's cash collateral during the first fourteen (14) days of the Chapter 11 Cases (the "Interim Period"). The Debtor also requests that continued use of cash collateral is equally necessary to preserve the value of the Debtor's assets and rights of all of the constituencies with claims or interests in this Chapter 11 Case.

7

28.     Section 363 of the Bankruptcy Code authorizes a debtor to use cash collateral if those parties having an interest in such cash collateral consent or the court authorizes the use. *See* 11 U.S.C. § 363(c)(2). The use of cash collateral, however, may be prohibited or conditioned, upon proper request, as necessary to adequately protect any interest in cash collateral. *See* 11 U.S.C. §363(e).

29.     A court may authorize the use of cash collateral upon showing that those with an interest in the cash collateral are adequately protected. *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, (Bankr. S.D. Tex. 2009) ("in order for this Court to authorize the use of cash collateral, the Lender must be adequately protected); *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) (A debtor requesting court approval to use cash collateral has the burden of proof as to the issue of "adequate protection".) Adequate protection requires examination of the creditor(s)' aggregate collateral position, not simply protection of its lien on cash. Adequate protection may be provided by granting replacement or additional liens "to the extent [that the use of cash collateral] results in a decrease in the value of [an] entity's interest in property." *See* 11 U.S.C. § 361(2). Authorizing a debtor to use cash collateral on an interim basis is appropriate where, as here, continuing the business as a going concern will cause the generation of future revenues upon which the secured lender is granted replacement liens. *See, e.g., In re Neise, Inc.,* 16 B.R. 600 (Bankr. D. Fla. 1981); *In re Certified Corp.*, 51 B.R. 768 (Bankr. D. Haw. 1985); *In re Post- Tron Systems, Inc.*, 106 B.R. 345 (Bankr. D.R.I. 1989).

30.     By authorizing the Debtor to use cash collateral, the Court will place the Debtor in a position to fund its operating expenses and to operate as a going concern for the immediate future. The Debtor needs to use cash collateral in order to, *inter alia*, pay its employees, suppliers, and meet other on-going business obligations. Without the authority to use cash collateral, the Debtor will be unable to fund its business operations in a manner that will allow the Debtor to continue to operate, to the detriment of *all* of the Debtor's creditors, including the lenders referred to herein and the pool

of unsecured creditors. Furthermore, without the ability to fund continuing operations, the Debtor and its estate will suffer immediate and irreparable harm. For example, employees will not continue to provide services if they are not paid the wages for which they have already worked, and vendors will not continue to provide necessary services or supplies if they are not paid. Therefore, the Debtor seeks the emergency relief requested herein.

31.     Attached to this Motion is a proposed form of the Interim Cash Collateral Order (the "Interim Cash Collateral Order") that authorizes the Debtor's use of cash collateral.

32.     The proposed offer of adequate protection on an interim basis is set forth in the attached proposed Interim Cash Collateral Order and incorporated by reference herein for the purpose of setting forth the proposed offer of adequate protection for lenders. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of each lender's collateral, if any, and failure of other forms of adequate protection provided by the Debtor. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, and court-approved administrative expense claims of estate professionals.

33.     The Debtor believes that the terms of the proposed Interim Cash Collateral Order as set forth above are fair and reasonable under the circumstances. The Debtor asserts that the value of PQPR's cash collateral will not diminish as a result of the use of cash in this case. The value of PQPR's interest in cash may fluctuate, but such value should not diminish, other than minimally, over the next fourteen (14) days, the period of interim relief requested.

34.     The Debtor believes that PQPR is entitled to the protections set forth in the proposed Interim Cash Collateral Order. The adequate protection provisions have been drafted to provide

9

protection without taking undue or inappropriate value from the estate or its unsecured creditors. Given that the interests of the lenders will be adequately protected, it is in the best interest of the Debtor, its estate, and all of their creditors to be able to continue operations during the Interim Period and for the Debtor to be authorized to use cash collateral as requested herein.

35. Therefore, the Debtor respectfully requests that it be authorized to use cash collateral as proposed herein for the purposes of paying necessary business expenses as allowed by Section 363 of the Bankruptcy Code, and that the Court grant PQPR a replacement lien on post-petition assets, as allowed by Sections 361, and/or 363 of the Bankruptcy Code, consistent with the terms and provisions contained in this Motion. The Debtor requests that this relief be granted on both an interim and final basis.

## **RESERVATION OF RIGHTS**

36. The Debtor reserves any and all rights in connection with the Heslin\Lewis Suit. Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights or remedies.

## **NO PRIOR REQUEST**

37. No previous request for the relief sought herein has been made to this Bankruptcy Court or any other court.

[*Remainder of Page Intentionally Left Blank*]

10

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the Court (i) authorize the use of cash collateral pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b); (ii) grant adequate protection to the pre-petition secured lenders; and (iii) grant such other and further relief as the Court may deem proper.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Raymond W. Battaglia*

11

005665

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

*/s/ Raymond W. Battaglia*

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

005667

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

005668

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August ___, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1. The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (this "Court").

2.      Debtor-in-Possession. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3.      Jurisdiction and Venue. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "Local Rules").

4.      Committee Formation.      To date, no official committee (a "Committee") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5.      Notice. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("PQPR"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule

2

005670

4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6.     Immediate Need for Use of Cash Collateral.  The Debtor asserts that an immediate and critical need exists for the Debtor to use Cash Collateral in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

7.     Conditional Consent to Use of Cash Collateral. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to the Motion as Exhibit A (the "Budget") for the period (the "Interim Period") from the Petition Date through and including August 15, 2022 (the "Termination Date").

8.     Good Cause/Fair and Reasonable Terms. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the

3

security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein. Any objections to the entry of this Order that have not been previously resolved or withdrawn are hereby overruled on their merits.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the

4

overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5. <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

6. <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

7. <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

8. <u>Adequate Protection – Replacement Liens</u>. As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "<u>Diminution in Value</u>"), the Pre-Petition Lender is hereby granted, effective  as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "<u>Replacement Liens</u>") in  all  currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible,  wherever located, now owned or hereafter acquired or arising (excluding

5

avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "Adequate Protection Collateral"). The Replacement Liens granted pursuant to this Order shall have the same priority as each of the Pre-Petition Lender's properly perfected unavoidable pre-petition liens but shall be subject to the Carve Out.

9.     Adequate Protection – Priority Administrative Claim.  As additional partial adequate protection for the Debtor's use of Cash Collateral, to the extent of any Diminution in Value and a failure of the other adequate protection provided by this Order the pre-petition lenders shall have an allowed priority administrative expense claim in this Case and any successor case as provided in and to the fullest extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code and otherwise (the "Adequate Protection Priority Claim").

10.     Carve Out. The Replacement Liens and Adequate Protection  Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "Estate Professionals"),  for incurred but unpaid fees, expenses and other costs (all such carve-out amounts referenced above, collectively, the "Carve Out").

11.     Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

6

12.    <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August _____ 2022, at __:___.m. Central time.  Objections to the entry of a final order approving the Motion shall be filed and served on counsel for the Debtor and pre- petition lenders not later than 4:00 p.m. Central time on August _____ 2022.

Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

7

**EXHIBIT A**

**13-Week  Budget**

005676

**Free Speech Systems LLC**
## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| | 1 (07/30–08/05/2022) | 2 (08/06–08/12/2022) | 3 (08/13–08/19/2022) | 4 (08/20–08/26/2022) | 5 (08/27–09/02/2022) | 6 (09/03–09/09/2022) | 7 (09/10–09/16/2022) | 8 (09/17–09/23/2022) | 9 (09/24–09/30/2022) | 10 (10/01–10/07/2022) | 11 (10/08–10/14/2022) | 12 (10/15–10/21/2022) | 13 (10/22–10/28/2022) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 7,741,357.16 |
| Advertising | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,690.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | - | (250,000.00) | - | (500,000.00) | - | - | - | - | - | - | - | - | - | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - | (27,270.00) | - | - | - | (27,270.00) | - | - | - | - | (81,810.00) |
| Texas Sales Tax | (5,337.87) | - | - | - | (5,337.87) | - | - | - | (5,337.87) | - | - | - | - | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | - | - | - | (17,541.98) | - | - | - | (17,541.98) | - | - | - | - | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | - | (11,073.89) |
| Software License Fees | (140.80) | - | - | - | (140.80) | - | - | - | (140.80) | - | - | - | - | (422.40) |
| Server Hosting Service | (28,595.13) | - | - | - | (28,595.13) | - | - | - | (28,595.13) | - | - | - | - | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | - | - | - | (55,728.00) | - | - | - | (55,728.00) | - | - | - | - | (167,184.00) |
| Satellite Service | (137,282.93) | - | - | - | (137,282.93) | - | - | - | (137,282.93) | - | - | - | - | (411,848.78) |
| Imaging License Fee | (9,201.25) | - | - | - | (9,201.25) | - | - | - | (9,201.25) | - | - | - | - | (27,603.75) |
| Software & Apps | (5,000.00) | - | - | - | (5,000.00) | - | - | - | (5,000.00) | - | - | - | - | (15,000.00) |
| Website Hosting | - | - | (266.50) | - | - | - | (266.50) | - | - | - | (266.50) | - | - | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | - | (719,717.72) |
| Insurance | (2,166.50) | - | - | - | (2,166.50) | - | - | - | (2,166.50) | - | - | - | - | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | - | - | - | (1,989.90) | - | - | - | (1,989.90) | - | - | - | - | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | - | - | - | (45,980.00) | - | - | - | (45,980.00) | - | - | - | - | (137,940.00) |
| Consulting Services | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | - | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | (256.19) | - | - | - | (256.19) | - | - | - | (256.19) | - | - | - | - | (768.58) |
| HVAC | (20,364.16) | - | - | - | (20,364.16) | - | - | - | (20,364.16) | - | - | - | - | (61,092.48) |
| CAM Charges | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | (15,322.89) |
| Water & Sewer | (1,708.55) | - | - | - | (1,708.55) | - | - | - | (1,708.55) | - | - | - | - | (5,125.66) |
| Gas Service | (132.09) | - | - | - | (132.09) | - | - | - | (132.09) | - | - | - | - | (396.28) |
| Pest Control | (244.65) | - | - | - | (244.65) | - | - | - | (244.65) | - | - | - | - | (733.95) |
| Waste Management | (351.81) | - | - | - | (351.81) | - | - | - | (351.81) | - | - | - | - | (1,055.43) |
| **Total Utilities** | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | - | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | - | - | - | (33,408.51) | - | - | - | (33,408.51) | - | - | - | - | (100,225.53) |
| Office Security | (31,111.90) | - | - | - | (31,111.90) | - | - | - | (31,111.90) | - | - | - | - | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | - | - | - | (1,777.19) | - | - | - | (1,777.19) | - | - | - | - | (5,331.56) |
| Janitorial | (5,983.33) | - | - | - | (5,983.33) | - | - | - | (5,983.33) | - | - | - | - | (17,950.00) |
| **Total Occupancy** | (72,280.93) | - | - | - | (72,280.93) | - | - | - | (72,280.93) | - | - | - | - | (216,842.78) |
| Supplies | (1,258.02) | - | - | - | (1,258.02) | - | - | - | (1,258.02) | - | - | - | - | (3,774.07) |

006672

Free Speech Systems LLC

## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| Total Personnel Expenses | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.97) |
| Vehicle Leases | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (4,411.68) |
| Total Travel Expenses | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| Total Operating Expenses | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | - | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| Total Other Expenses | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | - | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| Total Professional Fees | - | - | - | - | - | - | (174,868.00) | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

---

# Sandy Hook Families' EXHIBIT 2

---

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |
|---|---|
| In re: | ) Case No. 22- 60043 |
|  | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
|  | ) |
| Debtor. | ) |
|  | ) |

## DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF
## VOLUNTARY PETITION AND FIRST DAY MOTIONS

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      My name is W. Marc Schwartz ("Schwartz").

2.      I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3.      The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

1

5.　　　I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.　The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.　　　SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services　My firm represents individuals, companies and courts in a variety of assignments,　including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.　　　I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.　　　I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.　　　On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

2

10.     On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.  Background to Creation of Free Speech Systems, LLC

11.     Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12.     In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13.     Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14.     From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

005682

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.     Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC")*.

16.     Alex Jones was a natural.

17.     The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.     Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.     When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.     The predecessor operation of FSS in 2004 was an operation with just a handful of employees.  Alex Jones had a tiny office in the far south of Austin. He had two employees at

4

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.     As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.     By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.     While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.     After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.     The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

005684

26.     Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B.  Present Business of Free Speech Systems, LLC**

27.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28.     On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29.     The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30.     As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided.  The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

### C.  The Relationship Between Alex Jones and FSS

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected.  Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

35.  The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

### D.  The Debtor' Owners and Management

36.  At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.  Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.  Since then, Alex Jones has been the Managing Member of FSS.

39.  Since inception, Alex Jones has been a "single talent business", *to wit,* without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.  Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.  In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

8

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies. With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.     The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger. As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b) FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

005688

### E. The Relationship of FSS and PQPR

*Background Information About PQPR*

43.     PQPR was founded in 2013. The business began operations in September 2013.

44.     PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.     PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.     The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47.     Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR").  Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.     Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49.     As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer.  FSS pays PQPR, as its agent, funds required to purchase product, which then pays

10

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50.     Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.     Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.     In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53.     On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.     The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.     On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

005690

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F.  FSS Needs a Credit Card Processor**

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.  Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

005691

62.     The key players in credit card processing are:

- **Customer** – the person making a purchase.
- **Merchant** – the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway** – this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor** – (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network** – (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank** – (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank** – (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63.     In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

13

64.     After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.     Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.     FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS.  A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.     FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.     In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.     In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G.  Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

005694

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and *(e) Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74.     These two actions: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75.     As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76.     In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

16

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

77.     As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78.     Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79.     Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80.     InfoW, LLC f/k/a Infowars, LLC ("InfoW" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "InfoWDebtors"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"), on April 18, 2022 (the "Petition Date"), initiating Case No. 22-60020 in that court (the "Bankruptcy Case").

81.     The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been  cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.      The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H.  Current Financial Condition of Debtor**

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

87.     Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88.     Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

## I.     Critical Motions to Commence the Chapter 11 Case

### First Day Motions

89.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

19

- **Critical Vendors Motion**. *Debtor's Motion for an Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**. *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.     The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

005699

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

## **Procedural Motion**

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

005700

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.    I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### Operational Motions

97.    **Cash Collateral Motion**[6]. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.    The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.    Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

22

100.     The use of cash collateral required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**.  The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period").

101.     The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.     PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.     Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.     **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

23

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62. In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.

105.    After an extensive review and analysis of the Debtor's vendors, the Debtor and its professionals identified the vendors that supply products and services vital to the Debtor's continued operation. The Debtor relies on products and services from its Critical Vendors to operate its business, and, depend on the timely provision of specialized services to provide top-quality content and services to its customer base.

106.    The Critical Vendors procure and provide key services to producing and transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their mission-critical goods and services, the business of FSS would grind to a halt.

107.    I understand that the Debtor's trade relationship with its Critical Vendors is not governed by long-term contracts, and the Debtor believes those trade relationships will deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption and disturbances to the Debtor's business during the Chapter 11 Case.

108.    Subject to Court's approval, I understand the Debtor intends to pay Critical Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review, assess, and make payment on account of these claims. In return for paying these claims, the Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon each claimant's agreement to continue supplying goods and services to the Debtor in accordance

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.     I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.     **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.     In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.     To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.     The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.     The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### *Adequate Assurance Procedures*

115.     Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.     The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

005705

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

27

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118. **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit. Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119. The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120. The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

28

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2022.

W. Marc Schwartz, as Chief Restructuring
Officer of Free Speech Systems, LLC

---

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

| Free Speech Systems LLC |
|---|
| Comparative Profit and Loss Statement |
| For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2021 |

|  | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| *Total Income* | *64,970,641.85* | *14,320,983.15* |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| *Gross Profit* | *$ 13,092,308.12* | *$ 9,384,529.36* |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| *Total Expenses* | *23,387,247.86* | *6,346,192.35* |
| *Net Operating Income* | *$ (10,294,939.74)* | *$ 3,038,337.01* |
| **Other Income** | **507,168.04** | **1,019,713.81** |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| *Total Other Expenses* | *1,131,710.75* | *2,155,946.35* |
| *Net Other Income* | *(624,542.71)* | *(1,136,232.54)* |
| *Net Income* | *$ (10,919,482.45)* | *$ 1,902,104.47* |

005710

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

**Exhibit B**

```
╔══════════════════════════════════════╗
║        Free Speech Systems LLC         ║
║      Comparative Balance Sheet         ║
║  As of December 31, 2021 and May 31, 2022 ║
╚══════════════════════════════════════╝
```

|  | 2021 | 2022 |
|---|---:|---:|
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 1,508,720.21 | $ 1,159,247.90 |
| Accounts Receivable | 10,187,121.95 | 10,013,413.22 |
| **Other Current Assets** | | |
| Invenotry | 1,732,603.13 | 910,116.84 |
| Prepaid Expenses | 446,475.64 | 114,136.99 |
| Due from PQPR | (500.00) | - |
| Advance To Elevated Solutions | 27,870.00 | - |
| *Total Other Current Assets* | *2,206,448.77* | *1,024,253.83* |
| *Total Current Assets* | *13,902,290.93* | *12,196,914.95* |
| **Fixed Assets** | 1,679,438.66 | 1,580,779.46 |
| **Other Assets** | | |
| Intangible Assets | 21,270.83 | 15,333.33 |
| Security Deposits | 534,560.00 | 534,560.00 |
| *Total Other Assets* | *555,830.83* | *549,893.33* |
| *Total Assets* | *$ 16,137,560.42* | *$ 14,327,587.74* |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 4,732,966.89 | $ 1,217,685.58 |
| Credit Cards | 152,367.42 | 207,984.04 |
| **Other Current Liabilities** | | |
| David Jones Advance | 150,000.00 | 150,000.00 |
| Advances from PQPR | - | 571,920.57 |
| Due to PQPR | 23,058,367.00 | 23,058,367.00 |
| *Total Other Current Liabilities* | *23,208,367.00* | *23,780,287.57* |
| *Total Current Liabilities* | *28,093,701.31* | *25,205,957.19* |
| **Long Term Liabilities** | | |
| Note Due to PQPR | 54,580,405.22 | 53,845,074.41 |
| Note Payable - Winnebago | 93,505.62 | 82,524.37 |
| *Total Long Term Liabilities* | *54,673,910.84* | *53,927,598.78* |
| *Total Liabilities* | *$ 82,767,612.15* | *$ 79,133,555.97* |
| **Equity** | | |
| Member's Equity | (774,291.44) | - |
| Member Draws | (61,937,862.26) | (254,014.00) |
| Member Contributions | 4,305,810.14 | 311,350.00 |
| Opening Balance Equity | - | (66,765,408.70) |
| Retained Earnings | 2,695,774.28 | |
| Net Income | (10,919,482.45) | 1,902,104.47 |
| *Total Equity* | *$ (66,630,051.73)* | *$ (64,805,968.23)* |
| *Total Liabilities and Equity* | *$ 16,137,560.42* | *$ 14,327,587.74* |

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**Exhibit C**

<div style="border:1px solid black">

**Free Speech Systems, LLC**
**Statement of Cash Flows**

**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2022**

</div>

| | 2021 | 2022 |
|---|---:|---:|
| **Operating Activities** | | |
| *Net Income* | **($10,919,482.45)** | **$1,902,104.47** |
| *Adjustments to reconcile Net Income to Net Cash provided by operations:* | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| *Net cash provided by operating activities* | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| *Net cash provided by investing activities* | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| *Net cash provided by financing activities* | **22,850,016.65** | **(787,074.46)** |
| *Net cash increase for period* | **$952,374.76** | **($349,472.31)** |

Exhibit "D"


13-Week Cash Flow Forecast for FSS

**Exhibit D**

Free Speech Systems LLC
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period / Week Number | 07/30/2022-08/05/2022 (1) | 08/06/2022-08/12/2022 (2) | 08/13/2022-08/19/2022 (3) | 08/20/2022-08/26/2022 (4) | 08/27/2022-09/02/2022 (5) | 09/03/2022-09/09/2022 (6) | 09/10/2022-09/16/2022 (7) | 09/17/2022-09/23/2022 (8) | 09/24/2022-09/30/2022 (9) | 10/01/2022-10/07/2022 (10) | 10/08/2022-10/14/2022 (11) | 10/15/2022-10/21/2022 (12) | 10/22/2022-10/28/2022 (13) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | | | | 480,166.46 | | | | 480,166.46 | | | | 480,166.46 | | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,690.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | | (11,073.89) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | (266.50) | | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | | (719,717.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,950.00) | | | | (1,950.00) | | | | (1,950.00) | | | | | (5,869.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | | | (5,107.63) | | | | (5,107.63) | | | | (5,107.63) | | | (15,322.89) |
| HVAC | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

0067GC

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (4,411.68) |
| **Total Travel Expenses** | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (27,500.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (27,500.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | (35,328.00) | - | - | - | (52,992.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | (40,352.00) | - | - | - | (57,876.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | (60,000.00) | - | - | - | (40,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | (24,000.00) | - | - | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | - | - | - | - | (159,680.00) | - | - | - | (174,868.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

---

# Sandy Hook Families' EXHIBIT 3

---

005718

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
August 05, 2022
Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved by agreement or order of the Court or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1. The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the ~~Western~~ Southern District of Texas (this "Court").

2. Debtor-in-Possession. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner

has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3. <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "<u>Local Rules</u>").

4. <u>Committee Formation</u>. To date, no official committee (a "<u>Committee</u>") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5. <u>Notice</u>. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("<u>PQPR</u>"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule 4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6. <u>Immediate Need for Use of Cash Collateral</u>. The Debtor asserts that an immediate and critical need exists for the Debtor to use the alleged cash collateral[1] of PQPR as set forth in the budget defined below (the "<u>Cash Collateral</u>") in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

---

[1] As defined at 11 U.S.C. § 363(a).

7. <u>Conditional Consent to Use of Cash Collateral</u>. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to this Order as Exhibit A (the "<u>Budget</u>") for the period (the "<u>Interim Period</u>") from the Petition Date through and including August 26, 2022 (the "<u>Termination Date</u>"). The lender has agreed to the Debtor's use of Cash Collateral during the Interim Period exclusively in accordance with the terms, conditions, and limitations set forth in this Order and the Budget.

8. <u>Good Cause/Fair and Reasonable Terms</u>. The Debtor asserts that good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor

shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Payments to any insider during the Interim Period shall not exceed $20,000 in the aggregate.

6.      <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR $250,000 as provided in the Budget for "Repay PQPR Inventory" (the "<u>PQPR Payment</u>").  The PQPR Payment shall not be used to pay down the PQPR Notes (as defined in the Motion).  Creditors and parties in interest shall have thirty (30) days from the date a notice is filed on the docket that the PQPR Payment has been issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment.

7.      <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall

remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.    As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "<u>Diminution in Value</u>"), the Pre-Petition Lender is hereby granted, effective as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "<u>Replacement Liens</u>") in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "<u>Adequate Protection Collateral</u>") to the same extent as existed on the Petition Date. The Replacement Liens granted pursuant to this Order shall be subject to the Carve Out.

10.    <u>Carve Out</u>. The Replacement Liens and Adequate Protection Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "<u>Estate Professionals</u>"), for incurred but unpaid fees, expenses and other costs; fees and expenses of the appointed Subchapter V Trustee (all such carve-out amounts referenced above, collectively, the "<u>Carve Out</u>").

11.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

12.    <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, the Subchapter V Trustee, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

13.    <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August 24, 2022, at 10:00 a.m. Central time.

Signed:  August 05, 2022

Christopher Lopez
United States Bankruptcy Judge

005724

# Forecasted Interim Cash Collateral Budget
### Between July 29, 2022 and August 26, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 |
|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 |

**Income**

| | | | | |
|---|---|---|---|---|
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 |
| Advertising | - | - | - | 480,166.46 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 |
| **Total Income** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** |

**Selling & Product Costs**

| | | | | |
|---|---|---|---|---|
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) |
| Repay PQPR Inventory | - | (250,000.00) | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - |
| Texas Sales Tax | (5,337.87) | - | - | - |
| **Total Cost of Goods Sold** | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** | **(229,961.80)** |

**Operating Expenses**

**Advertising & Promotion**

| | | | | |
|---|---|---|---|---|
| Advertising & Promotion | (3,041.98) | - | - | - |
| Print Media | (3,000.00) | - | - | - |
| Radio Show Advertising | (11,500.00) | - | - | - |
| **Total Advertising & Promotion** | **(17,541.98)** | **-** | **-** | **-** |

**Computer/IT/IP Expense**

| | | | | |
|---|---|---|---|---|
| Internet & TV services | (2,082.90) | - | (1,608.39) | - |
| Software License Fees | (140.80) | - | - | - |
| Server Hosting Service | (28,595.13) | - | - | - |
| CDN Video Cloud Storage | (55,728.00) | - | - | - |
| Satellite Service | (137,282.93) | - | - | - |
| Imaging License Fee | (9,201.25) | - | - | - |
| Software & Apps | (5,000.00) | - | - | - |
| Website Hosting | - | - | (266.50) | - |
| **Total Computer/IT/IP Expense** | **(238,031.01)** | **-** | **(1,874.89)** | **-** |

| | | | | |
|---|---|---|---|---|
| Insurance | (2,166.50) | | | |

**Office & Administrative Expense**

| | | | | |
|---|---|---|---|---|
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) |
| Equipment Rental | (1,989.90) | - | - | - |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) |
| **Total Office & Administrative Expense** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** |

| | | | | |
|---|---|---|---|---|
| Outsourced Services | - | - | - | - |
| Consulting Services | - | - | - | - |

**Utilities**

| | | | | |
|---|---|---|---|---|
| Utility Deposit | (10,000.00) | | | |
| Electricity | - | - | (5,107.63) | - |
| HVAC | (256.19) | - | - | - |
| CAM Charges | (20,364.16) | - | - | - |
| Water & Sewer | (1,708.55) | - | - | - |
| Gas Service | (132.09) | - | - | - |
| Pest Control | (244.65) | - | - | - |
| Waste Management | (351.81) | - | - | - |
| **Total Utilities** | **(33,057.46)** | **-** | **(5,107.63)** | **-** |

**Occupancy**

| | | | | |
|---|---|---|---|---|
| Rent | (33,408.51) | - | - | - |
| Office Security | (31,111.90) | - | - | - |
| Repair & Maintenance - Building | (1,777.19) | - | - | - |
| Janitorial | (5,983.33) | | | |



EXHIBIT

A

005725

| | Period+A5:E83 | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 |
|---|---|---|---|---|---|
| **Total Occupancy** | | **(72,280.93)** | **-** | **-** | **-** |
| Supplies | | (1,258.02) | - | - | - |
| Telephone | | (18,337.88) | - | - | |
| **Personnel Expenses** | | | | | |
| Salaries & Wages - Base | | (168,467.44) | - | (168,467.44) | - |
| Payroll Tax | | (13,087.76) | - | (13,087.76) | - |
| Alex Jones Salary | | (10,000.00) | - | (10,000.00) | - |
| **Total Personnel Expenses** | | **(191,555.20)** | **-** | **(191,555.20)** | **-** |
| **Travel** | | | | | |
| Mileage/Parking/Tolls | | (99.69) | (99.69) | (99.69) | (99.69) |
| Vehicle Leases | | - | (1,470.56) | - | - |
| **Total Travel Expenses** | | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** |
| **Total Operating Expenses** | | **(576,647.03)** | **(1,898.71)** | **(198,965.88)** | **(428.15)** |
| ***Non-Operating Expenses*** | | | | | |
| Payment on PQPR Note | | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) |
| AMEX Payment | | - | - | - | - |
| **Total Other Expenses** | | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** |
| **Professional Fees** | | | | | |
| CRO Fees | | - | - | - | - |
| Financial Adviosr Fee | | - | - | - | - |
| Shannon & Lee LLP | | - | - | - | - |
| Ray Battaglia | | - | - | - | - |
| **Total Professional Fees** | | **-** | **-** | **-** | **-** |
| **Total Cash Flow** | | **$ (245,586.44)** | **$ 111,769.75** | **$ 164,702.59** | **$ 843,406.77** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 4

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## ORDER MODIFYING INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On August 11, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral* after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     Motion Granted. The Motion is hereby granted on an interim basis as set forth herein.

2.     Interim Order. The Interim Order shall be modified as follows:

The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the Motion, from the daily settlement contemporaneously with the distributions to FSS and PQPR

3.     Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Connecticut and Texas plaintiffs.

4.     The remaining terms, findings and provisions of the Interim Order are not amended or modified and remain in effect.

Signed: August 12, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

005728

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 5

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 24, 2022

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.     _Interim Order_. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.     _DIP Account_. The Debtor shall maintain debtor in possession ("_DIP_") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "_DIP Account_").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.     _Terms of Cash Collateral Use_. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "_Interim Period_") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     _No Payments to Insiders_. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.     _Payment to PQPR for Inventory Purchase_. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "_PQPR Payment_").  Creditors and parties in interest shall have thirty (30) days from the date

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7. <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8. <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9. <u>Adequate Protection – Replacement Liens</u>. The adequate protection and related carve outset forth in the First Interim Order are incorporated in the Second Interim Order.

10. <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11. <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12. <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13. <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. <u>Discovery</u>. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15. <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 1:00 p.m. Central time.

Signed:  August 24, 2022

Christopher Lopez
United States Bankruptcy Judge

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | | |
| Product Sales | | $ 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | | $ 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | | $ (250,000.00) | | $ (500,000.00) | | $ (750,000.00) |
| Merchant Account Fees | | $ (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | | $ (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | | $ (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | | $ (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | | $ - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | | $ - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | | $ - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | $ - |
| Bank Fees & Service Charges | | $ (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | | $ (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | | $ (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| Outsourced Services | | $ - | $ - | $ - | $ - | |
| Consulting Services | | $ - | $ - | $ - | $ - | |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | $ - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | $ - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | | $ - | $ (1,258.02) | | | $ (1,258.02) |
| Telephone | | | $ (18,337.88) | | | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

**Free Speech Systems LLC**
**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| Total Personnel Expenses | | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | | $ - |
| Mileage/Parking/Tolls | | $ (150.67) | $ (167.41) | $ (167.41) | $ (167.41) | $ (652.90) |
| Vehicle Leases | | $ - | $ - | $ (1,470.56) | $ - | $ (1,470.56) |
| **Total Travel Expenses** | | $ (150.67) | $ (167.41) | $ (1,637.97) | $ (167.41) | $ (2,123.46) |
| **Total Operating Expenses** | | $ (647.10) | $ (577,137.87) | $ (2,189.56) | $ (209,456.72) | $ (789,431.24) |
| ***Non-Operating Expenses*** | | | | | | $ - |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | $ - |
| **Total Other Expenses** | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | $ (25,000.00) | $ (25,000.00) |
| Fulfillment Expert | | $ (12,500.00) | $ - | $ - | $ - | $ (12,500.00) |
| Witness expenses and cost | | | | | | |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (50,000.00) | $ - | $ (50,000.00) |
| SALLC Fees | | $ - | $ - | $ - | | $ - |
| Shannon & Lee LLP | | $ - | $ - | $ - | | $ - |
| Ray Battaglia | | $ - | $ - | $ - | | $ - |
| **Total Professional Fees** | | $ (12,500.00) | $ - | $ (150,000.00) | $ (25,000.00) | $ (187,500.00) |
| **Total Cash Flow** | | $ 727,435.62 | $ (33,948.36) | $ (225,531.18) | $ 192,201.66 | $ 660,157.73 |

005735

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# Sandy Hook Families' EXHIBIT 6

005736

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
September 13, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## THIRD INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. This order is the third interim order ("Third Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Third Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5. <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, either directly or indirectly, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6. <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7. <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8. <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9. <u>Adequate Protection – Replacement Liens</u>. The adequate protection and related carve out set forth in the First and Second Interim Orders are incorporated in the Third Interim Order.

10. <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11. <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12. <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October 12, 2022, at 10:00 a.m. Central time.

Signed:  September 13, 2022

Christopher Lopez
United States Bankruptcy Judge

005740

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 8 | 9 | 10 | 11 | |
| **Income** | | | | | | |
| Product Sales | | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 4,000,000.00 |
| Advertising | | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 400,000.00 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 4,412,564.99 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (901,176.75) |
| Repay PQPR Inventory | | $ - | $ - | $ - | $ - | $ - |
| Merchant Account Fees | | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (196,000.00) |
| Shipping cost for drop ship orders | | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (53,144.99) |
| Fulfillment Services | | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (1,175,609.76) |
| Processor Fees | | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (160,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (621,482.87) | $ (654,090.74) | $ (621,482.87) | $ (621,482.87) | $ (2,518,539.36) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| 62410 Contract Broadcase Services | | $ (11,200.00) | | | | $ (11,200.00) |
| 62420 Contract Radio Show Production | | $ (25,000.00) | | | | $ (25,000.00) |
| 62430 Contract Video Production | | $ (10,000.00) | | | | $ (10,000.00) |
| 62470 Free Lance Contributors | | $ (3,500.00) | | | | $ (3,500.00) |
| Website Hosting | | $ - | $ - | $ - | $ - | |
| **Total Computer/IT/IP Expense** | | $ (49,700.00) | $ (238,031.01) | $ - | $ (1,608.39) | $ (289,339.41) |
| Insurance | | $ - | $ (2,166.50) | $ - | | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | | $ (77.08) | $ (77.08) | $ (77.08) | $ (77.08) | $ (308.34) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.53) | $ (3.53) | $ (3.53) | $ (3.53) | $ (14.11) |
| Business Meals | | $ (470.97) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,883.89) |
| **Total Office & Administrative Expense** | | $ (551.58) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,196.24) |
| | | | | | | |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between  September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-<br>09/23/2022 | 09/24/2022-<br>09/30/2022 | 10/01/2022-<br>10/07/2022 | 10/08/2022-<br>10/14/2022 | Total |
|---|---|---|---|---|---|---|
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | $ - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | $ - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | $ - | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |
| **Total Personnel Expenses** | | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | | $ (167.41) | $ (167.41) | $ (167.41) | $ (167.41) | $ (669.64) |
| Vehicle Leases | | $ - | $ - | $ - | $ (1,470.56) | $ (1,470.56) |
| **Total Travel Expenses** | | $ (167.41) | $ (167.41) | $ (167.41) | $ (1,637.97) | $ (2,140.20) |
| **Total Operating Expenses** | | $ (50,419.00) | $ (577,137.87) | $ (719.00) | $ (210,660.78) | $ (838,936.64) |
| **Non-Operating Expenses** | | | | | | |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | |
| **Total Other Expenses** | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | | |
| Fulfillment Expert | | $ (22,487.56) | $ - | $ - | $ - | $ (22,487.56) |
| Economic Loss Expert | | | | | | $ - |
| Alex Jones at Trial Cost | | $ (80,920.00) | | | | $ (80,920.00) |
| Witness expenses and trial costs | | $ (34,048.00) | | | | $ (34,048.00) |
| Brittany Paz | | | | | | $ - |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| SALLC Fees | | | $ - | $ - | $ (188,018.31) | $ (188,018.31) |
| Shannon & Lee LLP | | | $ - | $ - | $ (207,348.36) | $ (207,348.36) |
| Ray Battaglia | | | $ - | $ - | $ (47,316.80) | $ (47,316.80) |
| **Total Professional Fees** | | $ (137,455.56) | $ - | $ (200,000.00) | $ (442,683.47) | $ (780,139.03) |
| **Total Cash Flow** | | $ 288,783.82 | $ (133,087.37) | $ 275,939.38 | $ (176,685.88) | $ 254,949.95 |



EXHIBIT

A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

---

# Sandy Hook Families' EXHIBIT 7

---

005743

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 13, 2022

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FOURTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. This order is the fourth interim order ("Fourth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.   <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.   <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.   <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.   <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fourth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.   <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.   <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second and Third Interim Orders are incorporated in the Fourth Interim Order.

10.   <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.   <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.   <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October 26, 2022, at 1:00 p.m. Central time.

Signed:  October 13, 2022

Christopher Lopez
United States Bankruptcy Judge

005747

| | NEW 2 WEEK BUDGET | | |
|---|---|---|---|
| Week Number | 10/15/2022-10/21/2022 12 | 10/22/2022-10/28/2022 13 | Total |
| **Income** | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 1,190,978.03 |
| Advertising | - | - | - |
| Donations | 3,141.25 | 25,000.00 | 28,141.25 |
| **Total Income** | **598,630.26** | **620,489.01** | **1,219,119.27** |
| | | | |
| **Selling & Product Costs** | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (152,310.35) |
| Repay PQPR Inventory | - | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (53,594.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (15,823.63) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (190,556.48) |
| Processor Fees | (23,819.56) | (23,819.56) | (47,639.12) |
| eCommerce Store Maintenance | (25,000.00) | - | (25,000.00) |
| Texas Sales Tax | - | - | - |
| **Total Cost of Goods Sold** | **(254,961.80)** | **(229,961.80)** | **(484,923.59)** |
| | | | |
| **Operating Expenses** | | | |
| **Advertising & Promotion** | | | |
| Advertising & Promotion | - | - | - |
| Print Media | - | - | - |
| Radio Show Advertising | - | - | - |
| **Total Advertising & Promotion** | **-** | **-** | **-** |
| | | | |
| **Computer/IT/IP Expense** | | | |
| Internet & TV services | (1,608.39) | - | (1,608.39) |
| Software License Fees | - | - | - |
| Server Hosting Service | - | - | - |
| CDN Video Cloud Storage | - | - | - |
| Satellite Service | - | - | - |
| Imaging License Fee | - | - | - |
| Software & Apps | - | - | - |
| Website Hosting | (266.50) | - | (266.50) |
| **Total Computer/IT/IP Expense** | **(1,874.89)** | **-** | **(1,874.89)** |
| | | | |
| **Office & Administrative Expense** | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (91.81) |
| Insurance | - | (5,000.00) | (5,000.00) |
| Equipment Rental | - | - | - |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (4.20) |
| Business Meals | (400.00) | (400.00) | (800.00) |
| **Total Office & Administrative Expense** | **(448.00)** | **(5,448.00)** | **(5,896.01)** |
| | | | |
| **Utilities** | | | |
| Utility Deposit | | | |
| Electricity | (5,107.63) | - | (5,107.63) |
| HVAC | - | - | - |
| CAM Charges | - | - | - |
| Water & Sewer | - | - | - |
| Gas Service | - | - | - |
| Pest Control | - | - | - |
| Waste Management | - | - | - |
| **Total Utilities** | **(5,107.63)** | **-** | **(5,107.63)** |
| | | | |
| **Occupancy** | | | |
| Rent | - | - | - |
| Office Security | (3,975.00) | (3,975.00) | (7,950.00) |
| Repair & Maintenance - Building | - | (2,500.00) | (2,500.00) |
| Supplies | (5,000.00) | (2,500.00) | (7,500.00) |
| Telephone | | | |

EXHIBIT

A

005748

| | | | |
|---|---|---|---|
| Janitorial | - | - | - |
| **Total Occupancy** | **(8,975.00)** | **(8,975.00)** | **(17,950.00)** |
| | | | |
| **Personnel Expenses** | | | |
| Salaries & Wages - Base | (140,000.00) | - | (140,000.00) |
| Payroll Tax | (11,200.00) | - | (11,200.00) |
| 62410 Contract Broadcase Services | | (11,200.00) | (11,200.00) |
| 62420 Contract Radio Show Production | | (25,000.00) | (25,000.00) |
| 62430 Contract Video Production | | (10,000.00) | (10,000.00) |
| 62470 Free Lance Contributors | (3,500.00) | | (3,500.00) |
| Free Lance Contributors | - | - | - |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) |
| **Total Personnel Expenses** | **(174,700.00)** | **(46,200.00)** | **(220,900.00)** |
| | | | |
| **Travel** | | | |
| Mileage/Parking/Tolls | (100.00) | (100.00) | (200.00) |
| Vehicle Leases | - | - | - |
| **Total Travel Expenses** | **(100.00)** | **(100.00)** | **(200.00)** |
| | | | |
| **Total Operating Expenses** | **(191,205.53)** | **(60,723.00)** | **(251,928.53)** |
| | | | |
| ***Non-Operating Expenses*** | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (10,000.00) |
| **Total Other Expenses** | **(55,000.00)** | **(55,000.00)** | **(110,000.00)** |
| | | | |
| **Professional Fees** | | | |
| CRO Fees | - | (50,000.00) | (50,000.00) |
| Financial Adviosr Fee | - | - | - |
| Shannon & Lee LLP | - | - | - |
| Ray Battaglia | - | (30,000.00) | (30,000.00) |
| **Total Professional Fees** | **-** | **(80,000.00)** | **(80,000.00)** |
| | | | |
| **Total Cash Flow** | **97,462.94** | **194,804.21** | **292,267.15** |

005749

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC,** | § | |
| | § | **Case No. 22-60043 (CML)** |
| **Debtor.** | § | |

**PQPR HOLDINGS LIMITED, LLC'S WITNESS AND EXHIBIT LIST FOR
OCTOBER 26, 2022 HEARING**

PQPR Holdings Limited, LLC ("PQPR"), the secured creditor of the Debtor and a party-in-interest, respectfully submits this Witness and Exhibit List for the hearing scheduled for October 26, 2022:

**WITNESS LIST**

1. Robert Roe
2. David Jones
3. Any witness identified by any other party

**EXHIBIT LIST**

| Exhibit No. | Description |
|---|---|
| PQPR-1 | PQPR August 13, 2020 Note, Exh 4 to Dkt. No. 26 |
| PQPR-2 | Security Agreement, Exh 5 to Dkt. No. 26 |
| PQPR-3 | PQPR November 10, 2021 Note, Exh 6 to Dkt. No. 26 |
| PQPR-4 | PQPR UCC-1 Financing Statement, Exh 7 to Dkt. No. 26 |
| PQPR-5 | PQPR Forbearance Term Sheet, Exh 8 to Dkt. No. 26 |
| PQPR-6 | 13 Week Budget, Exh 9 to Dkt. No. 26 |
| PQPR-7 | Interim Cash Collateral Budget, Exh 10 to Dkt. No. 26 |
| PQPR-8 | 2nd Interim Cash Collateral Order and Budget, Dkt. No. 98 |
| PQPR-9 | 3rd Interim Cash Collateral Order and Budget, Dkt. No. 151 |
| PQPR-10 | PQPR Proof of Claim, Claim No. 11 |
| | |
| | Any exhibits offered by any other party |

Dated: October 24, 2022

Respectfully submitted,

STREUSAND, LANDON & OZBURN, LLP

By: _/s/Stephen W. Lemmon_
    Stephen W. Lemmon
    Texas Bar. No. 12194500
    STREUSAND, LANDON, OZBURN &
    LEMMON, LLP

1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746
Telephone: (512) 236-9900
Facsimile: (512) 236-9904
lemmon@slollp.com
**ATTORNEYS FOR**
**PQPR HOLDINGS LIMITED, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 24th day of October, 2022.

*/s/ Stephen W. Lemmon*
Stephen W. Lemmon

2

005751

# PROMISSORY NOTE

$29,588,000.00                     Austin, Texas                  August *13* , 2020

THIS PROMISSORY NOTE (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (**"Maker"**) and PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (**"Payee"**).

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty Nine Million Five Hundred Eighty-Eight Thousand and 00/100 Dollars ($29,588,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided hereinbelow.

1.    **Payment of Principal and Interest.**

    **(a)**    Interest, as provided below, is due and payable annually on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) until August 1, 2050 (the **"Maturity Date"**), when the entire amount of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"**), then such payment shall be due on the Business Day next succeeding the payment date.

    **(b)**    The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest on amounts advanced under this Note at the lesser of (i) **[one and 75/100 percent (1.75%)]** per annum (**"Contract Rate"**); (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

2.    **Maximum Interest Rate.** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in

EXHIBIT

4

005752

the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until payment in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

      **3.   Prepayment.** Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

      **4.   Waiver.** Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

      **5.   Amendments.** Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

      **6.   Events of Default.** The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered

005758

against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

      **7.**    **Remedy.** Upon the occurrence of payment default as provided  paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of  thirty (30) days' notice and opportunity to cure,the entire principal amount and accrued interest  of the Note then outstanding shall become immediately due and payable.

      **8.**    **Governing Law and Venue** . This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

      **9.**    **Attorneys' Fees and Expenses**  In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee, reasonable fees and costs, including attorneys' fees and expenses of colletion.

      EXECUTED to be effective as of the date first above written.

MAKER:

Alexander E. Jones
Managing Member
Free Speech Systems, LLC

005754

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the **"Security Agreement"**) is entered into effective as of August 2, 2020 (the **"Effective Date"**) by and between PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (the **"Secured Party"**) and Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (the **"Debtor"** or the **"Company"**).

Section I.    <u>CREATION OF SECURITY INTEREST</u>

The Debtor hereby grants to the Secured Party a security interest in the Collateral described in Section II of this Security Agreement to secure performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the "**Note**") and any and all other obligations of Debtor to Secured Party of any kind or character, now owed or hereafter arising (collectively, the **"Obligations"**). Any capitalized term herein not specifically defined will have the meaning as defined in the limited liability company agreement of the Secured Party.

Section II.    <u>COLLATERAL</u>

In order to secure the payment when due of any and all Obligations, the Debtor hereby pledges to the Secured Party and grants to the Secured Party a security interest in the following collectively, (the **"Collateral"**):

(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and

(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

The Secured Party is hereby granted a first priority lien and security interest in the Collateral to secure the Obligations. Debtor authorizes Secured Party to file a financing statement describing the Collateral in each and every jurisdiction necessary to perfect the

EXHIBIT

5

security interest and lien granted herein.

Section III.    PAYMENT OBLIGATIONS OF THE DEBTOR

1.    Debtor is not authorized to sell, convey, dispose of encumber or dispose of the Collateral without Secured Party's agreement or until the Obligations are paid in full. The Debtor will account fully and faithfully to the Secured Party for proceeds from disposition of the collateral in any manner and will pay or turn over promptly in cash, negotiable instruments, drafts, assigned accounts or chattel paper, all the proceeds from each sale to be applied to the Debtor's Obligations to the Secured Party, subject if other than cash, to final payment or collection. Application of such proceeds to Obligations of the Debtor will be in the sole discretion of the Secured Party, provided such application of proceeds is made by the Secured Party in a reasonable manner.

2.    The Debtor will pay to the Secured Party on demand all expenses and expenditures, including reasonable attorney's fees and other legal expenses incurred or paid by the Secured Party in exercising or protecting its interests, rights and remedies under this Security Agreement.

3.    The Debtor will pay immediately, without notice, the entire unpaid Obligations of the Debtor to the Secured Party whether created or incurred pursuant to this Security Agreement or otherwise, upon the Debtor's default under Section V of this Security Agreement.

4.    Delivery of the Collateral.

(a)    All certificates and instruments evidencing or representing the Collateral (if any) will be delivered to the Secured Party upon the execution and delivery of this Security Agreement. All other certificates and instruments constituting, evidencing or representing the Collateral from time to time will be delivered to the Secured Party promptly upon the receipt thereof by and/or on behalf of the Debtor. All such certificates and instruments will be held by or on behalf of the Secured Party pursuant hereto, and will be delivered to the Secured Party in suitable form for transfer by delivery or will be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.

(b)    If the Debtor receives, by virtue of its being or having been an owner of any Collateral, any (i) certificate, promissory note or instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for the Collateral, or (iii) distributions on dissolution, in total liquidation or from capital, capital surplus or paid-in surplus, the Debtor will receive such certificate, promissory note, instrument, payment or distribution in trust for the benefit of the Secured Party, will segregate it from the Debtor's other assets and will deliver it forthwith to the Secured Party in the exact form received, with any necessary endorsement and assignment duly executed in blank, to be held by the Secured Party as Collateral and as additional collateral security for the Obligations.

Section IV.    DEBTOR'S REPRESENTATION, WARRANTIES AND AGREEMENTS

2

005756

The Debtor makes the following representations, warranties and agreements:

1.    The pledge of the Collateral creates a valid and perfected first priority security interest in the pledged Collateral securing payment of the Obligations.

2.    The Debtor will, at its own expense,, do, make, procure, execute and deliver all acts, things, writings and assurances as the Secured Party may at any time request to protect, assure or enforce its interests, rights and remedies created by, provided in or emanating from this Security Agreement.

3.    The Debtor will sign and execute alone or with the Secured Party a Financing Statement and any and all other documents requested by Secured Party for perfection of the lien on the Collateral.

Section V.    EVENTS OF DEFAULT

The Debtor will be in default under this Security Agreement upon the happening of any condition or event set forth below (herein called an **"Event of Default"**):

1.    The Debtor's failure to pay when due any Obligations secured by this Security Agreement;

2.    Default by the Debtor in punctual performance of any of the obligations, covenants, terms or provisions contained or referred to in this Security Agreement or the Note;

3.    Any warranty, representation or statement contained in this Security Agreement or made or furnished to the Secured Party by or on behalf of the Debtor in connection with this Security Agreement or to induce the Secured Party to make a loan to Debtor proves to have been false in any respect when made or furnished;

4.    Loss, theft, sale (except as authorized in this Security Agreement) or encumbrance to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or

5.    The Debtor's dissolution, termination of existence, insolvency or business failure; the appointment of a receiver of all or any part of the property of the Debtor; an assignment for the benefit of creditors by the Debtor; the calling of a meeting of creditors of the Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against the Debtor.

6.    The Debtor shall have entered against it any judgment, arbitration award, fine or penalty for an amount in excess of $500,000, and such judgment, arbitration award, fine or penalty is not stayed or superseded within 30 days of entry.

Section VI.    SECURED PARTY'S RIGHTS AND REMEDIES

A.    Rights Exclusive of Default.

1.    This Security Agreement, the Secured Party's rights hereunder or the Obligations

3

005757

hereby secured may be assigned by Secured Party, and in any such case, the assignee will be entitled to all of the rights, privileges and remedies granted in this Security Agreement to the Secured Party.

2.  Upon the request of the Secured Party at any time, the Debtor will execute, sign, endorse, transfer or deliver in the name of the Debtor any other documents, necessary to perfect the security interest and obligations created by this Security Agreement.

3.  At its option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor agrees to reimburse the Secured Party on demand for any payment made, or expense incurred by the Secured Party pursuant to the foregoing authorization.

4.  Debtor will permit Secured Party, by its representatives and agents (a) to inspect the Collateral, (b) to examine and make copies of the records of Debtor relating to the Collateral, and (c) to discuss the Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers, employees, and accountants, all at such reasonable times and intervals as Secured Party may determine, and all at such Debtor's expense.

5.  Debtor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Secured Party such reasonable reports relating to the Collateral at such intervals as Secured Party shall from time to time request. Debtor will give prompt notice in writing to Secured Party of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral in the aggregate amount of $100,000.00 or more per calendar year.

B.  Rights in Event of Default

1.  Upon the occurrence of an Event of Default, Secured Party, in its sole discretion, may demand that all payments and distributions made to Debtor upon or with respect to the Collateral shall be paid and delivered to Secured Party, and Debtor agrees to take all such action as Secured Party may deem necessary or appropriate to cause all such payments and distributions to be made to Secured Party. Secured Party shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Secured Party. Such issuer shall be fully protected in relying on the written statement of Secured Party that it then holds a security interest which entitles it to receive such payments and distributions. Any and all money and other property paid over to or received by Secured Party hereunder shall be retained by Secured Party as additional collateral hereunder and may be applied by Secured Party to payment of the Obligations in such manner and order as Secured Party may elect in its sole discretion.

2.  In addition, Secured Party is entitled to exercise any and all contractual rights provided in this Security Agreement or any other loan document between Debtor and Secured Party, and any and all legal rights and remedies available to a secured party (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement.

3.  Secured Party is also entitled to, without notice, sell, lease, assign, grant an option

4

005758

or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, credit or for future delivery, and upon such terms as Secured Party may deem commercially reasonable. Neither Secured Party's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale. Debtor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Debtor at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made. Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. Subject to the provisions of applicable law, Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Secured Party may further postpone such sale by announcement made at such time and place.

4.    Debtor waives (to the extent permitted by law) all rights of redemption, stay, and/ or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereinafter enacted.

5.    Further, Secured Party may at any time after the occurrence of an Event of Default require, in its sole discretion and with notice to Debtor, that any receivables, as described in Section II above, be paid directly to Secured Party. In such event, Debtor shall, and shall permit Secured Party to, promptly notify the parties that owe the receivables to Debtor of Secured Party's interest therein and direct such parties to make payment of all amounts then or thereafter due directly to Secured Party. Upon receipt of any such notice from Secured Party, Debtor shall thereafter hold in trust for Secured Party, all amounts and proceeds (as such term is defined in *Section 9.102(a)(65)* of the UCC) received by it with respect to the receivables and immediately and at all times thereafter deliver to Secured Party all such amounts and proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements. Secured Party shall hold and apply funds so in such manner and order as Secured Party may elect in its sole discretion. If after the occurrence of an Event of Default, any party owing receivables fails or refuses to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Secured Party shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Debtor agrees that Secured Party may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any receivable, accept in full payment of any receivable such amount as Secured Party in its sole discretion shall determine or abandon any receivable, and any such action by Secured Party shall be commercially reasonable so long as Secured Party acts in good faith based on information known to it at the time it takes any such action. Regardless of any other provision hereof, however, Secured Party shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone except Debtor to account for funds that it shall actually receive hereunder.

6.    Debtor will reimburse Secured Party for all reasonable expenses incurred by Secured Party in taking ownership of the Collateral, including payment of Secured Party's

5

PQPR-2

reasonable attorney's fees and legal expenses.

7.     The Secured Party may remedy any default and may waive any default without waiving any other prior or subsequent default.

8.     Upon request of Secured Party after an Event of Default, Debtor shall execute and deliver to Secured Party irrevocable lockbox agreements in the form provided by or otherwise acceptable to Secured Party, which agreements shall be accompanied by an acknowledgment by the bank where the lockbox is located of the lien of Secured Party granted hereunder and of irrevocable instructions to wire all amounts collected therein to a special collateral account at Secured Party.

9.     The remedies of the Secured Party hereunder are cumulative, and the exercise of any one or more of the remedies provided for herein will not be construed as a waiver of any of the other remedies of the Secured Party.

Section VII.   ADDITIONAL AGREEMENTS

1.   **"Secured Party" and "Debtor,"** as used in this instrument, include the heirs, executors or administrators, successors, representatives, receivers, trustees and assigns of those parties.

2.     No delay or omission of Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Secured Party and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Secured Party until the Secured Obligations have been paid in full.

3.     Should any Collateral come into the possession of Secured Party, Secured Party may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral. Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Secured Party in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Contract Rate (as defined in the Note) until repaid and, together with such interest, shall be payable by Debtor to Secured Party upon demand and shall become part of the secured Obligations. However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Debtor, and Secured Party shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to the Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

6

PQPR-2

4. Except to the extent expressly otherwise provided herein and to the fullest extent permitted by applicable law, Debtor waives (a) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have; (b) with respect to any Collateral that is comprised of obligations, presentment and demand for payment, protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

5. Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

6. Debtor Remains Liable. Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and Obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

7. NO RELEASE OF DEBTOR. THE OBLIGATIONS OF DEBTOR UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED OR TERMINATED, NOR SHALL DEBTOR BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (until the Obligations have been indefeasibly paid in full), including:

(a) (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Obligations;

(b) (i) any failure to obtain, (ii) any release, composition or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Note or other loan documents between Debtor and Secured Party;

(c) (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any

7

PQPR-2

005701

release, compromise, settlement or extension of the time of payment of any Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any lien upon, (iv) any subordination of any lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of any lien or intended lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

**(d)**     any termination of or change in any relationship between Debtor and Secured Party;

**(e)**     any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of or other indulgence with respect to, any right, remedy or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Secured Party in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

**(f)**     ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF DEBTOR UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF DEBTOR HEREUNDER OR DISCHARGE DEBTOR FROM ANY OBLIGATION HEREUNDER.

**8.**     Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

**9.**     Further, notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the Obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**10.**     The section headings appearing in this instrument have been inserted for convenience only and will be given no substantive meaning or significance whatever in

PQPR-2
005782

construing the terms and provisions of this instrument. Terms used in this instrument which are defined in the Texas Uniform Commercial Code are used with the meanings as therein defined.

11. The law governing this secured transaction will be that of the State of Texas in force at the date of this instrument. Venue for any dispute arising out of this Security Agreement will be in the state or federal courts located in Travis County, Texas.

12. Debtor will not create, incur, or suffer to exist any lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) other liens permitted in writing by the Secured Party.

    13. The unenforceability of any provision of this Security Agreement will not affect the enforceability or validity of any other provision.

    14. This Security Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts taken together will constitute but one and the same instrument.

    15. THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

    EXECUTED as of the Effective Date.

**DEBTOR:**

Free Speech Systems, LLC

Alexander E. Jones, Managing Member

**SECURED PARTY:**

PQPR Holdings Limited, LLC

David R. Jones, Manager

9

PQPR-2

005763

# PROMISSORY NOTE

$25,300,000.00                          Austin, Texas                          November 10, 2021

**THIS PROMISSORY NOTE** (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (**"Maker"**) and PQPR Holdings Limited, LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701 (**"Payee"**).

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty-Five Million Three Hundred Thousand and 00/100 Dollars ($25,300,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided herein below.

## 1. Payment of Principal and Interest; Security

**(a)**     Principal and Interest (as provided below), are due and payable in annual installments of $1,939,644.81 on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) with the final payment being due and payable on November 10, 2036 (the **"Maturity Date"**), when the remaining balance of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"**), then such payment shall be due on the Business Day next succeeding the payment date.

**(b)**   The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest at the lesser of (i) [**one and 80/100 percent (1.80%)**] per annum (**"Contract Rate"**); (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%)**, or (ii) the highest rate for which Maker may legally contract under applicable law.

**(c)**   This Note is secured by a Security Agreement executed by Maker dated August 13, 2020 and evidenced by a UCC-1 recorded with the State of Texas on November 18, 2020.

2. **Maximum Interest Rate** - It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be

EXHIBIT

6

PQPR-3

005784

paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until paid in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

**3. Prepayment** – Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

**4. Waiver** - Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

**5. Amendments** - Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

**6. Events of Default** - The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

**7. Remedy** - Upon the occurrence of payment default as provided paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of thirty (30) days' notice and opportunity to cure, the entire principal amount and accrued interest of the Note then outstanding shall become immediately due and payable.

PQPR-3
005785

**8. Governing Law and Venue** – This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

**9. Attornevs' Fees and Expenses** – In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee reasonable fees and costs, including attorneys' fees and expenses, of collection.

EXECUTED to be effective as of the date first above written.

**MAKER:**

Free Speech Systems, LLC

By _____

Alexander E. Jones, Manager

**ACKNOWLEDGEMENT BY PAYEE:**

PQPR Holdings Limited, LLC

By _____

David R. Jones, Manager

PQPR-3
005786

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Acuity CxO LLC 5122929690

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Acuity CxO LLC
219 Black Wolf Run
Austin, TX 78738
USA

**FILING NUMBER:** 20-0058072731
**FILING DATE:** 11/18/2020     02:06 PM
**DOCUMENT NUMBER:** 1008390830002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | **Free Speech Systems LLC** | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3005 South Lamar Blvd, Suite D109-317** | **Austin** | **TX** | **78704** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | **PQPR Holdings Limited LLC** | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **100 Congress Avenue, 18th Floor** | **Austin** | **TX** | **78701** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

EXHIBIT

7

**Forbearance Agreement**
**Summary of Indicative Terms and Conditions**
**Free Speech Systems, LLC.**
**July 10, 2022**

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

**Credit Card Processing Fee:**     The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees.

4X (FOUR percent) WMS

**Allocation of Net Sales Proceeds:**

**FSS Inventory**     FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory**     PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

EXHIBIT
8

005768

PQPR-5

Auriam.

| | |
|---|---|
| **Warehouse and Fulfillment Related Expenses** | FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory. |
| **PQPR Debt** | FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000. Currently, FSS is paying PQPR $11,000 per business day. As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement. |
| | FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens. |
| **Term:** | 60 Days |
| **Reservation:** | Subject to revision after implementation based on actual operational results. |

Executed this _12_ day of July 2022.


Free Speech Systems, LLC


By: _____
    Marc Schwartz, Its Chief Restructuring Officer



PQPR Holdings Limited, LLC



By: _____
    David Jones, Its Manager

LLC

By: _____ Its Manager

PQPR-5

**EXHIBIT A**

**13-Week  Budget**

**EXHIBIT**

**9**

exhibitsticker.com

005771

**Free Speech Systems LLC**

**Forecasted 13 Week Cash Flow Budget**

Between July 30, 2022 and October 28, 2022

Period (Week Number):
1: 07/30/2022–08/05/2022 · 2: 08/06/2022–08/12/2022 · 3: 08/13/2022–08/19/2022 · 4: 08/20/2022–08/26/2022 · 5: 08/27/2022–09/02/2022 · 6: 09/03/2022–09/09/2022 · 7: 09/10/2022–09/16/2022 · 8: 09/17/2022–09/23/2022 · 9: 09/24/2022–09/30/2022 · 10: 10/01/2022–10/07/2022 · 11: 10/08/2022–10/14/2022 · 12: 10/15/2022–10/21/2022 · 13: 10/22/2022–10/28/2022

| Line Item | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 7,741,357.16 |
| Advertising | | | | 480,166.46 | | | | 480,166.46 | | | | | 480,166.46 | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.25 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.28) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | | (1,608.39) | | (11,073.89) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | | (266.50) | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | | (1,874.89) | | (719,717.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | | | | (1,989.90) | | | | (1,989.90) | | | | | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | | | (22,670.00) | | | | (22,670.00) | | | | | (68,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| HVAC | | | (5,107.63) | | | | (5,107.63) | | | | | (5,107.63) | | (15,322.89) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.27) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | | (5,107.63) | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Office/Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

006772

PQPR-6

Free Speech Systems LLC
## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| Total Personnel Expenses | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | (4,411.68) |
| Total Travel Expenses | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| Total Other Expenses | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| Total Professional Fees | - | - | - | - | - | - | (174,868.00) | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

PQPR-6

005773

# Forecasted 3 Week Cash Flow Budget

## Between July 30, 2022 and August 19, 2022

| | Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 |
|---|---|---|---|---|
| | Week Number | 1 | 2 | 3 |

### Income

| | | | | |
|---|---|---|---|---|
| Product Sales | | $  595,489.01 | $  595,489.01 | $  595,489.01 |
| Advertising | | - | - | - |
| Donations | | 3,141.25 | 3,141.25 | 3,141.25 |
| **Total Income** | | **598,630.26** | **598,630.26** | **598,630.26** |

### Selling & Product Costs

| | | | | |
|---|---|---|---|---|
| Inventory Purchase | | (76,155.17) | (76,155.17) | (76,155.17) |
| Repay PQPR Inventory | | - | (250,000.00) | - |
| Merchant Account Fees | | (26,797.01) | (26,797.01) | (26,797.01) |
| Shipping cost for drop ship orders | | (7,911.81) | (7,911.81) | (7,911.81) |
| Fulfillment Services | | (95,278.24) | (95,278.24) | (95,278.24) |
| Processor Fees | | (23,819.56) | (23,819.56) | (23,819.56) |
| eCommerce Store Maintenance | | (27,270.00) | - | - |
| Texas Sales Tax | | (5,337.87) | - | - |
| **Total Cost of Goods Sold** | | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** |

### Operating Expenses

**Advertising & Promotion**

| | | | | |
|---|---|---|---|---|
| Advertising & Promotion | | (3,041.98) | - | - |
| Print Media | | (3,000.00) | - | - |
| Radio Show Advertising | | (11,500.00) | - | - |
| **Total Advertising & Promotion** | | **(17,541.98)** | **-** | **-** |

**Computer/IT/IP Expense**

| | | | | |
|---|---|---|---|---|
| Internet & TV services | | (2,082.90) | - | (1,608.39) |
| Software License Fees | | (140.80) | - | - |
| Server Hosting Service | | (28,595.13) | - | - |
| CDN Video Cloud Storage | | (55,728.00) | - | - |
| Satellite Service | | (137,282.93) | - | - |
| Imaging License Fee | | (9,201.25) | - | - |
| Software & Apps | | (5,000.00) | - | - |
| Website Hosting | | - | - | (266.50) |
| **Total Computer/IT/IP Expense** | | **(238,031.01)** | **-** | **(1,874.89)** |
| Insurance | | (2,166.50) | - | - |

**Office & Administrative Expense**

| | | | | |
|---|---|---|---|---|
| Bank Fees & Service Charges | | (45.90) | (45.90) | (45.90) |
| Equipment Rental | | (1,989.90) | - | - |
| Office Supplies/Printing/Copy | | (2.10) | (2.10) | (2.10) |
| Business Meals | | (280.46) | (280.46) | (280.46) |
| **Total Office & Administrative Expense** | | **(2,318.36)** | **(328.46)** | **(328.46)** |

| | | | | |
|---|---|---|---|---|
| Outsourced Services | | (45,980.00) | - | - |
| Consulting Services | | (22,670.00) | - | (12,000.00) |
| **Utilities** | | | | |
| Electricity | | - | - | (5,107.63) |
| HVAC | | (256.19) | - | - |



EXHIBIT

10

005774

PQPR-7

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 |
|---|---|---|---|
| CAM Charges | (20,364.16) | - | - |
| Water & Sewer | (1,708.55) | - | - |
| Gas Service | (132.09) | - | - |
| Pest Control | (244.65) | - | - |
| Waste Management | (351.81) | - | - |
| **Total Utilities** | **(23,057.46)** | **-** | **(5,107.63)** |
| **Occupancy** | | | |
| Rent | (33,408.51) | - | - |
| Office Security | (31,111.90) | - | - |
| Repair & Maintenance - Building | (1,777.19) | - | - |
| Janitorial | (5,983.33) | - | - |
| **Total Occupancy** | **(72,280.93)** | **-** | **-** |
| Supplies | (1,258.02) | - | - |
| Telephone | (18,337.88) | - | - |
| **Personnel Expenses** | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) |
| Payroll Tax | (13,971.09) | - | (13,971.09) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) |
| **Total Personnel Expenses** | **(236,605.20)** | **-** | **(236,605.20)** |
| **Travel** | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) |
| Vehicle Leases | - | (1,470.56) | - |
| **Total Travel Expenses** | **(99.69)** | **(1,570.25)** | **(99.69)** |
| **Total Operating Expenses** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** |
| ***Non-Operating Expenses*** | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) |
| **Total Other Expenses** | **(184,890.28)** | **(15,500.00)** | **(199,890.28)** |
| **Professional Fees** | | | |
| CRO Fees | - | - | - |
| Financial Adviosr Fee | - | - | - |
| Shannon & Lee LLP | - | - | - |
| Ray Battaglia | - | - | - |
| **Total Professional Fees** | **-** | **-** | **-** |
| **Total Cash Flow** | **$ (529,176.72)** | **$ 101,269.75** | **$ (87,237.70)** |

PQPR-7

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 24, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

005776

2.     <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.     <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.     <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "<u>PQPR Payment</u>"). Creditors and parties in interest shall have thirty (30) days from the date

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7.     Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.     Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.     Adequate Protection – Replacement Liens.     The adequate protection and related carve outset forth in the First Interim Order are incorporated in the Second Interim Order.

10.     Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation, or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.     Credit Card Processing. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.     Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

905778

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     Discovery. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15.     Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 1:00 p.m. Central time.

Signed:  August 24, 2022

Christopher Lopez
United States Bankruptcy Judge

005779

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | | |
| Product Sales | $ | 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | $ | 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | $ | 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | $ | 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | $ | (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | $ | (250,000.00) | $ | $ (500,000.00) | $ | $ (750,000.00) |
| Merchant Account Fees | $ | (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | $ | (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | $ | (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | $ | (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | $ | - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | $ | - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | $ | (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | $ | - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | $ | - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | $ | - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | $ | - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | $ | - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | $ | - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | $ | - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | $ | - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | $ | - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | $ | - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | $ | - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | $ | - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | $ | - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | $ | - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | $ - |
| Bank Fees & Service Charges | $ | (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | $ | - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | $ | (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | $ | (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | $ | (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| **Outsourced Services** | $ | - | $ - | $ - | $ - | |
| Consulting Services | $ | - | $ - | $ - | $ - | |
| **Utilities** | | | | | | |
| Electricity | $ | - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | $ | - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | $ | - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | $ | - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | $ | - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | $ | - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | $ | - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | $ | - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | $ | - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | $ | - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | $ | - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | $ | - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | $ | - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | $ | - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | | $ (18,337.88) | | | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | $ | - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | $ | - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | $ | - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

**Free Speech Systems LLC**
**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|
| **Total Personnel Expenses** | $         - | $  (201,755.20) | $         - | $  (201,755.20) | $  (403,510.40) |
| **Travel** | | | | | $         - |
| Mileage/Parking/Tolls | $    (150.67) | $    (167.41) | $    (167.41) | $    (167.41) | $    (652.90) |
| Vehicle Leases | $         - | $         - | $  (1,470.56) | $         - | $  (1,470.56) |
| **Total Travel Expenses** | $    (150.67) | $    (167.41) | $  (1,637.97) | $    (167.41) | $  (2,123.46) |
| **Total Operating Expenses** | $    (647.10) | $  (577,137.87) | $  (2,189.56) | $  (209,456.72) | $  (789,431.24) |
| ***Non-Operating Expenses*** | | | | | $         - |
| Payment on PQPR Note | $  (5,000.00) | $  (5,000.00) | $  (5,000.00) | $  (5,000.00) | $  (20,000.00) |
| AMEX Payment | $         - | $         - | $         - | $         - | $         - |
| **Total Other Expenses** | $  (5,000.00) | $  (5,000.00) | $  (5,000.00) | $  (5,000.00) | $  (20,000.00) |
| **Professional Fees** | | | | | |
| Subchapter v Trustee retainer | | | | $  (25,000.00) | $  (25,000.00) |
| Fulfillment Expert | $  (12,500.00) | $         - | $         - | $         - | $  (12,500.00) |
| Witness expenses and cost | | | | | |
| Pattis & Smith | $         - | $         - | $  (100,000.00) | $         - | $  (100,000.00) |
| Reynal Law Firm, PC | $         - | $         - | $  (50,000.00) | $         - | $  (50,000.00) |
| SALLC Fees | $         - | $         - | $         - | | $         - |
| Shannon & Lee LLP | $         - | $         - | $         - | | $         - |
| Ray Battaglia | $         - | $         - | $         - | | $         - |
| **Total Professional Fees** | $  (12,500.00) | $         - | $  (150,000.00) | $  (25,000.00) | $  (187,500.00) |
| **Total Cash Flow** | $  727,435.62 | $  (33,948.36) | $  (225,531.18) | $  192,201.66 | $  660,157.73 |

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 13, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## THIRD INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. This order is the third interim order ("Third Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.    <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.    <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.    <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Third Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.    <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, either directly or indirectly, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.    <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

005783

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7. <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8. <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9. <u>Adequate Protection – Replacement Liens</u>. The adequate protection and related carve out set forth in the First and Second Interim Orders are incorporated in the Third Interim Order.

10. <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11. <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12. <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

005784

13. _Reservation of Rights_. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. _Final Cash Collateral Hearing_: A final hearing on the Motion shall be held before this Court on October 12, 2022, at 10:00 a.m. Central time.

Signed:  September 13, 2022

Christopher Lopez
United States Bankruptcy Judge

PQPR-9

005785

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 8 | 9 | 10 | 11 | |
| **Income** | | | | | | |
| Product Sales | | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 4,000,000.00 |
| Advertising | | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 400,000.00 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 4,412,564.99 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (901,176.75) |
| Repay PQPR Inventory | | $ - | $ - | $ - | $ - | $ - |
| Merchant Account Fees | | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (196,000.00) |
| Shipping cost for drop ship orders | | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (53,144.99) |
| Fulfillment Services | | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (1,175,609.76) |
| Processor Fees | | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (160,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (621,482.87) | $ (654,090.74) | $ (621,482.87) | $ (621,482.87) | $ (2,518,539.36) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| 62410 Contract Broadcase Services | | $ (11,200.00) | | | | $ (11,200.00) |
| 62420 Contract Radio Show Production | | $ (25,000.00) | | | | $ (25,000.00) |
| 62430 Contract Video Production | | $ (10,000.00) | | | | $ (10,000.00) |
| 62470 Free Lance Contributors | | $ (3,500.00) | | | | $ (3,500.00) |
| Website Hosting | | $ - | $ - | $ - | $ - | |
| **Total Computer/IT/IP Expense** | | $ (49,700.00) | $ (238,031.01) | $ - | $ (1,608.39) | $ (289,339.41) |
| Insurance | | | $ (2,166.50) | $ - | | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | | $ (77.08) | $ (77.08) | $ (77.08) | $ (77.08) | $ (308.34) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.53) | $ (3.53) | $ (3.53) | $ (3.53) | $ (14.11) |
| Business Meals | | $ (470.97) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,883.89) |
| **Total Office & Administrative Expense** | | $ (551.58) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,196.24) |
| | | | | | | |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |

005786

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between  September 17, 2022 and October 14, 2022**

| Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|
| Gas Service | $           - | $        (132.09) | $           - | $           - | $        (132.09) |
| Pest Control | $           - | $        (244.65) | $           - | $           - | $        (244.65) |
| Waste Management | $           - | $        (351.81) | $           - | $           - | $        (351.81) |
| **Total Utilities** | **$           -** | **$    (23,057.46)** | **$           -** | **$     (5,107.63)** | **$    (28,165.09)** |
| **Occupancy** | | | | | |
| Rent | $           - | $    (33,408.51) | $           - | $           - | $    (33,408.51) |
| Office Security | $           - | $    (31,111.90) | $           - | $           - | $    (31,111.90) |
| Repair & Maintenance - Building | $           - | $      (1,777.19) | $           - | $           - | $      (1,777.19) |
| Janitorial | $           - | $      (5,983.33) | $           - | $           - | $      (5,983.33) |
| **Total Occupancy** | **$           -** | **$    (72,280.93)** | **$           -** | **$           -** | **$    (72,280.93)** |
| Supplies | $           - | $      (1,258.02) | $           - | $           - | $      (1,258.02) |
| Telephone | $           - | $    (18,337.88) | $           - | $           - | $    (18,337.88) |
| **Personnel Expenses** | | | | | $           - |
| Salaries & Wages - Base | $           - | $  (168,467.44) | $           - | $  (168,467.44) | $  (336,934.88) |
| Payroll Tax | $           - | $    (13,287.76) | $           - | $    (13,287.76) | $    (26,575.52) |
| Alex Jones Salary | $           - | $    (20,000.00) | $           - | $    (20,000.00) | $    (40,000.00) |
| **Total Personnel Expenses** | **$           -** | **$  (201,755.20)** | **$           -** | **$  (201,755.20)** | **$  (403,510.40)** |
| **Travel** | | | | | |
| Mileage/Parking/Tolls | $        (167.41) | $        (167.41) | $        (167.41) | $        (167.41) | $        (669.64) |
| Vehicle Leases | $           - | $           - | $           - | $      (1,470.56) | $      (1,470.56) |
| **Total Travel Expenses** | **$        (167.41)** | **$        (167.41)** | **$        (167.41)** | **$      (1,637.97)** | **$      (2,140.20)** |
| **Total Operating Expenses** | **$    (50,419.00)** | **$  (577,137.87)** | **$        (719.00)** | **$  (210,660.78)** | **$  (838,936.64)** |
| **Non-Operating Expenses** | | | | | |
| Payment on PQPR Note | $      (5,000.00) | $      (5,000.00) | $      (5,000.00) | $      (5,000.00) | $    (20,000.00) |
| AMEX Payment | $           - | $           - | $           - | $           - | |
| **Total Other Expenses** | **$      (5,000.00)** | **$      (5,000.00)** | **$      (5,000.00)** | **$      (5,000.00)** | **$    (20,000.00)** |
| **Professional Fees** | | | | | |
| Subchapter v Trustee retainer | | | | | |
| Fulfillment Expert | $    (22,487.56) | | $           - | $           - | $    (22,487.56) |
| Economic Loss Expert | | | | | $           - |
| Alex Jones at Trial Cost | $    (80,920.00) | | | | $    (80,920.00) |
| Witness expenses and trial costs | $    (34,048.00) | | | | $    (34,048.00) |
| Brittany Paz | | | | | $           - |
| Pattis & Smith | $           - | $           - | $  (100,000.00) | $           - | $  (100,000.00) |
| Reynal Law Firm, PC | $           - | $           - | $  (100,000.00) | $           - | $  (100,000.00) |
| SALLC Fees | | $           - | $           - | $  (188,018.31) | $  (188,018.31) |
| Shannon & Lee LLP | | $           - | $           - | $  (207,348.36) | $  (207,348.36) |
| Ray Battaglia | | $           - | $           - | $    (47,316.80) | $    (47,316.80) |
| **Total Professional Fees** | **$  (137,455.56)** | **$           -** | **$  (200,000.00)** | **$  (442,683.47)** | **$  (780,139.03)** |
| **Total Cash Flow** | **$     288,783.82** | **$  (133,087.37)** | **$     275,939.38** | **$  (176,685.88)** | **$     254,949.95** |



EXHIBIT

A

| Fill in this information to identify the case: |
| --- |

| Debtor 1 | Free Speech Systems, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 22-60043 |

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

PQPR Holdings Limited LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Streusand Landon Ozburn & Lemmon, LLP<br>Name | Streusand Landon Ozburn & Lemmon, LLP<br>Name |
| 1801 S. Mopac Expy., Suite 320<br>Number      Street | 1801 S. Mopac Expy., Suite 320<br>Number      Street |
| Austin                 TX        78746<br>City               State           ZIP Code | Austin                 TX        78746<br>City               State           ZIP Code |
| Contact phone   512-220-2688 | Contact phone   512-220-2688 |
| Contact email   lemmon@slollp.com | Contact email   lemmon@slollp.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

PQPR-10

Official Form 410                              Proof of Claim

005788
page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____68,154,691.46_____ **Does this amount include interest or other charges?**

plus additional unpaid debt

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Goods sold, unpaid account, resulting in 2 Promissory Notes and subsequent additional unpaid goods sold.

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:     all assets of debtor

**Basis for perfection:**     UCC-1

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**     $  68,154,691.46

**Amount of the claim that is secured:**     $  68,154,691.46

**Amount of the claim that is unsecured:** $_____0.00___ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $_____

**Annual Interest Rate** (when case was filed)____per contract___%

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

PQPR-10

005789

Official Form 410          **Proof of Claim**          page 2

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|---|

☐ Yes. *Check one:* **Amount entitled to priority**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

### Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10 / 06 / 2022
               MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | David | R. | Jones |
|---|---|---|---|
| | First name | Middle name | Last name |

Title  _____

Company  PQPR Holdings Limited LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  _____
       Number       Street

_____
City                State     ZIP Code

Contact phone  _____  Email  davidrossjones@aol.com

**PQPR-10**

PQPR
Due from FSS - Proof of Claim
7/29/2022

Open Account
| | | |
|---|---|---:|
| Advance to FSS | $ | 121,920.27 |
| Due to PQPR | $ | 23,808,367.00 |
| PQPR Reimbursement Receivable | $ | (9,538,413.22) |
| | | |
| Balance | $ | 14,391,874.05 |

Notes
| | | |
|---|---|---:|
| Note 1 | $ | 29,538,183.63 |
| Note 2 | $ | 24,108,504.21 |
| | | |
| Total | $ | 53,646,687.84 |

Accrued Interest 8/20/21 to 11/10/21
| | | |
|---|---|---:|
| Note 1 Balance | $ | 29,538,183.63 |
| Interest Rate | | 1.75% |
| Annual Interest | $ | 516,918.21 |
| | | |
| Daily | $ | 1,416.21 |
| | | |
| Days* | | 82 |
| | | |
| Accrued Interest | $ | 116,129.57 |
| | | |
| Total | $ | 68,154,691.46 |

PQPR-10

005791

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Acuity CxO LLC 5122929690

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Acuity CxO LLC
219 Black Wolf Run
Austin, TX 78738
USA

**FILING NUMBER:** 20-0058072731
**FILING DATE:** 11/18/2020    02:06 PM
**DOCUMENT NUMBER:** 1008390830002
**FILED: Texas Secretary of State**
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Free Speech Systems LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3005 South Lamar Blvd, Suite D109-317** | **Austin** | **TX** | **78704** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **PQPR Holdings Limited LLC** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **100 Congress Avenue, 18th Floor** | **Austin** | **TX** | **78701** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
(2)all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

EXHIBIT

7

PQPR-10
PQPR-4

005792

Doc ID: ed98b89b619236351f8fb711d29b95290e7f088e

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## SHANNON & LEE LLP'S MOTION FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM AND GRANTING RELATED RELIEF

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

**SUMMARY**

| | | |
|---|---|---|
| Name of applicant: | | Shannon & Lee LLP |
| Applicant's professional role in case: | | Attorney for Debtor |
| Indicate whether this is an interim or final application: | | Final |
| Date order of employment was signed: | | N/A (Requested via this Motion) |
| | Beginning of Period | Ending of Period |
| Total period covered in application | July 29, 2022 | September 20, 2022 |
| Time periods covered by any prior applications | N/A | N/A |
| Total amounts awarded in all prior applications | $0.00 | |
| Amount of retainer received in the case | $0.00 | |
| Total fees applied for in this application and in all prior applications (include any retainer amounts applied or to be applied) | $320,196.25 | |
| Total professional fees requested in this application | $320,196.25 | |
| Total professional hours covered by this application | 523.1 | |
| Average hourly rate for professionals | $612.11 | |
| Total paraprofessional hours covered by this application | 0.0 | |
| Average hourly rate for paraprofessionals | N/A | |
| Reimbursable expenses sought in this application | $5,019.60 | |
| Total amount to be paid to Priority Unsecured Creditors | TBD | |
| Anticipated % Dividend to Priority Unsecured Creditors | TBD | |
| Total to be paid to General Unsecured Creditors | TBD | |
| Anticipated % Dividend to General Unsecured Creditors | TBD | |
| Date of confirmation hearing | TBD | |
| Indicate whether the plan has been confirmed | No | |

Shannon & Lee LLP (the "S&L") hereby moves for entry of an order substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a), 327, 330, 363, and 503 of title 11 of the United States Code (the "Bankruptcy Code") as follows.

2

**RELIEF REQUESTED**

1.      S&L requests that the Court enter an order, substantially in the Proposed Order (a) allowing S&L an administrative expense claim in the amount of $325,215.85 (the "Requested Administrative Expense Claim") or other amount as agreed to by the parties and announced at or prior to any hearing on this Motion or determined by the Court and (b) authorizing S&L to draw the allowed amount of the administrative expense claim allowed against S&L's prepetition retainer of $50,822.68 (the "Retainer").

**JURISDICTION**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

3.      The bases for the relief requested herein are sections 105(a), 327, 363(c), and/or 503(b)(1)(A) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2014, 2016, and/or 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

**A.  Bankruptcy Case and Procedural Posture**

4.      On July 29, 2022 (the "Petition Date"), the Free Speech Systems, LLC (the "Debtor") commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (the "Chapter 11 Case") with the Court.

5.      The Debtor filed an application to employ S&L on August 20, 2022 [ECF No. 83] (the "S&L Employment Application"). The Debtor sought to employ S&L to "be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case" under the terms set out in the

3

engagement letter attached to the S&L Employment Application.[1] S&L Employment Application at ¶ 22.

6.      The U.S. Trustee objected to the employment of S&L on September 12, 2022, and amended his objection on September 14, 2022 [ECF No. 154] (the "UST Objection"). The Sandy Hook Plaintiffs joined the UST Employment Application Objection on September 15, 2022 [ECF No. 166].

7.      The UST Objection argued that the Court should deny the S&L Employment Application because of the failure of S&L partner Kyung Lee to supplement his disclosures required under Bankruptcy Rule 2014 in the cases of (the "IW Cases") of InfoW, LLC, IWHealth, LLC, and Prison Planet, LLC  to indicate that he had begun working for the Debtor here prior to the dismissal of the IW Cases. The U.S. Trustee argued that it was "appropriate for the Court to exercise its broad discretion under Section 327(a) to address Attorney Lee's prior acts in the related cases—which this case is essentially a continuation of—and deny the S & L Application." UST Objection ¶ 51.

8.      The Court denied the S&L Employment Application at the September 20, 2022, hearing on the S&L Employment Application (the "September 20 Hearing"). The Court left open, however, the issue of whether S&L was entitled to compensation for the work performed:

> I understand that that's going to require some questions as to where that leaves Shannon and Lee and Mr. Schwartz in terms of you know, retention and the work that they've done. And I'll be looking to the Subchapter 5 trustee for guidance here, but there was good work done here. And I think Schwartz and Associates, right, helped the process. We've got cash collateral budgets in place and there was folks who would answer phone calls. From what I hear, what Mr. Schwartz encountered -- and I don't want anyone to leave thinking

---

[1] The Debtor sought to retain The Law Offices of Raymond Battaglia (the "Battaglia Firm") to "provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy." S&L Employment Application at ¶ 22.

005796

> that I don't think they should be compensated for -- for good work
> in this case.

Hrg. Tr. 256:14-24. The Court ruled that all rights were reserved with respect to that issue. *Id.* at 257:3-4.

9.    On October 4, 2022, S&L filed a motion under Rule 59 of the Federal Rules of Civil Procedure seeking a rehearing on the issue of disinterestedness and employment under Bankruptcy Code § 327(e) [ECF No. 206] (the "Rule 59 Motion"). Alex Jones [ECF No. 217] and the U.S. Trustee [ECF No. 223] filed objections to the Rule 59 Motion.[2] Both Jones and the U.S. Trustee disputed the standing/authority of S&L to seek the relief requested in the Rule 59 Motion. The U.S. Trustee also opposed the Rule 59 Motion on the grounds that employment under Section 327(e) was a new legal theory that was not raised in the S&L Employment Application.

10.     The Court set the Rule 59 Motion for hearing on October 12, 2022. So that negotiations could continue with the U.S. Trustee and other parties and interest, and to prevent potential conflicting outcomes, S&L requested that the hearing on the Rule 59 Motion be continued to November 16, 2022. In the absence of opposition from the that objected to the Rule 59 Motion, the Court continued the hearing.

### B.  Services Provided by S&L Prior to the Denial of the S&L Employment Application

> *i.    Professional Services Provided by S&L to the Debtor as Debtor-in-Possession*

11.    S&L maintained detailed written records of the time expended by its professionals rendering professional services to the Debtor during the period from July 29, 2022, through September 20, 2022 (the "Engagement Period"). These time records are reflected in the fee statement attached as **Exhibit A** hereto.

---

[2] The Sandy Hook Plaintiffs joined in the U.S. Trustee's objection [ECF No. 226].

005797

12.     As reflected in the time records, S&L professionals provided 523.1 hours of services to the Debtor, as debtor-in-possession, in connection with this chapter 11 case during the Engagement Period, representing $523.1 in fees at S&L's standard hourly rates (prior to reductions), as summarized in the following chart:

| Timekeeper | Year of First Bar Admission | Rate | Hours | Fees |
|---|---|---|---|---|
| Kyung S. Lee | 1984 | $850.00 | 263.4 | $223,890.00 |
| R. J. Shannon | 2014 | $625.00 | 248.4 | $155,250.00 |
| | | $312.50 | 11.3 | $3,531.25 |
| TOTAL: | | | 523.1 | $382,671.25 |

13.     S&L professionals provided services to the Debtor on several categories of matters necessary in this chapter 11 case. A summary of the time spent by S&L professionals on the various aspects of the chapter 11 case are reflected in the following chart:

| Category | Total Hours | Total Fees |
|---|---|---|
| Business Operations | 14.4 | $12,172.50 |
| Case Administration | 87.7 | $62,777.50 |
| Claims Administration and Objections | 2.70 | $1,687.50 |
| Fee/Employment Applications | 71.9 | $55,535.00 |
| Fee/Employment Objections[3] | 86.1 | $62,475.00 |
| Financing & Cash Collateral | 38.9 | $28,880.00 |
| Litigation | 116.4 | $80,536.25 |
| Meetings of Creditors | 6.6 | $5,137.50 |
| Plan and Disclosure Statement | 15.5 | $12,837.50 |
| Relief from Stay Proceedings | 82.9 | $60,632.50 |
| TOTAL: | 523.1 | $382,671.25 |

---

[3] The "Fee/Employment Objections" category reflects services provided related to responding and litigating the U.S. Trustee's objections to the Debtor's applications to employ S&L and Schwartz Associates, LLC.

6

14.     The largest portion of the services provided by S&L to the Debtor was related to the Sandy Hook Litigation and reflected in the Litigation (116.4 hours), Relief from Stay Proceedings (82.9 hours), and Fee/Employment Applications (71.9 hours) categories.[4] As the result of these services, (a) the Debtor was able to obtain or agree to modification of the automatic stay to allow certain of the Sandy Hook Litigation to continue without the expense of a contested hearing on the matters, (b) defend and try the Connecticut Litigation through the ongoing trial, thereby minimizing the interruption with the Debtor's operations and revenue generation, and (c) obtain the employment of its prepetition state-court counsel at a significantly reduced cost than obtaining new trial counsel.

15.     S&L professionals provided 87.7 hours of professional services related to Case Administration. Of this, at least 32.6 hours was related to responding to the Connecticut Plaintiffs' motion to appoint an official committee of tort claimants and remove the Debtor as debtor-in-possession [ECF No. 102] (the "Tort Committee Motion") and the motion to expedite the Tort Committee Motion [ECF No. 106]. Also falling under this category were services related to the preparation of and conferences with parties required under the Bankruptcy Code about the initial debtor interview (the "IDI") and related report, Debtor's schedules of assets and liabilities (the "Schedules"), Statement of Financial Affairs (the "SOFA"), and status report required under subchapter v. These services enabled the Debtor to avoid expensive litigation with respect to the Tort Committee Motion and instead direct the case to mediation with the goal of a consensual plan

---

[4] The "Fee/Employment Applications" category also represents services related to the Debtor's application to employ S&L, Schwartz Associates, and the Battaglia Firm. The "Litigation" category also represents services related to hearings on the Debtor's first day motions, preparing and responding to discovery requests on contested matters in the chapter 11 case, and analysis of potential avoidance actions.

of reorganization.[5] The services also enabled the Debtor to timely attend and provide the information required at the IDI, file its Schedules and SOFA, and file the status report.

16.     S&L professionals provided 86.1 hours of professional services falling under the Fee/Employment Objections category. These services are related to responding and litigating the U.S. Trustee's objections to the Debtor's applications to employ S&L and Schwartz Associates, LLC. Although these services were reasonably likely to benefit the estate by avoiding disruption to administration of this chapter 11 case, the Requested Administrative Expense Claim does *not* include amounts for these services. S&L has reduced the total amount reflected in the fee statement attached as Exhibit A—$387,690.85—by the $62,475.00 reflected in the Fee/Employment Claims Objection category to arrive at the Requested Administrative Expense Claim.

17.     S&L professionals provided 38.9 hours of professional services related to Financing and Cash Collateral. These services primarily relate to the Debtor's requests for use of cash collateral, with a significant portion of these services related to addressing issues in the Debtor's fulfillment of orders.[6] S&L also provided services in this category related to producing documents related to formal and informal discovery requests by the Sandy Hook Plaintiffs. As the result of these services, the Debtor was able to obtain use of cash collateral on an interim basis and obtain amendment of the first interim cash collateral order to allow the Debtor to fulfill orders and clear the backlog of orders to be shipped to its customers.

18.     S&L professionals provided 15.5 hours of services under the Plan and Disclosure Statement category. These services include (i) legal research and analysis related to the "disposable

---

[5] The Sandy Hook Plaintiffs filed a motion to continue the hearing on the Tort Committee Motion [ECF No. 216], which was granted by the Court on October 12, 2022 [ECF No. 234].

[6] At the beginning of the case, the Debtor had a significant backlog in shipping orders that had been paid for by its customers. Addressing these issues required amendments to the Debtor's first amended cash collateral order. Additionally, the Debtor called upon S&L to assist with procuring a new source of inventory purchasing and related financing so that it would be less reliant on PQPR.

income" definition to enable the Debtor to prepare financial projections related to a forthcoming plan of reorganization, issues of confidentiality of plan negotiations, and potential subordination of PQPR's asserted claim through a plan, (ii) drafting an outline of a plan concept, and (iii) a meeting in Austin, Texas on September 13, 2022, to discuss plan concepts with the Debtor. As the result of these services, the Debtor was able to begin a framework to use in discussions and negotiations with creditors on a plan of reorganization, which will likely be carried on by the new CRO in the mediation ordered by the Court at the October 12, 2022, hearing.

19.    S&L professionals provided 14.4 hours of services related to Business Operations. These relate to addressing inventory issues faced by the Debtor, issues related to lost revenue from unavailability of Alex Jones related to the trial in Connecticut, the Debtor's ongoing business relationship with PQPR, negotiation of a new agreement with an unrelated third party for ordering goods on consignment and processing order fulfilment, and issues regarding bitcoin donations. As the result of these services, the Debtor made improvements to its financial performance, improved its margins, was able to satisfy its obligations to its customers, and evaluated its ability to proceeding with the Connecticut Litigation to judgment. These services benefitted the Debtor's business operations and without the services the Debtor's estate would not have been able to achieve the results it did from the Petition Date through September 20, 2022.

20.    S&L professionals provided 6.6 hours of services falling under the Meetings of Creditors category. These services were related to discussions with creditors and attending and representing Marc Schwartz as the Debtor's representative at the section 341 meeting of creditors. As the result of these services, the Debtor attended the section 341 meeting of creditors, which was concluded on September 7, 2022. These services enabled the Debtor to meet is requirements under the Bankruptcy Code and Bankruptcy Rules.

9

21.     S&L professionals provided 2.7 hours of services related to Claims Administration and Objections. These services entailed (a) reviewing and analyzing Alex Jones's asserted proof of claim and analysis of relevant corporate documents, (b) analysis of the punitive damages verdict in the Heslin/Lewis Suit and research into the Texas caps on the same, and (c) analysis into claims against FSS that were also potential claims against the IW Debtors. As the result of these services, the Debtor was able to make an informed business decision with respect to Alex Jones's request for extension of the automatic stay and evaluate certain of the potential claims against the Debtor's bankruptcy estate. The work done by S&L provided the Debtor the necessary legal analysis and data points for the Debtor, through its CRO, to exercise its business judgment.

    *ii.     Out-of-Pocket Expenses Incurred by S&L for the Benefit of the Debtor as Debtor-in-Possession*

22.     In connection with providing the services set out above for the Debtor as debtor-in-possession, S&L incurred out-of-pocket expenses totaling $5,019.60. These expenses are reflected in the following chart:

| Date | Description | Amount |
|---|---|---|
| 7/29/2022 | Service of Filings: Printing and mailing of Utility Motion (printing and service through vendor). | $87.26 |
| 7/29/2022 | Service of Filings: Printing and mailing of Heslin/Lewis Stay Motion, Cash Collateral Motion, Critical Vendor Motion, and Motion to Extend time for Schedules and Statements (printing and service through vendor). | $176.88 |
| 7/29/2022 | Filing Fees: Chapter 11 Filing Fee (paid by S&L though filed through R. Battaglia ECF at his direction). | $1,738.00 |
| 7/31/2022 | Copy Costs: Copy two original sets of proposed Exhibits to share with Marc Schwartz at La Madeleine meeting on Sunday in Preparation for Hearing on Motion to Lift Stay. | $50.23 |
| 7/31/2022 | Copy Costs: Rush order binding of 6 Exhibit books for Hearing on Motion to Lift Stay in Favor of Heslin/Lewis on 8.1.22. | $221.90 |
| 8/8/2022 | RJS flight to Connecticut for hearing on motion to remand for Connecticut Litigation and return to Houston, TX, on United Airlines (Economy Plus). | $861.20 |
| 8/9/2022 | RJS charge for internet access on 8/9/22 flight from Houston, TX to Hartford, CT | $10.00 |

10

| Date | Description | Amount |
|---|---|---|
| 8/10/2022 | Rental Car: RJS car rental to travel from Windsor Locks, CT/Bradley Int'l Airport to Bridgeport, CT for hearing on Connecticut Plaintiffs' motion to remand. | $167.25 |
| 8/11/2022 | Hotel: RJS hotel, taxes, and 1 day internet charge for scheduled in-person hearing before Connecticut Bankruptcy Court related to removed Connecticut Litigation (Stay 8/9/22 to 8/11/22). | $394.70 |
| 8/11/2022 | RJS charge for Internet access on return flight on 8/ 11/22. | $10.00 |
| 8/24/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | $259.00 |
| 9/3/2022 | Form of Consignment Agreement to use with ███ Group. | $29.99 |
| 9/6/2022 | Printing copies of Exhibits to Motion to Appoint Tort Committee. | $54.65 |
| 9/8/2022 | Service of Filings: Service of pleadings on retaining special counsel (printing and postage through vendor). | $124.20 |
| 9/13/2022 | Milage: KSL travel to and from Austin after meetings with company and professionals re plan of reorganization. | $202.10 |
| 9/15/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | $98.19 |
| 9/18/2022 | Printing copies of exhibits for hearings on Application | $49.08 |
| 9/19/2022 | Binders and dividers for Exhibit Binders for Trial | $109.02 |
| 9/19/2022 | Copy costs of exhibits 3X for hearing on Application | $375.95 |
| | TOTAL: | $5,019.60 |

23.     These expenses were necessary expenses for the Debtor to incur to administer its chapter 11 case and, except for the travel cost of Mr. Lee from Houston to Austin to discuss the Plan, necessary to preserve the value of the Debtor's estate. The categories of expenses are described below:

a.  Chapter 11 Filing Fee ($1,738.00)—S&L paid the chapter 11 filing fee on behalf of the Debtor through the Court's CM/ECF system. This was the largest category of expenses.

b.  RJS Travel to Connecticut for Remand Hearing ($1,443.15)—The Connecticut Plaintiffs sought fees and expenses against the Debtor in their motion for remand in the removed Connecticut Litigation. The hearing was set on an expedited basis

11

as an in-person hearing.[7] Mr. Shannon traveled to Connecticut to represent the Debtor as debtor-in-possession at the hearing and incurred these expenses. The U.S. Bankruptcy Court for Connecticut did not assess fees or expenses against the Debtor.

c. Printing of Exhibits for Hearings ($860.83)—S&L printed and prepared the exhibit binders for the hearings at which the Debtor presented evidence using a third-party vendor.

d. Service of Filings ($745.53)—S&L served most of the filings by the Debtor in this case that required service. This was accomplished by a third-party service provider that is also used by the Battaglia Firm.

e. KSL Travel to Austin re Plan Discussions ($202.10)—On September 13, 2022, Mr. Lee traveled to Austin, Texas, to attend discussions with the Debtor and its professionals regarding a proposed plan of reorganization. Mr. Lee returned that same day to Houston, Texas.

f. Cost for Form Consignment Agreement ($29.99)—S&L provided services to the Debtor with respect to a potential agreement with an unrelated third-party for consignment/financing of inventory for the Debtor and an alternative fulfilment provider. Rather than creating a draft consignment agreement from scratch, S&L paid for a form consignment agreement from which to work.

## BASIS FOR RELIEF

**A. Compensation and Reimbursement of Expenses under Bankruptcy Code § 330 for Services Provided Prior to September 20, 2022**

*i. Ability to Seek Compensation Despite Denial of S&L Employment Application*

24.     While the Court questioned S&L's ability to impartially represent the Debtor regarding difficult decisions that may become necessary related to Alex Jones and PQPR (Hrg. Tr. 247:6-11), it also stated that its decision left open questions about where that left S&L in terms of retention and the work it performed prior to the ruling (Hrg. Tr. 256:14-17). Further, the Court stated that all parties' rights were reserved with respect to compensation for the services provided in the case. (Hrg. Tr. 257:3-4).

---

[7] The hearing was continued and changed to a remote hearing because of a positive COVID-19 test from counsel for the Connecticut Plaintiffs. The request for the continuance occurred the morning before the hearing. Mr. Shannon returned to Houston for the continued hearing rather than remaining in Connecticut.

005804

25.     The Debtor has elected to leave this issue for the relevant professionals to pursue.[8] On October 3, 2022, the Debtor filed an emergency application to employ Patrick Magill as replacement CRO and the Court entered an order approving the employment of Mr. Magill on October 13, 2022. The Court entered an order compelling mediation on October 12, 2022 [ECF No. 233]. On information and belief, the Debtor does not anticipate retaining co-counsel pending the outcome of the mediation.

26.     Courts have held that a professional may seek approval of its employment in connection with an application for compensation. In *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998), the debtor-in-possession entered an agreement to retain a broker and filed an application to employ the broker with the bankruptcy court. *Id.* at 477. After the broker began marketing the debtor's real property, the debtor later withdrew the application upon learning that the broker was a business partner for the successful purchaser and loaned the successful purchaser the escrow deposit to participate in an auction. *Id.* The broker later filed an application to employ on its own behalf. The Court denied the broker's application to employ because it was not filed by the debtor but that it should seek compensation under Bankruptcy Code § 503(b). *Id.* The bankruptcy court subsequently granted the broker's motion for administrative expense under section 503(b). *Id.* In ruling on the debtor's appeal, the Ninth Circuit B.A.P. reasoned that the broker *did* have standing to seek its employment and treated the request for administrative expense as an application to employ. *See Id.* at 479-80 ("The bankruptcy court's award of fees was de facto approval of [the broker's] employment."). Other courts have also considered and approved retroactive employment of the in the context of

---

[8] S&L has and will continue to seek the new CRO's views and has requested his input directly and through counsel for FSS. Through this Motion, S&L seeks only allowance of an administrative expense and related relief. S&L does not seek to require the Debtor to continue to engage S&L going forward.

005805

applications for compensation. *E.g.*, *In re McKenzie*, No. 08-16378, 2013 Bankr. LEXIS 2672 (Bankr. E.D. Tenn. July 2, 2013); *In re Little Greek Rest.*, 205 B.R. 484 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366 (Bankr. M.D. Ga. 1989); *see also In re Triangle Chems.*, 697 F.2d 1280, 1289 (5th Cir. 1983) (reversing a bankruptcy court's decision on the basis that the court had discretion to approve such employment).

27.    While the Court denied the relief requested S&L Employment Application—employment of S&L as bankruptcy co-counsel going forward—S&L submits that it was a disinterested person with respect to the services provided from the Petition Date through September 20, 2022, and is therefore eligible to be employed and compensated for such services. As set out in the declaration of Kyung Lee accompanying the S&L Employment Application and presented in evidence at the September 20 Hearing, neither S&L nor its attorneys (a) were a creditor, equity security holder, or insider of the Debtor during that period or (b) are or were within two years before the Petition Date a director, officer, or employee of the debtor.[9] Neither S&L nor its attorneys have any economic interest that would tend to lessen the value of the estate or create an actual or potential dispute in which the estate is a rival claimant. And, as set out in detail in the Rule 59 Motion, neither S&L nor its attorneys have a predisposition that renders bias against the estate under the circumstances with respect to the services provided during the Engagement Period.[10]

28.    The Court has the authority to allow compensation for S&L for the services provided to the Debtor through September 20, 2022, that are not related to any potential conflict, without disturbing the order entered on September 20, 2022.  As described in *In re Mehdipour*—

---

[9] S&L submits that it is entitled to an administrative expense claim for the services provided and expenses incurred.

[10] As set out in detail in the Rule 59 Motion, S&L identified and advocated for positions directly contrary to the positions asserted by Alex Jones and PQPR during and prior to the Engagement Period.

005806

summarized above—while compensation must be denied while a professional has a conflict, the "bankruptcy court has discretion to award or deny compensation for services performed outside of a conflict" and "[t]he court is not required to deny fees for work actually performed." 202 B.R. at 478. Other courts have similarly held that professionals may be retained and compensated for work performed unrelated to an adverse interest that they hold or represent. *See, e.g.*, *In re Relativity Media, LLC*, No. 18-11358 (MEW), 2018 Bankr. LEXIS 2037, at *20 (Bankr. S.D.N.Y. July 6, 2018) (authorizing employment of attorney for debtor-in-possession on the condition of obtaining separate counsel to address disputes against a party with respect to which the attorney had a conflict); *Exco Res. v. Milbank*, 2003 U.S. Dist. LEXIS 1442, at *26 (S.D.N.Y. Jan. 28, 2003) (affirming employment of counsel where attorney would not be handling any matter with respect to the matter in which the attorney had an adverse interest); *In re Granite Partners, L.P.*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) ("[A] conflict does not necessarily taint every aspect of the representation. Where the professional has performed some service of unquestioned value, total denial of fees might result in an inequitable windfall to the estate.") (allowing fees for services not related to any conflict); *In re Leslie Fay Cos.*, 175 B.R. 525, 539 (Bankr. S.D.N.Y. 1994) (authorizing attorney to continue to provide services on matters that it had already started but not take on new matters and allowing fees for unconflicted matters).

29.     In the alternative, S&L submits that it is eligible for employment under Bankruptcy Code § 327(e) for the limited purposes set out as S&L's primary responsibility in the S&L Employment Application.[11] These include (a) administrative matters such as the preparing and

---

[11] The U.S. Trustee's objection to the Rule 59 Motion argues that the Debtor did not request relief under Bankruptcy Code § 327(e) and therefore the Rule 59 Motion is the incorrect procedure to introduce this legal theory. If so, then the Court has not considered employment under section 327(e) previously and S&L submits that this Motion is an appropriate procedure to present this legal theory. Similarly, if the U.S. Trustee's position is correct, the reasoning would also apply to the employment of S&L for the limited time of the Engagement Period and matters unrelated to pursuing claims against Alex Jones or PQPR.

filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel.[12] S&L was first retained by the Debtor prior to the Petition Date, the employment of S&L to represent the estate on these limited matters was in the best interests of the Debtor's bankruptcy estate, and these matters do not involve asserting claims against Alex Jones or PQPR.

30.     Courts have authorized limited employment of a professional under Bankruptcy Code § 327(e) where employment was denied under section 327(a). In *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403 (D. Del. 2005), the debtor-in-possession sought to employ an attorney under section 327(a), but the application was denied because the attorney had a conflict of interest. *Id.* at 404. The debtor then filed an application to employ the attorney under section 327(e) to perform certain bankruptcy functions related to the attorney's prepetition work for the debtor. *Id.* The application under section 327(e) was approved by the bankruptcy court and the U.S. Trustee for Region 3 appealed. *Id.* The U.S. District Court for the District of Delaware affirmed the bankruptcy court's ruling.[13] *Id.* at 407. Other courts have also approved the retention of an attorney for a limited purpose where retention as general bankruptcy counsel would not be appropriate. *See, e.g., In re Star Ready Mix, Inc.*, Nos. 07-13753-B-7, TGM-4, 2008 Bankr. LEXIS 3400, at *5 (Bankr. E.D. Cal. Dec. 18, 2008) ("This court has

---

[12] These services would not include any services falling under the Claims Administration and Objections or Plan & Disclosure Statement Categories.

[13] The debtor in *In re Woodworkers Warehouse, Inc.* sought to retain the attorney to perform functions including to perform functions including (1) obtaining court approval for the use of cash collateral, (2) liquidating the Debtor's assets through a "going out of business sale" and disposing of related executory contracts, and (3) preparing and negotiating a key employee retention program and providing payment to critical personnel of the Debtor. 323 B.R. at 404. The general bankruptcy counsel's role was to conduct the basics of the chapter 11 case "including advising the Debtor with respect to its duties and powers; formulating, negotiating, finalizing and seeking confirmation of a plan of reorganization; reviewing and objecting to claims; and if appropriate, pursuing recovery of preferences and fraudulent conveyances, and providing for asset distribution to creditors." *Id.*

16

already denied the Trustee's application to employ Klein as general counsel based on Klein's prior and concurrent representation of a creditor with interests adverse to the bankruptcy estate and that ruling is now final. That ruling, however, did not foreclose the possibility of Klein's employment under § 327(e).").

     ii.    *The Requested Administrative Expense Claim Meets the Standards for Compensation and Reimbursement of Expenses under Bankruptcy Code § 330*

31.    Subject to employment for the services S&L provided through September 20, 2022, the Requested Administrative Expense Claim is compensable under Bankruptcy Code § 330.  The compensation awarded must be reasonable for services that were actually provided and necessary for administration of the bankruptcy estate or to achieve a reasonably likely benefit to the estate. *See* 11 U.S.C. § 330(a); *In re Woerner*, 783 F.3d 266, 276 (5th Cir. 2015). Reimbursement must be for actual and necessary expenses. *See* 11 U.S.C. § 330(a)(1)(B). Section 330(a)(3) indicates that courts should take into account all relevant factors in determining the amount of reasonable compensation and lists six (6) non-exclusive factors.

32.    The Fifth Circuit has instructed that additional factors apply with respect to attorneys. In *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), cert. denied, 431 U.S. 904 (1977), the Fifth Circuit adopted twelve factors to apply to the determination of awards of attorneys' fees in bankruptcy cases: (i) time and labor required; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the professional due to acceptance of the case; (v) the customary fee; (vi) whether the fee is contingent or fixed; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *In re First*

17

*Colonial*, 544 F.2d at 1298-99.  These factors were borrowed from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), a non-bankruptcy case, and are commonly referred to as the "*Johnson* factors."

33.     The original *Johnson* factors, as embraced by *First Colonial*, remain applicable to the determination of reasonableness of fees awarded under the Bankruptcy Code.  *In re ASARCO LLC*, No. 05-21207, 2011 WL 2975691, at *14 (Bankr. S.D. Tex. July 20, 2011). The principal change enacted through Bankruptcy Code § 330 is that compensation for estate professionals should be commensurate with fees awarded for comparable services in non-bankruptcy cases rather than strictly limited. *See In re Woerner*, 783 F.3d at 274.

34.     As reflected in Exhibit A hereto, the compensation S&L seeks in the Requested Administrative Expense Claim is on account of the actual and necessary services rendered and the reimbursement sought is on account of actual expenses incurred. Analysis of the factors in *First Colonial* and *Johnson* supports the reasonableness of the fees and expenses requested:

a.    Time and labor required. The professional services rendered by S&L on behalf of the Debtor required a high degree of professional competence and expertise. Exhibit A to this Motion contains copies of S&L's time entries for services provided to the Debtor, as debtor in possession, in this chapter 11 case through September 20, 2022, and sets forth in detail all the time for which compensation is sought, as well as the specific actions or matters addressed by each of the professionals.

b.    Novelty and difficulty of legal problems involved. This *Johnson* factor examines the degree of novelty and difficulty of the issues encountered by S&L in representing the Debtor.  S&L faced several difficult and complex legal issues, including:

- Devising mechanisms and strategy to enable the Sandy Hook Litigation to continue without interrupting the Debtor's operations in order to prevent diminution of the Debtor's bankruptcy estate or expensive litigation while presenting credible opposition to allow negotiations with the Connecticut Plaintiffs;

18

- Advising the Debtor on complex issues regarding the Sandy Hook Litigation, including whether the claims are personal injury tort claims under 28 U.S.C. § 157(d);

- Advising the Debtor with respect to the Tort Committee Motion and the uncertainty of issues surrounding subchapter v of chapter 11;

- Coordinating with the CRO data from the Debtor based on incomplete books and records to distill information necessary to complete the IDI, Schedules and SOFA; and

- Addressing the numerous emergencies arising related to the Debtor's daily business operations, fulfillment of orders, procurement of new products, management of inventory, and analyzing with the CRO financial records and projections to determine viable business plans in the context of the chapter 11 case.

c. <u>The skill requisite to perform the legal services properly</u>.  The services provided by S&L required a high level of skill, particularly because of the compressed time periods often involved.

d. <u>Preclusion of other employment due to the acceptance of this case</u>. S&L was largely precluded from seeking other employment while representing the Debtor in this chapter 11 case. There were thirty-six business days between the Petition Date and September 20, 2022. S&L provided 523.1 hours of billable services to the Debtor.[14] This amounts to 14.5 hours a day or 7.25 hours per business day per attorney at S&L. Additionally, because of the frequent emergencies, S&L had to maintain capacity.

e. <u>Customary fee</u>.  S&L's hourly billing rates charged in this matter are the rates that S&L regularly charges its hourly non-bankruptcy clients. In its prepetition practice with the Debtor, S&L applied a 10% discount for its role as co-counsel. The reduction reflected in the Requested Administrative Expense Claim reflects a 16.1% discount ($62,475.00) related to services falling under the Fee/Employment Objections category.

---

[14] The 523.1 hours of services includes time spent on the Fee/Employment Objections category. S&L has voluntarily reduced the amount of the Requested Administrative Expense Claim by $62,475.00—the amount reflected by the services under that category—based on discussions with the U.S. Trustee. However, these services were reasonably likely to benefit the estate by avoiding disruption to administration of this chapter 11 case when performed.

005811

f.   Whether the fee is fixed or contingent. S&L charges customary hourly rates, as adjusted annually, for the time expended by its attorneys and paraprofessionals in representing the Trustee.  S&L's fee is not outcome dependent.

g.   The amount of time involved and the results obtained. S&L provided 523.1 hours of billable services to the Debtor. S&L's actions in this case have allowed the Debtor, among other things, to (a) litigate to verdict 16 of the 19 claims of the Sandy Hook Litigation under negotiated terms that minimized interruptions to the Debtor's operations and revenue generation and avoided the expense to the estate of retaining new state court counsel, (b) continue fulfilling orders and generating revenue, (c) continue in the case so that a mediation could be set to resolve the numerous disputes; (d) avoid having to pay fees related to the removal of the Connecticut Litigation based on the misunderstanding of the Connecticut Superior Court with its bifurcation; and (e) provide discovery documents to the Plaintiffs, including documents that the Connecticut Plaintiffs assert were not provided in the Connecticut Litigation.

h.   The experience, reputation, and ability of the professionals who performed virtually all of the services in the case.  Mr. Lee has approximately 38 years of experience as an attorney focusing his practice on bankruptcy matters and Mr. Shannon has approximately 9 years of experience as judicial law clerk and attorney focusing his practice on bankruptcy matters. Both are experienced in all aspects of bankruptcy matters, possesses a high level of expertise, and an excellent reputation in the business and legal communities.

i.   At all times during the Engagement Period, S&L diligently fulfilled its duty as attorney for the Debtor as debtor-in-possession. All services rendered by S&L were necessary, proper, and beneficial to the chapter 11 case. Services performed by S&L were done in a professional, skilled, and expeditious manner, requiring substantially less time than would have been required by counsel with less experience in bankruptcy matters.

j.   The undesirability of the case. Representation of the Debtor in this chapter 11 case was undesirable. The Debtor's principal is a controversial figure and the subject of public ire. Further, given the contentious nature of the Sandy Hook Litigation and the underlying claims, even matters that should be easily agreed are fiercely contested.  On information and belief, the Debtor initially attempted to secure replacement co-counsel without success.

k.   Awards in similar cases. The compensation requested in this case is comparable to, if not less than, the compensation allowed in other cases similar in size and complexity to this case.

005812

l.  <u>Disbursements</u>.  S&L disbursed at least the sum of $5,019.60 for necessary expenses incurred in the rendition of professional services or on behalf of the Debtor.[15]  S&L's policy regarding charging of expenses is set forth in the retention agreement attached to its application to employ. This does not include additional amounts related to PACER searches, legal research, and similar matters, for which S&L is not seeking an administrative expense claim.

35.     S&L submits that the compensation and reimbursement sought in this Motion is for services provided and expenses incurred that were clearly necessary for the administration of the bankruptcy estate, in fact benefited the estate, or were reasonably likely to benefit the estate at the time they were performed. The compensation and reimbursement should therefore be allowed under the standard described by the Fifth Circuit described in *In re Woerner*, 783 F.3d 266 (5th Cir. 2015).

**B.  Administrative Expense under Bankruptcy Code Bankruptcy Code § 503(b)(1)(A) for Costs and Expenses Necessary to Preserve the Estate**

   i.   *Ability of Professional to Seek Costs and Expenses under Bankruptcy Code § 503(b)(1)(A)*

36.     *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998)—summarized above—additionally provides support for a professional seeking limited compensation under Bankruptcy Code § 503(b)(1)(A). According to the 9th Circuit B.A.P., "[c]ourts may allow compensation for professional services under § 503(b)(1)(A) as administrative expenses if the services provided by a disinterested professional were necessary to preserve the estate." *Id.* at 478. The standard for an administrative expense for such services is higher than for compensation under Bankruptcy Code § 330. *See id.* at 479 ("[I]n order for the court to grant compensation under § 503, the services 'must benefit all

---

[15] S&L incurred certain additional out-of-pocket expenses that were not recorded contemporaneously. Rather than attempting to recreate these expenses, S&L has not included such expenses in the Requested Administrative Expense Claim.

005813

the creditors, be necessary for a successful reorganization, and generally arise from operating the estate in the overall interests of the creditors.'").

37.     This is consistent with the Fifth Circuit Court of Appeals' decision in *McBride v. Riley (In re Riley)*, 923 F.3d 433 (5th Cir. 2019). Although *In re Riley* involved a chapter 13 case, the Court of Appeals reasoned that there were two ways that payments owed to a debtor's attorney could be classified as an administrative expense claim: "(1) if the payments are necessary expenses to preserve the estate under § 503(b)(1); or (2) if the payments are compensation or reimbursement under § 503(b)(2) (which links to 11 U.S.C. § 330(a), which, in turn, under § 330(a)(4)(B), permits 'reasonable compensation' for attorneys based on services rendered)."[16] *Id.* at 436.

38.     In analyzing whether particular expenses advanced by the attorney in *In re Riley* fell under the rubric, the Fifth Circuit applied the standard two-prong test of whether an obligation was an "administrative expense." *Id.* at 439. The first prong is that the obligation must arise from a post-petition transaction with the estate, rather than the debtor personally. *Id.* The second prong is that the goods or services received in exchange for the obligation must directly benefit the estate. *Id.* As indicated in the Court of Appeals' ultimate ruling that the relevant expenses could be considered and allowed as part of the attorney's compensation and reimbursement under section 330—but not as section 503(b)(1)(A) administrative expenses—the standard under section 503(b)(1)(A) is stricter. *See id.* at 441. The costs and expenses must maintain or add value to the estate to fall under Bankruptcy Code § 503(b)(1)(A). *Id.* at 440.

---

[16] In a chapter 11 case, section 330(a)(1)—rather than section 330(a)(4)(B)—applies with respect to professional compensation.

005814

ii.   *Certain Amounts of the Requested Administrative Expense Claim Reflect Costs and Expenses Necessary to Preserve the Estate*

39.     A significant portion of the Requested Administrative Expense Claim is for services provided to and expenses incurred on behalf of the Debtor, as debtor-in-possession, that directly preserved the Debtor's bankruptcy estate rather than simply benefit administration of the bankruptcy case. Among other things, these include:

a.   Representing the Debtor at the August 1 Lift Stay Hearing—S&L attorneys provided services to the Debtor in connection with the Debtor's emergency motion to modify the automatic stay to allow the Heslin/Lewis Suit to go forward [ECF No. 2]. This motion was necessary on an emergency basis to prevent plaintiffs Heslin and Lewis from filing a similar motion and the required response to the factual allegations under the relevant Bankruptcy Local Rules. The result was a substantial savings to the Debtor's bankruptcy estate.

b.   Addressing the Debtor's Fulfillment Issues—S&L attorneys provided services to the Debtor related to addressing issues with fulfilment of orders that had already been paid for by the Debtor's customers but not yet shipped by the Debtor. If the Debtor was unable to fulfill the backlogged orders, the Debtor's estate would be subject to credit card "charge-backs" that would either need to be paid by the Debtor post-petition or the Debtor would lose access to credit card processing altogether. These services were necessary to avoid a substantial diminution in the Debtor's estate.

c.   Representing the Debtor in Connection with the Motion to Remand—As described in the Rule 59 Motion and by Mr. Battaglia's statements at the September 20 Hearing, the Debtor removed the Connecticut Litigation based on incorrect information about the actions of the Connecticut Superior Court when it was continuing with the proceedings without severing the Debtor. In the Connecticut Plaintiff's motion to remand, they sought not only remand of the litigation but also fees and expenses, requiring the Debtor to respond to avoid resulting diminution of the Debtor's estate. S&L represented the Debtor in the response, which required travel to Connecticut for a scheduled in-person hearing set on an expedited basis. Although the U.S. Bankruptcy Court for the District of Connecticut ultimately remanded the Connecticut Litigation, it did not award fees and expenses to the Connecticut Plaintiffs as the result of the S&L's services.

d.   Opposing the Emergency Setting of the Tort Committee Motion—S&L provided services to the Debtor in connection with opposing the emergency setting of the Tort Committee Motion. This was necessary to prevent interruption to the Debtor's reorganization efforts and significant expense for a contested matter that ultimately did not need to occur at that time and, if the scheduled mediation is successful, may be avoided altogether. This prevented substantial administrative expense to the

23

Debtor's bankruptcy estate and benefited the estate by allowing the Debtor to focus on operations matters from which the Debtor generates revenue.

 e. <u>Addressing Motion to Compel in the Connecticut Litigation</u>—S&L attorneys provided services related to providing documents requested in the Connecticut Litigation and that were subject to a motion to compel filed after the Petition Date. These documents were related to "Google Analytics" and a "management agreement" testified to by the Debtor's employees pre-petition but that the Connecticut Plaintiffs asserted had not been produced in the litigation. The services provided by S&L were necessary for the Debtor to comply with its post-petition discovery obligations and to prevent additional sanctions—including potential monetary sanctions—that would have diminished the Debtor's bankruptcy estate. The Connecticut Plaintiffs asserted that certain of the documents ultimately provided through affidavits of the Debtor's employee Blake Roddy and Marc Schwartz as the result of S&L's services had been requested previously but were not been provided by the Debtor prior to the Petition Date.

 f. <u>Enabling the Connecticut Litigation to Continue with Minimal Interruption to the Debtor's Operations or Revenue Generation</u>—S&L provided services to the Debtor that enabled the Connecticut Litigation to continue in a manner that (a) minimized the disruption to the Debtor's operations and ability to generate revenue and (b) avoided expensive litigation on the Connecticut Plaintiff's motion for relief from stay. The services S&L provided were necessary to achieve this outcome that preserved the Debtor's estate by avoiding the interruption and the expense of the litigation.

 g. <u>Various Out-of-Pocket Expenses in Addition to the Above</u>—S&L incurred out-of-pocket expenses related to the service of pleadings filed by the Debtor in this chapter 11 case. These pleadings were filed in the Debtor's role as debtor-in-possession and the service of such pleadings was required by the Debtor in such role. Additionally, S&L incurred out-of-pocket expenses related to the preparation of exhibit binders for the hearings in the Debtor's chapter 11 case. These expenses were necessary to allow the Debtor to proceed in its chapter 11 case and obtain approval of matters critical to preserving the value of the Debtor's bankruptcy estate.

40. The services provided by S&L professionals directly related to preserving the assets of the Debtor's bankruptcy estate described above that reflect costs of at least $120,547.50.

**Exhibit B** hereto details the services provided that meet the higher standard required by Bankruptcy Code § 503(b)(1)(A).

41. The out-of-pocket expenses incurred by S&L on behalf of the Debtor directly related to preserving the assets of the Debtor's bankruptcy estate reflect expenses of at least

$3,049.51. **Exhibit C** hereto details these out-of-pocket expenses incurred that meet the higher stated required by Bankruptcy Code § 503(b)(1)(A).

### C. Application of Retainer for Payment of Filing Fee and Service Costs.

42.    S&L holds the Retainer in the amount of $50,822.68 in its IOLTA trust account. Under the Debtor's engagement agreement with the Debtor, the Debtor agreed to advance court filing fees. Additionally, the engagement agreement provided that the Debtor would be responsible for all printing, shipping, postage, and related services.

43.    S&L paid the filing fee of $1,738.00 in this chapter 11 case, $860.83 in printing and other costs related to the preparation of exhibits for hearings, and $745.53 in costs related to the service of filings with the Bankruptcy Court. S&L asserts that these are ordinary course expenses of the Debtor. To the extent not otherwise authorized pursuant to this Motion, S&L requests authority to draw on the Retainer that was provided for these expenses pursuant to Bankruptcy Code § 363(c).

<div align="center"><u>CONCLUSION</u></div>

WHEREFORE, S&L respectfully requests that this Court enter an order substantially in the form of the Proposed Order (a) in the amount of the Requested Administrative Expense Claim or other amount as agreed to by the parties and announced at or prior to any hearing on this Motion or determined by the Court and (b) authorizing S&L to draw the allowed amount of the administrative expense claim allowed against the Retainer. This relief is consistent with the Court's ruling at the September 20 Hearing and does not require disturbing the related order.

<div align="center">[<em>Remainder of Page Intentionally Left Blank</em>]</div>

Dated: October 24, 2022                    **SHANNON & LEE LLP**

/s/*R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within 24 hours of the filing, on the parties on the attached service list by U.S.P.S. first class mail.


/s/*R. J. Shannon*
R. J. Shannon

005818

## SERVICE LIST

Patrick Magill
Chief Restructuring Officer
Free Speech Systems, LLC
3019 Alvin Devane Blvd., STE 300
Austin, TX 78741

Attn: Ray Battalia
Law Offices of Raymond W. Battaglia
66 Granburg Cir.
San Antonio, TX 78218

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway. Suite 320
Austin, TX 78746

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 7870

Attn: Shelby Jordan Jordan & Ortiz,
P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

John D Malone Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite
1400 Houston, TX 77002

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548 Austin, TX 78711-254

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street Suite 1800
Dallas, TX 7520

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln Austin, TX 7870

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

Attn: Elizabeth C. Freeman
Jackson Walker LLP
1401 McKinney St., STE 1900
Houston, TX 77010

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Attn: Mark Bankson
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**ORDER GRANTING SHANNON & LEE LLP'S MOTION FOR ORDER ALLOWING**
**ADMINISTRATIVE EXPENSE CLAIM AND GRANTING RELATED RELIEF**

Came for consideration Shannon & Lee LLP's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief (the "Motion"). Upon consideration of the Motion, the record and evidence in the above-captioned case, it is hereby ORDERED THAT:

1.      Shannon & Lee LLP ("S&L") is allowed an administrative expense claim in the above-captioned chapter 11 case in the amount of **_$325,215.85_** (the "Allowed Administrative Expense Claim").

2.      S&L is authorized to draw on its prepetition retainer received from the Debtor in an amount up to the amount of the Allowed Administrative Expense Claim.

3.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

## EXHBIT A

**Shannon & Lee Fee and Expense Statement**

005821

 **SHANNON & LEE LLP**

# FEE STATEMENT

Internal # 16
Date: 10/07/2022

700 Milam, Suite 1300
Houston, Texas 77002
United States

Free Speech Systems, LLC

## 00010-Free Speech Systems, LLC
## Debtor in Possession

### Services

| Date | Attorney | Description | Hours | Rate | Total |
|------|----------|-------------|-------|------|-------|
| 07/30/2022 | KSL | Relief from Stay Proceedings: Handle requests from Marc Schwartz and team for copies of witness outlines, documents related to witness outline and cases relating to standard for lifting automatic stay to litigate in non-bankruptcy forum (.5) | 0.50 | $850.00 | $425.00 |
| 07/31/2022 | KSL | Relief from Stay Proceedings: Draft and finalize Witness and Exhibit List for Monday Hearing on Heslin\Lewis Lift Stay Matter (1.0); review 5th Circuit Cases on standard for permitting litigation to be conducted in separate forum (1.0); prepare Q&A and revise same for Marc Schwartz in connection with Heslin\Lewis hearing (1.0); o/c with Marc Schwartz at LaMadeleine to review exhibits, cases on lift stay and standard for same for Marc Schwartz testimony at Heslin\Lewis Hearing (1.0) | 4.00 | $850.00 | $3,400.00 |
| 07/31/2022 | RJS | Relief from Stay Proceedings: Attention to emails from K. Lee re witness and exhibit list re stay motion re Heslin/Lewis matter (.2); revise same and prepare exhibits for filing (.5); file and serve same (.2); prepare legal argument re same (1.0). | 1.90 | $625.00 | $1,187.50 |
| 08/01/2022 | RJS | Relief from Stay Proceedings: Prepare for (.6) and attend (1.1) hearing re Debtor's stay motion re Heslin/Lewis matter. | 1.70 | $625.00 | $1,062.50 |
| 08/01/2022 | RJS | Litigation: Attention to emails from N. Pattis re hearing scheduled in Connecticut litigation (.1); analyze order re same (.5); attend in person and Zoom call re same at M. Schwartz office (1.0). | 1.60 | $625.00 | $1,000.00 |
| 08/01/2022 | RJS | Relief from Stay Proceedings: Analyze Connecticut Plaintiffs lift-stay motion (.9); attention and respond to K. Lee emails re applicable law (.5); attention to N. Pattis email re estimate of cost for Connecticut | 1.40 | $625.00 | $875.00 |

| | | litigation. | | | |
|---|---|---|---|---|---|
| 08/01/2022 | KSL | Relief from Stay Proceedings: Prepare for hearing on Lift Stay to Permit Heslin\Lewis suits to proceed to judgment (1.0); attend hearing and handle same with Marc Schwarz, CRO (1.5); post-hearing conference with counsel and CRO to discuss next steps in chapter 11 case (1.0); continue to work on researching and preparing response as to Curtis Factors in connection with Connecticut Plaintiffs' Motion to Lift Stay (2.0). | 5.50 | $850.00 | $4,675.00 |
| 08/01/2022 | KSL | Financing: Numerous t/c with S. Lemmon, counsel for PQPR, on various issues relating to use of cash collateral (.6); follow-up call with Marc Schwartz and counsel to discuss preparation for First Day Motions not handled on 8/1/22 (1.5) | 2.10 | $850.00 | $1,785.00 |
| 08/02/2022 | RJS | Litigation: Attention to email from K. Lee re hearing in Connecticut litigation (.1); attend video conference with K. Lee, M. Schwartz, and R. Battaglia re same (1.0); attention to email from C. Atkinson from Pattis & Smith re removal of Connecticut litigation in light of state court continuing action with Debtor as party and analyze drafts of removal papers (.5); attention to email from C. Atkinson of filed versions of same (.2); follow up teleconference with N. Pattis, K. Lee, R. Battaglia, and M. Schwartz re same (1.0). | 2.80 | $625.00 | $1,750.00 |
| 08/02/2022 | RJS | Relief from Stay Proceedings: Analyze Connecticut Plaintiffs' motion for relief from stay (.5); various emails with K. Lee and M. Schwartz re evidence required (.5); outline response re same (4.7). | 5.70 | $625.00 | $3,562.50 |
| 08/02/2022 | KSL | Litigation: Conference call with Conn. counsel to obtain update on timetable for jury selection, trial and cost figures (1.0); extended conference calls with counsel for Debtor, CRO and Schwartz Associates on preparing for First Day Hearings (3.0); continue to provide various inserts to First Day Orders and coordinate with Ray Battaglia on finalization of Utility, Critical Vendor, Extension of Time to File Schedules and Cash Collateral (1.0); review new issues raised by objectors as to use of cash collateral, and, provide responses to same (1.0); respond to and discuss issues raised by Texas and Conn Plaintiffs through Jarrod Martin and discuss with Ray Battaglia (1.5); respond to call from N. Pattis on whether there has been an extension of the automatic stay to Alex Jones (.5) | 8.00 | $850.00 | $6,800.00 |
| 08/03/2022 | RJS | Financing: Prepare for (1.0) and attend (7.0) hearing on use of cash collateral and other first-day motions; post-hearing meeting with M. Schwartz, K. Lee, and R. Battaglia (1.2). | 9.20 | $625.00 | $5,750.00 |
| 08/03/2022 | RJS | Relief from Stay Proceedings: Begin drafting response for motion for relief from automatic stay. | 3.00 | $625.00 | $1,875.00 |

| 08/03/2022 | KSL | Litigation: Review objections to First Day Motions and prepare responses to same for counsel and client (1.5); attend hearing on First Day Motions and hearing on First Day Motion to Use Cash Collateral of PQPR and discuss strategy and testimony with clients (7.0). | 8.50 | $850.00 | $7,225.00 |
|---|---|---|---|---|---|
| 08/04/2022 | RJS | Relief from Stay Proceedings: Continue drafting Motion for relief from automatic stay and conducting related research (5.0); draft witness and exhibit list re same (.4); send same to M. Schwartz, K. Lee, and R. Battaglia (.1); call re evidence for Connecticut Plaintiffs' lift stay motion (1.0); attention to email re Connecticut Plaintiffs' requested continuance of same and confirm agreement of Debtor (.1). | 6.70 | $625.00 | $4,187.50 |
| 08/04/2022 | KSL | Relief from Stay Proceedings: Analyze "cause" as set out in Conn. Plaintiffs' Emergency Motion to Lift Stay and discuss strategy on how to defend with CRO and co-counsel (1.5); t/c with S. Lemmon re: PQPR position on lift stay motion and budget (.5); review email stating that Connecticut Plaintiffs are continuing hearing on Emergency Motion to Lift Stay scheduled for August 5 to August 24 (.4). | 2.40 | $850.00 | $2,040.00 |
| 08/04/2022 | KSL | Fee/Employment Applications: Begin editing and revising Application to Employ Shannon & Lee LLP, especially the Declaration and connections wto InfoW bankruptcy cases (2.0); edit and revise Application to retain CRO and Schwartz Associates as advisors for CRO (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/05/2022 | RJS | Financing: Attention to J. Martin email re FSS company agreement (.1); draft response to same with attached documents (.5). | 0.60 | $625.00 | $375.00 |
| 08/05/2022 | RJS | Claims Administration and Objections: Analyze A. Jones proof of claim filed in Bankruptcy case (.1); review relevant documents for contractual indemnity (.9); draft email to M. Schwartz, K. Lee, and M. Schwartz re same (.1). | 1.10 | $625.00 | $687.50 |
| 08/05/2022 | RJS | Litigation: Attention to order of U.S. Bankruptcy Court for the District of Connecticut order setting hearing on Connecticut Plaintiffs' motion for remand on expedited basis (.2); outline response to same and motion for withdrawal of reference (3.3). | 3.50 | $625.00 | $2,187.50 |
| 08/05/2022 | KSL | Litigation: Handle drafting of Suggestions of Bankruptcy for A. Reynal in appellate and state court actions (.5); analyze and document state court evidence of values by Expert Witness Pettingill on FSS Values (1.0). | 1.50 | $850.00 | $1,275.00 |
| 08/05/2022 | KSL | Fee/Employment Applications: Analyze issues relating to Applications for CRO and Schwartz Associates (1.0). | 1.00 | $850.00 | $850.00 |
| 08/06/2022 | RJS | Claims Administration and Objections: Attention to verdict on punitive damages and research Texas caps | 1.50 | $625.00 | $937.50 |

| | | | | | |
|---|---|---|---|---|---|
| | | re same (1.3); draft email to K. Lee and R. Battaglia re same (.2). | | | |
| 08/06/2022 | RJS | Litigation: Draft motion for pro hac vice for Connecticut bankruptcy court re removed Connecticut litigation (.9); draft motion for to withdrawal of the reference re same (2.5); analyze Connecticut Plaintiffs' motion to remand and draft response to same (5.6); draft email to M. Schwartz, K. Lee, N. Pattis, and R. Battaglia re same (.1). | 9.30 | $625.00 | $5,812.50 |
| 08/06/2022 | KSL | Fee/Employment Applications: Review comments provided by M. Schwartz to Application (.2); review and analyze new sections for Declaration iso Application to Retain and disclosures relating to InfoW (.8) | 1.00 | $850.00 | $850.00 |
| 08/07/2022 | RJS | Litigation: Updated pro hac vice application, motion to withdraw the reference, and response to motion to remand re Connecticut Litigation in response to K. Lee and R. Battaglia comments (1.5). | 1.50 | $625.00 | $937.50 |
| 08/07/2022 | RJS | Business Operations: Attention and respond to M. Schwartz emails re inventory issues (.3). | 0.30 | $625.00 | $187.50 |
| 08/07/2022 | KSL | Litigation: Work on building base case pleading for Motion to Withdraw the Reference to the District Court in Connecticut (2.0); edit and revise Pro Hac for RJ Shannon (.3); review and edit Response to Motion to Remand (1.0) | 3.30 | $850.00 | $2,805.00 |
| 08/08/2022 | RJS | Litigation: Call with N. Pattis re pleadings to file in Connecticut litigation (.1); draft email re visiting attorney application re same (.1); finalize motion to withdraw the reference and response to motion for remand re same (1.5); send same to N. Pattis and staff (.1); two calls with N. Pattis staff re filing of same (.1); confirm filing of same (.1); call with M. Schwartz, K. Lee, R. Battaglia, and N. Pattis re same (.5). | 2.40 | $625.00 | $1,500.00 |
| 08/08/2022 | RJS | Case Administration: Daily status call with M. Schwartz, K. Lee, R. Battaglia, with S. Jordan attending for part of call. | 1.00 | $625.00 | $625.00 |
| 08/08/2022 | KSL | Case Administration: Numerous t/cs with R. Battaglia, Norm Pattis, R. Shannon and M. Schwartz to discuss operational issues at FSS, retention issues with Connecticut counsel, and backlog on fulfillment of orders and additional cash collateral needed to complete same (1.5); extended call on daily FSS Team meeting to discuss issues on chapter 11 process and action plan (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/08/2022 | KSL | Litigation: Review of expert witness Pettingill's testimony in Heslin/Lewis Suit re valuation of FSS and methodology behind his opinion (.5). | 0.50 | $850.00 | $425.00 |
| 08/09/2022 | RJS | Litigation: Travel to Connecticut for 08/10/2022 | 6.50 | $312.50 | $2,031.25 |

| | | | | | |
|---|---|---|---|---|---|
| | | expedited hearing on Connecticut Plaintiffs' motion to remand (1/2 rate for non-working travel time). | | | |
| 08/09/2022 | RJS | Relief from Stay Proceedings: Attention to email from ADP re intention to terminate payroll services and respond to same. | 0.20 | $625.00 | $125.00 |
| 08/09/2022 | KSL | Business Operations: Work with Marc Schwartz and Ray Battaglia to understand extent of "backlog" issue and determine most appropriate solution (1.5); t/c with Norm Pattis to determine dislocation of Alex Jones with a Connecticut trial on his ability to do show and create sales for FSS (.5); extended call with FSS Team and Shelby Jordan, counsel for Alex Jones, on funding of fulfilling back orders and necessity for Alex Jones to be in Connecticut and absent from studio during Connecticut trial (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/09/2022 | KSL | Case Administration: Extended daily call with FSS Team to discuss daily assignments and action items requiring attention (1.0). | 1.00 | $850.00 | $850.00 |
| 08/09/2022 | KSL | Fee/Employment Applications: Continue to review and make additional edits to Application to Retain CRO, Declaration of Marc Schwartz, Application to Retain S&L and Declaration of Kyung S. Lee (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/10/2022 | RJS | Litigation: Calls with K. Lee re hearing on motion to remand re Connecticut Litigation (.2); prepare for hearing (2.3); call with N. Pattis re motion to continue filed by Connecticut Plaintiffs and attention to filing of same on docket (.2); call with K. Lee after hearing continued after traveling to vicinity of Bridgeport, Connecticut bankruptcy court (.1); call with N. Pattis after conclusion of disciplinary proceeding in Connecticut Superior Court related to Connecticut Plaintiffs' claims (.1); attention to filing by N. Pattis in Connecticut Bankruptcy Court and email M. Schwartz, K. Lee, and R. Battaglia about authorization (.2). | 3.10 | $625.00 | $1,937.50 |
| 08/10/2022 | RJS | Litigation: Travel from Windsor Locks, Connecticut to Pattis & Smith office in Newport, Connecticut in advance of hearing in Bridgeport, Connecticut, confirm hearing had been continued to 8/12/22, and return to Windsor Locks(1/2 non-working travel rate). | 2.00 | $312.50 | $625.00 |
| 08/10/2022 | RJS | Litigation: Travel time related to return rental car and proceed to Hartford, CT airport for return flight to Houston prior to delay and ultimate cancelation of flight due to storms in DC area and Houston (1/2 travel time). | 2.80 | $312.50 | $875.00 |
| 08/10/2022 | KSL | Litigation: T/c with R. Shannon to discuss arguments in Connecticut on Motions to Remand and response to same (.5); conference call with FSS Team to determine division of work and action plan of items to handle for FSS in Texas and Connecticut (1.0). | 1.50 | $850.00 | $1,275.00 |

| 08/10/2022 | KSL | Financing: Numerous t/cs with S. Lemmon to update on negotiations over cash collateral and discovery propounded by Plaintiffs' counsel (.8). | 0.80 | $850.00 | $680.00 |
|---|---|---|---|---|---|
| 08/10/2022 | KSL | Business Operations: Conference calls with M. Schwartz, C. Schwartz and Ray Battaglia on issues relating to fulfillment and backlog of shipping orders (1.0); conference call to review status of ADP proposed termination of FSS as client and whether alternative third-party administrator is required for FSS (1.0); continue to obtain facts and approaches to solving backlog and fulfillment issues at FSS and its dealings with Blue Asension Logistics, LLC (2.0). | 4.00 | $850.00 | $3,400.00 |
| 08/11/2022 | RJS | Litigation: Travel time to return to Houston from Connecticut (1/2 rate non-working travel). | 6.50 | $625.00 | $4,062.50 |
| 08/11/2022 | KSL | Case Administration: Draft, edit, and file notice of appearance for case (.5). | 0.50 | $850.00 | $425.00 |
| 08/11/2022 | KSL | Financing: Contact R. Saldana to determine availability of court to hear emergency motion to amend cash collateral order (.5); review fulfillment issue, cash collateral required in order to overcome backlog, factoring arrangement between Blue Asension and Alex Jones, extent of backlog and handle issues relating to handling same without affecting credit card processor and bank relating to same (3.0); numerous conference calls to discuss fulfillment issue and cash collateral amendment required (2.0); assist R. Battaglia in preparing for hearing on amendment to cash collateral hearing with drafts of Witness and Exhibit List, strategy considerations, topical areas to cover with both Patrick Riley and Marc Schwartz (2.0). | 7.50 | $850.00 | $6,375.00 |
| 08/12/2022 | RJS | Litigation: Prepare for (2.0); and attend (.7) remote hearing in Connecticut Bankruptcy Court re motion for remand; call with K. Lee re outcome of same (.1); respond to S. Jordan email re same (.1). | 2.90 | $625.00 | $1,812.50 |
| 08/12/2022 | RJS | Financing: Prepare for (.2) and attend (4.1) hearing on motion to amend interim cash collateral order. | 4.30 | $625.00 | $2,687.50 |
| 08/12/2022 | KSL | Financing: Prepare for hearings on amendment to cash collateral order and assist R. Battaglia in presentation of case and assist in cross-examination of witnesses (2.0); emails on negotiations with Plaintiffs counsel, subchapter v trustee and US Trustee on cash collateral amendment and issues relating to fulfillment and Blue Asension agreement (1.0); assist in preparation of witnesses Marc Schwartz and Patrick Riley by Ray Battaglia (1.5); assist Ray Battaglia at hearing on Emergency Motion to Amend Cash Collateral, review exhibits and formulate objections to admission of same to Objector's exhibits, and analyze revised 13 week budget and attend hearing by video (3.5); post-hearing discussions with M. Schwartz to make sure all issues | 8.30 | $850.00 | $7,055.00 |

| | | covered(.3) | | | |
|---|---|---|---|---|---|
| 08/13/2022 | RJS | Litigation: Review discovery request from plaintiffs and gather relevant documents from email. | 3.10 | $625.00 | $1,937.50 |
| 08/15/2022 | KSL | Litigation: Conference call with FSS Team to discuss issues relating to discovery, Connecticut Plaintiffs Emergency Motion to Lift Stay, Connecticut litigation and status of remand (1.0); Zoom call to discuss issues relating to extension of the automatic stay, the necessity of Alex Jones on the air, the effect it will have on FSS sales and testimony required at hearing on same (1.5) | 2.50 | $850.00 | $2,125.00 |
| 08/15/2022 | RJS | Fee/Employment Applications: Review application to employ drafted by K. Lee (.3); Revise and comments to application to employ S&L (2.2). | 2.50 | $625.00 | $1,562.50 |
| 08/15/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/15/2022 | RJS | Meetings of Creditors: Call with Steve Lemmon appended to daily status call. | 0.30 | $625.00 | $187.50 |
| 08/15/2022 | RJS | Litigation: Gather emails re disciplinary hearing of N. Pattis and A. Reynal related to estate's potential retention of attorneys for Connecticut litigation (1.0); send same to K. Lee for submission to Connecticut disciplinary counsel (.1); calls with K. Lee re same (.2). | 1.30 | $625.00 | $812.50 |
| 08/15/2022 | RJS | Litigation: Attention to order of remand of removed Connecticut Litigation (.2); attention and response to K. Lee email re appeal/other action with respect to remand order or extension of automatic stay requested by S. Jordan (.3). | 0.50 | $625.00 | $312.50 |
| 08/16/2022 | KSL | Litigation: Respond to emails and undertake analysis relating to extension of the automatic stay, the requirements for such extension under 5th Circuit law, Divine Ripe and cases discussed (2.0); interview Fulfillment Expert from Fort Worth Texas and follow-up with M. Schwartz (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/16/2022 | RJS | Litigation: Attention to, research regarding, and detailed response to email from S. Jordan re appeal/other action in response to the order remanding removed Connecticut litigation (2.0); draft follow up email re same proposing path forward allowing Connecticut litigation to continue (.8). | 2.80 | $625.00 | $1,750.00 |
| 08/16/2022 | RJS | Financing: Attend teleconference with potential expert regarding Blue Asension in connection with Debtor's request for use of cash collateral with K. Lee, M. Schwartz, and C. Schwartz and draft emails to M. Schwartz during teleconference. | 1.00 | $625.00 | $625.00 |
| 08/16/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/16/2022 | RJS | Relief from Stay Proceedings: Research and case | 3.30 | $625.00 | $2,062.50 |

|  |  | analysis re extension of the automatic stay to A. Jones in Connecticut litigation requested by S. Jordan (2.5); draft detailed email responding to K. Lee email re same (.6); draft follow up email re same issue for remaining Texas litigation (.2). |  |  |  |
|---|---|---|---|---|---|
| 08/16/2022 | RJS | Fee/Employment Applications: Finalize comments to application to employ S&L as co-counsel to the Debtor (.6); confirm computerized connections search re K. Lee declaration (no charge); draft email to S. Lee re same (.1). | 0.70 | $625.00 | $437.50 |
| 08/16/2022 | KSL | Case Administration: Attend daily call to discuss status of Emergency Motion to Lift Stay and Emergency Motion to use Cash Collateral (1.0). | 1.00 | $850.00 | $850.00 |
| 08/16/2022 | KSL | Fee/Employment Applications: Edit and revise draft Application to Retain CRO and Declaration of Marc Schwartz and circulate for review (1.0); review and revise Application to Retain S&L and Declaration of Kyung S. Lee (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/16/2022 | KSL | Financing: Several phone calls to S. Lemmon to discuss status of cash collateral order negotiations, new PQPR issues and discovery of PQPR documents (.6). | 0.60 | $850.00 | $510.00 |
| 08/17/2022 | KSL | Litigation: Numerous t/c with S. Jordan, counsel for Alex Jones, on issues relating to Connecticut Action (.5). | 0.50 | $850.00 | $425.00 |
| 08/17/2022 | RJS | Fee/Employment Applications: Research need for application to employ testifying expert re Blue Asencion (.7); draft email re same to M. Schwartz, C. Schwartz, and K. Lee (.1); revise J. Michaels engagement letter as counter proposal (.8); draft email re changes to M. Schwartz, C. Schwartz, and K. Lee re same (.1). | 1.70 | $625.00 | $1,062.50 |
| 08/17/2022 | RJS | Relief from Stay Proceedings: Revise response to Connecticut Plaintiffs' lift stay motion (3.8); incorporate comments re same (1.2); finalize response to Connecticut Plaintiffs' lift stay motion (.5); file and serve same (.4); draft email re availability of FSS employee witnesses in Connecticut litigation proceeding against A. Jones only to M. Schwartz, C. Schwartz, R. Battaglia, and K. Lee (.3). | 6.20 | $625.00 | $3,875.00 |
| 08/17/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/17/2022 | KSL | Relief from Stay Proceedings: T/c with R. Battaglia, M. Schwartz and R. Shannon on various issues relating to Emergency Motion to Lift Stay by Connecticut Plaintiffs (1.0); review and edit final version of FSS Response to Emergency Motion to Lift Stay (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/17/2022 | KSL | Business Operations: Conference call with CR3 Partners and Ray Battaglia to retain loss revenue due | 1.40 | $850.00 | $1,190.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | to unavailability of Alex Jones and fulfillment process at Blue Asension (1.0); t/c with S. Lemmon, counsel for PQPR, on issues relating to products shipped and not paid for by FSS pre-petition (.4). | | | |
| 08/17/2022 | KSL | Fee/Employment Applications: Review and revise final versions of Applications to Retain S&L and CRO (1.5) | 1.50 | $850.00 | $1,275.00 |
| 08/18/2022 | KSL | Fee/Employment Applications: Locate executed engagement letters for R. Shannon re: completion of Applications to Employ (.3). | 0.30 | $850.00 | $255.00 |
| 08/18/2022 | RJS | Relief from Stay Proceedings: Email to K. Lee re case law re S. Jordan request to extend automatic stay to A. Jones (.4); outline proposal of potential resolution of Connecticut Plaintiffs lift stay motion in advance of daily status call (.5); teleconference with N. Pattis, S. Jordan, M. Schwartz, R. Battaglia, and K. Lee re Connecticut litigation and stay (.8); update proposal drafted previously and send same to R. Battaglia (.1). | 1.80 | $625.00 | $1,125.00 |
| 08/18/2022 | RJS | Case Administration: Attend daily status call re matter. | 1.00 | $625.00 | $625.00 |
| 08/18/2022 | RJS | Fee/Employment Applications: Email to K. Lee re executed copy of S&L engagement letter (.1); revise applications to employ CRO and S&L (1.8); prepare proposed final versions of same and draft email to M. Schwartz re for review, approval, and signature (.2). | 2.10 | $625.00 | $1,312.50 |
| 08/18/2022 | KSL | Relief from Stay Proceedings: Numerous emails and discussions with R. Shannon on whether Fifth Circuit law allows extension of the automatic stay without identity of interest under Divine Ripe (1.0); extended conference call with Norm Pattis and FSS Team to discuss proof for Emergency Motion to Lift Stay filed by Conn Plaintiffs (1.0); conference call with lost revenue expert and FSS Team in anticipation of hearing on Lift Stay Motion (1.0); conference call with FSS Team to discuss outline of topics to handle, strategy on lift stay and handling of issues relating to Connecticut and Texas trial dates in August and September 2022 (2.0); analyze issues relating to whether the FSS Company Agreement and any amendment provides for indemnification of member and manager (.5); analyze whether by operation of law a manager and member are entitled to indemnification as a matter of Texas law (1.0). | 6.50 | $850.00 | $5,525.00 |
| 08/18/2022 | KSL | Financing: Numerous t/cs with S. Lemmon to discuss status of negotiations on cash collateral and discovery with Plaintiffs (.5). | 0.50 | $850.00 | $425.00 |
| 08/19/2022 | KSL | Relief from Stay Proceedings: Outline issues raised in Emergency Motion to LIft Stay and responses to same in preparation for witness outlines (1.5). | 1.50 | $850.00 | $1,275.00 |
| 08/19/2022 | RJS | Fee/Employment Applications: Review, revise, and | 1.40 | $625.00 | $875.00 |

| | | prepare proposed final version of R. Battaglia application to employ (.7); draft email to R. Battaglia re same (.1); draft email to M. Schwartz re proposed final versions of applications to employ (.1); attention and respond to K. Lee email re draft engagement letter for Pattis & Smith LLC (.2); attention and respond to K. Lee email re captions for Connecticut litigation in connection with application to employ Pattis & Smith LLC (.2); attention and respond to various emails with K. Lee re same (.1). | | | |
|---|---|---|---|---|---|
| 08/19/2022 | RJS | Relief from Stay Proceedings: Research compliance of Connecticut state court procedure with the automatic stay (1.8); draft email to K. Lee re same (.2). | 2.00 | $625.00 | $1,250.00 |
| 08/19/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/19/2022 | KSL | Case Administration: Extended conference call with FSS Team on daily call to determine status of various projects and work plan (1.0); numerous t/cs with Ray Battaglia, Norm Pattis, Andino Reynal, S. Lemmon, Marc Schwartz and R. Shannon on comments to retention pleadings, cash collateral order and budget, new product sale issues, and matters related to defense of the Connecticut Plaintiffs' Emergency Motion to Lift the Automatic Stay (.5). | 1.50 | $850.00 | $1,275.00 |
| 08/19/2022 | KSL | Fee/Employment Applications: Work on creating and revising retention pleadings, editing engagement letters, disclosures and forms of orders for Pattis & Smith on a flat fee basis and Reynal Law Firm on an hourly basis as special counsel for FSS in Connecticut litigation (4.0). | 4.00 | $850.00 | $3,400.00 |
| 08/20/2022 | RJS | Fee/Employment Applications: Final review applications to employ CRO, The Law Offices of Ray Battaglia, and Shannon & Lee LLP prior to filing (.3); finalize, file, and serve same (.5). | 0.80 | $625.00 | $500.00 |
| 08/21/2022 | KSL | Relief from Stay Proceedings: Arrange for calls among FSS professionals and Alex Jones team to discuss status of negotiations and agreements on cash collateral motion and Conn Plaintiffs' Emergency Motion to Lift Stay (.5); analyze issues on negotiations over the Lift Stay and discuss provisions acceptable to N. Pattis to allow representation of FSS and necessity of Pattis & Smith to the agreements (.5). | 1.00 | $850.00 | $850.00 |
| 08/21/2022 | RJS | Relief from Stay Proceedings: Teleconference with M. Schwartz, K. Lee, R. Battaglia, and S. Jordan re resolution of AEJ issues with agreement to Connecticut lift stay motion and retention of state court counsel (.5); follow up call re same with A. Reynal and N. Pattis present (.7). | 1.20 | $625.00 | $750.00 |
| 08/21/2022 | KSL | Relief from Stay Proceedings: Extended calls among FSS professionals, proposed state court litigation | 1.00 | $850.00 | $850.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | counsel, and J. Jordan to discuss resolution of Alex Jones issues regarding Connecticut Lift Stay Motion and retention of state court counsel (1.0). | | | |
| 08/21/2022 | KSL | Fee/Employment Applications: Work on editing various pleadings and retention letters reflecting changes as a result of calls and updates from parties (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/22/2022 | KSL | Fee/Employment Applications: Edit and revise comments and formula for compensating Connecticut and Texas state court litigation counsel by editing and revising retention agreement, Emergency Applications, Rule 2014 Disclosures and forms of orders (4.0). | 4.00 | $850.00 | $3,400.00 |
| 08/22/2022 | RJS | Case Administration: Attend daily status call re matter including preliminary views of J. Michels re Blue Asension. | 0.50 | $625.00 | $312.50 |
| 08/22/2022 | RJS | Fee/Employment Applications: Provide comments to K. Lee draft application to employ Pattis & Smith (.5); teleconferences with N. Pattis and A. Reynal re draft applications to employ same (1.0). | 1.50 | $625.00 | $937.50 |
| 08/22/2022 | KSL | Relief from Stay Proceedings: Extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lfit Stay Matter (1.0); numerous conference calls with co-counsel, CRO, State Court counsel and opposing counsel on Stay Lift Motion and issues relating to retention of state court counsel (2.0). | 3.00 | $850.00 | $2,550.00 |
| 08/23/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/23/2022 | RJS | Relief from Stay Proceedings: Attention and respond to various emails re stipulation further abating requirement to file W&E list, finalize same, and file and serve same (.5); teleconference with M. Schwartz, R. Battaglia, and K. Lee re Connecticut Plaintiffs comments to proposed agreed order (.6); teleconference with R. Chapple re same (.2); provide Debtor comments to proposed order to R. Chapple re same (.1). | 1.40 | $625.00 | $875.00 |
| 08/23/2022 | RJS | Fee/Employment Applications: Review and finalize applications to employ Pattis & Smith and the Reynal Law firm (1.1); file and serve same (.5). | 1.60 | $625.00 | $1,000.00 |
| 08/23/2022 | KSL | Fee/Employment Applications: Edit and revise comments and formula for compensating Connecticut and Texas state court litigation counsel by editing and revising retention agreement, Emergency Applications, Rule 2014 Disclosures and forms of orders (3.0). | 3.00 | $850.00 | $2,550.00 |
| 08/23/2022 | KSL | Relief from Stay Proceedings: Extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lift Stay Matter (1.0); extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lift Stay Matter (1.0); numerous conference calls with co-counsel, CRO, State Court counsel and | 5.00 | $850.00 | $4,250.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | opposing counsel on Lift Stay Motion and issues relating to retention of state court counsel (2.0); edit and file order on extending deadlines to file Witness and Exhibit List for Lift Stay Motion (1.0). | | | |
| 08/24/2022 | RJS | Relief from Stay Proceedings: Attention and respond to K. Lee emails re lift stay motion (.2); attend part of hearing on lift stay motion after conflicting hearing concluded (.2); draft notice of continued hearing re lift stay motion and applications to employ (.5); file and serve same (.3); draft email to R. Chapple re inclusion of lift stay motion in notice along with the applications to employ (.1); teleconference re lift stay issues (1.0). | 2.30 | $625.00 | $1,437.50 |
| 08/24/2022 | RJS | Fee/Employment Applications: Conduct research into UST comments about potential causes of action against state court counsel in connection with applications to employ Pattis and Reynal (.2); draft email to K. Lee, M. Schwartz, R. Battaglia, and S. Jordan re same (.1). | 0.30 | $625.00 | $187.50 |
| 08/24/2022 | KSL | Relief from Stay Proceedings: Prepare notes for meetings with Marc Schwartz and court in connection with Lift Stay Motion and Cash Collateral Extension Motion (1.0); breakfast meeting with M. Schwartz on same (1.0); handle portions of hearing relating to FSS on Lift Stay Motion (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/24/2022 | KSL | Fee/Employment Applications: Handle dialogue and exchange of data relating to agreements, terms and conditions of retaining special counsel for Connecticut and Texas litigation (3.0). | 3.00 | $850.00 | $2,550.00 |
| 08/24/2022 | KSL | Meetings of Creditors: Discuss with counsel for interested parties latest developments on case issues with client and co-counsel (1.5). | 1.50 | $850.00 | $1,275.00 |
| 08/25/2022 | RJS | Fee/Employment Applications: Various emails with K. Lee and team re information requested by UST re applications to employ Pattis and Reynal. | 0.50 | $625.00 | $312.50 |
| 08/25/2022 | RJS | Financing: Review communications and documents re Plaintiffs requests for production re cash collateral (2.5); prepare privilege log re same (.5); prepare shell response and send same to R. Battaglia (.5). | 3.50 | $625.00 | $2,187.50 |
| 08/25/2022 | RJS | Case Administration: Attend daily status call re matter (.5); attention to and analysis of motion to appoint tort committee and remove Debtor as DIP (3.7); draft email to Plaintiffs' counsel re exhibits attached to motion (.1). | 4.30 | $625.00 | $2,687.50 |
| 08/25/2022 | KSL | Fee/Employment Applications: Revise and edit Amended Declarations for Pattis and Reynal (1.0); revise and edit engagement letters for Reynal and Pattis (1.0); negotiate with Alex Jones over the share of fees to be borne by Alex Jones as to special counsel fees (1.0) | 3.00 | $850.00 | $2,550.00 |

005833

| 08/26/2022 | RJS | Case Administration: Attend daily status call re matter (.5); draft proposed written discovery on Plaintiffs re motion for tort claimants committee/remove DIP (4.1); draft response to motion to expedite same (6.3). | 10.90 | $625.00 | $6,812.50 |
|---|---|---|---|---|---|
| 08/26/2022 | RJS | Relief from Stay Proceedings: Attention to emails re Ally Auto repossessing Tahoe (.1); search docket to confirm service on Ally Auto and send proof of same to team (.3); prepare witness and exhibit list for August 29 hearing (1.3); finalize and file same (.5). | 2.20 | $625.00 | $1,375.00 |
| 08/26/2022 | RJS | Fee/Employment Applications: Review and provide comments/revisions to updated declaration of N. Pattis and A. Reynal. | 0.20 | $625.00 | $125.00 |
| 08/26/2022 | KSL | Case Administration: Prepare for and attend FSS Daily Team call to coordinate activities for CRO of FSS (1.5); analyze action items requiring attention over Labor Day weekend for FSS (1.0). | 3.50 | $850.00 | $2,975.00 |
| 08/26/2022 | KSL | Fee/Employment Applications: Handle issues relating to amendments for the Declarations for new special counsel firms (1.0); analyze action items requiring attention over Labor Day weekend for FSS (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/27/2022 | KSL | Case Administration: Undertake initial research and prepare first draft of Response to Motion to Expedite (1.0) (reduced to 1 hour from 5 to avoid duplication with RJ Shannon work on project previously started). | 1.00 | $850.00 | $850.00 |
| 08/27/2022 | RJS | Relief from Stay Proceedings: Respond to various emails to N. Pattis re effect of automatic stay on the Connecticut proceeding absent agreed order (.5); draft emails to S. Jordan re A. Jones agreement to paragraphs of proposed order re Connecticut Plaintiffs' motion for relief from stay (.1). | 0.60 | $625.00 | $375.00 |
| 08/27/2022 | RJS | Case Administration: Status call re negotiations re lift stay and applications to employ (.5); call with M. Haselden re matter and PQPR request for investigation (.2); follow-up call among M. Haselden, S. Lemmon, R. Battaglia, and K. Lee re same (.4); incorporate comments from K. Lee and R. Battaglia into response to Motion to Expedite Plaintiffs' motion for tort claimants committee/removal of DIP (3.2). | 4.30 | $625.00 | $2,687.50 |
| 08/27/2022 | KSL | Fee/Employment Applications: Work on revising Amended Disclosures for Special Counsel and gathering facts relating to each firm's payment and amendments from original agreement (3.0). | 3.00 | $850.00 | $2,550.00 |
| 08/27/2022 | KSL | Relief from Stay Proceedings: Numerous conferences with R. Battaglia on issues relating to Lift Stay Motion agreement and negotiations relating to same (.5); coordinate with Connecticut counsel and R. Battaglia issues to be negotiated with opposing counsel on Lift Stay Motion (1.5); consult CRO on various outstanding | 3.50 | $850.00 | $2,975.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | issues and walk him through the overlap of issues on retention and Lift Stay Agreement (.5); Zoom call to discuss status of negotiations and outstanding asks from parties (1.0). | | | |
| 08/28/2022 | KSL | Fee/Employment Applications: Work on multiple revisions to the retention orders for special counsel Pattis & Smith and The Reynal Firm (1.0); communicate with CRO and special counsel on forms of order and revisions thereto (.5); handle Amended Declaration to reflect corrections and necessary updates to Declarations (1.5); update US Trustee and negotiate with same on forms of orders for retention of Pattis and Reynal Firm (1.0). | 4.00 | $850.00 | $3,400.00 |
| 08/28/2022 | RJS | Case Administration: Further incorporate comments to response to motion to expedite Plaintiffs' motion for tort claimants committee (4.0); detailed read through and revisions to the same (2.3); finalize, file, and serve same (.5). | 6.80 | $625.00 | $4,250.00 |
| 08/28/2022 | KSL | Case Administration: Work on multiple edits and revisions to draft of Response to Motion to Expedite filed by the Conn Plaintiffs (3.0); numerous t/c with R. Battaglia to discuss sections in the Response (.4). | 3.40 | $850.00 | $2,890.00 |
| 08/28/2022 | KSL | Financing: Conference with S. Lemmon and M. Schwartz to discuss clawback capacity re PQPR (.5). | 0.50 | $850.00 | $425.00 |
| 08/29/2022 | RJS | Relief from Stay Proceedings: Prepare for (1.5) and attend (.6) hearing re lift stay motion and applications to employ Pattis and Reynal. | 2.10 | $625.00 | $1,312.50 |
| 08/29/2022 | RJS | Case Administration: Attend daily status call re matter (.5); review and finalize schedules through in person conference with M. Schwartz and K. Lee and various emails with same and R. Battaglia (6.5); file same (.4). | 7.40 | $625.00 | $4,625.00 |
| 08/29/2022 | KSL | Fee/Employment Applications: Edit and revise retention orders for Special Counsel for Pattis & Smith and The Reynal Firm (1.0); review issues on retention of special counsel with US Trustee and objecting creditors (1.0); analyze issues for hearing with Marc Schwartz (.5); handle matters at the scheduled hearing on Motion to Lift Stay and Retention of Special Counsel (1.0). | 3.50 | $850.00 | $2,975.00 |
| 08/29/2022 | KSL | Case Administration: Work on comments to IDI draft and to drafts of Schedules and SOFA (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/30/2022 | RJS | Case Administration: Attend daily status call (.5); outline notes re response to Plaintiffs' motion for tort claimants committee/remove DIP (1.0). | 1.50 | $625.00 | $937.50 |
| 08/30/2022 | RJS | Plan and Disclosure Statement: Various emails with K. Lee re beginning drafting plan of reorganization. | 0.50 | $625.00 | $312.50 |
| 08/30/2022 | KSL | Case Administration: Review and analyze IDI answers | 2.50 | $850.00 | $2,125.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | with M. Schwartz and prepare for and handle IDI with US Trustee's office (2.5). | | | |
| 08/30/2022 | KSL | Fee/Employment Applications: Handle further amendments and changes to any orders and agreements with respect to retention of Chris Martin as appellate counsel, including amending engagement letter and Application, Declaration and form of order (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/30/2022 | KSL | Litigation: Assist N. Pattis with issues in connection with starting trial in Connecticut (1.0); analyze issues relating to PQPR involvement in case and discovery (1.5) | 2.50 | $850.00 | $2,125.00 |
| 08/31/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/31/2022 | RJS | Litigation: Prepare various documents related to removal of cases in InfoW cases in connection with Plaintiffs' request for sanctions in Connecticut Litigation. | 0.70 | $625.00 | $437.50 |
| 08/31/2022 | KSL | Fee/Employment Applications: Continue to edit, revise and negotiate Chris Martin engagement letter and application with firm and counsel for Alex Jones (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/31/2022 | KSL | Case Administration: Analyze issues relating to whether the subchapter v trustee should investigate versus Tort Committee and analyze subchapter V cases of Corinthian on same (3.0). | 3.00 | $850.00 | $2,550.00 |
| 09/01/2022 | KSL | Litigation: Review response by PQPR and issues relating to use of incorrect term for Sandy Hook Plaintiffs and communications with counsel regarding same (1.5). | 1.50 | $850.00 | $1,275.00 |
| 09/01/2022 | KSL | Business Operations: Handle issues relating to emails from M. Randazza on claims arising from depositions, issues from reporters and handling of PQPR business issues (1.0); conference call among FSS business and legal to discuss developments in the case (1.0) | 2.00 | $850.00 | $1,700.00 |
| 09/01/2022 | KSL | Plan and Disclosure Statement: Collect cases and update M. Schwartz on "disposable income" definition to assist in modeling 3-5 year forecasts (1.0) | 1.00 | $850.00 | $850.00 |
| 09/01/2022 | RJS | Plan and Disclosure Statement: Draft detailed email to K. Lee and R. Battaglia about limits of common interest privilege and applicability to bankruptcy and plan negotiations. | 0.80 | $625.00 | $500.00 |
| 09/02/2022 | RJS | Case Administration: Draft email to K. Lee re timing of matters (.1); attend daily status call (.5). | 0.60 | $625.00 | $375.00 |
| 09/02/2022 | KSL | Litigation: Gather data and paper on preference payment made to Bankston and the Texas Plaintiffs (.5); analyze and gather data on recovery actions against PQPR (1.0). | 1.50 | $850.00 | $1,275.00 |

| 09/02/2022 | KSL | Case Administration: Draft, circulate and edit Motion to Compel Compliance with Bankruptcy Rule 2019 (2.5) | 2.50 | $850.00 | $2,125.00 |
|---|---|---|---|---|---|
| 09/02/2022 | KSL | Relief from Stay Proceedings: Follow-up on issues relating to ADP (.3). | 0.30 | $850.00 | $255.00 |
| 09/02/2022 | KSL | Case Administration: Draft, circulate and edit Motion to Compel Compliance with Bankruptcy Rule 2019 (2.5); | 2.50 | $850.00 | $2,125.00 |
| 09/02/2022 | RJS | Plan and Disclosure Statement: Draft email to K. Lee re projected disposable income calculation in subchapter v cases. | 0.20 | $625.00 | $125.00 |
| 09/02/2022 | RJS | Litigation: Revise written discovery requests re motion to appoint TCC and remove DIP (.3); draft email to K. Lee re same (.1); attention and respond to K. Lee email re exhibits to TCC motion (.2). | 0.60 | $625.00 | $375.00 |
| 09/02/2022 | RJS | Fee/Employment Applications: Attention to K. Lee draft of Interim Compensation Motion (.2); draft email re service of same (.1). | 0.30 | $625.00 | $187.50 |
| 09/03/2022 | RJS | Litigation: Attention and respond to emails from K. Lee re claims and avoidance actions (.2); follow up emails re particular potential avoidance actions and applicability of section 502(d) (.3). | 0.50 | $625.00 | $312.50 |
| 09/03/2022 | KSL | Business Operations: Study and analyze M. Schwartz term sheet from ▇▇▇▇ outlining $500,000 per week additional consignment financing agreement bullet points prepared by M. Schwartz (2.0); edit and revise first draft of Consignment and Financing Agreement (1.0); conference call with M. Schwartz and S. Jordan to discuss Consignment Agreement (.5) | 3.50 | $850.00 | $2,975.00 |
| 09/04/2022 | RJS | Litigation: Attention to emails re certified copies of bankruptcy documents for litigation (.1); request same from the Clerk of Court (.2). | 0.30 | $625.00 | $187.50 |
| 09/04/2022 | KSL | Litigation: Review and gather certain financial data requested by Norm Pattis in connection with Connecticut trial relating to financial condition of FSS, and, to be used with corporate representative B. Paz (2.0) | 2.00 | $850.00 | $1,700.00 |
| 09/05/2022 | KSL | Litigation: Follow up on gathering data for preference demand on payments made to Bankston and Connecticut Plaintiffs counsel, if any (1.0) | 1.00 | $850.00 | $850.00 |
| 09/05/2022 | KSL | Plan and Disclosure Statement: Study facts and conclusions from the Logistics Giving case and email S. Lemmon on plan concept re potential subordination of any allowed unsecured portion of asserted PQPR claim (2.5). | 2.50 | $850.00 | $2,125.00 |
| 09/05/2022 | KSL | Business Operations: Email review of bitcoin account issue by Marc Schwartz (.2) | 0.20 | $850.00 | $170.00 |

| 09/06/2022 | RJS | Claims Administration and Objections: Attention to K. Lee email re claims remaining against InfoW also against FSS and respond to same. | 0.10 | $625.00 | $62.50 |
|---|---|---|---|---|---|
| 09/06/2022 | RJS | Case Administration: Preliminary research re motion to appoint tort claimant committee (.3); attend daily status conference (.9); further research, outline, and begin drafting response to motion to appoint tort claimant committee (5.1). | 6.30 | $625.00 | $3,937.50 |
| 09/06/2022 | RJS | Litigation: Call with S. Lemmon, S. Jordan, K. Lee, and R. Battaglia re discovery matters. | 1.50 | $625.00 | $937.50 |
| 09/06/2022 | KSL | Fee/Employment Applications: Handle emails inquiring into recovery of out-of-pocket expenses for Pattis & Smith LLP and review of files to determine whether FSS should pay (.5) | 0.50 | $850.00 | $425.00 |
| 09/06/2022 | KSL | Litigation: Respond to requests from Connecticut counsel for affidavits relating to certain contentions made which are not accurate re: management agreement between FSS and PQPR, and other statements (2.0); review status of discovery and outstanding issues between Plaintiffs and Debtor with emails from J. Martin and R. Battaglia (1.0); respond to requests for information on previous cases and appearances by Connecticut counsel on disciplinary matters (2.0). | 5.00 | $850.00 | $4,250.00 |
| 09/06/2022 | KSL | Case Administration: Prepare for daily call with draft agenda (1.0); daily FSS call with CRO and counsel (1.0) | 2.00 | $850.00 | $1,700.00 |
| 09/06/2022 | RJS | Litigation: Emails with K. Lee re transcripts attached as exhibits to TCC motion (.2); draft email to J. Martin and R. Chapple re same (.1); send M. Schwartz drafts of written discovery requests re TCC motion (.1). | 0.40 | $625.00 | $250.00 |
| 09/07/2022 | RJS | Case Administration: Attend daily status call re matter (.4); outline factual background section for response to motion for TCC/removal of DIP (1.9). | 2.30 | $625.00 | $1,437.50 |
| 09/07/2022 | RJS | Meetings of Creditors: Listen and take notes re 341 meeting of creditors. | 1.80 | $625.00 | $1,125.00 |
| 09/07/2022 | KSL | Meetings of Creditors: Prepare M. Schwartz for 341 Meeting of Creditors (1.0); attend 341 Meeting of Creditors and represent Debtor through CRO at same (2.0). | 3.00 | $850.00 | $2,550.00 |
| 09/08/2022 | KSL | Litigation: Work on revising affidavit drafts for Norm Pattis from employees of FSS (1.0); edit and revise affidavit of Blake Roddy (.5); continue to review and revise affidavits relating to Google Analytics, analyze state court discovery on same and report findings to Marc Schwartz and counsel and discuss same with Norm Pattis (2.0); review same with Norm Pattis, Blake | 5.00 | $850.00 | $4,250.00 |

| | | Roddy and R.Shannon and update affidavit (1.5). | | | |
|---|---|---|---|---|---|
| 09/08/2022 | RJS | Litigation: Attention to request from N. Pattis/M. Schwartz re "management agreement" referenced in testimony in Connecticut Litigation and respond to same (.2); attention and respond to various emails re same (.2); draft affidavit re same for M. Schwartz re same for use in Connecticut Litigation (1.5); attention to emails re "Google Analytics" issue (.1); attend calls with N. Pattis, FSS employee Roddy, K. Lee, and M. Schwartz re same (.7); prepare draft Roddy affidavit providing the "Google Analytics" to Connecticut Plaintiffs (2.8); send same to Roddy and N. Pattis for review and editing (.1). | 5.60 | $625.00 | $3,500.00 |
| 09/08/2022 | KSL | Case Administration: Prepare for and attend daily FSS call with CRO and counsel (1.0); t/c with R. Battaglia on new developments in case (.5). | 1.00 | $850.00 | $850.00 |
| 09/09/2022 | KSL | Case Administration: Handle connection issue pointed out by M. Haselden as to A. Reynal and B. Shulse (.5); review emails relating to consignment agreement with ███ (.5); review discovery against PQPR (.5); review Shurwest case and facts (.5); analyze on FSS call status of case matters and division of responsibility (.5) | 2.00 | $850.00 | $1,700.00 |
| 09/09/2022 | RJS | Litigation: Attention to court setting hearing re PQPR/ Plaintiff discovery dispute and internal emails re same (.1); respond to same that able to attend hearing instead of Plan discussions in Austin (.1); research issues re appointing TCC and removal of DIP in subchapter v cases (3.7). | 3.90 | $625.00 | $2,437.50 |
| 09/10/2022 | KSL | Litigation: Review emails and schedules to determine how to staff hearing on Monday relating to PQPR discovery dispute, and, role of FSS (.5); handle subsidiary issues relating to Motion to Compel Discovery Against PQPR and effect on litigation overall (.5) | 1.00 | $850.00 | $850.00 |
| 09/10/2022 | KSL | Plan and Disclosure Statement: Continue to analyze with FSS Team issues affecting Debtor from discovery schedule and hearings on motions and plan formulation to determine strategy on how to approach creditors on plan concepts (2.0). | 2.00 | $850.00 | $1,700.00 |
| 09/11/2022 | KSL | Fee/Employment Applications: Handle retainer issue for special counsel Reynal (.3). | 0.30 | $850.00 | $255.00 |
| 09/11/2022 | KSL | Case Administration: Researching Young on removal of debtor in possession and procedure to handle (1.0); analyze Neosho case denying removal (.5); study and analyze secondary materials on standards for "cause" as to removal of debtor in possession, and, whether a party other than a debtor may propose a plan and what alternatives are available to court and creditors (1.5); review emails from S. Lemmon re: David Jones -Marc | 3.50 | $850.00 | $2,975.00 |

| | | Schwartz dialogue (.5) | | | |
|---|---|---|---|---|---|
| 09/11/2022 | KSL | Litigation: Handle issues relating to comments requested by Norm Pattis as to strategic concerns on Connecticut trial (1.5) | 1.50 | $850.00 | $1,275.00 |
| 09/12/2022 | KSL | Plan and Disclosure Statement: Continue to gather and collect data needed to discuss with Marc Schwartz and Ray Battaglia going forward on tasks requested by them, including outlining plan issues, plan drafting and conceptualizing disposable income, and whether avoidance actions are above or below the disposable income line (3.0) | 3.00 | $850.00 | $2,550.00 |
| 09/12/2022 | RJS | Fee/Employment Objections: Attention to and analyze objections to employment applications of Schwartz and Associates and S&L. | 3.50 | $625.00 | $2,187.50 |
| 09/13/2022 | KSL | Plan and Disclosure Statement: Travel to and from Austin, Texas for meetings with client representatives Shulse, Schwartz and Battaglia to discuss business and operational issues (7)(billed at 1/2 travel time 3.5); o/c in Austin to review data on sales and operational issues and discuss next steps, including assignments and plan drafting (2.0) | 5.50 | $850.00 | $4,675.00 |
| 09/13/2022 | RJS | Case Administration: Prepare for and attend hearing re PQPR/Plaintiffs discovery dispute and update Court about status report and scheduling hearings on U.S. Trustee Objections to employment applications (1.0); draft status report for subchapter v case (.9); revise same based on conversations with M. Schwartz, K. Lee, and R. Battaglia based on discussions in Austin (.3); file same (.2). | 2.40 | $625.00 | $1,500.00 |
| 09/13/2022 | RJS | Fee/Employment Objections: Provide relevant documents to U.S. Trustee re objections to applications to employ S&L (.5); research into U.S. Trustee objections to applications to employ S&L and CRO (2.1). | 2.60 | $625.00 | $1,625.00 |
| 09/14/2022 | RJS | Fee/Employment Applications: Prepare reply to S&L application to employ and gather relevant documents. | 11.20 | $625.00 | $7,000.00 |
| 09/15/2022 | RJS | Fee/Employment Objections: Draft reply to objection to S&L employment application (8.5); gather relevant documents for inclusion on W&E List (1.0); draft W&E list (.6). | 10.10 | $625.00 | $6,312.50 |
| 09/16/2022 | RJS | Fee/Employment Objections: Send H. Nguyen documents related to U.S. Trustee objection to Schwartz Employment Application (.3); finalize W&E list and exhibits re same (1.0); file same (.3); finalize reply re U.S. Trustee objection to S&L employment application (2.5); file and serve same (.2); outline witness questions (3.4). | 7.70 | $625.00 | $4,812.50 |

005840

| 09/17/2022 | KSL | Fee/Employment Objections: Continue to prepare for hearing on Application to Retain Schwartz Associates (4.0); review and revise pleadings and continue to prepare for hearings on Application to Retain S&L as bankruptcy counsel (4.0) | 8.00 | $850.00 | $6,800.00 |
|---|---|---|---|---|---|
| 09/17/2022 | RJS | Fee/Employment Objections: Provide comments on reply to U.S. Trustee objection to Schwartz application to employ (3.0); revise witness questions re same (1.2); call with J. Martin re Plaintiffs' joinder and contemplated plan provisions (.4). | 4.60 | $625.00 | $2,875.00 |
| 09/18/2022 | KSL | Fee/Employment Objections: Prepare for hearings on Application to Retain Schwartz and to Retain Shannon & Lee LLP (4.0); continue to edit and revise Reply for Schwartz in connection with US Trustee Objection to Retention (4.5) | 8.50 | $850.00 | $7,225.00 |
| 09/18/2022 | RJS | Fee/Employment Objections: Proofread and comment on reply to U.S. Trustee Objection to Schwartz objection (5.0); file and serve final version of same (.3). | 5.30 | $625.00 | $3,312.50 |
| 09/19/2022 | KSL | Fee/Employment Objections: Prepare for hearing on Applications to Retain CRO and Shannon & Lee with witness preparation and exhibits review (5.0); handle further email and document review to determine exact date of Engagement Letter for Marc Schwartz (2.0); analyze cases and legal arguments made in Reply and cases in connection with hearing on Application (4.0) | 12.00 | $850.00 | $10,200.00 |
| 09/19/2022 | RJS | Fee/Employment Objections: Prepare for hearing on U.S. Trustee objection to S&L and CRO employment applications. | 5.00 | $625.00 | $3,125.00 |
| 09/20/2022 | KSL | Case Administration: Prepare for hearing on Status Report to the Court on Administration of FSS case (.5). | 0.50 | $850.00 | $425.00 |
| 09/20/2022 | KSL | Fee/Employment Objections: Continue to prepare for hearing on Application to Retain CRO and S&L as co-counsel for FSS (4.0); attend hearing on Application, testify at hearing on Application and examine witnesses at hearing on Application (6.0). | 10.00 | $850.00 | $8,500.00 |
| 09/20/2022 | RJS | Fee/Employment Objections: Prepare and file supplemental W&E list for hearing on U.S. Trustee objection to application to employ S&L and CRO (.8); prepare for (2.0) and attend (6.5) hearing on employment applications. | 8.80 | $625.00 | $5,500.00 |

|  | Quantity Subtotal | 523.1 |
|---|---|---|
|  | Services Subtotal | $382,671.25 |

## Expenses

| Type | Date | Description | Quantity | Rate | Total |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Expense | 07/29/2022 | Service of Filings: Printing and mailing of Utility Motion (printing and service through vendor). | 1.00 | $87.26 | $87.26 |
| Expense | 07/29/2022 | Service of Filings: Printing and mailing of Heslin/Lewis Stay Motion, Cash Collateral Motion, Criticial Vendor Motion, and Motion to Extend time for Schedules and Statements (printing and service through vendor). | 1.00 | $176.88 | $176.88 |
| Expense | 07/29/2022 | Filing Fees: Chapter 11 Filing Fee (paid by S&L though filed through R. Battaglia ECF at his direction). | 1.00 | $1,738.00 | $1,738.00 |
| Expense | 07/31/2022 | Copy Costs: Copy two original sets of proposed Exhibits to share with Marc Schwartz at La Madeleine meeting on Sunday in Preparation for Hearing on Motion to Lift Stay. | 1.00 | $50.23 | $50.23 |
| Expense | 07/31/2022 | Copy Costs: Rush order binding of 6 Exhibit books for Hearing on Motion to Lift Stay in Favor of Heslin/Lewis on 8.1.22. | 1.00 | $221.90 | $221.90 |
| Expense | 08/08/2022 | RJS flight to Connecticut for hearing on motion to remand for Connecticut Litigation and return to Houston, TX, on United Airlines (Economy Plus). | 1.00 | $861.20 | $861.20 |
| Expense | 08/09/2022 | RJS charge for internet access on 8/9/22 flight from Houston, TX to Hartford, CT | 1.00 | $10.00 | $10.00 |
| Expense | 08/10/2022 | Rental Car: RJS car rental to travel from Windsor Locks, CT/Bradley Int'l Airport to Bridgeport, CT for hearing on Connecticut Plaintiffs' motion to remand. | 1.00 | $167.25 | $167.25 |
| Expense | 08/11/2022 | Hotel: RJS hotel, taxes, and 1 day internet charge for scheduled in-person hearing before Connecticut Bankruptcy Court related to removed Connecticut Litigation (Stay 8/9/22 to 8/11/22). | 1.00 | $394.70 | $394.70 |
| Expense | 08/11/2022 | RJS charge for Internet access on return flight on 8/11/22. | 1.00 | $10.00 | $10.00 |
| Expense | 08/24/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | 1.00 | $259.00 | $259.00 |
| Expense | 09/03/2022 | Form of Consignment Agreement to use with ███ Group. | 1.00 | $29.99 | $29.99 |
| Expense | 09/06/2022 | Printing copies of Exhibits to Motion to Appoint Tort Committee. | 1.00 | $54.65 | $54.65 |
| Expense | 09/08/2022 | Service of Filings: Service of pleadings on retaining special counsel (printing and postage through vendor). | 1.00 | $124.20 | $124.20 |
| Expense | 09/13/2022 | Mileage: KSL travel to and from Austin after meetings with company and professionals re plan of reorganization. | 1.00 | $202.10 | $202.10 |
| Expense | 09/15/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | 1.00 | $98.19 | $98.19 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Expense | 09/18/2022 | Printing copies of exhibits for hearings on Application | 1.00 | $49.08 | $49.08 |
| Expense | 09/19/2022 | Binders and dividers for Exhibit Binders for Trial | 1.00 | $109.02 | $109.02 |
| Expense | 09/19/2022 | Copy costs of exhibits 3X for hearing on Application | 1.00 | $375.95 | $375.95 |
| | | | | **Expenses Subtotal** | **$5,019.60** |

| Time Keeper | Position | Hours | Rate | Total |
|---|---|---|---|---|
| Kyung Lee | Attorney | 263.4 | $850.00 | $223,890.00 |
| R. J. Shannon | Attorney | 248.4 | $625.00 | $155,250.00 |
| R. J. Shannon | Attorney | 11.3 | $312.50 | $3,531.25 |
| | | | **Quantity Total** | **523.1** |
| | | | **Subtotal** | **$387,690.85** |
| | | | **Total** | **$387,690.85** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 16 | 11/06/2022 | $387,690.85 | $0.00 | $387,690.85 |
| | | | **Outstanding Balance** | **$387,690.85** |
| | | | **Total Amount Outstanding** | **$387,690.85** |

### IOLTA Trust Account

| Date | Type | Description | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| | | | **IOLTA Trust Account Balance** | | **$50,822.68** | |

## <u>EXHBIT B</u>

**Fees Allowable under Bankruptcy Code § 503(b)(1)**

| Date | Atty | Description | Hours | Rate | Ammount |
|------|------|-------------|-------|------|---------|
| 7/30/2022 | KSL | Relief from Stay Proceedings: Handle requests from Marc Schwartz and team for copies of witness outlines, documents related to witness outline and cases relating to standard for lifting automatic stay to litigate in nonbankruptcy forum (.5) | 0.5 | $ 850.00 | $       425.00 |
| 7/31/2022 | KSL | Relief from Stay Proceedings: Draft and finalize Witness and Exhibit List for Monday Hearing on Heslin\Lewis Lift Stay Matter (1.0); review 5th Circuit Cases on standard for permitting litigation to be conducted in separate forum (1.0); prepare Q&A and revise same for Marc Schwartz in connection with Heslin\Lewis hearing (1.0); o/c with Marc Schwartz at LaMadeleine to review exhibits, cases on lift stay and standard for same for Marc Schwartz testimony at Heslin\Lewis Hearing (1.0) | 4.0 | $ 850.00 | $     3,400.00 |
| 7/31/2022 | RJS | Relief from Stay Proceedings: Attention to emails from K. Lee re witness and exhibit list re stay motion re Heslin/Lewis matter (.2); revise same and prepare exhibits for filing (.5); file and serve same (.2); prepare legal argument re same (1.0). | 1.9 | $ 625.00 | $     1,187.50 |
| 8/1/2022 | RJS | Relief from Stay Proceedings: Prepare for (.6) and attend (1.1) hearing re Debtor's stay motion re Heslin/Lewis matter. | 1.7 | $ 625.00 | $     1,062.50 |
| 8/1/2022 | KSL | Relief from Stay Proceedings: Prepare for hearing on Lift Stay to Permit Heslin\Lewis suits to proceed to judgment (1.0); attend hearing and handle same with Marc Scharz, CRO (1.5); post-hearing conference with counsel and CRO to discuss next steps in chapter 11 case (1.0); continue to work on researching and preparing response as to Curtis Factors in connection with Connecticut Plaintiffs' Motion to Lift Stay (2.0). | 5.5 | $ 850.00 | $     4,675.00 |
| 8/5/2022 | RJS | Litigation: Attention to order of U.S. Bankruptcy Court for the District of Connecticut order setting hearing on Connecticut Plaintiffs' motion for remand on expedited basis (.2); outline response to same and motion for withdrawal of reference (3.3). | 3.5 | $ 625.00 | $     2,187.50 |
| 8/6/2022 | RJS | Litigation: Draft motion for pro hac vice for Connecticut bankruptcy court re removed Connecticut litigation (.9); analyze Connecticut Plaintiffs' motion to remand and draft response to same (5.6); draft email to M. Schwartz, K. Lee, N. Pattis, and R. Battaglia re same (.1). | 6.6 | $ 625.00 | $     4,125.00 |
| 8/7/2022 | RJS | Litigation: Updated pro hac vice application, motion to withdraw the reference, and response to motion to remand re Connecticut Litigation in response to K. Lee and R. Battaglia comments (1.5). | 1.5 | $ 625.00 | $       937.50 |

| Date | Initials | Description | Hours | Rate | Amount |
|------|----------|-------------|-------|------|--------|
| 8/7/2022 | KSL | Litigation: [E]dit and revise Pro Hac for RJ Shannon (.3); review and edit Response to Motion to Remand (1.0) | 1.3 | $ 850.00 | $ 1,105.00 |
| 8/7/2022 | RJS | Litigation: [E]dit and revise Pro Hac for RJ Shannon (.3); review and edit Response to Motion to Remand (1.0) | 1.3 | $ 625.00 | $ 812.50 |
| 8/8/2022 | RJS | Litigation: Call with N. Pattis re pleadings to file in Connecticut litigation (.1); draft email re visiting attorney application re same (.1); finalize motion to withdraw the reference and response to motion for remand re same (1.5); send same to N. Pattis and staff (.1); two calls with N. Pattis staff re filing of same (.1); confirm filing of same (.1); call with M. Schwartz, K. Lee, R. Battaglia, and N. Pattis re same (.5). | 2.4 | $ 625.00 | $ 1,500.00 |
| 8/9/2022 | RJS | Litigation: Travel to Connecticut for 08/10/2022 expedited hearing on Connecticut Plaintiffs' motion to remand (1/2 rate for non-working travel time) | 6.5 | $ 312.50 | $ 2,031.25 |
| 8/9/2022 | KSL | Business Operations: Work with Marc Schwartz and Ray Battaglia to understand extent of "backlog" issue and determine most appropriate solution (1.5); t/c with Norm Pattis to determine dislocation of Alex Jones with a Connecticut trial on his ability to do show and create sales for FSS (.5); extended call with FSS Team and Shelby Jordan, counsel for Alex Jones, on funding of fulfilling back orders and necessity for Alex Jones to be in Connecticut and absent from studio during Connecticut trial (1.0). | 3.0 | $ 850.00 | $ 2,550.00 |
| 8/10/2022 | RJS | Litigation: Calls with K. Lee re hearing on motion to remand re Connecticut Litigation (.2); prepare for hearing (2.3); call with N. Pattis re motion to continue filed by Connecticut Plaintiffs and attention to filing of same on docket (.2); call with K. Lee after hearing continued after traveling to vicinity of Bridgeport, Connecticut bankruptcy court (.1)[.] | 2.8 | $ 625.00 | $ 1,750.00 |
| 8/10/2022 | RJS | Litigation: Travel from Windsor Locks, Connecticut to Pattis & Smith office in Newport, Connecticut in advance of hearing in Bridgeport, Connecticut, confirm hearing had been continued to 8/12/22, and return to Windsor Locks(1/2 non-working travel rate). | 2.0 | $ 312.50 | $ 625.00 |
| 8/10/2022 | RJS | Litigation: Travel time related to return rental car and proceed to Hartford, CT airport for return flight to Houston prior to delay and ultimate cancelation of flight due to storms in DC area and Houston (1/2 travel time). | 2.8 | $ 312.50 | $ 875.00 |
| 8/10/2022 | KSL | Litigation: T/c with R. Shannon to discuss arguments in Connecticut on Motions to Remand and response to same (.5)[.] | 0.5 | $ 850.00 | $ 425.00 |

| 8/10/2022 | KSL | Business Operations: Conference calls with M. Schwartz, C. Schwartz and Ray Battaglia on issues relating to fulfillment and backlog of shipping orders (1.0)[.] | 1.0 | $ 850.00 | $ 850.00 |
|---|---|---|---|---|---|
| 8/11/2022 | RJS | Litigation: Travel time to return to Houston from Connecticut (1/2 rate non-working travel). | 6.5 | $ 312.50 | $ 2,031.25 |
| 8/11/2022 | KSL | Financing: Contact R. Saldana to determine availability of court to hear emergency motion to amend cash collateral order (.5); review fulfillment issue, cash collateral required in order to overcome backlog, factoring arrangement between Blue Asension and Alex Jones, extent of backlog and handle issues relating to handling same without affecting credit card processor and bank relating to same (3.0); numerous conference calls to discuss fulfillment issue and cash collateral amendment required (2.0); assist R. Battaglia in preparing for hearing on amendment to cash collateral hearing with drafts of Witness and Exhibit List, strategy considerations, topical areas to cover with both Patrick Riley and Marc Schwartz (2.0). | 7.5 | $ 850.00 | $ 6,375.00 |
| 8/12/2022 | RJS | Litigation: Prepare for (2.0); and attend (.7) remote hearing in Connecticut Bankruptcy Court re motion for remand; call with K. Lee re outcome of same (.1); respond to S. Jordan email re same (.1). | 2.9 | $ 625.00 | $ 1,812.50 |
| 8/12/2022 | KSL | Financing: Prepare for hearings on amendment to cash collateral order and assist R. Battaglia in presentation of case and assist in cross-examination of witnesses (2.0); emails on negotiations with Plaintiffs counsel, subchapter v trustee and US Trustee on cash collateral amendment and issues relating to fulfillment and Blue Asension agreement (1.0); assist in preparation of witnesses Marc Schwartz and Patrick Riley by Ray Battaglia (1.5); assist Ray Battaglia at hearing on Emergency Motion to Amend Cash Collateral, review exhibits and formulate objections to admission of same to Objector's exhibits, and analyze revised 13 week budget and attend hearing by video (3.5); post-hearing discussions with M. Schwartz to make sure all issues covered (.3)[.] | 8.3 | $ 850.00 | $ 7,055.00 |
| 8/17/2022 | RJS | Fee/Employment Applications: Research need for application to employ testifying expert re Blue Asencion (.7); draft email re same to M. Schwartz, C. Schwartz, and K. Lee (.1); revise J. Michaels engagement letter as counter proposal (.8); draft email re changes to M. Schwartz, C. Schwartz, and K. Lee re same (.1). | 1.7 | $ 625.00 | $ 1,062.50 |

| 8/19/2022 | KSL | Fee/Employment Applications: Work on creating and revising retention pleadings, editing engagement letters, disclosures and forms of orders for Pattis & Smith on a flat fee basis and Reynal Law Firm on an hourly basis as special counsel for FSS in Connecticut litigation (4.0). | 4.0 | $ 850.00 | $ 3,400.00 |
|---|---|---|---|---|---|
| 8/21/2022 | KSL | Relief from Stay Proceedings: Arrange for calls among FSS professionals and Alex Jones team to discuss status of negotiations and agreements on cash collateral motion and Conn Plaintiffs' Emergency Motion to Lift Stay (.5); analyze issues on negotiations over the Lift Stay and discuss provisions acceptable to N. Pattis to allow representation of FSS and necessity of Pattis & Smith to the agreements (.5). | 1.0 | $ 850.00 | $ 850.00 |
| 8/21/2022 | RJS | Relief from Stay Proceedings: Teleconference with M. Schwartz, K. Lee, R. Battaglia, and S. Jordan re resolution of AEJ issues with agreement to Connecticut lift stay motion and retention of state court counsel (.5); follow up call re same with A. Reynal and N. Pattis present (.7). | 1.2 | $ 625.00 | $ 750.00 |
| 8/21/2022 | KSL | Relief from Stay Proceedings: Extended calls among FSS professionals, proposed state court litigation counsel, and J. Jordan to discuss resolution of Alex Jones issues regarding Connecticut Lift Stay Motion and retention of state court counsel (1.0). | 1.0 | $ 850.00 | $ 850.00 |
| 8/22/2022 | KSL | Fee/Employment Applications: Edit and revise comments and formula for compensating Connecticut and Texas state court litigation counsel by editing and revising retention agreement, Emergency Applications, Rule 2014 Disclosures and forms of orders (4.0). | 4.0 | $ 850.00 | $ 3,400.00 |
| 8/22/2022 | RJS | Fee/Employment Applications: Provide comments to K. Lee draft application to employ Pattis & Smith (.5); teleconferences with N. Pattis and A. Reynal re draft applications to employ same (1.0). | 1.5 | $ 625.00 | $ 937.50 |
| 8/22/2022 | KSL | Relief from Stay Proceedings: Extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lfit Stay Matter (1.0); numerous conference calls with co-counsel, CRO, State Court counsel and opposing counsel on Stay Lift Motion and issues relating to retention of state court counsel (2.0). | 3.0 | $ 850.00 | $ 2,550.00 |
| 8/23/2022 | RJS | Relief from Stay Proceedings: Attention and respond to various emails re stipulation further abating requirement to file W&E list, finalize same, and file and serve same (.5); teleconference with M. Schwartz, R. Battaglia, and K. Lee re Connecticut Plaintiffs comments to proposed agreed order (.6); teleconference with R. Chapple re same (.2); provide Debtor comments to proposed order to R. Chapple re same (.1). | 1.4 | $ 625.00 | $ 875.00 |
| 8/23/2022 | RJS | Fee/Employment Applications: Review and finalize applications to employ Pattis & Smith and the Reynal Law firm (1.1); file and serve same (.5) | 1.6 | $ 625.00 | $ 1,000.00 |

| 8/23/2022 | KSL | Fee/Employment Applications: Edit and revise comments and formula for compensating Connecticut and Texas state court litigation counsel by editing and revising retention agreement, Emergency Applications, Rule 2014 Disclosures and forms of orders (3.0). | 3.0 | $ 850.00 | $ | 2,550.00 |
|---|---|---|---|---|---|---|
| 8/23/2022 | KSL | Relief from Stay Proceedings: [N]umerous conference calls with co-counsel, CRO, State Court counsel and opposing counsel on Lift Stay Motion and issues relating to retention of state court counsel (2.0); edit and file order on extending deadlines to file Witness and Exhibit List for Lift Stay Motion (1.0). | 3.0 | $ 850.00 | $ | 2,550.00 |
| 8/24/2022 | RJS | Relief from Stay Proceedings: Attention and respond to K. Lee emails re lift stay motion (.2); attend part of hearing on lift stay motion after conflicting hearing concluded (.2); draft notice of continued hearing re lift stay motion and applications to employ (.5); file and serve same (.3); draft email to R. Chapple re inclusion of lift stay motion in notice along with the applications to employ (.1); teleconference re lift stay issues (1.0). | 2.3 | $ 625.00 | $ | 1,437.50 |
| 8/24/2022 | RJS | Fee/Employment Applications: Conduct research into UST comments about potential causes of action against state court counsel in connection with applications to employ Pattis and Reynal (.2); draft email to K. Lee, M. Schwartz, R. Battaglia, and S. Jordan re same (.1). | 0.3 | $ 625.00 | $ | 187.50 |
| 8/24/2022 | KSL | Relief from Stay Proceedings: Prepare notes for meetings with Marc Schwartz and court in connection with Lift Stay Motion and Cash Collateral Extension Motion (1.0); breakfast meeting with M. Schwartz on same (1.0); handle portions of hearing relating to FSS on Lift Stay Motion (1.0). | 3.0 | $ 850.00 | $ | 2,550.00 |
| 8/24/2022 | KSL | Fee/Employment Applications: Handle dialogue and exchange of data relating to agreements, terms and conditions of retaining special counsel for Connecticut and Texas litigation (3.0). | 3.0 | $ 850.00 | $ | 2,550.00 |
| 8/25/2022 | RJS | Case Administration: [A]ttention to and analysis of motion to appoint tort committee and remove Debtor as DIP (3.7)[.] | 3.7 | $ 625.00 | $ | 2,312.50 |
| 8/25/2022 | KSL | Fee/Employment Applications: Revise and edit Amended Declarations for Pattis and Reynal (1.0); revise and edit engagment letters for Reynal and Pattis (1.0); negotiate with Alex Jones over the share of fees to be borne by Alex Jones as to special counsel fees (1.0) | 3.0 | $ 850.00 | $ | 2,550.00 |
| 8/26/2022 | RJS | Case Administration: [D]raft response to motion to expedite same [motion for tort claimants committee/remove DIP] (6.3). | 6.3 | $ 625.00 | $ | 3,937.50 |
| 8/26/2022 | RJS | Relief from Stay Proceedings: [P]repare witness and exhibit list for August 29 hearing (1.3); finalize and file same (.5). | 1.8 | $ 625.00 | $ | 1,125.00 |

| 8/26/2022 | RJS | Fee/Employment Applications: Review and provide comments/revisions to updated declaration of N. Pattis and A. Reynal. | 0.2 | $ 625.00 | $ 125.00 |
|---|---|---|---|---|---|
| 8/26/2022 | KSL | Fee/Employment Applications: Handle issues relating to amendments for the Declarations for new special counsel firms (1.0)[.] | 2.0 | $ 850.00 | $ 1,700.00 |
| 8/27/2022 | KSL | Case Administration: Undertake initial research and prepare first draft of Response to Motion to Expedite (1.0) (reduced to 1 hour from 5 to avoid duplication with RJ Shannon work on project previously started) | 1.0 | $ 850.00 | $ 850.00 |
| 8/27/2022 | RJS | Relief from Stay Proceedings: Respond to various emails to N. Pattis re effect of automatic stay on the Connecticut proceeding absent agreed order (.5); draft emails to S. Jordan re A. Jones agreement to paragraphs of proposed order re Connecticut Plaintiffs' motion for relief from stay (.1). | 0.6 | $ 625.00 | $ 375.00 |
| 8/27/2022 | RJS | Case Administration: [I]ncorporate comments from K. Lee and R. Battaglia into response to Motion to Expedite Plaintiffs' motion for tort claimants committee/removal of DIP (3.2). | 3.2 | $ 625.00 | $ 2,000.00 |
| 8/27/2022 | KSL | Fee/Employment Applications: Work on revising Amended Disclosures for Special Counsel and gathering facts relating to each firm's payment and amendments from original agreement (3.0). | 3.0 | $ 850.00 | $ 2,550.00 |
| 8/27/2022 | KSL | Relief from Stay Proceedings: Numerous conferences with R. Battaglia on issues relating to Lift Stay Motion agreement and negotiations relating to same (.5); coordinate with Connecticut counsel and R. Battaglia issues to be negotiated with opposing counsel on Lift Stay Motion (1.5); consult CRO on various outstanding issues and walk him through the overlap of issues on retention and Lift Stay Agreement (.5); Zoom call to discuss status of negotiations and outstanding asks from parties (1.0). | 3.5 | $ 850.00 | $ 2,975.00 |
| 8/28/2022 | KSL | Fee/Employment Applications: Work on multiple revisions to the retention orders for special counsel Pattis & Smith and The Reynal Firm (1.0); communicate with CRO and special counsel on forms of order and revisions thereto (.5); handle Amended Declaration to reflect corrections and necessary updates to Declarations (1.5); update US Trustee and negotiate with same on forms of orders for retention of Pattis and Reynal Firm (1.0). | 4.0 | $ 850.00 | $ 3,400.00 |
| 8/28/2022 | RJS | Case Administration: Further incorporate comments to response to motion to expedite Plaintiffs' motion for tort claimants committee (4.0); detailed read through and revisions to the same (2.3); finalize, file, and serve same (.5). | 6.8 | $ 625.00 | $ 4,250.00 |

| 8/28/2022 | KSL | Case Administration: Work on multiple edits and revisions to draft of Response to Motion to Expedite filed by the Conn Plaintiffs (3.0); numerous t/c with R. Battaglia to discuss sections in the Response (.4). | 3.4 | $ 850.00 | $ | 2,890.00 |
|---|---|---|---|---|---|---|
| 8/29/2022 | RJS | Relief from Stay Proceedings: Prepare for (1.5) and attend (.6) hearing re lift stay motion and applications to employ Pattis and Reynal. | 2.1 | $ 850.00 | $ | 1,785.00 |
| 8/29/2022 | KSL | Fee/Employment Applications: Edit and revise retention orders for Special Counsel for Pattis & Smith and The Reynal Firm (1.0); review issues on retention of special counsel with US Trustee and objecting creditors (1.0); analyze issues for hearing with Marc Schwartz (.5); handle matters at the scheduled hearing on Motion to Lift Stay and Retention of Special Counsel (1.0). | 3.5 | $ 850.00 | $ | 2,975.00 |
| 9/6/2022 | KSL | Litigation: Respond to requests from Connecticut counsel for affidavits relating to certain contentions made which are not accurate re: management agreement between FSS and PQPR, and other statements (2.0)[.] | 2.0 | $ 850.00 | $ | 1,700.00 |
| 9/8/2022 | KSL | Litigation: Work on revising affidavit drafts for Norm Pattis from employees of FSS (1.0); edit and revise affidavit of Blake Roddy (.5); continue to review and revise affidavits relating to Google Analytics, analyze state court discovery on same and report findings to Marc Schwartz and counsel and discuss same with Norm Pattis (2.0); review same with Norm Pattis, Blake Roddy and R. Shannon and update affidavit (1.5). | 5.0 | $ 850.00 | $ | 4,250.00 |
| 9/8/2022 | RJS | Litigation: Attention to request from N. Pattis/M. Schwartz re "management agreement" referenced in testimony in Connecticut Litigation and respond to same (.2); attention and respond to various emails re same (.2); draft affidavit re same for M. Schwartz re same for use in Connecticut Litigation (1.5); attention to emails re "Google Analytics" issue (.1); attend calls with N. Pattis, FSS employee Roddy, K. Lee, and M. Schwartz re same (.7); prepare draft Roddy affidavit providing the "Google Analytics" to Connecticut Plaintiffs (2.8); send same to Roddy and N. Pattis for review and editing (.1). | 5.6 | $ 625.00 | $ | 3,500.00 |
| | | | | *TOTAL:* | $ | **120,547.50** |

## <u>EXHBIT C</u>

**Expenses Allowable under Bankruptcy Code § 503(b)(1)**

| Date | Description | Amount |
|------|-------------|--------|
| 7/29/2022 | Service of Filings: Printing and mailing of Utility Motion (printing and service through vendor). | $      87.26 |
| 7/29/2022 | Service of Filings: Printing and mailing of Heslin/Lewis Stay Motion, Cash Collateral Motion, Criticial Vendor Motion, and Motion to Extend time for Schedules and Statements (printing and service through vendor). | $     176.88 |
| 7/31/2022 | Copy Costs: Copy two original sets of proposed Exhibits to share with Marc Schwartz at La Madeleine meeting on Sunday in Preparation for Hearing on Motion to Lift Stay. | $      50.23 |
| 7/31/2022 | Copy Costs: Rush order binding of 6 Exhibit books for Hearing on Motion to Lift Stay in Favor of Heslin/Lewis on 8.1.22. | $     221.90 |
| 8/8/2022 | RJS flight to Connecticut for hearing on motion to remand for Connecticut Litigation and return to Houston, TX, on United Airlines (Economy Plus). | $     861.20 |
| 8/9/2022 | RJS charge for internet access on 8/9/22 flight from Houston, TX to Hartford, CT | $      10.00 |
| 8/10/2022 | Rental Car: RJS car rental to travel from Windsor Locks, CT/Bradley Int'l Airport to Bridgeport, CT for hearing on Connecticut Plaintiffs' motion to remand. | $     167.25 |
| 8/11/2022 | Hotel: RJS hotel, taxes, and 1 day internet charge for scheduled in-person hearing before Connecticut Bankruptcy Court related to removed Connecticut Litigation (Stay 8/9/22 to 8/11/22). | $     394.70 |
| 8/11/2022 | RJS charge for Internet access on return flight on 8/11/22. | $      10.00 |
| 8/24/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | $     259.00 |
| 9/6/2022 | Printing copies of Exhibits to Motion to Appoint Tort Committee. | $      54.65 |
| 9/8/2022 | Service of Filings: Service of pleadings on retaining special counsel (printing and postage through vendor). | $     124.20 |
| 9/15/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | $      98.19 |
| 9/18/2022 | Printing copies of exhibits for hearings on Application | $      49.08 |
| 9/19/2022 | Binders and dividers for Exhibit Binders for Trial | $     109.02 |
| 9/19/2022 | Copy costs of exhibits 3X for hearing on Application | $     375.95 |
| | TOTAL: | $   3,049.51 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| DEBTOR. | § | **Chapter 11 (Subchapter V)** |
| | § | |

**MOTION OF W. MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC FOR
ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM
AND GRANTING RELATED RELIEF**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY
CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU
AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A
REPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST
FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE
THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY
THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A
TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT
FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND
HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE
HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT
MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE
THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR
ATTORNEY**

W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz"), hereby move

for entry of an order substantially in the form attached hereto (the "Proposed Order") pursuant to

sections 105(a), 327, 330, 363(b) and 503 of title 11 of the United States Code (the "Bankruptcy

Code") as follows:

**SUMMARY**

| Name of applicant: | W. Marc Schwartz and Schwartz Associates, LLC |
|---|---|
| | |

| | | |
|---|---|---|
| Applicant's professional role in case: | | Proposed Chief Restructuring Officer and Financial Advisor |
| Indicate whether this is an interim or final application: | | Final |
| Date order of employment was signed: | | N/A (Requested via this Motion) |
| | Beginning of Period | Ending of Period |
| Total period covered in application | July 30, 2022 | September 20, 2022 |
| Time periods covered by any prior applications | N/A | N/A |
| Total amounts awarded in all prior applications | | $0.00 |
| Amount of retainer received in the case | | $0.00 |
| Total fees applied for in this application and in all prior applications (include any retainer amounts applied or to be applied) | | $ |
| Total professional fees requested in this application | | $347,152.50[1] |
| Total professional hours covered by this application | | 899.20 |
| Average hourly rate for professionals | | $325.00 |
| Total paraprofessional hours covered by this application | | 0.0 |
| Average hourly rate for paraprofessionals | | N/A |
| Reimbursable expenses sought in this application | | $1,311.39 |
| Total amount to be paid to Priority Unsecured Creditors | | TBD |
| Anticipated % Dividend to Priority Unsecured Creditors | | TBD |
| Total to be paid to General Unsecured Creditors | | TBD |
| Anticipated % Dividend to General Unsecured Creditors | | TBD |
| Date of confirmation hearing | | TBD |
| Indicate whether the plan has been confirmed | | No |

## RELIEF REQUESTED

1.     Schwartz requests that the Court enter an order, substantially in the form of the Proposed Order (a) allowing Schwartz an administrative expense claim in the amount of $348,463.89 (the "Requested Administrative Expense Claim") or other amount as agreed to by the

---

[1] This amount represents a reduction of $12,197.00 in fees associated with the disputed Schwartz Employment Application.

9165701 v1 (72863.00002.000)

005855

parties and announced at or prior to any hearing on this Motion or determined by the Court and (b) authorizing Schwartz to draw the allowed amount of the administrative expense claim allowed against Schwartz's prepetition retainer of $75,000.00(the "Retainer").

## JURISDICTION

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

3.     The bases for the relief requested herein are sections 105(a), 327, 363(c), and/or 503(b)(1)(A) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2014, 2016, and/or 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A. Bankruptcy Case and Procedural Posture

4.     On July 29, 2022 (the "Petition Date"), the Free Speech Systems, LLC (the "Debtor") commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (the "Chapter 11 Case") with the Court.

5.     The Debtor filed an application to employ Schwartz on August 20, 2022 [ECF No. 83] (the "Schwartz Employment Application"). The Debtor sought to employ Schwartz as CRO to adequately perform its duties as debtor-in-possession including overseeing daily business affairs and operation of FSS, interfacing with Alex Jones ("Alex Jones" or "Jones"), PQPR Holdings Limited, LLC ("PQPR") and vendors on selection of Supplements and Non-Supplements to stock, preparation of schedules of assets and liabilities, compliance with reporting requirements and various orders of this Court, preparation of final information and testimony and formulation of bankruptcy strategy and plan of reorganization for FSS under the terms set out in the engagement

3

letter attached to the Schwartz Employment Application. Schwartz Employment Application at ¶ 1.

6.     The U.S. Trustee objected to the employment of Schwartz on September 12, 2022, and amended the objection on September 14, 2022 [ECF No. 145] (the "UST Objection").

7.     The UST Objection argued that the Court should deny the Schwartz Employment Application because of the failure of W. Marc Schwartz to supplement his disclosures required under Bankruptcy Rule 2014 in the cases of (the "IW Cases") of InfoW, LLC, IWHealth, LLC, and Prison Planet, LLC to indicate that he had begun working for the Debtor prior to the dismissal of the IW Cases. The U.S. Trustee argued that it was appropriate for the Court to exercise its broad discretion under Section 327(a) to address Mr. Schwartz's prior acts in the related cases—which this case is essentially a continuation of—and deny the Schwartz Application. UST Objection ¶ 2.

8.     The Court denied the Schwartz Employment Application at the September 20, 2022, hearing on the Schwartz Employment Application (the "September 20 Hearing"). The Court left open, however, the issue of whether Schwartz was entitled to compensation for the work performed:

> I understand that that's going to require some questions as to where that leaves Shannon and Lee and Mr. Schwartz in terms of you know, retention and the work that they've done. And I'll be looking to the Subchapter 5 trustee for guidance here, but there was good work done here. And I think Schwartz and Associates, right, helped the process. We've got cash collateral budgets in place and there was folks who would answer phone calls. From what I hear, what Mr. Schwartz encountered -- and I don't want anyone to leave thinking that I don't think they should be compensated for -- for good work in this case.

Hrg. Tr. 256:14-24. The Court ruled that all rights were reserved with respect to that issue. *Id.* at 257:3-4.

9165701 v1 (72863.00002.000)

005857

9.      On October 4, 2022, Schwartz filed a motion under Rule 59 of the Federal Rules of Civil Procedure seeking a rehearing on the issue of disinterestedness and employment under Bankruptcy Code § 327(e) [ECF No.207] (the "Rule 59 Motion"). Alex Jones [ECF No. 217] and the U.S. Trustee [ECF No. 223] filed objections to the Rule 59 Motion.[2] Both Jones and the U.S. Trustee disputed the standing/authority of Schwartz to seek the relief requested in the Rule 59 Motion.

10.     The Court set the Rule 59 Motion for hearing on October 12, 2022. So that negotiations could continue with the U.S. Trustee and other parties in interest, and to prevent potential conflicting outcomes, Schwartz requested that the hearing on the Rule 59 Motion be continued to November 16, 2022. In the absence of opposition from the parties that objected to the Rule 59 Motion, the Court continued the hearing.

**B. Services Provided by Schwartz Prior to Denial of the Schwartz Employment Application.**

11.     Schwartz maintained detailed written records of the time expended by its professionals rendering professional services to the Debtor during the period from July 30, 2022, through September 20, 2022 (the "Engagement Period"). These time records are reflected in the fee statement attached as **Exhibit A** hereto.

12.     As reflected in the time records, Schwartz professionals provided 899.20 hours of services to the Debtor, as debtor-in-possession, in connection with this chapter 11 case, , as summarized in the following chart which is also attached as **Exhibit C** hereto:

| Timekeeper | Rate | Hours | Fees | Years of Experience |
|---|---|---|---|---|
| Alex Taylor | 150.00 | 31.60 | $  4740.00 | 8 |
| Christian Schwartz | 470.00 | 130.90 | $  61,523.00 | 14 |

---

[2] The Sandy Hook Plaintiffs joined in the U.S. Trustee's objection [ECF No. 226].

| | | | | |
|---|---|---|---|---|
| Harold Lee | 280.00 | 115.40 | $ 32,312.00 | 4 |
| Marc Schwartz | 690.00 | 225.60 | $ 155,644.00 | 48 |
| Mary English | 210.00 | 128.30 | $ 26,943.00 | 7 |
| Priya Salagundla | 325.00 | 220.90 | $ 71,792.50 | 5 |
| Susan Schwartz | 150.00 | 46.50 | $ 6,975.00 | 49 |
| TOTAL: | | 899.20 | $359,949.50 | |

13.     Schwartz professionals provided services to the Debtor on several categories of matters necessary in this chapter 11 case. A summary of the time spent by Schwartz professionals on the various aspects of the chapter 11 case are reflected in the following chart which is attached as **Exhibit B**:

| Category | Total Hours | Total Fees |
|---|---|---|
| Preparation and maintenance of bankruptcy scheduled and Statement of Financial Affairs | 80.90 | $ 28,265.00 |
| Prepare and maintain rolling 13 week cash flow budgets | 45.70 | $ 17,738.00 |
| Maintaining books of account | 158.30 | $ 51,074.50 |
| Court filings | 30.70 | $ 19,385.00 |
| Prepare for and attend court hearings and creditor meetings | 82.10 | $ 48,317.00 |
| Inventory management and acquisition | 10.40 | $ 7,176.00 |
| Payroll | 19.10 | $ 9,157.00 |
| Managing accounts payable and banking | 306.20 | $ 85,456.50 |
| Attention to operations | 23.30 | $ 13,936.00 |
| Working on plan of reorganization | 9.10 | $ 6,279.00 |
| Travel time (1/2 time charged) | 17.00 | $ 8,840.00 |
| Meetings with bankruptcy counsel | 67.80 | $ 38,285.00 |
| Internal meetings | 17.40 | $ 6,407.50 |
| Other | 14.50 | $ 8,110.00 |
| Investigations | 2.90 | $ 2,001.00 |
| Discovery | 13.80 | $ 9,552.00 |

6

| | | | |
|---|---|---|---|
| TOTAL: | 899.20 | $ | 359,949.50 |

14.    In connection with providing the services set out above for the Debtor as debtor-in-possession, Schwartz incurred out-of-pocket expenses totaling $1,311.39. These expenses are reflected in the following chart which is also attached as **Exhibit D**:

| Date | Category | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 7/30/2022 | Prepare for and attend court hearings and creditor meetings | Documents for 1st day hearing | 58 | $  0.25 | $  14.50 |
| 8/17/2022 | Prepare for and attend court hearings and creditor meetings | (Hyatt) Hotel stay in Austin, TX. on 8/18/22 for Dr. Joe | 1 | $ 266.85 | $  266.85 |
| 8/16/2022 | Prepare for and attend court hearings and creditor meetings | (American airlines) Flight from DFW to AUS for Dr. Joe | 1 | $ 744.19 | $  744.19 |
| 8/16/2022 | Prepare for and attend court hearings and creditor meetings | (Allianz) Trip Insurance from DFW to AUS for Dr. Joe | 1 | $  42.20 | $  42.20 |
| 8/11/2022 | Managing accounts payable and banking | Endorsement stamps for checks | 1 | $  53.41 | $  53.41 |
| 8/03/2022 | Travel | Miles from SALLC office to Austin, TX and back | 328 | $  .58 | $  190.24 |
| | | | | TOTAL: | $1,311.39 |

15.    These expenses were necessary expenses for the Debtor to incur to administer its chapter 11 case and, to preserve the value of the Debtor's estate.

16.    Pursuant to the Local Rules of Bankruptcy Procedure, Schwartz has segregated its time spent on this engagement into project billing categories as follows:

7

a.   Schedules and SOFA.  Schwartz spent a total of 80.90 hours working on preparing Debtor's Schedules and Statement of Financial Affairs for which Schwartz requests allowance of an administrative expense of $28,265.00. Time spent in this category was devoted to tasks such as: researching the accounting records and recording the information contained therein in the appropriate sections of the Bankruptcy Schedules and Statement of Financial Affairs.

b.   Preparing and Maintaining Rolling 13 Week Cash Flow Budgets. Schwartz spent 45.70 hours preparing and maintaining Debtor's rolling 13 week cash flow budgets for which Schwartz requests allowance of an administrative expense of $17,738.00.  Time spent in this category was devoted to tasks such as:   analyzing Debtor's weekly operations as recorded in the Debtor's books of account for the two months preceding bankruptcy to identify recurring income and expenditures by the approximate week they were paid or received.  Following preparation of the initial 13 Week Budget, Schwartz updated the Budget as circumstance dictated and prepared actual to budget comparisons and variance reports which were provided to creditors representatives and the Subchapter V Trustee.

c.   Maintaining Books of Account.  Schwartz spent 158.30 hours maintaining Debtor's books of account for which Schwartz requests allowance of an administrative expense of $51,074.50.  Time spent in this category was devoted to tasks such as:  as the Debtor had no accounting personnel and was unable to locate a bookkeeping service willing to work for the Debtor, Schwartz personnel continued to maintain the books of account following the bankruptcy filing.  This involved recording all financial transactions in the books of account, and reconciling the bank and accounts payable ledgers each month.

d.   Court filings.  Schwartz spent 30.70 hours on court filings for which Schwartz requests allowance of an administrative expense of $19,385.00.  Time spent in this

9165701 v1 (72863.00002.000)

005861

category was devoted to tasks such as: This task principally consists of time spent reviewing court filings and drafts of proposed filings provided by counsel.

      e.     <u>Preparation for and Attendance at Court Hearings and Creditor Meeting</u>. Schwartz spent 82.10 hours preparing for and attending Court hearings and the Creditor Meeting for which Schwartz requests allowance of an administrative expense of 48,317.00. Time spent in this category was devoted to tasks such as: This task involved reviewing documents and schedules in preparation for attending court hearings, attending Initial Debtors Conference and the 341 meeting and respond to questions, and locating an expert on inventory fulfillment issues in preparation for probable testimony at a cash collateral hearing.

      f.     <u>Inventory Management and Acquisition</u>. Schwartz spent 10.40 hours on Debtor's inventory management and acquisition for which Schwartz requests allowance of an administrative expense of $7,176.00. Time spent in this category was devoted to tasks such as: This task was time spent by the CRO in working on solutions to acquiring new inventory without incurring additional liabilities and in evaluating inventory on hand and Debtor's proposed inventory acquisitions.

      g.     <u>Payroll</u>. Schwartz spent 19.10 hours with respect to Debtor's payroll for which Schwartz requests allowance of an administrative expense of $9,157.00. Time spent in this category was devoted to tasks such as: Following the filing of the Bankruptcy Petition, ADP, the Debtor's payroll service, advised the Debtor that it was terminating the business relationship. This time was incurred in locating a viable alternative payroll solution as well as replacement life, health and disability insurance for the Debtor's employees.

      h.     <u>Maintaining Accounts Payable and Banking</u>. Schwartz spent 306.20 hours maintaining Debtor's accounts payable and banking transactions for which Schwartz requests

9165701 v1 (72863.00002.000)

005862

allowance of an administrative expense of $85,456.50. Time spent in this category was devoted to tasks such as: This task involved making changes to the Debtor's accounts payable system to permit accounting to receive all vendor invoices when submitted by the vendor and clearing a large backlog of past due invoices. Daily Schwartz personnel received vendor invoices, processed them into accounts payable and set them up for payment. Ultimately, Schwartz personnel were paying the unpaid invoices every Friday.

    i. <u>Operations</u>. Schwartz spent 23.30 hours with respect to Debtor's operations for which Schwartz requests allowance of an administrative expense of $13,936.00. Time spent in this category was devoted to tasks such as: This task primarily involved reviewing daily reports on merchandise sales and fulfillment, meeting with Debtor senior management on personnel, inventory, and explaining new health care plan to employees.

    j. <u>Plan of Reorganization</u>. Schwartz spent 9.10 hours with respect to Debtor's Plan of Reorganization for which Schwartz requests allowance of an administrative expense of $6,279.00. Time spent in this category was devoted to tasks such as: This time principally consists of time spent analyzing operations and developing an estimate of probable disposable income for use in the proposed Plan of Reorganization.

    k. <u>Travel Time</u>. Schwartz spent 17.00 hours of travel time that was billed ay ½ the standard hourly rate for which Schwartz requests allowance of an administrative expense of $8,840.00. Time spent in this category was devoted to tasks such as: This is time spent traveling to and from the Debtor's principal place of business in Austin.

    l. <u>Meetings with Bankruptcy Counsel</u>. Schwartz spent 67.80 hours meeting with bankruptcy counsel for which Schwartz requests allowance of an administrative expense of $38,285.00. Time spent in this category was devoted to tasks such as: This task consists of time

9165701 v1 (72863.00002.000)

expended attending daily meetings with the Debtor's bankruptcy counsel to review issues, status of work in process, pending filings and hearings, and problems.

        m.    <u>Internal Meetings</u>.  Schwartz spent 17.40 hours for internal meetings for which Schwartz requests allowance of an administrative expense of $6,407.50.  Time spent in this category was devoted to tasks such as:  This task consists of meetings of Schwartz' personnel for the purpose of reviewing work completed, making assignments of work, and communicating information needed to complete assigned tasks.

        n.    <u>Other</u>.  Schwartz spent 14.50 hours on other miscellaneous matters for which Schwartz requests allowance of an administrative expense of $8,110.00.  Time spent in this category was devoted to tasks such as:  This involves a variety of miscellaneous tasks such as virtual meeting with the Debtor's corporate representative to brief her on current developments at the Debtor, reviewing proposed engagement agreements to employ counsel, and responding to questions from trial counsel.

        o.    <u>Investigations</u>.  Schwartz spent 2.90 hours on investigations for which Schwartz requests allowance of an administrative expense of $2,001.00.  Time spent in this category was devoted to tasks such as:  Researching transactions with PQPR and the Debtor, owner draws, and legal bills incurred by the Debtor.

        p.    <u>Discovery</u>.  Schwartz spent 13.80 hours on discovery for which Schwartz requests allowance of an administrative expense of $9,522.00.  Time spent in this category was devoted to tasks such as:  Responding to interrogatories and requests for production served on the Debtor.

<div align="center">

**BASIS FOR RELIEF**

</div>

    A.    **Compensation and Reimbursement of Expenses under Bankruptcy Code § 330 for Services Provided Prior to September 20, 2022**

<div align="center">11</div>

17.     While the Court questioned Schwartz's ability to impartially represent the Debtor regarding difficult decisions that may become necessary related to Alex Jones and PQPR (Hrg. Tr. 247:6-11), it also stated that its decision left open questions about where that left Schwartz in terms of retention and the work it performed prior to the ruling (Hrg. Tr. 256:14-17). Further, the Court stated that all parties' rights were reserved with respect to compensation for the services provided in the case. (Hrg. Tr. 257:3-4).

18.     The Debtor has elected to leave this issue for the relevant professionals to pursue.[3] On October 3, 2022, the Debtor filed an emergency application to employ Patrick Magill as replacement CRO and the Court entered an order approving the employment of Mr. Magill on October 13, 2022. The Court entered an order compelling mediation on October 12, 2022 [ECF No. 233].

19.     Courts have held that a professional may seek approval of its employment in connection with an application for compensation. In *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998), the debtor-in-possession entered an agreement to retain a broker and filed an application to employ the broker with the bankruptcy court. *Id.* at 477. After the broker began marketing the debtor's real property, the debtor later withdrew the application upon learning that the broker was a business partner for the successful purchaser and loaned the successful purchaser the escrow deposit to participate in an auction. *Id.* The broker later filed an application to employ on its own behalf. The Court denied the broker's application to employ because it was not filed by the debtor but that it should seek

---

[3] Schwartz has and will continue to offer its assistance to the new CRO and has done so directly and through counsel for FSS. Through this Motion, Schwartz seeks only allowance of an administrative expense and related relief. Schwartz does not seek to require the Debtor to continue to engage Schwartz going forward.

compensation under Bankruptcy Code § 503(b). *Id.* The bankruptcy court subsequently granted the broker's motion for administrative expense under section 503(b). *Id.* In ruling on the debtor's appeal, the Ninth Circuit B.A.P. reasoned that the broker *did* have standing to seek its employment and treated the request for administrative expense as an application to employ. *See Id.* at 479-80 ("The bankruptcy court's award of fees was de facto approval of [the broker's] employment."). Other courts have also considered and approved retroactive employment of the in the context of applications for compensation. *E.g.*, *In re McKenzie*, No. 08-16378, 2013 Bankr. LEXIS 2672 (Bankr. E.D. Tenn. July 2, 2013); *In re Little Greek Rest.*, 205 B.R. 484 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366 (Bankr. M.D. Ga. 1989); *see also In re Triangle Chems.*, 697 F.2d 1280, 1289 (5th Cir. 1983) (reversing a bankruptcy court's decision on the basis that the court had discretion to approve such employment).

20.     While the Court denied the Schwartz Employment Application—employment of Schwartz as CRO and FA going forward— Schwartz submits that it was a disinterested person with respect to the services provided from the Petition Date through September 20, 2022, and is therefore eligible to be employed and compensated for such services. As set out in the declaration of W. Marc Schwartz accompanying the Schwartz Employment Application and presented in evidence at the September 20 Hearing, Schwartz was not  (a) a creditor, equity security holder, or insider of the Debtor during that period or (b) or within two years before the Petition Date a director, officer, or employee of the debtor.  Schwartz does not have any economic interest that would tend to lessen the value of the estate or create an actual or potential dispute in which the estate is a rival claimant. And, as set out in detail in the Rule 59 Motion, Schwartz had no predisposition that renders bias against the estate under the circumstances with respect to the

services provided during the Engagement Period.[4]

21.     The Court has the authority to allow compensation for Schwartz for the services provided to the Debtor through September 20, 2022, that are not related to any potential conflict, without disturbing the order entered on September 20, 2022.  As described in *In re Mehdipour*—summarized above—while compensation must be denied while a professional has a conflict, the "bankruptcy court has discretion to award or deny compensation for services performed outside of a conflict" and "[t]he court is not required to deny fees for work actually performed." 202 B.R. at 478. Other courts have similarly held that professionals may be retained and compensated for work performed unrelated to an adverse interest that they hold or represent. *See, e.g.*, *In re Relativity Media, LLC*, No. 18-11358 (MEW), 2018 Bankr. LEXIS 2037, at *20 (Bankr. S.D.N.Y. July 6, 2018) (authorizing employment of attorney for debtor-in-possession on the condition of obtaining separate counsel to address disputes against a party with respect to which the attorney had a conflict); *Exco Res. v. Milbank*, 2003 U.S. Dist. LEXIS 1442, at *26 (S.D.N.Y. Jan. 28, 2003) (affirming employment of counsel where attorney would not be handling any matter with respect to the matter in which the attorney had an adverse interest); *In re Granite Partners, L.P.*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) ("[A] conflict does not necessarily taint every aspect of the representation. Where the professional has performed some service of unquestioned value, total denial of fees might result in an inequitable windfall to the estate.") (allowing fees for services not related to any conflict); *In re Leslie Fay Cos.*, 175 B.R. 525, 539 (Bankr. S.D.N.Y. 1994) (authorizing attorney to continue to provide services on matters that it had already started but not take on new matters and allowing fees for unconflicted matters).

**B.      The Requested Administrative Expense Claim meets the Standards of Compensation and Reimbursement Under Bankruptcy Code §330.**

22.     Subject to employment for the services Schwartz provided through September 20, 2022, the Requested Administrative Expense Claim is compensable under Bankruptcy Code § 330. The compensation awarded must be reasonable for services that were actually provided and

---

[4] As set out in detail in the Rule 59 Motion, Schwartz identified and advocated for positions directly contrary to the positions asserted by Alex Jones and PQPR during and prior to the Engagement Period.

9165701 v1 (72863.00002.000)

necessary for administration of the bankruptcy estate or to achieve a reasonably likely benefit to the estate. *See* 11 U.S.C. § 330(a); *In re Woerner*, 783 F.3d 266, 276 (5th Cir. 2015). Reimbursement must be for actual and necessary expenses. *See* 11 U.S.C. § 330(a)(1)(B). Section 330(a)(3) indicates that courts should take into account all relevant factors in determining the amount of reasonable compensation and lists six (6) non-exclusive factors.

23.     The Fifth Circuit has instructed that additional factors apply with respect to attorneys. In *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), cert. denied, 431 U.S. 904 (1977), the Fifth Circuit adopted twelve factors to apply to the determination of awards of attorneys' fees in bankruptcy cases: (i) time and labor required; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the professional due to acceptance of the case; (v) the customary fee; (vi) whether the fee is contingent or fixed; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *In re First Colonial*, 544 F.2d at 1298-99. These factors were borrowed from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), a non-bankruptcy case, and are commonly referred to as the "*Johnson* factors."

24.     Applied to the services of Schwartz in this Case, those factors are addressed as follows:

   a.     <u>Time and Labor Required.</u> The professional services rendered by Schwartz on behalf of the Debtor required a high degree of professional competence and expertise. **Exhibit A** to this Motion contains copies of Schwartz's time entries for services provided to the Debtor, as debtor in possession, in this chapter 11 case through September 20, 2022, and sets forth in detail all the time for which

compensation is sought, as well as the specific actions or matters addressed by each of the professionals.

b.  <u>Novelty and Difficulty of Questions Presented.</u> This Johnson factor examines the degree of novelty and difficulty of the issues encountered by Schwartz in representing the Debtor.  Schwartz faced several difficult and complex legal issues, including:

    i.  The General Ledger had not been posted for 2022;

    ii.  Devising mechanisms and strategy to locate the information to accurately post the General Ledger;

    iii.  ADP notified the Debtor that it had terminated the contract and Schwartz was forced to find a replacement payroll service;

    iv.  Obtaining health, life and disability insurance to replace that offered by ADP;

    v.  Creating the Schedules and SOFA;

    vi.  Addressing inventory fulfillment issues;

    vii.  Bookkeeping issues;

    viii.  Banking challenges;

    ix.  Balancing issues relating to the Texas and Connecticut Litigation;

    x.  Issues relating to PQPR; and

    xi.  Addressing the numerous emergencies arising related to the Debtor's daily business operations.

c.  <u>Skill Requisite to Perform Service.</u> The services provided by Schwartz required a high level of skill, particularly because of the compressed time periods and finding creative ways to finance the Debtor's business;

d.  <u>Preclusion of Other Employment Due to Acceptance of Case.</u> The complexity and urgency of this case severely curtailed Schwartz' ability to develop business;

e.  <u>Customary Fee.</u> The hourly rates sought herein are commensurate with the rates charged and approved in other bankruptcy proceedings pending in the Southern District of Texas;

f.   <u>Whether the Fee is Fixed or Contingent.</u> Schwartz charges its customary hourly rate and no part of its fee is contingent;

g.   <u>Time Limitations Imposed by Client or Other Circumstances.</u> The time requirements of this Case have been significant given the circumstances surrounding the Debtor;

h.   <u>Amount Involved and Results Obtained.</u>  Schwartz provided 899.20 hours of CRO and related services to the Debtor.  As a result of Schwartz's efforts, the Debtor was able to balance its books, prepare weekly financials, resolve issues with its vendors, implement a new payroll service and find alternative sources of funding;

i.   <u>Experience, Reputation and Ability of Professionals.</u> W. Marc Schwartz is experience bankruptcy professional with a stellar reputation.  The professionals reflected on **<u>Exhibit C</u>**, hereto are experienced restructuring professionals of significant integrity in the Southern District of Texas;

j.   <u>Undesirability of Case.</u> Representation of the Debtor in this chapter 11 case was undesirable. The Debtor's principal is a controversial figure and the subject of public ire. Further, given the contentious nature of the Sandy Hook Litigation and the underlying claims, even matters that should be easily agreed on are fiercely contested;

k.   <u>Nature and Length of Professional Relationship with Client.</u>  Schwartz acted as CRO in the IW Cases and thereafter was retained by this Debtor; and

l.   <u>Award in Similar Cases.</u> The compensation requested herein is comparable to, if not less than, the compensation allowed in other cases similar in size and complexity to this case.

**C.**    **Administrative Expense under Bankruptcy Code Bankruptcy Code § 503(b)(1)(A) for Costs and Expenses Necessary to Preserve the Estate**

25.    *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998)—summarized above—additionally provides support for a professional seeking limited compensation under Bankruptcy Code § 503(b)(1)(A). According to the 9th Circuit B.A.P., "[c]ourts may allow compensation for professional services under § 503(b)(1)(A) as administrative expenses if the services provided by a disinterested professional were necessary to preserve the estate." *Id.* at 478. The standard for an administrative expense for such services is higher than for compensation under Bankruptcy Code § 330. *See id.*

at 479 ("[I]n order for the court to grant compensation under § 503, the services 'must benefit all the creditors, be necessary for a successful reorganization, and generally arise from operating the estate in the overall interests of the creditors.'").

26.     This is consistent with the Fifth Circuit Court of Appeals' decision in *McBride v. Riley (In re Riley)*, 923 F.3d 433 (5th Cir. 2019). Although *In re Riley* involved a chapter 13 case, the Court of Appeals reasoned that there were two ways that payments owed to a debtor's attorney could be classified as an administrative expense claim: "(1) if the payments are necessary expenses to preserve the estate under § 503(b)(1); or (2) if the payments are compensation or reimbursement under § 503(b)(2) (which links to 11 U.S.C. § 330(a), which, in turn, under § 330(a)(4)(B), permits 'reasonable compensation' for attorneys based on services rendered)."[5] *Id.* at 436.

27.     In analyzing whether particular expenses advanced by the attorney in *In re Riley* fell under the rubric, the Fifth Circuit applied the standard two-prong test of whether an obligation was an "administrative expense." *Id.* at 439. The first prong is that the obligation must arise from a post-petition transaction with the estate, rather than the debtor personally. *Id.* The second prong is that the goods or services received in exchange for the obligation must directly benefit the estate. *Id.* As indicated in the Court of Appeals' ultimate ruling that the relevant expenses could be considered and allowed as part of the attorney's compensation and reimbursement under section 330—but not as section 503(b)(1)(A) administrative expenses—the standard under section 503(b)(1)(A) is stricter. *See id.* at 441. The costs and expenses must maintain or add value to the estate to fall under Bankruptcy Code § 503(b)(1)(A). *Id.* at 440.

28.     Schwartz submits that all of the Requested Administrative Expense Claims is for services provided to and expenses incurred on behalf of the Debtor that directly preserved the

---

[5] In a chapter 11 case, section 330(a)(1)—rather than section 330(a)(4)(B)—applies with respect to professional compensation.

Debtor's bankruptcy estate, including, without limitation (a) creating accounting information to facilitate a Plan of Reorganization; (b) managing vendor relationships; (c) preserving employee value and employee benefits; (d) providing a new inventory funding mechanism; and (e) preserving the Debtor's banking relationships.

### D. Application of Retainer.

29.     Schwartz holds the Retainer in the amount of $75,000.00 in its trust account. Schwartz requests that, upon allowance of this Motion, Schwartz be permitted to apply the retainer it is holding to its allowed administrative claim.   To the extent not otherwise authorized pursuant to this Motion, Schwartz requests authority to draw on the Retainer that was provided for these expenses pursuant to Bankruptcy Code § 363(c).

## CONCLUSION

WHEREFORE, Schwartz respectfully requests that this Court enter an order substantially in the form of the Proposed Order (a) in the amount of the Requested Administrative Expense Claim or other amount as agreed to by the parties and announced at or prior to any hearing on this Motion or determined by the Court and (b) authorizing Schwartz to draw the allowed amount of the administrative expense claim allowed against the Retainer. This relief is consistent with the Court's ruling at the September 20 Hearing and does not require disturbing the related order.

Respectfully submitted,

KANE RUSSELL COLEMAN & LOGAN PC

By:   /s/ Michael P. Ridulfo
      Michael P. Ridulfo
      State Bar No. 16902020
      Federal Bar No. 27086
      5151 San Felipe, Suite 800
      Houston, Texas 77056
      (713) 425-7400
      (713) 425-7700 (fax)
      E-mail: mridulfo@krcl.com

19

9165701 v1 (72863.00002.000)

005872

*Counsel for W. Marc Schwartz and Schwartz Associates, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within 24 hours of the filing, on the parties on the attached service list by U.S.P.S. first class mail.

*/s/Michael P. Ridulfo*
Michael P. Ridulfo

9165701 v1 (72863.00002.000)

005873

## SERVICE LIST

Debtor and Counsel

Free Speech Systems, LLC
3019 Alvin Devane Blvd., STE 300
Austin, TX 78741

Attn: Ray Battalia
Law Offices of Raymond W. Battaglia
66 Granburg Cir.
San Antonio, TX 78218

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

005874

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway. Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

Ryan E. Chapple Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 7870

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Attn: Shelby Jordan Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

John D Malone Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite
1400 Houston, TX 77002

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548 Austin, TX 78711-254

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street Suite 1800
Dallas, TX 7520

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln Austin, TX 7870

Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

Attn: Elizabeth C. Freeman
Jackson Walker LLP
1401 McKinney St., STE 1900
Houston, TX 77010

U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

27

# Exhibit A

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Employee Name | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|---|
| 7/30/2022 | Marc Schwartz | Hearing Prep- reviewing documents in preparation for pre hearing meeting with counsel for 1st day hearing | 5.00 | $ 690.00 | $ 3,450.00 |
| 7/31/2022 | Marc Schwartz | Reading pleading in Texas litigation | 2.00 | $ 690.00 | $ 1,380.00 |
| 7/31/2022 | Marc Schwartz | Reviewing 1st day motions | 0.40 | $ 690.00 | $ 276.00 |
| 7/31/2022 | Marc Schwartz | Review documents sent by K Lee related to ongoing litigation | 1.00 | $ 690.00 | $ 690.00 |
| 7/31/2022 | Marc Schwartz | Meet with K Lee to go over expected testimony tomorrow and precedent cases he asked me to review | 1.00 | $ 690.00 | $ 690.00 |
| 7/31/2022 | Marc Schwartz | Review cases provided by K Lee (.7), research legal expenses (.5) review Plaintiff's 4th petition (.6) read revised witness outline (.5) and integrate all into First Day Hearing binder (.2) | 2.50 | $ 690.00 | $ 1,725.00 |
| 8/1/2022 | Christian Schwartz | Christian Schwartz: First Day Hearing | 1.00 | $ 470.00 | $ 470.00 |
| 8/1/2022 | Christian Schwartz | Meet with M Schwartz (.7) Reach out to J Schulse (.3) | 1.00 | $ 470.00 | $ 470.00 |
| 8/1/2022 | Harold Lee | Status Meeting to discuss schedules required for motions and prepared same | 4.30 | $ 280.00 | $ 1,204.00 |
| 8/1/2022 | Marc Schwartz | Hearing prep with K Lee | 0.50 | $ 690.00 | $ 345.00 |
| 8/1/2022 | Marc Schwartz | Hearing on emergency motion to lift stay | 1.30 | $ 690.00 | $ 897.00 |
| 8/1/2022 | Marc Schwartz | Meeting with K Lee, RJ Shannon, S Jordan, R Battaglia following hearing to work on preparation for hearings on 8/3 and 8/5 | 1.00 | $ 690.00 | $ 690.00 |
| 8/1/2022 | Marc Schwartz | Work with K Lee and RJ Shannon on issues related to upcoming hearings this week | 0.40 | $ 690.00 | $ 276.00 |
| 8/1/2022 | Marc Schwartz | Reviewing A Jones Draw analysis through 2020 | 0.60 | $ 690.00 | $ 414.00 |
| 8/1/2022 | Priya Salagundla | Review of member's draw; Compensation | 2.90 | $ 325.00 | $ 942.50 |
| 8/2/2022 | Alex Taylor | TV Studio Rental Research | 0.60 | $ 150.00 | $ 90.00 |
| 8/2/2022 | Christian Schwartz | Review draw analysis | 1.50 | $ 470.00 | $ 705.00 |
| 8/2/2022 | Christian Schwartz | Meet with Staff re: status of work and next steps | 0.70 | $ 470.00 | $ 329.00 |
| 8/2/2022 | Christian Schwartz | Meet with Counsel re status and strategy | 1.80 | $ 470.00 | $ 846.00 |
| 8/2/2022 | Christian Schwartz | Review schedules and pleadings | 3.40 | $ 470.00 | $ 1,598.00 |
| 8/2/2022 | Harold Lee | Bookkeeping | 1.20 | $ 280.00 | $ 336.00 |
| 8/2/2022 | Harold Lee | Prepared Schedules for court filing | 5.90 | $ 280.00 | $ 1,652.00 |
| 8/2/2022 | Marc Schwartz | MANAGEMENT - Call with Pat Riley to discuss fulfillment issues | 0.80 | $ 690.00 | $ 552.00 |
| 8/2/2022 | Marc Schwartz | Call with counsel to prepare for Wed cash collateral hearing | 2.00 | $ 690.00 | $ 1,380.00 |
| 8/2/2022 | Marc Schwartz | MANAGEMENT Approve and sign bank account opening documents | 0.50 | $ 690.00 | $ 345.00 |
| 8/3/2022 | Christian Schwartz | Travel to a from Austin. 7 hours billed at half time | 3.50 | $ 470.00 | $ 1,645.00 |
| 8/3/2022 | Christian Schwartz | Meet with J Shulse in Austin | 6.00 | $ 470.00 | $ 2,820.00 |
| 8/3/2022 | Harold Lee | Bookkeeping and prepared schedules from same | 3.10 | $ 280.00 | $ 868.00 |
| 8/3/2022 | Marc Schwartz | Meeting with counsel prior to hearing | 1.00 | $ 690.00 | $ 690.00 |
| 8/3/2022 | Marc Schwartz | Attend and testify at cash collateral hearing | 6.00 | $ 690.00 | $ 4,140.00 |
| 8/3/2022 | Marc Schwartz | Meet with counsel after hearing to go over evidence for Friday's hearing on Motion to Lift Stay | 1.50 | $ 690.00 | $ 1,035.00 |
| 8/4/2022 | Alex Taylor | CT Cost of Living Research | 1.30 | $ 150.00 | $ 195.00 |
| 8/4/2022 | Alex Taylor | Review of AMEX Statement | 3.40 | $ 150.00 | $ 510.00 |
| 8/4/2022 | Christian Schwartz | Call with Counsel re status and strategy | 1.00 | $ 470.00 | $ 470.00 |
| 8/4/2022 | Christian Schwartz | Meet with Staff re status and next steps | 0.50 | $ 470.00 | $ 235.00 |
| 8/4/2022 | Christian Schwartz | Review credit card statements and critical vendors - | 0.50 | $ 470.00 | $ 235.00 |
| 8/4/2022 | Christian Schwartz | Meet with staff | 0.50 | $ 470.00 | $ 235.00 |
| 8/4/2022 | Christian Schwartz | Review FSS Financial information - | 1.20 | $ 470.00 | $ 564.00 |
| 8/4/2022 | Christian Schwartz | Communication with FSS Staff on new accounting procedures | 1.00 | $ 470.00 | $ 470.00 |
| 8/4/2022 | Harold Lee | Prepared Schedules and performed bookkeeping services | 2.30 | $ 280.00 | $ 644.00 |
| 8/4/2022 | Harold Lee | Bookkeeping | 3.00 | $ 280.00 | $ 840.00 |
| 8/4/2022 | Marc Schwartz | Read memo from counsel re Motion to Remand | 0.20 | $ 690.00 | $ 138.00 |
| 8/4/2022 | Marc Schwartz | Read depo selections from A Jones on donation accounts | 0.10 | $ 690.00 | $ 69.00 |
| 8/4/2022 | Marc Schwartz | Call with counsel to go over evidence and tasks to be done for hearing tomorrow on Motion to Lift Stay | 1.50 | $ 690.00 | $ 1,035.00 |
| 8/4/2022 | Marc Schwartz | Axos Bank on setting up Users and authorities | 0.50 | $ 690.00 | $ 345.00 |
| 8/4/2022 | Marc Schwartz | Reviewing American Express charges, instructions on identifying key vendors charging Amex card for services | 0.40 | $ 690.00 | $ 276.00 |
| 8/4/2022 | Marc Schwartz | Axos bank user setup, working with bank enrollment staff | 1.00 | $ 690.00 | $ 690.00 |
| 8/4/2022 | Marc Schwartz | Working on replacing Amex to cover vendors who provide hi tech services and charg a credit or debit card | 0.70 | $ 690.00 | $ 483.00 |
| 8/4/2022 | Mary English | Cost of Lifting Stay research for schedule and daily QuickBook entries of FSS vendo invoices for payment. | 3.30 | $ 210.00 | $ 693.00 |
| 8/4/2022 | Priya Salagundla | Internal status meeting re work completed and next steps | 0.50 | $ 325.00 | $ 162.50 |
| 8/4/2022 | Priya Salagundla | Updated daily depository schedule; review of AMEX vendors | 0.50 | $ 325.00 | $ 162.50 |
| 8/5/2022 | Alex Taylor | Review of AMEX Statement | 1.80 | $ 150.00 | $ 270.00 |
| 8/5/2022 | Christian Schwartz | Review Notes from yesterday. | 0.50 | $ 470.00 | $ 235.00 |
| 8/5/2022 | Christian Schwartz | Call with Security company on past due invoices | 0.30 | $ 470.00 | $ 141.00 |
| 8/5/2022 | Christian Schwartz | Meet with Staff re: status of work and next steps | 0.30 | $ 470.00 | $ 141.00 |
| 8/5/2022 | Christian Schwartz | Internal calls re: bills and invoices | 0.80 | $ 470.00 | $ 376.00 |



EXHIBIT
A
005877

FREE SPEECH SYSTEMS, LLC
SCHWARTZ ASSOCIATES, LLC
PROFESSIONAL FEES AND EXPENSES DETAIL
JULY 30 TO SEPTEMBER 19, 2022

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8/5/2022 | Harold Lee | Bookkeeping/Prepared Bankruptcy Schedules | 3 10 | $ 280.00 | $ 868.00 |
| 8/5/2022 | Harold Lee | Preparing bankruptcy schedules | 3 20 | $ 280.00 | $ 896.00 |
| 8/5/2022 | Marc Schwartz | MANAGEMENT working on getting vendors lined up to pay, problems with getting copies of documents and contracts, communication with vendors re payments | 1.00 | $ 690.00 | $ 690.00 |
| 8/5/2022 | Marc Schwartz | Email out debit card app, attend to emails from Ray and RJ | 0 10 | $ 690.00 | $ 69.00 |
| 8/5/2022 | Marc Schwartz | Researching payments to counsel at request of K Lee | 0 50 | $ 690.00 | $ 345.00 |
| 8/5/2022 | Marc Schwartz | MANAGEMENT Moving funds into sub bank accounts and working on setting up and paying vendors, researching past due bills. | 2.00 | $ 690.00 | $ 1,380.00 |
| 8/5/2022 | Mary English | Configuring new accounting system for processing payments of FSS vendor and payroll accounts. | 2.60 | $ 210.00 | $ 546.00 |
| 8/5/2022 | Priya Salagundla | Internal status meeting; directions on projects; | 2.60 | $ 325.00 | $ 845.00 |
| 8/5/2022 | Priya Salagundla | updated daily depository schedule | 0 20 | $ 325.00 | $ 65.00 |
| 8/5/2022 | Priya Salagundla | Internal project status updates and directions | 0.80 | $ 325.00 | $ 260.00 |
| 8/6/2022 | Marc Schwartz | MANAGEMENT Review Axos bank activity | 0 20 | $ 690.00 | $ 138.00 |
| 8/6/2022 | Marc Schwartz | Reviewing application to employ CRO and FA | 2 20 | $ 690.00 | $ 1,518.00 |
| 8/8/2022 | Christian Schwartz | Read through production uploaded | 1.40 | $ 470.00 | $ 658.00 |
| 8/8/2022 | Christian Schwartz | FSS - Status Call | 1.00 | $ 470.00 | $ 470.00 |
| 8/8/2022 | Christian Schwartz | Review payroll information | 1 20 | $ 470.00 | $ 564.00 |
| 8/8/2022 | Christian Schwartz | Watch valuation testimony | 1.00 | $ 470.00 | $ 470.00 |
| 8/8/2022 | Christian Schwartz | Review trial production. | 1.60 | $ 470.00 | $ 752.00 |
| 8/8/2022 | Harold Lee | Prepared Bankruptcy Schedules, performed Bookkeeping | 7.70 | $ 280.00 | $ 2,156.00 |
| 8/8/2022 | Marc Schwartz | Management - reviewing bank balances ( 1) Cash Collateral Order and limits on payments (.6), advising vendors of same (.3), , pay bills (.5) | 1.50 | $ 690.00 | $ 1,035.00 |
| 8/8/2022 | Marc Schwartz | discussing payments with critical vendors | 0.30 | $ 690.00 | $ 207.00 |
| 8/8/2022 | Marc Schwartz | correspondence with processor on allowed payments to PQPR | 0.20 | $ 690.00 | $ 138.00 |
| 8/8/2022 | Marc Schwartz | Status meeting with counsel | 1.00 | $ 690.00 | $ 690.00 |
| 8/8/2022 | Marc Schwartz | reading draft of CRO declaration to application to employ CRO | 0.70 | $ 690.00 | $ 483.00 |
| 8/8/2022 | Marc Schwartz | call with A Jones and B Roddy | 0.80 | $ 690.00 | $ 552.00 |
| 8/8/2022 | Marc Schwartz | MANAGEMENT working on fulfillment back lot including calls with A Jones, and with B Roddy and P Reilly on fulfillment issue | 1.00 | $ 690.00 | $ 690.00 |
| 8/8/2022 | Marc Schwartz | Call with counsel on Conn litigation | 1.00 | $ 690.00 | $ 690.00 |
| 8/8/2022 | Marc Schwartz | Communication with Austin Security to agree on Critical Vendor treatment in the bankruptcy | 0 30 | $ 690.00 | $ 207.00 |
| 8/8/2022 | Marc Schwartz | Reviewing declaration to Application to Employ as CRO | 0.40 | $ 690.00 | $ 276.00 |
| 8/8/2022 | Mary English | Administration of FSS accounts payable and supporting evidence of Bankruptcy Cod Basis For Relief.????? | 6.80 | $ 210.00 | $ 1,428.00 |
| 8/8/2022 | Priya Salagundla | Checked and updated security bank of Crawford transactions; | 5.40 | $ 325.00 | $ 1,755.00 |
| 8/8/2022 | Priya Salagundla | Reviewed bankruptcy schedules checklist | 0 20 | $ 325.00 | $ 65.00 |
| 8/8/2022 | Priya Salagundla | Daily status call with attorneys | 1.00 | $ 325.00 | $ 325.00 |
| 8/9/2022 | Christian Schwartz | Process payroll | 1.00 | $ 470.00 | $ 470.00 |
| 8/9/2022 | Christian Schwartz | Review payroll documents | 0.80 | $ 470.00 | $ 376.00 |
| 8/9/2022 | Christian Schwartz | Meet with M Schwartz on engagement status and upcoming work schedule | 1.00 | $ 470.00 | $ 470.00 |
| 8/9/2022 | Christian Schwartz | Review staff's completed work product | 2 50 | $ 470.00 | $ 1,175.00 |
| 8/9/2022 | Christian Schwartz | Review financial statements | 1 20 | $ 470.00 | $ 564.00 |
| 8/9/2022 | Harold Lee | Bookkeeping | 3 50 | $ 280.00 | $ 980.00 |
| 8/9/2022 | Harold Lee | Bankruptcy Schedules | 2 50 | $ 280.00 | $ 700.00 |
| 8/9/2022 | Marc Schwartz | read daily settlement report | 0 10 | $ 690.00 | $ 69.00 |
| 8/9/2022 | Marc Schwartz | Call with counsel on status and strategy | 1.00 | $ 690.00 | $ 690.00 |
| 8/9/2022 | Marc Schwartz | Working on description of fulfillment underestimation | 1.00 | $ 690.00 | $ 690.00 |
| 8/9/2022 | Marc Schwartz | Work with Axos to send first payroll wire to ADP | 0.70 | $ 690.00 | $ 483.00 |
| 8/9/2022 | Marc Schwartz | Getting payroll wire released by Axos bank | 1 10 | $ 690.00 | $ 759.00 |
| 8/9/2022 | Marc Schwartz | Meet with C Schwartz on engagement status and next steps | 1.00 | $ 690.00 | $ 690.00 |
| 8/9/2022 | Marc Schwartz | Meeting with counsel to discuss next filings | 1.00 | $ 690.00 | $ 690.00 |
| 8/9/2022 | Mary English | Administration of FSS accounts payable | 1 90 | $ 210.00 | $ 399.00 |
| 8/9/2022 | Mary English | ADP training for FSS payroll | 1.00 | $ 210.00 | $ 210.00 |
| 8/9/2022 | Mary English | adjusting Cost of Lifting Stay budget | 0 50 | $ 210.00 | $ 105.00 |
| 8/9/2022 | Priya Salagundla | QB review | 4.00 | $ 325.00 | $ 1,300.00 |
| 8/9/2022 | Priya Salagundla | Review with staff status of their work | 1.00 | $ 325.00 | $ 325.00 |
| 8/10/2022 | Christian Schwartz | Calls with Counsel on status and strategy | 1.00 | $ 470.00 | $ 470.00 |
| 8/10/2022 | Christian Schwartz | Look at new benefits and PEo | 2 50 | $ 470.00 | $ 1,175.00 |
| 8/10/2022 | Christian Schwartz | Review bills and accounting procedures | 1 50 | $ 470.00 | $ 705.00 |
| 8/10/2022 | Christian Schwartz | Review Insurance options with Rep | 3 50 | $ 470.00 | $ 1,645.00 |
| 8/10/2022 | Harold Lee | Bookkeeping | 3.00 | $ 280.00 | $ 840.00 |
| 8/10/2022 | Harold Lee | Bankruptcy Schedules | 1.40 | $ 280.00 | $ 392.00 |
| 8/10/2022 | Marc Schwartz | address ADP post bankruptcy funding requirements | 0 10 | $ 690.00 | $ 69.00 |
| 8/10/2022 | Marc Schwartz | management Review banking activity. | 0 30 | $ 690.00 | $ 207.00 |
| 8/10/2022 | Marc Schwartz | Call with counsel on fulfillment solution | 0.40 | $ 690.00 | $ 276.00 |

2

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8/10/2022 | Marc Schwartz | Status call with counsel | 0.70 | $ 690.00 | $ 483.00 |
| 8/10/2022 | Marc Schwartz | Working on Fulfillment situation summary | 1.60 | $ 690.00 | $ 1,104.00 |
| 8/10/2022 | Marc Schwartz | Reviewing drafts of motions to employ | 1 10 | $ 690.00 | $ 759.00 |
| 8/10/2022 | Marc Schwartz | Review applications to employ SLLLC and SALLC, | 0 30 | $ 690.00 | $ 207.00 |
| 8/10/2022 | Marc Schwartz | Research retainers and invoices on InfoWars and FSS for disclosure in FSS Application to Employ | 0 50 | $ 690.00 | $ 345.00 |
| 8/10/2022 | Mary English | Administration of FSS accounts payable (2), communication with ADP for payroll fees (.4), and AP preparation of weekly AP disbursements (3.7). | 6 10 | $ 210.00 | $ 1,281.00 |
| 8/10/2022 | Priya Salagundla | Quickbooks review | 1.70 | $ 325.00 | $ 552.50 |
| 8/10/2022 | Priya Salagundla | Internal project status updates with staff | 1 10 | $ 325.00 | $ 357.50 |
| 8/10/2022 | Priya Salagundla | cash collateral review, variance report review | 2.80 | $ 325.00 | $ 910.00 |
| 8/11/2022 | Christian Schwartz | Review CT budget | 0.70 | $ 470.00 | $ 329.00 |
| 8/11/2022 | Christian Schwartz | Review payroll reports | 2 30 | $ 470.00 | $ 1,081.00 |
| 8/11/2022 | Christian Schwartz | Daily call with Attorneys on strategy and status | 1.00 | $ 470.00 | $ 470.00 |
| 8/11/2022 | Harold Lee | Bookkeeping | 3 50 | $ 280.00 | $ 980.00 |
| 8/11/2022 | Harold Lee | updated cash budget | 3 20 | $ 280.00 | $ 896.00 |
| 8/11/2022 | Marc Schwartz | work on list of key employees and review new accounting procedures vis a vis processing invoices | 0 20 | $ 690.00 | $ 138.00 |
| 8/11/2022 | Marc Schwartz | Calls with counsel on fulfillment issue and getting concurrence of parties | 0 50 | $ 690.00 | $ 345.00 |
| 8/11/2022 | Marc Schwartz | Working on emergency motion addressing fulfillment payment change, email to A Jones on same | 1.00 | $ 690.00 | $ 690.00 |
| 8/11/2022 | Marc Schwartz | Status meeting on strategy with counsel | 1.00 | $ 690.00 | $ 690.00 |
| 8/11/2022 | Marc Schwartz | Getting Mary set up to make mobile deposits, endorse checks for mobile deposit, order endorsement stamp | 0.70 | $ 690.00 | $ 483.00 |
| 8/11/2022 | Marc Schwartz | call with attorneys in re UST and Sub v trustee positions, | 0 50 | $ 690.00 | $ 345.00 |
| 8/11/2022 | Marc Schwartz | Read Patrick Reilly witness outline | 0 20 | $ 690.00 | $ 138.00 |
| 8/11/2022 | Marc Schwartz | Call with R Battaglia (.2)and then A Jones on alternative to request for withholding from sales proceeds estimated cost of order fulfillment (.4) | 0.60 | $ 690.00 | $ 414.00 |
| 8/11/2022 | Mary English | Accounting services for past due FSS vendor invoices, . | 1.00 | $ 210.00 | $ 210.00 |
| 8/11/2022 | Mary English | discussions with Jeffrey Shulse in relation to donations and orders(1), mobile deposits of checks (3) | 4.00 | $ 210.00 | $ 840.00 |
| 8/11/2022 | Priya Salagundla | QB and A/P entry review | 2 90 | $ 325.00 | $ 942.50 |
| 8/11/2022 | Priya Salagundla | Work on project directions to manage staff assignments | 1.00 | $ 325.00 | $ 325.00 |
| 8/11/2022 | Priya Salagundla | AXOS bank setup, | 0.80 | $ 325.00 | $ 260.00 |
| 8/11/2022 | Priya Salagundla | Daily status call on strategy with counsel | 1 30 | $ 325.00 | $ 422.50 |
| 8/12/2022 | Christian Schwartz | Listen to BK hearing | 4.40 | $ 470.00 | $ 2,068.00 |
| 8/12/2022 | Harold Lee | Bookkeeping | 2 50 | $ 280.00 | $ 700.00 |
| 8/12/2022 | Harold Lee | prepared schedules for M Schwartz | 2.00 | $ 280.00 | $ 560.00 |
| 8/12/2022 | Marc Schwartz | Management - Work on accounts payable, pay bills | 1 10 | $ 690.00 | $ 759.00 |
| 8/12/2022 | Marc Schwartz | Preparing for hearing including reading witness outlines, motions in opposition | 1.70 | $ 690.00 | $ 1,173.00 |
| 8/12/2022 | Marc Schwartz | Attend hearing and testify | 4 30 | $ 690.00 | $ 2,967.00 |
| 8/12/2022 | Marc Schwartz | Pay bills | 0 50 | $ 690.00 | $ 345.00 |
| 8/12/2022 | Priya Salagundla | Priya Salagundla: QB review, | 3.60 | $ 325.00 | $ 1,170.00 |
| 8/12/2022 | Priya Salagundla | project status updates with staff and provide them directions | | $ | $ - |
| 8/12/2022 | Priya Salagundla | Cash management letter to K Lee; | 2.00 | $ 325.00 | $ 650.00 |
| 8/12/2022 | Priya Salagundla | A/P review | 1.60 | $ 325.00 | $ 520.00 |
| 8/14/2022 | Marc Schwartz | Research retail ecommerce fulfillment consultants | 1 20 | $ 690.00 | $ 828.00 |
| 8/15/2022 | Alex Taylor | Docket Updates | 0 10 | $ 150.00 | $ 15.00 |
| 8/15/2022 | Alex Taylor | Review additional listing of potential conflict relationships and cross reference to list received prior to engagement and to Firm client files | 0 30 | $ 150.00 | $ 45.00 |
| 8/15/2022 | Christian Schwartz | Review pleadings | 0.80 | $ 470.00 | $ 376.00 |
| 8/15/2022 | Christian Schwartz | Call potential expert and explain case | 0.70 | $ 470.00 | $ 329.00 |
| 8/15/2022 | Christian Schwartz | Research experts for case | 1.00 | $ 470.00 | $ 470.00 |
| 8/15/2022 | Harold Lee | Prepared Bankruptcy Schedules, Bookkeeping | 3 90 | $ 280.00 | $ 1,092.00 |
| 8/15/2022 | Marc Schwartz | Daily status call with counsel | 0.80 | $ 690.00 | $ 552.00 |
| 8/15/2022 | Marc Schwartz | Recording upcoming hearings, due dates and depositions | 0 30 | $ 690.00 | $ 207.00 |
| 8/15/2022 | Marc Schwartz | Researching 3PL consultants and industry | 1 20 | $ 690.00 | $ 828.00 |
| 8/15/2022 | Mary English | Administration of FSS accounts payable, and online banking deposit management. | 6 50 | $ 210.00 | $ 1,365.00 |
| 8/15/2022 | Priya Salagundla | Internal status review and discussions with staff | 1 10 | $ 325.00 | $ 357.50 |
| 8/15/2022 | Priya Salagundla | Accounting related discussions with M English and follow-up with her on projects status | 1.70 | $ 325.00 | $ 552.50 |
| 8/15/2022 | Priya Salagundla | Meeting with M English on accounting related questions | 0 50 | $ 325.00 | $ 162.50 |
| 8/15/2022 | Priya Salagundla | Review and Analysis of variance report | 1 30 | $ 325.00 | $ 422.50 |
| 8/16/2022 | Alex Taylor | Travel for Dr. Michels | 2.00 | $ 150.00 | $ 300.00 |
| 8/16/2022 | Alex Taylor | Review additional listing of potential conflict relationships and cross reference to list received prior to engagement and to Firm client files | 0.60 | $ 150.00 | $ 90.00 |
| 8/16/2022 | Christian Schwartz | Call with expert and attorneys | 1 30 | $ 470.00 | $ 611.00 |

3

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8/16/2022 | Christian Schwartz | Daily call with counsel on status and strategy | 0 50 | $ 470.00 | $ 235.00 |
| 8/16/2022 | Christian Schwartz | Communicate with staff on staus of engagment | 0 20 | $ 470.00 | $ 94.00 |
| 8/16/2022 | Harold Lee | Bookkeeping | 1.00 | $ 280.00 | $ 336.00 |
| 8/16/2022 | Marc Schwartz | Zoom interview with Joseph Michels | 1 20 | $ 690.00 | $ 828.00 |
| 8/16/2022 | Marc Schwartz | Status call with counsel | 1 20 | $ 690.00 | $ 828.00 |
| 8/16/2022 | Marc Schwartz | Call with B Roddy and P Riley on BAL and FSS WMS integrations, impact of back orders and preorders, expected savings from integration | 2.00 | $ 690.00 | $ 1,380.00 |
| 8/16/2022 | Marc Schwartz | Working on revised cash flow budget | 2.60 | $ 690.00 | $ 1,794.00 |
| 8/16/2022 | Marc Schwartz | Review and okay weekly cash flow variance report | 0 20 | $ 690.00 | $ 138.00 |
| 8/16/2022 | Mary English | Administration of FSS accounts payable, and online banking deposit management. | 2.40 | $ 210.00 | $ 504.00 |
| 8/16/2022 | Mary English | Research of Travis County records for inventory of appraised property. | 0 20 | $ 210.00 | $ 42.00 |
| 8/16/2022 | Priya Salagundla | QB review of entries, Financial statements and A/P | 3.70 | $ 325.00 | $ 1,202.50 |
| 8/16/2022 | Priya Salagundla | internal project updates with staff and provide directions | 2.00 | $ 325.00 | $ 650.00 |
| 8/16/2022 | Priya Salagundla | Follow-ups on bankruptcy schedules; information requests | 1 10 | $ 325.00 | $ 357.50 |
| 8/17/2022 | Christian Schwartz | Call with ADP | 1.00 | $ 470.00 | $ 470.00 |
| 8/17/2022 | Christian Schwartz | Call with counsel on status and strategy | 1.00 | $ 470.00 | $ 470.00 |
| 8/17/2022 | Christian Schwartz | Review Medical Insurance documents | 1 30 | $ 470.00 | $ 611.00 |
| 8/17/2022 | Harold Lee | Prepared Cash Budget | 3.00 | $ 280.00 | $ 840.00 |
| 8/17/2022 | Harold Lee | Bookkeeping service | 5.00 | $ 280.00 | $ 1,400.00 |
| 8/17/2022 | Marc Schwartz | Review application to employ Battaglia | 0.20 | $ 690.00 | $ 138.00 |
| 8/17/2022 | Marc Schwartz | Work on cash collateral budget | 0.30 | $ 690.00 | $ 207.00 |
| 8/17/2022 | Marc Schwartz | Review bank activity | 0.40 | $ 690.00 | $ 276.00 |
| 8/17/2022 | Marc Schwartz | Daily status call | 0.70 | $ 690.00 | $ 483.00 |
| 8/17/2022 | Marc Schwartz | Review Michels engagement agreement, send to RJ Shannon with questions, send revised redline to Michels, receive back, review, sign and send to Michels and RJ Shannon | 0.50 | $ 690.00 | $ 345.00 |
| 8/17/2022 | Marc Schwartz | Ask H Lee to reconcile cash collateral budget revenue to that reported in general ledger | 0.10 | $ 690.00 | $ 69.00 |
| 8/17/2022 | Marc Schwartz | Reading current draft of lift stay response | 0.60 | $ 690.00 | $ 414.00 |
| 8/17/2022 | Mary English | Accounting service in preparation of FSS weekly Accounts Payable distribution of funds (6) and review of documents provided by the Austin office's accounting department (2 2) | 8 20 | $ 210.00 | $ 1,722.00 |
| 8/17/2022 | Priya Salagundla | Meeting with J Shulse related to Bankruptcy Schedules | 3.00 | $ 325.00 | $ 975.00 |
| 8/17/2022 | Priya Salagundla | Gathered information and follow-ups on bankruptcy schedules | 2 20 | $ 325.00 | $ 715.00 |
| 8/17/2022 | Priya Salagundla | A/P review | 1 20 | $ 325.00 | $ 390.00 |
| 8/18/2022 | Alex Taylor | Docket Report | 0 10 | $ 150.00 | $ 15.00 |
| 8/18/2022 | Alex Taylor | J. Michels Travel | 0.60 | $ 150.00 | $ 90.00 |
| 8/18/2022 | Christian Schwartz | Daily call with Counsel | 1.00 | $ 470.00 | $ 470.00 |
| 8/18/2022 | Christian Schwartz | Review medical insurance with insurance broker | 1.00 | $ 470.00 | $ 470.00 |
| 8/18/2022 | Christian Schwartz | Conference to Discuss Expert Witness Issues with Christopher Brophy | 1.00 | $ 470.00 | $ 470.00 |
| 8/18/2022 | Christian Schwartz | Conference with N Pattis to Discuss Connecticut Trial Needs | 1.00 | $ 470.00 | $ 470.00 |
| 8/18/2022 | Harold Lee | Performed bookkeeping | 5.00 | $ 280.00 | $ 1,400.00 |
| 8/18/2022 | Harold Lee | prepared Bankruptcy Schedules | 0.70 | $ 280.00 | $ 196.00 |
| 8/18/2022 | Marc Schwartz | Pay J Michels retainer | 0.20 | $ 690.00 | $ 138.00 |
| 8/18/2022 | Marc Schwartz | Call with K Lee, R Battaglia, S Jordan, R Shannon and N Pattis | 1 10 | $ 690.00 | $ 759.00 |
| 8/18/2022 | Marc Schwartz | Call with prospective witness | 0.50 | $ 690.00 | $ 345.00 |
| 8/18/2022 | Marc Schwartz | Daily status call | 2.00 | $ 690.00 | $ 1,380.00 |
| 8/18/2022 | Marc Schwartz | Review Conn trial budget and amend, give changes to P Salangundla to be made to reflect expected actual witness days | 1.00 | $ 690.00 | $ 690.00 |
| 8/18/2022 | Marc Schwartz | Go over May 15, '22 inventory purchase from Hi- Tech Pharma with P Salagundla | 0.20 | $ 690.00 | $ 138.00 |
| 8/18/2022 | Marc Schwartz | Review bills to be paid with P Salagundla | 0.30 | $ 690.00 | $ 207.00 |
| 8/18/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds. | 6.30 | $ 210.00 | $ 1,323.00 |
| 8/18/2022 | Priya Salagundla | Staff information requests and follow-ups on bankruptcy schedules and QB review | 3.20 | $ 325.00 | $ 1,040.00 |
| 8/18/2022 | Priya Salagundla | Status meeting | 0.90 | $ 325.00 | $ 292.50 |
| 8/18/2022 | Priya Salagundla | A/P for the week review | 2.00 | $ 325.00 | $ 650.00 |
| 8/19/2022 | Alex Taylor | Docket Report | 0 20 | $ 150.00 | $ 30.00 |
| 8/19/2022 | Christian Schwartz | Call concerning ADP | 0 50 | $ 470.00 | $ 235.00 |
| 8/19/2022 | Christian Schwartz | Daily status and strategy call with Counsel | 1.00 | $ 470.00 | $ 470.00 |
| 8/19/2022 | Harold Lee | prepared Bankruptcy Schedules | 2.70 | $ 280.00 | $ 756.00 |
| 8/19/2022 | Harold Lee | Bookkeeping Services | 4.00 | $ 280.00 | $ 1,120.00 |
| 8/19/2022 | Marc Schwartz | RT travel time to Austin, 5 hours, billed 2 5 | 2 50 | $ 690.00 | $ 1,725.00 |
| 8/19/2022 | Marc Schwartz | Meet with J Michels prior to meeting with Blue Ascension | 0 50 | $ 690.00 | $ 345.00 |
| 8/19/2022 | Marc Schwartz | Meeting with J Michels, P Riley and B Roddy to analyze fulfillment operation at Blu Ascension | 4.00 | $ 690.00 | $ 2,760.00 |
| 8/19/2022 | Marc Schwartz | Daily status conference | 1.00 | $ 690.00 | $ 690.00 |

4

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|
| 8/19/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds (3)and communication with vendors (.3). | 3 30 | $ 210.00 | $ | 693.00 |
| 8/19/2022 | Priya Salagundla | Reviewed A/P (2),  followup with vendors for invoices and payment information (3), schedule paymentof AP in Axos (2.5) | 7 50 | $ 325.00 | $ | 2,437.50 |
| 8/20/2022 | Marc Schwartz | Read and respond to emails on Conn counsel not wanting to file application in BR court .3, | 0 30 | $ 690.00 | $ | 207.00 |
| 8/20/2022 | Marc Schwartz | proposed 2nd interim cash collateral order .2 | 0 20 | $ 690.00 | $ | 138.00 |
| 8/20/2022 | Marc Schwartz | Call with A Jones on stay, inventory balances and funding/budget | 0.40 | $ 690.00 | $ | 276.00 |
| 8/20/2022 | Marc Schwartz | Calls with N Pattis, K Lee and R Battaglia on N Pattis engagement by FSS | 0 50 | $ 690.00 | $ | 345.00 |
| 8/20/2022 | Marc Schwartz | Working on 2nd Interim Budget including calculating inventory acquisition | 1.00 | $ 690.00 | $ | 690.00 |
| 8/20/2022 | Marc Schwartz | Plaintiff' redlined cash collateral order | 0 10 | $ 690.00 | $ | 69.00 |
| 8/20/2022 | Marc Schwartz | Review applications to employ SALLC, Shannon Lee, and R W Battaglia | 0.40 | $ 690.00 | $ | 276.00 |
| 8/21/2022 | Marc Schwartz | Call with R Battaglia, K Lee, S Jordan, RJ Shannon | 0 50 | $ 690.00 | $ | 345.00 |
| 8/21/2022 | Marc Schwartz | Strategy meeting with counsel, A Jones and J Shulse | 1 50 | $ 690.00 | $ | 1,035.00 |
| 8/21/2022 | Marc Schwartz | Pay bills | 0 30 | $ 690.00 | $ | 207.00 |
| 8/22/2022 | Alex Taylor | Docket Report | 0 30 | $ 150.00 | $ | 45.00 |
| 8/22/2022 | Alex Taylor | Flight changes for Dr. Joe Michels | 0.70 | $ 150.00 | $ | 105.00 |
| 8/22/2022 | Christian Schwartz | Daily Status Call | 1.00 | $ 470.00 | $ | 470.00 |
| 8/22/2022 | Christian Schwartz | Review schedules and pleadings | 2.40 | $ 470.00 | $ | 1,128.00 |
| 8/22/2022 | Harold Lee | Performed Bookkeeping | 4.00 | $ 280.00 | $ | 1,120.00 |
| 8/22/2022 | Harold Lee | prepared Bankruptcy Schedules | 4 50 | $ 280.00 | $ | 1,260.00 |
| 8/22/2022 | Marc Schwartz | Pattis Smith engagement letter review | 0.40 | $ 690.00 | $ | 276.00 |
| 8/22/2022 | Marc Schwartz | Call with N Pattis, R Battaglia, RJ Shannon and K Lee on Pattis engagement letter and application to employ | 0 50 | $ 690.00 | $ | 345.00 |
| 8/22/2022 | Marc Schwartz | Arrange to pay for registration of FSS truck | 0 20 | $ 690.00 | $ | 138.00 |
| 8/22/2022 | Marc Schwartz | Reading draft of Andino Application to Employ and Engagement letter | 0.60 | $ 690.00 | $ | 414.00 |
| 8/22/2022 | Marc Schwartz | call with K Lee, RJ Shannon and A Freynal on Freynal engagement letter and application to employ | 0 50 | $ 690.00 | $ | 345.00 |
| 8/22/2022 | Marc Schwartz | Call with A Jones and S Rodgers on Infowars Platinum consignment deal and send email to counsel on same | 0.60 | $ 690.00 | $ | 414.00 |
| 8/22/2022 | Marc Schwartz | Read draft of 2nd Interim Cash Collateral Order | 0 30 | $ 690.00 | $ | 207.00 |
| 8/22/2022 | Marc Schwartz | Continue paying bills | 0 10 | $ 690.00 | $ | 69.00 |
| 8/22/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds. | 7.80 | $ 210.00 | $ | 1,638.00 |
| 8/22/2022 | Priya Salagundla | Internal project status updates and directions | 0 50 | $ 325.00 | $ | 162.50 |
| 8/22/2022 | Priya Salagundla | Reviewed Vendors and critical vendors and payment details | 2.40 | $ 325.00 | $ | 780.00 |
| 8/22/2022 | Priya Salagundla | Bankruptcy schedules information request and followups | 2 10 | $ 325.00 | $ | 682.50 |
| 8/23/2022 | Alex Taylor | Docket Report | 0 10 | $ 150.00 | $ | 15.00 |
| 8/23/2022 | Christian Schwartz | Review bk schedules | 1 30 | $ 470.00 | $ | 611.00 |
| 8/23/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ | 470.00 |
| 8/23/2022 | Marc Schwartz | Pay bills and payroll | 0.70 | $ 690.00 | $ | 483.00 |
| 8/23/2022 | Marc Schwartz | Status call | 0.80 | $ 690.00 | $ | 552.00 |
| 8/23/2022 | Marc Schwartz | Changes to 2nd interim budget | 0.20 | $ 690.00 | $ | 138.00 |
| 8/23/2022 | Marc Schwartz | Prepare budget variance report | 0.90 | $ 690.00 | $ | 621.00 |
| 8/23/2022 | Marc Schwartz | Review draft of filings and order | 0.50 | $ 690.00 | $ | 345.00 |
| 8/23/2022 | Marc Schwartz | call with counsel on preparations for hearing tomorrow on Continued Cash Collateral | 1.80 | $ 690.00 | $ | 1,242.00 |
| 8/23/2022 | Marc Schwartz | negotiations with plaintiffs' counsel,  R Chapelle, on Continued Cash Collateral Motion | 0 50 | $ 690.00 | $ | 345.00 |
| 8/23/2022 | Mary English | Assisting S Schwartz on FSS accounting procedures and updating vendor accounts | 8 10 | $ 210.00 | $ | 1,701.00 |
| 8/23/2022 | Priya Salagundla | Internal project direction with staff | 0.70 | $ 325.00 | $ | 227.50 |
| 8/23/2022 | Priya Salagundla | QB review | 5.00 | $ 325.00 | $ | 1,625.00 |
| 8/23/2022 | Priya Salagundla | Variance and Aurium report review | 2.00 | $ 325.00 | $ | 650.00 |
| 8/23/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 6.00 | $ 150.00 | $ | 900.00 |
| 8/24/2022 | Christian Schwartz | Review financials and schedules. | 1 50 | $ 470.00 | $ | 705.00 |
| 8/24/2022 | Christian Schwartz | Daily status call | 1.00 | $ 470.00 | $ | 470.00 |
| 8/24/2022 | Christian Schwartz | Counsel Call | 1.00 | $ 470.00 | $ | 470.00 |
| 8/24/2022 | Harold Lee | Performed bookkeeping services(4) and prepared bankruptcy schedules (3.6) | 7.60 | $ 280.00 | $ | 2,128.00 |
| 8/24/2022 | Marc Schwartz | Meet with K Lee to prepare for hearing | 0.40 | $ 690.00 | $ | 276.00 |
| 8/24/2022 | Marc Schwartz | Attend hearing on cash collateral and motion to lift stay | 1 20 | $ 690.00 | $ | 828.00 |
| 8/24/2022 | Marc Schwartz | analyzing funds available to purchase inventory, through end of cash budget | 1.00 | $ 690.00 | $ | 690.00 |
| 8/24/2022 | Marc Schwartz | research legal bills in 2021 QB | 0 20 | $ 690.00 | $ | 138.00 |
| 8/24/2022 | Marc Schwartz | Call with R Battaglia, K Lee and J Shulse on Alex consignment inventory, FSS legal bills | 1 20 | $ 690.00 | $ | 828.00 |

5

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8/24/2022 | Priya Salagundla | QB review; | 5.80 | $ 325.00 | $ 1,885.00 |
| 8/24/2022 | Priya Salagundla | follow up emails related to bankruptcy schedules | | | $ - |
| 8/25/2022 | Christian Schwartz | Daily call with counsel on status and strategy | 1.00 | $ 470.00 | $ 470.00 |
| 8/25/2022 | Christian Schwartz | Review pleadings and stop drafts | 1 30 | $ 470.00 | $ 611.00 |
| 8/25/2022 | Harold Lee | Bookkeeping (6)and prepared bankruptcy schedule(3.4) | 9.40 | $ 280.00 | $ 2,632.00 |
| 8/25/2022 | Marc Schwartz | Working on inventory issues related to InfoWars Platinum products and X7 order, reviewing POs and invoices. | 0.40 | $ 690.00 | $ 276.00 |
| 8/25/2022 | Marc Schwartz | FSS - Daily Status Call | 0.80 | $ 690.00 | $ 552.00 |
| 8/25/2022 | Marc Schwartz | Review Initial Debtor Report form, email to Dr. Jones and J Shulse for insurance policy information | 0.40 | $ 690.00 | $ 276.00 |
| 8/25/2022 | Marc Schwartz | Call with Dr. Jones to obtain more information on X7 inventory and when in stock. | 0.40 | $ 690.00 | $ 276.00 |
| 8/25/2022 | Marc Schwartz | Download and cash collateral orders | 0 20 | $ 690.00 | $ 138.00 |
| 8/25/2022 | Marc Schwartz | Working on Initial Debtor Report | 1 50 | $ 690.00 | $ 1,035.00 |
| 8/25/2022 | Marc Schwartz | Reading draft of interim application motion | 0 30 | $ 690.00 | $ 207.00 |
| 8/25/2022 | Marc Schwartz | Locating emails and combining into one folder for production review | 2.00 | $ 690.00 | $ 1,380.00 |
| 8/25/2022 | Marc Schwartz | Calls with A Jones and D Jones on Infowars Platinum product purchase and financing inventory purchases | 0.60 | $ 690.00 | $ 414.00 |
| 8/25/2022 | Marc Schwartz | Review changes to Initial Debtor report, call to K Lee to set up his review of report | 0.40 | $ 690.00 | $ 276.00 |
| 8/25/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds. | 7 10 | $ 210.00 | $ 1,491.00 |
| 8/25/2022 | Priya Salagundla | Accounts Payable review | 1.70 | $ 325.00 | $ 552.50 |
| 8/25/2022 | Priya Salagundla | Bankruptcy Schedules review | 3 50 | $ 325.00 | $ 1,137.50 |
| 8/25/2022 | Priya Salagundla | Project status updates and directions (1); bank activity review (.8) | 1.80 | $ 325.00 | $ 585.00 |
| 8/25/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 1.00 | $ 150.00 | $ 150.00 |
| 8/26/2022 | Alex Taylor | Docket Report | 0 20 | $ 150.00 | $ 30.00 |
| 8/26/2022 | Christian Schwartz | Phone calls with Ally Bank on repossessed vehicle | 5 90 | $ 470.00 | $ 2,773.00 |
| 8/26/2022 | Harold Lee | Bookkeeping and prepared Bankruptcy Schedules | 9.00 | $ 280.00 | $ 2,520.00 |
| 8/26/2022 | Marc Schwartz | Review schedules and SOFA | 1.30 | $ 690.00 | $ 897.00 |
| 8/26/2022 | Marc Schwartz | Daily status call | 0.60 | $ 690.00 | $ 414.00 |
| 8/26/2022 | Marc Schwartz | Call with J Shulse on IDR and Schedules data needed, overpayment of payroll | 0 30 | $ 690.00 | $ 207.00 |
| 8/26/2022 | Marc Schwartz | Calls (3) from A Jones | 0 20 | $ 690.00 | $ 138.00 |
| 8/26/2022 | Marc Schwartz | Work on repossessed truck | 0 50 | $ 690.00 | $ 345.00 |
| 8/26/2022 | Marc Schwartz | Work on ID report and schedules with K Lee and H Lee | 1.00 | $ 690.00 | $ 690.00 |
| 8/26/2022 | Marc Schwartz | Sign I D report and email to H Lee | 0 20 | $ 690.00 | $ 138.00 |
| 8/26/2022 | Marc Schwartz | Pay bills | 0.60 | $ 690.00 | $ 414.00 |
| 8/26/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds and communication with vendors. | 8 20 | $ 210.00 | $ 1,722.00 |
| 8/26/2022 | Priya Salagundla | QB and bankruptcy schedules review | 6 50 | $ 325.00 | $ 2,112.50 |
| 8/27/2022 | Marc Schwartz | Reading draft of response to Conn Plaintiffs motion, also case sent by K Lee | 0 30 | $ 690.00 | $ 207.00 |
| 8/27/2022 | Marc Schwartz | Work on response to plaintiffs production request | 3.00 | $ 690.00 | $ 2,070.00 |
| 8/27/2022 | Marc Schwartz | Call to discuss status of negotiations | 1.00 | $ 690.00 | $ 690.00 |
| 8/27/2022 | Marc Schwartz | Call with Sub v trustee | 0 20 | $ 690.00 | $ 138.00 |
| 8/28/2022 | Marc Schwartz | Debtor's response to Motion to Correct Motion to Appoint a Tort Committee and remove DIP | 0 30 | $ 690.00 | $ 207.00 |
| 8/28/2022 | Marc Schwartz | Reading UST ch 11 and sub v instructions | 0 30 | $ 690.00 | $ 207.00 |
| 8/28/2022 | Marc Schwartz | Upload files to Dropbox and share with R Battaglia | 0.40 | $ 690.00 | $ 276.00 |
| 8/28/2022 | Marc Schwartz | work on Production from QB ledgers | 3 20 | $ 690.00 | $ 2,208.00 |
| 8/28/2022 | Marc Schwartz | Zoom with S Lemmon and K Lee to review PQPR balance sheet as of 8/26/2022 | 0 20 | $ 690.00 | $ 138.00 |
| 8/29/2022 | Alex Taylor | Docket Report | 0 10 | $ 150.00 | $ 15.00 |
| 8/29/2022 | Christian Schwartz | Read through DIP guidelines. .2 Respond to emails .4 | 0.60 | $ 470.00 | $ 282.00 |
| 8/29/2022 | Christian Schwartz | Read through financial information as of this morning .9 | 0 90 | $ 470.00 | $ 423.00 |
| 8/29/2022 | Christian Schwartz | Call Ally re: releasing repossessed Tahoe | 2 50 | $ 470.00 | $ 1,175.00 |
| 8/29/2022 | Christian Schwartz | Call with Insurance Broker | 1.00 | $ 470.00 | $ 470.00 |
| 8/29/2022 | Christian Schwartz | Daily Status call | 1.00 | $ 470.00 | $ 470.00 |
| 8/29/2022 | Marc Schwartz | Working on Schedules and SOFA | 1.00 | $ 690.00 | $ 690.00 |
| 8/29/2022 | Marc Schwartz | Status conference with counsel | 0.60 | $ 690.00 | $ 414.00 |
| 8/29/2022 | Marc Schwartz | Attend hearing on Motion to Lift Stay, Employment of state court counsel | 0.80 | $ 690.00 | $ 552.00 |
| 8/29/2022 | Marc Schwartz | Work on Schedules with K Lee and RJ Shannon | 1.00 | $ 690.00 | $ 690.00 |
| 8/29/2022 | Marc Schwartz | Management, address Google Wire cutoff and internet bills not paid. | 0 50 | $ 690.00 | $ 345.00 |
| 8/29/2022 | Marc Schwartz | Review Initial Debtor Report in preparation for meeting tomorrow | 0 50 | $ 690.00 | $ 345.00 |

6

005882

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 8/29/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds (5) , attention to Accounting and Melinda Flores' relevant emails received, (2) and communication with vendors(.7). | 7.70 | $ 210.00 | $ 1,617.00 |
| 8/29/2022 | Priya Salagundla | Vendor follow-ups (4); Updated QB( 2) Directions to M English (.9) | 6 90 | $ 325.00 | $ 2,242.50 |
| 8/30/2022 | Christian Schwartz | Read and respond to counsel communication | 0.80 | $ 470.00 | $ 376.00 |
| 8/30/2022 | Marc Schwartz | Meeting with K Lee to review for IDI | 0.70 | $ 690.00 | $ 483.00 |
| 8/30/2022 | Marc Schwartz | Attend Initial Debtor Interview | 1.00 | $ 690.00 | $ 690.00 |
| 8/30/2022 | Marc Schwartz | Daily status call with counsel | 0.80 | $ 690.00 | $ 552.00 |
| 8/30/2022 | Marc Schwartz | Pull accounting for professional fees funded through trust account | 0.70 | $ 690.00 | $ 483.00 |
| 8/30/2022 | Marc Schwartz | Review and edit Variance and ████ Use of Cash | 0.40 | $ 690.00 | $ 276.00 |
| 8/30/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds (4.5), attention to Accounting and Melinda Flores' relevant emails received (2), and communication with vendors (1.1). | 7.60 | $ 210.00 | $ 1,596.00 |
| 8/30/2022 | Priya Salagundla | Call with Ben and Chris Andrews related to vendor logins | 0.80 | $ 325.00 | $ 260.00 |
| 8/30/2022 | Priya Salagundla | Vendor followups and Ally payment followup with J Shulse | 0.80 | $ 325.00 | $ 260.00 |
| 8/30/2022 | Priya Salagundla | Updated QB(5) prepared variance and Aurium reports (1) | 6.00 | $ 325.00 | $ 1,950.00 |
| 8/31/2022 | Alex Taylor | Docket Report | 0 20 | $ 150.00 | $ 30.00 |
| 8/31/2022 | Marc Schwartz | Meeting with A Jones, B Roddy, A Gucciardi and T Fruge to discuss credit card processors and inventory purchases | 2 50 | $ 690.00 | $ 1,725.00 |
| 8/31/2022 | Marc Schwartz | Meeting with A Jones and J Dalessio to discuss COO position | 1.00 | $ 690.00 | $ 690.00 |
| 8/31/2022 | Marc Schwartz | Daily status meeting | 0.80 | $ 690.00 | $ 552.00 |
| 8/31/2022 | Marc Schwartz | Review cash receipts and vendor invoices received in accounting office | 0 50 | $ 690.00 | $ 345.00 |
| 8/31/2022 | Marc Schwartz | RT travel time to FSS offices in Austin, billed one half of the combined 5 hours in order to bring total charged to same as at 50% of billing rate | 2 50 | $ 690.00 | $ 1,725.00 |
| 8/31/2022 | Marc Schwartz | Review draft of Martin Disere engagement letter | 0.40 | $ 690.00 | $ 276.00 |
| 8/31/2022 | Marc Schwartz | Reading analyses of possible actions by debtor in response to PQPr motion to charge the Sub v trustee with investigating debtor | 0.60 | $ 690.00 | $ 414.00 |
| 8/31/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds, management of Accounting and Melinda Flores' relevant emails received, and communication with vendors. | 5 10 | $ 210.00 | $ 1,071.00 |
| 8/31/2022 | Priya Salagundla | QB review | 1.60 | $ 325.00 | $ 520.00 |
| 8/31/2022 | Priya Salagundla | A/P and Vendor followups with M English | 1 20 | $ 325.00 | $ 390.00 |
| 8/31/2022 | Priya Salagundla | Updated Quick Books | 2.60 | $ 325.00 | $ 845.00 |
| 8/31/2022 | Susan Schwartz | Travel to and from Austin billed at 1/2 time | 2 50 | $ 150.00 | $ 375.00 |
| 8/31/2022 | Susan Schwartz | Opened mail and checks in the Austin office checking for unpaid invoices to update in Quick Books (3). Checked the accounting email account for unpaid invoice entries (2) | 5.00 | $ 150.00 | $ 750.00 |
| 9/1/2022 | Alex Taylor | Review docket for new entries and advise M Schwartz of nature of new entries | 0 10 | $ 150.00 | $ 15.00 |
| 9/1/2022 | Alex Taylor | Calling prospective bookkeeper in Austin to determine availablity at request of M Schwartz | 0 30 | $ 150.00 | $ 45.00 |
| 9/1/2022 | Alex Taylor | Reconciling vendor list with AMEX | 2 90 | $ 150.00 | $ 435.00 |
| 9/1/2022 | Marc Schwartz | Sending emails to R Battaglia | 1.00 | $ 690.00 | $ 690.00 |
| 9/1/2022 | Marc Schwartz | Status call | 0.80 | $ 690.00 | $ 552.00 |
| 9/1/2022 | Marc Schwartz | Call with T Enlow and order debit card for T Enlow use | 0 20 | $ 690.00 | $ 138.00 |
| 9/1/2022 | Marc Schwartz | Sending emails to R Battaglia to review for production | 2 50 | $ 690.00 | $ 1,725.00 |
| 9/1/2022 | Mary English | Accounting services in preparation of FSS weekly Accounts Payable distribution of funds. | 2 50 | $ 210.00 | $ 525.00 |
| 9/1/2022 | Priya Salagundla | Reviewed Accounts Payables and paid bills | 5 50 | $ 325.00 | $ 1,787.50 |
| 9/1/2022 | Susan Schwartz | Systematically check all of the accounting emails for unpaid accounts payable to input into QuickBooks | 2.00 | $ 150.00 | $ 300.00 |
| 9/2/2022 | Alex Taylor | Docket Report & FSS Accounting / Bookkeeping Meeting | 0.40 | $ 150.00 | $ 60.00 |
| 9/2/2022 | Alex Taylor | Vendor List Cross Reference | 1.00 | $ 150.00 | $ 150.00 |
| 9/2/2022 | Alex Taylor | Authorize.net | 0.60 | $ 150.00 | $ 90.00 |
| 9/2/2022 | Alex Taylor | AP | 2.20 | $ 150.00 | $ 330.00 |
| 9/2/2022 | Alex Taylor | Call with D Whitehair to go over employment | 1.20 | $ 150.00 | $ 180.00 |
| 9/2/2022 | Marc Schwartz | Call with C Cicack on inventory and cost issues | 0.40 | $ 690.00 | $ 276.00 |
| 9/2/2022 | Marc Schwartz | Status meeting | 0.60 | $ 690.00 | $ 414.00 |
| 9/2/2022 | Marc Schwartz | Working on debit card problem | 1.50 | $ 690.00 | $ 1,035.00 |
| 9/2/2022 | Marc Schwartz | Hiring Dani Whitehair part time bookkeeper for FSS in Austin | 0.50 | $ 690.00 | $ 345.00 |
| 9/2/2022 | Mary English | Travel to meet with J Shulse (1 hr, 1/2 billed) | 0 50 | $ 210.00 | $ 105.00 |
| 9/2/2022 | Mary English | meeting with J Shulse to discuss documents returned from Austin and new procedures | 2.00 | $ 210.00 | $ 420.00 |
| 9/2/2022 | Mary English | updating vendor forms of payment for weekly AP disbursements | 3.00 | $ 210.00 | $ 630.00 |
| 9/2/2022 | Priya Salagundla | Bill payments and vendor payment information | 8 50 | $ 325.00 | $ 2,762.50 |
| 9/2/2022 | Susan Schwartz | Working on updating Quick Books with the accounting emails on unpaid invoices | 4.00 | $ 150.00 | $ 600.00 |
| 9/3/2022 | Marc Schwartz | Work on Cicack draft term sheet | 1.00 | $ 690.00 | $ 690.00 |
| 9/3/2022 | Marc Schwartz | reading cases sent by K Lee on disposable income for Sub v plan | 1.00 | $ 690.00 | $ 690.00 |

005883

FREE SPEECH SYSTEMS, LLC
SCHWARTZ ASSOCIATES, LLC
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 9/3/2022 | Marc Schwartz | Call with S Jordan and K Lee on possible consignment deal | 0.40 | $ 690.00 | $ 276.00 |
| 9/3/2022 | Marc Schwartz | Continue reading cases on disposable income | 0 30 | $ 690.00 | $ 207.00 |
| 9/3/2022 | Marc Schwartz | QB reports for C Cicack | 0.60 | $ 690.00 | $ 414.00 |
| 9/3/2022 | Marc Schwartz | Updating calendar and work on timing of C Cicack visit. | 0 20 | $ 690.00 | $ 138.00 |
| 9/5/2022 | Christian Schwartz | Review financials (.7), review budget and projections(1.8)  Meet with benefits rep (1.5) | 4.00 | $ 470.00 | $ 1,880.00 |
| 9/5/2022 | Marc Schwartz | Pulling QB data on equity contributions and draws | 1.00 | $ 690.00 | $ 690.00 |
| 9/5/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 1.00 | $ 150.00 | $ 150.00 |
| 9/6/2022 | Christian Schwartz | Status Call | 1.00 | $ 470.00 | $ 470.00 |
| 9/6/2022 | Marc Schwartz | Pay bills | 0.60 | $ 690.00 | $ 414.00 |
| 9/6/2022 | Marc Schwartz | Daily status meeting | 0.80 | $ 690.00 | $ 552.00 |
| 9/6/2022 | Marc Schwartz | Researching PQPR/FSS transactions in QB | 1.00 | $ 690.00 | $ 690.00 |
| 9/6/2022 | Marc Schwartz | Online to pay bills and stop payment | 0 30 | $ 690.00 | $ 207.00 |
| 9/6/2022 | Priya Salagundla | Updated QB and Bill Payments | 8 50 | $ 325.00 | $ 2,762.50 |
| 9/6/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 2 50 | $ 150.00 | $ 375.00 |
| 9/7/2022 | Alex Taylor | Email Correspondence and Scheduling | 0.80 | $ 150.00 | $ 120.00 |
| 9/7/2022 | Alex Taylor | Call with J. Shulse on new hire | 0.60 | $ 150.00 | $ 90.00 |
| 9/7/2022 | Alex Taylor | Conference call with J. Shulse and D. Whitehair regarding Whitehair's new position and preparation for start next week | 1.70 | $ 150.00 | $ 255.00 |
| 9/7/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ 470.00 |
| 9/7/2022 | Marc Schwartz | Working on investigating Cloudflare non payment and processing WT to pay them | 1.00 | $ 690.00 | $ 690.00 |
| 9/7/2022 | Marc Schwartz | Daily status meeting | 0 50 | $ 690.00 | $ 345.00 |
| 9/7/2022 | Marc Schwartz | 341 meeting prep with K Lee | 1.00 | $ 690.00 | $ 690.00 |
| 9/7/2022 | Marc Schwartz | 341 Meeting | 2 50 | $ 690.00 | $ 1,725.00 |
| 9/7/2022 | Marc Schwartz | Work on Debtor's rogs and rfp for plaintiffs w K Lee | 0 50 | $ 690.00 | $ 345.00 |
| 9/7/2022 | Mary English | Process check deposits for Donations and Operating accounts (4) and preparation of redacted bank statements for filing (1) | 5.00 | $ 210.00 | $ 1,050.00 |
| 9/7/2022 | Priya Salagundla | Call with Cloudflare | 0 50 | $ 325.00 | $ 162.50 |
| 9/7/2022 | Priya Salagundla | Updated QB and Bill Payments | 1 30 | $ 325.00 | $ 422.50 |
| 9/7/2022 | Priya Salagundla | Updated Quick Books | 6.80 | $ 325.00 | $ 2,210.00 |
| 9/7/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 2.00 | $ 150.00 | $ 300.00 |
| 9/8/2022 | Alex Taylor | Meeting with M. Schwartz regarding new hire. | 0.70 | $ 150.00 | $ 105.00 |
| 9/8/2022 | Alex Taylor | Call with J. Shulse to go over Amex | 1 30 | $ 150.00 | $ 195.00 |
| 9/8/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ 470.00 |
| 9/8/2022 | Marc Schwartz | Fund payroll | 0 20 | $ 690.00 | $ 138.00 |
| 9/8/2022 | Marc Schwartz | Status meeting | 0.60 | $ 690.00 | $ 414.00 |
| 9/8/2022 | Marc Schwartz | Franchise tax return | 1 50 | $ 690.00 | $ 1,035.00 |
| 9/8/2022 | Marc Schwartz | Call with B Roddy with K Lee on question from N Pattis | 0 20 | $ 690.00 | $ 138.00 |
| 9/8/2022 | Marc Schwartz | Revised processor cash report | 0.50 | $ 690.00 | $ 345.00 |
| 9/8/2022 | Marc Schwartz | Read draft and final affidavit, sign and send to RJ | 1.00 | $ 690.00 | $ 690.00 |
| 9/8/2022 | Mary English | Obtaining vendor credentials for payment updates. | 0.70 | $ 210.00 | $ 147.00 |
| 9/8/2022 | Priya Salagundla | Updated Quick Books; Bill Payments; Weekly A/P review and updated vendor payment information | 8.50 | $ 325.00 | $ 2,762.50 |
| 9/8/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 1.00 | $ 150.00 | $ 150.00 |
| 9/9/2022 | Alex Taylor | Managing meeting with M Schwartz, CPA and attorneys | 1.00 | $ 150.00 | $ 150.00 |
| 9/9/2022 | Alex Taylor | Amex Review | 1.30 | $ 150.00 | $ 195.00 |
| 9/9/2022 | Alex Taylor | Jon Bowne Payment | 0.60 | $ 150.00 | $ 90.00 |
| 9/9/2022 | Alex Taylor | Internal Accounting Meeting | 0.40 | $ 150.00 | $ 60.00 |
| 9/9/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ 470.00 |
| 9/9/2022 | Marc Schwartz | Working with A Jones and J Dalessio on BAL order backlog due to book sales | 0.40 | $ 690.00 | $ 276.00 |
| 9/9/2022 | Marc Schwartz | Located prepaid debit card sent to T Enlow | 0.50 | $ 690.00 | $ 345.00 |
| 9/9/2022 | Marc Schwartz | Call with Brittany Paz to help prepare for trial | 1.00 | $ 690.00 | $ 690.00 |
| 9/9/2022 | Marc Schwartz | Daily status call | 1.00 | $ 690.00 | $ 690.00 |
| 9/9/2022 | Marc Schwartz | Meeting on reassignment of duties for FSS daily accounting | 0.70 | $ 690.00 | $ 483.00 |
| 9/9/2022 | Marc Schwartz | Calls with AJ, P Riley, J Dalessio and B Roddy on fulfillment issues, requested Dalessio to get orders reconciled and to prepare a report on products sold | 1.00 | $ 690.00 | $ 690.00 |
| 9/9/2022 | Priya Salagundla | Updated QB with bank transactions; AP review; weekly bill payments | 7 50 | $ 325.00 | $ 2,437.50 |
| 9/9/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 1.00 | $ 150.00 | $ 150.00 |
| 9/9/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 1 50 | $ 150.00 | $ 225.00 |
| 9/10/2022 | Marc Schwartz | Working on cash collateral budget | 2.60 | $ 690.00 | $ 1,794.00 |

8

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | | Amount |
|---|---|---|---|---|---|---|
| 9/10/2022 | Marc Schwartz | Read Michels report and invoice | 0.40 | $ 690.00 | $ | 276.00 |
| 9/10/2022 | Susan Schwartz | Checked accounting email for new invoices and new vendors and updated accounts payable in QuickBooks and vendor information. | 1.00 | $ 150.00 | $ | 150.00 |
| 9/12/2022 | Alex Taylor | Coordinating New Hire with J. Shulse | 0 50 | $ 150.00 | $ | 75.00 |
| 9/12/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ | 470.00 |
| 9/12/2022 | Marc Schwartz | Pull up and research status report requirements | 0.40 | $ 690.00 | $ | 276.00 |
| 9/12/2022 | Marc Schwartz | Status meeting | 1.40 | $ 690.00 | $ | 966.00 |
| 9/12/2022 | Marc Schwartz | Researching responses to questions raised at 341 | 1.00 | $ 690.00 | $ | 690.00 |
| 9/12/2022 | Marc Schwartz | Review changes to consignment agreement | 0.40 | $ 690.00 | $ | 276.00 |
| 9/12/2022 | Marc Schwartz | Review accounts payable | 0 50 | $ 690.00 | $ | 345.00 |
| 9/12/2022 | Priya Salagundla | Updated QB | 2 90 | $ 325.00 | $ | 942.50 |
| 9/12/2022 | Priya Salagundla | Critical Vendor A/P | 1.00 | $ 325.00 | $ | 325.00 |
| 9/12/2022 | Priya Salagundla | Meeting with Dani Whitehair to go over job responsibilities and deadlines | 0.70 | $ 325.00 | $ | 227.50 |
| 9/12/2022 | Priya Salagundla | Bill Payments | 1.50 | $ 325.00 | $ | 487.50 |
| 9/12/2022 | Susan Schwartz | Updated Quick Books accounts payable from the emails in the accounting email account | 3.00 | $ 150.00 | $ | 450.00 |
| 9/13/2022 | Christian Schwartz | Meeting in Austin - 3 | 3.00 | $ 470.00 | $ | 1,410.00 |
| 9/13/2022 | Christian Schwartz | Drive to Austin - 7/2=3.5 | 3.50 | $ 470.00 | $ | 1,645.00 |
| 9/13/2022 | Marc Schwartz | travel to and from Austin, 5 hours billed 2.5 | 2.50 | $ 690.00 | $ | 1,725.00 |
| 9/13/2022 | Marc Schwartz | meeting with A Jones and J Dallessio on FSS organization, roles of personnel | 2.00 | $ 690.00 | $ | 1,380.00 |
| 9/13/2022 | Marc Schwartz | Strategy meeting with R Battaglia K Lee | 2.00 | $ 690.00 | $ | 1,380.00 |
| 9/13/2022 | Marc Schwartz | Work in accounting office to review cash received and prepare for D Whitehair | 0.50 | $ 690.00 | $ | 345.00 |
| 9/13/2022 | Mary English | Management of vendor records | 1.00 | $ 210.00 | $ | 210.00 |
| 9/13/2022 | Priya Salagundla | prepared variance report | 2.50 | $ 325.00 | $ | 812.50 |
| 9/13/2022 | Priya Salagundla | Updated QB; | 5.00 | $ 325.00 | $ | 1,625.00 |
| 9/13/2022 | Susan Schwartz | Update accounts payable from the accounting email to unpaid invoices in Quick Books | 1.00 | $ 150.00 | $ | 150.00 |
| 9/14/2022 | Alex Taylor | Review docket and advise M Schwartz of new entries | 0 20 | $ 150.00 | $ | 30.00 |
| 9/14/2022 | Alex Taylor | Meetings with proposed CPA for FSS Franchise and Sales Tax returns and with Sub V trustee, | 0 10 | $ 150.00 | $ | 15.00 |
| 9/14/2022 | Christian Schwartz | Meet with FSS staff on health insurance | 2.00 | $ 470.00 | $ | 940.00 |
| 9/14/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ | 470.00 |
| 9/14/2022 | Marc Schwartz | Status meeting | 0 50 | $ 690.00 | $ | 345.00 |
| 9/14/2022 | Marc Schwartz | Work on getting debit card activated, | 0 50 | $ 690.00 | $ | 345.00 |
| 9/14/2022 | Marc Schwartz | planning meeting with J Dalessio and SALLC FSS personnel | 3 50 | $ 690.00 | $ | 2,415.00 |
| 9/14/2022 | Priya Salagundla | Updated QB with bank transactions, sales and inventory | 7 90 | $ 325.00 | $ | 2,567.50 |
| 9/14/2022 | Susan Schwartz | Updating accounts payable from the accounting email to Quick Books | 3 50 | $ 150.00 | $ | 525.00 |
| 9/14/2022 | Susan Schwartz | Continual checking for unpaid invoices in the accounting email to update in Quick Books | 1.00 | $ 150.00 | $ | 150.00 |
| 9/15/2022 | Alex Taylor | Locating Laptop that meets FSS specifications for new FSS accounting employee | 0 30 | $ 150.00 | $ | 45.00 |
| 9/15/2022 | Christian Schwartz | FSS - Daily Status Call | 1.00 | $ 470.00 | $ | 470.00 |
| 9/15/2022 | Marc Schwartz | Meeting with M Haseldon, E Freeman | 4.00 | $ 690.00 | $ | 2,760.00 |
| 9/15/2022 | Marc Schwartz | Emburse cards demo, prepaid debit cards | 1.00 | $ 690.00 | $ | 690.00 |
| 9/15/2022 | Mary English | Management of vendor records | 1.00 | $ 210.00 | $ | 210.00 |
| 9/15/2022 | Priya Salagundla | Updated QB; review AP balance and collected vendor payment information | 8 20 | $ 325.00 | $ | 2,665.00 |
| 9/15/2022 | Marc Schwartz | Download time records requested by UST | 0.20 | $ 690.00 | $ | 138.00 |
| 9/16/2022 | Alex Taylor | Review docket and advise M Schwartz of new entries | 0.30 | $ 150.00 | $ | 45.00 |
| 9/16/2022 | Marc Schwartz | Call with J Delassio and A Jones | 0.50 | $ 690.00 | $ | 345.00 |
| 9/16/2022 | Marc Schwartz | review and process bill payments | 0.20 | $ 690.00 | $ | 138.00 |
| 9/16/2022 | Marc Schwartz | Daily status meeting | 0.50 | $ 690.00 | $ | 345.00 |
| 9/16/2022 | Marc Schwartz | Working on amending schedules | 3.00 | $ 690.00 | $ | 2,070.00 |
| 9/16/2022 | Marc Schwartz | Call C Cicack on need for credit card processing intermediary | 0.50 | $ 690.00 | $ | 345.00 |
| 9/16/2022 | Mary English | Obtaining vendor credentials for ACH billing and document management. | 6.90 | $ 210.00 | $ | 1,449.00 |
| 9/16/2022 | Priya Salagundla | Updated QB and weekly AP payments | 7.50 | $ 325.00 | $ | 2,437.50 |
| 9/16/2022 | Susan Schwartz | Updated unpaid invoices from the accounting email to Quick Books | 2.00 | $ 150.00 | $ | 300.00 |
| 9/17/2022 | Marc Schwartz | Email to counsel on conversation with C Cicack | 0 50 | $ 690.00 | $ | 345.00 |
| 9/17/2022 | Marc Schwartz | Working on SOFA revision | 1 20 | $ 690.00 | $ | 828.00 |
| 9/17/2022 | Marc Schwartz | Working on disposable income projection | 2.60 | $ 690.00 | $ | 1,794.00 |
| 9/17/2022 | Marc Schwartz | Wes Perkins billings and contract | 0 20 | $ 690.00 | $ | 138.00 |
| 9/17/2022 | Susan Schwartz | Updated Schedule G in the Bankruptcy schedules (.5) and input unpaid invoices from accounting email into Quick Books (1.5) | 2.00 | $ 150.00 | $ | 300.00 |
| 9/17/2022 | Marc Schwartz | preparing for Tuesdays hearing | 1 10 | $ 690.00 | $ | 759.00 |
| 9/18/2022 | Christian Schwartz | Review sales for tax returns for TX CPA | 4 30 | $ 470.00 | $ | 2,021.00 |

9

**FREE SPEECH SYSTEMS, LLC**
**SCHWARTZ ASSOCIATES, LLC**
**PROFESSIONAL FEES AND EXPENSES DETAIL**
**JULY 30 TO SEPTEMBER 19, 2022**

| Date | Name | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 9/18/2022 | Marc Schwartz | working on disposable income determination | 0 90 | $ 690.00 | $ 621.00 |
| 9/18/2022 | Marc Schwartz | work on disposable income | 1 50 | $ 690.00 | $ 1,035.00 |
| 9/18/2022 | Susan Schwartz | Checked accounting email to see if any past due accounts payable had been posted to the accounting email | 1.00 | $ 150.00 | $ 150.00 |
| 9/19/2022 | Alex Taylor | Review docket and advise M Schwartz of new entries | 0 10 | $ 150.00 | $ 15.00 |
| 9/19/2022 | Alex Taylor | AMEX Vendor Notes for M Schwartz | 0 30 | $ 150.00 | $ 45.00 |
| 9/19/2022 | Marc Schwartz | Status meeting | 0.60 | $ 690.00 | $ 414.00 |
| 9/19/2022 | Marc Schwartz | Working on disposable income analysis | 1.80 | $ 690.00 | $ 1,242.00 |
| 9/19/2022 | Marc Schwartz | Banking, checking balances, balance transfers, attempting to pay vendor, review payments made | 0.70 | $ 690.00 | $ 483.00 |
| 9/19/2022 | Marc Schwartz | Continue working on disposable income analysis, finalize and send draft to counsel | 1.00 | $ 690.00 | $ 690.00 |
| 9/19/2022 | Christian Schwartz | Prepare for Status Conference | 8.00 | $ 470.00 | $ 3,760.00 |
| 9/19/2022 | Priya Salagundla | Updated QB with bank transactions, settlement reports | 7.40 | $ 325.00 | $ 2,405.00 |
| 9/19/2022 | Susan Schwartz | Updated unpaid invoices from the accounting email to Quick Books | 1 50 | $ 150.00 | $ 225.00 |
| 9/20/2022 | Marc Schwartz | Attend hearing on motion to employ CRO and Shannon Lee | 6 50 | $ 690.00 | $ 4,485.00 |
| 9/20/2022 | Christian Schwartz | Status Conference | 6 50 | $ 470.00 | $ 3,055.00 |
| 9/20/2022 | Alex Taylor | Review docket and advise M Schwartz of new entries | 0 10 | $ 150.00 | $ 15.00 |
| 9/20/2022 | Marc Schwartz | Prepare notes for Status Report | 0 50 | $ 690.00 | $ 345.00 |
| 9/20/2022 | Priya Salagundla | Updated QB and prepared weekly variance report | 8.00 | $ 325.00 | $ 2,600.00 |
| 9/20/2022 | Susan Schwartz | Checking on invoices posted in Quick Books and emailed to the accounting email account | 1.00 | $ 150.00 | $ 150.00 |
| | | **TOTAL FEES** | 899 20 | | $ 359,949.50 |

**EXPENSES**

| Date | Name | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|
| 7/30/2022 | Marc Schwartz | documents for 1st day hearing | 58.00 | $ 0.25 | $ 14.50 |
| 8/17/2022 | Marc Schwartz | (Hyatt) Hotel stay in Austin, TX on 08/18/2022 for Dr. Joe Michels | 1.00 | $ 266.85 | $ 266.85 |
| 8/16/2022 | Marc Schwartz | (American Airlines) Flight from DFW to AUS for Dr. Joe Michels on 08/18/2022 | 1.00 | $ 744.19 | $ 744.19 |
| 8/16/2022 | Marc Schwartz | (Allianz) Trip insurance from DFW to AUS for Dr. Joe Michels | 1.00 | $ 42.20 | $ 42.20 |
| 8/11/2022 | Marc Schwartz | Endorsement stamps for checks | 1.00 | $ 53.41 | $ 53.41 |
| 8/3/2022 | Christian Schwartz | Miles from SALLC Office to Austin, TX and back. | 328.00 | $ 0.58 | $ 190.24 |
| | | | | | $ 1,311.39 |
| | | **TOTAL FEES AND EXPENSES** | | | $ 361,260.89 |

# Exhibit B

005887

COMPENSATION BY PROJECT CATEGORY

| CATEGORY | HOURS | | AMOUNT |
|---|---|---|---|
| Preparation and maintenance of bankruptcy schedules and Statement of Financial Affairs | 80.90 | $ | 28,265.00 |
| Prepare and maintain rolling 13 week cash flow budgets | 45.70 | $ | 17,738.00 |
| Maintaining books of account | 158.30 | $ | 51,074.50 |
| Court filings | 30.70 | $ | 19,385.00 |
| Prepare for and attend court hearings and creditor meetings | 82.10 | $ | 48,317.00 |
| Inventory management and acquisition | 10.40 | $ | 7,176.00 |
| Payroll | 19.10 | $ | 9,157.00 |
| Managing accounts payable and banking | 306.20 | $ | 85,456.50 |
| Attention to operations | 23.30 | $ | 13,936.00 |
| Working on plan of reorganization | 9.10 | $ | 6,279.00 |
| Travel time (1/2 time charged) | 17.00 | $ | 8,840.00 |
| Meetings with bankruptcy counsel | 67.80 | $ | 38,285.00 |
| Internal meetings | 17.40 | $ | 6,407.50 |
| Other | 14.50 | $ | 8,110.00 |
| Investigations | 2.90 | $ | 2,001.00 |
| Discovery | 13.80 | $ | 9,522.00 |
| | 899.20 | $ | 359,949.50 |



EXHIBIT
B

005888

# Exhibit C

COMPENSATION BY PROFESSIONAL

| NAME | HOURS | RATE | AMOUNT | YEARS OF EXPERIENCE |
|------|-------|------|--------|---------------------|
| Alex Taylor | 31.60 | 150.00 | $ 4,740.00 | 8 |
| Christian Schwartz | 130.90 | 470.00 | $ 61,523.00 | 14 |
| Harold Lee | 115.40 | 280.00 | $ 32,312.00 | 4 |
| Marc Schwartz | 225.60 | 690.00 | $ 155,664.00 | 48 |
| Mary English | 128.30 | 210.00 | $ 26,943.00 | 7 |
| Priya Salagundla | 220.90 | 325.00 | $ 71,792.50 | 5 |
| Susan Schwartz | 46.50 | 150.00 | $ 6,975.00 | 49 |
| Total | 899.20 | | $ 359,949.50 | |



EXHIBIT
tabbies
005890

# Exhibit D

EXPENSES BY CATEGORY

| Date | Category | Description | Quantity | Unit Price | Amount |
|------|----------|-------------|----------|-----------|--------|
| 7/30/2022 | Prepare for and attend court hearings and creditor meetings | documents for 1st day hearing | 58.00 | $ 0.25 | $ 14.50 |
| 8/17/2022 | Prepare for and attend court hearings and creditor meetings | (Hyatt) Hotel stay in Austin, TX on 08/18/2022 for Dr. Joe | 1.00 | $ 266.85 | $ 266.85 |
| 8/16/2022 | Prepare for and attend court hearings and creditor meetings | (American Airlines) Flight from DFW to AUS for Dr. Joe | 1.00 | $ 744.19 | $ 744.19 |
| 8/16/2022 | Prepare for and attend court hearings and creditor meetings | (Allianz) Trip insurance from DFW to AUS for Dr. Joe | 1.00 | $ 42.20 | $ 42.20 |
| 8/11/2022 | Managing accounts payable and banking | Endorsement stamps for checks | 1.00 | $ 53.41 | $ 53.41 |
| 8/3/2022 | Travel | Miles from SALLC Office to Austin, TX and back. | 328.00 | $ 0.58 | $ 190.24 |

$ 1,311.39



EXHIBIT

005892

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**ORDER GRANTING MOTION OF W. MARC SCHAWARTZ AND SCHWARTZ**
**ASSOCIATES, LLC FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM**
**AND GRANTING RELATED RELIEF**

Came for consideration the Motion of W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz") for Order Allowing Administrative Expense Claim and Granting Related Relief (the "Motion"). Upon consideration of the Motion, the record and evidence in the above-captioned case, it is hereby ORDERED THAT:

1.     Schwartz is allowed an administrative expense claim in the above-captioned chapter 11 case in the amount of *$348,463.89* (the "Allowed Administrative Expense Claim").

2.     Schwartz is authorized to draw on its prepetition retainer received from the Debtor in an amount up to the amount of the Allowed Administrative Expense Claim.

3.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

| 1. NAME Stephen W. Lemmon | 2. PHONE NUMBER (512) 220-2688 | 3. DATE 10/25/2022 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL lemmon@slollp.com; rangel@slollp.com | 5. CITY Austin | 6. STATE TX | 7. ZIP CODE 78746 |

| 8. CASE NUMBER 22-60043 | 9. JUDGE Christopher Lopez | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 9/13/2022 | 11. TO 9/13/2022 |
| 12. CASE NAME In re Free Speech Systems, LLC | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY Houston | 14. STATE TX |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☒ OPENING STATEMENT (Plaintiff) | 09/13/2022 | | |
| ☒ OPENING STATEMENT (Defendant) | 09/13/2022 | | |
| ☒ CLOSING ARGUMENT (Plaintiff) | 09/13/2022 | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☒ CLOSING ARGUMENT (Defendant) | 09/13/2022 | | |
| ☒ OPINION OF COURT | 09/13/2022 | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | 09/13/2022 |
| ☐ SENTENCING | | Entire Hearing | |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☒ | ☐ | NO. OF COPIES | | |
| DAILY | | | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE /s/ Stephen W. Lemmon | PROCESSED BY |
|---|---|
| 19. DATE 10/25/2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | |
|---|---|---|---|
| ORDER RECEIVED | | | |
| DEPOSIT PAID | | | DEPOSIT PAID |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE 0.00 |

005894

DISTRIBUTION:     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 25, 2022

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

### ORDER GRANTING MOTION FOR EXTENSION OF TIME TO
### FILE A PLAN OF REORGANIZATION

Upon the *Debtor's* Motion for Extension of Time to File a Plan of Reorganization ("Motion")[1]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY ORDERED THAT**:

1.      Pursuant to 11 U.S.C. § 1189(b), the time to file a plan of reorganization is hereby extended until ***December 16, 2022***. This extension is without prejudice to requests for additional extensions.

2.      The Court retains exclusive jurisdiction with respect to all matters arising or related to the implementation, interpretation, and enforcement of this Order.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Motion.

The Court retains exclusive jurisdiction with respect to all matters arising or related to the implementation, interpretation, and enforcement of this Order.

Signed:  October 25, 2022

_____

Christopher Lopez
United States Bankruptcy Judge

005896

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FIFTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. On October 13, 2022, the Court entered a *Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 238]. This order is the Fifth interim order ("Fifth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final

hearing on the use of cash collateral.  The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.      <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fifth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.    Payment to PQPR for Inventory Purchase. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.    Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    Adequate Protection – Replacement Liens.  The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Fifth Interim Order.

10.    Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    Credit Card Processing. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order*

*Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.      Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.      Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.      Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on November ___, 2022, at _____ a.m. Central time.

Houston, Texas
Dated: October ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

| | 10/29/2022-11/04/2022 | 11/05/2022-11/11/2022 | 11/12/2022-11/18/2022 | 11/19/2022-11/25/2022 | | NOTES |
|---|---|---|---|---|---|---|
| **CURRENT 4 WEEK BUDGET** | | | | | | |
| Week Number | 14 | 15 | 16 | 17 | Total | |
| **Income** | | | | | | |
| Product Sales *(Net of 4.5% Merchant Fee)* | $ 575,000.00 | $ 575,000.00 | $ 600,000.00 | $ 750,000.00 | $ 2,500,000.00 | *Net of 4.5% CC Merchant fees.  Includes Shipping Fees and Sales Tax but excludes any PQPR related sales* |
| Advertising | - | - | - | - | - | |
| Refund of Chargeback Reserve | 618,000.00 | - | - | - | 618,000.00 | |
| Donations | 50,000.00 | 10,000.00 | 20,000.00 | 15,000.00 | 95,000.00 | |
| **Total Income** | **1,243,000.00** | **585,000.00** | **620,000.00** | **765,000.00** | **3,213,000.00** | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (89,125.00) | (89,125.00) | (93,000.00) | (116,250.00) | (387,500.00) | |
| PQPR Inventory Purchases | (50,000.00) | (50,000.00) | (50,000.00) | (50,000.00) | (200,000.00) | *Per 2nd interim cash collateral order ECF 98* |
| Fulfillment Services | (115,000.00) | (115,000.00) | (111,000.00) | (138,750.00) | (479,750.00) | |
| Processor Fees | - | - | - | - | - | *Aurium contract was cancelled 10/20, expect there to be a reduced fee in the future* |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | *Final ECDN Audit bills* |
| Texas Sales Tax (20% of Sales @ 6.25%) | (7,187.50) | (7,187.50) | (7,500.00) | (9,375.00) | (31,250.00) | |
| **Total Cost of Goods Sold** | **(261,312.50)** | **(261,312.50)** | **(274,000.00)** | **(314,375.00)** | **(1,111,000.00)** | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | - | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | **(14,760.00)** | **-** | **(3,000.00)** | **-** | **(17,760.00)** | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting  / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | **(251,000.00)** | **-** | **(28,750.00)** | **-** | **(279,750.00)** | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | - | - | (5,000.00) | (5,000.00) | *Liability and property, we don't have current Workers Comp policy* |
| Rent | (34,858.32) | - | - | - | (34,858.32) | |
| Utilites | (3,100.00) | - | (6,000.00) | - | (9,100.00) | |
| Janitorial | (3,000.00) | - | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | *Includes Konica Minolta copier lease* |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | **(52,558.32)** | **(5,600.00)** | **(17,600.00)** | **(13,100.00)** | **(88,858.32)** | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | - | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | *HR and Bookeeping Fees* |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) | - | (40,000.00) | |
| **Total Personnel Expenses** | **(192,250.00)** | **(5,950.00)** | **(146,850.00)** | **(5,949.91)** | **(350,999.91)** | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | **(500.00)** | **(100.00)** | **(100.00)** | **(650.00)** | **(1,350.00)** | |
| **Total Operating Expenses** | **(511,068.32)** | **(11,650.00)** | **(196,300.00)** | **(19,699.91)** | **(738,718.23)** | |
| ***Non-Operating Expenses*** | | | | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Total Other Expenses** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(20,000.00)** | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | (50,000.00) | (100,000.00) | |
| Trustee Fees | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Trustee Counsel | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Ray Battaglia | - | - | - | (50,000.00) | (50,000.00) | |
| **Total Professional Fees** | **(30,000.00)** | **(80,000.00)** | **(30,000.00)** | **(130,000.00)** | **(270,000.00)** | |
| **Total Cash Flow** | **435,619.18** | **227,037.50** | **114,700.00** | **295,925.09** | **1,073,281.77** | |



EXHIBIT

A

**SmBus, PlnDue, DsclsDue, ReqSepNtc, Subchapter_V, APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 22-60043

|  |  |
|---|---|
| *Date filed:* | 07/29/2022 |
| *Date of Intradistrict transfer:* | 08/04/2022 |
| *341 meeting:* | 09/07/2022 |
| *Deadline for filing claims:* | 10/07/2022 |
| *Deadline for filing claims (govt.):* | 02/07/2023 |
| *Deadline for objecting to discharge:* | 03/10/2023 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
Asset

*Debtor*
**Free Speech Systems LLC**
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741
TRAVIS-TX
SSN / ITIN: xxx-xx-0005

represented by **Raymond William Battaglia**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
2106019405
Email: rbattaglialaw@outlook.com

**Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**R. J. Shannon**
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002
713-714-5770
Email: rshannon@shannonpllc.com

**Christina Walton Stephenson**
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201
214-420-2163
Email: Crissie.Stephenson@crowedunlevy.com

*Trustee*
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

represented by **Elizabeth Carol Freeman**
The Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208-1209
832-779-3580
Email: liz@lizfreemanlaw.com

**Melissa Anne Haselden**
Haselden Farrow PLLC

005902

Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

*U.S. Trustee*
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

*Creditor Committee*
**Official Committee of Unsecured Creditors of Alexander E. Jones**
c/o Marty L. Brimmage, Jr.
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
214-969-2800

represented by **Marty L Brimmage**
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
214-969-2885
Fax : 214-969-4343
Email: mbrimmage@akingump.com

| Filing Date | # | Docket Text |
|---|---|---|
| 10/26/2022 | 256 | Courtroom Minutes. Time Hearing Held: 1:00 PM. Appearances: Elizabeth Freeman, Nicholas Lawson, Ha Nguyen, Ray Battaglia, Patrick Magill, Steve Lemmon, Ryan Chapple, Christopher Dylla, RJ Shannon, Mike Ridulfo. (Related document: 6 Motion for Cash Collateral). Interim Cash Collateral Order approved. **Further Cash Collateral Hearing is scheduled for 11/21/2022 at 02:00 PM.** (ZildeMartinez) (Entered: 10/26/2022) |

**UNITED STATES BANKRUPTCY COURT**

**Southern District of Texas**

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

---

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 10/26/2022 1:01:48 PM |
| Audio File Name : | 4bk2022-60043_20221026-130148.mp3 |
| Audio File Size : | 10392 KB |
| Audio Run Time : | [00:21:39] (hh:mm:ss) |

---

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 26, 2022

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FIFTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. On October 13, 2022, the Court entered a *Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 238]. This order is the Fifth interim order ("Fifth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final

hearing on the use of cash collateral.  The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.      Interim Order. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      DIP Account. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "DIP Account").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      Terms of Cash Collateral Use. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fifth Interim Order (the "Interim Period") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.     <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.     <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.     <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Fifth Interim Order.

10.     <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.     <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order*

*Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.     <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on November 21, 2022, at 2:00 p.m. Central time.

Signed:  October 26, 2022

Christopher Lopez
United States Bankruptcy Judge

005908

| | 10/29/2022-11/04/2022 | 11/05/2022-11/11/2022 | 11/12/2022-11/18/2022 | 11/19/2022-11/25/2022 | Total | NOTES |
|---|---|---|---|---|---|---|
| **CURRENT 4 WEEK BUDGET** | | | | | | |
| Week Number | 14 | 15 | 16 | 17 | | |
| **Income** | | | | | | |
| Product Sales (Net of 4.5% Merchant Fee) | $ 575,000.00 | $ 575,000.00 | $ 600,000.00 | $ 750,000.00 | $ 2,500,000.00 | Net of 4.5% CC Merchant fees.  Includes Shipping Fees and Sales Tax but excludes any PQPR related sales |
| Advertising | - | - | - | - | - | |
| Refund of Chargeback Reserve | 618,000.00 | - | - | - | 618,000.00 | |
| Donations | 50,000.00 | 10,000.00 | 20,000.00 | 15,000.00 | 95,000.00 | |
| **Total Income** | **1,243,000.00** | **585,000.00** | **620,000.00** | **765,000.00** | **3,213,000.00** | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (89,125.00) | (89,125.00) | (93,000.00) | (116,250.00) | (387,500.00) | |
| PQPR Inventory Purchase | (50,000.00) | (50,000.00) | (50,000.00) | (50,000.00) | (200,000.00) | Per 2nd interim cash collateral order ECF 98 |
| Fulfillment Services | (115,000.00) | (115,000.00) | (111,000.00) | (138,750.00) | (479,750.00) | |
| Processor Fees | - | - | - | - | - | Auriam contract was cancelled 10/20, expect there to be a reduced fee in the future |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | Final ECDN Audit bills |
| Texas Sales Tax (20% of Sales @ 6.25%) | (7,187.50) | (7,187.50) | (7,500.00) | (9,375.00) | (31,250.00) | |
| **Total Cost of Goods Sold** | **(261,312.50)** | **(261,312.50)** | **(274,000.00)** | **(314,375.00)** | **(1,111,000.00)** | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | - | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | **(14,760.00)** | **-** | **(3,000.00)** | **-** | **(17,760.00)** | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting  / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | **(251,000.00)** | **-** | **(28,750.00)** | **-** | **(279,750.00)** | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | - | - | (5,000.00) | (5,000.00) | Liability and property, we don't have current Workers Comp policy |
| Rent | (34,858.32) | - | - | - | (34,858.32) | |
| Utilites | (3,100.00) | - | (6,000.00) | - | (9,100.00) | |
| Janitorial | (3,000.00) | - | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | Includes Konica Minolta copier lease |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | **(52,558.32)** | **(5,600.00)** | **(17,600.00)** | **(13,100.00)** | **(88,858.32)** | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | - | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | HR and Bookeeping Fees |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) | - | (40,000.00) | |
| **Total Personnel Expenses** | **(192,250.00)** | **(5,950.00)** | **(146,850.00)** | **(5,949.91)** | **(350,999.91)** | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | **(500.00)** | **(100.00)** | **(100.00)** | **(650.00)** | **(1,350.00)** | |
| **Total Operating Expenses** | **(511,068.32)** | **(11,650.00)** | **(196,300.00)** | **(19,699.91)** | **(738,718.23)** | |
| **Non-Operating Expenses** | | | | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Total Other Expenses** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(20,000.00)** | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | (50,000.00) | (100,000.00) | |
| Trustee Fees | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Trustee Counsel | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Ray Battaglia | - | - | - | (50,000.00) | (50,000.00) | |
| **Total Professional Fees** | **(30,000.00)** | **(80,000.00)** | **(30,000.00)** | **(130,000.00)** | **(270,000.00)** | |
| **Total Cash Flow** | **435,619.18** | **227,037.50** | **114,700.00** | **295,925.09** | **1,073,281.77** | |



EXHIBIT

A

005909

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

## STIPULATION AND AGREED ORDER

The above-captioned debtor and debtor-in-possession (the "**Debtor**") and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "**Connecticut Plaintiffs**") (together with the Texas Plaintiffs, the "**Sandy Hook Families**") hereby enter into this stipulation and agreed order ("**Stipulation**") as follows:

WHEREAS, on July 29, 2022 (the "**Petition Date**") [Dkt. 1], the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, on August 12, 2022, the *Subchapter V Deadlines Order* [Dkt. 65] was entered setting the deadline for the Debtor to file a plan of reorganization (the "**Plan**") for October 27, 2022;

WHEREAS, on October 21, 2022, the Debtor filed its *Emergency Motion for Extension of Time to File a Plan of Reorganization* [Dkt. 246], requesting an extension to file its Plan;

005910

WHEREAS, on October 25, 2022, the Court entered the *Order Granting Motion for Extension of Time to File a Plan of Reorganization* [Dkt. 254], which extended the deadline for the Debtor to file its Plan until December 16, 2022; and

WHEREAS, the Debtor and the Sandy Hook Families have agreed to a corresponding extension of the deadline to object to dischargeability pursuant to any potentially applicable law, including, but not limited to 11 U.S.C. § 523(c), which is currently set for November 7, 2022,[1] and without agreeing to the applicability of same. All parties expressly reserve their rights regarding same.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:

1.      The deadline to object to dischargeability of the Debtor pursuant to 11 U.S.C. § 523(c) and any other potentially applicable law is extended to January 5, 2023.

Signed: _____        _____
                                Christopher Lopez
                                United States Bankruptcy Judge

---

[1] *See Notice of Chapter 11 Bankruptcy Case* [Dkt. 53-1]; *see also* Fed. R. Bankr. P. 4007(c) ("[A] complaint to determine the dischargeability of a debt under §523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under §341(a)").

STIPULATED AND AGREED ON OCTOBER 28, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

_____/s/_____Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

-and-

**THE TEXAS PLAINTIFFS**

Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**MCDOWELL HETHERINGTON LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
713-337-5580
713-337-8850-Facsimile

and

_____/s/_____Jarrod B. Martin_____
Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
713-356-1280
713-658-2553-Facsimile

-and-

**FREE SPEECH SYSTEMS, LLC**

_____/s/____Raymond W. Battaglia_____
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
210-601-9405

005913

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 28, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

### STIPULATION AND AGREED ORDER

The above-captioned debtor and debtor-in-possession (the "**Debtor**") and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "**Connecticut Plaintiffs**") (together with the Texas Plaintiffs, the "**Sandy Hook Families**") hereby enter into this stipulation and agreed order ("**Stipulation**") as follows:

WHEREAS, on July 29, 2022 (the "**Petition Date**") [Dkt. 1], the Debtor filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, on August 12, 2022, the *Subchapter V Deadlines Order* [Dkt. 65] was entered setting the deadline for the Debtor to file a plan of reorganization (the "**Plan**") for October 27, 2022;

WHEREAS, on October 21, 2022, the Debtor filed its *Emergency Motion for Extension of Time to File a Plan of Reorganization* [Dkt. 246], requesting an extension to file its Plan;

005914

WHEREAS, on October 25, 2022, the Court entered the *Order Granting Motion for Extension of Time to File a Plan of Reorganization* [Dkt. 254], which extended the deadline for the Debtor to file its Plan until December 16, 2022; and

WHEREAS, the Debtor and the Sandy Hook Families have agreed to a corresponding extension of the deadline to object to dischargeability pursuant to any potentially applicable law, including, but not limited to 11 U.S.C. § 523(c), which is currently set for November 7, 2022,[1] and without agreeing to the applicability of same. All parties expressly reserve their rights regarding same.

NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:

1.    The deadline to object to dischargeability of the Debtor pursuant to 11 U.S.C. § 523(c) and any other potentially applicable law is extended to January 5, 2023.

Signed:  October 28, 2022

Christopher Lopez
United States Bankruptcy Judge

---

[1] *See Notice of Chapter 11 Bankruptcy Case* [Dkt. 53-1]; *see also* Fed. R. Bankr. P. 4007(c) ("[A] complaint to determine the dischargeability of a debt under §523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under §341(a)").

STIPULATED AND AGREED ON OCTOBER 28, 2022 BY AND AMONG:

**THE CONNECTICUT PLAINTIFFS**

_____/s/_____Ryan E. Chapple_____
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**Cain & Skarnulis PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

-and-

**THE TEXAS PLAINTIFFS**

Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
**McDowell Hetherington LLP**
1001 Fannin Street, Suite 2700
Houston, Texas 77002
713-337-5580
713-337-8850-Facsimile

and

_____/s/_____Jarrod B. Martin_____
Jarrod B. Martin
State Bar No. 24070221
jarrod.martin@chamberlainlaw.com
**Chamberlain, Hrdlicka, White, Williams & Aughtry, PC**
1200 Smith Street, Suite 1400
Houston, Texas 77002
713-356-1280
713-658-2553-Facsimile

-and-

005916

**FREE SPEECH SYSTEMS, LLC**

_____/s/_____Raymond W. Battaglia_____
Raymond W. Battaglia
State Bar No. 01918055
rbattaglia@outlook.com
**LAW OFFICES OF RAY BATTAGLIA, PLLC**
66 Granburg Circle
San Antonio, Texas 78218
210-601-9405

005917

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**MOTION FOR ENTRY OF ORDER APPROVING REJECTION OF AURIAM SERVICES
LLC AGREEMENTAND GRANTING RELATED RELIEF**

> **This motion seeks an order that may adversely affect you. If you oppose the motion,
> you should immediately contact the moving party to resolve the dispute. If you and
> the moving party cannot agree, you must file a response and send a copy to the
> moving party. You must file and serve your response within 21 days of the date this
> was served on you. Your response must state why the motion should not be granted.
> If you do not file a timely response, the relief may be granted without further notice
> to you. If you oppose the motion and have not reached an agreement, you must
> attend the hearing. Unless the parties agree otherwise, the court may consider
> evidence at the hearing and may decide the motion at the hearing.**

> **Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY
JUDGE:

NOW COMES Free Speech Systems, LLC ("FSS" or the "Debtor"), the debtor and debtor-

in-possession in the above captioned case (the "Case"), and files this *Motion for Entry Order*

*Approving Rejection of Auriam Services LLC Agreement and Granting Related Relief* (the "Motion").

In support of the Motion, the Debtor respectfully represents as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§157 and

1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Venue is proper before this Court

pursuant to 28 U.S.C. §§1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 365, and

502 of the Bankruptcy Code ("Bankruptcy Code"), and Rules 6006 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). Such relief requested is also consistent with the Local Rules of Bankruptcy Procedure for the Southern District of Texas (the "<u>Local Rules</u>").

## **<u>BACKGROUND</u>**

3.      On July 29, 2022 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its businesses and manage its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On October 1, 2021, the Debtor and Auriam Services, LLC ("Auriam") entered into a Financial Services Agreement (the "Agreement").  Under the Agreement, Auriam provided credit card processing and other financial services to the Debtor.  Auriam charged a fixed fee equal to 10% of the total dollar amount of credit card charges processed by Auriam on behalf of the Debtor, in addition to netting third party costs and fees.

5.      By agreement dated July 10, 2022, the parties agreed to a reduction of the Auriam fixed fee from 10% to 4% for a period of 60 days.  The parties had informally extended this period of reduced fees on two occasions.

6.      The Debtor identified an unrelated third party credit card processor to replace Auriam for a reduced fee.  The replacement processor commenced services on October 21, 2022 and has agreed to waive its credit card processing fee for a period of 30 days and thereafter to provide substantially the same services Auriam provided for a fixed fee of 1.5% of the total dollar amount of credit card charges it processes on behalf of the Debtor.

## **<u>LAW AND AUTHORITIES</u>**

7.      Rejection of an executory contract is governed by section 365(a) of the Bankruptcy Code, which permits a debtor-in-possession to assume or reject an executory contract.  A debtor's decision to reject an executory contract must be based on the debtor's business judgment. *Sharon Steel*

---

*Corp. v. Nat'! Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.),* 872 F.2d 36, 39-40 (3d Cir. 1989).

8.     The business judgment test is not a strict standard and merely requires a showing that either assumption or rejection of a contract will benefit the debtors' estate. *In re Orion Pictures Corp.,* 4 F.3d 1095, 1099 (2d Cir. 1993); *see Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047 (4th Cir. 1985) ("Transposed to the bankruptcy context [from corporate litigation], the [business judgment] rule . . . requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion.").

9.     The Debtor requires the services of an intermediary to process credit card charges for merchandise sold through its sales channel.  The replacement processor is providing substantially the same services that Auriam provided for fifteen percent of the amount charged by Auriam under the Agreement and less than half the fees charged by Auriam under the modifications to the Agreement.

10.     The Debtor submits that rejection of the Agreement is in the best interests of the Debtor's estate and falls squarely within the business discretion of the Debtor.

WHEREFORE, the Debtor respectfully request that the Court grant the relief requested herein by entering an order, in the form annexed hereto as Exhibit A, (i) approving the rejection of the Agreement; (ii) relieving the estate from future performance obligations under the Agreement; (iii) establishing a bar date for Auriam to file a proof of claim(s) for damages they allege to have resulted from the rejection of that executory contract; and granting such further relief to which the Debtor may be entitled.

---

Respectfully submitted, November 3, 2022

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com

By:   */s/  Raymond W. Battaglia*
       Raymond W. Battaglia
       Texas Bar No. 01918055

**ATTORNEYS FOR FREE SPEECH SYSTEMS, LLC.**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list.

*/s/ Raymond W. Battaglia*
Raymond W. Battaglia

MOTION TO REJECT AURIAM AGREEMENT

4

005921

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher
Mattei, Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersFirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Jarrod B. Martin Chamberlain
Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla Assistant
Attorney General Bankruptcy &
Collections Division PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Attn: Ha M. Nguyen, Jayson B.
Ruff Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

## USPS Service List

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

005923

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

PQPR Holdings Limited,
LLC c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln
Austin, TX 78703

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive,
Suite 301
Coral Springs, FL 33065

John D Malone
Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Attn: Shelby Jordan Jordan &
Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street
Suite 1800
Dallas, TX 75201

Lynn Hamilton Butler
Husch Blackwell LP
111 Congress Ave., #1400
Austin, Texas 78701

005924

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER APPROVING REJECTION OF AURIAM SERVICES LLC AGREEMENT**
**AND GRANTING RELATED RELIEF**

Upon consideration of the *Motion for Entry Order Approving Rejection of Auriam Services LLC Agreement and Granting Related Relief* (the "Motion") [1] filed by Free Speech Systems, LLC ("FSS" or the "Debtor"), the debtor and debtor-in-possession in the above captioned case (the "Motion"); and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion has been provided, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is fair and reasonable, was proposed in good faith, is in the best interests of the Debtor and its estate and creditors and is within the business judgment of the Debtor; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Financial Services Agreement (the "Agreement") between the Debtor and Auriam Services, LLC ("Auriam") dated October 1, 2021, as amended from time to time, shall be and hereby is rejected effective as of the Petition Date; and it is further

ORDERED that the Debtor and the Auriam are relieved of any future performance obligations under the Agreement, including, but not limited to any rights to specific performance; and it is further

---

[1] All capitalized terms not defined in this Order shall be defined as set forth in the Motion.

EXHIBIT

A

ORDERED that any claims arising out of the rejected Agreement must be filed on or before thirty (30) days following the entry of this Order; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Houston, Texas
Dated: November ____, 2022

_____
CHRISTOPER LOPEZ, UNITED STATES
BANKRUPTCY JUDGE

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 07, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FREE SPEECH SYSTEMS LLC, | ) | Case No. 22-60043 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER AUTHORIZING THE RETENTION OF JACKSON WALKER LLP
## AS COUNSEL FOR THE SUBCHAPTER V TRUSTEE

CAME ON FOR CONSIDERATION the Application to Retain Jackson Walker LLP as Counsel the Subchapter V Trustee (the "Application").  Having reviewed the Application and the supporting documents thereto, and finding that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; that the Application was properly filed and served; that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and that venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and based upon good and sufficient cause appearing therefor; the Court ORDERS THAT:

1.       The Trustee is authorized to retain and employ Jackson Walker LLP ("Jackson Walker") as counsel upon the terms and conditions set forth in the Application and as modified herein.

2.       Jackson Walker shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's case in compliance with sections 330 and 331 of the Bankruptcy Code and applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any other applicable procedures and orders of the Court.  For billing purposes, Jackson Walker shall keep its time in one tenth (1/10) hour increments.  Jackson Walker

34075192v.1

005927

will use its best effort to avoid any duplication of services provided by any of the other professionals in this case.

3.      Jackson Walker will review its files periodically during the pendency of this chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, Jackson Walker will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a).

4.      To the extent that the Application or the Freeman Declaration is inconsistent with this Order, the terms of this Order shall govern.

5.      Notwithstanding anything to the contrary in the Application, Jackson Walker shall not be entitled to reimbursement for fees and expenses incurred in connection with any objection to its fees absent further order of this Court.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Signed:  November 07, 2022

Christopher Lopez
United States Bankruptcy Judge

2

34075192v.1

005928

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 22-60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **CHAPTER 11 (Subchapter V)** |
| | § | |
| **DEBTOR.** | § | |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO THE MOTIONS OF
SHANNON & LEE LLP AND W. MARC SCHWARTZ FOR ORDERS ALLOWING
ADMINISTRATIVE EXPENSE CLAIMS [DKT. NOS. 251 AND 252]**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), hereby submits his omnibus objection (the "Omnibus Objection") to Shannon & Lee LLP's ("S & L"), and W. Marc Schwartz and Schwartz Associates LLC's (collectively referred to as "Schwartz") motions (referred to individually as "S & L Motion" or "Schwartz Motion" and collectively as the "Admin Expense Motions") for orders allowing administrative expense claims pursuant to 11 U.S.C. § 503(b)(1)(A) for professional services provided during the period of July 29, 2022, to September 20, 2022. In support of the Omnibus Objection, the U.S. Trustee states the following:

**INTRODUCTION**

1. By the Admin Expense Motions, S & L and Schwartz (collectively referred to as the "Professionals") are seeking a total of $667,348.75[1] from the Debtor's bankruptcy estate in administrative expenses despite an extensive evidentiary hearing where the Court denied their employment applications based on the Professionals' holding a material adverse interest to that

---

[1] S&L seeks allowance of $320,196.25 and Schwartz seeks allowance of $347,152.50.

1

very estate.[2] The Professionals advance several theories to offer a mechanism for payment of their fees and expenses without an approved employment application, including seeking: (1) an allowance for fees under Section 330; (2) a priority payment under Section 503(b)(1)(A); (3) only as to S&L, a retroactive approval of its employment application under Section 327(e); (4) an approval of ordinary course payments for fees and expenses under Section 363(c); and (5) consent to the payments from all interested parties. But the Professionals' suggested theories for payment of their fees run afoul of Supreme Court precedent in *Lamie v. United States Trustee*, 540 U.S. 526 (2004), violate fundamental principles of statutory construction, and ignore the Bankruptcy Code's plain language and underlying purposes.

- First, an estate professional's employment under Section 327 is a prerequisite to a compensation award under Section 330. The Supreme Court in *Lamie* held that approval of an employment application under Section 327 is *sine qua non* to the professional receiving any compensation under Section 330. 540 U.S. 526, 534 (2004) (stating that a "debtor's attorney not engaged as provided by § 327 is simply not included within the class of persons eligible for compensation").

- Second, the Professionals' fees and expenses, in the amount of $667,348.75, do not qualify as administrative expenses under Section 503(b)(1)(A), and may only be awarded, if at all, under Sections 503(b)(2) and 330. But because their employment has been denied, the Professionals do not fall within the statutory scheme set forth in Sections 327 and 330 and therefore, are not entitled to the compensation they seek in the Admin Expense Motions.

- Third, S&L cannot be retroactively retained under Section 327(e) both because the *Debtor* is not seeking to retain it under that section, but also because the services it provided to the Debtor do not fall within that section's limited purview.

---

[2] At the evidentiary hearing on September 20, 2022, the Court stated:

> So [I'm considering] the Fifth Circuit guidance and an eye to the specific facts here and with attention to circumstances, there is evidence showing circumstances and instances that have and may in fact impact future ability to offer impartial and disinterested advice to FSS. And I understand that that has consequences, and I hope everyone hears it in my voice. This is not easy for me to do, but I'm required to make these decisions under [the] law and [the] Bankruptcy Code affords me the discretion to do so. And I'm not even sure this is a discretion issue. I think there's a material adverse interest to the estate.

Tr. September 20, 2022, at 248, 4–14.

005930

- Fourth, only the Debtor may request authority to use property of the estate under Section 363(c), and, in any event, the types of payments requested are not ordinary course.

- Finally, parties' consent cannot override statutory requirements nor a directive from the Supreme Court such as that in *Lamie*.

2.     The Court should not bless the Professionals' attempted subversion of the Bankruptcy Code's carefully considered statutory scheme for retention and payment of professionals in their endeavor to recover fees and expenses. Accordingly, the Admin Expense Motions should be denied.

## **PROCEDURAL BACKGROUND**

3.     On July 29, 2022, Free Speech Systems, LLC (the "<u>Debtor</u>") filed a chapter 11 voluntary petition and elected to proceed under Subchapter V of chapter 11.

4.     On August 20, 2022, the Debtor filed applications to employ Schwartz as the Debtor's Chief Restructuring Officer and S & L as the Debtor's bankruptcy co-counsel. *See* Dkt. Nos. 83 and 85. The U.S. Trustee filed objections to the applications, and the Sandy Hook Families filed joinders to those objections. *See* Dkt. Nos. 145, 147, 154, and 159.

5.     On September 20, 2022, the Court conducted an evidentiary hearing to consider S & L and Schwartz's employment applications. After considering the evidence and arguments presented over the course of about seven hours, the Court denied the applications for the reasons stated on the record. *See* Dkt. Nos. 181 and 182.

6.     On October 4, 2022, S & L and Schwartz filed motions for rehearing on the denial of their applications. *See* Dkt. Nos. 206 and 207. On October 11, 2022, the U.S. Trustee filed an omnibus objection to the motions for rehearing. *See* Dkt. No. 223.

7.     On October 24, 2022, S & L and Schwartz filed the Admin Expense Motions. *See* Dkt. Nos. 251 and 252. S & L and Schwartz requested combined fees in the total amount of

3

$667,348.75 for approximately seven weeks of work in the Debtor's Subchapter V bankruptcy case.

8.      On October 26, 2022, the Court entered the Fifth Interim Order Authorizing the Debtor's Use of Cash Collateral. *See* Dkt. No. 258. Based on the Debtor's budget attached to the Fifth Interim Cash Collateral Order, the Debtor's average weekly cash flow is $268,320.25 while expenses are $184,679.55. The Debtor's Schedules reported assets and liabilities in the amount of $14,663,434.46 and $54,642,512,48[3], respectively. *See* Dkt. No. 121.

9.      Both the motions for rehearing and the Admin Expense Motions were scheduled for hearing on November 16, 2022, but have been continued to a later date.

## ARGUMENT

**A.  The Supreme Court's Holding in *Lamie v. United States Trustee* Bars the Professionals from Seeking Fees Under Section 330 Because They Were Not Retained Under Section 327.**

10.     By the Admin Expense Motions, the Professionals seek "compensation and reimbursement of expenses under Bankruptcy Code § 330 for services provided prior to September 20, 2022." *See* Schwartz Mot. at 11 and S & L Mot. at 12. Section 330(a)(1)(A) provides in relevant part that the court may award to a trustee, a consumer privacy ombudsman, an examiner, an ombudsman, or a professional person employed under Section 327 – reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney. 11 U.S.C. § 330(a)(1)(A). As the Supreme Court in *Lamie* explained, "the statute authorizes an award of compensation to one of three types of persons: trustees, examiners, and § 327 professional persons," but "a debtor's attorney not engaged as provided by § 327 is simply not included within the class of persons eligible for compensation." 540 U.S. 526, 534 (2004).

---

[3] After the filing of this case, jury verdicts in Texas and Connecticut determined additional liabilities in the amount of $49,000,000 and $965,000,000.

005932

Case 4:23-cv-00463   Document 6-20   Filed on 03/23/23 in TXSD   Page 412 of 524

11. In the present case, although the Professionals filed employment applications pursuant to Section 327, the Court denied the applications because of the Professionals' inability to meet the disinterestedness requirement of Section 327. *See* Dkt. Nos. 181 and 182. The Professionals are thus not within Section 330's "class of persons eligible for compensation." *See Lamie,* 540 U.S. at 534. Any requested compensation pursuant to Section 330 must therefore be denied. As the Supreme Court directed in *Lamie,* "[a]dhering to conventional doctrines of statutory interpretation, we hold that § 330(a)(1) does not authorize compensation awards to debtors' attorneys from estate funds, unless they are employed as authorized by § 327." *Id.* at 538.

**B. The Professionals Do Not Have a Right to Fees and Expenses under Section 503(b)(1)(A) of the Bankruptcy Code.**

12. Because the Professionals do not meet the prerequisites for compensation under Section 330, they attempt to circumvent the Bankruptcy Code's statutory framework for retention and payment of fees by requesting orders instead allowing their fees and expenses as administrative claims in the total amount of $667,348.75 pursuant to Section 503(b)(1)(A). *See* Schwartz Mot. ¶¶ 1, 25-28, and S & L Mot. ¶¶ 1, 36-41. But the Professionals cannot meet the standard for an award under that section.

**a. Section 503(b)(1)(A) Does Not Apply to Professional Fees.**

13. Section 503(b) provides a non-exhaustive list of the type of expenses that are entitled to priority status. Section 503(b)(1)(A) is the catchall payment provision of Section 503, permitting payment of "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). As the Fifth Circuit has observed, the purpose of the "administrative priority" in Section 503(b)(1)(A) is to encourage "third parties" to provide the debtor with goods and services necessary for a successful reorganization and to conduct business as usual. *See Nabors*

5

*Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 442 (5th Cir. 2019); *see also In re Jartran, Inc.*, 732 F.2d 584, 590 (7th Cir. 1984) (explaining that Section 503 creates a "practical incentive to achieving reorganization for the benefit of all creditors"). Expenses entitled to administrative priority generally include repairs, freight, custodial services, insurance, storage, and rent. *See In re Frazier*, 569 B.R. 361, 367 (Bankr. S.D. Ga. 2017) (citing *Collier on Bankruptcy* 503.06[1] (16th ed. 2015)); *In re Montemayor Trucking Inc.*, 2006 WL 3545459, at *1-2 (Bankr. S.D. Tex. Dec. 8, 2006). By helping to ensure that the debtor can carry on business as usual with third parties during the bankruptcy case, the administrative priority of Section 503(b) enhances the odds of a successful reorganization.

14.     The Bankruptcy Code's approach to retention and compensation of professionals is distinct from the "business as usual" purpose of Section 503(b)(1)(A). Sections 327, 328, and 330 impose requirements that are designed to protect the interests of both the creditors and the debtor. For example, an attorney or other professional person must first apply to the court for approval to represent the bankruptcy estate, a process that includes submission of sworn disclosures enabling the court to satisfy itself that the attorney is a "disinterested person," who is both free from any of the disqualifying factors identified in Section 101(14) and "do[es] not hold or represent an interest adverse to the estate." 11 U.S.C. § 327(a). Further, after the court approves the application and the professional completes his work, the attorney must then apply to the court for compensation under Section 330, which compensation may be denied if, at any time during the employment, the professional was not "disinterested" or held an interest adverse to the bankruptcy estate. *See* 11 U.S.C. § 328(c). An attorney or other professional person that clears these hurdles may be compensated, but only in an amount that the court finds "reasonable" in light of the professional's "actual, necessary services." *See* 11 U.S.C. § 330(a)(1). In determining whether the fees are

6

reasonable, the court will consider several factors, including the time spent on the services, the rates charged, the necessity of the services, whether the services were completed within a reasonable time considering the difficulty, and the compensation charged by comparably skilled practitioners. 11 U.S.C. § 330(a)(3).

15.     Section 503(b)(1)(A) and the retention and compensation framework in Sections 327 to 330 are distinct, serve different purposes, and should not be used interchangeably. Multiple Circuit Courts and Bankruptcy Appellate Panels have held that Section 503(b)(1)(A) cannot serve as a basis for awarding fees to professionals where employment was denied under Section 327(a). *See In re Milwaukee Engraving Co.,* 219 F.3d 635, 639 (7th Cir. 2000)*; In re Albrecht,* 245 B.R. 666, 671 (B.A.P. 10th Cir. 2000); *Cushman & Wakefield of Conn., Inc. v. Keren Ltd. Partnership* (*In re Keren Ltd. Partnership*), 189 F.3d 86, 88 (2d Cir.1999); *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.),* 844 F.2d 99, 108-09 (3d Cir. 1988); *Shapiro Buchman L.L.P. v. Gore Bros. (In re Monument Auto Detail, Inc.),* 226 B.R. 219, 227 (B.A.P. 9th Cir. 1998); *McCutchen, Doyle, Brown & Enersen v. Off. Comm. of Unsecured Creditors (In re Weibel, Inc.),* 176 B.R. 209, 213 (B.A.P. 9th Cir. 1994).

16.     The statutory construction used by these courts recognizes the plain language and structure of the operative Bankruptcy Code provisions. The Bankruptcy Code's plain language specifies that professional's fees are "awarded" by the court, pursuant to a strict set of guidelines and constraints, *see* 11 U.S.C. §§ 327-30. Section 503(b)(1)(A) is not a separate basis for courts to "award" a professional's fees. This omission cannot be characterized as mere oversight because the very next subsection in Section 503(b) specifically authorizes the "allowance" of professional's fees that have been "awarded" pursuant to Section 330(a). *See* 11 U.S.C. §§ 330(a) and 503(b)(2). Applying the cardinal rule of statutory interpretation that "language must be read in context,"

7

several courts have correctly concluded "the Code logically forecloses the possibility of treating § 503(b)(1)(A) as authority to pay (and give priority to) claims that do not meet its substantive requirements." *Howard Hughes Co., L.L.C. v. Comm'r*, 805 F.3d 175, 181 (5th Cir. 2015); *In re Milwaukee Engraving Co.,* 219 F.3d at 636. Thus, Section 503(b)(1)(A) cannot be used as another avenue for professionals that do not otherwise meet the requirements of Section 327, 330, and 503(b)(2) to seek payments from a bankruptcy estate. *See In re HSD Venture*, 178 B.R. 831, 835 (Bankr. S.D. Cal.1995) (court observed that allowing a creditor who could not be employed by the estate to nevertheless provide post-petition services to the estate and have a claim allowed as an administrative expense "would eviscerate §§ 327, 101(14) and the policies of control of employment of professionals and the requirement of their disinterestedness").

17.     For example, in *In re Milwaukee Engraving Co.*, the Seventh Circuit considered an almost identical fact pattern to the present case and its holding is instructive. 219 F.3d 635 (7th Cir. 2000). A law firm sought retention as debtor's counsel under Section 327, but the retention was ultimately denied because the firm did not meet the requirement of being disinterested. Nonetheless, the bankruptcy court approved the payment of $15,000 of professional services that the law firm rendered to the debtor under Section 503(b)(1)(A), concluding that "it would be inequitable to deny [the firm's] compensation." *Id*. at 636. The Seventh Circuit reversed the bankruptcy court and held that "it would vitiate the limitations of § 327 if a bankruptcy court could deny an application under that section and order the estate to pay for the legal services anyways." *Id.* at 637. The Seventh Circuit rejected the law firm's argument that it could recover fees under § 503(b)(1)(A), writing, "One might as well erase § 503(b)(2) from the statute if attorneys may stake their claims under § 503(b)(1)(A) even when ineligible under §§ 327, 330, and 503(b)(2)." *Id*.

8

18.     In this district, the Court in *In re 1002 Gemini Interests, LLC* applied the holding in *In re Milwaukee Engraving Co*., and denied an examiner's request for compensation for services that exceeded the investigatory scope of his duties under the Bankruptcy Code and the additional duties assigned to him in the appointment order.[4] 2015 WL 913542, at *15 (Bankr. S.D. Tex. 2015). That examiner[5] requested "compensation based on a substantial contribution theory under Section 503 of the Bankruptcy Code" instead of Section 330, but the Court rejected this argument and concluded that professionals cannot circumvent Section 327 by arguing that they should be paid under Section 503, to wit: "However, the examiner and his professionals were not approved to perform the services related to the disallowed fees. The disallowed fees were for services that were outside the scope of the Order approving their employment." *Id.* at *14, 15.

### b. The Professionals' Reliance on *Mehdipour* and *Riley* is Misplaced and Unavailing.

19.     The Professionals in the Admin Expense Motions do not attempt to distinguish either *Milwaukee Engraving* or *1002 Gemini Interests*. Instead, they point this Court to other cases that do not stand for the proposition that Section 503(b)(1)(A) can be used to sidestep the specific limitations on retention and compensation of professionals under Sections 327 and 330.

---

[4] By permitting professionals a less restrictive standard to obtain compensation (allowing professionals to be compensated under Section 503(b)(1)(A)), would vitiate the need for compliance with Sections 327 and 330. In the case *In re Sanchez Energy Corp.*, 2021 WL 174364, at *4 (Bankr. S.D. Tex. 2021), the Court denied a request by an indenture trustee for an allowed administrative expense claim for fees under Section 503(b)(1)(A). Citing to the well-settled rule of statutory construction that the specific provisions govern general ones, the Court held that "it is the substantial contribution standard, not the benefit to the estate standard, that determines whether an indenture trustee can be paid on an administrative basis." *Id.* at *4. As noted by the Court, "if compensation is available under the lower standard of § 503(b)(1)(A), no indenture trustee would seek an administrative expense under § 503(b)(3) or (b)(5). Yet those provisions explicitly pertain to indenture trustees." *Id.* Similarly here, if the Court allows the Professionals to obtain an administrative claim for their fees under the more general Section 503(b)(1)(A), other estate professionals will be encouraged to pursue this less restrictive avenue than obtaining approval of their employment under Section 327 and fees under Section 330. *See In re Cutler Mfg. Corp.*, 95 B.R. 230, 231–32 (Bankr. M.D. Fla. 1989) ("Nor does this Court believe that Congress contemplated that individuals who would be ineligible to be employed as professionals under the facts in this case could come back later and seek compensation under § 503 for the same activities which they would be denied compensation under § 327").

[5] Mr. Schwartz was the examiner in the *1002 Gemini Interests* case.

20.     The Professionals rely on *Mehdipour v. Marcus & Millichap* (*In re Mehdipour*), 202 B.R. 474 (B.A.P. 9th Cir. 1996) and *McBride v. Riley (In re Riley)*, 923 F.3d 433 (5th Cir. 2019) as support for their argument that the Court can allow payment of their professional fees under Section 503(b)(1)(A). *See* Schwartz Mot. ¶¶ 25 and 26, and S & L Mot. ¶¶ 36 and 37. For example, the Professionals state that *Mehdipour* "provides support for a professional seeking limited compensation under Bankruptcy Code § 503(b)(1)(A)." *Id.* at ¶ 36. In support, the Professionals cite that, "[a]ccording to the 9th Circuit B.A.P. '[c]ourts may allow compensation for professional services under § 503(b)(1)(A) as administrative expenses if the services provided by a ***disinterested professional*** were necessary to preserve the estate." *Id.* (emphasis added). But the decision in *Mehdipour* was not intended to allow professionals who do not meet the retention requirements under Section 327 other means to obtain payment of their fees. The Ninth Circuit BAP made that clear in stating: "[c]ompensation under § 503 does not allow the professional to sidestep the requirements of § 327 and 330—the professional must still be disinterested and not hold any adverse interest." *Mehdipour*, 202 B.R. at 479. The Professionals' reliance on *Mehdipour* is misplaced. Their employment applications were denied precisely because the Court found the Professionals had a material adverse interest to the Debtor's estate.[6]

---

[6] Additionally, the Professionals' arguments rely on cases where professionals with conflict of interest issues were nonetheless employed by the estate, and conflict counsel would be used to address the conflict issues. *See* S & L Motion at ¶28 (citing to *In re Relativity Media, LLC*, No. 18-11358 (MEW), 2018 Bankr. LEXIS 2037, (Bankr. S.D.N.Y. July 6, 2018); *Exco Res. v. Milbank*, 2003 U.S. Dist. LEXIS 1442, at *26 (S.D.N.Y. Jan. 28, 2003). This is inapposite to the present case because the Professionals' employment applications have been wholly denied, and they are not authorized to work on anything related to this case. Thus, they are not entitled to any compensation related to the case. Further, the Professionals' reliance on cases allowing some professional fees and disallowing other fees under section 328(c) is misplaced because those professionals were previously retained by the estate under section 327. *See* S & L Motion at ¶28 (citing to *In re Granite Partners, L.P.*, 219 B.R. 22, 40-42 (Bankr. S.D.N.Y. 1998); *In re Leslie Fay Cos.*, 175 B.R. 525, 539 (Bankr. S.D.N.Y. 1994)). Once again, the Professionals here have never been retained, and thus Section 328(c) is inapplicable to them.

21.     Similarly, the Professionals argue that the Fifth Circuit in *Riley* "reasoned that there were two ways that payments owed to a debtor's attorney could be classified as an administrative expense claim: '(1) if the payments are necessary expenses to preserve the estate under § 503(b)(1), or (2) if the payments are compensation or reimbursement under § 503(b)(2)…'" *See* Schwartz Mot. ¶ 26, and S & L Mot. ¶ 37. Again, the Professionals' reliance on *Riley* is misguided, because the Fifth Circuit in that case did not authorize the payment of professional fees that would otherwise be awarded under Section 330 to be allowed under Section 503(b)(1)(A). Instead, in *Riley*, the Fifth Circuit examined a situation involving a debtor's attorney in a chapter 13 case with a "no-look" fee, which does not require a fee application and is presumptively reasonable under Section 330 and considered whether that attorney can seek reimbursement for expenses such as "advancing the costs of the filing fee, credit counsel fee, and a credit report fee." *In re Riley*, 923 F.3d at 436. The Fifth Circuit held that these expense payments did not meet the criteria of Section 503(b)(1)(A) but concluded that the payment for the expenses could be awarded under Section 330(a)(4)(B) if the bankruptcy court found that the expenses were reasonable. *Id*. at 443. The Fifth Circuit wrote "[t]herefore, we hold that 11 U.S.C. §§ 503(b) and 330 provide bankruptcy courts with the discretion to compensate debtor's counsel for advancing the costs of filing fees, credit counseling fees, and credit report fees if they choose to do so…" *Id*. The Fifth Circuit did not authorize professionals to seek attorney's fees under Section 503(b)(1)(A), rather, it provided limited reimbursements of documented costs to debtor's counsel in a chapter 13 case under Section 330(a)(4)(B). And the holding in *Riley* is not applicable to the present case as neither of the Professionals fall within the scope of Section 330(a)(4)(B) because the Debtor's case is not a chapter 12 or 13 case.

11

**C. The Debtor is Not Seeking Retention of S&L Under Section 327(e) and S&L's Services Do Not Fall Within its Parameters.**

22.     S&L also seeks retroactive retention under Section 327(e), incorrectly arguing that "it is eligible for employment under Bankruptcy Code § 327(e) for the limited purposes set out as S & L's primary responsibility in the S & L Employment Application." S & L Mot. ¶ 29. But S&L is not the appropriate party to seek retention under Section 327(e) and the Debtor has not sought to retain S&L under that or any section since denial of S&L's employment application. Moreover, S&L's services, which were central to the conduct of the bankruptcy case, would not comply with Section 327(e)'s limited purview.

23.     The Bankruptcy Code states that "[t]he trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e). Section 1107 places the debtor-in-possession in the position of an estate fiduciary, with the rights and powers of a trustee, and it requires the debtor to perform all duties of a trustee. Thus, the plain language of Section 327(e) provides that the authority to employ a professional is within the sole purview of the debtor, as debtor-in-possession. Under this statutory framework, only the Debtor may seek authority from the Court to employ S & L as special counsel under Section 327(e). The Debtor has not done so here.

24.     Moreover, S&L does not fall under the category of professionals that may be employed under Section 327(e).[7] Section 327(e) applies narrowly to attorneys who will provide a

---

[7] While Schwartz has not requested retention under Section 327(e), for the avoidance of doubt, because he is not an attorney, that section is wholly inapplicable to him.  In any event, his services for the Debtor were similarly focused on helping the Debtor conduct its bankruptcy case.

005940

limited scope of service, specifically "other than to represent the trustee in conducting the case." 11 U.S.C. § 327(e). S & L sought retention as bankruptcy co-counsel for the Debtor, which requires retention under section 327(a), not Section 327(e). Notably, the tasks that S & L describe in the S & L Motion clearly show that the firm was tasked with representing the trustee in conducting the bankruptcy case. *See* S & L Motion, ¶ 34. S & L cannot reframe its retention to one under Section 327(e) now that its employment under Section 327(a) has been denied.

> **D.  Section 363(c) Can Only be Invoked by a Debtor, and Payment of Professional Fees and Expenses is Not Ordinary Course.**

25.     The Professionals also improperly invoke Section 363(c) as a basis for payment of their professional fees and/or expenses, stating "To the extent not otherwise authorized pursuant to this Motion, [the Professionals] request[] authority to draw on the Retainer that was provided for these expenses pursuant to Bankruptcy Code § 363(c)." *See* Schwartz Mot. ¶ 29 and S & L Mot. ¶ 43. But only the Debtor may make the determination to use estate property in the ordinary course of business under Section 363(c) without notice and hearing, and in any event, drawing down on a professional retainer is not in the ordinary course of business.

26.     The Bankruptcy Code states that "[t]he *trustee* may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c) (emphasis added). As with Section 327(e), this language places the authority to use estate property within the sole purview of the trustee, or, under Section 1107, the debtor, as debtor-in-possession. Thus, only the Debtor may seek authority from the Court to request authority to use property of the estate under Section 363(b) or make the determination that a payment is in its ordinary course of business under Section 363(c), and again, the Debtor has not done so here.

13

27.     Section 363(c) generally permits the debtor-in-possession to use estate properties that third parties may have an interest in if the requirements of Section 363(c)(1)-(4) are satisfied. *See Wolters Vill., Ltd. v. Vill. Properties, Ltd. (In re Vill. Properties, Ltd.*), 723 F.2d 441, 444 (5th Cir. 1984).  But such use may only occur if it is in the *ordinary course of business*. A professional's draw on a retainer because its employment application has been denied cannot be in the ordinary course of a Debtor's business, particularly when the professional was primarily tasked with conducting a bankruptcy case rather than a debtor's ordinary course operations.

28.     Moreover, Sections 327, 330, and 503(b)(2) of the Bankruptcy Code are the only statutory provisions that specifically govern the payment of professional fees and reimbursement of expenses and are the sole avenue for seeking these payments. Adopting the Professionals' theory as a pathway for payment of professional fees under Section 363(c) would violate statutory construction by rendering the statutory language in those sections meaningless. As the Fifth Circuit has ruled in a different context, "[c]ourts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless…." *Whitaker Constr. Co. v. Benton & Brown, Inc. (In re Whitaker Constr. Co.)*, 411 F.3d 197, 205 (5th Cir. 2005).

### E.  The Parties Cannot "Consent" to Unauthorized Compensation.

29.     The Professionals state that they are requesting a total amount of $667,348.75 "or other amount as agreed to by the parties and announced at or prior to any hearing on this Motion." *See* Schwartz Mot. ¶ 1 and S & L Mot. ¶ 1. The improper payment of fees to the Professionals under Section 503(b)(1)(A), even if the U.S. Trustee, Subchapter V Trustee, the Debtor, and the Sandy Hook Families agree to it, cannot override the statutory requirements nor the directive from the Supreme Court in *Lamie* discussed herein. As set forth above, the Bankruptcy Code, through

14

sections 326-331 and 503, regulates both professional compensation and administrative expense payment from the estate in a comprehensive way that parties are not free to rewrite. *See* 11 U.S.C. §§ 326-331, 503; *see also Davis v. Elliot Mgmt. Corp . (In re Lehman Bros. Holdings, Inc.)*, 508 B.R. 283, 294 (S.D.N.Y. 2014) ("The Bankruptcy Code is meant to be a "comprehensive federal scheme . . . to govern" the bankruptcy process. Although flexibility is necessary[,] the federal scheme cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences . . .") (citations omitted).

30.     The Bankruptcy Code's numerous limitations on professional retention and compensation—including a limitation concerning who can be an estate professional—would be undermined if bypassed through consent of parties. A professional could evade its burden to make the detailed showings required under Sections 330 and 503 if payment depended on nothing more than consent from interested parties. *See id.* at 293 (noting that the comprehensive nature of section 503(b) is inconsistent with allowing "backdoor" payments through plan provision). And if restrictions on compensation for unretained or non-disinterested professionals is circumvented by consent, other Bankruptcy Code provisions relating to compensation could similarly be evaded—including prohibitions on compensation for unnecessary or duplicative services, *see* 11 U.S.C. § 330(a)(4); and on fee-splitting, *see* 11 U.S.C. § 504. Even if the U.S. Trustee, all creditors, and other interested parties were to affirmatively consent to the relief sought in the Admin Expense Motions, there would be no basis for this Court to create a consent exception for Professionals that contravenes the Bankruptcy Code.

## <u>CONCLUSION</u>

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court deny the Admin

Expense Motions and grant such other relief as is just and proper.

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: 11/14/2022                    */s/ HA M NGUYEN*
                                     Ha Nguyen, Trial Attorney
                                     CA Bar #305411
                                     FED ID NO. 3623593
                                     United States Department of Justice
                                     Office of the United States Trustee
                                     515 Rusk Street, Suite 3516
                                     Houston, Texas 77002
                                     E-mail: Ha.Nguyen@usdoj.gov
                                     Cell: 202-590-7962

16

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC | § | Chapter 11 (Subchapter V) |
| Debtor. | § | |

**ALEX E. JONES LIMITED OBJECTION TO SHANNON & LEE LLP, MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC'S MOTIONS FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM AND GRANTING RELATED RELIEF [DOC #251 AND #252]**

TO THE HONORABLE CHRIS LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Alex E. Jones (herein "Jones") files this Limited Objection (herein the "Limited Objection") to the fee and expense Applications of Shannon & Lee, LLP ("Debtor's Attorneys") and Marc Schwartz and Schwartz Associates**,** LLC, ("Debtor's CRO") (the "Fee Applications") as follows:

**I.
PRELIMINARY STATEMENT**

**A.       Background of Alex Jones Connection to These Fee Applications**

1.       The Debtor's attorneys and Debtor's CRO have served in that position in four separate but affiliated filings of Chapter 11 cases, the original three cases involving InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC (the "Prior Chapter 11 cases") and the current case of Free Speech Systems, LLC ("FSS").  In the Prior Chapter 11 cases, shortly after this Court entered its Orders confirming the withdrawal with prejudice of all of the claims by all Connecticut and Texas Sandy Hook Plaintiffs then-pending litigation (the "Sandy Hook Litigation"), the Debtors Attorneys and the Debtor's CRO commenced an engagement with the Debtor FSS as as it's professional legal counsel and financial professional.

005945

2.      Jones paid the retainers for the professionals retained in the prior Chapter 11 cases which fees and retainers for that work was not the subject of any requested Court approval. Additionally, Jones paid the professional retainers, in part, for these same professionals.

3.      Jones has also paid, during 2022, significant funds to further the prior Chapter 11 cases, also to fund dramatically increasing litigation costs (both attorney's fees and expenses and experts), to otherwise backstop the cash inadequate flow and professional retainers of FSS, aggregating approximately $10 million (which comprised the bulk of Alex Jones liquidity and more than 50% of his then net worth, $3 million of which came from the sale of Jones' homestead).

4.      Although Jones initiated the financial side of the Chapter 11s filed thus far, neither he nor his counsel directed or dictated either the Debtors Attorneys or the Debtor's CRO in any aspect of their professional work.   Jones' counsel had considerable input into the Debtors Attorneys thoughts and direction, unfortunately little of which was either followed or implemented.  To be clear, Jones does not object *in any respect* to the refusal to implement the recommendations and requests of Jones' Counsel, although both Jones and his Counsel did not agree with (i) the process or progress of the Debtors cases during their prior Chapter 11 cases; or (ii) the FSS case-decisions regarding the timing of the defense and trial of the Sandy Hook Litigation, the removals, consideration of claims, bar date issues, withdrawal of the reference, District Court litigation jurisdiction, and numerous other topics dealing with the process of a bankruptcy Debtor inundated by litigation claims all set for trial back-to-back on the petition date.[1]

**B.      Jones Makes No Objection to the Rates or Time Accounting, or the Discount Amount Proposed By Debtors Attorneys**

---

[1]      Jones references the Motion for Reconsideration and the lengths Debtors Counsel went (including quoting from privileged communication-emails) to portray and emphasize the difficult decision making the parties' and counsel were frequently involved.  Nothing in this Objection, however, waives any privileged communication or work product of any counsel, including Jones Counsel and nothing in this Objection is intended to imply that the debates and strategy conflicts were anything but strong opinions expressed by competent counsel.

5.      This Limited Objection does not complain of the hourly rate charged for the professional fees of either Debtors Attorneys or Debtor's CRO nor does this Limited Objection complain of the accuracy of the accounting for each of their hours, services, and expenses set out in the Applications.

6.      This Objection does not complain of the amount of the proposed fee and expense proposed deduction, or the fee amount (as discounted) by Debtors Attorneys, for the reasons set out below.  As noted above, Debtors Attorneys and Jones counsel had significant and frequent debate, disagreements, and opinions of the best legal position, strategies, and claims treatment, importantly, the reduction in fees and the agreement of Jones to those reduced fees, is the result of a fair compromise reflecting the opposing positions often taken by joint-interest counsel involved in complex litigation and bankruptcy cases.

**C.      Jones Has No Objection to Rates or Time Accounting of the Debtor's CRO**

7.      This Limited Objection does not complain of the hourly rate charged for the professional fees of Debtor's CRO nor does this Limited Objection complain of the accuracy of the accounting for the hours, services, and expenses set out in the CRO's Application.  However, as set out below, Jones does complain of the proposed discounted amount set out in the Debtor's CRO Application as exceeding the value to the estate of those professional services.

**II.**
**JONES' OBJCTIONS**

**A.      Limited Objection to the Application of Debtors Attorneys**

8.      The only issue and complaint made by Jones regarding the Debtors Attorneys Fee application deals with two areas:

**a.      Responsiveness to This Court's Questions and Concerns and the Unwarranted Pleading Regarding the U.S. Trustees Office**:  Immediately upon the filing of the

FSS Chapter 11 this Court set out on the record and in some detail, two important areas of the Court's concern:

      i.     First, the Court expressed concern regarding the overlap of services by the Debtors Attorneys (and the Debtor's CRO) and the fact that there had been no disclosures by either professional of the potential conflict of interest for serving, at the same time the winding-down the Prior Chapter 11 cases while at the same time initiating and advising if the FSS Chapter 11 could be filed; and

      ii.     Second, the several FSS Budgeted items that included payment of *all* of Jones out-of-pocket costs to attend the Connecticut trial (an $80,000.00 payment) and payment by FSS of all the then-due attorneys' fees to trial counsel representing *both Jones and FSS*.  The Court was concerned that Jones should be shouldering his share of these expenses.

9.     Both of these Court-expressed complaints called for a prompt and thorough response by Debtors counsel in charge.  Neither were responded to.  Even more disconcerting than the lack of a response at all to the Court-expressed concerns (much less thorough and in writing), was the inflammatory and inaccurate pleadings finally filed by Debtors Counsel to the US Trustee objection to Debtors Counsel's retention, effectively reciting the quoted transcript excerpts of the topics of the Court's concerns *that had never been addressed*.  Jones believes the offensive pleadings (and the implications of untruthful and unethical conduct by the US Trustee) that did not address the Court's concerns, were counter-productive to any effort to inform the Court of the basis and commercially reasonableness of the issues raised.

10.     Finally, Jones did not anticipate either the failure of Debtors counsel to promptly respond to the Court's questions would be followed at the hearing by Debtors Attorneys arguments

and the CRO testimony that all but ignored why the Debtor had proposed the budget items to be paid, including: (i) that the Debtor has a written employment (and statutory) obligation of indemnity and that the salary to be paid to Jones had been unilaterally suspended by the Debtor (such that Jones was furnishing , notwithstanding that Jones produced 100% of the gross revenues for FSS he had no cash flow or salary to pay his share; (ii) that Jones had paid 100% of FSS legal fees due shortly before the Chapter 11 filing; (iii) that Jones purchased $400,000.00 in consignment products to cover the Debtor's inability to obtain product because the Debtor's CRO budgeted a weekly amount *that was only 30% of the past 4 years actual need based on actual income*, shutting down new purchase sales for the first 23 days of the FSS Chapter 11 case (reflecting several million dollars in lost sales); among a number of other matters to be reported to the Court as part of the Connecticut and Texas status report on the judgments resulting and the additional costs 100% funded by Jones because of the failure to answer this Court's concerns. Finally, Jones has no objection to application of the retainer to the discounted fees and expenses of Debtors Attorneys but does not agree the payment schedule is reasonable for the current status of this FSS Chapter 11 case.

> b.      **All Fees Paid In All Four Chapter 11 Cases Should Be Fully Disclosed and Considered By This Court When Determining the Debtors Attorneys Application**: Jones believes that full disclosure of professional compensation should require the disclosure to this Court of the overall professional fees paid to Debtors Attorneys, including the Prior Chapter 11 cases.

> **B.      Limited Objection to the Application of Debtor's CRO**

11.      Jones generally agrees that the Debtor's CRO rendered services beneficial to the estate but does not agree that the amount reflects those benefits.  However, Debtor's CRO created

005949

or exaggerated operational problems that challenged the ability of FSS to operate at all and stop salary payments for the employee that furnished 100% of the FSS Income.

<div style="text-align: center;">

a. **The CRO Was Not An "Operations" CRO and Created Significant Operational Problems**

</div>

12. Initially, it was not until Debtor's CRO testified before this Court that Marc Schwartz had served possibly once before as a CRO before accepting this retention as the 4 Debtors CRO. Because operations did not become an issue in the Prior Chapter 11 cases before the Plaintiffs claims were dismissed with prejudice, what did become obvious to Jones by early August was that the Debtor's CRO was not an "operations" restructuring officer, but an accounting restructuring officer. Although the Debtors CRO accounting specialty was clearly needed, the absence of an experienced operating and budgeting professional for the FSS operations was significantly missing yet vitally important. As discussed above, Debtor's CRO did a line-item cash collateral budget with a specific number for "product purchases" per week (*i.e.*, the $150,000.00 per week, or gross product purchases annually of *$7.8 million!*). However, historical operations indicated six times that amount per week was needed to replace product sales. As a result, product re-ordering immediately exceeded the budget and re-ordering collapsed in less than a week as did cash flow along with that collapse. The credit card purchases were received and banked yet could not be used to re-purchase inventory because they exceeded the budgeted amount.

13. The budget issues created by the grossly incorrect budgeting filings and projections was only corrected by this Court's Order in late August, 2022, however, sales did not regain the pre-Chapter 11 ordering level until well after this Court determined in mid-September, 2022 not to appoint the Debtor's CRO as proposed.

14.     Jones believes the requested fees exceed the value to the estate of the services actually received.

15.     Finally, Jones has no objection to application of the retainer to the approved fees and expenses of Debtors Attorneys found by this Court but does not agree the proposed payment schedule is reasonable for the current status of this FSS Chapter 11 case.

      b.     **All Fees Paid In All Four Chapter 11 Cases Should Be Fully Disclosed and Considered By This Court When Determining the Debtor's CRO**

16.      Jones believes that full disclosure of professional compensation should require the disclosure to this Court of the overall professional fees paid to Debtor's CRO, including the Prior Chapter 11 cases.

### III.
### CONCLUSION

For the foregoing reasons, Jones requests these objections be considered and that compensation be determined in this Court's judgment, and that Jones be granted such other relief the Court deems just.

Dated: November 14, 2022

           Respectfully submitted,

           */s/ Shelby A. Jordan*
           SHELBY A. JORDAN
           State Bar No. 11016700
           S.D. No. 2195
           ANTONIO ORTIZ
           State Bar No. 24074839
           S.D. No. 1127322
           ***Jordan & Ortiz, P.C.***
           500 North Shoreline Blvd., Suite 900
           Corpus Christi, TX  78401
           Telephone: (361) 884-5678
           Facsimile:  (361) 888-5555
           Email:  sjordan@jhwclaw.com
                  aortiz@jhwclaw.com

Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via e-mail on counsel for Debtor, Shannon & Lee, LLP and Schwartz Associates, LLC and all parties receiving or entitled to notice through CM/ECF on November 14, 2022.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 (Subchapter V) |
| FREE SPEECH SYSTEMS LLC, | § | |
| . | § | Case No. 22-60043 (CML) |
| | § | |
| Debtor. | § | Jointly Administered |

**THE DEBTOR AND SUBCHAPTER V TRUSTEE'S JOINT
OBJECTION TO W. MARC SCHWARTZ AND SHANNON &LEE LLP'S
MOTIONS FOR ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIMS**

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above captioned chapter 11 case, and Melissa Haselden, the subchapter v trustee (the "Subchapter V Trustee"), file this joint objection regarding *Shannon & Lee LLP's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief* [Docket No. 251] and *Motion of W. Marc Schwartz and Schwartz Associates, LLC for Order Allowing Administrative Expense Claim and Granting Related Relief* [Docket No. 252] (jointly, the "Administrative Expense Applications") and states the following:

## BACKGROUND

1.      The Debtor commenced this bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and electing to proceed under subchapter V of chapter 11 on July 29, 2022 (the "Petition Date").

2.      On August 2, 2022, the Office of the United States Trustee for Region 7 appointed Melissa A. Haselden as the Subchapter V Trustee in this case [Docket No. 22].

3.      Prior to the Petition Date, FSS retained W. Marc Schwartz ("Schwartz") as Chief Restructuring Officer and retained Schwartz & Associates to perform various related accounting and forensic work.  FSS also retained Shannon & Lee LLP ("S&L") as co-counsel to the Debtor.

4.      On August 20, 2022, the Debtor filed its *Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz and Schwartz Associates LLC as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* [Docket No. 83] and the *Application of Debtor for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor, and (B) Granting Related Relief* [Docket No. 85].

5.      On September 20, 2022, the Court entered the *Order (A) Denying Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Denying Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* [Docket No. 181] and the *Order Denying Debtor's Application to Employ Bankruptcy Co-Counsel* [Docket No. 182] (collectively, the "<u>Orders Denying Employment</u>").

6.      On October 24, 2022, the Administrative Expense Applications were filed.

<div align="center">

**OBJECTION**

</div>

7.      The Administrative Expense Applications cannot be granted because there is not a basis under the Bankruptcy Code supporting their allowance.  The Debtor and Subchapter V Trustee object at this time to the Administrative Expense Applications solely with respect to the lack of legal authority for granting the Administrative Expense Applications.  Any  response with regards to value to the estate is reserved.

<div align="center">

**As Unretained Professionals of the Debtor, Schwartz and S&L Are Not Able to Seek Compensation Pursuant to Sections 330 or 503 of the Bankruptcy Code.**

</div>

8.      Schwartz and S&L seek compensation pursuant to sections 330 and 503 of the Bankruptcy Code.  However, sections 330 and 503 do not provide authority for the claims to be allowed.

<div align="center">

2

</div>

9.     The question presented similar to that recently faced by a court *In re Medley LLC*, 21-10526 (KBO) (Bankr. D. Del. December 13, 2021).  In *Medley*, the court denied a request to compromise under FRBP 9019 that included the payment of a portion of a law firm's fees.  The law firm previously filed a retention application under section 327, but after multiple objections, withdrew its application.  The liquidating trustee filed a 9019 motion seeking payment of a portion of the law firm's fees for work done prior to the withdrawal.  The court denied the request and found that

> [A]ny fees or expenses that are incurred on behalf of a debtor cannot be recovered by [the law firm], as substantial contribution or otherwise, because the Code doesn't allow for it under 503.  As an estate professional, the proper procedure was to obtain approval of the retention under 327 and then seek compensation under 330, and that didn't occur.

Tr. 31–32.

10.     Like the law firm in *Medley*, Schwartz and S&L did not obtain approval of their retentions under section 327 of the Bankruptcy Code.  Therefore, Schwartz and S&L cannot now seek compensation under sections 330 or 503 of the Bankruptcy Code.

**I.     Schwartz and S&L's Fees Are Not Compensable Pursuant to Section 330.**

11.     Section 330 of the Bankruptcy Code provides that "after notice . . . and a hearing . . . the court may award *to a professional person employed under section 327* . . . reasonable compensation for actual, necessary services rendered . . . and . . . reimbursement for actual, necessary expenses."  11 U.S.C. § 330 (emphasis added).  Retention under section 327 is a perquisite for professionals seeking compensation under section 330 of the Bankruptcy Code.  *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) "A debtor's attorney not engaged as provided by § 327 is simply not included within the class of persons eligible for compensation.").

12.     Neither Schwartz nor S&L are employed under section 327 of the Bankruptcy Code.  *See* Orders Denying Employment.  "As such, the plain wording of the statute dictates that

3

005955

the application be denied." *Decloutte v. Austin (In re Decloutte)*, 2018 Bankr. LEXIS 1869, *43 (Bankr. S.D. Tex. June 20, 2018).

## II.   Schwartz and S&L Are Ineligible to Seek Compensation Pursuant to Section 503(b)(1)(A).

13.   Section 503(b)(1)(A) of the Bankruptcy Code provides that "after notice and a hearing, there shall be allowed administrative expenses . . . the actual, necessary costs and expenses of preserving the estate including— (i) wages, salaries, and commissions for services rendered after the commencement of the case[.]" 11 U.S.C. § 503(b)(1)(A).

14.   Professionals cannot circumvent the requirements of section 327(a) of the Bankruptcy Code by seeking compensation as an administrative expense under section 503(b). *See e.g. F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.)*, 844 F.2d 99, 109 (3d Cir. 1988) (concluding that if a professional "were able to be compensated under section 503(b)(1)(A), it would render section 327(a) nugatory and would contravene Congress' intent in providing for prior approval"); *In re Milwaukee Engraving Co., Inc.*, 219 F.3d 635, 636 (7th Cir. 2000) ("By making express provision for employment under § 327, payment under § 330, and priority under § 503(b)(2), the Code logically forecloses the possibility of treating § 503(b)(1)(A) as authority to pay (and give priority to) claims that do not meet its substantive requirements"); *Cushman & Wakefield of Conn., Inc. v. Keren Ltd. P'Ship (In re Keren Ltd. P'ship)*, 189 F.3d 86, 88 (2d Cir. 1999) ("[A] broker or other professional generally may not avoid the requirements of Sections 327 and 330 by seeking administrative expense allowance under Section 503(b)(1)(A) rather than Section 503(b)(2)"); *In re Cutler Mfg. Corp.*, 95 Bankr. 230, 231-32 (Bankr. M.D. Fla. 1989) ("Nor does this Court believe that Congress contemplated that individuals who would be ineligible to be employed as professionals under the facts in this case could come back later and seek compensation under § 503 for the same activities which they would be denied compensation under

4

§ 327."); *In re Garden Ridge Corp.*, 326 B.R. 278, 281 (Bankr. D. Del. 2005) ("the Court is simply unable to extend *nunc pro tunc* analysis to the present situation after the Third Circuit unequivocally held that section 503(b)(1)(A) cannot be used to reimburse professionals for services rendered to the estate."); *In re Southern Div. Props. Inc.*, 110 B.R. 992, 996–97 (Bankr. N.D. Ga. 1990) ("This court cannot condone or permit a trustee, or an attorney representing a trustee, to circumvent the requirements of section 327(a) by seeking an administrative expense allowance under section 503(b)(3)(D) and (b)(4)").

15.     Because Schwartz and S&L's employment applications were denied, neither is a section 327 retained professional and are therefore ineligible to seek an administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.  The Debtor and the Trustee recognize the harsh consequence to professionals who provided services to a debtor post-petition but whose retention is not approved by a court.  However, a request for allowance of an administrative expense claim under section 503 cannot be used to circumvent the requirements of section 327 of the Bankruptcy Code.  The Court should deny the requests.

005957

Dated: November 14, 2022

/S/ Raymond W. Battaglia_____

Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Counsel to the Debtor and Debtor-In Possession*

and

/s/ Elizabeth Freeman

**JACKSON WALKER LLP**
Elizabeth Freeman (TX Bar No. 2400922)
Sean Gallagher (TX Bar No. 24101781)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: efreeman@jw.com
        sgallagher@jw.com

*Counsel for Melissa Haselden, Subchapter V Trustee*

6

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 14, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Elizabeth Freeman*
Elizabeth Freeman

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**SHANNON & LEE LLP'S REPLY TO THE UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO THE MOTIONS OF SHANNON & LEE LLP AND W. MARC SCHWARTZ FOR REHEARING ON THE ISSUE OF DISINTERESTEDNESS**

Shannon & Lee LLP ("S&L") replies to the United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Rehearing on the Issue of Disinterestedness [ECF No. 223] (the "UST Response") as follows:

**PRELIMINARY STATEMENT**

1.      The U.S. Trustee objects to Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206] (the "Rule 59 Motion") on the grounds that (a) the Rule 59 Motion was not filed by Free Speech Systems, LLC as debtor in possession (the "Debtor"), (b) the Rule 59 Motion does not meet the applicable standard for relief, and (c) the additional evidence that S&L seeks to present at the rehearing is cumulative of the evidence presented at the hearing. S&L responds to these points below.

2.      Giving credit to the UST Response, S&L filed Shannon & Lee LLP's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 251] (the "Administrative Expense Motion") on October 24, 2022. To the extent that the Administrative Expense Motion is not prejudiced by the Court's ruling on the S&L Employment Application, the

Rule 59 Motion will be either moot or so nearly so that it will be voluntarily withdrawn.[1] S&L does not seek to require the Debtor to engage S&L going forward or to continue to represent the Debtor in this chapter 11 case. Rather, the Rule 59 Motion seeks a rehearing on disinterestedness to resolve any uncertainty about S&L's ability to receive compensation for services provided to the Debtor through September 20, 2022.

3.     The U.S. Trustee's objection to the S&L Employment Application requested that the Court exercise its discretion and fashion an equitable remedy because Mr. Lee did not supplement his Bankruptcy Rule 2014 disclosures for employment of Kyung S. Lee PLLC ("KSLPLLC") in the IW Cases. The Court indicated at the September 20 Hearing that its ruling should not be interpreted as deciding that S&L or Schwartz Associates were prevented from receiving compensation for work done prior to the ruling. (Sept. 20, 2022, Hrg. Tr. 256:14-257:8). The Court's ruling and comments can be understood as granting the equitable remedy of denying S&L's employment because of the non-disclosure requested by the U.S. Trustee while leaving open S&L's ability to seek compensation through a separate pleading. Absent a ruling to that effect, however, the Court should grant the Rule 59 Motion and allow S&L a fair opportunity to present evidence and arguments on the issues raised by the Court in its ruling.

## ARGUMENT

### A.  S&L Has Standing and Statutory Authority to File and Pursue the Rule 59 Motion.

4.     Through the Rule 59 Motion, S&L seeks a rehearing on the issue of disinterestedness—an in particular, whether S&L had a predisposition under circumstances that render such a bias against the estate—in connection with the Debtor's application to employ S&L

---

[1] Reputational harm and loss of fees earned in the future may be sufficient to provide standing. *See KLG Gates LLP v. Brown*, 506 B.R. 177, 190-91 (E.D.N.Y. 2014). However, S&L would not pursue a remedy under the Rule 59 Motion if there was no pecuniary interest.

005961

as co-counsel [ECF No. 85] (the "S&L Employment Application"). S&L has statutory and constitutional standing to seek the relief requested in the Rule 59 Motion.

5.      Rule 59(a)(1)(B) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to the above-captioned chapter 11 case by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), provides in relevant part, that "[t]he court may grant a new trial on all or some of the issues—*and to any party*— . . . after a non-jury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." (emphasis added). Neither Federal Rule 59 nor Bankruptcy Rule 9023 limit relief to the original moving party.

6.      Title 11 of the United States Code (the "Bankruptcy Code") provides expansive rights to be heard in chapter 11 cases. Bankruptcy Code § 1109(b) provides that any "party in interest . . . may raise and may appear and be heard on any issue in a case under [chapter 11]." A "party in interest" is an entity that has a personal stake in the outcome that can be addressed by a favorable decision. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 417 (Bankr. S.D. Tex. 2009); *see also In re Am. Appliance*, 272 B.R. 587, 595 (Bankr. D.N.J. 2002) (holding that the test for whether an entity is a "party in interest" is whether it has a sufficient stake in the outcome of the proceeding to require representation).

7.      Further, as the Bankruptcy Appellate Panel for the Sixth Circuit held in *Bingham Greenebaum Doll, LLP v. Glenview Health Care Facility, Inc. (In re Glenview Health Care Facility, Inc.)*, 620 B.R. 582 (B.A.P. 6th Cir. 2020), the pecuniary interest of a professional in its fees is sufficient for Article III and appellate standing with respect to a denied application to employ. *Id.* at 585; *see also KLG Gates LLP v. Brown*, 506 B.R. 177, 190 (E.D.N.Y. 2014) (holding that a disqualified attorney had standing to appeal the disqualification order). Unless the denial of

3

the S&L Employment Application does not prejudice S&L's ability to seek compensation through the Administrative Expense Motion for the period from the petition date through September 20, 2022, S&L has a pecuniary interest sufficient for standing and to be a party in interest that can bring the Rule 59 Motion.[2]

8. The U.S. Trustee argues that the plain language of Bankruptcy Code § 327 provides that the Debtor is the only party that can seek employment of S&L and seek a rehearing of the S&L Employment Application. UST Response ¶ 9. But section 327(a) is silent on which party must seek approval of the employment.[3] The real question is the effect of Bankruptcy Rule 2014(a), which provides that "[a]n order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to §327, §1103, or §1114 of the Code shall be made only on application of the trustee or committee."

9. Applicable authority confirms that professionals may raise and be heard on issues involving their own employment in bankruptcy proceedings. Addressing a similar argument as that raised in the UST Response, the Sixth Circuit BAP in *In re Glenview Health Care Facility, Inc.* noted that, as a procedural rule, Bankruptcy Rule 2014(a) does not limit or extend jurisdiction. 620 B.R. at 585, n.2. The Bankruptcy Appellate Panel for the Ninth Circuit similarly reasoned in *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998), that allowing a professional to seek court approval of its retention was *not* inconsistent with Bankruptcy Code § 327 or Bankruptcy Rule 2014. *Id.* at 479. Bankruptcy

---

[2] S&L submits that there is authority supporting the proposition that S&L is not precluded or prejudiced in seeking compensation through the Administrative Expense Motion. *See* Administrative Expense Motion ¶¶ 24-30. This is also consistent with the Court's ruling at the September 20 Hearing. (Sept. 20, 2022, Hrg. Tr. 256:14-257:4). If the Administrative Expense Motion is not prejudiced by the Court's ruling at the September 20 Hearing, then S&L arguably would not have a pecuniary interest in seeking a rehearing on the S&L Employment Application.

[3] Bankruptcy Code § 327(a) provides that the trustee—and debtors in possession pursuant to Bankruptcy Code §§ 1107—"with the court's approval, may employ one or more attorneys . . . ." However, "[s]ection 327 does not, by its terms, limit standing of a professional to seek employment." *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 479 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998).

005963

Local Rule 2014-1(a) even indicates that applications to employ debtor's counsel would be filed by the attorney. And various courts have authorized the retroactive employment of professionals in connection with requests for compensation. *E.g.*, *In re McKenzie*, No. 08-16378, 2013 Bankr. LEXIS 2672 (Bankr. E.D. Tenn. July 2, 2013); *In re Little Greek Rest.*, 205 B.R. 484 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366 (Bankr. M.D. Ga. 1989); *see also In re Triangle Chems.*, 697 F.2d 1280, 1289 (5th Cir. 1983) (reversing a bankruptcy court's decision denying an application for compensation on the basis that the court had discretion to approve such employment in connection with the application).

10.     While the U.S. Trustee might be correct if S&L was seeking to require the Debtor to continue to engage S&L after the September 20 Hearing, that is not the relief requested through the Rule 59 Motion.[4] Rather, S&L seeks to resolve the dispute regarding its ability to receive compensation for the services it provided to the Debtor through September 20, 2022. If the Court's ruling at the September 20 Hearing does not prevent S&L from applying for and receiving allowed compensation, then the Rule 59 Motion would be unnecessary.[5]

**B.  The Rule 59 Motion Meets the Standard for a Rehearing under Rule 59(a).**

  *i.    Surprise from a new theory arising at trial is a valid basis for a rehearing.*

11.     The U.S. Trustee argues that the Rule 59 Motion does not meet the relevant standard for a rehearing under Rule 59(a). Quoting *Trevino v. Caliber Home Loans, Inc. (In re Trevino)*, 564 B.R. 890 (Bankr. S.D. Tex. 2017), the U.S. Trustee contends that "'[t]o be entitled to a new trial or hearing a party must show a manifest error of law, manifest error of fact, or newly

---

[4] Some caselaw supports the proposition that an attorney still has standing based on reputational effects and fees earned in the future. *See KLG Gates LLP v. Brown*, 506 B.R. 177, 190-91 (E.D.N.Y. 2014). However, S&L does not seek approval to continue to represent the Debtor through the Rule 59 Motion.

[5] S&L continues to negotiate with the parties to this chapter 11 case to obtain a consensual resolution of both the Rule 59 Motion and the Administrative Expense Motion.

005964

discovered evidence." UST Response ¶ 10. But that is not what *Trevino* says. According to *Trevino*—a decision about newly discovered evidence— "[t]he plain language of Rule 59(a)(2) indicates that a motion under that rule may be brought for many purposes, including seeking a new trial based on newly discovered evidence.)" *Id.* at 908. The case does not address the other "many purposes" for which a rehearing is appropriate.

12.     The language quoted in the U.S. Trustee's objection comes from a parenthetical to a "see also" citation to *Simon v. United States*, 891 F.2d 1154 (5th Cir. 1990). But *Simon* was an appeal of the denial of a motion under *Rule 59(e)* to alter or amend the judgement—rather than a rule 59(a) motion for rehearing—where the defendant did not raise an affirmative defense at or before trial. *Id.* at 1159. Courts have frequently held that amendment of a judgment under Rule 59(e) requires manifest error. *E.g.*, *Wease v. Ocwen Loan Servicing, L.L.C.*, 852 F. App'x 807, 809 (5th Cir. 2021); *In re Cyr*, 2020 U.S. Dist. LEXIS 255998, at *2 (W.D. Tex. July 16, 2020) (2020 WL 10056295); *Culpepper v. United States Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 76555, at *5 (N.D. Tex. May 31, 2013) (2013 WL 2370550). But Rule 59(e) seeks different relief than a Rule 59(a) motion based on surprise—Rule 59(e) calls into question the correctness of a judgment, rather than whether the movant was on notice of the factual and legal issues that would be the focus of the trial and had a fair opportunity to present its best case. *See Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (reasoning that "Rule 59(e) 'serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.'").

13.     S&L submits that the Court should apply the standard with respect to surprise under Rule 59(a) described in *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir. 1982). According to *Conway*:

6

> It is well settled that Rule 59 provides a means of relief in cases in which a party has been unfairly made the victim of surprise. . . . The surprise, however, must be "inconsistent with substantial justice" in order to justify a grant of a new trial. . . . The district court is therefore entitled to grant a new trial only if the admission of the surprise testimony actually prejudiced the plaintiffs' case. . . .This Court has limited reversible error from unfair surprise to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify.

*Id.* at 112 (citations omitted). "'[S]urprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a [Rule 59(a)] motion.'" *Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 410 (M.D. Pa. 2019) (quoting *Sanford v. Crittenden Memorial Hosp.*, 141 F.3d 882, 886 (8th Cir. 1998)).

14.    In a contested matter in a bankruptcy proceeding, the relevant question for a rehearing under Rule 59(a) due to surprise is whether the focus of the hearing was evident to the movant prior to the hearing. *See Kingsley Const., Inc. v. DDS Materials, Inc. (In re DDS Materials, Inc.)*, No. 92-2922, 1993 U.S. App. LEXIS 39036, at *7 (5th Cir. Sep. 9, 1993) (holding that that the bankruptcy court did not abuse its discretion because "[t]he bankruptcy court further found that any surprise which may have occurred was not inconsistent with substantial justice, since it was evident that to the parties that the focus of the full hearing would be upon which party breached the contracts.") (citing *Conway*, 687 F.2d at 111). The inquiry is on the factual and legal theories that the moving party should have anticipated would be litigated at the hearing.

15.    There was no indication that the September 20 Hearing would be about any predisposition of S&L or circumstances that might render such predisposition a bias against the Debtor's bankruptcy estate. All signs were that the focus of the hearing on the S&L Employment Application would the circumstances surrounding Mr. Lee not supplementing his Rule 2014 disclosures in the InfoW Cases. The Debtor and the U.S. Trustee communicated this to the Court

7

at the September 13, 2022, hearing at which the September 20 Hearing was scheduled.[6] (Sept. 13, 2022, Hrg. Tr. 36:1-9). This was the only issue addressed in the parties' briefing to the Court and it was the focus of their presentation to the Court. (Sept. 20, 2022, Hrg. Tr. 210:13-18; ECF Nos. 154 & 166). S&L submits that fairness and substantial justice require that S&L have the opportunity to prepare and present evidence and argument regarding the issue of its predisposition, irrespective of whether there are manifest errors based on the record at the September 20 Hearing.[7]

---

[6] At the September 13 hearing, Mr. Shannon for the Debtor and Mr. Nguyen for the U.S. Trustee represented to the Court as follows:

> MR. SHANNON: And again, Your Honor, I do believe that the U.S. Trustee's primary objection is about the disclosures in the InfoW case. That's really the crux of the objection and what will need to be investigated, so it's not -- I don't think it goes beyond that.

> MR. NGUYEN: That's correct. There was a prior nondisclosure that occurred before you. There's going to be some legal arguments on how you should address that, but that's where we are with the objection.

(Sept. 13, 2022, Hrg. Tr. 36:1-9). The U.S. Trustee also indicated that the discovery would be "very limited in terms of the scope of the employment – the scope of the engagement that occurred between May 24th through May 31st, and Mr. Lee in his declaration, there was about $21,000 of services." (Sept. 13, 2022, Hrg. Tr. 35:8-11).

[7] To the extent that manifest error is required for a rehearing based on surprise under Rule 59(a)—rather than applying only to Rule 59(e)—S&L submits that there were manifest errors of fact underlying the Court's ruling. A manifest error is one that is plain, indisputable, and disregards the credible evidence and controlling law. *Bender Square Partners v. Factory Mut. Ins. Co.*, No. 4:10-cv-4295, 2012 U.S. Dist. LEXIS 74709, at *7-8 (S.D. Tex. May 27, 2012) (2012 WL 1952265). Among the factual findings amounting to manifest error are:

a) <u>Mr. Lee's Statements at the May 19, 2022, Hearing</u>—The Court referenced in its ruling that Mr. Lee stated at the May 19, 2022, hearing in the IW Cases that he had to renegotiate the Plan Support Agreement. (Sept. 20, 2022, Hrg. Tr. 239:14-16). As reflected in the transcript of that hearing, however, Mr. Lee stated that the IW Debtors were going to evaluate "whether these debtors need to proceed with trying to confirm a plan with an amended plan support agreement or whether we are able to handle these creditors, the remaining creditors, outside of bankruptcy." (Debtor's Ex. 22, May 19, 2022, Hrg. Tr. 8:16-21). Mr. Lee also represented that he "hope[d] to do that very quickly." (May 19, 2022, Hrg. Tr. 8:23-24). The evidence at the September 20 Hearing was that the evaluation occurred and the decision to agree to dismiss the IW Cases in light of the costs of continuing those cases was made by May 23, 2022. (Debtor's Exs. 24 & 25).

b) <u>Omnibus Response to MTDs in IW Cases</u>—The Court referenced the Debtors' Omnibus Response to Motions to Dismiss (U.S. Trustee Ex. 7) (the "<u>IW MTD Response</u>") in its ruling, indicating that the statements in the IW MTD Response that there remained a bankruptcy purpose were inconsistent with the representations that only ministerial work remained in the IW Cases on May 24, 2022. (Sept. 20, 2022, Hrg. Tr. 243:3-9). This disregards the evidence that the reason for IW Debtors decision to agree to the dismissal was the cost of litigating with the U.S. Trustee's motion to dismiss the IW Cases, as indicated in the IW MTD Response (IW MTD Response ¶ 6) and confirmed by the testimony of Mr. Lee (Sept. 20, 2022, Hrg. Tr. 80:10-25, 88:12-23, 89:2-18, 90:15-25, & 91:2-3) and Mr. Schwartz (Sept. 20, 2022, Hrg. Tr. 163:7-25). The evidence was that the IW MTD Response required discovery and that the U.S. Trustee argued that estate funds could be better used to address claims outside of bankruptcy. (Debtor's Ex. 18). The IW Debtors, through Mr. Lee and Mr. Schwartz, ultimately agreed to dismiss the IW Cases to avoid this cost.

8

ii.     *Issues of control, independence, and loyalty were not raised in connection with the*
        *Debtor's application to employ S&L prior to the September 20 Hearing.*

16.     The U.S. Trustee also argues that "questions of control, independence, and loyalty

were raised at prior hearings, in pleadings filed by creditors, and even acknowledged by Mr.

Schwartz in his declaration, stating: 'Concerns were expressed at the inception of the InfoW

---

c)  Focus Group re Heslin/Lewis Suit— The Court referenced in its ruling that on July 1, 2022, that Mr. Lee attended and participated in a focus group on juror perception of Alex Jones but did not separate time billed by client. (Sept. 20, 2022, Hrg. Tr. 243:16-244:1). But the evidence at the September 20 Hearing was that Mr. Lee attended the focus group to understand the magnitude of the claims *against the Debtor* in the Heslin/Lewis Suit (Sept. 20, 2022, Hrg. Tr. 67:3-24). The very first motion considered in the Debtor's chapter 11 case, and argued by S&L attorney Mr. Shannon, was related to the Heslin/Lewis Suit (Sept. 20, 2022, Hrg. Tr. 68:4-12). Further, neither S&L nor any of its attorneys represented any other party in the Heslin/Lewis Suit that *could* have been billed for that time. The claims of Heslin and Lewis against InfoW, LLC were resolved on May 19, 2022 (Debtor's Ex. 21) and neither S&L nor its attorneys represented Alex Jones. (Sept. 20, 2022, Hrg. Tr. 62:19; Debtor's Ex. 4, 5, & 6).

d)  AmEx Charges—The Court referenced in its ruling the payment of AmEx charges in the Debtor's first proposed cash collateral budget, indicating that such charges "consisted primarily of personal charges not related to the business." (Sept. 20, 2022, Hrg. Tr. 247:21-24). The transcript of the August 3, 2022, hearing at which such charges were discussed was introduced into evidence by the U.S. Trustee. (U.S. Trustee's Ex. 15). Mr. Schwartz's testimony was that business expenses of the Debtor were paid through the AmEx card and that the amounts averaged approximately $300,000 per month. (Aug. 3, 2022, Hrg. Tr. 168:1-15). Although Mr. Schwartz testified that Alex Jones had in the past paid certain personal expenses that were recorded as owner draws and that the largest number of line items posted to the draw account was for Alex Jones's housekeeper (Aug. 3, 2022, Hrg. Tr. 168:20-25), there was *no evidence* that the AmEx obligation the Debtor sought authority to pay in the proposed first interim cash collateral order reflected primarily personal charges of Alex Jones. Further, the evidence was that the AmEx charges going forward would only be for business expenses. (Aug. 3, 2022, Hrg. Tr. 169:1-8, 187:19-22). Mr. Schwartz also testified that the Debtor was "probably going to have to just let American Express shave the wind and see what we can do." (Aug. 3, 2022, Hrg. Tr. 168:1-3). The proposed first interim cash collateral order does not indicate any predisposition.

e)  Proposed Third Cash Collateral Order—The Court referenced the Debtor's proposed Third Cash Collateral Order [ECF No. 148] that provided $80,000 in travel expenses related to Alex Jones attending the trial in the Connecticut Litigation and that the Court's attention was not directed to that proposed expense. (Sept. 20, 2022, Hrg. Tr. 244:2-12). If relevant to the Court's decision with respect to the S&L Employment Application, this disregarded the evidence. Mr. Battaglia filed and presented the proposed Third Cash Collateral Order to the Court. (Sept. 13, 2022, Hrg. Tr. 7:7-14:8; Sept. 20, 2022, Hrg. Tr. 13:4-14). Further, the evidence was that the proposed budget was communicated, negotiated, and agreed among the parties. (Sept. 13, 2022, Hrg. Tr. 5:24-6:2, 7:16-22). There was no failure of disclosure by S&L or indication that S&L had a predisposition causing bias against the Debtor's bankruptcy estate.

f)  Relationship with PQPR—The Court indicated that it had issues with the relationship with the Debtor and PQPR with their professionals having engaged extensively pre-petition. (Sept. 20, 2022, Hrg. Tr. 246:12-14). But the evidence at the September 20 Hearing was that issues with PQPR were hardly negotiated and at times contentious. (Sept. 20, 2022, Hrg. Tr. 65:7-16). The evidence also indicated that S&L never represented and has no connection to PQPR. (Sept. 20, 2022, Hrg. Tr. 61:23-62:15).

g)  Post-Petition Analysis of PQPR's Asserted Claim—The Court stated in its ruling that there was no evidence that the Debtor or its professionals analyzed the PQPR claim extensively post-petition and that the estate had not brought claims against PQPR. (Sept. 20, 2022, Hrg. Tr. 246:14-15). This disregarded the evidence that the Debtor scheduled PQPR's asserted claim as disputed (U.S. Trustee's Ex. 1 at p.15) and took the position that there was a basis for the avoidance of PQPR's asserted claim. [ECF No. 113 at n.4].

9

Debtors' bankruptcy cases whether I would be serving Alex Jones or the creditors of InfoW Debtors.'" UST Response ¶ 15 (footnotes omitted). The U.S. Trustee referenced the Court's questions about when Mr. Schwartz was retained by the Debtor and comments after the Plaintiff's oral motion for appointment of a tort claimant's committee, allegations about the IW Cases in the Plaintiff's motion to appoint a tort claimant's committee and remove the Debtor as debtor-in-possession about the IW Cases, and Mr. Schwartz's declaration regarding the IW Cases.

17.     None of these questions were about *S&L* or implied that S&L had any predisposition under circumstances that rendered the predisposition a bias against the estate. Nor were any of the issues raised by the U.S. Trustee or the Plaintiffs made in opposition to the S&L Employment Application or the application to employ Schwartz Associates. That made sense perfect sense—Bankruptcy Code § 327(a) is concerned with whether the professional has a *present* interest adverse to the estate or *concurrently* represents a party with such adverse interest. *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999); *In re Muma Servs., Inc.*, 286 B.R. 583, 590 (Bankr. D. Del. 2002); *Greene v. InforMD, LLC*, No. 17-1779-SDD-EWD, 2018 U.S. Dist. LEXIS 124062, at *8 (M.D. La. July 25, 2018) (2018 WL 3579470). The inquiry under section 327(a) is whether S&L had a "meaningful incentive" to act contrary to the best interests of the estate. *In re Quality Bev. Co.*, 216 B.R. 592, 595 (Bankr. S.D. Tex. 1995). The Debtor and S&L did not have reason to believe that the September 20 Hearing was on the allegations raised in the tort claimants committee motion or questions about Mr. Schwartz's independence in the IW Cases instead of the issues presented in the U.S. Trustee's objection to the S&L Employment Application.[8]

---

[8] The U.S. Trustee's objection to the S&L Employment Application raised only a single issue—what action should the Court take as the result of Mr. Lee not supplementing the Rule 2014 verified statement for the employment of KSLPLLC in the IW Cases. This was confirmed by the U.S. Trustee at the September 13, 2022, hearing. (Sept. 13, 2022 Hrg. Tr. 36:1-9).

005969

18.     The U.S. Trustee also asserts the Court clearly signaled its concerns during the Debtor's opening statement at the September 20, 2022, hearing. However, the crux of the Court's question was whether was a "throughline" between the non-disclosure in the InfoW Cases and the Debtor's chapter 11 case. The evidence and argument at the September 20 Hearing was focused on the issue of why Mr. Lee did not supplement his disclosures for KSLPLLC in the IW Cases after the May 24 meeting with the Debtor. The evidence prepared and introduced at the September 20 Hearing was that Mr. Lee did not supplement his disclosures because the IW Debtors had decided to agree with the U.S. Trustee's demanded dismissal of their cases and were no longer seeking to employ Mr. Lee or KSLPLLC under section 327(a).[9]

19.     Further, the Court identified the issue being Mr. Lee's relationship with Alex Jones and PQPR. (Sept. 20, 2022, Hrg. Tr. 27:21-28:1). The evidence presented at the September 20 Hearing was that S&L does not currently and has not previously represented either PQPR or Alex Jones. (Sept. 20, 2022, Hrg. Tr. 59:12-62:20; Debtor's Exs. 4, 5, & 6).

20.     Whether S&L had a material adverse interest arising from some predisposition was *not* raised prior to the close of evidence. The issue came up the first time in the Court's questions after the Debtor had finished its closing presentation. (Sept. 20, 2022, Hrg. Tr. 210:13-211:18). The evidence pointed to in the record in response to this question was that the Debtor refused Alex Jones's request to seek an extension of the automatic stay (Sept. 20, 2022, Hrg. Tr. 63:3-9), that the IW Debtors represented by Mr. Lee had considered the appropriate factors in agreeing to dismiss their cases (Sept. 20, 2022, Hrg. Tr. 87:16-91:3; Debtor's Ex. 24), and that the IW Debtors

---

[9] As the U.S. Trustee argued in the objection to the S&L Employment Application, "Rule 2014 has one primary purpose—to facilitate strict compliance with section 327." [ECF No. 154 at ¶ 154]. Evidence of whether Mr. Lee's supplemental disclosure was necessary, his reasoning for believing supplemental disclosure was not necessary, and the appropriate action of the Court in the Debtor's chapter 11 case appeared beforehand to be the only factual issues to be addressed at the September 20 Hearing.

represented by Mr. Lee focused on the benefit to their estates when obtaining dismissal with prejudice of the Sandy Hook Litigation claims against them rather than the effect of any related party.[10] (Sept. 20, 2022, Hrg. Tr. 83:10-84:3). The reason other relevant evidence was not introduced—including the evidence that S&L seeks to submit at a rehearing—was because the issue of a potential predisposition amounting to bias against the Debtor's estate was not raised prior to the September 20 Hearing.

> iii.   *S&L did not have the ability to address the issues on which the Court's ruling appears to rely.*

21.   S&L did not have a fair opportunity to address the issues identified by the Court in its ruling that went beyond the limited basis of the U.S. Trustee's objection or S&L's relationship with Alex Jones or PQPR. These included (a) Mr. Lee not billing any other party related to his attendance at the focus group on potential juror's perception of Alex Jones in connection with the Heslin/Lewis Suit (Sept. 20, 2022, Hrg. Tr. 243:18-19); (b) the proposed Third Amended Cash Collateral Order providing for payment Alex Jones's travel expenses and security during the Connecticut Sandy Hook trial (Sept. 20, 2022, Hrg. Tr. 244:5-12); (c) the Debtor's initial proposed payment of all legal fees for Connecticut state court counsel (Sept. 20, 2022, Hrg. Tr. 244:21-25); (d) Alex Jones's asserted indemnity (Sept. 20, 2022, Hrg. Tr. 247:14-16), (e) the Debtor's requested authority to pay the AmEx obligation in the first proposed interim cash collateral order (Sept. 20, 2022, Hrg. Tr. 247:21-24); and (f) post-petition analysis of PQPR's asserted secured claim and the estate's assertion of a claim against PQPR (Sept. 20, 2022, Hrg. Tr. 246:14-16). The issues referenced by the Court go beyond the limited basis of U.S. Trustee's

---

[10] S&L submits that there was no competent evidence that S&L had a predisposition that created a bias against the estate. *See supra* note 7. However, at a rehearing, the U.S. Trustee, the Sandy Hook Plaintiffs, and the Subchapter V Trustee would also be able to present evidence on the issue.

005971

objection to the S&L Employment Application or any relationship between S&L and Alex Jones or PQPR.

22.     Even if those issues had been raised prior to the close of evidence, the Debtor and S&L did not have the opportunity to gather and present evidence on the issues. The documentary evidence reflected and referenced in the Rule 59 Motion had to be gathered, prepared, and submitted to the Court and other parties in interest prior to the hearing. But the issues were not raised until after the September 20 Hearing had begun and there was no reason for the Debtor or S&L to believe that the evidence would be relevant to the matters litigated at the September 20 Hearing.[11] There was no practicable way for the Debtor or S&L to provide this evidence of S&L's predisposition at the September 20 Hearing without the issues being raised beforehand.

23.     Moreover, in the absence of allegations regarding S&L's disinterestedness, S&L— for itself and representing the Debtor—was limited in its ability to present the relevant evidence by applicable ethical rules. Under Texas Disciplinary Rule of Professional Conduct 1.05(d)(2), an attorney can disclose confidential client information that is not subject to attorney-client privilege

> [w]hen the lawyer has reason to believe it is necessary to do so in order to:
>
> (i)     carry out the representation effectively;

---

[11] S&L contends that there was no basis prior to the September 20 Hearing to suspect that evidence of the following— that S&L anticipates that it would submit at a rehearing—would be relevant to the issues litigated: (a) the prepetition negotiations with PQPR, representations by the Debtor through S&L that it would need to pursue an immediate avoidance action against PQPR absent a superior negotiated solution, or the reasoning that the solution negotiated with PQPR was superior; (b) S&L's response to PQPR's request to destroy certain information provided by PQPR; (c) S&L's representation of the Debtor in connection with scheduling PQPR's claim as disputed; (d) S&L's initial response to Alex Jones's request that the Debtor seek to stay enforcement of the Remand Order and extend the automatic stay to Alex Jones; (e) S&L's questioning of Alex Jones's asserted indemnity claim; (f) the alter ego finding in the Texas Litigation, including the Heslin/Lewis Suit with respect to which Mr. Lee attended the Juror perception focus group; and (g) the negotiations and analysis behind the Debtor's agreement to the Connecticut Lift Stay Motion and division of costs for Connecticut state court counsel, including the material risk that Alex Jones would cease supporting the Debtor. While this evidence would have addressed the issues raised on the Court's ruling, it was not relevant to any objection to, or issue raised with, the S&L Employment Application prior to the September 20 Hearing.

     (ii)     defend the lawyer or the lawyer's employees or associates against a claim of wrongful conduct;

     (iii)    respond to allegations in any proceeding concerning the lawyer's representation of the client; or

     (iv)    prove the services rendered to a client, or the reasonable value thereof, or both, in an action against another person or organization responsible for the payment of the fee for services rendered to the client.

But S&L had no reason to believe that disclosing the client information *was* necessary and there were no allegations concerning S&L's representation of the Debtor in this chapter 11 case made prior to the September 20 Hearing to which such evidence would respond. The ability of S&L to present evidence on these points was therefore significantly limited.

### C. The Evidence that S&L Seeks to Present at the Rehearing Is Appropriate for a Rule 59(a) Motion Based on Surprise.

24.     The U.S. Trustee argues that the additional evidence that S&L seeks to introduce at a rehearing is cumulative of the evidence already introduced at the September 20 Hearing. UST Response ¶ 18. The UST Response points to evidence presented at the September 20 Hearing that the Debtor, represented by S&L, took contrary positions to Alex Jones and PQPR and engaged in arm's-length negotiations with such parties that were at times contentious. UST Response ¶ 19.

25.     The additional evidence discussed in the Rule 59 Motion is not merely cumulative. "Cumulative evidence" is evidence that only corroborates, strengthens, or confirms other evidence. *See Chang v. City of Albany*, 150 F.R.D. 456, 461 (N.D.N.Y. 1993). The thrust of the additional evidence S&L seeks to introduce at a rehearing addresses a different issue than the evidence that was introduced at the September 20 Hearing. It seeks to show that S&L did not have a predisposition that created a bias against the Debtor's estate, whereas the evidence submitted at the September 20 Hearing addressed the existence of a relationship between Mr. Lee and Alex Jones or PQPR preventing S&L from representing the Debtor in taking positions opposed to the

14

interests of those parties. The additional evidence described in the Rule 59 Motion focuses on the *initial reactions* of S&L, which is directly relevant to whether S&L had a predisposition adverse to the Debtor's bankruptcy estate.

26.     Moreover, while newly discovered evidence that *is* merely cumulative does not provide a basis for altering or amending judgment under Rule 59(e), it is not clear that presenting cumulative evidence is inappropriate in a rehearing based on surprise. The rationale behind allowing rehearing under Rule 59(a) on the basis of surprise is that a major variance in theory that is not disclosed until after the trial is underway may deprive litigants of a fair hearing and be inconsistent with substantial justice. *See Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir. 1990) ("[S]urprise does not warrant a new trial unless it deprives the party of a fair hearing."); *Knowles v. Mut. Life Ins. Co.*, 788 F.2d 1038, 1040 (4th Cir. 1986) (affirming trial court decision to grant new trial based on surprise where new defense asserted at trial and plaintiff did not have a reasonable opportunity to prepare to address that defense prior to the hearing). Where there is a prejudicial surprise, the litigant is not able to prepare the evidence and arguments that would otherwise be available for the litigant to present its best case.

## CONCLUSION

27.     The Rule 59 Motion should be granted unless the Court's ruling on the S&L Employment Application does not prejudice the Administrative Expense Motion. S&L has the requisite authority to bring the Rule 59 Motion and the relevant facts meet the standard for a rehearing under Rule 59(a) based on surprise. Through the Rule 59 Motion, S&L seeks to present evidence and arguments that S&L is disinterested and does not have any predisposition limiting or interfering with its ability to advise or represent the Debtor on positions adverse to Alex Jones or PQPR. The Debtor and S&L did not have a fair and full opportunity to present evidence and

15

arguments on this point at the September 20 Hearing because the issue was not raised until after the hearing had begun.

28.     S&L does not seek to require the Debtor to engage S&L or for authority to continue representing the Debtor in this chapter 11 case. The point of the Rule 59 Motion is to provide S&L with a fair opportunity to establish S&L's disinterestedness and remove the uncertainty surrounding S&L's ability to receive compensation for services provided to the Debtor through the September 20 Hearing.

Dated: November 15, 2022               **SHANNON & LEE LLP**

                                       /s/*R. J. Shannon*
                                       Kyung S. Lee
                                       State Bar No. 12128400
                                       klee@shannonleellp.com
                                       R. J. Shannon
                                       State Bar No. 24108062
                                       rshannon@shannonleellp.com
                                       700 Milam Street, STE 1300
                                       Houston, Texas 77002
                                       Tel. (713) 714-5770


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.

                                       /s/*R. J. Shannon*

16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**REPLY OF W. MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC TO THE
UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO THE MOTIONS OF
SHANNON & LEE LLP AND W. MARC SCHWARTZ FOR REHEARING
ON THE ISSUE OF DISINTERESTEDNESS**

W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz"") reply to the United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Rehearing on the Issue of Disinterestedness [ECF No. 223] (the "UST Response") as follows:

## PRELIMINARY STATEMENT

1.      The U.S. Trustee objects to Schwartz's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Schwartz [ECF No. 206] (the "Rule 59 Motion") on the grounds that (a) the Rule 59 Motion was not filed by Free Speech Systems, LLC as debtor in possession (the "Debtor"), (b) the Rule 59 Motion does not meet the applicable standard for relief, and (c) the additional evidence that Schwartz seeks to present at the rehearing is cumulative of the evidence presented at the hearing. Schwartz responds to these points below.

2.      Giving credit to the UST Response, Schwartz filed a Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 252] (the "Administrative Expense Motion") on October 24, 2022. To the extent that the Administrative Expense Motion is

not prejudiced by the Court's ruling on the Schwartz Employment Application, the Rule 59 Motion will be either moot or so nearly so that it will be voluntarily withdrawn.[1] Schwartz does not seek to require the Debtor to engage Schwartz going forward or to continue to represent the Debtor in this chapter 11 case. Rather, the Rule 59 Motion seeks to establish Schwartz's disinterestedness to resolve any uncertainty about Schwartz's ability to receive compensation for services provided to the Debtor through September 20, 2022.

3.        The U.S. Trustee's objection to the Schwartz Employment Application requested that the Court exercise its discretion to fashion an equitable remedy because Schwartz did not supplement the Bankruptcy Rule 2014 disclosures for employment of Schwartz in the IW Cases. The Court indicated at the September 20 Hearing that its ruling should not be interpreted as deciding that Schwartz were prevented from receiving compensation for work done prior to the ruling. (Sept. 20, 2022 Hrg. Tr. 256:14-257:8).   The Court's ruling and comments can be understood as granting the requested equitable remedy of denying Schwartz's employment because of the non-disclosure, while leaving open Schwartz's ability to seek compensation through a separate pleading. Absent a ruling to that effect, however, the Court should grant the Rule 59 Motion and allow Schwartz a fair opportunity to present evidence and arguments with respect to Schwartz's predisposition and the circumstances raised by the Court.

## **ARGUMENT**

### **A. Schwartz Has Standing and Statutory Authority to File and Pursue the Rule 59 Motion.**

4.        Through the Rule 59 Motion, Schwartz seeks a rehearing on the issue of disinterestedness—and in particular, whether Schwartz had a predisposition under circumstances

---

[1] Reputational harm and loss of fees earned in the future may be sufficient to provide standing. *See KLG Gates LLP v. Brown*, 506 B.R. 177, 190-91 (E.D.N.Y. 2014). However, Schwartz would not pursue a remedy under the Rule 59 Motion if there was no pecuniary interest.

that render such a bias against the estate—in connection with the Debtor's application to employ Schwartz as CRO and Financial Advisor [ECF No. 83] (the "<u>Schwartz Employment Application</u>"). Schwartz has statutory and constitutional standing to seek the relief requested in the Rule 59 Motion.

5.      Rule 59(a)(1)(B) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>"), made applicable to the above-captioned chapter 11 case by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), provides in relevant part, that "[t]he court may grant a new trial on all or some of the issues—*and to any party*— . . . after a non-jury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." (emphasis added). Neither Federal Rule 59 nor Bankruptcy Rule 9023 limit relief to the original moving party.

6.      Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") provides expansive rights to be heard in chapter 11 cases. Bankruptcy Code § 1109(b) provides that any "party in interest . . . may raise and may appear and be heard on any issue in a case under [chapter 11]." A "party in interest" is an entity that has a personal stake in the outcome that can be addressed by a favorable decision. *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 417 (Bankr. S.D. Tex. 2009); *see also In re Am. Appliance*, 272 B.R. 587, 595 (Bankr. D.N.J. 2002) (holding that the test for whether an entity is a "party in interest" is whether it has a sufficient stake in the outcome of the proceeding to require representation).

7.      Further, as the Bankruptcy Appellate Panel for the Sixth Circuit held in *Bingham Greenebaum Doll, LLP v. Glenview Health Care Facility, Inc. (In re Glenview Health Care Facility, Inc.)*, 620 B.R. 582 (B.A.P. 6th Cir. 2020), the pecuniary interest of a professional in its fees is sufficient for Article III and appellate standing with respect to a denied application to

employ. *Id.* at 585; *see also KLG Gates LLP v. Brown*, 506 B.R. 177, 190 (E.D.N.Y. 2014) (holding that a disqualified attorney had standing to appeal the disqualification order). Unless the denial of the Schwartz Employment Application does not prejudice Schwartz's ability to seek compensation through the Administrative Expense Motion for the period from the petition date through September 20, 2022, Schwartz has a pecuniary interest sufficient for standing and to be a party in interest that can bring the Rule 59 Motion.[2]

8.      The U.S. Trustee argues that the plain language of Bankruptcy Code § 327 provides that the Debtor is the only party that can seek employment of Schwartz and seek a rehearing of the Schwartz Employment Application. UST Response ¶ 9. But section 327(a) is silent on which party must seek approval of the employment.[3] The real question is the effect of Bankruptcy Rule 2014(a), which provides that "[a]n order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to §327, §1103, or §1114 of the Code shall be made only on application of the trustee or committee."

9.      Applicable authority confirms that professionals may raise and be heard on issues involving their own employment in bankruptcy cases. Addressing a similar argument as that raised in the UST Response, the Sixth Circuit BAP in *In re Glenview Health Care Facility, Inc.* noted that, as a procedural rule, Bankruptcy Rule 2014(a) does not limit or extend jurisdiction. 620 B.R. at 585, n.2. The Bankruptcy Appellate Panel for the Ninth Circuit similarly reasoned in *Mehdipour*

---

[2] Schwartz submits that there is authority supporting the proposition that Schwartz is not precluded or prejudiced in seeking compensation through the Administrative Expense Motion. *See* Administrative Expense Motion ¶¶ 17-21. This is also consistent with the Court's ruling at the September 20 Hearing. (Sept. 20, 2022, Hrg. Tr. 256:14-257:4). If the Administrative Expense Motion is not prejudiced by the Court's ruling at the September 20 Hearing, then Schwartz arguably would not have a pecuniary interest in seeking a rehearing on the Schwartz Employment Application.

[3] Bankruptcy Code § 327(a) provides that the trustee—and debtors in possession pursuant to Bankruptcy Code §§ 1107—"with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons . . . .".  However, "[s]ection 327 does not, by its terms, limit standing of a professional to seek employment." *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 479 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998).

*v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998), that allowing a professional to seek court approval of its retention was *not* inconsistent with Bankruptcy Code § 327 or Bankruptcy Rule 2014. *Id.* at 479.  And various courts have authorized the retroactive employment of professionals in connection with requests for compensation. *E.g.*, *In re McKenzie*, No.  08-16378, 2013 Bankr. LEXIS 2672 (Bankr. E.D. Tenn. July 2, 2013); *In re Little Greek Rest.*, 205 B.R. 484 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366 (Bankr. M.D. Ga. 1989); *see also In re Triangle Chems.*, 697 F.2d 1280, 1289 (5th Cir. 1983) (reversing a bankruptcy court's decision denying an application for compensation on the basis that the court had discretion to approve such employment in connection with the application).

10.     While the U.S. Trustee might be correct if Schwartz was seeking to require the Debtor to continue to engage Schwartz after the September 20 Hearing, that is not the relief requested through the Rule 59 Motion. Rather, Schwartz seeks to resolve the dispute regarding its ability to receive compensation for the services it provided to the Debtor through September 20, 2022. If the Court's ruling at the September 20 Hearing does not prevent Schwartz from applying for and receiving allowed compensation, then the Rule 59 Motion would be unnecessary.[4]

**B.  The Rule 59 Motion Meets the Standard for a Rehearing under Rule 59(a).**

  *i.    Surprise from a new theory arising at trial is a valid basis for a rehearing.*

11.     The U.S. Trustee argues that the Rule 59 Motion does not meet the relevant standard. Quoting *Trevino v. Caliber Home Loans, Inc. (In re Trevino)*, 564 B.R. 890 (Bankr. S.D. Tex. 2017), the U.S. Trustee contends that "'[t]o be entitled to a new trial or hearing a party must show a manifest error of law, manifest error of fact, or newly discovered evidence." UST Response

---

[4] Schwartz continues to negotiate with the parties to this chapter 11 case to obtain a consensual resolution of both the Rule 59 Motion and the Administrative Expense Motion.

¶ 10. But that is not what *Trevino* says. According to *Trevino*—a decision about newly discovered evidence— "[t]he plain language of Rule 59(a)(2) indicates that a motion under that rule may be brought for many purposes, including seeking a new trial based on newly discovered evidence." *Id.* at 908. The case does not address the other "many purposes" for which a rehearing is appropriate.

12. The language quoted in the U.S. Trustee's objection comes from a parenthetical to a "see also" citation to *Simon v. United States*, 891 F.2d 1154 (5th Cir. 1990). But *Simon* was an appeal of a decision denying a motion under *Rule 59(e)* to alter or amend the judgement—rather than a rule 59(a) motion for rehearing—where the defendant did not raise an affirmative defense at or before trial. *Id.* at 1159. Courts have frequently held that amendment of a judgment under Rule 59(e) requires manifest error. *E.g.*, *Wease v. Ocwen Loan Servicing, L.L.C.*, 852 F. App'x 807, 809 (5th Cir. 2021); *In re Cyr*, 2020 U.S. Dist. LEXIS 255998, at *2 (W.D. Tex. July 16, 2020) (2020 WL 10056295); *Culpepper v. United States Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 76555, at *5 (N.D. Tex. May 31, 2013) (2013 WL 2370550). But Rule 59(e) seeks different relief than a Rule 59(a) motion based on surprise—Rule 59(e) calls into question the correctness of a judgment, rather than whether the movant was on notice of the factual and legal issues that would be the focus of the trial and had a fair opportunity to present its best case. *See Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (Reasoning that "Rule 59(e) 'serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.'").

13. Schwartz submits that the Court should apply the standard with respect to surprise under Rule 59(a) described in *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir. 1982). According to *Conway*:

> It is well settled that Rule 59 provides a means of relief in cases in which a party has been unfairly made the victim of surprise. . . . The surprise, however, must be "inconsistent with substantial justice" in order to justify a grant of a new trial. . . . The district court is therefore entitled to grant a new trial only if the admission of the surprise testimony actually prejudiced the plaintiffs' case. . . .This Court has limited reversible error from unfair surprise to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify.

*Id.* at 112 (citations omitted). "'[S]urprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a [Rule 59(a)] motion.'" *Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 410 (M.D. Pa. 2019) (quoting *Sanford v. Crittenden Memorial Hosp.*, 141 F.3d 882, 886 (8th Cir. 1998)).

14.    In a contested matter in a bankruptcy proceeding, the relevant question for a rehearing under Rule 59(a) due to surprise is whether the focus of the hearing was evident to the parties prior to the hearing. *See Kingsley Const., Inc. v. DDS Materials, Inc. (In re DDS Materials, Inc.)*, No. 92-2922, 1993 U.S. App. LEXIS 39036, at *7 (5th Cir. Sep. 9, 1993) (holding that that the bankruptcy court did not abuse its discretion because "[t]he bankruptcy court further found that any surprise which may have occurred was not inconsistent with substantial justice, since it was evident that to the parties that the focus of the full hearing would be upon which party breached the contracts.") (citing *Conway*, 687 F.2d at 111). The inquiry is on the factual and legal theories that the moving party should have anticipated would be litigated at the hearing.

15.    There was no indication that the September 20 Hearing would be about any predisposition of Schwartz or circumstances that might render such predisposition a bias against the Debtor's bankruptcy estate. All signs were that the focus of the hearing on the Schwartz Employment Application was going to be on the circumstances surrounding Mr. Schwartz not supplementing his Rule 2014 disclosures in the InfoW Cases. The Debtor and the U.S. Trustee

communicated this to the Court at the September 13, 2022, hearing at which the September 20

Hearing was scheduled.[5] (Sept. 13, 2022, Hrg. Tr. 36:1-9). This was the only issue addressed in

the parties' briefing to the Court and it was the focus of their presentation to the Court. (Sept. 20,

2022, Hrg. Tr. 210:13-18; ECF Nos. 154 & 166). Schwartz submits that fairness and substantial

justice require that Schwartz have the opportunity to prepare and present evidence and argument

regarding the issue of its predisposition, irrespective of whether there are manifest errors based on

the record at the September 20 Hearing.[6]

---

[5] At the September 13 hearing, Mr. Shannon for the Debtor and Mr. Nguyen for the U.S. Trustee represented to the Court as follows:

> MR. SHANNON: And again, Your Honor, I do believe that the U.S. Trustee's primary objection is about the disclosures in the InfoW case. That's really the crux of the objection and what will need to be investigated, so it's not -- I don't think it goes beyond that.

> MR. NGUYEN: That's correct. There was a prior nondisclosure that occurred before you. There's going to be some legal arguments on how you should address that, but that's where we are with the objection.

(Sept. 13, 2022, Hrg. Tr. 36:1-9). The U.S. Trustee also indicated that the discovery would be "very limited in terms of the scope of the employment – the scope of the engagement that occurred between May 24th through May 31st, and Mr. Lee in his declaration, there was about $21,000 of services." (Sept. 13, 2022, Hrg. Tr. 35:8-11).

[6] To the extent that manifest error *is* required for a rehearing based on surprise under Rule 59(a)—rather than applying only to Rule 59(e)—Schwartz submits that there *were* manifest errors of fact in the Court's ruling. A manifest error is one that is plain, indisputable, and disregards the credible evidence and controlling law. *Bender Square Partners v. Factory Mut. Ins. Co.*, No. 4:10-cv-4295, 2012 U.S. Dist. LEXIS 74709, at *7-8 (S.D. Tex. May 27, 2012) (2012 WL 1952265). Among the factual findings appearing to underlie the Court's ruling amounting to manifest error are:

    a)   <u>Mr. Lee's Statements at the May 19, 2022, Hearing</u>—The Court referenced in its ruling that Mr. Lee stated that he had to renegotiate the Plan Support Agreement in the IW Cases. (Sept. 20, 2022, Hrg. Tr. 239:14-16). As reflected in the May 19, 2022, hearing transcript, however, Mr. Lee stated that the IW Debtors were going to evaluate "whether these debtors need to proceed with trying to confirm a plan with an amended plan support agreement or whether we are able to handle these creditors, the remaining creditors, outside of bankruptcy." (Debtor's Ex. 22, May 19, 2022, Hrg. Tr. 8:16-21). Mr. Lee also represented that he "hope[d] to do that very quickly." (May 19, 2022, Hrg. Tr. 8:23-24). The evidence at the September 20 Hearing was that the evaluation occurred and the decision to agree to dismiss the IW Cases in light of the costs of continuing those cases was made by May 23, 2022. (Debtor's Exs. 24 & 25).

    b)   <u>Omnibus Response to MTDs in IW Cases</u>—The Court referenced the Debtors' Omnibus Response to Motions to Dismiss (U.S. Trustee Ex. 7) (the "<u>IW MTD Response</u>") in its ruling and indicated that the statements in the IW MTD Response that there remained a bankruptcy purpose were inconsistent with the representations that only ministerial work remained in the IW Cases on May 24, 2022. (Sept. 20, 2022, Hrg. Tr. 243:3-9). This disregards the evidence that the reason for IW Debtors decision to agree to the dismissal was the cost of litigating with the U.S. Trustee's motion to dismiss the IW Cases, as indicated in the IW MTD Response (IW MTD Response ¶ 6) and confirmed by the testimony of Mr. Lee (Sept. 20, 2022, Hrg. Tr. 80:10-25, 88:12-23, 89:2-18, 90:15-25, & 91:2-3) and Mr. Schwartz (Sept. 20, 2022, Hrg. Tr. 163:7-25). The evidence was that the IW MTD Response required discovery and that the U.S. Trustee argued that estate

> ii.   Issues of control, independence, and loyalty were not raised in connection with the Debtor's application to employ Schwartz prior to the September 20 Hearing.

16.   The U.S. Trustee also argues that "questions of control, independence, and loyalty were raised at prior hearings, in pleadings filed by creditors, and even acknowledged by Mr. Schwartz in his declaration, stating: 'Concerns were expressed at the inception of the InfoW Debtors' bankruptcy cases whether I would be serving Alex Jones or the creditors of InfoW Debtors.'" UST Response ¶ 15 (footnotes omitted). The U.S. Trustee referenced the Court's questions about when Mr. Schwartz was retained by the Debtor and comments after the Plaintiff's

---

funds could be better used to address claims outside of bankruptcy. (Debtor's Ex. 18). The IW Debtors, through Mr. Lee and Mr. Schwartz, ultimately agreed to dismiss the IW Cases to avoid this cost.

c)   AmEx Charges—The Court referenced in its ruling including the payment of AmEx charges in the Debtor's first proposed cash collateral budget, indicating that such charges "consisted primarily of personal charges not related to the business." (Sept. 20, 2022, Hrg. Tr. 247:21-24). The transcript of the August 3, 2022, hearing at which such charges were discussed was introduced into evidence by the U.S. Trustee. (U.S. Trustee's Ex. 15). Mr. Schwartz's testimony was that business expenses of the Debtor were paid through the AmEx card and that the amounts averaged approximately $300,000 per month. (Aug. 3, 2022, Hrg. Tr. 168:1-15). Although Mr. Schwartz testified that Alex Jones had in the past paid certain personal expenses that were recorded as owner draws and that the largest number of line items posted to the draw account was for Alex Jones's housekeeper (Aug. 3, 2022, Hrg. Tr. 168:20-25), there was *no evidence* that the AmEx obligation the Debtor proposed to pay in the first interim cash collateral order reflected primarily personal charges of Alex Jones. Further, the evidence was that the AmEx charges going forward would only be for business expenses. (Aug. 3, 2022, Hrg. Tr. 169:1-8, 187:19-22). Mr. Schwartz also indicated in his August 3, 2022, testimony that the Debtor would "probably going to have to just let American Express shave the wind and see what we can do." (Aug. 3, 2022, Hrg. Tr. 168:1-3). This does not indicate any predisposition of Schwartz.

d)   Proposed Third Cash Collateral Order—The Court referenced the Debtor's proposed Third Cash Collateral Order [ECF No. 148] that provided $80,000 in travel expenses related to Alex Jones attending the trial in the Connecticut Litigation and that the Court's attention was not directed to that proposed expense. (Sept. 20, 2022, Hrg. Tr. 244:2-12). If relevant to the Court's decision with respect to the Schwartz Employment Application, this disregarded the evidence. Mr. Battaglia filed and presented the proposed Third Cash Collateral Order to the Court. (Sept. 13, 2022, Hrg. Tr. 7:7-14:8; Sept. 20, 2022, Hrg. Tr. 13:4-14). Further, the evidence was that the proposed budget was communicated, negotiated, and agreed among the parties. (Sept. 13, 2022, Hrg. Tr. 5:24-6:2, 7:16-22). There was no failure of disclosure by Schwartz or indication of a predisposition.

e)   Relationship with PQPR—The Court indicated that it had issues with the relationship with the Debtor and PQPR with their professionals having engaged extensively pre-petition. (Sept. 20, 2022, Hrg. Tr. 246:12-14). But the evidence at the September 20 Hearing was that matters with PQPR were hardly negotiated and at times contentious. (Sept. 20, 2022, Hrg. Tr. 65:7-16).

f)   Post-Petition Analysis of PQPR's Asserted Claim—The Court stated in its ruling that there was no evidence that the Debtor or its professionals analyzed the PQPR claim extensively post-petition and that the estate had not brought claims against PQPR. (Sept. 20, 2022, Hrg. Tr. 246:14-15). This disregarded the evidence that the Debtor scheduled PQPR's asserted claim as disputed (U.S. Trustee's Ex. 1 at p.15) and took the position that there was a basis for the avoidance of PQPR's asserted claim. [ECF No. 113 at n.4].

oral motion for appointment of a tort claimant's committee, allegations about the IW Cases in the Plaintiff's motion to appoint a tort claimant's committee and remove the Debtor as debtor-in-possession about the IW Cases, and Mr. Schwartz's declaration regarding the IW Cases.

17.     None of these issues were raised by the U.S. Trustee or the Plaintiffs in opposition to the Schwartz Employment Application. That made sense perfect sense—Bankruptcy Code § 327(a) is concerned with whether the professional has a *present* interest adverse to the estate or *concurrently* represents a party with such adverse interest. *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999); *In re Muma Servs., Inc.*, 286 B.R. 583, 590 (Bankr. D. Del. 2002); *Greene v. InforMD, LLC*, No. 17-1779-SDD-EWD, 2018 U.S. Dist. LEXIS 124062, at *8 (M.D. La. July 25, 2018) (2018 WL 3579470). The inquiry under section 327(a) is whether Schwartz had a "meaningful incentive" to act contrary to the best interests of the estate. *In re Quality Bev. Co.*, 216 B.R. 592, 595 (Bankr. S.D. Tex. 1995).  Schwartz did not have reason to believe that the September 20 Hearing was on the allegations raised in the tort claimants committee motion or questions about Mr. Schwartz's independence in the IW Cases instead of the issues presented in the U.S. Trustee's objection to the Schwartz Employment Application.[7]

18.     The U.S. Trustee also asserts the Court clearly signaled its concerns during the Debtor's opening statement at the September 20, 2022, hearing. However, the crux of the Court's question was whether there was a "throughline" between the non-disclosure in the InfoW Cases and the Debtor's chapter 11 case. The evidence and argument at the September 20 Hearing was focused on the issue of why Mr. Schwartz did not supplement his disclosures in the IW Cases after the May 24 meeting with the Debtor. The evidence prepared and introduced at the September 20

---

[7] The U.S. Trustee's objection to the Schwartz Employment Application raised only a single issue—what action should the court take as the result of Mr. Schwartz not supplementing the Rule 2014 verified statement for the employment of Schwartz in the IW Cases. This was confirmed by the U.S. Trustee at the September 13, 2022, hearing.

Hearing was that the reason Mr. Schwartz did not supplement his disclosures was because the IW Debtors had decided to agree with the U.S. Trustee's demanded dismissal of their cases and were no longer seeking to employ Schwartz under section 327(a).[8]

19.     Further, the Court identified the issue being Mr. Schwartz's relationship with Alex Jones and PQPR. (Sept. 20, 2022, Hrg. Tr. 27:21-28:1).  That Schwartz may have had a material adverse interest arising from some predisposition was *not* raised prior to the close of evidence. The issue came up the first time in the Court's questions after the Debtor had finished its closing presentation. (Sept. 20, 2022, Hrg. Tr. 210:13-211:18). The evidence in the record pointed to was that the Debtor refused Alex Jones's request to seek an extension of the automatic stay (Sept. 20, 2022, Hrg. Tr. 63:3-9), that the IW Debtors represented had considered the appropriate factors in agreeing to dismiss their cases (Sept. 20, 2022, Hrg. Tr. 87:16-91:3; Debtor's Ex. 24), and that the IW Debtors focused on the benefit to their estates when obtaining dismissal with prejudice of the Sandy Hook Litigation claims against them rather than the effect of any related party.[9] (Sept. 20, 2022, Hrg. Tr. 83:10-84:3). The reason other evidence on this point was not introduced—including the evidence that Schwartz seeks to submit at a rehearing—was because the issue of a potential predisposition causing bias to the Debtor's estate was not raised prior to the September 20 Hearing so that it could be prepared and introduced.

---

[8] As the U.S. Trustee argued in the objection to the Schwartz Employment Application, "Rule 2014 has one primary purpose—to facilitate strict compliance with section 327." [ECF No. 154 at ¶ 154]. Evidence of whether Mr. Schwartz's supplemental disclosure was necessary, his reasoning for believing supplemental disclosure was not necessary, and the appropriate action of the Court in the Debtor's chapter 11 case appeared to be the only factual issues for the September 20 Hearing beforehand.

[9] Schwartz submits that there was no competent evidence that Schwartz had a predisposition that created a bias against the estate. *See supra* note 7. However, at a rehearing, the U.S. Trustee, the Sandy Hook Plaintiffs, and the Subchapter V Trustee would also be able to present evidence on the issue.

iii.   *Schwartz did not have the ability to address the issues on which the Court's ruling appears to rely.*

20.     Schwartz did not have a fair opportunity to address the issues identified by the Court in its ruling that went beyond the limited basis of the U.S. Trustee's objection or any relationship Schwartz has with Alex Jones or PQPR. These included (a) the proposed Third Amended Cash Collateral Order providing for payment Alex Jones's travel expenses and security during the Connecticut Sandy Hook trial (Sept. 20, 2022, Hrg.  Tr.  244:5-12); (b) the Debtor's initial proposed payment of all legal fees for Connecticut state court counsel (Sept. 20, 2022, Hrg. Tr. 244:21-25); (c) Alex Jones's asserted indemnity (Sept. 20, 2022, Hrg. Tr. 247:14-16), (d) the requested authority to pay the AmEx obligation in the first proposed Cash Collateral Order (Sept. 20, 2022, Hrg. Tr. 247:21-24); and (e) post-petition analysis of PQPR's asserted secured claim and the estate's assertion of a claim against PQPR (Sept. 20, 2022, Hrg. Tr. 246:14-16). The issues referenced by the Court go beyond the limited basis of U.S. Trustee's objection to the Schwartz Employment Application or any relationship Schwartz has with Alex Jones or PQPR.

21.     Even if those issues had been raised prior to the close of evidence, Schwartz did not have the opportunity to gather and present evidence on the issues. The documentary evidence reflected and referenced in the Rule 59 Motion had to be gathered, prepared, and submitted to the Court prior to the hearing. But these issues were not brought up until after the September 20 Hearing had begun and there was no reason for Schwartz to believe that the evidence would be relevant to the matters litigated at the September 20 Hearing.[10] There was no practicable way for

---

[10] Schwartz contends that there was no basis prior to the September 20 Hearing to suspect that evidence of the following—that Schwartz anticipates that it would submit at a rehearing—would be relevant to the issues litigated: (a) the prepetition negotiations with PQPR, representations by the Debtor through Schwartz that it would need to pursue an immediate avoidance action against PQPR absent a superior negotiated solution, or the reasoning that solution that was negotiated was superior; (b) Schwartz's representation of the Debtor in connection with scheduling PQPR's claim as disputed; (c) Schwartz's initial response to Alex Jones' request that the Debtor seek to stay enforcement of the Remand Order and extend the automatic stay to Alex Jones; (d) Schwartz's questioning of Alex

Schwartz to provide this evidence of Schwartz's predisposition at the September 20 Hearing without the issues being raised beforehand.

**C.    The Evidence that Schwartz Seeks to Present at the Rehearing Is Appropriate for a Rule 59(a) Motion Based on Surprise.**

22.    The U.S. Trustee argues that the additional evidence that Schwartz seeks to introduce at a rehearing is cumulative of the evidence already introduced at the September 20 Hearing. UST Response ¶ 18. The UST Response points to evidence presented at the September 20 Hearing that the Debtor, represented by Schwartz, took contrary positions to Alex Jones and PQPR and engaged in arm's-length negotiations with such parties that were at times contentious. UST Response ¶ 19.

23.    The additional evidence that Schwartz seeks to present is not merely cumulative. "Cumulative evidence" is evidence that only corroborates, strengthens, or confirms other evidence. *See Chang v. City of Albany*, 150 F.R.D. 456, 461 (N.D.N.Y. 1993). The thrust of the additional evidence Schwartz seeks to present at a rehearing addresses a different issue than what was introduced at the September 20 Hearing. It seeks to show that Schwartz did not have a predisposition that created a bias adverse to the Debtor's estate, whereas the evidence submitted at the September 20 Hearing addressed the existence of a relationship between Mr. Schwartz and Alex Jones or PQPR preventing Schwartz from representing the Debtor in taking opposing positions to those parties. The additional evidence described in the Rule 59 Motion focuses on the initial reactions of Schwartz, which is directly relevant to whether Schwartz had a predisposition adverse to the Debtor's bankruptcy estate.

---

Jones' asserted indemnity claim; (e) the negotiations and analysis behind the Debtor's agreement to the Connecticut Lift Stay Motion and division of costs for Connecticut state court counsel, including the material risk that Alex Jones would cease supporting the Debtor. While this evidence would have addressed the issues raised on the Court's ruling, it was not relevant to any objection to, or issue raised with, the Schwartz Employment Application prior to the September 20 Hearing.

24. Moreover, while newly discovered evidence that *is* merely cumulative does not provide a basis for altering or amending judgment under Rule 59(e), it is not clear that presenting cumulative evidence is inappropriate in a rehearing based on surprise. The rationale behind allowing rehearing under Rule 59(a) on the basis of surprise is that a major variance in theory that is not disclosed until after the trial is underway deprives litigants of a fair hearing that is consistent with substantial justice. *See Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir. 1990) ("[S]urprise does not warrant a new trial unless it deprives the party of a fair hearing."); *Knowles v. Mut. Life Ins. Co.*, 788 F.2d 1038, 1040 (4th Cir. 1986) (affirming trial court decision to grant new trial based on surprise where new defense asserted at trial and plaintiff did not have a reasonable opportunity to prepare to address that defense prior to the hearing). Where there is a prejudicial surprise, the litigant is not able to prepare the evidence and arguments that would otherwise be available for the litigant to present its best case.

## **CONCLUSION**

25. The Rule 59 Motion should be granted unless the Court's ruling on the Schwartz Employment Application does not prejudice the Administrative Expense Motion. Schwartz has the requisite authority to bring the Rule 59 Motion and the relevant facts meet the standard for a rehearing based under Rule 59(a) for surprise. Through the Rule 59 Motion, Schwartz seeks to present evidence and arguments that Schwartz is disinterested and does not have any predisposition limiting or interfering with its ability to advise or represent the Debtor on positions adverse to Alex Jones or PQPR. The Debtor and Schwartz did not have a fair and full opportunity to present evidence and arguments on this point at the September 20 Hearing because the issue was not raised until after the hearing had begun.

26.     Schwartz does not seek to require the Debtor to engage Schwartz or for authority to continue representing the Debtor in this chapter 11 case. The point of the Rule 59 Motion is to provide Schwartz with a fair opportunity to establish Schwartz's disinterestedness and remove the uncertainty surrounding Schwartz's ability to recover compensation for valuable services provided to the Debtor through the September 20, 2022 Hearing.

Dated: November 15, 2022

Respectfully submitted,

KANE RUSSELL COLEMAN & LOGAN PC

By:   */s/ Michael P. Ridulfo*
      Michael P. Ridulfo
      State Bar No. 16902020
      Federal Bar No. 27086
      5151 San Felipe, Suite 800
      Houston, Texas 77056
      (713) 425-7400
      (713) 425-7700 (fax)
      E-mail: mridulfo@krcl.com
      Attorney for W. Marc Schwartz and Schwartz Associates, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022, a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.

*/s/ Michael P. Ridulfo*
Michael P. Ridulfo

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

---

Emergency relief has been requested. Relief is requested not later than November 21, 2022, at 2:00 p.m.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on November 21, 2022 at 2:00 p.m.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "judgelopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.

---

### DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO ENTER INTO FINANCIAL SERVICES AGREEMENT

FREE SPEECH SYSTEMS, LLC. ("Debtor" of "FSS") debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") and files this Motion (the "Motion") seeking entry of an order, pursuant to sections 105(a),345, 363, 364, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002,4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to enter into a Financial Services Agreement (the "Agreement") with                                    ("Processor"), and granting such other

and further relief as necessary or appropriate.  In further support of this Motion, the Debtor would show the Court as follows:

<div align="center">**JURISDICTION**</div>

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 345, 363, 364, 1107, and 1108 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

<div align="center">**BACKGROUND**</div>

4.      On July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its businesses and manage its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The Debtor is engaged in the business of producing and syndicating Alex Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

6.      On its Infowars.com[1] website today, FSS makes available for sale to customers assorted dietary supplements.  The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements.

7.      Customer purchases through the Debtor's online sales channel are paid for by credit card. In order to mitigate the risk of financial de-platforming, the Debtor has required the services of an

---

[1] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

intermediary to process its credit card transactions.

8.      On October 1, 2021, the Debtor and Auriam Services, LLC ("Auriam") entered into a Financial Services Agreement (the "Auriam Agreement").  Under the Auriam Agreement, Auriam provided the intermediary credit card processing services to the Debtor.  Auriam charged a fixed fee equal to 10% of the total dollar amount of credit card charges processed by Auriam on behalf of the Debtor, in addition to netting third party costs and fees.

9.      By agreement dated July 10, 2022, the parties agreed to a reduction of the Auriam fixed fee from 10% to 4% for a period of 60 days.  The parties had informally extended this period of reduced fees on two occasions.

10.      The Debtor identified the Processor to replace Auriam for a reduced fee.  The replacement processor commenced services on October 21, 2022, and has agreed to waive its service fee for a period of 30 days and thereafter to provide substantially the same services Auriam provided for a fixed fee of 1.5% of the total dollar amount of credit card charges it processes on behalf of the Debtor.  A redacted copy of the Agreement is attached as Exhibit "A".

11.      The Processor has no prior relationship with the Debtor and is not an insider or affiliate of the Debtor as defined at 11 USC §§101(2) and (31).  The single member owner of the Processor has sold product through the Debtor's sales channel in the past but has no current business relationship with the Debtor.

12.      The Processor has no prior relationship with the Debtor and is not an insider or affiliate of the Debtor as defined at 11 USC §§101(2) and (31).  The sole shareholder of the Processor, or an entity related to Mr.           has sold product through the Debtor's sales channel in the past but has no current business relationship with the Debtor.  The Debtor has identified the following additional relationships between Mr.           and entities currently engaged or to be engaged in business with the Debtor:

      a.   Mr.           is the  sole  shareholder  of                               .

            ("           ) which the Debtor seeks to engage as a provider of financial

services in a contemporaneously filed motion.  If approved,             will be entitled to a service fee of 1.5% of all credit card transactions on behalf of FSS.

    b.   Mr.        is an employee of                              is an electronic payment processor and processes the Debtor's credit card payments.             earns of fee of 4.5% of all credit card transactions on behalf of FSS.            is aware of Mr.            relationship with                and has advised in writing that it approves of the arrangement between FSS and           .

    c.   Mr.        is the sole owner of                          ("<u>SAI</u>").  Under the terms of the Agreement with SAI Mr.        will receive no compensation or remuneration from FSS or the entities he contracts with to provide product sourcing and fulfillment services.

13.    Neither Alex Jones or any member of his family or any employee (current or former) of FSS (or any affiliate) or PQPR Holdings Limited, LLC (or any of its owners, officers, employees or affiliates), (i) own any interest in SAI or              (ii) have any contractual relationships with Mr.        , SAI or              or (iii) receive (currently or in the future) any form of remuneration from Mr.        , SAI or              Conversely neither SAI,              nor Mr.        (i) own any interest in FSS, PQPR Holdings Limited, LLC (or any of their affiliates), (ii) have any contractual relationships with Alex Jones or any member of his family, FSS (other than contracts approved by Order of this Court), or PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees), or (iii) receive any remuneration from Alex Jones or any member of his family, FSS, PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees) that has or will not be approved by Order of this Court.

## **<u>RELIEF REQUESTED</u>**

14.    By this Motion, the Debtor seeks entry of an Order authorizing the Debtor to operate under the Agreement with the Processor which is consistent with the Debtor's historical and customary practices but under significantly improved terms.

## BASIS FOR RELIEF

**A.  Debtor Requests Authority to Enter into the Financial Services Agreement with the Processor.**

15.     The Debtor's customers pay their purchases by credit card.  All of Debtor's credit card transactions are processed by the Processor under the Agreement.  The Debtor pays credit card processing fees to the credit card processor at a rate of 4.5% through a netting against payments to Debtor for credit card charges.  The Processor further nets its fee against the balance owed to the Debtor.

16.     After deducting their fees and other charges for the credit card transactions processed for Debtor, the Processor pays the funds due to Debtor into Debtor's operating account via ACH transactions. Deposits are made daily on business days, one day in arrears.

17.     Under the Agreement, certain transactions may be reversed or reduced for various reasons, including customer disputes to certain charges ("Chargebacks"). The Chargebacks occur after the initial transactions are processed and Debtor paid. Chargebacks are a normal and customary aspect of credit card processing and Debtor's Chargeback history reflects that only an exceedingly small percentage of Debtor's credit card charges result in Chargebacks.

18.     Debtor requests that it be authorized to operate under the Agreement in the ordinary and customary course of business.

19.     Without authority to operate under the under the Agreement, including satisfying necessary fees and Chargebacks, Debtor will be severely and negatively impacted and would essentially cease to do business due to the inability to accept credit cards from customers.  Accordingly, the Debtor respectfully requests that the Court allow it to operate as normal under the Agreement.

**B.     Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

20.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

WHEREFORE, for the reasons set forth above the Debtor respectfully requests that the Court enter an order in the form attached as Exhibit B (i) authorizing the Debtor to enter into the Agreement as described above, consistent with Debtor's historical and customary practices and (ii) granting any and all such other relief as the Court deems just and proper.

Respectfully submitted this November 15, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com

By:  /s/  Raymond W. Battaglia
       Raymond W. Battaglia
       Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN POSSESSION**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list.

/s/ Raymond W. Battaglia
Raymond W. Battaglia

**Financial Services Agreement**

This Financial Services Agreement ("The Agreement") as of October 19, 2022, is between _____ ("Servicer or Us") of Houston, Texas, and Free Speech Systems LLC ("Client or You") of Austin, Texas. Individually, Servicer and Client shall be referred to as a "Party'' and collectively as the "Parties". For good and valuable consideration. The receipt and sufficiency of which are hereby acknowledged. Servicer will provide Credit Card Processing and other Financial Services to Client as prescribed by this Agreement

**Client Representation, Warranties, & Authorizations**

By executing this Agreement, Client and individuals signing on behalf of Client hereby affirmatively state that they; (i) have the requisite power and authority to complete, execute, and submit this Agreement and to make and provide the acknowledgements, authorizations, and agreements set forth herein (ii) authorize Servicer to investigate the credit of the Client and each person signing on behalf of Client, (iii) agree to the fee schedule set forth herein.

**Merchant & Processing Fees**

For Credit Card Processing and other Financial Services, Client will pay to Servicer the following: (1.) All normal Credit Card Processing fees incurred by Servicer related to the processing of Client's credit card charges which is currently 4.5%. 2. All other fees charged by Credit Card Processor. 3. A fixed fee of 1.5 percent of the total dollar amount of Credit Card charges processed by Servicer on behalf of Client. 4. Additional services may be billed as agreed by both Parties. Servicer shall manage all credit card transactions on behalf of Client, and on a daily basis Servicer shall pay from settlements by deducting from daily credit card collections the merchant account fees as charged by the credit card processor (4.5% currently) and Servicer's service fee of 1.5%, and the remainder of the daily collections will be remitted to Client one day in arrears. As long as this Agreement remains in place, BankCard USA shall continue as the credit card processor unless and until the Parties agree otherwise in writing.

**Term**

This Agreement will be in effect for one year (the "Initial Term") commencing on the date of execution of this Agreement. At the expiration of the Initial Term, this Agreement shall continue from year to year under its then existing conditions unless and until a party hereto gives the other no less than 120 days written notice of termination prior to expiration of the Initial Term or of the one year extension then in effect.

**Early Termination**

In the event that Client wishes to terminate this Agreement prior to termination:( 1.) Client must first provide 60 advanced written notice of intent to terminate and then (2.) Pay all charges that have been charged through the date this Agreement terminates.

005997

**Mutual Non-Disparagement**

Both parties and their affiliates shall use their best efforts to cause their respective executive officers, directors, and employees lo refrain from making or publishing any statement critical of either Party, or its respective officers, directors, and employees.

**Mutual Confidentiality**

Each Party acknowledges that a material term of this Agreement is to keep all confidential information belonging to the other Party absolutely confidential and protect its release from the public. Each Party agrees not to divulge, reveal, report or use, for any purpose, any confidential information which the other Party has obtained or which was disclosed to the Party receiving the information by the other Party, except as  information is required by public disclosure rules of the United States of America, as required to be disclosed in a Court proceeding, including, but not limited to, in bankruptcy case no 22-60043 filed by Free Speech Systems, LLC pending In the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or in providing information to relevant financial or banking institutions as may be necessary for Servicer to provide such as in Processing and other financial information necessary for Merchant services. The obligation to protect the confidentiality of the other Party's confidential information will survive the termination of this Agreement and will continue for a period of 4 years from the date of such termination.

**Successors & Assigned**

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, legal representatives, successors, and assigns. This Agreement may not be assigned without the consent of all Parties hereto.

**Choice of Law and Venue**

This agreement shall be governed by and construed with the laws of the state of Texas.

**Complete Understanding of the Parties and Shall Not Be Modified**

This agreement contains the entire understanding between the Parties relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

**Amendments**

This agreement may only be amended in a written document signed by all Parties hereto.

Executed in Austin, Texas effective the day first written above.

**Services Understanding**

005998

Servicer and Client agree that Servicer will provide the following services: 1. Process Credit Card charges for merchandise sales and other income. 2. We may debit your bank account from time to time for amounts owed to us under the Agreement. 3. If you dispute any charge or funding, you must notify us within 60 days of the date of the statement where the charge or funding appears for Card Processing. 4. We have assumed certain risks by agreeing to provide you with Card processing or check services. Accordingly, we may take certain additional actions to mitigate our risk including but not limited to termination of the Agreement, and/or hold monies otherwise payable to you. 5. By executing this Agreement You authorize us and our Affiliates to obtain financial and credit information regarding your business and the signers and guarantors of the Agreement until all your obligations to us and our Affiliates are satisfied. 6. Such other services that we may from time to time agree.

**Indemnification & Hold Harmless**

Client hereby indemnifies and holds Servicer harmless for any and all claims arising from any content, business ongoings, public statements, product sales or claims, regulatory actions, or any other actions or claims arising out of Client's activities. Client agrees that Servicer has no liability for any and all ongoings of Client and makes no representations for any ongoings of Client. Further, Client acknowledges that it is wholly responsible for its own practices and operations.

for the term of this Agreement.


_____
                                  , Inc.
By: _____

It's: _____




_____
Free Speech Systems, LLC.
By: Patrick Magill
It's: Chief Restructuring Officer

Page 3

005999

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER**
**AUTHORIZING DEBTOR TO ENTER INTO FINANCIAL SERVICES AGREEMENT**

On November 14, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for Entry of Order Authorizing Debtor to Enter into Financial Services Agreement* ("Motion") after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

The Motion is hereby granted and the Debtor is authorized to enter into the Financial Services Agreement with ███████████████ . attached to the Motion.

Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a), and the Bankruptcy Local Rules are satisfied by such notice.

Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon entry. The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Houston, Texas
Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE



EXHIBIT

B

006000

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln
Austin, TX 78703

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065

John D Malone
Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street
Suite 1800
Dallas, TX 75201

Lynn Hamilton Butler
Husch Blackwell LP
111 Congress Ave., #1400
Austin, Texas 78701

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

---

**Emergency relief has been requested. Relief is requested not later than November 21, 2022, at 2:00 p.m.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on November 21, 2022 at 2:00 p.m.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "judgelopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO ENTER INTO FINANCIAL SERVICES AGREEMENT**

FREE SPEECH SYSTEMS, LLC. ("Debtor" of "FSS") debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") and files this Motion (the "Motion") seeking entry of an order, pursuant to sections 105(a),345, 363, 364, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002,4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to enter into a Financial Services Agreement (the "Agreement") with                    ("Processor"), and granting such other

and further relief as necessary or appropriate.  In further support of this Motion, the Debtor would show the Court as follows:

<div align="center">**JURISDICTION**</div>

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 345, 363, 364, 1107, and 1108 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

<div align="center">**BACKGROUND**</div>

4.      On July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its businesses and manage its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The Debtor is engaged in the business of producing and syndicating Alex Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

6.      On its Infowars.com[1] website today, FSS makes available for sale to customers assorted dietary supplements.  The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements.

7.      Customer purchases through the Debtor's online sales channel are paid for by credit card. In order to mitigate the risk of financial de-platforming, the Debtor has required the services of an

---

[1] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

intermediary to process its credit card transactions.

8. On October 1, 2021, the Debtor and Auriam Services, LLC ("Auriam") entered into a Financial Services Agreement (the "Auriam Agreement"). Under the Auriam Agreement, Auriam provided the intermediary credit card processing services to the Debtor. Auriam charged a fixed fee equal to 10% of the total dollar amount of credit card charges processed by Auriam on behalf of the Debtor, in addition to netting third party costs and fees.

9. By agreement dated July 10, 2022, the parties agreed to a reduction of the Auriam fixed fee from 10% to 4% for a period of 60 days. The parties had informally extended this period of reduced fees on two occasions.

10. The Debtor identified the Processor to replace Auriam for a reduced fee. The replacement processor commenced services on October 21, 2022, and has agreed to waive its service fee for a period of 30 days and thereafter to provide substantially the same services Auriam provided for a fixed fee of 1.5% of the total dollar amount of credit card charges it processes on behalf of the Debtor. A redacted copy of the Agreement is attached as Exhibit "A".

11. The Processor has no prior relationship with the Debtor and is not an insider or affiliate of the Debtor as defined at 11 USC §§101(2) and (31). The single member owner of the Processor has sold product through the Debtor's sales channel in the past but has no current business relationship with the Debtor.

12. The Processor has no prior relationship with the Debtor and is not an insider or affiliate of the Debtor as defined at 11 USC §§101(2) and (31). The sole shareholder of the Processor, or an entity related to Mr.         has sold product through the Debtor's sales channel in the past but has no current business relationship with the Debtor. The Debtor has identified the following additional relationships between Mr.         and entities currently engaged or to be engaged in business with the Debtor:

      a. Mr.         is the sole shareholder of                     .

      ("         ) which the Debtor seeks to engage as a provider of financial

services in a contemporaneously filed motion.  If approved,            will be

entitled to a service fee of 1.5% of all credit card transactions on behalf of FSS.

    b.   Mr.        is an employee of                          is an electronic

payment processor and processes the Debtor's credit card payments.

earns of fee of 4.5% of all credit card transactions on behalf of FSS.            is

aware of Mr.          relationship with              and has advised in writing

that it approves of the arrangement between FSS and            .

    c.   Mr.        is the sole owner of                        ("<u>SAI</u>").  Under the

terms of the Agreement with SAI Mr.          will receive no compensation or

remuneration from FSS or the entities he contracts with to provide product

sourcing and fulfillment services.

13.     Neither Alex Jones or any member of his family or any employee (current or former) of

FSS (or any affiliate) or PQPR Holdings Limited, LLC (or any of its owners, officers, employees or

affiliates), (i) own any interest in SAI or            (ii) have any contractual relationships with Mr.

, SAI or            or (iii) receive (currently or in the future) any form of remuneration from Mr.

, SAI or            Conversely neither SAI,            nor Mr.          (i) own any interest in

FSS, PQPR Holdings Limited, LLC (or any of their affiliates), (ii) have any contractual relationships with

Alex Jones or any member of his family, FSS (other than contracts approved by Order of this Court), or

PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees), or (iii) receive any

remuneration from Alex Jones or any member of his family, FSS, PQPR Holdings Limited, LLC (or any

of their affiliates, owners or employees) that has or will not be approved by Order of this Court.

## **<u>RELIEF REQUESTED</u>**

14.     By this Motion, the Debtor seeks entry of an Order authorizing the Debtor to operate under

the Agreement with the Processor which is consistent with the Debtor's historical and customary practices

but under significantly improved terms.

## BASIS FOR RELIEF

**A.  Debtor Requests Authority to Enter into the Financial Services Agreement with the Processor.**

15.     The Debtor's customers pay their purchases by credit card.  All of Debtor's credit card transactions are processed by the Processor under the Agreement.  The Debtor pays credit card processing fees to the credit card processor at a rate of 4.5% through a netting against payments to Debtor for credit card charges.  The Processor further nets its fee against the balance owed to the Debtor.

16.     After deducting their fees and other charges for the credit card transactions processed for Debtor, the Processor pays the funds due to Debtor into Debtor's operating account via ACH transactions. Deposits are made daily on business days, one day in arrears.

17.     Under the Agreement, certain transactions may be reversed or reduced for various reasons, including customer disputes to certain charges ("Chargebacks"). The Chargebacks occur after the initial transactions are processed and Debtor paid. Chargebacks are a normal and customary aspect of credit card processing and Debtor's Chargeback history reflects that only an exceedingly small percentage of Debtor's credit card charges result in Chargebacks.

18.     Debtor requests that it be authorized to operate under the Agreement in the ordinary and customary course of business.

19.     Without authority to operate under the under the Agreement, including satisfying necessary fees and Chargebacks, Debtor will be severely and negatively impacted and would essentially cease to do business due to the inability to accept credit cards from customers.  Accordingly, the Debtor respectfully requests that the Court allow it to operate as normal under the Agreement.

## B.     Waiver of Bankruptcy Rule 6004(a) and 6004(h)

20.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

WHEREFORE, for the reasons set forth above the Debtor respectfully requests that the Court enter an order in the form attached as Exhibit B (i) authorizing the Debtor to enter into the Agreement as described above, consistent with Debtor's historical and customary practices and (ii) granting any and all such other relief as the Court deems just and proper.

Respectfully submitted this November 15, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com


By:  /s/ Raymond W. Battaglia
      Raymond W. Battaglia
      Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN POSSESSION**


## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list.

/s/ Raymond W. Battaglia
Raymond W. Battaglia



**EXHIBIT**

**A**

This Fulfillment Agreement (this "Agreement") is entered on [_____] (the "Effective Date"), by and between _____ Inc having offices at 4548 Valley Spring Dr. Westlake Village, CA 91362, U.S.A. ("_____ Inc") and [_____], a [_____], having offices at [_____], ("Client"). _____ Inc and Client may be individuals referred to herein as a "Party" and collectively referred to herein as "Parties".

WHEREAS, _____ Inc provides product sourcing and fulfillment services for direct response marketers that market diet, nutritional, health and wellness products through various distribution channels;

WHEREAS, Client desires to retain _____ Inc to provide product sourcing and fulfillment services and _____ Inc desires to provide the same pursuant to the terms hereof;

NOW, THEREFORE, in consideration of the promises and mutual covenants described herein, the parties agree as follows:

ARTICLE I

ENGAGEMENT OF _____ Inc; FEES

1.1 Engagement. As of the Effective Date, Client hereby retains _____ Inc to perform the Services (as defined below) including such activities as may be related, ancillary, or necessary to perform the Services.

3.2 Manner of Payment; Late Payments. Payments by Client to _____ Inc under this Agreement shall be made by electronic fund transfers, check, or, other mutually accepted means. Late payments under this Article III shall bear interest at the prime rate plus ten percent (10%) per annum or the maximum amount permitted by applicable law, whichever is less.

3.3 Taxes. All amounts payable for Services hereunder are exclusive of any taxes. All taxes and other charges imposed by any taxing authority on any Service or Product shall be added to the appropriate invoice and shall be payable by Client in accordance with Section 3.1.

ARTICLE IV

TERMINATION; OBLIGATIONS UPON TERMINATION

4.1 Termination by Either Party. This Agreement may be terminated by either Party upon providing the other Party ninety (90) days written notice of such Party's desire to terminate this Agreement.

4.2 Termination by _____ Inc. In the event that (i) _____ Inc believes that Client's conduct or its Products or violate Applicable Law or pose a threat to _____ Inc' business or reputation; (ii) Client fails to satisfy the Minimum Threshold; or (iii) Client fails to remit to all outstanding amounts on or before the Due Date, then _____ Inc shall have the option to suspend the provision of Services or terminate this Agreement.

4.3 Obligations upon Termination. Client shall be obligated to remit all amounts owing to _____ Inc



1.2 Services. ▮▮▮▮▮▮▮▮ Inc shall provide product sourcing and fulfillment services for Client for such Products as set forth on Appendix A (the "Services"). The Parties hereby agree and acknowledge that the Services provided by ▮▮▮▮▮▮▮▮ Inc may be modified upon the mutual consent of the Parties.

1.3 Fees. For ▮▮▮▮▮▮▮▮ Inc' performance of the Services, Client shall pay ▮▮▮▮▮▮▮▮ Inc such amounts as provided on Appendix A (the "Fees"). The amount of the Fees may be modified by the mutual consent of the Parties.

1.4 Return Instructions. ▮▮▮▮▮▮▮▮ Inc will sort any returns to the best of its ability to inspect safety seals and determine which bottles can be resold. To do this, ▮▮▮▮▮▮▮▮ Inc may charge Client a flat fee per return. ▮▮▮▮▮▮▮▮ Inc accepts no liability for its performance of these services.

1.5 Compliance with Laws; Non-Infringement. Client shall be solely responsible for compliance with any applicable federal and state laws and regulations relating to the Product and Services, which includes, but shall not be limited to, any labeling, information or sales methods related to the Product and Services. Additionally, Client hereby covenants that the Product and any sales efforts and labeling related thereto shall comply with all federal and state laws and regulations, and, that such laws and regulations include, but, shall not be limited to (i) any Federal Trade Commission rules and regulations, including, but not limited to the "Mail Order Rule", "Telemarketing Sales Rule," and any other rules and regulations, relating to advertising, solicitation or otherwise; (ii) any Food and Drug Administration rules and regulations, including, but not limited to any labeling guidelines which may

upon the termination of this Agreement.

4.4 Survival. The terms and conditions of the following provisions shall survive the termination or expiration of this Agreement: Sections 1.3, 1.4, 1.5, 1.7, 1.9, 1.10, 1.11, 1.12, 2.2, 4.3, 4.4 and Article III, Article V, Article VI and Article VII.

ARTICLE V

LIMITATION OF LIABILITY

5.1 Limitation of Liability. IT IS UNDERSTOOD AND AGREED THAT ▮▮▮▮▮▮▮▮ Inc' LIABILITY WHETHER IN CONTRACT, IN TORT, UNDER ANY WARRANTY, IN NEGLIGENCE OR OTHERWISE SHALL NOT EXCEED THE RETURN OF THE AMOUNT OF THE PURCHASE PRICE PAID BY CUSTOMER FOR SUCH SPECIFIC SERVICE OR PRODUCT AND UNDER NO CIRCUMSTANCES SHALL ▮▮▮▮▮▮▮▮ Inc BE LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES. THE PRICE STATED FOR THE SERVICES IS A CONSIDERATION IN LIMITING ▮▮▮▮▮▮▮▮ Inc' LIABILITY. NO ACTION, REGARDLESS OF FORM, ARISING OUT OF THE TRANSACTIONS UNDER THIS AGREEMENT MAY BE BROUGHT BY CUSTOMER MORE THAN ONE YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.

5.2 Disclaimer of Warranties. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, ▮▮▮▮▮▮▮▮ Inc MAKES NO, AND DISCLAIMS ALL, WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT, WITH RESPECT TO THE SERVICES AND THE PRODUCTS.

relate to point size, type, label format and product claims; and (iii) all other federal and state rules and regulations which relate to the Product and Services (collectively, "Applicable Law") . Client hereby agrees and acknowledges that ███████ ███████ Inc shall not have any obligations with respect to any Products or Services being in compliance with Applicable Law.

1.6 ███████████████ Inc Obligations. ███████ ███████ Inc hereby covenants and agrees that it shall, during the term of this Agreement, perform the Services in a commercially reasonable manner. ███████████ Inc further covenants and agrees that it shall maintain reasonably accurate records and accounts of all transactions relating to the Services performed pursuant to this Agreement.

1.7 Client Obligations. Client hereby covenants and agrees that (i) it shall pay ██████████ Inc for Services in accordance with Article III of this Agreement; (ii) it shall provide ██████ ██████████ Inc with all documents and information necessary for ██████████████ Inc to perform the Services pursuant to this Agreement; and (iii) it shall comply with Applicable Law.

1.8 Right to Subcontract. In the performance of its obligations hereunder, ██████████ Inc shall have the right, in its sole discretion, to subcontract its rights and responsibilities to any third party, provided that ████████████ Inc shall remain responsible for the performance of any such third party.

1. **Independent Contractors. The Parties to this Agreement are independent contractors. Neither Party is an agent, representative or employee of the other Party. Neither Party will have any right, power or authority to enter into any agreement for or on behalf of, or incur**

███████████████ Inc MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY, SUITABILITY OR ADEQUACY OF THE SERVICES OR THE PRODUCTS FOR ANY PURPOSE OR USE.5.3

Force Majeure.

Any delay in or failure of performance by ██████ ██████████ Inc under this Agreement will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of ██████████████ Inc, including, but not limited to, acts of God, any deficiencies or failures of third-party providers to provide the Product(s), strikes, lockouts, slowdown, power outages or war.

**5.4. Client Indemnity. Client agrees to indemnify and hold ███████████ Inc, its affiliates, employees, officers, directors and shareholders harmless from and against any claims, suits, actions or proceedings (a "Claim") brought and damages, costs (including attorney's fees) or judgments awarded against ██████████ Inc that arise from or in connection with: (i) claims by any person or entity to the extent that such Claims are based upon or arise out of the Client's acts or omissions; (ii) breach by the Client of this Agreement, (iii) the Client's failure to comply with Applicable Law; and (iv) Client's failure to be the exclusive owner of any intellectual property, trademarks, designs and all goodwill associated with the Services, the Product, and any labeling or design services applied to such Product by ██████ ██████████ Inc or otherwise.**

ARTICLE VI

CONFIDENTIALITY

006012



any obligation or liability of, or to other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.

1.10 Cooperation.  The Parties will use good faith efforts to cooperate with each other in all matters relating to the provision and receipt of the Services, including, without limitation, cooperating in connection with obtaining all consents, approvals licenses or sublicenses reasonably necessary in order for ▮▮▮▮▮▮▮▮ Inc to perform the Services. Client shall be solely responsible for any costs incurred by ▮▮▮▮ ▮▮▮▮▮▮ Inc in connection with obtaining such consents or approvals or procuring such licenses or sublicenses. In the event that ▮▮▮▮ ▮▮▮▮▮ Inc reasonably believes that it is unable to provide any Service because of a failure to obtain any consent, approval, license or sublicense, the parties shall in good faith discuss and agree to an alternative approach; provided that, in no event shall ▮▮▮▮▮▮▮▮ Inc be required to provide such Service until such time that the Parties have agreed to an alternative approach or the relevant consent, approval, license or sublicense has been obtained. Client shall be solely responsible for any increased cost in providing a Service resulting from any agreed alternative approach.

1.11  Sourcing of Product.  Client hereby agrees and acknowledges that (i) ▮▮▮▮▮▮▮▮ Inc does not manufacture the Product and rather purchases the Product from a third-party on behalf of Client; and (ii) ▮▮▮▮▮▮ Inc shall not be liable for any deficiencies, recalls, inconsistencies or any other issue relating to the manufacture of the Product.

6.1  Confidentiality.  Each Party shall hold, and shall cause its employees, accountants, attorneys and other authorized representatives to hold, in confidence, and shall otherwise not disclose to anyone other than each of their respective accountants, attorneys and other authorized representatives, together with such other individuals or organizations as may from time to time be authorized in writing by the other Party or as may otherwise be required by any administrative body or required by law, all documents, records, data and information of each Party ("Confidential Information") disclosed by such Party to the other Party in connection with the performance of this Agreement. Confidential Information shall not include information that (1) is already or otherwise becomes publicly available through no act of receiving Party; (2) is lawfully received by receiving Party from third parties subject to no restriction of disclosure; or (3) can be shown by receiving Party to have been independently developed by such Party. Each Party shall promptly notify the other Party of any subpoena or other request or demand made to such Party seeking documents, records, data or information concerning the other Party or the Services provided hereunder, and shall resist production of any such materials consistent with its obligations pursuant to this Article. Neither Party shall use the Confidential Information of the other Party except to exercise its rights and perform its obligations hereunder.

ARTICLE VI

MISCELLANEOUS

7.1 Further Assurances. ▮▮▮▮▮▮▮▮ Inc and Client agree, upon the reasonable request of the other, to execute, acknowledge and deliver any and all

1.12   Content and Trademark Ownership and License.  Each party (the "Granting Party") hereby grants the other party (the "Receiving Party") a royalty free, non-exclusive, worldwide limited license to use, reproduce, publish, display, perform and distribute the Granting Party's applicable trademarks and service marks in connection with all marketing and distribution to carry out the express purpose of this Agreement.  The Receiving Party agrees that such marks are the exclusive property of the Granting Party and that all usage of such marks and any goodwill established by the use of such marks shall inure to the benefit of the Granting Party and that this Agreement does not confer any goodwill or other interests in such marks on the Receiving Party.  Neither party shall adopt or attempt to register any trademark, trade name, or service mark, which is confusingly similar to the other party's marks.  Termination of this Agreement shall immediately terminate the license(s) granted. Client represents and warrants that Client is the exclusive owner of any intellectual property, trademarks, designs and all goodwill associated with the Services, the Product(s), and any labeling or design services applied to such Product by ██████████ Inc or otherwise, and, that Client entering into and performing this Agreement will not violate any contract to which it is a party or any court order to which it is subject.

ARTICLE II

PERFORMANCE OF SERVICES

2.1  Minimum Purchase Amount.  In recognition of ██████████ Inc' fixed expenses associated with being available to provide Services to Client, Client agrees and acknowledges that it shall be required to cause ██████████ Inc to fulfill, at a minimum, one thousand dollars worth of products and/or services per month. (the "Minimum Threshold")

uch further in trument , and to do and perform any and all such other acts as may be necessary or appropriate in order to carry out the intent and purposes of this Agreement.

7.2 Waivers or Modifications. No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the Party to be charged therewith. No written waiver shall excuse the performance of any act( ) other than tho e specifically referred to therein. A waiver of any breach by any Party hereunder shall not constitute a waiver of any subsequent breach(es) by such Party hereunder

7 3 Governing Law  Thi  Agreement  hall be governed by the laws of the State of Colorado (regardless of the laws that might otherwise govern under applicable principles of conflicts of law) a  to all matter , including, but not limited to, matters of validity, construction, effect, performance and remedies.

7.4 Notices. Except as expressly otherwise provided herein, all notices, requests, demands, waiver  and other communication  under thi Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or by facsimile transmission or mailed (certified or regi tered mail, po tage prepaid, return receipt requested) to the address provided for such Party in the preamble to this Agreement.

7.5 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, such provi ion will be fully  evered and thi  Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof; and the remaining provi ion  hereof will remain in full force and

2.2.  Shipments. ███████████ Inc shall not be responsible for (i) any errors in shipping caused by improper addresses or mistakes provided by Client; and (ii) any late or undelivered shipments caused by customs or any shipping provider.   Any errors in shipping caused by mistakes of ██████████ Inc will be reshipped at no additional charge to Client.  Client agrees that it shall be solely responsible for all customer service relating to ████████████ Inc' performance of the Services and Client shall promptly notify ████████████ Inc of any shipping changes or errors prior to shipment.  Client acknowledges and agrees that once any Product has been shipped by █████████████ Inc shall no longer have any authority to modify any shipping instructions for such Product.


ARTICLE III

INVOICES; PAYMENT TERMS

3.1  Fees for Services; Invoices. ██████ ████████ Inc shall invoice Client on a weekly basis. Invoices shall specify the weekly Fees for, and provide reasonable detail regarding, the Services rendered during the previous month. The Fees shall be in accordance with such Appendix or as otherwise agreed to by the Parties. Invoices shall also include any adjustments required for credits or Product returns that were given or occurred during the previous month, in accordance with Article I of this Agreement. ████████████████ Inc' invoices shall be due and payable not later than seven (7) days after the date of the invoice (the "Due Date").  In the event Client fails to remit to all outstanding amounts on or before the Due Date, then ██████████ Inc shall have the option to suspend the provision of Services or terminate this Agreement.

effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

7.6 Entire Agreement. This Agreement and any Appendix referenced or attached hereto and thereto constitute the entire agreement between the Parties hereto.7.7 Assignment. █████ ████████ Inc shall have the right to assign this Agreement.

7.8 Binding Agreement. This Agreement is binding upon, and inures to the benefit of, the Parties and their respective successors. Nothing in this Agreement, expressed or implied, is intended to confer on any person, other than the Parties or their respective successors, any rights, remedies or liabilities under this Agreement.

7.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed an original, and such counterparts together shall constitute one and the same instrument.

7.10 No Impairment of Rights. No delay or omission by either Party hereto in exercising any right, power or privilege hereunder will impair such right, power or privilege, nor will any single or partial exercise of any such right, power or privilege preclude any further exercise thereof or the exercise of any other right, power or privilege.

IN WITNESS WHEREOF, the parties have caused this Fulfillment Agreement to be executed by their duly authorized representatives as of the day and year first above written.

006015



| ███████████████ Inc | [Company.Name] |
|---|---|
| ████████ <br> President | Signer: <br> Company name: |

Appendix A

1. Product. The "Product" shall be various dietary supplements and health and beauty products as agreed to by Client and ████████████ Inc.

2. Services. The "Services" shall consist of the following:

   - A. ████████████ Inc shall purchase the Product from a third-party provider on behalf of Client.
   - B. ████████████ Inc shall place labeling on the Product as instructed by Client.
   - C. Upon ████████████ Inc' receipt of proper instructions for fulfillment from Client for any particular customer order, ████████████ Inc shall perform all packing, shipping and tracking functions necessary to fulfill the order and ship Product.

3. Pricing. Client shall be obligated to compensate ████████████ Inc the amounts set forth on any invoice provided to Client by ████████████ Inc.

4. Deposit. A one-time non-refundable ($1,000) deposit will be required to open a fulfillment account. This fee is for set up and integration into our system. However, this deposit will be applied to any fulfillment invoice you receive in the first 60 days.

5. Minimum. All fulfillment accounts will have a minimum spend of $1000 per month.

- The Parties hereby agree and acknowledge that Client and ShipOffers may modify the terms of this Appendix A verbally and that such modifications shall be integrated into this Fulfillment Agreement.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER
AUTHORIZING DEBTOR TO ENTER INTO FULFILLMENT AGREEMENT**

On November 15, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for Entry of Order Authorizing Debtor to Enter into Fulfillment Agreement* ("Motion") after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

The Motion is hereby granted and the Debtor is authorized to enter into the Fulfillment Agreement with                    . attached to the Motion as Exhibit A.

Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a), and the Bankruptcy Local Rules are satisfied by such notice.

Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon entry. The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Houston, Texas
Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE



EXHIBIT

B

exhibitsticker.com

006017

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln
Austin, TX 78703

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065

John D Malone
Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street
Suite 1800
Dallas, TX 75201

Lynn Hamilton Butler
Husch Blackwell LP
111 Congress Ave., #1400
Austin, Texas 78701

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

---

Emergency relief has been requested. Relief is requested not later than November 21, 2022, at 2:00 p.m.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on November 21, 2022, at 2:00 p.m.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "judgelopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Lopez's home page. Select the case name, complete the required fields, and click "submit" to complete your appearance.

### DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO ENTER INTO PRODUCT FULFILLMENT AGREEMENT

FREE SPEECH SYSTEMS, LLC. ("Debtor" of "FSS") debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") and files this Motion (the "Motion") seeking entry of an order, pursuant to sections 105(a), 363, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to enter into a Fulfillment Agreement (the

"Agreement") with                              ("SAI"), and granting such other and further relief as necessary

or appropriate.  In further support of this Motion, the Debtor would show the Court as follows:

## JURISDICTION

1.        The United States Bankruptcy Court for the Southern District of Texas (the "Court") has

jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2).

2.        Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory bases for the relief requested herein are sections 105, 363, 1107, and 1108

of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

## BACKGROUND

4.        On July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under

Chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its businesses and manage its

affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.        The Debtor is engaged in the business of producing and syndicating Alex Jones' radio and

video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces

Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the

Genesis Communications Network on over 100 radio stations across the United States and via the internet

through websites including Infowars.com.

6.        On its Infowars.com[1] website today, FSS makes available for sale to customers assorted

dietary supplements.  The website also has available books, t-shirts and other products Jones advertises

during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements.

7.        FSS purchases to sell on its website two categories of products: (a) dietary supplements

("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied

---

[1] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

on PQPR to source Supplements as no other vendor would supply the Supplements for Jones to advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

8.      As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed formula.

9.      Pursuant to a forbearance agreement executed between PQPR and FSS on July 12, 2022 the formula for allocation of product sales proceeds was modified to provide that FSS would receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR receives 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was negotiated to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

10.      Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales.  In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.  Recently, FSS employed Blue Ascension, LLC ("Blue Ascension ") to take over this function. Blue Ascension charges FSS a flat fee per order regardless of the size of each order.  Under the Blue Ascension agreement, FSS pays $14 per order for shipping and an additional $6 per order for ancillary fulfillment services.

11.      The modified terms with PQPR were intended to allow the Debtor to purchase more product directly and receive a larger share of the profit margin from product sales and the transition to Blue Ascension was intended to extricate the Debtor from the fulfillment business.

12.      The transaction proposed in this Motion is intended to complete the transition of the Debtor's business model to fully outsource its product supply chain and third party logistics through a single provider.

13.     The Fulfillment Agreement with SAI (attached as Exhibit "A") provides that SAI will source diet, nutritional, health and wellness products at the direction of FSS from a product list at specified prices set forth therein.  Products not identified in the product list may be sourced at prices negotiated between SAI and FSS.  Products will be private labeled by SAI as instructed by FSS.

14.     SAI will also provide fulfillment services (shipping and handling) of product sales in accordance with FSS' instructions.  SAI will also manage all product returns.  Fulfillment pricing varies depending upon the size and weight of each order.  A copy of the packaging and shipping rates is attached to the Agreement.

15.     SAI is not charging the Debtor for its services.  SAI is serving as a "white label reseller" White label resellers act as intermediaries having contracted directly with a product supplier and 3PL[2].  The use of a white label reseller is necessary because parties are reluctant to enter into a relationship directly with the Debtor.

16.     SAI has no prior relationship with the Debtor and is not an insider or affiliate of the Debtor as defined at 11 USC §§101(2) and (31).  The sole shareholder of SAI,              or an entity related to Mr.         has sold product through the Debtor's sales channel in the past but has no current business relationship with the Debtor.  The Debtor has identified the following additional relationships between Mr.        and entities currently engaged or to be engaged in business with the Debtor:

    a.   Mr.         is the sole shareholder of                          .
       (              ") which the Debtor seeks to engage as credit card processor in a contemporaneously filed motion.  If approved,         will be entitled to a service fee of 1.5% of all credit card transactions on behalf of FSS.

    b.   Mr.      is an employee of                          is an electronic payment processor and processes the Debtor's credit card payments.         earns of fee of 4.5% of all credit card transactions on behalf of FSS.        is

---

[2] 3PL's are third party logistics providers that provide outsourcing supply chain management including product distribution, warehousing, inventory management, product assembly, packing shipping and record keeping.

aware of Mr. Cicack's relationship with      and has advised in writing

that it approves of the arrangement between FSS and

     c.    Mr.     is the sole owner of SAI. Under the terms of the Agreement with SAI

         Mr.     will receive no compensation or remuneration from FSS or the entities

         he contracts with to provide product sourcing and fulfillment services.

     17.     Neither Alex Jones or any member of his family or any employee (current or former) of FSS (or any affiliate) or PQPR Holdings Limited, LLC (or any of its owners, officers, employees, or affiliates), (i) own any interest in SAI or      (ii) have any contractual relationships with Mr. SAI or      or (iii) receive (currently or in the future) any form of remuneration from Mr. , SAI or      . Conversely neither SAI,      nor Mr.     (i) own any interest in FSS, PQPR Holdings Limited, LLC (or any of their affiliates), (ii) have any contractual relationships with Alex Jones or any member of his family, FSS (other than contracts approved by Order of this Court), or PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees), or (iii) receive any remuneration from Alex Jones or any member of his family, FSS, PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees) that has or will not be approved by Order of this Court.

## **RELIEF REQUESTED**

     18.     By this Motion, the Debtor seeks entry of an Order authorizing the Debtor to operate under the Agreement with the SAI which is consistent with the Debtor's historical and customary practices but under significantly improved terms.

## **BASIS FOR RELIEF**

**A.  Debtor Requests Authority Enter into the Agreement in The Ordinary Course of Business.**

     19.     Debtor requests that it be authorized to operate under the Agreement in the ordinary and customary course of business.

     20.     The financial terms of the Agreement with SAI will improve the Debtor's profitability while at the same time simplifying and streamlining its operations. Currently the Debtor bears the risk of

financial loss with respect to products its purchases if they are purchased in quantities or at prices that exceed customer demand.  Under the SAI Agreement, other than low minimum purchase requirements, SAI bears the risk regarding unsold product.

21.     Further, while SAI product pricing may be higher than product pricing under FSS' existing product sourcing with PQPR, the existing agreement with PQPR allocates ten percent (10%) of net sale receipts to PQPR.  Some of the product pricing from SAI is lower than FSS currently pays suppliers.  On average, SAI's prices are within ten percent (10%) of FSS' current product pricing.

22.     FSS currently pays $20 per shipment to FSS for fulfillment services.  SAI's fulfillment charges will be significantly lower than Blue Ascension.  SAI fulfillment charges vary by weight and package size.  Based on the weight and size of the average FSS order, FSS anticipates that the average shipping cost per package will be less than $10 per shipment. FSS expects that SAI's terms will be accretive to the Debtor's income and cash flow.

23.     Section 363(b) Bankruptcy Code addresses a debtor's use of property of the estate outside the ordinary course of the debtor's business and applies a business judgment test in evaluating such transactions.  In order to satisfy its fiduciary duty a debtor in possession must show an "articulated business justification, good business judgment, or sound business reasons." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).

24.     While FSS has sourced and sold product through a variety of transactions which are similar to the SAI Agreement, in an abundance of caution the Debtor seeks approval of the Agreement under section 363(b) of the Bankruptcy Code. The Agreement with SAI will simplify the Debtor's operations, avoid the need to finance product purchases, provide "just in time" product sourcing, making new products more readily available to customers, significantly reduce fulfillment costs and increase profitability.  The Debtor believes that the requirements of the business judgment test are met.

**B.     Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

25.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

WHEREFORE, for the reasons set forth above the Debtor respectfully requests that the Court enter an order in the form attached as Exhibit B (i) authorizing the Debtor to enter into the Agreement as described above, consistent with Debtor's historical and customary practices and (ii) granting any and all such other relief as the Court deems just and proper.

Respectfully submitted this November 15, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com


By:  /s/  Raymond W. Battaglia
       Raymond W. Battaglia
       Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN POSSESSION**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list.

/s/ Raymond W. Battaglia
Raymond W. Battaglia



**EXHIBIT**

**A**

This Fulfillment Agreement (this "Agreement") is entered on [_____] (the "Effective Date"), by and between [_____] Inc having offices at 4548 Valley Spring Dr. Westlake Village, CA 91362, U.S.A. ("[_____] Inc") and [_____], a [_____], having offices at [_____], ("Client"). [_____] Inc and Client may be individuals referred to herein as a "Party" and collectively referred to herein as "Parties".

WHEREAS, [_____] Inc provides product sourcing and fulfillment services for direct response marketers that market diet, nutritional, health and wellness products through various distribution channels;

WHEREAS, Client desires to retain [_____] Inc to provide product sourcing and fulfillment services and [_____] Inc desires to provide the same pursuant to the terms hereof,

NOW, THEREFORE, in consideration of the promises and mutual covenants described herein, the parties agree as follows:

ARTICLE I

ENGAGEMENT OF [_____] Inc; FEES

1.1 Engagement. As of the Effective Date, Client hereby retains [_____] Inc to perform the Services (as defined below) including such activities as may be related, ancillary, or necessary to perform the Services.

3.2  Manner of Payment; Late Payments. Payments by Client to [_____] Inc under this Agreement shall be made by electronic fund transfers, check, or, other mutually accepted means. Late payments under this Article III shall bear interest at the prime rate plus ten percent (10%) per annum or the maximum amount permitted by applicable law, whichever is less.

3.3 Taxes. All amounts payable for Services hereunder are exclusive of any taxes. All taxes and other charges imposed by any taxing authority on any Service or Product shall be added to the appropriate invoice and shall be payable by Client in accordance with Section 3.1.
ARTICLE IV

TERMINATION; OBLIGATIONS UPON TERMINATION

4.1  Termination by Either Party.  This Agreement may be terminated by either Party upon providing the other Party ninety (90) days written notice of such Party's desire to terminate this Agreement.

4.2 Termination by [_____] Inc.  In the event that (i) [_____] Inc believes that Client's conduct or its Products or violate Applicable Law or pose a threat to [_____] Inc' business or reputation; (ii) Client fails to satisfy the Minimum Threshold; or (iii) Client fails to remit to all outstanding amounts on or before the Due Date, then [_____] Inc shall have the option to suspend the provision of Services or terminate this Agreement.

4.3  Obligations upon Termination.  Client shall be obligated  to  remit  all  amounts  owing  to  [_____] Inc

006028



1.2 Services. ███████ Inc shall provide product sourcing and fulfillment services for Client for such Products as set forth on Appendix A (the "Services"). The Parties hereby agree and acknowledge that the Services provided by ███████ Inc may be modified upon the mutual consent of the Parties.

1.3 Fees. For ███████ Inc' performance of the Services, Client shall pay ███████ Inc such amounts as provided on Appendix A (the "Fees"). The amount of the Fees may be modified by the mutual consent of the Parties.

1.4 Return Instructions. ███████ Inc will sort any returns to the best of its ability to inspect safety seals and determine which bottles can be resold. To do this, ███████ Inc may charge Client a flat fee per return. ███████ Inc accepts no liability for its performance of these services.

1.5 Compliance with Laws; Non-Infringement. Client shall be solely responsible for compliance with any applicable federal and state laws and regulations relating to the Product and Services, which includes, but shall not be limited to, any labeling, information or sales methods related to the Product and Services. Additionally, Client hereby covenants that the Product and any sales efforts and labeling related thereto shall comply with all federal and state laws and regulations, and, that such laws and regulations include, but, shall not be limited to (i) any Federal Trade Commission rules and regulations, including, but not limited to the "Mail Order Rule", "Telemarketing Sales Rule," and any other rules and regulations, relating to advertising, solicitation or otherwise; (ii) any Food and Drug Administration rules and regulations, including, but not limited to any labeling guidelines which may

upon the termination of this Agreement.

4.4 Survival. The terms and conditions of the following provisions shall survive the termination or expiration of this Agreement: Sections 1.3, 1.4, 1.5, 1.7, 1.9, 1.10, 1.11, 1.12, 2.2, 4.3, 4.4 and Article III, Article V, Article VI and Article VII.

ARTICLE V

LIMITATION OF LIABILITY

5.1 Limitation of Liability. IT IS UNDERSTOOD AND AGREED THAT ███████ Inc' LIABILITY WHETHER IN CONTRACT, IN TORT, UNDER ANY WARRANTY, IN NEGLIGENCE OR OTHERWISE SHALL NOT EXCEED THE RETURN OF THE AMOUNT OF THE PURCHASE PRICE PAID BY CUSTOMER FOR SUCH SPECIFIC SERVICE OR PRODUCT AND UNDER NO CIRCUMSTANCES SHALL ███████ Inc BE LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES. THE PRICE STATED FOR THE SERVICES IS A CONSIDERATION IN LIMITING ███████ Inc' LIABILITY. NO ACTION, REGARDLESS OF FORM, ARISING OUT OF THE TRANSACTIONS UNDER THIS AGREEMENT MAY BE BROUGHT BY CUSTOMER MORE THAN ONE YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.

5.2 Disclaimer of Warranties. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, ███████ Inc MAKES NO, AND DISCLAIMS ALL, WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT, WITH RESPECT TO THE SERVICES AND THE PRODUCTS.



relate to point size, type, label format and product claims; and (iii) all other federal and state rules and regulations which relate to the Product and Services (collectively, "Applicable Law") .  Client hereby agrees and acknowledges that ███████ Inc shall not have any obligations with respect to any Products or Services being in compliance with Applicable Law.

1.6 ██████████████ Inc Obligations. ████████ Inc hereby covenants and agrees that it shall, during the term of this Agreement, perform the Services in a commercially reasonable manner. ████████████ Inc further covenants and agrees that it shall maintain reasonably accurate records and accounts of all transactions relating to the Services performed pursuant to this Agreement.

1.7  Client Obligations. Client hereby covenants and agrees that (i) it shall pay ██████ Inc for Services in accordance with Article III of this Agreement; (ii) it shall provide █████████ Inc with all documents and information necessary for ██████████ Inc to perform the Services pursuant to this Agreement; and (iii) it shall comply with Applicable Law.

1.8  Right to Subcontract. In the performance of its obligations hereunder, ██████████ Inc shall have the right, in its sole discretion, to subcontract its rights and responsibilities to any third party, provided that ██████████ Inc shall remain responsible for the performance of any such third party.

1.  **Independent Contractors.  The Parties to this Agreement are independent contractors. Neither Party is an agent, representative or employee of the other Party.  Neither Party will have any right, power or authority to enter into any agreement for or on behalf of, or incur**

████████████ Inc MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY, SUITABILITY OR ADEQUACY OF THE SERVICES OR THE PRODUCTS FOR ANY PURPOSE OR USE.5.3

Force Majeure.

Any delay in or failure of performance by ████ ██████ Inc under this Agreement will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of ████████ Inc, including, but not limited to, acts of God, any deficiencies or failures of third-party providers to provide the Product(s), strikes, lockouts, slowdown, power outages or war.

**5.4.  Client Indemnity.  Client agrees to indemnify and hold ████████ Inc, its affiliates, employees, officers, directors and shareholders harmless from and against any claims, suits, actions or proceedings (a "Claim") brought and damages, costs (including attorney's fees) or judgments awarded against ████████ Inc that arise from or in connection with: (i) claims by any person or entity to the extent that such Claims are based upon or arise out of the Client's acts or omissions; (ii) breach by the Client of this Agreement, (iii) the Client's failure to comply with Applicable Law; and (iv) Client's failure to be the exclusive owner of any intellectual property, trademarks, designs and all goodwill associated with the Services, the Product, and any labeling or design services applied to such Product by ████████ Inc or otherwise.**

ARTICLE VI

CONFIDENTIALITY



**any obligation or liability of, or to other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.**

1.10 Cooperation. The Parties will use good faith efforts to cooperate with each other in all matters relating to the provision and receipt of the Services, including, without limitation, cooperating in connection with obtaining all consents, approvals licenses or sublicenses reasonably necessary in order for ▮▮▮▮▮▮ Inc to perform the Services. Client shall be solely responsible for any costs incurred by ▮▮▮▮ ▮▮▮▮ Inc in connection with obtaining such consents or approvals or procuring such licenses or sublicenses. In the event that ▮▮▮▮ Inc reasonably believes that it is unable to provide any Service because of a failure to obtain any consent, approval, license or sublicense, the parties shall in good faith discuss and agree to an alternative approach; provided that, in no event shall ▮▮▮▮▮▮ Inc be required to provide such Service until such time that the Parties have agreed to an alternative approach or the relevant consent, approval, license or sublicense has been obtained. Client shall be solely responsible for any increased cost in providing a Service resulting from any agreed alternative approach.

1.11 Sourcing of Product. Client hereby agrees and acknowledges that (i) ▮▮▮▮▮▮ Inc does not manufacture the Product and rather purchases the Product from a third-party on behalf of Client; and (ii) ▮▮▮▮ Inc shall not be liable for any deficiencies, recalls, inconsistencies or any other issue relating to the manufacture of the Product.

6.1 Confidentiality. Each Party shall hold, and shall cause its employees, accountants, attorneys and other authorized representatives to hold, in confidence, and shall otherwise not disclose to anyone other than each of their respective accountants, attorneys and other authorized representatives, together with such other individuals or organizations as may from time to time be authorized in writing by the other Party or as may otherwise be required by any administrative body or required by law, all documents, records, data and information of each Party ("Confidential Information") disclosed by such Party to the other Party in connection with the performance of this Agreement. Confidential Information shall not include information that (1) is already or otherwise becomes publicly available through no act of receiving Party; (2) is lawfully received by receiving Party from third parties subject to no restriction of disclosure; or (3) can be shown by receiving Party to have been independently developed by such Party. Each Party shall promptly notify the other Party of any subpoena or other request or demand made to such Party seeking documents, records, data or information concerning the other Party or the Services provided hereunder, and shall resist production of any such materials consistent with its obligations pursuant to this Article. Neither Party shall use the Confidential Information of the other Party except to exercise its rights and perform its obligations hereunder.

ARTICLE VI

MISCELLANEOUS

7.1 Further Assurances. ▮▮▮▮▮▮ Inc and Client agree, upon the reasonable request of the other, to execute, acknowledge and deliver any and all

1.12   Content and Trademark Ownership and License.  Each party (the "Granting Party") hereby grants the other party (the "Receiving Party") a royalty free, non-exclusive, worldwide limited license to use, reproduce, publish, display, perform and distribute the Granting Party's applicable trademarks and service marks in connection with all marketing and distribution to carry out the express purpose of this Agreement.  The Receiving Party agrees that such marks are the exclusive property of the Granting Party and that all usage of such marks and any goodwill established by the use of such marks shall inure to the benefit of the Granting Party and that this Agreement does not confer any goodwill or other interests in such marks on the Receiving Party.  Neither party shall adopt or attempt to register any trademark, trade name, or service mark, which is confusingly similar to the other party's marks.  Termination of this Agreement shall immediately terminate the license(s) granted. Client represents and warrants that Client is the exclusive owner of any intellectual property, trademarks, designs and all goodwill associated with the Services, the Product(s), and any labeling or design services applied to such Product by ███████████ Inc or otherwise, and, that Client entering into and performing this Agreement will not violate any contract to which it is a party or any court order to which it is subject.

ARTICLE II

PERFORMANCE OF SERVICES

2.1  Minimum Purchase Amount.  In recognition of ███████████ Inc' fixed expenses associated with being available to provide Services to Client, Client agrees and acknowledges that it shall be required to cause ███████████ Inc to fulfill, at a minimum, one thousand dollars worth of products and/or services per month. (the "Minimum Threshold")

uch further in  trument  , and to do and perform any and all such other acts as may be necessary or appropriate in order to carry out the intent and purposes of this Agreement.

7.2 Waivers or Modifications. No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the Party to be charged therewith. No written waiver shall excuse the performance of any act( ) other than tho  e specifically referred to therein. A waiver of any breach by any Party hereunder shall not constitute a waiver of any subsequent breach(es) by such Party hereunder

7 3 Governing Law  Thi   Agreement   hall be governed by the laws of the State of Colorado (regardless of the laws that might otherwise govern under applicable principles of conflicts of law) a   to all matter  , including, but not limited to, matters of validity, construction, effect, performance and remedies.

7.4 Notices. Except as expressly otherwise provided herein, all notices, requests, demands, waiver  and other communication  under thi Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or by facsimile transmission or mailed (certified or regi  tered mail, po  tage prepaid, return receipt requested) to the address provided for such Party in the preamble to this Agreement.

7.5 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, such provi ion will be fully  evered and thi  Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof; and the remaining provi ion  hereof will remain in full force and

2.2.  Shipments.  ▮▮▮▮▮▮ Inc shall not be responsible for (i) any errors in shipping caused by improper addresses or mistakes provided by Client; and (ii) any late or undelivered shipments caused by customs or any shipping provider.   Any errors in shipping caused by mistakes of ▮▮▮▮▮▮ Inc will be reshipped at no additional charge to Client.  Client agrees that it shall be solely responsible for all customer service relating to ▮▮▮▮▮▮ Inc' performance of the Services and Client shall promptly notify ▮▮▮▮▮▮ Inc of any shipping changes or errors prior to shipment.  Client acknowledges and agrees that once any Product has been shipped by ▮▮▮▮▮▮ Inc shall no longer have any authority to modify any shipping instructions for such Product.


ARTICLE III

INVOICES; PAYMENT TERMS

3.1  Fees for Services; Invoices. ▮▮▮▮▮▮ Inc shall invoice Client on a weekly basis. Invoices shall specify the weekly Fees for, and provide reasonable detail regarding, the Services rendered during the previous month. The Fees shall be in accordance with such Appendix or as otherwise agreed to by the Parties. Invoices shall also include any adjustments required for credits or Product returns that were given or occurred during the previous month, in accordance with Article I of this Agreement. ▮▮▮▮▮▮ Inc' invoices shall be due and payable not later than seven (7) days after the date of the invoice (the "Due Date").  In the event Client fails to remit to all outstanding amounts on or before the Due Date, then ▮▮▮▮▮▮ Inc shall have the option to suspend the provision of Services or terminate this Agreement.

effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

7.6 Entire Agreement. This Agreement and any Appendix referenced or attached hereto and thereto constitute the entire agreement between the Parties hereto.7.7 Assignment. ▮▮▮▮▮▮ Inc shall have the right to assign this Agreement.

7.8 Binding Agreement. This Agreement is binding upon, and inures to the benefit of, the Parties and their respective successors. Nothing in this Agreement, expressed or implied, is intended to confer on any person, other than the Parties or their respective successors, any rights, remedies or liabilities under this Agreement.

7.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed an original, and such counterparts together shall constitute one and the same instrument.

7.10 No Impairment of Rights. No delay or omission by either Party hereto in exercising any right, power or privilege hereunder will impair such right, power or privilege, nor will any single or partial exercise of any such right, power or privilege preclude any further exercise thereof or the exercise of any other right, power or privilege.

IN WITNESS WHEREOF, the parties have caused this Fulfillment Agreement to be executed by their duly authorized representatives as of the day and year first above written.



| ▓▓▓▓▓▓▓▓▓▓ Inc | [Company.Name] |
|---|---|
| ▓▓▓▓▓▓▓<br>President | Signer:<br>Company name: |

Appendix A

1. Product. The "Product" shall be various dietary supplements and health and beauty products as agreed to by Client and ▓▓▓▓▓▓▓▓▓ Inc.

2. Services. The "Services" shall consist of the following:
   - A. ▓▓▓▓▓▓▓▓▓ Inc shall purchase the Product from a third-party provider on behalf of Client.
   - B. ▓▓▓▓▓▓▓▓▓ Inc shall place labeling on the Product as instructed by Client.
   - C. Upon ▓▓▓▓▓▓▓▓ Inc' receipt of proper instructions for fulfillment from Client for any particular customer order, ▓▓▓▓▓▓▓▓ Inc shall perform all packing, shipping and tracking functions necessary to fulfill the order and ship Product.

3. Pricing. Client shall be obligated to compensate ▓▓▓▓▓▓▓▓▓ Inc the amounts set forth on any invoice provided to Client by ▓▓▓▓▓▓▓ Inc.

4. Deposit. A one-time non-refundable ($1,000) deposit will be required to open a fulfillment account. This fee is for set up and integration into our system. However, this deposit will be applied to any fulfillment invoice you receive in the first 60 days.

5. Minimum. All fulfillment accounts will have a minimum spend of $1000 per month.

- The Parties hereby agree and acknowledge that Client and ShipOffers may modify the terms of this Appendix A verbally and that such modifications shall be integrated into this Fulfillment Agreement.

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
|     **Debtor.** | § | |

### ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO ENTER INTO FULFILLMENT AGREEMENT

On November 15, 2022, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "<u>Case</u>"), filed its *Emergency Motion for Entry of Order Authorizing Debtor to Enter into Fulfillment Agreement* ("<u>Motion</u>") after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

The Motion is hereby granted and the Debtor is authorized to enter into the Fulfillment Agreement with _____. attached to the Motion as Exhibit A.

Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a), and the Bankruptcy Local Rules are satisfied by such notice.

Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon entry. The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Houston, Texas
Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE



EXHIBIT

B

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln
Austin, TX 78703

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065

John D Malone
Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street
Suite 1800
Dallas, TX 75201

Lynn Hamilton Butler
Husch Blackwell LP
111 Congress Ave., #1400
Austin, Texas 78701

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

---

### NOTICE OF WITHDRAWAL OF MOTION FILED BY THE DEBTOR AT ECF # 275

PLEASE TAKE NOTICE that Free Speech Systems, LLC, hereby withdraws Emergency

Motion Seeking Entry of an Order Authorizing the Debtor to Enter into a Fulfillment Agreement

[Dkt. 276] filed on November 15, 2022.  The pleading was filed in error and was corrected by

filing a Motion of the same title at [Dkt 276].

Respectfully submitted this November 16, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com


By: _/s/  Raymond W. Battaglia_____
        Raymond W. Battaglia
        Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN**
**POSSESSION**


### CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system.

_/s/ Raymond W. Battaglia_____
Raymond W. Battaglia

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      A hearing (the "Hearing") is set for November 21, 2022, at 2:00 p.m. (prevailing Central Time) before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 401, 515 Rusk, Houston, TX  77002 (the "Court"), to consider the following matters:

**EMERGENCY MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO ENTER INTO FULFILLMENT AGREEMENT**

**EMERGENCY MOTION SEEKING ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO A FINANCIAL SERVICES AGREEMENT**

2.      Parties may attend the Hearing in person or electronically. Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GOTOMEETING platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JUDGELOPEZ". Click the settings icon in the upper right corner and enter your name under the personal information setting.

3.      Parties are encouraged to review the Court's procedures for telephonic appearances located on the Court's website at: https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-christopher m lopez

4.      The Court has invoked the protocol outlined in General Order 2020-4, as invoked by General Orders 2010 and 2020-10a and extended by General Order 2020-11. These orders may be found at: https://www.txs.uscourts.gov/bankruptcy/genord  Therefore, all persons may appear electronically via audio and video at the Hearing using the Court's electronic conference systems.

5.      Any exhibit offered by the Debtor will be filed on the Court's docket. Additionally, the Debtor may have demonstrative exhibits to aid in its presentation to the Court, copies of which may be obtained by any party by sending a request to the undersigned counsel to the Debtor at the email addresses listed below.

6.      If any party wishes to offer exhibits, these exhibits should be filed with the Clerk of the Court using the Court's CM/ECF system. Each exhibit should be filed as a separate attachment to an Exhibit List in compliance with Bankruptcy Local Rule 9013 and General Order 2020-04.

7. Witnesses presented by the Debtor may appear in person or via audio and video connection. Any person wishing to examine the witness will be permitted to do so during the hearing via audio and/or video, subject to approval of the Court.

  Respectfully submitted this November 16, 2022.

      THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
      66 Granburg Circle
      San Antonio, Texas 78218
      Telephone (210) 601-9405
      Email: rbattaglialaw@outlook.com


     By:  */s/ Raymond W. Battaglia*
       Raymond W. Battaglia
       Texas Bar No. 01918055

     **ATTORNEYS FOR THE DEBTOR IN POSSESSION**


       <u>**CERTIFICATE OF SERVICE**</u>

  A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail on November 16, 2022, to the parties on the attached service list


       */s/ Raymond W. Battaglia*
       Raymond W. Battaglia

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:

FREE SPEECH SYSTEMS, LLC

CASE NO: 22-60043

**DECLARATION OF MAILING**
**CERTIFICATE OF SERVICE**

Chapter: 11
Judge: Christopher Lopez
Hearing Location: Courtroom 401, 515 Rusk, Houston, TX 77002
Hearing Date: November 21, 2022
Hearing Time: 2:00 PM

On 11/17/2022, I did cause a copy of the following documents, described below,

Notice of Hearing - Motions to Approve Financial Services and Fulfillment Agreements

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing list exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice. com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R.Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 11/17/2022

/s/ Ray Battaglia
Ray Battaglia  01918055
Attorney for Debtor
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX  78218
210 601 9405
rbattaglialaw@outlook.com

006042

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:

FREE SPEECH SYSTEMS, LLC

CASE NO: 22-60043

**CERTIFICATE OF SERVICE**
**DECLARATION OF MAILING**

Chapter: 11
Judge: Christopher Lopez
Hearing Location: Courtroom 401, 515 Rusk, Houston, TX
77002
Hearing Date: November 21, 2022
Hearing Time: 2:00 PM

On 11/17/2022, a copy of the following documents, described below,

Notice of Hearing - Motions to Approve Financial Services and Fulfillment Agreements

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing list exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document(s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 11/17/2022



Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Ray Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX  78218

006043

PARTIES DESIGNATED AS "CM/ECF NOTICE" RECEIVED ELECTRONIC NOTICE BUT DID NOT PRODUCE RECEIPTS. THOSE
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

ELEVATED SOLUTIONS GROUP
28 MAPLEWOOD DRIVE
COS COB, CT 06870

CHRISTOPHER SADOWSKI
C/O COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE STE 301
CORAL SPRINGS, FL 33065

ATOMIAL LLC
1920 E. RIVERSIDE DR.
SUITE A-120 #124
AUSTIN, TX 78741

CLOUDFLARE, INC
DEPT LA 24609
PASADENA, CA 91185-4609

JACQUELYN BLOTT
200 UNIVERSITY BLVD
SUITE 225 #251
ROUND ROCK, TX 78665

JOEL SKOUSEN
PO BOX 565
SPRING CITY, UT 84662

COMMERCE CDN, LLC
221 E 63RD STREET
SAVANNAH, GA 31405

INTERNATIONAL
PAUL WATSON
9 RIVERDALE ROAD
RANMOOR SHEFFIELD
SOUTH YORKSHIRE S10 3FA
UNITED KINGDOM

BRENNAN GILMORE
C/O CIVIL RIGHTS CLINIC
600 NEW JERSEY AVENUE, NW
WASHINGTON, DC 20001

GREENAIR, INC
23569 CENTER RIDGE RD
WESTLAKE, OH 44145

EDGECAST, INC
DEPT CH 18120
PALATINE, IL 60055

READY ALLIANCE GROUP, INC
PO BOX 1709
SANDPOINT, ID 83864

GETTY IMAGES, INC
PO BOX 953604
ST. LOUIS, MO 63195-3604

RATSMEDICAL.COM
C/O RAPID MEDICAL
120 N REDWOOD RD
NORTH SALT LAKE, UT 84054

INTERNATIONAL
DAVID ICKE BOOKS LIMITED
C/O ICKONIC ENTERPRISES LIMITED
ST. HELEN'S HOUSE KING STREET
DERBY DE1 3EE
UNITED KINGDOM

WWCR
1300 WWCR AVE
NASHVILLE, TN 37218-3800

JW JIB PRODUCTIONS, LLC
2921 CARVELLE DRIVE
RIVIERA BEACH, FL 33404

CUSTOMTATTONOW.COM
16107 KENSINGTON DR. #172
SUGAR LAND, TX 77479

AT&T
PO BOX 5001
CAROL STREAM, IL 60197-5001

JUSTIN LAIR
1313 LOOKOUT AVE
KLAMATH FALLS, OR 97601

PQPR HOLDINGS LIMITED, LLC
C/O STEPHEN LEMMON
1801 S. MOPAC EXPRESSWAY
SUITE 320
AUSTIN, TX 78746

ATTN: SHELBY JORDAN
JORDAN & ORTIZ, P.C.
500 N. SHORELINE BLVD. SUITE 900
CORPUS CHRISTI, TEXAS 78401

STEPHEN A ROBERTS
STEPHEN A ROBERTS, P.C.
1400 MARSHALL LN
AUSTIN, TX 78703

ATTN: ERIC HENZY
ZEISLER & ZEISLER P.C.
10 MIDDLE STREET, 15TH FLOOR
BRIDGEPORT, CT 06604

ATTN: DANIEL DESOUZA
COPYCAT LEGAL PLLC
3111 N. UNIVERSITY DRIVE, SUITE 301
CORAL SPRINGS, FL 33065

JOHN D MALONE
ATTORNEY AT LAW
5400 BOSQUE BLVD., STE. 650
WACO, TX 76710

JASON STARKS
TRAVIS COUNTY ATTORNEY'S OFFICE
P.O. BOX 1748
AUSTIN, TX 78767

PARTIES DESIGNATED AS "EXPEDITED SERVICE" WERE SERVED WITH A COPY OF THIS PLEADING VIA FIRST-CLASS MAIL OR THE METHOD INDICATED. ALL OTHER PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

RICHARD A. COCHRANE                    LYNN HAMILTON BUTLER
AKIN GUMP STRAUSS HAUER & FELD         HUSCH BLACKWELL LP
2300 N. FIELD STREET                   111 CONGRESS AVE., #1400
SUITE 1800                             AUSTIN, TEXAS 78701
DALLAS, TX 75201