**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 (Subchapter V) |
| FREE SPEECH SYSTEMS LLC, | § | |
| . | § | Case No. 22-60043 (CML) |
| | § | |
| Debtor. | § | Jointly Administered |

**SUBCHAPTER V TRUSTEE'S RESPONSE TO PQPR HOLDINGS
LIMITED, LLC'S LIMITED OBJECTION AND SUPPLEMENTAL
OBJECTION TO SUBCHAPTER TRUSTEE'S MOTION FOR ENTRY
OF AN ORDER AUTHORIZING RETENTION OF M3 ADVISORY
PARTNERS, LP AS FINANCIAL ADVISOR TO THE SUBCHAPTER V TRUSTEE**

Melissa Haselden, the subchapter v trustee (the "Subchapter V Trustee") files this response regarding *PQPR Holdings Limited, LLC's Limited Objection to Subchapter Trustee's Motion for Entry of an Order Authorizing Retention of M3 Advisory Partners, LP as Financial Advisor to the Subchapter V Trustee* (the "Objection") [Docket No. 305] and supplemental objection (the "Supplemental Objection") [Docket No. 325] and states the following:

1. On November 19, 2022, the Subchapter V Trustee filed its *Motion for Entry of an Order Authorizing Retention of M3 Advisory Partners, LP as Financial Advisor to the Subchapter V Trustee* (the "M3 Application") [Docket No. 282]. On December 9, 2022, PQPR Holdings Limited, LLC("PQPR") filed its Objection [Docket No. 305] and then filed its Supplemental Objection on December 16, 2022 [Docket No. 325].

2. As further described in the M3 Application, the Subchapter V Trustee seeks retention of M3 Advisory Partners, LP ("M3") as financial advisor to assist in executing her duties as Subchapter V Trustee. Pursuant to this Court's order, the Subchapter V Trustee's duties were

expanded and she was tasked with undertaking an investigation.[1]  The Investigation includes reviewing many years worth of transfers and transactions with numerous parties.  The records maintained by the parties are incomplete and generally not in good order.  The scattered information complicates the process.  The Subchapter V Trustee requires the assistance of a financial advisor in fulfilling her duties.

3.     PQPR initially objected to the M3 Application subject to an agreed-upon or Court-approved budget and cap on the fees to be charged by M3. [Docket No. 305].  PQPR filed its Supplemental Objection indicating confusion about whether M3's compensation would be subject to review. [Docket No. 325].

4.     First, with regards to compensation, in addition to the Declaration of Brian Griffith stating the intention to file a fee application with the Court, the proposed M3 retention order itself provides in paragraph 2:

> M3 shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case in compliance with §§ 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, applicable provisions of the Bankruptcy Local Rules, and any other applicable orders of the Court.

If the M3 retention is approved, the Court is *ordering* M3 to apply for any compensation it seeks to be paid, full stop.

5.     PQPR also requests that M3 be subject to a compensation cap and limits on its scope of work.  The Subchapter V Trustee has duties under the Bankruptcy Code.  Further, the Court expanded the Subchapter V Trustee's powers.  The Subchapter V Trustee tasked by the Court with undertaking an the investigation in this case.

---

[1] *See Order Expanding the Subchapter V Trustee's Duties Pursuant to 11 U.S.C. § 1183(b)(2) of the Bankruptcy Code* [Docket No. 183].

006763

6.      It is not appropriate for a fiduciary in these circumstances to have its investigation budget capped.  It is particularly inappropriate when the party seeking to impose the limits on an investigation is an insider that is subject to that investigation.  The Trustee shares the concern regarding the economics of the case.  However, the retention phase is not the proper place to address such worries.  Retained professionals are entrusted to be vigilant and responsible with their efforts.  The hearing regarding consideration of an application for compensation is the reckoning.

December 16, 2022

> */s/ Elizabeth C. Freeman*
> **LAW OFFICE OF LIZ FREEMAN**
> Elizabeth C. Freeman (TX Bar No. 2400922)
> PO Box 61209
> Houston, TX 77208-1209
> Telephone: (832) 779-3580
> Email: liz@lizfreemanlaw.com
>
> *Counsel for Melissa Haselden,*
> *Subchapter V Trustee*
>
>
> **JACKSON WALKER LLP**
> Sean Gallagher (TX Bar No. 24101781)
> Emily Meraia (TX Bar No. 24129307)
> 100 Congress Avenue, Suite 1100
> Austin, TX 78701
> Telephone: 512-236-2000
> Email: sgallagher@jw.com
> Email: emeraia@jw.com
>
> *Counsel for Melissa Haselden,*
> *Subchapter V Trustee*

006764

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 16, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>/s/ *Elizabeth Freeman*</u>
Elizabeth Freeman

006765

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

<u>**SEVENTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND**</u>
<u>**PROVIDING PARTIAL ADEQUATE PROTECTION**</u>

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "<u>Motion</u>"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "<u>First Interim Order</u>"). The Court has subsequently conducted periodic hearings extending authority to use cash collateral on an interim basis. This order is the seventh interim order ("<u>Seventh Interim Order</u>"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "<u>Tort Plaintiffs</u>"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

006766

2.      <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Seventh Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.      <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and

parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.    Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    Adequate Protection – Replacement Liens.  The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Seventh Interim Order.

10.    Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    Credit Card Processing. The Debtor is authorized to remit fulfillment costs as provided in the Fulfillment Agreement previously approved by this Court's *Order Granting Emergency Motion for Entry of Order Authorizing Debtor to Enter into Fulfillment Agreement* [Dkt. No. 286] from the daily settlement contemporaneously with the distributions to FSS and PQPR.  Proceeds received by FSS for sales of PQPR inventory shall be held by FSS in trust pending distribution to PQPR by FSS.

12.    Reporting. The Debtor shall report each Thursday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Final Cash Collateral Hearing</u>: A further interim hearing on the Motion shall be held before this Court on January ___, 2023, at _____ a.m. Central time.

Houston, Texas
Dated: December ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

| | 12/24/2022-12/30/2022 | 12/31/2022-1/06/2023 | 1/07/2023-1/13/2023 | 1/14/2023-1/20/2023 | CURRENT 4 WEEK BUDGET | NOTES |
|---|---|---|---|---|---|---|
| Week Number | 22 | 1 | 2 | 3 | Total | |
| **Income** | | | | | | |
| Product Sales *(Net of 6.0% Merchant Fee)* | $ 200,000.00 | $ 225,000.00 | $ 265,000.00 | $ 285,000.00 | $ 975,000.00 | *Net of 6.0% CC Merchant fees.  Includes Shipping Fees and Sales Tax but excludes any PQPR related sales* |
| Point of Sales Revenue | $ 115,000.00 | $ 145,000.00 | 155,000.00 | 175,000.00 | 590,000.00 | *Fulfillment Vendor Product Sales* |
| Platinum / PQPR Commission | 85,000.00 | 85,000.00 | 85,000.00 | 85,000.00 | 340,000.00 | *Net of 80% payment to inventory owner* |
| Donations | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 30,000.00 | |
| **Total Income** | 407,500.00 | 462,500.00 | 512,500.00 | 552,500.00 | 1,935,000.00 | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (117,000.00) | (117,000.00) | (117,000.00) | - | (351,000.00) | *NutriScience Inventory* |
| Inventory Purchases | - | (250,000.00) | (250,000.00) | - | (500,000.00) | *Hi-Tec Inventory purchase per payment plan agreement* |
| PQPR Inventory Purchase | (50,000.00) | (50,000.00) | - | - | (100,000.00) | *Per 2nd interim cash collateral order ECF 98* |
| Point of Sale Product Cost | (28,750.00) | (36,250.00) | (38,750.00) | (43,750.00) | (147,500.00) | *Fulfillment Vendor product costs* |
| Fulfillment Services | (40,000.00) | (45,000.00) | (49,025.00) | (52,725.00) | (186,750.00) | *Assumes we do not transition to 3rd Party Fulfillment Vendor before 12/24/22* |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | |
| Texas Sales Tax (20% of Sales @ 6.25%) | (2,500.00) | (2,812.50) | (3,312.50) | (3,562.50) | (12,187.50) | *Final ECDN Audit bills* |
| **Total Cost of Goods Sold** | (238,250.00) | (501,062.50) | (470,587.50) | (100,037.50) | (1,309,937.50) | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | - | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | (14,760.00) | - | (3,000.00) | - | (17,760.00) | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting  / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | (251,000.00) | - | (28,750.00) | - | (279,750.00) | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | (34,858.32) | - | (5,000.00) | (5,000.00) | *Liability and property, we don't have current Workers Comp policy* |
| Rent | - | - | - | - | (34,858.32) | |
| Utilites | - | (3,100.00) | (6,000.00) | - | (9,100.00) | |
| Janitorial | - | (3,000.00) | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | *Includes Konica Minolta copier lease* |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | (11,600.00) | (46,558.32) | (17,600.00) | (13,100.00) | (88,858.32) | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | - | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | *HR and Bookeeping Fees* |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) | - | (40,000.00) | |
| **Total Personnel Expenses** | (192,250.00) | (5,950.00) | (146,850.00) | (5,949.91) | (350,999.91) | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | (500.00) | (100.00) | (100.00) | (650.00) | (1,350.00) | |
| **Total Operating Expenses** | (470,110.00) | (52,608.32) | (196,300.00) | (19,699.91) | (738,718.23) | |
| **Non-Operating Expenses** | | | | | | |
| Payment to PQPR | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | *Weekly adequate protection payment* |
| **Total Other Expenses** | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | - | (50,000.00) | |
| Trustee Fees | (15,000.00) | - | (15,000.00) | - | (30,000.00) | |
| Trustee Counsel | (15,000.00) | - | (15,000.00) | - | (30,000.00) | |
| Legal Fees - Reynal | - | (21,630.00) | - | - | (21,630.00) | |
| Ray Battaglia | - | (30,000.00) | - | - | (30,000.00) | |
| **Total Professional Fees** | (30,000.00) | (101,630.00) | (30,000.00) | - | (161,630.00) | |
| **Total Cash Flow** | (335,860.00) | (197,800.82) | (189,387.50) | 427,762.59 | (295,285.73) | |
| **Ending Cash** | 164,140.00 | (33,660.82) | (223,048.32) | 204,714.27 | | |

EXHIBIT

A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | )<br>) (Chapter 11) Subchapter V<br>) |
| FREE SPEECH SYSTEMS, LLC, | ) Case No. 22-60043 (CML)<br>) |
| Debtor. | )<br>)<br>) |

## AGREED ORDER MODIFYING THE AUTOMATIC STAY

Upon *Jones's Emergency Motion to Modify Stay Orders* [ECF. No. 300] (the "Stay

Modification Motion") filed in the above-captioned chapter 11 case (this "Chapter 11 Case") of

Free Speech Systems, Inc. (the "Debtor"); and the Court having found that the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Sandy Hook Post-Trial

Families,[1] the Debtor and Alexander E. Jones ("Jones" and together with the Debtor and the Sandy

Hook Post-Trial Families, the "Parties") having reached the following agreement, the Parties

stipulate and agree, and the Court hereby orders (the "Agreed Order") that:

1.      This Agreement is contingent upon the entry of the Agreed Order and is integral to

the Parties' agreement concerning the modification of the automatic stay.

---

[1] Neil Heslin and Scarlett Lewis (the "Texas Post-Trial Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach and Robert Parker (the "Connecticut Plaintiffs" and, together with the Texas Post-Trial Plaintiffs, the "Sandy Hook Post-Trial Families").  Actions filed by Leonard Pozner, Veronique De La Rosa and Marcel Fontaine (the "Texas Pre-Trial Plaintiffs" and, together with the Texas Post-Trial Plaintiffs, the "Texas Plaintiffs") have not yet been tried.  For ease of reference, this Agreed Order refers to all of the Texas Plaintiffs and Connecticut Plaintiffs together as the "Sandy Hook Families."

2.      This Agreement does not alter the terms of the *Agreed Order Modifying the Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgment* [ECF. No. 117], except as such terms are specifically implicated herein.

3.      Jones agrees to withdraw the Stay Modification Motion.

4.      The automatic stay under section 362(a) of title 11 of the United States Code (the "Bankruptcy Code") is modified immediately to (i) allow the Sandy Hook Post-Trial Families' Cases[2] to continue to proceed to entry of final judgment and (ii) once judgments are entered, to allow appeals, if any, to proceed and the Sandy Hook Post-Trial Families to pursue, respond to and participate in any such appeals without further order of the Court.

5.      Except to assert actions or claims against the Debtor in this Chapter 11 Case, Jones's chapter 11 case[3] or related proceedings, the automatic stay shall continue to enjoin the Sandy Hook Post-Trial Families and any other party, from exercising against the Debtor any remedies to collect or enforce any judgment against any assets of the Debtor or its bankruptcy estate including all property of the estate.

6.      Notwithstanding any prior agreements between or among the Parties, the Sandy Hook Post-Trial Families agree not to object to the joint retention by the Debtor and Jones of appellate counsel[4] in connection with appellate proceedings in the Sandy Hook Post-Trial Families' Cases (the "Joint Appellate Counsel"), with the reasonable and documented fees and expenses incurred by Joint Appellate Counsel to be shared equally by the Debtor and Jones;

---

[2] The "Sandy Hook Post-Trial Families' Cases" means the following cases pending against the Debtor and Jones: (i) *Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; and (ii) *Erica Lafferty,* et al. *v. Alex Jones,* et al., Case No. UWY-CV18-6046436-S; Sherlach v. Jones, No. UWY-CV18-6046437-S; and *Sherlach v. Jones*, No. UWYCV18- 6046438-S, in the Superior Court, Complex Litigation Docket at Waterbury, Connecticut.

[3] Case No. No. 22-33553 (the "Jones Chapter 11 Case").

[4] To the extent separate appellate counsel is needed for Texas and Connecticut appellate proceedings, the Debtor and Jones shall seek same.

006772

*provided* that such retention shall be approved by the Court and otherwise comply with Bankruptcy Code section 327 and all other applicable standards or be subject to a cap to be agreed upon by the Sandy Hook Families and the Official Committee of Unsecured Creditors appointed in the Jones Chapter 11 Case (the "UCC"); *provided further* that if approved by the Court and absent consent by the Sandy Hook Families and the UCC regarding any cap, Joint Appellate Counsel shall be required to file fee applications pursuant to Bankruptcy Code sections 327, 330 and 331, Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2016-1 of the Bankruptcy Local Rules for the Southern District of Texas and any order setting forth procedures for interim compensation and reimbursement of expenses for professionals in this Chapter 11 Case including, but not limited to, the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [ECF No. 202].

7.     For the avoidance of doubt, the Debtor and Jones shall be required to file and obtain approval by this Court of a retention application for the Joint Appellate Counsel on notice to all parties in interest in each of the Jones Chapter 11 Case and this Chapter 11 Case, and the Sandy Hook Post-Trial Families retain the right to evaluate and object to, if necessary, the terms of such retention to the extent they do not comply with applicable legal standards.  For the further avoidance of doubt, the Sandy Hook Post-Trial Families reserve the right to evaluate and object to, if necessary, any and all fee applications filed by Joint Appellate Counsel and all other estate compensated professionals to the extent such fees do not comply with applicable legal standards.

8.      Notwithstanding Bankruptcy Rule 4001(a)(3), this Agreed Order shall be effective immediately upon entry of it by the Court.

9.     The Court shall retain sole and exclusive jurisdiction with respect to the automatic stay and its application to any actions other than those expressly provided for in this Agreed Order

3

and any disputes arising in respect of termination of the lifting of the stay by failure to meet a necessary condition of the agreement reached between the Parties and approved herein.

Dated: _____, 2022

_____
THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**AGREED IN FORM AND SUBSTANCE**:

**Free Speech Systems, LLC**

By: /s/ Raymond W. Battaglia
Raymond W. Battaglia
Law Offices of Ray Battaglia, PLLC

*Counsel to the Debtor*

**The Sandy Hook Post-Trial Families**

By: /s/ David Zensky
David Zensky
Akin Gump Strauss Hauer & Feld LLP

*Co-Counsel to the Sandy Hook Post-Trial Families*

**Alexander E. Jones**

By: /s/ Vickie L. Driver
Vickie L. Driver
Crowe & Dunlevy PC

*Proposed Counsel to Alexander E. Jones*

4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
|  | ) |  |
| FREE SPEECH SYSTEMS, LLC | ) | Case No. 22-60043 |
|  | ) |  |
| Debtor. | ) |  |
| _____ | ) |  |

**ORDER GRANTING SUBCHAPTER TRUSTEE'S MOTION FOR ENTRY OF**
**AN ORDER AUTHORIZING RETENTION OF M3 ADVISORY PARTNERS, LP**
**AS FINANCIAL ADVISOR TO THE SUBCHAPTER V TRUSTEE**

CAME ON FOR CONSIDERATION the Motion of the Subchapter V Trustee for Entry of an Order Authorizing Retention of M3 Advisory Partners, LP as Financial Advisor ("Motion"). The Court, having considered same, and any response(s) thereto, and found that notice of the Motion was proper is of the opinion that the Motion should be GRANTED; it is therefore ORDERED

1. The Trustee is authorized to employ and retain M3 Advisory Partners, LP as Financial Advisors effective as of the October 20, 2022.

2. M3 shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case in compliance with §§ 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, applicable provisions of the Bankruptcy Local Rules, and any other applicable orders of the Court. Requests for interim compensation shall be governed by the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals [Docket No. 202].

3. M3 is entitled to reimbursement of actual and necessary expenses related to the Motion.

006775

4.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

6.      The Trustee is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated:

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| FREE SPEECH SYSTEMS, LLC | ) | Case No. 22-60043 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**ORDER GRANTING SUBCHAPTER TRUSTEE'S MOTION FOR ENTRY OF
AN ORDER AUTHORIZING RETENTION OF M3 ADVISORY PARTNERS, LP
AS FINANCIAL ADVISOR TO THE SUBCHAPTER V TRUSTEE**

CAME ON FOR CONSIDERATION the Motion of the Subchapter V Trustee for Entry of an Order Authorizing Retention of M3 Advisory Partners, LP as Financial Advisor ("Motion"). The Court, having considered same, and any response(s) thereto, and found that notice of the Motion was proper is of the opinion that the Motion should be GRANTED; it is therefore ORDERED

1.      The Trustee is authorized to employ and retain M3 Advisory Partners, LP as Financial Advisors effective as of the October ~~19~~20, 2022 ~~on the terms set forth in the Motion and Engagement Letter~~.

2.      M3 shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case, in compliance with §§ 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, applicable provisions of the Bankruptcy Local Rules, and any other applicable orders of the Court. Requests for interim compensation shall be governed by the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals [Docket No. 202].

3.      M3 is entitled to reimbursement of actual and necessary expenses related to the Motion.

4.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

6.      The Trustee is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated:

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 19, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) (Chapter 11) Subchapter V |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Case No. 22-60043 (CML) |
| | ) |
| Debtor. | ) |
| | ) |

## AGREED ORDER MODIFYING THE AUTOMATIC STAY

Upon *Jones's Emergency Motion to Modify Stay Orders* [ECF. No. 300] (the "Stay Modification Motion") filed in the above-captioned chapter 11 case (this "Chapter 11 Case") of Free Speech Systems, Inc. (the "Debtor"); and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Sandy Hook Post-Trial Families,[1] the Debtor and Alexander E. Jones ("Jones" and together with the Debtor and the Sandy Hook Post-Trial Families, the "Parties") having reached the following agreement, the Parties stipulate and agree, and the Court hereby orders (the "Agreed Order") that:

1.      This Agreement is contingent upon the entry of the Agreed Order and is integral to the Parties' agreement concerning the modification of the automatic stay.

---

[1] Neil Heslin and Scarlett Lewis (the "Texas Post-Trial Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach and Robert Parker (the "Connecticut Plaintiffs" and, together with the Texas Post-Trial Plaintiffs, the "Sandy Hook Post-Trial Families").  Actions filed by Leonard Pozner, Veronique De La Rosa and Marcel Fontaine (the "Texas Pre-Trial Plaintiffs" and, together with the Texas Post-Trial Plaintiffs, the "Texas Plaintiffs") have not yet been tried.  For ease of reference, this Agreed Order refers to all of the Texas Plaintiffs and Connecticut Plaintiffs together as the "Sandy Hook Families."

2.      This Agreement does not alter the terms of the *Agreed Order Modifying the Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgment* [ECF. No. 117], except as such terms are specifically implicated herein.

3.      Jones agrees to withdraw the Stay Modification Motion.

4.      The automatic stay under section 362(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") is modified immediately to (i) allow the Sandy Hook Post-Trial Families' Cases[2] to continue to proceed to entry of final judgment and (ii) once judgments are entered, to allow appeals, if any, to proceed and the Sandy Hook Post-Trial Families to pursue, respond to and participate in any such appeals without further order of the Court.

5.      Except to assert actions or claims against the Debtor in this Chapter 11 Case, Jones's chapter 11 case[3] or related proceedings, the automatic stay shall continue to enjoin the Sandy Hook Post-Trial Families and any other party, from exercising against the Debtor any remedies to collect or enforce any judgment against any assets of the Debtor or its bankruptcy estate including all property of the estate.

6.      Notwithstanding any prior agreements between or among the Parties, the Sandy Hook Post-Trial Families agree not to object to the joint retention by the Debtor and Jones of appellate counsel[4] in connection with appellate proceedings in the Sandy Hook Post-Trial Families' Cases (the "<u>Joint Appellate Counsel</u>"), with the reasonable and documented fees and expenses incurred by Joint Appellate Counsel to be shared equally by the Debtor and Jones;

---

[2] The "<u>Sandy Hook Post-Trial Families' Cases</u>" means the following cases pending against the Debtor and Jones: (i) *Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; and (ii) *Erica Lafferty,* et al. *v. Alex Jones,* et al., Case No. UWY-CV18-6046436-S; Sherlach v. Jones, No. UWY-CV18-6046437-S; and *Sherlach v. Jones*, No. UWYCV18- 6046438-S, in the Superior Court, Complex Litigation Docket at Waterbury, Connecticut.

[3] Case No. No. 22-33553 (the "<u>Jones Chapter 11 Case</u>").

[4] To the extent separate appellate counsel is needed for Texas and Connecticut appellate proceedings, the Debtor and Jones shall seek same.

2

*provided* that such retention shall be approved by the Court and otherwise comply with Bankruptcy Code section 327 and all other applicable standards or be subject to a cap to be agreed upon by the Sandy Hook Families and the Official Committee of Unsecured Creditors appointed in the Jones Chapter 11 Case (the "UCC"); *provided further* that if approved by the Court and absent consent by the Sandy Hook Families and the UCC regarding any cap, Joint Appellate Counsel shall be required to file fee applications pursuant to Bankruptcy Code sections 327, 330 and 331, Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 2016-1 of the Bankruptcy Local Rules for the Southern District of Texas and any order setting forth procedures for interim compensation and reimbursement of expenses for professionals in this Chapter 11 Case including, but not limited to, the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [ECF No. 202].

7. For the avoidance of doubt, the Debtor and Jones shall be required to file and obtain approval by this Court of a retention application for the Joint Appellate Counsel on notice to all parties in interest in each of the Jones Chapter 11 Case and this Chapter 11 Case, and the Sandy Hook Post-Trial Families retain the right to evaluate and object to, if necessary, the terms of such retention to the extent they do not comply with applicable legal standards.  For the further avoidance of doubt, the Sandy Hook Post-Trial Families reserve the right to evaluate and object to, if necessary, any and all fee applications filed by Joint Appellate Counsel and all other estate compensated professionals to the extent such fees do not comply with applicable legal standards.

8. Notwithstanding Bankruptcy Rule 4001(a)(3), this Agreed Order shall be effective immediately upon entry of it by the Court.

9. The Court shall retain sole and exclusive jurisdiction with respect to the automatic stay and its application to any actions other than those expressly provided for in this Agreed Order

and any disputes arising in respect of termination of the lifting of the stay by failure to meet a necessary condition of the agreement reached between the Parties and approved herein.

Signed:  December 19, 2022

Christopher Lopez
United States Bankruptcy Judge

**AGREED IN FORM AND SUBSTANCE**:

**Free Speech Systems, LLC**                                      **The Sandy Hook Post-Trial Families**

By: /s/ Raymond W. Battaglia                                      By: /s/ David Zensky
Raymond W. Battaglia                                              David Zensky
Law Offices of Ray Battaglia, PLLC                               Akin Gump Strauss Hauer & Feld LLP

*Counsel to the Debtor*                                           *Co-Counsel to the Sandy Hook Post-Trial Families*

**Alexander E. Jones**

By: /s/ Vickie L. Driver
Vickie L. Driver
Crowe & Dunlevy PC

*Proposed Counsel to Alexander E. Jones*

4

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 19, 2022

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

## ORDER GRANTING SECOND MOTION FOR EXTENSION OF TIME TO FILE A PLAN OF REORGANIZATION

Upon the Debtor's Second Motion for Extension of Time to File a Plan of Reorganization ("Motion")[1]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY ORDERED THAT**:

1.      Pursuant to 11 U.S.C. § 1189(b), the time to file a plan of reorganization is hereby extended until February 17, 2023. This extension is without prejudice to requests for additional extensions.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Motion.

2. The Court retains exclusive jurisdiction with respect to all matters arising or related to the implementation, interpretation, and enforcement of this Order.

Signed:  December 19, 2022

Christopher Lopez
United States Bankruptcy Judge

2

006784

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 19, 2022

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SEVENTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). The Court has subsequently conducted periodic hearings extending authority to use cash collateral on an interim basis. This order is the seventh interim order ("Seventh Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.     <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.     <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.     <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Seventh Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and

parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Seventh Interim Order.

10.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    <u>Credit Card Processing</u>. The Debtor is authorized to remit fulfillment costs as provided in the Fulfillment Agreement previously approved by this Court's *Order Granting Emergency Motion for Entry of Order Authorizing Debtor to Enter into Fulfillment Agreement* [Dkt. No. 286] from the daily settlement contemporaneously with the distributions to FSS and PQPR.  Proceeds received by FSS for sales of PQPR inventory shall be held by FSS in trust pending distribution to PQPR by FSS.

12.    <u>Reporting</u>. The Debtor shall report each Thursday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.    Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.    Final Cash Collateral Hearing: A further interim hearing on the Motion shall be held before this Court on January 20, 2023, at 11:00 a.m. Central time.

Signed: December 19, 2022

Christopher Lopez
United States Bankruptcy Judge

006788

| | 12/24/2022-12/30/2022 | 12/31/2022-1/06/2023 | 1/07/2023-1/13/2023 | 1/14/2023-1/20/2023 | | |
|---|---|---|---|---|---|---|
| | **CURRENT 4 WEEK BUDGET** | | | | | |
| Week Number | 22 | 1 | 2 | 3 | **Total** | NOTES |
| **Income** | | | | | | |
| Product Sales *(Net of 6.0% Merchant Fee)* | $ 200,000.00 | $ 225,000.00 | $ 265,000.00 | $ 285,000.00 | $ 975,000.00 | Net of 6.0% CC Merchant fees. Includes Shipping Fees and Sales Tax but excludes any PQPR related sales |
| Point of Sales Revenue | $ 115,000.00 | $ 145,000.00 | 155,000.00 | 175,000.00 | 590,000.00 | Fulfillment Vendor Product Sales |
| Platinum / PQPR Commission | 85,000.00 | 85,000.00 | 85,000.00 | 85,000.00 | 340,000.00 | Net of 80% payment to inventory owner |
| Donations | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 30,000.00 | |
| **Total Income** | 407,500.00 | 462,500.00 | 512,500.00 | 552,500.00 | 1,935,000.00 | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (117,000.00) | (117,000.00) | (117,000.00) | - | (351,000.00) | NutriScience Inventory |
| Inventory Purchases | - | (250,000.00) | (250,000.00) | - | (500,000.00) | Hi-Tec Inventory purchase per payment plan agreement |
| PQPR Inventory Purchase | (50,000.00) | (50,000.00) | - | - | (100,000.00) | Per 2nd interim cash collateral order ECF 98 |
| Point of Sale Product Cost | (28,750.00) | (36,250.00) | (38,750.00) | (43,750.00) | (147,500.00) | Fulfillment Vendor product costs |
| Fulfillment Services | (40,000.00) | (45,000.00) | (49,025.00) | (52,725.00) | (186,750.00) | Assumes we do not transition to 3rd Party Fulfillment Vendor before 12/24/22 |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | Final ECDN Audit bills |
| Texas Sales Tax (20% of Sales @ 6.25%) | (2,500.00) | (2,812.50) | (3,312.50) | (3,562.50) | (12,187.50) | |
| **Total Cost of Goods Sold** | (238,250.00) | (501,062.50) | (470,587.50) | (100,037.50) | (1,309,937.50) | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | - | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | (14,760.00) | - | (3,000.00) | - | (17,760.00) | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | (251,000.00) | - | (28,750.00) | - | (279,750.00) | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | - | - | (5,000.00) | (5,000.00) | Liability and property, we don't have current Workers Comp policy |
| Rent | - | (34,858.32) | - | - | (34,858.32) | |
| Utilites | - | (3,100.00) | (6,000.00) | - | (9,100.00) | |
| Janitorial | - | (3,000.00) | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | Includes Konica Minolta copier lease |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | (11,600.00) | (46,558.32) | (17,600.00) | (13,100.00) | (88,858.32) | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | - | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | HR and Bookeeping Fees |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) | - | (40,000.00) | |
| **Total Personnel Expenses** | (192,250.00) | (5,950.00) | (146,850.00) | (5,949.91) | (350,999.91) | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | (500.00) | (100.00) | (100.00) | (650.00) | (1,350.00) | |
| **Total Operating Expenses** | (470,110.00) | (52,608.32) | (196,300.00) | (19,699.91) | (738,718.23) | |
| ***Non-Operating Expenses*** | | | | | | |
| Payment to PQPR | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | Weekly adequate protection payment |
| **Total Other Expenses** | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | - | (50,000.00) | |
| Trustee Fees | (15,000.00) | - | (15,000.00) | - | (30,000.00) | |
| Trustee Counsel | (15,000.00) | - | (15,000.00) | - | (30,000.00) | |
| Legal Fees - Reynal | - | (21,630.00) | - | - | (21,630.00) | |
| Ray Battaglia | - | (30,000.00) | - | - | (30,000.00) | |
| **Total Professional Fees** | (30,000.00) | (101,630.00) | (30,000.00) | - | (161,630.00) | |
| **Total Cash Flow** | (335,860.00) | (197,800.82) | (189,387.50) | 427,762.59 | (295,285.73) | |
| **Ending Cash** | 164,140.00 | (33,660.82) | (223,048.32) | 204,714.27 | | |

EXHIBIT

A

006789

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 19, 2022

Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| **Debtor.** | § | |

### ORDER APPROVING REJECTION OF AURIAM SERVICES LLC AGREEMENT AND GRANTING RELATED RELIEF

Upon consideration of the *Motion for Entry Order Approving Rejection of Auriam Services LLC Agreement and Granting Related Relief* (the "<u>Motion</u>") [1] filed by Free Speech Systems, LLC ("FSS" or the "Debtor"), the debtor and debtor-in-possession in the above captioned case (the "Motion"); and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion has been provided, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is fair and reasonable, was proposed in good faith, is in the best interests of the Debtor and its estate and creditors and is within the business judgment of the Debtor; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Financial Services Agreement (the "Agreement") between the Debtor and Auriam Services, LLC ("Auriam") dated October 1, 2021, as amended from time to time, shall be and hereby is rejected effective as of the Petition Date; and it is further

ORDERED that the Debtor and the Auriam are relieved of any future performance obligations under the Agreement, including, but not limited to any rights to specific performance; and it is further

---

[1] All capitalized terms not defined in this Order shall be defined as set forth in the Motion.

ORDERED that any claims arising out of the rejected Agreement must be filed on or before thirty (30) days following the entry of this Order; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Signed:  December 19, 2022

Christopher Lopez
United States Bankruptcy Judge

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

| | | |
|---|---|---|
| 1. NAME<br>Robert Joseph Shannon | 2. PHONE NUMBER<br>(713) 714-5770 | 3. DATE<br>12/19/2022 |
| 4. DELIVERY ADDRESS OR EMAIL<br>rshannon@shannonleellp.com | 5. CITY<br>Houston | 6. STATE  7. ZIP CODE<br>TX       77002 |

| 8. CASE NUMBER<br>4:2022-bk-60043 | 9. JUDGE<br>Hon. Chris Lopez | DATES OF PROCEEDINGS |
|---|---|---|
| | | 10. FROM 12/19/2022   11. TO 12/19/2022 |
| 12. CASE NAME<br>In re Free Speech Systems LLC | | LOCATION OF PROCEEDINGS |
| | 13. CITY Houston | 14. STATE TX |

**15. ORDER FOR**

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☒ OPENING STATEMENT (Plaintiff) | 12/19/2022 | | |
| ☒ OPENING STATEMENT (Defendant) | 12/19/2022 | | |
| ☒ CLOSING ARGUMENT (Plaintiff) | 12/19/2022 | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☒ CLOSING ARGUMENT (Defendant) | 12/19/2022 | | |
| ☒ OPINION OF COURT | 12/19/2022 | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | Entire Hearing | 12/19/2022 |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to<br>Clerk for Records of the Court) | FIRST COPY | ADDITIONAL<br>COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☒ | ☐ | NO. OF COPIES | | |
| DAILY | | | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE<br>/s/Robert Joseph Shannon | PROCESSED BY |
|---|---|
| 19. DATE<br>12/19/2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | |
|---|---|---|---|
| ORDER RECEIVED | | | |
| DEPOSIT PAID | | | DEPOSIT PAID |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES  0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT   0.00 |
| ORDERING PARTY NOTIFIED<br>TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE      0.00 |

006792

DISTRIBUTION:     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

**SmBus, PlnDue, DsclsDue, ReqSepNtc, Subchapter_V, APPEAL, APPEAL_NAT**

## U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 22-60043

|  |  |
|---|---|
| *Date filed:* | 07/29/2022 |
| *Date of Intradistrict transfer:* | 08/04/2022 |
| *341 meeting:* | 09/07/2022 |
| *Deadline for filing claims:* | 10/07/2022 |
| *Deadline for filing claims (govt.):* | 02/07/2023 |
| *Deadline for objecting to discharge:* | 03/10/2023 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
Asset

**Debtor**
**Free Speech Systems LLC**
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741
TRAVIS-TX
SSN / ITIN: xxx-xx-0005

represented by **Raymond William Battaglia**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
2106019405
Email: rbattaglialaw@outlook.com

**Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**R. J. Shannon**
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002
713-714-5770
Email: rshannon@shannonpllc.com

**Christina Walton Stephenson**
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201
214-420-2163
Email: Crissie.Stephenson@crowedunlevy.com

**Trustee**
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

represented by **Elizabeth Carol Freeman**
The Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208-1209
832-779-3580
Email: liz@lizfreemanlaw.com

**Melissa Anne Haselden**
Haselden Farrow PLLC

006793

Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

*U.S. Trustee*
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

*Creditor Committee*
**Official Committee of Unsecured Creditors of Alexander E. Jones**
c/o Marty L. Brimmage, Jr.
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
214-969-2800

represented by **Marty L Brimmage**
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
214-969-2885
Fax : 214-969-4343
Email: mbrimmage@akingump.com

| Filing Date | # | Docket Text |
|---|---|---|
| 12/19/2022 | 336 | Courtroom Minutes. Time Hearing Held: 3:00 PM. Appearances: Ray Battaglia,Jayson Ruff, Ha Nguyen, Avi Moshenberg, Steve Lemmon, RJ Shannon, Marty Brimmage, David Zensky, Sara Brauner, Elizabeth Freemen, Vickie Driver, Shelby Jordan, Ryan Chapple, Mike Ridulfo. (Related documents: 6 Cash Collateral, 155 Application Authorizing Employment, 282 Application to Employ M3). ). For the reasons stated on the record, Motions Granted. Orders Signed. **Hybrid Hearing on (Related Doc. 6) is scheduled for 1/20/2023 at 11:00 AM.** (ZildeMartinez) (Entered: 12/19/2022) |

# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 12/19/2022 3:00:50 PM |
| Audio File Name : | 4bk2022-60043_20221219-150050.mp3 |
| Audio File Size : | 39914 KB |
| Audio Run Time : | [01:23:09] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: Free Speech Systems, LLC | | |

This lawyer, who is admitted to the State Bar of ____New York____:

| Name | Alexander Woolverton |
|---|---|
| Firm | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Street | 1285 Avenue of the Americas |
| City & Zip Code | New York, NY 10019 |
| Telephone | (212) 373-3256 |
| Licensed: State & Number | NY 5034343 |

Seeks to appear as the attorney for this party:

| The Connecticut Plaintiffs,* creditors and parties-in-interest | |
|---|---|
| Dated: 12/20/2022 | Signed: */s/ Alexander Woolverton* |

| COURT USE ONLY: The applicant's state bar reports their status as:_____ | |
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

Order

This lawyer is admitted *pro hac vice*.

Dated: _____          _____
                                         United States Bankruptcy Judge

---

\*      Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the "Connecticut Plaintiffs").

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: Free Speech Systems, LLC | | |

This lawyer, who is admitted to the State Bar of ____New York____:

| Name | Martin J. Salvucci |
|---|---|
| Firm | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Street | 1285 Avenue of the Americas |
| City & Zip Code | New York, NY 10019 |
| Telephone | (212) 373-3596 |
| Licensed: State & Number | NY 5704887, CO 54386, CA 338773 |

Seeks to appear as the attorney for this party:

| The Connecticut Plaintiffs,* creditors and parties-in-interest ||
|---|---|
| Dated: 12/20/2022 | Signed: */s/ Martin J. Salvucci* |

| COURT USE ONLY: The applicant's state bar reports their status as:_____ ||
|---|---|
| Dated: | Signed: _____ <br> Deputy Clerk |

Order

This lawyer is admitted *pro hac vice*.

Dated: _____

_____
United States Bankruptcy Judge

---

\*    Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the "Connecticut Plaintiffs").

UNITED STATES BANKRUPTCY COURT        SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: Free Speech Systems, LLC | | |

This lawyer, who is admitted to the State Bar of ____New York____ :

| | |
|---|---|
| Name | Kyle J. Kimpler |
| Firm | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Street | 1285 Avenue of the Americas |
| City & Zip Code | New York, NY 10019 |
| Telephone | (212) 373-3253 |
| Licensed: State & Number | NY 4721916 |

Seeks to appear as the attorney for this party:

| The Connecticut Plaintiffs,* creditors and parties-in-interest | |
|---|---|
| Dated: 12/20/2022 | Signed: */s/ Kyle J. Kimpler* |

| COURT USE ONLY: The applicant's state bar reports their status as:_____ | |
|---|---|
| Dated: | Signed: _____ <br> Deputy Clerk |

| Order |
|---|

This lawyer is admitted *pro hac vice*.

Dated: _____        _____
                                                        United States Bankruptcy Judge

---

*     Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the "Connecticut Plaintiffs").

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11 (Subchapter V)** |
| **FREE SPEECH SYSTEMS, LLC,** | § § | **Case No. 22-60043** |
| | § § | **(Joint Administration Requested)[1]** |
| Debtor. | § § § | |

**NOTICE OF APPEARANCE UNDER**
**FED. R. BANKR. P. 9010(b), REQUEST FOR ALL COPIES**
**PURSUANT TO FED. R. BANKR. P. 2002 AND REQUEST FOR ALL**
**PLEADINGS PURSUANT TO FED. R. BANKR. P. 3017(a) AND FED R. BANKR. P. 9007**

PLEASE TAKE NOTICE that Kyle J. Kimpler, Alexander Woolverton, and Martin J. Salvucci of Paul, Weiss, Rifkind, Wharton & Garrison LLP appear as counsel in the above-captioned chapter 11 case on behalf of Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (the "Connecticut Plaintiffs"), creditors and parties in interest in the above-captioned chapter 11 case.

The Connecticut Plaintiffs, by and through their undersigned counsel, request that all notices given or required to be given and all papers served or required to be served by U.S. Mail and by email in the above-captioned chapter 11 case be given to and served upon:

> Kyle J. Kimpler
> Alexander Woolverton
> Martin J. Salvucci

---

[1]    On December 2, 2022, the Debtor, together with Alexander E. Jones, filed the *Debtors' Joint Motion for Entry of Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure* [Docket. No. 296].

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
(212) 757-3990 (fax)
kkimpler@paulweiss.com
awoolverton@paulweiss.com
msalvucci@paulweiss.com

This request encompasses all notices, copies, and pleadings referred to in section 1109(b) of title 11 of the United States Code, or in rules 2002, 3017 or 9007 of the Federal Rules of Bankruptcy Procedure, including without limitation, any and all notices of any orders, motions, demands, complaints, petitions, pleadings, plans of reorganization, disclosure statements, requests or applications, and any other documents brought before this Court in this case, whether formal or informal, written or oral, or transmitted or conveyed by mail, hand delivery, delivery service, email, telephone, fax, telex, or otherwise, which affect or seek to affect this chapter 11 case.

This Notice of Appearance and Request for Notices is not, and shall not be deemed or construed to be, a waiver of any of the Connecticut Plaintiffs' substantive or procedural rights.

[*Remainder of page intentionally left blank*]

2

Respectfully submitted this 20th day of December, 2022.

/s/ Kyle J. Kimpler
Kyle J. Kimpler (*pro hac vice* pending)
Alexander Woolverton (*pro hac vice* pending)
Martin J. Salvucci (*pro hac vice* pending)
**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
(212) 757-3990 (fax)
kkimpler@paulweiss.com
awoolverton@paulweiss.com
msalvucci@paulweiss.com

-and-

/s/ Ryan E. Chapple
Ryan E. Chapple
State Bar No. 24036354
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
(512) 477-5000
(512) 477-5011 (fax)
rchapple@cstrial.com

***COUNSEL FOR CONNECTICUT PLAINTIFFS***

3

006801

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the foregoing document was forwarded by electronic transmission to all registered ECF users appearing in the case on December 20, 2022.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 20, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: Free Speech Systems, LLC | | |

This lawyer, who is admitted to the State Bar of ____New York____ :

| Name | Alexander Woolverton |
|---|---|
| Firm | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Street | 1285 Avenue of the Americas |
| City & Zip Code | New York, NY 10019 |
| Telephone | (212) 373-3256 |
| Licensed: State & Number | NY 5034343 |

Seeks to appear as the attorney for this party:

| The Connecticut Plaintiffs,* creditors and parties-in-interest ||
|---|---|
| Dated: 12/20/2022 | Signed: */s/ Alexander Woolverton* |

| COURT USE ONLY: The applicant's state bar reports their status as:_____ ||
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

| Order |
|---|

This lawyer is admitted *pro hac vice*.

Signed:  December 20, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

---

*      Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the "Connecticut Plaintiffs").

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS December 20, 2022

Nathan Ochsner, Clerk

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: Free Speech Systems, LLC | | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| Name | Martin J. Salvucci |
|---|---|
| Firm | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Street | 1285 Avenue of the Americas |
| City & Zip Code | New York, NY 10019 |
| Telephone | (212) 373-3596 |
| Licensed: State & Number | NY 5704887, CO 54386, CA 338773 |

Seeks to appear as the attorney for this party:

| The Connecticut Plaintiffs,* creditors and parties-in-interest | |
|---|---|
| Dated: 12/20/2022 | Signed: */s/ Martin J. Salvucci* |

| COURT USE ONLY: The applicant's state bar reports their status as:_____ | |
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

| Order |
|---|

This lawyer is admitted *pro hac vice*.

Signed:  December 20, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

---

\*      Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the "Connecticut Plaintiffs").

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 20, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT        SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|----------|---------|------------------|----------|
| Debtor | In Re: Free Speech Systems, LLC | | |

This lawyer, who is admitted to the State Bar of _____New York_____:

| | |
|---|---|
| Name | Martin J. Salvucci |
| Firm | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Street | 1285 Avenue of the Americas |
| City & Zip Code | New York, NY 10019 |
| Telephone | (212) 373-3596 |
| Licensed: State & Number | NY 5704887, CO 54386, CA 338773 |

Seeks to appear as the attorney for this party:

| The Connecticut Plaintiffs,* creditors and parties-in-interest | |
|---|---|
| Dated: 12/20/2022 | Signed: */s/ Martin J. Salvucci* |

| | |
|---|---|
| COURT USE ONLY: The applicant's state bar reports their status as:_____ | |
| Dated: | Signed: _____ Deputy Clerk |

| Order |
|---|

This lawyer is admitted *pro hac vice*.

Signed:  December 20, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

---

\*    Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the "Connecticut Plaintiffs").

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 20, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| FREE SPEECH SYSTEMS, LLC | ) | Case No. 22-60043 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER GRANTING SUBCHAPTER TRUSTEE'S MOTION FOR ENTRY OF
AN ORDER AUTHORIZING RETENTION OF M3 ADVISORY PARTNERS, LP
AS FINANCIAL ADVISOR TO THE SUBCHAPTER V TRUSTEE**

CAME ON FOR CONSIDERATION the Motion of the Subchapter V Trustee for Entry of

an Order Authorizing Retention of M3 Advisory Partners, LP as Financial Advisor ("Motion").

The Court, having considered same, and any response(s) thereto, and found that notice of the

Motion was proper is of the opinion that the Motion should be GRANTED; it is therefore

ORDERED

1.      The Trustee is authorized to employ and retain M3 Advisory Partners, LP as

Financial Advisors effective as of the October 20, 2022.

2.      M3 shall apply for compensation for professional services rendered and

reimbursement of expenses incurred in connection with this chapter 11 case in compliance with

§§ 330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, applicable provisions of the

Bankruptcy Local Rules, and any other applicable orders of the Court.  Requests for interim

compensation shall be governed by the Order Establishing Procedures for Interim Compensation

and Reimbursement of Expenses of Retained Professionals [Docket No. 202].

3.      M3 is entitled to reimbursement of actual and necessary expenses related to the

Motion.

4.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

6.      The Trustee is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed:  December 20, 2022

Christopher Lopez
United States Bankruptcy Judge

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER APPROVING DEBTOR'S APPLICATION TO EMPLOY MARTIN, DISIERE, JEFFERSON & WISDOM L.L.P. UNDER 11 U.S.C. § 327(e), AS SPECIAL COUNSEL, EFFECTIVE AS OF AUGUST 30, 2022**

Upon the application (the "Application")[1] filed by the Debtor to retain and employ Martin, Disiere, Jefferson & Wisdom L.L.P. (the "MDJW Law Firm" or "Firm") pursuant to Bankruptcy Code §§ 327(e) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Martin Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) the MDJW Law Firm does not represent an interest adverse to the Debtor's estate with respect to the matters upon which it is to be engaged; (vi) the MDJW Law Firm is qualified to represent the Debtor's estate under § 327(e) of the Bankruptcy Code; (vii) the terms of MDJW Law Firm's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice is necessary; **(ix)** the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application.

the best interest of the Debtor's estate; **(xi)** any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; **(xii)** and it further appearing that the Debtor and Alex Jones ("Jones") announced an agreement for the Debtor to pay only 50% of all the allowed fees and expenses to the MDJW Law Firm subject to Jones right to seek an adjustment to the allocation of fees and expenses and such agreement is in the best interest of the estate; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.     In accordance with Bankruptcy Code§§ 327(e) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain the MDJW Law Firm commencing on August 30, 2022, as special counsel, under the terms and conditions set forth in the Application, this Order and the Engagement Letter attached to the Application as Exhibit A.

2.     The MDJW Law Firm is authorized to perform Professional Services for the Debtor that are necessary or appropriate in connection with serving as special counsel in connection with the Travis County Sandy Hook Lawsuits.

3.     The MDJW Law Firm shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code§§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.     Fifty percent of all compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned bankruptcy case shall be paid

by the Debtor[2] after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

5.      This Order shall be immediately effective and enforceable upon entry.

6.      This Order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

7.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the MDJW Law Firm shall not be entitled to reimbursement of expenses or fees from the Debtor in connection with any objection to its fees without further order of the Court.

8.      The **MDJW** Law Firm shall not charge a markup to the Debtor with respect to any fees billed by contract attorneys who are hired by the MDJW Law Firm to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflicts checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

9.      The MDJW Law Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code. Furthermore, the Court retains the right to review any rate increases pursuant to § 330 of the Bankruptcy Code.

10.     The MDJW Law Firm shall use its reasonable efforts to avoid any duplication of

---

[2] This order is without prejudice to Alex Jones' right to request that the allocation of fees and expenses to the Debtor be adjusted.

services provided by any of the Debtor's other retained professionals.

11.    The MDJW Law Firm will review its files periodically during the pendency of this Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the MDJW Law Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

12.    To the extent that any of the Application, the Martin Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

13.    The Debtor and the MDJW Law Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

14.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: December ___, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

*Please Read Instructions:*

FOR COURT USE ONLY

DUE DATE:

| 1. NAME Marty L. Brimmage, Jr. | 2. PHONE NUMBER (214) 969-4633 | 3. DATE 12/21/2022 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL bkemp@akingump.com | 5. CITY Dallas | 6. STATE TX | 7. ZIP CODE 75201 |

| 8. CASE NUMBER 22-60043 | 9. JUDGE Christopher M. Lopez | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 12/19/2022 | 11. TO 12/19/2022 |
| 12. CASE NAME Free Speech Systems LLC | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY Houston | 14. STATE Texas |

15. ORDER FOR

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | 12/19/22 Hearing |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☒ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |
| | CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | | | ESTIMATE TOTAL | 0.00 |

| 18. SIGNATURE /s/ Marty L. Brimmage, Jr. | PROCESSED BY |
|---|---|
| 19. DATE December 21, 2022 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

006812

DISTRIBUTION:      COURT COPY      TRANSCRIPTION COPY      ORDER RECEIPT      ORDER COPY

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 21, 2022

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### ORDER APPROVING DEBTOR'S APPLICATION TO EMPLOY MARTIN, DISIERE, JEFFERSON & WISDOM L.L.P. UNDER 11 U.S.C. § 327(e), AS SPECIAL COUNSEL, EFFECTIVE AS OF AUGUST 30, 2022

Upon the application (the "Application")[1] filed by the Debtor to retain and employ Martin, Disiere, Jefferson & Wisdom L.L.P. (the "MDJW Law Firm" or "Firm") pursuant to Bankruptcy Code §§ 327(e) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Martin Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) the MDJW Law Firm does not represent an interest adverse to the Debtor's estate with respect to the matters upon which it is to be engaged; (vi) the MDJW Law Firm is qualified to represent the Debtor's estate under § 327(e) of the Bankruptcy Code; (vii) the terms of MDJW Law Firm's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice is necessary; **(ix)** the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application.

the best interest of the Debtor's estate; **(xi)** any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; **(xii)** and it further appearing that the Debtor and Alex Jones ("Jones") announced an agreement for the Debtor to pay only 50% of all the allowed fees and expenses to the MDJW Law Firm subject to Jones right to seek an adjustment to the allocation of fees and expenses and such agreement is in the best interest of the estate; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code§§ 327(e) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain the MDJW Law Firm commencing on August 30, 2022, as special counsel, under the terms and conditions set forth in the Application, this Order and the Engagement Letter attached to the Application as Exhibit A.

2.      The MDJW Law Firm is authorized to perform Professional Services for the Debtor that are necessary or appropriate in connection with serving as special counsel in connection with the Travis County Sandy Hook Lawsuits.

3.      The MDJW Law Firm shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code§§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      Fifty percent of all compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned bankruptcy case shall be paid

by the Debtor[2] after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

5.      This Order shall be immediately effective and enforceable upon entry.

6.      This Order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

7.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the MDJW Law Firm shall not be entitled to reimbursement of expenses or fees from the Debtor in connection with any objection to its fees without further order of the Court.

8.      The **MDJW** Law Firm shall not charge a markup to the Debtor with respect to any fees billed by contract attorneys who are hired by the MDJW Law Firm to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflicts checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

9.      The MDJW Law Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code. Furthermore, the Court retains the right to review any rate increases pursuant to § 330 of the Bankruptcy Code.

10.      The MDJW Law Firm shall use its reasonable efforts to avoid any duplication of

---

[2] This order is without prejudice to Alex Jones' right to request that the allocation of fees and expenses to the Debtor be adjusted.

services provided by any of the Debtor's other retained professionals.

11.    The MDJW Law Firm will review its files periodically during the pendency of this Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, the MDJW Law Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

12.    To the extent that any of the Application, the Martin Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

13.    The Debtor and the MDJW Law Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

14.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Signed:  December 21, 2022

_____
Christopher Lopez
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC | § | (Chapter 11, Subchapter V) |
| | § | |
| Debtor. | § | JUDGE CHRISTOPHER M. LOPEZ |
| | § | |

### EMERGENCY MOTION OF ALEXANDER E. JONES TO FIX A DATE BY WHICH DEBTOR MUST ASSUME OR REJECT EXECUTORY CONTRACT

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**EMERGENCY RELIEF IS REQUESTED NOT LATER THAN JANUARY 15, 2023.**

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
UNITED STATES BANKRUPTCY JUDGE:

Alexander E. Jones (the "Jones"), a creditor and party in interest in this case, files this

*Emergency Motion to Fix a Date by Which Debtor Must Assume or Reject Executory Contract* (the

"Motion") and in support thereof, respectfully represents as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.      BACKGROUND

2.      Jones hosts a syndicated radio and video talk show in Austin, Texas. FSS is a single member LLC, 100% owned by Jones, that produces and syndicates much of the show.

3.      On or about April 14, 2022, Free Speech Systems, LLC ("FSS" or the "Debtor") and Jones executed an Employment Agreement under which, among other things, FSS agreed to pay Jones the annual sum of $1,300,000.00 via twice-monthly payments (the "Contract").

4.      On or about July 29, 2022, FSS filed a voluntary petition for relief under subchapter v of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      On or about August 5, 2022, the Court in this case entered an *Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* [Doc. 41], the first of seven such orders (the "Interim Orders"), with the most recent having been entered on December 19, 2022 [Doc. 333]. Each of the Interim Orders budgeted for a biweekly salary payment to Jones, initially in the amount of $10,000.00, but raised in the Third Interim Order [Doc. 151] to $20,000.00.

6.      On December 2, 2022, Jones filed his voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

## III.      RELIEF REQUESTED

7.      Pursuant to 28 U.S.C. § 365(d)(2), Jones requests that the Court enter an order fixing a date by which the Debtor must assume or reject the Contract.

**JONES'S EMERGENCY MOTION TO FIX DATE BY WHICH DEBTOR MUST ASSUME OR REJECT CONTRACT - Page 2**

8.      FSS has not made a payment to Jones pursuant to the Contract postpetition, and the amount allotted by the court in the Interim Orders does not equal the salary promised to Jones under the Contract.

9.      This court has the authority under Section 365(d)(2) of the Bankruptcy Code to require the Debtor to determine whether to assume or reject an Agreement within a specified period of time.

10.     The best interests of the Debtor, its creditors, and the estate require that the Debtor be ordered to assume or reject the Agreement on or before January 31, 2023.

11.     Jones has sought emergency relief on this matter because, having recently filed his own petition for bankruptcy relief, he is in need of definitive information as to the amount he will receive in salary each month as soon as possible, in order to construct and propose a budget in his own proceeding.

FOR THE ABOVE REASONS, Jones respectfully requests that the Court enter an order (i) granting the Motion and (ii) granting such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 21st day of December 2022.


**CROWE & DUNLEVY, P.C.**

By: */s/ Christina W. Stephenson*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 737.218.6187
Email: dallaseservice@crowedunlevy.com

-and-


**JONES'S EMERGENCY MOTION TO FIX DATE BY WHICH DEBTOR MUST ASSUME OR REJECT CONTRACT - Page 3**

Shelby A. Jordan
State Bar No. 11016700
S.D. No. 2195
Antonio Ortiz
State Bar No. 24074839
S.D. No. 1127322
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
        aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**PROPOSED ATTORNEYS FOR ALEXANDER E. JONES**


## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that I conferred with counsel for the Debtor, Ray Battaglia, on December 21, 2022, via telephone and as of the filing of this Motion, the Debtor is unable to agree to the relief requested.

*/s/ Christina W. Stephenson*
Christina W. Stephenson


## <u>CERTIFICATE OF ACCURACY</u>

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Christina W. Stephenson*
Christina W. Stephenson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was served upon the parties listed below via e-mail, U.S. Mail, and/or electronic transmission via the Court's ECF noticing system on this 21st day of December, 2022.

(a)  The Debtor

(b)  The Office of the United States Trustee for the Southern District of Texas;

(c)  The 20 largest unsecured creditors for the Debtor regarding which the pleading impacts, if any;

(d)  Sub V Trustee for the Debtor;

(e)  The Office of the Attorney General of the State of Texas;

(f)  The United States Attorney's Office for the Southern District of Texas;

(g)  The Internal Revenue Service; and

(h)  All parties who have filed a notice of appearance and request for notice or service of all pleadings pursuant to Bankruptcy Rule 2002.

*/s/ Christina W. Stephenson* ___
Christina W. Stephenson

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC | § | (Chapter 11) |
| | § | |
| Debtor. | § | JUDGE CHRISTOPHER M. LOPEZ |
| | § | |

## ORDER GRANTING EMERGENCY MOTION TO MODIFY STAY

On December 21, 2022, Alexander E. Jones (the "Jones"), a creditor and party in interest in this case, filed his *Emergency Motion to Fix a Date by Which Debtor Must Assume or Reject Executory Contract and for Payment of Administrative Expense Claim* (the "Motion"). The Court finds that: (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the best interests of the Debtor, its creditors, and the estate requires that the Debtor determine whether to assume or reject the Agreement by the time set forth below; (iv) proper and adequate notice of the Motion has been given and no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon, good and sufficient cause exists for the granting of the relief as set forth herein.

Therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Debtor must elect to assume or reject the Contract set forth below on or before 12:00 noon on January 31, 2023 and provide written notice of its election to Alexander E. Jones at that time.

3.      If the Debtor elects to assume the Agreement it must, concurrently with the service

ORDER GRANTING EMERGENCY MOTION TO MODIFY STAY ORDERS – Page 1

006822

of notice thereof, provide to Alexander E. Jones: (a) all sums necessary to cure all prior defaults on the Contract, or adequate assurance of a prompt cure, and (b) adequate assurance of its future performance of its obligations under the Contract.

4.      The Court shall retain jurisdiction to hear and consider all disputes arising out of the interpretation or implementation of this Order.

### **# # #  END OF ORDER  # # #**

**Submitted by:**

_/s/ Christina W. Stephenson_
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
**CROWE & DUNLEVY, P.C.**
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 737-218-6187
Email: eservicedallas@crowedunlevy.com

**PROPOSED COUNSEL FOR THE DEBTOR**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

<u>**NOTICE OF HOURLY RATE INCREASE**</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On September 20.2022 the Court entered its *Order Approving Debtor's Application to Employ the Law Offices of Ray Battaglia, PLLC as Bankruptcy Counsel Commencing on July 29, 2022* [ECF #180] ("**Order**").

The Order included the following terms:

The Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court.

Commencing on January 1, 2023, the hourly rate for Ray Battaglia shall increase to $575.00.

Respectfully submitted this December 23, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com

By:  */s/ Raymond W. Battaglia*
Raymond W. Battaglia
Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN
POSSESSION**

<u>**CERTIFICATE OF SERVICE**</u>

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system.

*/s/ Raymond W. Battaglia*
Raymond W. Battaglia

006825

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In     Free Speech Systems LLC
Re:    Debtor                                    Case No.: 22−60043

                                                 Chapter: 11

___

### NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E−Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at http://www.txs.uscourts.gov.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at http://www.txs.uscourts.gov or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22 - 60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**SHANNON & LEE LLP'S OMNIBUS REPLY TO OBJECTIONS TO**
**ADMINISTRATIVE EXPENSE MOTION**

Shannon & Lee LLP ("S&L") replies to the objections by the United States Trustee [ECF No. 267] (the "UST Objection"), Alex Jones [ECF No. 268] (the "AEJ Limited Objection"), and the Debtor and Subchapter V Trustee [ECF No. 269] (the "Debtor/Trustee Objection") to Shannon & Lee LLP's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 251] (the "Administrative Expense Motion") as follows:

## INTRODUCTION

### A. Background

1.      The Debtor filed its application to employ S&L [ECF No. 85] (the "S&L Employment Application") on August 20, 2022. The Debtor sought to employ S&L as co-counsel along with the Law Firm of Ray W. Battaglia PLLC (the "Battaglia Firm"). The primary responsibility of the Battaglia Firm was to provide legal advice regarding strategy for the Debtor's chapter 11 case and implementation of that strategy. The Debtor contemplated that S&L's focus would be issues involving the Sandy Hook Litigation and routine, day-to-day matters.

2.      The U.S. Trustee filed an objection to the S&L Employment Application on September 12, 2022, and amended the objection on September 14, 2022 [ECF No. 154] (the "S&L Employment Application Objection"). Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique

De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs, and together with the Texas Plaintiffs, the "Sandy Hook Plaintiffs") joined the S&L Employment Application Objection. [ECF No. 159].

3.      The U.S. Trustee did not dispute the factual allegations made in the S&L Employment Application. Instead, the U.S. Trustee asked the Court to deny the S&L Employment Application because S&L attorney Kyung Lee did not supplement the Rule 2014 disclosures for Kyung S. Lee PLLC ("KSLPLLC") in the chapter 11 cases previously jointly administered under Case No. 22-60020 (the "IW Cases") for InfoW, LLC, Prison Planet TV, LLC, and IW Health, LLC (the "IW Debtors"). The U.S. Trustee argued that Lee was required to supplement his disclosures to reflect that he had agreed to meet and met with the Debtor on May 24, 2022, where potential restructuring options for the Debtor were discussed. At the September 13, 2022, hearing before this Court, the U.S. Trustee confirmed that this was the only basis for the S&L Employment Application Objection (Sept. 13, 2022, Hrg. Tr. 36:1-9). The Sandy Hook Plaintiffs did not expand upon the U.S. Trustee's objection in their joinder filed on September 15, 2022.

4.      The Debtor, through S&L, filed a reply to the UST Employment Application Objection [ECF No. 166] (the "S&L Employment Application Reply") on September 16, 2022. In the S&L Employment Application Reply, the Debtor argued that (a) Lee's disclosures in the IW Cases complied with Bankruptcy Rule 2014 because the IW Debtors were no longer seeking to obtain court approval of their professionals' employment, (b) the S&L Employment Application should be granted notwithstanding any failure of Lee and KSLPLLC to supplement their

006828

disclosures in the IW Cases, and (c) if the Court believed that a penalty should be imposed on S&L in the Debtor's case for Lee's failure to supplement his disclosures in the IW Cases, the Court should reduce S&L's allowable compensation.

5.    The Court held a hearing on the S&L Employment Application on September 20, 2022 (the "September 20 Hearing"). The Debtor recited in its opening statement that no party in interest disputed that S&L was disinterested. (Sept. 20, 2022, Hrg. Tr. 19:24-20:20:7). In the U.S. Trustee's opening statement, counsel for the U.S. Trustee confirmed that the non-disclosure was the only basis for the S&L Employment Application Objection. (Sept. 20, 2022, Hrg. Tr. 44:5-15). The Sandy Hook Plaintiffs also indicated that candor and disclosure was the only basis for their joinder. (Sept. 20, 2022, Hrg. Tr. 47:17-21). As the Court stated after the close of evidence, neither party had talked about what it means to hold an adverse interest to the estate. (Sept. 20, 2022, Hrg. Tr. 210:13-18). The Court ultimately denied the S&L Employment Application, seemingly at least in part on the grounds that S&L had a predisposition under circumstances that actually or potentially rendered such predisposition a bias against the estate and amounted to an interest materially adverse to the estate. (*See* Sept. 20, 2022, Hrg. Tr. 234:15-24, 248:13-14).

6.    On October 4, 2022, S&L filed Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206] (the "Rule 59 Motion"). The Rule 59 Motion requests a rehearing on the issue of disinterestedness on the grounds of unfair surprise. S&L seeks to present additional evidence and arguments at a rehearing pursuant to Rule 59(a) because the issue of disinterestedness was not raised or disputed prior to the September 20 Hearing. S&L contends that under the circumstances it did not have a full and fair opportunity to litigate the issue and seeks to present additional evidence that it would have

3

marshalled had it known that disinterestedness was an issue in controversy at the September 20 Hearing.

7.      The U.S. Trustee and Alex Jones filed objections to the Rule 59 Motion [ECF Nos. 217 & 223]. The Sandy Hook Plaintiffs joined the U.S. Trustee's objection. [ECF No. 226]. Central to the U.S. Trustee and Alex Jones's objections to the Rule 59 Motion is their assertion that S&L did not have standing or statutory authority to bring the Rule 59 Motion.[1] S&L filed replies to the objections to the Rule 59 Motion [ECF Nos. 218 & 270].

8.      While S&L contends that Rule 59(a) relief is appropriate under the circumstances, S&L continued to evaluate the Court's ruling at the September 20 Hearing in light of the position taken by the U.S. Trustee and Jones. The Court's ruling does not foreclose other avenues for S&L to address its primary motivation for filing the Rule 59 Motion and expressly left open questions about S&L's retention and work done prior to its ruling. (Sept. 20, 2022, Hrg. Tr. 256:14-17). The Court also indicated that all parties' rights were reserved on these questions and with respect to compensation. (Sept. 20, 2022, Hrg. Tr. 256:25-257:8). Considering the Court's statements and the positions of the U.S. Trustee and Jones, S&L filed the Administrative Expense Motion on October 24, 2022, as an alternative to the Rule 59 Motion.

9.      In the Administrative Expense Motion, S&L seeks the allowance of an administrative expense in the amount of $320,196.25 under various theories. First, S&L seeks retroactive approval of its employment for the limited period from the Petition Date through the September 20 Hearing under Bankruptcy Code § 327(a) or 327(e), award of compensation under Bankruptcy Code § 330, and allowance of an administrative expense under Bankruptcy Code § 503(b)(2). Second, S&L seeks de facto retroactive approval of its employment for the limited

---

[1] Based on the statements of Jones' counsel at the October 12, 2022, hearing, it is not clear whether Jones continues to oppose the Rule 59 Motion on this basis.

006830

period from the Petition Date through the September 20 Hearing and allowance of an administrative expense under Bankruptcy Code § 503(b)(1) for services and expenses necessary to preserve the estate. <u>Third</u>, even absent actual or *de facto* approval of its employment, S&L seeks allowance of an administrative expense for the out-of-pocket expenses S&L incurred that would have otherwise been borne by the estate. <u>Fourth</u>, even absent actual or *de facto* approval of its employment, S&L seeks authority to apply its prepetition Retainer to reimburse S&L for the Debtor's chapter 11 filing fee consistent with the prepetition engagement letter between the Debtor and S&L. S&L also seeks authority to apply its prepetition Retainer to the amount of any otherwise allowed administrative expense claim.[2]

10.     There were three (3) objections filed to the Administrative Expense Motion. In broad terms, the U.S. Trustee, the Debtor, and the Subchapter V Trustee oppose the allowance of an administrative expense absent the Court's approval of S&L's limited employment. Alex Jones filed a limited objection indicating that he does not oppose the amount of the administrative expense requested—reflecting a discount of $62,475—but disputes that immediate payment beyond S&L's prepetition Retainer is appropriate because of the Debtor's financial condition.

**B. Summary of Objections to the Administrative Expense Motion and Replies**

11.     The underlying dispute appears limited. The Plaintiffs and Alex Jones oppose the Rule 59 Motion but not the Administrative Expense Motion (subject to the reductions therein).[3] The Debtor and the Subchapter V Trustee did not object to the Rule 59 Motion but oppose the Administrative Expense Motion. Only the U.S. Trustee objected to both. But neither the Debtor,

---

[2] The proposed order attached to the Administrative Expense Motion contemplates that any allowed administrative expense exceeding the Retainer would be paid pursuant to a plan of reorganization or as otherwise agreed by the Debtor and subject to restrictions on the use of cash collateral.

[3] At the October 12, 2022, hearing, Jones's counsel indicated that his opposition to the Rule 59 Motion was that it might prevent the Debtor from moving forward with a new chief restructuring officer and that Jones sought to prevent any waiver of his common interest privilege. It is not clear whether Jones continues to oppose the Rule 59 Motion after clarification of the relief that S&L seeks therein.

006831

the Subchapter V Trustee, nor the U.S. Trustee (a) dispute that the Court can and should consider retroactive approval of S&L's limited employment through the Administrative Expense Motion, (b) assert that S&L holds or represents an interest adverse to the estate, or (c) argue that the compensation and expenses sought by S&L would not be reasonable under section 330 if that provision applies. Their unstated position appears to be simply that the Administrative Expense Motion cannot be granted unless the Court *does* retroactively approve S&L's limited employment. While S&L contends that there are also other available mechanisms available, that is one of the alternatives presented. *See* Administrative Expense Motion ¶¶ 26-30.

12.     Notwithstanding the apparent limited scope of the dispute, S&L responds in detail to the arguments set out in the objections in this Reply. The arguments raised in the objections to the Administrative Expense Motion and S&L's replies thereto are summarized below.

    i.     *UST Objection*

13.     The U.S. Trustee filed the UST Objection on November 14, 2022. The U.S. Trustee objects (a) to compensation under Bankruptcy Code § 330 because S&L has not been employed under Bankruptcy Code § 327; (b) to an administrative expense claim for fees and expenses under Bankruptcy Code § 503(b)(1)(A) because the section does not apply to professional fees, at least where the professional does not meet the requirements of Bankruptcy Code § 327; (c) to retroactive employment under Bankruptcy Code § 327(e) because the Debtor did not specifically seek to employ S&L under that provision and S&L provided some services related to "conducting the case" as that term is used Bankruptcy Code § 327(e); (d) to the use of the S&L's prepetition retainer for the Debtor's filing fee for this chapter 11 case because Bankruptcy Code § 363(c) can only be invoked by the Debtor and such payment is not ordinary course; and (e) to the consensual resolution of the disputes in the Administrative Expense Motion and the Rule 59 Motion.

6

14.     Although expressly raised in paragraphs 26-28 of the Administrative Expense Motion, the UST Objection does not address the Court's ability to retroactively authorize S&L's employment through the September 20 Hearing pursuant to Bankruptcy Code § 327(a) in connection with an application for compensation, as indicated by *In re Triangle Chems.*, 697 F.2d 1280 (5th Cir. 1983). The Fifth Circuit's decision was not called into question by *Lamie v. United States Tr.*, 540 U.S. 526 (2004), which dealt with compensation under Bankruptcy Code § 330 for the attorney of a chapter 7 debtor that *could not* have been employed under Bankruptcy Code § 327. Retroactive approval of S&L's employment through the September 20 Hearing is consistent with the Court's ruling and appropriate in light of the existence of lead counsel, the expansion of the Subchapter V Trustee's duties, the limited scope of the duties of a subchapter v debtor. Neither collateral estoppel nor law of the case doctrines prevent retroactive approval of S&L's employment on the limited basis requested in the Administrative Expense Motion and the UST Objection presents no arguments why retroactive approval of the limited employment cannot or should not be approved. S&L submits that it meets the relevant standards and the Court can and should retroactively approve the limited employment requested.

15.     The U.S. Trustee's argument with respect to Bankruptcy Code § 327(e) also fails to address the ability of a professional to seek approval of its own employment in connection with a request for compensation and further disregards the relevant caselaw about what constitutes "conducting the case" under the statute. S&L can seek approval of its employment through a request for compensation. And while certain of the services provided by S&L would not fall under the scope of employment under section 327(e) and therefore would not be compensable, the majority of the services S&L provided were related to the matters designated as S&L's primary

7

responsibility in the S&L Employment Application and for which S&L seeks approval of its employment under section 327(e) in the alternative.

16.     S&L disagrees with the U.S. Trustee's blanket assertion that Bankruptcy Code § 503(b)(1)(A) cannot provide a mechanism for the payment of professional fees or expenses. Even if a professional cannot look to the higher standards applied to administrative expenses under section 503(b)(1)(A) where it does not meet the requirements of section 327, *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), indicates that fees can be allowed as an administrative expense under section 503(b)(1)(A) where the professional *does* meet the standards of section 327 but is unable to seek approval of its own employment for some reason. In responding to this point, the U.S. Trustee does not and cannot articulate any adverse interest or assert that the adverse interest is present under the limited scope of employment sought. The U.S. Trustee asserts only that the S&L Employment Application was denied because the Court found the professionals had a material adverse interest to the Debtor's estate. Further, even if Bankruptcy Code § 503(b)(1)(A) is entirely unavailable for a professional's fees, S&L contends that the provision applies to out-of-pocket expenses that would have otherwise been borne by the estate. The U.S. Trustee presents no argument why these expenses (e.g., the cost of serving pleadings and notices) would not be necessary costs of preserving the estate.

17.     The U.S. Trustee's argument with respect to Bankruptcy Code § 363(c) does not respond to the limited relief sought by S&L. The Administrative Expense Motion seeks only authority for S&L to apply the Retainer to the Debtor's filing fee consistent with the terms of S&L's engagement letter with the Debtor. This meets the horizontal and vertical standards usually applied to determine whether a transaction is in the ordinary course. And there must be some mechanism to allow payments of a filing fee—which is in practice only payable after the filing of

006834

a petition—from amounts held in an attorney's trust account when that is what is contemplated in the relevant engagement agreement.

18.     The U.S. Trustee's assertion that the parties cannot consensually resolve the Administrative Expense Motion and Rule 59 Motion is also misplaced. The authority cited by the U.S. Trustee—*Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283 (S.D.N.Y. 2014)—indicates only that the parties cannot consent around the relevant standard that will apply. That case involved a plan of reorganization providing that the individual committee members' reasonable professional fees would be treated as administrative expenses without requiring any showing of substantial contribution. *Id.* at 287. That is not the situation presented here. S&L contends that (a) a rehearing under Rule 59(a) is appropriate; (b) S&L meets the standards for retroactive approval of its employment or *de facto* retroactive approval of its employment in connection with the Administrative Expense Motion; (c) S&L's services and expenses meet the standards for the award of compensation and reimbursement under section 330 in the amount of $320,196.25; (d) S&L's services and expenses meet the standard under section 503(b)(1)(A) in the amount of $123,597.01; and (e) even absent actual or *de facto* approval of its employment, S&L has a valid administrative expense claim for expenses that would have otherwise been borne by the estate and should be able to apply the Retainer to the Debtor's filing fee. And no party in interest has articulated any interest held or represented by S&L that is adverse to the Debtor's estate. A compromise here would not seek to alter the provisions of the Bankruptcy Code, but rather resolve (ostensibly) disputed application of the Bankruptcy Code to the particular facts.

     ii.     *Debtor/Trustee Objection*

19.     The Debtor and the Subchapter V Trustee filed their Debtor/Trustee Objection on November 14, 2022. The Debtor and Subchapter V Trustee argue that as an unretained

9

professional, S&L is not able to seek compensation pursuant to Bankruptcy Code §§ 330 or 503. The Debtor/Trustee Objection does not assert that (a) retroactive employment under Bankruptcy Code § 327(a) or (e) would be inappropriate, (b) S&L is not entitled to reimbursement of out of pocket expenses under Bankruptcy Code § 503(b)(1), or (c) S&L is not entitled to apply the prepetition Retainer for reimbursement of the Debtor's filing fee to initiate the chapter 11 case.

20.     The arguments advanced in the Debtor/Trustee Objection overlap those of the UST Objection. The Debtor and Subchapter V Trustee present a few additional authorities, while the U.S. Trustee makes additional arguments. S&L responds to and addresses together the Debtor/Trustee Objection and UST Objection in more detail below.

> iii.     *AEJ Limited Objection*

21.     Alex Jones filed a limited objection to the Administrative Expense Motion on grounds different from the U.S. Trustee, the Debtor, or the Subchapter V Trustee. Jones does not oppose the allowance of the Requested Administrative Expense Claim—subject to the discount described in the Administrative Expense Motion—or the application of the Retainer to the allowed amounts but "does not agree that the payment schedule is reasonable for the current status of this FSS Chapter 11 Case." AEJ Limited Objection ¶ 10. Jones asserts, in essence, that the $62,475.00 reduction in fees reflected in the Administrative Expense Motion should be *required* even absent S&L's voluntary reduction.

22.     Alex Jones makes two arguments in the AEJ Limited Objection. First, Jones takes issue with the services S&L provided the Debtor in connection with addressing the Court's concerns about the disclosures of Lee and Schwartz in the IW Cases and that Jones should be shouldering his share of the expenses for the Connecticut state court trial. Jones asserts that S&L should have made particular arguments that would have been beneficial to Jones, including that Jones (a) was entitled to indemnity from the Debtor, (b) paid 100% of the Debtor's legal fees

10

before the bankruptcy filing, and (c) purchased $400,000 in consignment products to cover the Debtor's inability to obtain product due to purported failures of the Debtor's CRO. <u>Second</u>, Jones asserts that S&L's compensation should be considered in light of the compensation paid in the IW Cases.

23.   As specifically detailed below, Alex Jones' arguments are misplaced. S&L *did* present arguments and evidence about the reasons the Rule 2014 disclosures were not supplemented in the IW Cases. And although not raised prior the September 20 Hearing or the close of evidence—preventing the Debtor and S&L from fully addressing the issue—S&L also told the Court the reasons for the Debtor's decision to pay Jones's travel expenses for the Connecticut trial and 100% of the state court counsel costs. Moreover, S&L could not have presented the arguments that Jones asserts it should have because they did not reflect the Debtor's position as of the September 20 Hearing, involved matters of which S&L was not aware, or are not true. And while S&L does not oppose disclosure of the compensation paid for services to the IW Debtors—none was paid in the IW Cases—that compensation is not relevant to the appropriate compensation for services provided to the Debtor in this chapter 11 case.

## <u>REPLY TO ARGUMENTS THAT S&L IS NOT ENTITLED TO COMPENSATION BECAUSE S&L'S EMPLOYMENT HAS NOT BEEN APPROVED</u>

24.   The U.S. Trustee, Debtor, and Subchapter V Trustee take the position that S&L cannot be allowed an administrative expense for compensation under Bankruptcy Code §§ 330 and 503(b)(1)(2) because S&L has not yet had its employment approved under Bankruptcy Code § 327(a). But none of the objections present any argument that the Court cannot or should not consider retroactive approval of S&L's employment for services provided through the September 20 Hearing. Nor does any party in interest object to the retroactive approval of S&L's employment under Bankruptcy Code § 327(a) on the limited basis set out in the Administrative Expense Motion.

11

This was an express basis for the relief requested by S&L. *See* Administrative Expense Motion ¶¶ 26-28.

25.     Retroactive approval of S&L's employment in connection with the Administrative Expense Motion is within the Court's authority and appropriate here. Such approval is consistent with the Court's ruling at the September 20 Hearing, it is not prevented by the doctrines of collateral estoppel or law of the case, and S&L meets the requirements for retroactive approval of the limited scope of employment requested in the Administrative Expense Motion.

### A. The Court Has Authority to Retroactively Approve S&L's Employment in Connection with the Administrative Expense Motion.

26.     The Fifth Circuit Court of Appeals held in *In re Triangle Chemicals*, 697 F.2d 1280 (5th Cir. 1983), that bankruptcy courts have the discretion to retroactively approve the employment of professionals in connection with a fee application. In *Triangle Chemicals*, the bankruptcy court denied an attorney's application for compensation because no order approving the attorney's employment had been entered. *Id.* at 1281-82. The bankruptcy court held that it did not have discretion to consider retroactive approval of the employment. *Id.* The Fifth Circuit panel vacated the order and remanded the matter to the bankruptcy court, holding that the employment could be retroactively approved where exceptional circumstances exist. *Id.* at 1282. Other courts have also concluded that retroactive approval of a professional's employment may be considered in connection with an application for compensation. *E.g.*, *In re McKenzie*, 2013 Bankr. LEXIS 2672, at *2-*3 (Bankr. E.D. Tenn. July 2, 2013) (2013 WL 3335168); *In re Little Greek Rest.*, 205 B.R. 484, 486 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366, 369-70 (Bankr. M.D. Ga. 1989); *see also In re Mohiuddin*, 627 B.R. 875, 884 (Bankr. S.D. Tex. 2021) (retroactively expanding the scope of attorney's employment under Bankruptcy Code § 327(e) in connection with an application for compensation).

12

27.     *Lamie v. United States Trustee*, 540 U.S. 526 (2004), does not abrogate or call into question *Triangle Chemicals*.[4] In *Lamie*, the attorney for a debtor sought compensation under Bankruptcy Code § 330 for services provided to the debtor after the case was converted to chapter 7. *Id.* at 532. The bankruptcy court denied the compensation based on the plain language of the statute and the district court and court of appeals affirmed the ruling. *Id.* The U.S. Supreme Court also affirmed, reasoning that the plain language of section 330(a)(1) did not authorize compensation for the attorney for a chapter 7 debtor—as opposed to the attorney for a debtor in possession with the powers of a trustee pursuant to Bankruptcy Code §§ 1107 or 1184—that was not employed by the trustee pursuant to section 327. *Id.* at 538-39. Retroactive approval of the employment was not an issue in *Lamie* and *could not* have been an issue because Bankruptcy Code § 327 does not provide for the employment of professionals by a chapter 7 debtor *qua* debtor.[5]

28.     *Decloutte v. Austin (In re Decloutte)*, 2018 Bankr. LEXIS 1869 (Bankr. S.D. Tex. June 20, 2018)—the only other case cited in the objections in opposition to S&L's request for compensation under section 330 and administrative expense under section 503(b)(2)—indicates that the court *should* consider retroactive approval of employment. In *Decloutte*, the attorney to a chapter 13 debtor used her position as counsel to take advantage of the debtor by misappropriating

---

[4] Although neither the U.S. Trustee, the Debtor, nor the Subchapter V Trustee claim that *Lamie* abrogates or calls into question *Triangle Chemicals*, these parties cite *Lamie* in their objections to the Administrative Expense Motion. *See* UST Objection ¶¶ 10-11; Debtor/Trustee Objection ¶¶ 11-12.

[5] The Supreme Court expressly stated that the statutory scheme did not prevent a debtor's attorney from representing the estate and therefore being entitled to receive compensation under Bankruptcy Code § 330, subject to employment by the trustee:

> Compensation for debtors' attorneys working on chapter 7 bankruptcies, moreover, is not altogether prohibited. Sections 327 and 330, taken together, allow chapter 7 trustees to engage attorneys, including debtors' counsel, and allow courts to award them fees. *See* §§ 327(a) and (e). Section 327's limitation on debtors' incurring debts for professional services without the chapter 7 trustee's approval is not absurd. In the context of a chapter 7 liquidation it advances the trustee's responsibility for preserving the estate.

*Lamie*, 540 U.S. at 537.

006839

estate property, filed false statements before the court, and facilitated criminal charges against the debtor based on knowingly false representations to silence the debtor. *Id.* at *38. Among the issues considered and decided by the Court was whether to grant retroactive employment of the attorney to represent the debtor and her estate as divorce counsel made contemporaneously with an application for compensation. *Id.* at *39-*40. The bankruptcy court denied the retroactive approval of the employment because the attorney "offer[ed] no legitimate explanation that would support *nunc pro tunc* approval."[6] *Id.* at *41. The point relevant here is that the court **_considered_** retroactive approval of the professional's employment on the merits—*Decloutte* is not a case where the "plain wording of the statute" ended the inquiry.

## B. Neither Collateral Estoppel nor Law of the Case Prevent Retroactive Approval of S&L's Employment on the Limited Basis Sought in the Administrative Expense Motion.

29.     No party in interest asserts that collateral estoppel nor the law of the case doctrine prevent the Court from considering and retroactively approving S&L's employment, as requested in the Administrative Expense Motion. These are affirmative defenses that generally must be raised by a party or otherwise waived. *See Ngomi Kariuki v. Tarango*, 709 F.3d 495, 508 (5th Cir. 2013). But even if the issues had been raised, neither collateral estoppel nor the law of the case doctrine prevent the Court from considering and retroactively approving S&L's employment.

> *i.  Consideration of retroactive employment is consistent with the Court's ruling at the September 20 Hearing.*

30.     At the core of the collateral estoppel and law of the case doctrines is the idea that matters finally decided by courts should usually remain decided. Collateral estoppel provides that once a court has decided an issue of fact or law necessary to a final ruling, that decision may

---

[6] The facts in *Delcoutte* were extreme. The bankruptcy court indicated that it would have denied the attorney's request for compensation even if it had approved retroactive employment. *In re Decloutte*, 2018 Bankr. LEXIS 1869, at *43.

006840

preclude relitigation of the issue in a different proceeding if certain elements are present. *In re Reddy Ice Holdings, Inc.*, 611 B.R. 802, 808 (Bankr. N.D. Tex. 2020). The law of the case doctrine—when applied to a court's own prior decision—is a discretionary practice whereby courts generally refuse to reopen issues that have been decided in the proceeding. *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). The doctrines are aimed at conserving judicial resources and preventing inconsistent decisions.

31.     The goals of the collateral estoppel and law of the case doctrines are not implicated here. In its ruling at the September 20 Hearing, the Court left open questions about S&L's retention for the work performed prior to that date. (Sept. 20, 2022, Hrg. Tr. 256:14-17 ("I understand that that's going to require some questions as to where that leaves Shannon and Lee and Mr. Schwartz in terms of you know, retention and the work that they've done.")). The Court also stated all rights were reserved with the respect to the issue of compensation for the work performed prior to the ruling. (Sept. 20, 2022, Hrg. Tr. 257:3-4). While the Court denied the specific relief requested in the S&L Employment Application—to approve the Debtor's employment of S&L going forward—it expressly left open other issues, including retention and compensation related to the work previously performed. Retroactive approval of S&L's employment in connection with the Administrative Expense Motion would therefore not be inconsistent with the Court's ruling.

32.     It makes sense under the circumstances that the Court would rule solely on the issue before it at the September 20 Hearing. While the Court had concerns about whether S&L could impartially represent the Debtor in making difficult decisions about Alex Jones and PQPR (Sept. 20, 2022, Hrg. Tr. 247:4-11), these concerns were not raised by any party in interest or actually litigated by the parties at the September 20 Hearing (Sept. 20, 2022, Hrg. Tr. 210:13-18). And they

15

were about *potential conflicts* relevant to issues that were not clearly within the scope of the Debtor's duties as a subchapter v debtor.[7] Denying the Debtor's request for ongoing employment of S&L while leaving open issues of approval of limited employment and compensation for work already performed allowed the case to move forward and is in line with the doctrines of collateral estoppel and law of the case.[8] Leaving these other issues open for a further hearing is also consistent with other decisions in this district where the court has raised issues in connection with employment that were not the focus of a hearing or briefing by the parties. *See In re LTHM Houston-Operations, LLC*, 2014 Bankr. LEXIS 4495, at *9-10 (Bankr. S.D. Tex. Oct. 24, 2014) (2014 WL 5449737) (setting an additional hearing on an issue identified by the Court in connection with an application to employ but that was not the focus of the original hearing or the briefing).

> ii.   *The necessary elements for collateral estoppel are not present.*

33.    Collateral estoppel would not apply to prevent retroactive employment of S&L for services provided prior to the Court's ruling even if it had been raised by a party and the Court did not expressly leave the issue open. Collateral estoppel applies to final orders when: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; ***and*** (3) the determination of the issue in the prior proceeding was a critical and necessary part of the ruling in the prior proceeding.[9] *In re Reddy Ice Holdings, Inc.*, 611 B.R.

---

[7] Employment under Bankruptcy Code § 327(a) governs employment of professionals to represent or assist the trustee or debtor in possession in carrying out its duties under the Bankruptcy Code. The Debtor's duties as debtor in possession do not include investigating the acts, conduct, assets, liabilities, and financial condition of the Debtor, the operation of the Debtor's business, or the desirability of the continuance of such business. *See* 11 U.S.C. §§ 1184(b) & 1106; (Sept. 20, 2022, Hrg. Tr. 251:1-3). To the extent that the speculative conflicts concerning the Court were to arise, it would be in the decision of whether to pursue claims against Jones and PQPR or assert defenses to the claims asserted by these parties.

[8] For the avoidance of doubt, S&L asserts the Court's ruling at the September 20 Hearing was erroneous and that the S&L Employment Application should have been granted.

[9] There is uncertainty as to whether an order denying an application to employ a professional is a final order. Some courts have held that orders that grant or deny applications to employ professionals are interlocutory. *E.g., Simon v. Amir (In re Amir)*, 436 B.R. 1, 12 (B.A.P. 6th Cir. 2010); *Green v. Gray*, 2013 U.S. Dist. LEXIS 38640, at *16-*17

16

802, 809-10 (Bankr. N.D. Tex. 2020) (quoting *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d

348, 353 (5th Cir. 2009)). None of the required elements are present here.

34.    The issues at stake between the S&L Employment Application and the

Administrative Expense Motion are not identical. In the S&L Employment Application, the Debtor

sought to employ S&L on an ongoing basis. In the Administrative Expense Motion, S&L seeks

retroactive approval of its employment only through the September 20 Hearing. Even if, for the

sake of argument, S&L has a predisposition interfering with its ability to impartially advise the

Debtor as debtor in possession with respect to the difficult decisions that may arise related to Jones

and PQPR, that is not implicated in S&L's ability to provide the services to the Debtor through the

September 20 Hearing. And under the "catchall provision" of Bankruptcy Code § 101(14)(C)—

referenced by the Court in its ruling—the relevant inquiry is whether S&L possesses a

predisposition under circumstances that render the predisposition a bias against the estate. *I.G.*

*Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005).  The

scope of S&L's employment requested in the Administrative Expense Motion are among the

circumstances that the Court should consider in determining whether S&L has an adverse interest

for "any other reason."

35.    S&L's disinterestedness was also not actually litigated at the September 20

Hearing. "'The requirement that an issue be "actually litigated" for collateral estoppel purposes

simply requires that the issue is raised, contested by the parties, submitted for determination by

---

(D. Mass. Mar. 18, 2013) (2013 WL 1124731); *cf. Rozelle v. Lowe*, 2016 U.S. Dist. LEXIS 194416, at *7 (W.D. Tex. Mar. 29, 2016) ("The Court agrees with Appellee that Appellants do not have an automatic right to appeal under Section 158(a)(1) because the order being appealed is not 'final.'"). However, this line of reasoning was called into serious question by *Ritzen Group., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020), in which the Supreme Court held that an order denying a motion for relief from stay was a final order. *See In re Glenview Health Care Facility, Inc.*, 2020 Bankr. LEXIS 329 (B.A.P. 6th Cir. Feb. 5, 2020) (indicating that the previous precedent in the Sixth Circuit may need to be reconsidered in light of *Ritzen Group*). If the order denying the S&L Employment Application is *not* a final order, that only makes it even more clear that collateral estoppel does not apply.

006843

the court, and determined.'" *In re Reddy Ice Holdings, Inc.*, 611 B.R. at 810 (quoting *In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2005)). No party in interest asserted that S&L was not a disinterested person at or prior to the September 20 Hearing. The U.S. Trustee opposed the S&L Employment Application because Lee did not supplement the Rule 2014 disclosures for KSLPLLC in the IW Cases. S&L Employment Application Objection ¶ 1. At the September 13, 2022, hearing before the Court, counsel for the U.S. Trustee confirmed that this was the sole basis for the objection. (Sept. 13, 2022, Hrg. Tr. 36:1-9). Counsel for the U.S. Trustee indicated in his opening statement at the September 20 Hearing that Lee's failure to supplement was the only reason the U.S. Trustee sought the denial of the S&L Employment Application. (Sept. 20, 2022, Hrg. Tr. 44:5-7). And after the close of evidence, the Court noted that "no one ever talked about . . . what it means to hold an adverse interest to the debtor or to the estate." (Sept. 20, 2022, Hrg. Tr. 210:16-18). The issue simply was not raised or contested by the parties in a way that would give rise to collateral estoppel.

36.     Further, any ruling that S&L had an actual conflict was not a critical and necessary part of the Court's ruling at the September 20 Hearing. An apparent conflict that may give rise to an adverse interest falls into one of three categories: (a) actual conflicts of interest; (b) potential conflicts of interest, and (c) appearances of conflict.[10] *E.g.*, *In re Boy Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022).  Courts have discretion to approve employment of a professional where there

---

[10] "An actual conflict of interest is 'an active competition between two interests, in which one interest can only be served at the expense of the other.'" *In re Ampal-Am. Israel Corp.*, 534 B.R. 569, 581 (Bankr. S.D.N.Y. 2015), *aff'd*, 554 B.R. 604 (S.D.N.Y. 2016), *aff'd*, 691 F. App'x 12 (2d Cir. 2017) (quoting *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 472 (Bankr. S.D.N.Y.2007)) (citing also *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y.1998). A potential conflict is where the parties are currently aligned but may turn out to be adverse on an issue in the future. *See, e.g.*, *id.*; *In re Schwindt*, 2013 Bankr. LEXIS 342, at *17 (Bankr. D. Colo. Jan. 28, 2013) (2013 WL 321297) (finding only a potential dispute where there were common interests; *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *24 (S.D. Tex. May 30, 2006) (affirming decision to authorize employment of attorney where "[a]ny conflict of interest of [attorney] is merely a potential conflict because there have been no avoidance or other claims identified so far against any of [attorney's] eight creditor-clients").

exists a potential conflict but must deny employment—at least absent the presence of separate counsel to address conflicts—if there exists an actual conflict.[11] *See, e.g.*, *id.* at 158 ("Attorneys with actual conflicts face *per se* disqualification, but disqualification is at the court's discretion for attorneys with potential conflicts."); *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *27 (S.D. Tex. May 30, 2006) (affirming bankruptcy court approval of employment where "there is at best only a potential conflict of interest between [attorney] and the Trustee"); *In re 2000 St. James Place, L.P*, 2010 Bankr. LEXIS 1246, at *4 (Bankr. S.D. Tex. Apr. 19, 2010) ("In the instant case, although there is a strong potential for conflict, there is no evidence as of yet of an actual conflict. Thus, the court will approve Debtor's employment of [attorney]."). The Court's ruling with respect to the S&L Employment Application is equally consistent with a finding of only a potential conflict, in which case the Court would have at least the discretion to approve the limited employment of S&L through the September 20 Hearing.[12] And the S&L Employment Application Objection sought denial on separate, entirely discretionary grounds.

      iii.    *Application of the law of the case doctrine is discretionary and exceptions apply under the facts here.*

37.    Nor does the law of the case doctrine prevent retroactive approval of S&L's employment in connection with the Administrative Expense Motion. "'When the law of the case doctrine is applied by a court to its own prior decisions, it is properly characterized as discretionary in nature.'" *Greener v. Cadle Co.*, 298 B.R. 82, 94 (N.D. Tex. 2003) (quoting *United States v. O'Keefe*, 169 F.3d 281, 283 (5th Cir. 1999)). A court can *always* revisit its prior decisions or the

---

[11] The involvement of the Battaglia Firm as lead counsel advising the Debtor on strategy fills effectively the same role as conflicts counsel in this case. Where conflict's counsel is present, courts may approve employment of separate counsel notwithstanding an asserted conflict. *See, e.g.*, *In re Relativity Media, LLC*, 2018 Bankr. LEXIS 2037, at *19 (Bankr. S.D.N.Y. July 6, 2018); *Exco Res. v. Milbank*, 2003 U.S. Dist. LEXIS 1442, at *26 (S.D.N.Y. Jan. 28, 2003).

[12] The Court indicated that its concern was that representation of the Debtor as debtor in possession "may include making difficult decisions about other parties, if necessary" (Sept. 20, 2022, Hrg. Tr. 247:9-11), referencing claims against PQPR and Alex Jones. At most, this would be a potential conflict.

006845

decisions of a coordinate court. *Id.* The doctrine "is not a barrier to correction of judicial error and is in no way sacrosanct." *Id.* at 95 (citing *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983)).

38.     Courts have frequently declined to apply the law of the case doctrine in three situations: (1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice. *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). The first and third exceptions apply here.

39.     As set out in the Rule 59 Motion, S&L seeks to present evidence directly relevant to the issue of whether S&L had a predisposition in favor of Alex Jones or PQPR that created bias against the estate.[13] This evidence includes, among other things, (a) S&L's prepetition analysis of PQPR's asserted secured claim and representations on behalf of the Debtor in related negotiations; (b) S&L's response to PQPR's requested destruction of information; (c) the scheduling of PQPR's asserted secured claim as disputed; (d) S&L's initial response to Alex Jones's requested extension of the automatic stay regarding the Connecticut Litigation; (e) S&L's independent questioning of Alex Jones's asserted indemnity; (f) the alter ego finding regarding the Texas Litigation; (g) the preparation, submission, and presenting of the proposed cash collateral order submitted to the Court on September 13, 2022; and (h) the negotiations surrounding the Debtor's agreement to lift the stay regarding the Connecticut Litigation, including Alex Jones's negotiation posture that he may cease his involvement with the Debtor. Although S&L submits that it did not have a full and fair opportunity to present such evidence at the September 20 Hearing, which justifies the Court granting a rehearing, S&L should also be able to present such evidence in connection with its

---

[13] S&L filed the Administrative Expense Motion based on the arguments made by the U.S. Trustee and Alex Jones in their objections to the Rule 59 Motion. To the extent that the Court considers retroactive employment of S&L on the merits of whether S&L meets the requirements of Bankruptcy Code § 327 in connection the Administrative Expense motion, the Rule 59 Motion is irrelevant, if not technically moot.

006846

request for retroactive approval of its limited employment through the Administrative Expense Motion, even if the Court denies the Rule 59 Motion. S&L intends to submit further evidence that did not exist at the September 20 Hearing.[14]

40.     Additional evidence of which the Court can take judicial notice is *already* before the Court. For example, the Court referenced in its ruling that the Debtor's estate had not made any claims against PQPR in the fifty-three (53) days between the Petition Date and the September 20 Hearing. (Sept. 20, 2022, Hrg. Tr. 246:16). Despite the removal of S&L as co-counsel and the replacement of Schwartz as CRO, the Debtor still has not brought an action against PQPR and continues to seek entry interim cash collateral orders rather than attempting to partially address the issue at a final cash collateral hearing. *See* Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 238]; Fifth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 258]; Sixth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 287]; Seventh Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 333]. And despite the Court's expansion of the Subchapter V Trustee's duties to include investigation of PQPR's claim and file a statement detailing her findings as soon as practicable (Sept. 20, 2022, Hrg. Tr. 254:3-7, 254:22-24), this has not yet occurred. At the time of the filing of this Reply, one-hundred (100) days have elapsed since the September 20 Hearing.

[14] For example, S&L provided services to the Debtor that ultimately resulted in the deal struck by the Debtor's replacement CRO Patrick Magill reflected in the Debtor's Emergency Motion for Entry of Order Authorizing Debtor to Enter into Financial Services Agreement [ECF No. 273] and Debtor's Emergency Motion for Entry of Order Authorizing Debtor to Enter into Product Fulfilment Agreement [ECF No. 276] filed by the Debtor on November 15, 2022. S&L's services provided prior to the September 20 Hearing enabled the Debtor to substantially uncouple its business from PQPR and obtain better economic terms through the arrangement with the third-party. Assisting the Debtor in pursuing this change to its business model tends to demonstrate that S&L did not have any predisposition that interfered with its ability to represent the Debtor in matters that benefited the Debtor's estate to the potential detriment of PQPR or Alex Jones.

21

006847

41.     All of that makes perfect sense. Some of the potential causes of action and defenses with respect to PQPR and its asserted claim are complicated and may be more efficiently and effectively addressed in the mediation or other consensual resolution.[15] But the Debtor was in discussions about potential mediation prior to the September 20 Hearing. (Sept. 20, 2022, Hrg. Tr. 9:11-16). The interim cash collateral orders do not release any rights to contest the validity or seek avoidance of PQPR's claim. And, as asserted by the Subchapter V Trustee in connection with the application to employ of M3 Advisory Partners, the issue requires expert financial analysis.[16]

42.     The Court also questioned the Debtor's request for authority to hire an appellate attorney and pay 60% of the fees for such attorney, with Alex Jones paying 40%. (Sept. 20, 2022, Hrg. Tr. 215:19-20). But the Debtor continued to seek authority to retain appellate counsel under the 60/40 split prior to Jones's agreement with the Sandy Hook Plaintiffs [ECF No. 329]. The

---

[15] The Subchapter V Trustee indicated in the Subchapter V Trustee's First Interim Status Report [ECF No. 227] (the "First Trustee Report") and Subchapter V Trustee's Second Interim Status Report [ECF No. 285] (the "Second Trustee Report") that she has interviewed and received certain financial information from various parties. By November 21, 2022—sixty-two (62) days after the expansion of her duties—the Subchapter V Trustee had "identified a number of potential claims and causes of action[]." Second Trustee Report ¶ 4.l. The Subchapter V Trustee noted, however, that she expected certain of these claims to be the subject of the mediation. Id. And despite that there is every reason to believe that the Subchapter V Trustee has been diligent in performing her duties, she had not completed her investigation by December 19, 2022. (Dec. 19, 2022, Hrg. Tr. 47:24-48:16). The issue is simply complicated, requires careful analysis, and is not something that could be accomplished in fifty-three (53) days of the case considering the other matters requiring attention in the case.

[16] In the Subchapter V Trustee's application to employ M3 [ECF No. 282] (the "M3 Employment Application"), the Subchapter V Trustee indicated that the employment was necessary "[b]ecause of the anticipated complexity investigating the matters ordered by the Court and facilitating development of a confirmable plan in this complicated case . . . ." M3 Employment Application ¶ 10. Further, in the Subchapter V Trustee's response to PQPR's objections to the M3 Employment Application [ECF No. 327] (the "M3 Employment Application Reply"), the Subchapter V Trustee represented to the Court:

> As further described in the M3 Application, the Subchapter V Trustee seeks retention of M3 Advisory Partners, LP ("M3") as financial advisor to assist in executing her duties as Subchapter V Trustee. Pursuant to this Court's order, the Subchapter V Trustee's duties were expanded and she was tasked with undertaking an investigation. The Investigation includes reviewing many years worth of transfers and transactions with numerous parties. The records maintained by the parties are incomplete and generally not in good order. The scattered information complicates the process. The Subchapter V Trustee requires the assistance of a financial advisor in fulfilling her duties.

M3 Employment Application Reply ¶ 2 (footnotes omitted). S&L believes that the Subchapter V Trustee is absolutely correct. But that was just as true in the first fifty-three (53) days of the case.

22

Court approved the Debtor's request to employ appellate counsel on December 19, 2022.[17] (Dec. 19, 2022, Hrg. Tr. 30:22-25). And for good reason. The Sandy Hook Plaintiffs have indicated that they may seek to oppose the dischargeablity of their claims. And the Sandy Hook Plaintiffs actively *desire* the appeals to go through absent a settlement to finally conclude the litigation and opposed Alex Jones's attempts to reimpose the stay. None of that was unforeseeable on September 14, 2022, when the Debtor filed its application to employ appellate counsel [ECF No. 155]. And the credible ability to go forward with an appeal was important to settlement negotiations.

43.    The Court further questioned the Debtor's proposed repayment of $750,000 to PQPR for the purchase of inventory that would be subject to a 90/10 split of proceeds in favor of the Debtor, instead of the 20/80 split of proceeds in favor of PQPR. (Sept. 20, 2022, Hrg. Tr. 215:21-23). Again, the Debtor has continued to pursue this after the September 20 Hearing. (Dec. 19, 2022, Hrg. Tr. 11:4-7); [ECF No. 333]. This decision also makes sense. The benefit to the Debtor's estate of receiving 90% of the proceeds from the related product instead of 20%, pursuant to prepetition Forbearance Agreement between PQPR and the Debtor, exceeds the cost to the Debtor's estate of the payments to PQPR. While other parties have negotiated for clawback rights, no one has opposed the payments from purported cash collateral being made initially.

---

[17] The court granted authority to employ appellate counsel on a 50/50 division of fees instead of the originally proposed 60/40 basis. [ECF No. 348]. But the Debtor sought a hearing on the retention at the 60/40 division, despite the lack of objection to a 50/50 division, because Alex Jones would not agree to that division prior to his deal with the Sandy Hook Plaintiffs [ECF No. 329]. And according to the representations of Jones's counsel at the December 19, 2022, the caveat to his agreement to the 50/50 division was that Jones would seek his full annualized salary of $1.3 million from the Debtor. (Dec. 19, 2022, Hrg. Tr. 14:2-6, 32:11-13). This would be an increase of approximately $60,000 per month. Jones has also represented that he may be required to seek alternative employment absent receiving his full salary. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25). Further, Jones filed a motion seeking to set a date by which the Debtor must assume or reject his employment contract [ECF No. 349]. This is the situation that S&L's negotiations with Jones for the 60/40 split (Sept. 20, 2022, Hrg. Tr. 64:17-65:4) were trying to avoid. Absent a negotiated agreement, assumption could require not just the $60,000 per month going forward but also cure for past salary and assumption of other terms of the Employment Agreement.

006849

44.    Other additional evidence of which the Court can take judicial notice comes from the positions and statements of Alex Jones in this case. In the AEJ Limited Objection, Jones asserts that S&L should have represented reasons favorable to Jones regarding the Debtor's proposed payment of Jones's travel expenses to attend the Connecticut Litigation and 100% of state court counsel fees.[18] AEJ Limited Objection ¶ 10. That S&L did not argue those points demonstrates that S&L was not taking direction from Jones or asserting positions to benefit Jones. Further, the *actual* reason behind the Debtor's decision—that it was demanded by Jones to continue employment with the Debtor (Sept. 20, 2022, Hrg. Tr. 216:10-13) and necessary to reach a deal with the Connecticut Plaintiffs regarding relief from the stay (Sept. 20, 2022, Hrg. Tr. 10:20-25)— was reflected at the the December 19, 2022, hearing. Jones's counsel asserted that he may be required to seek employment other than with the Debtor absent receiving adequate consideration from the Debtor. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25). And both Jones and the Debtor represented that this would leave the Debtor unable to operate. (Dec. 19, 2022, Hrg. Tr. 32:3-6, 38:15-16).

45.    S&L also submits that the Court's prior ruling contained clear error. As set out in S&L's reply to the U.S. Trustee's objection to the Rule 59 Motion [ECF No. 270] (the "Rule 59 Reply"), several factual predicates to the Court's ruling fall under the *higher* standard of manifest error. Rule 59 Reply ¶ 15 n.7. Among the other issues amounting to clear error are the following:

a.    *There was No Evidence at the September 20 Hearing that S&L Presently Held or Represented Any Interest Adverse to the Debtor's Estate*—The inquiry under Bankruptcy Code § 327(a) is whether the professional *presently* holds an adverse interest or *concurrently* represents a party with such adverse interest. *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999); *In re Muma Servs., Inc.*, 286 B.R. 583, 590 (Bankr. D. Del. 2002); *Greene v. InforMD, LLC*, 2018 U.S. Dist. LEXIS 124062, at *8 (M.D. La. July 25, 2018) (2018 WL 3579470). The issue was whether S&L had a "meaningful incentive" to act contrary to the best interests of the Debtor's

[18] Jones asserts that S&L's voluntary reduction in the Administrative Expense Motion would be required because of this purported failure.

24

bankruptcy estate, *In re Quality Bev. Co.*, 216 B.R. 592, 595 (Bankr. S.D. Tex. 1995), or a "personal interest" contrary to the interests of the bankruptcy estate, *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005). Further, such meaningful incentive or personal interest must be supported by evidence. *See In re McDermott Int'l, Inc.*, 614 B.R. 244, 255 (Bankr. S.D. Tex. 2020) (approving retention of a professional because there was no evidence of an adverse interest). There was no evidence of an adverse interest at the September 20 Hearing.[19] And while PQPR and Alex Jones have interests adverse to the Debtor's estate, there is no evidence indicating that S&L represented these parties. Indeed, the evidence introduced at the September 20 Hearing indicated that S&L *did not* represent these parties (Sept. 20, 2022, Hrg. Tr. 61:23-62:1, 62:16-20; 131:15-132:5, 149:23-150:4); Debtor's Ex. 3 [ECF No. 163-3]; Debtor's Ex. 5 [ECF No. 163-5]; Debtor's Ex. 6 [ECF No. 163-6]) and that S&L advised and represented the Debtor in taking positions directly adverse to these parties (Sept. 20, 2022, Hrg. Tr. 62:21-65:16).

b.  *The Court Had Discretion to Grant the S&L Employment Application Despite any Potential Conflict in Pursuing Actions or Defenses against PQPR or Jones*—The Court indicated in its ruling that it was not sure that its decision was discretionary because the Court thought there was a material adverse interest against the estate (Sept. 20, 2022, Hrg. Tr. 248:13-14). The Court indicated that it was concerned about whether S&L could impartially represent the Debtor in making difficult decisions about Alex Jones and PQPR (Sept. 20, 2022, Hrg. Tr. 247:8-11). But even if S&L might have a predisposition affecting its ability to pursuing claims or defenses against PQPR or Jones if that later became necessary, this was only a potential conflict. *See In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (reasoning that a potential conflict is a dispute that may become active if certain contingencies arise). Bankruptcy courts have discretion to approve the employment of a professional where there is only a potential conflict. *In re Boy Scouts of Am.*, 35 F.4th 149, 158 (3d Cir. 2022) ("Attorneys with actual conflicts face *per se* disqualification, but disqualification is at the court's discretion for attorneys with potential conflicts."); *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *27 (S.D. Tex. May 30, 2006) (affirming bankruptcy court approval of employment where "there is at best only a potential conflict of interest between [attorney] and the Trustee"); *In re 2000 St. James Place, L.P.*, 2010 Bankr. LEXIS 1246, at *5 (Bankr. S.D. Tex. Apr. 19, 2010) ("In the instant case, although there is a strong potential for conflict, there is no evidence as of yet of an actual conflict. Thus, the court will approve Debtor's employment of [attorney]."). And the actualization of any potential conflict with respect to pursuing claims or defenses against Jones or PQPR was remote. <u>First</u>, as recognized in the Court's

---

[19] With respect to S&L, the counsel for the U.S. Trustee speculated about the Debtor's proposed 60/40 division of state court counsel fees between Jones and the Debtor and discussions between the counsel and Lee, concluding that "I don't understand why 40/60." (Sept. 20, 2022, Hrg. Tr. 225:8-23). But that is not evidence. The actual evidence was that (a) the Debtor told Jones that he would have to pay a proportionate share and the agreement for a 60/40 split was negotiated with Jones arguing that he had already cut back his regular salary (Sept. 20, 2022, Hrg. Tr. 64:23-65:4) and (b) Schwartz made the decisions for the Debtor. (Sept. 20, 2022, Hrg. Tr. 196:7-9). Further, even if the U.S. Trustee's statements *were* evidence, the appearance of conflict is legally insufficient to warrant denial of an application to employ. *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *29 (S.D. Tex. May 30, 2006); *see also In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998) (reasoning that the "appearance of impropriety" or "horrible imaginings alone" do not amount to an adverse interest).

25

ruling at the September 20 Hearing, a subchapter v debtor is not mandated to investigate its own actions, conduct, assets, or liabilities. (Sept. 20, 2022, Hrg. Tr. 251:1-8). The Debtor's employment of S&L to assist the Debtor in fulfilling its duties as a subchapter v debtor in possession would not involve claims or defenses against Jones or PQPR except in an avoidance action or objection to claim. Second, the Debtor engaged the Battaglia Firm to provide legal advice regarding strategy and implementation of that strategy in the case, with S&L's primary responsibility being "the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case." S&L Employment Application ¶ 22. The Battaglia Law Firm had primary responsibility to advise the Debtor whether to bring an action against PQPR or Jones and the timing of any objection to claim. Third, the Court expanded the Subchapter V Trustee's duties to include the investigation contemplated by Bankruptcy Code § 1183 and particularly directed the Trustee to the secured claim asserted by PQPR and prepetition draws by Alex Jones. (Sept. 20, 2022, Hrg. Tr. 254:3-21). The likelihood of S&L advising the Debtor to ignore the Subchapter V Trustee's recommendation with respect to such causes of action or defenses is vanishingly remote.[20] *See In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *27 (S.D. Tex. May 30, 2006) ("[A]s a practical matter, because St. Paul raised this issue, the Trustee and his employed professionals are likely to give more careful review to the payments to these eight creditors than to any others."). At a minimum, the Court had discretion under the circumstances.

c. *Lee's Failure to Supplement His Disclosures for KSLPLLC after the IW Debtors Decided to Dismiss their Cases Does Not Suggest an Adverse Interest*—As the U.S. Trustee argued to this Court, Bankruptcy Rule 2014 "has one primary purpose—to facilitate strict compliance with section 327." S&L Employment Application Objection ¶ 45. And as the relevant caselaw indicates, the duty to make continuing disclosures is not contained in the text of Bankruptcy Rule 2014 but rather implied with respect to parties employed pursuant to section 327 or seeking court approval of their employment. *See, e.g., In re C & C Demo, Inc.*, 273 B.R. 502, 506-07 (Bankr. E.D. Tex. 2001) (holding that although Rule 2014(a) does not expressly require supplemental or continuing disclosure, this duty is implied by § 327); *In re Keller Fin. Serv. of Florida*, 243 B.R. 806, 813 (Bankr. M.D. Fla. 1999) (finding duty of continuing disclosure under Rule 2014(a) that is implied by requirements of Bankruptcy Code § 327); *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) ("Rule 2014(a) does not expressly require supplemental or continuing disclosure. . . . Nevertheless, section 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention."). Supplemental disclosure in the IW Cases would have been irrelevant to compliance with section 327 in those cases. The U.S. Trustee argued that the applications to employ professionals should be decided only after the Court's decision on the U.S. Trustee's

---

[20] S&L already represented the Debtor in making statements to the Court that PQPR's asserted claim and lien were subject to probable avoidance actions. *See* Debtor's Response to the Sandy Hook Families' Corrected Motion to Expedite Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession ¶ 8 n.4 [ECF No. 113] (indicating that the Debtor recognized that PQPR's claim and lien may be avoidable and for this reason the Debtor did not agree to limitations on challenging such claim and lien). It is difficult to even *imagine* that S&L would make such a representation to the Court and then advise the Debtor to dispute the existence of such potential actions against PQPR when recommended by the Subchapter V Trustee. And horrible imaginings do not amount to an adverse interest. *In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998).

006852

motion to dismiss and the Court agreed with this position. (May 19, 2022, Hrg. Tr. 14:9-15:9, 23:2-8, Debtor's Ex. 22 [ECF No. 163-22], U.S. Trustee's Ex. 14 [ECF No. 165-14]). When Lee met with the Debtor on May 24, 2022, the IW Debtor's had already decided to dismiss their cases rather than incurring the expense of litigating with the U.S. Trustee. On May 21, 2022, Lee recommended to Schwartz that the IW Debtors agree to dismiss their cases (Debtor's Ex. 24 [ECF No. 163-24]) and by May 23, 2022, Lee was working on obtaining dismissal of the IW Debtor's chapter 11 cases (Debtor's Ex. 25 [ECF No. 163-25]). On May 25, 2022, Lee informed counsel for the U.S. Trustee that the IW Debtor's would agree to dismiss their cases and counsel for the U.S. Trustee suggested a stipulation dismissing the cases instead of an independent motion, which Lee worked on with counsel to the U.S. Trustee's counsel until the stipulation of dismissal was filed on June 1, 2022. (Debtor's Ex. 26, [ECF No.163-26]). Even if Lee was required to supplement his Bankruptcy Rule 2014 disclosures under these circumstances, his failure to do so does not suggest an interest adverse to the Debtor's estate. Lee's evaluation was consistent with the text of Bankruptcy Rule 2014, the purpose of the rule, and the cases interpreting it.

d. *There was no Failure of Disclosure by S&L in the Debtor's Case*—The Court indicated in its ruling at the September 20 Hearing that there was a lack of candor in the Debtor's bankruptcy case. (Sept. 20, 2022, Hrg. Tr. 253:6-7). If the Court's finding was that there was a lack of candor by S&L, this is completely contrary to the evidence. The Court indicated that the $80,000 travel expense in the proposed Third Amended Cash Collateral Order [ECF No. 148] was not called to the Court's attention.[21] (Sept. 20, 2022, Hrg. Tr. 244:10-11). But this was negotiated among the parties and was filed and presented by the Court by the Battaglia Firm. (Sept. 13, 2022, Hrg. Tr. 5:24-7:22; Sept. 20, 2022, Hrg. Tr. 13:4-7). Any finding that a matter set out in public filings with the Court and presented by another attorney was a failure to disclose by S&L is clear error.

---

[21] The U.S. Trustee alleged in connection with other matters that Schwartz did not disclose that the Debtor overhauled its in-house fulfilment process prior to bankruptcy. At the August 12, 2022, hearing in the Debtor's chapter 11 case, counsel for the U.S. Trustee represented to the Court that "[w]e heard nothing about the chang[e] in fulfilment" at the August 3 hearing despite Schwartz being on the witness stand for nearly six hours. (Aug. 12, 2022, Hrg. Tr. 13:10-19). But this allegation was about *Schwartz* and is simply not true. As indicated in the August 3, 2022, hearing transcript—which was admitted into evidence at the September 20 Hearing as the U.S. Trustee's Exhibit 15 [ECF No. 165-15]—the change to fulfilment *was* disclosed:

- In the Debtor's opening statement, Mr. Battaglia informed the Court that prior to the Petition Date the Debtor, took efforts to improve its business operations including "changing the cost structure in the way that fulfilment is handled of product sales to reduce the overall overhead to the estate, [reducing] the headcount to the estate." (Aug. 3, 2022, Hrg. Tr. 47:6-9).

- Further, Schwartz testified about the Debtor's fulfilment process and the prepetition changes to the process. (Aug. 3, 2022, Hrg. Tr. 67:8-68:4, 71:3-72:5).

The U.S. Trustee also raised at the September 20 Hearing, that the Debtor's prepetition payment to KSLPLLC for services provided by that firm from May 24 to May 31, 2022, was not reflected in the Debtor's Statement of Financial Affairs. (U.S. Trustee's Ex. 2 [ECF No. 165-2]), which was signed by Schwartz. But as indicated in the Court's ruling (Sept. 20, 2022, Hrg. Tr. 232:15-17) payment to KSLPLLC *was* referenced in the S&L Employment Application. (Debtor's Ex. 1 [ECF No. 163-1], at p.5 n.1). There is no evidence to suggest that the omission from the SOFA was the result of S&L's failure to disclose.

006853

## C. Retroactive Approval of S&L's Employment for Services Provided Through the September 20 Hearing is Appropriate.

46.     Retroactive approval of the Debtor's limited employment of S&L for the period from the Petition Date through the September 20 Hearing is appropriate. There are exceptional circumstances justifying consideration of such retroactive approval through the Administrative Expense Motion and S&L meets the requirements for employment on the limited basis requested in the Administrative Expense Motion.

> i.     *Exceptional circumstances justify consideration of retroactive employment of S&L in connection with the Administrative Expense Motion.*

47.     Retroactive employment of a professional through an application for compensation is appropriate where there are "rare or exceptional circumstances[.]" *In re Triangle Chems.*, 697 F.2d 1280, 1289 (5th Cir. 1983); *accord In re Mohiuddin*, 627 B.R. 875, 884 (Bankr. S.D. Tex. 2021) (retroactively expanding scope of employment under Bankruptcy Code § 327 in connection with a fee application). Exceptional circumstances exist here.

48.     This is not a case where S&L is seeking untimely approval of its employment.[22] Pursuant to Bankruptcy Local Rule 2014-1(b)(1), the S&L Employment Application was deemed filed contemporaneous with S&L's commencement of provision of services to the Debtor as debtor in possession in this chapter 11 case. S&L filed the Rule 59 Motion prior to expiration of the period for such motion set out in Bankruptcy Rule 9023, and therefore the order denying the S&L

---

[22] Even if S&L was untimely in seeking approval of its employment, however, the circumstances would support retroactive consideration. S&L was under considerable time pressure to begin providing services for the Debtor. Immediately after the filing of the Debtor's chapter 11 case, S&L had to obtain a setting on the Debtor's motion to modify the automatic stay with respect to the Heslin/Lewis Suits [ECF No. 2]. The Debtor filed its chapter 11 case on a Friday, and a hearing on the motion to modify the automatic stay was held the following Monday morning. Several other emergency matters required S&L's services prior to consideration of the S&L Employment Application. Among other things, S&L (a) had to prepare a response to an emergency motion to remand in the removed Connecticut Litigation where the Connecticut Plaintiffs sought fees on three (3) days' notice of the deadline [*see* Adv. No. 22-05019 (Bankr. D. Conn.), Dkt. Nos. 5, 10 &14]; (b) address issues regarding fulfillment of orders [*see* ECF No. 55]; (c) respond to the Connecticut Plaintiff's motion for relief from stay [ECF No. 15]; and (d) provide information and discovery to the Sandy Hook Plaintiffs.

006854

Employment Application is not yet a final order. S&L filed the Administrative Expense Motion in light of the arguments made in the objections of the U.S. Trustee and Jones to the Rule 59 Motion as an alternative consistent with those parties' position and the Court's ruling at the September 20 Hearing.

49.     Further, in its ruling at the September 20 Hearing, the Court expressly left open questions regarding S&L's retention. (Sept. 20, 2022, Hrg. Tr. 256:14-17). At that time, however, the Debtor was left without management due to the denial of the Debtor's application to employ Schwartz as CRO. The Debtor was also put in a position where it had to decide whether to incur substantial expense on the issue and distract the Battaglia Firm from other matters necessary for the case prior to finding a replacement CRO. As a practical matter, the Debtor was unable to seek approval of limited retention of S&L.

50.     Where a debtor in possession does not endeavor to obtain approval of the employment of a professional that has provided services to the debtor or ceases seeking approval of such employment, the professional has standing to pursue its own employment. *See Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 479-80 (B.A.P. 9th Cir. 1996); *Blocksom v. Brown (In re Brown)*, 555 B.R. 854, 859 (Bankr. S.D. Ga. 2016) ("A trustee should not be allowed to leverage an exclusive ability to file employment applications against a professional seeking to be employed and compensated for services already performed."). This is an exceptional circumstance justifying consideration of retroactive approval of S&L's employment through the Administrative Expense Motion.

51.     Finally, the amount of the Requested Administrative Expense Claim is consistent with the amount contemplated by the interim cash collateral orders that were agreed to by the parties and approved by the Court. In the Third Amended Cash Collateral Order [ECF No. 151],

29

the Debtor received authority to use PQPR's asserted cash collateral to pay $207,348.36 to S&L during the relevant time period, subject to interim compensation procedures. The then-pending motion for interim compensation procedures [ECF No. 135], contemplated a procedure for allowing on an interim basis 80% of requested fees. Including the prepetition Retainer of $50,822.68, the total amount of compensation contemplated in the Third Amended Cash Collateral Order was $310,008.13.[23] The Requested Administrative Expense Claim of $325,215.85 is consistent with the expectations of the parties in interest.

> ii. *S&L is disinterested under at least the circumstances of limited employment for services provided by S&L through the September 20 Hearing.*

52.     S&L does not have or represent any interest adverse to the Debtor's estate. Neither S&L nor the attorneys associated with the firm: (a) are a creditor, equity security holder, or insider of the Debtor; (b) is or was ever a director, officer, or employee of the debtor; (c) possess or assert any economic interest lessening the value of the Debtor's bankruptcy estate or creating a potential dispute in which the estate is a rival claimant; or (d) represent or have ever represented Alex Jones, PQPR, or any other creditor in this chapter 11 case. Nor does S&L or the attorneys associated with the firm have any predisposition that limits or interferes with the ability of S&L to provide unbiased advice to the Debtor as debtor in possession.

53.     The concerns identified in the Court's ruling at the September 20 Hearing surrounded S&L's ability to provide unbiased advice with on matters involving claims and defenses against PQPR and Alex Jones. (Sept. 20, 2022, Hrg. Tr. 247:8-11). The evidence in connection with the Administrative Expense Motion will address these concerns.[24]

---

[23] ($207,348.36 / 0.8) + $50,822.68 = $310,008.13

[24] Much of the evidence that S&L will submit is summarized in the Rule 59 Motion; however, S&L will also seek to introduce additional evidence. For example, S&L attorney R. J. Shannon sent the email attached as Exhibit A to counsel for the Texas Plaintiffs on August 8, 2022. In that email, Shannon informed the Texas Plaintiffs of the Debtor's

54.     But even if, for the sake of argument, S&L had some predisposition limiting its ability to pursue actions or defenses to Alex Jones or PQPR under certain circumstances, that predisposition would **_not_** hinder S&L's ability to provide unbiased advice with respect to the limited scope of services relevant prior to the September 20 Hearing. As the Court recognized in its ruling at the September 20 Hearing, whether a proposed professional is disinterested requires attention to the circumstances that may impair a professional's ability to offer impartial advice to its client. (Sept. 20, 2022, Hrg. Tr. 235:1-4). The scope of the proposed employment and limitations to that employment are among the circumstances that the Court should consider.

55.     The Court's concerns were not issues that arose in the first fifty-three (53) days of the Debtor's chapter 11 case that comprise the period for which S&L seeks retroactive approval of its employment through the Administrative Expense Motion. During that time, the Debtor was focused on administrative matters and how to address the Sandy Hook Litigation without untenable interruption to its business or administrative expense incurred in drawn out litigation with the Sandy Hook Plaintiffs. Under the circumstances of employment limited to services provided through the September 20 Hearing, the potential of a conflict actualizing at some later time would not amount to an interest adverse to the Debtor's estate.

### REPLY TO ARGUMENT THAT RETROACTIVE EMPLOYMENT UNDER BANKRUPTCY CODE § 327(e) IS NOT AVAILABLE

56.     The U.S. Trustee argues that retroactive employment under Bankruptcy Code § 327(e) is not available because (a) S&L is not the appropriate party to seek its employment under

---

basis for designating PQPR as an insider and cautioned about positions that could harm the chances of successfully prosecuting an action against PQPR. In particular, Shannon warned that if the Texas Plaintiffs obtained a finding establishing that "PQPR is not an insider, we lose the extended preference lookback period w/r/t PQPR and make getting its lien avoided more of an up-hill battle" and that "[a]n unavoidable PQPR lien also opens up paths for Alex Jones to terminate his employment with the Debtor, force it into liquidation, credit bid for the assets, and continue on at a different entity to the detriment of the bankruptcy estate and your clients." Shannon also indicated that while he did not think that avoidability of the lien obviated the need for permission to use cash collateral prior to the actual avoidance, it would be a good outcome if the Sandy Hook Plaintiffs were successful in that endeavor.

006857

section 327(e) and (b) the scope of services reflected in the S&L Employment Application do not fall within the ambit of section 327(e). These arguments are inconsistent with applicable caselaw and the circumstances of this chapter 11 case.

**A.  S&L Can Seek Approval of its Employment in Connection with the Administrative Expense Motion.**

57.    The U.S. Trustee asserts that the plain language of Bankruptcy Code § 327(e) provides that only the Debtor—as debtor in possession—can seek approval of its employment of S&L under that provision. UST Objection ¶ 23. This is contrary to the statutory language and relevant authority.

58.    The language of Bankruptcy Code § 327(e) does not limit the party that can seek the approval of the employment of a professional. The statute provides:

> The trustee, with the court's approval, may employ, for a specified purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

While the statute requires that the trustee—or debtor in possession pursuant to Bankruptcy Code §§ 1107 or 1184—be the party to employ the professional, it is silent about which parties may seek court approval of the employment. Moreover, Bankruptcy Code § 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." The statutory framework does not prevent S&L from seeking the relief requested in the Administrative Expense Motion.

59.    Relevant authority supports S&L's position. A professional may seek approval of its own employment for services rendered to a debtor in possession pursuant to an engagement agreement with the debtor in possession where the Debtor ceases pursuing the approval of such employment. *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 480 (B.A.P. 9th

006858

Cir. 1996); *Blocksom v. Brown (In re Brown)*, 555 B.R. 854, 859 (Bankr. S.D. Ga. 2016) ("A trustee should not be allowed to leverage an exclusive ability to file employment applications against a professional seeking to be employed and compensated for services already performed."); *cf.* Bankruptcy Local Rule 2014-1(a) (requiring that an application for employment "by an attorney for the debtor" include certain information). An application for compensation and attendant administrative expense claim is an appropriate mechanism to seek such approval. *See In re Triangle Chems.*, 697 F.2d 1280, 1282 (5th Cir. 1983); *In re McKenzie*, 2013 Bankr. LEXIS 2672, at *2-*3 (Bankr. E.D. Tenn. July 2, 2013) (2013 WL 3335168); *In re Little Greek Rest.*, 205 B.R. 484, 486 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366, 369-70 (Bankr. M.D. Ga. 1989); *see also In re Mohiuddin*, 627 B.R. 875, 884 (Bankr. S.D. Tex. 2021) (retroactively expanding the scope of attorney's employment under Bankruptcy Code § 327(e) in connection with an application for compensation).

60.     The U.S. Trustee presents no argument as to why S&L cannot seek retroactive approval of its employment on a limited basis under Bankruptcy Code § 327(e). In its ruling at the September 20 Hearing, the Court left open the issue of where its decision left S&L in terms of retention for work previously done and compensation (Sept. 20, 2022, Hrg. Tr. 256:14-257:4). Courts have considered applications to employ under Bankruptcy Code § 327(e) after denial of an application under section 327(a). *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 405 (D. Del. 2005); *In re Star Ready Mix, Inc.*, 2008 Bankr. LEXIS 3400, at *5-*6 (Bankr. E.D. Cal. Dec. 18, 2008) (2008 WL 5338746) ("This court has already denied the Trustee's application to employ Klein as general counsel based on Klein's prior and concurrent representation of a creditor with interests adverse to the bankruptcy estate and that ruling is now final. That ruling, however, did not foreclose the possibility of Klein's employment

33

under § 327(e).")"; *see also* 3 COLLIER ON BANKRUPTCY ¶ 327.04[9] ("Although an attorney's lack
of disinterestedness may preclude employment by the trustee for general purposes in conducting a
bankruptcy case, the attorney may still be retained by the estate for a 'special purpose.'"). The
S&L Employment Application did not limit the subsection of Bankruptcy Code § 327 under which
the Debtor sought to employ S&L.[25] *See* S&L Employment Application ¶ 2. And, as set out further
below, the S&L Employment Application indicated that the Debtor sought to employ S&L for
clearly limited purposes while the Battaglia Firm was responsible for the strategy of the Debtor's
chapter 11 case and the implementation of that strategy. *Id.* at ¶ 22.

**B. Retroactive Approval of S&L's Employment under Bankruptcy Code § 327(e) is Appropriate.**

61.     S&L meets the standards for employment under Bankruptcy Code § 327(e) for the
limited matters contemplated to be S&L's primary responsibilities set out in the S&L Employment
Application. These matters include those related to (a) administrative matters such as the preparing
and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters
related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters
requested by the Debtor or lead bankruptcy counsel.

62.     Employment under Bankruptcy Code § 327(e) is appropriate where five (5)
elements are present: (1) employment by the trustee or debtor in possession for a specified special
purpose; (2) the specified purpose is not to represent the trustee or debtor in possession in
conducting the case; (3) the professional is an attorney that represented the debtor; (4) the
employment is in the best interest of the bankruptcy estate, and (5) the attorney does not represent

---

[25] While the S&L Employment Application argued that S&L met the standard for employment under section 327(a), the higher standard for disinterestedness under that provision subsumes entirely the similar standard for employment under section 327(e).

34

006860

or hold any interest adverse to the debtor or the estate with respect to the matter on which the attorney is to be employed. 11 U.S.C. § 327(e). S&L satisfies each of these requirements.

> i.   *The Debtor engaged S&L for specified limited purposes and S&L seeks, in the alternative, retroactive approval of its employment on such specified limited purposes.*

63.     The S&L Employment Application indicated that the Debtor sought to employ S&L for specified limited purposes. The Debtor contemplated that S&L would "be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case." S&L Employment Application ¶ 22. The Battaglia Firm's primary responsibility was to "provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy." *Id.* The Debtor engaged S&L to provide a limited scope of services to the Debtor while the Battaglia Firm was responsible for advising the Debtor with respect to the direction of the chapter 11 case and the actions necessary to effectuate the Debtor's restructuring.

64.     Similarly, S&L seeks in the alternative through the Administrative Expense Motion retroactive approval of its employment from the Petition Date through the September 20 Hearing for a specified limited purpose. The limited purposes for which S&L seeks retroactive approval of its employment through the Administrative Expense Motion are (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel. Administrative Expense Motion ¶ 29.

> ii.  *The limited purposes for which the Debtor engaged S&L and for which S&L seeks retroactive approval of its employment are not "conducting the case" under Bankruptcy Code § 327(e).*

65.     The statutory of framework of Bankruptcy Code § 327(e) excludes "conducting the case" from the specified purposes for which employment may be approved under that provision.

006861

Courts may approve employment under section 327(e) for a specified purpose as long as that specified purpose is not "conducting the case."

66.     Courts have interpreted "conducting the case" to involve the preparation of the chapter 11 plan, liquidating the estate, and assisting in the claims objection process. *In re Hart Oil & Gas, Inc.*, 2013 Bankr. LEXIS 3128, at *8 (Bankr. D.N.M. Aug. 2, 2013) (2013 WL 3992252) (collecting cases); *see also* 3 COLLIER ON BANKRUPTCY ¶ 327.04[9][c] ("The reference to 'conducting the case' in section 327(e) includes those matters that form a part of the administration of the case under the Code. In a reorganization case, these matters include assisting in formulating a plan and assisting the trustee in carrying out required investigations . . . ."). Where there is another attorney serving as general bankruptcy counsel, special counsel may be retained for limited bankruptcy matters including obtaining court approval for the use of cash collateral, selling assets and disposing of related executory contracts, and preparing and negotiating a key employee retention program and providing payment to critical personnel of the debtor. *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 408 (D. Del. 2005). Matters other than "conducting the case" fall within the scope of Bankruptcy Code § 327(e).

67.     The limited purposes for which S&L seeks retroactive approval of its employment by the Debtor—(a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel—are not the kind of core restructuring matters that courts have held to be "conducting the case" as that term is used in Bankruptcy Code § 327(e). Under the division of responsibilities contemplated in the S&L Employment Application and for which S&L seeks

006862

approval of in the Administrative Expense Motion, the Battaglia Firm would be responsible for advising the Debtor with respect to the strategy and matters amounting to "conducting the case."

     *iii.*    *The Debtor engaged S&L as an attorney and S&L seeks retroactive approval of its employment as an attorney.*

68.     There can be no reasonable dispute that the Debtor engaged S&L as an attorney or that S&L seeks retroactive approval of its employment as an attorney. As set out in the S&L Employment Application, the Debtor engaged S&L as an attorney. And S&L seeks compensation and retroactive authorization of its employment as an attorney.

     *iv.*    *S&L Represented the Debtor prior to the Petition Date.*

69.     It should similarly be undisputed that S&L represented the Debtor prior to the Petition Date. The Debtor executed an engagement letter retaining S&L on June 6, 2022, effective retroactively to May 24, 2022.[26] S&L began providing services to the Debtor on June 1, 2022 [ECF No. 163-3 at p.2].

     *v.*    *Employment of S&L for the limited purposes for which S&L seeks retroactive approval of its employment was in the best interests of the Debtor's bankruptcy estate.*

70.     The Debtor's engagement of S&L for the limited purposes for which S&L seeks retroactive approval of its employment was in the best interests of the Debtor's bankruptcy estate. S&L attorneys had deep knowledge of the Sandy Hook Litigation and their involvement allowed the Battaglia Firm to focus on strategy and the implementation of that strategy to conduct the Debtor's chapter 11 case. The Debtor needed additional counsel and S&L was particularly qualified to assist on the litigation issues.

---

[26] As indicated in the engagement letter, S&L was formed on June 1, 2022. However, Kyung Lee through KSLPLLC familiarized himself with background on the Debtor, conferenced with counsel for PQPR, and began working on a first-day declaration prior to that date. [ECF No. 163-9]. S&L began providing services to the Debtor on June 1, 2022 [ECF No. 163-3 at p.1].

006863

71.     S&L attorneys had extensive knowledge of the Sandy Hook Litigation as the result of their involvement in the IW Cases and work for the Debtor prior to the Petition Date. S&L attorneys were familiar with factual and legal issues of the litigation as well as the intersection of those issues with applicable bankruptcy law.[27] Issues surrounding the Sandy Hook Litigation and the automatic stay with respect to those actions were significant aspects of the early part of the Debtor's chapter 11 case and required substantial attention. Any new attorney would require substantial time to become familiar with the issues—for which the Debtor would incur substantial expense—and cause delay in resolving these issues in the Debtor's chapter 11 case.

72.     Further, the Debtor's engagement of S&L to address the issues surrounding the Sandy Hook Litigation and automatic stay provided the Debtor's lead counsel bandwidth to focus on strategy and implementation of that strategy to conduct the Debtor's chapter 11 case. The Battaglia Firm is a single attorney law firm, and as Mr. Battaglia represented to the Court at the September 20 Hearing, co-counsel was necessary to address the numerous issues in the early part of this case.[28] (Sept. 20, 2022, Hrg. Tr. 222:6-16). S&L provided at least 523.1 hours of services for the Debtor from the Petition Date through the September 20 Hearing on issues that would have otherwise required Mr. Battaglia's attention.

73.     The Debtor's engagement of S&L enabled the Debtor to move its chapter 11 case forward enough by the September 20 Hearing that it had a draft plan of reorganization prepared and was able to begin discussions about mediation with the Sandy Hook Plaintiffs. (*See* Sept. 20,

---

[27] For example, S&L had previously researched extensively whether the Sandy Hook Plaintiffs' claims fell under 28 U.S.C. § 157(b)(5) under caselaw in both the Southern District of Texas and the District of Connecticut. This allowed the Debtor to prepare its response to the Connecticut Plaintiffs' motion for relief from stay and respond to Alex Jones's request for stay of remand more efficiently than could have been handled by another firm.

[28] For example, S&L represented the Debtor in an emergency hearing in the U.S. Bankruptcy Court for the District of Connecticut on the same day that an emergency hearing with respect to amending the interim cash collateral order was held in this Court. It is unlikely that Mr. Battaglia could have prepared and argued both without co-counsel.

38

Hrg. Tr. 7:25-8:19, 9:11-16). Getting to this point required the Debtor to address numerous initial matters and reach a solution that would enable the Connecticut Litigation to continue without destroying the Debtor's ability to reorganize. This outcome required the retention of counsel in addition to the Battaglia Firm that was familiar with the details of the Sandy Hook Litigation.

> vi.   *S&L does not and did not during the engagement period represent or hold any interest adverse to the debtor or the estate with respect to the limited purposes for which S&L seeks retroactive approval of its employment under Bankruptcy Code § 327(e).*

74.    Even if S&L was not entirely disinterested for purposes of approval of employment under Bankruptcy Code § 327(a), S&L does not and did not during the engagement period represent or hold any interest adverse to the Debtor or the estate with respect to (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel. S&L therefore meets this element for approval of its employment under Bankruptcy Code § 327(e).

75.    An entity has an adverse interest to the estate where (a) it possesses or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or would create either an actual or potential dispute in which the estate is a rival claimant or (b) possesses a predisposition under circumstances that renders the predisposition a bias against the estate. *See I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005). The "definition must be employed with an eye to the specific facts of each case, and with attention to circumstances that may impair a professional's ability to offer impartial, disinterested advice to his or her client." *Id.* The question is whether S&L has a "meaningful incentive" to act contrary to the best interests of the Debtor's bankruptcy estate, *In re Quality Bev. Co.*, 216 B.R. 592, 595

39

(Bankr. S.D. Tex. 1995), or "personal interest" contrary to the interests of the bankruptcy estate, *In re W. Delta Oil Co.*, 432 F.3d at 355.

76.     S&L does not and did not during the engagement period represent any other party in connection with the Debtor's chapter 11 case or the Sandy Hook Litigation. Although S&L attorneys previously represented the IW Debtors in the litigation, (a) the Texas Plaintiffs released their claims against the IW Debtors by May 19, 2022; (b) the Connecticut Plaintiffs dismissed their claims against the IW Debtors with prejudice between May 13 and May 26, 2022;[29] and (c) the IW Debtors are not creditors in the Debtor's chapter 11 case. S&L does not and never has represented Alex Jones, PQPR, or any other party in interest in this chapter 11 case. [ECF Nos. 163-5 & 163-6]; (Sept. 20, 2022, Hrg. Tr. 61:23-62:1, 62:19-20, 131:15-132:5, 149:23-150:4). The S&L engagement agreement expressly provides that the representation of the Debtor did not include any "parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies) . . . ." [ECF No. 163-3, at p. 6 of 12]. Further, S&L took affirmative steps prepetition to ensure that Jones would not have control over the Debtor's restructuring. [ECF No. 178-1, 178-2, 178-3]; (Sept. 20, 2022, Hrg. Tr. 95:14-96:1).

77.     Similarly, S&L does not and did not during the engagement period possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or create either an actual or potential dispute with the Debtor with respect to the limited purposes for which S&L seeks retroactive approval of its employment under Bankruptcy Code § 327(e). The only economic interest S&L has in the Debtor's chapter 11 case is with respect to any administrative expense

---

[29] The Connecticut Plaintiffs filed a notice of dismissal of their claims with prejudice against the IW Debtors with the U.S. Bankruptcy Court for the District of Connecticut on May 13, 2022, along with an unopposed motion for dismissal of the claims with prejudice. [ECF No. 163-20]. The Connecticut Bankruptcy Court held a hearing on May 24, 2022, at which it granted the unopposed motion to dismiss and requested a proposed order. The Connecticut Bankruptcy Court entered the proposed order submitted by the Connecticut Plaintiffs on May 26, 2022. [Adv. No. 22-05006 (Bankr. D. Conn.), Dkt. No. 28].

claim allowed by the Court for the services provided and expenses incurred on behalf of the Debtor as debtor in possession.

78.     Nor does S&L possess any predisposition under circumstances that would render such predisposition a bias against the Debtor or the bankruptcy estate with respect to the limited purposes for which S&L seeks retroactive approval of its employment under Bankruptcy Code§ 327(e). *West Delta Oil* illustrates the kind of situation that might give rise to a predisposition amounting to an adverse interest. In that case, the attorney for the debtor in possession simultaneously represented the debtor and sought to acquire a financial interest in the debtor along with a group of other investors. *In re W. Delta Oil Co.*, 432 F.3d at 356-57. In reaching its holding that the attorney possessed an adverse interest, the Fifth Circuit Court of Appeals reasoned that:

> A lawyer who simultaneously represents a debtor in a bankruptcy proceeding and seeks to acquire a financial interest in the debtor faces myriad quandaries, particularly in the liquidation context. In essence, the lawyer is representing a seller (the debtor) and a buyer (himself). Efforts to preserve and enhance the value of the seller's assets will work inevitably against the buyer's interest in purchasing at the lowest price possible. In addition, efforts to market the seller to other potential bidders may drive up the price, forcing buyers to increase their bids. Moreover, opting to reorganize rather than liquidate may reduce or eliminate possible avenues for anyone wishing to acquire specific economic interests. In short, by operating as a potential buyer, a lawyer for a bankruptcy estate possesses a predisposition to reduce the price of the estate's assets which works to the detriment of the estate, its creditors, and its equity stakeholders.

*Id.* at 356. A predisposition creates an adverse interest where the circumstances give rise to a *personal interest* that the professional has in the bankruptcy case. *See id.* at 355 ("[A]ttorneys engaged in the conduct of a bankruptcy case should be free of the slightest personal interest . . . ." (internal quotation marks omitted)). S&L does not have any personal interest predisposing it to take actions contrary to the Debtor or the estate with respect to (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements,

006867

(b) matters related to enabling the Sandy Hook Litigation to continue to judgment, or (c) specific matters requested by the Debtor or lead bankruptcy counsel.

79.     With respect to administrative matters and matters requested by the Debtor and lead bankruptcy counsel, S&L submits that it is unreasonable that any personal interest even *could* exist. There is no room for personal interest on matters like obtaining service of pleadings and notices of hearings, preparing the status report required by Bankruptcy Code § 1188(c), or representing the Debtor at the section 341 meeting. And matters requested by the Debtor or lead bankruptcy counsel outside of S&L's primary responsibility necessarily involve the evaluation by another counsel.

80.     Further, the positions represented in this chapter 11 case and the IW Cases indicate that S&L and its professionals has no predisposition with respect to the Sandy Hook Litigation. In this chapter 11 case, S&L represented the Debtor in seeking to maintain the automatic stay to the extent necessary to preserve the Debtor's estate and in agreeing to and affirmatively seeking modification of the automatic stay where beneficial to the estate. *See* Debtor's Response to Emergency Motion for Relief from the Automatic Stay [ECF No. 78]; Agreed Order Modifying the Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgement [ECF No. 117]; Debtor's Emergency Motion for an Order Modifying the Automatic Stay to Allow the Heslin[]/Lewis State Court Suit to Continue to Judgement [ECF No. 2]. S&L also represented the Debtor in rejecting Alex Jones's request to extend the automatic stay as to him individually. In the IW Cases, S&L professionals removed and opposed remand of the Sandy Hook Litigation absent dismissal of the claims against the IW Debtors with prejudice, [Adv. No. 22-01023-hcm (Bankr. W.D. Tex.), Dkt. No. 9]; [Adv. No. 22-05004 (Bankr. D. Conn.), Dkt. No. 22], but sought to *expedite* dismissal of the claims against the IW Debtor with prejudice and attendant remand of the

42

removed litigation when offered by the Plaintiffs, [Case No. 22-60020 (Bankr. S.D. Tex.), Dkt. Nos. 91-15 & 91-16]. S&L was agnostic about whether the Sandy Hook Litigation claims were determined in state court or bankruptcy court, except to the extent it affected the relevant bankruptcy estates.

## C. The Majority of Services S&L Provided to the Debtor During the Engagement Period Do Not Constitute Representing the Debtor in "Conducting the Case."

81.     The U.S. Trustee argues that the Court cannot retroactively approve S&L's employment under Bankruptcy Code § 327(e) because the services provided by S&L include representation on matters that are "conducting the case." UST Objection ¶ 24. But this does not present a serious obstacle. A professional is not entitled to compensation for services that exceed the scope of its employment. *See, e.g.*, *In re Mohiuddin*, 627 B.R. 875, 880 (Bankr. S.D. Tex. 2021) ("Estate professionals are not entitled to compensation for work exceeding the scope of the order authorizing the professional's employment."). If the Court retroactively approved S&L's employment under Bankruptcy Code § 327(e), only the services falling under the relevant scope of the employment would be compensable.

82.     Most of the services provided by S&L would be appropriate under Bankruptcy Code § 327(e).  As set out in the Administrative Expense Motion, the largest portion of the services provided by S&L to the Debtor were related to the Sandy Hook Litigation and reflected in the Litigation (116.4 hours; $80,536.25), Relief from Stay Proceedings (82.9 hours; $60,632.50), and Fee/Employment Applications (71.9 hours; $44,535.00) categories. The services in these categories that were not related to the Sandy Hook Litigation were largely either administrative matters or matters the Debtor designated for S&L to handle. The services provided in other categories also largely reflect matters that S&L was asked to handle. For example, S&L was tasked

006869

with responding to the Tort Committee Motion [ECF no. 102] and the attendant the motion to expedite [ECF No. 107], and S&L recorded such services under the Case Administration category.

83.      Certain services provided by S&L, however, do not fall within the scope of § 327(e). For example, S&L professionals provided 15.5 hours of services under the Plan and Disclosure Statement Category and 2.7 hours of services in the Claims Administration and Objections category. While these services benefited the estate and were related to matters involving the Sandy Hook Litigation—e.g., the analysis of Jones's asserted indemnity claim was relevant in the Debtor's rejection of Jones's request for the Debtor to seek extension of the automatic stay—they likely amount to providing services related to "conducting the case" as that term is used in Bankruptcy Code § 327(e).

84.      The law is clear on what the effect would be if the Court retroactively approves S&L's employment under section 327(e). Only the matters within the scope of employment would be compensable. But the thrust of the services provided by S&L were for the particular purpose identified in the S&L Employment Application to be S&L's primary responsibility and for which S&L seeks retroactive approval of its employment under Bankruptcy Code § 327(e) in the alternative.

## REPLY TO ARGUMENTS THAT S&L IS NOT ENTITLED TO COMPENSATION OR EXPENSES UNDER BANKRUPTCY CODE § 503(b)(1)(A)

85.      The UST Objection and Debtor/Trustee Objection oppose allowance of an administrative expense under Bankruptcy Code § 503(b)(1)(A) for S&L's fees. But their arguments do not undercut the position that S&L actually asserts.

86.      S&L submits that even if the Court adopts the U.S. Trustee's mistaken assertion that S&L cannot seek retroactive approval of its limited employment under section 327, the Court can still grant *de facto* approval of S&L's employment and allow an administrative expense under

44

section 503(b)(1)(A) because S&L meets the substantive requirements of section 327. Further, expenses incurred by S&L that would otherwise have been borne by the estate—e.g., the cost of serving pleadings—are properly administrative expenses of the estate even absent S&L's ability to meet the substantive requirements of section 327.

**A. Bankruptcy Code § 503(b)(1)(A) Provides a Mechanism to Allow an Administrative Expense Claim for S&L's Fees if the Court Determines that S&L Does Not Have the Ability to Seek Approval of its Employment.**

87.    The UST Objection and the Debtor/Trustee Objection cite numerous cases supporting the proposition that Bankruptcy Code § 503(b)(1)(A) cannot be used to circumvent the substantive requirements of Bankruptcy Code § 327. S&L agrees that this is consistent with the weight of authority.[30]

88.    However, this either misunderstands or ignores S&L's actual argument with respect to section 503(b)(1)(A). S&L's contention that section 503(b)(1)(A) can form a basis to allow fees where the professional's employment could have been approved under section 327 but for the professional's inability to seek approval of its own employment for some reason. *Mehdipour v.*

---

[30] S&L contends that this authority is no longer persuasive in light of subsequent developments in the law on the standards applied to professional compensation under Bankruptcy Code § 330. The premise underlying these decisions is that allowing professional compensation under section 503(b)(1)(A) would render nugatory sections 327, 330, and/or 503(b)(2). *See, e.g., F/S Airlease II v. Simon*, 844 F.2d 99, 109 (3d Cir. 1988). While this would be sound if the same standard applied to allowance of compensation under section 330 (and thus allowance as an administrative expense under 503(b)(2)) and an administrative expense under section 503(b)(1)(A), the standards are no longer the same. An administrative expense under section 503(b)(1)(A) requires showing that the goods or services received by the bankruptcy estate in exchange for the obligation directly benefit the estate. *McBride v. Riley (In re Riley)*, 923 F.3d 433, 439 (5th Cir. 2019). While binding Fifth Circuit precedent *previously* required a professional's services to have resulted an identifiable, tangible, and material benefit to the estate for an award of compensation under section 330 viewed retrospectively, this was abrogated by the Fifth Circuit Court of Appeals sitting *en banc* in *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015), in which the Fifth Circuit adopted a prospective standard focused on whether the services were reasonably likely to benefit the estate at the time the services were provided. *Id.* at 268. Therefore, there are amounts allowable under sections 330 and 503(b)(2) that would *not* be allowable under 503(b)(1), even where both provisions are available. *Cf. In re Riley*, 923 F.3d at 440-41 (so holding with respect to expenses). Sections 327, 330, and 503(b)(2) would not be rendered nugatory by the existence of an alternative mechanism that requires a higher showing, covers less, and does not provide the same certainty.

45

*Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303

(9th Cir. 1998), supports S&L's position.

89.      It is not clear that any objecting party disagrees with this application of section

503(b)(1) and *Mehdipour*. Neither the Debtor nor the Subchapter V Trustee oppose the Rule 59

Motion or S&L's ability to seek retroactive approval of its limited employment under Bankruptcy

Code § 327(a) or (e). The Plaintiffs oppose the Rule 59 Motion but not the Administrative Expense

Motion. Alex Jones possibly still opposes the Rule 59 Motion but not the Administrative Expense

Motion to the extent that the Requested Administrative Expense Claim includes S&L's voluntary

reduction. The U.S. Trustee does not directly argue against retroactive approval of S&L's limited

employment under Bankruptcy Code § 327(a) and asserts that S&L's reliance on *Mehdipour* is

misplaced because the S&L Employment Application was denied due to the Court's finding that

S&L had a material adverse interest, not because *Mehdipour* does not apply or was wrongly

decided. Nevertheless, to the extent that a dispute could be inferred from the UST Objection or the

Debtor/Trustee Objection, S&L addresses the issue below.

     *i.*    *Mehdipour is applicable if the Court adopts the position urged by the U.S. Trustee
that S&L lacks authority to seek approval of its limited employment.*

90.      In *Mehdipour*, a debtor in possession engaged a broker to market and sell real

property owned by the bankruptcy estate. 202 B.R. at 477. The debtor filed an application to

employ the broker but later withdrew the application.[31] *Id.* The bankruptcy court ruled that the

broker lacked standing to file its own application seeking approval of its employment. *Id.* The

bankruptcy court granted, however, the broker's application for an administrative expense under

---

[31] The debtor in *Mehdipour* withdrew the application after it learned that the real estate agent providing services to the
debtor through the broker (a) assisted the purchaser of the property (who was also a client of the agent) in finding
partners for the acquisition of the property, (b) contacted his business partner in other transactions about the potential
deal, and (c) loaned money to the purchaser for an escrow deposit for the property. 202 B.R. at 477. The bankruptcy
court held that notwithstanding these connections the broker was disinterested and did not hold a participatory interest
in the purchaser. *Id.* at 480.

006872

Bankruptcy Code § 503(b)(1)(A), which the debtor appealed. *Id.* at 477-78. The Bankruptcy Appellate Panel for the Ninth Circuit affirmed the ruling of the bankruptcy court. *Id.* at 481. The 9th Circuit also affirmed. *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 139 F.3d 1303, 1303 (9th Cir. 1998) (per curiam).

91.     In reaching its decision to affirm, the BAP reasoned that section 503(b)(1) was available to allow professional fees where the professional meets the requirements of section 327. *In re Mehdipour*, 202 B.R. at 478-79. Relevant to the Court's decision was that there was no practical method for the professional to obtain approval of its employment under the circumstances. *See id.* at 479 ("[The broker] availed itself of every potential method for obtaining court approval of its employment. After its application was denied, [the broker]'s only recourse was to apply for fees pursuant to § 503."). The bankruptcy court's allowance of the administrative expense under Bankruptcy Code § 503(b)(1)(A) was *de facto* retroactive approval of the professional's employment. *Id.* at 480.

92.     While *Mehdipour* addresses a particular and uncommon situation, the position advanced by the U.S. Trustee would create an analogous situation here. The U.S. Trustee argues that S&L does not have the ability to (a) pursue the Rule 59 Motion or (b) seek retroactive approval of its employment under Bankruptcy Code § 327(e).[32] The Court should reject those arguments.[33] But if it does not, the reasoning of *Mehdipour* applies and the Court should consider the same relevant factors under Bankruptcy Code § 503(b)(1)(A). The point of the Ninth Circuit BAP's

---

[32] The UST Objection does not, however, argue that S&L is not able to seek retroactive approval of its employment under Bankruptcy Code § 327(a).

[33] *Mehdipour* notes that the bankruptcy court's ruling that the broker did not have standing was in error. 202 B.R. at 479. According to the BAP, "[s]ection 327 does not, by its terms, limit standing of a professional to seek employment." *Id.*

006873

decision is that what matters is whether the professional meets the standard for employment under Bankruptcy Code § 327.

> ii.   *Mehdipour is consistent with Gemini Interests and other decisions holding that Bankruptcy Code § 503(b) does not provide a way to avoid the substantive requirements of Bankruptcy Code § 327.*

93.   The UST Objection arguably implies that S&L's reading of *Mehdipour* is inconsistent with *In re 1002 Gemini Interests LLC*, 2015 Bankr. LEXIS 612 (Bankr. S.D. Tex. Feb. 27, 2015) (2015 WL 913542). But there is no inconsistency. *Gemini Interests* and related authority did not address the situation at issue in *Mehdipour* or that the U.S. Trustee's position would create here. Indeed, *Gemini Interests* expressly considered retroactive employment on the merits. *Id.* at 41-42. While *Gemini Interests* and other cases indicate that section 503(b) cannot be used to get around the substantive requirements of section 327, those authorities do not prohibit allowing a claim under that section where that is the only recourse for consideration of a professional's employment on the merits.

94.   In *Gemini Interests*, the bankruptcy court denied allowance of certain requested compensation by an examiner (9.3 hours) and his counsel (30.5 hours) for services that exceeded the scope of the examiner's duties under the relevant appointment order. *See id.* at *15-*22, *24-*33. The examiner and his professionals sought in the alternative that the fees be allowed as substantial contribution claims under Bankruptcy Code § 503(b)(3). *Id.* at 38-39. The court denied the request for allowance of the fees under section 503(b)(3), adopting the reasoning of several circuit court decisions holding that professionals could not circumvent the requirements of section 327 through section 503(b).[34] *Id.* at 39.

---

[34] *Gemini Interests* was decided prior to the Fifth Circuit's abrogation in *Woerner* of the retrospective "material benefit to the estate" standard for professional compensation under Bankruptcy Code § 330. The bankruptcy court's opinion in *Gemini Interests* was published on February 27, 2015. The Fifth Circuit's *en banc* opinion in *Woerner* was published on April 9, 2015. It is questionable whether the reasoning in *Gemini Interest* still stands.

006874

95.     However, the court in *Gemini Interests* expressly evaluated whether to retroactively expand the powers of the examiner and his counsel. *Id.* at 41-42. The examiner failed to establish excusable neglect for the delay in seeking the expansion of the appointment and employment orders and so was not entitled to such retroactive expansion.[35] *Id.* The court did not need to address the issue that the U.S. Trustee seeks to create here and the 9th Circuit BAP addressed in *Mehdipour*—where the professional meets the requirements of one or more provisions of section 327 but lacks standing to seek approval of its employment.

96.     Similarly, the other authorities cited in the UST Objection and the Debtor/Trustee Objection for the proposition that Bankruptcy Code § 503(b) does not provide an alternative to the substantive requirements of Bankruptcy Code § 327 did not address a situation where the professional was unable to seek consideration of retroactive employment on the merits. In many of these cases, retroactive approval of employment was expressly considered. *See, e.g.*, *F/S Airlease II v. Simon*, 844 F.2d 99, 105-108 (3d Cir. 1988) (evaluating whether retroactive approval of employment of professional appropriate); *Cushman & Wakefield v. Keren P'ship (in Re Keren P'shp.)*, 189 F.3d 86, 87-88 (2d Cir. 1999) (affirming bankruptcy court's decision to deny retroactive approval of professional's employment); *In re Cutler Mfg. Corp.*, 95 B.R. 230, 231 (Bankr. M.D. Fla. 1989) ("This Court has found [the professional] was not eligible to be employed as a professional. If these individual persons had sought to be employed as a professional, they, too, would have been denied because they are not disinterested persons. They cannot now come to this Court *upon the same facts and evidence* and seek to establish under § 503 rights they could

---

[35] The court also questioned without deciding whether it had "the authority to retroactively expand the scope of a professional's powers in order to approve that professional's compensation for work that was performed outside the scope of the original retention order." *In re 1002 Gemini Interests LLC*, 2015 Bankr. LEXIS 612, at *41-*42. But in the subsequent case of *In re Mohiuddin*, 627 B.R. 875 (Bankr. S.D. Tex. 2021), the same judge—Judge Marvin Isgur— held that the court *did* have the authority to retroactively expand the scope of professionals. *Id.* at 884.

006875

not acquire under § 327." (emphasis supplied)). In others, the ability of the professional to seek retroactive approval of its employment was referenced in the decision. *See, e.g.*, *In re S. Diversified Props., Inc.*, 110 B.R. 992, 996 (Bankr. N.D. Ga. 1990) (noting that the professional neither requested retroactive approval of employment nor showed exceptional circumstances); *Shapiro Buchman LLP v. Gore Bros. (In re Monument Auto Detail)*, 226 B.R. 219, 226 (B.A.P. 9th Cir. 1998) (evaluating the professional's assertion regarding retroactive employment that it failed to seek from the bankruptcy court); *McCutchen, Doyle, Brown & Enersen v. Official Comm. of Unsecured Creditors (In re Weibel, Inc.)*, 176 B.R. 209, 213 (B.A.P. 9th Cir. 1994) (holding that the professional failed to establish that it met the requirements for employment of Bankruptcy Code § 327); *cf. In re Albrecht*, 245 B.R. 666, 668 (B.A.P. 10th Cir. 2000) (noting that the professional's employment had been approved as special counsel after previously being denied under section 327(a)). In the remaining authorities, the facts at issue did not involve a situation where the professional met the requirements for retroactive approval of its employment but lacked standing to seek such approval. *See In re Milwaukee Engraving Co.*, 219 F.3d 635 (7th Cir. 2000); *In re Garden Ridge Corp.*, 326 B.R. 278, 281 (Bankr. D. Del. 2005) (referencing also the ability to seek retroactive approval of employment). By and large, these cases reject the limitations on standing that the U.S. Trustee asserts here and would make *Mehdipour* applicable.

97.     That *Mehdipour* is not inconsistent with these decisions is reflected in the argument presented in the UST Objection. According to the U.S. Trustee:

> the decision in *Mehdipour* was not intended to allow professionals who do not meet the retention requirements under Section 327 other means to obtain payment of their fees. The Ninth Circuit BAP made that clear in stating: "[c]ompensation under § 503 does not allow the professional to sidestep the requirements of § 327 and 330—the professional must still be disinterested and not hold any adverse interest." *Mehdipour*, 202 B.R. at 479.

UST Objection ¶ 20. S&L does not disagree with the U.S. Trustee's reading of *Mehdipour*. But the decision does mean something—that courts can consider a professional's compensation under the relevant standards of Bankruptcy Code § 327 and retroactive approval employment notwithstanding unusual circumstances preventing formal approval of that employment.

> iii.   *The denial of the S&L Employment Application does not prevent evaluation of whether S&L meets the requirements of §327 in connection with the Administrative Expense Motion.*

98.     Directly addressing S&L's position, the UST Objection states that S&L's reliance on *Mehdipour* is misplaced because the S&L Employment Application was denied as the result of the Court's finding that S&L had an adverse interest. UST Objection ¶ 20. This argument is flawed.

99.     As addressed above, neither collateral estoppel nor the law of the case doctrine applies with respect to the Administrative Expense Motion. *Supra* ¶¶ 29-45. The Court stated in its ruling at the September 20 Hearing that its decision would require further questions about S&L's retention and work performed and that all parties' rights were reserved regarding compensation for work performed for the Debtor prior to the ruling. (Sept. 20, 2022, Hrg. Tr. 256:14-257:4). Collateral estoppel does not apply because (a) the issues at stake are not identical S&L seeks a more limited scope of employment in the administrative expense motion, (b) the issue of S&L's disinterestedness was not "actually litigated" because it was not raised or contested by the parties, and (c) the issue of S&L's disinterestedness was not a critical and necessary part of the Court's decision because the decision is consistent with a potential conflict that is not an issue in light of the limited employment and the U.S. Trustee argued for an independent, entirely discretionary basis to deny the S&L Employment Application. The law of the case doctrine is discretionary and exceptions to the general doctrine are present because (x) S&L seeks to present substantial additional evidence on the issue of its disinterestedness and (y) the Court's ruling at the September 20 Hearing was clear error.

51

100.    The real question is whether S&L *actually has* an adverse interest and what any adverse interest entails. The U.S. Trustee does not directly assert that S&L has an adverse interest, but rather that the Court previously found that S&L had one. UST Objection ¶ 20. Neither the U.S. Trustee, any other party in interest, nor the Court has articulated *what* that adverse interest is. Neither the U.S. Trustee nor any party in interest has argued for the existence of this adverse interest in connection with the S&L Employment Application or the Administrative Expense Motion. S&L contends that this is because no such adverse interest exists.

101.    S&L seeks to establish that it does not hold or represent any adverse interest in connection with either (a) the Rule 59 Motion; (b) retroactive approval of S&L's employment in connection with a request for administrative expense under section 330 and 503(b)(2); or (c) *de facto* retroactive approval of S&L's employment in connection with a request for administrative expense under section 503(b)(1). To the extent that the U.S. Trustee does not oppose consideration of this issue by the Court, but rather just consideration in connection with the request under Bankruptcy Code § 503(b)(1), the dispute is not material. S&L raised *Mehdipour* because of the position taken by the U.S. Trustee.

**B.  Bankruptcy Code § 503(b)(1)(A) Provides a Mechanism for Reimbursement of S&L's Out-of-Pocket Expenses that Would Have Been Borne by the Debtor.**

102.    Neither the UST Objection, the Debtor/Trustee Objection, nor the AEJ Limited Objection directly oppose S&L's request for reimbursement of expenses under Bankruptcy Code § 503(b)(1)(A). However, the U.S. Trustee's arguments could possibly apply to reimbursement of these expenses.

103.    S&L contends that at least expenses that would otherwise be payable by the Debtor as administrative expenses under Bankruptcy Code § 503(b)(1) are reimbursable to S&L under that provision. These include, among other things, the costs of noticing pleadings and hearings that

006878

would have otherwise been borne by the Debtor and payable by the Debtor's estate. *Cf. In re Sanchez Energy Corp.*, 2021 Bankr. LEXIS 1175, at *32 (Bankr. S.D. Tex. May 3, 2021) (2021 WL 1747364) (reasoning that the debtor in possession would have been obligated to provide notice if the applicant had not provided such notice for the debtor).

104.     The Fifth Circuit's reasoning in *McBride v. Riley (In re Riley)*, 923 F.3d 433 (5th Cir. 2019), supports S&L's position. The U.S. Trustee argues that *Riley* does not apply because the issue was related to a chapter 13 case. But this overlooks *how* the Fifth Circuit analyzed the issue before it and the statutory scheme of Bankruptcy Code § 503.

105.     The relevant issue in *Riley* was whether the bankruptcy court committed legal error by concluding that certain expenses incurred by the attorney for a chapter 13 debtor were "not reimbursable as necessary expenses to preserve the estate under 11 U.S.C. § 503(b)(1)." *Id.* at 437. The Fifth Circuit panel did not reject the reimbursement out of hand—for example, by holding that such reimbursement could only occur pursuant to sections 330(a) and 503(b)(2)—but instead analyzed the expenses under the standard two prong test applicable to all other asserted section 503(b)(1) claims. According to *Riley*, the standard is: "First, the debt must arise from a post-petition transaction with the estate, rather than a transaction with the debtor personally; second, the goods or services received in exchange for the debt must directly benefit the estate." *Id.* at 439. While *Riley* ultimately held that the expenses at issue did not qualify as expenses necessary to preserve the estate, *id.*, what is relevant here is the way that the Fifth Circuit analyzed the issue.

106.     Section 503 does not make a distinction between attorneys for chapter 13 debtors and attorneys for chapter 11 debtors in possession. Rather, Bankruptcy Code § 503(b)(2) provides that administrative expenses include "compensation and reimbursement awarded under section 330(a) of [the Bankruptcy Code.]" The difference lies in what is required for an award under

006879

section 330(a) for an attorney to a chapter 13 debtor and an attorney for a chapter 11 debtor. If Bankruptcy Code § 503(b)(1) provides an alternative mechanism for allowance of expenses incurred by an attorney for a chapter 13 debtor that could also potentially be allowed under section 330(a)—as the Fifth Circuit's reasoning in *Riley* indicates it does—it would also provide an alternative for the allowance of expenses for attorneys for chapter 11 debtors.

107.     *Riley* also demonstrates why this reading of section 503 does not render any provision of the Bankruptcy Code meaningless. Some expenses *may be* reimbursable under Bankruptcy Code §§ 330(a) and 503(b)(2) that *are not as a matter of law* reimbursable under Bankruptcy Code § 503(b)(1). *Id.* at 440,443. This applies for an attorney for a chapter 11 debtor in possession just as much as it does for an attorney for a chapter 13 debtor. Bankruptcy Code § 330(a)(1)(B) provides for reimbursement for actual and necessary expenses related to providing services reasonably likely to benefit the debtor's estate viewed prospectively. *See Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015). Under Bankruptcy Code § 503(b)(1)(A), the costs and expenses must *actually be* necessary for preserving the estate. *See In re Riley*, 923 F.3d at 439.

## REPLY TO ARGUMENT THAT S&L IS NOT ENTITLED TO APPLY ITS RETAINER TO PAY THE FILING FEE FOR THE DEBTOR'S CHAPTER 11 CASE

108.     The U.S. Trustee argues that S&L improperly seeks to invoke Bankruptcy Code § 363(c) as a basis for payment of its professional fees and expenses. But that is not the relief sought in the Administrative Expense Motion.

109.     S&L seeks to apply its Retainer to the $1,738.00 filing fee incurred by the Debtor in this chapter 11 case. Administrative Expense Motion ¶ 43. Under the engagement agreement between the Debtor and S&L (the "Engagement Agreement"), the Debtor was required to reimburse S&L for filing fees, which would be included in S&L's invoices to the Debtor if paid

54

by S&L. (Debtor's Ex. 3 at p.12 [ECF No. 163-3]). The use of the Retainer to pay the filing fee according to the Engagement Agreement is in the ordinary course of business for the Debtor.

110.    Courts have utilized a "horizontal" test and a "vertical" test to determine whether a transaction falls within a debtor in possession's ordinary course of business. *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test "requires the court to look to similar businesses and determines whether the transaction at issue is one that would normally be entered into by a similar business." 3 COLLIER ON BANKRUPTCY ¶ 363.03[1]. The vertical test asks "whether the transaction is one that creditors would reasonable expect the debtor to enter into." *Id.*

111.    Both the horizontal and vertical tests support approving application of the Retainer to the filing fee as an ordinary course expense here. Section 1930 of title 28 of the United States Code required the Debtor to pay the filing fee upon commencing its chapter 11 case. The use of retainer funds held in trust by an attorney for a debtor in possession to pay this required filing fee pursuant to an engagement agreement is a common practice. The transaction is therefore one that would normally be entered into by a business filing a chapter 11 case and could be reasonably anticipated by creditors.

112.    Further, the Debtor does not oppose the use of the Retainer to cover the filing fee as requested in the Administrative Expense Motion. The Debtor and the Subchapter V Trustee oppose only the allowance of an administrative expense for S&L's fees, absent court approval of S&L's employment.[36]

---

[36] Further, as set out above, neither the Debtor nor the Subchapter V Trustee oppose the Rule 59 Motion nor present any argument in the Debtor/Trustee Objection against retroactive employment of S&L.

006881

## REPLY TO ARGUMENT THAT THE PARTIES CANNOT CONSENSUALLY RESOLVE THE DISPUTES IN THE ADMINISTRATIVE EXPENSE MOTION, THE RULE 59 MOTION, AND OTHER OSTENSIBLE DISPUTES

113.    The U.S. Trustee argues in essence that the parties cannot consensually resolve the Administrative Expense Motion, the Rule 59 Motion, and S&L's right to appeal the denial of the S&L Employment Application. *See* UST Objection ¶¶ 29-30. Under the U.S. Trustee's view, the parties would be required to litigate the matters to conclusion, including any appeals.

114.    The U.S. Trustee cites *Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283 (S.D.N.Y. 2014), in support of this position. In *Lehman*, members of the official committee of unsecured creditors sought an administrative expense for the fees of professionals retained by the individual committee members. *Id.* at 287. The proposed plan of reorganization provided that the individual committee members' reasonable professional fees would be treated as administrative expenses, and the bankruptcy court confirmed the plan. *Id.* at 287-88. In accordance with the plan, the individual committee members filed applications for the payment of their individual professional fees, which the bankruptcy court granted over the Region 2 U.S. Trustee's objection. *Id.* at 288. The U.S. District Court for the Southern District of New York reversed the bankruptcy court's ruling, reasoning that "because § 503(b)—the sole source of administrative expense—excludes paying professional fee expenses on the basis of committee membership, the Individual Members cannot have their professional fee expenses paid as administrative expenses solely on the basis of their committee membership." *Id.* at 290-92, 296. The district court remanded the proceeding to the bankruptcy court to determine whether the individual committee members made substantial contributions that would entitle them to have their professional fee expenses paid as administrative expense claims under Bankruptcy Code § 503(b)(4). *Id.* at 296.

006882

115.    As cases interpreting *Lehman* have explained, however, the decision does not prevent settlement of asserted professional fees where there exists a mechanism for the payment of the professional fees at issue. *See City of Rockford v. Mallinckrodt PLC (In re Mallinckrodt PLC)*, 2022 U.S. Dist. LEXIS 54785, at \*39 (D. Del. Mar. 28, 2022) (2022 WL 906458); *In re Mallinckrodt PLC*, 639 B.R. 837, 906 n. 229 (Bankr. D. Del. 2022); *In re Purdue Pharma L.P.*, 633 B.R. 53, 66 (Bankr. S.D.N.Y. 2021), overruled on other grounds by 635 B.R. 26 (S.D.N.Y. 2021); *In re Stearns Holdings*, LLC, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019). The issue in *Lehman* was that the plan provided for the payment of the individual committee members' legal fees without requiring them to show any substantial contribution. It did not involve the settlement of asserted but disputed substantial contribution claims, but rather sought to avoid entirely the need to demonstrate substantial contribution.

116.    Here, any settlement of the Administrative Expense Motion would also result in a settlement of (a) the Rule 59 Motion; (b) potential appeal of the denial of the S&L Employment Application; (c) retroactive approval of S&L's employment for the limited period under Bankruptcy Code § 327(a); (d) retroactive approval of S&L's employment for the limited period and under limited scope under Bankruptcy Code § 327(e); (e) *de facto* retroactive approval of S&L's employment for matters outside of any conflict as in *Mehdipour*; (f) S&L's right to an administrative expense for out-of-pocket expenses that would otherwise have been borne by the Debtor; (g) S&L's right to apply the Retainer to the Debtor's filing fee; and (h) S&L's appellate rights. Further, no party has asserted that S&L actually has or represents any interest adverse to the Debtor's estate, and the Court's ruling left open questions about S&L's retention and the work performed prior to the September 20 Hearing. There is a basis for the relief S&L requests. Rather

than rewriting the Bankruptcy Code as in *Lehman*, a settlement here would resolve the (ostensible) dispute regarding the application of the Bankruptcy Code to the facts present here.

## REPLY TO ARGUMENTS OF ALEX JONES

117.    The arguments in the AEJ Limited Objection are substantially different from those of the U.S. Trustee, the Debtor, or the Subchapter V Trustee. Jones does not oppose the allowance of S&L's requested administrative expense claim—subject to the discount set out in the Administrative Expense Motion—or the application of the Retainer to such amount, but "does not agree the payment schedule is reasonable for the current status of this FSS Chapter 11 case." AEJ Limited Objection ¶ 10. Jones asserts, however, that the amount of the voluntary discount would be *required* absent the voluntary discount because S&L did not make certain arguments that would have been beneficial to Jones's positions in the Debtor's chapter 11 case. Further, Jones contends that the Court should consider the professional fees paid in the IW Cases in determining appropriate compensation.

118.    Although there is no apparent dispute—S&L did not seek any specific payment schedule for its Requested Administrative Expense Claim other than application of the Retainer—S&L replies to Jones's arguments below.

### A. Alex Jones's Arguments that S&L Did Not Address the Issues Set out in the Objection to the S&L Employment Application and Should Have Raised Other Points at the September 20 Hearing Are Misplaced.

119.    Jones argues that S&L's's fees should be reduced to the amount indicated in the Administrative Expense Motion even absent S&L's voluntary reduction of $62,475.00. Jones asserts that S&L did not adequately respond to the concerns relating to (a) Lee and Schwartz not supplementing their disclosures in the IW Cases or (b) the Debtor's initial proposal to pay Alex Jones's travel expenses and the fees for state court counsel related to the Connecticut Litigation.

006884

Jones submits that S&L should have presented certain arguments that coincidentally would benefit Jones vis-à-vis the Debtor's estate in other matters.

120.     Jones's arguments are misplaced. <u>First</u>, the Debtor and S&L *did* present arguments and evidence surrounding the reasons Lee did not supplement the Rule 2014 disclosures in the IW Cases. <u>Second</u>, the Debtor—through S&L and the Battaglia Firm—also informed the Court of the actual reasons behind the Debtor's proposed payment of Jones's travel expenses and 100% of the costs of the state court litigators related to the Connecticut Litigation. The issue was not raised until after the close of evidence, however, preventing more substantive argument and evidence from being presented at the September 20 Hearing. And <u>third</u>, even if the issues were raised prior to the hearing, S&L could not have made the arguments and representations that Jones asserts it should have.

   *i.* *The reasons that Lee and Schwartz did not supplement their Rule 2014 disclosures in the IW Cases were addressed at the September 20 Hearing.*

121.     The Debtor and S&L did in fact address at the September 20 Hearing the reasons that Lee and Schwartz did not supplement their Rule 2014 disclosures in the IW Cases. This was briefed and the focus of the September 20 Hearing. Lee and Schwartz did not believe that supplemental disclosure was required under the circumstances because the IW Debtors had agreed with the U.S. Trustee's demand to dismiss their cases and were no longer seeking to have their employment approved by the Court (Sept. 20, 2022, Hrg. Tr. 89:2-18, 92:11-94:22, 132:24-133:5, 169:16-170:11). They may have been mistaken, but the reasons were presented to the Court at the September 20 Hearing.

006885

ii.   *The Debtor presented arguments regarding the proposed payment by the Debtor of Alex Jones's travel expenses and fees for state court counsel related to the Connecticut Litigation.*

122.   As set out in detail in the Rule 59 Motion and the reply to the U.S. Trustee's objection thereto, issues surrounding the Debtor's proposed payment for Alex Jones's travel expenses or 100% of the cost for state court counsel were not raised in the U.S. Trustee's objection to the S&L Employment Application or at the September 20 Hearing until after the close of evidence. The U.S. Trustee's objection to the to the S&L employment application raised a single issue—the action the Court should take as the result of Lee not supplementing the Rule 2014 verified statement for the employment of KSLPLLC in the IW Cases. The objection did not dispute S&L's disinterestedness. Counsel for the U.S. Trustee confirmed that this was the sole issue at the September 13 Hearing. (Sept. 13, 2022, Hrg. Tr. 36:6-9). And the Debtor's proposed payment for Alex Jones's travel expenses or 100% of the state court counsel expenses was not raised in connection with the S&L Employment Application until after the close of evidence. (Sept. 20, 2022, Hrg. Tr. 215:8-23).

123.   After the close of evidence, the Court questioned *who* was making the decisions for the Debtor's estate to propose to pay the travel expense for Alex Jones to testify in the Connecticut Litigation, the fees for state-court counsel for the Connecticut Litigation, and other matters.[37] (Sept. 20, 2022, Hrg. Tr. 215:8-23). The Court focused the inquiry to the person making the decision for the Debtor.[38] (Sept. 20, 2022, Hrg. Tr. 216:4-9).

---

[37] After the Debtor's opening statement, the Court indicated that the question it was focused on is whether there was a "throughline" from the IW Cases to the Debtor's chapter 11 case. (Sept. 20, 2022, Hrg. Tr. 28:5-8). The evidence introduced was that the decisions in the IW Cases were based on the benefit to the IW Debtors and their estates. (Sept. 20, 2022, Hearing 83:10-84:3, 88:12-91:3, 142:17-144:8, 162:1-24, 163:7-11, 170:4-11, 175:20-176:10, 177:11-15, 206:11-207:9).

[38] The Court returned to the inquiry of who was making the decisions multiple times. (Sept. 20, 2022, Hrg. Tr. 216:4-9, 217:1-2).

006886

124.    The Debtor, through S&L, responded to the Court's question indicating that the decision was made by Schwartz after a demand by Alex Jones and arm's-length negotiations. (Sept. 20, 2022, Hrg. Tr. 215:24-216:13, 217:1-3). Further, S&L represented to the Court that the give and take between the Debtor and Jones was because Jones was the most important person to the financial viability of the company and its restructuring efforts, and the proposed payments were necessary to maintain Jones's support of the Debtor and continuing his involvement with the company. (Sept. 20, 2022, Hrg. Tr. 216:10-13, 217:19-21).

125.    Mr. Battaglia for the Debtor added additional considerations that went into the decision. Mr. Battaglia pointed out that other factors informing the Debtor's decision were (a) Jones's ability to pay, (b) the risk of the state court attorneys not willing to go forward, and (c) the necessity that the Debtor produce Jones as a witness in the Connecticut Litigation. (Sept. 20, 2022, Hrg. Tr. 221:4-18).

126.    The proposed payment of travel expenses and 100% of state court counsel expenses was not raised prior to the September 20 Hearing so that the Debtor and S&L could prepare more substantive argument and evidence. But even if it was, the S&L would not have made the particular arguments preferred by Alex Jones. While Jones put forward reasons for his demands—including his asserted indemnity, that he provided services to the Debtor despite not receiving his contractual salary, and his efforts to support the Debtor's bankruptcy cases—the motivation for the Debtor was that Jones indicated that an agreement was necessary for Jones's continued support of the Debtor, the Debtor's need to ensure that it had representation in the Connecticut Litigation to reach

006887

agreement with the Connecticut Plaintiffs regarding their motion for relief from stay, and the Debtor's need to produce Jones as a witness in the Connecticut Litigation.[39]

127.    The reasons Jones believed that his demands had merit was, at most, ancillary to the Debtor's decision. That Jones had at least some colorable basis for his demands and had acted to support the Debtor's reorganization efforts would have certainly been appropriate factors for Schwartz, as the Debtor's CRO, to consider.[40] But it was not central to the decision-making process. And without the opportunity to delve into these potential secondary considerations, S&L was not able to make representations about them to the Court at the September 20 Hearing.

　　　　iii.    *The Debtor had not adopted the position that Alex Jones was entitled to his asserted an indemnity and S&L had reason to doubt the asserted indemnity.*

128.    As communicated to Jones's counsel prior to the September 20 Hearing, the Debtor had not adopted Alex Jones's position on his asserted indemnity. Further, S&L was aware of facts and law suggesting that Jones was *not* entitled to the indemnity. S&L simply could not have made the arguments that Jones asserts it should have presented to the Court.

129.    Under Texas law, a member or manager of a limited liability company is not automatically entitled to indemnity. Section 101.402 of the Texas Business Organizations Code provides that "[a] limited liability company may: (1) indemnify a person; (2) pay in advance or reimburse expenses incurred by a persona; and (3) purchase or procure or establish and maintain insurance or other arrangement to indemnify or hold harmless a person."[41] For purposes of the

---

[39] The issue of Jones's continued support of the Debtor came up at the December 19, 2022, hearing before this Court. After previously only agreeing to a 60/40 split of attorney fees with respect to Texas appellate counsel, Jones ultimately assented to a 50/50 division of fees. But his counsel at the hearing indicated that the caveat was that Jones would seek his full salary of $1.3 million annualized. (Dec. 19, 2022, Hrg. Tr. 14:2-6). And Jones's counsel indicated that absent Jones receiving his full contractual salary or some other negotiated amount, he may have to seek third-party employment. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25). The issue for the Debtor and its estate is that Jones's continued involvement is necessary to the Debtor. (Dec. 19, 2022, Hrg. Tr. 32:3-13, 37:17-22, 38:15-17).

[40] If Jones had been entirely unreasonable in his demands or uniformly antagonistic to the Debtor's restructuring efforts, assent to Jones' demands may have been less likely.

[41] The Debtor is a Texas limited liability company and Alex Jones is the sole member of the Debtor.

006888

statute, a "'person' includes a member, manager, or officer of a limited liability company or an assignee of a membership interest in the company." The use of "may" in the statute indicates that the indemnification is permissive rather than mandatory. *Pedernal Energy, LLC v. Bruington Eng'g, LTD.*, 536 S.W.3d 487, 492 (Tex. 2017) (citing Tex. Gov't Code § 311.016(1)).

130.    Section 26.01 of the Texas Business and Commercial Code requires "a promise of one person to answer for the debt, default, or miscarriage of another person" to be reflected in a signed writing in order for such promise to be enforceable. The statute applies to indemnification, subject to ordinary exceptions to statute of frauds defenses. *See ALCOA v. Hydrochem Indus. Servs.*, 2005 Tex. App. LEXIS 2010, at *12 (Tex. App. Mar. 17, 2005).

131.    The Debtor's governing documents do not provide for indemnification of members or managers. Attached as Exhibit B hereto is a copy of the Debtor's company agreement (the "Company Agreement").[42] The only reference to any indemnification or reimbursement rights is reflected in paragraph 11.02 of the Company Agreement and provides only for indemnification of a "Liquidator" and references "the indemnification rights set forth in the Certification of Formation." According to the paragraph 1.01 of the Company Agreement, the Certificate of Formation was filed with the Texas Secretary of State on November 16, 2007.

132.    A copy of the Certificate of Formation dated November 16, 2007, for Free Speech Systems, LLC, on file with the Texas Secretary of State is attached hereto as Exhibit C (the "Debtor Certificate of Formation"). The Debtor Certificate of Formation contains no mention of any indemnification or reimbursement rights.[43]

---

[42] The Debtor's company agreement was previously admitted into evidence as Debtor's Exhibit 32 at the September 20 Hearing. [ECF No. 163-32].

[43] A certificate of correction was filed with the Secretary of State on January 3, 2008 (the "Debtor Certificate of Correction"), a copy of which is attached as Exhibit D hereto. The Certificate of Correction also does not mention any indemnification or reimbursement rights.

133.     Attached as <u>Exhibit E</u> hereto is a copy of the employment agreement between the Debtor and Alex Jones dated April 14, 2022 (the "<u>AEJ Employment Agreement</u>"). Paragraph 10 of the AEJ Employment Agreement provides that "Employer agrees to indemnify and hold harmless, and furnish and pay counsel of Employee['s] choice, in the event that claims or suit are brought against Alex Jones arising out if his performance of this Employment Agreement, unless such claims are established by clear and convincing evidence to have arisen from Alex Jones['s] actual fraud." However, the first paragraph of the AEJ Employment Agreement indicates that "[t]his Employment Agreement and accompanying Employee Annuity and Life Insurance Plan is entered into by and between Employer Free Speech Systems, LLC . . . and Alex Jones, Employee ***on April 14, 2022*** . . . ." (emphasis added). Each of the lawsuits comprising the Sandy Hook Litigation was commenced and related to acts occurring prior to April 14, 2022.

134.     S&L attorneys analyzed the indemnity issue in connection with other matters prior to the September 20 Hearing. On August 5, 2022, S&L attorney R. J. Shannon spent 1.1 hours analyzing Jones's proof of claim filed in the Debtor's chapter 11 case, reviewing relevant documents for contractual indemnity, and drafting an email to the Debtor's CRO and counsel regarding the same. [ECF No. 251-2, at p.3]. On August 16, 2022, Shannon informed Jones's attorney by email that although Jones asserted an indemnity claim "it's not in any of the documents prior to April 2022." [ECF No. 206-7, at p.1]. On August 18, 2022, S&L attorney Kyung Lee spent 1.5 hours analyzing issues regarding whether the Debtor Company Agreement provided for indemnification of a member or manager and whether a member or manager was entitled to indemnification as a matter of law. [ECF No. 251-2, at p.9]. The issue was relevant to providing

006890

documents to the Connecticut Plaintiffs and Jones's request that the Debtor seek to extend the automatic stay to him with respect to the Connecticut Litigation.[44]

135.    Jones's desire that the Debtor have accepted his asserted indemnity claim and made that argument at the September 20 Hearing is understandable, but that was just not the case. And it would not have been an appropriate for S&L to reference Jones's asserted indemnity to the Court when there were significant reasons to doubt its validity. Even if Jones *is* entitled to indemnification from the Debtor, that was not so obvious that failing to raise that point at the September 20 Hearing justifies reducing S&L's compensation.

> *iv.*    *Alex Jones did not pay 100% of the Debtor's Legal Fees Prior to the filing of the Debtor's Chapter 11 Case.*

136.    S&L's fees were paid from funds belonging to the Debtor. The initial retainer S&L received originated directly from the Debtor. The payment S&L received on July 28, 2022, was paid from Schwartz Associates LLC's client trust account. On information and belief based on representations from Schwartz, these funds belonged to the Debtor and were paid to Schwartz Associates' client trust account directly from the Debtor. Schwartz testified about this at the September 20 Hearing. (*See* Sept. 20, 2022, Hrg. Tr. 174:3-13). S&L has no reason to believe Schwartz's testimony or his prior representations to S&L were inaccurate.

> *v.*    *S&L was not aware that Alex Jones purchased $400,000 in consignment products and, assuming that he did, it would not have been directly relevant.*

137.    If Alex Jones purchased $400,000 in consignment products to cover the Debtor's inability to obtain product prior to the September 20 Hearing, S&L was not aware of this

---

[44] If Jones was unambiguously entitled to an indemnity, this would support extending the automatic stay to Jones with respect to the Connecticut Litigation. There were other reasons to decline Jones's request—e.g., it might make it more likely that the Court would modify the stay to allow the litigation to also continue against the Debtor—but the issue was important to the Debtor's evaluation.

006891

transaction or involved in its execution. S&L could not have raised it to the Court at the September 20 Hearing.

138.    Further, if S&L had been aware of Jones's alleged purchase of the consignment products, it would not have changed the position asserted at the September 20 Hearing. As represented at the September 20 Hearing, the reason for the proposed payments was that Jones demanded this to continue his involvement with the Debtor and to agree to the Debtor's deal with the Connecticut Plaintiffs regarding their lift stay motion.[45]

**B.    S&L Does Not Oppose Disclosure of Payment of Professional Fees Paid Relating to the IW Debtors' Restructuring, But Such Fees Are Not Relevant to the Appropriate Compensation in this Chapter 11 Case.**

139.    Alex Jones argues that the Court should consider the fees paid for services provided to the IW Debtors in determining the appropriate compensation in the Debtor's chapter 11 case. AEJ Limited Objection at p.5. S&L does not oppose the disclosure, but the fees paid relating to the IW Debtors' restructuring are not relevant to compensation for services provided to the Debtor.

*i.    Fees paid for services provided to the IW Debtors.*

140.    Employment of the IW Debtors' proposed professionals was never taken up by the Court. The U.S. Trustee argued that employment of any professionals in the IW Cases should not be considered until after the decision on its motion to dismiss because approval of employment would be unnecessary in the event of dismissal allowing the IW Debtors to address compensation

---

[45] Jones's agreement to the resolution of the Connecticut Plaintiffs' lift stay motion was necessary for at least three (3) reasons. First, the Connecticut Plaintiffs required Jones to agree to certain parts of the agreed lift stay order as a condition of their agreement with the Debtor. Second, Jones's consent was required as a practical matter for the Debtor's prepetition state court counsel to continue representing the Debtor and engaging separate counsel would cost the Debtor's estate significantly more and make agreeing to lift the stay with respect to the Connecticut Litigation unfeasible. Third, the principal problem to the Debtor's estate presented by allowing the Connecticut Litigation to continue was that it would require Jones to be off the air for a significant period of time, but Jones had the right to attend the entire trial. The deal that the Debtor cut with the Connecticut Plaintiffs to minimize the disruption of the Connecticut Litigation would have been meaningless if Jones decided to attend the entire trial notwithstanding that deal.

006892

of their professionals outside of bankruptcy.[46] (May 19, 2022, Hrg. Tr. 14:9-15:9). The Court agreed that the Schwartz employment application should not be considered until after its decision on the dismissal of the IW Debtor's cases. (May 19, 2022, Hrg. Tr. 23:2-8) (the Court stating that it did not want to address the application to employ the CRO and other matters until "after we know on the motion to dismiss"). The KSLPLLC employment application was never set for hearing.

141.    The IW Debtors agreed to the dismissal of their cases and finalized a stipulation of dismissal with the U.S. Trustee that was filed on June 1, 2022 [ECF No. 163-27] (the "IW Dismissal Stipulation"). Consistent with the U.S. Trustee's position, the IW Dismissal Stipulation provided a mechanism for the payment for the Subchapter V Trustee, but left compensation of the IW Debtors' proposed professionals to applicable nonbankrutpcy law. The Court entered the IW Dismissal Stipulation on June 10, 2022. [ECF No. 163-22].

142.    The fees paid and expenses reimbursed to the law firms with which S&L attorneys were involved for services to the IW Debtors were made prior to the filing of the IW Cases or after their dismissal. Parkins Lee & Rubio LLP/Parkins & Rubio LLP received fees totaling

---

[46] As represented by attorney Jayson Ruff, the U.S. Trustee's position was that:

> The only other comment I would say is to the extent that the Court does push that out, assuming these cases are dismissed, then we don't think that any of the other pending motions applications should be heard until that same date after that time. . . .

> If these cases aren't to continue, then none of that is really necessary. The cases can get dismissed. You know, the debtors can go ahead and pay their creditors, including their professionals however they want to. The only thing we probably would want to have some treatment for in the dismissal order, again, assuming that's the route that we end up toing, is to allow for Ms. [Haselden] to apply for her fees and make sure that this Court retains jurisdiction for the payment of her fees.

(May 19, 2022, Hrg. Tr. 14:9-13, 15:1-9). This was in line with discussions among counsel for the U.S. Trustee and the IW Debtors. [ECF No. 163-18].

006893

$321,670.93 and expenses totaling $7,976.50. KSPLLC/S&L received fees totaling $68,307.50 and no expenses.

143.    On information and belief, all or nearly all of the funds paid to the IW Debtors' professionals came from the "Initial Trust Funding" under the Declaration of Trust for the 2022 Litigation Settlement Trust (the "Declaration of Trust"), a copy of which is attached hereto as Exhibit F. These funds were to be paid to the trust by Alex Jones to pay the costs of administration of the IW Cases and professional fees. Declaration of Trust, at p.45. The source of the funds were to be from the proceeds of Jones's exempt property. *Id.* Jones was represented by counsel in the negotiation of the Declaration of Trust.

> ii.    *The compensation paid for services provided to the IW Debtors is not relevant to the Requested Administrative Expense Claim.*

144.    The standard relevant to evaluating requested compensation under Bankruptcy Code § 330 is whether it is reasonable for the services that were actually provided and necessary to achieve a reasonably likely benefit to the estate. *See* 11 U.S.C. § 330(a); *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015). Among the relevant factors are: (i) time and labor required; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the professional due to acceptance of the case; (v) the customary fee; (vi) whether the fee is contingent or fixed; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298-99 (5th Cir. 1977). The fees earned for services provided to the IW Debtors do not factor into the appropriate compensation under this framework.

68

145.    Arguably, the fees paid by the IW Debtors for services provided by S&L attorneys would be relevant if S&L was seeking a fee enhancement. S&L *does* contend that the familiarity of its attorneys with the Sandy Hook Litigation made the firm especially qualified to perform the services set out as S&L's primary responsibility in the S&L Employment Application. And without this familiarity and knowledge, S&L would not have been able to achieve the results described in the Administrative Expense Motion without expending substantially more time. This could be a factor supporting a fee enhancement if S&L's attorneys—or the firms employing them—had already been compensated for developing that relevant knowledge. But S&L does not seek any fee enhancement in the Administrative Expense Motion.

146.    There is no basis for reducing otherwise allowable compensation in this case because of fees paid by the IW Debtors for services related to their restructuring. The IW debtors received substantial benefits from the services provided to them. As the result of the services provided, the IW Debtors resolved liabilities that total approximately $1.5 billion while continuing to own their assets and incurring no obligation to make ongoing payments

147.    The IW Debtors remained subject to the Sandy Hook Litigation when they filed their petitions for chapter 11 relief. The IW Debtors had unsuccessfully sought dismissal of the claims against them—including because they did not participate in the alleged tortious conduct[47]—

---

[47] In the Heslin and Fontaine suits, InfoW, LLC argued that it was not a proper defendant because there was no evidence that it actively participated in the publication of the defamatory statements. *See Infowars, LLC v. Fontaine*, 2019 Tex. App. LEXIS 9303, at *4 (Tex. App. Oct. 24, 2019) (2019 WL 5444400); *Jones v. Heslin*, 2020 Tex. App. LEXIS 2441, at *15 (Tex. App. Mar. 25, 2020) (2020 WL 1452025). In affirming the trial court's denial of the motions to dismiss the actions under the Texas Citizens Participation Act, the Texas Court of Appeals held that there was clear and specific evidence supporting a rational inference that InfoW, LLC was involved in the operation of the Infowars.com website. *Heslin*, 2020 Tex. App. LEXIS 2441, at *16 ("We conclude, as we did in *Fontaine*, that the Terms of Use show that users of Infowars.com initiated a relationship with Infowars, LLC, and that Infowars, LLC, was involved in the website's operation."). While the Texas Plaintiffs took the position in the IW Cases that InfoW was not a proper subchapter v debtor because it did not engage in sufficient business activities, this was contrary to their assertions in the state court litigation and the decisions of both the state trial court and the state court of appeals ruling in their favor.

and were subject to default judgements for discovery abuses. By May 13, 2022, the Connecticut Plaintiffs had filed with the U.S. Bankruptcy Court for the District of Connecticut (a) a notice of dismissal with prejudice of their claims against the IW Debtors and (b) an unopposed motion to dismiss their claims against the IW Debtors.[48] (ECF No. 163-20). By May 19, 2022, the IW Debtors and the Texas Plaintiffs had reached an agreement releasing the claims against the IW Debtors. (ECF No. 163-21). In exchange, the IW Debtors agreed to not oppose remand of the removed Sandy Hook Litigation. The IW Debtors received more than they could have reasonably hoped for as the result of the services provided by their professionals.

## **CONCLUSION**

148.    For the reasons set out above, the Court should overrule the UST Objection, Debtor/Trustee Objection, and AEJ Limited Objection and grant the Administrative Expense Motion. Even if the Court accepts all of the arguments and positions set out in the objections, they do not undercut that the Court has the discretion to consider retroactive approval of S&L's limited employment from the Petition Date through the September 20 Hearing, or present any reason to deny S&L's request for such approval requested in the Administrative Expense Motion. No party in interest has ever asserted that S&L holds or represents an interest adverse to the estate. And no party in interest has disputed that the amount of the Requested Administrative Expense Claim— as already reduced—reflects reasonable compensation for the services S&L provided to the Debtor.

149.    The dispute appears to revolve around the appropriate mechanism and characterization. The Debtor and Subchapter V Trustee do not oppose the Rule 59 Motion. The

---

[48] The U.S. Bankruptcy Court for the District of Connecticut granted the motion to dismiss with prejudice the claims against the IW Debtors on May 24, 2022, and requested a proposed order. The proposed order was submitted on May 25, 2022, and the order was entered by the court on May 26, 2022.

006896

Sandy Hook Plaintiffs and Alex Jones do not oppose the Administrative Expense Motion, subject to S&L's voluntary reduction. And while the U.S. Trustee opposes both, he does not dispute that the Court has the authority to retroactively approve S&L's employment for the period from the Petition Date through the September 20 Hearing in connection with the Administrative Expense Motion or argue that such retroactive approval would be inappropriate here. S&L contends that any of the bases submitted would be appropriate and drafted the proposed order accompanying the Administrative Expense Motion to be agnostic about the basis. The Court should not let disagreement over technicalities distract it from reaching the correct result.

Dated: December 29, 2022    **SHANNON & LEE LLP**

        /s/*R. J. Shannon*
        Kyung S. Lee
        State Bar No. 12128400
        klee@shannonleellp.com
        R. J. Shannon
        State Bar No. 24108062
        rshannon@shannonleellp.com
        700 Milam Street, STE 1300
        Houston, Texas 77002
        Tel. (713) 714-5770

## CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.

        /s/*R. J. Shannon*

006897

## **EXHIBIT A**

**August 8, 2022, Email from R. Shannon to J. Martin**

**R. J. Shannon**

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Monday, August 8, 2022 7:09 PM |
| **To:** | Martin, Jarrod B.; rbattaglialaw@outlook.com; Kyung S. Lee |
| **Subject:** | Re: FSS |

Jarrod—

Your clients have alleged that PQPR was an insider in the TUFTA action, but below are the bases for PQPR being an insider that we have identified. There may be others, but I don't think that PQPR disputes that it is an insider so I'm not going to try to parse them.

**Way 1 (Statutory):**

1) Bankruptcy Code § 101(31)(E) includes in the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Bankruptcy Code § 101(2)(B) in the definition of "affiliate" a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, . . . by an entity that directly or indirectly owns controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . .";

3) Alex Jones indirectly owns or controls 20% or more of PQPR and directly owns 20% or more of the Debtor;

4) Therefore, PQPR and the Debtor are affiliates and insiders.

**Way 2 (Statutory):**

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Alex Jones is an affiliate of Free Speech Systems;
   a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
   b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is an insider to Alex Jones.
   a. Bankruptcy Code § 101(2)(B) provides that an "affiliate" also includes a "corporation 20% or more whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, but the debtor";
   b. Alex Jones indirectly owns or controls 20% or more of the outstanding voting securities in PQPR and is thus an affiliate;

4) Therefore, PQPR is an affiliate and insider of the Debtor.

**Way 3 (Non-Statutory)*:**

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

1

006899

2) Alex Jones is an affiliate of Free Speech Systems;

    a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";

    b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is controlled by Dr. David Jones;

4) Dr. David Jones is Alex Jones' father, and thus an insider of Alex Jones if he was a debtor under Bankruptcy Code § 101(31)(A)(i);

5) This is substantially similar to statutory insiders under the Bankruptcy Code and PQPR is therefore a non-statutory insider.

*Bankruptcy Code § 1182(1)(A) does not except only the debt to *statutory* insiders from the cap.

Your clients may just be looking for a way to challenge PQPR's lien on the grounds that it is avoidable (I don't think that gets around the need for permission to use cash collateral prior to that avoidance but good for you if you are successful) but you should think long and hard about where the path leads if you are looking for a ruling that PQPR is ***not*** an insider. Plaintiffs in the TUFTA action have already quixotically asserted and put on evidence in the Heslin/Lewis trial that FSS was solvent to the tune of at least $135 million, which I'm sure had Steve Lemmon jumping for joy. If you get a finding that establishes that PQPR is not an insider, we lose the extended preference lookback period w/r/t PQPR and make getting its lien avoided more of an up-hill battle. An unavoidable PQPR lien also opens up paths for Alex Jones to terminate his employment with the Debtor, force it into liquidation, credit bid for the assets, and continue on at a different entity to the detriment of the bankruptcy estate and your clients.

Thanks,
R. J.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Monday, August 8, 2022 at 4:41 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

Following up.

Also, Ray, discovery is about to be sent to FSS and PQPR. I think everyone is aiming for depositions for august 19 and 22. Can we agree that discovery will be produced by August 16? Call me if you want to discuss. 832-580-6261. If I don't hear from you I'll call you tomorrow.

Get Outlook for iOS

---

**From:** Martin, Jarrod B.
**Sent:** Sunday, August 7, 2022 2:15:36 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>; rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>; Kyung S.

006900

Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

RJ, a follow-up question: Could you explain how PQPR is a statutory insider or affiliate for purposes of the sub v debt limit?

Jarrod B. Martin
Shareholder

Chamberlain Hrdlicka *Attorneys at Law*

Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Saturday, August 6, 2022 8:07 PM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

**\*\*EXTERNAL EMAIL\*\***

---

Jarrod—See attached. Kelly Jones' interest was apparently transferred to Alex Jones in connection with their divorce, but we don't have a copy of the divorce decree.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Saturday, August 6, 2022 at 7:16 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

Thanks. Can you send me the relevant corporate documents for the Debtor (LLC agreement, etc.)?

Jarrod B. Martin
Shareholder

Chamberlain Hrdlicka *Attorneys at Law*

Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Friday, August 5, 2022 10:51 AM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

**\*\*EXTERNAL EMAIL\*\***

---

006901

Jarrod,

See the attached employment agreement between the Debtor and Alex Jones.

Thanks,
R. J.

--
R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Sent:** Thursday, August 4, 2022 2:29 PM
**To:** rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FSS

Can you guys send me the April 2022 Jones employment agreement?

Jarrod

Get Outlook for iOS

006902

# EXHIBIT B

**Debtor Company Agreement**

006903

## COMPANY AGREEMENT OF
## FREE SPEECH SYSTEMS, LLC

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

1.  **Formation of the Company.**

    **1.01  Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

    **1.02  Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

    **1.03  Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

2.  **Organization of the Company.**

    **2.01  Name of the Company.** The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

    **2.02  Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

    **2.03  Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

**2.04   Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3.     **Definitions.**

**3.01   Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this <u>Section 3.01</u>.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(<u>d</u>)(<u>4</u>), 1.704-1(b)(2)(ii)(<u>d</u>)(<u>5</u>), and 1.704-1(b)(2)(ii)(<u>d</u>)(<u>6</u>) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(<u>d</u>) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Agreement**" means this Agreement, including <u>Schedule A</u>, as originally executed and as subsequently amended from time to time.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to <u>Section 4.04</u> of this Agreement.

"**Capital Contribution**" means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "<u>Initial Capital Contributions</u>" means, as to any Member, the contributions described in <u>Section 4.01</u>. "<u>Additional Capital Contributions</u>" means, as to any Member, the contributions described in <u>Section 4.02</u>.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in <u>Section 1</u> of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

"**Code**" means to the Internal Revenue Code of 1986, as it has been and may be amended.

"**Company**" means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

"**Company Minimum Gain**" shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Company Property**" or "**Company Properties**" means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

- 2 -

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company. The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

- 3 -

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interest**" means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

"**Person**" means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

"**Profits**" and "**Losses**" means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

"**Required Interest**" means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

"**Standard Rate**" means a per annum rate of interest equal to ten percent (10%), compounded annually.

"**Tax Distribution**" with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

"**TBOC**" means the Texas Business Organizations Code, as it may be amended from time to time.

- 4 -

006907

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

**3.02  Other Defined Terms.**  Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

**4.  Capital of the Company.**

**4.01  Initial Capital Contributions.**  Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

**4.02  Additional Capital Contributions.**  The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers.  For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

**4.03  Failure to Make Additional Capital Contributions.**  If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

**4.04  Capital Accounts.**  A Capital Account shall be established and maintained for each Member.  It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations.  In that regard, each Member's Capital Account shall be:

(a)  Increased by:

- 5 -

      (i)     The amount of money contributed by that Member to the Company;

      (ii)    The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

      (iii)   Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

      (b)    Decreased by:

      (i)     The amount of money distributed to that Member by the Company;

      (ii)    The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

      (iii)   Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

      (iv)   Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

      **4.05**   **Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

      5.     **Allocations.**

      **5.01**   **Allocation of Profits.** After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

006909

(a)     First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)     Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02    **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)     Losses for any taxable year shall be allocated in the following order and priority;

(i)     First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)     The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03    **Special Allocations.** The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations.   Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)     Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

     **5.04**   **Curative Allocations.** The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04. Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

     **5.05**   **Section 704(c) Allocations.** In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

     **5.06**   **Other Allocation Rules.** In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

     **5.07**   **Allocations on Transfer.** Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

         (a)    For the months prior to the transfer, to the assignor;

         (b)    For the months subsequent to the transfer, to the assignee; and

006912

(c)     For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6.     **Distributions.**

6.01     **Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.02     **Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)     Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.03     **Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

006913

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

7.    **Fiscal Matters; Books and Records.**

7.01    **Bank Accounts; Investments.** Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

7.02    **Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

7.03    **Books and Records of Account.** The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

7.04    **Tax Returns and Information.** The Members intend for the Company to be treated as a partnership for tax purposes. The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of: (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

7.05    **Tax Elections.** The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

7.06    **"Tax Matters Member."** The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

- 11 -

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

8.    **Management of the Company.**

    **8.01    Management.**    The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation.  The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

    **8.02    Powers of Managers/Delegation of Authority.** The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04.  Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

    **8.03    Action by Managers.** Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held.  No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

9.    **Membership in the Company.**

    **9.01    Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

    **9.02    Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

- 12 -

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

### 10.    Restrictions Upon Membership Interests.

**10.01  Generally.**    The ownership and transferability of Interests in the Company are substantially restricted.  Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business.  Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02  Authorized Transfers at Death.**  An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.  However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03  Authorized Estate Planning Transfers.**  An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

006916

**10.04   Nonrecognition of an Unauthorized Transfer.**   The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer").   If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05   Effect of Unauthorized Transfers.**   If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)   The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)   The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)   Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)   Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)   In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate.   The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid.   The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)   Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)   Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06   Deemed Unauthorized Transfers.**   In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

- 14 -

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

(a)     the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

(b)     the Bankruptcy of a Member;

(c)     the appointment of a receiver for all or substantially all of the assets of a Member;

(d)     the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

(e)     a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07  Admission of Substituted Members.

(a)     Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require.   Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

(b)     Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

(i)     the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

(ii)     the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

(iii)     the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

- 15 -

(iv)     the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)     such other conditions as the Managers may reasonably impose.

(c)     In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08  Status of a Substituted Member.**  A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company.  Any such Substituted Member shall be treated as a Member.  In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09  Assignee of a Membership Interest.**  Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10  Membership Interest Pledge or Encumbrance.**  No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest.  It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

11.     **Dissolution and Winding Up.**

**11.01  Events Causing Dissolution.**  The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02  Winding Up.**  If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)     Appointment of Liquidator.  The winding up of the Company's affairs shall be supervised by a Liquidator.  The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)     Powers of Liquidator.  In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)     First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)     Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 12.     Miscellaneous.

**12.01    Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee.  For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02    Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03    Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04    Amendment.**  Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05    Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter.  Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06    Creditors Not Benefited.**  Nothing in this Agreement is intended to benefit any creditor of the Company or a Member.  No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07    Arbitration.**  Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

- 18 -

006921

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief.  The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement.  The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

      **12.08  Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

      This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

- 19 -

EXECUTED to be effective as of the Effective Date.

**Members**:

_____
Kelly Jones

_____
Alex Jones

**Managers**:

_____
Alex Jones

SIGNATURE PAGE

006923

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $49.00 | 49% |
| Totals: | $100.00 | 100.00% |

## SCHEDULE B

## DETERMINATION OF FAIR MARKET VALUE
## OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A.  The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B.  Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement.  If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party.  If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed.  Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser.  If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest.  If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C.  For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding.  The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser.  The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D.  During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended.  Upon the final determination of fair market value, all time limits shall automatically commence.

## <u>EXHIBIT C</u>

**Debtor Certificate of Formation**



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 800898797 11/16/2007
Document #: 193325990002
Image Generated Electronically
for Web Filing**

## Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

### Free Speech Systems, LLC

The name of the entity must contain the words "Limited Liability Company" or "Limited Company," or an accepted abbreviation of such terms. The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

## Article 2 – Registered Agent and Registered Office

☐A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Elizabeth  M.  Schurig**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**100 Congress Avenue 22nd Floor   Austin  TX  78701**

## Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

**OR**

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Kelly     Jones**                    Title: **Manager**
Address: **6601 Dogwood Creek Drive    Austin  TX, USA  78746**

Manager 2: **Alex     Jones**                    Title: **Manager**
Address: **6601 Dogwood Creek Drive    Austin  TX, USA  78746**

## Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

## Supplemental Provisions / Information

006927

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Elizabeth M. Schurig**      **100 Congress Avenue 22nd Floor Austin, TX 78701**

## Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

**Elizabeth M. Schurig**

Signature of Organizer

**FILING OFFICE COPY**

006928

## **EXHIBIT D**

**Debtor Certificate of Correction**

006929

**Form 403**
**(Revised 01/06)**

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: $15**



**Certificate of Correction**

This space reserved for office use.

**F I L E D**
In the Office of the
Secretary of State of Texas

JAN 03 2008

Corporations Section

---

## Entity Information

The name of the filing entity is:

Free Speech Systems, LLC

State the name of the entity as currently shown in the records of the secretary of state. If the certificate of correction corrects the name of the entity, state the present name and not the name as it will be corrected.

The file number issued to the filing entity by the secretary of state is:   800898797

---

## Filing Instrument to be Corrected

The filing instrument to be corrected is :   Certificate of Formation
The date the filing instrument was filed with the secretary of state:   11/16/2007
<em>mm/dd/yyyy</em>

---

## Identification of Errors and Corrections
### (Indicate the errors that have been made by checking the appropriate box or boxes; then provide the corrected text.)

☐ The entity name is inaccurate or erroneously stated. The corrected entity name is:

_____

☐ The registered agent name is inaccurate or erroneously stated. The corrected registered agent name is:

Corrected Registered Agent
(Complete either A or B, but not both.)

A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

B. The registered agent is an individual resident of the state whose name is:

_____

| *First* | *Middle* | *Last Name* | *Suffix* |
|---------|----------|-------------|----------|

**RECEIVED**

JAN 0 3 2008

Form 403   **Secretary of State**                    3                              006930

☐ The registered office address is inaccurate or erroneously stated.  The corrected registered office address is:

Corrected Registered Office Address

<table>
<tr><td></td><td></td><td>TX</td><td></td></tr>
<tr><td><em>Street Address (No P.O. Box)</em></td><td><em>City</em></td><td><em>State</em></td><td><em>Zip Code</em></td></tr>
</table>

☐ The purpose of the entity is inaccurate or erroneously stated.  The purpose is corrected to read as follows:

_____

_____

☐ The period of duration of the entity is inaccurate or erroneously stated.

The period of duration is corrected to read as follows:

_____

### Identification of Other Errors and Corrections

(Indicate the other errors and corrections that have been made by checking and completing the appropriate box or boxes.)

☐ **Other errors and corrections**.  The following inaccuracies and errors in the filing instrument are corrected as follows:

☐ **Add**   Each of the following provisions was omitted and should be added to the filing instrument. The identification or reference of each added provision and the full text of the provision is set forth below.

☑ **Alter**   The following identified provisions of the filing instrument contain inaccuracies or errors to be corrected.  The full text of each corrected provision is set forth below:

Article 3 - Governing Authority
Alex Jones, Manager
910 West Mary Street, Austin, Texas 78704

☑ **Delete**   Each of the provisions identified below was included in error and should be deleted.

Article 3 - Governing Authority
Kelly Jones, Manager
6601 Dogwood Creek Drive, Austin, Texas 78746

Form 403                                              4

☐ **Defective Execution**   The filing instrument was defectively or erroneously signed, sealed, acknowledged or verified.   Attached is a correctly signed, sealed, acknowledged or verified instrument.

## Statement Regarding Correction

The filing instrument identified in this certificate was an inaccurate record of the event or transaction evidenced in the instrument, contained an inaccurate or erroneous statement, or was defectively or erroneously signed, sealed, acknowledged or verified.  This certificate of correction is submitted for the purpose of correcting the filing instrument.

## Effectiveness of Filing

After the secretary of state files the certificate of correction, the filing instrument is considered to have been corrected on the date the filing instrument was originally filed except as to persons adversely affected.  As to persons adversely affected by the correction, the filing instrument is considered to have been corrected on the date the certificate of correction is filed by the secretary of state.

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date:  12|15|2007

Signature and title of authorized person (see instructions)

## **EXHIBIT E**

**AEJ Employment Agreement**

006933

# FREE SPEECH SYSTEMS, LLC
# EMPLOYMENT AGREEMENT
## and accompanying
### EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN

This Employment Agreement and accompanying Employee Annuity and Life Insurance Plan is entered into by and between Employer **Free Speech Systems, LLC**, (herein the "Company" or the "Employer") and Alex Jones, Employee on April _4_, 2022, as follows:

      Whereas, it is the intention of the Employer to employ Alex Jones to render his personal services to Employer in exchange for compensation for his personal services ("Current Wages" or "Wage") upon and subject to the terms and conditions hereinafter set out; and

      Whereas, it is the intention of the Employer to provide an employer plan and program (herein the Company" and its  Annuity and Life Insurance Program" or the "Plan") whereby an Employee Alexander Jones (as described herein) of the Company may, through this Company's Plan, make designations of dedication of Wages and salaries, compensation, bonus or other compensation for Employees personal services rendered ("Compensation" or "Current Wages") to and at the direction of Employer are to be used for the purchase in the name of the Employee by Employer as and if earned, and from time to time, Annuity Contracts as described and defined in of Article § 1108.001 *et seq* of the Texas Insurance Code and other applicable laws of the State of Texas and the United States of America, whereby the Employee's Current Wages for services rendered to or for the benefit of the Company are administered so as to be paid directly by the Company, pursuant to this Employer Annuity and Life Insurance Plan provided in the statute, to an insurance company issuing the Plan administered annuity and life insurance.

      NOW, THEREFORE Alex Jones and the Employer agree as follows:

## I.
## EMPLOYMENT AGREEMENT

      1.     The Employer employs Alex Jones and Alex Jones hereby accepts employment with the Company, upon and subject to the terms and conditions hereinafter set forth.

      2.     Alex Jones shall be employed by Employer to continue to broadcast his public programing and Employer shall continue to furnish all assistance necessary to allow Alex Jones to continue his public broadcast.

      3.     Alex Jones shall further to continue to promote products and services agreed to by Employer and Employer shall continue to furnish all assistance necessary, including processing of credit card charges for the products and services.

      4.     Alex Jones shall have the unrestricted right to use the Employer's trademarks, tradenames, intellectual property and web cites maintained, including the Inforwar web site and

Page 1 of 10

web domain for all purposes in furtherance of his public broadcast.

5     Alex Jones agrees to devote all of the time necessary to continue his public broadcasts and allow his brand to be used in advertising and promotions as he has done in the past and Employer agrees to furnish all support staff and facilities to continue such support as it has done in the past and to maintain Employer's trademarks, tradenames, intellectual property and websites maintained, including the Inforwar web site and web domain for all purposes in furtherance of his public broadcast.

6.    Alex Jones agrees to devote such time as necessary to accomplish his continued public broadcast but shall not be restricted in other projects or programs from time to time in the sole discretion of Alex Jones.

7.    As Wages for his personal services under this Employment Agreement Alex Jones will be paid the annual sum of $1,300,000.00 in bi-monthly payments and shall reimburse Alex Jones for all expenses incurred in this employment and in any efforts to promote the broadcast, including travel, meals, lodging, cell phone, and other expenses.   All Wages for personal services by Alex Jones will be subject to the EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN attached hereto as Exhibit "1" which terms are incorporated herein by reference for all purposes as if set out herein verbatim.

8.    The Employment of Alex Jones is on an "at will" basis which may be terminated by either party without cause.  Upon termination Alex Jones shall have (i). all wages accrued to him under this Employment Agreement subject to the Annuity election as set out in Exhibit "1"; and (ii)  an irrevocable assignment of the exclusive use (but not the ownership) for a period of four years after termination, of all of Employer's trademarks, tradenames, intellectual property and websites maintained, including the Inforwar web site and web domain.

9.    The Parties agree that other than claims of Alex Jones arising under the Annuity and Life Insurance Program, or the Indemnity portion herein below, in no event will any dispute between the Parties result in a claim or the aggregate of all claims, of more than $5,000.00 and such claims made not paid within 30 days of the demand shall be subject to a ½ day arbitration that must be started and commenced not more than 60 days from the written demand.

10.    Employer agrees to indemnify and hold harmless, and furnish and pay counsel of Employees choice, in the event that claims or suit are brought against Alex Jones arising out of his performance of this Employment Agreement, unless such claims are established by clear and convincing evidence to have arisen from Alex Jones actual fraud.

11.    This Employment Agreement may be amended or modified from time to time by written agreement of the Parties.

12.    There are no third-party beneficiaries intended to be entitled to any rights or remedies under or pursuant to the terms of this Employment Agreement.
13.    This Agreement shall be interpreted in accordance with and governed by the laws

Employment Agreement and
Annuit Plan

of Texas without regard to any conflict of laws principles. All disputes arising out of or in connection with this Agreement shall be subject to the sole and exclusive jurisdiction of the state or federal courts of, and located in, Harris County, Texas.

14.     No portion of this Employment Agreement is severable and no waiver of any of the provisions of this Agreement shall be effective unless made in writing and signed both Parties.

15.     Because of the nature of the relationship of Employee to Employer, the Employer waives any and all fiduciary duties or fiduciary obligations that otherwise may arise from this relationship, and the parties agree that Alex Jones has no liability to Employer except for acts of actual fraud, established by final order under clear and convincing evidence.

16.     This Employment Agreement may be executed in multiple counterparts each of which shall be deemed an original.

REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK

Employment Agreement and
Annuit Plan

006936

**EMPLOYER:**
**FREE SPEECH SYSTEMS, LLC**

Melinda Flores, authorized agent
Internal Accounting and Records

**EMPLOYEE:   ALEX JONES**

**Attachment:**  Exhibit "1"  **EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN**

Page 4 of 10

Employment Agreement and
Annuit Plan

006937

# EXHIBIT "1".
## EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN

This Plan shall be implemented effective April 1, 2022, and shall apply, at the election of the Employee, to all Current Wages due to the Employee as salary, wages, and bonuses for personal services rendered to the Company earned after the "Effective Date." The Plan shall include the following provisions, as may be amended from time to time:

## ARTICLE I
## DEFINITIONS

1.01    <u>EXECUTIVE COMMITTEE</u>.    Executing and administering this Company Annuity and Life Insurance Program is: Free Speech Systems L.L.C., (herein the "Executive Committee") as named from time to time by the member or manager of Employer. This Plan is effective and in full force notwithstanding a vacancy in the position an executive or Committee Member.

1.02    <u>PLAN</u>. The name of the Plan as adopted by the Company is: FREE SPEECH SYSTEMS, LLC EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN.

1.03    <u>EMPLOYEE</u>. The following Employees are eligible to participate in the Plan:
      (a)    No exclusions, except as provided in Article II.
      (b)    An Employee having prior service with the Company (or its predecessor) on a full time basis for longer than two (2) consecutive years shall be entitled to designate a portion of that Employee's Current Wages for personal services the Employee has rendered to the Company (and for which the Company is otherwise obligated to compensate the Employee) for payment by the Company directly to the designated insurance company issuing the annuity and life insurance for the purchase of an annuity and life insurance qualified under Article § 1108.001 *et seq* of the Texas Insurance Code, as amended, in the name of and for the sole benefit of the Employee or his/her designated beneficiaries.

1.04    <u>DISTRIBUTIONS</u>.
**Treatment of Elective Distributions**.

(a)    "Contribution" as used herein is the elective contributions of the Employee, of that portion of the Current Wages for personal services rendered to Company, to be paid over by the Company on the Employee's behalf to the insurance company issuing the Employee designated annuity and life insurance exclusively in the name of the Employee and for the exclusive benefit of the Employee. Wages shall include a set salary together with any bonus or earn-out payments based upon an agreed percentage of product sales gross earnings by the Employer, as reported by Employer (collectively "Wage" or "Wages").
(b)    The annuity and life insurance to be purchased shall be as designated by the

Page 5 of 10

Employee, and the Company shall have no responsibility to make such designation or to ensure that such designation is in any manner a safe, proper or adequate investment; provided however, so long as the Employee elects to remain in the Plan, the Employee may not make any payments on the designated purchased annuity and life insurance except through this Plan.

(c)     In addition, each Employee shall be required to sign a written designation naming each insurance company issuing any annuity and life insurance elected by the Employee which such designation shall include a complete release of Company for any liability with respect to the Company's dealings with such insurance company.  In particular, the release shall also caution the Employee that their designation of the insurance company  and the purchase by the Company of the annuity and life insurance on behalf of the Employee will not be investigated at any time by the Company for the purpose of determining the soundness of the insurance company, the appropriateness of the investment, or the future likelihood of return on the investment, the protection afforded by law of the investment, or otherwise.

(d)     In every case the Company shall have no liability to the Employee or the particular insurance company except to turn over exclusively for the Employee's benefit all such designated Wages, including all Annuities purchased from time to time.

(e)     Upon such proper written designation, and upon the qualification of the Employee under the requirements of any such insurance company's requirements to issue an annuity and life insurance to or for the benefit of such Employee, the Company shall withhold from the Employee the gross  amount of Current Wages (after deduction of all tax obligations imposed upon the Company and the Employee by law, if any, including the FICA and withholding tax obligations of the Employee) necessary to equal the amount of "Net Wages" designated to be paid to the insurance company to purchase the annuity and life insurance.

(f)     Upon proper designation by the Employee, only the Company shall directly distribute to such insurance company issuing the Employee designated annuity and life insurance, all such Net Wages designated by the Employee in writing from time to time.

(g)     Once the proper payment has been made by the Company to the insurance company issuing the annuity and life insurance, the Company shall have no further responsibility or liability for the payment of such Net Wage and the Employee agrees to, and shall specifically be deemed to have, released the Company for all claims arising out of the payment by Company to the insurance company issuing the annuity and life insurance.

(h)     In the event that the Employer is joined in, or named in, any attachment, garnishment, collection proceeding at law or in equity, the Employer may at its election withhold such wages and deposit same into the registry of the Court having or asserting jurisdiction over such funds so as to determine the respective rights to the wages being withheld from the Employee, in which event the Employer shall be entitled to recover its reasonable attorneys fees and costs either from the creditor or party seeking attachment, garnishment, or the like, or from the wages as the Court may order.

(i)     Once the life insurance or annuity payment has been made by the Company, the treatment of such payments by the insurance company, by the Internal Revenue Service, any third parties claiming an interest or by the Employee shall be subject to all existing tax laws; that is, the Employee shall own the policy or annuity and shall remain liable for all taxes accrued, if any, upon such Net Wages paid to the insurance company over and above the amounts required to be withheld by law by the Company, and the Company shall withhold any Employee portion as may be required by applicable tax law in the same amount as if such payment had been made

Employment Agreement and
Annuit Plan

directly to the Employees.  Such withheld portion shall be held in trust by the Employer and timely turned over to the appropriate taxing unit as required by such law, directly by the Company.

(j)      At any time after the annuity and life insurance has been issued and taken out, except as otherwise herein provided, the Company shall own no interest in the annuity and life insurance and its sole responsibility shall be to timely turn over the Current Wages designated by the Employee to the insurance company for the purpose of application of such funds to the purchase of the qualified annuity and/or life insurance.

(k)      The Company shall keep an accurate record of, and shall administer only, the payments made to the insurance company issuing the annuity and life insurance, and all of the requests for such payment made by the Employee to the Company.  Additionally, the Employee shall only be permitted to make twelve (12) Payment Designations per year, which would include, however, twelve (12) pay periods and/or twelve (12) bonus pay periods.

1.05    PLAN YEAR/LIMITATION YEAR.

**Plan Year**.  Plan Year means: The 12 consecutive month period ending every December 31st of each year (the first Plan year consisting, beginning on the Effective Date and ending on December 31 of that year).

1.06    EFFECTIVE DATE.

**New Plan**.  The "Effective Date" of the Plan is:  December 31, 2021, after which Current Wages earned may become subject to this Plan.

1.07    HOUR OF SERVICE.  The crediting method for Wages Earned is: The actual method set out in any employment agreement between Employer and Employee providing for salary and salary earn-outs for sales performance, and such other compensation based on a minimum number of Platform shows or interviews per quarter

.

## ARTICLE II
## EMPLOYEE PARTICIPANTS

2.01    ELIGIBILITY

**Eligibility conditions**.  To become a Participant in the Plan, an Employee must satisfy the following eligibility conditions:

(a)      Attainment of age 21

(b)      Service requirement.  ONE year of full-time service without an intervening Break in Service (including service of the Company's predecessor businesses).

**Time of Participation**.  An Employee may become a Participant immediately following the date the Employee completes the eligibility conditions and deliver a Payment Designation Form to the Executive Committee.

2.02    YEAR OF SERVICE - PARTICIPATION.

**Hours of Service**.  An Hourly Employee must complete 1,500 Hours per year to be considered in Service.  A non-hourly employee must earn and be eligible for payment of commission wages before becoming eligible as set out herein.

Employment Agreement and
Annuit Plan

## ARTICLE III
## EMPLOYER CONTRIBUTIONS AND FORFEITURES

3.01   <u>AMOUNT</u>.  The amount of the Employer's annual contribution to the Annuity and Life Insurance will be as follows:

      (a)   The Company will not contribute to the Plan with respect to any period unless provided by special designation in writing of the Company and provided that such contributions are deemed wages for personal services rendered or bonus designated to a particular Employee.

      (b)   The Company shall not be entitled to any part or portion of the Annuity and Life Insurance benefit, and no forfeiture rights inure to the Company in any Contributions made by the Employee.

      (c)   The Company shall administer the payment of funds to the insurance company, shall account to the Employee for all record keeping concerning any annuities purchased, and shall, from time to time in the sole discretion of the Company, report to the Employee concerning the annuity and life insurance transactions, values, and other information furnished to the Company by the insurance company or other sources.

3.02   <u>INTERFERENCE WITH PLAN</u>.  Consistent with Section 5.02 hereinbelow, The Company shall not honor nor in any circumstance pay or turn over to any third party, whether individual, private entity, or governmental entity on any claim made against the subject of this Plan, it being the express intention of the parties to this Plan that every Employee right earned under his or her participation in this Plan shall be exempt from any such claim, seizure, garnishment, attachment, or other action or proceeding and shall be treated for all purposes as if a spendthrift trust as to any unpaid Current Wages, and as fully exempt property as to any earned Annuity Contract or Life Insurance purchased by the Company, as well as all proceeds thereof paid at any time to or for the benefit of Employee.

3.03.   Defense and Indemnity:   Employer shall defend this Plan and the protection provided under this plan for the Annuities and Life Insurance purchased which if purchased pursuant to the Texas statutory provisions shall be exempt as to the contracts or policies and proceeds thereof.  Employer will defend against any claim made by any third party and only if such defense is successful, all costs of defense may be assessed against any future purchase of any Annuity or Life Insurance under this Plan.

## ARTICLE IV
## TERMINATION OF SERVICE - PARTICIPANT VESTING

4.01   <u>NORMAL RETIREMENT</u>.  Normal Retirement Age under the Plan is the later of the date the Participant attains sixty-five (65) years of age or the fifth (5th) anniversary of the first day of the Plan Year in which the Participant commenced participation in the Plan. However, the Employee may terminate participation in the Plan at any time without forfeiture of any earned Income

4.02   <u>VESTING SCHEDULE</u>.  The Company elects the following vesting schedule: Immediate vesting, 100% nonforfeitable at all times.   Employee may not assign nor encumber his or her interest in or rights under this Plan prior the issuance, from time to time, of the Annuities provided herein.   This Plan, to the extent that assets are held from wages of the Employee, is in the nature of a spendthrift trust that cannot be attached, levied, garnished, or otherwise encumbered by any third party.

## ARTICLE V
## TIME AND METHOD OF PAYMENTS OF BENEFITS

5.01   <u>TIME OF PAYMENT OF ACCRUED BENEFIT</u>.

**Distribution date**.

(a)      The Employee elects any distribution dates through dealings directly with the annuity and life insurance issuer subject to the provisions of this Plan.  Any penalty for early distribution shall be the sole responsibility of the Employee.

(b)      The Employee may terminate participation under this Plan at any time and be entitled to a distribution as the particular annuity and life insurance contract selected by the Employee and may deal with such insurance or annuity at the Employee's sole discretion.  This right, however, is non-alienable, and shall not terminate any exemption rights pursuant to Texas law (including the Texas Insurance Code) and is further subject to Section 5.02 hereof.

5.02   <u>ALIENATION</u>

(a)      Subject to the exceptions provided below, and while the Employer is a participant in this Plan or is the owner of any annuity and life insurance acquired as a participant of this Plan, no benefit which shall be payable out of the Annuity and Life Insurance Fund to any person (including a Participant Employee or his Beneficiary) nor shall any benefit be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any such person nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.   It is the intention of Employer to protect the insurance benefits and annuity benefits provided in this program as set forth in the Texas Insurance Code and any other Texas exemption law protecting individual's assets from garnishment, attachment, sequestration, alienation, involuntary sale, transfer, or assignment, or voluntary pledge, encumbrance, or charge which would defeat any exemption right of the Employee.

(b)      This provision shall not apply to the extent a Participant or Beneficiary withdraws from participation in the Plan in whole or in part, and:

(i)      has canceled or terminated the annuity and life insurance acquired while a Plan participant, in whole or in part (and if not in whole, then as applicable to the partial termination); or

(ii)      has the annuity and life insurance or any particular annuity and life

Page 9 of 10

insurance previously acquired as a participant of this Plan administered by the individual participant Employee, with respect, however, only to premiums paid after the Employee has completely withdrawn from the Plan.

## ARTICLE VI
## EXECUTIVE COMMITTEE - DUTIES WITH RESPECT
## TO PARTICIPANT'S ACCOUNTS

6.01 The Executive Committee duties herein shall be only to

a.      determine from time to time the eligibility of any Employee request to participate in the Plan; and

b.      to insure that the Company is keeping accurate books and records of this Plan distribution and administration of the Employee's designated wages; and

c.      institute such procedures or Plan rules as necessary to accomplish the Plan purpose, including, but not limited to, Employee relations regarding Plan participation or administration, and to selection (only at the request of an Employee) of an annuity and life insurance contract.

6.02    The Company shall fully indemnify and hold harmless each and every Executive Committee member from any and all claims by any third party arising out of this Plan.

## ARTICLE VII
## AMENDMENT, MODIFICATION OR TERMINATION

7.01    Upon recommendation of the Executive Committee, the Board of Directors of the Company may amend, modify, or terminate this Plan provided, however, no amendment shall in any manner reduce or impair the Employee's rights in acquired Annuities or Insurance Policies, no impair the entitlement and exemption afforded by law in favor of the Employee.

A full copy of this Plan and any modifications or changes may be obtained from the offices of the Executive Committee at the Employer's office.

Employment Agreement and
Annuit Plan

006943

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 (Subchapter V) |
| | ) |
| FREE SPEECH SYSTEMS LLC, | ) Case No. 22-60043 (CML) |
| | ) |
| Debtor. | ) |
| | ) |

**RESERVATION OF RIGHTS OF THE**
**SANDY HOOK FAMILIES WITH RESPECT TO THE**
**EMERGENCY MOTION OF ALEXANDER E. JONES TO FIX A DATE BY**
**WHICH DEBTOR MUST ASSUME OR REJECT EXECUTORY CONTRACT**

1.     The Sandy Hook Families,[1] as creditors and parties in interest in the above-captioned chapter 11 case, hereby submit this reservation of rights (this "Reservation of Rights") in response to the *Emergency Motion of Alexander E. Jones to Fix a Date by Which Debtor Must Assume or Reject Executory Contract* [Docket No. 349] (the "Motion").

2.     The Sandy Hook Families obtained multiple judgments in the aggregate amount more than one-and-a-half billion dollars through lawsuits against Free Speech Systems, LLC (the "Debtor"), among others, in both Texas and Connecticut.  The Sandy Hook Families are—by far—the largest creditors in this chapter 11 case.

3.     The Sandy Hook Families take no position on Mr. Jones' Motion to the extent it merely requests that the Court fix a date by which the Debtor must either assume

---

[1]     The individual plaintiffs that, together, comprise the "Sandy Hook Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker, who are plaintiffs in the Connecticut litigation (together, the "Connecticut Plaintiffs"), and Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine, who are plaintiffs in the Texas actions (together, the "Texas Plaintiffs").

006944

or reject the employment agreement that the Debtor purportedly executed with Mr. Jones on or about April 14, 2022 (as may be modified from time to time, the "Employment Agreement").

4.      The Motion, however, improperly asks the Court to do more than just fix a date by which the Debtor must decide whether to assume or reject the Employment Agreement.  For example, the Proposed Order conflates the issue of fixing a decision date with the actual assumption of the Employment Agreement itself, thereby suggesting that— should the Debtor determine to assume the Employment Agreement—then such assumption would be effective on January 31, 2023, and that the Debtor must cure prior defaults and provide adequate assurance of future performance at such time. *See* Proposed Order ¶ 3.

5.      Based on the extremely limited information currently available, the Sandy Hook Families oppose the Debtor's assumption of the Employment Agreement.

6.      More fundamentally, whether the Debtor elects to assume the Employment Agreement is not an issue before the Court, because no party has properly presented that question to the Court.  If the Debtor elects to pursue assumption of the Employment Agreement, it must file a motion seeking permission to do so from the Court and setting forth the bases for such assumption.  The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") require that the Debtor—in the event it wishes to assume or reject any executory contract or unexpired lease—must seek permission from the Court to do so via motion with reasonable notice and opportunity for a hearing. *See* Fed. R. Bankr. P. 6006(a), 9014(a).

006945

7.    If the Debtor files such a motion, then the Sandy Hook Families will respond based on the legal arguments and factual record set forth therein, as well as any discovery produced in connection therewith.  But neither Mr. Jones nor the Debtor should be permitted to short-circuit the procedural safeguards set forth in the Bankruptcy Rules by assuming the Employment Agreement without the filing of an assumption motion with due notice to the Debtor's creditors.

8.    For the avoidance of doubt, the Sandy Hook Families reserve their rights to amend or supplement this Reservation of Rights on any basis and reserve all rights and remedies with respect to the Employment Agreement and otherwise in this chapter 11 case.

006946

Dated: December 30, 2022

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**
By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
Email:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
By: */s/ Jarrod B. Martin*
Jarrod B. Martin
State Bar No. 24070221
Tyler W. Greenwood
State Bar No. 24123219
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
Email:  jarrod.martin@chamberlainlaw.com

***Co-Counsel to the Texas Plaintiffs***

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
Email:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
Email:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Alexander Woolverton (admitted *pro hac vice*)
Martin J. Salvucci (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
Email:  kkimpler@paulweiss.com
Email:  awoolverton@paulweiss.com
Email:  msalvucci@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Reservation of Rights has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 30th day of December 2022.

_/s/ Ryan E. Chapple_
Ryan E. Chapple

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) (Chapter 11) Subchapter V |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Case No. 22-60043 (CML) |
| | ) |
| Debtor. | ) |
| | ) |

**STIPULATION AND AGREED ORDER EXTENDING**
**THE DEADLINE TO OBJECT TO DISCHARGEABILITY**

       The above-captioned debtor and debtor-in-possession (the "Debtor"), Neil Heslin,

Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "Texas

Plaintiffs"), David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley,

Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino,

William Aldenberg, William Sherlach and Robert Parker (the "Connecticut Plaintiffs" and,

together with the Texas Plaintiffs, the "Sandy Hook Families") and the official committee of

unsecured creditors in the chapter 11 case of Alexander E. Jones (together with the Debtor and the

Sandy Hook Families, the "Parties") hereby enter into this stipulation and agreed order

("Stipulation") as follows:

       WHEREAS, on July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under subchapter V of chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the

"Court");

       WHEREAS, on August 12, 2022, the Court entered the *Subchapter V Deadlines*

*Order* [ECF No. 65], setting the deadline for the Debtor to file a plan of reorganization (the "Plan")

for October 27, 2022;

WHEREAS, on October 21, 2022, the Debtor filed its *Emergency Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 246], requesting an extension to file its Plan;

WHEREAS, on October 25, 2022, the Court entered the *Order Granting Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 254], which extended the deadline for the Debtor to file its Plan until December 16, 2022;

WHEREAS, on October 28, 2022, the Court entered the *Stipulation and Agreed Order* [ECF No. 260] extending the deadline to object to dischargeability pursuant to any potentially applicable law, including, but not limited to Bankruptcy Code section 523(c), to January 5, 2023;

WHEREAS, on December 6, 2022, the Debtor filed its *Second Emergency Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 299], requesting an extension of time to file its Plan;

WHEREAS, on December 19, 2022, the Court entered the *Order Granting Second Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 332], which extended the deadline for the Debtor to file its Plan until February 17, 2022; and

WHEREAS, the Parties have agreed to a corresponding extension of the deadline to object to dischargeability pursuant to any potentially applicable law, including, but not limited to Bankruptcy Code section 523(c), and without agreeing to the applicability of same.  The Parties expressly reserve their rights regarding same.

**NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:**

2

1.      The deadline to object to dischargeability pursuant to Bankruptcy Code section

523(c) and any other potentially applicable law is extended to March 10, 2023.


Dated: _____


_____
THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**AGREED IN FORM AND SUBSTANCE**:

**Free Speech Systems, LLC**
By: */s/ Raymond W. Battaglia*
Raymond W. Battaglia
Law Offices of Ray Battaglia, PLLC
*Counsel to the Debtor*

**The Texas Plaintiffs**
By: */s/ Avi Moshenberg*
Avi Moshenberg
McDowell Hetherington LLP
*Counsel to the Texas Plaintiffs*
*-and-*
Jarrod B. Martin
Chamberlain, Hrdlicka, White,
Williams & Aughtry, PC
*Bankruptcy Counsel to the Texas Plaintiffs*

**The Official Committee of Unsecured Creditors of Alexander E. Jones**
By: */s/ David M. Zensky*
David M. Zensky
Akin Gump Strauss Hauer & Feld LLP
*Proposed Counsel to the Official Committee of Unsecured Creditors of Alexander E. Jones*

**The Connecticut Plaintiffs**

By: */s/ Alinor C. Sterling*
Alinor C. Sterling
Koskoff Koskoff & Bieder PC
*Counsel to the Connecticut Plaintiffs*

*-and-*
Ryan E. Chapple
Cain & Skarnulis PLLC
*Bankruptcy Co-Counsel to the Connecticut Plaintiffs*
*-and-*
Kyle J. Kimpler
Paul, Weiss, Rifkind, Wharton & Garrison LLP
*Bankruptcy Co-Counsel to the Connecticut Plaintiffs*

3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FREE SPEECH SYSTEMS, LLC | ) | Case No. 22-60043 |
| | ) | |
| Debtor. | ) | Chapter 11 (Subchapter V) |
| | ) | |

<u>**CERTIFICATE OF SERVICE OF NOTICE OF STATUS CONFERENCE**</u>

I hereby certify that on December 30, 2022 a true and correct copy of the *Notice of Status Conference on January 6, 2023*, attached hereto as <u>Exhibit A</u> was served (a) via email on the parties indicated in <u>Exhibit B</u> hereto and (b) via U.S.P.S. first-class mail was initiated through a third-party vendor with an anticipated mailing date of January 2, 2023, to the parties indicated on <u>Exhibit C</u> hereto. Further, a copy of this Certificate of Service with the attached exhibits was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.

Dated: December 30, 2022

*/s/R. J. Shannon*
R. J. Shannon
TX Bar No. 24108062
SHANNON & LEE LLP
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: rshannon@shannonleellp.com
Phone: (713) 714-5770

**<u>EXHBIT A</u>**

**NOTICE OF STATUS CONFERENCE ON JAUARY 6, 2022**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) |
| FREE SPEECH SYSTEMS, LLC | ) Case No. 22-60043 |
| | ) |
| Debtor. | ) Chapter 11 (Subchapter V) |
| | ) |

**<u>NOTICE OF STATUS CONFERENCE ON JANUARY 6, 2023</u>**

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      Judge Lopez of the U.S. Bankruptcy Court for the Southern District of Texas has set a status conference (the "<u>Status Conference</u>") in the above-captioned case on **<u>January 6, 2023, at 9:00 a.m. (Central Time)</u>** on the <u>(a)</u> Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206], <u>(b)</u> Motion of W. Marc Schwartz and Schwartz Associates, LLC Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ W. Marc Schwartz and Schwartz Associates, LLC [ECF No. 207], <u>(c)</u> Shannon & Lee LLP's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 251], and <u>(d)</u> Motion of W. Marc Schwartz and Schwartz Associates, LLC for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 252].

2.      The Status Conference on these matters will be conducted in **<u>Courtroom 401, 515 Rusk, Houston, TX 77002</u>**. You may participate in the Status Conference either in person or by an audio and video connection.

006954

3.      Audio communication will be by use of the Court's dial-in facility. You may access the facility at **832-917-1510**. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is **590153**. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page (https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-christopher-m-lopez). The meeting code is "**JudgeLopez**". Click the settings icon in the upper right corner and enter your name under the personal information setting.

Dated: December 30, 2022                    **SHANNON & LEE LLP**

                                            /s/*R. J. Shannon*
                                            Kyung S. Lee
                                            State Bar No. 12128400
                                            klee@shannonleellp.com
                                            R. J. Shannon
                                            State Bar No. 24108062
                                            rshannon@shannonleellp.com
                                            700 Milam Street, STE 1300
                                            Houston, Texas 77002
                                            Tel. (713) 714-5770

2

**EXHBIT B**

**SERVICE BY EMAIL**

Patrick Magill
Chief Restructuring Officer
Free Speech Systems, LLC
3019 Alvin Devane Blvd. Ste 300
Austin, Texas 78741
patrick@magillpc.com

Raymond Battaglia
The Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
rbattaglialaw@outlook.com

United States Trustee
c/o Ha Nguyen
Office of the U.S. Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.com

Connecticut Plaintiffs
c/o Ryan Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, TX 78701
rchapple@cstrial.com

Texas Plaintiffs
c/o Jarrod Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlainlaw.com

Melissa Haselden, Subchapter V Trustee
700 Milam, Suite 1300
Pennzoil Place
Houston, Texas 7002
mhaselden@haseldenfarrow.com

Elizabeth Freeman
The Law Office of Liz Freeman, PLLC
PO Box 61209
Houston, TX 77208-1209
liz@lizfreemanlaw.com

Alexander E. Jones
c/o Shelby Jordan
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX 78401
sjordan@jhwclaw.com

Alexander E. Jones
c/o Vickie Driver
Crowe & Dunlevy, P.C.
2525 McKinnon St. Suite 425
Dallas, TX 75201
vickie.driver@crowedunlevy.com

W. Marc Schwartz
c/o Michael Ridulfo
Kane Russell Coleman Logan
5151 San Felipe, Suite 800
Houston, Texas 77056
mridulfo@krcl.com

006956

## EXHBIT C

**SERVICE BY U.S.P.S. FIRST CLASS MAIL**

Label Matrix for local noticing
0541-4
Case 22-60043
Southern District of Texas
Houston
Fri Dec 30 18:21:26 CST 2022

Ally Bank, c/o AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118-7901

Free Speech Systems LLC
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741-7417

PQPR Holdings Limited, LLC
c/o Streusand Landon Ozburn & Lemmon LLP
attn: Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746-9817

Reeves Law, PLLC
702 Rio Grande St., Ste. 203
Austin, TX 78701-2720

Security Bank of Crawford
P.O. BOx 90
Crawford, Tx 76638-0090

Shannon & Lee LLP
700 Milam Street, STE 1300
Houston, TX 77002-2736

Texas Comptroller of Public Accounts, Revenu
Christopher J. Dylla
P.O. Box 12548
Austin, TX 78711-2548

Travis County
c/o Jason A. Starks
P.O. Box 1748
Austin, TX 78767-1748

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

ADP Total Source Insurance
10200 Sunset Drive
Miami, FL 33173-3033

ADP TotalSource Payroll
10200 Sunset Drive
Miami, FL 33173-3033

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

AWIO Web Services LLC
6608 Truxton Ln
Raleigh, NC 27616-6694

Addshoppers, Inc
222 S. Church Street , #410M
Charlotte, NC 28202-3213

Airco Mechanical, LTD
PO Box 1598
Round Rock, TX 78680-1598

Alex E. Jones
c/o Jordan & Ortiz, P.C.
Attn: Shelby Jordan
500 North Shoreline Blvd, STE 900
Corpus Christi, TX 78401-0658

Alex Emeric Jones
c/o Jordan & Ortiz, P.C.
Attention: Shelby Jordan
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78401-0658

Ally Auto
PO Box 9001948
Louisville, KY 40290-1948

Amazon Marketplace
Amazon Payments, Inc.
410 Terry Ave N.
Seattle, WA 98109-5210

Amazon Web Services
410 Terry Avenue North
Seattle, WA 98109-5210

American Express
PO Box 650448
Dallas, TX 75265-0448

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

American Media/Reality Zone
PO Box 4646
Thousand Oaks, CA 91359-1646

Andrews, Christopher
210 N. Beyer Stree
Marion, TX 78124-4014

Atomial, LLC
1920 E. Riverside Drive
Suite A-120 #124
Austin, TX 78741-1350

Balcones Recycling Inc.
PO Box 679912
Dallas, TX 75267-9916

Biodec, LLC
901 S. Mopac Expressway, Building 4, Ste
Austin, TX 78746-5776

Blott, Jacquelyn
200 University Boulevard
Suite 225 #251
Round Rock TX 78665-1096

006958

Brennan Gilmore
c/o Civil Rights Clinic
ATTN: Andrew Mendrala
600 New Jersey Avenue, NW
Washington, DC 20001-2022

Campco
4625 W. Jefferson Blvd
Los Angeles, CA 90016-4006

Carlee Soto Parisi
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

Carlos Soto
c/o Ryan Chapple
303 Colorado Street, Ste. 2850
Austin, TX 78701-4653

Chelsea Green Publishing
85 North Main Street Ste 120
White River Junction, VT 05001-7135

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive Ste. 301
Coral Springs, FL 33065-5058

City of Austin
c/o Austin Energy
 4815 Mueller Blvd.
Austin, TX 78723-3573

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Comptroller of Public Accounts
C/O Office of the Attorney General
Bankruptcy - Collections Division MC-008
PO Box 12548
Austin TX  78711-2548

Constant Contact, Inc.
1601 Trapelo Road
Watham, MA 02451-7357

CustomTattoNow.com
16107 Kensington Dr #172
Sugar Land, TX 77479-4224

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

David Wheeler
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

(p)DE LAGE LANDEN FINANCIAL
ATTN LITIGATION & RECOVERY
1111 OLD EAGLE SCHOOL ROAD
WAYNE PA 19087-1453

Deese, Stetson
328 Greenland Blvd. #81
Death Valley, CA 92328-9600

DirectTV
PO Box 5006
Carol Stream, IL 60197-5006

Dona Soto
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

EPS, LLC
17350 State Hwy 249, Ste 220, #4331
Houston, TX 77064-1132

ERM Protect
800 South Douglas Road, Suite 940N
Coral Gables, FL 33134-3125

Edgecast, Inc.
Dept CH 18120
Palatine, IL 60055-0001

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06807-2601

Erica Lafferty
c/o Joseph Mirrione
27 Elm Street
New Haven, CT 06510-2087

Estate of Marcel Fontaine
Chamberlain Hrdlicka
attn? Jarrod B. Martin
1200 Smith, Suite 1400
Houston TX 77002-4496

FW Robert Broadcasting Co
2730 Loumor Ave
Metairie, LA 70001-5425

Francine Wheeler
c/o Ryan Chapple
303 Colorado Street
Suite 2850
Austin, TX 78701-4653

Frost Insurance Agency
401 Congress Avenue, 14th Floor
Austin ,TX 78701-3793

Gabriela Tolentino
5701 S Mopac Expy
Austin, TX 78749-1464

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

Gracenote
29421 Network Place
Chicago, IL 60673-1294

Greenair, Inc
23569 Center Ridge Road
Westlake, OH 44145-3642

006959

Haivision Network Video
Deot CH 19848
Palatine, IL 60055-9848

Ian Hockley
Ryan Chapple
303 Colorado Street
Suite 2850
Austin, TX 78701-4653

Impact Fire Services, LLC
PO Box 735063
Dallas, TX 75373-5063

Independent Publishers Group
PO Box 2154
Bedford Park, IL 60499-2154

Iron Mountain, Inc
PO Box 915004
Dallas, TX 75391-5004

JCE SEO
6101 Broadway
San Antonio, TX 78209-4561

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404-1855

Jacqueline Barden
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

Jennifer Hensel
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

Jeremy Richman
c/o Koskoff Koskoff & Bieder
350 Fairfield Ave
Bridgeport, CT 06604-6014

Jillian Soto-Marino
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601-6533

KI4U.com
212 Oil Patch Lane
Gonzales, TX 78629-8028

LIT Industrial
1717 McKinney Ave #1900
Dallas, TX 75202-1253

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL 33433-3426

Leonard Pozner
c/o Chamberlain Hrdlicka
attn:  Jarrod B. Martin
1200 Smith, Suite 1400
Houston TX 77002-4496

Lincoln-Remi Group, LLC
1200 Benstein Rd.
Commerce Twp., MI 48390-2200

Logo It, LLC
820 Tivy Street
Kerrville, TX 78028-3654

Lumen/Level 3 Communications
PO Box 910182
Denver, CO 80291-0182

MRJR Holdings, LLC
PO Box 27740
Las Vegas, NV 89126-7740

MVD Entertainment Group
203 Windsor Rd
Pottstown, PA 19464-3405

Magento
PO Box 204125
Dallas, TX 75320-4105

Mark Barden
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin Tx 78701-4653

Microsoft Bing Ads
c/o Microsoft Online, Inc.
P.O. Box 847543
1950 N Stemmons Fwy, Ste 5010
Dallas, TX 75207-3199

Miller, Sean
PO Box 763
Wyalusing, PA 18853-0763

Music Videos Distributors
203 Windsor Rd
Pottstown, PA 19464-3405

Neil Heslin
c/o Chamberlain Hrdlicka
Attn: Jarrod B. Martin
1200 Smith, Suite 1400
Houston TX 77002-4496

NetSuite Inc
Bank of America Lockbox Services
Chicago, IL 60693-0001

New Relic
188 Spear Street, Suite 1200
San Francisco, CA 94105-1752

Newegg.com
9997E. Rose Hills Road
Whittier, CA 90601

006960

Nicole Hockley
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

One Party America, LLC
6700 Woodlands Parkway, Suite 230-309
The Woodlands, TX 77382-2575

Orkin, Inc.
5810 Trade Center Drive, Suite 300
Austin, TX 78744-1365


PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746-9817

Pattison Law Firm, P.C.
501 IH-35
Austin, TX 78702-3229

Payarc
411 West Putnam Avenue, Ste 340
Greenwich, CT 06830-6291


Paymentus
18390 NE 68th St
Redmond, WA 98052-5057

Paz Law, LLC
1021 Orange Center Road
Orange, CT 06477-1216

Percision Oxygen
13807 Thermal Dr
Austin, TX 78728-7735


Perfect Imprints.com
709 Eglin Pkwy NE
Fort Walton Beach, FL 32547-2527

Perkins, Wes
General Delivery
Lockhart, TX 78644-9999

Pipe Hitters Union, LLC
PO Box 341194
Austin, TX 78734-0020


Post Hill Press, LLC
8115 Isabella Lane, Ste. 4
Brentwood, TN 37027-9110

Poulsen, Debra
112 Eames St.
Elkhorn, WI 53121-1228

Power Reviews, Inc.
1 N. Dearborn Street
Chicago, IL 60602-4331


Precision Camera
2438 W Anderson Ln
Austin, TX 78757-1149

Private Jets, LLC
1250 E. Hallandale Beach Blvd, Suite 505
Hallandale, FL 33009-4635

Protection 1 Alarm
PO Box 219044
Kansas City, MO 64121-9044


Public Storage
2301 E. Ben White Blvd
Austin, TX 78741-7110

Pullman & Comley, LLC
850 Main Street
Bridgeport, CT 06604-4988

Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
702-420-2001
ecf@randazza.com 89117-3400


RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054-2792

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864-0901

Reeves Law, PLLC
Attn: Bradley Reeves
702 Rio Grande St., Suite 203
Austin, TX 78701-2720


Renaissance
PO Box 8036
Wisconsin Rapids, WI 54495-8036

Restore America
PO Box 147
Grimsley, TN 38565-0147

Richard Coan,
Chapter 7 Trustee for Debtor, Erica Laff
c/o Eric Henzy
10 Middle Street
Bridgeport, CT 06604-4257


Robert Parker
c/o Ryan Chapple
303 Colorado Street, Suite 2850
Austin TX 78701-4653

SLNT
30 N Gould St, Ste 20647
Sheridan, WY 82801-6317

Scarlett Lewis
c/o Chamberlain Hrdlicka
Attn:  Jarrod B. Martin
1200 Smith, Suite 1400
Houston TX 77002-4496 006961

Security Bank of Crawford
6688 North Lone Star Parkway
PO Box 90
Crawford, TX 76638-0090

Simon & Schuster
PO Box 70660
Chicago, IL 60673-0660

SintecMedia NYC, Inc. DBA Operative
PO Box 200663
Pittsburgh, PA 15251-2662

Skousen, Joel
PO Box 565
Spring City, UT 84662-0565

Skyhorse Publishing
307 West 36th Street, 11th Floor
New York, NY 10018-6592

Sparkletts & Sierra Springs
PO Box 660579
Dallas, TX 75266-0579

Spectrum Enterprise aka Time Warner Cable
1600 Dublin Road
Columbus, OH 43215-2098

Stamps.com
1990 E Grand Ave.
El Segundo, CA 90245-5013

Stone Edge Technologies, Inc
660 American Avenue, Suite 204
King of Prussia, PA 19406-4032

Stratus Technologies
5 Mill & Main Place, Suite 500
Maynard, MA 01754-2660

Studio 2426, LLC
1920 E. Riverside Drive, Suite A120, ï¿½
Austin, TX 78741-1350

Synergy North America, Inc
 11001 W. 120th Avenue, Suite 400
Broomfield, CO 80021-3493

TD Canada Trust
421 7th Avenue SW
Calgary, AB T2P 4K9, Canada

Texas Comptroller
PO Box 13003
Austin, TX 78711-3003

Texas Disposal Systems, Inc
PO Box 674090
Dallas, TX 75267-4090

Texas Gas Service
PO Box 219913
Kansas City, MO 64121-9913

Textedly
133 N. Citrus Ave., Suite 202
Los Angeles, CA 90036

The Creative Group
c/o Robert Half
2884 Sand Hill Road, Ste 200
Menlo Park, CA 94025-7072

The Hartford
PO Box 14219
Lexington, KY 40512-4219

The Steam Team, Inc
1904 W. Koeing Lane
Austin, TX 78756-1211

Third Coast Graphics, Inc
110 Del Monte Dr.
Friendswood, TX 77546-4487

Thomas, David
79 Malone Hill Road
Elma, WA 98541-9206

Travelers
PO Box 660317
Dallas, TX 75266-0317

Travis County
PO Box 149328
Austin, TX 78714-9328

Travis County c/o Jason A. Starks
PO Box 1748
Austin, Texas 78767-1748

U.S. Legal Support
PO Box 4772
Houston, TX 77210-4772

Uline Shipping Supply
12575 Uline Drive
Pleasant Prarie, WI 53158-3686

Vazquez, Valdemar Rodriguez
145 Quail Ridge Drive
Kyle TX 78640-9788

Verizon
PO Box 660108
Dallas, TX 75266-0108

Verizon Edgecast
13031 West Jefferson Blvd, Building 900
Los Angeles, CA 90094-7002

Veronique De La Rosa
c/o Chamberlain Hrdlicka
attn:  Jarrod B. Martin
1200 Smith, Suite 1400
Houston TX 77002-4496

Vultr
14 Cliffwood Avenue, Suite 300
Matawan, NJ 07747-3931

WMQM-AM 1600
21 Stephen Hill Road
Atoka, TN 38004-7183

WWCR
1300 WWCR Avenue
Nashville, TN 37218-3800

Waste Connections Lone Star, Inc.
PO Box 17608
Austin, TX 78760-7608

Water Event - Pure Water Solutions
1310 Missouri St
South Houston, TX 77587-4537

Watson, Paul
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Westwood One, LLC
3542 Momentum Place
Chicago, IL 60689-5335

William Aldenberg
c/o Ryan Chapple
303 Colorado Street, Ste 2850
Austin, TX 78701-4653

William Sherlach
c/o Ryan Chapple
303 Colorado Stret, Suite 2850
Austin TX 78701-4653

Willow Grove Productions
1810 Rockcliff Road
Austin, TX 78746-1215

Wisconsin Dept of Revenue
Special Procedures Unit
POB 8901
Madison, WI 53708-8901

Wisconsin Dept. of Revenue
PO Box 3028
Milwaukee, WI 53201-3028

Your Promtional Products, LLC
133 North Friendswood STE 186
Friendswood, TX 77546-3746

Zendesk, Inc
989 Market Street
San Francisco, CA 94103-1708

Zoom US
55 Almaden Blvd, 6th Floor
San Jose, CA 95113-1608

eBay
2025 Hamilton Avenue
San Jose, CA 95125-5904

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405-4226

mongoDB Cloud
1633 Broadway
39th Floor
New York, NY 10019-6757

Alex E Jones
c/o Jordan & Ortiz PC
500 N Shoreline Blvd
Ste 900
Corpus Christi, TX 78401-0658

Christina Walton Stephenson
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201-1543

David Wheeler, et al.
c/o Cain & Skarnulis PLLC
303 Colorado Street
Suite 2850
Austin, TX 78701-4653

Kyung Shik Lee
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027-5499

Kyung Shik Lee
Shannon & Lee LLP
Pennzoil Place-Suite 1300
HOUSTON, TX 77027 United States

Leonard Pozner
c/o McDowell Hetherington LLP
Attention: Avi Moshenberg
1001 Fannin Street
Suite 2700
Houston, TX 77002-6774

Marcel Fontaine
c/o McDowell Hetherington LLP
Attention: Avi Moshenberg
1001 Fannin
Suite 2700
Houston, TX 77002-6774

Melissa A Haselden
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002-2736

Neil Heslin
c/o McDowell Hetherington LLP
Attention: Avi Moshenberg
1001 Fannin Street
Suite 2700
Houston, TX 77002-6774

R. J. Shannon
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002-2736

Raymond William Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218-3010

```
Scarlett Lewis                          Shelby A Jordan                         Veronique De La Rosa
c/o McDowell Hetherington LLP           c/o McDowell Hetherington LLP           c/o McDowell Hetherington LLP
Attention: Avi Moshenberg               Attention: Avi Moshenberg               Attention: Avi Moshenberg
1001 Fannin Street                      1001 Fannin Street                      1001 Fannin Street
Suite 2700                              Suite 2700                              Suite 2700
Houston, TX 77002-6774                  Houston, TX 77002-6774                  Houston, TX 77002-6774
```

         The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
         by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

```
De Lage Landen Financial Services, Inc.     (d)Konica Minolta Premier Finance
1111 Old Eagle School Road                  PO Box 41602
Wayne, PA  190087                           Philadelphia, PA 19101-1602
```

         The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(u)ADP TotalSource, Inc.                    (u)Schwartz Associates, LLC            (u)Schwartz and Associates, LLC



(d)Ally Bank c/o AIS Portfolio Services, LLC  (u)Resistance Manifesto              (u)David Ross Jones
4515 N. Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118-7901



(u)Marc Schwartz                            (u)W. Marc Schwartz                    End of Label Matrix
                                                                                   Mailable recipients   182
                                                                                   Bypassed recipients     8
                                                                                   Total                 190
```

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 03, 2023

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER APPROVING REJECTION OF OF WAREHOUSE LEASE AGREEMENT**
**WITH EXPO GLO, LLC  AND GRANTING RELATED RELIEF**

Upon consideration of the *Motion for Entry Order Approving Rejection of Warehouse Lease Agreement with Expo GLO, LLC and Granting Related Relief* (the "Motion") [1] filed by Free Speech Systems, LLC ("FSS" or the "Debtor"), the debtor and debtor-in-possession in the above captioned case (the "Motion"); and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion has been provided, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is fair and reasonable, was proposed in good faith, is in the best interests of the Debtor and its estate and creditors and is within the business judgment of the Debtor; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the November 30, 2017, Lease Agreement (the "Agreement") between the Debtor and Expo GLO, LLC ("Expo") for the lease of approximately 136,000 square feet of warehouse space located at 6231 E. Stassney Lane, Austin, Texas (the "Leased "Premises"), shall be and hereby is rejected effective as of the Petition Date; and it is further

---

[1] All capitalized terms not defined in this Order shall be defined as set forth in the Motion.

ORDERED that the Debtor and the Expo GLO, LLC are relieved of any future performance obligations under the Agreement, including, but not limited to any rights to specific performance; and it is further

ORDERED that any claims arising out of the rejected Agreement must be filed on or before thirty (30) days following the entry of this Order; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Signed:  January 03, 2023

Christopher Lopez
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 03, 2023
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

**ORDER APPROVING REJECTION OF OF VEHICLE LEASE AGREEMENT WITH**
**ALLY BANK AND GRANTING RELATED RELIEF**

Upon consideration of the *Motion for Entry Order Approving Rejection of Vehicle Lease Agreement with Ally Bank and Granting Related Relief* (the "Motion") [1] filed by Free Speech Systems, LLC ("FSS" or the "Debtor"), the debtor and debtor-in-possession in the above captioned case (the "Motion"); and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion has been provided, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is fair and reasonable, was proposed in good faith, is in the best interests of the Debtor and its estate and creditors and is within the business judgment of the Debtor; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the June 8, 2020, Lease Agreement (the "Agreement") between the Debtor and Ally Bank ("Ally") for the lease of a 2020 Chevrolet Tahoe (the "Leased Vehicle"), shall be and hereby is rejected effective as of the Petition Date; and it is further

---

[1] All capitalized terms not defined in this Order shall be defined as set forth in the Motion.

ORDERED that the Debtor and Ally Bank are relieved of any future performance obligations under the Agreement, including, but not limited to any rights to specific performance; and it is further

ORDERED that any claims arising out of the rejected Agreement must be filed on or before thirty (30) days following the entry of this Order; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Signed:  January 03, 2023

Christopher Lopez
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| FREE SPEECH SYSTEMS LLC | § | CASE NO. 22-60043 |
| *Debtor* | § | |
| | § | |

## NOTICE OF APPEARANCE AND REQUEST FOR NOTICE

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, Sweetwater Holdings Group, Inc. ("Sweetwater"), and request that copies of all motions, pleadings, notices, orders, proposed orders, proposed disclosure statements and plans, and other filings be served on Walter J. Cicack electronically or at the address stated below:

> Walter J. Cicack
> HAWASH CICACK & GASTON LLP
> 3401 Allen Parkway, Suite 200
> Houston, Texas 77019
> (713) 658-9015 - tel/fax
> wcicack@hcgllp.com

Sweetwater further request that the Clerk of the above-named Court mail to Walter J. Cicack copies of all notices to parties-in-interest hereinafter given in the case in accordance with Bankruptcy Rules 2002, 3017, and 9013, and any other Bankruptcy Rule or local rule governing notices.

Respectfully submitted,

HAWASH CICACK & GASTON LLP

 */s/ Walter J. Cicack*
WALTER J. CICACK
State Bar No. 04250535
wcicack@hcgllp.com
3401 Allen Parkway, Suite 200
Houston, Texas 77019
(713) 658-9015 - tel/fax
***Attorneys for Sweetwater Holdings Group, Inc.***

**<u>Certificate of Service</u>**

I hereby certify that a true and correct copy of the foregoing document has been served through the Court's ECF noticing system on this 4th day of January, 2023.

_/s/ Walter J. Cicack_____
Walter J. Cicack

2

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 04, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | (Chapter 11) Subchapter V |
|  | ) |  |
| FREE SPEECH SYSTEMS, LLC, | ) | Case No. 22-60043 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## STIPULATION AND AGREED ORDER EXTENDING
## THE DEADLINE TO OBJECT TO DISCHARGEABILITY

The above-captioned debtor and debtor-in-possession (the "Debtor"), Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (the "Texas Plaintiffs"), David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach and Robert Parker (the "Connecticut Plaintiffs" and, together with the Texas Plaintiffs, the "Sandy Hook Families") and the official committee of unsecured creditors in the chapter 11 case of Alexander E. Jones (together with the Debtor and the Sandy Hook Families, the "Parties") hereby enter into this stipulation and agreed order ("Stipulation") as follows:

WHEREAS, on July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court");

WHEREAS, on August 12, 2022, the Court entered the *Subchapter V Deadlines Order* [ECF No. 65], setting the deadline for the Debtor to file a plan of reorganization (the "Plan") for October 27, 2022;

WHEREAS, on October 21, 2022, the Debtor filed its *Emergency Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 246], requesting an extension to file its Plan;

WHEREAS, on October 25, 2022, the Court entered the *Order Granting Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 254], which extended the deadline for the Debtor to file its Plan until December 16, 2022;

WHEREAS, on October 28, 2022, the Court entered the *Stipulation and Agreed Order* [ECF No. 260] extending the deadline to object to dischargeability pursuant to any potentially applicable law, including, but not limited to Bankruptcy Code section 523(c), to January 5, 2023;

WHEREAS, on December 6, 2022, the Debtor filed its *Second Emergency Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 299], requesting an extension of time to file its Plan;

WHEREAS, on December 19, 2022, the Court entered the *Order Granting Second Motion for Extension of Time to File a Plan of Reorganization* [ECF No. 332], which extended the deadline for the Debtor to file its Plan until February 17, 2022; and

WHEREAS, the Parties have agreed to a corresponding extension of the deadline to object to dischargeability pursuant to any potentially applicable law, including, but not limited to Bankruptcy Code section 523(c), and without agreeing to the applicability of same.  The Parties expressly reserve their rights regarding same.

**NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:**

2

1.    The deadline to object to dischargeability pursuant to Bankruptcy Code section 523(c) and any other potentially applicable law is extended to March 10, 2023.

Signed:  January 04, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

**AGREED IN FORM AND SUBSTANCE**:

**Free Speech Systems, LLC**
By: */s/ Raymond W. Battaglia*
Raymond W. Battaglia
Law Offices of Ray Battaglia, PLLC
*Counsel to the Debtor*

**The Texas Plaintiffs**
By: */s/ Avi Moshenberg*
Avi Moshenberg
McDowell Hetherington LLP
*Counsel to the Texas Plaintiffs*
*-and-*
Jarrod B. Martin
Chamberlain, Hrdlicka, White,
Williams & Aughtry, PC
*Bankruptcy Counsel to the Texas Plaintiffs*

**The Official Committee of Unsecured Creditors of Alexander E. Jones**
By: */s/ David M. Zensky*
David M. Zensky
Akin Gump Strauss Hauer & Feld LLP
*Proposed Counsel to the Official Committee of Unsecured Creditors of Alexander E. Jones*

**The Connecticut Plaintiffs**

By: */s/ Alinor C. Sterling*
Alinor C. Sterling
Koskoff Koskoff & Bieder PC
*Counsel to the Connecticut Plaintiffs*

*-and-*
Ryan E. Chapple
Cain & Skarnulis PLLC
*Bankruptcy Co-Counsel to the Connecticut Plaintiffs*
*-and-*
Kyle J. Kimpler
Paul, Weiss, Rifkind, Wharton & Garrison LLP
*Bankruptcy Co-Counsel to the Connecticut Plaintiffs*

3

006973

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22 - 60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| DEBTOR. | § | Chapter 11 (Subchapter V) |
| | § | |

JOINDER OF W. MARC SCHWARTZ AND SCHWARTZ ASSOCIATES, LLC TO
SHANNON & LEE, LLP'S OMNIBUS REPLY TO OBJECTIONS TO
ADMINISTRATIVE EXPENSE MOTION

W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz") hereby submit

this Joinder to Shannon & Lee, LLP's Omnibus Reply to Objections to Administrative Expense

Motion [the "Reply", ECF No. 362] as follows:

1.      Schwartz hereby joins in the Reply with respect to all statements and arguments

made therein that are equally applicable to Schwartz.

WHEREFORE, Schwartz respectfully requests that the Court consider this Joinder and

grant such other and further relief to which Schwartz may be entitled.

January 5, 2023

Respectfully submitted,

KANE RUSSELL COLEMAN & LOGAN PC

By:  /s/ Michael P. Ridulfo
      Michael P. Ridulfo
      State Bar No. 16902020
      Federal Bar No. 27086
      5151 San Felipe, Suite 800
      Houston, Texas 77056
      (713) 425-7400
      (713) 425-7700 (fax)
      E-mail: mridulfo@krcl.com
      Attorney for W. Marc Schwartz and
      Schwartz Associates, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2023, a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.


*/s/ Michael P. Ridulfo*
Michael P. Ridulfo

**SmBus, PlnDue, DsclsDue, ReqSepNtc, Subchapter_V, APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 22-60043

| | |
|---|---|
| *Date filed:* | 07/29/2022 |
| *Date of Intradistrict transfer:* | 08/04/2022 |
| *341 meeting:* | 09/07/2022 |
| *Deadline for filing claims:* | 10/07/2022 |
| *Deadline for filing claims (govt.):* | 02/07/2023 |
| *Deadline for objecting to discharge:* | 03/10/2023 |

*Assigned to:* Bankruptcy Judge Christopher M. Lopez
Chapter 11
Voluntary
Asset

*Debtor*
**Free Speech Systems LLC**
3019 Alvin Devane Blvd. STE 300
Austin, TX 78741
TRAVIS-TX
SSN / ITIN: xxx-xx-0005

represented by **Raymond William Battaglia**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218
2106019405
Email: rbattaglialaw@outlook.com

**Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**R. J. Shannon**
Shannon & Lee LLP
700 Milam St., STE 1300
Houston, TX 77002
713-714-5770
Email: rshannon@shannonpllc.com

**Christina Walton Stephenson**
Crowe & Dunlevy
2525 McKinnon St.
Ste 425
Dallas, TX 75201
214-420-2163
Email: Crissie.Stephenson@crowedunlevy.com

*Trustee*
**Melissa A Haselden**
Haselden Farrow PLLC
Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149

represented by **Elizabeth Carol Freeman**
The Law Office of Liz Freeman
PO Box 61209
Houston, TX 77208-1209
832-779-3580
Email: liz@lizfreemanlaw.com

**Melissa Anne Haselden**
Haselden Farrow PLLC

Pennzoil Place
700 Milam
Suite 1300
Houston, TX 77002
832.819.1149
Fax : 866.405.6038
Email: mhaselden@haseldenfarrow.com

*U.S. Trustee*
**US Trustee**
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002
713-718-4650

represented by **Ha Minh Nguyen**
Office of the United States Trustee
515 Rusk St
Ste 3516
Houston, TX 77002
202-590-7962
Email: ha.nguyen@usdoj.gov

**Jayson B. Ruff**
Office of the United States Trustee
515 Rusk St.
Ste. 3516
Houston, TX 77002
713-718-4650
Fax : 713-718-4670
Email: jayson.b.ruff@usdoj.gov

*Creditor Committee*
**Official Committee of Unsecured Creditors**
**of Alexander E. Jones**
c/o Marty L. Brimmage, Jr.
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
214-969-2800

represented by **Marty L Brimmage**
Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, TX 75201
214-969-2885
Fax : 214-969-4343
Email: mbrimmage@akingump.com

| Filing Date | # | Docket Text |
|---|---|---|
| 01/06/2023 | ⬤374 | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: RJ Shannon, Mike Ridulfo, Ha Nguyen, Jayson Ruff, Elizabeth Freeman, David Zensky, Ray Battaglia, Steve Lemmon. (Related document: 206 Motion to Reconsider, 207 Motion to Reconsider, 251 Application for Compensation, Application for Administrative Expenses, 252 Application for Compensation). Status Conference held. **Hybrid Hearing scheduled for 1/20/2023 at 10:00 AM.** (ZildeMartinez) (Entered: 01/06/2023) |

# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2022-60043

Free Speech Systems LLC

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2022-60043 |
| Case Title : | Free Speech Systems LLC |
| Audio Date\Time: | 1/6/2023 9:00:50 AM |
| Audio File Name : | 4bk2022-60043_20230106-090050.mp3 |
| Audio File Size : | 4600 KB |
| Audio Run Time : | [00:09:35] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF
TEXAS
HOUSTON DIVISION

Case number  22-60043

In re:  FREE SPEECH SYSTEMS LLC

Taxpayer number:  XXXXXXX6953

WITHDRAWAL OF
CLAIM # 6
PRIORITY PROOF OF CLAIM

Name of Creditor:  Texas Comptroller of Public Accounts
on behalf of the State of Texas
and local sales tax jurisdictions.

Send notices to:  Office of the Attorney General
Bankuptcy & Collections Division MC-008
P.O. Box 12548
Austin, TX 78711-2548
Phone:  512-463-2173

1.  DATE OF CLAIM:  09/13/2022

2.  TOTAL AMOUNT OF CLAIM:  $ 93,593.90
SALES AND USE TAX CH. 151,(321,322,323)

3.  DATE DEBT WAS INCURRED:  04/01/2022 to 07/29/2022

4.  THE CLAIM REFERENCED ABOVE IS HEREBY WITHDRAWN

Date:  01/06/2023

/S/ LIONEL CORDELE KIMBLE
LIONEL CORDELE KIMBLE
Accounts Examiner
Revenue Accounting Division
Texas Comptroller of Public Accounts
512-463-4510

Penalty for presenting fraudulent claim: fine of up to $500,000 or imprisonment for up to 5
years, or both.  18 U.S.C. secs. 152 and 3571

Form VT-359 (Rev.8-19/7)

006979

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF
TEXAS
HOUSTON DIVISION

Case number  22-60043

In re:  FREE SPEECH SYSTEMS LLC

Taxpayer number:  XXXXXXX6953

WITHDRAWAL OF
CLAIM # 36
ADMINISTRATIVE EXPENSE CLAIM AND REQUEST FOR PAYMENT

Name of Creditor:  Texas Comptroller of Public Accounts
on behalf of the State of Texas
and local sales tax jurisdictions.

Send notices to:  Office of the Attorney General
Bankuptcy & Collections Division MC-008
P.O. Box 12548
Austin, TX 78711-2548
Phone:  512-463-2173

1.  DATE OF CLAIM AND REQUEST:  10/13/2022

2.  TOTAL AMOUNT OF CLAIM AND REQUEST:  $ 27,882.13
SALES AND USE TAX CH. 151,(321,322,323)

3.  DATE DEBT WAS INCURRED:  07/30/2022 to 10/11/2022

4.  THE CLAIM REFERENCED ABOVE IS HEREBY WITHDRAWN

Date:  01/06/2023

/S/ LIONEL CORDELE KIMBLE
LIONEL CORDELE KIMBLE
Accounts Examiner
Revenue Accounting Division
Texas Comptroller of Public Accounts
512-463-4510

Penalty for presenting fraudulent claim: fine of up to $500,000 or imprisonment for up to 5
years, or both.  18 U.S.C. secs. 152 and 3571

Form VT-359 (Rev.8-19/7)

006980

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

## NOTICE OF WITHDRAWAL OF APPEARANCE
## AND REQUEST FOR REMOVAL FROM SERVICE LISTS

**PLEASE TAKE NOTICE** that Alexander Woolverton, having previously filed a *Notice of Appearance and Request for Service of Papers* [Docket No. 341], hereby withdraws his appearance on behalf of Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker (collectively, the Connecticut Plaintiffs), in the above-captioned matter, and requests that he be removed from all service lists in the above-captioned Proceeding.

**PLEASE TAKE FURTHER NOTICE** that the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, and its attorneys of record, other than Alexander Woolverton, continue to represent the Connecticut Plaintiffs and hereby request that all notices required in the above-referenced case continue to be served to such attorneys of record.

006981

Respectfully submitted this 10th day of January 2023.

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

-and-

Kyle J. Kimpler (admitted *pro hac vice*)
Alexander Woolverton (admitted *pro hac vice)*
Martin J. Salvucci (admitted *pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
(212) 757-3990 (fax)
kkimpler@paulweiss.com
msalvucci@paulweiss.com

**ATTORNEYS FOR CONNECTICUT
PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice of Withdrawal
of Appearance has been served on counsel for Debtor, Debtor, and all parties receiving or
entitled to notice through CM/ECF on this 10th day of January 2023.

_____/s/ Ryan E. Chapple_____
Ryan E. Chapple

006982

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 (Subchapter V) |
| FREE SPEECH SYSTEMS LLC, | § | |
| . | § | Case No. 22-60043 (CML) |
| | § | |
| Debtor. | § | Jointly Administered |

**DEBTOR AND SUBCHAPTER V TRUSTEE'S JOINT LIMITED OBJECTION TO**
**EMERGENCY MOTION OF ALEXANDER E. JONES TO FIX A DATE BY WHICH**
**DEBTOR MUST ASSUME OR REJECT EXECUTORY CONTRACT**

Free Speech Systems, LLC (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") and Melissa Haselden, the subchapter v trustee (the "Subchapter V Trustee") file this limited objection (the "Objection") to *Emergency Motion of Alexander E. Jones to Fix a Date by which Debtor Must Assume or Reject Executory Contract* [Docket No. 349] (the "Motion") filed by Alexander E. Jones ("Mr. Jones") and state the following:

1.      Mr. Jones seeks entry of an order fixing a date by which the Debtor must assume or reject an employment agreement between the Debtor and Jones (the "Contract").  The Debtor and Subchapter V Trustee object to the Motion at this time because the relief requested is premature.

2.      Mr. Jones is without question central to the success of the FSS.  However, the business operations of FSS continue to morph and improve through the effort of the CRO working with Mr. Jones and the Debtor's employees.  Decisions with regards to Mr. Jones' employment agreement will certainly be informed by the developing business operations.  Given the evolving landscape of the business and the case as well as the anticipated mediation, it is premature at this time to establish a date by which Mr. Jones' employment agreement must be assumed or rejected.

January 11, 2023
/s/ *Raymond W. Battaglia*

**LAW OFFICE OF RAYMOND W. BATTAGLIA**
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Grandburg Circle
San Antonio, Texas 78218

*Counsel to Free Speech Systems, LLC, Debtor and Debtor-in-Possession*

*/s/ Elizabeth C. Freeman*

**LAW OFFICE OF LIZ FREEMAN**
Elizabeth C. Freeman (TX Bar No. 2400922)
PO Box 61209
Houston, TX 77208-1209
Telephone: (832) 779-3580
Email: liz@lizfreemanlaw.com

*Counsel for Melissa Haselden, Subchapter V Trustee*

**JACKSON WALKER LLP**
Sean Gallagher (TX Bar No. 24101781)
Emily Meraia (TX Bar No. 24129307)
100 Congress Avenue, Suite 1100
Austin, TX 78701
Telephone: 512-236-2000
Email: sgallagher@jw.com
Email: emeraia@jw.com

*Counsel for Melissa Haselden, Subchapter V Trustee*

2

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 11, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>/s/ *Elizabeth Freeman*</u>
Elizabeth Freeman

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
|  | ) |  |
| FREE SPEECH SYSTEMS, LLC, | ) | Case No. 22-60043 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**NOTICE OF BANKRUPTCY RULE 2004 EXAMINATION OF
PQPR HOLDINGS LIMITED, LLC BY THE SANDY HOOK FAMILIES**

Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 2004-1 of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), PQPR Holdings Limited, LLC ("**PQPR**") is commanded to produce documents and electronically stored information ("**ESI**"), and respond to the request for production (the "**Request**"), identified in the attached **Exhibit A**, to **Avi Moshenberg,** McDowell Hetherington, LLP, 1001 Fannin Street, Suite 2700 Houston, Texas 77002, and by electronic mail to the undersigned, counsel to Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "**Connecticut Plaintiffs**," and together with the Texas Plaintiffs, the "**Sandy Hook Families**"), no later than **February 11, 2023 at 5:00 p.m. CT** (the "**Production Date**").

Please take further notice that the Sandy Hook Families reserve their rights under title 11 of the United States Code (the "**Bankruptcy Code**"), the Bankruptcy Rules, the Local Rules, and any applicable law regarding the subject matter of this Notice and to amend, supplement, and/or

modify **Exhibit A** attached hereto in accordance with the Bankruptcy Code, the Bankruptcy Rules,

the Local Rules, and other applicable law.

Dated: January 12, 2023

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**
By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
Email:  Avi.Moshenberg@mhllp.com

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
Email:  rchapple@cstrial.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
By: */s/ Tyler W. Greenwood*
Jarrod B. Martin
State Bar No. 24070221
Tyler W. Greenwood
State Bar No. 24123219
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
Email:  jarrod.martin@chamberlainlaw.com
        tyler.greenwood@chamberlainlaw.com
***Co-Counsel to the Texas Plaintiffs***

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
Email:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Martin J. Salvucci (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
Email:  kkimpler@paulweiss.com
Email:  msalvucci@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to Local Rule 2004-1, I hereby certify that counsel for the Sandy Hook Families emailed counsel for PQPR about the Sandy Hook Families' Rule 2004 request in the form reflected in **Exhibit A** on December 21 and 27, 2022 but PQPR's counsel never responded.

*/s/ Avi Moshenberg*
Avi Moshenberg

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 12, 2023, a true and correct copy of the foregoing and the attached **Exhibit A** was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Tyler W. Greenwood*
Tyler W. Greenwood

# EXHIBIT A

# DEFINITIONS

The following definitions apply to the Request.  Unless otherwise defined herein, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense.

1.      The term "*Affiliate*" or "*Affiliates*" shall have the meaning ascribed to the term "Affiliate" under 11 U.S.C. § 101(2).

2.      The terms "*all*," "*any*," and "*each*" shall each be construed as encompassing any and all of these terms.

3.      The connectives "*and*" and "*or*" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a Request all Documents or responses that might otherwise be construed to be outside of its scope.

4.      The term "*Communication*" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).  For the avoidance of doubt, this may encompass any oral, written, or electronic transmission of information without limitation, including meetings, discussions, conversations, telephone calls, email messages, text messages, Bloomberg messages, chat messages, Instant Bloomberg chat messages, social media messages (e.g., Facebook), WhatsApp chat messages, GroupMe chat messages, or other messaging platforms, memoranda, letters, analyst reports, telecopies, telefaxes, telexes, conferences, seminars, messages, notes, video tapes, photographs, microfilm, microfiche, magnetic disks, or other media of any kind.

5.      The term "*Document*" is defined to be synonymous in meaning and equal in scope to the usage of the term "*documents or electronically stored information*" in Fed. R. Civ. P. 34(a)(1)(A), including but not limited to all writings, drawings, graphs, charts, photographs, sound recordings, images, electronically stored information, and other data or data compilations.  This

includes documents stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, including but not limited to emails, texts, chats, spreadsheets, and power points.  A draft or non-identical copy is a separate document within the meaning of this term.

6.      The term "*including*" shall mean "including, but not limited to."

7.      The term "*Person*" shall mean any natural person or any legal entity, and their Affiliates and Professionals, including, without limitation, any business or governmental entity or association.

8.      The terms "*You*", and "*Your*" shall mean PQPR Holdings Limited, LLC and any of its affiliates, parents, subsidiaries, predecessors and successors in interest, and any of its former or current employees, members, managers, officers, directors, beneficial owners, agents, advisors, attorneys, Professionals, or anyone else acting on its behalf.

9.      The term "*Professional*" shall mean any Person or entity engaged to provide or involved in providing professional services of any kind at any time, including without limitation, any attorneys, consultants, independent contractors, advisors, and testifying or non-testifying experts.

10.      The term "*Trustee*" shall mean the subchapter V trustee appointed in the above-captioned case, and any of its former or current employees, agents, advisors, attorneys, Professionals, or anyone else acting on its behalf.

11.      The definitions described above shall apply regardless of whether such term is capitalized or not capitalized.

12.      Any references to a Person shall be deemed to include such Person's agents, accountants, advisors, employees, attorneys and other Professionals, officers, directors, direct or

indirect shareholders, members, representatives, Affiliates, subsidiaries, predecessors, successors, assigns, or any other individual or entity acting or purporting to act on behalf of such Person.

13.     The use of any singular noun shall be construed to include the plural, and vice versa, and a verb in any tense shall be construed as the use of the verb in all other tenses.

## <u>INSTRUCTIONS</u>

1.     These instructions incorporate by reference the requirements and duties of the Federal Bankruptcy Rules, the Federal Rules, and the Local Rules.

2.     Each Request is continuing in nature.  If at any time additional Documents responsive to the Request come into Your possession, custody, or control or are brought to Your attention, prompt supplementation of Your response to this Request is required.

3.     You are requested to produce all Documents and information requested herein that are within Your possession, custody, or control or in the possession, custody, or control of Your current and former officers, directors, agents, employees, representatives, Affiliates, Professionals, or any other Person or entity acting or purporting to act on Your behalf.

4.     All Documents shall be produced in TIFF format with OCR images, provided, however, that documents in Excel format shall be provided in native format.  All Documents shall be produced with metadata, including but not limited to the date created/sent, author, recipients, cc-copies, bcc-blind copies, and whether the document contains redactions.

5.     If the response to any Request consists, in whole or in part, of an objection on the basis of or including burdensomeness, then provide those documents that can be produced without undue burden.  For such documents that are too burdensome to produce, describe the process or method required to obtain said documents, the quantity and location of the documents involved, and the estimated costs of the search.

6.      Any Document or other information that falls within the scope of this Request that is withheld on the basis of a claim of privilege, work product protection, or any other grounds should be identified in writing by date, title/file name/"re line"/subject, addressee/to/cc/bcc, addressor/from, document type, and topic covered and listed with a statement of the grounds alleged for withholding such document, communication, or other information, including any common interest or joint defense privilege claimed.

7.      If Your response to any Request is any other objection, You must indicate if information is being withheld based on the objection(s), provide all information not covered by the objection, and state the specific basis of the objection.

8.      If any Document responsive to this Request has been destroyed, state when the Document was destroyed, identify the Person who destroyed the Document, and the Person who directed that it be destroyed.  Additionally, detail the reasons for the destruction, describe the nature of the Document, identify the Persons who created, sent, received, or reviewed the Document, and state in as much detail as possible the contents of the Document.

9.      Subject to Instruction No. 4 above, Documents should be produced in the manner they are kept in the ordinary course of business.  In producing Documents, all Documents that are physically attached to each other, or segregated or separated from other Documents, when originally located, should be produced as is.

10.     Except where otherwise specified, the Request seeks Documents dated, created, or otherwise obtained at any time through the date of Your response.  For the avoidance of doubt, this Request seeks Documents created before and after the Petition Date.

11.     By serving this Request, the Sandy Hook Families reserve all rights, do not waive any of their rights, and expressly reserve the right to modify or otherwise to supplement this Request.

## **REQUEST FOR PRODUCTION**

1.     Produce all Documents and Communications that You have provided to the Trustee through the Production Date and all Documents and Communications that You will provide to the Trustee after the Production Date.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11, Subchapter V |
| | § | |
| Free Speech Systems, LLC | § | Case No. 22–60043 (CML) |
| | § | |
| Debtor | § | |

---

### NOTICE OF FINAL JUDGMENT

---

This notice seeks to notify the Court that on January 13, 2022, a final judgment was rendered in the state-court litigation between Texas Plaintiffs Neil Heslin and Scarlett Lewis and Defendants Free Speech Systems and Alex Jones. The final judgment is attached for the Court's convenience as Exhibit 1.

Dated: January 13, 2023                    Respectfully submitted,


MᶜDOWELL HETHERINGTON LLP

By: */s/ Avi Moshenberg*
Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

&

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, PC

By: */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tyler W. Greenwood

Texas Bar No. 24123219
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tyler.greenwood@chamberlainlaw.com

***Counsel for Mr. Heslin and Ms. Lewis***

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 13, 2023, a true and correct copy of the foregoing Motion was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Avi Moshenberg*
Avi Moshenberg

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and FREE SPEECH | § | 261st DISTRICT COURT |
| SYSTEMS, LLC | § | |

## **FINAL JUDGMENT**

On July 25, 2022, this case came before the Court for trial by jury.[1] Plaintiffs Neil Heslin and Scarlett Lewis appeared personally and through their attorney of record and announced ready for trial. Defendants Alex E. Jones and Free Speech Systems, LLC appeared personally and through their attorney of record and announced ready for trial. After a jury of twelve qualified jurors was duly selected, impaneled, and sworn to try the case, the jury heard the evidence and arguments of counsel. After the evidence was closed, the Court submitted this case to the jury. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record.

Based on the evidence presented during trial, the jury returned a verdict in favor of Plaintiffs and against Defendants. The questions submitted to the jury and

---

[1] Initially, this case was filed as three separate lawsuits by Plaintiffs, which were then consolidated. *See* Cause No.: D-1-GN-18-001835; *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-19-004651; *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-006623; *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 98th Judicial District Court of Travis County, Texas.

the jury's findings are attached as Exhibits 1 and 2 and are incorporated by reference into this final judgment. The jury's findings, along with the Court's default judgment and resulting admissions, entitle Plaintiffs Neil Heslin and Scarlett Lewis to a judgment against Defendants Alex E. Jones and Free Speech Systems, LLC as set forth in their Fifth Amended Petition. Alternatively, to the extent that a necessary element of their recovery has been omitted, the Court implies a finding to support it.

It is therefore **ORDERED** that Plaintiffs Neil Heslin and Scarlett Lewis shall have and recover of, from, and against Defendants Alex E. Jones and Free Speech Systems, LLC the following:

1. the amounts of $26,810,000 to Plaintiff Neil Heslin and $22,500,000 to Plaintiff Scarlett Lewis; plus

2. Prejudgment interest at the annual rate of 5% from the day this case was filed by Plaintiffs until the day before the date of the judgment in the amounts of $323,150 to Plaintiff Neil Heslin and $284,250 to Plaintiff Scarlett Lewis; plus

3. Costs of court previously assessed by the Court in the amount of $126,523.80; plus

4. All other court costs shall be taxed against Defendants Alex E. Jones and Free Speech Systems, LLC.

006997

It is further **ORDERED** that postjudgment interest shall accrue on the amount of $50,043,923.80 at the rate of 5%, compounded annually, from the date the judgment is signed until all amounts are paid in full.

It is further **ORDERED** that all writs and processes as may be necessary in the enforcement and collection of this judgment or the costs of court shall issue as necessary.

Of importance to the Court is that no party sought a judgment addressing the constitutionality, either in general or as specifically applied in this case, of the limitation on the amount of recovery prescribed by Tex. Civ. Prac. & Rem. Code 41.008(b).  Instead, Plaintiff's Fifth Amended Petition includes a cause of action referenced in Tex. Civ. Prac. & Rem. Code 41.008(c), which exempts this judgment from the exemplary damages limitation.  Upon taking office a Judge swears to uphold both the Constitution of Texas and the Constitution of the United States.  I am withholding my own judgment on the question at this time, confident that should the Plaintiffs' Fifth Amended Petition be struck for some reason the constitutionality of Tex. Civ. Prac. & Rem. Code 41.008(b) at least in this case will be raised at that time.

This judgment finally disposes of all claims and all parties and is appealable.

Signed on January 12, 2023.

JUDGE PRESIDING
MAYA GUERRA GAMBLE

-3-

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | |
| DEBTOR. | § | **Chapter 11 (Subchapter V)** |
| | § | |

## WITNESS AND EXHIBIT LIST

| | |
|---|---|
| Judge: | Hon. Christopher M. Lopez |
| Hearing Date: | Friday, January 20, 2023 |
| Hearing Time: | 10:00 a.m. (Central Standard Time) |
| Party's Name: | Shannon & Lee LLP |
| Attorney's Name: | R. J. Shannon; Kyung S. Lee |
| Attorney's Phone: | (713) 714-5770 |
| Nature of Proceeding: | Hearing on:<br>• Shannon & Lee LLP's Motion pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP (the "S&L Motion for Rehearing"). |

Shannon & Lee LLP ("S&L"), the movant in the S&L Motion for Rehearing, hereby submits this supplemental exhibit list in connection with the hearing to be held on Wednesday, January 20, 2022, at 1:00 p.m. (Central Standard Time) (the "Hearing") on the S&L Motion for Rehearing.

## WITNESSES

S&L may call any of the following witnesses at the Hearing, whether in person or by proffer:

1. R. J. Shannon;
2. Kyung S. Lee;
3. W. Marc Schwartz;
4. Any witness called or designated by any other party; and
5. Any witnesses necessary to rebut the testimony of any witnesses called or designated by any other party.

006999

## <u>EXHIBITS</u>

S&L may offer for admission into evidence any of the following exhibits, and any exhibit designated by any other party, at the Hearing:

| Ex. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1 | S&L Employment Application [ECF Nos. 85, 163-1, 163-2, 163-3, & 163-4] | | | | |
| 2 | U.S. Trustee's Amended Objection to S&L Employment Application [ECF No. 154] | | | | |
| 3 | Transcript of September 13, 2022, Hearing [ECF No. 179] | | | | |
| 4 | Joinder by the Sandy Hook Plaintiffs [ECF No. 159] | | | | |
| 5 | Reply to the U.S. Trustee's Objection to S&L Employment Application [ECF No. 166] | | | | |
| 6 | Transcript of September 20, 2022, Hearing [ECF No. 194] | | | | |
| 7 | Transcript of May 19, 2022, Hearing in IW Cases [ECF Nos. 163-22, 165-14] | | | | |
| 8 | Omnibus Response in IW Cases [ECF No. 165-7] | | | | |
| 9 | August 3, 2022, Hearing Transcript [ECF Nos. 63, 165-15] | | | | |
| 10 | S&L June 2022 Time Records re Prepetition Services to the Debtor [ECF No. 163-7] | | | | |
| 11 | Forbearance Agreement dated July 10, 2022 [ECF No. 26-8] | | | | |
| 12 | Debtor's Schedules [ECF Nos. 121, 165-1] | | | | |

2

| Ex. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 13 | August 16, 2022, Email from R. Shannon to S. Jordan responding to AEJ Request for FSS to Seek Stay of Remand Order and Extension of Automatic Stay to AEJ | | | | |
| 14 | August 16, 2022, Email from S. Jordan to R. Battaglia and K. Lee responding to FSS Response to AEJ Request for FSS to Seek Stay of Remand Order and Extension of Automatic Stay to AEJ | | | | |
| 15 | August 17, 2022, Email from S. Jordan to R. Shannon re FSS Plans if AEJ Unable to Conduct Show for FSS | | | | |
| 16 | August 19-22, 2022, Emails among K. Lee and S. Jordan re AEJ's Payment of Legal Expenses re Special Counsel | | | | |
| 17 | S&L Fee Statement and Time Records re Services Provided to the Debtor from the Petition Date through September 20, 2022 | | | | |
| 18 | Schwartz Affidavit re Management Agreement in Connecticut Litigation | | | | |
| 19 | Roddy Affidavit re Google Analytics Documents re Management Agreement in Connecticut Litigation | | | | |
| 20 | Order of Travis County District Court finding Alter Ego with respect to the Heslin/Lewis Suit | | | | |
| 21 | Transcript of August 2, 2022, Hearing before Connecticut Superior Court | | | | |
| 22 | August 8, 2022, Email from R. Shannon to J. Martin re PQPR insider status and avoidance of PQPR lien | | | | |
| 23 | June 30, 2022, Email from R. Shannon re PQPR P&L Statements | | | | |

007001

| Ex. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 24 | May 11, 2022, Email from R. Shannon to M. Beatty and A. Moshenberg re Expediting Dismissal of Claims against IW Debtors and Attendant Remand of Removed Litigation | | | | |
| 25 | May 11, 2022, Email from R. Shannon to R. Chapple and R. Williams re Expediting Dismissal of Claims against IW Debtors and Attendant Remand of Removed Litigation | | | | |
| 26 | Declaration of R. Shannon re Testimony and Additional Documents S&L will seek to Introduce at Rehearing or in Connection with Administrative Expense Motion | | | | |
| 27 | Presentation for January 20, 2023, Hearing on Shannon & Lee LLP's Rule 59 Motion | | | | |

S&L reserves the right to supplement, amend or delete any witness and exhibits prior to the Hearing.  The S&L also reserves the right to ask the Court to take judicial notice of any document.  S&L finally reserves the right to introduce exhibits previously admitted.

[*Remainder of Page Intentionally Left Blank*]

4

Dated: January 18, 2023                    SHANNON & LEE LLP


/s/ *R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-‐60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

## APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTHORIZING EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR, AND (B) GRANTING RELATED RELIEF

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves for entry of an order, substantially in the form attached hereto (the "Proposed Order") pursuant to sections 105(a) and 327 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the retention of Shannon & Lee LLP ("S&L" or the "Firm") as bankruptcy co-counsel for FSS (the "Application") pursuant to that certain engagement letter agreement by and between the Debtor and S&L, a copy of which is attached hereto as Exhibit A (the "Engagement Agreement"), as modified by the Proposed

Order. In support of the Application, the Debtor submits the Declaration of Kyung S. Lee attached hereto as Exhibit B (the "Lee Declaration") and respectfully represents as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

2.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

3.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code (the "Chapter 11 Case") with the Court.

4.      The Debtor continues to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

5.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.     Proposed Employment of S&L

####         i.       Scope of Employment

6.      Subject to the Court's approval, S&L will serve as bankruptcy co-counsel in connection with the Debtor's Chapter 11 Case, commencing on July 29, 2022.

2

ii.     *Necessity of Employment*

7.      The Debtor believes that the assistance of counsel specializing in bankruptcy was and is necessary and appropriate to administer this Chapter 11 Case with the goal of ultimately confirming a plan of reorganization. The Debtor cannot proceed in chapter 11 without counsel and would face extreme difficulty complying with the provisions of the Bankruptcy Code and successfully reorganizing its financial affairs for the benefit of its creditors without attorneys who focus their practice on corporate bankruptcy.

iii.    *Reasons for Selection*

8.      The Debtor seeks to retain S&L because of the extensive experience of its attorneys. Mr. Shannon and Mr. Lee have extensive experience in all aspects of corporate bankruptcy and in representing chapter 11 debtors in this district. Further, due to their involvement in the bankruptcy cases of the InfoWDebtors (defined below), S&L attorneys have familiarity with the Debtor's corporate structure, the litigation brought against the Debtor related to statements after the Sandy Hook mass shooting (the "Sandy Hook Litigation"), and many of the relevant creditors and parties in interest.  Familiarity with the Sandy Hook Litigation has been particularly important in the early stages of the Chapter 11 Case.

9.      S&L is familiar with the Debtor's financial condition in connection with the preparation of the Debtor's petition, schedules, and statement prior to the Petition Date. Substantial effort was also expended by the CRO to bringing the books and records of FSS up to speed prior to the Petition Date. The CRO also spent significant time to understanding the commercial and vendor relationship forming the core basis of FSS's business.  S&L was intimately involved in that entire learning process.

007006

10.     Any other firm would need to expend significant time and effort to become familiar with the Debtor's business and business model that would delay making progress in administering the Chapter 11 Case.

11.     The Debtor therefore believes that S&L is well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner as bankruptcy co-counsel for FSS.

    *iv.     Proposed Compensation & Reimbursement*

12.     S&L intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the guidelines (the "Guidelines") established by the U.S. Trustee, and any orders of this Court in this Chapter 11 Case (the "Orders"), for all services performed and expenses incurred during its representation of the Debtor.

13.     Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, the Debtor proposes to pay S&L as set out in the Engagement Agreement attached hereto as Exhibit B and as summarized in the following chart:

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| RJ Shannon | $650 |
| Associate Attorneys | $300 - $650 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

14.     The Debtor believes that S&L's agreed terms of reimbursement, compensation, and hourly rates are reasonable. S&L will notify the Debtor and the U.S. Trustee of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

4

*v.*      *Retainer*

15.      Effective as of June 1, 2022, Kyung Lee and R. J. Shannon formed the law firm of Shannon & Lee LLP to practice corporate bankruptcy law. Mr. Shannon and Lee are the only two attorneys of S&L. On June 6, 2022, FSS executed the Engagement Letter and retaining S&L.[1] FSS paid S&L a retainer of $100,000 on or about June 7, 2022, that was held in trust in S&L's IOLTA account.

16.      On July 28, 2022, (a) FSS paid S&L $84,034.12 for work performed by S&L during the month of June 2022 and (b) S&L took into income $99,177.32 from the $100,000 retainer for work performed by S&L from July 1 to July 29, 2022.[2] $822.68 remained in the S&L IOLTA account.

17.      On July 29, 2022, prior to the filing of its petition for chapter 11 relief, FSS replenished S&L's IOLTA account with a wire transfer of $50,000. The total amount of retainer S&L held in its IOLTA account on behalf of FSS on the Petition Date was $50,822.68 (the "Retainer"). S&L continues to hold the Retainer in trust in its IOLTA Account.

18.      The Proposed Order provides that S&L shall continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

*vi.*      *Connections*

19.      The Lee Declaration sets out S&L's connections with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and

---

[1] The Engagement Letter was effective May 24, 2022, on which date Kyung Lee began providing services to FSS, practicing through Kyung S. Lee PLLC ("KSLPLLC"). KSLPLLC received payment from the Debtor of $21,986.59 for services provided to FSS from May 24, 2022, through May 31, 2022.

[2] This amount included an estimate of six hours of services for each of Mr. Shannon and Mr. Lee on July 28 and July 29, 2022. The actual time expended exceeded the estimate.

007008

any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, S&L does not hold any connections other than those disclosed in the Lee Declaration.

20. Mr. Shannon and Mr. Lee previously represented InfoW, LLC, IWHealth, LLC, and Prison Planet TV, LLC (the "InfoWDebtors"), in the cases jointly administered as Case No. 22-60020 before this Court.[3] One or more of the InfoWDebtors were defendants in the Sandy Hook Litigation. On May 13, 2022, the Connecticut Sandy Hook plaintiffs filed notices of dismissal with prejudice as to their claims against the InfoWDebtors.[4] *See* Dkt. No. 98, Case No. 22-60020 (Bankr. S.D. Tex.). On May 18, 2022, the Texas Sandy Hook plaintiffs and the InfoWDebtors entered a stipulation to resolve their claims against the InfoWDebtors, which was approved and ordered by the Court on May 19, 2022. *See* Dkt. Nos. 96 and 98, Case No. 22-60020 (Bankr. S.D. Tex.). The InfoWDebtors and the U.S. Trustee agreed to the dismissal of the InfoWDebtors' chapter 11 cases on June 1, 2022, which dismissal was ordered by the Court on June 10, 2022. Dkt. Nos. 110 and 114, Case No. 22-60020 (Bankr. S.D. Tex.). The Debtor does not have any claims against the InfoWDebtors and does not believe that the InfoWDebtors have any claims against the Debtor.

21. The Debtor believes that S&L neither holds nor represents a disqualifying interest that is adverse to the estate and is a "disinterested person." If any new relevant facts or relationships are discovered, S&L will supplement its disclosure to the Court.

---

[3] The InfoWDebtors' applications to employ of Parkins & Rubio LLP and KSLPLLC were never approved in the InfoWDebtors' chapter 11 cases.

[4] Upon the dismissal with prejudice of the Connecticut Sandy Hook plaintiffs' claims against the InfoWDebtors—and the then forthcoming dismissal of claims with prejudice of the Texas Sandy Hook plaintiffs—the restructuring contemplated by the Plan Support Agreement at in the InfoWDebtors' bankruptcy case was no longer possible.

007009

*vii.*     *Co-Counsel Relationship*

22.     S&L is being retained to serve as co-counsel for FSS along with The Law Offices of Ray W. Battaglia, PLLC (the "Battaglia Firm"). The two law firms have agreed to a division of labor substantially like the manner which multiple attorneys within the same law firm would handle a similar case. Each firm is aware of the need to avoid duplication of effort and have taken steps to minimize the degree to which their services will overlap. S&L will be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case. The Battaglia Firm will provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy. The firms will allocate primary responsibility as appropriate for drafting pleadings and handling contested matters and meetings with the Debtor and opposing counsel. For certain matters it will be necessary to involve more than one lawyer and the firms will jointly handle such matters, mindful of the need to avoid duplication whenever possible.

## RELIEF REQUESTED

23.     The Debtor requests that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtor to retain S&L as bankruptcy co-counsel, pursuant to the terms of the Engagement Agreement, as modified by the Proposed Order, effective as of July 29, 2022.

## BASIS FOR RELIEF

24.     Subject to bankruptcy court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the

7

trustee's duties . . . ." Bankruptcy Code § 327(c) provides that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

25.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

> (a)     Be filed by the trustee or committee and served on the United States Trustee (except in case under chapter 9 of the Bankruptcy Code);

> (b)     State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

> (c)     Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

## A.     S&L Meets the Requirements of Bankruptcy Code § 327(a)

26.     Based on the Lee Declaration, the Debtor submits that S&L neither holds nor represents a disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

27.     The term "disinterested person" is defined by the Bankruptcy Code. According to Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have

8

> an interest materially adverse to the interest of the estate or of any
> class of creditors or equity security holders, by reason of any direct
> or indirect relationship to, connection with, or interest in, the debtor,
> or for any other reason.

28.     The Lee Declaration discloses no connections with the Debtor that would disqualify S&L as a "disinterested person" and the Debtor is aware of no connections in addition to those disclosed in the Lee Declaration.

**B.      This Application and the Lee Declaration Meet the Requirements of Bankruptcy Rule 2014**

29.     This Application and the Lee Declaration meet the requirements as set out in Bankruptcy Rule 2014.  This Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, the proposed arrangement for compensation.  The Lee Declaration is a verified statement pursuant to 28 U.S.C § 1746 that sets out all connections that S&L has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee.  The Debtor is not aware of any other connections in addition to those disclosed in the Lee Declaration.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form of the Proposed Order approving the employment of S&L commencing on July 29, 2022, and grant any other relief that is just and proper.

[*Remainder of Page Intentionally Left Blank*]

007012

Dated: August 20, 2022

Respectfully submitted,

W. Marc Schwartz
Chief Restructuring Officer and Authorized
Representative of Free Speech Systems,
LLC, Debtor and Debtor-in-Possession

007013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

*/s/R. J. Shannon*

007015

## USPS Service List

### Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

13

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

## Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

## U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

14

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 0660

15

007018

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

## ORDER APPROVING DEBTOR'S APPLICATION
## TO EMPLOY SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL

Upon the application (the "Application")[1] filed by the Debtor to retain and employ Shannon & Lee LLP ("S&L") pursuant to Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, as more fully set forth in the Application and all exhibits and attachments to the Application; and upon the Court's finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the Application and the Lee Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and Orders and procedures of this Court; (v) S&L does not represent an interest adverse to the Debtor's estate with respect to the matters upon which it is to be engaged and is a "disinterested person" within the meaning of that term under § 101(14) of the Bankruptcy Code; (vi) S&L is qualified to represent the Debtor's estate under § 327 of the Bankruptcy Code; (vii) the terms of S&L's employment have been disclosed and are reasonable under the circumstances; (viii) proper and adequate notice of the Application, the deadline to file any objections to the Application, and the hearing thereon was given, and no other or further notice

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application.

is necessary; (ix) the legal and factual bases set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interest of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at the hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain S&L commencing on the Petition Date, as bankruptcy co-counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.      S&L is authorized to perform any and all legal services for the Debtor that are necessary or appropriate in connection with the Chapter 11 Case.

3.      S&L shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      S&L shall continue to hold the Retainer (as defined in the Application) in trust on behalf of the Debtor, until further order of the Court.

5.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

6.      This order shall be immediately effective and enforceable upon entry.

007020

7.      This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

8.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, S&L shall not be entitled to reimbursement of expenses or fees from the Debtor in connection with any objection to its fees, without further order of the Court.

9.      S&L shall not charge a markup to the Debtor with respect to any fees billed by contract attorneys who are hired by S&L to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflicts checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

10.     S&L shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

11.     S&L shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

12.     S&L will review its files periodically during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, S&L will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

007021

13.     To the extent that any of the Application, the Lee Declaration, or the Engagement Agreement are inconsistent with this Order, the terms of the Order shall govern.

14.     The Debtor and S&L are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2022

_____
**UNITED STATES BANKRUPTCY JUDGE**

4

007022

**Exhibit A**

Engagement Agreement

Kyung S. Lee
Attorney at Law



Pennzoil Place
700 Milam St.
Suite 1300
Houston, TX 77002

# SHANNON & LEE LLP

klee@kslpllc.com| Direct: 713-301-4751

June 6, 2022

## PRIVILEGED AND CONFIDENTIAL

Alex E. Jones
Managing Member
Free Speech Systems, LLC
910 West Mary Street
Austin, Texas 78704

Re: <u>Attorney Engagement Letter of Shannon & Lee LLP by Free Speech Systems, LLC</u>

Dear Mr. Jones:

Thank you for selecting Shannon & Lee LLP ("<u>S&L</u>" or the "<u>Firm</u>") as legal counsel for Free Speech Systems, LLC ("<u>FSS</u>", "<u>you</u>" or "<u>Client</u>"). We appreciate the trust and confidence that your decision places in us and we look forward to building a close and mutually rewarding relationship.

The purpose of this letter and the attached Terms of Retention (together, the "<u>Engagement Letter</u>") is to set forth the terms of legal representation of the above referenced Client.

*Scope of Engagement.* S&L shall serve as attorney and legal counsel for the Client in connection with the following (the "<u>Matter</u>"): Serve as co-restructuring counsel for the Client, effective as of May 24, 2022.[1]

*Legal Fees and Expenses.* For the work performed by S&L for the Client, S&L shall be entitled to a fee in the amount equal to the time expended by each attorney, paralegal and other staff member multiplied by the hourly rates set forth in the attached Hourly Billing Rate Schedule. The Client is responsible for reimbursing the Firm for expenses incurred on behalf of the Client pursuant to the attached Client Expense Policy.

---

[1] As S&L was formed on June 1, 2022, fees earned prior to June 1, 2022 shall be allocated to the respective professional liability company between the two partners. For work performed and fees earned after June 1, 2022, such fees shall be deemed to be earned by S&L. This notice is being provided due to recent departure of the two partners from their previous law firms and practice of law with their respective limited liability companies during the stub period of May 15, 2022 through June 1, 2022.

Alex E. Jones
June 6, 2022
Page 2 of 11

*Retainer.* As a condition to S&L accepting this engagement on your behalf, you have agreed to provide a retainer of $1000,000.00 (the "<u>Retainer</u>") in connection with this Matter. The instructions for remitting the retainer funds to the Firm will be provided in a separate electronic correspondence. The Retainer will serve as a security deposit and will be applied towards your final invoice for this Matter. Any balance will be returned to you. If you do not pay your invoices timely, the Firm may apply the Retainer to an unpaid invoice. The Firm reserves the right to have the Retainer replenished by the Client if the Firm anticipates that there is a risk in collecting future attorney's fees and/or reimbursement of costs. Prior to filing for bankruptcy, the Firm shall take into income any fees and costs incurred and invoiced such that the Firm and the Client do not have a debtor-creditor relationship as of the filing date.

*Invoices/Fee Statements.* The Firm's invoices will be issued to you during the month, if not more often, following the month that services are provided. The invoice will include a fee statement providing the details of the legal services performed, and the expenses incurred, for the Client. The invoices shall be informational only and shall be paid upon allowance by a Bankruptcy Court order.

*Conflicts.* The Firm has conducted an initial conflicts search based on information you provided. The Firm did not identify any connection that would prevent the Firm from representing you in this Matter. S&L may conduct additional conflicts searches following the commencement of this engagement. If the Firm identifies any conflict, then the Firm shall immediately notify the Client and the Firm and the Client shall take further actions as may reasonably be required to satisfy the Firm's ethical obligations and duties to the Client, all as more particularly described in the Terms of Retention.

The two partners of S&L have acted as general bankruptcy counsel for InfoW, LLC, IWHealth, LLC and Prison Private tv Ltd. These three companies were affiliates of FSS, have license agreements with FSS and are in the process of having their Subchapter v bankruptcy cases dismissed. If any issues arise in connection with the license agreement between the FSS and InfoW, S&L intends to have co-counsel or conflict counsel matters related to such dispute. Otherwise, the Firm does not believe that such connection precludes it from representing FSS on the matters to which it is being asked to be engaged.

*General Prospective Waiver and Informed Consent.* The Firm represents many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future Clients will have disputes or transactions with you. You agree that we may continue to represent or may undertake in the future to represent existing or new Client in any business or transactional matter that is not substantially related to our work for you, even if the interests of such Client in those other matters are directly adverse to you. We are not aware of any such matters at the present time. We agree, however, that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage. <u>You are not giving the Firm a prospective waiver as to conflicting representation related to a litigation matter against</u> <u>you</u>. We encourage you to seek independent counsel regarding the import of the potential conflicts and prospective waiver discussed and this acknowledgment, waiver and informed consent. We

Alex E. Jones
June 6, 2022
Page 3 of 11

emphasize that you remain completely free to seek independent counsel at any time even if you decide
to sign this Engagement Letter agreeing to its terms and the Terms of Retention.

Please call me with any questions you have after you complete your review of this Engagement
Letter including the Terms of Retention. If the Engagement Letter is acceptable to you in this form,
please indicate so by signing, dating, and returning it to me and funding the Retainer.

Very truly yours,

*Kyung S. Lee*

Kyung S. Lee
Kyung S. Lee PLLC
Shannon & Lee LLP

ACCEPTED AND AGREED:

Free Speech Systems, LLC

Authorized Officer of Free Speech Systems, LLC

Dated

Alex E. Jones
June 6, 2022
Page 4 of 11

## ADDENDUM TO ENGAGEMENT LETTER

The appropriate Client point of contact to address payment status:

Name:
Title:
Phone:
Work Email:

Invoices are to be delivered as follows:

☐ By email: _____

    Email: _____

☐ By regular mail:

Address: _____
         _____
         _____

007027

Alex E. Jones
June 6, 2022
Page 5 of 11

## TERMS OF RETENTION

These Terms of Retention are part of the S&L Engagement Letter. Because they are an integral part of our agreement to provide legal services, we ask that you review this document carefully. If you have any questions after reading it, please contact us promptly.

*Who Will Provide Legal Services?* In most cases, one attorney will be your principal contact. From time to time, that attorney may delegate parts of your work to other attorneys or to legal assistants or non-legal professionals in the Firm. We do this to involve those with special knowledge or experience in an area and to provide services to you in a timely, efficient, and cost-effective manner. I will be the primary attorney from our Firm who will be representing the Client.

*Scope of the Representation.* As a Firm, we undertake to provide representation and advice on the legal matters for which we are engaged, and it is important that we both have a clear understanding of the legal services that the Firm has agreed to provide. In our Engagement Letter with you, we specify the matter in which we will provide representation and the scope of the services we will provide. Please note that we do not provide legal advice regarding any tax issues or effects nor are we responsible for notifying any insurance carrier of any lawsuit. If there are any questions about the terms of engagement, including the scope of the representation that we are to provide in the matter, please raise those questions promptly with your principal contact at the Firm.

*Identity of Client.* It is our policy to represent only the person or entity identified in our Engagement Letter and not any affiliates. For example, unless otherwise specifically stated in our Engagement Letter, if you are a business organization (corporation, partnership, LLC, etc.), our representation does not include any parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies); if you are an individual, our representation does not include your employer, partners, spouse, siblings, or other family members.

*Your Cooperation.* To enable us to provide effective representation, you agree to: (1) disclose to us, fully and accurately and on a timely basis, all facts and documents that are or might be material or that we may request, (2) keep us apprised on a timely basis of all developments relating to the representation that are or might be material, (3) attend meetings, conferences, and other proceedings when it is reasonable to do so, and (4) otherwise cooperate fully with us.

*Outcomes.* We cannot and do not guarantee the outcome of any matter. Any expression of our professional judgment regarding your matter or the potential outcome is, of course, limited by our knowledge of the facts and based on the law at the time of expression. It is also subject to any unknown or uncertain factors or conditions beyond our control. Any expressions on our part concerning the outcome of the representation, or any other legal matters, are based on our professional judgment and are not guarantees.

*Conflicts of Interest.* We attempt to identify actual and potential conflicts at the outset of any engagement. In some instances, the applicable rules of professional conduct may limit our ability to represent Client with conflicting or potentially conflicting interests. Those rules of conduct often allow us to exercise our independent judgment in determining whether our relationship with one client prevents us from representing another. In other situations, we may be permitted to represent a client only if both or all

Alex E. Jones
June 6, 2022
Page 6 of 11

Client consent to that representation. If a controversy unrelated to the subject matter of the representation develops between you and any other client of the Firm, we will follow the applicable rules of professional responsibility to determine whether we may represent either you or the other client in the unrelated matter. Unfortunately, sometimes conflicts arise or become apparent after work begins on an engagement. If this happens, we will do our best to address and resolve the situation in the manner that best serves the interests of all of our affected Client. Rules concerning conflicts of interest vary with the jurisdiction. In order to avoid any uncertainty, the Texas Disciplinary Rules of Professional Conduct will be applicable to the representation.

Texas law requires that we inform the Client of the existence of a grievance process. The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar's Office of Chief Disciplinary Counsel will provide you with information about how to file a complaint. Please call 1-800-932-1900 for more information. Also, the Supreme Court of Texas has promulgated The Texas Lawyer's Creed - A Mandate for Professionalism, which states that an attorney should inform a client of the creed's contents when undertaking a representation. We will send you a copy of the creed upon request. It is also available online at https://www.texasbar.com.

*Fees.* The basis for determining our fee for legal services is set forth in the Engagement Letter itself. If you are unclear about the basis for determining your fee, please contact the attorney responsible for your representation. Clients frequently ask us to estimate the fees and other charges they are likely to incur in connection with a particular matter. We are pleased to respond to such requests, whenever possible, with an estimate based upon our professional judgment. This estimate always carries the understanding that, unless we agree otherwise in writing, it does not represent a maximum, minimum, or fixed-fee quotation.

*Expenses.* Our Firm may incur and pay a variety of charges on your behalf in connection with the engagement. Whenever we incur such charges on your behalf, we will bill them to you as part of your invoice in accordance with the attached Client Expense Policy.

*Delinquent Account and Withdrawal of Engagement.* We will bill you on a periodic basis, for fees and other charges, as described in the Engagement Letter. Should your account become delinquent and satisfactory payment terms are not arranged, as permitted under the rules regulating our profession, we will be required to withdraw from the representation. In most cases, and except as prohibited by ethical considerations, if your account becomes more than 30 days delinquent, we will cease representation until we can arrive at a mutually satisfactory arrangement for payment of the delinquent account and the resumption of services. At such time we may charge interest on the outstanding amount due of one and a half percent per month or the maximum amount allowed under applicable law, whichever is less.

*Additional Retainer.* If the representation will require a concentrated period of activity, such as a trial, arbitration, or hearing, we reserve the right to require the payment of all amounts then owing to us and the payment to us of an additional retainer for the fees and expenses we estimate will be incurred in preparing for and completing the trial, arbitration, or hearing, as well as arbitration fees likely to be assessed. If you fail to timely pay any   retainer deposit requested, we will have the right to cease performing further work for you and withdraw from the representation.

007029

Alex E. Jones
June 6, 2022
Page 7 of 11

*Obligation to Pay Fees and Expenses.* Unless your Engagement Letter expressly provides that a third-party is agreeing to pay your attorney's fees and such third-party has agreed in writing, regardless of whether you are insured to cover the particular risk or you are pursuing parties for recovery of attorneys' fees and other charges, it remains your obligation to pay all amounts due to us within the time periods reflected in the Engagement Letter.

*Retention of Complementary Counsel.* From time to time in the course of our engagement it may become prudent to engage additional counsel to work with and complement our representation of you. That complementary representation will only be done with your prior written consent and on terms and conditions which you approve. The engagement of complementary counsel may be done directly with you or through our firm, depending on the nature and extent of the representation involved.

*Conclusion of Engagement.* Because our Firm has been engaged to provide legal services in connection with the representation in the matter as specifically defined in our Engagement Letter, the attorney-client relationship terminates upon our completion of our services related to the representation in the matter. After completion of the representation, upon written notification by the Firm that the matter is terminated, changes may occur in the applicable laws or regulations that could affect your future rights and liabilities in regard to the matter. Unless we are actually engaged after the completion of the representation to provide additional legal services, the Firm has no continuing obligation to give advice with respect to any future legal developments that may relate to the matter. If you later retain us to perform further or additional services, our attorney-client relationship will be subject to the terms of engagement agreed to at that time; in the absence of any specific agreement, these Additional Terms of Engagement shall apply to the further or additional representation.

*Termination.* We look forward to the opportunity to complete our representation of you on the specified matter. You may, however, terminate our representation at any time, with or without cause, by notifying us in writing. We will return your papers and other property to you promptly upon receipt of your request for those materials unless they are appropriately subject to a lien. You agree that we will own and retain our own files pertaining to the matter or case, including, for example, Firm administrative records, time and expense reports, personnel and staffing materials, credit and accounting records, and internal attorney's work product such as drafts, notes, internal memoranda, and legal and factual research including investigative reports, prepared by or for the internal use of attorneys. Your termination of our services will not affect your responsibility for payment of legal services rendered and other charges incurred before termination and in connection with an orderly transition of the matter.

*Document Retention.* You acknowledge and agree that the Firm may maintain all documents related to your matter digitally. The Firm is not required to maintain physical copies of any documents. At the conclusion of our representation of you, it is our firm's policy to return to you any physical documents to you. We will provide you with copies of any other documents you specifically request (such as copies of depositions, court documents, etc.), and you agree to pay for the associated copying costs and any professional time incurred in identifying any such documents you request. You agree that our Firm may elect to keep at its own expense, copies of any documents related to this matter or otherwise returned to you. Anytime following seven (7) years after the conclusion of our representation of you, the Firm may destroy or delete any files related to your engagement.

Alex E. Jones
June 6, 2022
Page 8 of 11

*Dispute Resolution.* The Engagement Letter is being entered and is to be performed within the State of Texas. The Engagement Letter shall be interpreted in accordance with Texas law (without application of choice of law principles). All parties to the Engagement Letter agree that Houston, Harris County, Texas is the only permitted location (the venue) for the resolution of all disputes that arise under or relate in any way to the Engagement Letter or to any of the services provided by our Firm.

*Binding Arbitration.* Any dispute arising out of or relating to this agreement, our interactions leading to it, or our performance of the agreement or of the representation of you shall be resolved through binding arbitration in Harris County, Texas. First, sixty (60) days before filing any arbitration proceeding, the party requesting relief must demand and attend mandatory mediation before a mutually acceptable mediator to attempt to resolve any dispute. In the event the parties are unable to resolve such dispute, the affected party shall initiate an arbitration proceeding utilizing the rules of (but not employing) the American Arbitration Association ("AAA") for the arbitration of complex commercial cases. In any dispute of less than $250,000, the parties shall jointly appoint a single arbitrator. In any dispute of a greater amount, each party shall appoint his/her or its own party arbitrator, and these two-party arbitrators shall in turn appoint a third, neutral arbitrator. All party arbitrators' conduct and tests for eligibility shall be governed by AAA rules of disinterest. The time limits hereunder shall not apply in the event emergency injunctive relief is required, but only to the extent of such emergency injunctive relief itself. The decision by the arbitration panel will be final and binding.

You should know that for your agreement to arbitrate to be effective under Texas law, you as the client must receive sufficient information about the differences between litigation and arbitration to permit you to make an informed decision about whether to agree to binding arbitration. Under the Texas Rules of Disciplinary Procedure, we can explain the significant advantages and disadvantages of binding arbitration to the extent we reasonably believe is necessary for an informed decision by you. The scope of the explanation will depend on the sophistication, education and experience of the client.

In the case of a highly sophisticated client such as a large business entity that frequently employs outside lawyers, no explanation at all may be necessary. In situations involving Clients who are individuals or small businesses, we normally advise the client of the following possible advantages and disadvantages of arbitration as compared to a judicial resolution of disputes: (1) the cost and time savings frequently found in arbitration, (2) the waiver of significant rights, such as the right to a jury trial, (3) the possible reduced level of discovery, (4) the relaxed application of the rules of evidence, and (5) the loss of the right to a judicial appeal because arbitration decisions can be challenged only on very limited grounds.

Additional factors you as the client should consider are: (1) the privacy of the arbitration process compared to a public trial; (2) the method for selecting arbitrators; and (3) the obligation, if any, of the client to pay some or all of the fees and costs of arbitration, if those expenses could be substantial. Although the disclosure can vary from client to client, depending on the circumstances, the overriding concern is that we should provide information necessary for the client to make an informed decision.

Alex E. Jones
June 6, 2022
Page 9 of 11

*By returning the executed Engagement Letter, you acknowledge that you have been provided ample opportunity to have counsel explain to you the advantages and disadvantages of binding arbitration to make an informed decision about agreeing to the provision.*

*Modifications.* The Engagement Letter and these Additional Terms of Engagement reflect our entire agreement on the terms of this engagement. These written terms of engagement are not subject to any oral agreements or understandings, and any change in those terms can only be made in writing signed by you and the Firm.

Alex E. Jones
June 6, 2022
Page 10 of 11

### Hourly Billing Rate Schedule

| BILLER | RATE |
|---|---|
| Kyung S. Lee | $850 |
| R.J. Shannon | $650 |
| Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50 - $100 |

007033

Alex E. Jones
June 6, 2022
Page 11 of 11

Client Expense Policy

In connection with the representation of a client, the Firm may incur expenses. Unless the Engagement Letter expressly provides to the contrary, the Firm's and the Client's rights and responsibilities related to such expenses are as follows:

*Legal Research and Related Services.* The Firm subscribes to certain online research services. These subscription-based services are part of the Firm's overhead and not charged to the Client. Certain services are charged on a per-transaction including, without limitation, the following examples: UCC searches, lien searches, title searches and other record searches. The Client is responsible for these pre-transaction charges. The Firm will advance the costs for all such services and submit bills to you for reimbursement. The Firm may seek prior approval from you if the anticipated aggregate monthly expense for such services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Document Management and eDiscovery Services.* The Firm subscribes to advanced document management software systems. These subscription-based systems are part of the Firm's overhead and not charged to the Client. The Client is responsible for eDiscovery services. eDiscovery service providers typically charge per gigabyte of information stored. Additional services from the outside vendor may be required other than storage of the information and typically these are separately charged. If the Firm uses an eDiscovery service during the representation, then the Firm will seek the Client's prior approval before incurring expenses for such services. Rather than billing these expenses through the Firm, the Firm reserves the right to have the Client contract directly with the outside vendor to pay for these expenses. For the avoidance of doubt, the Client is responsible to the Firm for the payment of all fees and expenses incident to the firm's review and processing of discovery materials that are not handled by an outside vendor.

*Printing, Shipping, Postage and Related Expenses.* For all printing, shipping, postage, and related services the Firm may handle them in house or use an outside vendor. The Client is responsible for all such printing, shipping, postage, and related services at costs or the prevailing market rate if handled in house. The Firm may seek prior approval from the Client if the anticipated aggregate monthly expense for printing, shipping, postage, and related services exceeds $500.00. The Firm reserves the right to have the Client pay these expenses directly.

*Travel Expenses.* The Client will reimburse the Firm for expenses incurred in connection with out-of-town travel, but only for coach class travel and, where appropriate, the cost of a rental car. All related travel expenses, i.e., lodging and meals, must be reasonable under the circumstances. The Firm will advance all such travel expenses and submit bills to you for reimbursement which will be included in the regular invoices to the Client. The attorney handling your matter will confer with you prior to traveling for your matter. Consistent with local bankruptcy rules, the Firm bills travel at ½ billable hourly rate when the lawyer is not working on the Client matter while travelling. The Firm will endeavor to locate a substitute service agent.

*Court Costs.* If requested by the Firm, the Client will advance court filing fees and all similar expenses prior to the Firm incurring such expenses. Any such expenses incurred by the Firm, will be included in the Firm's invoices to the Client for payment.

**Exhibit B**

Lee Declaration

007035

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DECLARATION OF KYUNG S. LEE IN SUPPORT OF**
**THE DEBTOR' APPLICATION TO EMPLOY**
**SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL**

I, Kyung S. Lee, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State of Texas and United States District Court for the Southern District of Texas.  As of June 1, 2022, I am a partner in the Houston office of the law firm Shannon & Lee LLP ("S&L"), located at 700 Milam Street, Suite 1300, Houston, Texas 77002.

2.      I am making this declaration in support of the Debtor's Application to Employ Shannon & Lee LLP as Bankruptcy Co-Counsel, effective as of July 29, 2022 (the "Application"). Unless otherwise indicated, capitalized terms used but not defined herein have the meanings ascribed to such terms in the Application.

3.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge, upon the client and matter records of S&L reviewed by me or derived from information available to me that I believe to be true and correct or opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

007036

A.      **Scope of Services**

4.      Pursuant to the Engagement Agreement, the Application, and the Proposed Order attached thereto, S&L will serve as bankruptcy co-counsel to the Debtor in connection with the Chapter 11 Case for the period commencing on July 29, 2022.  In connection with this representation, S&L will take all necessary and appropriate actions to administer the Debtor's Chapter 11 Case.

B.      **Proposed Compensation**

5.      S&L will apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including §§ 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, Guidelines, and Orders for all services performed and expenses incurred during its representation of the Debtor.

6.      Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and the Orders, S&L intends to request the allowance of its compensation as set out in the Engagement Agreement and as summarized in the following chart:

| BILLER | RATE |
| --- | --- |
| Kyung S. Lee | $850 |
| R.J. Shannon | $650 |
| Other Associate Attorneys | $300 - $600 |
| Paralegals | $150 - $250 |
| Legal Assistants | $50-$100 |

7.      These rates reflect the rates that S&L ordinarily charges clients in bankruptcy and non-bankruptcy matters and are less than or equal to the rates of similarly skilled and experienced attorneys in this district.  S&L submits that these agreed terms of reimbursement, compensation,

007037

and hourly rates are reasonable. S&L will notify the Debtor of any change in the hourly rates charged for services rendered.

**C.    Retainer & Prepetition Payments**

8.    Pursuant to the Engagement Agreement, FSS retained S&L to represent it in connection with its restructuring, effective as of May 24, 2022. Pursuant to the Engagement Agreement, FSS paid S&L a $100,000 retainer.

9.    S&L invoiced FSS for work it did during the month of June 2022 in the total amount of $84,034.12. Prior to the Petition Date, FSS paid the June invoice.

10.    S&L then invoiced FSS for work it did during the period July 1-July 29, 2022 in the total amount of $99,177.32. Prior to the Petition Date, the Firm took into income $99,177.32 from the Retainer, leaving a balance of $822.68 in S&L's IOLTA account.

11.    Prior to the Petition Date, FSS wired $50,000 to S&L's IOLTA account to replenish the Retainer. As of the Petition Date, S&L's IOLTA account balance was $50,822.68 (the "Retainer").

12.    Under the proposed employment with the Debtor, S&L will continue to hold the Retainer in trust for satisfaction of its final fees and expenses as authorized by the Court, or as otherwise directed by the Court.

**D.    Disclosure of Connections**

*i.    Search and General Descriptions of Connections*

13.    S&L performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas.

007038

14.     I conducted a search of S&L files to determine using the list of parties in interest listed in <u>Schedule 1</u> hereto whether the Firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the Firm had and did not represent any of the parties listed on Schedule 1. S&L may have provided services to creditors or other parties in interest inadvertently omitted from Schedule 1 or the description above. If such connections exist, they would be on matters wholly unrelated to the service for which FSS seeks to engage S&L.

15.     The email and computerized search uncovered no connections other than the following:

    a. S&L represented the Debtor prior to the Petition Date.

    b. Mr. Shannon and I previously represented the InfoWDebtors in their chapter 11 cases jointly administered under Case No. 22-60020. Certain creditors of the InfoWDebtors are also creditors of FSS. Additionally, Mr. Shannon and I represented the InfoWDebtors in the negotiations of the Plan Support Agreement under which FSS and Alex Jones committed to provide funding for the InfoWDebtors' contemplated reorganization, prior to the dismissal of the Sandy Hook plaintiffs' decision to dismiss their claims against the InfoWDebtors with prejudice.

    c. Mr. Schwartz was the CRO of the InfoWDebtors while S&L attorneys represented the InfoWDebtors.

    d. Mr. Shannon was previously employed by Akin Gump Strauss Hauer & Feld LLP.

    *ii.     Further Description of Connections to the InfoWDebtors*

16.     Beginning on or about March 23, 2022, I, as a partner of Parkins Lee & Rubio LLP, and R.J. Shannon, as an associate, represented the InfoWDebtors in connection with their chapter 11 cases that were filed on April 17 and 18, 2022. On May 15, 2022, I began representing the InfoWDebtors, practicing under Kyung S. Lee PLLC. On June 1, 2022, S&L began business and provided services to the InfoWDebtors in connection with the hearing on the stipulation and order dismissing the InfoWDebtors cases and final administrative matters after the dismissal of the cases.

17. After extensive negotiations prior to filing their petitions, Alex Jones assigned his interests in the InfoWDebtors to a litigation Settlement Trust (the "LST") and Mr. Jones and FSS entered into a Plan Support Agreement (the "PSA"). Mr. Shannon and I represented the InfoWDebtors in connection with those negotiations.

18. Section 8 of the PSA contained various provisions under which the PSA and the obligations of the parties thereto would terminate. The provisions under which the PSA would terminate under its terms included, among other things: (i) dismissal of the InfoWDebtors' chapter 11 cases; (ii) failure to obtain appointment of the trustees for LST; (iii) failure to file a plan pursuant to the terms of the PSA; (iv) failure to obtain confirmation of a plan pursuant to the terms of the PSA; and (v) the remand of the Sandy Hook Actions and continuation of the state court proceedings.

19. On April 17 and April 18, 2022, the InfoWDebtors filed petitions for relief under chapter 11, subchapter v, of the Bankruptcy Code.

20. The Texas Sandy Hook plaintiffs, the Connecticut Sandy Hook plaintiffs, and the U.S. Trustee immediately filed emergency motions to dismiss the bankruptcy cases of the InfoWDebtors.

21. Although the InfoWDebtors filed emergency motions to appoint trustees for the LST and retain W. Marc Schwartz to serve as the CRO for InfoWDebtors, the Texas Sandy Hook plaintiffs, Connecticut Sandy Hook plaintiffs, and the U.S. Trustee each opposed hearings on those emergency motions prior to their motions to dismiss.

22. By May 6, 2022, counsel for both the Texas and Connecticut plaintiffs announced that they were dismissing their claims against the InfoWDebtors from their respective lawsuits. CRO Schwartz directed me to work with plaintiffs' counsel to make sure that their claims were

5

withdrawn with prejudice against the InfoWDebtors. The InfoWDebtors finalized, submitted and had the Bankruptcy Court approve the Stipulations of Dismissal of the Texas plaintiffs Claims with prejudice by May 19, 2022. The Connecticut plaintiffs filed pleadings to dismiss their claims against the InfoWDebtors with prejudice in the removed actions on or about May 13, 2022.

23.     After dismissal of the Sandy Hook plaintiffs' claims against the InfoWDebtors, the PSA could no longer serve its intended purpose and had terminated by its own terms. While counsel for Alex Jones and FSS advised the Court that the parties would extend the PSA deadlines beyond April 30, 2022, the Amended PSA was negotiated but never executed because the LST trustees were never appointed.

24.     The CRO of the InfoWDebtors and I then analyzed the best way to go forward with the remaining claims against the InfoWDebtors and concluded that, in light of the U.S. Trustee's continued opposition to the bankruptcy cases, dismissal of the InfoWDebtors' bankruptcy cases was in the best interest of the estate. First, the InfoWDebtors still had to litigate with the U.S. Trustee regarding dismissal. Second, the *raison d'etre* for the bankruptcy (to have the plaintiffs participate as claimants under the plan of reorganization) no longer existed. Third, the estate had limited access to funds to administer the estate, in light of the termination of the PSA. Fourth, dismissals of both Texas and Connecticut plaintiffs' claims with prejudice left the estate with only four remaining creditors.

25.     The CRO then directed me to work with the U.S. Trustee's office to have the InfoWDebtors' bankruptcy cases dismissed. On June 1, 2022, the U.S. Trustee and the Debtors filed a Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. On June 10, 2022, the Bankruptcy Court approved the Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases.

26.     The first services any attorney of Shannon & Lee LLP provided to FSS occurred on May 24, 2022, were provided by me through Kyung S. Lee PLLC when I traveled to Austin, Texas to discuss the potential restructuring relating to FSS. The InfoWDebtors were negotiating the terms of the stipulation with the U.S. Trustee to dismiss the case that was filed on June 1, 2022, at this time.

27.     As of May 19, 2022, and continuing through today, the InfoWDebtors and FSS are not adverse. No default exists under the license agreement between InfoW and FSS. To the best of my knowledge, there are no claims between FSS and the InfoWDebtors.

28.     Out of an abundance of caution and to assure the Court and the FSS creditors that S&L does not have a bias or an adverse interest against FSS or its estate, Kyung S. Lee PLLC submitted a written resignation of its engagement to serve as restructuring counsel to InfoWDebtors prior to submission of the Application.

29.     The results of the foregoing connections search process confirm that neither I, S&L, nor any of its employees or partners, to the best of my knowledge, have any disqualifying connections. Neither I, S&L, or any partner of S&L (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

**E.  Affirmative Statement of Disinterestedness**

30.     Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and S&L are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

31.     I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any

7

interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

32.     S&L is not a creditor, an equity security holder, or an insider of the Debtor; S&L is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and S&L does not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

33.     S&L does not possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate. S&L also does not possess or assert any economic interest that would create either an actual or potential dispute in which the estate is a rival claimant. S&L does not have any incentive to act contrary to the best interests of the estate and its creditors.

**F.      Bankruptcy Rule 2016(b) Disclosures**

34.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, S&L has not shared or agreed to share (a) any of its compensation from the representation of the Debtor with any other persons, or (b) any compensation any other persons have received, may have received, or will receive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August  20, 2022,

By: /s/*Kyung S. Lee*
                    Kyung S. Lee

8

007043

**SCHEDULE 1**

**TO LEE DECLARATION**

**SEARCHED PARTIES**

<u>Debtor & Professionals</u>

    Law Office of Ray Battaglia            Schwartz Associates


<u>Debtor's Equity</u>

    Alexander E. Jones

<u>Largest 20 Unsecured Creditors & Litigation Claimants</u>

| | |
|---|---|
| Elevated Solutions Group | Dona Soto |
| Atomial LLC | Erica Lafferty |
| Cloudfare, Inc. | Francine Wheeler |
| Jacquelyn Blott | Ian Hockley |
| Joel Skousen | Jacqueline Barden |
| eCommerce CDN LLC | Jennifer Hensel |
| Paul Watson | Jeremy Richman |
| Greenair, Inc. | Jillian Soto |
| Edgecast, Inc. | Leonard Pozner |
| Ready Alliance Group, Inc. | Marcel Fontaine |
| Getty Images, Inc. | Mark Barden |
| RatsMedical.com | Neil Heslin |
| David Icke Books Limited | Nicole Hockley |
| WWCR | PQPR Holdings Limited, LLC |
| CustomTattoNow.com | Robert Parker |
| AT&T | Scarlett Lewis |
| Justin Lair | Veronique De La Rosa |
| Brennan Gilmore | William Sherlach |
| Carlee Soto-Parisi | William Aledenberg |
| Carlos Soto | Larry Klayman |
| Christopher Sadowski | Randazza Legal Group |

<u>Attorneys for Creditors and Parties in Interest</u>

| | |
|---|---|
| Kaster Lynch Farrar & Ball LLP | Jordan & Ortiz, P.C. |
| Koskoff Koskoff & Bieder | McDowell Heterhington LLP |
| Fertitta & Reynal LLP | The Akers Law Firm PLLC |
| Pattis & Smith, LLC | Copycat Legal PLLC |
| Zeisler & Zeisler P.C. | |

Waller Lansden Dortch & Davis,
LLP

Akin Gump Strauss Hauer & Feld
LLP

<u>U.S. Bankruptcy Judges and Staff</u>

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro

Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

<u>U.S. Trustee Personnel</u>

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera

Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

007045

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC | § | CHAPTER 11 |
| | § | |
| DEBTOR | § | |

**UNITED STATES TRUSTEE'S AMENDED OBJECTION TO THE APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING THE EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR AND (B) GRANTING RELATED RELIEF**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), by and through his undersigned counsel, hereby submits his objection (the "Objection") to the Debtor's Application for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief (the "S & L Application"). In support of his Objection to the S & L Application, the U.S. Trustee states to the Court as follows:

**INTRODUCTION**

1. The U.S. Trustee objects to the S & L Application because attorney Kyung Lee ("Attorney Lee"), a partner at Shannon & Lee LLP ("S & L"), failed to disclose his connections to Free Speech Systems, LLC ("FSS" or the "Debtor") in the bankruptcy cases of InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC (collectively referred to as the "InfoW Debtors" or the "InfoW Cases").[1] In the InfoW Cases, the InfoW Debtors represented to the Court and parties that they would negotiate at arm's length with FSS and Alex Jones ("Jones"), the proposed third-party funders and counterparties to the negotiations. On May 19, 2022, Attorney Lee, through the law

---

[1] References to the InfoW Cases refer to Case Nos. 22-60020, 22-60021, and 22-60022 filed in the Southern District of Texas. The cite to "InfoW Docket" refers to Case No. 22-60020.

1

firm Kyung S. Lee PLLC ("KSLPLLC"), filed an application in the InfoW Cases whereby KSLPLLC sought to be employed as bankruptcy counsel for the InfoW Debtors. Attached to the application was a declaration by Attorney Lee, affirmatively stating that he had no connections to FSS and Jones (the "InfoW Lee Declaration"). Shortly after filing the application, however, Attorney Lee began providing legal services to FSS, while contemporaneously representing the InfoW Debtors.

2.  Attorney Lee never amended or supplemented the InfoW Lee Declaration after he was retained by FSS and did not otherwise inform the Court, creditors, and U.S. Trustee of his connections during the InfoW Cases as required by Bankruptcy Rule 2014. Attorney Lee's connections to FSS and Jones were only recently discovered in this case, after the Court conducted its own inquiry and questioned the professionals at the hearing on August 3, 2022. In addition to the violations under Bankruptcy Rule 2014, the lack of full disclosure in the InfoW Lee Declaration also violated the Southern District of Texas' Guidelines for Professional Conduct. All practicing attorneys in this district "[owe] to the judiciary, candor, diligence, and the utmost respect." *See* S.D. Tex. Local R., Appendix D. Guidelines for Professional Conduct.

3.  The defective disclosures in the InfoW Lee Declaration, while filed in a previous case, are not minor matters to ignore. The Court should address the issue in this case, which is, in many ways, a continuation of the previous cases. Section 327(a) of the Bankruptcy Code provides the Court with broad discretion to consider prior acts of the applicant to determine whether to approve an employment application. The Court should consider the nondisclosure in order to effectuate the disclosure obligations required by Bankruptcy Rule 2014.  The conduct in the InfoW Cases involved related debtors and almost the identical parties in interest. Moreover, Attorney Lee was employed by FSS while he filed pleadings and made statements to the Court in the InfoW Cases

2

that indicated that all InfoW estate professionals including Attorney Lee were independent and without outside influences. S & L, through the conduct of its named partner, should not be exempt from the consequences of the omissions because the InfoW Cases were dismissed; especially when S & L, with Attorney Lee, is now seeking approval from this Court to be employed by FSS—the very connection that was previously concealed from the Court. The disclosure procedures in Bankruptcy Rule 2014 are clear—the proposed professional must disclose all connections and may not unilaterally determine which connections impact his disinterestedness. S & L's attorney did not comply with his disclosure obligations, and through his noncompliance violated the ethical duties of candor, diligence, and the utmost respect owed to the Court.

4.  This is an unusual scenario. The Court never had the opportunity to rule on the employment application in the InfoW Cases. Because the InfoW Cases are now closed, it is appropriate for the Court in the present case to exercise its broad discretion under Section 327(a) to consider the nondisclosure in the related InfoW Cases to determine whether to approve the S & L Application. To protect the integrity of the bankruptcy system, the Court should refuse to overlook the disclosure failures in the InfoW Cases and as a result, should deny the S & L Application in the present case.

## FACTUAL BACKGROUND

### A.  General Information.

5.  On July 29, 2022, FSS filed a chapter 11 voluntary petition and elected to proceed under Subchapter V of chapter 11 on its petition.

6.  On August 2, 2022, the U.S. Trustee appointed Melissa Haselden as the FSS' Subchapter V Trustee in the present case.

7.  No committee has been appointed. Unless the Court determines there is cause for the

3

appointment of a creditors' committee and orders the appointment of one, the U.S. Trustee is prohibited from soliciting and appointing a committee in a subchapter V case. 11 U.S.C. § 1102(a)(3).

**B. The InfoW Debtors create a structure to negotiate opposite FSS and Jones after filing their bankruptcy cases.**

8. On April 17, 2022, and April 18, 2022, the InfoW Debtors filed chapter 11 voluntary petitions and elected to proceed under Subchapter V of chapter 11 on their respective petitions.[2] The InfoW Debtors, like FSS, were all 100% owned by Jones prior to the filing of the cases. InfoW Docket No. 6 at ¶ 6.

9. On April 18, 2022, the U.S. Trustee appointed Melissa Haselden as the InfoW Debtors' Subchapter V Trustee.

10. Before the filing of the InfoW Cases, in 2018, certain plaintiffs brought actions in Texas and Connecticut against Jones, FSS, and the InfoW Debtors relating to statements made by Jones and other employees of FSS stating, among other things, that the Sandy Hook school shootings were a hoax (such plaintiffs are referred to herein as the "Sandy Hook Plaintiffs" and individually as the "Connecticut Plaintiffs" and "Texas Plaintiffs").

11. In 2022, Jones, FSS, and the InfoW Debtors sought to limit their liability to the Sandy Hook Plaintiffs' defamation claims through the creation of the Litigation Settlement Trust (the "LST") and the Plan Support Agreement (the "PSA). Three days prior to the filing of the InfoW Cases, the InfoW Debtors, Jones, and FSS entered into the LST, with Jones and FSS agreeing to fund $725,000 into the LST to pay the administrative expenses of the InfoW Cases. The LST was designed to remove control of the equity of the InfoW Debtors from Jones and give it to a trust

---

[2] InfoW, LLC filed just shortly before midnight on April 17, 2022, while IWHealth, LLC and Prison Planet TV, LLC's petitions were docketed shortly after midnight on April 18, 2022.

007049

held by trustees. According to the InfoW Debtors, "[t]his provides a clean break between the [InfoW]Debtors' former management and allows the funding of a proposed plan to be negotiated at arm's length between the Debtors, FSS, and Jones." InfoW Docket No. 6 at ¶ 18.

12. Simultaneously with the creation of the LST, the InfoW Debtors entered into the PSA with Jones and FSS that dictated a roadmap for the InfoW Cases. FSS and Jones would be the funders of the plan because the InfoW Debtors had little or no assets. InfoW Docket No. 6 at 7. As part of the roadmap, the InfoW Debtors sought to retain W. Marc Schwartz as the chief restructuring officer ("CRO Schwartz") for the InfoW Debtors. InfoW Docket No. 6-2.

13. On April 27, 2022, the Connecticut Plaintiffs filed a motion to dismiss the InfoW Cases. InfoW Docket No. 36. On that same day, the Texas Plaintiffs joined the motion to dismiss and filed their supplemental motion to dismiss. InfoW Docket No. 42.

14. On April 29, 2022, the U.S. Trustee filed his motion to dismiss. InfoW Docket No. 50. The U.S. Trustee alleged, among other reasons, that the InfoW Cases were filed in bad faith and were engineered for the purpose of shielding Jones and FSS from liability. *Id.* at ¶ 36.

15. A status conference was held on April 29, 2022. At the status conference, the Court scheduled an evidentiary hearing for all three motions to dismiss for May 27, 2022.

16. On May 13, 2022, the Connecticut Plaintiffs filed a notice of dismissal with prejudice of claims against the InfoW Debtors in the United States Bankruptcy Court for the District of Connecticut. A status conference was scheduled for May 24, 2022, for the Connecticut Court to consider the Connecticut Plaintiffs' dismissal of the InfoW Debtors from the defamation lawsuits. InfoW Docket No. 98.

17. On May 18, 2022, the Texas Plaintiffs agreed to dismiss their claims against the InfoW Debtors in the defamation lawsuits filed in state court. On May 19, 2022, the Court entered the

007050

"Stipulation and Order" which memorialized this agreement between the Texas Plaintiffs and the InfoW Debtors. InfoW Docket No. 99.

**C. Lee and Schwartz begin to represent FSS in addition to the InfoW Debtors but do not inform the Court.**

18. On May 18, 2022, the InfoW Debtors filed an Emergency Motion to Continue Hearing Date on Motion to Dismiss (the "Emergency Continuance Motion"). In the continuance request, the InfoW Debtors represented that:

> Continuing the Original Hearing Date until June will also permit the CRO who has been engulfed in evaluating the dismissals with prejudice issues to now focus on the remaining creditors of the Debtors. The CRO will be able to evaluate either before or by the June hearing date whether he should proceed with trying to confirm a subchapter v plan of reorganization or handle these claims outside of bankruptcy. Again, such effort will be [sic] wise use of limited financial resources. Such an approach will also save valuable judicial resources.

InfoW Docket No. 95, at ¶ 21.

19. On the morning of May 19, 2022, Attorney Lee filed an Application to Employ KSLPLLC as Attorneys for the Debtors (the "KSLPLLC Application"). InfoW Docket No. 97. The KSLPLLC Application was accompanied by the InfoW Lee Declaration. InfoW Docket No. 97-1.

20. In the InfoW Lee Declaration, Attorney Lee affirmatively stated that he had no connections with FSS and Jones. The InfoW Lee Declaration provided the following:

> KSLPLLC performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtors, creditors, any other party in interest, their respect[sic] attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the Southern District of Texas. I conducted a search of KSLPLLC files to determine using the list of parties listed in Schedule I hereto whether the firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the firm had not and did not presently represent any of the parties listed on Schedule 1.
>
> The results of the forging connections search process confirm that neither I, KSLPLLC, nor any of its employees or shareholders, to the best of my knowledge, have any disqualifying connections…the only connection to any of

007051

the parties on Schedule 1 is by virtue of having represented the three Debtors
while a partner at PLR.

InfoW Docket No. 97-1, at ¶¶ 10-12.

21. Schedule I attached to the InfoW Lee Declaration included "Free Speech Systems LLC"
and "Alex Jones" as "Searched Parties." InfoW Docket No. 97-1. Attorney Lee signed and
executed the InfoW Lee Declaration on May 19, 2022. *Id*.

22. In the afternoon of May 19, 2022, the Court conducted a hearing on the Emergency
Continuance Motion. At the hearing, the Connecticut Plaintiffs and Texas Plaintiffs announced
that they were proceeding with their dismissal with prejudice of the InfoW Debtors as defendants
in both the Texas and Connecticut defamation lawsuits.

23. In consideration of parties working to finalize the state court dismissals with prejudice,
Attorney Lee requested additional time to respond to the U.S. Trustee's motion to dismiss the
InfoW Cases. Among the bases for the continuance was that the CRO needed additional time to
fulfill his fiduciary duties to the other creditors and Attorney Lee stated that "the other part that I
have to do is renegotiate the plan support agreement if the debtors intended to move forward with
respect to a small subchapter v plan." Tr. May 19, 2022, at 16, 21-24.

24. Based on the representations made by Attorney Lee, the Court reset the evidentiary hearing
for June 10, 2022. Towards the conclusion of the status hearing, Attorney Lee assured the Court
of the chief restructuring officer's commitment to the InfoW Debtors and stated the following:

> MR. LEE: I do want you to know that Mr. Schwartz in his fiduciary capacity is
> evaluating all alternatives.
>
> THE COURT: Oh, I'm sure he is.
>
> MR. LEE: I just want you to know that.

Tr. May 19, 2022, at 23, 13-16.

7

25. Despite those representations, according to CRO Schwartz, sometime on that same day, May 19, 2022, Attorney Lee asked CRO Schwartz to send an engagement letter to FSS outlining his retention as the CRO for FSS. CRO Schwartz prepared an engagement letter that day and it was sent via e-mail to Ray Battaglia, counsel for FSS. FSS Docket No. 14-4.

26. On May 26, 2022, Attorney Lee appeared on behalf of the InfoW Debtors at the Section 341 Meeting. The U.S. Trustee continued the creditors' meeting for one week, to June 2, 2022. As of May 26, 2022, there was no agreement between the U.S. Trustee and the InfoW Debtors to dismiss the InfoW Cases.

27. On June 1, 2022, the U.S. Trustee and the InfoW Debtors finalized a stipulated dismissal order. The stipulated dismissal order was submitted later that day.

28. On June 2, 2022, the InfoW Debtors, through Attorney Lee, filed a response to the U.S. Trustee's motion to dismiss. The InfoW Debtors asserted that, as of June 2, 2022, the InfoW Cases still served valid bankruptcy purposes, despite their agreement with the U.S. Trustee to dismissal just a day before. At the time of the response, both Attorney Lee and CRO Schwartz were providing services to FSS, but the InfoW Debtors stated that the CRO was "independent" and "the duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering." InfoW Docket No. 112 at ¶¶ 6-7. The response did not mention any relationship between FSS and Schwartz or between Lee and FSS.

29. On June 10, 2022, the Court held a hearing on the motion to dismiss and allowed all parties to provide any comments. Neither Schwartz nor counsel for the InfoW Debtors, who both addressed the Court that day, informed the Court of any connections to FSS. The Court then entered the stipulated order dismissing the InfoW cases. InfoW Docket No. 114.

**D. During the FSS case, the Court and parties learn about Schwartz's and Lee's representation of FSS during the InfoW cases.**

8

30. On July 26, 2022, the damages phase of the defamation lawsuit against FSS and Jones began in Austin, Texas. On July 29, 2022, at the conclusion of the first week of trial in Austin, FSS filed for bankruptcy protection.

31. On that same day, CRO Schwartz filed a Declaration with the Court in support of the first day motions. Docket No. 10. In that Declaration, Schwartz informed the Court for the first time that "[o]n June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022. *Id.* at ¶ 9. Schwartz also declared, "Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized." *Id.* at ¶ 40. SALLC was retained to perform various accounting and forensic work associated with his mandate.

32. On August 1, 2022, at the consent of FSS and the Texas Plaintiffs, the Court entered an order lifting the automatic stay and allowing the trial in Austin to proceed to judgment. Further, at this hearing, the Court expressed concerns about transparency in the bankruptcy process, specifically the May 19th engagement between CRO Schwartz and FSS while the InfoW Cases were pending. The Court asked the following:

> I need to understand as well, on May 19th, you were representing three debtors who are on the opposite side of a proposed plan support agreement. We never took action but you were also seeking retention from Free Speech at the same time? I don't think I ever knew about that.

33. On August 3, 2022, the Court conducted a cash collateral hearing (the "August 3rd hearing"). At the hearing, CRO Schwartz, who was now acting as the CRO for FSS, testified for several hours. Again, a point of concern raised by the Court was the nondisclosure of connections

between the estate professionals[3] in the InfoW Cases and FSS and Jones. The Court asked the following:

> Let me get the question – I might as well ask it now because it's a good spot…I just need to understand it. On May 19th, there was a hearing before me where on May 18th, there was a request for a continuation on a motion to dismiss…and in this case, there is a letter dated by you to Free Speech dated the same day. I may be reading much into this, but it seems to me that you – either you wrote the letter that day or you had been in conversation with Free Speech before you wrote that – before that day you sent the letter. And I just need to understand – none of this was ever disclosed to me in connection with the case and the cases were dismissed on June the 10th officially, which tells me that Mr. Jones signed a retention letter. So, you were actively retained before these cases were dismissed – the last cases were dismissed – and I just need to understand, one, why that was never disclosed to me, and two, when did you begin to start soliciting or having conversations about representing Free Speech Systems…

Tr. August 3, 2022 at 147-148, 21:19.

In response to the Court's questions, CRO Schwartz stated that he could not recall the date but assured the Court that conversations concerning the FSS engagement only occurred "after we had been substantially convinced that we were going to be terminating the InfoWars bankruptcy." Tr. August 3, 2022 at 149, 4-8.

34. After listening to several hours of testimony at the August 3rd Hearing and upon the Sandy Hook Families' oral request for the formation of a tort claimant committee, the Court stated the following:

> [T]here's been oral request for the appointment of a committee, and that can be done by the Court for cause. I'm not going to grant that today, but I am going to express some real concerns about what I heard, and I'll express what they are. You know, whether you realize it or not, Mr. Schwartz was negotiating on both sides of a deal.

Tr. August 3, 2022 at 239, 9:17.

---

[3] During CRO Schwartz's testimony, the Court indicated that it had concerns regarding Attorney Lee's retention by FSS as well: "I [ask] Mr. Lee a few questions as well at some point, but I'll need to understand that as well, but today's not that day. Today's cash collateral, and so I do want – and I know I took this off on a tangent." Tr. August 3, 2022, at 150, 9-11.

007055

35. Based on the testimony at the August 3rd Hearing, the Court further questioned the independence of S & L and CRO Schwartz at the outset of the present case as it relates to potential claims against Jones and other insiders:

> [T]he Debtor is going to have to make some tough decisions at some point. And it's going to have to really analyze those claims and see whether those claims have any merit…[and] I'm not sure that parties who were introduced in the last case could fill that role either. But the Debtor needs to hear that from me, and I think debtors are entitled, especially early on in a case, to think about what the judge may have to say. And these are certainly rare comments, but these are certainly uncommon cases.

Tr. August 3, 2022, at 241, 5-19.

36. On August 20, 2022, FSS filed applications to employ CRO Schwartz (the "Schwartz Application") as the Debtor's Chief Restructuring Officer and S & L as co-counsel. The S & L Application was accompanied by a declaration by Attorney Lee (the "FSS Lee Declaration"). The FSS Lee Declaration disclosed for the first time that "the first services any attorney of Shannon & Lee LLP provided to FSS occurred on May 24, 2022, were provided by me through Kyung S. Lee PLLC…" FSS Docket No. 85-3, ¶ 26. Further, the S & L Application disclosed that "KSLPLLC received payment from the Debtor of $21,986.59 for services provided to FSS from May 24, 2022, through May 31, 2022." *Id*. at FN. 1.[4] Lastly, the FSS Lee Declaration provided that attorneys of S & L "represented the InfoW Debtors in the negotiations of the Plan Support Agreement under which FSS and Alex Jones committed to provide funding for the InfoW Debtors." *Id.* at 85-3, ¶ 15(b).

---

[4] FSS filed a Statement of Financial Affairs (the "SOFA") on August 29, 2022. FSS Docket No. 122. Question 11 on the SOFA requires disclosure of payments related to bankruptcy – "List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case." Payments to Shannon & Lee were identified, as of June 6, 2022, however, no payments in the amount of $21, 986.59 were recorded on FSS's SOFA.

37. In the Schwartz Application, FSS asserted that "the CRO and SALLC's mandate to 'lead InfoW's management and personnel through the restructuring process' had for all practical purposes concluded by May 19, and for sure by June 6." FSS Docket No. 83, ¶ 44.

38. On August 25, 2022, the Sandy Hook Plaintiffs filed a motion to request the appointment of a tort claimants committee and to remove the debtor-in-possession. The Sandy Hook Plaintiffs alleged, among other reasons, that CRO Schwartz mismanaged the estate resources for Jones' benefit and failed to disclose his connections to FSS while acting as the CRO for the InfoW Debtors. FSS Docket No. 102.

## OBJECTION

39. The S & L Application should be denied due to Attorney Lee's deficient disclosure of his connections to FSS and Jones in the related InfoW Cases. The disclosure process is self-policed by the professionals that appear before the Court, and when a disclosure violation occurs, it should be met with a strong rebuke. While this is an unusual scenario in that the KSLPLLC Application in the InfoW Cases was never heard and the InfoW Cases are now closed, the current case is related to the prior cases and includes substantially all the same players. To effectuate the disclosure mandates in Bankruptcy Rule 2014 and to address the prior nondisclosure, the Court should exercise its broad discretion under Section 327(a) to consider the prior acts of an S & L attorney in violation of the disclosure obligations and to deny the S & L Application in this related case.

**A. The Court has Broad Discretion under 11 U.S.C. § 327(a) in Deciding Whether to Approve an Application to Employ an Estate Professional.**

40. The Bankruptcy Code provides a uniform scheme for retaining and compensating court-authorized attorneys under 11 U.S.C. §§ 327-331, 503, and 507. Section 327 provides that the debtor-in-possession may employ, with the Court's approval, professionals who are disinterested and who do not hold or represent interest adverse to the estate. 11 U.S.C. §§ 327. In addition, the

12

applicants must also comply with Bankruptcy Rule 2014(a). *See In re Bechuck*, 472 B.R. 371, 375 (Bankr. S.D. Tex. 2012).

41. Section 327(a) of the Bankruptcy Code provides the Court with a wide latitude of discretion when professionals are seeking to work on behalf the bankruptcy estates. The statutory language of section 327(a) shows that Congress intended the bankruptcy court to have broad discretion in making its determination, as it provides that "the trustee [or debtor in possession, under 11 U.S.C. § 1107], with the court's approval *may* employ one or more [professionals]." [emphasis added]. Congress could not have more clearly stated that (i) no professionals, on any terms, can be employed without prior court authorization, and (ii) the court has broad discretion in deciding whether to approve or disapprove an employment application, and is not required to accept the proposed professional's application. The court may – or may not, in its sound discretion – approve a proposed employment application. *Cf. United States v. Rodgers,* 461 U.S. 677, 706 (1983) ("the word 'may,' when used in a statute, usually implies some degree of discretion").

42. Many decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a). *See, e.g.*, *In re Jackson*, 484 B.R. 141, 154 (Bankr. S.D. Tex. 2012) *citing Arnes v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003 (5th Cir. 1995); *In re Bigler, LP*, 422 B.R. 638, 643 (Bankr. S.D. Tex. 2010) ("This Court has substantial discretion to grant an application to employ a professional for the estate."); *Miller v. United States Trustee*, 197 F.3d 13, 17 (1st Cir. 1999) ("Bankruptcy courts historically have been accorded wide discretion to oversee the terms and conditions of a debtor's engagement of professionals[.]"); *Interwest Bus. Equip. v. United States Trustee*, 23 F.3d 311, 315 (10th Cir. 1994) ("[W]e will not second guess a decision not to approve professionals under § 327 unless it exhibits a clear abuse of discretion[.]"); *Harold & Williams Dev. Co.*, 977 F.2d 906, 909

13

(4th Cir. 1992) (the Bankruptcy Code "gives broad discretion to the bankruptcy court over the appointment of professionals to work on behalf of the . . . estate"); *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987) ("Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals."); *Elias v. Lisowski Law Firm (In re Elias)*, 215 B.R. 600, 603 (B.A.P. 9th 1997) ("A bankruptcy court's decision regarding an application for the employment of a professional is reviewed for abuse of discretion.").

43. The Court is not required to approve an application that satisfies the requirements of Section 327(a). "Even if the technical requirements of disinterestedness and not holding or representing an interest adverse to the estate are met, the Court has the discretion to deny the application." *In re LTHM Houston-Operations*, LLC, 2014 WL 5449737, at *5 (Bankr. S.D. Tex. 2014). Additionally, "while disinterestedness and the absence of conflicts may be central to the inquiry, they are by no means exclusive. Indeed, section 327(a) vests the authority for 'approval' within the sound discretion of the court. That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons…" *In re Kurtzman,* 220 B.R. 538, 542 (S.D.N.Y. 1998).

44. In the exercise of its discretion under Section 327, the Court is instructed "into taking account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." *LTHM Houston-Operations, at *5; see also Official Comm. of Unsecured Creditors v. Harris* (*In re Southwest Food Distribs., LLC*), 561 F.3d 1106, 1112-13 (10th Cir. 2009) (bankruptcy court does not err in considering proposed compensation terms when ruling on employment application); *Harold & Williams Dev. Co.*, 977 F.2d at 910 (bankruptcy court must not "abdicate the equitable discretion granted to it," but must "take into account the facts of a

14

particular case and the overall objectives of the bankruptcy system"); *In re Kurtzman*, 220 B.R. 538, 540 (S.D.N.Y. 1998) (finding that the bankruptcy court did not abuse its discretion when it denied the retention of counsel based on "prior problems involving time records, billing errors, professional conduct, and overall costs of legal services that had led to its conclusion of loss of confidence in the firm"). Here, the requirements that professionals lay bare their connections play an integral part of the Court's function to determine a proposed professional's fitness to represent the bankruptcy estate. "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." *In re Downs*, 103 F.3d. 472, 480 (6th Cir. 1996). Bankruptcy courts must be able to expect the proposed professional appointed under 327 to disclose all connections and follow the applicable rules concerning disclosure. "Plainly, the Court will not approve the employment of counsel that does not comport with the applicable ethical and disciplinary regulations." *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991).[5]

**B. As Part of Their Duty to the Court and the Estate, Professionals Have a Continuing Duty to Disclose All Connections with Creditors and Parties in Interest.**

45. Bankruptcy Rule 2014 imposes a complementary duty of disclosure on the applicant so that the Court and parties in interest can determine whether the professional satisfies disinterestedness requirements. Rule 2014 has one primary purpose—to facilitate strict

---

[5] In exercising discretion to deny an application to employ, "the bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007)(internal quotations omitted). In the present case, the Court is not depriving the Debtor of its choice in counsel, notably because S & L is proposed co-counsel. If the Court denies the S & L Application, the Debtor continues to be represented by another counsel. While the Bankruptcy Code provides deference to a debtor's choice of counsel, that deference is not absolute. "In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate." *In re Doors & More Inc.*, 126 B.R. 43 at 45. Here, the prior acts of an S&L attorney, namely the omissions of his connections to FSS and Jones, require the Court to take actions to preserve the integrity of the bankruptcy system and effectuate the disclosure mandates. The seriousness of the omissions and need to preserve the integrity of the system outweigh the Debtor's choice of counsel, especially when the Debtor is represented by co-counsel.

007060

compliance with section 327. "[T]he requirements of Fed. R. Bankr. P. 2014 are more encompassing than those governing disinterestedness inquiry under section 327. For while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014, 'all connections' that are not so remote as to be *de minimis* must be disclosed." *In re Leslie Fay Companies, Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994).

46. The applicant has the duty to disclose all relevant information to the court and "may not exercise any discretion to withhold information." *In re Woodcraft Studios, Inc.*, 464 B.R. 1, 8 (N.D. Cal. 2011). Thus, "professionals 'cannot pick or choose which connections are irrelevant or trivial.'" *U.S. v. Gallene*, 182 F.3d 578, 588 (7th Cir. 1999) (concluding that a misstatement in a Rule 2014 statement constitutes a material misstatement for purposes of 18 U.S.C. § 152). The duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and "requires 'spontaneous, timely, and complete disclosure.'" *In re The Harris Agency*, 462 B.R. 514, 524 (E.D. Pa. 2011); *see also In re Granite Partners, L.P., 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998)* (court should not have to "rummage through files or conduct independent fact-finding investigations" to determine whether the professional should be disqualified).

47. The disclosure requirements in Rule 2014 are "rooted in the fiduciary relationship between courts and attorneys." *In re Griffin*, 313 B.R. 757, 763 (Bankr. N.D. Ill. 2004). "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." *In re Downs*, 103 F.3d 472, 480 (6th Cir. 1996). Applicants "who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012) (citations omitted). "[L]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in

16

the end there was no prejudice." *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001); *see also In re Rabex Amuru of N.C., Inc.*, 198 B.R. 892, 897 (Bankr. M.D.N.C. 1996) (attorneys for debtor removed because of appearance of impropriety, even though no harm done to debtor). Professionals must "be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action." *In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011); *see also In re EBW Laser Inc*., 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required.").

### C. In Exercising Its Broad Discretion, the Bankruptcy Court Should Deny the S & L Application Because of Attorney Lee's Failure to Affirmatively and Timely Disclose His Connections with FSS.

48. The defective disclosure in the InfoW Lee Declaration, which was a statement under penalty of perjury before the Court, is not a minor matter. It "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc*., 331 B.R. 176, 189 (Bankr. D. Del. 2005). "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate." *Id.* As noted, Rule 2014 "is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court, and other parties in interest, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure." *In re Matco Elec. Group, Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008).

49. Under the PSA and LST in the InfoW Cases, Jones and FSS were designated as the "Third Party Funders." The question regarding the validity of the PSA and LST, and the negotiations

17

surrounding the origination of these documents were contested issues at the center of the InfoW Cases. Unlike other plan support agreements in other chapter 11 cases, no creditors, including the Sandy Hook Plaintiffs, participated in the drafting or negotiations of the PSA and LST. The primary parties to those negotiations were the InfoW Debtors, FSS, and Jones. FSS was on the other side of the transaction from the InfoW Debtors. Even after the InfoW Debtors reached agreements with the Sandy Hook Plaintiffs, the InfoW Debtors did not agree to dismiss the case until June 1, 2022. Attorney Lee informed the Court on May 19, 2022, that he might have to renegotiate the PSA with FSS and Jones to pay the remaining creditors should the InfoW Debtors remain in bankruptcy.

50. Moreover, Attorney Lee had multiple opportunities to disclose to the Court his connections to FSS and Jones. After Attorney Lee was retained by FSS as counsel, the InfoW Debtors filed a response to the U.S. Trustee's motion to dismiss, maintaining that "the duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering." FSS Docket No. 112, ¶ 7. The response is silent concerning the fact that just days before, Attorney Lee provided legal services for FSS and was employed as its bankruptcy counsel. Following the response on June 2, the Court conducted a hearing on the stipulation to dismiss in the InfoW Cases on June 10, 2022. Neither the CRO nor counsel for the InfoW Debtors, who both addressed the Court that day, informed the Court of any connections to FSS. By remaining silent, whether in pleadings, at hearings, or by failing to amend the InfoW Lee Declaration, Attorney Lee misrepresented his connections to the Court and violated the ethical duties of candor and diligence. *See* S.D. Tex. Local R., Appendix D. Guidelines for Professional Conduct; *see also In re Bradley*, 495 B.R. 747, 786 (Bankr. S.D. Tex. 2013)(Attorney's failure to correct misstatements demonstrated lack of candor and respect to the Court).

007063

51. While noncompliance with Bankruptcy Rule 2014 may result in disqualification and/or total disgorgement of fees in the InfoW Cases, the transgressions in the InfoW Cases eclipsed the confines of Bankruptcy Rule 2014 because those cases are now dismissed. Bankruptcy Rule 2014 alone is not sufficient to address Attorney Lee's nondisclosure of his connections to FSS and Jones in the InfoW Cases. However, the integrity of the bankruptcy system requires that the Court address Attorney Lee's omissions of his connections to FSS and Jones in the InfoW Lee Declaration. Here, it is appropriate for the Court to exercise its broad discretion under Section 327(a) to address Attorney Lee's prior acts in the related cases—which this case is essentially a continuation of—and deny the S & L Application. Put simply, Attorney Lee did not inform the Court of his connections in a related case, involving the identical parties in interest. Attorney Lee was employed by FSS while he filed pleadings and made statements to the Court that indicated that all estate professionals including CRO Schwartz and Attorney Lee were independent and without outside influences. S & L should not be exempt from the consequences of the prior acts of its named partner attorney because the InfoW Cases were dismissed; especially when S & L, through the same attorney, is now seeking approval from this Court to be employed by FSS—thereby asking the Court to bless the very connection that Attorney Lee previously failed to disclose to the Court. To maintain the integrity of the bankruptcy system and to fully effectuate the mandatory disclosure requirements in Rule 2014, the Court should deny the S & L Application.

19

## CONCLUSION

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court deny the S & L

Application and grant such other relief as is just and proper.

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: 9/14/2022

/s/ HA M NGUYEN
Ha Nguyen, Trial Attorney
CA Bar #305411
FED ID NO. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means
via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 14th day
of September, 2022.

/s/ Ha M. Nguyen
Ha M. Nguyen

007065

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3                                )  CASE NO: 22-60043-cml
                                  )
 4   FREE SPEECH SYSTEMS, LLC,    )  Houston, Texas
                                  )
 5           Debtor.             )  Tuesday, September 13, 2022
                                  )
 6                                )  1:03 p.m. - 1:49 p.m.
     -----------------------------)
 7

 8                              TRIAL

 9        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Free Speech Systems,  R.J. SHANNON
                               Shannon & Lee LLP
13                             700 Milam Street, Suite 1300
                               Houston, TX 77002
14
                               RAYMOND WILLIAM BATTAGLIA
15                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
16                             San Antonio, TX 78218

17   For Veronique De La       AVI MOSHENBERG
     Rosa, et al.:             McDowell Hetherington, LLP
18                             1001 Fannin, Suite 2700
                               Houston, TX 77002
19
                               JARROD B. MARTIN
20                             Chamberlain, Hrdlicka, White,
                               Williams & Aughtry P.C.
21                             1200 Smith Street, Suite 1400
                               Houston, TX 77002
22
     For David Wheeler,        RYAN E. CHAPPLE
23   et al.:                   Cain & Skarnulis PLLC
                               303 Colorado Street, Suite 2850
24                             Austin, TX 78701

25
```

```
 1   For the U.S. Trustee:    HA MINH NGUYEN
                              Office of the United States Trustee
 2                            515 Rusk Street, Suite 3516
                              Houston, TX 77002
 3
     For PQPR:                STEPHEN LEMMON
 4                            Streusand Landon Ozburn and Lemmon
                              1801 S Mopac Expressway, Suite 320
 5                            Austin, TX 78746

 6   For the SubChapter V     MELISSA ANNE HASELDEN
     Trustee:                 Haselden Farrow, PLLC
 7                            Pennzoil Place
                              700 Milam, Suite 1300
 8                            Houston, TX 77002

 9   Court Reporter:          ZILDE MARTINEZ

10   Courtroom Deputy:        ZILDE MARTINEZ

11   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
12                            Mineola, NY 11501
                              Tel: 800-727-6396
13

14

15   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

```
1            HOUSTON, TEXAS; TUESDAY, SEPTEMBER 13, 2022; 1:03 PM

2                          (Call to Order)

3            CLERK:  All rise.

4            MAN 1:  I was actually -- my door was shut because

5    I was in the restroom when they came by.  I saw them walk

6    past --

7            THE COURT:  This is Judge Lopez.

8            MAN 1:  (indiscernible).

9            THE COURT:  Might want to put your phone on mute.

10           WOMAN 1:  -- like it scared me because we came

11   around the corner (indiscernible) and like --

12           MAN 1:  Yeah, it --

13           WOMAN 1:  You had the door shut.

14           THE COURT:  Folks, this is Judge Lopez.  I can

15   hear everything.  Yes.  I'll do it.

16           This is Judge Lopez, folks.  Good afternoon.  It

17   is now 1:03.  I'm going to call Free Speech here on

18   September 13th, one o'clock docket.  Something just got

19   filed.  My understanding is we're going to take up cash

20   collateral and then we will also take up -- talk about

21   emergency motion to compel.  So why don't I take

22   appearances.  Why don't I start in the courtroom.

23           MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi

24   Moshenberg and Jarrod Martin here on behalf of the Texas

25   plaintiffs, Your Honor.
```

Page  4

```
 1                THE COURT:  Okay.
 2                MR. MOSHENBERG:  Jarrod Martin has a hearing at
 3     1:30, so he may be stepping out in regard to that matter.
 4     And then just so the Court understands, I'm going to be
 5     handling the motion to compel issue and Jarrod Martin is
 6     spearheading the discussions with the other side about cash
 7     collateral, so let him speak to those issues.
 8                THE COURT:  Why don't we take -- well, we'll see
 9     where this goes.  Okay, thank you.
10                MR. MOSHENBERG:  Thank you, Your Honor.
11                MR. NGUYEN:  Good afternoon, Your Honor.  Ha
12     Nguyen for the U.S. Trustee.  I also have Millie Sall from
13     the U.S. Trustee's office here with me.
14                THE COURT:  Good afternoon.
15                MR. LEMMON:  Your Honor, Steve Lemmon on behalf of
16     PQPR.
17                THE COURT:  Good afternoon.
18                MR. SHANNON:  Good afternoon, Your Honor.  RJ
19     Shannon on behalf of the Debtor, Free Speech Systems LLC.
20                THE COURT:  Okay.  Good afternoon.
21                MR. SHANNON:  And believe on the telephone or on
22     the -- electronically Ray Battaglia may be on as well.
23                THE COURT:  Okay.
24                MR. SHANNON:  Thank you.
25                THE COURT:  Sounds great.  Good afternoon.  Ms.
```

1    Haselden, good afternoon.

2           MS. HASELDEN:  Good afternoon, Your Honor.

3    Melissa Haselden and I also have with me Elizabeth Freeman,

4    proposed counsel for Subchapter V Trustee.

5           THE COURT:  Okay.  Good afternoon.  Okay.  We have

6    covered the courtroom.  Let me just open it up.  Does anyone

7    wish to make an appearance who's on video.  Mr. Chapple, I

8    see you there.  Do you wish to make an appearance?

9           MR. CHAPPLE:  Yes, Your Honor.  Thank you for

10   recognizing me.  Ryan Chapple on behalf of the Connecticut

11   plaintiffs.

12          THE COURT:  Okay.  Folks the line is completely

13   unmuted.  I'm going to try to keep it completely unmuted so

14   I don't have to -- I can focus on the arguments and -- but

15   anyone else wish to make an appearance?

16          MR. BATTAGLIA:  Yes, Your Honor.  Good afternoon.

17   This is Ray Battaglia.  On behalf of Free Speech Systems.

18          THE COURT:  Good afternoon, Mr. Battaglia.  Anyone

19   else?  Okay.  Might be easier for me if we talked about cash

20   collateral first and then took up the motions to compel.  So

21   why don't we start there.  I did see that something got

22   filed.  Read it briefly and I'm still reading it.  Maybe you

23   can give me the high points.

24          MR. MARTIN:  I can give you high points, Your

25   Honor, and Mr. Battaglia can chime in as well.  We are able

```
 1   to reach another agreement on interim use of cash
 2   collateral.  The only material changes are the PQPR payment
 3   provisions from before regarding the clawback, those were
 4   removed and instead there's a language in there that
 5   preserves the clawback rights in the previous interim
 6   orders.  To date, out of that $750,000, $250,000 has been
 7   paid.  The other $500,000 has not yet been paid so you have
 8   one clock kind of ticking on that.
 9            Obviously, that's reserving all rights relating
10   to, you know, broader litigation, but specifically as to
11   those payments as to whether they were proper in this course
12   of business.  That's --
13            THE COURT:  Okay,
14            MR. MARTIN:  -- what the clock is ticking as far
15   as -- and then there's an updated budget as well and Mr.
16   Battaglia can speak to that.
17            THE COURT:  I did see that you all need a final
18   cash collateral hearing as well, right?
19            MR. MARTIN:  Correct, Your Honor.
20            THE COURT:  Or a time, I should say.
21            MR. MARTIN:  And we had proposed having that heard
22   at the same time as the tort committee hearing.
23            THE COURT:  Okay.  Do you think 10 a.m. would work
24   for everyone, if we're going to work through the day on
25   that?  I don't think there's a lot of hearings that are
```

1   going to go on at the same time there.  Would 10 a.m. work

2   for October 12th?

3           MR. MARTIN:  It's okay for the Texas plaintiffs,

4   Your Honor.

5           THE COURT:  Okay.  Mr. Battaglia, would that work

6   for you?

7           MR. BATTAGLIA:  Yes, Your Honor, and I've had

8   conversations with Mr. Martin -- this is Ray Battaglia, for

9   FSS -- about frankly at the end of the day probably doing

10  another interim at that time.

11          THE COURT:  Okay.

12          MR. BATTAGLIA:  Just -- I think we're fine running

13  on that basis, but yes.  That'd be fine.

14          THE COURT:  Okay.  Is there anything you wish to

15  tell me about --

16          MR. BATTAGLIA:  And I guess one more thing, Your

17  Honor, I should point out is that Ms. Freeman had asked for

18  a couple of -- minor modification to the proposed order

19  regarding payments to insiders and that the words directly

20  or indirectly were inserted, and I don't think that does

21  injustice to anyone who had previously signed off on the

22  proposed order, but I wanted to at least mention it.

23          THE COURT:  Okay.  I looked at the budget.  There

24  were two items that I just want somebody to clarify for me.

25  One of them says Alex Jones trial cost, what is that, for

Page 8

1    $80,000?

2              MR. BATTAGLIA:  Your Honor, Mr. Jones is -- has

3    required to appear at trial in Connecticut and he's unable

4    to travel, like perhaps your or I can in the sense he does

5    require security when he goes somewhere and he doesn't stay

6    in a hotel.

7              THE COURT:  Why is the Debtor paying that?

8              MR. BATTAGLIA:  I don't think that we're providing

9    --

10             THE COURT:  He's a defendant.

11             MR. BATTAGLIA:  Because --

12             THE COURT:  Isn't he -- Mr. Battaglia, isn't he a

13   defendant in the same lawsuit?

14             MR. BATTAGLIA:  He is a defendant as well as FSS.

15   Yes, Your Honor, and we had provisions in the lift stay

16   order that we could include a budget for his travel

17   expenses.  And I think some of his travel expenses really

18   relate to his being there on behalf of FSS.

19             THE COURT:  I received this 15 minutes ago.  We're

20   not going to do that.  You all can come back and ask for it,

21   but we're not paying for travel expenses for co-defendant on

22   15 minutes' notice to the Court about that.  Never seen that

23   before.  I'm not aware of it.  Somebody wants to come back

24   on additional notice, you're more than happy to do so.  It's

25   not a no, but it's not a today.  I need more information on

1    that.  So I'm just telling -- what are the other witness

2    expenses and trial costs?  What does that relate to?  Does

3    that relate to specifically to FSS or something else?

4           MR. BATTAGLIA:  They are employees of FSS that

5    plaintiffs have requested to be present or alternatively

6    FSS' counsel has requested to be present.

7           THE COURT:  Okay.

8           MR. BATTAGLIA:  At trial.

9           THE COURT:  Okay.

10           MR. BATTAGLIA:  And also was included in the lift

11    stay order that those expenses would be allowed to be

12    reimbursed.

13           THE COURT:  Relates to the FSS' defense.  I think

14    lifting the automatic stay makes perfect -- I entered an

15    order lifting the stay.  You're going to have to provide

16    some additional information, if somebody -- provide the

17    evidence today, we can take is up.  But if you want me to

18    sign an order today providing expenses for co-defendant in

19    litigation, I'm going to need more than just the parties'

20    agreement on that.  I think I have an independent duty to

21    take a look at this and I don't understand it.

22           But that's -- that just means somebody can come

23    back and ask for it.  It just means that literally this got

24    filed 15 minutes before the hearing and I've reviewed it and

25    you want me to sign it today.  That's what I'm wanting to

1    do.

2              Mr. Lemmon, let me ask you.  You're the -- far as

3    I know.  It sounds like there's agreement between the tort

4    plaintiffs and the Debtors.  You're still listed as a

5    secured party.

6              MR. LEMMON:  Yes, Your Honor.

7              THE COURT:  Your client is still listed as a

8    secured party.  I just need to make sure that you're okay

9    with this order.  It says an agreed cash collateral order.

10             MR. LEMMON:  Yes, Your Honor.  I reviewed the form

11   of order and my client has no objection.

12             THE COURT:  Okay.  Thank you.  So I know you got a

13   1:30 and Mr. Battaglia, you can tell me otherwise, but I'm

14   willing to sign the order today extending the use of cash

15   collateral to October the 12th at a hearing on the budget.

16   The rest of the budget looks fine to me.  Actually had one

17   more question.  And there was an increased cost to the

18   fulfillment expert.  What is that?  I did -- or who is that?

19             MR. BATTAGLIA:  It's Blue Ascension, Your Honor,

20   and this was the subject of the modification to the cash

21   collateral order.  It -- really travels based on estimated

22   sales for the period.

23             THE COURT:  Okay.

24             MR. BATTAGLIA:  And they're not completely

25   connected because of course the sales are presented to you

1   and all these expenses on an approval basis, but they don't

2   track day-to-day the shipping.  They happen a week later or

3   several days later, but it's an estimate of what's expected

4   to pay for both the shipping and the fulfillment cost that

5   has been presented or discussed in front of the Court

6   before.

7          THE COURT:  And that's different than the

8   fulfillment services line?  There's a line --

9          MR. BATTAGLIA:  Your Honor, I'm afraid I don't --

10          THE COURT:  There's a line item for fulfillment

11   services.

12          MR. BATTAGLIA:  I need to --

13          THE COURT:  There's a line item for fulfillment

14   services and then I see one for a fulfillment expert.  It

15   was there last time.  It just went up this time around.  I

16   just --

17          MR. BATTAGLIA:  I'm sorry --

18          THE COURT:  -- need to make sure --

19          MR. BATTAGLIA:  I'm sorry, Your Honor.  The

20   fulfillment expert is after the hearing in which Blue

21   Ascension became something of an issue.  Mr. Schwartz, in

22   trying to fulfill his obligations and resolve the questions

23   that had been presented, has hired someone to come in and

24   evaluate the fulfillment operations of Blue Ascension and to

25   evaluate the cost structure.

```
 1              THE COURT:  I remember that.

 2              MR. BATTAGLIA:  And under --

 3              THE COURT:  I remember that.

 4              MR. BATTAGLIA:  So.

 5              THE COURT:  I remember that.  Yeah.

 6              MR. BATTAGLIA:  That's what that line item is for.

 7              THE COURT:  Got it.  Got it.  Got it.  Yeah, I

 8    remember that and I do remember Mr. Schwartz talking about

 9    that at the last interim hearing on August 24.  So that

10    makes sense to me.  I have no additional questions.

11              Mr. Nguyen, Ms. Haselden, are you all okay with --

12    if I sign this order with the provisions that I've set

13    forth?

14              MR. NGUYEN:  Yes, Your Honor.  We have no

15    objections to the cash collateral.  It was the deal that was

16    struck and we were involved.  I've taken a look at it.

17              THE COURT:  Okay.

18              MR. NGUYEN:  I'm fine with the order.  Thank you.

19              THE COURT:  Thank you.

20              MS. HASELDEN:  Yes, Your Honor.  We have no

21    objection with the changes that are --

22              THE COURT:  Okay.

23              MS. HASELDEN:  -- Ms. Freeman --

24              THE COURT:  And again, with the other part, people

25    -- I just, I don't have any evidence as to why that's
```

1   necessary or how it's -- why FSS should pay for it.  I'm

2   happy to hear evidence on it, if there is any.  If not,

3   we're all going to --

4          MR. BATTAGLIA:  Your Honor --

5          THE COURT:  We're all going to come back in a

6   couple weeks.  It's just -- I haven't, I'm not comfortable

7   doing it today.

8          MR. BATTAGLIA:  Your Honor, this is Ray Battaglia

9   again.  I understand.  I'll -- if you would like, I'll

10  revise the budget accordingly or with the Court, made their

11  --

12         THE COURT:  No.

13         MR. BATTAGLIA:  -- certainly says if the budget

14  doesn't, so I'll -- whatever the Court --

15         THE COURT:  I can --

16         MR. BATTAGLIA:  -- favors and then we'll come back

17  and ask the Court for --

18         THE COURT:  Okay.  I can --

19         MR. BATTAGLIA:  -- those expenses with more

20  explanation.

21         THE COURT:  I can figure it out on my end and I

22  think it's just a short line or something, either in the

23  order or just striking it --

24         MR. BATTAGLIA:  Yes, sir.

25         THE COURT:  -- from the budget, but I can sign it.

1    Mr. Lemmon, if you can just confirm you're okay with me

2    signing the order as provided.

3              MR. LEMMON:  Yes, Your Honor.  My client has no

4    objection.

5              THE COURT:  Okay.  Okay.  Thank you.  And I've

6    heard from the United States Trustee.  I've heard from

7    Subchapter V Trustee.  I will sign that order.  Looks like

8    sales are still doing really well, which is good for FSS.

9              So, okay.  I will now turn things over to, guess

10   Mr. Moshenberg, you filed the motion.  Turn it over to you,

11   sir.

12             MR. MOSHENBERG:  Thank you, Your Honor.

13             THE COURT:  You can move that mic closer to you.

14             MR. MOSHENBERG:  Sure.

15             THE COURT:  No problem.

16             MR. MOSHENBERG:  Can you hear me all right, Your

17   Honor?

18             THE COURT:  Just fine.  Thank you.

19             MR. MOSHENBERG:  Thank you very much and thank you

20   for hearing this issue so quickly, Your Honor.  So as the

21   Court is well aware, this cash collateral issue is something

22   the parties are continuing to debate and do discovery on and

23   we're preparing for that cash collateral hearing, looks like

24   on October 12th.

25             One of the issues in that cash collateral motion

1   has to do with the nature of the PQPR debt, as the Court

2   knows.  It's not only the nature of the debt but also how

3   that debt was arrived at and the actual amount of the debt

4   itself.  As the Court knows, we've worked together with Free

5   Speech Systems in terms of reaching interim cash collateral

6   orders, same thing with PQPR, and that's something we've

7   been very proud of, the fact that we've been able to work

8   with them when needed.

9          And one of the agreements that the parties reached

10   and the Court entered an order on was Document 98 which is

11   the second cash collateral order.  And Paragraph No. 14,

12   Your Honor, really codifies the agreement that the Court

13   blessed that the parties to do discovery as it relates to

14   the cash collateral order and what it says is it provides

15   that PQPR as well as FSS, but really we're focused on PQPR

16   today, PQPR was supposed to provide documents in response to

17   document -- to discovery requests and provide other

18   discovery responses by certain date.  Then after that date,

19   the parties were going to have a deposition of PQPR's

20   corporate representative.

21          Paragraph 14 of Document 98 also says that if

22   there's some sort of dispute relating to the discovery, then

23   that the parties can move on an emergency basis.  Now, that

24   being agreed to, the parties did issue discovery requests

25   and the Texas plaintiffs served discovery requests that were

1    focused on this targeted issue about the nature of the PQPR

2    debt and the amount of the PQPR debt.

3           And just so the Court understands, Exhibits 1, 2,

4    and 3 to the motion to compel, I've conferred with opposing

5    counsel and their finding that admitted.  That way Jarrod

6    can leave a little sooner without having to get those

7    documents in.

8           THE COURT:  Let's make him stay.  Just fine.

9    Thank you.

10          MR. MOSHENBERG:  But Documents 1, 2, and 3 in

11   support of that motion or exhibits, rather, it's the

12   discovery request, the responses, and then the attempt to

13   meet and confer.  Now, the cash collateral motion, you know,

14   of course the underlying notes, the cash collateral here

15   that PQPR has with Free Speech Systems, it's not an ordinary

16   note that you would find, for instance, when a bank is

17   giving out a secured loan for a promissory note.

18          What you have here is you've got promissory notes

19   that are basically memorializing 50-some million dollars,

20   $53 million in past obligations owed.  So it's not future

21   money being paid out under a security arrangement.  It's

22   supposedly some legal obligation to pay a debt that was

23   incurred in the past.

24          And so a lot of our discovery requests were

25   focused on figuring out what's the nature of that underlying

```
 1    debt that preceded the promissory notes.  And that's why we
 2    just served those discovery responses that are in Exhibit 1
 3    and the responses that are in Exhibit 2.  The problem is --
 4    and this is in Exhibit 2 -- is that the responses PQPR
 5    provided list a bunch of boilerplate objections and then it
 6    just states what documents PQPR has decided to produce.
 7            What we have a problem with their responses is
 8    first of all, there's really two issues.  The first one is,
 9    we don't really know whether responsive documents are being
10    withheld on the basis of an objection.  They just provide
11    these boilerplate objections saying we object to this
12    request, here's what we'll produce.  It's unclear from the
13    responses, are there other responsive documents out there
14    that are responsive to that request that are being withheld.
15            THE COURT:  Have the parties conferred?
16            MR. MOSHENBERG:  We have tried to.  We did speak
17    this morning, Your Honor.  So we tried to confer for several
18    days, as Exhibit 3 shows to our motion.  We didn't hear
19    anything for a long time, Your Honor.  Finally, yesterday,
20    after they filed their response, there was a brief
21    communication where they sort of invited us to send another
22    email and explain what we want, and we did that.
23            We sent a long email detailing the documents we
24    want and why we want them, and they responded and they
25    basically said the effect of well, you don't need to have
```

1    these documents.  First, take the deposition and then see if

2    you need the documents.  Obviously, that's not what the

3    discovery rules contemplate.  If there's responsive

4    documents out there and they're discoverable, then we have a

5    right to receive them.

6           Of course, in practice, you need the documents in

7    order to take a meaningful deposition.  So legally, I don't

8    really understand why that's a reason to not turn over a

9    responsive document.  Doesn't make any sense in normal

10   practice of law, but especially doesn't make sense given

11   that the parties already agreed that they were going to turn

12   over responsive documents before the deposition, and that's

13   what Document 98, Paragraph 14 shows.  So I don't really

14   understand the basis for that.

15          The other issue that they mention is they sort of

16   indicate there might be some responsive documents.  There

17   may not be other ones.  They don't exist.  If -- and this

18   really is a big part of the issue.  We don't want responsive

19   documents being held on the basis of an objection.  If there

20   are no responsive documents, they're required under Rule 34

21   to say so.  We just want to know that there's no documents

22   out there that are being withheld.  And it seems like for

23   some of these discovery requests, that may be the case.

24          What they need to do is withdraw their improper

25   objections and just say, there's no responsive documents in

```
 1    --
 2              THE COURT:  Do you think some of these requests
 3    are overly broad?
 4              MR. MOSHENBERG:  I don't, Your Honor.  I'm happy
 5    to handle any specific --
 6              THE COURT:  Let's start.
 7              MR. MOSHENBERG:  Sure.
 8              THE COURT:  We're talking about cash collateral.
 9              MR. MOSHENBERG:  Yes, Your Honor.
10              THE COURT:  Produce all agreements, contracts, and
11    -- all agreements between FSS and PQPR.  What purpose does
12    that serve with cash collateral --
13              MR. MOSHENBERG:  It's --
14              THE COURT:  -- unrelated to the debt?
15              MR. MOSHENBERG:  Well -- and so when we --
16              THE COURT:  I'll give you a few.  Produce all
17    documents evidencing any agreements between FSS and PQPR.
18    Right?  Regardless if it relates to the debt.  Say there's
19    an agreement -- what do you mean by agreements, right?
20    That's different from contracts and promissory notes.  All
21    of them.  Produce -- let's see.  Produce all employee lists
22    for PQPR from September 1st, 2013 to the present.  Why do
23    you need to know who works at PQPR in 2013 to determine
24    whether the debt is owed at that amount or not?  I'm just
25    asking.  It's the kind of -- all documents and
```

1    communications evidencing, so every communication evidencing

2    the ownership of PQPR from its inception.  You don't find

3    that to be a little overly broad?

4            MR. MOSHENBERG:  No, I --

5            THE COURT:  Documents just saying, we formed PQPR

6    in 2013, so I'm going to have to go back in 30 days' notice

7    and file -- and find every email that shows every time that

8    they say that they're the owner from 2013 in connection with

9    a cash collateral hearing that was schedule to occur today?

10           MR. MOSHENBERG:  Well, not necessarily, Your

11   Honor.  But to be clear, we detailed in an email yesterday,

12   we talked to them about what we were specifically looking --

13           THE COURT:  -- not what you said.  You said you

14   didn't think some of these were overly broad.

15           MR. MOSHENBERG:  Sure.  And let me be clear, and

16   we can always -- of course, the rules allow us to narrow it

17   to the extent it is discoverable and I want to be --

18           THE COURT:  Taking you up on your first statement.

19           MR. MOSHENBERG:  Sure, Your Honor.  I don't think

20   the way that you read the question, Your Honor, the request

21   --

22           THE COURT:  I read it the way you wrote it.

23           MR. MOSHENBERG:  Sure.  And I want to be clear.  I

24   didn't perceive it that way.  When we as a group circulated

25   these drafts, what we're referring to, the draft contracts,

1  agreements, however they want to call it, between Free

2  Speech Systems and PQPR.

3          THE COURT:  -- I'm going.

4          MR. MOSHENBERG:  Sure.

5          THE COURT:  I think some of these are really

6  broad, but it could be narrowed to address what you need and

7  then I think Mr. Lemmon is going to have to tell me if these

8  -- some of these requests were narrowly tailored towards

9  cash collateral and the debt that exists, I understand your

10  initial -- his initial response, but maybe he was jammed for

11  time.  But now we're a couple of weeks out now and we're

12  going to go further, even further out.  I don't understand.

13  I think some of these requests can be narrowly tailored in a

14  way to specifically address the issue and I would need to

15  understand from PQPR whether they would still have an

16  objection to that.

17          But I -- you're asking me whether I think an

18  organizational chart is appropriate.  I do.  If you're

19  asking me whether they need to identify all facilities and

20  offices used by them, I don't know.  You'll have to tell me

21  whether that's appropriate or not, but I do think that the

22  parties could talk and narrowly tailor this in a way that

23  really gets to the heart.  I do understand the issue.

24          There were -- there was a large amount of debt

25  that was -- this is different.  This is not just a loan

1    agreement where money was advanced, a loan agreement was

2    signed and then funds were advanced on a loan and there was

3    security taken on that.  This seems to be a little different

4    and you're -- I think you're entitled to get documents that

5    are based on that.

6            MR. MOSHENBERG:  Sure.

7            THE COURT:  I just want -- I just think things can

8    be narrowly tailored in a way that really addresses what

9    you're doing that relates to cash collateral, and I'm happy

10   to do that, but I think the parties could really sit down

11   and see if that could get done, with my guidance.

12           I think there's a difference between seeking

13   documents for other purposes, and I'm not saying that's what

14   you did.  I just -- if we're going to limit it to cash

15   collateral, which is what's going on, then I think you can

16   get the docs and I think there are.  And I agree with you,

17   if all you are receiving is the underlying loan documents

18   and some worksheets, I think Mr. Lemmon is going to have to

19   tell me if there's more or admit that there's more or not.

20           But I think some of these can be more narrowly

21   tailored to address the debt, but that's a simple thing.

22           MR. MOSHENBERG:  I totally agree, Your Honor, and

23   candidly, my normal practice, I usually am able to meet and

24   confer and reach some sort of deal.  The reason the motion

25   was filed is because we just heard nothing for about a week

1    and we tried our best and, you know, it turns out Mr. Lemmon

2    was busy meeting with Ms. Haselden and trying to promote his

3    motion to investigate instead of doing the discovery he

4    promised to do under our agreement.

5           THE COURT:  That's right.  The motion to

6    investigate is still out there as well.

7           MR. MOSHENBERG:  Yes, Your Honor.  And we totally

8    agree.  You know, if there's room to narrow it, absolutely.

9    We're not looking for every document under the sun, so I

10   agree with you and I think we'll be able to work it out.

11   But I do want to be clear and I would love some guidance

12   from the Court.  I mean, our wish list is essentially to

13   make sure that if there are no responsive documents that

14   they withdraw their objections and say there's no responsive

15   documents, assuming that it's been tailored as the Court has

16   discussed.

17          And then if there are responsive documents that

18   are tailored as was discussed, that absolutely produce them.

19   And I'm happy to work with Mr. Lemmon on that.  I think we

20   could probably do that, and if not, we can come back to the

21   Court soon if that works.

22          THE COURT:  Okay.  That's perfect.  Thank you.

23   Let me hear from Mr. Lemmon.

24          MR. LEMMON:  Judge, I'm chagrined to be here on a

25   discovery motion.  I don't think I've appeared on a

```
 1    contested discovery motion in federal court in 20 years, but
 2    part of this is on me, and that is that Mr. Martin reached
 3    out to me on Labor Day by email and I read his briefly.  It
 4    was to me and to Mr. Battaglia and I believe --
 5              AUTOMATED VOICE:  Conference muted.
 6              MR. LEMMON:  -- the first part of it dealt with a
 7    privilege log, right, which I didn't really find applicable
 8    and I did not give his email, when I read it on my iPhone
 9    when I got off the golf course, the -- in the way that I
10    should have.
11              The follow-up email again came to me and I read it
12    on my iPhone the day before the creditors meeting and it was
13    Mr. Martin's suggestion we visit after the creditors
14    meeting.  I completely zoned on those.  Just didn't see
15    them.  So I was surprised when I got the emergency motion.
16    I called Mr. Martin because the Court will recall I'm the
17    person that offered discovery informally at the time of the
18    August -- I think it was -- 3rd hearing.  And -- because I
19    was going on vacation.
20              I wanted everybody to be able to get what we had
21    and we have somebody who did the forensic accounting
22    relating to the underlying debt and was instrumental in the
23    -- knows about the execution of the notes and that's the
24    person I've offered and whose work papers I've sent.  And
25    we've offered him repeatedly for deposition.  That
```

1    deposition is currently set for October 4th and I suppose

2    that the plaintiffs will go forward taking it this time.

3            I had talked originally with Mr. Martin and I

4    thought we had an agreement that I was going to produce the

5    documents related to the existence of the debt which I

6    viewed as the key issue related to cash collateral.  And we

7    will.  We will absolutely produce everything related to the

8    existence of the debt or reasonably related to the existence

9    of the debt, Your Honor, and I don't have a problem with

10   that.

11           THE COURT:  You think that includes negotiations

12   surrounding the formulation of the debt?

13           MR. LEMMON:  I believe that there are no documents

14   regarding the negotiations regarding the formation of the

15   debt.  The way the debt occurred, Your Honor, was that PQPR

16   sold to FSS on open account and they kept a ledger, right.

17   And so those accounting issue -- entries are all, of course,

18   relevant, right.  My problem is that -- and when we got the

19   document requests while I was on vacation, it demanded a

20   response in eight days at that time.

21           We weren't able to do that.  My problem is that

22   that ledger has a lot of other things in it, right, such as

23   every purchase my client's ever made.  Right, it's my

24   client's general ledger and we don't find that to be germane

25   to any of the discussions.  So what we have is we have a

1    compilation done by the forensic accountant of all of those

2    and we can work with everybody to get them what they need

3    regarding the existence of the debt.  I don't have a problem

4    with that, Your Honor.

5            Just want to say one other thing, and that is

6    yesterday I called Mr. Martin and I said, what is it that

7    you guys really want.  And he said well, we need your

8    spreadsheets in native format and I agreed immediately.  I

9    said, they won't be Bates labeled that way, but we'll give

10   them to you.  And he said Mr. Moshenberg may want something

11   different.  I got an extensive email from him last night.  I

12   responded.  I called him.  Finally reached him this morning.

13           I said, what is it that you really want on an

14   emergency basis.  He said, I need you to withdraw every

15   single one of your objections and produce every single

16   document.  Judge, we will absolutely work with him.

17           Let me just mention one other thing, Your Honor,

18   that's a concern to us and that is we have asked for a

19   protective order in this case and we've circulated.  We

20   think we have agreement on the protective order, but there

21   are parties that are downloading our documents that we sent

22   to them and I don't know who those parties are exactly.

23           And so I've asked for them to tell us who has

24   signed off on the protective order but this illustrates one

25   of the problems in this case and that is, you know, this is

1    my client's proprietary information and we do not want it

2    traveling around the world.  So -- and so the protective

3    order that everybody has agreed to is just the standard

4    Southern District protective order with no changes

5    whatsoever.  But for that reason, we have concerns about

6    production in this case and we do need the signed signature

7    pages on the protective order before people are downloading

8    our documents.

9         So with all that said, Your Honor, we absolutely

10   will produce all of the documents relating to the debt.  You

11   know, we just need this tailored a little bit and we'll get

12   them all of that.

13        THE COURT:  Let me -- what I'm thinking about

14   doing, a couple of things and Mr. Lemmon, (indiscernible)

15   stand here, I want you to -- give the opportunity to react

16   to what I'm saying.  I'm going to deny your request for

17   emergency consideration to appoint the Subchapter V Trustee.

18   I'm going to -- expand the powers of the Subchapter V

19   Trustee.  I want to take everything up at one time.  I want

20   to take everything up on the 12th.  I want to think about

21   everything and I'm going to make a decision about

22   everybody's requests at that time.

23        That doesn't mean that the Subchapter V Trustee

24   can't, if she's doing whatever work she has, I'm not here to

25   impede whatever she's doing.  I'm just saying I want to take

1    up the consideration and sign whatever I'm going to sign

2    because what I don't want to do is, quite frankly, limit her

3    or limit myself in any way.  I want to have the full range

4    of options to -- based on evidence that I hear as to what I

5    think the Subchapter V may or may not be doing.  May want to

6    do more.  May want to do a little bit less.  Just -- I just

7    need to hear what the evidence is and I want to take it up

8    all at the same time.

9           I'm also going to say I don't think I need to rule

10   on anything today, but everybody reserves the right to come

11   back and tell me.  I am asking all of the professionals in

12   this case -- I understand the history here.  Understand that

13   there's a lot of tension between clients but I expect the

14   professionals to work together and to do it, so I think I'm

15   really reaching out to both sides, asking everyone to really

16   consider the rhetoric in the papers and the -- what gets

17   presented at the hearing.

18          I just am asking all the professionals to really

19   talk about what they want in connection with this hearing

20   and what you need in connection with cash collateral.  And

21   if the parties can't work it out, then come back to me but -

22   - I'll leave it there.

23          I think there's a way for you -- comes to

24   questions about protective orders, I think that's standard.

25   I think professionals should be able to work through that

```
 1    really easy.  So I hope no one is downloading information

 2    and taking advantage of information without protection, if

 3    that's what folks are looking for.  At the same, Mr. Lemmon,

 4    when it comes to PQPR, if there are additional documents

 5    that are responsive, at some point someone's going to have

 6    to say I do agree with Mr. Moshenberg; here's all I've got

 7    and I've got nothing else, and I think that representation

 8    is standard.

 9            I don't think you need to remove your objection,

10    quite frankly, but I do think at some point people need to

11    know, you know, this is all you've got so that when they

12    show up to a hearing, they know that they've received all

13    responsive documents -- responsive nonprivileged documents.

14    So -- and I know the professionals here.  I'm talking very

15    basic standard things here, so I'll leave it there.

16            MR. LEMMON:  And Judge, just so I'm clear, and we

17    will produce everything related to the debt.  We would

18    produce an org chart.  I'm told there is not one.  But we

19    don't have a problem at all with that and we'll take all

20    these things up on the 12th, I suppose.

21            THE COURT:  That's when I want to take it up.  If

22    parties have different views on all this, they can certainly

23    take it up, but I don't want to take it up.  I don't know

24    what I'm going to hear on the 12th.

25            MR. LEMMON:  Sure.
```

```
1              THE COURT:  And regardless of how I rule on the
2    12th, I think the Subchapter V Trustee has to do her job and
3    do her job the way she sees fit, so that's not for me to --
4              MR. LEMMON:  May --
5              THE COURT:  -- up now.
6              MR. LEMMON:  May I say one thing, Your Honor?
7              THE COURT:  Sure.
8              MR. LEMMON:  And -- the meeting we had yesterday
9    with the Subchapter V Trustee and counsel was characterized
10   as some sort of sales job.  Would that I was such a great
11   advocate that I could put a sales job over on Ms. Freeman or
12   --
13             THE COURT:  I don't want to get into it.
14             MR. LEMMON:  -- you know, Ms. Haselden and it's --
15   it was informational.  We're happy to cooperate to the
16   fullest extent with the Sub V Trustee, so.
17             MR. MOSHENBERG:  (indiscernible).
18             THE COURT:  Yeah, absolutely.
19             MR. MOSHENBERG:  I am confident we're going to be
20   able to work together and figure out the scope of what is
21   discoverable, but I do want to make sure we're on the same
22   page about timing, Your Honor.  We have a deposition on the
23   4th.  His position has been that you can get the documents
24   after the deposition.  We think we're entitled to them
25   beforehand.  That was what was agreed to.
```

```
 1              THE COURT:  I feel really confident that that's
 2    probably not going to be the case after today.
 3              MR. MOSHENBERG:  That -- I'm sorry.
 4              THE COURT:  That you will receive the documents in
 5    time to take a deposition.
 6              MR. MOSHENBERG:  That we will?
 7              THE COURT:  Yeah.
 8              MR. MOSHENBERG:  Okay.
 9              THE COURT:  I feel pretty confident about that,
10    without me having to get involved.
11              MR. MOSHENBERG:  I appreciate that, Your Honor,
12    and --
13              THE COURT:  I feel really confident that you're
14    not going to get them, like, October 1st, either.  You know,
15    that you'll get them in due course as quickly as possible on
16    a rolling basis.
17              MR. MOSHENBERG:  I appreciate that.
18              THE COURT:  That sounds right to me.
19              MR. MOSHENBERG:  I appreciate that, Your Honor.
20              THE COURT:  And look, I'm here on 24 hours'
21    notice, so if you get nervous, if things are getting tight
22    and you don't think things are going the way they are, I can
23    -- you know, it's just an email to my case manager, right,
24    and we can get on the phone in less than 24 hours we can
25    have a hearing, or the same day.  So this isn't saying I'm
```

```
 1    continuing everything, right, and maybe the issue become

 2    moot.  Maybe it doesn't.  But I'm here and I'm just hoping

 3    that the professionals can -- I'm asking the professionals

 4    to get in a room and have a serious meeting about what's

 5    needed.  I think you're probably entitled to a lot of what

 6    you've asked for but maybe it just needs to be narrowed in a

 7    way that would make sense in light of the timing in terms of

 8    where we are, and I think that can be accomplished in fairly

 9    short order.  The documents either exist or they don't.  Mr.

10    Lemmon either can produce them or not and we'll see where it

11    goes.

12             MR. MOSHENBERG:  That's fair, Your Honor.

13             THE COURT:  And everybody's rights are reserved.

14    Everybody's rights are reserved, U.S. Trustee's rights, any

15    other creditors' rights, Subchapter V Trustee's rights,

16    Debtor's rights, everybody's rights are reserved on these

17    issues.  I think we've just got to get to the 12th and then

18    see where things go, right, and if this gets -- we'll see

19    where things are at that time.  But I'm really, really

20    asking the professionals to hear what I'm saying and I don't

21    think anyone has to agree on anything.

22             I do think it makes sense to be civil and work

23    through these issues as the professionals, take care and do

24    it.

25             Is there anything -- I'm going to sign that order,
```

007097

1    cash collateral extension order today.  Let me ask the U.S.

2    Trustee, since I've got you here.  Is there anything -- I

3    saw that you filed objections to certain retention

4    applications.  Two of those individuals aren't here, so I

5    don't want to pick a date to take that up.  I don't want to

6    take it up on the 12th.  That seems like a lot --

7           MR. NGUYEN:  Understood, Your Honor.  Mr. Shannon

8    --

9           THE COURT:  -- in one day.  Mr. Shannon, I just --

10   but maybe you all can get together and we can pick a date

11   and just reach out to my case manager at that time.  I don't

12   need to comment.  I haven't read them -- haven't read

13   anything.

14          MR. NGUYEN:  Sure --

15          THE COURT:  I just say that it got filed, but

16   maybe we can pick a date.  There's a lot, I think, scheduled

17   for the 12th and I think there's -- has to be a day where we

18   can do retentions on a separate track.

19          MR. SHANNON:  Yeah.  Your Honor, one thing that --

20   there is a status hearing set in this case for September

21   20th.

22          THE COURT:  Yes, that's --

23          MR. SHANNON:  And I think that's probably about

24   the -- you know, it's quick, but still has some time for

25   gathering the required information.  So Your Honor, we would

1    request setting those applications to employ the CRO and

2    Shannon and Lee LLP on that date, if possible.

3            THE COURT:  You want to take it up at that hearing

4    on the 20th?

5            MR. SHANNON:  Yes, on September 20th.

6            MR. NGUYEN:  Your Honor, I have no problem with

7    that.  I understand Mr. Shannon doesn't want to put his

8    employment at risk.  He doesn't want to work longer than,

9    you know, Your Honor's --

10           THE COURT:  No, no, no.

11           MR. NGUYEN:  I'm certainly -- you know, we'll work

12   with the schedule.  I told Mr. Shannon this morning,

13   whenever he wants to do it, we'll be ready.  We'll raise our

14   objections and go forward with it.

15           THE COURT:  Let me just take a look at something.

16   Scheduled at one o'clock for the 20th?  Is that right?

17           MR. SHANNON:  I believe so, Your Honor.

18           THE COURT:  Okay.  Okay.  Yeah, let's take it up

19   at one.  Okay.  That works for me, September 20th at 1 p.m.

20           MR. NGUYEN:  And just for clarity, Your Honor, Mr.

21   Shannon and I spoke this morning.  He requested a little bit

22   more clarity on my objection.  I use an entity instead of an

23   individual.  I normally do that to tone down the rhetoric,

24   but Mr. Shannon asked me to be more clear in terms of when I

25   make the --

```
1              THE COURT:  I understand.

2              MR. NGUYEN:  I'm going to file a corrected motion.

3    If he wants me to be clear, I'm happy to do it and I'm not -

4    - I just want to make sure the record's clear.  That

5    corrected motion is going to be filed sometime this

6    afternoon or by the end of the day.

7              And then the second thing is, we talked about some

8    limited discovery.  It's very limited in terms of the scope

9    of the employment -- the scope of the engagement that

10   occurred between May 24th through May 31st, and Mr. Lee in

11   his declaration, there was about $21,000 of services.  I

12   asked Mr. Shannon to explain what those services are and we

13   just need some records of that to go forward with twenty --

14   other than that, I don't intend at the hearing on the 20th

15   it's going to go long.

16             THE COURT:  Okay.  No, no.  I'll give it as much

17   time as we need.  It's important, but I appreciate it so

18   that -- really appreciate you thinking about that.  So can

19   we -- do you think, Mr. Schwartz, we can take that up on the

20   20th as well?

21             MR. SHANNON:  I believe Mr. Schwartz will be here

22   anyway.

23             THE COURT:  For the status report?

24             MR. SHANNON:  For the status report.

25             THE COURT:  Okay.
```

1          MR. SHANNON:  And again, Your Honor, I do believe

2    that the U.S. Trustee's primary objection is about the

3    disclosures in the InfoW case.  That's really the crux of

4    the objection and what will need to be investigated, so it's

5    not -- I don't think it goes beyond that.

6          MR. NGUYEN:  That's correct.  There was a prior

7    nondisclosure that occurred before you.  There's going to be

8    some legal arguments on how you should address that, but

9    that's where we are with the objection.

10         THE COURT:  I can -- we'll take it up on the 20th

11   and if Mr. Schwartz, you can just -- I will assume Mr.

12   Schwartz will be here, but if anything changes just reach

13   out to Ms. Saldana and let her know, but I will -- we will

14   set Schwartz' application as CRO and Shannon and Lee and

15   take it up at -- on the 20th.

16         Ms. Haselden, anything we need to talk about?

17   Anything from your perspective before the 20th?

18         MS. HASELDEN:  (indiscernible).

19         THE COURT:  All right.  I do note -- and this is a

20   hyper technical point and I want to -- well, you're telling

21   me.  If there's anything you want to talk about, I'll take a

22   look at something.

23         MS. HASELDEN:  Your Honor knows this case is very

24   unusual and because of the motions that have been filed by

25   both the parties in the case, the Debtor and the plaintiffs,

007101

1    seeking to expand my role, I mean, I've found it necessary

2    first to go ahead and engage counsel.  And then, you know,

3    Mr. Lemmon had requested that we meet with his client and

4    because of the nature and the posture of the case, we went

5    ahead and set the meeting.  I think, you know, at some point

6    we will need a little clarification on exactly what I need

7    to do.

8            Normally, some of this investigatory work, you

9    know, is not necessary, so I guess between now and the 12th,

10   I'll try to figure out --

11           THE COURT:  Yeah, look, I mean, I'm interested to

12   know your thoughts as well on -- you know.  That's why I

13   don't want to -- I don't want to take anything up on a rush.

14   I don't know what the evidence is.  I don't know what the

15   evidence is going to show.  May show something, may show

16   nothing.

17           I think I'd want to know if, you know, as I

18   consider expanding the role of the Subchapter V Trustee,

19   what you would see that role to be and what you think it

20   should be as well, if anything.  I don't want to put any

21   words or thoughts in your -- in you.  I just want to know

22   that I -- you're an important part of the Subchapter V

23   process and I want to know what you think.  Okay?

24           MS. HASELDEN:  Thank you, Your Honor.  Yes.  We're

25   learning and the parties are all at this point cooperating

1    and providing information.

2         THE COURT:  So Mr. Shannon, the only hyper

3    technical point is 1188(c) requires the report get filed on

4    the docket before the meeting, 14 days before.

5         MR. SHANNON:  Yes, Your Honor.  I believe you --

6         THE COURT:  The hearing.

7         MR. SHANNON:  I believe you filed an order that

8    set the date that the --

9         THE COURT:  I did.

10        MR. SHANNON:  -- status report needs to be filed.

11        THE COURT:  I did.

12        MR. SHANNON:  And I believe it's today, is what

13   that order says.

14        THE COURT:  No.  That's what I was trying to --

15        MR. SHANNON:  I'm sorry.  I don't remember the

16   docket number, unfortunately.

17        THE COURT:  Yeah.

18        MR. SHANNON:  Around 50 or so.

19        THE COURT:  That makes two of us.  Let's see.  If

20   today's the day, I just want to make sure something gets

21   filed so we comply with the code.  That's where I was going.

22   It wasn't to -- anything other than that.  I just want to

23   make sure that we're complying with -- that a status report

24   gets filed so that we're compliant with the Bankruptcy Code.

25        MR. SHANNON:  Yes, Your Honor.  And I just went,

```
 1   what your order said rather than --
 2           THE COURT:  No, no, no, you should.  You should.
 3           MR. SHANNON:  Okay.
 4           THE COURT:  No, no, no.  You absolutely should.
 5   No, I -- we set them for a reason on that date and I
 6   remember and I just want to make sure that we're all on the
 7   same page.  Yeah, it's Docket 65, so --
 8           MR. SHANNON:  Yes, Your Honor.  I believe
 9   originally the status report, the idea was to actually have
10   it a week after that.  Mr. Schwartz will be out of the
11   country during that week, so I believe that the date for the
12   status conference got pushed back a week and the report did
13   move as well.
14           THE COURT:  No, no, no.  I think we're all on the
15   same page.  Think we're all on the same -- yeah.  Today's
16   your day.
17           MR. SHANNON:  All right.  Thank you, Your Honor.
18           THE COURT:  Sounds like you're having some fun
19   this afternoon.  All right, folks.  Anything else we need to
20   talk about?  All right.  Thank you, everyone.
21           CLERK:  All rise.
22
23       (Proceedings adjourned at 1:49 p.m.)
24
25
```

```
1                        CERTIFICATION

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 20, 2022
```

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**SANDY HOOK FAMILIES' JOINDER TO UNITED STATES TRUSTEE'S AMENDED OBJECTION TO THE APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR AND (B) GRANTING RELATED RELIEF**
**[Related to ECF Nos. 85 and 154]**

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively the Texas Plaintiffs) and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively the Connecticut Plaintiffs) (and together the Sandy Hook Families) hereby file this joinder (Joinder) to the *United States Trustee's Amended Objection to the Application of Debtor for an Order (A) Authorizing the Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief* (the Objection) [Dkt. 154], filed in response to *Application of the Debtor for an Order (A) Authorizing the Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel to the Debtor and (B) Granting Related Relief* (the Employment Application) [Dkt. 85]. In support of this Joinder, the Sandy Hook Families state as follows:

1.  The Sandy Hook Families join in, and hereby incorporate by reference, the arguments made by the United States Trustee in the Objection.

007106

2.     The Debtor filed its Employment Application on August 20, 2022.

3.     The United States Trustee filed the Objection on September 14, 2022.

4.     For the reasons stated in the Objection and this Joinder, the Sandy Hook Families respectfully request that the Court deny the Employment Application and grant such other and further relief as it may deem just and proper.

Respectfully submitted this 15th day of September 2022.

MCDOWELL HETHERINGTON LLP

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, PC

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Bankruptcy Counsel for Connecticut Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Joinder has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 15th day of September 2022.

_____*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

007108

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**DEBTOR'S REPLY TO UNITED STATES TRUSTEE'S AMENDED OBJECTION TO
THE APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTORIZING
EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR
THE DEBTOR, AND (B) GRANTING RELATED RELIEF**

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession

in the above-captioned chapter 11 case, replies to the U.S. Trustee's amended objection [ECF. No.

154] (the "Objection") to the Application of Debtor for an Order (A) Authorizing Employment of

Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief

[ECF No. 85] (the "S&L Application") as follows:

**PRELIMINARY STATEMENT**

1.      The U.S. Trustee does not dispute any of the allegations in the S&L Application or

contend that S&L does not meet the requirement to be employed under Bankruptcy Code § 327(a).

There is no disagreement that (a) S&L does not hold or represent any disqualifying adverse interest

and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application

¶¶ 21 & 26); (b) the FSS Lee Declaration disclosed all relevant connections in this case

(Application ¶ 29); (c) S&L is well qualified and uniquely able to represent FSS in its chapter 11

case in an efficient and timely manner (Application ¶ 11); (d) the familiarity of S&L professionals

with the Sandy Hook Litigation was particularly important to the Debtor as debtor in possession

in the early parts of the case (Application ¶ 8); or (e) S&L's agreed terms of reimbursement,

compensation, and hourly rates are reasonable (Application ¶ 14). Nor does the U.S. Trustee assert that denial of the S&L Application would benefit the Debtor's estate or aid administration of the case.

2.    Instead, the basis for the Objection is that Kyung Lee did not supplement his declaration (the "IW Lee Declaration") in support of the IW Debtors' application to employ Kyung S. Lee PLLC ("KSLPLLC") in Case No. 22-60022 (the "IW Cases") in the four (4) business days between May 24, 2022, when Mr. Lee met with FSS regarding its potential restructuring, and June 1, 2022, when the U.S. Trustee and the IW Debtors agreed to the dismissal of the IW Cases.[1] The U.S. Trustee wants this Court to not only find that Mr. Lee's disclosure violated Bankruptcy Rule 2014, but also that the violation was so severe that it warrants what is in effect imposing a sanction in a *different* case by denying the application of a *different* Debtor to employ a *different* law firm. The U.S. Trustee's position is not supported by the law or facts.

3.    Bankruptcy Rule 2014 requires a verified statement disclosing connections to accompany an application to employ, and courts have held that Bankruptcy Code 327(a) implies that the obligation continues for professionals that are employed by or are seeking employment by the estate. But Mr. Lee and KSLPLLC were no longer seeking to be employed in the IW Debtors' cases when he began providing services to FSS on May 24, 2022.[2] After reaching agreements resolving the claims of the Connecticut Plaintiffs (on May 13, 2022) and the Texas Plaintiffs (on May 18, 2022), the IW Debtors decided to agree to dismiss their cases as demanded by the U.S.

---

[1] Of the seven (7) total days the trustee takes issue with, May 28-30, 2022, comprised the Memorial Day weekend. On May 25, Mr. Lee informed the U.S. Trustee and the Subchapter V Trustee by email that the IW Debtors intended to dismiss their case. A copy of this email is attached as Exhibit A hereto. On May 26, Mr. Lee attended the section 341 meeting of creditors for the IW Debtors, at which he informed the parties in attendance that the IW Debtors had decided to agree to the dismissal of their cases, as requested by the U.S. Trustee, and would work to effectuating such dismissal. On May 27, 2022, Mr. Lee was negotiating the stipulation of dismissal with the U.S. Trustee that was ultimately filed with the Court on June 1.

[2] Mr. Lee was not formally retained by FSS until June 6, 2022. The services provided by Mr. Lee in May 2022 were related to becoming familiar with FSS and its financial condition.

2

Trustee. By May 23, 2022, Mr. Lee had drafted a motion to dismiss the IW Cases. Mr. Lee was not at that time seeking to be retained as an estate professional in any meaningful way. IW Debtors had already decided not to employ Mr. Lee or any other professionals.

4.      Further, even if Mr. Lee was required by Bankruptcy Rule 2014 and Bankruptcy Code 327(a) to supplement his disclosure of connections despite the IW Debtors' decision to dismiss, that oversight would not justify denying *this* Debtor's application to employ Shannon & Lee LLP in *this* chapter 11 case. None of the authorities cited in the Objection support that position and the relief would be entirely unprecedented.[3] While the Court has discretion to consider factors beyond just compliance with Bankruptcy Code 327(a), that discretion should be reasonably applied. What matters is whether employing S&L benefits the Debtor's estate and furthers administration of its chapter 11 case. The U.S. Trustee does not dispute these issues favor approving the employment of S&L.

5.      Whether Mr. Lee's disclosures in the IW Cases were sufficient should be addressed separately from the Application. The procedurally proper way for the U.S. Trustee to raise the issue would be to reopen the IW Cases and seek sanctions against Mr. Lee. Inflicting collateral damage on the Debtor, its estate, and the administration of this chapter 11 case by denying the Application is entirely unjustified.

## ARGUMENT

### A. Mr. Lee's Disclosures in the IW Cases Complied with Bankruptcy Rule 2014.

6.      Bankruptcy Rule 2014 requires applications to employ professionals to "be accompanied by a verified statement of the person to be employed setting forth the person's

---

[3] While this might seem like hyperbole, it is not. Attached as Exhibit B hereto is a summary and analysis of each of the twenty-seven cases cited in the Objection. Not a *single* case cited in the Objection supports what the U.S. Trustee asks the Court to do here.

007111

connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." As the U.S. Trustee states in the Objection, the "one primary purpose" of these disclosures is "to facilitate strict compliance with section 327." Objection ¶ 45.

7.     Although the text of Bankruptcy Rule 2014 does not require continuing disclosures, courts have held that Bankruptcy Code § 327 implies this obligation. *See, e.g.*, *In re C & C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex 2001) (holding that although Rule 2014(a) does not expressly require supplemental or continuing disclosure, duty is implied pursuant to § 327); *In re Keller Fin. Serv. of Florida*, 243 B.R. 806, 813 (Bankr. M.D.Fla. 1999) (duty of continuing disclosure under Rule 2014(a) is implied by requirements of § 327); *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (Section 327(a) implies a duty of continuing disclosure and requires professionals to reveal connections that arise after their retention.). The reasoning is that ongoing disclosures are necessary to ensure that the professionals that have been retained remain conflict free. The Fifth Circuit Court of Appeals has adopted this reasoning and held that professionals employed or seeking employment as estate professionals must "to promptly notify the court if any potential for conflict arises." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005).

8.     No court has held that Bankruptcy Rule 2014 requires ongoing disclosure by persons that are *not* seeking to be employed as an estate professional, such as when a case has been That makes sense—the "one primary purpose" of the disclosures required under Bankruptcy Rule 2014 no longer exists when the professional will not be employed under Bankruptcy Code § 327. The U.S. Trustee is asking for the Court to create law, not apply it.

007112

9.      When Mr. Lee met with FSS on May 24, 2022, the IW Debtors had already determined to dismiss their chapter 11 cases when Mr. Lee first provided services to FSS.  At that time the IW Debtors were no longer seeking to employ KSPLLC or any other party in interest as an estate professional. By May 18, 2022, the IW Debtors had effectively resolved all the claims of the Texas Plaintiffs [*see* Case No. 22-60020, Dkt No. 96] and the Connecticut Plaintiffs [*see* Case No. 22-60020, Dkt. No. 98]. Soon after the IW Debtors determined that continuing their cases in the face of the U.S. Trustee's continued opposition did not benefit the IW Debtors or their remaining creditors. By Monday, May 23, 2022, Mr. Lee had drafted a motion to dismiss the IW Debtors' bankruptcy cases.[4] And Mr. Lee promptly informed the U.S. Trustee by email on May 25, 2022, and other parties in interest at the 341 meeting on Thursday, May 26, 2022, that the IW Debtors intended to seek dismissal of their cases. Mr. Lee then promptly negotiated a stipulation of dismissal with the U.S. Trustee that was finalized and filed with the Court on June 1, 2022.

10.      Under these circumstances, Mr. Lee did not have an obligation to supplement his disclosures related to the IW Debtors' application to employ KSLPLLC. On May 24, the IW Debtors were no longer seeking to employ KSLPPC or Mr. Lee under Bankruptcy Code § 327(a). The statute therefore did not imply a duty to provide further disclosures at that time. The Objection presents cites no authority to the contrary.

11.      If the U.S. Trustee believed that ongoing disclosure of connections in the IW Cases was necessary to maintain the integrity of the bankruptcy process, the motion to dismiss those cases should have been withdrawn. The thrust of the U.S. Trustee's motion to dismiss—that the IW Cases were a litigation tactic—no longer applied because the Texas Plaintiffs and the Connecticut Plaintiffs no longer asserted claims against the IW Debtors. Supplemental disclosures

---

[4] A copy of an email from Mr. Lee to Marc Schwartz, Christian Schwartz, and Harold Lee of Schwartz & Associates LLC reflecting that Mr. Lee had drafted a motion to dismiss the IW Cases is attached as <u>Exhibit C</u> hereto.

007113

would have of course been necessary if the IW Cases had continued and the IW Debtors sought to employ KSLPLLC. But the U.S. Trustee opposed the IW Debtors remaining in bankruptcy the cases and the IW Debtors believed that the expense of that fight would outweigh any benefit. Ultimately, the U.S. Trustee's demands are the reason that a supplemental disclosure by Mr. Lee was not necessary.[5]

**B. Even *if* Mr. Lee Should Have Supplemented His Disclosures in the IW Cases, the Debtor's Application to Employ Shannon & Lee LLP in this Case Should Be Approved.**

12.     Of course, the sufficiency of Mr. Lee's disclosure of KSLPLLC's connections related to the IW Debtors' application to employ KSLPLLC in their cases is not the issue that the Court has to decide in the Application. The issue before the Court is whether it should authorize FSS to employ Shannon & Lee LLP as bankruptcy co-counsel in this chapter 11 case. The Court should reject the U.S. Trustee's improper request to indirectly punish Mr. Lee through this contested matter and grant the Application.

13.     The U.S. Trustee does not dispute that the Application and S&L meet all the requirements of Bankruptcy Code 327(a) and Bankruptcy Rule 2014 for employment in the Debtor's chapter 11 case. Nor does the U.S. Trustee dispute the allegations in the Application that (a) S&L does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 21 & 26); (b) Mr. Lee's declaration in this chapter 11 case disclosed all relevant connections in this case (Application ¶ 29); (c) S&L is well qualified and uniquely able to represent FSS in its chapter 11 case in an

---

[5] As indicated in the May 17, 2022, email from Jayson Ruff to Mr. Lee, attached hereto as <u>Exhibit D</u>, the U.S. Trustee's took the position in the IW Cases was that the remaining creditors—including holders of administrative claims—should be paid outside of the bankruptcy process from FSS and/or Alex Jones. That the U.S. Trustee now complains that "the Court never had the opportunity to rule on [KSLPLLC's] employment application in the InfoW Cases" is nothing but hypocrisy.

007114

efficient and timely manner (Application ¶ 11); (d) the familiarity of S&L professionals with the Sandy Hook Litigation was particularly important to the Debtor as debtor in possession in the early parts of the case (Application ¶ 8); or (e) S&L's agreed terms of reimbursement, compensation, and hourly rates are reasonable (Application ¶ 14). Most importantly, the U.S. Trustee does not contend that Debtor's employment of S&L is not the best interests of the Debtor's bankruptcy estate or useful to administration of the chapter 11 case.

14.     *Every* decision that the U.S. Trustee cites in the objection that is relevant to the topic indicates that the effect on the bankruptcy estate and administration of the case are the proper considerations that should guide the Court's discretion. The most clearly relevant include:

a.  *In re LTHM Houston-Operations, LLC*, 2014 WL 5449737 (Bankr. S.D. Tex. 2014)—In *LTHM*, the U.S. Bankruptcy Court for the Southern District of Texas held that it "is instructed to exercise its discretion by taking into account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system. Section 327(a) acknowledges that the purpose of the professional's employment is to represent or assist the trustee in carrying out the trustee's duties under this title. Accordingly, the Court must consider whether the benefits of employing [the professional] exceed the potential impact it may have on the trustee's ability to fulfill his duties to the estate." *Id.* at *5 (internal citations and quotation marks omitted).

b.  *In re Bigler, LP*, 422 B.R. 638 (Bankr. S.D. Tex. 2010)—In *Bigler*, the U.S. Bankruptcy Court for the Southern District of Texas considered an application to employ an investment bankruptcy firm that included a "tail period" provision under which the proposed professional would receive compensation even if the debtors consummated a transaction after terminating the employment agreement. The court held that in exercising its broad discretion, the court "focuses on whether the proposed terms are reasonable." *Id.* at 643.

c.  *In re Smith*, 507 F.3d 64 (2d Cir. 2007)— As directly quoted in the Objection, the Second Circuit Court of Appeals reasoned in *Smith* that "[i]n exercising its approval function, however, the bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." *Id.* at 71.

d.  *Harold & Williams Dev. Co.*, 977 F.2d 906 (4th Cir. 1992)—The Fourth Circuit Court of Appeals was even more clear in *Harold & Williams*, instructing that "once the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327 . . . the discretion of the bankruptcy court must be exercised in a

7

way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding." *Id.* at 910 (internal citations omitted).

The U.S. Trustee does not present a single case that even *suggests* that the Court should exercise its discretion to deny an application to employ a professional that meets the requirements of Bankruptcy Code § 327 because the circumstances created by the U.S. Trustee's demand for immediate dismissal in a previous case is contrary to his new-found appreciation and desire for the disclosures that would have been required absent such dismissal.[6]

15.     Denying the Debtor's Application to employ Shannon & Lee LLP would harm the Debtor's bankruptcy estate and hinder administration of this chapter 11 case. Although Mr. Battaglia is an excellent bankruptcy attorney—as he has demonstrated several times in this case—this matter is not a one-man job. And retaining any other attorney would not possess the significant knowledge and experience of the Debtor and the relevant litigation for which the Debtor retained S&L in this case. Again, the U.S. Trustee does not assert otherwise in the Objection.

**C.  If the Court Determines that Some Action Should Be Taken in this Chapter 11 Case to Address Mr. Lee's Disclosures in the IW Cases, the Debtor Submits that the Court Should Limit Shannon & Lee LLP's Compensation in this Case by an Appropriate Amount Considering the Novelty of the Issue.**

16.     The U.S. Trustee is in effect seeking a sanction against Mr. Lee for actions related to a different case, for a different client, and for a different law firm with the Debtor as collateral damage. *See, e.g.*, *In re EBW Laser, Inc.*, 333 B.R. 351, 359-60 (Bankr. M.D.N.C. 2005) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required by Rule 2014.") (quoted by the U.S. Trustee); *In re*

---

[6] The U.S. Trustee has not filed any motion to enforce Bankruptcy Rule 2019 in these cases, so disclosure and transparency appear to be important to the U.S. Trustee only sometimes.

007116

*Granite Partners, L.P.*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) (analyzing disqualification for failure to disclose connections as a sanction). That request is inappropriate, is not supported by applicable law, and should be denied.

17. However, if the Court concludes that Mr. Lee's disclosure in the IW Cases was deficient and that some action should be taken in *this* chapter 11 case, the Debtor submits that a reasonable action would be that the compensation for S&L allowed in this case should be reduced by the compensation received by KSLPLLC received from FSS prior to June 1, 2022. These amounts total $24,409.09.[7]

18. In the alternative, *In re Byington*, 454 B.R. 648 (Bankr. W.D. Va. 2011), may present a framework for an appropriate way to address any failure by Mr. Lee to disclose connections in the IW Cases. In *Byington*, the attorney for two individual chapter 11 debtors did not disclose payments from the debtors' son—against whom the estate had potential avoidance action claims—that were used to pay the debtors' filing fee. *Id.* at 660. Although the court determined that the attorney's disclosures were insufficient, it declined to deny the debtors' application to employ the attorney because of the apparent novelty of the issue and instead ruled that compensation would not be approved for the attorney's services relating to correcting the deficiency or in asserting that the disclosure was not required. *Id.* Here, the U.S. Trustee's assertions are entirely unprecedented.

19. While not justified, either of these options would better proportioned to the conduct that the U.S. Trustee asserts violated Bankruptcy Rule 2014—Mr. Lee not disclosing his meeting with FSS in the four (4) business days that elapsed before the filing of the stipulation of dismissal

---

[7] A copy of KSLPLLC's invoice for the period from May 24, 2022, to May 31, 2022, is attached hereto as Exhibit E.

in the IW Cases—than denying the Application and derailing the Debtor's chapter 11 case. If the Court takes any action, it should be a measured one.

### <u>CONCLUSION</u>

20.     If the U.S. Trustee believes that Bankruptcy Rule 2014 required Mr. Lee to disclose his meeting with FSS in the IW Cases, even though the IW Debtors had at that time agreed to the U.S. Trustee's own motion to dismiss, there is a way to raise that issue. But it is not in objecting to the employment of a different law firm, by a different debtor, in a different case.  There is no dispute that S&L meets the requirements for employment or that its employment will benefit the estate and administration of this chapter 11 case. The Application should therefore be granted.

*[Remainder of Page Intentionally Left Blank]*

007118

Dated: September 16, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

007119

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within one hour of filing, by email on the following parties:

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave, STE 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov

Melissa Haselden
SUBCHAPTER V TRUSTEE
700 Milam, Suite 1300
Houston, TX
mhaselden@haseldenfarrow.com

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Elizabeth Freeman
JACKSON WALKER LLP
1401 McKinney St., Suite 1900
Houston, TX 77010
efeeman@jw.com

Ryan Chapple
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, TX 78701
rchapple@cstrial.com

Avi Moshenberg
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Jarrod B. Martin
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS, & AUGHTRY, PC
1200 Smith Street, Suite 1400
Houston, Texas 77002
jarrod.martin@chamberalinlaw.com

/s/R. J. Shannon
R. J. Shannon

12

007120

# **EXHIBIT A**

007121

Case 4:23-cv-00463 Document 6-23 Filed on 03/23/23 in TXSD Page 361 of 1229
Case 22-60043 Document 16-1 Filed in TXSB on 09/19/22 Page 1 of 1
Tuesday, September 13, 2022 at 19:47:34 Central Daylight Time

**Subject:** InfoW\Update

**Date:** Wednesday, May 25, 2022 at 12:29:13 PM Central Daylight Time

**From:** Kyung S. Lee <klee@kslpllc.com>

**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>

**CC:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>

Marc Schwartz and I wanted to report to the group as follows:

1. The Texas Plaintiffs and Debtors agreed on Stipulations of Dismissals last week. Judge Lopez approved them last Thursday. Judge Mott signed orders remanding cases earlier this week. The Texas Plaintiffs are no longer creditors or hold claims against the Debtors.
2. The removal Connecticut Bankruptcy Court held a status conference yesterday. Connecticut Plaintiffs are to submit orders of dismissal by Thursday 5.26.22. Judge Manning said she would sign them Friday 5.27.22. Debtors are to submit dismissals of motions to remove by Monday 5.30.22.
3. Marc has instructed me to file Motions to Dismiss the Chapter 11 Cases on Tuesday 5.31.22 and eliminate any continuing administrative expenses.
4. We have a conflict as to the 341 Meeting of Creditors for tomorrow and the Debtors will not have a representative attend.

Thanks.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

# <u>EXHIBIT B</u>

Case 22-60043   Document 166-2   Filed in TXSB on 09/16/22   Page 2 of 20

**Summary and Analysis of Cases Cited by the U.S. Trustee in the Objection**

| No. | Cases Cited in the Objection | Summary and Analysis |
|---|---|---|
| 1 | *United States v. Rodgers*, 461 U.S. 677, 706 (1983). | **Overview:**<br><br>*Rodgers* involved an appeal of a decision holding that government could seek a sale, under the Internal Revenue Code of 1954, 26 U.S.C.S. § 7403, of only the respondent delinquent taxpayers' interests in their property and not the entire property.<br><br>**Analysis:**<br><br>The U.S. Trustee cites this case for the proposition that courts have entirely unbound discretion to approve or decline to approve an application of a chapter 11 debtor in possession to employ a professional that meets the statutory requirements and quotes in a parenthetical that " 'the word 'may', when used in a statute, usually implies some degree of discretion[.]" (Objection ¶ 41).<br><br>The Court should ignore the U.S. Trustee's spin on the Supreme Court's language. As the immediately following sentence in Rodgers indicates, "[t]his common-sense principle of statutory construction is by no means invariable, however, . . . and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute. . . ." While bankruptcy courts do have *some* discretion to consider factors beyond technical compliance with Bankruptcy Code § 327 that are germane to the purposes of Bankruptcy Code § 327, the discretion is not unlimited and should be guided by precedent. Precedent indicates that it is the interests of the estate and administration of the bankruptcy case that are relevant to that discretion. |
| 2 | *In re Jackson*, 484 B.R. 141, 154 (Bankr. S.D. Tex. 2012). | **Overview:**<br><br>*Jackson* involved the request by a chapter 7 trustee to employ his law firm under Bankruptcy Code § 327(a) to represent him in his role as trustee of the bankruptcy estate and, in particular prosecuting potential patent infringement actions. The court denied the application without prejudice because (a) the description of the need for retention of the particular attorney on this matter was insufficient, (b) the disclosure of connections did not describe any search of potential defendants in the patent matters, and (c) the application was not adequate for the Court to determine that the attorney selected was in the best interests of the estate as required for a trustee to retain his own firm.<br><br>**Analysis:**<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). However, *Jackson* held that the application at issue did not meet the requirements |

1

| | | |
|---|---|---|
| 3 | *In re Bigler, LP*, 422 B.R. 638, 643 (Bankr. S.D. Tex. 2010). | under Bankruptcy Code § 327 or Bankruptcy Rule 2014. The Trustee does *not* assert that the Debtor's Application to employ S&L fails to meet this requirement. |
| | | **Overview:** |
| | | *Bigler* involved an application to employ an investment banking firm that included a "tail period" provision under which the firm would receive compensation if the debtors consummated a transaction within 12 months after termination of the agreement. The court approved the application to employ the investment banker despite the because of the testimony of the debtors' CRO that the terms were negotiated and because compensation was subject to approval under section 330. |
| | | **Analysis:** |
| | | The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). While this decision does support such discretion, the court specifically states that "[i]n exercising this discretion, this Court focuses on whether the proposed terms are reasonable." |
| 4 | *Miller v. United States Trustee*, 197 F.3d 13, 17 (1st Cir. 1999). | **Overview:** |
| | | *Miller* was an appeal of a bankruptcy court's order disqualifying debtor's counsel and disgorging retainers and fees after the debtor's counsel violated the retention order by drawing against the retainer and receiving post-petition payments in violation of the court's order. The attorney argued on appeal that drawing against the retainer was proper and that the bankruptcy court abused its discretion by ordering disgorgement of all fees. The First Circuit Court of Appeals affirmed the bankruptcy court's ruling. |
| | | **Analysis:** |
| | | The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The First Circuit Court of Appeals did reason that "[b]ankruptcy courts historically been accorded wide discretion to oversee the terms and conditions of a debtor's engagement . . . ." However, the reasoning of the Court of Appeals was also based on the bankruptcy court's "continuing authority to revisit an order employing a particular attorney to represent a debtor." The facts are also entirely inapposite. |
| 5 | *Interwest Bus. Equip. v. United States Trustee*, 23 F.3d 311, 315 (10th Cir. 1994). | **Overview:** |
| | | *Interwest* involved an appeal of a bankruptcy court's denial of an application to employ debtor's counsel. The bankruptcy court denied the application to employ the attorney because of a conflict of interest arising from the attorney's representation multiple debtors who held claims against one another. The bankruptcy court had determined that there was an actual conflict of interest that required representation by separate counsel. The Tenth Circuit Court of Appeals affirmed the decision of the bankruptcy court. |
| | | **Analysis:** |

2

007125

The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The Tenth Circuit Court of Appeals did conclude that it would not "second guess" a decision not to approve professionals under section 327 "unless it exhibits a clear abuse of discretion, circumstances not present in the case at hand." However, the discretion that the bankruptcy court in *Interwest* exercised was regarding whether the representation of multiple debtors created an *actual* conflict. Further, the Tenth Circuit also reasoned that the discretion was "to ensure professionals are disinterested and do not represent interests adverse to the estate" rather than the unprincipled discretion the U.S. Trustee seeks in the Objection.

| 6 | *Harold & Williams Dev. Co.*, 977 F.2d 906, 909 (4th Cir. 1992). | Overview:

*Harold* involved an appeal of a bankruptcy court's decision to deny the application of a single person to serve as both lawyer and accountant for the estate. The bankruptcy court ruled that there was a per se rule against the employment of a single person in both roles. The district court rejected the imposition of the per se rule but held that the bankruptcy court did not abuse its discretion. The Fourth Circuit Court of Appeals reversed the lower decisions, holding that there was no per se rule and that the bankruptcy court abused its discretion.

Analysis:

The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The Fourth Circuit Court of Appeals did conclude that bankruptcy courts had discretion but further stated that:

Thus, once the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327, *see* Bankr. Rule 2014(a), the discretion of the bankruptcy court must be exercised in a way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding. *Cf. In re BH & P*, 949 F.2d at 1316.

*Harold* stands for the proposition that what matters is the interests of the bankruptcy estate and its creditors. The U.S. Trustee does not dispute that employment of S&L is in best interest of the debtor and its estate. That is directly contrary to the U.S. Trustee's position in the Objection. |

3

| | | |
|---|---|---|
| 7 | *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987). | **Overview:**<br><br>*Martin* involved a novel factual situation. To pay for their legal services pre-petition, the debtors delivered a note secured by a second lien on the debtors real property. The note was outstanding when the debtors filed for chapter 11 relief. The case was converted to chapter 7 and there was an objection to the attorney's fees because it was not a disinterested party by way of the secured note. The bankruptcy court allowed the attorney's compensation (subject to non-allowable compensation) but invalidated the note and lien. The First Circuit Court of Appeals determined that there was no per se rule that applied and remanded the matter to the bankruptcy court to determine whether the attorney's security interest was allowable under the particular facts.<br><br>**Analysis:**<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." *See* Objection ¶ 42. The First Circuit Court of Appeals stated—as partially quoted by the U.S. Trustee—that "[h]istorically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals." The Court of Appeals also noted that "horrible imaginings alone cannot be allowed to carry the day."<br><br>*Martin* does not support the U.S. Trustee's overall position in the Objection. The discretion at issue in *Martin* was with respect to the factual determination of whether the attorney was a disinterested person. The U.S. Trustee does not dispute that S&L is disinterested. |
| 8 | *Elias v. Lisowski Law Firm (In re Elias)*, 215 B.R. 600, 603 (B.A.P. 9th 1997). | **Overview:**<br><br>*Elias* involved a post-bankruptcy fee dispute in which an attorney employed in a bankruptcy case sought to enforce its rights in state court after dismissal of the debtor's bankruptcy case. The Ninth Circuit BAP summarized the facts as follows:<br><br>After the debtor's chapter 11 case was dismissed, her bankruptcy attorney filed a state-court lawsuit against her for $ 10,000.00 of unpaid chapter 11 attorney's fees. The debtor filed a motion for summary judgment in the state-court action, arguing that her former attorney was not entitled to any fees because he had secured his employment in the bankruptcy case fraudulently by failing to disclose his prior connection with the debtor, the fee he received for the bankruptcy retainer, or his receipt of a potential $ 3,000.00 preference from the debtor on the eve of filing.<br><br>Prior to ruling on the motion for summary judgment, the state court requested that the bankruptcy court rule upon the viability of the attorney's lien, the status of the attorney's employment in the bankruptcy case, and whether a preference claim against the attorney could affect his ability to collect a fee. |

4

Pursuant to the state court's request, the debtor filed a motion in the bankruptcy court seeking to vacate the order authorizing counsel's employment, cancel the attorney's lien, and determine that counsel was not entitled to any fees.

Exercising its discretion, the bankruptcy court denied the debtor's motion. The bankruptcy court also found that it had no jurisdiction to enter further orders concerning the disputed fees. The debtor appealed.

The Ninth Circuit BAP affirmed the decision of the bankruptcy court.

Analysis:

The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." *See* Objection ¶ 42. While the Ninth Circuit Court of Appeals stated in dicta that the appellate standard of review for a bankruptcy court decision with respect to an application to employ, its holding was that the bankruptcy court lacked jurisdiction:

> We are not satisfied either that the bankruptcy court had jurisdiction to grant the relief requested by the Debtor, or that there has been a showing that the bankruptcy court abused its discretion in refusing to reopen the dismissed case in order to review pending state-court issues concerning disputed attorneys' fees. We therefore AFFIRM the decision of the bankruptcy court.

*Elias* does not support the U.S. Trustee's overall position in the Objection.

| 9 | *In re LTHM Houston-Operations, LLC*, 2014 WL 5449737, at *5 (Bankr. S.D. Tex. 2014).<br><br>2014 Bankr. LEXIS 4495, at *1 (Bankr. S.D. Tex. Oct. 24, 2014). | Overview:<br><br>The issue presented in *LTHM* was wither Bankruptcy Code § 327(a) & (d) necessarily precluded the employment of a consulting firm with which the chapter 7 trustee had a significant professional relationship. The chapter 7 trustee sought to hire his firm as his financial advisor and accountant. The court ultimately re-set the hearing on the application to focus on the benefits and risks created by the firm's employment.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *LTHM*:<br><br>• "Even if the technical requirements of disinterestedness and not holding or representing an interest adverse to the estate are met, the Court has the discretion to deny the application." (Objection ¶ 43).<br>• In the exercise of its discretion under Section 327, the Court is instructed "into taking account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." (Objection ¶ 44).<br><br>However, the U.S. Trustee leaves out the following paragraph of the opinion that indicates the considerations that guide the exercise of that discretion: |

5

The Court is instructed to exercise its discretion by taking into account "the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." *Id.* at 10. *Section 327(a) acknowledges that the purpose of the professional's employment is "to represent or assist the trustee in carrying out the trustee's duties under this title." 327(a). Accordingly, the Court must consider whether the benefits of employing Claro exceed the potential impact it may have on the trustee's ability to fulfill his duties to the estate.*

(emphasis added).

*LTHM* does not support the U.S. Trustee's position in the Objection. As that case indicates, the discretion of the court to consider issues beyond technical compliance with Bankruptcy Code § 327 are about the benefit to the estate. The U.S. Trustee does not dispute that employment of S&L is in the best interests of the Debtor's estate or administration of its chapter 11 case.

| 10 | *In re Kurtzman*, 220 B.R. 538, 542 (S.D.N.Y. 1998). | <u>Overview:</u>

*Kurtzman* involved appeals related to a chapter 7 trustee's applications to (a) employ his law firm in several cases because the court determined that employment of the trustee's firm was not in the best interest of the estates based on the court's prior dealings with the firm and (b) an unrelated firm because the rates it charged were too high. The U.S. District Court for the Southern District of New York affirmed the decisions.

<u>Analysis:</u>

The U.S. Trustee quotes the following language from *Kurtzman*:

- Additionally, "while disinterestedness and the absence of conflicts may be central to the inquiry, they are by no means exclusive. Indeed, section 327(a) vests the authority for 'approval' within the sound discretion of the court. That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons…" (Objection ¶ 43).

- … finding that the bankruptcy court did not abuse its discretion when it denied the retention of counsel based on "prior problems involving time records, billing errors, professional conduct, and overall costs of legal services that had led to its conclusion of loss of confidence in the firm") (Objection ¶ 44).

However, the U.S. Trustee conspicuously leaves out the example of the "other reasons" that *Kurtzman* identifies are proper to guide the bankruptcy court's discretion and breezes over the facts at issue in that case. The full sentence that the U.S. Trustee partially quotes in paragraph 43 of the Objection is: "That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons *such as, for example, inexperience*." (emphasis added). Further, *Kurtzman*, like |

6

every other case, makes clear that the other factors that courts should consider in exercising of discretion relate to what was in the best interests of the bankruptcy estate:

> By its very nature, the "best interest of the estate" under § 327(d) is a concept that affords the court considerable discretion in making evaluations and comparisons regarding the performance of counsel. In light of this discretion, the Court below was entitled to rely on its own first-hand observations and, based on those observations, to draw its own conclusions regarding professional performance. Here, the presiding judge was in a unique position to observe the conduct of counsel over a significant period of time, and to compare counsel's performance with that of other attorneys performing similar work. The Court articulated and specified its concerns, which admittedly were of a conclusory nature, and afforded Appellant an opportunity to respond. Since the "right" that Appellant seeks to vindicate rests in the final analysis with the discretion of the Court, we cannot conclude that the hearing afforded Appellant failed to meet constitutional standards.

*Kurtzman* does not support the U.S. Trustee's position in the Objection. There is no dispute that it is in the best interests of the Debtor's bankruptcy estate to retain S&L and that doing so will further administration of the Debtor's chapter 11 case.

| 11 | *Official Comm. of Unsecured Creditors v. Harris (In re Southwest Food Distribs., LLC),* 561 F.3d 1106, 1112-13 (10th Cir. 2009). | Overview: *Harris* involved the denial of an official committee's application to employ counsel. The bankruptcy court denied the retention of counsel because the rates that were significantly higher than the prevailing local rates and there was no evidence that the case required national rates. The committee appealed. The Tenth Circuit Court of Appeals affirmed the Bankruptcy Court's decision. Analysis: The U.S. Trustee cites *Harris* with a parenthetical that the case stands for the proposition that consideration of compensation terms was not reversible error. That is an accurate representation of the holding in *Harris* but it is inapposite to the Debtor's chapter 11 case here. The U.S. Trustee does not dispute that S&L's fees are reasonable. |

7

| | *In re Downs*, 103 F.3d. 472, 480 (6th Cir. 1996). | **Overview:**<br><br>Among other issues, *Downs* involved an appeal of a bankruptcy court's order imposing sanctions on an attorney for failing to disclose his fee arrangement with the debtor, which was paid by a creditor, as required by Bankruptcy Code § 329 and Bankruptcy Rule 2016. The Sixth Circuit Court of Appeals affirmed the sanctions.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Downs*: "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." (Objection ¶¶ 44 & 47). But *Downs* does not deal with Bankruptcy Code § 327 or Bankruptcy Rule 2014. The case is inapplicable to the issue in the Application. |
|---|---|---|
| 12 | *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991). | **Overview:**<br><br>In *Doors & More*, the bankruptcy court denied an application to employ counsel. The application to employ the attorney contained numerous problems, including it was not signed by the Debtor, did not state the reasons for the attorney's section, and did not indicate whether the attorney had any present connections with any of the creditors. Based on those and other issues, the bankruptcy court determined that (a) the attorney could not provide competent representation to the estate, (b) it would not be in the best interest of the estate for the court to approve the attorney's appointment, and (c) the attorney's appointment would not aid in administration of the case.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Doors & More*:<br><br>• "Plainly, the Court will not approve the employment of counsel that does not comport with the applicable ethical and disciplinary regulations." (Objection ¶ 44).<br>• "In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her own best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate." (Objection ¶ 44, n.5).<br><br>The ethical issues presented in *Doors & More* was where the attorney could provide competent representation. According to the bankruptcy court:<br><br>Both the Michigan Rules of Professional Conduct and the best interest of a bankruptcy estate require that the attorney selected to represent the estate must be able to provide competent representation. In a Chapter 11 case, an attorney can provide competent representation to the estate only if the attorney is thoroughly familiar with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Bankruptcy, and especially Chapter 11 bankruptcy, is a highly specialized area of law. An attorney for a debtor in possession must have expert knowledge of bankruptcy law in order to achieve a successful result. Experience indicates that a business that files a Chapter 11 case, by definition, is already in |

8

| | |
|---|---|
| | trouble. Although competent counsel can by no means insure a successful reorganization, incompetent counsel will almost certainly insure failure. Only an attorney with expert knowledge of bankruptcy law can properly aid in the administration of the case.<br><br>The U.S. Trustee does not dispute that S&L is familiar with bankruptcy and competent to represent the Debtor in its chapter 11 case. |
| 13 | *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007). | Overview:<br><br>In *Smith*, the chapter 7 trustee obtained an order to remove the debtor's preferred choice of special personal injury counsel and denied the debtor's motion to dismiss the chapter 7 case. The district court and the Second Circuit Court of Appeals affirmed the bankruptcy court's ruling.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Smith*: "[T]he bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." (Objection ¶ 44, n.5). *Smith* is **directly** contrary to the U.S. Trustee's position in the Objection.<br><br>Indeed, *Smith* is also instructive on the considerations beyond simply compliance with Bankruptcy § Code 327 that are appropriate to guide the Court's discretion:<br><br>Thus, section 327(a) does not give a bankruptcy court authority to reject a trustee's choice of counsel solely because of an objection by the debtor. Rather, the debtor's objection is relevant only to a bankruptcy court's consideration of the best interest of the estate, or of whether the chosen special counsel is conflicted.<br><br>Applying these principles here, we find no error in the Bankruptcy Court's determination that there were "no circumstances" that would give it reason to interfere with Geltzer's decision to remove Schwartz as special personal injury counsel. There was no indication or allegation that the attorney with whom Geltzer chose to replace Schwartz was conflicted or unqualified to litigate the personal injury action, and ample evidence supported the Bankruptcy Court's conclusion that the best interest of the estate would not be served by requiring Geltzer to continue to be represented by Schwartz, including, inter alia, Schwartz's delay in amending the state court caption and his transferring the personal injury file to Ginsberg without court or trustee approval. Indeed, the only factor weighing in favor of rejecting Geltzer's motion was Smith's preference to have Schwartz and Ginsberg prosecute the personal injury action. But that preference alone is insufficient to turn this into one of the "rarest cases" in which interference with the trustee's choice could be justified. |

9

| | | |
|---|---|---|
| 14 | *In re Leslie Fay Companies, Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994). | As *Smith* indicates, the relevant factors guiding courts' discretion are (a) the best interest of the estate, (b) the qualifications of the proposed attorney, and (c) and whether the chosen counsel has a conflict. The U.S. Trustee does object to S&L's employment on any of those grounds.<br><br>**Overview:**<br><br>*Leslie Fay* involved the failure of the chapter 11 debtor's counsel to disclose connections with potential targets of litigation by the debtor and the debtor's seventh largest creditor. The bankruptcy court appointed an examiner and the examiner determined that the attorney was not disinterested in the matter. The United States trustee for the district sought to disqualify the attorney on the grounds of failure to disclose the connections under Bankruptcy Rule 2014 and because the attorney was not disinterested. The bankruptcy court found that the attorney represented interests that were materially adverse at the time of its retention and failed to properly disclose its connections under Bankruptcy Rule 2014. The bankruptcy court determined that the best interests of the estate warranted (a) allowing the attorney to complete the services it had begun and see the case through reorganization and finish the pending contested matters and adversary proceedings, while requiring replacement counsel to handle new matters and (b) imposing an economic sanction in the amount of the costs of the examiner's investigation and the failure to disclose.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Leslie Fay*: "[T]he requirements of Fed. R. Bankr. P. 2014 are more encompassing than those governing disinterestedness inquiry under section 327. For while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014, 'all connections' that are not so remote as to be de minimis must be disclosed." (Objection ¶ 46). As set out in the Reply, however, this disclosure is required of professionals who are employed by the bankruptcy estate or seeking to be employed by the bankruptcy estate. The attorney at issue in *Leslie Fay* was employed by the debtor pursuant to Bankruptcy Code § 327(a). The facts are not the same as those present here and the case does not support the U.S. Trustee's position. |
| 15 | *In re Woodcraft Studios, Inc.*, 464 B.R. 1, 8 (N.D. Cal. 2011). | **Overview:**<br><br>In *Woodcraft Studios*, the bankruptcy court denied a fee application filed by the attorney to a chapter 11 debtor after the case was converted to chapter 7 and ordered the disgorgement of the prepetition retainer. The attorney affirmatively stated in the application to employ and Bankruptcy Rule 2014 disclosure that the attorney did not represent the debtor prior to the petition date or have any connections to parties in interest in the case. After conversion, the bankruptcy court determined that the attorney represented and received fees from the debtor prior to the petition date. On appeal, the U.S. District Court for the Northern District of California affirmed the bankruptcy court's ruling |

10

**Analysis:**

The U.S. Trustee quotes the following language from *Woodcraft Studios*: The applicant has the duty to disclose all relevant information to the court and "may not exercise any discretion to withhold information." (Objection ¶ 46). However, the opinion goes on the state the following:

> "The purpose of such disclosure is to permit the Court and parties in interest to determine whether the connection disqualifies the applicant from the employment sought, or whether further inquiry should be made before deciding whether to approve the employment. This decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment." *In re Lee*, 94 B.R. 172, 176 (Bankr. C.D. Cal.1988).

*Woodcraft Studios* does not stand for the proposition that Bankruptcy Rule 2014 imposes a duty to supplement disclosures of connections after the professional is no longer seeking to be retained in the bankruptcy case. It does not support the U.S. Trustee's position in the Objection that Mr. Lee's disclosures were deficient.

| 16 | *U.S. v. Gallene*, 182 F.3d 578, 588 (7th Cir. 1999). | **Overview:**<br><br>*Gallene* involved a criminal case in which the district court entered convictions and sentences against a bankruptcy attorney for knowingly and fraudulently making a false material declaration in a bankruptcy case. A jury returned verdicts finding that attorney for a chapter 11 debtor failed to disclose connections of his firm to a debtor's senior secured creditor and related parties. The issue was raised among the attorney's firm two months before the debtor filed bankruptcy and the bankruptcy court held hearings about other connections that were disclosed in the attorney's 2014 declaration. When the court ordered the attorney to file a supplemental declaration, the connection with the senior secured creditor were still not disclosed.<br><br>**Analysis:**<br><br>The U.S. Trustee quotes the following language from *Gallene*: "Thus, 'professionals "cannot pick or choose which connections are irrelevant or trivial.""" (Objection ¶ 46). However, other portions of the same paragraph from which the U.S. Trustee draws its quotation indicates that the obligation to disclose connections is limited:<br><br>The Bankruptcy Code requires that attorneys *who seek to be employed as counsel for a debtor* apply for the bankruptcy court's approval of that employment. See In re Crivello, 134 F.3d 831, 835-36 (7th Cir. 1998). *Bankruptcy Rule 2014 requires the potential attorney for the debtor* to set forth under oath any "connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr. P. 2014(a).<br><br>*Gallene* does not support the U.S. Trustee's position in the Objection. |

11

007134

| 17 | *In re The Harris Agency*, 462 B.R. 514, 524 (E.D. Pa. 2011). | **Overview:**

In *Harris Agency* the attorney for a chapter 11 debtor failed to disclose that a creditor had agreed to pay the attorney's fees for representing the debtor and that the debtor had agreed to repay the amounts advanced by that creditor. The bankruptcy court entered an order disqualifying the attorney from further representation of the debtor in the chapter 11 case but did not disqualify the attorney from the beginning of the case. In connection with a subsequent fee application, the court found that the attorney had also previously entered an appearance for a non-debtor affiliate of the debtor prior to disqualification. The bankruptcy court entered a second order disqualifying the attorney as of the date of the conflicting representation, partially disallowing fees and expenses, and mandating disgorgement of fees received in excess of the amount allowed. The U.S. District Court for the Eastern District of Pennsylvania affirmed the bankruptcy court's rulings.

**Analysis:**

The U.S. Trustee quotes the following language from *Harris Agency*: "'The duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and 'requires 'spontaneous, timely, and complete disclosure.'"" (Objection ¶ 46). A more complete quote is as follows:

> ***Attorneys who seek approval by the court to represent a debtor, pursuant to § 327(a)***, must file an application for employment that complies with the disclosure requirements of Rule 2014. Rule 2014(a) requires that "[t]he application shall state . . . to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest," and "shall be accompanied by a verified statement . . . setting forth the person's connections with the debtor, creditors, [and] any other party in interest . . . ." The duty to disclose under Rule 2014 ***continues throughout an attorney's representation of the debtor***, and requires "spontaneous, timely, and complete disclosure . . . ." Rome v. Braunstein, 19 F.3d 54, 59 (1st Cir. 1994).

Again, the U.S. Trustee cherry-picks quotes to arrive at a misleading result. *Harris Agency* does not support the U.S. Trustee's position. |
| 18 | *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998). | **Overview:**

In *Granite Partners*, the attorney retained by a chapter 11 trustee retained the attorney to represent the estate represented a larger creditor that was an investigation target in five open matters that were not disclosed in the attorney's Bankruptcy Rule 2014 disclosures. During the course of the attorney's representation of the chapter 11 trustee, the attorney opened approximately 400 additional matters for the creditor resulting in $9 million in fees that it did not disclose. The matter was not disclosed until the attorney filed its final fee application and the bankruptcy court appointed a fee examiner who determined that the attorney represented interests adverse to the estate. The bankruptcy court denied all of the attorney's fees related to investigative services and reduced the fee award by 15% for non-investigative disclosures. |

12

**Analysis:**

The U.S. Trustee cites *Granite Partners* for the proposition that "[t]he duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and requires spontaneous, timely, and complete disclosure" and the parenthetical that "court[s] should not have to 'rummage through files or conduct independent fact-finding investigations' to determine whether the professional should be disqualified." (Objection ¶ 46).

However, the *Granite Partners* makes clear that the purpose of Bankruptcy Rule 2014 disclosures is "*to determine qualification under section 327.*" The attorney in *Granite Partners* was employed as an estate professional and further was sanctioned only to the extent necessary to prevent compensation for matters on which the attorney could not be retained under section 327. Nothing in *Granite Partners* supports sanctioning a *different* law firm in a *different* case for the actions of an attorney that was not, at the time of the asserted non-disclosure, seeking to be retained by the bankruptcy estate. The case does not support the U.S. Trustee's position in the Objection.

**Overview:**

In *Griffin*, the attorney to a chapter 7 debtor sought payment from the estate for post-petition services provided to the debtor. The attorney was never retained by the chapter 7 trustee. Additionally, the debtors took a post-petition loan to pay the attorney's fees for work related to redeeming the debtor's vehicle (pursuant to a prepetition retainer agreement). The bankruptcy court held that the fees were not allowable, were not properly disclosed pursuant to Bankruptcy Code § 329 or Bankruptcy Rule 2016, and had to be disgorged if already paid.

**Analysis:**

The U.S. Trustee quotes the following language from *Griffin*: "The disclosure requirements in Rule 2014 are 'rooted in the fiduciary relationship between courts and attorneys.'" (Objection ¶ 47). The U.S. Trustee appears to misrepresent the following language from *Griffin* in the Objection:

> Section 329 of the Code and Rule 2016(b) are rooted in the fiduciary relationship between courts and attorneys.

In any event, as important as Bankruptcy Rule 2014 may be, that is not a reason to use the important requirement as a club against this Debtor as requested by the U.S. Trustee.

**Overview:**

In *American International Refinery*, the liquidating trustee in a chapter 11 case brought an adversary proceeding against the chapter 11 debtors' former attorneys seeking disgorgement of fees during the bankruptcy. The bankruptcy court ordered a sanction of $135,000 for the attorney's failure to adequately

| 19 | *In re Griffin*, 313 B.R. 757, 763 (Bankr. N.D. Ill. 2004). |
| 20 | *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012). |

13

disclose various connections it had to the debtors and creditors, but found that the attorney did not have a disqualifying adverse interest and did not disgorge the remaining $607,000 that the attorney received in the case. The liquidating trustee appealed. The Fifth Circuit Court of Appeals affirmed the decision of the bankruptcy court.

Analysis:

The U.S. Trustee quotes the following language from *American International Refinery*: "Applicants 'who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.'" (Objection ¶ 47).

Again, considering the broader language from which the U.S. Trustee derived its quotation is necessary to understand what the case actually said:

> Courts may deny all compensation to professionals who fail to make adequate disclosure, and "counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *West Delta Oil*, 432 F.3d at 355 (quotation marks omitted); *see also Rome v. Braunstein*, 19 F.3d 54, 59-60 (1st Cir. 1994) ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and [Rule] 2014(a), court-appointed counsel proceed at their own risk."). In determining an appropriate sanction, an important consideration is whether the failure was intentional. *Crivello*, 134 F.3d at 839 (stating that "a bankruptcy court should punish a willful failure to disclose the connections . . . as severely as an attempt to put forth a fraud on the court.").

*American International Refinery* supports the proposition that *if* Mr. Lee had failed to disclose his connections with FSS in the IW Cases, been employed by the IW Debtors' bankruptcy, and sought compensation, the Court would have discretion to deny such requested fees. Because of the U.S. Trustee's insistence on dismissing the IW Cases, that never happened. The Fifth Circuit's decision does not support for the U.S. Trustee's position in the Objection.

| 21 | *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001). | Overview:<br><br>In *Midway*, in connection with a final fee application after conversion of a case from chapter 11 to chapter 7, counsel for a chapter 11 debtor sought compensation that included amounts due under an undisclosed contingency fee arrangement, and attorney lien claim. The U.S. trustee and certain creditors objected to the fee application because of the failure to disclose the connections under Bankruptcy Rule 2014 and the waiver implied thereby. The bankruptcy court allowed only approximately 55% of the attorney's fees, considering, among other things, the period of time it took the attorney to make the disclosure and the certain prejudice to the estate caused by such non-disclosure. The bankruptcy court disallowed the attorney lien claim. |

14

Case 22-60043   Document 166-2   Filed in TXSB on 09/16/22   Page 16 of 20

| | | |
|---|---|---|
| | | **Analysis:** |
| | | The U.S. Trustee quotes the following language from *Midway*: "'[L]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice.'" (Objection ¶ 47). The context of the quote is as follows: |
| | | Trittipo argues that the lack of disclosure has not caused any prejudice to the estate in general. This argument ignores the objective of requiring disclosure. The objective of requiring disclosure is not so much to protect against prejudice to the estate, but to ensure undivided loyalty and untainted advice from professionals. *Crivello*, 134 F.3d at 836. That is why lack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice. *Filene's Basement*, 239 B.R. at 849. Trittipo's lack of prejudice argument is relevant, however, in assessing the amount of disallowance, which is discussed below. *See Diamond Mortgage*, 135 B.R. at 96. |
| | | *Midway* does not support the U.S. Trustee's position in the Objection. There is no dispute that S&L has disclosed relevant connections in the Debtor's chapter 11 case. The decision does not indicate that a professional who is no longer seeking to be retained as an estate professional has an obligation to supplement disclosures. Nor does the decision indicate that a failure of an attorney in a previous case, for a different client, at a different law firm, should be disqualifying. |
| 22 | *In re Rabex Amuru of N.C., Inc.*, 198 B.R. 892, 897 (Bankr. M.D.N.C. 1996). | **Overview:** |
| | | *Rabex* involved an application by a chapter 11 debtor to employ an attorney. There was a dispute about the ownership of the equity interests in the debtor between to potential parent companies and the debtor was a named defendant in related state court litigation. One of these parent companies paid the retainer for the debtor's proposed attorney, was continuing to make the attorney's payment during the chapter 11 case, and authorized the bankruptcy filing. The bankruptcy court determined that these facts created the appearance of a conflict of interest sufficient that the attorney was not a disinterested person despite the lack of any wrongdoing by the attorney. |
| | | **Analysis:** |
| | | The U.S. Trustee cites *Rabex* for the proposition that "[l]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice" and indicates in the parenthetical that "attorneys for debtor removed because of the appearance of impropriety, even though no harm done to the debtor[.]'" (Objection ¶ 47). That is not an accurate representation of what the case stands for—there was no issue with disclosure in Rabex and the bankruptcy court held that being paid by one of the disputed owners of the debtor amounted to attorney no longer being a disinterested person. |
| | | In any event, the facts of *Rabex* are not relevant to the Trustee's position in the Objection. |

15

| | |
|---|---|
| 23 | *In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011). | **Overview:**

The relevant issue in *Byington* was whether there was an obligation to disclose a pre-filing transfer by the debtors' son for the filing fee for the chapter 11 case. The bankruptcy court held that the pre-filing transfer from the debtors' son should have been disclosed. Because of the novelty of the issue, however, the bankruptcy court held that the failure to disclose the payment was not sufficient to deny the application to employ the attorney but that the attorney would not be entitled to compensation for correcting the deficiency or in asserting that the disclosure was not required.

**Analysis:**

The U.S. Trustee quotes the following language from *Byington*: "Professionals must 'be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action.'" (Objection ¶ 47)

Again, looking at the context of the language quoted by the U.S. Trustee makes clear that this obligation only applies to professionals who are actively seeking to be employed by the estate:

> Published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their attorneys, ***whose employment is sought to be approved***, be meticulous in disclosing "all connections" with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action.

*Byington* does not support the U.S. Trustee's position that Mr. Lee was required to supplement his disclosure for KSLPLLC after the IW Debtors had decided to dismiss their cases, as demanded by the U.S. Trustee, and no longer intended to pursue Mr. Lee's employment as an estate professional. It certainly does not support the U.S. Trustee's position that this should be imputed on *this* Debtor seeking to employ S&L in *this* chapter 11 case.

Moreover, *Byington* suggests what would be an appropriate action for the Court to take here if it determines that Mr. Lee's disclosure of connections in the IW Cases was deficient. Like the bankruptcy court in *Byington* did, the Court should simply not allow Mr. Lee compensation for asserting the disclosure was not required. Denial of the Debtor's application to employ S&L and harm to the Debtor's estate and administration if its chapter 11 case is not called for here. |
| 24 | *In re EBW Laser Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005). | **Overview:**

In EBW Laser, an attorney was retained as special counsel to a chapter 11 debtor on a contingency fee basis to pursue litigation against a third-party. The chapter 11 case was converted to a case under chapter 7 and the chapter 7 trustee, acting as his own counsel, negotiated a settlement with the defendant in which the bankruptcy estate received a cash payment. The attorney submitted an application for compensation based on the |

16

| | | |
|---|---|---|
| | | contingency fee agreement under which he was retained in the chapter 11 case. The bankruptcy court rejected the attorney's argument for contingency fees but held that the attorney was entitled to reasonable compensation for the post-petition, pre-conversion services provided as a chapter 11 administrative expense claim.<br><br>Among the issues raised by the chapter 7 trustee in his objection to the attorney's fee application was that the attorney inadequately disclosed the terms of the prepetition engagement of the attorney by the debtor. The attorney claimed that there was a side agreement that was essential to the chapter 7 trustee's ultimate settlement but that side agreement was not disclosed. Although the bankruptcy court held that the attorney's affidavit provided largely met the requirements of Bankruptcy Rule 2014, the court reduced the compensation awarded to the attorney by $3,000 (10%) because of the failure to disclose the side agreement.<br><br>*Analysis:*<br><br>The U.S. Trustee quotes the following language from *EBW Laser*: "The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required." (Objection ¶ 47). While the quoted language was contained in the opinion, that is not what the bankruptcy court did.<br><br>*EBW Laser* also demonstrates that what the U.S. Trustee is seeking through the Objection is in fact a sanction. The Application in *this* case by *this* Debtor is not the appropriate place for the U.S. Trustee to seek or the Court to impose that sanction. |
| 25 | *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). | *Overview:*<br><br>In *eToys*, a shareholder and administrative claimant of a chapter 11 debtor, and the U.S. trustee filed motions seeking various relief against attorneys and consultants for the debtor and committee, including disgorgement of fees. Certain of the motions were settled or addressed for procedural reasons while others were decided on the merits. Among other things, the bankruptcy court found that the debtor's attorney had a disqualifying conflict and failed to adequately disclose that connection. The bankruptcy court ordered the attorney's fees paid in the case for matters related to that conflict to be disgorged.<br><br>*Analysis:*<br><br>The U.S. Trustee quotes the following language from *eToys* in the Objection:<br><br>It "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure *by an attorney seeking employment* is indispensable to the court's discharge of its duty to *assure the attorney's eligibility for employment under section 327(a)* and to make an informed decision on whether the engagement is in the best interest of the estate." *Id.* |

17

| | | |
|---|---|---|
| 26 | *In re Matco Elec. Group, Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008). | (Objection ¶ 48) (emphasis added). The very language quoted by the U.S. Trustee in the Objection indicates that the reasoning does not apply to Mr. Lee under the facts present here. *eToys* does not support the U.S. Trustee's position in the Objection.<br><br>Overview:<br><br>In *Matco*, the U.S. trustee field a motion seeking to disallow and disgorge fees paid to former counsel to the an official committee in a chapter 11 case. In its Bankruptcy 2014 declaration accompanying the application to employ the attorney, it disclosed that one of the members of its firm was related to an officer and shareholder of one of the debtor's significant creditors. The U.S. trustee asserted that the disclosure was insufficient. The bankruptcy court agreed that the disclosure of the connection was purposely vague and reduced the attorney's final fees by one-half of the amount of holdback of interim fees awarded in the case.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Matco*:<br><br>As noted, Rule 2014 "is not intended to condone a game of cat and mouse where the *professional seeking appointment* provides only enough disclosure to whet the appetite of the UST, the court, and other parties in interest, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure."<br><br>(Objection ¶ 48). Again, the language that the U.S. Trustee decided to quote in the Objection indicates that the obligation to make disclosures only applies to professionals that are seeking to be employed as estate professionals. *Matco* does not support the U.S. Trustee's position that a professional is obligated to supplement disclosures under Bankruptcy Rule 2014 after the debtor has decided to agree with the U.S. trustee to dismiss its case and the professional is no longer seeking employment (or compensation) in the case. |
| 27 | *In re Bradley*, 495 B.R. 747, 786 (Bankr. S.D. Tex. 2013). | Overview:<br><br>In *Bradley* the bankruptcy court imposed on an attorney, his attorney, his firm, and the attorney's assistant because (a) the attorney allowing his non-lawyer assistant to prepare conversion schedules and statement of financial affairs and file such documents without requiring the debtors to review and sign them and (b) the attorney allowed an unprepared appearance attorney to represent the debtors at section 341 meetings without disclosing the amount paid to such attorney.<br><br>Analysis:<br><br>The U.S. Trustee cites *Bradly* for the proposition that "[b]y remaining whether in pleadings, at hearings, or by failing to amend the InfoW Lee Declaration, Attorney Lee misrepresented his connections to the Court and violated the ethical duties of candor and diligence" with the parenthetical explanation that an "[a]ttorney's failure to correct misstatements demonstrated a lock of candor and respect to the Court). (Objection ¶ 50). |

18

With such a bold statement one might think that the U.S. Trustee would have equally bold support. But the facts at issue in *Bradley* are just as inapposite as every other authority cited by the U.S. Trustee in the Objection. The conduct that the bankruptcy court found violated ethical duties in *Bradley* were as follows:

[Attorney] breached Guideline D in at least the following respects: (1) he filed the Defective Pleadings without obtaining the Debtors' signatures, [Finding of Fact Nos. 25(a), 32(b), 35(b)]; (2) he allowed his legal assistant (i.e., Gutierrez) to forge the Debtors' original signatures on the Defective Pleadings, [Finding of Fact Nos. 25, 31, 32(b), 34]; (3) he instructed Gutierrez to file the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA despite knowing that those documents contained inaccuracies or knowing that he had not checked to confirm that the information contained therein was entirely accurate, [Finding of Fact Nos. 32(c), 36]; (4) he failed to inform the Debtors that Carter would represent them at their meetings of creditors, [Finding of Fact No. 38(d)]; (5) he did not prepare Carter for either of the Debtors' meetings of creditors, [Finding of Fact Nos., 38, 53]; (6) he filed, or allowed to be filed, an incorrect Rule 2016 Disclosure, [Finding of Fact No. 37]; and (7) he failed to own up to these transgressions until after the Chapter 7 Trustee brought them to the attention of the Court. Each of these actions alone is cause for concern; taken together, they seriously undermine Aduwa's personal integrity and professional reputation.

In turn, Mr. Lee did not amend his Bankruptcy Rule 2014 disclosures in the three (3) business days after first meeting with FSS because the IW Debtors had decided to agree with the U.S. Trustee to dismiss their cases and were no longer seeking to retain Mr. Lee as an estate professional.

19

# **EXHIBIT C**

Case 4:23-cv-00463 Document 6-23 Filed on 03/23/23 in TXSD Page 383 of 1229
Case 22-60043 Document 166-3 Filed in TXSB on 09/16/22 Page 2 of 2
Tuesday, September 13, 2022 at 19:43:07 Central Daylight Time

**Subject:** InfoW\Motion to Dismiss Chapter 11 Cases

**Date:** Monday, May 23, 2022 at 8:25:59 PM Central Daylight Time

**From:** Kyung S. Lee <klee@kslpllc.com>

**To:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>

**Attachments:** InfoW_MotiontoDismissChapter11Cases_5_23_22_8PM.docx

Everyone: Here is a first draft of the Motion to Dismiss the Chapter 11 Cases. Please review and provide me your comments. I would like to at least have in my mind know that we have done what we were supposed to have done as fiduciaries for the 3 debtors and have concluded with the CRO that dismissal is the route to go and is in the best interest of the Debtors, their estates and creditors.

I would like to file this Motion to Dismiss by Wednesday and skip the 341 Meeting of Creditors on Thursday, which will be more waste of fees and expenses of these 3 debtors for the CRO and his professionals.

**Kyung S. Lee**

Kyung S. Lee PLLC

**Pennzoil Place**
**700 Milam-Suite 1300**
**Houston, Texas 77002**
Email: klee@kslpllc.com
**Cell: (713) 301-4751**
Alternate Email: kslee50@gmail.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

007144

**Page 1 of 1**

# **EXHIBIT D**

Case 22-33553 Document 66-34 Filed in TXSB on 03/23/23 Page 385 of 1229
Case 4:22-cv-00463 Document 6-34 Filed on 03/23/23 in TXSD Page 385 of 1229
Thursday, June 16, 2022 at 13:51:07 Central Daylight Time

| | |
|---|---|
| **Subject:** | InfoW |
| **Date:** | Tuesday, May 17, 2022 at 8:34:29 AM Central Daylight Time |
| **From:** | Ruff, Jayson B. (USTP) |
| **To:** | kslee50@gmail.com |
| **Attachments:** | image001.png |

\*\*\*Settlement Communication Subject to FRE 408\*\*\*
Kyung,

Following on our conversation yesterday, please let me know when you have had a chance to discuss these matters with Marc.  As I mentioned yesterday, the UST still believes that the best option is for these cases to be dismissed and we intend to push forward with our motion.  That will include getting discovery from your client.  I have been holding off on doing that at your request, but time is running very short so we will need to resolve these matters very soon or you will need to give me a date early next week for a deposition of Marc.  As set forth in our pleadings, these cases have the badges of a bad faith filing.  Even with all of the Sandy Hook Plaintiffs "leaving the party" so to speak, that does not change how these cases arrived.  I understand that there are a few creditors that remain, but each of those can be paid following dismissal and payment agreements could be made outside of bankruptcy.

A few things to consider:

- I would note that according to the schedules filed by these Debtors, Mr. Jones and FSS (the "Jones Parties") are co-liable for all of the Debtors' remaining debts.  Given that the Jones Parties are also the primary source of funding for these Debtors' cases, they can agree to fund payment of these claims outside of bankruptcy as well.
- Inside of bankruptcy, it would appear that because Mr. Jones was taking royalty payments that belonged to IWHealth prepetition, that Debtors' estates would have claims against Mr. Jones for the return of those funds anyway.  Another reason for the Jones Parties to agree to pay the Debtors' remaining creditors outside of bankruptcy.  I am sure the royalty payments he received exceeds the amount of the Debtors' remaining debts.
- The Jones Parties are the primary funding sources for Debtors inside of and outside of bankruptcy.  They have already committed $725k toward resolving the claims of these Debtors.  Is there any reason why those funds could not be used to pay the remaining creditors of the Debtor following dismissal?  Seems like that amount may be more than enough.  Continuing in the bankruptcy will likely require significantly more funding.
- Based on the declarations filed with the petitions and statements made in court, it appears these Debtors are simply holding companies with no operations to speak of.  What is there to even reorganize?  Seems that dismissal or possibly conversion even are the better options for these Debtors.  Although, I understand that conversion would mean that the Jones Parties ability to use the IP held by the Debtors may then be at risk.  Another reason for them to agree to pay those creditors outside of bankruptcy.
- Dismissal is the more efficient and cheaper option for these Debtors as it will save from administrative and litigation costs and will still allow Debtors options to resolve their claims.

More can be said, but I believe the foregoing is enough.  I am hopeful that we can come to an agreement soon.  Please let me know when you believe you will be in a position to discuss these matters further.

Kinds regards,

*Jayson B. Ruff*

Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov

PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

# EXHIBIT E

007148

# Kyung S. Lee PLLC

700 Milam, Suite 1300
Houston, Texas 77002

# INVOICE

Invoice # 2
Date: 06/07/2022
Due On: 07/07/2022

W. Marc Schwartz
Free Speech Systems, LLC
712 Main Street-Suite 1830
HOUSTON, Texas 77002

## 00003-Free Speech Systems, LLC

## Represent FSS in connection with preparation of FSS for potential filing of bankruptcy as a Subchapter v Debtor.

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 05/24/2022 | Research and email RJ Shannon on background research of FSS so as to be prepared for discussion in Austin (1.5); travel to and from Austin, Texas and not working (charged at 1/2 time of 6 hours)(3); extended conference with client, Schwartz Associates, B. Roe, S. Jordan, and RJ Shannon to discuss options and issues with FSS restructuring (5.0) | 9.50 | $850.00 | $8,075.00 |
| Service | 05/25/2022 | Follow-up with research on background facts relating to how FSS came about, operational history and litigation history of same for purposes of drafting First Day Declaration of Marc Schwartz (3.0) | 3.00 | $850.00 | $2,550.00 |
| Service | 05/25/2022 | Follow-up on data received at meeting, new data gathered and research for prose on historical operations of FSS (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/26/2022 | Review and analyze 2 Valuation Reports for PQPR and FSS, analyze same for background information on FSS for pleadings and determine status of case information in both (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/27/2022 | Coordinate with State Court counsel on sanctions issues and explain approach to handling same (.5); numerous conferences with S. Lemmon, counsel for PQPR (1.0); locate critical documents for S. Lemmon and forward (.5) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/28/2022 | Analyze State Court litigation production to determine data produced to opposing counsel in state court and collect key documents to share with parties (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/29/2022 | Continue to review financial data discovered during search of State Court litigation production and analyze same (2.0) | 2.00 | $850.00 | $1,700.00 |

007149

| Service | 05/30/2022 | Review and analyze background corporate documents and additional documents discovered from reviewing State Court production in DropBox files (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/31/2022 | Work on Declaration for Marc Schwartz as CRO for FSS and incorporate facts learned through investigation (4.0) | 4.00 | $850.00 | $3,400.00 |

|  |  |  |  | **Total** | **$24,225.00** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 7 | 07/07/2022 | $184.09 | $0.00 | $184.09 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2 | 07/07/2022 | $24,225.00 | $0.00 | $24,225.00 |

|  |  |  | **Outstanding Balance** | **$24,409.09** |
|  |  |  | **Total Amount Outstanding** | **$24,409.09** |

Please make all amounts payable to: Kyung S. Lee PLLC

Please pay within 30 days.

007150

```
 1                     UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF TEXAS
 2                           HOUSTON DIVISION

 3                                   )   CASE NO: 22-60043-cml
                                     )
 4    FREE SPEECH SYSTEMS, LLC,      )   Houston, Texas
                                     )
 5             Debtor.               )   Tuesday, September 20, 2022
                                     )
 6                                   )   1:03 p.m. - 7:30 p.m.
      -----------------------------)
 7

 8                                  TRIAL

 9            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                    UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Free Speech Systems: R.J. SHANNON
                                Shannon & Lee LLP
13                              700 Milam Street, Suite 1300
                                Houston, TX 77002
14
                                RAYMOND WILLIAM BATTAGLIA
15                              Law Offices of Ray Battaglia, PLLC
                                66 Granburg Circle
16                              San Antonio, TX 78218

17                              KYUNG SHIK LEE
                                Kyung S. Lee PLLC
18                              4723 Oakshire Drive, Apt. B
                                Houston, TX 77027
19
      For Veronique De La       JARROD B. MARTIN
20    Rosa, et al.:             Chamberlain, Hrdlicka, White,
                                Williams & Aughtry P.C.
21                              1200 Smith Street, Suite 1400
                                Houston, TX 77002
22
      For David Wheeler,        RYAN E. CHAPPLE
23    et al.:                   Cain & Skarnulis PLLC
                                303 Colorado Street, Suite 2850
24                              Austin, TX 78701

25
```

Page 2

```
 1    For the U.S. Trustee:    HA MINH NGUYEN
                               JAYSON B. RUFF
 2                             Office of the United States Trustee
                               515 Rusk Street, Suite 3516
 3                             Houston, TX 77002

 4    For PQPR:                STEPHEN LEMMON
                               Streusand Landon Ozburn and Lemmon
 5                             1801 S Mopac Expressway, Suite 320
                               Austin, TX 78746
 6
      For the SubChapter V     MELISSA ANNE HASELDEN
 7    Trustee:                 Haselden Farrow, PLLC
                               Pennzoil Place
 8                             700 Milam, Suite 1300
                               Houston, TX 77002
 9
      Court Reporter:          ZILDE MARTINEZ
10
      Courtroom Deputy:        ZILDE MARTINEZ
11
      Transcribed by:          Veritext Legal Solutions
12                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
13                             Tel: 800-727-6396

14


15
      Proceedings recorded by electronic sound recording;
16    Transcript produced by transcription service.

17


18


19


20


21


22


23


24


25
```

```
1                              INDEX

2    PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3    KYUNG LEE

4    MARC SCHWARTZ

5

6    GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

7

8

9

10

11   PLAINTIFFS' EXHIBITS                              RECEIVED

12

13

14

15   GOVERNMENT'S EXHIBITS                             RECEIVED

16

17

18

19

20

21

22

23

24

25
```

```
1          HOUSTON, TEXAS; TUESDAY, SEPTEMBER 20, 2022; 1:03 PM
2                          (Call to Order)
3          THE COURT:  Okay.  Good afternoon, everyone.  This
4    is Judge Lopez.  Today is September 20th.  We are here in
5    Free Speech Systems here at the Subchapter V status
6    conference and also to take up a few retention applications,
7    one for Mark Schwartz and Schwartz & Associates as financial
8    advisors, Shannon & Lee as counsel to the Debtor, and also
9    Mr. Battaglia as counsel to you and the Debtors.
10         So let me go ahead and take appearances, first in
11   the courtroom and then we'll see where this goes.
12         Good morning.  I should say good afternoon.
13         MR. SHANNON:  Good afternoon, Your Honor.  R.J. of
14   Shannon & Lee LLP, on behalf of the Debtor.  Also in the
15   courtroom is Mr. Lee here and Mr. Battaglia is here also on
16   behalf of the Debtor.
17         One correction, Your Honor, at least there was no
18   objection to Mr. Battaglia.
19         THE COURT:  I still have an independent duty to
20   take it up.  Just because nobody objects doesn't mean we
21   don't take it up.
22         MR. SHANNON:  Yes, Your Honor.  I will say that
23   there are -- you know, the witness and exhibit list did not
24   contemplate this, but Mr. Battaglia is here.
25         THE COURT:  I'm not saying we're going to spend a
```

Page 5

```
 1    lot of time on it, but we have to take it up.
 2              MR. SHANNON:  Got you.
 3              THE COURT:  Okay.
 4              MR. NGUYEN:  Good afternoon.  Ha Hguyen for the
 5    U.S. Trustee.  Also from my office is Jayson Ruff and also
 6    Christopher Roth Travis.
 7              THE COURT:  Okay, good afternoon.
 8              MR. MARTIN:  Good afternoon, Your Honor.  Jarrod
 9    Martin for Texas plaintiffs.
10              THE COURT:  Okay, good afternoon.
11              MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan
12    Chapple for the Connecticut plaintiffs.
13              THE COURT:  Good afternoon, sir.
14              MS. HASELDEN:  Good afternoon, Your Honor.
15    Elizabeth Haselden, Subchapter 5 Trustee, and I have with me
16    Elizabeth Freeman.
17              THE COURT:  Okay, good afternoon.  Anyone else in
18    the courtroom wish to make an appearance?  Okay.  I've muted
19    the line.  If you wish to make an appearance, you'll need to
20    hit 5 star.  There are a number of people on the line, and I
21    think it's just easier to go that route.  Anyone else wish
22    to make an appearance at this time, just hit 5 star.
23              Okay, going with a 512375.
24              MR. LEMMON:  Your Honor, Steve Lemmon for PQPR.
25              THE COURT:  Good afternoon, Mr. Lemmon.  Mr.
```

```
 1    Lemmon, I'm going to leave your unmuted, okay?  Just please
 2    keep your phone on mute.
 3              MR. LEMMON:  Yes, sir.
 4              THE COURT:  Okay, thank you.  Anyone else?  Seems
 5    to be it on the line.  Why don't we, I guess, the status
 6    conference that is required under the Bankruptcy Code.  I'd
 7    like to start with that to satisfy the statutory duty of the
 8    Debtor and make sure that we comply with the Bankruptcy Code
 9    and get a status update as to where these cases are, and
10    then let's take up the retentions.
11              But before we do that, that's the order.  If
12    there's anything anyone wishes to tell me at a high level
13    picture for purposes of today and where things stand, now's
14    the time to tell me or we can take it up in due course.
15              Okay.  If we can start with the status conference,
16    that'd be great.  Thank you.
17              Good afternoon, Mr. Battaglia.  Good to see you.
18              MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray
19    Battaglia for the Debtors.  The Debtor filed its status
20    report at the time dictated by the Court's prior order.
21    It's a relatively brief status report.  Obviously, things
22    have happened in front of this Court and the parties are
23    well aware of.
24              THE COURT:  Can you just get that mic just a
25    little bit closer to you or just curve it a little bit, make
```

Page 7

1    sure the folks on the line can hear you.

2         MR. BATTAGLIA:  Is that better, Judge.

3         THE COURT:  Oh, much better.  Thank you.

4         MR. BATTAGLIA:  Thank you.  Many things have

5    happened in the Court that primarily relate to operating

6    issues, and I'll not belabor the record with a recitation of

7    those.  If the Court wants to ask regarding developments in

8    those, I'll be happy to discuss them.

9         Obviously, we have hearings set on a number of

10   matters on October 12th, and I don't think there's a need to

11   belabor where we are on those.  There is discovery, the

12   deposition of Mr. Schwartz that will happen Friday.  Mr.

13   Rowe's deposition is set for October 4th.

14        THE COURT:  Who's Mr. Rowe?

15        MR. BATTAGLIA:  Mr. Rowe was a consultant that was

16   retained to assist in evaluating the numbers that formed the

17   PQPR debt.

18        THE COURT:  Okay.

19        MR. BATTAGLIA:  So he was instrumental in that

20   effort and, therefore, he's someone with knowledge and

21   information that is requested.  And ultimately, currently

22   he's an employee or he's employed by, at least as a

23   consultant on a contract basis, by PQPR.

24        THE COURT:  Okay.

25        MR. BATTAGLIA:  With respect to really the

1    fundamental push of this case, the plan of reorganization,

2    we have a draft of a plan of reorganization that we're fine

3    tuning a little bit.  I've had conceptual conversations with

4    Mr. Lemmon on behalf of PQPR, Mr. Jordan on behalf of Alex

5    Jones, the Sub V Trustee and her counsel, we've had a more

6    thorough conversation.  And this morning, Mr. Martin and I

7    had a conversation.  I haven't had a time to circle back to

8    the Texas plaintiffs, but, hopefully, those discussions have

9    been shared.

10          Our goal, as opposed to filing it, just filing it

11   when we think we're ready, is to share it with the other

12   parties.  I have no allusions that we'll come to a

13   consensual plan, but I'm certainly willing to try.  The

14   conversations with Mr. Martin were fruitful.  I've had

15   conversations in the past that I've sort of equated it to

16   Lucy was holding the football today.  Whether that football

17   will be there when I kick, I don't know.  But in the past,

18   Lucy didn't even have the football, so that's progress in my

19   mind, and I hope we can do something.

20          Because at the end of the day, my charge and the

21   Debtors' charge in this case as I see it is to maximize the

22   asset value and pay creditors who are owed money with a lot

23   of claims, and that's all I'm here to do.  And if that's the

24   goal of the plaintiffs is to maximize the return on account

25   of their claims, then we have common ground to discuss.

1           And conceptually, of course, the timing of the

2      allowance of those claims of plaintiffs is going to be,

3      without settlement, will be a longer road because there will

4      be appeals and that process will take whatever time it

5      takes.  But the Debtor does generate, we anticipate will

6      continue to generate, net disposable income that can be

7      dedicated to a plan.  Obviously, proceeding under a Sub V

8      changes the confirmation dynamic tremendously for this Court

9      and the burden's on the Debtor to prove are certainly

10     smaller.

11          Mr. Martin and I discussed today possibilities.

12     I'm not saying anybody's agreed to any of this at this

13     point, but perhaps once the plan is shared, that it might be

14     fruitful to seek a mediation in front of perhaps Judge

15     Isgur.  I know he's got a docket now that's been a little

16     more burdened lately, but that's a possibility.

17          And whether it would be more fruitful to proceed

18     to negotiate the plan, as opposed to October 12th hearings.

19     Again, nobody's agreed, nobody's suggesting that's tenable

20     at all.  But ultimately, in my mind as Debtors' counsel, if

21     the plaintiffs were successful in removing the Debtor, the

22     Debtor is still the only party who can propose a plan of

23     reorganization.  And the plan as proposed and confirmed, the

24     Debtor's back in, what are we doing here, so I don't know.

25     We'll see where that goes.  I know Mr. Martin has to circle

1    back to a number of people to see whether anything that we

2    discuss this morning germinates and it may or may not, but

3    our goal is to file a plan of reorganization in the next

4    week to two weeks, and that's where we are, Judge.

5            THE COURT:  Okay.

6            MR. BATTAGLIA:  Happy to answer any questions the

7    Court may have.

8            THE COURT:  I had a couple of questions.  Mr.

9    Schwartz wasn't here last time.  They were kind of financial

10   questions.  And here as we kind of proceeded along, I had a

11   couple of real technical questions, and I can lay them out

12   and anyone can answer them.

13           One was, and I still was looking for a little bit

14   of clarity.  In connection with the last proposed cash

15   collateral order, there was an $80,000 or so request for --

16   I think it was labeled, like, Alex Jones trial travel or

17   something.

18           MR. BATTAGLIA:  Yes, sir.

19           THE COURT:  What did that relate to?

20           MR. BATTAGLIA:  Your Honor, I can answer that.

21   The lift stay order that we presented to you to allow the

22   Connecticut litigation to proceed, part of the agreement

23   that was encompassed in that order was that the Connecticut

24   plaintiffs would not object to the travel expenses for Mr.

25   Jones or for employees.

1              THE COURT:  I understand they didn't object.  I

2    just want to know what it related to.

3              MR. BATTAGLIA:  I understand.

4              THE COURT:  No one told me.

5              MR. BATTAGLIA:  So the budget item there, $34,000

6    of the $80,000 related to just security expenses.  Mr. Jones

7    does not travel freely without security in this world that

8    we're in today and particularly, I guess, being in the

9    backyard of the Sandy Hook disaster.

10             THE COURT:  Why is the estate paying for that?

11             MR. BATTAGLIA:  Well, he is an estate witness as

12   well.  His appearance is just as vital for us as it is for

13   Alex Jones.

14             THE COURT:  Was he paying for any of his travel?

15             MR. BATTAGLIA:  He was not, and you suggested that

16   we needed to come back to you with -- and my conversation

17   with Mr. Jones's counsel was he proceeds, and we'll go back

18   to the Court and ask what the Court thinks is appropriate to

19   pay.

20             THE COURT:  And I'm being honest, I don't know

21   what to do with every time there's a motion filed that we

22   start off with 100 percent we pay for the owner's personal

23   expenses.  And then, like, if the Court has to find it,

24   identify it, notify parties that he's noticed it, and then

25   people come back with their requests.

```
 1              I don't -- who's negotiating this on behalf of the

 2     estate?  Like, why am I finding issues that are 100 percent

 3     in a case where there's two defendants.  I just want to

 4     understand what's happening.

 5              MR. BATTAGLIA:  Your Honor, the last item in the

 6     budget that we were waiting on to be able to present to

 7     parties was the cost of the travel related to the trial.

 8              THE COURT:  The 34,000 was for?

 9              MR. BATTAGLIA:  Was for security.

10              THE COURT:  And what was the remaining, I don't

11     know, 36,000 or 46,000?

12              MR. BATTAGLIA:  So there's obviously airline fees,

13     which we've priced based at a premium economy rate, not a

14     first class rate, for the security personnel and for Mr.

15     Jones.  There was lodging, there were food and other typical

16     expenses associated with travel, vehicles.  And, again, this

17     is for, you know, not just Mr. Jones, but the security

18     personnel who are attending.

19              THE COURT:  Okay.

20              MR. BATTAGLIA:  So we heard you.  We'll accumulate

21     receipts and come back to the Court with an appropriate...

22              THE COURT:  I thought folks heard me when I said I

23     had issues with Mr. Andino and other counsel when that was

24     100 to zero.  I just want to know exactly what's being on

25     the table.  It feels like I'm finding these things, because
```

1    I asked everyone at the last hearing is there anything I

2    should know about this cash collateral budget, and everyone

3    stayed quiet.

4         MR. BATTAGLIA:  It came together, again, at the

5    last minute.  I submitted the budget, along with the draft

6    revised order on the Sunday prior to that hearing, which was

7    on a Tuesday as I recall.

8         THE COURT:  Okay.

9         MR. BATTAGLIA:  You know, it --

10        THE COURT:  I got it.

11        MR. BATTAGLIA:  -- came together rather quickly,

12   Judge.

13        THE COURT:  I appreciate that.  And if that's the

14   answer, that's the answer.

15        I had another question that just related to the

16   schedules.  I saw in the schedules -- and normally, this is

17   what happens at a status conference.  The Debtors filed

18   schedules and the Court asks questions about things like

19   that.

20        There was a payment of about a million dollars to

21   American Express, and if I remember correctly, American

22   Express related to personal expenses.  I'll show it on my

23   screen.  I just want to make sure and maybe it related to

24   something different.  I just wanted to understand.  Let me

25   share my screen here.  Excuse me in the SOFAs, not in the

1    schedules, but in the SOFAs.

2          There were three payments totaling a million

3    dollars, like, leading up to this case to American Express,

4    but I'll let Mr. Schwartz in connection with the first day

5    hearings and cash collateral.  That related to personal

6    expenses.  Are those personal expenses that million dollars?

7          MR. BATTAGLIA:  No, sir.  I'm not going to suggest

8    to the Court that there are no personal expenses in and

9    amongst the million dollars.  But the Debtor had, under

10   prior operations, had a bad habit of using the AmEx card to

11   pay for everything.

12         THE COURT:  Okay, business expense.  Okay, that

13   makes sense to me.

14         MR. BATTAGLIA:  And consequently, a lot of vendors

15   didn't even show up on the accounts payable list because

16   they were paid through AmEx.

17         THE COURT:  Okay.

18         MR. BATTAGLIA:  I would venture to guess a

19   significant, substantial portion of that million related to

20   technical purchases or vendors or suppliers related to the

21   business itself.

22         THE COURT:  Okay.

23         MR. BATTAGLIA:  But I won't tell the Court

24   standing here today that all of it is.

25         MR. BATTAGLIA:  And the $3.1 million to PQPR, who

1   authorized that; was that Mr. Schwartz?

2           MR. BATTAGLIA:  That would have been payments to

3   insiders over a one-year period.  It was under an agreement

4   that --

5           THE COURT:  This looks like it was done over the

6   last 30 days before the case filed.  It's happened before,

7   don't get me wrong.  I'm just trying to understand who

8   authorized these payments.

9           MR. BATTAGLIA:  I'm not aware of the 3 million.

10  There was the prior deal that existed before Mr. Schwartz

11  came into place that paid $11,000 per business day in

12  service of the debt.  But it's not entirely impossible that

13  this also relates to inventory purchases.  PQPR was the

14  primary source of inventory.

15          THE COURT:  That's why I seen that it was in

16  combination of the --

17          MR. BATTAGLIA:  So it maybe a combination of the

18  two and it does say both.

19          THE COURT:  Okay.

20          MR. BATTAGLIA:  No payments in advances.

21          THE COURT:  Okay.  No one is seeing my screen,

22  right?  Somebody needs to talk to me.  No one's been seeing

23  anything I've been looking at.  All righty, that's helpful.

24  Let me share my screen right this time.  That's helpful, now

25  we're looking at stuff.  Miss Santos, you all stop me if you

1    think I'm doing something wrong.

2              That was the $3.1 million.  A million-dollar

3    payment was here on AmEx, $150,000.  Was Mr. Jones an

4    employee, Mr. David Jones an employee?

5              MR. BATTAGLIA:  At certain times, he had been, but

6    he is obviously the Debtors' principal's father.  He's Alex

7    Jones's father.

8              THE COURT:  Okay.  And I know this is October of

9    2021, so that was a while back.  I just want to make sure I

10   understand.

11             MR. SCHWARTZ:  He was not an employee --

12             THE COURT:  At the time?

13             MR. SCHWARTZ:  -- at that time.  That was an

14   advance.

15             THE COURT:  Okay.  Okay, payment on advance.  I

16   couldn't tell if it related to the PQPR.

17             MR. SCHWARTZ:  He just got $150,000.

18             THE COURT:  Okay.  Those were my questions and

19   some of that stuff we covered last time, so I think I have

20   what I need.  Does anyone have any statements or any

21   questions that anybody wants to talk about in connection

22   with the status conference?

23             Oh, I forgot to ask, is assuming the Connecticut

24   litigation has started --

25             MR. BATTAGLIA:  It has, Your Honor.

```
 1                THE COURT:  -- or is ongoing.  Is there a time --
 2                MR. BATTAGLIA:  I think Mr. Jones is on the stand.
 3                THE COURT:  Does anyone know, like, when it's
 4     supposed to end?
 5                MR. LEE:  Your Honor, this is Kyung Lee for the
 6     record.
 7                THE COURT:  Yes, sir.
 8                MR. CHAPPLE:  Your Honor, Ryan Chapple for the --
 9                THE COURT:  I don't want any commentary or spin on
10     it.  I just want to know, like, if there's any timetable.
11                MR. CHAPPLE:  Absolutely.  I believe
12     conservatively, maybe a week and a half or two more weeks is
13     my general understanding, but that answer changes daily.
14                THE COURT:  No, no, no, I understand.
15                MR. CHAPPLE:  So that's the last I  heard.
16                THE COURT:  Okay, but it has started and it's
17     proceeding.  Is it still in the -- it sounds like it's
18     started started, not just jury selection.
19                MR. LEE:  That's correct, Your Honor.
20                MR. CHAPPLE:  There are witnesses.  They're taking
21     witnesses, live witnesses.
22                THE COURT:  Okay.
23                MR. CHAPPLE:  And I heard previously longer time
24     estimates, so I mean...
25                THE COURT:  Okay, yeah, and I got it.  I got it,
```

```
 1   okay.  Does anyone have any statements they wish to make at
 2   this time in connection with the status report?  Okay.  Then
 3   the easiest thing to do maybe -- I know Mr. Battaglia's
 4   retention is up as well.  I saw no objections.  I looked it,
 5   I reviewed, and I'm comfortable with the representations
 6   there.  Anyone object to the retention of Mr. Ray Battaglia?
 7            May I ask the U.S. Trustee on this, so you're okay
 8   with the proposed form of order that was filed?
 9            MR. NGUYEN:  Yes, Your Honor.  I have no problem
10   with Mr. Battaglia's order.
11            THE COURT:  Okay.  Mr. Battaglia, I'm going to
12   note that for the record, there was an application to retain
13   you as counsel for FSS.  I'm going to find that there's been
14   proper notice of today's hearing on it and service of the
15   application.  It's also been proper.  The Court has reviewed
16   the standards under 327 and finds that they've been
17   satisfied.  I also note that there's been no objection and
18   the U.S. Trustee has also approved the proposed form of
19   order.
20            Miss Haselden, I will ask you as well, and you can
21   give me a thumbs up if you're there.  Are you okay with the
22   proposed form of order?  Okay, okay.
23            Then, Mr. Battaglia, I will approve that retention
24   application and I'll get it signed and on the docket this
25   afternoon.
```

1          MR. BATTAGLIA:  Thank you, Your Honor.  Your

2     Honor, I would note one thing is that I was retained as co-

3     counsel, and obviously what happens today will be a --

4          THE COURT:  No, no, no, no, I understand that, and

5     I didn't mean to imply anything.  I just -- you were

6     employed as co-counsel and I guess what I meant to say is

7     I'm approving your retention application.

8          MR. BATTAGLIA:  And I appreciate it, Your Honor.

9          THE COURT:  Maybe that's the easiest way of saying

10    it.  I got it.

11         Okay, let's see.  FSS filed the remaining

12    applications.  I'll let you take lead.

13         MR. SHANNON:  Thank you, Your Honor.  As the Court

14    has noted, we're here on two applications.  They are

15    applications by the Debtor, Free Speech Systems LLC, to

16    employ Marc Schwartz as its CRO, and Schwartz & Associates

17    LLC to help him with that; that is Docket No. 83.  We're

18    also here on an application by the Debtor to employ Shannon

19    & Lee LLP as bankruptcy co-counsel; that's Docket No. 85.

20         The U.S. Trustee has objected to both

21    applications; they're at Docket No. 145 and Docket No. 154.

22    The plaintiffs have joined those objections, filed by

23    joinders.

24         And, Your Honor, there's no dispute that Mr.

25    Schwartz and Shannon & Lee LLP meet the requirements for

1    employment under Section 327(a).  That's not what the

2    objection is about.  There's no dispute that the CRO,

3    proposed CRO and Shannon & Lee are disinterested in this

4    case.  There's no dispute that the retention of these

5    applicants is in the best interests of the Debtors'

6    bankruptcy estate.  That's not what the U.S. Trustee is

7    objecting about.

8            There's no dispute that administration of these

9    Chapter 11 cases will be furthered by the retention of the

10   applicants.  There's really no contention on anything about

11   this case -- that's Case No. 22-643 -- will be furthered by

12   denying the application of the Debtor to employ these

13   applicants.

14           The U.S. Trustee's contention is that the

15   applications to employ should be denied because Mr. Schwartz

16   and Mr. Lee did not amend and supplement their disclosures

17   in the InfoW bankruptcy cases, and that's the entire basis

18   for the objection.

19           And I believe that the U.S. Trustee's position is

20   that after Mr. Schwartz and Mr. Lee met with FSS on May

21   24th, that they should have done a supplemental disclosure

22   in the InfoW cases.

23           THE COURT:  What do you think?

24           MR. SHANNON:  Well, Judge --

25           THE COURT:  You were there.  What do you think?

```
 1            MR. SHANNON:  Well, and actually on May 19th, I

 2    was not there, but I was at the May 24th meeting.

 3            THE COURT:  You were at the May 19th hearing.  You

 4    understand, you were involved in the last cases.  What do

 5    you think?

 6            MR. SHANNON:  Well, Judge, I don't think that's

 7    what Bankruptcy Rule 2014 requires.

 8            THE COURT:  Okay.

 9            MR. SHANNON:  It's not in the text of the rule.

10    The cases that have looked at it and said there is a

11    continuing duty to disclosure, they all say it's because of

12    Section 327(a).  In 327(a), you can only be employed as an

13    estate professional if you're a disinterested party.

14    Section 328 also says you can only be compensated if you're

15    a disinterested professional.

16            At that time, at the time of the May 24th meeting,

17    the InfoW debtors had already decided to dismiss their

18    cases.  They had -- that decision was made, you know, around

19    the May 19th hearing, sometime between then.  By May 23rd,

20    Mr. Lee had put together a motion to dismiss and he had

21    advised Mr. Schwartz that the cases should be dismissed;

22    that was his analysis.  On May 23rd, he had a draft motion

23    to dismiss prepared and they informed the U.S. Trustee of

24    that decision on May 25th.

25            At that point, Your Honor, neither Mr. Schwartz
```

1    nor Mr. Lee were seeking to be employed by the bankruptcy

2    estate.  They never were employed by the bankruptcy estate,

3    but they also at that point were not seeking to be employed

4    by the bankruptcy estate.

5            And when you look at the cases that talk about

6    this, that is what is important.  It's whether the

7    professional is seeking to be employed or has been employed

8    by an order of the Court.

9            Judge, I'll give you just a timeline of events,

10   just a little bit of a broader one.

11           THE COURT:  Okay.

12           MR. SHANNON:  The InfoW cases were filed on April

13   17th and April 18th.  April 29th, the Debtor files an

14   amended trust agreement and plan and support agreement.  And

15   that agreement was never signed by the parties and the

16   reason why was because that same day, the U.S. Trustee filed

17   a motion to dismiss.

18           And then on May 3rd, the plaintiffs came and said,

19   look, we just to release our claims against these InfoW

20   debtors.  We don't want to be involved in this bankruptcy

21   case; we don't want to deal with it.  And that took a little

22   while to effectuate.  So between May 3rd -- by May 13th, the

23   Connecticut plaintiffs had filed pleadings to dismiss the IW

24   debtors from their actions, again, because they didn't want

25   to be involved in the IW debtors' bankruptcy cases.

1          By May 18th, the Texas plaintiffs and the IW

2   debtors had reached a stipulation resolving their claims;

3   that was filed with the Court.  And then on May 19th at 2:00

4   p.m., the IW debtors or this Court entered that stipulation

5   resolving the claims of the Texas plaintiffs against the IW

6   debtors, not this debtor; there's no argument there.

7          Now that same day earlier, Mr. Lee files his

8   application to employ or filed the IW debtors application to

9   employ Kyung S. Lee PLLC.  Now at that time, there was

10  nothing to disclose.  Later that day, FSS contacted Mr. Lee

11  about a potential meeting in Austin the following Tuesday.

12  It was very clear to everyone that the PSA was dead, that

13  that wasn't going to be the way to go.  And Mr. Lee told

14  this Court that the IW debtors were considering to try to

15  get more funding from somewhere else, to try to go with a

16  plan without that, or to just dismiss the cases as the U.S.

17  Trustee demanded.

18          May 21st -- and this will be all in the evidence -

19  - on May 21st, Mr. Lee sent an email to Marc Schwartz, and I

20  believe May 21st was a Saturday.  In that email, Mr. Lee

21  outlined the reasons why the IW debtors should agree with

22  the U.S. Trustee and dismiss their cases, and in particular,

23  it was because it wasn't worth the expense of litigating

24  with the U.S. Trustee over those cases.  There were only, at

25  the time, I think they believed there were four creditors

Page 24

1    remaining; turns out there were actually only three.  Mr.

2    Gilmore, one of the creditors that was remaining in the IW

3    cases actually had been paid, or at least I believe had been

4    paid at that time, definitely been paid by now.

5           On May 23rd, as I said, Mr. Lee had drafted a

6    motion to dismiss for the IW debtors and had circulated it

7    to Mr. Schwartz.  May 24th was the meeting in Austin where

8    they talked about the potential representation of FSS.  May

9    25th, Mr. Lee informed the U.S. Trustee of the IW debtors'

10   intent to dismiss their cases; that had been decided

11   previously.

12          As part of those communications, the U.S.

13   Trustee's attorney informed Mr. Lee, don't file a motion to

14   dismiss; just stipulate and agree to our motion to dismiss

15   that's already pending.

16          On May 26th, Mr. Lee attended the 341 meeting for

17   the IW debtors.  At that 341 meeting, Mr. Lee announced that

18   the IW debtors had decided to dismiss their cases.

19          THE COURT:  What date was that?  What date was

20   that?

21          MR. SHANNON:  That was May 26th.

22          THE COURT:  Thank you.

23          MR. SHANNON:  On June 1st, the stipulation of

24   dismissal agreed to between the IW debtors and the U.S.

25   Trustee was filed.  And it wasn't until June 5th that Mr.

1    Schwartz had finalized an application -- or finalized a

2    draft engagement letter.  They had sent it to Mr. Lee.  Mr.

3    Lee commented on it, sent it back to him with these

4    comments.  And that June 5th engagement letter is the

5    engagement letter that ultimately continues and that

6    ultimately that FSS seeks to retain Mr. Schwartz under the

7    debt.

8             On June 6th, both the engagement letter by Mr. Lee

9    and Mr. Schwartz were signed, and then on June 10th, the

10   Court entered the order dismissing the IW cases.

11            That's also the date that FSS is actually, you

12   know, paid retainers to Lee and Schwartz.  I believe in the

13   application, Shannon & Lee had said it was on or about June

14   7th.  There is an email saying it was going to be paid on

15   June 7th, and we actually looked at the bank and confirmed

16   that; it wasn't actually until June 10th.

17            THE COURT:  Okay.

18            MR. SHANNON:  And again, Your Honor, I just -- at

19   the May 24th meeting, which is the first time there was a

20   disclosable connection, a connection that meant something,

21   the IW debtors had decided to dismiss their case.

22            But I don't think that's even the whole argument

23   here, Your Honor, because even if Mr. Lee and Mr. Schwartz,

24   you know, should have disclosed that connection to the

25   Court, even though the case had been decided to be

1    dismissed, even though they were no longer seeking to be

2    employed, that's not really what we're here for.  What we're

3    here for is whether FSS should be allowed to retain these

4    two parties.

5          Judge, you could -- the U.S. Trustee could go

6    back, could reopen the IW cases and seek sanctions, and

7    that's what the Courts call the proper solution to a, you

8    know, failure to disclose under Rule 2014; they call it

9    sanctions.  And I don't think that those sanctions are

10   appropriate to be imposed on the Debtor FSS, and that's

11   really what the U.S. Trustee is asking you to do.  There are

12   no cases that say that's an appropriate sanction, none, none

13   that I could find.

14         THE COURT:  I'm not sure there's many cases where

15   a debtor's professional started working for another plan

16   support party either, so I don't know if you're going to

17   find facts like that either.  So I understand what you mean,

18   but I read that argument and you got to -- it's not just

19   that easy.  There aren't many cases where two parties to a

20   plan, a debtor was working for one plan support party under

21   a trust taking direction from a trust and then starts

22   working for another plan support party and never discloses

23   it to the Court.  I'm not sure you're going to find many

24   cases like that.

25         MR. SHANNON:  That's true, Your Honor, but there's

1   also --

2           THE COURT:  I can promise you every case is

3   distinguishable, right?

4           MR. SHANNON:  But, you know --

5           THE COURT:  The question is what's the legal

6   principle that apples.

7           MR. SHANNON:  Sure.  The legal principle that

8   applies is about who is getting punished here, and they're

9   trying to see get punished essentially FSS.  I mean, what

10  this is and what the effect would be, would be to decapitate

11  this debtor.

12          THE COURT:  And I'm going to tell you something

13  because I want you to engage in a dialogue with me.  The

14  concern, when you really boil it down, I think you're

15  looking at this too -- you know, looking at this kind of

16  through a check the box perspective, right?  If the

17  behavior, the non-disclosures began in one case and it there

18  are potential conflicts through acts that Mr. Schwartz and

19  Mr. Lee have taken that continue into this case, then the

20  history is important.

21          For example, if, for example, you know, Mr. Lee or

22  Mr. Schwartz's relationship with Mr. Jones or PQPR is

23  concerning, it raises an issue as to whether either one of

24  them can provide sound legal advice to the estate or sound

25  financial advice to the estate, then the history is

007177

1    important, right?

2            So you can't just -- I understand your point that

3    if there's a lack of disclosure in one case, you should look

4    at it as that case and it shouldn't essentially carry

5    forward as a penalty into the new case.  The question is, is

6    there a throughline essentially; that's the question that

7    you've got to answer today, at least that's where I'm

8    focused on.

9            If you're asking me, you know, how I --

10           MR. SHANNON:  Yes, Your Honor.  I'll just state --

11           THE COURT:  -- think about it, that's the way I

12   think about it.  So, for example, so when Mr. Lee is working

13   -- I think you described in May, and Mr. Schwartz are

14   working in late May and have decided that there's no hope

15   for InfoW, what do I do with the fact that there's a

16   pleading filed with me in this case that says on June 2nd,

17   the Debtor is still considering all options, right?

18           How then do I view that, right?  That's the real

19   question, right, and whether that, the changing of the

20   jersey in essence, you know, whether that had already

21   occurred, but no one told me, right.  And so, that's the,

22   hey, we're still considering all options, hey, as a

23   fiduciary, we're thinking about everything, and five days

24   later, you're in a meeting in Austin, you know, with the two

25   plan funding sources in the current case.

```
 1              MR. SHANNON:  And Judge --

 2              THE COURT:  The question is does that carry,

 3    right, into FSS and into this case and it should be judged

 4    into FSS.  And I know that that's where the evidence is; I'm

 5    just telling you the way I'm thinking about this now.  So as

 6    arguments get made, that's the way I -- that's what I'm

 7    thinking about.

 8              MR. SHANNON:  Sorry, Judge.  And I'll just say

 9    that there is no allegation in the objection of anything

10    that you just said, and I agree that that would be something

11    to consider.

12              THE COURT:  I have an independent duty, though.

13    That's my concern, so you're going to have to address that.

14              MR. SHANNON:  I understand.  I understand, Your

15    Honor.

16              THE COURT:  They do mention the June 2nd pleading,

17    though, right?

18              MR. SHANNON:  I believe in the June 2nd pleading,

19    there had already been this stipulation.

20              THE COURT:  Not being disclosed to me, that's what

21    I'm saying.  Everybody may have known.  It's what was

22    represented to me and whether that continues into this case

23    is that's the question I've got to figure out.

24              So let me ask you, Mr. Shannon, did you work on

25    the responses to the objections?
```

```
1              MR. SHANNON:  I did, Your Honor.

2              THE COURT:  Okay.  I'm going to hand you a copy.

3    I want to take this up now before we take up the evidence.

4    That's a copy of what was filed, and there are serious

5    allegations in here.  And I can't avoid not paying attention

6    to them because if they're true, then we're going to have to

7    deal with them, okay.

8              I'm going to turn you to Paragraph 2.

9              MR. LEE:  Your Honor, can I interject?  This is

10   the Schwartz response?

11             THE COURT:  Yeah, yeah.  It's what was filed.

12             MR. LEE:  This is my work, Your Honor.

13             THE COURT:  Anyone can answer.  I asked if you

14   worked on them.

15             MR. LEE:  I'll take care of these, Your Honor.

16             THE COURT:  Okay.  So on Page 2, Paragraph 2.

17             MR. LEE:  Yes, Your Honor.

18             THE COURT:  You say that the U.S. Trustee

19   sprinkled, right, tabloid headlines, fabrications, and

20   misrepresentations.

21             MR. LEE:  Yes, Your Honor.

22             THE COURT:  And that their fabrications are

23   unethical.

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  I want you to point me to the language
```

1    in the -- I'm going to want you to -- and I'm going to print

2    you a copy of the objection.  I want you to tell me what

3    they are.

4              MR. LEE:  And, in fact, I do that in the pleading

5    in my view.

6              THE COURT:  I don't think you do.  This is real

7    serious.  I want to know what's unethical.

8              MR. LEE:  First of all, on Paragraph 4 --

9              THE COURT:  Okay.

10             MR. LEE:  -- where the U.S. Trustee argues that

11   Schwartz did not disclose -- on objection Paragraph 49 that

12   Schwartz did not disclose his connections to FSS or Jones

13   during the InfoW cases; that is a statement in the

14   objection.  And previously in Paragraphs 14 and 15 of the

15   objection, the U.S. Trustee says Schwartz made these

16   declarations in the beginning.

17             THE COURT:  Did he make them to me?

18             MR. LEE:  They were in the pleading filed with the

19   Bankruptcy Court, Your Honor.  That's what I'm saying.  They

20   made the representations in a pleading filed with the Court,

21   and then he changes them --

22             THE COURT:  Schwartz disclosed his connections to

23   me during the InfoWar cases?

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  When?

1          MR. LEE:  In the application that he filed with

2    the Court.

3          THE COURT:  In the InfoW cases?

4          MR. LEE:  Yes, Your Honor, absolutely.

5          THE COURT:  What did he disclose?

6          MR. LEE:  He disclosed that he -- if I may, Your

7    Honor, may I turn to the exhibits?

8          THE COURT:  Mm hmm.  What did he disclose?  Did he

9    tell me he was working for them?

10          MR. LEE:  No.  He filed an application at the very

11    beginning of the case which was Exhibit No. -- I believe one

12    of the early exhibits that got postponed.

13          THE COURT:  Their argument is that nothing was

14    supplemented.  Was there ever a disclosure to the Court that

15    Mr. Schwartz started working for FSS during the InfoWars

16    cases?

17          MR. LEE:  The answer is no, you're not.

18          THE COURT:  So that's not a lie.  Can you tell me

19    what's unethical here?

20          MR. LEE:  But, Your Honor, if I may --

21          THE COURT:  Point me out to what's unethical.  No,

22    because that's serious allegations, right.  You're saying

23    that a branch of the Department of Justice is conducting

24    unethical behavior; that's real serious.  So point me to the

25    unethical behavior that you're describing in this objection.

1          MR. LEE:  Well, that's number one in my view, Your

2     Honor.

3          THE COURT:  You think that's unethical?

4          MR. LEE:  Well, I think that if you say something

5     that's untrue on one page and then you say something else

6     different on another page, then I think that --

7          THE COURT:  Just established that it wasn't --

8     that what you're saying, Schwartz did not disclose his

9     connections to FSS or Jones during the InfoWars.  I never

10    knew about that, so that's a true statement to me.  It's

11    true to me.  It's absolutely true to me, and you just

12    confirmed that I never knew about that, no one never told

13    me, so how is that unethical?

14         I think their whole argument is that no one ever

15    described anything to the Court.

16         MR. LEE:  Your Honor, my statement in Paragraph 4

17    was pointing that in the earlier paragraphs, he pointed out

18    that he made the disclosures at the beginning of the

19    bankruptcy case, which he did in the application.

20         THE COURT:  And he never updated them.

21         MR. LEE:  And, Your Honor, there's no dispute that

22    from May 19th on, neither Lee nor Schwartz made a

23    supplemental disclosure.

24         THE COURT:  That's what they're arguing, though.

25    That's what I read the objection to say is that, Judge, that

```
 1    should have weight.  Tell me where the fact -- where the
 2    unethical behavior is.
 3              MR. LEE:  Well --
 4              THE COURT:  I can print you a copy of their
 5    objection because I want you to point me out.
 6              MR. LEE:  No, Your Honor.  I apologize if you took
 7    it that way, but my percept- --
 8              THE COURT:  I'm just going to interrupt you.  So
 9    let's go to Page 5.
10              MR. LEE:  Yes, Your Honor.
11              THE COURT:  Last paragraph, last in Paragraph 8,
12    okay, "The myth has been perpetuated by the United States
13    Trustee by pointing to the lynching mob at the May 19th," --
14    who is the, what is this mob that you're describing?
15              MR. LEE:  The mob that I'm describing is the fact
16    that everyone knew this --
17              THE COURT:  That's how dangerous that language is?
18              MR. LEE:  Well, Your Honor, one of the reasons why
19    is because, in fact, every time an event takes place in this
20    case, every conduct that we're subject to is somehow
21    misconstrued, misinterpreted.  And no one comes to this
22    Court and tells you the context in which certain things
23    occur.
24              THE COURT:  Well, I'm asking you.  We're going to
25    put you on the stand.
```

```
 1              MR. LEE:  Yes, Your Honor.

 2              THE COURT:  But tell me what's the -- who are

 3    these people that constitute this mob?

 4              MR. LEE:  Well, in the case of --

 5              THE COURT:  No, in accordance with your statement;

 6    who are you describing in this?

 7              MR. LEE:  I think in this instance, I'm describing

 8    the U.S. Trustee's office.

 9              THE COURT:  That's the mob?

10              MR. LEE:  Yes, Your Honor.

11              THE COURT:  I understand, okay.  Let's go then to

12    Page 7, Paragraph 12.  I'm assuming that there are -- you're

13    saying you're being besmirched with lies.

14              MR. LEE:  Yes, Your Honor.

15              THE COURT:  And that the U.S. Trustee decided to

16    pour gasoline on an ember.

17              MR. LEE:  Yes, Your Honor.

18              THE COURT:  And quoting my concerns.

19              MR. LEE:  Yes, Your Honor.

20              THE COURT:  Has anyone addressed my concerns in

21    any of these pleadings?  Has anybody told me about -- has

22    anyone addressed in any of the pleadings in here why the

23    Court was never informed?  Is there a sentence in your

24    response or the response to Mr. Schwartz that addresses the

25    concern that I raised at the beginning of the case; that no
```

```
 1   one informed me about anything that happened in the InfoW
 2   cases.
 3            MR. LEE:  The point is precisely that, you know.
 4            THE COURT:  Can you tell me a sentence where my
 5   concern was addressed?
 6            MR. LEE:  Your Honor --
 7            THE COURT:  In your response, can you tell me --
 8   can you point me to a sentence anywhere in this here that
 9   you describe where the gasoline is being drawn on because of
10   the comments that I made.
11            MR. LEE:  No, Your Honor.  It's not the fact that
12   your comments were creating the fire.  It's the fact --
13            THE COURT:  No, no, no.  They poured gasoline on
14   my comment.
15            MR. LEE:  Your comments --
16            THE COURT:  Tell me where the gasoline is.
17            MR. LEE:  The gasoline is the suggestion that
18   there was some type of unethical conduct when, if they had
19   asked about the sequence and they should have investigated
20   it after you made those comments to us, we could have told
21   them the sequence of events that took place here.
22            THE COURT:  I'm going to tell you, the question
23   I'm going to ask is why didn't you tell me.  Why did you
24   stand up and tell me that -- why did you stand up on May
25   19th --
```

1          MR. LEE:  Yes, Your Honor.

2          THE COURT:  -- and tell me that you all were

3    pursuing other options, and then five days later, you're in

4    a meeting and you're drafting first day declarations a week

5    later; that's what's going to come out.  And I'm just

6    telling you those are the questions that I'm going to ask

7    you, but I want it under oath.

8          MR. LEE:  Your Honor, I'm happy to go under oath

9    and tell you that.

10          THE COURT:  No, no.  I think you're going to have

11    to because I think there's been an objection.  So why don't

12    we just -- I'm just telling you where this is going.

13          MR. LEE:  Your Honor, I'm --

14          THE COURT:  I'm just concerned about the inflamm-

15    -- I asked, and Mr. Shannon was here.  I asked all parties

16    to really -- this is an emotional case and I get it.  And

17    I'm not one to -- I think people should defend themselves

18    vigorously, especially with what's at stake, and I think

19    there's strong emotions on both sides.  I asked everyone to

20    really consider the rhetoric that was here.  In one matter,

21    I had to seal something because of inflammatory language.

22    I've even stopped exhibits from being shown.

23          So when I start hearing that the U.S. Trustee has

24    engaged in unethical behavior, I take those things really

25    seriously.  I'm going to tell you, maybe you can point me

1    out to something, but as of right now, I would have an

2    ethical duty to report any such behavior, and I find none.

3    So I'm satisfied that I've taken care of my duties to

4    investigate whether there was anything in this -- anywhere

5    in this response that really displayed unethical behavior or

6    whether there were flat out lies in these statements, and I

7    find none.

8            That doesn't mean, and I want the U.S. Trustee to

9    understand, I don't mean I don't approve the application.

10   It just means that the reporting obligation that I would

11   have if I found some unproper behavior on behalf of the

12   United States Trustee, I believe has been satisfied.

13           So, Mr. Shannon, how do you want to proceed?

14           MR. SHANNON:  Thank you, Your Honor.

15           THE COURT:  You can take them up at the same time,

16   however you want.  How do you feel comfortable proceeding

17   with Mr. Schwartz and Mr. Lee.  I want you to put on your

18   presentation.  I had to take care of that first because I

19   can't deal with that in the middle of a hearing where there

20   are allegations that go beyond the scope of what we're

21   talking about today.  I had to address that.

22           MR. SHANNON:  Understood, Your Honor.  Your Honor,

23   you basically heard my argument.  But to respond to what you

24   were raising before, there are --

25           THE COURT:  Which portion of it?

```
 1              MR. SHANNON:  I'm sorry.

 2              THE COURT:  I apologize.

 3              MR. SHANNON:  The Court had raised the issue that,

 4     well, if there was something that affected this case, if

 5     there was a connection or some kind of conflict in this

 6     case.  The evidence will show that there is none.

 7              THE COURT:  Okay.

 8              MR. SHANNON:  And ready to have evidence unless

 9     you have any questions for me.

10              THE COURT:  No, no.  I want to give the United

11     States Trustee an opportunity to just kind of make a brief

12     opening if that's what they choose to do.

13              And, Mr. Hguyen, I see it.  I just want to make

14     sure -- got a lot of people listening in.  I want to make

15     sure everybody has an opportunity to hear everything.

16              MR. NGUYEN:  Understood, Your Honor.

17              THE COURT:  Just get close to a mic whenever you

18     do speak.

19              MR. NGUYEN:  Your Honor, we filed two objections

20     in this case, and we don't take these objections lightly.

21     You know, the matter before the Court is primarily focused

22     on disclosure.  Disclosure is looked at most important.  And

23     I remember the first day we were in here and I told the

24     Court, you know, we're going to look at this case with fresh

25     eyes, but as long as everyone operated with complete
```

1    transparency and if there is any lack of transparency, we

2    would be bringing it before the Court.

3            And, Your Honor, during Mr. Shannon's

4    presentation, I don't -- he didn't say, but he seems to

5    suggest that somehow we knew about the connections in the

6    InfoW cases.  I can tell the Court that none of that was

7    told to us.  We found out the same time you found out.

8            So, Your Honor, since transparency in bankruptcy

9    cases in general, you know, plays a very important role.

10   The Debtor has to be transparent, creditors have to be

11   transparent when they file proof of claim, and there's a

12   high standard of transparency that's imposed to almost all

13   the professionals that appear in front of you.

14           The professionals need to come out and lay bare

15   all of their connections.  There's discussions of

16   disclosable connections, material connections, or

17   disqualifying connections.  That's not the standard under

18   Rule 2014.  You disclose all your connections.  You don't

19   pick and choose which connections to disclose and not

20   disclose and, quite frankly, that's what happened in the

21   InfoW case.

22           They decided on May 24th in a room up in Austin to

23   not proceed with the bankruptcy case.  You know, the Court

24   wasn't in that room and understanding (sound glitch)

25   plaintiffs were in that room.  So based on that decision,

1   they made the determination not to disclose to Your Honor

2   their connection with FSS beginning May 24th.

3          And, Your Honor, I think the connection actually

4   began on May 19th when Mr. Lee picked up that phone call and

5   he acted as the recruiter for FSS and asked Mr. Schwartz,

6   who was the CRO, the guy who is in the driver's seat for

7   InfoW cases, to pretty much change his jersey and then work

8   for FSS.  You know that day, May 19th, was when the

9   connection occurred.  And that's under the rule, under Rule

10  2014, that is when they needed to disclose that connection.

11         I know there's discussion about, well, you know,

12  it was May 24th, maybe it was June 6th when we executed

13  agreement.  The date seems to fluctuate, but it all comes

14  down to that May 19th, as far as we know, because the

15  conversation could have occurred before, but we know there

16  was a phone call on May 19th.

17         And remember on May 19th, we were all in this

18  courtroom and there were discussions about Mr. Schwartz

19  needed to -- he needed a month, I think that's what the

20  original request was, to handle the remaining creditors.

21  But all of a sudden within that afternoon, Mr. Schwartz was

22  ready to send that engagement letter to FSS to change his

23  role.

24         And FSS, no matter we're not -- you know, under

25  the rules, all connection, but the connection to FSS was so

1   central to the InfoW case.  This is not talking about your

2   neighbor's mailman's sister.  This is the counterparty that

3   was sitting at a negotiation table in the FSS case.

4          THE COURT:  Mr. Nguyen, let me ask you.  The

5   argument raised by Mr. Shannon is, look, that's we're

6   rehashing InfoW issues, and you have your rights as to

7   whatever it is in the InfoW case.  But when we look at the

8   FSS case, it's different and you should look at FSS.  And

9   what you're seeking to do is inject, you know, potential

10  non-disclosure issues in the InfoW case and infect them into

11  this case.  What's your response to that?

12         MR. NGUYEN:  Your Honor, we're obligated, we are

13  obligated to bring this objection in this case.  Remember,

14  FSS was the connection that they did not tell you in the

15  InfoW case.

16         Now, they're coming into this case asking you to

17  approve -- you're actually -- if you approve these

18  applications, you're actually compounding the disclosure

19  failures in the other case, because FSS is the connection

20  that was not disclosed to you from May 19th all the way to

21  June 10th.  It wasn't disclosed to the Sandy Hook family, it

22  wasn't disclosed to the U.S. Trustee.  I don't believe the

23  Subchapter V Trustee knew about it.

24         The reason why we're objecting is this is the very

25  connection.  The Court is a witness to this.  The Court was

```
1    not told about any of this.  And you say, oh, now it's

2    improper for us to raise this objection while you're asking

3    the Court to bless a connection that wasn't disclosed?  It's

4    relevant here, Your Honor.  They didn't disclose the

5    connection to FSS.  This is the client, the same -- I mean,

6    there are some -- I call them distractions.  There are some

7    distractions saying, oh well, it was a different law firm.

8         Well, you know, when we were talking about 327,

9    we're talking about professionals.  Change your letterhead,

10   doesn't matter, we're talking about professionals.  We're

11   talking about the same people, we're talking about the same

12   connection that was not disclosed to you.

13        And it's, in many ways, a continuation of the

14   previous case because this is the connection that -- I don't

15   want to -- I'm trying to use my words carefully.  There was

16   an non-disclosure of this connection and they're asking you

17   to bless this connection, so that's my response to that.

18        And I'm not obligated to object to this.  I'm

19   obligated to bring this before the Court and I'm not doing

20   this for any unethical reasons.

21        And, you know, I'm glad Your Honor went through

22   that reply.  I wasn't going to do it, but that -- I wasn't

23   going to address it, but I think it's important that there

24   were a serious attacks on my character and also Mr. Ruff's

25   character.  And all I got to say about that is, you know,
```

1    Mr. Ruff and myself appear in front of Your Honor all the
2    time.  You know what type of lawyers we are, and I will just
3    leave it at that, Your Honor.  I won't address the language
4    that was in the reply.

5         But, Your Honor, all we're saying here is there
6    was a serious non-disclosure that occurred with this very
7    connection.  I think under Rule 2014, there is a proverbial
8    fox that guards the henhouse.  What we're asking is harsh,
9    but, you know, disclosure violations when they occur, you
10   know, sometimes the consequences are harsh.  A lot of cases,
11   you might get disqualified.  A lot of cases, you lose all
12   your fees.  But sometimes, that's what it takes to uphold
13   the integrity of the bankruptcy system and that's why we're
14   asking for Your Honor to deny the two applications that are
15   before you.

16        THE COURT:  Thank you.  Is there anyone else who
17   wishes to make any form of an opening if you will.  Mr.
18   Battaglia.

19        MR. BATTAGLIA:  Yes, Your Honor.  Ray Battaglia
20   for Free Speech Systems.  I was Free Speech Systems' counsel
21   in the IW bankruptcy cases.  I guess ultimately my
22   perspective on this, since I've been --

23        THE COURT:  Can you just get closer to the mic?  I
24   want to make sure folks can hear you.

25        MR. BATTAGLIA:  All right.  The continuity I have

1    with this is I am the representative, legal representative

2    of FSS in both cases.  And obviously, there was a certain

3    logic to retaining counsel that had some familiarity with

4    the players and the baseline issues existing here with

5    litigation and the like.

6            So it can't be extraordinary to anybody that prior

7    counsel and prior CRO would be logical selections, not the

8    least of which is the number of people who are willing to

9    take representation of an Alex Jones-related entity is

10   small.  It's a very small universe of professionals.

11           But my perspective on this is did they meet the

12   standard of disinterestedness.  I can't comment on the

13   disclosure issues in the IW case, but my perspective on it

14   is were they disinterested at the time that communication

15   was established about them coming to provide services to

16   FSS.

17           By, I believe it was May 19th, if not before, the

18   litigation claims against the IW debtors had been dismissed

19   with prejudice, and, therefore, as of that date or slightly

20   before then, IW and FSS were ships passing in the night.

21   They did not have common ownership; they did not have common

22   creditors.  There just was no connection at that point in

23   that they'd been disconnected by the dismissals with

24   prejudice, a decision that the plaintiffs themselves decided

25   to make.  Texas plaintiffs actually made that decision the

1    day of or just prior to the filing of the IW cases.

2    Connecticut plaintiffs took a little bit longer and filed

3    their dismissal pleadings in the Connecticut cases.

4         So as far as I could tell from my perspective,

5    they were disinterested; they met the standard.  They didn't

6    represent common shareholders, they didn't represent parties

7    who had common claims against themselves.  And the PSA,

8    which I know is important to you -- and you raised this

9    before when we talked about how it terminated in its own

10   terms and you had asked would there be an extension, and I

11   told you we would agree to extend it and we submitted the

12   draft that was negotiated with the litigation trustees with

13   a new date.

14        It was never executed because by the time it came

15   up, there was no purpose to be served anymore by a PSA.  The

16   PSA was exclusively designed to pay the Connecticut and

17   Texas plaintiffs' claims.  They didn't exist against IW, so

18   there was no purpose served by the PSA at that point.  It

19   was a dead document.  The relationships between the

20   entities, the IW and the FSS entities had ceased to exist by

21   the dismissals.

22        And so, from the Debtors' perspective in selecting

23   counsel and selecting a CRO, we found someone who we believe

24   to be completely disinterested at the time that we engaged

25   them.

```
 1              THE COURT:  Thank you.  Anyone else?  Mr. Chapple.

 2              MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

 3    again on behalf of the Connecticut plaintiffs.

 4              Your Honor, we did, along with the Texas

 5    plaintiffs, filed a joinder to the objections to the

 6    employment objections.  The only note that I would make here

 7    is that candor and disclosure are important with the

 8    parties.  It's always of the utmost importance, especially

 9    in this context, especially when we have these two cases

10    abutting back to back.

11              And when the latter case was filed under

12    Subchapter V, which by statute does not have all of the

13    components relating to oversight and there's typically no

14    committee.  There's typically the creditors who do

15    participate are not as sophisticated as the creditors you

16    see in a typical large Chapter 11.

17              So I believe the only point that the Connecticut

18    plaintiffs, and I believe the Texas plaintiffs as well,

19    would make is that candor and disclosure is absolutely of

20    the utmost importance here, and that's why we filed our

21    joinder to the Trustee's objections.

22              That's all I have right now, Your Honor.

23              THE COURT:  Thank you.  Okay, Mr. Shannon.  The

24    only request I'm going to make is anytime anyone speaks, I

25    just want to make sure -- just get as close as you can to
```

```
1    one of the mics.  If you've got a booming voice, you're

2    good; if you have a soft voice, I just ask that you get a

3    little closer.  I want to make sure that we have a good

4    record.  And obviously, the hearing's being recorded, so I

5    want to make sure that we have a good record for today.

6              Mr. Shannon, I apologize.

7              MR. SHANNON:  Yes, thank you, Your Honor.  I guess

8    first before the hearing --

9              THE COURT:  Actually, I want to talk -- before you

10   get into any argument, exhibits.  Was there any agreement on

11   exhibits as to what the parties could agree to up front?

12             MR. SHANNON:  Yes, Your Honor.  I believe that all

13   of the exhibits are agreed, and those would be --

14             THE COURT:  Hold on.  Let me just make sure we

15   have a good record.  I just want to pull docket numbers and

16   make sure that we're all good on that.  So I see one at 163,

17   Mr. Shannon, where you have exhibits --

18             MR. SHANNON:  One through 34.

19             THE COURT:  -- 1 through 34.  Any objection to

20   that?

21             MR. NGUYEN:  No objection, Your Honor.  We've

22   agreed for all the exhibits.

23             THE COURT:  Okay, let me just go one by one then.

24   So what about 165; that's the U.S. Trustee's, I believe.

25             MR. SHANNON:  No objection, Your Honor, from the
```

1    debtor.

2              THE COURT:  Okay, so that is Exhibits 1 through

3    16?

4              MR. SHANNON:  Yes, Your Honor.  I do believe that

5    on Exhibit 16 is a --

6              THE COURT:  Demonstrative?

7              MR. SHANNON:  -- demonstrative.

8              MR. NGUYEN:  One through 15, Your Honor, so 16

9    doesn't need to go in.

10             THE COURT:  Okay, 1 through 15 at Docket No. 165.

11   You filed one, an additional one today, Mr. Shannon.  Is

12   there any objection to that?

13             MR. NGUYEN:  No, Your Honor.  We discussed it, no

14   objection.

15             THE COURT:  Okay, so then that would be at 178,

16   Exhibits 35 through 37?

17             MR. NGUYEN:  That's correct, Your Honor.

18             THE COURT:  Okay.  So then we have essentially 1

19   through 37 on behalf of Free Speech and U.S. Trustee

20   Exhibits 1 through 15.  Did I get that right?

21             MR. NGUYEN:  Yes, Your Honor.

22             THE COURT:  Okay.  All right, that was the last

23   housekeeping piece.

24             Mr. Shannon, I'm really going to stay quiet this

25   time.  I apologize.

```
 1            MR. SHANNON:  Yes, Your Honor.  I mean, I don't

 2      know if you would like to hear a response from me or we

 3      could just start evidence.

 4            THE COURT:  I want you to proceed.

 5            MR. SHANNON:  Great.  You know, Your Honor, my

 6      understanding from what I hear is that what this Court is

 7      interested in hearing is whether there is anything that

 8      creates a conflict that does not allow Shannon & Lee LLP or

 9      Mr. Schwartz to exercise their fiduciary duties.

10            THE COURT:  I think it's a factor for sure.  I

11      mean, it's the test, right.

12            MR. SHANNON:  So, Your Honor, with that, I would

13      just --

14            THE COURT:  But I want you to put on whatever

15      presentation you want.  I put out that thought because, you

16      know, obviously, I think there could be a connection between

17      the two cases, but you're free to tell me there is none,

18      one, but I just inquire as to that.  But I want you to put

19      on your full presentation.

20            MR. SHANNON:  Your Honor, I would just like to go

21      to evidence and call Mr. Lee.

22            THE COURT:  Okay.  Mr. Lee, please take the stand.

23      I'll get you close to a mic.  There is a binder on the

24      stand.  Who's binder?

25            MR. SHANNON:  Both of those are the Debtors, Your
```

```
 1    Honor.  The large binder would be Exhibits 1 through 35, and
 2    the small binder is Exhibits -- or 1 through 34, I'm sorry.
 3             THE COURT:  And then 35 through 37?
 4             MR. SHANNON:  That's correct.
 5             THE COURT:  Okay.
 6             MR. LEE:  Your Honor, I have in my possession a
 7    blank calendar for 2022.
 8             THE COURT:  Okay.
 9             MR. LEE:  Because the dates are -- I'm just...
10             THE COURT:  Understood.  Raise your right hand.
11    Do you swear to tell the truth, the whole truth, and nothing
12    but the truth.
13             MR. LEE:  I do.
14             THE COURT:  Okay.  You may be seated, sir.
15                   DIRECT EXAMINATION OF KYUNG LEE
16    BY MR. SHANNON:
17    Q    Good afternoon, Mr. Lee.  Can you state your full name
18    for the record.
19    A    Kyung, K-Y-U-N-G, middle name Shik, S-H-I-K, last name
20    Lee, L-E-E.
21    Q    And do you understand that you're here for the
22    consideration of the application for the CRO and Shannon &
23    Lee LLP by the Debtor, Free Speech Systems?
24    A    I am.
25    Q    What is your role in this bankruptcy cases?
```

1    A    In the FSS bankruptcy case, I am a partner with Shannon

2    & Lee, and I'm being put up as a co-counsel for the Debtor,

3    FSS.

4    Q    And, Mr. Lee, when was Shannon & Lee LLP founded?

5    A    In June 1, 2022.

6    Q    Mr. Lee, are you a licensed attorney?

7    A    I am.

8    Q    How long have you been a licensed attorney?

9    A    Since September of 1984.

10   Q    And can you describe your practice for the Court?

11   A    My focus is on corporate bankruptcy work, either for

12   the debtor, committees, or creditors, and I've been doing it

13   since 1984.  Practiced with Sheinfeld Maley & Kay for a

14   number of years and went off for the group in 1993 with

15   Verner Kiipfert and practiced with them as their bankruptcy

16   group for 10 years, and then went off with a small group to

17   join a boutique called Diamond McCarthy, was their

18   bankruptcy group for a number of years until 2018.

19        And then I left to work for Kasowitz Benson for

20   one year, and then formed my own firm as of 2019 and

21   practiced for about six months by myself and then partnered

22   up with my former partner, Mr. Leonard Parkins and Charles

23   Rubio, as of August 1, 2020, and practiced with them two

24   years until May 15th, 2022, when I departed and practiced

25   law with myself for 15 days, from May 15, 2022 to June 1,

1    2022, and then I formed a partnership with you to form

2    Shannon & Lee LLP as of June 1, 2022.

3    Q    Thank you, Mr. Lee.  Are you involved in any

4    professional groups related to your practice?

5    A    I am.  I'm a member of the American Bar Association.

6    I'm a member of the American Bankruptcy Institute.  I belong

7    to the TMA organization here in Houston.  I'm an active

8    member of the American Bar Association Business Bankruptcy

9    Committee, serve on the subcommittee on government powers.

10   I also have acted in the past with the Texas Disciplinary

11   Committee in sanctioning and disciplining attorneys who are

12   in violation of ethical obligations and served on that

13   committee for about five years in the last 1980s, and also

14   serve on several other committees in connection with

15   minority attorneys.

16   Q    Thank you.  If you could turn in the large exhibit book

17   there to Tab No. 1.

18   A    Yes, sir.

19   Q    Take a look at that exhibit and let me know if you're

20   familiar with this document.

21   A    I am.

22   Q    Can you explain what this document is?

23   A    Exhibit No. 1 is an application of Shannon & Lee to be

24   retained as bankruptcy co-counsel in the FSS bankruptcy

25   case.

1  Q    Mr. Lee, when you say co-counsel, what is your
2  understanding of what Shannon & Lee LLPs role would be if
3  the application to employ is granted?
4  A    Shannon & Lee will work together with the Law Offices
5  of Ray Battaglia to represent Debtor FSS in the bankruptcy
6  case.  The division of responsibility will be like in a
7  large law firm where Mr. Battaglia would have certain
8  responsibilities because he's technically the lead counsel
9  and have overall strategy, global kind of responsibility
10  about the case.

11       And it's contemplated that Shannon & Lee will take
12  over a lot of the issues relating to the daily operations of
13  the business and assist Mr. Schwartz in implementing many of
14  the operational issues, as well as assisting Mr. Battaglia
15  in all the work that has to be done in the case.
16  Q    And to date, what kind of things have you been involved
17  in with the Debtor, what matters?
18  A    Since the filing of the bankruptcy case, I've been
19  involved in most of the daily operational issues that have
20  confronted the company, in drafting pleadings with you.  I
21  guess primarily my work has been investigating sort of the
22  capital structure of the company, understanding its business
23  background so as to be able to draft the declaration for Mr.
24  Schwartz in connection with the filing of the bankruptcy
25  case.

```
 1                Number two, understanding the finances of the
 2    company so as to be able to determine what would be an
 3    acceptable disposable net income for the next three years
 4    for a plan of reorganization, as well as understanding the
 5    company's capital structure in order to be able to complete
 6    the financials and also the schedules and the monthly
 7    operating reports, and strategize with respect to the plan
 8    of reorganization.
 9    Q     Mr. Lee, do you have familiarity with the Debtors'
10    corporate structure?
11    A     I do.
12    Q     How did you get that familiarity?
13    A     It started on May 24th, 2022, when we were invited to
14    come to a meeting in Austin, Texas, and we started the data
15    gathering process at that point in time with Mr. Schwartz
16    and with the company people that were available at that
17    time.  It was an arduous task because the company's books
18    and records were not in the best shape.  And so, by the time
19    we got through June 5th or June 6th at that time, we
20    gathered very few documents and were still looking for
21    documents regarding what the company's capital structure
22    looked like, and we're still gathering those document.
23                To this day, we have some of the documents.  But
24    for example, as a major secured creditor, Security Bank of
25    Crawford, we have a proof of claim that still doesn't make
```

```
1    sense and we still don't have their corporate documents as

2    to their secured claim, so we're still missing documents.

3    Q     Mr. Lee, do you have familiarity with the litigation

4    against the Debtors?

5    A     I do.

6    Q     How did you get that familiarity?

7    A     I got the familiarity by studying the state court

8    lawsuits that have been filed.  The state court litigators

9    in Texas made available to me their state court discovery,

10   and so, I studied the thousands of pages of documents that

11   were produced and went through those files to understand

12   what the issues were, as well as what had been produced in

13   the last four years of litigation, in order to determine

14   what documents had been produced relating to the financial

15   aspects of the company, so as to understand what had been

16   represented to the state court litigators so as to

17   understand what will be presented against us in a bankruptcy

18   case.

19   Q     And, Mr. Lee, to date, have you been involved at all in

20   preparing the proposed plan of reorganization that will come

21   in this case?

22   A     I have.

23   Q     And about how much time would you say you've spent on

24   that?

25   A     I've spent, I would say, I can't give you quite a
```

1    number, but I can tell you that I've been involving staying

2    up quite late in drafting a plan of reorganization

3    internally.  I've had strategy sessions with the company

4    internally with you, as well as Mr. Schwartz and Mr.

5    Battaglia, over the classification of various claims, as

6    well as the treatment of various creditors and the concepts

7    of how to put disposable net income and calculate those and

8    had discussions with how to proceed to confirmation on such

9    a plan, and also how to dedicate the avoidance actions and

10   to whom they should be dedicated.

11   Q    Thank you, Mr. Lee.  When was Shannon & Lee LLP first

12   retained by the Debtor, Free Speech Systems LLC?

13   A    My recollection is that the engagement letter was

14   executed on June 6, 2022, when Mr. Alex Jones signed the

15   engagement letter when we were in Austin, Texas.

16   Q    Did Shannon & Lee LLP receive a retainer?

17   A    We did.

18   Q    And when was that retainer received?

19   A    To my knowledge, the retainer was received on June 10,

20   2022, and was sent to us by FSS.

21   Q    Thank you.  If you could look at this Exhibit 1 and

22   turn to Paragraph 15.

23   A    I'm there.

24   Q    You beat me there.  If you could just review Paragraph

25   15.

```
 1    A    I have.

 2    Q    And let me know if anything in that needs to be

 3    changed.

 4    A    It does.  The last sentence where it says that the

 5    retainer was received on or about June 7, 2022 was

 6    incorrect.  We received an email saying that it was sent on

 7    June 7th, but it turns out that our bank records show that

 8    the receipt was on June 10, 2022.

 9    Q    Thank you, Mr. Lee.  If you could turn in your exhibit

10    book to Exhibit 3.

11    A    Yes, sir.  I'm there.

12    Q    Could you tell me what this -- or are you familiar with

13    this document?

14    A    I am.

15    Q    Can you tell me what this document is?

16    A    It's the engagement letter we prepared for FSS that was

17    prepared on or about June 5, 2022, and executed by Mr. Jones

18    on June 6, 2022, retaining Shannon & Lee for the company

19    FSS.

20             THE COURT:  Mr. Shannon, is there any objection to

21    me showing this on the screen, just so --

22             MR. SHANNON:  No, Your Honor.

23             THE COURT:  I want to make sure because normally,

24    our local rules require that exhibits get filed on the

25    docket.  I don't mind waiving it today, but I just want to
```

1   make sure we can all follow along.

2              MR. SHANNON:  Yes.  And, Your Honor, the exhibits

3   were filed on the docket.

4              THE COURT:  Oh, I know, and just no one's -- we're

5   not putting them up.  I just want to make sure that

6   everybody who may be watching or in the courtroom can follow

7   along, if it's okay, but I'm only going to go to the pages

8   that you point to.

9              MR. SHANNON:  Okay.  Thank you, Your Honor.

10              THE COURT:  Okay, thank you.

11   BY MR. SHANNON:

12   Q    Okay, Mr. Lee, if you could turn to Exhibit 4 in that

13   book.

14   A    Yes.

15   Q    Are you familiar with this document?

16   A    I am.

17   Q    Can you describe what this document is?

18   A    This is the declaration that I prepared in connection

19   with the filing of our application in the FSS bankruptcy

20   case, and it recites the declaration of disinterestedness

21   that we're required to file in connection with our

22   application.

23   Q    And did you review this document before coming to court

24   today?

25   A    I did.  And, in fact, I'm responsible for having

1    drafted this document in the first place.

2    Q    And are there any corrections that need to be made to

3    this document?

4    A    I don't believe so.

5    Q    Thank you.  Could you turn to Tab No. 5 and take a look

6    through that.  Are you familiar with this document?

7    A    I'm generally familiar with this document.  It's a

8    conflicts check.  Yes, I'm generally familiar with it.

9    Q    What is this document?

10   A    The document is a conflicts check that you ran in

11   connection with our Clio software program showing the

12   conflicts check that you performed in connection with the

13   potential representation of FSS in this bankruptcy case,

14   which is also Document Nos. 5 and 6.  It shows the hits that

15   we received, if any, in doing the conflicts check before we

16   undertook the representation.

17   Q    And can you tell based on this document on or about

18   what date it was created?

19   A    Performed, it looks like one was performed on August

20   16, 2022, and the other one, Exhibit No. 6, was performed on

21   or about September 16, 2022 if that's correct.

22   Q    Well, okay, let's turn to Exhibit 6 then.  You kind of

23   jumped ahead of me there.

24   A    Sure, sorry about that.

25   Q    Are you familiar with this document and, if so, what is

1    it?

2    A    It's another conflicts check performed by you.

3    Q    Okay.  And you had just said that this one was

4    performed on 9/16.

5    A    That's correct.

6    Q    Okay.  If there were any conflicts -- let me retract

7    that.  What does this document show; what does it determine?

8    A    It determines that there are no conflicts that we're

9    aware of within our firm system that are creditors of the

10   FSS corporation that would create any kind of issue for the

11   firm being able to undertake the representation or that

12   would create a problem of disinterestedness for us.

13   Q    And do you know how this document is -- how it runs,

14   how it's created?

15   A    I have a general idea of it, but it looks like it does

16   kind of a computer search and then it hits on these words

17   that are within our computer system, and if there's a hit,

18   it hits it.  But that's about the best way I know -- I'm not

19   a -- even though I'm not a science major.

20   Q    That's fine.  Let me just ask you, and I'm not asking

21   whether it's in these documents.

22   A    Right.

23   Q    Does Shannon & Lee LLP have any connection to PQPR?

24   A    No.

25   Q    Did it ever represent PQPR?

1    A    We have never represented PQPR.  And again...

2    Q    What connections does Shannon & Lee have to Alex Jones.

3    A    Well, before you -- I want to answer the question about

4    PQPR.  Counsel to PQPR, Mr. Steve Lemmon, was a former

5    partner of mine at Sheinfeld Maley & Kay between 1984 and

6    1993.  Again, I haven't disclosed that, but that's one

7    connection that is there.  Another connection is that Millie

8    Saul was an associate that I trained for four years between

9    1998 and 1992, which I also did not disclose.  But those are

10   as a result of practicing in the bankruptcy area, you tend

11   to have a lot of connections.  And those are the two that I

12   guess, depending upon the day, maybe I should have

13   disclosed; I didn't.  But I didn't disclose them because I

14   don't think they have any impact on my ability to be fair

15   and unbiased in this estate.

16   Q    Thank you, Mr. Lee.  So now a question about Alex

17   Jones.

18   A    Yes, sir.

19   Q    Does Shannon & Lee LLP represent Alex Jones?

20   A    We do not.

21   Q    Has -- strike that question.  Has the Debtor, Free

22   Speech Systems LLC, in this bankruptcy case ever taken any

23   position contrary to Alex Jones?

24   A    Yes.

25   Q    And could you describe one of them?

1    A     In this bankruptcy case, as an example?

2    Q     Yes.

3    A     We've taken lots of adverse positions to Alex Jones.

4    One, there's been a request by Mr. Jones to extend the

5    automatic stay to him; we've told him we can't do that.

6    Number two, he's asked us to bear 100 percent of the costs

7    of all these things, including legal, in connection with

8    these lawsuits; we've told him we're not going to do that,

9    and we've had to fight him on that.

10             THE COURT:  Mr. Lee.

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  On the state court litigation, isn't

13   that what FSS filed originally was a request to pay for 100

14   percent of the legal expenses for Mr. -- the two counsels

15   that are in the litigation in Connecticut?

16             THE WITNESS:  We did, Your Honor.  And then once

17   you told us that we couldn't do that, when we filed the

18   retention pleadings for Mr. Martin, the appellate lawyer, we

19   already told them that we could only bear either 50 to 60

20   percent of those costs.

21             THE COURT:  But I'm saying that you said that you

22   went against Mr. Jones on that.  That was at the request of

23   the United States Trustee and the Court that said that they

24   weren't going to approve without paying their fair share.

25   How did Shannon & Lee take a contrary position?  The

```
1    application was filed requesting 100 percent of the fees on
2    an emergency basis.
3            THE WITNESS:  Your Honor, that is correct.  We did
4    file an emergency basis saying -- to bear the 100 percent
5    and then negotiations subsequently took place.  And, you're
6    right, I need to correct my testimony.
7            THE COURT:  You're talking about after?
8            THE WITNESS:  Yes, Your Honor.
9            THE COURT:  Okay.
10           THE WITNESS:  Yes, Your Honor, absolutely.
11           THE COURT:  Thank you.  Thank you.
12           THE WITNESS:  We did file it as 100 percent, and
13   then subsequently, there were negotiations that resulted in
14   the reduction to 50 and 40 percent, I believe -- 60 percent.
15   Yes, Your Honor, absolutely.
16   BY MR. SHANNON:
17   Q    And, Mr. Lee, just to clarify.  So in the most recent
18   application to employ litigation counsel, the appellate
19   counsel.
20   A    Yes.
21   Q    In that one, there was not a request to pay the full
22   amount.
23   A    That's correct.  We already made -- we already told Mr.
24   Jones's counsel that Mr. Jones would have to bear a
25   proportionate share and they've agreed to bear 40 percent
```

```
 1    and we agreed to bear 60 percent.  And the arguments were
 2    that Mr. Jones has already been cut back on some of his
 3    regular salary and we had an arm's length negotiations over
 4    that issue and came down to a 40/60 split.
 5    Q    And what about PQPR; were there any, you know, contrary
 6    positions taken?
 7    A    To be blunt about it, there were almost fistfights over
 8    the negotiations between PQPR and FSS and Mr. Jones, so to
 9    suggest that we're all in bed together is just nonsense.
10    We've had many disputes over all the terms of the
11    relationship among us, and there's not been one group of
12    people getting into bed together and arranging something
13    secret.  It has been very hardily fought.  It's been very
14    hardily -- it's been negotiated very hard and there have
15    been terms that had to require lots of negotiations to get
16    to a final resolution.
17    Q    Thank you, Mr. Lee.  If you could turn in the exhibit
18    book to Exhibit 7.
19    A    I'm there.
20    Q    Are you familiar with this document?
21    A    I am.
22    Q    And if so, what is it?
23    A    It's the invoice for Shannon & Lee for the month of
24    June 2022 for FSS and the time records for what we did for
25    them during the month of June 2022.
```

1    Q    If you could look through this document and see if you

2    can determine how many hours Shannon & Lee LLP professionals

3    worked on this matter in that month.

4    A    On Page 6 of 7 on Exhibit No. 7, it says that the total

5    was 127 hours and 95 minutes for the month of June 2022.

6    Q    It's .95 hours.

7    A    I'm sorry, .95.  127 hours and .95 whatever hours.

8    Q    Could you turn to Exhibit 8.  Are you familiar with

9    this document and what is it?

10   A    I am.  This is the July invoice that Shannon & Lee

11   supplied to the client, FSS, for the work we did in the

12   month of July 2022.

13   Q    And same question, how many hours does this reflect

14   spent on the matter?

15   A    On Page 5 of 7, it reflects it looks like 140 -- I'm

16   sorry -- I think it's 140.85 hours.

17   Q    Thank you, Mr. Lee.

18        THE COURT:  I have a question on this page and I'm

19   going to ask you anyway.  So on Page 1, you attended a focus

20   group hosted by someone and participated on a jury

21   perception of Alex Jones.  That was work for FSS?

22        THE WITNESS:  Yes, Your Honor.  We're co-

23   defendant.

24        THE COURT:  Okay.

25        THE WITNESS:  We're co-defendant.

```
 1              THE COURT:  I understand.  Thank you.

 2   BY MR. SHANNON:

 3   Q    And, Mr. Lee, let's actually talk about that particular

 4   time.  What was that time entry the Judge just brought up

 5   about the focus group?  Can you describe what you did during

 6   that time?

 7   A    Yes.  I was asked by Andino Reynal, and I spelled this

 8   wrong here, who was our state court litigator who was

 9   conducting focus groups to come in at 10:00 and listen to

10   what the group was saying and how they reacted, and I ended

11   up participating and listening and watching it to determine

12   how the group was reacting to some of the questions and

13   issues that were being brought up about the soon-to-be tried

14   case and getting a sense of the various ranges of jury

15   verdicts that they would give for certain claims.

16              And I was asked to listen to those and get a sense

17   of this so that I could have an idea of the kind of range of

18   estimation of claims that we could kind of get an idea of.

19   Again, just a way of approximating a range of claims for

20   purposes of getting ready for the bankruptcy.

21   Q    And you said the case that was soon to be tried.  Do

22   you know what case that you were talking about?

23   A    I believe it was the Texas case called the Heslin/Lewis

24   suits that went to trial in Texas.

25   Q    And did that case play -- that state court litigation
```

1    have anything that was filed in the bankruptcy case about

2    that?  Was anything filed in the bankruptcy case about it?

3    A    In this case or in the last --

4    Q    In this case.

5    A    The Heslin/Lewis suit, yes.  In fact, that was the

6    motion that was filed on the first day of the FSS bankruptcy

7    case in which the Debtor, FSS, agreed to lift the automatic

8    stay so that that lawsuit could proceed to trial to

9    judgment.  And we filed the motion to lift stay on the very

10   first day and we went and came before Judge Lopez to get

11   relief so that that lawsuit could proceed to judgment before

12   Judge Gamble.

13   Q    And, Mr. Lee, do you remember who argued that motion on

14   behalf of the Debtor?

15   A    It was either you or Mr. Battaglia, I believe; that's

16   my best recollection.  I apologize, but I just don't -- I

17   don't have a good recollection of that day.

18   Q    That's fine, Mr. Lee.  If you could turn in the exhibit

19   book to Tab 9.

20   A    I'm there.

21   Q    What is this document?

22   A    This is an invoice that I submitted to Mr. Schwartz for

23   work that I did on behalf of Free Speech between the period

24   of 5/24 and June 1, when I was practicing alone as Kyung S.

25   Lee PLLC, and that was the invoice I sent to Mr. Schwartz

1    for the work I was doing during that period of time.

2    Q    Okay.  And now why is this for -- you know, why does it

3    say Kyung S. Lee PLLC and not Shannon & Lee LLP?

4    A    Because I was asked to depart at Parkins Lee & Rubio

5    because of a positional conflict that my partners, Parkins &

6    Rubio, discovered on a case that we had brought together in

7    the LTL bankruptcy case.  So when I left the firm on May

8    15th, I did not have another shop to go to, so I went back

9    to my own and practiced by myself for 15 days.

10            And then you and I ended up practicing law

11   together starting on June 1, so I practiced law by myself

12   under Kyung S. Lee PLLC.  And at that point in time, InfoW

13   debtors did not have counsel and so, I thought it was

14   important for me to get myself situation so that I could

15   help Mr. Schwartz finish up the InfoW case, and I did it

16   under the rubric of Kyung S. Lee PLLC, which is a PLLC which

17   I had set up after I left Kasowitz Benson in 2018.

18   Q    Mr. Lee, if you could just summarize the work you did,

19   how would you do that?

20   A    I think the best way to say it is what I've already

21   said before.  These were organizational and informational

22   gathering meetings that we were invited to come to Austin to

23   discuss FSS.  And as you can see by my time entries there

24   starting on May 24th, we were gathering documents and data

25   to understand the company, what it did, what its capital

1    structure was, what its history was, and to gather documents

2    to understand and verify what its corporate and capital

3    structure was and to understand, moreover, what had been

4    produced in the state court system because there had been

5    four years of litigation and my concern was to make sure

6    that I understood what had been produced there so as to be

7    able to manage what we would be -- what would be used

8    against us in the bankruptcy court once...

9            If the company had to go into bankruptcy, I wanted

10   to find out what financial data had been produced so that we

11   wouldn't be contradicting what we'd be saying in the

12   bankruptcy court versus what had been produced previously.

13   Q    And was there ever an engagement letter with Kyung S.

14   Lee PLLC and FSS?

15   A    I think there must have been one.  I just don't

16   remember right now off the top of my head whether there was

17   one or not, but...

18   Q    You don't remember whether --

19   A    I just don't remember it because I remember there was

20   so many things going on and it was for a 15-day period, and

21   I just don't remember.  Most likely, there would have been

22   one, but I just don't know.  I can't answer you accurately

23   right now off the top of my head, but I'm happy to go look

24   in my records and see if there was one.

25   Q    Well, I don't think we need to do that.  Could you turn

1   back to Exhibit 3 for me.

2   A    Sure.

3   Q    And if you could go to the second page of that

4   document.

5   A    I'm there.

6   Q    And if you could read that Footnote 1 and let me know

7   if that refreshes your recollection.

8   A    Footnote 1 says, "As S&L was formed on June --

9   Q    I don't need you to read it.

10  A    Okay.

11  Q    Does it refresh your recollection?

12  A    It does not refresh my recollection as to whether there

13  was a written engagement letter.  But I put the client on

14  notice that I have been practicing by myself May 15th and

15  June 1 and that to the extent the fees were paid, that they

16  would be allocated to my PLLC for that period of time to

17  make sure the client knew that there was a separation of

18  entities.

19  Q    Okay.  All right, and so, Mr. Lee, what is your

20  understanding of what the U.S. Trustee's objection is in

21  this case?

22  A    The U.S. Trustee's objection, as I understand it, is

23  that Kyung S. Lee, Mr. Lee I guess, that I failed to make

24  the appropriate disclosures when I was getting involved with

25  FSS as of May 24, 2022.  And more accurately, that I failed

1    to disclose to them and to the Court and to the creditors my

2    involvement starting as of May 19, 2022 with FSS and going

3    through the June 10th period of time.

4    Q    Okay, thank you.  I'm going to skip quite a number of

5    these exhibits, but if you could just tell me briefly what

6    your involvement in the InfoW cases was.

7    A    My involvement in the InfoW case was I was the primary

8    partner in charge of representing the three debtors, along

9    with you as my primary associate at Parkins Lee & Rubio, and

10   we were the primary bankruptcy counsel for the three

11   debtors.

12   Q    And what was the -- what was trying to be accomplished

13   in those InfoW cases?

14   A    Prior to the filing of the bankruptcy case, Alex Jones

15   and FSS and the debtors had agreed to a plan structure in

16   which, number one, Mr. Jones dedicated the equity interest

17   in the three debtors into a trust agreement so that he would

18   have no interest in the three companies, first of all, so

19   that he would lose all interest in that.

20          Number two, the trust would be manned by two

21   former bankruptcy judges, Judges Nelms and Schmidt, who

22   would basically be the trustees over the three entities

23   during the bankruptcy case, as well as on a post-

24   confirmation basis.

25          Number three, the plan contemplated that the trust

1   would oversee a plan of reorganization whereby the plan

2   contributors -- that would be FSS and Alex Jones -- would

3   contribute the following things upon confirmation of the

4   plan: (a) $2 million on the effective date of the plan; (b)

5   approximately, I believe, some amount of money each quarter

6   -- I think it was either $200,000 or $500,000 a quarter,

7   such that for the next X number of years, the total

8   consideration was going to be $10 million to the total group

9   of tort and contingent unsecured claimants at that time.

10          And then number three, the trust had been funded

11   with approximately $725,000 of cash, which would be enough

12   funds to fund the Chapter 11 administrative process so that

13   the InfoW debtors could get the plan confirmed with these

14   elements in it: the LST trust, the plan support agreement,

15   as well as funding during the Chapter 11 case, which all was

16   predicated on the idea of getting the Connecticut plaintiffs

17   and the Texas plaintiffs under one roof so they could all be

18   adjudicated and handled in one roof under the bankruptcy

19   Court.

20   Q    Okay.

21   A    Was that clear?  I just want to make sure.

22   Q    It was clear.  It was clear.  If you could turn to Tab

23   No. 12.

24   A    I'm there.

25   Q    Are you familiar with this document and, if so, what is

1    it?

2    A    This is the emergency application that the debtor

3    drafted in order to --

4    Q    You said the debtor.  Who do you mean?

5    A    Oh, I apologize.  This is the application or emergency

6    application submitted by the InfoW debtors to put in place

7    the two liquidation trustees, former Judge Nelms and former

8    Judge Schmidt, so they could oversee the trust that would

9    essentially be supervising the plan of reorganization, as

10   well as the Chapter 11 process when they were in place to

11   further negotiate the plan support agreement.

12   Q    And just from your memory without looking at the

13   exhibit, do you remember if the plan support agreement you

14   just talked about had a termination date?

15   A    Yes.

16   Q    Do you remember what that date was?

17   A    There were several: April 30, 2022, I believe was one.

18   Number two, there were other conditions, including I believe

19   Paragraph 8 of the plan support agreement contains several

20   termination provisions, including the necessity for filing a

21   plan of reorganization by April 30th.  There was also a

22   provision requiring that the LST trustees be appointed by

23   the bankruptcy court by April 30th.  And those are the two

24   ones that I remember specifically which were contained in

25   Paragraph 8 of the plan support agreement that I remember

1    reading.

2    Q    Okay.  And what was -- under the plan support

3    agreement, there were other parties that were funding this,

4    not the IW debtors, correct?

5    A    That is correct.

6    Q    And why were they doing that?

7    A    The whole idea was that Mr. Jones and FSS would be

8    funding the trust in order to get what they called a full

9    release.  In other words, there would never be a release

10   like in the Purdue or these Boy Scouts cases.  The idea was

11   that they would get a full release only and only -- if and

12   only when the creditors in the trust got paid in full.  And

13   the idea was that they would dedicate the amount of monies

14   into the plan over the period of the plan so that only when

15   those creditors in the plan got paid in full would they get

16   a release.

17   Q    And was that agreement you just talked about ever

18   renegotiated in the IW cases?

19   A    It was.

20   Q    Can you describe that renegotiation?

21   A    I can give you only just general terms because I myself

22   and Mr. Schwartz, we were not involved in it intimately

23   because we were on the operational side.  The major

24   negotiations took place between the potential trustee's

25   counsel, which was Mr. Okin for Mr. Nelms and Mr. Schmidt,

1    and I believe the counsel for Mr. Jones, which was Shelby

2    Jordan, and counsel for FSS, which was Mr. Battaglia, and I

3    believe you were involved in looking at the documents.

4              They all got renegotiated so as to take in the

5    concerns of this Court and the creditors and they got filed

6    on the Court as Document ECF No. 48 on April 29, 2022, and

7    they were redlined to reflect all the changes that were made

8    by the parties and also a clean copy was filed at ECF No.

9    48.

10   Q    If you could turn in the exhibit binder to Tab 14.

11   A    Yes, sir.

12   Q    Take a look at this exhibit and, I guess, first, are

13   you familiar with it?

14   A    I am.

15   Q    And what is this document?

16   A    This is ECF 48 on InfoW case.  This is a document

17   that's the notice that was filed attaching both the clean

18   and the redline copies of the trust, as well as the PSA, the

19   plan support agreement, that was renegotiated between April

20   17th, the petition date, and April 29, 2022, among the

21   parties and filed with the Court to reflect the changes that

22   the parties were making as the case progressed.

23   Q    Okay.  Who negotiated this agreement on behalf of Free

24   Speech Systems?

25   A    Ray Battaglia as I remember.

```
 1    Q     Okay.  Who did you represent in the limited

 2    negotiations you just testified?

 3    A     The three debtors, InfoW debtors.

 4    Q     And what about Mr. Schwartz.

 5    A     InfoW debtors.

 6    Q     Okay.  And I guess just to ask, who did I represent in

 7    that?

 8    A     InfoW debtors.

 9    Q     Were the amended PSA reflected in here ever executed?

10    A     No.

11    Q     And why not?

12    A     Number one, the emergency motion to appoint the

13    trustees, Exhibit No. 5 or the one that we just talked

14    about.  I'm going to go back to it, just a minute, one

15    second to be clear.  Exhibit No. 12, which was the emergency

16    motion to appoint the trustees; that was never approved by

17    the Court, and it kept on being passed and continued, so

18    that was never done.

19          Number two, the documents that were renegotiated

20    that the people worked on day in and day out that got filed

21    on April 29th.  The role changed completely on May 3rd when

22    the Connecticut plaintiffs and the Texas plaintiffs filed a

23    notice with this Court saying, Your Honor, we need a status

24    conference with you because we have some news that we want

25    to tell you about certain things we have done in our
```

1    respective state court, which was specifically we're going

2    to dismiss InfoW debtors from our respective state court

3    litigation, and that's the notice they sent.

4            So the Court set a hearing, I believe, on or about

5    May 6, 2022, in which they came to Court and said, Your

6    Honor, we think this case -- we don't want to be part of

7    this case anymore and here are the pleadings we're filing in

8    the respective state courts to show that we're dismissing

9    the three InfoW debtors from both the Connecticut and the

10   Texas state courts in the Sandy Hook lawsuits.

11   Q    Well, when you say state courts, were those litigations

12   removed through the Federal Bankruptcy Court at that time?

13   A    I apologize for not clarifying that.  On the day that

14   we had filed bankruptcy for the three debtors, InfoW debtors

15   on April 17 and 18, 2022.

16   Q    Is that a yes?

17   A    Yes, I'm sorry.  Yes, I apologize.

18   Q    And so, is that what you meant when you said state

19   court litigation, the removed state court litigation?

20   A    I did.  I'm getting ahead of myself.

21   Q    If you could turn to Tab 16.

22   A    Yes.

23   Q    Are you familiar with this document and, if so, what is

24   it?

25   A    This is the -- let me just look at the date.  This is

1   the filing made by the, I believe the Connecticut plaintiffs

2   on May 2nd in which they're requesting an expedited status

3   conference with Judge Lopez in which they want to announce

4   to the Court that they had basically filed motions to

5   dismiss their claims against the InfoW debtors in

6   Connecticut state court litigation.

7   Q    Okay.  And so, when you referenced May 3rd, is this one

8   of the documents you were --

9   A    I am, that's correct.  I apologize for the mistaken

10  date.

11  Q    No need to apologize.  If you could turn to Tab 17.

12  A    Yes.

13  Q    Same questions.  Are you familiar with this and, if so,

14  what is it?

15  A    This is the same document.  This is a document that was

16  filed by the Texas plaintiffs stating that on May 6, 2022,

17  they want to join in the request by the Connecticut

18  plaintiffs for a status conference with Judge Lopez, also

19  wanting to say we're dismissing the InfoW debtors from their

20  respective lawsuits in Texas.

21  Q    And this is the other one that you had just talked

22  about as affecting the PSA.

23  A    Correct.

24  Q    Okay.  If you could turn to Tab 18.

25  A    Yes, I'm there.

1    Q    What is this -- are you familiar with this document

2    and, if so, what is it?

3    A    The document is an email from Mr. Ruff from the U.S.

4    Trustee's office on May 17th in which memorializes our

5    discussion that we've had regarding the direction of the

6    case.  It's a memorialization of our conversation he and I

7    have had, which we've had many of during the case regarding

8    the direction of the case, and he's setting forth his

9    arguments of why, at least from his perspective, he believes

10   that the cases should be dismissed as soon as possible.

11   Q    And if you could look down that and read that last

12   bullet point there out loud.

13   A    The last bullet points says from Mr. Ruff, "Dismissal

14   is the more efficient and cheaper option for these debtors

15   as it will save from administrative and litigation costs and

16   will still allow debtors options to resolve their claims."

17   Q    And, Mr. Lee, did you -- you received this email,

18   correct?

19   A    I did.

20   Q    Did you evaluate it?

21   A    I did, and I also evaluated it with Mr. Schwartz.

22   Every time one of these came, Mr. Schwartz and I discussed

23   it, we evaluated all the things that Mr. Ruff was saying and

24   considered it with all the other factors that we had to deal

25   with in the bankruptcy case, in the InfoW bankruptcy case.

1    Q    Okay.  If you could turn to Tab No. 19.

2    A    Yes, I'm there.

3    Q    Are you familiar with this document and, if so, what is

4    it?

5    A    It is, 19 is a copy of my application for Kyung S. Lee

6    PLLC.  It's the application to be retained in the bankruptcy

7    case of InfoW, which I filed on May 19, 2022.  And my

8    recollection is that I filed this application probably first

9    thing or early in the morning on May 19th because we had the

10   status conference with Judge Lopez at 2:00 p.m. that day in

11   which we were going to the Court and tell the Judge that we

12   had reached final agreement with the Texas plaintiffs about

13   the stipulation regarding their dismissal of their claims

14   against the debtors with prejudice.

15   Q    And, Mr. Lee, did you have any connection with FSS when

16   this was filed?

17   A    Absolutely none, other than the fact that they were

18   counterparties to the PSA when we first started the

19   bankruptcy case.  And, in fact, that's a point that I want

20   to clarify for this Court, and that is not until after I

21   finished the status conference with Judge Lopez on that

22   date, May 19th, that I received a call from Mr. Battaglia to

23   come to Austin and that's the point that I've been trying to

24   tell everyone since.  And that's the reason why, even if I

25   were able to make that disclosure, I couldn't make the

1    disclosure to Judge Lopez at 2:00 p.m. because I didn't

2    receive the call from FSS about coming to a meeting before

3    2:00 p.m.

4    Q    Okay, thank you.  If you could turn to Tab 20.

5    A    Yes.

6    Q    Are you familiar with this document and, if so, what is

7    it?

8    A    This is the document, as I recall, that the Connecticut

9    plaintiffs filed on or about May 19th before the hearing in

10   which they gave notice that in Connecticut that they had

11   filed their motions to dismiss with prejudice their claims

12   against the debtors, InfoW debtors, by motion.  There had

13   been a mistrust by the Connecticut plaintiffs to do any kind

14   of stipulations with the debtors because they thought that

15   it would be used later against them by one of the co-

16   defendants to say something that it didn't say, so they

17   proceeded by motion, while the Texas plaintiffs did

18   stipulations with the InfoW debtors that Mr. Battaglia and I

19   worked on that we presented to Judge Lopez on May 19th at

20   2:00 p.m.

21   Q    If you can talk about that stipulation, if you could

22   turn to Tab 21.

23   A    Yes.

24   Q    Are you familiar with this document and, if so, what is

25   it?

```
 1   A    I am.  Exhibit No. 21 is the stipulation that the Texas

 2   plaintiffs and I worked on behalf of the debtor InfoW, Mr.

 3   Battaglia and I negotiated this during the week before May

 4   19th and we filed this either the day before on the Court's

 5   docket and then we came to Court on May 19th and asked Judge

 6   Lopez to approve it.  And then Mr. Battaglia, I believe,

 7   took it and he filed it in the Western District of Texas so

 8   that Judge Mott and others could rule on their motions to

 9   remand.

10   Q   Mr. Lee, I have a question.  How did this benefit FSS,

11   this stipulation and order?

12   A   This stipulation had nothing to do with FSS.  I was not

13   thinking about FSS.  This was for the benefit of the debtor.

14   It was for the fact that they were dismissing the claims.

15   And my charge from Mr. Schwartz, ever since we were told

16   that the plaintiffs in both Connecticut and Texas were

17   dismissing us, my charge from Mr. Schwartz to me was make

18   sure that they dismiss us with prejudice, that there are no

19   longer creditors, and make sure that those dismissals are

20   absolutely clean and that they are gone forever from these

21   estates.

22         That was my duty and he told me to go implement

23   that and that's what I was told to do from May 19th until

24   these things got done -- from May 3rd until May 19th; that

25   was my charge, that's what I worked on.
```

1    Q    And you said the debtor and you said the estates.  You

2    mean the InfoW debtors?

3    A    InfoW debtors, yes.

4    Q    I want you to turn to Tab 26.

5    A    I'm there.

6    Q    I want you to read through it and it goes on for a

7    couple of pages and tell me what this document or if you're

8    familiar with this document and, if so, what it is.

9    A    I'm familiar with the document.  This is an email which

10   starts the string on May 25, 2022, if you go back to Page 5

11   of 5 on Exhibit No. 26.  This is a document in which after I

12   had evaluated -- let me just start.  May 19th is when we go

13   to Court and tell Judge Lopez that the Texas plaintiffs have

14   stipulated to dismissal with prejudice.  Judge Lopez signs

15   the stipulation and we file it.

16        Thereafter, we start working.  Mr. Schwartz and I

17   start evaluating whether or not the company should proceed

18   to Chapter 11 or dismiss.  We make an evaluation, which

19   we'll talk about in some of these other emails.  But Mr.

20   Schwartz tells me, we've concluded, that we're going to

21   dismiss the case, and we make the announcement to the U.S.

22   Trustee on May 25th -- that's the first email that you see

23   at the very beginning on Page 5 of 5 -- at which point in

24   time, Mr. Ruff and I begin discussions on how to get the

25   dismissals done.

```
 1                I'm telling Mr. Ruff I need some more time because

 2      I want to do it right because I may take more time to get

 3      some of these things done because I've been pressured to do

 4      it so quickly, I don't want to make any mistakes.  He says,

 5      Kyung, get it done quickly.  You can do it through a

 6      stipulation of dismissal of our motion to dismiss.  So we

 7      look at that idea and we start drafting a stipulation of

 8      dismissal.  We go back and forth and --

 9                MR. NGUYEN:  Objection, Your Honor.  I don't think

10      hearsay testimony.

11                THE WITNESS:  He's a party.

12                MR. NGUYEN:  He's explaining what Mr. Russ was

13      saying.  Mr. Ruff (indiscernible)

14                THE COURT:  There's an objection, a hearsay

15      objection.  What's your response?

16                MR. SHANNON:  Your Honor, he's talking about the

17      status of negotiations that are really the crux of the U.S.

18      Trustee's objection to the applications to employ.

19                THE COURT:  Overruled.  He can answer.

20                THE WITNESS:  So basically, this chain of emails

21      starts on May 25th, and then the next thing you see is Mr.

22      Ruff send us on May 27th a proposed stipulated dismissal on

23      May 27th.  The problem I had with the May 27th draft that he

24      sent me was it starts off by saying, "The motion to dismiss

25      by the U.S. Trustee is granted," and that wasn't our deal.
```

```
 1    That wasn't what the agreement was.  The agreement was we're

 2    going to dismiss the case because we had no further need for

 3    the case.  And so, I had to then go and redraft the entire

 4    thing and work with Mr. Schwartz and go get that process

 5    too, so that's what I worked on so that took another day.

 6              And then as you can see, we marked that, and by

 7    June 1, we've gotten it back to Mr. Ruff and he's going

 8    through it and he's eliminated a lot of things that I've

 9    asked for, but we've now come to an agreement by June 1 on

10    that dismissal order or stipulation.

11              So this is what it reflects, but from May 25th to

12    June 1, only thing we're working on between me and him was

13    getting that document correct.

14    BY MR. SHANNON:

15    Q    Thank you, Mr. Lee.  And I actually got a little bit

16    out of order.  I jumped ahead of myself there.

17    A    Sorry about that.

18    Q    If you could go back to Tab 23.

19    A    Sure.

20    Q    Are you familiar with this document and, if so, what is

21    it?

22    A    It is.  This is an email I sent to Mr. Schwartz on May

23    24th -- or on May 19th at 5:24 p.m.  Recall we came to Court

24    on May 19th at 2:00 p.m. and the hearing before Judge Lopez

25    lasted from 2:00 to 2:28 p.m., in which we announced the
```

1    stipulation of dismissal and Judge Lopez signed the

2    stipulation.  I got the call from Mr. Battaglia afterwards

3    and he said, please come to Austin next Tuesday.  I had not

4    mentioned any of this to Mr. Schwartz because of all this

5    other work we were still doing.  And it was only at 5:24

6    that I sent him this email saying, hey, we've been invited

7    to come to Austin to talk about FSS, so let's -- I just want

8    you to know that's when the meeting is going to be.

9           And I didn't mention any of this stuff to him

10   until the hearing was over, until we had dismissed all the

11   claims and, at least in my mind, knew there was no

12   relationship between FSS and InfoW debtors at that point in

13   time because there were no claims that existed between the

14   litigation claimants and FSS, at least at one datapoint that

15   I had.

16   Q    Okay.  And if you could go to Tab 24.

17   A    Yes.

18   Q    Same questions.  Are you familiar with this document

19   and, if so, what is it?

20   A    I am.  This is a document that I prepared after I sent

21   the email on Thursday, May 19th.  I took time on Friday, May

22   20th, Saturday, May 21 to evaluate my InfoW file.  Because

23   one of the things I did not want to do is create this very

24   same problem that we're having right now, which is I did not

25   want the Court, the creditors, or anyone to think that we

1   were running from one project to go into another one

2   thinking that we had all these little issues.

3          So I took it upon myself to study the problem and

4   say, Marc, do we have a problem here, do we need to analyze

5   this, and I took it upon myself for two days to study this

6   and this was the conclusion that I reached, and it was sent

7   to him on Saturday, May 21 at 10:52 in the morning.  And I

8   said I've been evaluating these things and I said, here, I

9   started the evaluation ever since we saw Judge Lopez on

10  Thursday about the dismissals and whether we need to

11  evaluate any of these other things.

12         I said, I've continued to evaluate those issues

13  and reaching the conclusion that the cost to prosecute the

14  Subchapter V bankruptcies for the three debtors to

15  confirmation, especially with opposition from the U.S.

16  Trustee, the fact that the remaining claims or obligations

17  also jointly (indiscernible) by Free Speech Systems; (c) the

18  debtor should have sufficient funds; (d) debtor's reserve

19  and that there should be enough money for the Subchapter V

20  Trustee and that the most efficient way to administer the

21  debtors is to file as soon as possible a motion to dismiss

22  the bankruptcy case.  The motion to dismiss the bankruptcy

23  will be on 21 days' notice to all creditors.

24         I think it would behoove all of us to all agree

25  that this is the right conclusion, that we're moving to

1    implementation of dismissal as the goal.

2    Q    Okay.  So I just want to know, you testified earlier

3    about an email from Mr. Ruff.  Did what Mr. Ruff tell you

4    have any, you know, bearing on your decision here; did you

5    consider what he said in that?

6    A    Absolutely.  As of May 17th, Mr. Ruff had taken the

7    position that no applications for employment of

8    professionals would ever come before a hearing on a motion

9    to dismiss.  He had said that in his email on May 17th and

10   he had continued to take that position throughout any

11   discussions that we've had.

12           So in order for us to get our applications

13   approved in the InfoW case, the estate would have had to

14   spend monies to beat the U.S. Trustee on his motion to

15   dismiss to have the case approved as a Subchapter 11(sic)

16   only to feather our own nests at that point in time to get

17   our applications approved so that we could have final fee

18   applications.

19   Q    Okay.  Let's see, and if we could just go to Tab 25

20   now.

21           THE COURT:  Mr. Lee, hold on.  I'm going to ask

22   you a question about that.

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Are you saying that if you would have

25   requested a hearing date in front of me about an application

1    that I wouldn't have considered it because of what the

2    United States Trustee was arguing?

3            THE WITNESS:  No, Your Honor.  I'm not suggesting

4    that at all.  What I'm suggesting is that the way that the

5    case had already been set, it was clear to me that the U.S.

6    Trustee had already set the motion to dismiss in front of

7    all the applications first.

8            And, number two, that in order to get the

9    applications heard, at least it was my perception, that the

10   U.S. Trustee would oppose that because he was saying that

11   the bankruptcy case was an improper bankruptcy case, and he

12   was saying that it would be improper to have professionals

13   employed in an improper bankruptcy case and, therefore, he

14   wasn't going to let that happen.

15           He wanted the case dismissed without the stamp of

16   a bankruptcy court allowing a professional to be employed.

17   That's the position I think took.  And so, I have to

18   evaluate those facts with Mr. Schwartz and say, was it worth

19   it for us to have that fight to get the fee apps approved.

20   Because as you will see, I again on May 30th, Mr. Schwartz,

21   should we have that fight just to get the protections for

22   us, the professionals, and Mr. Schwartz said to me again,

23   no, Kyung, that's stupid.  Why would you spend more estate

24   monies just to feather our own nest to get bulletproof

25   protection for our fee applications?

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  That's just not worth it.  That's

 3    the dialogue we were having internally.

 4              THE COURT:  Thank you.

 5              THE WITNESS:  Okay.

 6    BY MR. SHANNON:

 7    Q    Okay.  So, Mr. Lee, then let's go to Tab 25.

 8    A    Yes, sir.

 9    Q    Are you familiar with this document and, if so, what is

10    it?

11    A    This document is the email I sent to Marc Schwartz,

12    Chris Schwartz, and Harold on Monday, May 23rd.  Recall, May

13    19th, we have the hearing with the Court.  May 21, I give

14    the analysis.  And to make sure the estate is run lean, I've

15    drafted a motion to dismiss by May 23rd.

16    Q    Okay.  And so, it's after that that then the

17    conversation with the U.S. Trustee you talked about before

18    happened.

19    A    Takes place starting on May 25.

20    Q    Okay.  And on May 24 was the meeting with FSS --

21    A    Correct.

22    Q    -- that is at issue.

23    A    That's correct.

24    Q    Go to Exhibit 27.

25    A    Yes, sir.
```

1    Q    Same questions.  Are you familiar and, if so, what is

2    it briefly?

3    A    This is the stipulation that Mr. Ruff and I worked on

4    from May 25th until June 1, and then we filed it with the

5    Court.  And then it was on, I believe, 10 days' notice and

6    Judge Lopez signed it on June 10th.

7    Q    Okay.  Let me just ask you, was -- well, I guess it's

8    already clear.  Is it correct that KSL PLLC, Kyung S. Lee

9    PLLC, it was never employed in the IW bankruptcy case.

10   A    We were not.

11   Q    At what point did you believe that the IW debtors had

12   determined they were not going forward with that employment?

13   A    May 21.

14   Q    Okay.  And why did you believe that?

15   A    Because I had recommended to Mr. Schwartz that the case

16   be dismissed, and Mr. Schwartz had agreed with me.  And by

17   the time we were going to dismiss the case, there wasn't

18   going to be further need for retaining professionals.  And

19   then that was supplemented by my continuing dialogue with

20   Mr. Ruff from the U.S. Trustee's office, who said let's be

21   efficient in how we administer this Chapter 11 case.  You

22   can pay your professionals outside of bankruptcy and let's

23   dismiss the case and be done with it so that the only thing

24   we should be worrying about is Miss Haselden, Melissa

25   Haselden, the Subchapter V Trustee, and make sure that she

1   has enough -- that the estate has enough money to pay her

2   fees and let's get the case dismissed.

3   Q    And do you remember when you might have heard that from

4   Mr. Ruff?

5   A    It started with the email on May 17th, which we've

6   talked about already, and was repeated throughout the entire

7   negotiations process.  When I was asking for more time, he

8   was asking for dismissal and handle all your administrative

9   fees outside of the bankruptcy.

10  Q    Okay.  I'm just going to ask you straight up, Mr. Lee,

11  why was there never a supplemental Rule 2014 disclosure for

12  Kyung S. Lee PLLC?

13  A    Number one, as we've talked about in our papers, we

14  didn't move -- the idea of seeking employment disappeared as

15  far as the applicant was concerned when the case was going

16  to be dismissed shortly, number one.

17       Number two, if I didn't disclose this to the

18  Court, I apologize, but I think the only time I saw the

19  Court was on May 19th and then June 10th, I believe.  I

20  don't think there was a time between those two periods that

21  I saw the Court.  And as I indicated, I did not know about

22  the FSS meeting until after the May 19th hearing.

23       Number three, I just need to let people know there

24  was not a certainty when we went to this meeting on May 24

25  that Kyung Lee or Marc Schwartz was going to be retained.

1    The idea that there was a letter that Mr. Schwartz sent to

2    me on May 19th, got signed on May 19th, and he got engaged,

3    it's just not true; that's not what happened.  He sent the

4    letter, and it got lost in the ether and neither of our

5    engagement letters got signed until June 6, and we were just

6    there to see if we were going to be retained.

7            And again, I did my best to, on May 21, to

8    evaluate the situation internally with the client and the

9    client said, look, we're done with this case, there's

10   nothing more to do here, and there's no adversary between

11   FSS and InfoW debtors because there's no conflict, and we

12   didn't deal with any of these issues between the two

13   companies between that period of time.

14           And there was a lot of uncertainty because on the

15   other hand, especially for a professional like me, I have

16   client confidences I have to keep.  And so, there were a lot

17   of factors that were going in my mind, and I felt very

18   confident that, from my perspective, there was nothing

19   impinging on the estate because we weren't dealing with any

20   FSS issues at that point in time and had nothing to do with

21   them.

22           And again, if I erred, it's my fault.

23   Q    Okay.  I want you now to go to the small book.

24   A    Sure.

25   Q    And turn to Tab 1.  We're going to switch gears a

 1    little bit and now we're going to talk about Mr. Schwartz

 2    very briefly.

 3    A    Sure.

 4    Q    Same questions as always.  Are you familiar with this

 5    document behind Tab 1?

 6    A    I am.

 7    Q    And, if so, what is it?

 8    A    This is an email that I located last night at midnight

 9    in searching through my outbox and it is an email that I

10    sent to Mr. Schwartz on June 5.

11            THE COURT:  Is this Docket 178?

12            MR. SHANNON:  Yes.

13            THE COURT:  Okay.  I just want to make sure.

14            THE WITNESS:  178-1.  It's an email that I found

15    last night at around midnight.  And what it is it's an email

16    that I sent to Mr. Schwartz on June 5, okay, and if you look

17    on your calendar, June 5 is a Sunday.  And it's an email I

18    sent to him saying, hey, I've made some revisions to your

19    engagement agreement, and I've done it based upon looking at

20    the company agreement of FSS.

21            And the reason why I was doing that was because

22    all the creditors were complaining mightily about, oh, Mr.

23    Schwartz is just the lackey in InfoW; he doesn't have any

24    authority.  So I took the company agreement of FSS, and I

25    tightened up the provisions about his authority, and I

1   redlined it, and I sent it to him on June 5th.

2          And when I looked at last night, I said, you know

3   what, this looks kind of funny, it looks very familiar.  So

4   when I looked at the redline which is attached and I took

5   the engagement letter that everyone's been saying was dated

6   May 19th and it's attached to his application, I took that,

7   and I looked at it and I compared it word for word, and I

8   realized that my redline is the engagement letter.

9   BY MR. SHANNON:

10  Q    Well, let's talk about the redline.  Let's go to Tab 2.

11  A    Sure.

12  Q    Is this the redline that you're talking about?

13  A    It is the redline I'm talking about.  And as you can

14  see, it's a redline that I did for Mr. Schwartz on June 5,

15  2022, in which I tightened up all these things and give him

16  really good powers I think.  And so, all these changes are

17  made, and if you look at the application letter that is

18  attached to his letter, the engagement letter, you will see

19  that every one of these changes are incorporated into it.

20         And so, it was impossible for Mr. Schwartz to have

21  given this letter, the one that he got signed to the company

22  FSS on May 19th.  It's impossible because I hadn't given him

23  these comments until June 5.  And you could see it because

24  at the top of this letter, you see the comma 2022; there's

25  no space between the two letters.  When you see the final

1    engagement letter, it still has that same mistake on it.

2    And I don't know why somebody put May 19th on the top as the

3    final one, but it's got the same error.

4              THE COURT:  Can I ask you a question, Mr. Lee.  I

5    want you to take a look at the screen.  Take a look at the

6    screen there.  It's a supplemental declaration filed by Mr.

7    Reynal.  I'll stipulate that he filed this -- we'll get the

8    date on it -- and that's special counsel.

9              Here's what he said.  Do you consider this to be a

10   true and accurate statement -- I've got to deal with that

11   too -- to your knowledge?  He's saying that FSS retained

12   Schwartz on May 19th and that Schwartz asked him, who's a

13   criminal defense lawyer, whether Mr. Schwartz knew of any

14   financial executive.

15             So I understand what you're saying.  I'm also

16   looking at this and here's another statement filed by

17   someone under -- this was filed on September 12th --

18             THE WITNESS:  Yes.

19             THE COURT:  -- under penalty of perjury.

20             THE WITNESS:  Right.

21             THE COURT:  And it's speaking of an additional

22   relationship on May 19th.  And I will stipulate to you --

23   I'm just trying to see if I can put all the pieces together.

24             THE WITNESS:  Your Honor, I have an answer for

25   you.

```
 1                   THE COURT:  If you don't know it and you filed it.

 2                   THE WITNESS:  I drafted it.

 3                   THE COURT:  Oh, okay.

 4                   THE WITNESS:  I drafted it.  So until I discovered

 5     this issue last night, I was also under the mistaken

 6     impression that the letter was dated May 19th is what I'm

 7     trying to tell you.

 8                   THE COURT:  So do you think Mr. Reynal is -- do

 9     you think the statement that he's making here under penalty

10     of perjury is untrue?

11                   THE WITNESS:  It is untrue because I wrote it for

12     him, and so it was my mistake too.

13                   MR. SHANNON:  Judge, if I could --

14                   THE COURT:  No, no, no.  We take witnesses.  You

15     get to ask questions and so do I.  I'm just trying to put

16     all the pieces together.

17                   THE WITNESS:  Yes, Your Honor.

18                   THE COURT:  Thank you.

19                   THE WITNESS:  It's my fault.

20                   THE COURT:  No, no, no.

21                   THE WITNESS:  It's my fault.

22     BY MR. SHANNON:

23     Q    All right.  Let's go to Tab -- actually, let's answer

24     that real quick.  If you go back to the big book.

25     A    Sure.
```

1    Q    And we'll go to towards the end here.

2              THE COURT:  Mr. Lee, I've got more questions.  So

3    in the previous exhibits that were shown, Mr. Schwartz is

4    attending meetings on May 24th.  So even if I accept that

5    the work was not -- maybe that the retention letter that Mr.

6    Schwartz is indicating, you know, was filed later, he's

7    certainly attending meetings in May in connection with a

8    potential FSS restructuring, right, because he was at the

9    May 25th meeting.

10             THE WITNESS:  May 24th.  Yes, Your Honor, he was.

11             THE COURT:  Okay.

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.

14             THE WITNESS:  No disagreement on that point.

15             THE COURT:  Okay.  I just wanted to understand.

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  I understand your point though.

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             MR. SHANNON:  Sorry, I'm going to take one second.

21             THE WITNESS:  Sure.

22             THE COURT:  Take your time.  So let me ask you

23   this as well, and I'm just trying to put all the pieces

24   together.  Here is Mr. Schwartz's declaration that he filed

25   in connection with the first day case, and he says May 19th

1    as well.  Are you telling me that Mr. Schwartz got it wrong

2    too?

3                    THE WITNESS:  Your Honor, the reason why everyone

4    got it wrong is because I'm the person drafting all of

5    these, and I got --

6                    THE COURT:  I'm assuming somebody's reading it

7    before they sign it.

8                    THE WITNESS:  Your Honor, that's correct.  I can't

9    deny your sentence, what you just said.  But I'm the one

10   who's drafting these, and I did not know -- I did not

11   remember this until last night is what I'm trying to tell

12   Your Honor.

13                   THE COURT:  I know, I understand.  It sounds like

14   Mr. Schwartz didn't either.

15                   THE WITNESS:  No, no one did.  I apologize.  I

16   apologize.

17                   THE COURT:  Okay.  I don't think you remembered it

18   when we first talked about it at the first hearing.

19                   THE WITNESS:  That's correct.

20                   THE COURT:  Okay.

21                   THE WITNESS:  No one did, and I didn't remember it

22   until last night when I came across the email.

23                   THE COURT:  Okay.

24   BY MR. SHANNON:

25   Q    Okay.  Well, Mr. Lee, can you go back to that big book

```
 1   and go to Tab 30.

 2   A    Sure.

 3   Q    If you could go back to the big book and go to Tab 30.

 4   A    Sure.

 5   Q    Are you familiar with that document?

 6   A    Yes, I am.

 7   Q    Can you tell me what it is?

 8   A    That is the attachment to Mr. Schwartz's application in

 9   the FSS bankruptcy case.  It is a copy of his engagement

10   letter to FSS signed on or about June 6, 2022 by Mr. Jones.

11   Q    And what was this letter dated?

12   A    It's dated at the top as May 19, 2022.

13   Q    Okay, no further questions about that.  Okay, now back

14   to the small binder.  I'm sorry, wanted to clarify that.

15   All right, now if you could just go to Tab 3 in that small

16   binder.  Are you familiar with this document?

17   A    It is -- I am.  I am.

18   Q    Please describe to me what this is in relation to the

19   other (sound drops).

20   A    If you look from the bottom up, you will see that this

21   is the email that I sent to Mr. Schwartz on Sunday, where I

22   ask him for his Word document of the engagement letter so

23   that I could make the changes based upon my review of the

24   company engagement letter -- company agreement of FSS.  And

25   then I sent him at 3:05 p.m. certain revisions that we
```

1    looked at are behind Exhibit No. 2.

2              And then at 4:20, he says to me, I'm fine with

3    these changes, and he says you want me to make them, and

4    then he says, I need to read Paragraph 8.01 of the company

5    agreement.  And I tell him I want you to make -- he tells me

6    I want -- I tell him, please make the changes and bring both

7    the redline and the clean to Austin so we can show it to

8    Ray, meaning Ray Battaglia, and client and have it signed.

9    It is too difficult and confusing to do it otherwise.  Do

10   you see what I'm saying?

11             And so, it's concluding our discussion about the

12   changes that need to be made to his engagement letter that

13   he needs to bring to Austin on June 6, the Monday, the next

14   day.

15   Q    So that's when the Schwartz engagement letter was

16   actually signed, irrespective of when the letter was dated.

17   A    That's correct.

18   Q    Okay.

19             MR. SHANNON:  Well, no further questions from me,

20   Your Honor.

21             THE COURT:  I just have one question.

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  So here is the Schwartz declaration

24   submitted in connection with his application.

25             THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Paragraph 19 and 20, he's referring to

2    May 19th again.  Is it your understanding that Mr. Schwartz

3    got that wrong too?

4          THE WITNESS:  Yes, Your Honor, because again --

5    (reads to himself) -- on this sentence, it's correct because

6    I called him after our hearing with you to come to Austin,

7    and that's what he's referring to there.

8          THE COURT:  Okay.  But is it possible that your

9    draft -- there was a draft on May 19th that was submitted,

10   and Mr. Schwartz started working for FSS around May 19th.

11   It's just the final draft of the document was dated -- with

12   the additional language and it was still dated May 19th

13   because that's when the work was done.  Happens all the time

14   in Chapter 11 cases.

15         THE WITNESS:  No, I understand what you're saying.

16   The answer is that Mr. Schwartz probably submitted something

17   to me, and I submitted something to Mr. Battaglia, but it

18   got lost in the paperwork and neither Shannon & Lee nor

19   Schwartz Associates or the CRO had an engagement letter

20   signed until June 6th.

21         THE COURT:  Okay.

22         THE WITNESS:  That's what happened.

23         THE COURT:  Completely understand.

24         THE WITNESS:  So whatever recitations I made about

25   May 19th, it was based upon an erroneous statement or

1   assumption that I made and all those were written by me with

2   that erroneous statement until I found this last night.

3                    THE COURT:  Okay.

4                    THE WITNESS:  That's my error.

5                    MR. SHANNON:  I don't know if this would be a

6   redirect because I did say I pass the witness, Your Honor.

7                    THE COURT:  You did.  You did.

8                    MR. SHANNON:  I can wait.

9                    THE COURT:  Okay.  So why don't we take five

10  minutes and let everybody just take a moment, let everyone

11  stretch their legs out.  Why don't we -- it's 3:17, why

12  don't we come back at 3:25.

13                   THE WITNESS:  Okay.

14                   THE COURT:  Okay, thank you.

15                   CLERK:  All rise.

16                   (Recess)

17                   CLERK:  All rise.

18                   THE COURT:  Okay, we are back on the record in

19  Free Speech.  Mr. Lee, I'll remind you that you're still

20  under oath.

21                   THE WITNESS:  Yes, Your Honor.

22                   THE COURT:  Okay.  Mr. Nguyen, you may proceed

23  with cross examination and just get close to a mic.  I want

24  to make sure we can hear you.

25                   MR. NGUYEN:  I will do my best, Your Honor.

```
 1                THE COURT:  Thank you.

 2                MR. NGUYEN:  Sometimes I forget.  Your Honor, I

 3     got some assistance from Mr. Travis who will be --

 4                THE COURT:  Okay.

 5                MR. NGUYEN:  -- if I can ask Your Honor to give

 6     him control, he's going to be -- I didn't, I was trying to

 7     save paper.

 8                THE COURT:  Okay.

 9                MR. NGUYEN:  So he's going to be showing the

10     exhibits on the screen.  I can't see Mr. Lee's computer, but

11     is the screen --

12                THE COURT:  I think once I -- I think mister --

13     okay, you're good.  You should be --

14                MR. NGUYEN:  Okay.

15                THE COURT:  Okay.

16                MR. NGUYEN:  Great, and Mr. Travis, if you can

17     just go to 163-18 and we'll just start out with that email.

18     Maybe you can just make it a little bit bigger.

19                     CROSS EXAMINATION OF KYUNG LEE

20     BY MR. NGUYEN:

21     Q    Mr. Lee -- nice to see you, Mr. Lee.

22     A    How are you, Mr. Nguyen?

23     Q    I'm doing well.  Thank you for asking.

24     A    Thank you.

25     Q    I just want to jump to this one before I forget.  This
```

1   was an email that you were discussing with Mr. Shannon about

2   -- I think the way you described it was this email was a

3   memorialization of a discussion between yourself and Mr.

4   Ruff.  Was that the testimony?

5   A    Based upon the first sentence.  "Following on our

6   conversation yesterday, please let me know when you've had a

7   chance to discuss these matters with Marc."

8   Q    Okay.  And did you respond to this email?

9   A    I don't know.

10  Q    You've attached Mr. Ruff's email, but -- and I think

11  you said he made some good points about the administrative

12  cost and the dismissal, but were you on board with

13  dismissing the InfoW cases on May 17th, when this email was

14  sent to you?

15  A    The answer is I don't think I made any kind of

16  decisions because I hadn't discussed it with Mr. Schwartz on

17  May 17th yet.

18  Q    So you think the Court should have the benefit of

19  seeing your response to this email just to determine your

20  mental state as of May 17th?

21       THE COURT:  (indiscernible).  Just curl the mic

22  down.  I want to make sure we can hear you.

23  BY MR. NGUYEN:

24  Q    You didn't attach your responses to the exhibit, right?

25  A    I didn't know what exhibits you're going to attach, so

1   no, I don't -- I didn't attach anything if that's what --

2   that's your question.

3          MR. NGUYEN:  Your Honor, I have a rebuttal

4   exhibit, if I can just hand it up to the party.

5          THE COURT:  Sure.

6          MR. NGUYEN:  And Your Honor, may I approach?

7          THE COURT:  Okay.

8          MR. NGUYEN:  I'm going to ask Mr. Shannon

9   (indiscernible).

10         MR. SHANNON:  Yeah, I'm not sure what this is in

11  rebuttal to that --

12         MR. NGUYEN:  Your Honor, the testimony was on May

13  17th.  There was a decision to dismiss the case based on --

14         MR. SHANNON:  I don't believe that was the

15  testimony, Your Honor.

16         THE COURT:  What's the --

17         MR. NGUYEN:  Your Honor, the use of this exhibit

18  without the response, they were making arguments that all

19  these were good points.  I'm just rebutting the fact that

20  they weren't on board at this time.

21         THE COURT:  If you want to impeach the testimony,

22  then --

23         MR. NGUYEN:  Sure.

24         THE COURT:  Then do that.

25         MR. NGUYEN:  Thank you, Your Honor.

```
 1    BY MR. NGUYEN:

 2    Q    Mr. Lee, did you respond to this email?

 3    A    Looks like I responded to, based upon what you showed

 4    me, looks like I did on 4:45 p.m.

 5    Q    And did you describe the email that I believe is on

 6    165-18 as a diatribe?

 7    A    Yes.

 8    Q    And you also told Mr. Ruff to send notice of

 9    depositions for Mr. Schwartz?

10    A    Right.

11    Q    And at this time, you hadn't made the decision to

12    dismiss the case, right?

13    A    That's correct.

14    Q    And --

15    A    We're fighting with the U.S. Trustee on May 17th.  That

16    is correct.

17    Q    Yeah, and you also sent the DOJ legal manual to Mr.

18    Ruff and you told Mr. Ruff to read the DOJ manual, is --

19    A    That's correct.  I was very upset with him.

20    Q    Did Mr. Ruff ever tell you not to amend your

21    declaration in the InfoW case?

22    A    We never discussed my declaration in InfoW case.  No.

23    Q    Okay. And earlier, you mentioned that you've been

24    practicing bankruptcy law since September of 1984, right?

25    A    That's correct.
```

1   Q   Thank you.  And you file a lot of bankruptcy cases?

2   A   I filed cases.

3   Q   Okay.  And you're familiar with Rule 2014, correct?

4   A   Generally, I am.

5   Q   Okay.  And earlier, we went through the little history

6   with the law firms that you were with and just so I can get

7   it clear as it relates to the InfoW case, at this time,

8   you're currently with Shannon & Lee LLP, correct?

9   A   I am.

10  Q   And that started on June 1st, 2022, correct?

11  A   That is correct.

12  Q   And prior to Shannon & Lee LLP, you were with Kyung S.

13  Lee PLLC; is that correct?

14  A   That is correct, for 15 days.

15  Q   And that started May 15 to May 31st, 2022?

16  A   May 16th, 2022 through May 31.  I think May has 31

17  days.

18  Q   Okay.  And prior to -- I'm going to call it KSL PLLC --

19  you were with Perkins, Lee, and Rubio LLC, correct?

20  A   From August 1, 2022 through May 15th, 2022.

21  Q   Okay, so when the InfoW cases were filed on April 17th

22  and -- it was a midnight filling, so there's some cases in

23  April 17th and there was some cases on April -- one case on

24  April 18th, you filed with the firm Perkins, Lee, and Rubio.

25  A   That is correct.

1    Q    Okay.  And prior to the filing -- prior to the filing

2    of the InfoW cases -- and when I talk about InfoW case, I'm

3    talking about InfoW, IWHealth, and Prison Planet, those

4    cases --

5    A    Yes, sir.

6    Q    You were involved in the negotiation of the plan

7    support agreement?

8    A    Yes.

9    Q    Okay.  And you were representing these three entities

10   in the negotiation of those plan -- in the negotiation of

11   the plan support agreement, correct?

12   A    Yes.

13   Q    Okay.  And when you were negotiating on behalf of the

14   InfoW Debtors, you were -- well, who were you negotiating

15   with on the plan support --

16   A    Against or with?

17   Q    Who were the parties to the plan support agreement?

18   A    There was -- Ray Battaglia was representing Free Speech

19   Systems and Mr. Jordan was representing Alex Jones.

20   Q    So it was Alex Jones, Free Speech Systems, and the

21   InfoW Debtor.

22   A    That's right.  We were the party that was going to be

23   the recipient of the funds from Free Speech Systems as well

24   as Alex Jones under the plan support agreement.

25   Q    So there was Alex Jones, Free Speech Systems, and InfoW

1    Debtors, correct?

2    A    That's correct.

3    Q    Okay, thank you.  And then after the bankruptcy case

4    was filed, there was, I believe -- it's a restated and

5    amended plan support agreement that was filed with the Court

6    on April 29th --

7    A    Incorrect.  There was a restated and amended trust

8    agreement, but only an amended plan support agreement.

9    Q    Got it.  So there was an amended plan support agreement

10   filed with the Court on April 29 --

11   A    Correct.

12          THE COURT:  And Nguyen, I want you to take the

13   microphone and just take it -- just turn it down a little a

14   bit.  (indiscernible).

15          MR. NGUYEN:  I'm going to leave it right here.

16          THE COURT:  Well -- that's perfect.  Thank you.

17   And I apologize.

18          MR. NGUYEN:  I apologize, Your Honor.  Sometimes I

19   -- zoned in and I forget.  I'll be more mindful.

20   BY MR. NGUYEN:

21   Q    And Mr. Lee, the parties -- I'm stepping away.  The

22   parties to the negotiation under the amended plan support

23   agreement were the InfoW Debtors, Alex Jones, and Free

24   Speech Systems.  Correct?

25   A    Incorrect.

```
 1    Q    Who else?

 2    A    The trust lawyers.  LST.

 3    Q    Mr. Okin

 4    A    Mr. Okin and he represented the trust Trustees which

 5    were former Judge Nelms and former Judge Schmidt.  They were

 6    the primary ones involved in the negotiations because they

 7    were the ones who were going to take over direction of the

 8    case insofar as negotiations with the parties.

 9    Q    Mr. Lee, are you familiar with the U.S. Trustee's

10    motion to dismiss in the InfoW cases?

11    A    I am.

12    Q    Thank you.  And we'll get back to that in a little bit.

13    And before the U.S. Trustee filed a motion to dismiss, the

14    Connecticut plaintiff and Texas plaintiff also filed motion

15    to dismiss -- motions to dismiss in the InfoW cases,

16    correct?

17    A    That is correct.

18    Q    Yeah.  And if I remember correctly, the Court set a May

19    27th hearing date for all three motions; is that correct?

20    A    That is correct.

21    Q    Okay.  And then there were deadlines for yourself in

22    representing the InfoWars Debtors (indiscernible) to respond

23    to three motions by May 230th, 2022?

24    A    I can't remember the exact day, but there were certain

25    deadlines set for us to respond to.
```

Page 113

```
 1   Q    All right.  You had to respond to all three motions,
 2   correct?
 3   A    That is correct.
 4   Q    And earlier, you mentioned -- on May 3rd, you described
 5   it as the world changed on May 3rd, right?
 6   A    I think that's correct.
 7   Q    Okay.  So as we got closer to the May -- I'll just say
 8   May 20th deadline for you to respond, your objective at the
 9   time was not to take care of the motion to dismiss but to
10   dismiss the plaintiff's claims with prejudice; is that a
11   correct statement?
12   A    I don't understand your question.
13   Q    Okay.  So there's two competing tasks that you have to
14   do, right?  One is to respond to our motion to dismiss and
15   the other task is to make sure that the claims against the
16   InfoW Debtors were dismissed with prejudice and you were
17   more focused on the second task as opposed to responding to
18   our motion to dismiss --
19   A    That's a fair statement.
20   Q    Okay, thank you.  So on May 18th, 2022, you filed a
21   document with the Court and in that document you were
22   requesting additional time to -- you were requesting
23   additional time to -- especially kicking out the deadlines,
24   right, the May 27th deadline to June and then extending your
25   deadline to respond to the U.S. Trustee's motions; is that
```

1    correct?

2    A    That motion asked for several things and it was subject

3    of negotiation between Mr. Ruff and me to kick out the

4    deadlines, discovery deadlines and everything else until I

5    had sufficient time to finish up the negotiations and the

6    stipulations with the dismissing creditors.

7              MR. NGUYEN:   Okay.   And Mr. Travis, can you pull

8    up Exhibit 165-6?

9    BY MR. NGUYEN:

10   Q    And Mr. Lee, are you familiar with this document?

11   A    Can I see the whole thing?

12   Q    Sure.

13             MR. NGUYEN:   Can you please scroll down to Mr. Lee

14   can see the whole thing?

15   BY MR. NGUYEN:

16   A    Yes, generally I'm familiar with this.   This is the one

17   that we sought some more time.   Yes.

18   Q    And is this a document that you drafted?

19   A    Yes, it is.

20   Q    Okay.   And in this motion, you were asking the Court to

21   continue the May 27th date to June 24th, 2022; is that

22   correct?

23   A    I can't read it right now, but --

24   Q    Okay.

25   A    If you say, if you represent that to be the case --

1    Q    Well --

2    A    -- then that's true.

3    Q    Well, let's let you see it.

4         MR. NGUYEN:  Can you scroll to Paragraph 18, Mr.

5    Travis?  And then if you just go to Page 6 a little bit, Mr.

6    Travis.

7    BY MR. NGUYEN:

8    Q    June 24th, 2022.  You see that?

9    A    Yes.

10   Q    So in your motion, the basis for that is restated in

11   Paragraph 21.

12        MR. NGUYEN:  Can you scroll down to Paragraph 21?

13   BY MR. NGUYEN:

14   Q    Mr. Lee, can you read Paragraph 21?

15   A    Sure.  "Continuing the original hearing date until June

16   will also permit a CRO who has been engulfed in evaluating

17   dismissals with prejudice issues to now focus on the

18   remaining creditors of the Debtors.  The CRO will be able to

19   evaluate either before or by the June hearing date whether

20   he should proceed with trying to confirm a subchapter plan

21   of reorganization or handle these claims outside of

22   bankruptcy.  Again, such efforts would be wise use of the

23   limited financial resources.  Such an approach will also

24   save valuable judicial resources."

25   Q    Okay.  And the question is, on May 18th, why do you

1    need an entire month for the CRO to accomplish this?

2    A     Because one, I had not known what else needed to be

3    done with respect to the rest of the dismissals.  For

4    example, we had a Connecticut hearing to dismiss the actual

5    cases up in Connecticut.  That was number one.  That was

6    supposed to take place the week after May 17th.

7          And number two, I needed time to evaluate all the

8    things that Mr. Schwartz hadn't been focusing in on and I

9    was just asking for time in order to be able to do that and

10   that was just my best guess as to what we needed to be able

11   to calmly evaluate because we hadn't had one second of time

12   since April 17th because we had filed the bankruptcy on

13   April 17th and we'd been working around the clock to figure

14   out everything and things had changed very quickly.  And so

15   I was trying to get as much time as possible for the Trustee

16   and for the law firm -- for the lawyers on our side to

17   evaluate which way we should go.

18   Q     Thank you, Mr. Lee.  Did any of the InfoW Debtors have

19   any claims against Alex Jones or Free Speech Systems?

20   A     Not to my knowledge.

21   Q     Did you check?

22   A     Well, sure.  We --

23   Q     Okay.

24   A     -- checked in our schedules, et cetera.

25   Q     Right.  That's good.  So IWHealth LLC had royalty

1    payments, correct?

2    A    That is correct.

3    Q    Was it Longevity or Yongevity?  I always mess it up?

4    A    It starts with a Y.  Yongevity.

5    Q    Okay.  And at a certain point, the royalty payments

6    were deposited into the InfoW Debtors' accounts, correct?

7    A    IWHealth's account.

8    Q    IWHealth account.  But --

9    A    That's correct.

10   Q    But prior to that, where were the funds for the royalty

11   payments --

12   A    They may have been diverted prior to the time -- some

13   of them may have been gone to somebody else rather than to

14   IWHealth.

15   Q    When you say somebody else, could've gone to Alex

16   Jones.

17   A    That is correct.  It could've gone to Alex Jones.

18   Q    Okay.  And how many of those payments went to Alex

19   Jones?

20   A    We don't know.

21   Q    Did you check?

22   A    No, we did not.  Not to my -- I did not check.

23   Q    So if payments that are supposed to go to IWHealth is

24   going to Alex Jones, you think IWHealth has a claim against

25   Alex Jones for those payments?

1    A    Sure.

2    Q    Okay, thank you.  Let's get back to that motion.  So

3    you filed on the 18th.  It was an emergency motion and the

4    Court, as always, gave you a hearing the very next day, May

5    19th.  Correct?

6    A    If you say so.

7    Q    Okay.  Well, May 19th is an important date, right?  We

8    were in Court on May 19th?

9    A    It was an important date, because that's when we went

10   to go get the stipulations approved.  That's when all the

11   parties wanted to get the Texas stipulations approved.

12   Q    Were we in Court on May 19th?

13   A    Yes.

14   Q    Okay, thank you.  And May 19th was also important

15   because that morning you file your application to be

16   employed for the InfoW Debtors with your new law firm, Kyung

17   S. Lee PLLC, correct?

18   A    That is the day I filed my application.  That is

19   correct.

20   Q    And the application requested retention as effective of

21   May 16th?

22   A    That is correct.

23   Q    Great.  And since 1984, I'm assuming you've encountered

24   the word connections far as it relates to a bankruptcy case;

25   is that correct?

Page 119

```
 1   A    I have.

 2   Q    Great.  So let's talk about your application on -- that

 3   was filed on -- I believe it was filed on May 19th.

 4        MR. NGUYEN:  And Mr. Travis, can you go to Docket

 5   No. 165-3 which is, I believe, Mr. Lee's application in the

 6   InfoW case.  And if you can just scroll down to Paragraph

 7   22.

 8   BY MR. NGUYEN:

 9   Q    Do you see Paragraph 22, Subparagraph C on the screen,

10   Mr. Lee?

11   A    Yes.

12   Q    And Paragraph C is actually just a restatement of

13   Bankruptcy Rule 2014, correct?

14   A    Yes.

15   Q    And do you see the word person's connections there on

16   Subparagraph C on the second line?

17   A    I do.

18   Q    Is there any qualifier in front of the word connections

19   besides the person's connection?  Does it say material

20   connection?

21   A    No.

22   Q    Okay.  It's just connection, right?

23   A    That's correct way to read that sentence.  Yes.

24   Q    Okay.  And let's flip over to your declaration which is

25   on same exhibit.  If you can just go to 13 of 30.  Scroll
```

1    down to Paragraph 10.  Do you see Paragraph 10 right there

2    on the screen, Mr. Lee?

3    A    I do.  I've got it also on paper here.

4    Q    Okay, great.  So the second line in Paragraph 10 talks

5    about disclosable connections.

6    A    That's correct.

7    Q    What is the difference between a disclosable connection

8    and just a regular connection?

9    A    From my perspective if it's, for example, if you have a

10   conflict that should be a disclosable connection.  If you

11   have a connection that could mean something like, you know,

12   somewhat remote like come connection -- like you work with

13   somebody in the U.S. Trustee's office or you know somebody

14   in the Court system.  Again, you know, as I said on the

15   direct testimony, I look at it as whether or not such a

16   connection could bias you in a case or create some kind of a

17   adverse problem for you as a lawyer in a case.  That's how I

18   look at it.  So it's my own version of what I think should

19   be disclosed as -- if it adversely impacts you is the way I

20   think about it.

21   Q    Well, let's look at Paragraph 11 down there.

22   A    Sure.

23   Q    It talks about disqualifying connections.

24   A    Right.

25   Q    What is the difference between a disclosable

```
 1    connection, a disqualifying connection?  What's the

 2    difference between the two?

 3    A    I think the --

 4         MR. BATTAGLIA:  Your Honor, I'm going to object.

 5    He's asking legal conclusions.  Mr. Lee is a lawyer, but

 6    he's here right now as a witness.

 7         THE COURT:  We're just asking what he meant, I

 8    think.  I'm going to overrule that.  I think the question is

 9    just trying to clarify what he meant in his declaration, not

10    whether it's a legal conclusion or not, just trying to make

11    an understanding as to what he meant.

12    BY MR. NGUYEN:

13    A    I think what I meant in the (indiscernible)

14    disqualifying connections is it's not a connection such that

15    it disqualified me from being counsel by virtue of having

16    that connection under Rule 2014.  It's not a conflict, as an

17    example.  I don't have any -- I didn't have a conflict in

18    being able to represent this Debtor, is my statement there.

19    Q    Is it your understanding that Rule 2014 requires you to

20    disclose all connection, not just only disclosable

21    connection or disqualifying connection?

22    A    Well, from my perspective?

23    Q    Yeah, I'm asking for your understanding.

24    A    My understanding is is that there has to be some limit

25    as to what connections you should disclose because if you
```

Page 122

```
1    took the word literally, connections literally, you'd have

2    to disclose everything under the world, especially if you've

3    been a bankruptcy lawyer or professional forever.  That's

4    why you have language in it that says, you know, I've been

5    practicing the law for many years and so you may have come

6    across certain parties, et cetera.

7         That's why you have all those caveats, so the purpose

8    of, in my view, of a 2014 disclosure is to let Courts know,

9    for example, you have a connection that could adversely

10   affect you in doing your job.  That's how I looked at it.

11   That's how I look at it when I do my 2014 disclosures.

12   That's the way I think about it, like I did on my May 21

13   email to my client saying, do we have an issue here that we

14   need to think about.

15   Q    Okay.  Thank you.

16        MR. NGUYEN:  And Mr. Travis, can you turn to Page

17   18 of 30?  And when I say 18 of 30, I'm talking about the

18   Bates stamp on top.

19   BY MR. NGUYEN:

20   Q    You see the third paragraph down there, Mr. Lee?  It

21   says retainer.

22   A    Yes.

23   Q    The firm there is capitalized and when it says the

24   firm, right, that's KSL PLLC; is that correct?

25   A    Yes.  If that engagement letter is with KSL PLLC.
```

1   Q    Yeah, we're in the same document.

2   A    Okay.

3   Q    So, and then client is capitalized there.  You see down

4   there, the firm has not requested a retainer from the

5   client?

6   A    Right.

7   Q    Client is the InfoW Debtors, correct?

8   A    Can you scroll up?  I just want to make sure if that's

9   the same letter.  If the client is defined as the InfoW

10  Debtors, yes.

11  Q    Okay, great.

12  A    That's correct.

13  Q    So from reading this paragraph on the retainer, is it

14  fair to say that KSL PLLC did not request a retainer from

15  the InfoW Debtors; is that correct?

16  A    That is correct.

17  Q    Okay.  And if we can just turn back to the declaration

18  at Page 13 of 30.  You see Paragraph 9 there, Mr. Lee?  It

19  says, KSL PLLC has requested a retainer.  I'm just going to

20  stop it there.

21  A    Yes.

22  Q    Who -- if you didn't request a retainer from Mr.

23  Schwartz who was representing InfoW Debtors, who did you

24  request a retainer from?

25  A    It's again -- the fault is mine.  It's -- number one, I

1    never requested a retainer.  The language in Paragraph 9 is

2    incorrect.

3    Q    Did you read the declaration before you filed --

4    A    I did and the language there saying as requested

5    retainer is incorrect.  What the -- statement in the

6    engagement letter is the correct one, that I never got one

7    and I never requested one.

8    Q    Okay.  So next time, I should rely on the engagement

9    letter, but not the declaration?

10   A    Mr. Nguyen, I told you, I made mistakes and I'm telling

11   you this is a mistake and I'm owning up to it, so you know,

12   that's my mistake.

13   Q    That's fine.  So you didn't request a retainer from

14   anyone else?  You didn't ask any of the third party funders

15   to pay your retainer?

16   A    No.  First of all, it was a post-petition matter and I

17   thought it was going to very hard to get a retainer and so I

18   didn't ask one for InfoW.

19   Q    That's --

20   A    That's the major reason.

21   Q    So just to recap, so May 18th, the motion to extend a

22   bunch deadlines was filed.  On May 19th, the morning of, you

23   file the KSL PLLC application and then there was a hearing

24   scheduled for the afternoon on May 19th; is that correct?

25   A    That is correct.

1    Q    And on the afternoon of May 19th, you were requesting

2    additional time.  I think you were asking for a month, but

3    Mr. Ruff had an issue with a month.  He thought it was too

4    long; is that correct?

5    A    Yes, I believe that's correct.

6    Q    Okay.  And one of the reasons -- and we can pull the

7    transcript if need be -- you told the Court that you needed

8    this additional time because if the InfoW Debtors were going

9    to remain in Subchapter V, you might have to renegotiate the

10   plan support agreement, correct?

11   A    Well, I may have said that, but --

12   Q    Thank you.

13   A    Wait, wait, wait --

14   Q    He -- Mr. Shannon can bring you on redirect.  That's

15   all I needed.

16   A    But that's not what I said.

17   Q    So -- and then also before the hearing adjourned on May

18   19th, you also told the Court Mr. Schwartz in his fiduciary

19   capacity is evaluating alternative.  Do you recall telling

20   the Court that?

21   A    I did.

22   Q    Okay.  And when you say fiduciary capacity, fiduciary

23   capacity to who?

24   A    To InfoW Debtors.

25   Q    Okay.  Was one of the alternatives that you were

1   thinking at the time that Mr. Schwartz would be the chief

2   restructuring officer for Free Speech Systems?

3   A     When I made that statement, I was addressing a

4   different issue raised by the Court.

5   Q     Great.  The consideration of whether Mr. Schwartz

6   should be the CRO for Free Speech Systems actually occurred

7   on May 19th, correct?

8   A     No.

9   Q     There was no consideration on May 19th?

10  A     No.

11  Q     Okay.  After the hearing on May 19th, did you receive a

12  phone call from someone at Free Speech Systems?

13  A     From Ray Battaglia.

14  Q     Okay.  And Mr. Battaglia was representing Free Speech

15  Systems at the time, correct?

16  A     That is correct.

17  Q     Were you still in the courthouse when you received this

18  phone call?

19  A     No.

20  Q     How long was the conversation?

21  A     Very short, I believe.

22  Q     During the call, were there any discussions regarding

23  your potential engagement with FSS?

24  A     No.  It was a call basically saying please come to

25  Austin.

1    Q    Okay.  Was there any discussion of Mr. Schwartz'

2    potential engagement with FSS on May 19th?

3    A    No.  In fact, the discussion really revolved around the

4    need for somebody with a contact with a commercial bank,

5    Axos Bank, that needed a commercial banking relationship.

6    Q    After the phone call on May 19th with Mr. Battaglia,

7    you contact Mr. Schwartz and you said that on May 24th, you

8    were going to meet with -- I'm not sure who -- well, let's

9    step back.  There is an email from you on May 19th to Mr.

10   Schwartz telling Mr. Schwartz that you were going to make it

11   up to Austin on May 24th, correct?

12   A    Well, let's be real clear.  The email that I sent him

13   was what I sent him, at 5:24 p.m.  It's --

14   Q    Well --

15   A    -- three-line sentence email that says, "We are asked

16   to come to a meeting in Austin on May 24th."

17   Q    So the meeting on May 24th was scheduled on May 19th;

18   is that a fair statement?

19   A    It says, "I told Ray we can be there by 11:30 and see

20   if he can set up a meeting to start then.  We can do

21   Connecticut status hearing at 1 p.m. and continue with FSS

22   meeting thereafter in Austin."

23   Q    So --

24   A    That was at 5:24 p.m.

25   Q    So is it fair to say that on May 19th, there was a

1    meeting scheduled for May 24th in Austin?

2    A    Yes.

3    Q    Okay.

4    A    Yes.

5    Q    And excuse my ignorance.  I'm a northerner from Chicago

6    and I moved down here it's very cold in Chicago and I'm not

7    familiar with distances.  How long does it take to get from

8    Houston to Austin?

9    A    Three hours.  Or two-and-a-half hours, depending how

10   fast you drive.

11   Q    And does Mr. Battaglia live in Austin?

12   A    San Antonio.

13   Q    So how long does it take to drive from San Antonio to

14   Austin?

15   A    One-and-a-half hours or one hour, depending on how Ray

16   drives.

17   Q    Fair enough.

18        THE COURT:  Sorry.

19   BY MR. NGUYEN:

20   Q    The meeting on May twenty -- well, let me ask --

21        MR. BATTAGLIA:  To be fair, it's more traffic.

22   BY MR. NGUYEN:

23   Q    So the meeting that was scheduled on May 24, that

24   wasn't a meeting to renegotiate a plan support agreement,

25   was it?

1   A    Absolutely not.

2   Q    Okay.  Fair enough.  It was a meeting to discuss

3   potential restructuring for FSS; is that correct?

4   A    It was a meeting to discuss FSS generally and it was

5   just walking about the state of FSS condition and for people

6   to get background documentation on FSS.

7   Q    Where did you meet on May 24th?

8   A    At the offices of FSS.

9   Q    In Alvin Devane?  Is that how you --

10  A    That's correct, it's on Alvin Devane with all the

11  shaded windows and studios.  That's correct.

12  Q    And earlier we -- when we were going through the KSL

13  PLLC and we were going through connections and disqualifying

14  connection and disclosable connection, you think this was a

15  connection that needed to be disclosed?

16  A    The answer is, from my perspective, I didn't know yet

17  what it was because I didn't know what they wanted.  I

18  didn't know if they were going to retain me.  I didn't know

19  what was going on.  I just had an idea that we had -- we

20  were asked to come to a meeting.  We were going to discuss

21  things and I knew that insofar as it could involve that

22  representation, but nobody had promised me anything except

23  come to a meeting.

24  Q    And normally, do you drive three hours just to get

25  information from a potential client?

```
 1   A    As a debtor counsel, I fly on airplanes to go to

 2   meetings.  Yes.  Prospective clients.  Yes, I do.

 3   Q    So let me understand.  So you don't think the

 4   connection should've been disclosed on May 19th?

 5   A    Well, here's the reason why.

 6   Q    Well --

 7   A    There was nothing I could disclose when I was here in

 8   Court at 2 p.m., is what I'm trying to tell you, because I

 9   didn't get the call until after I left the Court.

10   Q    So after you got the phone call after Court from Mr.

11   Battaglia and after you sent the email to Mr. Schwartz, you

12   -- at that point, there was a connection that was required

13   to be disclosed?

14   A    The answer is, I had -- I don't think I had a

15   connection that I could disclose because I didn't know what

16   that connection was.

17   Q    Who was at the meeting on May 24th?

18   A    Mr. Battaglia, Mr. Schwartz, I think Mr. Jordan showed

19   up for -- on behalf of -- and Mr. Jones.  I believe Mr.

20   Shannon showed up for the meeting.  And then at some point

21   in time, I believe Mr. Jones attended the meeting to give us

22   his views on things and also sign some of the agreements.

23   And I believe there may have been some other participants,

24   but those are the ones that I remember primarily.  Mr.

25   Schwartz was there and Mr. Battaglia and -- yeah, those are
```

1    the primary people.

2              MR. NGUYEN:  And Mr. Travis, can you go to 165-10?

3    BY MR. NGUYEN:

4    Q    So prior to coming to the meeting, you did some

5    research on FSS and then you emailed background research to

6    Mr. Shannon; is that correct?

7    A    Yes.

8    Q    Okay.  Thank you. And you see on the bottom there, it

9    says "Extended conference with client, Schwartz Associates,

10   B. Rowe, S. Jordan, and RJ Shannon to discuss options and

11   issues with FSS restructuring."  You see that?

12   A    Yes, I do.

13   Q    You see it says five hours there?

14   A    Yes.

15   Q    It says client there.  Who's the client?

16   A    I guess I was referring to FSS at that point in time.

17   Q    Was it Mr. Jones?

18   A    No.

19   Q    Mr. Jones, the owner of the company wasn't the client

20   at the time?

21   A    Mr. Nguyen, we've never represented Mr. Jones.  I've

22   never represented Mr. Jones.

23   Q    So who are you referring to client?  Because you list

24   everyone else.

25   A    Well, the memo, the invoice is being sent to FSS and

1    therefore I'm making it to FSS.  If I'd represented Mr.

2    Jones, I wouldn't be sitting here representing FSS today.

3    Q    Let me ask you. Mr. Jordan.  Mr. Jordan was at that

4    meeting.  Who does Mr. Jordan represent?

5    A    Represents Mr. Jones.

6    Q    And on May 25th, you spent about three hours driving,

7    depending how fast you drive, and about five hours actually

8    meeting people at the facilities at FSS; is that correct?

9    A    You mean on May 24th, not 25th?

10   Q    I'm sorry, May 24th.

11   A    Yes.

12   Q    And --

13   A    That's right.

14   Q    And at that point -- and earlier, we talked about

15   connections and I won't go to -- you think there was a

16   connection on May 24th that needed to be disclosed?

17   A    No.

18   Q    No connection that needed to be disclosed to the Court?

19   A    No.

20   Q    You start billing for FSS on May 24th and you don't

21   think there's a connection that needed to be disclosed to

22   the Court?

23   A    I did not.

24   Q    Okay.  You think it's a problem that in your

25   declaration on -- in the KSL PLLC that there's a pending

Page 133

1   declaration with the Court that says that you had no

2   connections to FSS and Alex Jones, you think that's an

3   issue?

4   A    Well, to me it was not, because the case was going to

5   be dismissed and we were not seeking employment anymore.

6   Q    And Mr. Schwartz was at this meeting, correct?

7   A    That's correct.

8   Q    Did Mr. Schwartz billed for this meeting?

9   A    I don't know.

10   Q    Does Mr. Schwartz generally do stuff without billing?

11   A    Lots of times he does.

12   Q    Good.  And the meeting as you notate on the entry, it

13   was to discuss options and issues with FSS restructuring,

14   correct?

15   A    Correct.

16   Q    Okay.  And I'm sure there's going to be an attorney-

17   client privilege.  I won't ask about the conversation, so

18   we'll just move on.  Prior to June 10th, did you tell any of

19   the Sandy Hook plaintiff or their attorneys that you were

20   doing work for FSS on May 24th?

21   A    No.

22   Q    Prior to June 10th, you didn't tell anyone at the U.S.

23   Trustee's office that you were working for FSS on May 24th;

24   is that correct?

25   A    That is correct.

Page 134

```
 1   Q    Prior to June 10th, you didn't tell the Court that you
 2   were working for FSS on May 24th; is that correct?
 3   A    That is correct.
 4   Q    As a matter of fact, your trip to Austin on May 24th
 5   was not disclosed to the Court until August 20th when you
 6   filed your declaration in the Shannon & Lee application; is
 7   that correct?
 8   A    That's accurate.
 9   Q    That's the first time you ever told any -- either the
10   Court, the U.S. Trustee, or the creditors that you made the
11   trip up to Austin on May 24th; is that correct?
12   A    That is accurate.
13   Q    And on May 24th, just to be clear, you were still
14   representing the InfoW Debtors, correct?
15   A    That is correct.
16   Q    So I just want to go back to -- if you go back to 165-
17   3.  So on May -- I believe May 19th, in your declaration at
18   Paragraph 19, if you can just go there.
19        MR. NGUYEN:  Paragraph 19, Mr. Travis.  Give me
20   one second.  I apologize.  Paragraph 19 on the motion.
21   BY MR. NGUYEN:
22   Q    Mr. Lee, can you read Paragraph 19 to me?
23   A    "The Debtors believe that KSL PLLC neither holds nor
24   represents a disqualifying interest that is adverse to the
25   estate and is a disinterested person.  If any new relevant
```

1    facts or relationships are discovered, KSL PLLC will

2    supplement its disclosure to the Court."

3    Q    But you told the Court this statement on May 19th,

4    correct?

5    A    That is correct.

6    Q    But you didn't supplement it, correct?

7    A    That's correct.

8          MR. NGUYEN:  Okay.  And let's go back to 165-10.

9    I apologize, Mr. Travis.  I'm jumping around a little bit.

10   BY MR. NGUYEN:

11   Q    Let's go through some of these time entries and just

12   make sure I understand what you were doing for FSS during

13   this time.  So on May 26, you were still representing the

14   InfoW Debtors, but you were looking at valuation reports for

15   PQPR on behalf of FSS; is that correct?

16   A    I was reviewing two reports that I found out about that

17   were historical regarding PQPR and FSS that had been

18   discovered that were like basically 2012, 2013 reports.

19   Q    So is that a yes to my question, sir?

20   A    Yes, it is.

21   Q    Okay, thank you.  And on May 28th and May 29th, you

22   were analyzing data from the state court counsel; you see

23   that?

24   A    Yes.

25   Q    Is that what you did on May 28th and May 29th?

1    A    Yes.

2    Q    Okay.  And when we think about state court litigation,

3    we're really thinking about the Texas litigation and the

4    Connecticut litigation, correct?

5    A    Well, what I'm referring to there is just merely the

6    Texas state court litigation, because I didn't have access

7    to the discovery in the Connecticut litigation.

8    Q    Who gave you the state court litigation production that

9    you were analyzing on May 28th?

10   A    I'm trying to think.  It must've been the Reynal firm.

11   Q    And it wasn't any documents from Connecticut, correct?

12   A    No.  It was not.

13   Q    Okay.  And towards the end of this, so from May -- I

14   believe May 24th to May 31st, you billed for a total amount

15   of $24,409.09; is that correct?

16   A    That is correct.

17   Q    Were you paid this amount?

18   A    Yes, I was.

19        MR. NGUYEN:  Okay.  If we can just go back to

20   Exhibit 165-9.  And if you go to Page 5 on the motion, Mr.

21   Travis.

22   BY MR. NGUYEN:

23   Q    Mr. Lee, do you see the footnote there on Page 5?  And

24   I'm going to read it to you.  "KSL PLLC received payment

25   from the Debtor of $21,986.59 for services provided to FSS

1    from May 24th, 2022 through May 31st, 2022."  And the

2    question is, did I read that correctly?

3    A    You did read that correctly.

4    Q    Okay.  Thank you.  And when were you paid for the legal

5    services for KSL PLLC?

6    A    I don't know it off the top of my head, but it's

7    something I could give you -- to you if you need that.  I

8    just don't know, but I think it was sometime in June or

9    July.  June.

10   Q    Okay.

11   A    I just don't know the answer off the top of my head.

12   Q    And you assisted Mr. Schwartz in the preparation of the

13   schedules and Statement of Financial Affairs in the FSS

14   case?

15   A    Yes.

16   Q    And you've been doing this for a while.  You know in

17   the Statement of Financial Affairs, there's a section that

18   requires disclosure of payments related to bankruptcy

19   services.  Are you familiar with that section?

20   A    I am.

21   Q    Okay.

22        MR. NGUYEN:  Let's -- if you can go to 165-2, Mr.

23   Travis.  And if you can turn to Page 9 of 28, right.

24   BY MR. NGUYEN:

25   Q    Do you see any payments disclosed to KSL PLLC on Line

Page 138

1    11?

2    A    I think that we addressed that in the global head

3    notes, in the global notes with respect to the fact that

4    there were certain payments made and they were distributed

5    to the -- Schwartz Associates.  I think we were going to

6    supplement that also with the Ray Battaglia PLLC.

7    Q    You see how the payment to Shannon & Lee was disclosed

8    --

9    A    Yes.

10   Q    -- through the SA LLC Trust?

11   A    Yes.

12   Q    But the question is, do you see the KSL PLLC payments

13   here?

14   A    I do not.

15   Q    Okay, thank you.

16   A    I do not.

17   Q    And the Statement of Financial Affairs is signed under

18   penalty of perjury by Mr. Schwartz, correct?

19   A    That is correct.

20   Q    Okay.  And --

21   A    That is correct.

22   Q    And did you know, did Mr. Schwartz, do you know if he

23   looked over the Statement of Financial Affairs before it was

24   filed with the bankruptcy court?

25   A    He did, because --

```
 1    Q    Okay.

 2    A    He did.

 3    Q    Would you agree with me that the payment to KSL PLLC

 4    should be listed on the Statement of Financial Affairs?

 5    A    Most likely.

 6    Q    Is that a yes?

 7    A    It is a yes.

 8    Q    Thank you.

 9    A    Yeah.

10    Q    So let's just talk about the InfoW cases and the

11    stipulations.  Beginning May 27th, you and -- and tell me if

12    it's before May 27 -- you and Mr. Ruff, you actually began

13    exchanging draft of a stipulated dismissal on May 27.

14    That's when the actual change of language happened, correct?

15    A    If you tell me that's what happened.  All I know is I

16    told him it was May 25th.  He sent me something based upon

17    the emails that I have, was -- I believe the first one he

18    sent me was probably on May 27th.

19    Q    Yeah. Don't look at the document --

20    A    Okay.

21    Q    -- ask you.  If you don't know the answer --

22    A    I don't know the answer to -- off the top of my head.

23    I have to look at a document.

24    Q    Fair enough.

25         MR. NGUYEN:  Mr. Travis, can you go to 163-26?  If
```

```
 1    you scroll to -- can you scroll up a little bit, Mr. Travis,
 2    please?  See the dates here.  Scroll all the way to the
 3    bottom of this email chain.  If you scroll up one more to
 4    the next email by Mr. Ruff.  If you can go to --
 5    BY MR. NGUYEN:
 6    Q    On May 27th, at about 3:16 p.m., Mr. Ruff sent you a
 7    draft of the proposed stipulated dismissal, correct?
 8    A    This email says that.  That's correct.
 9    Q    Okay.  And on May 31st, if we scroll up, you circulated
10    some comments to the draft.
11    A    It's a rewrite.
12    Q    Right, and one of the issue you took with the
13    stipulated dismissal order that Mr. Ruff draft was, it says,
14    the motion to dismiss is granted.
15    A    That's correct.
16    Q    Okay.  And so we were exchanging language as of May
17    31st, but there wasn't no agreement to dismiss the case,
18    correct?
19    A    Mr. Nguyen --
20    Q    Was there signatures on --
21    A    The answer to your question about the signatures is
22    there was no --
23    Q    Okay.
24    A    -- the concept of this agreement --
25    Q    And --
```

Page 141

 1    A      -- authority in place.

 2    Q     And then on June 1st, there's an email from Mr. Ruff.

 3    Do you see that?  It's a long email in response to your

 4    draft of the stipulated dismissal.  Mr. Ruff had some issues

 5    with how your draft was drafted, correct?

 6    A     Yes, sir.

 7    Q     And one of the issues he took was there were

 8    exculpations on your draft of the stipulated dismissal,

 9    correct?

10    A     That is correct.

11    Q     Okay.  Why did you feel the need to include an

12    exculpation clause?

13    A      Well, in light of the fact that the Trustee was

14    opposing the professionals from getting retained and that if

15    we would -- gotten retained and gotten final fee

16    applications approved, we would've had the protections of

17    the bankruptcy court, so since the Trustee was saying they

18    wanted the cases dismissed and did not want the

19    professionals to be retained, we thought at least that we

20    should ask for exculpation in light of the fact that the

21    Trustee was standing in the way of us getting retained.  I

22    thought that was a reasonable ask.

23    Q     And so after this email, we cleaned up the stipulated

24    dismissal order and the stipulation was actually filed with

25    the Court on June 1st, correct?

1    A    That is correct.

2    Q    Okay.  And prior -- well, let me strike that.  And you

3    understand on June 1st, even though my office and yourself

4    agreed to dismissal via our stipulation, the cases weren't

5    dismissed until Judge Lopez put his signature on that

6    stipulation, correct?

7    A    I do agree with that.

8    Q    Okay.  So on June 1st, the representations of the InfoW

9    Debtors was not over.

10   A    That is correct.

11   Q    And so the stipulation was filed on June 1st and then

12   on June 2nd, you file on behalf of InfoW, Debtors' omnibus

13   response to motion to dismiss.  Is that correct?

14   A    That's correct.

15   Q    Okay.  You drafted this response?

16   A    Mr. Shannon and I both worked on it.

17   Q    Okay.  What was the point of filing a response to the

18   motion to dismiss if the parties already stipulated?

19   A    There were several reasons for it.  Number one, there

20   were allegations that were outstanding that people were

21   going to use against the InfoW Debtors in a negative way and

22   so we felt as a fiduciary it was it was incumbent upon us to

23   set the record straight as to what happened in the case.

24   That was number one.  Number two, everybody thought that the

25   case had been filed in bad faith and made those allegations

007292

1   as the central core of any pleading they filed, and I

2   thought it was important for the Debtor to set the record

3   straight before the case was dismissed so that things like

4   this wouldn't happen again.

5   Q    Okay.

6   A    So it was incumbent upon us to file that as a fiduciary

7   to set the record straight.  And number three, we didn't

8   want pleadings that were filed that didn't go unchallenged

9   in that case because of the publicity and all the issues

10   that surrounded it.  So we thought it was incumbent upon the

11   Debtors to set the record straight before the cases got

12   dismissed completely.

13   Q    And it was setting the record straight as to

14   allegations against the InfoW Debtors.  The purpose of the

15   response was not to defend Alex Jones and Free Speech

16   Systems, the client you were representing on the day that

17   you filed the response, correct?

18   A    Mr. Nguyen, we were representing the InfoW Debtors.  As

19   you will read in the response, it was a response by the

20   three Debtors.

21   Q    Okay.  Let me ask -- so the purpose of the response was

22   not to defend Alex Jones and Free Speech Systems, correct?

23   A    There is not one word in that response, docket number

24   whatever it is, that defends FSS or Alex Jones.  It defends

25   the rationale for filing the InfoW Debtors' bankruptcy cases

1    and it defends the allegations that made by the U.S. Trustee

2    and the plaintiff saying it was a bad faith filing.

3    Q    And in your response on June 2nd, you used the word

4    independent to describe the CRO.  Isn't it a little bit

5    misleading to describe the CRO as independent when the CRO

6    is working for Free Speech Systems?  It's a yes or no

7    question.  Is it misleading to --

8    A    It is not misleading, Mr. Nguyen.

9    Q    Thank you.  And earlier you testified I think around

10   May 24, you were no longer seeking to be employed by the

11   InfoW Debtors, correct?

12   A    That is an incorrect statement of what I testified to.

13   I testified that as of May 21, I'd already decided based

14   upon the position you had -- your office had taken and the

15   analysis that I'd done that we were no longer seeking to be

16   retained as of Saturday, May 21 when I finished my memo and

17   analysis.

18   Q    Okay.

19        MR. NGUYEN:   (indiscernible) just pull up -- if

20   you can pull up 165-7.

21   BY MR. NGUYEN:

22   Q    Let me ask you this.  On June 2nd, did you still have

23   fiduciary duties to the InfoW Debtors?

24   A    I did.

25   Q    Even though you were not seeking employment?

Page 145

1   A   I did.

2   Q   Okay.  And isn't it a little bit misleading to say that

3   the fiduciary duties were clear and unwavering when you were

4   employed by FSS at that time?

5   A   No.  The duties that I had to InfoW Debtors were

6   unwavering and they were fulfilled to 1,000 percent on June

7   2nd through June 10th.

8   Q   Okay, so -- but on June 2nd, you were drafting the

9   first day declaration for FSS, correct?

10  A   What has that got to do with the fiduciary duty

11  obligations that I had to InfoW Debtors?  I fulfilled every

12  one of them.

13  Q   Again, on June 2nd, you were drafting the first day

14  declaration for Mr. Schwartz for the FSS --

15  A   The answer is, Mr. Nguyen, I was putting together a

16  draft declaration for Mr. Schwartz as CRO for FSS, which had

17  nothing to do with InfoW Debtors.  The three Debtors had

18  been dismissed by the plaintiffs.  They had no relationship

19  with FSS at that time except for one relationship which was

20  stable and no dispute between them.

21  Q   So in that June 2nd filing, nowhere in that filing did

22  you mention you started working for FSS; is that correct?

23  A   That is accurate.  That's correct.

24  Q   Nowhere in that filing did you mention that Mr.

25  Schwartz was at this time working for FSS; is that correct?

Page 146

```
 1    A    That is also accurate.

 2    Q    And earlier, you mentioned that by the time you filed

 3    this, I guess it's a response on June 2nd, you were no

 4    longer seeking employment from the InfoW Debtors.

 5            MR. NGUYEN:  Mr. Travis, can you scroll down to

 6    the signature line?  Go up one, to the motion, the signature

 7    line on the motion.  All the way at the bottom.  At the

 8    bottom of the motion.

 9    BY MR. NGUYEN:

10    Q    You see where it says proposed counsel for the Debtor?

11    Who were you proposing to be counsel to the Debtor when you

12    signed that signature?

13    A    The Debtors, the InfoW Debtors.

14    Q    And you were proposing to the Court to be the Debtor,

15    right, when you signed that signature?

16    A    That's how I called myself.  That is correct.

17    Q    Okay.

18    A    And so I call myself that the entire time between May

19    19th through June 10th.

20    Q    And until the end of June 10th, you didn't resolve the

21    KSL PLLC application, correct?

22    A    That is also correct, Mr. Nguyen.

23    Q    Mr. Schwartz didn't withdraw his application as of June

24    10th, correct?

25    A    That is also correct.
```

```
 1   Q    And there was no amendment, no supplements to any of --
 2   to either of the applications in the InfoW case, correct?
 3   A    That is correct.
 4   Q    And on June 10th, the Court conducted a hearing on the
 5   stipulated dismissal, correct?
 6   A    I think the Court really conduct -- took up the
 7   stipulation.  I don't know if it conducted a hearing, but
 8   basically took up the stipulation.
 9   Q    Fair enough.  And you appeared at the June 10th hearing
10   but you were on video.  I believe at the time, you were with
11   your mother in California?
12   A    I was at my niece's high school graduation.
13   Q    Right.
14   A    So Mr. Shannon was here in person and I appeared via
15   video.
16   Q    Okay.  So Mr. Shannon was here and was -- Mr. Schwartz
17   was here as well?
18   A    I don't recall whether he attended or not.
19   Q    And do you recall Mr. Shannon making the announcement
20   that there was a new firm, Shannon & Lee LLP at the time?
21   A    I believe so.
22   Q    Okay.  But there was no announcement of any connections
23   to FSS on June 10th; is that correct?
24   A    That is -- I don't recall any.
25   Q    Okay.  And let me ask you this.  Like, when did the
```

1    representation of the InfoW Debtors end?  Did it end with

2    the stipulated dismissal?

3    A    In my view, it ended -- it terminated really all for

4    practical purposes when the case was dismissed, because

5    there was no longer need for counsel to aid them in their

6    restructuring which was the scope of our engagement.

7    Q    Okay.

8    A    And so that's how I viewed it, because the scope of our

9    engagement was, the matter was to help them in their

10   restructuring.  When the case got dismissed as of June 10th,

11   the purpose of our engagement and the scope of our matter

12   disappeared.

13   Q    Okay.  Give me one second --

14   A    Sure.

15            THE COURT:  I think he meant me, Mr. Lee.

16            THE WITNESS:  I'm sorry.  I apologize.  I'm sorry,

17   Your Honor.  You know, when you get sitting up here, you

18   kind of fade away.  I apologize.

19   BY MR. NGUYEN:

20   Q    Mr. Lee, when the Texas plaintiff and the Connecticut

21   plaintiff dismissed their claims against the InfoW Debtors,

22   were there remaining claims?

23   A    Yes.

24   Q    About $140,000 in claims?  Is that --

25   A    I think there were closed to $190,000 of claims and

1    then there were still unknown facts, but there were about

2    four claimants and it turns out that maybe one of them had

3    been paid and -- so, but there was uncertainty about them,

4    but there was about four claims remaining.

5    Q    And was FSS a joint Debtor to those claims?

6    A    Yes, they were.

7    Q    Thank you.

8         MR. NGUYEN:  No further questions, Your Honor.

9    Thank you for --

10        THE COURT:  Okay.

11        MR. NGUYEN:  -- opportunity.

12        THE COURT:  Mr. Shannon -- well, let me, before

13   you go there, let me ask, does any other party who opposes

14   the retention of either Mr. Lee or Ms. Schwartz have any

15   questions?  Okay.  Mr. Shannon, any redirect?

16        MR. SHANNON:  Yes, Your Honor, just a couple

17   questions.

18        THE COURT:  Okay.  Before you begin, I'm going to

19   take back the power of the screen, just so -- yep.  Perfect.

20   Thank you.  Mr. Shannon, please proceed.

21                  REDIRECT EXAMINATION OF KYUNG LEE

22   BY MR. SHANNON:

23   Q    Mr. Lee, I just want to clarify something.  Who does

24   Shannon & Lee LLP propose to represent in this case?

25   A    Free Speech Systems LLC, the Debtor.

```
1    Q    Has Shannon & Lee LLP ever represented Alex Jones?

2    A    We have never represented Alex Jones.

3    Q    Have you ever represented Alex Jones?

4    A    I have never represented Alex Jones.

5    Q    Mr. Lee, did you sign the Debtor's schedules and

6    Statement of Financial Affairs?

7    A    I did not.

8    Q    I want to talk a little bit about the request for

9    exculpation and the reason for the response.  Has there

10   been, in these cases or -- rewind that.  In the InfoW cases

11   and the surrounding litigation, has there been a history of

12   sanctions sought?

13   A    Yes.

14   Q    Has there been sanctions that were sought against the

15   attorney who removed those cases?

16   A    Absolutely.

17   Q    And the bankruptcy court -- I'm actually talking about

18   particularly the cases, the Texas cases that were removed

19   from Austin State District Court to the Texas Bankruptcy

20   Court -- Western District of Texas Bankruptcy Court.  Were

21   there requests for sanctions against the attorneys who

22   provided services to the InfoW Debtors in that?

23   A    Yes.

24   Q    Now, where those sanctions against Shannon & Lee LLP?

25   A    Not necessarily.  Some of them could be, but they were
```

```
 1   asserted against state court counsel and we didn't know how
 2   far they could reach.
 3   Q    And those are attorneys who provided services to the
 4   InfoW Debtors, correct?
 5   A    That's correct.
 6   Q    Okay.
 7              MR. SHANNON:  No further questions, Your Honor.
 8              THE COURT:  Okay.  Any further redirect?  Okay.
 9   Mr. Lee, thank you for your time.
10              THE WITNESS:  Thank you, Your Honor.
11              THE COURT:  Mr. Shannon, do you have any other
12   witnesses or any other evidence?
13              MR. SHANNON:  Yes, Your Honor.  If it's okay with
14   the Court, Mr. Lee was going to now handle questions of Mr.
15   Schwartz.
16              THE COURT:  Okay.
17              MR. LEE:  Call Mr. Schwartz.
18              THE COURT:  Okay.
19              MR. NGUYEN:  Your Honor (indiscernible).
20              THE COURT:  All right.  Good to see you, again.
21   Do you swear to tell the truth, the whole truth, and nothing
22   but the truth?
23              THE WITNESS:  I do.
24              THE COURT:  Okay.  Please have a seat.  And if you
25   can pull that microphone close to you.  Just want to make
```

```
 1   sure that we can all hear each other.  Mr. Lee, just from --
 2   I want you to take as much time as you want.  I'm just
 3   thinking from a timing standpoint, we can -- we're going to
 4   go until we're done today.
 5            MR. LEE:  Thirty minutes?
 6            THE COURT:  Okay.  No, no, no, I just -- so why
 7   don't we then do a direct, take a short break, and then
 8   we'll come back and do cross like we did before.  Okay?
 9            MR. LEE:  Okay.
10            THE COURT:  Okay.  Thank you.
11            DIRECT EXAMINATION OF MARC SCHWARTZ
12   BY MR. LEE:
13   Q    State your name for the record.
14   A    Marc Schwartz.
15   Q    And how many years have you been in the financial
16   restructuring business?
17   A    Since around 1984.
18   Q    And during that period of time, have you generally been
19   keeping up with your ethical requirements of practicing in
20   the bankruptcy court?
21   A    Trying to.
22   Q    What does that mean?
23   A    Well, I have to meet ethical requirements.  I'm a CPA.
24   Specific requirements are laid out every two years.  In the
25   bankruptcy arena, I don't have that formality, but I am
```

1    trying to stay aware of the issues as -- what's come up.  I

2    do (indiscernible) the AICPA's code of ethics usually works

3    pretty well.

4    Q    Now, you've testified before this Court in this case,

5    correct?

6    A    Yes.

7    Q    And you've also appeared before this Court in the InfoW

8    bankruptcy case, correct?

9    A    Yes.

10   Q    So could you tell the Court generally just your

11   educational background and we'll talk about your other

12   background after that, but tell the Court where you went to

13   school -- college.

14   A    College.  I had bachelor of economics from Princeton

15   University, master in accounting and finance from University

16   of Chicago's Booth School of Business.

17   Q    And you finished your MBA in how many years?

18   A    One-and-a-half.

19   Q    All right.  And how were you able to do that?

20   A    Well, I went summer school and I (indiscernible)

21   economics (indiscernible) Princeton.  I placed out of a lot

22   of courses, so I was able to (indiscernible) prior hours

23   with -- you know, (indiscernible) classes.

24   Q    So after you graduated from University of Chicago, what

25   did you do in your career?

Page 154

1    A    I went to work as a junior accountant for firm of --

2    became PriceWaterhouseCoopers in its Chicago office.

3    Q    And how long did you stay there?

4    A    I was with (indiscernible) Coopers and Lybrand for 20

5    years.

6    Q    And were you working in the restructuring financial

7    advisory space at that point in time?

8    A    Yeah.  I was technically still in the audit practice

9    and I had significant audit clients, but I was in charge of

10   the forensic evaluation services practice in Houston, which

11   included -- I started doing my bankruptcy work with them in

12   '84 and continued that, doing that bankruptcy work here.

13   Q    Have you been working in the bankruptcy field since

14   '84?

15   A    Yes.

16   Q    And in that time period, what type of work have you

17   been doing in the bankruptcy field?

18   A    Well, '84 we started doing work for Chapter 7 Trustees

19   in the area of compliance work, i.e., tax compliance.  In

20   addition in connection with litigation, we got involved

21   working with -- for the Trustees on some of the larger

22   litigation projects.  I mean, (indiscernible) I had 1,100

23   Chapter 7 cases open.

24   Q    How about your experience in the Chapter 11 arena?

25   A    I worked in Chapter 11, really, that in 1993, for me.

Page 155

```
1    I did some Chapter 11 work prior to that, doing some
2    committee work in the '80s, '90s, doing some debtor --
3    assistant counsel for debtors, preparing companies' filing
4    and then serving during the bankruptcy itself.  And in '93,
5    when I left Coopers and U.S. Trustee's office called me and
6    asked me to get involved in a Chapter 11 as Trustee and
7    that's when I started doing trustee work which expanded to
8    trusteeships, examiners, examiners with expanded powers.  I
9    still do get some debtor-creditor work as well.
10   Q    Now, do you also do receiver work?
11   A    Yes.
12   Q    Now, do you understand the concept of being a
13   fiduciary?
14   A    I believe I do, yes.
15   Q    Can you tell the Court and the parties here what your
16   understanding of what a fiduciary means?
17   A    Being a fiduciary means that (indiscernible) a
18   fiduciary, you owe a duty to the party whose assets, whose
19   business, whose -- you've been placed in responsibility
20   over.  And that means that that duty is their interest
21   supersedes your interest.
22   Q    Since you've been involved in this area of
23   restructuring and financial advisory, have you ever been
24   reported for violations of any of your ethical obligations
25   to a client or to a party?
```

```
 1    A    No.

 2    Q    Mr. Schwartz, I want to first turn your attention to

 3    the topic of your May 19th letter and if you'll take a look

 4    at the small binder that's in front of you.  First of all,

 5    before you go into this binder and look at these two

 6    exhibits or three exhibits, can you explain to the Court the

 7    controversy that you're aware of regarding the -- your

 8    engagement letter of May 19th, 2022?  Are you familiar with

 9    the various allegations and challenges to that letter?

10    A    Well, I'm (indiscernible) the fact there's -- that the

11    (indiscernible) of the letter has brought a lot of attention

12    and I will right now tell you (indiscernible) what you said,

13    I'm the one who put the May 19 on there.

14    Q    Let's talk about -- let's give the judge and the

15    parties exactly the reasons why the confusion was first

16    created.  Because as I read the objection, you were asked

17    certain questions at a previous court hearing and you seemed

18    to indicate that you sent this letter on or about May 19th.

19    A    I did.  I sent the letter to you.  (indiscernible)

20    asked me to get a draft of an engagement letter.

21    Q    All right.

22    A    I sent you all a draft.  I (indiscernible) had

23    everything.

24    Q    Now, did that letter that you sent to me as you now

25    discover turn out to be the letter that was signed by the
```

157

1    client FSS on June 6, 2022?

2    A    No.  It was not my draft.

3    Q    Okay.  Now let's turn to Exhibit No. 178-1, 178-2, 178-

4    3.  That's in front of you, that little binder.

5    A    Okay.  I'm sorry.

6    Q    Okay?  Mr. Schwartz, take a look at it and I don't know

7    if --

8              MR. LEE:  Have these been admitted, Mr. Nguyen?

9              THE COURT:  Yes, they have.

10   BY MR. LEE:

11   Q    Can you tell the Court, first of all, when I showed you

12   these emails regarding these letters, this exchange?

13   A    Well, recently, like yesterday, yeah.  I mean, because

14   I'd forgotten about this exchange.

15   Q    And so tell the Court what happened here that -- and

16   summarize it for the Court on Exhibits 1, 2, and 3 and how

17   the engagement letter that was ultimately signed and

18   attached to your application came about.

19   A    Well, May 19th, as I said, I believe I sent it to you.

20   You asked me to re-send it to you on Sunday, June 5th which

21   fits with (indiscernible) kind of got lost somewhere.

22   (indiscernible) modifications to it and sent me back those

23   revisions on Sunday, June 5th at 3:40 in the afternoon.  I

24   accepted those revisions and had -- where it is -- yeah.

25   Yeah, I accepted those revisions at 4:20 that day

1    (indiscernible) asked me to go ahead and print out.  When I

2    did that, I went ahead and put the date of May 19th on it

3    because that's when I originally drafted it.  May 24th, a

4    few business days later is when we -- I visited Austin with

5    you.

6    Q    Okay.

7    A    (indiscernible).  I think, Judge, you mentioned it

8    happens in bankruptcy.  I sit there and with all this is

9    because I did not put in front of this, as of May 19th, this

10   letter.  That was what my thinking was.

11   Q    so the engagement letter that you sent on May 19th was

12   never executed, correct?

13   A    Correct.

14          MR. CHAPPLE:  (indiscernible).

15          THE COURT:  Sustained.

16   BY MR. LEE:

17   Q    Which engagement letter was executed by the client on

18   June 6, 2022?

19   A    The one that (indiscernible) took to Austin on

20   (indiscernible) on June 5th is my -- yeah, I would've

21   prepared it on June 5th.

22          THE COURT:  Overruled.

23   BY MR. LEE:

24   Q    Mr. Schwartz, I want you to turn to Exhibit 23 in your

25   big binder, please.

```
 1   A    I have it.

 2   Q    Do you recognize the Exhibit No. 23?

 3   A    (indiscernible) be related to the Austin visit starting

 4   at 11:30.

 5   Q    To the best of your recollection, do you recall whether

 6   or not I or anyone else from any other party mentioned to

 7   you to come to a meeting regarding FSS prior to my sending

 8   you this email on May 19th, 2022 -- 5:24?

 9           MR. CHAPPLE:  Objection (indiscernible).

10           THE COURT:  Sustained.

11   BY MR. LEE:

12   Q    Mr. Schwartz, do you recall reading this email at 5:24

13   on that date?

14   A    Yes.

15   Q    Was this the first time you read this email?

16   A    Yeah, five -- yes.  That date at 5/24 was the first

17   time I read it.

18   Q    And was this the first time the subject matter came up

19   that's contained in this email?

20   A    Yes.

21   Q    Had you ever had this subject come up before this time?

22   A    No.

23   Q    And what did you do in response to this email?

24   A    What did I do in response?

25   Q    Yes, sir.  If anything.
```

1    A    Okay, I looked at my calendar to see if I could be in

2    Austin with you on the 24th.

3    Q    Now turn to -- looking to Exhibit No. 24.

4          THE COURT:  Before you go there.  So the email

5    says, "I told Ray we can be there by 11:30."  What did you

6    understand that, if the topic had never come up?

7          THE WITNESS:  The 11:30?

8          THE COURT:  It said --

9          THE WITNESS:  (indiscernible).

10         THE COURT:  It said, "I told Ray we can be there

11   by 11:30."  The question before you was that before this

12   email the topic had never come up and I'm just trying to

13   understand then what did you understand that you were going

14   -- be there by 11:30.  What did you understand at that time?

15         THE WITNESS:  My typical experience is when

16   someone asks, like a lawyer or someone asks me to a meeting,

17   they have a project in mind.

18         THE COURT:  So you knew at some point before this

19   email that you were going to be asked to go to a meeting?

20         THE WITNESS:  No.  I didn't know until I -- that I

21   was going to be asked.

22         THE COURT:  That's what confusing.  The email

23   starts and says, "I told Ray we can be there by 11:30."  So

24   --

25         THE WITNESS:  (indiscernible), Mr. Lee told me

```
 1    that Ray had said can you come to Austin for a meeting.
 2              THE COURT:  That's what I was trying to --
 3              THE WITNESS:  -- on the 24th.
 4              THE COURT:  -- understand.  And that was -- was
 5    that before this email?
 6              THE WITNESS:  Yeah, because then this is the
 7    confirming the time.
 8              THE COURT:  Do you recall when that --
 9              THE WITNESS:  That would've been -- this is --
10    well, it had to have been after the hearing because we
11    didn't know about it before the hearing.  So (indiscernible)
12    --
13              THE COURT:  Okay.
14              THE WITNESS:  -- five or 4:30.
15              THE COURT:  Thank you.
16    BY MR. LEE:
17    Q    All right.  Mr. Schwartz, I asked you to take a look at
18    Exhibit No. 24 and see if you recognize that document.
19    A    Yes.
20    Q    Can you describe that document to the Court?
21    A    (indiscernible) a summary I prepared and sent of
22    (indiscernible) evaluation of the situation we were in with
23    the three debtors and possible approaches and, quite
24    frankly, look at the economics of various alternatives we
25    had.
```

1    Q    Okay.  Mr. Schwartz, had you been thinking about how to

2    proceed with the InfoW cases before I wrote you this email

3    on May 21?

4    A    I'd been thinking about it since we got the first word

5    that they wanted to dismiss us at the time without

6    prejudice.  So I knew, okay, if they're smart they're going

7    to (indiscernible) dismiss us with prejudice and we need to

8    think about what happens then.

9    Q    So tell the Court what you did in response to the --

10   once you read this email from me on Saturday, May 21.  What

11   type of actions or response, if any, you did in reaction to

12   my email that I sent you.

13   A    I told you we have to stop this through -- get this

14   case dismissed.  We can't afford to keep us working on this

15   when there's (indiscernible) benefit to the estate of us

16   doing that, nor economic benefit.

17   Q    And what kind of analysis did you do in order to come

18   to that conclusion?

19   A    My analysis (indiscernible) whole lot.  I -- you know,

20   what's, you know, we don't have any assets to recover.  We

21   can incur fees.  We had seventy-something thousand dollars

22   in the bank (indiscernible) I'm going to blow this $70,000

23   and what do we have to show for it.  Nothing.  And if we get

24   out of here there's still $50,000 in the estate.

25   Q    Now, was there at some point in time -- look at Exhibit

 1    No. 25.  Do you recognize Exhibit No. 25?

 2    A    Yes.

 3    Q    And what is that document?

 4    A    This is an email you sent me attaching a draft of the

 5    motion to dismiss, the 5/23/22 draft telling me about that

 6    and also telling me we're going to skip the 341 meeting.

 7    Q    And was the -- what was the rationale for us moving as

 8    quickly as we did to try to get these cases dismissed at

 9    that point in time?

10    A    Because it's just costing money.  You know, it's

11    costing expensive professional time.

12    Q    So do you recall also that I had attended a hearing on

13    May 19th with the bankruptcy court?

14    A    Yes.

15    Q    And that I explained to the Court that we had to

16    evaluate alternatives; do you recall that?

17              MR. CHAPPLE:  (indiscernible).

18              THE COURT:  Sustained.

19    BY MR. LEE:

20    Q    Do you recall what I told the Court on May 19th

21    regarding the future of the bankruptcy case?

22    A    Yes.

23    Q    And what -- do you recall what I had told the Court?

24    A    You just said, we're looking at alternatives.  I went,

25    okay, fine.  He (indiscernible) lawyer.  I said, dismiss it.

Page 164

```
 1    Q    All right.  Now, one of the things that's been asked of
 2    you or alleged against you is that you had apparently been
 3    on both sides of the transaction.  Are you aware of that
 4    allegation?
 5    A    I'm aware of the allegation.
 6    Q    Mr. Schwartz, in your job over the last 40 years in the
 7    bankruptcy arena as a financial advisor, do you understand
 8    the term being on both sides of a transaction?
 9    A    Yes.
10    Q    Tell everyone here what that means to you.
11    A    What it means to me is quite literally wearing two
12    hats, your hats are negotiating with each other and you're -
13    - so you're really negotiating with yourself.  Or some
14    portion of it's yourself.
15    Q    So let's talk about the plan support agreement.  Before
16    the bankruptcy was filed, tell the Court what role you
17    played on behalf of InfoWar debtors with respect to the
18    negotiation of the plan support agreement, if any.  And I
19    remember you came on the scene, so tell the Court what role
20    you played in formulating that document before the petition
21    date of April 17th.
22    A    In formulating, I'm almost none -- none other than, I
23    mean, the last (indiscernible) I had to review, but the
24    substantive economics were established before I came along.
25    The concept of the trust, the concept of the trustees, the
```

```
 1   concept of the (indiscernible) judges preexisted

 2   (indiscernible).  I always (indiscernible) to look for

 3   implications that I could (indiscernible) for the Debtors

 4   that (indiscernible) may not like but -- and just generally

 5   doesn't make sense to me or is there anything confusing in

 6   it, but it --

 7   Q    And then do you recall so far the testimony that those

 8   agreements, the declaration of trust as well as the plan

 9   support agreement went -- underwent revision from April 17th

10   to April 29th?  Do you recall that testimony?

11            MR. CHAPPLE:  Objection.

12            THE COURT:  Overruled.

13   BY MR. LEE:

14   A    (indiscernible) those revisions.

15   Q    What role did you play in those discussions and

16   negotiations?

17   A    None.

18   Q    And why was that?

19   A    That was because the judges had their counsel looking

20   at it and they basically went away and looked at it and

21   worked on it and worked on it and worked on it, and then all

22   of a sudden, there was the product.

23   Q    And do you recall that it was on, what, April 29th,

24   2022 as ECF 48 which got filed on the record?

25   A    Yes.
```

1    Q    Would it still be -- would it be fair to say that the

2    world changed for InfoW Debtors on June 3rd or 6th when the

3    plaintiffs decided to dismiss the claims against the Debtor?

4    A    June 3rd --

5    Q    Third.

6    A    (indiscernible).

7    Q    I'm sorry, May 3rd.

8    A    Yeah.  Yes.

9    Q    And tell the Court why that was.

10   A    Well, the PSA, plan support agreement, and the trust

11   were structured in order to bring the Texas and the

12   Connecticut plaintiffs into the Court for the process of

13   hopefully efficiently and fairly getting their claims

14   liquidated for an amount that they would be paid by the

15   trust.  With the plaintiffs moving to dismiss us from the

16   cases, we -- there would be no standing for us that the

17   trust, the Debtors and the trust -- the Debtors wouldn't be

18   there, so there would be no standing to (indiscernible)

19   plaintiffs' claims into the (indiscernible) offices of the

20   bankruptcy court.

21   Q    Now, before we reach the May 19th hearing date, do you

22   recall the direction that you gave me with respect to what I

23   needed to do for the InfoW Debtors' bankruptcy case as to

24   those stipulations?

25   A    Stipulations of the Texas (indiscernible), I said

```
 1   absolutely (indiscernible).  Can't dismiss it
 2   (indiscernible) out of there, (indiscernible) unless we get
 3   (indiscernible) with prejudice.  I was (indiscernible) that.
 4   Q    So your focus to me was to make sure those got done
 5   correctly; is that accurate?
 6   A    yes.
 7   Q    And do you also recall that with respect to the
 8   Connecticut plaintiffs, they decided to proceed by way of
 9   motion, not by stipulation, correct?
10   A    Right --
11         MR. RUFF:  There was an objection, Your Honor.
12         THE COURT:  Overruled.
13         MR. RUFF:  Thank you.
14   BY MR. LEE:
15   Q    You also recall whether or not there was tension
16   between the Debtor, especially counsel for the Debtor, Mr.
17   Lee -- me -- and Mr. Ruff before May 19th with respect to
18   the speed at which we wanted to get -- both parties wanted
19   to get the --
20         MR. RUFF:  Objection, Your Honor.  Calls for
21   speculation.
22         THE COURT:  Sustained.
23         MR. LEE:  I haven't even finished my question,
24   Your Honor.
25         THE COURT:  Really obvious.
```

Page 168

```
1              MR. LEE:  I apologize.
2              THE COURT:  No worries.
3    BY MR. LEE:
4    Q    Do you know whether or not there were -- based on
5    reviewing the emails between me and Mr. Ruff where there was
6    tension between the Debtors' counsel and the U.S. Trustee's
7    counsel before May 19th as to the disposition of this case?
8    A    Yes.
9    Q    What was that dispute?
10   A    That -- I recall it was whether or not dismiss -- our
11   filing was legitimate should've been allowed.  I mean
12   (indiscernible) from the very beginning.
13   Q    Okay.  And do you recall where your application to
14   retain was placed insofar as being heard by the Court?
15   A    I don't think it had a date.
16   Q    Do you recall my reporting to you as to the results of
17   the hearing on May 19th, 2022 after the dismissal of the
18   Texas and the Connecticut plaintiffs?
19   A    Yes.
20   Q    And do you recall my telling you the conversations I
21   had with respect to the dismissal of the cases by the U.S.
22   Trustee and their position about the case?
23   A    I remember you discussing with me their position.  I
24   don't think at that time it had significantly changed in
25   terms of our view (indiscernible) accomplished.
```

1    Q    So going back to Exhibit No. 24 in front of you, as of
2    May 21, 2022, had you made a decision or -- had you made a
3    decision as to whether or not the InfoW Debtors' cases would
4    continue in Chapter 11 or be dismissed?
5    A    By this date, I was convinced it was not -- they were
6    not going to continue.
7    Q    And by May 23rd, 2022, when I had forwarded to you a
8    draft of the motion to dismiss Chapter 11 cases, had your
9    views in any way changed about dismissing the cases?
10   A    No.
11   Q    And so did you direct me then on May 25, 2022 to advise
12   the U.S. Trustee that the Debtors were dismissing their
13   cases?
14   A    Yeah, we talked about that, somewhere (indiscernible)
15   May 25 that I told do it.
16   Q    So as of at least May 25, was there any expectation
17   that you as a CRO or Schwartz & Associates would be retained
18   as an estate professional in the InfoW Debtors bankruptcy
19   cases?
20   A    No expectation, no.  I figured at that point, it wasn't
21   going to happen.
22   Q    And in fact, did you learn from me through the emails I
23   forwarded to you that the U.S. Trustee did not want you to
24   be retained as an estate professional?
25   A    Yes, I did.

1    Q    And that included any other professionals including

2    lawyers; is that correct?

3    A    Right.  That's what I understood.

4    Q    Would it have made business sense for you as a chief

5    restructuring officer to have spent the monies and the

6    administrative claim to fight the U.S. Trustee and get the

7    case in place in order to have our applications heard and

8    our fee applications then blessed by this Bankruptcy Court

9    in the InfoW bankruptcy case?

10   A    In my opinion, if I had done that, then I would've been

11   guilty of violating my fiduciary responsibilities.

12   Q    Mr. Schwartz, in your work since -- prior to April

13   17th, the petition date of InfoW Debtors to now, have you

14   ever worked directly for Mr. Alex Jones?

15   A    No.

16   Q    All right.  And insofar as your present duties today as

17   the chief restructuring officer or proposed chief

18   restructuring officer of FSS, tell the Court the kind of

19   interaction you had with Mr. Jones in your capacity as the

20   CRO.  How does -- how do you interact with him?

21   A    Well, it's pleasant.  We speak frequently.  He

22   sometimes will call me two or three times a day, sometimes

23   in 30 minutes.  Usually, he has problems.  He needs my

24   (indiscernible) help him resolve or he's asking permission

25   to do something.  They're cordial.  And that or I call him

1   to (indiscernible) focus on something.

2   Q    Does he get to direct what you do and how you operate

3   your business at FSS as a CRO?

4   A    No.  I operate the business and I direct the business.

5   I -- no.

6   Q    So what role, if any, does he -- is he involved in your

7   business decision making at FSS?

8   A    Well, first off, he is the leading key sales guy.

9   Nothing really gets sold of any substance but by him, so he

10  is (indiscernible) component to the business.  He also has -

11  - because of that and his tremendous understanding and

12  knowledge of the products that we sell, particularly in the

13  supplements and compounds or -- (indiscernible) say

14  compounds, the chemical products that we sell and the market

15  demand for them.  He's (indiscernible) very well and

16  (indiscernible) the suppliers to a great extent, so he's an

17  important from the standpoint of (indiscernible) important

18  as a source of information and to help me (indiscernible) we

19  should be doing on the product side.

20  Q    Now, because of these things he does, have you given

21  him any preferential treatment insofar as paying his claims

22  or treating him differently because of his role in this

23  bankruptcy case in any way?

24  A    I don't think so.

25  Q    Insofar as wages are concerned that he's entitled to,

Page 172

```
 1    has he been afforded his full wages under the cash

 2    collateral order to date?

 3    A    The amount has been allowed.  He's been paid.

 4    Q    Is that the full amount that he's entitled to under his

 5    employment contract that he was with FSS today?

 6    A    It is not the amount.

 7    Q    How much is it lower by?

 8    A    (indiscernible) a million-three annual salary, if you

 9    will, the employment agreement.  We're currently paying him

10    $20,000 a pay period so that's about $480,000 at that rate.

11    And prior to this, we paid him $10,000 or $20,000 a pay -- a

12    month -- $40,000 a month, $20,000 a month.  So he's getting

13    less than half of his -- what his agreement calls for.

14    Q    Mr. Schwartz, you've also highlighted in your

15    declaration and previous testimony some of the issues that

16    you discovered at FSS when you came on the scene.  Do you

17    remember that?

18    A    Yes.

19    Q    And can you tell the Court in a brief summary some of

20    the, I guess, problems you encountered and found and what

21    you've done about them to date?

22    A    Well, we -- the time the declaration we had

23    substantially brought the books current (indiscernible) on

24    the bookkeeping (indiscernible).  The inventory has been a

25    continuing problem, having the right inventory.  We don't
```

```
 1   have a good system yet for inventory management in the sense
 2   of information flow.  (indiscernible) working on that.  We -
 3   - our cost of processing of credit cards was extremely high,
 4   about 14, 15 percent, extremely high.  I got it down to 4
 5   percent.  Negotiated that and we're currently
 6   (indiscernible) to try to reduce that cost.
 7        We're looking at alternative sources of inventory
 8   financing which will get us more inventory (indiscernible)
 9   for the Christmas holiday sales and sustain our company
10   going forward.  What have I missed?  I've hired a CRO --
11   excuse me, an operating manager and I've hired
12   (indiscernible) bookkeeper, keeping operations
13   (indiscernible) bringing someone on board in the offices at
14   FSS as an employee of FSS and in contracting with the
15   bookkeeping services.  Matter of fact, I have meetings with
16   them tomorrow.  So it's a few of the things we -- you know,
17   we're facing.  You know (indiscernible) a chapter in the
18   book but we're (indiscernible) that under control and we are
19   close to getting prepaid credit cards.  We've been in -- we
20   had a couple of (indiscernible), but I think we've got a
21   vendor now who's not afraid.
22   Q    Let's talk about the schedules that Mr. --
23   A    Yeah.
24   Q    -- asked me about and some of the omissions he alluded
25   to.  Tell the Court what is the stage of amending the
```

 1    schedules after the Debtor submitted them last week.  Can

 2    you talk -- tell the Court what is going on there?

 3    A    The specific (indiscernible) and I discussed that at

 4    the 341 meeting that if you noticed where there's no mention

 5    of Shannon & Lee, there's Schwartz & Associates.  That's

 6    like a $380,000 payment.  What happened is (indiscernible)

 7    was wired to me to my trust account and then we distributed

 8    it to Shannon & Lee and Kyung S. Lee PLLC and I think even

 9    some to Mr. Battaglia, so I (indiscernible) that schedule

10    was -- I've got it on (indiscernible) for that page where I

11    have the tale.  (indiscernible) got what laid out there so

12    it -- but it was for prepetition fees or retainers and so

13    we're working on that.

14        I just learned Friday of a transaction that was booked

15    as other income which was actually a contribution of capital

16    by (indiscernible).  That will change the schedules with

17    that booked right.  That was done in July prepetition.

18    There are the -- there's a question of why on the payments

19    to creditors there was no (indiscernible).  That was asked

20    and that has been -- actually what happened is the

21    (indiscernible) report to July 22nd, not July 29th so we've

22    added seven more days of payments on there.

23        So it's come forward.  I'm going to go back through and

24    see, okay, what else have we got in here.  We've got at

25    least one unsecured creditor who's told me, I'm not owed

1    anything.  I owe you people money.  So --

2    Q    So would it be fair to say that you're still drinking

3    from a fire hose?

4    A    It's a smaller fire hose, but it's still a fire hose.

5    Q    And would it still be accurate to say that you are

6    constantly correcting, amending, updating data in order to

7    make them as accurate as possible and not hiding things from

8    creditors or the Court?

9    A    Yeah, we're not trying to hide anything.

10   Q    So let's go back to talking about the issue of being on

11   both sides of the transaction.  Do you recall us talking

12   about that.  Did you ever end up being on both sides of the

13   transaction after May 19th, 2022 when I left this Court and

14   told the Court we would either evaluate dismissing the case

15   or having to go back and negotiate either an amendment to

16   the PSA or a new funding agreement, did you, while you were

17   going up and sitting at FSS' office end up negotiating for

18   InfoW for more money or trying to do that?

19   A    No.

20   Q    And tell the Court why not.

21   A    Well, again, I mean, let me put it this way.  The

22   description of the situation we were in after that date, we

23   were trying to decide do we continue or do we dismiss.  At

24   that point in time, we -- I think all the professionals

25   involved -- were in that position where it would've been

1    more beneficial for us financially to keep going.

2    Q    For the professionals?

3    A    For the professionals.  So we were in that -- that

4    happens. Regularly in bankruptcy and receiverships.  You get

5    to a point where, hey, keep going or stop?  And I can make

6    more money if I keep going.  That was -- that's exactly that

7    situation.  I did not go out of turn to negotiate more money

8    for the plan sponsors.  First off, I couldn't give a -- I

9    can't come up with a reason why they should give us money.

10   And two, there is no benefit to doing it.

11   Q    Now, another criticism that's been leveled against you

12   and me is that we came here and we told the Court that we're

13   going to do our fiduciary duty.  Do you recall that

14   criticism?

15   A    I remember very strongly the judge's words on that.

16   Q    Do you recall that one of the issues that came up when

17   the plaintiffs dismissed their claims, that one of the

18   concerns that the parties had is that the Debtor, InfoW

19   Debtors, would not accept their dismissal and would try to

20   perpetuate the bankruptcy cases?  Do you recall that, sir?

21              MR. CHAPPLE:  Objection.

22              THE COURT:  Sustained.

23   BY MR. LEE:

24   Q    Do you recall one of the objectives that the plaintiffs

25   were saying that the InfoW Debtors would be trying to do

1    after the plaintiffs trying to dismiss their cases?

2    A    I recall that they didn't trust us and were trying to

3    figure out what were we up to.  That's what made it so hard

4    to get -- and actually, I thought it would be, you know,

5    what's so hard about with prejudice in a dismissal and it

6    actually became an issue.  But it was because of the

7    distrust out there.

8              MR. CHAPPLE:  Objection.

9              THE COURT:  I'll overrule.  He can --

10   BY MR. LEE:

11   Q    And so Mr. Schwartz, at the end of the day, did you

12   conclude that dismissal of the bankruptcy cases as of May

13   21, '22, when I sent you the email was in the best interest

14   of this estate?

15   A    Yes.

16             THE COURT:  Okay.  Overruled.

17   BY MR. LEE:

18   Q    During the time between May 19th through June 10th,

19   were you ever involved in discussions with any party, any

20   part, in which you took an adverse position to InfoW Debtors

21   on any topic?

22             MR. LEE:  Pass the witness, Your Honor.

23             THE COURT:  Okay.  Before we take a break, there

24   are two questions I've been -- forgot to ask you earlier

25   (indiscernible) relevant now.  What is (indiscernible)

```
 1    prepared like a budget to actual, just comparing essentially
 2    the cash collateral budgets to what has been actually spent?
 3    I've only seen estimated budgets in the cash collateral.
 4    I'd love to see kind of a reconciliation of budget to
 5    actual.  What I mean for that -- by that, I'm just
 6    (indiscernible) explaining in general if cash collateral
 7    budget would budget a million dollars in potential gross
 8    receipts over a period of time.  Maybe you took in a
 9    million.  Maybe you took in a million-five.  Maybe you took
10    in a half a million.  Has there been any reconciliation of
11    budget to actual?
12              THE WITNESS:  What we did is every -- except for
13    today because today is Tuesday, the day it's due, we do a
14    budget to actual.  What I actually do now is -- and we've
15    done this every week -- is budget this is week seven, I
16    think.  Last week is week seven.  So we budget -- the budget
17    we had for cash collateral, the actuals, the variance, and
18    then the bankruptcy to date where you can see the whole
19    picture.
20              THE COURT:  Okay.
21              THE WITNESS:  That's done every week.
22              THE COURT:  Okay.  I was just curious.  Just -- I
23    hadn't seen it, but I know that sometimes it gets filed with
24    an MOR or --
25              THE WITNESS:  I didn't even --
```

1                THE COURT:  Just a question.

2                THE WITNESS:  I don't think it's getting filed.

3                THE COURT:  It may not.  Just something I, at some

4     point, I'd mention.  I'd like to see just to understand the

5     true financials.  There's something else and -- apologize.

6     And if you look at your screen, whenever it decides to load.

7     The dot, dot, dots make it look like it's -- it's your first

8     day declaration with the exhibits.  See if I can get this to

9     load up in a faster way, what I'm looking for.  Always meant

10    to ask you this question.

11               It's always when you want something to load

12    quickly.  All right.  So you recall there were the -- those

13    exhibits you filed, the comparative profit -- P&L

14    statements.

15               THE WITNESS:  Yes, sir.

16               THE COURT:  So here's something I've always meant

17    to ask you.  So in 2021, InfoWars Health and Prison Planet

18    paid -- looks like FSS book income from InfoWars Health and

19    Prison Planet in 2021, but in -- they didn't in 2022.  Do

20    you know what the income was attributed to in 2021 for

21    InfoWars Health or Prison Planet?

22               THE WITNESS:  I may have to go back and look, Your

23    Honor.  I mean, I -- InfoWars Health is tone one who owns --

24    that monthly royalty is about $38,000 and so, and Prison

25    Planet, I --

1          THE COURT:  But InfoWars Health had paid FSS, is

2     that -- was that the correct way to book it?

3          THE WITNESS:  It'd all depend on what the -- that

4     relationship is actually controlled by Dr. David Jones and

5     sometimes they move these around.

6          THE COURT:  So in 2022, would InfoWars Health have

7     owed FSS any funds?

8          THE WITNESS:  No.  No, that funds -- my

9     understanding, those -- 2022, those funds, we were told,

10    that royalty relation actually belongs to Health, to Health.

11         THE COURT:  Got it.

12         THE WITNESS:  And that that's when I said --

13    actually the one who said no, I need that money --

14         THE COURT:  You need that money.

15         THE WITNESS:  -- right now.

16         THE COURT:  I remember.  That's why I was

17    wondering.  I know at some point, it turned and you turned

18    it around to start receiving it.

19         THE WITNESS:  Once it -- I actually don't know

20    where it is now because --

21         THE COURT:  Okay.

22         THE WITNESS:  I hadn't (indiscernible) signer on

23    the bank account for IWHealth.  Haven't found a way to

24    unravel that mess.

25         THE COURT:  Okay.

1          THE WITNESS:  And haven't seen any more money come

2     in.

3          THE COURT:  And for Prison Planet, do you know

4     what that 5,000 --

5          THE WITNESS:  No.

6          THE COURT:  Okay.  Okay.  Those are my only

7     questions.  I just been meaning to ask you.  I needed to

8     understand just the relationship.  Why don't we -- who's

9     going to ask questions on cross?  Mr. Ruff?  Mr. Chapple,

10    are you going to have any examination?  Okay.  So why don't

11    we -- it's 5:15.  Why don't we come back on in five minutes,

12    let everyone take a break and then we'll come back in five

13    minutes and we'll continue with cross.

14         CLERK:  All rise.

15         (Recess)

16         THE COURT:  We are back on the record in Free

17    Speech.  Mr. Schwartz, I remind you are still under oath and

18    Mr. Ruff, I have one more question and I'm going to take the

19    liberty.

20         MR. RUFF:  Go ahead, Your Honor.

21         THE COURT:  And it was a question that I asked Mr.

22    Lee and I wanted to -- you're the better person to ask just

23    to understand it.  I'm trying to -- again, just trying to

24    put the timing together and I put it up on the screen

25    earlier and I'm going to see if I can find it again.  Just

1    give me a second.  This is just the docket entry.  This is

2    what I meant to ask you.  Well, I'll take the drama out.

3    The question had to do with the declaration that was filed

4    by Mr. Andino Reynal saying in that -- here we go.

5         That statement -- I just want you to look at

6    paragraphs 5 and 6.  It says that in May of -- May 19th, FSS

7    retained you as a CRO and that you contacted Mr. Reynal if

8    you knew of any financial executive that was able to come

9    and work at FSS, and that criminal defense lawyer

10   recommended Mr. Jeffrey Schultz and -- with essentially the

11   -- with his recommendation that FSS hire Mr. Schultz.  Can

12   you confirm the accuracy of statements in paragraph 5 or 6

13   is there anything that you would clarify?

14        THE WITNESS:  Well, the only thing I want --

15        THE COURT:  You didn't sign this so I'm just -- so

16   I want to be very clear about that.   You didn't sign this.

17   This is saying something about what happened in May

18   regarding -- including, as it pertains to you and I'm just

19   trying to understand what your understanding was.

20        THE WITNESS:  Well, in terms of the hiring of Jeff

21   Schultz --

22        THE COURT:  Maybe I can ask it this --

23        THE WITNESS:  There's more to the process than

24   just me recommending Schultz.

25        THE COURT:  But was it in May of 2022 that you --

1             THE WITNESS:  Oh, yeah.  I think so.  I'd have to

2       go back and look at my calendar.

3             THE COURT:  But did you -- this --

4             THE WITNESS:  No, wait a minute.  May?  I'm sorry.

5       I don't know if that's right.

6             THE COURT:  Okay.  This also -- you think it was

7       May or sometime after May?

8             THE WITNESS:  I know it was after May because I've

9       been -- my engagement letter wasn't signed until June 7th

10      (indiscernible) as of May 19th and that's where he got a

11      date, but he's wrong on the month of May because I can tell

12      you right off the bat -- I mean, we didn't do much of

13      anything until the retainer came in because under my

14      agreement, I had to get the retainer too for the engagement

15      to be effective.  So June 10th, we're working.  Now June

16      10th I'm screaming, I need somebody.  So it would have been

17      in June.

18            THE COURT:  Did you contact Mr. Reynal and ask if

19      he knew of --

20            THE WITNESS:  Yes, I asked all -- everybody.  So

21      it was kind of a blanket request.  Nobody -- and he --

22      Andino called me up and said, I got somebody but let me tell

23      you the situation.

24            THE COURT:  May I just ask a silly question.

25      You're a professional with over 40 years of experience.  Why

```
 1    did you contact a criminal defense lawyer about someone to

 2    hire as a potential accountant in a business?

 3              THE WITNESS:  I actually -- just let all the

 4    lawyers know -- I mean, he was, you know, just in the room

 5    because he defends -- he's defending the Texas cases.

 6              THE COURT:  Right.

 7              THE WITNESS:  So he was there and I said, you

 8    know, I'm looking for somebody.

 9              THE COURT:  Oh, I understand.  Thank you for the

10    clarification, sir.  Thank you.

11                                  EXAMINATION

12    BY MR. RUFF:

13    Q    Good afternoon, Mr. Schwartz.

14    A    Mr. Ruff, you have a halo around you now.

15    Q    Do I?  Don't be deceived.

16    A    Believe me, I'm not.

17    Q    Now Mr. Schwartz, you have more than 40 years of

18    experience in the restructuring business.  Correct?

19              THE COURT:  That's my line.

20              MR. RUFF:  Oh.

21              THE WITNESS:  So it must be right.

22              THE COURT:  I'm sorry.  Go ahead.

23    BY MR. RUFF:

24    Q    And during these 40-plus years, you have frequently

25    served as a chief restructuring officer or CRO.  Is that
```

Page 185

```
 1    correct?

 2    A    Not that frequently.  That's a relatively new concept

 3    to me anyway.  I mean, back then, the owner in charge --

 4    Chapter 11 trustee -- only in (indiscernible) years have we

 5    -- have I been doing CROs.  But I distinguish between the

 6    trustee and the CRO, though -- the concept of the -- you

 7    know, the trustee, I get paid less but I also have more

 8    protection from the court.  CRO, I get paid more.  I still

 9    have to do the same work.

10            MR. RUFF:  Can you -- Mr. Ross is going to be --

11            THE COURT:  All right.

12            MR. RUFF:  Then if you could go to Page 9.  It

13    will be Paragraph 26 (indiscernible).

14    BY MR. RUFF:

15    Q    Mr. Schwartz, would you mind reading the second

16    sentence in Paragraph 26 for me?

17    A    Yes.  He frequently serves as a chief restructuring

18    officer, as a federal and state court appointed receiver in

19    bankruptcy and non-bankruptcy and -- what happened --

20    proceedings, and that he's -- do you want me to read the

21    rest?

22    Q    No, that's all I needed you to read.  So this was your

23    application for employment and it -- in there, it

24    represented that you frequently served as a chief

25    restructuring officer.
```

1    A    Wait a minute.  I think -- I says -- could you go back

2    to that page?  Frequently serves as a chief restructuring

3    officer, as a federal and state court appointed receiver, in

4    bankruptcy.  So I frequently serve in those capacities, as a

5    receiver and as a CRO and probably what I should say is --

6    well, as an examiner also, but that's kind of gone passe.

7    Q    Would it be accurate to say that you frequently have

8    served as a professional in bankruptcy?

9    A    That's accurate.

10   Q    Okay.  Very good.  And so you are familiar with the

11   need to disclose connections when seeking employment in a

12   bankruptcy case.  Is that correct?

13   A    Yes.

14   Q    Okay.  And, Mr. Schwartz, you were the chief

15   restructuring officer in the -- what I will refer to as the

16   Info W cases.  Is that correct?

17   A    Yes.

18   Q    All right.  Now in the Info W cases, there was a plan

19   support agreement and a litigation settlement trust.  Is

20   that correct?

21   A    Correct.

22   Q    All right.  Now those agreements were negotiated prior

23   to your being retained as the chief restructuring officer or

24   after?

25   A    Substantively, prior.  Like I said, the -- do you have

```
 1    -- well -- the structure of what was being planned, i.e.,
 2    the structure of the trust and the proposed trustees, the
 3    litigation of the PSA, extensively had been developed.  The
 4    financing had all been negotiated prior to my arrival.  That
 5    was pretty well known.  I mean, if there was any question,
 6    that was minor on that so there was -- the agreements
 7    themselves were still being -- going through the editing
 8    stages, but the -- substantially, you know, the car was
 9    designed and chassis built and they were just finishing off
10    the waxing.
11    Q    Now -- and again, in the Info W cases under those
12    agreements, Alex Jones and Free Speech Systems -- FSS --
13    were the third-party funders who were going to contribute
14    funds under the litigation settlement trust to pay the
15    creditors in the Info W cases.  Is that correct?
16    A    Well, they were contributing funds to the trust and
17    they were setting aside funds for the professional costs.
18    Q    So there was no -- under those agreements, there was no
19    consideration or funds being given for the creditors of the
20    Info W debtors?
21    A    Well, I said there's funds -- there are funds being set
22    aside in the trust for the benefit of the creditors and
23    there were funds being set aside -- I think they were
24    actually held in an (indiscernible) account to pay the
25    professionals.  That money all came from -- was coming from
```

1    Mr. Jones and FSS.

2    Q    Is it your recollection that there was approximately or

3    maybe $10 million to be funded under those agreements?

4    A    Well, the estimation of the amount that would

5    ultimately be funded is 10 million.  There was $2 million,

6    as I recall, of cash up front.  There was another amount --

7    $40,000 -- 500,000 -- $480,000 a year for five years.  That

8    was coming from another source, and then FSS itself would

9    devote its net income to the trust as well.  (indiscernible)

10   But some of that depending on which estimate you use for

11   FSS, is 10, 12, $15 million.

12   Q    And you were the -- as the chief restructuring officer,

13   you were the party designated to represent the interest of

14   the Info W Debtors under those agreements.  Correct?

15   A    Yes.

16   Q    And that's in the negotiation of those agreements?

17   Correct?

18   A    Well, yes, once I came on board.

19   Q    Okay.  And there was testimony earlier about an amended

20   plan support agreement and a litigation settlement trust

21   being filed with the court on April 19th.  Do you recall

22   that?

23   A    Yes.

24   Q    Okay.  So the parties were in negotiation again,

25   yourself on behalf on the Info W Debtors, Alex Jones for

Page 189

```
 1   himself, FSS for itself, and the proposed trustees under the
 2   litigation settlement trust.  Is that correct?
 3   A    (No audible response)
 4   Q    So those were -- let me rephrase.  Yeah.  So the
 5   parties that were negotiating at the time were the Info W
 6   Debtors, Alex Jones, Free Speech Systems, and the litigation
 7   -- proposed litigation -- settlement trustees.  Is that
 8   correct?
 9   A    Yes.
10   Q    All right.  And more negotiations were required because
11   the trustees or the proposed trustees of the litigation
12   settlement trust had not agreed to that document yet.  Is
13   that correct?
14   A    Correct.  They had not signed off on it.
15   Q    So as of April 29th when that was filed, you were on
16   opposite sides of the table from FSS.  Is that correct?
17   A    Well, I guess that's one way to look at it.  Yeah, we
18   were -- they were negotiating -- well --
19   Q    I'll take your answer.  If yes is the answer -- yes or
20   no and you said yes.  I'll take it.
21   A    Well, I (indiscernible) opposite sides because we're
22   not fighting.  But, yes, we're not -- we're each looking for
23   our own interest or our own constituents' interest.
24   Q    Very well.  I'll take that as well too.  So you were
25   there for the interest of the Info W Debtors.  Correct?  You
```

1    were not there for the interest of FSS at that time.

2    A    Correct.  And then -- you say Debtors and the primary

3    responsibility is to the Debtor's creditors, obviously.  So

4    that's what I'm mostly concerned about.

5    Q    Now moving on, on April 18th, 2022, the Info W Debtors

6    filed an application to request authority to employ you as

7    their chief restructuring officer in the Info W cases.

8    Correct?

9    A    Okay.  Sorry.  I don't recall the date but --

10   Q    Does that sound correct to you?

11   A    Yes, that sounds correct.

12   Q    Now prior to the application being filed on April 18th,

13   you reviewed the application.  Correct?

14   A    Yes.

15   Q    Okay.  And you also reviewed your declaration before it

16   was filed.  Correct?

17   A    Yes.

18   Q    Okay.  Who drafted your declaration?

19   A    (indiscernible), I believe.

20   Q    Okay.  But ultimately, since the declaration was signed

21   by you -- correct -- the declaration was signed by you.

22   Correct?

23   A    Yes.

24   Q    Okay.  And do you understand that you're responsible

25   for the content within the declaration?

1   A    Yes.

2   Q    Okay.  And the declaration was signed under penalty of

3   perjury.  Correct?

4   A    That's what I remember.

5   Q    Okay.  And when you sign a document under penalty of

6   perjury, you're signed attesting to the fact that it's true

7   and accurate.  Correct?

8            MR. LEE:  Objection.  He's asking the witness for

9   a legal conclusion.

10           THE COURT:  I think he's just testifying to what

11  the words say at the bottom of the declaration.

12           MR. LEE:  As long as that's the case.

13           THE COURT:  Yeah.  I'll overrule.  To your

14  knowledge.

15           THE WITNESS:  To my -- okay.  That it's true and

16  correct?  Yes, to the best of my knowledge -- the best of my

17  knowledge, it's true and correct.

18           MR. RUFF:  Okay.

19  BY MR. RUFF:

20  Q    Do you recall who filed the employment application in

21  the Info W cases?  Which attorney?

22  A    The employment applications?

23  Q    For yourself.  Yeah, who filed that?

24  A    I believe Mr. Lee did as counsel for the Debtor --

25  Debtors.

1    Q    All right.  Prior to them filing it, they got your

2    authorization to file that application.  Is that correct?

3    A    Yes.

4    Q    Okay.  Now attached to the application, was an

5    engagement letter.  Do you recall who signed the engagement

6    on behalf on the Info W Debtors?

7    A    No, I do not.

8    Q    All right.  I think you're on the same exhibit.  It

9    will be I think Page 32.  Scroll down.  There you go.  No,

10   back down where the signatures are.  All right.  Do you

11   recall this document, Mr. Schwartz?

12   A    Yes.

13   Q    All right.  What is this document to your recollection?

14   A    This appears to be our engagement letter.

15   Q    With the Info W Debtors?  Is that correct?

16   A    Yes.

17   Q    Okay.  And do you see who signed on behalf of --

18   A    Yes.

19   Q    Who signed that?

20   A    Alex Jones.

21   Q    Okay.  Thank you.  Now on the declaration filed on the

22   Info W cases, you affirmatively stated that there was no

23   connection to Free Speech Systems, LLC.  Is that correct?

24   A    Correct.

25   Q    And on the declaration filed in the Info W cases, you

1    also affirmatively stated that there was connection to Alex

2    Jones.  Is that correct?

3    A     That's correct.

4    Q     All right.  So from April 18th, 2022, to the dismissal

5    of the Info W cases which happened on June 10th, 2022, you

6    did not provide any subsequent amendments to the

7    declaration.  Is that correct?

8    A     I don't recall doing any.  I don't think so.

9    Q     Now let's if anything changes in your declaration and a

10   new connection developed.  Do you understand that you were

11   required to supplement your declaration?

12   A     Yes.

13   Q     Okay.  But you didn't supplement it at any time, did

14   you?

15   A     I did not.

16   Q     Okay.  Now fast forwarding a little bit to May 19th,

17   2022, you sent an engagement letter to FSS outlining the

18   terms upon which you would serve as its CRO.  Is that

19   correct?

20   A     That's incorrect.

21   Q     Okay.  Can you clear that up for me?  Did you -- let me

22   back then.  Restate the question.  Did you draft an

23   engagement letter for FSS on -- for your -- excuse me --

24   strike.

25         Did you draft an engagement letter to serve as CRO of

1  FSS on May 19th, 2022?

2  A    Yes.

3  Q    Okay.  Did you send that engagement letter to anyone on

4  May 19th, 2022?

5  A    Yes.

6  Q    Who did you send it to?

7  A    Mr. Lee.

8  Q    Okay.  So you were actively seeking an engagement to

9  serve as the CRO of FSS as early as May 19th, 2022?

10  A    I wouldn't -- you know, I was -- Mr. Lee asked me to

11  put together an engagement letter but we'd not had any

12  discussions with FSS or any of its principals or any of its

13  counsel -- I had not -- about employment.  So I did

14  (indiscernible) gave him a draft of the engagement letter so

15  he could see the terms under which I would take the job on,

16  but we had not sat down with anybody and even gotten

17  background information at that point.  I can't say I'm

18  actively seeking.  I'm actively seeking information.

19  Q    So it's your testimony today that when you send out an

20  engagement letter, you're not seeking to be engaged?

21  A    Most of the time when I get asked to send an engagement

22  letter, they're asked -- they want to look at the -- look at

23  the terms of my engagement.  That's typically what happens

24  and they will call back and if you're got a problem or not.

25  So (indiscernible) anticipating an engagement but it doesn't

1  always happen.  You know, some people just like certain

2  clauses that we don't give on.  It's whatever.  And we

3  (indiscernible) ask for a draft and I sent a draft

4  engagement letter.  Yeah, I think it was draft.  And -- but

5  we had not sat down and talked with anybody about it at that

6  point in time.

7  Q    So is it your testimony then that as of May 19th, you

8  were desiring in an engagement with FSS as its chief

9  restructuring officer?

10  A    I'd say I was interested in it for certain.

11  Q    Okay.  Very good.  Now serving as the chief

12  restructuring officer of FSS, that an important role.

13  Correct?

14  A    Well, some people think so.  Some people don't.

15  Q    I'm asking you if you think it's an important role.

16  A    Well, I mean, it's a responsible role.  I mean, you

17  have to take it seriously.

18  Q    Okay.  In that role now you actually run FSS.  Correct?

19  A    Well, as much as any one person could run 50 people.

20  Q    Okay.

21  A    They still have their own -- I mean, I am the chief --

22  I (indiscernible) call it CRO because (indiscernible) chief

23  executive officers at this level so I have the

24  responsibility for everything going on but I don't do

25  everything.

1    Q    So it wasn't your testimony earlier that -- let me back

2    up.  Strike that.

3         You testified earlier that Alex Jones doesn't control

4    FSS now.  Correct?

5    A    That is -- Alex -- that is correct but Alex Jones has a

6    lot of influence over the employees there still.

7    Q    Okay.  But it also was your testimony that you make all

8    management decisions.  Is that correct?

9    A    That is correct.  He comes to me.

10   Q    Okay.  So that's a pretty significant role then at FSS.

11   Is it not?

12   A    It's a lot of responsibility so, yeah, I mean --

13   Q    Okay.  And it was certainly a connection, wasn't it?

14   A    It was -- (indiscernible) it's --

15   Q    In the --

16   A    (indiscernible) it's a connection today.

17   Q    Okay.

18   A    But InfoWars is not a connection today.

19   Q    When you're -- but when you were seeking employment as

20   the chief restructuring officer and drafting any engagement

21   letter, you didn't see that as a connection at that time?

22   A    No.

23   Q    Okay.  When did you believe that there was connection?

24   A    Well, I believe we were still negotiating working with

25   the PSA and that was in force, definitely there was a

1    connection because they were the funding source for the --
2    one of the funding sources for the PSA, but once that PSA
3    was voided -- I mean, they've had -- (indiscernible) they
4    were an independent -- they were no longer involved.  They
5    were no longer an influential entity and (indiscernible)
6    they had no part -- no place at the table.
7    Q    Now you had a meeting in Austin on May 24th.  Is that
8    correct?
9    A    Correct.
10   Q    Okay.  And that was to discuss the FSS restructuring.
11   Is that correct?
12   A    That was to get introduced to it and they explained
13   that -- you know, they -- (indiscernible) doing
14   (indiscernible) saw a lot of them going over the proposed
15   structure of the (indiscernible) trust and the PSA and the
16   funding sources and we had some quite discussions about the
17   funding sources.
18   Q    So on May 24th, you were talking about the PSA for the
19   Info W Debtors?
20   A    I'm sorry.  May -- I apologize.  You're right.  My
21   brain just jumped back two months because I remember that
22   vividly.  Yeah, May 24th, we discussed the FSS bankruptcy
23   and some of the issues involved.
24   Q    Okay.  So as of May 24th, there was already a planned
25   FSS bankruptcy being talked about?

007347

```
1    A    I wouldn't say it was a plan.  There was a -- the

2    possibility of a bankruptcy was being talked about.

3    Q    Okay.  And you were seeking to serve as or being

4    considered as the chief restructuring officer of FSS in that

5    plan.  Is that correct?

6    A    I believe I was being interviewed for it, yes.

7    Q    Okay.  And you didn't think that that was an important

8    connection?

9    A    As it goes to InfoWars, no, I did not, again, because

10   FSS was no longer in the InfoWars bankruptcy.  They were

11   gone.

12   Q    Was FSS jointly liable for all of the Info W Debtor's

13   debts?

14   A    No.  They'd all been dismissed from our standpoint.

15   Q    What about the remaining debts?

16   A    Oh, the other three?  I was actually -- yes, that's one

17   of the considerations we had was why should we spend money

18   here.  I mean, they got all the money and they're the ones -

19   - they are jointly liable for that.

20   Q    Now the U.S. Trustee filed a motion to dismiss the Info

21   W cases on April 29th.  Correct?

22   A    I believe that's correct.

23   Q    All right.  And the motion was set to be heard on May

24   27th.  Correct?

25   A    Correct.
```

1   Q    All right.  And on May 18th, the Info W Debtors filed a

2   motion seeking to continue the hearing to June 24th.   Is

3   that correct?

4   A    Correct.

5   Q    Did you authorize the filing of that motion to continue

6   the hearings?

7   A    Yeah.  I'm -- I never actually said I authorize you to

8   do this (indiscernible) but I was aware of it.  You know, we

9   were talking about it.

10  Q    He made you aware that he wanted to file the motion and

11  you didn't object to it.  Is that accurate?

12  A    Correct.  That's fine.

13  Q    All right.

14  A    (indiscernible) but I understand that.

15  Q    I'm sorry.  You wanted --

16  A    I wanted it sooner but I could understand the need to

17  (indiscernible) more time than June 10th.

18  Q    What did you think might need more be happen sooner?

19  A    Well, my hope you could do is get an agreement on

20  getting the bankruptcy dismissed.

21  Q    All right.  And then the hearing on the motion to

22  continue the dates was on May 19th, 2022.  Correct?

23  A    That was busy day so I'm going to have to accept your

24  word for the 19th.  I just --

25  Q    Well, the motion was filed on the 18th.  Correct?

Page 200

```
1    A    The motion for the continuance?

2    Q    Yes.

3    A    I'm sorry.  Yes.

4    Q    And then the hearing for the continuance was on the

5    19th.  Correct?

6    A    Right.

7    Q    Okay.  And the motion was never withdrawn at any point.

8    Correct?

9    A    The motion to --

10   Q    Continue.

11   A    -- continue?  I don't recall one way or the other.

12   Q    So there was not any sort of final decision to dismiss

13   the Info W cases as of May 19th then.  Correct?

14   A    Well, it was dependent on being able to work out with

15   you a mutual -- mutually agreed way of doing it.  So the --

16   Q    All right.

17         MR. RUFF:  I'm going to object as nonresponsive,

18   Your Honor.  I asked him if there was a decision to --

19         THE COURT:  I'm going to overrule.  He can answer

20   the question.

21         THE WITNESS:  Oh, (indiscernible) I definitely

22   knew in my mind I wanted to withdraw.  But (indiscernible) I

23   think I said earlier, once the Texas and Connecticut

24   Defendants released us with -- dismissed us with prejudice,

25   I mean, I knew at that moment, we're going to have to
```

1    terminate this bankruptcy and that's what we ended up with.

2    BY MR. RUFF:

3    Q    So if you knew you wanted to terminate the bankruptcy

4    right away, why were the Info W Debtors seeking to continue

5    to push it out until June 24th?

6    A    Because Mr. Lee was working on how he was going to get

7    this accomplished.  Plus we had to make sure everything was

8    finalized with the Texas and Connecticut matters in terms of

9    the state courts and, you know, what they had to do on the

10   dismissals.  I believe that was -- we were having to wait

11   for some of that time and then we had to allow time to work

12   -- negotiate with the U.S. Trustee's Office.

13   Q    And now Mr. Lee had sent an email to you on May 21st

14   that he was going over with you earlier recommending the

15   dismissal of the bankruptcy cases.  Correct?

16   A    Right.

17   Q    Okay.  Had he made a recommendation to dismiss the

18   bankruptcy cases before that?

19   A    I can't he made a recommendation.  We had discussed it.

20   I think he wanted to, you know, sit down and go logically

21   through it and make sure he wasn't -- we were covering all

22   the bases.

23   Q    And you let him know on May 23rd, yes, go forward.

24   Let's get these things dismissed.  Is that correct?

25   A    Yes.

Page 202

```
1    Q    All right.  But that was all after May 19th.  Correct?
2    Nothing before that?
3    A    I mean, I can't say we didn't have discussions before
4    that.  I don't think he was yet committed to the -- you
5    know, to do it.  He hadn't gone through his legal analysis
6    and I looked at it from a practical business standpoint and
7    says, you know, there's no point in us being here.
8    Q    Okay.
9    A    But I -- you know, he represents the Debtors and he's
10   got to go through the legal process and tell me how we're
11   going to get it done and make sure we can -- everything is
12   taken care of.  So the final decision to pull the trigger
13   was May 23rd but that -- I had no doubt where we were going.
14   Q    Do you recall having a phone call with Mr. Battaglia on
15   May 17th?
16   A    On May 17th?  You going to have to help me out.  I
17   don't remember it.
18        MR. RUFF:  Pull up 155-13.  Can you go to Page 8,
19        please?  All right.  Can you blow up to 33
20        (indiscernible)?
21   BY MR. RUFF:
22   Q    Do you recognize this document, Mr. Schwartz?
23   A    It looks a copy of our time records.
24   Q    Okay.  Do you see that time entry there right where the
25   cursor is blinking?
```

1    A    I do.

2    Q    Can you read that for me?

3    A    It says call with R. Battaglia.

4    Q    Who is the R. Battaglia that's being referred to in

5    that time entry?

6    A    That's Ray Battaglia.

7    Q    Okay.  Do you recall what that call was about?

8    A    No, I do not and that's -- what's the date on that one?

9    May 17th?  No, I don't recall.

10   Q    Okay.  But Mr. Battaglia was representing Free Speech

11   Systems at that time.  Correct?

12   A    Right.

13   Q    Was that your understanding?

14   A    Yes.  He did represent Free Speech Systems.

15   Q    Okay.  But you have no recollection of what that call

16   is?

17   A    No.  I mean, access document -- (indiscernible) wait a

18   minute.  It may have been about access.  I don't know but

19   that's just because the entry above it's about access --

20   (indiscernible).  Working on the bank accounts.  No, I don't

21   know.

22   Q    So moving on, on May 25th, you had directed Mr. Lee is

23   prepare a motion to dismiss the Info W cases.  Is that

24   correct?

25   A    I directed him to get them dismissed so I guess that

Page 204

```
 1   means I directed him to get a motion or to work out with you
 2   a motion.
 3   Q    Okay.  But before that time, you -- there had been
 4   discussions about a possible dismissal but no direction from
 5   you to get the cases dismissed.  Is that correct?
 6   A    Right.
 7   Q    Okay.  Now ultimately, the United Stated Trustee and
 8   the Info W Debtors stipulated to a dismissal of the Info W
 9   cases on June 1st.  Correct?
10   A    Correct.
11   Q    All right.  But the cases were not dismissed until June
12   10th after the court held a hearing.  Correct?
13   A    Correct.
14   Q    All right.  At no time prior to the cases being
15   dismissed did you file a supplemental declaration.  Correct?
16   A    Correct.
17   Q    And at no time prior to the dismissal did you have your
18   employment application withdrawn.  Correct?
19   A    Correct.
20   Q    So you were still serving as the chief restructuring
21   officer of the Info W Debtors when their cases were
22   dismissed.  Correct?
23   A    Correct.
24   Q    But at no time prior to the Info W cases being
25   dismissed did you disclose to the Court or to the United
```

```
 1    States Trustee your connection with Free Speech Systems as

 2    its chief restructuring officer.  Correct?

 3    A    That's is correct.  I didn't consider them an

 4    interested party.

 5    Q    So you didn't think that a co-liable debtor was a party

 6    and interest to the Info W Debtors?

 7    A    Co-viable?

 8    Q    Co-liable.

 9    A    Co-liable.  Okay.  I'm sorry.  It sounded like co-

10    viable.  No, I didn't.

11    Q    Is that usually your judgment that parties who are

12    jointly liable for a debt are not parties and interest?

13    A    I can't see -- I'd have to think about that.  I'm not

14    sure I agree with that.  I think it depends on a lot of

15    things but FSS was out of the picture as far as I was

16    concerned and they had no interest in InfoWars.  InfoWars

17    didn't have any interest in them.  I'm not sure if it's

18    called liable in this makes it necessarily an interested

19    party or not.

20          MR. RUFF:  I have no further questions

21    (indiscernible).

22          THE COURT:  Okay.  Mr. Lee, do you have any

23    redirect?

24          MR. LEE:  Two questions.

25          THE COURT:  Okay.
```

```
 1                    REDIRECT EXAMINATION

 2   BY MR. LEE:

 3   Q    Mr. Schwartz, between the period of May 19th through

 4   June 10th, '22, was there ever a matter of where you acted

 5   adversely to the interest of Info W Debtor?

 6   A    No.

 7   Q    Between the period of May 19th through June 10th, '22,

 8   was there ever a matter that involved a dispute between FSS

 9   and Info W Debtors on which you had to act?

10   A    No.

11   Q    Let's talk about the remaining creditors that we talked

12   about and the joint liability.  Do you recall whether or not

13   we discussed the remaining claimants before we went on

14   embarking on a new project?  Do you recall --

15   A    Yes.

16   Q    Okay.

17   A    We talked about that in the process of deciding whether

18   or not to terminate the bankruptcy.

19   Q    And tell the Court what you -- what we discussed.

20   A    Well, I remember that we discussed, one, it could be

21   better handled outside; two, because FSS is the -- and Mr.

22   Jones are the -- essentially, they're the big pocketbooks.

23   We had -- at that time, we had $70,000 for three companies.

24   That was it -- all the money.  So, you know, there was not

25   much -- you know, it was going to get resolved but it had to
```

```
 1   -- let them resolve when they resolve -- let them -- handled

 2   it and then in that process, resolve those claims on

 3   InfoWars -- the InfoWar Debtors.

 4   Q    And tell the Court and the creditors here whether any

 5   of the actions you took in the Info W Debtors cases while

 6   you were acting and consulting with FSS starting on May 24th

 7   -- did it adversely affect anything you did in the Info W

 8   Debtors' bankruptcy cases?

 9   A    No.

10            MR. LEE:  Pass the witness, Your Honor.

11            THE COURT:  Okay.  Any re-cross?  Okay.  Thank you

12   very much, sir.

13            THE WITNESS:  Thank you.

14            THE COURT:  Okay.  Mr. Shannon, any other

15   witnesses?

16            MR. SHANNON:  No other witnesses for us, Your

17   Honor.

18            THE COURT:  Okay.  Can I consider, I should say,

19   the evidence on your side completed?

20            MR. SHANNON:  Yes.

21            THE COURT:  Okay.  Turning now to the other side,

22   does anyone present any witness or any --

23            MR. RUFF:  No, Your Honor.

24            THE COURT:  Okay.  Mr. (indiscernible)?  Okay.

25   Okay.  What do you wish to tell me, sir?  Why don't we give
```

1   you -- everyone a brief opportunity to present any closing

2   statements and then give me a few minutes and I'll rule.

3           MR. SHANNON:  And I will keep it very brief, Your

4   Honor.

5           THE COURT:  I want you to take your time.  Don't -

6   - we'll go until we're done.

7           MR. SHANNON:  Your Honor, as we said in the

8   beginning, there is no dispute about these bankruptcy cases

9   -- this bankruptcy case -- the FSS bankruptcy case.  There's

10   no dispute that the applicants that this Debtor wants to

11   employ are disinterested, that they do not hold or represent

12   any interest adverse to this Debtors' bankruptcy estate.

13   There's no dispute there.

14           Again, the issue that the U.S. Trustee has brought

15   up and the only issue that the evidence has brought up is

16   this potential failure to supplement 2014 disclosures in the

17   Info W bankruptcy case.  And maybe the U.S. Trustee's

18   (indiscernible) agrees then it's not something that I knew

19   before.  Maybe it's -- maybe the U.S. Trustee is right, that

20   even though the agreement to dismiss the case has been

21   reached, you know what, Mr. Lee and Mr. Schwartz should have

22   supplemented their disclosures.

23           And if that's the case, though, Your Honor, it's

24   still not a good reason to decapitate this Debtor in this

25   case and basically shut FSS down, and there's been no

```
 1    argument that denial of these applications to employ will

 2    benefit the estate, and the case law says that's what

 3    important.  There's been no argument or no evidence that

 4    denial of these applications to employ will further

 5    administration of these bankruptcies -- of this bankruptcy.

 6    It simply wouldn't -- removing, you know, more than half of

 7    the Debtors' attorneys -- it wouldn't help.

 8             Now again, Your Honor, if there was a failure to

 9    supplement the disclosures, I believe the Debtor has

10    submitted a reasonable alternative to what the sanctions

11    should be and that sanction should not be to deny the

12    application to employ.  You know what, if Mr. Lee made a

13    mistake, it's that he should have waited to dismiss the case

14    -- dismiss the Info W Debtors' cases before representing

15    FSS.  I'm sure if he went back that's what he would do.  And

16    the alternative that the Debtors suggest is disallow Shannon

17    & Lee, LLP's fees in that amount -- $24,409, and that would

18    basically put everybody in the situation that the U.S.

19    Trustee says people should have been in.  That actually puts

20    the Debtor in a better position, right, because they got --

21    they would have gotten free legal services.  That is -- the

22    Debtor's fine with that.  I believe that Shannon & Lee, LLP,

23    will continue to represent the Debtor if that's the Court's

24    ruling.

25             But there is no case law that mandates that
```

```
 1    outcome.  It's not supported by the evidence which all the

 2    evidence has -- all the evidence you've heard is that Mr.

 3    Lee and Mr. Schwartz tried to do their fiduciary duties to

 4    the Info W Debtors.  They've been trying to do their

 5    fiduciary duties to this Debtor.  They've stood up to some

 6    pressure from these parties that are supposedly or

 7    potentially -- you know, that there potentially could be,

 8    you know, insiders that I guess is what the U.S. Trustee is

 9    worried about.  That's all the evidence that's been in front

10    of this Court.

11          So with that, Your Honor, unless you have any

12    questions from me, that's my presentation.

13          THE COURT:  I just have one.  So nobody's actually

14    talked about the fifth circuit standards for retention.

15    There's been responses to -- (indiscernible) gone back and

16    forth which was the problem with the pleadings and no one

17    ever talked about, right, what it means to hold an adverse

18    interest to the debtor or to the estate.

19          When you look at West Delta Oil, right, fifth

20    circuit said -- you look -- a professional possesses or

21    asserts any economic interest that would tend to lessen the

22    value of the estate or that would create an actual potential

23    dispute in which the estate in a rival claim (indiscernible)

24    to possess a predisposition under circumstances that render

25    such a bias against the estate.  That was a Utah case that
```

1   the fifth circuit was looking on and said, look, that's a

2   good definition.  You got to look at it with the eyes and

3   attention to circumstances which may impair a professional's

4   ability to offer impartial disinterested advice to his or

5   her client, right.  That's what it means to have an adverse

6   interest.

7        And you look at cases like West Delta Oil and

8   Waldron versus Adams and Reese case and that case says --

9   I'm going to ask the United States Trustee the same

10  question.  It says attorneys engaged in the conduct of a

11  bankruptcy case should be free of the slightest personal

12  interest which might be reflected in their decisions

13  concerning the matters of the debtors (indiscernible) which

14  might impair the high degree of impartiality or detached

15  judgment expected of them.

16       I got it that you're saying no one should look to

17  the last case.  What's your answer to what the fifth circuit

18  requires me to look at?

19       MR. SHANNON:  Well, I would say, look, the

20  question is about Mr. Schwartz and Shannon & Lee, LLP, and

21  whether they have either an economic interest or some

22  interest that is adverse to this bankruptcy.  That's not the

23  case, Your Honor, and I believe that everything -- all the

24  evidence is support of that.  I believe that was clear based

25  on the application and there has -- none of the parties have

1   disputed that.

2         THE COURT:  Do you think Shannon & Lee, Mr.

3   Schwartz -- let's just get the real question, right.  Do you

4   think Shannon & Lee or Mr. Schwartz can render solid advice

5   or impartial advice to FSS if it meant taking an action

6   against an insider?

7         MR. SHANNON:  Your Honor, absolutely and I can

8   tell you that both Mr. Lee and I have taken that position.

9         THE COURT:  I didn't hear one today.  Which one

10  did you take?  The one that Mr. -- when he testified to that

11  was me.  Which one did you take?

12        MR. SHANNON:  Oh, that Mr. -- Mr. Jones -- Alex

13  Jones --

14        THE COURT:  Again, I -- this case is -- what

15  complicates this case is that there are well known people

16  involved in it.  I just want you to take all that out.  Just

17  --

18        MR. SHANNON:  No, I understand --

19        THE COURT:  -- and the facts that you have today -

20  - can a professional who is engaged in the -- all the

21  evidence that the United States Trustee has (indiscernible)

22  setting aside and let's just call it company A, owner A --

23  could Shannon & Lee provide -- give the Court comfort that

24  Shannon & Lee or Mr. Schwartz can provide impartial advice

25  to the estate based on what we've heard today, right?  And I

1    know -- just let me finish -- I know that you're saying that

2    I should just look at the last case as nothing, but, right,

3    I was here.  So what do I -- in considering the cases that

4    I'm thinking about, how do you then -- what weight or what

5    consideration should I give to what happened in the last

6    case as I consider whether you can render impartial -- fair

7    and impartial advice to the estate in this case?

8        MR. SHANNON:  Your Honor, I would actually point

9    out the track record, right.  I mean, it did not benefit

10   Alex Jones or FSS to not fight the Texas Plaintiffs or the

11   Connecticut Plaintiffs getting rid of their claims in the

12   Info W cases.  That was -- did not help those parties.  The

13   Info W Debtors said, that's not what -- and Mr. Schwartz

14   obviously was the one making this decision ultimately -- you

15   know, the decision that was made was how does it benefit

16   this estate and these Debtors.  That was the focus in those

17   cases.  It was not what benefits the owner.  It's not what

18   benefits the related parties.

19        I believe in this case, there was, you know, some

20   requests to do things that the Debtor didn't believe were

21   the best interest of the Debtor's estate.  Mr. Schwartz as

22   the CRO, you know, Shannon & Lee, LLP representing the

23   Debtor, obviously Mr. Battaglia as well, said those things

24   do not benefit the estate and that's what Mr. Lee testified

25   to about extending the automatic stay to Alex Jones.  He

1   said, no, we're not going to do that.  So I would actually

2   look at the track record in this case and the last case to

3   give the Court that comfort.

4        THE COURT:  What evidence can you point me to in

5   the record?  That's what today's about, right?

6        MR. SHANNON:  Well, Mr. Lee's testimony that he --

7   you know, that the Debtor here, FSS, denied or pushed back

8   on that request from Alex Jones.

9        THE COURT:  Thank you.

10       MR. SHANNON:  So that's in the record.  I also

11  believe that Mr. Lee's email on May 21st, right -- it really

12  points out what was considered in that decision.  It was not

13  any pressure from FSS, and again, frankly, I believe that

14  the -- you know, the dismissal or the not putting up any

15  opposition to the dismissal by the Texas Plaintiffs and the

16  Connecticut Plaintiffs in the Info W cases -- that was not

17  for the benefit of anyone else other than those Debtors.

18  And so that's the evidence I think the Court should consider

19  on that issue.

20       THE COURT:  What about Mr. Schwartz?  What about -

21  - I think -- I understand your position with Shannon & Lee.

22  What about Mr. Schwartz?

23       MR. SHANNON:  Well, Mr. Schwartz was the ultimate

24  decision maker.

25       THE COURT:  Well, I thought he was taking

```
 1    direction from the initial trustee.

 2         MR. SHANNON:  The initial trustee gave no

 3    direction at all in that first case.  If you remember, that

 4    was the emergency behind getting the former judges appointed

 5    because the initial trustee had no role in that case.  The

 6    initial trustee, frankly, is someone who is very close to

 7    Mr. Jones.

 8         THE COURT:  The conflict that I'm having in my

 9    mind -- and again, I don't like it when judges don't share

10    their thoughts -- so Mr. Schwartz testified that, you know,

11    the owner has no authority on decisions as it related to the

12    bankruptcy case.  It certainly has influence and there's no

13    denying that, right, and it's an important consideration.

14    Who's putting in the cash collateral budget to pay for an

15    $80,000 travel expense where the (indiscernible) pays for

16    everything, right?  Like who's putting that in?  That's Mr.

17    Schwartz making that decision?  Is that -- that's Mr.

18    Schwartz saying, pay 100 percent of the legal expenses in

19    the Connecticut litigation?  That's Mr. Schwartz saying,

20    let's go 40/60 on an appeal on a case in which you're going

21    to get ready to file plan?  That's Mr. Schwartz saying, pay

22    PQPR, you know, $750,000 in the first -- that's Mr.

23    Schwartz?

24         MR. SHANNON:  It is ultimately Mr. Schwartz,

25    Judge, but I will say this.
```

```
1              THE COURT:  Maybe it is.
2              MR. SHANNON:  There are arms length negotiations
3    in that --
4              THE COURT:  That's what I'm saying, but who's the
5    (indiscernible) let's put in an $80,000 travel expense or
6    let's go 60 -- let's go 100 -- we'll pay 100 percent of the
7    state court litigation that's already started in
8    Connecticut?  Who's making that decision?  That's what --
9    where's the arms length there?
10             MR. SHANNON:  The demand would be by Mr. Jones and
11   really through Mr. Jones's counsel, saying, this is what we
12   need to do.  Otherwise, it's not worth Mr. Jones, you know,
13   continuing on in this company.
14             THE COURT:  Do you see the tension with this case
15   and as it relates to -- this case is interesting because
16   there's active litigation --
17             THE COURT:  And, Your Honor, the one thing I will
18   say --
19             THE COURT:  -- right, the Debtor and owners are
20   co-Defendants in litigation and so that's what makes this
21   tricky aside from the issue and it involves tortes.
22             MR. SHANNON:  The one thing I'll say, Your Honor,
23   is that if the CRO -- the application employed the CRO is
24   not done then who is making the entire decision.  There is
25   no other party to --
```

1          THE COURT:  I'm asking, who's making the decision

2     now?

3          MR. SHANNON:  It's Mr. Schwartz.

4          THE COURT:  Okay.

5          MR. SHANNON:  And that's why you have the first

6     day of this hearing Mr. Lee did not remember.  I can ask the

7     Court to take judicial notice.  I was the one there.

8          THE COURT:  Oh, I know why you asked the question.

9          MR. SHANNON:  That's why we agreed ultimately to

10    extend or to allow a relief from the automatic stay for the

11    Connecticut Plaintiffs to go forward.  That's no something

12    Mr. Jones wanted.  That's something that the Debtor believed

13    was in the best interest of this estate and that Mr.

14    Schwartz believed was in the best interest of this estate.

15         THE COURT:  Okay.

16         MR. SHANNON:  And so I think that's the evidence,

17    Your Honor, that it -- if Mr. Jones or if this Debtor was

18    acting strictly for the benefit of Mr. Jones, those things

19    wouldn't have happened, right.  And sure, there are -- there

20    is some give and take there, right, and he is the most

21    important person (indiscernible).

22         THE COURT:  No question.

23         MR. SHANNON:  But there is --

24         THE COURT:  That's not surprising in companies,

25    right.  That's not surprising especially in the nature of

1    the business in which the Debtor's involved in.  That's not

2    surprising.  So I don't want anyone to think that it's rare.

3            MR. SHANNON:  So, Your Honor, that's the answer I

4    have to your question.

5            THE COURT:  Thank you very much.

6            MR. SHANNON:  Thank you, Your Honor.

7            THE COURT:  Okay.  Mr. Battaglia.  Yes, sir.

8            MR. BATTAGLIA:  Thank you, Your Honor.  Ray

9    Battaglia for Free Speech Systems.

10           A lot of what I heard today relates to what the

11   standard I know the Court holds attorneys to in terms of

12   their disclosures, in terms of the accuracy of what they put

13   in front of this Court, and I wish Mr. Lee had done a little

14   better on some of the dates and some of the other things.  I

15   understand the ambiguity over whether or not there was a

16   conflict based on the context of what was going on in the IW

17   case at that particular time.

18           It was clear well before you signed the

19   stipulation dismissing the case or the order dismissing the

20   case that this case was going to be dismissed.  There was

21   nobody propping up the case, not the Debtor, not my client

22   FSS, not Mr. Jones, not the Connecticut Plaintiffs, not the

23   U.S. Trustee's Office.  Everybody wanted the case dismissed

24   and well before you signed that order and well before May

25   19th if that's the key date, it was pretty clear that this

1    case was going to be dismissed.  The structure of how it was

2    be accomplished, what the literal language of an order or

3    stipulation would say, had some things to be worked out, but

4    there really wasn't any question that this case was -- that

5    that case -- the IW case -- was filed for the purpose of

6    trying to create a vehicle to settle litigation claims.

7         Once those litigants dismissed their claims with

8    prejudice -- claim that by the way they had held dearly,

9    steadfastly for four years against those Debtors -- they

10   just dismissed them literally overnight.  And so the purpose

11   of that case was gone, the purpose of the PSA, the purpose

12   of the litigation and trust -- all of those things were

13   gone, and so can someone hold up a candle and say, well,

14   there should have been a disclosure the first time you had a

15   conversation with me or a meeting in Austin on the 24th of

16   May.  Perhaps.  But at that point, FSS had gone from an

17   active participant to almost a stranger to the case, and so

18   -- I'm a firm believer that better to ask permission than

19   beg forgiveness and I think what you're hearing is some

20   begging of forgiveness today that it could have been done

21   better and cleaner, and I guess I could lay claim to

22   perfection.

23        I can't.  I screw up.  It happens.  I've been

24   doing this for 39 years.  I guarantee you I see pleadings

25   that I use as a template for the next case and go, oh, my

1   God, I can't believe I didn't catch that.  It happens every

2   day.  We're human.  But I think the real issue for the Court

3   is, what does that mean in terms of these parties' ability

4   to act on behalf of FSS and its creditors, and I don't think

5   it affects their abilities at all.  And as Mr. Lee

6   testified, there have been occasions where I assure you the

7   principles of the Debtor are not in league with FSS --

8   filing the immediate motion to lift the stay to allow Texas

9   case to go forward.  You could probably assume Mr. Jones

10  didn't like the idea of having to continue in that trial.

11  Filing the motion to lift the stay to allow the Connecticut

12  litigation to go forward and not proceed with other remedies

13  that are recognized by this Court and other courts about

14  injunctive relief and extension of the automatic stay.  Even

15  the removal that was done of the Connecticut litigation was

16  done with great hesitance and reluctance on our part but

17  only because it was unclear what the Connecticut court had

18  done, vis-à-vis FSS.  Not Alex Jones -- FSS.

19          So there have been numerous occasions where I

20  assure the Court that Mr. Jones and Mr. Jordan have had some

21  very terse conversations with us about what he thinks we

22  ought to be doing and we haven't done it.  And Mr. Lee and -

23  - I'll tell you, Mr. Shannon has had some terse

24  conversations with me on those topics as well.  So there's

25  no pushovers here.  There's nobody's doing Mr. Jones's

1   bidding other than his lawyers who represent him, and I

2   appreciate that the Court is concerned about the fee issues

3   on the litigation and I accept that.  I understand it.

4           I think that the thing that the Court doesn't get

5   to hear is what's Mr. Jones's ability to pay.  What happens

6   if he can't pay?  What happens if his state court lawyer

7   who's set for trial and we want to negotiate to lift the

8   automatic stay say, I won't go forward.  How do we deal with

9   that?  We're liable for that claim.  FSS is liable for that

10  claim.  We've agreed to produce Mr. Jones and through

11  negotiations that were extensive about who would show up at

12  trial.  The idea of making sure he shows up and -- you know,

13  that's a cost.  I told you it came in late in the day.  With

14  more time would we have rethought it and done better?

15  Perhaps.  Perhaps not.  It's just -- it's important that he

16  be there.  I'm important to me that he be there.  It's

17  important to him as well, but it's important to me and on

18  behalf of FSS.

19          So I hear the issues and I don't want to say

20  they're gotchas because they're not.  I mean, things should

21  have been done better in the IW cases.  There should have

22  been perhaps some more disclosure.  There should have been

23  some dates that were fixed.  I assure you I wouldn't have

24  contacted anybody had I thought there was a conflict of

25  interest coming into this case.  But the idea that I would

1    contact people who had familiarity with the issues involved

2    in the case, it can't be foreign to the Court.  I mean, it

3    makes complete sense and as I said, if you were to decide

4    that these parties can't be retained, I don't know where to

5    go.

6                I came into this as co-counsel.  I've been a solo

7    practitioner now for seven years.  I'm not with a big firm

8    anymore.  I can't -- and I'm hitting my later years of

9    hopefully practicing law, I can't run this hard anymore.  I

10   can't -- I couldn't possibly handle this case without co-

11   counsel and I don't know who out there would even consider

12   for a moment jumping in if it wasn't Shannon & Lee.  So when

13   Mr. Shannon says decapitate the Debtor, that's exactly what

14   would happen here and that clearly wouldn't be in anybody's

15   best interest, particularly as we're negotiating hopefully a

16   plan to proceed.

17               You know, we've made significant advances in

18   fixing this Debtor to the point where it can contribute net

19   cash (indiscernible).  The goal here is, as I said in the

20   very first hearing in front of you, I understand what this

21   bankruptcy code is about is paying creditors and that's all

22   I'm about.  It's my job to maximize the value of this estate

23   to pay creditors who are owed legitimate claims and that's

24   what I intend to do, but it isn't going to happen without

25   the help of a CRO and one who knows the business and without

1   assistance of effective co-counsel.

2          I can't do it myself.  I'm not -- when I told you

3   earlier that I had applied to be co-counsel, the point I was

4   driving home is, I don't know what --

5          THE COURT:  Right.

6          MR. BATTAGLIA:  -- your ruling to day will do to

7   me because I couldn't conceivably professionally stay in

8   this case and say, I can deliver the results that I'm

9   required to deliver to a client in zealous representation.

10  So that's really what I meant and I'll be happy to answer

11  any questions.

12         THE COURT:  Thank you for your time.

13         MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14  the U.S. Trustee.  I just want to make some comments to Mr.

15  Battaglia's statement.  He has a very grasp on disclosure.

16  He understands what needs to be disclosed and I think

17  partially that's why one of the reasons his application is

18  not being objected to, but what you heard on evidence today

19  -- you heard both Mr. Schwartz and you heard Mr. Lee -- they

20  sat up there and they said, you know, as of May 24th, they

21  didn't think there was a need for disclosure on May 24th.

22         Your Honor, that -- the case law in rule 2014,

23  that is not a decision for them to make.  2014 is about

24  laying all of your connections out on the table for the

25  Court and the parties to examine.

 1           THE COURT:  Why should it carry -- why should that

 2    carry into this case?

 3           MR. NGUYEN:  Your Honor, because this is the very

 4    connection that was concealed from you.  Your Honor, it's so

 5    important.  I mean, we have the technical requirements of

 6    327.  I agree with you.  The fifth circuit in Delta Oil

 7    explains it well.  But then there's another piece to this,

 8    and that piece is the disclosure piece.  And disclosure in

 9    the bankruptcy system is -- it's self-policed.  It's self-

10    policed by these professionals.

11           Like I said earlier, it's about the fox guarding

12    the henhouse, right.  So when you have a disclosure

13    violation, the Court should respond strongly because, you

14    know, that is what motivates other professionals to fully

15    disclose all of their connections.  Consequences for non-

16    disclosures are often harsh.  Sometimes people get

17    disqualified.  Sometimes people get full disgorgement of

18    their fees.  These are harsh remedies.  I understand.  But

19    they are required remedies to protect the integrity of the

20    bankruptcy system.

21           And, Your Honor, there was -- there is always --

22    since the beginning of this case, there was always a cloud

23    and I think Mr. Schwartz recognized it when he put in his

24    declaration.  There was always a question of loyalty here --

25    loyalty to Alex Jones or FSS.  That question has always been

```
1   a big issue in this case, and, you know, I go back to the --
2   I guess the August 3rd hearing when we found out that there
3   was American Express payment on the cash collateral budget
4   that was going to pay Alex Jones's housekeeper.  I think
5   that was the testimony at the time.
6           Who made that decision?  But Mr. Schwartz was the
7   one sitting up there testifying about the American Express.
8   Your Honor brings a good point about the 50/50 split for Mr.
9   Reynal and Mr. Pattis.  You know, I had many conversations
10  with Mr. Lee over that weekend and it's like, I don't -- Mr.
11  Lee was fighting for 40/60 for both of the applications.
12  And I said, Mr. Lee, like why are we giving Mr. Jones a
13  discount because one was 40/60 the other was 50/50.  It was
14  an argument of, hey, you should do 40/60 for this -- you
15  know, for this one as well.
16          And I was asking Mr. Lee, why are we shooting
17  ourselves in the foot. I want the state to have a fair deal,
18  but why are you arguing for 40/60 to give Mr. Jones an extra
19  10 percent discount.  So we ultimately ended up on the
20  50/50.  And then there was another counsel that was filed --
21  I think the appellate counsel in the Texas litigation -- and
22  I had the same objections there.  They did 40/60.  I don't
23  understand why 40/60.  They should be 50/50.
24          THE COURT:  That will get reconsidered after
25  today, after reading (indiscernible) but --
```

Page 226

1              MR. NGUYEN:  It needs to be 50/50, Your Honor.  So
2    on top of all of these concerns about potential bias, you
3    have the non-disclosure that happened in the prior case.
4    Remember, all of these parties were hired by Alex Jones.
5    Look at the engagement letter.  Alex Jones drew out --
6              THE COURT:  But that's typical in a small case,
7    all right.  I mean, it's not small in number but in terms of
8    small business where, you know, the owner hires everybody.
9    That's not surprising in a sub-Chapter 5 case.  So I'm --
10             MR. NGUYEN:  I agree, Your Honor, but think about
11   -- and like I said at the beginning of the opening, the
12   Court is a witness to everything that's gone on here.  We're
13   not talking about something that happened before a different
14   judge in a different case.  You were here throughout the
15   entire thing.  Statements were made to you, declarations
16   were filed.  Candor was important in the prior case.  Candor
17   is important in the case, and as Your Honor was going
18   through some of the exhibits, you know, there's an issue --
19   there's -- there are statements in Mr. Schwartz's
20   declaration that says May 19th and it turns out that that's
21   incorrect.  Mr. Schwartz testified he read his declaration,
22   but there's mistakes all over the place.
23             So that big issue -- that non-disclosure issue --
24   I just don't think you can get away from it.  And I think
25   it's important to remember what happened in the prior cases

1   because of May 19th, Mr. Battaglia said he would have

2   amended and disclosed, but the professional that sat up

3   here, they -- we asked them, you know, was this a connection

4   that should have been disclosed.  They all said no.  They

5   are still defiant about their duty to disclose.  Most

6   professionals would just come and file a supplement but

7   these professionals were --

8         THE COURT:  Well, I'm sure they're do it now if

9   you'll give them a chance.  You know, the question should

10  the -- you know --

11        MR. NGUYEN:  Your Honor, I --

12        THE COURT:  Go ahead.

13        MR. NGUYEN:  There was a connection that was not

14  disclosed.  Declarations were filed.  They were incorrect.

15  Statements were made to you to the contrary, that

16  (indiscernible) indicated that they were independent.  There

17  were multiple opportunities to disclose Free Speech System

18  as a connection.

19        Now they're coming in.  They're asking you to

20  approve this connection that they didn't disclose.  We can't

21  just -- we can't do that in terms of -- that just can't be

22  the case when there is an utter failure of disclosure, a

23  lack of acknowledgment from the professional, and now

24  they're asking you to bless it.  By blessing the application

25  now, you're actually compounding the non-disclosure in the

Page 228

1    prior case because you're essentially approving it, and

2    that's the problem we have.

3           So there is a sense of bias here.  There are

4    questions and then you compound it by having this non-

5    disclosure that they refused to acknowledge.  I think it's a

6    huge problem, Your Honor, and I would ask the Court to

7    consider just integrity of the process -- integrity for

8    these creditors who are here, who are demanding candor.

9    Candor is important.  So I would ask the Court to deny these

10   two applications.  The system demands it -- of it.  I just

11   don't know how else to put it.

12          There will be harsh consequences to it, but, you

13   know, that's -- sometimes that happens when you're not

14   upfront about your connections with the Court.  And so, Your

15   Honor, that's all I have.  I won't belabor the point.  We've

16   been here for a while.  We take a strong position on it

17   because the system demands a strong response to a non-

18   disclosure of this sort.

19          THE COURT:  Thank you.

20          MR. SHANNON:  If I could just make one correction

21   --

22          THE COURT:  Sure.

23          MR. SHANNON:  There was no misrepresentation in

24   either Mr. Lee or Mr. Schwartz' declarations in the Info W

25   cases.  They weren't (indiscernible).  And I just want to

```
1     correct it and this is I think why Mr. Lee got so upset and
2     obviously filed a reply that he should not have.  There was
3     --
4                 THE COURT:  Well, I think he can file what he
5     wants.  I just think I get questions based upon what gets
6     filed.
7                 MR. SHANNON:  Exactly.  So I just -- I want to
8     make that one clarification, that it was not a declaration
9     that was mistakenly (indiscernible).  It was just not
10    supplemented maybe as it should be.
11                THE COURT:  Okay.  Thank you.  Folks, it's 6:32.
12    I'm going to take a look at something.  I'm going to come
13    out at 6:40.  I'm going to rule on it.  Thank you.
14                CLERK:  All rise.
15                (Recess)
16                THE COURT:  Okay, so we are back on the record in
17    Free Speech.  I'll just note for the record, Mr. Battaglia,
18    I did get a chance to look, and your order is on the docket,
19    so I just -- okay.
20                So what is remaining, two retention applications,
21    and they are filed at Docket Numbers 83 and 85.  They were
22    filed on August 12th.  The application to employ Shannon and
23    Lee as bankruptcy co-counsel to the Debtor and the
24    application to employ W. Marc Schwartz and Schwartz
25    Associates LLC (indiscernible) essentially as financial
```

1   advisors as well.  This is a court proceeding under 28

2   U.S.C. 157(b)(2)(A).

3          Court finds that there's been proper service of

4   the application and then proper notice of today's hearing.

5   The Court has considered the evidence, and here's my ruling

6   on the applications.  I do note, before I begin that -- here

7   is just the -- or -- or Free Speech -- well, we'll disagree,

8   but what the Court has done, that's just the nature of what

9   the Court has to do.  The Court is required to weigh the

10   evidence and apply the law as faithfully as I can and that's

11   what I believe that I'm doing now.

12          So the Debtor FSS seeks to employ Mr. Schwartz as

13   chief restructuring officer and his firm Schwartz Associates

14   LLC as advisors on Section 327(a) of the Bankruptcy Code.

15   FSS also seeks to employ Shannon and Lee as bankruptcy co-

16   counsel.  US Trustee objects to both employment

17   applications.  The Trustee argues that these professionals

18   failed to disclose important connections required under

19   Bankruptcy Rule 2014 and recently dismissed bankruptcy

20   cases.  The Sandy Hook plaintiffs filed a statement joining

21   in and supporting the US Trustee's objection.

22          In response, FSS argues (indiscernible) motion by

23   Schwartz and Lee that previously dismissed bankruptcy cases

24   are not a valid basis to deny retention of these

25   professionals in these cases.  FSS argues that these

1    professionals satisfy the requirements for employment under

2    Section 327(a) of the Bankruptcy Code in this case.  Based

3    on our evidence and applicable law, the Court is going to

4    deny the applications to retain Schwartz as CRO and

5    Schwartz's LLC Associates as financial advisors and Shannon

6    and Lee as co-counsel to FSS.

7            On July 29, FSS started this --

8            Yes.  That's fine.  I'm still writing.  Do you

9    want to get him back on the line?

10           RECORDED VOICE:  -- are ten attendees in this

11   conference.  Your host has joined.

12           Conference muted.

13           THE COURT:  Okay.  As I said, based on the

14   evidence and applicable law, I'm going to deny both

15   retention applications.  On July 29, FSS started this case.

16   About three weeks later, FSS filed applications to employ

17   Schwartz as CRO along with his firm as financial advisors,

18   and Shannon and Lee as co-counsel.  Mr. Ray Battaglia has

19   always represented FSS as the (indiscernible) other proposed

20   counsel and has been approved today.  No party objected to

21   his retention, so he is retained as bankruptcy counsel to

22   FSS at this point.

23           Schwartz submitted a declaration in support of his

24   retention, stating that neither him nor Schwartz Associates

25   was contacted about serving as CRO for Free Speech until

1    July 19th, 2022, when (indiscernible) in the Debtor's

2    bankruptcy cases has reached a favorable outcome for those

3    debtors.  He says that for all practical purposes,

4    (indiscernible) to reorganize the InfoW debtors had

5    concluded because the bankruptcy cases no longer had the

6    necessary participants to implement the global settlement.

7    He had (indiscernible) to restructure and reorganize InfoW

8    debtors at that point and that also the work he was

9    performing was ministerial.

10           The Shannon and Lee retention application included

11   a declaration by Mr. Lee.  It states, and I quote, "The

12   first services of our attorneys, Shannon and Lee, provided

13   to FSS, occurred on July 24th, 2022.  They were provided by

14   Lee through Kyung S. Lee PLLC."

15           The application also disclosed that Mr. Lee

16   received payment for services rendered between May 24th and

17   May 31st, 2022.  Section 327(a) of the Bankruptcy Code

18   authorizes a Chapter 11 Debtor with the Court's approval to

19   employ one or another attorneys, accountants, or other

20   professional persons do not hold or represent the interests

21   adverse to the estate and other disinterested persons to

22   represent or help the Debtor carry out its duties under

23   Chapter 11.

24           I want to be really clear.  Debtors have the right

25   the choose their lawyers.  The Bankruptcy Court has the duty

1    to ensure Section 327 is satisfied.  The text of 327(a)

2    states that retention is subject to court approval.

3    Assuming that the technical requirements of Section 327 are

4    satisfied, the Bankruptcy Code gives a bankruptcy court

5    discretion to deny an application.  That should be used, in

6    my opinion, very sparingly.  But this Court must consider

7    the facts of each case.

8         The text of Section 327(a) also requires

9    application for two-prong tests for employment of

10   professionals.  In order to (indiscernible) employ a

11   professional that one, does not hold or represent an

12   interest adverse to the estate and is a disinterested

13   person.  The term "disinterested person" is defined under

14   Section 101(14) of the Bankruptcy Code.  Neither one of

15   these two prongs overlap because the definition -- Part C of

16   the definition of "disinterested person" includes a person

17   who does not have an interest materially adverse to the

18   estate.

19        The application to employ a professional requires

20   an accompanied verified statement of the proposed retention

21   requirement of Bankruptcy Rule 2014.  Under that, a

22   professional must disclose all known connections the

23   professional has with the debtor, including insiders with

24   the debtor, creditors and other parties in interest in the

25   case, other proposed professionals the debtor seeks to

```
1    retain, and the Office of the United States Trustee.

2              Such public disclosure provides important

3    transparency to the Bankruptcy process and helps bankruptcy

4    courts evaluate if a professional is disinterested and

5    doesn't hold an adverse interest to the estate.  We

6    emphasize the professional has to be disinterested and not

7    hold an adverse interest to the estate.  Professionals

8    retained under the Section 327 represent the estate.  Thus,

9    in some cases, a professional representation of the estate

10   may conflict with the interest of shareholders and secured

11   and unsecured creditors.

12             So what does it mean to represent or hold any

13   interest adverse to the estate and to be disinterested?

14   Bankruptcy Code does not define the phrase "represent or

15   hold any interest adverse to the debtor to the estate."  The

16   Fifth Circuit (Indiscernible) that the oil company 432 F.3rd

17   347, Fifth Circuit 2005 reviewed and adopted -- or reviewed

18   a definition used by other circuits.  And that was to

19   possess or assert any economic interest that would tend to

20   lessen the value of the bankruptcy estate that would either

21   create either an actual or potential dispute in which the

22   estate is a rival claimant or to possess a predisposition

23   under circumstances that render such bias against the

24   estate.

25             The Fifth Circuit held that while the definition
```

1    was helpful, had to be employed with an eye to the specific

2    facts of each case and with attention to circumstances that

3    may impair a professional's ability to offer impartial,

4    disinterested advice to the client.  The Fifth Circuit has

5    also held that the standards for (indiscernible) conflict

6    are strict and professionals engaged in the conduct of a

7    bankruptcy case "should be free of the slightest personal

8    interest which might be reflected in their decisions

9    concerning matters of the debtors' estates or which impair -

10   - might impair" -- excuse me -- "a high degree of

11   impartiality and detached judgment expected by them during

12   the course of administration."

13           I want to start with the oil, 432 F.3d at 355.

14   I'll also cite to Waldron v. Adams & Reese in re, right,

15   American International Refinery, Inc. 676 F.3d 455, pincite

16   462 Fifth Circuit 2012.  Under Section 101(14), the term

17   "disinterested person" means a person that's not a creditor,

18   an equity security holder, or an insider.  That's A; B, is

19   or was not within two years before the date of the filing of

20   the petitioner, a director, officer, or an employee of the

21   debtor; and C, does not have an interest materially adverse

22   to the interest of the estate or any class of creditors or

23   equity security holders by reason, any direct or indirect

24   relationship to or in connection with or interest in the

25   debtor, or for any other reason.

1          I'd say Lee and Schwartz satisfy parts A and B of

2   the definition of disinterested.  And I acknowledge that

3   Schwartz was retained as CRO pre-petition, but the actual

4   entity retained by FSS is Schwartz Associates LLC.  Right,

5   and so Schwartz Associates is not a creditor, equity

6   security holder, an insider and was not within two years of

7   the filing of the petition date a director, officer, or an

8   employee of the Debtor.  It's a fine distinction.  That's

9   why individuals who work for Schwartz LLC, as in Mr.

10  Schwartz, can be retained pre-petition and still not be held

11  to be an officer.  It's the entity that got retained, not

12  him individually.

13          The question for any other reason, what does that

14  mean?  It's also known as the catch-all clause.  It's

15  sufficiently broad to include any professional with an

16  interest or relationship that would even faintly counter the

17  independence or impartial attitude required by the Code.

18          I'll cite to Judge Iscara's decision on -- it's

19  either LTHM Houston Operations LLC 2014 WL 5449737

20  Bankruptcy Seventh District of Texas 2014.  In this the Code

21  requires that there may be additional instances based on the

22  facts where a professional may have an interest material

23  adverse to the estate.  The US Trustee objects to the

24  retentions mainly based on actions and failures to disclose

25  in three recently dismissed bankruptcy cases.  FSS really

1     wants the Court to overlook the history of the past as not

2     really relevant, but this case cannot be divorced from the

3     history of the prior cases.

4          Before FSS started this case, Schwartz served as

5     proposed CRO and Lee served as proposed counsel in

6     Subchapter 5 bankruptcy cases of InfoW LLC, IW Health LLC,

7     and Prison Planet TV LLC.  These entities were original

8     affiliates of FSS.  Mr. Jones owned 100 percent of the

9     equity in FSS.  He also owned 100 percent of the equity in

10    the InfoW entities.  FSS, Mr. Jones, and the InfoW entities

11    were also defendants in what I would call Sandy Hook-related

12    litigation, defamation lawsuits pending in Texas and

13    Connecticut State courts.

14         InfoW, IW Health, and Prison Planet filed

15    bankruptcy cases in the Southern District of Texas in April

16    of 2022.  Shortly before the filing, Mr. Jones assigned his

17    equity and his interest in these entities to a 2022

18    litigation settlement trust.  This Court was informed in

19    that case that the litigation settlement trust removed

20    control of the InfoW debtors from Mr. Jones.  The trust was

21    managed by an actual trustee and was supposed to be

22    eventually managed by two new trustees.  The trustees would

23    then have full governance authority over the Debtors.  The

24    litigation trust was first funded by Jones and FSS.

25         FSS, Mr. Jones, and the InfoW debtors also signed

1   a plan support agreement.  Part of the stated goal of the

2   InfoW cases was to negotiate a financial settlement between

3   the InfoW debtors and the Sandy Hook plaintiffs to resolve

4   defamation lawsuits pending in Texas and Connecticut.  Such

5   a settlement would have also resolved litigation against the

6   third-party contributors to the litigation trust, which

7   included FSS.

8           On April 29th -- well, I'll note, at least at the

9   beginning of the case, Mr. Schwartz was proposed CRO was

10  subject to the oversight and the direction of the initial

11  trustee, at least according to the court filings of the

12  litigation trust.  Mr. Lee was also proposed counsel for the

13  InfoW debtors and was taking direction from Mr. Schwartz as

14  CRO.  On April 29th, the US Trustee moved to dismiss the

15  InfoW cases, alleging, among other things, that the cases

16  were filed in bad faith and engineered to shield Mr. Jones

17  and FSS from liability.  An evidentiary hearing was

18  originally scheduled for May 27th.

19          The Court held a hearing on May 19th.  You've

20  heard a lot about that hearing today.  It's an important

21  hearing both for what was stated to the Court and what

22  wasn't disclosed.  Texas plaintiffs announced that they were

23  dismissing their claims against the InfoW debtors with

24  prejudice in the Texas defamation lawsuits, thus leaving Mr.

25  Jones and FSS as defendants in the Texas litigation.  The

1  Court also signed a stipulation on that day to that effect,

2  authorizing the parties to proceed in the Texas litigation.

3          Around that same time, the plaintiffs in the

4  Connecticut State litigation had filed a notice of dismissal

5  to claimants against the InfoW Debtors in the Connecticut

6  State court, which again, would have also left Mr. Jones and

7  FSS as defendants.  To allow the parties time to finalize

8  these state court dismissals with prejudice, which was the

9  issue at the time, Mr. Lee requested more time to respond to

10  the US Trustee's motion to dismiss the InfoW cases.  Among

11  the basis stated for the continuance was that Mr. Schwartz

12  needed more time to fulfill his fiduciary duties to other

13  creditors.

14          Mr. Lee also stated on the record at that hearing

15  that the other part that I have to do is renegotiate the

16  plan support agreement.  The debtors intended to

17  (indiscernible) with respect to a small Subchapter 5 plan.

18  Mr. Lee, with Mr. Schwartz right next to him, also told the

19  Court that they want me to know that Mr. Schwartz in his

20  fiduciary capacity is evaluating all alternatives.  Based on

21  his representations and agreements between the parties, the

22  Court reset an evidentiary hearing on the motion to dismiss

23  for some time in June.

24          What was unknown to the Court at this time, it

25  sounds like there was a meeting shortly after that hearing,

1    was that Schwartz and Lee would soon plan to start working

2    for FSS.  On May 25th, Mr. Lee starts working on a first-day

3    declaration for FSS, according to the time records admitted

4    into evidence, which means that around that time, Mr.

5    Schwartz was also part of the FSS team.  This continued into

6    early June, which means that Mr. Lee's statement about

7    exploring all options, if truthful -- and I don't doubt his

8    sincerity at the time -- but if it would have been played

9    out, then Mr. Schwartz would have then potentially found

10   himself negotiating as the CRO for the InfoW debtors on one

11   side and CRO for FSS on the other side.

12            Considering the history of the prior cases is

13   important, and that's why it's important, because what was

14   told to me on May 19th is that Mr. Schwartz was exploring

15   all options.  When you look at the statements filed in the

16   declarations in support of retentions, it's impossible to

17   recognize -- to reconcile, excuse me, that statement with

18   Mr. Schwartz's declaration that his duties are

19   (indiscernible) and that he had nothing to restructure or

20   reorganize.

21            Based on all (indiscernible) submitted by Mr. Lee

22   to Mr. Schwartz on -- Mr. Lee submitted an invoice to Mr.

23   Schwartz on behalf of FSS, stating that Lee and his comrade,

24   Mr. Shannon, met with Mr. Schwartz and counsel to Mr. Jones

25   to discuss issues about an FSS restructuring on May 24th for

```
 1    five hours.  And that's -- right, that's five days after the

 2    hearing.  On May 25th, Mr. Lee researched the information to

 3    prepare first a declaration for Mr. Schwartz in connection

 4    with an FSS bankruptcy.  On May 26th, he was organizing PQPR

 5    valuation reports.  On May 27th, he coordinated with state

 6    court counsel on state court sanction (indiscernible), and

 7    "located critical documents for counsel to PQPR."  PQPR is

 8    managed by Mr. Jones's father.

 9         The next few days, Mr. Lee spent time analyzing

10    the data produced to state court counsel even though what

11    was represented -- even though, at that time, the InfoW

12    debtors were in the process of being dismissed with

13    prejudice.  On May 31st, they kept looking at a declaration

14    for Schwartz as CRO for FSS.  During this time, Mr. Schwartz

15    spent a lot of time working for FSS, hiring staff in order

16    with PQPR, its owners, and Mr. Jones.

17         Thus, at the time the bankruptcy strategy to

18    implement -- to be implemented in the InfoW cases

19    essentially failed and a group of parties went in order to

20    proceed with a new strategy for FSS.  Lee and Schwartz took

21    part in this strategy even though they were technically

22    supposed to work as fiduciaries for the InfoW Debtors.

23         I need to stress here, too, weren't they per se

24    (indiscernible) with secure letters and its counsel pre-

25    petition?  It happens all the time in large Chapter 11
```

1   bankruptcy cases.  Right?  It happens very often before

2   Chapter 11 cases are filed, either in an effort to avoid

3   bankruptcy or offer to negotiate in connection with the

4   Chapter 11 case.  Right?  Including the use of cash

5   collateral.  Right?  Debtors often want to have a consensual

6   use of cash collateral on the first day, try to enter

7   sometimes -- debtors may around the country enter into

8   restructuring support agreements and plan support agreements

9   or entering into pre-packaged Chapter 11 plans or --

10  various, many reasons to enter into negotiations with a

11  secured creditor.  Right?

12          What makes this case different is that Schwartz

13  and Lee were working for FSS.  They were also technically

14  working for the InfoW debtors.  Right?  And at some point,

15  the litigation trust and (indiscernible) broke down and who

16  was represented to the Court that Mr. Schwartz was taking

17  direction from?  Apparently that all had broke down.  So

18  there was a (indiscernible) separation between his affiliate

19  entities and the (indiscernible).  And there are other -- a

20  breach of corporate formalities disclosed in public

21  documents or things just went away.  And they could have

22  expired on their own.  Not to say that any of those things

23  were wrong.

24          It's just that, again, on June 2nd -- right, and

25  this is why things get tricky, but just leave it there.

1    Maybe there's nothing wrong, but on June 2nd, the InfoW's

2    response to the US Trustee's motion to dismiss.  Response

3    was filed by counsel for the debtors.  And despite their

4    representations and the declarations of that ministerial

5    work happening in May in this case, in the adjoined

6    pleading, professionals represented to the Court and to the

7    public that the InfoW cases still served our bankruptcy

8    purposes -- would they say -- nonetheless, the debtor's own

9    acknowledgment of their independent CRO.  How are you

10   independent if you're working for and hiring for FSS at that

11   time?  I don't really -- how are you -- what does

12   independence mean at that time?  I recognize that this also

13   was in the best interest of the debtors and their estates.

14   Right?

15          The InfoW cases are dismissed on June 10th, based

16   on internal records.  In July of 2022, Mr. Lee is assistant

17   counsel to Mr. Jones on the data issues between Mr. Jones

18   and FSS.  (Indiscernible) FSS for attending a focus group

19   and participated in a jury perception of Mr. Jones.  It was

20   a separate defendant in the Connecticut and Texas cases.

21   You're paid to do no effort, no evidence, of no effort to

22   separate your performance for the debtor and work performed

23   for FSS or potential claims that folks may have against each

24   other at that time.  The issue is that that's continued

25   post-petition and FSS's responses failed to appreciate this

1    point.

2            FSS's response focuses primarily on trying to cast

3    the US Trustee's Office in a negative light, rather than

4    proving that these professionals don't hold an adverse

5    interest to the estate and are disinterested.  During the

6    case, for example, FSS sought approval of a cash collateral

7    lawyer providing for approximately $80,000 in travel

8    expenses for the lawyer of FSS.  All of the travel expenses

9    for him and others were to be paid 100 percent by the FSS

10   estate.  I will tell you that no one called that out to me.

11   It was the Court who highlighted that issue.  And maybe

12   $80,000 is what's required for people to travel.  Of course,

13   that's not really the question.

14           The question is, who was negotiating on behalf of

15   the estate as to this 100 percent of all travel expenses to

16   go participate in a defamation trial on damages as a co-

17   defendant, 100 percent to be paid for by an entity in

18   bankruptcy?

19           In August of '22, FSS filed application to retain

20   two special counsels to represent it in the Connecticut

21   State court trial.  FSS's initial request was to, again, pay

22   for full legal fees on behalf of itself and the co-

23   defendant.  In a tort trial on damages, the estate proposed

24   to pay 100 percent for the legal fees for itself and its

25   owner as a separate defendant in the case.  Again, the Court

1    highlights that issue.  I must say I do believe that -- I

2    pre-empted the United States Trustee who has also stood up

3    right away and said this was an issue that we had, if I

4    remember that hearing correctly.

5         In September '22, in (indiscernible), special

6    counselor to FSS, who's one of the aforementioned special

7    counsel, filed a supplemental declaration which was drafted

8    by Mr. Lee.  And he states that since May 19th, FSS retained

9    Schwartz as its CRO and that Schwartz, as counsel for FSS, a

10   (indiscernible) defense lawyer (indiscernible) financial

11   executive was able to come and work at FSS in their

12   accounting department.  According to the declaration, he

13   recommends Jeffrey Schwartz as CRO.

14        I would note that Mr. Schwartz could not remember

15   if the retention occurred in May or later.  And there was

16   great confusion, although May 19th was cited in multiple

17   declarations filed in this case, FSS, Mr. Schwartz, Mr. Lee

18   essentially argue that maybe that was closer to June when it

19   was -- when those retention application, excuse me, when

20   those engagement letters were sent in by Mr. Jones in June.

21   But certainly the work, regardless of when the applications

22   were dated, certainly there was a meeting on the 24th when

23   the work started.

24        Mr. Schwartz also disclosed that FSS's books and

25   records were in disarray when he started working

1    (indiscernible), that the 2021 ledger had not been

2    completed, and the books had not been closed.  There was no

3    transaction that had been recorded in the 2022 ledger.  As a

4    result, both financial statements were produced for FSS for

5    the 18 years before his engagement.  Schwartz and Associates

6    also found out that reconciliations for 2021 are in 2022 and

7    were inadequate, out of their control -- actually, they

8    (indiscernible) controls, including lack of segregation of

9    duties, lack of supervision, reveal of accounting functions

10   -- this is all in Mr. Schwartz's declarations earlier in

11   this case -- more billings to PQPR.

12            I have issues about the relationship with FSS and

13   PQR, with their professionals certainly engaged extensively

14   with pre-petition.  The Court really -- I didn't hear any

15   evidence that they've analyzed it seriously post-petition.

16   And the estate made no claims against PQPR.  And recall that

17   PQPR is managed by an outsider.  They're approximately --

18   according to what was noted, right, in August of 2020 and

19   November 2021, there were security agreements signed on and

20   proto-signed on to the total of approximately $54 million.

21   That is subject to a fraudulent transfer litigation pending

22   outside of this district.  That may be 100 percent

23   legitimate and properly secured.  I don't know.  Someone

24   needs to do this work.

25            In this case, the professionals prior to post-

1    petition actions and this Court's assessment based on the

2    evidence colors the independence and the impartiality

3    required by the Bankruptcy Code.  Not just an appearance of

4    conflict of interest.  There are adverse interests to the

5    estate based on the evidence related to Mr. Jones and PQPR.

6    The lack of transparency and the lack of disclosures

7    required under Bankruptcy Rule 2014, which says any

8    connections, give this Court a lot of concern about whether

9    these professionals can impartially represent FSS, which may

10   include making difficult decisions about other parties, if

11   necessary.

12        The estate may -- I have no idea -- hold claims,

13   defenses to claims, and costs of actions against third

14   parties.  For instance, based on the time records entered

15   into evidence, Mr. Jones may allege a right to an indemnity

16   from FSS.  I know that he's been seeking personal expenses

17   paid.  Right?

18        And I know that Exhibit 163-8, there's a July 11th

19   time entry where counsel assisted Mr. Jones as counsel on

20   indemnity issues between FSS and Mr. Jones.  Right?  He had

21   first a cash collateral motion.  It was the Court who

22   questioned the material (indiscernible) for about $172,000

23   that consisted primarily of personal charges not related to

24   the business.

25        FSS's schedules also list pre-petition payments to

007397

1   the same vendor for about a million dollars.

2   (Indiscernible) attorney at this time how much relates to

3   purely FSS's business expenses, but that work needs to get

4   done.  So consider I'm the Fifth Circuit guidance and an eye

5   to the specific facts here and with attention to

6   circumstances, there is evidence showing circumstances and

7   instances that have and may in fact impact future ability to

8   offer impartial and disinterested advice to FSS.

9          And I understand that that has consequences, and I

10  hope everyone hears it in my voice.  This is not easy for me

11  to do, but I'm required to make these decisions under law

12  and Bankruptcy Code affords me the discretion to do so.  And

13  I'm not even sure this is a discretion issue.  I think

14  there's a material adverse interest to the estate.

15         And I stress that this decision is based on the

16  facts presented in this case.  I really want to stress this

17  because I know a lot of people are listening.  No one should

18  read this decision as a critique of using local counsel or

19  using co-counsel in a case.  I understand that debtors needs

20  sometimes not to retain multiple law firms when appropriate.

21         Again, I stress debtors have an absolute right to

22  seek to retain professionals that will assist in their

23  Chapter 11 case.  I'm a firm believer in that.  This

24  decision has no application in those instances.  None.  This

25  decision also has no application whenever professionals

```
 1    (indiscernible) by a group of affiliated debtors.  It
 2    happens all the time in Chapter 11.  A debtor, sometimes a
 3    financial advisor, sometimes an investment banker gets
 4    retained by Company A and all of its related entities.
 5            And sometimes that means a debtor, right, a group
 6    of debtors file at the beginning because you're trying to
 7    keep a group of entities out of bankruptcy as you negotiate.
 8    And sometimes, right, debtors counsel has to advise clients
 9    that, well, another subset has to go in at a later time.
10    And it often happens in restructurings.  Those often --
11    those instances are much different in the -- in this case.
12    In this case, you know, a proposed CRO and counsel were
13    actively representing the InfoW debtors.  Right?
14            Let's not forget whose interests are held by a
15    litigation trust and are solely represented, (indiscernible)
16    affiliated entities.  I also note that FSS is not without
17    counsel to continue this case.  I take what Mr. Battaglia
18    really said -- I really take it to heart.  I don't -- I
19    don't like where we are today.  I think I'm making the right
20    decision under the law.  I think I'm commanded by the law,
21    the Fifth Circuit case law, to make this decision.
22            I also know that what occurred today is limited to
23    today.  I think Shannon and Lee and Mr. Schwartz and
24    Schwartz and Associates can appear in another case in front
25    of me with no issues.  I mean zero.  I really mean that.  I
```

1    hope they can take comfort in that.  And any future case is

2    going to be just judged on those facts and nothing today or

3    in this case changes that for me or any professional.  I

4    hope to never make a similar decision as long as I'm on the

5    bench.  But judges are required to make difficult decisions

6    sometimes and this is one of those today.

7          I noted earlier, and I'll note it again, I find

8    there was some strong language used in the response to the

9    US Trustee's objection.  And I find nothing improper about

10   the arguments raised in those objections, not because I

11   ruled in the way that I did, but also just looking at it

12   independently, I take statements very seriously in the court

13   and filed with the Court, sometimes better to ask than to

14   make assumptions.  So something else I need to do today

15   based on what I've heard.  So Chapter 5 is the new addition,

16   relatively new addition, to the Bankruptcy Code.  And it

17   provides a streamlined process for small businesses to

18   reorganize.

19         So Chapter 5 involves the appointment of a

20   Subchapter 5 trustee to provide oversight of the debtor in

21   possession and helps facilitate negotiation of what will be

22   hopefully or consensually reorganized, reorganization plan.

23   As with any case, a Subchapter 5 bankruptcy requires a

24   debtor to be forthcoming about its affairs.  The Subchapter

25   5 trustee, the court, and its creditors are all

1      stakeholders.  Interestingly, the debtor in Subchapter 5 is

2      not mandated to investigate its own acts, conduct, and

3      liabilities in financial condition.

4              But 11 U.S.C. 1183(b)(2), a court for cost and on

5      the request of a party of interest, the trustee or the

6      United States Trustee may order an expansion of the

7      Subchapter 5 trustee's power to include the power specified

8      in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code.

9      1106(a)(3) says, "Except to the extent the Court orders

10     otherwise, the trustee shall investigate the acts, conducts,

11     assets, liabilities, and the financial condition of the

12     debtor, the operation of the debtor's business, and the

13     design or ability of the continuance of such business, and

14     any other matter relevant to the case or to formulation of

15     the plan, and as soon as practical, upon a statement of an

16     investigation conducted, including any fact ascertained

17     pertaining to fraud, dishonesty, incompetent, misconduct,

18     mismanagement, or irregularity in the mismanagement of the

19     affairs of the debtor or to a cause of action available to

20     the estate."

21             It's not on a cause.  A cause is not defined in

22     the Bankruptcy Code.  When you look at cases, trying to

23     define a cause in the Fifth Circuit, or how a cause is

24     viewed, according to the Fifth Circuit apply a flexible

25     standard, giving the bankruptcy courts flexibility to

1    determine whether a cause exists.  And it's a fact in

2    (indiscernible) inquiry that must be determined on a case-

3    by-case basis.

4          The leading treatise (indiscernible) on bankruptcy

5    law provides that the standard for cause under 1183(b)(2)

6    should not be higher than the standard for cause, say, for

7    example, removing a Subchapter 5 trustee.  I agree with

8    that.  There always ought to be cause.  Weigh the facts and

9    the evidence and make a determination as to whether there's

10   cause based on the facts.

11         I don't like the factors because not all the

12   factors apply in every case, and this case is not different

13   -- it's far different than a Subchapter 5 case where someone

14   is trying to keep a pizza shop going.  Section 105(a) of the

15   Bankruptcy Code authorizes a court to sua sponte expand the

16   Subchapter 5 trustee's duties under 1183(b)(2) even though

17   the subsection requires -- uses the phrase "on request of a

18   party in interest" when you look at 105(a).  I do note that

19   a party has already requested that.  That hearing was set

20   for another date and under certain circumstances.  I believe

21   it was PQPR.  And I'm going to expand that today sua sponte.

22         There's a clear and pressing need to expand the

23   role of the Subchapter 5 trustee and to direct her to

24   investigate.  That doesn't mean that there's anything wrong.

25   It just means that in this particular case, there has to be

1 work done for the debtor to really understand the scope of

2 its assets and potential claims and liabilities.  I do note,

3 there's been a lot of talk about candor and how the Court

4 feels about it.  I'm would note and I do think there was a

5 lack of candor under Rule -- Bankruptcy Rule 2014 in the

6 last case.  And I do think there was some lack of candor in

7 this case.

8    I've expressed concern since the first hearing

9 about what happened.  And as this case has progressed and

10 based on what I've heard today and the evidence that I was

11 able to review, those concerns continue to exist.  And I

12 think if someone's going to investigate the Debtor in this

13 case, it really has to be someone impartial, someone with no

14 connection from the InfoW cases, who represented a party in

15 interest.  And I believe that's the Subchapter 5 trustee who

16 is independent and remains independent.

17    Someone has to do the work, and the Bankruptcy

18 Code gives the answer.  It's the Subchapter 5 trustee.  I

19 won't rehash the concerns that I have.  You heard them

20 earlier.  For other reasons I stated earlier about the

21 concerns that I've had with disclosure, lack of candor

22 leading into this case, there is cause to expand the

23 Subchapter 5 trustee's duties under Section 1183(b)(2), to

24 include exactly what the code says, investigate the acts,

25 conduct, assets, liabilities, and financial condition of the

1    Debtor, the operation of the Debtor's business, and the

2    desirability of the continuation of the business.

3             I want to give the Subchapter 5 trustee some

4    guiding.  I think that includes investigating the

5    approximately $54 million security claim listed in favor of

6    PQPR Holdings Limited LLC described in Schedule D at Docket

7    Number 121, investigating Free Speech Systems credit card

8    processor, solely for any insider relationship.  That's what

9    I'm focused on, the inside, if there's any potential insider

10   relationship that I should be aware of or anything that

11   gives the Subchapter 5 trustee any concern.  Right?

12            There maybe -- I don't think at this stage, I

13   don't think there's a need to disclose who it is.  And if

14   there is, I want there to be real caution before that's

15   done.  But if there's an insider, that needs to be

16   disclosed.  I think there also -- there has also been much

17   discussion about the $61 million, maybe $62 million member

18   draw 2021 and $254,000 member draw 2022 listed in the Free

19   Speech Systems comparative balance sheet as of December 31,

20   2021 and May 31, 2022 attached to Mr. Schwartz's declaration

21   filed at Docket Number 10.

22            Under 1106(a)(4), the trustee is to get to work

23   and file a statement detailing her findings as soon as

24   practicable, as described under 1106(a)(4).  Look, I realize

25   that there are other pending motions filed by the Sandy Hook

1    families to appoint a tort claimants' committee and to

2    remove Free Speech as a debtor in possession.

3           I'm not ruling on any of those issues and I'm not

4    describing any of them now.  I may need to take up one of

5    them soon.  I also note, and I state for the record, it is

6    rare, I think, in Subchapter 5 cases for -- the need for a

7    Subchapter 5 trustee to hire counsel or professionals to

8    assist in the duties.  And I think this is the case where

9    it's required.  So Ms. Hazleton, I think you need to find --

10   you need to get a team.  And I'm telling you, I want folks

11   with no connection to any of these cases to assist you in

12   your work.  It looks like you've already found one person.

13          Let's start the process of retaining what you

14   need.  I've charged you to do work and I need you to do it

15   as quickly as possible, but you can't do it on your own.  So

16   no one should read this as a Subchapter 5 trustee and think

17   that you know, I should -- don't cite this case as the

18   reason that you need to hire counsel.  There may be other

19   reasons.  I just think this case is different for all the

20   above reasons.  And again, I'm not saying anything is wrong.

21   You may find all the investigations are proper and that you

22   don't find anything.  Fine with me.  File that and say that.

23          But there has to be greater transparency in this

24   case.  I understand that PQPR may want to have discussions

25   about what that means, but it's going to cost what it costs.

```
 1    I'm just telling you now.  Right?  You can work on a budget,
 2    but I'm charging the trustee to do the work, and it'll cost
 3    what it costs.  And I understand that that may require
 4    negotiations with a secured lender as to what that means and
 5    we already have a hearing teed up where we can take all that
 6    up.
 7            I don't know -- and really -- what you see in my
 8    face is really listening to what Mr. Battaglia said and
 9    weighing on me.  I don't want to rule anymore.  That's
10    enough for me today.  I think people have a right to listen
11    to what I said.  I'll enter some orders today, and I'll say
12    for the reasons stated on the record.  I will say this and I
13    don't want -- yeah, I'll say this.
14            I understand that that's going to require some
15    questions as to where that leaves Shannon and Lee and Mr.
16    Schwartz in terms of you know, retention and the work that
17    they've done.  And I'll be looking to the Subchapter 5
18    trustee for guidance here, but there was good work done
19    here.  And I think Schwartz and Associates, right, helped
20    the process.  We've got cash collateral budgets in place and
21    there was folks who would answer phone calls.  From what I
22    hear, what Mr. Schwartz encountered -- and I don't want
23    anyone to leave thinking that I don't think they should be
24    compensated for -- for good work in this case.
25            The US Trustee is free to disagree with me on
```

Page 257

1    that.  And I'll be looking to guidance from the Subchapter 5

2    trustee as to what I heard in my gut is right or if I should

3    be concerned about something.  Everybody's rights are

4    reserved on this.  I don't want anyone to think anything

5    about these professionals.  I've ruled.  I didn't say

6    anything about them.  It just talks about the ruling, the

7    very difficult decision I had to make in this case.  That's

8    it.  That's what it means to me.

9         If it means something to anyone else, then you're

10   not paying attention to what I really said.  I have a great

11   amount of respect for people and the work that professionals

12   do in bankruptcy cases is not easy.  And I know that the

13   work that gets done when people aren't here across the

14   United States is difficult work.  It requires bankruptcy

15   lawyers.  Bankruptcy professionals have to balance a great

16   number of things.  The process is incredibly important as

17   well along the way.  Without process and without

18   transparency, people lose faith in the process.

19        And so standards must be satisfied to ensure that

20   the process can continue and people can have faith in the

21   process.  But also, right, Congress writes laws.  Judges

22   apply them as faithfully as possible.  And that's what I've

23   done today.  I wish everyone the best.  That's -- that's

24   enough for me today, folks.  You all have a good day.

25        Yes, sir.  Mr. Battaglia.

1           MR. BATTAGLIA:  Mr. Schwartz's deposition was set

2    pursuant to the cash collateral hearing for Friday.

3    Obviously, he won't be appearing.  There was a 30(b)(6)

4    deposition notice that we had other opposition to, but I

5    honestly have no idea who I can even present, so I have no -

6    -

7           THE COURT:  Yeah, I understand that.  And I

8    understand that.

9           MR. BATTAGLIA:  (Indiscernible).

10          THE COURT:  I understand that there are decisions

11   that I've made that may have consequences.  And everybody's

12   going to have to think about what I did today.

13          MR. BATTAGLIA:  I understand, Your Honor.  I just

14   (indiscernible) parties should know --

15

16          THE COURT:  No, no, I understand.  That's what --

17   I'm looking at them, so I -- you all need to think --

18   everybody needs to think about that.  So I agree.

19          MR. BATTAGLIA:  And there's a lot for me to sort

20   out in my own mind in terms of who I pick up the phone and

21   call about a business issue tomorrow.

22          THE COURT:  Yeah.

23          MR. BATTAGLIA:  I'm not sure who that'll be.  We

24   were already cooperating with the Sub-B trustee on

25   investigation issues, so that's fine.  We'll keep doing

Page 259

```
1    that.  I don't know what it means for me.  I will not

2    continue to represent a -- I don't -- never run away from a

3    representation --

4             THE COURT:  I understand.

5             MR. BATTAGLIA:  -- in my life.  But if I can't

6    meet my obligations as counsel --

7             THE COURT:  I understand.

8             MR. BATTAGLIA:  -- (indiscernible) what it means.

9    And I'll file appropriate pleadings if -- once I have some

10   time to digest this and figure out how we might be able to

11   move.

12            THE COURT:  I understand.

13            MR. BATTAGLIA:  Thank you.

14            THE COURT:  Have a good day, everyone.

15            CLERK:  All rise.

16            (Whereupon these proceedings were concluded at

17   6:32 PM)

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3                      RULINGS

 4                                          Page      Line

 5   Applications for Retention of Co-Counsel

 6   and CRO DENIED                         228        9

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 23, 2022
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                    )   CASE NO: 22-60020-cml
                                      )
 4    INFOW, LLC. and IWHealth,       )   Houston, Texas
      LLC.,                           )
 5                                    )   Thursday, May 19, 2022
                 Debtors.            )
 6                                    )   2:01 p.m. - 2:28 p.m.
                                      )
 7    ------------------------------)

 8                                  MOTION

 9           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For U.S. Trustee:        JASON RUFF
                               HA NGUYEN
13                             MELISSA HAZELTON
                               U.S. Trustee
14                             950 Pennsylvania Avenue NW
                               Washington, D.C. 20530
15
      For Debtor:             KYUNG S. LEE
16                            MARK SCHWARTZ
                              Kyung S. Lee, PLLC
17                            700 Milan Street, Suite 1300
                              Houston, TX 77002
18
      For Connecticut Plaintiff:
19                             RANDY WILLIAMS
                               Byman & Associates, PLLC
20                             7924 Broadway, Suite 104
                               Pearland, TX 77581
21
                               RYAN CHAPPLE
22                             Cain & Skarnulis, PLLC
                               303 Colorado Street, Suite 2850
23                             Austin, TX 78701

24

25
```

Page 2

```
 1    For Texas Plaintiff:    MAX BEATTY
                              The Beatty Law Firm
 2                            1127 Eldridge Parkway, Suite 300
                              Houston, TX 77077
 3                            AVI MOSHENBERG
                              McDowell Hetherington
 4                            First City Tower
                              1001 Fannin Street, #2700
 5                            Houston, TX 77002

 6    For Free Speech Systems: RAY BATTAGLIA
                              Law Offices of Ray Battaglia, PLLC
 7                            66 Granburg Circle
                              San Antonio, TX 78218
 8

 9    Court Reporter:         KIMBERLY PICOTA

10    Courtroom Deputy:       KIMBERLY PICOTA

11    Transcribed by:         Veritext Legal Solutions
                              330 Old Country Road, Suite 300
12                            Mineola, NY 11501
                              Tel: 800-727-6396
13

14

15    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

Page  3

```
 1              HOUSTON, TEXAS; THURSDAY, MAY 19, 2022; 2:01 P.M.

 2              THE COURT:  Okay.  Okay.  Good afternoon,

 3    everyone.  This is Judge Lopez here on an emergency request

 4    for a continuance in Infowars.  Why don't we take

 5    appearances.  Why don't I begin with appearances in the

 6    courtroom.

 7              Mr. Lee?

 8              MR. LEE:  Good afternoon, Your Honor.  Kyung Lee

 9    with the law firm of Kyung S. Lee PLLC for the three

10    debtors.  I am here in the courtroom with Mr. Mark Schwartz,

11    the chief restructuring officer of the three debtors.

12              THE COURT:  Okay.  Good afternoon, sir.

13              MR. SCHWARTZ:  Thank you, Your Honor.

14              THE COURT:  Mr. Ruff, good afternoon.

15              MR. RUFF:  Yes.  Good afternoon, Your Honor.  With

16    me today -- Jayson Ruff on behalf of the U.S. Trustee's

17    Office.  And Ha Nguyen with me today.

18              THE COURT:  Okay.  Good afternoon.

19              MR. WILLIAMS:  Good afternoon, Your Honor.  Randy

20    Williams for the Connecticut plaintiffs.  Ryan Chapple and

21    Connecticut counsel are all on the Zoom.

22              THE COURT:  Okay.  Good afternoon.

23              MR. BEATTY:  Your Honor, Max Beatty on behalf of

24    the Texas plaintiffs.  I also have Mr. Avi Moshenberg with

25    me here today.
```

1              THE COURT:  Good afternoon.  Good afternoon to

2    both of you.

3              Okay.  Anyone else in the courtroom wish to make

4    an appearance?  Okay.

5              Ms. Hazelton, I see you there, the Subchapter V

6    trustee.  Good afternoon.  I think -- oh, I muted you,

7    didn't I?  I've got everyone muted.  So if anyone wishes to

8    make an appearance, you can hit five-start.  Ms. Hazelton,

9    just hit it just so I know that -- and I'll keep your line

10   unmuted.  All right.  There is a 210-601 number.

11             MR. BATTAGLIA:  Yes, Your Honor.  This is Ray

12   Battaglia on behalf of Free Speech Systems.  I don't know

13   that I will be participating today, but I will make an

14   appearance.

15             THE COURT:  Okay.  And I'll keep your line

16   unmuted, Mr. Battaglia, just in case.  Good afternoon, sir.

17             MR. BATTAGLIA:  Thank you, Judge.

18             THE COURT:  Okay.  Ms. Hazelton, can you hit five-

19   star?  I want to make sure I've got your line unmuted as

20   well.  There's a 281-846 number.

21             MS. HAZELTON:  Your Honor, Melissa Hazelton,

22   Subchapter V Trustee.

23             THE COURT:  Okay.  Good afternoon.  Does anyone

24   else wish to make an appearance on the phone?  Just hit

25   five-star and I will recognize you.  Okay.

1          Mr. Lee, why don't I turn it over to you, sir.

2          MR. LEE:  Good afternoon, Your Honor.  May it

3    please the Court.  Before I hit emergency motion Docket 95

4    requesting the continuances of the hearing for next week as

5    well as the various answer dates, I would like to address

6    the Court with respect to some of the procedural issues that

7    are taking place --

8          THE COURT:  Okay.

9          MR. LEE:  -- and update you on those.  Number one,

10   the initial debtor interview is taking place tomorrow

11   afternoon.  And Mr. Schwartz and I will be handling that

12   with the U.S. Trustee's Office.  The data has been provided

13   to them yesterday, and we will handle that hearing or the

14   call tomorrow.

15         Number two, Mr. Beatty and I concluded

16   negotiations and finalization of the dismissals with

17   prejudice of the Texas plaintiff's lawsuits yesterday, and

18   Mr. Beatty will probably want to speak to you about those

19   issues today.  But that is done.

20         THE COURT:  Okay.

21         MR. LEE:  And so wanted you to know that.  And I

22   believe the stipulation, the general one has been filed.

23   There are subsidiary stipulations which you also agreed to,

24   and he can speak to those issues if you'd like to have him

25   discuss those.

```
 1                THE COURT:  Okay.

 2                MR. LEE:  Number Three.  The Connecticut

 3      plaintiffs have decided to move by way of motion to dismiss

 4      their lawsuits in Connecticut against the three debtors.

 5      And there is a status conference that Judge Manning has set

 6      for next Tuesday at 2:00 p.m. Eastern Standard time, and

 7      there is going to be a conference call on that matter for

 8      that time.

 9                THE COURT:  Okay.

10                MR. LEE:  So I can tell you a little bit more

11      about that after it's occurred, but I just wanted to let you

12      know the timing on that.

13                THE COURT:  Thank you.

14                MR. LEE:  Number four.  The 341 meeting of

15      creditors will take place next Thursday, on May 26th.  And

16      Mr. Ruff and I have talked about what we need to get ready

17      to do that.

18                Number five.  I just got a notice during lunch

19      today that the Western District of Texas has set a hearing

20      on June 21-22 in connection with the removal and abstention

21      and remand hearing on the "TUFTA" lawsuit that some of the

22      plaintiffs filed against the debtors and other parties.  And

23      again, I think that can be handled administratively, but I

24      just wanted you to know that matter is out there for setting

25      at that time.
```

1          THE COURT:  Thank you.

2          MR. LEE:  Now, addressing Docket 95.  And I don't

3     think I need to go into it in any substantive detail.  But I

4     just wanted to let you know that what we moved to do was to

5     extend the answer date from May 20th to June 17th, the

6     exhibit designation date from May 25th to June 22nd, and we

7     requested a hearing date from May 27th through June 24th and

8     to have discovery be available to especially Mr. Ruff, who

9     has been working with -- on behalf of the U.S. Trustee's

10    Office so that he could have discovery pending.

11         It is contemplated that after this week, there

12    should be only one motion to dismiss or on file that should

13    be active, hopefully.  But again, the implementation of the

14    dismissals with prejudice has taken a little longer time

15    than I expected.  And again, I built in when I filed my

16    emergency motion time to be able to carefully implement all

17    of those.  And again, that's the reason for the time that

18    I've requested so that I don't have to prepare for the

19    motions to dismiss as well as trying to get all those things

20    correctly done.

21         I'm happy to work and do both if I'm forced to do

22    that.  But as I set out in my motion, I think it's not a

23    good use of judicial or financial resources of this estate

24    to do that.  And that's why I've asked for some time.

25         Mr. Ruff has indicated that he wants a shorter

```
 1    time.  And I've tried to discuss that with him this morning.
 2    And it's all been very friendly.  And so again, I am
 3    amenable to another deadline, a shorter deadline if they
 4    wish.  But again, the reasons for the requests I've made for
 5    my deadlines is because I anticipate having to implement all
 6    the dismissals.  And I want to make sure I have done it
 7    correctly and that I've given the other courts other than
 8    the home court here time to get those things done.  And
 9    that's the basis for my asking for the specific dates I
10    have.
11           Again, I am also amenable to the idea of having a
12    shorter period but having -- an intermediate status
13    conference would be like every Friday where we can check in
14    and say, Your Honor, we need more time or we're good with
15    the time schedule that we have.  So we are very flexible on
16    that.  And again, Mr. Schwartz and I are going to evaluate
17    whether after the dismissals would prejudice the Texas and
18    Connecticut plaintiffs, whether these debtors need to
19    proceed with trying to confirm a plan with an amended plan
20    support agreement or whether we are able to handle these
21    creditors, the remaining creditors, outside of bankruptcy.
22           THE COURT:  Okay.
23           MR. LEE:  So that's an evaluation we are going to
24    make.  And we hope to do that very quickly.
25           THE COURT:  Thank you.  Actually, sir, is it okay
```

1    if I hear from Mr. Beatty first?

2            MR. RUFF:  That would be just fine, Your Honor.

3    It's your court.

4            THE COURT:  No, no, no.  I'm just -- I saw the

5    stipulation.  I just wanted to hear from you, Mr. Beatty,

6    just confirmation.  Does the stip that is on file cover what

7    we would call the Texas litigation?

8            MR. BEATTY:  Yes, Your Honor, it does.  And Mr.

9    Lee referred to some other stipulations that I would call

10   them supporting stipulations.  They're just simplified to

11   make it easy for the Court in each of the Western District

12   cases.  So we do have this larger stipulation that we filed

13   with the Bankruptcy Court, but Mr. Lee and I have already

14   passed back and forth, agreed, and actually put on file the

15   Rule 41 stipulations of dismissal with the court for the

16   Western District of Texas.  One of the cases.  The TUFTA

17   case is a little bit different in the following sense.

18   There's a couple of procedural differences there dealing

19   with whether or not the parties were served and whether or

20   not the removal was done correctly.  There we have actually,

21   due to concurrent jurisdiction with both the Western

22   District of Texas as well as the underlying state court, we

23   have filed a non-suit in the state court with prejudice

24   there.  So we think we've implemented the initial steps on

25   whatever we have to do for those to get everything

1   dismissed.  It's really the remand that Mr. Lee referred to

2   it as taking some amount of time there.  We did file

3   yesterday additional motions for remand noting our

4   agreement.  Hopefully those things can be resolved rather

5   quickly.

6           THE COURT:  Okay.  I guys the question is are you

7   -- maybe I -- Mr. Ruff, Ms. Hazelton, is there any issue

8   with me signing this right now?

9           MR. RUFF:  Your Honor, the stipulation that was

10  filed?

11          THE COURT:  Mm-hmm.

12          MR. RUFF:  No issue from the U.S. Trustee's Office

13  perspective.

14          THE COURT:  Ms. Hazelton?

15          MS. HAZELTON:  No issues here, Your Honor.

16          THE COURT:  Anyone in the room?  Anyone have any

17  issues?  Okay.  I'm going to sign it now.

18          MR. BEATTY:  Thank you, Your Honor.

19          THE COURT:  The parties are in agreement with

20  that.  I told everybody I wasn't going to stand in the way

21  of an agreement.  I have read it.  It's the parties'

22  agreement.  I'll sign it.  I'll sign it right now.  It at

23  least allows the parties the clarity I think that they need,

24  and I think it will certainly -- something you can present

25  to the courts in the Western District of Texas.  And I think

1    it at least clears a little bit of the road that Mr. Lee was

2    referring to in terms of what may be coming for him at a

3    future point in time.

4         MR. BEATTY:  And that was the intent, Your Honor.

5    And what we had hoped to do is I was actually going to ask

6    you to sign it today because our intent is to in addition to

7    the stipulation that we filed already, to take this

8    stipulation with the Court's signature, file it in the

9    Western District of Texas so that there the court can be

10   comfortable that you had the opportunity to look at it as

11   the home court and that you're also comfortable with what we

12   are doing.

13        THE COURT:  Okay.  I have signed it.  It is off to

14   docketing and it will hit the docket in the next ten, 15

15   minutes, Mr. Beatty.

16        MR. BEATTY:  Thank you, Your Honor.  Mr. Beatty, I

17   don't know what that means for your participating going

18   forward, but I would say in a few minutes you'll have

19   greater clarity on that as well.

20        MR. BEATTY:  Well, I think the answer is that

21   means you won't get to see my smiling face here anymore.

22   But yes, thank you very much, Your Honor.

23        THE COURT:  Okay.  Thank you.  Mr. Ruff, I just

24   wanted to -- actually, go ahead.  Go ahead.  Let me hear

25   from the Connecticut plaintiffs.

1          Let me just say I was able to read the pleadings

2     that were filed.  I very much appreciate the notice.  Was

3     very helpful for me to just kind of keep track of what's

4     going on.  So I thought the updates were very helpful, and I

5     very much appreciate it.  I'm not going to comment obviously

6     on what's going to happen in Connecticut.  But I just would

7     ask if Judge Manning issues any rulings or anything

8     substantive happens, if someone can just provide an update

9     just like you did, I think it would be very helpful for me

10    if she enters something.  I don't need any commentary or

11    anything.  I just need more of a docket entry just to

12    understand if anything happened or if there is any further

13    hearing schedule.  It just helps me kind of keep track of

14    stuff.

15          MR. WILLIAMS:  Yes, Your Honor.  I just wanted to

16    make the announcement on behalf of the Connecticut

17    plaintiffs that as to the Debtor's emergency motion to

18    continue, we really believe those issues are now between

19    them and the U.S. Trustee as far as timing because we had

20    filed the motions to dismiss with prejudice.  That was put

21    in the notice.

22          THE COURT:  Got it.

23          MR. WILLIAMS:  The Court has now set that for

24    status conference on Tuesday.  We're going to ask the Court

25    since there is no opposition to that, to enter the

1    dismissal.  And then once it's dismissed, the Debtors have

2    agreed they will no longer have objection to remand and that

3    the Court then pick that up and remand the cases.  So

4    hopefully by next Tuesday we will -- after that's concluded

5    and if that happened, then we would be filing our notice of

6    withdrawal of our motion to dismiss.  But until we hear from

7    the Connecticut court, we're not able to do that.  But we

8    will -- to the extent we are still in it, because we are

9    waiting on that, whatever the Court decides between the

10   Debtors and the U.S. Trustee as far as timing, we are not

11   going to impose on that.  We'll follow the Court's guidance

12   with what their argument are and timing.

13        THE COURT:  Okay.  Thank you very much.

14        MR. RUFF:  Again, Your Honor.  Thank you.  You

15   know what, the U.S. Trustee's Office, we appreciate and are

16   supportive of the Plaintiffs being able to resolve their

17   issues with these debtors and the way that they're doing

18   that.  And we certainly are agreeable to pushing out the

19   hearing on our motion so that those issues can be resolved

20   definitively.  That's fine.

21        But, Your Honor, I still don't think that we

22   really need more than a couple-week extension.  And that

23   would be our preference.  You know, we are happy to move

24   forward as soon as possible.  It seems, based on

25   representations that have been made by both Plaintiff's

```
 1    counsel that Texas plaintiffs are out.  They're withdrawn
 2    now as of today.  And it sounds like Connecticut, as soon as
 3    they get their answer and the court up in Connecticut there,
 4    that they will agree to withdraw as well, too.  So if they
 5    do that, then Mr. Lee no longer has to focus on their
 6    motions to dismiss and he no longer has to worry about
 7    those.  It will just be ours.  And we would like to move
 8    forward with it as expeditiously as possible. After that.
 9          The only other comment I would say is to the
10    extent that the Court does push that out, assuming these
11    cases are dismissed, then we don't think that any of the
12    other pending motions applications should be heard until
13    that same date after that time.  We have already provided
14    comments as far as the CRO motion assuming that these case
15    are going to go forward.  So we've already started that
16    process.  We're not just waiting until the very last moment
17    on that.  To the extent that there are any substantive
18    issues, we can work those out and resolve those.
19          But, for example, it's a little unclear, and I
20    think Mr. Lee has to -- is working out with his client as
21    far as the -- there is no longer a litigation settlement
22    trust and there's no longer that mechanism of management by
23    the trustees I don't think, or the service managers for the
24    equity of these debtors that the CRO would report to.  So I
25    think things like that need to be cleaned up if these cases
```

1    are to continue.  If these cases aren't to continue, then

2    none of that is really necessary.  The cases can get

3    dismissed.  You know, the debtors can go ahead and pay their

4    creditors, including their professionals however they want

5    to.  The only thing we probably would want to have some

6    treatment for in the dismissal order, again, assuming that's

7    the route that we end up toing, is to allow for Ms. Hazelton

8    to apply for her fees and make sure that this Court retains

9    jurisdiction for the payment of her fees.

10           THE COURT:  So Mr. Ruff, are you agreeing to a

11   continuance or not?

12           MR. RUFF:  Yes.  We are not opposed to a

13   continuance, Your Honor.

14           THE COURT:  And how long?

15           MR. RUFF:  Two weeks.  That's what we think would

16   be -- somewhere around June 10th is what we had proposed.

17           THE COURT:  Okay.  Okay.  Mr. Beatty, your stip

18   has hit the docket.

19           MR. BEATTY:  Thank you, Your Honor.

20           THE COURT:  I'm not kicking you out.  I'm just

21   telling you.

22           MR. BEATTY:  As much as you'd like to.

23           THE COURT:  Okay.  Mr. Lee, why do you need more

24   time than the 10th?

25           MR. LEE:  Your Honor, things tend to take a longer

1   time than we initially planned.  I think it was four weeks

2   ago everybody declared that they did not want to be

3   creditors of this estate.  And it started off with

4   dismissals without prejudice and having to negotiate all of

5   those to get it right.  And it's not because we didn't want

6   to get it right or do it the right way, but it just takes

7   some time in light of the fact that the parties have been

8   litigating these issues and there's a lot of distrust.  And

9   we've had to build that.

10          With respect to the implementation of the

11  dismissals, I don't think it's as simple as Mr. Ruff

12  describes it.  It's not just a matter of dismissals that

13  takes place and then we're done.  There is implementation

14  that has to take place both in Connecticut and in Texas.

15  And the Debtors are going to have to be involved in that

16  process and implementing that.  So I need some time to do

17  that.

18          And secondly, there are claims that need to be

19  addressed in connection with the remaining estate that our

20  creditors have nothing to do with the Sandy Hook issues.

21          And then number three, Your Honor, the other part

22  that I have to do is renegotiate a plan support agreement if

23  the debtors intend to move forward with respect to a smaller

24  subchapter V plan to see if we can get something confirmed.

25          So I've built in some time to be able to do all of

1    that without having the -- sort of Damocles sword over me

2    every two weeks in saying I've got to go and try a motion to

3    dismiss.  But if the Court thinks that that sword should be

4    over me, I'm fine with that, too.

5            THE COURT:  I don't want to say it's a sword,

6    because I don't think it is.  I think the Debtor filed a

7    case and people have filed motions, and they get a chance

8    for a hearing.  And the Debtor has to respond to it.  I'm

9    assuming the Debtor was prepared to go on the 27th.  So if

10   we push it out for June the 10th, that feels right to me.

11   And I'm going to tell you why.

12           I certainly understand the dynamics of change.

13           MR. LEE:  Yes, Your Honor.

14           THE COURT:  And I still don't how much -- look, I

15   know according to the schedules and the statements, the

16   Debtor has no cash.  I don't know where cash is coming from.

17   The Debtor doesn't generate income.  I don't know who the --

18   if there's a trust, I don't know how administrative expenses

19   are going to get paid.  And this is still a Subchapter V

20   case.  We are about 30 days in.  I think everybody is going

21   to have to put their cards on the table and figure out

22   what's there.  And I think you and Mr. Schwartz are going to

23   have to figure out -- it sounds like Connecticut plaintiffs

24   are out, signed the order for the Texas plaintiffs.  I think

25   you all have got to figure out now that that's gone,

```
 1    assuming that everything goes through -- and again, I don't
 2    want to wish -- I don't want to speak for any other court
 3    and the work that they have to do.  But assuming that they
 4    go, Mr. Lee, I think you're going to have to ask yourself
 5    what's left and what kind of case and what chapter it should
 6    proceed in.  And I think the trustee gets a right to know
 7    what your plans are.  To me, that's where I see the
 8    extension for.  I think they've got to kind of figure out
 9    what's left and how do you proceed.  Is it still under
10    Subchapter V?  Is it something else?  And so I think you've
11    got to figure all that out.  But I don't know -- pushing it
12    out a month without knowing where there's any source of
13    revenue coming from and what the third-party contributors
14    are or are not doing, I think we've got to know some answers
15    before then to see what kind of case -- if we have a case at
16    all.  And I'm not saying we don't.  I just don't know what's
17    out there.
18              MR. LEE:  Your Honor, let me allay your concerns.
19              THE COURT:  I'm not sure you're going to be able
20    to do it today.
21              MR. LEE:  I'm going to do it today for you, Your
22    Honor, by saying --
23              THE COURT:  That would be impressive.
24              MR. LEE:  You're actually right.  I'm not going to
25    argue with trying to get any more time.  They've set it for
```

```
 1    June 10th.  We'll be ready.  We'll work like dogs to get
 2    there.  And if we don't, we'll come back to you and ask for
 3    more time if we run into a jam.  But I hear all the concerns
 4    that you're saying.  I think they are very legitimate as
 5    Debtor's counsel and as you pronounced it.  And let's get it
 6    on.  Let's do it on June 10th.  And let's just get it done.
 7              THE COURT:  Okay.
 8              MR. LEE:  I agree with you.
 9              THE COURT:  Mr. Lee, I've got one question for
10    you.  Just since -- and this has nothing to do with what we
11    were just describing.  It's just trying to understand -- I
12    understand kind of procedurally where the Texas Plaintiffs
13    are and the Connecticut plaintiffs.
14              MR. LEE:  Sure.
15              THE COURT:  The trust.  Is the initial trustee
16    still involved, Mr. Du?
17              MR. LEE:  Yes.
18              THE COURT:  And who represents Mr. Du?
19              MR. LEE:  I don't know right now.  I just know
20    that Mr. Du is the trustee of the trust that was given the
21    obligation to put the company into bankruptcy.
22              THE COURT:  Okay.  Okay.  I know Mr. Du had
23    noticed parties in the trustee agreement, but I didn't know
24    if those remained the noticed parties for the trust or
25    whether Mr. Du was still involved.  So Mr. Schmidt and Mr.
```

1    (indiscernible) are at this point not -- they're still

2    waiting?

3         MR. LEE:  Yes, Your Honor.  That's correct.  That

4    is correct.  And I think by virtue of the Texas and

5    Connecticut plaintiff having withdrawn, I think the bigger

6    concept of trying to go global resolution, that's probably

7    become moot at this point in time.

8         THE COURT:  Okay.

9         MR. LEE:  So yes, Your Honor.  And you have made

10   all the issues that you've identified.  We are on it.

11        THE COURT:  I know.  I know I'm not raising -- I'm

12   just trying to -- we are all here.  I might as well just try

13   to understand kind of procedurally where we are and kind of

14   where the case is.  I think I -- look, I like where we are

15   going.  The Trustee is not opposed to a two-week extension.

16   Let's do a two-week extension.  And without prejudice,

17   obviously, to the ability to come back to ask for more time.

18        MR. LEE:  Absolutely.

19        THE COURT:  But I'm going to tell you though, if

20   we go further out, I'm going to need all parties to agree to

21   it.  If not, we'll just have to take them up and see where

22   we go.  I don't want to take up any other motions before

23   then because I don't know what kind of case we have and

24   what's going on.  And I want to give you an opportunity to

25   get it done.  So we'll push this out for a couple of weeks.

```
 1   And I'm sure -- and I would ask you as well, Mr. Beatty, if
 2   there's any updates, if you will.  I know that with respect
 3   to what happens in the Texas courts, just -- I think just
 4   providing for informational purposes.  I mean it.  I want no
 5   spin on any of it.  I mean, as boring as it comes, I am at
 6   docket entry and I don't need whereas clauses, and I know I
 7   have jurisdiction.  I mean, where we are, just plain docket
 8   entries.  And I would ask the Connecticut plaintiffs to do
 9   as well.  Just the notice.  Just so everybody knows what's
10   going on and everybody can just see and we all have
11   transparency in the process.
12            MR. WILLIAMS:  More than happy to do so.
13            THE COURT:  Okay.  Thank you.  So that would push
14   out the hearing to Friday, June 10th at -- what time are we
15   -- we were going to start at 9:00 a.m.  Why don't we start
16   at 9:00 a.m. on Friday, June 10th.  And the witness and
17   exhibit list would then get pushed out to Wednesday, June
18   8th.
19            MR. LEE:  Yes.
20            THE COURT:  Okay.  And the objection deadline,
21   what are we going to do about -- what are you all agreeing
22   on that?
23            MR. LEE:  We had talked about objection deadline
24   of being a week before whenever the hearing is.
25            THE COURT:  So maybe June 3rd?
```

```
1              MR. LEE:  So June 3rd.

2              THE COURT:  Okay.

3              MR. LEE:  And then a reply deadline be the same

4     day as the witness and exhibit on the 8th.

5              THE COURT:  Okay.  So I would ask June 8th at noon

6     exhibits, June 3rd, just any time on June 3rd for your

7     response, Mr. Lee.

8              MR. LEE:  That's perfectly fine with the Debtor's,

9     Your Honor.

10             THE COURT:  I don't care what time you get it on

11    file there.

12             Mr. Ruff, your response is fine with me.  I don't

13    care when you --

14             MR. RUFF:  We'll get it on file before close of

15    business, Your Honor.  It won't be a midnight filling.

16             THE COURT:  Okay.

17             MR. RUFF:  We'll give Your Honor some time to read

18    it.

19             THE COURT:  No, no.  Old habits die hard.  So I'm

20    up early and stay up late.  So don't worry about me.

21             I think we had a hearing scheduled for June 3rd.

22    It probably makes sense to push that out, don't you think?

23             MR. LEE:  Could we move it all to the June 10th?

24             THE COURT:  Yeah.

25             MR. RUFF:  We agree with that, Your Honor.
```

```
 1              THE COURT:  What did we have on June --

 2              MR. LEE:  Both the trustee motion, and I think the

 3    CRO motion has been on a 21-day notice as well as the bar

 4    date motion, Your Honor.

 5              THE COURT:  Oh yeah.  I don't want to touch those

 6    until we know what -- yeah.  But I agree.  We'll take them

 7    up -- original plan.  Take them up after we know on the

 8    motion to dismiss.

 9              MR. RUFF:  We'll be ready to go, Your Honor.

10              THE COURT:  Okay.

11              MR. LEE:  Your Honor?

12              THE COURT:  Yes.

13              MR. LEE:  I do want you to know that Mr. Schwartz

14    in his fiduciary capacity is evaluating all alternatives.

15              THE COURT:  Oh, I'm sure he is.

16              MR. LEE:  I just want you to know that.

17              THE COURT:  No doubt.  I've got no doubt.  And I'm

18    sure -- I've got no doubt about that.  I know Mr. Schwartz

19    is professional.  He's doing his job.  I've got no doubt

20    about it.

21              MR. LEE:  Thank you, Your Honor.

22              THE COURT:  Okay.  Anyone in the courtroom,

23    anything else anyone wishes to say at this time?  Anyone on

24    the phone, if you wish to hit five-star.

25              Okay.  All right, folks.  It sounds like we will
```

```
1   not see each other on the 27th.  It looks like we will see

2   each other potentially on June 10th.  Thanks, everyone.

3   Have a good day.

4              (Whereupon these proceedings were concluded at

5   2:28 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 23, 2022
```

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22 - 60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

## DEBTORS' OMNIBUS RESPONSE TO MOTIONS TO DISMISS

InfoW, LLC ("InfoW"), IWHealth, LLC ("IWH"), and Prison Planet TV, LLC ("PTV," and together with InfoW and IWH, the "Debtors"), the debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases, hereby file this response to (a) *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Designation as Subchapter V Small Business Vendors* (sic) [ECF No. 36] (the "Connecticut Plaintiffs' MTD"); (b) *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] (the "Texas Plaintiffs' MTD"); and (c) *Motion to Dismiss Debtors' Chapter 11 Cases*, [ECF No. 50] (the "UST MTD") and together with the Connecticut Plaintiffs' MTD and the Texas Plaintiffs' MTD, the "Motions to Dismiss"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Connecticut Plaintiffs' MTD and Texas Plaintiffs' MTD are moot. The Texas Plaintiffs' claims against the Debtors were released and the Texas Plaintiffs' MTD was withdrawn

---

[1] The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

[2] The Debtors have made the business decision to dismiss these chapter 11 cases and have filed the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110]. This Response is filed to make sure that the allegations in any of the Motions to Dismiss are not in any way construed by any party as an admission by the Debtors for any purpose and to preserve the Debtors' rights if the Court declines to enter an order approving the stipulation.

by the Stipulation and Order entered on May 19, 2022 [ECF No. 99] (the "Texas Plaintiffs'
Stipulation"). The U.S. Bankruptcy Court for the District of Connecticut entered an order
dismissing the Connecticut Plaintiffs claims against the Debtors with prejudice on May 26, 2022,
as reflected in the Order attached hereto as Exhibit A (the "Connecticut Plaintiffs' Dismissal
Order"). The Connecticut and Texas Plaintiffs are no longer creditors in or affected by these
chapter 11 cases.

2. The U.S. Trustee still seeks dismissal of the cases.[3] Although the Debtors have at
least $140,000 of asserted claims against them that could be satisfied through the chapter 11 case,
the ability to pay those claims and administrative expenses, and valuable assets that could be
liquidated if funds were not otherwise available.[4] The Debtors' former link to Alex Jones is too
great a sin in the U.S. Trustee's eyes for the Debtors to overcome—despite the U.S. Trustee's
paradoxical objection to the appointment of independent management for the Debtors.[5]

3. The U.S. Trustee's assertions in the UST MTD cannot be the *actual* reasons that
the U.S. Trustee still wants these cases dismissed. The crux of the argument in the UST MTD is
that the chapter 11 cases were just a litigation tactic and thus were filed in bad faith. But the
litigation that the U.S. Trustee claims was the sole, bad-faith purpose of these cases is no longer
affected. Despite the resolution of the litigation vis-à-vis the Debtors, however, the U.S. Trustee
still seeks dismissal.

---

[3] References to the "U.S. Trustee" are to the U.S. Trustee in his official capacity and includes his agents. The Debtors
adopt the style of reference used in the UST MTD (e.g., referring to the U.S. Trustee as "he") without asserting that
the actions or knowledge attributed to the U.S. Trustee are the actions or knowledge of Kevin M. Epstein personally.

[4] Debtor InfoW owns the domain name "infowars.com." Although it licenses that name to Free Speech Systems, LLC
("FSS"), a condition of that license—negotiated by the Debtors' prepetition—was that $715,000 of initial funding
under the PSA would be paid to satisfy the administrative expenses of these chapter 11 cases. FSS's failure to deliver
the funds would be a breach of the license agreement and allow InfoW to sell or license the domain name.

[5] *See Objection of United States Trustee to Debtors' Emergency Motion for Order Authorizing Appointment of Russell
F. Nelms and Richard S. Schmidt as Trustees of the 2022 Litigation Settlement Trust and Granting Related Relief*
[ECF No. 18].

007438

4. The U.S. Trustee's other arguments in the UST MTD are similarly belied by logic or the U.S. Trustee's inconsistent actions in these cases. The chapter 11 cases put *these three Debtors* in a position to pay more to their creditors than would have been possible absent chapter 11—approximately $10.0 million, even before the proposed litigation settlement trustees (the "Proposed Trustees") were in place to give the Debtors an opportunity for further negotiations with the third-party funding contributors. But apparently the U.S. Trustee does not believe that paying creditors more than they would receive in a liquidation is a valid reorganizational purpose. The U.S. Trustee complains that the PSA and LST were negotiated by insiders but objected when the Debtors sought to put in place independent third-party fiduciaries in the form of the Proposed Trustees to enable further negotiations.[6] The U.S. Trustee argues that the lawsuits that precipitated the chapter 11 cases primarily concerned non-debtors even though the Debtors had been *defendants* in those lawsuits for four years and faced death penalty sanctions when they claimed they did not have financial information to produce in discovery. And finally, the U.S. Trustee asserts that the Debtors are attempting to abuse subchapter v of chapter 11 of the Bankruptcy Code despite not directly claiming that the Debtors fail to meet the requirements for such relief under the Bankruptcy Code.

5. While the above dubious positions could be attributed to overzealousness, the U.S. Trustee's statements regarding the Debtors' goals in chapter 11 come perilously close to outright deception. On April 17, 2022, the Debtors provided Assistant U.S. Trustee Millie Sall a copy of their contemplated plan of reorganization, as reflected in Exhibit B hereto. The U.S. Trustee was

---

[6] As the Court is aware and the U.S. Trustee indicated, further negotiations with respect to the PSA and LST *did* occur even before the U.S. Trustee filed the UST MTD. *See Notice of Amended and Restated Declaration of Trust and Plan Support Agreement* [ECF No. 48]. The U.S. Trustee asserts that the amended and restated PSA and LST "simply attempt to obfuscate what the earlier version make clear—that the Debtors are using these cases to benefit Alex Jones and FSS, not the Sandy Hook Plaintiffs." UST MTD at p.4 n.6. The evidentiary support the U.S. Trustee has for that representation to the Court, as required by Rule 11, will unfortunately likely remain a mystery.

007439

*aware* that the Debtors (a) were not contemplating any third-party releases, (b) did not intend to deprive the plaintiffs of their jury trial rights, and (c) the contemplated estimation would be voluntary with respect to allowance.[7] To propose that contemplated plan, however, the Debtors needed appointment and buy-in from the Proposed Trustees, as the U.S. Trustee was aware. Conveniently, the U.S. Trustee opposed the appointment of the proposed trustees even though the appointment would have resolved several of the issues raised in the UST MTD.

6.      The facts are that these chapter 11 cases were filed in good faith and would still serve a valid bankruptcy purpose. Nonetheless, the Debtors, under the management of their independent CRO, recognize that the dismissal is in the best interests of the Debtors and their estates because the U.S. Trustee continued opposition to the cases. The U.S. Trustee has decided to run up the administrative expense of these cases even though no party with a remaining pecuniary interest has a problem. That clearly does not square with the U.S. Trustees claimed role in the bankruptcy process, but that is neither here nor there.

7.      The duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering. The Debtors have therefore agreed to the dismissal of the chapter 11 cases pursuant to the *Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [ECF No. 110] (the "Stipulation of Dismissal"). The dismissal of the Chapter 11 Cases should be according to the Stipulation and not any of the Motions to Dismiss, which should be denied as moot or on the merits.

---

[7] It should not be a surprise that the Debtors were (prior to the dismissal of claims against them with prejudice ) and Jones and FSS still are likely to appeal any significant judgment. The contemplated plan provided that there would be no appeal or other challenge if the plaintiffs *elected* to determine their claims through an estimation-like claims allowance process. The Debtors submit that kind of voluntary give and take is indisputably appropriate.

4

# ARGUMENT

**A. The Motions to Dismiss Are or Will Be Moot Upon Entry of the Stipulation of Dismissal.**

8.     "A pleading is moot when a court's decision on a pending motion will be 'hypothetical or academic' or 'without any practical significance.'" *Halton v. Triplett (In re Triplett)*, Nos. 19-42570, 20-04059, 2022 Bankr. LEXIS 64, at *5 (Bankr. E.D. Tex. Jan. 10, 2022) (quoting *Scarborough-St. James Corp. v. 67500 S. Main St., Richmond, LLC (In re Scarborough-St. James Corp.)*, 554 B.R. 714, 720 (D. Del. 2016)) (internal quotation marks omitted).

9.     Each of the Motions to Dismiss are already moot or will be moot upon approval of the Stipulation of Dismissal. The Texas Plaintiffs' MTD was withdrawn pursuant to the Texas Plaintiffs' Stipulation. But if not, it would be moot because the movants are no longer creditors and have stated they want no further involvement in these chapter 11 cases. The movants with respect to the Connecticut Plaintiffs' MTD are also no longer creditors of the Debtors pursuant to the Connecticut Plaintiffs' Dismissal Order and have told this Court that they want nothing more to do with these chapter 11 cases. The UST Motion either is or will be moot pursuant to the Stipulation of Dismissal.

**B. The Debtors Filed their Bankruptcy Petitions in Good Faith.**

10.     To the extent that the Court finds that the Motions to Dismiss are not moot, they should be denied on the merits. The Debtors filed their petitions in good faith and these chapter 11 cases have a valid reorganizational purpose.

*i.     Standard for dismissal for bad faith dismissal.*

11.     Bankruptcy relief requires good faith in the commencement, prosecution, and confirmation of bankruptcy proceedings. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986). The Fifth Circuit has instructed that courts should look to a debtor's financial condition,

007441

motives, and local financial realities. *Id.* at 1072. The "traditional" bankruptcy case is where a debtor is facing financial difficulties that pose an existential threat. *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 280–81 (Bankr. N.D. Tex. 2021); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) ("Courts . . . have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."). "Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d at 1072.

12.     To amount to "bad faith" that precludes bankruptcy relief, the facts must "rise to the level of egregiousness necessary to conclude that the reorganization process is being perverted . . . ." *In re Little Creek Dev. Co.*, 779 F.2d. at 1073; *accord In re StatePark Bldg. Grp., Ltd.*, 316 B.R. 466, 476 (Bankr. N.D. Tex. 2004) ("To find bad faith, the court must find that the facts surrounding the filing of the petition are particularly egregious."); *see also In re Greene Ave. Restoration II Corp.*, 597 B.R. 202, 217 (Bankr. E.D.N.Y. 2019) ("Dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."); *In re MBM Ent., LLC*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) "[A] bankruptcy petition should be dismissed for lack of good faith only sparingly and with great caution."). The question is not whether bankruptcy could have been avoided with the benefit of hindsight, but rather whether the Debtor's management could properly conclude that chapter 11 was an appropriate way to address existing or potential difficulties. *See In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *8 (Bankr. N.D. Tex. Jan. 26, 2005). The purpose of the analysis is to "prevent[] abuse of the bankruptcy process by debtors whose overriding motive is to delay

007442

creditors without benefitting them in any way or to achieve reprehensible purposes." *In re Little Creek Dev. Co.*, 779 F.2d. at 1072.

       ii.    <u>*The chapter 11 cases have valid reorganizational purposes.*</u>

13.    The Debtors were not a financially healthy companies with no need to reorganize. Each of the plaintiffs brought and continued lawsuits against one or more of the Debtors. Those plaintiffs had obtained judgments with respect to liability. Absent restructuring, the Debtors did not have the ability to pay any significant judgment or even the already-imposed sanctions.[8] Chapter 11 relief was necessary for these three Debtors.

14.    The plaintiffs eventually decided that a jury verdict against Alex Jones and FSS was more important to them than maximizing their recovery. That is, of course, their prerogative but it is entirely irrelevant to bad faith. If creditor protestations were indicative of bad faith, virtually every chapter 11 case filed would be subject to dismissal. The Debtors did not try to prevent the plaintiffs from dismissing the cases with prejudice and indeed attempted to *expedite* the process.

15.    The U.S. Trustee's apparent problem is that Alex Jones and FSS would have also received a benefit under the Debtors' contemplated restructuring. Not for nothing, but that is why those parties were willing to pay into a trust to be distributed according to a plan (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters. If the bankruptcy was just to delay, the money did not need to be on the table.[9] Rather, those funds going to creditors for their claims against the Debtors was the *entire point* of these chapter 11 cases.

---

[8] Sanctions were assessed against InfoW for the failure of *FSS* to present a corporate representative who was properly prepared to testify on the designated topics.

[9] The Debtors had to *negotiate* for these funds prepetition with an eye to using the appointment of the litigation settlement trustees to get even more consideration. That appears to be a foreign concept to the U.S. Trustee.

007443

16.     Reading between the lines, the U.S. Trustee seems to imply that it would have been preferable for the Debtors to have filed for chapter 11 without the $7.7+ million commitment from Jones and FSS. That is completely unreasonable, to put it charitably.

17.     There is no evidence that the funds that the Debtors negotiated for their former creditors was insufficient—it would have adduced in an estimation proceeding for feasibility if it existed—much less that it was so little that it amounts to a "perversion" of the bankruptcy process or egregious conduct. Courts have held under more problematic facts that the concept the Debtors proposed could potentially result in a confirmable plan of reorganization that made dismissal for bad faith appropriate. *See In re LTL Mgmt., LLC*, 637 B.R. 396, 407-09 (Bankr. D.N.J. 2022).[10]

18.     Paying joint claims of FSS and Alex Jones in a chapter 11 plan would have also served the bankruptcy purpose of maximizing the value of the Debtors' assets. The key intellectual property owned by the Debtors is the domain name "infowars.com." That domain name is most valuable while FSS is operating and Alex Jones is on the air. Additionally, the funds from Youngevity received by IWH are related to FSS's operations. While the Plaintiffs—and perhaps the U.S. Trustee—would prefer Alex Jones to not have a platform, that is irrelevant to these chapter 11 cases. Bankruptcy is about putting dollars in the pockets of creditors.

      *iii.*    <u>*The U.S. Trustee's arguments about the PSA and LST are meritless, disingenuous, or inapposite.*</u>

19.     The U.S. Trustee's arguments about the PSA and LST (paragraphs 37-42) were and remain baseless.  The U.S. Trustee's complaints are essentially as follows:

---

[10] In LTL, a Johnson & Johnson ("<u>J&J</u>") subsidiary was organized in Texas, another J&J subsidiary with tort liabilities merged into that Texas entity, the newly merged entity conducted a divisive merger in which all of the tort liabilities were put into a new non-operating entity, J&J entered into a funding agreement with the liable entity, and the entity was moved to a different district where it filed bankruptcy. The Debtors here have been defendants in the litigation for years and filed for bankruptcy in the district in which they were domiciled. Also, there are no allegations that the Debtors' actions killed anyone or caused them to develop cancer.

007444

      a.   The PSA and LST provided that financial information of Jones and FSS relevant to the contemplated restructuring are (i) subject to confidentiality provisions by the proposed trustees and the Debtors' professionals and may be provided to other parties only with a protective order and (ii) related to estimated claims rather than actual claims;

      b.   The PSA requires an estimation procedure;

      c.   The "handwriting is on the wall" that the Debtors are going to seek extension of the automatic stay to Jones and involuntary non-consensual releases; and

      d.   The creditors did not participate in the negotiation of the PSA or LST before the Debtors filed their petitions.

The U.S. Trustee wants the Court to rule that those "facts" are evidence that the Debtors' bankruptcy cases are an attempt to "pervert" the bankruptcy process. Despite the U.S. Trustee's presumably faux outrage, they show nothing of the sort.

20.     Companies and individuals typically require confidentiality provisions before providing non-public financial information and would want a protective order before that information is shared. And even if Alex Jones and FSS were Debtors, the only financial information that would be *public* would be their schedules, statements, and monthly operating reports. Any other non-public financial could only be compelled by a Rule 2004 examination or other discovery and would almost certainly be subject to a protective order if requested. The U.S. Trustee's argument on this point has absolutely no merit.

21.     The U.S. Trustee's arguments with respect to the estimation procedures and non-consensual third-party releases gets close to being disingenuous. As reflected in Exhibit B hereto, the Debtors provided the U.S. Trustee's office a copy of the Debtor's contemplated plan of reorganization on April 17, 2022. The U.S. Trustee was or should have been aware that the estimation procedures contemplated by the Debtors were only (a) for purposes of feasibility or (b) upon election by litigation claimholders. Rather than using the information the U.S. Trustee had

9

available, however, the UST MTD decided to engage in flights of fancy because it better suited his position.

22.     Whether "handwriting was on the wall" as to the extension of the stay to FSS and Jones is a matter of opinion. In any event, it certainly did not happen. The Debtors sought central adjudication of the claims against them but that is hardly tantamount to an extension of the automatic stay.[11]

23.     Finally, that the Debtors did not engage the plaintiffs in the formation of the PSA or LST is inapposite. The U.S. Trustee cannot seriously contend that failure to have a prepackaged chapter 11 case is an indication of bad faith. That is especially true here where the Debtors negotiated a mechanism expressly for the purpose of further negotiations in the appointment of the Proposed Trustees. The entire point of the Proposed Trustees was to give creditors someone unquestionably neutral with whom to negotiate.

>   iv.   *One or more of the Debtors were defendants in each of the Sandy Hook Lawsuits and liability had already been established prior to resolution during these chapter 11 cases.*

24.     The U.S. Trustee makes noise about the fact that Sandy Hook Lawsuits "do not arise from the Debtors' conduct" but rather "from the allegedly tortious, intentional conduct of Alex Jones and FSS (through its employees) . . . ." UST MTD ¶ 44. The Debtors agree with the U.S. Trustee that the Debtors were entitled to judgment as a matter of law based on the pleadings in the Sandy Hook Litigation. But the relevant state courts—whose opinions actually matter—decided differently. These two state courts even entered judgment against the Debtors.

25.     Ironically, the U.S. Trustee's argument directly cuts against the assertion that the Debtors are not "honest but unfortunate debtors." According to the U.S. Trustee, the Debtors did

---

[11] Moreover, centralized adjudication of claims is one of the central features of the U.S. bankruptcy process.

007446

nothing to cause liability but were still found liable. The *plaintiffs* made the decision to sue these Debtors, pursue litigation against them, and obtain judgments even though there was no basis for liability. The Debtors' use of bankruptcy to resolve those claims—by attempting to paying them in full—was appropriate. When the plaintiffs agreed to have their claims against the Debtors resolved through dismissals with prejudice, the Debtors were more than happy to oblige and worked with the plaintiffs to expedite that process.

> v.   *The Debtors qualify for subchapter v of chapter 11*

26.     The U.S. Trustee never asserts that the Debtors do not qualify for subchapter v. Rightly so. It is hard to imagine *how* the Debtors could have possibly incurred any liability except through engaging in business activities. They did not run up their credit cards on trips to Cabo.

27.     Instead, the U.S. Trustee takes issue with Bankruptcy Code § 1182 not including unliquidated liabilities in the calculation of maximum debt to qualify as a subchapter v debtor. The U.S. Trustee wants this Court to unabashedly and directly modify the language that Congress enacted in the Small Business Restructuring Act of 2019 because the U.S. Trustee thinks it should be different.[12] The U.S. Trustee may very well know better than Congress, but obviously that is inappropriate.

> vi.   *The chapter 11 cases were not merely a litigation tactic*

28.     As indicated above, the Debtors had valid reorganizational purposes that they sought to accomplish through these chapter 11 cases. The Debtors were prepared with a plan that would have provided as much as $10.0 million for the resolution and payment of claims in a way

---

[12] The U.S. Trustee asserts that "[l]ittle doubt exists that the total damage award against the Debtors, Alex Jones, FSS, and other non-debtor solvent entities of the Alex Jones Enterprise would exceed the debt limit currently in place for subchapter V." UST MTD ¶ 48. There are 21 plaintiffs and the debt limit for subchapter v is $3,024,725. The Debtors severely doubt the U.S. Trustee has a factual basis to assert that the damages of *any* of the plaintiffs exceeds $144,035.71 other than sheer speculation.

11

that had the potential to shortcut months of successive jury trials and years of appeals. And again, the U.S. Trustee was in possession of that contemplated plan when he filed the UST MTD.

29.     The U.S. Trustee also points to the statements of Alex Jones's personal lawyer that the goal of the bankruptcy was to force estimation.[13] But Jones has no control over the Debtors. And, if anything, it shows *why* the Debtors locked Jones and FSS in under the PSA and LST. At the end of the day, the desires of Alex Jones matter even less to the Debtors than the U.S. Trustee's desire to re-write Bankruptcy Code § 1182.

30.     The Debtors' conduct during the chapter 11 cases confirms that the point of the bankruptcy cases was to resolve the claims against the Debtors. Although the Debtors opposed the plaintiffs' dubious dismissals *without* prejudice, their position was consistently that they would gladly resolve the claims against them through dismissal *with* prejudice rather than money from Jones and FSS.[14] After the issues were resolved, the Debtors took actions to expedite the process.

## C.  The Debtors Agree That Dismissal is in the Best Interests of Creditors in Light of the U.S. Trustee's Unreasonable Position.

31.     The U.S. Trustee has made it clear that he will continue to oppose the Debtor's efforts to pay its remaining creditors through these chapter 11 cases even though there is no remaining creditor opposition.

32.     Under these circumstances, the Debtors' CRO has determined that dismissal would be in the best interests of the Debtors and their creditors. While the U.S. Trustee is free to ignore the proclaimed mission of the U.S. Trustee Program "to promote the integrity and efficiency of

---

[13] Perhaps the U.S. Trustee believes that Jones should have been willing to contribute $7.7+ million for nothing, but that is not the way the world works outside of government.

[14] The problem with dismissal *without* prejudice would have been that the plaintiffs could have arguably filed proofs of claim, thereby continuing to assert claims while removing the Debtors' ability to pay them in full. Although the statute of limitations would have run absent bankruptcy, the effect of the automatic stay and the claims bar date may have tolled the applicable limitations period.

007448

the bankruptcy system for the benefit of all stakeholders[,]" the Debtors and their professionals are bound by their fiduciary duties. The Debtors have therefore entered into Stipulation of Dismissal, under which the Debtors seek dismissal of these chapter 11 cases.

## CONCLUSION

33. Based on the foregoing, the Debtors do not oppose dismissal of these chapter 11 cases, but such dismissal not under any of the grounds set forth in the Motions to Dismiss. Instead, the Court should enter the Stipulation of Dismissal agreed to by the Debtors, the U.S. Trustee, and the Subchapter V Trustee.

[*Remainder of Page Intentionally Left Blank*]

007449

Dated: June 2, 2022

**KYUNG S. LEE PLLC**

_/s/ Kyung S. Lee_
Kyung S. Lee
TX Bar No. 12128400
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: klee@kslpllc.com
Phone: 713-301-4751

_Proposed Counsel to the Debtors_

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing document was served at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service.

_/s/Kyung S. Lee_
Kyung S. Lee

007450

```
 1                  UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3   Avi Moshenberg,              )  CASE NO:  22-60043
                                  )  ADVERSARY
 4              Plaintiffs,        )
                                  )  Houston, Texas
 5        Vs.                     )
                                  )  Wednesday, August 3, 2022
 6   Free Speech Systems LLC,          )
                                  )  10:02 a.m. - 5:05 p.m.
 7              Defendants.        )
     ------------------------------)

 8

 9                            TRIAL

10        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE

11

12   APPEARANCES:

13   For Plaintiffs:        MARCEL FONTAINE
                            McDowell Hetherington LLP
14                          1001 Fannin Suite 2700
                            Houston, Texas 77002
15
     For Defendant:         RAY BATTAGLIA
16                          Law Offices of Ray Battaglia, PLLC
                            66 Granburg Circle
17                          San Antonio, Texas 78218

18   Court Reporter:

19   Courtroom Deputy:      Zilde Martinez

20   Transcribed by:        Veritext Legal Solutions
                            330 Old Country Road, Suite 300
21                          Mineola, NY 11501
                            Tel: 800-727-6396
22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

```
 1                          INDEX

 2   PLAINTIFFS' WITNESSES    DIRECT   CROSS   REDIRECT   RECROSS

 3

 4

 5   DEBTOR'S WITNESSES    DIRECT   CROSS   REDIRECT   RECROSS

 6   W. Marc Schwartz       52      101,     228

 7                                  159,

 8                                  177,

 9                                  223

10   PLAINTIFFS' EXHIBITS                      RECEIVED

11

12   DEBTOR'S EXHIBITS                         RECEIVED

13   Exhibit 1      CV of W. Marc Schwartz     52

14   Exhibit 3      Plan Support Agreement     59

15   Exhibit 2      Engagement letter between

16                  W. Marc Schwartz and FSS   60

17   Exhibit 8      Forbearance agreement      70

18   Exhibit 4      8/13/20 promissory note    74

19   Exhibit 5      8/2020 security agreement  75

20   Exhibit 6      11/10/2021 promissory note 76

21   Exhibit 7      UCC 1 Financing Statement  77

22   Exhibit 11     Critical Vendor List       89

23

24

25
```

```
1        HOUSTON, TEXAS; WEDNESDAY, AUGUST 3, 2022; 10:02 A.M.

2                          (Call to Order)

3           THE COURT:  Good morning, everyone.  This is Judge

4    Lopez.  Today is August 3rd.  I'm going to call the Free

5    Speech Systems case here on first days.  I've completely

6    muted to the phone line so I'm going to take appearances in

7    the courtroom then I'm going to take appearances for anyone

8    on the phone.  If you wish to be recognized, you just need

9    to hit five star, give me a second and I will unmute your

10   line.

11          I'll just remind everyone who may be appearing, by

12   video that appearing by video is just the same as appearing

13   live in Court.  So, I would just ask that everyone please

14   observe the decorum that you would use if you were live in

15   the courtroom, that you would exercise that same judgment if

16   you were appearing by video.

17          So, with that said, let me go ahead and take

18   appearances.  And I will begin in the courtroom.

19          MR. BATTAGLIA:  Good morning, Your Honor.  I

20   assume this microphone is working.  Your technology is --

21          THE COURT:  We're good today.

22          MR. BATTAGLIA:  Okay, good.  Ray Battaglia on

23   behalf of Free Speech Systems.  Appearing with me today are

24   Hyung Lee and RJ Shannon.  Also present in the courtroom is

25   Marc Schwartz, the Chief Restructuring Officer for my
```

1    client.  And on the telephone, Norm Pattis, the Counsel for

2    the Debtor in the Connecticut State Court litigation.

3            THE COURT:  Okay, thank you.  And if -- I can --

4    good to see you in person, Mr. Battaglia.

5            MR. BATTAGLIA:  Good to see you, Judge.

6            THE COURT:  Good morning.

7            MR. MOSHENBERG:  Good morning, Your Honor.  How

8    are you?

9            THE COURT:  Good.  Good morning.

10           MR. MOSHENBERG:  I'm here on behalf of the Texas

11   Plaintiffs, Avi Moshenberg.  And also, as we had hoped, we

12   have secured Jarrod Martin and Marty Brimmage as our

13   bankruptcy counsel on behalf of the Texas Plaintiffs, Your

14   Honor.

15           THE COURT:  Okay, good morning.

16           MR. CHAPPLE:  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MR. CHAPPLE:  Nice to see you again.  Ryan Chapple

19   on behalf of the Connecticut Plaintiffs.  I have my

20   colleague, Eleanor Sterling here in the courtroom.

21           THE COURT:  Good to see you.

22           MR. CHAPPLE:  And Mr. Chris Mattei on the line as

23   well.

24           THE COURT:  Okay, good morning.

25           MR. NGUYEN:  Good morning, Your Honor, Ha Nguyen

1    appearing on behalf of the United States Trustee.  Also with

2    me in the courtroom is Assistant U.S. Trustee Millie Sall.

3              THE COURT:  Oh, pleasure.  Seen the name, a

4    pleasure.  Nice to see you.

5              MR. LEMMON:  Your Honor, Steve Lemmon.  I

6    represent PQPR Holdings Limited.

7              THE COURT:  Oh, good morning.

8              MS. HASELDEN:  Good morning, Your Honor.  Melissa

9    Haselden, the Chapter 5 Trustee.

10             THE COURT:  Good morning, Ms. Haselden.  Anyone

11   else in the courtroom wish to make an appearance?

12             MR. CHAPPLE:  Your Honor, my apologies.  I

13   neglected to make clear and introduce Mr. Brimmage as

14   counsel for the Connecticut Plaintiffs as well.

15             THE COURT:  Oh, okay, good morning.  Okay.  I

16   think we've taken all the appearances in the courtroom.  If

17   anyone wishes to make an appearance who's on the line, why

18   don't you hit five star and I will unmute your line.  Okay.

19   I've got a 361 area code.

20             MR. JORDAN:  Judge, Shelby Jordan.  I represent

21   Alex Jones.

22             THE COURT:  Okay, good morning.  Mr. Jordan, I'm

23   going to mute --

24             MR. JORDAN:  Good morning, Judge.

25             THE COURT:  -- I'm going to leave the other line

1    unmuted.  If you could just keep your phone on mute during

2    the time, but if you wish to make a statement, obviously,

3    I'll keep your line unmuted.  You don't need to hit five

4    star again.

5         MR. JORDAN:  All right, thanks.  Thank you.

6         THE COURT:  Anyone else wish to make an

7    appearance?  Okay, I've got an area code 203.

8         MR. PATTIS:  Judge, this is Norm Pattis.  I don't

9    have an appearance in the file, but I was asked to make

10   myself available today, so I am here.

11        THE COURT:  Okay.  Thank you.  Mr. Pattis, just

12   for clarification, you represent just FSS in the Connecticut

13   --

14        MR. PATTIS:  I'm sorry, sir?

15        THE COURT:  Just want --

16        MR. PATTIS:  No sir.  I represent --

17        THE COURT:  Go ahead.

18        MR. PATTIS:  I apologize, sir.  I represent Free

19   Speech Systems and Alex Jones in the Connecticut Litigation.

20        THE COURT:  Okay, thank you.  Now, I'll keep your

21   line unmuted as well.  And just keep your phone on mute,

22   sir.  Thank you.

23        MR. PATTIS:  Yes, sir.

24        THE COURT:  Would anyone else wish to make an

25   appearance?  Okay, now that we've taken all the appearances,

```
 1    Mr. Battaglia, I'll turn it over to you.

 2           MR. BATTAGLIA:  Thank you, Your Honor.  Ray

 3    Battaglia for Free Speech Systems.  The matters before the

 4    Court today are Docket Number 6, the cash collateral motion.

 5    And with that motion, Your Honor, we have an issue that

 6    lingers with the -- I'll call them the Plaintiffs' Group --

 7           THE COURT:  Mm hmm.

 8           MR. BATTAGLIA:  -- that I'll come back to and

 9    discuss in a moment, and we can decide how to proceed.

10           THE COURT:  Mm hmm.

11           MR. BATTAGLIA:  With respect to the motion to

12    provide adequate assurance for payment of utilities, Docket

13    Number 7, the Court had suggested that a two-week segregated

14    escrow be established.  I'm wise enough to -- and have

15    inserted that in the proposed form of order.  And unless the

16    Court requires more, there's no opposition to that motion

17    with that change.

18           THE COURT:  Okay.

19           MR. BATTAGLIA:  Generally, the motion provides

20    pretty standard procedures for a utility to come in and

21    request additional adequate assurance if they think -- and

22    then a protocol for how that proceeds.  But generally,

23    between the two-week escrow and the ability to generate cash

24    flow, we've offered that as adequate assurance at this

25    juncture.
```

```
 1              THE COURT:  Okay.  Let me hear from Mr. Nguyen.
 2   Mr. Nguyen, have you had an opportunity to --
 3              MR. NGUYEN:  Yes, Your Honor.  I've also spoke
 4   with Mr. Battaglia.  We have no objection to the utilities
 5   motion.
 6              THE COURT:  Okay.  Is there a revised proposed
 7   form of order that I can --
 8              MR. BATTAGLIA:  I will upload an order this
 9   evening, Your Honor.
10              THE COURT:  Okay.  Let me just hear this -- I
11   spoke to the utilities motion, which is at Docket Number 7.
12   Anyone wish to be heard in connection with that particular
13   emergency motion?  Okay, anyone on the line?  Let me just
14   check.  And if you do, you need to hit five star.
15              Okay.  I would just note then for the record that
16   at Docket Number 7, it was an emergency motion seeking entry
17   of an order approving the Debtor's proposed form of adequate
18   assurance of payment for future utility services and
19   approving adequate assurance procedures.
20              A very common first day motion to provide adequate
21   assurance to utility providers without adequate assurance,
22   Section 366 of the Bankruptcy Code would allow utility
23   providers to not -- essentially not provide services if they
24   so wish to.  So, upon the furnishing of adequate protection
25   -- actually, adequate assurance and the related procedures,
```

```
 1    I'm going to ask the Debtor to ease into the Chapter 11
 2    process and still maintain all of its utilities on an
 3    ongoing basis.
 4            So, I have proposed at the last hearing, and Mr.
 5    Battaglia has kindly agreed, to take the Court's
 6    consideration of a two-week deposit at -- in a segregated
 7    account that would serve as adequate assurance.  Any utility
 8    can come in and ask for additional assurance, but I am
 9    comfortable with a two-week in a segregated account.
10            And Mr. Battaglia, it can be placed -- I've got a
11    question about the bank accounts, just so I understand the
12    cash management system.  But theoretically, I'm comfortable
13    with just it segregated with -- still held by the Debtors.
14            MR. BATTAGLIA:  Separate account, Your Honor, or
15    just accounting segregated?
16            THE COURT:  Just accounting segregation for my
17    purposes is fine.  Just something that utilities cand feel
18    comfortable, that they could look to that's accounted for on
19    the books.
20            MR. BATTAGLIA:  We are in the process of opening
21    DIP accounts with Access Bank.
22            THE COURT:  Okay.
23            MR. BATTAGLIA:  And moving the Debtor's accounts
24    to that bank.
25            THE COURT:  Okay.  It just makes it easier.  And
```

1    at the end of the case, then if -- depending on where we end

2    up, one can provide an order and a plan or something that,

3    you know, the deposit would then go back at the end of the

4    case.  It just makes it a little bit easier.

5         So, with the proposed change, I'll grant the

6    emergency motion at Docket Number 7.  I would just ask that

7    you run the proposed order by Mr. Nguyen before you get it

8    on file.  Make sure the Trustee's okay with it, and then

9    file it on the Docket and I'll take a look at it.  If it

10   looks good, I'll sign it, okay?

11        MR. BATTAGLIA:  Depending upon how late we go

12   today, I'll leave the -- well, Mr. Nguyen, by tomorrow,

13   Judge.

14        THE COURT:  Okay, and if any other party asks to

15   see it, just -- can I just make sure that everyone takes a

16   look at it before you upload it?  But I find this to be

17   fairly routine.  So --

18        MR. BATTAGLIA:  Your Honor, Docket Number 8 is the

19   Debtor's emergency motion for authority to pay critical

20   vendors.

21        THE COURT:  Why don't we take up 9 first and then

22   we can kind of take up 6 and 8 together?  Because I think

23   they relate.

24        MR. BATTAGLIA:  That's fine, Judge.  The Docket

25   Number 9 is the Debtor's emergency motion to extend time to

1    file schedules and statements of affairs.  There's no

2    opposition to the relief requested in that motion.

3         THE COURT:  Okay.  Does anyone wish to be heard in

4    connection with the motion to file -- I should say to extend

5    the time to file schedules and statements?  Just checking

6    online.  Okay.  This is another what I consider to be

7    procedural ordinary course, it's just providing for

8    essentially a two-week extension of the time.  I want the

9    Debtor to get the schedules right and to take the time to

10   get it right so there's no filing of amendments if that's --

11   it has the right to do that, but I'd rather you come out

12   with what you feel is right.  So --

13        MR. BATTAGLIA:  And Your Honor, the proposed

14   order, the 15th day falls on a Sunday, so I've put a date

15   certain of the following Monday.

16        THE COURT:  Okay.

17        MR. BATTAGLIA:  The Code authorizes only a 15-day

18   extension for a Sub B case without further cause.

19        THE COURT:  No, it's fine.  The 29th is fine.  I

20   want you to -- if that's the date you'll feel you can get it

21   right by, then let's do that.  Let me just -- I'm signing

22   that order right now and I'm going to send it off to

23   Docketing.

24        Mr. Nguyen, can you just talk to me, just

25   generally at the 10,000-foot level?  I just want to

1    understand the Debtor's cash management -- current cash

2    management system.  Where does it hold bank accounts and

3    what's going on there?

4            MR. BATTAGLIA:  The current bank account is at

5    Security Bank in Crawford, and it'll be moved to Access Bank

6    as a DIP account.  Security, not a DIP approved account.

7            THE COURT:  Okay.  Is Access?

8            MR. BATTAGLIA:  Yes.

9            THE COURT:  Okay.  And Mr. Nguyen, I'm sure you'll

10   -- I'm just going to -- you'll be working with them on the -

11   -

12           MR. NGUYEN:  Yes, Your Honor.

13           THE COURT:  Okay.

14           MR. NGUYEN:  We'll check the bank account to make

15   sure it's properly collateralized and approved -- on the

16   approved list.  I believe it is, but (indiscernible) I

17   imagine it is.  I haven't seen the list.

18           THE COURT:  Okay, I'll -- but if any issues come

19   up, then you'll just let me know, but I'm going to assume

20   that, if I grant debt relief related, that there's no issues

21   with the cash management system now, and we'll be -- you all

22   continue to work on that, so there's no issue for me to take

23   up on that.

24           MR. BATTAGLIA:  Yes, sir.

25           THE COURT:  Okay.  (Indiscernible) how many

1    employees (indiscernible) right now?

2            MR. BATTAGLIA:  There are 58 employees.  They're

3    employed through a PEO with ADP.  And we're current on

4    payroll.  We paid the payroll through the filing date to

5    avoid having any disruption with employees.

6            THE COURT:  Okay.  So, it's just a related

7    question, so I want to look at the budget for employee

8    payroll, that's not including any pre-petition amount?

9            MR. BATTAGLIA:  It will not.

10           THE COURT:  Okay.  How much cash on hand does the

11   Debtor have from the petition date?

12           MR. BATTAGLIA:  Your Honor, it's --

13           THE COURT:  Just roughly.

14           MR. BATTAGLIA:  -- I'll let (indiscernible) give

15   the current --

16           THE COURT:  Just on the back of the envelope.  I

17   won't hold you to the number.  I'm just trying to understand

18   just generally.

19           MR. BATTAGLIA:  As of filing date, approximately

20   $1.3 million, of which about $800,000 was not cash

21   collateral.

22           THE COURT:  About $800,000?

23           MR. BATTAGLIA:  One of the -- yeah, the Debtors

24   you will learn, receives large donations on occasion.

25           THE COURT:  Mm hmm.  Okay.

1           MR. BATTAGLIA:  And obviously there's great

2    variability in that in the sense --

3           THE COURT:  So that half a million of just what

4    you would consider cash collateral, about $1.3 million and

5    about $800,000 we would call restricted for now, and then

6    another half a million --

7           MR. BATTAGLIA:  My estimate, yes, sir.

8           THE COURT:  Okay.

9           MR. BATTAGLIA:  Now, that's the full accounting.

10          THE COURT:  So, and we'll get into this, and I

11   kind of just want to understand before we get into the cash

12   collateral motion, just when I looked at the budget, it's

13   your 13-week cash flow using -- it's just simply going week-

14   by-week.  I don't -- I didn't see kind of a beginning cash,

15   ending cash analysis there.  And that's why I was asking.

16   So, are you comfortable --

17          MR. BATTAGLIA:  It was not in the -- because as of

18   the time we filed the motion, we didn't know what the

19   beginning cash balance would be.

20          THE COURT:  Okay.

21          MR. BATTAGLIA:  But we obviously can provide that.

22          THE COURT:  Okay.

23          MR. BATTAGLIA:  It's now, as we understand it,

24   about $1.3 million.  And you know, in-flows, Judge, the

25   nature of the cash generation aspects of this business,

1   obviously the broadcast generally in and of itself doesn't

2   produce revenue except by advertising, and also by

3   generating product sales.  And product sales are dependent

4   on a number of things.  One of them is Alex Jones being the

5   broadcaster.

6        THE COURT:  Mm hmm.

7        MR. BATTAGLIA:  And another one is the

8   availability of inventory, which has been an issue in the

9   first quarter of this year, and one that we are rapidly

10  solving for.

11       THE COURT:  Okay.  And I'm going to let you turn

12  to your presentation.  I apologize for -- I just had a

13  couple of questions to understand.

14       MR. BATTAGLIA:  I'm here to answer the Court's

15  questions, Judge.

16       THE COURT:  So, I understand that the -- just from

17  the -- my knowledge from the prior cases, there were cases

18  pending in Austin and in Connecticut.  There was one of the

19  litigation claims as continuing out of assigned, an order

20  lifting a stay.  We still had the fraudulent transfer action

21  in Austin.  So, those are the two Austin actions that I was

22  aware of.  And there was, what we call the Sandy Hook

23  litigation in and -- pending in Connecticut.

24       MR. BATTAGLIA:  There's one other lawsuit in

25  Austin.  It's the Fontaine lawsuit, which is not

```
1    consolidated with Austin (indiscernible) lawsuit --

2              THE COURT:  Oh, that's right.

3              MR. BATTAGLIA:  -- and is not currently in trial.

4              THE COURT:  Got it, okay.  That was the --

5              MR. MOSHENBERG:  There's also -- yeah, thank you.

6    There's the Posner case, also, Your Honor.  It's another

7    Sandy Hook litigation.

8              THE COURT:  Right, yeah, no, no.  That's exactly

9    right.  But they're all kind of related.

10             MR. MOSHENBERG:  Yes sir.

11             THE COURT:  They're -- those were the ones that

12   were released on a case -- I get it there were several cases

13   on it, but this -- I'm thinking just in buckets.  In the

14   Connecticut litigation, I do remember that there were

15   potentially several lawsuits pending, but they were overall

16   related.  The same kind of set of Plaintiffs there.  Are

17   there -- is there any additional litigation with respect to

18   this Debtor that's different than the --

19             MR. BATTAGLIA:  Your Honor, I think --

20             THE COURT:  I guess what I'm looking at --

21             MR. BATTAGLIA:  Sandy Hook related?

22             THE COURT:  Well, I'm thinking -- I remember the

23   three Debtors were all actually Defendants in the -- in all

24   of these litigation, in one way or the other, whether the

25   InfoW, IW Health, and Prison Planet.  Is FSS asserting any
```

1    claims against -- any cross-claims, any counter-claims

2    against any other parties related to this litigation?  Are

3    they being sued separately by any party in any parts of this

4    litigation?  I'm just trying to understand.

5         I understood the last Debtors I had.  I just --

6    I'm just trying to get up to speed so if folks start

7    mentioning litigation claims, then I'm up to speed.  Is

8    there any other litigation that I should be aware of that

9    relates to Mr. Jones, any of his entities, as it relates to

10   FSS that's different or in addition to the ones that I

11   mentioned?

12        MR. BATTAGLIA:  Yes, sir.  With respect to the

13   Sandy Hook litigation, the extent the -- and I'll call it

14   the IW Defendants --

15        THE COURT:  Mm hmm.

16        MR. BATTAGLIA:  -- have been dismissed with

17   prejudice.  There are no cross-claims or counter-claims

18   between those parties.

19        There is I think one piece of litigation that does

20   join both IW and FSS, and that was a lawsuit filed in

21   Florida that the Debtor and its affiliates were successful

22   and won at trial.  And it's up on appeal.  It was a -- no

23   damages, shall we say acquittal judgment entered in the

24   Florida case.  That case has been pending for a while with

25   no action ongoing.

007467

1             THE COURT:  Okay.

2             MR. BATTAGLIA:  In terms of other litigation, I'm

3     aware of, and there could be a few more, but these are the

4     ones I'm aware of, I know that FSS was sued for intellectual

5     property improper use, copyright infringement, a lawsuit

6     which is not extraordinary for this business.

7             And that is probably a couple of months past

8     answer date.  And there is a lawyer representing the Debtor.

9     And then I am aware of another lawsuit filed in New York, I

10    think Federal Court -- don't hold me to that -- that alleged

11    that an ADA violation for not making its website accessible

12    or its purchasing website accessible to, I think it was

13    visually impaired individuals.  And that -- it was filed at

14    or about the same time as the copyright infringement case.

15            THE COURT:  Okay.

16            MR. BATTAGLIA:  Those are the ones I'm aware of.

17            THE COURT:  Thank you.

18            MR. LEE:  Your Honor, Kyung Lee for the record.  I

19    just want to supplement that -- what Mr. Battaglia said.

20            THE COURT:  If you can just get closer to the mic.

21    I want to make sure everybody can hear you.  I appreciate

22    it.

23            MR. LEE:  I'll just tell Mr. Battaglia --

24            THE COURT:  And just considering these are

25    preliminary questions, I just want to make sure that I

```
 1   understand the lay of the land before we --

 2         MR. LEE:  For purposes of complete transparency,

 3   Your Honor, there was an indemnity claim that Mr. Jones

 4   filed against FSS in the Connecticut litigation last week,

 5   which has been stricken by the Connecticut Judge, Honorable

 6   Bellis yesterday.

 7         So, I just want you to know that there was an

 8   indemnity claim made by Alex Jones against FSS.  So, that's

 9   another claim that existed.  And I think Mr. Jones is also

10   going to assert a proof of claim in the FSS bankruptcy case.

11         THE COURT:  Okay.

12         MR. LEE:  I just wanted to let you know that.

13         THE COURT:  So, but you said that litigation, that

14   cause of action is it -- doesn't seem like it's live

15   anymore, is that --

16         MR. BATTAGLIA:  There is an update, obviously, of

17   developments from yesterday.  And I am going to give the

18   straight version without any color on either side.

19         THE COURT:  Okay.

20         MR. BATTAGLIA:  It is that the judge preceded with

21   hearings yesterday in Connecticut and did strike the cross-

22   claim.  And then apparently, suggested that the litigation

23   should go forward and pick a jury, although FSS was still a

24   party to that litigation and had not been settled.  As a

25   consequence, FSS filed a notice of removal of that
```

```
 1   litigation.

 2              THE COURT:  Okay.

 3              MR. BATTAGLIA:  We didn't feel it was appropriate

 4   with --

 5              THE COURT:  Where is it pending now, in front of a

 6   bankruptcy court, like an adversary proceeding in front of

 7   bankruptcy court or something?

 8              MR. BATTAGLIA:  It will be pending in front of a

 9   Bankruptcy Court.  Is it Bridgeport?

10              MR. LEE:  Yes.

11              MR. BATTAGLIA:  It's in Bridgeport.

12              THE COURT:  Okay, okay.

13              MR. BATTAGLIA:  So, that's the status of it.  And

14   I know the parties are having some conversation about what

15   that means for Friday, the emergency motion to lift stay.

16   Nothing further to report on it.

17              THE COURT:  Okay.  No, no, no, I just -- I

18   appreciate it.  I know that there's a lot of moving pieces

19   and I just want to just understand that before we got into

20   the motion, just so we're all on the same page.  I think you

21   answered all my basic questions.  I just wanted to

22   understand kind of the employees' insurance.  Any issues

23   with insurance that I should be aware of?

24              MR. BATTAGLIA:  We have insurance coverage.  And I

25   believe part of the payments in the critical vendor include
```

```
 1    payment of the policy.
 2              THE COURT:  Okay.  All righty.  I will stay quiet
 3    and let you --
 4              MR. BATTAGLIA:  No, you won't, Judge.
 5              THE COURT:  -- turn it back over to you.
 6              MR. BATTAGLIA:  This is your courtroom.
 7              So, the remaining two matters, Your Honor, are the
 8    cash collateral motion and the critical vendor motion.  And
 9    where we stand on those, Mr. Martin and I have had several
10    conversations on the cash collateral motion.  There's
11    certain accommodations being made, and I'll -- the biggest
12    one relates to a $250,000 payment to PQPR that is shown in
13    the budget.  That is a -- the way the Debtor operates with
14    PQPR in inventory, if PQPR purchase inventory, pays for it,
15    sells it through our sales channel, the Debtor gets 20
16    percent of the net.  PQPR gets 80 percent of the net.  If
17    it's FSS's inventory, and obviously, FSS is Free Speech
18    Systems, 90 percent goes to the Debtor and 10 percent goes
19    to PQPR for its involvement in the purchasing and
20    involvement in the -- as I understand it, supplements have
21    to have, and don't hold me to this word -- be sold under
22    some certification, and Dr. Jones individually, PQPR holds
23    that certification.  That's my very basic understanding.
24              And so, there is inventory that we have agreed to
25    purchase from PQPR.  It has not been delivered yet, that
```

```
 1    it's pre-paid $750,000 for.  We would like to move that
 2    inventory into the FSS inventory category and sell it and
 3    receive 90 percent of the net.  The profit margin on
 4    supplements can be anywhere from 3X to 5X, so we think it's
 5    a good investment for this estate.  And the accommodation
 6    that the Plaintiffs have requested is that they have a 30-
 7    day look claw back window look -- to file something, if they
 8    think the payment is inappropriate.  And we're amenable to
 9    that.
10         There are some other changes we've agreed to,
11    particularly strengthening the reservation and the no waiver
12    provisions that aren't intended.  We have proposed a
13    replacement lien to the equivalent validity and priority of
14    the existing PQPR pre-petition liens.  Obviously, if there's
15    no pre-petition lien, there's no replacement lien.  And the
16    -- I think the remaining -- there was also a request that we
17    limit any insider payments to not more than $20,000,
18    exclusive of that $250,000 payment I just mentioned.  And
19    we're amenable to that.  We'll put that in an order.
20         So, the hang-up here that we have, and we can
21    discuss it in a little more detail later, is that they've
22    requested that they be given challenge rights with respect
23    to the PQPR liens, like, basically, Louisiana World
24    Exposition rights.  And the Debtor is not amenable to that.
25         We have two options as far as proceeding.  One of
```

1    course, is just to go forward with the full-blown hearing.

2    And the other is for, I guess Mr. Martin and I, and I'm not

3    sure who else, to stand up and say why we think the creation

4    of the Tort Committee is a good idea or a bad idea at this

5    point in time, and let the Court give us some direction on

6    that.  I'm amenable to whatever the Court would like to do.

7    But other than that, there's no opposition to the use of

8    cash collateral.

9            THE COURT:  Okay.  And with respect to the

10    critical vendor motion, where do things stand?

11            MR. BATTAGLIA:  The only comment I received was

12    from Mr. Nguyen, who asked that I make a proffer of the

13    critical nature of the vendors.  Otherwise, there's no

14    opposition of the critical vendors.

15            THE COURT:  Okay.  And the critical vendors, when

16    is it generally?  And we haven't taken any evidence, but I

17    just want to understand it.  When are those payments due?

18    When do you need them?  When does the Debtor need to make

19    those payments?

20            MR. BATTAGLIA:  I think they do come in.  They're

21    probably staggered, but some of them are very important.

22    You know, obviously, you're in the broadcast business in the

23    modern world.  Access to the internet and satellite and

24    other things is vital.  And if you go dark, it's extremely

25    costly.

```
 1              So, I don't know specifically.  And Mr. Schwartz
 2    may or may not know precisely when those payments are due.
 3    But certainly, I would say within the next two weeks, we
 4    have to make -- we have to commence making payments.
 5              THE COURT:  Okay.
 6              MR. BATTAGLIA:  I think they're not broken out as
 7    critical vendor payments in the budget.  They're included
 8    within the expense items.
 9              THE COURT:  Okay, thank you.
10              MR. BATTAGLIA:  So --
11              THE COURT:  Let me hear from -- go ahead.
12              MR. BATTAGLIA:  And then as far as the remaining
13    things, you had asked at the last hearing to have Mr.
14    Schwartz address the relationship with IW.  I'm prepared to
15    do that however the Court would like.  And you know, I have
16    to make one comment.  I kept hitting five star the other day
17    because I kept hearing about $62 million going to Alex Jones
18    in the last two years -- and I think it's in the objection.
19    $62 million has been drawn on account of Alex Jones over 15
20    years, over $30 million of which was to pay income taxes,
21    which this is a flowthrough entity, and the LLC has an
22    obligation to pay the tax obligations.
23              I understand those payments were directly from FSS
24    to the IRS.  So, I just -- I'm not going to go any further
25    than that to say I can't leave that -- the misinformation
```

1    going out across the globe without offering some

2    explanation, because it's highly prejudicial.  But I'm

3    prepared to proceed however the Court would direct me.

4            THE COURT:  Okay.

5            MR. BATTAGLIA:  You want me to turn the podium

6    over?

7            THE COURT:  Yeah, let me just hear if anyone --

8    what other parties may have to say at this time.

9            MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

10    again, on behalf of the Connecticut Plaintiffs.  And I --

11    just a little logistics today.  And I'm sure you know

12    because you read the pleadings.  The Connecticut Plaintiffs

13    and the Texas Plaintiffs filed a joint objection.

14            THE COURT:  Mm hmm.

15            MR. CHAPPLE:  So, today, I believe Mr. Moshenberg,

16    Mr. Brimmage, and myself, collectively refer to the group as

17    the Sandy Hook Plaintiffs.

18            THE COURT:  Okay.

19            MR. CHAPPLE:  A few comments about what Mr.

20    Battaglia said with regard to just the narrow issue of cash

21    collateral.  I think it was an accurate recitation of where

22    we are in the back and forth between the parties.  But I

23    want to add a little color to one issue, and then I want to

24    raise one issue that Mr. Battaglia didn't mention.

25            The issue that he didn't mention, that has been

```
 1    part of the discussion is discovery, the opportunity for the

 2    Sandy Hook Plaintiffs, between now and a final hearing on

 3    cash collateral, to depose Mr. Schwartz and a representative

 4    of PQPR and to obtain written discovery from both of those

 5    parties relating to the underlying debt that is really at

 6    the key of all of this cash collateral discussion.  So, I

 7    believe we're on the same page there, but I just wanted to

 8    raise that and let the Court know that issue.

 9              THE COURT:  Yeah, yeah --

10              MR. BATTAGLIA:  Ray Battaglia for FSS.  We have

11    agreed to reasonable discovery.  We're not going to oppose

12    that.  There may be some timing issues.  Apparently, this is

13    vacation time of the world and I'm happy to say that I never

14    take a vacation, so it's not my --

15              THE COURT:  I was going to say, when did people

16    start doing that?  Just kidding, everyone.  I'm glad

17    everyone takes vacation.  Go ahead.

18              MR. CHAPPLE:  So, Your Honor, that's just --

19    that's issue one that I wanted to raise, that he didn't

20    speak about earlier.  The other issue, and the issue -- he's

21    right.  The impasse that we've reached, the issue that is

22    crucial to the Sandy Hook Plaintiffs is the lien issue and

23    the ability to challenge this lien.

24              THE COURT:  So, tell me, your clients -- well,

25    from the Sandy Hook Plaintiffs' side's perspective, what
```

```
 1   should a cash collateral order look like, if you had your
 2   way today?  What should an interim order look like today?
 3               MR. CHAPPLE:  Today, the interim order should --
 4               THE COURT:  What do you want in it?  What do you
 5   want out of it?
 6               MR. CHAPPLE:  We are agreeable, and I think it'll
 7   be a short back and forth between the Debtor and the
 8   Connecticut, or excuse me, the Sandy Hook Plaintiffs, going
 9   line by line in the 14-day budget that they have.  We've
10   made some modifications.  The original 14-day budget I
11   believe had payments of $54,000 to Mr. Jones.  We've reduced
12   that amount.  So, we've kind of gone back and forth on all
13   of those issues.  I think the sticking point --
14               THE COURT:  So, there's an agreed form of -- well,
15   let's just call it interim -- a proposed form of interim
16   budget, where there -- the line items is -- there may be
17   agreement on buckets for line items for the next couple of
18   weeks.
19               MR. CHAPPLE:  Yes.
20               THE COURT:  Okay.
21               MR. CHAPPLE:  Yes, Your Honor.
22               THE COURT:  Okay.
23               MR. CHAPPLE:  The sticking point is whether or not
24   the Sandy Hook Plaintiffs or any party in this litigation,
25   any party in interest, has standing to challenge the
```

1    purported lien that PQPR has over the cash that's in the

2    hand of Free Speech Systems.  And so -- go ahead.

3              THE COURT:  No, no, so your objection asks for

4    some language basically saying that I'm not making any

5    findings about whether there's a lien -- a valid lien or

6    not.  If that language is included, what else do you need

7    for purposes now?  Do you want me to grant you standing on

8    an interim basis, do you?  Is that what you're asking?

9              MR. CHAPPLE:  If we --

10             THE COURT:  I'm just trying to understand.

11             MR. CHAPPLE:  Sure, sure, sure.  No, and I

12   appreciate that.  If we have the language that we put in the

13   proposed objection that basically makes the finding that you

14   just --

15             THE COURT:  Mm hmm.

16             MR. CHAPPLE:  -- that you just recited, then I

17   would want just a few minutes to confer with my co-counsel,

18   but I believe we are okay there.

19             The other thing, Your Honor, that we were talking

20   about in the hall right before this, that Mr. Battaglia

21   mentioned, is the Court's ability to appoint a Plaintiffs --

22   a Tort Plaintiffs Committee similar to what Judge Isgur did

23   in the Watson Grinding case, that gives that oversight and

24   power to a committee to challenge those liens and to

25   investigate the validity of those liens.

```
 1          THE COURT:  Right.  So, I will -- I'll tell you,
 2   Mr. Battaglia's going to have to tell me, and how he feels
 3   about that language.  I'm not telling you to agree to it or
 4   not.  I just need to understand what your position is, if
 5   that language is included for purposes of an interim order,
 6   then I'm -- the Court isn't making any findings as to
 7   whether there's a lien or not.  You'll have to let me know
 8   about that.
 9          MR. BATTAGLIA:  Your Honor, I'll do that after the
10   other side is complete -- whoever is going to present --
11          THE COURT:  Okay.  You know, I agreed 1102(a)(3) -
12   -
13          MR. CHAPPLE:  Your Honor, may I go grab my --
14          THE COURT:  Oh absolutely.  And I'm not saying
15   this is what you're asking for --
16          MR. CHAPPLE:  Mm hmm.
17          THE COURT:  -- I'm just noting 1102(a)(3) says
18   that unless the Court for cause orders otherwise of
19   committee creditors may it not be appointed in a small
20   business case or a case under Sub Chapter 5.
21          So, I'm of -- I don't believe I have authority to
22   do anything today, but I do think if someone filed a motion,
23   and we take it up as -- and then we'd find whether there
24   would be cause, unless someone can show me cause today.
25          So, if -- I'm not comfortable agreeing me just
```

1    ordering it over the objection of a party.  Someone's going

2    to have to show cause, and if there's cause then you win.

3    But someone's going to have to tee the issue up as to

4    whether there's cause to appoint a committee.  And if there

5    is -- and maybe that's what you're asking for, is to say

6    that if you're asking for a committee like the Watson

7    Grinding Committee, and that was, I believe, and Trustee

8    will have to tell me, it felt like an official committee.

9    What maybe was a -- someone will have to tell me.  But I

10   think Sub Chapter 5 is a little different.

11            MR. CHAPPLE:  Mm hmm.

12            THE COURT:  So, I don't -- the answer may not --

13   the answer just may be no today, but maybe at some point,

14   maybe you do get it at a final, if you can prove cause or

15   not.  But someone will have to show me where I would have

16   authority to do it today and based on what.  And maybe that

17   evidence comes out today.  But those'll be the questions

18   that I've got.

19            MR. CHAPPLE:  I understand, and I appreciate that

20   clarification, Your Honor.  I think what we do now is take a

21   short recess, let me confer with my colleagues on kind of

22   the question you had about the language that's in the

23   objection, and if that gets us there in the interim.  And

24   then also, I know we were absolutely interested in moving

25   for the creation of a committee for cause.  And we can also

1    talk about that dynamic, and whether or not we feel like if

2    we move forward today in -- while we're objecting to the

3    motion for interim use of cash collateral, we can also prove

4    up the cause needed to form the committee.  So, if the Court

5    will give me that latitude, we can visit for just a few

6    minutes and come back.

7              THE COURT:  You're asking for time to meet, yeah.

8    Mr. Battaglia, I just would need to know, and I'm not

9    telling you one way or the other what you should do.

10   Obviously, I'm already suggesting it one way or the other.

11   I just need to understand that was some requested language

12   in an objection that I read, and I just need to understand

13   whether you'd be comfortable with that.  Because again, I'm

14   just trying to understand.  We haven't taken any evidence or

15   anything.  I just need to understand.

16             But I would need to hear as well -- Mr. Lemmon,

17   you have to tell me one way or the other whether there's a

18   lot of proposed changes to an order, and PQPR would have to

19   let me know whether they'd be amenable to that as well.  And

20   I'll give them the latitude to say yes or no.

21             MR. BATTAGLIA:  Your Honor, I think the changes

22   that Mr. Martin and I exchanged by email last night that are

23   agreed to are a cap on insider distributions of $20,000,

24   individual insiders.

25             THE COURT:  Mm hmm.

1          MR. BATTAGLIA:  The $250,000 inventory purchase
2   payment with the claw back provision.  The -- there's
3   nothing in my proposed order that has this Court validating
4   any liens or debts of anybody.  It simply says that there is
5   a replacement lien of equal stature.  That's it.  But
6   they've requested some reservation sand non-waiver language,
7   and -- at least what I saw last night, and I don't know that
8   I recall whether it's the same in the objection, we've
9   agreed to insert that language.  We've agreed to reasonable
10  discovery.

11         And Your Honor, the problem I have with a Tort
12  Committee at this juncture, aside from the fact that there's
13  no motion, aside from the fact that we've agreed to a level
14  of discovery so they can at least take a look behind the
15  curtain, is that creation of a Tort Committee on behalf of
16  creditors who at this point have no -- they have a claim,
17  but they have an unliquidated claim, we don't know whether
18  that claim is going to swamp this Debtor or whether it's
19  going to be manageable and can be paid from operations of
20  the estate, which renders pursuit of, you know, fraudulent
21  conveyance claims as kind of a tomorrow issue.

22         But there's no limitations running on any of these
23  questions.  We just don't see it as a today issue.  If you
24  appoint a Tort Committee with the Debtor's sort of start-up
25  growth back into revenue with product deliveries, the costs

```
 1    of that committee are going to swamp this case.  They just

 2    are.  They're going to hire a lawyer and they're going to

 3    charge it to the estate and they're going to swamp this

 4    case.  We think that let them take a look and we can come

 5    back and revisit the issue when it's before the Court.

 6    That's our position on appointment of a committee at this

 7    point.

 8         THE COURT:  Okay.  So, you're okay with inserting

 9    -- and I want you to confirm that -- the only language that

10    I've read obviously is the language that was in the

11    objection.  Maybe during the break, you can take a look at -

12    -

13         MR. BATTAGLIA:  I will, I will.

14         THE COURT:  -- that language, or maybe Mr. Martin

15    can confirm what that -- you know, I still want to -- and

16    again, and I know there -- still have to put up some

17    evidence.  I still need an evidentiary basis.  And maybe Mr.

18    Schwartz's declaration does the trick or whatever to support

19    critical vendor and cash collateral.

20         MR. BATTAGLIA:  Absolutely.

21         THE COURT:  And I know that.  And again, and at

22    the same time there, maybe I can -- at that time, you can

23    provide the -- I don't know, the clarity that I was looking

24    for with respect to Mr. Schwartz's relationship now with

25    these Debtors as opposed to the last cases.
```

```
 1          MR. BATTAGLIA:  And if the Court's okay with a
 2   proffer at that point, I'm happy to do it.  If not, I'll
 3   call Mr. Schwartz (indiscernible).
 4          THE COURT:  Okay, I'll let you all figure it out
 5   and we'll see if we got a contested hearing or not and
 6   whether the declaration's going to work or not.  So --
 7          MR. CHAPPLE:  Yes, sir.
 8          THE COURT:  It is 10:42.  How much time do you
 9   think you all need?  Okay, I'll come back at 10:52, more or
10   less.
11          MR. LEE:  Your Honor?
12          THE COURT:  Yes?
13          MR. LEE:  I have one housekeeping administrative
14   matter.
15          THE COURT:  Okay.
16          MR. LEE:  I just wanted to alert this Court to.
17   Since we're all here today -- Kyung Lee for the record --
18   you know that we have ECF Number 15, the emergency motion
19   for relief from automatic stay scheduled for Friday --
20          THE COURT:  Mm hmm.
21          MR. LEE:  -- at 10 a.m.  And based upon some of
22   the activities that have taken place in Connecticut --
23          THE COURT:  Mm hmm.
24          MR. LEE:  -- especially the removal of the
25   litigation that took place yesterday, I've consulted, or
```

```
 1    I've asked the counsel for the Connecticut Plaintiffs,
 2    whether or not the hearing on Friday is moot because there
 3    is no -- going to be a jury selection, as I understand it,
 4    which was the basis for the emergency motion, whether there
 5    is going to be any jury selection on Monday, next Monday.
 6              So, I just wanted to raise that issue because I'd
 7    rather have Mr. Schwartz go up to Austin and work on other
 8    stuff rather than be here in the courtroom this week.  So,
 9    just wanted to raise that.
10              THE COURT:  I'll let the Connecticut Plaintiffs
11    tell me what you want to do.
12              MR. LEE:  Right.
13              THE COURT:  You asked for an emergency hearing,
14    I'll grant you one.  And if you want to come back another
15    day, you can do that.  If you want to go forward on Friday
16    with the Southern District of Texas, you'll get your day, if
17    you want it.  And you just tell me what you want to do.
18              If you want to take some time and talk about it,
19    I'll come back in 10 minutes, and we can talk about
20    everything.
21              MR. CHAPPLE:  Thank you, Your Honor.
22              THE COURT:  Okay.
23              MR. CHAPPLE:  As of now, we still want to go
24    forward on Friday.  We're still discussing it.  And one
25    other thing, I -- it always takes a little bit longer than I
```

1    want it to.  Could we do the top of the hour?  Could we do

2    11:00 instead of 10:42?

3             THE COURT:  Well, I was going to tell you that --

4    that was going to get tricky for me then.

5             MR. CHAPPLE:  Oh wait -- I don't want it to be

6    tricky.

7             THE COURT:  No, I'd rather -- what I was going to

8    say, I would rather just round up, so if someone would come

9    back and ask me for more time.  So, it's 10:43.  I'm going

10   to come back at 11:00, and then I'll check in.  If the

11   parties want more time, you let me know, okay?

12            MR. CHAPPLE:  Thank you, Your Honor.

13            THE COURT:  For the folks who are on the line, I'm

14   going to mute the audio.  But -- I'm going to mute the line.

15   I'm going to let the parties in here have the ability to

16   talk freely.  If there's someone you need to talk to, then

17   call them by the cell, but I'm going to mute the line

18   because I'm stepping off and I'll come back on.

19       (Recess)

20            CLERK:  All rise.

21            THE COURT:  Okay.  I'm back in on the record in

22   Free Speech Systems.  Mr. Battaglia, why don't you tell me

23   where we are?

24            MR. BATTAGLIA:  As far as the language that was

25   suggested, the -- I added one word, moreover nothing herein

1    shall grant or prejudice the rights of -- it goes on to talk

2    about the rights to challenge the liens and challenge the

3    debt.  We don't dispute any creditor and party in interest

4    that has a right to contest the debt of PQPR and the liens.

5            At this point, I just don't want it to infer going

6    further that there's any additional rights that are

7    conferred by this order.

8            THE COURT:  Okay.  Kind of status quo.  Okay.  And

9    --

10           MR. BATTAGLIA:  They stand as far as the --

11           THE COURT:  Yeah.

12           MR. BATTAGLIA:  -- Tort Committee issue.

13           THE COURT:  So --

14           MR. CHAPPLE:  Thank you, Your Honor.  Ryan

15    Chapple, thank you for the time.  Appreciate it.  We've had

16    discussions between the Connecticut Plaintiffs and Texas

17    Plaintiffs.  And our position is that cause exists today to

18    appoint a committee.  And the reason that cause exists is

19    even if we have protective language in an interim order,

20    there's still no party that has standing in this case to

21    challenge the validity of those liens.

22           And we believe that the lack of standing for any

23    party to challenge the validity of a lien is cause to

24    appoint a plaintiffs committee today.  And we think it's

25    consistent with the thoughts that the U.S. Trustee has

1    espoused on Monday, and I believe it will espouse again

2    today about the need for oversight here.

3            And really, this underlying debt and this lien is

4    a fundamental issue in this bankruptcy case.  And we feel

5    like we have to have a mechanism and the most logical

6    mechanism is a plaintiffs committee that would have the

7    oversight and the ability to challenge those liens.

8            I know that Mr. Brimmage wants to make some --

9    make a few remarks as well, but I wanted to reiterate that,

10   and I believe Mr. Ha would like to make a few remarks as

11   well.

12           THE COURT:  Okay, thank you.

13           MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to touch base with some of

15   the first day motion.  The first thing is the critical

16   vendor motion.  Mr. Battaglia and I, we worked out some

17   language.

18           THE COURT:  Okay.

19           MR. NGUYEN:  He's going to put on some evidence to

20   show the necessity of the payments.  Every time there's a

21   payment outside the statutory scheme, you know, we need

22   (indiscernible) any (indiscernible) --

23           THE COURT:  No, no, no, I agree.  I'm looking for

24   it.

25           MR. NGUYEN:  And then, in addition to that, in the

```
 1    proposed order, there's going to be a redline for the

 2    critical vendor, there's going to be a mechanism that allows

 3    people to know which critical vendor gets paid.  And then

 4    there's a billing objection period that we put in the order

 5    to allow other creditors who object.  And then there's

 6    potential claw back from the critical vendor.  And that --

 7    you're going to see it once we submit the proposed --

 8            THE COURT:  The claw back, if someone doesn't

 9    provide ordinary --

10            MR. NGUYEN:  Correct, Your Honor.  Or they can

11    challenge the critical nature of that particular vendor.

12            THE COURT:  Yeah.

13            MR. NGUYEN:  It's going to be in a proposed order

14    that Mr. Battaglia's going to file.  And as to the cash

15    collateral, I just wanted to make sure the Court understands

16    that we -- the U.S. Trustee, we do have concerns with the

17    underlying transaction.  I said it on Monday.

18            THE COURT:  Mm hmm.

19            MR. NGUYEN:  It is an affiliate insider debt.

20    When you look at the breakdown of the company, you know, 20

21    percent essentially is owned by Dr. Jones and Alex Jones'

22    wife.  The other 80 percent is indirectly owned by another

23    company that Alex Jones has a majority stake in, someone --

24    there is dealing between parties who are -- you know,

25    there's an insider here.  They're dealing with family
```

1    members.  We pay particular important attention to it.

2          And I think it's particularly important for

3    someone to be able to take a look at this lien and be able

4    to tell the Court whether we have a legitimate debt or not.

5    And I think that's one of the burden that Debtor needs to

6    prove.  It's that before you can actually approve the use of

7    cash collateral, you've got to prove that there's an

8    underlying debt and it needs to be a valid debt.

9          There's a lot of discussion about Tort Committee.

10   On Monday, I mentioned that, you know, this is not your

11   typical Sub Chapter 5 case.  You usually don't have a $60

12   million loan in a Sub Chapter 5 case.  You don't have $62

13   million in (indiscernible) draws in a Sub Chapter 5 case.

14         And I've always urged the Court to slow the

15   process down, and also consider whether additional

16   protections are needed in this case.  And one of the things

17   I point to is maybe there is a need for a Tort Committee to

18   actually take a look at this loan.  Because usually in any

19   cash collateral case -- in any case where there's a cash

20   collateral, one of the first things I do is I always go in

21   and I preserve the challenge period for the lien for any

22   committee.  That's ordinary.  That's routine.  And any case

23   before you, where I think there's going to be a formation of

24   a committee, we preserve that challenge period.  There's no

25   challenge period here.  Quite frankly, because you know,

007490

1    there's no one who has that standing to bring that challenge

2    to the cash collateral.

3            I'm not advocating one way or the other for the

4    Tort Committee, but I let the Court know, you know, once the

5    Court orders the forming of the committee, my office stands

6    ready, and we will get on it and we will move, and we will

7    have an appointment as quickly as possible.

8            That's all I have to say, Your Honor, and thank

9    you very much.

10           THE COURT:  Thank you.  Mr. Brimmage, good to see

11   you.

12           MR. BRIMMAGE:  Good morning, Your Honor.  It's

13   good to be before the Court.  Marty Brimmage with Akin Gump

14   Strauss Hauer & Feld here on behalf of the Texas Defendant

15   or Texas Plaintiffs as well as the Connecticut Plaintiffs.

16           It's always funny to me when the judge on the

17   bench starts citing a code and starts looking at it and

18   everybody starts scrambling to find their code and remind

19   themselves what it said.

20           But I'm glad you did that because 1102(a)(3) says

21   exactly what you said it did.  Unless the Court for cause

22   orders otherwise --

23           THE COURT:  Mm hmm.

24           MR. BRIMMAGE:  Meaning, the Court can order for

25   cause.

```
 1              THE COURT:  Mm hmm.

 2              MR. BRIMMAGE:  And I think that's exactly what you

 3    have right here, right now.  It doesn't say upon an

 4    evidentiary hearing and findings, and you know, dah, dah,

 5    dah, in a contested matter where there's whatever the Court

 6    finds cause.

 7              It says, the Court for cause.  And I think you

 8    have for cause, for the reasons articulated by the U.S.

 9    Trustee and the reasons articulated in the cash collateral

10    order that you're being asked to consider right now.  There

11    is nobody -- if there -- typically, there's a challenge

12    period at some point, right?  30, 60, 90 days come in and

13    challenge.  There is nobody that could come in and seek

14    standing to challenge that lien right now.  Maybe by design,

15    maybe not.  That is your cause, Your Honor.  You're going to

16    enter a cash collateral order where nobody can challenge the

17    underlying lien.

18              And now, I'm not asking you to prejudge standing.

19    That's a whole different gig and we'll deal with that in due

20    time.  But right here right now, I think you have cause

21    because without it, you need to have a body that can come

22    and seek standing and attempt to prove that they should have

23    standing and go and check out these liens.  As the U.S.

24    Trustee articulated, that doesn't exist right now.

25              So, Your Honor, for all the reasons that have been
```

1    articulated to you right now, I think cause exists, and I

2    think under 1102(a)(3), the Court for cause can order a Tort

3    Committee.

4         You have heard about the litigation that's

5    surrounding and involved in this case.  It's predominantly,

6    overwhelmingly, 99.9 percent related to the Sandy Hook

7    Plaintiffs, whether it's a TUFTA action or it's the

8    Connecticut Plaintiffs or it's the Texas Plaintiffs.  And I

9    don't want to say they're all exactly the same, but they all

10   derive from the same facts and circumstances and the same

11   issues.

12        THE COURT:  Mm hmm.

13        MR. BRIMMAGE:  That is who the Tort Committee I

14   think should be comprised of.  We'll leave it to the U.S.

15   Trustee, who said that he can act quickly.  The U.S.

16   Trustee's Office stands ready to act quickly, so that -- and

17   that's what I think we need, Your Honor, and I think that's

18   what you need.  You need that acted quickly so that this

19   case can be adjudicated on the merits, and that we can

20   determine the validity of that lien once and for all from a

21   body that has the authority to seek standing.

22        And with that, Your Honor, I'd answer any

23   questions the Court may have.

24        THE COURT:  Yeah.  I'm going to sit here and

25   listen to a little evidence now and see where things go.

```
 1                MR. BRIMMAGE:  Thank you, Your Honor.

 2                THE COURT:  Thank you.

 3                MR. LEMMON:  Your Honor, if I may, Steve Lemmon on

 4   behalf of the secured creditor, PQPR.

 5                THE COURT:  Mm hmm.

 6                MR. LEMMON:  I just want to make a couple of

 7   observations, Judge.

 8                THE COURT:  Mm hmm.

 9                MR. LEMMON:  First of all, I started with a 20-

10   page cash collateral order, and -- that had a number of

11   findings, had a number of protections for my client, had all

12   the things that we use.  And I determined that in this

13   particular case, with the level of suspicion that's out

14   there in the world, not evidence right now, but suspicion

15   that's out there in the world, that it'd be inappropriate

16   perhaps to do that, just so we could avoid this kind of

17   problem.

18                I believe that the current cash collateral order

19   is really nothing more than a recitation of what the law is.

20   If my client has a lien and if the cash collateral is being

21   used, then I get a replacement lien to the extent that I

22   have a valid lien.  Nothing in it is a finding that

23   prohibits anybody, any party in interest from challenging

24   the lien.

25                Now, Judge, my observation right now is that right
```

1    now the evidentiary record is nil.  And in this case, I

2    mean, I -- we heard the U.S. Trustee say that they want to

3    perhaps slow things down.  I don't see anything going really

4    fast right now from my perspective in this case.  I'm one of

5    the people with a vacation that is going to bollocks up

6    formal discovery in the next couple of weeks.  And I know

7    that there are other vacations.

8         But I've offered informal discovery, Judge, just

9    so people can assuage some of their fears, some of their

10   concerns so that they can find out what's going on.  And I'm

11   not asking anybody to give up any of their rights right now

12   in connection with this cash collateral order.  It is the

13   most bland cash collateral order I have ever seen in my

14   career.

15        And so, I -- you know, I tried to avoid this fight

16   by giving up all the things I normally would negotiate for,

17   and -- in thinking that we would just address that later in

18   a final order.  This is an interim order.  We're willing to

19   consent to it in order to let this Debtor try its business

20   plan.

21        And that's all I have to say.

22        THE COURT:  Thank you.  Mr. Battaglia, you know,

23   there's one question.  It's related, but not entirely on

24   point.  But I want to make sure I ask you the question.  And

25   it's the question that every judge asks at the beginning of

1    every case.  What does the Debtor hope to accomplish through

2    this Chapter 11 process?

3           MR. BATTAGLIA:  Well, Your Honor, the impetus for

4    filing with the Debtor's just inability to be in two places

5    and fund two trials at one time.  And you know, ultimately,

6    we don't know what the number's going to be in terms of the

7    potential exposure in Connecticut and in Texas.  Eventually,

8    some tribunal is going to give us a number.  Will it be

9    appealed?  I think there's a virtual certainty it's going to

10   be appealed, probably from either side at the end of the

11   day.

12          But this Debtor entity, which has the capacity to

13   generate significant revenue has been harmed by the manner

14   in which it operates.  And by that, let me just -- what I

15   probably said, and my co-counsel's probably getting tired of

16   hearing me.  This is kind of like the garage band that

17   became the boy band overnight, and had his girlfriend

18   running the books, and the head roadie being the business

19   manager.

20          The entity has never -- it's been run like a

21   family business.  It's never had appropriate management and

22   accounting controls.  It's an inverted T as far as

23   management, where a lot of fiefdoms exist and they go to

24   Alex, who wants to run a show.  He's not a business manager.

25          And so, implementing Mr. Schwartz and Jeff Schultz

1    into the process has really changed things considerably in a

2    very short period of time.  There have been a lot of changes

3    in a matter of months, both in the sense of getting the

4    accounting up to date, changing the manner in which product

5    is purchased and sold to increase the revenues, increasing

6    advertising revenue on the program, you know, changing the

7    cost structure in the way that fulfillment is handled of

8    product sales to reduce the overall overhead to the estate,

9    producing the headcount to the estate.  So, a lot of changes

10    have been made that we expect will generate revenue.

11          And if the goal of this bankruptcy at the end of

12    the day is to have FSS be able to pay its creditors, then

13    that effort is worthwhile to everybody in this room.  And

14    so, if you're asking me, what does the plan look like today?

15    I can't tell you.  It's premature.

16          THE COURT:  It's fine.  I wish -- what the -- the

17    estate --

18          MR. BATTAGLIA:  There are so many options that are

19    available out there in this world today, and in terms of

20    raising funds or monetizing this asset that could be

21    explored, depending again on what the numbers turn out to

22    be.

23          THE COURT:  Okay.

24          MR. BATTAGLIA:  So, that's kind of a broad brush,

25    Judge, but --

```
 1              THE COURT:  Okay.
 2              MR. BATTAGLIA:  I do want to say, I'm not clear.
 3    I understand that standing to file an avoidance action is
 4    limited, but I don't understand that these parties don't
 5    already have the right to contest the debt.  Any party can
 6    file an objection to a claim and any party can take 2004,
 7    you know, examinations and, you know, we'll agree to --
 8    we've already agreed to discovery.
 9              So, I'm not sure that as it stands today, in terms
10    of making an initial evaluation of this claim, that they
11    don't already have the standing to do that.  They don't need
12    anything more.  They don't need a Louisiana World Exposition
13    case at this juncture.  And honestly, I mean, the cynical me
14    says I want to get a committee appointed so that the estate
15    can pay for it.  And we can't.  We'll never be able to.
16    We'll kill this case, and all of the promise that Mr.
17    Schwartz is generating through changes and operations that
18    he's made will be for naught.
19              It won't stop Alex Jones from broadcasting.
20    There'll be -- somewhere, a platform for him to continue.
21    So, if the goal here is to silence him, that's simply never
22    going to happen.  It may just kill FSS.
23              THE COURT:  Okay.  And I really want to be clear
24    about this.  We're going to run a case and focusing on the
25    Debtor that's in front of me.  And I understand that there
```

```
 1   are a lot of moving pieces and a lot of folks involved and a
 2   lot of emotions on both sides.  We're going to run a case
 3   and I'm going to leave it there.
 4             MR. BATTAGLIA:  Yes, sir.
 5             THE COURT:  And we'll see where we go.  Why don't
 6   you call -- what evidence do you have to support either
 7   position?  How do you wish to proceed?
 8             MR. BATTAGLIA:  Your Honor, if I can, I'll just
 9   proffer Mr. Schwartz, and he's available and he's in the
10   courtroom.
11             THE COURT:  Oh.  Let me just ask.  Is there any
12   objection to the proffer of the witness?
13             MR. BRIMMAGE:  Your Honor, yes, we --
14             THE COURT:  Okay.  Mr. Schwartz, come on and take
15   the stand.  Let me just -- I'm going to swear the witness
16   in.  Are you -- do you swear to tell the truth, the whole
17   truth, and nothing but the truth?
18             THE WITNESS:  Yes, I do.
19             THE COURT:  Okay.  You may have a seat, sir.
20             Mr. Battaglia, how do you wish to proceed with
21   respect to any exhibits, if you wish to --
22             MR. BATTAGLIA:  I have emailed exhibits to all of
23   the parties last night, and I have a bound version to hand
24   to the witness.
25             THE COURT:  Okay.
```

```
1              MR. BATTAGLIA:  And they're filed on the record.
2              THE COURT:  So, I want to make sure folks can
3    follow online, so if you can -- are they -- is there any --
4    let me ask you this.  Is there any -- let me ask the
5    Connecticut side or the U.S. Trustees.  Is there any
6    agreement on any of the exhibits, or how are we doing this?
7              MR. BATTAGLIA:  May I approach the witness, Your
8    Honor?
9              THE COURT:  Yeah.  Just a second.  I just want to
10   know, what's -- are you providing the exhibits that are
11   filed at Docket Number 26?
12             MR. BATTAGLIA:  Yes, Your Honor.
13             THE COURT:  Okay.  And Connecticut, tell me what
14   they want to do.  On 1 through 26, was there any agreement
15   on any of this?
16             MR. BRIMMAGE:  Your Honor, the Tort Plaintiffs can
17   agree to the admissibility of Exhibits -- Debtor Exhibits 1,
18   2, 9, and 10.
19             THE COURT:  1, 2, 9, and 10?
20             MR. BRIMMAGE:  Yes, Your Honor.
21             THE COURT:  Okay.  That's what there's agreement
22   on.  Mr. Nguyen?
23             MR. NGUYEN:  Yeah.  Your Honor, Ha Nguyen for the
24   U.S. Trustee.  I don't have any objection to Exhibit 1, 2,
25   3, 9, 10, 11, 12.  The rest needs to be -- foundation needs
```

1    to be laid.

2              THE COURT:  You said -- can you repeat those

3    numbers?

4              MR. NGUYEN:  1, 2, 3, 9, 10, 11, and 12.  No

5    objection from the U.S. Trustee for those exhibits.

6              THE COURT:  Okay.  All right.  It looks like there

7    is agreement on 1, 2, 9, and 10.  Everything else, you're

8    going to have to prove up.

9              MR. BATTAGLIA:  Yes, sir.  And 12 does not need to

10   be offered at this point.  It related to a motion the Court

11   has granted.

12             THE COURT:  That's correct.

13             MR. BATTAGLIA:  May I approach the witness, Your

14   Honor?

15             THE COURT:  Yes.  Just for anyone following online

16   on the Docket, you look at the Court's Docket, exhibits that

17   are -- will be shown to the witness -- Mr. Schwartz, I'm

18   going to ask that you let the examination direct you to

19   where you're going in the exhibit list.  You know, some of

20   those exhibits have not been admitted into evidence, and I

21   want to make sure that you just answer the questions that

22   are asked of you.  If there is any objection, I ask that you

23   give me an opportunity to resolve the objection, and then

24   I'll let you know if you can answer the question or not,

25   okay?

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Okay.  All righty.  Mr. Battaglia, you
 3    may proceed.
 4              MR. BATTAGLIA:  Has the witness been sworn, Your
 5    Honor?
 6              THE COURT:  Yes.
 7              MR. BATTAGLIA:  I'm sorry, I didn't hear that.
 8              DIRECT EXAMINATION OF W. MARC SCHWARTZ
 9    BY MR. BATTAGLIA:
10    Q    Good morning, Mr. Schwartz.  Would you state your name
11    for the record?
12    A    Marc Schwartz.
13    Q    Would you turn to Exhibit Number 1?  Is that your CV?
14         (Exhibit 1 received into evidence)
15    BY MR. BATTAGLIA:
16    A    Yes, it is.
17    Q    Is it true, correct, and accurate?
18    A    True, correct, and I believe it is still accurate.
19    Q    Mr. Schwartz, without going into excruciating detail,
20    can you tell the Court who you are and what you do?
21    A    I'm a CPA.  I'm accredited in financial -- certified in
22    financial forensics by the American Institute of CPAs.  I'm
23    a certified fraud examiner from the Association of Certified
24    Fraud Examiners, and I'm a licensed private investigator in
25    the State of Texas.  I have practiced as a CPA since
```

1    approximately 1974, I think.

2         Became involved in working in the bankruptcy world in

3    the 80s with the collapse of the energy and real estate and

4    banking industry in Texas.  And worked in that field, along

5    with my -- I was an auditor in public accounting.  Up until

6    that point, continued as a financial statement auditor --

7    following that, but also worked extensively with litigation

8    and in restructuring and bankruptcy, primarily working for

9    Chapter 7 Trustees.

10        '93 I left my -- the firm I was associated with,

11   started my own practice, and began working as a Chapter 11

12   Trustee for the Southern District and the Western Districts

13   of Texas.  And here with that work, working also as a

14   examiner -- examiner with expanded powers.  And doing civil

15   litigation, financial economic expert witness work.

16        And the -- sometime in the back -- in the dim back --

17   dim past, I was asked to serve as a Federal Court Receiver

18   in a Federal -- in a Federal Trade Commission matter where I

19   was a receiver over two groups of companies that were

20   involved in defending themselves from a FTC matter in

21   Federal Court, and then became involved in and asked to

22   serve as a State Court Receiver.

23        So, today our practice involves Financial Restructuring

24   involving in and out of bankruptcy expert witness work in

25   the civil courts, civil litigation primarily, and as a

1    receiver in Federal and State Court matters.

2    Q    Thank you, sir.  The Judge had asked some questions at

3    the last hearing about the -- your relationship with the

4    InfoW and affiliated bankruptcy cases filed in this Court,

5    so I want to discuss that for a moment.  What was your role

6    in the InfoW cases, and by that I'm referring to all three

7    related entities?

8    A    I was engaged to be the CRO of those companies prior to

9    their filing.

10   Q    And is that case pending today?

11   A    Oh, the bankruptcy is not pending.

12   Q    And why was the case dismissed from your perspective?

13   A    Well, from my perspective the goal of the case was to

14   bring the Texas -- let's refer to the Texas and the

15   Connecticut litigation into a resolution process where we

16   could get the -- liquidation of the damages and develop a

17   plan for that.  The parties -- the Plaintiffs entered into

18   an agreement with us to dismiss their claims against the

19   Debtors with prejudice, ultimately, and as a result of that,

20   they were no longer involved in litigation.  We had two or

21   three minor creditors, which we had handled outside of

22   litigation.  So, if -- that determined to be a lot cheaper

23   to resolve that case by dismissing it, which the U.S.

24   Trustee agreed with, and let us resolve these things outside

25   of the bankruptcy process.

```
 1   Q    And do you recall approximately when the Plaintiffs,

 2   Texas and Connecticut, agreed to dismiss their claims of

 3   prejudice?

 4   A    I'm -- in terms of the approximate date, I don't

 5   recall.  I believe the motion to dismiss, at least one of

 6   them was granted on -- I think it was May 19th, that was on

 7   the Texas Plaintiffs.  I don't -- I'm not recalling the

 8   Connecticut Plaintiffs' date.

 9   Q    Who, at the time the cases were filed, the IW cases

10   were filed, owned the interest in IW?

11   A    Concerning -- (indiscernible) the three companies?

12   Q    Yes, sir.

13   A    It was owned by a trust that had been set up prior to

14   the filing of bankruptcy, which was to be the vehicle for

15   funding, any resolution that could be -- if that had

16   occurred.

17   Q    So, what claims does, or do any of the IW affiliates

18   have against Free Speech Systems as we stand here today?

19   A    None that I'm aware of.

20   Q    What claims does Free Speech Systems have against any

21   of the IW affiliates?

22   A    None that I'm aware of.

23   Q    And how was the Plan to be funded in the IW cases?

24   A    Initially with funds submitted -- injected by Mr. Jones

25   from personal assets of his.  As I recall, it was also to be
```

007506

```
 1    funded, I think once it went effective, with the -- with

 2    revenues provided -- not revenues, with income from --

 3    earned by FSS, which would fund it over a five-year period.

 4    Q    And what was the operative document by which those

 5    revenue contributions were to be made?

 6    A    It was called a Plan -- it was named a Plan Support

 7    Agreement.

 8    Q    Could you turn to Exhibit 3 in your binder, please?

 9    Take a moment and look through it, and when you're done let

10    me know if that's a true and correct copy of the Plan

11    Support Agreement.

12    A    Yes, sir, it appears to be.

13            MR. BATTAGLIA:  Your Honor, I would offer Exhibit

14    3.

15            THE COURT:  Any objection?

16            MR. BRIMMAGE:  (Indiscernible).

17            THE COURT:  All right, a little bit more

18    foundation, Mr. Battaglia.

19            MR. BATTAGLIA:  Yes, sir.

20    BY MR. BATTAGLIA:

21    Q        You're familiar with the books and records of the

22    InfoW entity?

23    A    Entities?  Yes.  Yes.

24    Q    And did InfoWars enter into this agreement -- into a

25    Plan Funding Agreement?
```

1              MR. BRIMMAGE:  Your Honor, (indiscernible).

2              MR. BATTAGLIA:  Your Honor --

3              MR. BRIMMAGE:  (Indiscernible).

4              THE COURT:  Mr. Battaglia?

5              MR. BATTAGLIA:  Your Honor, the witness was the

6    CRO for these entities, and this is a business record, and

7    that's where we're headed.

8              THE COURT:  Okay, just ask him that question.

9              MR. BATTAGLIA:  Sure.

10             THE COURT:  And I'll sustain the objection.

11             MR. BATTAGLIA:  Sure.

12   BY MR. BATTAGLIA:

13   Q        Is this a record that was maintained within the

14   files of the InfoW entities?

15   A     Yes.

16   Q     And were you the custodian of those records?

17   A     Yes, I guess so.

18   Q     And --

19             MR. BRIMMAGE:  Your Honor, (indiscernible) --

20             THE COURT:  Yeah, I -- why don't you just ask a

21   few more questions.  I'm going to sustain the objection, why

22   don't you ask a few more foundational questions.  I think

23   you'll get there.

24   BY MR. BATTAGLIA:

25   Q     So, with respect to the business records of InfoW, you

```
 1    were in physical possession of some of those records, were

 2    you not?

 3    A     Yes, I am.

 4    Q     And is the Plan Support Agreement one of the records

 5    that you maintained physical possession of?

 6    A     Yes, it is.

 7    Q     And you're familiar with the manner and means in which

 8    those business records were maintained within your auspices

 9    as a CRO?

10    A     Yes.

11    Q     And is Exhibit 3 a document that was within your

12    control and held as a business record of IW, and the

13    affiliated entities?

14    A     Yes, it is.

15    Q     And do you recognize Exhibit 3?

16    A     Yes, I do.

17    Q     Is it a true and correct copy of the business record

18    that was the Plan Support Agreement?

19    A     Yes.

20          MR. BATTAGLIA:  I would offer Exhibit 3.

21          MR. BRIMMAGE:  (Indiscernible).

22          THE COURT:  I'm going to overrule the objection.

23    I'm going to admit 3 for what it is.  It's a Plan Support

24    Agreement, and it's a public document as well.  It's been

25    filed on the Docket in the prior case in which it was the
```

1    CRO, so, Mr. Brimmage, you can ask -- you can cross-examine

2    about all that stuff.

3         (Exhibit 3 received into evidence)

4    BY MR. BATTAGLIA:

5    Q    Would you turn to section eight of Exhibit 3?

6         THE COURT:  I do want to make one clarification,

7    and this could be a very hyper-technical point, but the

8    version that's on the Docket is highlighted, and the version

9    that I'm admitting, for the record, that I want a clean copy

10   of it, the version that I'm seeing on Docket 26 has certain

11   language highlighted, and that's not what I'm admitting.  If

12   you're asking me for a publicly filed version of you know,

13   22-6002063, Document 63 without highlights --

14        MR. BATTAGLIA:  Yes, sir.

15        THE COURT:  I'm okay with that.  But if you're

16   asking to admit what you've -- well, the Docket Number 26,

17   that I won't admit, but I'm -- a clean version can be

18   admitted into the record.

19        MR. BATTAGLIA:  Shall I supplement, Your Honor?

20        THE COURT:  Yeah.  Yes, please.

21   BY MR. BATTAGLIA:

22   Q    When you look at the -- Section Eight, what does it

23   provide for?

24   A    It's the termination provision of the agreement.

25   Q    Under the terms under Section Eight, what is your

1    understanding about whether this agreement remains in

2    effect?

3    A    My understanding is the agreement was terminated.

4    Q    And is it true that the bankruptcy cases for the IW

5    entities were dismissed?

6    A    Yes, it is.

7    Q    Is it true that there was no order approving the

8    Litigation Settlement Trustees by April 30, 2022?

9    A    That is correct.

10   Q    And that there was no Plan on file by April 30, 2022?

11   A    That is correct.

12   Q    What is your involvement on behalf of FSS, the Debtor?

13   A    I was hired to be its Chief Restructuring Officer.

14   Q    And, can you turn to Exhibit 2, please?  And this has

15   been admitted into evidence, is that your engagement

16   agreement with Free Speech Systems?

17        (Exhibit 2 received into evidence)

18   A    Yes, it is.

19   Q    And when was that dated?

20   A    It was dated May 19th, 2022.

21   Q    When was it executed?

22   A    I believe it was June 7th.

23   Q    Of 2022?

24   A    2022.  Yes, June 6th, excuse me, of 2022.

25   Q    Can you describe what level of authority over the

```
 1    Debtor and its operations you were afforded under this
 2    agreement?
 3    A    Really, it's absolute authority over the operations.  I
 4    agreed to consult with Mr. Jones on major decisions.
 5    Q    So, who has control over the bank accounts?
 6    A    I do.
 7    Q    Who has control over payroll?
 8    A    I do.
 9    Q    Who has control over hiring and firing of employees?
10    A    I do.
11    Q    Who has control over the records of the Debtor?
12    A    I do.
13    Q    And is it within your unilateral power to hire and fire
14    employees?
15    A    Yes.
16    Q    To open and close bank accounts?
17    A    Yes.
18    Q    Who will be the signatory on the Access DIP account?
19    A    I will be.
20    Q    Anybody else?
21    A    No.
22    Q    Do you have authority to make operational changes
23    within the Debtor's operations?
24    A    Yes.
25    Q    Have you in fact made such changes?
```

1    A    Yes.

2    Q    What role does Alex Jones play in any of the areas

3    we've just discussed?

4    A    Because of his experience, obviously, with the company,

5    and his knowledge of the customers -- and customers -- of

6    the vendors, and the personnel, when he's available to me to

7    consult with to get more guidance information on, if I had a

8    -- several changes I've implementing -- am implementing, I

9    went and said, this is what I'm going to do, do you have a

10   problem with it?  If it is, tell me what that problem is.

11   Q    At the time you were installed as the Chief

12   Restructuring Officer, what was the management structure of

13   Free Speech Systems?

14   A    Someone in the process of this case referred it to --

15   referred to it as an inverted T, and I think that's a good

16   description.  There is Alex, and then there's everybody

17   else.

18   Q    And is that -- in your experience, the way a successful

19   business is, or should be managed?

20   A    No.

21   Q    What was the status of the accounting controls on the

22   date that you became CRO?

23   A    As far as I can tell they were non-existent.

24   Q    Who performed the accounting on behalf of Free Speech

25   Systems?

1    A    At what time?

2    Q    Prior to you becoming a CRO.

3    A    Oh, the 17 months or so prior to my becoming CRO, it

4    appeared to me nobody did.

5    Q    Was there anybody with an accounting degree or

6    background that provided accounting services?

7    A    There was a consultant who had been hired, Mr. Roe,

8    who's a CPA, who provided some advisory consulting services.

9    He was not involved and was not permitted to be involved in

10   the actual accounting process.  The people responsible for

11   maintaining the books and records did not have accounting

12   degrees.

13   Q    What was the state of the company's accounting books

14   when you became CRO?

15   A    2021, I had -- this was on June 6th date.  2021 had not

16   been closed, which means the books were not completed, and

17   year-end closed.  There had been no recording of any entries

18   in 2022 other than automatic downloads from the bank

19   transactions.  So, they were -- 20 -- 2021 was at -- was

20   incomplete and had not -- was not able to produce any

21   financial statements of meaning, and 2022 was untouched.

22   Q    Were you able to find typical accounting reports on

23   your entry in as CRO?

24   A    No.

25   Q    So, balance sheets, income statements, there were no

1  current --

2  A    There were no financial reports that I could -- there

3  were no financial reports at all, that had ever been

4  produced in at least the last 18 months.

5  Q    What, at the time that you became CRO, what was the

6  Debtor's business relationship with PQPR Holdings, Limited?

7  And I'll just call it PQPR.

8  A    At the time I became CRO, PQPR was facilitating the

9  purchase of inventory by FSS.  In addition, PQPR was

10  purchasing and selling its own inventory and FSS was selling

11  PQPR inventory as well.

12  Q    And who to your knowledge owns PQPR?

13  A    Carol and David Jones, who are Mr. Alex Jones' parents.

14  And in -- through an intermediary entity, Mr. Alex Jones

15  himself owns.  So, about -- the -- turns out about 80 -- 72

16  percent of the interest is indirectly owned by Mr. Alex

17  Jones, and the 18 percent balance -- if that's right -- 28

18  percent balance, is owned by Carol and David Jones.

19          MR. BRIMMAGE:  (Indiscernible).

20          THE COURT:  I'm just going to -- I'm going to

21  allow it just as his understanding, and not for the truth of

22  the matter asserted.  All right.  It's a -- just testifying

23  as his understanding of the corporate structure, and I'll

24  allow him to do it.

25  BY MR. BATTAGLIA:

1    Q    So, prior to your joining FSS, what -- how were

2    proceeds of inventory sales allocated?

3    A    I've identified at least two methods.  For a period of

4    years, it appears PQPR purchased --

5         MR. BRIMMAGE:  Your Honor, I hate to interrupt.

6    (Indiscernible).

7         THE COURT:  Yeah, I think you -- yeah, I'm going

8    to sustain that objection.  Well, maybe you can ask a few

9    more background questions there.

10   BY MR. BATTAGLIA:

11   Q    Sure.  Have you reviewed the historical operations

12   between the Debtor and PQPR?

13   A    Yes.

14   Q    And what is your understanding of the allocation of

15   proceeds between PQPR and FSS from inventory sales?

16   A    Up to some date in 2021, which I don't recall the exact

17   date, I think it was in November, PQPR purchased inventory

18   at the request of FSS.  It then marked up that inventory and

19   sold it to FSS, which then marked up the inventory for sale

20   to the public.

21        MR. BRIMMAGE:  (Indiscernible).

22        THE COURT:  I'm going to let you -- I'm going to

23   just allow it just as his understanding of what it is, I'm

24   going to let you explore though -- the door's open.  I'm

25   going to let you explore, sir, where he gained that

```
 1    information.
 2    BY MR. BATTAGLIA:
 3    Q    And based on your review of the books, and your
 4    discussions with -- well, your review of the books and
 5    records and contracts that you've seen, how did that
 6    relationship change?  You said that up until November of
 7    2021 --
 8    A    Yeah, it changed on -- I believe it was November 2021,
 9    to where the -- as opposed to marking up and selling
10    inventory to FSS, they entered into -- the arrangement
11    changed to where FSS would sell the unmarked inventory and
12    receive 20 percent of the proceeds, and 80 percent of the
13    proceeds would be paid to PQPR.
14    Q    How does the Debtor -- or how, I guess, how does the
15    Debtor effectuate sales transactions?
16    A    It's almost all over the internet.
17    Q    So --
18    A    Credit card charges by the -- through the internet.
19    Q    And, what did the Debtor pay for credit card
20    processing, prior to your involvement?
21    A    Prior to my involvement, it was paying in total about
22    14.5 to 14.9 percent.  Four point -- well, there was 10
23    percent going to a facilitator, if you will, and the balance
24    of that 14.9, 14.8, whatever it was, goes to the actual
25    credit card processor.
```

```
 1   Q    Why was the Debtor paying such a high rate?

 2   A    Because it needed to -- they had been de-platformed and

 3   had lost its credit card processor, so the facilitator was

 4   brought in as an intermediary to receive the proceeds from

 5   the credit card processor, and to be in fact the face that

 6   the Fed credit card processor saw, and it then distributes

 7   the money, the funds, to PQPR and FSS.

 8   Q    How were sales fulfilled, and what do you understand

 9   when I use the word fulfilled?

10   A    Yeah, what do I understand, you mean?

11   Q    Yes, yes.

12   A    Yes, well, fulfillment was and to me is once the

13   customer places an order, that someone has to go pull

14   merchandise out of the warehouse, package it, box it, put

15   postage or whatever you'd use, whether it's UPS, the UPS

16   stamp on it, there's -- put a sticker on it, and ship it to

17   the customer.  So, fulfillment's that process of -- but also

18   includes here, warehousing, managing the warehouse with

19   product in it, and that -- that is -- from when it's

20   received to the warehouse to when it's shipped to the

21   customers is fulfillment.

22   Q    And who employed the individuals that were doing

23   fulfillment prior to you becoming CRO?

24   A    FSS employed -- well, FSS employed them for a period of

25   time, and then they were transferred -- excuse me.  FSS uses
```

1   ADP for its payroll.  These employees were on that payroll.

2   Subsequently, they're then charging the fulfillment payroll

3   to PQPR, although they stayed -- still stayed on -- on the

4   FSS ADP payroll account.

5   Q    Let's turn and talk about what's happened since you

6   became the CRO.  Can you tell the Court where the Debtors

7   stands in its accounting records currently?

8   A    Well, we've closed through May 2022, those were

9   included -- those financials were included in the material

10  we filed in connection with the bankruptcy.  The -- June,

11  we've gotten all the transactions in, we have to go back and

12  do closing review and make sure that we've -- well, one

13  thing we did and critical, we got the bank accounts

14  reconciled.  I forgot to mention, there'd never been a bank

15  -- there hadn't been a bank account reconciliation we could

16  find, so we reconciled the bank accounts through May.  I

17  believe July's are done also.

18       So, we're current, we've produced financial statements,

19  we have not yet started working on we've -- going down and

20  digging up, producing managing accounting statements, but

21  we've got the primary financials done.

22  Q    Okay.  And who is responsible, primarily responsible

23  for maintenance of the accounting records for FSS?

24  A    Right now it's -- you mentioned Mr. Schultz, as I hired

25  Mr. -- we hired -- FSS hired Mr. Schultz to come in and take

1    over as business manager.  But the actual

2    bookkeeping/accounting work is being taken over by -- so, of

3    my low -- my personnel, my bookkeeping personnel, until we

4    get a bookkeeping service in place there.  So, the

5    accounting was handled by, essentially us through -- as FA's

6    and by the business manager.

7    Q    And are you familiar with Mr. Schultz's accounting

8    qualifications?

9    A    Yes.

10   Q    And what are they?

11   A    He has a bachelor's degree in accounting from

12   University of Houston.  He served as a CFO -- I mean, not

13   immediately, but through a period of years, and most

14   recently, CFO, and then CEO of companies, so he's very

15   knowledgeable of that -- accounting and financial reporting

16   aspects.

17   Q    Earlier you talked about prior relationship with PQPR,

18   has it changed?

19   A    Yes.  The entered -- FSS and PQPR entered a new

20   agreement under which sharing ratios changed, where FSS

21   inventory -- FSS gets 90 percent of the proceeds from the

22   sale of it, PQPR gets 10 percent, and inventory that is

23   acquired by PQPR for its own account, they -- and if it's

24   sold, it's 80 percent of that goes to PQPR, and 20 percent

25   goes to FSS.

1    Q    And in the process of changing that relationship, what

2    was done regarding the credit card processing costs?

3    A    I -- one of my -- I insisted that that be reduced, and

4    it was negotiated down to four percent.

5    Q    So four plus the 4.9 charged --

6    A    Correct.

7    Q    -- by the banks.

8    A    Yeah, this is for the intermediary, four percent, and

9    then the 4.9, is their regular bank processing charge.  And

10   that, by the way, varies by the type of credit cards used.

11   Q    Turn to Exhibit 8, please.  Tell the Court what that

12   is.

13   A    This is the Forbearance Agreement entered into on July

14   10th of 2022.

15   Q    And were you involved in negotiation and drafting of

16   this document?

17   A    Negotiating the document and reviewing the draft, yes.

18   Q    And is this a true and correct copy of the Forbearance

19   Agreement entered into between the parties?

20   A    Yes, it is.

21        MR. BATTAGLIA:  Your Honor, I would offer Exhibit

22   8 into evidence.

23        THE COURT:  Any objection?  It's admitted.  26-8

24   is admitted.

25        (Exhibit 8 received into evidence)

```
 1              MR. BATTAGLIA:  Thank you, Your Honor.

 2    BY MR. BATTAGLIA:

 3    Q    Have there been any changes in the manner in which

 4    fulfillment of product sales is handled?

 5    A    Yes.

 6    Q    What are those changes?

 7    A    A significant one was prior to filing bankruptcy, we

 8    engaged a third-party fulfillment service to take over

 9    fulfillment for FSS's and PQPR's products, and FSS's

10    products.

11    Q    Who employs the individuals who actually pull product

12    and ship it?

13    A    The fulfillment service we hired.

14    Q    And how do you pay fulfillment?  Is it a flat rate per

15    month, or what's the term?

16    A    It's a flat rate per shipment.

17    Q    And overall, shifting to this vehicle, what's the

18    effect on the Debtor's expenses?

19    A    It -- based on my analysis, it should be a push in the

20    sense that there should not be much of a net increase, if

21    any, and cost -- of the actual cost, the fulfillment should

22    be -- improve our efficiency though, because that would be

23    not something that we have to manage and worry about.

24    Q    And would that answer change if volumes increased

25    significantly?
```

1    A    No, it should not.

2    Q    Let's talk about --

3    A    Let me stop.  It may actually it probably -- if volumes

4    increase, our cost of fulfillment per dollar may actually go

5    down, could go down.

6    Q    I want to talk about the PQPR debt now.  As the Chief

7    Restructuring Officer, do you control the business records

8    of FSS?

9    A    Yes.

10   Q    And are you familiar with the business records of FSS?

11   A    Yes.

12   Q    And the manner in which they're maintained?

13   A    Yes.

14   Q    Do you recognize Exhibit 4?

15   A    Yes.

16   Q    What is it?

17   A    The promissory note dated August 13th, 2020 between

18   Free Speech Systems, LLC and PQPR Holdings Limited, LLC.

19   Q    Is this a true and correct copy of the promissory note

20   that is within the business records of the Debtor?

21        MR. BRIMMAGE:  Your Honor, (indiscernible).

22   Hearsay.  (Indiscernible) prove this up.  (Indiscernible)

23   and any further testimony (indiscernible).

24        MR. BATTAGLIA:  Your Honor, if I may respond?

25        THE COURT:  Yes, please.

```
 1              MR. BATTAGLIA:  It's an absurd suggestion that a

 2    custodian is ineligible to testify to the authenticity of a

 3    business record, and that what one must do is find someone

 4    who is employed by the Debtor as the custodian back at the

 5    time the document was originated.  There is no requirement

 6    that a party -- that a custodian be a signatory to every

 7    document, that's equally an absurd evidentiary requirement.

 8    There's no way business records would ever come in if those

 9    requirements were required.

10              MR. BRIMMAGE:  (Indiscernible).

11              MR. BATTAGLIA:  He can authenticate a business

12    record, which is what he's done.  And legal documents are

13    business records, just as accounting records are, and any

14    other document within the control of an entity of a party.

15              MR. BRIMMAGE:  (Indiscernible).

16              THE COURT:  I'm going to admit it as a business

17    record.  I think custodian doesn't need -- just that the

18    reports that are -- it just has to be a circumstantial

19    guarantee of trustworthiness of the document, and it can be

20    brought in by someone who was just a custodian, and he's the

21    CRO.  The question that I have for you, Mr. Schwartz, is

22    when did you first view this -- have you ever viewed this

23    document before today?

24              THE WITNESS:  Oh yes, I have.

25              THE COURT:  When did you view this document for
```

```
 1    the first time?  Do you recall what month?
 2              THE WITNESS:  I would have -- June of this year.
 3              THE COURT:  Okay.
 4              THE WITNESS:  I would say early June.  I'd have to
 5    look back at my time record so you can tell (indiscernible).
 6              THE COURT:  No, it's one and the same.  I'll admit
 7    it.  It's --
 8         (Exhibit 4 received into evidence)
 9              MR. BRIMMAGE:  Your Honor, (indiscernible).
10              THE COURT:  I'll let you take him up on cross.
11    I'm going to let you take him up on cross.
12    BY MR. BATTAGLIA:
13    Q    Can you turn to Exhibit 5, please?  Can you tell the
14    Court what that is?
15    A    This is a security agreement entered into between PKR
16    Holdings and FSS, dated August 2020.
17    Q    That's your --
18    A    Yes, I'm sorry.
19    Q    Sorry.  And have you seen this document before?
20    A    Yes.
21    Q    Would it be true you saw it at or about the same time
22    you saw the prior exhibit?
23    A    Yes.
24    Q    Does this appear to be a true and correct copy of the
25    document that is maintained within the business records of
```

```
 1    Free Speech Systems?

 2    A     Yes.

 3          MR. BATTAGLIA:  Your Honor, I would offer Exhibit

 4    5.

 5          MR. BRIMMAGE:  Objection.

 6          THE COURT:  Yeah, I understand.  I'm going to

 7    admit it as a business record, but -- and I know you're

 8    going to have questions for -- and I'm going to let you ask

 9    those questions about the scope of his knowledge of it, this

10    document, and questions about it.  It's in evidence, so you

11    get to ask questions about it, and it's relevant to the cash

12    collateral motion and critical vendors.  So, you may

13    proceed, counsel.

14          (Exhibit 5 received into evidence)

15          MR. BATTAGLIA:  Thank you, Your Honor.

16    BY MR. BATTAGLIA:

17    Q     Could you turn to Exhibit 6, please?

18    A     Yes, sir.

19    Q     And can you tell the Court what that is?

20    A     This is another promissory note that's been dated

21    November 10th, 2021 between Free Speech Systems and PQPR

22    Holdings in the amount of 25,300,000.

23    Q     And does that -- have you seen this document on or

24    about the same time as you responded to the preceding

25    documents?
```

```
 1    A    Yes.

 2    Q    And does this appear to be a true and correct copy of

 3    that promissory note that is within the business records of

 4    the Debtor?

 5    A    Yes, it is.

 6              MR. BATTAGLIA:  Offer Exhibit 6.

 7              MR. BRIMMAGE:  (Indiscernible).

 8              THE COURT:  Understood, overruled.  It's admitted.

 9         (Exhibit 6 received into evidence)

10    BY MR. BATTAGLIA:

11    Q    Can you turn to Exhibit 7, please?  Can you tell the

12    Court what that is?

13    A    This is a copy of UCC financing statement, November

14    18th of 2020 for --

15    Q    And was this -- did you see this document for the first

16    time about the same time as the preceding documents?

17    A    Yes.

18    Q    And is this document maintained as a business record in

19    the Debtor's files and records?

20    A    Yes.

21    Q    Does this appear to be a true and correct copy of the

22    UCC 1 financing statement?

23    A    Yes.

24    Q    Does it bear a filing number with the Secretary of

25    State's office?
```

1    A    Yes, it does.

2            MR. BATTAGLIA:  Offer Exhibit 7.

3            THE COURT:  Any objection?  It's admitted.

4        (Exhibit 7 received into evidence)

5    BY MR. BATTAGLIA:

6    Q    If you would turn to Exhibit 9 and keep your finger on

7    Exhibit 10.

8    A    Yes, sir.

9    Q    Okay, do you recognize Exhibit 9?

10   A    Yes.

11   Q    What is it?

12   A    This is a copy of the 13-week cash flow forecast that I

13   had prepared for Free Speech Systems.

14   Q    Now, we're here today on an interim motion, can you

15   turn to Exhibit 10 please, and keep your finger on 9?

16   A    Yes, sir.

17   Q    What is that?

18   A    Exhibit 10 is a blow up of the first three weeks of the

19   cash flow forecast on Exhibit 9.

20   Q    They're identical in terms of the numbers displayed for

21   the three-week period, yes?  Go back to 9.  Would you tell

22   the Court generally what authority you're seeking today, to

23   use cash collateral today?  What do you want to pay?

24   A    The bills.

25   Q    A little more detail.

```
 1    A     The bills and the cost of operating the Debtor.

 2    Q     Payroll?

 3    A     Payroll, lights, electricity, a lot of

 4    telecommunications or internet-related vendors who provide

 5    the backbone for the telemarketing and the production or --

 6    of the show, if you will.

 7    Q     What about product cost?

 8    A     There's some product cost in here.

 9    Q     There's one entry in here of a $250,000 proposed

10    payment to PQPR.  Can you tell the Court what that's for?

11    A     Yes, PQPR advanced $750,000 towards the purchase of

12    inventory --

13    Q     Advanced to who?

14    A     Advanced to FSS towards the purchase of merchandise

15    inventory.

16    Q     Did they advance to FSS or to the supplier?

17    A     The money was paid to a supplier as part of a million-

18    and-a-half-dollar prepayment that was made to -- in order --

19    to order inventory from that supplier.

20    Q     Why is it advantageous to pay to acquire -- and there's

21    two installments to pay for inventory, are there not?

22    A     Well, there are --

23    Q     PQPR inventory, I'm sorry.

24    A     Now, I'm confused.

25    Q     Okay.  So, there's a $250,000 payment --
```

```
 1   A     Oh, yes.  There's --

 2   Q     -- included in the budget.

 3   A     There's $250,000, and there's subsequently a $500,000

 4   payment in the budget to repay PQPR for that $750,000.

 5   Q     Why is it advantageous for FSS to acquire that

 6   inventory that PQPR is purchasing?

 7   A     Because PQPR essentially was out of -- not PQPR.  FSS

 8   was out of inventory essentially, of any -- of that was

 9   high-value and had a high marketability to it.  And that had

10   to be replaced in order to make this plan work and make the

11   company work.  So.

12   Q     What does the Debtor get if its PQPR products sold

13   through the Debtor's sales channel?

14   A     Well, this is -- this -- well, I mean, it depends on

15   what -- which way you look at this.

16   Q     If you didn't buy it.

17   A     If we didn't buy it, that PQ -- wait a minute.

18   Q     If FSS did not pay this $250,000, what would this --

19   how would the sales proceeds be allocated?

20   A     80 percent PQPR, 20 percent Debtor.

21   Q     How are they allocated if you're allowed to purchase

22   the inventory from PQPR?

23   A     10 percent PQPR, 90 percent Debtor.

24   Q     And what's the markup on products of the type that are

25   being purchased?
```

```
 1   A    300 to 400 percent.

 2   Q    In your business judgment, is it better to pay the 250

 3   or not pay the 250 to PQPR?

 4   A    It's better to pay the 250.

 5   Q    So, in coming up with these projections, can you

 6   describe for the Court a little bit what your basic

 7   assumptions are?

 8   A    The inventories that we -- that were acquired, and that

 9   are being rolled into the sales, they're being shipped in at

10   intervals as they're produced.  We had a one shipment about

11   two weeks before filing, three weeks before filing.  We had

12   a second shipment within a -- the week before filing.  As

13   those products come into the warehouse, Alex Jones starts

14   pushing them on the shelf, and we can see a marked increase

15   in daily sales, we get daily sales reports.

16        And so, what we did in watch -- and I did in watching

17   these, and one of the things I asked for was give me time to

18   see the impact of these sales.  We were able to see a

19   various -- an increase, definitely an increase, significant

20   increase in daily sales.  So, prior to filing, just prior to

21   filing, let's just look at the last five business days of

22   sales, and that's what we use as our base.  As we're -- have

23   more product coming in, we're seeing they -- these are

24   increasing sales, and they're being attracted to the market.

25        And I said, okay, well take that times 125 percent and
```

1   that will be our weekly sales budget, and we should be able

2   to accommodate that.

3   Q   Do you -- would you tell the Court; do you perceive

4   that as aggressive or a conservative income budgeting?

5   A   I see it as conservative.  We had -- this was two of

6   the six products, which we're still operating with these two

7   products.  The next one's coming in next week.  So, we've

8   got a layering effect coming, but -- on this, but it's not

9   at all what I consider aggressive.  If you ask Mr. Jones,

10   his -- he -- and he has the experience, he believes he'll be

11   substantially -- these are substantial understatements.

12         MR. BRIMMAGE:  (Indiscernible).

13         THE COURT:  Sustained.

14  BY MR. BATTAGLIA:

15   Q   Can you tell the Court, is there a correlation between

16   sales and Mr. Jones' broadcasting, or someone else, or a

17   repeat broadcast?

18         MR. BRIMMAGE:  (Indiscernible).

19         THE COURT:  We'll see what he -- let's hear his

20   answer.

21  BY MR. BATTAGLIA:

22   Q   Have you examined that to determine whether there's a

23   correlation?

24   A   Have I examined it?  I have -- I've had -- there are

25   people at FSS that keep track of that information.  So --

```
 1    Q    And have you looked at that information to --

 2    A    Yes.

 3    Q    -- make a determination?

 4         THE COURT:  And I don't think you answered the

 5    question.  Why don't you ask the question again.  I don't

 6    think you actually answered the question.

 7         MR. BATTAGLIA:  I'm not sure I remember precisely

 8    what the question was, Judge, I'm sorry.

 9         THE WITNESS:  Is there a correlation?

10         THE COURT:  Yeah, is -- well, is there a

11    correlation, and --

12    BY MR. BATTAGLIA:

13    Q    Have you reviewed books and records to see if there's a

14    correlation between sales when Mr. Jones' on air or not?

15    A    Well, I've asked, what is the correlation; and I've

16    been told what it is.

17         THE COURT:  That's -- you're not answering the

18    question.  The question is, have you reviewed documents to

19    determine whether there's a correlation?  It's --

20         THE WITNESS:  I have not received a document at

21    this time.

22    BY MR. BATTAGLIA:

23    Q    You have an understanding of whether there's a

24    correlation between when Mr. Jones is on the air or not?

25    A    Yes.
```

```
 1   Q    What is that understanding?

 2             MR. BRIMMAGE:  (Indiscernible) I've been told.

 3             THE COURT:  Yeah.  I'm going to -- I guess the

 4   question that would then follow is what is your

 5   understanding based on?  And that's going to then inform

 6   what your answer will be.  You said you had -- you developed

 7   an understanding of it.  You haven't reviewed a document,

 8   but you've developed an understanding.  What is that

 9   understanding based on?

10             THE WITNESS:  The person in charge of e-commerce

11   which track -- and he -- one of the things he does is he

12   tracks daily sales of product and tracks hours of all people

13   on the air, but particularly, he'll actually focus on Alex

14   Jones.  And when Alex Jones is not on the air, we see a 30 -

15   - we could see a 30 percent drop in sales.

16             THE COURT:  Yeah, but what --

17             THE WITNESS:  That's what he's --

18             THE COURT:  You're saying we.

19             THE WITNESS:  (Indiscernible), sorry, Your Honor.

20             THE COURT:  No, no, no, I mean we as in -- you

21   said you haven't reviewed a document, so what's that based

22   on?  That 30 percent?  Is that based on something someone

23   told you?

24             THE WITNESS:  Correct, that's based on Mr. Roddy's

25   data that he maintains.
```

1          THE COURT:  Have you reviewed that data?

2          THE WITNESS:  I -- no, I've actually been tied up

3    getting ready for this hearing.

4          THE COURT:  Okay.  I'm going to sustain the

5    objection.

6    BY MR. BATTAGLIA:

7    Q    If you are not authorized to use cash collateral today,

8    what's the -- going to be the effect on the Debtor's

9    business?

10   A    As I think I mentioned earlier, we have about 800,000

11   of cash that is not cash collateral, so we can pay our bills

12   this first week it looks -- I believe.  We could pay a --

13   most of our bills this first week, not all of them.

14   Q    And if you don't pay your bills, what's going to happen

15   to the Debtor?

16   A    It depends on which ones we don't pay, but it's going

17   to be a -- if we can't pay critical -- the critical vendors,

18   then we will be shut down.

19   Q    Well, let's turn and talk about critical vendors.

20          MR. BRIMMAGE:  Your Honor, (indiscernible).

21          THE COURT:  That's just this -- I'm going to --

22   I'm just going to (indiscernible) it -- that wasn't based on

23   any evidence, I think he's going to have to testify as to

24   why, give me a little bit more as to why.  But he's allowed

25   to say what he thinks.  Why he thinks that I think is

 1    probably the more relevant question, and I think we'll get

 2    there.  I think that's where Mr. Battaglia is going anyway.

 3              MR. BATTAGLIA:  Yes, actually I was going to turn

 4    to critical vendors, they're very related, but I'll just ask

 5    that question now and put it to rest.

 6              THE COURT:  Well --

 7    BY MR. BATTAGLIA:

 8    Q    Why do you think that it would shut the business down?

 9    A    Well, if we can't broadcast, we can't sell.  So, if we

10    lose a vendor who's critical to our ability to broadcast, if

11    we can't operate our e-commerce platform, we can't sell,

12    even if we could broadcast.  If we can't fulfill orders,

13    then we're not going to be able to fulfill what we've been

14    paid for, and those revenues have to go back to those --

15    will have to go back to those customers.  So, it's -- and

16    all of these are -- we're, you know, the company's in a

17    situation right now where there's not a lot of breathing

18    room.

19    Q    Let's pick an example, it's one of the critical

20    vendors.  Do you know who Cloudflare Inc. is?

21    A    I have a bit of knowledge about Cloudflare, yes.

22    Q    What do they do?

23    A    They're part of our e-commerce platforming.

24    Q    And they provide security for purchasers, right?

25    A    Right.

1   Q    And for transactions over the internet?

2   A    Right.

3   Q    What happens if Cloudflare does not continue providing

4   services?

5   A    We're out of business.  We're shut down.  We're not out

6   of business, we're shut down until we can find a

7   replacement, if we can find one.

8   Q    There are other vendors who are identified as

9   providing, I'm going to call it internet access, I'm not a

10  troglodyte, but I'm only marginally above that, but let's

11  say contact to content users, you know who I'm talking

12  about, internet providers, satellite providers, and the

13  like.  What happens if the Debtor is unable to pay those?

14  A    The same thing, we're shut off.  We can't -- if you

15  don't have access to the satellite, you can't broadcast.

16  Q    What happens if the Debtor's unable to pay its

17  employees?

18  A    Well, I suspect that would be, it was a big issue with

19  the ability to keep going if we don't have any employees.

20  Q    If you would please turn to Exhibit 11.

21       THE COURT:  Mr. Battaglia, you were talking about

22  critical vendors, and then you talked about employees.

23       MR. BATTAGLIA:  Your Honor, I was just using the

24  critical vendors as an example of some of the uses of cash

25  collateral.  Obviously, they're critical vendors as well,

```
1    and I'll get to the critical vendors here.
2              THE COURT:  Okay.  But --
3              MR. BATTAGLIA:  Separately.
4              THE COURT:  -- are the employees viewed as
5    critical vendors?
6              MR. BATTAGLIA:  No, sir, but they're being paid
7    under the cash collateral budget.
8              THE COURT:  Okay.  Okay.
9              MR. BATTAGLIA:  And that was my point.
10             THE COURT:  I just wanted to make sure that we
11   were clear.
12             MR. BATTAGLIA:  Yes, sir.
13   BY MR. BATTAGLIA:
14   Q    You got Exhibit 11 in front of you?
15   A    Yes, I do.
16   Q    And do you recognize this document?
17   A    Yes, I do.
18             MR. BATTAGLIA:  Your Honor, this is attached to
19   the motion and/or order that were filed requesting the
20   authority to pay critical vendors.
21   BY MR. BATTAGLIA:
22   Q    Is this a true and correct copy of the list of vendors
23   that you proposed to have authority to pay under the
24   critical vendor motion?
25   A    Yes, it is.
```

1    MR. BATTAGLIA:  Your Honor, I would offer Exhibit

2    11 into evidence.

3    THE COURT:  Any objection?

4    MR. BRIMMAGE:  (Indiscernible).

5    THE COURT:  Okay.  It show for -- what truth of

6    the matter is asserted, it is a -- I can just admit it -- or

7    I'll accept it for the purpose of these are the -- that you

8    seek to pay.  And those are the amounts that you believe

9    that you need to pay them.

10    (Exhibit 11 received into evidence)

11    MR. BATTAGLIA:  That's fine, Your Honor.

12    BY MR. BATTAGLIA:

13    Q    So, there's a list of, I see 20 vendors here.  I want

14    to talk, first of all, generally about FSS's ability to

15    identify and contract with suppliers of goods and services.

16    Generally, in -- do you have an understanding as to whether

17    or not it's easy for this Debtor to replace vendors?

18    A    Yes.

19    Q    What is that understanding?

20    MR. BRIMMAGE:  (Indiscernible).

21    THE COURT:  I don't know.  Overrule it to the

22    extent of -- I want to hear it, how do you?  You can answer

23    the question.

24    BY MR. BATTAGLIA:

25    A    Yes, I do.

1    Q    What is that understanding?

2    A    It can be very difficult.  The -- starting around, I

3    think 2018, but -- today, I'd say today, if we lose a

4    vendor, it can be hard to find a replacement vendor.  Most

5    recent examples I'm aware of are the impact on the bank card

6    processing, where we ended up having to get an intermediary

7    vendor, if you will, to shield the processor from our

8    identity, if you will.  The -- (indiscernible) are unable to

9    find a bank to bank with, going from one of the big

10   international banks to a small rural, Texas State bank.

11        Even an issue of me trying to transfer our banking to

12   Access, which is a major bank on the east coast.  It's

13   actually a savings institution, does a lot of work in the

14   bankruptcy field.  And I wanted to move our banking there

15   prior to filing so that we could easily just transition

16   right into the DIP accounts without changing anything.  And

17   they concluded they would not do it per the bankruptcy

18   without an order from the Bankruptcy Court, and I could not

19   a -- they would not open the banking.  And they require that

20   I be the single signatory, period.

21   Q    Have you had experience attempting to replace the

22   controller position or bookkeeper position?

23   A    Yes, it has been very hard.

24   Q    Why?

25   A    The company's located in Austin, Texas.  And they've

1   had real trouble with finding companies who would be willing

2   to be associated with FSS in Austin, Texas.  And finding

3   somebody (indiscernible) accept having an FSS on their

4   resume.  We just lost one employee, he's coming back as a

5   consultant, contract employee.  He did not want FS -- he

6   wanted to get FSS off his resume.

7   Q    So, understanding that there's -- due to Alex Jones'

8   notoriety, there are limitations on the pool of suppliers of

9   goods and services; is that a fair statement?

10           MR. BRIMMAGE:  (Indiscernible).

11           THE COURT:  Sustained.

12   BY MR. BATTAGLIA:

13   Q    What is your understanding about the effect of Alex

14   Jones' notoriety on the ability to attract alternate

15   suppliers of goods and services?

16   A    It makes it difficult.

17           THE COURT:  Can I tell you on the critical vendor,

18   and for my purposes, Mr. Battaglia, I -- maybe you can focus

19   on -- I'm say, (indiscernible) to go into this question for

20   me, Mr. Battaglia, maybe I can ask the witness, but there

21   are three insurance providers, there's -- right?  There's a

22   -- there are three insurance providers here.  Someone who

23   does trash service, and someone that does the alarm service.

24   But I don't think you need to focus on those.  I mean,

25   unless -- but you tell me the insurance was all paid up, so

1    what is this insurance?

2         MR. BATTAGLIA:  I think they are periodic

3    installments, Your Honor, based on --

4         THE COURT:  Okay.

5         MR. BATTAGLIA:  -- the size of these.

6         THE COURT:  Okay.  All right.

7         MR. BATTAGLIA:  Your Honor, I'll -- and I'll focus

8    on the larger ones, and --

9         THE COURT:  No, I just, to me -- I can --

10   (indiscernible) can object if they want, but I don't think

11   they will.  I suspect they're more focused on the analysis

12   that went into creating this list.  But if you're telling --

13   yeah, the Debtor wants insurance, and maybe that's the

14   better answer for that.  And you've got to maintain

15   insurance.  And you can tell me why you need to maintain the

16   insurance, and that will probably get me over the hump on

17   those.  But maybe you can ask questions.  I think you've

18   already touched on Cloudflare, but maybe you can talk a

19   little bit about what Amazon Web Services does and the

20   security folks.

21        MR. BATTAGLIA:  Yes, sir.

22        THE COURT:  Okay.

23   BY MR. BATTAGLIA:

24   Q    If you'll look at Exhibit 11, and I'll just kind of run

25   down and focus on some of the more substantial -- what does

1    Amazon Web Services provide?

2    A    They do what it says, they provide our web services.

3    Amazon has a huge commercial web service operation they

4    developed for their own internal use for selling a product,

5    and which they now make available to third-parties.

6    Q    Yeah.  How important is that to Debtor's ongoing

7    operation, to maintain that relationship?

8    A    Again, it's critical, it's another component to get to

9    the -- get up -- get to the customers is having access to

10   commercial web services.

11   Q    ATXHD is a satellite uplink why are they critical to

12   the Debtor's business?

13   A    Again, to broadcast across United States is done by

14   satellite.

15   Q    And what happens if they terminate services?

16   A    We won't be broadcasting across the United States until

17   we find an alternative.

18   Q    Austin Security and Investigation is $28,000.  Why is

19   security vital to this Debtor?

20   A    Security's vital because the company and Mr. Jones are

21   extremely in the public eye, and they are extremely

22   controversial.  So, we have -- or FSS has armed security 24

23   hours a day, seven days a week in their facilities.

24           THE COURT:  Is this armed security in the

25   building?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  Okay.

3              THE WITNESS:  And the buildings, there's no names

4     on the buildings.

5              THE COURT:  Okay.

6              THE WITNESS:  When you drive by you don't know

7     what's in there.

8     BY MR. BATTAGLIA:

9     Q    Cloudflare you've touched upon, so let's move to the

10    next largest one.  Getty Images, Inc., you -- tell the Court

11    what that's for?

12    A    Getty Images is a major supplier.  Think about any

13    program, talk show, whatever you've seen on television,

14    they'll bring up pictures of this, that, or the other.  They

15    get it from Getty, so it's for content for the show.  At

16    least, the shows are -- if you haven't watched one, are

17    operated as talk shows.  So, images, clips, et cetera are

18    all a very important part of the production.

19    Q    Hay Vision Network Video.  What do they do?

20    A    This is, again, I've moved a little bit up the

21    technical ladder of streaming bandwidth, which I really

22    didn't know anything about, but I know a little bit more

23    now.  But essentially, having the bandwidth to push out.  If

24    you think about streaming video and it stops and starts and

25    stops and starts, well, the bigger the bandwidth you get,

1   the better that experience is.  So, that provides the

2   ability to stream a lot of gigabytes of visuals and sound

3   out to the market.

4   Q   And if the Debtor didn't have that added bandwidth,

5   what effect would it have on the experience?

6   A   It would again, the shows would be absolutely

7   unwatchable.

8   Q   With respect to the smaller dollar items in here, are

9   each of them, to your opinion, vital to the continued

10  operations of the Debtor?

11  A   Yes.

12  Q   With respect to the insurance, can you give the Court a

13  flavor as to why those are one of the relatively minor, but

14  -- let's see towards the bottom, the Hartford, and

15  Travelers, I think there's two.

16  A   Hartford, Travelers, and then there's the Frost.  Just,

17  you know, this capacity of having insurance for the property

18  and casualty insurance on the assets.  There is a tremendous

19  investment in -- there are four studios onsite and the

20  technology in each one of those is quite large and

21  expensive.  There's a lot of dollars there to be insured and

22  protected.  If something happens, a fire in the building,

23  whatever, that's a lot of assets we've got to protect.

24  Q   Now, are you specifically asking the Court to allow you

25  to pay these, or order you to pay these amounts?

```
 1    A    No.

 2    Q    What are you asking for?

 3    A    I'm asking to be able to pay up to these amounts.

 4    Q    So, for example, I see Amazon Web Services at $77,000.

 5    It's unusual to have a flat number like that.  What is the

 6    basis for that?

 7    A    These were -- what we did was go back and look at the

 8    last three or four months and developed an average.

 9    (Indiscernible), I suspect the average got rounded to

10    77,000.

11              MR. BRIMMAGE:  Objection, testifying, speculating.

12              THE COURT:  I'll sustain that objection.

13    BY MR. BATTAGLIA:

14    Q    Is it fair to assume that perhaps you don't have the

15    invoice yet for pre-petition services from Amazon Web

16    Services?

17              MR. BRIMMAGE:  Objection, leading.

18              THE COURT:  Sustained.

19    BY MR. BATTAGLIA:

20    Q    What information have you received about the pre-

21    petition amounts owed to Amazon Web Services to this date?

22    A    I have not received a bill yet, so I don't know.

23              MR. BATTAGLIA:  Your Honor, may I have a minute

24    consult with my co-counsel?

25              THE COURT:  Absolutely.
```

```
1               MR. BATTAGLIA:  Thank you.
2    BY MR. BATTAGLIA:
3    Q    What conditions are imposed on the vendors if you pay
4    them under this -- if the Court grants the relief requested?
5    What do they have to do?
6    A    Continue to provide service.
7    Q    On what terms?
8    A    Normal.  Their normal terms we've been operating under
9    pre-bankruptcy.
10   Q    And if they don't?
11   A    If they don't?
12   Q    The order allows you to claw back --
13   A    Yeah, I can claw back but I mean from a business
14   standpoint --
15              MR. BATTAGLIA:  One more moment.  Pass the
16   witness, Your Honor
17              THE COURT:  Okay.
18              MR. BATTAGLIA:  I don't know when it would be
19   appropriate.  I think Mr. Schwartz is drying out there.
20              THE COURT:  Yeah, I was just going to ask folks.
21   I want to be respectful of -- I know folks need to -- may
22   need to eat, and I want to be respectful of that.  Does it
23   make sense to break now, come back, I don't know, 45
24   minutes, and then come back and pick up?  Okay.  Why don't
25   we come back on the record at 1:15.
```

```
 1          Mr. Schwartz, I would remind you that you're still

 2   under oath so you're not able to talk to anyone about your

 3   testimony.

 4          So, we will continue.  We'll break for lunch and

 5   come back at 1:15.  I am going to keep Go to Meeting open.

 6   I'm going to hang up the line, and then we will come back on

 7   the line -- I think we will open up the line about 10

 8   minutes before we start.  So, it will be sometime between

 9   1:00 and 1:05, but I'll make sure if anyone's dialed in,

10   that you'll be able to hear everything.  But we'll hang up

11   the line and I'll keep Go to Meeting open for now.  Okay?

12   Thank you.

13          MR. BATTAGLIA:  Thank you, Your Honor.

14      (Off the record)

15          CLERK:  All rise.  Please be seated.

16          MR. BATTAGLIA:  Your Honor, is it okay if I have

17   this?

18          THE COURT:  Absolutely.

19          MR. BATTAGLIA:  Thank you.

20          THE COURT:  Okay.  This is Judge Lopez.  The time

21   is 1:22, back on the record in Free Speech.  Let me just --

22   I think we're going to turn to the cross-examination at this

23   time.

24          Mr. Schwartz, I remind you that you're still under

25   oath.  Okay?
```

1                THE WITNESS:  Yes, Your Honor.

2                THE COURT:  Okay.  Mr. Moshenberg.

3                MR. MOSHENBERG:  Yes, Your Honor.  If it's all

4       right with the Court, I'm going to be cross-examining Mr.

5       Schwartz on behalf of the Texas Plaintiffs and Mr. Brimmage

6       will be cross-examining Mr. Schwartz on behalf of the

7       Connecticut Plaintiffs, Your Honor.

8                THE COURT:  No problem.

9                MR. BATTAGLIA:  Your Honor, I understand Mr.

10      Brimmage represents both of them.  I mean, I don't --

11      there's no sense in having the same party taking multiple

12      shots here.

13               THE COURT:  Well, they're -- they both filed a

14      joint objection.  So, I'm going to give both of them an

15      opportunity for cross.  If I do see overlap, I will -- so.

16      Go for it.

17               MR. MOSHENBERG:  Fair enough, thank you.

18               THE COURT:  They filed a joint objection, but they

19      are different.  They've always been different from the very

20      beginning.

21               MR. BATTAGLIA:  Yes, but Mr. Brimmage represents

22      both.

23               THE COURT:  He does, he does.  He's picking today.

24      Let's just see where it goes.  All your rights are

25      preserved.  If it starts to get a little out of hand, I'll

1    handle it.

2            MR. MOSHENBERG:  Your Honor, I'm going to Austin

3    later to attend the trial happening in Austin, so I have

4    every incentive to get out of here as soon as we can.

5            THE COURT:  I don't, so take your time.

6            MR. MOSHENBERG:  Fair enough.  Thank you, Your

7    Honor.

8            THE COURT:  Let me ask you this, in terms of

9    exhibits, how do you intend to show the witness?  Do you

10   have --

11           MR. MOSHENBERG:  We do have an exhibit list, Your

12   Honor.  We're going to pull them up, as --

13           THE COURT:  Well, let me ask it before you begin.

14           MR. MOSHENBERG:  Yes, Your Honor.

15           THE COURT:  Maybe I can then ask the same

16   questions.  Are you looking to -- by pull them up, is

17   someone going to ask me for permission to -- how do you

18   intend on doing this, Mr. Martin?  Okay.  Are you -- do you

19   intend to show exhibits out of 28, from Exhibit 28?  Docket

20   28, I should say.

21           Jarrod Martin, where are you?  There you are.  Mr.

22   Martin, I'm going to make you the presenter.  Let me make

23   you a presenter.  Is there -- just before you show anything.

24   Let's see, you have a number of exhibits at 28.  You just

25   want to go through them or are the parties -- is there

1    anything the parties can stipulate to now?  There may be

2    some overlap, right?

3             MR. BATTAGLIA:  Your Honor, I'm afraid that this

4    was filed while I was in my car on my way here, so I

5    actually haven't had an opportunity to look at them.

6             THE COURT:  Well, let's look at them now.  I think

7    a lot of this is public, by the way.  If you want to, Mr.

8    Battaglia, if you want to take a moment, I'll give you a

9    moment to just review them.  If not, we can just take them

10   up one by one.

11            I'll give you a few minutes to review.  It's a

12   first-day hearing, so everybody filed witness and exhibit

13   lists late.  So, I'm going to -- I will say for the parties

14   who are online, in the Go to Meeting feature, if you were to

15   hover your mouse around the right side, you'll see a plus

16   and minus.  And so, depending on the way it's shown on the

17   scroll, you'll still be able to zoom in or zoom out to be

18   able to view a particular document that is shown on the

19   screen.

20            MR. MOSHENBERG:  Your Honor, it may make more

21   sense to go one by one as we go because I may not use all

22   these exhibits anyway.  If the Court is more comfortable

23   doing that, I don't mind proceeding that way.

24            THE COURT:  It's your presentation, counsel, I'll

25   let you --

```
 1              MR. MOSHENBERG:  Yeah, my vote is to just start
 2    with the cross and I'll admit what I try to admit and take
 3    them one by one.
 4              THE COURT:  That works.
 5              MR. BATTAGLIA:  I have no issues with 1, 2, and 3,
 6    Your Honor.
 7              MR. MOSHENBERG:  Your Honor, I may not try to
 8    admit those, but it's good to know that there is no
 9    objection to 1, 2, or 3.
10              THE COURT:  Well, now it just sounds like we ought
11    to just start.
12              MR. MOSHENBERG:  Okay, fair enough.
13              CROSS-EXAMINATION OF W. MARC SCHWARTZ
14    BY MR. MOSHENBERG:
15    Q    All right.  Mr. Schwartz, you made some declarations in
16    this case, correct?
17    A    I believe I did one.
18    Q    Okay.  And you understand that the statements you made
19    in that declaration was under oath?
20    A    Yes.
21    Q    And that's the same oath that you're under today,
22    correct?
23    A    Yes.
24    Q    And you understand that it's important to tell the
25    truth in a declaration, correct?
```

```
 1    A    Yes.

 2    Q    You agree that it's important to tell the truth period,

 3    correct?

 4    A    I don't know what you mean by telling the truth period.

 5    It's important to tell the truth.

 6    Q    Okay.  And that's what I'm trying to confirm.  You

 7    agree it's important to tell the truth.

 8    A    I did agree with you.

 9    Q    Okay.  You were hired as the CRO in the InfoW

10    bankruptcy, correct?

11    A    Yes.

12    Q    Do you recall that you spoke at the first day hearing

13    for that bankruptcy?

14    A    I recall I spoke at the first day hearing, yes.

15    Q    Do you recall that at the time you said you hadn't even

16    heard of Alex Jones before being approached to be the CRO?

17    A    Yes.

18    Q    That's still the truth?

19    A    That fact hasn't changed.  I still hadn't heard of him

20    before then.

21    Q    Do you recall telling the Court that you don't really

22    agree with his views and something to the effect of that you

23    put them in the same group as the people who denied the

24    landing on the moon?

25    A    I've missed the first part of it.  I don't agree with
```

```
 1   his views?

 2   Q    Sure.

 3   A    I don't necessarily agree with his views.

 4   Q    That's what I was confirming.  You don't agree with his

 5   views, and I think he even said something to the effect of,

 6   you know, you put him in the same category as the moon

 7   landing deniers?

 8   A    Correct.  I think I said that.

 9   Q    And the point I'm raising here is that you told the

10   Court that you did not find Jones to be credible; is that

11   right?

12   A    I have to revisit what I said at that time.  I mean it

13   was -- I have to see what I said.

14   Q    Is it your testimony today that you do find Alex Jones

15   to be a credible person?

16   A    Credible, in certain respects, yes.

17   Q    Okay.  The respects relating to this bankruptcy; is

18   that what your testimony is?

19   A    Respect in leading to this bankruptcy?

20   Q    In respect to this bankruptcy is that your testimony?

21        MR. BATTAGLIA:  Objection, Your Honor.  It's

22   overbroad.

23        THE WITNESS:  Yeah, I'm confused by the question.

24        THE COURT:  Hold on a second.  I'm going to

25   sustain that objection.  You can ask a different one.
```

```
 1             MR. MOSHENBERG:  Okay.
 2   BY MR. MOSHENBERG:
 3   Q   Well, we'll explore that in a minute.  You understand,
 4   though, that in some contexts, Alex Jones does not tell the
 5   truth.  You understand that, correct?
 6   A   I believe that some people believe he does not tell the
 7   truth.  That's obvious from the from the litigation.
 8   Q   Okay.  I also want you to answer my question though.
 9   You understand that in some context, Alex Jones does not
10   tell the truth.
11             MR. BATTAGLIA:  Again, Your Honor, I'm going to
12   object.  This line of questioning is irrelevant
13   (indiscernible) be overbroad.
14             THE COURT:  What's the relevance of the questions?
15             MR. MOSHENBERG:  Your Honor, he's the CRO.  He's
16   relying on the information that the sole owner of the
17   company, Alex Jones, is providing him.
18             THE COURT:  Why don't you ask him if he's relying
19   on it?
20             MR. MOSHENBERG:  Okay.
21   BY MR. MOSHENBERG:
22   Q   Have you relied on any information Alex Jones has
23   provided to you directly or through his attorneys?
24   A   Well, I mean, yes, but it's information I've
25   corroborated.
```

```
 1   Q    Okay.  So, you're relying on information he provided
 2   you.  And what I want to know is do you understand that in
 3   certain context, Alex Jones does not tell the truth?
 4   A    Like all human beings, including yourself, he does not
 5   always tell the truth.
 6   Q    Okay.  Well, let's talk about an instance where he
 7   definitely didn't.  You understand that Jones and Free
 8   Speech Systems were determined by two different courts to be
 9   liable for intentionally lying, for defamation.  You
10   understand that, correct?
11            MR. BATTAGLIA:  Your Honor, again, I'm going to
12   object.  The entire line of questioning is irrelevant to the
13   issues before the Court today.  This is interim cash
14   collateral hearing.
15            THE COURT:  Why don't you help me with the
16   relevance of where you're going, counsel?
17            MR. MOSHENBERG:  Your Honor, what I want to
18   understand right now in a Subchapter 5 context, Your Honor,
19   where we have the CRO and we have the information that the
20   CRO is given by people who have been already adjudicated by
21   several courts to be liars, not just in underlying causes of
22   action, but also the abuses of the legal process.
23            THE COURT:  Okay.  I just asked you what the
24   relevance is.  I know you're trying to sneak stuff in, but -
25   -
```

```
 1              MR. MOSHENBERG:  It's going to go to the

 2    credibility.  I'm not trying to sneak anything, Your Honor.

 3    Just to be clear, I'm just going to the credibility of the

 4    of the witness.  That's all I'm trying to get at, Your

 5    Honor.

 6              THE COURT:  The credibility of this witness?

 7              MR. MOSHENBERG:  Yes, Your Honor.

 8              THE COURT:  Okay.  I'll allow a little bit of it

 9    to some extent, but don't go too far.

10              MR. MOSHENBERG:  All right, Your Honor.

11    BY MR. MOSHENBERG:

12    Q    Of course, you're not Alex Jones, and I hope that at

13    least you'd agree with me that it's important in bankruptcy

14    to have transparency, oversight in an investigation.  You'd

15    agree with that?

16    A    I believe in bankruptcy, there should be transparency

17    for certain.  That's why we have oversight.  I mean, I've

18    got the Court, I've got a Sub 5 Trustee.  I'm going to not

19    intentionally obfuscate anything.

20    Q    Now, you've never worked for Free Speech Systems,

21    correct?

22    A    Before this engagement, no.

23    Q    Okay.  And before this engagement, you were never

24    contracted by Free Speech Systems in any way?

25    A      No.
```

1    Q    Okay.

2    A    Not that I'm aware of.

3    Q    Have you ever been contracted by Alex Jones or PQPR

4    before, at all, actually?

5    A    No.  I never knew they existed prior to the first

6    bankruptcy.

7    Q    Now, you -- I want to cover your declaration.  Exhibit

8    3.  (Indiscernible).  Now, Mr. Schwartz, can you see that?

9    A    Yes.

10   Q    Okay.  And that is your declaration, correct?

11   A    It appears to be, at least the second page -- the first

12   page of it.

13   Q    Okay.  And this is your statement under penalty of

14   perjury, correct?

15   A    Correct.

16   Q    I want to turn to Paragraph 4 for a moment.  It says

17   "Except as otherwise indicated, all facts as set forth in

18   this declaration are based upon my personal knowledge, my

19   review of relevant documents, or my opinion based on

20   experience, knowledge and information concerning the Debtor.

21   If called upon to testify, I would testify competently to

22   the facts set forth in this declaration."  Did I read that

23   correctly?

24   A    Yes, you did.

25   Q    What relevant documents did you review when you refer

1    to them in Paragraph 4?

2    A    Thousands of would-be pages if we printed them, out of

3    accounting records.  Of course, the general ledgers, the

4    prior general ledgers, financial statements drawn from those

5    general ledgers, contracts.  I don't have an inventory of

6    those items, but that's generally the types of documents I

7    looked at, would have looked at, and I'm sure there are

8    numerous others.

9    Q    Okay.

10   A    There's some various financial analyses, I remember

11   that.

12   Q    When  you say contracts, what contracts did you review?

13   A    Well, the -- I saw the notes.  I saw --

14   Q    Where those notes something that --

15   A    I think I saw other contracts.  I just don't recall

16   them.  If I can finish my answer.

17   Q    Sure.  I thought you were done.  Those contracts, the

18   promissory notes, were that -- was that just something you

19   found in the file when you started your investigation or

20   were those given to you?

21   A    They're probably given to me.

22   Q    They were given to you by the lawyers?

23   A    No, I don't think so.  I -- they were all recorded in

24   the books of account.  So, I said, okay, I need -- what are

25   these?  Let me see these.  And I believe Mr. Roe gave them

007558

1    to me.

2    Q    Do you find Mr. Roe to be a credible person?

3    A    I think.  Yes, I think it's incredible like all of us,

4    we have our weaknesses.

5    Q    What sort of steps did you take to determine that Mr.

6    Roe a credible person?

7    A    Well, I worked with him for a couple of months in

8    connection with the first bankruptcy, so I had an

9    opportunity to see him in action, work with him.  I found he

10   did not try to hide things from me.  And I did test him to

11   see if he would.  He was confident, knows accounting,

12   understood accounting, and understood the problems in the

13   financial records.  So --

14   Q    Is it fair to say beyond your interactions with him

15   over a few weeks, that you didn't do any other vetting of

16   him?

17   A    No, I don't think we did any formal vetting of him.

18   Q    Okay.

19          THE COURT:  Just a second.  Just a second.  I was

20   hearing some background noise and it looks like the line got

21   unmuted.  I'm muting the line again.  If anybody wishes to

22   be heard at some point, you'll need to hit five star.  I

23   apologize.  I just wanted to make sure that you weren't

24   interrupted with background noise.

25          MR. MOSHENBERG:  Thank you, Your Honor.  I

1    appreciate it.

2           Can we look at Exhibit 10, please?  Can you scroll

3    down a little bit more?  I want to make sure Mr. Schwartz

4    has a chance to look at it.  I'm going to ask him if he's

5    ever looked at this document before.

6    BY MR. MOSHENBERG:

7    Q    So, Mr. Schwartz, when you're ready, just let me know

8    whether you've ever reviewed it.

9    A    I don't believe I've seen this before.

10   Q    Okay.  Do you have any reason to doubt that this is the

11   default judgment that was entered in the Connecticut

12   Plaintiffs' case in Connecticut?

13          MR. BATTAGLIA:  Objection, Your Honor, asked and

14   answered.  He said he has never seen it.

15          THE COURT:  I'll sustain.

16          MR. MOSHENBERG:  Okay.

17   BY MR. MOSHENBERG:

18   Q    My question is do you have any reason to doubt that

19   this is the default judgment?

20          MR. BATTAGLIA:  Objection, Your Honor, same

21   objection.  How can the witness answer when he said he has

22   never it before?

23          THE COURT:  Yeah.  That was sustained.

24   BY MR. MOSHENBERG:

25   Q    This is a publicly filed document granting the default

```
 1    judgment against Alex Jones.  I'll represent that to you.
 2    And what I want to look at is Page 7 --
 3              MR. BATTAGLIA:  Your Honor, I'm going to object to
 4    him asking questions about a document that's not in
 5    evidence.  It's (indiscernible) --
 6              MR. MOSHENBERG:  It's a public document, Your
 7    Honor.  It's the same standard as --
 8              MR. BATTAGLIA:  There's no indicia of reliability
 9    here.  It's a certified document and I've never seen it
10    either.
11              THE COURT:  Why don't you -- I don't -- you're
12    asking the question to a witness about a document that's not
13    been admitted into evidence.  Maybe you should move for it
14    to be admitted.
15              MR. MOSHENBERG:  Sure.  Your Honor, I would like
16    to move to admit Exhibit 10 into evidence.
17              MR. BATTAGLIA:  Objection.  No foundation.
18              THE COURT:  What's your response, counsel?
19              MR. MOSHENBERG:  Well, it's part of a publicly
20    filed document in Connecticut, Your Honor, if you go to the
21    top page.  It is a court default judgment in the Connecticut
22    Plaintiffs' case.
23              MR. BATTAGLIA:  It's not a certified copy.  There
24    is no representation that this is valid.  I've never seen it
25    before.  I have no idea what's --
```

1          MR. MOSHENBERG:  And it's also your --

2          MR. BATTAGLIA:  Excuse me, counsel.

3          THE COURT:  You got let him finish the objection

4    and then you can answer.  Go ahead.

5          MR. BATTAGLIA:  There's no indicia here that this

6    in accurate document.  Where it is or not, I have no idea.

7    no idea.  I've never seen it before, neither has the

8    witness.

9          MR. MOSHENBERG:  Your Honor, I'm offering it for

10   impeachment purposes only.   I don't even need to prove it

11   for the truth of the matter asserted.

12         THE COURT:  What is the purpose for the

13   impeachment that you're seeking?  On what point are you

14   seeking to impeach the witness?

15         MR. MOSHENBERG:  The court in the Connecticut case

16   determined that Mr. Roe was not credible, actually did not

17   consider his evidence because he did not find the witness to

18   be credible and that the witness had sanitized records.

19         THE COURT:  Well, what does it have to do with Mr.

20   Schwartz?

21         MR. MOSHENBERG:  He relied on him as part of this

22   bankruptcy.

23         THE COURT:  What is the impeached -- what is the,

24   what is the statement that he made that you're impeaching

25   him on?

```
 1          MR. MOSHENBERG:  Well, excuse me.  What I mean is
 2   it's going to his credibility, that he's relying on as the
 3   CRO information done by Mr. Roe, who has been adjudicated by
 4   a judge in Connecticut as not providing reliable
 5   information.
 6          THE COURT:  I'm going to sustain the objection.
 7   You can come up with something that will -- maybe you can
 8   come up with something, but that he hasn't said anything
 9   within the scope of his direct that would warrant an
10   impeachment on that point.  And maybe this is a certified
11   copy, maybe it's not.  Maybe you can come up with something.
12   But I'm also struggling to see the relevance of this in
13   connection with a critical vendor motion and a cash
14   collateral motion.  But maybe you can get me there as well.
15          MR. MOSHENBERG:  All right, Your Honor.  Well, I'm
16   going to focus for a moment on ways to get this in before
17   you in a reliable way.
18          THE COURT:  Okay.
19          MR. MOSHENBERG:  I'm going to move on in the
20   meantime, Your Honor.  And I'll tie that to that.
21          THE COURT:  I'm sure Mr. Brimmage is already
22   thinking of stuff.  But go ahead.
23   BY MR. MOSHENBERG:
24   Q    So I have here accounting records, prior ledgers,
25   financial statements, contracts, inventory, financial
```

1    analyses.  Is there anything else that you relied on in your

2    work so far that you reviewed?

3    A    I'm certain there are.

4    Q    Okay.  Does anything else come to mind?

5    A    Purchase orders, sales orders, invoices.

6    Q    Is that all?

7    A    Give me a chance to think.  I mean you're asking me off

8    the top of my head.

9    Q    Sure.  Did you read any depositions?

10   A    No, not off -- I don't think so.

11   Q    Okay.  All right.  So, aside from the documents you

12   reviewed, what else did you do to make yourself comfortable

13   with the information that you're relying on, and that Free

14   Speech provided you?

15   A    Well, I talked to people, asked them -- pertinent

16   people who had knowledge of those areas.

17   Q    Okay.  Which individuals did you talk to?

18   A    Blake Roddy is one, Bob Roe is another one.  Alex Jones

19   is another one.  David Jones.  Anthony (indiscernible).  I

20   visited some with Melinda Flores.  A gentleman named

21   Zimmerman.

22   Q    Say that again, please.

23   A    A gentleman named Zimmerman.  A gentleman last name

24   Elmo, I don't remember his first name.  I believe it's Elmo.

25   Of course, I talked to counsel.  They were reviewing

```
 1   documents as well.  Patrick -- oh, and you asked me in

 2   connection with the declaration, Patrick Riley.  Those are

 3   the names I can recall.

 4   Q   Okay.  Let's go to Paragraph 11.  And I'm back at

 5   Exhibit 3 right now.  This is your declaration we covered

 6   earlier.

 7          THE COURT:  Just to be clear, this is the

 8   declaration that was filed in this case?

 9          MR. MOSHENBERG:  Yes, Your Honor.

10          THE COURT:  Okay, thank you.

11   BY MR. MOSHENBERG:

12   Q   Okay.  I want to look at Paragraph 11 please.  It says

13   that Alex Jones, it says born in 1974, Alex Jones or Jones,

14   is the son of Carol Jones, a homemaker, David Jones, a

15   prominent dentist.  Jones moved from Dallas to Austin as a

16   teenager.  Did I read that correctly?

17   A   Yes.

18   Q   That is not based on your personal knowledge; is it?

19   A   No.

20   Q   Okay.  But you testified, you swore in this declaration

21   that that was based on -- that fact is based on your

22   personal knowledge, but you don't know that.

23   A   I said my, my declaration said it was based on

24   documents I reviewed.  I put up the three categories we

25   already talked about.  This was I saw, I read an article
```

```
 1    that mentioned, I believe, it was an article that stated
 2    this.
 3    Q    And you just took that to be true?  You read an article
 4    and you determined that it was true?
 5    A    It was one of the documents I reviewed.  I mean, take
 6    any one of the documents, you can say did I take it as true?
 7    No, I took a look.  You know, it's a piece of information
 8    that may or may not be true.  It appears to be true.  But I
 9    said I saw in a couple of places and the press reported it,
10    so, my God, it must be right.
11    Q    So, let me understand this.  You didn't know if
12    something was true.  You saw it.  You thought it was true
13    and that was enough for you to swear it was true in this
14    Court --
15    A    No, I consulted with my attorneys as well, or the
16    attorneys on this case as well.  You know, it's if we go
17    through this, we got to, you know, are we certain this is
18    all right.
19    Q    And so you had no idea.  You just relied on other
20    people, and you swore to that being true?
21    A    Everything I've done in this is based on information
22    provided by others.  I didn't create any of the data I
23    looked at, any of the documents I looked at, or anything.
24    Some, you know, they could all have been fabricated and that
25    -- but I don't believe they were.  So, it's based, all based
```

1    on someone giving me something.  And I, to some -- some

2    vetted more than others.  And I asked, this is one that I

3    remember talking to counsel about this one.  Are we sure

4    this, we know this, are we comfortable with our references

5    on this?  I saw the article.  Are we comfortable using it?

6    Q    But you don't know if it's true and you swore that it's

7    true to this Court?

8         MR. BATTAGLIA:  Objection, Your Honor.  Asked and

9    answered.  Frankly, it's badgering at this point.

10        THE COURT:  Well, no, see I think -- I think, I

11   think you get to explore a little bit.  Can we go up a

12   little bit.  I'm going to overrule the objection.  Kind of

13   scroll up to the very beginning.  Paragraphs 1 or 2.  Okay.

14        So, tell me where in this declaration it says that

15   the statements that you made are based on conversations with

16   other people?  It says, based on personal knowledge, your

17   review of relevant documents, or your opinion based upon

18   experience, knowledge, and information concerning the

19   Debtor.  And then you --

20        THE WITNESS:  I don't -- it doesn't say based on

21   conversations, but it should be because I talked to a lot of

22   people as I said.

23        THE COURT:  Okay.  You can ask your question.  I'm

24   going to overrule the objection.

25   BY MR. MOSHENBERG:

```
1    Q    So, you didn't know whether it was true, but you swore
2    that this was true, what Paragraph 11 says.  That's what I
3    wanted to confirm with you today.
4    A    Well, based on my -- it's based on my information,
5    knowledgeable, and belief at the time.  And it may not be
6    true.  Maybe he wasn't born in '74.  That --
7    Q    Not, you could know --
8         THE COURT:  I just want you to let him finish the
9    answer and then --
10        MR. MOSHENBERG:  Yes, Your Honor, I apologize.
11   BY MR. MOSHENBERG:
12   A    Based on the information I had and based on my vetting
13   of that information, I took that piece of information as
14   true.  It is important?  I don't know.
15   Q    I'm fine with you following up, but I do want to answer
16   to my question, which is you didn't know whether this was
17   true, but you swore that it was true.  And I just wanted to
18   confirm that today.  You didn't know if this was true, but
19   you swore to it.
20   A    Well, I believed it was true.  But the knowledge like
21   you knowing about 64 million, you didn't know that was true.
22   But you said it.  It's the same thing.  I didn't, you know,
23   I believed this was true.  I said it.  I believe it's still
24   true.
25   Q    But you don't know whether it's true.
```

 1    A    I did not see him get born.

 2    Q    Okay.  Let's look at Paragraph 12.  Take a moment and

 3    review it.

 4    A    Okay.

 5    Q    Is it fair to say that you don't have any personal

 6    knowledge of whether he was -- about Austin, about in the

 7    early 1990s, Austin was a dirt-cheap home to artists,

 8    musicians, and sign makers.  And according to Shannon Burke,

 9    who's a local talk show radio host said all this

10    information.  Do you know any of these things to be

11    personally true?  Did you have personal knowledge of this?

12    A    No, you -- the -- this was cited.  I actually cited the

13    source for that.

14    Q    Okay.  And you actually reviewed that source.  Is that

15    your sworn testimony?

16    A    I looked at that.  I read it.  Yes.

17              THE COURT:  You read the Buzzfeed article?

18              THE WITNESS:  Yes, I did.  I remember this one,

19    reading it.

20              THE COURT:  Okay.

21    BY MR. MOSHENBERG:

22    Q    Okay.  How about Paragraph 13 then.  Take a moment and

23    read that.

24    A    That's also in the Buzzfeed article.

25    Q    Okay.  So, you don't actually know whether that's true.

```
 1    You're just relying on the Buzzfeed article, correct?
 2    A    Yes.
 3    Q    Okay.  And are you saying you don't know whether this
 4    is true in this, anywhere in here?  Do you ever make that
 5    qualification?  You acknowledge Buzzfeed, but you represent
 6    this as being a true statement.  You're swearing that this
 7    is a true statement, sir, based on something you read on
 8    Buzzfeed.
 9    A    Well, I'm citing Buzzfeed to say this is where I got
10    the information from.
11    Q    Where does it say that?  It says Buzzfeed.  Where does
12    it -- where is that qualification here?
13    A    When I footnoted it -- when we footnoted it with the
14    citation, that tells you the source of it.  And that I can -
15    - you know, I'm relying on Buzzfeed and their reporting, but
16    it doesn't say that I've done anything to verify that
17    Buzzfeed did the job they were supposed to do.
18    Q    Right.  And you swore that this statement is true
19    though.  You acknowledge Buzzfeed, but you don't say I don't
20    know if this is true or not, but this is what Buzzfeed says.
21    You swore in a declaration to its truth.
22    A    That's the truth, that's a true quote from Buzzfeed.
23    Q    That's not what you wrote.  You didn't say according to
24    Buzzfeed, they said this, and I don't know if it's true.
25    You represented this as true.
```

1   A    I represented this came from Buzzfeed.

2   Q    You don't know if it's true?

3   A    No.

4        MR. BATTAGLIA:  Your Honor, we're just being

5   argumentative.

6        THE COURT:  I think, I think we just got the

7   answer.  I think he just said no.  And I think you're going

8   to ask another question.

9   BY MR. MOSHENBERG:

10  Q    Okay.  I'll speed this along.  Why don't we look, why

11  don't you take a moment and look at Paragraphs 14, 15.  Is

12  it the same issue?  You don't know whether it's true, you're

13  just relying on other sources?

14  A    Yes.  Those are both relying on other sources.

15  Q    Right, because you don't know whether those statements

16  are true, whether those allegations, those factual

17  statements are actually true.  You don't know?

18  A    No.

19  Q    How about Alex Jones was a natural, Number 16?  How did

20  you know that he was a natural in all of this?  Or is it you

21  didn't know?

22  A    That's a quote.  That's not something --

23  Q    I don't see a quotation mark.

24  A    I agree with you.  It's not, and it's cited directly,

25  but that should have been cited.

1    Q    That's something that you're swearing as being true in

2    your declaration.

3    A    Well, based on the evidence I've seen, which is the

4    operating results, at least from 1907 -- 2007 forward, he's

5    obviously, extremely successful at this.

6    Q    But you saw some documents and you decided based on

7    those some documents that was so true that you swore to it

8    being true in a declaration to this Court?

9    A    That Alex Jones is a natural, I don't, I don't think I

10   have a problem with that at all based on what I saw from

11   2007 forward.

12   Q    Right.

13   A    But the evidence I'm used to saying, which is numbers.

14   Q    I thought you said you hadn't heard of him until this

15   engagement.  How did you know he was a natural?

16   A    I just told you; I look at his numbers from 2007

17   forward as well.

18   Q    Okay.

19             THE COURT:  What do you mean by looking at his

20   numbers?  What --

21             THE WITNESS:  Financial results.

22             THE COURT:  From FSS?

23             THE WITNESS:  Yeah, FSS, I think started business

24   in 2007.

25             THE COURT:  I just wanted to clarify what you

```
 1   meant by his financial numbers.  Not -- you mean --

 2              THE WITNESS:  FSS's financials.

 3              THE COURT:  Okay, thank you.

 4   BY MR. MOSHENBERG:

 5   Q    I mean, we can speed this along.  Why don't we look at

 6   17, 18, 19, those three paragraphs.  Take a moment and

 7   review them.  I'll ask my questions when you're ready.

 8   A    Okay.

 9   Q    Same problem, you're swearing these things are true and

10   you don't know whether they are.  You just looked at some

11   sources and you swore that those things were true?

12   A    I swear, yeah, these are cites from those sources.

13   Q    Right, but you don't at all say this is what these

14   sources reported, but I don't know whether they're true.

15   You swore to them being true.

16   A    Well, I swear that these are proper cites from these

17   sources.

18   Q    Where does it say that?

19   A    Well, because it's based on the information I had,

20   these sources said this.  This si -- I'm telling you this is

21   what these sources said.

22   Q    That that big qualification you just gave, where's that

23   in your declaration?

24   A    I don't think you'll see that that specific wording in

25   the declaration.
```

```
 1    Q    Right, because in your declaration, you say the
 2    following, I swear under penalty of perjury is true based on
 3    my personal knowledge.  And you don't know whether these
 4    things are true.  You just looked at some sources and swore
 5    they were true.
 6    A    Well, it's -- my declaration says my personal knowledge
 7    is based on the documentation I reviewed as well as the
 8    other two factors like we've already covered in Paragraph 3,
 9    I think.  It's based on that.  See, none of the documents
10    that I reviewed did I create everywhere.  So, you can say
11    the whole thing is not based on my knowledge.
12    Q    I agree.  And I want be very clear that my point is I
13    understand you review things, but lots of people can review
14    stuff and then not decide whether it's true or not.  You
15    reviewed those things and you decided to swear to this Court
16    without knowing whether it actually was that it's true
17    without any of your own personal knowledge.
18    A    I mean, obviously, I do what I do.  I look at other
19    stuff and I interpret it.  In this case this is material,
20    it's -- you know, that people -- other people wrote.  I
21    didn't say it's my source.  I cited to the sources they came
22    from.  But I -- yeah, everything I do is based on
23    information that has existed even before I heard the name
24    Alex Jones.
25    Q    Are you done with your answer, sir?
```

1    A    Yes.

2    Q    Let's look at the first sentence of Paragraph 19.

3    "When Jones started broadcasting on the radio in the late

4    1990s, he closely followed the talk radio playbook.  He

5    built a large, devoted audience of far-right conspiracy

6    believers."  Did I read that correctly?

7    A    Yes.

8    Q    There's no cite there.  Do you agree with that?

9    A    I think that all this paragraph is in SPLC, where it

10    came from.  Excuse me, there's a -- it came out of

11    Intelligencer, is what it says.

12    Q    Where does it say that?

13    A    On the last -- second to the last line.  Right.  I see

14    that sentence has the Intelligencer cited.  I'm talking

15    about the first sentence.  You represented that was true.

16    There's no cite there.  There's no qualification at all.

17    You just said it.

18    A    I think all of that, all of that came from the

19    Intelligencer.  The only thing that didn't was the last

20    sentence about the hundred stations, which came from SPLC.

21    Q    There's no cite there.  You agree with that?

22    A    I don't agree with that at all.

23         THE COURT:  That one has been asked and answered.

24    BY MR. MOSHENBERG:

25    Q    Okay.  All right.  Well, let's go to the next

1    paragraph.  Take a moment and look at that please.  Again,

2    you didn't have any personal knowledge of anything in there,

3    correct?  And take your time reading it.

4    A    Correct.  As I said, none of this is personal, well

5    except for my analysis of numbers, which I don't have

6    personal knowledge of.  But this, excuse me, could you put

7    that paragraph back?

8    Q    Number 20, thank you.

9              THE COURT:  Number 20.

10   BY MR. MOSHENBERG:

11   A    I believe that I did talk about this with Dr. Jones.

12   Q    Okay.  But you didn't know personally whether it was

13   true or not.  You just relied on Dr. Jones.  You didn't know

14   if it was true.

15   A    Right, I don't have personal knowledge of anything.

16   Q    But you swore to it being a fact.

17             MR. BATTAGLIA:  Your Honor, I'm going to object.

18   Counsel keeps saying that he says personal knowledge based

19   on documents, experience, knowledge, and information.

20             THE COURT:  I think the testimony is, is that he's

21   citing to documents, but those documents didn't really form

22   his personal knowledge.  It's just citing stuff.  I think

23   that's what this -- these paragraphs are showing.  Unless

24   Mr. Schwartz wants to tell me that he developed personal

25   knowledge based on -- personal knowledge, I should say,

```
 1   based on news articles and the deposition reference.  It
 2   sounds like you're just, in this citing --
 3            MR. MOSHENBERG:  It's not a brief, Your Honor.
 4   It's a declaration.
 5            THE COURT:  No, no, no.  I'm just going -- I think
 6   at the core of what you're doing is just citing articles to
 7   try to provide background information.  Do I understand that
 8   correctly?
 9            THE WITNESS:  Yes.  That's correct, Your Honor.
10            THE COURT:  Okay.  I'm just going to caution you.
11   The way your declaration is drafted, and I will be honest
12   with you, it does say you developed personal knowledge based
13   on this.  And as I read this, I knew this line of
14   questioning was coming.  So, that's why I'm allowing it.
15            THE WITNESS:  I apologize, Your Honor.
16            THE COURT:  I'm sure next time you'll cut all this
17   out and get right to the stuff you know.  But today, they
18   get to ask questions about it, and we'll figure out what you
19   know.
20   BY MR. MOSHENBERG:
21   Q   It is fair to say --
22            MR. MOSHENBERG:  Thank you, Your Honor.  I didn't
23   mean to cut you off.
24            THE COURT:  No, no, no.  I didn't mean to
25   interrupt your examination.
```

007577

```
 1   BY MR. MOSHENBERG:
 2   Q    Is it fair to say sort of based on this exchange --
 3   because earlier I asked if you read any depositions and you
 4   hadn't, correct?
 5   A    Yes.  I don't recall.  I may have -- I don't recall
 6   reading any depositions.  I don't even recall, like, reading
 7   it -- I may have read an excerpt of this deposition, but I
 8   don't recall it.
 9   Q    Yeah.  Well, you agree in Paragraph 20 you cite to a
10   deposition that you haven't read?
11   A    Correct.
12   Q    And it's the same problem, right, on 21, 22, 24, you're
13   citing to this deposition, and you hadn't read it.
14   A    That is correct.
15   Q    And you swore -- based on a deposition you never read;
16   you swore these things were true based on your personal
17   knowledge?
18   A    Correct.
19   Q    Let's take a break from your declaration, sir.  Why
20   don't we go --
21           MR. MOSHENBERG:  Can you pull up Exhibit 1,
22   please?  I think Jarrod quit the case because I asked him to
23   pull up exhibits for me.
24           MR. BRIMMAGE:  We are going to have to take a
25   quick break, Your Honor.  I'm sorry.  I have a Mac.
```

007578

1    THE COURT:  No, no worries.  But I think I

2    probably need to make you a presenter.

3    MR. BRIMMAGE:  Well, I'm on Jarrod's machine.

4    THE COURT:  Oh.  Do you want to take a break?

5    MR. MOSHENBERG:  I think it'll just be one moment,

6    Your Honor.  We're looking at exhibit one please.

7    MR. BRIMMAGE:  (Indiscernible).  And I did want

8    (indiscernible) the issue.  Thanks, Your Honor.

9    MR. MOSHENBERG:  We're looking at Exhibit 1,

10   please.

11   THE COURT:  What's the exhibit you're going to?

12   MR. MOSHENBERG:  Number 1, Your Honor.

13   THE COURT:  Number 1.

14   MR. MOSHENBERG:  Yes, Your Honor.

15   THE COURT:  Mr. Martin, I believe you're still the

16   presenter.  If anything has changed, if you need me to do

17   anything, you let me know.  I don't see you.  That's what --

18   oh, there you are.  You're still the presenter.

19   BY MR. MOSHENBERG:

20   Q    Can you see the document, sir?

21   A    Are you talking about the petition?  Yes, sir.

22   Q    Yes.

23   A    Yes, sir.

24   Q    I almost called you Your Honor.  Now, the -- you've

25   seen this document before, correct?

1    A    Yes.

2    Q    Okay.  I want to look on this first page.  And Part IV,

3    it says Debtor's address.  It says principal place of

4    business.  Do you see that?

5    A    Yes.

6    Q    Okay.  It looks like it's in Austin, Texas.

7    A    Yes, sir.

8    Q    Okay.  And I think I remember looking in your

9    declaration too, but it is your understanding that they are

10   based in Austin, correct?

11   A    They being FSS?  Yes.

12   Q    Right.  They've got an office building there.  And I

13   think also a warehouse you mentioned.

14   A    Yes.

15   Q    Okay.  All right.  Let's go to Page 3, please, Section

16   XI.  Do you see Section XI, check all that apply?  Why is

17   this case fall to this District?

18   A    Yes.

19   Q    And can you read the box that's checked please?

20   A    There it said, its domicile place, principal place of

21   business or principal assets in this district for 180 days

22   immediately preceding the date of this petition or for a

23   longer part of such 180 days than in any other district.

24   Q    Okay.  That statement is not correct; is it?

25   A    I believe it --

1           MR. BATTAGLIA:  Objection, Your Honor.  I believe

2    that calls for a legal conclusion of what the definition of

3    domicile is.

4           THE COURT:  Yeah, I'm going to sustain that

5    objection.

6    BY MR. MOSHENBERG:

7    Q    What activities are occurring in Houston on behalf of

8    Free Speech Systems?

9    A    In Houston, I don't know.

10   Q    What about in the Southern District?

11   A    Southern District --

12   Q    Yes.

13   A    Well, its business activities are occurring in the

14   state of Texas, and I understand that's the domicile.

15   Q    My understanding is it's all happening in the Austin

16   area, correct?

17   A    Well, I mean all the physical activity is in the Austin

18   area.

19   Q    Right.

20   A    But they sell all over the country.

21   Q    Right.  But you're not aware of anything in particular

22   happening in the Houston area, correct?

23   A    No.

24   Q    Galveston, Victoria, nothing there?

25   A    No.

1    Q    Okay.  So, what was the basis for you checking that

2    box?

3    A    My understanding from counsel is that there's case law

4    out there that a quick Texas entity is domiciled in the

5    state of Texas, and you can pick any district.

6    Q    Okay.  And this is -- of course, if we go to the next

7    page, Page 4, you're swearing under the penalty of perjury

8    that what's in here is correct, correct?

9    A    Correct.

10   Q    So, is it fair to put this in the same bucket of things

11   that you swore as being true even though you didn't really

12   know if it was true or not?

13   A    Well, I'm not a lawyer, so I don't consider my reading

14   of the case law definitive.  But based on the case law I

15   read; this is correct.

16   Q    That their domicile is in this district?

17   A    Yes.

18   Q    Okay.  Even though you're aware of no activities

19   happening in this area?

20        MR. BATTAGLIA:  Objection, Your Honor, asked and

21   answered.

22        THE COURT:  I'm going to sustain that.

23   BY MR. MOSHENBERG:

24   Q    Actually, let's go to Page 13 of that document.  Were

25   you the one that prepared this balance sheet?

1   A    I'm sorry.  What are you referring to?

2   Q    I'm looking on Page 13 of 17.  Excuse me, balance

3   sheet.

4   A    If you look at Page 13 of 17, at the very top, it says

5   "Comparative Profit and Loss Statement."

6   Q    I think that's 12.  Oh, it's the exhibit.  Can you go

7   to the next page, please?  I'm looking at the balance sheet.

8   Were you the one that prepared this?

9   A    No, I think I had one of my staff prepare this.

10  Q    And it's no secret I want to talk to you about the

11  numbers across the bottom.

12  A    Okay.

13  Q    The reports in 2021, 61 million, almost $62 million in

14  member draws; isn't that right?

15  A    Let me clarify your statement for you.  It reports that

16  as of 12/31/21, member draws totaled $61,937,000 -- 938,000.

17  Q    Your testimony is that there were no $61 million in

18  draws in 2021?

19  A    Draws, the total of all draws was $61 million at

20  12/31/21.  That number is correct.

21  Q    And your testimony here is when it says as of

22  12/31/2021, that means as of the date the company was

23  formed?  As of and then to 12/31/2021?

24          MR. BATTAGLIA:  Your Honor, I'm going to object to

25  the form of the question.  I'm not quite sure I understood

```
 1   it.
 2              THE WITNESS:  I didn't understand it.
 3              THE COURT:  Well, that makes three of us.
 4   BY MR. MOSHENBERG:
 5   Q    Okay.  My point is where on this document does it say
 6   the beginning date?
 7   A    It doesn't.
 8   Q    Right.  So, there's no -- nothing, here that represents
 9   what you're saying that years earlier there was a $61
10   million in draws.
11   A    What represents that is that member draws was
12   61,937,000 as of 12/31/2021.  That's what that number
13   represents.  That is -- that's a balance sheet.  It's a
14   basic accounting.
15   Q    And you're relying on the financials that were provided
16   to your assistant in order to report that?
17   A    No.
18   Q    What were you relying on relying on?
19   A    We were relying on the general ledgers that were the --
20   QuickBooks system, which is the accounting system.  If you
21   allow me to explain the answer.
22   Q    I'd like to know what you were relying on.
23   A    Okay.  I'm relying on the general ledgers.
24   Q    Okay.  And didn't you say in your beginning testimony
25   earlier today that the financials were all messed up?
```

007584

```
1    A    I said that 12/31/21 had not been closed when we were
2    engaged and 12/31/22 had not been posted.
3    Q    Okay.  You said more than that though.  I think you're
4    saying that the financials were a mess, right?
5               MR. BATTAGLIA:  Your Honor, I object to the
6    characterizing the witness's testimony.  He said what he
7    said.
8               THE COURT:  All right.  Well, Mr. Schwartz, do you
9    recall saying that the statements were -- financial
10   statements were a mess?
11              MR. SCHWARTZ:  I said 12/21 and 12/22 were a mess.
12   We didn't do anything to -- have to do anything to 12/20 and
13   prior.
14   BY MR. MOSHENBERG:
15   Q    Well, you said -- all right.
16              THE COURT:  Go ahead.
17   BY MR. MOSHENBERG:
18   A    You said --
19   Q    You said that the people that kept the books beforehand
20   didn't even have accounting degrees, right?
21   A    The people who were -- no.  The people who kept the
22   books when I came on board had no accounting degrees.
23   Q    Mm hmm.
24   A    My predecessor -- I do not know when she was terminated
25   but I've had several people tell me that she was an
```

1   excellent accountant.

2   Q   And it's based on that solely that you determined that

3   those numbers are right, the $62 million in draws.

4   A   No.  I -- okay.  This is what the financial statements

5   reflect.  I did not have to do, and I have not gone back --

6   and for any reason -- I had no reason to go back and audit

7   2020 and prior.  But I had to get 2021 and 2022 up to date

8   and current and posted.  As of 12/31/21, I will clarify for

9   the Court, from 2007 when this company was formed to

10  12/31/21, net draw was -- by Mr. Jones -- was -- to Mr.

11  Jones -- for $62 million, rounded.  From the period of -- if

12  I did that right -- what is that, 14 years, 15 years -- 14

13  years.

14  Q   Okay.  And since the lawsuits were filed, the

15  defamation cases by the Sandy Hook families, how much money

16  in draws did Alex Jones take?

17  A   My -- probably about --

18          THE COURT:  Why don't we put a date on it?  Why

19  don't we just put a date on it just so we're -- we have a

20  clean record --

21          MR. MOSHENBERG:  It was in 2018, Your Honor.

22          THE COURT:  -- because there were multiple

23  lawsuits and I just want to make sure that we're all clear.

24  So, your question if from the beginning, since 2018?

25          MR. MOSHENBERG:  Sure.  Yes, Your Honor.

007586

```
 1    Actually, since April of 2018.
 2              THE COURT:  Okay.
 3              THE WITNESS:  I can't answer since April of 2018.
 4    I've not just gone -- I've got the information.  It's
 5    available to me.  I haven't gone back and looked at that.
 6    I'm --
 7              THE COURT:  Do you know what the draws would have
 8    been over the last three years?  Why don't we say it that --
 9              THE WITNESS:  For the last -- well, okay.  In 20 -
10    -
11              THE COURT:  I think you can say what the -- yeah.
12    Just (indiscernible) --
13              THE WITNESS:  Did you -- okay.  2022, it was
14    $254,000 through May.  2021, I think it was $2 million.
15    2020, 2019, probably 7 million, maybe.  And this --
16              THE COURT:  Total or each year?
17              THE WITNESS:  Each year, and these are total
18    draws.  The taxes on the income of FSS are also accounted
19    for as draws when they're taken out and paid.  So, for
20    example, the $64 million, we know $30 million of that I
21    think -- what was it -- over the last -- since 2012, was
22    paid to the IRS.
23    BY MR. MOSHENBERG:
24    Q    $30 million?  How much income do you need to have pay
25    $30 million to the IRS?
```

1    A    You can -- well, divide that by point four, and that's

2    the taxable income.

3    Q    That was Alex Jones' tax income?

4    A    Well, FFS is a -- this -- disregarded, thank you --

5    entity and so --

6              THE COURT:  Hold on.  So, Mr. Battaglia, I --

7    yeah.

8              THE WITNESS:  I apologize.  I'm at that age where

9    it takes time -- it takes a few minutes to --

10             THE COURT:  No.  Well, I don't --

11             THE WITNESS:  -- pull things out.  A disregarded

12   entity, so all of the income and expenses of FSS appear on

13   Mr. Jones' personal tax return and he has to pay the tax.

14   So, when there's taxable income, FSS has to -- FSS pays the

15   money to the IRS.  It doesn't flow through Mr. Jones'

16   personal accounts.

17   BY MR. MOSHENBERG:

18   Q    Okay.  Are you -- have you seen any sort of document --

19   did you know, I should say, that there was document produced

20   in the Sandy Hook litigation in Texas -- in the Fontaine

21   litigation -- by Free Speech Systems' corporate

22   representative, showing draws between 2018 and 2021 of $18

23   million?  Did you know that?

24   A    No, I'd have to see that.

25   Q    Okay.  Based on your numbers, does that sound right?

007588

```
 1    Between 2018 and 2021, $18 million in draws were taken out

 2    of the company.

 3    A    I mean, I'd have to look at the -- look at it.  I don't

 4    think that ties.  We're looking -- we were looking at total

 5    draws -- 60-something million and -- I do know this, that of

 6    the total draws, less than half occurred after 2018.  There

 7    was actually more in draws before 2018.

 8    Q    Okay.  So --

 9    A    But I'd have to look -- the details of the numbers, I

10    don't have them with me.

11    Q    Okay.  So, when we're talking about 2018 to present, 30

12    million-ish, that's what you were talking about?

13    A    In total draws?

14    Q    Yeah.

15    A    I don't think it's -- that's not -- I mean, we have the

16    exact number.  I don't want to give you a number that's

17    going to be -- you know, you deserve the right number not

18    that one, not something off the top of my head.

19    Q    Those are considerable draws though, you agree?

20    A    It would be to me.

21    Q    Yeah.  And you don't know what Free Speech System

22    received in return for those draws, correct?

23    A    By, you don't -- draws are the equivalent of dividends

24    in a C corp.

25    Q    Right.
```

1    A    Or an S corp.  So, you don't get anything in return for

2    paying -- giving return of the -- of capital or your return

3    of income to your investors.  That's what they're entitled

4    to from -- for investing in you in the first place.

5    Q    Right.  They don't receive any sort of value in return

6    for giving this draw out.

7    A    Same way you don't get -- you know, the question is, do

8    you get any in -- value in return for paying the interest on

9    the debt.

10   Q    You don't.

11   A    Or you -- you know, you receive the debt, you receive

12   the equity.

13   Q    But at the time the draw was made, there was no value

14   given to Free Speech Systems?  Like you were saying, it's

15   like a dividend.  There was no benefit to --

16   A    It's like a dividend.  It's a return of -- it's, you

17   know -- what Free Speech System got was the initial

18   investment and then the buildup of equity over time to use

19   it to invest in the business as long-term capital.

20   Q    That's not what they got when they made a draw.  When

21   they made a draw, they got nothing.  They just lost money.

22        MR. BATTAGLIA:  Objection.  Again, counsel --

23   (indiscernible) asked and answered.

24        THE COURT:  Yeah.  I -- on that one, I'm tending

25   to agree, so I'm going to sustain that objection.

```
 1    BY MR. MOSHENBERG:

 2    Q    If Alex Jones hadn't taken $62 million out of the

 3    company in that time period or $30 million or $18 million

 4    since 2018, he hadn't taken money out of the company, there

 5    wouldn't have been a bankruptcy, correct?

 6              MR. BATTAGLIA:  Objection, Your Honor.  Calls for

 7    speculation.

 8              THE COURT:  Sustained.

 9    BY MR. MOSHENBERG:

10    Q    In your opinion, would it have needed to file

11    bankruptcy if that money had still been in there?

12              MR. BATTAGLIA:  Objection.  Calls for speculation.

13              THE COURT:  I did analyze the case and authorized

14    the filing.  You can answer that.

15    BY MR. MOSHENBERG:

16    A    If $30 million had been in the company, depending on

17    the nature of the asset it was invested in, it might or

18    might not have been bankrupt.  If it was sitting there in

19    the bank account, then no, we wouldn't be in bankruptcy.  If

20    he hadn't paid the IRS, we wouldn't -- well, we would have

21    been shut down, so --

22    Q    All right.  You've got a background in investigating

23    fraud is my understanding, correct?

24    A    I have done some of that.

25    Q    Are you familiar with what fraudulent transfers are?
```

```
 1    A    I have some understanding of that.
 2    Q    Okay.  You understand that Alex Jones and Free Speech
 3    Systems have been accused of making fraudulent transfers to
 4    insiders?
 5    A    I have heard that.  I have not read the complaint.
 6    Q    Okay.  You're not familiar with what the actual lawsuit
 7    alleges?
 8    A    I'm -- well, I understand it alleges a fraudulent
 9    transfer.  A fraudulent transfer is -- that's about the
10    extent of my knowledge.
11    Q    Okay.  You don't know any of the details supporting
12    those allegations?
13    A    Not at this time I don't.
14    Q    Okay.  You understand that Free Speech Systems and
15    Jones were in fact sued for making -- let me skip that
16    question.  Have you investigated at all whether any of the
17    draws were in fact fraudulent transfers?
18    A    No.
19    Q    I want to go back to Exhibit 3, Paragraph 35.  Can you
20    read that statement out loud, please?
21    A    "The CRO's continuing to evaluate where the estate has
22    causes of action to claw back any payments or distributions
23    to Alex Jones."
24    Q    Is it fair to say that at the time this was written
25    that you hadn't evaluated it yet from your prior answer?
```

```
 1    A     Correct.  We had not.

 2    Q     Okay.  So, this isn't true that you're continuing to

 3    evaluate?

 4    A     No, we're -- I mean, we continue to be aware of the

 5    possibility and if we see any evidence of it -- we have not

 6    done any conservative investigation of that.

 7    Q     Okay.  The statement should say --

 8          THE COURT:  Let me get you where you're going.

 9    The question is, are you continuing to evaluate.  Is that

10    statement accurate?

11          THE WITNESS:  Yes.  I have not made a decision

12    either way.  Are there actionable distributions or are there

13    not?  We just have not, you know, we're aware of it's -- of

14    the situation.  It's common in any company bankruptcy and if

15    we see something, we will note it and keep track of it so

16    that at least once we get started on that phase of the

17    engagement, we'll have that knowledge already.

18          MR. MOSHENBERG:  Object as nonresponsive, Your

19    Honor.

20          THE COURT:  Sustained.

21    BY MR. MOSHENBERG:

22    Q     Your testimony is you hadn't even started

23    investigating.  That's what you just me.  You hadn't started

24    yet.  So, you're not continuing, you haven't started.

25    A     Well, I don't read this this way and you're always
```

1    evaluating.  It's just part of the job.  Now, I have not

2    started the actual -- okay, now let's start the formal

3    investigation and start putting together the evidence and

4    focus on that.  That is not just where our focus is right

5    now.

6    Q    Okay.  So, you haven't started, correct?

7    A    Yeah.  So, like I said, our focus -- we have not

8    directed our focus there as of yet.

9    Q    You -- are the draws -- the significant draws that Alex

10   Jones has taken out of the company, do you think those

11   warrant an investigation as to whether those fraudulent

12   transfers?

13   A    I don't think whether I think they're warranted or not,

14   I think I'm obligated to look at that.

15   Q    Okay.  But from what you know right now, do you know --

16   do you think it's warranted to investigate whether those are

17   fraudulent transfers?

18   A    I don't care whether it's warranted or not.  I have to

19   look at it, so I'm going to look at it.

20   Q    I understand but I'd like an answer to my question.

21   A    Well, I don't know what warrant has to do with it.  It

22   just -- I think draws are always warranted in

23   investigations.  So, then in that context, then yes, they

24   warrant investigation because they -- draws should always be

25   investigated in a bankruptcy.

```
 1   Q    Okay.  Now, when you were the CRO of InfoW, you were

 2   part of the attempt to secure a release of Alex Jones and

 3   Free Speech Systems as part of that bankruptcy plan.

 4   Correct?

 5   A    Not -- as I recall, that was part of a revision in the

 6   Plan Support Agreement that had certain events occurred --

 7   certain payments were made -- that they would get a release.

 8   Q    Right.  And the goal was to pay $10 million to those

 9   claimants, right?

10   A    I note the number on the table it was $10 million.

11   That's what was -- had been committed to at that time, in

12   the beginning.

13   Q    Okay.  And so, we were saying a moment ago, 18 million,

14   30 million, 60 million, the draws are something that need to

15   be investigated, whether they're fraudulent transfers.  But

16   you were trying to secure a release in that bankruptcy of

17   Jones and Free Speech Systems for $10 million while you were

18   the CRO of InfoW --

19              MR. BATTAGLIA:  Your Honor --

20   BY MR. MOSHENBERG:

21   A     -- and you hadn't disclosed --

22   MR. MOSHENBERG:  Let me finish my question, please BY MR.

23   MOSHENBERG:

24   A     -- and you hadn't disclosed that at the time that you

25   were part of that effort, you were the CRO for Free Speech
```

1    Systems as well, or that you were at least being engaged to

2    be.

3        MR. BATTAGLIA:  Your Honor, I'm going to object on

4    a couple of grounds.  One, relevance of any of this to a

5    cash collateral -- interim cash collateral -- hearing,

6    number one.  Number two, counsel is -- if he wants to talk

7    about what the Plan Support Agreement says, it's in

8    evidence.  It doesn't say a release for 10 million.  It says

9    a release for (indiscernible) over and over and over again.

10   So, he's mischaracterizing the record, the documents in

11   evidence --

12       THE COURT:  I'll sustain the objection on that

13   ground, and I do think he can answer the question about how

14   he was negotiating -- whether he was negotiating the Plan

15   Support Agreement or parties to Plan Support Agreement on

16   behalf of InfoW debtors and was soliciting was to be the CRO

17   of Free Speech at that same time.  And I think that goes to

18   credibility and I think you can --

19       THE WITNESS:  Is that the --

20       THE COURT:  Well, I think you can answer that

21   question.  You know, and I mean, you can ask that question

22   again but if you do want to ask a question about the Plan

23   Support Agreement, I do think it makes more sense to just --

24   it's in evidence.  You can just ask the questions about that

25   and show him a document and that way we can at least have a

```
 1    clean record.

 2             THE WITNESS:  Sure.

 3    BY MR. MOSHENBERG:

 4    Q    So, what's the answer?

 5    A    To the Court's question?

 6    Q    Yes.

 7    A    The Plan Support Agreement had been terminated by April

 8    30th because conditions precedent to it had not been met.

 9             THE COURT:  Let me take over.  That was never --

10    was that ever told to (indiscernible)?

11             THE WITNESS:  I believe you pointed out in your --

12    at one point from the bench there, you said, this has to be

13    -- if we don't know this by April 30th, this thing's dead,

14    isn't it?

15             THE COURT:  And everybody was assuring me at the

16    time that they were going to extend it and keep working.

17             THE WITNESS:  Well, it never got signed.  Later,

18    we did continue working but by -- in May -- by May 19th for

19    certain, or prior to May 19th, we were negotiating with the

20    Plaintiffs in both cases --

21             THE COURT:  Let me get the question -- I might as

22    well ask it now because it's a good spot.  I can wait until

23    the end, or I can ask it now and don't read too much into

24    it.  I just need to understand it.  On May 19th, there was a

25    hearing before me where on May 18th, there was a request for
```

1   a continuation on a motion to dismiss.  The hearing on the

2   motion to dismiss -- we held an emergency hearing on the

3   19th where there was a proposed stipulation presented to me

4   to dismiss -- allow the dismissal -- of the -- what I would

5   call the Austin -- one portion of the Austin litigation, and

6   I signed it on that day.

7           And in this case, there is a letter dated by you

8   to Free Speech dated the same day.  I may be reading much

9   into this, but it seems to me that you -- either you wrote

10   the letter that day or you had been in conversation with

11   Free Speech before you wrote that -- before that day you

12   sent the letter.  And I just need to understand -- none of

13   this was ever disclosed to me in connection with the case

14   and the cases were dismissed on June the 10th officially,

15   which tells me that Mr. Jones signed a retention letter.

16   So, you were actively retained before these cases were

17   dismissed -- the last cases were dismissed -- and I just

18   need to understand, one, why that was never disclosed to me,

19   and two, when did you begin to start soliciting or having

20   conversations about representing Free Speech Systems.

21           Why don't -- that's a compound question.  I think

22   that's unfair.  When did you begin to have conversations

23   with anyone from Free Speech Systems about potentially

24   representing them?

25           THE WITNESS:  I had conversations with Mr. Lee, in

```
1    I believe --
2              THE COURT:  Mr. Lee was representing the Debtors
3    too.
4              THE WITNESS:  -- and Mr. Jordan who represented --
5    I think still does represent Mr. Jones.  I don't know when
6    those were, but it was after we had been substantially
7    convinced that we were going to be terminating the InfoWars
8    bankruptcy.
9              THE COURT:  You wrote the letter on May 19th.
10             THE WITNESS:  On May 19th, Mr. Lee asked me to
11   send him an engagement letter for Free Speech -- the Free
12   Speech engagement.
13             THE COURT:  Okay.
14             THE WITNESS:  And to be quite honest with you, I
15   didn't even think about it at that time.
16             THE COURT:  No, I appreciate the honesty.  I
17   appreciate disclosure.  It seeks a retainer.  When did you
18   receive that retainer?
19             THE WITNESS:  Lord --
20             THE COURT:  That month?
21             THE WITNESS:  No, it was --
22             THE COURT:  Let just say if the letter was signed
23   on June -- the letter was officially signed on June 6th --
24             THE WITNESS:  June 6th.
25             THE COURT:  When did you -- did you receive it
```

1    before or after you were retained, or right about that time?

2              THE WITNESS:  It was -- no, it was not right

3    around -- it was after, definitely.

4              THE COURT:  After.  Okay.

5              THE WITNESS:  You know, it was several weeks after

6    at least.

7              THE COURT:  Okay.  Okay.  Sorry.  That was the

8    question -- that was the clarification that I had mentioned

9    I had wanted to understand the day before.  I guess Mr. Lee

10   a few questions as well at some point, but I'll need to

11   understand that as well, but today's not that day.  Today's

12   cash collateral, and so I do want -- and I know I took this

13   off on tangent.  Now, I'm going to bring it back.  I did

14   want to focus on cash collateral, and I want to focus on

15   critical vendor, and I want to understand -- I've given you

16   some leeway.  Maybe that's the better way of saying.  I've

17   given you some leeway to kind of have general conversation

18   about the CRO role and what investigation and he's done to

19   formulate in connection with the budget, but now I'm going

20   to ask you to laser focus on these two motions.

21   BY MR. MOSHENBERG:

22   Q    Okay.  Let's look at that part of Exhibit 3, the ledger

23   (indiscernible).  I want to focus on the part where it

24   provides for a budget for Alex Jones of $54,000 every other

25   week.  Do you see that part?

1   A    Not yet.

2   Q    Can you see it?

3   A    Yes.

4   Q    Okay.  And in total, it ends up being about $379,000,

5   correct?

6   A    I can't tell.  He's -- whatever it says.  I mean, I

7   can't see that.  Would you have your associate or partner

8   reduce the size?  Thank you.

9   Q    Yeah.  (Indiscernible) $379,000 and that's over a 13-

10  week period, correct?

11  A    Correct.

12  Q    Okay.  And if you translate $379,000 over a 13-week

13  period, that translates to about a salary of $1.5 million.

14  Do you understand that?

15  A    Well, I don't believe that's correct.  Mr. Jones --

16  this is a -- Mr. Jones has an appointment agreement for 1.3

17  million.  Some amount of it and I think it's about 8,000 of

18  (indiscernible) Patriot is paid through the payroll system.

19  This should be that difference.  So, you got 26 pay periods

20  in the year so you can do the math.  It will be -- should

21  add up to 1.3, those two components.

22  Q    Well, I did 379 -- 13 weeks is a quarter of a year,

23  right, 52 weeks --

24  A    Yeah, but we can't do -- you've got to do it by --

25  because we pay a biweekly, not semi-monthly.

1    Q    Okay.

2    A    So, that's -- something about the math in that

3    calculation -- you got to multiply that number by 26 to get

4    an annual rate.

5    Q    Okay.  So -- but your point is, $1.3 million salary.

6    A    Total -- his total is 1.3 million.

7    Q    Okay.

8          THE COURT:  I'm just going to tell everyone.

9    Judge -- math and don't claim to be -- (indiscernible) in

10   excel spreadsheet for you, but it's essentially treading a

11   $54,000 bimonthly, you know, but that -- if you take that

12   over 26 periods -- you multiply the 54,000 times -- you get

13   to like a $1.4 million number.

14          THE WITNESS:  That case, well --

15          THE COURT:  If you multiply it times 24, you get

16   to the 1.3.  It's --

17          THE WITNESS:  Oh, shoot.  I apologize, Your Honor.

18          THE COURT:  It's okay.

19          THE WITNESS:  Okay.

20   BY MR. MOSHENBERG:

21   Q    And that's salary separate from the draws that he's

22   taking out of the company, right?

23   A    Correct.

24   Q    Okay.  You understand that in the Free Speech Systems

25   corporate representative, that position, the document that

1     produced showed that he had an annual salary of about

2     $625,000.

3           MR. BATTAGLIA:  Objection, Your Honor.  The

4     question is about a deposition he was not present at and --

5           THE COURT:  Yeah.  I'm going to sustain that.  I

6     want you focused on the questions -- I've given you plenty

7     of room --

8           MR. MOSHENBERG:  Sure.

9           THE COURT:  -- and Mr. Brimmage is going to ask

10    questions too and I want him -- I want you all focused on --

11    you got questions about the budget, ask the budget.

12          MR. MOSHENBERG:  Well, what I'm trying to

13    understand is, if there were documents produced to us by

14    Free Speech showing that his salary was $625,000 a year, why

15    is he receiving a $1.3 million salary under this budget.

16          THE COURT:  Do you have those documents?

17          MR. MOSHENBERG:  Yes, Your Honor.  They were notes

18    provide as part of the deposition --

19          THE COURT:  No, I'm asking you are they on your

20    witness and exhibit list?

21          MR. MOSHENBERG:  They are, Your Honor.

22          THE COURT:  Why don't you show that then?

23          MR. MOSHENBERG:  It's Exhibit 12.

24    BY MR. MOSHENBERG:

25    Q    These were notes that were provided by the corporate

```
 1   representative based on her review in preparing for her
 2   30(b)(6) deposition.  They were admitted as part of the
 3   deposition.  And if you look, about halfway down, it says,
 4   AJ paid a salary of $625,000 a year.
 5   A    As of what date?  Do you know?
 6   Q    Well, this deposition occurred in -- February 15th of
 7   2022, this year.
 8   A    I'd have to look back and see the date of the
 9   employment agreement that I was -- given to me that I have,
10   which is what the 1.3 is based on.
11   Q    Right.  And that employment agreement was created in
12   April of this year, correct?
13   A    You're probably -- you may be right.  I think you're
14   right.
15   Q    Right.  It was kind of about the same time as all the
16   bankruptcies with the InfoW started happening, right,
17   leading up to the Alex Jones trial that was first set in
18   April, 2022, right?
19   A    I don't know about the first setting of the Alex Jones
20   trial, but I do recall -- I'd have to look back and see when
21   I got involved with the InfoWars bankruptcy, if it was in
22   April or not or prior to -- after that.  I don't know when
23   they actually got started.  It was before I had -- the
24   planning for that started before I ever got involved.
25   Q    Okay.
```

007604

```
 1    A    Sometime before I got involved.

 2    Q    But you relied on that $1.3 million based on an

 3   agreement that was created in April of 2022, correct?

 4    A    Right.  That's the contract I have (indiscernible) --

 5    Q    It wasn't based on prior pay that he was receiving?

 6    A    No.

 7    Q    So, in --

 8         THE COURT:  Okay.  Mr. Moshenberg, he's answered

 9   the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11         MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13    Q    You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16         THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19    Q    Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21    A    No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24    Q    And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other
```

007605

1    week.

2    A    I -- no, what I decided was, look, the agreement says

3    1.3 million.  I'm going to put you -- I'm putting into your

4    payroll.  That's what the contract says.  You know, if it

5    gets thrown, it gets thrown out.  Whatever --

6    Q    There's no emergency, right?  There's no emergency to

7    pay him those funds.  Isn't that the reality?  You were

8    saying a moment ago he wasn't even making any money.  Well,

9    what is the emergency in this motion that he receive $54,000

10   every other week?

11   A    I can't say there's an emergency.

12   Q    He doesn't need it.

13   A    I wouldn't -- I don't know.  I mean, I can't there was

14   an emergency.  He didn't --

15   Q    Certainly, from the Debtor's part, there's no

16   emergency.  There's no, we have to pay him this or Alex

17   Jones is going to quit, right?  We're not worried about

18   that.

19   A    I don't believe that's the case.

20   Q    Yeah, I don't think so either.

21        THE COURT:  Mr. Moshenberg, now is the time that

22   you start reading the room.  I want you to focus on

23   questions that relate to the budget for cash collateral or -

24   -

25        MR. MOSHENBERG:  Okay.  Fair enough, Your Honor.

```
 1     Give me one moment, Your Honor.

 2           THE COURT:  Take your time.

 3           MR. MOSHENBERG:  Your Honor, if it works for you,

 4     what I'll do to save time is, if I could save my line of

 5     questions for recross if needed --

 6           THE COURT:  Sure.

 7           MR. MOSHENBERG:  --  but we'll just do it that way

 8     instead just to speed things along.

 9           THE COURT:  Okay.  But before you go, is -- maybe

10     the parties can help me, and I'm just -- as I think through

11     this -- I know it's not official, but my understanding was

12     that the parties were agreeing -- and to my knowledge, Mr.

13     Jones hasn't objected to it, and if there's somebody let me

14     know -- that the $54,000 number was going to count on the

15     20,000, right?

16           MR. BATTAGLIA:  20,000 for the interim cash

17     collateral period.  Yes, sir.

18           THE COURT:  Okay.  I just wanted to make sure that

19     I understood.

20           MR. BATTAGLIA:  Yes.

21           THE COURT:  Okay.  Okay.  Actually, the reason I'm

22     asking all the questions -- regardless if it's 625 or 1.3

23     for the interim period, it would be some number below even

24     the 625 for purposes of interim, and I want to make sure all

25     of his rights are reserved to come back and prove that at
```

```
 1    one point who has the right number.  I'm not getting into
 2    that.  I just want to make sure that I understand what's on
 3    the table now.
 4              Mr. Schwartz, let me ask, are you ready to
 5    continue or do you need five minutes to use the restroom or
 6    something?
 7              THE WITNESS:  I think I'm okay, Your Honor.
 8              THE COURT:  Okay.
 9              THE WITNESS:  If I turn yellow, I'll raise my
10    hand, Your Honor.
11              THE COURT:  Okay.
12              MR. BATTAGLIA:  Judge, my rule is I never waste an
13    opportunity to a bathroom (indiscernible) --
14              THE COURT:  No, no, no.  I just -- it's the
15    witness so -- just maybe two minutes?
16              MR. MOSHENBERG:  No, Your Honor.
17              THE COURT:  Okay.
18              MR. MOSHENBERG:  (Indiscernible).
19              THE COURT:  That's fine.  I'm just trying to
20    understand the deal --
21              MR. MOSHENBERG:  Yeah.
22              THE COURT:  -- where things stood --
23              MR. MOSHENBERG:  Well --
24              THE COURT:  -- and maybe they've changed.  That's
25    what I'm trying to get to.
```

```
 1              MR. MOSHENBERG:  Yeah.  (Indiscernible).

 2              MR. BATTAGLIA:  I didn't know that need was a

 3    basis here as entitlement to.  I mean, I don't necessarily

 4    my salary.  I'm not sure whether you need your more --

 5              THE COURT:  I get it.

 6              MR. BRIMMAGE:  By the way, there is no

 7    (indiscernible) --

 8              THE COURT:  The record says what it says, and I'll

 9    let parties make the argument based on what they want.

10              MR. NGUYEN:  Thank you, Your Honor --

11              THE COURT:  So, why don't we -- why don't you ask

12    your question and then we'll take a five-minute break and

13    then we'll continue with the cross-examination.

14              MR. NGUYEN:  Thank you, Your Honor.  I will be --

15              THE COURT:  No, no, no.  I want you to take as

16    much time as you need.  That's not --

17              MR. NGUYEN:  -- as brief as possible.

18              THE COURT:  -- that I'm trying to rush you.

19              MR. NGUYEN:  Understood, Your Honor.

20    BY MR. NGUYEN:

21    Q    I just have a couple of question, Mr. Schwartz, about

22    your engagement with FFS and your prior engagement with

23    InfoW.  The Judge asked you some questions.  I still --

24    there's still a little bit of gaps in the timeline and I

25    just -- if you can help me, just walk me through your
```

1    engagement.  So, Mr. Schwartz, can you just tell me exactly

2    when your engagement with the InfoW entities began?

3    A    I don't have -- I don't recall the date of that

4    engagement letter.

5    Q    The cases were filed back in, I believe, April --

6    A    Yeah.  It would have been in April right before the

7    case was filed.

8    Q    And presently, are you still the chief restructuring

9    officer for the InfoW entities?

10   A    Yes, I am.

11   Q    And who at the InfoW entities would have the right to

12   terminate your engagement as the CRO?

13   A    I've asked that question.  I don't know the answer.

14   Q    Well, who hired you as the CRO for the InfoW entities?

15   A    The interim Trustee.

16   Q    And who is that?

17   A    Robert Dew.

18   Q    And did Mr. Dew sign the engagement letter for the

19   InfoW entities or was it, Alex Jones?

20   A    No, it was -- well, I'm pretty sure it was Robert Dew.

21   I may have to look at that.

22   Q    And overall, how much money were you paid for your

23   services as the CRO in the InfoW entities?

24   A    I'm -- I'd have to speculate.  I don't recall.  I know

25   had leftovers from my retainer.

```
 1    Q    How much was the retainer?

 2    A    You would ask me that.  It was over $30,000, I know

 3    that.

 4    Q    You said you had leftovers?

 5    A    Yes.

 6    Q    Okay.  And who paid the retainer?

 7    A    That was paid by Mr. Jones, but I -- it was paid by Mr.

 8    Jones' lawyer.  I assume it was Mr. Jones' funds but --

 9    Q    And as the CRO for the InfoW entities, you were the one

10    that had the authority to enter into the stipulation with

11    U.S. Trustee to dismiss those cases?

12    A    Yes, I believe I did.

13    Q    Did you need to get authority from Mr. Jones to enter

14    into that stipulation?

15    A    No.

16    Q    And earlier, you mentioned that there was an engagement

17    letter sent to FFS around -- I believe the conversation was

18    May 19th, but I think the actual engagement letter was May

19    16th; is that correct?

20    A    I believe it was May 19th.  That's -- Mr. Lee asked for

21    it.  I don't know when it got to FSS.

22    Q    And how did you got word that FSS was looking for a

23    chief restructuring officer for you to send in an engagement

24    letter to FSS?

25    A    Mr. Lee called me and asked me to send an engagement
```

007611

```
 1    letter.

 2    Q    Did you speak to Mr. Jones about being the CRO for FSS?

 3    A    Not until June 6th.

 4    Q    Do you -- in the InfoW cases, did you file an

 5    application to be employed as the CRO for the InfoW

 6    entities?

 7    A    I didn't file it, but it was filed.  There was one

 8    filed.

 9    Q    Did you submit a verified statement with your

10    application?

11    A    Yes, I believe so.

12    Q    And in your verified statement, did you disclose

13    anywhere in there that you were seeking employment from FSS?

14    A    I don't believe so.

15    Q    And you serve as a bankruptcy professional that's been

16    appointed and approved by the court before in other cases?

17    A    Yes.  But on your former question, I have -- I was not

18    talking to FSS about serving as their CRO when I was engaged

19    by InfoW.

20    Q    In your experience as a bankruptcy professional, do you

21    think there's a continuing obligation for professionals that

22    appear before the court to supplement their disclosures and

23    tell the court of any connections that occurred during the

24    case?

25    A    Yeah.  The appointment orders require that.
```

1    Q    And that didn't happen in InfoW cases, correct?

2    A    Correct.  There was no appointment.

3    Q    But you still had a verified statement that was filed

4    with the Court, and you didn't supplement that verified

5    statement.

6    A    No, I didn't -- I was never appointed, so --

7    Q    And earlier, Mr. Battaglia talked about your authority

8    as the CRO for FSS.  Who do you get your direction from as

9    the CRO?

10   A    Me and the Court.

11   Q    Okay.  So, if Mr. Battaglia files a Chapter 11 Plan in

12   this case, you don't have to seek Alex Jones' approval of

13   that plan before it's submitted to the Court?

14   A    No.  We wouldn't look for his approval.  We'd look for

15   his input.

16   Q    Can Mr. Jones fire you as the CRO?

17   A    No.  Well, I guess he -- he'd have to (indiscernible)

18   here to get permission first.  I think actually the Court

19   would fire me.

20   Q    And earlier, there was a discussion of the PQPR notes,

21   one for about 29 million and the other was about 25 million

22   and some change.

23   A    Yes, sir.

24   Q    Do you recall that conversation?  Have you taken any

25   steps to verify that amount of the debt under the promissory

```
 1   notes to ensure that those amounts are accurate?
 2   A    All I've done so far is I have seen calculation of the
 3   makeup of the amount that was in the first note and some of
 4   the supporting documentation.  And I said I have seen it.
 5   I've done nothing on vetting that.  On the second note, I
 6   don't think I've seen anything.  And quite frankly, that's -
 7   - right now, we're still trying to get this company
 8   operating and fighting fires before we get to looking at --
 9   we're going to have to do that.  We know that.
10   Q    And in your declaration at Paragraph 53 -- Karen, can
11   you blow up the declaration?
12        THE COURT:  I've got to make Mr. Martin a
13   presenter again.
14        MR. NGUYEN:  Thank you, Your Honor.
15        THE COURT:  No, no worries.  I -- it was a
16   document that was up a bit earlier and I just wanted to make
17   sure that it was taken down.  Mr. Martin, if I've done
18   anything wrong -- if I need to do it again, let me know.
19   Okay.
20        MR. NGUYEN:  Paragraph 53, Mr. Martin.
21   BY MR. NGUYEN:
22   Q    Mr. Schwartz, can you see Paragraph 53 in your
23   declaration?
24   A    Yes.
25   Q    And it says, on or about August 13th, 2020, FSS and
```

1     PQPR executed a promissory note in the principal amount of

2     29,588,000 made payable to PQPR which memorialized their

3     accrued obligations of FSS to PQPR through December 31st,

4     2018.  Do you see that?

5     A     Yes.

6     Q     How do you know to put in your declaration under

7     penalty of perjury that this amount was memorialized with

8     the accrued obligations?

9     A     This is one where I said I saw the detail of the

10    calculation and some of the supporting documents in it.  It

11    identifies the transactions going back -- actually, it

12    should be from 12/31/2018.

13    Q     And you mentioned some supporting documents.  What are

14    some of those supporting documents?

15    A     These were schedules of billings, (indiscernible) PQPR

16    for inventory and credits, i.e., payments, applied to those

17    billings and they were developed out of the general ledger

18    system there, accounting transactions pulled out of the

19    general ledger system.  We didn't go beyond that.

20    Q     You didn't look at any -- have you -- did you seen any

21    invoices?

22    A     No.  We haven't done that.  It's --

23    Q     Have you seen any bank statements that show some

24    payments from PQPR?

25    A     Not in this time period.  We have not gone back that

1    far yet.

2    Q    Are there any bank statements?

3    A    Well, that's good question.  Right now, there aren't.

4    I've got to go back and check and make sure when we change

5    banks, we don't lose access to those bank statements.

6    Q    So, when you put in your disclosure this was the amount

7    that was memorialized in accrued obligations, you don't know

8    that for a fact.

9    A    Well, I know for a fact and that they showed me -- I

10   have the calculation for the amount of the 29,588,000 and I

11   see from the source date that it is from invoices and

12   payments records.

13   Q    But you don't --

14   A    To me, as an accountant, that tells me that's what I'm

15   looking at.

16   Q    But you haven't seen the billings or the invoices or

17   the --

18   A    We have not vouched it yet to ensure it's actually

19   properly calculated.

20   Q    And in your declaration, you -- on the cash collateral,

21   you mentioned that there was extensive and difficult

22   negotiation with PQPR over the use of cash collateral.  Do

23   you recall that part of your declaration?

24   A    Yes.

25   Q    Who did you communicate with at the PQPR to extensively

1    negotiate the use of cash collateral?

2    A    It was primarily David Jones and his -- and Steve

3    Lemmon.

4    Q    And did Alex Jones have any input in the use of -- in

5    the negotiations for the use of cash collateral?

6    A    Yes.  He would come in to the negotiating sessions

7    intermittently.

8    Q    And is it your understanding that the 80 percent

9    ownership of PQPR is owned by an entity that Alex Jones

10   owns?

11   A    Yes.

12   Q    And I just want to take a look at the budget.  The

13   Plaintiff went over the salary to Mr. Jones, but there is --

14   there's a line item on the budget for an American Express

15   payment of about $172,000.  I think it was the first week in

16   August.  Can you just tell me what that is?

17   A    That's the amount we -- of American Express.

18   Q    So, it's a pre-petition debt?

19   A    No.  That's -- okay.  Excuse me.  Let me fix that.

20   You're right.  It's not a pre-petition debt.  Based on our

21   spending history, this is the amount that will be -- come

22   due.  Well, maybe, you know -- and that's -- you probably

23   hit it on the head.  That probably is pre-petition.

24   Q    So, why is it necessary to pay American Express for a

25   pre-petition debt in the cash collateral 13-week budget?

1    A    Well, I would have argued we should -- well, it's --

2    we're probably going to have to just let American Express

3    shave the wind and see what we can do.  We have some charges

4    that go through them but they would be on the critical

5    vendor's list so we can take care of that there.

6    Q    Have you seen the invoices for the American Express

7    charges?

8    A    I have received -- seen some of them.  They're

9    extensive.  We're spending $300,000 a month on average with

10   American Express, and one of the problems we have is the

11   accounting staff did not distribute those charges.  So, all

12   we have is, if you look at the income statement, there's a

13   line item for American Express, because we can't tell you

14   whether it's for electricity, entertainment, or electronic

15   supplies for the production studio.

16   Q    Does Mr. Jones run any of his personal expenses through

17   this American Express card?

18   A    Yes.

19   Q    What are those expenses?

20   A    I've not done an extensive look at it other than I've

21   looked at the charges being -- those are charges against his

22   distribution account, his draw account.  But there -- his

23   housekeeper has charges on it, you know, cleaning,

24   housekeeping type stuff.  And that's the biggest number of

25   line items I recall seeing is her.

007618

```
 1    Q    So, help me understand.  Why is it an emergency for
 2    this Court to approve a payment to American Express to pay
 3    Mr. Jones' housekeeper?
 4    A    Well, like I said, the company has been paying the
 5    credit card, but those charges are charged as distributions
 6    against him.  I would not -- I'm not intending that going
 7    forward by any means, and we've informed him he can't put
 8    those on his credit card.
 9    Q    And how long have Mr. Jones used the American Express
10    credit card to charge his personal expenses?
11    A    It goes back quite a ways.  I don't -- I didn't -- you
12    know, I looked at some of the history on the account the
13    last 18 months and said, you know, I'm not -- you know, the
14    last 18 months, it's been regular.
15    Q    How about the vehicle leases on the budget, about 14 --
16    I believe it's 14 on every two weeks.  Whose car is that?
17    A    Those are actually vans, I believe, that the production
18    studio uses.
19    Q    Does the company pay for Mr. Jones' car?
20    A    No, not that I -- not that I have seen.  I'm told not,
21    and I haven't seen evidence of it.
22    Q    And earlier, one of the questions that the Judge asked
23    you is, what do you hope to accomplish in this bankruptcy
24    case, and I believe I missed your answer, or I believe Mr.
25    Battaglia answered the question.  But, you know, what is the
```

1    purpose of this bankruptcy case?

2    A    I think Mr. Battaglia answered that question when asked

3    by the Judge.  It's, quite frankly, the -- we can't go to

4    trial in Connecticut and be -- I mean, we have a trial team

5    stuck here if this needs to go to Connecticut to help try

6    that case.  We don't have the money to pay for that at this

7    point in time.  That's a huge problem right there.  So, it's

8    -- we just can't afford the Connecticut case, the time, or

9    the dollars right now.  Now, it's -- Alex Jones being off

10   the air for two months is not acceptable.  We won't be here.

11   We won't last two weeks in that situation, so we have to

12   work out a way to make all this happen.

13   Q    And as the Chief Restructuring Officer of FSS and Mr.

14   Jones being the sole owner and member of FSS, have you had

15   an opportunity to talk to Mr. Jones about the purpose of

16   this bankruptcy case?

17   A    Yes.

18   Q    And is his purpose aligned with what you just stated to

19   the Court as the purpose of the filing of this bankruptcy?

20   A    Yeah.  He knows we can't go double team.  We cannot do

21   it.  I think he'd like to get it out of the Connecticut

22   court, but I don't -- you know, we told him that ain't going

23   to work.

24   Q    You know, in your declaration, Mr. Schwartz, you

25   describe Mr. Jones as a natural radio personality and the --

```
 1    and I'm assuming you've had some opportunity to observe some
 2    of the content aired by InfoWars.
 3    A    Is that a question?
 4    Q    Yes, Your Honor -- sorry, Mr. Schwartz.
 5    A    Then you assume -- I have had tried to look at the
 6    program a few times.
 7    Q    Are you aware that after the hearing that we had on
 8    Monday, Mr. Jones appeared on his radio show, and he
 9    expressly told listeners of FSS about the purpose of this
10    bankruptcy filing.  Are you aware of that video?
11    A    No.
12    Q    Okay.  And you said that based on your conversation
13    with Mr. Jones, that it's your understanding that Mr. Jones'
14    purpose here is to make sure you don't fight multiple fronts
15    in terms of litigation.  You want to bring it all here and
16    that's the purpose of the bankruptcy filing, correct?
17    A    That's -- I mean, the discussions I've been involved
18    with him, you know, relating to that is, I mean, that's been
19    an expression what we have to do.  We can't do this.
20    Q    And the purpose of the bankruptcy is not to tie up the
21    damages from the Plaintiff for years and years and years?
22    A    No.  That could be done by appeal.  You don't need to -
23    -
24    Q    Okay.
25         MR. NGUYEN:  Mr. Martin, can blow up the
```

1    (indiscernible) --

2            THE COURT:  Actually, just two questions on the

3    budget.  And just to -- just so I understand, can you just

4    go back to the budget, Mr. Martin?  Just go to the first

5    page.  It's just two simple questions.  There's a line item

6    for outsourced services and -- for about -- yeah, just on

7    the first page.  There's a line item -- let's see -- it is -

8    - where is it?  It's by the total office and admin expense.

9    Now, where'd you go?  Yeah, there's a line item for

10   outsource --

11           THE WITNESS:  Outsource services?

12           THE COURT:  -- and then consulting services.

13   Those are the only two that I just didn't -- those are the

14   two that popped out to me that I just wanted to get some

15   clarification on.

16           THE WITNESS:  Those are two categories we have got

17   to investigate.

18           THE COURT:  Okay.

19           THE WITNESS:  Because, first off, we have to get -

20   - presumably, these are contractual relationships and I want

21   to see the contracts --

22           THE COURT:  Okay.

23           THE WITNESS:  -- which I have not seen, and I want

24   to know exactly what they're doing and why we need to keep

25   paying them to do it.

```
 1              THE COURT:  Okay.
 2              THE WITNESS:  There's this -- there are quite a
 3    number of -- I'd say, 10 or 12 entities in these two
 4    categories combined that --
 5              THE COURT:  Okay.
 6              THE WITNESS:  I put them in there because we've
 7    been -- they're in their regular expenditure and --
 8              THE COURT:  Can you give me an example of an
 9    outsourced service and a consulting service?
10              THE WITNESS:  Oh, for one, for example is --
11    there's an individual who does -- the Sound Simplistic does
12    web design.  What he does -- he does very sophisticated web
13    design for the company, based on a retainer of 25,000 a
14    month.  That is a little -- seems a little bit --
15              THE COURT:  That's an outsource service or
16    consulting --
17              THE WITNESS:  I believe that is consulting
18    services.
19              THE COURT:  Okay.
20              THE WITNESS:  Now -- yeah, no, that's an outsource
21    service.
22              THE COURT:  Okay.  And then what's an example of a
23    consulting service?
24              THE WITNESS:  Well, consulting services -- I'm
25    drawing a blank on an entity.  Consulting on the marketing.
```

1    You're selling product into this audience group and part of
2    it is looking at that, I believe, and --
3             THE COURT:  Okay.
4             THE WITNESS:  That's what I'm -- it's a marketing
5    service as a -- what would the market service we need be.
6    It's got to be something to do with reaching out and how do
7    we touch those people most effectively.
8             THE COURT:  Okay.
9             THE WITNESS:  That's why I said, it's -- that's
10   looking at -- it's what I think I'm going to see.  Now I
11   want to -- show me what it really is.
12            THE COURT:  Okay.
13            THE WITNESS:  Those are very definitely two areas
14   we have got to dig into.
15            THE COURT:  Okay.  Thank you.  Mr. Nguyen, I'm
16   sorry.
17            MR. NGUYEN:  No problem, Your Honor.
18   BY MR. NGUYEN:
19   Q    And before I get to Exhibit 8, I just want to clarify a
20   point.  You mention earlier that the Court was the one that
21   appoints you and the Court was the one that fired you --
22   that can fire you.  Do you remember that testimony?
23   A    Yes.  I guess I would modify that this way, by saying,
24   since I'm not appointed yet, Mr. Jones did hire me.
25   Arguably, I guess he could fire me before I'm appointed.

1    Q    So based on corporate formalities, you're an officer of

2    the company, correct?

3    A    As CRO, I am an officer of the company.

4    Q    And the owner of the company is who?

5    A    Alex Jones.

6    Q    Okay.

7         MR. NGUYEN:  Mr. Martin, can you (indiscernible)?

8    I'm almost done, Your Honor.  I would just like to

9    (indiscernible) questions (indiscernible) Exhibit

10   (indiscernible) there was a admitted (indiscernible).

11        THE COURT:  I'm sorry, Mr. Martin.  I can't hear

12   you.  Can you just get close to a mic?  I'm going to tell

13   you, why don't you go to another question.  I'm not

14   interested.

15        MR. NGUYEN:  Okay.  Your Honor, I will pass the

16   witness.  Thank you.

17        THE COURT:  Thank you.  Why don't we -- and again,

18   I don't want anyone to read one way or the other.  I'm

19   focused on cash collateral and critical vendor.  And why

20   don't we take a five-minute break.  Mr. Brimmage, can you

21   just -- I don't want to -- I want you to take as much time

22   as you want.  I just -- from a scheduling standpoint, how

23   long do you think you'll go?  Okay.

24        MR. BRIMMAGE:  (Indiscernible) start at 10 after

25   the hour.  (Indiscernible).

```
 1          THE COURT:  Okay.  Okay.

 2          MR. BRIMMAGE:  (Indiscernible).

 3          THE COURT:  Okay.  Like, I know how it is.  I'm

 4     just trying to get a sense from scheduling and timing.  Oh,

 5     that's fine.  Okay.  Let's all take a -- I'll come back on

 6     at 3:15.

 7          Mr. Schwartz, you're again under oath

 8     (indiscernible) remind you.  Okay.  I'll come back.

 9       (Recess)

10          CLERK:  All rise.

11          THE COURT:  Anyhow.  Before we start, Mr.

12     Brimmage, in terms of your presentation, are you going to

13     have -- are you going use Mr. Martin to show --

14          MR. BRIMMAGE:  I am, Your Honor.

15          THE COURT:  Okay.

16          MR. BRIMMAGE:  What I'm going to hope to do is

17     minimize the document use and refer to documents he's --

18     we've already looked at --

19          THE COURT:  Okay.

20          MR. BRIMMAGE:  -- and kind of move from there.

21     But if we need to pull it up, we'll put it up and keep it.

22          THE COURT:  Okay.  I just want to make sure that -

23     - Mr. Martin, I'm going to make -- I think you -- oh, you're

24     still the presenter so you'll be able to proceed.  Okay.

25          And Mr. Schwartz, you understand that you're still
```

```
 1    under oath?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Mr. Brimmage, you may proceed.

 4    BY MR. BRIMMAGE:

 5    Q    Mr. Schwartz, my name is Marty Brimmage and I'm with

 6    Akin Gump Strauss Hauer & Feld and I'm going to question you

 7    today on behalf of the Connecticut Plaintiffs.  You and I

 8    have never met before that I recall; is that right?

 9    A    I do not recall meeting you either.

10    Q    Okay.

11    A    I know the name.  I don't know why.

12    Q    Okay.  Good.  I'm glad my memory isn't quite that

13    faulty.  What I'm going to attempt to do is what I call

14    quick hits.  I'm going to -- some of the things I'm going to

15    talk about, I'm going to refer to your prior testimony

16    today, but I'm not going to intend to repeat that.  I'm

17    going to try to maybe ask some follow up.  So, I'm going to

18    try to be efficient with your time.  I would appreciate if

19    you would do the same.  Does that sound fair?

20    A    If I can.

21    Q    Okay.  Did you have a chance to confer with your

22    counsel during the break?

23    A    About the case?  No.

24    Q    Okay.  Did you have a chance to talk to your counsel

25    during the break?
```

1    A    Oh, yeah.

2    Q    Okay.  All right.  Let's pick up on a few things if we

3    could.  I think you have testified in a variety of ways to

4    what I'm going to -- I'm going to try to paraphrase -- the

5    sloppy status of the financial records when you became the

6    CRO; is that correct?

7    A    I've talked about it.  I know that.  I don't how many

8    times I've done it.

9    Q    Fair enough to say, it's sloppy records, right?

10   A    Well, that's one description.  I would say something

11   not -- they don't come up to sloppy.

12   Q    Okay.  And when you took over, the 2021 general ledger

13   had not been completed and the books had not closed, right?

14   A    Correct.

15   Q    And as a result, no financial statements were produced

16   for FSS for the 18 months preceding your engagement, right?

17   A    Well, the fact is, no financial statements were

18   produced, charity I'm saying, as a result.  Had they been

19   updated; I don't know if they would have been produced

20   financial statements even then.

21   Q    So, is my statement true?

22   A    Well, that's -- I mean, I've made assumption of a

23   result of the books not being -- but I do know they did not

24   produce financial statements.

25   Q    So that's a yes.

```
 1    A    Yes, sir.
 2    Q    Okay.  And you found no bank reconciliations for 2021
 3    or 2022, right?
 4    A    Correct.
 5    Q    You found that FSS personnel expressed no criticism of
 6    not receiving any financial reports to assist them in doing
 7    their functional responsibilities, right?
 8    A    Correct.
 9    Q    They were -- appeared unaware of information that would
10    be available to them to timely prepare their financials,
11    right?
12    A    Timely prepare their financials?
13    Q    Right.
14    A    That statement confuses me.
15    Q    Okay.
16    A    Are you talking about the statement beforehand?
17    Q    Did you find that FSS personnel appeared to be unaware
18    of the management -- that the management information was
19    available to them from -- unaware that -- let me start over.
20    It's easy for me to say, right?
21         Were you aware that FSS personnel appeared to be
22    unaware of the management information that was available to
23    them to prepare timely and detailed financial statements and
24    analysis?
25    A    I was aware that management personnel seemed unaware of
```

007629

```
 1    the information available to them to do their jobs.  That

 2    would be accounting's responsible to actually prepare

 3    financial statements.  That's what -- that point there Is

 4    what threw me.

 5    Q    Fair enough.  You would agree with me that internal

 6    accounting controls were inadequate, right?

 7    A    Yes.

 8    Q    There was a lack of segregation of duties?

 9    A    Yes.

10    Q    Lack of supervisory review?

11    A    Yes.

12    Q    Including billings to PQPR Holdings, right?

13    A    Correct.

14    Q    When did you come on to FSS?

15    A    June 6th is when I was hired.

16    Q    And so, all these findings that we're talking about are

17    subsequent to June 6th, right?

18    A    Yes.

19    Q    Okay.

20    A    And well, let me step back.  I've been told by Mr. Roe

21    that the general ledgers were not up to speed.  I did not

22    realize the significance of that statement when he told it

23    to me.  That was prior to June 6th.

24    Q    Yeah.  You didn't realize just how bad all the

25    financials and accounting were until you got on the scene,
```

007630

1    right?

2    A    Correct.

3    Q    They were a mess, right?

4    A    They were nonexistent.

5    Q    That's worse than a mess.

6    A    Yep.

7    Q    All right.  You would agree with me that the --

8    locating accurate financial records is a tedious task at

9    FSS, right?

10   A    Locating accurate financial records?

11   Q    Is a tedious task at FSS, isn't it?

12   A    In general, yes.

13   Q    And specifically yes, right?

14   A    Well, I mean, some banks can -- you know, are

15   accessible.  But in general, don't expect them to be.

16            MR. BRIMMAGE:  Mr. Martin, can we pull up

17   Defendant's -- I'm sorry -- I think it's Exhibit 3, the

18   declaration of Mr. Schwartz in this case, and go to

19   Paragraph 94, please?

20   BY MR. BRIMMAGE:

21   Q    We'll blow it up for you, Mr. Schwartz.

22   A    Oh, I can probably read it.

23   Q    Okay.  If you'll just read it to yourself.  I'm not

24   going to attempt to impeach you.  I'm just going to ask the

25   question again and see if we can move it quickly.  Does that

```
 1   sound fair?

 2   A     Yes.

 3   Q     Okay.  Tell me when you're done.

 4   A     Okay.  I'm done.

 5   Q     All right.  Isn't it true that locating financial

 6   records is a tedious task at FSS?

 7   A     I think when you asked me that a minute ago, I

 8   responded with another word than tedious.

 9   Q     Mr. Schwartz, is that a yes or a no?

10   A     That is what this says.

11   Q     Is that true or not true?

12   A     That is not true today.

13   Q     Okay.  Do you recall when you signed your declaration?

14   A     Sometime around the time of filing.

15   Q     July 29th?

16   A     Okay.  Would you leave that paragraph up, please, or go

17   back to it?

18   Q     July 29th?

19   A     Yes.  Sounds about right.

20   Q     So it was true on July 29th?

21   A     I believed it to be true on July 29th.

22   Q     Well, hang on.  You believed it to be true, or it was

23   true?  I want the Court to understand.

24   A     No, I mean --

25   Q     You tell us.  You pick.  Was it true, or you believed
```

1    it to be true?

2    A    I believed it to be true.  Like everything else in

3    here, I believed it to be true.

4    Q    But it may not be true; is that correct?

5    A    True.  And everyone says something's true, it may not

6    be, and in this case, I found out that was not true.

7    Q    I think we are getting a clear picture of what you

8    think the truth is.  Let me ask you the next one.  The

9    recordkeeping for orders, invoices, expense reports,

10   American Express charge reports are not well organized;

11   isn't that correct?

12   A    That's correct.

13   Q    And other records on the computer system also require

14   additional time to retrieve, correct?

15   A    Correct.

16   Q    You testified in your declaration that you have

17   extensive experience serving as a fiduciary in bankruptcy.

18   Do you recall that?

19   A    Yes.

20   Q    What is a fiduciary in bankruptcy?

21   A    It's the same, in my opinion, a fiduciary in any --

22   many other capacities.  It's someone who takes possession of

23   assets belonging to another and owes a duty to the

24   beneficial ownership of those assets that put that -- the

25   interests of the beneficial owner first.

1    Q    Anything else?

2    A    I mean, there are some other components of fiduciary,

3    but that's the primary one that I've always known.

4    Q    Okay. The assets in the FSS bankruptcy, who's going to

5    be the beneficial owner of those assets?

6    A    Well, the beneficial -- the beneficiary of those assets

7    right now would be the creditors, (indiscernible) first.

8    Q    Creditors. Anybody else?

9    A    No. First off is creditors, secured and unsecured.

10    Q    In all your experience as a fiduciary in bankruptcy,

11    who do you see as the creditors in this case?

12    A    The people that the estate owes money to.

13    Q    Who is that?

14    A    In this case we have secured creditors. You have

15    unsecured creditors. You have administrative claimants.

16    You have the -- and well -- I mean, yeah. Government

17    creditors, I think they classify as unsecured, but higher

18    class.

19    Q    Okay. What analysis or investigation did you do to

20    determine who the creditors or potential creditors are in

21    this bankruptcy?

22    A    Really, we haven't completed -- they haven't even done

23    the schedules yet.

24    Q    Okay.

25    A    We looked at who we owed money to as of the filing date

1    and listed them.  Those are creditors.

2    Q    That's all you did up to the filing date, right?

3    A    Well, I mean, we read the loan agreements and the

4    security instrument, but I can't think of a -- I mean, I

5    don't know what there was to do with the -- we know about

6    the contingent claimants in terms of your clients.  So, I

7    don't think we did any more investigation than that at this

8    time.

9    Q    No more investigation than that before you started

10   seeking the cash collateral order that you're asking the

11   Court to approve, correct?

12   A    Correct.

13   Q    Okay.  You've not done any investigation into what I'm

14   going to call the Plaintiffs -- the Texas and the

15   Connecticut and the TUFTA collective group, Plaintiffs'

16   claims, correct?

17   A    Correct.

18   Q    You don't have an opinion one way or another whether

19   they were wronged or not; is that right?

20   A    The TUFTA claimants and your clients?

21   Q    Yes.

22   A    No.  That's for a tryer.

23   Q    Have you done any analysis or estimation of potential

24   amounts of the claims that could be had?

25   A    No.

```
 1    Q    Have you asked for any analysis or estimation of that?

 2    A    No.

 3    Q    Do you believe it's your job to ask for that or to look

 4    into that?

 5    A    No.

 6    Q    Why is it not your job?

 7    A    Well, it's up the courts to decide, liquidate those

 8    claims.

 9    Q    Okay.

10    A    If he came to me and said what could we settle them

11    for, you know, I may be able to come up with a number that

12    we could provide, but it's not going to be the value of the

13    claim, I suspect.

14    Q    You've testified about Mr. Jones -- I guess Alex --

15    there's multiple Joneses, right?

16    A    There's two I'm aware of.

17    Q    And who are the two?

18    A    Alex Jones and Dr. Jones was who I call them.

19    Q    Who's Dr. Jones?

20    A    Alex Jones' father.

21    Q    What's the first name of Dr. Jones?

22    A    David.

23    Q    So, father/son Alex/David Jones, right?

24    A    Yes.

25    Q    All right.  You testified that Alex Jones puts personal
```

```
 1    expenses on the American Express card, right?

 2    A    Yes.

 3    Q    Do others put personal expenses on the American Express

 4    card?

 5    A    I don't know that.  I would --

 6    Q    (Indiscernible)

 7    A    -- not be surprised.

 8    Q    -- if you don't know.

 9    A    I don't know that yet.

10    Q    Yeah, you don't know.  You haven't looked into that?

11    A    No.

12    Q    Okay.  They could, right?

13    A    They could, yes.

14    Q    And you're asking the Court to use cash collateral to

15    pay American Express?

16    A    Yes.

17    Q    Okay.  But no investigation?

18    A    That hasn't been done yet.

19    Q    You also testified that you intend Alex Jones to not

20    charge the American Express going forward, right?

21    A    No.  He can use the American Express, but not for his

22    personal expenses.

23    Q    All right.  Have you confirmed, as you're testifying

24    today in front of this Court, that Mr. Alex Jones has not

25    used the AMEX for any personal expenses since the
```

1    bankruptcy's been filed?

2    A    No.  I have not had a chance to do that.

3    Q    Have you done anything to cut off Mr. Jones or anybody

4    else from using the AMEX for personal expenses?

5    A    We've started collecting the cards from all the

6    employees.  That is something to be done.

7    Q    Okay.

8    A    Okay?

9    Q    What else?

10   A    We started to collecting the cards.  I have -- as I

11   said, I have not had a chance to look at Alex's charges

12   since the filing.

13   Q    Okay.

14   A    But we'll do that.  And I was in -- I believe -- I

15   don't know if David Jones has a card or not.  We'll find --

16   we'll see what his charges are if they've come against FSS.

17   Q    You don't know if David Jones has a card, right?

18   A    I do not.

19   Q    How many cards are there?

20   A    I don't know.

21   Q    You haven't collected Mr. Alex Jones' card yet, have

22   you?

23   A    No.

24   Q    How many cards have you collected?

25   A    I don't know.  They're doing that today.

1   Q   No idea how many they've collected?

2   A   As I said, I don't know.  It's being done today.

3   Q   Before today, is it fair to say no cards were

4   collected?

5   A   That's -- not by me.  No, we have not collected cards

6   before today.

7   Q   Okay.  And you don't have any personal knowledge that

8   as you're testifying right now, any cards have actually been

9   collected, right?

10   A   No.  I've been here all day.

11   Q   So, that's correct.  You have no personal knowledge?

12   A   That's what I said.  I don't know.  I've been here all

13   day.

14   Q   Okay.  When you were asked about Mr. Jones' car, you

15   said you didn't know.  You said, I didn't -- I don't think

16   so, but I don't know.

17   A   I got confused.  I mean, the question was whether the

18   company pays for Mr. Jones' car.

19   Q   Right.

20   A   And I said no.

21   Q   No, and no expenses associated with the car; is that

22   right?

23   A   Not unless they come through on the American Express

24   and they're -- what I saw, they're charged to his draw.  So,

25   to that extent, the company paid -- would pay for them, but

```
 1   they're charged -- they were being charged to his draw.

 2   Q    Okay.  But the company initially pays for them?

 3   A    Yes, because it pays the AMEX bill.

 4   Q    Okay.

 5   A    Now, and we say initially.  It's probably on there --

 6   where he works, that'd be charged to his draw before the

 7   AMEX bill gets paid.  So --

 8   Q    Yeah.

 9   A    You know, he gets charged for them before AMEX gets

10   paid.

11   Q    If there's a large judgment in the Austin lawsuit,

12   how's it going to get paid?

13   A    That I don't know.

14   Q    You testified that there's $800,000 in unencumbered

15   cash right now, right?

16   A    Correct.

17   Q    And where did you say -- what did you say the source of

18   that cash was?

19   A    Donations.

20   Q    Donations.  Have you done an analysis of donations over

21   the past five years?

22   A    What do you mean by an analysis of donations?

23   Q    The analysis of how many -- how much money has come in

24   for donations for FSS in the last five years?

25   A    I have looked at that number.  I -- what do you mean by
```

```
 1    analysis?  I have looked at the number, the amount of the
 2    donations over the last five years, seven years.
 3    Q    How much is it annually?
 4    A    Could I look at Exhibit -- I think it's B, the income
 5    statement that's attached to the --
 6    Q    Let me just ask -- we can go there if you need to --
 7    can you not answer without looking at a document?
 8    A    No.  You're asking me for the number.
 9    Q    Can you give us a ballpark?
10    A    It varies.  It's been -- seven figures.
11    Q    Seven figures?
12    A    Yeah.
13    Q    All right.  So, in the next -- well, how much in -- and
14    is it true all the cash donations are unencumbered?
15    A    Yes.  I asked -- I asked that specific question of my
16    lawyers, is that cash collateral also?  And they said no.
17    Q    When you asked your lawyers, who did you ask?
18    A    Mr. Lee and Mr. Battaglia.  I guess they're not my
19    lawyers; they're the Debtor's lawyers.
20    Q    You have your own lawyer though, right?
21    A    No.
22    Q    You don't?
23    A    No.
24    Q    You don't have your own lawyer?
25    A    No.
```

```
 1   Q    Okay.

 2   A    Should I get one?

 3   Q    I'm going to leave it.  Do you recall your engagement

 4   letter that you talked about, with FSS?

 5   A    It depends on what you're asking me to recall from it.

 6   Q    Well, it was Exhibit 2 that you spoke to about your

 7   lawyers.  It was actually one of the documents that was

 8   admitted by agreement.  The May 19, 2022 --

 9   A    Right.

10   Q    -- engagement letter?

11   A    Right.

12   Q    Do you recall that?

13   A    Yes.

14   Q    Okay.  It says in there that's CRO's counsel.  That

15   ring a bell with you?

16   A    Yeah, I believe there was a provision in there that I

17   would be permitted to engage counsel.  I have not done that.

18   Q    Okay.  It says FFS will fund $20,000 retainer to be

19   paid to SA LLC, so that SA LLC can engage Mike Ridulfo, of

20   Kane Russell Coleman Logan, to serve as legal counsel to the

21   CRO, correct?

22   A    Correct.

23   Q    You have not engaged Mr. Ridulfo?

24   A    No.

25   Q    Did the $20,000 retainer get paid?
```

1    A    No.

2    Q    So, prior to the commencement of the engagement, that

3    retainer was not paid?

4    A    Correct.  No retainer was paid prior to the signing of

5    that engagement letter.

6    Q    Even though the engagement letter required it?

7    A    Yes, sir.

8    Q    Do you have an opinion one way or another about whether

9    not the engagement letter is enforceable or not?

10   A    Well, I think --

11   Q    I don't think it's that funny.

12   A    What I -- I'm doing -- I think it's terribly

13   enforceable, but I'm not a lawyer and I haven't, you know --

14   I don't think anyone -- I have not asked a lawyer to look at

15   it from enforceability standpoint.

16   Q    Okay.  And you haven't required the -- all of the

17   requirements in the engagement letter to be met; is that

18   correct?

19   A    Well, I -- no, the retainer was paid.  It just wasn't

20   paid in the terms of the agreement.

21   Q    You just testified that the retainer for Mr. Ridulfo

22   was never paid.

23   A    That retainer has not been paid.

24   Q    So --

25   A    I was asked not to engage Mr. Ridulfo.

1    Q    Who asked you not to?

2    A    Mr. Battaglia.

3    Q    What did he ask you that?

4    A    Concerned over costs.

5    Q    Concerned over costs.  So let me make sure we're clear,

6    Mr. Schwartz.  You're using Mr. Battaglia as your own

7    personal CRO attorney as well as the FSS attorney, right?

8            MR. BATTAGLIA:  Objection, Your Honor.

9    (Indiscernible) question.  He can ask a question, but he's

10   putting words in the witness' mouth.  If he wants to know if

11   I'm his lawyer individually, ask that.

12           THE COURT:  I think that's what he did.

13           MR. BRIMMAGE:  I did.

14           MR. BATTAGLIA:  (indiscernible) what he asked

15   (indiscernible).

16   BY MR. BRIMMAGE:

17   A    Well, the answer is, Mr. Battaglia is not my lawyer.

18   He asked me for -- you know, very simply.  He said, I'm

19   concerned about the legal cost.  Do you need

20   (indiscernible).  And I said, well, I don't -- it doesn't

21   seem like it right now, so I'll hold off.

22   Q    The engagement letter negotiated the right for you to

23   seek your own attorney, correct?

24   A    It did.

25   Q    In fact, it said FSS will find $20,000 prior to

1   commencing the engagement, right?

2   A    Correct.

3   Q    And you took advice from FSS counsel not to engage your

4   own CRO counsel, correct?

5   A    I don't --

6   Q    That's what you just testified to.

7   A    I don't think I testified that that was advice.  He

8   asked me not to do it.  He said he's concerned about the

9   legal costs.

10  Q    Okay.

11  A    And after -- you know, I said, okay, I don't see that

12  I'm going to have to have my own counsel here; $20,000 ain't

13  going to pay for much anyway.

14  Q    As the CRO, the only counsel you consult with are FSS

15  counsel?

16  A    Correct.

17  Q    Now, let's stick with your engagement letter while

18  we're here for a little bit, Exhibit 2.  It's dated May

19  19th, 2022, correct?

20  A    Correct.

21  Q    And -- but it's signed by Mr. Jones on June 6th, 2022,

22  right?

23  A    Correct.

24  Q    Why the discrepancy?

25  A    I believe Mr. Jones was committed to signing it and

```
 1   ready to sign it until June 6th.
 2   Q    Why is that?
 3   A    Well, you'd have to ask Mr. Jones.  I know we had a
 4   meeting with him on June 6th to discuss the terms of the
 5   engagement letter.
 6   Q    Was he concerned about any particular term?
 7   A    Yes.  He was concerned about the amount of authority I
 8   had.
 9   Q    All right.  Let's talk about amount of authority.  Was
10   he concerned about anything else?
11   A    Not specifically, no.
12   Q    Okay.  Now, I'm confused about your prior testimony,
13   and I just want to clarify.  Isn't it true that Mr. Jones
14   can fire you right here, right now, if he wanted to?
15   A    That's -- from my reading of the engagement letter,
16   that's my interpretation.  That he has -- still has the
17   authority to terminate me.
18   Q    Okay.  For whatever reason he wants to, right?
19   A    Yes.  I don't think there's a qualifier in there on
20   termination.
21   Q    Okay.  And along those lines, you testified -- and it's
22   been a while -- that you have full authority over a lot of
23   stuff, except major decisions.  Do you recall that
24   testimony?
25   A    No, I didn't say that.
```

1    Q    You did.

2    A    No, I didn't say that.  If I did, it's misunderstood.

3    I don't -- I had authority over major decisions, but I

4    agreed I would consult with Mr. Jones before I executed any

5    of those decisions.  I did not say that I could not execute

6    any decision I deemed necessary.

7    Q    What constitutes a major decision that you would

8    consult with Mr. Jones over?

9    A    Well, a major decision would be product line changes,

10   for example.  That would be a significant decision.  A major

11   decision would be, there are certain key personnel on the

12   area of marketing in the production area, which I think

13   would be major decisions if I determined I needed to

14   terminate somebody in those categories.  I consulted with

15   him on the termination of the previous accountant because

16   she had been there for a long time and had been a

17   significant role in the company.  Those were decisions that

18   -- and ramifications throughout the organization or in the

19   operation of the business.  And it would be insane of me to

20   have executed some decision like that without talking to Mr.

21   Jones about it.

22   Q    What about the decision to file for bankruptcy?

23   A    I mean, that was --

24   Q    Whose decision was that?

25   A    The final decision?  That's a good question.  Mr. Jones

007647

```
 1   agreed that we needed to file bankruptcy.  The selection of
 2   the date, he concurred with.  The recommendation of the date
 3   came from others.
 4   Q    Well, let's be clear, Mr. Schwartz.  You were hired
 5   because the decision was made to file for bankruptcy.
 6   A    Well --
 7   Q    You were hired to be the CRO.  You did not make that
 8   decision.  That decision was already made, which is why you
 9   came on the scene; isn't that right?
10   A    Well, I mean, yes.  The perception was that they needed
11   to file bankruptcy, needed to file bankruptcy.  The question
12   was, could they?  And that was part of my job was to
13   determine if the company could actually file bankruptcy.
14   Q    Okay.  Whose perception, was it?
15   A    I think it was Mr. Jones' and his counsel.
16   Q    Which counsel was that?
17   A    That would be Mr. Jordan, in addition, Mr. Lee and Mr.
18   Battaglia and Mr. Shannon.
19   Q    Okay.  They all -- FSS counsel and Mr. Alex Jones'
20   counsel all got together on whether or not to file
21   bankruptcy -- put FSS into bankruptcy?
22   A    That was that they decided it was a definite option and
23   I got -- I became involved when it was -- it didn't get
24   finalized --
25   Q    All right.
```

007648

```
 1   A     -- initially.  It wasn't final when I became -- got

 2   involved that we would be filing bankruptcy.

 3   Q     And when you say they, that's who you're talking about,

 4   those -- that group of counsel, right?

 5   A     Yes.

 6   Q     For all those different Alex Jones-related entities,

 7   right, and Alex Jones himself?

 8   A     Well, no, these -- they represented FSS and Alex Jones,

 9   that group.

10   Q     Okay.

11   A     What other entities I -- we're not there.

12   Q     Who represented the InfoWars Three Debtors prior, that

13   you were the CRO for them?

14   A     Prior was Mr. Lee, Mr. Shannon, I believe, and Mr.

15   Battaglia was involved in that.

16   Q     The same lawyers --

17   A     I'm not sure if they all represented the three of them.

18   Q     Yeah.  Same lawyers we've got here?

19   A     Yes.

20   Q     Okay.

21            MR. BRIMMAGE:  Yeah.  We're going to let the

22   witness answer.

23            MAN 1:  Sorry about that.

24            MR. BRIMMAGE:  That's okay.

25   BY MR. BRIMMAGE:
```

1    Q    So, let me just circle back make sure that we're clear.

2         Your testimony earlier that only the Court can fire

3    you, that's not the case right now, right?  That's not true?

4    A    I don't believe so.

5    Q    Okay.  I appreciate that.  Let's circle back, if we

6    could, to this donation topic.  Is it true that FSS has

7    received donations in cryptocurrency?

8    A    Mr. Jones received some donations in cryptocurrency.

9    Q    Were those directly to him personally, or are those to

10   FSS?

11   A    They were to his personal -- whatever accounts you call

12   those things.

13   Q    Okay.  They were not to FSS?

14   A    No.

15   Q    Is your --

16   A    Not directly.

17   Q    You've investigated that, and you're rock-solid

18   positive under oath in front of this Court today that that

19   was not to FSS, right?

20   A    No.  I mean, what I'm telling you right now is those

21   donations were given to Mr. Jones.  The -- I have not -- we

22   have not done an investigation as to should they have been

23   Jones' or FSS's.

24   Q    I'm more confused than when I started.  The donations

25   were made to FSS and FSS gave those cryptocurrency donations

007650

```
1    to Mr. Jones?

2    A    No.  FSS did not touch those currencies.  They went to

3    Mr. Jones.

4    Q    Directly?

5    A    Directly.

6    Q    You haven't investigated whether they should have come

7    to FSS?

8    A    We have not.  Although we have looked at -- no, we have

9    not done that investigation.  We've done -- seen some

10   preliminary information.

11   Q    Okay.  Was -- is the amount this year so far around $8

12   million?

13   A    I'm -- well, I haven't seen a full accounting.  We were

14   told it was $9 million.

15   Q    I'll take $9 million.  And so, the cryptocurrency, $9

16   million were donated to InfoWars, InfoWars.com?

17   A    Not to --

18   Q    Is that right?

19   A    Not to my knowledge.  I don't --

20   Q    Okay.  Well, tell the Court where -- who received those

21   donations from the very beginning, the $9 million in

22   cryptocurrency, what entity, what person received them

23   first?

24        MR. BATTAGLIA:  Objection, Your Honor.  Asked and

25   answered.  He said that it was received by Mr. Jones,
```

```
 1    several times.
 2              THE COURT:  He can clarify.  (Indiscernible).
 3    BY MR. BRIMMAGE:
 4    A    I'm not sure (indiscernible) clarify that.  They went -
 5    - to my -- my understanding is that they went to Mr. Jones.
 6    As I said, we have not investigated that.  But that's what
 7    I've been told; that they went directly to Mr. Jones.
 8    Q    Okay.  Thank you.  Does Mr. Jones have a direct place
 9    where people can make donations directly to him personally?
10    A    Well, on the -- I'm not a cryptocurrency guy.  But
11    these were made, apparently, to his cryptocurrency vault, or
12    whatever they call that thing.  So, to that extent, yes, he
13    has his own bank account, people can make donations to that
14    if they have it.
15    Q    Okay.  So, it can be made directly to him --
16    A    Yes.
17    Q    Okay.  Mr. Schwartz, when I'm flipping pages, I'm
18    saving both of us a lot of time.  So, be patient with me.
19    You talked with your attorney about the Plan Support
20    Agreement, which was Exhibit 3.  Do you recall that?
21    A    Yes.
22    Q    All right.  And that was April 15, 2022 is when it was
23    signed, right?
24    A    The -- was that --
25    Q    I'll represent to you that's what it says.
```

1    A    Okay.  Thank you.

2    Q    That was before your time as CRO, right?

3    A    I'm not sure -- was that before I was CRO there?  I --

4    I'm out at -- and I don't remember when I was hired as CRO.

5    I thought it was prior to that.

6    Q    Hired as CRO for which entity?

7    A    The three -- all three are on the engagement letter.

8    InfoWars, IWHealth, and Prison Planet.

9    Q    What about the FSS engagement?

10   A    That was by FSS, a separate engagement letter.

11   Q    Right.  And that was after April 15th, 2022, right?

12   A    Correct.

13   Q    And you didn't do any investigation or analysis

14   regarding the Plan Support Agreement, correct?

15   A    I'm not sure what you mean.

16   Q    You -- it was given to you, right?

17   A    No.  I was -- a draft was given to me to read and

18   comment on and make recommended changes to it.

19   Q    A draft back -- before it was signed on April 15 --

20   A    Yes.

21   Q    When you were the InfoWars CRO?

22   A    Yes.

23   Q    Okay.  Got it, got it, got it.  Thank you.  Let's go to

24   the two promissory notes that you testified to.  Can we do

25   that?  I'm going to try to do them in one, but if we need to

1    break them up, we can.  Isn't it true that you've done

2    nothing to date to determine the validity of those notes?

3    A    I believe I've described to Mr. -- somebody already,

4    that all I've done is look at an analysis showing the

5    computation of the note balances and some of the supporting

6    documentation.

7    Q    But --

8    A    That is not nothing, but that is -- that's the limit of

9    it.

10   Q    For one of the notes?

11   A    For one of the notes, correct?

12   Q    But not for the other note?

13   A    I don't believe I've seen anything on the other note.

14   Q    Okay.  And for the one note that you did see something,

15   you didn't do any investigation about the veracity of the

16   information that you were provided.  You just looked at the

17   information you were provided and accepted it as true for

18   now; is that correct?

19   A    Well, I looked at it.  I did not -- have not gone -- we

20   have not started tracing out the information.  So, I -- I

21   mean, you say I looked at it and took it for true.  I don't

22   take it for anything.  It's not true.  It's not false.  It's

23   not proven.

24   Q    Okay.

25   A    To me.

```
1    Q    All right.  Fair enough.  You don't know, testifying
2    today, whether the notes are valid and enforceable or not,
3    correct?
4    A    Yeah.  That would be more of a legal question for me.
5    Q    Okay.  Where did you get the notes from?
6    A    Well, I was at FSS's offices, so --
7    Q    Have you had discussions with counsel about the notes?
8    A    Yes.  I was about to say I may have gotten them from
9    counsel, because they were looking all of the documentation
10   before I ever got involved.
11   Q    Right.  And if you got them from counsel, do you recall
12   which counsel might have given them to you?
13   A    No.
14   Q    Okay.  Fair to say you've had conversations with
15   counsel about the notes?
16   A    Yes.
17   Q    Other than your conversations though, you've done no
18   investigations or analysis regarding the veracity of the
19   notes, correct?
20   A    That's correct.  That's not on the -- that's not come
21   up to the top of the to-do list yet.
22   Q    When does that get to the top of the to-do list?
23   A    When we get this -- get this thing stabilized and
24   operating and we didn't -- and turned it, investigating
25   claims.
```

```
 1    Q    You're asking for use of cash collateral in large part

 2    based on the notes, right?

 3    A    No.  I'm asking to use the cash collateral because

 4    we've got the notes out there showing the collateral right

 5    now, or the -- well, I mean, noteholders do.

 6    Q    Have you investigated whether or not you can forbear

 7    paying on the notes during the pendency of the bankruptcy

 8    for now?

 9    A    Well, we entered into a forbearance agreement prior to

10    filing of the bankruptcy.

11    Q    Now, you've filed for bankruptcy.

12    A    Right.  And then part of that agreement, we can reduce

13    the payments on the notes.  But -- so now we're in

14    bankruptcy.

15    Q    Now, you're in bankruptcy.  Have you investigated what

16    your rights are as a CRO of a debtor with regard to paying

17    the notes or holding off on paying the notes for right now?

18    A    I have not had that conversation with the lawyers.

19    Q    Okay.

20    A    And I would have to talk to them.

21    Q    I get that.  But you haven't looked into that yet,

22    right?

23    A    No.

24    Q    Has anybody told you, you have to make these payments

25    right here, right now, with the cash collateral you're
```

```
 1   seeking from the -- the authority from the Court?  Has
 2   anybody told you, you have to do it, you must do it?
 3   A    No.  I mean, I don't think I'd be here, because --
 4   Q    Okay.  That's fair.  That's fair.  And so, you don't
 5   know that you have to do it, right?
 6   A    No.  If the Court says no, then we don't have to do it.
 7   Q    I kind of like the sound of that.  Let's go to these
 8   critical vendors.
 9            MR. BATTAGLIA:  Objection to the sidebar.
10            THE COURT:  I'll sustain.
11   BY MR. BRIMMAGE:
12   Q    Let's go to the critical vendors, if we could.  You've
13   already talked a lot about this, so I just want to make
14   sure.  The uniform security, that's a lot of money, right?
15   A    It's a lot of security.  It's 24/7.
16   Q    And is that -- is that -- if Mr. Jones wasn't there,
17   would you still need all that security?
18   A    If he was not in the building that day?
19   Q    Yeah.  Or no, not in the building.
20   A    If he was not in InfoWars at all?
21   Q    Yeah.
22   A    Very probably not.
23   Q    Okay.  All right.  Did you look at that with regard to
24   that -- whether or not that's a personal expense that should
25   be borne by Mr. Jones and paid for with his cryptocurrency
```

007657

```
 1   money or other money?
 2   A    No.  It's an expense.  It's the provided security to
 3   the employees working there.
 4   Q    Well, but if Mr. Jones wasn't there, you just testified
 5   the employees don't need that kind of security.
 6   A    Well, they don't need that because there wouldn't be
 7   any business.
 8   Q    Now, you talked to the Court about the three insurance
 9   companies, right?
10   A    Right.
11   Q    And you said, look, there's a lot of important assets
12   here that are vital, right?
13   A    Yes.
14   Q    Can you describe for the Court the difference between
15   the three insurance policies and what they cover?
16   A    Not -- no, I don't -- no.  Just their names.
17   Q    You don't have any --
18   A    Property casualty.  We have general liability and -- I
19   don't know what the third one is.
20   Q    I get that.
21   A    Drawing a blank.
22   Q    Apologize.  I get that.  But you can't describe for the
23   Court the three different policies and what they cover,
24   correct?
25   A    Correct.
```

```
 1    Q    Has anybody told you that you need all three and you
 2    must pay them right now?
 3    A    Yes.  That was how -- that was the --
 4    Q    Who told you that?
 5    A    Well, no one told me that.  They told the people I put
 6    in charge of preparing this list.  And that was based on
 7    going to the employees and saying, okay, what do you have?
 8    What do you have, what vendors do you use, and tell us how
 9    important they are and what we need -- why we need to have
10    them on this list?
11    Q    You were talking to the Court about this little bit,
12    and you talked about claw back.  Do you recall that?
13    A    On Mr. Jones?  Yes.
14    Q    Well, I'm talking about payments to the critical
15    vendors.  You --
16    A    No.
17    Q    -- this -- you (indiscernible) a little bit?
18    A    Yes.
19    Q    And you started saying it, but you didn't finish.  You
20    said, but if we pay them, we have the right to claw back.
21    But you would agree with me, practically, that's not going
22    to happen, right?
23    A    If they're critical vendors and we want to claw back,
24    we have to assess what's the risk to the business of doing
25    that.  So, there may be a legal right, but it may not be
```

1    something we'd be able to execute on.

2    Q    And even -- that's correct.  And even if you decided

3    you wanted to claw it back and no longer have a relationship

4    with that vendor, the chances are you're not getting that

5    money back, right?

6    A    It'd be a fight.

7              MR. BRIMMAGE:  Your Honor, I'm not going to make

8    my time, but I'm going to keep moving.

9              THE COURT:  Sounds like I need to see the claw

10   back language.

11   BY MR. BRIMMAGE:

12   Q    In your declaration -- I'm going to do some quick hits

13   -- you talked about personal knowledge, relevant documents

14   in your opinion, right?

15   A    Mm hmm.  Yes.

16   Q    You would agree with me that nothing happened -- that

17   happened before your engagement that you have personal

18   knowledge of, right?

19   A    I think I even said that earlier.  But --

20   Q    Okay.  You also said that -- I'm not going to go

21   paragraph by paragraph, but a lot of your testimony is based

22   on conversations with others or stuff you've read but know

23   is true, correct?

24   A    Correct.

25   Q    And at least as we're sitting here today, the Court has

1    no way of knowing when you testify whether or not it's true

2    and you have personal knowledge of it, or whether you're

3    just relying on someone else, and you don't know if it's

4    true; isn't that correct?

5           MR. BATTAGLIA:  Objection, Your Honor.

6    Argumentative.

7           THE COURT:  Yeah.  Mr. Brimmage, can you break

8    that question up a little bit?  I --

9           MR. BRIMMAGE:  I --

10          THE COURT:  -- couldn't follow it myself.

11          MR. BRIMMAGE:  Absolutely.

12   BY MR. BRIMMAGE:

13   Q    We're going back to your testimony and your personal

14   knowledge.

15          MR. BRIMMAGE:  And Your Honor, I think I need to

16   ask the predicate question one more time.  It's a repeat,

17   but it gives me momentum.

18   BY MR. BRIMMAGE:

19   Q    So, you testified that some of the stuff that you've

20   testified to in your declaration and otherwise is based on

21   stuff you've read or been told, right?

22   A    Yes.

23   Q    And some of the stuff you've been -- that you've read,

24   you don't know if it's true or not true, right?

25   A    Some of the stuff I've been told; I don't know if it's

1    true or not true.

2    Q    That was my next question.  Thank you.  So, there's no

3    way for this Court to know when you're testifying in that

4    box whether or not your statements are actually true or not

5    true, correct?

6    A    Nothing that we are looking at in here, including the

7    13-week budget, is based on information that we created.

8    It's information that was -- we compiled from the records of

9    the company we booked.  But everything in there is based on

10   those records.

11            MR. BRIMMAGE:  Let me object as nonresponsive,

12   Your Honor, and let me try it one more time.

13            THE COURT:  I'm going to overrule that.  I think

14   he's trying to answer the question, but I know where you're

15   going.  But you can ask another question.

16            MR. BRIMMAGE:  All right.

17   BY MR. BRIMMAGE:

18   Q    As a fiduciary, do you have an obligation to know what

19   the truth is?  Yes, or no?

20   A    Well, I'm -- you know, sorry, I'm not a philosopher,

21   but I can tell you I can -- I have an obligation to tell the

22   truth as I know it.  But I may not know the truth.

23   Q    And if you don't know the truth, as a fiduciary do you

24   have an obligation to not make a statement unless you know

25   it's true?

007662

```
 1   A    If I believe it's true, then I believe it's true, then

 2   I may -- and I may be wrong.  If I knew it wasn't the truth,

 3   I wouldn't say it.

 4   Q    But you could believe it's true based on something you

 5   read or heard, right?

 6   A    I could believe it's true based on an analysis of a

 7   schedule.

 8   Q    The last paragraph of your declaration says, "I declare

 9   under penalty of perjury that the foregoing is true and

10   correct."  Do you recall that?

11   A    Yes.

12   Q    Okay.  Who drafted your declaration?

13   A    For the most part, Mr. Lee drafted a lot of it, and I

14   drafted a lot of it.

15   Q    When you drafted it and put like a citation of where it

16   came from, so-and-so's deposition, was that you or Mr. Lee,

17   or somebody else?

18   A    That -- well, my understanding that it was Mr. Lee.

19   Q    Okay.  All those citations were not yours, right?

20   A    Correct.

21   Q    Those came from Mr. Lee, right?  And do you recall the

22   deposition that was cited in here?  I'm looking for it for

23   the name and I don't recall it.

24   A    Jacobson.

25   Q    Jacobson.  Did you read Jacobson's deposition?
```

```
 1   A    I don't recall reading it.

 2   Q    I think that's what you testified to before.  I just

 3   wanted to see if that -- if I heard it right.

 4        Let's go to the bankruptcy filing, in your head.

 5   You've already talked about this, but I had a follow-up.

 6   Paragraph 11 is the one you talked to counsel about already,

 7   about -- in the district for 180 days, right?  Did you rely

 8   on counsel in making that checkmark on that box for this

 9   document?

10   A    Yes.

11   Q    Okay.  I think you said the case law you saw -- did you

12   read cases to help you get comfortable with checking that

13   box?

14   A    I read the -- I read the case; I understand which is

15   the one we're relying on by Judge Hale.

16   Q    But what case is that?

17   A    I knew you were going to ask me that.  Erg, or

18   something like that.  E-R-G, maybe, something like that.

19   Q    Judge Hale?

20   A    Judge Hale of the Western -- up in Fort Worth.

21   Q    Okay.  The Northern District of Texas?

22   A    Yeah.

23   Q    All right.  Who gave you that case?

24   A    I believe Mr. Lee gave it to me.

25   Q    Okay.  And when Mr. Lee gave it to you and when you
```

```
 1   read that case, did you ask, what does it mean when it says

 2   principal assets in this district?  Did you ask that

 3   question of any -- Mr. Lee or anybody else?

 4   A    I don't recall.  We looked at -- I looked at that case

 5   back in the filing of the first bankruptcy.

 6   Q    Okay.  Do you know what in this district means?

 7   A    Yeah.  I assume it refers to the Federal District.

 8   Q    Do you think it means the Southern District of Texas,

 9   where this Court is sitting?

10   A    That's the way I always interpreted it.

11   Q    Okay.  But just to summarize, you don't recall -- you

12   testified there are no assets of FSS in the Southern

13   District, right?

14   A    Not that I'm aware of.

15   Q    Okay. Okay.  All right.  I might get in trouble for

16   going over this because you talked to the Judge about it a

17   little bit.  So, I would like to follow up a little bit.

18   A    Okay.

19   Q    This is the discussion you had regarding when you were

20   the CRO -- you still are -- for what I call the InfoWars

21   Debtors, right, the three?

22   A    Yes.

23   Q    Right?  And your declaration or your statement of

24   disinterestedness, right?

25   A    Yes.
```

1    Q    And the involvement of FSS, that wasn't disclosed to

2    the Court or anybody else, right?

3    A    Correct.  When you say anybody else, I mean the people

4    involved with the InfoWars that were aware of it.

5    Q    Okay.  The public wasn't aware, right?

6    A    I don't believe so.

7    Q    And the Judge wasn't aware, right?

8    A    No.

9    Q    And the Plaintiffs' lawyers from Texas and Connecticut

10   to the best of your knowledge weren't aware or made aware,

11   right?

12   A    To the best of my knowledge.

13   Q    When you say that you were disinterested, what does

14   that mean to you?

15   A    Well, I'm -- in my opinion, it means I have no

16   conflict.  I -- there's no party that I'm involved with is

17   adverse or has an interest in what I'm doing.

18   Q    Did FSS play a role at all in the InfoWar bankruptcy?

19   A    FSS agreed to provide -- was going to provide cash flow

20   to the settlement fund.

21   Q    And who on behalf of FSS was going to authorize that or

22   approve that?

23   A    That would have been Mr. Jones.

24   Q    Mr. Jones.  And you were -- but you were the CRO at the

25   time of the InfoWar entities, right?

```
 1   A    I was CRO of the InfoWar entities.

 2   Q    Right.  So FSS was a counterparty that was going to

 3   provide money to fund some of the issues in the InfoWar

 4   bankruptcy, right?

 5   A    Yes, under the Plan Support Agreement.

 6   Q    And FSS had their own counsel, or did they have the

 7   same counsel?

 8   A    I have no idea who FSS's counsel was in that.

 9   Q    Okay.

10   A    I don't know.

11   Q    You don't know?

12   A    Mm mm.

13   Q    When you were the CRO of the InfoWar Debtor entities,

14   did you have fiduciary duties then?

15   A    Through those Debtor entities, yes.

16   Q    Did you have fiduciary duties at that time to FSS?

17   A    Not that I'm aware of.

18   Q    Okay.  Let me ask you just a couple of what I think are

19   follow-up questions.  This goes back to the general ledgers

20   that were a mess when you arrived on the scene.  Do you

21   recall that discussion?

22   A    We had several, I believe so.

23   Q    Okay.  Does Melinda Flores ring a bell to you?

24   A    The name does, yes.

25   Q    Who is that?
```

```
 1    A    She was the -- I think her title was Controller when I
 2    came on the scene as CRO of FSS.
 3    Q    And do you know what time period she was responsible
 4    for preparing the FSS books?
 5    A    As I recall, she closed the 2020 books.  So, at least
 6    sometime in 2020, if not prior thereto.  She may have been
 7    there in 2019.  I just don't -- you know -- I might have
 8    heard that.  I don't know.  I know she closed the 2020
 9    books.
10    Q    You haven't looked into that at this point, right?
11    A    Yeah.  Unless -- I mean, unless someone shows me
12    there's a need for me to look into --
13    Q    Okay.
14    A    -- her administration.
15    Q    Okay.  All right.  Okay.
16         MR. BRIMMAGE:  Your Honor, if I can just have like
17    60 seconds for a quick --
18         THE COURT:  Absolutely.  Take your time.
19         MR. BRIMMAGE:  -- and continue my -- I'll consult
20    with him, but I'm also going to look at my notes real quick.
21    BY MR. BRIMMAGE:
22    Q    Mr. Schwartz, just a couple more final questions.  And
23    thank you for your patience.  Have you assisted in preparing
24    any of the witnesses that have been deposed in any of these
25    State Court actions?
```

```
 1    A    No.  Oh, wait a minute.  Excuse me.  There was a --
 2    yes, I did talk to somebody.
 3    Q    Do you recall who the somebody was?
 4    A    She was a corporate rep.
 5    Q    Corporate rep for who?
 6    A    That I don't know.  I assume FSS, but I don't know.
 7    Q    Why did you help prepare this witness?
 8    A    Because the knowledge we had gained on the accounting
 9    and accounting records, I was asked to talk to her and
10    answer specific questions she might have to fill out her
11    knowledge.  Because prior to what we had done, the
12    accounting records were absolutely unreliable for '21 and
13    '22.
14    Q    And you don't know if you talked to her because she was
15    being deposed on behalf of FSS or some other entity,
16    correct?
17    A    She was being deposed.  I remember that.  And --
18              THE COURT:  Do you recall when that was?
19              THE WITNESS:  Might have been early in July, is
20    what I think; mid -- maybe mid-July.  But it seems like by
21    then we were heavy into --
22              THE COURT:  Okay.
23              THE WITNESS:  -- other stuff.  But we were -- it
24    had taken us until then to get enough of the accounting
25    records up to date where they were usable information coming
```

```
 1    out.

 2    BY MR. BRIMMAGE:

 3    Q    Could it have been June 27th that the deposition took

 4    place?

 5    A    Is it -- Brittany is her name?

 6    Q    Brittany Paz?

 7    A    Yeah.  Okay.  If that was the date, then it was a

 8    couple of days prior to that.

 9    Q    It was prior to that, right?

10    A    Yeah.

11    Q    So you had been on the scene --

12    A    Not long.

13    Q    Less than a month?

14    A    Yes.

15    Q    Right?  All right.  With books and records that are a

16    mess, right?

17    A    Yep.

18    Q    Okay.  Have you read any of the Plaintiffs' lawsuit

19    complaints?

20    A    I read the -- was that the Fourth Amended Complaint, I

21    believe by the Connecticut complainants.  I read that

22    recently.

23    Q    Any others?

24    A    I don't -- I probably read some of the Texas complaints

25    at some point in this process.  Seems like I did but then --
```

```
 1    I had to read the Fourth for some --  I guess recently to
 2    prep for, I think, for something -- for some of this stuff
 3    this week.
 4    Q    Are you keeping up with the Austin trial?
 5    A    Very little time to keep up with that then.
 6    Q    You would agree with me that the Austin trial result
 7    could have a significant impact on this bankruptcy, right?
 8    A    I don't know.  I mean, it's going to -- I expect to
 9    have a big judgment, and if we don't have a big judgment,
10    even a little judgement's going to have a -- both would have
11    an effect on the bankruptcy.  We have to recognize that.
12    Q    What is a big judgment?  What effect does --
13    A    I know that I understand that the Plaintiffs' opening
14    statements they asked for $145 million.  That would be a big
15    judgment.
16    Q    And if there's a big judgment, what impact do you
17    foresee on this bankruptcy?
18              MR. BATTAGLIA:  Objection, Your Honor.  Calls for
19    speculation.
20              THE COURT:  Yeah, well, just find out where we're
21    going with this one, Mr. Brimmage?
22              MR. BRIMMAGE:  Yeah.  Where I'm going, Your Honor
23    --
24              THE COURT:  Might have gone out of bounds on it.
25              MR. BRIMMAGE:  Absolutely.  I think what we're
```

```
 1    hearing is that Mr. Schwartz has done nothing -- well, I'm
 2    going to say this, and then I'm going to try to elicit the
 3    testimony, so here we go -- has done --
 4                  THE COURT:  Well, just --
 5                  MR. BRIMMAGE:  -- nothing to look after the
 6    Plaintiffs' --
 7                  THE COURT:  Well, no, no.  Just elicit the
 8    testimony and then you can make the argument at the end.
 9                  MR. BRIMMAGE:  Okay.
10    BY MR. BRIMMAGE:
11    Q    Let me ask you this.  You already -- we've already
12    talked about, and you already testified that you've not done
13    anything to assess or analyze the veracity of the various
14    lawsuits by the Plaintiffs across the country, right?
15    A    Correct.
16    Q    And if you are not looking after those potential or
17    actual unsecured, unliquidated, contingent creditors, whose
18    job in this bankruptcy is it to look after them?
19    A    I'm not sure what you mean by not looking after them in
20    this.  My job, as I understand it, and always understood it,
21    is to -- is to get the estate back onto a reasonable basis
22    and generating income, whether that's going to sufficient to
23    pay the creditors or not.  But I can't do anything more than
24    protect the assets and try to increase the value of the
25    estate.  That is -- I mean, I'm not a tryer of fact, so I
```

1   can't do much on the case side.

2   Q   I appreciate that.  But it's -- you don't believe it's

3   your job to look after the various Plaintiffs and their

4   unsecured claims in this case; is that correct?

5          MR. BATTAGLIA:  Your Honor, I'm going to object.

6   I think he answered that question --

7          THE COURT:  Yeah.

8          MR. BATTAGLIA:  -- in his prior answer.

9          THE COURT:  I think he's answered the question,

10   Mr. Brimmage.

11          MR. BRIMMAGE:  All right.  I appreciate it, Mr.

12   Schwartz.  Your Honor, what I'm getting at is we need a Tort

13   Committee.  Thank you.

14          THE COURT:  Thank you.  Mr. Lemmon?

15          MR. LEMMON:  Thank you, Your Honor.

16   BY MR. LEMMON:

17   Q   Mr. Schwartz, you and I have known each other

18   professionally for over 30 years, right?

19   A   Since you were a baby lawyer.

20   Q   Yes, sir.

21          MR. BRIMMAGE:  Your Honor, just (indiscernible) --

22          THE COURT:  I was going to --

23          MR. BRIMMAGE:  -- because it seems

24   (indiscernible).

25          MR. LEMMON:  I'm getting to that point with my

```
1    next question, Your Honor.

2              THE COURT:  Let's see where this goes.

3    BY MR. LEMMON:

4    Q    But in this case, our relationship has been -- we've

5    got a good relationship, you and I, professionally and we're

6    friendly, aren't we?

7    A    Most of the time.

8    Q    Okay.  In this particular case, our relationship has

9    been adversarial; is that correct?

10   A    Extremely so.

11   Q    Now, you remember, and you've been asked about the

12   discussions -- the negotiations about the forbearance

13   agreement, right?

14   A    Are you asking me if I remember the negotiations?

15   Q    Right.

16   A    I sure do.

17   Q    And those negotiations were heated, weren't they?

18             MR. BRIMMAGE:  (Indiscernible).

19             THE COURT:  Yeah.

20             MR. LEMMON:  Your Honor --

21             MR. BRIMMAGE:  (Indiscernible).

22             MR. LEMMON:  Your Honor, I'm adverse --

23             MR. BRIMMAGE:  (Indiscernible).

24             THE COURT:  Let me ask this.  How are you adverse

25   to -- at this time?
```

```
 1              MR. LEMMON:  I'm adverse to the Debtor with
 2    regards to issues concerning the cash collateral.  I have,
 3    on behalf of my client, consented to the form of order that
 4    was proposed by the Debtor.  But that was also after
 5    negotiations.  So, I am not opposed to the relief that the
 6    that the Debtor is seeking on an interim basis today.  But I
 7    want to make clear my client's position and our
 8    separateness.  And my client's position has been attacked
 9    here today.
10              THE COURT:  I think you've done it.  I think you
11    done it.
12    BY MR. LEMMON:
13    Q    Why was the forbearance agreement important from the
14    Debtor's perspective?
15    A    The forbearance agreement, we needed -- needed the
16    reduction in the cost of the processor fee.  We needed to
17    change the ratio of sharing the sales proceeds.  Those two
18    were critical to the survival of the Debtor.
19    Q    And is the Debtor trying to change its business plan;
20    in other words, I mean the way it does business, the way it
21    acquires product and sells product?
22    A    Well, yes and no.  We are trying to be much more
23    selective in the product we acquire.  We are trying very
24    hard to separate so it's clear what's our product and what
25    is not because we think we get higher margins on our
```

```
 1    product.  I shouldn't say ours -- the FSS's.  From the
 2    standpoint of the overall business operation, it needs
 3    organization.  It needs a lot of training.  Personnel are --
 4    grew up in their jobs, but they don't know what they should
 5    be doing and what they --how they should be making decisions
 6    and on what data they should be making decisions.
 7    Q    Is the Debtor attempting, in part, to transition away
 8    from mostly buying products from my client to buying
 9    products on its own?
10    A    Yes.
11              MR. BRIMMAGE:  Objection.
12              THE COURT:  Yeah, and Mr. Lemmon, I think none of
13    us discussed any of this.  I'm going to, kind of, keep you
14    within the bounds of where things are going.  So, if you've
15    got a couple of questions, I'm --
16              MR. LEMMON:  Thank you, Your Honor.
17    BY MR. LEMMON:
18    Q    Do you have an estimate of the legal expenses that the
19    Debtor has incurred in the Sandy Hook litigation?
20    A    I have a number, which from the accounting records, I
21    do not believe it's accurate.  And the reason is, the
22    recording of entries and legal fees don't -- the description
23    does not always tell you what case or even what firm it
24    relates to.  But best that what we can identify is what we
25    know being related to this -- the Texas case is, it's a --
```

```
 1              MR. BRIMMAGE:  Objection.  (Indiscernible).

 2              THE COURT:  Yeah, I'm going to let him finish the

 3     answer because I think he's just giving his thoughts.  But

 4     again, I'm -- those kinds of questions about cash collateral

 5     or the critical and the emotional, I'll let you go there,

 6     Mr. Lemmon, but is it really -- I just -- with your client,

 7     those are cash collaterals are nothing that you're

 8     interested in.

 9              MR. LEMMON:  That's true, but I believe that this

10     question has to do, in part, with that.  And so, if the

11     witness could be allowed to finish his question -- his

12     answer.

13              THE COURT:  Okay, well, I'll allow it.

14     BY MR. LEMMON:

15     A    From what I can tell, FSS identified payments of

16     approximately $4.5 million through 2022, from 2018 through

17     2022.

18     Q    You were asked a few questions about cryptocurrency,

19     and whether that cryptocurrency was cash collateral.  Do you

20     recall having discussions with me and with my client where

21     we were trying to establish that it was cash collateral?

22              MR. BRIMMAGE:  Objection.  (Indiscernible).

23              THE COURT:  Sustained.

24     BY MR. LEMMON:

25     Q    Do you recall any discussions with me and my client on
```

007677

1    that subject?

2    A    Yes.

3    Q    And to your knowledge, do you know whether we did an

4    investigation trying to prove that it was cash collateral?

5              MR. BRIMMAGE:  Objection.  (Indiscernible).

6              THE COURT:  Yeah, I'm going to sustain that.  Mr.

7    Lemmon, if your client has a position on it, then they can

8    file something or make an argument about it.  But whether

9    you've done an analysis or not, I'm sure you'll tell me at

10   some time, at some point.

11             MR. LEMMON:  Thank you, Your Honor.

12             THE COURT:  But all your rights are reserved.  I

13   mean --

14             MR. LEMMON:  Of course.  Thank you.  Thank you,

15   Your Honor.  That's all I have.

16             THE COURT:  Okay.  I'll give you a brief redirect.

17             MR. BATTAGLIA:  Your Honor, I'll be

18   proportionately brief.

19             REDIRECT EXAMINATION OF W. MARC SCHWARTZ

20   BY MR. BATTAGLIA:

21   Q    So, you were asked an awful lot of questions on cross

22   about the things that you haven't done about validating Mr.

23   Jones' draws, about validating or examining the precise

24   amounts that were advanced by PQPR, about valuating the

25   Plaintiffs' litigation claims.  Tell me again when you were

1    retained.

2    A    June the 6th of 2022.

3    Q    And tell me again when this bankruptcy case was filed.

4    A    July 29th.

5    Q    Good Lord, Mr. Schwartz, what have you been doing?  Why

6    haven't you evaluated those matters?

7    A    We have spent most of that time, substantially all of

8    the time, getting accounting books up to date so we could

9    determine what our cash flows looked like and what we --

10   whether we could or could not even file.

11   Q    And what amount of your workday is focused on FSS

12   business?

13   A    Post-petition?  I get about two hours a day, if I'm

14   lucky, on the business side.

15   Q    Okay.  But on the non-business side of FSS, total time

16   delegated to FSS?

17   A    Oh, my total time on FSS is -- honestly speaking, I'm

18   not the only one, but it's easy eight to nine hours a day.

19   Q    And are there -- how many people within the Schwartz

20   and Associates firm are dedicating time to the FSS file?

21   A    Four and a half or so.

22   Q    And you mentioned a Mr. Schultz, Schultz --

23   A    Schultz, it's pronounced Schultz.

24   Q    How much of his time is being dedicated towards FSS?

25   A    He's full-time.

1    Q    And so, all these people dedicating all this time,

2    again, you mentioned getting the books and records, what

3    else have you focused on, aside from getting the books and

4    records in a usable state?

5    A    Trying to figure out why we are constantly being

6    surprised with invoices that we didn't know were sitting out

7    there getting old.

8    Q    What about product orders?

9    A    Product orders.  Yes, definitely product orders and

10   reconciling deposits.  For example, we have one vendor that

11   we -- $1.5 million was sent to, a little over $1.5 million,

12   and $1,350,000 worth of product was actually ordered.  We

13   have a 250-something thousand- dollar credit sitting there,

14   which we were unaware of.  We had to find that, reconcile

15   that, and discuss that with Mr. Jones.  Why is that here?

16   Q    So, your focus has been on normalizing the business of

17   this juncture?

18   A    Yes.

19          MR. BRIMMAGE:  Your Honor, objection.  Leading.

20          THE COURT:  Sustained.

21   BY MR. BATTAGLIA:

22   Q    What has your focus been on this since your engagement?

23   A    I've been trying to get my arms around it and get it

24   into a standard operating mechanism where people go to work,

25   they know what their job is going to be that day, they do

```
 1    it, and we get rid of the last-minute catastrophes that have

 2    to be handled.  And that stated, we are literally right now

 3    in the -- oh, you've got to pay this bill because, you know,

 4    it's way past due and we're going to get cut off.

 5    Q    In order of priority, to protect and preserve the value

 6    of the estate and generate revenue, what are the most

 7    important things to do?

 8    A    Get control of the costs and get the revenue coming in

 9    the door.

10    Q    Where does evaluating Alex Jones' draw come on that

11    list?

12    A    That comes when you've got all -- got the business

13    running on an even keel, maybe I can start those processes.

14    Q    Where does evaluating the PQPR debt?

15    A    It comes in the same category.

16    Q    Where does evaluating the Plaintiffs' claims fit in

17    that regard?

18    A    Well, right now, with them sitting in the courts, I

19    mean, the Court's going to determine the Plaintiffs' claims.

20    I don't -- it's hard for me to see what I need to do to

21    evaluate -- to quantify the Plaintiffs' claims.  It's not a

22    matter to come to me.

23    Q    What is your role in the litigation, the Plaintiffs'

24    litigation?

25    A    I'm -- obviously, to the extent there's discovery, my
```

```
 1    role is to cooperate and assist in that, try to make sure --

 2    I have the perception that information was requested that we

 3    didn't have, or at least I've been told that that's not

 4    something we track.  But that clearly was not made known,

 5    and I also have a perception there was a lot of stuff put

 6    out there by people who just didn't know what they were

 7    doing.

 8    Q    Did Debtor have legal representation in both of those

 9    lawsuits?

10    A    Yes.

11    Q    And it's not Mr. Lee or myself?

12    A    Correct.

13    Q    What is your intention regarding investigating the

14    matters that have been discussed here, the Alex Jones draws,

15    the note balance, and ultimately, I guess, the Plaintiffs'

16    claims?

17    A    Well, there are a number of -- they fall in the

18    category of the number of deadlines we have to investigate.

19    And they are, you know, once we get past fire drill and get

20    this thing under control, which hopefully is within sight of

21    happening, we have to do a little bit more hiring.  Then we

22    can turn around and start, you know, get into the more

23    routine -- supporting the bankruptcy, supporting the Chapter

24    5 Trustee, and starting to evaluate and investigate the

25    claims.
```

1    Q    You were asked a series of questions regarding Mr.

2    Jones' draw -- historical draws and salary.  I want to visit

3    that a little bit here.  You've at least reviewed, from the

4    general ledger, what the distributions were to Mr. Jones for

5    the period from 2012, say, to 2022?

6    A    I've seen them, yes.

7    Q    And how -- there were some questions asked about post-

8    April 2018 draws.  Can you tell the Court, comparatively

9    speaking in the three or so years before 2018 or four years

10   -- and the four years following 2018, were they different,

11   the same?  How did they compare?

12   A    No, the draws declined following 2018 from the previous

13   period.

14   Q    The Debtor broadcast, the primary broadcast that FSS

15   transmits is called what?

16   A    The Alex Jones Show.

17   Q    Huh.  Is he important to that show?

18   A    Very much so, yes.

19   Q    In your opinion, is Mr. Jones valuable to FSS in his

20   ability to generate revenue in the future?

21   A    Yes, very much so.

22   Q    Why is that?

23   A    He has -- he's a salesman.  He's a -- his forte is

24   selling, and he's very, very, very good at it, and he can

25   sell to his audience.

1    Q    In your opinion, who at FSS is more valuable than Alex

2    Jones?

3    A    Who is more valuable?

4    Q    Yes.

5    A    Nobody.

6    Q    Do you have an opinion as to whether or not a salary of

7    a $1.3 million is appropriate for Mr. Jones and what he

8    contributes to this venture?

9    A    Well, I don't think it's anywhere near representing the

10   value that he provides.  It's quite appropriate from the

11   standpoint of FSS.  You know, it's good for FSS because I

12   think it's far below, way below what he could achieve and

13   has achieved in the past.

14   Q    You were asked some questions about why did FSS file

15   and I think you said something about because of the state of

16   litigation.  What other purposes were primary in your

17   decision to proceed with filing?

18   A    Well, the other purpose is, as I pointed out, the --

19   this organization, this business needs to be reorganized.

20   It has to become -- it's -- it does not have the internal

21   information loop to identify when it's heading into the

22   ditch and to help it make decisions to avoid that.  It has

23   gotten itself in the position where he has to get fully into

24   the ditch until it realizes it has a survival problem.  That

25   takes a reorganization and rethinking.  That takes managers

1    who begin to monitor the financial information related,

2    their operation and the overall operation.

3    Q    In 2021, now that you've closed the books, to what

4    degree was the Debtor profitable or unprofitable?

5    A    It was unprofitable.  It lost about $10 million in

6    2021.

7    Q    And to date, has that trend changed?

8    A    Well, through May 31st, I think we reported a profit

9    around a million dollars or so, but a significant part of

10   that was donations.  Donations are not operating results, so

11   it's hard to account for them.  So, it's definitely improved

12   from what it was in 2021, but I don't think we're anywhere

13   near a sound basis yet.

14   Q    Lots of questions about accounting issues, which you

15   were asked on direct and cross and everybody wants to call

16   it mess and terrible.  Was the ledger, at least up to 2021,

17   reliable?

18   A    It appears to be, yes.

19   Q    And the problem in 2022 is, that there had been no

20   postings as of --

21   A    Correct.

22   Q    Okay.  So, what information that was necessary to close

23   2021 and to book entries in 2022 was not made available to

24   you?

25            THE COURT:  I think you've covered that road.  I

```
 1    think you've covered that road, Mr. Battaglia.
 2    BY MR. BATTAGLIA:
 3    Q    I just want to ask, have you been provided access to
 4    all the information you need to do your job?
 5    A    Yes.
 6             MR. BATTAGLIA:  May I have one minute with my co-
 7    counsel?
 8             THE COURT:  Absolutely.
 9             MR. BATTAGLIA:  I'll pass the witness.  Thank you,
10    Mr. Schwartz.
11             THE COURT:  Okay.  I think I'm ready.  I want to
12    note two technical things and then I'll get into the
13    rulings.  One is -- and I'm going to consider it an
14    oversight, but I want it corrected today.  I looked at the
15    Debtor's petition, voluntary petition, and Mr. Battaglia,
16    you didn't sign it.  I need you to sign it today.  It's --
17    I'm just looking -- I don't -- I see where your name is
18    listed, but I don't see -- I'm going to share my screen.
19    I'm going to consider that just an oversight, but I want it
20    corrected.  It's required on a voluntary petition and that's
21    what I see on the voluntary petition, so I want that
22    corrected.  I want it corrected today, unless there's an
23    amended on file, and if there is, someone let me know.
24             This case was filed in the Victoria Division and
25    in May 19th -- on May 19th, excuse me.
```

007686

```
 1            MR. BATTAGLIA:  (Indiscernible) this case?
 2            THE COURT:  No, no, no.  I'm saying -- I'm saying,
 3    this case was filed in Victoria and on May 19th --
 4            MR. BATTAGLIA:  Okay.
 5            THE COURT:  -- Bankruptcy Court entered a General
 6    Order 22-3.  It deals with Division of filing locations, and
 7    it amends Local Rule 1002-1, and it says, (indiscernible)
 8    that cases must be filed in the division of the Debtor's
 9    principal location.  Principal location, if the Debtor has
10    none, the principal location is the Houston Division, and
11    that's what would have qualified in this case.
12            I'm going to -- you know, (indiscernible) the
13    Houston Division, based on my experience with the prior
14    cases and the efficiency and the best interests of the
15    estate, I'm going to transfer the case to the Houston
16    Division, and I'm going to transfer it to myself and keep
17    the case and we're going to keep the same case number.  But
18    it should be in Houston.  I want to make sure that we're
19    observing the local rules as done.  Parties have their
20    rights, but I want to make sure that those two technical
21    things, one I'll take care of on the back end, one, Mr.
22    Battaglia, you need to sign a declaration.
23            So, that -- but before the Court are two matters,
24    the utility -- I've signed schedules extension that's on the
25    docket.  Utilities you're going to tweak.  What's left now
```

007687

1    is cash collateral and the critical vendor motion.

2            And let me just excuse you.  You can have a seat.

3            Here's what I'm going to do.  I'm both -- I'm just

4    going to note that notice of today's hearings was proper,

5    the Court considered the evidence on the record, as well as

6    the testimony of Mr. Schwartz.  I appreciate Mr. Schwartz's

7    candor and his testimony.  Some of it I found very helpful.

8    Some of it I found honestly troubling.  Some of it is not

9    surprising for a Debtor early on in a case.  Management may

10   not be completely able to have its arms around a case so

11   that doesn't surprise me.  But everybody knows why these

12   last cases were filed, or the driving impetus, but driving

13   the last case and this case and that's -- there are some

14   major lawsuits going on in Austin and in Connecticut, and

15   they're very serious lawsuits that make some very serious

16   allegations.

17           It's not for me to comment on the merits of any of

18   them.  Those processed -- the process in Austin will run and

19   I don't want to say anything one way or the other about

20   what's happening in that lawsuit.  I just know that it is a

21   significant action, and I do know, and I don't want to make

22   light of it, that there are some -- they are real people and

23   real faces behind each one of them, they're real Plaintiffs

24   who have experienced real pain.  And I think Mr. Jones is --

25   and these Debtors are entitled to put on their defense and

1    it's not for me to comment one way or the other.  I just

2    know that there's a lot of seriousness and I take it as

3    such.

4            And so, I take each case that is filed before me

5    with the same degree of focus, preparation as one would hope

6    that a bankruptcy judge would.  And I've took the last cases

7    really seriously and prepared really hard and I've done the

8    same here.

9            So, there's two motions here, and really the

10   question is, is how you stabilize the company now.  There's

11   also been -- there's been oral request for the appointment

12   of a committee, and that can be done by the Court for cause.

13   I'm not going to grant that today, but I am going to express

14   some real concerns about what I heard, and I'll express what

15   they are.

16           You know, whether you realize it or not, Mr.

17   Schwartz was negotiating on both sides of a deal.  And what

18   was represented to me in the last case was that there was --

19   the parties were going to propose mediation and there was a

20   Plan Support Agreement and asking me to approve  Plan

21   Support Agreement entry into where parties were going to try

22   to -- at least what was stated to me in the last case was

23   that, parties were going to ask for mediation and to try to,

24   you know, ask the Plan, there were milestones, and third-

25   party contributors consisting of Mr. Jones and Free Speech

007689

1    were at least offering to put some money on the table to see

2    if there could be a deal that was worked out and that didn't

3    happen.  And I'm not saying it should have happened.  Again,

4    I'm just saying the fact it did not happen, so I'm not

5    saying there was not a good reason that it shouldn't have

6    happened.  Again, I'm just pointing to the fact that that

7    did not occur.

8            But Mr. Schwartz, you spoke with both third-party

9    contributors at the time, and at least what you're telling

10   me, Mr. Lee was involved as well at the time, then both

11   parties were representing the InfoW Debtors who were --

12   quite frankly, membership interests had been transferred to

13   a trust.  And so, I haven't fully thought through, but I'm

14   concerned that you still may represent the InfoW Debtors as

15   their CRO and how you're purporting to act as the CRO in

16   this case.  And I don't -- at some point, someone's going to

17   have to make some really hard decisions.  I'm -- quite

18   frankly, I'm a little surprised you hadn't read some of the

19   litigation because at least InfoW was involved in the

20   litigation for every one of these last time.  So -- and that

21   was supposedly the purpose of the litigation.

22           So, I'm a little surprised that the CRO is telling

23   me today that he hasn't read, at least, the -- or has a good

24   working knowledge of the lawsuits, including the fraudulent

25   transfer litigation.  I didn't know whether the fraudulent

1    transfer litigation has any merit.  I don't know whether --
2    I've heard today about the potential indemnity that Mr.
3    Jones may have against FSS.  And you may file a proof of
4    claim.  He may file a proof of claim, he may not.  That's
5    not surprising in a case whereas -- but the Debtor is going
6    to have to make some tough decisions at some point.  And
7    it's going to have to really analyze those claims and see
8    whether those claims have any merit and whether there are
9    claims that the estate has that it may bring on its own, and
10   I don't know if there are any.  That's certainly not for me
11   to comment on, but someone's going to have to do the hard
12   work, and I don't know how that hard work gets done from
13   what I'm hearing.
14          And I'm not sure that parties who were introduced
15   in the last case could fill that role either.  But the
16   Debtor needs to hear that from me, and I think debtors are
17   entitled, especially early on in a case, to think about what
18   the judge may have to say.  And these are certainly rare
19   comments, but these are certainly uncommon cases.
20          And I don't want to -- there's a request for the
21   appointment of a Tort Committee and I think it's not wholly
22   unfounded to ask for one.  And I think I owe them a real
23   answer as to why I'm not going to appoint one today.  The
24   fact that a Debtor has got to get its books right, that
25   doesn't surprise -- that's -- I think professionals can get

```
 1    their hands wrapped around that and can drink from the
 2    firehose from it and stabilize the company.  But I think
 3    there's going to be some hard decisions that have to get
 4    made, and maybe the answer is that there are no claims.
 5    Maybe the answer is that everybody's entitled to what
 6    they're saying they are.  Maybe the answer is that, you
 7    know, the secured creditor is a valid secured creditor, it's
 8    a validity priority to the extent that there's liens that's
 9    valid.  I have no idea, but I know somebody's got to go do
10    that work.
11          Someone has to do the hard work on that, and I
12    don't know who is going to do the work.  I don't know who is
13    going to make the call if there really is something there to
14    do.  And I think the Debtor is going to have to really give
15    some thought about who is truly independent and whether
16    someone can convince me otherwise about that.
17          But for purposes of today, I'm not going to
18    appoint one, but certainly it's without prejudice and maybe
19    I hear something that tips me over.  I'm sure this is not
20    going to be the last time a request is made, but I do read
21    it as my call.  Mr. -- but I do know that if I do appoint
22    something or authorize one, that I will turn it over to the
23    Office of the United States Trustee, who will then do their
24    work.  I won't get involved in that part of it.  But I'm not
25    going to appoint one today.  I think the Debtor has to think
```

1   about what I'm saying today.

2           But for purposes of today, I'm going to authorize

3   the use of cash collateral on a limited basis.  And here's

4   what I'm going to approve on this, and I've got a, kind of,

5   an additional request at the end.  I have a line item,

6   "Outsource Services/Consulting Services", there'll be

7   repayments on those.  That's about $45,980, $22,670.  I've

8   heard no evidence that any of that is an emergency and

9   should be authorized today.  You can come ask for it on a

10  final.  It's without prejudice but will not get paid in the

11  interim.  The American Express bill, no.  It's about

12  $172,000.  That bill will not be -- I'm not authorizing

13  payment on -- any payments on that card.  You can ask for it

14  on a final.  Mr. Jones' employment salary.  I think the

15  parties had initially talked about a reduction to $20,000.

16  I'll authorize the payment of $20,000 for Mr. Jones.  I

17  think the employees -- my understanding is that none of the

18  work that they would be paid for is pre-petition and I want

19  -- the employees do the work, they should get paid.  So, I'm

20  going to authorize the payments up to the amounts.

21          The language that the (indiscernible) Plaintiffs

22  requested in their objection must be put in any order.  I

23  also want in the order, that I am also making no findings --

24  and this order won't be construed in any way in a similar

25  way with respect to any donations that we heard about today,

```
 1    restricted, unrestricted, how they can be used.  I'm making
 2    no findings about that.  I want to make sure that the order
 3    also says that no draws are permitted in my interim order.
 4          I'm going to set a final hearing on this on -- I
 5    think the parties can do it August 15th I think is when cash
 6    collateral runs out anyway.  Come back on August 15th at
 7    10:00 a.m., and we'll just go till we're done on that.  It's
 8    going to be an interim order.
 9          Before the order, Mr. Schwartz, it says that it's
10    in evidence.  Your engagement letter says that you were
11    delegated those managerial duties, either Paragraph 8.01 of
12    the Free Speech Systems Company Agreement.  I don't know
13    what that is, and I want you filing it.  I want -- to the
14    extent if it's -- I don't -- I think it should be a public
15    document.  But if anybody wants to tell me it should be
16    filed under seal, it should be.  But if a CRO is going to --
17    I need to understand what your role is and what those
18    managerial duties are under 8.01.  I want that filed on the
19    Docket so all parties can see and have the ability to ask
20    questions about it.
21          And will tell you, on the -- it sounds like under
22    the budget, some of those are buckets based on historicals,
23    and that's fine.  Mr. Schwartz, you're to use your judgment.
24    I don't want to hear about some insider payments.  I don't
25    want to hear about something -- use your judgment.  If it
```

```
 1    borders on problematic, the answer is kick it to the final.

 2              With respect to the critical vendor motion, I'm

 3    going to authorize -- I'm going to grant the critical vendor

 4    motion.  But Subchapter 5 Trustee and -- has to be involved

 5    and it has to see what -- exactly where these payments are

 6    going to go.  It sounds like there are buckets here and I

 7    want to know that these payments are being made in the

 8    ordinary course of business.  In other words, if there's a

 9    payment due at the end of the month, nothing is getting

10    prepaid.  If the bill is due and it's one of those entities

11    and the bill is $20,000, then that's just what they're going

12    to pay before they come to a final.  They can come ask for

13    the remainder at a final.

14              I want to see the order for the claw back.  I will

15    assure, you know, that I want that order to have some teeth.

16    And I'm not asking for anything extra and what is ordinary

17    in a critical vendor motion in the Southern District of

18    Texas.  There are plenty of examples of that.  Mr. Brimmage

19    has seen them a million times.  I'm sure Debtor's counsel

20    has seen them as well, and the Trustee can point to a

21    million examples.  Everybody knows what the standard

22    language looks like.  Put it in there.

23              But if I sign the order, it's going to have some

24    teeth, which is why I'm saying just, you know, I don't think

25    they need to sign anything saying, you know, I don't think
```

1    they need a critical vendor agreement for the trash person,

2    but they need to understand, and it needs to be explained to

3    them if they don't, if they can -- they don't, and I do

4    intend to enforce that order. And so, it sounds like you

5    all are going to upload three orders, so we could sit here

6    and hack one out old school. I'll leave it up to you. What

7    do you want to do?

8          MR. BATTAGLIA: Your Honor, let me take a stab

9    because I think most of the terms we've talked about prior

10   to hearing as far as cash collateral and the critical

11   vendor, the U.S. Trustees can tell me if they have any

12   federal language on claw back. I think there's language in

13   there and I'm -- this will shock the world, but I think I

14   got the form of motion and order from a pleading that Mr.

15   Brimmage is on. So -- but I'll run it by --

16         THE COURT: That doesn't mean he didn't object to

17   it when he got to a hearing on it though.

18         MR. BATTAGLIA: Understood. And if I could have a

19   central point of contact, if Mr. Martin is the person, I

20   will share drafts of all of these orders as they're revised

21   with --

22         THE COURT: As soon as they're signed -- I should

23   say or upon uploaded, just let my case manager know, Ms.

24   Saldana. Have them take a look at it and if it looks okay

25   to me --

007696

```
 1          MR. BATTAGLIA:  Share them with all three and take
 2   comments --
 3          THE COURT:  Yeah.
 4          MR. BATTAGLIA:  -- and criticisms and they'll --
 5   I'll have their agreement before we upload them.
 6          THE COURT:  You know, I'm nervous.  I mean, I get
 7   cash collateral in trial, but utilities should not trail.
 8   That one should get done pretty quickly and you should be
 9   able to add some language in the critical vendor motion, and
10   Ms. Haselden, if there's anything that you are concerned
11   about, then just kick it to a final order.  You can have a
12   hearing within two days, 24 hours on any one-off that you
13   think that you all can't agree on.  I just want -- the
14   bucket is based on historicals, and I want to make sure if
15   it's assurance and trash, I'm -- I don't need to see any of
16   those, but that relates to the business.  You know, if it
17   relates to someone -- to anything personal, don't do it.
18   That's not what I'm authorizing.  I'm only authorizing what
19   is essential for the business.  Everybody's rights are
20   preserved.
21          I think the Debtor needs to look forward to having
22   a more robust conversation with the Debtor on the 15th about
23   the things I've talked about and I'm going to give some
24   thought, as well, to where we are.  Maybe there's a good
25   answer, maybe there's not, but I take it from the
```

1    Connecticut Plaintiffs and the Texas Plaintiffs that if you

2    want to file something, file something.  If you want to

3    renew at a final, I don't -- I'm fine either way.  I don't -

4    - the Code doesn't require anything in writing, and so, I'm

5    not going to hold you all to that.  I think you can -- if

6    there's anything you wish to supplement before the final in

7    connection with a final, and I think that's standard, quite

8    frankly, then do so.  If there's some reasonable discovery,

9    then go for it.  I don't need to be involved in that, but if

10   you need me, let me know.  But that's -- I take it there's

11   going to be a lot of work between now and the 15th, but it

12   is what it is.

13        Mr. Lemmon?

14        MR. LEMMON:  The Court may recall the discussion

15   earlier this morning about the vacation schedules.

16        THE COURT:  Yep.

17        MR. LEMMON:  I am out that whole week of the 15th.

18        THE COURT:  Okay.

19        MR. LEMMON:  And I'm leaving this Sunday and out -

20   - well, I get back that Friday of that week.  I would --

21        THE COURT:  The Debtor runs out of leave -- I

22   think it runs through the 15th, so that's why I --

23        MR. LEMMON:  Yes, and so, I think it's highly

24   likely that it'll be important to -- you know, I'm just

25   saying I think it would be highly likely that we'll need to

```
 1    have a further interim.  But I don't want to delay the

 2    discovery process, and so I'd like to start some informal

 3    discovery and I've mentioned that to the Plaintiffs' counsel

 4    to, you know, just start, so that -- start getting some

 5    information.  But I wanted to let the Court know about that

 6    impending problem on the 15th.

 7               THE COURT:  Okay.  Mr. Brimmage?

 8               MR. BRIMMAGE:  Can I address that impending

 9    problem?

10               THE COURT:  Yep.

11               MR. BRIMMAGE:  We have several on our team that

12    that week is very problematic for too.

13               THE COURT:  Okay.

14               MR. BRIMMAGE:  So --

15               THE COURT:  What works best?

16               MR. MARTIN:  We agree on it.

17               THE COURT:  I just don't want the Debtor to run

18    out of cash or have to come back.  So --

19               MR. MARTIN:  Yeah.  Yeah.  Totally in agreement.

20               THE COURT:  So --

21               MR. MARTIN:  Yeah, yeah.  Totally understand.

22               MR. BATTAGLIA:  Your Honor, I asked for 14 days,

23    but the three-week budget is included.  And I don't recall

24    if --

25               THE COURT:  So, what works best?  I'm not going to
```

1    -- yeah --

2            MR. MARTIN:  We discussed previously, Your Honor,

3    about extending the interim to the 23rd or 24th of August.

4            THE COURT:  All right.

5            MR. MARTIN:  To accommodate for both my vacation

6    schedule and Mr. Lemmon's vacation schedule.

7            THE COURT:  I'm looking.  Okay, I'm looking.

8            MR. BATTAGLIA:  Or the 24th and the 23rd, if

9    possible, Your Honor.

10           THE COURT:  Or the 24th?  What do I have?

11           MR. BATTAGLIA:  I have a charitable entity that

12   I'm the Board Chair of that I have a Board meeting that

13   morning, but it would be the second one I've missed in 10

14   years, so, I could miss the 24th.  I'm available the 23rd.

15           THE COURT:  You just ask -- Ms. Saldana, can you

16   take a look on the 24th, I've got something at 4:00 p.m. --

17           MR. MARTIN:  The 24th for half a day, there is a

18   Subchapter 5 Trustee Committee meeting that I've committed

19   to, but I can certainly --

20           THE COURT:  All right.  Well, you're going to take

21   a loss on that one.

22           MR. MARTIN:  I'm happy to do that.  I'll get the

23   play-by-play from Judge Norman later.

24           THE COURT:  On the 24th, Ms. Saldana, I think --

25   can I do the 24th or is there something there?  I know I've

1    got a pre-trial conference at 4:00 p.m.  Do I have anything

2    earlier?  All right.

3           MR. LEE:  Your Honor, we have an economic issue in

4    light of going to the 24th.  In light of some of the carve

5    outs you made with respect to things that we cannot pay.

6    So, that's what they're talking about right now, between Mr.

7    Schwartz and --

8           THE COURT:  Okay.  And look, if you need a break

9    to get to the 24th, and -- but if the 24th works, why don't

10   we do 10:00 a.m. on the 244th.  We'll just pencil it in and

11   if anything changes.  Do the parties -- the parties here

12   agree, if the -- what I'll call the Collective Sandy Hook

13   Plaintiff, PQPR, and the Debtor agree on a date and time and

14   some breaks, then I'm not going to stand in the way of that.

15          MR. BATTAGLIA:  So, Your Honor, I can include the

16   budgets for the three-week budget and attach that as the

17   approval on the 14 days?

18          THE COURT:  Yeah, if you all are --

19          MR. BATTAGLIA:  Thank you, Your Honor.

20          THE COURT:  Well, hold on a second.  Let me take a

21   look at that.

22          MR. BATTAGLIA:  Understood if there's --

23          THE COURT:  Because I think -- if you go out that

24   extra wait, doesn't that add a really big payment in there?

25   Another -- let me take a look at week three.  Are we going -

1    - between the 24th, right?  You're going to have to hold off

2    on the half a million dollar -- I'm just telling you now.

3    Just on the 24th.

4              MR. BATTAGLIA:  What day was that to be paid on?

5    Do you know?

6              THE COURT:  Yeah, the (indiscernible) may not be

7    (indiscernible), but I'm not going to feel comfortable with

8    a half a million-dollar payment without a final.

9              MR. BATTAGLIA:  I assumed as much, Your Honor.

10             THE COURT:  Okay.

11             MR. BATTAGLIA:  So, we'll remove that from the

12   budgeting.

13             THE COURT:  And then, I think Mr. Jones' salary

14   comes up again.  I think you can budget for the 20, but it

15   could be 54 at the final.  He has the right to come in and

16   ask on that.

17             MR. BATTAGLIA:  We're just going to do 20 in this

18   order.

19             THE COURT:  Okay.

20             MR. BATTAGLIA:  We're limiting it to 20.  We're

21   not going to change it.

22             THE COURT:  Okay.  Just subject to a final?

23             MR. BATTAGLIA:  Yes, sir.

24             THE COURT:  Okay.  And obviously continuing, no

25   AMEX, no consultant, those payments will continue.  Just --

1    so it's essentially, kind of, it should be in a lot of ways,

2    what I've approved in Week 1.  Week 3 should mirror Week 1

3    minus the $500,000 payment.

4            MR. BATTAGLIA:  Mr. Schwartz does have a concern

5    that some of those consultants may really be vital, and I

6    understand --

7            THE COURT:  Just -- no, I'm saying, just ask for a

8    hearing in two or three days and --

9            MR. BATTAGLIA:  That's what I explained to him.

10   First, we'll try to deal with counsel on the other side if

11   we can --

12           THE COURT:  Okay.  And if the parties already

13   agreed it and you all stick to it and they're necessary and

14   there's no fight about.  If not, you can get a hearing in 24

15   hours.

16           MR. BATTAGLIA:  I'll try to work on it informally

17   and if not --

18           THE COURT:  Okay, Ms. Haselden, I'm going to -- I

19   want you to take a look at that, as well, on those.

20           Mr. Brimmage?

21           MR. BRIMMAGE:  Your Honor, point of clarification

22   with regard to the motion to appoint a Tort Committee.

23           THE COURT:  Mm hmm.

24           MR. BRIMMAGE:  I just want to make sure I'm clear.

25   Are you denying that?  Are you just holding that?  What

007703

```
 1   would you like from us?  I just want to make sure we're

 2   clear because we would want this record to be part of

 3   whatever that effort is.

 4             THE COURT:  No, no, I think it continues.  I

 5   think, you know --

 6             MR. BRIMMAGE:  Okay.

 7             THE COURT:  I think you've raised the issue today.

 8   It wasn't -- you haven't filed anything.  You made a formal

 9   request today.  But there was a request, and I had the

10   authority.  I waived to do it today and I'm just telling

11   folks I didn't do it, but everything is cumulative.

12             MR. BRIMMAGE:  Okay.

13             THE COURT:  I don't expect, in a full evidentiary

14   record, next I mean --

15             MR. BRIMMAGE:  Okay.  You would like us to file

16   something and tee it up again and we can use today's record

17   with whatever other record we need and take it from there?

18             THE COURT:  If that's what you all want to do,

19   yeah, and we can pick a date, yeah.

20             MR. BRIMMAGE:  Okay.  All right.  Thank you, Your

21   Honor.

22             THE COURT:  Mm hmm.

23             MR. BRIMMAGE:  Do we need to do that -- can we do

24   that on an expedited basis?  Not a two-day notice, but not a

25   21-day notice?
```

```
1                 THE COURT:  No, look I --

2                 MR. BRIMMAGE:  We'll see?

3                 THE COURT:  I know you'll be back on the 15th, so

4    I know if you --

5                 MR. BRIMMAGE:  Or the 24th.  Okay.

6                 THE COURT:  Oh, and that's not the 15th, the 24th.

7    Yes, that's exactly right.  So, that would make sense.  If

8    you've got something --

9                 MR. BRIMMAGE:  Okay.

10                THE COURT:  -- on file this week, then just tee up

11   the issue, then maybe we can just take it up on the 24th at

12   that time, yeah.

13                MR. BRIMMAGE:  Thank you, Your Honor.

14                THE COURT:  That's what I mean.  That's a -- and

15   now that we're going further out, I think it provides -- I

16   think the Debtor needs time to think about what I said.  But

17   I think the Debtor would need a thorough and fair

18   opportunity to respond to anything, especially if something

19   got filed, and I wouldn't dare do that on short notice.  I

20   think the Debtor is entitled to that, so -- okay.  Anything

21   else we need to take care of today?

22                MR. BRIMMAGE:  No, sir.

23                THE COURT:  Okay.  So, you all are going to upload

24   orders and then get them to Ms. Saldana.  I will assure you,

25   24 hours you may get an email from her just to make sure --
```

```
1              MR. BATTAGLIA:  I'm going to try to turn them
2      tonight if I can get home quick enough.
3              THE COURT:  Yeah.
4              MR. BATTAGLIA:  If not, it'll be in the morning,
5      and I'll turn them to the parties.
6              THE COURT:  Good luck.  Thank you.  Take care.
7      Have a good day.
8              MR. LEMMON:  Thank you, Your Honor.
9          (Proceedings adjourned at 5:05 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        CERTIFICATION

 2

 3     I certify that the foregoing is a correct transcript from

 4     the electronic sound recording of the proceedings in the

 5     above-entitled matter.

 6

 7

 8

 9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 12, 2022
```

 **SHANNON & LEE LLP**

# INVOICE

Invoice # 10
Date: 07/05/2022
Due On: 08/04/2022

700 Milam, Suite 1300
Houston, Texas 77002
United States

Free Speech Systems, LLC

## 00008-Free Speech Systems, LLC
## Financial Restructuring

### Services

| Date | Attorney | Description | Hours | Rate | Total |
|------|----------|-------------|-------|------|-------|
| 06/01/2022 | KSL | Continue to gather agreements, data from state court receiver discovery and share new discovery on financial data with counsel and CRO that affects restructuring strategy (.5) | 0.50 | $850.00 | $425.00 |
| 06/02/2022 | KSL | Handle issues relating to FSS bankruptcy preparation and follow-up with calls and Zoom meetings with co-counsel to discuss how to approach FSS and key issues relating to same (1); continue to scour State Court discovery and pull key discovery that could affect bankruptcy case (1.) | 2.00 | $850.00 | $1,700.00 |
| 06/03/2022 | KSL | Review issues relating to ▮▮▮ Agreement, and other arrangements relating to transactions between PQPR and FSS and analyze same; extended t/c with S. Lemmon to understand position of David Jones and Anthony on issues from PQPR and ▮▮▮; further calls with Marc Schwartz to discuss schedule of preparation for filing; t/c with R. Battaglia to discuss same (2) | 2.00 | $850.00 | $1,700.00 |
| 06/05/2022 | RJS | Conference with K. Lee re PQPR lien and note; draft memo re PQPR lien and note . | 3.60 | $625.00 | $2,250.00 |
| 06/05/2022 | KSL | Handle call with Marc Schwartz and RJ Shannon on results of analysis of ▮▮▮ Agreement and impact of percentages in agreement on ability of FSS to make any income (1.0) | 1.00 | $850.00 | $850.00 |
| 06/06/2022 | RJS | Travel to and return from Austin re meeting about restructuring and goals (1/2 rate) | 5.00 | $312.50 | $1,562.50 |
| 06/06/2022 | RJS | Meeting in Austin re restructuring and potential bankruptcy among FSS professionals and conference with separate attorneys from Alex Jones and PQPR. | 4.50 | $625.00 | $2,812.50 |

| 06/06/2022 | KSL | Travel to and from Austin, Texas for FSS meetings (3)(6 hours billed at 1/2 travel time); meeting with counsel, CRO and SchwartzAssociates and B. Roe to discuss preparing for FSS bankruptcy case (5.0)(meeting joined by Shelby Jordan and Steve Lemmon at different portions of the meeting) | 8.00 | $850.00 | $6,800.00 |
|---|---|---|---|---|---|
| 06/07/2022 | KSL | Extended conference call to clarify position of FSS and its advisors relating to restructuring and its goals (1.0); further review of issues relating to projected timeline for filing, what has to be accomplished prior to that time and whether it is feasible to do so (1.0) | 2.00 | $850.00 | $1,700.00 |
| 06/08/2022 | KSL | O/c with Marc Schwartz to highlight new issues to handle relating to FSS preparation for bankruptcy (.5); analyze data from State Court discovery and handle new data and share with other parties, mark and note for inclusion into Marc Schwarz declaration (1.5) | 2.00 | $0.00 | $0.00 |
| 06/09/2022 | KSL | Continue to review State Court Discovery files to determine a) Cash movement from Security Bank accounts for Cash Management Motion, b) net worth discovery folder to determine whether financials produced contradict true condition of FSS as analyzed by Marc Schwartz, and c) review death penalty sanctions and why it occurred and what it means (3)) | 3.00 | $850.00 | $2,550.00 |
| 06/10/2022 | RJS | Review NDA for Axos Bank and revise same for March Schwartz. | 0.50 | $625.00 | $312.50 |
| 06/11/2022 | RJS | Review various emails and docket entries re Conn. sanctions motion; gather various relevant documents relevant to the same; draft email to N. Pattis re same. | 0.80 | $625.00 | $500.00 |
| 06/13/2022 | RJS | Teleconference re various litigation and restructuring matters. | 1.00 | $625.00 | $625.00 |
| 06/13/2022 | KSL | Focus on assisting Marc Schwartz on assuring FSS does not suffer any additional penalties and sanctions in connection with corporate representative depositions in Connecticut by reviewing State Court discovery to analyze scope of corporate representative discovery, depositions taken to date, and handle any financial data discussed during such discovery as it relates to present efforts to analyze financial condition of FSS (4) | 4.00 | $850.00 | $3,400.00 |
| 06/14/2022 | RJS | Call re restructuring matters. | 1.00 | $625.00 | $625.00 |
| 06/14/2022 | KSL | Review Motion for Sanctions for Bad Faith Removal in preparation for responding to same or assisting Norm Pattis and Cameron Atkinson (1.5); lunch meeting with Marc Schwartz to discuss FSS issues and catch up on work to be done (1.5); extended call with team to review issues on project timeline and what work needs to be done (1.0); review notices of deposition for corporate representatives (.5); review motions for sanctions and response available to Connecticut and | 5.00 | $850.00 | $4,250.00 |

| Date | Atty | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| | | Texas counsel (.5) | | | |
| 06/15/2022 | RJS | Email Marc re next steps in matter in response to email re information (.3); analyze corporate rep. deposition in Conn matter and email team re same (.2); analyze Texas sanctions motion re removal (.5); draft email re same to team (.3); gather relevant documents re same (2.0); draft detailed email re same to A. Reynal (.4). | 3.70 | $625.00 | $2,312.50 |
| 06/15/2022 | KSL | O/c with Marc Schwartz after the ROCC breakfast to discuss status of financial statement preparation for FSS (.5); analyze Norm Pattis emails on status of bankruptcy preparation and timing of when case will be ready for filing (.5); emails with RJ Shannon on new issues raised by FSS (.5); t/c with S. Lemmon, counsel for PQPR on restructuring issues (.5); analyze and handle conference calls among CRO, counsel and PQPR on various business and negotiating issues on transaction between the parties (1) | 3.00 | $850.00 | $2,550.00 |
| 06/16/2022 | KSL | Continue to gather factoids from State Court Discovery folders and depositions to incorporate into Marc Schwartz Declaration (1.0); analyze and restructure form of Schwartz Declaration (1.0) | 2.00 | $850.00 | $1,700.00 |
| 06/17/2022 | KSL | Continue review of State Court Discovery files to gather factoids for Schwartz Declaration and create inserts for various sections of Schwartz Declaration (2) | 2.00 | $850.00 | $1,700.00 |
| 06/19/2022 | RJS | Travel to Austin re meeting re restructuring (1/2 rate). | 2.50 | $625.00 | $1,562.50 |
| 06/20/2022 | KSL | Travel to and from Austin, Texas for meetings at FSS headquarters on Alvin Devane with counsel, B. Roe, Alex Jones, Shelby Jordan, Ray Battaglia and Marc Schwartz (3.0)(6.0 hours at 1/2 travel time per US Trustee Guidelines); attend meeting at FSS with counsel and business people to discuss status of FSS case preparation (4.0) | 7.00 | $850.00 | $5,950.00 |
| 06/20/2022 | RJS | Attend meeting in Austin, TX re restructuring. | 4.00 | $625.00 | $2,500.00 |
| 06/21/2022 | RJS | Gather documents needed for Axos bank; draft email to M. Schwartz, K. Lee, and R. Battaglia attaching same. | 0.20 | $625.00 | $125.00 |
| 06/21/2022 | KSL | Review outline of to dos to prepare for Chapter 11 filing for FSS (.5); analyze status of State Court Discovery files to determine additional documents and data to be used in Marc Schwartz Declaration (2.5); lunch meeting with Marc Schwartz and Jeff Shulse to determine status of financial information preparation for FSS Bankruptcy Filing (2.0) | 5.00 | $850.00 | $4,250.00 |
| 06/22/2022 | RJS | Attention to email from Texas SOS re certificate of fact; draft email re same to M. Schwartz; attention to email from R. Battaglia and M. Schwartz re meeting with PQPR; draft response re same suggesting Zoom meeting; draft email to A. Reynal re sanctions motion | 0.40 | $625.00 | $250.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | hearing on 6/14/22. | | | |
| 06/22/2022 | RJS | Draft Declaration re sanctions motion re removal. | 5.73 | $625.00 | $3,581.25 |
| 06/23/2022 | RJS | Finalize Declaration re Texas sanctions motion and gather exhibits; draft email to A. Reynal and team re same. | 1.91 | $625.00 | $1,193.75 |
| 06/23/2022 | KSL | Review and edit Declaration of RJ Shannon in Response and in Support of Opposition to Bad Faith Removal Motions by Plaintiffs (1.0); review Exhibits 23, 24 and 25 of the Declaration and determine whether they support arguments made in the Declaration and response of Heslin Plaintiff to same (1.0); conference calls and review of exhibits on latest status of ability of Schwartz to generate accurate financial information for FSS to file chapter 11 and sustain company in Chapter 11 (1); review new issues raised by State Court actions and hearings on attorneys' fees in Texas State Court (1.0) | 4.00 | $850.00 | $3,400.00 |
| 06/24/2022 | RJS | Attend hearing on motion re amending sanctions order; organize notes re same. | 1.04 | $625.00 | $650.00 |
| 06/24/2022 | RJS | Attention to K. Lee email re FSS-PQPR memorandum; provide comments to same; draft email re same to K. Lee. | 0.58 | $625.00 | $362.50 |
| 06/24/2022 | KSL | Review and analyze MOU to determine whether arrangement works and is feasible; listen to response from S. Lemmon on MOU; discuss same with client and opposing counsel and determine approach that is equitable for both parties; review corporate deposition transcript of Zimmerman, Dew and several others on various topics to determine whether factoids available for Marc Schwartz Declaration; review David Jones deposition to do same (3) | 3.00 | $850.00 | $2,550.00 |
| 06/25/2022 | RJS | Attention to emails re Friday hearing; draft email to K. Lee, R. Battaglia, M. Schwartz re same. | 0.48 | $625.00 | $300.00 |
| 06/27/2022 | RJS | Obtain transcript of 6/10/22 hearing in IW bankruptcy case; draft email to team re same; attention to response from A. Reynal; initial call re modification of PQPR deal. | 0.50 | $625.00 | $312.50 |
| 06/27/2022 | RJS | Call with S. Lemmon, M. Schwartz, K. Lee, and R. Battaglia re amending PQPR relationship. | 1.30 | $625.00 | $812.50 |
| 06/27/2022 | KSL | Complete review of Exhibits 23, 24 and 25 to RJ Declaration to assure that "bad faith" arguments are addressed and supported by response filed (1.0); Handle fall out from issues relating to circulation of MOU by J. Shulse and why such proposal is opposed by S. Lemmon (1.0); Call with M. Schwartz to discuss issues relating to financial information for FSS (.5); edit and revise latest draft of M. Schwartz Declaration (1.0); | 4.50 | $850.00 | $3,825.00 |

| | | Conference call with R. Battaglia and R. Shannon to discuss strategy on how to handle State Court cases (1.0) | | | |
|---|---|---|---|---|---|
| 06/28/2022 | RJS | Finalize declaration re Texas sanctions motion; send same to A. Reynal; review pleadings in Texas state court in advance of 3 pm call with S. Jordan, R. Battaglia, K. Lee, and A. Reynal. | 2.84 | $625.00 | $1,775.00 |
| 06/28/2022 | RJS | Prepare response re email re PQPR; prepare for and attend 3 pm meeting re litigation. | 1.90 | $625.00 | $1,187.50 |
| 06/28/2022 | RJS | Prepare WIP List for filing | 3.17 | $625.00 | $1,981.25 |
| 06/28/2022 | KSL | Write emails to M. Schwartz on financials and status of when they will be ready, negotiations on revised arrangements with PQPR and new agreements to be entered into among the parties (.5); extended conference call among Ray Battaglia and S. Lemmon to discuss latest developments on PQPR and SFF (.5); Call on FSS with team on MOU and action plan required on same (1.0); continue to review depositions of corporate representatives and Alex Jones to determine factoids critical to Marc Schwartz Declaration (1.0) | 3.00 | $850.00 | $2,550.00 |
| 06/29/2022 | RJS | Draft email re CODI tax implications to R. Battaglia, S. Jordan, and K. Lee; finish drafting WIP/Task List for bankruptcy filing; draft email to K. Lee and R. Battaglia re same; | 2.20 | $625.00 | $1,375.00 |
| 06/29/2022 | KSL | Outline topics on which data is required from SchwartzAssociates to complete (1.0); review status of Schwartz Declaration to determine new topics to include for finalization (1.0); Lunch with Marc Schwartz and RJ Shannon to review issues on FSS and how to break log jam in financial data requirements to make progress for filing chapter 11 (1.0); t/c with R. Battaglia and Steve Lemmon to discuss issues relating to new agreement between the parties (1.0); continue to edit and revise Schwartz Declaration (1.0) | 5.00 | $850.00 | $4,250.00 |
| 06/30/2022 | RJS | Zoom call with M. Schwartz and K. Lee re PQPR financials; attention to K. Lee email re same and S. Lemmon request to destroy same; research and draft detailed email re same; teleconference with M. Schwartz, C. Schwartz, K. Lee, R. Battaglia, and S. Jordan re same. | 4.70 | $625.00 | $2,937.50 |
| 06/30/2022 | RJS | Research SOL issues re malpractice claims; draft email to team re same. | 0.40 | $625.00 | $250.00 |
| 06/30/2022 | KSL | T/c with R. Battaglia on latest developments in case (.5); review financials provided by M. Schwartz (1.0); t/c with S. Lemmon on PQPR Financials (.4); review issues relating to return of financials (.6); review issues relating to 13 week cash flow forecasts for FSS (.5); | 6.00 | $850.00 | $5,100.00 |

007712

edit and revise M. Schwartz Declaration as it relates to history of FSS, years 2009-2014 and add in excerpts from deposition transcripts (2.0); conference call with client and legal team to discuss PQPR Financials (.5); review data on cash management system at FSS and locate pleadings relating to same (.5)

| | |
|---|---|
| **Quantity Subtotal** | **127.95** |
| **Services Subtotal** | **$93,356.25** |

## Expenses

| Type | Date | Description | Quantity | Rate | Total |
|------|------|-------------|----------|------|-------|
| Expense | 06/21/2022 | Texas SOS Search and Filings: Texas SOS search and certificate of fact for Free Speech Systems, LLC | 1.00 | $15.00 | $15.00 |
| | | | **Expenses Subtotal** | | **$15.00** |

| Time Keeper | Position | Hours | Rate | Total |
|-------------|----------|-------|------|-------|
| Kyung Lee | Attorney | 72.0 | $850.00 | $61,200.00 |
| Kyung Lee | Attorney | 2.0 | $0.00 | $0.00 |
| R. J. Shannon | Attorney | 48.95 | $625.00 | $30,593.75 |
| R. J. Shannon | Attorney | 5.0 | $312.50 | $1,562.50 |

| | |
|---|---|
| **Quantity Total** | **127.95** |
| **Subtotal** | **$93,371.25** |
| **Invoice Discount** | **10.0% (-$9,337.13)** |
| | *Agreed 10% discount* |
| **Total** | **$84,034.12** |
| **Payment (07/28/2022)** | **-$84,034.12** |
| **Balance Owing** | **$0.00** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|

| 10 | 08/04/2022 | $84,034.12 | $84,034.12 | $0.00 |

## IOLTA Trust Account

| Date | Type | Description | Matter | Receipts | Payments | Balance |
|------|------|-------------|--------|----------|----------|---------|
| 06/18/2022 | Retainer | Retainer for representation | 00008-Free Speech Systems, LLC | | $100,000.00 | $100,000.00 |
| 07/28/2022 | | Payment for invoice #12 | 00008-Free Speech Systems, LLC | $99,177.32 | | $822.68 |
| 07/29/2022 | Retainer | Retainer in advance of bankruptcy filing. | 00008-Free Speech Systems, LLC | | $50,000.00 | $50,822.68 |
| | | | **IOLTA Trust Account Balance** | | **$0.00** | |

Please make all amounts payable to: Shannon & Lee LLP

Please pay within 30 days.

**Forbearance Agreement**
**Summary of Indicative Terms and Conditions**
**Free Speech Systems, LLC.**
**July 10, 2022**

*Free Speech Systems, LLC ("FSS") has discovered certain problems with its record keeping and inventory. These problems, along with litigation expenses, have created a cash flow difficulty, which FSS believes to be temporary. FSS has requested, and PQPR Holdings Limited, LLC ("PQPR"), a secured creditor and provider of product to FSS, has agreed, to a temporary forbearance of certain terms for a period of 60 days, as follows:*

**Credit Card Processing Fee:**   The "fixed fee" provided for in the Financial Services Agreement between FSS and _____ LLC and the MOU shall be reduced from ten percent (10%) to two percent (2%) of gross sales proceeds, net of credit card processing fees.

4% (Four percent) WMS

**Allocation of Net Sales Proceeds:**

**FSS Inventory**   FSS Inventory means inventory which PQPR has ordered from vendors on FSS' behalf and for which FSS has pre-paid (prior to product delivery) all or part of the cost of the product.

FSS shall receive 90% of the Net Sales Proceeds and PQPR shall receive 10% of the Net Sales Proceeds. Such sums will be distributed to FSS and PQPR by

FSS shall pay one third any amount advanced by PQPR for FSS Inventory within 30 days following execution of final documents memorializing this agreement, with the balance of PQPR's advances for FSS Inventory due 15 days thereafter.

**PQPR Inventory**   PQPR Inventory means inventory which PQPR has ordered from vendors on PQPR's behalf and for which PQPR has paid the cost of the product.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through FSS sales channels shall be paid 20% to FSS and 80% to PQPR.

PQPR Net Sales Proceeds generated from the sale of PQPR Inventory through non FSS sales channels shall be paid 10% to FSS and 90% to PQPR.

All payments will be distributed to FSS and PQPR by

EXHIBIT
8

**Warehouse and Fulfillment Related Expenses**
FSS will pay one hundred percent (100%) of the employee, lease and shipping expenses associated with the warehouse and fulfillment operations in connection with the sale of PQPR and FSS Inventory.

**PQPR Debt**
FSS owes PQPR as represented by the notes dated August 13, 2020, and November 10, 2021 in the total original amount of $54,888,000.   Currently, FSS is paying PQPR $11,000 per business day.  As a temporary accommodation to FSS, PQPR agrees to reduce the amount FSS will pay to PQPR to $2,500 per business day to be applied to interest on the PQPR Notes for thirty (30) days following the effective date of this agreement, increasing to $5,500 per business day thereafter through the term of this forbearance agreement.

FSS will acknowledge the validity and priority of the PQPR debt and liens and will agree to a replacement lien of equal scope and priority to PQPR's existing liens.

**Term:**
60 Days

**Reservation:**
Subject to revision after implementation based on actual operational results.

Executed this _12_ day of July 2022.

Free Speech Systems, LLC

By: _____

Marc Schwartz, Its Chief Restructuring Officer

PQPR Holdings Limited, LLC

By: _____

David Jones, Its Manager

LLC

By: _____  Its Manager

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## GLOBAL NOTES AND STATEMENT OF LIMITATIONS, METHODOLOGY, AND DISCLAIMER REGARDING DEBTOR'S SCHEDULES AND STATEMENTS

The Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed by Free Speech Systems, LLC, the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") are unaudited and were prepared pursuant to section 521 of Title 11 of the United States Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") by the Debtor's chief restructuring officer (the "CRO"). While the CRO has made reasonable efforts to file complete and accurate Schedules and Statements based upon information available at the time of preparation, the Schedules and Statements remain subject to further review and verification by the Debtor. Subsequent information may result in material changes in financial and other data contained in the Schedules and Statements. The Debtor reserves the right to amend its Schedules and Statements from time to time as may be necessary or appropriate. The Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements (the "Global Notes") is incorporated by reference in, and comprises an integral part of, the Schedules and Statements and should be referred to and reviewed in connection with any review of the Schedules and Statements.

1. <u>Description of the Cases and "As Of" Information Date</u>. On July 29, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor currently operates its business and possess its property as a debtor-in-possession under section 1184 of the Bankruptcy Code. Unless otherwise noted, all asset and liability information is as of the Petition Date.

2. <u>Basis of Presentation</u>. These Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), nor are they intended to fully reconcile to any financial statements otherwise prepared and/or distributed by the Debtor.

3. <u>Causes of Action</u>. Despite its reasonable efforts, as described above, the Debtor may not have set forth all of its claims, causes of actions and potential recoveries in its Schedules and Statements. The Debtor reserves all rights with respect to any causes of action it may possess, and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such causes of action.

4.    Insiders. The listing or failure to list a person or other entity as an "insider" in the Schedules and Statements is not intended to be nor should it be construed as a binding admission that such person or entity is or is not an insider. The Debtor reserves the right to dispute or challenge the designation of any individual or entity in connection with any other matter arising in the Debtor's chapter 11 case.

5.    Intellectual Property Rights. Any omission of intellectual property from the Schedules and Statements shall not be an admission that such intellectual property rights have been abandoned, have been terminated or otherwise expired by their terms or have been assigned or otherwise transferred pursuant to a sale, acquisition or other transaction. In accordance with the foregoing, the Debtor reserves all of its rights with respect to the legal status of any and all intellectual property rights, regardless of whether such intellectual property rights are or are not listed in the Schedules and Statements.

6.    Summary of Significant Reporting Policies. The Schedules and Statements have been signed by W. Marc Schwartz, the CRO to the Debtor. In reviewing and signing the Schedules and Statements, Mr. Schwartz has necessarily relied upon the efforts, statements, and representations of the Debtor's business records and personnel. Mr. Schwartz has not personally verified the accuracy of each such statement and representation, including, but not limited to, statements and representations concerning amounts owed to creditors. The Debtor made reasonable efforts to accurately report asset, liability, disbursement and other information on its Statements and Schedules, and the Debtor adopted the following conventions in the preparation of the Schedules and Statements.

a.    Fair Market Value; Book Value. Unless otherwise noted, the value of each asset and liability of the Debtor is shown on the basis of the book value of such asset or liability in the Debtor's accounting books and records. As applicable, assets that have been fully depreciated or were expensed for accounting purposes have no net book value. As a result, the value of the Debtor's assets and liabilities set forth on the Schedules and Statements may not always reflect the current market values of such property and/or liabilities. The Debtor reserves its right to amend or adjust the value of each asset or liability set forth herein.

b.    Liabilities. The Debtor reserves the right to dispute any liability indicated in its Schedules notwithstanding the designation in the Schedules and Statements.

c.    Claims. The Debtor's Schedules and Statements list creditors and set forth the Debtor's estimate of the claims of creditors as of the Petition Date. The Bankruptcy Court has authorized the Debtor to, among other things make payments to certain critical vendors and utility providers. As a result, the actual unpaid claims of creditors that ultimately may be allowed in this case may differ from the amounts set forth in the Schedules and Statements. The inclusion of any such amounts in the Schedules and Statements shall not be deemed to obligate the Debtor to pay such amounts in and of themselves.

d.    Disputed, Contingent and/or Unliquidated Claims. Schedules D and E/F permit the Debtor to designate a claim as disputed, contingent and/or unliquidated. A failure

2

007719

to designate a claim on any of these Schedules as disputed, contingent and/or unliquidated does not constitute an admission that such claim is not subject to objection. The Debtor reserves the right to dispute, or assert offsets or defenses to, any claim reflected on these Schedules as to amount, liability, or status. Moreover, the Debtor reserves the right to amend its Schedules and Statements as necessary and appropriate.

7.    <u>General Conventions Relating to the Schedules of Assets and Liabilities</u>. The

Debtor adopted the following conventions in connection with the preparation of the Schedules:

a.    <u>Schedule D</u>. Except as otherwise agreed pursuant to a stipulation or agreed order entered by the Bankruptcy Court, the Debtor reserves the right to dispute or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D of the Debtor. Moreover, although the Debtor may have scheduled claims of various creditors as secured claims, the Debtor reserve all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim. The descriptions provided on Schedule D are intended only to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens. Nothing in the Global Notes or the Schedules and Statements shall be deemed a modification or interpretation of the terms of such agreements.

b.    <u>Schedule G</u>. While reasonable efforts have been made to ensure the accuracy of the Schedule of Executory Contracts, inadvertent errors or omissions may have occurred. The Debtor hereby reserves all rights to dispute the validity, status or enforceability of any contract, agreement or lease set forth on Schedule G and to amend or supplement such Schedule as necessary. The contracts, agreements and leases listed on Schedule G may have expired or may have been modified, amended or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letter and other documents, instruments and agreements which may not be listed therein. Certain of the real property leases listed on Schedule G may contain renewal options, guarantees of payments, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights. Such rights, powers, duties and obligations are not set forth on Schedule G. Certain of the executory agreements may not have been memorialized and could be subject to dispute. Additionally, the Debtor may be parties to various other agreements concerning real property, such as easements, rights of way, subordination, non-disturbance, supplemental agreements, amendments/letter agreements, title documents, consents, site plans, maps and other miscellaneous agreements. Such agreements, if any, are not set forth on Schedule G. Certain of the agreements listed on

3

Schedule G may be in the nature of conditional sales agreements or secured financings. The presence of a contract or agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease. The Debtor reserves all rights, claims and causes of action with respect to the contracts and agreements listed on these Schedules and Statements, including the right to dispute or challenge the characterization or the structure of any transaction, document or instrument.

c.      Schedule H. Codefendants in litigation matters involving the Debtor are not listed in Schedule H unless the trial court has made a ruling that results in an identity of interest between the Debtor and such co-defendant.

[*Remainder of Page Intentionally Left Blank*]

4

**Fill in this information to identify the case:**

Debtor name    Free Speech Systems, LLC

United States Bankruptcy Court for the:    Southern    District of    Texas
(State)

Case number (If known):    22-60043

☐ Check if this is an amended filing

## Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals    12/15

| Part 1: | Summary of Assets |
| --- | --- |

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

    1a. **Real property:**
    Copy line 88 from *Schedule A/B*.................................................    $ 1,335,971.23

    1b. **Total personal property:**
    Copy line 91A from *Schedule A/B*.................................................    $ 13,327,463.23

    1c. **Total of all property:**
    Copy line 92 from *Schedule A/B*.................................................    $ 14,663,434.46

| Part 2: | Summary of Liabilities |
| --- | --- |

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
    Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*............................    $ 53,646,687.84

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

    3a. **Total claim amounts of priority unsecured claims:**
    Copy the total claims from Part 1 from line 5a of *Schedule E/F* ............................    $ _____

    3b. **Total amount of claims of nonpriority amount of unsecured claims:**
    Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F* ............................    **+** $ 995,824.64

4. **Total liabilities**............................................................................    $ 54,642,512.48
    Lines 2 + 3a + 3b

007722

**Fill in this information to identify the case:**

Debtor name  Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern _____ District of Texas
(State)

Case number (if known): 22-60043

☐ Check if this is an
amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

## Part 1:  Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand** | $ 951.31

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

Please see attached schedule
for additional Bank accounts

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. ▮▮▮▮▮▮ | Checking | 8 5 6 3 | $ 118,999.04 |
| 3.2. ▮▮▮▮▮▮ | Checking | 8 5 1 4 | $ 1,163,808.79 |

*See continuation sheet*

4. **Other cash equivalents** *(Identify all)*

   4.1. ___  | $ _____
   4.2. _____ | $ _____

5. **Total of Part 1**

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80. | $1,284,759.14

## Part 2:  Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

| 7.1. ▮▮▮▮▮▮ (Credit card processing) | $ 500,000.00 |
| 7.2. LIT Industrial (Security Deposit) | $ 33,360.00 |

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

**8  Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**   Please see attached schedule
for additional prepayments

Description, including name of holder of prepayment

8.1 The Travelers Companies (Prepaid Insurance) ................................................ $ 1,224.50

8.2 The Hartford (Prepaid Insurance) ................................................................... $ 1,444.31

* See continuation sheet*

**9. Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.   $ 687,969.95

---

## Part 3:  Accounts receivable

**10.  Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

| | | | Current value of debtor's interest |
|---|---|---|---|

**11  Accounts receivable**

11a. 90 days old or less:   0.00 ── 0.00 = →   $ 0.00
                            face amount    doubtful or uncollectible accounts

11b. Over 90 days old:   9,788,413.22 ── 0.00 = →   $ 9,788,413.22
                         face amount       doubtful or uncollectible accounts

**12  Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.   $ 9,788,413.22

---

## Part 4:  Investments

**13.  Does the debtor own any investments?**

☑ No. Go to Part 5.

☐ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

**14.  Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1 _____ _____ $ _____

14.2 _____ _____ $ _____

**15.  Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                                    % of ownership:

15.1 _____ _____ %  _____ $ _____

15.2 _____ _____ %  _____ $ _____

**16.  Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1 _____ _____ $ _____

16.2 _____ _____ $ _____

**17.  Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.   $ 0.00

---

007724

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.

☑ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **20. Work in progress** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **21. Finished goods, including goods held for resale** | | | | |
| Merchandise | 07/29/2022 MM / DD / YYYY | $ 1,327,107.43 | Net Book Value | $ 1,327,107.43 |
| **22. Other inventory or supplies** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |

23. **Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ 1,327,107.43

24. **Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value 89,882.37    Valuation method Net Book Value    Current value 89,882.37

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| **29. Farm animals** Examples: Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $__ | _____ | $_____ |

007725

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|--------|--------------------------|--------------------------------|
|        | Name                     |                                |

**33. Total of Part 6.**
Add lines 28 through 32. Copy the total to line 85.

$ 0.00

**34. Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

   ☐ No

   ☐ Yes

**35. Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

**36. Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

**37. Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

**Part 7:    Office furniture, fixtures, and equipment; and collectibles**

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---------------------|-------------------------------------------------------|-----------------------------------------|------------------------------------|
| **39. Office furniture** | | | |
| Rugs, Chairs, Lamps and other Office Furnitures | $ 3,285.92 | Net Book Value | $ 3,285.92 |
| **40. Office fixtures** | | | |
| | $ ___ | _____ | $ _____ |
| **41. Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| Computer Equipments and Software | $ 44,180.49 | Net Book Value | $ 44,180.49 |
| **42. Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 Artwork | $ 73.00 | Net Book Value | $ 73.00 |
| 42.2 _____ | $ _____ | _____ | $ _____ |
| 42.3 _____ | $ _____ | _____ | $ _____ |

**43. Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86.

$ 47,539.41

**44. Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☑ Yes

**45. Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

007726

| Debtor | Free Speech Systems, LLC | | Case number *(if known)* | 22-60043 |
|---|---|---|---|---|
| | Name | | | |

## Part 8: Machinery, equipment, and vehicles

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e , VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

**47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | General description | Net book value | Valuation method | Current value |
|---|---|---|---|---|
| 47.1 | 2021 Winnebago Adventurer Model 35F (VIN:1F66F5DN1LOA03038) | $ 0.00 | Net Book Value | $ 0.00 |
| 47.2 | 2015 Ford F-450 Model F45 (VIN: 1FDUF4HT0FEC06013) | $ 148,890.74 | Net Book Value | $ 148,890.74 |
| 47.3 | | $ | | $ |
| 47.4 | | $ | | $ |

**48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | | |
|---|---|---|---|---|
| 48.1 | | $ | | $ |
| 48.2 | | $ | | $ |

**49. Aircraft and accessories**

| | | | | |
|---|---|---|---|---|
| 49.1 | | $ | | $ |
| 49.2 | | $ | | $ |

**50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | | |
|---|---|---|---|---|
| | Production and Other Equipments | $ 40,262.53 | Net Book Value | $ 40,262.53 |

**51. Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.

$ 189,153.27

**52. Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No

☑ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

Debtor    Free Speech Systems, LLC
          _____          Case number (if known) 22-60043
          Name

## Part 9:    Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as<br>Assessor Parcel Number (APN), and type of property<br>(for example, acreage, factory, warehouse, apartment<br>or office building), if available. | Nature and extent<br>of debtor's interest<br>in property | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|
| 55.1  Warehouse Improvement (3019 Alvin Devane Blvd Austin, TX 78741) | Leasehold Improvement | $ 1,335,971.23 | Net Book Value | $ 1,335,971.23 |
| 55.2 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.3 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.4 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.5 _____ | _____ | $ _____ | _____ | $ _____ |
| 55.6 _____ | _____ | $ _____ | _____ | $ _____ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$ 1,335,971.23

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☑ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 10:    Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of<br>debtor's interest<br>(Where available) | Valuation method<br>used for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets**<br>_____ | $ _____ | _____ | $ _____ |
| **61. Internet domain names and websites**<br>Domain Names, Websites and Website Developments | $ 2,520.81 | Net Book Value | $ 2,520.81 |
| **62. Licenses, franchises, and royalties**<br>_____ | $ _____ | _____ | $ _____ |
| **63. Customer lists, mailing lists, or other compilations**<br>_____ | $ _____ | _____ | $ _____ |
| **64. Other intangibles, or intellectual property**<br>_____ | $ _____ | _____ | $ _____ |
| **65. Goodwill**<br>_____ | $ _____ | _____ | $ _____ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 2,520.81

007728

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|--------|--------------------------|--------------------------------|
| | Name | |

---

67. **Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?**
- ☑ No
- ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
- ☐ No
- ☑ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
- ☑ No
- ☐ Yes

## Part 11: All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.
- ☑ No. Go to Part 12.
- ☐ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

71. **Notes receivable**
Description (include name of obligor)

_____   _____ – _____ = ➜   $_____
                          Total face amount    doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**
Description (for example, federal, state, local)

_____   Tax year _____   $_____
_____   Tax year _____   $_____
_____   Tax year _____   $_____

73. **Interests in insurance policies or annuities**

_____   $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____   $

Nature of claim      _____
Amount requested    $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____   $

Nature of claim      _____
Amount requested    $__     ____

76. **Trusts, equitable or future interests in property**

_____   $_____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____   $_____
_____   $_____

78. **Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90.

$ 0.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
- ☐ No
- ☐ Yes

---

007729

| Debtor | Free Speech Systems, LLC | Case number (if known) 22-60043 |
|---|---|---|
| | Name | |

<table>
<tr><td><strong>Part 12:</strong></td><td><strong>Summary</strong></td></tr>
</table>

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 1,284,759.14 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 687,969.95 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 9,788,413.22 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 1,327,107.43 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 47,539.41 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 189,153.27 | |
| 88. **Real property.** *Copy line 56, Part 9.* .......................................➔ | | $ 1,335,971.23 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 2,520.81 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column............................. 91a. | $ 13,327,463.23 | + 91b. $ 1,335,971.23 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ............................................. $ 14,663,434.46

Debtor: Free Speech Systems, LLC                                    Case Number: 22 - 60043

Part 1.
3. Additional checking, savings, money market, or financial brokerage accounts

| Name of Institution | Account Type | Last 4 digits of Account Number | Current value of debtor's Interest |
|---|---|---|---|
| ███████████ | Checking | 8522 | $1,000.00 |
| ███████████ | Checking | 8621 | $0.00 |
| ███████████ | Checking | 5675 | $0.00 |
| ███████████ | Checking | 8746 | $0.00 |

Part 2.
8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent

| Description, including name of holder of prepayment | Current value of debtor's Interest |
|---|---|
| Frost Insurance Agency | $4,899.14 |
| Stratus | $2,124.27 |
| Shannon & Lee LLP | $100,000.00 |
| ATXHD, Inc | $41,342.00 |
| Protection 1 Alarm | $2,559.73 |
| CubeSmart | $1,016.00 |

[To Supplement: Retainer of The Law Offices of Ray Battaglia, PLLC on the Petition Date - Est. $77,235.00]

007731

**Fill in this information to identify the case:**

Debtor name _Free Speech Systems, LLC_

United States Bankruptcy Court for the: _Southern_   District of _Texas_
(State)

Case number (If known): _22-60043_

☐ Check if this is an amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property   12/15

Be as complete and accurate as possible.

1. Do any creditors have claims secured by debtor's property?
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☐ Yes. Fill in all of the information below.

**Part 1:    List Creditors Who Have Secured Claims**

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|

**2.1**

Creditor's name
PQPR Holdings Limited LLC

Describe debtor's property that is subject to a lien
Please see attached                    $ 53,646,687.84    $ 14,663,434.46

Creditor's mailing address
3005 S Lamar Blvd Ste D109-317
Austin TX 78704-8864

Describe the lien
Uniform Commercial Code Lien

Is the creditor an insider or related party?
☐ No
■ Yes

Creditor's email address, if known

Is anyone else liable on this claim?
■ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

Date debt was incurred   2020/08/13

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.

Do multiple creditors have an interest in the same property?
■ No
☐ Yes. Specify each creditor, including this creditor, and its relative priority.

☐ Contingent
☐ Unliquidated
■ Disputed

**2.2**

Creditor's name

Describe debtor's property that is subject to a lien
                                      $_____    $_____

Creditor's mailing address

Describe the lien

Creditor's email address, if known

Is the creditor an insider or related party?
☐ No
☐ Yes

Is anyone else liable on this claim?
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

Date debt was incurred

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.

Do multiple creditors have an interest in the same property?
☐ No
☐ Yes. Have you already specified the relative priority?
     ☐ No. Specify each creditor, including this creditor, and its relative priority.

     ☐ Yes. The relative priority of creditors is specified on lines ___

☐ Contingent
☐ Unliquidated
☐ Disputed

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**    $_____

007732

| Debtor | Free Speech Systems, LLC | Case number (if known) | 22-60043 |
|---|---|---|---|
| | Name | | |

| Part 2: | List Others to Be Notified for a Debt Already Listed in Part 1 |
|---|---|

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |
| | Line 2. __ | ___ ___ ___ ___ |

Free Speech Systems, LLC

## 2.1    Describe debtor's property that is subject to a lien

(1) All fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Haappease, Gut Fution, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Incuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survivial Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and all gross revenue, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with repect to any of the foregoing

Fill in this information to identify the case:

Debtor **Free Speech Systems LLC**

United States Bankruptcy Court for the: **Southern** District of **Texas**
(State)

Case number **22-60043**
(If known)

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B*)* and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| **Part 1:** | List All Creditors with PRIORITY Unsecured Claims |
|---|---|

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ☑ No. Go to Part 2.
   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  | | Total claim | Priority amount |
|---|---|---|---|

**2.1** Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** ___ ___ ___ ___

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

Total claim $_____

Priority amount $_____

**2.2** Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** ___ ___ ___ ___

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

$_____

$_____

**2.3** Priority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**

_____

**Last 4 digits of account number** ___ ___ ___ ___

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____)

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**

_____

**Is the claim subject to offset?**
☐ No
☐ Yes

$_____

$_____

007735

| Debtor | Free Speech Systems LLC | Case number *(if known)* 22-60043 |
|--------|-------------------------|-----------------------------------|
| | Name | |

## Part 2: List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | | Amount of claim |
|---|---|---|---|

**3.1** 
**Nonpriority creditor's name and mailing address**
Addshoppers, Inc

15806 Brookway Dr Ste 200
Huntersville, NC 28078

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____
**Last 4 digits of account number** __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 2,989.00

**3.2**
**Nonpriority creditor's name and mailing address**
Air Supply of North Texas aka Precision Oxygen

2829 Fort Worth Avenue
Dallas, TX 75211

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____
**Last 4 digits of account number** __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 105.48

**3.3**
**Nonpriority creditor's name and mailing address**
Airco Mechanical, LTD

PO Box 1598
Round Rock, TX 78680

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____
**Last 4 digits of account number** __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 17,268.71

**3.4**
**Nonpriority creditor's name and mailing address**
AT&T Mobile

PO Box 5001
Carol Stream, IL 60197-5001

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____
**Last 4 digits of account number** __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 5,167.41

**3.5**
**Nonpriority creditor's name and mailing address**
Atomial, LLC

1920 E. Riverside Drive Suite A-120 #124
Austin, TX 78741

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____
**Last 4 digits of account number** __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 50,400.00

**3.6**
**Nonpriority creditor's name and mailing address**
Austin Security & Investigation Solutions

PO Box 2904
Pflugerville, TX 78691

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____
**Last 4 digits of account number** __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 5,961.87

007736

| Debtor | Free Speech Systems LLC | Case number (if known) |
|---|---|---|
| | Name | |

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.7** Nonpriority creditor's name and mailing address

Blott, Jacquelyn, Attorney at Law

200 University Boulevard Suite 225 #251

Round Rock, TX 78665

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 58,280.00

---

**3.8** Nonpriority creditor's name and mailing address

City of Austin

PO Box 2267

Austin, TX 78783

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 6,532.68

---

**3.9** Nonpriority creditor's name and mailing address

CTRMA Processing

PO Box 734182

Dallas, TX 75373

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 24.23

---

**3.10** Nonpriority creditor's name and mailing address

eCommerce CDN, LLC

221 E 63rd Street

Savannah, GA 31405

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 27,270.00

---

**3.11** Nonpriority creditor's name and mailing address

Elevated Solutions Group

706 W Ben White Blvd, Bldg B, Ste 188

Austin, TX 78740

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 319,148.16

---

007737

| Debtor | Free Speech Systems LLC | | Case number (if known) | |
|---|---|---|---|---|
| | Name | | | |

| **Part 2:** | **Additional Page** |
|---|---|

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.12** Nonpriority creditor's name and mailing address

Getty Images, Inc

PO Box 953604

St. Louis, MO 63195-3604

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 9,201.25

---

**3.13** Nonpriority creditor's name and mailing address

Gibson, Ronald

4012 Pleasant Grove Church Rd

Shelby NC, 28150-2842

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 3,000.00

---

**3.14** Nonpriority creditor's name and mailing address

Gracenote Media Services, LLC

29421 Network Place

Chicago, IL 60673-1294

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 119.98

---

**3.15** Nonpriority creditor's name and mailing address

Greenair, Inc

23569 Center Ridge Road

Westlake, OH 44145

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 12,240.00

---

**3.16** Nonpriority creditor's name and mailing address

Impact Fire Services LLC

PO Box 735063

Dallas, TX 75373-5063

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
☐ No
☐ Yes

$ 165.00

---

007738

| Debtor | Free Speech Systems LLC | Case number (if known) | 22-00463 |
|---|---|---|---|
| | Name | | |

## Part 2: | Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.17** | **Nonpriority creditor's name and mailing address**
JCE SEO

6101 Broadway

San Antonio, TX 78209

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** _____

**$ 5,000.00**

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.18** | **Nonpriority creditor's name and mailing address**
JW JIB Productions, LLC

2921 Carvelle Drive

Riviera Beach, FL 33404

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**$ 7,000.00**

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.19** | **Nonpriority creditor's name and mailing address**
Konica Minolta Premier Finance

PO Box 41602

Philadelphia, PA 19101-1602

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**$ 1,847.87**

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3. 20** | **Nonpriority creditor's name and mailing address**
Kount An Equifax Company

PO Box 740253

Atlanta, GA 30374

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**$ 11,172.00**

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

---

**3.21** | **Nonpriority creditor's name and mailing address**
Lumen/Level 3 Communications

PO Box 910182

Denver, CO 80291-0182

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**$ 7,906.43**

Date or dates debt was incurred _____
Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
☐ No
☐ Yes

007739

Debtor  Free Speech Systems LLC
_____
Name

Case number (if known) _22-60043_____

---

| Part 2: | Additional Page |
| --- | --- |

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
| --- | --- |

**3.22** **Nonpriority creditor's name and mailing address**

Lyman, Daniel

5832 Elton Road

Venice, FL 34293

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

$ 3,500.00

---

**3.23** **Nonpriority creditor's name and mailing address**

PQPR Holdings

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

$ 0.00

---

**3.24** **Nonpriority creditor's name and mailing address**

MRJR Holdings, LLC

PO Box 27740

Las Vegas, NV 89426

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

$ 0.00

---

**3.25** **Nonpriority creditor's name and mailing address**

Sparkletts & Sierra Springs

PO Box 660579

Dallas, TX 75266-0579

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

$ 1,084.14

---

**3.26** **Nonpriority creditor's name and mailing address**

Texas Gas Service

PO Box 219913

Kansas City, MO 64121

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

Date or dates debt was incurred   _____
Last 4 digits of account number   __ __ __ __

$ 1,078.28

---

007740

## Part 2:  Additional Page

| | Amount of claim |
|---|---|
| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | |

**3.27** Nonpriority creditor's name and mailing address

Willow Grove Productions

1810 Rockcliff Road

Austin, TX 78746

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,700.00

**3.28** Nonpriority creditor's name and mailing address

WMQM-AM 1600

21 Stephen Hill Road

Atoka, TN 38004

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 2,500.00

**3.29** Nonpriority creditor's name and mailing address

American Express

200 Vesey Street

New York, NY 10285

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☒ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 54,279.78

**3. 30** Nonpriority creditor's name and mailing address

David Jones

3005 S Lamar Blvd Ste D109-317

Austin TX 78704-8864

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 150,000.00

**3.31** Nonpriority creditor's name and mailing address

Campco

4625 W. Jefferson Blvd

Los Angeles, CA 90016

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
Check all that apply.
☒ Contingent
☒ Unliquidated
☒ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

007741

| Debtor | | | |
|---|---|---|---|
| Free Speech Systems LLC | | | |

Name

Case number *(if known)* _____

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

| 3.32 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $ 0.00 |
|---|---|---|---|

**3.32**

Nonpriority creditor's name and mailing address

CustomTattoNow.com

16107 Kensington Dr #172

Sugar Land, TX 77479

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed
- ☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.33**

Nonpriority creditor's name and mailing address

David Icke Books Limited

1a Babbington Lane

Derby, England DE11SU

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.34**

Nonpriority creditor's name and mailing address

American Media/Reality Zone

PO Box 4646

Thousand Oaks, CA 91359

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.35**

Nonpriority creditor's name and mailing address

Justin Lair

1313 Lookout Ave

Klamath Falls, OR 97601

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.36**

Nonpriority creditor's name and mailing address

RatsMedical.com

1211 E Bridle Trail Rd

Draper, UT 84020

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: _____

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

007742

| Debtor | Free Speech Systems LLC | | |
|---|---|---|---|
| | Name | Case number (if known) | 22-60043 |

## Part 2: | Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.37** | **Nonpriority creditor's name and mailing address**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Date or dates debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed
- ☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

**3.38** | **Nonpriority creditor's name and mailing address**

Skousen, Joel

PO Box 565

Spring City, UT 84662

**Date or dates debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

**3.39** | **Nonpriority creditor's name and mailing address**

Wisconsin Dept. of Revenue

PO Box 3028

Milwaukee, WI 53201-3028

**Date or dates debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

**3.40** | **Nonpriority creditor's name and mailing address**

Watson, Paul

9 Riverdale Road Ranmoor Sheffield

South Yorkshire, United Kingdom S10 3FA

**Date or dates debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

**3.41** | **Nonpriority creditor's name and mailing address**

Verizon Wireless

PO Box 660108

Dallas, TX 75266

**Date or dates debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**As of the petition filing date, the claim is:**
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

007743

| Debtor | Free Speech Systems LLC | Case number (if known) 22-60043 |
|--------|-------------------------|--------------------------------|
| | Name | |

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.42** Nonpriority creditor's name and mailing address

Miller, Sean

PO Box 763

Wyalusing, PA 18853

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.43** Nonpriority creditor's name and mailing address

Spectrum Enterprise aka Time Warner Cable

PO Box 60074

City of Industry, CA 91716

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.44** Nonpriority creditor's name and mailing address

Ready Alliance Group, Inc

PO Box 1709

Sandpoint, ID 83864

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.45** Nonpriority creditor's name and mailing address

One Party America, LLC

6700 Woodlands Parkway Suite 230-309

The Woodlands, TX 77382

As of the petition filing date, the claim is:
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.46** Nonpriority creditor's name and mailing address

LCJ Pictures LLC

PO Box 19549

Austin, TX 78760

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Basis for the claim: _____

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 89,882.37

---

007744

| Debtor | Free Speech Systems LLC | |
|--------|-------------------------|-|
| | Name | |
| | | Case number *(if known)* |

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.47** Nonpriority creditor's name and mailing address

Brennan Gilmore

c/o Civil Rights Clinic, 600 New Jersey Ave NW

Washington, DC 20001

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed
- ☐ Liquidated and neither contingent nor disputed

**Basis for the claim:** Litigation Settlement

$ 50,000.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

---

**3.48** Nonpriority creditor's name and mailing address

Christopher Sadowski

c/o Copy Cat Legal PLLC, 3111 N. University Drive,

Coral Springs, FL 33065

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** Asserted copyright

$ 90,000.00

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

---

**3.49** Nonpriority creditor's name and mailing address

Neil Heslin

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** Litigation claim

$ 0.00

Date or dates debt was incurred 2018

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

---

**3. 50** Nonpriority creditor's name and mailing address

Scarlett Lewis

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred 2018

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

---

**3.51** Nonpriority creditor's name and mailing address

Leonard Pozner

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston TX 77002

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

**Basis for the claim:** Litigation Claim

$ 0.00

Date or dates debt was incurred 2018

Last 4 digits of account number __ __ __ __

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

007745

Debtor    Free Speech Systems LLC
          _____
          Name

          Case number (if known) _____

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.52** Nonpriority creditor's name and mailing address

Veronique De La Rosa

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

As of the petition filing date, the claim is:
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed
- ■ Liquidated and neither contingent nor disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred     2018

Last 4 digits of account number     __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.53** Nonpriority creditor's name and mailing address

Marcel Fontaine

c/o Jarrod B. Martin, Chamberlain Hrdlicka

1200 Smith Street, Suite 1400, Houston, TX 77002

As of the petition filing date, the claim is:
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred     2018

Last 4 digits of account number     __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.54** Nonpriority creditor's name and mailing address

David Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred     2018

Last 4 digits of account number     __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.55** Nonpriority creditor's name and mailing address

Francine Wheeler

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred     2018

Last 4 digits of account number     __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

**3.56** Nonpriority creditor's name and mailing address

Jacqueline Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

As of the petition filing date, the claim is:
Check all that apply.
- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: Litigation Claim

Date or dates debt was incurred     2018

Last 4 digits of account number     __ __ __ __

Is the claim subject to offset?
- ☐ No
- ☐ Yes

$ 0.00

---

007746

Debtor  Free Speech Systems LLC
Name

Case number *(if known)*

## Part 2:  Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.57** | **Nonpriority creditor's name and mailing address**

Mark Barden

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

**Basis for the claim:**  Litigation Claim

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

**3.58** | **Nonpriority creditor's name and mailing address**

Nicole Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**  Litigation Claim

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

**3.59** | **Nonpriority creditor's name and mailing address**

Ian Hockley

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**  Litigation Claim

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

**3. 60** | **Nonpriority creditor's name and mailing address**

Jennifer Hensel

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**  Litigation Claim

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

**3.61** | **Nonpriority creditor's name and mailing address**

Donna Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**As of the petition filing date, the claim is:**
*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

**Basis for the claim:**  Litigation Claim

Date or dates debt was incurred  2018

Last 4 digits of account number  ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

$ 0.00

007747

Debtor  Free Speech Systems LLC
        Name

Case number (if known) 22-9988

---

| Part 2: | Additional Page |

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |

**3.62** Nonpriority creditor's name and mailing address
Carlee Soto Parisi

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number          ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed
☐ Liquidated and neither contingent nor disputed

Basis for the claim:  Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.63** Nonpriority creditor's name and mailing address
Carlos M. Soto

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St. STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number          ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:  Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.64** Nonpriority creditor's name and mailing address
Jillian Soto-Marino

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number          ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:  Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.65** Nonpriority creditor's name and mailing address
William Aldenberg

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number          ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:  Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

**3.66** Nonpriority creditor's name and mailing address
William Sherlach

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

Date or dates debt was incurred          2018

Last 4 digits of account number          ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
■ Contingent
■ Unliquidated
■ Disputed

Basis for the claim:  Litigation Claim

Is the claim subject to offset?
☐ No
☐ Yes

$ 0.00

---

007748

| Debtor | Free Speech Systems LLC | |
|---|---|---|
| | Name | |
| | | Case number (if known) _____ |

---

**Part 2:** **Additional Page**

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

---

**3.67** | Nonpriority creditor's name and mailing address

Robert Parker

c/o Ryan Chapple, Cain & Skarnulis PLLC

303 Colorado St, STE 2850, Austin, TX 78701

**Date or dates debt was incurred**     2018

**Last 4 digits of account number**    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed
- ☐ Liquidated and neither contingent nor disputed

**Basis for the claim:**   Litigation Claim

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.68** | Nonpriority creditor's name and mailing address

Yan Luis

c/o Noor A. Sabb, 280 North Broadway, STE 300

Jericho, New York 11753

**Date or dates debt was incurred**     _____

**Last 4 digits of account number**    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☑ Contingent
- ☑ Unliquidated
- ☑ Disputed

**Basis for the claim:**   ADA Claim

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.___** | Nonpriority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**     _____

**Last 4 digits of account number**    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:**   _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.___** | Nonpriority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**     _____

**Last 4 digits of account number**    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:**   _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

**3.___** | Nonpriority creditor's name and mailing address

_____

_____

_____

**Date or dates debt was incurred**     _____

**Last 4 digits of account number**    ___ ___ ___ ___

**As of the petition filing date, the claim is:**
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Basis for the claim:**   _____

**Is the claim subject to offset?**
- ☐ No
- ☐ Yes

$ 0.00

---

007749

Debtor _____ Free Speech Systems LLC
         Name

Case number (if known)_____

## Part 3: List Others to Be Notified About Unsecured Claims

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.2. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.3. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.4. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 41. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.5. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.6. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.7. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.8. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.9. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.10. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |
| 4.11. | Line ____ / ☐ Not listed. Explain _____ | __ __ __ __ |

007750

Debtor  Free Speech Systems LLC
        Name

Case number *(if known)*_____

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---------|---------------------------------------------------------------|

5. **Add the amounts of priority and nonpriority unsecured claims.**

|  |  | Total of claim amounts |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | $ 0.00 |
| 5b. **Total claims from Part 2** | 5b. + | $ 995,824.64 |
| 5c. **Total of Parts 1 and 2** Lines 5a + 5b = 5c. | 5c. | $ 995,824.64 |

007751

**Fill in this information to identify the case:**

Debtor name _Free Speech Systems, LLC_

United States Bankruptcy Court for the: _Southern_ District of _Texas_
(State)

Case number (If known): _22-60043_ Chapter _11_

☐ Check if this is an amended filing

Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases 12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☒ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest: Financial services Agreement / For Credit Card Processing and Other Financial Service | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉<br>PQPR Holdings Limited LLC: PO Box 19549 Austin TX 78760 - 9549 |
| State the term remaining: 9 years and 2 months | |
| List the contract number of any government contract | |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest: Employment Agreement / For Employment of Alex Jones | Alex Jones: 3019 Alvin Devane Blvd Austin TX 78741 |
| State the term remaining: "At will" Basis | |
| List the contract number of any government contract | |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest: Lease Agreement / Studio Lease | BCC UBC LLC: 901 S. Mopac Expressway Plaza I, Suite 60, Austin , TX 78746 |
| State the term remaining: 2 years and 5 Months | |
| List the contract number of any government contract | |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest: Service Agreement / For Back Ground Checks and Investigative Services | Austin Security and Investigation Solutions LLC: PO Box 2904 Pflugerville, TX 78691 |
| State the term remaining: 9 Months, Renews Automatically | |
| List the contract number of any government contract | |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest: Building and Land Lease Agreement / Warehouse Lease | Expo Glo, LLC: 1717 McKinney Ave, Suite 1900 Dallas, TX 75202-1236 |
| State the term remaining: Renews Monthly | |
| List the contract number of any government contract | |

007752

**Fill in this information to identify the case:**

Debtor name    Free Speech Systems, LLC

United States Bankruptcy Court for the: Southern    District of    Texas
                                                                   _(State)_

Case number (If known):    22-60043

☐ Check if this is an amended filing

## Official Form 206H

## Schedule H: Codebtors                                                      12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Does the debtor have any codebtors?**

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☑ Yes

**2.** **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.* Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.**

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| **Name** | **Mailing address** | **Name** | Check all schedules that apply: |
| 2.1 Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin   TX   78741 <br> City   State   ZIP Code | Niel Heslin | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.2 Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin   TX   78741 <br> City   State   ZIP Code | Scarlett Lewis | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.3 Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin   TX   78741 <br> City   State   ZIP Code | Leonard Pozner | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.4 Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin   TX   78741 <br> City   State   ZIP Code | Veronique De La Rosa | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.5 Alex E. Jones | 3019 Alvin Devane Blvd. <br> Street <br><br> Austin   TX   78741 <br> City   State   ZIP Code | Marcel Fontaine | ☐ D <br> ☑ E/F <br> ☐ G |
| 2.6 | Street <br><br> City   State   ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |

007753

Official Form 206H                          Schedule H: Codebtors                          page 1 of 1

| Fill in this information to identify the case and this filing |
| --- |

| Debtor Name | Free Speech Systems, LLC | | |
| United States Bankruptcy Court for the: | Southern | District of | Texas |
| | | | (State) |
| Case number (*if known*): | 22-60043 | | |

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authori ed to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that re uires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual s position or relationship to the debtor, the identity of the document, and the date.  Ban ruptcy Rules 1008 and 9011.

ARNIN  -- Ban ruptcy fraud is a serious crime.  Ma ing a false statement, concealing property, or obtaining money or property by fraud in connection with a ban ruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18  .S.C.    152, 1341, 1519, and 3571.

| | Declaration and signature |
| --- | --- |

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☒  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☒  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☒  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☒  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☒  *Schedule H: Codebtors* (Official Form 206H)

☒  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  Amended *Schedule*

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒  Other document that requires a declaration  Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding Debtor's Schedules and Statements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  08/29/2022     ✗ _W. Marc Schwartz_ (signature)
MM / DD /                Signature of individual signing on behalf of debtor

                         W. Marc Schwartz
                         Printed name

                         Chief Restructuring Officer
                         Position or relationship to debtor

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Tuesday, August 16, 2022 9:56 AM |
| **To:** | Shelby Jordan; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

   b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors \***are**\* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

1

    c.  It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

    d.  Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)  The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.


R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294


**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

4

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Tuesday, August 16, 2022 2:06 PM |
| **To:** | Ray Battaglia; Kyung S. Lee |
| **Cc:** | R. J. Shannon |
| **Subject:** | Re: Isn't this our case in Conn |

Ray and Kyung:  Based on RJ's total rejection of all defenses and all matters filed in Conn I do not think a conference to discuss how to protect the ongoing business is a total waste of time.

> "The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate."

So, after 300 words of negative, I leave it to the Debtors to decide how to keep Alex supporting the efforts.   I'm sure RJ has an answer since Alex will be left to fighting these battles on his own.

Shelby

---

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just

1

007760

uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2)  It's not obvious that the Debtor should seek to extend the stay:

    a.  According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

    b.  I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

    c.  It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

    d.  Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3)  The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee

007761

<klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

3

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

4

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

### Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

## R. J. Shannon

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Wednesday, August 17, 2022 8:38 AM |
| **To:** | R. J. Shannon; Ray Battaglia; Kyung S. Lee |
| **Subject:** | Re: Isn't this our case in Conn |

RJ - I have been waiting since this email to hear the Debtors Plan when Alex sales go dark because he is in trial in Conn.  If you have one, please forward so I may share with Alex.  In light of your opinions  in your email, this is a critical request.

Shelby

**From:** RJ Shannon <rshannon@shannonleellp.com>
**Date:** Tuesday, August 16, 2022 at 9:56 AM
**To:** Shelby Jordan <sjordan@jhwclaw.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

Shelby,

The Connecticut bankruptcy court did not rule that the claims are personal injury tort claims under 157(b)(5)—the Debtor's position is that they are not—or that there was not at least "related to" jurisdiction. The Debtor's position is that they claims are *not* personal injury tort claims. Instead, the Connecticut bankruptcy court ruled that there was a reason to permissively abstain.

We can quibble with some of the Connecticut bankruptcy court's rulings on particular factors—I think comity is neutral under Breaknell and the litigation is definitely central to the bankruptcy case—but the fact that removal would require getting a whole new judge up to speed when the current state court judge has been involved for four years and is ready to go and already considering motions in limine is independently sufficient for remand. The Gen-On case is factually and procedurally way different.

But there are more fundamental issues I have:

1) I don't think the Debtor would have removed if we had an accurate view of the situation. Norm misunderstood when he reported to us that the state court was proceeding to jury selection on the claims against the Debtor. What the state court *actually* did is bifurcate the trial so that it was proceeding only as to Alex Jones and not the Debtor. It's a funky way to handle it, but Norm argued that severance was not allowed, the court seemed to give some credence to that argument, and it's not clear that what the court did was improper instead of just uncommon. We successfully created enough of an issue so that the judge did not award fees and costs to the Plaintiffs—there are arguments, just not winning arguments—but remand was all but certain.

2) It's not obvious that the Debtor should seek to extend the stay:

   a. According to Norm, there are claims against Alex Jones for his own actions and claims against the Debtor. Unlike in Texas, there was no finding of alter ego by default and Judge Bellis has not been nearly as tough on evidentiary rules. So we have the ability to separate off issues of what Alex Jones did with respect to FSS and what FSS employees did with respect to Alex Jones. Take the Texas trial as an

007766

example—(i) The defamation award was only $100k (and Alex Jones only did some of those statements) whereas the remaining $4.0 million of exemplary damages was for intentional infliction of emotional distress which was from *other* FSS employees sending people to Sandy Hook; and (ii) On the other hand, whether it is right or not, having Alex Jones also on trial probably doesn't help matters for FSS.

b. I don't see how we meet the standard for extending the stay with respect to the Connecticut litigation, which is only supposed to be granted in "extreme and unusual circumstances." Extending the stay is appropriate where: (i) the Debtor is a guarantor of the obligation; (ii) the claim is against the Debtor's insurer; or (iii) there is such an identity between the debtor and a third-party defendant that the debtor may be said to be the real party in interest. I know that you have asserted an indemnity claim for Alex Jones, but it's not in any of the documents prior to April 2022, and the Connecticut Litigation does not assert alter ego (this is different for the remaining Texas litigation). And if the factors *are* met, the more likely outcome is that the stay would also be lifted as to the Debtor, which Marc tells me would affect the Debtor.

c. It will be a serious blow to the Debtor's credibility when we say that the point of the bankruptcy is to find a way to pay and resolve the claims rather than to merely protect Alex Jones. That would be a point in favor of the appointment of a committee, and the additional costs that would incur.

d. Incurring costs to fight to extend the stay—which, if successful, would merely delay rather than prevent anything—instead of incurring costs litigating in Connecticut is not obviously a better use of estate resources. The right time to seek an extension of the stay for the Connecticut litigation was at the beginning of the case, when we did not have a bunch of discovery due and upcoming deadlines. That was presented to the group but the instead the decision was made that Alex would file a cross action and rely on that. We might just have to live with that decision. From your client's perspective, the better course of action might be better for the Debtor to also litigate in Connecticut and bear some of the cost.

3) The Debtor needs to focus on things that will preserve and increase the value of its estate and not fall into the trap that the Plaintiffs are in of just fighting everything for the sake of fighting. I can't tell Marc that I believe that seeking a stay will accomplish anything other than incur expense to the estate.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:36 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: Isn't this our case in Conn

RJ:  I wasn't clear – Isn't this is why we need to seek a stay in the Conn District Court – while we seek an injunction in Judge Lopez Court – for him to rule that there is clear related to jurisdiction and seek a transfer to the "Home" Court –

007767

The BR Court took away the right of the District Court to determine the issue of withdrawal of the reference and handling of the case and trial by the "Home" district court which 157(b)(5) mandates.

Shelby

---

**From:** Shelby Jordan <sjordan@jhwclaw.com>
**Date:** Tuesday, August 16, 2022 at 6:31 AM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Ray Battaglia <rbattaglialaw@outlook.com>, "Kyung S. Lee" <klee@shannonleellp.com>
**Subject:** Isn't this our case in Conn

Isn't this the outcome we want in Conn District Court –

United States Court of Appeals
for the Fifth Circuit
No. 21-20557
In re GenOn Mid-Atlantic Development, L.L.C.
Debtor,
Natixis Funding Corporation,
Appellant,
versus
GenOn Mid-Atlantic, L.L.C.,
Appellee.
Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-cv-3078
Before Smith, Wiener, and Southwick, Circuit Judges.
Jerry E. Smith, Circuit Judg

**Bankruptcy Removal Isn't the Same as General Removal, Fifth Circuit Explains**

Fifth Circuit finds 'related to' jurisdiction in a lawsuit between two third parties who were neither debtors nor creditors.

Fifth Circuit Judge Jerry E. Smith wrote an erudite opinion on the finer points of post-confirmation and "related to" jurisdiction. Most notably, though, his opinion explores the finer points regarding abstention. It's a "must read" for jurisdiction buffs.

Procedurally and factually, a case can't be more complicated. The following exposition glosses over 10 pages of minutia to give our readers a sense of the facts from 100,000 feet.

The leading character in the drama was a non-debtor operator of leased power plants. The power plant operator's parent was a huge power producer in chapter 11 in Houston.

007768

The antagonist was a bank that issued $130 million in letters of credit in favor of the non-debtor subsidiary. The subsidiary paid $130 million cash for the bank to issue the LCs. In other words, the bank was fully covered, or so it thought.

Indeed, the bank was fully covered until someone made a mistake. Through an error in a complex transaction, the bank opened itself up to tens of millions of dollars of liability in excess of $130 million. Disputes arose when the bank was called on the unexpected liability.

The result was a settlement engrafted onto the parent's chapter 11 plan that was confirmed in Houston but not consummated entirely. The settlement exonerated the parent-debtor from liability on the unexpected liability.

However, the bank sued the non-debtor subsidiary and third parties in state court in New York. Claiming that the state court lawsuit was related to the Houston bankruptcy, the non-debtor subsidiary withdrew the suit to federal district court in New York based on "related to" jurisdiction.

The bank filed a motion to remand to state court. The district judge in New York sought an opinion from Chief Bankruptcy Judge David R. Jones of Houston on the question of whether the suit could have an effect on the parent's chapter 11 case to justify bankruptcy jurisdiction.

Bankruptcy Judge Jones found a "huge potential effect" on the bankruptcy, prompting the district judge in New York to deny the motion to remand and transfer venue to Houston.

Back in Houston, the district court referred the lawsuit to Bankruptcy Judge Jones for report and recommendation. Ultimately, the Houston district judge accepted the report and recommendation by Bankruptcy Judge Jones and entered a take-nothing judgment. In other words, the bank was stuck with liability in excess of $130 million.

The bank appealed to the Fifth Circuit, to no avail. Of interest to our readers, we will focus on the discussions of jurisdiction and abstention in Circuit Judge Smith's July 29 opinion.

Jurisdiction

The bank claimed that the judgment was a nullity because there was no federal jurisdiction since the dispute involved only non-debtor third parties and the scope of "related to" jurisdiction narrows after confirmation.

The outcome turned on the contours of "related to" jurisdiction under 29 U.S.C § 1334(b).

Following Fifth Circuit precedent in *Craig's Stores*, *Zale* and *Enron*, Judge Smith said that the pivotal question was whether the suit pertained to the implementation or execution of the parent's chapter 11 plan. He said that the case was "at the limit of related-to jurisdiction" and was "closer than our usual related-to fare."

Judge Smith said that "related to" jurisdiction was not foreclosed just because the dispute was between third parties who were neither debtors nor creditors in the parent's chapter 11 case.

In the settlement that was part of the parent's plan, the non-debtor subsidiary had pledged to maintain large cash reserves as comfort for the owners of the power plants it operated. If it were denuded of cash by the bank's lawsuit, the settlement would bust and the parent couldn't consummate the confirmed plan.

Judge Smith found "related to" jurisdiction because he saw a nexus between the lawsuit and the implementation and execution of the parent's plan.

4

Judge Smith was careful to say that his holding would not sweep every lawsuit against a debtor's subsidiary into bankruptcy court. Rather, he held that

> post-confirmation jurisdiction is proper only where the dispute pertains to the plan's implementation or execution. Few disputes between non-debtors qualify . . . . To fall within our post-confirmation jurisdiction, a dispute typically must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities.

Because there was jurisdiction, "removal was proper," Judge Smith said.

Abstention

Judge Smith next ruled that 28 U.S.C. § 1334(c)(2) did not require abstention.

"[I]n a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which *an action could not have been commenced in a court of the United States* absent jurisdiction under this section," the subsection says, "the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." [Emphasis added.]

Among the four requisites of abstention, the appeal turned on whether there would not have been federal jurisdiction were there no "related to" jurisdiction. In other words, would there have been diversity or federal question jurisdiction? Clearly, there was no federal question jurisdiction, so diversity jurisdiction was decisive.

The non-debtor subsidiary said there was diversity jurisdiction between it and the bank, but the bank said there was no diversity jurisdiction because there was no complete diversity considering the other defendants in New York.

Judge Smith said "it's true" that diversity jurisdiction would not allow removal of the bank's claims against all of the defendants in New York, but "that's not what Section 1334(c)(2) asks." The bankruptcy removal statute, 28 U.S.C. § 1452(a), allows removal of "any claim or cause of action."

The abstention statute, he said,

> commands abstention only where "an action" regarding the claims before the federal district court "could not have been commenced" in a federal court absent bankruptcy jurisdiction. In other words, federal courts must abstain only if "the claim" in the federal court "has no independent basis for federal jurisdiction."

Judge Smith was saying that abstention turns on the claims removed to bankruptcy court under "related to" jurisdiction, not the lawsuit filed in state court. He distinguished bankruptcy removal, which permits removal of a "claim," from the general removal statute, 28 U.S.C. § 1446(a), which allows removal of a "civil action."

Judge Smith said that the subsidiary brought only state-law claims "against it" into federal court.

Because an action based only on those "claims" could have been brought in federal court under diversity jurisdiction, Judge Smith held that "abstention was not required."

Finding no abuse of discretion, Judge Smith upheld denial of the motion to abstain. In the next 15 pages, he upheld dismissal of the bank's claims on the merits and affirmed the judgment of the district court.

5

007771

**R. J. Shannon**

| | |
|---|---|
| **From:** | Shelby Jordan <sjordan@jhwclaw.com> |
| **Sent:** | Monday, August 22, 2022 2:32 PM |
| **To:** | Kyung S. Lee; R. J. Shannon |
| **Cc:** | Marc Schwartz; Ray Battaglia |
| **Subject:** | Re: Engagement Letter in word |

I'm checking with Alex but I suspect with the indemnity his answer is none if FSS has funds.  Let me talk to him.

**From:** "Kyung S. Lee <klee@shannonleellp.com>
**Date:** Friday, August 19, 2022 at 3:28 PM
**To:** RJ Shannon <rshannon@shannonleellp.com>, Shelby Jordan <sjordan@jhwclaw.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Ray Battaglia <rbattaglialaw@outlook.com>
**Subject:** FW: Engagement Letter in word

1. Can you look at your Connecticut Removal file and send me a WORD document with the "captions" of the Sandy Hook Lawsuits? Is there just one, or several? I need this for the Engagement Letter for Norm to make sure it is right.
2. Marc, note Norm's request that the post-petition retainer be increased from $25,000 to $100,000.
3. Shelby, I am sure the Court and creditors are going to want to know what Alex will be funding of Norm's fees and retainers. I wanted to raise it now.
4. I am going to start working on the Application for Pattis & Smith so we don't have any estoppel arguments from the Plaintiffs' counsel.

Kyung S. Lee
Shannon & Lee LLP
Cell: 713-301-4751
klee@shannonleellp.com

**From:** Norm Pattis <NPattis@pattisandsmith.com>
**Date:** Friday, August 19, 2022 at 1:25 PM
**To:** Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: Engagement Letter in word

Kyung

Sharon is out today.

If this covers the CT cases, too, can you make the retainer amount $100,000?

Otherwise, fine.

Norm

**From:** Kyung S. Lee <klee@shannonleellp.com>
**Sent:** Friday, August 19, 2022 2:07 PM

1

**To:** Sharon Abramson <sabramson@pattisandsmith.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>; Shelby Jordan <sjordan@jhwclaw.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** Re: Engagement Letter in word

Sharon, here is a redline of the original Engagement Letter, marked with my changes. Please review  and let me know if you have any questions. Once you tell me you are good with the changes, I can turn it into a final and circulate to Alex and Marc.

Kyung S. Lee
Shannon & Lee LLP
Cell: 713-301-4751
klee@shannonleellp.com

---

**From:** Sharon Abramson <sabramson@pattisandsmith.com>
**Date:** Thursday, August 18, 2022 at 3:45 PM
**To:** Kyung S. Lee <klee@shannonleellp.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Engagement Letter in word

Good afternoon:

Engagement letter in word is attached.

Kind regards,

Sharon Abramson
Office Manager

Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
T: (203) 393-3017
F: (203) 393-9745
https://www.pattislawfirm.com/

Confidentiality Notice: This email message (including attachments) is from Pattis and Smith LLC and is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sec. 2510-2521. The information contained in this transmittal, including any attachment, is privileged and confidential information and is intended only for the person or entity to which it is addressed. If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying or distribution or the taking of any action in reliance on the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please contact the sender immediately and delete this transmittal from any computer or other data bank. Thank you.



# FEE STATEMENT

Internal # 16
Date: 10/07/2022

700 Milam, Suite 1300
Houston, Texas 77002
United States

Free Speech Systems, LLC

## 00010-Free Speech Systems, LLC
## Debtor in Possession

### Services

| Date | Attorney | Description | Hours | Rate | Total |
|------|----------|-------------|-------|------|-------|
| 07/30/2022 | KSL | Relief from Stay Proceedings: Handle requests from Marc Schwartz and team for copies of witness outlines, documents related to witness outline and cases relating to standard for lifting automatic stay to litigate in non-bankruptcy forum (.5) | 0.50 | $850.00 | $425.00 |
| 07/31/2022 | KSL | Relief from Stay Proceedings: Draft and finalize Witness and Exhibit List for Monday Hearing on Heslin\Lewis Lift Stay Matter (1.0); review 5th Circuit Cases on standard for permitting litigation to be conducted in separate forum (1.0); prepare Q&A and revise same for Marc Schwartz in connection with Heslin\Lewis hearing (1.0); o/c with Marc Schwartz at LaMadeleine to review exhibits, cases on lift stay and standard for same for Marc Schwartz testimony at Heslin\Lewis Hearing (1.0) | 4.00 | $850.00 | $3,400.00 |
| 07/31/2022 | RJS | Relief from Stay Proceedings: Attention to emails from K. Lee re witness and exhibit list re stay motion re Heslin/Lewis matter (.2); revise same and prepare exhibits for filing (.5); file and serve same (.2); prepare legal argument re same (1.0). | 1.90 | $625.00 | $1,187.50 |
| 08/01/2022 | RJS | Relief from Stay Proceedings: Prepare for (.6) and attend (1.1) hearing re Debtor's stay motion re Heslin/Lewis matter. | 1.70 | $625.00 | $1,062.50 |
| 08/01/2022 | RJS | Litigation: Attention to emails from N. Pattis re hearing scheduled in Connecticut litigation (.1); analyze order re same (.5); attend in person and Zoom call re same at M. Schwartz office (1.0). | 1.60 | $625.00 | $1,000.00 |
| 08/01/2022 | RJS | Relief from Stay Proceedings: Analyze Connecticut Plaintiffs lift-stay motion (.9); attention and respond to K. Lee emails re applicable law (.5); attention to N. Pattis email re estimate of cost for Connecticut | 1.40 | $625.00 | $875.00 |

| | | litigation. | | | |
|---|---|---|---|---|---|
| 08/01/2022 | KSL | Relief from Stay Proceedings: Prepare for hearing on Lift Stay to Permit Heslin\Lewis suits to proceed to judgment (1.0); attend hearing and handle same with Marc Schwarz, CRO (1.5); post-hearing conference with counsel and CRO to discuss next steps in chapter 11 case (1.0); continue to work on researching and preparing response as to Curtis Factors in connection with Connecticut Plaintiffs' Motion to Lift Stay (2.0). | 5.50 | $850.00 | $4,675.00 |
| 08/01/2022 | KSL | Financing: Numerous t/c with S. Lemmon, counsel for PQPR, on various issues relating to use of cash collateral (.6); follow-up call with Marc Schwartz and counsel to discuss preparation for First Day Motions not handled on 8/1/22 (1.5) | 2.10 | $850.00 | $1,785.00 |
| 08/02/2022 | RJS | Litigation: Attention to email from K. Lee re hearing in Connecticut litigation (.1); attend video conference with K. Lee, M. Schwartz, and R. Battaglia re same (1.0); attention to email from C. Atkinson from Pattis & Smith re removal of Connecticut litigation in light of state court continuing action with Debtor as party and analyze drafts of removal papers (.5); attention to email from C. Atkinson of filed versions of same (.2); follow up teleconference with N. Pattis, K. Lee, R. Battaglia, and M. Schwartz re same (1.0). | 2.80 | $625.00 | $1,750.00 |
| 08/02/2022 | RJS | Relief from Stay Proceedings: Analyze Connecticut Plaintiffs' motion for relief from stay (.5); various emails with K. Lee and M. Schwartz re evidence required (.5); outline response re same (4.7). | 5.70 | $625.00 | $3,562.50 |
| 08/02/2022 | KSL | Litigation: Conference call with Conn. counsel to obtain update on timetable for jury selection, trial and cost figures (1.0); extended conference calls with counsel for Debtor, CRO and Schwartz Associates on preparing for First Day Hearings (3.0); continue to provide various inserts to First Day Orders and coordinate with Ray Battaglia on finalization of Utility, Critical Vendor, Extension of Time to File Schedules and Cash Collateral (1.0); review new issues raised by objectors as to use of cash collateral, and, provide responses to same (1.0); respond to and discuss issues raised by Texas and Conn Plaintiffs through Jarrod Martin and discuss with Ray Battaglia (1.5); respond to call from N. Pattis on whether there has been an extension of the automatic stay to Alex Jones (.5) | 8.00 | $850.00 | $6,800.00 |
| 08/03/2022 | RJS | Financing: Prepare for (1.0) and attend (7.0) hearing on use of cash collateral and other first-day motions; post-hearing meeting with M. Schwartz, K. Lee, and R. Battaglia (1.2). | 9.20 | $625.00 | $5,750.00 |
| 08/03/2022 | RJS | Relief from Stay Proceedings: Begin drafting response for motion for relief from automatic stay. | 3.00 | $625.00 | $1,875.00 |

007775

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 08/03/2022 | KSL | Litigation: Review objections to First Day Motions and prepare responses to same for counsel and client (1.5); attend hearing on First Day Motions and hearing on First Day Motion to Use Cash Collateral of PQPR and discuss strategy and testimony with clients (7.0). | 8.50 | $850.00 | $7,225.00 |
| 08/04/2022 | RJS | Relief from Stay Proceedings: Continue drafting Motion for relief from automatic stay and conducting related research (5.0); draft witness and exhibit list re same (.4); send same to M. Schwartz, K. Lee, and R. Battaglia (.1); call re evidence for Connecticut Plaintiffs' lift stay motion (1.0); attention to email re Connecticut Plaintiffs' requested continuance of same and confirm agreement of Debtor (.1). | 6.70 | $625.00 | $4,187.50 |
| 08/04/2022 | KSL | Relief from Stay Proceedings: Analyze "cause" as set out in Conn. Plaintiffs' Emergency Motion to Lift Stay and discuss strategy on how to defend with CRO and co-counsel (1.5); t/c with S. Lemmon re: PQPR position on lift stay motion and budget (.5); review email stating that Connecticut Plaintiffs are continuing hearing on Emergency Motion to Lift Stay scheduled for August 5 to August 24 (.4). | 2.40 | $850.00 | $2,040.00 |
| 08/04/2022 | KSL | Fee/Employment Applications: Begin editing and revising Application to Employ Shannon & Lee LLP, especially the Declaration and connections wto InfoW bankruptcy cases (2.0); edit and revise Application to retain CRO and Schwartz Associates as advisors for CRO (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/05/2022 | RJS | Financing: Attention to J. Martin email re FSS company agreement (.1); draft response to same with attached documents (.5). | 0.60 | $625.00 | $375.00 |
| 08/05/2022 | RJS | Claims Administration and Objections: Analyze A. Jones proof of claim filed in Bankruptcy case (.1); review relevant documents for contractual indemnity (.9); draft email to M. Schwartz, K. Lee, and M. Schwartz re same (.1). | 1.10 | $625.00 | $687.50 |
| 08/05/2022 | RJS | Litigation: Attention to order of U.S. Bankruptcy Court for the District of Connecticut order setting hearing on Connecticut Plaintiffs' motion for remand on expedited basis (.2); outline response to same and motion for withdrawal of reference (3.3). | 3.50 | $625.00 | $2,187.50 |
| 08/05/2022 | KSL | Litigation: Handle drafting of Suggestions of Bankruptcy for A. Reynal in appellate and state court actions (.5); analyze and document state court evidence of values by Expert Witness Pettingill on FSS Values (1.0). | 1.50 | $850.00 | $1,275.00 |
| 08/05/2022 | KSL | Fee/Employment Applications: Analyze issues relating to Applications for CRO and Schwartz Associates (1.0). | 1.00 | $850.00 | $850.00 |
| 08/06/2022 | RJS | Claims Administration and Objections: Attention to verdict on punitive damages and research Texas caps | 1.50 | $625.00 | $937.50 |

| | | | | | |
|---|---|---|---|---|---|
| | | re same (1.3); draft email to K. Lee and R. Battaglia re same (.2). | | | |
| 08/06/2022 | RJS | Litigation: Draft motion for pro hac vice for Connecticut bankruptcy court re removed Connecticut litigation (.9); draft motion for to withdrawal of the reference re same (2.5); analyze Connecticut Plaintiffs' motion to remand and draft response to same (5.6); draft email to M. Schwartz, K. Lee, N. Pattis, and R. Battaglia re same (.1). | 9.30 | $625.00 | $5,812.50 |
| 08/06/2022 | KSL | Fee/Employment Applications: Review comments provided by M. Schwartz to Application (.2); review and analyze new sections for Declaration iso Application to Retain and disclosures relating to InfoW (.8) | 1.00 | $850.00 | $850.00 |
| 08/07/2022 | RJS | Litigation: Updated pro hac vice application, motion to withdraw the reference, and response to motion to remand re Connecticut Litigation in response to K. Lee and R. Battaglia comments (1.5). | 1.50 | $625.00 | $937.50 |
| 08/07/2022 | RJS | Business Operations: Attention and respond to M. Schwartz emails re inventory issues (.3). | 0.30 | $625.00 | $187.50 |
| 08/07/2022 | KSL | Litigation: Work on building base case pleading for Motion to Withdraw the Reference to the District Court in Connecticut (2.0); edit and revise Pro Hac for RJ Shannon (.3); review and edit Response to Motion to Remand (1.0) | 3.30 | $850.00 | $2,805.00 |
| 08/08/2022 | RJS | Litigation: Call with N. Pattis re pleadings to file in Connecticut litigation (.1); draft email re visiting attorney application re same (.1); finalize motion to withdraw the reference and response to motion for remand re same (1.5); send same to N. Pattis and staff (.1); two calls with N. Pattis staff re filing of same (.1); confirm filing of same (.1); call with M. Schwartz, K. Lee, R. Battaglia, and N. Pattis re same (.5). | 2.40 | $625.00 | $1,500.00 |
| 08/08/2022 | RJS | Case Administration: Daily status call with M. Schwartz, K. Lee, R. Battaglia, with S. Jordan attending for part of call. | 1.00 | $625.00 | $625.00 |
| 08/08/2022 | KSL | Case Administration: Numerous t/cs with R. Battaglia, Norm Pattis, R. Shannon and M. Schwartz to discuss operational issues at FSS, retention issues with Connecticut counsel, and backlog on fulfillment of orders and additional cash collateral needed to complete same (1.5); extended call on daily FSS Team meeting to discuss issues on chapter 11 process and action plan (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/08/2022 | KSL | Litigation: Review of expert witness Pettingill's testimony in Heslin/Lewis Suit re valuation of FSS and methodology behind his opinion (.5). | 0.50 | $850.00 | $425.00 |
| 08/09/2022 | RJS | Litigation: Travel to Connecticut for 08/10/2022 | 6.50 | $312.50 | $2,031.25 |

| | | | | | |
|---|---|---|---|---|---|
| | | expedited hearing on Connecticut Plaintiffs' motion to remand (1/2 rate for non-working travel time). | | | |
| 08/09/2022 | RJS | Relief from Stay Proceedings: Attention to email from ADP re intention to terminate payroll services and respond to same. | 0.20 | $625.00 | $125.00 |
| 08/09/2022 | KSL | Business Operations: Work with Marc Schwartz and Ray Battaglia to understand extent of "backlog" issue and determine most appropriate solution (1.5); t/c with Norm Pattis to determine dislocation of Alex Jones with a Connecticut trial on his ability to do show and create sales for FSS (.5); extended call with FSS Team and Shelby Jordan, counsel for Alex Jones, on funding of fulfilling back orders and necessity for Alex Jones to be in Connecticut and absent from studio during Connecticut trial (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/09/2022 | KSL | Case Administration: Extended daily call with FSS Team to discuss daily assignments and action items requiring attention (1.0). | 1.00 | $850.00 | $850.00 |
| 08/09/2022 | KSL | Fee/Employment Applications: Continue to review and make additional edits to Application to Retain CRO, Declaration of Marc Schwartz, Application to Retain S&L and Declaration of Kyung S. Lee (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/10/2022 | RJS | Litigation: Calls with K. Lee re hearing on motion to remand re Connecticut Litigation (.2); prepare for hearing (2.3); call with N. Pattis re motion to continue filed by Connecticut Plaintiffs and attention to filing of same on docket (.2); call with K. Lee after hearing continued after traveling to vicinity of Bridgeport, Connecticut bankruptcy court (.1); call with N. Pattis after conclusion of disciplinary proceeding in Connecticut Superior Court related to Connecticut Plaintiffs' claims (.1); attention to filing by N. Pattis in Connecticut Bankruptcy Court and email M. Schwartz, K. Lee, and R. Battaglia about authorization (.2). | 3.10 | $625.00 | $1,937.50 |
| 08/10/2022 | RJS | Litigation: Travel from Windsor Locks, Connecticut to Pattis & Smith office in Newport, Connecticut in advance of hearing in Bridgeport, Connecticut, confirm hearing had been continued to 8/12/22, and return to Windsor Locks(1/2 non-working travel rate). | 2.00 | $312.50 | $625.00 |
| 08/10/2022 | RJS | Litigation: Travel time related to return rental car and proceed to Hartford, CT airport for return flight to Houston prior to delay and ultimate cancelation of flight due to storms in DC area and Houston (1/2 travel time). | 2.80 | $312.50 | $875.00 |
| 08/10/2022 | KSL | Litigation: T/c with R. Shannon to discuss arguments in Connecticut on Motions to Remand and response to same (.5); conference call with FSS Team to determine division of work and action plan of items to handle for FSS in Texas and Connecticut (1.0). | 1.50 | $850.00 | $1,275.00 |

| | | | | | |
|---|---|---|---|---|---|
| 08/10/2022 | KSL | Financing: Numerous t/cs with S. Lemmon to update on negotiations over cash collateral and discovery propounded by Plaintiffs' counsel (.8). | 0.80 | $850.00 | $680.00 |
| 08/10/2022 | KSL | Business Operations: Conference calls with M. Schwartz, C. Schwartz and Ray Battaglia on issues relating to fulfillment and backlog of shipping orders (1.0); conference call to review status of ADP proposed termination of FSS as client and whether alternative third-party administrator is required for FSS (1.0); continue to obtain facts and approaches to solving backlog and fulfillment issues at FSS and its dealings with Blue Asension Logistics, LLC (2.0). | 4.00 | $850.00 | $3,400.00 |
| 08/11/2022 | RJS | Litigation: Travel time to return to Houston from Connecticut (1/2 rate non-working travel). | 6.50 | $625.00 | $4,062.50 |
| 08/11/2022 | KSL | Case Administration: Draft, edit, and file notice of appearance for case (.5). | 0.50 | $850.00 | $425.00 |
| 08/11/2022 | KSL | Financing: Contact R. Saldana to determine availability of court to hear emergency motion to amend cash collateral order (.5); review fulfillment issue, cash collateral required in order to overcome backlog, factoring arrangement between Blue Asension and Alex Jones, extent of backlog and handle issues relating to handling same without affecting credit card processor and bank relating to same (3.0); numerous conference calls to discuss fulfillment issue and cash collateral amendment required (2.0); assist R. Battaglia in preparing for hearing on amendment to cash collateral hearing with drafts of Witness and Exhibit List, strategy considerations, topical areas to cover with both Patrick Riley and Marc Schwartz (2.0). | 7.50 | $850.00 | $6,375.00 |
| 08/12/2022 | RJS | Litigation: Prepare for (2.0); and attend (.7) remote hearing in Connecticut Bankruptcy Court re motion for remand; call with K. Lee re outcome of same (.1); respond to S. Jordan email re same (.1). | 2.90 | $625.00 | $1,812.50 |
| 08/12/2022 | RJS | Financing: Prepare for (.2) and attend (4.1) hearing on motion to amend interim cash collateral order. | 4.30 | $625.00 | $2,687.50 |
| 08/12/2022 | KSL | Financing: Prepare for hearings on amendment to cash collateral order and assist R. Battaglia in presentation of case and assist in cross-examination of witnesses (2.0); emails on negotiations with Plaintiffs counsel, subchapter v trustee and US Trustee on cash collateral amendment and issues relating to fulfillment and Blue Asension agreement (1.0); assist in preparation of witnesses Marc Schwartz and Patrick Riley by Ray Battaglia (1.5); assist Ray Battaglia at hearing on Emergency Motion to Amend Cash Collateral, review exhibits and formulate objections to admission of same to Objector's exhibits, and analyze revised 13 week budget and attend hearing by video (3.5); post-hearing discussions with M. Schwartz to make sure all issues | 8.30 | $850.00 | $7,055.00 |

| | | covered(.3) | | | |
|---|---|---|---|---|---|
| 08/13/2022 | RJS | Litigation: Review discovery request from plaintiffs and gather relevant documents from email. | 3.10 | $625.00 | $1,937.50 |
| 08/15/2022 | KSL | Litigation: Conference call with FSS Team to discuss issues relating to discovery, Connecticut Plaintiffs Emergency Motion to Lift Stay, Connecticut litigation and status of remand (1.0); Zoom call to discuss issues relating to extension of the automatic stay, the necessity of Alex Jones on the air, the effect it will have on FSS sales and testimony required at hearing on same (1.5) | 2.50 | $850.00 | $2,125.00 |
| 08/15/2022 | RJS | Fee/Employment Applications: Review application to employ drafted by K. Lee (.3); Revise and comments to application to employ S&L (2.2). | 2.50 | $625.00 | $1,562.50 |
| 08/15/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/15/2022 | RJS | Meetings of Creditors: Call with Steve Lemmon appended to daily status call. | 0.30 | $625.00 | $187.50 |
| 08/15/2022 | RJS | Litigation: Gather emails re disciplinary hearing of N. Pattis and A. Reynal related to estate's potential retention of attorneys for Connecticut litigation (1.0); send same to K. Lee for submission to Connecticut disciplinary counsel (.1); calls with K. Lee re same (.2). | 1.30 | $625.00 | $812.50 |
| 08/15/2022 | RJS | Litigation: Attention to order of remand of removed Connecticut Litigation (.2); attention and response to K. Lee email re appeal/other action with respect to remand order or extension of automatic stay requested by S. Jordan (.3). | 0.50 | $625.00 | $312.50 |
| 08/16/2022 | KSL | Litigation: Respond to emails and undertake analysis relating to extension of the automatic stay, the requirements for such extension under 5th Circuit law, Divine Ripe and cases discussed (2.0); interview Fulfillment Expert from Fort Worth Texas and follow-up with M. Schwartz (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/16/2022 | RJS | Litigation: Attention to, research regarding, and detailed response to email from S. Jordan re appeal/other action in response to the order remanding removed Connecticut litigation (2.0); draft follow up email re same proposing path forward allowing Connecticut litigation to continue (.8). | 2.80 | $625.00 | $1,750.00 |
| 08/16/2022 | RJS | Financing: Attend teleconference with potential expert regarding Blue Asension in connection with Debtor's request for use of cash collateral with K. Lee, M. Schwartz, and C. Schwartz and draft emails to M. Schwartz during teleconference. | 1.00 | $625.00 | $625.00 |
| 08/16/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/16/2022 | RJS | Relief from Stay Proceedings: Research and case | 3.30 | $625.00 | $2,062.50 |

| | | analysis re extension of the automatic stay to A. Jones in Connecticut litigation requested by S. Jordan (2.5); draft detailed email responding to K. Lee email re same (.6); draft follow up email re same issue for remaining Texas litigation (.2). | | | |
|---|---|---|---|---|---|
| 08/16/2022 | RJS | Fee/Employment Applications: Finalize comments to application to employ S&L as co-counsel to the Debtor (.6); confirm computerized connections search re K. Lee declaration (no charge); draft email to S. Lee re same (.1). | 0.70 | $625.00 | $437.50 |
| 08/16/2022 | KSL | Case Administration: Attend daily call to discuss status of Emergency Motion to Lift Stay and Emergency Motion to use Cash Collateral (1.0). | 1.00 | $850.00 | $850.00 |
| 08/16/2022 | KSL | Fee/Employment Applications: Edit and revise draft Application to Retain CRO and Declaration of Marc Schwartz and circulate for review (1.0); review and revise Application to Retain S&L and Declaration of Kyung S. Lee (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/16/2022 | KSL | Financing: Several phone calls to S. Lemmon to discuss status of cash collateral order negotiations, new PQPR issues and discovery of PQPR documents (.6). | 0.60 | $850.00 | $510.00 |
| 08/17/2022 | KSL | Litigation: Numerous t/c with S. Jordan, counsel for Alex Jones, on issues relating to Connecticut Action (.5). | 0.50 | $850.00 | $425.00 |
| 08/17/2022 | RJS | Fee/Employment Applications: Research need for application to employ testifying expert re Blue Asencion (.7); draft email re same to M. Schwartz, C. Schwartz, and K. Lee (.1); revise J. Michaels engagement letter as counter proposal (.8); draft email re changes to M. Schwartz, C. Schwartz, and K. Lee re same (.1). | 1.70 | $625.00 | $1,062.50 |
| 08/17/2022 | RJS | Relief from Stay Proceedings: Revise response to Connecticut Plaintiffs' lift stay motion (3.8); incorporate comments re same (1.2); finalize response to Connecticut Plaintiffs' lift stay motion (.5); file and serve same (.4); draft email re availability of FSS employee witnesses in Connecticut litigation proceeding against A. Jones only to M. Schwartz, C. Schwartz, R. Battaglia, and K. Lee (.3). | 6.20 | $625.00 | $3,875.00 |
| 08/17/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/17/2022 | KSL | Relief from Stay Proceedings: T/c with R. Battaglia, M. Schwartz and R. Shannon on various issues relating to Emergency Motion to Lift Stay by Connecticut Plaintiffs (1.0); review and edit final version of FSS Response to Emergency Motion to Lift Stay (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/17/2022 | KSL | Business Operations: Conference call with CR3 Partners and Ray Battaglia to retain loss revenue due | 1.40 | $850.00 | $1,190.00 |

007781

| | | | | | |
|---|---|---|---|---|---|
| | | to unavailability of Alex Jones and fulfillment process at Blue Asension (1.0); t/c with S. Lemmon, counsel for PQPR, on issues relating to products shipped and not paid for by FSS pre-petition (.4). | | | |
| 08/17/2022 | KSL | Fee/Employment Applications: Review and revise final versions of Applications to Retain S&L and CRO (1.5) | 1.50 | $850.00 | $1,275.00 |
| 08/18/2022 | KSL | Fee/Employment Applications: Locate executed engagement letters for R. Shannon re: completion of Applications to Employ (.3). | 0.30 | $850.00 | $255.00 |
| 08/18/2022 | RJS | Relief from Stay Proceedings: Email to K. Lee re case law re S. Jordan request to extend automatic stay to A. Jones (.4); outline proposal of potential resolution of Connecticut Plaintiffs lift stay motion in advance of daily status call (.5); teleconference with N. Pattis, S. Jordan, M. Schwartz, R. Battaglia, and K. Lee re Connecticut litigation and stay (.8); update proposal drafted previously and send same to R. Battaglia (.1). | 1.80 | $625.00 | $1,125.00 |
| 08/18/2022 | RJS | Case Administration: Attend daily status call re matter. | 1.00 | $625.00 | $625.00 |
| 08/18/2022 | RJS | Fee/Employment Applications: Email to K. Lee re executed copy of S&L engagement letter (.1); revise applications to employ CRO and S&L (1.8); prepare proposed final versions of same and draft email to M. Schwartz re for review, approval, and signature (.2). | 2.10 | $625.00 | $1,312.50 |
| 08/18/2022 | KSL | Relief from Stay Proceedings: Numerous emails and discussions with R. Shannon on whether Fifth Circuit law allows extension of the automatic stay without identity of interest under Divine Ripe (1.0); extended conference call with Norm Pattis and FSS Team to discuss proof for Emergency Motion to Lift Stay filed by Conn Plaintiffs (1.0); conference call with lost revenue expert and FSS Team in anticipation of hearing on Lift Stay Motion (1.0); conference call with FSS Team to discuss outline of topics to handle, strategy on lift stay and handling of issues relating to Connecticut and Texas trial dates in August and September 2022 (2.0); analyze issues relating to whether the FSS Company Agreement and any amendment provides for indemnification of member and manager (.5); analyze whether by operation of law a manager and member are entitled to indemnification as a matter of Texas law (1.0). | 6.50 | $850.00 | $5,525.00 |
| 08/18/2022 | KSL | Financing: Numerous t/cs with S. Lemmon to discuss status of negotiations on cash collateral and discovery with Plaintiffs (.5). | 0.50 | $850.00 | $425.00 |
| 08/19/2022 | KSL | Relief from Stay Proceedings: Outline issues raised in Emergency Motion to Lift Stay and responses to same in preparation for witness outlines (1.5). | 1.50 | $850.00 | $1,275.00 |
| 08/19/2022 | RJS | Fee/Employment Applications: Review, revise, and | 1.40 | $625.00 | $875.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | prepare proposed final version of R. Battaglia application to employ (.7); draft email to R. Battaglia re same (.1); draft email to M. Schwartz re proposed final versions of applications to employ (.1); attention and respond to K. Lee email re draft engagement letter for Pattis & Smith LLC (.2); attention and respond to K. Lee email re captions for Connecticut litigation in connection with application to employ Pattis & Smith LLC (.2); attention and respond to various emails with K. Lee re same (.1). | | | |
| 08/19/2022 | RJS | Relief from Stay Proceedings: Research compliance of Connecticut state court procedure with the automatic stay (1.8); draft email to K. Lee re same (.2). | 2.00 | $625.00 | $1,250.00 |
| 08/19/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/19/2022 | KSL | Case Administration: Extended conference call with FSS Team on daily call to determine status of various projects and work plan (1.0); numerous t/cs with Ray Battaglia, Norm Pattis, Andino Reynal, S. Lemmon, Marc Schwartz and R. Shannon on comments to retention pleadings, cash collateral order and budget, new product sale issues, and matters related to defense of the Connecticut Plaintiffs' Emergency Motion to Lift the Automatic Stay (.5). | 1.50 | $850.00 | $1,275.00 |
| 08/19/2022 | KSL | Fee/Employment Applications: Work on creating and revising retention pleadings, editing engagement letters, disclosures and forms of orders for Pattis & Smith on a flat fee basis and Reynal Law Firm on an hourly basis as special counsel for FSS in Connecticut litigation (4.0). | 4.00 | $850.00 | $3,400.00 |
| 08/20/2022 | RJS | Fee/Employment Applications: Final review applications to employ CRO, The Law Offices of Ray Battaglia, and Shannon & Lee LLP prior to filing (.3); finalize, file, and serve same (.5). | 0.80 | $625.00 | $500.00 |
| 08/21/2022 | KSL | Relief from Stay Proceedings: Arrange for calls among FSS professionals and Alex Jones team to discuss status of negotiations and agreements on cash collateral motion and Conn Plaintiffs' Emergency Motion to Lift Stay (.5); analyze issues on negotiations over the Lift Stay and discuss provisions acceptable to N. Pattis to allow representation of FSS and necessity of Pattis & Smith to the agreements (.5). | 1.00 | $850.00 | $850.00 |
| 08/21/2022 | RJS | Relief from Stay Proceedings: Teleconference with M. Schwartz, K. Lee, R. Battaglia, and S. Jordan re resolution of AEJ issues with agreement to Connecticut lift stay motion and retention of state court counsel (.5); follow up call re same with A. Reynal and N. Pattis present (.7). | 1.20 | $625.00 | $750.00 |
| 08/21/2022 | KSL | Relief from Stay Proceedings: Extended calls among FSS professionals, proposed state court litigation | 1.00 | $850.00 | $850.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | counsel, and J. Jordan to discuss resolution of Alex Jones issues regarding Connecticut Lift Stay Motion and retention of state court counsel (1.0). | | | |
| 08/21/2022 | KSL | Fee/Employment Applications: Work on editing various pleadings and retention letters reflecting changes as a result of calls and updates from parties (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/22/2022 | KSL | Fee/Employment Applications: Edit and revise comments and formula for compensating Connecticut and Texas state court litigation counsel by editing and revising retention agreement, Emergency Applications, Rule 2014 Disclosures and forms of orders (4.0). | 4.00 | $850.00 | $3,400.00 |
| 08/22/2022 | RJS | Case Administration: Attend daily status call re matter including preliminary views of J. Michels re Blue Asension. | 0.50 | $625.00 | $312.50 |
| 08/22/2022 | RJS | Fee/Employment Applications: Provide comments to K. Lee draft application to employ Pattis & Smith (.5); teleconferences with N. Pattis and A. Reynal re draft applications to employ same (1.0). | 1.50 | $625.00 | $937.50 |
| 08/22/2022 | KSL | Relief from Stay Proceedings: Extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lfit Stay Matter (1.0); numerous conference calls with co-counsel, CRO, State Court counsel and opposing counsel on Stay Lift Motion and issues relating to retention of state court counsel (2.0). | 3.00 | $850.00 | $2,550.00 |
| 08/23/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/23/2022 | RJS | Relief from Stay Proceedings: Attention and respond to various emails re stipulation further abating requirement to file W&E list, finalize same, and file and serve same (.5); teleconference with M. Schwartz, R. Battaglia, and K. Lee re Connecticut Plaintiffs comments to proposed agreed order (.6); teleconference with R. Chapple re same (.2); provide Debtor comments to proposed order to R. Chapple re same (.1). | 1.40 | $625.00 | $875.00 |
| 08/23/2022 | RJS | Fee/Employment Applications: Review and finalize applications to employ Pattis & Smith and the Reynal Law firm (1.1); file and serve same (.5). | 1.60 | $625.00 | $1,000.00 |
| 08/23/2022 | KSL | Fee/Employment Applications: Edit and revise comments and formula for compensating Connecticut and Texas state court litigation counsel by editing and revising retention agreement, Emergency Applications, Rule 2014 Disclosures and forms of orders (3.0). | 3.00 | $850.00 | $2,550.00 |
| 08/23/2022 | KSL | Relief from Stay Proceedings: Extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lift Stay Matter (1.0); extended call with FSS Team to discuss issues relating to Cash Collateral Order and Lift Stay Matter (1.0); numerous conference calls with co-counsel, CRO, State Court counsel and | 5.00 | $850.00 | $4,250.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | opposing counsel on Lift Stay Motion and issues relating to retention of state court counsel (2.0); edit and file order on extending deadlines to file Witness and Exhibit List for Lift Stay Motion (1.0). | | | |
| 08/24/2022 | RJS | Relief from Stay Proceedings: Attention and respond to K. Lee emails re lift stay motion (.2); attend part of hearing on lift stay motion after conflicting hearing concluded (.2); draft notice of continued hearing re lift stay motion and applications to employ (.5); file and serve same (.3); draft email to R. Chapple re inclusion of lift stay motion in notice along with the applications to employ (.1); teleconference re lift stay issues (1.0). | 2.30 | $625.00 | $1,437.50 |
| 08/24/2022 | RJS | Fee/Employment Applications: Conduct research into UST comments about potential causes of action against state court counsel in connection with applications to employ Pattis and Reynal (.2); draft email to K. Lee, M. Schwartz, R. Battaglia, and S. Jordan re same (.1). | 0.30 | $625.00 | $187.50 |
| 08/24/2022 | KSL | Relief from Stay Proceedings: Prepare notes for meetings with Marc Schwartz and court in connection with Lift Stay Motion and Cash Collateral Extension Motion (1.0); breakfast meeting with M. Schwartz on same (1.0); handle portions of hearing relating to FSS on Lift Stay Motion (1.0). | 3.00 | $850.00 | $2,550.00 |
| 08/24/2022 | KSL | Fee/Employment Applications: Handle dialogue and exchange of data relating to agreements, terms and conditions of retaining special counsel for Connecticut and Texas litigation (3.0). | 3.00 | $850.00 | $2,550.00 |
| 08/24/2022 | KSL | Meetings of Creditors: Discuss with counsel for interested parties latest developments on case issues with client and co-counsel (1.5). | 1.50 | $850.00 | $1,275.00 |
| 08/25/2022 | RJS | Fee/Employment Applications: Various emails with K. Lee and team re information requested by UST re applications to employ Pattis and Reynal. | 0.50 | $625.00 | $312.50 |
| 08/25/2022 | RJS | Financing: Review communications and documents re Plaintiffs requests for production re cash collateral (2.5); prepare privilege log re same (.5); prepare shell response and send same to R. Battaglia (.5.). | 3.50 | $625.00 | $2,187.50 |
| 08/25/2022 | RJS | Case Administration: Attend daily status call re matter (.5); attention to and analysis of motion to appoint tort committee and remove Debtor as DIP (3.7); draft email to Plaintiffs' counsel re exhibits attached to motion (.1). | 4.30 | $625.00 | $2,687.50 |
| 08/25/2022 | KSL | Fee/Employment Applications: Revise and edit Amended Declarations for Pattis and Reynal (1.0); revise and edit engagement letters for Reynal and Pattis (1.0); negotiate with Alex Jones over the share of fees to be borne by Alex Jones as to special counsel fees (1.0) | 3.00 | $850.00 | $2,550.00 |

| 08/26/2022 | RJS | Case Administration: Attend daily status call re matter (.5); draft proposed written discovery on Plaintiffs re motion for tort claimants committee/remove DIP (4.1); draft response to motion to expedite same (6.3). | 10.90 | $625.00 | $6,812.50 |
|---|---|---|---|---|---|
| 08/26/2022 | RJS | Relief from Stay Proceedings: Attention to emails re Ally Auto repossessing Tahoe (.1); search docket to confirm service on Ally Auto and send proof of same to team (.3); prepare witness and exhibit list for August 29 hearing (1.3); finalize and file same (.5). | 2.20 | $625.00 | $1,375.00 |
| 08/26/2022 | RJS | Fee/Employment Applications: Review and provide comments/revisions to updated declaration of N. Pattis and A. Reynal. | 0.20 | $625.00 | $125.00 |
| 08/26/2022 | KSL | Case Administration: Prepare for and attend FSS Daily Team call to coordinate activities for CRO of FSS (1.5); analyze action items requiring attention over Labor Day weekend for FSS (1.0). | 3.50 | $850.00 | $2,975.00 |
| 08/26/2022 | KSL | Fee/Employment Applications: Handle issues relating to amendments for the Declarations for new special counsel firms (1.0); analyze action items requiring attention over Labor Day weekend for FSS (1.0). | 2.00 | $850.00 | $1,700.00 |
| 08/27/2022 | KSL | Case Administration: Undertake initial research and prepare first draft of Response to Motion to Expedite (1.0) (reduced to 1 hour from 5 to avoid duplication with RJ Shannon work on project previously started). | 1.00 | $850.00 | $850.00 |
| 08/27/2022 | RJS | Relief from Stay Proceedings: Respond to various emails to N. Pattis re effect of automatic stay on the Connecticut proceeding absent agreed order (.5); draft emails to S. Jordan re A. Jones agreement to paragraphs of proposed order re Connecticut Plaintiffs' motion for relief from stay (.1). | 0.60 | $625.00 | $375.00 |
| 08/27/2022 | RJS | Case Administration: Status call re negotiations re lift stay and applications to employ (.5); call with M. Haselden re matter and PQPR request for investigation (.2); follow-up call among M. Haselden, S. Lemmon, R. Battaglia, and K. Lee re same (.4); incorporate comments from K. Lee and R. Battaglia into response to Motion to Expedite Plaintiffs' motion for tort claimants committee/removal of DIP (3.2). | 4.30 | $625.00 | $2,687.50 |
| 08/27/2022 | KSL | Fee/Employment Applications: Work on revising Amended Disclosures for Special Counsel and gathering facts relating to each firm's payment and amendments from original agreement (3.0). | 3.00 | $850.00 | $2,550.00 |
| 08/27/2022 | KSL | Relief from Stay Proceedings: Numerous conferences with R. Battaglia on issues relating to Lift Stay Motion agreement and negotiations relating to same (.5); coordinate with Connecticut counsel and R. Battaglia issues to be negotiated with opposing counsel on Lift Stay Motion (1.5); consult CRO on various outstanding | 3.50 | $850.00 | $2,975.00 |

|  |  | issues and walk him through the overlap of issues on retention and Lift Stay Agreement (.5); Zoom call to discuss status of negotiations and outstanding asks from parties (1.0). |  |  |  |
|---|---|---|---|---|---|
| 08/28/2022 | KSL | Fee/Employment Applications: Work on multiple revisions to the retention orders for special counsel Pattis & Smith and The Reynal Firm (1.0); communicate with CRO and special counsel on forms of order and revisions thereto (.5); handle Amended Declaration to reflect corrections and necessary updates to Declarations (1.5); update US Trustee and negotiate with same on forms of orders for retention of Pattis and Reynal Firm (1.0). | 4.00 | $850.00 | $3,400.00 |
| 08/28/2022 | RJS | Case Administration: Further incorporate comments to response to motion to expedite Plaintiffs' motion for tort claimants committee (4.0); detailed read through and revisions to the same (2.3); finalize, file, and serve same (.5). | 6.80 | $625.00 | $4,250.00 |
| 08/28/2022 | KSL | Case Administration: Work on multiple edits and revisions to draft of Response to Motion to Expedite filed by the Conn Plaintiffs (3.0); numerous t/c with R. Battaglia to discuss sections in the Response (.4). | 3.40 | $850.00 | $2,890.00 |
| 08/28/2022 | KSL | Financing: Conference with S. Lemmon and M. Schwartz to discuss clawback capacity re PQPR (.5). | 0.50 | $850.00 | $425.00 |
| 08/29/2022 | RJS | Relief from Stay Proceedings: Prepare for (1.5) and attend (.6) hearing re lift stay motion and applications to employ Pattis and Reynal. | 2.10 | $625.00 | $1,312.50 |
| 08/29/2022 | RJS | Case Administration: Attend daily status call re matter (.5); review and finalize schedules through in person conference with M. Schwartz and K. Lee and various emails with same and R. Battaglia (6.5); file same (.4). | 7.40 | $625.00 | $4,625.00 |
| 08/29/2022 | KSL | Fee/Employment Applications: Edit and revise retention orders for Special Counsel for Pattis & Smith and The Reynal Firm (1.0); review issues on retention of special counsel with US Trustee and objecting creditors (1.0); analyze issues for hearing with Marc Schwartz (.5); handle matters at the scheduled hearing on Motion to Lift Stay and Retention of Special Counsel (1.0). | 3.50 | $850.00 | $2,975.00 |
| 08/29/2022 | KSL | Case Administration: Work on comments to IDI draft and to drafts of Schedules and SOFA (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/30/2022 | RJS | Case Administration: Attend daily status call (.5); outline notes re response to Plaintiffs' motion for tort claimants committee/remove DIP (1.0). | 1.50 | $625.00 | $937.50 |
| 08/30/2022 | RJS | Plan and Disclosure Statement: Various emails with K. Lee re beginning drafting plan of reorganization. | 0.50 | $625.00 | $312.50 |
| 08/30/2022 | KSL | Case Administration: Review and analyze IDI answers | 2.50 | $850.00 | $2,125.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | with M. Schwartz and prepare for and handle IDI with US Trustee's office (2.5). | | | |
| 08/30/2022 | KSL | Fee/Employment Applications: Handle further amendments and changes to any orders and agreements with respect to retention of Chris Martin as appellate counsel, including amending engagement letter and Application, Declaration and form of order (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/30/2022 | KSL | Litigation: Assist N. Pattis with issues in connection with starting trial in Connecticut (1.0); analyze issues relating to PQPR involvement in case and discovery (1.5) | 2.50 | $850.00 | $2,125.00 |
| 08/31/2022 | RJS | Case Administration: Attend daily status call re matter. | 0.50 | $625.00 | $312.50 |
| 08/31/2022 | RJS | Litigation: Prepare various documents related to removal of cases in InfoW cases in connection with Plaintiffs' request for sanctions in Connecticut Litigation. | 0.70 | $625.00 | $437.50 |
| 08/31/2022 | KSL | Fee/Employment Applications: Continue to edit, revise and negotiate Chris Martin engagement letter and application with firm and counsel for Alex Jones (2.0). | 2.00 | $850.00 | $1,700.00 |
| 08/31/2022 | KSL | Case Administration: Analyze issues relating to whether the subchapter v trustee should investigate versus Tort Committee and analyze subchapter V cases of Corinthian on same (3.0). | 3.00 | $850.00 | $2,550.00 |
| 09/01/2022 | KSL | Litigation: Review response by PQPR and issues relating to use of incorrect term for Sandy Hook Plaintiffs and communications with counsel regarding same (1.5). | 1.50 | $850.00 | $1,275.00 |
| 09/01/2022 | KSL | Business Operations: Handle issues relating to emails from M. Randazza on claims arising from depositions, issues from reporters and handling of PQPR business issues (1.0); conference call among FSS business and legal to discuss developments in the case (1.0) | 2.00 | $850.00 | $1,700.00 |
| 09/01/2022 | KSL | Plan and Disclosure Statement: Collect cases and update M. Schwartz on "disposable income" definition to assist in modeling 3-5 year forecasts (1.0) | 1.00 | $850.00 | $850.00 |
| 09/01/2022 | RJS | Plan and Disclosure Statement: Draft detailed email to K. Lee and R. Battaglia about limits of common interest privilege and applicability to bankruptcy and plan negotiations. | 0.80 | $625.00 | $500.00 |
| 09/02/2022 | RJS | Case Administration: Draft email to K. Lee re timing of matters (.1); attend daily status call (.5). | 0.60 | $625.00 | $375.00 |
| 09/02/2022 | KSL | Litigation: Gather data and paper on preference payment made to Bankston and the Texas Plaintiffs (.5); analyze and gather data on recovery actions against PQPR (1.0). | 1.50 | $850.00 | $1,275.00 |

| 09/02/2022 | KSL | Case Administration: Draft, circulate and edit Motion to Compel Compliance with Bankruptcy Rule 2019 (2.5) | 2.50 | $850.00 | $2,125.00 |
|---|---|---|---|---|---|
| 09/02/2022 | KSL | Relief from Stay Proceedings: Follow-up on issues relating to ADP (.3). | 0.30 | $850.00 | $255.00 |
| 09/02/2022 | KSL | Case Administration: Draft, circulate and edit Motion to Compel Compliance with Bankruptcy Rule 2019 (2.5); | 2.50 | $850.00 | $2,125.00 |
| 09/02/2022 | RJS | Plan and Disclosure Statement: Draft email to K. Lee re projected disposable income calculation in subchapter v cases. | 0.20 | $625.00 | $125.00 |
| 09/02/2022 | RJS | Litigation: Revise written discovery requests re motion to appoint TCC and remove DIP (.3); draft email to K. Lee re same (.1); attention and respond to K. Lee email re exhibits to TCC motion (.2). | 0.60 | $625.00 | $375.00 |
| 09/02/2022 | RJS | Fee/Employment Applications: Attention to K. Lee draft of Interim Compensation Motion (.2); draft email re service of same (.1). | 0.30 | $625.00 | $187.50 |
| 09/03/2022 | RJS | Litigation: Attention and respond to emails from K. Lee re claims and avoidance actions (.2); follow up emails re particular potential avoidance actions and applicability of section 502(d) (.3). | 0.50 | $625.00 | $312.50 |
| 09/03/2022 | KSL | Business Operations: Study and analyze M. Schwartz term sheet from ▓▓▓▓ outlining $500,000 per week additional consignment financing agreement bullet points prepared by M. Schwartz (2.0); edit and revise first draft of Consignment and Financing Agreement (1.0); conference call with M. Schwartz and S. Jordan to discuss Consignment Agreement (.5) | 3.50 | $850.00 | $2,975.00 |
| 09/04/2022 | RJS | Litigation: Attention to emails re certified copies of bankruptcy documents for litigation (.1); request same from the Clerk of Court (.2). | 0.30 | $625.00 | $187.50 |
| 09/04/2022 | KSL | Litigation: Review and gather certain financial data requested by Norm Pattis in connection with Connecticut trial relating to financial condition of FSS, and, to be used with corporate representative B. Paz (2.0) | 2.00 | $850.00 | $1,700.00 |
| 09/05/2022 | KSL | Litigation: Follow up on gathering data for preference demand on payments made to Bankston and Connecticut Plaintiffs counsel, if any (1.0) | 1.00 | $850.00 | $850.00 |
| 09/05/2022 | KSL | Plan and Disclosure Statement: Study facts and conclusions from the Logistics Giving case and email S. Lemmon on plan concept re potential subordination of any allowed unsecured portion of asserted PQPR claim (2.5). | 2.50 | $850.00 | $2,125.00 |
| 09/05/2022 | KSL | Business Operations: Email review of bitcoin account issue by Marc Schwartz (.2) | 0.20 | $850.00 | $170.00 |

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 09/06/2022 | RJS | Claims Administration and Objections: Attention to K. Lee email re claims remaining against InfoW also against FSS and respond to same. | 0.10 | $625.00 | $62.50 |
| 09/06/2022 | RJS | Case Administration: Preliminary research re motion to appoint tort claimant committee (.3); attend daily status conference (.9); further research, outline, and begin drafting response to motion to appoint tort claimant committee (5.1). | 6.30 | $625.00 | $3,937.50 |
| 09/06/2022 | RJS | Litigation: Call with S. Lemmon, S. Jordan, K. Lee, and R. Battaglia re discovery matters. | 1.50 | $625.00 | $937.50 |
| 09/06/2022 | KSL | Fee/Employment Applications: Handle emails inquiring into recovery of out-of-pocket expenses for Pattis & Smith LLP and review of files to determine whether FSS should pay (.5) | 0.50 | $850.00 | $425.00 |
| 09/06/2022 | KSL | Litigation: Respond to requests from Connecticut counsel for affidavits relating to certain contentions made which are not accurate re: management agreement between FSS and PQPR, and other statements (2.0); review status of discovery and outstanding issues between Plaintiffs and Debtor with emails from J. Martin and R. Battaglia (1.0); respond to requests for information on previous cases and appearances by Connecticut counsel on disciplinary matters (2.0). | 5.00 | $850.00 | $4,250.00 |
| 09/06/2022 | KSL | Case Administration: Prepare for daily call with draft agenda (1.0); daily FSS call with CRO and counsel (1.0) | 2.00 | $850.00 | $1,700.00 |
| 09/06/2022 | RJS | Litigation: Emails with K. Lee re transcripts attached as exhibits to TCC motion (.2); draft email to J. Martin and R. Chapple re same (.1); send M. Schwartz drafts of written discovery requests re TCC motion (.1). | 0.40 | $625.00 | $250.00 |
| 09/07/2022 | RJS | Case Administration: Attend daily status call re matter (.4); outline factual background section for response to motion for TCC/removal of DIP (1.9). | 2.30 | $625.00 | $1,437.50 |
| 09/07/2022 | RJS | Meetings of Creditors: Listen and take notes re 341 meeting of creditors. | 1.80 | $625.00 | $1,125.00 |
| 09/07/2022 | KSL | Meetings of Creditors: Prepare M. Schwartz for 341 Meeting of Creditors (1.0); attend 341 Meeting of Creditors and represent Debtor through CRO at same (2.0). | 3.00 | $850.00 | $2,550.00 |
| 09/08/2022 | KSL | Litigation: Work on revising affidavit drafts for Norm Pattis from employees of FSS (1.0); edit and revise affidavit of Blake Roddy (.5); continue to review and revise affidavits relating to Google Analytics, analyze state court discovery on same and report findings to Marc Schwartz and counsel and discuss same with Norm Pattis (2.0); review same with Norm Pattis, Blake | 5.00 | $850.00 | $4,250.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | Roddy and R.Shannon and update affidavit (1.5). | | | |
| 09/08/2022 | RJS | Litigation: Attention to request from N. Pattis/M. Schwartz re "management agreement" referenced in testimony in Connecticut Litigation and respond to same (.2); attention and respond to various emails re same (.2); draft affidavit re same for M. Schwartz re same for use in Connecticut Litigation (1.5); attention to emails re "Google Analytics" issue (.1); attend calls with N. Pattis, FSS employee Roddy, K. Lee, and M. Schwartz re same (.7); prepare draft Roddy affidavit providing the "Google Analytics" to Connecticut Plaintiffs (2.8); send same to Roddy and N. Pattis for review and editing (.1). | 5.60 | $625.00 | $3,500.00 |
| 09/08/2022 | KSL | Case Administration: Prepare for and attend daily FSS call with CRO and counsel (1.0); t/c with R. Battaglia on new developments in case (.5). | 1.00 | $850.00 | $850.00 |
| 09/09/2022 | KSL | Case Administration: Handle connection issue pointed out by M. Haselden as to A. Reynal and B. Shulse (.5); review emails relating to consignment agreement with ▮▮▮ (.5); review discovery against PQPR (.5); review Shurwest case and facts (.5); analyze on FSS call status of case matters and division of responsibility (.5) | 2.00 | $850.00 | $1,700.00 |
| 09/09/2022 | RJS | Litigation: Attention to court setting hearing re PQPR/ Plaintiff discovery dispute and internal emails re same (.1); respond to same that able to attend hearing instead of Plan discussions in Austin (.1); research issues re appointing TCC and removal of DIP in subchapter v cases (3.7). | 3.90 | $625.00 | $2,437.50 |
| 09/10/2022 | KSL | Litigation: Review emails and schedules to determine how to staff hearing on Monday relating to PQPR discovery dispute, and, role of FSS (.5); handle subsidiary issues relating to Motion to Compel Discovery Against PQPR and effect on litigation overall (.5) | 1.00 | $850.00 | $850.00 |
| 09/10/2022 | KSL | Plan and Disclosure Statement: Continue to analyze with FSS Team issues affecting Debtor from discovery schedule and hearings on motions and plan formulation to determine strategy on how to approach creditors on plan concepts (2.0). | 2.00 | $850.00 | $1,700.00 |
| 09/11/2022 | KSL | Fee/Employment Applications: Handle retainer issue for special counsel Reynal (.3). | 0.30 | $850.00 | $255.00 |
| 09/11/2022 | KSL | Case Administration: Researching Young on removal of debtor in possession and procedure to handle (1.0); analyze Neosho case denying removal (.5); study and analyze secondary materials on standards for "cause" as to removal of debtor in possession, and, whether a party other than a debtor may propose a plan and what alternatives are available to court and creditors (1.5); review emails from S. Lemmon re: David Jones -Marc | 3.50 | $850.00 | $2,975.00 |

|  |  | Schwartz dialogue (.5) |  |  |  |
|---|---|---|---|---|---|
| 09/11/2022 | KSL | Litigation: Handle issues relating to comments requested by Norm Pattis as to strategic concerns on Connecticut trial (1.5) | 1.50 | $850.00 | $1,275.00 |
| 09/12/2022 | KSL | Plan and Disclosure Statement: Continue to gather and collect data needed to discuss with Marc Schwartz and Ray Battaglia going forward on tasks requested by them, including outlining plan issues, plan drafting and conceptualizing disposable income, and whether avoidance actions are above or below the disposable income line (3.0) | 3.00 | $850.00 | $2,550.00 |
| 09/12/2022 | RJS | Fee/Employment Objections: Attention to and analyze objections to employment applications of Schwartz and Associates and S&L. | 3.50 | $625.00 | $2,187.50 |
| 09/13/2022 | KSL | Plan and Disclosure Statement: Travel to and from Austin, Texas for meetings with client representatives Shulse, Schwartz and Battaglia to discuss business and operational issues (7)(billed at 1/2 travel time 3.5); o/c in Austin to review data on sales and operational issues and discuss next steps, including assignments and plan drafting (2.0) | 5.50 | $850.00 | $4,675.00 |
| 09/13/2022 | RJS | Case Administration: Prepare for and attend hearing re PQPR/Plaintiffs discovery dispute and update Court about status report and scheduling hearings on U.S. Trustee Objections to employment applications (1.0); draft status report for subchapter v case (.9); revise same based on conversations with M. Schwartz, K. Lee, and R. Battaglia based on discussions in Austin (.3); file same (.2). | 2.40 | $625.00 | $1,500.00 |
| 09/13/2022 | RJS | Fee/Employment Objections: Provide relevant documents to U.S. Trustee re objections to applications to employ S&L (.5); research into U.S. Trustee objections to applications to employ S&L and CRO (2.1). | 2.60 | $625.00 | $1,625.00 |
| 09/14/2022 | RJS | Fee/Employment Applications: Prepare reply to S&L application to employ and gather relevant documents. | 11.20 | $625.00 | $7,000.00 |
| 09/15/2022 | RJS | Fee/Employment Objections: Draft reply to objection to S&L employment application (8.5); gather relevant documents for inclusion on W&E List (1.0); draft W&E list (.6). | 10.10 | $625.00 | $6,312.50 |
| 09/16/2022 | RJS | Fee/Employment Objections: Send H. Nguyen documents related to U.S. Trustee objection to Schwartz Employment Application (.3); finalize W&E list and exhibits re same (1.0); file same (.3); finalize reply re U.S. Trustee objection to S&L employment application (2.5); file and serve same (.2); outline witness questions (3.4). | 7.70 | $625.00 | $4,812.50 |

| 09/17/2022 | KSL | Fee/Employment Objections: Continue to prepare for hearing on Application to Retain Schwartz Associates (4.0); review and revise pleadings and continue to prepare for hearings on Application to Retain S&L as bankruptcy counsel (4.0) | 8.00 | $850.00 | $6,800.00 |
|---|---|---|---|---|---|
| 09/17/2022 | RJS | Fee/Employment Objections: Provide comments on reply to U.S. Trustee objection to Schwartz application to employ (3.0); revise witness questions re same (1.2); call with J. Martin re Plaintiffs' joinder and contemplated plan provisions (.4). | 4.60 | $625.00 | $2,875.00 |
| 09/18/2022 | KSL | Fee/Employment Objections: Prepare for hearings on Application to Retain Schwartz and to Retain Shannon & Lee LLP (4.0); continue to edit and revise Reply for Schwartz in connection with US Trustee Objection to Retention (4.5) | 8.50 | $850.00 | $7,225.00 |
| 09/18/2022 | RJS | Fee/Employment Objections: Proofread and comment on reply to U.S. Trustee Objection to Schwartz objection (5.0); file and serve final version of same (.3). | 5.30 | $625.00 | $3,312.50 |
| 09/19/2022 | KSL | Fee/Employment Objections: Prepare for hearing on Applications to Retain CRO and Shannon & Lee with witness preparation and exhibits review (5.0); handle further email and document review to determine exact date of Engagement Letter for Marc Schwartz (2.0); analyze cases and legal arguments made in Reply and cases in connection with hearing on Application (4.0) | 12.00 | $850.00 | $10,200.00 |
| 09/19/2022 | RJS | Fee/Employment Objections: Prepare for hearing on U.S. Trustee objection to S&L and CRO employment applications. | 5.00 | $625.00 | $3,125.00 |
| 09/20/2022 | KSL | Case Administration: Prepare for hearing on Status Report to the Court on Administration of FSS case (.5). | 0.50 | $850.00 | $425.00 |
| 09/20/2022 | KSL | Fee/Employment Objections: Continue to prepare for hearing on Application to Retain CRO and S&L as co-counsel for FSS (4.0); attend hearing on Application, testify at hearing on Application and examine witnesses at hearing on Application (6.0). | 10.00 | $850.00 | $8,500.00 |
| 09/20/2022 | RJS | Fee/Employment Objections: Prepare and file supplemental W&E list for hearing on U.S. Trustee objection to application to employ S&L and CRO (.8); prepare for (2.0) and attend (6.5) hearing on employment applications. | 8.80 | $625.00 | $5,500.00 |

|  |  |  | **Quantity Subtotal** | **523.1** |
|---|---|---|---|---|
|  |  |  | **Services Subtotal** | **$382,671.25** |

## Expenses

| Type | Date | Description | Quantity | Rate | Total |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Expense | 07/29/2022 | Service of Filings: Printing and mailing of Utility Motion (printing and service through vendor). | 1.00 | $87.26 | $87.26 |
| Expense | 07/29/2022 | Service of Filings: Printing and mailing of Heslin/Lewis Stay Motion, Cash Collateral Motion, Criticial Vendor Motion, and Motion to Extend time for Schedules and Statements (printing and service through vendor). | 1.00 | $176.88 | $176.88 |
| Expense | 07/29/2022 | Filing Fees: Chapter 11 Filing Fee (paid by S&L though filed through R. Battaglia ECF at his direction). | 1.00 | $1,738.00 | $1,738.00 |
| Expense | 07/31/2022 | Copy Costs: Copy two original sets of proposed Exhibits to share with Marc Schwartz at La Madeleine meeting on Sunday in Preparation for Hearing on Motion to Lift Stay. | 1.00 | $50.23 | $50.23 |
| Expense | 07/31/2022 | Copy Costs: Rush order binding of 6 Exhibit books for Hearing on Motion to Lift Stay in Favor of Heslin/Lewis on 8.1.22. | 1.00 | $221.90 | $221.90 |
| Expense | 08/08/2022 | RJS flight to Connecticut for hearing on motion to remand for Connecticut Litigation and return to Houston, TX, on United Airlines (Economy Plus). | 1.00 | $861.20 | $861.20 |
| Expense | 08/09/2022 | RJS charge for internet access on 8/9/22 flight from Houston, TX to Hartford, CT | 1.00 | $10.00 | $10.00 |
| Expense | 08/10/2022 | Rental Car: RJS car rental to travel from Windsor Locks, CT/Bradley Int'l Airport to Bridgeport, CT for hearing on Connecticut Plaintiffs' motion to remand. | 1.00 | $167.25 | $167.25 |
| Expense | 08/11/2022 | Hotel: RJS hotel, taxes, and 1 day internet charge for scheduled in-person hearing before Connecticut Bankruptcy Court related to removed Connecticut Litigation (Stay 8/9/22 to 8/11/22). | 1.00 | $394.70 | $394.70 |
| Expense | 08/11/2022 | RJS charge for Internet access on return flight on 8/11/22. | 1.00 | $10.00 | $10.00 |
| Expense | 08/24/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | 1.00 | $259.00 | $259.00 |
| Expense | 09/03/2022 | Form of Consignment Agreement to use with ███ Group. | 1.00 | $29.99 | $29.99 |
| Expense | 09/06/2022 | Printing copies of Exhibits to Motion to Appoint Tort Committee. | 1.00 | $54.65 | $54.65 |
| Expense | 09/08/2022 | Service of Filings: Service of pleadings on retaining special counsel (printing and postage through vendor). | 1.00 | $124.20 | $124.20 |
| Expense | 09/13/2022 | Mileage: KSL travel to and from Austin after meetings with company and professionals re plan of reorganization. | 1.00 | $202.10 | $202.10 |
| Expense | 09/15/2022 | Service of Filings: Service of Pleadings (printing and postage through vendor). | 1.00 | $98.19 | $98.19 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Expense | 09/18/2022 | Printing copies of exhibits for hearings on Application | 1.00 | $49.08 | $49.08 |
| Expense | 09/19/2022 | Binders and dividers for Exhibit Binders for Trial | 1.00 | $109.02 | $109.02 |
| Expense | 09/19/2022 | Copy costs of exhibits 3X for hearing on Application | 1.00 | $375.95 | $375.95 |
| | | | | **Expenses Subtotal** | **$5,019.60** |

| Time Keeper | Position | Hours | Rate | Total |
|---|---|---|---|---|
| Kyung Lee | Attorney | 263.4 | $850.00 | $223,890.00 |
| R. J. Shannon | Attorney | 248.4 | $625.00 | $155,250.00 |
| R. J. Shannon | Attorney | 11.3 | $312.50 | $3,531.25 |
| | | | **Quantity Total** | **523.1** |
| | | | **Subtotal** | **$387,690.85** |
| | | | **Total** | **$387,690.85** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 16 | 11/06/2022 | $387,690.85 | $0.00 | $387,690.85 |
| | | | **Outstanding Balance** | **$387,690.85** |
| | | | **Total Amount Outstanding** | **$387,690.85** |

### IOLTA Trust Account

| Date | Type | Description | Matter | Receipts | Payments | Balance |
|---|---|---|---|---|---|---|
| | | | **IOLTA Trust Account Balance** | | **$50,822.68** | |

| | |
|---|---|
| NO. X06-UWY-CV-18-6046436-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| ERICA LAFFERTY, ET AL. | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |
| NO. X06-UWY-CV-18-6046437-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| WILLIAM SHERLACH | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |
| NO. X06-UWY-CV-18-6046438-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| WILLIAM SHERLAC, ET AL. | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |

## AFFADAVIT OF BLAKE RODDY

I, Blake Roddy, aver the following statements under penalty of perjury:

1.      My name is Blake Roddy. I am over the age of 18 years old and am competent to make this affidavit (the "Affidavit").

2.      I am currently employed by Free Speech Systems, LLC ("FSS"). I have been employed by FSS since 2013. I work as an e-commerce manager for FSS.

3.      I had a meeting with Attorney Brittany Paz the first quarter of 2022. I do not remember the exact date of this meeting, but my best recollection was that it was in or about March 2022. It is my understanding that this meeting was in connection with Attorney Paz's preparations to testify as a corporate representative of FSS in a deposition.

4.     I was asked to create Google Analytics reports prior to my meeting with Attorney Paz. I do not use or maintain Google Analytics reports in the ordinary performance of my employment with FSS. To the best of my knowledge, such Google Analytics reports are not used or maintained by FSS in the ordinary course of its business.

5.     I created the Google Analytics reports as requested prior to my meeting with Attorney Paz. Attorney Paz and I discussed such Google Analytics documents in connection with our meeting.

6.     I did not maintain physical copies of the Google Analytics reports I prepared for my meeting with Attorney Paz. I do not believe that I ever created physical copies of the Google Analytics reports. Although I do not recall the exact details of my meeting with Attorney Paz, I believe the review of such Google Analytics reports with Attorney Paz was conducted on a computer monitor.

7.     At the direction of FSS's Chief Restructuring Officer and at the request of FSS's attorneys in certain litigation, I have conducted a search of my computer files for the Google Analytics reports that I discussed with Attorney Paz. That search uncovered the Google Analytics reports from March 2022 attached to this Affidavit as Exhibit A (the "Attached Google Analytics Reports").

8.     I believe that the Attached Google Analytics Reports are the Google Analytics reports that I reviewed and discussed with Attorney Paz in connection with her preparation to testify as a corporate representative of FSS. I have no reason to believe that I discussed any other Google Analytics reports with Attorney Paz. I am not aware of any reason that the Attached Google Analytics Reports would be reflected in my computer files other than because those are the Google Analytics reports that I discussed with Attorney Paz at our meeting.

2

*[Remainder of Page Intentionally Left Blank]*

Executed on: 09/09/2022

_____
Blake Roddy

THE STATE OF TEXAS

COUNTY OF TRAVIS

     BEFORE ME, the affiant authority, this day appeared  Marion Michelle Fruge

who after being duly sworn, stated upon oath that the foregoing was true and correct. Sworn to before me

this  9  day of September, 2022.

_____
NOTARY PUBLIC STATE OF TEXAS

MARION MICHELLE FRUGE
Notary Public, State of Texas
Comm. Expires 05-26-2023
Notary ID 132028704

3

## EXHIBIT A TO RODDY DECLARATION

Attached Google Analytics Reports

Filed in The District Court
of Travis County, Texas

JUN 2 7 2022  CJ

At_____3:20____ᴘ.M.

Velva L. Price, District Clerk

### D-1-GN-18-001835

| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261ˢᵗ DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

### D-1-GN-18-001842

| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345ᵗʰ DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

## ORDER ON DEFENDANTS' MOTIONS TO MODIFY AND/OR CLARIFY

---

On this day, the Court considered Defendants' May 27, 2022 "Defendants' Partially Unopposed Motion to Correct/Modify 'Order on Attorney's Fees for Plaintiffs' Motion for Sanctions Regarding Corporate Deposition'" relating to a Sanctions Order issued on April 15, 2022. After considering the pleadings and evidence, and after holding a hearing on June 24, 2022, the Court makes the following findings:

1)      The Court finds that Defendants failed to meet their burden to show the Court's April 15ᵗʰ sanctions have a preclusive effect under *Braden*.

3)      The Court finds that pursuant to the default judgment, Alex Jones and Free Speech Systems, LLC are admitted to be alter egos. Even absent the default judgment, the Court notes that the record supports a finding that Alex Jones and Free Speech Systems, LLC

1

007800

are alter egos. The Court further finds that both Mr. Jones and Free Speech Systems, LLC are both "a party...whose conduct necessitated the motion" under Rule 215.1(d).

4)      Having considered Plaintiffs' evidence of attorney's fees, and having considered Defendants' April 15th objections to those fees, the Court continues to find that the fees are reasonable and the sanction is appropriate and just.

5)      The Court GRANTS Defendants' Motion with regard to D-1-GN-18-001835 (the *Heslin* matter) as it concerns Owen Shroyer.  Therefore, it is ORDERED that Mr. Shroyer has no obligation to satisfy the sanctions award of April 15, 2022. Defendants' Motions to Correct/Modify are in all other respects DENIED.

6)      Defendants are ordered to pay the sanctions within 20 days of this order.


Dated June 24, 2022.


Hon. Maya Guerra Gamble

2

1

DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  AUGUST 2, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES



          BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE



A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY MATT BLUMENTHAL

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS


                          Recorded and Transcribed by:
                          Debbie Ellis
                          Court Recording Monitor
                          400 Grand Street
                          Waterbury, CT  06702

007802

2

1          THE COURT:  We are on the record in the three

2     related Lafftery versus Jones matters.  Lead docket

3     number Waterbury CV186046436.  I'm going to ask counsel

4     to please identify themselves for the record.

5          ATTY. MATTEI:  Good morning, your Honor.  Chris

6     Mattei on behalf of the plaintiffs.  With me is my

7     colleague Matt Blumenthal.

8          THE COURT:  Good morning.

9          ATTY. PATTIS:  Norm Pattis on behalf of Mr. Jones,

10    Free Speech Systems, Judge.  Good morning.

11         THE COURT:  Good morning.

12         ATTY. WILLIAMS:  Good morning, your Honor.  John

13    Williams with a special appearance on behalf of

14    Mr. Jones.

15         THE COURT:  Good morning.  So I think I may be

16    able to avoid the first issue with respect to the

17    objection for the media request.  Mr. Ferraro, have you

18    seen any members of the media here today?

19         THE CLERK:  There's one but nobody who had

20    requested to record.

21         THE COURT:  Okay.  So in light of the fact that no

22    one is here, I can avoid that issue.

23         THE CLERK:  Your Honor, I apologize.  I do think

24    the Connecticut Public Radio person is on his way.  He

25    called me and asked about the address but I don't see

26    him yet.

27         THE COURT:  All right.  I'm not going to delay the

3

1    proceedings for that, so he will not be able to film

2    today.  Okay.

3         So this may be less than five minutes or we may be

4    here all day depending on how this works.  So my first

5    question and this is really a yes or a no or an I don't

6    know.  That's what I want.  I don't want long

7    explanations.  I'm not looking for argument, just a yes

8    or a no or I don't know.  I'll start with Attorney

9    Mattei and then I will ask Attorney Pattis.

10        So my question is, whether the bankruptcy court

11   granted a motion to extend the bankruptcy stay to Alex

12   Jones who has not filed for bankruptcy?  So Attorney

13   Mattei, yes, no or I don't know?

14        ATTY. MATTEI:  No, your Honor.

15        THE COURT:  Okay.  Attorney Pattis, do you agree

16   or disagree with that, sir?

17        ATTY. PATTIS:  Neither.  I don't know is my

18   answer.

19        THE COURT:  Okay.  I'm happy to pass the matter

20   since your client would know, I assume, since you're

21   representing your client.  Would you like me to pass it

22   for a few minutes and we can make a call?

23        ATTY. PATTIS:  He's testifying today.  I tried to

24   reach him yesterday, a per your order and was

25   unsuccessful.  I don't know if I can reach his trial

26   counsel but I'll try.

27        THE COURT:  I know that you had mentioned, I think

4

1        you had reached out to Mr. Stuckel actually since

2        Mr. Ferraro was getting back from his Italy trip, with

3        respect to having bankruptcy counsel use the link to

4        watch it on Microsoft Teams so, I assume, they're

5        available.

6              ATTY. PATTIS:  I assume so too.

7              THE COURT:  So maybe they would be the ones that

8        you could try to reach.  And I just simply want to know

9        whether the bankruptcy court granted a motion to extend

10       the bankruptcy stay to Alex Jones who, to my knowledge,

11       has not filed bankruptcy.

12             ATTY. PATTIS:  I will find out, Judge.

13             THE COURT:  Okay.  So we'll take a five-minute

14       recess.  Thank you.

15             (Whereupon, there was a recess.)

16             THE COURT:  You could be seated.  That was quick,

17       Attorney Pattis.

18             ATTY. PATTIS:  It still took two phone calls.

19             THE COURT:  And the answer?

20             ATTY. PATTIS:  No such motion was filed,

21       therefore, no such motion is granted.

22             THE COURT:  Thank you.

23             So the automatic stay that is in effect as to Free

24       Speech System, LLC who filed for bankruptcy, I believe,

25       on Friday, does not automatically extend to solvent

26       codefendants even where they are similarly legal or

27       factually, so and I don't see that any motion for stay

5

1    has been filed here.

2         I'm going to next turn to the, I have to say

3    untimely cross claim.  I will give Attorney Williams an

4    opportunity to be heard but I do want to start out by

5    saying that it is, everyone has their responsibilities

6    and obligations in this case.  And one of my

7    responsibilities is to maintain the orderly procedure

8    of the court docket and cases and to prevent any

9    interference with the fair administration of justice.

10        And my concern here, Mr. Williams, and I'll give

11   you as much time as you need to respond, is that the

12   cross claim is untimely, improper, and that it delays

13   the trial.  And so I am considering using my statutory

14   authority and inherent authority in sua sponte

15   dismissing or striking the claim at this time.  So I'm

16   happy to have you be heard.

17        I do want to mention one thing before I forget is

18   that your appearance, you're going to need to correct

19   your appearance because your appearance, you didn't use

20   the right form.  There's a specific form that has to be

21   used for limited appearance and that form has different

22   language on it then the standard appearance form that

23   we're all used to.  So, for example, in the limited

24   appearance form you only agree to accept service on

25   your particular issue.  So I do want to tell you that

26   right now you are in for Mr. Jones full force and that

27   you'll need to correct that probably by way of a motion

6

1          or whatever you think is appropriate.

2              But in any event, let me hear you with respect to

3          your cross claim.

4              ATTY. WILLIAMS:  Your Honor, your Honor has raised

5          as I understand it and I apologize my hearing leaves a

6          lot to be desired but as I understand it, your Honor

7          has raised the question of untimeliness and

8          specifically as I look at the docket, there's no notice

9          of closed pleadings.  The case is proceeding as I

10         understand it as a hearing in damages.  It seems to me

11         that the cross claim is completely collateral to that.

12         There should not in any way have an impact on this

13         trial and in deed is the sort of thing that might well

14         be deferred until the end of the trial.

15             So if I have done something, your Honor used the

16         word improper, if I did something that was improper, I

17         can only tell your Honor it was certainly not my

18         intention and I apologize to the court for any offense

19         that I have given to you or inconvenience to anybody

20         else.  It was in no way my intention.

21             THE COURT:  No offense taken but we just need to

22         follow the rules, that's all.  So I raise the issue of

23         the untimeliness being improper and form and the delay

24         that it would work on the trial.  Is there anything

25         else that you wanted to add?

26             ATTY. WILLIAMS:  Well, your Honor, I didn't

27         believe that it was untimely.  But obviously the Free

7

 1          Speech Systems I would have expected would oppose that

 2          if they felt that it was untimely.  Your Honor, as

 3          again said it's improper, I don't understand in what

 4          way it would be improper except that I didn't request

 5          your permission, which I didn't understand was required

 6          and I didn't believe it would have any impact on the

 7          case.

 8              I have read the motion to strike.  Counsel there

 9          indicates that --

10              THE COURT:  You're ahead of me Mr. Williams

11          because I haven't read it but --

12              ATTY. WILLIAMS:  I didn't hear you, your Honor.

13              THE COURT:  I said you're ahead of me because I

14          didn't read the motion to strike because it would now

15          require us to engage in pleading practice, request

16          to -- motion to strike, answer, special defenses,

17          motions for summary judgment and obviously we're down

18          for jury selection today.

19              ATTY. WILLIAMS:  Well, your Honor, all I can say

20          is that I did not intend any -- to do anything

21          improper.  I thought I was proceeding appropriately.

22          If I wasn't, I can only say that I am humbly apologetic

23          to the court.

24              THE COURT:  So I don't -- when I say untimely, and

25          please be seated if you like or remain standing

26          wherever you're most comfortable.  But when I say

27          untimely, it was filed well beyond the close of

8

1    pleadings deadline and the operative scheduling order.

2    I can't even find the last scheduling order, it's so

3    old.  And the deadline for the close of pleadings has

4    long passed.  It was not listed in the joint trial

5    management report which was ordered to be filed.  It

6    wasn't filed when the Jones defendants filed their

7    denials with their notice of defenses and their special

8    defenses and it's obviously filed on the eve of trial.

9        And when I say improper, I don't mean that you,

10   sir, did anything, you know, improperly to offend the

11   court by any means, so please don't think that.  But

12   what you would need to do with such a pleading is file

13   either a request to file the pleading, you know, beyond

14   the deadlines, file a motion with it, file a motion to

15   amend pleadings, something because otherwise, nothing

16   would prevent you from in the middle of evidence, you

17   or anyone else just dropping a pleading in the file and

18   expecting the parties and the court to adjudicate it.

19   So, we can't just have generally what we say with an

20   answer is an answer in cross claim or an answer in

21   counterclaim, certainly there was no answer here given

22   the default but there was the denial and the notice as

23   the defenses and the special defenses and I would have

24   expected it bare minimum to have it filed then.

25       And, you know, with respect to the delay, it would

26   delay the trial as it was filed five days before jury

27   selection.  So I have to say that Mr. Jones is not in

9

1    compliance with his obligations to plead in accordance

2    with our rules of practice and the scheduling order.

3         So pursuant to Connecticut General Statute 52-97

4    and Connecticut Practice Book Section 10-21, the cause

5    of action set forth in the untimely cross claim cannot

6    conveniently be heard with the main complaint.  And the

7    issues raised on the cross claim, even had the cross

8    claim been timely and properly filed, do not arise out

9    of the transaction which is the subject of the

10   plaintiff's complaint, which is required by Practice

11   Book 10-10.

12        For example, one of the basis for relief is an

13   injunction requiring someone from Free Speech Systems

14   to attend the trial.  So in short, it would be

15   impossible to hear and adjudicate the cross claim given

16   that jury selection starts today as it cannot

17   conveniently be heard with the main complaint.

18        So for these reasons, the court directs that the

19   cross claim be deleted or dismissed from this case and,

20   of course, nothing prevents Mr. Jones from filing a

21   separate action and if that does occur in the normal

22   course of business, the parties will be at notice that

23   the court will exercise jurisdiction over that matter

24   and bring it to this docket.  That is the most

25   efficient way to proceed.  But it will not be part of

26   this present case.

27        ATTY. WILLIAMS:  Thank you, your Honor.

10

1          THE COURT:  You're welcome.

2          So I have a couple of housekeeping matters.  I was

3     happy to see that you could agree on the number of

4     alternates which I understand was four and that you had

5     a total of five challenges, but I wasn't sure how you

6     were breaking it down.  Are you doing four and one or

7     three and two?

8          ATTY. MATTEI:  We agree that they be unrestricted,

9     your Honor.

10         THE COURT:  I will not, that I will not agree too.

11    I stick with the statute.  I like that statute.

12         ATTY. MATTEI:  My proposal then, Judge and I --

13         THE COURT:  Why don't you discuss it off the

14    record and then let me know if you have an agreement on

15    it.  Okay.  Thank you.

16         Mr. Pattis, there was one and I didn't pull it up,

17    but there was going to be one late motion in limine.

18    You had an attorney in your office who was not

19    available to file it due to some health issues.  And

20    I'm not sure if that was a motion in limine on behalf

21    of Mr. Jones and Free Speech Systems or just Free

22    Speech Systems because if it is on behalf of Mr. Jones,

23    it's well past filing, so what would you suggest?

24         ATTY. PATTIS:  It was both, but we're not going to

25    file it now.

26         THE COURT:  Okay.

27         ATTY. PATTIS:  He did not get out of the hospital

007811

11

```
 1      yet.
 2             THE COURT:  Sorry to hear that.
 3             ATTY. PATTIS:  Yeah, as are we.
 4             Given the law of the case and the way things seem
 5      to be evolving given the motion practice we can address
 6      that interest in the other motions that are to be
 7      argued later.
 8             THE COURT:  Very good.
 9             ATTY. PATTIS:  So there will not be another --
10             THE COURT:  And then I looked last night and I
11      thought yesterday was the deadlines for the replies to
12      the objections to the motions in limine, I saw the
13      plaintiffs' replies, are you not filing replies or are
14      you planning on filing them today because they were due
15      yesterday?
16             And again, I don't know if they're just are
17      directed to Free Speech Systems and of course we're not
18      adjudicating that now.
19             ATTY. PATTIS:  I have been advised by bankruptcy
20      counsel that the stay binds my hands as to Free Speech
21      Systems, and that I cannot act on his behalf it would
22      act as his peril.  They would pertain to both, so I
23      took the position that the stay was applicable as to
24      that.  I understand -- I'm here as to your order and I
25      don't mean to be defiant, but I've been told I act at
26      my peril if I act as to Free Speech Systems.
27             THE COURT:  So you don't want to act on behalf of
```

12

1    Mr. Jones in filing replies since you do represent

2    Mr. Jones and Mr. Jones is a nondebtor and there's no

3    stay at this point?  Listen, I'm not saying that at any

4    point the bankruptcy counsel can't file a motion in

5    bankruptcy court and have the stay extended to

6    Mr. Jones but right now, you're telling me that's why I

7    asked, that's why I started --

8         ATTY. PATTIS:  No, I understand.

9         THE COURT:  -- but there is no stay that extends

10   to Mr. Jones.

11        ATTY. PATTIS:  But there is as to a party that I

12   represent so I feel like I have a conflict at this

13   point, because I'm told I can't act with respect to one

14   and should act with respect to others and now I'm in a

15   position where I've got to parse what to do with

16   respect to each and that strikes me as that sort of

17   1.73 issue that I would need a little bit more time,

18   not an infinite amount of time to address.

19        And, you know, the issue you raised about whether

20   they should file the stay to extend to Mr. Jones that

21   hadn't occurred to me, I'm not a bankruptcy -- I had

22   altercate hands.

23        THE COURT:  Well, I think the law is clear that

24   when one defendant in a case files for bankruptcy it

25   doesn't automatically extend to all other defendants

26   even if they are similarly factually or legally and you

27   would have to move in bankruptcy court to extend the

13

1    stay.

2         Now last time we had this issue when Info Wars and

3    Prison Planet maybe, when they filed for bankruptcy, we

4    had the exact same situation and I believe I entered a

5    very similar order in response to that and then I think

6    what happened and you correct me if I'm wrong, I think

7    that you removed the remaining case to bankruptcy

8    court.  So that it wasn't so much --

9         ATTY. PATTIS:  I understand that.

10        THE COURT:  So here I didn't see and I checked

11   before I came out on the record, I didn't see any

12   removal to bankruptcy court of the pending claims and I

13   didn't see anything about a stay.

14        ATTY. PATTIS:  I was instructed not to file

15   removal papers by bankruptcy counsel for reasons of

16   their own that I didn't inquire as to.  And so I am

17   left in this awkward position now where if we proceed

18   as to Jones but not as to Free Speech that operates

19   almost constructively as a severance and I believe the

20   law is clear that a severance that adversely affects a

21   debtor is prohibited once the debtor is in bankruptcy.

22        So it's my request that and it's my understanding

23   that, I don't know if it's Houston, I don't recall what

24   city in Texas, in the Texas bankruptcy court there's a

25   hearing Friday morning with respect to the plaintiff's

26   emergency motion for relief from stay.

27        THE COURT:  But that emergency motion is a relief

14

1    from stay as to the debtor, Free Speech Systems --

2         ATTY. PATTIS:  Right.

3         THE COURT:  -- we are all on the same page here.

4    Everyone is on the same page.  They're under federal

5    bankruptcy law which, I believe me, respect.  There is

6    an automatic stay as to the debtor, Free Speech

7    Systems, LLC.  If you told me this is why I started

8    asking this question, if you said to me, yes -- because

9    I tried to look last night and I could not access the

10   through Pacer the records or I would have cancelled

11   this if I saw that it was extended.  As I'm

12   understanding it, clearly there's no doubt that there

13   was no extension of that stay to the solvent remaining

14   defendant Mr. Jones, nor has such a motion been filed,

15   so there is an active claim right now against Alex

16   Jones.  There's causes of action and we're down for

17   jury selection.

18        So, I can't, you know, I can't solve for you what

19   instructions you're getting from your client or

20   bankruptcy counsel but I have a remaining claim, but I

21   understand from what you're telling me it's your

22   position, well you can tell me your position why don't

23   you.

24        ATTY. PATTIS:  I'm asking for a recess until a

25   motion is heard on Friday.  I find myself in a position

26   where I cannot satisfy my obligations to both clients.

27   Mr. Jones expects a defense as does Free Speech.

007815

15

1            I am told Free Speech the action will not proceed

2       as to they may or may not have identical interest in

3       every instance but I don't see how I can proceed as to

4       one client and not the other.

5            THE COURT:  So and then let's just hypothetically

6       say that we either didn't pick until Friday and Friday

7       the motion is heard and the motion it's a motion to --

8            ATTY. PATTIS:  For relief from stay.

9            THE COURT:  Okay, let's say that --

10           ATTY. PATTIS:  That's my understanding of it.  I

11      haven't filed it.

12           THE COURT:  So let's say that's denied and so the

13      stay is in effect as to Free Speech System.

14           ATTY. PATTIS:  At this point, Judge, I would be in

15      touch with bankruptcy counsel saying you left me

16      hanging here without a motion for an application as to

17      Jones or a removal, the trial court takes the position

18      that its capable -- that as a matter of law it would be

19      appropriate to proceed with Mr. Jones and I might have

20      to seek independent ethic's counsel advice because I'm

21      starting to feel a 1.73 (inaudible) because I'm now in

22      a position where I can meet the needs of one client but

23      not the other in a proceeding and I've not been in this

24      position before.

25           THE COURT:  Attorney Mattei.

26           ATTY. MATTEI:  Your Honor, what I see Attorney

27      Pattis be doing is asking for making an oral motion for

16

1       continuance for jury selection.  We oppose that motion

2       for continuance.  Mr. Jones is more than adequate

3       represented in bankruptcy court in Houston.  They are

4       well aware of this jury selection.  They actually filed

5       a motion to lift the stay as to the ongoing trial in

6       Texas.  And so they're well aware of the implications

7       that --

8           THE COURT:  So that -- excuse me.  The motion to

9       lift the stay was as to the debtor?

10          ATTY. MATTEI:  As to the debtor Free Speech

11      Systems.  And so they're more than aware of occasions

12      of not moving the stay with respect to Mr. Jones,

13      they've not done that knowing that jury selection is

14      scheduled for today.

15          The bankruptcy, which was filed on Friday,

16      Mr. Pattis has had the weekend and now Monday to

17      investigate the extent to which any conflict prevents

18      him from proceeding today on behalf of Mr. Jones.  But

19      the facts of the case establishes that there is no

20      conflict and there can be no conflict because Mr. Jones

21      and Free Speech Systems are all egos to one another.

22      They have been represented by the same counsel

23      throughout.  There's no suggestion or evidence that any

24      position taken by Mr. Jones here would be adverse to a

25      company that he 100 percent controls, Free Speech

26      Systems.

27          And so there's just no basis to grant a

007817

17

1       continuance here where Mr. Jones is the one that has

2       manufactured this situation on the eve of jury

3       selection to prevent us from going forward.  So we want

4       to proceed today with jury selection.

5            THE COURT:  So here's what I would say, we are

6       going to proceed but if and when a motion is granted in

7       the bankruptcy court, that extends the stay to

8       Mr. Jones, the court needs to be notified immediately

9       and we will cease activity because that would then stay

10      the claim against Mr. Jones as well.  But short of

11      that, listen I suppose Mr. Jones could file for

12      bankruptcy and that would stay the rest of the case

13      under federal law or the bankruptcy court can extend

14      the stay to Mr. Jones.

15           So if either one of those happens, I'm sure you'll

16      let me know immediately and we will stop our

17      proceedings.

18           All right.  So we're going to start jury selection

19      at 10:00.  Just as a reminder please no snapshots or

20      screen shots or whatever you want to call it of the

21      jury confidential jury questionnaires.  Anyone who --

22      so if your clients are here at any point either during

23      jury selection or trial the trial will be in the

24      courtroom next door.

25           But during jury selection and during trial anyone

26      who's seated at counsel table or in the well of the

27      courtroom would have to wait for a recess to leave or

007818

18

1    you can leave in between jurors if you understand what

2    I'm saying.  I don't want people in the well of the

3    courtroom getting up and leaving in the middle of the

4    voir dire, if they're in the well of the courtroom.

5    Now people in the gallery they can come and go as they

6    please but for trial as well, if we're not in a recess

7    any of your clients or other lawyers that are in the

8    well of the courtroom would have to wait for recess.  I

9    don't want people coming and going.  But if there's any

10   believe me any need for a quick break because someone

11   needs to leave or you have an emergency or whatever,

12   I'm happy to take another recess, so you just let me

13   know and ask for a recess and I'm sure we'll take a

14   recess.  I just don't want any commotion.

15        During the -- I am going to remain on the bench at

16   least for the immediate future.  I don't have any other

17   conflicts right now.  I don't know if that's going to

18   remain the whole time but the juror, potential juror

19   will sit next to me up here.  I don't know if you want,

20   I guess, Mr. Ferraro, maybe we can move the lectern up

21   for the lawyers.

22        THE CLERK:  Wherever counsel wants to.

23        THE COURT:  Why don't you discuss where you want

24   it but I'm telling you now I want you to give the

25   jurors space.  I don't want you leaving that lectern

26   area and clouding the jurors and I'm going to say the

27   same thing for witnesses as well.  So I don't want

19

1      anybody invading their space.

2          So here's what I would say on the replies to the

3      motions in limine by Mr. Jones.  If Mr. Jones wishes,

4      he's not ordered to, he doesn't have to but if he

5      wishes to file replies to the motions in limine, and

6      that was due yesterday, Mr. Jones will have until the

7      end of business tomorrow to file his replies if he

8      wants to.

9          I'm prepared to go on the introduction to the

10     panel.  I have, thank you, I have all the information

11     that you gave us with respect to the parties and the

12     witnesses and so forth.  So I think for the

13     introduction to the panel, you're going to be very

14     brief.  You're just going to simply say who you are and

15     what other lawyers are with you and if you want to

16     mention if you have clients here or not, that's fine.

17     But I don't want to hear anything beyond that, no

18     description of the case.  It's going to be very very

19     brief otherwise I am going to cut you off.  That's not

20     the opportunity to start any further details.

21         All right.  So we will be back right at 10:00 p.m.

22     for jury selection.

23         ATTY. MATTEI:  Your Honor, I'm sorry.  One

24     housekeeping matter.  I sent to Mr. Stuckel this

25     morning a proposed revised description of the case for

26     the court to consider giving to the jury in light of

27     the fact we now only have one defendant for whom we are

20

1      picking.  The initial jointly agreed upon statement

2      referred to both defendants and I sent the revision to

3      Mr. Stuckel.  Attorney Pattis I spoke to him

4      beforehand, he indicated that he objects so I just want

5      to flag the court given that right now we are only

6      picking with respect to Mr. Jones.

7          THE COURT:  Well, I planned on deleting Free

8      Speech Systems in the language as a defendant.  I

9      understand that you're objecting basically, Attorney

10     Pattis, even going forward into the proceeding and such

11     but do you have any suggestions on the proposed

12     language or not?

13         ATTY. PATTIS:  Yes.  I don't believe the court can

14     refer to Free Speech Systems.  I don't think the court

15     can refer to Mr. Jones as acting through Free Speech

16     Systems without adversely affecting Free Speech Systems

17     in violation of the stay, so that's the basis of my

18     disagreement.

19         If the court's going to proceed as to Mr. Jones I

20     think it should delete reference to Free Speech Systems

21     from the proposed joint statement.

22         ATTY. MATTEI:  I just in response regardless of

23     Free Speech Systems status that fact is established as

24     a result of fault not, so there's not any question that

25     that is true to be evidence in the case regardless of

26     whether Free Speech --

27         ATTY. PATTIS:  That will be a litigated issue

21

1        whether he'll be evidence, we think any evidence to

2        that effect would be in violation of the stay because

3        it acts to the detriment of Free Speech Systems while

4        it's --

5            THE COURT:  I think we can be very clear in our

6        preliminary instructions and our jury instructions that

7        this case is proceeding only as to Mr. Jones

8        individually so I'm not concerned that they're going to

9        be confused.  So if you can't come up with your own

10       language I'm more than capable of coming up with my own

11       language.  Okay.

12           ATTY. WILLIAMS:  Your Honor, may I be excused?

13           THE COURT:  Well, Mr. Williams, sure but you're

14       going to have to file --

15           ATTY. WILLIAMS:  A motion to withdraw.

16           THE COURT:  Unless you can somehow assure me as an

17       officer of the court that Mr. Jones retained you solely

18       for the purposes of the cross claim and not for any

19       other reason.  Because I explained to you the issue.

20           ATTY. WILLIAMS:  I understand.

21           THE COURT:  And I don't want to be hasty and make

22       mistakes and informally let you out of the case if in

23       fact that's not true.

24           ATTY. WILLIAMS:  Your Honor, I assure you as an

25       officer of the court that that was the sole purpose

26       that he retained me and I have no other interest in

27       this case whatsoever.

22

1          THE COURT:  All right.  Do you agree with that,

2     Attorney Pattis?

3          ATTY. PATTIS:  I reviewed the papers and I agree.

4          THE COURT:  I'm sorry.

5          ATTY. PATTIS:  I've reviewed the engagement

6     letter, I agree that there's no ambiguity with respect

7     to that.

8          THE COURT:  So your client, Mr. Jones, is not

9     going to object if I informally let Mr. Williams out.

10         ATTY. PATTIS:  On behalf of Mr. Jones, I'll make

11    that representation.

12         THE COURT:  And Attorney Mattei, you don't want to

13    be heard on this, correct?

14         ATTY. MATTEI:  No, your Honor.

15         THE COURT:  All right.  So ordered.

16         ATTY. WILLIAMS:  Thank you, your Honor.

17         THE COURT:  We'll take a recess.

18         (Whereupon, there was a recess.)

19       *           *           *           *           *

20

21

22

23

24

25

26

27

007823

23

```
 1
     DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION
 2
     ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
 3   v.                               :  AT WATERBURY, CONNECTICUT
     ALEX EMRIC JONES                 :  AUGUST 2, 2022
 4

 5   DKT NO:  X06-UWY-CV186046437-S

 6   WILLIAM SHERLACH
     V.
 7   ALEX EMRIC JONES

 8
     DKT NO:  X06-UWY-CV186046438-S
 9
     WILLIAM SHERLACH
10   V.
     ALEX EMRIC JONES
11
                       E L E C T R O N I C
12                 C E R T I F I C A T I O N

13          I hereby certify the electronic version is a true and

14   correct transcription of the audio recording of the

15   above-referenced case, heard in Superior Court, G.A. 4 of

16   Waterbury, Connecticut before the Honorable Barbara N. Bellis,

17   Judge, on August 2, 2022.

18

19          Dated this 2nd day of August, 2022 in Waterbury,

20   Connecticut.

21

22

23

24          _____

25                     Debbie A. Ellis
                    Court Recording Monitor
26

27
```

007824

## R. J. Shannon

**From:**          R. J. Shannon
**Sent:**          Monday, August 8, 2022 7:09 PM
**To:**            Martin, Jarrod B.; rbattaglialaw@outlook.com; Kyung S. Lee
**Subject:**       Re: FSS

Jarrod—

Your clients have alleged that PQPR was an insider in the TUFTA action, but below are the bases for PQPR being an insider that we have identified. There may be others, but I don't think that PQPR disputes that it is an insider so I'm not going to try to parse them.

### Way 1 (Statutory):

1) Bankruptcy Code § 101(31)(E) includes in the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Bankruptcy Code § 101(2)(B) in the definition of "affiliate" a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, . . . by an entity that directly or indirectly owns controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . .";

3) Alex Jones indirectly owns or controls 20% or more of PQPR and directly owns 20% or more of the Debtor;

4) Therefore, PQPR and the Debtor are affiliates and insiders.

### Way 2 (Statutory):

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Alex Jones is an affiliate of Free Speech Systems;
    a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
    b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is an insider to Alex Jones.
    a. Bankruptcy Code § 101(2)(B) provides that an "affiliate" also includes a "corporation 20% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, but the debtor";
    b. Alex Jones indirectly owns or controls 20% or more of the outstanding voting securities in PQPR and is thus an affiliate;

4) Therefore, PQPR is an affiliate and insider of the Debtor.

### Way 3 (Non-Statutory)*:

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

1

007825

2)  Alex Jones is an affiliate of Free Speech Systems;
   a.  Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
   b.  Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3)  PQPR is controlled by Dr. David Jones;

4)  Dr. David Jones is Alex Jones' father, and thus an insider of Alex Jones if he was a debtor under Bankruptcy Code § 101(31)(A)(i);

5)  This is substantially similar to statutory insiders under the Bankruptcy Code and PQPR is therefore a non-statutory insider.

*Bankruptcy Code § 1182(1)(A) does not except only the debt to *statutory* insiders from the cap.

Your clients may just be looking for a way to challenge PQPR's lien on the grounds that it is avoidable (I don't think that gets around the need for permission to use cash collateral prior to that avoidance but good for you if you are successful) but you should think long and hard about where the path leads if you are looking for a ruling that PQPR is ***not*** an insider. Plaintiffs in the TUFTA action have already quixotically asserted and put on evidence in the Heslin/Lewis trial that FSS was solvent to the tune of at least $135 million, which I'm sure had Steve Lemmon jumping for joy. If you get a finding that establishes that PQPR is not an insider, we lose the extended preference lookback period w/r/t PQPR and make getting its lien avoided more of an up-hill battle. An unavoidable PQPR lien also opens up paths for Alex Jones to terminate his employment with the Debtor, force it into liquidation, credit bid for the assets, and continue on at a different entity to the detriment of the bankruptcy estate and your clients.

Thanks,
R. J.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Monday, August 8, 2022 at 4:41 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

Following up.

Also, Ray, discovery is about to be sent to FSS and PQPR. I think everyone is aiming for depositions for august 19 and 22. Can we agree that discovery will be produced by August 16? Call me if you want to discuss. 832-580-6261. If I don't hear from you I'll call you tomorrow.

Get Outlook for iOS

---

**From:** Martin, Jarrod B.
**Sent:** Sunday, August 7, 2022 2:15:36 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>; rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>; Kyung S.

007826

Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

RJ, a  follow-up question: Could you explain how PQPR is a statutory insider or affiliate for purposes of the sub v debt limit?

Jarrod B. Martin
Shareholder

Chamberlain Hrdlicka
Attorneys at Law

Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Saturday, August 6, 2022 8:07 PM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

**\*\*EXTERNAL EMAIL\*\***

---

Jarrod—See attached. Kelly Jones' interest was apparently transferred to Alex Jones in connection with their divorce, but we don't have a copy of the divorce decree.

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Saturday, August 6, 2022 at 7:16 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

Thanks. Can you send me the relevant corporate documents for the Debtor (LLC agreement, etc.)?

Jarrod B. Martin
Shareholder

Chamberlain Hrdlicka
Attorneys at Law

Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Friday, August 5, 2022 10:51 AM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

**\*\*EXTERNAL EMAIL\*\***

---

007827

Jarrod,

See the attached employment agreement between the Debtor and Alex Jones.

Thanks,
R. J.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Sent:** Thursday, August 4, 2022 2:29 PM
**To:** rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FSS

Can you guys send me the April 2022 Jones employment agreement?

Jarrod

Get Outlook for iOS

007828

## R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Thursday, June 30, 2022 2:57 PM |
| **To:** | Kyung S. Lee; MSchwartz@schwartzassociates.us; rbattaglialaw@outlook.com; jshulse@chartcapitalmgmt.com; sjordan@jhwclaw.com |
| **Subject:** | RE: A few questions |
| **Attachments:** | Rethinking Lawyer Ethics to Allow the Rules of Evidence Rules of.pdf |

My research into the case law and relevant ethical rules is that we are **_not required_** to delete or destroy the additional documents, which seems to just be the P&L. In light of the pending TUFTA action, I think we **_should not_** destroy the documents because it would arguably be spoilation of evidence.

(1) The documents were not wrongfully obtained.
    a. Melinda Flores—an FSS employee—provided these documents in response to the request of an FSS consultant. She had access to this information.
    b. This does not appear to be a misappropriation of a trade secret because PQPR did not take any actions to keep the information secret *from FSS* and it does not have independent value derived from being kept secret. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6).
    c. Factors for whether something is a trade secret are according to *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009):
        i. The extent to which the information is known outside of the business;
        ii. The extent to which it is known by employees involved in the business;
        iii. The extent of measures taking to guard the secrecy of the information;
        iv. The value of the information to the business and to its competitors;
        v. The amount of effort or money in developing the information; and
        vi. The ease or difficulty with which the information could be properly acquired or duplicated by others.
    d. Use of a trade secret requires attempting to use the trade secret for profit from commercial use. *Atl. Richfield Co. v. Misty Prods.*, Inc., 820 S.W.2d 414, 422 (Tex. App. 1991)
    e. There is no implied contract re confidentiality under Texas law. *See Sci. Mach. & Welding, Inc. v. Rose*, No. 03-20-00564-CV, 2022 Tex. App. LEXIS 1884, at *14 (Tex. App.—Austin Mar. 23, 2022)

(2) The documents are not privileged vis-à-vis FSS.
    a. I don't see any applicable privilege here. These were not created for litigation or contain attorney-client statements.
    b. Lemmon might argue that they are privileged w/r/t to other parties as a trade secret, but that's an issue for another time addressed in my recommendation below.
        i. Texas Rule of Evidence 507 allows a person to prevent other persons from disclosing trade secrets.
        ii. Lemmon could assert that privilege if FSS was required to disclose the Income Statement to someone else and argue that it is a trade secret. A holder of a trade secret may divulge information to a limited extent without destroying its status as a trade secret. *Schwimmer v. Presidio Indus. LLC*, No. 3:10-CV-2213-P, 2011 U.S. Dist. LEXIS 161754, at *16 (N.D. Tex. Feb. 11, 2011).
        iii. Texas Rule of Evidence 511(b)(2) and Rule of Civil Procedure 193.3(d) would prevent a waiver of privilege if made in discovery.

(3) The applicable ethical rules do not require destruction of the documents.

1

    a. Attached law review article details the changes to the ABA model rules that the Texas courts have used as persuasive authority before.

    b. The Texas Disciplinary Rules do not contain anything about this and the Texas Rules of Evidence merely state that inadvertent disclosures maintain their privilege.

(4) The applicable case law does not require destruction of the documents.

    a. There is some caselaw that allows for (but does not require) the disqualification of attorneys where they have and use **_privileged_** information obtained by their client. *See In re Meador*, 968 S.W.2d 346, 351 (Tex. 1998).

        i. The Texas Supreme Court identified the following factors for disqualification for use of privileged documents outside of formal discovery: 1) Whether the attorney knew or should have known the material was privileged; 2) The promptness with which the attorney notices the opposing side that he or she has received the its privileged information; 3) The extent to which the attorney reviews and digests the privileged information; 3) The significance of the privileged information; 4) The extent to which the movant may be at fault for the unauthorized disclosure; 5) The extent to which the non-movant will suffer prejudice from the disqualification.

        ii. Each of these factors other than No. 3 is in our favor even if it is technically privileged for one reason or another.

    b. Further, those cases talk about harm whereas here the document should be discoverable in any dispute where they are relevant.

    c. Texas Rules of Evidence do not apply since the document was not sent inadvertently for was it in response to a discovery request. Melinda must have intended to send these exact documents but apparently just did not listen to what David said.

I would tell Lemmon that our research indicates that we are not required to destroy the additional document and we are concerned that doing so may be spoliation of evidence regarding the TUFTA action but **_(a)_** we are happy to hear from him to reconsider if we are missing something, **_(b)_** we will hold the information confidential subject to obtaining the document in discovery if there is a dispute with PQPR, and **_(c)_** we will inform Lemmon if we are compelled to produce it to a third party so that PQPR can assert any relevant privilege against production by FSS. Splits the baby nicely, and if we are right that it is not privileged as a trade secret, we would be able to obtain in discovery.

What do you all think?

--

R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Kyung S. Lee <klee@shannonleellp.com>
**Sent:** Thursday, June 30, 2022 12:35 PM
**To:** MSchwartz@schwartzassociates.us; rbattaglialaw@outlook.com; R. J. Shannon <rshannon@shannonleellp.com>; jshulse@chartcapitalmgmt.com; sjordan@jhwclaw.com
**Subject:** Re: A few questions

Let's give everyone a little time to think about the issues. I propose we have a Zoom somewhere between 3-6 depending on folks' schedules.

For right now, I will propose a Zoom at 3PM CST today among us. If anyone has a conflict, please speak up. Marc, can you circulate Zoom Room for 3 now and if people have conflicts we can use that same Zoom Room for a different time that fits everyone's schedule?

007830

**Kyung S. Lee**
Partner
**Shannon & Lee LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Cell: (713) 301-4751
klee@shannonleellp.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Thursday, June 30, 2022 at 12:32 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, R. J. Shannon (FIRM) <rshannon@shannonleellp.com>, Jeffrey Shulse <jshulse@chartcapitalmgmt.com>, Shelby Jordan <sjordan@jhwclaw.com>
**Subject:** RE: A few questions

Should we Zoom?

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Thursday, June 30, 2022 12:29 PM
**To:** rbattaglialaw@outlook.com; R. J. Shannon (FIRM) <rshannon@shannonleellp.com>; Marc Schwartz <MSchwartz@schwartzassociates.us>; Jeffrey Shulse <jshulse@chartcapitalmgmt.com>; Shelby Jordan <sjordan@jhwclaw.com>
**Subject:** Re: A few questions

Gentlemen: Lemmon is not happy these documents were sent to us. Apparently, David Jones only authorized the balance sheet of PQPR to be sent to us. Here are PQPR's instructions on how to handle these erroneously produced documents. I have not encountered this situation before, so I need guidance or a little research on this point to make sure we are doing what is right for Schwartz and FSS.

**Kyung S. Lee**
**Shannon & Lee LLP**
Cell: 713-301-4751
klee@shannonleellp.com

---

**From:** Stephen Lemmon <lemmon@slollp.com>
**Date:** Thursday, June 30, 2022 at 12:24 PM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Cc:** rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, R. J. Shannon (FIRM)

<rshannon@shannonleellp.com>
**Subject:** Re: A few questions

This is a mistake.  The documents need to be returned and all copies destroyed.

Sent from my iPhone


On Jun 30, 2022, at 12:14 PM, Kyung S. Lee <klee@kslpllc.com> wrote:


Please review and let's chat.

Kyung S. Lee
Kyung S. Lee PLLC
Partner
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
Mobile (713) 301-4751
Klee@kslpllc.com
www.kslpllc.com



---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Sent:** Thursday, June 30, 2022 12:05:50 PM
**To:** Kyung S. Lee <klee@kslpllc.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FW: A few questions


---

**From:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
**Sent:** Thursday, June 30, 2022 10:47 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Subject:** Fwd: A few questions

These don't make any sense to me … there are some huge numbers on the balance sheet that net against other huge numbers … I'm digging into it

Sent from my iPhone

Begin forwarded message:

> **From:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
> **Date:** June 30, 2022 at 10:36:42 AM CDT
> **To:** Jeffrey Shulse <jshulse@outpostcc.com>
> **Subject: Fwd: A few questions**


Sent from my iPhone

4

007832

Begin forwarded message:

> **From:** Melinda Flores <melinda@freespeechsystems.com>
> **Date:** June 30, 2022 at 9:56:46 AM CDT
> **To:** Jeffrey Shulse <jshulse@chartcapitalmgmt.com>
> **Cc:** Melinda Flores <melinda@freespeechsystems.com>
> **Subject: Re: A few questions**
>
>
> Jeff,
> Attached is the payroll information you requested as well as the PQPR
> reports.  You can call me at 11....512-497-0948
> Thanks,
>
> Melinda
>
> ----- Original Message -----
> From: "Jeffrey Shulse" <jshulse@chartcapitalmgmt.com>
> To: "Melinda Flores" <melinda@freespeechsystems.com>
> Sent: Wednesday, June 29, 2022 7:25:26 PM
> Subject: Re: A few questions
>
> Yes ... sounds good
>
> Sent from my iPhone
>
>> On Jun 29, 2022, at 6:14 PM, Melinda Flores
>> <melinda@freespeechsystems.com> wrote:
>>
>> This will be fine, Jeff.  Will 11 am work for you?  I can
>> send some reports over to you before then for review if
>> you'd like.
>>
>>
>> Melinda
>>
>>
>> ----- Original Message -----
>> From: "Jeffrey Shulse"
>> <jshulse@chartcapitalmgmt.com>
>>
>> To: "Melinda Flores"
>> <melinda@freespeechsystems.com>
>>
>> Sent: Wednesday, June 29, 2022 9:54:53 AM
>>
>> Subject: Re: A few questions
>>
>>
>> And my first day was 6/21 ... just fyi
>>
>>
>> Sent from my iPhone

5

On Jun 29, 2022, at 9:52 AM, Jeffrey Shulse <jshulse@chartcapitalmgmt.com> wrote:


If you want to talk remotely tomorrow … I don't want you to change everything around for me … and I don't have a need to drive to Austin just to drive to Austin


Remote tomorrow is fine with me if it works for you?


Sent from my iPhone


> On Jun 29, 2022, at 9:44 AM, Melinda Flores <melinda@freespeechsystems.com> wrote:

Hi Jeff,

Sorry I missed you yesterday.  I wasn't aware you were coming in and I had some back to back up appointments in the afternoon.

I received your paperwork and all looks good.  We didn't get the background check in time to include you in this Friday's payday

6

007834

so your first payday will
be 07/15/22 and will
cover the pay period
that started Monday
06/27/22 and ends
07/10/22 in addition to
the last couple of days
of the period that just
ended.  Your first pay
will be a live check that
will need to be
deposited.  Your direct
deposit will start on the
following pay period.

I spoke to Dr. Jones
yesterday and gave me
the go ahead and give
you financials for
2021.  I can have that
ready for you tomorrow
and we can actually sit
in the conference room
and remote in to
QuickBooks if need be.

I can also provide the
payroll information for
you as well.

I usually work remotely
on Tuesdays and
Thursdays but since
you're coming in
tomorrow I'll be here in
the office.  More likely I
will work from home on
Friday this week.

Thanks,

Melinda

----- Original Message --
---

From: "Jeffrey Shulse"
<jshulse@chartcapitalm
gmt.com>

To: "Melinda Flores"
<melinda@infowars.co
m>

Sent: Tuesday, June 28,
2022 2:23:06 PM

Subject: A few
questions

Melinda,

I believe you are out
this afternoon... so a
few quick items

Did you get my new
hire paperwork I put in
your basket last
week?  Any questions
or issues ?  When is
payroll ?  I assume we
are paid on Friday's ?

I need financial info for
PQPR ... Bob Roe is
going to give you the
"all clear" ... but I need
to sift through the last
12 months of info to
figure out some costs ...
say 1/1/2021 to
12/31/21 and maybe
Q1 of 2022?  Again, I
need to do some cost
analysis to figure out
some fair revenue
sharing percentages

It would also be helpful
to see ADP payroll info
for the last 6-8 months
... how about 10/1/21
to 5/31/22?  I need to
put together an org
chart by company that

8

actually pays the salary, what company they actually do work for ... FSS or PQPR and what "department" they work in ... if you already have something like that .... It would be a helpful start

I will be back in Austin on Thursday morning... what is your schedule for the next few days ?

Thanks

Jeff Shulse

Sent from my iPhone

007837

**R.J. Shannon**

| | |
|---|---|
| **From:** | R.J. Shannon |
| **Sent:** | Wednesday, May 11, 2022 11:44 AM |
| **To:** | Max Beatty; avi.moshenberg@mhllp.com |
| **Cc:** | Kyung Lee; Adam Rodriguez |
| **Subject:** | InfoW - Proposed Stipulation [Subject to FRE 408] |
| **Attachments:** | IW - Draft Stipulation re Texas Plaintiffs 4867-8066-2303 v.1.docx |

[Subject to FRE 408]

Max,

As discussed yesterday, attached is a draft stipulation that we believe would resolve all the disputes between the parties without having to deal separately in each adversary proceeding. Please let us know your thoughts and any comments.

In addition to stating that your clients are relying on the assets disclosed in the Schedules, we made the non-existence of any material undisclosed assets an express requirement for the release. Hopefully, that will alleviate any concern you have that Jones of FSS later try to claim that something was property of one of the Debtors when the stipulation was entered.

Feel free to share with your counterparts for the Connecticut Plaintiffs. We made the language general enough that it should just be a matter of swapping out names.

Thanks,
R. J.

**R. J. Shannon**
Associate
**Parkins Lee & Rubio LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Direct: (713) 715-1660
Cell: (512) 693-9294
rshannon@parkinslee.com
www.parkinslee.com

1

007838

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 22-60020 |
| | ) | |
| INFOW, LLC, *et al.*, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

## STIPULATION AND ORDER

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine

(collectively, the "Texas Plaintiffs" and together with the Debtors, the "Parties") hereby enter into

this stipulation (the "Stipulation") and agree as follows:

WHEREAS, on April 18, 2022 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under subchapter v of chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy

Court");

WHEREAS, prior to the Petition Date, the Texas Plaintiffs commenced state-court actions

against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free*

*Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District

Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech*

*Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas;

***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

*Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; **_(d)_** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and **_(e)_** *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC,  JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "State Court Litigation");

WHEREAS, one or more of the Debtors removed or attempted to remove the lawsuits comprising the State Court Litigation to the U.S. Bankruptcy Court for the Western District of Texas (the "Removal Court");

WHEREAS, the Texas Plaintiffs filed *The Texas Litigation Plaintiffs' Supplemental Motion to Dismiss Petition* [ECF No. 42] (the "Motion to Dismiss") with the U.S. Bankruptcy Court for the Southern District of Texas on April 27, 2022 (the "Motion to Dismiss");

WHEREAS, the Debtors filed their respective Schedules of Assets and Liabilities on May 2, 2022 [ECF Nos. 59 through 78] (collectively, the "Schedules") indicating that the Debtors have *de minimis* assets other than (a) domain names, trademarks, copyrights, and intellectual property rights associated with websites; (b) royalty payments related to Youngevity; (c) causes of action for malpractice for their prepetition attorneys; and (d) rights to payments from Alex Jones ("AEJ") and Free Speech Systems, LLC ("FSS") for administrative expenses and satisfaction of claims under the Plan Support Agreement [ECF Nos. 6-3 and 48-2] (the "PSA") and Declaration of Trust for the 2022 Litigation Settlement Trust [ECF Nos. 6-2 and 48-1] (the "Declaration of Trust");

007840

WHEREAS, after investigation by the Debtors' Chief Restructuring Officer and professionals, the Debtors do not believe that the Debtors have any assets other than those reflected in the Schedules, PSA, and/or Declaration of Trust;

WHEREAS, relying on the veracity of the Schedules and disclosure of the PSA and Declaration of Trust, the Texas Plaintiffs no longer wish to be creditors of the Debtors or otherwise participate in the Debtors' bankruptcy cases;

**NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:**

1.      *Release of Claims Against the Debtors*.  Subject to Paragraph 2 of this Stipulation, each of the Texas Plaintiffs hereby releases the Debtors and their respective bankruptcy estates from any and all claims, causes of action, equitable remedies, or rights to payment, existing on the date the Parties executed this Stipulation. For the avoidance of doubt, the Texas Plaintiffs each release any and all claims or rights to payment for sanctions against the Debtors or their bankruptcy estates to the fullest extent allowable under applicable nonbankruptcy law and shall not seek the imposition or collection of any sanctions awarded against the Debtors or their bankruptcy estates for acts occuring prior to the date the Parties entered into this Stipulation.  The Texas Plaintiffs and the Debtors shall cooperate to provide for the dismissal with prejudice of the Debtors from each of the actions comprising the State Court Litigation.

2.      *Limitations on Release*. The release of the Debtors by the Texas Plaintiffs contained in this Stipulation shall not be effective to the extent that the Debtors hold material undisclosed assets on the date that the Parties entered into this Stipulation that is property of the Debtors' bankruptcy estates under 11 U.S.C. §§ 541 or 1115. The Debtors' disclosed assets comprise: (a) those assets reflected in the Schedules and (b) funds contemplated to be paid under the PSA or

3

Declaration of Trust, irrespective of whether the PSA or Declaration of Trust contemplated such funds to be paid to the Debtors, their estates, or the 2022 Litigation Settlement Trust. To the extent that the Texas Plaintiffs assert that the Debtors or their estates owned material undisclosed assets on the date of this Stipulation and seek to assert claims against the Debtors that would otherwise be released, the Texas Plaintiffs shall file a motion with the Bankruptcy Court seeking an order determining that the releases contemplated by this Stipulation have no force and effect.

3.      *Withdrawal of the Motion to Dismiss*. The Texas Plaintiffs' hereby withdraw their Motion to Dismiss without prejudice to refiling if the Bankruptcy Court does not approve this Stipulation. Upon approval of the Stipulation the withdrawal shall be with prejudice.

4.      *Withdrawal of Opposition to Remand*. Upon approval of this Stipulation, the Texas Plaintiffs may file a pleading or other document, to be approved by the Debtors, which approval shall not be unreasonably withheld, with the Removal Court notifying the Removal Court of this Stipulation and that the Debtors do not oppose remand. At the Texas Plaintiffs' request, the Debtors shall join in the Texas' Plaintiffs filing or take other reasonable steps to inform the Removal Court that the Debtors do not oppose remand.

5.      *Non-Applicability of Automatic Stay and/or Releases to Non-Debtor Parties*. For the avoidance of doubt, (a) the automatic stay pursuant to section 362 of the Bankruptcy Code does not prohibit the continuation of the State Court Litigation against any person other than the Debtors;  (b) the release of the Debtors by the Texas Plaintiffs in this Stipulation shall not release any claims, causes of actions, or other rights against any person other than the Debtors.

6.      *Subject to Bankruptcy Court Approval*. This Stipulation shall be immediately binding on the Parties and subject only to the approval of the Bankruptcy Court. To the extent that

007842

the Bankruptcy Court denies approval of this Stipulation, the Stipulation and the releases and mutual obligations contained herein shall be of no further force and effect.

7. *Retention of Jurisdiction*. The Court shall have and retain (a) with respect to any dispute among only the Parties, sole and exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the implementation and/or interpretation of this Stipulation and (b) with respect to any dispute involving any other person, including any of the Parties and AEJ and/or FSS, non-exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the implementation and/or interpretation of this Stipulation. The Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation. Any motion or application brought before the Court to resolve a dispute arising from or related to this Stipulation shall be brought on notice as provided by and in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of Texas.

8. *Modification of Stipulation*. This Stipulation shall not be modified, altered, amended, or vacated without written consent of all Parties hereto.

Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

007843

STIPULATED AND AGREED ON MAY ___, 2022 BY AND AMONG:

**NEIL HESLIN, SCARLETT LEWIS,**
**LEONARD POZNER, VERONIQUE**
**DE LA ROSA, and MARCEL FONTAINE**

*/s/ DRAFT*
THE BEATTY LAW FIRM PC
J. Maxwell Beaty
State Bar No. 24051740
max@beattypc.com
1127 Eldridge Pkwy
Suite 300, #383
Houston, Texas 77077
Tel. 832-529-3381

*/s/ DRAFT*
MCDOWELL HETHERINGTON LLP
Avi Moshenberg
State Bar No. 24083532
avi.moshenberg@mhllp.com
1001 Fannin Street, Suite 77002
Houston, Texas 77002
Tel. 713-337-5580
*Counsel to the Texas Plaintiffs*

-and-

**INFOW, LLC (F/K/A INFOWARS, LLC),**
**IWHEALTH, LLC (F/K/A INFOWARS**
**HEALTH, LLC), AND PRISON PLANET TV, LLC**

*/s/ DRAFT*
PARKINS LEE & RUBIO LLP
Kyung S. Lee
State Bar No. 12128400
klee@parkinslee.com
R. J. Shannon
State Bar No. 24108062
rshannon@parkinslee.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. 713-715-1660
*Proposed Counsel to the Debtors and*
*Debtors in Possession*

007844

## R.J. Shannon

| | |
|---|---|
| **From:** | R.J. Shannon |
| **Sent:** | Wednesday, May 11, 2022 12:52 PM |
| **To:** | rchapple@cstrial.com; rww@bymanlaw.com |
| **Cc:** | Kyung Lee; Adam Rodriguez |
| **Subject:** | InfoW, LLC - Proposed Stipulation Resolving Disputes [Subject to FRE 408] |
| **Attachments:** | IW - Draft Stipulation re Conn Plaintiffs 4869-8126-8255 v.1.docx |

[Subject to FRE 408]

Ryan and Randy,

We have discussed the possibility of resolving the Debtors' various disputes with the Texas Plaintiffs through a stipulation confirming that the Texas Plaintiffs will not assert claims against the Debtors and the Debtors will not oppose remand of the state court litigation. We would like to make the same proposal to the Connecticut Plaintiffs. The issue we have with the dismissals in both sets of cases is that they purport to be without prejudice so that the Plaintiffs could potentially still assert claims against the Debtors/their estates.

Attached is a draft stipulation that we believe would resolve all the disputes between the parties without having to deal separately in each adversary proceeding or incur unnecessary expense in the bankruptcy case. It is identical to what we proposed to the Texas Plaintiffs with different names and a couple non-substantive nits. The Texas Plaintiffs have not yet agreed to this, but appeared to be open to the concept.

Our understanding is that the primary concern of both sets of Plaintiffs is that Jones and FSS might later try to claim that something was property of one of the Debtors when the stipulation was entered. To protect your clients against that, the draft stipulation provides that the Connecticut Plaintiffs are relying on the assets disclosed in the schedules and made the non-existence of any material undisclosed assets an express requirement for the release to be effective. Jones/FSS would have nothing to gain from playing that game.

Please let us know your thoughts and any comments on the Stipulation. We sent the draft for the Texas Plaintiffs to Max Beatty (max@beattypc.com) and Avi Moshenberg (avi.moshenberg@mhllp.com) about an hour ago.

Thanks,
R. J.

**R. J. Shannon**
Associate
**Parkins Lee & Rubio LLP**
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Direct: (713) 715-1660
Cell: (512) 693-9294
rshannon@parkinslee.com
www.parkinslee.com

007845

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| In re: | Case No. 22-60020 |
| INFOW, LLC, *et al.*, | Chapter 11 (Subchapter V) |
| Debtors.[1] | Jointly Administered |

## STIPULATION AND ORDER

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs" and together with the Debtors, the "Parties") hereby enter into this stipulation (the "Stipulation") and agree as follows:

WHEREAS, on April 18, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under subchapter v of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, the Connecticut Plaintiffs commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Lafferty et al. v Jones et al.*, Docket No. UWY-CV18-6046436-S, in the Connecticut Superior Court; ***(b)*** *Sherlach et al. v. Jones et al.*, Docket No. UWY-CV18-6046437-S, in the Connecticut Superior Court; and ***(c)*** *Sherlach v. Jones*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are as follows: InfoW, LLC, f/k/a Infowars, LLC (6916), IWHealth, LLC f/k/a Infowars Health, LLC (no EIN), Prison Planet TV, LLC (0005). The address for service to the Debtors is PO Box 1819, Houston, TX 77251-1819.

*et al.*, Docket No. UWY-CV18-6046438-S, in the Connecticut Superior Court (collectively, as may have been consolidated, the "State Court Litigation");

WHEREAS, one or more of the Debtors removed or attempted to remove the lawsuits comprising the State Court Litigation to the U.S. Bankruptcy Court for the District of Connecticut (the "Removal Court");

WHEREAS, the Connecticut Plaintiffs filed *Connecticut Plaintiffs' Emergency Motion to Dismiss Chapter 11 Cases and Objection to Debtors' Designation as Subchapter V Small Vendors* [ECF No. 36] (the "Motion to Dismiss") with the U.S. Bankruptcy Court for the Southern District of Texas on April 26, 2022 (the "Motion to Dismiss");

WHEREAS, the Debtors filed their respective Schedules of Assets and Liabilities on May 2, 2022 [ECF Nos. 59 through 78] (collectively, the "Schedules") indicating that the Debtors have *de minimis* assets other than (a) domain names, trademarks, copyrights, and intellectual property rights associated with websites; (b) royalty payments related to Youngevity; (c) causes of action for malpractice for their prepetition attorneys; and (d) rights to payments from Alex Jones ("AEJ") and Free Speech Systems, LLC ("FSS") for administrative expenses and satisfaction of claims under the Plan Support Agreement [ECF Nos. 6-3 and 48-2] (the "PSA") and Declaration of Trust for the 2022 Litigation Settlement Trust [ECF Nos. 6-2 and 48-1] (the "Declaration of Trust");

WHEREAS, after investigation by the Debtors' Chief Restructuring Officer and professionals, the Debtors do not believe that the Debtors have any assets other than those reflected in the Schedules, PSA, and/or Declaration of Trust;

WHEREAS, relying on the veracity of the Schedules and disclosure of the PSA and Declaration of Trust, the Connecticut Plaintiffs no longer wish to be creditors of the Debtors or otherwise participate in the Debtors' bankruptcy cases;

2

**NOW, THEREFORE, IT IS STIPULATED BY THE PARTIES AND, UPON APPROVAL BY THE BANKRUPTCY COURT, ORDERED THAT:**

1.      *Release of Claims Against the Debtors.*  Subject to Paragraph 2 of this Stipulation, each of the Connecticut Plaintiffs hereby releases the Debtors and their respective bankruptcy estates from any and all claims, causes of action, equitable remedies, or rights to payment, existing on the date the Parties executed this Stipulation. For the avoidance of doubt, the Connecticut Plaintiffs each release any and all claims or rights to payment for sanctions against the Debtors or their bankruptcy estates to the fullest extent allowable under applicable nonbankruptcy law and shall not seek the imposition or collection of any sanctions awarded against the Debtors or their bankruptcy estates for acts occuring prior to the date the Parties entered into this Stipulation.  The Connecticut Plaintiffs and the Debtors shall cooperate to provide for the dismissal with prejudice of the Debtors from each of the actions comprising the State Court Litigation.

2.      *Limitations on Release.* The release of the Debtors by the Connecticut Plaintiffs contained in this Stipulation shall not be effective to the extent that the Debtors hold material undisclosed assets on the date that the Parties entered into this Stipulation that is property of the Debtors' bankruptcy estates under 11 U.S.C. §§ 541 or 1115. The Debtors' disclosed assets comprise: (a) those assets reflected in the Schedules and (b) funds contemplated to be paid under the PSA or Declaration of Trust, irrespective of whether the PSA or Declaration of Trust contemplated such funds to be paid to the Debtors, their estates, or the 2022 Litigation Settlement Trust. To the extent that the Connecticut Plaintiffs assert that the Debtors or their estates owned material undisclosed assets on the date of this Stipulation and seek to assert claims against the Debtors that would otherwise be released, the Connecticut Plaintiffs shall file a motion with the

3

Bankruptcy Court seeking an order determining that the releases contemplated by this Stipulation have no force and effect.

3.    *Withdrawal of the Motion to Dismiss*. The Connecticut Plaintiffs' hereby withdraw their Motion to Dismiss without prejudice to refiling if the Bankruptcy Court does not approve this Stipulation. Upon approval of the Stipulation, the withdrawal shall be with prejudice.

4.    *Withdrawal of Opposition to Remand*. Upon approval of this Stipulation, the Connecticut Plaintiffs may file a pleading or other document, to be approved by the Debtors, which approval shall not be unreasonably withheld, with the Removal Court notifying the Removal Court of this Stipulation and that the Debtors do not oppose remand. At the Connecticut Plaintiffs' request, the Debtors shall join in the Connecticut Plaintiffs' filing or take other reasonable steps to inform the Removal Court that the Debtors do not oppose remand.

5.    *Non-Applicability of Automatic Stay and/or Releases to Non-Debtor Parties*. For the avoidance of doubt, (a) the automatic stay pursuant to section 362 of the Bankruptcy Code does not prohibit the continuation of the State Court Litigation against any person other than the Debtors; and (b) the release of the Debtors by the Connecticut Plaintiffs in this Stipulation shall not release any claims, causes of actions, or other rights against any person other than the Debtors.

6.    *Subject to Bankruptcy Court Approval*. This Stipulation shall be immediately binding on the Parties and subject only to the approval of the Bankruptcy Court. To the extent that the Bankruptcy Court denies approval of this Stipulation, the Stipulation and the releases and mutual obligations contained herein shall be of no further force and effect.

7.    *Retention of Jurisdiction*. The Court shall have and retain (a) with respect to any dispute among only the Parties, sole and exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the

007849

implementation and/or interpretation of this Stipulation and (b) with respect to any dispute involving any other person, including any of the Parties and AEJ and/or FSS, non-exclusive jurisdiction over the enforcement of the terms of this Stipulation as well as with respect to all matters arising from or related to the implementation and/or interpretation of this Stipulation. The Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation. Any motion or application brought before the Court to resolve a dispute arising from or related to this Stipulation shall be brought on notice as provided by and in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of Texas.

8.      *Modification of Stipulation*. This Stipulation shall not be modified, altered, amended, or vacated without written consent of all Parties hereto.

Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

STIPULATED AND AGREED ON MAY ___, 2022 BY AND AMONG:

**DAVID WHEELER, FRANCINE WHEELER, JACQUELINE BARDEN, MARK BARDEN, NICOLE HOCKLEY, IAN HOCKLEY, JENNIFER HENSEL, DONNA SOTO, CARLEE SOTO PARISI, CARLOS M. SOTO, JILLIAN SOTO-MARINO, WILLIAM ALDENBERG, WILLIAM SHERLACH, AND ROBERT PARKER**

*/s/ DRAFT*
CAIN & SKARNULIS PLLC
Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
303 Colorado Street, Suite 2850
Austin, Texas 78701
Tel. 512-477-5000

*/s/ DRAFT*
BYMAN & ASSOCIATES PLLC
Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
7924 Broadway, Suite 104
Pearland, Texas 77581
Tel. 281-884-9262
*Counsel to the Connecticut Plaintiffs*

-and-

**INFOW, LLC (F/K/A INFOWARS, LLC), IWHEALTH, LLC (F/K/A INFOWARS HEALTH, LLC), AND PRISON PLANET TV, LLC**

*/s/ DRAFT*
PARKINS LEE & RUBIO LLP
Kyung S. Lee
State Bar No. 12128400
klee@parkinslee.com
R. J. Shannon
State Bar No. 24108062
rshannon@parkinslee.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. 713-715-1660
*Proposed Counsel to the Debtors and Debtors in Possession*

6

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**<u>DECLARATION OF ROBERT JOSEPH SHANNON</u>**

I, Robert Joseph Shannon, declare under penalty of perjury as follows:

1.      I am an attorney at law duly admitted and in good standing to practice in the State of Texas and United States District Court for the Southern District of Texas among other courts. I am a partner at Shannon & Lee LLP ("<u>S&L</u>").

2.      I am making this declaration in connection with Shannon & Lee's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206] (the "<u>Rule 59 Motion</u>").

3.      Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge.

4.      Along with potentially other documentary evidence, S&L anticipates introducing into evidence either at a rehearing requested in the Rule 59 Motion and/or the hearing on Shannon & Lee's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 251] (the "<u>Administrative Expense Motion</u>") the documents attached to the Witness and Exhibit List filed with the Court on January 18, 2023, as Exhibits 13 through 25 (the "<u>Demonstrative Exhibits</u>").

5.      S&L also anticipates introducing into evidence at a rehearing requested in the Rule 59 Motion and/or the hearing on the Administrative Expense Motion the following documents (the "Non-Demonstrative Exhibits" and together with the Demonstrative Exhibits and other exhibits submitted at such rehearing and/or hearing on the Administrative Expense Motion, the "Additional Documentary Evidence"):

   a.   Memorandum dated June 5, 2022, regarding PQPR's asserted lien and note;

   b.   Email dated August 6, 2022, from R. Shannon to K. Lee, R. Battaglia, and M. Schwartz regarding Alex Jones's asserted indemnity; and

   c.   Spreadsheet prepared by Schwartz Associates LLC of the costs that that the Debtor would incur to prevent interruption to the Debtor's business if Alex Jones attended the entire trial in Connecticut.

6.      S&L contends that it can disclose these the Non-Demonstrative Exhibits in connection with a rehearing or a hearing Administrative Expense Motion notwithstanding any potential attorney-client privilege pursuant to Rule 1.05(c)(5) of the Texas Disciplinary Rules of Professional Conduct.

7.      S&L anticipates submitting testimony related to the Additional Documentary Evidence and other matters that it contends will show, among other things demonstrating that S&L does not have or represent any interest adverse to the Debtor's estate, that:

   a.   S&L's initial reaction to Alex Jones's request for the Debtor to seek extension of the automatic stay to Mr. Jones and take other actions preventing the Connecticut Litigation from continuing was that the Debtor should reject the request;

   b.   S&L questioned Jones's asserted indemnity on its own initiative;

   c.   The Debtor's proposed payment of Mr. Jones's travel expenses to attend the Connecticut Litigation and 100% of state court counsel fees was negotiated to allow the Debtor to reach agreement with the Connecticut Plaintiffs with respect to their motion to modify the automatic stay to allow the Connecticut Litigation to continue;

2

d.  The Connecticut Plaintiffs required in order to reach the contemplated deal with the Debtor that Mr. Jones to agree to certain aspects of the agreed order modifying the automatic stay to allow the Connecticut Litigation to continue;

e.  The Debtor's proposed payment of Jones's travel expenses to attend the Connecticut Litigation and 100% of state court counsel fees was negotiated by the Debtor in the context of Mr. Jones asserting through his counsel that Mr. Jones may cease his involvement with the Debtor;

f.  S&L believed that (i) Mr. Jones's agreement to joint representation by the existing state court counsel was necessary to allow such joint representation and (ii) finding replacement counsel was dubious and would likely cost significantly more than paying 100% of the fees for the existing counsel;

g.  When the Court indicated that it would not approve the Debtor bearing 100% of fees for the existing state court counsel, the Debtor, through S&L used that as additional leverage to renegotiate the division of costs with Mr. Jones;

h.  In its representation of the Debtor prior to the September 20 Hearing related to the Connecticut Litigation, S&L worked to provide information to the Connecticut Plaintiffs that contradicted previous testimony of Mr. Jones;

i.  S&L attorneys did not take direction from Mr. Jones in the Debtor's case or the IW Cases;

j.  There was a previous default alter ego finding in the Heslin/Lewis Suit related to the jury focus group attended by Kyung Lee on July 1, 2022;

k.  Mr. Lee assisted Mr. Jones's counsel on the indemnity issue on July 11, 2022, by helping to secure separate counsel for Mr. Jones on Mr. Jones's asserted indemnity to ensure there would be no conflict preventing the existing state court counsel from continuing to represent the Debtor;

l.  S&L's initial reaction to PQPR's asserted secured claim was that, at a minimum, the lien was likely avoidable;

m.  In prepetition negotiations with PQPR, the Debtor, through S&L, represented that the alternative to a negotiated solution was an immediate action in any bankruptcy to avoid PQPR's asserted lien and/or note;

n.  As the result of the prepetition negotiations with PQPR, the Debtor negotiated the Forbearance Agreement that provided benefits to the Debtor, and subsequently its bankruptcy estate, that could not have been achieved non-consensually through an avoidance action;

3

o. S&L informed the Plaintiffs in connection with providing requested information that it believed there was a basis to avoid PQPR's asserted lien and cautioned the Plaintiffs from taking actions that could make avoidance more difficult;

p. On its own initiative, S&L analyzed and advised against the prepetition request from PQPR to destroy certain information about PQPR's finances;

q. S&L raised the possibility of potential subordination of PQPR's asserted secured claim in postpetition discussions and negotiations with PQPR;

r. S&L first suggested at the August 3, 2022, hearing the expansion of the Subchapter V Trustee's duties in response to the Sandy Hook Plaintiffs' stated desire for independent review of PQPR's asserted secured claim;

s. S&L worked to secure a replacement for PQPR, Blue Asension, and Aurium that was ultimately finalized by the Debtor under management of Patrick Magill and approved by the Court in connection with the Debtor's motions for approval to enter into the financial services agreement [ECF No. 273] and fulfilment agreement [ECF No. 276];

t. S&L did not prepare the proposed Third Interim Cash Collateral Order [ECF No. 148] or present it to the Court;

u. S&L's services related to the proposed payment of Mr. Jones travel expenses contained in the proposed Third Interim Cash Collateral Order was limited to working with Mr. Schwartz to determine a means for the Debtor to be able to agree to modification of the automatic stay with respect to the Connecticut Litigation in a manner that would not cause untenable disruption to the Debtor's operations but not the particular $80,000 amount that was ultimately proposed through the Third Interim Cash Collateral Order; and

v. S&L assisted Mr. Schwartz in locating and providing information and documents in the Connecticut Litigation that allegedly had not been provided to the Connecticut Plaintiffs despite numerous requests.

8.     I did not believe that that the evidence described above was relevant to the U.S. Trustee's objection to the S&L employment application based on (i) the contents of the objection; (ii) discussions with the attorneys for the U.S. Trustee and Sandy Hook Plaintiffs; (iii) the representations at the September 13, 2022, hearing; and (iv) the joinder by the Sandy Hook Plaintiffs. I therefore did not prepare the Additional Documentary Evidence, the additional testimony that S&L seeks to submit at the rehearing and/or hearing on the Administrative Expense

4

Motion, or legal arguments about what constitutes a predisposition under circumstances that renders that predisposition an interest adverse to the estate for the September 20, 2022, hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 18, 2023,

By: /s/ *R. J. Shannon*
   Robert Joseph Shannon

5

007856

1/18/2023



SHANNON & LEE LLP

**Presentation for January 20, 2023, Hearing on Shannon & Lee LLP's Rule 59 Motion**

1

# BACKGROUND

2

007857

1

# Court's Ruling on the S&L Employment Application

- Court denied the S&L Employment Application in its ruling at the September 20 Hearing.
  - Order entered on September 20, 2022 [ECF No. 182], referencing the ruling on the record.

- The Court's ruling appears to be based on the conclusion that S&L was at least potentially not a disinterested person due to an actual or potential predisposition under circumstances that rendered the predisposition an interest materially adverse to the Debtor's bankruptcy estate.
  - Referenced the "catch-all" provision of Bankruptcy Code § 101(14)(C).
  - "The term 'disinterested person' means a person that . . . does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."

- But the Court left open questions about <u>(a)</u> where the ruling leaves S&L "in terms of retention and the work that they've done" and <u>(b)</u> compensation for the services provided by S&L. (Sept. 20, 2022, Hrg. Tr. 256:14-257:4).
  - Consistent with the way that bankruptcy courts in this district have handled new issues raised by the court *sua sponte* in connection with the employment of professionals. *See In re LTHM Houston-Operations, LLC*, 2014 Bankr. LEXIS 4495, at *9-*10 (Bankr. S.D. Tex. Oct. 24, 2014) (2014 WL 5449737) (setting an additional hearing on an issue identified by the court but not briefed by the parties).

3

# Rule 59 Motion

- <u>Motion for Relief</u>
  - Shannon & Lee's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206] (the "<u>Rule 59 Motion</u>").

- <u>Objections/Responses</u>
  - Response and Initial Objection of Alex E. Jones to the Motion to Reconsider this Court's Ruling Declining to Employ the Firm of Shannon and Lee, PLLC [sic] [Dkt #206] and Marc Schwartz and Schwartz Associates, LLC [Dkt #207] and Alternatively, for Continuance of the Hearing Now Set for October 12, 2022 [ECF No. 217].
  - United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Rehearing on the Issue of Disinterestedness [Dkt. Nos. 206 and 207] [ECF No. 223].
  - Sandy Hook Families' Joinder to United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Rehearing on the Issue of Disinterestedness [ECF No. 226].

- <u>Replies</u>
  - Shannon & Lee LLP's Reply to the Response and Initial Objection of Alex E. Jones to Shannon & Lee LLP's Rule 59 Motion [ECF No. 218]
  - Shannon & Lee LLP's Reply to the United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Rehearing on the Issue of Disinterestedness [ECF No. 270].

4

# Administrative Expense Motion

- **Motion for Relief**

    - Shannon & Lee's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 251].

    - Asked the Court to allow administrative expense in the amount of $325,215.95 or as otherwise agreed among the parties and requested at the hearing.

- **Objections**

    - United States Trustee's Omnibus Objection to the Motions of Shannon & Lee LLP and W. Marc Schwartz for Orders Allowing Administrative Expense Claims [Dkt. Nos. 251 and 252] [ECF No. 267].

    - Alex E. Jones Limited Objection to Shannon & Lee LLP, Marc Schwartz and Schwartz Associates, LLC's Motions for Order Allowing Administrative Expense Claim and granted Related Relief [DOC #251 and #252] [ECF No. 268].

    - The Debtor and Subchapter V Trustee's Joint Objection to W. Marc Schwartz and Shannon & Lee LLP's Motions for Order Allowing Administrative Expense Claims [ECF No. 269].

- **Replies**

    - Shannon & Lee LLP's Omnibus Reply to Objections to Administrative Expense Motion [ECF No. 362]

5

# Comparison of Relief Requested

### Rule 59 Motion

- Rehearing on issue of disinterestedness with respect to S&L Employment Application.

- Present additional evidence and arguments and the Court to rule on that basis.

### Administrative Expense Motion

- Retroactive approval of employment on a limited basis, award of compensation pursuant to Bankruptcy Code § 330, and allowance of an administrative expense claim pursuant to Bankruptcy Code § 503(b)(2).

- *De facto* retroactive approval of employment on a limited basis and allowance of an administrative expense claim pursuant to Bankruptcy Code § 503(b)(1).

- Allowance of an administrative expense claim for expenses that would have otherwise been borne by the estate.

- Authority to apply prepetition retainer to payment of the filing fee.

6

# Basis for Relief Requested in the Rule 59 Motion

7

## Rule 59(a) of the Federal Rules of Civil Procedure

- Rule 59(a) of the Federal Rules of Civil Procedure
  - Made applicable by Rule 7023 of the Federal Rules of Bankruptcy Procedure.

- Rule 59(a)(1)(B)
  - "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after  a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."

- Rule 59(a)(2)
  - "After a nonjury trial, the court may, on motion for a new trial, open the judgement if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."

- The question is whether the reason that S&L seeks a rehearing is something for which a rehearing has been granted before by a court sitting in equity.

8

## Unfair Surprise

---

- *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir. 1982).
  - "It is well settled that Rule 59 provides a means of relief in cases in which a party has been unfairly made the victim of surprise." *Id.* at 111.
  - The surprise must have caused prejudice and thus been inconsistent with substantial justice. *Id.*

- Other courts recognize this as a basis for Rule 59(a).
  - "'[S]urprise during trial, by a major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion.'" *Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 410 (M.D. Pa. 2019) (quoting *Sanford v. Crittenden Memorial Hosp.*, 141 F.3d 882, 886 (8th Cir. 1998)).
  - *See also Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 286-288 (1st Cir. 1993); *Twigg V. Norton Co.*, 894 F.2d 672, 674-675 (4th Cir. 1990).

- The relevant question in a contested matter in a bankruptcy proceeding for a rehearing under Rule 59(a) due to surprise is *whether the focus of the hearing was evident to the movant prior to the hearing*.
  - *See Kingsley Const., Inc. v. DDS Materials, Inc. (In re DDS Materials, Inc.)*, 1993 U.S. App. LEXIS 39036, at *7 (5th Cir. Sep. 9, 1993) (1993 WL 373500) (holding that that the bankruptcy court did not abuse its discretion because "[t]he bankruptcy court further found that any surprise which may have occurred was not inconsistent with substantial justice, since it was evident that to the parties that the focus of the full hearing would be upon which party breached the contracts.") (citing *Conway*, 687 F.2d at 111).

9

## Evident Focus—Prior to the September 20 Hearing

---

- All indications prior to the September 20 Hearing were that dispute was about the circumstances surrounding the decision of Mr. Lee not to supplement his disclosures for Kyung S. Lee PLLC in the IW Cases

- U.S. Trustee's Objection to the S&L Employment Application.
  - The only basis raised in the objection was that Mr. Lee did not supplement his disclosures in the IW Cases for Kyung S. Lee PLLC after meeting with the Debtor on May 24, 2022.
  - Bankruptcy Local Rule 9013-1(g) incorporates Bankruptcy Rule 7008, which in turn incorporates Rule 8 of the Federal Rules of Civil Procedure.
  - Rule 8(b) of the Federal Rules of Civil Procedure requires responses to allegations in a pleading or those allegations are deemed admitted.

- Discussions with the U.S. Trustee prior to the September 20 Hearing.

- Representations at the September 13, 2022, Hearing.

    Mr. Shannon: And again, Your Honor, I do believe that that U.S. Trustee's primary objection is about the disclosures in the InfoW case. That's really the crux of the objection and what will need to be investigated, so it's not—I don't think it goes beyond that.

    Mr. Nguyen: That's correct. There was a prior nondisclosure that occurred before you. There's going to be some legal arguments on how you should address that, but that's where we are with the objection.

    (Sept. 13, 2022, Hrg. Tr. 36:1-9).

- Plaintiff's Joinder to the U.S. Trustee's Objection.

10

1/18/2023

## Evident Focus—At the September 20 Hearing

- In the Debtor's opening statement, S&L indicated what the dispute was just about the disclosures.

    - "There is no dispute that the CRO, proposed CRO and Shannon & Lee are disinterested in this case. There's no dispute that the retention of these applicants is in the best interests of the Debtor['s] bankruptcy estate. That's not what the U.S. Trustee is objecting about." (Sept. 20, 2022, Hrg. Tr. 20:2-7).

    - The Court indicated that what it wanted to know was whether there was a "throughline" from the IW Cases to the Debtor's chapter 11 case. (Sept. 20, 2022, Hrg. Tr. 28:2-8).

- U.S. Trustee's opening statement also indicated that the only issue was the non-disclosure.

    - "But, Your Honor, all we're saying here is there was a serious non-disclosure that occurred with this very connection." (Sept. 20, 2022, Hrg. Tr. 44:5-7).

- Court questioned disinterestedness for the first time _after_ the Debtor's closing presentation.

    - "So nobody's actually talked about the fifth circuit standards for retention. There's been responses to – (indiscernable) going back and forth which was the problem with the pleadings and no ones ever talked about, right, what it means to hold an adverse interest to the debtor or to the estate." (Sept. 20, 2022, Hrg. Tr. 210:13-18).

11

## Prejudice

- The Court's decision referenced the catchall provision of Bankruptcy Code § 101(14)(C) relating to an interest materially adverse to the estate for "any other reason" based on a predisposition under circumstances that rendered the predisposition an interest materially adverse to the Debtor's estate.

    - Inherently something that needs to be raised and articulated to prepare and present evidence and argument about.

- But for the surprise, S&L would have been able to:

    - Present evidence relevant to predisposition regarding Alex Jones and PQPR but not the issue raised in the objection to the S&L Employment Application;

    - Direct the Court to the other evidence in the record that was not the focus of the hearing; and

    - Argue to the Court the correct application of the law.

- S&L was particularly hindered because under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct it was not able to disclose confidential information—including attorney-client privileged or other information—because it was not responding to any allegations or reasonably necessary.

- Even if none of this would have changed the Court's decision, it would still matter with respect to establishing the record on appeal.

    - A request for rehearing under Rule 59(a) based on surprise is not about correcting judicial error. It is about ensuring a full and fair opportunity to present evidence and arguments. _See Twigg v. Norton Co._, 894 F.2d 672, 675 (4th Cir. 1990).

12

## Additional Evidence Regarding Predisposition Toward Alex Jones

- • **The rejection of Alex Jones's request for extension of the stay and other actions was S&L's _initial_ reaction.**
  - • August 16, 2022, Email from R. Shannon to S. Jordan [ECF No. 206-7] (Ex. 13).

- • **The Debtor's proposed payment of Jones's travel expenses and state court counsel fees was negotiated (a) to enable an agreement with the Connecticut Plaintiffs, (b) in the context of Jones's demand with Jones indicating he may cease involvement with the Debtor, and (c) with S&L initially taking the position that Jones should bear some cost.**
  - • August 16, 2022, Email from R. Shannon to S. Jordan [ECF No. 206-7] (Ex. 13)
  - • August 16, 2022, Email from S. Jordan to R. Battaglia and K. Lee [ECF No. 206-8] (Ex. 14)
  - • August 17, 2022, Email from S. Jordan to R. Shannon [ECF No. 206-11] (Ex. 15)
  - • August 19, 2022, Email from K. Lee to S. Jordan and response [ECF No. 206-12] (Ex. 16)

- • **S&L questioned Jones's asserted indemnity on its own initiative.**
  - • August 16, 2022, Email from R. Shannon to S. Jordan [ECF No. 206-7] (Ex. 16)
  - • August 6, 2022, Email from R. Shannon to K. Lee, R. Battaglia, and M. Schwartz (Ex. 26 ¶ 5.b).

- • **S&L's services related to providing information to Connecticut Plaintiffs contrary to statements of Alex Jones.**
  - • Schwartz Affidavit in Connecticut Litigation (Exs. 17 & 18)
  - • Roddy Affidavit in Connecticut Litigation (Exs. 17 & 19)

- • **S&L attorneys did not take direction from Alex Jones in the Debtor's case or the IW Cases. (Ex. 26 ¶ 7.i)**

- • **Addressing the Court's particular concerns.**
  - • Default alter ego finding in the Heslin/Lewis suit related to jury focus group attended by Lee [ECF No. 206-10] (Ex. 20)
  - • Lee "assist[ed]" Jones's counsel on indemnity issue on July 11, 2022, by working to secure separate counsel for Jones on the issue to ensure no conflict preventing existing state court counsel from continuing to represent the Debtor [ECF No. 206-5] (Ex. 21)

13

## Additional Evidence Regarding Predisposition Toward PQPR

- • **S&L's initial reaction and statements with respect to PQPR's asserted lien and claim.**
  - • Memorandum dated June 5, 2022, regarding PQPR's asserted lien and note (Ex. 26 ¶ 5.a)
  - • Debtor's position asserted through S&L in prepetition negotiations with PQPR (Ex. 26 ¶ 7.m)
  - • Email dated August 8, 2022, from R. Shannon to J. Martin [ECF No. 362-1] (Ex. 22)

- • **S&L's position with respect to PQPR's request for the Debtor to destroy certain information.**
  - • Email dated June 30, 2022, from R. Shannon to various parties [ECF No. 206-3] (Ex. 23)

- • **Post-petition negotiations with PQPR regarding treatment of asserted lien and claim.**
  - • Potential subordination of PQPR claim raised by S&L (Ex. 26 ¶ 7.q)

- • **S&L first suggested expansion of the Subchapter V Trustee's duties to investigate PQPR's asserted lien and note to address the Sandy Hook Plaintiffs' desire for independent review.**
  - • At the August 3, 2022, hearing, S&L raised with Jarrod Martin, Stephen Lemmon, and Melissa Haselden (Ex. 26 ¶ 7.r)

- • **S&L worked to secure a replacement for PQPR, Blue Asension, and Aurium that was ultimately finalized by the Debtor under management of Patrick Magill and approved by the Court**
  - • Redacted & related time entries in fee statement [ECF No. 251-2] (Ex. 17)
  - • Motions for approval to enter into the Financial Services Agreement [ECF No. 273] and Fulfilment Agreement [ECF No. 276]

14

## Evidence Already Admitted Regarding Predisposition Toward Alex Jones

- Debtor's response to Jones's request to extend the automatic stay.
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 63:3-5)

- Steps taken by S&L to ensure that Alex Jones did not control the Debtor or its restructuring.
  - June 5, 2022, Redline of Schwartz Engagement Letter and related emails [ECF Nos. 178-1, 178-2, 178-3]
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 95:14-96:19)
  - Schwartz's Testimony (Aug. 3, 2022, Hrg. Tr. 60:25-62:10, 163:7-19)

- S&L does not and has never represented Alex Jones.
  - S&L Engagement Letter [ECF No. 163-3]
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 62:19-20, 131:15-132:5, 150:1-4)
  - S&L Client Database Search [ECF Nos. 163-5, 163-6]

- Decisions in the IW Cases were made for benefit of those bankruptcy estates, not Alex Jones.
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 83:10-84:3, 88:12-91:3, 142:17-144:2)
  - Schwartz's Testimony (Sept. 20, 2022, Hrg. Tr. 162:1-24, 163:7-11, 170:4-11, 175:20-176:10, 177:11-15, 206:11-207:9)
  - IW Trustee Motion [ECF No. 163-12]

- Negotiations with Jones regarding division of fees for state court counsel.
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 64:17-65:4)

- Schwartz was making decisions for the Debtor.
  - Schwartz Testimony (Sept. 20, 2022, Hrg. Tr. 196:7-9); (Aug. 3, 2022, Hrg. Tr. 60:25-62:10, 163:7-19)

15

## Evidence Already Admitted Regarding Predisposition Toward PQPR

- Evidence regarding the prepetition negotiations with PQPR.
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 65:7-16)
  - *Schwartz's Testimony (August 3, 2022, Hrg. Tr. 69:17-70:20; 224:8-225:18)*
  - *Forbearance Agreement [ECF No. 26-8]*

- Evidence that S&L does not and never has represented PQPR.
  - Lee's Testimony (Sept. 20, 2022, Hrg. Tr. 61:23-61:1)
  - Client Database Search [ECF Nos. 163-5 & 163-6]
  - S&L Engagement Letter [ECF No. 163-3]

- Debtor's Schedule D listed PQPR's asserted secured claim as disputed.
  - [ECF Nos. 121 & 165-1]

- S&L immediately identified PQPR's asserted claim and lien as an issue and prepared a memorandum.
  - S&L time records [ECF No. 163-7]

- Reasons the Debtor did not immediately bring an action against PQPR.
  - Schwartz's Testimony (Aug. 3, 2022, Hrg. Tr. 163:20-166:19, 228:21-231:15, 232:13-25)

16

1/18/2023

## Evidence Appropriate For Judicial Notice

- Debtor's actions and representations since the September 20 Hearing.
  - Continued to seek and obtained *interim* cash collateral orders under the same framework. [ECF Nos. 238, 258, 287, & 333].
  - Still proposes to pay PQPR for prepetition purchase of product. (Dec. 19, 2022, Hrg. Tr. 11:4-6); ECF No. 333].
  - More than 100 days has passed since the September 20 Hearing and still no action brought against PQPR or Alex Jones.
  - Continued to seek retention of state-court counsel under 60/40 division of costs until Jones's agreement with Plaintiffs.

- Subchapter V Trustee's actions and representations since the September 20 Hearing.
  - Investigation has gone on for more than 100 days.
  - Investigation required significant information gathering. [ECF Nos. 227 & 285]
  - Subchapter V Trustee and counsel required separate expert financial analysis to perform the investigation. [ECF Nos. 282 & 327]

- Alex Jones's actions and representations since the September 20 Hearing.
  - Represented that the caveat to agreement to 50/50 division of costs for joint appellate counsel was that Jones would seek full salary from the Debtor. (Dec. 19, 2022, Hrg. Tr. 14:2-10).
  - Represented to the Court that may need to seek separate employment. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25).
  - Filed a motion to set a date by which the Debtor must assume or reject employment agreement. [ECF No. 349].

- The Battaglia Firm filed and presented to the Court the proposed Third Interim Cash Collateral Order.
  - [ECF No. 148]; (Sept. 13, 2022, Hrg. Tr. 5:24-14:11); (Sept. 20, 2022, Hrg. Tr. 13:4-12).

- The Debtor, through the Battaglia Firm, represented that it was contemplating mediation at the time of the September 20 Hearing.
  - (Sept. 20, 2022, Hrg. Tr. 9:11-16).

17

## Legal Arguments that Would Have Been Made If the Issue Was in Controversy at the September 20, 2022, Hearing

- What constitutes an adverse interest for purposes of Bankruptcy Code §§ 327(a) and 101(14).
  - An adverse interest requires (a) material incentive to act contrary to the interests of the estate or (b) a personal interest that is contrary to the estate.
  - Inquiry is whether S&L *presently* has or represents an adverse interest.
  - The questions about why the Debtor proposed to pay Alex Jones's travel expenses and 100% of the state court fees in order to reach a deal with the Connecticut Plaintiffs were, at most, merely appearances of conflict that are legally insufficient for denial of an application to employ.
  - In chapter 11, only trustees and examiners, not debtors in possession have authority to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor.

- Approval of the S&L Employment Application was appropriate under Bankruptcy Code § 327(e) was appropriate even if S&L had an adverse interest that would prevent it from serving as general bankruptcy co-counsel.
  - The S&L Employment Application contemplated already that S&L's primary responsibility would be limited to matters related to the Sandy Hook Litigation and day-to-day administrative matters.
  - More tightly limiting the scope of S&L's employment would still allow the Battaglia Firm additional bandwidth to handle matters amounting to "conducting the case."

- Mr. Lee's failure to supplement his disclosures in the IW Cases does not suggest an adverse interest against the Debtor's estate.
  - Even if Mr. Lee's belief was incorrect that the duty to supplement Rule 2014 disclosures implied by the purpose of ensuring compliance with Bankruptcy Code § 327 does not continue when a debtor in possession has agreed to the dismissal of its case expressly prior to court approval of its employment of professionals, that belief was reasonable based on the relevant authority.

18

# Objections and Replies

19

---

## U.S. Trustee & Alex Jones—Standing/Authority to Bring Motion

- Contrary to the language in Rule 59(a)(1).
  - "The court may, on motion, grant a new trial on all or some of the issues—*and to any party*—as follows. . . ."

- Contrary to Bankruptcy Code § 1109(b).
  - "A party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter."
  - A person is a party in interest where it has a personal stake in the outcome that can be addressed by a favorable decision. *In re Cypresswood Land Partners, I,* 409 B.R. 396, 417 (Bankr. S.D. Tex. 2009).

- Courts have held that a professional can seek relief with respect to a denied application to employ.
  - *Bingham Greenebaum Doll, LLP v. Glenview Health Care Facility, Inc. (In re Glenview Health Care Facility, Inc.),* 620 B.R. 582, 584 (B.A.P. 6th Cir. 2020); *KLG Gates LLP v. Brown,* 506 B.R. 177, 190 (E.D.N.Y. 2014), *Mehdipour v. Marcus & Millichap (In re Mehdipour),* 202 B.R. 474, 479 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998) ("Section 327 does not, by its terms, limit standing of a professional to seek employment.").

- *But* they have a point if—and only if—the Court's ruling does not prejudice S&L in seeking approval of a limited scope of employment for period from the Petition Date through September 20, 2022, in connection with a request for compensation.
  - It does not get everything, but most of S&L's personal stake. *See KLG Gates LLP v. Brown,* 506 B.R. 177, 190 (E.D.N.Y. 2014).
  - Unclear that there is a dispute about this.
    - No objection to Administrative Expense Motion from the Sandy Hook Plaintiffs and Jones only filed limited objection.
    - In their objections to the Administrative Expense Motion neither the U.S. Trustee, the Debtor, nor the Subchapter V Trustee argue that the Court *cannot* or *should not* retroactively approve S&L's employment for the limited period.
  - Collateral estoppel and law of the case do not apply for some of the same reasons that a rehearing would be appropriate.

20

007866

10

# U.S. Trustee—Manifest Error

- Manifest error is _not_ required for a rehearing based on surprise.
  - What is required is that there was a new legal theory that arose at the hearing.

- The cases that require manifest error involve motions under Rule 59(e) to alter or amend judgment.
  - *Wease v. Ocwen Loan Servicing, L.L.C.*, 852 F. App'x 807, 809 (5th Cir. 2021); *In re Cyr*, 2020 U.S. Dist. LEXIS 255998, at *2 (W.D. Tex. July 16, 2020) (2020 WL 10056295); *Culpepper v. United States Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 76555, at *5 (N.D. Tex. May 31, 2013) (2013 WL 2370550).
  - Rule 59(e) is about altering or amending a judgment based on the existing evidence to correct judicial error. *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004).
  - Rule 59(a) based on surprise is about grating a rehearing to allow a party a full and fair opportunity to litigate the relevant issues. *See Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir. 1990) (["Surprise does not warrant a new trial unless it deprives the party of a fair hearing"); *Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 410 (M.D. Pa. 2019) ("Courts will grant a new trial on the basis of 'surprise' only when it deprives the movant of a fair hearing.") (quoting *Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, 2006 U.S. Dist. LEXIS 14999, at *33 (D. Del. Mar. 31, 2006)).

- S&L contends that there was manifest error with respect to factual findings that appear to underlie the Court's decision.
  - Mr. Lee's Statements at the May 19, 2022, hearing in the IW Cases
  - Omnibus Response to the Motions to Dismiss in the IW Cases
  - American Express Payment in the Proposed First Interim Cash Collateral Order
  - Proposed Third Amended Cash Collateral Order
  - Relationship with PQPR
  - Post-Petition Analysis of PQPR's Asserted Claim

21

# U.S. Trustee—Additional Evidence is Cumulative

- Cumulative evidence is not an issue for a rehearing based on surprise.

- The cases that discuss cumulative evidence involve Rule 59 motions that are based on newly discovered evidence.
  - *See Trans Miss. Corp. v. United States*, 494 F.2d 770, 773 (5th Cir. 1974) ("Among others which might be made, a sufficient answer to this claim of error is that evidence merely cumulative or impeaching is not generally within the cannon of 'newly discovered evidence' for Rule 59 or Rule 60(b) purposes.").
  - The issue here is not newly discovered evidence, but that there was not a full and fair opportunity to present case with respect to disinterestedness or the purported adverse interest "for any other reason."

- The evidence that S&L seeks to introduce at a rehearing is not "cumulative."
  - Cumulative evidence is evidence that only corroborates, strengthens, or confirms other evidence. *See Chang v. City of Albany*, 150 F.R.D. 456, 461 (N.D.N.Y. 1993).

- Among other things, the additional evidence that S&L seeks to introduce would:
  - Go to the initial reactions of S&L to provide evidence of predisposition.
  - Show that Alex Jones's attorney represented that Jones may cease his involvement with the Debtor in response to the rejection of his requests with respect to the Connecticut Litigation and extension of the automatic stay.
  - Show that S&L's initial position was that Jones should bear some cost with respect to the Connecticut state court counsel.
  - Show that S&L questioned Jones's asserted indemnity on its own initiative.
  - Show that S&L immediately recognized PQPR's asserted claim and lien was an issue and analyzed that issue.
  - Show that the Debtor represented in negotiations with PQPR that the alternative to a negotiated solution was an immediate action in bankruptcy to avoid the lien.
  - Show that S&L warned the Plaintiffs from taking actions that might make avoidance of PQPR's asserted lien more difficult.

22

1/18/2023

## Alex Jones—Common Interest Privilege

- **Issue for the actual rehearing.**
  - Alex Jones does not contend that this covers all of the evidence that S&L seeks to submit.
  - Under Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct, S&L can disclose (a) confidential information necessary to establish its requested administrative expense claim against the Debtor and (b) non-attorney client privileged information necessary to address allegations in a proceeding concerning its representation of the Debtor.

- **Common interest privilege.**
  - Prevents waiver of otherwise privileged evidence.
  - Requires that the communication must be (a) independently privileged but for the disclosure and (b) disclosed to an aligned party to further that common legal interest. *Osherow v. Vann (In re Hardwood P-G, Inc.)*, 403 B.R. 445, 460 (Bankr. W.D. Tex. 2009) (quoting *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 2008 U.S. Dist. LEXIS 45011, *26-27 (N.D. Ill. Jun. 9, 2008)).
  - Because the common interest privilege is an obstacle to truth seeking, it must be construed narrowly to achieve the goal of allowing consultation between legal advisors and clients. *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).

- **The evidence is not independently privileged.**
  - Attorney-client privilege protects confidential communications from the client to the attorney for the purposes of seeking legal representation and communications from the attorney that would tend to disclose those confidential communications from the client. *Hodges, Grant & Kaufmann v. United States Gov't, Dep't of Treasury, IRS*, 768 F.2d 719, 720-21 (5th Cir. 1985).
  - Work product privilege is not a substantive privilege but rather a protection from discovery encapsulated in Rule 26(b)(3). *United States ex rel. Fisher v. Homeward Residential, Inc.*, 2015 U.S. Dist. LEXIS 100109, at *6 (E.D. Tex. July 31, 2015).

- **The additional evidence is not about matters within the common legal interest.**
  - Common legal interest requires more than simply desiring a successful outcome of the case but rather that the relevant legal interest is common to the parties. *United States ex rel. Fisher v. Homeward Residential, Inc.*, 2016 U.S. Dist. LEXIS 32910, at *15 (E.D. Tex. Mar. 15, 2016) ("'A shared rooting interest in the "successful outcome of a case" . . . is not a common legal interest").

23

# Conclusion

24

## Considerations

1. **Was the basis of the Court's ruling the evident focus of the September 20 Hearing prior to the hearing?**
   - The U.S. Trustee's objection raised a different issue and disinterestedness deemed admitted under Bankruptcy Local Rule 9013-1(g).
   - Representations at the September 13, 2022, hearing at which the September 20 Hearing was scheduled.
   - Joinder by the Sandy Hook Plaintiffs.
   - Parties' opening statements.
   - The Court noted itself during the September 20 Hearing that "nobody's actually talked about the fifth circuit standards for retention . . . No one ever talked about, right, what it means to hold an adverse interest to the debtor or the estate." (Sept. 20, 2022, Hrg. Tr. 210:13-18).

2. **Did S&L have a full and fair opportunity to prepare and present evidence and arguments about whether it had a predisposition under circumstances that made such predisposition adverse to the estate?**
   - Adverse interest for "any other reason" based on a predisposition is inherently something that must be articulated in order to prepare a response.
   - The issue was put in controversy for the first time after the hearing had begun while Bankruptcy Local Rule 9013-2 required exchanging and filing witness and exhibit lists and exhibits prior to the hearing.
   - Rule 1.05 of the Texas Disciplinary Rules of Professional Conduct limited S&L's ability to present confidential information.

3. **What outcome that puts all the evidence in the record?**
   - Transparency would be furthered by granting a rehearing.

25

## How the Court Should Rule

- **The Court should either (a) grant the Rule 59 Motion _or_ (b) deny the Rule 59 Motion _because it is unnecessary_ as S&L can seek retroactive approval of its employment through the Administrative Expense Motion, which is not prejudiced by the Court's ruling.**
  - Relief under Rule 59(a)(1)(B) is appropriate and would be required but for the Court's actual ruling and the particular circumstances.
  - _But_ the Court's ruling indicated that it would require further questions about S&L's retention and compensation for the work already done, and at most the Court's ruling was that the Debtor failed to meet its burden of proof with respect to disinterestedness.
  - Collateral estoppel or law of the case does not apply to the relief requested in the Administrative Expense Motion.
  - Holding further hearing is consistent with the way that courts in this district have addressed issues raised by the Court but not addressed in the parties' briefing or the focus of the hearing. _In re LTHM Houston-Operations, LLC,_ 2014 Bankr. LEXIS 4495, at *9-*10 (Bankr. S.D. Tex. Oct. 24, 2014) (2014 WL 5449737).

- **Set a hearing on the remaining issues.**
  - Whether S&L meets the standards under Bankruptcy Code § 327 for employment for the limited period from the Petition date through September 20, 2022.
  - Whether S&L is entitled to an administrative expense either under Bankruptcy Code §§ 330 and 503(b)(2) or through some other mechanism and what amount.

26

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

**SANDY HOOK FAMILIES'
WITNESS AND EXHIBIT LIST**

| | |
|---|---|
| Judge | Hon. Christopher M. Lopez |
| Hearing Date | Friday, January 20, 2023 |
| Hearing Time | 11:00 a.m. (CST) |
| Party's Name | Sandy Hook Families |
| Attorney's Names | Ryan Chapple, (Connecticut Plaintiffs)<br>Avi Moshenberg, Jarrod Martin (Texas Plaintiffs) |
| Attorney's Phone | 512-477-5000 (Ryan Chapple)<br>713-337-5580 (Avi Moshenberg)<br>713-356-1280 (Jarrod Martin) |
| Nature of Proceeding | Cash Collateral Motion [Dkt. 6] |

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs" and together, the "Sandy Hook Families") hereby submit this Witness and Exhibit List in connection with the hearing on *Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Cash Collateral Motion") [Dkt. 6]; to be held on Friday, January 20, 2023 at 11:00 a.m. (Central Standard Time):

007870

The Sandy Hook Families reserve the right to supplement, amend, or revise this Witness and Exhibit List at any time prior to the hearing.  The Sandy Hook Families reserve the right to supplement the Witness and Exhibit List with new witnesses and additional exhibits.  Further, the Sandy Hook Families reserve the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document.  The Sandy Hook Families further reserve the right to introduce exhibits previously admitted.

### WITNESS LIST

The Sandy Hook Families may call the following witnesses at the hearing:

1. Patrick Magill, Chief Restructuring Officer of Debtor;
2. Any witness necessary to rebut the testimony of any witness called or designated by any other parties;
3. Any witness listed or called by any other party.

### EXHIBIT LIST

The Sandy Hook Families may offer for admission into evidence any of the following exhibits at the hearing:

| No. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1. | Debtor's Emergency Motion for an Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender [Dkt. 6] | | | | |
| 2. | Declaration of W. Marc Schwartz in Support of | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Voluntary Petition and First Day Motions [Dkt. 10] | | | | |
| 3. | Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 41] | | | | |
| 4. | Order Modifying Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 64] | | | | |
| 5. | Second Interim Order Authorizing Debtor Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 98] | | | | |
| 6. | Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 151] | | | | |
| 7. | Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 238] | | | | |
| 8. | Fifth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 258] | | | | |
| 9. | Sixth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 287] | | | | |
| 10. | Seventh Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [Dkt. 333] | | | | |
| | Any document or pleading filed in the above-captioned case | | | | |

| Any exhibits identified or offered by any other party | | | | |
|---|---|---|---|---|
| Any exhibits necessary for impeachment and/or rebuttal purposes | | | | |

Respectfully submitted this 18th day of January 2023.

MᴄDᴏᴡᴇʟʟ Hᴇᴛʜᴇʀɪɴɢᴛᴏɴ LLP

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com
***Counsel for the Texas Plaintiffs***

-and-

Cʜᴀᴍʙᴇʀʟᴀɪɴ, Hʀᴅʟɪᴄᴋᴀ, Wʜɪᴛᴇ,
    Wɪʟʟɪᴀᴍs & Aᴜɢʜᴛʀʏ, PC

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
***Bankruptcy Counsel for the Texas
Plaintiffs***

By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
Cᴀɪɴ & Sᴋᴀʀɴᴜʟɪs PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile
***Bankruptcy Counsel for Connecticut
Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Witness and Exhibit List has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 18th day of January 2023.

*/s/ Ryan E. Chapple*
Ryan E. Chapple

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 1

007875

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
|  | ) |  |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DEBTOR'S EMERGENCY MOTION FOR AN INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(B) AND (II) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDER**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the above-referenced chapter 11 case, hereby files this emergency motion (the "Motion") seeking an order from the Court (i) authorizing the use of cash collateral pursuant to Sections 105, 361, and 363

of the Bankruptcy Code and Bankruptcy Rule 4001(b); and (ii) granting adequate protection to the Debtor's pre-petition secured lenders. In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "<u>First Day Declaration</u>"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## **<u>JURISDICTION AND VENUE</u>**

1.      On July 29, 2022 (the "<u>Petition Date</u>"), the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>").

2.      The Debtor continues in the possession of its property and is operating and managing its businesses as debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

3.      No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 361, and 363 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

## **<u>FSS' BACKGROUND</u>[1]**

6.      Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum for Alex's first broadcast.  In 1996 he transitioned to talk

---

[1] Additional factual background and information regarding the Debtor and its operations is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions*

007877

radio. After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees. Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7. What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full blown studio, and employing over 60 people. By 2013, FSS started selling dietary supplements to its growing listener base.

8. Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9. FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10. On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11. As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.

---

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

3

This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13.     Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS.  The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14.     Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15.     FSS purchased to sell on its website two categories of products: (a) dietary supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to

4

advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales.  In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.  Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company.  The fulfillment company charges FSS a flat fee per order regardless of size.  Historically, fulfillment has cost an average of ten percent of sales, without considering payroll, the new agreement is estimated to cost sixteen percent of sales.

## PQPR INDEBTEDNESS

18.     As discussed above, PQPR ordered and paid for Supplements which it marked up and then sold to FSS. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

19.     The indebtedness to PQPR had accrued over a period of years from the sale of PQPR products through the Debtor's internet platform, generated by the Debtor and Alex Jones' sponsorship of those products.  The PQPR Note balance represents the unpaid share of the proceeds from product sales by PQPR to FSS over a four year period for which the Debtor did not fully remit the proceeds to PQPR.

5

20.     On or about August 13, 2020, the Debtor executed that certain Promissory Note in favor of PQPR in the original principal amount of $29,588,000.00 (the "<u>PQPR Note</u>"). A security agreement of the same date granted PQPR a security interest in all of the Debtor's personal property assets, including but not limited to the Debtor's tangible and intangible property, accounts, and proceeds derived from those assets (the "<u>PQPR Security Agreement</u>"). PQPR filed a UCC-1 financing statement with the Texas Secretary of State that on November 18, 2020.

21.     The PQPR Security Agreement secures the obligations under the PQPR Note and any future advances owing by the Debtor to PQPR.  Specifically, "Obligations" is defined in the PQPR Security Agreement to include "any and all other obligations of Debtor to [PQPR] of any kind or character, now owed or hereafter arising."

22.     Subsequent to the date of the PQPR Note, the Debtor accrued additional indebtedness to PQPR representing a portion of PQPR's share of the proceeds from product sales from the date of the PQPR Note through November 10, 2021, for which the Debtor did not fully remit the required proceeds to PQPR.  The Debtor executed a second promissory note ("<u>Second PQPR Note</u>" and together with the PQPR Note, collectively the "<u>PQPR Notes</u>") in the amount of $25,300,000.  The Second PQPR Note is also secured by the PQPR Security Agreement.

23.     As of the Petition Date, $53,655,082.29 of principal and $11,794,19 of interest are due and owing under the PQPR Notes.

## **RELIEF REQUESTED**

24.     Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of

6

007881

rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." [6] 11 U.S.C. § 363(a).

25.     11 U.S.C. § 363(c)(2) states as follows:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
>> (A)        each entity that has an interest in such cash collateral consents; or
>> (B)        the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

26.     The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral. Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR. Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

27.     The Debtor requires the use of cash collateral to pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, inventory purchases, lease payments, marketing, taxes, and insurance. Those uses required in the next fourteen (14) days from the date of the emergency hearing are set forth on the budgets attached hereto as **Exhibit A** and incorporated herein by reference. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, and any other secured creditors purporting to hold an interest in the Debtor's cash collateral during the first fourteen (14) days of the Chapter 11 Cases (the "Interim Period"). The Debtor also requests that continued use of cash collateral is equally necessary to preserve the value of the Debtor's assets and rights of all of the constituencies with claims or interests in this Chapter 11 Case.

7

28.     Section 363 of the Bankruptcy Code authorizes a debtor to use cash collateral if those parties having an interest in such cash collateral consent or the court authorizes the use. *See* 11 U.S.C. § 363(c)(2). The use of cash collateral, however, may be prohibited or conditioned, upon proper request, as necessary to adequately protect any interest in cash collateral. *See* 11 U.S.C. §363(e).

29.     A court may authorize the use of cash collateral upon showing that those with an interest in the cash collateral are adequately protected. *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, (Bankr. S.D. Tex. 2009) ("in order for this Court to authorize the use of cash collateral, the Lender must be adequately protected); *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) (A debtor requesting court approval to use cash collateral has the burden of proof as to the issue of "adequate protection".) Adequate protection requires examination of the creditor(s)' aggregate collateral position, not simply protection of its lien on cash. Adequate protection may be provided by granting replacement or additional liens "to the extent [that the use of cash collateral] results in a decrease in the value of [an] entity's interest in property." *See* 11 U.S.C. § 361(2). Authorizing a debtor to use cash collateral on an interim basis is appropriate where, as here, continuing the business as a going concern will cause the generation of future revenues upon which the secured lender is granted replacement liens. *See, e.g., In re Neise, Inc.,* 16 B.R. 600 (Bankr. D. Fla. 1981); *In re Certified Corp.*, 51 B.R. 768 (Bankr. D. Haw. 1985); *In re Post- Tron Systems, Inc.*, 106 B.R. 345 (Bankr. D.R.I. 1989).

30.     By authorizing the Debtor to use cash collateral, the Court will place the Debtor in a position to fund its operating expenses and to operate as a going concern for the immediate future. The Debtor needs to use cash collateral in order to, *inter alia*, pay its employees, suppliers, and meet other on-going business obligations. Without the authority to use cash collateral, the Debtor will be unable to fund its business operations in a manner that will allow the Debtor to continue to operate, to the detriment of *all* of the Debtor's creditors, including the lenders referred to herein and the pool

007883

of unsecured creditors. Furthermore, without the ability to fund continuing operations, the Debtor and its estate will suffer immediate and irreparable harm. For example, employees will not continue to provide services if they are not paid the wages for which they have already worked, and vendors will not continue to provide necessary services or supplies if they are not paid. Therefore, the Debtor seeks the emergency relief requested herein.

31.     Attached to this Motion is a proposed form of the Interim Cash Collateral Order (the "Interim Cash Collateral Order") that authorizes the Debtor's use of cash collateral.

32.     The proposed offer of adequate protection on an interim basis is set forth in the attached proposed Interim Cash Collateral Order and incorporated by reference herein for the purpose of setting forth the proposed offer of adequate protection for lenders. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent the diminution of value of each lender's collateral, if any, and failure of other forms of adequate protection provided by the Debtor. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, and court-approved administrative expense claims of estate professionals.

33.     The Debtor believes that the terms of the proposed Interim Cash Collateral Order as set forth above are fair and reasonable under the circumstances. The Debtor asserts that the value of PQPR's cash collateral will not diminish as a result of the use of cash in this case. The value of PQPR's interest in cash may fluctuate, but such value should not diminish, other than minimally, over the next fourteen (14) days, the period of interim relief requested.

34.     The Debtor believes that PQPR is entitled to the protections set forth in the proposed Interim Cash Collateral Order. The adequate protection provisions have been drafted to provide

9

protection without taking undue or inappropriate value from the estate or its unsecured creditors. Given that the interests of the lenders will be adequately protected, it is in the best interest of the Debtor, its estate, and all of their creditors to be able to continue operations during the Interim Period and for the Debtor to be authorized to use cash collateral as requested herein.

35.     Therefore, the Debtor respectfully requests that it be authorized to use cash collateral as proposed herein for the purposes of paying necessary business expenses as allowed by Section 363 of the Bankruptcy Code, and that the Court grant PQPR a replacement lien on post-petition assets, as allowed by Sections 361, and/or 363 of the Bankruptcy Code, consistent with the terms and provisions contained in this Motion. The Debtor requests that this relief be granted on both an interim and final basis.

## RESERVATION OF RIGHTS

36.     The Debtor reserves any and all rights in connection with the Heslin\Lewis Suit. Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights or remedies.

## NO PRIOR REQUEST

37.     No previous request for the relief sought herein has been made to this Bankruptcy Court or any other court.

[*Remainder of Page Intentionally Left Blank*]

10

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the Court (i) authorize the use of cash collateral pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b); (ii) grant adequate protection to the pre-petition secured lenders; and (iii) grant such other and further relief as the Court may deem proper.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/ *Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/ *Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Raymond W. Battaglia*

11

007886

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

/s/ Raymond W. Battaglia

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

2

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

007889

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) Case No. 22- <u>60043</u> |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

**INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND
PROVIDING PARTIAL ADEQUATE PROTECTION**

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "<u>Case</u>"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "<u>Motion</u>"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "<u>Order</u>") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August ___, 2022 (the "<u>Interim Hearing</u>"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1. The Chapter 11 Case. On July 29, 2022 (the "<u>Petition Date</u>") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (this "Court").

2.  **Debtor-in-Possession**. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3.  **Jurisdiction and Venue**. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "Local Rules").

4.  **Committee Formation**.    To date, no official committee (a "Committee") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5.  **Notice**. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("PQPR"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule

007891

4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6.  <u>Immediate Need for Use of Cash Collateral</u>.  The Debtor asserts that an immediate and critical need exists for the Debtor to use Cash Collateral in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

7.  <u>Conditional Consent to Use of Cash Collateral</u>. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to the Motion as Exhibit A (the "<u>Budget</u>") for the period (the "<u>Interim Period</u>") from the Petition Date through and including August 15, 2022 (the "<u>Termination Date</u>").

8.  <u>Good Cause/Fair and Reasonable Terms</u>. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the

security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein. Any objections to the entry of this Order that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.      <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the

4

overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

6.      Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

7.      Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

8.      Adequate Protection – Replacement Liens.        As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "Diminution in Value"), the Pre-Petition Lender is hereby granted, effective as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "Replacement Liens") in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding

5

avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "Adequate Protection Collateral"). The Replacement Liens granted pursuant to this Order shall have the same priority as each of the Pre-Petition Lender's properly perfected unavoidable pre-petition liens but shall be subject to the Carve Out.

9.    Adequate Protection – Priority Administrative Claim.  As additional partial adequate protection for the Debtor's use of Cash Collateral, to the extent of any Diminution in Value and a failure of the other adequate protection provided by this Order the pre-petition lenders shall have an allowed priority administrative expense claim in this Case and any successor case as provided in and to the fullest extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code and otherwise (the "Adequate Protection Priority Claim").

10.    Carve Out. The Replacement Liens and Adequate Protection  Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "Estate Professionals"),  for incurred but unpaid fees, expenses and other costs (all such carve-out amounts referenced above, collectively, the "Carve Out").

11.    Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

6

12.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August _____ 2022, at __:___.m. Central time.  Objections to the entry of a final order approving the Motion shall be filed and served on counsel for the Debtor and pre- petition lenders not later than 4:00 p.m. Central time on August _____ 2022.

Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

7

007896

## EXHIBIT A

**13-Week  Budget**

**Free Speech Systems LLC**

## Forecasted 13 Week Cash Flow Budget

Between July 30, 2022 and October 28, 2022

| | 1 (07/30–08/05) | 2 (08/06–08/12) | 3 (08/13–08/19) | 4 (08/20–08/26) | 5 (08/27–09/02) | 6 (09/03–09/09) | 7 (09/10–09/16) | 8 (09/17–09/23) | 9 (09/24–09/30) | 10 (10/01–10/07) | 11 (10/08–10/14) | 12 (10/15–10/21) | 13 (10/22–10/28) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 7,741,357.16 |
| Advertising | | | | 480,166.46 | | | | 480,166.46 | | | | 480,166.46 | | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,690.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | | (11,073.88) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | (266.50) | | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | | (719,717.72) |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,980.90) | | | | (1,980.90) | | | | (1,980.90) | | | | | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| HVAC | | | (5,107.63) | | | | (5,107.63) | | | | (5,107.63) | | | (15,322.89) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Office Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

007898

## Free Speech Systems LLC
## Forecasted 13 Week Cash Flow Budget
Between July 30, 2022 and October 28, 2022

| | Period 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | | | | | (18,337.88) | | | | (18,337.88) | | | | | (15,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | (379,166.67) |
| Total Personnel Expenses | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | | (1,470.56) | | | | (1,470.56) | | | | (1,470.56) | | | | (4,411.68) |
| Total Travel Expenses | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (5,707.66) |
| Total Operating Expenses | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | | (172,390.28) | | (172,390.28) | | (172,390.28) | | (172,390.28) | | (172,390.28) | | | (1,034,341.69) |
| Total Other Expenses | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | | | | | | | (52,992.00) | | (35,328.00) | | | | | (88,320.00) |
| Financial Advisor Fee | | | | | | | (57,876.00) | | (40,352.00) | | | | | (98,228.00) |
| Shannon & Lee LLP | | | | | | | (40,000.00) | | (60,000.00) | | | | | (100,000.00) |
| Ray Battaglia | | | | | | | (24,000.00) | | (24,000.00) | | | | | (48,000.00) |
| Total Professional Fees | | | | | | | (174,868.00) | | (159,680.00) | | | | | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | 440,373.41 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | ) Case No. 22-  60043  |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

## DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF
## VOLUNTARY PETITION AND FIRST DAY MOTIONS

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      My name is W. Marc Schwartz ("Schwartz").

2.      I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3.      The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

1

007901

5.     I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.   The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.     SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services   My firm represents individuals, companies and courts in a variety of assignments,  including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.     I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.     I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.     On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

007902

10. On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. Background to Creation of Free Speech Systems, LLC

11. Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12. In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13. Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14. From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

3

007903

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.     Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC")*.

16.     Alex Jones was a natural.

17.     The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.     Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.     When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.     The predecessor operation of FSS in 2004 was an operation with just a handful of employees.  Alex Jones had a tiny office in the far south of Austin. He had two employees at

4

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.    As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.    By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.    While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.    After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.    The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

007905

26.     Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B.  Present Business of Free Speech Systems, LLC**

27.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28.     On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29.     The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30.     As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided.  The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

6

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

### C.  The Relationship Between Alex Jones and FSS

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected.  Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

35.     The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

### D.  The Debtor' Owners and Management

36.     At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.     Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.      Since then, Alex Jones has been the Managing Member of FSS.

39.     Since inception, Alex Jones has been a "single talent business", _to wit_, without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.     Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.     In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

007908

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies. With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.     The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger. As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b) FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

007909

### E. The Relationship of FSS and PQPR

*Background Information About PQPR*

43.     PQPR was founded in 2013. The business began operations in September 2013.

44.     PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.     PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.     The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47.     Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR").   Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.     Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49.     As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer.  FSS pays PQPR, as its agent, funds required to purchase product, which then pays

10

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50.     Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.     Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.     In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53.     On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.     The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.     On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

007911

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F.  FSS Needs a Credit Card Processor**

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.   Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

007912

62.    The key players in credit card processing are:

- **Customer** – the person making a purchase.
- **Merchant** – the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway** – this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor** – (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network** – (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank** – (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank** – (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing them to accept card payments. Acquiring banks can also serve as credit card processors.

63.    In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

13

64.     After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.     Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.     FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS.  A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.     FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.     In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.     In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

14

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G.  Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

007915

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and **_(e)_** *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74.     These two actions: **_(a)_** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; **_(b)_** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75.     As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76.     In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

16

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "<u>Connecticut State Court Litigation</u>" together with the Texas State Court Litigation are hereinafter referred to as the "<u>Sandy Hook Lawsuits</u>").

77.    As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78.    Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79.    Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80.    InfoW, LLC f/k/a Infowars, LLC ("<u>InfoW</u>" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "<u>InfoWDebtors</u>"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "<u>Bankruptcy Court</u>"), on April 18, 2022 (the "<u>Petition Date</u>"), initiating Case No. 22-60020 in that court (the "<u>Bankruptcy Case</u>").

81.    The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

17

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.      The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H. Current Financial Condition of Debtor**

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

18

87.     Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88.     Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

## I.     Critical Motions to Commence the Chapter 11 Case

### First Day Motions

89.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

007919

- **Critical Vendors Motion**. *Debtor's Motion for an Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**. *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.     The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

20

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

## Procedural Motion

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

21

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.     I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### Operational Motions

97.     **Cash Collateral Motion[6]**. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.     The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.     Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

22

100.     The use of cash collateral  required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**.  The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim  Period").

101.     The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.     PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.     Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.     **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

007923

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62. In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.

105.    After an extensive review and analysis of the Debtor's vendors, the Debtor and its professionals identified the vendors that supply products and services vital to the Debtor's continued operation. The Debtor relies on products and services from its Critical Vendors to operate its business, and, depend on the timely provision of specialized services to provide top-quality content and services to its customer base.

106.    The Critical Vendors procure and provide key services to producing and transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their mission-critical goods and services, the business of FSS would grind to a halt.

107.    I understand that the Debtor's trade relationship with its Critical Vendors is not governed by long-term contracts, and the Debtor believes those trade relationships will deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption and disturbances to the Debtor's business during the Chapter 11 Case.

108.    Subject to Court's approval, I understand the Debtor intends to pay Critical Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review, assess, and make payment on account of these claims. In return for paying these claims, the Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon each claimant's agreement to continue supplying goods and services to the Debtor in accordance

24

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.    **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.    In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.    To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.    The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

007925

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.    The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### *Adequate Assurance Procedures*

115.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.    The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

26

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

007927

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118.    **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit.  Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119.    The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120.    The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

007928

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.**7**

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July,  2022.

W. Marc Schwartz, as Chief Restructuring
Officer of Free Speech Systems, LLC

---

7 In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

007929

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

| | Free Speech Systems LLC<br>Comparative Profit and Loss Statement<br>For the Year Ended December 31, 2021 and the Five Months<br>Ended May 31, 2021 |
|---|---|

| | | 2021 | | 2022 |
|---|---|---|---|---|
| **Income** | | | | |
| Product Sales | $ | 52,661,022.49 | $ | 10,969,769.29 |
| Advertising Income | | 5,761,997.51 | | - |
| Donations | | 710,154.12 | | 2,876,213.86 |
| Fulfillment Services | | 3,533,223.00 | | - |
| Administrative Services | | 1,903,898.95 | | - |
| Media Production Sales | | - | | 475,000.00 |
| Infowars Health | | 38,123.60 | | - |
| Prison Planet | | 4,877.62 | | - |
| Uncategorized Income | | 357,344.56 | | - |
| *Total Income* | | *64,970,641.85* | | *14,320,983.15* |
| Cost of Goods Sold | | 51,878,333.73 | | 4,936,453.79 |
| *Gross Profit* | $ | *13,092,308.12* | $ | *9,384,529.36* |
| **Expenses** | | | | |
| Advertising & Promotion | | 364,387.73 | | 107,994.01 |
| Computer/IT/IP Expense | | 5,036,717.02 | | 1,307,339.15 |
| Insurance Expense | | 54,558.40 | | 31,898.90 |
| Office & Administrative Expense | | 277,863.76 | | 26,373.93 |
| Contract Services | | 1,591,039.49 | | 359,592.69 |
| Professional Fees | | 4,126,906.48 | | 1,623,771.42 |
| Occupancy | | 1,624,864.40 | | 345,602.34 |
| Utilities | | 115,461.34 | | 127,855.13 |
| Taxes Paid | | 50,281.71 | | 4,409.71 |
| Telephone Expense | | 304,776.62 | | 85,341.24 |
| Personnel & Payroll Expenses | | 6,879,811.39 | | 2,157,298.60 |
| Travel | | 975,711.28 | | 64,900.23 |
| Equipment Purchase | | 123,696.05 | | - |
| Production | | 393,712.54 | | - |
| Radio Show | | 145,177.77 | | - |
| Royalties | | 1,197,472.71 | | - |
| Equipment Rental | | 27,322.86 | | - |
| Meals and Entertainment | | 97,486.31 | | - |
| Uncategorized Expense | | - | | 103,815.00 |
| *Total Expenses* | | *23,387,247.86* | | *6,346,192.35* |
| *Net Operating Income* | $ | *(10,294,939.74)* | $ | *3,038,337.01* |
| **Other Income** | | **507,168.04** | | **1,019,713.81** |
| **Other Expenses** | | 18,963.30 | | 206.15 |
| Interest Expense | | 857,498.17 | | 397,669.19 |
| Donation | | 10,000.00 | | - |
| Amortization Expense | | 35,361.28 | | 5,937.50 |
| Depreciation Expense | | 209,888.00 | | 98,750.20 |
| AMEX Charges | | - | | 1,653,383.31 |
| *Total Other Expenses* | | *1,131,710.75* | | *2,155,946.35* |
| *Net Other Income* | | *(624,542.71)* | | *(1,136,232.54)* |
| *Net Income* | $ | *(10,919,482.45)* | $ | *1,902,104.47* |

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

**Exhibit B**

```
┌─────────────────────────────────────────────────┐
│              Free Speech Systems LLC              │
│            Comparative Balance Sheet              │
│      As of December 31, 2021 and May 31, 2022     │
└─────────────────────────────────────────────────┘
```

|  | 2021 | 2022 |
|---|---:|---:|
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 1,508,720.21 | $ 1,159,247.90 |
| Accounts Receivable | 10,187,121.95 | 10,013,413.22 |
| **Other Current Assets** | | |
| Invenotry | 1,732,603.13 | 910,116.84 |
| Prepaid Expenses | 446,475.64 | 114,136.99 |
| Due from PQPR | (500.00) | - |
| Advance To Elevated Solutions | 27,870.00 | - |
| *Total Other Current Assets* | *2,206,448.77* | *1,024,253.83* |
| *Total Current Assets* | *13,902,290.93* | *12,196,914.95* |
| **Fixed Assets** | 1,679,438.66 | 1,580,779.46 |
| **Other Assets** | | |
| Intangible Assets | 21,270.83 | 15,333.33 |
| Security Deposits | 534,560.00 | 534,560.00 |
| *Total Other Assets* | *555,830.83* | *549,893.33* |
| *Total Assets* | *$ 16,137,560.42* | *$ 14,327,587.74* |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 4,732,966.89 | $ 1,217,685.58 |
| Credit Cards | 152,367.42 | 207,984.04 |
| **Other Current Liabilities** | | |
| David Jones Advance | 150,000.00 | 150,000.00 |
| Advances from PQPR | - | 571,920.57 |
| Due to PQPR | 23,058,367.00 | 23,058,367.00 |
| *Total Other Current Liabilities* | *23,208,367.00* | *23,780,287.57* |
| *Total Current Liabilities* | *28,093,701.31* | *25,205,957.19* |
| **Long Term Liabilities** | | |
| Note Due to PQPR | 54,580,405.22 | 53,845,074.41 |
| Note Payable - Winnebago | 93,505.62 | 82,524.37 |
| *Total Long Term Liabilities* | *54,673,910.84* | *53,927,598.78* |
| *Total Liabilities* | *$ 82,767,612.15* | *$ 79,133,555.97* |
| **Equity** | | |
| Member's Equity | (774,291.44) | - |
| Member Draws | (61,937,862.26) | (254,014.00) |
| Member Contributions | 4,305,810.14 | 311,350.00 |
| Opening Balance Equity | - | (66,765,408.70) |
| Retained Earnings | 2,695,774.28 | |
| Net Income | (10,919,482.45) | 1,902,104.47 |
| *Total Equity* | *$ (66,630,051.73)* | *$ (64,805,968.23)* |
| *Total Liabilities and Equity* | *$ 16,137,560.42* | *$ 14,327,587.74* |

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

007934

**Exhibit C**

---

**Free Speech Systems, LLC**
**Statement of Cash Flows**

**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2022**

| | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| *Net Income* | **($10,919,482.45)** | **$1,902,104.47** |
| <u>*Adjustments to reconcile Net Income to Net Cash provided by operations:*</u> | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| *Net cash provided by operating activities* | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| *Net cash provided by investing activities* | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| *Net cash provided by financing activities* | **22,850,016.65** | **(787,074.46)** |
| *Net cash increase for period* | **$952,374.76** | **($349,472.31)** |

Exhibit "D"

13-Week Cash Flow Forecast for FSS

007936

# Exhibit D

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| | Wk 1 07/30–08/05/22 | Wk 2 08/06–08/12/22 | Wk 3 08/13–08/19/22 | Wk 4 08/20–08/26/22 | Wk 5 08/27–09/02/22 | Wk 6 09/03–09/09/22 | Wk 7 09/10–09/16/22 | Wk 8 09/17–09/23/22 | Wk 9 09/24–09/30/22 | Wk 10 10/01–10/07/22 | Wk 11 10/08–10/14/22 | Wk 12 10/15–10/21/22 | Wk 13 10/22–10/28/22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | 595,489.01 | $ 7,741,357.16 |
| Advertising | 480,166.46 | | | | 480,166.46 | | | | 480,166.46 | | | | | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | (2,082.90) | | (1,608.39) | | | (11,073.89) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting Service | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | | (266.50) | | | | (266.50) | | | | (266.50) | | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | (238,031.01) | | (1,874.89) | | | (719,717.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | | | | (1,989.90) | | | | (1,989.90) | | | | | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | (22,670.00) | | (12,000.00) | | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | | | (5,107.63) | | | | (5,107.63) | | | | (5,107.63) | | | (15,322.89) |
| HVAC | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | (23,057.46) | | (5,107.63) | | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Off-Site Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,336.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (6,331.16) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

007931

Case 22-60043   Document 10   Filed in TXSB on 07/29/22   Page 38 of 38

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022- 08/05/2022 | 08/06/2022- 08/12/2022 | 08/13/2022- 08/19/2022 | 08/20/2022- 08/26/2022 | 08/27/2022- 09/02/2022 | 09/03/2022- 09/09/2022 | 09/10/2022- 09/16/2022 | 09/17/2022- 09/23/2022 | 09/24/2022- 09/30/2022 | 10/01/2022- 10/07/2022 | 10/08/2022- 10/14/2022 | 10/15/2022- 10/21/2022 | 10/22/2022- 10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (1,470.56) | - | - | (4,411.68) |
| **Total Travel Expenses** | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | - | - | - | - | - | - | (174,868.00) | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

007938

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 3

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 05, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved by agreement or order of the Court or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1.    The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the ~~Western~~ Southern District of Texas (this "Court").

2.    Debtor-in-Possession.   The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner

has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3. <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "<u>Local Rules</u>").

4. <u>Committee Formation</u>. To date, no official committee (a "<u>Committee</u>") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5. <u>Notice</u>. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("<u>PQPR</u>"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule 4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6. <u>Immediate Need for Use of Cash Collateral</u>. The Debtor asserts that an immediate and critical need exists for the Debtor to use the alleged cash collateral[1] of PQPR as set forth in the budget defined below (the "<u>Cash Collateral</u>") in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

---

[1] As defined at 11 U.S.C. § 363(a).

7.      Conditional Consent to Use of Cash Collateral. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to this Order as Exhibit A (the "Budget") for the period (the "Interim Period") from the Petition Date through and including August 26, 2022 (the "Termination Date"). The lender has agreed to the Debtor's use of Cash Collateral during the Interim Period exclusively in accordance with the terms, conditions, and limitations set forth in this Order and the Budget.

8.      Good Cause/Fair and Reasonable Terms. The Debtor asserts that good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      Motion Granted. The Motion is hereby granted on an interim basis as set forth herein.

2.      Interim Order. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      DIP Account. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "DIP Account"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor

shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5. <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Payments to any insider during the Interim Period shall not exceed $20,000 in the aggregate.

6. <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR $250,000 as provided in the Budget for "Repay PQPR Inventory" (the "<u>PQPR Payment</u>"). The PQPR Payment shall not be used to pay down the PQPR Notes (as defined in the Motion). Creditors and parties in interest shall have thirty (30) days from the date a notice is filed on the docket that the PQPR Payment has been issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment.

7. <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8. <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall

remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9. <u>Adequate Protection – Replacement Liens</u>.     As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "<u>Diminution in Value</u>"), the Pre-Petition Lender is hereby granted, effective as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "<u>Replacement Liens</u>") in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "<u>Adequate Protection Collateral</u>") to the same extent as existed on the Petition Date. The Replacement Liens granted pursuant to this Order shall be subject to the Carve Out.

10. <u>Carve Out</u>. The Replacement Liens and Adequate Protection Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "<u>Estate Professionals</u>"), for incurred but unpaid fees, expenses and other costs; fees and expenses of the appointed Subchapter V Trustee (all such carve-out amounts referenced above, collectively, the "<u>Carve Out</u>").

11. <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

12.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, the Subchapter V Trustee, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

13.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August 24, 2022, at 10:00 a.m. Central time.


Signed:  August 05, 2022

Christopher Lopez
United States Bankruptcy Judge

007945

# Forecasted Interim Cash Collateral Budget
### Between July 29, 2022 and August 26, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 |
|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 |

## Income
| | | | | |
|---|---|---|---|---|
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 |
| Advertising | - | - | - | 480,166.46 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 |
| **Total Income** | **598,630.26** | **598,630.26** | **598,630.26** | **1,078,796.72** |

## Selling & Product Costs
| | | | | |
|---|---|---|---|---|
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) |
| Repay PQPR Inventory | - | (250,000.00) | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - |
| Texas Sales Tax | (5,337.87) | - | - | - |
| **Total Cost of Goods Sold** | **(262,569.67)** | **(479,961.80)** | **(229,961.80)** | **(229,961.80)** |

## Operating Expenses
### Advertising & Promotion
| | | | | |
|---|---|---|---|---|
| Advertising & Promotion | (3,041.98) | - | - | - |
| Print Media | (3,000.00) | - | - | - |
| Radio Show Advertising | (11,500.00) | - | - | - |
| **Total Advertising & Promotion** | **(17,541.98)** | **-** | **-** | **-** |

### Computer/IT/IP Expense
| | | | | |
|---|---|---|---|---|
| Internet & TV services | (2,082.90) | - | (1,608.39) | - |
| Software License Fees | (140.80) | - | - | - |
| Server Hosting Service | (28,595.13) | - | - | - |
| CDN Video Cloud Storage | (55,728.00) | - | - | - |
| Satellite Service | (137,282.93) | - | - | - |
| Imaging License Fee | (9,201.25) | - | - | - |
| Software & Apps | (5,000.00) | - | - | - |
| Website Hosting | - | - | (266.50) | - |
| **Total Computer/IT/IP Expense** | **(238,031.01)** | **-** | **(1,874.89)** | **-** |
| Insurance | (2,166.50) | - | - | - |

### Office & Administrative Expense
| | | | | |
|---|---|---|---|---|
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) |
| Equipment Rental | (1,989.90) | - | - | - |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) |
| **Total Office & Administrative Expense** | **(2,318.36)** | **(328.46)** | **(328.46)** | **(328.46)** |

| | | | | |
|---|---|---|---|---|
| Outsourced Services | - | - | - | - |
| Consulting Services | - | - | - | - |

### Utilities
| | | | | |
|---|---|---|---|---|
| Utility Deposit | (10,000.00) | - | - | - |
| Electricity | - | - | (5,107.63) | - |
| HVAC | (256.19) | - | - | - |
| CAM Charges | (20,364.16) | - | - | - |
| Water & Sewer | (1,708.55) | - | - | - |
| Gas Service | (132.09) | - | - | - |
| Pest Control | (244.65) | - | - | - |
| Waste Management | (351.81) | - | - | - |
| **Total Utilities** | **(33,057.46)** | **-** | **(5,107.63)** | **-** |

### Occupancy
| | | | | |
|---|---|---|---|---|
| Rent | (33,408.51) | - | - | - |
| Office Security | (31,111.90) | - | - | - |
| Repair & Maintenance - Building | (1,777.19) | - | - | - |
| Janitorial | (5,983.33) | - | - | - |



EXHIBIT

A

007946

| Period+A5:E83 | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 |
|---|---|---|---|---|
| **Total Occupancy** | **(72,280.93)** | **-** | **-** | **-** |
| Supplies | (1,258.02) | - | - | - |
| Telephone | (18,337.88) | - | - | |
| **Personnel Expenses** | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - |
| Payroll Tax | (13,087.76) | - | (13,087.76) | - |
| Alex Jones Salary | (10,000.00) | - | (10,000.00) | - |
| **Total Personnel Expenses** | **(191,555.20)** | **-** | **(191,555.20)** | **-** |
| **Travel** | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) |
| Vehicle Leases | - | (1,470.56) | - | - |
| **Total Travel Expenses** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** |
| **Total Operating Expenses** | **(576,647.03)** | **(1,898.71)** | **(198,965.88)** | **(428.15)** |
| ***Non-Operating Expenses*** | | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) |
| AMEX Payment | - | - | - | - |
| **Total Other Expenses** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** |
| **Professional Fees** | | | | |
| CRO Fees | - | - | - | - |
| Financial Adviosr Fee | - | - | - | - |
| Shannon & Lee LLP | - | - | - | - |
| Ray Battaglia | - | - | - | - |
| **Total Professional Fees** | **-** | **-** | **-** | **-** |
| **Total Cash Flow** | **$ (245,586.44)** | **$ 111,769.75** | **$ 164,702.59** | **$ 843,406.77** |

007947

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 4

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 12, 2022
Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### ORDER MODIFYING INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On August 11, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral* after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. Motion Granted. The Motion is hereby granted on an interim basis as set forth herein.

2. Interim Order. The Interim Order shall be modified as follows:

The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the Motion, from the daily settlement contemporaneously with the distributions to FSS and PQPR

3. Reporting. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Connecticut and Texas plaintiffs.

4. The remaining terms, findings and provisions of the Interim Order are not amended or modified and remain in effect.

Signed: August 12, 2022

Christopher Lopez
United States Bankruptcy Judge

007949

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 5

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 24, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## SECOND INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). This order is the second interim order ("Second Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2. <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3. <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4. <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Second Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5. <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6. <u>Payment to PQPR for Inventory Purchase</u>. Notwithstanding the limitation on payments to insiders set forth in the preceding paragraph, the Debtor is authorized to use Cash Collateral to pay PQPR up to $750,000 as provided in the Budget for "Repay PQPR Inventory" (each payment comprising a portion of the $750,000, a "<u>PQPR Payment</u>").  Creditors and parties in interest shall have thirty (30) days from the date

they receive notice that a PQPR Payment was issued to object to the appropriateness of that payment and file pleadings with the Court seeking to clawback the PQPR Payment. The Debtor shall provide notice of a PQPR Payment to creditors and parties in interest on the same day the payment is issued.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.    The adequate protection and related carve outset forth in the First Interim Order are incorporated in the Second Interim Order.

10.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.    <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.    <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.    <u>Discovery</u>. The Tort Plaintiffs issued written discovery to the Debtor and PQPR relating to the use of cash collateral on a final basis. PQPR and the Debtor will provide written discovery responses and produce responsive documents to the Tort Plaintiffs no later than August 30. If PQPR and the Debtor have objections to discovery, it will be their obligation file written objections to discovery before August 30, 2022. PQPR and the Debtor will make a good faith effort to begin producing responsive documents on a rolling basis as soon as possible, but not later than August 29th, 2022. The Tort Plaintiffs will provide deposition topics no later than August 22, which may be subject to amendment once document production is reviewed. The Debtor shall present a corporate representative for deposition on September 6, 2022. PQPR shall present a corporate representative for deposition on September 8. PQPR, the Debtor, and the Tort Plaintiffs agree that any discovery dispute may be heard on an emergency basis.

15.    <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on September 13, 2022, at 1:00 p.m. Central time.

Signed:  August 24, 2022

Christopher Lopez
United States Bankruptcy Judge

007954

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 4 | 5 | 6 | 7 | |
| **Income** | | | | | | |
| Product Sales | $ | 900,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 3,900,000.00 |
| Advertising | $ | 480,166.46 | $ - | $ - | $ - | $ 480,166.46 |
| Donations | $ | 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,383,307.71 | $ 1,003,141.25 | $ 1,003,141.25 | $ 1,003,141.25 | $ 4,392,731.45 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | $ | (76,155.17) | $ (76,155.17) | $ (225,294.19) | $ (225,294.19) | $ (602,898.72) |
| Repay PQPR Inventory | $ | (250,000.00) | | $ (500,000.00) | $ - | $ (750,000.00) |
| Merchant Account Fees | $ | (44,100.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (191,100.00) |
| Shipping cost for drop ship orders | $ | (11,957.62) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (51,816.36) |
| Fulfillment Services | $ | (219,512.20) | $ (243,902.44) | $ (243,902.44) | $ (243,902.44) | $ (951,219.51) |
| Processor Fees | $ | (36,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (156,000.00) |
| eCommerce Store Maintenance | $ | - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | $ | - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (637,724.99) | $ (454,951.73) | $ (1,071,482.87) | $ (571,482.87) | $ (2,735,642.47) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | $ | - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | $ | - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | $ | - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | $ | - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | $ | - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | $ | - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | $ | - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | $ | - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | $ | - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | $ | - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | $ | - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| Website Hosting | $ | - | $ - | $ - | $ (266.50) | $ (266.50) |
| **Total Computer/IT/IP Expense** | $ | - | $ (238,031.01) | $ - | $ (1,874.89) | $ (239,905.91) |
| Insurance | $ | - | $ (2,166.50) | $ - | $ - | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | $ - |
| Bank Fees & Service Charges | $ | (69.38) | $ (77.08) | $ (77.08) | $ (77.08) | $ (300.63) |
| Equipment Rental | $ | - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | $ | (3.17) | $ (3.53) | $ (3.53) | $ (3.53) | $ (13.76) |
| Business Meals | $ | (423.88) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,836.79) |
| **Total Office & Administrative Expense** | $ | (496.43) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,141.08) |
| Outsourced Services | $ | - | $ - | $ - | $ - | |
| Consulting Services | $ | - | $ - | $ - | $ - | |
| **Utilities** | | | | | | |
| Electricity | $ | - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | $ | - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | $ | - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | $ | - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |
| Gas Service | $ | - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | $ | - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | $ | - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | $ | - | $ (23,057.46) | $ - | $ (5,107.63) | $ (28,165.09) |
| **Occupancy** | | | | | | |
| Rent | $ | - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | $ | - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | $ | - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | $ | - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | $ | - | $ (72,280.93) | $ - | $ - | $ (72,280.93) |
| Supplies | $ | - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | $ | - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | $ | - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | $ | - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |

EXHIBIT

A

007955

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 4 - Week 7)**

**Between August 20, 2022 and September 16, 2022**

| | Period | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | Total |
|---|---|---|---|---|---|---|
| **Total Personnel Expenses** | | $ - | $ (201,755.20) | $ - | $ (201,755.20) | $ (403,510.40) |
| **Travel** | | | | | | $ - |
| Mileage/Parking/Tolls | | $ (150.67) | $ (167.41) | $ (167.41) | $ (167.41) | $ (652.90) |
| Vehicle Leases | | $ - | $ - | $ (1,470.56) | $ - | $ (1,470.56) |
| **Total Travel Expenses** | | $ (150.67) | $ (167.41) | $ (1,637.97) | $ (167.41) | $ (2,123.46) |
| **Total Operating Expenses** | | $ (647.10) | $ (577,137.87) | $ (2,189.56) | $ (209,456.72) | $ (789,431.24) |
| ***Non-Operating Expenses*** | | | | | | $ - |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | $ - |
| **Total Other Expenses** | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | $ (25,000.00) | $ (25,000.00) |
| Fulfillment Expert | | $ (12,500.00) | $ - | $ - | $ - | $ (12,500.00) |
| Witness expenses and cost | | | | | | |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (50,000.00) | $ - | $ (50,000.00) |
| SALLC Fees | | $ - | $ - | $ - | | $ - |
| Shannon & Lee LLP | | $ - | $ - | $ - | | $ - |
| Ray Battaglia | | $ - | $ - | $ - | | $ - |
| **Total Professional Fees** | | $ (12,500.00) | $ - | $ (150,000.00) | $ (25,000.00) | $ (187,500.00) |
| **Total Cash Flow** | | $ 727,435.62 | $ (33,948.36) | $ (225,531.18) | $ 192,201.66 | $ 660,157.73 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 6

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 13, 2022

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## THIRD INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. This order is the third interim order ("Third Interim Order"), negotiated between the Debtor and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.  Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.    <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.    <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.    <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Third Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.    <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, either directly or indirectly, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $20,000.

6.    <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.      <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.      <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.      <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First and Second Interim Orders are incorporated in the Third Interim Order.

10.      <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.      <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.      <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on October 12, 2022, at 10:00 a.m. Central time.

Signed:  September 13, 2022

Christopher Lopez
United States Bankruptcy Judge

007961

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-<br>09/23/2022 | 09/24/2022-<br>09/30/2022 | 10/01/2022-<br>10/07/2022 | 10/08/2022-<br>10/14/2022 | Total |
|---|---|---|---|---|---|---|
| | Week Number | 8 | 9 | 10 | 11 | |
| **Income** | | | | | | |
| Product Sales | | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 4,000,000.00 |
| Advertising | | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 400,000.00 |
| Donations | | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 3,141.25 | $ 12,564.99 |
| **Total Income** | | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 1,103,141.25 | $ 4,412,564.99 |
| **Selling & Product Costs** | | | | | | |
| Inventory Purchase | | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (225,294.19) | $ (901,176.75) |
| Repay PQPR Inventory | | $ - | $ - | $ - | $ - | $ - |
| Merchant Account Fees | | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (49,000.00) | $ (196,000.00) |
| Shipping cost for drop ship orders | | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (13,286.25) | $ (53,144.99) |
| Fulfillment Services | | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (293,902.44) | $ (1,175,609.76) |
| Processor Fees | | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (40,000.00) | $ (160,000.00) |
| eCommerce Store Maintenance | | $ - | $ (27,270.00) | $ - | $ - | $ (27,270.00) |
| Texas Sales Tax | | $ - | $ (5,337.87) | $ - | $ - | $ (5,337.87) |
| **Total Cost of Goods Sold** | | $ (621,482.87) | $ (654,090.74) | $ (621,482.87) | $ (621,482.87) | $ (2,518,539.36) |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Advertising & Promotion | | $ - | $ (3,041.98) | $ - | $ - | $ (3,041.98) |
| Print Media | | $ - | $ (3,000.00) | $ - | $ - | $ (3,000.00) |
| Radio Show Advertising | | $ - | $ (11,500.00) | $ - | $ - | $ (11,500.00) |
| **Total Advertising & Promotion** | | $ - | $ (17,541.98) | $ - | $ - | $ (17,541.98) |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | | $ - | $ (2,082.90) | $ - | $ (1,608.39) | $ (3,691.30) |
| Software License Fees | | $ - | $ (140.80) | $ - | $ - | $ (140.80) |
| Server Hosting Service | | $ - | $ (28,595.13) | $ - | $ - | $ (28,595.13) |
| CDN Video Cloud Storage | | $ - | $ (55,728.00) | $ - | $ - | $ (55,728.00) |
| Satellite Service | | $ - | $ (137,282.93) | $ - | $ - | $ (137,282.93) |
| Imaging License Fee | | $ - | $ (9,201.25) | $ - | $ - | $ (9,201.25) |
| Software & Apps | | $ - | $ (5,000.00) | $ - | $ - | $ (5,000.00) |
| 62410 Contract Broadcase Services | | $ (11,200.00) | | | | $ (11,200.00) |
| 62420 Contract Radio Show Production | | $ (25,000.00) | | | | $ (25,000.00) |
| 62430 Contract Video Production | | $ (10,000.00) | | | | $ (10,000.00) |
| 62470 Free Lance Contributors | | $ (3,500.00) | | | | $ (3,500.00) |
| Website Hosting | | $ - | $ - | $ - | $ - | |
| **Total Computer/IT/IP Expense** | | $ (49,700.00) | $ (238,031.01) | $ - | $ (1,608.39) | $ (289,339.41) |
| Insurance | | $ - | $ (2,166.50) | $ - | | $ (2,166.50) |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | | $ (77.08) | $ (77.08) | $ (77.08) | $ (77.08) | $ (308.34) |
| Equipment Rental | | $ - | $ (1,989.90) | $ - | $ - | $ (1,989.90) |
| Office Supplies/Printing/Copy | | $ (3.53) | $ (3.53) | $ (3.53) | $ (3.53) | $ (14.11) |
| Business Meals | | $ (470.97) | $ (470.97) | $ (470.97) | $ (470.97) | $ (1,883.89) |
| **Total Office & Administrative Expense** | | $ (551.58) | $ (2,541.48) | $ (551.58) | $ (551.58) | $ (4,196.24) |
| **Utilities** | | | | | | |
| Electricity | | $ - | $ - | $ - | $ (5,107.63) | $ (5,107.63) |
| HVAC | | $ - | $ (256.19) | $ - | $ - | $ (256.19) |
| CAM Charges | | $ - | $ (20,364.16) | $ - | $ - | $ (20,364.16) |
| Water & Sewer | | $ - | $ (1,708.55) | $ - | $ - | $ (1,708.55) |

007962

**Free Speech Systems LLC**

**Forecasted Interim Cash Flow Budget (Week 8- Week 11)**

**Between September 17, 2022 and October 14, 2022**

| | Period | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | Total |
|---|---|---|---|---|---|---|
| Gas Service | | $ - | $ (132.09) | $ - | $ - | $ (132.09) |
| Pest Control | | $ - | $ (244.65) | $ - | $ - | $ (244.65) |
| Waste Management | | $ - | $ (351.81) | $ - | $ - | $ (351.81) |
| **Total Utilities** | | **$ -** | **$ (23,057.46)** | **$ -** | **$ (5,107.63)** | **$ (28,165.09)** |
| **Occupancy** | | | | | | |
| Rent | | $ - | $ (33,408.51) | $ - | $ - | $ (33,408.51) |
| Office Security | | $ - | $ (31,111.90) | $ - | $ - | $ (31,111.90) |
| Repair & Maintenance - Building | | $ - | $ (1,777.19) | $ - | $ - | $ (1,777.19) |
| Janitorial | | $ - | $ (5,983.33) | $ - | $ - | $ (5,983.33) |
| **Total Occupancy** | | **$ -** | **$ (72,280.93)** | **$ -** | **$ -** | **$ (72,280.93)** |
| Supplies | | $ - | $ (1,258.02) | $ - | $ - | $ (1,258.02) |
| Telephone | | $ - | $ (18,337.88) | $ - | $ - | $ (18,337.88) |
| **Personnel Expenses** | | | | | | $ - |
| Salaries & Wages - Base | | $ - | $ (168,467.44) | $ - | $ (168,467.44) | $ (336,934.88) |
| Payroll Tax | | $ - | $ (13,287.76) | $ - | $ (13,287.76) | $ (26,575.52) |
| Alex Jones Salary | | $ - | $ (20,000.00) | $ - | $ (20,000.00) | $ (40,000.00) |
| **Total Personnel Expenses** | | **$ -** | **$ (201,755.20)** | **$ -** | **$ (201,755.20)** | **$ (403,510.40)** |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | | $ (167.41) | $ (167.41) | $ (167.41) | $ (167.41) | $ (669.64) |
| Vehicle Leases | | $ - | $ - | $ - | $ (1,470.56) | $ (1,470.56) |
| **Total Travel Expenses** | | **$ (167.41)** | **$ (167.41)** | **$ (167.41)** | **$ (1,637.97)** | **$ (2,140.20)** |
| **Total Operating Expenses** | | **$ (50,419.00)** | **$ (577,137.87)** | **$ (719.00)** | **$ (210,660.78)** | **$ (838,936.64)** |
| *Non-Operating Expenses* | | | | | | |
| Payment on PQPR Note | | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (5,000.00) | $ (20,000.00) |
| AMEX Payment | | $ - | $ - | $ - | $ - | |
| **Total Other Expenses** | | **$ (5,000.00)** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (5,000.00)** | **$ (20,000.00)** |
| **Professional Fees** | | | | | | |
| Subchapter v Trustee retainer | | | | | | |
| Fulfillment Expert | | $ (22,487.56) | $ - | $ - | $ - | $ (22,487.56) |
| Economic Loss Expert | | | | | | $ - |
| Alex Jones at Trial Cost | | $ (80,920.00) | | | | $ (80,920.00) |
| Witness expenses and trial costs | | $ (34,048.00) | | | | $ (34,048.00) |
| Brittany Paz | | | | | | $ - |
| Pattis & Smith | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| Reynal Law Firm, PC | | $ - | $ - | $ (100,000.00) | $ - | $ (100,000.00) |
| SALLC Fees | | | $ - | $ - | $ (188,018.31) | $ (188,018.31) |
| Shannon & Lee LLP | | | $ - | $ - | $ (207,348.36) | $ (207,348.36) |
| Ray Battaglia | | | $ - | $ - | $ (47,316.80) | $ (47,316.80) |
| **Total Professional Fees** | | **$ (137,455.56)** | **$ -** | **$ (200,000.00)** | **$ (442,683.47)** | **$ (780,139.03)** |
| **Total Cash Flow** | | **$ 288,783.82** | **$ (133,087.37)** | **$ 275,939.38** | **$ (176,685.88)** | **$ 254,949.95** |



EXHIBIT

A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 7

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
October 13, 2022
Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FOURTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. This order is the fourth interim order ("Fourth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

007965

1.     <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.     <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.     <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.     <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fourth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.     <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment and (ii) the obligation of the Debtor to provide notice

of a PQPR Payment to creditors and parties in interest as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order.

7.    <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second and Third Interim Orders are incorporated in the Fourth Interim Order.

10.    <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12.    <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13.     Reservation of Rights. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14.     Final Cash Collateral Hearing: A final hearing on the Motion shall be held before this Court on October 26, 2022, at 1:00 p.m. Central time.

Signed:  October 13, 2022

Christopher Lopez
United States Bankruptcy Judge

007968

| | NEW 2 WEEK BUDGET | | |
|---|---|---|---|
| Week Number | 10/15/2022-10/21/2022 12 | 10/22/2022-10/28/2022 13 | Total |
| **Income** | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 1,190,978.03 |
| Advertising | - | - | - |
| Donations | 3,141.25 | 25,000.00 | 28,141.25 |
| **Total Income** | **598,630.26** | **620,489.01** | **1,219,119.27** |
| **Selling & Product Costs** | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (152,310.35) |
| Repay PQPR Inventory | - | - | - |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (53,594.01) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (15,823.63) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (190,556.48) |
| Processor Fees | (23,819.56) | (23,819.56) | (47,639.12) |
| eCommerce Store Maintenance | (25,000.00) | - | (25,000.00) |
| Texas Sales Tax | - | - | - |
| **Total Cost of Goods Sold** | **(254,961.80)** | **(229,961.80)** | **(484,923.59)** |
| **Operating Expenses** | | | |
| **Advertising & Promotion** | | | |
| Advertising & Promotion | - | - | - |
| Print Media | - | - | - |
| Radio Show Advertising | - | - | - |
| **Total Advertising & Promotion** | **-** | **-** | **-** |
| **Computer/IT/IP Expense** | | | |
| Internet & TV services | (1,608.39) | - | (1,608.39) |
| Software License Fees | - | - | - |
| Server Hosting Service | - | - | - |
| CDN Video Cloud Storage | - | - | - |
| Satellite Service | - | - | - |
| Imaging License Fee | - | - | - |
| Software & Apps | - | - | - |
| Website Hosting | (266.50) | - | (266.50) |
| **Total Computer/IT/IP Expense** | **(1,874.89)** | **-** | **(1,874.89)** |
| **Office & Administrative Expense** | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (91.81) |
| Insurance | - | (5,000.00) | (5,000.00) |
| Equipment Rental | - | | |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (4.20) |
| Business Meals | (400.00) | (400.00) | (800.00) |
| **Total Office & Administrative Expense** | **(448.00)** | **(5,448.00)** | **(5,896.01)** |
| **Utilities** | | | |
| Utility Deposit | | | |
| Electricity | (5,107.63) | - | (5,107.63) |
| HVAC | - | - | - |
| CAM Charges | - | - | - |
| Water & Sewer | - | - | - |
| Gas Service | - | - | - |
| Pest Control | - | - | - |
| Waste Management | - | - | - |
| **Total Utilities** | **(5,107.63)** | **-** | **(5,107.63)** |
| **Occupancy** | | | |
| Rent | - | - | - |
| Office Security | (3,975.00) | (3,975.00) | (7,950.00) |
| Repair & Maintenance - Building | - | (2,500.00) | (2,500.00) |
| Supplies | (5,000.00) | (2,500.00) | (7,500.00) |
| Telephone | | | |

EXHIBIT

A

007969

| | | | |
|---|---|---|---|
| Janitorial | - | - | - |
| **Total Occupancy** | **(8,975.00)** | **(8,975.00)** | **(17,950.00)** |
| | | | |
| **Personnel Expenses** | | | |
| Salaries & Wages - Base | (140,000.00) | - | (140,000.00) |
| Payroll Tax | (11,200.00) | - | (11,200.00) |
| 62410 Contract Broadcase Services | | (11,200.00) | (11,200.00) |
| 62420 Contract Radio Show Production | | (25,000.00) | (25,000.00) |
| 62430 Contract Video Production | | (10,000.00) | (10,000.00) |
| 62470 Free Lance Contributors | (3,500.00) | | (3,500.00) |
| Free Lance Contributors | - | - | - |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) |
| **Total Personnel Expenses** | **(174,700.00)** | **(46,200.00)** | **(220,900.00)** |
| | | | |
| **Travel** | | | |
| Mileage/Parking/Tolls | (100.00) | (100.00) | (200.00) |
| Vehicle Leases | - | - | - |
| **Total Travel Expenses** | **(100.00)** | **(100.00)** | **(200.00)** |
| | | | |
| **Total Operating Expenses** | **(191,205.53)** | **(60,723.00)** | **(251,928.53)** |
| | | | |
| ***Non-Operating Expenses*** | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (10,000.00) |
| **Total Other Expenses** | **(55,000.00)** | **(55,000.00)** | **(110,000.00)** |
| | | | |
| **Professional Fees** | | | |
| CRO Fees | - | (50,000.00) | (50,000.00) |
| Financial Adviosr Fee | - | - | - |
| Shannon & Lee LLP | - | - | - |
| Ray Battaglia | - | (30,000.00) | (30,000.00) |
| **Total Professional Fees** | **-** | **(80,000.00)** | **(80,000.00)** |
| | | | |
| **Total Cash Flow** | **97,462.94** | **194,804.21** | **292,267.15** |

007970

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 8

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 26, 2022

Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

## FIFTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "<u>Motion</u>"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "<u>First Interim Order</u>"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("<u>Second Interim Order</u>") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("<u>Third Interim Order</u>") [Dkt. No. 151]. On October 13, 2022, the Court entered a *Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("<u>Third Interim Order</u>") [Dkt. No. 238]. This order is the Fifth interim order ("<u>Fifth Interim Order</u>"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "<u>Tort Plaintiffs</u>"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final

007972

hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.    <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.    <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.    <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Fifth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.    <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.     <u>Further Authorization</u>.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.     <u>Taxes</u>.  Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.     <u>Adequate Protection – Replacement Liens</u>.  The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Fifth Interim Order.

10.     <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.     <u>Credit Card Processing</u>. The Debtor is authorized to instruct its credit card processor to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order*

*Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR.

12. <u>Reporting</u>. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13. <u>Reservation of Rights</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on November 21, 2022, at 2:00 p.m. Central time.

Signed:  October 26, 2022

Christopher Lopez
United States Bankruptcy Judge

007975

| | 10/29/2022-11/04/2022 | 11/05/2022-11/11/2022 | 11/12/2022-11/18/2022 | 11/19/2022-11/25/2022 | Total | NOTES |
|---|---|---|---|---|---|---|
| **CURRENT 4 WEEK BUDGET** | | | | | | |
| Week Number | 14 | 15 | 16 | 17 | | |
| **Income** | | | | | | |
| Product Sales *(Net of 4.5% Merchant Fee)* | $ 575,000.00 | $ 575,000.00 | $ 600,000.00 | $ 750,000.00 | $ 2,500,000.00 | *Net of 4.5% CC Merchant fees. Includes Shipping Fees and Sales Tax but excludes any PQPR related sales* |
| Advertising | - | - | - | - | - | |
| Refund of Chargeback Reserve | 618,000.00 | - | - | - | 618,000.00 | |
| Donations | 50,000.00 | 10,000.00 | 20,000.00 | 15,000.00 | 95,000.00 | |
| **Total Income** | **1,243,000.00** | **585,000.00** | **620,000.00** | **765,000.00** | **3,213,000.00** | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (89,125.00) | (89,125.00) | (93,000.00) | (116,250.00) | (387,500.00) | |
| PQPR Inventory Purchase | (50,000.00) | (50,000.00) | (50,000.00) | (50,000.00) | (200,000.00) | *Per 2nd interim cash collateral order ECF 98* |
| Fulfillment Services | (115,000.00) | (115,000.00) | (111,000.00) | (138,750.00) | (479,750.00) | *Aurium contract was cancelled 10/20, expect there to be a* |
| Processor Fees | - | - | - | - | - | *reduced fee in the future* |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | *Final ECDN Audit bills* |
| Texas Sales Tax (20% of Sales @ 6.25%) | (7,187.50) | (7,187.50) | (7,500.00) | (9,375.00) | (31,250.00) | |
| **Total Cost of Goods Sold** | **(261,312.50)** | **(261,312.50)** | **(274,000.00)** | **(314,375.00)** | **(1,111,000.00)** | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | - | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | **(14,760.00)** | **-** | **(3,000.00)** | **-** | **(17,760.00)** | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | **(251,000.00)** | **-** | **(28,750.00)** | **-** | **(279,750.00)** | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | - | - | (5,000.00) | (5,000.00) | *Liability and property, we don't have current Workers Comp policy* |
| Rent | (34,858.32) | - | - | - | (34,858.32) | |
| Utilites | (3,100.00) | - | (6,000.00) | - | (9,100.00) | |
| Janitorial | (3,000.00) | - | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | *Includes Konica Minolta copier lease* |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | **(52,558.32)** | **(5,600.00)** | **(17,600.00)** | **(13,100.00)** | **(88,858.32)** | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | - | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | *HR and Bookeeping Fees* |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) | - | (40,000.00) | |
| **Total Personnel Expenses** | **(192,250.00)** | **(5,950.00)** | **(146,850.00)** | **(5,949.91)** | **(350,999.91)** | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | **(500.00)** | **(100.00)** | **(100.00)** | **(650.00)** | **(1,350.00)** | |
| **Total Operating Expenses** | **(511,068.32)** | **(11,650.00)** | **(196,300.00)** | **(19,699.91)** | **(738,718.23)** | |
| ***Non-Operating Expenses*** | | | | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Total Other Expenses** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(5,000.00)** | **(20,000.00)** | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | (50,000.00) | (100,000.00) | |
| Trustee Fees | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Trustee Counsel | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Ray Battaglia | - | - | - | (50,000.00) | (50,000.00) | |
| **Total Professional Fees** | **(30,000.00)** | **(80,000.00)** | **(30,000.00)** | **(130,000.00)** | **(270,000.00)** | |
| **Total Cash Flow** | **435,619.18** | **227,037.50** | **114,700.00** | **295,925.09** | **1,073,281.77** | |



EXHIBIT

A

007976

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 9

007977

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
November 21, 2022
Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### SIXTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). On August 24, 2022, the Court entered a *Second Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Second Interim Order") [Dkt. No. 98]. On September 13, 2022, the Court entered a *Third Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Third Interim Order") [Dkt. No. 151]. On October 13, 2022, the Court entered a *Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Fourth Interim Order") [Dkt. No. 238]. On October 26, 2022, the Court entered a *Fifth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* ("Fifth Interim Order") [Dkt. No. 258]. This order is the Sixth interim order ("Sixth Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort

Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.  <u>Interim Use</u>. The Court approves the interim use of cash collateral as set forth herein.

2.  <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.  <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>"). All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.  <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Sixth Interim Order (the "<u>Interim Period</u>") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.  <u>No Payments to Insiders</u>. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.     <u>Payment to PQPR for Inventory Purchase</u>. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.     <u>Further Authorization</u>. The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.     <u>Taxes</u>. Nothing in this Order shall be construed to grant PQPR (the "<u>Pre-Petition Lender</u>") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.     <u>Adequate Protection – Replacement Liens</u>. The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Sixth Interim Order.

10.     <u>Subsequent Modification of Order</u>. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.     <u>Credit Card Processing</u>. The Debtor is authorized to remit to Blue Ascension, LLC its fulfillment charges as set forth in the *Emergency Motion to Amend Interim Order Authorizing the Use of Cash Collateral*, from the daily settlement contemporaneously with the distributions to FSS and PQPR. Proceeds

received by FSS for sales of PQPR inventory shall be held by FSS in trust pending distribution to PQPR by FSS.

12. _Reporting_. The Debtor shall report each Tuesday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales. A copy of the report shall be forwarded to the U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13. _Reservation of Rights_. Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. _Final Cash Collateral Hearing_: A further interim hearing on the Motion shall be held before this Court on December 19, 2022, at 3:00 p.m. Central time.

Signed: November 21, 2022

Christopher Lopez
United States Bankruptcy Judge

007981

| | 11/26/2022-12/02/2022 | 12/03/2022-12/09/2022 | 12/10/2022-12/16/2022 | 12/17/2022-12/23/2022 | Total | NOTES |
|---|---|---|---|---|---|---|
| **CURRENT 4 WEEK BUDGET** | | | | | | |
| **Week Number** | 18 | 19 | 20 | 21 | | |
| **Income** | | | | | | |
| Product Sales (Net of 6.0% Merchant Fee) | $ 950,000.00 | $ 800,000.00 | $ 725,000.00 | $ 475,000.00 | $ 2,950,000.00 | Net of 6.0% CC Merchant fees.  Includes Shipping Fees and Sales Tax but excludes any PQPR related sales |
| Point of Sales Revenue | | | 191,970.00 | 115,182.00 | 307,152.00 | █████ Product Sales |
| Advertising | - | - | - | - | - | |
| Refund of Chargeback Reserve | - | - | - | - | - | |
| Donations | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 40,000.00 | |
| **Total Income** | 960,000.00 | 810,000.00 | 926,970.00 | 600,182.00 | 3,297,152.00 | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (117,000.00) | (117,000.00) | (117,000.00) | (117,000.00) | (468,000.00) | NutriScience Inventory |
| Inventory Purchases | (250,000.00) | (250,000.00) | (250,000.00) | (250,000.00) | (1,000,000.00) | Hi-Tec Inventory purchase per payment plan agreement |
| PQPR Inventory Purchase | (50,000.00) | (50,000.00) | (50,000.00) | (50,000.00) | (200,000.00) | Per 2nd interim cash collateral order ECF 98 |
| Point of Sale Product Cost | | | (93,850.00) | (56,310.00) | (150,160.00) | █████ product costs |
| Fulfillment Services | (190,000.00) | (160,000.00) | (134,125.00) | (87,875.00) | (572,000.00) | Assumes we do not transition to █████ before 12/24/22 |
| Processor Fees | - | - | - | - | - | Arium contract was cancelled 10/20  expect there to be a reduced fee in the future |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | Final ECDN Audit bills |
| Texas Sales Tax (20% of Sales @ 6.25%) | (11,875.00) | (10,000.00) | (9,062.50) | (5,937.50) | (36,875.00) | |
| **Total Cost of Goods Sold** | (618,875.00) | (587,000.00) | (666,537.50) | (567,122.50) | (2,439,535.00) | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | (14,760.00) | - | (3,000.00) | - | (17,760.00) | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting  / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | (251,000.00) | - | (28,750.00) | - | (279,750.00) | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | - | - | (5,000.00) | (5,000.00) | Liability and property  we don't have current Workers Comp policy |
| Rent | (34,858.32) | | | | (34,858.32) | |
| Utilites | (3,100.00) | | (6,000.00) | - | (9,100.00) | |
| Janitorial | (3,000.00) | - | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | Includes Konica Minolta copier lease |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | (52,558.32) | (5,600.00) | (17,600.00) | (13,100.00) | (88,858.32) | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | HR and Bookeeping Fees |
| Alex Jones Salary | (20,000.00) | | (20,000.00) | | (40,000.00) | |
| **Total Personnel Expenses** | (192,250.00) | (5,950.00) | (146,850.00) | (5,949.91) | (350,999.91) | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | (500.00) | (100.00) | (100.00) | (650.00) | (1,350.00) | |
| **Total Operating Expenses** | (511,068.32) | (11,650.00) | (196,300.00) | (19,699.91) | (738,718.23) | |
| **Non-Operating Expenses** | | | | | | |
| Payment on PQPR Note | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Total Other Expenses** | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | (50,000.00) | (100,000.00) | |
| Trustee Fees | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Trustee Counsel | (15,000.00) | (15,000.00) | (15,000.00) | (15,000.00) | (60,000.00) | |
| Legal Fees - Reynal | (42,000.00) | - | - | (18,000.00) | (60,000.00) | |
| Ray Battaglia | - | - | - | (50,000.00) | (50,000.00) | |
| **Total Professional Fees** | (72,000.00) | (80,000.00) | (30,000.00) | (148,000.00) | (330,000.00) | |
| **Total Cash Flow** | (246,943.32) | 126,350.00 | 29,132.50 | (139,640.41) | (231,101.23) | |
| **Ending Cash** | 253,056.68 | 379,406.68 | 408,539.18 | 268,898.77 | | |

EXHIBIT

A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 22-60043 |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | Chapter 11 (Subchapter V) |
| Debtor | § | |

# EXHIBIT 10

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 19, 2022
Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| Debtor. | § | |

### SEVENTH INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of an interim order pursuant to Sections 105, 361, and 363 of title 11 of the United States Code,11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001,and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court held an interim hearing on the Motion on August 3, 2022 (the "Interim Hearing") and entered an order approving the interim use of cash collateral. (the "First Interim Order"). The Court has subsequently conducted periodic hearings extending authority to use cash collateral on an interim basis. This order is the seventh interim order ("Seventh Interim Order"), negotiated between the Debtor, PQPR and certain tort claimants pursuing litigation against the Debtor and others in Texas and Connecticut (the "Tort Plaintiffs"). The Debtor and the Tort Plaintiffs reserve all rights relating to a final hearing on the use of cash collateral. The findings contained in the First Interim Order are incorporated by reference.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      Interim Use. The Court approves the interim use of cash collateral as set forth herein.

2.      Interim Order. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      DIP Account. The Debtor shall maintain debtor in possession ("DIP") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "DIP Account").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using Cash Collateral funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      Terms of Cash Collateral Use. The Debtor is hereby authorized to use Cash Collateral during the period covered by this Seventh Interim Order (the "Interim Period") to pay the items set forth in the revised Budget attached to this Order as Exhibit A, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Other than as provided for in the Budget, no payments to any insider during the Interim Period shall exceed $10,000.

6.      Payment to PQPR for Inventory Purchase. The (i) rights of Creditors and parties in interest to object to the appropriateness of post-petition payments to PQPR for Inventory Purchases and file pleadings with the Court seeking to clawback the PQPR Payment as set forth in the First and Second Interim Cash Collateral Orders are fully preserved by this Order and (ii) the Debtor shall provide notice to creditors and

parties in interest upon the upon payment in full of the $500,000 inventory purchase payment to PQPR originally scheduled to be paid in the Second Interim Cash Collateral Order and the time for objections to that payment shall expire 30 days following the date the notice of final payment is filed with the Court.

7.    Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

8.    Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

9.    Adequate Protection – Replacement Liens.  The adequate protection and related carve out set forth in the First Second Third and Fourth Interim Orders are incorporated in the Seventh Interim Order.

10.    Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

11.    Credit Card Processing. The Debtor is authorized to remit fulfillment costs as provided in the Fulfillment Agreement previously approved by this Court's *Order Granting Emergency Motion for Entry of Order Authorizing Debtor to Enter into Fulfillment Agreement* [Dkt. No. 286] from the daily settlement contemporaneously with the distributions to FSS and PQPR.  Proceeds received by FSS for sales of PQPR inventory shall be held by FSS in trust pending distribution to PQPR by FSS.

12.    Reporting. The Debtor shall report each Thursday for the preceding calendar week reflecting weekly sales and disbursement of the proceeds of those sales.  A copy of the report shall be forwarded to the

U.S. Trustee, the Subchapter V Trustee, counsel for PQPR and Jarrod Martin as a representative of the Tort Plaintiffs.

13. _Reservation of Rights._ Nothing herein shall constitute a finding or ruling by this Court that any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes (as defined in the Motion) is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including but not limited to the Debtor, any official committee appointed in the Chapter 11 Case or any other creditor, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged and disputed lien or alleged and disputed security interest held by the alleged Pre-Petition Lender in respect of the purported PQPR Notes.

14. _Final Cash Collateral Hearing_: A further interim hearing on the Motion shall be held before this Court on January 20, 2023, at 11:00 a.m. Central time.

Signed: December 19, 2022

Christopher Lopez
United States Bankruptcy Judge

007987

| | 12/24/2022-12/30/2022 | 12/31/2022-1/06/2023 | 1/07/2023-1/13/2023 | 1/14/2023-1/20/2023 | CURRENT 4 WEEK BUDGET | NOTES |
|---|---|---|---|---|---|---|
| Week Number | 22 | 1 | 2 | 3 | Total | |
| **Income** | | | | | | |
| Product Sales *(Net of 6.0% Merchant Fee)* | $ 200,000.00 | $ 225,000.00 | $ 265,000.00 | $ 285,000.00 | $ 975,000.00 | *Net of 6.0% CC Merchant fees. Includes Shipping Fees and Sales Tax but excludes any PQPR related sales* |
| Point of Sales Revenue | $ 115,000.00 | $ 145,000.00 | 155,000.00 | 175,000.00 | 590,000.00 | *Fulfillment Vendor Product Sales* |
| Platinum / PQPR Commission | 85,000.00 | 85,000.00 | 85,000.00 | 85,000.00 | 340,000.00 | *Net of 80% payment to inventory owner* |
| Donations | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 30,000.00 | |
| **Total Income** | 407,500.00 | 462,500.00 | 512,500.00 | 552,500.00 | 1,935,000.00 | |
| | | | | | | |
| **Selling & Product Costs** | | | | | | |
| Inventory Cost | (117,000.00) | (117,000.00) | (117,000.00) | - | (351,000.00) | *NutriScience Inventory* |
| Inventory Purchases | - | (250,000.00) | (250,000.00) | - | (500,000.00) | *Hi-Tec Inventory purchase per payment plan agreement* |
| PQPR Inventory Purchase | (50,000.00) | (50,000.00) | - | - | (100,000.00) | *Per 2nd interim cash collateral order ECF 98* |
| Point of Sale Product Cost | (28,750.00) | (36,250.00) | (38,750.00) | (43,750.00) | (147,500.00) | *Fulfillment Vendor product costs* |
| Fulfillment Services | (40,000.00) | (45,000.00) | (49,025.00) | (52,725.00) | (186,750.00) | *Assumes we do not transition to 3rd Party Fulfillment Vendor before 12/24/22* |
| eCommerce Store Maintenance | - | - | (12,500.00) | - | (12,500.00) | |
| Texas Sales Tax (20% of Sales @ 6.25%) | (2,500.00) | (2,812.50) | (3,312.50) | (3,562.50) | (12,187.50) | *Final ECDN Audit bills* |
| **Total Cost of Goods Sold** | (238,250.00) | (501,062.50) | (470,587.50) | (100,037.50) | (1,309,937.50) | |
| | | | | | | |
| **Operating Expenses** | | | | | | |
| **Advertising & Promotion** | | | | | | |
| Print Media | - | - | (3,000.00) | - | (3,000.00) | |
| Radio Show Advertising | (14,760.00) | - | - | - | (14,760.00) | |
| **Total Advertising & Promotion** | (14,760.00) | - | (3,000.00) | - | (17,760.00) | |
| | | | | | | |
| **Computer/IT/IP Expense** | | | | | | |
| Internet & TV services | (2,500.00) | - | (1,750.00) | - | (4,250.00) | |
| Server Hosting / Cloud Service / Ecomm | (90,000.00) | - | (15,000.00) | - | (105,000.00) | |
| Satellite Service | (140,000.00) | - | - | - | (140,000.00) | |
| Telecommunications | (18,500.00) | - | (2,000.00) | - | (20,500.00) | |
| Image License, Software & Other | - | - | (10,000.00) | - | (10,000.00) | |
| **Total Computer/IT/IP Expense** | (251,000.00) | - | (28,750.00) | - | (279,750.00) | |
| | | | | | | |
| **Office & Administrative Expense** | | | | | | |
| Bank Fees & Service Charges | (200.00) | (200.00) | (200.00) | (200.00) | (800.00) | |
| Insurance | - | - | - | (5,000.00) | (5,000.00) | *Liability and property, we don't have current Workers Comp policy* |
| Rent | - | (34,858.32) | - | - | (34,858.32) | |
| Utilites | - | (3,100.00) | (6,000.00) | - | (9,100.00) | |
| Janitorial | - | (3,000.00) | (2,000.00) | - | (5,000.00) | |
| Office Security | (9,000.00) | (4,000.00) | (4,000.00) | (4,000.00) | (21,000.00) | |
| Repair & Maintenance | - | - | - | (2,500.00) | (2,500.00) | |
| Supplies/Printing/Copy | (2,000.00) | (1,000.00) | (5,000.00) | (1,000.00) | (9,000.00) | *Includes Konica Minolta copier lease* |
| Business Meals | (400.00) | (400.00) | (400.00) | (400.00) | (1,600.00) | |
| **Total Office & Administrative Expense** | (11,600.00) | (46,558.32) | (17,600.00) | (13,100.00) | (88,858.32) | |
| | | | | | | |
| **Personnel Expenses** | | | | | | |
| Salaries & Wages & Benefits | (110,000.00) | - | (110,000.00) | - | (220,000.00) | |
| Payroll Tax | (10,400.00) | - | (10,400.00) | 0.09 | (20,799.91) | |
| Contract Employees | (49,450.00) | (4,450.00) | (4,450.00) | (4,450.00) | (62,800.00) | |
| Consulting Services | (2,400.00) | (1,500.00) | (2,000.00) | (1,500.00) | (7,400.00) | *HR and Bookeeping Fees* |
| Alex Jones Salary | (20,000.00) | - | (20,000.00) | - | (40,000.00) | |
| **Total Personnel Expenses** | (192,250.00) | (5,950.00) | (146,850.00) | (5,949.91) | (350,999.91) | |
| | | | | | | |
| **Travel** | | | | | | |
| Mileage/Parking/Tolls | (500.00) | (100.00) | (100.00) | (100.00) | (800.00) | |
| Vehicle Leases | - | - | - | (550.00) | (550.00) | |
| **Total Travel Expenses** | (500.00) | (100.00) | (100.00) | (650.00) | (1,350.00) | |
| | | | | | | |
| **Total Operating Expenses** | (470,110.00) | (52,608.32) | (196,300.00) | (19,699.91) | (738,718.23) | |
| | | | | | | |
| ***Non-Operating Expenses*** | | | | | | |
| Payment to PQPR | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | *Weekly adequate protection payment* |
| **Total Other Expenses** | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) | (20,000.00) | |
| | | | | | | |
| **Professional Fees** | | | | | | |
| CRO Fees | - | (50,000.00) | - | - | (50,000.00) | |
| Trustee Fees | (15,000.00) | - | (15,000.00) | - | (30,000.00) | |
| Trustee Counsel | (15,000.00) | - | (15,000.00) | - | (30,000.00) | |
| Legal Fees - Reynal | - | (21,630.00) | - | - | (21,630.00) | |
| Ray Battaglia | - | (30,000.00) | - | - | (30,000.00) | |
| **Total Professional Fees** | (30,000.00) | (101,630.00) | (30,000.00) | - | (161,630.00) | |
| | | | | | | |
| **Total Cash Flow** | (335,860.00) | (197,800.82) | (189,387.50) | 427,762.59 | (295,285.73) | |
| | | | | | | |
| **Ending Cash** | 164,140.00 | (33,660.82) | (223,048.32) | 204,714.27 | | |

EXHIBIT

A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22-60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | **Chapter 11** |
| | § | |
| **Debtor** | § | |

**UNITED STATES TRUSTEE'S WITNESS/EXHIBIT LIST**

| Main Case No: 22-60043 | Name of Debtor: Free Speech Systems, LLC |
|---|---|
| | |
| | |
| Witnesses: | |
| | Judge: **Christopher Lopez** |
| | |
| Any witness called by any other party | Hearing Date: January 20, 2023 |
| | Hearing Time: 10:00 am |
| | Party's Name: United States Trustee |
| | Attorney's Name: Jayson B. Ruff |
| | Attorney's Phone: 202-573-6960 |
| | |

NATURE OF PROCEEDINGS: The Court is considering two motions for reconsideration under Rule 59.

007989

**EXHIBITS**

| Ex. # | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1 | Any exhibit introduced by any other party | | | | |
| 2 | Any exhibit identified or offered by any other party | | | | |
| | | | | | |

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: <u>January 18, 2023</u>                     <u>*/s/ Jayson B. Ruff*</u>
                                                    Jayson B. Ruff, Trial Attorney
                                                    MI Bar #P69893
                                                    United States Department of Justice
                                                    Office of the United States Trustee
                                                    515 Rusk Street, Suite 3516
                                                    Houston, Texas 77002
                                                    E-mail: jayson.b.ruff@usdoj.gov
                                                    Cell: 202-575-6960

2