## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## AMENDED WITNESS AND EXHIBIT LIST

| | |
|---|---|
| Judge: | Hon. Christopher M. Lopez |
| Hearing Date: | Friday, January 20, 2023 |
| Hearing Time: | 10:00 a.m. (Central Standard Time) |
| Party's Name: | W. Marc Schwartz and Schwartz Associates, LLC |
| Attorney's Name: | Michael P. Ridulfo |
| Attorney's Phone: | (713) 714-5770 |
| Nature of Proceeding: | Hearing on: <ul><li>Motion of W. Marc Schwartz and Schwartz Associates, LLC Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ W. Marc Schwartz and Schwartz Associates, LLC.</li></ul> |

W. Marc Schwartz and Schwartz Associates, LLC (collectively "Schwartz"), hereby submit this Amended Witness and Exhibit List in connection with the hearing to be held on Friday, January 20, 2022, at 10:00 a.m. (Central Standard Time) (the "Hearing") on Schwartz's Motion for Rehearing.

## WITNESSES

Schwartz may call any of the following witnesses at the Hearing, whether in person or by proffer:

1. R. J. Shannon;
2. W. Marc Schwartz;

3. Any witness called or designated by any other party; and

4. Any witnesses necessary to rebut the testimony of any witnesses called or designated by any other party.

## EXHIBITS

Schwartz may offer for admission into evidence any of the following exhibits, and any

exhibit designated by any other party, at the Hearing:

| Ex. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 1 | Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions [ECF No. 10] | | | | |
| 2 | Schwartz Employment Application [ECF Nos. 83] | | | | |
| 3 | U.S. Trustee's Amended Objection to Schwartz Employment Application [ECF No. 154] | | | | |
| 4 | Transcript of September 13, 2022, Hearing [ECF No. 179] | | | | |
| 5 | Joinder by the Sandy Hook Plaintiffs [ECF No. 159] | | | | |
| 6 | Transcript of September 20, 2022, Hearing [ECF No. 194] | | | | |
| 7 | Transcript of May 19, 2022, Hearing in IW Cases [ECF Nos. 163-22, 165-14] | | | | |
| 8 | Omnibus Response in IW Cases [ECF No. 165-7] | | | | |
| 9 | August 3, 2022, Hearing Transcript [ECF Nos. 63, 165-15] | | | | |
| 10 | Forbearance Agreement dated July 10, 2022 [ECF No. 26-8] | | | | |
| 11 | Debtor's Schedules [ECF Nos. 121, 165-1] | | | | |

| Ex. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|---|---|---|---|---|---|
| 12. | August 16, 2022, Email from R. Shannon to S. Jordan responding to AEJ Request for FSS to Seek Stay of Remand Order and Extension of Automatic Stay to AEJ | | | | |
| 13. | August 16, 2022, Email from S. Jordan to R. Battaglia and K. Lee responding to FSS Response to AEJ Request for FSS to Seek Stay of Remand Order and Extension of Automatic Stay to AEJ | | | | |
| 14. | August 17, 2022, Email from S. Jordan to R. Shannon re FSS Plans if AEJ Unable to Conduct Show for FSS | | | | |
| 15. | August 19-22, 2022, Emails among K. Lee and S. Jordan re AEJ's Payment of Legal Expenses re Special Counsel | | | | |
| 16. | Schwartz Affidavit re Motion to Compel in Connecticut Litigation | | | | |
| 17. | Roddy Affidavit re Google Analytics Documents | | | | |
| 18. | Order of Travis County District Court finding Alter Ego with respect to the Heslin/Lewis Suit | | | | |
| 19. | Transcript of August 2, 2022, Hearing before Connecticut Superior Court | | | | |
| 20. | August 8, 2022, Email from R. Shannon to J. Martin re PQPR insider status and avoidance of PQPR lien | | | | |
| 21. | June 30, 2022, Email from R. Shannon re PQPR P&L Statements | | | | |
| 22. | May 11, 2022, Email from R. Shannon to M. Beatty and A. Moshenberg re Expediting Dismissal of Claims against IW Debtors and Attendant Remand of Removed Litigation | | | | |

| Ex. | Description | Offered | Objection | Admitted/ Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 23. | May 11, 2022, Email from R. Shannon to R. Chapple and R. Williams re Expediting Dismissal of Claims against IW Debtors and Attendant Remand of Removed Litigation | | | | |
| 24. | Alex E. Jones Limited Objection to Motions Allowing Administrative Fee Expense Claim [ECF No. 268] | | | | |
| 25. | Declaration of W. Marc Schwartz | | | | |

Schwartz reserves the right to supplement, amend or delete any witness and exhibits prior to the Hearing.  The S&L also reserves the right to ask the Court to take judicial notice of any document.  S&L finally reserves the right to introduce exhibits previously admitted.

Dated: January 18, 2023

Respectfully submitted,

KANE RUSSELL COLEMAN & LOGAN PC

By:   */s/ Michael P. Ridulfo*
Michael P. Ridulfo
State Bar No. 16902020
Federal Bar No. 27086
5151 San Felipe, Suite 800
Houston, Texas 77056
(713) 425-7400
(713) 425-7700 (fax)
E-mail: mridulfo@krcl.com
***Counsel for W. Marc Schwartz and Schwartz Associates, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) by email to those on the attached service list.

/s/ Michael P. Ridulfo
Michael P. Ridulfo

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Hetherington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

# EXHIBIT 1

007997

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22-__60043____ |
| FREE SPEECH SYSTEMS, LLC, | Chapter 11 (Subchapter V) |
| Debtor. | |

## DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF
## VOLUNTARY PETITION AND FIRST DAY MOTIONS

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.     My name is W. Marc Schwartz ("Schwartz").

2.     I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3.     The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively.  I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.     Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

1



EXHIBIT 1

007998

5.      I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.   The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.      SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services     My firm represents individuals, companies and courts in a variety of assignments,  including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.      I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.      I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.      On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

007999

10.     On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. Background to Creation of Free Speech Systems, LLC

11.     Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12.     In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13.     Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14.     From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

008000

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.     Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC")*.

16.     Alex Jones was a natural.

17.     The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.     Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.     When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.     The predecessor operation of FSS in 2004 was an operation with just a handful of employees. Alex Jones had a tiny office in the far south of Austin. He had two employees at

4

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.    As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.    By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.    While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.    After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.    The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

008002

26.     Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B.  Present Business of Free Speech Systems, LLC**

27.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28.     On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29.     The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30.     As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided.  The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

6

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

### C.  The Relationship Between Alex Jones and FSS

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected.  Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

008004

35.     The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

### D.  The Debtor' Owners and Management

36.     At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.     Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.     Since then, Alex Jones has been the Managing Member of FSS.

39.     Since inception, Alex Jones has been a "single talent business", _to wit_, without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.     Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.     In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

8

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies. With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.     The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger. As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b) FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

008006

### E.  The Relationship of FSS and PQPR

*Background Information About PQPR*

43.     PQPR was founded in 2013. The business began operations in September 2013.

44.     PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.     PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.     The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
| --- | --- |
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47.     Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR").   Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.     Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

49.     As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer.  FSS pays PQPR, as its agent, funds required to purchase product, which then pays

10

008007

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50.     Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.     Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.     In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53.     On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.     The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.     On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

11

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

**F.  FSS Needs a Credit Card Processor**

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.  Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

12

62.     The key players in credit card processing are:

- **Customer** – the person making a purchase.
- **Merchant** – the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway** – this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor** – (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network** – (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank** – (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank** – (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63.     In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

008010

64.    After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.    Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.    FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS. A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.    FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.    In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.    In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

008011

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G. Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *(c) Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *(d) Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

15

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County,

Texas; and *(e) Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel*

*Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited*

*LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings,*

*LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-

22-001610, in the 200th District Court for Travis County (collectively, as may have been

consolidated, the "Texas State Court Litigation").

74. These two actions: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech*

*Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of

Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems,*

*LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the

"Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial

of the Heslin/Lewis Suit.

75. As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has

been stayed by the automatic stay provision of the Bankruptcy Code.

76. In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in

Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

16

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

77.     As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78.     Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79.     Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80.     InfoW, LLC f/k/a Infowars, LLC ("InfoW" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "InfoWDebtors"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"), on April 18, 2022 (the "Petition Date"), initiating Case No. 22-60020 in that court (the "Bankruptcy Case").

81.     The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

17

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "Third-Party Funding Contributors") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant.  Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been  cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.      The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H.  Current Financial Condition of Debtor**

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

008015

87.     Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88.     Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

I.      **Critical Motions to Commence the Chapter 11 Case**

**First Day Motions**

89.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion.** *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion.** *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

19

- **Critical Vendors Motion**. *Debtor's Motion for an Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**. *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.    The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.    The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

20

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

### Procedural Motion

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

008018

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.     I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

## Operational Motions

97.     **Cash Collateral Motion**[6]. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.     The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.     Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

008019

100.     The use of cash collateral required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**.   The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period").

101.     The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.     PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.     Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.     **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

23

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical

Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62.

In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-

one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the

Court, to consider approval of the Critical Vendors Motion on a final basis.

105.     After an extensive review and analysis of the Debtor's vendors, the Debtor and

its professionals identified the vendors that supply products and services vital to the Debtor's

continued operation. The Debtor relies on products and services from its Critical Vendors to

operate its business, and, depend on the timely provision of specialized services to provide top-

quality content and services to its customer base.

106.     The Critical Vendors procure and provide key services to producing and

transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely

fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their

mission-critical goods and services, the business of FSS would grind to a halt.

107.     I understand that the Debtor's trade relationship with its Critical Vendors is not

governed by long-term contracts, and the Debtor believes those trade relationships will

deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical

Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption

and disturbances to the Debtor's business during the Chapter 11 Case.

108.     Subject to Court's approval, I understand the Debtor intends to pay Critical

Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review,

assess, and make payment on account of these claims. In return for paying these claims, the

Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon

each claimant's agreement to continue supplying goods and services to the Debtor in accordance

008021

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.    **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.    In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.    To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.    The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

25

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.    The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### Adequate Assurance Procedures

115.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.    The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

008023

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "<u>Determination Hearing</u>"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

27

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117. I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118. **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit. Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119. The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120. The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

008025

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2022.

W. Marc Schwartz, as Chief Restructuring Officer of Free Speech Systems, LLC

---

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

008026

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

**Free Speech Systems LLC**
**Comparative Profit and Loss Statement**
**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2021**

| | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| ***Total Income*** | ***64,970,641.85*** | ***14,320,983.15*** |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| ***Gross Profit*** | **$ 13,092,308.12** | **$ 9,384,529.36** |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| ***Total Expenses*** | ***23,387,247.86*** | ***6,346,192.35*** |
| ***Net Operating Income*** | **$ (10,294,939.74)** | **$ 3,038,337.01** |
| **Other Income** | 507,168.04 | 1,019,713.81 |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| ***Total Other Expenses*** | ***1,131,710.75*** | ***2,155,946.35*** |
| ***Net Other Income*** | ***(624,542.71)*** | ***(1,136,232.54)*** |
| ***Net Income*** | **$ (10,919,482.45)** | **$ 1,902,104.47** |

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

**Exhibit B**

| Free Speech Systems LLC<br>Comparative Balance Sheet<br>As of December 31, 2021 and May 31, 2022 | | |
|---|---|---|

| | 2021 | 2022 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash | $ 1,508,720.21 | $ 1,159,247.90 |
| Accounts Receivable | 10,187,121.95 | 10,013,413.22 |
| **Other Current Assets** | | |
| Invenotry | 1,732,603.13 | 910,116.84 |
| Prepaid Expenses | 446,475.64 | 114,136.99 |
| Due from PQPR | (500.00) | - |
| Advance To Elevated Solutions | 27,870.00 | - |
| *Total Other Current Assets* | *2,206,448.77* | *1,024,253.83* |
| *Total Current Assets* | *13,902,290.93* | *12,196,914.95* |
| **Fixed Assets** | 1,679,438.66 | 1,580,779.46 |
| **Other Assets** | | |
| Intangible Assets | 21,270.83 | 15,333.33 |
| Security Deposits | 534,560.00 | 534,560.00 |
| *Total Other Assets* | *555,830.83* | *549,893.33* |
| *Total Assets* | *$ 16,137,560.42* | *$ 14,327,587.74* |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ 4,732,966.89 | $ 1,217,685.58 |
| Credit Cards | 152,367.42 | 207,984.04 |
| **Other Current Liabilities** | | |
| David Jones Advance | 150,000.00 | 150,000.00 |
| Advances from PQPR | - | 571,920.57 |
| Due to PQPR | 23,058,367.00 | 23,058,367.00 |
| *Total Other Current Liabilities* | *23,208,367.00* | *23,780,287.57* |
| *Total Current Liabilities* | *28,093,701.31* | *25,205,957.19* |
| **Long Term Liabilities** | | |
| Note Due to PQPR | 54,580,405.22 | 53,845,074.41 |
| Note Payable - Winnebago | 93,505.62 | 82,524.37 |
| *Total Long Term Liabilities* | *54,673,910.84* | *53,927,598.78* |
| *Total Liabilities* | *$ 82,767,612.15* | *$ 79,133,555.97* |
| **Equity** | | |
| Member's Equity | (774,291.44) | - |
| Member Draws | (61,937,862.26) | (254,014.00) |
| Member Contributions | 4,305,810.14 | 311,350.00 |
| Opening Balance Equity | - | (66,765,408.70) |
| Retained Earnings | 2,695,774.28 | - |
| Net Income | (10,919,482.45) | 1,902,104.47 |
| *Total Equity* | *$ (66,630,051.73)* | *$ (64,805,968.23)* |
| *Total Liabilities and Equity* | *$ 16,137,560.42* | *$ 14,327,587.74* |

008030

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**Exhibit C**

Free Speech Systems, LLC
Statement of Cash Flows

**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2022**

| | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| *Net Income* | **($10,919,482.45)** | **$1,902,104.47** |
| *Adjustments to reconcile Net Income to Net Cash provided by operations:* | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| *Net cash provided by operating activities* | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| *Net cash provided by investing activities* | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| *Net cash provided by financing activities* | **22,850,016.65** | **(787,074.46)** |
| *Net cash increase for period* | **$952,374.76** | **($349,472.31)** |

Exhibit "D"

13-Week Cash Flow Forecast for FSS

# Exhibit D

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period Ending | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | | | 480,166.46 | 480,166.46 | | | | 480,166.46 | | | | | | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 1,078,796.72 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 598,630.26 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPA Inventory | | (250,000.00) | | (500,000.00) | | | | | | | | | | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | | | | (27,270.00) | | | | (27,270.00) | | | | | (81,810.00) |
| Texas Sales Tax | (5,337.87) | | | | (5,337.87) | | | | (5,337.87) | | | | | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.80) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | | | | (3,041.98) | | | | (3,041.98) | | | | | (9,125.93) |
| Print Media | (3,000.00) | | | | (3,000.00) | | | | (3,000.00) | | | | | (9,000.00) |
| Radio Show Advertising | (11,500.00) | | | | (11,500.00) | | | | (11,500.00) | | | | | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | | | | (17,541.98) | | | | (17,541.98) | | | | | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | (1,608.39) | | | (2,082.90) | | (1,608.39) | | (2,082.90) | | | (1,608.39) | | (11,072.89) |
| Software License Fees | (140.80) | | | | (140.80) | | | | (140.80) | | | | | (422.40) |
| Server Hosting | (28,595.13) | | | | (28,595.13) | | | | (28,595.13) | | | | | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | | | | (55,728.00) | | | | (55,728.00) | | | | | (167,184.00) |
| Satellite Service | (137,282.93) | | | | (137,282.93) | | | | (137,282.93) | | | | | (411,848.78) |
| Imaging License Fee | (9,201.25) | | | | (9,201.25) | | | | (9,201.25) | | | | | (27,603.75) |
| Software & Apps | (5,000.00) | | | | (5,000.00) | | | | (5,000.00) | | | | | (15,000.00) |
| Website Hosting | | (266.50) | | | | | (266.50) | | | | | (266.50) | | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | (1,874.89) | | | (238,031.01) | | (1,874.89) | | (238,031.01) | | | (1,874.89) | | (719,217.72) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Insurance | (2,166.50) | | | | (2,166.50) | | | | (2,166.50) | | | | | (6,499.50) |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | | | | (1,989.90) | | | | (1,989.90) | | | | | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | | | | (45,980.00) | | | | (45,980.00) | | | | | (137,940.00) |
| Consulting Services | (22,670.00) | (12,000.00) | | | (22,670.00) | | (12,000.00) | | (22,670.00) | | | (12,000.00) | | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | | (5,107.63) | | | | | (5,107.63) | | | | | (5,107.63) | | (15,322.89) |
| HVAC | (256.19) | | | | (256.19) | | | | (256.19) | | | | | (768.58) |
| CAM Charges | (20,364.16) | | | | (20,364.16) | | | | (20,364.16) | | | | | (61,092.48) |
| Water & Sewer | (1,708.55) | | | | (1,708.55) | | | | (1,708.55) | | | | | (5,125.66) |
| Gas Service | (132.09) | | | | (132.09) | | | | (132.09) | | | | | (396.28) |
| Pest Control | (244.65) | | | | (244.65) | | | | (244.65) | | | | | (733.95) |
| Waste Management | (351.81) | | | | (351.81) | | | | (351.81) | | | | | (1,055.43) |
| **Total Utilities** | (23,057.46) | (5,107.63) | | | (23,057.46) | | (5,107.63) | | (23,057.46) | | | (5,107.63) | | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | | | | (33,408.51) | | | | (33,408.51) | | | | | (100,225.53) |
| Office Security | (31,111.90) | | | | (31,111.90) | | | | (31,111.90) | | | | | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | | | | (1,777.19) | | | | (1,777.19) | | | | | (5,331.56) |
| Janitorial | (5,983.33) | | | | (5,983.33) | | | | (5,983.33) | | | | | (17,950.00) |
| **Total Occupancy** | (72,280.93) | | | | (72,280.93) | | | | (72,280.93) | | | | | (216,842.78) |
| Supplies | (1,258.02) | | | | (1,258.02) | | | | (1,258.02) | | | | | (3,774.07) |

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | | | | (18,337.88) | | | | (18,337.88) | | | | | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | | (54,166.67) | (379,166.67) |
| Total Personnel Expenses | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Lease | | (1,470.56) | | | | (1,470.56) | | | | | (1,470.56) | | | (4,411.68) |
| Total Travel Expenses | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (5,707.66) |
| Total Operating Expenses | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PDPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | | (172,390.28) | | (172,390.28) | | (172,390.28) | | (172,390.28) | | (172,390.28) | | | (1,034,341.69) |
| Total Other Expenses | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | | | | | | | (52,992.00) | | (35,328.00) | | | | | (88,320.00) |
| Financial Advisor Fee | | | | | | | (57,876.00) | | (40,352.00) | | | | | (98,228.00) |
| Shannon & Lee LLP | | | | | | | (40,000.00) | | (60,000.00) | | | | | (100,000.00) |
| Ray Battaglia | | | | | | | (24,000.00) | | (24,000.00) | | | | | (48,000.00) |
| Total Professional Fees | | | | | | | (174,868.00) | | (159,680.00) | | | | | (334,548.00) |
| Total Cash Flow | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,556.72) | $ 313,240.33 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | $ 440,373.41 |

# EXHIBIT 2

008036

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

### APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C) <u>GRANTING RELATED RELIEF</u>

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Free Speech Systems, LLC (the "<u>Debtor</u>" or "<u>FSS</u>"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), hereby moves for entry of an order substantially in the form attached hereto (the "<u>Proposed Order</u>") pursuant to sections 105(a) and 327 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") authorizing the retention of W. Marc Schwartz (the "<u>CRO</u>" or "<u>Schwartz</u>") of Schwartz Associates, LLC ("<u>SALLC</u>") as the Chief Restructuring Officer (the "<u>Application</u>") pursuant to that certain engagement letter agreement by



EXHIBIT
2
008037

and between the Debtor and SALLC, a copy of which is attached hereto as <u>Exhibit A</u> (the

"<u>Engagement Agreement</u>").[1] In support of the Application, the Debtor submits the Declaration of

W. Marc Schwartz attached hereto as <u>Exhibit B</u> (the "<u>Schwartz Declaration</u>") and respectfully

represents as follows:

<b><u>REQUESTED RELIEF</u></b>

1.      Entry of the Proposed Order (a) approving the appointment and employment of

Schwartz and to perform the services set forth in the Engagement Agreement as the CRO for FSS

is necessary for the Debtor to adequately perform its duties as a debtor-in-possession, including

overseeing daily business affairs and operations of FSS, interfacing with Alex Jones ("<u>Alex Jones</u>"

or "<u>Jones</u>"), PQPR Holdings Limited, LLC ("<u>PQPR</u>") and vendors on selection of Supplements

and Non-Supplements to stock,  preparation of schedules of assets and liabilities, compliance with

reporting requirements and various orders of this Court, preparation of financial information and

testimony and formulation of bankruptcy strategy and plan of reorganization for FSS and (b)

approving the employment of SALLC in connection with the CRO's duties.

2.      Especially for a subchapter v debtor, this Court's approval of the retention of the

CRO and SALLC by the Debtor is critical and indispensable to assuring that the chapter 11 process

begins smoothly, and, that the Debtor has the optimal managers to help formulate a sound business

and reorganization plan quickly. Without the CRO and SALLC, the Debtor cannot survive in

chapter 11.

<b><u>JURISDICTION</u></b>

3.      The United States Bankruptcy Court for the Southern District of Texas (the

"<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core

---

[1] The Engagement Agreement references paragraph 8.01 of the Debtor's company agreement. A copy of the Company agreement is attached hereto as <u>Exhibit C</u>.

2

proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

4.      The bases for the relief requested herein are sections 105, 327, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules for the Bankruptcy Court for the Southern District of Texas (the "Local Rules").

## BACKGROUND

### A.  Case Background

5.      On July 29, 2022 (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11, subchapter v, of the Bankruptcy Code with the Court.

6.      The Debtor continue to operate its businesses and manage its properties as a Debtor and a Debtor-in-Possession pursuant to Bankruptcy Code § 1182(2).

7.      As of the filing of this Application, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for Region 7 (the "U.S. Trustee").

### B.  The Debtor

8.      Alex E. Jones ("Jones") owns one hundred percent (100%) of the equity in FSS.

9.      FSS is presently engaged in the business of producing and syndicating Jones' and other radio and video talk shows and selling products targeted to Jones' audience via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) and other programs from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.     On its InfowarsStore.com website, FSS makes available to customers dietary supplements, including Bodease, Vitamin Mineral Fusion, Vitamin D3 Gummies, Ultimate

3

008039

Immune Support Pack, Pollen Block, Tea Tree Shampoo, and other health products (collectively, "Supplements"). The website also has available books, videos, t-shirts and other products (collectively, "Non-Supplements") Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of Supplements which have traditionally been supplied by or through PQPR, an affiliated entity.

11.     As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios. This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.     FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

13.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from InfowarsStore.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

14.     Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones.

15.     PQPR formulates supplements for FSS to market on its shows.  Ultimately, FSS relied on PQPR to supply the Supplements as other vendors would not supply FSS. PQPR ordered

4

and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018, FSS has had difficulty finding third parties willing and able to fulfill product sales. In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.

18.     Recently, FSS retained a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company. The fulfillment company charges FSS a flat fee per order regardless of size.

### C. Pending Litigation Against the Debtor

19.     The Debtor's financial distress stems primarily from statements of Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Various parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

20.     The relatives of the Sandy Hook victims and certain other parties (the "Sandy Hook Plaintiffs") assert, among other things, that Jones and other employees of FSS made defamatory statements and inflicted emotional distress. In 2018, the Sandy Hook Plaintiffs brought actions in Texas and Connecticut (collectively, the "Sandy Hook Lawsuits") against Jones, FSS and certain affiliates of the Debtor. The crux of the allegations in the Sandy Hook Lawsuits is that Jones and

5

008041

FSS employees damaged the Sandy Hook Plaintiffs by saying or implying that the Sandy Hook shooting did not occur, and that the entire incident was a "false flag" hoax.

21.     Jones, FSS, and the Debtor have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits. Despite the substantial amount spent, both the Texas and Connecticut courts have ruled that Jones and the Debtor failed to comply with discovery requirements such that judgment on *liability* has been entered against them by default.

22.     The jury in the Heslin\Lewis State Court Action returned jury verdicts against FSS and Jones ordering them to pay $45,200,000 in punitive damages on top of $4,100,000 in compensatory damages on Thursday and Friday August 4 and 5, 2022. The Debtor requires the services of the CRO to assist it in managing the business of FSS while it reviews the next steps in the Sandy Hook Lawsuits.

### D.  The Debtor Needs a CRO and SALLC

23.     Since inception, FSS has been a "single talent business", *to wit*, without Alex Jones and his show, there would neither be an InfoWars nor any internet sales. Despite the rapid growth in the diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems. FSS failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. The Debtor and its employees continued to run the business with an inverted T structure, as though it was still a family business.

24.     In 2022, Alex Jones retained professionals to evaluate FSS. Since May 2022, FSS has retained Schwartz as its CRO with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. Schwartz retained his firm Schwartz Associates to perform various accounting and forensic work associated with his mandate.

6

008042

25.     Throughout the review conducted by the CRO and his team, they have been given complete access to FSS employees, books and records.

26.     Among the preliminary conclusions reached in Schwartz' analysis of FSS are: (a) Although the company had a controller and two bookkeepers (none of which appear to have any formal accounting background), the 2021 general ledger had not been completed and the books for that period were not closed; (b) Few transactions had been recorded in the 2022 general ledger; (c) No financial statements were produced for the company for the 18 months preceding Schwartz' engagement; (d) The bank accounts had not been reconciled in 2021 or 2022; and (e) Internal accounting controls were completely inadequate, including lack of segregation of duties, absence of written monthly, quarterly and annual closing schedules, lack of supervisory review of key accounting functions, including vendor set up, bank reconciliations, inventory reconciliations, or intercompany billings; (f) Payments to vendors were debited to an expense account, but not to the specific vendor account; and (g) Credit card transactions were not recorded to specific expense accounts.

27.     Since their engagement, Schwartz and his team have closed the books for 2021 and made significant progress fixing past bookkeeping omissions and oversights. As a result of these actions, the CRO has a vastly improved understanding of FSS's financial standing and its ability to operate profitably going forward.  Schwartz has also renegotiated business terms with PQPR on the allocation of proceeds from product sales to be more favorable to FSS.

**E.  Proposed Employment of Schwartz as the CRO**

     i.     *Scope of Employment*

28.     The Debtor seeks to engage Schwartz as the CRO to advise and lead the day-to-day restructuring efforts of the Debtor, pursuant to the Engagement Agreement. The Debtor contemplates that the CRO will perform some or all the following tasks:

7

a.  Make business and debt restructuring decisions, including as it relates to business strategy(ies) and other key elements of the business;

b.  Manage due diligence requests and other items requested by various constituents as part of the restructuring process;

c.  Prepare cash flow forecasts and related financial and business models;

d.  Identify and implement short and long-term liquidity initiatives;

e.  Prepare Statement of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the Court, as well as provide necessary testimony before the Court on matters within CRO's areas of expertise;

f.  Review inventory marketability and provide monetization alternatives;

g.  Make operating decisions;

h.  Implement cost containment measures;

i.  Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and other parties-in-interest and submit proposals to the Court;

j.  Work to maximize the value of the Debtor;

k.  Oversee all business decisions of Debtor, as necessary or required, utilizing CRO's business judgment;

l.  Execute all documents and take all other acts necessary to effectuate the restructuring of the Debtor; and

m.  The Debtor also seeks authority for other staff of SALLC to perform services required to assist the CRO within the scope of this engagement.

ii.  *Necessity of Employment*

29.   The Debtor believes that the retention and employment of the CRO is necessary and appropriate to operate the Debtor's business properly and administer the Chapter 11 Case and ultimately prepare and obtain confirmation of a plan of reorganization. While Alex Jones produces his show and markets products on his show, the Debtor needs a professional with financial

8

008044

expertise to serve as an officer of the Debtor to perform the services indicated in the Engagement Agreement.

### iii.   _Reasons for Selection_

30.    The Debtor believes that the CRO is well qualified to provide management services that will assist and enhance the Debtor's efforts to maximize value to their creditors.

31.    Schwartz is a licensed CPA with more than 40 years' experience providing expert witness and financial restructuring services. He frequently serves as a chief restructuring officer, and as a federal and state court appointed receiver, in bankruptcy and non-bankruptcy proceedings. Mr. Schwartz is one of approximately 200 full members of the National Association of Federal Equity Receivers. He understands how to be a fiduciary.

### iv.   _Proposed Compensation & Reimbursement_

32.    The Debtor intends to file a motion to establish interim compensation procedures in this case. Schwartz and SALLC intend to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including sections 330 and 331, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim compensation order entered in these Chapter 11 Case.

33.    Subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, the Debtor proposes to pay on an hourly basis the CRO and SALLC, as set out in the Engagement Agreement and summarized in the following chart:

| BILLER | RATE |
| --- | --- |
| W. Marc Schwartz (CRO) | $690.00 per hour |
| M. Christian Schwartz | $470.00 per hour |
| Managers | $350.00 per hour |
| Associates | $280.00 per hour |
| Analysts | $210.00 per hour |
| Administrative Staff | $95.00 per hour |

9

008045

34.     Additionally, the Engagement Agreement provides that the Debtor shall be responsible for the reasonable and necessary documented out-of-pocket costs and expenses incurred by CRO and SALLC in connection with the engagement. SALLC will submit detailed documentation of all expenses incurred in connection with requests for reimbursement.

35.     The Debtor believes that the agreed terms of reimbursement, compensation, and hourly rates are reasonable. The CRO will notify the Debtor of any change in the hourly rates charged for services rendered while the Chapter 11 Case is pending.

     *v.*     *Retainer*

36.     The Debtor engaged the CRO prior to the Petition Date. The CRO and SALLC received a retainer of $75,000.00 and a total payment of $78,811.39 for pre-petition work performed for FSS. The source of the retainer and the payment of the invoices is FSS.

37.     Pursuant to the Engagement Agreement, the Debtor proposes that SALLC will hold the Retainer to be applied to SALLC's final fees and expenses at the conclusion of the engagement. The Proposed Order modifies the Engagement Agreement such that the CRO and SALLC shall not draw on the Retainer except upon order of the Court awarding final compensation and reimbursement in the Chapter 11 Case.

     *vi.*     *Disinterested*

38.     Neither Schwartz nor SALLC is a creditor, equity security holder or an insider of FSS. Under Bankruptcy Code § 101(31)(B), the "corporation" is the closest entity similar to an LLC, which FSS is. An "insider" if the debtor is a corporation, includes " (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).

10

39.     Schwartz and SALLC do not qualify as an insider under (i), (iv), (v) and (vi).

40.     Schwartz served since May 19, 2022, as the CRO of the Debtor, and therefore may qualify under (ii). SALLC does not.

41.     Schwartz and SALLC do not qualify as a "person in control" of the debtor, as Schwartz had delegated to it managerial duties of the LLC, but those duties under Texas law cannot be supplanted by the rights of the owners of the LLC. Schwartz and SALLC do not qualify as an insider under (iii).

42.     Neither Schwartz nor SALLC have been within 2 years before the date of filing of the petition, a director, officer, or employee of the debtor. Again, Schwartz served as the CRO of FSS prior to the Petition Date.

43.     Neither Schwartz nor SALLC have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason. Prior to entry into the Engagement Agreement, Schwartz and SALLC did not have a materially adverse interest to FSS.

44.     Their acting in a similar role at InfoWDebtors did not create an "interest materially adverse" to the interest of FSS's creditors or equity security holders. First, there was no dispute between FSS and InfoW over the licensing agreement over the name and the tradename. Second, the CRO and SALLC's mandate to "lead InfoW's management and personnel through the restructuring process" had for all practical purposes concluded by May 19, and for sure by June 6. May 19 is when the Texas and Connecticut Plaintiffs dismissed all of their claims against the InfoWDebtors via stipulations or motions. June 6 is when the Bankruptcy Court signed the Stipulation for Dismissal of the Chapter 11 Cases of the InfoWDebtors.

008047

*vii.*   *Connections*

45.     The Schwartz Declaration sets out the connections of the CRO and SALLC with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, and any person employed in the office of the United States Trustee. To the best of the Debtor's knowledge, neither the CRO nor SALLC hold any connections other than those disclosed in the Schwartz Declaration.

46.     Schwartz has familiarity with the players involved in FSS as he served as the CRO of InfoWDebtors. As described in the Schwartz Declaration, Schwartz continues to serve as the CRO for the three (3) companies, InfoW, LLC, IWHealth, LLC and Prison Planet, tv Ltd. The bankruptcy cases of those three companies have been dismissed and Schwartz has not been asked to undertake any new assignments for these three companies. At the present time, Schwartz's only duties with respect to the InfoWDebtors is to receive and deposit the return of the excess of the funds paid to the subchapter v Trustee in that case and the amount allowed in her final fee application.

47.     At the time Schwartz was engaged  on June 6, 2022 as CRO by FSS, he was the CRO of the InfoWDebtors. By that time,  the InfoWDebtors' bankruptcy cases were substantially over in that the CRO had negotiated the release with prejudice of the InfoWDebtors from the Texas and Connecticut litigation and had reached an agreement with the United States Trustee to move for dismissal of the subject bankruptcy cases.

48.     The Debtor believes that neither the CRO nor SALLC holds or represents any disqualifying interest that is adverse to the estate, and each is a "disinterested person." If any new relevant facts or relationships are discovered, the CRO and SALLC will supplement its disclosure to the Court and the U.S. Trustee.

008048

## BASIS FOR RELIEF

49.     Subject to Court approval, Bankruptcy Code § 327(a) authorizes trustees—and Debtor-in-Possession—to "employ one or more attorney's accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties . . . ." Bankruptcy Code § 327(c) says that "[i]n a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

50.     Bankruptcy Rule 2014 requires certain disclosures prior to the entry of an order approving the employment of a professional. According to Bankruptcy Rule 2014, the application must:

     a.   Be filed by the trustee or committee and served on the United States Trustee (except in cases under chapter 9 of the Bankruptcy Code);

     b.   State the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee; and

     c.   Be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

## A.  The CRO and SALLC Meet the Requirements of Bankruptcy Code § 327(a)

008049

51.     Based on the Schwartz Declaration, the Debtor submits that neither the CRO nor SALLC hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code.

52.     The Bankruptcy Code defines what it means to be a "disinterested person" Bankruptcy Code § 101(14):

> The term "disinterested person" means a person that— (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

The Schwartz Declaration discloses no connections with the Debtor that would disqualify the CRO or SALLC as a "disinterested person" and the Debtor is not aware of any connections in addition to those disclosed in the Schwartz Declaration.

## B. This Application and the Schwartz Declaration Meet the Requirements of Bankruptcy Rule 2014.

53.     This Application and the Schwartz Declaration meet the requirements as set out in Bankruptcy Rule 2014. The Application is made by the Debtor and sets out the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, and the proposed arrangement for compensation. The Schwartz Declaration is a verified statement pursuant to 28 U.S.C. § 1746 that sets out all connections that the CRO and SALLC has with the Debtor, creditors, any other party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee. The Debtor is not aware of any other connections in addition to those disclosed in the Schwartz Declaration.

14

008050

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form of the Proposed Order approving the employment of the CRO and SALLC effective as of the Petition Date, pursuant to the terms of the Engagement Agreement and grant any other appropriate relief.

Dated: August 20, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

*/s/Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

*/s/R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

15

008051

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service on the date of filing, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list within 1 business day of the filing, and (c) the following parties by email on the date of filing:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Attn: Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Attn: Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Attn: Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002
jarrod.martin@chamberlinlaw.com

Attn: Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division

PO Box 12548
Austin, TX 78711-2548
christopher.dylla@oag.texas.gov

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002
mhaselden@haseldenfarro.com

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of U.S. Trustee
515 Rusk, Suite 3516
Houston, TX 77002
ha.nguyen@usdoj.gov
jayson.b.ruff@usdoj.gov

/s/R. J. Shannon

17

008053

**USPS Service List**

**Twenty Largest Unsecured Creditors**

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

18

008054

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479


AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

### Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

### Parties Filing Notice of Appearance

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Jarrod B. Martin
Chamberlain Hrdlicka
1200 Smith Street, Suite 1400
Houston, TX 77002

Randy W. Williams
Byman & Associates PLLC
7924 Broadway, Suite 104
Pearland, TX 77581

Christopher J. Dylla
Assistant Attorney General
Bankruptcy & Collections Division
PO Box 12548
Austin, TX 78711-2548

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

### Subchapter V Trustee

Melissa Haselden
Subchapter V Trustee
700 Milam, Suite 1300
Houston, TX 77002

### U.S. Trustee

Attn: Ha M. Nguyen, Jayson B. Ruff
Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

19

**Additional Notice Parties**

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterling, Christopher
Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

008056

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Case No. 22--60043 |
| | § | |
| DEBTOR. | § | (Subchapter V Debtor) |
| | § | Chapter 11 |

ORDER (A) AUTHORIZING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF
RESTRUCTURING OFFICER, (B) AUTHORIZING EMPLOYMENT OF STAFF OF
SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF
RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF

Upon the *Debtor's Application for Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief* (the "Application")[1]; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.     The Application is granted, to the extent set forth herein.

---

[1] Capitalized terms used by not otherwise defined in this Order shall have the meanings ascribed to such terms in the Application.

2.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain W. Marc Schwartz, effective as of the Petition Date, as its chief restructuring officer (the "CRO"), under the terms and conditions set forth in the Application and the Engagement Agreement attached to the Application as Exhibit A thereto, as modified herein.

3.      The CRO shall hold confidential any material, non-public information of or pertaining to FSS and/or Alexander E. Jones delivered to the CRO, except to the extent that such information and the person to whom such information is disclosed are subject to a protective order that is entered in these Chapter 11 Case.

4.      The CRO is authorized to delegate appropriate tasks to Schwartz Associates, LLC ("SALLC"), pursuant to the terms of the Engagement Agreement.

5.      The CRO and SALLC shall be compensated for their services and reimbursed for actual expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules, and any orders of this Court; *provided, however*, that the CRO and SALLC shall not seek reimbursement from the Debtor's estate for any fees incurred in defending any fee applications in this Chapter 11 Case.

6.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

008058

7.      Notwithstanding anything to the contrary in the Engagement Agreement, the CRO and SALLC shall hold any prepetition retainer, pending a final order allowing compensation and reimbursement in these cases or order otherwise directing disposition of the retainer amounts.

8.      Notwithstanding anything to the contrary in the Application, the Engagement Agreement, or the Declaration attached to the Application, the CRO and SALLC shall not be entitled to reimbursement or fees and expenses in connection with any objection to their fees, without further order of the Court.

9.      The CRO and SALLC shall provide ten (10) business days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

10.     The CRO and SALLC shall use reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals in this Chapter 11 Case.

11.     The CRO and SALLC will review their files periodically during the pendency of the Chapter 11 Case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the CRO and SALLC will use reasonable efforts to identify such further developments and will promptly file a supplemental Declaration, as required by Fed. R. Bankr. P. 2014(a).

12.     To the extent the Application, the Schwartz Declaration, or the Engagement Agreement is inconsistent with this Order, the terms of this Order shall govern.

3

13.     The Debtor, the CRO, and SALLC are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

14.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated this ___ day of August, 2022.

_____

UNITED STATES BANKRUPTCY JUDGE

4

008060

## EXHIBIT A

**Engagement Agreement**



**Schwartz**Associates

May 19,2022

<u>**VIA EMAIL**</u>

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. CRO will work to maximize returns and to assure a fair pro rata distribution to all unsecured creditors.

I.    **Scope of Engagement**

CRO will lead FSS' management and personnel through the restructuring process. It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

1

> EXHIBIT
> 4
> tabbies

008062



**Schwartz** Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;
8. Implement cost containment measures;
9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;
10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.
11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

**II.    Indemnification**

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

2



**Schwartz** Associates

### III.   Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.   Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.   Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3



**Schwartz**Associates

### VI.    Term & Termination

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

### VII.    Compensation

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS.  SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

4



**Schwartz** Associates

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII. CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX. Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5

008066



**Schwartz** Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

008067

**<u>EXHIBIT B</u>**

**Schwartz Declaration**

008068

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |
| | § | |

## DECLARATION OF W. MARC SCHWARTZ

I, W. Marc Schwartz, declare under penalty of perjury as follows:

1.      I am a CPA and a founder and chairman of Schwartz Associates, LLC ("SALLC"). On my behalf and SALLC's, I am duly authorized to execute this Declaration in support of the Application filed by Free Speech Systems, LLC  (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Chapter 11 Case") seeking approval to retain me as the chief restructuring officer ("CRO") and SALLC to assist me in those duties.

2.      Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, upon the client and matter records of SALLC reviewed by me or SALLC staff under my supervision and direction or derived from information available to me that I believe to be true and correct or my opinion based upon experience, knowledge and information concerning the restructuring of debtor-creditor relationships, workouts, chapter 11 process and the Debtor.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**A. Application to Employ CRO**

3.     I have reviewed the Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC in Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related Relief (the "Application"). The Application accurately describes my proposed role as the CRO.

**B. Disclosure of Connections**

4.     SALLC performed the following actions to determine whether it or any of its professionals has any disclosable connections to the Debtor, creditors, any other party in interest, their attorneys or accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the U.S. Bankruptcy Court for the Southern District of Texas:

   a.   First, SALLC staff sent emails to all email account holders within SALLC requesting the recipient respond to any representation known to be adverse or otherwise connected to the Debtor or its estate. Neither I nor my staff received any responses indicating that a conflict or connection exists.

   b.   Second, SALLC staff conducted a computerized search of all clients of SALLC using the list of parties in interest listed in Schedule 1 hereto.

   c.   No connections or potential connections were identified.

   d.   Analyzed with FSS bankruptcy counsel whether having previously served as the CRO of InfoW, LLC, IWHealth LLC and Prison Planet TV LLC created a disqualifying connection or constituted a connection requiring disclosure in the Rule 2014 Statement.

5.     The email and computerized search uncovered no connections other than I and SALLC have worked with many of the same parties and creditors in connection with serving as the CRO and SALLC serving as my staff in the InfoWDebtors bankruptcy cases. The equity in and to the InfoWDebtors had been transferred by Alex Jones to a separate trust, so that Mr. Jones

2

008070

had no ownership interest or control over the equity of those entities. On the other hand, Alex Jones is the sole owner and managing member of FSS.

6.       The Creditors and Parties in Interest and Attorneys for Creditors and Parties in Interest in Schedule 1 is similar to the creditors and parties in interest in the InfoWDebtors bankruptcy cases. As a result of their decision to withdraw their claims against the InfoWDebtors, these same parties are no longer creditors and parties in interest against InfoWDebtors.

7.       The Creditors and Parties in Interest here are adverse to FSS, similar to the position they were against InfoWDebtors. Applicant submits that previously serving as CRO for InfoWDebtors does not create an actual or potential conflict of interest as against the Creditors and Parties in Interest.

8.       Out of an abundance of caution, Applicant sets forth below the chronology of his involvement with InfoWDebtors, and, FSS, to establish that he did not start serving as the CRO for FSS until his mandate under the InfoWDebtors Engagement Agreement had terminated.

9.       *"Connection" to the InfoWDebtors.* InfoW, LLC, f/k/a Infowars, LLC, IW Health, LLC f/k/a Infowars Health, LLC, Prison Planet TV, LLC (the "InfoWDebtors") were not financially healthy companies with no need to reorganize. Each of the Plaintiffs brought and continued lawsuits against one or more of the InfoWDebtors for over four (4) years. Both the Texas and Connecticut Plaintiffs had obtained judgments with respect to liability. Absent restructuring, the InfoWDebtors did not have the ability to pay any significant judgment or even the already-imposed sanctions. Chapter 11 relief was necessary for the InfoWDebtors.

10.      On April 17 and 18, 2022 (the "Petition Date"), each of the InfoWDebtors commenced a bankruptcy case by filing a petition for relief under chapter 11, subchapter v, of the

3

008071

Bankruptcy Code with the United States Bankruptcy Court, Southern District of Texas, Victoria Division.

11.     In the InfoWDebtors' bankruptcy cases, Alex Jones and FSS agreed to pay into a trust pursuant to a Plan Support Agreement ("PSA") to be distributed according to a confirmed plan of reorganization (a) $725,000 initial funding plus any additional costs of the reorganization, (b) $2.0 million in cash on the effective date of a plan of reorganization, and (c) $250,000 per quarter for 60 quarters.

12.     Immediately after the Petition Date, the Texas Plaintiffs, the Connecticut Plaintiffs and the U.S. Trustee all filed emergency motions to dismiss the bankruptcy cases of the InfoWDebtors. The Texas and Connecticut Plaintiffs did not want to engage in negotiations over the proposed plan treatment with the Debtors, FSS or Alex Jones.

13.     While the InfoWDebtors had filed a series of emergency pleadings to have the former Bankruptcy Judges Nelms and Schmidt to Serve as Trustees of the 2022 Litigation Settlement Trust [ECF No. 6](the "Trustee Motion") and Marc Schwartz serve as the CRO for InfoWDebtors approved [ECF No. 7]("CRO Application"), the Texas Plaintiffs, Connecticut Plaintiffs and the U.S. Trustee all opposed hearings on those emergency motions and requested the Court to consider their emergency motions to dismiss the Chapter 11 Cases first. By the time of dismissal of the InfoWDebtors' bankruptcy cases in June, 2022, the Court had not ruled on the Trustee Motion and the CRO Application.

14.     By May 6, 2022, *only 18 days after the Petition Date*, counsel for both the Texas and Connecticut Plaintiffs announced that they were dismissing their claims against the InfoWDebtors from their respective lawsuits. I directed my bankruptcy counsel to work with Plaintiffs' counsel to make sure that their claims were withdrawn with prejudice against the

4

InfoWDebtors.   The Connecticut Plaintiffs filed motions to dismiss their claims against the InfoWDebtors with prejudice on or about May 13, 2022. The InfoWDebtors finalized, submitted and had the Bankruptcy Court approve the Stipulations of Dismissal of the Texas Plaintiffs Claims with Prejudice by May 19, 2022.

15.    Upon dismissal of the Plaintiffs' claims against the InfoWDebtors, the purpose for the PSA no longer existed and it terminated by its own terms.   While counsel for FSS and Alex Jones advised the Court that the parties would extend the PSA deadlines beyond April, the Amended PSA was negotiated but never executed and the Litigation Trustee's never approved the amendment.

16.    I then conferred with my bankruptcy counsel to determine whether continuation of the subchapter v bankruptcy cases was in the best interest of the estates. First, the InfoWDebtors still had to litigate with the U.S. Trustee as to whether the InfoWDebtors were proper subchapter v debtors. Second, the *raison d'etre* for the bankruptcy (to have the Plaintiffs participate as claimants under the plan of reorganization) no longer existed. Third, I had limited access to funds to administer the estates, in light of breaches under the PSA. Fourth, the dismissals of both Texas and Connecticut Plaintiffs' claims with prejudice left the estate with only four (4) remaining creditors.

17.    I had to decide whether I needed the cost and expense of a chapter 11 to handle the four (4) remaining claims against the InfoWDebtors. I concluded I did not. I then immediately directed my bankruptcy counsel to work with the U.S. Trustee's office in order to have the InfoWDebtors' bankruptcy cases dismissed.

5

008073

18.     On June 1, 2022, the U.S. Trustee and the Debtors filed a Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases. On June 6, 2022, the Bankruptcy Court approved the Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases.

19.     Neither I nor SALLC was contacted about serving as a CRO for Free Speech Systems, LLC until May 19, 2022, when my assignment in the InfoWDebtors bankruptcy case had reached a favorable outcome for those debtors. For all practical purposes, my mandate to reorganize the InfoWDebtors had concluded because the bankruptcy cases no longer had the necessary participants to implement the global settlement. I had nothing to restructure or reorganize of InfoWDebtors at that point. The balance of the work I was performing was ministerial.

20.     As of May 19, 2022 and continuing through today, there is no adversity between any of the dismissed InfoWDebtors and FSS. No default exists under the license agreement between InfoW and FSS. To the best of my knowledge, there are no claims that exist between FSS and the InfoWDebtors. Furthermore, my mandate under the InfoW Engagement Agreement to be "in charge of the Client's restructuring process" terminated by its own terms. InfoW Engagement Agreement, P1. InfoWDebtors no longer needed anyone in charge of the restructuring process because the major claims against them had been withdrawn with prejudice.

21.     Out of an abundance of caution and to assure that the Court and the FSS parties that the CRO does not have biases, I submitted a written resignation of my position as CRO and the resignation of SALLC as my staff to InfoWDebtors to the Trustee of the InfoWDebtors prior to my filing this Declaration.

22.     The results of the foregoing connections search process and Declaration confirm that neither I, SALLC, nor any of its employees or shareholders, to the best of my knowledge, have

6

008074

any disqualifying connections. Neither I nor SALLC (a) have any debt or equity securities in the Debtor, (b) are an insider of the Debtor, or (c) was a creditor of the Debtor on the Petition Date.

### C. Affirmative Statement of Disinterestedness

23.    Based on the connections review conducted to date and described herein, to the best of my knowledge and insofar as I can ascertain, I and SALLC are "disinterested persons" within the meaning of Bankruptcy Code § 101(14), as modified by Bankruptcy Code § 1107(b), as required by Bankruptcy Code § 327(a).

24.    I am not a creditor, an equity security holder, or an insider of the Debtor; I am not and was not within 2 years before the Petition Date a director of the Debtor; and I do not have any interest materially adverse to the interests of the Debtor's bankruptcy estate or any class of creditors or equity security holders.

25.    SALLC is not a creditor, an equity security holder, or an insider of the Debtor; SALLC is not and was not within 2 years before the Petition Date an employee, officer, or director of the Debtor; and SALLC does not have any interest materially adverse to the interests of the Debtor' bankruptcy estates or any class of creditors or equity security holders.

26.    My having previously served as the CRO of InfoWDebtors and the connections to the same parties from that case will not in the slightest degree color my independent and impartial attitude required by the Code. In fact, I believe my previous experience with the parties involved will allow me to negotiate in good faith, foster communication among the constituents and often allow parties to achieve negotiated results rather than litigation.

27.    My previous service as the CRO of InfoWDebtors demonstrates that I faithfully will execute my fiduciary duties. Concerns were expressed at the inception of the InfoWDebtors bankruptcy case whether I would be serving Alex Jones or the creditors of InfoWDebtors. While it would have been beneficial to Alex Jones to contest the withdrawal of claims against the Debtors

008075

and prolong those bankruptcy cases, I directed counsel to assure only one thing in those negotiations: Assure that the InfoWDebtors had no more claims that could be asserted against it by the Texas and Connecticut Plaintiffs. Once that was accomplished, I quickly assessed that the best course for those debtors was to solve the remaining debtor-creditor issues outside of chapter 11.

28.     I do not possess or have any economic interest that would tend to lessen the value of the FSS bankruptcy estate. Nor one that would create either an actual or potential dispute in the which the two estates are rival claimants. Even if such a dispute were to arise, I would be representing FSS at this time, as I have resigned from being a CRO at InfoWDebtors. Furthermore, I would most likely have to recuse myself if it involved a matter on which I had done work for InfoWDebtors prior to my being engaged by FSS.

29.     I do not possess a pre-disposition under the circumstances that render such a bias against the estate. I can serve as an effective disinterested fiduciary at FSS.

30.     Finally, SALLC and I were retained pursuant to the Engagement Letter prior to the Petition Date to prepare for the filing. My understanding is that Bankruptcy Code § 1107(b) provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

## D. Bankruptcy Rule 2016(b) Disclosures

31.     Pursuant to Bankruptcy Code § 504 and Bankruptcy Rule 2016, neither I nor SALLC have shared or agreed to share (a) any of its compensation from the employment by the Debtor with any other persons or (b) any compensation any other persons have received, may have received, or will receive.

8

008076

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 20, 2022,                    By: _____
                                                     W. Marc Schwartz

9

008077

## SCHEDULE 1

## TO SCHWARTZ DECLARATION

## SEARCHED PARTIES

Debtor & Professionals

    Law Office of Ray Battaglia            Shannon  & Lee, PLLC

Debtor's Equity

    Alexander E. Jones

Creditors & Parties in Interest

Brennan Gilmore                Leonard Pozner
Carlee Soto-Parisi            Marcel Fontaine
Carlos Soto                      Mark Barden
Christopher Sadowski        Neil Heslin
Dona Soto                      Nicole Hockley
Erica Lafferty               PQPR Holdings Limited, LLC
Francine Wheeler           Robert Parker
Free Speech Systems, LLC    Scarlett Lewis
Ian Hockley                Veronique De La Rosa
Jacqueline Barden         William Sherlach
Jennifer Hensel             William Aledenberg
Jeremy Richman           Larry Klayman
Jillian Soto                 Randazza Legal Group

Attorneys for Creditors and Parties in Interest

Kaster Lynch Farrar & Ball LLP    McDowell Heterhington LLP
Koskoff Koskoff & Bieder        The Akers Law Firm PLLC
Fertitta & Reynal LLP           Copycat Legal PLLC
Pattis & Smith, LLC             Waller Lansden Dortch & Davis,
Zeisler & Zeisler P.C.           LLP
Jordan & Ortiz, P.C.

U.S. Bankruptcy Judges and Staff

2

008078

Chief Judge David R. Jones
Judge Marvin Isgur
Judge Christopher M. Lopez
Judge Jeffrey P. Norman
Judge Eduardo V. Rodriguez
Albert Alonzo
Ana Castro

Tracey Conrad
Jeannie Chavez
LinhThu Do
Tyler Laws
Kimberly Picota
Vriana Portillo
Mario Rios

U.S. Trustee Personnel

Alicia Barcomb
Jacqueline Boykin
Luci Johnson-Davis
Hector Duran
Barbra Griffin
Brian Henault
Linda Motton
Ha Nguyen
Glenn Otto
Yasmin Rivera

Jayson B. Ruff
Millie Sall
Patricia Schmidt
Christy Simmons
Gwen Smith
Stephen Statham
Christopher R. Travis
Clarissa Waxton
Jana Whitworth

## EXHIBIT C

**FSS Company Agreement**

008080

## COMPANY AGREEMENT OF
## FREE SPEECH SYSTEMS, LLC

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

### 1.     Formation of the Company.

**1.01     Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

**1.02     Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

**1.03     Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

### 2.     Organization of the Company.

**2.01     Name of the Company.** The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

**2.02     Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

**2.03     Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

2.04    **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3.    **Definitions.**

3.01    **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"**Agreement**" means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

"**Capital Account**" means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

"**Capital Contribution**" means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

"**Certificate of Formation**" means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

"**Code**" means to the Internal Revenue Code of 1986, as it has been and may be amended.

"**Company**" means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

"**Company Minimum Gain**" shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"**Company Property**" or "**Company Properties**" means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

008082

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company. The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

008083

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"**Percentage Interest**" means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

"**Person**" means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

"**Profits**" and "**Losses**" means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

"**Required Interest**" means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

"**Standard Rate**" means a per annum rate of interest equal to ten percent (10%), compounded annually.

"**Tax Distribution**" with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

"**TBOC**" means the Texas Business Organizations Code, as it may be amended from time to time.

- 4 -

008084

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

**3.02   Other Defined Terms.**   Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

**4.   Capital of the Company.**

**4.01   Initial Capital Contributions.**   Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

**4.02   Additional Capital Contributions.**   The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers.  For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

**4.03   Failure to Make Additional Capital Contributions.**   If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

**4.04   Capital Accounts.**   A Capital Account shall be established and maintained for each Member.  It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations.  In that regard, each Member's Capital Account shall be:

(a)   Increased by:

- 5 -

(i)     The amount of money contributed by that Member to the Company:

(ii)    The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)   Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)    Decreased by:

(i)     The amount of money distributed to that Member by the Company;

(ii)    The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)   Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)   Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

4.05   **Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

5.     **Allocations.**

5.01   **Allocation of Profits.** After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

- 6 -

008086

(a)    First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02    **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)    Losses for any taxable year shall be allocated in the following order and priority;

(i)    First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)    Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)    The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03    **Special Allocations.** The following special allocations shall be made in the following order:

(a)    **Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    **Member Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This __Section 5.03(b)__ is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     __Qualified Income Offset__. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(_d_)(4), 1.704-1(b)(2)(ii)(_d_)(5), or 1.704-1(b)(2)(ii)(_d_)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; __provided__ __that__ an allocation pursuant to this __Section 5.03(c)__ shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this __Section 5__ have been tentatively made as if this __Section 5.03(c)__ were not in this Agreement.

(d)     __Gross Income Allocation__. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; __provided__ __that__ an allocation pursuant to this __Section 5.03(d)__ shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this __Section 5__ have been tentatively made as if __Section 5.03(c)__ and this __Section 5.03(d)__ were not in this Agreement.

(e)     __Nonrecourse Deductions__. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)     __Member Nonrecourse Deductions__. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     __Section 754 Adjustments__. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(_m_)(2) or Section 1.704-1(b)(2)(iv)(_m_)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

008088

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

5.04   **Curative Allocations.**  The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04.   Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

5.05   **Section 704(c) Allocations.**  In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

5.06   **Other Allocation Rules.**  In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

5.07   **Allocations on Transfer.**  Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

(a)   For the months prior to the transfer, to the assignor;

(b)   For the months subsequent to the transfer, to the assignee; and

008089

(c) .For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6. **Distributions.**

**6.01 Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a) First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b) Then, the balance, to the Members in accordance with their respective Percentage Interests.

**6.02 Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a) First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b) Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c) Then, the balance, to the Members in accordance with their respective Percentage Interests.

**6.03 Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

- 10 -

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

### 7. Fiscal Matters; Books and Records.

**7.01 Bank Accounts; Investments.** Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**7.02 Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

**7.03 Books and Records of Account.** The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

**7.04 Tax Returns and Information.** The Members intend for the Company to be treated as a partnership for tax purposes. The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of: (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

**7.05 Tax Elections.** The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

**7.06 "Tax Matters Member."** The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

- 11 -

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

8. **Management of the Company.**

8.01 **Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation. The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

8.02 **Powers of Managers/Delegation of Authority.** The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04. Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

8.03 **Action by Managers.** Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held. No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

9. **Membership in the Company.**

9.01 **Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

9.02 **Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

008092

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

## 10.   Restrictions Upon Membership Interests.

**10.01 Generally.**   The ownership and transferability of Interests in the Company are substantially restricted.  Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business. Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02 Authorized Transfers at Death.**  An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.  However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03 Authorized Estate Planning Transfers.**  An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

- 13 -

008093

**10.04  Nonrecognition of an Unauthorized Transfer.**  The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer").  If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05  Effect of Unauthorized Transfers.**  If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)  The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)  The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)  Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)  Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)  In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate.  The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid.  The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)  Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)  Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06  Deemed Unauthorized Transfers.**  In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

- 14 -

008094

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

(a)     the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

(b)     the Bankruptcy of a Member;

(c)     the appointment of a receiver for all or substantially all of the assets of a Member;

(d)     the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

(e)     a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

**10.07  Admission of Substituted Members.**

(a)     Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require.  Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

(b)     Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

(i)     the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

(ii)     the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

(iii)     the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

- 15 -

008095

(iv)    the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)    such other conditions as the Managers may reasonably impose.

(c)    In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

10.08   Status of a Substituted Member.   A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company. Any such Substituted Member shall be treated as a Member. In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

10.09   Assignee of a Membership Interest.   Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

10.10   Membership Interest Pledge or Encumbrance.   No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest. It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

11.    Dissolution and Winding Up.

11.01   Events Causing Dissolution.   The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

11.02   Winding Up.   If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)    Appointment of Liquidator.   The winding up of the Company's affairs shall be supervised by a Liquidator. The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)    Powers of Liquidator.   In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

008096

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)     First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)     Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

008097

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 12. **Miscellaneous.**

**12.01 Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee. For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02 Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04 Amendment.** Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05 Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06 Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or a Member. No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07 Arbitration.** Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

008098

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief. The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement. The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

    **12.08   Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

    This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

[Signature Page Follows]

008099

EXECUTED to be effective as of the Effective Date.

Members:

_____
Kelly Jones

_____
Alex Jones

Managers:

_____
Alex Jones

SIGNATURE PAGE

008100

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas  78746 | $49.00 | 49% |
| Totals: | $100.00 | 100.00% |

SCHEDULE A

## SCHEDULE B

### DETERMINATION OF FAIR MARKET VALUE
### OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A. The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B. Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement. If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party. If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed. Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser. If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest. If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C. For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding. The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser. The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D. During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended. Upon the final determination of fair market value, all time limits shall automatically commence.

008102

# EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 22-60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR** | § | |

**UNITED STATES TRUSTEE'S AMENDED OBJECTION TO THE APPLICATION OF**
**DEBTOR FOR AN ORDER (A) AUTHORIZING THE EMPLOYMENT OF SHANNON**
**& LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR AND (B)**
**GRANTING RELATED RELIEF**

TO THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "U.S.

Trustee"), by and through his undersigned counsel, hereby submits his objection (the "Objection")

to the Debtor's Application for an Order (A) Authorizing Employment of Shannon & Lee LLP as

Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief (the "S & L Application").

In support of his Objection to the S & L Application, the U.S. Trustee states to the Court as follows:

**INTRODUCTION**

1.  The U.S. Trustee objects to the S & L Application because attorney Kyung Lee ("Attorney

Lee"), a partner at Shannon & Lee LLP ("S & L"), failed to disclose his connections to Free Speech

Systems, LLC ("FSS" or the "Debtor") in the bankruptcy cases of InfoW, LLC, IWHealth, LLC

and Prison Planet TV, LLC (collectively referred to as the "InfoW Debtors" or the "InfoW

Cases").[1] In the InfoW Cases, the InfoW Debtors represented to the Court and parties that they

would negotiate at arm's length with FSS and Alex Jones ("Jones"), the proposed third-party

funders and counterparties to the negotiations.  On May 19, 2022, Attorney Lee, through the law

---

[1] References to the InfoW Cases refer to Case Nos. 22-60020, 22-60021, and 22-60022 filed in the Southern District of Texas. The cite to "InfoW Docket" refers to Case No. 22-60020.



firm Kyung S. Lee PLLC ("KSLPLLC"), filed an application in the InfoW Cases whereby KSLPLLC sought to be employed as bankruptcy counsel for the InfoW Debtors. Attached to the application was a declaration by Attorney Lee, affirmatively stating that he had no connections to FSS and Jones (the "InfoW Lee Declaration"). Shortly after filing the application, however, Attorney Lee began providing legal services to FSS, while contemporaneously representing the InfoW Debtors.

2.   Attorney Lee never amended or supplemented the InfoW Lee Declaration after he was retained by FSS and did not otherwise inform the Court, creditors, and U.S. Trustee of his connections during the InfoW Cases as required by Bankruptcy Rule 2014. Attorney Lee's connections to FSS and Jones were only recently discovered in this case, after the Court conducted its own inquiry and questioned the professionals at the hearing on August 3, 2022. In addition to the violations under Bankruptcy Rule 2014, the lack of full disclosure in the InfoW Lee Declaration also violated the Southern District of Texas' Guidelines for Professional Conduct. All practicing attorneys in this district "[owe] to the judiciary, candor, diligence, and the utmost respect." *See* S.D. Tex. Local R., Appendix D. Guidelines for Professional Conduct.

3.   The defective disclosures in the InfoW Lee Declaration, while filed in a previous case, are not minor matters to ignore. The Court should address the issue in this case, which is, in many ways, a continuation of the previous cases. Section 327(a) of the Bankruptcy Code provides the Court with broad discretion to consider prior acts of the applicant to determine whether to approve an employment application. The Court should consider the nondisclosure in order to effectuate the disclosure obligations required by Bankruptcy Rule 2014.   The conduct in the InfoW Cases involved related debtors and almost the identical parties in interest. Moreover, Attorney Lee was employed by FSS while he filed pleadings and made statements to the Court in the InfoW Cases

2

that indicated that all InfoW estate professionals including Attorney Lee were independent and without outside influences. S & L, through the conduct of its named partner, should not be exempt from the consequences of the omissions because the InfoW Cases were dismissed; especially when S & L, with Attorney Lee, is now seeking approval from this Court to be employed by FSS—the very connection that was previously concealed from the Court. The disclosure procedures in Bankruptcy Rule 2014 are clear—the proposed professional must disclose all connections and may not unilaterally determine which connections impact his disinterestedness. S & L's attorney did not comply with his disclosure obligations, and through his noncompliance violated the ethical duties of candor, diligence, and the utmost respect owed to the Court.

4.   This is an unusual scenario. The Court never had the opportunity to rule on the employment application in the InfoW Cases. Because the InfoW Cases are now closed, it is appropriate for the Court in the present case to exercise its broad discretion under Section 327(a) to consider the nondisclosure in the related InfoW Cases to determine whether to approve the S & L Application. To protect the integrity of the bankruptcy system, the Court should refuse to overlook the disclosure failures in the InfoW Cases and as a result, should deny the S & L Application in the present case.

**FACTUAL BACKGROUND**

**A.  General Information.**

5.   On July 29, 2022, FSS filed a chapter 11 voluntary petition and elected to proceed under Subchapter V of chapter 11 on its petition.

6.   On August 2, 2022, the U.S. Trustee appointed Melissa Haselden as the FSS' Subchapter V Trustee in the present case.

7.   No committee has been appointed. Unless the Court determines there is cause for the

3

appointment of a creditors' committee and orders the appointment of one, the U.S. Trustee is prohibited from soliciting and appointing a committee in a subchapter V case. 11 U.S.C. § 1102(a)(3).

   **B. The InfoW Debtors create a structure to negotiate opposite FSS and Jones after filing their bankruptcy cases.**

8. On April 17, 2022, and April 18, 2022, the InfoW Debtors filed chapter 11 voluntary petitions and elected to proceed under Subchapter V of chapter 11 on their respective petitions.[2] The InfoW Debtors, like FSS, were all 100% owned by Jones prior to the filing of the cases. InfoW Docket No. 6 at ¶ 6.

9. On April 18, 2022, the U.S. Trustee appointed Melissa Haselden as the InfoW Debtors' Subchapter V Trustee.

10. Before the filing of the InfoW Cases, in 2018, certain plaintiffs brought actions in Texas and Connecticut against Jones, FSS, and the InfoW Debtors relating to statements made by Jones and other employees of FSS stating, among other things, that the Sandy Hook school shootings were a hoax (such plaintiffs are referred to herein as the "Sandy Hook Plaintiffs" and individually as the "Connecticut Plaintiffs" and "Texas Plaintiffs").

11. In 2022, Jones, FSS, and the InfoW Debtors sought to limit their liability to the Sandy Hook Plaintiffs' defamation claims through the creation of the Litigation Settlement Trust (the "LST") and the Plan Support Agreement (the "PSA). Three days prior to the filing of the InfoW Cases, the InfoW Debtors, Jones, and FSS entered into the LST, with Jones and FSS agreeing to fund $725,000 into the LST to pay the administrative expenses of the InfoW Cases. The LST was designed to remove control of the equity of the InfoW Debtors from Jones and give it to a trust

_____

[2] InfoW, LLC filed just shortly before midnight on April 17, 2022, while IWHealth, LLC and Prison Planet TV, LLC's petitions were docketed shortly after midnight on April 18, 2022.

4

008107

held by trustees.  According to the InfoW Debtors, "[t]his provides a clean break between the [InfoW]Debtors' former management and allows the funding of a proposed plan to be negotiated at arm's length between the Debtors, FSS, and Jones."  InfoW Docket No. 6 at ¶ 18.

12. Simultaneously with the creation of the LST, the InfoW Debtors entered into the PSA with Jones and FSS that dictated a roadmap for the InfoW Cases. FSS and Jones would be the funders of the plan because the InfoW Debtors had little or no assets. InfoW Docket No. 6 at 7. As part of the roadmap, the InfoW Debtors sought to retain W. Marc Schwartz as the chief restructuring officer ("CRO Schwartz") for the InfoW Debtors. InfoW Docket No. 6-2.

13. On April 27, 2022, the Connecticut Plaintiffs filed a motion to dismiss the InfoW Cases. InfoW Docket No. 36. On that same day, the Texas Plaintiffs joined the motion to dismiss and filed their supplemental motion to dismiss. InfoW Docket No. 42.

14. On April 29, 2022, the U.S. Trustee filed his motion to dismiss. InfoW Docket No. 50. The U.S. Trustee alleged, among other reasons, that the InfoW Cases were filed in bad faith and were engineered for the purpose of shielding Jones and FSS from liability. *Id*. at ¶ 36.

15. A status conference was held on April 29, 2022. At the status conference, the Court scheduled an evidentiary hearing for all three motions to dismiss for May 27, 2022.

16. On May 13, 2022, the Connecticut Plaintiffs filed a notice of dismissal with prejudice of claims against the InfoW Debtors in the United States Bankruptcy Court for the District of Connecticut. A status conference was scheduled for May 24, 2022, for the Connecticut Court to consider the Connecticut Plaintiffs' dismissal of the InfoW Debtors from the defamation lawsuits. InfoW Docket No. 98.

17. On May 18, 2022, the Texas Plaintiffs agreed to dismiss their claims against the InfoW Debtors in the defamation lawsuits filed in state court. On May 19, 2022, the Court entered the

5

"Stipulation and Order" which memorialized this agreement between the Texas Plaintiffs and the

InfoW Debtors. InfoW Docket No. 99.

### C. Lee and Schwartz begin to represent FSS in addition to the InfoW Debtors but do not inform the Court.

18. On May 18, 2022, the InfoW Debtors filed an Emergency Motion to Continue Hearing

Date on Motion to Dismiss (the "Emergency Continuance Motion"). In the continuance request,

the InfoW Debtors represented that:

> Continuing the Original Hearing Date until June will also permit the CRO who has been engulfed in evaluating the dismissals with prejudice issues to now focus on the remaining creditors of the Debtors. The CRO will be able to evaluate either before or by the June hearing date whether he should proceed with trying to confirm a subchapter v plan of reorganization or handle these claims outside of bankruptcy. Again, such effort will be [sic] wise use of limited financial resources. Such an approach will also save valuable judicial resources.

InfoW Docket No. 95, at ¶ 21.

19. On the morning of May 19, 2022, Attorney Lee filed an Application to Employ KSLPLLC

as Attorneys for the Debtors (the "KSLPLLC Application"). InfoW Docket No. 97. The KSLPLLC

Application was accompanied by the InfoW Lee Declaration. InfoW Docket No. 97-1.

20. In the InfoW Lee Declaration, Attorney Lee affirmatively stated that he had no connections

with FSS and Jones. The InfoW Lee Declaration provided the following:

> KSLPLLC performed the following actions to determine whether it or any of its attorneys has any disclosable connections, to the Debtors, creditors, any other party in interest, their respect[sic] attorneys and accountants, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any of the judges for the Southern District of Texas. I conducted a search of KSLPLLC files to determine using the list of parties listed in Schedule I hereto whether the firm had any connections to or represented any of the parties listed on Schedule 1. The search revealed that the firm had not and did not presently represent any of the parties listed on Schedule 1.

> The results of the forging connections search process confirm that neither I, KSLPLLC, nor any of its employees or shareholders, to the best of my knowledge, have any disqualifying connections…the only connection to any of

6

the parties on Schedule 1 is by virtue of having represented the three Debtors while a partner at PLR.

InfoW Docket No. 97-1, at ¶¶ 10-12.

21. Schedule I attached to the InfoW Lee Declaration included "Free Speech Systems LLC" and "Alex Jones" as "Searched Parties." InfoW Docket No. 97-1. Attorney Lee signed and executed the InfoW Lee Declaration on May 19, 2022. *Id.*

22. In the afternoon of May 19, 2022, the Court conducted a hearing on the Emergency Continuance Motion. At the hearing, the Connecticut Plaintiffs and Texas Plaintiffs announced that they were proceeding with their dismissal with prejudice of the InfoW Debtors as defendants in both the Texas and Connecticut defamation lawsuits.

23. In consideration of parties working to finalize the state court dismissals with prejudice, Attorney Lee requested additional time to respond to the U.S. Trustee's motion to dismiss the InfoW Cases. Among the bases for the continuance was that the CRO needed additional time to fulfill his fiduciary duties to the other creditors and Attorney Lee stated that "the other part that I have to do is renegotiate the plan support agreement if the debtors intended to move forward with respect to a small subchapter v plan." Tr. May 19, 2022, at 16, 21-24.

24. Based on the representations made by Attorney Lee, the Court reset the evidentiary hearing for June 10, 2022. Towards the conclusion of the status hearing, Attorney Lee assured the Court of the chief restructuring officer's commitment to the InfoW Debtors and stated the following:

> MR. LEE: I do want you to know that Mr. Schwartz in his fiduciary capacity is evaluating all alternatives.
>
> THE COURT: Oh, I'm sure he is.
>
> MR. LEE: I just want you to know that.

Tr. May 19, 2022, at 23, 13-16.

7

25. Despite those representations, according to CRO Schwartz, sometime on that same day, May 19, 2022, Attorney Lee asked CRO Schwartz to send an engagement letter to FSS outlining his retention as the CRO for FSS. CRO Schwartz prepared an engagement letter that day and it was sent via e-mail to Ray Battaglia, counsel for FSS. FSS Docket No. 14-4.

26. On May 26, 2022, Attorney Lee appeared on behalf of the InfoW Debtors at the Section 341 Meeting. The U.S. Trustee continued the creditors' meeting for one week, to June 2, 2022. As of May 26, 2022, there was no agreement between the U.S. Trustee and the InfoW Debtors to dismiss the InfoW Cases.

27. On June 1, 2022, the U.S. Trustee and the InfoW Debtors finalized a stipulated dismissal order. The stipulated dismissal order was submitted later that day.

28. On June 2, 2022, the InfoW Debtors, through Attorney Lee, filed a response to the U.S. Trustee's motion to dismiss. The InfoW Debtors asserted that, as of June 2, 2022, the InfoW Cases still served valid bankruptcy purposes, despite their agreement with the U.S. Trustee to dismissal just a day before. At the time of the response, both Attorney Lee and CRO Schwartz were providing services to FSS, but the InfoW Debtors stated that the CRO was "independent" and "the duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering." InfoW Docket No. 112 at ¶¶ 6-7. The response did not mention any relationship between FSS and Schwartz or between Lee and FSS.

29. On June 10, 2022, the Court held a hearing on the motion to dismiss and allowed all parties to provide any comments. Neither Schwartz nor counsel for the InfoW Debtors, who both addressed the Court that day, informed the Court of any connections to FSS. The Court then entered the stipulated order dismissing the InfoW cases. InfoW Docket No. 114.

**D. During the FSS case, the Court and parties learn about Schwartz's and Lee's representation of FSS during the InfoW cases.**

8

30. On July 26, 2022, the damages phase of the defamation lawsuit against FSS and Jones began in Austin, Texas. On July 29, 2022, at the conclusion of the first week of trial in Austin, FSS filed for bankruptcy protection.

31. On that same day, CRO Schwartz filed a Declaration with the Court in support of the first day motions. Docket No. 10. In that Declaration, Schwartz informed the Court for the first time that "[o]n June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022. *Id.* at ¶ 9. Schwartz also declared, "Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized." *Id.* at ¶ 40. SALLC was retained to perform various accounting and forensic work associated with his mandate.

32. On August 1, 2022, at the consent of FSS and the Texas Plaintiffs, the Court entered an order lifting the automatic stay and allowing the trial in Austin to proceed to judgment. Further, at this hearing, the Court expressed concerns about transparency in the bankruptcy process, specifically the May 19th engagement between CRO Schwartz and FSS while the InfoW Cases were pending. The Court asked the following:

> I need to understand as well, on May 19th, you were representing three debtors who are on the opposite side of a proposed plan support agreement. We never took action but you were also seeking retention from Free Speech at the same time? I don't think I ever knew about that.

33. On August 3, 2022, the Court conducted a cash collateral hearing (the "August 3rd hearing"). At the hearing, CRO Schwartz, who was now acting as the CRO for FSS, testified for several hours. Again, a point of concern raised by the Court was the nondisclosure of connections

008112

between the estate professionals[3] in the InfoW Cases and FSS and Jones. The Court asked the following:

> Let me get the question – I might as well ask it now because it's a good spot...I just need to understand it. On May 19th, there was a hearing before me where on May 18th, there was a request for a continuation on a motion to dismiss...and in this case, there is a letter dated by you to Free Speech dated the same day. I may be reading much into this, but it seems to me that you – either you wrote the letter that day or you had been in conversation with Free Speech before you wrote that – before that day you sent the letter. And I just need to understand – none of this was ever disclosed to me in connection with the case and the cases were dismissed on June the 10th officially, which tells me that Mr. Jones signed a retention letter. So, you were actively retained before these cases were dismissed – the last cases were dismissed – and I just need to understand, one, why that was never disclosed to me, and two, when did you begin to start soliciting or having conversations about representing Free Speech Systems...

Tr. August 3, 2022 at 147-148, 21:19.

In response to the Court's questions, CRO Schwartz stated that he could not recall the date but assured the Court that conversations concerning the FSS engagement only occurred "after we had been substantially convinced that we were going to be terminating the InfoWars bankruptcy." Tr. August 3, 2022 at 149, 4-8.

34. After listening to several hours of testimony at the August 3rd Hearing and upon the Sandy Hook Families' oral request for the formation of a tort claimant committee, the Court stated the following:

> [T]here's been oral request for the appointment of a committee, and that can be done by the Court for cause. I'm not going to grant that today, but I am going to express some real concerns about what I heard, and I'll express what they are. You know, whether you realize it or not, Mr. Schwartz was negotiating on both sides of a deal.

Tr. August 3, 2022 at 239, 9:17.

---

[3] During CRO Schwartz's testimony, the Court indicated that it had concerns regarding Attorney Lee's retention by FSS as well: "I [ask] Mr. Lee a few questions as well at some point, but I'll need to understand that as well, but today's not that day. Today's cash collateral, and so I do want – and I know I took this off on a tangent." Tr. August 3, 2022, at 150, 9-11.

10

35. Based on the testimony at the August 3rd Hearing, the Court further questioned the

independence of S & L and CRO Schwartz at the outset of the present case as it relates to potential

claims against Jones and other insiders:

> [T]he Debtor is going to have to make some tough decisions at some point. And
> it's going to have to really analyze those claims and see whether those claims
> have any merit…[and] I'm not sure that parties who were introduced in the last
> case could fill that role either. But the Debtor needs to hear that from me, and I
> think debtors are entitled, especially early on in a case, to think about what the
> judge may have to say. And these are certainly rare comments, but these are
> certainly uncommon cases.

Tr. August 3, 2022, at 241, 5-19.

36. On August 20, 2022, FSS filed applications to employ CRO Schwartz (the "Schwartz

Application") as the Debtor's Chief Restructuring Officer and S & L as co-counsel. The S & L

Application was accompanied by a declaration by Attorney Lee (the "FSS Lee Declaration"). The

FSS Lee Declaration disclosed for the first time that "the first services any attorney of Shannon &

Lee LLP provided to FSS occurred on May 24, 2022, were provided by me through Kyung S. Lee

PLLC…" FSS Docket No. 85-3, ¶ 26.  Further, the S & L Application disclosed that "KSLPLLC

received payment from the Debtor of $21,986.59 for services provided to FSS from May 24, 2022,

through May 31, 2022." *Id.* at FN. 1.[4] Lastly, the FSS Lee Declaration provided that attorneys of

S & L "represented the InfoW Debtors in the negotiations of the Plan Support Agreement under

which FSS and Alex Jones committed to provide funding for the InfoW Debtors." *Id.* at 85-3, ¶

15(b).

---

[4] FSS filed a Statement of Financial Affairs (the "SOFA") on August 29, 2022. FSS Docket No. 122. Question 11 on
the SOFA requires disclosure of payments related to bankruptcy – "List any payments of money or other transfers of
property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to
another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring,
seeking bankruptcy relief, or filing a bankruptcy case." Payments to Shannon & Lee were identified, as of June 6,
2022, however, no payments in the amount of $21, 986.59 were recorded on FSS's SOFA.

008114

37. In the Schwartz Application, FSS asserted that "the CRO and SALLC's mandate to 'lead InfoW's management and personnel through the restructuring process' had for all practical purposes concluded by May 19, and for sure by June 6." FSS Docket No. 83, ¶ 44.

38. On August 25, 2022, the Sandy Hook Plaintiffs filed a motion to request the appointment of a tort claimants committee and to remove the debtor-in-possession. The Sandy Hook Plaintiffs alleged, among other reasons, that CRO Schwartz mismanaged the estate resources for Jones' benefit and failed to disclose his connections to FSS while acting as the CRO for the InfoW Debtors. FSS Docket No. 102.

## OBJECTION

39. The S & L Application should be denied due to Attorney Lee's deficient disclosure of his connections to FSS and Jones in the related InfoW Cases. The disclosure process is self-policed by the professionals that appear before the Court, and when a disclosure violation occurs, it should be met with a strong rebuke. While this is an unusual scenario in that the KSLPLLC Application in the InfoW Cases was never heard and the InfoW Cases are now closed, the current case is related to the prior cases and includes substantially all the same players.  To effectuate the disclosure mandates in Bankruptcy Rule 2014 and to address the prior nondisclosure, the Court should exercise its broad discretion under Section 327(a) to consider the prior acts of an S & L attorney in violation of the disclosure obligations and to deny the S & L Application in this related case.

**A. The Court has Broad Discretion under 11 U.S.C. § 327(a) in Deciding Whether to Approve an Application to Employ an Estate Professional.**

40. The Bankruptcy Code provides a uniform scheme for retaining and compensating court-authorized attorneys under 11 U.S.C. §§ 327-331, 503, and 507. Section 327 provides that the debtor-in-possession may employ, with the Court's approval, professionals who are disinterested and who do not hold or represent interest adverse to the estate. 11 U.S.C. §§ 327. In addition, the

12

008115

applicants must also comply with Bankruptcy Rule 2014(a). *See In re Bechuck*, 472 B.R. 371, 375 (Bankr. S.D. Tex. 2012).

41. Section 327(a) of the Bankruptcy Code provides the Court with a wide latitude of discretion when professionals are seeking to work on behalf the bankruptcy estates. The statutory language of section 327(a) shows that Congress intended the bankruptcy court to have broad discretion in making its determination, as it provides that "the trustee [or debtor in possession, under 11 U.S.C. § 1107], with the court's approval *may* employ one or more [professionals]." [emphasis added]. Congress could not have more clearly stated that (i) no professionals, on any terms, can be employed without prior court authorization, and (ii) the court has broad discretion in deciding whether to approve or disapprove an employment application, and is not required to accept the proposed professional's application. The court may – or may not, in its sound discretion – approve a proposed employment application. *Cf. United States v. Rodgers,* 461 U.S. 677, 706 (1983) ("the word 'may,' when used in a statute, usually implies some degree of discretion").

42. Many decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a). *See, e.g.*, *In re Jackson*, 484 B.R. 141, 154 (Bankr. S.D. Tex. 2012) *citing Arnes v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003 (5th Cir. 1995); *In re Bigler, LP*, 422 B.R. 638, 643 (Bankr. S.D. Tex. 2010) ("This Court has substantial discretion to grant an application to employ a professional for the estate."); *Miller v. United States Trustee*, 197 F.3d 13, 17 (1st Cir. 1999) ("Bankruptcy courts historically have been accorded wide discretion to oversee the terms and conditions of a debtor's engagement of professionals[.]"); *Interwest Bus. Equip. v. United States Trustee*, 23 F.3d 311, 315 (10th Cir. 1994) ("[W]e will not second guess a decision not to approve professionals under § 327 unless it exhibits a clear abuse of discretion[.]"); *Harold & Williams Dev. Co.*, 977 F.2d 906, 909

13

008116

(4th Cir. 1992) (the Bankruptcy Code "gives broad discretion to the bankruptcy court over the appointment of professionals to work on behalf of the . . . estate"); *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987) ("Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals."); *Elias v. Lisowski Law Firm (In re Elias)*, 215 B.R. 600, 603 (B.A.P. 9th 1997) ("A bankruptcy court's decision regarding an application for the employment of a professional is reviewed for abuse of discretion.").

43. The Court is not required to approve an application that satisfies the requirements of Section 327(a). "Even if the technical requirements of disinterestedness and not holding or representing an interest adverse to the estate are met, the Court has the discretion to deny the application." *In re LTHM Houston-Operations*, LLC, 2014 WL 5449737, at *5 (Bankr. S.D. Tex. 2014). Additionally, "while disinterestedness and the absence of conflicts may be central to the inquiry, they are by no means exclusive. Indeed, section 327(a) vests the authority for 'approval' within the sound discretion of the court. That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons…" *In re Kurtzman,* 220 B.R. 538, 542 (S.D.N.Y. 1998).

44. In the exercise of its discretion under Section 327, the Court is instructed "into taking account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." *LTHM Houston-Operations, at *5; see also Official Comm. of Unsecured Creditors v. Harris (In re Southwest Food Distribs., LLC)*, 561 F.3d 1106, 1112-13 (10th Cir. 2009) (bankruptcy court does not err in considering proposed compensation terms when ruling on employment application); *Harold & Williams Dev. Co.*, 977 F.2d at 910 (bankruptcy court must not "abdicate the equitable discretion granted to it," but must "take into account the facts of a

14

008117

particular case and the overall objectives of the bankruptcy system"); *In re Kurtzman*, 220 B.R. 538, 540 (S.D.N.Y. 1998) (finding that the bankruptcy court did not abuse its discretion when it denied the retention of counsel based on "prior problems involving time records, billing errors, professional conduct, and overall costs of legal services that had led to its conclusion of loss of confidence in the firm"). Here, the requirements that professionals lay bare their connections play an integral part of the Court's function to determine a proposed professional's fitness to represent the bankruptcy estate. "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." *In re Downs*, 103 F.3d. 472, 480 (6th Cir. 1996). Bankruptcy courts must be able to expect the proposed professional appointed under 327 to disclose all connections and follow the applicable rules concerning disclosure. "Plainly, the Court will not approve the employment of counsel that does not comport with the applicable ethical and disciplinary regulations." *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991).[5]

### B. As Part of Their Duty to the Court and the Estate, Professionals Have a Continuing Duty to Disclose All Connections with Creditors and Parties in Interest.

45. Bankruptcy Rule 2014 imposes a complementary duty of disclosure on the applicant so that the Court and parties in interest can determine whether the professional satisfies disinterestedness requirements. Rule 2014 has one primary purpose—to facilitate strict

---

[5] In exercising discretion to deny an application to employ, "the bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007)(internal quotations omitted). In the present case, the Court is not depriving the Debtor of its choice in counsel, notably because S & L is proposed co-counsel. If the Court denies the S & L Application, the Debtor continues to be represented by another counsel. While the Bankruptcy Code provides deference to a debtor's choice of counsel, that deference is not absolute. "In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her own best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate." *In re Doors & More Inc.*, 126 B.R. 43 at 45. Here, the prior acts of an S&L attorney, namely the omissions of his connections to FSS and Jones, require the Court to take actions to preserve the integrity of the bankruptcy system and effectuate the disclosure mandates. The seriousness of the omissions and need to preserve the integrity of the system outweigh the Debtor's choice of counsel, especially when the Debtor is represented by co-counsel.

008118

compliance with section 327. "[T]he requirements of Fed. R. Bankr. P. 2014 are more encompassing than those governing disinterestedness inquiry under section 327. For while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014, 'all connections' that are not so remote as to be *de minimis* must be disclosed." *In re Leslie Fay Companies, Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994).

46.   The applicant has the duty to disclose all relevant information to the court and "may not exercise any discretion to withhold information." *In re Woodcraft Studios, Inc.*, 464 B.R. 1, 8 (N.D. Cal. 2011). Thus, "professionals 'cannot pick or choose which connections are irrelevant or trivial.'" *U.S. v. Gallene*, 182 F.3d 578, 588 (7th Cir. 1999) (concluding that a misstatement in a Rule 2014 statement constitutes a material misstatement for purposes of 18 U.S.C. § 152). The duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and "requires 'spontaneous, timely, and complete disclosure.'" *In re The Harris Agency*, 462 B.R. 514, 524 (E.D. Pa. 2011); *see also In re Granite Partners, L.P., 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998)* (court should not have to "rummage through files or conduct independent fact-finding investigations" to determine whether the professional should be disqualified).

47.   The disclosure requirements in Rule 2014 are "rooted in the fiduciary relationship between courts and attorneys." *In re Griffin*, 313 B.R. 757, 763 (Bankr. N.D. Ill. 2004). "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." *In re Downs*, 103 F.3d 472, 480 (6th Cir. 1996). Applicants "who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012) (citations omitted). "[L]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in

16

the end there was no prejudice." *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001); *see also In re Rabex Amuru of N.C., Inc.*, 198 B.R. 892, 897 (Bankr. M.D.N.C. 1996) (attorneys for debtor removed because of appearance of impropriety, even though no harm done to debtor). Professionals must "be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action." *In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011); *see also In re EBW Laser Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required.").

### C. In Exercising Its Broad Discretion, the Bankruptcy Court Should Deny the S & L Application Because of Attorney Lee's Failure to Affirmatively and Timely Disclose His Connections with FSS.

48. The defective disclosure in the InfoW Lee Declaration, which was a statement under penalty of perjury before the Court, is not a minor matter. It "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate." *Id.* As noted, Rule 2014 "is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court, and other parties in interest, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure." *In re Matco Elec. Group, Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008).

49. Under the PSA and LST in the InfoW Cases, Jones and FSS were designated as the "Third Party Funders." The question regarding the validity of the PSA and LST, and the negotiations

008120

surrounding the origination of these documents were contested issues at the center of the InfoW Cases. Unlike other plan support agreements in other chapter 11 cases, no creditors, including the Sandy Hook Plaintiffs, participated in the drafting or negotiations of the PSA and LST. The primary parties to those negotiations were the InfoW Debtors, FSS, and Jones. FSS was on the other side of the transaction from the InfoW Debtors. Even after the InfoW Debtors reached agreements with the Sandy Hook Plaintiffs, the InfoW Debtors did not agree to dismiss the case until June 1, 2022. Attorney Lee informed the Court on May 19, 2022, that he might have to renegotiate the PSA with FSS and Jones to pay the remaining creditors should the InfoW Debtors remain in bankruptcy.

50. Moreover, Attorney Lee had multiple opportunities to disclose to the Court his connections to FSS and Jones. After Attorney Lee was retained by FSS as counsel, the InfoW Debtors filed a response to the U.S. Trustee's motion to dismiss, maintaining that "the duty of the Debtors and their professionals as estate fiduciaries is clear and unwavering." FSS Docket No. 112, ¶ 7. The response is silent concerning the fact that just days before, Attorney Lee provided legal services for FSS and was employed as its bankruptcy counsel. Following the response on June 2, the Court conducted a hearing on the stipulation to dismiss in the InfoW Cases on June 10, 2022. Neither the CRO nor counsel for the InfoW Debtors, who both addressed the Court that day, informed the Court of any connections to FSS. By remaining silent, whether in pleadings, at hearings, or by failing to amend the InfoW Lee Declaration, Attorney Lee misrepresented his connections to the Court and violated the ethical duties of candor and diligence. *See* S.D. Tex. Local R., Appendix D. Guidelines for Professional Conduct; *see also In re Bradley*, 495 B.R. 747, 786 (Bankr. S.D. Tex. 2013)(Attorney's failure to correct misstatements demonstrated lack of candor and respect to the Court).

18

008121

51. While noncompliance with Bankruptcy Rule 2014 may result in disqualification and/or total disgorgement of fees in the InfoW Cases, the transgressions in the InfoW Cases eclipsed the confines of Bankruptcy Rule 2014 because those cases are now dismissed. Bankruptcy Rule 2014 alone is not sufficient to address Attorney Lee's nondisclosure of his connections to FSS and Jones in the InfoW Cases. However, the integrity of the bankruptcy system requires that the Court address Attorney Lee's omissions of his connections to FSS and Jones in the InfoW Lee Declaration. Here, it is appropriate for the Court to exercise its broad discretion under Section 327(a) to address Attorney Lee's prior acts in the related cases—which this case is essentially a continuation of—and deny the S & L Application. Put simply, Attorney Lee did not inform the Court of his connections in a related case, involving the identical parties in interest. Attorney Lee was employed by FSS while he filed pleadings and made statements to the Court that indicated that all estate professionals including CRO Schwartz and Attorney Lee were independent and without outside influences. S & L should not be exempt from the consequences of the prior acts of its named partner attorney because the InfoW Cases were dismissed; especially when S & L, through the same attorney, is now seeking approval from this Court to be employed by FSS— thereby asking the Court to bless the very connection that Attorney Lee previously failed to disclose to the Court. To maintain the integrity of the bankruptcy system and to fully effectuate the mandatory disclosure requirements in Rule 2014, the Court should deny the S & L Application.

008122

## CONCLUSION

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court deny the S & L

Application and grant such other relief as is just and proper.

RESPECTFULLY SUBMITTED:
KEVIN M. EPSTEIN
UNITED STATES TRUSTEE

DATED: 9/14/2022

*/s/ HA M NGUYEN*
Ha Nguyen, Trial Attorney
CA Bar #305411
FED ID NO. 3623593
United States Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, Texas 77002
E-mail: Ha.Nguyen@usdoj.gov
Cell: 202-590-7962

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means
via ECF transmission to all Pacer System participants in these bankruptcy cases, on the 14th day
of September, 2022.

/s/ Ha M. Nguyen
Ha M. Nguyen

20

008123

# EXHIBIT 4

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                              )   CASE NO: 22-60043-cml
                                )
 4    FREE SPEECH SYSTEMS, LLC,  )   Houston, Texas
                                )
 5            Debtor.           )   Tuesday, September 13, 2022
                                )
 6                              )   1:03 p.m. - 1:49 p.m.
      ------------------------------)
 7

 8                                  TRIAL

 9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Free Speech Systems, R.J. SHANNON
                               Shannon & Lee LLP
13                             700 Milam Street, Suite 1300
                               Houston, TX 77002
14
                               RAYMOND WILLIAM BATTAGLIA
15                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
16                             San Antonio, TX 78218

17    For Veronique De La      AVI MOSHENBERG
      Rosa, et al.:            McDowell Hetherington, LLP
18                             1001 Fannin, Suite 2700
                               Houston, TX 77002
19
                               JARROD B. MARTIN
20                             Chamberlain, Hrdlicka, White,
                               Williams & Aughtry P.C.
21                             1200 Smith Street, Suite 1400
                               Houston, TX 77002
22
      For David Wheeler,       RYAN E. CHAPPLE
23    et al.:                  Cain & Skarnulis PLLC
                               303 Colorado Street, Suite 2850
24                             Austin, TX 78701

25
```



```
 1    For the U.S. Trustee:      HA MINH NGUYEN
                                 Office of the United States Trustee
 2                               515 Rusk Street, Suite 3516
                                 Houston, TX 77002
 3
      For PQPR:                  STEPHEN LEMMON
 4                               Streusand Landon Ozburn and Lemmon
                                 1801 S Mopac Expressway, Suite 320
 5                               Austin, TX 78746

 6    For the SubChapter V       MELISSA ANNE HASELDEN
      Trustee:                   Haselden Farrow, PLLC
 7                               Pennzoil Place
                                 700 Milam, Suite 1300
 8                               Houston, TX 77002

 9    Court Reporter:            ZILDE MARTINEZ

10    Courtroom Deputy:          ZILDE MARTINEZ

11    Transcribed by:            Veritext Legal Solutions
                                 330 Old Country Road, Suite 300
12                               Mineola, NY 11501
                                 Tel: 800-727-6396
13

14

15    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

```
 1        HOUSTON, TEXAS; TUESDAY, SEPTEMBER 13, 2022; 1:03 PM
 2                         (Call to Order)
 3             CLERK:  All rise.
 4             MAN 1:  I was actually -- my door was shut because
 5    I was in the restroom when they came by.  I saw them walk
 6    past --
 7             THE COURT:  This is Judge Lopez.
 8             MAN 1:  (indiscernible).
 9             THE COURT:  Might want to put your phone on mute.
10             WOMAN 1:  -- like it scared me because we came
11    around the corner (indiscernible) and like --
12             MAN 1:  Yeah, it --
13             WOMAN 1:  You had the door shut.
14             THE COURT:  Folks, this is Judge Lopez.  I can
15    hear everything.  Yes.  I'll do it.
16             This is Judge Lopez, folks.  Good afternoon.  It
17    is now 1:03.  I'm going to call Free Speech here on
18    September 13th, one o'clock docket.  Something just got
19    filed.  My understanding is we're going to take up cash
20    collateral and then we will also take up -- talk about
21    emergency motion to compel.  So why don't I take
22    appearances.  Why don't I start in the courtroom.
23             MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi
24    Moshenberg and Jarrod Martin here on behalf of the Texas
25    plaintiffs, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MR. MOSHENBERG:  Jarrod Martin has a hearing at

 3    1:30, so he may be stepping out in regard to that matter.

 4    And then just so the Court understands, I'm going to be

 5    handling the motion to compel issue and Jarrod Martin is

 6    spearheading the discussions with the other side about cash

 7    collateral, so let him speak to those issues.

 8              THE COURT:  Why don't we take -- well, we'll see

 9    where this goes.  Okay, thank you.

10              MR. MOSHENBERG:  Thank you, Your Honor.

11              MR. NGUYEN:  Good afternoon, Your Honor.  Ha

12    Nguyen for the U.S. Trustee.  I also have Millie Sall from

13    the U.S. Trustee's office here with me.

14              THE COURT:  Good afternoon.

15              MR. LEMMON:  Your Honor, Steve Lemmon on behalf of

16    PQPR.

17              THE COURT:  Good afternoon.

18              MR. SHANNON:  Good afternoon, Your Honor.  RJ

19    Shannon on behalf of the Debtor, Free Speech Systems LLC.

20              THE COURT:  Okay.  Good afternoon.

21              MR. SHANNON:  And believe on the telephone or on

22    the -- electronically Ray Battaglia may be on as well.

23              THE COURT:  Okay.

24              MR. SHANNON:  Thank you.

25              THE COURT:  Sounds great.  Good afternoon.  Ms.
```

1    Haselden, good afternoon.

2              MS. HASELDEN:   Good afternoon, Your Honor.

3    Melissa Haselden and I also have with me Elizabeth Freeman,

4    proposed counsel for Subchapter V Trustee.

5              THE COURT:   Okay.  Good afternoon.  Okay.  We have

6    covered the courtroom.  Let me just open it up.  Does anyone

7    wish to make an appearance who's on video.  Mr. Chapple, I

8    see you there.  Do you wish to make an appearance?

9              MR. CHAPPLE:   Yes, Your Honor.  Thank you for

10   recognizing me.  Ryan Chapple on behalf of the Connecticut

11   plaintiffs.

12             THE COURT:   Okay.  Folks the line is completely

13   unmuted.  I'm going to try to keep it completely unmuted so

14   I don't have to -- I can focus on the arguments and -- but

15   anyone else wish to make an appearance?

16             MR. BATTAGLIA:   Yes, Your Honor.  Good afternoon.

17   This is Ray Battaglia.  On behalf of Free Speech Systems.

18             THE COURT:   Good afternoon, Mr. Battaglia.  Anyone

19   else?  Okay.  Might be easier for me if we talked about cash

20   collateral first and then took up the motions to compel.  So

21   why don't we start there.  I did see that something got

22   filed.  Read it briefly and I'm still reading it.  Maybe you

23   can give me the high points.

24             MR. MARTIN:   I can give you high points, Your

25   Honor, and Mr. Battaglia can chime in as well.  We are able

1  to reach another agreement on interim use of cash

2  collateral.  The only material changes are the PQPR payment

3  provisions from before regarding the clawback, those were

4  removed and instead there's a language in there that

5  preserves the clawback rights in the previous interim

6  orders.  To date, out of that $750,000, $250,000 has been

7  paid.  The other $500,000 has not yet been paid so you have

8  one clock kind of ticking on that.

9          Obviously, that's reserving all rights relating

10  to, you know, broader litigation, but specifically as to

11  those payments as to whether they were proper in this course

12  of business.  That's --

13          THE COURT:  Okay,

14          MR. MARTIN:  -- what the clock is ticking as far

15  as -- and then there's an updated budget as well and Mr.

16  Battaglia can speak to that.

17          THE COURT:  I did see that you all need a final

18  cash collateral hearing as well, right?

19          MR. MARTIN:  Correct, Your Honor.

20          THE COURT:  Or a time, I should say.

21          MR. MARTIN:  And we had proposed having that heard

22  at the same time as the tort committee hearing.

23          THE COURT:  Okay.  Do you think 10 a.m. would work

24  for everyone, if we're going to work through the day on

25  that?  I don't think there's a lot of hearings that are

1   going to go on at the same time there.  Would 10 a.m. work

2   for October 12th?

3          MR. MARTIN:  It's okay for the Texas plaintiffs,

4   Your Honor.

5          THE COURT:  Okay.  Mr. Battaglia, would that work

6   for you?

7          MR. BATTAGLIA:  Yes, Your Honor, and I've had

8   conversations with Mr. Martin -- this is Ray Battaglia, for

9   FSS -- about frankly at the end of the day probably doing

10  another interim at that time.

11         THE COURT:  Okay.

12         MR. BATTAGLIA:  Just -- I think we're fine running

13  on that basis, but yes.  That'd be fine.

14         THE COURT:  Okay.  Is there anything you wish to

15  tell me about --

16         MR. BATTAGLIA:  And I guess one more thing, Your

17  Honor, I should point out is that Ms. Freeman had asked for

18  a couple of -- minor modification to the proposed order

19  regarding payments to insiders and that the words directly

20  or indirectly were inserted, and I don't think that does

21  injustice to anyone who had previously signed off on the

22  proposed order, but I wanted to at least mention it.

23         THE COURT:  Okay.  I looked at the budget.  There

24  were two items that I just want somebody to clarify for me.

25  One of them says Alex Jones trial cost, what is that, for

```
 1    $80,000?

 2            MR. BATTAGLIA:  Your Honor, Mr. Jones is -- has

 3    required to appear at trial in Connecticut and he's unable

 4    to travel, like perhaps your or I can in the sense he does

 5    require security when he goes somewhere and he doesn't stay

 6    in a hotel.

 7            THE COURT:  Why is the Debtor paying that?

 8            MR. BATTAGLIA:  I don't think that we're providing

 9    --

10            THE COURT:  He's a defendant.

11            MR. BATTAGLIA:  Because --

12            THE COURT:  Isn't he -- Mr. Battaglia, isn't he a

13    defendant in the same lawsuit?

14            MR. BATTAGLIA:  He is a defendant as well as FSS.

15    Yes, Your Honor, and we had provisions in the lift stay

16    order that we could include a budget for his travel

17    expenses.  And I think some of his travel expenses really

18    relate to his being there on behalf of FSS.

19            THE COURT:  I received this 15 minutes ago.  We're

20    not going to do that.  You all can come back and ask for it,

21    but we're not paying for travel expenses for co-defendant on

22    15 minutes' notice to the Court about that.  Never seen that

23    before.  I'm not aware of it.  Somebody wants to come back

24    on additional notice, you're more than happy to do so.  It's

25    not a no, but it's not a today.  I need more information on
```

 1    that.  So I'm just telling -- what are the other witness

 2    expenses and trial costs?  What does that relate to?  Does

 3    that relate to specifically to FSS or something else?

 4            MR. BATTAGLIA:  They are employees of FSS that

 5    plaintiffs have requested to be present or alternatively

 6    FSS' counsel has requested to be present.

 7            THE COURT:  Okay.

 8            MR. BATTAGLIA:  At trial.

 9            THE COURT:  Okay.

10            MR. BATTAGLIA:  And also was included in the lift

11    stay order that those expenses would be allowed to be

12    reimbursed.

13            THE COURT:  Relates to the FSS' defense.  I think

14    lifting the automatic stay makes perfect -- I entered an

15    order lifting the stay.  You're going to have to provide

16    some additional information, if somebody -- provide the

17    evidence today, we can take is up.  But if you want me to

18    sign an order today providing expenses for co-defendant in

19    litigation, I'm going to need more than just the parties'

20    agreement on that.  I think I have an independent duty to

21    take a look at this and I don't understand it.

22            But that's -- that just means somebody can come

23    back and ask for it.  It just means that literally this got

24    filed 15 minutes before the hearing and I've reviewed it and

25    you want me to sign it today.  That's what I'm wanting to

1    do.

2           Mr. Lemmon, let me ask you.  You're the -- far as

3    I know.  It sounds like there's agreement between the tort

4    plaintiffs and the Debtors.  You're still listed as a

5    secured party.

6           MR. LEMMON:  Yes, Your Honor.

7           THE COURT:  Your client is still listed as a

8    secured party.  I just need to make sure that you're okay

9    with this order.  It says an agreed cash collateral order.

10          MR. LEMMON:  Yes, Your Honor.  I reviewed the form

11   of order and my client has no objection.

12          THE COURT:  Okay.  Thank you.  So I know you got a

13   1:30 and Mr. Battaglia, you can tell me otherwise, but I'm

14   willing to sign the order today extending the use of cash

15   collateral to October the 12th at a hearing on the budget.

16   The rest of the budget looks fine to me.  Actually had one

17   more question.  And there was an increased cost to the

18   fulfillment expert.  What is that?  I did -- or who is that?

19          MR. BATTAGLIA:  It's Blue Ascension, Your Honor,

20   and this was the subject of the modification to the cash

21   collateral order.  It -- really travels based on estimated

22   sales for the period.

23          THE COURT:  Okay.

24          MR. BATTAGLIA:  And they're not completely

25   connected because of course the sales are presented to you

1    and all these expenses on an approval basis, but they don't

2    track day-to-day the shipping.  They happen a week later or

3    several days later, but it's an estimate of what's expected

4    to pay for both the shipping and the fulfillment cost that

5    has been presented or discussed in front of the Court

6    before.

7             THE COURT:  And that's different than the

8    fulfillment services line?  There's a line --

9             MR. BATTAGLIA:  Your Honor, I'm afraid I don't --

10            THE COURT:  There's a line item for fulfillment

11   services.

12            MR. BATTAGLIA:  I need to --

13            THE COURT:  There's a line item for fulfillment

14   services and then I see one for a fulfillment expert.  It

15   was there last time.  It just went up this time around.  I

16   just --

17            MR. BATTAGLIA:  I'm sorry --

18            THE COURT:  -- need to make sure --

19            MR. BATTAGLIA:  I'm sorry, Your Honor.  The

20   fulfillment expert is after the hearing in which Blue

21   Ascension became something of an issue.  Mr. Schwartz, in

22   trying to fulfill his obligations and resolve the questions

23   that had been presented, has hired someone to come in and

24   evaluate the fulfillment operations of Blue Ascension and to

25   evaluate the cost structure.

```
 1              THE COURT:  I remember that.

 2              MR. BATTAGLIA:  And under --

 3              THE COURT:  I remember that.

 4              MR. BATTAGLIA:  So.

 5              THE COURT:  I remember that.  Yeah.

 6              MR. BATTAGLIA:  That's what that line item is for.

 7              THE COURT:  Got it.  Got it.  Got it.  Yeah, I

 8    remember that and I do remember Mr. Schwartz talking about

 9    that at the last interim hearing on August 24.  So that

10    makes sense to me.  I have no additional questions.

11              Mr. Nguyen, Ms. Haselden, are you all okay with --

12    if I sign this order with the provisions that I've set

13    forth?

14              MR. NGUYEN:  Yes, Your Honor.  We have no

15    objections to the cash collateral.  It was the deal that was

16    struck and we were involved.  I've taken a look at it.

17              THE COURT:  Okay.

18              MR. NGUYEN:  I'm fine with the order.  Thank you.

19              THE COURT:  Thank you.

20              MS. HASELDEN:  Yes, Your Honor.  We have no

21    objection with the changes that are --

22              THE COURT:  Okay.

23              MS. HASELDEN:  -- Ms. Freeman --

24              THE COURT:  And again, with the other part, people

25    -- I just, I don't have any evidence as to why that's
```

```
 1    necessary or how it's -- why FSS should pay for it.  I'm

 2    happy to hear evidence on it, if there is any.  If not,

 3    we're all going to --

 4              MR. BATTAGLIA:  Your Honor --

 5              THE COURT:  We're all going to come back in a

 6    couple weeks.  It's just -- I haven't, I'm not comfortable

 7    doing it today.

 8              MR. BATTAGLIA:  Your Honor, this is Ray Battaglia

 9    again.  I understand.  I'll -- if you would like, I'll

10    revise the budget accordingly or with the Court, made their

11    --

12              THE COURT:  No.

13              MR. BATTAGLIA:  -- certainly says if the budget

14    doesn't, so I'll -- whatever the Court --

15              THE COURT:  I can --

16              MR. BATTAGLIA:  -- favors and then we'll come back

17    and ask the Court for --

18              THE COURT:  Okay.  I can --

19              MR. BATTAGLIA:  -- those expenses with more

20    explanation.

21              THE COURT:  I can figure it out on my end and I

22    think it's just a short line or something, either in the

23    order or just striking it --

24              MR. BATTAGLIA:  Yes, sir.

25              THE COURT:  -- from the budget, but I can sign it.
```

```
 1    Mr. Lemmon, if you can just confirm you're okay with me

 2    signing the order as provided.

 3              MR. LEMMON:  Yes, Your Honor.  My client has no

 4    objection.

 5              THE COURT:  Okay.  Okay.  Thank you.  And I've

 6    heard from the United States Trustee.  I've heard from

 7    Subchapter V Trustee.  I will sign that order.  Looks like

 8    sales are still doing really well, which is good for FSS.

 9              So, okay.  I will now turn things over to, guess

10    Mr. Moshenberg, you filed the motion.  Turn it over to you,

11    sir.

12              MR. MOSHENBERG:  Thank you, Your Honor.

13              THE COURT:  You can move that mic closer to you.

14              MR. MOSHENBERG:  Sure.

15              THE COURT:  No problem.

16              MR. MOSHENBERG:  Can you hear me all right, Your

17    Honor?

18              THE COURT:  Just fine.  Thank you.

19              MR. MOSHENBERG:  Thank you very much and thank you

20    for hearing this issue so quickly, Your Honor.  So as the

21    Court is well aware, this cash collateral issue is something

22    the parties are continuing to debate and do discovery on and

23    we're preparing for that cash collateral hearing, looks like

24    on October 12th.

25              One of the issues in that cash collateral motion
```

1    has to do with the nature of the PQPR debt, as the Court

2    knows.  It's not only the nature of the debt but also how

3    that debt was arrived at and the actual amount of the debt

4    itself.  As the Court knows, we've worked together with Free

5    Speech Systems in terms of reaching interim cash collateral

6    orders, same thing with PQPR, and that's something we've

7    been very proud of, the fact that we've been able to work

8    with them when needed.

9         And one of the agreements that the parties reached

10   and the Court entered an order on was Document 98 which is

11   the second cash collateral order.  And Paragraph No. 14,

12   Your Honor, really codifies the agreement that the Court

13   blessed that the parties to do discovery as it relates to

14   the cash collateral order and what it says is it provides

15   that PQPR as well as FSS, but really we're focused on PQPR

16   today, PQPR was supposed to provide documents in response to

17   document -- to discovery requests and provide other

18   discovery responses by certain date.  Then after that date,

19   the parties were going to have a deposition of PQPR's

20   corporate representative.

21        Paragraph 14 of Document 98 also says that if

22   there's some sort of dispute relating to the discovery, then

23   that the parties can move on an emergency basis.  Now, that

24   being agreed to, the parties did issue discovery requests

25   and the Texas plaintiffs served discovery requests that were

1    focused on this targeted issue about the nature of the PQPR

2    debt and the amount of the PQPR debt.

3           And just so the Court understands, Exhibits 1, 2,

4    and 3 to the motion to compel, I've conferred with opposing

5    counsel and their finding that admitted.  That way Jarrod

6    can leave a little sooner without having to get those

7    documents in.

8           THE COURT:  Let's make him stay.  Just fine.

9    Thank you.

10          MR. MOSHENBERG:  But Documents 1, 2, and 3 in

11   support of that motion or exhibits, rather, it's the

12   discovery request, the responses, and then the attempt to

13   meet and confer.  Now, the cash collateral motion, you know,

14   of course the underlying notes, the cash collateral here

15   that PQPR has with Free Speech Systems, it's not an ordinary

16   note that you would find, for instance, when a bank is

17   giving out a secured loan for a promissory note.

18          What you have here is you've got promissory notes

19   that are basically memorializing 50-some million dollars,

20   $53 million in past obligations owed.  So it's not future

21   money being paid out under a security arrangement.  It's

22   supposedly some legal obligation to pay a debt that was

23   incurred in the past.

24          And so a lot of our discovery requests were

25   focused on figuring out what's the nature of that underlying

1    debt that preceded the promissory notes.  And that's why we

2    just served those discovery responses that are in Exhibit 1

3    and the responses that are in Exhibit 2.  The problem is --

4    and this is in Exhibit 2 -- is that the responses PQPR

5    provided list a bunch of boilerplate objections and then it

6    just states what documents PQPR has decided to produce.

7         What we have a problem with their responses is

8    first of all, there's really two issues.  The first one is,

9    we don't really know whether responsive documents are being

10   withheld on the basis of an objection.  They just provide

11   these boilerplate objections saying we object to this

12   request, here's what we'll produce.  It's unclear from the

13   responses, are there other responsive documents out there

14   that are responsive to that request that are being withheld.

15        THE COURT:  Have the parties conferred?

16        MR. MOSHENBERG:  We have tried to.  We did speak

17   this morning, Your Honor.  So we tried to confer for several

18   days, as Exhibit 3 shows to our motion.  We didn't hear

19   anything for a long time, Your Honor.  Finally, yesterday,

20   after they filed their response, there was a brief

21   communication where they sort of invited us to send another

22   email and explain what we want, and we did that.

23        We sent a long email detailing the documents we

24   want and why we want them, and they responded and they

25   basically said the effect of well, you don't need to have

1    these documents.  First, take the deposition and then see if

2    you need the documents.  Obviously, that's not what the

3    discovery rules contemplate.  If there's responsive

4    documents out there and they're discoverable, then we have a

5    right to receive them.

6          Of course, in practice, you need the documents in

7    order to take a meaningful deposition.  So legally, I don't

8    really understand why that's a reason to not turn over a

9    responsive document.  Doesn't make any sense in normal

10   practice of law, but especially doesn't make sense given

11   that the parties already agreed that they were going to turn

12   over responsive documents before the deposition, and that's

13   what Document 98, Paragraph 14 shows.  So I don't really

14   understand the basis for that.

15         The other issue that they mention is they sort of

16   indicate there might be some responsive documents.  There

17   may not be other ones.  They don't exist.  If -- and this

18   really is a big part of the issue.  We don't want responsive

19   documents being held on the basis of an objection.  If there

20   are no responsive documents, they're required under Rule 34

21   to say so.  We just want to know that there's no documents

22   out there that are being withheld.  And it seems like for

23   some of these discovery requests, that may be the case.

24         What they need to do is withdraw their improper

25   objections and just say, there's no responsive documents in

```
 1      --
 2              THE COURT:  Do you think some of these requests
 3   are overly broad?
 4              MR. MOSHENBERG:  I don't, Your Honor.  I'm happy
 5   to handle any specific --
 6              THE COURT:  Let's start.
 7              MR. MOSHENBERG:  Sure.
 8              THE COURT:  We're talking about cash collateral.
 9              MR. MOSHENBERG:  Yes, Your Honor.
10              THE COURT:  Produce all agreements, contracts, and
11   -- all agreements between FSS and PQPR.  What purpose does
12   that serve with cash collateral --
13              MR. MOSHENBERG:  It's --
14              THE COURT:  -- unrelated to the debt?
15              MR. MOSHENBERG:  Well -- and so when we --
16              THE COURT:  I'll give you a few.  Produce all
17   documents evidencing any agreements between FSS and PQPR.
18   Right?  Regardless if it relates to the debt.  Say there's
19   an agreement -- what do you mean by agreements, right?
20   That's different from contracts and promissory notes.  All
21   of them.  Produce -- let's see.  Produce all employee lists
22   for PQPR from September 1st, 2013 to the present.  Why do
23   you need to know who works at PQPR in 2013 to determine
24   whether the debt is owed at that amount or not?  I'm just
25   asking.  It's the kind of -- all documents and
```

1    communications evidencing, so every communication evidencing

2    the ownership of PQPR from its inception.  You don't find

3    that to be a little overly broad?

4              MR. MOSHENBERG:  No, I --

5              THE COURT:  Documents just saying, we formed PQPR

6    in 2013, so I'm going to have to go back in 30 days' notice

7    and file -- and find every email that shows every time that

8    they say that they're the owner from 2013 in connection with

9    a cash collateral hearing that was schedule to occur today?

10             MR. MOSHENBERG:  Well, not necessarily, Your

11   Honor.  But to be clear, we detailed in an email yesterday,

12   we talked to them about what we were specifically looking --

13             THE COURT:  -- not what you said.  You said you

14   didn't think some of these were overly broad.

15             MR. MOSHENBERG:  Sure.  And let me be clear, and

16   we can always -- of course, the rules allow us to narrow it

17   to the extent it is discoverable and I want to be --

18             THE COURT:  Taking you up on your first statement.

19             MR. MOSHENBERG:  Sure, Your Honor.  I don't think

20   the way that you read the question, Your Honor, the request

21   --

22             THE COURT:  I read it the way you wrote it.

23             MR. MOSHENBERG:  Sure.  And I want to be clear.  I

24   didn't perceive it that way.  When we as a group circulated

25   these drafts, what we're referring to, the draft contracts,

1    agreements, however they want to call it, between Free

2    Speech Systems and PQPR.

3              THE COURT:  -- I'm going.

4              MR. MOSHENBERG:  Sure.

5              THE COURT:  I think some of these are really

6    broad, but it could be narrowed to address what you need and

7    then I think Mr. Lemmon is going to have to tell me if these

8    -- some of these requests were narrowly tailored towards

9    cash collateral and the debt that exists, I understand your

10   initial -- his initial response, but maybe he was jammed for

11   time.  But now we're a couple of weeks out now and we're

12   going to go further, even further out.  I don't understand.

13   I think some of these requests can be narrowly tailored in a

14   way to specifically address the issue and I would need to

15   understand from PQPR whether they would still have an

16   objection to that.

17             But I -- you're asking me whether I think an

18   organizational chart is appropriate.  I do.  If you're

19   asking me whether they need to identify all facilities and

20   offices used by them, I don't know.  You'll have to tell me

21   whether that's appropriate or not, but I do think that the

22   parties could talk and narrowly tailor this in a way that

23   really gets to the heart.  I do understand the issue.

24             There were -- there was a large amount of debt

25   that was -- this is different.  This is not just a loan

1    agreement where money was advanced, a loan agreement was

2    signed and then funds were advanced on a loan and there was

3    security taken on that.  This seems to be a little different

4    and you're -- I think you're entitled to get documents that

5    are based on that.

6            MR. MOSHENBERG:  Sure.

7            THE COURT:  I just want -- I just think things can

8    be narrowly tailored in a way that really addresses what

9    you're doing that relates to cash collateral, and I'm happy

10   to do that, but I think the parties could really sit down

11   and see if that could get done, with my guidance.

12           I think there's a difference between seeking

13   documents for other purposes, and I'm not saying that's what

14   you did.  I just -- if we're going to limit it to cash

15   collateral, which is what's going on, then I think you can

16   get the docs and I think there are.  And I agree with you,

17   if all you are receiving is the underlying loan documents

18   and some worksheets, I think Mr. Lemmon is going to have to

19   tell me if there's more or admit that there's more or not.

20           But I think some of these can be more narrowly

21   tailored to address the debt, but that's a simple thing.

22           MR. MOSHENBERG:  I totally agree, Your Honor, and

23   candidly, my normal practice, I usually am able to meet and

24   confer and reach some sort of deal.  The reason the motion

25   was filed is because we just heard nothing for about a week

1 and we tried our best and, you know, it turns out Mr. Lemmon

2 was busy meeting with Ms. Haselden and trying to promote his

3 motion to investigate instead of doing the discovery he

4 promised to do under our agreement.

5   THE COURT:  That's right.  The motion to

6 investigate is still out there as well.

7   MR. MOSHENBERG:  Yes, Your Honor.  And we totally

8 agree.  You know, if there's room to narrow it, absolutely.

9 We're not looking for every document under the sun, so I

10 agree with you and I think we'll be able to work it out.

11 But I do want to be clear and I would love some guidance

12 from the Court.  I mean, our wish list is essentially to

13 make sure that if there are no responsive documents that

14 they withdraw their objections and say there's no responsive

15 documents, assuming that it's been tailored as the Court has

16 discussed.

17   And then if there are responsive documents that

18 are tailored as was discussed, that absolutely produce them.

19 And I'm happy to work with Mr. Lemmon on that.  I think we

20 could probably do that, and if not, we can come back to the

21 Court soon if that works.

22   THE COURT:  Okay.  That's perfect.  Thank you.

23 Let me hear from Mr. Lemmon.

24   MR. LEMMON:  Judge, I'm chagrined to be here on a

25 discovery motion.  I don't think I've appeared on a

1    contested discovery motion in federal court in 20 years, but

2    part of this is on me, and that is that Mr. Martin reached

3    out to me on Labor Day by email and I read his briefly.  It

4    was to me and to Mr. Battaglia and I believe --

5                AUTOMATED VOICE:  Conference muted.

6                MR. LEMMON:  -- the first part of it dealt with a

7    privilege log, right, which I didn't really find applicable

8    and I did not give his email, when I read it on my iPhone

9    when I got off the golf course, the -- in the way that I

10   should have.

11               The follow-up email again came to me and I read it

12   on my iPhone the day before the creditors meeting and it was

13   Mr. Martin's suggestion we visit after the creditors

14   meeting.  I completely zoned on those.  Just didn't see

15   them.  So I was surprised when I got the emergency motion.

16   I called Mr. Martin because the Court will recall I'm the

17   person that offered discovery informally at the time of the

18   August -- I think it was -- 3rd hearing.  And -- because I

19   was going on vacation.

20               I wanted everybody to be able to get what we had

21   and we have somebody who did the forensic accounting

22   relating to the underlying debt and was instrumental in the

23   -- knows about the execution of the notes and that's the

24   person I've offered and whose work papers I've sent.  And

25   we've offered him repeatedly for deposition.  That

1    deposition is currently set for October 4th and I suppose

2    that the plaintiffs will go forward taking it this time.

3         I had talked originally with Mr. Martin and I

4    thought we had an agreement that I was going to produce the

5    documents related to the existence of the debt which I

6    viewed as the key issue related to cash collateral.  And we

7    will.  We will absolutely produce everything related to the

8    existence of the debt or reasonably related to the existence

9    of the debt, Your Honor, and I don't have a problem with

10   that.

11        THE COURT:  You think that includes negotiations

12   surrounding the formulation of the debt?

13        MR. LEMMON:  I believe that there are no documents

14   regarding the negotiations regarding the formation of the

15   debt.  The way the debt occurred, Your Honor, was that PQPR

16   sold to FSS on open account and they kept a ledger, right.

17   And so those accounting issue -- entries are all, of course,

18   relevant, right.  My problem is that -- and when we got the

19   document requests while I was on vacation, it demanded a

20   response in eight days at that time.

21        We weren't able to do that.  My problem is that

22   that ledger has a lot of other things in it, right, such as

23   every purchase my client's ever made.  Right, it's my

24   client's general ledger and we don't find that to be germane

25   to any of the discussions.  So what we have is we have a

1    compilation done by the forensic accountant of all of those

2    and we can work with everybody to get them what they need

3    regarding the existence of the debt.  I don't have a problem

4    with that, Your Honor.

5         Just want to say one other thing, and that is

6    yesterday I called Mr. Martin and I said, what is it that

7    you guys really want.  And he said well, we need your

8    spreadsheets in native format and I agreed immediately.  I

9    said, they won't be Bates labeled that way, but we'll give

10   them to you.  And he said Mr. Moshenberg may want something

11   different.  I got an extensive email from him last night.  I

12   responded.  I called him.  Finally reached him this morning.

13        I said, what is it that you really want on an

14   emergency basis.  He said, I need you to withdraw every

15   single one of your objections and produce every single

16   document.  Judge, we will absolutely work with him.

17        Let me just mention one other thing, Your Honor,

18   that's a concern to us and that is we have asked for a

19   protective order in this case and we've circulated.  We

20   think we have agreement on the protective order, but there

21   are parties that are downloading our documents that we sent

22   to them and I don't know who those parties are exactly.

23        And so I've asked for them to tell us who has

24   signed off on the protective order but this illustrates one

25   of the problems in this case and that is, you know, this is

1    my client's proprietary information and we do not want it

2    traveling around the world.  So -- and so the protective

3    order that everybody has agreed to is just the standard

4    Southern District protective order with no changes

5    whatsoever.  But for that reason, we have concerns about

6    production in this case and we do need the signed signature

7    pages on the protective order before people are downloading

8    our documents.

9            So with all that said, Your Honor, we absolutely

10   will produce all of the documents relating to the debt.  You

11   know, we just need this tailored a little bit and we'll get

12   them all of that.

13           THE COURT:  Let me -- what I'm thinking about

14   doing, a couple of things and Mr. Lemmon, (indiscernible)

15   stand here, I want you to -- give the opportunity to react

16   to what I'm saying.  I'm going to deny your request for

17   emergency consideration to appoint the Subchapter V Trustee.

18   I'm going to -- expand the powers of the Subchapter V

19   Trustee.  I want to take everything up at one time.  I want

20   to take everything up on the 12th.  I want to think about

21   everything and I'm going to make a decision about

22   everybody's requests at that time.

23           That doesn't mean that the Subchapter V Trustee

24   can't, if she's doing whatever work she has, I'm not here to

25   impede whatever she's doing.  I'm just saying I want to take

1   up the consideration and sign whatever I'm going to sign

2   because what I don't want to do is, quite frankly, limit her

3   or limit myself in any way.  I want to have the full range

4   of options to -- based on evidence that I hear as to what I

5   think the Subchapter V may or may not be doing.  May want to

6   do more.  May want to do a little bit less.  Just -- I just

7   need to hear what the evidence is and I want to take it up

8   all at the same time.

9        I'm also going to say I don't think I need to rule

10   on anything today, but everybody reserves the right to come

11   back and tell me.  I am asking all of the professionals in

12   this case -- I understand the history here.  Understand that

13   there's a lot of tension between clients but I expect the

14   professionals to work together and to do it, so I think I'm

15   really reaching out to both sides, asking everyone to really

16   consider the rhetoric in the papers and the -- what gets

17   presented at the hearing.

18        I just am asking all the professionals to really

19   talk about what they want in connection with this hearing

20   and what you need in connection with cash collateral.  And

21   if the parties can't work it out, then come back to me but -

22   - I'll leave it there.

23        I think there's a way for you -- comes to

24   questions about protective orders, I think that's standard.

25   I think professionals should be able to work through that

1    really easy.  So I hope no one is downloading information

2    and taking advantage of information without protection, if

3    that's what folks are looking for.  At the same, Mr. Lemmon,

4    when it comes to PQPR, if there are additional documents

5    that are responsive, at some point someone's going to have

6    to say I do agree with Mr. Moshenberg; here's all I've got

7    and I've got nothing else, and I think that representation

8    is standard.

9          I don't think you need to remove your objection,

10   quite frankly, but I do think at some point people need to

11   know, you know, this is all you've got so that when they

12   show up to a hearing, they know that they've received all

13   responsive documents -- responsive nonprivileged documents.

14   So -- and I know the professionals here.  I'm talking very

15   basic standard things here, so I'll leave it there.

16          MR. LEMMON:  And Judge, just so I'm clear, and we

17   will produce everything related to the debt.  We would

18   produce an org chart.  I'm told there is not one.  But we

19   don't have a problem at all with that and we'll take all

20   these things up on the 12th, I suppose.

21          THE COURT:  That's when I want to take it up.  If

22   parties have different views on all this, they can certainly

23   take it up, but I don't want to take it up.  I don't know

24   what I'm going to hear on the 12th.

25          MR. LEMMON:  Sure.

```
1              THE COURT:  And regardless of how I rule on the

2    12th, I think the Subchapter V Trustee has to do her job and

3    do her job the way she sees fit, so that's not for me to --

4              MR. LEMMON:  May --

5              THE COURT:  -- up now.

6              MR. LEMMON:  May I say one thing, Your Honor?

7              THE COURT:  Sure.

8              MR. LEMMON:  And -- the meeting we had yesterday

9    with the Subchapter V Trustee and counsel was characterized

10   as some sort of sales job.  Would that I was such a great

11   advocate that I could put a sales job over on Ms. Freeman or

12   --

13             THE COURT:  I don't want to get into it.

14             MR. LEMMON:  -- you know, Ms. Haselden and it's --

15   it was informational.  We're happy to cooperate to the

16   fullest extent with the Sub V Trustee, so.

17             MR. MOSHENBERG:  (indiscernible).

18             THE COURT:  Yeah, absolutely.

19             MR. MOSHENBERG:  I am confident we're going to be

20   able to work together and figure out the scope of what is

21   discoverable, but I do want to make sure we're on the same

22   page about timing, Your Honor.  We have a deposition on the

23   4th.  His position has been that you can get the documents

24   after the deposition.  We think we're entitled to them

25   beforehand.  That was what was agreed to.
```

 1          THE COURT:  I feel really confident that that's

 2   probably not going to be the case after today.

 3          MR. MOSHENBERG:  That -- I'm sorry.

 4          THE COURT:  That you will receive the documents in

 5   time to take a deposition.

 6          MR. MOSHENBERG:  That we will?

 7          THE COURT:  Yeah.

 8          MR. MOSHENBERG:  Okay.

 9          THE COURT:  I feel pretty confident about that,

10   without me having to get involved.

11          MR. MOSHENBERG:  I appreciate that, Your Honor,

12   and --

13          THE COURT:  I feel really confident that you're

14   not going to get them, like, October 1st, either.  You know,

15   that you'll get them in due course as quickly as possible on

16   a rolling basis.

17          MR. MOSHENBERG:  I appreciate that.

18          THE COURT:  That sounds right to me.

19          MR. MOSHENBERG:  I appreciate that, Your Honor.

20          THE COURT:  And look, I'm here on 24 hours'

21   notice, so if you get nervous, if things are getting tight

22   and you don't think things are going the way they are, I can

23   -- you know, it's just an email to my case manager, right,

24   and we can get on the phone in less than 24 hours we can

25   have a hearing, or the same day.  So this isn't saying I'm

1    continuing everything, right, and maybe the issue become

2    moot.  Maybe it doesn't.  But I'm here and I'm just hoping

3    that the professionals can -- I'm asking the professionals

4    to get in a room and have a serious meeting about what's

5    needed.  I think you're probably entitled to a lot of what

6    you've asked for but maybe it just needs to be narrowed in a

7    way that would make sense in light of the timing in terms of

8    where we are, and I think that can be accomplished in fairly

9    short order.  The documents either exist or they don't.  Mr.

10   Lemmon either can produce them or not and we'll see where it

11   goes.

12          MR. MOSHENBERG:  That's fair, Your Honor.

13          THE COURT:  And everybody's rights are reserved.

14   Everybody's rights are reserved, U.S. Trustee's rights, any

15   other creditors' rights, Subchapter V Trustee's rights,

16   Debtor's rights, everybody's rights are reserved on these

17   issues.  I think we've just got to get to the 12th and then

18   see where things go, right, and if this gets -- we'll see

19   where things are at that time.  But I'm really, really

20   asking the professionals to hear what I'm saying and I don't

21   think anyone has to agree on anything.

22          I do think it makes sense to be civil and work

23   through these issues as the professionals, take care and do

24   it.

25          Is there anything -- I'm going to sign that order,

1    cash collateral extension order today.  Let me ask the U.S.

2    Trustee, since I've got you here.  Is there anything -- I

3    saw that you filed objections to certain retention

4    applications.  Two of those individuals aren't here, so I

5    don't want to pick a date to take that up.  I don't want to

6    take it up on the 12th.  That seems like a lot --

7              MR. NGUYEN:  Understood, Your Honor.  Mr. Shannon

8    --

9              THE COURT:  -- in one day.  Mr. Shannon, I just --

10   but maybe you all can get together and we can pick a date

11   and just reach out to my case manager at that time.  I don't

12   need to comment.  I haven't read them -- haven't read

13   anything.

14             MR. NGUYEN:  Sure --

15             THE COURT:  I just say that it got filed, but

16   maybe we can pick a date.  There's a lot, I think, scheduled

17   for the 12th and I think there's -- has to be a day where we

18   can do retentions on a separate track.

19             MR. SHANNON:  Yeah.  Your Honor, one thing that --

20   there is a status hearing set in this case for September

21   20th.

22             THE COURT:  Yes, that's --

23             MR. SHANNON:  And I think that's probably about

24   the -- you know, it's quick, but still has some time for

25   gathering the required information.  So Your Honor, we would

```
 1    request setting those applications to employ the CRO and

 2    Shannon and Lee LLP on that date, if possible.

 3            THE COURT:  You want to take it up at that hearing

 4    on the 20th?

 5            MR. SHANNON:  Yes, on September 20th.

 6            MR. NGUYEN:  Your Honor, I have no problem with

 7    that.  I understand Mr. Shannon doesn't want to put his

 8    employment at risk.  He doesn't want to work longer than,

 9    you know, Your Honor's --

10            THE COURT:  No, no, no.

11            MR. NGUYEN:  I'm certainly -- you know, we'll work

12    with the schedule.  I told Mr. Shannon this morning,

13    whenever he wants to do it, we'll be ready.  We'll raise our

14    objections and go forward with it.

15            THE COURT:  Let me just take a look at something.

16    Scheduled at one o'clock for the 20th?  Is that right?

17            MR. SHANNON:  I believe so, Your Honor.

18            THE COURT:  Okay.  Okay.  Yeah, let's take it up

19    at one.  Okay.  That works for me, September 20th at 1 p.m.

20            MR. NGUYEN:  And just for clarity, Your Honor, Mr.

21    Shannon and I spoke this morning.  He requested a little bit

22    more clarity on my objection.  I use an entity instead of an

23    individual.  I normally do that to tone down the rhetoric,

24    but Mr. Shannon asked me to be more clear in terms of when I

25    make the --
```

```
 1            THE COURT:  I understand.

 2            MR. NGUYEN:  I'm going to file a corrected motion.

 3    If he wants me to be clear, I'm happy to do it and I'm not -

 4    - I just want to make sure the record's clear.  That

 5    corrected motion is going to be filed sometime this

 6    afternoon or by the end of the day.

 7            And then the second thing is, we talked about some

 8    limited discovery.  It's very limited in terms of the scope

 9    of the employment -- the scope of the engagement that

10    occurred between May 24th through May 31st, and Mr. Lee in

11    his declaration, there was about $21,000 of services.  I

12    asked Mr. Shannon to explain what those services are and we

13    just need some records of that to go forward with twenty --

14    other than that, I don't intend at the hearing on the 20th

15    it's going to go long.

16            THE COURT:  Okay.  No, no.  I'll give it as much

17    time as we need.  It's important, but I appreciate it so

18    that -- really appreciate you thinking about that.  So can

19    we -- do you think, Mr. Schwartz, we can take that up on the

20    20th as well?

21            MR. SHANNON:  I believe Mr. Schwartz will be here

22    anyway.

23            THE COURT:  For the status report?

24            MR. SHANNON:  For the status report.

25            THE COURT:  Okay.
```

1      MR. SHANNON:  And again, Your Honor, I do believe

2   that the U.S. Trustee's primary objection is about the

3   disclosures in the InfoW case.  That's really the crux of

4   the objection and what will need to be investigated, so it's

5   not -- I don't think it goes beyond that.

6      MR. NGUYEN:  That's correct.  There was a prior

7   nondisclosure that occurred before you.  There's going to be

8   some legal arguments on how you should address that, but

9   that's where we are with the objection.

10      THE COURT:  I can -- we'll take it up on the 20th

11   and if Mr. Schwartz, you can just -- I will assume Mr.

12   Schwartz will be here, but if anything changes just reach

13   out to Ms. Saldana and let her know, but I will -- we will

14   set Schwartz' application as CRO and Shannon and Lee and

15   take it up at -- on the 20th.

16      Ms. Haselden, anything we need to talk about?

17   Anything from your perspective before the 20th?

18      MS. HASELDEN:  (indiscernible).

19      THE COURT:  All right.  I do note -- and this is a

20   hyper technical point and I want to -- well, you're telling

21   me.  If there's anything you want to talk about, I'll take a

22   look at something.

23      MS. HASELDEN:  Your Honor knows this case is very

24   unusual and because of the motions that have been filed by

25   both the parties in the case, the Debtor and the plaintiffs,

1    seeking to expand my role, I mean, I've found it necessary

2    first to go ahead and engage counsel.  And then, you know,

3    Mr. Lemmon had requested that we meet with his client and

4    because of the nature and the posture of the case, we went

5    ahead and set the meeting.  I think, you know, at some point

6    we will need a little clarification on exactly what I need

7    to do.

8         Normally, some of this investigatory work, you

9    know, is not necessary, so I guess between now and the 12th,

10   I'll try to figure out --

11        THE COURT:  Yeah, look, I mean, I'm interested to

12   know your thoughts as well on -- you know.  That's why I

13   don't want to -- I don't want to take anything up on a rush.

14   I don't know what the evidence is.  I don't know what the

15   evidence is going to show.  May show something, may show

16   nothing.

17        I think I'd want to know if, you know, as I

18   consider expanding the role of the Subchapter V Trustee,

19   what you would see that role to be and what you think it

20   should be as well, if anything.  I don't want to put any

21   words or thoughts in your -- in you.  I just want to know

22   that I -- you're an important part of the Subchapter V

23   process and I want to know what you think.  Okay?

24        MS. HASELDEN:  Thank you, Your Honor.  Yes.  We're

25   learning and the parties are all at this point cooperating

1    and providing information.

2            THE COURT:  So Mr. Shannon, the only hyper

3    technical point is 1188(c) requires the report get filed on

4    the docket before the meeting, 14 days before.

5            MR. SHANNON:  Yes, Your Honor.  I believe you --

6            THE COURT:  The hearing.

7            MR. SHANNON:  I believe you filed an order that

8    set the date that the --

9            THE COURT:  I did.

10           MR. SHANNON:  -- status report needs to be filed.

11           THE COURT:  I did.

12           MR. SHANNON:  And I believe it's today, is what

13   that order says.

14           THE COURT:  No.  That's what I was trying to --

15           MR. SHANNON:  I'm sorry.  I don't remember the

16   docket number, unfortunately.

17           THE COURT:  Yeah.

18           MR. SHANNON:  Around 50 or so.

19           THE COURT:  That makes two of us.  Let's see.  If

20   today's the day, I just want to make sure something gets

21   filed so we comply with the code.  That's where I was going.

22   It wasn't to -- anything other than that.  I just want to

23   make sure that we're complying with -- that a status report

24   gets filed so that we're compliant with the Bankruptcy Code.

25           MR. SHANNON:  Yes, Your Honor.  And I just went,

1    what your order said rather than --

2           THE COURT:  No, no, no, you should.  You should.

3           MR. SHANNON:  Okay.

4           THE COURT:  No, no, no.  You absolutely should.

5    No, I -- we set them for a reason on that date and I

6    remember and I just want to make sure that we're all on the

7    same page.  Yeah, it's Docket 65, so --

8           MR. SHANNON:  Yes, Your Honor.  I believe

9    originally the status report, the idea was to actually have

10   it a week after that.  Mr. Schwartz will be out of the

11   country during that week, so I believe that the date for the

12   status conference got pushed back a week and the report did

13   move as well.

14          THE COURT:  No, no, no.  I think we're all on the

15   same page.  Think we're all on the same -- yeah.  Today's

16   your day.

17          MR. SHANNON:  All right.  Thank you, Your Honor.

18          THE COURT:  Sounds like you're having some fun

19   this afternoon.  All right, folks.  Anything else we need to

20   talk about?  All right.  Thank you, everyone.

21          CLERK:  All rise.

22

23          (Proceedings adjourned at 1:49 p.m.)

24

25

```
 1                        CERTIFICATION

 2

 3      I certify that the foregoing is a correct transcript from

 4      the electronic sound recording of the proceedings in the

 5      above-entitled matter.

 6

 7

 8

 9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  September 20, 2022
```

# EXHIBIT 5

008165

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

### SANDY HOOK FAMILIES' JOINDER TO UNITED STATES TRUSTEE'S
### AMENDED OBJECTION TO THE APPLICATION OF DEBTOR FOR AN
### ORDER (A) AUTHORIZING EMPLOYMENT OF SHANNON & LEE LLP
### AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR
### AND (B) GRANTING RELATED RELIEF
### [Related to ECF Nos. 85 and 154]

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively the Texas Plaintiffs) and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively the Connecticut Plaintiffs) (and together the Sandy Hook Families) hereby file this joinder (Joinder) to the *United States Trustee's Amended Objection to the Application of Debtor for an Order (A) Authorizing the Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief* (the Objection) [Dkt. 154], filed in response to *Application of the Debtor for an Order (A) Authorizing the Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel to the Debtor and (B) Granting Related Relief* (the Employment Application) [Dkt. 85].   In support of this Joinder, the Sandy Hook Families state as follows:

1.      The Sandy Hook Families join in, and hereby incorporate by reference, the arguments made by the United States Trustee in the Objection.



2.      The Debtor filed its Employment Application on August 20, 2022.

3.      The United States Trustee filed the Objection on September 14, 2022.

4.      For the reasons stated in the Objection and this Joinder, the Sandy Hook Families respectfully request that the Court deny the Employment Application and grant such other and further relief as it may deem just and proper.

Respectfully submitted this 15th day of September 2022.

**McDowell Hetherington LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**Chamberlain, Hrdlicka, White, Williams & Aughtry, PC**

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

***Bankruptcy Counsel for the Texas Plaintiffs***

008167

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Bankruptcy Counsel for Connecticut Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Joinder has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 15th day of September 2022.

_____*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

# EXHIBIT 6

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3                                )  CASE NO: 22-60043-cml
                                  )
 4   FREE SPEECH SYSTEMS, LLC,    )  Houston, Texas
                                  )
 5           Debtor.             )  Tuesday, September 20, 2022
                                  )
 6   -----------------------------)  1:03 p.m. - 7:30 p.m.

 7

 8                                TRIAL

 9        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Free Speech Systems:  R.J. SHANNON
                               Shannon & Lee LLP
13                             700 Milam Street, Suite 1300
                               Houston, TX 77002
14
                               RAYMOND WILLIAM BATTAGLIA
15                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
16                             San Antonio, TX 78218

17                             KYUNG SHIK LEE
                               Kyung S. Lee PLLC
18                             4723 Oakshire Drive, Apt. B
                               Houston, TX 77027
19
     For Veronique De La       JARROD B. MARTIN
20   Rosa, et al.:             Chamberlain, Hrdlicka, White,
                               Williams & Aughtry P.C.
21                             1200 Smith Street, Suite 1400
                               Houston, TX 77002
22
     For David Wheeler,        RYAN E. CHAPPLE
23   et al.:                   Cain & Skarnulis PLLC
                               303 Colorado Street, Suite 2850
24                             Austin, TX 78701

25
```

EXHIBIT

008170

Page 2

```
 1   For the U.S. Trustee:    HA MINH NGUYEN
                              JAYSON B. RUFF
 2                            Office of the United States Trustee
                              515 Rusk Street, Suite 3516
 3                            Houston, TX 77002

 4   For PQPR:                STEPHEN LEMMON
                              Streusand Landon Ozburn and Lemmon
 5                            1801 S Mopac Expressway, Suite 320
                              Austin, TX 78746
 6
     For the SubChapter V     MELISSA ANNE HASELDEN
 7   Trustee:                 Haselden Farrow, PLLC
                              Pennzoil Place
 8                            700 Milam, Suite 1300
                              Houston, TX 77002
 9
     Court Reporter:          ZILDE MARTINEZ
10
     Courtroom Deputy:        ZILDE MARTINEZ
11
     Transcribed by:          Veritext Legal Solutions
12                            330 Old Country Road, Suite 300
                              Mineola, NY 11501
13                            Tel: 800-727-6396

14


15
     Proceedings recorded by electronic sound recording;
16   Transcript produced by transcription service.

17

18

19

20

21

22

23

24

25
```

008171

1                                    INDEX

2     PLAINTIFFS' WITNESSES     DIRECT     CROSS     REDIRECT     RECROSS

3     KYUNG LEE

4     MARC SCHWARTZ

5

6     GOVERNMENT'S WITNESSES     DIRECT     CROSS     REDIRECT     RECROSS

7

8

9

10

11    PLAINTIFFS' EXHIBITS                                    RECEIVED

12

13

14

15    GOVERNMENT'S EXHIBITS                                  RECEIVED

16

17

18

19

20

21

22

23

24

25

 1          HOUSTON, TEXAS; TUESDAY, SEPTEMBER 20, 2022; 1:03 PM

 2                        (Call to Order)

 3          THE COURT:  Okay.  Good afternoon, everyone.  This

 4     is Judge Lopez.  Today is September 20th.  We are here in

 5     Free Speech Systems here at the Subchapter V status

 6     conference and also to take up a few retention applications,

 7     one for Mark Schwartz and Schwartz & Associates as financial

 8     advisors, Shannon & Lee as counsel to the Debtor, and also

 9     Mr. Battaglia as counsel to you and the Debtors.

10          So let me go ahead and take appearances, first in

11     the courtroom and then we'll see where this goes.

12          Good morning.  I should say good afternoon.

13          MR. SHANNON:  Good afternoon, Your Honor.  R.J. of

14     Shannon & Lee LLP, on behalf of the Debtor.  Also in the

15     courtroom is Mr. Lee here and Mr. Battaglia is here also on

16     behalf of the Debtor.

17          One correction, Your Honor, at least there was no

18     objection to Mr. Battaglia.

19          THE COURT:  I still have an independent duty to

20     take it up.  Just because nobody objects doesn't mean we

21     don't take it up.

22          MR. SHANNON:  Yes, Your Honor.  I will say that

23     there are -- you know, the witness and exhibit list did not

24     contemplate this, but Mr. Battaglia is here.

25          THE COURT:  I'm not saying we're going to spend a

1      lot of time on it, but we have to take it up.

2              MR. SHANNON:  Got you.

3              THE COURT:  Okay.

4              MR. NGUYEN:  Good afternoon.  Ha Hguyen for the

5      U.S. Trustee.  Also from my office is Jayson Ruff and also

6      Christopher Roth Travis.

7              THE COURT:  Okay, good afternoon.

8              MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

9      Martin for Texas plaintiffs.

10              THE COURT:  Okay, good afternoon.

11              MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan

12      Chapple for the Connecticut plaintiffs.

13              THE COURT:  Good afternoon, sir.

14              MS. HASELDEN:  Good afternoon, Your Honor.

15      Elizabeth Haselden, Subchapter 5 Trustee, and I have with me

16      Elizabeth Freeman.

17              THE COURT:  Okay, good afternoon.  Anyone else in

18      the courtroom wish to make an appearance?  Okay.  I've muted

19      the line.  If you wish to make an appearance, you'll need to

20      hit 5 star.  There are a number of people on the line, and I

21      think it's just easier to go that route.  Anyone else wish

22      to make an appearance at this time, just hit 5 star.

23              Okay, going with a 512375.

24              MR. LEMMON:  Your Honor, Steve Lemmon for PQPR.

25              THE COURT:  Good afternoon, Mr. Lemmon.  Mr.

1    Lemmon, I'm going to leave your unmuted, okay?  Just please

2    keep your phone on mute.

3              MR. LEMMON:  Yes, sir.

4              THE COURT:  Okay, thank you.  Anyone else?  Seems

5    to be it on the line.  Why don't we, I guess, the status

6    conference that is required under the Bankruptcy Code.  I'd

7    like to start with that to satisfy the statutory duty of the

8    Debtor and make sure that we comply with the Bankruptcy Code

9    and get a status update as to where these cases are, and

10   then let's take up the retentions.

11             But before we do that, that's the order.  If

12   there's anything anyone wishes to tell me at a high level

13   picture for purposes of today and where things stand, now's

14   the time to tell me or we can take it up in due course.

15             Okay.  If we can start with the status conference,

16   that'd be great.  Thank you.

17             Good afternoon, Mr. Battaglia.  Good to see you.

18             MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray

19   Battaglia for the Debtors.  The Debtor filed its status

20   report at the time dictated by the Court's prior order.

21   It's a relatively brief status report.  Obviously, things

22   have happened in front of this Court and the parties are

23   well aware of.

24             THE COURT:  Can you just get that mic just a

25   little bit closer to you or just curve it a little bit, make

1     sure the folks on the line can hear you.

2          MR. BATTAGLIA:  Is that better, Judge.

3          THE COURT:  Oh, much better.  Thank you.

4          MR. BATTAGLIA:  Thank you.  Many things have

5     happened in the Court that primarily relate to operating

6     issues, and I'll not belabor the record with a recitation of

7     those.  If the Court wants to ask regarding developments in

8     those, I'll be happy to discuss them.

9          Obviously, we have hearings set on a number of

10    matters on October 12th, and I don't think there's a need to

11    belabor where we are on those.  There is discovery, the

12    deposition of Mr. Schwartz that will happen Friday.  Mr.

13    Rowe's deposition is set for October 4th.

14         THE COURT:  Who's Mr. Rowe?

15         MR. BATTAGLIA:  Mr. Rowe was a consultant that was

16    retained to assist in evaluating the numbers that formed the

17    PQPR debt.

18         THE COURT:  Okay.

19         MR. BATTAGLIA:  So he was instrumental in that

20    effort and, therefore, he's someone with knowledge and

21    information that is requested.  And ultimately, currently

22    he's an employee or he's employed by, at least as a

23    consultant on a contract basis, by PQPR.

24         THE COURT:  Okay.

25         MR. BATTAGLIA:  With respect to really the

1    fundamental push of this case, the plan of reorganization,

2    we have a draft of a plan of reorganization that we're fine

3    tuning a little bit.  I've had conceptual conversations with

4    Mr. Lemmon on behalf of PQPR, Mr. Jordan on behalf of Alex

5    Jones, the Sub V Trustee and her counsel, we've had a more

6    thorough conversation.  And this morning, Mr. Martin and I

7    had a conversation.  I haven't had a time to circle back to

8    the Texas plaintiffs, but, hopefully, those discussions have

9    been shared.

10          Our goal, as opposed to filing it, just filing it

11   when we think we're ready, is to share it with the other

12   parties.  I have no allusions that we'll come to a

13   consensual plan, but I'm certainly willing to try.  The

14   conversations with Mr. Martin were fruitful.  I've had

15   conversations in the past that I've sort of equated it to

16   Lucy was holding the football today.  Whether that football

17   will be there when I kick, I don't know.  But in the past,

18   Lucy didn't even have the football, so that's progress in my

19   mind, and I hope we can do something.

20          Because at the end of the day, my charge and the

21   Debtors' charge in this case as I see it is to maximize the

22   asset value and pay creditors who are owed money with a lot

23   of claims, and that's all I'm here to do.  And if that's the

24   goal of the plaintiffs is to maximize the return on account

25   of their claims, then we have common ground to discuss.

1          And conceptually, of course, the timing of the

2   allowance of those claims of plaintiffs is going to be,

3   without settlement, will be a longer road because there will

4   be appeals and that process will take whatever time it

5   takes.  But the Debtor does generate, we anticipate will

6   continue to generate, net disposable income that can be

7   dedicated to a plan.  Obviously, proceeding under a Sub V

8   changes the confirmation dynamic tremendously for this Court

9   and the burden's on the Debtor to prove are certainly

10   smaller.

11          Mr. Martin and I discussed today possibilities.

12   I'm not saying anybody's agreed to any of this at this

13   point, but perhaps once the plan is shared, that it might be

14   fruitful to seek a mediation in front of perhaps Judge

15   Isgur.  I know he's got a docket now that's been a little

16   more burdened lately, but that's a possibility.

17          And whether it would be more fruitful to proceed

18   to negotiate the plan, as opposed to October 12th hearings.

19   Again, nobody's agreed, nobody's suggesting that's tenable

20   at all.  But ultimately, in my mind as Debtors' counsel, if

21   the plaintiffs were successful in removing the Debtor, the

22   Debtor is still the only party who can propose a plan of

23   reorganization.  And the plan as proposed and confirmed, the

24   Debtor's back in, what are we doing here, so I don't know.

25   We'll see where that goes.  I know Mr. Martin has to circle

1    back to a number of people to see whether anything that we

2    discuss this morning germinates and it may or may not, but

3    our goal is to file a plan of reorganization in the next

4    week to two weeks, and that's where we are, Judge.

5              THE COURT:  Okay.

6              MR. BATTAGLIA:  Happy to answer any questions the

7    Court may have.

8              THE COURT:  I had a couple of questions.  Mr.

9    Schwartz wasn't here last time.  They were kind of financial

10   questions.  And here as we kind of proceeded along, I had a

11   couple of real technical questions, and I can lay them out

12   and anyone can answer them.

13             One was, and I still was looking for a little bit

14   of clarity.  In connection with the last proposed cash

15   collateral order, there was an $80,000 or so request for --

16   I think it was labeled, like, Alex Jones trial travel or

17   something.

18             MR. BATTAGLIA:  Yes, sir.

19             THE COURT:  What did that relate to?

20             MR. BATTAGLIA:  Your Honor, I can answer that.

21   The lift stay order that we presented to you to allow the

22   Connecticut litigation to proceed, part of the agreement

23   that was encompassed in that order was that the Connecticut

24   plaintiffs would not object to the travel expenses for Mr.

25   Jones or for employees.

```
 1            THE COURT:  I understand they didn't object.  I
 2    just want to know what it related to.
 3            MR. BATTAGLIA:  I understand.
 4            THE COURT:  No one told me.
 5            MR. BATTAGLIA:  So the budget item there, $34,000
 6    of the $80,000 related to just security expenses.  Mr. Jones
 7    does not travel freely without security in this world that
 8    we're in today and particularly, I guess, being in the
 9    backyard of the Sandy Hook disaster.
10            THE COURT:  Why is the estate paying for that?
11            MR. BATTAGLIA:  Well, he is an estate witness as
12    well.  His appearance is just as vital for us as it is for
13    Alex Jones.
14            THE COURT:  Was he paying for any of his travel?
15            MR. BATTAGLIA:  He was not, and you suggested that
16    we needed to come back to you with -- and my conversation
17    with Mr. Jones's counsel was he proceeds, and we'll go back
18    to the Court and ask what the Court thinks is appropriate to
19    pay.
20            THE COURT:  And I'm being honest, I don't know
21    what to do with every time there's a motion filed that we
22    start off with 100 percent we pay for the owner's personal
23    expenses.  And then, like, if the Court has to find it,
24    identify it, notify parties that he's noticed it, and then
25    people come back with their requests.
```

1          I don't -- who's negotiating this on behalf of the

2     estate?  Like, why am I finding issues that are 100 percent

3     in a case where there's two defendants.  I just want to

4     understand what's happening.

5          MR. BATTAGLIA:  Your Honor, the last item in the

6     budget that we were waiting on to be able to present to

7     parties was the cost of the travel related to the trial.

8          THE COURT:  The 34,000 was for?

9          MR. BATTAGLIA:  Was for security.

10          THE COURT:  And what was the remaining, I don't

11     know, 36,000 or 46,000?

12          MR. BATTAGLIA:  So there's obviously airline fees,

13     which we've priced based at a premium economy rate, not a

14     first class rate, for the security personnel and for Mr.

15     Jones.  There was lodging, there were food and other typical

16     expenses associated with travel, vehicles.  And, again, this

17     is for, you know, not just Mr. Jones, but the security

18     personnel who are attending.

19          THE COURT:  Okay.

20          MR. BATTAGLIA:  So we heard you.  We'll accumulate

21     receipts and come back to the Court with an appropriate...

22          THE COURT:  I thought folks heard me when I said I

23     had issues with Mr. Andino and other counsel when that was

24     100 to zero.  I just want to know exactly what's being on

25     the table.  It feels like I'm finding these things, because

1    I asked everyone at the last hearing is there anything I

2    should know about this cash collateral budget, and everyone

3    stayed quiet.

4            MR. BATTAGLIA:  It came together, again, at the

5    last minute.  I submitted the budget, along with the draft

6    revised order on the Sunday prior to that hearing, which was

7    on a Tuesday as I recall.

8            THE COURT:  Okay.

9            MR. BATTAGLIA:  You know, it --

10           THE COURT:  I got it.

11           MR. BATTAGLIA:  -- came together rather quickly,

12   Judge.

13           THE COURT:  I appreciate that.  And if that's the

14   answer, that's the answer.

15           I had another question that just related to the

16   schedules.  I saw in the schedules -- and normally, this is

17   what happens at a status conference.  The Debtors filed

18   schedules and the Court asks questions about things like

19   that.

20           There was a payment of about a million dollars to

21   American Express, and if I remember correctly, American

22   Express related to personal expenses.  I'll show it on my

23   screen.  I just want to make sure and maybe it related to

24   something different.  I just wanted to understand.  Let me

25   share my screen here.  Excuse me in the SOFAs, not in the

1    schedules, but in the SOFAs.

2          There were three payments totaling a million

3    dollars, like, leading up to this case to American Express,

4    but I'll let Mr. Schwartz in connection with the first day

5    hearings and cash collateral.  That related to personal

6    expenses.  Are those personal expenses that million dollars?

7          MR. BATTAGLIA:  No, sir.  I'm not going to suggest

8    to the Court that there are no personal expenses in and

9    amongst the million dollars.  But the Debtor had, under

10   prior operations, had a bad habit of using the AmEx card to

11   pay for everything.

12          THE COURT:  Okay, business expense.  Okay, that

13   makes sense to me.

14          MR. BATTAGLIA:  And consequently, a lot of vendors

15   didn't even show up on the accounts payable list because

16   they were paid through AmEx.

17          THE COURT:  Okay.

18          MR. BATTAGLIA:  I would venture to guess a

19   significant, substantial portion of that million related to

20   technical purchases or vendors or suppliers related to the

21   business itself.

22          THE COURT:  Okay.

23          MR. BATTAGLIA:  But I won't tell the Court

24   standing here today that all of it is.

25          MR. BATTAGLIA:  And the $3.1 million to PQPR, who

1    authorized that; was that Mr. Schwartz?

2           MR. BATTAGLIA:  That would have been payments to

3    insiders over a one-year period.  It was under an agreement

4    that --

5           THE COURT:  This looks like it was done over the

6    last 30 days before the case filed.  It's happened before,

7    don't get me wrong.  I'm just trying to understand who

8    authorized these payments.

9           MR. BATTAGLIA:  I'm not aware of the 3 million.

10   There was the prior deal that existed before Mr. Schwartz

11   came into place that paid $11,000 per business day in

12   service of the debt.  But it's not entirely impossible that

13   this also relates to inventory purchases.  PQPR was the

14   primary source of inventory.

15          THE COURT:  That's why I seen that it was in

16   combination of the --

17          MR. BATTAGLIA:  So it maybe a combination of the

18   two and it does say both.

19          THE COURT:  Okay.

20          MR. BATTAGLIA:  No payments in advances.

21          THE COURT:  Okay.  No one is seeing my screen,

22   right?  Somebody needs to talk to me.  No one's been seeing

23   anything I've been looking at.  All righty, that's helpful.

24   Let me share my screen right this time.  That's helpful, now

25   we're looking at stuff.  Miss Santos, you all stop me if you

1   think I'm doing something wrong.

2           That was the $3.1 million.  A million-dollar

3   payment was here on AmEx, $150,000.  Was Mr. Jones an

4   employee, Mr. David Jones an employee?

5           MR. BATTAGLIA:  At certain times, he had been, but

6   he is obviously the Debtors' principal's father.  He's Alex

7   Jones's father.

8           THE COURT:  Okay.  And I know this is October of

9   2021, so that was a while back.  I just want to make sure I

10  understand.

11          MR. SCHWARTZ:  He was not an employee --

12          THE COURT:  At the time?

13          MR. SCHWARTZ:  -- at that time.  That was an

14  advance.

15          THE COURT:  Okay.  Okay, payment on advance.  I

16  couldn't tell if it related to the PQPR.

17          MR. SCHWARTZ:  He just got $150,000.

18          THE COURT:  Okay.  Those were my questions and

19  some of that stuff we covered last time, so I think I have

20  what I need.  Does anyone have any statements or any

21  questions that anybody wants to talk about in connection

22  with the status conference?

23          Oh, I forgot to ask, is assuming the Connecticut

24  litigation has started --

25          MR. BATTAGLIA:  It has, Your Honor.

1        THE COURT:  -- or is ongoing.  Is there a time --

2        MR. BATTAGLIA:  I think Mr. Jones is on the stand.

3        THE COURT:  Does anyone know, like, when it's

4    supposed to end?

5        MR. LEE:  Your Honor, this is Kyung Lee for the

6    record.

7        THE COURT:  Yes, sir.

8        MR. CHAPPLE:  Your Honor, Ryan Chapple for the --

9        THE COURT:  I don't want any commentary or spin on

10   it.  I just want to know, like, if there's any timetable.

11       MR. CHAPPLE:  Absolutely.  I believe

12   conservatively, maybe a week and a half or two more weeks is

13   my general understanding, but that answer changes daily.

14       THE COURT:  No, no, no, I understand.

15       MR. CHAPPLE:  So that's the last I heard.

16       THE COURT:  Okay, but it has started and it's

17   proceeding.  Is it still in the -- it sounds like it's

18   started started, not just jury selection.

19       MR. LEE:  That's correct, Your Honor.

20       MR. CHAPPLE:  There are witnesses.  They're taking

21   witnesses, live witnesses.

22       THE COURT:  Okay.

23       MR. CHAPPLE:  And I heard previously longer time

24   estimates, so I mean...

25       THE COURT:  Okay, yeah, and I got it.  I got it,

1    okay.  Does anyone have any statements they wish to make at

2    this time in connection with the status report?  Okay.  Then

3    the easiest thing to do maybe -- I know Mr. Battaglia's

4    retention is up as well.  I saw no objections.  I looked it,

5    I reviewed, and I'm comfortable with the representations

6    there.  Anyone object to the retention of Mr. Ray Battaglia?

7                 May I ask the U.S. Trustee on this, so you're okay

8    with the proposed form of order that was filed?

9             MR. NGUYEN:  Yes, Your Honor.  I have no problem

10   with Mr. Battaglia's order.

11            THE COURT:  Okay.  Mr. Battaglia, I'm going to

12   note that for the record, there was an application to retain

13   you as counsel for FSS.  I'm going to find that there's been

14   proper notice of today's hearing on it and service of the

15   application.  It's also been proper.  The Court has reviewed

16   the standards under 327 and finds that they've been

17   satisfied.  I also note that there's been no objection and

18   the U.S. Trustee has also approved the proposed form of

19   order.

20                 Miss Haselden, I will ask you as well, and you can

21   give me a thumbs up if you're there.  Are you okay with the

22   proposed form of order?  Okay, okay.

23                 Then, Mr. Battaglia, I will approve that retention

24   application and I'll get it signed and on the docket this

25   afternoon.

1          MR. BATTAGLIA:  Thank you, Your Honor.  Your

2     Honor, I would note one thing is that I was retained as co-

3     counsel, and obviously what happens today will be a --

4          THE COURT:  No, no, no, no, I understand that, and

5     I didn't mean to imply anything.  I just -- you were

6     employed as co-counsel and I guess what I meant to say is

7     I'm approving your retention application.

8          MR. BATTAGLIA:  And I appreciate it, Your Honor.

9          THE COURT:  Maybe that's the easiest way of saying

10    it.  I got it.

11         Okay, let's see.  FSS filed the remaining

12    applications.  I'll let you take lead.

13         MR. SHANNON:  Thank you, Your Honor.  As the Court

14    has noted, we're here on two applications.  They are

15    applications by the Debtor, Free Speech Systems LLC, to

16    employ Marc Schwartz as its CRO, and Schwartz & Associates

17    LLC to help him with that; that is Docket No. 83.  We're

18    also here on an application by the Debtor to employ Shannon

19    & Lee LLP as bankruptcy co-counsel; that's Docket No. 85.

20         The U.S. Trustee has objected to both

21    applications; they're at Docket No. 145 and Docket No. 154.

22    The plaintiffs have joined those objections, filed by

23    joinders.

24         And, Your Honor, there's no dispute that Mr.

25    Schwartz and Shannon & Lee LLP meet the requirements for

1    employment under Section 327(a).  That's not what the

2    objection is about.  There's no dispute that the CRO,

3    proposed CRO and Shannon & Lee are disinterested in this

4    case.  There's no dispute that the retention of these

5    applicants is in the best interests of the Debtors'

6    bankruptcy estate.  That's not what the U.S. Trustee is

7    objecting about.

8              There's no dispute that administration of these

9    Chapter 11 cases will be furthered by the retention of the

10   applicants.  There's really no contention on anything about

11   this case -- that's Case No. 22-643 -- will be furthered by

12   denying the application of the Debtor to employ these

13   applicants.

14             The U.S. Trustee's contention is that the

15   applications to employ should be denied because Mr. Schwartz

16   and Mr. Lee did not amend and supplement their disclosures

17   in the InfoW bankruptcy cases, and that's the entire basis

18   for the objection.

19             And I believe that the U.S. Trustee's position is

20   that after Mr. Schwartz and Mr. Lee met with FSS on May

21   24th, that they should have done a supplemental disclosure

22   in the InfoW cases.

23             THE COURT:  What do you think?

24             MR. SHANNON:  Well, Judge --

25             THE COURT:  You were there.  What do you think?

1          MR. SHANNON:  Well, and actually on May 19th, I

2     was not there, but I was at the May 24th meeting.

3          THE COURT:  You were at the May 19th hearing.  You

4     understand, you were involved in the last cases.  What do

5     you think?

6          MR. SHANNON:  Well, Judge, I don't think that's

7     what Bankruptcy Rule 2014 requires.

8          THE COURT:  Okay.

9          MR. SHANNON:  It's not in the text of the rule.

10    The cases that have looked at it and said there is a

11    continuing duty to disclosure, they all say it's because of

12    Section 327(a).  In 327(a), you can only be employed as an

13    estate professional if you're a disinterested party.

14    Section 328 also says you can only be compensated if you're

15    a disinterested professional.

16          At that time, at the time of the May 24th meeting,

17    the InfoW debtors had already decided to dismiss their

18    cases.  They had -- that decision was made, you know, around

19    the May 19th hearing, sometime between then.  By May 23rd,

20    Mr. Lee had put together a motion to dismiss and he had

21    advised Mr. Schwartz that the cases should be dismissed;

22    that was his analysis.  On May 23rd, he had a draft motion

23    to dismiss prepared and they informed the U.S. Trustee of

24    that decision on May 25th.

25          At that point, Your Honor, neither Mr. Schwartz

1    nor Mr. Lee were seeking to be employed by the bankruptcy

2    estate.  They never were employed by the bankruptcy estate,

3    but they also at that point were not seeking to be employed

4    by the bankruptcy estate.

5              And when you look at the cases that talk about

6    this, that is what is important.  It's whether the

7    professional is seeking to be employed or has been employed

8    by an order of the Court.

9              Judge, I'll give you just a timeline of events,

10   just a little bit of a broader one.

11             THE COURT:  Okay.

12             MR. SHANNON:  The InfoW cases were filed on April

13   17th and April 18th.  April 29th, the Debtor files an

14   amended trust agreement and plan and support agreement.  And

15   that agreement was never signed by the parties and the

16   reason why was because that same day, the U.S. Trustee filed

17   a motion to dismiss.

18             And then on May 3rd, the plaintiffs came and said,

19   look, we just to release our claims against these InfoW

20   debtors.  We don't want to be involved in this bankruptcy

21   case; we don't want to deal with it.  And that took a little

22   while to effectuate.  So between May 3rd -- by May 13th, the

23   Connecticut plaintiffs had filed pleadings to dismiss the IW

24   debtors from their actions, again, because they didn't want

25   to be involved in the IW debtors' bankruptcy cases.

1          By May 18th, the Texas plaintiffs and the IW

2     debtors had reached a stipulation resolving their claims;

3     that was filed with the Court.  And then on May 19th at 2:00

4     p.m., the IW debtors or this Court entered that stipulation

5     resolving the claims of the Texas plaintiffs against the IW

6     debtors, not this debtor; there's no argument there.

7          Now that same day earlier, Mr. Lee files his

8     application to employ or filed the IW debtors application to

9     employ Kyung S. Lee PLLC.  Now at that time, there was

10    nothing to disclose.  Later that day, FSS contacted Mr. Lee

11    about a potential meeting in Austin the following Tuesday.

12    It was very clear to everyone that the PSA was dead, that

13    that wasn't going to be the way to go.  And Mr. Lee told

14    this Court that the IW debtors were considering to try to

15    get more funding from somewhere else, to try to go with a

16    plan without that, or to just dismiss the cases as the U.S.

17    Trustee demanded.

18         May 21st -- and this will be all in the evidence -

19    - on May 21st, Mr. Lee sent an email to Marc Schwartz, and I

20    believe May 21st was a Saturday.  In that email, Mr. Lee

21    outlined the reasons why the IW debtors should agree with

22    the U.S. Trustee and dismiss their cases, and in particular,

23    it was because it wasn't worth the expense of litigating

24    with the U.S. Trustee over those cases.  There were only, at

25    the time, I think they believed there were four creditors

1    remaining; turns out there were actually only three.  Mr.

2    Gilmore, one of the creditors that was remaining in the IW

3    cases actually had been paid, or at least I believe had been

4    paid at that time, definitely been paid by now.

5         On May 23rd, as I said, Mr. Lee had drafted a

6    motion to dismiss for the IW debtors and had circulated it

7    to Mr. Schwartz.  May 24th was the meeting in Austin where

8    they talked about the potential representation of FSS.  May

9    25th, Mr. Lee informed the U.S. Trustee of the IW debtors'

10   intent to dismiss their cases; that had been decided

11   previously.

12        As part of those communications, the U.S.

13   Trustee's attorney informed Mr. Lee, don't file a motion to

14   dismiss; just stipulate and agree to our motion to dismiss

15   that's already pending.

16        On May 26th, Mr. Lee attended the 341 meeting for

17   the IW debtors.  At that 341 meeting, Mr. Lee announced that

18   the IW debtors had decided to dismiss their cases.

19        THE COURT:  What date was that?  What date was

20   that?

21        MR. SHANNON:  That was May 26th.

22        THE COURT:  Thank you.

23        MR. SHANNON:  On June 1st, the stipulation of

24   dismissal agreed to between the IW debtors and the U.S.

25   Trustee was filed.  And it wasn't until June 5th that Mr.

1    Schwartz had finalized an application -- or finalized a

2    draft engagement letter.  They had sent it to Mr. Lee.  Mr.

3    Lee commented on it, sent it back to him with these

4    comments.  And that June 5th engagement letter is the

5    engagement letter that ultimately continues and that

6    ultimately that FSS seeks to retain Mr. Schwartz under the

7    debt.

8              On June 6th, both the engagement letter by Mr. Lee

9    and Mr. Schwartz were signed, and then on June 10th, the

10   Court entered the order dismissing the IW cases.

11             That's also the date that FSS is actually, you

12   know, paid retainers to Lee and Schwartz.  I believe in the

13   application, Shannon & Lee had said it was on or about June

14   7th.  There is an email saying it was going to be paid on

15   June 7th, and we actually looked at the bank and confirmed

16   that; it wasn't actually until June 10th.

17             THE COURT:  Okay.

18             MR. SHANNON:  And again, Your Honor, I just -- at

19   the May 24th meeting, which is the first time there was a

20   disclosable connection, a connection that meant something,

21   the IW debtors had decided to dismiss their case.

22             But I don't think that's even the whole argument

23   here, Your Honor, because even if Mr. Lee and Mr. Schwartz,

24   you know, should have disclosed that connection to the

25   Court, even though the case had been decided to be

1   dismissed, even though they were no longer seeking to be

2   employed, that's not really what we're here for.  What we're

3   here for is whether FSS should be allowed to retain these

4   two parties.

5          Judge, you could -- the U.S. Trustee could go

6   back, could reopen the IW cases and seek sanctions, and

7   that's what the Courts call the proper solution to a, you

8   know, failure to disclose under Rule 2014; they call it

9   sanctions.  And I don't think that those sanctions are

10  appropriate to be imposed on the Debtor FSS, and that's

11  really what the U.S. Trustee is asking you to do.  There are

12  no cases that say that's an appropriate sanction, none, none

13  that I could find.

14         THE COURT:  I'm not sure there's many cases where

15  a debtor's professional started working for another plan

16  support party either, so I don't know if you're going to

17  find facts like that either.  So I understand what you mean,

18  but I read that argument and you got to -- it's not just

19  that easy.  There aren't many cases where two parties to a

20  plan, a debtor was working for one plan support party under

21  a trust taking direction from a trust and then starts

22  working for another plan support party and never discloses

23  it to the Court.  I'm not sure you're going to find many

24  cases like that.

25         MR. SHANNON:  That's true, Your Honor, but there's

1    also --

2         THE COURT:  I can promise you every case is

3    distinguishable, right?

4         MR. SHANNON:  But, you know --

5         THE COURT:  The question is what's the legal

6    principle that apples.

7         MR. SHANNON:  Sure.  The legal principle that

8    applies is about who is getting punished here, and they're

9    trying to see get punished essentially FSS.  I mean, what

10   this is and what the effect would be, would be to decapitate

11   this debtor.

12        THE COURT:  And I'm going to tell you something

13   because I want you to engage in a dialogue with me.  The

14   concern, when you really boil it down, I think you're

15   looking at this too -- you know, looking at this kind of

16   through a check the box perspective, right?  If the

17   behavior, the non-disclosures began in one case and it there

18   are potential conflicts through acts that Mr. Schwartz and

19   Mr. Lee have taken that continue into this case, then the

20   history is important.

21        For example, if, for example, you know, Mr. Lee or

22   Mr. Schwartz's relationship with Mr. Jones or PQPR is

23   concerning, it raises an issue as to whether either one of

24   them can provide sound legal advice to the estate or sound

25   financial advice to the estate, then the history is

 1    important, right?

 2           So you can't just -- I understand your point that

 3    if there's a lack of disclosure in one case, you should look

 4    at it as that case and it shouldn't essentially carry

 5    forward as a penalty into the new case.  The question is, is

 6    there a throughline essentially; that's the question that

 7    you've got to answer today, at least that's where I'm

 8    focused on.

 9           If you're asking me, you know, how I --

10           MR. SHANNON:  Yes, Your Honor.  I'll just state --

11           THE COURT:  -- think about it, that's the way I

12    think about it.  So, for example, so when Mr. Lee is working

13    -- I think you described in May, and Mr. Schwartz are

14    working in late May and have decided that there's no hope

15    for InfoW, what do I do with the fact that there's a

16    pleading filed with me in this case that says on June 2nd,

17    the Debtor is still considering all options, right?

18           How then do I view that, right?  That's the real

19    question, right, and whether that, the changing of the

20    jersey in essence, you know, whether that had already

21    occurred, but no one told me, right.  And so, that's the,

22    hey, we're still considering all options, hey, as a

23    fiduciary, we're thinking about everything, and five days

24    later, you're in a meeting in Austin, you know, with the two

25    plan funding sources in the current case.

1           MR. SHANNON:  And Judge --

2           THE COURT:  The question is does that carry,

3    right, into FSS and into this case and it should be judged

4    into FSS.  And I know that that's where the evidence is; I'm

5    just telling you the way I'm thinking about this now.  So as

6    arguments get made, that's the way I -- that's what I'm

7    thinking about.

8           MR. SHANNON:  Sorry, Judge.  And I'll just say

9    that there is no allegation in the objection of anything

10   that you just said, and I agree that that would be something

11   to consider.

12          THE COURT:  I have an independent duty, though.

13   That's my concern, so you're going to have to address that.

14          MR. SHANNON:  I understand.  I understand, Your

15   Honor.

16          THE COURT:  They do mention the June 2nd pleading,

17   though, right?

18          MR. SHANNON:  I believe in the June 2nd pleading,

19   there had already been this stipulation.

20          THE COURT:  Not being disclosed to me, that's what

21   I'm saying.  Everybody may have known.  It's what was

22   represented to me and whether that continues into this case

23   is that's the question I've got to figure out.

24          So let me ask you, Mr. Shannon, did you work on

25   the responses to the objections?

```
 1              MR. SHANNON:  I did, Your Honor.
 2              THE COURT:  Okay.  I'm going to hand you a copy.
 3    I want to take this up now before we take up the evidence.
 4    That's a copy of what was filed, and there are serious
 5    allegations in here.  And I can't avoid not paying attention
 6    to them because if they're true, then we're going to have to
 7    deal with them, okay.
 8              I'm going to turn you to Paragraph 2.
 9              MR. LEE:  Your Honor, can I interject?  This is
10    the Schwartz response?
11              THE COURT:  Yeah, yeah.  It's what was filed.
12              MR. LEE:  This is my work, Your Honor.
13              THE COURT:  Anyone can answer.  I asked if you
14    worked on them.
15              MR. LEE:  I'll take care of these, Your Honor.
16              THE COURT:  Okay.  So on Page 2, Paragraph 2.
17              MR. LEE:  Yes, Your Honor.
18              THE COURT:  You say that the U.S. Trustee
19    sprinkled, right, tabloid headlines, fabrications, and
20    misrepresentations.
21              MR. LEE:  Yes, Your Honor.
22              THE COURT:  And that their fabrications are
23    unethical.
24              MR. LEE:  Yes, Your Honor.
25              THE COURT:  I want you to point me to the language
```

1    in the -- I'm going to want you to -- and I'm going to print

2    you a copy of the objection.  I want you to tell me what

3    they are.

4              MR. LEE:  And, in fact, I do that in the pleading

5    in my view.

6              THE COURT:  I don't think you do.  This is real

7    serious.  I want to know what's unethical.

8              MR. LEE:  First of all, on Paragraph 4 --

9              THE COURT:  Okay.

10             MR. LEE:  -- where the U.S. Trustee argues that

11   Schwartz did not disclose -- on objection Paragraph 49 that

12   Schwartz did not disclose his connections to FSS or Jones

13   during the InfoW cases; that is a statement in the

14   objection.  And previously in Paragraphs 14 and 15 of the

15   objection, the U.S. Trustee says Schwartz made these

16   declarations in the beginning.

17             THE COURT:  Did he make them to me?

18             MR. LEE:  They were in the pleading filed with the

19   Bankruptcy Court, Your Honor.  That's what I'm saying.  They

20   made the representations in a pleading filed with the Court,

21   and then he changes them --

22             THE COURT:  Schwartz disclosed his connections to

23   me during the InfoWar cases?

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  When?

```
 1              MR. LEE:  In the application that he filed with
 2    the Court.
 3              THE COURT:  In the InfoW cases?
 4              MR. LEE:  Yes, Your Honor, absolutely.
 5              THE COURT:  What did he disclose?
 6              MR. LEE:  He disclosed that he -- if I may, Your
 7    Honor, may I turn to the exhibits?
 8              THE COURT:  Mm hmm.  What did he disclose?  Did he
 9    tell me he was working for them?
10              MR. LEE:  No.  He filed an application at the very
11    beginning of the case which was Exhibit No. -- I believe one
12    of the early exhibits that got postponed.
13              THE COURT:  Their argument is that nothing was
14    supplemented.  Was there ever a disclosure to the Court that
15    Mr. Schwartz started working for FSS during the InfoWars
16    cases?
17              MR. LEE:  The answer is no, you're not.
18              THE COURT:  So that's not a lie.  Can you tell me
19    what's unethical here?
20              MR. LEE:  But, Your Honor, if I may --
21              THE COURT:  Point me out to what's unethical.  No,
22    because that's serious allegations, right.  You're saying
23    that a branch of the Department of Justice is conducting
24    unethical behavior; that's real serious.  So point me to the
25    unethical behavior that you're describing in this objection.
```

1        MR. LEE:  Well, that's number one in my view, Your

2    Honor.

3        THE COURT:  You think that's unethical?

4        MR. LEE:  Well, I think that if you say something

5    that's untrue on one page and then you say something else

6    different on another page, then I think that --

7        THE COURT:  Just established that it wasn't --

8    that what you're saying, Schwartz did not disclose his

9    connections to FSS or Jones during the InfoWars.  I never

10   knew about that, so that's a true statement to me.  It's

11   true to me.  It's absolutely true to me, and you just

12   confirmed that I never knew about that, no one never told

13   me, so how is that unethical?

14       I think their whole argument is that no one ever

15   described anything to the Court.

16       MR. LEE:  Your Honor, my statement in Paragraph 4

17   was pointing that in the earlier paragraphs, he pointed out

18   that he made the disclosures at the beginning of the

19   bankruptcy case, which he did in the application.

20       THE COURT:  And he never updated them.

21       MR. LEE:  And, Your Honor, there's no dispute that

22   from May 19th on, neither Lee nor Schwartz made a

23   supplemental disclosure.

24       THE COURT:  That's what they're arguing, though.

25   That's what I read the objection to say is that, Judge, that

1    should have weight.  Tell me where the fact -- where the

2    unethical behavior is.

3              MR. LEE:  Well --

4              THE COURT:  I can print you a copy of their

5    objection because I want you to point me out.

6              MR. LEE:  No, Your Honor.  I apologize if you took

7    it that way, but my percept- --

8              THE COURT:  I'm just going to interrupt you.  So

9    let's go to Page 5.

10             MR. LEE:  Yes, Your Honor.

11             THE COURT:  Last paragraph, last in Paragraph 8,

12   okay, "The myth has been perpetuated by the United States

13   Trustee by pointing to the lynching mob at the May 19th," --

14   who is the, what is this mob that you're describing?

15             MR. LEE:  The mob that I'm describing is the fact

16   that everyone knew this --

17             THE COURT:  That's how dangerous that language is?

18             MR. LEE:  Well, Your Honor, one of the reasons why

19   is because, in fact, every time an event takes place in this

20   case, every conduct that we're subject to is somehow

21   misconstrued, misinterpreted.  And no one comes to this

22   Court and tells you the context in which certain things

23   occur.

24             THE COURT:  Well, I'm asking you.  We're going to

25   put you on the stand.

1          MR. LEE:  Yes, Your Honor.

2          THE COURT:  But tell me what's the -- who are

3    these people that constitute this mob?

4          MR. LEE:  Well, in the case of --

5          THE COURT:  No, in accordance with your statement;

6    who are you describing in this?

7          MR. LEE:  I think in this instance, I'm describing

8    the U.S. Trustee's office.

9          THE COURT:  That's the mob?

10         MR. LEE:  Yes, Your Honor.

11         THE COURT:  I understand, okay.  Let's go then to

12    Page 7, Paragraph 12.  I'm assuming that there are -- you're

13    saying you're being besmirched with lies.

14         MR. LEE:  Yes, Your Honor.

15         THE COURT:  And that the U.S. Trustee decided to

16    pour gasoline on an ember.

17         MR. LEE:  Yes, Your Honor.

18         THE COURT:  And quoting my concerns.

19         MR. LEE:  Yes, Your Honor.

20         THE COURT:  Has anyone addressed my concerns in

21    any of these pleadings?  Has anybody told me about -- has

22    anyone addressed in any of the pleadings in here why the

23    Court was never informed?  Is there a sentence in your

24    response or the response to Mr. Schwartz that addresses the

25    concern that I raised at the beginning of the case; that no

1    one informed me about anything that happened in the InfoW

2    cases.

3              MR. LEE:  The point is precisely that, you know.

4              THE COURT:  Can you tell me a sentence where my

5    concern was addressed?

6              MR. LEE:  Your Honor --

7              THE COURT:  In your response, can you tell me --

8    can you point me to a sentence anywhere in this here that

9    you describe where the gasoline is being drawn on because of

10   the comments that I made.

11             MR. LEE:  No, Your Honor.  It's not the fact that

12   your comments were creating the fire.  It's the fact --

13             THE COURT:  No, no, no.  They poured gasoline on

14   my comment.

15             MR. LEE:  Your comments --

16             THE COURT:  Tell me where the gasoline is.

17             MR. LEE:  The gasoline is the suggestion that

18   there was some type of unethical conduct when, if they had

19   asked about the sequence and they should have investigated

20   it after you made those comments to us, we could have told

21   them the sequence of events that took place here.

22             THE COURT:  I'm going to tell you, the question

23   I'm going to ask is why didn't you tell me.  Why did you

24   stand up and tell me that -- why did you stand up on May

25   19th --

1          MR. LEE:  Yes, Your Honor.

2          THE COURT:  -- and tell me that you all were

3     pursuing other options, and then five days later, you're in

4     a meeting and you're drafting first day declarations a week

5     later; that's what's going to come out.  And I'm just

6     telling you those are the questions that I'm going to ask

7     you, but I want it under oath.

8          MR. LEE:  Your Honor, I'm happy to go under oath

9     and tell you that.

10          THE COURT:  No, no.  I think you're going to have

11     to because I think there's been an objection.  So why don't

12     we just -- I'm just telling you where this is going.

13          MR. LEE:  Your Honor, I'm --

14          THE COURT:  I'm just concerned about the inflamm-

15     -- I asked, and Mr. Shannon was here.  I asked all parties

16     to really -- this is an emotional case and I get it.  And

17     I'm not one to -- I think people should defend themselves

18     vigorously, especially with what's at stake, and I think

19     there's strong emotions on both sides.  I asked everyone to

20     really consider the rhetoric that was here.  In one matter,

21     I had to seal something because of inflammatory language.

22     I've even stopped exhibits from being shown.

23          So when I start hearing that the U.S. Trustee has

24     engaged in unethical behavior, I take those things really

25     seriously.  I'm going to tell you, maybe you can point me

1    out to something, but as of right now, I would have an

2    ethical duty to report any such behavior, and I find none.

3    So I'm satisfied that I've taken care of my duties to

4    investigate whether there was anything in this -- anywhere

5    in this response that really displayed unethical behavior or

6    whether there were flat out lies in these statements, and I

7    find none.

8              That doesn't mean, and I want the U.S. Trustee to

9    understand, I don't mean I don't approve the application.

10   It just means that the reporting obligation that I would

11   have if I found some unproper behavior on behalf of the

12   United States Trustee, I believe has been satisfied.

13             So, Mr. Shannon, how do you want to proceed?

14             MR. SHANNON:  Thank you, Your Honor.

15             THE COURT:  You can take them up at the same time,

16   however you want.  How do you feel comfortable proceeding

17   with Mr. Schwartz and Mr. Lee.  I want you to put on your

18   presentation.  I had to take care of that first because I

19   can't deal with that in the middle of a hearing where there

20   are allegations that go beyond the scope of what we're

21   talking about today.  I had to address that.

22             MR. SHANNON:  Understood, Your Honor.  Your Honor,

23   you basically heard my argument.  But to respond to what you

24   were raising before, there are --

25             THE COURT:  Which portion of it?

1          MR. SHANNON:  I'm sorry.

2          THE COURT:  I apologize.

3          MR. SHANNON:  The Court had raised the issue that,

4    well, if there was something that affected this case, if

5    there was a connection or some kind of conflict in this

6    case.  The evidence will show that there is none.

7          THE COURT:  Okay.

8          MR. SHANNON:  And ready to have evidence unless

9    you have any questions for me.

10          THE COURT:  No, no.  I want to give the United

11    States Trustee an opportunity to just kind of make a brief

12    opening if that's what they choose to do.

13          And, Mr. Hguyen, I see it.  I just want to make

14    sure -- got a lot of people listening in.  I want to make

15    sure everybody has an opportunity to hear everything.

16          MR. NGUYEN:  Understood, Your Honor.

17          THE COURT:  Just get close to a mic whenever you

18    do speak.

19          MR. NGUYEN:  Your Honor, we filed two objections

20    in this case, and we don't take these objections lightly.

21    You know, the matter before the Court is primarily focused

22    on disclosure.  Disclosure is looked at most important.  And

23    I remember the first day we were in here and I told the

24    Court, you know, we're going to look at this case with fresh

25    eyes, but as long as everyone operated with complete

1   transparency and if there is any lack of transparency, we

2   would be bringing it before the Court.

3          And, Your Honor, during Mr. Shannon's

4   presentation, I don't -- he didn't say, but he seems to

5   suggest that somehow we knew about the connections in the

6   InfoW cases.  I can tell the Court that none of that was

7   told to us.  We found out the same time you found out.

8          So, Your Honor, since transparency in bankruptcy

9   cases in general, you know, plays a very important role.

10  The Debtor has to be transparent, creditors have to be

11  transparent when they file proof of claim, and there's a

12  high standard of transparency that's imposed to almost all

13  the professionals that appear in front of you.

14         The professionals need to come out and lay bare

15  all of their connections.  There's discussions of

16  disclosable connections, material connections, or

17  disqualifying connections.  That's not the standard under

18  Rule 2014.  You disclose all your connections.  You don't

19  pick and choose which connections to disclose and not

20  disclose and, quite frankly, that's what happened in the

21  InfoW case.

22         They decided on May 24th in a room up in Austin to

23  not proceed with the bankruptcy case.  You know, the Court

24  wasn't in that room and understanding (sound glitch)

25  plaintiffs were in that room.  So based on that decision,

1    they made the determination not to disclose to Your Honor

2    their connection with FSS beginning May 24th.

3         And, Your Honor, I think the connection actually

4    began on May 19th when Mr. Lee picked up that phone call and

5    he acted as the recruiter for FSS and asked Mr. Schwartz,

6    who was the CRO, the guy who is in the driver's seat for

7    InfoW cases, to pretty much change his jersey and then work

8    for FSS. You know that day, May 19th, was when the

9    connection occurred. And that's under the rule, under Rule

10   2014, that is when they needed to disclose that connection.

11        I know there's discussion about, well, you know,

12   it was May 24th, maybe it was June 6th when we executed

13   agreement. The date seems to fluctuate, but it all comes

14   down to that May 19th, as far as we know, because the

15   conversation could have occurred before, but we know there

16   was a phone call on May 19th.

17        And remember on May 19th, we were all in this

18   courtroom and there were discussions about Mr. Schwartz

19   needed to -- he needed a month, I think that's what the

20   original request was, to handle the remaining creditors.

21   But all of a sudden within that afternoon, Mr. Schwartz was

22   ready to send that engagement letter to FSS to change his

23   role.

24        And FSS, no matter we're not -- you know, under

25   the rules, all connection, but the connection to FSS was so

```
1    central to the InfoW case.  This is not talking about your

2    neighbor's mailman's sister.  This is the counterparty that

3    was sitting at a negotiation table in the FSS case.

4         THE COURT:  Mr. Nguyen, let me ask you.  The

5    argument raised by Mr. Shannon is, look, that's we're

6    rehashing InfoW issues, and you have your rights as to

7    whatever it is in the InfoW case.  But when we look at the

8    FSS case, it's different and you should look at FSS.  And

9    what you're seeking to do is inject, you know, potential

10   non-disclosure issues in the InfoW case and infect them into

11   this case.  What's your response to that?

12        MR. NGUYEN:  Your Honor, we're obligated, we are

13   obligated to bring this objection in this case.  Remember,

14   FSS was the connection that they did not tell you in the

15   InfoW case.

16        Now, they're coming into this case asking you to

17   approve -- you're actually -- if you approve these

18   applications, you're actually compounding the disclosure

19   failures in the other case, because FSS is the connection

20   that was not disclosed to you from May 19th all the way to

21   June 10th.  It wasn't disclosed to the Sandy Hook family, it

22   wasn't disclosed to the U.S. Trustee.  I don't believe the

23   Subchapter V Trustee knew about it.

24        The reason why we're objecting is this is the very

25   connection.  The Court is a witness to this.  The Court was
```

1    not told about any of this.  And you say, oh, now it's

2    improper for us to raise this objection while you're asking

3    the Court to bless a connection that wasn't disclosed?  It's

4    relevant here, Your Honor.  They didn't disclose the

5    connection to FSS.  This is the client, the same -- I mean,

6    there are some -- I call them distractions.  There are some

7    distractions saying, oh well, it was a different law firm.

8          Well, you know, when we were talking about 327,

9    we're talking about professionals.  Change your letterhead,

10   doesn't matter, we're talking about professionals.  We're

11   talking about the same people, we're talking about the same

12   connection that was not disclosed to you.

13         And it's, in many ways, a continuation of the

14   previous case because this is the connection that -- I don't

15   want to -- I'm trying to use my words carefully.  There was

16   an non-disclosure of this connection and they're asking you

17   to bless this connection, so that's my response to that.

18         And I'm not obligated to object to this.  I'm

19   obligated to bring this before the Court and I'm not doing

20   this for any unethical reasons.

21         And, you know, I'm glad Your Honor went through

22   that reply.  I wasn't going to do it, but that -- I wasn't

23   going to address it, but I think it's important that there

24   were a serious attacks on my character and also Mr. Ruff's

25   character.  And all I got to say about that is, you know,

1   Mr. Ruff and myself appear in front of Your Honor all the

2   time.  You know what type of lawyers we are, and I will just

3   leave it at that, Your Honor.  I won't address the language

4   that was in the reply.

5           But, Your Honor, all we're saying here is there

6   was a serious non-disclosure that occurred with this very

7   connection.  I think under Rule 2014, there is a proverbial

8   fox that guards the henhouse.  What we're asking is harsh,

9   but, you know, disclosure violations when they occur, you

10  know, sometimes the consequences are harsh.  A lot of cases,

11  you might get disqualified.  A lot of cases, you lose all

12  your fees.  But sometimes, that's what it takes to uphold

13  the integrity of the bankruptcy system and that's why we're

14  asking for Your Honor to deny the two applications that are

15  before you.

16          THE COURT:  Thank you.  Is there anyone else who

17  wishes to make any form of an opening if you will.  Mr.

18  Battaglia.

19          MR. BATTAGLIA:  Yes, Your Honor.  Ray Battaglia

20  for Free Speech Systems.  I was Free Speech Systems' counsel

21  in the IW bankruptcy cases.  I guess ultimately my

22  perspective on this, since I've been --

23          THE COURT:  Can you just get closer to the mic?  I

24  want to make sure folks can hear you.

25          MR. BATTAGLIA:  All right.  The continuity I have

1    with this is I am the representative, legal representative

2    of FSS in both cases.  And obviously, there was a certain

3    logic to retaining counsel that had some familiarity with

4    the players and the baseline issues existing here with

5    litigation and the like.

6           So it can't be extraordinary to anybody that prior

7    counsel and prior CRO would be logical selections, not the

8    least of which is the number of people who are willing to

9    take representation of an Alex Jones-related entity is

10   small.  It's a very small universe of professionals.

11          But my perspective on this is did they meet the

12   standard of disinterestedness.  I can't comment on the

13   disclosure issues in the IW case, but my perspective on it

14   is were they disinterested at the time that communication

15   was established about them coming to provide services to

16   FSS.

17          By, I believe it was May 19th, if not before, the

18   litigation claims against the IW debtors had been dismissed

19   with prejudice, and, therefore, as of that date or slightly

20   before then, IW and FSS were ships passing in the night.

21   They did not have common ownership; they did not have common

22   creditors.  There just was no connection at that point in

23   that they'd been disconnected by the dismissals with

24   prejudice, a decision that the plaintiffs themselves decided

25   to make.  Texas plaintiffs actually made that decision the

1    day of or just prior to the filing of the IW cases.

2    Connecticut plaintiffs took a little bit longer and filed

3    their dismissal pleadings in the Connecticut cases.

4         So as far as I could tell from my perspective,

5    they were disinterested; they met the standard.  They didn't

6    represent common shareholders, they didn't represent parties

7    who had common claims against themselves.  And the PSA,

8    which I know is important to you -- and you raised this

9    before when we talked about how it terminated in its own

10    terms and you had asked would there be an extension, and I

11    told you we would agree to extend it and we submitted the

12    draft that was negotiated with the litigation trustees with

13    a new date.

14         It was never executed because by the time it came

15    up, there was no purpose to be served anymore by a PSA.  The

16    PSA was exclusively designed to pay the Connecticut and

17    Texas plaintiffs' claims.  They didn't exist against IW, so

18    there was no purpose served by the PSA at that point.  It

19    was a dead document.  The relationships between the

20    entities, the IW and the FSS entities had ceased to exist by

21    the dismissals.

22         And so, from the Debtors' perspective in selecting

23    counsel and selecting a CRO, we found someone who we believe

24    to be completely disinterested at the time that we engaged

25    them.

```
 1          THE COURT:  Thank you.  Anyone else?  Mr. Chapple.
 2          MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple
 3   again on behalf of the Connecticut plaintiffs.
 4          Your Honor, we did, along with the Texas
 5   plaintiffs, filed a joinder to the objections to the
 6   employment objections.  The only note that I would make here
 7   is that candor and disclosure are important with the
 8   parties.  It's always of the utmost importance, especially
 9   in this context, especially when we have these two cases
10   abutting back to back.
11          And when the latter case was filed under
12   Subchapter V, which by statute does not have all of the
13   components relating to oversight and there's typically no
14   committee.  There's typically the creditors who do
15   participate are not as sophisticated as the creditors you
16   see in a typical large Chapter 11.
17          So I believe the only point that the Connecticut
18   plaintiffs, and I believe the Texas plaintiffs as well,
19   would make is that candor and disclosure is absolutely of
20   the utmost importance here, and that's why we filed our
21   joinder to the Trustee's objections.
22          That's all I have right now, Your Honor.
23          THE COURT:  Thank you.  Okay, Mr. Shannon.  The
24   only request I'm going to make is anytime anyone speaks, I
25   just want to make sure -- just get as close as you can to
```

1    one of the mics.  If you've got a booming voice, you're

2    good; if you have a soft voice, I just ask that you get a

3    little closer.  I want to make sure that we have a good

4    record.  And obviously, the hearing's being recorded, so I

5    want to make sure that we have a good record for today.

6            Mr. Shannon, I apologize.

7            MR. SHANNON:  Yes, thank you, Your Honor.  I guess

8    first before the hearing --

9            THE COURT:  Actually, I want to talk -- before you

10   get into any argument, exhibits.  Was there any agreement on

11   exhibits as to what the parties could agree to up front?

12           MR. SHANNON:  Yes, Your Honor.  I believe that all

13   of the exhibits are agreed, and those would be --

14           THE COURT:  Hold on.  Let me just make sure we

15   have a good record.  I just want to pull docket numbers and

16   make sure that we're all good on that.  So I see one at 163,

17   Mr. Shannon, where you have exhibits --

18           MR. SHANNON:  One through 34.

19           THE COURT:  -- 1 through 34.  Any objection to

20   that?

21           MR. NGUYEN:  No objection, Your Honor.  We've

22   agreed for all the exhibits.

23           THE COURT:  Okay, let me just go one by one then.

24   So what about 165; that's the U.S. Trustee's, I believe.

25           MR. SHANNON:  No objection, Your Honor, from the

1    debtor.

2          THE COURT:  Okay, so that is Exhibits 1 through

3    16?

4          MR. SHANNON:  Yes, Your Honor.  I do believe that

5    on Exhibit 16 is a --

6          THE COURT:  Demonstrative?

7          MR. SHANNON:  -- demonstrative.

8          MR. NGUYEN:  One through 15, Your Honor, so 16

9    doesn't need to go in.

10          THE COURT:  Okay, 1 through 15 at Docket No. 165.

11    You filed one, an additional one today, Mr. Shannon.  Is

12    there any objection to that?

13          MR. NGUYEN:  No, Your Honor.  We discussed it, no

14    objection.

15          THE COURT:  Okay, so then that would be at 178,

16    Exhibits 35 through 37?

17          MR. NGUYEN:  That's correct, Your Honor.

18          THE COURT:  Okay.  So then we have essentially 1

19    through 37 on behalf of Free Speech and U.S. Trustee

20    Exhibits 1 through 15.  Did I get that right?

21          MR. NGUYEN:  Yes, Your Honor.

22          THE COURT:  Okay.  All right, that was the last

23    housekeeping piece.

24          Mr. Shannon, I'm really going to stay quiet this

25    time.  I apologize.

1          MR. SHANNON:  Yes, Your Honor.  I mean, I don't
2     know if you would like to hear a response from me or we
3     could just start evidence.
4          THE COURT:  I want you to proceed.
5          MR. SHANNON:  Great.  You know, Your Honor, my
6     understanding from what I hear is that what this Court is
7     interested in hearing is whether there is anything that
8     creates a conflict that does not allow Shannon & Lee LLP or
9     Mr. Schwartz to exercise their fiduciary duties.
10          THE COURT:  I think it's a factor for sure.  I
11     mean, it's the test, right.
12          MR. SHANNON:  So, Your Honor, with that, I would
13     just --
14          THE COURT:  But I want you to put on whatever
15     presentation you want.  I put out that thought because, you
16     know, obviously, I think there could be a connection between
17     the two cases, but you're free to tell me there is none,
18     one, but I just inquire as to that.  But I want you to put
19     on your full presentation.
20          MR. SHANNON:  Your Honor, I would just like to go
21     to evidence and call Mr. Lee.
22          THE COURT:  Okay.  Mr. Lee, please take the stand.
23     I'll get you close to a mic.  There is a binder on the
24     stand.  Who's binder?
25          MR. SHANNON:  Both of those are the Debtors, Your

1    Honor.  The large binder would be Exhibits 1 through 35, and

2    the small binder is Exhibits -- or 1 through 34, I'm sorry.

3            THE COURT:  And then 35 through 37?

4            MR. SHANNON:  That's correct.

5            THE COURT:  Okay.

6            MR. LEE:  Your Honor, I have in my possession a

7    blank calendar for 2022.

8            THE COURT:  Okay.

9            MR. LEE:  Because the dates are -- I'm just...

10            THE COURT:  Understood.  Raise your right hand.

11    Do you swear to tell the truth, the whole truth, and nothing

12    but the truth.

13            MR. LEE:  I do.

14            THE COURT:  Okay.  You may be seated, sir.

15                    DIRECT EXAMINATION OF KYUNG LEE

16    BY MR. SHANNON:

17    Q    Good afternoon, Mr. Lee.  Can you state your full name

18    for the record.

19    A    Kyung, K-Y-U-N-G, middle name Shik, S-H-I-K, last name

20    Lee, L-E-E.

21    Q    And do you understand that you're here for the

22    consideration of the application for the CRO and Shannon &

23    Lee LLP by the Debtor, Free Speech Systems?

24    A    I am.

25    Q    What is your role in this bankruptcy cases?

1   A    In the FSS bankruptcy case, I am a partner with Shannon

2   & Lee, and I'm being put up as a co-counsel for the Debtor,

3   FSS.

4   Q    And, Mr. Lee, when was Shannon & Lee LLP founded?

5   A    In June 1, 2022.

6   Q    Mr. Lee, are you a licensed attorney?

7   A    I am.

8   Q    How long have you been a licensed attorney?

9   A    Since September of 1984.

10  Q    And can you describe your practice for the Court?

11  A    My focus is on corporate bankruptcy work, either for

12  the debtor, committees, or creditors, and I've been doing it

13  since 1984.  Practiced with Sheinfeld Maley & Kay for a

14  number of years and went off for the group in 1993 with

15  Verner Kiipfert and practiced with them as their bankruptcy

16  group for 10 years, and then went off with a small group to

17  join a boutique called Diamond McCarthy, was their

18  bankruptcy group for a number of years until 2018.

19           And then I left to work for Kasowitz Benson for

20  one year, and then formed my own firm as of 2019 and

21  practiced for about six months by myself and then partnered

22  up with my former partner, Mr. Leonard Parkins and Charles

23  Rubio, as of August 1, 2020, and practiced with them two

24  years until May 15th, 2022, when I departed and practiced

25  law with myself for 15 days, from May 15, 2022 to June 1,

1    2022, and then I formed a partnership with you to form

2    Shannon & Lee LLP as of June 1, 2022.

3    Q    Thank you, Mr. Lee.  Are you involved in any

4    professional groups related to your practice?

5    A    I am.  I'm a member of the American Bar Association.

6    I'm a member of the American Bankruptcy Institute.  I belong

7    to the TMA organization here in Houston.  I'm an active

8    member of the American Bar Association Business Bankruptcy

9    Committee, serve on the subcommittee on government powers.

10   I also have acted in the past with the Texas Disciplinary

11   Committee in sanctioning and disciplining attorneys who are

12   in violation of ethical obligations and served on that

13   committee for about five years in the last 1980s, and also

14   serve on several other committees in connection with

15   minority attorneys.

16   Q    Thank you.  If you could turn in the large exhibit book

17   there to Tab No. 1.

18   A    Yes, sir.

19   Q    Take a look at that exhibit and let me know if you're

20   familiar with this document.

21   A    I am.

22   Q    Can you explain what this document is?

23   A    Exhibit No. 1 is an application of Shannon & Lee to be

24   retained as bankruptcy co-counsel in the FSS bankruptcy

25   case.

1    Q    Mr. Lee, when you say co-counsel, what is your

2    understanding of what Shannon & Lee LLPs role would be if

3    the application to employ is granted?

4    A    Shannon & Lee will work together with the Law Offices

5    of Ray Battaglia to represent Debtor FSS in the bankruptcy

6    case.  The division of responsibility will be like in a

7    large law firm where Mr. Battaglia would have certain

8    responsibilities because he's technically the lead counsel

9    and have overall strategy, global kind of responsibility

10   about the case.

11           And it's contemplated that Shannon & Lee will take

12   over a lot of the issues relating to the daily operations of

13   the business and assist Mr. Schwartz in implementing many of

14   the operational issues, as well as assisting Mr. Battaglia

15   in all the work that has to be done in the case.

16   Q    And to date, what kind of things have you been involved

17   in with the Debtor, what matters?

18   A    Since the filing of the bankruptcy case, I've been

19   involved in most of the daily operational issues that have

20   confronted the company, in drafting pleadings with you.  I

21   guess primarily my work has been investigating sort of the

22   capital structure of the company, understanding its business

23   background so as to be able to draft the declaration for Mr.

24   Schwartz in connection with the filing of the bankruptcy

25   case.

1          Number two, understanding the finances of the

2   company so as to be able to determine what would be an

3   acceptable disposable net income for the next three years

4   for a plan of reorganization, as well as understanding the

5   company's capital structure in order to be able to complete

6   the financials and also the schedules and the monthly

7   operating reports, and strategize with respect to the plan

8   of reorganization.

9   Q    Mr. Lee, do you have familiarity with the Debtors'

10  corporate structure?

11  A    I do.

12  Q    How did you get that familiarity?

13  A    It started on May 24th, 2022, when we were invited to

14  come to a meeting in Austin, Texas, and we started the data

15  gathering process at that point in time with Mr. Schwartz

16  and with the company people that were available at that

17  time.  It was an arduous task because the company's books

18  and records were not in the best shape.  And so, by the time

19  we got through June 5th or June 6th at that time, we

20  gathered very few documents and were still looking for

21  documents regarding what the company's capital structure

22  looked like, and we're still gathering those document.

23          To this day, we have some of the documents.  But

24  for example, as a major secured creditor, Security Bank of

25  Crawford, we have a proof of claim that still doesn't make

1    sense and we still don't have their corporate documents as

2    to their secured claim, so we're still missing documents.

3    Q    Mr. Lee, do you have familiarity with the litigation

4    against the Debtors?

5    A    I do.

6    Q    How did you get that familiarity?

7    A    I got the familiarity by studying the state court

8    lawsuits that have been filed.  The state court litigators

9    in Texas made available to me their state court discovery,

10   and so, I studied the thousands of pages of documents that

11   were produced and went through those files to understand

12   what the issues were, as well as what had been produced in

13   the last four years of litigation, in order to determine

14   what documents had been produced relating to the financial

15   aspects of the company, so as to understand what had been

16   represented to the state court litigators so as to

17   understand what will be presented against us in a bankruptcy

18   case.

19   Q    And, Mr. Lee, to date, have you been involved at all in

20   preparing the proposed plan of reorganization that will come

21   in this case?

22   A    I have.

23   Q    And about how much time would you say you've spent on

24   that?

25   A    I've spent, I would say, I can't give you quite a

1    number, but I can tell you that I've been involving staying

2    up quite late in drafting a plan of reorganization

3    internally.  I've had strategy sessions with the company

4    internally with you, as well as Mr. Schwartz and Mr.

5    Battaglia, over the classification of various claims, as

6    well as the treatment of various creditors and the concepts

7    of how to put disposable net income and calculate those and

8    had discussions with how to proceed to confirmation on such

9    a plan, and also how to dedicate the avoidance actions and

10   to whom they should be dedicated.

11   Q    Thank you, Mr. Lee.  When was Shannon & Lee LLP first

12   retained by the Debtor, Free Speech Systems LLC?

13   A    My recollection is that the engagement letter was

14   executed on June 6, 2022, when Mr. Alex Jones signed the

15   engagement letter when we were in Austin, Texas.

16   Q    Did Shannon & Lee LLP receive a retainer?

17   A    We did.

18   Q    And when was that retainer received?

19   A    To my knowledge, the retainer was received on June 10,

20   2022, and was sent to us by FSS.

21   Q    Thank you.  If you could look at this Exhibit 1 and

22   turn to Paragraph 15.

23   A    I'm there.

24   Q    You beat me there.  If you could just review Paragraph

25   15.

1    A    I have.

2    Q    And let me know if anything in that needs to be

3    changed.

4    A    It does.  The last sentence where it says that the

5    retainer was received on or about June 7, 2022 was

6    incorrect.  We received an email saying that it was sent on

7    June 7th, but it turns out that our bank records show that

8    the receipt was on June 10, 2022.

9    Q    Thank you, Mr. Lee.  If you could turn in your exhibit

10   book to Exhibit 3.

11   A    Yes, sir.  I'm there.

12   Q    Could you tell me what this -- or are you familiar with

13   this document?

14   A    I am.

15   Q    Can you tell me what this document is?

16   A    It's the engagement letter we prepared for FSS that was

17   prepared on or about June 5, 2022, and executed by Mr. Jones

18   on June 6, 2022, retaining Shannon & Lee for the company

19   FSS.

20            THE COURT:  Mr. Shannon, is there any objection to

21   me showing this on the screen, just so --

22            MR. SHANNON:  No, Your Honor.

23            THE COURT:  I want to make sure because normally,

24   our local rules require that exhibits get filed on the

25   docket.  I don't mind waiving it today, but I just want to

1    make sure we can all follow along.

2              MR. SHANNON:  Yes.  And, Your Honor, the exhibits

3    were filed on the docket.

4              THE COURT:  Oh, I know, and just no one's -- we're

5    not putting them up.  I just want to make sure that

6    everybody who may be watching or in the courtroom can follow

7    along, if it's okay, but I'm only going to go to the pages

8    that you point to.

9              MR. SHANNON:  Okay.  Thank you, Your Honor.

10             THE COURT:  Okay, thank you.

11   BY MR. SHANNON:

12   Q    Okay, Mr. Lee, if you could turn to Exhibit 4 in that

13   book.

14   A    Yes.

15   Q    Are you familiar with this document?

16   A    I am.

17   Q    Can you describe what this document is?

18   A    This is the declaration that I prepared in connection

19   with the filing of our application in the FSS bankruptcy

20   case, and it recites the declaration of disinterestedness

21   that we're required to file in connection with our

22   application.

23   Q    And did you review this document before coming to court

24   today?

25   A    I did.  And, in fact, I'm responsible for having

1    drafted this document in the first place.

2    Q    And are there any corrections that need to be made to

3    this document?

4    A    I don't believe so.

5    Q    Thank you.  Could you turn to Tab No. 5 and take a look

6    through that.  Are you familiar with this document?

7    A    I'm generally familiar with this document.  It's a

8    conflicts check.  Yes, I'm generally familiar with it.

9    Q    What is this document?

10   A    The document is a conflicts check that you ran in

11   connection with our Clio software program showing the

12   conflicts check that you performed in connection with the

13   potential representation of FSS in this bankruptcy case,

14   which is also Document Nos. 5 and 6.  It shows the hits that

15   we received, if any, in doing the conflicts check before we

16   undertook the representation.

17   Q    And can you tell based on this document on or about

18   what date it was created?

19   A    Performed, it looks like one was performed on August

20   16, 2022, and the other one, Exhibit No. 6, was performed on

21   or about September 16, 2022 if that's correct.

22   Q    Well, okay, let's turn to Exhibit 6 then.  You kind of

23   jumped ahead of me there.

24   A    Sure, sorry about that.

25   Q    Are you familiar with this document and, if so, what is

1    it?

2    A    It's another conflicts check performed by you.

3    Q    Okay.  And you had just said that this one was

4    performed on 9/16.

5    A    That's correct.

6    Q    Okay.  If there were any conflicts -- let me retract

7    that.  What does this document show; what does it determine?

8    A    It determines that there are no conflicts that we're

9    aware of within our firm system that are creditors of the

10   FSS corporation that would create any kind of issue for the

11   firm being able to undertake the representation or that

12   would create a problem of disinterestedness for us.

13   Q    And do you know how this document is -- how it runs,

14   how it's created?

15   A    I have a general idea of it, but it looks like it does

16   kind of a computer search and then it hits on these words

17   that are within our computer system, and if there's a hit,

18   it hits it.  But that's about the best way I know -- I'm not

19   a -- even though I'm not a science major.

20   Q    That's fine.  Let me just ask you, and I'm not asking

21   whether it's in these documents.

22   A    Right.

23   Q    Does Shannon & Lee LLP have any connection to PQPR?

24   A    No.

25   Q    Did it ever represent PQPR?

```
 1    A      We have never represented PQPR.  And again...

 2    Q      What connections does Shannon & Lee have to Alex Jones.

 3    A      Well, before you -- I want to answer the question about

 4    PQPR.  Counsel to PQPR, Mr. Steve Lemmon, was a former

 5    partner of mine at Sheinfeld Maley & Kay between 1984 and

 6    1993.  Again, I haven't disclosed that, but that's one

 7    connection that is there.  Another connection is that Millie

 8    Saul was an associate that I trained for four years between

 9    1998 and 1992, which I also did not disclose.  But those are

10    as a result of practicing in the bankruptcy area, you tend

11    to have a lot of connections.  And those are the two that I

12    guess, depending upon the day, maybe I should have

13    disclosed; I didn't.  But I didn't disclose them because I

14    don't think they have any impact on my ability to be fair

15    and unbiased in this estate.

16    Q      Thank you, Mr. Lee.  So now a question about Alex

17    Jones.

18    A      Yes, sir.

19    Q      Does Shannon & Lee LLP represent Alex Jones?

20    A      We do not.

21    Q      Has -- strike that question.  Has the Debtor, Free

22    Speech Systems LLC, in this bankruptcy case ever taken any

23    position contrary to Alex Jones?

24    A      Yes.

25    Q      And could you describe one of them?
```

1   A     In this bankruptcy case, as an example?

2   Q     Yes.

3   A     We've taken lots of adverse positions to Alex Jones.

4   One, there's been a request by Mr. Jones to extend the

5   automatic stay to him; we've told him we can't do that.

6   Number two, he's asked us to bear 100 percent of the costs

7   of all these things, including legal, in connection with

8   these lawsuits; we've told him we're not going to do that,

9   and we've had to fight him on that.

10          THE COURT:  Mr. Lee.

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  On the state court litigation, isn't

13   that what FSS filed originally was a request to pay for 100

14   percent of the legal expenses for Mr. -- the two counsels

15   that are in the litigation in Connecticut?

16          THE WITNESS:  We did, Your Honor.  And then once

17   you told us that we couldn't do that, when we filed the

18   retention pleadings for Mr. Martin, the appellate lawyer, we

19   already told them that we could only bear either 50 to 60

20   percent of those costs.

21          THE COURT:  But I'm saying that you said that you

22   went against Mr. Jones on that.  That was at the request of

23   the United States Trustee and the Court that said that they

24   weren't going to approve without paying their fair share.

25   How did Shannon & Lee take a contrary position?  The

1    application was filed requesting 100 percent of the fees on

2    an emergency basis.

3           THE WITNESS:  Your Honor, that is correct.  We did

4    file an emergency basis saying -- to bear the 100 percent

5    and then negotiations subsequently took place.  And, you're

6    right, I need to correct my testimony.

7           THE COURT:  You're talking about after?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  Okay.

10          THE WITNESS:  Yes, Your Honor, absolutely.

11          THE COURT:  Thank you.  Thank you.

12          THE WITNESS:  We did file it as 100 percent, and

13   then subsequently, there were negotiations that resulted in

14   the reduction to 50 and 40 percent, I believe -- 60 percent.

15   Yes, Your Honor, absolutely.

16   BY MR. SHANNON:

17   Q    And, Mr. Lee, just to clarify.  So in the most recent

18   application to employ litigation counsel, the appellate

19   counsel.

20   A    Yes.

21   Q    In that one, there was not a request to pay the full

22   amount.

23   A    That's correct.  We already made -- we already told Mr.

24   Jones's counsel that Mr. Jones would have to bear a

25   proportionate share and they've agreed to bear 40 percent

1    and we agreed to bear 60 percent.  And the arguments were

2    that Mr. Jones has already been cut back on some of his

3    regular salary and we had an arm's length negotiations over

4    that issue and came down to a 40/60 split.

5    Q    And what about PQPR; were there any, you know, contrary

6    positions taken?

7    A    To be blunt about it, there were almost fistfights over

8    the negotiations between PQPR and FSS and Mr. Jones, so to

9    suggest that we're all in bed together is just nonsense.

10   We've had many disputes over all the terms of the

11   relationship among us, and there's not been one group of

12   people getting into bed together and arranging something

13   secret.  It has been very hardily fought.  It's been very

14   hardily -- it's been negotiated very hard and there have

15   been terms that had to require lots of negotiations to get

16   to a final resolution.

17   Q    Thank you, Mr. Lee.  If you could turn in the exhibit

18   book to Exhibit 7.

19   A    I'm there.

20   Q    Are you familiar with this document?

21   A    I am.

22   Q    And if so, what is it?

23   A    It's the invoice for Shannon & Lee for the month of

24   June 2022 for FSS and the time records for what we did for

25   them during the month of June 2022.

1    Q    If you could look through this document and see if you

2    can determine how many hours Shannon & Lee LLP professionals

3    worked on this matter in that month.

4    A    On Page 6 of 7 on Exhibit No. 7, it says that the total

5    was 127 hours and 95 minutes for the month of June 2022.

6    Q    It's .95 hours.

7    A    I'm sorry, .95.  127 hours and .95 whatever hours.

8    Q    Could you turn to Exhibit 8.  Are you familiar with

9    this document and what is it?

10    A    I am.  This is the July invoice that Shannon & Lee

11    supplied to the client, FSS, for the work we did in the

12    month of July 2022.

13    Q    And same question, how many hours does this reflect

14    spent on the matter?

15    A    On Page 5 of 7, it reflects it looks like 140 -- I'm

16    sorry -- I think it's 140.85 hours.

17    Q    Thank you, Mr. Lee.

18          THE COURT:  I have a question on this page and I'm

19    going to ask you anyway.  So on Page 1, you attended a focus

20    group hosted by someone and participated on a jury

21    perception of Alex Jones.  That was work for FSS?

22          THE WITNESS:  Yes, Your Honor.  We're co-

23    defendant.

24          THE COURT:  Okay.

25          THE WITNESS:  We're co-defendant.

1           THE COURT:  I understand.  Thank you.

2    BY MR. SHANNON:

3    Q    And, Mr. Lee, let's actually talk about that particular

4    time.  What was that time entry the Judge just brought up

5    about the focus group?  Can you describe what you did during

6    that time?

7    A    Yes.  I was asked by Andino Reynal, and I spelled this

8    wrong here, who was our state court litigator who was

9    conducting focus groups to come in at 10:00 and listen to

10   what the group was saying and how they reacted, and I ended

11   up participating and listening and watching it to determine

12   how the group was reacting to some of the questions and

13   issues that were being brought up about the soon-to-be tried

14   case and getting a sense of the various ranges of jury

15   verdicts that they would give for certain claims.

16           And I was asked to listen to those and get a sense

17   of this so that I could have an idea of the kind of range of

18   estimation of claims that we could kind of get an idea of.

19   Again, just a way of approximating a range of claims for

20   purposes of getting ready for the bankruptcy.

21   Q    And you said the case that was soon to be tried.  Do

22   you know what case that you were talking about?

23   A    I believe it was the Texas case called the Heslin/Lewis

24   suits that went to trial in Texas.

25   Q    And did that case play -- that state court litigation

1   have anything that was filed in the bankruptcy case about

2   that?  Was anything filed in the bankruptcy case about it?

3   A    In this case or in the last --

4   Q    In this case.

5   A    The Heslin/Lewis suit, yes.  In fact, that was the

6   motion that was filed on the first day of the FSS bankruptcy

7   case in which the Debtor, FSS, agreed to lift the automatic

8   stay so that that lawsuit could proceed to trial to

9   judgment.  And we filed the motion to lift stay on the very

10   first day and we went and came before Judge Lopez to get

11   relief so that that lawsuit could proceed to judgment before

12   Judge Gamble.

13   Q    And, Mr. Lee, do you remember who argued that motion on

14   behalf of the Debtor?

15   A    It was either you or Mr. Battaglia, I believe; that's

16   my best recollection.  I apologize, but I just don't -- I

17   don't have a good recollection of that day.

18   Q    That's fine, Mr. Lee.  If you could turn in the exhibit

19   book to Tab 9.

20   A    I'm there.

21   Q    What is this document?

22   A    This is an invoice that I submitted to Mr. Schwartz for

23   work that I did on behalf of Free Speech between the period

24   of 5/24 and June 1, when I was practicing alone as Kyung S.

25   Lee PLLC, and that was the invoice I sent to Mr. Schwartz

1    for the work I was doing during that period of time.

2    Q    Okay.  And now why is this for -- you know, why does it

3    say Kyung S. Lee PLLC and not Shannon & Lee LLP?

4    A    Because I was asked to depart at Parkins Lee & Rubio

5    because of a positional conflict that my partners, Parkins &

6    Rubio, discovered on a case that we had brought together in

7    the LTL bankruptcy case.  So when I left the firm on May

8    15th, I did not have another shop to go to, so I went back

9    to my own and practiced by myself for 15 days.

10          And then you and I ended up practicing law

11   together starting on June 1, so I practiced law by myself

12   under Kyung S. Lee PLLC.  And at that point in time, InfoW

13   debtors did not have counsel and so, I thought it was

14   important for me to get myself situation so that I could

15   help Mr. Schwartz finish up the InfoW case, and I did it

16   under the rubric of Kyung S. Lee PLLC, which is a PLLC which

17   I had set up after I left Kasowitz Benson in 2018.

18   Q    Mr. Lee, if you could just summarize the work you did,

19   how would you do that?

20   A    I think the best way to say it is what I've already

21   said before.  These were organizational and informational

22   gathering meetings that we were invited to come to Austin to

23   discuss FSS.  And as you can see by my time entries there

24   starting on May 24th, we were gathering documents and data

25   to understand the company, what it did, what its capital

1    structure was, what its history was, and to gather documents

2    to understand and verify what its corporate and capital

3    structure was and to understand, moreover, what had been

4    produced in the state court system because there had been

5    four years of litigation and my concern was to make sure

6    that I understood what had been produced there so as to be

7    able to manage what we would be -- what would be used

8    against us in the bankruptcy court once...

9            If the company had to go into bankruptcy, I wanted

10   to find out what financial data had been produced so that we

11   wouldn't be contradicting what we'd be saying in the

12   bankruptcy court versus what had been produced previously.

13   Q    And was there ever an engagement letter with Kyung S.

14   Lee PLLC and FSS?

15   A    I think there must have been one.  I just don't

16   remember right now off the top of my head whether there was

17   one or not, but...

18   Q    You don't remember whether --

19   A    I just don't remember it because I remember there was

20   so many things going on and it was for a 15-day period, and

21   I just don't remember.  Most likely, there would have been

22   one, but I just don't know.  I can't answer you accurately

23   right now off the top of my head, but I'm happy to go look

24   in my records and see if there was one.

25   Q    Well, I don't think we need to do that.  Could you turn

1    back to Exhibit 3 for me.

2    A    Sure.

3    Q    And if you could go to the second page of that

4    document.

5    A    I'm there.

6    Q    And if you could read that Footnote 1 and let me know

7    if that refreshes your recollection.

8    A    Footnote 1 says, "As S&L was formed on June --

9    Q    I don't need you to read it.

10   A    Okay.

11   Q    Does it refresh your recollection?

12   A    It does not refresh my recollection as to whether there

13   was a written engagement letter.  But I put the client on

14   notice that I have been practicing by myself May 15th and

15   June 1 and that to the extent the fees were paid, that they

16   would be allocated to my PLLC for that period of time to

17   make sure the client knew that there was a separation of

18   entities.

19   Q    Okay.  All right, and so, Mr. Lee, what is your

20   understanding of what the U.S. Trustee's objection is in

21   this case?

22   A    The U.S. Trustee's objection, as I understand it, is

23   that Kyung S. Lee, Mr. Lee I guess, that I failed to make

24   the appropriate disclosures when I was getting involved with

25   FSS as of May 24, 2022.  And more accurately, that I failed

1    to disclose to them and to the Court and to the creditors my

2    involvement starting as of May 19, 2022 with FSS and going

3    through the June 10th period of time.

4    Q    Okay, thank you.  I'm going to skip quite a number of

5    these exhibits, but if you could just tell me briefly what

6    your involvement in the InfoW cases was.

7    A    My involvement in the InfoW case was I was the primary

8    partner in charge of representing the three debtors, along

9    with you as my primary associate at Parkins Lee & Rubio, and

10   we were the primary bankruptcy counsel for the three

11   debtors.

12   Q    And what was the -- what was trying to be accomplished

13   in those InfoW cases?

14   A    Prior to the filing of the bankruptcy case, Alex Jones

15   and FSS and the debtors had agreed to a plan structure in

16   which, number one, Mr. Jones dedicated the equity interest

17   in the three debtors into a trust agreement so that he would

18   have no interest in the three companies, first of all, so

19   that he would lose all interest in that.

20        Number two, the trust would be manned by two

21   former bankruptcy judges, Judges Nelms and Schmidt, who

22   would basically be the trustees over the three entities

23   during the bankruptcy case, as well as on a post-

24   confirmation basis.

25        Number three, the plan contemplated that the trust

1    would oversee a plan of reorganization whereby the plan

2    contributors -- that would be FSS and Alex Jones -- would

3    contribute the following things upon confirmation of the

4    plan: (a) $2 million on the effective date of the plan; (b)

5    approximately, I believe, some amount of money each quarter

6    -- I think it was either $200,000 or $500,000 a quarter,

7    such that for the next X number of years, the total

8    consideration was going to be $10 million to the total group

9    of tort and contingent unsecured claimants at that time.

10         And then number three, the trust had been funded

11    with approximately $725,000 of cash, which would be enough

12    funds to fund the Chapter 11 administrative process so that

13    the InfoW debtors could get the plan confirmed with these

14    elements in it: the LST trust, the plan support agreement,

15    as well as funding during the Chapter 11 case, which all was

16    predicated on the idea of getting the Connecticut plaintiffs

17    and the Texas plaintiffs under one roof so they could all be

18    adjudicated and handled in one roof under the bankruptcy

19    Court.

20    Q    Okay.

21    A    Was that clear?  I just want to make sure.

22    Q    It was clear.  It was clear.  If you could turn to Tab

23    No. 12.

24    A    I'm there.

25    Q    Are you familiar with this document and, if so, what is

1    it?

2    A    This is the emergency application that the debtor

3    drafted in order to --

4    Q    You said the debtor.  Who do you mean?

5    A    Oh, I apologize.  This is the application or emergency

6    application submitted by the InfoW debtors to put in place

7    the two liquidation trustees, former Judge Nelms and former

8    Judge Schmidt, so they could oversee the trust that would

9    essentially be supervising the plan of reorganization, as

10   well as the Chapter 11 process when they were in place to

11   further negotiate the plan support agreement.

12   Q    And just from your memory without looking at the

13   exhibit, do you remember if the plan support agreement you

14   just talked about had a termination date?

15   A    Yes.

16   Q    Do you remember what that date was?

17   A    There were several: April 30, 2022, I believe was one.

18   Number two, there were other conditions, including I believe

19   Paragraph 8 of the plan support agreement contains several

20   termination provisions, including the necessity for filing a

21   plan of reorganization by April 30th.  There was also a

22   provision requiring that the LST trustees be appointed by

23   the bankruptcy court by April 30th.  And those are the two

24   ones that I remember specifically which were contained in

25   Paragraph 8 of the plan support agreement that I remember

```
 1   reading.

 2   Q    Okay.  And what was -- under the plan support

 3   agreement, there were other parties that were funding this,

 4   not the IW debtors, correct?

 5   A    That is correct.

 6   Q    And why were they doing that?

 7   A    The whole idea was that Mr. Jones and FSS would be

 8   funding the trust in order to get what they called a full

 9   release.  In other words, there would never be a release

10   like in the Purdue or these Boy Scouts cases.  The idea was

11   that they would get a full release only and only -- if and

12   only when the creditors in the trust got paid in full.  And

13   the idea was that they would dedicate the amount of monies

14   into the plan over the period of the plan so that only when

15   those creditors in the plan got paid in full would they get

16   a release.

17   Q    And was that agreement you just talked about ever

18   renegotiated in the IW cases?

19   A    It was.

20   Q    Can you describe that renegotiation?

21   A    I can give you only just general terms because I myself

22   and Mr. Schwartz, we were not involved in it intimately

23   because we were on the operational side.  The major

24   negotiations took place between the potential trustee's

25   counsel, which was Mr. Okin for Mr. Nelms and Mr. Schmidt,
```

1    and I believe the counsel for Mr. Jones, which was Shelby

2    Jordan, and counsel for FSS, which was Mr. Battaglia, and I

3    believe you were involved in looking at the documents.

4              They all got renegotiated so as to take in the

5    concerns of this Court and the creditors and they got filed

6    on the Court as Document ECF No. 48 on April 29, 2022, and

7    they were redlined to reflect all the changes that were made

8    by the parties and also a clean copy was filed at ECF No.

9    48.

10   Q    If you could turn in the exhibit binder to Tab 14.

11   A    Yes, sir.

12   Q    Take a look at this exhibit and, I guess, first, are

13   you familiar with it?

14   A    I am.

15   Q    And what is this document?

16   A    This is ECF 48 on InfoW case.  This is a document

17   that's the notice that was filed attaching both the clean

18   and the redline copies of the trust, as well as the PSA, the

19   plan support agreement, that was renegotiated between April

20   17th, the petition date, and April 29, 2022, among the

21   parties and filed with the Court to reflect the changes that

22   the parties were making as the case progressed.

23   Q    Okay.  Who negotiated this agreement on behalf of Free

24   Speech Systems?

25   A    Ray Battaglia as I remember.

1  Q    Okay.  Who did you represent in the limited

2  negotiations you just testified?

3  A    The three debtors, InfoW debtors.

4  Q    And what about Mr. Schwartz.

5  A    InfoW debtors.

6  Q    Okay.  And I guess just to ask, who did I represent in

7  that?

8  A    InfoW debtors.

9  Q    Were the amended PSA reflected in here ever executed?

10 A    No.

11 Q    And why not?

12 A    Number one, the emergency motion to appoint the

13 trustees, Exhibit No. 5 or the one that we just talked

14 about.  I'm going to go back to it, just a minute, one

15 second to be clear.  Exhibit No. 12, which was the emergency

16 motion to appoint the trustees; that was never approved by

17 the Court, and it kept on being passed and continued, so

18 that was never done.

19        Number two, the documents that were renegotiated

20 that the people worked on day in and day out that got filed

21 on April 29th.  The role changed completely on May 3rd when

22 the Connecticut plaintiffs and the Texas plaintiffs filed a

23 notice with this Court saying, Your Honor, we need a status

24 conference with you because we have some news that we want

25 to tell you about certain things we have done in our

1  respective state court, which was specifically we're going

2  to dismiss InfoW debtors from our respective state court

3  litigation, and that's the notice they sent.

4         So the Court set a hearing, I believe, on or about

5  May 6, 2022, in which they came to Court and said, Your

6  Honor, we think this case -- we don't want to be part of

7  this case anymore and here are the pleadings we're filing in

8  the respective state courts to show that we're dismissing

9  the three InfoW debtors from both the Connecticut and the

10 Texas state courts in the Sandy Hook lawsuits.

11 Q    Well, when you say state courts, were those litigations

12 removed through the Federal Bankruptcy Court at that time?

13 A    I apologize for not clarifying that.  On the day that

14 we had filed bankruptcy for the three debtors, InfoW debtors

15 on April 17 and 18, 2022.

16 Q    Is that a yes?

17 A    Yes, I'm sorry.  Yes, I apologize.

18 Q    And so, is that what you meant when you said state

19 court litigation, the removed state court litigation?

20 A    I did.  I'm getting ahead of myself.

21 Q    If you could turn to Tab 16.

22 A    Yes.

23 Q    Are you familiar with this document and, if so, what is

24 it?

25 A    This is the -- let me just look at the date.  This is

1   the filing made by the, I believe the Connecticut plaintiffs

2   on May 2nd in which they're requesting an expedited status

3   conference with Judge Lopez in which they want to announce

4   to the Court that they had basically filed motions to

5   dismiss their claims against the InfoW debtors in

6   Connecticut state court litigation.

7   Q    Okay.  And so, when you referenced May 3rd, is this one

8   of the documents you were --

9   A    I am, that's correct.  I apologize for the mistaken

10  date.

11  Q    No need to apologize.  If you could turn to Tab 17.

12  A    Yes.

13  Q    Same questions.  Are you familiar with this and, if so,

14  what is it?

15  A    This is the same document.  This is a document that was

16  filed by the Texas plaintiffs stating that on May 6, 2022,

17  they want to join in the request by the Connecticut

18  plaintiffs for a status conference with Judge Lopez, also

19  wanting to say we're dismissing the InfoW debtors from their

20  respective lawsuits in Texas.

21  Q    And this is the other one that you had just talked

22  about as affecting the PSA.

23  A    Correct.

24  Q    Okay.  If you could turn to Tab 18.

25  A    Yes, I'm there.

008248

1    Q    What is this -- are you familiar with this document

2    and, if so, what is it?

3    A    The document is an email from Mr. Ruff from the U.S.

4    Trustee's office on May 17th in which memorializes our

5    discussion that we've had regarding the direction of the

6    case.  It's a memorialization of our conversation he and I

7    have had, which we've had many of during the case regarding

8    the direction of the case, and he's setting forth his

9    arguments of why, at least from his perspective, he believes

10   that the cases should be dismissed as soon as possible.

11   Q    And if you could look down that and read that last

12   bullet point there out loud.

13   A    The last bullet points says from Mr. Ruff, "Dismissal

14   is the more efficient and cheaper option for these debtors

15   as it will save from administrative and litigation costs and

16   will still allow debtors options to resolve their claims."

17   Q    And, Mr. Lee, did you -- you received this email,

18   correct?

19   A    I did.

20   Q    Did you evaluate it?

21   A    I did, and I also evaluated it with Mr. Schwartz.

22   Every time one of these came, Mr. Schwartz and I discussed

23   it, we evaluated all the things that Mr. Ruff was saying and

24   considered it with all the other factors that we had to deal

25   with in the bankruptcy case, in the InfoW bankruptcy case.

1    Q    Okay.  If you could turn to Tab No. 19.

2    A    Yes, I'm there.

3    Q    Are you familiar with this document and, if so, what is

4    it?

5    A    It is, 19 is a copy of my application for Kyung S. Lee

6    PLLC.  It's the application to be retained in the bankruptcy

7    case of InfoW, which I filed on May 19, 2022.  And my

8    recollection is that I filed this application probably first

9    thing or early in the morning on May 19th because we had the

10   status conference with Judge Lopez at 2:00 p.m. that day in

11   which we were going to the Court and tell the Judge that we

12   had reached final agreement with the Texas plaintiffs about

13   the stipulation regarding their dismissal of their claims

14   against the debtors with prejudice.

15   Q    And, Mr. Lee, did you have any connection with FSS when

16   this was filed?

17   A    Absolutely none, other than the fact that they were

18   counterparties to the PSA when we first started the

19   bankruptcy case.  And, in fact, that's a point that I want

20   to clarify for this Court, and that is not until after I

21   finished the status conference with Judge Lopez on that

22   date, May 19th, that I received a call from Mr. Battaglia to

23   come to Austin and that's the point that I've been trying to

24   tell everyone since.  And that's the reason why, even if I

25   were able to make that disclosure, I couldn't make the

1    disclosure to Judge Lopez at 2:00 p.m. because I didn't

2    receive the call from FSS about coming to a meeting before

3    2:00 p.m.

4    Q    Okay, thank you.  If you could turn to Tab 20.

5    A    Yes.

6    Q    Are you familiar with this document and, if so, what is

7    it?

8    A    This is the document, as I recall, that the Connecticut

9    plaintiffs filed on or about May 19th before the hearing in

10   which they gave notice that in Connecticut that they had

11   filed their motions to dismiss with prejudice their claims

12   against the debtors, InfoW debtors, by motion.  There had

13   been a mistrust by the Connecticut plaintiffs to do any kind

14   of stipulations with the debtors because they thought that

15   it would be used later against them by one of the co-

16   defendants to say something that it didn't say, so they

17   proceeded by motion, while the Texas plaintiffs did

18   stipulations with the InfoW debtors that Mr. Battaglia and I

19   worked on that we presented to Judge Lopez on May 19th at

20   2:00 p.m.

21   Q    If you can talk about that stipulation, if you could

22   turn to Tab 21.

23   A    Yes.

24   Q    Are you familiar with this document and, if so, what is

25   it?

```
 1   A    I am.  Exhibit No. 21 is the stipulation that the Texas

 2   plaintiffs and I worked on behalf of the debtor InfoW, Mr.

 3   Battaglia and I negotiated this during the week before May

 4   19th and we filed this either the day before on the Court's

 5   docket and then we came to Court on May 19th and asked Judge

 6   Lopez to approve it.  And then Mr. Battaglia, I believe,

 7   took it and he filed it in the Western District of Texas so

 8   that Judge Mott and others could rule on their motions to

 9   remand.

10   Q    Mr. Lee, I have a question.  How did this benefit FSS,

11   this stipulation and order?

12   A    This stipulation had nothing to do with FSS.  I was not

13   thinking about FSS.  This was for the benefit of the debtor.

14   It was for the fact that they were dismissing the claims.

15   And my charge from Mr. Schwartz, ever since we were told

16   that the plaintiffs in both Connecticut and Texas were

17   dismissing us, my charge from Mr. Schwartz to me was make

18   sure that they dismiss us with prejudice, that there are no

19   longer creditors, and make sure that those dismissals are

20   absolutely clean and that they are gone forever from these

21   estates.

22        That was my duty and he told me to go implement

23   that and that's what I was told to do from May 19th until

24   these things got done -- from May 3rd until May 19th; that

25   was my charge, that's what I worked on.
```

 1   Q     And you said the debtor and you said the estates.   You

 2   mean the InfoW debtors?

 3   A     InfoW debtors, yes.

 4   Q     I want you to turn to Tab 26.

 5   A     I'm there.

 6   Q     I want you to read through it and it goes on for a

 7   couple of pages and tell me what this document or if you're

 8   familiar with this document and, if so, what it is.

 9   A     I'm familiar with the document.  This is an email which

10   starts the string on May 25, 2022, if you go back to Page 5

11   of 5 on Exhibit No. 26.  This is a document in which after I

12   had evaluated -- let me just start.  May 19th is when we go

13   to Court and tell Judge Lopez that the Texas plaintiffs have

14   stipulated to dismissal with prejudice.  Judge Lopez signs

15   the stipulation and we file it.

16         Thereafter, we start working.  Mr. Schwartz and I

17   start evaluating whether or not the company should proceed

18   to Chapter 11 or dismiss.  We make an evaluation, which

19   we'll talk about in some of these other emails.  But Mr.

20   Schwartz tells me, we've concluded, that we're going to

21   dismiss the case, and we make the announcement to the U.S.

22   Trustee on May 25th -- that's the first email that you see

23   at the very beginning on Page 5 of 5 -- at which point in

24   time, Mr. Ruff and I begin discussions on how to get the

25   dismissals done.

```
 1              I'm telling Mr. Ruff I need some more time because
 2    I want to do it right because I may take more time to get
 3    some of these things done because I've been pressured to do
 4    it so quickly, I don't want to make any mistakes.  He says,
 5    Kyung, get it done quickly.  You can do it through a
 6    stipulation of dismissal of our motion to dismiss.  So we
 7    look at that idea and we start drafting a stipulation of
 8    dismissal.  We go back and forth and --
 9              MR. NGUYEN:  Objection, Your Honor.  I don't think
10    hearsay testimony.
11              THE WITNESS:  He's a party.
12              MR. NGUYEN:  He's explaining what Mr. Russ was
13    saying.  Mr. Ruff (indiscernible)
14              THE COURT:  There's an objection, a hearsay
15    objection.  What's your response?
16              MR. SHANNON:  Your Honor, he's talking about the
17    status of negotiations that are really the crux of the U.S.
18    Trustee's objection to the applications to employ.
19              THE COURT:  Overruled.  He can answer.
20              THE WITNESS:  So basically, this chain of emails
21    starts on May 25th, and then the next thing you see is Mr.
22    Ruff send us on May 27th a proposed stipulated dismissal on
23    May 27th.  The problem I had with the May 27th draft that he
24    sent me was it starts off by saying, "The motion to dismiss
25    by the U.S. Trustee is granted," and that wasn't our deal.
```

1    That wasn't what the agreement was.  The agreement was we're

2    going to dismiss the case because we had no further need for

3    the case.  And so, I had to then go and redraft the entire

4    thing and work with Mr. Schwartz and go get that process

5    too, so that's what I worked on so that took another day.

6              And then as you can see, we marked that, and by

7    June 1, we've gotten it back to Mr. Ruff and he's going

8    through it and he's eliminated a lot of things that I've

9    asked for, but we've now come to an agreement by June 1 on

10   that dismissal order or stipulation.

11             So this is what it reflects, but from May 25th to

12   June 1, only thing we're working on between me and him was

13   getting that document correct.

14   BY MR. SHANNON:

15   Q    Thank you, Mr. Lee.  And I actually got a little bit

16   out of order.  I jumped ahead of myself there.

17   A    Sorry about that.

18   Q    If you could go back to Tab 23.

19   A    Sure.

20   Q    Are you familiar with this document and, if so, what is

21   it?

22   A    It is.  This is an email I sent to Mr. Schwartz on May

23   24th -- or on May 19th at 5:24 p.m.  Recall we came to Court

24   on May 19th at 2:00 p.m. and the hearing before Judge Lopez

25   lasted from 2:00 to 2:28 p.m., in which we announced the

```
 1   stipulation of dismissal and Judge Lopez signed the

 2   stipulation.  I got the call from Mr. Battaglia afterwards

 3   and he said, please come to Austin next Tuesday.  I had not

 4   mentioned any of this to Mr. Schwartz because of all this

 5   other work we were still doing.  And it was only at 5:24

 6   that I sent him this email saying, hey, we've been invited

 7   to come to Austin to talk about FSS, so let's -- I just want

 8   you to know that's when the meeting is going to be.

 9        And I didn't mention any of this stuff to him

10   until the hearing was over, until we had dismissed all the

11   claims and, at least in my mind, knew there was no

12   relationship between FSS and InfoW debtors at that point in

13   time because there were no claims that existed between the

14   litigation claimants and FSS, at least at one datapoint that

15   I had.

16   Q    Okay.  And if you could go to Tab 24.

17   A    Yes.

18   Q    Same questions.  Are you familiar with this document

19   and, if so, what is it?

20   A    I am.  This is a document that I prepared after I sent

21   the email on Thursday, May 19th.  I took time on Friday, May

22   20th, Saturday, May 21 to evaluate my InfoW file.  Because

23   one of the things I did not want to do is create this very

24   same problem that we're having right now, which is I did not

25   want the Court, the creditors, or anyone to think that we
```

1   were running from one project to go into another one

2   thinking that we had all these little issues.

3        So I took it upon myself to study the problem and

4   say, Marc, do we have a problem here, do we need to analyze

5   this, and I took it upon myself for two days to study this

6   and this was the conclusion that I reached, and it was sent

7   to him on Saturday, May 21 at 10:52 in the morning.  And I

8   said I've been evaluating these things and I said, here, I

9   started the evaluation ever since we saw Judge Lopez on

10  Thursday about the dismissals and whether we need to

11  evaluate any of these other things.

12       I said, I've continued to evaluate those issues

13  and reaching the conclusion that the cost to prosecute the

14  Subchapter V bankruptcies for the three debtors to

15  confirmation, especially with opposition from the U.S.

16  Trustee, the fact that the remaining claims or obligations

17  also jointly (indiscernible) by Free Speech Systems; (c) the

18  debtor should have sufficient funds; (d) debtor's reserve

19  and that there should be enough money for the Subchapter V

20  Trustee and that the most efficient way to administer the

21  debtors is to file as soon as possible a motion to dismiss

22  the bankruptcy case.  The motion to dismiss the bankruptcy

23  will be on 21 days' notice to all creditors.

24       I think it would behoove all of us to all agree

25  that this is the right conclusion, that we're moving to

1    implementation of dismissal as the goal.

2    Q    Okay.  So I just want to know, you testified earlier

3    about an email from Mr. Ruff.  Did what Mr. Ruff tell you

4    have any, you know, bearing on your decision here; did you

5    consider what he said in that?

6    A    Absolutely.  As of May 17th, Mr. Ruff had taken the

7    position that no applications for employment of

8    professionals would ever come before a hearing on a motion

9    to dismiss.  He had said that in his email on May 17th and

10   he had continued to take that position throughout any

11   discussions that we've had.

12        So in order for us to get our applications

13   approved in the InfoW case, the estate would have had to

14   spend monies to beat the U.S. Trustee on his motion to

15   dismiss to have the case approved as a Subchapter 11(sic)

16   only to feather our own nests at that point in time to get

17   our applications approved so that we could have final fee

18   applications.

19   Q    Okay.  Let's see, and if we could just go to Tab 25

20   now.

21        THE COURT:  Mr. Lee, hold on.  I'm going to ask

22   you a question about that.

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Are you saying that if you would have

25   requested a hearing date in front of me about an application

 1    that I wouldn't have considered it because of what the

 2    United States Trustee was arguing?

 3         THE WITNESS:  No, Your Honor.  I'm not suggesting

 4    that at all.  What I'm suggesting is that the way that the

 5    case had already been set, it was clear to me that the U.S.

 6    Trustee had already set the motion to dismiss in front of

 7    all the applications first.

 8         And, number two, that in order to get the

 9    applications heard, at least it was my perception, that the

10    U.S. Trustee would oppose that because he was saying that

11    the bankruptcy case was an improper bankruptcy case, and he

12    was saying that it would be improper to have professionals

13    employed in an improper bankruptcy case and, therefore, he

14    wasn't going to let that happen.

15         He wanted the case dismissed without the stamp of

16    a bankruptcy court allowing a professional to be employed.

17    That's the position I think took.  And so, I have to

18    evaluate those facts with Mr. Schwartz and say, was it worth

19    it for us to have that fight to get the fee apps approved.

20    Because as you will see, I again on May 30th, Mr. Schwartz,

21    should we have that fight just to get the protections for

22    us, the professionals, and Mr. Schwartz said to me again,

23    no, Kyung, that's stupid.  Why would you spend more estate

24    monies just to feather our own nest to get bulletproof

25    protection for our fee applications?

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  That's just not worth it.  That's

 3     the dialogue we were having internally.

 4              THE COURT:  Thank you.

 5              THE WITNESS:  Okay.

 6     BY MR. SHANNON:

 7     Q    Okay.  So, Mr. Lee, then let's go to Tab 25.

 8     A    Yes, sir.

 9     Q    Are you familiar with this document and, if so, what is

10     it?

11     A    This document is the email I sent to Marc Schwartz,

12     Chris Schwartz, and Harold on Monday, May 23rd.  Recall, May

13     19th, we have the hearing with the Court.  May 21, I give

14     the analysis.  And to make sure the estate is run lean, I've

15     drafted a motion to dismiss by May 23rd.

16     Q    Okay.  And so, it's after that that then the

17     conversation with the U.S. Trustee you talked about before

18     happened.

19     A    Takes place starting on May 25.

20     Q    Okay.  And on May 24 was the meeting with FSS --

21     A    Correct.

22     Q    -- that is at issue.

23     A    That's correct.

24     Q    Go to Exhibit 27.

25     A    Yes, sir.
```

1    Q    Same questions.  Are you familiar and, if so, what is

2    it briefly?

3    A    This is the stipulation that Mr. Ruff and I worked on

4    from May 25th until June 1, and then we filed it with the

5    Court.  And then it was on, I believe, 10 days' notice and

6    Judge Lopez signed it on June 10th.

7    Q    Okay.  Let me just ask you, was -- well, I guess it's

8    already clear.  Is it correct that KSL PLLC, Kyung S. Lee

9    PLLC, it was never employed in the IW bankruptcy case.

10   A    We were not.

11   Q    At what point did you believe that the IW debtors had

12   determined they were not going forward with that employment?

13   A    May 21.

14   Q    Okay.  And why did you believe that?

15   A    Because I had recommended to Mr. Schwartz that the case

16   be dismissed, and Mr. Schwartz had agreed with me.  And by

17   the time we were going to dismiss the case, there wasn't

18   going to be further need for retaining professionals.  And

19   then that was supplemented by my continuing dialogue with

20   Mr. Ruff from the U.S. Trustee's office, who said let's be

21   efficient in how we administer this Chapter 11 case.  You

22   can pay your professionals outside of bankruptcy and let's

23   dismiss the case and be done with it so that the only thing

24   we should be worrying about is Miss Haselden, Melissa

25   Haselden, the Subchapter V Trustee, and make sure that she

1   has enough -- that the estate has enough money to pay her

2   fees and let's get the case dismissed.

3   Q     And do you remember when you might have heard that from

4   Mr. Ruff?

5   A     It started with the email on May 17th, which we've

6   talked about already, and was repeated throughout the entire

7   negotiations process.  When I was asking for more time, he

8   was asking for dismissal and handle all your administrative

9   fees outside of the bankruptcy.

10  Q     Okay.  I'm just going to ask you straight up, Mr. Lee,

11  why was there never a supplemental Rule 2014 disclosure for

12  Kyung S. Lee PLLC?

13  A     Number one, as we've talked about in our papers, we

14  didn't move -- the idea of seeking employment disappeared as

15  far as the applicant was concerned when the case was going

16  to be dismissed shortly, number one.

17        Number two, if I didn't disclose this to the

18  Court, I apologize, but I think the only time I saw the

19  Court was on May 19th and then June 10th, I believe.  I

20  don't think there was a time between those two periods that

21  I saw the Court.  And as I indicated, I did not know about

22  the FSS meeting until after the May 19th hearing.

23        Number three, I just need to let people know there

24  was not a certainty when we went to this meeting on May 24

25  that Kyung Lee or Marc Schwartz was going to be retained.

1    The idea that there was a letter that Mr. Schwartz sent to

2    me on May 19th, got signed on May 19th, and he got engaged,

3    it's just not true; that's not what happened.  He sent the

4    letter, and it got lost in the ether and neither of our

5    engagement letters got signed until June 6, and we were just

6    there to see if we were going to be retained.

7            And again, I did my best to, on May 21, to

8    evaluate the situation internally with the client and the

9    client said, look, we're done with this case, there's

10   nothing more to do here, and there's no adversary between

11   FSS and InfoW debtors because there's no conflict, and we

12   didn't deal with any of these issues between the two

13   companies between that period of time.

14           And there was a lot of uncertainty because on the

15   other hand, especially for a professional like me, I have

16   client confidences I have to keep.  And so, there were a lot

17   of factors that were going in my mind, and I felt very

18   confident that, from my perspective, there was nothing

19   impinging on the estate because we weren't dealing with any

20   FSS issues at that point in time and had nothing to do with

21   them.

22           And again, if I erred, it's my fault.

23   Q    Okay.  I want you now to go to the small book.

24   A    Sure.

25   Q    And turn to Tab 1.  We're going to switch gears a

1    little bit and now we're going to talk about Mr. Schwartz

2    very briefly.

3    A     Sure.

4    Q     Same questions as always.  Are you familiar with this

5    document behind Tab 1?

6    A     I am.

7    Q     And, if so, what is it?

8    A     This is an email that I located last night at midnight

9    in searching through my outbox and it is an email that I

10   sent to Mr. Schwartz on June 5.

11          THE COURT:  Is this Docket 178?

12          MR. SHANNON:  Yes.

13          THE COURT:  Okay.  I just want to make sure.

14          THE WITNESS:  178-1.  It's an email that I found

15   last night at around midnight.  And what it is it's an email

16   that I sent to Mr. Schwartz on June 5, okay, and if you look

17   on your calendar, June 5 is a Sunday.  And it's an email I

18   sent to him saying, hey, I've made some revisions to your

19   engagement agreement, and I've done it based upon looking at

20   the company agreement of FSS.

21          And the reason why I was doing that was because

22   all the creditors were complaining mightily about, oh, Mr.

23   Schwartz is just the lackey in InfoW; he doesn't have any

24   authority.  So I took the company agreement of FSS, and I

25   tightened up the provisions about his authority, and I

1   redlined it, and I sent it to him on June 5th.

2           And when I looked at last night, I said, you know

3   what, this looks kind of funny, it looks very familiar.  So

4   when I looked at the redline which is attached and I took

5   the engagement letter that everyone's been saying was dated

6   May 19th and it's attached to his application, I took that,

7   and I looked at it and I compared it word for word, and I

8   realized that my redline is the engagement letter.

9   BY MR. SHANNON:

10  Q    Well, let's talk about the redline.  Let's go to Tab 2.

11  A    Sure.

12  Q    Is this the redline that you're talking about?

13  A    It is the redline I'm talking about.  And as you can

14  see, it's a redline that I did for Mr. Schwartz on June 5,

15  2022, in which I tightened up all these things and give him

16  really good powers I think.  And so, all these changes are

17  made, and if you look at the application letter that is

18  attached to his letter, the engagement letter, you will see

19  that every one of these changes are incorporated into it.

20          And so, it was impossible for Mr. Schwartz to have

21  given this letter, the one that he got signed to the company

22  FSS on May 19th.  It's impossible because I hadn't given him

23  these comments until June 5.  And you could see it because

24  at the top of this letter, you see the comma 2022; there's

25  no space between the two letters.  When you see the final

1    engagement letter, it still has that same mistake on it.

2    And I don't know why somebody put May 19th on the top as the

3    final one, but it's got the same error.

4        THE COURT:  Can I ask you a question, Mr. Lee.  I

5    want you to take a look at the screen.  Take a look at the

6    screen there.  It's a supplemental declaration filed by Mr.

7    Reynal.  I'll stipulate that he filed this -- we'll get the

8    date on it -- and that's special counsel.

9        Here's what he said.  Do you consider this to be a

10   true and accurate statement -- I've got to deal with that

11   too -- to your knowledge?  He's saying that FSS retained

12   Schwartz on May 19th and that Schwartz asked him, who's a

13   criminal defense lawyer, whether Mr. Schwartz knew of any

14   financial executive.

15       So I understand what you're saying.  I'm also

16   looking at this and here's another statement filed by

17   someone under -- this was filed on September 12th --

18       THE WITNESS:  Yes.

19       THE COURT:  -- under penalty of perjury.

20       THE WITNESS:  Right.

21       THE COURT:  And it's speaking of an additional

22   relationship on May 19th.  And I will stipulate to you --

23   I'm just trying to see if I can put all the pieces together.

24       THE WITNESS:  Your Honor, I have an answer for

25   you.

```
1              THE COURT:  If you don't know it and you filed it.
2              THE WITNESS:  I drafted it.
3              THE COURT:  Oh, okay.
4              THE WITNESS:  I drafted it.  So until I discovered
5     this issue last night, I was also under the mistaken
6     impression that the letter was dated May 19th is what I'm
7     trying to tell you.
8              THE COURT:  So do you think Mr. Reynal is -- do
9     you think the statement that he's making here under penalty
10    of perjury is untrue?
11             THE WITNESS:  It is untrue because I wrote it for
12    him, and so it was my mistake too.
13             MR. SHANNON:  Judge, if I could --
14             THE COURT:  No, no, no.  We take witnesses.  You
15    get to ask questions and so do I.  I'm just trying to put
16    all the pieces together.
17             THE WITNESS:  Yes, Your Honor.
18             THE COURT:  Thank you.
19             THE WITNESS:  It's my fault.
20             THE COURT:  No, no, no.
21             THE WITNESS:  It's my fault.
22    BY MR. SHANNON:
23    Q    All right.  Let's go to Tab -- actually, let's answer
24    that real quick.  If you go back to the big book.
25    A    Sure.
```

1   Q     And we'll go to towards the end here.

2         THE COURT:  Mr. Lee, I've got more questions.  So

3   in the previous exhibits that were shown, Mr. Schwartz is

4   attending meetings on May 24th.  So even if I accept that

5   the work was not -- maybe that the retention letter that Mr.

6   Schwartz is indicating, you know, was filed later, he's

7   certainly attending meetings in May in connection with a

8   potential FSS restructuring, right, because he was at the

9   May 25th meeting.

10        THE WITNESS:  May 24th.  Yes, Your Honor, he was.

11        THE COURT:  Okay.

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.

14        THE WITNESS:  No disagreement on that point.

15        THE COURT:  Okay.  I just wanted to understand.

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  I understand your point though.

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  Thank you.

20        MR. SHANNON:  Sorry, I'm going to take one second.

21        THE WITNESS:  Sure.

22        THE COURT:  Take your time.  So let me ask you

23   this as well, and I'm just trying to put all the pieces

24   together.  Here is Mr. Schwartz's declaration that he filed

25   in connection with the first day case, and he says May 19th

1    as well.  Are you telling me that Mr. Schwartz got it wrong

2    too?

3            THE WITNESS:  Your Honor, the reason why everyone

4    got it wrong is because I'm the person drafting all of

5    these, and I got --

6            THE COURT:  I'm assuming somebody's reading it

7    before they sign it.

8            THE WITNESS:  Your Honor, that's correct.  I can't

9    deny your sentence, what you just said.  But I'm the one

10   who's drafting these, and I did not know -- I did not

11   remember this until last night is what I'm trying to tell

12   Your Honor.

13           THE COURT:  I know, I understand.  It sounds like

14   Mr. Schwartz didn't either.

15           THE WITNESS:  No, no one did.  I apologize.  I

16   apologize.

17           THE COURT:  Okay.  I don't think you remembered it

18   when we first talked about it at the first hearing.

19           THE WITNESS:  That's correct.

20           THE COURT:  Okay.

21           THE WITNESS:  No one did, and I didn't remember it

22   until last night when I came across the email.

23           THE COURT:  Okay.

24   BY MR. SHANNON:

25   Q    Okay.  Well, Mr. Lee, can you go back to that big book

1    and go to Tab 30.

2    A    Sure.

3    Q    If you could go back to the big book and go to Tab 30.

4    A    Sure.

5    Q    Are you familiar with that document?

6    A    Yes, I am.

7    Q    Can you tell me what it is?

8    A    That is the attachment to Mr. Schwartz's application in

9    the FSS bankruptcy case.  It is a copy of his engagement

10   letter to FSS signed on or about June 6, 2022 by Mr. Jones.

11   Q    And what was this letter dated?

12   A    It's dated at the top as May 19, 2022.

13   Q    Okay, no further questions about that.  Okay, now back

14   to the small binder.  I'm sorry, wanted to clarify that.

15   All right, now if you could just go to Tab 3 in that small

16   binder.  Are you familiar with this document?

17   A    It is -- I am.  I am.

18   Q    Please describe to me what this is in relation to the

19   other (sound drops).

20   A    If you look from the bottom up, you will see that this

21   is the email that I sent to Mr. Schwartz on Sunday, where I

22   ask him for his Word document of the engagement letter so

23   that I could make the changes based upon my review of the

24   company engagement letter -- company agreement of FSS.  And

25   then I sent him at 3:05 p.m. certain revisions that we

1   looked at are behind Exhibit No. 2.

2       And then at 4:20, he says to me, I'm fine with

3   these changes, and he says you want me to make them, and

4   then he says, I need to read Paragraph 8.01 of the company

5   agreement.  And I tell him I want you to make -- he tells me

6   I want -- I tell him, please make the changes and bring both

7   the redline and the clean to Austin so we can show it to

8   Ray, meaning Ray Battaglia, and client and have it signed.

9   It is too difficult and confusing to do it otherwise.  Do

10  you see what I'm saying?

11      And so, it's concluding our discussion about the

12  changes that need to be made to his engagement letter that

13  he needs to bring to Austin on June 6, the Monday, the next

14  day.

15  Q   So that's when the Schwartz engagement letter was

16  actually signed, irrespective of when the letter was dated.

17  A   That's correct.

18  Q   Okay.

19      MR. SHANNON:  Well, no further questions from me,

20  Your Honor.

21      THE COURT:  I just have one question.

22      THE WITNESS:  Yes, Your Honor.

23      THE COURT:  So here is the Schwartz declaration

24  submitted in connection with his application.

25      THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Paragraph 19 and 20, he's referring to

2    May 19th again.  Is it your understanding that Mr. Schwartz

3    got that wrong too?

4          THE WITNESS:  Yes, Your Honor, because again --

5    (reads to himself) -- on this sentence, it's correct because

6    I called him after our hearing with you to come to Austin,

7    and that's what he's referring to there.

8          THE COURT:  Okay.  But is it possible that your

9    draft -- there was a draft on May 19th that was submitted,

10   and Mr. Schwartz started working for FSS around May 19th.

11   It's just the final draft of the document was dated -- with

12   the additional language and it was still dated May 19th

13   because that's when the work was done.  Happens all the time

14   in Chapter 11 cases.

15         THE WITNESS:  No, I understand what you're saying.

16   The answer is that Mr. Schwartz probably submitted something

17   to me, and I submitted something to Mr. Battaglia, but it

18   got lost in the paperwork and neither Shannon & Lee nor

19   Schwartz Associates or the CRO had an engagement letter

20   signed until June 6th.

21         THE COURT:  Okay.

22         THE WITNESS:  That's what happened.

23         THE COURT:  Completely understand.

24         THE WITNESS:  So whatever recitations I made about

25   May 19th, it was based upon an erroneous statement or

1    assumption that I made and all those were written by me with

2    that erroneous statement until I found this last night.

3              THE COURT:  Okay.

4              THE WITNESS:  That's my error.

5              MR. SHANNON:  I don't know if this would be a

6    redirect because I did say I pass the witness, Your Honor.

7              THE COURT:  You did.  You did.

8              MR. SHANNON:  I can wait.

9              THE COURT:  Okay.  So why don't we take five

10   minutes and let everybody just take a moment, let everyone

11   stretch their legs out.  Why don't we -- it's 3:17, why

12   don't we come back at 3:25.

13             THE WITNESS:  Okay.

14             THE COURT:  Okay, thank you.

15             CLERK:  All rise.

16             (Recess)

17             CLERK:  All rise.

18             THE COURT:  Okay, we are back on the record in

19   Free Speech.  Mr. Lee, I'll remind you that you're still

20   under oath.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Okay.  Mr. Nguyen, you may proceed

23   with cross examination and just get close to a mic.  I want

24   to make sure we can hear you.

25             MR. NGUYEN:  I will do my best, Your Honor.

1          THE COURT:  Thank you.

2          MR. NGUYEN:  Sometimes I forget.  Your Honor, I

3   got some assistance from Mr. Travis who will be --

4          THE COURT:  Okay.

5          MR. NGUYEN:  -- if I can ask Your Honor to give

6   him control, he's going to be -- I didn't, I was trying to

7   save paper.

8          THE COURT:  Okay.

9          MR. NGUYEN:  So he's going to be showing the

10  exhibits on the screen.  I can't see Mr. Lee's computer, but

11  is the screen --

12         THE COURT:  I think once I -- I think mister --

13  okay, you're good.  You should be --

14         MR. NGUYEN:  Okay.

15         THE COURT:  Okay.

16         MR. NGUYEN:  Great, and Mr. Travis, if you can

17  just go to 163-18 and we'll just start out with that email.

18  Maybe you can just make it a little bit bigger.

19              CROSS EXAMINATION OF KYUNG LEE

20  BY MR. NGUYEN:

21  Q    Mr. Lee -- nice to see you, Mr. Lee.

22  A    How are you, Mr. Nguyen?

23  Q    I'm doing well.  Thank you for asking.

24  A    Thank you.

25  Q    I just want to jump to this one before I forget.  This

1    was an email that you were discussing with Mr. Shannon about

2    -- I think the way you described it was this email was a

3    memorialization of a discussion between yourself and Mr.

4    Ruff.  Was that the testimony?

5    A    Based upon the first sentence.  "Following on our

6    conversation yesterday, please let me know when you've had a

7    chance to discuss these matters with Marc."

8    Q    Okay.  And did you respond to this email?

9    A    I don't know.

10   Q    You've attached Mr. Ruff's email, but -- and I think

11   you said he made some good points about the administrative

12   cost and the dismissal, but were you on board with

13   dismissing the InfoW cases on May 17th, when this email was

14   sent to you?

15   A    The answer is I don't think I made any kind of

16   decisions because I hadn't discussed it with Mr. Schwartz on

17   May 17th yet.

18   Q    So you think the Court should have the benefit of

19   seeing your response to this email just to determine your

20   mental state as of May 17th?

21       THE COURT:  (indiscernible).  Just curl the mic

22   down.  I want to make sure we can hear you.

23   BY MR. NGUYEN:

24   Q    You didn't attach your responses to the exhibit, right?

25   A    I didn't know what exhibits you're going to attach, so

1   no, I don't -- I didn't attach anything if that's what --

2   that's your question.

3            MR. NGUYEN:  Your Honor, I have a rebuttal

4   exhibit, if I can just hand it up to the party.

5            THE COURT:  Sure.

6            MR. NGUYEN:  And Your Honor, may I approach?

7            THE COURT:  Okay.

8            MR. NGUYEN:  I'm going to ask Mr. Shannon

9   (indiscernible).

10            MR. SHANNON:  Yeah, I'm not sure what this is in

11   rebuttal to that --

12            MR. NGUYEN:  Your Honor, the testimony was on May

13   17th.  There was a decision to dismiss the case based on --

14            MR. SHANNON:  I don't believe that was the

15   testimony, Your Honor.

16            THE COURT:  What's the --

17            MR. NGUYEN:  Your Honor, the use of this exhibit

18   without the response, they were making arguments that all

19   these were good points.  I'm just rebutting the fact that

20   they weren't on board at this time.

21            THE COURT:  If you want to impeach the testimony,

22   then --

23            MR. NGUYEN:  Sure.

24            THE COURT:  Then do that.

25            MR. NGUYEN:  Thank you, Your Honor.

1    BY MR. NGUYEN:

2    Q    Mr. Lee, did you respond to this email?

3    A    Looks like I responded to, based upon what you showed

4    me, looks like I did on 4:45 p.m.

5    Q    And did you describe the email that I believe is on

6    165-18 as a diatribe?

7    A    Yes.

8    Q    And you also told Mr. Ruff to send notice of

9    depositions for Mr. Schwartz?

10   A    Right.

11   Q    And at this time, you hadn't made the decision to

12   dismiss the case, right?

13   A    That's correct.

14   Q    And --

15   A    We're fighting with the U.S. Trustee on May 17th.  That

16   is correct.

17   Q    Yeah, and you also sent the DOJ legal manual to Mr.

18   Ruff and you told Mr. Ruff to read the DOJ manual, is --

19   A    That's correct.  I was very upset with him.

20   Q    Did Mr. Ruff ever tell you not to amend your

21   declaration in the InfoW case?

22   A    We never discussed my declaration in InfoW case.  No.

23   Q    Okay. And earlier, you mentioned that you've been

24   practicing bankruptcy law since September of 1984, right?

25   A    That's correct.

```
 1    Q    Thank you.  And you file a lot of bankruptcy cases?

 2    A    I filed cases.

 3    Q    Okay.  And you're familiar with Rule 2014, correct?

 4    A    Generally, I am.

 5    Q    Okay.  And earlier, we went through the little history

 6    with the law firms that you were with and just so I can get

 7    it clear as it relates to the InfoW case, at this time,

 8    you're currently with Shannon & Lee LLP, correct?

 9    A    I am.

10    Q    And that started on June 1st, 2022, correct?

11    A    That is correct.

12    Q    And prior to Shannon & Lee LLP, you were with Kyung S.

13    Lee PLLC; is that correct?

14    A    That is correct, for 15 days.

15    Q    And that started May 15 to May 31st, 2022?

16    A    May 16th, 2022 through May 31.  I think May has 31

17    days.

18    Q    Okay.  And prior to -- I'm going to call it KSL PLLC --

19    you were with Perkins, Lee, and Rubio LLC, correct?

20    A    From August 1, 2022 through May 15th, 2022.

21    Q    Okay, so when the InfoW cases were filed on April 17th

22    and -- it was a midnight filling, so there's some cases in

23    April 17th and there was some cases on April -- one case on

24    April 18th, you filed with the firm Perkins, Lee, and Rubio.

25    A    That is correct.
```

1    Q    Okay.  And prior to the filing -- prior to the filing

2    of the InfoW cases -- and when I talk about InfoW case, I'm

3    talking about InfoW, IWHealth, and Prison Planet, those

4    cases --

5    A    Yes, sir.

6    Q    You were involved in the negotiation of the plan

7    support agreement?

8    A    Yes.

9    Q    Okay.  And you were representing these three entities

10   in the negotiation of those plan -- in the negotiation of

11   the plan support agreement, correct?

12   A    Yes.

13   Q    Okay.  And when you were negotiating on behalf of the

14   InfoW Debtors, you were -- well, who were you negotiating

15   with on the plan support --

16   A    Against or with?

17   Q    Who were the parties to the plan support agreement?

18   A    There was -- Ray Battaglia was representing Free Speech

19   Systems and Mr. Jordan was representing Alex Jones.

20   Q    So it was Alex Jones, Free Speech Systems, and the

21   InfoW Debtor.

22   A    That's right.  We were the party that was going to be

23   the recipient of the funds from Free Speech Systems as well

24   as Alex Jones under the plan support agreement.

25   Q    So there was Alex Jones, Free Speech Systems, and InfoW

1    Debtors, correct?

2    A    That's correct.

3    Q    Okay, thank you.  And then after the bankruptcy case

4    was filed, there was, I believe -- it's a restated and

5    amended plan support agreement that was filed with the Court

6    on April 29th --

7    A    Incorrect.  There was a restated and amended trust

8    agreement, but only an amended plan support agreement.

9    Q    Got it.  So there was an amended plan support agreement

10   filed with the Court on April 29 --

11   A    Correct.

12          THE COURT:  And Nguyen, I want you to take the

13   microphone and just take it -- just turn it down a little a

14   bit.  (indiscernible).

15          MR. NGUYEN:  I'm going to leave it right here.

16          THE COURT:  Well -- that's perfect.  Thank you.

17   And I apologize.

18          MR. NGUYEN:  I apologize, Your Honor.  Sometimes I

19   -- zoned in and I forget.  I'll be more mindful.

20   BY MR. NGUYEN:

21   Q    And Mr. Lee, the parties -- I'm stepping away.  The

22   parties to the negotiation under the amended plan support

23   agreement were the InfoW Debtors, Alex Jones, and Free

24   Speech Systems.  Correct?

25   A    Incorrect.

1    Q    Who else?

2    A    The trust lawyers.  LST.

3    Q    Mr. Okin

4    A    Mr. Okin and he represented the trust Trustees which

5    were former Judge Nelms and former Judge Schmidt.  They were

6    the primary ones involved in the negotiations because they

7    were the ones who were going to take over direction of the

8    case insofar as negotiations with the parties.

9    Q    Mr. Lee, are you familiar with the U.S. Trustee's

10   motion to dismiss in the InfoW cases?

11   A    I am.

12   Q    Thank you.  And we'll get back to that in a little bit.

13   And before the U.S. Trustee filed a motion to dismiss, the

14   Connecticut plaintiff and Texas plaintiff also filed motion

15   to dismiss -- motions to dismiss in the InfoW cases,

16   correct?

17   A    That is correct.

18   Q    Yeah.  And if I remember correctly, the Court set a May

19   27th hearing date for all three motions; is that correct?

20   A    That is correct.

21   Q    Okay.  And then there were deadlines for yourself in

22   representing the InfoWars Debtors (indiscernible) to respond

23   to three motions by May 230th, 2022?

24   A    I can't remember the exact day, but there were certain

25   deadlines set for us to respond to.

1    Q    All right.  You had to respond to all three motions,

2    correct?

3    A    That is correct.

4    Q    And earlier, you mentioned -- on May 3rd, you described

5    it as the world changed on May 3rd, right?

6    A    I think that's correct.

7    Q    Okay.  So as we got closer to the May -- I'll just say

8    May 20th deadline for you to respond, your objective at the

9    time was not to take care of the motion to dismiss but to

10   dismiss the plaintiff's claims with prejudice; is that a

11   correct statement?

12   A    I don't understand your question.

13   Q    Okay.  So there's two competing tasks that you have to

14   do, right?  One is to respond to our motion to dismiss and

15   the other task is to make sure that the claims against the

16   InfoW Debtors were dismissed with prejudice and you were

17   more focused on the second task as opposed to responding to

18   our motion to dismiss --

19   A    That's a fair statement.

20   Q    Okay, thank you.  So on May 18th, 2022, you filed a

21   document with the Court and in that document you were

22   requesting additional time to -- you were requesting

23   additional time to -- especially kicking out the deadlines,

24   right, the May 27th deadline to June and then extending your

25   deadline to respond to the U.S. Trustee's motions; is that

1    correct?

2    A    That motion asked for several things and it was subject

3    of negotiation between Mr. Ruff and me to kick out the

4    deadlines, discovery deadlines and everything else until I

5    had sufficient time to finish up the negotiations and the

6    stipulations with the dismissing creditors.

7         MR. NGUYEN:  Okay.  And Mr. Travis, can you pull

8    up Exhibit 165-6?

9    BY MR. NGUYEN:

10   Q    And Mr. Lee, are you familiar with this document?

11   A    Can I see the whole thing?

12   Q    Sure.

13        MR. NGUYEN:  Can you please scroll down to Mr. Lee

14   can see the whole thing?

15   BY MR. NGUYEN:

16   A    Yes, generally I'm familiar with this.  This is the one

17   that we sought some more time.  Yes.

18   Q    And is this a document that you drafted?

19   A    Yes, it is.

20   Q    Okay.  And in this motion, you were asking the Court to

21   continue the May 27th date to June 24th, 2022; is that

22   correct?

23   A    I can't read it right now, but --

24   Q    Okay.

25   A    If you say, if you represent that to be the case --

1    Q    Well --

2    A    -- then that's true.

3    Q    Well, let's let you see it.

4         MR. NGUYEN:  Can you scroll to Paragraph 18, Mr.

5    Travis?  And then if you just go to Page 6 a little bit, Mr.

6    Travis.

7    BY MR. NGUYEN:

8    Q    June 24th, 2022.  You see that?

9    A    Yes.

10   Q    So in your motion, the basis for that is restated in

11   Paragraph 21.

12        MR. NGUYEN:  Can you scroll down to Paragraph 21?

13   BY MR. NGUYEN:

14   Q    Mr. Lee, can you read Paragraph 21?

15   A    Sure.  "Continuing the original hearing date until June

16   will also permit a CRO who has been engulfed in evaluating

17   dismissals with prejudice issues to now focus on the

18   remaining creditors of the Debtors.  The CRO will be able to

19   evaluate either before or by the June hearing date whether

20   he should proceed with trying to confirm a subchapter plan

21   of reorganization or handle these claims outside of

22   bankruptcy.  Again, such efforts would be wise use of the

23   limited financial resources.  Such an approach will also

24   save valuable judicial resources."

25   Q    Okay.  And the question is, on May 18th, why do you

1    need an entire month for the CRO to accomplish this?

2    A    Because one, I had not known what else needed to be

3    done with respect to the rest of the dismissals.   For

4    example, we had a Connecticut hearing to dismiss the actual

5    cases up in Connecticut.   That was number one.   That was

6    supposed to take place the week after May 17th.

7         And number two, I needed time to evaluate all the

8    things that Mr. Schwartz hadn't been focusing in on and I

9    was just asking for time in order to be able to do that and

10   that was just my best guess as to what we needed to be able

11   to calmly evaluate because we hadn't had one second of time

12   since April 17th because we had filed the bankruptcy on

13   April 17th and we'd been working around the clock to figure

14   out everything and things had changed very quickly.   And so

15   I was trying to get as much time as possible for the Trustee

16   and for the law firm -- for the lawyers on our side to

17   evaluate which way we should go.

18   Q    Thank you, Mr. Lee.   Did any of the InfoW Debtors have

19   any claims against Alex Jones or Free Speech Systems?

20   A    Not to my knowledge.

21   Q    Did you check?

22   A    Well, sure.   We --

23   Q    Okay.

24   A    -- checked in our schedules, et cetera.

25   Q    Right.   That's good.   So IWHealth LLC had royalty

1   payments, correct?

2   A    That is correct.

3   Q    Was it Longevity or Yongevity?  I always mess it up?

4   A    It starts with a Y.  Yongevity.

5   Q    Okay.  And at a certain point, the royalty payments

6   were deposited into the InfoW Debtors' accounts, correct?

7   A    IWHealth's account.

8   Q    IWHealth account.  But --

9   A    That's correct.

10   Q    But prior to that, where were the funds for the royalty

11   payments --

12   A    They may have been diverted prior to the time -- some

13   of them may have been gone to somebody else rather than to

14   IWHealth.

15   Q    When you say somebody else, could've gone to Alex

16   Jones.

17   A    That is correct.  It could've gone to Alex Jones.

18   Q    Okay.  And how many of those payments went to Alex

19   Jones?

20   A    We don't know.

21   Q    Did you check?

22   A    No, we did not.  Not to my -- I did not check.

23   Q    So if payments that are supposed to go to IWHealth is

24   going to Alex Jones, you think IWHealth has a claim against

25   Alex Jones for those payments?

1   A      Sure.

2   Q      Okay, thank you.  Let's get back to that motion.  So

3   you filed on the 18th.  It was an emergency motion and the

4   Court, as always, gave you a hearing the very next day, May

5   19th.  Correct?

6   A      If you say so.

7   Q      Okay.  Well, May 19th is an important date, right?  We

8   were in Court on May 19th?

9   A      It was an important date, because that's when we went

10  to go get the stipulations approved.  That's when all the

11  parties wanted to get the Texas stipulations approved.

12  Q      Were we in Court on May 19th?

13  A      Yes.

14  Q      Okay, thank you.  And May 19th was also important

15  because that morning you file your application to be

16  employed for the InfoW Debtors with your new law firm, Kyung

17  S. Lee PLLC, correct?

18  A      That is the day I filed my application.  That is

19  correct.

20  Q      And the application requested retention as effective of

21  May 16th?

22  A      That is correct.

23  Q      Great.  And since 1984, I'm assuming you've encountered

24  the word connections far as it relates to a bankruptcy case;

25  is that correct?

1    A    I have.

2    Q    Great.  So let's talk about your application on -- that

3    was filed on -- I believe it was filed on May 19th.

4        MR. NGUYEN:  And Mr. Travis, can you go to Docket

5    No. 165-3 which is, I believe, Mr. Lee's application in the

6    InfoW case.  And if you can just scroll down to Paragraph

7    22.

8    BY MR. NGUYEN:

9    Q    Do you see Paragraph 22, Subparagraph C on the screen,

10   Mr. Lee?

11   A    Yes.

12   Q    And Paragraph C is actually just a restatement of

13   Bankruptcy Rule 2014, correct?

14   A    Yes.

15   Q    And do you see the word person's connections there on

16   Subparagraph C on the second line?

17   A    I do.

18   Q    Is there any qualifier in front of the word connections

19   besides the person's connection?  Does it say material

20   connection?

21   A    No.

22   Q    Okay.  It's just connection, right?

23   A    That's correct way to read that sentence.  Yes.

24   Q    Okay.  And let's flip over to your declaration which is

25   on same exhibit.  If you can just go to 13 of 30.  Scroll

1    down to Paragraph 10.  Do you see Paragraph 10 right there

2    on the screen, Mr. Lee?

3    A    I do.  I've got it also on paper here.

4    Q    Okay, great.  So the second line in Paragraph 10 talks

5    about disclosable connections.

6    A    That's correct.

7    Q    What is the difference between a disclosable connection

8    and just a regular connection?

9    A    From my perspective if it's, for example, if you have a

10   conflict that should be a disclosable connection.  If you

11   have a connection that could mean something like, you know,

12   somewhat remote like come connection -- like you work with

13   somebody in the U.S. Trustee's office or you know somebody

14   in the Court system.  Again, you know, as I said on the

15   direct testimony, I look at it as whether or not such a

16   connection could bias you in a case or create some kind of a

17   adverse problem for you as a lawyer in a case.  That's how I

18   look at it.  So it's my own version of what I think should

19   be disclosed as -- if it adversely impacts you is the way I

20   think about it.

21   Q    Well, let's look at Paragraph 11 down there.

22   A    Sure.

23   Q    It talks about disqualifying connections.

24   A    Right.

25   Q    What is the difference between a disclosable

1    connection, a disqualifying connection?  What's the

2    difference between the two?

3    A    I think the --

4         MR. BATTAGLIA:  Your Honor, I'm going to object.

5    He's asking legal conclusions.  Mr. Lee is a lawyer, but

6    he's here right now as a witness.

7         THE COURT:  We're just asking what he meant, I

8    think.  I'm going to overrule that.  I think the question is

9    just trying to clarify what he meant in his declaration, not

10   whether it's a legal conclusion or not, just trying to make

11   an understanding as to what he meant.

12   BY MR. NGUYEN:

13   A    I think what I meant in the (indiscernible)

14   disqualifying connections is it's not a connection such that

15   it disqualified me from being counsel by virtue of having

16   that connection under Rule 2014.  It's not a conflict, as an

17   example.  I don't have any -- I didn't have a conflict in

18   being able to represent this Debtor, is my statement there.

19   Q    Is it your understanding that Rule 2014 requires you to

20   disclose all connection, not just only disclosable

21   connection or disqualifying connection?

22   A    Well, from my perspective?

23   Q    Yeah, I'm asking for your understanding.

24   A    My understanding is is that there has to be some limit

25   as to what connections you should disclose because if you

1    took the word literally, connections literally, you'd have

2    to disclose everything under the world, especially if you've

3    been a bankruptcy lawyer or professional forever.  That's

4    why you have language in it that says, you know, I've been

5    practicing the law for many years and so you may have come

6    across certain parties, et cetera.

7        That's why you have all those caveats, so the purpose

8    of, in my view, of a 2014 disclosure is to let Courts know,

9    for example, you have a connection that could adversely

10   affect you in doing your job.  That's how I looked at it.

11   That's how I look at it when I do my 2014 disclosures.

12   That's the way I think about it, like I did on my May 21

13   email to my client saying, do we have an issue here that we

14   need to think about.

15   Q    Okay.  Thank you.

16        MR. NGUYEN:  And Mr. Travis, can you turn to Page

17   18 of 30?  And when I say 18 of 30, I'm talking about the

18   Bates stamp on top.

19   BY MR. NGUYEN:

20   Q    You see the third paragraph down there, Mr. Lee?  It

21   says retainer.

22   A    Yes.

23   Q    The firm there is capitalized and when it says the

24   firm, right, that's KSL PLLC; is that correct?

25   A    Yes.  If that engagement letter is with KSL PLLC.

 1   Q   Yeah, we're in the same document.

 2   A   Okay.

 3   Q   So, and then client is capitalized there.  You see down

 4   there, the firm has not requested a retainer from the

 5   client?

 6   A   Right.

 7   Q   Client is the InfoW Debtors, correct?

 8   A   Can you scroll up?  I just want to make sure if that's

 9   the same letter.  If the client is defined as the InfoW

10   Debtors, yes.

11   Q   Okay, great.

12   A   That's correct.

13   Q   So from reading this paragraph on the retainer, is it

14   fair to say that KSL PLLC did not request a retainer from

15   the InfoW Debtors; is that correct?

16   A   That is correct.

17   Q   Okay.  And if we can just turn back to the declaration

18   at Page 13 of 30.  You see Paragraph 9 there, Mr. Lee?  It

19   says, KSL PLLC has requested a retainer.  I'm just going to

20   stop it there.

21   A   Yes.

22   Q   Who -- if you didn't request a retainer from Mr.

23   Schwartz who was representing InfoW Debtors, who did you

24   request a retainer from?

25   A   It's again -- the fault is mine.  It's -- number one, I

1    never requested a retainer.  The language in Paragraph 9 is

2    incorrect.

3    Q    Did you read the declaration before you filed --

4    A    I did and the language there saying as requested

5    retainer is incorrect.  What the -- statement in the

6    engagement letter is the correct one, that I never got one

7    and I never requested one.

8    Q    Okay.  So next time, I should rely on the engagement

9    letter, but not the declaration?

10   A    Mr. Nguyen, I told you, I made mistakes and I'm telling

11   you this is a mistake and I'm owning up to it, so you know,

12   that's my mistake.

13   Q    That's fine.  So you didn't request a retainer from

14   anyone else?  You didn't ask any of the third party funders

15   to pay your retainer?

16   A    No.  First of all, it was a post-petition matter and I

17   thought it was going to very hard to get a retainer and so I

18   didn't ask one for InfoW.

19   Q    That's --

20   A    That's the major reason.

21   Q    So just to recap, so May 18th, the motion to extend a

22   bunch deadlines was filed.  On May 19th, the morning of, you

23   file the KSL PLLC application and then there was a hearing

24   scheduled for the afternoon on May 19th; is that correct?

25   A    That is correct.

1    Q    And on the afternoon of May 19th, you were requesting

2    additional time.  I think you were asking for a month, but

3    Mr. Ruff had an issue with a month.  He thought it was too

4    long; is that correct?

5    A    Yes, I believe that's correct.

6    Q    Okay.  And one of the reasons -- and we can pull the

7    transcript if need be -- you told the Court that you needed

8    this additional time because if the InfoW Debtors were going

9    to remain in Subchapter V, you might have to renegotiate the

10   plan support agreement, correct?

11   A    Well, I may have said that, but --

12   Q    Thank you.

13   A    Wait, wait, wait --

14   Q    He -- Mr. Shannon can bring you on redirect.  That's

15   all I needed.

16   A    But that's not what I said.

17   Q    So -- and then also before the hearing adjourned on May

18   19th, you also told the Court Mr. Schwartz in his fiduciary

19   capacity is evaluating alternative.  Do you recall telling

20   the Court that?

21   A    I did.

22   Q    Okay.  And when you say fiduciary capacity, fiduciary

23   capacity to who?

24   A    To InfoW Debtors.

25   Q    Okay.  Was one of the alternatives that you were

```
 1   thinking at the time that Mr. Schwartz would be the chief
 2   restructuring officer for Free Speech Systems?
 3   A    When I made that statement, I was addressing a
 4   different issue raised by the Court.
 5   Q    Great.  The consideration of whether Mr. Schwartz
 6   should be the CRO for Free Speech Systems actually occurred
 7   on May 19th, correct?
 8   A    No.
 9   Q    There was no consideration on May 19th?
10   A    No.
11   Q    Okay.  After the hearing on May 19th, did you receive a
12   phone call from someone at Free Speech Systems?
13   A    From Ray Battaglia.
14   Q    Okay.  And Mr. Battaglia was representing Free Speech
15   Systems at the time, correct?
16   A    That is correct.
17   Q    Were you still in the courthouse when you received this
18   phone call?
19   A    No.
20   Q    How long was the conversation?
21   A    Very short, I believe.
22   Q    During the call, were there any discussions regarding
23   your potential engagement with FSS?
24   A    No.  It was a call basically saying please come to
25   Austin.
```

1  Q    Okay.  Was there any discussion of Mr. Schwartz'

2  potential engagement with FSS on May 19th?

3  A    No.  In fact, the discussion really revolved around the

4  need for somebody with a contact with a commercial bank,

5  Axos Bank, that needed a commercial banking relationship.

6  Q    After the phone call on May 19th with Mr. Battaglia,

7  you contact Mr. Schwartz and you said that on May 24th, you

8  were going to meet with -- I'm not sure who -- well, let's

9  step back.  There is an email from you on May 19th to Mr.

10  Schwartz telling Mr. Schwartz that you were going to make it

11  up to Austin on May 24th, correct?

12  A    Well, let's be real clear.  The email that I sent him

13  was what I sent him, at 5:24 p.m.  It's --

14  Q    Well --

15  A    -- three-line sentence email that says, "We are asked

16  to come to a meeting in Austin on May 24th."

17  Q    So the meeting on May 24th was scheduled on May 19th;

18  is that a fair statement?

19  A    It says, "I told Ray we can be there by 11:30 and see

20  if he can set up a meeting to start then.  We can do

21  Connecticut status hearing at 1 p.m. and continue with FSS

22  meeting thereafter in Austin."

23  Q    So --

24  A    That was at 5:24 p.m.

25  Q    So is it fair to say that on May 19th, there was a

1    meeting scheduled for May 24th in Austin?

2    A    Yes.

3    Q    Okay.

4    A    Yes.

5    Q    And excuse my ignorance.  I'm a northerner from Chicago

6    and I moved down here it's very cold in Chicago and I'm not

7    familiar with distances.  How long does it take to get from

8    Houston to Austin?

9    A    Three hours.  Or two-and-a-half hours, depending how

10   fast you drive.

11   Q    And does Mr. Battaglia live in Austin?

12   A    San Antonio.

13   Q    So how long does it take to drive from San Antonio to

14   Austin?

15   A    One-and-a-half hours or one hour, depending on how Ray

16   drives.

17   Q    Fair enough.

18             THE COURT:  Sorry.

19   BY MR. NGUYEN:

20   Q    The meeting on May twenty -- well, let me ask --

21             MR. BATTAGLIA:  To be fair, it's more traffic.

22   BY MR. NGUYEN:

23   Q    So the meeting that was scheduled on May 24, that

24   wasn't a meeting to renegotiate a plan support agreement,

25   was it?

1    A    Absolutely not.

2    Q    Okay.  Fair enough.  It was a meeting to discuss

3    potential restructuring for FSS; is that correct?

4    A    It was a meeting to discuss FSS generally and it was

5    just walking about the state of FSS condition and for people

6    to get background documentation on FSS.

7    Q    Where did you meet on May 24th?

8    A    At the offices of FSS.

9    Q    In Alvin Devane?  Is that how you --

10   A    That's correct, it's on Alvin Devane with all the

11   shaded windows and studios.  That's correct.

12   Q    And earlier we -- when we were going through the KSL

13   PLLC and we were going through connections and disqualifying

14   connection and disclosable connection, you think this was a

15   connection that needed to be disclosed?

16   A    The answer is, from my perspective, I didn't know yet

17   what it was because I didn't know what they wanted.  I

18   didn't know if they were going to retain me.  I didn't know

19   what was going on.  I just had an idea that we had -- we

20   were asked to come to a meeting.  We were going to discuss

21   things and I knew that insofar as it could involve that

22   representation, but nobody had promised me anything except

23   come to a meeting.

24   Q    And normally, do you drive three hours just to get

25   information from a potential client?

1   A    As a debtor counsel, I fly on airplanes to go to

2   meetings.  Yes.  Prospective clients.  Yes, I do.

3   Q    So let me understand.  So you don't think the

4   connection should've been disclosed on May 19th?

5   A    Well, here's the reason why.

6   Q    Well --

7   A    There was nothing I could disclose when I was here in

8   Court at 2 p.m., is what I'm trying to tell you, because I

9   didn't get the call until after I left the Court.

10  Q    So after you got the phone call after Court from Mr.

11  Battaglia and after you sent the email to Mr. Schwartz, you

12  -- at that point, there was a connection that was required

13  to be disclosed?

14  A    The answer is, I had -- I don't think I had a

15  connection that I could disclose because I didn't know what

16  that connection was.

17  Q    Who was at the meeting on May 24th?

18  A    Mr. Battaglia, Mr. Schwartz, I think Mr. Jordan showed

19  up for -- on behalf of -- and Mr. Jones.  I believe Mr.

20  Shannon showed up for the meeting.  And then at some point

21  in time, I believe Mr. Jones attended the meeting to give us

22  his views on things and also sign some of the agreements.

23  And I believe there may have been some other participants,

24  but those are the ones that I remember primarily.  Mr.

25  Schwartz was there and Mr. Battaglia and -- yeah, those are

1    the primary people.

2              MR. NGUYEN:  And Mr. Travis, can you go to 165-10?

3    BY MR. NGUYEN:

4    Q    So prior to coming to the meeting, you did some

5    research on FSS and then you emailed background research to

6    Mr. Shannon; is that correct?

7    A    Yes.

8    Q    Okay.  Thank you. And you see on the bottom there, it

9    says "Extended conference with client, Schwartz Associates,

10   B. Rowe, S. Jordan, and RJ Shannon to discuss options and

11   issues with FSS restructuring."  You see that?

12   A    Yes, I do.

13   Q    You see it says five hours there?

14   A    Yes.

15   Q    It says client there.  Who's the client?

16   A    I guess I was referring to FSS at that point in time.

17   Q    Was it Mr. Jones?

18   A    No.

19   Q    Mr. Jones, the owner of the company wasn't the client

20   at the time?

21   A    Mr. Nguyen, we've never represented Mr. Jones.  I've

22   never represented Mr. Jones.

23   Q    So who are you referring to client?  Because you list

24   everyone else.

25   A    Well, the memo, the invoice is being sent to FSS and

1    therefore I'm making it to FSS.  If I'd represented Mr.

2    Jones, I wouldn't be sitting here representing FSS today.

3    Q    Let me ask you.  Mr. Jordan.  Mr. Jordan was at that

4    meeting.  Who does Mr. Jordan represent?

5    A    Represents Mr. Jones.

6    Q    And on May 25th, you spent about three hours driving,

7    depending how fast you drive, and about five hours actually

8    meeting people at the facilities at FSS; is that correct?

9    A    You mean on May 24th, not 25th?

10   Q    I'm sorry, May 24th.

11   A    Yes.

12   Q    And --

13   A    That's right.

14   Q    And at that point -- and earlier, we talked about

15   connections and I won't go to -- you think there was a

16   connection on May 24th that needed to be disclosed?

17   A    No.

18   Q    No connection that needed to be disclosed to the Court?

19   A    No.

20   Q    You start billing for FSS on May 24th and you don't

21   think there's a connection that needed to be disclosed to

22   the Court?

23   A    I did not.

24   Q    Okay.  You think it's a problem that in your

25   declaration on -- in the KSL PLLC that there's a pending

1    declaration with the Court that says that you had no

2    connections to FSS and Alex Jones, you think that's an

3    issue?

4    A    Well, to me it was not, because the case was going to

5    be dismissed and we were not seeking employment anymore.

6    Q    And Mr. Schwartz was at this meeting, correct?

7    A    That's correct.

8    Q    Did Mr. Schwartz billed for this meeting?

9    A    I don't know.

10   Q    Does Mr. Schwartz generally do stuff without billing?

11   A    Lots of times he does.

12   Q    Good.  And the meeting as you notate on the entry, it

13   was to discuss options and issues with FSS restructuring,

14   correct?

15   A    Correct.

16   Q    Okay.  And I'm sure there's going to be an attorney-

17   client privilege.  I won't ask about the conversation, so

18   we'll just move on.  Prior to June 10th, did you tell any of

19   the Sandy Hook plaintiff or their attorneys that you were

20   doing work for FSS on May 24th?

21   A    No.

22   Q    Prior to June 10th, you didn't tell anyone at the U.S.

23   Trustee's office that you were working for FSS on May 24th;

24   is that correct?

25   A    That is correct.

 1   Q    Prior to June 10th, you didn't tell the Court that you

 2   were working for FSS on May 24th; is that correct?

 3   A    That is correct.

 4   Q    As a matter of fact, your trip to Austin on May 24th

 5   was not disclosed to the Court until August 20th when you

 6   filed your declaration in the Shannon & Lee application; is

 7   that correct?

 8   A    That's accurate.

 9   Q    That's the first time you ever told any -- either the

10   Court, the U.S. Trustee, or the creditors that you made the

11   trip up to Austin on May 24th; is that correct?

12   A    That is accurate.

13   Q    And on May 24th, just to be clear, you were still

14   representing the InfoW Debtors, correct?

15   A    That is correct.

16   Q    So I just want to go back to -- if you go back to 165-

17   3.  So on May -- I believe May 19th, in your declaration at

18   Paragraph 19, if you can just go there.

19        MR. NGUYEN:  Paragraph 19, Mr. Travis.  Give me

20   one second.  I apologize.  Paragraph 19 on the motion.

21   BY MR. NGUYEN:

22   Q    Mr. Lee, can you read Paragraph 19 to me?

23   A    "The Debtors believe that KSL PLLC neither holds nor

24   represents a disqualifying interest that is adverse to the

25   estate and is a disinterested person.  If any new relevant

1    facts or relationships are discovered, KSL PLLC will

2    supplement its disclosure to the Court."

3    Q    But you told the Court this statement on May 19th,

4    correct?

5    A    That is correct.

6    Q    But you didn't supplement it, correct?

7    A    That's correct.

8              MR. NGUYEN:  Okay.  And let's go back to 165-10.

9    I apologize, Mr. Travis.  I'm jumping around a little bit.

10   BY MR. NGUYEN:

11   Q    Let's go through some of these time entries and just

12   make sure I understand what you were doing for FSS during

13   this time.  So on May 26, you were still representing the

14   InfoW Debtors, but you were looking at valuation reports for

15   PQPR on behalf of FSS; is that correct?

16   A    I was reviewing two reports that I found out about that

17   were historical regarding PQPR and FSS that had been

18   discovered that were like basically 2012, 2013 reports.

19   Q    So is that a yes to my question, sir?

20   A    Yes, it is.

21   Q    Okay, thank you.  And on May 28th and May 29th, you

22   were analyzing data from the state court counsel; you see

23   that?

24   A    Yes.

25   Q    Is that what you did on May 28th and May 29th?

1    A    Yes.

2    Q    Okay.  And when we think about state court litigation,

3    we're really thinking about the Texas litigation and the

4    Connecticut litigation, correct?

5    A    Well, what I'm referring to there is just merely the

6    Texas state court litigation, because I didn't have access

7    to the discovery in the Connecticut litigation.

8    Q    Who gave you the state court litigation production that

9    you were analyzing on May 28th?

10   A    I'm trying to think.  It must've been the Reynal firm.

11   Q    And it wasn't any documents from Connecticut, correct?

12   A    No.  It was not.

13   Q    Okay.  And towards the end of this, so from May -- I

14   believe May 24th to May 31st, you billed for a total amount

15   of $24,409.09; is that correct?

16   A    That is correct.

17   Q    Were you paid this amount?

18   A    Yes, I was.

19        MR. NGUYEN:  Okay.  If we can just go back to

20   Exhibit 165-9.  And if you go to Page 5 on the motion, Mr.

21   Travis.

22   BY MR. NGUYEN:

23   Q    Mr. Lee, do you see the footnote there on Page 5?  And

24   I'm going to read it to you.  "KSL PLLC received payment

25   from the Debtor of $21,986.59 for services provided to FSS

1    from May 24th, 2022 through May 31st, 2022."  And the

2    question is, did I read that correctly?

3    A    You did read that correctly.

4    Q    Okay.  Thank you.  And when were you paid for the legal

5    services for KSL PLLC?

6    A    I don't know it off the top of my head, but it's

7    something I could give you -- to you if you need that.  I

8    just don't know, but I think it was sometime in June or

9    July.  June.

10   Q    Okay.

11   A    I just don't know the answer off the top of my head.

12   Q    And you assisted Mr. Schwartz in the preparation of the

13   schedules and Statement of Financial Affairs in the FSS

14   case?

15   A    Yes.

16   Q    And you've been doing this for a while.  You know in

17   the Statement of Financial Affairs, there's a section that

18   requires disclosure of payments related to bankruptcy

19   services.  Are you familiar with that section?

20   A    I am.

21   Q    Okay.

22        MR. NGUYEN:  Let's -- if you can go to 165-2, Mr.

23   Travis.  And if you can turn to Page 9 of 28, right.

24   BY MR. NGUYEN:

25   Q    Do you see any payments disclosed to KSL PLLC on Line

```
 1   11?
 2   A    I think that we addressed that in the global head
 3   notes, in the global notes with respect to the fact that
 4   there were certain payments made and they were distributed
 5   to the -- Schwartz Associates.  I think we were going to
 6   supplement that also with the Ray Battaglia PLLC.
 7   Q    You see how the payment to Shannon & Lee was disclosed
 8   --
 9   A    Yes.
10   Q    -- through the SA LLC Trust?
11   A    Yes.
12   Q    But the question is, do you see the KSL PLLC payments
13   here?
14   A    I do not.
15   Q    Okay, thank you.
16   A    I do not.
17   Q    And the Statement of Financial Affairs is signed under
18   penalty of perjury by Mr. Schwartz, correct?
19   A    That is correct.
20   Q    Okay.  And --
21   A    That is correct.
22   Q    And did you know, did Mr. Schwartz, do you know if he
23   looked over the Statement of Financial Affairs before it was
24   filed with the bankruptcy court?
25   A    He did, because --
```

1    Q    Okay.

2    A    He did.

3    Q    Would you agree with me that the payment to KSL PLLC

4    should be listed on the Statement of Financial Affairs?

5    A    Most likely.

6    Q    Is that a yes?

7    A    It is a yes.

8    Q    Thank you.

9    A    Yeah.

10   Q    So let's just talk about the InfoW cases and the

11   stipulations.  Beginning May 27th, you and -- and tell me if

12   it's before May 27 -- you and Mr. Ruff, you actually began

13   exchanging draft of a stipulated dismissal on May 27.

14   That's when the actual change of language happened, correct?

15   A    If you tell me that's what happened.  All I know is I

16   told him it was May 25th.  He sent me something based upon

17   the emails that I have, was -- I believe the first one he

18   sent me was probably on May 27th.

19   Q    Yeah. Don't look at the document --

20   A    Okay.

21   Q    -- ask you.  If you don't know the answer --

22   A    I don't know the answer to -- off the top of my head.

23   I have to look at a document.

24   Q    Fair enough.

25        MR. NGUYEN:  Mr. Travis, can you go to 163-26?  If

1    you scroll to -- can you scroll up a little bit, Mr. Travis,

2    please?  See the dates here.  Scroll all the way to the

3    bottom of this email chain.  If you scroll up one more to

4    the next email by Mr. Ruff.  If you can go to --

5    BY MR. NGUYEN:

6    Q    On May 27th, at about 3:16 p.m., Mr. Ruff sent you a

7    draft of the proposed stipulated dismissal, correct?

8    A    This email says that.  That's correct.

9    Q    Okay.  And on May 31st, if we scroll up, you circulated

10   some comments to the draft.

11   A    It's a rewrite.

12   Q    Right, and one of the issue you took with the

13   stipulated dismissal order that Mr. Ruff draft was, it says,

14   the motion to dismiss is granted.

15   A    That's correct.

16   Q    Okay.  And so we were exchanging language as of May

17   31st, but there wasn't no agreement to dismiss the case,

18   correct?

19   A    Mr. Nguyen --

20   Q    Was there signatures on --

21   A    The answer to your question about the signatures is

22   there was no --

23   Q    Okay.

24   A    -- the concept of this agreement --

25   Q    And --

1    A    -- authority in place.

2    Q    And then on June 1st, there's an email from Mr. Ruff.

3    Do you see that?  It's a long email in response to your

4    draft of the stipulated dismissal.  Mr. Ruff had some issues

5    with how your draft was drafted, correct?

6    A    Yes, sir.

7    Q    And one of the issues he took was there were

8    exculpations on your draft of the stipulated dismissal,

9    correct?

10   A    That is correct.

11   Q    Okay.  Why did you feel the need to include an

12   exculpation clause?

13   A    Well, in light of the fact that the Trustee was

14   opposing the professionals from getting retained and that if

15   we would -- gotten retained and gotten final fee

16   applications approved, we would've had the protections of

17   the bankruptcy court, so since the Trustee was saying they

18   wanted the cases dismissed and did not want the

19   professionals to be retained, we thought at least that we

20   should ask for exculpation in light of the fact that the

21   Trustee was standing in the way of us getting retained.  I

22   thought that was a reasonable ask.

23   Q    And so after this email, we cleaned up the stipulated

24   dismissal order and the stipulation was actually filed with

25   the Court on June 1st, correct?

1    A    That is correct.

2    Q    Okay.  And prior -- well, let me strike that.  And you

3    understand on June 1st, even though my office and yourself

4    agreed to dismissal via our stipulation, the cases weren't

5    dismissed until Judge Lopez put his signature on that

6    stipulation, correct?

7    A    I do agree with that.

8    Q    Okay.  So on June 1st, the representations of the InfoW

9    Debtors was not over.

10   A    That is correct.

11   Q    And so the stipulation was filed on June 1st and then

12   on June 2nd, you file on behalf of InfoW, Debtors' omnibus

13   response to motion to dismiss.  Is that correct?

14   A    That's correct.

15   Q    Okay.  You drafted this response?

16   A    Mr. Shannon and I both worked on it.

17   Q    Okay.  What was the point of filing a response to the

18   motion to dismiss if the parties already stipulated?

19   A    There were several reasons for it.  Number one, there

20   were allegations that were outstanding that people were

21   going to use against the InfoW Debtors in a negative way and

22   so we felt as a fiduciary it was it was incumbent upon us to

23   set the record straight as to what happened in the case.

24   That was number one.  Number two, everybody thought that the

25   case had been filed in bad faith and made those allegations

1    as the central core of any pleading they filed, and I

2    thought it was important for the Debtor to set the record

3    straight before the case was dismissed so that things like

4    this wouldn't happen again.

5    Q    Okay.

6    A    So it was incumbent upon us to file that as a fiduciary

7    to set the record straight.  And number three, we didn't

8    want pleadings that were filed that didn't go unchallenged

9    in that case because of the publicity and all the issues

10   that surrounded it.  So we thought it was incumbent upon the

11   Debtors to set the record straight before the cases got

12   dismissed completely.

13   Q    And it was setting the record straight as to

14   allegations against the InfoW Debtors.  The purpose of the

15   response was not to defend Alex Jones and Free Speech

16   Systems, the client you were representing on the day that

17   you filed the response, correct?

18   A    Mr. Nguyen, we were representing the InfoW Debtors.  As

19   you will read in the response, it was a response by the

20   three Debtors.

21   Q    Okay.  Let me ask -- so the purpose of the response was

22   not to defend Alex Jones and Free Speech Systems, correct?

23   A    There is not one word in that response, docket number

24   whatever it is, that defends FSS or Alex Jones.  It defends

25   the rationale for filing the InfoW Debtors' bankruptcy cases

1    and it defends the allegations that made by the U.S. Trustee

2    and the plaintiff saying it was a bad faith filing.

3    Q    And in your response on June 2nd, you used the word

4    independent to describe the CRO.  Isn't it a little bit

5    misleading to describe the CRO as independent when the CRO

6    is working for Free Speech Systems?  It's a yes or no

7    question.  Is it misleading to --

8    A    It is not misleading, Mr. Nguyen.

9    Q    Thank you.  And earlier you testified I think around

10   May 24, you were no longer seeking to be employed by the

11   InfoW Debtors, correct?

12   A    That is an incorrect statement of what I testified to.

13   I testified that as of May 21, I'd already decided based

14   upon the position you had -- your office had taken and the

15   analysis that I'd done that we were no longer seeking to be

16   retained as of Saturday, May 21 when I finished my memo and

17   analysis.

18   Q    Okay.

19        MR. NGUYEN:  (indiscernible) just pull up -- if

20   you can pull up 165-7.

21   BY MR. NGUYEN:

22   Q    Let me ask you this.  On June 2nd, did you still have

23   fiduciary duties to the InfoW Debtors?

24   A    I did.

25   Q    Even though you were not seeking employment?

1    A    I did.

2    Q    Okay.  And isn't it a little bit misleading to say that

3    the fiduciary duties were clear and unwavering when you were

4    employed by FSS at that time?

5    A    No.  The duties that I had to InfoW Debtors were

6    unwavering and they were fulfilled to 1,000 percent on June

7    2nd through June 10th.

8    Q    Okay, so -- but on June 2nd, you were drafting the

9    first day declaration for FSS, correct?

10   A    What has that got to do with the fiduciary duty

11   obligations that I had to InfoW Debtors?  I fulfilled every

12   one of them.

13   Q    Again, on June 2nd, you were drafting the first day

14   declaration for Mr. Schwartz for the FSS --

15   A    The answer is, Mr. Nguyen, I was putting together a

16   draft declaration for Mr. Schwartz as CRO for FSS, which had

17   nothing to do with InfoW Debtors.  The three Debtors had

18   been dismissed by the plaintiffs.  They had no relationship

19   with FSS at that time except for one relationship which was

20   stable and no dispute between them.

21   Q    So in that June 2nd filing, nowhere in that filing did

22   you mention you started working for FSS; is that correct?

23   A    That is accurate.  That's correct.

24   Q    Nowhere in that filing did you mention that Mr.

25   Schwartz was at this time working for FSS; is that correct?

1    A    That is also accurate.

2    Q    And earlier, you mentioned that by the time you filed

3    this, I guess it's a response on June 2nd, you were no

4    longer seeking employment from the InfoW Debtors.

5              MR. NGUYEN:  Mr. Travis, can you scroll down to

6    the signature line?  Go up one, to the motion, the signature

7    line on the motion.  All the way at the bottom.  At the

8    bottom of the motion.

9    BY MR. NGUYEN:

10   Q    You see where it says proposed counsel for the Debtor?

11   Who were you proposing to be counsel to the Debtor when you

12   signed that signature?

13   A    The Debtors, the InfoW Debtors.

14   Q    And you were proposing to the Court to be the Debtor,

15   right, when you signed that signature?

16   A    That's how I called myself.  That is correct.

17   Q    Okay.

18   A    And so I call myself that the entire time between May

19   19th through June 10th.

20   Q    And until the end of June 10th, you didn't resolve the

21   KSL PLLC application, correct?

22   A    That is also correct, Mr. Nguyen.

23   Q    Mr. Schwartz didn't withdraw his application as of June

24   10th, correct?

25   A    That is also correct.

1    Q    And there was no amendment, no supplements to any of --

2    to either of the applications in the InfoW case, correct?

3    A    That is correct.

4    Q    And on June 10th, the Court conducted a hearing on the

5    stipulated dismissal, correct?

6    A    I think the Court really conduct -- took up the

7    stipulation.  I don't know if it conducted a hearing, but

8    basically took up the stipulation.

9    Q    Fair enough.  And you appeared at the June 10th hearing

10   but you were on video.  I believe at the time, you were with

11   your mother in California?

12   A    I was at my niece's high school graduation.

13   Q    Right.

14   A    So Mr. Shannon was here in person and I appeared via

15   video.

16   Q    Okay.  So Mr. Shannon was here and was -- Mr. Schwartz

17   was here as well?

18   A    I don't recall whether he attended or not.

19   Q    And do you recall Mr. Shannon making the announcement

20   that there was a new firm, Shannon & Lee LLP at the time?

21   A    I believe so.

22   Q    Okay.  But there was no announcement of any connections

23   to FSS on June 10th; is that correct?

24   A    That is -- I don't recall any.

25   Q    Okay.  And let me ask you this.  Like, when did the

1    representation of the InfoW Debtors end?  Did it end with

2    the stipulated dismissal?

3    A    In my view, it ended -- it terminated really all for

4    practical purposes when the case was dismissed, because

5    there was no longer need for counsel to aid them in their

6    restructuring which was the scope of our engagement.

7    Q    Okay.

8    A    And so that's how I viewed it, because the scope of our

9    engagement was, the matter was to help them in their

10    restructuring.  When the case got dismissed as of June 10th,

11    the purpose of our engagement and the scope of our matter

12    disappeared.

13    Q    Okay.   Give me one second --

14    A    Sure.

15            THE COURT:  I think he meant me, Mr. Lee.

16            THE WITNESS:  I'm sorry.  I apologize.  I'm sorry,

17    Your Honor.  You know, when you get sitting up here, you

18    kind of fade away.  I apologize.

19    BY MR. NGUYEN:

20    Q    Mr. Lee, when the Texas plaintiff and the Connecticut

21    plaintiff dismissed their claims against the InfoW Debtors,

22    were there remaining claims?

23    A    Yes.

24    Q    About $140,000 in claims?  Is that --

25    A    I think there were closed to $190,000 of claims and

1    then there were still unknown facts, but there were about

2    four claimants and it turns out that maybe one of them had

3    been paid and -- so, but there was uncertainty about them,

4    but there was about four claims remaining.

5    Q    And was FSS a joint Debtor to those claims?

6    A    Yes, they were.

7    Q    Thank you.

8              MR. NGUYEN:  No further questions, Your Honor.

9    Thank you for --

10             THE COURT:  Okay.

11             MR. NGUYEN:  -- opportunity.

12             THE COURT:  Mr. Shannon -- well, let me, before

13   you go there, let me ask, does any other party who opposes

14   the retention of either Mr. Lee or Ms. Schwartz have any

15   questions?  Okay.  Mr. Shannon, any redirect?

16             MR. SHANNON:  Yes, Your Honor, just a couple

17   questions.

18             THE COURT:  Okay.  Before you begin, I'm going to

19   take back the power of the screen, just so -- yep.  Perfect.

20   Thank you.  Mr. Shannon, please proceed.

21                  REDIRECT EXAMINATION OF KYUNG LEE

22   BY MR. SHANNON:

23   Q    Mr. Lee, I just want to clarify something.  Who does

24   Shannon & Lee LLP propose to represent in this case?

25   A    Free Speech Systems LLC, the Debtor.

1    Q    Has Shannon & Lee LLP ever represented Alex Jones?

2    A    We have never represented Alex Jones.

3    Q    Have you ever represented Alex Jones?

4    A    I have never represented Alex Jones.

5    Q    Mr. Lee, did you sign the Debtor's schedules and

6    Statement of Financial Affairs?

7    A    I did not.

8    Q    I want to talk a little bit about the request for

9    exculpation and the reason for the response.  Has there

10   been, in these cases or -- rewind that.  In the InfoW cases

11   and the surrounding litigation, has there been a history of

12   sanctions sought?

13   A    Yes.

14   Q    Has there been sanctions that were sought against the

15   attorney who removed those cases?

16   A    Absolutely.

17   Q    And the bankruptcy court -- I'm actually talking about

18   particularly the cases, the Texas cases that were removed

19   from Austin State District Court to the Texas Bankruptcy

20   Court -- Western District of Texas Bankruptcy Court.  Were

21   there requests for sanctions against the attorneys who

22   provided services to the InfoW Debtors in that?

23   A    Yes.

24   Q    Now, where those sanctions against Shannon & Lee LLP?

25   A    Not necessarily.  Some of them could be, but they were

1    asserted against state court counsel and we didn't know how

2    far they could reach.

3    Q     And those are attorneys who provided services to the

4    InfoW Debtors, correct?

5    A     That's correct.

6    Q     Okay.

7              MR. SHANNON:  No further questions, Your Honor.

8              THE COURT:  Okay.  Any further redirect?  Okay.

9    Mr. Lee, thank you for your time.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Mr. Shannon, do you have any other

12   witnesses or any other evidence?

13             MR. SHANNON:  Yes, Your Honor.  If it's okay with

14   the Court, Mr. Lee was going to now handle questions of Mr.

15   Schwartz.

16             THE COURT:  Okay.

17             MR. LEE:  Call Mr. Schwartz.

18             THE COURT:  Okay.

19             MR. NGUYEN:  Your Honor (indiscernible).

20             THE COURT:  All right.  Good to see you, again.

21   Do you swear to tell the truth, the whole truth, and nothing

22   but the truth?

23             THE WITNESS:  I do.

24             THE COURT:  Okay.  Please have a seat.  And if you

25   can pull that microphone close to you.  Just want to make

1    sure that we can all hear each other.  Mr. Lee, just from --

2    I want you to take as much time as you want.  I'm just

3    thinking from a timing standpoint, we can -- we're going to

4    go until we're done today.

5         MR. LEE:  Thirty minutes?

6         THE COURT:  Okay.  No, no, no, I just -- so why

7    don't we then do a direct, take a short break, and then

8    we'll come back and do cross like we did before.  Okay?

9         MR. LEE:  Okay.

10        THE COURT:  Okay.  Thank you.

11             DIRECT EXAMINATION OF MARC SCHWARTZ

12   BY MR. LEE:

13   Q    State your name for the record.

14   A    Marc Schwartz.

15   Q    And how many years have you been in the financial

16   restructuring business?

17   A    Since around 1984.

18   Q    And during that period of time, have you generally been

19   keeping up with your ethical requirements of practicing in

20   the bankruptcy court?

21   A    Trying to.

22   Q    What does that mean?

23   A    Well, I have to meet ethical requirements.  I'm a CPA.

24   Specific requirements are laid out every two years.  In the

25   bankruptcy arena, I don't have that formality, but I am

1    trying to stay aware of the issues as -- what's come up.  I

2    do (indiscernible) the AICPA's code of ethics usually works

3    pretty well.

4    Q    Now, you've testified before this Court in this case,

5    correct?

6    A    Yes.

7    Q    And you've also appeared before this Court in the InfoW

8    bankruptcy case, correct?

9    A    Yes.

10   Q    So could you tell the Court generally just your

11   educational background and we'll talk about your other

12   background after that, but tell the Court where you went to

13   school -- college.

14   A    College.  I had bachelor of economics from Princeton

15   University, master in accounting and finance from University

16   of Chicago's Booth School of Business.

17   Q    And you finished your MBA in how many years?

18   A    One-and-a-half.

19   Q    All right.  And how were you able to do that?

20   A    Well, I went summer school and I (indiscernible)

21   economics (indiscernible) Princeton.  I placed out of a lot

22   of courses, so I was able to (indiscernible) prior hours

23   with -- you know, (indiscernible) classes.

24   Q    So after you graduated from University of Chicago, what

25   did you do in your career?

1    A    I went to work as a junior accountant for firm of --

2    became PriceWaterhouseCoopers in its Chicago office.

3    Q    And how long did you stay there?

4    A    I was with (indiscernible) Coopers and Lybrand for 20

5    years.

6    Q    And were you working in the restructuring financial

7    advisory space at that point in time?

8    A    Yeah.  I was technically still in the audit practice

9    and I had significant audit clients, but I was in charge of

10   the forensic evaluation services practice in Houston, which

11   included -- I started doing my bankruptcy work with them in

12   '84 and continued that, doing that bankruptcy work here.

13   Q    Have you been working in the bankruptcy field since

14   '84?

15   A    Yes.

16   Q    And in that time period, what type of work have you

17   been doing in the bankruptcy field?

18   A    Well, '84 we started doing work for Chapter 7 Trustees

19   in the area of compliance work, i.e., tax compliance.  In

20   addition in connection with litigation, we got involved

21   working with -- for the Trustees on some of the larger

22   litigation projects.  I mean, (indiscernible) I had 1,100

23   Chapter 7 cases open.

24   Q    How about your experience in the Chapter 11 arena?

25   A    I worked in Chapter 11, really, that in 1993, for me.

1    I did some Chapter 11 work prior to that, doing some

2    committee work in the '80s, '90s, doing some debtor --

3    assistant counsel for debtors, preparing companies' filing

4    and then serving during the bankruptcy itself.  And in '93,

5    when I left Coopers and U.S. Trustee's office called me and

6    asked me to get involved in a Chapter 11 as Trustee and

7    that's when I started doing trustee work which expanded to

8    trusteeships, examiners, examiners with expanded powers.  I

9    still do get some debtor-creditor work as well.

10   Q    Now, do you also do receiver work?

11   A    Yes.

12   Q    Now, do you understand the concept of being a

13   fiduciary?

14   A    I believe I do, yes.

15   Q    Can you tell the Court and the parties here what your

16   understanding of what a fiduciary means?

17   A    Being a fiduciary means that (indiscernible) a

18   fiduciary, you owe a duty to the party whose assets, whose

19   business, whose -- you've been placed in responsibility

20   over.  And that means that that duty is their interest

21   supersedes your interest.

22   Q    Since you've been involved in this area of

23   restructuring and financial advisory, have you ever been

24   reported for violations of any of your ethical obligations

25   to a client or to a party?

1    A    No.

2    Q    Mr. Schwartz, I want to first turn your attention to

3    the topic of your May 19th letter and if you'll take a look

4    at the small binder that's in front of you.  First of all,

5    before you go into this binder and look at these two

6    exhibits or three exhibits, can you explain to the Court the

7    controversy that you're aware of regarding the -- your

8    engagement letter of May 19th, 2022?  Are you familiar with

9    the various allegations and challenges to that letter?

10   A    Well, I'm (indiscernible) the fact there's -- that the

11   (indiscernible) of the letter has brought a lot of attention

12   and I will right now tell you (indiscernible) what you said,

13   I'm the one who put the May 19 on there.

14   Q    Let's talk about -- let's give the judge and the

15   parties exactly the reasons why the confusion was first

16   created.  Because as I read the objection, you were asked

17   certain questions at a previous court hearing and you seemed

18   to indicate that you sent this letter on or about May 19th.

19   A    I did.  I sent the letter to you.  (indiscernible)

20   asked me to get a draft of an engagement letter.

21   Q    All right.

22   A    I sent you all a draft.  I (indiscernible) had

23   everything.

24   Q    Now, did that letter that you sent to me as you now

25   discover turn out to be the letter that was signed by the

1    client FSS on June 6, 2022?

2    A    No.  It was not my draft.

3    Q    Okay.  Now let's turn to Exhibit No. 178-1, 178-2, 178-

4    3.  That's in front of you, that little binder.

5    A    Okay.  I'm sorry.

6    Q    Okay?  Mr. Schwartz, take a look at it and I don't know

7    if --

8              MR. LEE:  Have these been admitted, Mr. Nguyen?

9              THE COURT:  Yes, they have.

10   BY MR. LEE:

11   Q    Can you tell the Court, first of all, when I showed you

12   these emails regarding these letters, this exchange?

13   A    Well, recently, like yesterday, yeah.  I mean, because

14   I'd forgotten about this exchange.

15   Q    And so tell the Court what happened here that -- and

16   summarize it for the Court on Exhibits 1, 2, and 3 and how

17   the engagement letter that was ultimately signed and

18   attached to your application came about.

19   A    Well, May 19th, as I said, I believe I sent it to you.

20   You asked me to re-send it to you on Sunday, June 5th which

21   fits with (indiscernible) kind of got lost somewhere.

22   (indiscernible) modifications to it and sent me back those

23   revisions on Sunday, June 5th at 3:40 in the afternoon.  I

24   accepted those revisions and had -- where it is -- yeah.

25   Yeah, I accepted those revisions at 4:20 that day

1    (indiscernible) asked me to go ahead and print out.  When I

2    did that, I went ahead and put the date of May 19th on it

3    because that's when I originally drafted it.  May 24th, a

4    few business days later is when we -- I visited Austin with

5    you.

6    Q    Okay.

7    A    (indiscernible).  I think, Judge, you mentioned it

8    happens in bankruptcy.  I sit there and with all this is

9    because I did not put in front of this, as of May 19th, this

10   letter.  That was what my thinking was.

11   Q    so the engagement letter that you sent on May 19th was

12   never executed, correct?

13   A    Correct.

14        MR. CHAPPLE:  (indiscernible).

15        THE COURT:  Sustained.

16   BY MR. LEE:

17   Q    Which engagement letter was executed by the client on

18   June 6, 2022?

19   A    The one that (indiscernible) took to Austin on

20   (indiscernible) on June 5th is my -- yeah, I would've

21   prepared it on June 5th.

22        THE COURT:  Overruled.

23   BY MR. LEE:

24   Q    Mr. Schwartz, I want you to turn to Exhibit 23 in your

25   big binder, please.

```
 1   A    I have it.

 2   Q    Do you recognize the Exhibit No. 23?

 3   A    (indiscernible) be related to the Austin visit starting

 4   at 11:30.

 5   Q    To the best of your recollection, do you recall whether

 6   or not I or anyone else from any other party mentioned to

 7   you to come to a meeting regarding FSS prior to my sending

 8   you this email on May 19th, 2022 -- 5:24?

 9        MR. CHAPPLE:  Objection (indiscernible).

10        THE COURT:  Sustained.

11   BY MR. LEE:

12   Q    Mr. Schwartz, do you recall reading this email at 5:24

13   on that date?

14   A    Yes.

15   Q    Was this the first time you read this email?

16   A    Yeah, five -- yes.  That date at 5/24 was the first

17   time I read it.

18   Q    And was this the first time the subject matter came up

19   that's contained in this email?

20   A    Yes.

21   Q    Had you ever had this subject come up before this time?

22   A    No.

23   Q    And what did you do in response to this email?

24   A    What did I do in response?

25   Q    Yes, sir.  If anything.
```

1    A    Okay, I looked at my calendar to see if I could be in

2    Austin with you on the 24th.

3    Q    Now turn to -- looking to Exhibit No. 24.

4         THE COURT:  Before you go there.  So the email

5    says, "I told Ray we can be there by 11:30."  What did you

6    understand that, if the topic had never come up?

7         THE WITNESS:  The 11:30?

8         THE COURT:  It said --

9         THE WITNESS:  (indiscernible).

10        THE COURT:  It said, "I told Ray we can be there

11   by 11:30."  The question before you was that before this

12   email the topic had never come up and I'm just trying to

13   understand then what did you understand that you were going

14   -- be there by 11:30.  What did you understand at that time?

15        THE WITNESS:  My typical experience is when

16   someone asks, like a lawyer or someone asks me to a meeting,

17   they have a project in mind.

18        THE COURT:  So you knew at some point before this

19   email that you were going to be asked to go to a meeting?

20        THE WITNESS:  No.  I didn't know until I -- that I

21   was going to be asked.

22        THE COURT:  That's what confusing.  The email

23   starts and says, "I told Ray we can be there by 11:30."  So

24   --

25        THE WITNESS:  (indiscernible), Mr. Lee told me

1    that Ray had said can you come to Austin for a meeting.

2              THE COURT:  That's what I was trying to --

3              THE WITNESS:  -- on the 24th.

4              THE COURT:  -- understand.  And that was -- was

5    that before this email?

6              THE WITNESS:  Yeah, because then this is the

7    confirming the time.

8              THE COURT:  Do you recall when that --

9              THE WITNESS:  That would've been -- this is --

10   well, it had to have been after the hearing because we

11   didn't know about it before the hearing.  So (indiscernible)

12   --

13             THE COURT:  Okay.

14             THE WITNESS:  -- five or 4:30.

15             THE COURT:  Thank you.

16   BY MR. LEE:

17   Q    All right.  Mr. Schwartz, I asked you to take a look at

18   Exhibit No. 24 and see if you recognize that document.

19   A    Yes.

20   Q    Can you describe that document to the Court?

21   A    (indiscernible) a summary I prepared and sent of

22   (indiscernible) evaluation of the situation we were in with

23   the three debtors and possible approaches and, quite

24   frankly, look at the economics of various alternatives we

25   had.

1    Q    Okay.  Mr. Schwartz, had you been thinking about how to

2    proceed with the InfoW cases before I wrote you this email

3    on May 21?

4    A    I'd been thinking about it since we got the first word

5    that they wanted to dismiss us at the time without

6    prejudice.  So I knew, okay, if they're smart they're going

7    to (indiscernible) dismiss us with prejudice and we need to

8    think about what happens then.

9    Q    So tell the Court what you did in response to the --

10   once you read this email from me on Saturday, May 21.  What

11   type of actions or response, if any, you did in reaction to

12   my email that I sent you.

13   A    I told you we have to stop this through -- get this

14   case dismissed.  We can't afford to keep us working on this

15   when there's (indiscernible) benefit to the estate of us

16   doing that, nor economic benefit.

17   Q    And what kind of analysis did you do in order to come

18   to that conclusion?

19   A    My analysis (indiscernible) whole lot.  I -- you know,

20   what's, you know, we don't have any assets to recover.  We

21   can incur fees.  We had seventy-something thousand dollars

22   in the bank (indiscernible) I'm going to blow this $70,000

23   and what do we have to show for it.  Nothing.  And if we get

24   out of here there's still $50,000 in the estate.

25   Q    Now, was there at some point in time -- look at Exhibit

1   No. 25.  Do you recognize Exhibit No. 25?

2   A    Yes.

3   Q    And what is that document?

4   A    This is an email you sent me attaching a draft of the

5   motion to dismiss, the 5/23/22 draft telling me about that

6   and also telling me we're going to skip the 341 meeting.

7   Q    And was the -- what was the rationale for us moving as

8   quickly as we did to try to get these cases dismissed at

9   that point in time?

10  A    Because it's just costing money.  You know, it's

11  costing expensive professional time.

12  Q    So do you recall also that I had attended a hearing on

13  May 19th with the bankruptcy court?

14  A    Yes.

15  Q    And that I explained to the Court that we had to

16  evaluate alternatives; do you recall that?

17          MR. CHAPPLE:  (indiscernible).

18          THE COURT:  Sustained.

19  BY MR. LEE:

20  Q    Do you recall what I told the Court on May 19th

21  regarding the future of the bankruptcy case?

22  A    Yes.

23  Q    And what -- do you recall what I had told the Court?

24  A    You just said, we're looking at alternatives.  I went,

25  okay, fine.  He (indiscernible) lawyer.  I said, dismiss it.

1    Q    All right.  Now, one of the things that's been asked of

2    you or alleged against you is that you had apparently been

3    on both sides of the transaction.  Are you aware of that

4    allegation?

5    A    I'm aware of the allegation.

6    Q    Mr. Schwartz, in your job over the last 40 years in the

7    bankruptcy arena as a financial advisor, do you understand

8    the term being on both sides of a transaction?

9    A    Yes.

10   Q    Tell everyone here what that means to you.

11   A    What it means to me is quite literally wearing two

12   hats, your hats are negotiating with each other and you're -

13   - so you're really negotiating with yourself.  Or some

14   portion of it's yourself.

15   Q    So let's talk about the plan support agreement.  Before

16   the bankruptcy was filed, tell the Court what role you

17   played on behalf of InfoWar debtors with respect to the

18   negotiation of the plan support agreement, if any.  And I

19   remember you came on the scene, so tell the Court what role

20   you played in formulating that document before the petition

21   date of April 17th.

22   A    In formulating, I'm almost none -- none other than, I

23   mean, the last (indiscernible) I had to review, but the

24   substantive economics were established before I came along.

25   The concept of the trust, the concept of the trustees, the

1    concept of the (indiscernible) judges preexisted

2    (indiscernible).  I always (indiscernible) to look for

3    implications that I could (indiscernible) for the Debtors

4    that (indiscernible) may not like but -- and just generally

5    doesn't make sense to me or is there anything confusing in

6    it, but it --

7    Q    And then do you recall so far the testimony that those

8    agreements, the declaration of trust as well as the plan

9    support agreement went -- underwent revision from April 17th

10   to April 29th?  Do you recall that testimony?

11            MR. CHAPPLE:  Objection.

12            THE COURT:  Overruled.

13   BY MR. LEE:

14   A    (indiscernible) those revisions.

15   Q    What role did you play in those discussions and

16   negotiations?

17   A    None.

18   Q    And why was that?

19   A    That was because the judges had their counsel looking

20   at it and they basically went away and looked at it and

21   worked on it and worked on it and worked on it, and then all

22   of a sudden, there was the product.

23   Q    And do you recall that it was on, what, April 29th,

24   2022 as ECF 48 which got filed on the record?

25   A    Yes.

1    Q    Would it still be -- would it be fair to say that the

2    world changed for InfoW Debtors on June 3rd or 6th when the

3    plaintiffs decided to dismiss the claims against the Debtor?

4    A    June 3rd --

5    Q    Third.

6    A    (indiscernible).

7    Q    I'm sorry, May 3rd.

8    A    Yeah.  Yes.

9    Q    And tell the Court why that was.

10   A    Well, the PSA, plan support agreement, and the trust

11   were structured in order to bring the Texas and the

12   Connecticut plaintiffs into the Court for the process of

13   hopefully efficiently and fairly getting their claims

14   liquidated for an amount that they would be paid by the

15   trust.  With the plaintiffs moving to dismiss us from the

16   cases, we -- there would be no standing for us that the

17   trust, the Debtors and the trust -- the Debtors wouldn't be

18   there, so there would be no standing to (indiscernible)

19   plaintiffs' claims into the (indiscernible) offices of the

20   bankruptcy court.

21   Q    Now, before we reach the May 19th hearing date, do you

22   recall the direction that you gave me with respect to what I

23   needed to do for the InfoW Debtors' bankruptcy case as to

24   those stipulations?

25   A    Stipulations of the Texas (indiscernible), I said

1    absolutely (indiscernible).  Can't dismiss it

2    (indiscernible) out of there, (indiscernible) unless we get

3    (indiscernible) with prejudice.  I was (indiscernible) that.

4    Q    So your focus to me was to make sure those got done

5    correctly; is that accurate?

6    A    yes.

7    Q    And do you also recall that with respect to the

8    Connecticut plaintiffs, they decided to proceed by way of

9    motion, not by stipulation, correct?

10   A    Right --

11        MR. RUFF:  There was an objection, Your Honor.

12        THE COURT:  Overruled.

13        MR. RUFF:  Thank you.

14   BY MR. LEE:

15   Q    You also recall whether or not there was tension

16   between the Debtor, especially counsel for the Debtor, Mr.

17   Lee -- me -- and Mr. Ruff before May 19th with respect to

18   the speed at which we wanted to get -- both parties wanted

19   to get the --

20        MR. RUFF:  Objection, Your Honor.  Calls for

21   speculation.

22        THE COURT:  Sustained.

23        MR. LEE:  I haven't even finished my question,

24   Your Honor.

25        THE COURT:  Really obvious.

```
 1              MR. LEE:  I apologize.

 2              THE COURT:  No worries.

 3   BY MR. LEE:

 4   Q    Do you know whether or not there were -- based on

 5   reviewing the emails between me and Mr. Ruff where there was

 6   tension between the Debtors' counsel and the U.S. Trustee's

 7   counsel before May 19th as to the disposition of this case?

 8   A    Yes.

 9   Q    What was that dispute?

10   A    That -- I recall it was whether or not dismiss -- our

11   filing was legitimate should've been allowed.  I mean

12   (indiscernible) from the very beginning.

13   Q    Okay.  And do you recall where your application to

14   retain was placed insofar as being heard by the Court?

15   A    I don't think it had a date.

16   Q    Do you recall my reporting to you as to the results of

17   the hearing on May 19th, 2022 after the dismissal of the

18   Texas and the Connecticut plaintiffs?

19   A    Yes.

20   Q    And do you recall my telling you the conversations I

21   had with respect to the dismissal of the cases by the U.S.

22   Trustee and their position about the case?

23   A    I remember you discussing with me their position.  I

24   don't think at that time it had significantly changed in

25   terms of our view (indiscernible) accomplished.
```

1    Q    So going back to Exhibit No. 24 in front of you, as of

2    May 21, 2022, had you made a decision or -- had you made a

3    decision as to whether or not the InfoW Debtors' cases would

4    continue in Chapter 11 or be dismissed?

5    A    By this date, I was convinced it was not -- they were

6    not going to continue.

7    Q    And by May 23rd, 2022, when I had forwarded to you a

8    draft of the motion to dismiss Chapter 11 cases, had your

9    views in any way changed about dismissing the cases?

10   A    No.

11   Q    And so did you direct me then on May 25, 2022 to advise

12   the U.S. Trustee that the Debtors were dismissing their

13   cases?

14   A    Yeah, we talked about that, somewhere (indiscernible)

15   May 25 that I told do it.

16   Q    So as of at least May 25, was there any expectation

17   that you as a CRO or Schwartz & Associates would be retained

18   as an estate professional in the InfoW Debtors bankruptcy

19   cases?

20   A    No expectation, no.  I figured at that point, it wasn't

21   going to happen.

22   Q    And in fact, did you learn from me through the emails I

23   forwarded to you that the U.S. Trustee did not want you to

24   be retained as an estate professional?

25   A    Yes, I did.

1   Q    And that included any other professionals including

2   lawyers; is that correct?

3   A    Right.  That's what I understood.

4   Q    Would it have made business sense for you as a chief

5   restructuring officer to have spent the monies and the

6   administrative claim to fight the U.S. Trustee and get the

7   case in place in order to have our applications heard and

8   our fee applications then blessed by this Bankruptcy Court

9   in the InfoW bankruptcy case?

10  A    In my opinion, if I had done that, then I would've been

11  guilty of violating my fiduciary responsibilities.

12  Q    Mr. Schwartz, in your work since -- prior to April

13  17th, the petition date of InfoW Debtors to now, have you

14  ever worked directly for Mr. Alex Jones?

15  A    No.

16  Q    All right.  And insofar as your present duties today as

17  the chief restructuring officer or proposed chief

18  restructuring officer of FSS, tell the Court the kind of

19  interaction you had with Mr. Jones in your capacity as the

20  CRO.  How does -- how do you interact with him?

21  A    Well, it's pleasant.  We speak frequently.  He

22  sometimes will call me two or three times a day, sometimes

23  in 30 minutes.  Usually, he has problems.  He needs my

24  (indiscernible) help him resolve or he's asking permission

25  to do something.  They're cordial.  And that or I call him

1    to (indiscernible) focus on something.

2    Q    Does he get to direct what you do and how you operate

3    your business at FSS as a CRO?

4    A    No.  I operate the business and I direct the business.

5    I -- no.

6    Q    So what role, if any, does he -- is he involved in your

7    business decision making at FSS?

8    A    Well, first off, he is the leading key sales guy.

9    Nothing really gets sold of any substance but by him, so he

10   is (indiscernible) component to the business.  He also has -

11   - because of that and his tremendous understanding and

12   knowledge of the products that we sell, particularly in the

13   supplements and compounds or -- (indiscernible) say

14   compounds, the chemical products that we sell and the market

15   demand for them.  He's (indiscernible) very well and

16   (indiscernible) the suppliers to a great extent, so he's an

17   important from the standpoint of (indiscernible) important

18   as a source of information and to help me (indiscernible) we

19   should be doing on the product side.

20   Q    Now, because of these things he does, have you given

21   him any preferential treatment insofar as paying his claims

22   or treating him differently because of his role in this

23   bankruptcy case in any way?

24   A    I don't think so.

25   Q    Insofar as wages are concerned that he's entitled to,

1   has he been afforded his full wages under the cash

2   collateral order to date?

3   A    The amount has been allowed.  He's been paid.

4   Q    Is that the full amount that he's entitled to under his

5   employment contract that he was with FSS today?

6   A    It is not the amount.

7   Q    How much is it lower by?

8   A    (indiscernible) a million-three annual salary, if you

9   will, the employment agreement.  We're currently paying him

10  $20,000 a pay period so that's about $480,000 at that rate.

11  And prior to this, we paid him $10,000 or $20,000 a pay -- a

12  month -- $40,000 a month, $20,000 a month.  So he's getting

13  less than half of his -- what his agreement calls for.

14  Q    Mr. Schwartz, you've also highlighted in your

15  declaration and previous testimony some of the issues that

16  you discovered at FSS when you came on the scene.  Do you

17  remember that?

18  A    Yes.

19  Q    And can you tell the Court in a brief summary some of

20  the, I guess, problems you encountered and found and what

21  you've done about them to date?

22  A    Well, we -- the time the declaration we had

23  substantially brought the books current (indiscernible) on

24  the bookkeeping (indiscernible).  The inventory has been a

25  continuing problem, having the right inventory.  We don't

1    have a good system yet for inventory management in the sense

2    of information flow.  (indiscernible) working on that.  We -

3    - our cost of processing of credit cards was extremely high,

4    about 14, 15 percent, extremely high.  I got it down to 4

5    percent.  Negotiated that and we're currently

6    (indiscernible) to try to reduce that cost.

7         We're looking at alternative sources of inventory

8    financing which will get us more inventory (indiscernible)

9    for the Christmas holiday sales and sustain our company

10   going forward.  What have I missed?  I've hired a CRO --

11   excuse me, an operating manager and I've hired

12   (indiscernible) bookkeeper, keeping operations

13   (indiscernible) bringing someone on board in the offices at

14   FSS as an employee of FSS and in contracting with the

15   bookkeeping services.  Matter of fact, I have meetings with

16   them tomorrow.  So it's a few of the things we -- you know,

17   we're facing.  You know (indiscernible) a chapter in the

18   book but we're (indiscernible) that under control and we are

19   close to getting prepaid credit cards.  We've been in -- we

20   had a couple of (indiscernible), but I think we've got a

21   vendor now who's not afraid.

22   Q    Let's talk about the schedules that Mr. --

23   A    Yeah.

24   Q    -- asked me about and some of the omissions he alluded

25   to.  Tell the Court what is the stage of amending the

1    schedules after the Debtor submitted them last week.  Can

2    you talk -- tell the Court what is going on there?

3    A    The specific (indiscernible) and I discussed that at

4    the 341 meeting that if you noticed where there's no mention

5    of Shannon & Lee, there's Schwartz & Associates.  That's

6    like a $380,000 payment.  What happened is (indiscernible)

7    was wired to me to my trust account and then we distributed

8    it to Shannon & Lee and Kyung S. Lee PLLC and I think even

9    some to Mr. Battaglia, so I (indiscernible) that schedule

10   was -- I've got it on (indiscernible) for that page where I

11   have the tale.  (indiscernible) got what laid out there so

12   it -- but it was for prepetition fees or retainers and so

13   we're working on that.

14        I just learned Friday of a transaction that was booked

15   as other income which was actually a contribution of capital

16   by (indiscernible).  That will change the schedules with

17   that booked right.  That was done in July prepetition.

18   There are the -- there's a question of why on the payments

19   to creditors there was no (indiscernible).  That was asked

20   and that has been -- actually what happened is the

21   (indiscernible) report to July 22nd, not July 29th so we've

22   added seven more days of payments on there.

23        So it's come forward.  I'm going to go back through and

24   see, okay, what else have we got in here.  We've got at

25   least one unsecured creditor who's told me, I'm not owed

1    anything.  I owe you people money.  So --

2    Q    So would it be fair to say that you're still drinking

3    from a fire hose?

4    A    It's a smaller fire hose, but it's still a fire hose.

5    Q    And would it still be accurate to say that you are

6    constantly correcting, amending, updating data in order to

7    make them as accurate as possible and not hiding things from

8    creditors or the Court?

9    A    Yeah, we're not trying to hide anything.

10   Q    So let's go back to talking about the issue of being on

11   both sides of the transaction.  Do you recall us talking

12   about that.  Did you ever end up being on both sides of the

13   transaction after May 19th, 2022 when I left this Court and

14   told the Court we would either evaluate dismissing the case

15   or having to go back and negotiate either an amendment to

16   the PSA or a new funding agreement, did you, while you were

17   going up and sitting at FSS' office end up negotiating for

18   InfoW for more money or trying to do that?

19   A    No.

20   Q    And tell the Court why not.

21   A    Well, again, I mean, let me put it this way.  The

22   description of the situation we were in after that date, we

23   were trying to decide do we continue or do we dismiss.  At

24   that point in time, we -- I think all the professionals

25   involved -- were in that position where it would've been

1    more beneficial for us financially to keep going.

2    Q    For the professionals?

3    A    For the professionals.  So we were in that -- that

4    happens. Regularly in bankruptcy and receiverships.  You get

5    to a point where, hey, keep going or stop?  And I can make

6    more money if I keep going.  That was -- that's exactly that

7    situation.  I did not go out of turn to negotiate more money

8    for the plan sponsors.  First off, I couldn't give a -- I

9    can't come up with a reason why they should give us money.

10   And two, there is no benefit to doing it.

11   Q    Now, another criticism that's been leveled against you

12   and me is that we came here and we told the Court that we're

13   going to do our fiduciary duty.  Do you recall that

14   criticism?

15   A    I remember very strongly the judge's words on that.

16   Q    Do you recall that one of the issues that came up when

17   the plaintiffs dismissed their claims, that one of the

18   concerns that the parties had is that the Debtor, InfoW

19   Debtors, would not accept their dismissal and would try to

20   perpetuate the bankruptcy cases?  Do you recall that, sir?

21            MR. CHAPPLE:  Objection.

22            THE COURT:  Sustained.

23   BY MR. LEE:

24   Q    Do you recall one of the objectives that the plaintiffs

25   were saying that the InfoW Debtors would be trying to do

1    after the plaintiffs trying to dismiss their cases?

2    A    I recall that they didn't trust us and were trying to

3    figure out what were we up to.  That's what made it so hard

4    to get -- and actually, I thought it would be, you know,

5    what's so hard about with prejudice in a dismissal and it

6    actually became an issue.  But it was because of the

7    distrust out there.

8              MR. CHAPPLE:  Objection.

9              THE COURT:  I'll overrule.  He can --

10   BY MR. LEE:

11   Q    And so Mr. Schwartz, at the end of the day, did you

12   conclude that dismissal of the bankruptcy cases as of May

13   21, '22, when I sent you the email was in the best interest

14   of this estate?

15   A    Yes.

16             THE COURT:  Okay.  Overruled.

17   BY MR. LEE:

18   Q    During the time between May 19th through June 10th,

19   were you ever involved in discussions with any party, any

20   part, in which you took an adverse position to InfoW Debtors

21   on any topic?

22             MR. LEE:  Pass the witness, Your Honor.

23             THE COURT:  Okay.  Before we take a break, there

24   are two questions I've been -- forgot to ask you earlier

25   (indiscernible) relevant now.  What is (indiscernible)

1    prepared like a budget to actual, just comparing essentially

2    the cash collateral budgets to what has been actually spent?

3    I've only seen estimated budgets in the cash collateral.

4    I'd love to see kind of a reconciliation of budget to

5    actual.  What I mean for that -- by that, I'm just

6    (indiscernible) explaining in general if cash collateral

7    budget would budget a million dollars in potential gross

8    receipts over a period of time.  Maybe you took in a

9    million.  Maybe you took in a million-five.  Maybe you took

10   in a half a million.  Has there been any reconciliation of

11   budget to actual?

12           THE WITNESS:  What we did is every -- except for

13   today because today is Tuesday, the day it's due, we do a

14   budget to actual.  What I actually do now is -- and we've

15   done this every week -- is budget this is week seven, I

16   think.  Last week is week seven.  So we budget -- the budget

17   we had for cash collateral, the actuals, the variance, and

18   then the bankruptcy to date where you can see the whole

19   picture.

20           THE COURT:  Okay.

21           THE WITNESS:  That's done every week.

22           THE COURT:  Okay.  I was just curious.  Just -- I

23   hadn't seen it, but I know that sometimes it gets filed with

24   an MOR or --

25           THE WITNESS:  I didn't even --

1          THE COURT:  Just a question.

2          THE WITNESS:  I don't think it's getting filed.

3          THE COURT:  It may not.  Just something I, at some

4    point, I'd mention.  I'd like to see just to understand the

5    true financials.  There's something else and -- apologize.

6    And if you look at your screen, whenever it decides to load.

7    The dot, dot, dots make it look like it's -- it's your first

8    day declaration with the exhibits.  See if I can get this to

9    load up in a faster way, what I'm looking for.  Always meant

10   to ask you this question.

11         It's always when you want something to load

12   quickly.  All right.  So you recall there were the -- those

13   exhibits you filed, the comparative profit -- P&L

14   statements.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  So here's something I've always meant

17   to ask you.  So in 2021, InfoWars Health and Prison Planet

18   paid -- looks like FSS book income from InfoWars Health and

19   Prison Planet in 2021, but in -- they didn't in 2022.  Do

20   you know what the income was attributed to in 2021 for

21   InfoWars Health or Prison Planet?

22         THE WITNESS:  I may have to go back and look, Your

23   Honor.  I mean, I -- InfoWars Health is tone one who owns --

24   that monthly royalty is about $38,000 and so, and Prison

25   Planet, I --

1          THE COURT:  But InfoWars Health had paid FSS, is

2     that -- was that the correct way to book it?

3          THE WITNESS:  It'd all depend on what the -- that

4     relationship is actually controlled by Dr. David Jones and

5     sometimes they move these around.

6          THE COURT:  So in 2022, would InfoWars Health have

7     owed FSS any funds?

8          THE WITNESS:  No.  No, that funds -- my

9     understanding, those -- 2022, those funds, we were told,

10    that royalty relation actually belongs to Health, to Health.

11         THE COURT:  Got it.

12         THE WITNESS:  And that that's when I said --

13    actually the one who said no, I need that money --

14         THE COURT:  You need that money.

15         THE WITNESS:  -- right now.

16         THE COURT:  I remember.  That's why I was

17    wondering.  I know at some point, it turned and you turned

18    it around to start receiving it.

19         THE WITNESS:  Once it -- I actually don't know

20    where it is now because --

21         THE COURT:  Okay.

22         THE WITNESS:  I hadn't (indiscernible) signer on

23    the bank account for IWHealth.  Haven't found a way to

24    unravel that mess.

25         THE COURT:  Okay.

1          THE WITNESS:  And haven't seen any more money come

2     in.

3          THE COURT:  And for Prison Planet, do you know

4     what that 5,000 --

5          THE WITNESS:  No.

6          THE COURT:  Okay.  Okay.  Those are my only

7     questions.  I just been meaning to ask you.  I needed to

8     understand just the relationship.  Why don't we -- who's

9     going to ask questions on cross?  Mr. Ruff?  Mr. Chapple,

10    are you going to have any examination?  Okay.  So why don't

11    we -- it's 5:15.  Why don't we come back on in five minutes,

12    let everyone take a break and then we'll come back in five

13    minutes and we'll continue with cross.

14         CLERK:  All rise.

15         (Recess)

16         THE COURT:  We are back on the record in Free

17    Speech.  Mr. Schwartz, I remind you are still under oath and

18    Mr. Ruff, I have one more question and I'm going to take the

19    liberty.

20         MR. RUFF:  Go ahead, Your Honor.

21         THE COURT:  And it was a question that I asked Mr.

22    Lee and I wanted to -- you're the better person to ask just

23    to understand it.  I'm trying to -- again, just trying to

24    put the timing together and I put it up on the screen

25    earlier and I'm going to see if I can find it again.  Just

 1    give me a second.  This is just the docket entry.  This is

 2    what I meant to ask you.  Well, I'll take the drama out.

 3    The question had to do with the declaration that was filed

 4    by Mr. Andino Reynal saying in that -- here we go.

 5           That statement -- I just want you to look at

 6    paragraphs 5 and 6.  It says that in May of -- May 19th, FSS

 7    retained you as a CRO and that you contacted Mr. Reynal if

 8    you knew of any financial executive that was able to come

 9    and work at FSS, and that criminal defense lawyer

10    recommended Mr. Jeffrey Schultz and -- with essentially the

11    -- with his recommendation that FSS hire Mr. Schultz.  Can

12    you confirm the accuracy of statements in paragraph 5 or 6

13    is there anything that you would clarify?

14           THE WITNESS:  Well, the only thing I want --

15           THE COURT:  You didn't sign this so I'm just -- so

16    I want to be very clear about that.   You didn't sign this.

17    This is saying something about what happened in May

18    regarding -- including, as it pertains to you and I'm just

19    trying to understand what your understanding was.

20           THE WITNESS:  Well, in terms of the hiring of Jeff

21    Schultz --

22           THE COURT:  Maybe I can ask it this --

23           THE WITNESS:  There's more to the process than

24    just me recommending Schultz.

25           THE COURT:  But was it in May of 2022 that you --

1           THE WITNESS:  Oh, yeah.  I think so.  I'd have to

2    go back and look at my calendar.

3           THE COURT:  But did you -- this --

4           THE WITNESS:  No, wait a minute.  May?  I'm sorry.

5    I don't know if that's right.

6           THE COURT:  Okay.  This also -- you think it was

7    May or sometime after May?

8           THE WITNESS:  I know it was after May because I've

9    been -- my engagement letter wasn't signed until June 7th

10   (indiscernible) as of May 19th and that's where he got a

11   date, but he's wrong on the month of May because I can tell

12   you right off the bat -- I mean, we didn't do much of

13   anything until the retainer came in because under my

14   agreement, I had to get the retainer too for the engagement

15   to be effective.  So June 10th, we're working.  Now June

16   10th I'm screaming, I need somebody.  So it would have been

17   in June.

18          THE COURT:  Did you contact Mr. Reynal and ask if

19   he knew of --

20          THE WITNESS:  Yes, I asked all -- everybody.  So

21   it was kind of a blanket request.  Nobody -- and he --

22   Andino called me up and said, I got somebody but let me tell

23   you the situation.

24          THE COURT:  May I just ask a silly question.

25   You're a professional with over 40 years of experience.  Why

1    did you contact a criminal defense lawyer about someone to

2    hire as a potential accountant in a business?

3           THE WITNESS:  I actually -- just let all the

4    lawyers know -- I mean, he was, you know, just in the room

5    because he defends -- he's defending the Texas cases.

6           THE COURT:  Right.

7           THE WITNESS:  So he was there and I said, you

8    know, I'm looking for somebody.

9           THE COURT:  Oh, I understand.  Thank you for the

10   clarification, sir.  Thank you.

11                              EXAMINATION

12   BY MR. RUFF:

13   Q    Good afternoon, Mr. Schwartz.

14   A    Mr. Ruff, you have a halo around you now.

15   Q    Do I?  Don't be deceived.

16   A    Believe me, I'm not.

17   Q    Now Mr. Schwartz, you have more than 40 years of

18   experience in the restructuring business.  Correct?

19           THE COURT:  That's my line.

20           MR. RUFF:  Oh.

21           THE WITNESS:  So it must be right.

22           THE COURT:  I'm sorry.  Go ahead.

23   BY MR. RUFF:

24   Q    And during these 40-plus years, you have frequently

25   served as a chief restructuring officer or CRO.  Is that

1    correct?

2    A    Not that frequently.  That's a relatively new concept

3    to me anyway.  I mean, back then, the owner in charge --

4    Chapter 11 trustee -- only in (indiscernible) years have we

5    -- have I been doing CROs.  But I distinguish between the

6    trustee and the CRO, though -- the concept of the -- you

7    know, the trustee, I get paid less but I also have more

8    protection from the court.  CRO, I get paid more.  I still

9    have to do the same work.

10            MR. RUFF:  Can you -- Mr. Ross is going to be --

11            THE COURT:  All right.

12            MR. RUFF:  Then if you could go to Page 9.  It

13   will be Paragraph 26 (indiscernible).

14   BY MR. RUFF:

15   Q    Mr. Schwartz, would you mind reading the second

16   sentence in Paragraph 26 for me?

17   A    Yes.  He frequently serves as a chief restructuring

18   officer, as a federal and state court appointed receiver in

19   bankruptcy and non-bankruptcy and -- what happened --

20   proceedings, and that he's -- do you want me to read the

21   rest?

22   Q    No, that's all I needed you to read.  So this was your

23   application for employment and it -- in there, it

24   represented that you frequently served as a chief

25   restructuring officer.

 1   A    Wait a minute.  I think -- I says -- could you go back

 2   to that page?  Frequently serves as a chief restructuring

 3   officer, as a federal and state court appointed receiver, in

 4   bankruptcy.  So I frequently serve in those capacities, as a

 5   receiver and as a CRO and probably what I should say is --

 6   well, as an examiner also, but that's kind of gone passe.

 7   Q    Would it be accurate to say that you frequently have

 8   served as a professional in bankruptcy?

 9   A    That's accurate.

10   Q    Okay.  Very good.  And so you are familiar with the

11   need to disclose connections when seeking employment in a

12   bankruptcy case.  Is that correct?

13   A    Yes.

14   Q    Okay.  And, Mr. Schwartz, you were the chief

15   restructuring officer in the -- what I will refer to as the

16   Info W cases.  Is that correct?

17   A    Yes.

18   Q    All right.  Now in the Info W cases, there was a plan

19   support agreement and a litigation settlement trust.  Is

20   that correct?

21   A    Correct.

22   Q    All right.  Now those agreements were negotiated prior

23   to your being retained as the chief restructuring officer or

24   after?

25   A    Substantively, prior.  Like I said, the -- do you have

1    -- well -- the structure of what was being planned, i.e.,

2    the structure of the trust and the proposed trustees, the

3    litigation of the PSA, extensively had been developed.  The

4    financing had all been negotiated prior to my arrival.  That

5    was pretty well known.  I mean, if there was any question,

6    that was minor on that so there was -- the agreements

7    themselves were still being -- going through the editing

8    stages, but the -- substantially, you know, the car was

9    designed and chassis built and they were just finishing off

10   the waxing.

11   Q    Now -- and again, in the Info W cases under those

12   agreements, Alex Jones and Free Speech Systems -- FSS --

13   were the third-party funders who were going to contribute

14   funds under the litigation settlement trust to pay the

15   creditors in the Info W cases.  Is that correct?

16   A    Well, they were contributing funds to the trust and

17   they were setting aside funds for the professional costs.

18   Q    So there was no -- under those agreements, there was no

19   consideration or funds being given for the creditors of the

20   Info W debtors?

21   A    Well, I said there's funds -- there are funds being set

22   aside in the trust for the benefit of the creditors and

23   there were funds being set aside -- I think they were

24   actually held in an (indiscernible) account to pay the

25   professionals.  That money all came from -- was coming from

1    Mr. Jones and FSS.

2    Q    Is it your recollection that there was approximately or

3    maybe $10 million to be funded under those agreements?

4    A    Well, the estimation of the amount that would

5    ultimately be funded is 10 million.  There was $2 million,

6    as I recall, of cash up front.  There was another amount --

7    $40,000 -- 500,000 -- $480,000 a year for five years.  That

8    was coming from another source, and then FSS itself would

9    devote its net income to the trust as well.  (indiscernible)

10    But some of that depending on which estimate you use for

11    FSS, is 10, 12, $15 million.

12    Q    And you were the -- as the chief restructuring officer,

13    you were the party designated to represent the interest of

14    the Info W Debtors under those agreements.  Correct?

15    A    Yes.

16    Q    And that's in the negotiation of those agreements?

17    Correct?

18    A    Well, yes, once I came on board.

19    Q    Okay.  And there was testimony earlier about an amended

20    plan support agreement and a litigation settlement trust

21    being filed with the court on April 19th.  Do you recall

22    that?

23    A    Yes.

24    Q    Okay.  So the parties were in negotiation again,

25    yourself on behalf on the Info W Debtors, Alex Jones for

1   himself, FSS for itself, and the proposed trustees under the

2   litigation settlement trust.  Is that correct?

3   A    (No audible response)

4   Q    So those were -- let me rephrase.  Yeah.  So the

5   parties that were negotiating at the time were the Info W

6   Debtors, Alex Jones, Free Speech Systems, and the litigation

7   -- proposed litigation -- settlement trustees.  Is that

8   correct?

9   A    Yes.

10  Q    All right.  And more negotiations were required because

11  the trustees or the proposed trustees of the litigation

12  settlement trust had not agreed to that document yet.  Is

13  that correct?

14  A    Correct.  They had not signed off on it.

15  Q    So as of April 29th when that was filed, you were on

16  opposite sides of the table from FSS.  Is that correct?

17  A    Well, I guess that's one way to look at it.  Yeah, we

18  were -- they were negotiating -- well --

19  Q    I'll take your answer.  If yes is the answer -- yes or

20  no and you said yes.  I'll take it.

21  A    Well, I (indiscernible) opposite sides because we're

22  not fighting.  But, yes, we're not -- we're each looking for

23  our own interest or our own constituents' interest.

24  Q    Very well.  I'll take that as well too.  So you were

25  there for the interest of the Info W Debtors.  Correct?  You

1    were not there for the interest of FSS at that time.

2    A    Correct.  And then -- you say Debtors and the primary

3    responsibility is to the Debtor's creditors, obviously.  So

4    that's what I'm mostly concerned about.

5    Q    Now moving on, on April 18th, 2022, the Info W Debtors

6    filed an application to request authority to employ you as

7    their chief restructuring officer in the Info W cases.

8    Correct?

9    A    Okay.  Sorry.  I don't recall the date but --

10   Q    Does that sound correct to you?

11   A    Yes, that sounds correct.

12   Q    Now prior to the application being filed on April 18th,

13   you reviewed the application.  Correct?

14   A    Yes.

15   Q    Okay.  And you also reviewed your declaration before it

16   was filed.  Correct?

17   A    Yes.

18   Q    Okay.  Who drafted your declaration?

19   A    (indiscernible), I believe.

20   Q    Okay.  But ultimately, since the declaration was signed

21   by you -- correct -- the declaration was signed by you.

22   Correct?

23   A    Yes.

24   Q    Okay.  And do you understand that you're responsible

25   for the content within the declaration?

1  A     Yes.

2  Q     Okay.  And the declaration was signed under penalty of

3  perjury.  Correct?

4  A     That's what I remember.

5  Q     Okay.  And when you sign a document under penalty of

6  perjury, you're signed attesting to the fact that it's true

7  and accurate.  Correct?

8          MR. LEE:  Objection.  He's asking the witness for

9  a legal conclusion.

10          THE COURT:  I think he's just testifying to what

11  the words say at the bottom of the declaration.

12          MR. LEE:  As long as that's the case.

13          THE COURT:  Yeah.  I'll overrule.  To your

14  knowledge.

15          THE WITNESS:  To my -- okay.  That it's true and

16  correct?  Yes, to the best of my knowledge -- the best of my

17  knowledge, it's true and correct.

18          MR. RUFF:  Okay.

19  BY MR. RUFF:

20  Q     Do you recall who filed the employment application in

21  the Info W cases?  Which attorney?

22  A     The employment applications?

23  Q     For yourself.  Yeah, who filed that?

24  A     I believe Mr. Lee did as counsel for the Debtor --

25  Debtors.

1    Q    All right.  Prior to them filing it, they got your

2    authorization to file that application.  Is that correct?

3    A    Yes.

4    Q    Okay.  Now attached to the application, was an

5    engagement letter.  Do you recall who signed the engagement

6    on behalf on the Info W Debtors?

7    A    No, I do not.

8    Q    All right.  I think you're on the same exhibit.  It

9    will be I think Page 32.  Scroll down.  There you go.  No,

10   back down where the signatures are.  All right.  Do you

11   recall this document, Mr. Schwartz?

12   A    Yes.

13   Q    All right.  What is this document to your recollection?

14   A    This appears to be our engagement letter.

15   Q    With the Info W Debtors?  Is that correct?

16   A    Yes.

17   Q    Okay.  And do you see who signed on behalf of --

18   A    Yes.

19   Q    Who signed that?

20   A    Alex Jones.

21   Q    Okay.  Thank you.  Now on the declaration filed on the

22   Info W cases, you affirmatively stated that there was no

23   connection to Free Speech Systems, LLC.  Is that correct?

24   A    Correct.

25   Q    And on the declaration filed in the Info W cases, you

1    also affirmatively stated that there was connection to Alex

2    Jones.  Is that correct?

3    A    That's correct.

4    Q    All right.  So from April 18th, 2022, to the dismissal

5    of the Info W cases which happened on June 10th, 2022, you

6    did not provide any subsequent amendments to the

7    declaration.  Is that correct?

8    A    I don't recall doing any.  I don't think so.

9    Q    Now let's if anything changes in your declaration and a

10   new connection developed.  Do you understand that you were

11   required to supplement your declaration?

12   A    Yes.

13   Q    Okay.  But you didn't supplement it at any time, did

14   you?

15   A    I did not.

16   Q    Okay.  Now fast forwarding a little bit to May 19th,

17   2022, you sent an engagement letter to FSS outlining the

18   terms upon which you would serve as its CRO.  Is that

19   correct?

20   A    That's incorrect.

21   Q    Okay.  Can you clear that up for me?  Did you -- let me

22   back then.  Restate the question.  Did you draft an

23   engagement letter for FSS on -- for your -- excuse me --

24   strike.

25        Did you draft an engagement letter to serve as CRO of

1    FSS on May 19th, 2022?

2    A    Yes.

3    Q    Okay.  Did you send that engagement letter to anyone on

4    May 19th, 2022?

5    A    Yes.

6    Q    Who did you send it to?

7    A    Mr. Lee.

8    Q    Okay.  So you were actively seeking an engagement to

9    serve as the CRO of FSS as early as May 19th, 2022?

10   A    I wouldn't -- you know, I was -- Mr. Lee asked me to

11   put together an engagement letter but we'd not had any

12   discussions with FSS or any of its principals or any of its

13   counsel -- I had not -- about employment.  So I did

14   (indiscernible) gave him a draft of the engagement letter so

15   he could see the terms under which I would take the job on,

16   but we had not sat down with anybody and even gotten

17   background information at that point.  I can't say I'm

18   actively seeking.  I'm actively seeking information.

19   Q    So it's your testimony today that when you send out an

20   engagement letter, you're not seeking to be engaged?

21   A    Most of the time when I get asked to send an engagement

22   letter, they're asked -- they want to look at the -- look at

23   the terms of my engagement.  That's typically what happens

24   and they will call back and if you're got a problem or not.

25   So (indiscernible) anticipating an engagement but it doesn't

1    always happen.  You know, some people just like certain

2    clauses that we don't give on.  It's whatever.  And we

3    (indiscernible) ask for a draft and I sent a draft

4    engagement letter.  Yeah, I think it was draft.  And -- but

5    we had not sat down and talked with anybody about it at that

6    point in time.

7    Q    So is it your testimony then that as of May 19th, you

8    were desiring in an engagement with FSS as its chief

9    restructuring officer?

10   A    I'd say I was interested in it for certain.

11   Q    Okay.  Very good.  Now serving as the chief

12   restructuring officer of FSS, that an important role.

13   Correct?

14   A    Well, some people think so.  Some people don't.

15   Q    I'm asking you if you think it's an important role.

16   A    Well, I mean, it's a responsible role.  I mean, you

17   have to take it seriously.

18   Q    Okay.  In that role now you actually run FSS.  Correct?

19   A    Well, as much as any one person could run 50 people.

20   Q    Okay.

21   A    They still have their own -- I mean, I am the chief --

22   I (indiscernible) call it CRO because (indiscernible) chief

23   executive officers at this level so I have the

24   responsibility for everything going on but I don't do

25   everything.

```
 1   Q    So it wasn't your testimony earlier that -- let me back

 2   up.  Strike that.

 3        You testified earlier that Alex Jones doesn't control

 4   FSS now.  Correct?

 5   A    That is -- Alex -- that is correct but Alex Jones has a

 6   lot of influence over the employees there still.

 7   Q    Okay.  But it also was your testimony that you make all

 8   management decisions.  Is that correct?

 9   A    That is correct.  He comes to me.

10   Q    Okay.  So that's a pretty significant role then at FSS.

11   Is it not?

12   A    It's a lot of responsibility so, yeah, I mean --

13   Q    Okay.  And it was certainly a connection, wasn't it?

14   A    It was -- (indiscernible) it's --

15   Q    In the --

16   A    (indiscernible) it's a connection today.

17   Q    Okay.

18   A    But InfoWars is not a connection today.

19   Q    When you're -- but when you were seeking employment as

20   the chief restructuring officer and drafting any engagement

21   letter, you didn't see that as a connection at that time?

22   A    No.

23   Q    Okay.  When did you believe that there was connection?

24   A    Well, I believe we were still negotiating working with

25   the PSA and that was in force, definitely there was a
```

1    connection because they were the funding source for the --

2    one of the funding sources for the PSA, but once that PSA

3    was voided -- I mean, they've had -- (indiscernible) they

4    were an independent -- they were no longer involved.  They

5    were no longer an influential entity and (indiscernible)

6    they had no part -- no place at the table.

7    Q    Now you had a meeting in Austin on May 24th.  Is that

8    correct?

9    A    Correct.

10   Q    Okay.  And that was to discuss the FSS restructuring.

11   Is that correct?

12   A    That was to get introduced to it and they explained

13   that -- you know, they -- (indiscernible) doing

14   (indiscernible) saw a lot of them going over the proposed

15   structure of the (indiscernible) trust and the PSA and the

16   funding sources and we had some quite discussions about the

17   funding sources.

18   Q    So on May 24th, you were talking about the PSA for the

19   Info W Debtors?

20   A    I'm sorry.  May -- I apologize.  You're right.  My

21   brain just jumped back two months because I remember that

22   vividly.  Yeah, May 24th, we discussed the FSS bankruptcy

23   and some of the issues involved.

24   Q    Okay.  So as of May 24th, there was already a planned

25   FSS bankruptcy being talked about?

1    A    I wouldn't say it was a plan.  There was a -- the

2    possibility of a bankruptcy was being talked about.

3    Q    Okay.  And you were seeking to serve as or being

4    considered as the chief restructuring officer of FSS in that

5    plan.  Is that correct?

6    A    I believe I was being interviewed for it, yes.

7    Q    Okay.  And you didn't think that that was an important

8    connection?

9    A    As it goes to InfoWars, no, I did not, again, because

10   FSS was no longer in the InfoWars bankruptcy.  They were

11   gone.

12   Q    Was FSS jointly liable for all of the Info W Debtor's

13   debts?

14   A    No.  They'd all been dismissed from our standpoint.

15   Q    What about the remaining debts?

16   A    Oh, the other three?  I was actually -- yes, that's one

17   of the considerations we had was why should we spend money

18   here.  I mean, they got all the money and they're the ones -

19   - they are jointly liable for that.

20   Q    Now the U.S. Trustee filed a motion to dismiss the Info

21   W cases on April 29th.  Correct?

22   A    I believe that's correct.

23   Q    All right.  And the motion was set to be heard on May

24   27th.  Correct?

25   A    Correct.

1   Q    All right.  And on May 18th, the Info W Debtors filed a

2   motion seeking to continue the hearing to June 24th.  Is

3   that correct?

4   A    Correct.

5   Q    Did you authorize the filing of that motion to continue

6   the hearings?

7   A    Yeah.  I'm -- I never actually said I authorize you to

8   do this (indiscernible) but I was aware of it.  You know, we

9   were talking about it.

10  Q    He made you aware that he wanted to file the motion and

11  you didn't object to it.  Is that accurate?

12  A    Correct.  That's fine.

13  Q    All right.

14  A    (indiscernible) but I understand that.

15  Q    I'm sorry.  You wanted --

16  A    I wanted it sooner but I could understand the need to

17  (indiscernible) more time than June 10th.

18  Q    What did you think might need more be happen sooner?

19  A    Well, my hope you could do is get an agreement on

20  getting the bankruptcy dismissed.

21  Q    All right.  And then the hearing on the motion to

22  continue the dates was on May 19th, 2022.  Correct?

23  A    That was busy day so I'm going to have to accept your

24  word for the 19th.  I just --

25  Q    Well, the motion was filed on the 18th.  Correct?

 1   A     The motion for the continuance?

 2   Q     Yes.

 3   A     I'm sorry.  Yes.

 4   Q     And then the hearing for the continuance was on the

 5   19th.  Correct?

 6   A     Right.

 7   Q     Okay.  And the motion was never withdrawn at any point.

 8   Correct?

 9   A     The motion to --

10   Q     Continue.

11   A     -- continue?  I don't recall one way or the other.

12   Q     So there was not any sort of final decision to dismiss

13   the Info W cases as of May 19th then.  Correct?

14   A     Well, it was dependent on being able to work out with

15   you a mutual -- mutually agreed way of doing it.  So the --

16   Q     All right.

17         MR. RUFF:  I'm going to object as nonresponsive,

18   Your Honor.  I asked him if there was a decision to --

19         THE COURT:  I'm going to overrule.  He can answer

20   the question.

21         THE WITNESS:  Oh, (indiscernible) I definitely

22   knew in my mind I wanted to withdraw.  But (indiscernible) I

23   think I said earlier, once the Texas and Connecticut

24   Defendants released us with -- dismissed us with prejudice,

25   I mean, I knew at that moment, we're going to have to

1    terminate this bankruptcy and that's what we ended up with.

2    BY MR. RUFF:

3    Q    So if you knew you wanted to terminate the bankruptcy

4    right away, why were the Info W Debtors seeking to continue

5    to push it out until June 24th?

6    A    Because Mr. Lee was working on how he was going to get

7    this accomplished.  Plus we had to make sure everything was

8    finalized with the Texas and Connecticut matters in terms of

9    the state courts and, you know, what they had to do on the

10   dismissals.  I believe that was -- we were having to wait

11   for some of that time and then we had to allow time to work

12   -- negotiate with the U.S. Trustee's Office.

13   Q    And now Mr. Lee had sent an email to you on May 21st

14   that he was going over with you earlier recommending the

15   dismissal of the bankruptcy cases.  Correct?

16   A    Right.

17   Q    Okay.  Had he made a recommendation to dismiss the

18   bankruptcy cases before that?

19   A    I can't he made a recommendation.  We had discussed it.

20   I think he wanted to, you know, sit down and go logically

21   through it and make sure he wasn't -- we were covering all

22   the bases.

23   Q    And you let him know on May 23rd, yes, go forward.

24   Let's get these things dismissed.  Is that correct?

25   A    Yes.

1    Q    All right.  But that was all after May 19th.  Correct?

2    Nothing before that?

3    A    I mean, I can't say we didn't have discussions before

4    that.  I don't think he was yet committed to the -- you

5    know, to do it.  He hadn't gone through his legal analysis

6    and I looked at it from a practical business standpoint and

7    says, you know, there's no point in us being here.

8    Q    Okay.

9    A    But I -- you know, he represents the Debtors and he's

10   got to go through the legal process and tell me how we're

11   going to get it done and make sure we can -- everything is

12   taken care of.  So the final decision to pull the trigger

13   was May 23rd but that -- I had no doubt where we were going.

14   Q    Do you recall having a phone call with Mr. Battaglia on

15   May 17th?

16   A    On May 17th?  You going to have to help me out.  I

17   don't remember it.

18        MR. RUFF:  Pull up 155-13.  Can you go to Page 8,

19        please?  All right.  Can you blow up to 33

20        (indiscernible)?

21   BY MR. RUFF:

22   Q    Do you recognize this document, Mr. Schwartz?

23   A    It looks a copy of our time records.

24   Q    Okay.  Do you see that time entry there right where the

25   cursor is blinking?

1    A    I do.

2    Q    Can you read that for me?

3    A    It says call with R. Battaglia.

4    Q    Who is the R. Battaglia that's being referred to in

5    that time entry?

6    A    That's Ray Battaglia.

7    Q    Okay.  Do you recall what that call was about?

8    A    No, I do not and that's -- what's the date on that one?

9    May 17th?  No, I don't recall.

10    Q    Okay.  But Mr. Battaglia was representing Free Speech

11    Systems at that time.  Correct?

12    A    Right.

13    Q    Was that your understanding?

14    A    Yes.  He did represent Free Speech Systems.

15    Q    Okay.  But you have no recollection of what that call

16    is?

17    A    No.  I mean, access document -- (indiscernible) wait a

18    minute.  It may have been about access.  I don't know but

19    that's just because the entry above it's about access --

20    (indiscernible).  Working on the bank accounts.  No, I don't

21    know.

22    Q    So moving on, on May 25th, you had directed Mr. Lee is

23    prepare a motion to dismiss the Info W cases.  Is that

24    correct?

25    A    I directed him to get them dismissed so I guess that

1    means I directed him to get a motion or to work out with you

2    a motion.

3    Q    Okay.  But before that time, you -- there had been

4    discussions about a possible dismissal but no direction from

5    you to get the cases dismissed.  Is that correct?

6    A    Right.

7    Q    Okay.  Now ultimately, the United Stated Trustee and

8    the Info W Debtors stipulated to a dismissal of the Info W

9    cases on June 1st.  Correct?

10   A    Correct.

11   Q    All right.  But the cases were not dismissed until June

12   10th after the court held a hearing.  Correct?

13   A    Correct.

14   Q    All right.  At no time prior to the cases being

15   dismissed did you file a supplemental declaration.  Correct?

16   A    Correct.

17   Q    And at no time prior to the dismissal did you have your

18   employment application withdrawn.  Correct?

19   A    Correct.

20   Q    So you were still serving as the chief restructuring

21   officer of the Info W Debtors when their cases were

22   dismissed.  Correct?

23   A    Correct.

24   Q    But at no time prior to the Info W cases being

25   dismissed did you disclose to the Court or to the United

1    States Trustee your connection with Free Speech Systems as

2    its chief restructuring officer.   Correct?

3    A    That's is correct.  I didn't consider them an

4    interested party.

5    Q    So you didn't think that a co-liable debtor was a party

6    and interest to the Info W Debtors?

7    A    Co-viable?

8    Q    Co-liable.

9    A    Co-liable.  Okay.  I'm sorry.  It sounded like co-

10   viable.  No, I didn't.

11   Q    Is that usually your judgment that parties who are

12   jointly liable for a debt are not parties and interest?

13   A    I can't see -- I'd have to think about that.  I'm not

14   sure I agree with that.  I think it depends on a lot of

15   things but FSS was out of the picture as far as I was

16   concerned and they had no interest in InfoWars.  InfoWars

17   didn't have any interest in them.  I'm not sure if it's

18   called liable in this makes it necessarily an interested

19   party or not.

20        MR. RUFF:  I have no further questions

21   (indiscernible).

22        THE COURT:  Okay.  Mr. Lee, do you have any

23   redirect?

24        MR. LEE:  Two questions.

25        THE COURT:  Okay.

```
 1                    REDIRECT EXAMINATION

 2   BY MR. LEE:

 3   Q    Mr. Schwartz, between the period of May 19th through

 4   June 10th, '22, was there ever a matter of where you acted

 5   adversely to the interest of Info W Debtor?

 6   A    No.

 7   Q    Between the period of May 19th through June 10th, '22,

 8   was there ever a matter that involved a dispute between FSS

 9   and Info W Debtors on which you had to act?

10   A    No.

11   Q    Let's talk about the remaining creditors that we talked

12   about and the joint liability.  Do you recall whether or not

13   we discussed the remaining claimants before we went on

14   embarking on a new project?  Do you recall --

15   A    Yes.

16   Q    Okay.

17   A    We talked about that in the process of deciding whether

18   or not to terminate the bankruptcy.

19   Q    And tell the Court what you -- what we discussed.

20   A    Well, I remember that we discussed, one, it could be

21   better handled outside; two, because FSS is the -- and Mr.

22   Jones are the -- essentially, they're the big pocketbooks.

23   We had -- at that time, we had $70,000 for three companies.

24   That was it -- all the money.  So, you know, there was not

25   much -- you know, it was going to get resolved but it had to
```

1    -- let them resolve when they resolve -- let them -- handled

2    it and then in that process, resolve those claims on

3    InfoWars -- the InfoWar Debtors.

4    Q    And tell the Court and the creditors here whether any

5    of the actions you took in the Info W Debtors cases while

6    you were acting and consulting with FSS starting on May 24th

7    -- did it adversely affect anything you did in the Info W

8    Debtors' bankruptcy cases?

9    A    No.

10            MR. LEE:  Pass the witness, Your Honor.

11            THE COURT:  Okay.  Any re-cross?  Okay.  Thank you

12    very much, sir.

13            THE WITNESS:  Thank you.

14            THE COURT:  Okay.  Mr. Shannon, any other

15    witnesses?

16            MR. SHANNON:  No other witnesses for us, Your

17    Honor.

18            THE COURT:  Okay.  Can I consider, I should say,

19    the evidence on your side completed?

20            MR. SHANNON:  Yes.

21            THE COURT:  Okay.  Turning now to the other side,

22    does anyone present any witness or any --

23            MR. RUFF:  No, Your Honor.

24            THE COURT:  Okay.  Mr. (indiscernible)?  Okay.

25    Okay.  What do you wish to tell me, sir?  Why don't we give

1    you -- everyone a brief opportunity to present any closing

2    statements and then give me a few minutes and I'll rule.

3              MR. SHANNON:  And I will keep it very brief, Your

4    Honor.

5              THE COURT:  I want you to take your time.  Don't -

6    - we'll go until we're done.

7              MR. SHANNON:  Your Honor, as we said in the

8    beginning, there is no dispute about these bankruptcy cases

9    -- this bankruptcy case -- the FSS bankruptcy case.  There's

10   no dispute that the applicants that this Debtor wants to

11   employ are disinterested, that they do not hold or represent

12   any interest adverse to this Debtors' bankruptcy estate.

13   There's no dispute there.

14              Again, the issue that the U.S. Trustee has brought

15   up and the only issue that the evidence has brought up is

16   this potential failure to supplement 2014 disclosures in the

17   Info W bankruptcy case.  And maybe the U.S. Trustee's

18   (indiscernible) agrees then it's not something that I knew

19   before.  Maybe it's -- maybe the U.S. Trustee is right, that

20   even though the agreement to dismiss the case has been

21   reached, you know what, Mr. Lee and Mr. Schwartz should have

22   supplemented their disclosures.

23              And if that's the case, though, Your Honor, it's

24   still not a good reason to decapitate this Debtor in this

25   case and basically shut FSS down, and there's been no

 1   argument that denial of these applications to employ will

 2   benefit the estate, and the case law says that's what

 3   important.  There's been no argument or no evidence that

 4   denial of these applications to employ will further

 5   administration of these bankruptcies -- of this bankruptcy.

 6   It simply wouldn't -- removing, you know, more than half of

 7   the Debtors' attorneys -- it wouldn't help.

 8          Now again, Your Honor, if there was a failure to

 9   supplement the disclosures, I believe the Debtor has

10   submitted a reasonable alternative to what the sanctions

11   should be and that sanction should not be to deny the

12   application to employ.  You know what, if Mr. Lee made a

13   mistake, it's that he should have waited to dismiss the case

14   -- dismiss the Info W Debtors' cases before representing

15   FSS.  I'm sure if he went back that's what he would do.  And

16   the alternative that the Debtors suggest is disallow Shannon

17   & Lee, LLP's fees in that amount -- $24,409, and that would

18   basically put everybody in the situation that the U.S.

19   Trustee says people should have been in.  That actually puts

20   the Debtor in a better position, right, because they got --

21   they would have gotten free legal services.  That is -- the

22   Debtor's fine with that.  I believe that Shannon & Lee, LLP,

23   will continue to represent the Debtor if that's the Court's

24   ruling.

25          But there is no case law that mandates that

1    outcome.  It's not supported by the evidence which all the

2    evidence has -- all the evidence you've heard is that Mr.

3    Lee and Mr. Schwartz tried to do their fiduciary duties to

4    the Info W Debtors.  They've been trying to do their

5    fiduciary duties to this Debtor.  They've stood up to some

6    pressure from these parties that are supposedly or

7    potentially -- you know, that there potentially could be,

8    you know, insiders that I guess is what the U.S. Trustee is

9    worried about.  That's all the evidence that's been in front

10   of this Court.

11          So with that, Your Honor, unless you have any

12   questions from me, that's my presentation.

13          THE COURT:  I just have one.  So nobody's actually

14   talked about the fifth circuit standards for retention.

15   There's been responses to -- (indiscernible) gone back and

16   forth which was the problem with the pleadings and no one

17   ever talked about, right, what it means to hold an adverse

18   interest to the debtor or to the estate.

19          When you look at West Delta Oil, right, fifth

20   circuit said -- you look -- a professional possesses or

21   asserts any economic interest that would tend to lessen the

22   value of the estate or that would create an actual potential

23   dispute in which the estate in a rival claim (indiscernible)

24   to possess a predisposition under circumstances that render

25   such a bias against the estate.  That was a Utah case that

1    the fifth circuit was looking on and said, look, that's a

2    good definition.  You got to look at it with the eyes and

3    attention to circumstances which may impair a professional's

4    ability to offer impartial disinterested advice to his or

5    her client, right.  That's what it means to have an adverse

6    interest.

7         And you look at cases like West Delta Oil and

8    Waldron versus Adams and Reese case and that case says --

9    I'm going to ask the United States Trustee the same

10   question.  It says attorneys engaged in the conduct of a

11   bankruptcy case should be free of the slightest personal

12   interest which might be reflected in their decisions

13   concerning the matters of the debtors (indiscernible) which

14   might impair the high degree of impartiality or detached

15   judgment expected of them.

16        I got it that you're saying no one should look to

17   the last case.  What's your answer to what the fifth circuit

18   requires me to look at?

19        MR. SHANNON:  Well, I would say, look, the

20   question is about Mr. Schwartz and Shannon & Lee, LLP, and

21   whether they have either an economic interest or some

22   interest that is adverse to this bankruptcy.  That's not the

23   case, Your Honor, and I believe that everything -- all the

24   evidence is support of that.  I believe that was clear based

25   on the application and there has -- none of the parties have

1    disputed that.

2         THE COURT:  Do you think Shannon & Lee, Mr.

3    Schwartz -- let's just get the real question, right.  Do you

4    think Shannon & Lee or Mr. Schwartz can render solid advice

5    or impartial advice to FSS if it meant taking an action

6    against an insider?

7         MR. SHANNON:  Your Honor, absolutely and I can

8    tell you that both Mr. Lee and I have taken that position.

9         THE COURT:  I didn't hear one today.  Which one

10   did you take?  The one that Mr. -- when he testified to that

11   was me.  Which one did you take?

12        MR. SHANNON:  Oh, that Mr. -- Mr. Jones -- Alex

13   Jones --

14        THE COURT:  Again, I -- this case is -- what

15   complicates this case is that there are well known people

16   involved in it.  I just want you to take all that out.  Just

17   --

18        MR. SHANNON:  No, I understand --

19        THE COURT:  -- and the facts that you have today -

20   - can a professional who is engaged in the -- all the

21   evidence that the United States Trustee has (indiscernible)

22   setting aside and let's just call it company A, owner A --

23   could Shannon & Lee provide -- give the Court comfort that

24   Shannon & Lee or Mr. Schwartz can provide impartial advice

25   to the estate based on what we've heard today, right?  And I

1    know -- just let me finish -- I know that you're saying that

2    I should just look at the last case as nothing, but, right,

3    I was here.  So what do I -- in considering the cases that

4    I'm thinking about, how do you then -- what weight or what

5    consideration should I give to what happened in the last

6    case as I consider whether you can render impartial -- fair

7    and impartial advice to the estate in this case?

8              MR. SHANNON:  Your Honor, I would actually point

9    out the track record, right.  I mean, it did not benefit

10   Alex Jones or FSS to not fight the Texas Plaintiffs or the

11   Connecticut Plaintiffs getting rid of their claims in the

12   Info W cases.  That was -- did not help those parties.  The

13   Info W Debtors said, that's not what -- and Mr. Schwartz

14   obviously was the one making this decision ultimately -- you

15   know, the decision that was made was how does it benefit

16   this estate and these Debtors.  That was the focus in those

17   cases.  It was not what benefits the owner.  It's not what

18   benefits the related parties.

19              I believe in this case, there was, you know, some

20   requests to do things that the Debtor didn't believe were

21   the best interest of the Debtor's estate.  Mr. Schwartz as

22   the CRO, you know, Shannon & Lee, LLP representing the

23   Debtor, obviously Mr. Battaglia as well, said those things

24   do not benefit the estate and that's what Mr. Lee testified

25   to about extending the automatic stay to Alex Jones.  He

1    said, no, we're not going to do that.  So I would actually

2    look at the track record in this case and the last case to

3    give the Court that comfort.

4         THE COURT:  What evidence can you point me to in

5    the record?  That's what today's about, right?

6         MR. SHANNON:  Well, Mr. Lee's testimony that he --

7    you know, that the Debtor here, FSS, denied or pushed back

8    on that request from Alex Jones.

9         THE COURT:  Thank you.

10        MR. SHANNON:  So that's in the record.  I also

11   believe that Mr. Lee's email on May 21st, right -- it really

12   points out what was considered in that decision.  It was not

13   any pressure from FSS, and again, frankly, I believe that

14   the -- you know, the dismissal or the not putting up any

15   opposition to the dismissal by the Texas Plaintiffs and the

16   Connecticut Plaintiffs in the Info W cases -- that was not

17   for the benefit of anyone else other than those Debtors.

18   And so that's the evidence I think the Court should consider

19   on that issue.

20        THE COURT:  What about Mr. Schwartz?  What about -

21   - I think -- I understand your position with Shannon & Lee.

22   What about Mr. Schwartz?

23        MR. SHANNON:  Well, Mr. Schwartz was the ultimate

24   decision maker.

25        THE COURT:  Well, I thought he was taking

1    direction from the initial trustee.

2         MR. SHANNON:  The initial trustee gave no

3    direction at all in that first case.  If you remember, that

4    was the emergency behind getting the former judges appointed

5    because the initial trustee had no role in that case.  The

6    initial trustee, frankly, is someone who is very close to

7    Mr. Jones.

8         THE COURT:  The conflict that I'm having in my

9    mind -- and again, I don't like it when judges don't share

10   their thoughts -- so Mr. Schwartz testified that, you know,

11   the owner has no authority on decisions as it related to the

12   bankruptcy case.  It certainly has influence and there's no

13   denying that, right, and it's an important consideration.

14   Who's putting in the cash collateral budget to pay for an

15   $80,000 travel expense where the (indiscernible) pays for

16   everything, right?  Like who's putting that in?  That's Mr.

17   Schwartz making that decision?  Is that -- that's Mr.

18   Schwartz saying, pay 100 percent of the legal expenses in

19   the Connecticut litigation?  That's Mr. Schwartz saying,

20   let's go 40/60 on an appeal on a case in which you're going

21   to get ready to file plan?  That's Mr. Schwartz saying, pay

22   PQPR, you know, $750,000 in the first -- that's Mr.

23   Schwartz?

24        MR. SHANNON:  It is ultimately Mr. Schwartz,

25   Judge, but I will say this.

 1           THE COURT:  Maybe it is.

 2           MR. SHANNON:  There are arms length negotiations

 3     in that --

 4           THE COURT:  That's what I'm saying, but who's the

 5     (indiscernible) let's put in an $80,000 travel expense or

 6     let's go 60 -- let's go 100 -- we'll pay 100 percent of the

 7     state court litigation that's already started in

 8     Connecticut?  Who's making that decision?  That's what --

 9     where's the arms length there?

10           MR. SHANNON:  The demand would be by Mr. Jones and

11     really through Mr. Jones's counsel, saying, this is what we

12     need to do.  Otherwise, it's not worth Mr. Jones, you know,

13     continuing on in this company.

14           THE COURT:  Do you see the tension with this case

15     and as it relates to -- this case is interesting because

16     there's active litigation --

17           THE COURT:  And, Your Honor, the one thing I will

18     say --

19           THE COURT:  -- right, the Debtor and owners are

20     co-Defendants in litigation and so that's what makes this

21     tricky aside from the issue and it involves tortes.

22           MR. SHANNON:  The one thing I'll say, Your Honor,

23     is that if the CRO -- the application employed the CRO is

24     not done then who is making the entire decision.  There is

25     no other party to --

```
 1              THE COURT:  I'm asking, who's making the decision

 2    now?

 3              MR. SHANNON:  It's Mr. Schwartz.

 4              THE COURT:  Okay.

 5              MR. SHANNON:  And that's why you have the first

 6    day of this hearing Mr. Lee did not remember.  I can ask the

 7    Court to take judicial notice.  I was the one there.

 8              THE COURT:  Oh, I know why you asked the question.

 9              MR. SHANNON:  That's why we agreed ultimately to

10    extend or to allow a relief from the automatic stay for the

11    Connecticut Plaintiffs to go forward.  That's no something

12    Mr. Jones wanted.  That's something that the Debtor believed

13    was in the best interest of this estate and that Mr.

14    Schwartz believed was in the best interest of this estate.

15              THE COURT:  Okay.

16              MR. SHANNON:  And so I think that's the evidence,

17    Your Honor, that it -- if Mr. Jones or if this Debtor was

18    acting strictly for the benefit of Mr. Jones, those things

19    wouldn't have happened, right.  And sure, there are -- there

20    is some give and take there, right, and he is the most

21    important person (indiscernible).

22              THE COURT:  No question.

23              MR. SHANNON:  But there is --

24              THE COURT:  That's not surprising in companies,

25    right.  That's not surprising especially in the nature of
```

1    the business in which the Debtor's involved in.  That's not

2    surprising.  So I don't want anyone to think that it's rare.

3            MR. SHANNON:  So, Your Honor, that's the answer I

4    have to your question.

5            THE COURT:  Thank you very much.

6            MR. SHANNON:  Thank you, Your Honor.

7            THE COURT:  Okay.  Mr. Battaglia.  Yes, sir.

8            MR. BATTAGLIA:  Thank you, Your Honor.  Ray

9    Battaglia for Free Speech Systems.

10           A lot of what I heard today relates to what the

11   standard I know the Court holds attorneys to in terms of

12   their disclosures, in terms of the accuracy of what they put

13   in front of this Court, and I wish Mr. Lee had done a little

14   better on some of the dates and some of the other things.  I

15   understand the ambiguity over whether or not there was a

16   conflict based on the context of what was going on in the IW

17   case at that particular time.

18           It was clear well before you signed the

19   stipulation dismissing the case or the order dismissing the

20   case that this case was going to be dismissed.  There was

21   nobody propping up the case, not the Debtor, not my client

22   FSS, not Mr. Jones, not the Connecticut Plaintiffs, not the

23   U.S. Trustee's Office.  Everybody wanted the case dismissed

24   and well before you signed that order and well before May

25   19th if that's the key date, it was pretty clear that this

1    case was going to be dismissed.  The structure of how it was

2    be accomplished, what the literal language of an order or

3    stipulation would say, had some things to be worked out, but

4    there really wasn't any question that this case was -- that

5    that case -- the IW case -- was filed for the purpose of

6    trying to create a vehicle to settle litigation claims.

7          Once those litigants dismissed their claims with

8    prejudice -- claim that by the way they had held dearly,

9    steadfastly for four years against those Debtors -- they

10    just dismissed them literally overnight.  And so the purpose

11    of that case was gone, the purpose of the PSA, the purpose

12    of the litigation and trust -- all of those things were

13    gone, and so can someone hold up a candle and say, well,

14    there should have been a disclosure the first time you had a

15    conversation with me or a meeting in Austin on the 24th of

16    May.  Perhaps.  But at that point, FSS had gone from an

17    active participant to almost a stranger to the case, and so

18    -- I'm a firm believer that better to ask permission than

19    beg forgiveness and I think what you're hearing is some

20    begging of forgiveness today that it could have been done

21    better and cleaner, and I guess I could lay claim to

22    perfection.

23          I can't.  I screw up.  It happens.  I've been

24    doing this for 39 years.  I guarantee you I see pleadings

25    that I use as a template for the next case and go, oh, my

1    God, I can't believe I didn't catch that.  It happens every

2    day.  We're human.  But I think the real issue for the Court

3    is, what does that mean in terms of these parties' ability

4    to act on behalf of FSS and its creditors, and I don't think

5    it affects their abilities at all.  And as Mr. Lee

6    testified, there have been occasions where I assure you the

7    principles of the Debtor are not in league with FSS --

8    filing the immediate motion to lift the stay to allow Texas

9    case to go forward.  You could probably assume Mr. Jones

10   didn't like the idea of having to continue in that trial.

11   Filing the motion to lift the stay to allow the Connecticut

12   litigation to go forward and not proceed with other remedies

13   that are recognized by this Court and other courts about

14   injunctive relief and extension of the automatic stay.  Even

15   the removal that was done of the Connecticut litigation was

16   done with great hesitance and reluctance on our part but

17   only because it was unclear what the Connecticut court had

18   done, vis-à-vis FSS.  Not Alex Jones -- FSS.

19          So there have been numerous occasions where I

20   assure the Court that Mr. Jones and Mr. Jordan have had some

21   very terse conversations with us about what he thinks we

22   ought to be doing and we haven't done it.  And Mr. Lee and -

23   - I'll tell you, Mr. Shannon has had some terse

24   conversations with me on those topics as well.  So there's

25   no pushovers here.  There's nobody's doing Mr. Jones's

1    bidding other than his lawyers who represent him, and I

2    appreciate that the Court is concerned about the fee issues

3    on the litigation and I accept that.  I understand it.

4         I think that the thing that the Court doesn't get

5    to hear is what's Mr. Jones's ability to pay.  What happens

6    if he can't pay?  What happens if his state court lawyer

7    who's set for trial and we want to negotiate to lift the

8    automatic stay say, I won't go forward.  How do we deal with

9    that?  We're liable for that claim.  FSS is liable for that

10   claim.  We've agreed to produce Mr. Jones and through

11   negotiations that were extensive about who would show up at

12   trial.  The idea of making sure he shows up and -- you know,

13   that's a cost.  I told you it came in late in the day.  With

14   more time would we have rethought it and done better?

15   Perhaps.  Perhaps not.  It's just -- it's important that he

16   be there.  I'm important to me that he be there.  It's

17   important to him as well, but it's important to me and on

18   behalf of FSS.

19        So I hear the issues and I don't want to say

20   they're gotchas because they're not.  I mean, things should

21   have been done better in the IW cases.  There should have

22   been perhaps some more disclosure.  There should have been

23   some dates that were fixed.  I assure you I wouldn't have

24   contacted anybody had I thought there was a conflict of

25   interest coming into this case.  But the idea that I would

1    contact people who had familiarity with the issues involved

2    in the case, it can't be foreign to the Court.  I mean, it

3    makes complete sense and as I said, if you were to decide

4    that these parties can't be retained, I don't know where to

5    go.

6              I came into this as co-counsel.  I've been a solo

7    practitioner now for seven years.  I'm not with a big firm

8    anymore.  I can't -- and I'm hitting my later years of

9    hopefully practicing law, I can't run this hard anymore.  I

10   can't -- I couldn't possibly handle this case without co-

11   counsel and I don't know who out there would even consider

12   for a moment jumping in if it wasn't Shannon & Lee.  So when

13   Mr. Shannon says decapitate the Debtor, that's exactly what

14   would happen here and that clearly wouldn't be in anybody's

15   best interest, particularly as we're negotiating hopefully a

16   plan to proceed.

17             You know, we've made significant advances in

18   fixing this Debtor to the point where it can contribute net

19   cash (indiscernible).  The goal here is, as I said in the

20   very first hearing in front of you, I understand what this

21   bankruptcy code is about is paying creditors and that's all

22   I'm about.  It's my job to maximize the value of this estate

23   to pay creditors who are owed legitimate claims and that's

24   what I intend to do, but it isn't going to happen without

25   the help of a CRO and one who knows the business and without

1    assistance of effective co-counsel.

2         I can't do it myself.  I'm not -- when I told you

3    earlier that I had applied to be co-counsel, the point I was

4    driving home is, I don't know what --

5         THE COURT:  Right.

6         MR. BATTAGLIA:  -- your ruling to day will do to

7    me because I couldn't conceivably professionally stay in

8    this case and say, I can deliver the results that I'm

9    required to deliver to a client in zealous representation.

10   So that's really what I meant and I'll be happy to answer

11   any questions.

12        THE COURT:  Thank you for your time.

13        MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to make some comments to Mr.

15   Battaglia's statement.  He has a very grasp on disclosure.

16   He understands what needs to be disclosed and I think

17   partially that's why one of the reasons his application is

18   not being objected to, but what you heard on evidence today

19   -- you heard both Mr. Schwartz and you heard Mr. Lee -- they

20   sat up there and they said, you know, as of May 24th, they

21   didn't think there was a need for disclosure on May 24th.

22        Your Honor, that -- the case law in rule 2014,

23   that is not a decision for them to make.  2014 is about

24   laying all of your connections out on the table for the

25   Court and the parties to examine.

1          THE COURT:  Why should it carry -- why should that

2     carry into this case?

3          MR. NGUYEN:  Your Honor, because this is the very

4     connection that was concealed from you.  Your Honor, it's so

5     important.  I mean, we have the technical requirements of

6     327.  I agree with you.  The fifth circuit in Delta Oil

7     explains it well.  But then there's another piece to this,

8     and that piece is the disclosure piece.  And disclosure in

9     the bankruptcy system is -- it's self-policed.  It's self-

10    policed by these professionals.

11         Like I said earlier, it's about the fox guarding

12    the henhouse, right.  So when you have a disclosure

13    violation, the Court should respond strongly because, you

14    know, that is what motivates other professionals to fully

15    disclose all of their connections.  Consequences for non-

16    disclosures are often harsh.  Sometimes people get

17    disqualified.  Sometimes people get full disgorgement of

18    their fees.  These are harsh remedies.  I understand.  But

19    they are required remedies to protect the integrity of the

20    bankruptcy system.

21         And, Your Honor, there was -- there is always --

22    since the beginning of this case, there was always a cloud

23    and I think Mr. Schwartz recognized it when he put in his

24    declaration.  There was always a question of loyalty here --

25    loyalty to Alex Jones or FSS.  That question has always been

1    a big issue in this case, and, you know, I go back to the --

2    I guess the August 3rd hearing when we found out that there

3    was American Express payment on the cash collateral budget

4    that was going to pay Alex Jones's housekeeper.  I think

5    that was the testimony at the time.

6            Who made that decision?  But Mr. Schwartz was the

7    one sitting up there testifying about the American Express.

8    Your Honor brings a good point about the 50/50 split for Mr.

9    Reynal and Mr. Pattis.  You know, I had many conversations

10   with Mr. Lee over that weekend and it's like, I don't -- Mr.

11   Lee was fighting for 40/60 for both of the applications.

12   And I said, Mr. Lee, like why are we giving Mr. Jones a

13   discount because one was 40/60 the other was 50/50.  It was

14   an argument of, hey, you should do 40/60 for this -- you

15   know, for this one as well.

16           And I was asking Mr. Lee, why are we shooting

17   ourselves in the foot.  I want the state to have a fair deal,

18   but why are you arguing for 40/60 to give Mr. Jones an extra

19   10 percent discount.  So we ultimately ended up on the

20   50/50.  And then there was another counsel that was filed --

21   I think the appellate counsel in the Texas litigation -- and

22   I had the same objections there.  They did 40/60.  I don't

23   understand why 40/60.  They should be 50/50.

24           THE COURT:  That will get reconsidered after

25   today, after reading (indiscernible) but --

1        MR. NGUYEN:  It needs to be 50/50, Your Honor.  So

2   on top of all of these concerns about potential bias, you

3   have the non-disclosure that happened in the prior case.

4   Remember, all of these parties were hired by Alex Jones.

5   Look at the engagement letter.  Alex Jones drew out --

6        THE COURT:  But that's typical in a small case,

7   all right.  I mean, it's not small in number but in terms of

8   small business where, you know, the owner hires everybody.

9   That's not surprising in a sub-Chapter 5 case.  So I'm --

10        MR. NGUYEN:  I agree, Your Honor, but think about

11   -- and like I said at the beginning of the opening, the

12   Court is a witness to everything that's gone on here.  We're

13   not talking about something that happened before a different

14   judge in a different case.  You were here throughout the

15   entire thing.  Statements were made to you, declarations

16   were filed.  Candor was important in the prior case.  Candor

17   is important in the case, and as Your Honor was going

18   through some of the exhibits, you know, there's an issue --

19   there's -- there are statements in Mr. Schwartz's

20   declaration that says May 19th and it turns out that that's

21   incorrect.  Mr. Schwartz testified he read his declaration,

22   but there's mistakes all over the place.

23        So that big issue -- that non-disclosure issue --

24   I just don't think you can get away from it.  And I think

25   it's important to remember what happened in the prior cases

1    because of May 19th, Mr. Battaglia said he would have

2    amended and disclosed, but the professional that sat up

3    here, they -- we asked them, you know, was this a connection

4    that should have been disclosed.  They all said no.  They

5    are still defiant about their duty to disclose.  Most

6    professionals would just come and file a supplement but

7    these professionals were --

8              THE COURT:  Well, I'm sure they're do it now if

9    you'll give them a chance.  You know, the question should

10   the -- you know --

11             MR. NGUYEN:  Your Honor, I --

12             THE COURT:  Go ahead.

13             MR. NGUYEN:  There was a connection that was not

14   disclosed.  Declarations were filed.  They were incorrect.

15   Statements were made to you to the contrary, that

16   (indiscernible) indicated that they were independent.  There

17   were multiple opportunities to disclose Free Speech System

18   as a connection.

19             Now they're coming in.  They're asking you to

20   approve this connection that they didn't disclose.  We can't

21   just -- we can't do that in terms of -- that just can't be

22   the case when there is an utter failure of disclosure, a

23   lack of acknowledgment from the professional, and now

24   they're asking you to bless it.  By blessing the application

25   now, you're actually compounding the non-disclosure in the

1    prior case because you're essentially approving it, and

2    that's the problem we have.

3           So there is a sense of bias here.  There are

4    questions and then you compound it by having this non-

5    disclosure that they refused to acknowledge.  I think it's a

6    huge problem, Your Honor, and I would ask the Court to

7    consider just integrity of the process -- integrity for

8    these creditors who are here, who are demanding candor.

9    Candor is important.  So I would ask the Court to deny these

10   two applications.  The system demands it -- of it.  I just

11   don't know how else to put it.

12          There will be harsh consequences to it, but, you

13   know, that's -- sometimes that happens when you're not

14   upfront about your connections with the Court.  And so, Your

15   Honor, that's all I have.  I won't belabor the point.  We've

16   been here for a while.  We take a strong position on it

17   because the system demands a strong response to a non-

18   disclosure of this sort.

19          THE COURT:  Thank you.

20          MR. SHANNON:  If I could just make one correction

21   --

22          THE COURT:  Sure.

23          MR. SHANNON:  There was no misrepresentation in

24   either Mr. Lee or Mr. Schwartz' declarations in the Info W

25   cases.  They weren't (indiscernible).  And I just want to

1    correct it and this is I think why Mr. Lee got so upset and

2    obviously filed a reply that he should not have.  There was

3    --

4           THE COURT:  Well, I think he can file what he

5    wants.  I just think I get questions based upon what gets

6    filed.

7           MR. SHANNON:  Exactly.  So I just -- I want to

8    make that one clarification, that it was not a declaration

9    that was mistakenly (indiscernible).  It was just not

10   supplemented maybe as it should be.

11          THE COURT:  Okay.  Thank you.  Folks, it's 6:32.

12   I'm going to take a look at something.  I'm going to come

13   out at 6:40.  I'm going to rule on it.  Thank you.

14          CLERK:  All rise.

15          (Recess)

16          THE COURT:  Okay, so we are back on the record in

17   Free Speech.  I'll just note for the record, Mr. Battaglia,

18   I did get a chance to look, and your order is on the docket,

19   so I just -- okay.

20          So what is remaining, two retention applications,

21   and they are filed at Docket Numbers 83 and 85.  They were

22   filed on August 12th.  The application to employ Shannon and

23   Lee as bankruptcy co-counsel to the Debtor and the

24   application to employ W. Marc Schwartz and Schwartz

25   Associates LLC (indiscernible) essentially as financial

 1    advisors as well.  This is a court proceeding under 28

 2    U.S.C. 157(b)(2)(A).

 3          Court finds that there's been proper service of

 4    the application and then proper notice of today's hearing.

 5    The Court has considered the evidence, and here's my ruling

 6    on the applications.  I do note, before I begin that -- here

 7    is just the -- or -- or Free Speech -- well, we'll disagree,

 8    but what the Court has done, that's just the nature of what

 9    the Court has to do.  The Court is required to weigh the

10    evidence and apply the law as faithfully as I can and that's

11    what I believe that I'm doing now.

12          So the Debtor FSS seeks to employ Mr. Schwartz as

13    chief restructuring officer and his firm Schwartz Associates

14    LLC as advisors on Section 327(a) of the Bankruptcy Code.

15    FSS also seeks to employ Shannon and Lee as bankruptcy co-

16    counsel.  US Trustee objects to both employment

17    applications.  The Trustee argues that these professionals

18    failed to disclose important connections required under

19    Bankruptcy Rule 2014 and recently dismissed bankruptcy

20    cases.  The Sandy Hook plaintiffs filed a statement joining

21    in and supporting the US Trustee's objection.

22          In response, FSS argues (indiscernible) motion by

23    Schwartz and Lee that previously dismissed bankruptcy cases

24    are not a valid basis to deny retention of these

25    professionals in these cases.  FSS argues that these

1    professionals satisfy the requirements for employment under

2    Section 327(a) of the Bankruptcy Code in this case.  Based

3    on our evidence and applicable law, the Court is going to

4    deny the applications to retain Schwartz as CRO and

5    Schwartz's LLC Associates as financial advisors and Shannon

6    and Lee as co-counsel to FSS.

7         On July 29, FSS started this --

8         Yes.  That's fine.  I'm still writing.  Do you

9    want to get him back on the line?

10        RECORDED VOICE:  -- are ten attendees in this

11   conference.  Your host has joined.

12        Conference muted.

13        THE COURT:  Okay.  As I said, based on the

14   evidence and applicable law, I'm going to deny both

15   retention applications.  On July 29, FSS started this case.

16   About three weeks later, FSS filed applications to employ

17   Schwartz as CRO along with his firm as financial advisors,

18   and Shannon and Lee as co-counsel.  Mr. Ray Battaglia has

19   always represented FSS as the (indiscernible) other proposed

20   counsel and has been approved today.  No party objected to

21   his retention, so he is retained as bankruptcy counsel to

22   FSS at this point.

23        Schwartz submitted a declaration in support of his

24   retention, stating that neither him nor Schwartz Associates

25   was contacted about serving as CRO for Free Speech until

1    July 19th, 2022, when (indiscernible) in the Debtor's

2    bankruptcy cases has reached a favorable outcome for those

3    debtors.  He says that for all practical purposes,

4    (indiscernible) to reorganize the InfoW debtors had

5    concluded because the bankruptcy cases no longer had the

6    necessary participants to implement the global settlement.

7    He had (indiscernible) to restructure and reorganize InfoW

8    debtors at that point and that also the work he was

9    performing was ministerial.

10         The Shannon and Lee retention application included

11   a declaration by Mr. Lee.  It states, and I quote, "The

12   first services of our attorneys, Shannon and Lee, provided

13   to FSS, occurred on July 24th, 2022.  They were provided by

14   Lee through Kyung S. Lee PLLC."

15         The application also disclosed that Mr. Lee

16   received payment for services rendered between May 24th and

17   May 31st, 2022.  Section 327(a) of the Bankruptcy Code

18   authorizes a Chapter 11 Debtor with the Court's approval to

19   employ one or another attorneys, accountants, or other

20   professional persons do not hold or represent the interests

21   adverse to the estate and other disinterested persons to

22   represent or help the Debtor carry out its duties under

23   Chapter 11.

24         I want to be really clear.  Debtors have the right

25   the choose their lawyers.  The Bankruptcy Court has the duty

1    to ensure Section 327 is satisfied.   The text of 327(a)

2    states that retention is subject to court approval.

3    Assuming that the technical requirements of Section 327 are

4    satisfied, the Bankruptcy Code gives a bankruptcy court   .

5    discretion to deny an application.   That should be used, in

6    my opinion, very sparingly.   But this Court must consider

7    the facts of each case.

8         The text of Section 327(a) also requires

9    application for two-prong tests for employment of

10   professionals.   In order to (indiscernible) employ a

11   professional that one, does not hold or represent an

12   interest adverse to the estate and is a disinterested

13   person.   The term "disinterested person" is defined under

14   Section 101(14) of the Bankruptcy Code.   Neither one of

15   these two prongs overlap because the definition -- Part C of

16   the definition of "disinterested person" includes a person

17   who does not have an interest materially adverse to the

18   estate.

19        The application to employ a professional requires

20   an accompanied verified statement of the proposed retention

21   requirement of Bankruptcy Rule 2014.   Under that, a

22   professional must disclose all known connections the

23   professional has with the debtor, including insiders with

24   the debtor, creditors and other parties in interest in the

25   case, other proposed professionals the debtor seeks to

1    retain, and the Office of the United States Trustee.

2           Such public disclosure provides important

3    transparency to the Bankruptcy process and helps bankruptcy

4    courts evaluate if a professional is disinterested and

5    doesn't hold an adverse interest to the estate.  We

6    emphasize the professional has to be disinterested and not

7    hold an adverse interest to the estate.  Professionals

8    retained under the Section 327 represent the estate.  Thus,

9    in some cases, a professional representation of the estate

10   may conflict with the interest of shareholders and secured

11   and unsecured creditors.

12          So what does it mean to represent or hold any

13   interest adverse to the estate and to be disinterested?

14   Bankruptcy Code does not define the phrase "represent or

15   hold any interest adverse to the debtor to the estate."  The

16   Fifth Circuit (Indiscernible) that the oil company 432 F.3rd

17   347, Fifth Circuit 2005 reviewed and adopted -- or reviewed

18   a definition used by other circuits.  And that was to

19   possess or assert any economic interest that would tend to

20   lessen the value of the bankruptcy estate that would either

21   create either an actual or potential dispute in which the

22   estate is a rival claimant or to possess a predisposition

23   under circumstances that render such bias against the

24   estate.

25          The Fifth Circuit held that while the definition

1    was helpful, had to be employed with an eye to the specific

2    facts of each case and with attention to circumstances that

3    may impair a professional's ability to offer impartial,

4    disinterested advice to the client.  The Fifth Circuit has

5    also held that the standards for (indiscernible) conflict

6    are strict and professionals engaged in the conduct of a

7    bankruptcy case "should be free of the slightest personal

8    interest which might be reflected in their decisions

9    concerning matters of the debtors' estates or which impair -

10   - might impair" -- excuse me -- "a high degree of

11   impartiality and detached judgment expected by them during

12   the course of administration."

13          I want to start with the oil, 432 F.3d at 355.

14   I'll also cite to Waldron v. Adams & Reese in re, right,

15   American International Refinery, Inc. 676 F.3d 455, pincite

16   462 Fifth Circuit 2012.  Under Section 101(14), the term

17   "disinterested person" means a person that's not a creditor,

18   an equity security holder, or an insider.  That's A; B, is

19   or was not within two years before the date of the filing of

20   the petitioner, a director, officer, or an employee of the

21   debtor; and C, does not have an interest materially adverse

22   to the interest of the estate or any class of creditors or

23   equity security holders by reason, any direct or indirect

24   relationship to or in connection with or interest in the

25   debtor, or for any other reason.

1        I'd say Lee and Schwartz satisfy parts A and B of

2    the definition of disinterested.  And I acknowledge that

3    Schwartz was retained as CRO pre-petition, but the actual

4    entity retained by FSS is Schwartz Associates LLC.  Right,

5    and so Schwartz Associates is not a creditor, equity

6    security holder, an insider and was not within two years of

7    the filing of the petition date a director, officer, or an

8    employee of the Debtor.  It's a fine distinction.  That's

9    why individuals who work for Schwartz LLC, as in Mr.

10   Schwartz, can be retained pre-petition and still not be held

11   to be an officer.  It's the entity that got retained, not

12   him individually.

13       The question for any other reason, what does that

14   mean?  It's also known as the catch-all clause.  It's

15   sufficiently broad to include any professional with an

16   interest or relationship that would even faintly counter the

17   independence or impartial attitude required by the Code.

18       I'll cite to Judge Iscara's decision on -- it's

19   either LTHM Houston Operations LLC 2014 WL 5449737

20   Bankruptcy Seventh District of Texas 2014.  In this the Code

21   requires that there may be additional instances based on the

22   facts where a professional may have an interest material

23   adverse to the estate.  The US Trustee objects to the

24   retentions mainly based on actions and failures to disclose

25   in three recently dismissed bankruptcy cases.  FSS really

1    wants the Court to overlook the history of the past as not

2    really relevant, but this case cannot be divorced from the

3    history of the prior cases.

4            Before FSS started this case, Schwartz served as

5    proposed CRO and Lee served as proposed counsel in

6    Subchapter 5 bankruptcy cases of InfoW LLC, IW Health LLC,

7    and Prison Planet TV LLC.  These entities were original

8    affiliates of FSS.  Mr. Jones owned 100 percent of the

9    equity in FSS.  He also owned 100 percent of the equity in

10   the InfoW entities.  FSS, Mr. Jones, and the InfoW entities

11   were also defendants in what I would call Sandy Hook-related

12   litigation, defamation lawsuits pending in Texas and

13   Connecticut State courts.

14           InfoW, IW Health, and Prison Planet filed

15   bankruptcy cases in the Southern District of Texas in April

16   of 2022.  Shortly before the filing, Mr. Jones assigned his

17   equity and his interest in these entities to a 2022

18   litigation settlement trust.  This Court was informed in

19   that case that the litigation settlement trust removed

20   control of the InfoW debtors from Mr. Jones.  The trust was

21   managed by an actual trustee and was supposed to be

22   eventually managed by two new trustees.  The trustees would

23   then have full governance authority over the Debtors.  The

24   litigation trust was first funded by Jones and FSS.

25           FSS, Mr. Jones, and the InfoW debtors also signed

1    a plan support agreement.  Part of the stated goal of the

2    InfoW cases was to negotiate a financial settlement between

3    the InfoW debtors and the Sandy Hook plaintiffs to resolve

4    defamation lawsuits pending in Texas and Connecticut.  Such

5    a settlement would have also resolved litigation against the

6    third-party contributors to the litigation trust, which

7    included FSS.

8              On April 29th -- well, I'll note, at least at the

9    beginning of the case, Mr. Schwartz was proposed CRO was

10   subject to the oversight and the direction of the initial

11   trustee, at least according to the court filings of the

12   litigation trust.  Mr. Lee was also proposed counsel for the

13   InfoW debtors and was taking direction from Mr. Schwartz as

14   CRO.  On April 29th, the US Trustee moved to dismiss the

15   InfoW cases, alleging, among other things, that the cases

16   were filed in bad faith and engineered to shield Mr. Jones

17   and FSS from liability.  An evidentiary hearing was

18   originally scheduled for May 27th.

19             The Court held a hearing on May 19th.  You've

20   heard a lot about that hearing today.  It's an important

21   hearing both for what was stated to the Court and what

22   wasn't disclosed.  Texas plaintiffs announced that they were

23   dismissing their claims against the InfoW debtors with

24   prejudice in the Texas defamation lawsuits, thus leaving Mr.

25   Jones and FSS as defendants in the Texas litigation.  The

1    Court also signed a stipulation on that day to that effect,

2    authorizing the parties to proceed in the Texas litigation.

3           Around that same time, the plaintiffs in the

4    Connecticut State litigation had filed a notice of dismissal

5    to claimants against the InfoW Debtors in the Connecticut

6    State court, which again, would have also left Mr. Jones and

7    FSS as defendants.  To allow the parties time to finalize

8    these state court dismissals with prejudice, which was the

9    issue at the time, Mr. Lee requested more time to respond to

10   the US Trustee's motion to dismiss the InfoW cases.  Among

11   the basis stated for the continuance was that Mr. Schwartz

12   needed more time to fulfill his fiduciary duties to other

13   creditors.

14          Mr. Lee also stated on the record at that hearing

15   that the other part that I have to do is renegotiate the

16   plan support agreement.  The debtors intended to

17   (indiscernible) with respect to a small Subchapter 5 plan.

18   Mr. Lee, with Mr. Schwartz right next to him, also told the

19   Court that they want me to know that Mr. Schwartz in his

20   fiduciary capacity is evaluating all alternatives.  Based on

21   his representations and agreements between the parties, the

22   Court reset an evidentiary hearing on the motion to dismiss

23   for some time in June.

24          What was unknown to the Court at this time, it

25   sounds like there was a meeting shortly after that hearing,

1    was that Schwartz and Lee would soon plan to start working

2    for FSS.  On May 25th, Mr. Lee starts working on a first-day

3    declaration for FSS, according to the time records admitted

4    into evidence, which means that around that time, Mr.

5    Schwartz was also part of the FSS team.  This continued into

6    early June, which means that Mr. Lee's statement about

7    exploring all options, if truthful -- and I don't doubt his

8    sincerity at the time -- but if it would have been played

9    out, then Mr. Schwartz would have then potentially found

10   himself negotiating as the CRO for the InfoW debtors on one

11   side and CRO for FSS on the other side.

12           Considering the history of the prior cases is

13   important, and that's why it's important, because what was

14   told to me on May 19th is that Mr. Schwartz was exploring

15   all options.  When you look at the statements filed in the

16   declarations in support of retentions, it's impossible to

17   recognize -- to reconcile, excuse me, that statement with

18   Mr. Schwartz's declaration that his duties are

19   (indiscernible) and that he had nothing to restructure or

20   reorganize.

21           Based on all (indiscernible) submitted by Mr. Lee

22   to Mr. Schwartz on -- Mr. Lee submitted an invoice to Mr.

23   Schwartz on behalf of FSS, stating that Lee and his comrade,

24   Mr. Shannon, met with Mr. Schwartz and counsel to Mr. Jones

25   to discuss issues about an FSS restructuring on May 24th for

1     five hours.  And that's -- right, that's five days after the

2     hearing.  On May 25th, Mr. Lee researched the information to

3     prepare first a declaration for Mr. Schwartz in connection

4     with an FSS bankruptcy.  On May 26th, he was organizing PQPR

5     valuation reports.  On May 27th, he coordinated with state

6     court counsel on state court sanction (indiscernible), and

7     "located critical documents for counsel to PQPR."  PQPR is

8     managed by Mr. Jones's father.

9          The next few days, Mr. Lee spent time analyzing

10     the data produced to state court counsel even though what

11     was represented -- even though, at that time, the InfoW

12     debtors were in the process of being dismissed with

13     prejudice.  On May 31st, they kept looking at a declaration

14     for Schwartz as CRO for FSS.  During this time, Mr. Schwartz

15     spent a lot of time working for FSS, hiring staff in order

16     with PQPR, its owners, and Mr. Jones.

17          Thus, at the time the bankruptcy strategy to

18     implement -- to be implemented in the InfoW cases

19     essentially failed and a group of parties went in order to

20     proceed with a new strategy for FSS.  Lee and Schwartz took

21     part in this strategy even though they were technically

22     supposed to work as fiduciaries for the InfoW Debtors.

23          I need to stress here, too, weren't they per se

24     (indiscernible) with secure letters and its counsel pre-

25     petition?  It happens all the time in large Chapter 11

1   bankruptcy cases.  Right?  It happens very often before

2   Chapter 11 cases are filed, either in an effort to avoid

3   bankruptcy or offer to negotiate in connection with the

4   Chapter 11 case.  Right?  Including the use of cash

5   collateral.  Right?  Debtors often want to have a consensual

6   use of cash collateral on the first day, try to enter

7   sometimes -- debtors may around the country enter into

8   restructuring support agreements and plan support agreements

9   or entering into pre-packaged Chapter 11 plans or --

10  various, many reasons to enter into negotiations with a

11  secured creditor.  Right?

12         What makes this case different is that Schwartz

13  and Lee were working for FSS.  They were also technically

14  working for the InfoW debtors.  Right?  And at some point,

15  the litigation trust and (indiscernible) broke down and who

16  was represented to the Court that Mr. Schwartz was taking

17  direction from?  Apparently that all had broke down.  So

18  there was a (indiscernible) separation between his affiliate

19  entities and the (indiscernible).  And there are other -- a

20  breach of corporate formalities disclosed in public

21  documents or things just went away.  And they could have

22  expired on their own.  Not to say that any of those things

23  were wrong.

24         It's just that, again, on June 2nd -- right, and

25  this is why things get tricky, but just leave it there.

1   Maybe there's nothing wrong, but on June 2nd, the InfoW's

2   response to the US Trustee's motion to dismiss.  Response

3   was filed by counsel for the debtors.  And despite their

4   representations and the declarations of that ministerial

5   work happening in May in this case, in the adjoined

6   pleading, professionals represented to the Court and to the

7   public that the InfoW cases still served our bankruptcy

8   purposes -- would they say -- nonetheless, the debtor's own

9   acknowledgment of their independent CRO.  How are you

10  independent if you're working for and hiring for FSS at that

11  time?  I don't really -- how are you -- what does

12  independence mean at that time?  I recognize that this also

13  was in the best interest of the debtors and their estates.

14  Right?

15          The InfoW cases are dismissed on June 10th, based

16  on internal records.  In July of 2022, Mr. Lee is assistant

17  counsel to Mr. Jones on the data issues between Mr. Jones

18  and FSS.  (Indiscernible) FSS for attending a focus group

19  and participated in a jury perception of Mr. Jones.  It was

20  a separate defendant in the Connecticut and Texas cases.

21  You're paid to do no effort, no evidence, of no effort to

22  separate your performance for the debtor and work performed

23  for FSS or potential claims that folks may have against each

24  other at that time.  The issue is that that's continued

25  post-petition and FSS's responses failed to appreciate this

1    point.

2         FSS's response focuses primarily on trying to cast

3    the US Trustee's Office in a negative light, rather than

4    proving that these professionals don't hold an adverse

5    interest to the estate and are disinterested.  During the

6    case, for example, FSS sought approval of a cash collateral

7    lawyer providing for approximately $80,000 in travel

8    expenses for the lawyer of FSS.  All of the travel expenses

9    for him and others were to be paid 100 percent by the FSS

10    estate.  I will tell you that no one called that out to me.

11    It was the Court who highlighted that issue.  And maybe

12    $80,000 is what's required for people to travel.  Of course,

13    that's not really the question.

14         The question is, who was negotiating on behalf of

15    the estate as to this 100 percent of all travel expenses to

16    go participate in a defamation trial on damages as a co-

17    defendant, 100 percent to be paid for by an entity in

18    bankruptcy?

19         In August of '22, FSS filed application to retain

20    two special counsels to represent it in the Connecticut

21    State court trial.  FSS's initial request was to, again, pay

22    for full legal fees on behalf of itself and the co-

23    defendant.  In a tort trial on damages, the estate proposed

24    to pay 100 percent for the legal fees for itself and its

25    owner as a separate defendant in the case.  Again, the Court

1   highlights that issue.  I must say I do believe that -- I

2   pre-empted the United States Trustee who has also stood up

3   right away and said this was an issue that we had, if I

4   remember that hearing correctly.

5          In September '22, in (indiscernible), special

6   counselor to FSS, who's one of the aforementioned special

7   counsel, filed a supplemental declaration which was drafted

8   by Mr. Lee.  And he states that since May 19th, FSS retained

9   Schwartz as its CRO and that Schwartz, as counsel for FSS, a

10  (indiscernible) defense lawyer (indiscernible) financial

11  executive was able to come and work at FSS in their

12  accounting department.  According to the declaration, he

13  recommends Jeffrey Schwartz as CRO.

14         I would note that Mr. Schwartz could not remember

15  if the retention occurred in May or later.  And there was

16  great confusion, although May 19th was cited in multiple

17  declarations filed in this case, FSS, Mr. Schwartz, Mr. Lee

18  essentially argue that maybe that was closer to June when it

19  was -- when those retention application, excuse me, when

20  those engagement letters were sent in by Mr. Jones in June.

21  But certainly the work, regardless of when the applications

22  were dated, certainly there was a meeting on the 24th when

23  the work started.

24         Mr. Schwartz also disclosed that FSS's books and

25  records were in disarray when he started working

1    (indiscernible), that the 2021 ledger had not been

2    completed, and the books had not been closed.  There was no

3    transaction that had been recorded in the 2022 ledger.  As a

4    result, both financial statements were produced for FSS for

5    the 18 years before his engagement.  Schwartz and Associates

6    also found out that reconciliations for 2021 are in 2022 and

7    were inadequate, out of their control -- actually, they

8    (indiscernible) controls, including lack of segregation of

9    duties, lack of supervision, reveal of accounting functions

10   -- this is all in Mr. Schwartz's declarations earlier in

11   this case -- more billings to PQPR.

12          I have issues about the relationship with FSS and

13   PQR, with their professionals certainly engaged extensively

14   with pre-petition.  The Court really -- I didn't hear any

15   evidence that they've analyzed it seriously post-petition.

16   And the estate made no claims against PQPR.  And recall that

17   PQPR is managed by an outsider.  They're approximately --

18   according to what was noted, right, in August of 2020 and

19   November 2021, there were security agreements signed on and

20   proto-signed on to the total of approximately $54 million.

21   That is subject to a fraudulent transfer litigation pending

22   outside of this district.  That may be 100 percent

23   legitimate and properly secured.  I don't know.  Someone

24   needs to do this work.

25          In this case, the professionals prior to post-

1    petition actions and this Court's assessment based on the

2    evidence colors the independence and the impartiality

3    required by the Bankruptcy Code.   Not just an appearance of

4    conflict of interest.   There are adverse interests to the

5    estate based on the evidence related to Mr. Jones and PQPR.

6    The lack of transparency and the lack of disclosures ·

7    required under Bankruptcy Rule 2014, which says any

8    connections, give this Court a lot of concern about whether

9    these professionals can impartially represent FSS, which may

10   include making difficult decisions about other parties, if

11   necessary.

12       The estate may -- I have no idea -- hold claims,

13   defenses to claims, and costs of actions against third

14   parties.   For instance, based on the time records entered

15   into evidence, Mr. Jones may allege a right to an indemnity

16   from FSS.   I know that he's been seeking personal expenses

17   paid.   Right?

18       And I know that Exhibit 163-8, there's a July 11th

19   time entry where counsel assisted Mr. Jones as counsel on

20   indemnity issues between FSS and Mr. Jones.   Right?   He had

21   first a cash collateral motion.   It was the Court who

22   questioned the material (indiscernible) for about $172,000

23   that consisted primarily of personal charges not related to

24   the business.

25       FSS's schedules also list pre-petition payments to

1    the same vendor for about a million dollars.

2    (Indiscernible) attorney at this time how much relates to

3    purely FSS's business expenses, but that work needs to get

4    done.  So consider I'm the Fifth Circuit guidance and an eye

5    to the specific facts here and with attention to

6    circumstances, there is evidence showing circumstances and

7    instances that have and may in fact impact future ability to

8    offer impartial and disinterested advice to FSS.

9         And I understand that that has consequences, and I

10   hope everyone hears it in my voice.  This is not easy for me

11   to do, but I'm required to make these decisions under law

12   and Bankruptcy Code affords me the discretion to do so.  And

13   I'm not even sure this is a discretion issue.  I think

14   there's a material adverse interest to the estate.

15        And I stress that this decision is based on the

16   facts presented in this case.  I really want to stress this

17   because I know a lot of people are listening.  No one should

18   read this decision as a critique of using local counsel or

19   using co-counsel in a case.  I understand that debtors needs

20   sometimes not to retain multiple law firms when appropriate.

21        Again, I stress debtors have an absolute right to

22   seek to retain professionals that will assist in their

23   Chapter 11 case.  I'm a firm believer in that.  This

24   decision has no application in those instances.  None.  This

25   decision also has no application whenever professionals

1    (indiscernible) by a group of affiliated debtors.  It

2    happens all the time in Chapter 11.  A debtor, sometimes a

3    financial advisor, sometimes an investment banker gets

4    retained by Company A and all of its related entities.

5         And sometimes that means a debtor, right, a group

6    of debtors file at the beginning because you're trying to

7    keep a group of entities out of bankruptcy as you negotiate.

8    And sometimes, right, debtors counsel has to advise clients

9    that, well, another subset has to go in at a later time.

10   And it often happens in restructurings.  Those often --

11   those instances are much different in the -- in this case.

12   In this case, you know, a proposed CRO and counsel were

13   actively representing the InfoW debtors.  Right?

14        Let's not forget whose interests are held by a

15   litigation trust and are solely represented, (indiscernible)

16   affiliated entities.  I also note that FSS is not without

17   counsel to continue this case.  I take what Mr. Battaglia

18   really said -- I really take it to heart.  I don't -- I

19   don't like where we are today.  I think I'm making the right

20   decision under the law.  I think I'm commanded by the law,

21   the Fifth Circuit case law, to make this decision.

22        I also know that what occurred today is limited to

23   today.  I think Shannon and Lee and Mr. Schwartz and

24   Schwartz and Associates can appear in another case in front

25   of me with no issues.  I mean zero.  I really mean that.  I

1   hope they can take comfort in that.  And any future case is

2   going to be just judged on those facts and nothing today or

3   in this case changes that for me or any professional.  I

4   hope to never make a similar decision as long as I'm on the

5   bench.  But judges are required to make difficult decisions

6   sometimes and this is one of those today.

7            I noted earlier, and I'll note it again, I find

8   there was some strong language used in the response to the

9   US Trustee's objection.  And I find nothing improper about

10  the arguments raised in those objections, not because I

11  ruled in the way that I did, but also just looking at it

12  independently, I take statements very seriously in the court

13  and filed with the Court, sometimes better to ask than to

14  make assumptions.  So something else I need to do today

15  based on what I've heard.  So Chapter 5 is the new addition,

16  relatively new addition, to the Bankruptcy Code.  And it

17  provides a streamlined process for small businesses to

18  reorganize.

19            So Chapter 5 involves the appointment of a

20  Subchapter 5 trustee to provide oversight of the debtor in

21  possession and helps facilitate negotiation of what will be

22  hopefully or consensually reorganized, reorganization plan.

23  As with any case, a Subchapter 5 bankruptcy requires a

24  debtor to be forthcoming about its affairs.  The Subchapter

25  5 trustee, the court, and its creditors are all

1    stakeholders.  Interestingly, the debtor in Subchapter 5 is

2    not mandated to investigate its own acts, conduct, and

3    liabilities in financial condition.

4         But 11 U.S.C. 1183(b)(2), a court for cost and on

5    the request of a party of interest, the trustee or the

6    United States Trustee may order an expansion of the

7    Subchapter 5 trustee's power to include the power specified

8    in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code.

9    1106(a)(3) says, "Except to the extent the Court orders

10   otherwise, the trustee shall investigate the acts, conducts,

11   assets, liabilities, and the financial condition of the

12   debtor, the operation of the debtor's business, and the

13   design or ability of the continuance of such business, and

14   any other matter relevant to the case or to formulation of

15   the plan, and as soon as practical, upon a statement of an

16   investigation conducted, including any fact ascertained

17   pertaining to fraud, dishonesty, incompetent, misconduct,

18   mismanagement, or irregularity in the mismanagement of the

19   affairs of the debtor or to a cause of action available to

20   the estate."

21        It's not on a cause.  A cause is not defined in

22   the Bankruptcy Code.  When you look at cases, trying to

23   define a cause in the Fifth Circuit, or how a cause is

24   viewed, according to the Fifth Circuit apply a flexible

25   standard, giving the bankruptcy courts flexibility to

1    determine whether a cause exists.  And it's a fact in

2    (indiscernible) inquiry that must be determined on a case-

3    by-case basis.

4            The leading treatise (indiscernible) on bankruptcy

5    law provides that the standard for cause under 1183(b)(2)

6    should not be higher than the standard for cause, say, for

7    example, removing a Subchapter 5 trustee.  I agree with

8    that.  There always ought to be cause.  Weigh the facts and

9    the evidence and make a determination as to whether there's

10   cause based on the facts.

11           I don't like the factors because not all the

12   factors apply in every case, and this case is not different

13   -- it's far different than a Subchapter 5 case where someone

14   is trying to keep a pizza shop going.  Section 105(a) of the

15   Bankruptcy Code authorizes a court to sua sponte expand the

16   Subchapter 5 trustee's duties under 1183(b)(2) even though

17   the subsection requires -- uses the phrase "on request of a

18   party in interest" when you look at 105(a).  I do note that

19   a party has already requested that.  That hearing was set

20   for another date and under certain circumstances.  I believe

21   it was PQPR.  And I'm going to expand that today sua sponte.

22           There's a clear and pressing need to expand the

23   role of the Subchapter 5 trustee and to direct her to

24   investigate.  That doesn't mean that there's anything wrong.

25   It just means that in this particular case, there has to be

1     work done for the debtor to really understand the scope of

2     its assets and potential claims and liabilities.  I do note,

3     there's been a lot of talk about candor and how the Court

4     feels about it.  I'm would note and I do think there was a

5     lack of candor under Rule -- Bankruptcy Rule 2014 in the

6     last case.  And I do think there was some lack of candor in

7     this case.

8          I've expressed concern since the first hearing

9     about what happened.  And as this case has progressed and

10    based on what I've heard today and the evidence that I was

11    able to review, those concerns continue to exist.  And I

12    think if someone's going to investigate the Debtor in this

13    case, it really has to be someone impartial, someone with no

14    connection from the InfoW cases, who represented a party in

15    interest.  And I believe that's the Subchapter 5 trustee who

16    is independent and remains independent.

17         Someone has to do the work, and the Bankruptcy

18    Code gives the answer.  It's the Subchapter 5 trustee.  I

19    won't rehash the concerns that I have.  You heard them

20    earlier.  For other reasons I stated earlier about the

21    concerns that I've had with disclosure, lack of candor

22    leading into this case, there is cause to expand the

23    Subchapter 5 trustee's duties under Section 1183(b)(2), to

24    include exactly what the code says, investigate the acts,

25    conduct, assets, liabilities, and financial condition of the

1   Debtor, the operation of the Debtor's business, and the

2   desirability of the continuation of the business.

3          I want to give the Subchapter 5 trustee some

4   guiding.  I think that includes investigating the

5   approximately $54 million security claim listed in favor of

6   PQPR Holdings Limited LLC described in Schedule D at Docket

7   Number 121, investigating Free Speech Systems credit card

8   processor, solely for any insider relationship.  That's what

9   I'm focused on, the inside, if there's any potential insider

10  relationship that I should be aware of or anything that

11  gives the Subchapter 5 trustee any concern.  Right?

12         There maybe -- I don't think at this stage, I

13  don't think there's a need to disclose who it is.  And if

14  there is, I want there to be real caution before that's

15  done.  But if there's an insider, that needs to be

16  disclosed.  I think there also -- there has also been much

17  discussion about the $61 million, maybe $62 million member

18  draw 2021 and $254,000 member draw 2022 listed in the Free

19  Speech Systems comparative balance sheet as of December 31,

20  2021 and May 31, 2022 attached to Mr. Schwartz's declaration

21  filed at Docket Number 10.

22         Under 1106(a)(4), the trustee is to get to work

23  and file a statement detailing her findings as soon as

24  practicable, as described under 1106(a)(4).  Look, I realize

25  that there are other pending motions filed by the Sandy Hook

1    families to appoint a tort claimants' committee and to

2    remove Free Speech as a debtor in possession.

3          I'm not ruling on any of those issues and I'm not

4    describing any of them now.  I may need to take up one of

5    them soon.  I also note, and I state for the record, it is

6    rare, I think, in Subchapter 5 cases for -- the need for a

7    Subchapter 5 trustee to hire counsel or professionals to

8    assist in the duties.  And I think this is the case where

9    it's required.  So Ms. Hazleton, I think you need to find --

10   you need to get a team.  And I'm telling you, I want folks

11   with no connection to any of these cases to assist you in

12   your work.  It looks like you've already found one person.

13         Let's start the process of retaining what you

14   need.  I've charged you to do work and I need you to do it

15   as quickly as possible, but you can't do it on your own.  So

16   no one should read this as a Subchapter 5 trustee and think

17   that you know, I should -- don't cite this case as the

18   reason that you need to hire counsel.  There may be other

19   reasons.  I just think this case is different for all the

20   above reasons.  And again, I'm not saying anything is wrong.

21   You may find all the investigations are proper and that you

22   don't find anything.  Fine with me.  File that and say that.

23         But there has to be greater transparency in this

24   case.  I understand that PQPR may want to have discussions

25   about what that means, but it's going to cost what it costs.

1    I'm just telling you now.  Right?  You can work on a budget,

2    but I'm charging the trustee to do the work, and it'll cost

3    what it costs.  And I understand that that may require

4    negotiations with a secured lender as to what that means and

5    we already have a hearing teed up where we can take all that

6    up.

7           I don't know -- and really -- what you see in my

8    face is really listening to what Mr. Battaglia said and

9    weighing on me.  I don't want to rule anymore.  That's

10    enough for me today.  I think people have a right to listen

11    to what I said.  I'll enter some orders today, and I'll say

12    for the reasons stated on the record.  I will say this and I

13    don't want -- yeah, I'll say this.

14           I understand that that's going to require some

15    questions as to where that leaves Shannon and Lee and Mr.

16    Schwartz in terms of you know, retention and the work that

17    they've done.  And I'll be looking to the Subchapter 5

18    trustee for guidance here, but there was good work done

19    here.  And I think Schwartz and Associates, right, helped

20    the process.  We've got cash collateral budgets in place and

21    there was folks who would answer phone calls.  From what I

22    hear, what Mr. Schwartz encountered -- and I don't want

23    anyone to leave thinking that I don't think they should be

24    compensated for -- for good work in this case.

25           The US Trustee is free to disagree with me on

1    that.  And I'll be looking to guidance from the Subchapter 5

2    trustee as to what I heard in my gut is right or if I should

3    be concerned about something.  Everybody's rights are

4    reserved on this.  I don't want anyone to think anything

5    about these professionals.  I've ruled.  I didn't say

6    anything about them.  It just talks about the ruling, the

7    very difficult decision I had to make in this case.  That's

8    it.  That's what it means to me.

9         If it means something to anyone else, then you're

10   not paying attention to what I really said.  I have a great

11   amount of respect for people and the work that professionals

12   do in bankruptcy cases is not easy.  And I know that the

13   work that gets done when people aren't here across the

14   United States is difficult work.  It requires bankruptcy

15   lawyers.  Bankruptcy professionals have to balance a great

16   number of things.  The process is incredibly important as

17   well along the way.  Without process and without

18   transparency, people lose faith in the process.

19        And so standards must be satisfied to ensure that

20   the process can continue and people can have faith in the

21   process.  But also, right, Congress writes laws.  Judges

22   apply them as faithfully as possible.  And that's what I've

23   done today.  I wish everyone the best.  That's -- that's

24   enough for me today, folks.  You all have a good day.

25        Yes, sir.  Mr. Battaglia.

1          MR. BATTAGLIA:  Mr. Schwartz's deposition was set

2     pursuant to the cash collateral hearing for Friday.

3     Obviously, he won't be appearing.  There was a 30(b)(6)

4     deposition notice that we had other opposition to, but I

5     honestly have no idea who I can even present, so I have no -

6     -

7          THE COURT:  Yeah, I understand that.  And I

8     understand that.

9          MR. BATTAGLIA:  (Indiscernible).

10          THE COURT:  I understand that there are decisions

11     that I've made that may have consequences.  And everybody's

12     going to have to think about what I did today.

13          MR. BATTAGLIA:  I understand, Your Honor.  I just

14     (indiscernible) parties should know --

15

16          THE COURT:  No, no, I understand.  That's what --

17     I'm looking at them, so I -- you all need to think --

18     everybody needs to think about that.  So I agree.

19          MR. BATTAGLIA:  And there's a lot for me to sort

20     out in my own mind in terms of who I pick up the phone and

21     call about a business issue tomorrow.

22          THE COURT:  Yeah.

23          MR. BATTAGLIA:  I'm not sure who that'll be.  We

24     were already cooperating with the Sub-B trustee on

25     investigation issues, so that's fine.  We'll keep doing

1    that.  I don't know what it means for me.  I will not

2    continue to represent a -- I don't -- never run away from a

3    representation --

4            THE COURT:  I understand.

5            MR. BATTAGLIA:  -- in my life.  But if I can't

6    meet my obligations as counsel --

7            THE COURT:  I understand.

8            MR. BATTAGLIA:  -- (indiscernible) what it means.

9    And I'll file appropriate pleadings if -- once I have some

10   time to digest this and figure out how we might be able to

11   move.

12           THE COURT:  I understand.

13           MR. BATTAGLIA:  Thank you.

14           THE COURT:  Have a good day, everyone.

15           CLERK:  All rise.

16           (Whereupon these proceedings were concluded at

17   6:32 PM)

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3                    RULINGS

 4                                    Page      Line

 5   Applications for Retention of Co-Counsel

 6   and CRO DENIED                    228       9

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 23, 2022
```

# EXHIBIT 7

008431

```
 1                    UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                  )  CASE NO: 22-60020-cml
                                    )
 4   INFOW, LLC. and IWHealth,      )  Houston, Texas
     LLC.,                          )
 5                                  )  Thursday, May 19, 2022
               Debtors.             )
 6                                  )  2:01 p.m. - 2:28 p.m.
                                    )
 7   ----------------------------)

 8                               MOTION

 9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For U.S. Trustee:        JASON RUFF
                              HA NGUYEN
13                            MELISSA HAZELTON
                              U.S. Trustee
14                            950 Pennsylvania Avenue NW
                              Washington, D.C. 20530
15
     For Debtor:             KYUNG S. LEE
16                           MARK SCHWARTZ
                             Kyung S. Lee, PLLC
17                           700 Milan Street, Suite 1300
                             Houston, TX 77002
18
     For Connecticut Plaintiff:
19                           RANDY WILLIAMS
                             Byman & Associates, PLLC
20                           7924 Broadway, Suite 104
                             Pearland, TX 77581
21
                             RYAN CHAPPLE
22                           Cain & Skarnulis, PLLC
                             303 Colorado Street, Suite 2850
23                           Austin, TX 78701

24

25
```

EXHIBIT
7

008432

```
 1    For Texas Plaintiff:      MAX BEATTY
                                The Beatty Law Firm
 2                              1127 Eldridge Parkway, Suite 300
                                Houston, TX 77077
 3                              AVI MOSHENBERG
                                McDowell Hetherington
 4                              First City Tower
                                1001 Fannin Street, #2700
 5                              Houston, TX 77002

 6    For Free Speech Systems:  RAY BATTAGLIA
                                Law Offices of Ray Battaglia, PLLC
 7                              66 Granburg Circle
                                San Antonio, TX 78218
 8

 9    Court Reporter:           KIMBERLY PICOTA

10    Courtroom Deputy:         KIMBERLY PICOTA

11    Transcribed by:           Veritext Legal Solutions
                                330 Old Country Road, Suite 300
12                              Mineola, NY 11501
                                Tel: 800-727-6396
13

14

15    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

```
 1          HOUSTON, TEXAS; THURSDAY, MAY 19, 2022; 2:01 P.M.

 2          THE COURT:  Okay.  Okay.  Good afternoon,

 3    everyone.  This is Judge Lopez here on an emergency request

 4    for a continuance in Infowars.  Why don't we take

 5    appearances.  Why don't I begin with appearances in the

 6    courtroom.

 7          Mr. Lee?

 8          MR. LEE:  Good afternoon, Your Honor.  Kyung Lee

 9    with the law firm of Kyung S. Lee PLLC for the three

10    debtors.  I am here in the courtroom with Mr. Mark Schwartz,

11    the chief restructuring officer of the three debtors.

12          THE COURT:  Okay.  Good afternoon, sir.

13          MR. SCHWARTZ:  Thank you, Your Honor.

14          THE COURT:  Mr. Ruff, good afternoon.

15          MR. RUFF:  Yes.  Good afternoon, Your Honor.  With

16    me today -- Jayson Ruff on behalf of the U.S. Trustee's

17    Office.  And Ha Nguyen with me today.

18          THE COURT:  Okay.  Good afternoon.

19          MR. WILLIAMS:  Good afternoon, Your Honor.  Randy

20    Williams for the Connecticut plaintiffs.  Ryan Chapple and

21    Connecticut counsel are all on the Zoom.

22          THE COURT:  Okay.  Good afternoon.

23          MR. BEATTY:  Your Honor, Max Beatty on behalf of

24    the Texas plaintiffs.  I also have Mr. Avi Moshenberg with

25    me here today.
```

1          THE COURT:  Good afternoon.  Good afternoon to

2     both of you.

3          Okay.  Anyone else in the courtroom wish to make

4     an appearance?  Okay.

5          Ms. Hazelton, I see you there, the Subchapter V

6     trustee.  Good afternoon.  I think -- oh, I muted you,

7     didn't I?  I've got everyone muted.  So if anyone wishes to

8     make an appearance, you can hit five-start.  Ms. Hazelton,

9     just hit it just so I know that -- and I'll keep your line

10    unmuted.  All right.  There is a 210-601 number.

11         MR. BATTAGLIA:  Yes, Your Honor.  This is Ray

12    Battaglia on behalf of Free Speech Systems.  I don't know

13    that I will be participating today, but I will make an

14    appearance.

15         THE COURT:  Okay.  And I'll keep your line

16    unmuted, Mr. Battaglia, just in case.  Good afternoon, sir.

17         MR. BATTAGLIA:  Thank you, Judge.

18         THE COURT:  Okay.  Ms. Hazelton, can you hit five-

19    star?  I want to make sure I've got your line unmuted as

20    well.  There's a 281-846 number.

21         MS. HAZELTON:  Your Honor, Melissa Hazelton,

22    Subchapter V Trustee.

23         THE COURT:  Okay.  Good afternoon.  Does anyone

24    else wish to make an appearance on the phone?  Just hit

25    five-star and I will recognize you.  Okay.

1            Mr. Lee, why don't I turn it over to you, sir.

2            MR. LEE:  Good afternoon, Your Honor.  May it

3    please the Court.  Before I hit emergency motion Docket 95

4    requesting the continuances of the hearing for next week as

5    well as the various answer dates, I would like to address

6    the Court with respect to some of the procedural issues that

7    are taking place --

8            THE COURT:  Okay.

9            MR. LEE:  -- and update you on those.  Number one,

10   the initial debtor interview is taking place tomorrow

11   afternoon.  And Mr. Schwartz and I will be handling that

12   with the U.S. Trustee's Office.  The data has been provided

13   to them yesterday, and we will handle that hearing or the

14   call tomorrow.

15           Number two, Mr. Beatty and I concluded

16   negotiations and finalization of the dismissals with

17   prejudice of the Texas plaintiff's lawsuits yesterday, and

18   Mr. Beatty will probably want to speak to you about those

19   issues today.  But that is done.

20           THE COURT:  Okay.

21           MR. LEE:  And so wanted you to know that.  And I

22   believe the stipulation, the general one has been filed.

23   There are subsidiary stipulations which you also agreed to,

24   and he can speak to those issues if you'd like to have him

25   discuss those.

1            THE COURT:  Okay.

2            MR. LEE:  Number Three.  The Connecticut

3    plaintiffs have decided to move by way of motion to dismiss

4    their lawsuits in Connecticut against the three debtors.

5    And there is a status conference that Judge Manning has set

6    for next Tuesday at 2:00 p.m. Eastern Standard time, and

7    there is going to be a conference call on that matter for

8    that time.

9            THE COURT:  Okay.

10            MR. LEE:  So I can tell you a little bit more

11    about that after it's occurred, but I just wanted to let you

12    know the timing on that.

13            THE COURT:  Thank you.

14            MR. LEE:  Number four.  The 341 meeting of

15    creditors will take place next Thursday, on May 26th.  And

16    Mr. Ruff and I have talked about what we need to get ready

17    to do that.

18            Number five.  I just got a notice during lunch

19    today that the Western District of Texas has set a hearing

20    on June 21-22 in connection with the removal and abstention

21    and remand hearing on the "TUFTA" lawsuit that some of the

22    plaintiffs filed against the debtors and other parties.  And

23    again, I think that can be handled administratively, but I

24    just wanted you to know that matter is out there for setting

25    at that time.

1          THE COURT:  Thank you.

2          MR. LEE:  Now, addressing Docket 95.  And I don't

3   think I need to go into it in any substantive detail.  But I

4   just wanted to let you know that what we moved to do was to

5   extend the answer date from May 20th to June 17th, the

6   exhibit designation date from May 25th to June 22nd, and we

7   requested a hearing date from May 27th through June 24th and

8   to have discovery be available to especially Mr. Ruff, who

9   has been working with -- on behalf of the U.S. Trustee's

10  Office so that he could have discovery pending.

11         It is contemplated that after this week, there

12  should be only one motion to dismiss or on file that should

13  be active, hopefully.  But again, the implementation of the

14  dismissals with prejudice has taken a little longer time

15  than I expected.  And again, I built in when I filed my

16  emergency motion time to be able to carefully implement all

17  of those.  And again, that's the reason for the time that

18  I've requested so that I don't have to prepare for the

19  motions to dismiss as well as trying to get all those things

20  correctly done.

21         I'm happy to work and do both if I'm forced to do

22  that.  But as I set out in my motion, I think it's not a

23  good use of judicial or financial resources of this estate

24  to do that.  And that's why I've asked for some time.

25         Mr. Ruff has indicated that he wants a shorter

1    time.  And I've tried to discuss that with him this morning.

2    And it's all been very friendly.  And so again, I am

3    amenable to another deadline, a shorter deadline if they

4    wish.  But again, the reasons for the requests I've made for

5    my deadlines is because I anticipate having to implement all

6    the dismissals.  And I want to make sure I have done it

7    correctly and that I've given the other courts other than

8    the home court here time to get those things done.  And

9    that's the basis for my asking for the specific dates I

10   have.

11          Again, I am also amenable to the idea of having a

12   shorter period but having -- an intermediate status

13   conference would be like every Friday where we can check in

14   and say, Your Honor, we need more time or we're good with

15   the time schedule that we have.  So we are very flexible on

16   that.  And again, Mr. Schwartz and I are going to evaluate

17   whether after the dismissals would prejudice the Texas and

18   Connecticut plaintiffs, whether these debtors need to

19   proceed with trying to confirm a plan with an amended plan

20   support agreement or whether we are able to handle these

21   creditors, the remaining creditors, outside of bankruptcy.

22          THE COURT:  Okay.

23          MR. LEE:  So that's an evaluation we are going to

24   make.  And we hope to do that very quickly.

25          THE COURT:  Thank you.  Actually, sir, is it okay

1    if I hear from Mr. Beatty first?

2           MR. RUFF:  That would be just fine, Your Honor.

3    It's your court.

4           THE COURT:  No, no, no.  I'm just -- I saw the

5    stipulation.  I just wanted to hear from you, Mr. Beatty,

6    just confirmation.  Does the stip that is on file cover what

7    we would call the Texas litigation?

8           MR. BEATTY:  Yes, Your Honor, it does.  And Mr.

9    Lee referred to some other stipulations that I would call

10   them supporting stipulations.  They're just simplified to

11   make it easy for the Court in each of the Western District

12   cases.  So we do have this larger stipulation that we filed

13   with the Bankruptcy Court, but Mr. Lee and I have already

14   passed back and forth, agreed, and actually put on file the

15   Rule 41 stipulations of dismissal with the court for the

16   Western District of Texas.  One of the cases.  The TUFTA

17   case is a little bit different in the following sense.

18   There's a couple of procedural differences there dealing

19   with whether or not the parties were served and whether or

20   not the removal was done correctly.  There we have actually,

21   due to concurrent jurisdiction with both the Western

22   District of Texas as well as the underlying state court, we

23   have filed a non-suit in the state court with prejudice

24   there.  So we think we've implemented the initial steps on

25   whatever we have to do for those to get everything

1  dismissed.  It's really the remand that Mr. Lee referred to

2  it as taking some amount of time there.  We did file

3  yesterday additional motions for remand noting our

4  agreement.  Hopefully those things can be resolved rather

5  quickly.

6           THE COURT:  Okay.  I guys the question is are you

7  -- maybe I -- Mr. Ruff, Ms. Hazelton, is there any issue

8  with me signing this right now?

9           MR. RUFF:  Your Honor, the stipulation that was

10  filed?

11           THE COURT:  Mm-hmm.

12           MR. RUFF:  No issue from the U.S. Trustee's Office

13  perspective.

14           THE COURT:  Ms. Hazelton?

15           MS. HAZELTON:  No issues here, Your Honor.

16           THE COURT:  Anyone in the room?  Anyone have any

17  issues?  Okay.  I'm going to sign it now.

18           MR. BEATTY:  Thank you, Your Honor.

19           THE COURT:  The parties are in agreement with

20  that.  I told everybody I wasn't going to stand in the way

21  of an agreement.  I have read it.  It's the parties'

22  agreement.  I'll sign it.  I'll sign it right now.  It at

23  least allows the parties the clarity I think that they need,

24  and I think it will certainly -- something you can present

25  to the courts in the Western District of Texas.  And I think

1    it at least clears a little bit of the road that Mr. Lee was

2    referring to in terms of what may be coming for him at a

3    future point in time.

4         MR. BEATTY:  And that was the intent, Your Honor.

5    And what we had hoped to do is I was actually going to ask

6    you to sign it today because our intent is to in addition to

7    the stipulation that we filed already, to take this

8    stipulation with the Court's signature, file it in the

9    Western District of Texas so that there the court can be

10   comfortable that you had the opportunity to look at it as

11   the home court and that you're also comfortable with what we

12   are doing.

13        THE COURT:  Okay.  I have signed it.  It is off to

14   docketing and it will hit the docket in the next ten, 15

15   minutes, Mr. Beatty.

16        MR. BEATTY:  Thank you, Your Honor.  Mr. Beatty, I

17   don't know what that means for your participating going

18   forward, but I would say in a few minutes you'll have

19   greater clarity on that as well.

20        MR. BEATTY:  Well, I think the answer is that

21   means you won't get to see my smiling face here anymore.

22   But yes, thank you very much, Your Honor.

23        THE COURT:  Okay.  Thank you.  Mr. Ruff, I just

24   wanted to -- actually, go ahead.  Go ahead.  Let me hear

25   from the Connecticut plaintiffs.

1          Let me just say I was able to read the pleadings

2     that were filed.  I very much appreciate the notice.  Was

3     very helpful for me to just kind of keep track of what's

4     going on.  So I thought the updates were very helpful, and I

5     very much appreciate it.  I'm not going to comment obviously

6     on what's going to happen in Connecticut.  But I just would

7     ask if Judge Manning issues any rulings or anything

8     substantive happens, if someone can just provide an update

9     just like you did, I think it would be very helpful for me

10    if she enters something.  I don't need any commentary or

11    anything.  I just need more of a docket entry just to

12    understand if anything happened or if there is any further

13    hearing schedule.  It just helps me kind of keep track of

14    stuff.

15          MR. WILLIAMS:  Yes, Your Honor.  I just wanted to

16    make the announcement on behalf of the Connecticut

17    plaintiffs that as to the Debtor's emergency motion to

18    continue, we really believe those issues are now between

19    them and the U.S. Trustee as far as timing because we had

20    filed the motions to dismiss with prejudice.  That was put

21    in the notice.

22          THE COURT:  Got it.

23          MR. WILLIAMS:  The Court has now set that for

24    status conference on Tuesday.  We're going to ask the Court

25    since there is no opposition to that, to enter the

1    dismissal.  And then once it's dismissed, the Debtors have

2    agreed they will no longer have objection to remand and that

3    the Court then pick that up and remand the cases.  So

4    hopefully by next Tuesday we will -- after that's concluded

5    and if that happened, then we would be filing our notice of

6    withdrawal of our motion to dismiss.  But until we hear from

7    the Connecticut court, we're not able to do that.  But we

8    will -- to the extent we are still in it, because we are

9    waiting on that, whatever the Court decides between the

10   Debtors and the U.S. Trustee as far as timing, we are not

11   going to impose on that.  We'll follow the Court's guidance

12   with what their argument are and timing.

13             THE COURT:  Okay.  Thank you very much.

14             MR. RUFF:  Again, Your Honor.  Thank you.  You

15   know what, the U.S. Trustee's Office, we appreciate and are

16   supportive of the Plaintiffs being able to resolve their

17   issues with these debtors and the way that they're doing

18   that.  And we certainly are agreeable to pushing out the

19   hearing on our motion so that those issues can be resolved

20   definitively.  That's fine.

21             But, Your Honor, I still don't think that we

22   really need more than a couple-week extension.  And that

23   would be our preference.  You know, we are happy to move

24   forward as soon as possible.  It seems, based on

25   representations that have been made by both Plaintiff's

1 counsel that Texas plaintiffs are out.  They're withdrawn

2 now as of today.  And it sounds like Connecticut, as soon as

3 they get their answer and the court up in Connecticut there,

4 that they will agree to withdraw as well, too.  So if they

5 do that, then Mr. Lee no longer has to focus on their

6 motions to dismiss and he no longer has to worry about

7 those.  It will just be ours.  And we would like to move

8 forward with it as expeditiously as possible. After that.

9    The only other comment I would say is to the

10 extent that the Court does push that out, assuming these

11 cases are dismissed, then we don't think that any of the

12 other pending motions applications should be heard until

13 that same date after that time.  We have already provided

14 comments as far as the CRO motion assuming that these case

15 are going to go forward.  So we've already started that

16 process.  We're not just waiting until the very last moment

17 on that.  To the extent that there are any substantive

18 issues, we can work those out and resolve those.

19    But, for example, it's a little unclear, and I

20 think Mr. Lee has to -- is working out with his client as

21 far as the -- there is no longer a litigation settlement

22 trust and there's no longer that mechanism of management by

23 the trustees I don't think, or the service managers for the

24 equity of these debtors that the CRO would report to.  So I

25 think things like that need to be cleaned up if these cases

```
 1    are to continue.  If these cases aren't to continue, then
 2    none of that is really necessary.  The cases can get
 3    dismissed.  You know, the debtors can go ahead and pay their
 4    creditors, including their professionals however they want
 5    to.  The only thing we probably would want to have some
 6    treatment for in the dismissal order, again, assuming that's
 7    the route that we end up toing, is to allow for Ms. Hazelton
 8    to apply for her fees and make sure that this Court retains
 9    jurisdiction for the payment of her fees.
10              THE COURT:  So Mr. Ruff, are you agreeing to a
11    continuance or not?
12              MR. RUFF:  Yes.  We are not opposed to a
13    continuance, Your Honor.
14              THE COURT:  And how long?
15              MR. RUFF:  Two weeks.  That's what we think would
16    be -- somewhere around June 10th is what we had proposed.
17              THE COURT:  Okay.  Okay.  Mr. Beatty, your stip
18    has hit the docket.
19              MR. BEATTY:  Thank you, Your Honor.
20              THE COURT:  I'm not kicking you out.  I'm just
21    telling you.
22              MR. BEATTY:  As much as you'd like to.
23              THE COURT:  Okay.  Mr. Lee, why do you need more
24    time than the 10th?
25              MR. LEE:  Your Honor, things tend to take a longer
```

1    time than we initially planned.  I think it was four weeks

2    ago everybody declared that they did not want to be

3    creditors of this estate.  And it started off with

4    dismissals without prejudice and having to negotiate all of

5    those to get it right.  And it's not because we didn't want

6    to get it right or do it the right way, but it just takes

7    some time in light of the fact that the parties have been

8    litigating these issues and there's a lot of distrust.  And

9    we've had to build that.

10          With respect to the implementation of the

11   dismissals, I don't think it's as simple as Mr. Ruff

12   describes it.  It's not just a matter of dismissals that

13   takes place and then we're done.  There is implementation

14   that has to take place both in Connecticut and in Texas.

15   And the Debtors are going to have to be involved in that

16   process and implementing that.  So I need some time to do

17   that.

18          And secondly, there are claims that need to be

19   addressed in connection with the remaining estate that our

20   creditors have nothing to do with the Sandy Hook issues.

21          And then number three, Your Honor, the other part

22   that I have to do is renegotiate a plan support agreement if

23   the debtors intend to move forward with respect to a smaller

24   subchapter V plan to see if we can get something confirmed.

25          So I've built in some time to be able to do all of

1    that without having the -- sort of Damocles sword over me

2    every two weeks in saying I've got to go and try a motion to

3    dismiss.  But if the Court thinks that that sword should be

4    over me, I'm fine with that, too.

5         THE COURT:  I don't want to say it's a sword,

6    because I don't think it is.  I think the Debtor filed a

7    case and people have filed motions, and they get a chance

8    for a hearing.  And the Debtor has to respond to it.  I'm

9    assuming the Debtor was prepared to go on the 27th.  So if

10   we push it out for June the 10th, that feels right to me.

11   And I'm going to tell you why.

12        I certainly understand the dynamics of change.

13        MR. LEE:  Yes, Your Honor.

14        THE COURT:  And I still don't how much -- look, I

15   know according to the schedules and the statements, the

16   Debtor has no cash.  I don't know where cash is coming from.

17   The Debtor doesn't generate income.  I don't know who the --

18   if there's a trust, I don't know how administrative expenses

19   are going to get paid.  And this is still a Subchapter V

20   case.  We are about 30 days in.  I think everybody is going

21   to have to put their cards on the table and figure out

22   what's there.  And I think you and Mr. Schwartz are going to

23   have to figure out -- it sounds like Connecticut plaintiffs

24   are out, signed the order for the Texas plaintiffs.  I think

25   you all have got to figure out now that that's gone,

1    assuming that everything goes through -- and again, I don't

2    want to wish -- I don't want to speak for any other court

3    and the work that they have to do.  But assuming that they

4    go, Mr. Lee, I think you're going to have to ask yourself

5    what's left and what kind of case and what chapter it should

6    proceed in.  And I think the trustee gets a right to know

7    what your plans are.  To me, that's where I see the

8    extension for.  I think they've got to kind of figure out

9    what's left and how do you proceed.  Is it still under

10   Subchapter V?  Is it something else?  And so I think you've

11   got to figure all that out.  But I don't know -- pushing it

12   out a month without knowing where there's any source of

13   revenue coming from and what the third-party contributors

14   are or are not doing, I think we've got to know some answers

15   before then to see what kind of case -- if we have a case at

16   all.  And I'm not saying we don't.  I just don't know what's

17   out there.

18             MR. LEE:  Your Honor, let me allay your concerns.

19             THE COURT:  I'm not sure you're going to be able

20   to do it today.

21             MR. LEE:  I'm going to do it today for you, Your

22   Honor, by saying --

23             THE COURT:  That would be impressive.

24             MR. LEE:  You're actually right.  I'm not going to

25   argue with trying to get any more time.  They've set it for

1    June 10th.  We'll be ready.  We'll work like dogs to get

2    there.  And if we don't, we'll come back to you and ask for

3    more time if we run into a jam.  But I hear all the concerns

4    that you're saying.  I think they are very legitimate as

5    Debtor's counsel and as you pronounced it.  And let's get it

6    on.  Let's do it on June 10th.  And let's just get it done.

7              THE COURT:  Okay.

8              MR. LEE:  I agree with you.

9              THE COURT:  Mr. Lee, I've got one question for

10   you.  Just since -- and this has nothing to do with what we

11   were just describing.  It's just trying to understand -- I

12   understand kind of procedurally where the Texas Plaintiffs

13   are and the Connecticut plaintiffs.

14             MR. LEE:  Sure.

15             THE COURT:  The trust.  Is the initial trustee

16   still involved, Mr. Du?

17             MR. LEE:  Yes.

18             THE COURT:  And who represents Mr. Du?

19             MR. LEE:  I don't know right now.  I just know

20   that Mr. Du is the trustee of the trust that was given the

21   obligation to put the company into bankruptcy.

22             THE COURT:  Okay.  Okay.  I know Mr. Du had

23   noticed parties in the trustee agreement, but I didn't know

24   if those remained the noticed parties for the trust or

25   whether Mr. Du was still involved.  So Mr. Schmidt and Mr.

 1   (indiscernible) are at this point not -- they're still

 2   waiting?

 3          MR. LEE:  Yes, Your Honor.  That's correct.  That

 4   is correct.  And I think by virtue of the Texas and

 5   Connecticut plaintiff having withdrawn, I think the bigger

 6   concept of trying to go global resolution, that's probably

 7   become moot at this point in time.

 8          THE COURT:  Okay.

 9          MR. LEE:  So yes, Your Honor.  And you have made

10   all the issues that you've identified.  We are on it.

11          THE COURT:  I know.  I know I'm not raising -- I'm

12   just trying to -- we are all here.  I might as well just try

13   to understand kind of procedurally where we are and kind of

14   where the case is.  I think I -- look, I like where we are

15   going.  The Trustee is not opposed to a two-week extension.

16   Let's do a two-week extension.  And without prejudice,

17   obviously, to the ability to come back to ask for more time.

18          MR. LEE:  Absolutely.

19          THE COURT:  But I'm going to tell you though, if

20   we go further out, I'm going to need all parties to agree to

21   it.  If not, we'll just have to take them up and see where

22   we go.  I don't want to take up any other motions before

23   then because I don't know what kind of case we have and

24   what's going on.  And I want to give you an opportunity to

25   get it done.  So we'll push this out for a couple of weeks.

 1   And I'm sure -- and I would ask you as well, Mr. Beatty, if

 2   there's any updates, if you will.  I know that with respect

 3   to what happens in the Texas courts, just -- I think just

 4   providing for informational purposes.  I mean it.  I want no

 5   spin on any of it.  I mean, as boring as it comes, I am at

 6   docket entry and I don't need whereas clauses, and I know I

 7   have jurisdiction.  I mean, where we are, just plain docket

 8   entries.  And I would ask the Connecticut plaintiffs to do

 9   as well.  Just the notice.  Just so everybody knows what's

10   going on and everybody can just see and we all have

11   transparency in the process.

12            MR. WILLIAMS:  More than happy to do so.

13            THE COURT:  Okay.  Thank you.  So that would push

14   out the hearing to Friday, June 10th at -- what time are we

15   -- we were going to start at 9:00 a.m.  Why don't we start

16   at 9:00 a.m. on Friday, June 10th.  And the witness and

17   exhibit list would then get pushed out to Wednesday, June

18   8th.

19            MR. LEE:  Yes.

20            THE COURT:  Okay.  And the objection deadline,

21   what are we going to do about -- what are you all agreeing

22   on that?

23            MR. LEE:  We had talked about objection deadline

24   of being a week before whenever the hearing is.

25            THE COURT:  So maybe June 3rd?

```
 1              MR. LEE:  So June 3rd.

 2              THE COURT:  Okay.

 3              MR. LEE:  And then a reply deadline be the same

 4    day as the witness and exhibit on the 8th.

 5              THE COURT:  Okay.  So I would ask June 8th at noon

 6    exhibits, June 3rd, just any time on June 3rd for your

 7    response, Mr. Lee.

 8              MR. LEE:  That's perfectly fine with the Debtor's,

 9    Your Honor.

10              THE COURT:  I don't care what time you get it on

11    file there.

12              Mr. Ruff, your response is fine with me.  I don't

13    care when you --

14              MR. RUFF:  We'll get it on file before close of

15    business, Your Honor.  It won't be a midnight filling.

16              THE COURT:  Okay.

17              MR. RUFF:  We'll give Your Honor some time to read

18    it.

19              THE COURT:  No, no.  Old habits die hard.  So I'm

20    up early and stay up late.  So don't worry about me.

21              I think we had a hearing scheduled for June 3rd.

22    It probably makes sense to push that out, don't you think?

23              MR. LEE:  Could we move it all to the June 10th?

24              THE COURT:  Yeah.

25              MR. RUFF:  We agree with that, Your Honor.
```

```
 1              THE COURT:  What did we have on June --
 2              MR. LEE:  Both the trustee motion, and I think the
 3    CRO motion has been on a 21-day notice as well as the bar
 4    date motion, Your Honor.
 5              THE COURT:  Oh yeah.  I don't want to touch those
 6    until we know what -- yeah.  But I agree.  We'll take them
 7    up -- original plan.  Take them up after we know on the
 8    motion to dismiss.
 9              MR. RUFF:  We'll be ready to go, Your Honor.
10              THE COURT:  Okay.
11              MR. LEE:  Your Honor?
12              THE COURT:  Yes.
13              MR. LEE:  I do want you to know that Mr. Schwartz
14    in his fiduciary capacity is evaluating all alternatives.
15              THE COURT:  Oh, I'm sure he is.
16              MR. LEE:  I just want you to know that.
17              THE COURT:  No doubt.  I've got no doubt.  And I'm
18    sure -- I've got no doubt about that.  I know Mr. Schwartz
19    is professional.  He's doing his job.  I've got no doubt
20    about it.
21              MR. LEE:  Thank you, Your Honor.
22              THE COURT:  Okay.  Anyone in the courtroom,
23    anything else anyone wishes to say at this time?  Anyone on
24    the phone, if you wish to hit five-star.
25              Okay.  All right, folks.  It sounds like we will
```

1    not see each other on the 27th.  It looks like we will see

2    each other potentially on June 10th.  Thanks, everyone.

3    Have a good day.

4            (Whereupon these proceedings were concluded at

5    2:28 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATION

 2

 3      I certify that the foregoing is a correct transcript from

 4      the electronic sound recording of the proceedings in the

 5      above-entitled matter.

 6

 7

 8

 9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  May 23, 2022
```